Paul S. Aronzon (*pro hac vice* pending)
Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
One Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-_____ (__) |
| | ) |
| Debtors.[1] | ) Joint Administration Requested |
| | ) |

**DECLARATION OF MARC R. MONTAGNER, CHIEF FINANCIAL OFFICER AND INTERIM CO-CHIEF OPERATING OFFICER OF LIGHTSQUARED INC., (A) IN SUPPORT OF FIRST DAY PLEADINGS AND (B) PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY RULES FOR UNITED STATES BANKRUPTCY COURT FOR SOUTHERN DISTRICT OF NEW YORK**

Under 28 U.S.C. § 1746, I, Marc R. Montagner, declare as follows under penalty of perjury:

1.      I am the Chief Financial Officer and the Interim Co-Chief Operating

Officer of LightSquared Inc. (collectively, with its affiliated debtors and debtors in possession,

"LightSquared" or the "Debtors").  I have been employed in this and other capacities by

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629) and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 450 Park Avenue, Suite 2201, New York, NY 10022.

LightSquared since January 1, 2012.[2]  Accordingly, I am familiar with LightSquared's day-to-day operations, business and financial affairs, and I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "Chapter 11 Cases") and in support of the (a) Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), filed on the date hereof (the "Petition Date") and (b) relief requested in the motions and applications that the Debtors filed with the Court on the Petition Date (collectively, the "First Day Pleadings").

2.    As described herein, the First Day Pleadings seek, among other things, to provide for the Debtors' continued use of cash collateral and to provide adequate assurance to the Debtors' prepetition lenders, to ensure the continuation of the Debtors' cash management system and other business operations without interruption, as well as, in general, to maintain employee confidence and morale and to establish certain other administrative procedures to promote a seamless transition into the Chapter 11 Cases.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought in each of these pleadings is necessary to permit an effective transition into the Chapter 11 Cases.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

---

[2]    In addition to serving as Chief Financial Officer and the interim Co-Chief Operating Officer of LightSquared, I also serve as Chief Financial Officer for each of LightSquared's Debtor affiliates.

3.      I have reviewed the factual support set forth in each of the First Day

Pleadings and attest to the accuracy thereof.  Except as otherwise indicated, all facts set forth

herein are based on my personal knowledge, my discussions with other members of the Debtors'

senior management, my review of relevant documents or my opinion based upon experience,

knowledge and information concerning the Debtors' operations and financial affairs.  If called

upon to testify, I would testify competently to the facts set forth in this Declaration.  I am

authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is intended to provide a summary overview of the

Debtors' businesses and these Chapter 11 Cases.  Sections A through F of this Declaration

provide an overview of the Debtors' businesses, organizational structure, capital structure, events

giving rise to these Chapter 11 Cases and information regarding the Chapter 11 Cases.  The

Declaration then summarizes the relief requested in certain of the First Day Pleadings and lists

the schedules of information required by Local Rule 1007-2.

**A.      General Overview**

5.      Since its incorporation in 1985, LightSquared has been a pioneer and

innovator in the mobile satellite-communications industry.  Indeed, LightSquared was the first

private mobile satellite-communications company to offer wholesale mobile satellite services

throughout North America to both companies and government agencies for bandwidth power and

capacity, telephony resale, data and dispatch services and retail voice users.  Moreover, in 2001,

convinced that adding a terrestrial land-based component to its satellite system would optimize

the use of its mobile satellite service spectrum and provide a wholesale communications system

with superior reliability and coverage, LightSquared was the first to apply to the Federal

Communications Commission (the "FCC") for authority to implement an innovative new

wireless service to be operated in conjunction with the mobile satellite service it already provided.  As the FCC began adopting rules in 2003 to encourage and permit other mobile satellite service licensees to offer superior ground-based mobile services using spectrum already allocated for mobile satellite services, LightSquared submitted a new application in conformance with such rules requesting authorization to deploy and operate a terrestrial network.  In 2004, the FCC granted LightSquared authority, and it became the first mobile satellite service licensee authorized to deploy and operate a terrestrial network.

6.      Based on, and in furtherance of, these regulatory approvals, LightSquared began to design and deploy its 4G LTE open wireless broadband network, commissioned two, state-of-the-art, next-generation satellites, SkyTerra-1 and SkyTerra-2, and invested significant funds in furtherance of its network.  From 2001 to date, LightSquared invested approximately $4 billion of funds in its wireless network business plan from moneys borrowed or capital contributed by its shareholders.  During such period of time, LightSquared worked closely with numerous public and federal agencies as it moved toward deployment of its network and entered into agreements with customers.

7.      In 2010, the FCC approved the transfer of control of the LightSquared entity holding the underlying license, but conditioned its approval on LightSquared satisfying an aggressive terrestrial network build-out schedule that required coverage of at least 100 million people by December 31, 2012, at least 145 million people by December 31, 2013 and at least 260 million people by December 31, 2015.  To ensure that it satisfied the FCC's conditions to approval in full and, in reliance on such approval, LightSquared continued investing billions of dollars and entered into various agreements to aid in the deployment of its nationwide wireless broadband network.

8.      As mentioned above, at each stage of the FCC approval process –
beginning as early as 2001 – LightSquared worked cooperatively with public and federal
agencies, including the Global Positioning Systems ("GPS") industry and the United States GPS
Industry Council (the "USGIC"), a trade association that represents the interests of certain
members of the GPS industry, to protect against, and alleviate, harmful emissions into other
bands, including the adjacent GPS frequency band, arising from ground-based operations in the
spectrum in which LightSquared operates.  Initially, the GPS industry's only concern was that
LightSquared's transmissions could inadvertently drift into the GPS band – a phenomenon
known as out-of-band emissions.  Later, however, the GPS industry expressed concern that out-
of-band emissions from LightSquared's low-power indoor base stations could potentially
interfere with GPS.  To resolve all out-of-band emission concerns, LightSquared and the USGIC
on numerous occasions entered into private, voluntary agreements whereby LightSquared
consented to technical modifications of its license and certain limitations on its out-of-band
emissions into the GPS band – including, completely foregoing the terrestrial use of an entire 8
MHz of its allocated spectrum.  Such modifications and limitations were far more rigorous than
those required by the FCC and cost LightSquared hundreds of millions of dollars to implement.
As a result of these agreements, however, the USGIC and others, including federal agencies,
actively supported LightSquared's deployment of a nationwide wireless broadband network for
close to a decade.

9.      Almost a decade later, however, and after LightSquared obtained
numerous FCC approvals and expended substantial time, effort and money to deploy its
nationwide wireless broadband network in a manner that satisfied the concerns of all interested
parties, the GPS industry – for the first time – began raising concerns in 2010 that

5

LightSquared's terrestrial base stations may cause overload interference to GPS receivers and other GPS devices.  As it had done in all previous situations, LightSquared offered to work with the various governmental agencies and the GPS industry to rectify these issues and to expend significant resources in aid thereof.  Unlike all previous situations, however, the GPS industry refused to compromise with LightSquared and instead sought to convince regulatory agencies to strip LightSquared of its ability to use its allocated spectrum for terrestrial purposes.  Despite the fact that overload interference to GPS receivers and other GPS devices were problems not of LightSquared's making, but rather, caused by GPS manufacturers designing, producing and selling receivers that are capable of receiving signals from LightSquared's allocated portion of the spectrum, the FCC required LightSquared to work with the GPS community to resolve these new concerns and imposed technical submission and testing requirements.

10.     Fully cooperating with these requests, LightSquared conducted the required tests and, on June 30, 2011, submitted to the FCC the final report of the technical working group (the "TWG") that it co-chaired with the USGIC.  Upon request for additional technical submissions and testing by the FCC, LightSquared, at the request of the National Telecommunications and Information Administration (the "NTIA"), (a) developed a joint testing plan with the Executive Steering Group of the Interagency National Executive Committee for Spaced-Based Positioning, Navigation, and Timing ("EXCOM") to validate data on the performance of cellular and personal/general navigation GPS receivers and (b) engaged in separate discussions, and worked directly, with the FAA regarding impacts to certified aviation GPS receivers.  Testing on all fronts subsequently ensued, with (x) the National Space-Based Positioning, Navigation, and Timing Systems Engineering Forum (the "NPEF"), on behalf of EXCOM, testing general/personal navigation GPS receivers, (y) the NTIA overseeing the testing of cellular GPS

receivers to validate the measurements performed by the TWG and (z) the FAA and LightSquared continuing to analyze the potential impact to certified aviation GPS receivers.

11.     According to the GPS industry, the results of the testing showed that LightSquared's proposed mobile broadband network would impact GPS services in such a way that there was no practical way to mitigate the potential harmful interference from LightSquared's planned terrestrial operations. Although heavily disputing the results of the testing as flawed and raising such concerns before the FCC, LightSquared nonetheless offered yet additional significant concessions to rectify *interference by GPS receivers* with LightSquared's allocated portion of the spectrum – but all for naught. In February 2012, the FCC proposed to modify LightSquared's satellite license to suspend indefinitely its underlying terrestrial component and invited interested parties to comment. LightSquared filed its comments on March 16, 2012 and its reply to comments of other interested parties on March 30, 2012. All parties now await an FCC decision on LightSquared's ability to use its spectrum for terrestrial purposes.

12.     Recognizing that it would need additional time to resolve its issues with the FCC and the GPS industry and to preserve resources on hand, LightSquared implemented a number of corporate initiatives and reached out to its major creditor constituents in an attempt to avoid the need for this chapter 11 filing. LightSquared, among other things: (a) substantially reduced its headcount (almost cutting the number of employees in half), (b) implemented significant cost cutting measures, thereby reducing its monthly burn rate by approximately 30%, (c) obtained an amendment from a significant counterparty that preserved important spectrum and deferred significant cash payments – assisting with its cash flow – for a number of years, (d) was relieved from its obligations under an agreement with SprintCom, Inc. ("Sprint") that would have required it to deploy significant amounts of cash over the next several years, (e)

7

obtained an extension of maturity of an approximately $320 million secured loan at Debtor

LightSquared Inc. until December 31, 2012 and (f) obtained interim agreements from its

prepetition secured lenders at Debtor LightSquared LP to allow discussions regarding

implementation of an out-of-court restructuring.  Ultimately, despite its best efforts,

LightSquared could not reach a mutually satisfactory agreement with its prepetition secured

lenders, and LightSquared was forced to commence these Chapter 11 Cases to preserve the value

of its assets and pursue a resolution of concerns regarding its spectrum.

**B.      Introduction**

13.      On the Petition Date, each of the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.

14.      The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  The Debtors have requested the joint administration of these Chapter 11 Cases for

procedural purposes.  No trustee, examiner or statutory committee of unsecured creditors has

been appointed in these Chapter 11 Cases.

**C.      Overview of Debtors' Corporate Structure and Businesses**

*(i)      Debtors' Corporate Structure*

15.      LightSquared Inc., a mobile communications company with headquarters

in New York, was incorporated in Delaware in 1985.  On March 29, 2010, SkyTerra

Communications, Inc. ("SkyTerra"), LightSquared Inc.'s predecessor company, consummated a

merger with Sol Private Corp. ("Sol Private"), resulting in certain Harbinger Capital Partners

("Harbinger") investment funds acquiring all of the outstanding stock of SkyTerra not previously

held by Harbinger.  Following the consummation of the merger, SkyTerra continued as the

surviving corporation and was wholly-owned by Harbinger through HGW US Holding

Company, L.P. ("HGW US").  SkyTerra subsequently changed its name to LightSquared Inc. on

July 20, 2010.

16.     As of the Petition Date, Harbinger indirectly owned approximately 96% of

LightSquared Inc.'s outstanding common stock.

17.     LightSquared Inc. owns, directly or indirectly, approximately 26 domestic

and foreign subsidiaries in various jurisdictions throughout the United States and in three (3)

foreign countries.  LightSquared Inc. and substantially all of its U.S. and Canadian subsidiaries

are Debtors in these Chapter 11 Cases.[3]  A corporate organization chart is annexed as Exhibit A

hereto.

*(ii)     Debtors' Businesses*

a.     Debtors' Satellite Business

18.     LightSquared was the first private mobile satellite-communications

company to offer mobile satellite services throughout North America, initially using two

geostationary satellites[4] as well as a portion of the electromagnetic spectrum known as the L-

Band.  Since its first satellite became operational in 1996, LightSquared has provided satellite

communications services – which include data, voice, fax and dispatch services – to companies

---

[3]     TVCC Holding Company, LLC, TVCC Intermediate Corp., Columbia One Six Partners IV, Inc., Columbia FMS Spectrum Partners IV, Inc., TVCC One Six Holdings LLC and CCMM I LLC are not Debtors in these Chapter 11 Cases.  Moreover, LightSquared (UK) Limited, LightSquared Inc.'s indirect English subsidiary, is not a Debtor in these Chapter 11 Cases.

[4]     These two first-generation satellites, known as MSAT-1 and MSAT-2, currently provide services to some existing customers, and have also, since March 10, 2012, provided emergency back-up service to all of LightSquared's customers due to a solar flare(s), which temporarily disabled the SkyTerra-1 satellite, one of LightSquared's two next-generation satellites.  LightSquared is currently finalizing the assessment of the solar flare(s) prior to transitioning customers back to that satellite for service.  LightSquared will also rely upon the MSAT system until such time that SkyTerra-2, LightSquared's second next-generation satellite, is launched.  Both MSAT-1 and MSAT-2 are approaching the ends of their useful lives and are part of the Prepetition LP Collateral (as defined below).  They have, in the past, experienced anomalies and Solid State Power Amplifier failures and neither currently operates at full capacity.

and federal, state, provincial, local and foreign governments that are wholesale purchasers of bandwidth power and capacity, resellers of telephony, data and dispatch services and retail voice users.  Today, LightSquared's mobile satellite business generates approximately $30 million in annual revenue and provides service to approximately 300,000 end users.

19.    LightSquared launched SkyTerra-1 in November 2010, which, as mentioned above, is one of two next-generation satellites that have been constructed by LightSquared.  LightSquared's next-generation satellites are two of the most powerful mobile satellites ever constructed.  Each is equipped with a 22 meter (75 foot) diameter antenna, which provides ten (10) times better performance than that provided by LightSquared's prior satellites.  The satellites have the capability of forming up to five hundred (500) beams over North America and can operate with devices that are as small as standard cell phones or USB modems.  The SkyTerra-1 and SkyTerra-2 satellite networks utilize state-of-the art ground-based beam forming systems.  Such systems allow flexibility in beam shapes, number, bandwidth allocation and beam power allocation, which is unprecedented in prior mobile satellite systems.  SkyTerra-1 is fully operational, and SkyTerra-2 is constructed and stored in preparation for launch.

20.    LightSquared currently operates three (3) lines of business, including Mobile Satellite Communications ("MSAT"), Mobile Data Services ("MDS") and Private Network Carriers ("PNC") through a wholesale business model whereby its partners bill the end users, and LightSquared bills its partners at a wholesale rate.  Through these three lines of business, LightSquared has over fifteen wholesale partners, including, but not limited to, Comtech Mobile Datacom Corporation, XATA Corporation, SkyBitz, Outerlink, Omnistar, Wireless Matrix, EMS Technologies/Honeywell, Network Innovations, Glentel, Astrum, Infosat, Inmosat and

International Satellite Service, that collectively support approximately 300,000 subscribers across several markets throughout North America.

