Marc E. Kasowitz
David M. Friedman
Jed I. Bergman
Christine A. Montenegro
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:

LIGHTSQUARED INC., *et al.*,

                         Debtors.

-------------------------------------------------------------------:

HARBINGER CAPITAL PARTNERS LLC, HGW US
HOLDING COMPANY LP, BLUE LINE DZM CORP.,
AND HARBINGER CAPITAL PARTNERS SP, INC.,

                         Plaintiffs,

                - against-

CHARLES W. ERGEN, ECHOSTAR CORPORATION,
DISH NETWORK CORPORATION, L-BAND
ACQUISITION LLC, SP SPECIAL
OPPORTUNITIES LLC, SP SPECIAL OPPORTUNITIES
HOLDINGS LLC, SOUND POINT CAPITAL
MANAGEMENT LP, AND STEPHEN KETCHUM,

                         Defendants.

-------------------------------------------------------------------X

:  Chapter 11
:
:  Case No. 12-12080 (SCC)
:
:  Jointly Administered
:
:  Adv. Proc. No. _____
:
:
:
:  **COMPLAINT**
:

Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line

DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger"), as and for their

complaint against Defendants Charles W. Ergen ("Ergen"), EchoStar Corporation ("EchoStar"),

Dish Network Corporation ("Dish"), L-Band Acquisition LLC ("LBAC," and with Ergen,

EchoStar, and Dish, the "Dish/EchoStar Defendants"), SP Special Opportunities LLC ("Sound

Point"), SP Special Opportunities Holdings LLC ("SP Holdings"), Sound Point Capital

Management LP ("SP Capital"), and Stephen Ketchum ("Ketchum"), hereby allege upon

knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Harbinger is an investment fund engaged in the development and operation of an

innovative satellite-and-terrestrial wireless-services network, through its ownership and control

of debtor LightSquared Inc. and its subsidiaries ("LightSquared").  It brings this action against

Ergen and entities he controls, including Dish, EchoStar, LBAC, Sound Point, and SP Holding,

to seek redress for Defendants' fraud and other tortious conduct aimed at misappropriating

Harbinger's control over and investment in LightSquared, and destroying Harbinger's

contractual rights and business opportunities relating to that investment.  These Defendants,

aided and abetted by Defendants SP Capital and Ketchum, are engaged in a fraudulent scheme

to:  (1) deprive Harbinger of its investment in and control of LightSquared and its valuable

wireless spectrum; (2) prevent LightSquared -- a potential competitor to Dish and EchoStar --

from emerging from bankruptcy under Harbinger's control; and (3) misappropriate the valuable

spectrum assets at a discount to their true value.  Defendants' fraudulent scheme has materially

harmed Harbinger's contractual rights and opportunities as LightSquared's controlling

shareholder, and will improperly provide Ergen and his entities with an unfair advantage as a

bidder for the spectrum assets, absent relief from this Court.  Defendants' misconduct has

already harmed Harbinger, and, if their scheme succeeds, will cause Harbinger billions of dollars in additional damages.

2.      The tortious scheme alleged herein had several components.  *First*, Defendants fraudulently infiltrated the senior-most tranche of LightSquared's capital structure, secretly amassing, based on knowing misrepresentations of fact, a position as the single largest holder of LightSquared's secured debt obligations (the "Loan Debt").  In particular, the Dish/EchoStar Defendants purchased the Loan Debt through Defendant Sound Point -- a new investment vehicle created for this purpose, whose connection to Ergen they deliberately concealed, despite Harbinger's diligent inquiries.  To make those purchases and become a debt-holder, Sound Point was required to represent -- and did represent, repeatedly -- that it was an "Eligible Assignee" under LightSquared's operative Credit Agreement (the "Credit Agreement").

3.      As Defendants were well aware, Sound Point's representations that it was an "Eligible Assignee" were false.  Under the relevant contractual definitions -- intended to protect LightSquared and Harbinger from interference by competitors in the company's capital structure -- the term "Eligible Assignee" excludes LightSquared's competitors, including Dish and EchoStar, as well as any entity that they directly or indirectly control.  Because Dish and EchoStar unquestionably control each and every activity of Sound Point, it was not an "Eligible Assignee," and was prohibited from purchasing the Loan Debt.  Its written representations to the contrary were false and misleading.

4.      Ergen through his Dish/EchoStar entities and Sound Point intended that Harbinger should, and in fact it did, rely on these continuous misrepresentations and the fraud to which they gave rise.  If Harbinger had known that Ergen was purchasing Loan Debt based on false and misleading statements, it would have directed UBS AG ("UBS") -- the Administrative Agent

under the Credit Agreement, which was responsible for monitoring compliance with the
"Eligible Assigneee" provisions -- to stop authorizing those purchases, and taken other steps to
prevent Ergen's continued wrongful intrusion into LightSquared's capital structure.

5.      The provisions of the Credit Agreement prohibiting the acquisition of Loan Debt
by competitors were specifically negotiated by Harbinger personnel, and were of enormous
importance to Harbinger in protecting its ownership and control over LightSquared.  The process
by which Loan Debt could be acquired, including the unequivocal representations required of
prospective purchasers that they were "Eligible Assignees," was at all relevant times relied upon
by Harbinger to protect its controlling investment by ensuring that the LightSquared capital
structure was free of competitors' influences.

6.      The Dish/EchoStar Defendants concealed their connection to Sound Point for
over a year, creating an opening for Sound Point to purchase over a billion dollars in Loan Debt,
often at significant discounts to par, and thus to become LightSquared's largest creditor.  During
this time, both Sound Point and the Dish/EchoStar Defendants repeatedly rebuffed inquiries from
Harbinger and others as to who was behind Sound Point's corporate façade.  By the time Sound
Point's true identity was revealed, it had already contracted to purchase enough Loan Debt to
severely impair Harbinger's rights in LightSquared's bankruptcy proceeding, and thereby to
block Harbinger's efforts to negotiate a consensual plan of reorganization.

7.      *Second*, as another component of their fraudulent scheme, the Dish/EchoStar
Defendants and Sound Point disrupted Harbinger's efforts to negotiate a plan of reorganization
with LightSquared's lenders.  They did so by causing Sound Point to enter into binding
commitments to purchase hundreds of millions of dollars of Loan Debt from LightSquared's
existing lenders, but then refusing -- without justification or excuse, and contrary to settled

4

industry practice -- to settle those trades.  With those trades suspended in limbo for weeks and then months, Harbinger was unable to ascertain the true identity of the holders of the largest block of Loan Debt.  This substantially impeded Harbinger's efforts to negotiate with a key constituency -- LightSquared's lenders -- during the critical "exclusivity period," in which the holders of Loan Debt and other creditors were not entitled to propose a plan of reorganization.  Only after the exclusivity clock had almost run out did Defendants close the trades.

8.      *Third*, Ergen used these same "hung trades" as a mechanism to interfere with Harbinger's efforts to raise exit financing for LightSquared.  The existing LightSquared lenders with whom Ergen contracted, and whose trades he refused to close -- investment funds that were fully familiar with LightSquared and had extensive experience with the company and its long-term prospects -- were the very same investment funds that would have served as lenders in LightSquared's exit financing facility.  Ergen fraudulently misrepresented to these lenders that he was permitted to own the Loan Debt and would promptly close the trades.  But as long as Ergen refused to settle the pending trades, these lenders could not be certain that they had sold their old debt and could not take on new exposure to LightSquared.  Ergen deliberately kept these trades open in order to prevent Harbinger from raising the capital it needed for Harbinger to cash out all of LightSquared's creditors and preserve its controlling equity interest -- a scheme that successfully and tortiously interfered with Harbinger's prospective economic advantage.  As a result, although Harbinger has access to the capital markets for a LightSquared-related capital raise, that access is no longer at the level available before Ergen began his misdeeds.

