**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT IS SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. SOLICITATION OF ACCEPTANCES OR REJECTIONS MAY NOT OCCUR UNTIL THE BANKRUPTCY COURT APPROVES THE DISCLOSURE STATEMENT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*,[1] | Case No. 12-12080 (SCC) |
| Debtors. | Jointly Administered |

**SPECIFIC DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR LIGHTSQUARED INC. AND ITS SUBSIDIARIES PROPOSED BY HARBINGER CAPITAL PARTNERS, LLC**

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman
Adam L. Shiff
Daniel A. Fliman
Matthew B. Stein
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Harbinger Capital Partners, LLC*

Dated:    August 30, 2013
          New York, New York

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  SUMMARY OF THE HARBINGER PLAN ..................................................... 4

    A.   Introduction ........................................................................................ 4

    B.   Overview ............................................................................................ 4

        1.   Corporate Structure ................................................................. 4

        2.   Exit Facility and Postpetition Liquidity Through the Effective Date ........ 4

        3.   Other Financial Terms .............................................................. 5

III. TREATMENT AND ESTIMATED RECOVERIES UNDER THE HARBINGER PLAN ................................................................................... 6

IV.  CLASSES ENTITLED TO VOTE ON THE HARBINGER PLAN ................. 9

V.   CERTAIN RISK FACTORS SPECIFIC TO THE HARBINGER PLAN ........ 9

    A.   FCC Approval ..................................................................................... 9

    B.   Consummation of Exit Facility .......................................................... 9

    C.   Additional Factors ............................................................................ 10

        1.   The Proponent Has No Duty To Update ................................. 10

        2.   No Representations Outside The Joint Disclosure Statement ................. 10

        3.   No Legal or Tax Advice Is Provided To You By The Harbinger Specific Disclosure Statement ............................... 10

        4.   No Admission Made ............................................................... 10

VI.  CONFIRMATION OF THE HARBINGER PLAN ....................................... 11

    A.   Requirements For Confirmation Of The Harbinger Plan .................. 11

        1.   Requirements of Section 1129(a) of the Bankruptcy Code ................. 11

        2.   Requirements of Section 1129(b) of the Bankruptcy Code ................. 13

        3.   Releases ................................................................................. 14

4.    Exculpation and Injunction Provisions ..................................................... 14

VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
HARBINGER PLAN ....................................................................................................... 15

A.    Liquidation Under Chapter 7 ................................................................................ 15

B.    Alternative Plans Of Reorganization .................................................................... 15

1.    The Ad Hoc Plan ...................................................................................... 16

CONCLUSION ................................................................................................................................. 21

# I.

## INTRODUCTION[2]

THE INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT ("HARBINGER SPECIFIC DISCLOSURE STATEMENT") FOR THE JOINT PLAN OF REORGANIZATION FOR LIGHTSQUARED INC. AND ITS SUBSIDIARIES PROPOSED BY HARBINGER CAPITAL PARTNERS, LLC ("HARBINGER" OR "PROPONENT") IS INCLUDED HEREIN FOR PURPORSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION FOR LIGHTSQUARED INC. AND ITS SUBSIDIES PROPOSED BY HARBINGER CAPITAL PARTNERS, LLC ("HARBINGER PLAN"), AS MAY BE MODIFIED, AMENDED, AND/OR SUPPLEMENTED FROM TIME TO TIME AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE HARBINGER PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE HARBINGER PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE ("BANKRUPTCY CODE").

ALL CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE HARBINGER PLAN ARE ADVISED AND ENCOURAGED TO READ THE GENERAL DISCLOSURE STATEMENT FILED BY THE DEBTORS ("GENERAL DISCLOSURE STATEMENT" AND TOGETHER WITH THE HARBINGER SPECIFIC DISCLOSURE STATEMENT, "JOINT DISCLOSURE STATEMENT"), THE HARBINGER DISCLOSURE STATEMENT, AND THE HARBINGER PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE HARBINGER PLAN OR ANY OTHER PLAN FILED IN THESE CASES (COLLECTIVELY, "COMPETING PLANS").  ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE HARBINGER PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE V OF THE GENERAL DISCLOSURE STATEMENT AND ARTICLE V OF THE HARBINGER SPECIFIC DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE HARBINGER PLAN OR ANY COMPETING PLAN.  A COPY OF THE HARBINGER PLAN IS ATTACHED HERETO AS EXHIBIT A.  SUMMARIES AND STATEMENTS IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE HARBINGER PLAN AND THE EXHIBITS ANNEXED TO THE HARBINGER PLAN.  THE STATEMENTS CONTAINED IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT, THE HARBINGER SPECIFIC DISCLOSURE STATEMENT AND THE TERMS OF THE HARBINGER PLAN, THE TERMS OF THE HARBINGER PLAN WILL GOVERN.

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Harbinger Plan.

THE HARBINGER SPECIFIC DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS OBTAINED DIRECTLY FROM THE DEBTORS, AS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN OR ADOPTED BY THE HARBINGER SPECIFIC DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN THE GENERAL DISCLOSURE STATEMENT.

