# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED, INC., *et al.*,[1] | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## SPECIFIC DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN FOR ONE DOT SIX CORP. PROPOSED BY U.S. BANK NATIONAL ASSOCIATION AND MAST CAPITAL MANAGEMENT, LLC

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael S. Stamer
Philip C. Dublin
One Bryant Park
New York, New York  10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Counsel to U.S. Bank National Association and Mast Capital Management, LLC*

Dated   New York, New York
        August 30, 2013

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), Inc. Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and Inc. TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

**Table of Contents**

Page

I. SUMMARY OF THE ONE DOT SIX PLAN ..............................................................3

    A.    **Introduction** ...................................................................................3
          1.    Overview .............................................................................4
          2.    Distribution to Classes of Claims Against, and Equity
                Interests In, One Dot Six ...................................................5
          3.    Corporate Governance of One Dot Six ...........................6

    B.    **The One Dot Six Plan is Fair, Reasonable and In the Best
        Interests of the Debtors' Estates and All Creditors** ...............................6

    C.    **Business Justifications for the Sale** ..........................................................6

II. CLASSES ENTITLED TO VOTE ON THE ONE DOT SIX PLAN ......................7

III. TREATMENT UNDER THE ONE DOT SIX PLAN..............................................7

IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES ...................................................................................................11
          1.    General Treatment ...........................................................11
          2.    Notice of Proposed Assumption of Executory Contracts or
                Unexpired Leases .............................................................12
          3.    Claims Based on Rejection of Executory Contracts or
                Unexpired Leases .............................................................13
          4.    Compensation and Benefit Programs...............................13
          5.    Post-Petition Contracts and Leases .................................13

V. SIGNIFICANT PROVISIONS OF THE PURCHASE AGREEMENT .................14
          1.    Purchased Assets..............................................................14
           2.    Excluded Assets ...............................................................14
           3.    Assumed Liabilities .........................................................14
           4.    Excluded Liabilities .........................................................14
           5.    Purchase Price..................................................................15
           6.    Certain Conditions to Closing..........................................15

VI. CERTAIN FACTORS AFFECTING THE ONE DOT SIX PLAN......................15

    A.    **Certain Risk Factors Specific to the One Dot Six Plan** .......................15
          1.    Risks Related to the One Dot Six Sale..............................15

i

2.      Risk of Insufficient Cash to Fund Distributions to Holders
        of Claims Against, and Equity Interests in, One Dot Six in
        Full ...................................................................................................16
3.      FCC-Related Considerations and Risks Respecting One
        Dot Six's Business ..........................................................................16
        (a)     The FCC License and Spectrum Lease Arrangement
                are Subject to a High Degree of Government
                Regulation ...........................................................................16
        (b)     The Value of the Assets is Dependent Upon the
                FCC Renewing the Underlying FCC License....................16
        (c)     FCC Regulations and the Approval Process Could
                Delay or Impede the One Dot Six Sale and Intended
                Reorganization ....................................................................17
4.      Risk of Non-Confirmation of the One Dot Six Plan......................17
5.      Non-Consensual Confirmation .....................................................17

B.      **Additional Factors to Be Considered** ....................................................**17**
1.      The Plan Proponents Have No Duty to Update .............................17
2.      No Representations Outside the One Dot Six Specific
        Disclosure Statement and the General Disclosure Statement ........18
3.      Plan Proponents Can Withdraw the One Dot Six Plan .................18
4.      No Legal or Tax Advice Is Provided to You by the One Dot
        Six Specific Disclosure Statement ................................................18
5.      No Admission Made .......................................................................18

C.      **Certain Tax Matters** ................................................................................**18**

**VII. CONFIRMATION OF THE ONE DOT SIX PLAN** ...........................................**19**

A.      **Requirements for Confirmation of the One Dot Six Plan** ....................**19**
1.      Requirements of Bankruptcy Code Section 1129(a) .....................19
        (a)     General Requirements...........................................................19
        (b)     The Best Interests Test and the Plan Proponents'
                Liquidation Analysis ...........................................................20
        (c)     Feasibility............................................................................22
2.      Requirements of Bankruptcy Code Section 1129(b) .....................22
        (a)     No Unfair Discrimination ...................................................22
        (b)     Fair and Equitable Test .......................................................22
3.      Failure to Vote on the One Dot Six Plan ......................................23

**VIII. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION**
**OF THE ONE DOT SIX PLAN**..........................................................................**23**

A.      **Liquidation Under Chapter 7** ................................................................**23**

B.      **Alternative Plan of Reorganization**........................................................**24**

**IX. CERTAIN U.S. FEDERAL INCOME TAX  CONSEQUENCES OF THE ONE DOT SIX PLAN**..................................................................................**24**

    1.    Certain U.S. Federal Income Tax Consequences to One Dot Six ........................................................................................26

        (a)    LightSquared, Inc. Consolidated Group ............................26

        (b)    Cancellation of Debt and Reduction of Tax Attributes.....................................................................26

        (c)    Alternative Minimum Tax .................................................27

    2.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Against, or Equity Interests In, One Dot Six under the One Dot Six Plan ....................................................27

        (a)    Accrued but Unpaid Interest .............................................28

        (b)    Market Discount.................................................................28

        (c)    Limitations on Use of Capital Losses ...............................29

        (d)    Medicare Tax on Net Investment Income..........................29

        (e)    Information Reporting and Backup Withholding ..............30

    3.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders under the One Dot Six Plan....................................30

        (a)    Information Reporting and Backup Withholding for Non-U.S. Holders.............................................................30

**CONCLUSION** ..............................................................................................**32**

THE INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF ONE DOT SIX CORP. ("ONE DOT SIX") PROPOSED BY U.S. BANK NATIONAL ASSOCIATION AND MAST CAPITAL MANAGEMENT, LLC (ON BEHALF OF ITSELF AND ITS MANAGEMENT FUNDS AND ACCOUNTS) (THE "ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN FOR ONE DOT SIX AS IT MAY BE MODIFIED, AMENDED, AND/OR SUPPLEMENTED FROM TIME TO TIME (THE "ONE DOT SIX PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE ONE DOT SIX PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE ONE DOT SIX PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, ONE DOT SIX ENTITLED TO VOTE ON THE ONE DOT SIX PLAN ARE ADVISED AND ENCOURAGED TO READ THE GENERAL DISCLOSURE STATEMENT, THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT AND THE ONE DOT SIX PLAN *IN THEIR ENTIRETY* BEFORE VOTING TO ACCEPT OR REJECT THE ONE DOT SIX PLAN OR ANY OTHER PLAN FILED IN THE DEBTORS' CHAPTER 11 CASES (COLLECTIVELY, THE "COMPETING PLANS").  ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, ONE DOT SIX ENTITLED TO VOTE ON THE ONE DOT SIX PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE V OF THE GENERAL DISCLOSURE STATEMENT AND ARTICLE VI OF THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE ONE DOT SIX PLAN OR ANY COMPETING PLAN.  A COPY OF THE ONE DOT SIX PLAN IS ANNEXED HERETO AS EXHIBIT A.  SUMMARIES AND STATEMENTS MADE IN THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ONE DOT SIX PLAN AND THE EXHIBITS ANNEXED TO THE ONE DOT SIX PLAN AND THE EXHIBITS ANNEXED TO THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT, THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT AND THE TERMS OF THE ONE DOT SIX PLAN, THE TERMS OF THE ONE DOT SIX PLAN WILL GOVERN.

THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS OBTAINED DIRECTLY FROM THE DEBTORS, AS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN OR ADOPTED BY THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN THE GENERAL DISCLOSURE STATEMENT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN THE GENERAL DISCLOSURE STATEMENT AND THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE PLAN PROPONENTS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, THE PLAN PROPONENTS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE ONE DOT SIX PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, ONE DOT SIX.

THE STATEMENTS CONTAINED IN THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND THE DELIVERY OF THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THE ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT DO NOT

2

PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN
THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE
AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN
SUCH AGREEMENT.

