| | |
|---|---|
| WHITE & CASE LLP | WHITE & CASE LLP |
| 1155 Avenue of the Americas | Southeast Financial Center, Suite 4900 |
| New York, NY 10036 | 200 South Biscayne Blvd. |
| Telephone: (212) 819-8200 | Miami, FL 33131 |
| Facsimile: (212) 354-8113 | Telephone: (305) 371-2700 |
| Glenn M. Kurtz | Facsimile: (305) 358-5744 |
| Andrew C. Ambruoso | Thomas E Lauria (admitted *pro hac vice*) |
| Julia M. Winters | Matthew C. Brown (admitted *pro hac vice*) |

*Counsel to the Ad Hoc Secured Group of LightSquared LP Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**THE AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS'
RESPONSE TO THE OBJECTION OF L-BAND ACQUISITION, LLC TO THE
JANUARY 13, 2014 STATEMENT OF THE AD HOC SECURED GROUP
OF LIGHTSQUARED LP LENDERS AND NOTICE OF INTENT TO
PROCEED WITH CONFIRMATION OF THE FIRST AMENDED JOINT
<u>CHAPTER 11 PLAN AND MOTION FOR DECLARATORY RELIEF</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).

NEWYORK 9097282

The Ad Hoc Secured Group of LightSquared LP Lenders, excluding SP Special Opportunities, LLC (the "Ad Hoc LP Secured Group"),[2] which group is comprised of secured creditors and parties in interest in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby files this response (the "Response") to the Objection of L-Band Acquisition, LLC ("LBAC") to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent to Proceed With Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief [Docket No. 1232] (the "LBAC Motion"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.    LBAC has stood before this Court for the past six months touting the unconditional $2.22 billion "bag of money" it has offered to purchase substantially all of the assets of the LP Debtors. It used this largely unconditional offer to induce the Ad Hoc LP Secured Group to file a sale plan based on such offer and to seek substantial bid protections for LBAC, including a $51.8 million breakup fee, in exchange for LBAC agreeing to serve as the stalking horse bidder. When those bid protections were disputed by the Debtors and nearly all other stakeholders in these cases, LBAC agreed to make its offer irrevocable until February 15, 2014 as part of a compromise to resolve such objections. As soon as the auction passed and no other bidders submitted qualified bids, however, LBAC repudiated its agreement, demanding a

---

[2] As of the date hereof, the Ad Hoc LP Secured Group is comprised of Capital Research and Management Company, Cyrus Capital Partners, L.P., Fir Tree Capital Opportunity Master Fund, L.P., Intermarket Corporation, SP Special Opportunities LLC and UBS AG, Stamford Branch. Collectively, the members of the Ad Hoc LP Secured Group or their affiliates are the advisors to or beneficial owners of, or the holders or managers of, various accounts with investment authority, contractual authority or voting authority for $1,379,606,450.74 in aggregate principal amount of loans made pursuant to that certain credit agreement, dated as of October 1, 2010 (as amended, supplemented, restated or otherwise modified from time to time, the "Prepetition LP Facility Credit Agreement"), by and among LightSquared LP as borrower, its affiliate guarantors and the lenders party thereto (the "LightSquared LP Lenders") from time to time, which represents approximately 82% of the outstanding LP Secured Loans. See Seventh Supplemental Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019 [Docket No. 770] (the "W&C 2019 Statement").

2

conditional deal and a payment delay of up to a year without any offsetting price increase. With the Debtors essentially out of cash and teetering on the verge of administrative insolvency, LBAC then purported improperly to terminate its offer and filed the LBAC Motion seeking declaratory relief from the Court approving such termination.

2. LBAC relies primarily on the Plan Support Agreement (the "PSA") by and among the Ad Hoc LP Secured Group, LBAC and DISH Network Corporation ("DISH") and, secondarily, on LBAC's Asset Purchase Agreement (the "APA"). Neither the PSA nor the APA, however, addresses the issue before the Court: the revocability of LBAC's offer. Rather, the issue is governed by the Court's order approving bid procedures [Docket No. 892] ("Bid Procedures Order")—which unambiguously requires that LBAC's stalking horse bid remain irrevocable until February 15, 2014. LBAC's argument that its stalking horse bid had to remain open only if it was the second highest bid submitted is wrong and makes no sense. A stalking horse agreement sets a floor for the auction regardless of whether there are no other bids, lower bids or higher bids. LBAC cannot repudiate its obligations simply because there were no higher bids.