21.     <u>MSAT Business</u>.  LightSquared's MSAT business provides circuit-switched voice, low data rate services and push-to-talk ("<u>PTT</u>") services, which are sold through LightSquared's authorized wholesale service providers and are utilized by a variety of governmental agencies at the federal, state and local level, as well as by various markets in the enterprise space.  LightSquared is currently the only commercial satellite operator in North America offering PTT service.  LightSquared's two-way, PTT radio service over satellite is a popular option for communications in remote areas or during emergency situations, and its dispatch or two-way radio style is familiar to the public safety community and ideal for command and control.  Thus, in the public/government sector, LightSquared's MSAT business serves end users in public safety, emergency management and defense as well as health and education.

22.     Specifically, LightSquared's PTT products and services were utilized by public safety and education (such as the University of North Carolina Wilmington) end users during, and in preparation for, several disasters, including Hurricane Katrina (Mississippi Department of Wildlife, Fisheries and Parks), Hurricane Gustav (several federal, state and local agencies), Hurricane Irene (DE State Police, MD Emergency Management Agency), Kentucky ice storms (Kentucky Department for Public Health) and, most recently, the tornadoes in Kentucky (Kentucky Department for Public Health).  In all of these disasters, LightSquared's mobile satellite service, with its PTT capability, provided instant communications for public safety agencies and a means for interoperability among disparate agencies.

23.     Moreover, in recent years, the United States has faced a variety of costly natural and man-made disasters, including hurricanes, tornadoes, wildfires, flooding and

earthquakes, as well as the 9/11 terrorist attacks, which have amplified the need for dependable

communications that enable organizations to communicate with each other.  Often, the only means

available to the public safety/emergency responder community to do so is through mobile satellite

communications.  To address these needs, federal, state and local agencies have voluntarily banded

together with LightSquared in a public-private partnership to create the Satellite Mutual Aid Radio

Talkgroup ("SMART") program – enabling nationwide and regional interoperability at no

additional cost to LightSquared users.  Since SMART is a feature provided at no cost to

LightSquared's public safety end users, the SMART program, incorporating such SMART feature,

is a cost-efficient program that delivers measurable return on investment – swift and reliable

communications interoperability for emergency response and contingency operations.  With the

rapid growth of SMART, public safety and emergency responders have a resource that enables

communications interoperability that is immediate, reliable and always available.

            24.    It is thus no surprise that the nationwide and regional SMART end users

include, among others, (a) JSMART, utilized by public safety agencies across the country and

managed by the DOJ Wireless Management, (b) LSMART, utilized nationally by law

enforcement and managed by the U.S. Marshals Service, (c) USMART, utilized by urban search

and rescue teams across the United States and managed by the Montgomery County, Maryland

Fire & Rescue Service, (d) NE SMART, utilized by the northeast states and managed by the

Connecticut State Police, (e) WSMART, utilized by the western states and managed by the

California Emergency Management Agency and (f) MWSMART, utilized by the midwest states

and managed by the Indiana Department of Homeland Security.

            25.    The MSAT line of business also serves various markets in the enterprise

space, including maritime, oil and gas, utilities, transportation, media and recreation.  In the

maritime vertical market, especially in Alaska, fishermen rely on LightSquared's PTT capability

while at sea in extreme environments, especially north of 60° toward the Aleutians.

Additionally, enterprise users in the oil and gas industry rely on LightSquared's mobile satellite

service in the Gulf region to communicate with workboats and on oil rigs/platforms for

instantaneous communication between rigs/boats and back to operations centers on the coast.

        26.    <u>MDS Business</u>.  LightSquared's second line of business, MDS, is a low data

rate service offering used primarily for applications such as fleet and load management, email,

vehicle tracking, two-way messaging and broadcast messaging.  Like LightSquared's MSAT

services, MDS is sold through LightSquared's authorized wholesale service providers and is

utilized by various end users.  One such end user, the New Mexico State Police, utilizes MDS in

police cruisers to enable officers to perform database lookups on ruggedized laptops in remote

areas where no terrestrial communications exist and LightSquared's satellite service is the only

means by which to meet this critical data communications requirement in an effective manner.

        27.    <u>PNC Business</u>.  Finally, LightSquared's third line of business, PNC, enables

customers to lease bandwidth from LightSquared over which they offer custom satellite data

solutions (typically, asset tracking services for truck and rail) to a wide variety of end users.  In

connection therewith, LightSquared's PNC customers are responsible for developing a custom air

interface, providing hub, end-user equipment and servicing end users.  One of LightSquared's

largest PNC customers, SkyBitz, provides asset tracking services through LightSquared's satellite

capacity for Tri State Motor Transit Co., an end user that hauls high-risk cargo such as munitions,

explosives and nuclear fuel bound for sites from coast to coast.  LightSquared's satellite capacity

ensures that trailers hauling this cargo are constantly tracked where terrestrial communications

do not exist.  Another PNC customer, Comtech Mobile Datacom Corp., provides service to the

United States military, utilizing LightSquared's service in North America in connection with the

Blue Force Tracking system that tracks all military assets.

      b.      Debtors' Terrestrial Component of Satellite Business

      28.      In the late 1990s, LightSquared determined that adding a terrestrial (*i.e.*,

land-based) component to its satellite system would optimize the use of the L-Band and provide

a communications system with superior reliability and coverage. By combining a nationwide

system of terrestrial base stations with one of the largest commercial satellites ever launched –

the state-of-the-art SkyTerra-1 – LightSquared could offer coverage of a satellite system in North

America and the capacity of a next-generation, high-speed wireless broadband network.

      29.      LightSquared determined that a significant market opportunity was created

for a wholesale-only, 4th Generation Long Term Evolution ("4G LTE") wireless broadband

network due to, among other things, (a) the proliferation of new mobile devices, such as

smartphones and tablets, which accelerated demand for ubiquitous, on-the-go data-rich Internet

services, (b) limited wireless network capacity available to support increased data usage and

(c) substantial costs and barriers to entry preventing smaller carriers and new operators from

deploying nationwide 4G LTE networks. LightSquared believed that many wireless operators

would face significant challenges meeting network demands due to spectrum availability and

capital shortages because the wireless communications industry was (and currently remains)

dominated by a small number of established, national wireless carriers and current levels of data

transmission already utilized significant network capacity. This led LightSquared to conclude

that some carriers would be unable to deploy their own 4G LTE networks in a timely and cost-

effective manner, while others would be unable to install enough capacity to serve the needs of

their existing customer bases, thereby resulting in such carriers being unable to offer comparable

service quality and speeds on a cost-competitive basis with the largest national carriers.  To address this imbalance, LightSquared's strategy was, and currently remains, to enable a broad range of potential wholesale customers to launch competitive retail wireless service offerings using wholesale capacity on LightSquared's 4G LTE network.

30.     Accordingly, LightSquared initiated the process of building the only 4G LTE open wireless broadband network that incorporates satellite coverage throughout North America and offers people the speed, value and reliability of universal connectivity, wherever they may be located.  Through its wholesale-only business model, service providers without their own wireless network, or that have limited geographic coverage or spectrum, will be able to market and sell their own devices, applications and services using the LightSquared network at a competitive price and without retail competition from LightSquared.

31.     As of the Petition Date, the Debtors employed approximately 168 people in the United States and Canada.  As of February 29, 2012, the Debtors had approximately $4.48 billion in assets (book value) and $2.29 billion in liabilities.

*(iii)    LightSquared's Spectrum*

32.     Key to the implementation of LightSquared's 4G LTE open wireless broadband network is the availability of licensed, leased or pooled 51 MHz of spectrum to LightSquared debtor entities, which consists of the following:[5]

- 24 MHz.  24 MHz of L-Band Mobile Satellite Service ("MSS") spectrum held by LightSquared LP and SkyTerra (Canada) Inc.  These spectrum holdings are subject to the

---

[5]     LightSquared previously also had access to an additional 8 MHz of 1.4 GHz leased terrestrial spectrum held by One Dot Four Corp., a wholly-owned direct subsidiary of LightSquared Inc.  Indeed, in July 2010, One Dot Four Corp. entered into that certain Long-Term De Facto Transfer Lease Agreement (the "One Dot Four Lease") with TerreStar 1.4 Holdings LLC (a bankruptcy remote subsidiary of TerreStar Corporation) and TerreStar Corporation to lease the exclusive rights held by TerreStar 1.4 Holdings LLC, under licenses issued by the FCC, to use spectrum located at the 1390-1395 MHz and 1432-1435 MHz frequencies to offer service in the United States.  The One Dot Four Lease, however, was terminated on April 20, 2012, thereby terminating LightSquared's access to this portion of the spectrum.

following licenses granted by the FCC or Industry Canada to LightSquared Subsidiary LLC or SkyTerra (Canada) Inc., each a wholly-owned indirect subsidiary of LightSquared LP:

- A license to launch and operate (a) an L-Band MSS satellite known at the time as AMSC-1 (now named MSAT-2), which operates at the 103.3 West Longitude orbital position, and (b) MSV-1 (re-named SkyTerra-1), a replacement second-generation L-Band MSS satellite, which operates at the 101 West Longitude orbital position.

- A license to launch and operate an L-Band MSS satellite known as MSAT-1, which operates at the 106.5 West Longitude orbital position and an Approval in Principle to launch and operate MSV-2 (re-named SkyTerra-2), a replacement second-generation L-Band MSS satellite at the 107.3 West Longitude orbital position.

- Multiple spectrum licenses and authorizations to make use of LightSquared's portion of the 1626.5 – 1660.5 MHz (Uplink) and 1525 – 1559 MHz (Downlink) L-band spectrum for service links and the 12.75-13.25 GHz (Uplink) and 10.7-10.95, 11.2-11.45 GHz (Downlink) spectrum for feeder links in the provision of MSS services in Canada and the United States via the MSAT-1, MSAT-2, SkyTerra-1 and SkyTerra-2 satellites. The Canadian portion of the L-Band spectrum has been authorized for use in the United States and the U.S. portion of this spectrum has been authorized for use in Canada.

In 2003, the FCC permitted MSS licensees, including the predecessor of LightSquared Subsidiary LLC, to deploy Ancillary Terrestrial Component ("ATC") networks (subject to certain technical and service requirements), which meant that LightSquared could operate a terrestrial wireless network. In March 2010, the FCC issued an order granting a predecessor of LightSquared Subsidiary LLC additional flexibility for the design of its ATC network and enabling it to operate with greater capacity and spectrum efficiency.

- Additional 22 MHz. The 24 MHz of L-Band MSS spectrum held by LightSquared LP and SkyTerra (Canada) Inc. may be increased by 22 MHz to an aggregate of 46 MHz of aggregate L-Band ATC spectrum pursuant to that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Inmarsat Cooperation Agreement"), by and between LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited ("Inmarsat"), which governs the use of L-Band spectrum for both MSS and ATC services in North America. In the current phase of the Inmarsat Cooperation Agreement, LightSquared Subsidiary LLC holds a total of 24 MHz of L-Band spectrum. Upon the achievement of certain events, including regulatory approvals and coordination among other international L-Band operators, LightSquared LP and SkyTerra (Canada) Inc. will have the option to implement coordinated access for up to 2 x 23 MHz of L-Band spectrum (including large 10 x 10 MHz blocks of contiguous channels). As a result, LightSquared ultimately will have

access to 46 MHz[6] of L-Band spectrum in the United States and Canada, consisting of the 24 MHz licensed to LightSquared LP and SkyTerra (Canada) Inc. and the addition of 22 MHz through implementation of the Inmarsat Cooperation Agreement.

- <u>5 MHz</u>.  An additional 5 MHz of 1.6 GHz leased terrestrial spectrum of One Dot Six Corp., a wholly-owned direct subsidiary of LightSquared Inc., is available.  On July 16, 2007, TVCC One Six Holdings LLC, an indirectly wholly-owned subsidiary of One Dot Six Corp., entered into a Master Agreement with Crown Castle MM Holding LLC and OP LLC ("<u>OP</u>" and, together with Crown Castle MM Holding LLC, "<u>Crown Castle</u>"), in which the parties agreed to enter into either a long-term de facto transfer lease agreement or a spectrum management lease agreement with respect to the lease by OP of its rights to TVCC One Six Holdings LLC under a license issued by the FCC to use spectrum at the 1670-1675 MHz frequencies and Call Sign WPYQ831 in the United States.  On April 13, 2010, One Dot Six Corp. acquired all of TVCC One Six Holdings LLC's rights to use this spectrum under its lease with Crown Castle pursuant to that certain Lease Purchase Agreement, between One Dot Six Corp., as purchaser, TVCC One Six Holdings LLC, as seller, and TVCC Holding Company, LLC (the "<u>One Dot Six Lease Purchase Agreement</u>" and, collectively with all rights conveyed thereby to One Dot Six Corp. in that certain (i) Long-Term De Facto Transfer Lease Agreement, dated as of July 23, 2007, between OP LLC, as lessor, and TVCC One Six Holdings, LLC, as lessee, and (ii) the Long-Term De Facto Transfer Sublease Agreement, dated as of August 13, 2008, between OP LLC, as lessee, and TVCC One Six Holdings, LLC, as lessor, the "<u>One Dot Six Lease</u>").  One Dot Six Corp. also has a purchase option to acquire the underlying FCC licenses for this spectrum.

  (iv)    *LightSquared's Wholesale Agreements*

33.    LightSquared's success in attracting wholesale customers interested in purchasing capacity on its 4G LTE network has been key to the successful implementation of its wholesale-only business strategy to date, and is indicative of the significant market opportunity that exists for LightSquared's wholesale 4G LTE solution.  Prior to the deterioration of the FCC regulatory approval process in late 2011 and early 2012 (as discussed in further detail below), LightSquared had made exceptional progress marketing its wholesale 4G LTE solution to a wide range of potential customers.  As of December 31, 2011, LightSquared had entered into wholesale agreements with over thirty (30) customers, including national and regional wireless operators and national retailers.  LightSquared had also entered into discussions or advanced

---

[6]    Currently, 6 MHz of the 46 MHz must be used for satellite-only purposes.

negotiations with numerous potential wholesale customers within a variety of sectors, including wireless carriers and resellers, national retailers, consumer electronics manufacturers, cable operators, wireline carriers, satellite operators and other communication service providers.

## D.    Debtors' Capital Structure

### (i)    LightSquared Inc. Facility

34.    Certain of the Debtors are party to that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Prepetition Inc. Credit Agreement"), between LightSquared Inc., as borrower, the subsidiary guarantors party thereto, namely One Dot Four Corp., One Dot Six Corp. and One Dot Six TVCC Corp. (each, a "Prepetition Inc. Subsidiary Guarantor" and, collectively, the "Prepetition Inc. Subsidiary Guarantors"), the lenders party thereto (collectively, the "Prepetition Inc. Lenders") and U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch (in such capacity, the "Prepetition Inc. Agent").  The Prepetition Inc. Lenders provided term loans in the aggregate principal amount of $278,750,000 (the "Prepetition Inc. Credit Facility").  Pursuant to that certain Waiver and Second Amendment to Credit Agreement, dated as of March 15, 2012 (the "Inc. Waiver and Amendment"), between LightSquared Inc., the Prepetition Inc. Subsidiary Guarantors, the Prepetition Inc. Lenders and the Prepetition Inc. Agent, the maturity date for the Prepetition Inc. Credit Facility was extended from July 1, 2012 to December 31, 2012.

35.    Amounts outstanding under the Prepetition Inc. Credit Facility are allegedly secured by a first-priority security interest in (a) the One Dot Six Lease, (b) the capital stock of each Prepetition Inc. Subsidiary Guarantor (i.e., One Dot Four Corp., One Dot Six Corp.

and One Dot Six TVCC Corp.) and (c) all proceeds and products of each of the foregoing (collectively, the "Prepetition Inc. Collateral").[7]

36.    As of the Petition Date, an aggregate amount of approximately $322,333,494 was outstanding under the Prepetition Inc. Credit Facility.