9.      In a parallel manipulation, Sound Point also used "hung trades" of equity interests in LightSquared to interfere tortiously with Harbinger's ability to have Jefferies LLC ("Jefferies") -- an investment bank that Defendants knew would play a key role in arranging

Harbinger's exit financing, and that the Bankruptcy Court ultimately approved to do so -- raise the capital necessary for Harbinger to form a plan of reorganization that would pay off all of LightSquared's creditors and leave its shareholders' equity interests intact.  To frustrate Harbinger's efforts, Sound Point induced Jefferies to enter into two "back-to-back" transactions with other investment funds, with Jefferies as the middleman and Sound Point as the ultimate buyer, for the purchase of bundled interests in (a) Loan Debt and (b) LightSquared LP's preferred shares (the "LP Preferred").  Sound Point knew that the investment funds from which it arranged to make these bundled purchases were involved in advanced negotiations with Harbinger over a consensual plan, and that entering into these trades would disrupt those negotiations.  Moreover, Sound Point intentionally misrepresented to Jefferies that it was permitted to acquire both types of securities, despite knowing full well that it was prohibited from acquiring the Loan Debt under the Credit Agreement, and the LP Preferred under the Stockholders' Agreement (as defined below).  Sound Point then refused to close the second leg of the "back-to-back" transaction -- over $160 million in trades -- leaving Jefferies exposed to millions of dollars in unclosed trades.  That deliberate tortious interference with Harbinger's relationship with Jefferies created a significant additional road block to Harbinger's obtaining exit financing from Jefferies on the original terms and time frame that both Harbinger and Jefferies had contemplated.

10.    *Fourth*, the Dish/EchoStar Defendants resorted to another newly created investment vehicle, Defendant LBAC, to make a low-ball, bad-faith bid (the "Ergen Bid") for LightSquared's most valuable assets -- its wireless spectrum licenses -- priced substantially below their true value and at almost exactly the amount of the outstanding Loan Debt obligations.  In other words, these Defendants made a bid that did little more than pay

themselves back on the debt that they had fraudulently acquired through the manipulative

schemes described above. Defendants then improperly leaked the confidential, heavily

discounted bid to the press to further disrupt Harbinger's capital raise, sowing confusion and

doubt among potential investors as to whether the spectrum assets had sufficient value to serve

as adequate collateral for raising exit financing or other investment capital.

11.     If the Ergen Bid prevails, the Dish/EchoStar Defendants would unfairly profit

from their fraud. Having acquired over a billion dollars in Loan Debt below par through Sound

Point, the sale contemplated by the Ergen Bid would result in a distribution for that same Loan

Debt at par plus accrued and unpaid interest. Stated differently, because the Dish/EchoStar

Defendants can recoup their Loan Debt investments at a substantial profit, their position allows

them effectively to bid at a discount to all other bidders -- an unfair advantage over other

potential bidders that was obtained by fraudulent means.

12.     *Fifth*, to aid their attempt to force the untimely sale of the spectrum assets, the

Dish/EchoStar Defendants have worked through Sound Point to neutralize the main group of

LightSquared's secured prepetition lenders (the "Ad Hoc Secured Group") and upend

negotiations with Harbinger over a plan that would preserve Harbinger's equity interest. As the

single largest holder of LightSquared's Loan Debt -- which it acquired through fraudulent means

-- Sound Point joined, and now controls, the Ad Hoc Secured Group. Sound Point leveraged that

control to scuttle all negotiations between LightSquared and its creditors, and to cause the Ad

Hoc Secured Group to file an Ergen-friendly plan of reorganization for LightSquared LP, leaving

all other LightSquared stakeholders, including Harbinger, empty-handed.

13.     Through this concerted plan of misconduct, Defendants have stymied Harbinger's

efforts to propose and implement a full cash pay plan and otherwise protect the unique value of

its controlling investment in LightSquared.  Defendants' fraudulent and tortious scheme already

has caused Harbinger to suffer significant damages.  If that scheme is fully realized, it would

result in additional billions of dollars in damages to Harbinger.  Accordingly, Harbinger brings

this action seeking the equitable disallowance of Sound Point's Loan Debt, and compensatory

and punitive damages with respect to its plenary claims for fraud, tortious interference with

contract and prospective economic advantage, unfair competition, and civil conspiracy, in

amounts to be determined at trial.

## PARTIES

14.     Plaintiff Harbinger Capital Partners LLC is a Delaware limited liability company

with its principal place of business in New York.

15.     Plaintiff HGW US Holding Company LP is a Delaware limited partnership with

its principal place of business in New York.

16.     Plaintiff Blue Line DZM Corp. is a Delaware corporation with its principal place

of business in New York.

17.     Plaintiff Harbinger Capital Partners SP, Inc. is a Delaware corporation with its

principal place of business in New York.  Together, Harbinger Capital Partners LLC, HGW US

Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc., are the

majority shareholders of LightSquared and control LightSquared, and hold a general unsecured

claim against LightSquared LP and claims against LightSquared Inc.

18.     Defendant Ergen, a natural person, is a citizen of the state of Colorado.  Ergen is

the founder, Executive Chairman of the board of directors, and majority owner of Defendants

EchoStar and Dish.  As of November 30, 2012, Ergen controlled approximately 88% of Dish's

voting shares, and approximately 80% of EchoStar's voting shares.  Ergen controls EchoStar and

Dish, including through his majority equity stakes in both companies and voting power.  Both

Dish and EchoStar's public filings reveal that Ergen can act for them with no independent

oversight.  Through his control of Dish, Ergen also controls Defendant LBAC.  Ergen is also the

sole member and managing member of SP Holdings, which in turn is the sole member and

managing member of Sound Point.  Through his various business ventures, Ergen is in the

business of operating satellite communications companies which provide services across the

country, including in New York.

19.    Defendant EchoStar is a publicly traded company organized under the laws of

Nevada, with its principal place of business in Colorado.  EchoStar is a satellite communications

company that currently operates, leases, or manages a number of satellites, including the

satellites that provide services to EchoStar's sister company, Dish.  EchoStar is controlled by

Ergen, who founded EchoStar in or about 1980, serves on its board of directors as Executive

Chairman, and controls a majority of EchoStar's voting shares.

20.    Defendant Dish is a publicly traded company organized under the laws of

Nevada, with its principal place of business in Colorado.  Dish is a competitor of LightSquared.

It is a provider of broadband and satellite television services and aims to expand its broadband

offerings, including by building out an integrated terrestrial network, similar to that which

LightSquared intends to offer.  Dish is controlled by Ergen, who founded Dish in or about 1995,

serves on its board of directors as Executive Chairman, and controls a majority of Dish's voting

shares.

21.    Defendant LBAC is a limited liability company organized under the laws of

Delaware with its principal place of business in Colorado.  LBAC is a wholly-owned subsidiary

of Dish, controlled by Ergen.  LBAC was formed for the sole purpose of bidding on

LightSquared's spectrum assets, both through the Ergen Bid and as the stalking horse bidder in a

plan proposed and supported by Sound Point and others in the Chapter 11 Cases (as defined below).

22.     Defendant Sound Point is an investment vehicle organized under the laws of Delaware, with its headquarters in New York. Sound Point's sole member and manager is SP Holdings, which in turn has Ergen as its sole member and managing member. Because Ergen both controls Dish and EchoStar and acts unilaterally on their behalf, Dish and EchoStar, directly or indirectly, control Sound Point as well. Sound Point has been acquiring debt in LightSquared since at least May 2012, and currently holds over $1 billion of LightSquared's Loan Debt.

23.     Defendant SP Holdings is a holding company organized under the laws of Delaware, with its headquarters in New York. Ergen is the sole member and managing member of SP Holdings, and SP Holdings in turn is the sole member and manager of Sound Point.

24.     Defendant SP Capital is an investment management firm organized under the laws of Delaware, with its headquarters in New York. SP Capital's founder and managing member is Ketchum. SP Capital serves as trading manager for Sound Point and facilitates and advises Sound Point on its investments and investment strategies, as described further herein, in exchange for lucrative fees.

25.     Defendant Ketchum, a natural person, is a citizen of the state of New York. Ketchum is the founder and managing member of SP Capital, and serves as the trading manager of Sound Point. Ketchum is a former banker to Defendant Dish and has a longstanding relationship with Ergen.