FURTHER, YOU ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH (1) FUTURE FINANCIAL RESULTS AND LIQUIDITY, INCLUDING THE ABILITY TO FINANCE OPERATIONS IN THE NORMAL COURSE, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW COMMON SHARES TO BE ISSUED UNDER THE HARBINGER PLAN, (III) THE RELATIONSHIPS WITH AND PAYMENT TERMS PROVIDED BY TRADE CREDITORS, (IV) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (V) FUTURE DISPOSITIONS AND ACQUISITIONS, (VI) THE EFFECT OF COMPETITIVE PRODUCTS, SERVICES OR PRICING BY COMPETITORS, (VII) THE PROPOSED RESTRUCTURING COSTS AND COSTS ASSOCIATED THEREWITH, (VIII) THE ABILITY TO OBTAIN RELIEF FROM THE BANKRUPTCY COURT TO FACILITATE THE SMOOTH OPERATION UNDER CHAPTER 11, (IX) THE CONFIRMATION AND CONSUMMATION OF THE HARBINGER PLAN, AND (X) EACH OF THE OTHER RISKS IDENTIFIED HEREIN AND IN THE GENERAL DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, YOU CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE PROPONENTS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THE HARBINGER SPECIFIC DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE HARBINGER SPECIFIC DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, THE PROPONENT OR ANY OTHER

PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURUITIES, OR OTHER LEGAL EFFECTS OF THE HARBINGER PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND THE DELIVERY OF THE HARBINGER SPECIFIC DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE HARBINGER PLAN SHOULD CAREFULLY READ THE GENERAL DISCLOSURE STATEMENT AND THE HARBINGER SPECIFIC DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING THE HARBINGER PLAN, PRIOR TO VOTING ON THE HARBINGER PLAN OR ANY OF THE COMPETING PLANS.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAIN IN SUCH AGREEMENT.

THE PROPONENT BELIEVES THAT THE HARBINGER PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE RECOVERY FOR THE DEBTORS' CREDITORS AND INTEREST HOLDERS, ENABLE  THE DEBTORS TO REORGANIZE SUCESSFULLY, AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND, THAT ACCEPTANCE OF THE HARBINGER PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS, AND THEIR EQUITY INTEREST HOLDERS.

**THE PROPONENTS URGE ALL CREDITORS AND INTEREST HOLDERS TO ACCEPT THE HARBINGER PLAN.  THE PROPONENTS BELIEVE THAT THE HARBINGER PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR THE DEBTORS' CREDITORS AND EQUITY INTEREST HOLDERS.**

IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT, (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THE HARBINGER SPECIFIC DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.

## SUMMARY OF THE HARBINGER PLAN

### A.    Introduction.

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in the Harbinger Specific Disclosure Statement, the General Disclosure Statement and the Harbinger Plan. Harbinger is the proponent of the plan within the meaning of Section 1129 of the Bankruptcy Code. The Proponent reserves the right to modify the Harbinger Plan consistent with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

### B.    Overview.

#### 1.    Corporate Structure.

The Harbinger Plan described herein constitutes a separate plan of reorganization for each of the Debtors. The Harbinger Plan provides that, on the Effective Date, all Holders of Claims and Equity Interests will be paid in full through the distribution of cash and new secured notes issued by LightSquared Inc. and LightSquared LP and new unsecured notes issued by LightSquared Inc. Further, pursuant to the Harbinger Plan, the Debtors will continue to exist after the Effective Date as separate entities, in accordance with applicable law, and will maintain their pre-petition organizational structure. On, or as promptly as reasonably practicable after the Effective Date, LightSquared Inc. shall issue shares of new stock ("New Common Shares"), New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Harbinger Plan. The board of directors of New LightSquared Inc. shall consist of seven (7) directors, subject to the terms of the Exit Facility (as defined below). The members of the board of directors shall be appointed in the following manner: (a) three (3) directors shall be appointed by the Proponent in its sole and absolute discretion; (b) three (3) directors shall be appointed by the Proponent who (i) shall be independent as contemplated by NYSE rules, and (ii) shall not be officers, directors, employees or affiliates of the Proponent; and (c) the Chief Executive Officer shall be a director.

#### 2.    Exit Facility and Postpetition Liquidity Through the Effective Date.

Subject to the terms of Article IV.C of the Harbinger Plan, on the Effective Date, LightSquared Inc., as borrower, and other Debtors, as guarantors, shall become a party to, and be bound by the terms of, a new financing commitment ("Exit Facility") in an amount sufficient, along with the other sources of consideration for plan distributions, to satisfy all obligations under the Harbinger Plan due on the Effective Date, including, without limitation, the payment in full in Cash of the Allowed Prepetition Inc. Facility Claims (except those held by Harbinger).

Harbinger has reached an agreement with Melody Capital Advisors LLC, as Lead Arranger (the "Exit Lender") with regard to the Exit Facility. The agreement remains subject to conditions and documentation, and its terms will be detailed in the Harbinger Specific Disclosure Statement as soon as practicable and prior to the hearing to consider approval of this Harbinger

Specific Disclosure Statement. As discussed below, the Exit Lender has agreed and committed that $190 million of the Exit Facility may be drawn by the Debtors during the course of the Chapter 11 Cases as junior DIP financing.

It is anticipated that the Exit Facility will be in the amount of at least $500 million and will share a first lien on all of the Debtors' assets with the holders of the New LP Facility Notes (as defined below). The Exit Facility will mature after the maturity of the New LP Facility Notes. The Exit Facility provides -- and the Exit Lender has committed -- that the Debtors, at their option, may access $190 million of the Exit Facility prior to December 15, 2013 as DIP financing, to provide the Debtors with the funds necessary to continue their operations without disruption through June 30, 2014. The DIP financing will be secured only by a junior lien on the assets of LightSquared Inc. and will be entitled to administrative priority status in the Debtors' Chapter 11 Cases, provided that the administrative claim against LightSquared LP shall be limited to the proceeds received by LightSquared LP from such financing.