**THE PLAN PROPONENTS BELIEVE THAT THE ONE DOT SIX PLAN
IS FAIR AND EQUITABLE, WILL MAXIMIZE THE RECOVERY FOR ONE
DOT SIX'S CREDITORS AND ALL PARTIES IN INTEREST, WILL ENABLE
ONE DOT SIX TO CONFIRM A CHAPTER 11 PLAN, AND ACCOMPLISHES
THE OBJECTIVES OF CHAPTER 11.**

**THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS AGAINST,
AND EQUITY INTERESTS IN, ONE DOT SIX TO VOTE TO ACCEPT THE
ONE DOT SIX PLAN ON THE BALLOT APPLICABLE TO THE ONE DOT SIX
PLAN.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS
CIRCULAR 230, HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS
IN, ONE DOT SIX ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF
FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THE ONE DOT
SIX SPECIFIC DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN
TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AGAINST,
OR EQUITY INTERESTS IN, ONE DOT SIX FOR THE PURPOSE OF
AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE
INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN
CONNECTION WITH THE PROMOTION OR MARKETING OF THE
TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS
OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, ONE DOT SIX
SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR
CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## I. SUMMARY OF THE ONE DOT SIX PLAN[2]

### A.    Introduction[3]

The following summary is a general overview only, which is qualified in its entirety by,
and should be read in conjunction with, the more detailed discussions, information, and financial
statements and notes thereto appearing elsewhere in the One Dot Six Specific Disclosure
Statement, the General Disclosure Statement and the One Dot Six Plan.  U.S. Bank National
Association ("U.S. Bank") and Mast Capital Management, LLC (on behalf of itself and its
management funds and accounts, collectively, "Mast") are the proponents of the One Dot Six
Plan within the meaning of Bankruptcy Code section 1129 (the "Plan Proponents").  The Plan

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the One Dot Six Plan.
[3] The description of the One Dot Six Plan contained in the One Dot Six Specific Disclosure Statement is qualified in
its entirety by the One Dot Six Plan and the operative provisions thereof.  To the extent there is any inconsistency
between the description of the One Dot Six Plan in the One Dot Six Specific Disclosure Statement and One Dot Six
Plan, the One Dot Six Plan and the operative provisions therein shall control.

Proponents reserve the right to modify the One Dot Six Plan consistent with Bankruptcy Code section 1127 and Bankruptcy Rule 3019.

The One Dot Six Plan described herein constitutes a plan pursuant to chapter 11 of the Bankruptcy Code for the resolution of Claims against, and Equity Interests in, One Dot Six, one of the Debtors in the above-captioned cases. The One Dot Six Plan does not comprise a plan for, nor is it proposed with respect to, any other Debtor whose Chapter 11 Case is being jointly administered with the Chapter 11 Case of One Dot Six.[4]

1.    Overview

Mast, one of the co-proponents of the One Dot Six Plan, is the Debtors' sole DIP Lender and largest non-affiliate holder of indebtedness under the Inc. Facility Credit Agreement. Founded in 2002, Mast is a "Registered Investment Advisor" located in Boston, Massachusetts that manages approximately $1.3 billion in assets across a flagship fund and 4 single LP funds. Joining Mast as co-proponent of the One Dot Six Plan is U.S. Bank, agent under the Inc. Facility Credit Agreement. The DIP Claims and the Claims arising under the Inc. Facility Credit Agreement held by Mast are secured by the DIP Collateral and the Prepetition Inc. Collateral, respectively (each as defined in the Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors to Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay [Dkt. No. 224]), which collateral includes substantially all of the Assets of One Dot Six.

The One Dot Six Plan is premised on the sale of One Dot Six's Assets pursuant to a Bankruptcy Court-supervised auction process, in connection with which an entity formed by Mast will serve as the Stalking Horse Bidder for the Assets identified in the Stalking Horse Agreement, a draft of which is attached hereto as Exhibit B. The One Dot Six Plan contemplates a Stalking Horse Bid in the form of a credit bid in an amount equal to (i) all Obligations (as defined in the DIP Credit Agreement) owing under the DIP Credit Agreement, plus (ii) $1.00 of obligations owing under the Inc. Facility Credit Agreement held by Mast in the form of Inc. Facility – One Dot Six Guaranty Claims, plus Cash in an amount necessary to satisfy those obligations under the One Dot Six Plan that are required to be satisfied in Cash, if any. The Stalking Horse Bid shall be subject to higher and better offers in accordance with the bid procedures filed on [September 10, 2013], attached hereto as Exhibit C.

Pursuant to the proposed auction procedures governing the sale of One Dot Six's Assets, any qualified bid must include a Cash component in an amount sufficient to: (i) make distributions required to be in the form of Cash to holders of Allowed Claims in accordance with the terms of the One Dot Six Plan, (ii) fund certain reserves established under the One Dot Six Plan as and to the extent applicable, and (iii) (other than with respect to the Stalking Horse Bid) pay all amounts due to be paid to the Stalking Horse Bidder in the event the Stalking Horse Bidder is not the winning bidder.

---

[4] See Order Directing the Joint Administration of the Debtors' Chapter 11 Cases [Docket No. 33].

The One Dot Six Plan provides for the classification and treatment of Claims against, and Equity Interests in, One Dot Six.  The One Dot Six Plan designates five (5) Classes of Claims and one (1) Class of Equity Interests, which classify all Claims against, and Equity Interests in, One Dot Six.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims against, and Equity Interests in, One Dot Six.

Holders of Claims in Classes 1 and 2, comprised of Priority Non-Tax Claims and Other Secured Claims, respectively, will receive payment in full on account of their Allowed Claims or otherwise be rendered unimpaired.  The holders of Claims or Equity Interests in Classes 3, 4, 5 and 6, comprised of Inc. Facility – One Dot Six Guaranty Claims, Inc. Facility – One Dot Six Subordinated Guaranty Claims, One Dot Six General Unsecured Claims, and Equity Interests, respectively, will receive (depending on the outcome of the auction process) pro-rata distributions on account of their Allowed Claims and Equity Interests in accordance with the provisions of the One Dot Six Plan.

Following the Effective Date, One Dot Six will be managed and administered by an entity designated by the Plan Proponents, referred to as the Plan Administrator.  The Plan Administrator's responsibilities will include, among other things, overseeing the Wind Down of One Dot Six, monetizing the Retained Assets, taking actions necessary to settle and compromise Claims against, the One Dot Six Estate and ensuring compliance with the terms of the One Dot Six Plan.[5]

 2. <u>Distribution to Classes of Claims Against, and Equity Interests In, One Dot Six</u>

As provided by Bankruptcy Code section 1123(a)(1), Administrative Claims, One Dot Six Fee Claims, U.S. Trustee Fees, DIP Claims and Priority Tax Claims against One Dot Six shall not be classified under the One Dot Six Plan, and shall instead be treated separately as Unclassified Claims on the terms set forth in <u>Article II</u> of the One Dot Six Plan.  Unless otherwise agreed to by the applicable holders of such Claims, holders of such Claims will receive payment in full on account of their Claims and as such are not entitled to vote on the One Dot Six Plan.

The One Dot Six Plan provides for the classification of all other Claims against, and Equity Interests in, One Dot Six.  A Claim against, or Equity Interest in, One Dot Six is placed in a particular Class for purposes of voting on the One Dot Six Plan, and receiving distributions pursuant to the One Dot Six Plan, to the extent applicable, only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

---

[5] The Plan Proponents believe that (i) the payment or other satisfaction of the DIP Claims and (ii) the payment or other satisfaction of all or a portion of the Inc. Facility – One Dot Six Guaranty Claims pursuant to the terms of the One Dot Six Plan will result in subrogation, contribution and/or reimbursement claims assertable by One Dot Six against Lightsquared Inc. for that amount of such DIP Claims and Inc. Facility – One Dot Six Guaranty Claims allocable to Lightsquared Inc.  Any such subrogation, contribution and/or reimbursement claims shall constitute Retained Assets.