3. It is ironic that LBAC asks the Court to allow it to repudiate its obligations based on the Debtors' liquidity issues. It is LBAC that has caused the liquidity problems here. In any case, confirmation of the Ad Hoc LP Secured Group's chapter 11 plan [Docket No. 970-1] (the "Ad Hoc Plan") will solve such liquidity issues and permit a prompt conclusion of these Chapter 11 Cases.

3

**BACKGROUND**

4. The Court is familiar with the history and procedural posture of these Chapter 11 Cases. The background set forth herein is intended only to provide context for the Response.

5. On May 15, 2013, LBAC presented the Debtors with an unsolicited stalking horse offer to purchase certain assets of LightSquared LP and its subsidiaries, including licenses, authorizations and agreements for the use of 46 MHz of L-Band spectrum (the "LP Assets"), for $2 billion in cash and the assumption of certain material obligations related to the LP Assets (the "Initial LBAC Offer"). The Initial LBAC Offer was not conditioned on approval of the Debtors' pending regulatory applications before the FCC. The Initial LBAC Offer, by its terms, was to remain open until May 31, 2013. LBAC voluntarily extended the May 31, 2013 deadline in the Initial LBAC Offer indefinitely. (See June 3, 2013 email from R. Strickland to M. Barr, attached hereto as Exhibit "A")

6. Exclusivity terminated in these Chapter 11 Cases on July 15, 2013. On July 23, 2013, the Ad Hoc LP Secured Group, including SP Special Opportunities LLC ("SPSO"), entered into the PSA with LBAC and DISH. The PSA contemplated confirmation of the Ad Hoc Plan, which was premised on a sale of substantially all of the LP Assets pursuant to an auction process where LBAC would serve as the stalking horse bidder with an initial bid of $2.22 billion in cash and the assumption of certain material obligations related to the LP Assets (the "LBAC Bid"). The material terms of the LBAC Bid, including the assets to be purchased, the purchase price to be paid and the conditions to payment, were contained in the APA attached to the PSA as Exhibit "B".

7. The PSA referenced certain target dates, set forth in Exhibit "C" to the PSA, by which the parties to the PSA intended to achieve milestones related to the Ad Hoc Plan (the "<u>Milestones</u>"). Among other things, the Milestones provided that the Ad Hoc Plan be consummated on or before December 31, 2013. Notably, this date was chosen by the Ad Hoc LP Secured Group, and was not an important date to LBAC during the negotiations.

8. On July 23, 2013, the Ad Hoc LP Secured Group filed a joint chapter 11 plan for the LP Debtors [Docket No. 764], identifying LBAC as the stalking horse bidder under the plan, and also filed the disclosure statement with respect to the plan, which included the APA as Exhibit "F" thereto. On the same day, a hearing (the "<u>July 23 Hearing</u>") was held to consider the Debtors' Motion for Entry of Order Formalizing Certain Procedures, Scheduling Hearing Dates, and Establishing Other Deadlines in Connection with Disclosure Statement and Chapter 11 Plan Process [Docket No. 757] (the "<u>Scheduling Motion</u>"). At the July 23 Hearing, counsel for LBAC acknowledged that the LBAC Bid was a firm offer:

- "When you offer a company that is in Chapter 11 two billion dollars of cash . . . when you've got a bag [of] two billion dollars in cash sitting on your front porch, that speaks volumes." (July 23, 2013 Hr'g Tr. 25:2-7 (Strickland)); and

- "[O]ur asset purchase agreement isn't a fantastical, Swiss cheese, meaningless document. It's a very real offer for very real green money that is not contingent on the thing that is highly complicated and highly sensitive." (July 23, 2013 Hr'g Tr. 24:9-13 (Strickland)).

On July 24, 2013, the Court entered an order [Docket No. 772], scheduling, among other things, a hearing on bid procedures.

9. On August 28, 2013, the Ad Hoc LP Secured Group filed a motion seeking authorization to conduct an auction of the LP Assets, approving LBAC as the stalking horse bidder and approving the procedures for the auction [Docket No. 809] (the "<u>Bid</u>

5

NEWYORK 9097282

Procedures Motion"). The Bid Procedures Motion was contested by various parties, including the Debtors, who filed their own sale plan and motion to approve bid procedures.

10.     On September 24, 2013, the Court held a hearing on the issue of reimbursement of LBAC's expenses in connection with its stalking horse bid. During the hearing, LBAC's counsel again represented to the Court that it was important for LBAC to receive the bid protections it sought because its bid was unconditional:

- "[W]e have been out here effectively serving as everybody's backup and everybody's floor and everybody's stalking horse, since July. And we really don't want to be hanging out here anymore without appropriate buyer protections." (Sept. 24, 2013 Hr'g Tr. 42:11-15 (Strickland)); and

- "But there certainly is a requirement in the plan support agreement . . . that that is something that we—like every other stalking horse who is participating in something like this, let alone someone who's offering the amount of cash that my client is—we are anticipating having a breakup fee be put before Your Honor on Monday." (Sept. 24, 2013 Hr'g Tr. 43:10-14 (Strickland)).