*(ii)    LightSquared LP Facility*

37.    Certain of the Debtors are also party to that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Prepetition LP Credit Agreement"), between LightSquared LP, as borrower, LightSquared Inc. and the other parent guarantors party thereto, namely LightSquared Investors Holdings Inc., LightSquared GP Inc. and TMI Communications Delaware, Limited Partnership (collectively, the "Prepetition LP Parent Guarantors"), the subsidiary guarantors party thereto, namely ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc. and SkyTerra (Canada) Inc. (collectively, the "Prepetition LP Subsidiary Guarantors"), the lenders party thereto (the "Prepetition LP Lenders" and, together with the Prepetition Inc. Lenders, the "Prepetition Lenders"), UBS AG, Stamford Branch, as administrative agent (in such capacity, and together with Wilmington Trust FSB,[8] the "Prepetition LP Agent" and, together with the Prepetition Inc. Agent, the "Prepetition Agents"), and other parties thereto, under which the Prepetition LP Lenders provided term loans in the aggregate principal amount of $1,500,000,000 (the "Prepetition LP Credit Facility").

---

[7]    Previously, the Prepetition Inc. Credit Facility also was collateralized by the One Dot Four Lease. However, such lease is no longer part of the collateral package given that such lease has been terminated (as discussed above).

[8]    Wilmington Trust FSB serves as collateral trustee pursuant to that certain Collateral Trust Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "LP Collateral Trust Agreement"), between LightSquared LP, UBS AG, Stamford Branch and Wilmington Trust FSB.

38.    Amounts outstanding under the Prepetition LP Credit Facility are allegedly secured by a first-priority security interest in (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP and the Prepetition LP Parent Guarantors (except LightSquared Inc.), (c) the equity interests of the Prepetition LP Subsidiary Guarantors and (d) the rights of LightSquared Inc. under and arising out of the Inmarsat Cooperation Agreement (collectively, the "Prepetition LP Collateral").[9]

39.    As of the Petition Date, an aggregate amount of approximately $1,700,571,106 was outstanding under the Prepetition LP Credit Facility.

(iii)    Sprint Agreement

40.    LightSquared Inc. and LightSquared LP were also parties to that certain Master Services Agreement, dated as of June 3, 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Sprint Master Services Agreement"), with Sprint, pursuant to which Sprint agreed to design, deploy, operate, manage and maintain a nationwide terrestrial broadband mobile network that would utilize LightSquared's spectrum to provide 4G wireless services throughout the United States.  The Debtors initially paid Sprint $310 million in advance payments for work on the network and its eventual operation, $65

---

[9]    The Prepetition LP Collateral does not include the following:  (a) any permit or license issued by a Governmental Authority (as defined in the Prepetition LP Credit Agreement) or other agreement to the extent the terms thereof validly prohibit the creation by the pledgor thereof of a security interest in such permit, license or other agreement; (b) property subject to any purchase money or vendor financing if the contract or other agreement in which such lien is granted validly prohibits the creation of any other lien on such property; (c) property subject to any capital lease; (d) any intent-to-use trademark application to the extent a security interest therein would result in the loss by the pledgor thereof of any material rights therein; (e) certain deposit and securities accounts securing currency hedging or credit card vendor programs or letters of credit provided to vendors in the ordinary course of business; (f) equity interests in (i) excess of 66% in non-U. S. subsidiaries held by a US subsidiary, (ii) LightSquared Network LLC, and (iii) any joint venture or similar entity to extent the terms of such investment restrict such security interest; and (g) any consumer goods subject to the Canadian Security Agreement (as defined in the Prepetition LP Credit Agreement) (collectively, the "Prepetition LP Excluded Collateral").

million of which was refunded to the Debtors on March 15, 2012 and $2.3 million of which was refunded to the Debtors on May 4, 2012.

              41.      Obligations outstanding under the Sprint Master Services Agreement were allegedly secured by a second-priority security interest in the Prepetition LP Collateral.  On March 16, 2012, Sprint sent a notice to LightSquared announcing its intention to terminate and unwind the Sprint Master Services Agreement.  In furtherance thereof, each party ceased to provide certain specified services, reconciled all amounts owing as between them and coordinated the release of the liens securing LightSquared's obligations, which process is still ongoing.  As of the Petition Date, the Debtors do not believe any amounts are owing to Sprint under the Master Services Agreement.  To the contrary, the only obligations outstanding are those owed by Sprint on account of a refund of an additional advance payments made to Sprint.

              *(iv)*     *Stockholders' Equity*

              42.      <u>LightSquared Inc. Series A and B Preferred Stock</u>.  LightSquared Inc., a privately held company, has issued 50,505 shares of Convertible Series A Preferred Stock ("<u>Series A Preferred Stock</u>") and 175,872.34 shares of Convertible Series B Preferred Stock ("<u>Series B Preferred Stock</u>" and, together with the Series A Preferred Stock, the "<u>Preferred Stock</u>").  The Preferred Stock is entitled to vote on all matters on which holders of common stock of LightSquared Inc. are entitled to vote, on an as converted basis voting as a single class with all other shares entitled to vote on such matters.  The shares of Preferred Stock are convertible into shares of common stock of LightSquared Inc. at any time, and are subject to mandatory conversion at LightSquared Inc.'s option upon the occurrence of certain events.  The Preferred Stock is subject to mandatory redemption on the date that is five years after the issue date of such Preferred Stock and at the option of the holder of such Preferred Stock upon the

occurrence of certain events.  The Preferred Stock ranks senior with respect to distributions to LightSquared Inc.'s outstanding common stock.

43.     LightSquared LP Series A Preferred Units.  LightSquared LP has 164,646.47 outstanding non-voting Series A Preferred Units ("Preferred LP Units").  Subject to certain consent rights, the Preferred LP Units have no voting rights.  Consent of a majority of the Preferred LP Units is required to make certain amendments to LightSquared LP's organizational documents, effect certain capital contributions, issue securities that are senior or pari passu to the Preferred LP Units with respect to distributions, pay certain dividends or incur certain indebtedness.  The Preferred LP Units are exchangeable into shares of common stock of LightSquared Inc. at any time at the option of the holders, and are subject to mandatory exchange at LightSquared Inc.'s option upon the occurrence of certain events.  The Preferred LP Units are subject to mandatory redemption on the date that is five years after the issue date of such Preferred LP Units and at the option of LightSquared LP or the holder of such Preferred LP Units upon the occurrence of certain events.  The Preferred LP Units rank senior with respect to distributions to LightSquared LP's outstanding Common Units.

44.     LightSquared Inc. Common Stock.  LightSquared Inc. has issued 91,878,629 shares of common stock to HGW US, an indirect wholly-owned subsidiary of Harbinger, and 3,387,916 shares to SK Telecom Co., Ltd.  Each holder of common stock is entitled to one vote for each share on all matters submitted to a vote of the stockholders.

45.     LightSquared LP Common Units.  LightSquared LP's common units are all indirectly owned by LightSquared Inc.

E.      **Events Leading to Bankruptcy Filing**

(i)      *FCC Process*

46.      <u>Early 2000s</u>.  In 2001, to implement its national terrestrial network,
LightSquared submitted an application to the FCC seeking authority for an innovative new
wireless service to be operated in conjunction with its MSS license.  The FCC initiated a
rulemaking proceeding regarding the establishment of rules for LightSquared's wireless network,
specifically identifying potential emissions interference to GPS as a concern.[10]  This public
proceeding lasted over four (4) years and involved scores of interested parties, including the GPS
industry and other federal agencies.

47.      During this time, the GPS industry's only concern centered around out-of-
band emissions.  To resolve such concerns, USGIC and LightSquared entered into a private,
voluntary agreement in 2002 whereby LightSquared consented to certain limitations on its out-
of-band emissions into the GPS band that were far more rigorous than those required by the
FCC.  Despite the significant cost and burden imposed on LightSquared by such agreement,
LightSquared incorporated the new limits into its revised application to the FCC with the support
of the USGIC.

48.      Thereafter, in 2003, the FCC adopted rules (the "<u>2003 Rules</u>") permitting
MSS licensees, after satisfying certain preconditions known as "gating criteria," to integrate an
ATC into their satellite networks, which would enable MSS licensees to offer ground-based
mobile services using the same spectrum resources already allocated to their MSS operations

---

[10]      The source of GPS interference concerns stemmed from LightSquared's proximity to the GPS band.
LightSquared is authorized to operate in 46 MHz of the L-Band spectrum, including the portion of
spectrum between 1525 MHz - 1559 MHz.  GPS operates in the 1559 MHz – 1610 MHz band, directly
adjacent to LightSquared's allocated frequencies.  The GPS industry, however, has designed its receivers in
a manner that makes them capable of receiving signals from LightSquared's allocated portion of the
spectrum.

(the "2003 FCC Order").  Pursuant to the 2003 FCC Order, LightSquared submitted a new

application requesting authorization to deploy and operate a terrestrial network, and the USGIC

filed a letter in support thereof.  Consequently, in 2004, the FCC granted LightSquared's

application to deploy and operate a terrestrial network, thereby making LightSquared the first

MSS licensee authorized to operate on a terrestrial basis.  LightSquared thereafter began

investing significant funds to design and deploy its 4G LTE open wireless broadband network

and, in furtherance thereof, commissioned its two next-generation satellites, SkyTerra-1 and

SkyTerra-2.

49.     2005-2010.  In 2005, the FCC revised many of the technical standards

governing terrestrial operations in the L-Band, and specifically removed a limit it had imposed in

the 2003 Rules on the number of terrestrial base stations that an MSS/ATC provider may deploy

(the "2005 Reconsideration Order").  In connection therewith, the FCC received and

incorporated into each of those rules extensive input from the public and federal agencies,

including recommendations offered by the USGIC and the NTIA that would protect against

harmful emissions from MSS/ATC operations into other bands, including the GPS frequency

bands.  No party in those proceedings raised any issue of possible overload interference to GPS

receivers.

50.     Since the 2005 Reconsideration Order, LightSquared has continued to

participate in FCC proceedings concerning the terms and conditions of its licenses, even as it

concurrently moved toward deployment of its integrated network.  During those proceedings, the

FCC, LightSquared and members of the GPS community continued to address and resolve

interference concerns.  Specifically, on July 10, 2009, in connection with the FCC's

consideration of an application to modify an MSS/ATC license now held by LightSquared, the

GPS community expressed a concern that out-of-band emissions from LightSquared's "femtocells" (*i.e.*, low-power indoor base stations designed to improve network coverage inside buildings) could potentially interfere with GPS.  Working cooperatively with the GPS industry, LightSquared entered into another private agreement with the USGIC, in which LightSquared voluntarily agreed to restrict the out-of-band emissions of its femtocells.  Thereafter, the USGIC and LightSquared submitted a joint letter to the FCC stating that the USGIC's interference concerns had been resolved.  Given that (a) technical modifications to the license were again coordinated with, and agreed to by, the Executive Branch of the U.S. government, and (b) no other concerns were raised with respect to GPS interference, in March 2010, the FCC granted the modification application, acknowledging that the voluntary agreements between LightSquared and the USGIC resolved any interference issue.

51.    <u>2010 and Beyond</u>.  In 2010, the FCC also approved LightSquared's terrestrial network, as well as the transfer of control of the entity now known as LightSquared Subsidiary LLC, which entity held the underlying license.  The FCC conditioned its approval of the transfer on LightSquared actually moving forward with its plan to use its MSS spectrum to provide 4G LTE mobile wireless service and to build a terrestrial network.  To ensure that goal was met, the FCC imposed an aggressive (and costly) build-out schedule on LightSquared, requiring coverage of at least 100 million people by December 31, 2012, at least 145 million by December 31, 2013, and at least 260 million people by December 31, 2015.  No party sought reconsideration of that build-out requirement, and no formal objections were raised relative to any alleged GPS interference.  LightSquared, in reliance on this approval and to ensure that it satisfied the FCC's conditions to approval in full, invested billions of dollars and entered into the

Sprint Master Services Agreement and other agreements to deploy its nationwide wireless broadband network.

52.     In November 2010, LightSquared sought a modification to its ATC authorization that would allow LightSquared to meet the MSS/ATC gating criteria in a way that would provide additional flexibility with respect to mobile devices (such as handsets).  As originally adopted in 2003 and confirmed in the 2005 Reconsideration Order, the gating criteria are rules the FCC applies to the provision of ATC service that are intended to ensure that the operator maintains a substantial mobile satellite service.  One gating criterion requires the MSS/ATC operator to provide an "integrated service," meaning a service that integrates both the satellite and terrestrial services.  While the FCC left open how operators could meet the integrated service requirement, it did establish a safe harbor that assumes compliance if the devices used by consumers are capable of communicating with both the satellite and terrestrial networks.  These devices are referred to as "dual-mode devices."  LightSquared's application in November 2010 sought permission for LightSquared's wholesale customers to provide their retail consumers with devices that only connected with the terrestrial network, provided that LightSquared offered its wholesale customers a single rate for access to both the satellite and terrestrial network, regardless of whether they used both of them.

53.     In determining whether to approve the application, the FCC considered that (a) LightSquared was significantly committed to MSS satellite service, (b) realization of LightSquared's MSS/ATC business plan necessarily included rationalization of interleaved L-Band spectrum into contiguous blocks that would support next generation broadband technologies and (c) LightSquared had made enforceable commitments that would increase the availability of terrestrial mobile wireless broadband service, including to new users in rural areas

26

and the public safety community.  In recognition of these considerations, while the FCC did not agree that LightSquared's proposal complied with the integrated service rule, the FCC nevertheless granted LightSquared a limited waiver (the "<u>Conditional Waiver Order</u>") of the rule, and narrowly addressed LightSquared's obligations with respect to mobile devices that wholesale customers would make available to their retail customers for use on LightSquared's MSS/ATC network.

54.    During the waiver proceeding on requirements for mobile devices, however, the GPS community raised concerns that LightSquared's terrestrial base stations (*i.e.*, its cell towers) may cause widespread overload interference to GPS receivers and other GPS devices.  As opposed to the earlier concerns about the power of LightSquared's transmissions, which were addressed by the agreement discussed above, these new concerns – raised for the first time – arose entirely as a result of the design of GPS devices.  Instead of limiting the frequencies used by these devices to only those used by the GPS network, GPS manufacturers had designed devices that looked across wide swaths of spectrum outside of the GPS band.  In effect, these devices not only received GPS frequencies, but also received frequencies in LightSquared's band, thus creating the possibility that a relatively powerful signal from one of LightSquared's base stations would overload a GPS receiver.

55.    Rather than dismiss the GPS industry's concern – one of its own making[11]– the FCC established conditions that LightSquared must satisfy before it can provide commercial service under the mobile device provisions of the Conditional Waiver Order. Specifically, the FCC required LightSquared to work with the GPS community to resolve the

---

[11]    As mentioned above, commercial GPS manufacturers have continued to design, produce and sell receivers that, for no justifiable technical reason, are capable of receiving signals from LightSquared's allocated portion of the spectrum.  Thus, just like any manufacturer who deliberately designs a defective product, the GPS industry should bear its own costs of recalling and repairing its products, or like any other "squatter," GPS should pay for its trespass, and use of, LightSquared's spectrum.

new concerns through an Interference Resolution Process, which process would be deemed

finished when the FCC (after consultation with the NTIA) concludes that the potential harmful

interference concerns have been resolved, before LightSquared would move forward to launch

its competitive 4G LTE service.  The FCC imposed these conditions notwithstanding the fact

that the possibility of tens of thousands of base stations across the country, all operating at power

levels that could cause overload of poorly designed receivers, was created by operation of the

FCC's 2003 and 2005 orders.  Nothing in the waiver granted by the FCC increased or otherwise

changed the likelihood of overload interference in any way.