## JURISDICTION AND VENUE

26.     This Court has original subject-matter jurisdiction over this action under 28 U.S.C. §§ 1334(b) and 157 because (i) as to Count I of the Complaint, it is a "core proceeding" under section 157 (b)(2)(B), and, (ii) as to the remaining counts in the Complaint, it is "related

to," the jointly administered bankruptcy cases of LightSquared and its affiliated debtors and debtors-in-possession currently pending in the United States Bankruptcy Court for the Southern District of New York, *In re LightSquared Inc., et al.*, No. 12-12080 ("Chapter 11 Cases"), insofar as, among other things, (a) the allegations herein involve Defendants' wrongful acquisition of LightSquared's debt securities and other manipulative conduct taken to gain an advantage in the Chapter 11 Cases and (b) a judgment in favor of Harbinger in this action may affect the debtors' rights and obligations. This action contains both core and non-core matters. Pursuant to Rule 7008(a) of the Federal Rules of Bankruptcy Procedure, Plaintiffs consent to entry of final orders or judgment by the bankruptcy court as to its non-core claims, claims II through VII, except to the extent that the claims are triable by jury.

27.    This Court has personal jurisdiction over Defendants under Rule 7004 of the Federal Rules of Bankruptcy Procedure, Rule 4 of the Federal Rules of Civil Procedure, and New York CPLR §§ 301 and 302, because Defendants reside in New York and/or they committed one or more tortious acts within or without the state, causing injury to Harbinger within the state, and because service has been effectuated in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

28.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because this action is related to the Chapter 11 Cases.

## BACKGROUND

### A.    Harbinger's Investment in LightSquared.

29.    Harbinger indirectly owns in excess of 82% of LightSquared, a provider of communications and broadband services. LightSquared has been delivering satellite-based mobile voice and data services since 1995 to hundreds of thousands of devices used in the public safety, security, transportation, fleet management, and asset tracking sectors. To provide these

services, LightSquared licenses extremely valuable spectrum from the Federal Communications Commission ("FCC").

30.     Harbinger has invested significant capital and labor over the course of many years to develop, through LightSquared, a unique, next-generation ancillary terrestrial network ("ATC Network") that would employ both satellite service and ground-based antennas to provide nationwide state-of-the-art "4G-LTE" (Fourth Generation -- Long Term Evolution) broadband mobile services.

31.     To gain FCC authorization to use its spectrum in this innovative manner, Harbinger diligently worked with the FCC and other public and federal agencies, while investing substantial equity and providing hundreds of millions of dollars in debt financing to build out the ATC Network.  In 2010, in connection with Harbinger's acquisition of its controlling equity interest in LightSquared, Harbinger entered into an agreement with the FCC to have LightSquared build out the ATC Network and provide coverage to at least 260 million people by the end of 2015 (the "2010 FCC Agreement").

**B.     LightSquared Files For Bankruptcy.**

32.     In February 2012, the FCC issued a formal notice (the "FCC Notice") -- contrary to the terms of the 2010 FCC Agreement with Harbinger -- proposing to suspend indefinitely LightSquared's authorization to build out its ATC Network.

33.     Following the FCC Notice, on May 14, 2012, LightSquared and several of its affiliates (collectively, the "Debtors") commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  LightSquared continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

34.    As alleged more fully below, Defendants have sought to exploit LightSquared's bankruptcy to strip away its valuable spectrum assets and defeat Harbinger's efforts to negotiate a plan of reorganization that maintains Harbinger's equity interest and control rights.  The Dish/EchoStar Defendants are eager to acquire the spectrum and related assets for themselves to launch their own wireless business, which would offer broadband, text and voice services to compete in the integrated broadband network market.

35.    Unwilling or unable to expend the time and resources necessary to license and build their own network, these Defendants hatched a scheme to manipulate LightSquared's Chapter 11 Cases to acquire LightSquared's valuable spectrum licenses at a distressed price. Critical to Defendants' scheme was keeping Harbinger from being in a position to repay LightSquared's creditors and retain its investment and control rights.  By weakening Harbinger, Defendants understood that they would be in a better position to force a sale of LightSquared's spectrum, pursuant to which they could "credit-bid" their wrongfully acquired Loan Debt to acquire the spectrum on the cheap.  In one stroke, this ploy would allow Defendants first to disable a major competitor, Harbinger, and then to expand their relatively new broadband offerings by taking advantage of the significant time and resources Harbinger already invested to build out these revolutionary networks.

C.    **Defendants Fraudulently Acquire A
Massive Position In LightSquared's Loan Debt.**

36.    To carry out this scheme, the Dish/EchoStar Defendants, acting through Sound Point, secretly accumulated a controlling position (over $1 billion) in LightSquared's Loan Debt, which gave them tremendous power over Harbinger in connection with the Chapter 11 Cases. The Dish/EchoStar Defendants have since exploited that power to (1) prevent Harbinger from obtaining financing during the exclusivity period that would have paid creditors in full and

13

preserved Harbinger's control rights and equity interest; and (2) attempt to force LightSquared to

sell its valuable spectrum assets to them for use in the Dish/EchoStar Defendants' business.

### 1. Defendants Use Sound Point As A Front To Evade the Restrictions Under The Credit Agreement That Prohibit Transfers to Competitors.

37.      At the heart of Defendants' fraudulent scheme was concealing their purchases --

and, critically, attempting to evade explicit contractual restrictions on such purchases -- by using

Sound Point as a front.  It is undisputed that Sound Point is an Ergen vehicle:  he is the sole

member and managing member of SP Holdings, which in turn is the sole member and managing

member of Sound Point.  Both entities were created with the knowledge and substantial

assistance of Ergen's longtime banker, Ketchum, and Ketchum's investment fund, SP Capital.

Indeed, SP Capital's CFO signed the certificates of formation, as an "authorized person," for

both SP Holdings and Sound Point.  By establishing a new investment vehicle that could not be

linked to Ergen, Dish, or EchoStar based on public information, the Dish/EchoStar Defendants

managed to carry out their plan in secret.

38.      The Dish/EchoStar Defendants unlawfully used Sound Point to circumvent the

Credit Agreement's explicit restrictions on permissible purchasers.  As they were well aware,

that agreement, dated as of October 1, 2010, between and among LightSquared LP, a direct

subsidiary of LightSquared, UBS as "Agent" and the entities that from time to time would serve

as "Lenders" (as defined therein), included a series of provisions that protect LightSquared and

Harbinger from opportunistic competitors, such as Defendants, who might pose as lenders to

develop a position in LightSquared's capital structure.

39.      In particular, Section 10.04 of the Credit Agreement only permits an existing

lender to "assign to one or more *Eligible Assignees* all or a portion of its rights and obligations

under this Agreement."  Credit Agreement § 10.04(b) (emphasis added).  The definition of

14

"Eligible Assignee" makes clear that it "shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person *or any Disqualified Company*." *Id.* § 1.01 (emphasis added). A "Disqualified Company" is defined as "any operating company which is a direct competitor of the Borrower," as well as "any known subsidiary thereof."

40.     Each of Dish and EchoStar is a "Disqualified Company" under the Credit Agreement, and thus neither can be an "Eligible Assignee." Ergen himself, as a natural person, also cannot be an "Eligible Assignee." Thus, the plain terms of the Credit Agreement barred them from acquiring the Loan Debt.

41.     Recognizing that restriction, but nevertheless seeking to acquire the Loan Debt to further their fraudulent scheme, the Dish/EchoStar Defendants worked with SP Capital and Ketchum to carry out their purchases through Sound Point. Although Defendants have publicly taken the position that Sound Point is an "Eligible Assignee," it is not -- and as the secretive nature of their purchases confirms, Defendants knew it all along.

42.     Sound Point was disqualified under the plain terms of the Credit Agreement. Under the relevant definitions, a "Disqualified Company" also includes "any known subsidiary thereof." *See id.* The term "Subsidiary" is broadly defined to include any entity "Controlled" by the Disqualified Company (*see id.* § 1.01), with "Control" broadly defined as the "possession, *directly or indirectly*, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract *or otherwise*." *Id.* (emphasis added). Reading these definitions together, the Credit Agreement plainly restricts purchases of Loan Debt by Dish, EchoStar, and any entity known by them which they directly or indirectly control -- whether through ownership of voting securities, by contract or otherwise.