While Harbinger intends to use its best efforts to obtain confirmation and consummation of its plan by December 31, 2013 (and, indeed, because the FCC review of the Harbinger Plan will be quicker than its review of the other plans which all require a sale of the Debtors' spectrum assets to a new operator, Harbinger believes that only its plan is capable of consummation within this timeframe -- see Article VII.B below), factors beyond any party's control, including the requirement of FCC approval incident to the Harbinger Plan and all other plans (and confirmed by the FCC in its filing dated August 30, 2013), dictate that the Debtors' retain the necessary liquidity to actualize the regulatory relief and benefits that are anticipated and which will deliver enormous incremental value to the Debtors' estates. Indeed, Harbinger believes that it would be unfortunate and imprudent for the Debtors' estates not to have financing available to continue operations through the first half of 2014. Harbinger is aware of no other proposal for such necessary liquidity other than that offered by the Exit Lender, let alone a proposal which funds the Debtors on terms which are subordinate to all existing secured creditors. This highly unusual and beneficial arms-length financing, in Harbinger's view, strongly validates the robust solvency of the Debtors and their enormous economic potential.

### 3.    **Other Financial Terms.**

a.    On the Effective Date, LightSquared LP, as borrower, shall become a party to, and be bound by the terms of, a new first lien term loan facility ("New LP First Lien Term Loan Facility") maturing three years from the Effective Date. The notes ("New LP Facility Notes") issued pursuant to the New LP First Lien Term Loan Facility shall bear interest at (i) 9% per annum payable in kind during the first year, (ii) 10% per annum payable in kind or 8% per annum payable in cash during the second year, and (iii) 11% per annum payable in kind or 9% per annum payable in cash during the third year, issued in the principal amount of $2,183 million (subject to decrease upon the disallowance of Claims held by the Ergen Parties), and the repayment of which shall be secured by Liens on substantially all of the assets of the New LP Facility Obligors *pari passu* with the Liens securing the Exit Financing and senior to all other Liens. The New LP Facility Notes will be distributed to the holders of allowed claims under LightSquared LP's prepetition term loan facility in full satisfaction of those claims.

b.        On the Effective Date, LightSquared Inc., as borrower, shall become a party to, and be bound by the terms of, a new subordinated loan facility ("New Inc. Subordinated Loan Facility") in the amount of $573 million (subject to decrease upon the disallowance of Equity Interests held by the Ergen Parties). The New Inc. Subordinated Loan Facility shall bear interest at a rate of 14% payable in kind and have a mature on the sixth anniversary of the Effective Date. The New Inc. Subordinated Loan Facility shall be unsecured and the notes issued under that facility will be used to satisfy in full the Equity Interests held by all Holders of the Debtors' preferred stock (whether at LightSquared Inc. or LightSquared LP).

c.        On the Effective Date, Harbinger shall make a capital contribution to reorganized LightSquared Inc. of $259 million through (i) the voluntary contribution of $159 million of Prepetition Inc. Facility Claims, in exchange for New Common Shares in an amount to be determined prior to the hearing on this Harbinger Specific Disclosure Statement, and (ii) by backstopping a rights offering of $100 million to holders of existing common stock.

d.        The Debtors' existing cash, together with the proceeds of the Exit Facility and Harbinger's capital contributions shall be used to fund the cash obligations under the Harbinger Plan due on the Effective Date, including (i) payment in full of Prepetition Inc  Facility Claims (other than the claim of Harbinger), (ii) payment in full of the principal amount of general unsecured claims, (iv) payment of administrative and priority claims, and (iv) meeting the Debtors' ongoing liquidity requirements. Additionally, the Harbinger Plan contemplates that when the FCC approves the use of the NOAA spectrum, LightSquared will have the necessary funding to meet requisite usage fees related to accessing and sharing the that spectrum.

## III.

## TREATMENT AND ESTIMATED RECOVERIES
## UNDER THE HARBINGER PLAN

**Chart of Consideration Allocable to Non-Classified Claims**

| Class | Treatment | Estimated Claim Amounts | Estimated Recovery |
|---|---|---|---|
| DIP Facility Claims | Payment in full, in Cash, on or prior to Effective Date | [$66,000,000] | 100% |
| Administrative Expense and Tax Priority Claims | Payment in full, in Cash, on the Effective Date or at the time such Administrative Expense Claim or Priority Claim becomes Allowed. | [$25,000,000] | 100% |

**Chart of Consideration Allocable to Classified Claims**

| Class Number | Class | Treatment | Estimated Claim Amounts | Estimated Recovery |
|---|---|---|---|---|
| Class 1 | Prepetition Inc. Facility Claims | Payment in full, in Cash, on the Effective Date or at time such Non-Affiliate Prepetition Inc. Facility Claim becomes Allowed; provided, however, that Affiliate Holders of Prepetition Inc. Facility Claims have agreed to accept a lesser treatment of their Prepetition Inc. Facility Claims and receive a pro rata share of __% of New Common Shares, on the Effective Date. | [$440,000,000] | 100% |
| Class 2 | Prepetition LP Facility Claims | Payment in full, of a pro rata share of the New LP First Lien Term Loan Facility on the Effective Date or at the time such Prepetition LP Facility Claim becomes Allowed. | [$2,183,000,000] | 100% (subject to the outcome of the Ergen Litigation, as defined below) |
| Class 3 | Other Secured Claims | Either (i) payment in full, in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired, on the Effective Date or at such time such Other Secured Claim becomes Allowed. | | 100% |
| Class 4 | Other Priority Claims | Payment in full, in Cash, on the Effective Date or at such time such Other Priority | | 100% |