A chart summarizing the consideration each Class of Claims or Equity Interests is entitled to receive under the One Dot Six Plan is set forth at Article II below.

3.    Corporate Governance of One Dot Six

From and after the Effective Date, One Dot Six shall be managed and administered by the Plan Administrator, who shall have full authority to administer the provisions of the One Dot Six Plan and the Purchase Agreement.  The Plan Administrator may, subject to the terms of the Purchase Agreement, take any actions contemplated by the One Dot Six Plan or the Purchase Agreement on behalf of One Dot Six to the extent permitted by (i) the Sale Order, (ii) the Confirmation Order and (iii) the articles of incorporation, by-laws, or similar organizational documents of One Dot Six in place as of the Effective Date.

**B.    The One Dot Six Plan is Fair, Reasonable and In the Best Interests of the Debtors' Estates and All Creditors**

The Plan Proponents believe that the terms of the One Dot Six Plan are fair, reasonable and in the best interests of the One Dot Six Estate and all parties in interest.

**C.    Business Justifications for the Sale**

The One Dot Six Plan contemplates the One Dot Six Sale.  The proposed One Dot Six Sale provides the One Dot Six Estate with a mechanism to provide creditors and equity holders of One Dot Six with recoveries on account of their Claims against, and Equity Interests in, One Dot Six through the receipt of proceeds of the One Dot Six Sale, which will be distributed pursuant to the One Dot Six Plan.  The Stalking Horse Bid submitted by the Stalking Horse Bidder will be subject to higher and better offers, thereby ensuring that the One Dot Six Estate will realize the best price obtainable for the Assets.

The Plan Proponents remain supportive of any course of action that will maximize value for the One Dot Six Estate, including the Debtors' efforts to obtain Specified Regulatory Approvals.  At this time, however, there is no certainty as to whether or if the Specified Regulatory Approvals will be obtained.  Accordingly, the Plan Proponents have proposed the One Dot Six Plan as a means of monetizing the One Dot Six Assets for the benefit of all stakeholders of One Dot Six.

**THE PLAN PROPONENTS BELIEVE THAT THE ONE DOT SIX PLAN WILL ENABLE ONE DOT SIX TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE ONE DOT SIX PLAN IS IN THE BEST INTERESTS OF ONE DOT SIX AND ITS STAKEHOLDERS.  THE PLAN PROPONENTS URGE CREDITORS AND HOLDERS OF EQUITY INTERESTS TO VOTE TO ACCEPT THE ONE DOT SIX PLAN ON THE BALLOT APPLICABLE TO THE ONE DOT SIX PLAN.**

## II. CLASSES ENTITLED TO VOTE ON THE ONE DOT SIX PLAN

The following chart describes whether each Class of Claims and Equity Interests is entitled to vote to accept or reject the One Dot Six Plan. For a complete description of voting procedures and deadlines, please see <u>Article I.C.</u> of the General Disclosure Statement.

| **Class** | **Claim** | **Status** | **Voting Rights** |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| Class 3 | Inc. Facility – One Dot Six Guaranty Claims | Impaired | Entitled to Vote |
| Class 4 | Inc. Facility – One Dot Six Subordinated Guaranty Claims | Impaired | Entitled to Vote |
| Class 5 | One Dot Six General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Equity Interests | Impaired | Entitled to Vote |

## III. TREATMENT UNDER THE ONE DOT SIX PLAN

**<u>Chart of Consideration Allocable to Unclassified Claims</u>**

The following is a summary of the consideration that Unclassified Claims are entitled to receive under the One Dot Six Plan.

| **Unclassified Claim** | **Amount** | **Treatment** |
|---|---|---|
| Administrative Claims | [TBD] | Each holder of an Allowed Administrative Claim shall receive, (i) the amount of such holder's Allowed Administrative Claim in one payment of Plan Consideration in the form of Cash (to the extent not previously paid by One Dot Six) or (ii) such other treatment as may be agreed upon in writing by One Dot Six (or, if after the Effective Date, the Disbursing Agent), the Purchaser, and such holder; *provided*, that such treatment shall not provide a recovery to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; *provided*, *further*, that an Administrative Claim |

|  |  | representing a liability incurred in the ordinary course of business of One Dot Six may be paid by One Dot Six (or, if after the Effective Date, the Disbursing Agent) in the ordinary course of business; *provided*, *further*, that the Break-Up Fee, if applicable, and Expense Reimbursement shall be paid in accordance with the terms of the Stalking Horse Agreement and Bid Procedures Order; and *provided*, *further*, that any Allowed Administrative Claim accrued or incurred prior to the Effective Date, but not paid on or prior to the Effective Date, shall be paid from the reserve established pursuant to the One Dot Six Plan (and, to the extent that amounts deposited in the reserve established pursuant to the One Dot Six Plan are insufficient to pay such Allowed Administrative Claim, One Dot Six may withdraw Cash from the Wind Down Reserve to pay such Allowed Administrative Claim). |
|---|---|---|
| DIP Claims | $61,804,787.46 *as of July 31, 2013, plus interest, exit fees, other fees, expenses and all other obligations incurred under the DIP Credit Agreement through and including the Effective Date.* | All DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount due and owing under the DIP Credit Agreement. Each holder of an Allowed DIP Claim shall be paid in full in Plan Consideration in the form of Cash on the Effective Date, except to the extent such holder agrees to less favorable treatment; *provided*, *however*, that in the event the Stalking Horse Bidder submits the Successful Bid, the amount of all DIP Claims shall be reduced on a dollar-for-dollar basis by the amount of DIP Claims that are credit bid in connection with the Successful Bid. |
| Priority Tax Claims | [$0] | Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of such Allowed Priority Tax Claim: (a) Plan Consideration in the form of Cash in the amount of such Allowed Priority Tax Claim (to the extent not previously paid by One Dot Six) on the later of (i) the applicable Plan Distribution Date and (ii) as soon as practicable after such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) |

|  |  | such other treatment as may be agreed to by such holder of an Allowed Priority Tax Claim, One Dot Six (or, if after the Effective Date, the Disbursing Agent) and the Purchaser; *provided*, that such treatment shall not provide a recovery to such holder having a present value as of the Effective Date in excess of such holder's Allowed Priority Tax Claim. |

**Chart of Consideration Allocable to Each Class**

The following is a summary of the consideration each Class of Claims and Equity Interests is entitled to receive under the One Dot Six Plan.

| Class | Amount | Treatment |
|-------|--------|-----------|
| Priority Non-Tax Claims | [$0] | The legal, equitable and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered.  Unless otherwise agreed to by a holder of an Allowed Priority Non-Tax Claim, One Dot Six (or, if after the Effective Date, the Disbursing Agent) and the Purchaser, each holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Non-Tax Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Claim. |
| Other Secured Claims | [$0] | Unless otherwise agreed to by a holder of an Allowed Other Secured Claim, One Dot Six (or, if after the Effective Date, the Disbursing Agent) and the Purchaser, each holder of an Allowed Other Secured Claim shall receive, at the election of the Plan Proponents or the Plan Administrator, as applicable: (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Other Secured Claim; or (2) such other treatment that will render the Other Secured Claim unimpaired pursuant to Bankruptcy Code section 1124. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until (A) full and final payment of such Allowed Other Secured Claim is made as provided in the One Dot Six Plan or (B) the |