11.     Indeed, throughout these Chapter 11 Cases, counsel for LBAC and DISH have repeatedly referenced LBAC's commitment to the LBAC Bid and LBAC's willingness to make good on its firm, unconditional offer:

- "[T]he bid itself is an opportunity that LBAC and DISH network very much want, as do its shareholders." (Oct. 9, 2013 Hr'g Tr. 20:2-8 (Strickland)); and

- "If the LP debtors want the bag of money that LBAC is offering, they have to agree to the agreement, or they have to negotiate a different agreement. But there's not any other way around that." (Dec. 10, 2013 Hr'g Tr. 140:7-10 (Strickland)).

12.     The Ad Hoc LP Secured Group pointed out that the bid protections sought by LBAC were critical in order to ensure a firm bid that would serve as a floor for the auction in these Chapter 11 Cases:

6

- "Consequently, if the LBAC bid protections are not adopted, then these Cases are in the problematic position of moving to auction without any stalking horse minimum bid, which could substantially damage these estates." (Omnibus Reply of the Independent Ad Hoc Secured Group of LightSquared LP Lenders to Bid Procedures Objections [Docket No. 863] ¶ 22);

- "Given that the Debtors have no stalking horse bidder, and will not agree to a $2.22 billion all-cash offer, it appears that the Debtors are really trying to keep the stalking horse protections from the existing stalking horse, LBAC, <u>even though (or more accurately because) LBAC can terminate its bid if it does not receive such protections</u>." (Objection of the Independent Ad Hoc Secured Group of LightSquared LP Lenders to LightSquared's Mot. for Entry of Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief [Docket No. 850] ¶ 4) (emphasis added).

13. Mr. Zelin likewise testified that the bid protections were necessary to bind LBAC:

- "While I cannot know with certainty what LBAC's reaction will be if the Independent Ad Hoc Group's Proposed Bid Procedures are not approved, <u>I do know that the failure to approve the Bid Protections will provide LBAC an opportunity to terminate its Stalking Horse Bid</u>, a decision that may be influenced by, among other things, the Debtors' failure to identify an alternative stalking horse bidder. <u>Without the approval of the Bid Protections, LBAC's willingness to maintain its purchase price at any Auction is uncertain</u>." (Decl. of Steven Zelin in Supp. of the Objection of the Independent Ad Hoc Secured Group of LightSquared LP Lenders to LightSquared's Mot. for Entry of Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief [Docket No. 850-2] ¶ 14) (emphasis added).

14. The parties negotiated the extent to which the LBAC Bid would be irrevocable, and LBAC ultimately agreed to keep the LBAC Bid open and irrevocable through the outside date of February 15, 2014. The Special Committee announced the agreement in open

7

court: "LBAC has agreed, and Ms. Strickland can confirm, that they'll remain a backup bidder for sixty days following entry of the confirmation order with an outside date of February 15th." (Sept. 30, 2013 Hr'g Tr. 74:9-77:18 (Sussberg))

15.     On October 1, 2013, the Court entered the Bid Procedures Order. The Bid Procedures Order further provides that all Qualified Bids "must be irrevocable until entry . . . of the [c]onfirmation [o]rder[ ]." (Bid Procedures Order § e.x) And with respect to LBAC's bid in particular, the Bid Procedures Order provides that it must remain open and irrevocable until the earlier of sixty days after confirmation and February 15, 2014:

> **Irrevocability of Certain Bids.** The Successful Bid(s) shall remain irrevocable in accordance with the terms of the purchase agreement(s) executed by the Successful Bidder(s); . . . provided further, that LBAC has agreed to serve as the Second Highest Bidder for the LP Assets, and that the LBAC Bid shall remain irrevocable, until the earlier of sixty (60) days after entry of the Confirmation Order(s) and February 15, 2014. . . .

(Bid Procedures Order § j (emphasis added)) The Bid Procedures Order also provides LBAC with significant bid protections, including a $51.8 million breakup fee, an expense reimbursement and other bid protections. (Bid Procedures Order 4)

16.     On October 28, 2013, the Ad Hoc LP Secured Group filed a solicitation version of the Ad Hoc Plan and the related disclosure statement, and commenced solicitation of the Ad Hoc Plan. The voting deadline for the Ad Hoc Plan was December 30, 2013. (See Order Modifying Previously Scheduled Hearing Dates and Deadlines in Connection with Chapter 11 Plan Process [Docket No. 1061]) On January 3, 2014, Kurtzman Carson Consultants LLC, as Claims and Noticing Agent for these Chapter 11 Cases, filed the Certification of Gil Hopenstand with respect to Tabulation of Votes on Competing Plans [Docket No. 1189]. This tabulation

8

indicated that the Ad Hoc Plan received the requisite votes accepting such plan and is thus confirmable.