        56.     In connection with the Interference Resolution Process, on June 30, 2011,

LightSquared submitted the final report of the technical working group that it co-chaired with the

USGIC.  The FCC issued a public notice in connection therewith seeking comments and also

subsequently requested additional technical submissions and testing.  Thus, in the ensuing

months, various tests were conducted by various federal agencies, including the NTIA, EXCOM

and the FAA, in coordination with LightSquared, to validate data on the performance of cellular,

personal/general navigation and certified aviation GPS receivers.  On February 14, 2012, the

FCC received a letter from the NTIA (the "NTIA Letter"), which stated that, through its

monitoring of the testing conducted in the Interference Resolution Process and its coordination

of additional testing of LightSquared's equipment by other federal agencies to assess the

interference effects of such equipment on GPS receivers and devices, the NTIA has concluded

that (a) LightSquared's proposed mobile broadband network will impact GPS services and

(b) there currently is no practical way to mitigate the potential harmful interference from

LightSquared's planned terrestrial operations in the 1525-1559 MHz band such that

LightSquared could successfully deploy an adequate commercial network.

57.     On February 15, 2012, the FCC stated in a public notice (the "2012 Public Notice") that the Interference Resolution Process had not been successfully completed by LightSquared because alleged harmful interference concerns were not resolved to the FCC's satisfaction.  Moreover, the FCC concluded that, although the overload interference issues were raised by the GPS community in connection with the Conditional Waiver Order, the interference addressed by the NTIA Letter is associated not with the mobile handsets at issue therein, but rather, with LightSquared's planned terrestrial base stations and, thereby, the full LightSquared ATC service authorized in 2004 and 2010.  Accordingly, the FCC proposed to vacate the Conditional Waiver Order and modify LightSquared's satellite license to suspend indefinitely LightSquared's underlying ATC authorization, first granted in 2004, to an extent consistent with the NTIA Letter.  The FCC invited interested parties to comment on these proposals by March 1, 2012, but subsequently extended such deadline to March 16, 2012.  LightSquared filed its comments to the 2012 Public Notice on March 16, 2012 and filed its reply to the comments of other interested parties on March 30, 2012.

58.     If the FCC proceeds to vacate the Conditional Waiver Order and/or modify LightSquared's satellite license to suspend indefinitely LightSquared's underlying ATC authorization, such events (a) will likely cause significant harm to the Debtors, including their ability to continue deployment of their nationwide wireless broadband network business plan and recoup benefits from the billions of dollars already spent in reliance on its previous approvals received form the FCC and (b) may constitute events of default under both the Prepetition Inc. Credit Agreement and the Prepetition LP Credit Agreement, among other potential ramifications.  LightSquared thus remains committed to finding a resolution with the FCC and the GPS industry to resolve all remaining concerns.

(ii)    *Cost-Cutting Measures and Negotiations with Respect to the Prepetition Inc.
Credit Agreement and Prepetition LP Credit Agreement*

59.    Throughout the first quarter of 2012, LightSquared faced liquidity

challenges.  Specifically, LightSquared LP was obligated to make a $25 million interest payment

to the Prepetition LP Lenders on March 30, 2012, which reduced the availability of cash on hand

to LightSquared LP.  Moreover, although LightSquared was able to extend the maturity date of

the Prepetition Inc. Credit Facility to December 31, 2012 in connection with the Inc. Waiver and

Amendment, in light of, among other things, the recent turn of events in the FCC process and the

GPS industry's most recent allegations, LightSquared Inc. has not been able to refinance the

facility or raise capital to aid it in the deployment of its 4G LTE network (as required by the

FCC).

60.    In an attempt to ease its liquidity constraints and preserve cash,

LightSquared began to undertake substantial cost-cutting initiatives during the first quarter of

2012, including executing a major reduction in staff and entering into negotiations with its

contractual counterparties to defer or reduce payments.  As part of this effort, LightSquared

successfully renegotiated the Inmarsat Cooperation Agreement, pursuant to that certain

Amendment No. 2, dated as of April 18, 2012, to (a) suspend Phase 2 (as defined in the Inmarsat

Cooperation Agreement) of the Inmarsat Cooperation Agreement until March 31, 2014, with the

understanding that LightSquared may, at its option, elect to restart Phase 2 prior to such date;

(b) during such period of suspension, eliminate any Phase 2 payments to Inmarsat, including the

quarterly payment of approximately $29.6 million due on March 31, 2012 (which, if not paid,

would have triggered cross-defaults under both the Prepetition Inc. Credit Agreement and the

Prepetition LP Credit Agreement) and (c) on April 1, 2014, or an earlier date as elected by

LightSquared, recommence Phase 2 payments based on a restructured payment plan that will

differ from the previous Phase payments and be dependent on certain future outcomes with regard to deployment of the LightSquared network.  In addition, a payment for certain transition services was renegotiated within the scope of the amended terms for Phase 2.  Moreover, LightSquared terminated the One Dot Four Lease, thereby obviating the requirement to pay TerreStar 1.4 Holdings LLC $2 million on March 23, 2012 and an additional $2 million on April 23, 2012.

61.     On March 16, 2012, Sprint terminated the Sprint Master Services Agreement, an event which LightSquared considered to be in its ultimate best interests.  Since Sprint's entry into the Sprint Master Services Agreement with LightSquared, LightSquared and Sprint had worked closely together to weather the delays – engendered by the GPS Interference Resolution Process – in the build-out of a terrestrial broadband mobile network throughout the United States.  Indeed, Sprint on numerous occasions had agreed to amend the Sprint Master Services Agreement to extend the date by which it was entitled to unwind the Sprint Master Services Agreement (the "Sprint Unwind Period").  However, on March 16, 2012, the date on which the Sprint Unwind Period commenced, Sprint determined not only that it would not extend the Sprint Unwind Period beyond such date, but it also chose to unwind the Sprint Master Services Agreement.  Given the reduced operations and liquidity of LightSquared at this juncture, it made good economic sense for LightSquared not to be burdened with the costs of the Sprint Master Services Agreement, which LightSquared and certain of its Prepetition Lenders believed was in their collective best interests.  Nonetheless, after termination of the Sprint Master Services Agreement, certain Prepetition Lenders took the view that such termination would trigger cross-defaults under both the Prepetition Inc. Credit Agreement and the Prepetition LP Credit Agreement.

(iii)    *Prepetition Discussions with Prepetition Lenders*

62.    Recognizing the (a) impact of the foregoing events and the liquidity

constraints on its business operations and (b) necessity of an extended period in which to resolve

its issues with the FCC as well as to streamline its business operations and financial obligations,

LightSquared began negotiations with the Prepetition Lenders in February 2011 to waive, among

others, the then potential events of default asserted by the Prepetition Lenders.  On March 15,

2012, LightSquared was able to secure the Inc. Waiver and Amendment with the requisite

number of the Prepetition Inc. Lenders and a short, forty-five (45)-day waiver, subsequently

extended by two waivers each granting an additional seven days, with the requisite number of the

Prepetition LP Lenders (the "LP Waiver").  In connection with the Inc. Waiver and Amendment,

(x) the maturity date for the Prepetition Inc. Credit Facility was extended from July 1, 2012 to

December 31, 2012, (y) a two percent (2%) non-cash fee was paid to the UBS AG, Stamford

Branch, as administrative agent, for the ratable account of each Prepetition Inc. Lender and

(z) Harbinger agreed to subordinate amounts owing to it under the Prepetition Inc. Credit Facility

to amounts owing to the other Prepetition Inc. Lenders under the Prepetition Inc. Credit Facility

in exchange for 2.5 million penny warrants.

63.    During the fifty-nine (59)-day period, LightSquared and the Prepetition

Lenders attempted to negotiate a global restructuring that would provide LightSquared with the

liquidity and runway necessary to resolve its issues with the FCC.  Despite working diligently

and in good faith, however, LightSquared and the Prepetition Lenders were not able to

consummate a global restructuring on terms acceptable to all interested parties.  The Debtors

were thus faced with no option but to commence these Chapter 11 Cases as the Debtors believed

the Prepetition Lenders would attempt to exercise remedies and sweep the very cash necessary to

conduct LightSquared's business and provide LightSquared with the requisite time to address FCC concerns.[12]

**F.     Development of Business Plan**

64.     The Debtors intend to vigorously defend their rights in the ongoing 2012 Public Notice process, while simultaneously pursuing a resolution with the FCC and other federal government agencies that will permit it to deploy its terrestrial network – a process that may last up to two years.  The Debtors thus commenced these Chapter 11 Cases in a compressed timeframe to give them the breathing room necessary to resolve the issues arising out of the 2012 Public Notice and to continue discussions with the relevant government agencies.  This dual-track approach will ensure the Debtors' exit from bankruptcy in the quickest and most efficient manner possible, all while maintaining the ongoing viability and profitability of the Debtors' businesses and maximizing the value of the Debtors' estates for all stakeholders.

**First Day Pleadings[13]**

65.     As discussed above, concurrently with the filing of their chapter 11 petitions, the Debtors filed various First Day Pleadings, which they believe are necessary to (a) continue the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintain the confidence and support of customers, including public safety agencies, employees, suppliers and certain other key constituencies and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and,

---

[12]     The Debtors are also in the process of commencing ancillary proceedings in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada to recognize these Chapter 11 Cases and implement the relief provided thereby to the Debtors.

[13]     Unless otherwise defined, terms defined herein have the meaning ascribed to them in the respective First Day Pleading described.

ultimately, will be critical to the Debtors' ability to achieve a successful reorganization. It is also

my understanding that the First Day Pleadings reflect the comments of the United States Trustee

for the Southern District of New York.

**A.     Procedural Motions**

(i)     _Joint Administration Motion._  *Debtors' Motion for Entry of Order Directing Joint
Administration of Related Chapter 11 Cases*

66.     The Debtors seek joint administration of these Chapter 11 Cases for

procedural purposes only.  As described above, each of the twenty (20) Debtors in these Chapter

11 Cases is an affiliate of LightSquared Inc., and the Debtors share key financial and operational

systems.

67.     The joint administration of these Chapter 11 Cases, to the best of my

knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will

joint administration adversely affect the Debtors' respective creditors because this motion

requests only administrative, not substantive, consolidation of the estates.  Intercompany claims

among the Debtors also will be preserved and each of the Debtors will maintain separate records

of assets and liabilities.  Thus, I believe that individual creditors' rights should not be harmed by

the relief requested.  Instead, non-Debtor parties in interest should benefit from the cost

reductions associated with the joint administration of these Chapter 11 Cases.

(ii)    _KCC Retention._  *Debtors' Application for Entry of Order Authorizing and
Approving Employment and Retention of Kurtzman Carson Consultants LLC as
Claims and Noticing Agent for Debtors and Debtors in Possession*

68.     The Debtors propose to engage Kurtzman Carson Consultants LLC

("KCC") to act as claims and noticing agent, in order to assume full responsibility for the

distribution of notices and maintenance, processing and docketing of proofs of claims filed in

these Chapter 11 Cases.  KCC is a bankruptcy administrator that specializes in providing

comprehensive chapter 11 administrative services, including noticing, claims processing and other related services critical to the effective administration of large chapter 11 cases. KCC's retention should maximize efficiency in administering these Chapter 11 Cases and ease administrative burdens that otherwise would fall upon the Debtors and the Clerk of the United States Bankruptcy Court for the Southern District of New York.

69.     The Debtors obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Based on all engagement proposals obtained and reviewed, I believe that KCC will provide the most cost-effective and efficient service as the claims and noticing agent for these Chapter 11 Cases. Accordingly, the Debtors chose KCC based on its experience, reputation and the competitiveness of its fees. I believe that KCC is well-qualified to serve in the capacity of claims and noticing agent and that KCC's retention is in the best interests of the Debtors' estates and all parties in interest.

   (iii)    *Creditor Matrix Motion.  Debtors' Motion for Entry of Order Authorizing Debtors To (A) Prepare Electronic Lists of Creditors and Equity Security Holders in Lieu of Submitting and Filing Formatted Mailing Matrix, (B) File Consolidated List of Debtors' 20 Largest Unsecured Creditors and (C) Mail Initial Notices*

70.     The Debtors request authority to (a) prepare a consolidated list of creditors and a list of equity security holders in the format or formats currently maintained in the ordinary course of business in lieu of submitting and filing a formatted mailing matrix, (b) file a consolidated list of the Debtors' twenty (20) largest unsecured creditors and (c) mail initial notices in connection with these Chapter 11 Cases through KCC, the Debtors' proposed claims and noticing agent.

71.     The Debtors propose to retain KCC as claims and noticing agent in connection with the Debtors' Chapter 11 Cases to assist the Debtors in preparing creditor lists

and mailing initial notices.  With such assistance, the Debtors will be prepared to file computer-readable lists of creditors and equity security holders upon request and will be capable of undertaking all mailings required of the Debtors during the pendency of these Chapter 11 Cases. Converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

72.    Consolidating the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database should be sufficient to enable KCC to promptly notice those parties.  Accordingly, I believe that maintaining electronic format lists of creditors and equity security holders, rather than preparing and filing separate matrices, will maximize efficiency and accuracy, and reduce costs.

*(iv)*    *Schedules and Statements Extension Motion*.  *Debtors' Motion for Entry of Order Granting Extension of Time To File Schedules and Statement*

73.    The Debtors request a thirty (30)-day extension of time to file their (a) statements of financial affairs, (b) schedules of assets and liabilities, (c) schedules of current income and expenditures, (d) schedules of executory contracts and unexpired leases and (e) lists of equity security holders (collectively, the "Schedules and Statements") through and including June 27, 2012.

74.    The Debtors have begun compiling the information required to complete the Schedules and Statements.  Nevertheless, as a consequence of the complexity of the Debtors' business operations, coupled with the limited time and resources available, the Debtors have not yet finished gathering such information.

75.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases and the volume of information that must be reviewed, prepared and included in their Schedules and Statements, I do not anticipate that the Debtors will be able to complete their Schedules and Statements within the fourteen (14) days required by the Federal Rules of Bankruptcy Procedure. Moreover, I believe that focusing the attention of key accounting and legal personnel on vital operational and restructuring matters during the critical first weeks after filing these Chapter 11 Cases, rather than on preparing their Schedules and Statements, will facilitate the Debtors' smooth transition into chapter 11.  Accordingly, I believe that obtaining an extension of time to file the Schedules and Statements will maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest.

**B.      Operational Motions**

(i)      *Cash Management Motion.  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors To (I) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms, and (II) Continue Intercompany Transactions, (B) Providing Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Debtors' Banks To Honor All Related Payment Requests and (D) Waiving Investment Guidelines of Section 345(b) of Bankruptcy Code*

76.     The Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to use their existing cash management systems, current bank accounts and current business forms (without reference to the Debtors' status as debtors in possession), (ii) open new debtor in possession bank accounts with authorized depository banks and close any existing bank accounts as the Debtors deem necessary and appropriate in their sole discretion and (iii) continue performing ordinary course Intercompany Transactions (as defined below) and have Intercompany Claims (as defined below) resulting from Intercompany Transactions be granted

administrative expense priority and (b) waiving the investment guidelines of section 345(b) of

the Bankruptcy Code.

77.   Cash Management Systems.  In the ordinary course of business, the

Debtors utilize two integrated, centralized cash management systems to collect, manage, disburse

and invest funds used in their operations.  There is one cash management system (the "Inc.