15

43.     Sound Point plainly is subject to this restriction.  Because Dish and EchoStar act through Ergen as Executive Chairman, who in turn has the power as SP Holdings' sole member and managing member to direct Sound Point, both Dish and EchoStar possess the power -- "directly or indirectly" -- to control Sound Point.  The identity of interests and overlapping control is complete:  Ergen controls Dish and EchoStar and makes decisions on their behalf; Ergen then acts unilaterally and with complete authority for Dish and EchoStar to carry out those decisions; and Ergen controls Sound Point.

44.     Through its counsel -- which, tellingly, serves as Dish-controlled LBAC's counsel as well -- Sound Point has taken the position that it is not indirectly controlled by Dish because, while both entities admittedly are controlled by Ergen, the entities allegedly have nothing to do with each other.  It posits the following fictional diagram:



45.     In fact, however, Dish directly (or at least indirectly) controls Sound Point because (a) Ergen controls and makes decisions for Dish; (b) Dish acts through Ergen as its Executive Chairman; and (c) Ergen controls Sound Point.  In graphic terms:



46.     Thus, for purposes of the Credit Agreement, Dish and EchoStar "directly or indirectly" "control" Sound Point, making Sound Point a "Subsidiary" of EchoStar and Dish -- and therefore a "Disqualified Company."  Putting this in simple and practical terms, when Dish

makes a decision (as it has) to buy LightSquared's assets, that decision is made by and through Ergen, Dish's chairman. Ergen, as Dish's Executive Chairman, is authorized to carry out that decision on behalf of Dish, and he similarly has the power to direct -- and indeed *has* directed -- Sound Point to facilitate that purchase by filing a plan to effectuate that transaction. Dish's control of Sound Point thus is beyond peradventure.

47.     Although no more evidence is necessary to establish Dish's control of Sound Point, the surrounding facts and circumstances corroborate that conclusion. Thus, the same counsel represents Sound Point on the one hand, and LBAC on the other, in the Chapter 11 Cases. When Sound Point caused the Ad Hoc Group to propose a plan for LightSquared, as discussed more fully below, the proposed stalking horse bidder was none other than Dish, through its vehicle LBAC. Moreover, public information further suggests that Dish itself, at Ergen's command, may have funded all or part of Sound Point's acquisition of the Loan Debt. Such funding would, of course, be entirely consistent with the fact that Dish directly or indirectly controls Sound Point.

**2.     Defendants Make Blatantly False Statements, Upon Which Harbinger Relies, To Acquire The Loan Debt.**

48.     Defendants' acquisition of Loan Debt was not only a violation of the Credit Agreement between LightSquared and its Lenders; it was also a fraud against Harbinger. Because the Credit Agreement requires prospective investors of the Loan Debt to disclose their identity to UBS and affirm in writing that they are Eligible Assignees, Defendants could have completed these purchases only by providing false and misleading information.

49.     Under the Credit Agreement, UBS's prior written consent is required for any transfer of an interest in the Loan Debt. Credit Agreement § 10.04(b). To effectuate such a transfer, the parties must execute and deliver to UBS an "Assignment and Assumption" and

"Administrative Questionnaire" (collectively, the "Purchase Documentation").  *Id.* § 10.04(c).

The Purchase Documentation requires the prospective purchaser to make certain specific

representations concerning, among other things, its identity and its status as an "Eligible

Assignee."  *Id.* § 10.04(b).  Assignment is conditioned upon "acceptance and recording" by UBS

-- as agent -- of the Purchase Documentation, which then records in a register ("Register") the

names and addresses of the Lenders and their interest in the Loan Debt.  *Id.* § 10.04(b), 10.04(c).

UBS cannot approve the transfer of Loan Debt unless it is to an Eligible Assignee with properly

executed Purchase Documentation, and thus acts in a non-discretionary capacity as a gatekeeper

to LightSquared's capital structure on LightSquared and Harbinger's behalf.

50.    The Credit Agreement requires that any information furnished by any lender in

connection with the Agreement shall not contain any material misstatement of fact or omit to

state any material fact necessary to make the statements therein not misleading.  *Id.* § 3.14.  The

protections that the Credit Agreement afforded against competitors encroaching in

LightSquared's capital structure -- including the processes by which UBS would monitor

Eligible Assignees and require Purchase Documentation -- were critical terms to Harbinger,

which personally negotiated for their inclusion in the Credit Agreement in order to protect its

ownership interests and control rights.  It was imperative to Harbinger and LightSquared that

they know at all times the true identity of the investors holding LightSquared's Loan Debt, and

Harbinger vigilantly monitored the trades and debt-holders as recorded by UBS on the Register.

51.    To disguise Sound Point's relationship with Dish and EchoStar, the

Dish/EchoStar Defendants through Sound Point made blatant misrepresentations in the Purchase

Documentation submitted to UBS by falsely claiming that:  (i) Sound Point meets all

requirements of an Eligible Assignee and (ii) Sound Point will perform in accordance with the

18

terms of the Credit Agreement, including not purchasing the Loan Debt as a "Disqualified Company." In furtherance of the Dish/EchoStar Defendants' plan, each time the Sound Point Defendants acquired the Loan Debt, they knowingly repeated the same misrepresentations and material omissions in the Purchase Documentation.

52.     At the time of the fraud, Defendants were aware that it was UBS's job to monitor the Purchase Documentation, and that Harbinger and LightSquared relied upon the veracity of the Purchase Documentation to ensure that no competitor acquired Loan Debt. Defendants intended that Harbinger and LightSquared rely on their misrepresentations, which were a necessary part of their attempt to purchase the Loan Debt, and induced UBS to accept and record the assignments of Loan Debt. Any approved transfer by UBS meant that the transferee had properly represented that it was an "Eligible Assignee." If Harbinger had known that Sound Point was acquiring Loan Debt on false pretenses, and making affirmative misstatements of fact in its Purchase Documentation, Harbinger would have directed UBS -- successfully -- to stop accepting such documentation from Sound Point and taken any and all other available steps, including seeking relief from this Court, to curtail those improper purchases.

53.     Although published reports speculated that Dish was behind Sound Point's purchases, Harbinger was unable -- despite diligent efforts -- to determine the true facts. In addition to affirmatively misrepresenting its eligibility as a debt-holder under the Credit Agreement, Sound Point repeatedly rebuffed inquiries by Harbinger directly, as well as by both Harbinger's and LightSquared's financial advisors, as to who was behind Sound Point's corporate façade. The fact that Defendants intentionally hid and affirmatively misrepresented Ergen's position in LightSquared's capital structure and flat-out refused to identify his relationship with Sound Point for over a year, until confronted on May 21, 2013 by the

19

Bankruptcy Court, only confirms that Defendants were fully aware that Sound Point is a "Disqualified Company" under the Credit Agreement.

54.    SP Capital and Ketchum acted in furtherance of the scheme, and provided the Dish/EchoStar Defendants with substantial assistance, by arranging and facilitating the Loan Debt trades.  SP Capital and Ketchum were aware of and/or took part in devising the scheme to flout the restrictions in the Credit Agreement, motivated by an ongoing business relationship with the Dish/EchoStar Defendants and substantial fees.  The Dish/EchoStar Defendants could not have executed the scheme on their own and/or without SP Capital's brokerage license and its expertise in identifying counterparties.

55.    Had Harbinger known the truth about Sound Point's role, it would have stopped Defendants from acquiring a blocking position in the Loan Debt; it would have sought relief from the Bankruptcy Court; and it would have taken other steps to address the fraudulent and improper interference with its control rights over LightSquared.

**D.    Defendants Manipulate Hundreds of Millions Of Dollars In Trades, Neutralizing Potential Investors In A Harbinger-Sponsored Reorganization.**

56.    In addition to fraudulently entering LightSquared's capital structure, Defendants actively manipulated the bankruptcy process by improperly leaving hundreds of millions of dollars in Loan Debt trades in limbo for weeks or even months.  By May 20, 2013, Sound Point had contracted for, but refused to close, approximately $593,757,031.76 in Loan Debt trades (and closer to $610,019,568.01 counting trades held by brokers on that date) -- more than 33% of the *total* outstanding Loan Debt obligations.  Indeed, Sound Point kept open a number of trades that it had entered into as far back as December 12, 2012.