| | | Claim becomes Allowed. | | |
|---|---|---|---|---|
| Class 5 | General Unsecured Claims | Payment of principal amount of Claim in full, in Cash, on the Effective Date or at the time such General Unsecured Claim becomes Allowed. | [$10,000,000] | 100% |
| Class 6 | Intercompany Claims | On the Effective Date or as soon thereafter as practicable, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof. | [$_____] | 100% |
| Class 7 | Existing LP Preferred Stock Equity Interests | Payment in full, by distribution of New Inc. Subordinated Loan Facility Notes with a face amount equal to the higher of (i) the fixed liquidation preference or (ii) the fixed redemption price of Existing LP Preferred Interests as of the Effective Date. | [$296,000,000] | 100% (subject to the outcome of the Ergen Litigation, as defined below) |
| Class 8 | Existing Inc. Preferred Stock Equity Interests | Payment in full, by distribution of New Inc. Subordinated Loan Facility Notes with a face amount equal to the higher of (i) the fixed liquidation preference or (ii) the fixed redemption price of the Existing Inc. Preferred Interests as of the Effective Date. | [$277,000,000] | 100% |
| Class 9 | Existing Inc. Common Stock Equity Interests | Retention of its pro rata share of __% of New Common Shares on the Effective Date. | | |
| Class 10 | Intercompany Interests | On the Effective Date or as soon thereafter as practicable, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof. | | 100% |

# IV.

## CLASSES ENTITLED TO VOTE ON THE HARBINGER PLAN

The following chart describes whether each Class of Claims and Equity Interests is entitled to vote to accept or reject the Harbinger Plan. For a complete description of voting procedures and deadlines, please see Article I.C of the General Disclosure Statement.

| Class Number | Class | Impaired/Unimpaired | Entitled To Vote |
|---|---|---|---|
| Class 1 | Prepetition Inc. Facility Claims | Unimpaired | No |
| Class 2 | Prepetition LP Facility Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No |
| Class 4 | Other Priority Claims | Unimpaired | No |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Intercompany Claims | Unimpaired | No |
| Class 7 | Existing LP Preferred Stock Equity Interests | Impaired | Yes |
| Class 8 | Existing Inc. Preferred Stock Equity Interests | Impaired | Yes |
| Class 9 | Existing Inc. Common Stock Equity Interests | Impaired | Yes |
| Class 10 | Intercompany Interests | Unimpaired | No |

# V.

## CERTAIN RISK FACTORS SPECIFIC TO THE HARBINGER PLAN

For a complete description of the risk factors affecting the reorganization of the Debtors, please see Article V of the General Disclosure Statement. Below are the specific risk factors affecting the Harbinger Plan:

**A.      FCC Approval.**

As a condition precedent for the occurrence of the Effective Date, the FCC shall grant new or modified authorizations to the Debtors to permit LightSquared access to at least 25 MHz of spectrum for terrestrial use.

**B.      Consummation of Exit Facility.**

As a condition precedent for the occurrence of the Effective Date, the Reorganized Debtors shall enter into the Exit Facility in the amount of not less than $500 million to provide

the Reorganized Debtors with the requisite Cash to satisfy their obligations under the Harbinger Plan and capitalize the Reorganized Debtors with sufficient liquidity post-emergence.

**C.    Additional Factors.**

**1.    The Proponent Has No Duty To Update.**

The statements contained in the Harbinger Specific Disclosure Statement are made by the Proponent as of the date hereof, unless otherwise specified herein, and the delivery of the Harbinger Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponent has no duty to update the Harbinger Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**2.    No Representations Outside The Joint Disclosure Statement.**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Harbinger Specific Disclosure Statement are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Joint Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Harbinger Specific Disclosure Statement that are other than as contained in, or included with, the Harbinger Specific Disclosure Statement should not be relied upon by you in arriving at your decision.

**3.    No Legal or Tax Advice Is Provided To You
By The Harbinger Specific Disclosure Statement.**

The contents of the Harbinger Specific Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest. The Harbinger Specific Disclosure Statement is not legal advice to you. The Harbinger Specific Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Harbinger Plan or object to Confirmation of the Harbinger Plan.

**4.    No Admission Made.**

The Harbinger Plan and this Harbinger Specific Disclosure Statement is an offer to resolve the claims against and interests in the Debtors. Accordingly, nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Harbinger Plan on the Debtors or on Holders of Claims or Equity Interests or be deemed an admission in any litigation to which Harbinger is a party.