9

| | | Collateral securing such Liens is sold and such Liens shall attach to the respective proceeds of such sale to the extent attributable to such Collateral and with the same validity, priority, force and effect. |
|---|---|---|
| Inc. Facility – One Dot Six Guaranty Claims | $208,645,789.92 _as of the Petition Date, plus (i) interest, including all default interest thereon, payable from the Petition Date through and including the Effective Date, (ii) the Inc. Facility Prepayment Premium allocable to the Inc. Facility – One Dot Six Guaranty Claims, and (iii) fees and expenses payable to the Inc. Facility Agent from the Petition Date through and including the Effective Date._ | Each holder of an Allowed Inc. Facility – One Dot Six Guaranty Claim will receive on account of its Inc. Facility – One Dot Six Guaranty Claim its Pro Rata Share of Plan Consideration (if any) remaining after (A) payment in full of Unclassified Claims and (B) payment in full of Priority Non-Tax Claims and Other Secured Claims; _provided_, _however_, that in the event the Stalking Horse Bidder submits the Successful Bid, the amount of all Inc. Facility – One Dot Six Guaranty Claims shall be reduced on a dollar-for-dollar basis by the amount of Inc. Facility – One Dot Six Guaranty Claims that are credit bid in connection with the Successful Bid. |
| Inc. Facility – One Dot Six Subordinated Guaranty Claims | $113,557,696.10 _as of the Petition Date, plus (i) interest, including all default interest thereon, payable from the Petition Date through and including the Effective Date and (ii) the Inc. Facility Prepayment Premium allocable to the Inc. Facility – One Dot Six Subordinated Guaranty Claims._ | Each holder of an Allowed Inc. Facility – One Dot Six Subordinated Guaranty Claim will receive on account of its Inc. Facility – One Dot Six Subordinated Guaranty Claim its Pro Rata Share of Plan Consideration (if any) remaining after (A) payment in full of Unclassified Claims, (B) payment in full of Priority Non-Tax Claims and Other Secured Claims, and (C) payment in full of Inc. Facility – One Dot Six Guaranty Claims.  In the event that there is not sufficient Plan Consideration to satisfy the Claims identified in (A), (B) and (C) in full, holders of Inc. Facility – One Dot Six Subordinated Guaranty Claims shall receive no recovery on account of such Claims. |
| One Dot Six General Unsecured Claims | [$0] | Each holder of an Allowed One Dot Six General Unsecured Claim will receive in full and final satisfaction, settlement, release and discharge, and in exchange for each One Dot Six General Unsecured Claim its Pro Rata Share of Plan Consideration (if any) remaining |

| | | |
|---|---|---|
| | | after (A) payment in full of Unclassified Claims, (B) payment in full of Priority Non-Tax Claims and Other Secured Claims, (C) payment in full of Inc. Facility – One Dot Six Guaranty Claims, and (D) payment in full of Inc. Facility – One Dot Six Subordinated Guaranty Claims.  In the event that there is not sufficient Plan Consideration to satisfy the Claims identified in (A), (B), (C) and (D) in full, holders of One Dot Six General Unsecured Claims shall receive no recovery on account of such Claims. |
| Equity Interests | N/A | Each holder of a Equity Interest will receive in full and final satisfaction, settlement, release and discharge and in exchange for each Equity Interest its Pro Rata Share of Plan Consideration (if any) remaining after (A) payment in full of Unclassified Claims, (B) payment in full of Priority Non-Tax Claims and Other Secured Claims, (C) payment in full of Inc. Facility – One Dot Six Guaranty Claims, (D) payment in full of Inc. Facility – One Dot Six Subordinated Guaranty Claims and (E) payment in full of One Dot Six General Unsecured Claims.  In the event that there is not sufficient Plan Consideration to satisfy the Claims identified in (A), (B), (C), (D) and (E) in full, holders of Equity Interests shall receive no recovery on account of such Equity Interests. |

## IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.    <u>General Treatment</u>

As of and subject to the occurrence of the Effective Date and payment (or provision of the adequate assurance of payment) of the applicable Cure Costs, to the fullest extent permitted under applicable law, all executory contracts and unexpired leases of One Dot Six shall be deemed to be rejected by One Dot Six as of the Effective Date, except for any executory contract or unexpired lease that:  (i) previously has been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; (ii) is designated specifically or by category as a contract or lease to be assumed on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is a Designated Contract; or (iv) is the subject of a separate motion to assume and assign to a Person other than the Purchaser or to reject under Bankruptcy Code

11

section 365 pending on the Effective Date.  Listing a contract or lease in the Schedule of Assumed Executory Contracts and Unexpired Leases shall not constitute an admission by One Dot Six that One Dot Six has any liability thereunder.

To the extent that an executory contract or unexpired lease is a Designated Contract, any such Designated Contract will be assumed by One Dot Six on the Effective Date and assigned by One Dot Six to the Purchaser at the Closing.  Each executory contract or unexpired lease assumed pursuant to the One Dot Six Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by One Dot Six and the Plan Administrator in accordance with its terms, except as such terms may have been modified by such order.

Notwithstanding anything to the contrary in the One Dot Six Plan, but subject to the terms and conditions of the Purchase Agreement, One Dot Six and the Purchaser shall have the right to alter, amend, modify or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time before the Effective Date; provided, that to the extent that, as of the Closing Date, there is any pending dispute between One Dot Six and a counterparty to an executory contract or unexpired lease regarding the Cure Costs payable under such contract or lease, One Dot Six shall reserve the right to remove the applicable contract or lease to the Schedule of Assumed Executory Contracts and Unexpired Leases following the resolution of such dispute, in which event such contract or lease shall be deemed rejected.

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute the approval, pursuant to Bankruptcy Code sections 365(a) and 1123(b), of: (i) the assumptions and rejections of executory contracts and unexpired leases pursuant to <u>Article VIII.A.1</u> of the One Dot Six Plan; and (ii) the assumption and assignment of the Designated Contracts pursuant to <u>Article VIII.A.2</u> of the One Dot Six Plan.

2.    <u>Notice of Proposed Assumption of Executory Contracts or Unexpired Leases</u>

At least ten (10) calendar days prior to the Confirmation Hearing, the Plan Proponents will file with the Court and serve upon the counterparties to the executory contracts and unexpired leases to be assumed by One Dot Six under the One Dot Six Plan a notice regarding the proposed assumption of their executory contract or unexpired lease and the proposed cure obligations substantially in the form attached as Schedule 6 to the Disclosure Statement Order[6] (the "<u>Contract and Lease Counterparties Notice</u>").  The Contract and Lease Counterparties Notice will (a) list the applicable Cure Costs, if any, (b) describe the procedures for filing objections to the proposed assumption or Cure Costs, and (c) explain the process by which related disputes shall be resolved by the Bankruptcy Court.

To the extent that One Dot Six and/or the Purchaser alter, amend, modify or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases after the date that is ten

---

[6] As defined in the Debtors' Motion for Entry of Order (i) Approving Solicitation and Notice Procedures with Respect to Confirmation of Competing Plans, (ii) Approving the Forms of Various Ballots and Notices in Connection Therewith, (iii) Approving the Scheduling of Certain Dates in Connection with Confirmation of Competing Plans, and (iv) Granting Related Relief [Dkt. No. 820].

(10) calendar days prior to the Confirmation Hearing, the appropriate party shall file notice of any modification or supplement with the Bankruptcy Court (the "Supplemental Contract and Lease Counterparties Notice") and provide notice of the modification or supplement to each affected counterparty within five days of such decision. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related cure amount must be filed, served and actually received by the notice parties identified on the Supplemental Contract and Lease Counterparties Notice within 10 business days after service of the Supplemental Contract and Lease Counterparties Notice.

       3.       Claims Based on Rejection of Executory Contracts or Unexpired Leases

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as One Dot Six General Unsecured Claims. Upon receipt of their applicable Plan Distribution (if any) pursuant to Article III.C.5 of the One Dot Six Plan, all such Claims shall be discharged on the Effective Date, and shall not be enforceable against One Dot Six, the Plan Administrator, the Purchaser or their respective properties or interests in property (and shall not, for the avoidance of doubt, constitute Assumed Liabilities). For the avoidance of doubt, in the event that no Plan Distributions are made to holders of One Dot Six General Unsecured Claims pursuant to the terms of the One Dot Six Plan, all such Claims shall be deemed discharged on the Effective Date.