17. On January 7, 2014, counsel for DISH and LBAC sent counsel for the Ad Hoc LP Secured Group a letter (the "January 7 Letter") purporting to terminate the PSA effective January 10, 2014, pursuant to Section 6.1(f)(1)—i.e., for failure to achieve the Milestones. (Jan. 7 Letter, attached hereto as Exhibit "B") The PSA does not provide a right to terminate the LBAC Bid, nor does it address the subject in any way.

18. The Ad Hoc LP Secured Group filed a statement [Docket No. 1220] on January 13, 2014, stating that it intended to seek confirmation of the Ad Hoc Plan. LBAC subsequently filed the LBAC Motion on January 16, 2014.

### RESPONSE

19. The LBAC Motion fails to demonstrate any legal basis for permitting LBAC to withdraw its irrevocable offer to purchase the LP Assets.[3] First, while LBAC dedicated much of the LBAC Motion to the purported termination of the PSA, it is the Bid Procedures Order, not the PSA, that controls this dispute. The Bid Procedures Order clearly and unambiguously requires LBAC to keep its offer irrevocable through February 15, 2014, and LBAC received substantial consideration in the form of bid protections for agreeing to do so. Second, consistent with LBAC's repeated representations to the Court and parties in interest in these Chapter 11 Cases, the APA referenced in the Bid Procedures Order is a valid offer that can

---

[3] The LBAC Motion seeks a declaratory judgment "declaring that both the PSA and LBAC Bid were terminated in their entirety on or before January 10, 2014". (LBAC Mot. 18) LBAC's request for declaratory relief should be denied for violating Federal Rule of Bankruptcy Procedure 7001. Bankruptcy Rule 7001(9) requires parties seeking a declaratory judgment to do so by commencing an adversary proceeding. Fed. R. Bankr. P. 7001(9); In re Teligent, Inc., 459 B.R. 190, 195 (Bankr. S.D.N.Y. 2011). Particularly where such a request raises complex issues best decided "in an orderly fashion that protects [the non-moving party's] rights," courts have denied requests for declaratory relief styled as motions rather than adversary proceedings. See, e.g., In re Eastman Kodak Co., No. 12-10202, 2012 WL 2255719, at *3-*4 (Bankr. S.D.N.Y. June 15, 2012). The LBAC Motion should thus be denied as procedurally improper.

9

be accepted by the LP Debtors or by a confirmation order in accordance with the Bid Procedures Order and New York law. Accordingly, the Court should enforce the Bid Procedures Order and, upon acceptance of the LBAC Bid at any time prior to February 15, 2014, confirm the Ad Hoc Plan.

> **A.  The Bid Procedures Order Controls this Dispute and Requires LBAC to Keep its Offer Open Through February 15, 2014**

20. As LBAC's primary argument (to which it devotes nearly half of the LBAC Motion), LBAC asserts that it has no further obligation to proceed with the LBAC Bid because its January 7 Letter "properly terminated" the PSA. (LBAC Mot. ¶ 4) Although the Ad Hoc LP Secured Group disagrees with LBAC's assertion that the PSA was properly terminated, termination of the PSA is irrelevant to LBAC's obligations under the Bid Procedures Order. It is the Bid Procedures Order, and not the PSA, that governs LBAC's rights and responsibilities to the estates as the stalking horse bidder and determines the date upon which LBAC's offer to purchase the LP Assets may be revoked.[4]

21. The PSA provides that, under appropriate circumstances, LBAC could terminate the PSA for not meeting the Milestones related to confirmation and funding. The PSA is silent as to, and does not provide, any right to terminate the APA or to withdraw the LBAC Bid. If the parties had intended that the failure to meet such Milestones would give LBAC the right to terminate the APA or withdraw its offer to purchase the LP Assets, the PSA would have

---

[4] LBAC asserts that the statements of counsel to the Ad Hoc LP Secured Group "demonstrate that the Ad Hoc LP Secured Group continued to be cognizant of the Milestones and anxious to ensure that the Milestones were not met so LBAC could not terminate the PSA and the LBAC Bid." (LBAC Mot. ¶ 22) As an initial matter, the statements of the Ad Hoc LP Secured Group or any other third party have no bearing on the enforceability of LBAC's offer to the LP Debtors or the irrevocability of such offer as provided for in the Bid Procedures Order. In any event, the statements referenced by LBAC only demonstrate a concern that the PSA, as opposed to the LBAC Bid, could be terminated. Termination of the PSA would have a number of potentially adverse consequences to the Ad Hoc LP Secured Group, including, most importantly, leaving LBAC, DISH and SPSO no longer bound to supporting the Ad Hoc Plan and free to pursue a different chapter 11 plan that would be less desirable to the Ad Hoc LP Secured Group.