Group Cash Management System") for the "Inc. Group," which consists of  both Debtor and

non-Debtor entities.[14]   The second cash management system (the "LP Group Cash Management

System" and, together with the Inc. Group Cash Management System, the ("Cash Management

Systems") is for the "LP Group," which, is comprised of LightSquared LP and its direct

subsidiaries.[15]  Both the Inc. Group Cash Management System and LP Group Cash Management

System have one main concentration account that feeds into and, in some cases, receives funds

from, various bank accounts (the "Bank Accounts") that are held with several banks in the

United States and Canada (the "Cash Management Banks").

78.   The Bank Accounts comprising the Inc. Group Cash Management System

are further described as follows:

(a)   Inc. Group Concentration Account:  LightSquared Inc.
maintains one (1) disbursement and operating account at
SunTrust Bank ("SunTrust") in the name of LightSquared
Inc. (the "Inc. Group Concentration Account") that serves
as a primary collection point for all funds moved into and
through the Inc. Group Cash Management System.  The

---

[14]   The "Inc. Group" consists of (a) the following Debtor entities:  LightSquared Inc., LightSquared Investors
Holdings Inc., One Dot Six Corp., One Dot Four Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC,
SkyTerra Investors LLC, TMI Communications Delaware, Limited Partnership, LightSquared GP Inc. and
One Dot Six TVCC Corp. and (b) the following non-Debtor entities:  TVCC Holding Company, LLC,
TVCC Intermediate Corp., Columbia One Six Partners IV, Inc., Columbia FMS Spectrum Partners IV, Inc.,
TVCC One Six Holdings LLC and CCMM I LLC.

[15]   The "LP Group" consists of (a) the following Debtor entities:  LightSquared LP, ATC Technologies, LLC,
LightSquared Corp., LightSquared Finance Co. LightSquared Network LLC, LightSquared Inc. of Virginia,
LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc. and SkyTerra (Canada) Inc. and Lightsquared
Bermuda Ltd.; and (b) the following non-Debtor entities:  LightSquared (UK) Limited.

Inc. Group Concentration Account is funded manually, on an as needed basis, with (i) the proceeds of loans under the Prepetition Inc. Credit Agreement, (ii) proceeds from the Inc. Group Investment Accounts (as defined herein), (iii) proceeds from the Inc. Group Restricted Account (as defined herein) and (iv) proceeds from approved dividends periodically distributed by LightSquared LP.  The Inc. Group Concentration Account, in turn, serves as one of the two (2) Inc. Group Disbursement/Operating Accounts (as further described herein) and funds, and will continue to fund postpetition, the remainder of the Inc. Group Disbursement/Operating Accounts.  All wire and automated clearing house payments, including those relating to operating expenses, insurance, and taxes, are made, either directly or indirectly, from this account.

(b)   Disbursement/Operating Accounts:  In addition to the Inc. Group Concentration Account, the Inc. Group maintains one (1) corporate disbursement and operating accounts at SunTrust in the name of One Dot Six Corp. (the "One Dot Six Corp. Disbursement/Operating Account" and, together with the Inc. Group Concentration Account, the "Inc. Group Disbursement/Operating Accounts").  The Inc. Group Disbursement/ Operating Accounts are all funded manually, on an as needed basis.  The Inc. Group Concentration Account funds shortfalls in the One Dot Six Corp. Disbursement/Operating Account.  The Inc. Group Disbursement/Operating Accounts are used to pay general corporate expenses, including accounts payable, of the Inc. Group members.

(c)   Restricted Account:  The Inc. Group maintains one (1) interest-bearing certificate of deposit account (the "Inc. Group Restricted Account") in the name of LightSquared Inc. at Bank of America, N.A.  The Inc. Group Restricted Account contains collateral associated with the Inc. Group's corporate travel and entertainment credit card program.

(d)   Investment Accounts:  The Inc. Group maintains two (2) investment accounts at the Royal Bank of Canada ("RBC") (the "Inc. Group Investment Accounts").  The Inc. Group Investment Accounts are funded by excess funds transferred from the Inc. Group Concentration Account and through dividends approved by LightSquared LP.  Funds in the Inc. Group Investment Account are invested per the Inc.

Group's corporate investment guidelines. In the past, the Inc. Group manually transferred funds from the Inc. Group Investment Accounts to the Inc. Group Concentration Account or third parties periodically on an as needed basis. All transfers between the Inc. Group Investment Accounts and the Inc. Group Concentration Account are initiated by the Debtors' approved bank signatories, including the treasury manager or treasurer, delivering transfer instructions to the investment managers responsible for the applicable accounts.

79.     The Bank Accounts comprising the LP Group Cash Management System are further described as follows:

(a)     <u>LP Group Concentration Account</u>:  LightSquared LP maintains one (1) disbursement and operating account at SunTrust in the name of LightSquared LP (the "<u>LP Group Concentration Account</u>") that serves as a primary collection point for all funds moved into and through the LP Group Cash Management System.  The LP Group Concentration Account is funded manually, on an as needed basis, with (i) proceeds of loans under the Prepetition LP Credit Agreement, (ii) on very rare occasions, funds from the LightSquared Corp. SunTrust Disbursement/Operating Account (as defined herein) and LightSquared Corp. Scotiabank Disbursement/Operating Account (as defined herein), (iii) funds from the LightSquared LP Investment Accounts (as defined herein), (iv) funds from the LP Group Restricted Account (as defined herein) and (v) funds from the Inc. Group Concentration Account.  The LP Group Concentration Account, in turn, serves as one of the four (4) LP Group Disbursement/Operating Accounts (as defined herein) and funds, and will continue to fund postpetition, the remainder of the LP Group Disbursement/Operating Accounts.  All wire and automated clearing house payments, including those relating to operating expenses, payroll, insurance and taxes, are made, either directly or indirectly, from this account.

(b)     <u>Lockbox</u>:  The LP Group maintains a lockbox with SunTrust (the "<u>LP Group Lockbox</u>").  In the ordinary course, customers deposit checks into the LP Group Lockbox, which are credited to the LP Group Concentration Account.  The LP Group Lockbox will be maintained postpetition.

(c)    <u>Disbursement/Operating Accounts</u>:  In addition to the LP Group Concentration Account, the LP Group maintains (i) two (2) corporate disbursement and operating accounts at SunTrust in the names of LightSquared Corp. (the "<u>LightSquared Corp. SunTrust Disbursement/Operating Account</u>") and LightSquared Network LLC (the "<u>LightSquared Network LLC Disbursement/Operating Account</u>") and (ii) one (1) Canadian dollar corporate disbursement and operating account at Scotiabank under the name of LightSquared Corp. (the "<u>LightSquared Corp. Scotiabank Disbursement/Operating Account</u>" and, together with the LP Group Concentration Account, the LightSquared Corp. SunTrust Disbursement/Operating Account and the LightSquared Network LLC Disbursement/Operating Account, the "<u>LP Group Disbursement/Operating Accounts</u>").  The LP Group Disbursement/Operating Accounts are all funded manually, on an as needed basis.  The LP Group Concentration Account funds shortfalls in the LightSquared Corp. SunTrust Disbursement/Operating Account, the LightSquared Corp. Scotiabank Disbursement/Operating Account and the LightSquared Network LLC Disbursement/Operating Account.  The LP Group Disbursement/Operating Accounts are used to pay general corporate expenses, including accounts payable, of the LP Group members.

(d)    <u>Restricted Account</u>:  The LP Group maintains one (1) interest-bearing restricted money market account (the "<u>LP Group Restricted Account</u>") in the name of LightSquared LP at Comerica Bank.  The LP Group Restricted Account is funded by the LP Group Concentration Account, as needed, and contains collateral associated with the Inc. Group's letters of credit and credit card collateral.  Unrestricted funds contained in the LP Group Restricted Account may be transferred out of the account via telephone with a personal identification number.

(e)    <u>Investment Accounts</u>:  The LP Group maintains three (3) investment accounts (the "<u>LP Group Investment Accounts</u>" and, together with the LightSquared LP Inc. Investment Accounts, the "<u>Investment Accounts</u>").  The LP Investment Accounts are funded by excess funds transferred from the LP Group Concentration Account and invested per the Inc. Group's corporate investment guidelines.  In the past, the

LP Group manually transferred funds from the LP Investment Accounts to the LP Group Concentration Account or third parties periodically on an as needed basis. All transfers between the LP Investment Accounts and the LP Group Concentration Account are initiated by the Debtors' approved bank signatories, including the treasury manager or treasurer, delivering transfer instructions to the investment managers responsible for the applicable accounts.

(f)    Foreign Exchange Deposit Account.  The LP Group maintains a Euro deposit account in the name of LightSquared LP (the "LP Group Foreign Exchange Deposit Account") at Wells Fargo Bank, N.A.  The LP Group Foreign Exchange Deposit Account is used to hold Euro hedge proceeds and, as of the Petition Date, holds a *de minimis* account balance.  Two other accounts at SunTrust were historically used by the Debtors for Euro and Canadian dollar hedge proceeds, but they currently are not in use.

80.    I am advised that the *Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") require, among other things, that, unless the Court orders otherwise, a debtor (a) close all existing bank accounts and open new debtor in possession accounts, (b) maintain a separate debtor in possession account for cash collateral and (c) obtain checks that bear the designation "debtor in possession."  I believe that strict enforcement of the U.S. Trustee Guidelines in these Chapter 11 Cases, however, would disrupt the ordinary financial operations of the Debtors, reducing efficiencies and causing unnecessary expense.  The Debtors have utilized the Cash Management Systems in their current form for years as part of their ordinary and usual business practices. Requiring the Debtors to maintain separate accounts would decentralize their Cash Management Systems because, given the corporate and financial structure of the Debtors, it would be difficult to establish an entirely new cash management system for each Debtor or group of Debtors.  To comply with the U.S. Trustee Guidelines, I understand that the Debtors also would need to

execute new signatory cards and depository agreements and create a new system for manually

issuing checks and paying postpetition obligations.  I believe that the delays that would result

from opening these accounts, revising cash management procedures and instructing customers to

redirect payments would disrupt the Debtors' business operations at this critical time, have little

or no benefit to their respective estates and potentially destroy value.  Therefore, I believe that

continued operation of the Cash Management Systems will greatly facilitate their transition into

chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and

minimizing delays in payment of postpetition obligations.  I understand that no parties in interest

will be harmed by the continued maintenance of the existing Cash Management Systems,

including the maintenance, servicing and administration of the Bank Accounts, because the

Debtors have implemented appropriate mechanisms to ensure that payments will not be made on

any obligation incurred before the Petition Date, other than those authorized by the Court.

        81.     The Debtors request further relief from the requirement in the U.S. Trustee

Guidelines that all receipts and all disbursements of estate funds be by check with a notation

representing the reason for the disbursement.  Given the Debtors' current operations, it is

necessary for the Debtors to conduct transactions by debit, wire, automated clearing house

("ACH") transfers, ACH credit, ACH debit, corporate credit cards and other similar methods.

To deny the Debtors the opportunity to conduct transactions by these methods would, I believe,

likely interfere with the Debtors' performance of their contracts and unnecessarily distract the

Debtors from their business operations, as well as create additional costs to be borne by the

Debtors and their creditors.  To effect this relief, the Debtors request that the Cash Management

Banks be authorized and directed to continue to pay, honor and execute any and all debit

instructions, wires and ACH payments issued and drawn on the Bank Accounts after the Petition

Date.

82.     Additionally, in the ordinary course, the Cash Management Banks charge,

and the Debtors pay, honor or allow the deduction from the appropriate account, certain service

and other fees, costs, charges and expenses (collectively, the "Bank Fees").  The Debtors request

that the Cash Management Banks be given the authority to (a) continue to charge the Debtors the

Bank Fees and (b) charge back to the Bank Accounts returned items,[16] whether such items are

dated prior to, on or subsequent to the Petition Date, in the ordinary course.

83.     To facilitate implementation of the above-requested relief, the Debtors

request that all applicable banks and other financial institutions be authorized to receive, process,

honor and pay all checks presented for payment and to honor all electronic payment requests

made by the Debtors related to the postpetition obligations described herein.  The Debtors further

request that all such banks and financial institutions be authorized to rely on the Debtors'

designation of any particular check or electronic payment request as approved pursuant to this

Motion.

84.     Business Forms.  In the ordinary course of business, the Debtors utilize

various checks, business cards, letterhead, purchase orders and invoices (collectively, the

"Business Forms") containing customary LightSquared logos and insignia.  To minimize

expense and avoid confusion on the part of the Debtors' employees, customers and suppliers, the

Debtors request that they be authorized to continue to use all correspondence and Business

Forms, as such forms were in existence immediately prior to the Petition Date without reference

to the Debtors' status as debtors in possession.  Upon depletion of the Business Forms stock, the

---

[16]     Chargebacks include ordinary course banking fees for services related to, among other things, check
processing, wire processing, online reporting and the lockbox.  The Debtors anticipate such chargebacks to
amount to approximately $1,200.

Debtors will obtain new Business Forms reflecting their status as debtors in possession, the

Debtors' bankruptcy case name and number and the type of account.  Such authorization will

enable the Debtors to avoid the expense and delay of ordering new Business Forms.

Additionally, I understand that the Debtors will obtain a stamp that they will use to indicate their

status as debtors in possession and will also immediately update their computer-generated checks

to reflect the same.

85.    <u>Investment Practices</u>.  In the ordinary course of business, the Debtors'

Investment Accounts are subject to certain guidelines (the "<u>Investment Practices</u>").  Pursuant to

the Investment Practices, the Debtors invest surplus cash, through the Investment Accounts, in

(a) obligations issued, fully guaranteed or insured by U.S. government agencies, authorities,

instrumentalities or sponsored entities ("<u>U.S. Government Securities</u>"), (b) money market mutual

funds with high ratings under Standard & Poor's Rating Group ("<u>S&P</u>") and Moody's Investor

Service, Inc. ("<u>Moody's</u>") and (c) to a more limited degree, certificates of deposit, commercial

paper and repurchase agreements with high ratings under S&P and Moody's.

86.    I am advised that for those investments of the Debtors that are not

investments "insured or guaranteed by the United States or by a department, agency or

instrumentality of the United States or backed by the full faith and credit of the United States,"

under the Bankruptcy Code, the Debtors' estates must require a bond in favor of the United

States secured by the undertaking of a U.S. Trustee-approved corporate surety.  I am also advised

that it is within the Court's discretion to waive or modify such investment guideline for "cause."

87.    I believe that cause exists for waiving the investment and deposit

guidelines of section 345 of the Bankruptcy Code.  First, I understand that the Investment

Accounts (a) only invest in U.S. Government Securities and (b) in securities that carry high

ratings from S&P's and Moody's. In other words, an investment in the Investment Accounts carries the same or similar credit risk as a direct investment in U.S. Government Securities. Second, I understand that if the Debtors are limited to direct investments in U.S. Government Securities, they would need to work with their current investment managers to establish (a) a new account to trade the securities and (b) new associated controls and procedures. Thus, I believe that the risk of a compliance breakdown in connection with these activities is at least as large as any incremental risk posed by investment in the Investment Accounts, and the costs associated with these activities would likely exceed the yield on the investments.

88.     <u>Intercompany Transactions</u>.   In the ordinary course of business, cash amounts may be received or paid by one Debtor entity on behalf of other Debtor entities and, depending on the transaction, have been historically recorded as capital contributions or equity investments (the "<u>Cash Transactions</u>").  The Debtors and certain non-Debtor affiliates utilize a cost allocation system, through which expenses initially paid by a Debtor or a non-Debtor affiliate for the benefit of other Debtors or non-Debtor affiliates are allocated to the appropriate entities in proportion to the benefits received by such entities (together with the Cash Transactions, the "<u>Intercompany Transactions</u>").  As a result of the Intercompany Transactions, intercompany receivables and payables are created for each applicable Debtor in the ordinary course of business (the "<u>Intercompany Claims</u>").  Although I am aware that the Debtors have, in the past, created notes to evidence some of the Intercompany Transactions (the "<u>Intercompany Notes</u>"), the Intercompany Transactions are also sometimes settled by book entry, rather than by an actual transfer of cash evidenced by Intercompany Notes.  The Debtors maintain records of all transfers and can ascertain, trace and account for all Intercompany Transactions and will continue to do so during these Chapter 11 Cases.