57.    Leaving trades open for this extended period of time is completely at odds with common market practice, and it has no legitimate economic rationale.  It did, however, serve

Ergen's illegitimate purpose:  impeding Harbinger's ability during the exclusivity period to negotiate a consensual plan of reorganization with LightSquared's largest stakeholders that would preserve Harbinger's equity and control rights.  Because the trades did not close, the Loan Debt did not appear on the Register as having transferred to Sound Point, making it impossible for LightSquared and Harbinger to determine the identity of the true holders of the Loan Debt, with whom LightSquared and Harbinger wished to negotiate a plan.  As a result, in the months leading up to the termination of LightSquared's exclusivity on July 15, 2013 -- a period during which debtors and creditors often partake in active negotiations  -- Harbinger and LightSquared were left in limbo without a critical mass of lenders with which to engage.

58.    Further, Defendants knew that the well-established financial institutions that already owned the Loan Debt, and were fully familiar with LightSquared's finances and the Chapter 11 Cases, were the very same investors that ultimately would provide LightSquared's exit financing.  Indeed, as Defendants knew, Harbinger already was engaged in extensive negotiations concerning a new debt structure with these very same lenders.  These creditors agreed to sell Defendants their Loan Debt in reliance on Defendants' fraudulent misrepresentations that Defendants were permitted to hold the debt and would seasonably close the trades.  In fact, Defendants had no intention of closing the trades during this critical period, because they intended to leave the lenders who had agreed to sell to Sound Point unsure whether they still had exposure to the Loan Debt.  This manipulative scheme substantially impeded Harbinger's attempts to locate potential sources of exit financing for LightSquared, causing those efforts to fail, because these creditors -- who likely would have invested in a LightSquared exit financing package absent Defendants' interference -- could not commit to increase their exposure to LightSquared because of the open trades.

21

59.     It was not until after Sound Point joined the Ad Hoc Secured Group on June 13, 2013, approximately one month before LightSquared's exclusivity terminated, that it finally closed most of its long-pending trades.  By that time, of course, the damage to Harbinger was already done:  its efforts to negotiate an exit-financing package and a plan had been materially impaired.

**E.     Defendants Tortiously Interfere With Harbinger's Ability
To Raise Exit Financing By Manipulating Additional Trades
Based on Blatant Misrepresentations.**

60.     A critical part of Harbinger and LightSquared's negotiations with the Ad Hoc Secured Group was to obtain, prior to the expiration of exclusivity on July 15, 2013, a commitment for exit financing in an amount sufficient to satisfy the Ad Hoc Secured Group's claims in full.  To that end, Harbinger negotiated and supported LightSquared's retention of Jefferies to secure a senior secured term loan for LightSquared, in an amount sufficient to form the cornerstone of a plan that would repay all of LightSquared's creditors in full and leave Harbinger's controlling equity interest intact (the "Exit Loan").  Harbinger also entered into an integrally related agreement to pay Jefferies certain fees associated with the Exit Loan financing, anticipated to be up to approximately $80 million.  Jefferies expressly confirmed that it was "highly confident" it could raise the full amount of the Exit Loan.  Although that commitment was subject to a number of conditions, as is customary in any commercial financing transaction, it is highly likely that those conditions would have been satisfied and the financing achieved.  On June 7, 2013, the Bankruptcy Court authorized Jefferies to act as the sole manager and placement agent or arranger for the exit financing.

61.     Defendants derailed the Exit Loan by entering into a series of trades, involving Jefferies and others, which they knew they could never lawfully execute.  Defendants knew -- based on Harbinger's relationship and ongoing discussions with Jefferies, Jefferies' expertise in

22

this field, and Defendants' own longstanding relationship with Jefferies -- that Jefferies would be

retained to arrange the Exit Loan.  Armed with that knowledge, the Dish/EchoStar Defendants

caused Sound Point, in or about March 2013, to enter into two "back-to-back" transactions, with

Jefferies as the middleman and two other investment funds as the indirect counterparties, for

bundled purchases of both the LP Preferred and Loan Debt.  Sound Point knew that the

investment funds from which it arranged to make these bundled purchases were involved in

advanced negotiations with Harbinger over a consensual plan, and that arranging these trades

would disrupt those negotiations.  Critically, in connection with these transactions, Defendants,

through Sound Point, falsely represented to Jefferies that Sound Point could lawfully purchase

both the Loan Debt and the LP Preferred.  Jefferies relied upon those representations, to its

detriment and Harbinger's, in entering into the trades.

62.     Those representations were false as well.  *First*, as discussed above, Sound Point

was not authorized to purchase the Loan Debt.  *Second*, Sound Point's purchase of the LP

Preferred violated a related agreement -- the Stockholders' Agreement ("Stockholders'

Agreement").  That agreement among LightSquared and its shareholders, including Harbinger,

provides Harbinger with expansive control and management rights over LightSquared that are

intended to protect the significant amounts of capital and resources that Harbinger has invested

in its controlling position in LightSquared.

63.     As one such protection, Section 2.1 of the Stockholders' Agreement prohibits the

transfer of LP Preferred units to EchoStar or its "respective Affiliates or funds managed by such

entities or their Affiliates."  *Id*.  As Ergen himself has now admitted, in a transferee affirmation

required by the Stockholders' Agreement, Sound Point is an "Affiliate" (as defined therein) of

Dish and EchoStar.  Accordingly, the Stockholders' Agreement prohibits the transfer of the

Preferred LP Units to Sound Point, and Sound Point's statements to the contrary were false and misleading.

64.     After entering into these trades, Defendants reneged and refused to close unless LightSquared and Harbinger would agree to waive the transfer restrictions under the Stockholders' Agreement.  Defendants knew full well that LightSquared and Harbinger could not agree to that unreasonable ultimatum -- which was never a term under the original deal -- because it would damage LightSquared's independence from its competitors and impair Harbinger's control rights.

65.     Defendants' sudden refusal to uphold their prior agreements and close on their trades interfered with LightSquared's ability to raise the critical exit financing within the exclusivity period and on the terms agreed upon by the parties, because Jefferies -- caught in the middle by Ergen's machinations -- was unable to take on additional exposure to LightSquared debt due to the over $160 million in LightSquared securities that remained on its books. Defendants' willful and fraudulent interference caused Jefferies' failure to secure the full and required amount of the exit financing.  As a result, Harbinger was directly harmed, and its economic opportunity to obtain the financing needed to repay all of LightSquared's creditors in cash, and to enable LightSquared to emerge from bankruptcy with Harbinger's equity interest and control rights preserved, was severely impaired.

**F.     Defendants' Low-Ball Bid And Plan Filing Seek
        To Further Disrupt Harbinger's Financing Efforts.**

**1.     The Ergen Bid.**

66.     In a further effort to derail Harbinger's efforts to refinance and reorganize LightSquared, the Dish/EchoStar Defendants made a bad faith, low-ball bid for LightSquared's valuable spectrum assets.  On May 15, 2013 -- before Sound Point had disclosed its connection

to the Dish/EchoStar Defendants, and when LightSquared was still within its exclusivity period -- the Dish/EchoStar Defendants made an unsolicited bid, through a newly formed Dish subsidiary, LBAC, to purchase LightSquared's most valuable assets, including its 46 MHz of "L-Band" spectrum, for $2 billion.  This bid plainly was initiated by the Dish/EchoStar Defendants; LBAC was not even formed as a corporate entity until May 28, 2013, nearly two weeks *after* the Ergen Bid was transmitted by LBAC's counsel (which is also Sound Point's counsel) to LightSquared's financial advisor.

67.     Although the Ergen Bid was labeled "CONFIDENTIAL," the Dish/EchoStar Defendants promptly leaked it to the press.  They did so not only to chill ongoing negotiations between LightSquared, Harbinger, and the Ad Hoc Secured Group by creating doubt as to the viability of a consensual plan, but also to disrupt Harbinger's ability to raise capital for LightSquared.  By bidding substantially less than what the market believed the "L-Band" spectrum was worth, Defendants sought to drive down the public perception of LightSquared's enterprise value, induce uncertainty as to the spectrum's utility as collateral, and undermine the credibility of Harbinger's ability to propose a plan of consensual reorganization that would pay off all of LightSquared's creditors and preserve Harbinger's equity interest and control rights.