# VI.

## CONFIRMATION OF THE HARBINGER PLAN

A.    **Requirements For Confirmation Of The Harbinger Plan.**

    1.    **Requirements of Section 1129(a) of the Bankruptcy Code.**

        (a)    **General Requirements.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in Section 1129 of the Bankruptcy Code have been satisfied. Such requirements are more fully set forth in Article IV.C of the General Disclosure Statement. Harbinger believe that the Harbinger Plan satisfies (or will satisfy on or prior to the Effective Date as required by law) these requirements:

        (b)    **The Best Interest Test and the Debtors' Liquidation Analysis.**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code ("Best Interest Test"), Holders of Allowed Claims and Interests must either (a) accept the Harbinger Plan or (b) receive or retain under the Harbinger Plan property of a value, as of the Harbinger Plan's assumed Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

The first step in meeting the Best Interest Test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of Chapter 7 cases. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the Chapter 7 cases. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority Claims that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to Creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code. Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Harbinger Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the Chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of the Creditors' Committee appointed by the United States Trustee pursuant to Section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a Chapter 7 liquidation, additional Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditors would receive any distribution until all senior Creditors are paid in full, with interest, and no equity holder receives any distribution until all Creditors are paid in full, with interest.

The Debtors, with the assistance of the restructuring and financial advisors, have prepared a hypothetical liquidation analysis ("Liquidation Analysis") in connection with the General Disclosure Statement. *See* Exhibit C to the General Disclosure Statement. The Proponents adopt the Liquidation Analysis in its entirety for illustrative purposes relating to the Harbinger Specific Disclosure Statement.

Given that the Harbinger Plan proposes to pay all Holders of Claims, Existing Inc. Preferred Stock, and Existing LP Preferred Stock in full, such plan by definition provides treatment at least as favorable as in a liquidation under Chapter 7. Moreover, after consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 7 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail; and (iii) substantial increases in claims which would be satisfied on a priority basis, the Proponents have determined that in a Chapter 7 case, Confirmation of the Harbinger Plan will provide each Creditor of the Debtors and each Holder of a Claim or Interest with a recovery that substantially mitigates each of the foregoing risks. UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS MADE BY THE DEBTORS AND THEIR ADVISORS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. FURTHERMORE, THE PROPONENTS HAVE NOT CONDUCTED AN INDEPENDENT ANALYSIS OF THE DEBTORS' LIQUIDATION ANALYSIS AND CANNOT ENSURE THE ACCURACY THEREOF. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. THE PROPONENTS ARE USING THE DEBTORS' ANALYSIS SOLELY FOR ILLUSTRATIVE PURPOSES.

### (c)    **Feasibility.**

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. Attached hereto as Exhibit B is a projection of cash flow over the 12 month period following the Effective

Date, demonstrating the Debtors' ability to meet their financial obligations under the Harbinger Plan, together with a schedule of sources and uses of consideration under the Harbinger Plan.

## 2.    Requirements of Section 1129(b) of the Bankruptcy Code.

The Bankruptcy Court may confirm the Harbinger Plan over the rejection or deemed rejection of the Harbinger Plan by a Class of Claims or Interests if the Harbinger Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

### (a)    No Unfair Discrimination.

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

### (b)    Fair and Equitable Test.

This test applies to Classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class:

       (i)    Secured Claims.  Each Holder of an Impaired secured Claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the Allowed amount of its secured Claim and receives deferred Cash payments having a value, as of the effective date of the Harbinger Plan, of at least the Allowed amount of such Claim, or (ii) receives the "indubitable equivalent" of its Allowed secured Claim.

       (ii)    Unsecured Claims.  Either (i) each Holder of an Impaired unsecured Claim receives or retains under the Harbinger Plan property of a value equal to the amount of its Allowed unsecured Claim, or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Harbinger Plan.

       (iii)    Interests.  Either (i) such Interest Holder will receives or retain under the Harbinger Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock, and (b) the value of the stock, or (ii) the Holders of Interests that are junior to the Interests of the dissenting Class will not receive or retain any property under the Harbinger Plan.

The Proponents believe that the Harbinger Plan will satisfy both the "unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding the rejection of the Harbinger Plan by any Class of Claims or Interests.

3.    **Releases.**

The Harbinger Plan, in contrast to the Ad Hoc Plan (defined below) does not provide for what Harbinger considers to be illegal releases in favor of the Ad Hoc Secured Group's (as defined below) handpicked favored parties. The Harbinger Plan provides only for traditional exculpation provisions in favor of the Debtor, the Exit Lender and the Proponent.

4.    **Exculpation and Injunction Provisions.**

**Except as otherwise specifically provided in the Harbinger Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any exculpated Claim, except for willful misconduct (including fraud) or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Harbinger Plan. The Exculpated Parties have, and upon Confirmation of the Harbinger Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Harbinger Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Harbinger Plan or such distributions made pursuant to the Harbinger Plan.**

**Except as otherwise expressly provided in the Harbinger Plan or for obligations issued pursuant to the Harbinger Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been discharged pursuant to Article VIII.A of the Harbinger Plan or are subject to exculpation pursuant to Article VIII.D of the Harbinger Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtors: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Harbinger Plan. Nothing in the Harbinger Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a**

14

nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity shall: (1) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action; and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

## VII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE HARBINGER PLAN

If the Harbinger Plan is not confirmed and consummated, alternatives to the Harbinger Plan include (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, or (ii) confirmation of an alternative plan of reorganization proposed in the Chapter 11 Cases.