Except as otherwise provided in the Confirmation Order or Sale Order, each Person who is a party to a contract or lease rejected under the One Dot Six Plan must file with the Bankruptcy Court and serve on the Plan Administrator, not later than thirty (30) days after the Effective Date, a Proof of Claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever barred from filing a Claim, or sharing in distributions under the One Dot Six Plan, related to such alleged rejection damages.

       4.       Compensation and Benefit Programs

All employment and severance policies, and all compensation and benefit plans, policies, and programs of One Dot Six applicable to its employees, retirees and nonemployee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the One Dot Six Plan and on the Effective Date will be rejected unless any of the foregoing is an Acquired Asset and the counterparty thereto receives a notice of assumption, in which case the same shall be assumed and assigned to the Purchaser pursuant to the Purchase Agreement and in accordance with Bankruptcy Code sections 365 and 1123.

       5.       Post-Petition Contracts and Leases

To the extent set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, all contracts, agreements and leases that were entered into or assumed by One Dot Six after the Petition Date (other than the Purchase Agreement) shall be deemed assumed by One Dot Six on the Effective Date, and, with respect to any such contracts, agreements or leases that

are Designated Contracts, assigned to the Purchaser at Closing, without a need for any consent or approval of, or notice to, the counterparty to any such contract, agreement or lease.

## V. SIGNIFICANT PROVISIONS OF THE PURCHASE AGREEMENT[7]

1.   <u>Purchased Assets</u>

At Closing, One Dot Six agrees to sell to Purchaser, free and clear of all Liens (other than certain Permitted Liens and Assumed Liabilities) and Purchaser agrees to purchase from One Dot Six the Acquired Assets, which include, among other things, the following by way of summary only: (i) the Equipment; (ii) the Spectrum Lease Agreement; (iii) the Designated Contracts; (iv) certain Claims; (v) any books, records, files or papers of One Dot Six related to the Acquired Assets; (vi) Cash; and (vii) the Intellectual Property.

2.   <u>Excluded Assets</u>

The Purchase Agreement provides for Excluded Assets including, among others, equity interests in subsidiaries.

3.   <u>Assumed Liabilities</u>

On the Closing Date, Purchaser shall assume, among others, the following Liabilities of One Dot Six: (i) certain Liabilities arising out of or relating to the ownership of the Acquired Assets and the operation of the Business by Purchaser or any of its assignees after the Effective Date; (ii) certain Liabilities under the Assumed Contracts arising after the Effective Date; (iii) Liabilities for any and all Transfer Taxes due as a result of the transactions contemplated by the Purchase Agreement, if any; (iv) Cure Costs; and (v) certain Liabilities for Transferred Employees.

4.   <u>Excluded Liabilities</u>

The Purchase Agreement provides that the Non-Assumed Liabilities are all Liabilities of One Dot Six, other than the Assumed Liabilities assumed by Purchaser, which Non-Assumed Liabilities include, among others, (i) any Liabilities arising out of or in connection with any indebtedness of One Dot Six to its lenders, noteholders or otherwise; (ii) all Liabilities arising from or relating to the employment, or termination of employment, of any of One Dot Six's employees, including pursuant to Employee Benefit Plans, other than those specifically assumed pursuant to Section 6.6 of the Purchase Agreement; (iii) all Rejection Damages; and (iv) any Liabilities that arise, whether before, on or after the Closing, out of, or in connection with, the Excluded Assets, including any contract that is not an Assumed Contract.

---

[7] Capitalized terms used but not otherwise defined in this <u>Article V</u> have the meanings ascribed to them in either the One Dot Six Plan or the Purchase Agreement, as applicable.

5.      Purchase Price

In consideration for the Acquired Assets, and subject to the terms and conditions of the Purchase Agreement, Purchaser shall (a) pay to One Dot Six Cash in the amount required to (i) fund distributions required to be in the form of Cash to holders of Allowed Claims in accordance with the terms of the One Dot Six Plan, (ii) fund certain reserves established under the One Dot Six Plan, and (iii) (other than with respect to the Stalking Horse Bid) pay all amounts due to be paid to the Stalking Horse Bidder in the event the Stalking Horse Bidder is not the winning bidder; (b) in the event the Purchaser is the Stalking Horse Bidder, release under the DIP Credit Agreement and the Inc. Facility Credit Agreement all or a portion of the Liabilities arising thereunder in an aggregate amount equal to all Obligations (as defined in the DIP Credit Agreement) owing thereunder plus $1.00 of obligations owing under the Inc. Facility Credit Agreement held by Mast in the form of Inc. Facility – One Dot Six Guaranty Claims under Bankruptcy Code section 363(k); and (c) assume the Assumed Liabilities.

6.      Certain Conditions to Closing

i.   Approval of Plan.  All conditions to the Effective Date set forth in the One Dot Six Plan (including the entry of the Confirmation Order and the Sale Order by the Bankruptcy Court) shall have been satisfied, or duly waived with the express written consent of Purchaser, in accordance with the applicable provisions of the One Dot Six Plan and the transactions contemplated by the One Dot Six Plan to occur on or prior to the Closing shall have been or shall be consummated simultaneously with the Closing in accordance with the One Dot Six Plan.

ii.  HSR and FCC Consent.  Any applicable waiting period under the HSR Act shall have expired or shall have been earlier terminated.  In addition, the parties shall have received the FCC Consent.

iii. Sellers' Deliveries.  One Dot Six shall have delivered to Purchaser all items set forth in Section 3.2 of the Purchase Agreement.

iv.  Purchaser's Deliveries.  Purchaser shall have delivered to One Dot Six all items set forth in Section 3.3 of the Purchase Agreement.

## VI.

## CERTAIN FACTORS AFFECTING THE ONE DOT SIX PLAN

## A.      Certain Risk Factors Specific to the One Dot Six Plan

1.      Risks Related to the One Dot Six Sale

There can be no assurance that the One Dot Six Sale will be timely consummated.  The closing conditions set forth in the Purchase Agreement must be satisfied or waived in accordance with the Purchase Agreement.  Since many of these conditions have not yet been achieved, there can be no assurance when the conditions will be met and that there will not be a reduction in the

distributions under the One Dot Six Plan.  The Purchaser could breach or fail to perform under the Purchase Agreement, or conditions to consummation of the Purchase Agreement could fail to be satisfied.  In that event, there is no guarantee that another Person will express interest in either (i) acquiring the Acquired Assets or (ii) acquiring the Acquired Assets in an amount equal to or greater than the proposed purchase price.  Additionally, there can be no assurance that the auction of the Acquired Assets will result in a bid that is higher or otherwise better than the Stalking Horse Bid.

     2.    <u>Risk of Insufficient Cash to Fund Distributions to Holders of Claims Against, and Equity Interests in, One Dot Six in Full</u>

There is a risk that there may not be sufficient sale proceeds generated by the auction process to fund Plan Distributions to holders of Claims and/or Equity Interests.  A number of factors will affect the amount of Cash available for distribution under the One Dot Six Plan, including, without limitation, the amount of Cash contemplated by the bid ultimately selected as the Successful Bid.

     3.    <u>FCC-Related Considerations and Risks Respecting One Dot Six's Business</u>

     (a)    *The FCC License and Spectrum Lease Arrangement are Subject to a High Degree of Government Regulation*

The communications industry is highly regulated by governmental entities and regulatory authorities.  One Dot Six's ability to assign the Spectrum Lease Arrangement is completely dependent upon OP, LLC, an indirect subsidiary of Crown Castle International Corp. ("<u>Crown Castle</u>"), continuing to hold the FCC License for the Spectrum.  The failure to obtain or maintain the necessary governmental authorizations, specifically the FCC License and the Spectrum Lease Arrangement, would impair One Dot Six's ability to assign the Spectrum Lease Arrangement and would have a material adverse effect on its financial condition.