10

said so. Given the specific language regarding termination rights in the PSA and the PSA's silence regarding termination of the APA or withdrawal of the LBAC Bid, the PSA cannot be read to include a right to terminate the LBAC Bid (even if termination would not violate a court order, as it would).

22. Indeed, the Bid Procedures Order clearly and unambiguously provides that "the LBAC Bid shall remain irrevocable until the earlier of sixty (60) days after entry of the Confirmation Order(s) and February 15, 2014." (Bid Procedures Order § j) The Court acknowledged this fact in late-October, after the Bid Procedures Order was entered, observing that "**we now got the LBAC bid locked in, which before we had it locked in, perhaps there was a sense that if the claims were disallowed, maybe the bid would go away**."[5] (Oct. 29, 2013 Hr'g Tr. 107:20-23) (emphasis added)

23. In a desperate attempt to evade the clear and unambiguous language of section j of the Bid Procedures Order, LBAC argues that such provision was added solely to address LBAC's agreement to serve as a back-up bidder, if it were outbid at the auction. (LBAC Mot. ¶ 21) According to LBAC, it was bound only if another bidder emerged, but could freely walk away from the deal if the LBAC Bid proved to be the highest or only bid offered for the LP Assets. The Bid Procedures Order simply does not state that. Moreover, LBAC's "interpretation" makes no sense. It would be absurd for LBAC to be bound only if its bid is not needed, but free to abandon the Debtors—which, as LBAC notes, are in the midst of a liquidity crisis—if the LBAC Bid proved to be the sole bid or the best bid.

---

[5] LBAC later made a conflicting assertion that its bid was conditioned on the release of the Ergen Litigation. To the contrary, equitable subordination claims are excluded from the releases in the Ad Hoc Plan. (Ad Hoc Plan § 13.1(c) (excluding from claims released under the Ad Hoc Plan "claims against any Person arising from or relating to such Person's fraud, gross negligence or willful misconduct ... as determined by a Final Order of the Bankruptcy Court.").

11

24. Moreover, the Bid Procedures Order contains language specific to the LBAC Bid, providing for a particular period of irrevocability for the LBAC Bid separate and apart from the defined term "Second Highest Bidder": "the LBAC Bid shall remain irrevocable until the earlier of sixty (60) days after entry of the Confirmation Order(s) and February 15, 2014." (Bid Procedures Order § j)  LBAC's interpretation would read this language out of the Bid Procedures Order and, therefore, violate black letter rules of construction requiring courts to avoid interpretations rendering language superfluous.  See, e.g., Gayle v. Nat'l R.R. Passenger Corp., 701 F. Supp. 2d 556, 566 (S.D.N.Y. 2010) (construing contract terms "[t]o avoid rendering the specific provisions . . . surplusage," holding that "the [specific] provisions must be read to qualify the more general contract provisions . . . ."); Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009) (noting that courts may not read an agreement "to make any of its terms meaningless, or construe its language to render particular provisions 'mere surplusage.'") (citations omitted).

25. Further, in addition to section j of the Bid Procedures Order, section d(ii) deemed the LBAC Bid a Qualified Bid, and section e(x) specifically provided that all Qualified Bids "must be irrevocable until entry . . . of the [c]onfirmation [o]rder."  LBAC cannot argue legitimately that, unlike all other Qualified Bids, its bid was freely revocable unless it happened to be the back-up bidder, particularly when it is the only party with bid protections.

26. LBAC's argument that its bid should be freely revocable is also completely inconsistent with the purpose of having a stalking horse bid.  A stalking horse agreement, by definition, sets a minimum price intended to attract other potential purchasers, to prevent low-ball bids, and to generally provide value to the estates by serving as a backstop.  See In re WestPoint Stevens, Inc., 600 F.3d 231, 239 n.3 (2d Cir. 2010) ("A 'stalking horse' contract

12

is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers."); see also 2 Bankr. Desk Guide § 15.30 (noting that a stalking horse bid "benefits the estate by providing a floor bid at or above which the assets will be sold."). A stalking horse agreement that permits the stalking horse to abandon the deal at will would be illusory, offering no value to the estate or its stakeholders. See In re Marrose Corp., No. 89-12171, 1992 WL 33848, at *6 (Bankr. S.D.N.Y. Feb. 15, 1992) (noting that stalking horse agreements are appropriate "in the Chapter 11 context" only if they "enhance the bidding to the benefit of creditors of the estate.").