89.     I believe that continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.  First, were the Debtors to obtain (to the extent at all possible) the services they currently receive from other Debtors pursuant to the Intercompany Transactions on an isolated per-company basis, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtors would be required to divert their attention from their restructuring efforts and the desired smooth transition into operating as debtors in possession.  Moreover, because the Prepetition LP Lenders have not consented to the Debtors' use of cash collateral, the Debtors have no recourse but to use the approximately $15 million cash on hand at the Inc. Group to, among other things, engage in ongoing discussions with the FCC regarding the deployment of the Debtors' network, maintain business relationships with their vendors, suppliers and customers, pay their employees and otherwise finance their operations in the interim while the Debtors attempt to negotiate consensual use of cash collateral with the Prepetition LP Lenders or seek Court authorization to use such cash collateral.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

90.     To ensure that each individual Debtor will not, at the expense of creditors, fund the operations of another Debtor or another affiliated entity, the Debtors request that the Court authorize the Debtors to treat all Intercompany Claims arising after the Petition Date in the ordinary course of business as administrative expenses of the relevant Debtor.  I am advised that if the Court authorizes the Debtors to treat Intercompany Claims as administrative expenses, then

each entity utilizing funds flowing through the Cash Management Systems should continue to bear ultimate repayment responsibility for such ordinary course claims.

91.     In addition, the Debtors request that the Court authorize the Debtors to preserve and exercise intercompany setoff rights.  The Cash Management Systems allow the Debtors to track all obligations owing between related entities.  I am advised that this ensures that all setoffs of Intercompany Claims will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.  Therefore, the Debtors request that the Debtors and their non-Debtor affiliates be expressly authorized to set off prepetition and postpetition obligations arising on account of Intercompany Transactions between a Debtor and another Debtor or between a Debtor and a non-Debtor affiliate.

(ii)     *Wages Motion.  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, But Not Directing, Debtors To (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Benefits and (III) Continue Employee Benefits Programs and (B) Authorizing and Directing Financial Institutions To Honor All Related Checks and Electronic Payment Requests*

92.     The Debtors seek entry of an order (a) authorizing the Debtors to (i) pay certain prepetition wages, salaries and other compensation, such as the rank and file bonus program, taxes, withholdings and reimbursable expenses, (ii) pay and honor obligations relating to employee benefits programs and (iii) continue their employee benefits programs on a postpetition basis and (b) authorizing and directing financial institutions to receive, process, honor and pay all checks issued and electronic requests made relating to the foregoing.

93.     The Debtors employ approximately one hundred sixty-eight (168) employees, thirty-one (31) of which are employed by the Debtors on an hourly-basis (the "Hourly Employees") and the remainder of which are employed by the Debtors on a full-time, salaried basis (the "Full-Time Employees" and, together with the Hourly Employees, the

"Employees").  In addition to their Employees, the Debtors supplement their workforce with consultants and independent contractors depending on the Debtors' business needs.  The Debtors regularly utilize the services of approximately seven (7) consultants or independent contractors (the "Contractors").

94.     Just as the Debtors depend on the Employees and Contractors for their day-to-day operations, the Employees and Contractors depend on the Debtors.  Indeed, the vast majority of the Employees and Contractors rely exclusively on payments received from the Debtors for their compensation, benefits and expense reimbursements (as applicable) to continue to pay their daily living expenses.  Among other things, the Debtors pay and incur a number of obligations related to their Employees and Contractors (as applicable), such as (a) wages and salaries, overtime compensation, bonuses and incentive programs and other compensation, (b) federal, state and provincial withholding and income taxes and other withheld amounts (including, without limitation, wage garnishments, pre-tax and after-tax deductions, the Employees' share of Canadian Employment Insurance premiums and Canada Pension Plan contributions, taxes and 401(k) contributions), (c) reimbursement of business expenses, (d) medical, vision and dental benefits, (e) short- and long-term disability coverage, (f) accidental death and dismemberment, and life insurance, (g) supplemental insurance benefits, (h) workers' compensation benefits, (i) vacation time, paid time off and leaves of absence, (j) retirement benefits and other employee savings plans, pensions and severance benefits, (k) employee assistance and tuition assistance programs, various reimbursable expenses and flexible spending and (l) other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described herein, the "Employee

Obligations").[17]  In an effort to minimize the personal hardship to the Employees and to maintain

morale and stability in the Debtors' business operations during this critical juncture, the Debtors

request authority to continue to pay and honor, in their discretion (except where payments are

required by applicable law), amounts arising under or in connection with the Debtors' Employee

Obligations.

        95.       By the Wages Motion, the Debtors request authority to pay Employee

Obligations during the interim period.  I have been advised that the majority of all prepetition

amounts owed on account of the Employee Obligations have been satisfied.  Certain amounts

may remain outstanding due to a number of factors, including (a) discrepancies that exist

between amounts paid prepetition and the amounts that should have been paid, (b) the possibility

that some prepetition checks or other payments may not have cleared before the Petition Date,

(c) the fact that certain accrued obligations may not yet have become due and payable as of the

Petition Date and (d) the possibility that certain prepetition amounts related to the Employees

may have accrued but remain outstanding because they are pending approval or have not yet

been submitted.

        96.       Additionally, the Debtors request that the Court authorize and direct all

applicable banks and financial institutions to receive, process, honor and pay any and all checks

drawn or electronic fund transfers from their accounts whether such checks were presented prior

to or after the Petition Date, to the extent such checks or electronic fund transfers are expressly

identified by the Debtors as relating directly to the authorized payments of the Employee

Obligations.  The Debtors also respectfully request authority to issue new postpetition checks, or

---

[17]    The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the
Debtors' official policies or other practices, programs or agreements, whether written or unwritten,
evidencing an arrangement among the Debtors and their Employees (each, an "Official Policy").  In the
event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such
Official Policy shall govern.

effect new electronic fund transfers, on account of such claims to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Chapter 11 Cases.  I have been advised that the Debtors have sufficient availability of funds to pay the amounts described herein in the ordinary course of business and sufficient controls to prevent checks or wire transfer requests from being honored inadvertently.

97.     Moreover, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Debtors' Employees, solely to the extent the Employees may assert claims under the workers' compensation program, to proceed with such claims.

98.     I believe that providing for satisfaction of the Employee Obligations is essential to the preservation of the Debtors' businesses.  It is important to minimize the personal hardship the Debtors' Employees would suffer if prepetition Employee Obligations were not paid when due or as expected.  Additionally, it is important to maintain morale and enhance the Debtors' ability to retain Employees during this restructuring process.  Failing to pay our Employee Obligations could have a material adverse impact on the day-to-day operations of the Debtors' businesses.  I have also been informed that the Debtors must continue certain programs, notably the workers' compensation program, in order to maintain the legal right to operate their businesses.  I believe that obtaining the authority to pay all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

(iii)    _Insurance Motion_.  Debtors' Motion for Entry of an Order (A) Authorizing, But
Not Directing, Debtors To Continue To Administer Insurance Coverage and
(B) Authorizing Financial Institutions To Honor All Related Checks and
Electronic Payment Requests

99.    The Debtors seek entry of an order (a) authorizing, but not directing, the

Debtors, in their sole discretion, to (i) maintain and continue to honor certain insurance programs

and policies (including the renewal of those policies and agreements due to expire during these

Chapter 11 Cases) and (ii) pay certain obligations in respect thereof including, without

limitation, the payment of all premiums, premium financing payments, claims, deductibles,

administrative expenses and all other charges and expenses incurred and becoming due and

payable in the period between the Petition Date and the date of the final hearing, on an

uninterrupted basis, consistent with the Debtors' practices in effect prior to the commencement

of the Debtors' Chapter 11 Cases, whether relating to the period prior to or after the

commencement of these Chapter 11 Cases, and (b) authorizing and directing financial

institutions to receive, process, honor and pay all checks issued and electronic requests made

relating to the foregoing.

100.    In connection with the operation of the Debtors' businesses and the

management of their properties, the Debtors maintain a comprehensive insurance program that

provides coverage related to, among other things, property damage, general liability, umbrella

liability, automobile liability, fiduciary liability, employment practices liability, cargo, directors

and officers' liability, space insurance and international liability (collectively, the "Insurance

Programs").

101.    The Debtors maintain certain general insurance programs to help manage

the risks associated with their business operations in the United States, Canada and

internationally when employees travel to countries outside of the United States and Canada.  In

addition, the Debtors maintain in-orbit insurance on their SkyTerra-1 satellite (the "Satellite Insurance Program") that covers losses and liabilities associated with the satellite of up to $250,000,000.  It is important that the Debtors maintain the Satellite Insurance Program in order to protect the value of this critical asset because the satellite is not covered by any of the other Insurance Programs.

102.    The Debtors are required to pay premiums under the Insurance Programs based upon a fixed rate established and billed by each individual insurance provider.  Last year, the Debtors' annual premiums together with the associated taxes and fees for the Insurance Programs (the "Insurance Obligations") totaled approximately $4,200,000.

103.    Pursuant to their Insurance Programs, the Debtors are required to pay various deductibles and related fees.  For the current policy periods and the immediately preceding policy periods, no obligations have accrued with respect to deductibles under the Insurance Programs, except the employment practices liability policy.  With respect to the Debtors' insurance policy that covers employment practices liability, the Debtors estimate that up to $75,000 of deductibles may accrue over the next several months for the current policy period.

104.    The Debtors employ several insurance agents including Willis North America, Inc., Willis Inspace and Aon Financial Services Group (together, the "Insurance Agents") to assist with the procurement and negotiation of their Insurance Programs.  All broker fees incurred by the Debtors in connection with the Insurance Programs are absorbed into the Insurance Obligations.  No separate broker fees are paid to the Insurance Agents.

105.    Coverage under the current Satellite Insurance Program policy commenced on November 15, 2011.  Pursuant to this policy, the Debtors became liable for total

premiums of approximately $3.45 million for coverage until November 15, 2012. The Debtors

negotiated a payment schedule whereby they pay this premium in quarterly installments, and the

Debtors intend to make the final installment payment of approximately $862,000 on or before

August 12, 2012. As of the Petition Date, the Debtors believe that no other prepetition amounts

are accrued and outstanding with respect to the Insurance Programs. Certain Insurance

Programs, including the Satellite Insurance Program, will expire on August 1, 2012 and

November 15, 2012, if not renewed – which the Debtors intend to do in the ordinary course of

business.

   106. I believe that the Insurance Programs are essential to the preservation of

the value of the Debtors' businesses, property and assets, and I understand that they are required

under the Debtors' prepetition credit agreements. Failure to pay premiums for the Policies when

due may harm the Debtors' estates in several ways, including the loss of insurance coverage and

subsequent need to obtain replacement insurance on an emergency basis, likely at a higher price.

   107. Accordingly, I believe that obtaining the authority to maintain the

Insurance Programs in accordance with the Debtors' prepetition business practices is in the best

interests of the Debtors and their estates and will protect the Debtors' assets and enable the

Debtors to continue to operate their businesses in chapter 11 without disruption.

  *(iv)* <u>*Taxes Motion*</u>*. Debtors' Motion for Entry of Interim and Final Orders*
    *(A) Authorizing, But Not Directing, Debtors To Pay Taxes and Fees and*
    *(B) Authorizing and Directing Financial Institutions To Honor All Related Checks*
    *and Electronic Payment Requests*

   108. The Debtors seek entry of an order (a) authorizing, but not directing, the

Debtors to pay certain business, franchise, personal property, sales and use, goods and services,

harmonized sales, excise and other taxes, as well as certain annual reporting fees, FCC Fees and

Canadian Regulatory Fees (each as defined in the motion) and (b) authorizing and directing

financial institutions to receive, process, honor and pay all checks issued and electronic requests made relating to the foregoing.

109.    In the ordinary course of their businesses, the Debtors (a) collect and/or incur taxes, including certain business, corporation, franchise, partnership, personal property, provincial, capital, non-resident withholding, sales and use, goods and services, harmonized sales, excise and other taxes[18] (collectively, the "Taxes"), (b) charge certain annual reporting fees, FCC fees and Canadian Regulatory Fees, and other similar charges and assessments (collectively, the "Fees") on behalf of various taxing, licensing and other regulatory authorities (collectively, the "Authorities") and (c) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' businesses in the ordinary course.  The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations.[19]  The Debtors estimate that, as of the Petition Date, they have collected and/or incurred approximately $1 million in aggregate Taxes and Fees, which were not currently due and owing as of the Petition Date.[20]

110.    The Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways.  The Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' businesses.  The

---

[18]    The Debtors do not seek authority to collect and pay state and federal employee withholding taxes under this Motion but rather request such authority as part of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but Not Directing, Debtors (I) To Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) To Pay and Honor Employee Medical and Other Benefits and (III) To Continue Employee Benefits Programs and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests, filed concurrently herewith.

[19]    Some of the Taxes and Fees are "trust fund" taxes that the Debtors have collected and hold in trust for the benefit of the Authorities.  I understand that, therefore, such funds do not constitute "property of the estate" as discussed below and could not otherwise be used by the Debtors' estates.

[20]    Notwithstanding the foregoing, the Debtors reserve their rights to contest the amount of any Taxes and Fees on any grounds they deem appropriate.

Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will be administratively burdensome to the Debtors' estates.  Furthermore, certain directors and officers could be subject to personal liability, which would likely distract those key personnel from their duties related to the Debtors' restructuring efforts.  Moreover, with respect to the Fees, the Debtors' failure to pay such Fees to the Authorities and other relevant third parties may cause the Debtors to incur late fees, penalties and other charges in addition to the Fees.  Accordingly, I believe that obtaining the authority to pay the Authorities in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and allow the Debtors to continue to operate their businesses in chapter 11 without disruption.

> (v)     *Tax Attributes Motion. Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests and Claims in the Debtors*

111.    The Debtors seek entry of an order authorizing the Debtors to establish procedures to protect the potential value of LightSquared's consolidated net operating tax loss carryforwards ("NOLs") and certain other tax attributes, including, potentially, a net unrealized built-in loss in its assets (together with NOLs, the "Tax Attributes").

112.    The Debtors estimate that, as of the date hereof, LightSquared and certain of its subsidiaries have incurred NOLs in excess of $1.5 billion (a portion of which is subject to limitation).  The Debtors also may have significant net unrealized built-in tax losses.

113.    I understand that the Tax Attributes may be valuable assets of the estates because title 26 of the United States Code (the "Tax Code") generally permits corporations to carry forward their losses to offset future income.  The Debtors expect to continue to opearte their businesses and, accordingly, a significant amount of gain and other income may be

recognized following the consummation of these Chapter 11 Cases. Absent any intervening limitations, the Tax Attributes could substantially reduce the Debtors' future U.S. federal income tax liability in respect of such gain and income. Any reduction in the Debtors' tax liability would enhance the Debtors' economic position for the benefit of all parties in interest.

114. I further understand that the ability of the Debtors to use the Tax Attributes to offset future income is subject to certain statutory limitations and that section 382 of the Tax Code limits a corporation's use of its NOLs and other tax attributes to offset future income after that corporation has undergone an "ownership change." I understand that a section 382 ownership change of LightSquared could significantly reduce or eliminate the Debtors' ability to use the Tax Attributes, thereby resulting in a potential loss of value to the Debtors' estates. To the best of my knowledge, and subject to certain interpretational issues, I do not believe that a section 382 ownership change that would limit the Debtors' ability to use the Tax Attributes has occurred with respect to LightSquared (other than an ownership change that occurred in March 2010, which caused approximately $400 million of NOLs to become subject to limitation).