68.     Accordingly, while the Dish/EchoStar Defendants were well aware that Harbinger's equity interest in LightSquared as an ongoing business was valued at many billions more than $2 billion, they nevertheless proceeded to create uncertainty and disrupt LightSquared's orderly reorganization by leaking the Ergen Bid to the press.  In a transparent attempt to shield the Dish/EchoStar Defendants from the legal consequences of the Ergen Bid, the term sheet setting forth the bid itself declares that it "represents settlement discussions and is subject to FRE 408."  A communication pursuant to Federal Rule of Evidence ("FRE") 408 is,

25

by definition, a settlement communication between adverse parties. Because only Sound Point was an adverse party at that time, with a massive holding of Loan Debt, the invocation of FRE 408 in the Ergen Bid further reveals the identity of interest between Dish and Sound Point.

69.     The Ergen Bid was thus part and parcel of the Dish/EchoStar Defendants' scheme to disrupt Harbinger's negotiations with the Ad Hoc Secured Group during the exclusivity period and force a distress sale of the spectrum assets at a fraction of their true value (estimated to be many billions of dollars in excess of the bid). By forcing a sale, the Dish/EchoStar Defendants could acquire the spectrum assets on the cheap to launch their own stand-alone wireless network. Indeed, Ergen's intended use of the spectrum assets is evidenced by the fact that Dish is the managing member of LBAC.

70.     Moreover, if their discounted bid is successful, the Dish/EchoStar Defendants and Sound Point also stand to profit unfairly from Sound Point's fraudulent purchase of over $1 billion in Loan Debt. That Loan Debt was purchased at a significant discount to par, but would be repaid at par, plus accrued interest -- a windfall in excess of $200 million. Aside from these improper gains, a forced sale would destroy Harbinger's investment and improperly enrich Defendants by transferring to them "L-Band Spectrum" assets -- assets vital to LightSquared's business -- at a fraction of their true value.

### 2.     Sound Point Causes The Filing Of An Ergen-Friendly Plan.

71.     In furtherance of their efforts to gain control of the spectrum assets, the Dish/EchoStar Defendants caused Sound Point to join the Ad Hoc Secured Group on June 13, 2013, prior to the expiration of the exclusivity period. As the largest debt-holding member of the Ad Hoc Secured Group (holding more than twice as much Loan Debt as all other members combined), Sound Point was able to gain control of the Ad Hoc Secured Group, run out the clock on the exclusivity period, and scuttle negotiations among the Ad Hoc Secured Group,

LightSquared, and Harbinger, thereby preventing Harbinger from proposing and implementing a plan that would have kept its controlling equity interests intact.

72.    Having upended all negotiations, the Dish/EchoStar Defendants worked through Sound Point to propose a plan that would displace Harbinger and put them in control of the spectrum assets.  On July 23, 2013, only eight days after the exclusivity period expired, Sound Point -- now in control of the Ad Hoc Secured Group -- caused the Ad Hoc Secured Group to file a *Joint Chapter 11 Plan For LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed By The Ad Hoc Secured Group Of LightSquared LP Lenders* (the "Sound Point Plan").

73.    Defendants also caused the other members of the Ad Hoc Secured Group to enter into a plan support agreement supporting the Sound Point Plan, which prohibited them from engaging in, continuing, or otherwise participating in any negotiations regarding any alternative plan.  Accordingly, Sound Point used its leverage as a fraudulent and ineligible holder of Loan Debt to cut off prematurely the ongoing negotiations between and among the Ad Hoc Secured Group, LightSquared, and Harbinger, effectively precluding any hope of a global settlement for a plan of reorganization for LightSquared.

**G.    Ergen's Prior Misconduct Confirms His Bad Faith And Improper Intent.**

74.    Although the misconduct of Ergen and his companies in these Chapter 11 Cases is fully actionable in its own right, their culpability and mental state are further confirmed by prior instances of similar wrongdoing.  Indeed, Ergen and his companies have a longstanding history of abusing the bankruptcy process and engaging in wrongdoing to destroy a potential competitor and extract its valuable assets.

75.     In 2008, for example, Ergen acted through Dish to acquire the spectrum assets of another satellite communications company, DBSD North America, Inc. ("DBSD").  After DBSD filed for bankruptcy in 2009, Dish acquired a substantial amount of debt to block a plan of reorganization and force an asset sale to gain control of DBSD's valuable spectrum assets for itself.  The bankruptcy court, recognizing Dish's motives, designated Dish's votes against the plan, finding that Dish was not acting in good faith but was acting out of its own strategic and anti-competitive interests.  After having been sanctioned for its misconduct, Dish simply made a higher offer and acquired the assets.

76.     More recently, Ergen set his sights on acquiring the assets of Clearwire Corporation ("Clearwire") after it had entered into a merger agreement with Sprint Nextel Corporation ("Sprint").  Ergen caused Dish to make a tender offer for Clearwire's stock, which allegedly violated the shareholder rights of Sprint and other equity holders and tortiously interfered with the pending merger agreement.  According to a complaint filed against Dish at the time, Dish duped Clearwire's minority shareholders into believing that Dish would pay them a higher price for their stock than they would receive through a Sprint merger, in an effort to cause the minority shareholders to vote against the Sprint merger or create the perception that the merger could be defeated.  Dish made a series of non-binding or unactionable offers for Clearwire's minority shares which allegedly were conditioned on untenable terms that would induce breaches of Clearwire's existing agreements.  Soon after Sprint sued for this misconduct, Dish withdrew its misleading tender offer.

77.     Though these examples of prior wrongdoing are not the basis of the claims asserted herein, they nevertheless confirm that Ergen has not hesitated to violate agreements, make misrepresentations, abuse his position as a creditor, or engage in other inequitable conduct

28

to achieve his self-interested goals.  His conduct in these cases is entirely in accord.  Importantly, the Ergen philosophy appears to be to wreak as much havoc as possible to achieve a heavily discounted price, and then to pay fair value only if he is caught in his misconduct.

### H.     Harbinger Has Been Harmed By Defendants' Fraudulent, Bad Faith Conduct.

78.     Defendants' actions were made with a single goal:  to strip away Harbinger's control of LightSquared, and prevent Harbinger from competing with Defendants in the wireless broadband market.

79.     Harbinger has invested enormous amounts of capital, labor, expertise and other resources in LightSquared and its development and build-out of the ATC Network.  Defendants' conduct seeks to deprive Harbinger of the fruits of its substantial and unique investment, in an attempt to seize the spectrum assets and prevent Harbinger from confirming a plan of reorganization for LightSquared to repay its creditors and for Harbinger to retain its equity and control rights.

80.     Defendants' wrongdoing complained of herein has caused unique damages to Harbinger, interfering with its long-standing efforts and investments to maximize the value of the ATC Network and its efforts to put forward a viable plan of reorganization.  If Defendants' fraudulent scheme succeeds, Harbinger stands to lose the entirety of its investment and control rights and to suffer billions of dollars in damages.

### AS AND FOR A FIRST CAUSE OF ACTION

### (Equitable Disallowance -- Against Sound Point)

81.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 80 above as if fully set forth herein.

82.    Sound Point has engaged in inequitable conduct by, among other things:

(a)    Fraudulently acquiring over $1 billion of the Loan Debt by acting as a shill for

Dish and EchoStar in an attempt to circumvent restrictions in the Credit

Agreement prohibiting Defendants from holding the Loan Debt, repeatedly

making material fraudulent representations and omissions as to the true identity of

the holder of the Loan Debt, and continuing to conceal the true identity of Sound

Point despite repeated inquiries;

(b)    Intentionally disrupting Harbinger's negotiations with LightSquared's creditors

by keeping trades of Loan Debt open for weeks and months, such that Harbinger

could not identify the true holder of the Loan Debt and the sellers of that debt

were kept in limbo;

(c)    Intentionally disrupting Harbinger's negotiations with LightSquared's creditors

by tendering a low-ball bid through its affiliate LBAC for certain of

LightSquared's assets, and disclosing the amount of the confidential Ergen Bid to

the public, such that potential investors would undervalue the assets;

(d)    Intentionally disrupting Harbinger's effort to facilitate and raise capital for

LightSquared in connection with an exit facility arranged by Jefferies by keeping

open trades of the Loan Debt and LP Preferred, such that Jefferies would be

unable to arrange for exit financing until the open trades were settled;

(e)    Intentionally disrupting Harbinger's effort to facilitate and raise capital for

LightSquared in connection with an exit facility by failing to close trades of the

Loan Debt made with the most likely potential lenders in the new exit facility,

because the uncertainty of the open trades made those lenders reluctant to issue

new debt; and

(f)    Knowingly and wrongfully gaining control of the Ad Hoc Secured Group to

prematurely cut off Harbinger and LightSquared's negotiations with the Ad Hoc

Secured Group.