**A.    Liquidation Under Chapter 7.**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recovery of Holders of Claims and Interests and the Debtors' liquidation analysis are set forth in Article VI.A.1.b above, entitled Confirmation of the Harbinger Plan; Requirements for Confirmation of the Harbinger Plan; The Best Interests Test and the Debtors' Liquidation Analysis. The Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Harbinger Plan because the Harbinger Plan will pay all creditors and preferred shareholders in full. Moreover, a liquidation of the Debtors is undesirable because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee; and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

**B.    Alternative Plans Of Reorganization.**

Certain parties, including the Ad Hoc Secured Group of LightSquared LP Lenders ("Ad Hoc Secured Group"), have proposed, or have indicated that they intend to propose, alternative plans of reorganization for one or more of the Debtors that contemplate a sale of the Debtors' spectrum assets. Although the Harbinger Plan is not without risks, as set forth in Article V above, all alternative plans (other than the Harbinger Plan) are dependent upon sale of the Debtors' spectrum assets that will precipitate a longer and more complex review of change of control issues by the FCC compared with a review of the Harbinger Plan. Harbinger believes that a proposed sale of the spectrum involves a significant and complicated risk that will, at best, result in extensive delays in any other plan becoming effective, and, at worst, could result in the failure of the alternative plan after such lengthy delays. Moreover, Harbinger believes that a proposed sale of the Debtors' assets should only be pursued as a protective measure if the

Debtors are unable to obtain relief from the FCC sufficient to meet the conditions of the Harbinger Plan. Otherwise, any proposed sale necessarily will shortchange the estates of the enormous value to be realized upon FCC relief. Given that the Harbinger Plan is the only plan that provides for full payment to creditors and preferred shareholders and the ability to go effective on a quicker timeline, Harbinger strongly believes that its plan is superior to all others.

Harbinger intends to offer its evaluation of other plans as and when they are proposed. At this juncture, only the plan proposed by the Ad Hoc Secured Group (the "Ad Hoc Plan") has been filed.

### 1.    The Ad Hoc Plan.

The Ad Hoc Plan contemplates the sale of LightSquared LP's assets, consisting primarily of the L-Band spectrum and related contractual rights, to an entity controlled by Charles Ergen (such entity referred to below as "Ergen").

### (a)    Illegal Transfer Without FCC Approval.

The Ad Hoc Plan proposes that Ergen will purchase the spectrum without FCC approval by creating what Harbinger considers to be a fictitious structure whereby, pending FCC approval of a transfer to Ergen, the spectrum remains technically under the control of LightSquared LP. This technical control, however, is devoid of substance insofar as Ergen will hold 100% of the economic interest in the spectrum immediately, will have control over filling the highly likely numerous vacancies in LightSquared LP management, and will control LightSquared LP's funding needs. Harbinger believes that the FCC will reject this fiction and require Ergen, like all other potential buyers, to fully comply with applicable regulatory procedures for his intended change of control.

The FCC has previously taken issue when full payment for FCC-licensed assets has been made in advance of securing FCC consent for the assignment or transfer of control of such licenses to the purchasing party. Specifically in the bankruptcy context, the FCC's Review Board designated the issue of a possible unauthorized transfer of control stating its concern that "the entire purchase price has been prepaid and nothing remains to be paid upon approval of the transfer."[3] Citing that precedent, ten years later the FCC revoked an unauthorized transfer of control, concluding, among other factors stated: "[the FCC licensee] received the entire $50,000 purchase price and has kept it. Control by [the FCC licensee], we find, was transferred illegally."[4]

Similarly in the context of shared services among broadcast stations, the FCC has made clear "that a licensee must retain the economic incentive to control programming aired over its

---

[3] *Arthur A. Cirilli,* 3 FCC 2d 893, 897, ¶9 (Rev. Bd. 1966).

[4] *Revocation of the licenses of Superior Communications Co., Inc. Licensee of stations KAQ73, KAQ74, and KAQ75, licensed in the Point to Point Microwave Radio Service,* Order of Revocation, 57 FCC 2d 772, 776, ¶16 (1976).

station."[5]  In the absence of such economic interest, control of the license is attributed to the party that would be paying for the operation of the licensed facilities and spectrum — here, the purchaser of the spectrum assets under the Ad Hoc Plan.  Prior FCC consent for such purchaser to acquire lawfully such control would be required.

Over and above the very significant matter of requiring prior FCC consent to implement the Ad Hoc Plan, stripping the existing licensee of any incentive to make valuable use of the spectrum for which it is licensed while the purchaser decides whether to seek such licenses himself or find another buyer would raise significant policy concerns at the FCC regarding the warehousing of valuable spectrum.  As proposed, for however long it takes the purchaser to decide whether even to seek FCC authorization for the spectrum itself and/or for another buyer to be sought, and then for the process of securing FCC consent for such an assignment, no one would have any interest in the spectrum to develop it for any beneficial use.  Such a strategy of putting valuable spectrum on hold while the purchaser develops his plans would be directly contrary to FCC policies.  As the FCC stated when DISH (an Ergen entity) sought to continue to keep vacant a valuable orbital slot:  "Allowing DISH to continue to suspend operations at a location that it has left vacant for over two years -- and for which it still has no committed plans - - would allow DISH to warehouse scarce orbit and spectrum resources, contrary to Commission policy."[6]  The FCC might well reach the same conclusion here, particularly since DISH, as the likely stalking horse purchaser under the Ad Hoc Plan, has made no progress in developing the considerable amount of S-band spectrum that it acquired from DBSD and TerreStar out of bankruptcy.

  **(b)**  **FCC Change of Control Approval Would Create Significant Delay.**

It is inconceivable that the purchaser of the spectrum assets would be in a position to close on a purchase of such assets in a three or four month time frame between approval of the disclosure statement and confirmation of the Ad Hoc Plan.  Before the FCC will act on an application to assign or transfer control of FCC licenses, it must issue a public notice accepting the application for filing and establish a pleading cycle in the public notice giving interested parties an opportunity to comment – typically 30 days for initial comments and 15 days for reply comments.