     (b)    *The Value of the Assets is Dependent Upon the FCC Renewing the Underlying FCC License*

Crown Castle and One Dot Six must comply with complex and changing FCC rules and regulations to maintain the FCC License and the Spectrum Lease Arrangement.  Non-compliance with FCC technical and legal requirements could result in fines, additional conditions, revocation, cancellation or non-renewal of the FCC License, or other adverse FCC actions that could prevent closing of the One Dot Six Sale.

The FCC License was issued for a ten-year term that expires on October 1, 2013 and will have to be renewed or extended prior to expiration.  At such time, Crown Castle will receive a renewal expectancy for the FCC License that is used to provide substantial service to the public.  One Dot Six soon will begin to use the Spectrum under the Spectrum Lease Arrangement, and it is not possible to determine the likelihood that One Dot Six, on behalf of Crown Castle, will be able to satisfy the substantial service requirement by the October 1, 2013 deadline.  If the substantial service requirement is not satisfied and a waiver or extension of the requirement is not obtained from the FCC, the FCC License will not be renewed by the FCC and the Spectrum

Lease will be terminated.  The loss of the FCC License, including failure to renew the FCC License, would prevent the closing of the One Dot Six Sale.

      (c)     *FCC Regulations and the Approval Process Could Delay or Impede the One Dot Six Sale and Intended Reorganization*

The One Dot Six Sale is subject to prior FCC approval and that could involve a lengthy review period prior to FCC approval.  One Dot Six anticipates that it will need FCC approval before the emergence of One Dot Six from chapter 11.  One Dot Six may not be able to obtain such FCC approval on a timely basis, if at all, and the FCC may impose new or additional conditions as part of any review of such a request.  As a result, these approval requirements could impede or prevent the intended reorganization and closing of the One Dot Six Sale.

    4.    Risk of Non-Confirmation of the One Dot Six Plan

Although the Plan Proponents believe that the One Dot Six Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the One Dot Six Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

    5.    Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept the One Dot Six Plan, the Bankruptcy Court may nevertheless confirm the One Dot Six Plan at the Plan Proponents' request if at least one impaired Class of Claims has accepted the One Dot Six Plan (such acceptance being determined without including the vote of any "insider" in such Class), and as to each impaired Class that has not accepted the One Dot Six Plan, if the Bankruptcy Court determines that the One Dot Six Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Class.  The Plan Proponents believe that the One Dot Six Plan satisfies these requirements, but there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.    Additional Factors to Be Considered**

    1.    The Plan Proponents Have No Duty to Update

The statements contained in the One Dot Six Specific Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of the One Dot Six Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Plan Proponents have no duty to update the One Dot Six Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

      2.        <u>No Representations Outside the One Dot Six Specific Disclosure Statement and the General Disclosure Statement</u>

No representations concerning or related to One Dot Six, the Chapter 11 Case of One Dot Six, or the One Dot Six Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the One Dot Six Specific Disclosure Statement, the General Disclosure Statement and any other disclosure statement for a plan related to One Dot Six approved by the Bankruptcy Court. Any representations or inducements made to secure your acceptance or rejection of the One Dot Six Plan that are other than as contained in, or included with, the One Dot Six Specific Disclosure Statement, the General Disclosure Statement and any other disclosure statement for a plan related to One Dot Six approved by the Bankruptcy Court should not be relied upon by you in arriving at your decision.

      3.        <u>Plan Proponents Can Withdraw the One Dot Six Plan</u>

The Plan Proponents may withdraw the One Dot Six Plan at any time.

      4.        <u>No Legal or Tax Advice Is Provided to You by the One Dot Six Specific Disclosure Statement</u>

The contents of the One Dot Six Specific Disclosure Statement should <u>not</u> be construed as legal, business or tax advice. Each holder of a Claim against, or Equity Interest in, One Dot Six should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim against, or Equity Interest in, One Dot Six.

The One Dot Six Specific Disclosure Statement is <u>not</u> legal advice to you. The One Dot Six Specific Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the One Dot Six Plan or object to confirmation of the One Dot Six Plan.

      5.        <u>No Admission Made</u>

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the One Dot Six Plan on One Dot Six or on holders of Claims against, or Equity Interests in, One Dot Six.

**C.    Certain Tax Matters**

For a summary of certain federal income tax consequences of the One Dot Six Plan to holders of Claims against, and Equity Interests in, One Dot Six, see <u>Article IX</u> below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE ONE DOT SIX PLAN."

## VII. CONFIRMATION OF THE ONE DOT SIX PLAN

**A.     Requirements for Confirmation of the One Dot Six Plan**

    1.     <u>Requirements of Bankruptcy Code Section 1129(a)</u>

        (a)     *General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in Bankruptcy Code section 1129 have been satisfied:

      (i)     The One Dot Six Plan complies with the applicable provisions of the Bankruptcy Code.

      (ii)     The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

      (iii)     The One Dot Six Plan has been proposed in good faith and not by any means proscribed by law.

      (iv)     Any payment made or promised by the Plan Proponents, One Dot Six, the Disbursing Agent, the Plan Administrator or any other Person for services or for costs and expenses in, or in connection with, the Chapter 11 Case of One Dot Six, or in connection with the One Dot Six Plan and incident to the Chapter 11 Case of One Dot Six, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the One Dot Six Plan is reasonable, or if such payment is to be fixed after confirmation of the One Dot Six Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

      (v)     The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the One Dot Six Plan, as a director or officer of One Dot Six, an affiliate of One Dot Six, or a successor to One Dot Six under the One Dot Six Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors, holders of Equity Interests in One Dot Six and with public policy, and the Plan Proponents have disclosed the identity of any insider that will be employed or retained by One Dot Six, and the nature of any compensation for such insider.

      (vi)     With respect to each Class of Claims against, or Equity Interests in, One Dot Six, each holder of an impaired Claim against, or Equity Interest in, One Dot Six either has accepted the One Dot Six Plan or will receive or retain under the One Dot Six Plan on account of such holder's Claim against, or Equity Interest in, One Dot Six, property of a value, as of the Effective Date, that is not

less than the amount such holder would receive or retain if One Dot Six were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)   Except to the extent the One Dot Six Plan meets the requirements of Bankruptcy Code section 1129(b) (discussed below), each Class of Claims or Equity Interests has either accepted the One Dot Six Plan or is not impaired under the One Dot Six Plan.

(viii)  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the One Dot Six Plan provides that Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims will be paid in full on the Effective Date.

(ix)    At least one Class of impaired Claims has accepted the One Dot Six Plan, determined without including any acceptance of the One Dot Six Plan by any insider holding a Claim in such Class.

(x)     Confirmation of the One Dot Six Plan is not likely to be followed by the liquidation or the need for further financial reorganization of One Dot Six or any successor to One Dot Six under the One Dot Six Plan, unless such liquidation or reorganization is proposed in the One Dot Six Plan. See discussion of "Feasibility" below.

(xi)    The One Dot Six Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in Bankruptcy Code section 1114), at the level established pursuant to Bankruptcy Code section 1114(e)(1)(B) or 1114(g) at any time prior to confirmation of the One Dot Six Plan, for the duration of the period that One Dot Six has obligated itself to provide such benefits, if any.

(b)     *The Best Interests Test and the Plan Proponents' Liquidation Analysis*

Pursuant to Bankruptcy Code section 1129(a)(7) (often called the "Best Interests Test"), holders of Allowed Claims against, and Equity Interests in, One Dot Six must either (a) accept the One Dot Six Plan or (b) receive or retain under the One Dot Six Plan property of a value, as of the One Dot Six Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if One Dot Six were to be liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

The first step in meeting the Best Interests Test is to determine the dollar amount that would be generated from a hypothetical liquidation of One Dot Six's Assets and properties in the context of a Chapter 7 case. The gross amount of Cash available would be the sum of the proceeds from the disposition of One Dot Six's Assets and the Cash held by One Dot Six at the time of the commencement of a Chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such Assets, the costs and expenses of the liquidation, and

such additional administrative expenses and priority Claims that may result from the termination of One Dot Six's businesses and the use of Chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with Bankruptcy Code section 726 (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the One Dot Six Plan on the Effective Date.