27. Thus, LBAC frankly acknowledged that it was setting a floor, which could be accomplished only if LBAC's Bid was irrevocable:

> [T]he value [provided by a stalking horse bidder is] created in serving as the backstop in setting the floor [and having been] bound far longer than any other party has been bound . . . . [L]ike every other stalking horse who is participating in something like this, let alone someone who's offering the amount of cash that my client is – we are anticipating having a breakup fee be put before Your Honor . . . . [W]e have been out here effectively serving as everybody's backup and everybody's floor and everybody's stalking horse, since July. And we really don't want to be hanging out here anymore without appropriate buyer protections.

(Sept. 24, 2013 Hr'g Tr. 42:11-15, 43:12-15; Sept. 30, 2013 Hr'g Tr. 57:9-13 (Strickland)) (emphasis added)

28. The Debtors, the Special Committee, and other parties in interest would never have agreed to allow, and presumably the Court would never have permitted, LBAC to obtain its bid protections, including a $51.8 million break-up fee, if the LBAC Bid was freely revocable.

13

29. Pursuant to this Court's Bid Procedures Order, the LBAC Bid remains irrevocable and may be accepted up to and including February 15, 2014. LBAC has no right at this time to withdraw its stalking horse bid.

### B. The LBAC Bid is a Binding and Enforceable Offer

30. LBAC made a firm, binding offer in the form of the APA (as modified by the Bid Procedures Order)[6] to purchase the LP Assets, which the LP Debtors and their estates are entitled to accept (or may be ordered to accept in connection with plan confirmation), regardless of any separate negotiations or agreements, including the PSA, among LBAC and the Ad Hoc LP Secured Group.

31. LBAC asserts that "[t]he terms of the LBAC Bid, which the Ad Hoc LP Secured Group seeks to specifically enforce, are set forth in a draft asset purchase agreement that is not enforceable against LBAC or any other party" because the APA was not executed, only one of the nine contemplated exhibits was attached, and there were blanks and brackets for missing material terms. (LBAC Mot. ¶ 17) Again, LBAC completely disregards the plain language of the Bid Procedures Order – the LBAC Bid did not need to be signed because it was deemed a "Qualified Bid" by the Bid Procedures Order to which it was attached. (Bid Procedures Order § d.ii) Further, LBAC's assertion is directly controverted by numerous statements on the part of LBAC's own counsel and representatives, including that the APA "isn't a fantastical, Swiss cheese, meaningless document. It's a very real offer for very real green money that is not contingent" on FCC approval (July 23, 2013 Hr'g Tr. 24:9-13 (Strickland)).

---

[6] The Bid Procedures Order incorporates and modifies the APA. (Bid Procedures Order n.5 ("In the event of any conflict between the summary of the LBAC Bid contained herein and the [APA], the [APA], as expressly modified by these Bid Procedures and the Approval Order, shall control."))

14

32. Even if the LBAC Bid was not part of a court order, as it is, the fact that the APA was not signed would be irrelevant. Kowalchuk v. Stroup, 873 N.Y.S.2d 43, 49 (N.Y. App. Div. 2009) ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound."). The record overwhelmingly demonstrates that LBAC intended to be bound. Indeed, it would be impossible for LBAC legitimately to argue that it submitted a stalking horse bid, and received stalking horse protections, but never had an intention to be bound. To the contrary, as explained above, LBAC admitted its intention to be bound. (See ¶¶ 26, 35, supra)

33. LBAC's argument that there were incomplete terms also is irrelevant. (LBAC Mot. ¶ 17) An agreement is enforceable where it contains the material terms of a deal. See Kowalchuk, 873 N.Y.S.2d at 49. Material terms generally cover the price, the assets to be purchased and conditions to funding. See Gerber v. Computer Assocs. Int'l, Civ. A. No. 91-3610, 2000 WL 307379, at *1 (E.D.N.Y. Mar. 14, 2000) (noting that price and conditions precedent are material terms in tender offer). Here, all those terms were agreed to, as were numerous non-material terms, as demonstrated by an approximately 70-page APA. Indeed, the Executive Vice President of Corporate Development of DISH, Thomas Cullen, recently testified that he believed the APA was "substantially agreed to" by LBAC and DISH in July 2013. (Jan. 17, 2014 Hr'g Tr. 200:7-9 (Cullen)) In any case, courts simply fill in any missing terms. See, e.g., Gonzalez v. Don King Prods., Inc., 17 F. Supp. 2d 313, 314 (S.D.N.Y. 1998) ("When parties fail to state an essential term clearly or omit such a term, courts attempt to ascertain the intent of the parties and enforce the contract."); Better Living Now, Inc. v. Image Too, Inc., 67 A.D.3d 940, 942, 889 N.Y.S. 2d 653 (2d Dep't 2009) (noting that "a definite term of duration need not be related in express terms, and may be implied."); Haines v. City of N.Y., 41 N.Y.2d