115. In furtherance of the automatic stay provisions of section 362 of the Bankruptcy Code and pursuant to section 105 of the Bankruptcy Code, the Debtors seek authority to prevent certain changes in the ownership of LightSquared stock to protect against the occurrence of an ownership change during the pendency of these Chapter 11 Cases and, thus, preserve the potential value of the Tax Attributes during such time.

116. I also understand that as part of the resolution of these Chapter 11 Cases, the actions taken pursuant to the Debtors' chapter 11 plan may cause, for tax purposes, an "ownership change" within the meaning of section 382 of the Tax Code but that the Debtors may

be entitled to the special relief afforded by section 382(l)(5) of the Tax Code for ownership

changes pursuant to a confirmed chapter 11 plan or applicable court order.  Although there can

be no assurance that section 382(l)(5) of the Tax Code will ultimately be available to the

Debtors, the Debtors are proposing certain procedures and restrictions that seek to preserve the

Debtors' ability to propose a chapter 11 plan and related transactions that maximize the value of

the Tax Attributes following a chapter 11 plan in a manner that does not unduly affect the trading

of debt securities.

117.    The requested relief allows the free trading of debt securities before a plan

is proposed and, with respect to any debt securities acquired on or after the date of the Tax

Attributes Motion, mandates sell-downs as needed after a plan is proposed, to avoid breaching

the section 382(l)(5) limits upon consummation of a plan.  It is intended both to preserve the

value and liquidity of debt securities in the hands of their holders and to allow the Debtors the

flexibility to structure a chapter 11 plan that preserves the maximum potential value of the Tax

Attributes.

118.    Accordingly, I believe that establishing the proposed procedures will

protect the value of the Tax Attributes while not unduly restricting trading in the Debtors' stock

and debt securities, so approval of the procedures is in the best interests of the Debtors and their

estates.

*(vi)*      *Foreign Representative Motion.  Debtors' Motion for Entry of an Order Authorizing LightSquared LP To Act as Foreign Representative Pursuant to 11 U.S.C. § 1505*

119.    The Debtors seek entry of an order authorizing LightSquared LP ("LSLP")

to act as the foreign representative on behalf of the Debtors' estates in any judicial or other

proceedings in a foreign country, including the Canadian Proceedings (as defined below).

120.    As further described herein, in addition to their operations in the United

States, the Debtors also have certain assets and limited operations in Canada.  Thus, in

connection with the commencement of these Chapter 11 Cases, the Debtors have filed chapter 11

petitions for three Debtors incorporated in Canada:  SkyTerra Holdings (Canada) Inc., SkyTerra

(Canada) Inc. and LightSquared Corp. (collectively, the "Canadian Debtors"), each of which is a

subsidiary of LSLP.  LSLP, as the proposed Foreign Representative (defined below), will shortly

seek ancillary relief in Canada on behalf of all of the Debtors, pursuant to the Companies'

Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended (the "CCAA") in the

Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") in Toronto, Ontario,

Canada.  I understand that the purpose of the ancillary proceedings (the "Canadian Proceedings")

is to request that the Canadian Court recognize these Chapter 11 Cases as a "foreign main

proceeding" under the applicable provisions of the CCAA  in order to, among other things,

protect the Debtors' assets and operations in Canada.

121.    I understand from counsel that, to commence the Canadian Proceedings,

the Debtors need authority for a Debtor entity to act as the "foreign representative" on behalf of

the Debtors' estates (the "Foreign Representative") and, therefore, the Debtors seek to appoint

LSLP as such Foreign Representative.

122.    I further understand from counsel that, in order for LSLP to be recognized

as the Foreign Representative of the Debtors in the Canadian Proceedings, and thereby apply to

have these Chapter 11 Cases recognized by the Canadian Court, the Court must enter an order

authorizing LSLP to act as the Foreign Representative in the Canadian Proceedings.  I

understand that if such order is granted, LSLP will be able to file that order with the Canadian

Court as the instrument authorizing LSLP to act as the Foreign Representative pursuant to

section 46 of the CCAA.

123.    Accordingly, I believe that appointing LSLP to act as the Foreign

Representative will allow coordination of the Canadian Proceedings and these Chapter 11 Cases

and is in the best interests of the Debtors and their estates.

   (vii)   _Cash Collateral Motion_.  _Motion of Debtors for Interim and Final Orders (A)
           Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection
           to Prepetition Secured Parties, (C) Modifying Automatic Stay and (D) Scheduling
           Interim and Final Hearings_

124.    The Debtors intend to use certain unencumbered cash during the interim

period to fund their operations and these Chapter 11 Cases.  The Debtors will track all

intercompany transactions pursuant to the Cash Management Motion if authorized.  The Debtors

will only seek use of cash collateral on an interim basis if an interim order approving the Cash

Management Motion is not entered permitting use of such unencumbered cash.  In such event,

Mr. Montagner will provide live testimony in connection therewith.  The Debtors will request a

date for a final hearing on the Cash Collateral Motion at the first day hearing.

## **Information Required by Local Bankruptcy Rule 1007-2**

125.    Local Bankruptcy Rule 1007-2 requires certain information related to the

Debtors, which is attached hereto as Exhibit B.

126.    Pursuant to Local Bankruptcy Rule 1007-2 (a)(3), Schedule 1 hereto lists

the names and addresses of the members of, and attorneys for (if known), any _ad hoc_ committees

of creditors formed prepetition.

127.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 hereto lists

the following information with respect to each of the holders of the Debtors' 20 largest

unsecured claims on a consolidated basis, excluding claims of insiders:  the creditor's name,

address (including the number, street, apartment or suite number and zip code, if not included in

the post office address) and telephone number; the name(s) of persons(s) familiar with the

Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent,

unliquidated, disputed or partially secured.

128.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Schedule 3</u> hereto

provides the following information with respect to each of the holders of the five (5) largest

material secured claims against the Debtors on a consolidated basis:  the creditor's name, address

(including the number, street, apartment or suite number and zip code, if not included in the post

office address) and telephone number; the amount of the claim; a brief description of the

collateral securing the claim; an estimate of the value of the collateral and whether the claim or

lien is disputed.

129.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> hereto

provides a summary of the Debtors' assets and liabilities on a consolidated basis.

130.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Schedule 5</u> provides a

summary of the Debtors' stock, debentures or other securities in the Debtors that are publicly

held.

131.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 6</u> hereto

provides a list of the Debtors' property in the possession or custody of any custodian, public

officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity,

giving the name, address and telephone number of such entity and the location of the court in

which any proceeding relating thereto is pending.

132.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 7</u> hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

133.    Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 8</u> hereto provides the location of the Debtors' substantial assets, the location of their books and records and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

134.    Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 9</u> hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

135.    Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 10</u> hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

136.    Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Schedule 11</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders and partners) and the estimated amount to be paid to officers, stockholders, directors and financial partners and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

137.    Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 12</u> hereto provides, for the 30-day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to

accrue but remain unpaid, other than professional fees, and any other information relevant to an

understanding of the foregoing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 14th day of May, 2012.

By:      /s/ Marc R. Montagner
Name:    **Marc R. Montagner**
Title:   **Chief Financial Officer and**
         **Interim Co-Chief Operating Officer**
         **LightSquared Inc.**
         **450 Park Avenue, Suite 2201,**
         **New York, NY 10022**

## <u>Exhibit A</u>

**The Debtors' Corporate Organization Chart**

LIGHTSQUARED ENTITIES



## Exhibit B

**Additional Information Required Pursuant to Local Rule 1007-2**

## Schedule 1 – Committee Formed Prepetition

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the names and addresses of the members and attorneys for any *ad hoc* committee organized prior to the Petition Date.

The Ad Hoc Secured Group of Prepetition LP Lenders was formed in or around April 2012 to negotiate the out-of-court restructuring described in the Montagner Declaration.

| Committee | Committee Members[1] | Counsel for Committee |
|---|---|---|
| **Ad Hoc Secured Group of Prepetition LP Lenders** | **Appaloosa Management L.P.** <br> 51 John F. Kennedy Parkway <br> Short Hills, NJ 07928 <br><br> **Capital Research and Management Company** <br> 11100 Santa Monica Boulevard, 15th Floor <br> Los Angeles, CA  90025 <br><br> **Fortress Investment Group** <br> 1345 Avenue of the Americas, 46th Floor <br> New York, NY  10105 <br><br> **Knighthead Capital Management LLC** <br> 623 Fifth Avenue, 29th Floor <br> New York, NY 10022 <br><br> **Redwood Capital Management** <br> 910 Sylvan Avenue <br> Englewood Cliffs, NJ 07632 | **Thomas E. Lauria, Esq.** <br> **White & Case LLP** <br> 1155 Avenue of the Americas <br> New York, NY 10036 |

---

[1]  The members, or funds managed by the members, of the *ad hoc* committee listed are to the best of the Debtors' knowledge and based on information provided by counsel to the ad hoc committee.

**Schedule 2 - Holders of Debtors' 20 Largest Unsecured Claims on a Consolidated Basis**

### CONSOLIDATED LIST OF CREDITORS HOLDING
### 20 LARGEST UNSECURED CLAIMS

On May 14, 2012, LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.  Pursuant to Rule 1007-2(a)(4) of the Local Bankruptcy Rules for the Southern District of New York, the following provides information with respect to the holders of the twenty (20) largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding claim amounts (including principal and interest) as of May 12, 2012.

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent, Unliquidated, Disputed, Or Subject To Setoff |
|---|---|---|---|---|---|
| 1 | Boeing Satellite Systems Inc. | 2260 E. Imperial Hwy. El Segundo, CA 90245 Attn:  Mr. W. James McNerney Jr., President and CEO Tel:  310-364-4000 Fax:  310-364-6677 | $7,483,005.75 | Trade | Contingent, Disputed |
| 2 | Alcatel-Lucent | 3 av. Octave Gréard 75007 Paris, France Attn:  Mr. Ben Verwaayen, Chief Executive Officer Tel:  +33 (0)1 40 76 10 10 Email:  execoffice@alcatel-lucent.com | $7,343,549.00 | Trade | Contingent, Disputed |
| 3 | AnyDATA Corporation | 5 Oldfield Irvine, CA 92618 Attn:  Dr. Soon B. Shin, President & CEO Tel:  949-900-6040 Fax:  949-600-9909 | $690,000.00 | Trade | Contingent, Disputed |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent, Unliquidated, Disputed, Or Subject To Setoff |
|---|---|---|---|---|---|
| 4 | Bandrich Inc. | No. 188, 7f, Baociao Rd<br>Sin-Dian City<br>Taipei, Taiwan 23146<br>Attn: Dr. Wen-Yi Kuo, CEO<br>Tel: +866 - 2 - 2799 - 8851<br>Fax: +866 - 2 - 2799 - 8812 | $390,600.00 | Trade | Contingent, Disputed |
| 5 | Burson-Marsteller | 230 Park Avenue South<br>New York, NY 10003-1528<br>Attn: Mr. Tony Telloni, Market Leader<br>Tel: 212-614-4000<br>Fax: 212-598-5320 | $264,761.75 | Trade | |
| 6 | Level 3 Communications LLC | 1025 Eldorado Boulevard<br>Broomfield, CO 80021<br>Attn: Mr. James Q. Crowe, CEO<br>Tel: 720-888-1000<br>Fax: 720-888-5085 | $169,436.84 | Trade | Disputed |
| 7 | Oracle Inc. | 500 Oracle Parkway<br>Redwood Shores, CA 94065<br>Attn: Mr. Lawrence J Ellison, CEO<br>Tel: 650-506-7000<br>Fax: 650-506-7200 | $163,979.61 | Trade | |
| 8 | SBA Structures Inc. | 2900 Broken Sound Parkway, NW<br>Boca Raton, FL 33487<br>Attn: Mr. Jeffrey A Stoops, President & CEO<br>Tel: 561-995-7670<br>Fax: 561-989-5374 | $100,800.00 | Trade | Disputed |
| 9 | SBA Towers III LLC | 2900 Broken Sound Parkway, NW<br>Boca Raton, FL 33487<br>Attn: Mr. Jeffrey A Stoops, President & CEO<br>Tel: 561-995-7670<br>Fax: 561-989-5374 | $77,350.00 | Trade | Disputed |
| 10 | USAC | 2000 L Street NW, Suite 200<br>Washington, DC 20036<br>Attn: Mr. Scott Barash, Acting CEO<br>Tel: 202-776-0200<br>Fax: 202-776-0080 | $56,686.66 | Professional | |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent, Unliquidated, Disputed, Or Subject To Setoff |
|---|---|---|---|---|---|
| 11 | Liebert Services Inc. | 1050 Dearborn Drive<br>Columbus, OH 43085<br>Attn: Mr. Bob Bauer, Group Vice President<br>Tel: 614-888-0246<br>Fax: 614-841-6882 | $39,115.20 | Trade | |
| 12 | Westar Satellite Services LP | 777 Westar Lane<br>Cedar Hill, TX 75104<br>Attn: Mr. Rob Tannor, CEO<br>Tel: 972-291-6000<br>Fax: 972-291-6030 | $38,451.76 | Landlord | |
| 13 | Shockey Scofield Solutions, LLC | 333 N Fairfax St Ste 100<br>Alexandria, VA 22314<br>Attn: Mr. John Scofield<br>Tel: 202-507-1721<br>Email: scofield@s-3group.com | $35,000.00 | Professional | |
| 14 | Intelsat | 3400 International Drive Northwest<br>Washington, DC 20008<br>Attn: Mr. David McGlade, CEO<br>Tel: 202-944-6800<br>Fax: 202-944-7898 | $32,609.89 | Landlord | |
| 15 | SED Systems | 18 Innovation Place<br>Saskatoon, SK S7K 3P7 Canada<br>Attn: Mr. Brent McConnell, President<br>Tel: 306-931-3425<br>Fax: 306-933-1486 | $31,640.70 | Landlord | |
| 16 | Cyberbridge | 1515 E Wdfield Road # 860<br>Schaumburg, IL 60173<br>Attn: Brij Shah, President<br>Tel: 847-598-1101<br>Fax: 847-413-1635 | $28,969.70 | Trade | |
| 17 | Mehlman Capitol Strategies | 1750 K Street, NW. Suite 350<br>Washington, DC 20006<br>Attn: Ms. Amy Mehlman<br>Tel: 202-457-1970<br>Fax: 202-457-1971 | $20,000.00 | Professional | |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent, Unliquidated, Disputed, Or Subject To Setoff |
|---|---|---|---|---|---|
| 18 | Verizon | 140 West Street<br>New York, NY 10007<br>Attn:  Mr. Lawrence T. Babbio, Jr., President<br>Tel:  212-395-1000<br>Fax:  212-571-1897 | $15,716.59 | Trade | |
| 19 | AT&T | 208 South Akard Street<br>Dallas, TX 75202<br>Attn:  Mr. Randall Stephenson, CEO<br>Tel:  210-821-4105<br>Fax:  314-331-9896 | $15,181.34 | Trade | |
| 20 | Polaris Logistics | 22650 Executive Dr. , Suite 137<br>Sterling, VA 20166<br>Attn:  Mr. Alan Clem, Senior Account Executive<br>Tel:  703-435-2858<br>Fax:  410-712-4657 | $11,770.00 | Landlord | |

**Schedule 3 - Holders of Debtors' 5 Largest Material Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five (5) largest material secured claims on a consolidated basis. The five largest secured creditors are the lenders under the Prepetition Inc. Credit Agreement and the Prepetition LP Credit Agreement. UBS AG, Stamford Branch is the administrative agent under both the Prepetition Inc. Credit Agreement and the Prepetition LP Credit Agreement.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding material claim amounts (including principal and interest) of $2,022,904,600.

| | Creditor | Contact: Mailing Address & Telephone Number & Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | U.S. Bank National Association, as administrative agent under Prepetition Inc. Credit Agreement | U.S. Bank Global Corporate Trust Services 300 Delaware Avenue, 9th Floor Wilmington, DE 19801 Attention: James A. Hanley V.P. - Relationship Management Office: (302) 576-3714 Fax: (302) 576-3717 Email: james.hanley1@usbank.com | $322,333,494 | Amounts outstanding under the Prepetition Inc. Credit Facility are secured by a first-priority security interest in (a) certain lease agreements (b) the capital stock of each Prepetition Inc. Subsidiary Guarantor and (c) all proceeds and products of each of the foregoing. |
| 2. | UBS AG, Stamford Branch, as administrative agent under Prepetition LP Credit Agreement<br><br>Wilmington Trust FSB, as collateral agent under the LP Collateral Trust Agreement | 677 Washington Boulevard Stamford, CT 06901 Attention: Houssem Daly (203) 719-4176 Email: dl-ubsagency@ubs.com<br><br>1100 North Market Street Wilmington, Delaware 19890 Attention: James A. Hanley Office: (302) 636-6453 Fax: (302) 636-4145 | $1,700,571,106 | Amounts outstanding under the Prepetition LP Credit Facility are secured by a first-priority security interest in (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP, the Prepetition LP Parent Guarantors (except LightSquared Inc.) and the Prepetition LP Subsidiary Guarantors and (c) the rights of LightSquared Inc. under the Inmarsat Cooperation Agreement (collectively, the "Prepetition LP Collateral"). |

## Schedule 4 - Summary of Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of February 29, 2012.  The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):[2]  Approximately $4.48 billion.