83.    Defendants' grossly inequitable conduct directly resulted in injury to Harbinger in

addition to the unsecured creditors of LightSquared LP, the interest holders of LightSquared LP,

the creditors of LightSquared Inc., and the interest holders of LightSquared Inc.  Specifically,

Defendants' conduct -- which was intended to misappropriate Harbinger's ownership interests in

and control over LightSquared -- prevented Harbinger from securing exit financing on its

original terms and in its original timeframe and deprived Harbinger of the ability to negotiate a

global plan of reorganization with legitimate creditors that would provide value to all of the

Debtors' creditors, instead allowing the Dish/EchoStar Defendants to hijack the Chapter 11

Cases and propose a plan to acquire spectrum at a distressed price (taking advantage of the

distress that they created).

84.    If Sound Point's claims are allowed, those claims would consume a substantial

portion of the value of LightSquared LP's estate and substantially diminish the value available

for distribution to Harbinger, in addition to the unsecured creditors of LightSquared LP, the

interest holders of LightSquared LP, the creditors of LightSquared Inc., and the interest holders

of LightSquared Inc.

85.    Equitable disallowance of Sound Point's claims is consistent with the provisions

of the Bankruptcy Code and related case law.

86.     By reason of the foregoing, Plaintiffs are entitled to judgment (a) equitably disallowing Sound Point's claims in their entirety; or alternatively and at a minimum, (b) equitably disallowing Sound Point's claims to the extent that payment upon those claims would result in Defendants' realizing a profit from their wrongdoing.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Fraud -- Against The Dish/EchoStar Defendants, Sound Point, and SP Holdings)

87.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 86 above as if fully set forth herein.

88.     The Dish/EchoStar Defendants, Sound Point and SP Holdings (the "Ergen Defendants") intentionally and/or recklessly made false and misleading affirmative statements of material fact regarding, among other things that (a) the true identity of the investors purchasing the Loan Debt, (b) Sound Point was an "Eligible Assignee" allowed to purchase the debt and (c) Defendant Sound Point was complying with the Credit Agreement because it was not acquiring the debt as a "Disqualified Company."

89.     The Ergen Defendants intentionally and/or recklessly also failed to disclose material information known only to them and specifically not known to Plaintiffs.  These instances of nondisclosure include, but are not limited to, the facts that (a) Sound Point was purchasing the Loan Debt by and on behalf of the Dish/EchoStar Defendants, (b) Sound Point was not an "Eligible Assignee" and (c) Defendant Sound Point was actually a "Disqualified Company."  The Ergen Defendants were under a duty to disclose such information because their nondisclosure made their prior statements about being qualified to purchase the Loan Debt misleading.

90.     The Ergen Defendants made these material misrepresentations, and omitted disclosing the material facts known only to them herein alleged, intending to prevent Harbinger

32

from taking steps to stop the Ergen Defendants from acquiring a significant holding in

LightSquared.  Harbinger reasonably relied upon the Ergen Defendants' misrepresentations and

omissions in the Purchase Documentation, which was submitted to UBS as Agent -- on which

Defendants knew LightSquared and Harbinger would rely and LightSquared and Harbinger in

fact did rely -- in continuing to invest labor, capital and other resources into LightSquared, and

refraining from taking steps to curb the improper purchases of LightSquared's Loan Debt.

Plaintiffs have been damaged by the Ergen Defendants' intentional or reckless misconduct.  The

Ergen Defendants' fraudulent conduct, as alleged herein, was outrageous, willful and wanton,

and perpetrated with an evil motive and a reckless indifference to the rights of Plaintiffs.  The

Ergen Defendants' fraudulent scheme alleged herein was intended to misappropriate Harbinger's

ownership interests in and control over LightSquared, and, if it is allowed to come to fruition,

Harbinger will lose the entirety of its unique controlling interest in LightSquared and suffer

additional billions of dollars in damages.

91.     By reason of the foregoing, Plaintiffs are entitled to a judgment against the Ergen

Defendants, jointly and severally, for compensatory and punitive damages in an amount to be

determined at the trial, but in excess of $2 billion.

### AS AND FOR A THIRD CAUSE OF ACTION

**(Aiding and Abetting Fraud -- Against SP Capital and Ketchum)**

92.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 91 above as if fully set forth herein.

93.     As alleged herein, the Ergen Defendants engaged in a fraud against Plaintiffs by

intentionally and/or recklessly failing to disclose material information known only to them and

specifically not known to Plaintiffs, including but not limited to the facts that (a) Sound Point

was purchasing the Loan Debt by and on behalf of the Dish/EchoStar Defendants, (b) Sound

Point was not an "Eligible Assignee," and (c) Defendant Sound Point was actually a

"Disqualified Company."

94.     Defendants SP Capital and Ketchum had actual knowledge of the Ergen

Defendants' fraud, as evidenced by the fact that:  (a) they were familiar with the Dish/EchoStar

Defendants' business and knew that the Dish/EchoStar Defendants were competitors of

LightSquared; (b) as trade manager for Sound Point, they knew that the Credit Agreement had

restrictions prohibiting Defendants' purchases of the Loan Debt; (c) they knew, therefore, that

they had to engage in fraud to circumvent those contractual restrictions; and (d) despite that

knowledge, Ketchum and SP Capital, as Sound Point's trade manager, repeatedly arranged and

facilitated the purchase of the Loan Debt.

95.     By arranging and facilitating the prohibited trades and operating as a front, which

enabled the Ergen Defendants to make false representations and material omissions and hide

their status as LightSquared's competitor, Defendants SP Capital and Ketchum provided

substantial assistance to the Ergen Defendants in carrying out their fraud.  Without this

assistance, the Ergen Defendants would not have had the opportunity to wrongfully acquire the

Loan Debt.  Harbinger relied upon the misrepresentations and omissions complained-of herein

by continuing to invest labor, capital and other resources into LightSquared and refraining from

taking steps to curb the improper purchases of the Loan Debt.  SP Capital's and Ketchum's

substantial assistance to the Ergen Defendants in the commission of their fraud was a direct and

proximate cause of Plaintiffs' injuries.

96.     Plaintiffs have been damaged by SP Capital's and Ketchum's wrongdoing.  Their

misconduct in aiding and abetting the Ergen Defendants' fraud, as alleged herein, was

outrageous, willful and wanton, and perpetrated with an evil motive and a reckless indifference

to the rights of Plaintiffs. The Ergen Defendants' fraudulent scheme that SP Capital and Ketchum aided and abetted, as alleged herein, was intended to misappropriate Harbinger's ownership interests in and control over LightSquared. If that scheme is allowed to come to fruition, then Harbinger will lose the entirety of its unique controlling interest in LightSquared and suffer additional billions of dollars in damages.

97.     By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants SP Capital and Ketchum, jointly and severally, for compensatory and punitive damages in an amount to be determined at the trial, but in excess of $2 billion.

### AS AND FOR A FOURTH CAUSE OF ACTION

**(Tortious Interference With Prospective Economic Advantage
-- Against The Ergen Defendants)**

98.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 97 above as if fully set forth herein.

99.     Since the filing of these Chapter 11 Cases, Harbinger -- as LightSquared's controlling shareholder -- has attempted to negotiate a plan with LightSquared's creditors and to raise sufficient new financing to pay off those creditors in full and retain its controlling equity interests. The Ergen Defendants were aware of these efforts.

100.     Harbinger has not been able to propose a plan to pay all of LightSquared's creditors in cash, an outcome to which Harbinger devoted substantial time and resources and upon which it reached material agreement with Jefferies and others. Defendants' misconduct caused the failure of those efforts to pay all LightSquared creditors in cash.