Moreover, given the stated plans of DISH, as the likely stalking horse purchaser, to reconfigure usage of LightSquared's uplink and downlink L-band spectrum, the FCC may well

---

[5] *In the Matter of KHNL/KGMB License Subsidiary, LLC; Licensee of Stations KHNL(TV) and KGMB(TV), Honolulu, Hawaii And HITV License Subsidiary, Inc.; Licensee of Station KFVE(TV), Honolulu, Hawaii* , Memorandum Opinion and Order and Notice of Apparent Liability, 26 FCC Rcd 16087, 16093, ¶ 19 (Chief Media Bur. 2011).

[6] *In the Matter of DISH Operating L.L.C. Application to Suspend Operations at the 148 [degrees] W.L. Orbital Location*, Memorandum Opinion and Order, 27 FCC Rcd 5923, 5923, ¶ 1 (Chief, Int'l Bureau 2011).

require a rulemaking proceeding to effectuate such reconfiguration in addition to a transfer of control adjudicatory proceeding.[7]

In a significant transaction, such as the transfer of control of LightSquared, the public notice and comment period alone consumes two to three months.[8] Once the comment period closes, the comments need to be evaluated and an order must be drafted. Given the significant issues that would be presented in an Ergen acquisition of LightSquared or, for that matter, an Ergen-directed transfer of control of LightSquared, the transfer application will be addressed at the FCC level, which involves an additional level of review involving the commissioners and their staff. In view of the complex issues presented by an Ergen acquisition or an Ergen-directed transfer of control of LightSquared, FCC processing of the LightSquared application could well take one to one and a half years to review the change of control issue alone.[9]

(c)    **DISH, As Likely Stalking Horse, Further Complicates Ad Hoc Plan.**

An FCC application seeking authority for DISH to acquire LightSquared would raise multiple issues that would require careful FCC consideration. Stanton Dodge, DISH's Executive Vice President, has acknowledged that when it comes to combining LightSquared's spectrum with DISH's existing spectrum, "[t]here are lots of hoops to jump through from a regulatory point of view."[10] It is a virtual certainty that multiple parties would oppose the application vigorously. Grant of this application would give DISH an interest in large swathes of spectrum that can be used to provide broadband services, including the terrestrial portion of LightSquared's spectrum; the terrestrial portion of the spectrum DISH acquired from TerreStar and DBSD; and 700 MHz spectrum a DISH affiliate acquired at auction. The FCC, not to mention the Department of Justice, would need to evaluate whether the consolidation of this spectrum in DISH's hands would have an anti-competitive impact in the broadband market. The FCC and the Department of Justice also would have to consider whether giving DISH control over the mobile satellite spectrum held by LightSquared and the mobile satellite spectrum formerly held by TerreStar and DBSD would give rise to undue concentration. In addition, given DISH's failure to construct network facilities using the S-band spectrum he acquired from

---

[7] When DISH acquired TerreStar and DBSD, it sought reconfiguration of their spectrum. The FCC denied DISH's request to authorize this reconfiguration on a waiver basis, and it instead initiated a rulemaking proceeding to consider the changes DISH had proposed. *See Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Bands*, Report and Order and Order of Proposed Modification, FCC 12-151 (Dec. 17, 2012) at ¶ 14. Based on this precedent, a rulemaking proceeding is the likely course of action for the FCC if DISH seeks to reconfigure LightSquared's spectrum and to reconfigure further the spectrum DISH acquired from TerreStar and DISH.

[8] For example, in the SoftBank-Sprint transaction, the FCC applications were filed on November 15, 2012, and the initial pleading cycle did not close until two and one-half months later, on February 1, 2013. The FCC subsequently extended the pleading cycle through February 25, 2013, which was more than three months from the date the applications were filed.

[9] For example, in large transactions in recent times that required FCC approval, the filing-to closing period for Sirius-XM was 17 months; for Frontier-Verizon it was 14 months; for Comcast-NBCU it was 13 months; for AT&T-Qualcomm it also was 13 months; and for Qwest-CenturyLink it was 12 months.

[10] Communications Daily (Aug. 22, 2013) at 1.

TerreStar and DBSD, a DISH application would involve significant spectrum speculation and warehousing issues.

DISH's plan to reconfigure the uplink and downlink designations for LightSquared's spectrum and the spectrum DISH acquired from TerreStar and DBSD[11] adds a significant layer of complexity to the transfer application, in addition to the necessity of a separate rulemaking proceeding, as noted above. The FCC would need to address whether this plan would be the source of unacceptable interference to adjacent bands, including the GPS band, and would have to consider the impact of the plan on other users of LightSquared's spectrum, including Inmarsat and its Department of Defense customers.

          (d)        **The Asset Purchase Agreement Contemplated By The Ad Hoc Plan Requires Consent of Entities Who Are Not Parties To The Sale.**

Section 7.1(a) of the Asset Purchase Agreement requires, as a condition to funding, that the parties to the Asset Purchase Agreement obtain all consents and approvals required to assign that certain Inmarsat Cooperation Agreement to the purchaser. The assignment of the Inmarsat Cooperation Agreement is a critical part of the sale. However, two of the parties to the Inmarsat Cooperation Agreement, LightSquared Inc. and Inmarsat Global Limited, are not parties to the Asset Purchase Agreement or part of the Ad Hoc Plan (indeed, Inmarsat Global Limited is not even a debtor in these Chapter 11 Cases) and there is no assurance that the requisite consents and approvals to effectuate the assignment will be obtained. Moreover, the ability to obtain such consents and approvals is out of the control of the parties to the Asset Purchase Agreement. In contrast, the assignment of the Inmarsat Cooperation Agreement is not an issue in the Harbinger Plan.