The One Dot Six costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by One Dot Six during its Chapter 11 Case and allowed in the Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals. Moreover, in a Chapter 7 liquidation, additional Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by One Dot Six both prior to, and during the pendency of, its Chapter 11 Case.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 7 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Plan Proponents have determined that confirmation of the One Dot Six Plan will provide each holder of a Claim against, or Equity Interest in, One Dot Six with a recovery that is not less than it would receive pursuant to a liquidation of One Dot Six under Chapter 7.

The liquidation analysis is further described in Exhibit D hereto, entitled "Liquidation Analysis". For the avoidance of doubt, the Plan Proponents do not adopt the liquidation analysis set forth in the General Disclosure Statement for any purpose.

UNDERLYING THE PLAN PROPONENTS' LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS MADE BY THE PLAN PROPONENTS AND THEIR ADVISORS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE PLAN PROPONENTS AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE PLAN PROPONENTS. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION

ANALYSIS WOULD BE REALIZED IF ONE DOT SIX WERE, IN FACT, TO UNDERGO A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH IN THE LIQUIDATION ANALYSIS.

(c)    *Feasibility*

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the One Dot Six Plan meets this requirement, the Plan Proponents have analyzed One Dot Six's ability to meet its financial obligations as contemplated thereunder.  As a result of the Purchase Agreement and contemplated Stalking Horse Bid, the Plan Proponents believe One Dot Six will be able to make all payments required to be made pursuant to the One Dot Six Plan.

2.    Requirements of Bankruptcy Code Section 1129(b)

The Bankruptcy Court may confirm the One Dot Six Plan over the rejection or deemed rejection of the One Dot Six Plan by a Class of Claims against, or Equity Interests in, One Dot Six if the One Dot Six Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

(a)    *No Unfair Discrimination*

This test applies to Classes of Claims against, or Equity Interests in, One Dot Six that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

(b)    *Fair and Equitable Test*

This test applies to Classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class, plus postpetition interest.  As to the dissenting Class, the test sets different standards, depending on the type of Claims or Equity Interests in such class:

(i)    Secured Claims.  Each holder of an impaired secured Claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the Allowed amount of its secured Claim and receives deferred Cash payments having a value, as of the effective date of the One Dot Six Plan, of at least the Allowed amount of such Claim or (ii) receives the "indubitable equivalent" of its Allowed secured Claim.  Secured Claims are not impaired under the One Dot Six Plan.

(ii)    Unsecured Claims.    Either (i) each holder of an impaired unsecured Claim receives or retains under the One Dot Six Plan

22

property of a value equal to the amount of its Allowed unsecured Claim or (ii) the holders of Claims against, and Equity Interests in, One Dot Six that are junior to the Claims of the dissenting Class will not receive or retain any property under the One Dot Six Plan.

(iii)    Equity Interests.  Either (i) each holder of an Equity Interest will receive or retain under the One Dot Six Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of Equity Interests that are junior to the Equity Interests of the dissenting Class will not receive or retain any property under the One Dot Six Plan.

The Plan Proponents believe the One Dot Six Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement.

3.    Failure to Vote on the One Dot Six Plan

If no holders of Claims against, or Equity Interests in, One Dot Six in a particular Class vote to accept or reject the One Dot Six Plan, the One Dot Six Plan shall be deemed accepted by the holders of such Claims against, or Equity Interests in, One Dot Six in such Class.  *See In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988); *In re Adelphia Commc'ns Corp., et al.*, 368 B.R. 140, 261-262 (Bankr. S.D.N.Y. 2007); *cf. In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989); *In re Tribune Co.*, 464 B.R. 126, 184-85 (Bankr. D.Del. 2011).

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE ONE DOT SIX PLAN

If the One Dot Six Plan is not confirmed and consummated, alternatives to the One Dot Six Plan include (i) liquidation of One Dot Six under Chapter 7 of the Bankruptcy Code, (ii) confirmation of a Competing Plan or (iii) confirmation of another plan of reorganization proposed in the Chapter 11 Cases (or in the Chapter 11 Case of One Dot Six).

## A.    Liquidation Under Chapter 7

If no plan can be confirmed, One Dot Six's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Assets of One Dot Six for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recovery of holders of Claims against, and Equity Interests in, One Dot Six is set forth in Article VII above, entitled "CONFIRMATION OF THE ONE DOT SIX PLAN"; Requirements for Confirmation of the One Dot Six Plan; The Best Interests Test and the Plan Proponents' Liquidation Analysis."  The Plan Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to holders of Claims against, and Equity Interests in, One Dot Six than those provided for in the One Dot Six Plan because of, among other things, (i) the likelihood that the Assets of One Dot Six would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee and (iii) additional expenses and Claims,

23

some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of One Dot Six's operations.

**B.    Alternative Plan of Reorganization**

If the One Dot Six Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate a different chapter 11 plan for One Dot Six.  Such a plan of reorganization might involve either a reorganization and continuation of One Dot Six's business or an orderly liquidation of its Assets under chapter 11.

**IX. CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE ONE DOT SIX PLAN**

The following is a summary of certain U.S. federal income tax consequences of the One Dot Six Plan to One Dot Six and certain holders of Claims against, and Equity Interests in, One Dot Six.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the One Dot Six Specific Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and none of the Plan Proponents or One Dot Six intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the One Dot Six Plan discussed below.  Events occurring after the date of the One Dot Six Specific Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the restructuring.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the One Dot Six Plan to One Dot Six or LightSquared, Inc., or any U.S. Holder or Non-U.S. Holder (as defined below).  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the One Dot Six Plan described below.

This summary does not apply to holders of Claims against, or Equity Interests in, One Dot Six that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Equity Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies).  Unless stated otherwise, the following discussion assumes that holders of Allowed Claims against, or Equity Interests in, One Dot Six hold such Claims or Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to One Dot Six, the LightSquared, Inc. consolidated group

("LightSquared Group"), and holders of Allowed Claims or Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or non-U.S. tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims against, or Equity Interests in, One Dot Six that, in any case, is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a holder of Claims against, or Equity Interests in, One Dot Six that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims against, or Equity Interests in, One Dot Six, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims or Equity Interests.

The U.S. federal income tax consequences of the One Dot Six Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim against, or Equity Interest in, One Dot Six. Each holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and non-U.S. law, of the restructuring described in the One Dot Six Plan.

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. THE TAX ADVICE CONTAINED IN THIS ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS ONE DOT SIX SPECIFIC DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

1.    Certain U.S. Federal Income Tax Consequences to One Dot Six

(a)    *LightSquared, Inc. Consolidated Group*

One Dot Six is a member of the LightSquared Group, which files its tax returns on a consolidated basis for federal (and certain state) tax purposes.  Accordingly, One Dot Six's U.S. federal income tax return information and liability (or losses) are included on the LightSquared Group consolidated return.  Currently, it is anticipated that One Dot Six will remain a member of the LightSquared Group through the Effective Date.

Under the terms and conditions of the Purchase Agreement, the Plan Proponents cannot determine whether One Dot Six will recognize gain or loss on the One Dot Six Sale.  To the extent that it recognizes gain, it is unclear whether One Dot Six will have sufficient current year tax loss and net operating loss ("NOL") carryovers, determined on a separate company basis, to offset such income.  However, the LightSquared Group currently has approximately $1.5 billion of NOL carryovers, of which approximately $400 million are limited due to an earlier ownership change.  Currently, the Plan Proponents believe such amounts are more than sufficient to offset any gain that might be recognized on the One Dot Six Sale.

The Plan Proponents believe that there is not currently a tax sharing agreement between the LightSquared Group and One Dot Six.

(b)    *Cancellation of Debt and Reduction of Tax Attributes*

As a result of the One Dot Six Plan, One Dot Six's aggregate outstanding indebtedness will be eliminated.  In general, absent an exception, a debtor will recognize cancellation of debt ("COD") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price.  The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 case and the discharge of debt occurs pursuant to that case.  Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of COD income which it excluded from gross income.  As a general rule, tax attributes will be reduced in the following order: (i) NOLs; (ii) most tax credits; (iii) capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (v) foreign tax credits.  A debtor with COD income may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code.