15

769, 772, 396 N.Y.S.2d 155 (N.Y. 1977) ("In the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the circumstances surrounding the parties' intent."); Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655, 661 (S.D.N.Y. 1959) ("Where it appears that the parties did in fact intend that the obligation terminate at an ascertainable time, the courts, in effect, will supply the missing clause and construe the contract accordingly.").

34.   Finally, LBAC asserts that even if the APA was enforceable, LBAC would be entitled to terminate that agreement immediately. Specifically, LBAC incorrectly asserts that the APA provides that it may be terminated if a sale order has not been entered by December 11, 2013, and no sale order was entered by such deadline. (LBAC Mot. ¶ 18) One, LBAC cannot simultaneously argue that the APA is unenforceable, and then rely on the APA's terms to avoid its obligations. Two, the Bid Procedures Order, which requires LBAC to keep its bid open until February 15, 2014, controls over the APA because it is a court order and by its express terms. (Bid Procedures Order n.5 ("In the event of any conflict between the summary of the LBAC Bid contained herein and the [APA], the [APA], as expressly modified by these Bid Procedures and the Approval Order, shall control.")) Three, the December 11, 2013 deadline was added to the APA after, and entry of the Bid Procedures Order (it was blank at the time of entry of the Bid Procedures Order), no party was authorized to change the Court's Bid Procedures Order.[7] Four, the counterparty to LBAC's offer, the LP Debtors, did not agree to a

---

[7] Though the Bid Procedures Order incorporated the terms of the APA as it existed at the time, in the form attached as Exhibit "F" to the Disclosure Statement, the Court did not leave the revocability or termination of the LBAC Bid open for further negotiation. (Cf. Bid Procedures Order 8 (providing that the APA "shall not be modified as it relates to the LBAC Bid Protections, including with respect to the timing or circumstances under which the LBAC Bid Protections are earned . . . .")).

16

change in the Order or the revocation of the LBAC Bid. To the contrary, the Debtors argued zealously for the February 15, 2014 date set forth in the Bid Procedures Order.

        **C.**     **The Bid Procedures Order Should Be Enforced**

        35.     The Court can and should enforce the Bid Procedures Order to ensure the orderly conclusion of these cases.[8] Holding purchasers to their commitments is critical to maintaining an orderly sale process, and bankruptcy courts have thus ordered purchasers who attempt an eleventh hour retreat, like LBAC, to specifically perform their commitments when necessary. See, e.g., In re Noble Int'l, Ltd., No. 09-51720, 2009 Bankr. LEXIS 5457, at *17-*18 (Bankr. E.D. Mich. May 29, 2009) (retaining jurisdiction to enforce stalking horse agreement and to compel specific performance of agreement's terms); cf. Stokes v. Firestone (In re Stokes), 198 B.R. 168 (E.D. Va. 1996) (upholding bankruptcy court's order pursuant to section 105 directing specific performance of settlement agreement between the debtor and a third-party for the conveyance of real property); In re Winston Inn & Rest. Corp., 120 B.R. 631, 636 (E.D.N.Y. 1990) (describing bankruptcy courts' supervisory powers with respect to judicial sales). Such relief is particularly appropriate here, where LBAC agreed to specific performance:

> Sellers and Purchaser hereby acknowledge and agree that <u>any breach</u> of the terms of this Agreement would give rise to

---

[8] The Bid Procedures Order is an order of this Court, and as such falls within the Court's general jurisdiction to interpret and enforce its own orders. See, e.g., In re Charter Commc'ns, No. 09-11435, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. 2010) ("All courts retain jurisdiction to interpret and enforce their own orders"); see also In re River Center Holdings, LLC, 394 B.R. 704, 712 (Bankr. S.D.N.Y. 2008) (recognizing Bankruptcy Court's discretionary power pursuant to section 105(a) to "enforce and implement" earlier-entered orders); see also Stokes v. Firestone (In re Stokes), 198 B.R. 168 (E.D. Va. 1996) (upholding the bankruptcy court's reliance on section 105 in ordering specific performance of a settlement agreement between the debtor and a third-party for the conveyance of real property). Additionally, this Court expressly retained jurisdiction with respect to all matters arising from the interpretation, implementation, and enforcement of the Bid Procedures Order. (Bid Procedures Order ¶ 18) Finally, if the Court confirms the Ad Hoc Plan and approves the LBAC Bid as the successful bid, the Court has the power under section 1142(b) of the Bankruptcy Code to order LBAC and DISH to take all actions necessary to implement the deal. See 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.").