Total Liabilities:  Approximately $2.29 billion.

---

[2]    The chapter 11 petitions also reflect the value of each Debtor's assets on a book value basis.

**Schedule 5 - Schedule of Publicly Held Securities**

None.

**Schedule 6 - Debtors' Property Not in the Debtors' Possession**

The Debtors' SkyTerra-2 satellite is in the possession of Boeing Satellite Systems ("<u>Boeing</u>") at 1950 E. Imperial Hwy, El Segundo, CA  90245.  The satellite ground segment assets related to the SkyTerra-2 satellite are also in Boeing's possession in various locations in California, Ottawa (Ontario), Saskatoon (Saskatchewan) and Texas.

## Schedule 7 - Debtors' Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

### Owned Real Property

None.

### Leased Property

| Address | City | State | Country | Zip Code |
|---|---|---|---|---|
| 10802 Parkridge Blvd. | Reston | VA | USA | 20191 |
| Orbit Logistics 4227 Carolina Avenue | Richmond | VA | USA | 23222 |
| Alaska Public Telecommunications Inc. 3877 University Drive | Anchorage | AK | USA | 99503 |
| 21091 FM 507 | Harlingen | TX | USA | 78550 |
| 7246 Humboldt Hill Road | Humboldt | CA | USA | 95503 |
| 450 Park Avenue | New York | NY | USA | 10022 |
| Dallas Gateway 777 Westar Lane | Cedar Hill | TX | USA | 75104 |
| Napa Gateway 961 Anselmo Court | Napa | CA | USA | 94558 |
| 8181 Jetstar Drive | Irving | TX | USA | 75063 |
| Polaris Logistics 6675 Amberton Drive Suite 1 | Elkridge | MD | USA | 21075 |
| 1601 Telesat Court | Ottawa | Ontario | Canada | K1B 5R3 |
| Calgary Teleport 1780 Centre Avenue NE | Calgary | Alberta | Canada | T2E 2P5 |
| 446 Logy Bay Road | St. John's | Newfoundland | Canada | A1C552 |
| Saskatoon Gateway 107 Perimeter Road | Saskatoon | Saskatchewan | Canada | S7N 2R3 |
| 167 Avenue, Kilometer 18.9 Pajaros Ward | Bayamon | Puerto Rico | Puerto Rico | 00957 |
| 4600 Air Way | San Diego | CA | USA | 92102 |

## Schedule 8 - Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

The books and records for all Debtors in the United States (except for LightSquared Inc. and LightSquared LP), the United Kingdom and Bermuda are primarily located at 10802 Parkridge Blvd, Reston, VA  20191.

The books and records for LightSquared Inc. and LightSquared LP are primarily located at 450 Park Avenue, New York, NY 10022.

The books and records for the Canadian Debtors are primarily located at 1601 Telesat Court, Ottawa, ON K1B 1B9.

The Debtors' primary assets consist of the (i) SkyTerra-1 SBN (comprised by the satellite and the ground infrastructure), which is currently located in its assigned orbital slot over the North American landmass (orbital slot 101.3°), (ii) SkyTerra-2 satellite which is currently in storage at Boeing Satellite Systems (BSS) in El Segundo, California, (iii)  lease for the 1.6 GHz spectrum with third parties that hold the FCC licenses for such spectrum and (iv) licenses to use certain other L-band spectrum in the United States and Canada.  In addition to the aforementioned assets, the Debtors own various equipment which is currently located at the various leased locations detailed in the above schedule regarding the Debtors' property.

**Schedule 9 - Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the debtor or a seizure of its property may be imminent.

None.

**Schedule 10 - Senior Management**

Pursuant to Local Rule 1008-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Approximate Start Date | Responsibilities and Prior Experience |
|------|-------|------------------------|----------------------------------------|
| *LightSquared Inc., LightSquared Investors Holdings Inc, TMI Communications Delaware, Limited Partnership* | | | |
| Marc Montagner | Chief Financial Officer and Co-Chief Operating Officer | January 1, 2012 | Marc Montagner is responsible for the company's daily financial operations and oversees investor and bondholder relations.<br><br>Prior to joining LightSquared, Montagner was managing partner of Dupont Circle Partners, a mergers and acquisitions advisory firm specializing in the media, technology and telecommunications industries. Before joining Dupont Circle Partners, he served as executive vice president, sales, marketing and strategy for SkyTerra, LightSquared's predecessor company, where he worked on the regulatory, technical and business issues associated with deploying a new terrestrial wireless service to be operated in conjunction with its MSS license.<br><br>Previously, he was managing director and co-head of the Global Telecom, Media and Technology Merger and Acquisition Group of Banc of America Securities where he advised a number of companies during acquisitions. Montagner was also senior vice president, corporate development and mergers and acquisitions for Sprint Nextel Corporation, where he was responsible for all M&A activities for the company, including the $70 billion merger between Sprint and Nextel. Prior to Sprint Nextel, Montagner was a managing director in the Telecom and Media Group at Morgan Stanley. Montagner started his career in the telecom industry at France Telecom. |
| Curtis Lu | Vice President and Secretary | October 1, 2010 | Curtis Lu is responsible for advising on all legal matters affecting the company.<br><br>Previously, Curtis was the Senior Vice President, Deputy General Counsel, and Chief Ethics and Compliance Officer for Time Warner. Prior to his joining Time Warner, Curtis served as Senior Vice President and Principal Deputy General Counsel for Fannie Mae from 2006 to 2009. He also served as Fannie Mae's Acting General Counsel from mid-2008 until his departure to join Time Warner. From 2002 to 2006, Curtis was Senior Vice President and Deputy General Counsel for America Online, Inc. (AOL). He also served as AOL's Acting General Counsel from mid-2005 until his departure to join Fannie Mae.<br><br>Curtis began his legal career at the law firm of Latham & Watkins, where he was a litigation partner. He served as a law clerk to Judge Thomas Clark of the United States Court of Appeals for the Eleventh Circuit and a Teaching Fellow at |

| Name | Title | Approximate Start Date | Responsibilities and Prior Experience |
|---|---|---|---|
| | | | Stanford Law School. He received a B.A. from the University of Virginia and a J.D. from Harvard Law School. He currently serves as the Chairman of the Board of Directors of the Asian Pacific American Legal Resource Center. |
| Elizabeth Creary | Vice President and Assistant Secretary | January 23, 2009 | Beth Creary is responsible for advising on all legal day to day matters affecting the Company and its subsidiaries.<br><br>Previously, Beth was Senior Counsel to the predecessor entities of the Company and continues as the Vice-President and Corporate Counsel to its Canadian affiliate SkyTerra (Canada) Inc. and its wholly-owned Canadian subsidiary, LightSquared Corp. Prior to joining the Company, Beth was an associate in the law firm of Nelligan, O'Brien, Payne LLP in Ottawa, Canada focused in their client areas of banking and corporate-commercial matters.<br><br>She received a B.A. (joint English and Legal Studies) from the University of Waterloo and a J.D. from the University of Ottawa Law School. She currently serves on the Board of Directors of the Children's International Summer Villages, Ottawa and is a mentor in the University of Ottawa Law School Women's Legal Mentorship program. |
| Kurt Haufler | Vice President and Treasurer | February 24, 2011 | Kurt Haufler is responsible for managing the treasury operations including communication with administrative agents, compliance with corporate covenants, overseeing corporate risk management, and assisting in financial transactions.<br><br>Previously, Kurt was Director of Finance and Assistant Treasurer to the predecessor entities of the Company and performed similar roles. In that position he was a key member of the finance team that merged Mobile Satellite Ventures into the public company SkyTerra as well as SkyTerra into LightSquared. Prior to joining the Company, Kurt served in multiple roles within finance organizations including at American Mobile Satellite and Raytheon, with positions including Director of Finance and Sr. Manager of Financial Planning and Analysis.<br><br>He was a dual major and received a B.S. in Finance as well as Marketing from the Carroll School of Management at Boston College. |
| *One Dot Four Corp., One Dot Six Corp. and One Dot Six TVCC Corp.* | | | |
| Marc Montagner | Chief Financial Officer | January 1, 2012 | Same as above |
| Curtis Lu | Vice President and Secretary | October 1, 2010 | Same as above |
| Elizabeth Creary | Vice President and Assistant Secretary | January 23, 2009 | Same as above |
| Kurt Haufler | Vice President and Treasurer | February 24, 2011 | Same as above |

| Name | Title | Approximate Start Date | Responsibilities and Prior Experience |
|------|-------|------------------------|----------------------------------------|
| Jeff Carlisle | Vice President, Regulatory Affairs & Public Policy | October 1, 2010 | Jeff Carlisle is responsible for all domestic and international regulatory and policy matters including those at the FCC, Congress, the Executive Branch, the ITU, and in foreign markets.<br><br>Before joining LightSquared, Jeff served as Vice President of Regulatory Affairs for SkyTerra Communications.  Prior to SkyTerra, he consulted for the Presidential Transition Team, and he spent a number of years as a leading telecommunications attorney.  As Vice President, International Public Policy and Government Relations of Lenovo, the global computer manufacturer, Jeff headed its Washington office from 2005 until 2008.  In 2001, Jeff joined the FCC as Deputy Chief and then Chief of the Wireline Competition Bureau.  In 2000, Jeff opened his own legal practice, negotiating vendor, services, and leasing agreements for telecommunications companies and representing a company that developed some of the first residential installations of VoIP services.  From 1995 to 2000, he practiced law at O'Melveny & Myers, starting as a transactional attorney and then specializing in broadcast and telecommunications law.<br><br>Jeff received a B.A. in History, magna cum laude and with honors, from UCLA; a J.D. from Boalt Hall at the University of California, Berkeley; and an M.A. in Law and Diplomacy from The Fletcher School. |
| *LightSquared GP Inc., LightSquared LP, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC* | | | |
| Marc Montagner | Chief Financial Officer | | Same as above |
| Douglas Smith | Chief Network Officer & Interim Co-Chief Operating Officer | June 30, 2010 | Doug is responsible for LightSquared's network design, deployment, and operations.<br><br>Before joining LightSquared, Doug was senior vice president, engineering and operations for Clearwire, a nationwide mobile broadband WiMAX network.  Prior to that he was senior vice president and chief technical operations officer for Sprint Nextel.  From 2005 to 2007 he served in the roles of vice president of strategy and standards; vice president of network engineering; and vice president of the iDEN Quality Assurance Initiative for Sprint Nextel.  From 1999 to 2005, as vice president of national technical support and then operations for Nextel, Doug was responsible for operating Nextel's nationwide network serving more than 20 million subscribers.  Prior to 1999, Doug held various engineering and management positions with GTE and Nextel.<br><br>Doug holds a Masters of Science in Management of Technology from the Wharton School, University of Pennsylvania; and a Bachelor of Science in Electrical Engineering from Merrimack College. |
| Curtis Lu | Vice President and Secretary | October 1, 2010 | Same as above |

| Name | Title | Approximate Start Date | Responsibilities and Prior Experience |
|---|---|---|---|
| Elizabeth Creary | Vice President and Assistant Secretary | January 23, 2009 | Same as above |
| Kurt Haufler | Vice President and Treasurer | February 24, 2011 | Same as above |
| Jeff Snyder | SVP, Satellite Engineering & Operations | October 12, 2009 | Jeff Snyder is responsible for managing the procurement, construction, launch, testing, and operation of the next-generation satellite network and spacecraft being built for the LightSquared network by Boeing.<br><br>Before joining LightSquared, Jeff served in the same capacity for SkyTerra Communications and was also responsible for the operation of the company's two existing satellites. Prior to that he was Senior Vice President for Space and Ground Systems at XM Satellite Radio, where he was the driving force behind the technical development, program implementation, contract management, and regulatory affairs of the XM Satellite Radio system.  Prior to joining XM, Jeff was the Vice President of Space Systems for Worldspace Corporation, managing the development and delivery of the Afristar and Asiastar satellites. Before Worldspace he held various positions in business development and sales, program management, engineering, and manufacturing at Lockheed Martin and GE Aerospace.<br><br>Jeff has also played various roles at GE/RCA Americom, as a program manager and in systems engineering working on fixed service satellites and the development of one of the first direct broadcast satellite systems.<br><br>Jeff is a graduate of the University of Maryland, where he received a B.S. in Aerospace Engineering. |
| *Lightsquared Bermuda Ltd.* | | | |
| Deborah Hubbard-Taylor | Secretary | May 9, 2008 | Representatives of Registered Agent on LightSquared Bermuda Ltd.'s behalf |
| Dawna Ferguson | Assistant Secretary | May 9, 2008 | Representatives of Registered Agent on LightSquared Bermuda Ltd.'s behalf |
| *SkyTerra Holdings (Canada) Inc.* | | | |
| Elizabeth Creary | Secretary | March 24, 2005 | Same as above |
| *SkyTerra (Canada) Inc.* | | | |
| Elizabeth Creary | Vice President, Corporate Counsel | March 24, 2005 | Same as above |

**Schedule 11 - Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (not including Officers, Directors and Stockholders)** | Approximately $1,720,000 for four (4) weeks. |
| **Payments to Officers, Directors and Stockholders** | <u>Officers</u>:  Approximately $300,000 for four (4) weeks. <br><br> <u>Directors</u>:  $0. <br><br> <u>Stockholders</u>:  $0. |
| **Payments to Financial and Business Consultants** | <u>Approximately</u> $40,000 for four (4) weeks. |

**Schedule 12 - Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Estimated Financial Data for 30-Day Period Postpetition

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| Cash Receipts | $3,100,000 |
| Cash Disbursements (excluding professional fees) | $10,200,000 |
| Net Cash Loss | $7,100,000 |
| Unpaid Obligations (excluding professional fees) | $2,700,000 |
| Unpaid Receivables (excluding professional fees) | $3,100,000 |