101.     The Ergen Defendants were aware of Harbinger's efforts and negotiations described above. In seeking to misappropriate Harbinger's ownership interests in and control over LightSquared, the Ergen Defendants intentionally and without justification interfered with

35

Harbinger's prospective economic advantage with creditors through tortious conduct, wrongful economic pressure, and other wrongful means, including, without limitation, by:

    (a)    Deliberately and improperly keeping trades of Loan Debt open for weeks and months, including by fraudulently misrepresenting to these creditors that Defendants were permitted to enter into such trades, such that Harbinger could not identify the true holders of the Loan Debt and the sellers of that debt -- including the parties Defendants knew would be lenders in the new exit facility -- were kept in limbo and unable to take on new financing commitments to LightSquared;

    (b)    Tendering a low-ball bid through LBAC for certain of LightSquared's assets, and disclosing the amount of the confidential Ergen Bid to the public, such that potential investors would undervalue the assets;

    (c)    Knowingly and wrongfully gaining control of the Ad Hoc Secured Group to prematurely cut off Harbinger and LightSquared's negotiations with the Ad Hoc Secured Group.

102.    As a result of this interference, Harbinger's efforts to negotiate a plan with its creditors have been stymied and it has been unable to raise sufficient exit financing to repay all creditors under the terms and timeframe contemplated by the original engagement.

103.    By reason of the foregoing, Plaintiffs are entitled to a judgment against the Ergen Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at the trial, but in excess of $2 billion.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**(Tortious Interference With Jefferies Relationship -- Against The Ergen Defendants)**

104.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 103 above as if fully set forth herein.

105.    Harbinger and Jefferies have a longstanding and public relationship.  Jefferies is experienced in distressed capital raises, and familiar with LightSquared and trading in its securities.  Thus, when the Ergen Defendants entered into back-to-back trades with debt-holders using Jefferies as a broker, they were aware that Jefferies would be retained to provide exit financing.

106.    In fact, on May 30, 2013, LightSquared ultimately did engage Jefferies -- which engagement was approved by the bankruptcy court -- to act as sole and exclusive manager and placement agent or arranger to secure the Exit Loan in an amount sufficient to form the cornerstone of a plan that would pay off all of LightSquared's creditors in full and allow Harbinger to retain its equity interests.  In addition to negotiating and supporting LightSquared's retention of Jefferies in connection with the Exit Loan, Harbinger itself was party to an integrally related agreement with Jefferies to fund up to approximately $80 million in fees associated with that financing in exchange for Jefferies providing the financing.  The Ergen Defendants were aware of Harbinger's agreement to pay approximately $80 million in fees to secure the Exit Loan, which was publicly disclosed to the bankruptcy court in the motion to approve Jefferies' engagement.  Thus, prior to entering into these agreements, Harbinger and Jefferies had an ongoing relationship and an expectation of the prospective economic advantage of arranging financing for the Exit Loan, and thereafter, Harbinger was party to an integrated agreement for Jefferies to arrange financing for the Exit Loan.

107.    In seeking to misappropriate Harbinger's ownership interests in and control over
LightSquared, the Ergen Defendants intentionally and without justification interfered with
Harbinger's contractual and/or protected business relationship with Jefferies by tortious conduct,
wrongful economic pressure, and other wrongful means.  Among other things, the Ergen
Defendants acted through Sound Point to enter into two "back-to-back" transactions with
Jefferies to acquire LightSquared's Loan Debt and LP Preferred interests.  The Ergen Defendants
knew that Sound Point was not permitted to acquire these interests, and would be unable to settle
the "back-to-back" trades, but fraudulently misrepresented to Jefferies that Sound Point was a
permitted purchaser.  Jefferies relied upon these misrepresentations in entering into the trades
with Sound Point.  Moreover, once it entered into the trades, the Ergen Defendants continued
their tortious interference by refusing to take steps to unwind the trades or otherwise rectify their
own wrongdoing.

108.    When Sound Point refused to settle the trades, Jefferies was left holding over
$160 million in LightSquared securities on its books, preventing it from raising the full amount
of the Exit Loan on its original terms and in the original timeframe contemplated by the parties.

109.    Sound Point's interference caused Jefferies' failure to raise the full amount of the
Exit Loan.  Prior to that interference, Jefferies in fact stated that it was "highly confident" that it
could raise the full Exit Loan amount, allowing LightSquared to repay its creditors in full and
Harbinger to retain its equity interests.  However, as a result of the Ergen Defendants' tortious
interference, Jefferies has been unable to perform its contractual commitments to raise the Exit
Loan in the full amount.  Harbinger has been harmed by that wrongdoing:  its economic
opportunity to obtain the financing needed to repay all of its creditors in cash, and to enable

LightSquared to emerge from bankruptcy with Harbinger's equity interest and control rights preserved, has been frustrated.

110.    By reason of the foregoing, Plaintiffs are entitled to a judgment against the Ergen Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at the trial, but in excess of $2 billion.

### AS AND FOR A SIXTH CAUSE OF ACTION

### (Unfair Competition -- Against all Defendants)

111.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

112.    Defendants fraudulently and in bad faith misappropriated LightSquared's Loan Debt -- unbeknownst to Harbinger -- through Sound Point, to obtain a blocking position in LightSquared's capital structure so they could unfairly compete against Harbinger by (i) forcing Harbinger to sell LightSquared's assets to them or (ii) preventing the confirmation of a plan that retains Harbinger's equity in LightSquared.  If Harbinger is deprived of its investment in LightSquared and its control over the spectrum assets, its investment interest in LightSquared will be destroyed and it will be unable to develop the ATC Network to compete against the Dish/EchoStar Defendants in the integrated broadband network.

113.    Harbinger's efforts to maximize its investment in LightSquared already have been severely compromised.  If Defendants' plan to obtain an unfair competitive advantage succeeds, then Harbinger will be deprived of its investment in LightSquared and will suffer additional billions of dollars in damages.

114.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at the trial, but in excess of $2 billion.

### AS AND FOR A SEVENTH CAUSE OF ACTION

### (Civil Conspiracy -- Against all Defendants)

115.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 114 above as if fully set forth herein.

116.    As alleged above, Defendants fraudulently acquired LightSquared's Loan Debt to

Harbinger's detriment.

117.    Defendants, individually and collectively, and others, did corruptly conspire and

agree to injure Harbinger by misappropriating its ownership interests in and control over

LightSquared, as set forth above, and intentionally participated in this conspiracy.  Among other

things, the Dish/EchoStar Defendants conspired with SP Capital and Ketchum to acquire the

Loan Debt fraudulently.

118.    But for Defendants' concerted and fraudulent acts, there would have been no

reason for the resulting injury to Harbinger.

119.    By reason of the foregoing, Plaintiffs are entitled to a judgment against

Defendants, jointly and severally, for compensatory and punitive damages in an amount to be

determined at the trial, but in excess of $2 billion.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues and claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as

follows:

A.      Either (i) equitably disallowing Sound Point's claims in their entirety; or
        alternatively and at a minimum, (ii) equitably disallowing Sound Point's claims to
        the extent that payment upon those claims would result in Defendants' realizing a
        profit from their wrongdoing;

B.    Compensatory damages in an amount to be proven at trial, but not less than $2 billion;

C.    Punitive damages in an amount to be proven at trial, but not less than $2 billion;

D.    Costs and fees, including attorneys' fees;

E.    Pre- and post-judgment interest, to the maximum extent permitted by law; and

F.    Such other and further relief as this Court deems appropriate.

Dated:  New York, New York
        August 6, 2013

                              Respectfully submitted,

                              KASOWITZ, BENSON, TORRES
                               & FRIEDMAN LLP


                              By:    /s/ David M. Friedman
                                   Marc E. Kasowitz
                                   David M. Friedman
                                   Jed I. Bergman
                                   Christine A. Montenegro

                                   1633 Broadway
                                   New York, New York 10019
                                   Tel. (212) 506-1700
                                   Fax (212) 506-1800

                                   *Attorneys for Plaintiffs Harbinger Capital*
                                   *Partners LLC, HGW US Holding Company LP,*
                                   *Blue Line DZM Corp., and*
                                   *Harbinger Capital Partners SP, Inc.*