          (e)        **The Ad Hoc Plan Impermissibly Contemplates Significant Relief Under Section 365 of the Bankruptcy Code After the Effective Date.**

Section 10.3(e) of the Ad Hoc Plan improperly authorizes the Bankruptcy Court to approve the sale of Ergen's assets and the assignment of his designated executory contracts to an "Alternative Purchaser" after the plan's effective date. In other words, the Ad Hoc Plan would permit Ergen, long after consummation of that plan and in the event he fails in his FCC change of control application, to invoke the Bankruptcy Court's jurisdiction for his sole benefit to authorize the "free and clear" sale of assets in which only he has an economic interest, as well as the assignment of executory contracts, to his hand-picked purchaser.

The Ad Hoc Plan cannot create bankruptcy court jurisdiction where none exists. The Court cannot retain jurisdiction for the sole benefit of Mr. Ergen to authorize and sanitize the transfer of assets where the estate has no interest. The only means to achieve such ongoing jurisdiction is for the LightSquared LP estate to retain the ability to repurchase the spectrum assets from Ergen at his cost plus interest at any time prior to the transfer of such assets to Ergen following FCC approval of his application. Harbinger understands that Ergen has refused such a structure.

---

[11] *See* Communications Daily (Aug. 22, 2013) at 1-3.

(f)    **The Ad Hoc Plan Cannot Provide For
The Sale Of Assets Non-Ad Hoc Plan Debtor.**

The Ad Hoc Plan impermissibly contemplates a sale of assets by Debtors that are not reorganized through the Ad Hoc Plan.

(g)    **DISH, the Presumptive Stalking Horse Purchaser,
Is Not A Good Faith Purchaser.**

DISH, the presumptive Ergen-designee and stalking horse purchaser under the Asset Purchaser Agreement as contemplated by the Ad Hoc Plan, has not acted in good faith during the pendency of these Chapter 11 Cases. Section 363(m) of the Bankruptcy Code requires that a purchaser of a debtor's assets must act in good faith for the Bankruptcy Court to approve the sale. Courts have held that misconduct including fraud, concealment of material facts, or other attempts to take grossly unfair advantage of other bidders destroys a purchaser's good faith.

As more fully described in Article III.D.3 of the General Disclosure Statement, on August 6, 2013, Harbinger commenced an adversary proceeding against DISH, Ergen and certain of their affiliates seeking the equitable disallowance of their claims in these Chapter 11 Cases, in addition to common law claims of fraud, tortious interference with prospective economic advantage, unfair competition and civil conspiracy ("Ergen Litigation").

Specifically, the plaintiffs allege that Ergen fraudulently infiltrated the senior-most tranche of LightSquared LP's capital structure, secretly amassing at significant discounts to par, based on knowing misrepresentations of fact, a position as the single largest holder of the Prepetition LP Facility Claims. In particular, Ergen purchased the debt through Sound Point -- a new investment vehicle created for this purpose, whose connection to Ergen was deliberately concealed for over a year, despite diligent inquiries. Ergen also disrupted Harbinger's efforts to negotiate a plan of reorganization with the Debtors' creditors by causing Sound Point to enter into binding commitments to purchase hundreds of millions of dollars of debt from existing lenders, but then refusing -- without justification or excuse, and contrary to settled industry practice -- to settle those trades. Ergen used these same "hung trades" as a mechanism to interfere with Harbinger's efforts to raise exit financing for the Debtors. The existing lenders with whom Ergen contracted, and whose trades he refused to close -- investment funds that were fully familiar with the Debtors and had extensive experience with the company and its long-term prospects -- were the very same investment funds that would have served as lenders in the Debtors' exit financing facility that would have allowed the Debtors to pay all of its creditors in full and in cash. Even absent the effects of Ergen's misconduct on Harbinger, the mere fact that Ergen succeeded in illegally purchasing LightSquared LP secured debt at a discount gives him an unfair advantage with respect to other bidders. Inasmuch as Ergen's bid does little more than pay himself back on the illegally purchased debt, Ergen improperly has achieved a lower cost of purchase than any other buyer who played by the rules.

Harbinger believes, based upon the facts alleged in the Ergen Litigation, that Ergen is not a good faith purchaser. The Claims and Interests asserted by Ergen against LightSquared LP are Disputed and will be paid in full in the consideration referred to in Article III hereof only if, and

to the extent such Claims and Interests are Allowed pursuant to a Final Order of the Bankruptcy Court.

## CONCLUSION

Harbinger respectfully submits that its plan maximizes the value of the Debtors' estates, provides for the Debtors' to achieve their goals of obtaining critical FCC relief and repaying all their creditors and preferred shareholders in full, and minimizes to the greatest possible extent the enormous risk and delay of approval of a change of control. For these reasons, Harbinger urges all creditors and shareholders entitled to vote to accept the Harbinger Plan.

Dated:   August 30, 2013
New York, New York

By: /s/ *David M. Friedman*
David M. Friedman
Adam L. Shiff
Daniel A. Fliman
Matthew B. Stein

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Harbinger Capital Partners LLC*