The amount of COD income, if any (and, accordingly, the amount of tax attributes required to be reduced), cannot be known with certainty until after the Effective Date.  Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the COD income at issue.  Since One Dot Six likely will be liquidated following the closing of the One Dot Six Sale, and it is anticipated that the

Effective Date and liquidation will occur in the same tax year, it is expected that no reduction of the tax attributes of One Dot Six will be required because there will be no Assets remaining at One Dot Six. Nonetheless, NOLs are reduced by the amount of such COD. To the extent that One Dot Six has its own NOLs remaining after calculating its taxable income for such year, they will be reduced by the amount of any COD. If One Dot Six does not have sufficient NOLs attributable to it to be reduced by the amount of any COD, then One Dot Six's other tax attributes, if any, will be reduced. If One Dot Six does not sufficient other tax attributes to be reduce by the remaining COD, the NOLs of the LightSquared Group (including any restricted NOLs) will be reduced by the amount of such excess COD. It is anticipated that the LightSquared Group will have current losses and NOL carryovers to offset any current income and COD.

(c)    *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes).

It is not anticipated that the One Dot Six Sale will cause the LightSquared Group to incur AMT.

2.    <u>Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Against, or Equity Interests In, One Dot Six under the One Dot Six Plan</u>

The U.S. federal income tax consequences of the One Dot Six Plan to U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the One Dot Six Plan and the distributions provided for or by the One Dot Six Plan generally will depend upon, among other things: (i) the manner in which a holder acquired a Claim or Equity Interest; (ii) the length of time a Claim or Equity Interest has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction in the current or prior years; (v) whether the U.S. Holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the U.S. Holder's method of tax accounting; (vii) whether the U.S. Holder will realize foreign currency exchange gain or loss with respect to a Claim or Equity Interest; and (viii) whether a Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims and Equity Interests are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

A U.S. Holder receiving a payment under the One Dot Six Plan in satisfaction of its Claim or Equity Interest generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received and (ii) its adjusted tax basis in the Claim or Equity Interest. Subject to the rules

discussed below relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the One Dot Six Plan by U.S. Holders of Claims or Equity Interests that hold their Claims or Equity Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset.  Capital gain or loss will be long-term if the Claim or Equity Interest was held by the U.S. Holder for more than one year and otherwise will be short-term. Payments received in respect of trade Claims against One Dot Six (i.e., Claims against One Dot Six based on accounts or notes receivable acquired in the ordinary course of a trade or business for services rendered or from the sale of stock in trade, inventory, and other property held mainly for sale to customers in a trade or business) generally will be treated as ordinary income or loss to the U.S. Holder.

If the One Dot Six Sale is through a credit bid, a U.S. Holder will recognize gain or loss to the extent that its share of the amount of the DIP Claims and/or Inc. Facility -- One Dot Six Guaranty Claims, as applicable, used to credit bid the purchase price exceed the U.S. Holder's basis in such Claims.  If the purchase price for the One Dot Six Sale is less than the amount of the DIP Claims and/or Inc. Facility -- One Dot Six Guaranty Claims and is paid in the form of a credit bid, the loss (or, less likely, gain) on the balance of such Claims will be computed as set forth in the preceding paragraph.

(a)    *Accrued but Unpaid Interest*

A portion of the consideration received by participating U.S. Holders may be attributable to accrued but unpaid interest with respect to their Claims against One Dot Six.  Such amount should be taxable to the U.S. Holders as ordinary interest income to the extent that the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full.  If the One Dot Six Plan is consummated, One Dot Six will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest, pursuant to the One Dot Six Plan.  Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a chapter 11 plan is binding for U.S. federal income tax purposes.  However, no assurance can be given that the IRS will not challenge such allocation.  If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the U.S. Holder's gross income.  U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the One Dot Six Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

(b)    *Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim against One Dot Six may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all payments which, at the time of purchase, remain to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest that is unconditionally payable in cash or other property (other than debt instruments of the issuer) at least annually at a single fixed rate.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

(c)     *Limitations on Use of Capital Losses*

U.S. Holders of Claims against, or Equity Interest in, One Dot Six who recognize capital losses as a result of the distributions under the One Dot Six Plan will be subject to limits on their use of capital losses. For non-corporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

(d)     *Medicare Tax on Net Investment Income*

Legislation enacted in 2010 requires certain U.S. Holders who are individuals, estates or trusts to pay a Medicare tax of 3.8% (in addition to taxes they would otherwise be subject to) on their "net investment income," which includes, among other things, interest, dividends, and capital gains from the sale or other disposition of property other than property held in a trade or business.

      (e)     *Information Reporting and Backup Withholding*

In general, U.S. Holders (other than corporations and other exempt holders) may be subject to information reporting requirements with respect to certain payments, including the payments with respect to Claims against, or Equity Interests in, One Dot Six pursuant to the One Dot Six Plan. In addition, such U.S. Holders may be subject to backup withholding at a rate of 28% on such payments if such U.S. Holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its U.S. federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

      3.     <u>Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders under the One Dot Six Plan</u>

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and non-U.S. income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the One Dot Six Plan, and its ownership of Claims against, or Equity Interests in, One Dot Six.

A Non-U.S. Holder of a Claim or Equity Interest generally will not be subject to U.S. federal income tax with respect to the receipt of any Cash or other consideration under the One Dot Six Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. If a Non-U.S. Holder is subject to U.S. federal income tax under either of these circumstances, the Non-U.S. Holder would generally be subject to taxation in manner similar to a U.S. Holder as described above. Any such Non-U.S. Holder should consult its tax advisor regarding its particular circumstances.

      (a)     *Information Reporting and Backup Withholding for Non-U.S. Holders*

Unless certain exceptions apply, One Dot Six must report annually to the IRS and to each Non-U.S. Holder certain payments to such non-U.S. Holder, including any interest paid during the taxable year (even if such payment is exempt from U.S. withholding and tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments by One Dot Six or its paying agent to a Non-U.S. Holder if such Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that One Dot Six or their paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Withholding is not an additional tax.  Any amounts withheld from a payment to a Non-U.S. Holder under the rules described above will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS.  A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting, withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

**Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE ONE DOT SIX PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, ONE DOT SIX ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE ONE DOT SIX PLAN.**

## CONCLUSION

The Plan Proponents believe that confirmation and implementation of the One Dot Six Plan is in the best interests of all holders of Claims against, and Equity Interests in, One Dot Six, and urge holders of impaired Claims and Equity Interests to vote to accept the One Dot Six Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Voting Deadline.

Dated: August 30, 2013

Respectfully submitted,

**U.S. BANK NATIONAL ASSOCIATION**
as Inc. Facility Agent

By: _____
Name:    James A. Hanley
Title:    Vice President


**MAST CAPITAL MANAGEMENT, LLC**
on behalf of itself and its management funds and accounts

By: _____
Name:    Adam Kleinman
Title:    Authorized Signatory

*Signature page for the One Dot Six Specific Disclosure Statement*

Dated: August 30, 2013

Respectfully submitted,

**U.S. BANK NATIONAL ASSOCIATION**
as Inc. Facility Agent

By: _____
Name:    James A. Hanley
Title:    Vice President

**MAST CAPITAL MANAGEMENT, LLC**
on behalf of itself and its management funds and
accounts

By: _____
Name:    Adam Kleinman
Title:    Authorized Signatory

*Signature page for the One Dot Six Specific Disclosure Statement*

## **EXHIBIT A**

**THE ONE DOT SIX PLAN**

**[TO BE FILED SEPARATELY]**

## **EXHIBIT B**

**STALKING HORSE AGREEMENT**

# EXHIBIT C

**BID PROCEDURES**

**[TO BE FILED]**

## **EXHIBIT D**

**LIQUIDATION ANALYSIS**

**[TO BE FILED]**