> irreparable harm for which money damages would not be an adequate remedy, and, accordingly agree that, in addition to any other remedies, Sellers and Purchaser or their respective successors or assigns shall be entitled to <u>enforce the terms of this Agreement by</u> a decree of <u>specific performance</u> without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(APA § 9.10 (emphasis added))

36. LBAC's improper attempt to avoid its obligations puts these cases at risk precisely because LBAC consistently represented that it understood itself to be bound—and, indeed, that it was ready and eager to make good on its offer. As counsel to LBAC and DISH repeatedly indicated:

- "[T]he bid itself is an opportunity that LBAC and DISH network very much want, as do its shareholders." (Oct. 9, 2013 Hr'g Tr. 20:2-8 (Strickland));

- "I think it means that they have to decide whether or not they want to sell this to the holder of the bag of money, or they want to pursue litigious-like things." (Nov. 25, 2013 Hr'g Tr. 34:14-16 (Strickland));

- "If the LP debtors want the bag of money that LBAC is offering, they have to agree to the agreement, or they have to negotiate a different agreement. But there's not any other way around that." (Dec. 10, 2013 Hr'g Tr. 140:7-10 (Strickland));

37. The Court should thus enforce the Bid Procedures Order and, if necessary, sanction LBAC for its failure to do so. <u>See</u> <u>In re Max Frankel</u>, 192 B.R. 623, 628 (Bankr. S.D.N.Y. 1996) (holding purchaser in contempt for failing to close transaction within thirty days, as required by court order); <u>see generally</u> <u>Hoti Enters., L.P.</u> v. <u>GECMC 2007 C-1 Burnett St., LLC (In re Hoti Enters., L.P.)</u>, Civ. A. No. 12-8030, 2013 WL 1812197, at *18 (S.D.N.Y. Apr. 26, 2013) (upholding bankruptcy court's contempt order enforcing directive contained in confirmation order, consistent with bankruptcy court's "inherent power to enforce its own

NEWYORK 9097282

order.").

## RESERVATION OF RIGHTS

38. As discussed above, the Ad Hoc LP Secured Group and other parties in interest relied on the LBAC Bid. The purported termination of such bid by LBAC at the eleventh hour, at a time when the Debtors are nearly out of cash, has already caused and will continue to cause significant harm to the Debtors' estates and their stakeholders, including the Ad Hoc LP Secured Group. LBAC's actions have further complicated an extremely challenging plan process in the Debtors' cases, and may result in the most desirable plan, one that was largely unconditional and provided a significant return to the LP Debtors' stakeholders, being taken off the table. Accordingly, the Ad Hoc LP Secured Group reserves its rights to seek damages and any other appropriate remedies against LBAC, DISH, SPSO and Charles Ergen in connection with the purported termination of the LBAC Bid.

## CONCLUSION

For the reasons set forth above, the Ad Hoc LP Secured Group respectfully requests that the Court enter an order enforcing the Bid Procedures Order, denying the relief requested by LBAC in the LBAC Motion and awarding such other and further relief as may be just and proper.

NEWYORK 9097282

Dated: January 20, 2014
      New York, New York

                                WHITE & CASE LLP

By:   /s/ *Glenn M. Kurtz*
      Glenn M. Kurtz
      Andrew C. Ambruoso
      Julia M. Winters
      1155 Avenue of the Americas
      New York, NY 10036
      Telephone:  (212) 819-8200
      Facsimile:  (212) 354-8113
      gkurtz@whitecase.com
      aambruoso@whitecase.com
      jwinters@whitecase.com

      Thomas E Lauria (*admitted pro hac vice*)
      Matthew C. Brown (*admitted pro hac vice*)
      Southeast Financial Center, Suite 4900
      200 South Biscayne Blvd.
      Miami, FL 33131
      Telephone:  (305) 371-2700
      Facsimile:  (305) 358-5744
      tlauria@whitecase.com
      mbrown@whitecase.com

      *Counsel to the Ad Hoc Secured Group of LightSquared LP Lenders*