Robert J. Giuffra, Jr.
Brian T. Frawley
Brian D. Glueckstein
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

-and-

Rachel C. Strickland
Andrew D. Sorkin
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Co-Counsel to L-Band Acquisition, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | | |
| In re: ) | Chapter 11 | |
| ) | | |
| LIGHTSQUARED INC., *et al.* ) | Case No. 12-12080 (SCC) | |
| ) | | |
| Debtors.[1] ) | Jointly Administered | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | | |

**REPLY IN FURTHER SUPPORT OF OBJECTION OF L-BAND ACQUISITION,**
**LLC TO THE JANUARY 13, 2014 STATEMENT OF THE AD HOC SECURED**
**GROUP OF LIGHTSQUARED LP LENDERS AND NOTICE OF**
**INTENT TO PROCEED WITH CONFIRMATION OF THE FIRST AMENDED**
**JOINT CHAPTER 11 PLAN AND MOTION FOR DECLARATORY RELIEF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629) and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

11149564.5

L-Band Acquisition, LLC ("**LBAC**") hereby submits this reply (the "**Reply**") in further support of the *Objection of L-Band Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent to Proceed With Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief* [Docket No. 1232] (the "**Objection and Motion**"),[2] and to address the response [Docket No. 1238] (the "**Response**") filed by the ad hoc secured group of LightSquared LP Lenders (the "**Ad Hoc Group**") to the Objection and Motion.   In support of the Reply and the Objection and Motion, LBAC relies upon and incorporates by reference the excerpts from the publicly-filed documents annexed hereto as **Exhibits A through F**.[3]   In further support of the Objection and Motion, LBAC respectfully states as follows:

## PRELIMINARY STATEMENT

1.      This dispute is a matter of straightforward contract interpretation. LBAC's contractual right to terminate the PSA and LBAC Bid does not boil down to a game of "he said, she said."  The four corners of the relevant documents and the record of these cases speak for themselves.  On July 23, 2013, the Ad Hoc Group filed the PSA, which included the Form APA <u>as an exhibit</u>.  The PSA – a duly executed and binding contract – required LBAC to prosecute the LBAC Bid, and the Ad Hoc Group to prosecute its plan (the "**Ad Hoc Group Plan**"), only for "so long as [the PSA] shall not have been terminated in accordance with Section 6" of the PSA.  <u>See</u> Ex. A, PSA at § 1.2(f).

---

[2]      Capitalized terms used but not defined herein have the meanings assigned to them in the Objection and Motion (including defined terms from the Notice of Intent (as defined in the Objection and Motion) or the Ad Hoc Group Plan that are incorporated by reference in the Objection and Motion).

[3]      References to "Ex. __" refer to exhibits to this Reply.  References to "Mot. Ex. __" refer to exhibits to the Objection and Motion.

2.     Roughly two months later, in September 2013, the Ad Hoc Group sought approval of bid protections for LBAC, as they were required to do under the PSA.  At that time, the Ad Hoc Group advised all parties in interest and the Court about the state of the LBAC Bid. The Ad Hoc Group's pleadings put parties squarely on notice that the Form APA was merely a draft, and that LBAC could terminate the LBAC Bid under the PSA if, among other things, a Bid Procedures Order acceptable "in form and substance to the Plan Sponsors and [LBAC]" (i.e., including acceptable bid protections) were not entered prior to the applicable PSA Milestone. Id. at Exhibit C.

3.     To try to evade LBAC's clear termination rights with respect to the LBAC Bid under the PSA, the Ad Hoc Group distorts the Bid Procedures Order and the circumstances surrounding this Court's entry of that order.  The Bid Procedures Order did not render LBAC bound to any contract other than the one that it duly executed.  At the time LBAC was awarded "stalking horse" status, LBAC was bound and, if contractual milestones and other conditions that were publicly filed and repeatedly brought to all parties' attention had been satisfied, LBAC would have been required to satisfy its obligations under the PSA and remain committed to the LBAC Bid.  As the record makes clear, LBAC honored its obligations thereunder (including its duty to continue to negotiate the Form APA in good faith), until the clearly-stated Milestones in the PSA were not timely satisfied.

4.     At all times, LBAC made no secret of its contractual right to terminate the LBAC Bid and the possibility that it would exercise those rights – including at the November 25, 2013 hearing at which the Special Committee requested that the Court adjourn the plan confirmation hearing until January 2014 to facilitate the Special Committee's pursuit of alternative transactions.  In granting the requested adjournment, the Court recognized the risk

that granting the extension would cause the Confirmation Milestone not to be satisfied such that

LBAC might terminate the LBAC Bid, identifying it as "a risk for the special committee to be

evaluating, . . . a risk we've always been concerned about, . . . keeping LBAC bound and at the

table." See Mot. Ex. N, Transcript of November 25, 2013 hearing (Unsealed Portion), at 28:7-8.

The Special Committee, which, like all other parties in these cases, was well-aware of the

Debtors' looming liquidity problems, indicated that it was willing to risk its "bird in the hand" –

the LBAC Bid – to attempt to find a superior transaction.

5.      The risk with which the Court was concerned – termination of the LBAC

Bid – came to fruition on January 7, 2014, when LBAC provided notice of termination of the

PSA based on the undeniable failure of the Confirmation Milestone.  While the Ad Hoc Group

may be frustrated with that outcome, LBAC's termination rights were well-known by all and the

Ad Hoc Group cannot now use litigation to re-write the terms of its bargain with LBAC.  The

relevant documents, and the record of these cases are clear, and further litigation of these matters

will only serve to waste the scarce assets of the Debtors' estates and the Court's time.  The Court

should rule that the PSA and LBAC Bid were properly terminated in their entirety.[4]

## **REPLY**

I.      **The PSA Governs the Revocability of the LBAC Bid**

6.      The LBAC Bid was at all times subject to the terms and conditions,

including the Milestones, set forth in the now-terminated PSA.  The Ad Hoc Group's assertion

that "[t]he PSA is silent as to, and does not provide, any right to terminate the APA or to

withdraw the LBAC Bid," Response at ¶ 21, is contrary to the plain terms of the PSA itself,

---

[4]      The Ad Hoc Group's assertion in the Response that Bankruptcy Rule 7001 requires LBAC to commence an
adversary proceeding in order to seek a declaratory judgment is incorrect.  Bankruptcy Rule 7001 provides
only that requests for declaratory judgments relating to the matters specified in subparagraphs (1) through
(8) of Bankruptcy Rule 7001 – none of which is applicable here – must be raised via an adversary
proceeding.  See Bankruptcy Rule 7001.

11149564.5

which prohibited LBAC from withdrawing the LBAC Bid only while the PSA was effective.

See Ex. A, PSA at § 1.2(f) ("As consideration for the Plan Sponsors entering into this

Agreement, so long as this Agreement shall not have been terminated in accordance with Section

6 hereof, the Stalking Horse Bidder agrees that . . . it:  . . . (f) Shall not withdraw its offer made

pursuant to the Stalking Horse Agreement.") (emphasis added).  Moreover, the PSA provides

expressly that the "Agreement" may be terminated for, among other reasons, the failure to meet

Milestones, and the PSA provides expressly that "Agreement" includes the APA.  Section 7.1 of

the PSA states "The Plan, the Stalking Horse Agreement, the Milestones, the Bid Procedures,

and the Transferee Acknowledgement (collectively, the "Exhibits") are expressly incorporated

herein by reference and are made part of this Agreement.  ***References to "the Agreement," "this***

***Agreement," "herein" or "hereof" include this Agreement and each of the Exhibits.***"  See Ex.

A, PSA at § 7.1 (emphasis added).

   7. Thus, LBAC had every right to terminate the LBAC Bid upon LBAC's

contractually-permitted termination of the PSA.  Where, as here, the parties' intent is "clearly

and unambiguously set forth, effect must be given to the intent as indicated by the language

used." Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989); In re Dynegy Inc.,

486 B.R. 585, 590 (Bankr. S.D.N.Y. 2013) (New York law requires that "a written contract is to

be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal

language they have employed.") (quotation omitted).   The notion that LBAC could not terminate

the LBAC Bid regardless of whether the PSA was terminated cannot be squared with Section

1.2(f) of the PSA.

   8. The Ad Hoc Group has itself acknowledged that the PSA governs LBAC's

right to revoke the LBAC Bid.  In the reply filed by the Ad Hoc Group in further support of its

motion for approval of bid procedures and bid protections for LBAC [Docket No. 863], the Ad

Hoc Group cited the very Milestone termination right that LBAC ultimately exercised, Section

6.1(f)(1) of the PSA, as a potential basis for LBAC to terminate the <u>LBAC Bid</u>, not just the PSA,

in the event that one or more Milestones were not met.  <u>See</u> Ex. B, Ad Hoc Group Bid

Procedures Reply, Docket No. 863 at ¶ 21 (citing PSA as operative document under which

LBAC could terminate LBAC Bid, Ad Hoc Group stated that "LBAC can terminate **its stalking**

**horse bid**, which is precisely what Harbinger desires. (**<u>See</u> Plan Support Agreement §**

**6.1(f))**.") (emphasis added).  As here, "when a contract affords a party the unqualified right to

limit its life by notice of termination[,] that right is absolute and will be upheld in accordance

with its clear and unambiguous terms." <u>Red Apple Child Dev. Ctr. v. Cmty. Sch. Districts Two</u>,

303 A.D.2d 156, 157 (1st Dep't 2003).  The Ad Hoc Group's argument that LBAC's termination

right was somehow not absolute is "contrary to the reasonable expectations of the parties" at the

time they entered into the PSA.  <u>In re Oneida, Ltd.</u>, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009)

(noting that "[t]he parties' interpretation of the contract, in practice, prior to litigation, is

compelling evidence of the parties' intent.") (quoting <u>Ocean Transp., Inc. v. Am. Phil. Fiber</u>

<u>Indus.</u>, 743 F.2d 85, 91 (2d Cir. 1984).

      9.     This Court's approval of bid protections for the LBAC Bid did not change

the nature or source of LBAC's termination rights.  As the Ad Hoc Group itself recognized in its

motion for approval of bid procedures and bid protections for LBAC, "[t]he Bid Protections were

essential inducements and conditions relating to the Stalking Horse Bidder's entry into, and

continuing obligations **under the PSA** . . ." – not any other agreement.  Ex. C, Ad Hoc Group

Bid Procedures Motion, Docket No. 809 at ¶ 94.  It is telling that only now, after LBAC has

properly exercised its termination right, the Ad Hoc Group has decided to abandon its prior

(correct) recitation of LBAC's obligations.

10.     The Ad Hoc Group's theory that LBAC was bound to consummate the

LBAC Bid independent of the PSA makes no sense.  If that theory were correct, there would

have been little need for the Ad Hoc Group to ensure that the Milestones were satisfied or to

make LBAC a party to the PSA in the first place.  While the Ad Hoc Group now insists that

"termination of the PSA would have a number of potentially adverse consequences to the Ad

Hoc Group, including, most importantly, leaving LBAC, DISH and SPSO no longer bound to

supporting the Ad Hoc Plan," Response at ¶ 20, n.4, this rationale does not apply to LBAC and

DISH, who held no claims against the Debtors at the time the PSA was negotiated or thereafter

and, thus, had no right to propose or vote on any chapter 11 plan in the Debtors' cases.  LBAC

and DISH were parties to the PSA for one reason only:  to establish a contractual obligation on

the part of such parties to keep the LBAC Bid on the table.  Once the PSA was terminated, that

obligation disappeared.  This was the bargain that the Ad Hoc Group, LBAC and DISH struck,

and this Court may not rewrite that bargain.  See Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d

Cir. 1992) (citation omitted) (noting that under New York law, the court may not "redraft a

contract to accord with its instinct for the dispensation of equity upon the facts of a given case");

see also Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429, 434 (S.D.N.Y. 1999) (citation

omitted) (noting that "the court's inquiry is limited to whether a party's actions in terminating

the contract are consistent with the purposes described in the contract's termination provisions").

11.     Stripped of its rhetoric, the Ad Hoc Group's argument boils down to its

claim that the APA is a firm offer to purchase by LBAC, and its further assertion that the

Debtors remain free to accept or reject that offer.  Yet, it is beyond dispute that the PSA imposed

7

conditions on the terms of LBAC's offer, including temporal deadlines.  Under well-settled law,

temporal conditions on an offer to contact must be strictly enforced.  "Just as the offeror is at

liberty to make no offer at all, it is also at liberty to dictate whatever terms it sees fit if it chooses

to make an offer. Among these requirements may be acceptance within a specified time, and if

no acceptance is made within that time, the power of acceptance necessarily expires."  1

Williston on Contracts  § 5.5 (4th ed.).  "[I]t is clear that a lapsed offer cannot be accepted."

Thomas America Corp. v. Fitzgerald, 97 F. Supp. 523, 524 (S.D.N.Y. 1997).  Under the terms of

the PSA, the obligation of LBAC to keep open its offer has expired, and the offer is no longer

open to acceptance.

II.    **The Bid Procedures Order Did Not Change LBAC's Termination Rights**

12.    The Ad Hoc Group asks the Court to rule, based primarily on its out-of-

context citation of a proviso from the Bid Procedures Order and Bid Procedures and other

provisions thereof, that the Bid Procedures Order amended LBAC's contractual rights to

terminate the PSA and withdraw the LBAC Bid.  But none of the cited provisions of the Bid

Procedures Order supports this result.

13.    The primary provision on which the Ad Hoc Group relies is paragraph (j)

of the Bid Procedures, which establishes requirements governing the irrevocability of the

successful bid and back-up bid following the Auction.  As discussed in paragraph 21 of the

Objection and Motion, in response to a narrow concern raised by the Court regarding LBAC's

initial unwillingness to serve as a back-up bidder following an auction, the parties agreed to add

the following proviso (the "**Paragraph (j) Proviso**") to paragraph (j) of the Bid Procedures:

> provided further, that LBAC has agreed to serve as the Second Highest
> Bidder for the LP Assets, and that the LBAC Bid shall remain irrevocable,
> until the earlier of sixty (60) days after entry of the Confirmation Order(s)
> and February 15, 2014.

11149564.5

Ex. D, Bid Procedures Order, Exhibit A at ¶ (j).[5]  The statement of counsel to the Special

Committee on the record of the September 30, 2013 hearing regarding bid procedures – cited by

both LBAC and the Ad Hoc Group in their respective pleadings – confirms that the scope of the

Paragraph (j) Proviso is narrow, and that LBAC's agreement to its addition was not a waiver of

LBAC's express contractual right to withdraw the LBAC Bid under the PSA or an unconditional

commitment to make the LBAC Bid irrevocable.  See Mot. Ex. J, Transcript of September 30,

2013 hearing ("**9/30 Hrg. Tr.**") at 74:14-20 [Docket No. 899] ("MR. SUSSBERG:  --which go

to the breakup fee payment, and the scenarios in which it's paid, as well as the status of LBAC as

a backup bidder.  LBAC has agreed, and Ms. Strickland can confirm, that they'll remain a

**backup bidder for sixty days following entry of the confirmation order** with an outside date

of February 15th.") (emphasis added).  As the Court will recall, the Paragraph (j) Proviso was

merely a commitment to serve as a back-up bidder for the LP Assets for a limited period of time

that ultimately became irrelevant because (a) no alternative bids for the LP Assets were received,

(b) no Auction was held, and (c) no Successful Bidder (as defined in the Bid Procedures) was

selected – not even the LBAC Bid.[6]  Accordingly, the provisions of paragraph (j), including the

Paragraph (j) Proviso, were never triggered and are inapplicable here.

      14.    The Ad Hoc Group's claim that LBAC's interpretation of its obligations

ignores "black letter rules of construction" by rendering the Paragraph (j) Proviso superfluous

---

[5]     The Bid Procedures Order defines the "Second-Highest Bidder" as the "bidder(s), including, for the avoidance of doubt, the Stalking Horse Bidders . . . that submits . . . the next highest or otherwise best bid(s) (the 'Second Highest Bid') for the Assets **at the Auction**." Id. (emphasis added).

[6]     After the scheduled date of the Auction, the Debtors filed a notice indicating that no bid had been identified as a successful bid.  See Mot. Ex. K, Docket No. 1086, LightSquared's Auction Related Notice.  Moreover, the Ad Hoc Group never declared the LBAC Bid the successful bid for the purposes of the Ad Hoc Group Plan either.  While not necessary for the Court to consider, to the contrary, the Ad Hoc Group sought to negotiate away the secured lenders' interest cap, among other things, as a condition to deeming LBAC the successful bidder.

gets it backwards.  See Response at ¶ 24.  To the contrary, the Ad Hoc Group's construction of

that proviso, i.e., that the LBAC Bid became irrevocable, period, until February 15, 2014,

renders the first clause of the Paragraph (j) Proviso ("LBAC has agreed to serve as the Second

Highest Bidder for the LP Assets") superfluous.  Were the LBAC Bid irrevocable under any

circumstances, as the Ad Hoc Group asserts, there would be no need to clarify that LBAC was

obligated to serve as back-up bidder, as that obligation would have been a foregone conclusion.

Thus, the Ad Hoc Group's construction of LBAC's obligations violates the very principles of

construction the Ad Hoc Group purports to rely on.

      15.     Moreover, the requirements for submitting a Qualified Bid (as defined in

the Bid Procedures) are irrelevant to the revocability of the LBAC Bid.  The specific Qualified

Bid-related provisions on which the Ad Hoc Group relies are paragraph (e)(x), which provides

that Qualified Bids other than the successful bid and back-up bid must remain irrevocable until

entry of the confirmation order, and paragraph (d)(ii), which deems the LBAC Bid a Qualified

Bid.  See Response at ¶ 25; Ex. D, Bid Procedures Order, Exhibit A at ¶¶ (d)(ii), (e)(x).  That the

LBAC Bid was deemed a Qualified Bid does not mean that the LBAC Bid actually satisfied each

of the Qualified Bid requirements set forth in paragraph (e) of the Bid Procedures, and certainly

does not change the terms of the LBAC Bid or LBAC's termination rights under the PSA.

LBAC and the LBAC Bid were not required to, and did not, comply with other requirements for

Qualified Bidder/Qualified Bid status, including the requirements that Qualified Bids for the LP

Assets be accompanied by an executed purchase agreement, a good faith deposit of $100 million

and evidence of financial wherewithal to consummate the relevant Qualified Bid.  See id. at

¶¶ (e)(ii)(A), (e)(iii), (e)(vi).  Indeed, the Ad Hoc Group acknowledges elsewhere in the

Response that LBAC was not required to satisfy the Qualified Bid requirements, claiming that

the Form APA did not need to be signed by LBAC to be irrevocable.  See Response at ¶ 31

("[T]he LBAC Bid did not need to be signed because it was deemed a 'Qualified Bid' by the Bid

Procedures Order . . . .").

16.     The Ad Hoc Group also argues that the fact that LBAC was deemed a

"stalking horse" bidder under the Bid Procedures Order bears on the revocability of the LBAC

Bid.  See Response at ¶¶ 26-29.  In the Ad Hoc Group's view, once a bid is designated as a

stalking horse bid and bid protections are approved, the stalking horse bid cannot be revoked

under any circumstances.  That is simply not true.  In fact, Stalking Horse Agreements can and

do contain covenants and milestones, similar to those contained in the PSA here, that entitle a

stalking horse bidder to terminate its bid if they are not satisfied.  See, e.g., In re Hostess Brands,

Inc., Case No. 12-22052 (RDD) [Docket No. 2239, Ex. A] (Bankr. S.D.N.Y. Jan. 30, 2013) at

§ 4.4(a), (g) (stalking horse purchase agreement, approved by order dated February 11, 2013

[Docket No. 2275], permitted termination by purchaser or sellers if closing and/or entry of bid

procedures order failed to occur prior to specified dates); In re Grubb & Ellis Co., Case No. 12-

10685 [Docket No. 94] (Bankr. S.D.N.Y. Mar. 7, 2012) at § 7.1(d)-(f) (stalking horse agreement

attached to bid procedures order permitted stalking horse to terminate agreement by written

notice if closing, entry of bid procedures order, and entry of sale order did not occur by specified

dates); In re TerreStar Networks Inc., Case No. 10-15446 (SHL) [Docket No. 645, Ex. A]

(Bankr. S.D.N.Y. Jun. 22, 2011) at § 8.1(g) (stalking horse agreement attached to bid procedures

order permitted stalking horse purchaser to terminate agreement on written notice to sellers if

orders approving bid protections and sale to stalking horse were not entered by specified dates);

In re Chrysler LLC, Case No. 09-50002 (AJG) [Docket No. 190, Ex. A] (Bankr. S.D.N.Y. May

3, 2009) at § 10.01(c), (j) (stalking horse agreement, later approved by order dated May 7, 2009

[Docket No. 492], provided for termination of agreement in the event that bid procedures order

was not entered or closing did not occur by specified dates). The preservation of such

termination rights in a stalking horse agreement is not antithetical to the purposes of designating

a stalking horse and approving bid protections, as the stalking horse bid remains "locked in," and

serves as a floor for higher and better offers, for so long as the governing contract (here, the

PSA) requires. Stalking horse bidder status is not, as the Ad Hoc Group asserts, an

unconditional guarantee of irrevocability.

17.    LBAC's contractual obligations were properly noticed and well publicized

at all times. Given that, it is unconscionable for the Ad Hoc Group to use LBAC's termination to

gin up more litigation and insinuate that anything improper has occurred.

### III.    <u>The Form APA Is Incomplete and Cannot Be Enforced Against LBAC</u>

18.    The Court should also reject the Ad Hoc Group's theory that, upon entry

of the Bid Procedures Order, LBAC's offer was no longer subject to termination under the PSA.

The Form APA was never executed by LBAC or any other party, nor has the Form APA ever

been in a substantially complete form capable of being enforced against any of the parties

thereto. At all times after it was initially filed <u>as an exhibit</u> to the PSA on July 23, 2013, the

Form APA was a work in progress, subject to further negotiation and approval by LBAC. Thus,

the Form APA is not a binding contract under New York law. "To create a binding contract,

there must be a manifestation of mutual assent sufficiently definite to assure that the parties are

truly in agreement with respect to all material terms[.]" <u>Express Indus. & Terminal Corp. v.</u>

<u>N.Y. State Dep't of Transp.</u>, 93 N.Y.2d 584, 589 (1999).

19.    The 7/23 Form APA, which was the form of purchase agreement the Court

was asked to (and did) approve at the September 30, 2013 hearing regarding bid procedures, was

far from complete, a fact that all parties understood:

- The 7/23 Form APA included the following header at the top of each page of the form agreement:  "DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)."  See Ex. E, 7/23 Form APA.

- The 7/23 Form APA included brackets or blanks with respect to the following material issues, among others:  (a) definition of the Debtors' "Business" (which defined the scope of numerous representations, warranties, and covenants); (b) whether certain assets would be included in the purchased assets; (c) whether certain employee liabilities would be assumed, and the limit on the aggregate amount of employee liabilities to be assumed by LBAC; (d) allocation of responsibility for contract cure costs between the estate and LBAC; (e) the scope of various representations and warranties; (f) covenants relating to the timing of seeking certain regulatory approvals; (g) timing of LBAC's contract designation; (h) the outside date upon which the Form APA could be terminated if funding had not occurred; and (i) the deadline for entry of an order approving the sale contemplated by the Form APA which, if not satisfied, would entitle LBAC to terminate.  See id. at Recitals, §§ 2.1(s), 2.3(a), 2.4, 2.5, Art. IV, 6.3(c), 6.3(e), 6.6, 6.10, 6.11, 8.1(c), 8.1(g).

- The PSA included a Milestone requiring the Form APA to be in a form acceptable to LBAC and the Ad Hoc Group and capable of execution by September 20, 2013 (the "**Acceptable Agreement Milestone**").  See Ex. A, PSA at Exhibit C.  The Acceptable Agreement Milestone was not satisfied at the hearing regarding entry of the Bid Procedures Order, which counsel to the Ad Hoc Group acknowledged in informing the Court that the Acceptable Agreement Milestone needed to be (and ultimately was) extended.  See Mot. Ex. J, 9/30 Hrg. Tr. at 98:9-15 ("MR. LAURIA:  Good.  And we have one other thing we have to do.  We had the same date for finalizing the form of the agreement for purposes of our separate deal.  THE COURT:  Right.  MR. LAURIA:  And we're going to have to kick that out a little bit, because the schedules are being delivered over the next few days.").

20.     Even after further negotiations, the Ad Hoc Group and LBAC never achieved a meeting of the minds on a number of material terms of the APA.  As the Ad Hoc Group notes, material terms include "conditions to funding."  See Response at ¶ 33 (citing Gerber v. Computer Assocs. Int'l, Civ. A. No. 91-3610, 2000 WL 307379, at *1 (E.D.N.Y. Mar. 14, 2000)).  Although conditions to funding were drafted in the Form APA, the scope of multiple key funding conditions was to be defined by schedules to the Form APA that were never agreed

upon.  Specifically, Section 7.1(a)(iii) of the Form APA provided that a condition to funding was

that "other than [certain regulatory approvals including FCC and Industry Canada transfer of

control approvals], all consents and approvals of any Person set forth in Section 7.1(a)(iii) of the

Disclosure Letter, shall have been obtained and shall be in effect," and Section 7.1(a)(iv) of the

Form APA set forth a separate funding condition requiring that "other than [FCC and Industry

Canada transfer of control approvals], all Regulatory Approvals under Antitrust Laws set forth in

Section 7.1(a)(iv) of the Disclosure Letter shall have occurred."  See Ex. F, 10/28 Form APA,

§§ 7.1(a)(iii), (iv).  LBAC provided drafts of the schedules in question to the Ad Hoc Group, but

never received a single comment or acknowledgement back.  The scope of these conditions was

material both to LBAC, which sought to ensure that it would not be required to assume the risk

of various regulatory approvals (excluding FCC and Industry Canada transfer of control

approvals), and to the Ad Hoc Group, which sought to minimize the risk that funding of the

LBAC Bid would not occur.

21.     Moreover, the scope of various draft representations and warranties in the

Form APA was never defined because no seller disclosure letter conforming to those

representations and warranties was ever drafted, let alone finalized.  Material exhibits were also

subject to ongoing negotiations; most notably, the Inmarsat Side Letter, the Release, the Escrow

Agreement and Operating Budget (each as defined in the Form APA).

22.     Thus, the instant facts are easily distinguishable from those in Kowalchuk

v. Stroup, 873 N.Y.S. 2d 43 (N.Y. App. Div. 2009), cited by the Ad Hoc Group for the

proposition that "the fact that the [Form] APA was not signed [is] irrelevant."  Response at ¶ 32.

In Kowalchuk, all material terms of the proposed settlement at issue had been proposed by

settling defendant and accepted in writing by the settling plaintiff prior to the settling defendant's

14

attempted withdrawal of his settlement offer.  Kowalchuk, 873 N.Y.S. at 45.  That offer and

acceptance was sufficient to establish an enforceable contract, notwithstanding that the

settlement documentation was not executed, because the offer accepted by plaintiff "includ[ed]

all the essential material terms of that offer."  Id. at 46. [7]  In contrast, here, the Form APA is not a

substantially complete agreement with respect to which a court could "simply fill in any missing

terms," as the Ad Hoc Group blithely asserts.  Response ¶ 33.  For a court to resolve by judicial

fiat open essential contractual issues relating to items like the Operating Budget, the Inmarsat

Side Letter, disclosure schedules and related conditions, representations and warranties, and

covenants would violate governing New York contract law.  Where the "essential terms of an

agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract

will result."  Dreyfuss v. eTelecare Global Solutions-US, Inc., 2008 WL 4974864, at *4

(S.D.N.Y. Nov. 19, 2008) (quoting Brookhaven Hous. Coal. v. Solomon, 583 F.2d 584, 593 (2d

Cir. 1978)).[8]

　　　　23.　　Nor do the miscellaneous statements of LBAC's counsel selectively cited

by the Ad Hoc Group constitute evidence that LBAC intended to be bound to anything besides

the PSA, subject to the terms and conditions set forth therein.  Each and every one of the cited

statements was made while the PSA was effective – i.e., between July 23, 2013 and January 7,

2014, inclusive.  See Response at ¶ 8 (citing statements of LBAC counsel from July 23, 2013

---

[7]    Although the Kowalchuk court found that a contract had been formed upon plaintiff's email acceptance of
defendant's offer, it is also notable that the parties in Kowalchuk eventually did negotiate settlement
documentation, and the settlement documentation had in fact been signed by the defendant prior to his
purported withdrawal of his offer.  Id. at 45.

[8]    The Ad Hoc Group cites three inapposite cases merely holding that a contract need not contain a "definite
term of duration."  See Better Living Now, Inc. v. Image Too, Inc., 67 A.D.3d 940, 941-42 (2d Dep't
2009); Haines v. City of N.Y., 41 N.Y.2d 769, 772 (1977); Warner-Lambert Pharm. Co. v. John J.
Reynolds, Inc., 178 F. Supp. 655, 661 (S.D.N.Y. 1959).  None resulted in the Court imposing material
terms upon the parties as would be required here to complete the Form APA.  In this case, the operative
contract did include a definite term of duration.

11149564.5

hearing), ¶ 10 (statements of LBAC counsel from September 24 hearing), ¶ 11 (statements of

LBAC counsel from October 9, 2013 and December 10, 2013 hearings), ¶ 36 (statements of

counsel from October 9, 2013, November 25, 2013 and December 10, 2013 hearings).  These

statements were nothing more than confirmation that LBAC had bound itself to a PSA that

"locked in" the LBAC Bid unless and until the PSA was terminated in accordance with its terms.

24.     To be clear, the Form APA did have significance in that it set forth the

framework of the "deal" that LBAC and the Ad Hoc Group agreed to continue to negotiate <u>under

the PSA</u>.  As such, it isn't a meaningless document, it is just not enforceable on a stand alone

basis and must be viewed through the PSA, which was the only binding contract between the

parties.

IV.     **Even If the LBAC Bid Were Enforceable, *Which it is Not*, LBAC Would Have a
        Termination Right Under Section 8.1(g) of the Form APA, and the
        <u>Ad Hoc Group Would Have No Right of Specific Performance</u>**

25.     Despite asserting that the Form APA is somehow an enforceable contract,

the Ad Hoc Group urges the Court to "read out" of that contract Section 8.1(g), which would

give LBAC the right to terminate the Form APA (if it were enforceable) based on the failure to

obtain entry of a Court order approving the sale contemplated thereby on or prior to December

11, 2013.  <u>Id.</u> at ¶ 34; <u>see</u> <u>also</u>, Ex. F, 10/28 Form APA at § 8.1(g).  <u>First</u>, the Ad Hoc Group

mischaracterizes LBAC's arguments regarding the enforceability of the Form APA and Section

8.1(g) thereof.  To be clear, LBAC does not believe the Form APA is enforceable against LBAC

in any respect.  But even if the Form APA were enforceable, LBAC *still* would be permitted to

terminate it.  There is no inconsistency between these points.  They are merely alternative

arguments.

26.     <u>Second</u>, the Ad Hoc Group's argument that the Bid Procedures Order (and

specifically, the Paragraph (j) proviso) modified Section 8.1(g) of the Form APA is contrary to

the plain language of the Bid Procedures Order.  Response at ¶ 34.  Nothing in the Bid

Procedures Order modifies Section 8.1(g) of the Form APA.  As set forth in Section II above, the

Paragraph (j) Proviso relates only to the conditions under which LBAC would be bound to serve

as a back-up bidder, and does not expressly modify any provision of the Form APA except for

Section 8.1(e) of the 7/23 Form APA, which had provided that LBAC would not be required to

serve as back-up bidder.  See, e.g., Ex. E, 7/23 Form APA at § 8.1(e).  Where the Bid Procedures

Order or Bid Procedures modified the Form APA, they did so expressly.  See, e.g., Ex. D, Bid

Procedures Order at ¶ 8 ("[T]ermination of the LBAC Stalking Horse Agreement pursuant to

section 8.1(b) thereof, which shall be deemed to occur as a result of an event contemplated in

section 8.1(b), shall not result in or otherwise trigger the payment of the LBAC Bid Protections

pursuant to section 8.3 of the LBAC Stalking Horse Agreement or otherwise."); see also id.,

Exhibit A at ¶ (d)(ii) ("In the event of any conflict between the summary of the LBAC Bid

contained herein and the LBAC Stalking Horse Agreement, the LBAC Stalking Horse

Agreement, as **expressly** modified by these Bid Procedures and the Approval Order, shall

control.") (emphasis added).

       27.    Third, the Ad Hoc Group's argument that because the December 11, 2013

date was added to Section 8.1(g) after entry of the Bid Procedures Order, the change was

"unauthorized" misconstrues the Bid Procedures Order and, if accepted, would actually have

precluded completion of the Form APA.  As the Ad Hoc Group notes, the deadline set forth in

Section 8.1(g) was blank in the 7/23 Form APA, the only form before the Court when the Bid

Procedures Order was entered.  Response ¶ 34.  To interpret the Bid Procedures Order's general

prohibition on modifications relating to the LBAC Bid Protections (the timing of earning and

payment of which is set forth in Section 8.3 of the Form APA, not Section 8.1) as prohibiting

modifications to Section 8.1(g) would make it impossible for the parties to fill in the blank for that material term.  And, the fact that the Ad Hoc Group agreed to these changes to conform the Form APA to the Milestones demonstrates that the Ad Hoc Group's current claim that the Form APA is a binding and irrevocable offer is just litigation argument and not the contemporaneous view of any of the parties to the agreements.

28.    Fourth, that the Debtors did not agree to the termination event is irrelevant.  The Debtors have not agreed to a single term of the Form APA and have done nothing but oppose the LBAC Bid.  For all of the foregoing reasons, short of the Court rewriting one of the material terms of the Form APA (and drafting many others from scratch), there would be no way to prevent LBAC from terminating the Form APA immediately even if it were enforceable – which it is not.

29.    Finally, as LBAC observed in the Objection and Motion, pursuant to Section 9.5 of the Form APA, the Ad Hoc Group is not entitled to seek the relief it requests, i.e., specific performance.  See Objection and Motion at ¶ 18, n.8; Ex. F, 10/28 Form APA at §§ 9.5, 9.10.  The Debtors are the only parties that would be entitled to enforce any remedies under the Form APA, if they were parties to an agreement and if that agreement were enforceable.  Section 9.5 of the Form APA expressly limits the extent to which the Ad Hoc Group are third party beneficiaries, and excludes the right to enforce any specific performance obligation set forth in Section 9.10.  Thus, even if the Court were to find that the Form APA is enforceable, Section 9.5 provides an independent basis to deny the relief sought by the Ad Hoc Group.  See India.Com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (holding that "Negating Clause, entitled 'No Third Party Beneficiaries,'" "specifically foreclosed" any right by a third party to recover for breach of contract).

11149564.5

30.     The Debtors' situation is not one that can be remedied in the manner in which the Ad Hoc Group suggests.  In fact, if LBAC's termination is not determined to be valid based on the plain wording of its executed contract and the full record of these cases, one can only guess what future stalking horse bidders may require in subsequent cases to ensure their contracts are upheld.  Respectfully, any remedy that seeks to undo or delay LBAC's lawful termination would be inconsistent with the law and violate public policy.

11149564.5

## CONCLUSION

For all of the reasons set forth herein and in the Objection and Motion, LBAC

respectfully requests that the Court enter a judgment declaring that the PSA and LBAC Bid were

terminated in their entirety on or before January 10, 2014, and grant such other and further relief

as may be just or proper.

Dated: January 21, 2014
      New York, New York

<div style="margin-left:40%">

WILLKIE FARR & GALLAGHER LLP


By:  /s/ Rachel C. Strickland
    Rachel C. Strickland
    Andrew D. Sorkin

787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

-and-

SULLIVAN & CROMWELL LLP

Robert J. Giuffra, Jr.
Brian T. Frawley
Brian D. Glueckstein

125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Co-Counsel to L-Band Acquisition, LLC*

</div>

# **EXHIBIT A**

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement") is made and entered into as of July 23, 2013, by and among (i) SP Special Opportunities, LLC ("SPSO"), (ii) the other undersigned lenders under the LP Credit Agreement (as defined below), exclusive of SPSO (each, a "Supporting LP Lender" and, together with SPSO, the "Plan Sponsors"), (iii) L-Band Acquisition, LLC (the "Stalking Horse Bidder") and (iv) solely for the purposes of Section 7.11 hereof, DISH Network Corporation ("Parent Entity"). The Plan Sponsors, the Stalking Horse Bidder, and each other person that becomes a party to this Agreement in accordance with the terms hereof shall be referred to herein individually as a "Party" and collectively as the "Parties"; provided, however, that the Parent Entity shall not be deemed a Party for any purposes of any provision hereunder other than Section 7.11 of this Agreement. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined herein).

## RECITALS

**WHEREAS**, on May 14, 2012 (the "Petition Date"), LightSquared Inc. and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Debtors are operating their businesses as debtors in possession in jointly administered cases under chapter 11 of the Bankruptcy Code that are styled as In re LightSquared Inc., et. al., Case No. 12-12080 (SCC) (the "Chapter 11 Cases");

**WHEREAS**, on May 18, 2012, the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and the proceeding before the Canadian Court, the "CCAA Recognition Proceeding") granted orders under Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36 (the "CCAA") that, among other things, recognized the Chapter 11 Cases as a "foreign main proceeding" pursuant to Part IV of the CCAA;

**WHEREAS**, each Plan Sponsor is a holder of a Claim, as defined in section 101(5) of the Bankruptcy Code (each, an "LP Lender Claim"), arising under that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "LP Credit Agreement"), between LightSquared LP, as borrower, LightSquared, Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc. and TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc. and SkyTerra (Canada) Inc., as guarantors, the lenders party thereto, UBS AG, Stamford Branch, as administrative agent, Wilmington Trust FSB, as collateral trustee, and UBS Securities LLC, as arranger, syndication agent and documentation agent;

**WHEREAS**, one or more Plan Sponsors may also hold or acquire Claims against or equity interests in Debtor LightSquared LP and/or its Debtor subsidiaries (including, without limitation, the Series A Preferred Units issued by LightSquared LP) other than LP Lender Claims

date of any Milestone the approval of the Disclosure Statement or the confirmation and consummation of the Plan.

(b)     Nothing in this Agreement shall impair, prohibit, limit or restrict the rights of any Supporting LP Lender in connection with (i) the auction process to be conducted pursuant to the bid procedures related to the LP Sale set forth in Exhibit D attached hereto (the "Bid Procedures"), as approved by the Bankruptcy Court pursuant to the Bid Procedures Order, (ii) the Order Further Extending LightSquared's Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereof [Docket No. 522], entered by the Bankruptcy Court on February 13, 2013, (iii) soliciting Potential Bidders (as defined in the Bid Procedures), or engaging in discussions and negotiations with Potential Bidders; or (iv) selecting the Successful Bidder (as defined in the Bid Procedures).

**1.2     Stalking Horse Bidder's Commitments.**

As consideration for the Plan Sponsors entering into this Agreement, so long as this Agreement shall not have been terminated in accordance with Section 6 hereof, the Stalking Horse Bidder agrees that, by having executed and become party to this Agreement, it:

(a)     Shall use commercially reasonable efforts to effectuate and consummate the transactions contemplated by this Agreement, the Plan and the Stalking Horse Agreement;

(b)     Shall use commercially reasonable efforts to obtain the Confirmation Order;

(c)     Shall not directly or indirectly seek, solicit, support, or vote in favor of any Alternative Plan;

(d)     Shall not directly or indirectly (a) engage in, continue, or otherwise participate in any negotiations regarding any Alternative Plan, (b) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternative Plan, or (c) withhold, withdraw, qualify, or modify its approval or recommendation of this Agreement, the Plan, the Disclosure Statement, the Stalking Horse Agreement or the Bid Procedures;

(e)     Shall not encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with entry of the Disclosure Statement Order or, after approval thereof, the Confirmation Order;

(f)     Shall not withdraw its offer made pursuant to the Stalking Horse Agreement;

(g)     Shall not take any action that is inconsistent with this Agreement, the Plan or the Stalking Horse Agreement, or that would unreasonably delay beyond the date of any Milestone the approval of the Disclosure Statement or the confirmation and consummation of the Plan; and

4

BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR. NOTWITHSTANDING THE FOREGOING PROVISIONS, NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

**Section 6.**     **Termination.**

**6.1**     **Termination Events.**

This Agreement may be terminated:

(a)     immediately upon the written agreement of all the Parties to terminate this Agreement;

(b)     by any Party, solely as to such party, immediately upon the failure of the third Milestone set forth on Exhibit C to be satisfied;

(c)     by any Party, solely as to such Party, immediately following the occurrence of any event described in clause (1) or (2) below:

     (1)     any of the Chapter 11 Cases relating to a Debtor that owns material assets to be purchased pursuant to the Stalking Horse Agreement is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

     (2)     the Confirmation Order is vacated pursuant to Section 11.4 of the Plan;

(d)     by any Supporting LP Lender, upon three (3) business days written notice to each of the other Parties following the occurrence of any event described in clause (1) or (2) below:

     (1)     the Plan has not been consummated by December 31, 2013 and the holders of LP Lender Claims shall not have received their Plan Consideration; or

     (2)     there has been a material breach of any representation, warranty or covenant contained in this Agreement by SPSO or the Stalking Horse Bidder.

(e)     by SPSO, upon three (3) business days written notice to each of the other Parties following the occurrence of a material breach of any representation, warranty or covenant contained in this Agreement by any of the Supporting LP Lenders.

9

(f)     by the Stalking Horse Bidder, upon three (3) business days written notice to each of the other Parties following the occurrence of any event described in clause (1), (2), (3), (4) or (5) below:

    (1)     a Milestone has not been met;

    (2)     there has been a material breach of any representation, warranty or covenant contained in this Agreement by any of the Supporting LP Lenders;

    (3)     consummation of the transactions contemplated by the Stalking Horse Agreement has become legally impossible as the result of an event or occurrence specified in Section 8.1(b) of the Stalking Horse Agreement;

    (4)     the Plan Sponsors have withdrawn the Plan or publicly announced their intention not to support the Plan or provided written notice to the Stalking Horse Bidder of their intention to do so; or

    (5)     any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable.

The provisions of this Section 6.1 are intended solely for the Parties; provided, however, that no Party to this Agreement may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions. Any such termination (or partial termination) of this Agreement shall not restrict the Parties' rights and remedies for any breach of this Agreement by any Party, including, but not limited to, the reservation of rights set forth in Section 4 hereof, and the right of specific performance set forth in Section 7.11.

Further, notwithstanding anything to the contrary contained in this Agreement, to the extent any Debtor or any of Harbinger Capital Partners LLC or its affiliates ("Harbinger Parties") takes or has taken any action or failed to take any action that (a) may result in a condition set forth in this Agreement or the Stalking Horse Agreement to not be satisfied or (b) may give rise to a termination right pursuant to Section 6.1 hereof or under the Stalking Horse Agreement (as the case may be, a "Debtor/Harbinger Impediment"), then the Parties shall prepare and file with the Bankruptcy Court a joint motion ("Motion to Compel"), in form and substance reasonably satisfactory to each Party, to remedy a Debtor/Harbinger Impediment, and each Party shall support any other Parties' request that such Motion to Compel be heard by the Bankruptcy Court on an expedited basis. In the event that a Motion to Compel is filed by the Parties in accordance with this paragraph, no Party shall terminate this Agreement or the Stalking Horse Agreement until the Bankruptcy Court enters an order with respect to the Motion to Compel, and if the Bankruptcy Court grants the Motion to Compel, this Agreement and/or the Stalking Horse Agreement may not be terminated based on the Debtor/Harbinger Impediment that was the subject of the Motion to Compel; provided, however, that notwithstanding the foregoing, nothing herein shall be deemed to modify or otherwise affect the right of the Stalking Horse Bidder to terminate this Agreement in accordance with Section 6.1(f)(1) hereof.

# **EXHIBIT B**

Docket #0863  Date Filed: 9/23/2013

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Glenn M. Kurtz
Andrew C. Ambruoso

Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Thomas E Lauria (*admitted pro hac vice*)
Matthew C. Brown (*admitted pro hac vice*)

*Counsel to the Ad Hoc Secured Group of
LightSquared LP Lenders*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**OMNIBUS REPLY OF THE INDEPENDENT AD HOC SECURED GROUP OF
LIGHTSQUARED LP LENDERS TO BID PROCEDURES OBJECTIONS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).



1212080130923000000000006

as the filing of the plan of reorganization by Harbinger (the "Harbinger Plan") and Harbinger's

public objection to a sale are what may potentially chill bidding.

20.    Equity wants to sacrifice the recoveries of senior creditors as they play for option

value.  SIG, a holder of Inc. preferred equity,[6] notably characterizes regulatory approval as "too

risky a gamble to expect" bidders to assume, and states that "it is unreasonable to expect any

other acquiror to bear the regulatory risk." (SIG Obj. ¶¶ 19-20)  Yet the objectors want the

secured lenders to bear that "unreasonable risk" by giving up a bird in the hand for some

potential additional value that anyone would view as "too risky a gamble."

**C.    The LBAC Stalking Horse Bid Protections
        Should Be Approved**

21.    It is predictable that Harbinger, the Debtors as controlled by Harbinger, and

Centaurus, a participant in financing Harbinger's Plan, oppose the LBAC stalking horse

protections.  Without the stalking horse protections, LBAC can terminate its stalking horse bid,

which is precisely what Harbinger desires.  (See Plan Support Agreement § 6.1(f))  Indeed,

Harbinger's objection again confirms that it is "a vocal and steadfast opponent of any sale of the

Debtors' assets, pushing instead for reorganization" and that a sale of the assets would be over

"Harbinger's strong disagreement." (Harbinger Obj. ¶ 9)  Indeed, Harbinger's efforts to fight off

LBAC are so extreme that Harbinger filed a lawsuit against LBAC for "interfering" with its

ownership of the Debtors by trying to purchase the LP Assets, even though the assets are to be

auctioned.  (Adv. Compl. ¶ 1)  Harbinger, and those working with Harbinger on a non-sale plan,

should not be permitted to scuttle a sale by objecting to the approvals required to maintain the

only existing bid.

---

[6]  SIG owns 151,515 units (approximately 97%) of the Series B Inc. Preferred shares.  (See SIG Obj. ¶ 1)

# **EXHIBIT C**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Glenn M. Kurtz
Andrew C. Ambruoso

WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Thomas E Lauria (*admitted pro hac vice*)
Matthew C. Brown (*admitted pro hac vice*)

*Counsel to the Ad Hoc Secured Group of
LightSquared LP Lenders*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**MOTION OF THE INDEPENDENT AD HOC SECURED GROUP OF LIGHTSQUARED
LP LENDERS FOR AN ORDER: (I) (A) AUTHORIZING THE INDEPENDENT AD
HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS TO CONDUCT AN
AUCTION FOR THE SALE OF CERTAIN ASSETS OF LIGHTSQUARED LP AND
CERTAIN OF ITS AFFILIATED DEBTORS IN CONNECTION WITH THE JOINT
CHAPTER 11 PLAN FOR LIGHTSQUARED LP AND CERTAIN OF ITS AFFILIATED
DEBTORS, OR, IN THE ALTERNATIVE (B) CONDITIONING THE DEBTORS'
CONTINUED POWERS AS DEBTORS IN POSSESSION ON THE APPOINTMENT OF
AN INDEPENDENT COMMITTEE OF THE DEBTORS' BOARD TO CONDUCT SUCH
AUCTION, OR, IN THE FURTHER ALTERNATIVE, (C) DIRECTING
APPOINTMENT OF A TRUSTEE; (II) APPROVING STALKING HORSE BIDDER
AND BID PROCEDURES WITH RESPECT TO THE AUCTION; (III) SCHEDULING
THE AUCTION; (IV) APPROVING THE FORM AND SCOPE OF NOTICE OF THE
BID PROCEDURES AND THE AUCTION; (V) APPROVING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).

bidders. See Metaldyne, 409 B.R. at 670 (approving bid protections because, among other factors, "the stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids"); Integrated Res., 147 B.R. at 661-62. Specifically, courts have found that break-up fees are necessary to create an incentive for a stalking horse bidder to spend the requisite time and money investigating a debtor's assets before entering into an agreement to purchase those assets. See, e.g., Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 623 (S.D.N.Y. 1987) (citation omitted).

93.     In assessing proposed break-up fees in chapter 11 cases, courts consider the following factors: (i) whether the relationship of the parties who negotiated the break-up fee is arms' length; (ii) whether the fee hampers rather than encourages bidding; and (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price. Integrated Res., 147 B.R. at 657. Here, an analysis of these three factors supports approval of the Break-Up Fee.

94.     First, the discussions between the Independent Ad Hoc Group and the Stalking Horse Bidder have been arms' length. The Bid Protections were essential inducements and conditions relating to the Stalking Horse Bidder's entry into, and continuing obligations under the PSA, and were negotiated by the Independent Ad Hoc Group and the Stalking horse Bidder in good faith and at arm's length, as evidenced by the Stalking Horse Bidder increasing its initial bid by $220 million. In making such a favorable initial bid, the Stalking Horse Bidder relied on the Bid Protections, without which the opportunity to obtain what may be the highest and best available offer for the LP Assets may be lost.

95.     Second, The Independent Ad Hoc Group believes that the Break-Up Fee will not hamper any other party's ability to offer a higher or better bid. The Break-Up Fee is not so large relative to the minimum bidding increment as to have a "chilling effect" on other prospective

NEWYORK 8923679

# **EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

### ORDER (A) ESTABLISHING BID PROCEDURES, (B) SCHEDULING DATE AND TIME FOR AUCTION, (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) APPROVING FORM OF NOTICE, AND (E) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of LightSquared Inc. and certain of its affiliates,

as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors")[3] in the

above-captioned chapter 11 cases (the "Chapter 11 Cases"), for entry of an order (the "Order"),

pursuant to sections 105, 503, 507, 1123, and 1129 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 6004-1,

6006-1, and 9006-1 of the Local Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules"), and General Order M-383 of the United States

---

[1]     The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable.

[3]     For the avoidance of doubt, any decision to be made, or action to be taken, by LightSquared under the Bid Procedures, the Auction, and any resulting Sale, shall be made or taken at the direction of the independent committee of LightSquared's board of directors.



1212080131001000000000001

7.     Any objections to the Court's approval of the Sale must be filed and served in accordance with the Disclosure Statement Order[8] by November 26, 2013 at 4:00 p.m. (prevailing Eastern time) and on the following parties:  (i) Milbank, Tweed, Hadley & M^CCloy LLP, One Chase Manhattan Plaza, New York, NY 10005, Attn:  Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq., counsel to LightSquared, (ii) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (Attn:  Paul M. Basta, Esq. and Joshua A. Sussberg, Esq.), counsel to the Independent LightSquared Committee, (iii) the Notice Parties, and (iv) any additional entities on the Master Service List (as defined in the Case Management Order); provided, however, that objections to LightSquared's selection of the highest and otherwise best bid only must be filed, served, and received by the aforementioned parties by December 6, 2013 at 11:59 p.m. (prevailing Eastern time).  The failure to file and serve an objection to the Court's approval of the Sale shall be a bar to the assertion thereof at the Confirmation Hearing or thereafter.

**Bid Protections**

8.     ***LBAC Bid Protections.***  The LBAC Break-Up Fee set forth in the Bid Procedures is hereby approved to the extent set forth herein.  LightSquared is authorized and directed to pay the LBAC Break-Up Fee to LBAC in accordance with the terms of the LBAC Stalking Horse Agreement and the Bid Procedures, without further order of this Court; provided, however, the LBAC Stalking Horse Agreement shall not be modified as it relates to the LBAC Bid Protections, including with respect to the timing or circumstances under which the LBAC Bid Protections are earned and become an allowed administrative claim against the LP Debtors;

---

[8]     "Disclosure Statement Order" means *Order (I) Approving Disclosure Statements, (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of Competing Plans, (III) Approving Forms of Various Ballots and Notices in Connection Therewith, (IV) Approving Scheduling of Certain Dates in Connection with Confirmation of Competing Plans, and (V) Granting Related Relief.*

provided, further, and notwithstanding anything to the contrary in the LBAC Stalking Horse

Agreement, the LBAC Break-Up Fee shall be earned (and any claim of LBAC in respect of same

shall be an allowed administrative expense claim against the LP Debtors) at the times set forth in

the LBAC Stalking Horse Agreement, but shall not be payable by the LP Debtors until

consummation of an alternative transaction; provided, further, and for the avoidance of doubt,

termination of the LBAC Stalking Horse Agreement pursuant to section 8.1(b) thereof, which

shall be deemed to occur as a result of an event contemplated in section 8.1(b), shall not result in

or otherwise trigger the payment of the LBAC Bid Protections pursuant to section 8.3 of the

LBAC Stalking Horse Agreement or otherwise.

        9.     ***MSAC Bid Protections.***  In connection with the MSAC Bid, MSAC shall

be entitled to the Inc. Expense Reimbursement.

        10.     ***Potential Stalking Horse Bid Protections.***  To the extent LightSquared

determines to proceed with a transaction proposed by a Potential Stalking Horse Bidder that

includes the payment of Potential Stalking Horse Bid Protections, LightSquared shall (a) provide

a confidential written Notice of Proposed Grant of Potential Stalking Horse Bid Protections (a

"Bid Protections Notice") by hand delivery, e-mail, facsimile, or overnight courier to each of the

Stakeholder Parties and each of their respective counsel and financial advisors  (the "Bid

Protections Notice Parties"), inviting the Bid Protections Notice Parties to a meeting at the

offices of Milbank, Tweed, Hadley & McCloy LLP on not less than one (1) business day's

notice, and (b) orally advise counsel to the Bid Protections Notice Parties of (i) the name of the

Potential Stalking Horse Bidder, (ii) LightSquared's estimated range of aggregate consideration

offered by such bidder and the form thereof, (iii) the proposed Potential Stalking Horse Bid

Protections to be provided, and (iv) any material conditions to the proposed transaction (the "Bid

# BID PROCEDURES

Set forth below are the procedures (the "<u>Bid Procedures</u>") to be employed in connection with the proposed auction (the "<u>Auction</u>") and sale (the "<u>Sale</u>") of (i) substantially all of the assets (the "<u>LP Assets</u>") of LightSquared LP ("<u>LSLP</u>"), ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (collectively, the "<u>LP Debtors</u>"), (ii) substantially all of the assets (the "<u>Inc. Assets</u>" and, together with the LP Assets, the "<u>Assets</u>") of LightSquared Inc., LightSquared Investors Holdings Inc., SkyTerra Rollup LLC, One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp., TMI Communications Delaware, Limited Partnership, LightSquared GP Inc., and SkyTerra Investors LLC (the "<u>Inc. Debtors</u>" and, together with the LP Debtors, the "<u>Debtors</u>" or "<u>LightSquared</u>"),[1] or (iii) any grouping or subset of the Assets.

A hearing (the "<u>Confirmation Hearing</u>") to consider approval of the Sale of the Assets, or any grouping or subset thereof, shall be conducted on December 10, 2013 at 10:00 a.m. (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton U.S. Custom House, Courtroom No. 621, One Bowling Green, New York, NY 10004 (the "<u>Bankruptcy Court</u>").  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served in accordance with the *Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. 121] (the "<u>Case Management Order</u>").

a.   **Assets to Be Sold.**  LightSquared will offer for Sale all or substantially all of the Assets. For the avoidance of doubt, in connection with the Sale and these Bid Procedures, any Potential Bidder (as defined below) may submit a bid for any or all of the Assets of LightSquared, and, for purposes hereof, "Sale" shall be deemed to include a sale of any grouping or subset of the Assets.  LightSquared, in consultation with (i) the Ad Hoc Secured Group, exclusive of SPSO[2] and its affiliates (the "<u>Independent Ad Hoc Secured</u>

---

[1]   For the avoidance of doubt, any decision to be made by LightSquared under these Bid Procedures, or in connection with the plan process, including, without limitation, the acceptance of any Successful Bid (or Second-Highest Bid) (each as defined below), shall be made by the independent committee of LightSquared's board of directors (the "<u>Independent LightSquared Committee</u>").  Actions taken by the Independent LightSquared Committee may be taken (a) on the advice of Kirkland & Ellis LLP ("<u>Kirkland</u>"), as counsel to the Independent LightSquared Committee, and/or the advice of Moelis & Company ("<u>Moelis</u>"), as LightSquared's financial advisor, or (b) by Kirkland or Moelis, in each case at the direction of the Independent LightSquared Committee.  For further avoidance of doubt, in connection with any decision made by the Independent LightSquared Committee under these Bid Procedures, or in connection with the plan process, the Independent LightSquared Committee may also consult with counsel to, and advisors for, any other party in LightSquared's chapter 11 cases, including, without limitation, LightSquared's regulatory counsel.

[2]   The "<u>Ad Hoc Secured Group</u>" means that certain ad hoc secured group of holders of loans made pursuant to that certain Credit Agreement, dated as of October 1, 2010, between LSLP, as borrower, certain of LSLP's affiliates (including, but not limited to, the other Sellers), as guarantors, the lenders party thereto,

    ii.    must have delivered the most current audited (if applicable) and the most current unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring Assets, the Financials of the Potential Bidder's equity holder(s) or other financial backer(s), or such other form of financial disclosure and evidence reasonably acceptable to LightSquared, in consultation with the Stakeholder Parties, demonstrating such Potential Bidder's financial ability to: (A) close the proposed transaction (the "<u>Proposed Transaction</u>") contemplated by the Potential Bidder's proposed purchase agreement (together with its exhibits and schedules, and any ancillary agreements related thereto, the "<u>Proposed Agreement</u>"); and (B) provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by LightSquared and assigned to the Potential Bidder; <u>provided</u>, that if a Potential Bidder is unable to provide Financials, LightSquared, in consultation with the Stakeholder Parties, may accept such other information sufficient to demonstrate to LightSquared's reasonable satisfaction (after consultation with the Stakeholder Parties) that such Potential Bidder has the financial wherewithal and ability to consummate the Proposed Transaction; and

    iii.    shall comply with all reasonable requests for additional information by LightSquared, in consultation with the Stakeholder Parties, or LightSquared's advisors, in consultation with the Stakeholder Parties, regarding such Potential Bidder's financial wherewithal and ability to consummate and perform obligations in connection with the Sale. Failure by a Potential Bidder to comply with requests for additional information may be a basis for LightSquared, in consultation with the Stakeholder Parties, to determine that a bid made by such Potential Bidder is not a Qualified Bid.

d.    **<u>Form Purchase Agreement, Stalking Horse Bids, and Related Protections</u>.**

    i.    ***Form Purchase Agreement.*** With these Bid Procedures, LightSquared is providing a form purchase agreement (with certain ancillary agreements thereto, the "<u>Form APA</u>"), a true and correct copy of which is attached as Schedule 1-A hereto.

    ii.    ***LBAC.*** L-Band Acquisition, LLC ("<u>LBAC</u>"), as set forth in that certain purchase agreement attached as Exhibit F to the Disclosure Statement for Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc. Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders filed on July 23, 2013 [Docket No. 765] (as

3

expressly modified by these Bid Procedures or the Approval Order, the "LBAC Stalking Horse Agreement"), has submitted a Qualified Bid (as expressly modified by these Bid Procedures or the Approval Order, the "LBAC Bid") for the purchase of the LP Assets of (A) cash in the amount of $2.22 billion; plus (B) the value of Employee Obligations assumed by LBAC; plus (C) certain Cure Amounts; plus (D) the amount of liabilities specifically designated in the LBAC Stalking Horse Agreement as assumed liabilities.  In addition, the LBAC Bid provides that receipt of the FCC Consent and Industry Canada Approval is not a condition precedent for the funding of the cash purchase price payable thereunder.[3]  In connection with the LBAC Bid, LBAC shall be entitled to a break-up fee of $51.8 million, i.e., 2 1/3% of the cash purchase price offered by the LBAC Bid (the "LBAC Break-Up Fee" and, together with the LP Expense Reimbursement,[4] the "LBAC Bid Protections"), which shall be payable to LBAC on the terms and conditions set forth in the LBAC Stalking Horse Agreement and Approval Order (as defined below); provided, that in the event that LightSquared agrees to provide a break-up or similar fee to any other Stalking Horse Bidder that exceeds the LBAC Break-Up Fee (e.g., a larger percentage and/or a fee based on cash and non-cash consideration) (a "Larger Break-Up Fee") and such Larger Break-Up Fee is approved by the Bankruptcy Court in accordance with these Bid Procedures, the LBAC Break-Up Fee shall be deemed to increase such that the LBAC Break-Up Fee shall be equal to the Larger Break-Up Fee, expressed as a percentage of the applicable components of the applicable Stalking Horse Bid.  Upon approval of any Larger Break-Up Fee in accordance with these Bid Procedures, LightSquared shall provide written notice (which may include email from counsel to LightSquared) to LBAC of same as well as of the calculation method of such Larger Break-Up Fee.[5]

iii.   **MSAC.**  Mast Spectrum Acquisition Corp. and/or one or more of its affiliates or designees ("MSAC"), as set forth in that certain purchase agreement attached as Exhibit B to the Specific Disclosure Statement for Chapter 11 Plan for One Dot Six Corp. Proposed by U.S. Bank National Association and MAST Capital Management, LLC filed on August 30, 2013 [Docket No. 824] (the "MSAC Stalking Horse Agreement"), has submitted a Qualified Bid in the form of a credit bid (the "MSAC Bid") for the purchase of the assets of One Dot Six Corp. (the "One Dot Six

---

[3]   Terms used in this paragraph and not otherwise defined herein shall have the meanings set forth in the LBAC Stalking Horse Agreement.

[4]   "LP Expense Reimbursement" has the meaning set forth in the *Order Approving Expense Reimbursement and Related Relief for L-Band Acquisition, LLC and MAST Spectrum Acquisition Company LLC and Related Entities* [Docket No. 880] (the "Expense Order").

[5]   The summary of the LBAC Bid contained in this section (d)(ii) is qualified in its entirety by the terms of the LBAC Stalking Horse Agreement.  In the event of any conflict between the summary of the LBAC Bid contained herein and the LBAC Stalking Horse Agreement, the LBAC Stalking Horse Agreement, as expressly modified by these Bid Procedures and the Approval Order, shall control.

Protections Objection (which hearing may be conducted in person or telephonically) as soon as the Bankruptcy Court can hear the parties (the "Bid Protections Hearing"). At any Bid Protections Hearing, this Court only shall consider whether the grant of the Potential Stalking Horse Bid Protections, as disclosed in the Bid Protections Disclosure, should be approved. The Bid Protections Hearing shall be conducted *in camera* and attendance and participation shall be limited to the Bid Protections Notice Parties.

(D)  To the extent LightSquared, in consultation with the Stakeholder Parties, enters into any such Potential Stalking Horse Agreement(s), the agreement(s) shall be placed on the Bankruptcy Court's docket and notice thereof shall be given to all parties on LightSquared's master service list maintained by KCC pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and Rule 2002-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York and any entities that have filed a request for service of filings pursuant to Bankruptcy Rule 2002.

v.  The Qualified Bid made by the applicable Stalking Horse Bidder plus the applicable Bid Protections will then act as the minimum Qualified Bid (the "Baseline Bid") for the applicable Assets for purposes of, and subject to higher and better offers at, the Auction.

e.  **Participation Requirements.**  Unless otherwise ordered by the Bankruptcy Court, to participate in the Bidding Process, each person that is a Potential Bidder (each, a "Qualified Bidder") must submit a bid that adheres to the requirements below (each, a "Qualified Bid"). Notwithstanding anything in these Bid Procedures to the contrary, each Stalking Horse Bidder shall be deemed to (i) be a Qualified Bidder, (ii) have submitted a Qualified Bid, and (iii) shall not be required to take any further action in order to participate at the Auction (if any).  Nothing in these Bid Procedures shall prohibit Harbinger Capital Partners, LLC ("Harbinger") and its affiliates from submitting a Qualified Bid.

i.  Qualified Bidders must deliver written copies of their bids no later than **5:00 p.m. (prevailing Eastern time) on November 20, 2013 (the "Bid Deadline")** to:  (A) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq. and Karen Gartenberg, Esq.), counsel to LightSquared; (B) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (Attn: Paul M. Basta, Esq. and Joshua A. Sussberg, Esq.), counsel to the Independent LightSquared Committee, (C) White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036 (Attn: Thomas E Lauria, Esq., Glenn M.

7

Kurtz, Esq., and Andrew C. Ambruoso, Esq.), counsel to the Ad Hoc Secured Group; and (D) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn:  Philip C. Dublin, Esq., Kenneth A. Davis, Esq., and Meredith A. Lahaie, Esq.), counsel to MAST and U.S. Bank, as administrative agent under the Prepetition Inc. Credit Agreement and administrative agent under the DIP Credit Agreement (each as defined below) (collectively, the "Notice Parties").  LightSquared may, in its reasonable discretion (after providing advance notice to the Stakeholder Parties of such decision), extend the Bid Deadline once or successively, but it is not obligated to do so; provided, that in no event shall the Bid Deadline be extended beyond November 25, 2013.  If LightSquared extends the Bid Deadline, it shall promptly notify all Potential Bidders of the extension.

ii.     All Qualified Bids must be in the form of an offer letter, which letter states:

(A)     that such Qualified Bidder offers to purchase any grouping or subset of Assets without indemnification and upon other terms and conditions set forth in a Proposed Agreement, copies of which (one hard copy executed by an individual authorized to bind such Qualified Bidder together with electronic copies in Word format of (1) a clean version of the Proposed Agreement and (2) a marked version or versions of the Proposed Agreement against the Form APA and/or the applicable Stalking Horse Agreement (showing amendments and modifications thereto)), are to be provided to the Notice Parties;

(B)     that such Qualified Bidder is prepared to consummate the transaction set forth in the Proposed Agreement promptly following (1) entry of an order of the Bankruptcy Court approving the Sale to the Successful Bidder(s) pursuant to the terms of one or more plans of reorganization (the "Confirmation Order(s)") and (2) receipt of other requisite governmental and regulatory approvals on the terms set forth in such Proposed Agreement;

(C)     that the offer shall remain open and irrevocable as provided below;

(D)     that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court; and

(E)     which of LightSquared's leases and executory contracts are to be assumed and assigned in connection with the consummation of the Qualified Bidder's bid.

8

iii.     All Qualified Bids shall be accompanied by a deposit into escrow with LightSquared of an amount in cash equal to:

(A)     with respect to a Qualified Bid for the LP Assets, a subset of the LP Assets, or any grouping or subset of the LP Assets and the Inc. Assets, $100,000,000; or

(B)     with respect to a Qualified Bid solely for the Inc. Assets, or any subset thereof, 5% of the proposed purchase price, as determined by the amount of consideration to be provided to the applicable Debtors' estates in connection with the proposed Sale, exclusive of the assumption of liabilities (the amounts set forth in clause (A) or this clause (B), each a "Good Faith Deposit");

provided, however, that any Qualified Bidder who is also a secured lender to LightSquared and submits a Qualified Bid by credit bid shall not be required to provide a Good Faith Deposit; provided, that a majority in amount of such Qualified Bid (determined by reference to the aggregate consideration to be provided to LightSquared's estates on account of such Qualified Bid) is in the form of a credit bid.  For the avoidance of doubt, consistent with the rights provided to them pursuant to the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (a) Authorizing Inc. Obligors To Obtain Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Status, (c) Granting Adequate Protection, and (d) Modifying Automatic Stay* [Docket No. 224] (as amended, the "DIP Order"), MAST and U.S. Bank shall be entitled to credit bid their claims arising under the Prepetition Inc. Credit Agreement and the DIP Credit Agreement (each as defined in the DIP Order).

iv.     Qualified Bids may provide for forms of consideration that include cash or a combination of cash and other distributable forms of consideration that may be distributed under a plan of reorganization or further order of the Bankruptcy Court (for the avoidance of doubt, other than with respect to assumed liabilities), which shall be delivered to the applicable Debtors' estates on the Closing Date; provided, however, that a Qualified Bid must include a minimum cash component sufficient to pay any applicable Bid Protections plus all of the following allowed Claims, to the extent required by, and as defined in, the applicable plan(s):  Administrative Claims, Priority Tax Claims, Other Priority Claims, and U.S. Trustee Fees.

v.     A Qualified Bid must exceed the aggregate consideration to be paid to or for LightSquared's applicable estates as follows:

(A)     a Qualified Bid solely in respect of (1) the LP Assets or any grouping or subset thereof, or (2) any grouping or subset of

9

the LP Assets and Inc. Assets must exceed the aggregate consideration to be paid to, or for the benefit of, LightSquared's estates as set forth in the applicable Baseline Bid(s) plus $50,000,000, the minimum overbid increment at the Auction; and

(B)     a Qualified Bid solely in respect of the Inc. Assets, or any subset thereof, must exceed the aggregate consideration to be paid to or for the benefit of the Inc. Debtors' estates as set forth in the applicable Baseline Bid(s) plus $10,000,000, the minimum overbid increment at the Auction;

provided, that LightSquared expressly reserves its right to accept, after consultation with the Stakeholder Parties, some other lesser minimum overbid increment if it determines such increment to be appropriate under the circumstances and will better promote the goals of the Bidding Process.

vi.     All Qualified Bids shall be accompanied by satisfactory evidence, in the opinion of LightSquared, in consultation with the Stakeholder Parties, of the Qualified Bidder's ability to:  (A) fund the purchase price proposed by the Qualified Bidder with cash on hand (or sources of immediately available funds) or other distributable forms of consideration, and (B) otherwise perform all transactions contemplated by the Proposed Agreement.

vii.    All Qualified Bids must fully disclose the identity of each entity that will be bidding for the applicable Assets or otherwise participating in connection with such bid (including any equity holder or other financial backer if the Qualified Bidder is an entity formed for the purpose of acquiring Assets), and the complete terms of any such participation, as well as whether each such person or entity holds an interest in another mobile satellite service provider or terrestrial wireless operator and, if so, the name of the mobile satellite service provider or terrestrial wireless operator and the nature and size of the interest; provided, that LightSquared and the Stakeholder Parties will keep such information confidential and will not disclose such information without the written consent of the applicable Potential Bidder, except to the Information Officer, who shall also keep such information confidential.  Further, each bid must provide sufficient information regarding both the Potential Bidder and any participants (and each of their ultimate controlling persons, if any) to permit LightSquared and the Stakeholder Parties to ascertain whether a petition for declaratory ruling to permit indirect foreign ownership of LightSquared's Federal Communications

10

Commission ("FCC") licenses (or the applicable Debtors owning such licenses) must be filed with the FCC.

viii.   Qualified Bids must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its bid and execution of the Proposed Agreement and the consummation of the transactions contemplated thereby.

ix.    Except as set forth herein with respect to the LBAC Stalking Horse Agreement and the MSAC Stalking Horse Agreement or the Expense Order, Qualified Bids must not entitle the Qualified Bidder to any termination or break-up fee, expense reimbursement, or similar type of payment; provided, however, that as stated above, LightSquared reserves the right to, prior to the Bid Deadline, in consultation with the Stakeholder Parties, and subject to section (d)(iv), enter into a separate agreement with a Potential Stalking Horse Bidder under which such Potential Stalking Horse Bidder's Qualified Bid would be deemed the Stalking Horse Bid for the Auction of the applicable Assets and for which such Potential Stalking Horse Bidder would be entitled to, subject to section (d)(iv), payment at any funding of the purchase price in connection with the Sale of such Assets to a Successful Bidder that is not such Potential Stalking Horse Bidder of a break-up fee that would not exceed 3% of the cash purchase price of the Assets proposed by such Potential Stalking Horse Bidder plus a maximum expense reimbursement equal to $2,000,000.

x.     Qualified Bids must be irrevocable until entry by the Bankruptcy Court of the Confirmation Order(s) and recognition by the Canadian Court (as defined below) of the Confirmation Order(s) (unless chosen as a Successful Bid or Second-Highest Bid, in which case such bid shall be irrevocable on the terms set forth in section (j) below).

xi.    A Qualified Bid may be submitted in the form of a plan of reorganization.

Pursuant to the terms and conditions of this section (e), no later than two (2) calendar days prior to the commencement of the Auction, LightSquared shall notify each Potential Bidder of LightSquared's determination, in consultation with the Stakeholder Parties, of whether it is a Qualified Bidder.  Any bid that is not deemed a "Qualified Bid" shall not be considered by LightSquared.  Prior to the Auction, LightSquared, after consultation with the Stakeholder Parties, shall notify the Qualified Bidders of the Qualified Bid or Bids it believes to represent the then highest or otherwise best bid(s) (the "Starting Qualified Bid(s)").

f.    **Flexible Asset Packages.**  Bidders are invited to bid on any grouping or subset of the Assets; provided, that all bids should include a proposed allocation of purchase consideration among the subject Assets on a debtor-by-debtor basis.

11

highest or otherwise best bid(s), as determined by LightSquared, after consultation with the Stakeholder Parties.

i.   **Acceptance of Qualified Bids.**   Subject to the terms of the Approval Order, at the conclusion of the Auction, (i) the successful bid(s) shall be the bid(s) made in accordance with that order of the Bankruptcy Court approving these Bid Procedures (the "Approval Order") that represent, in LightSquared's discretion, after consultation with the Stakeholder Parties, the highest or otherwise best offer(s) for the applicable Assets (each, a "Successful Bid" and, each Qualified Bidder who submitted a Successful Bid, a "Successful Bidder"); and (ii) LightSquared, after consultation with the Stakeholder Parties, shall announce the identity of the Successful Bidder(s).  There shall be no further bidding after the conclusion of the Auction.

LightSquared's acceptance of the Successful Bid(s) is conditioned upon approval by the Bankruptcy Court of the Successful Bid(s) at the Confirmation Hearing and entry of the Confirmation Order(s).

j.   **Irrevocability of Certain Bids.**   The Successful Bid(s) shall remain irrevocable in accordance with the terms of the purchase agreement(s) executed by the Successful Bidder(s); provided, that (i) the last bid at the Auction (or submitted if the bidder did not bid at the Auction) of the bidder(s), including, for the avoidance of doubt, the Stalking Horse Bidders (each, a "Second-Highest Bidder"), that submits, in LightSquared's discretion, after consultation with the Stakeholder Parties, the next highest or otherwise best bid(s) (each, a "Second-Highest Bid") for the Assets[8] at the Auction shall be subject to the terms of such Second-Highest Bidder(s)' purchase agreement(s), irrevocable until the earlier of:  (a) sixty (60) days after entry of the Confirmation Order(s) approving the Successful Bid(s) or such later date as may be set forth in the Second-Highest Bidder's Proposed Agreement; and (b) the date on which LightSquared receives the purchase price in connection with the Successful Bid(s) or the Second-Highest Bid(s) (the "Outside Back-up Date"), and (ii) subject to the terms of each Second-Highest Bidder(s)' purchase agreement, the Good Faith Deposit of the Second-Highest Bidder(s) shall be returned within five (5) business days of the Outside Back-up Date; provided further, that LBAC has agreed to serve as the Second Highest Bidder for the LP Assets, and that the LBAC Bid shall remain irrevocable, until the earlier of sixty (60) days after entry of the Confirmation Order(s) and February 15, 2014.  The identity of the Second-Highest Bidder(s) and the amount and material terms of the Second-Highest Bid(s) shall be announced by LightSquared at the conclusion of the Auction.  Following the entry of the Confirmation Order(s), if a Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the Second-Highest Bidder for the applicable Assets will be deemed to be the Successful Bidder (and the Second-Highest Bid the Successful Bid), and LightSquared will be authorized and directed to consummate the Sale with such Second-Highest Bidder without further order

---

[8]   For the avoidance of doubt, the Second Highest Bid(s) may contemplate the purchase of groupings or subsets of the Assets that are different from any groupings or subsets of the Assets reflected in the Successful Bid(s).

of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the applicable LightSquared estates, and LightSquared shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder, subject to the terms of, and the limitations and restrictions set forth in, the Proposed Agreement of the Successful Bidder or the Stalking Horse Agreement, as the case may be.

k.    **Return of Good Faith Deposit.**  Except as otherwise provided in this section (k) with respect to any Successful Bid or Second-Highest Bid, the Good Faith Deposits of all Qualified Bidders shall be returned upon or within five (5) business days after entry of the Confirmation Order(s).  The Good Faith Deposit of the Successful Bidder(s) shall be held until funding of purchase price in connection with the Sale and applied in accordance with the Successful Bid(s).  The Good Faith Deposit of the Second-Highest Bidder(s) shall be returned as set forth in section (j) above.

l.    **Modifications.**    At or before the Confirmation Hearing, consistent with these Bid Procedures and to obtain the highest or otherwise best offer(s) for the Assets, LightSquared, after consultation with the Stakeholder Parties, may impose such other terms and conditions as it may determine (after consultation with the Stakeholder Parties) to be in the best interests of LightSquared's estates and creditors.

m.    **Reservation of Rights.**  LightSquared may (i) determine which Qualified Bid(s), if any, constitutes the highest or otherwise best offer for the applicable Assets and (ii) reject at any time before entry of the Confirmation Order(s) approving one or more Qualified Bid, any bid that is:  (A) inadequate or insufficient; (B) not in conformity with title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), these Bid Procedures, or the terms and conditions of the Sale; or (C) contrary to the best interests of LightSquared, its estates, its creditors, and other parties in interest.  Nothing in these Bid Procedures shall, or shall be deemed to, unless otherwise provided for herein or by order of the Bankruptcy Court, (1) amend, modify, limit, or otherwise affect the terms or conditions of the Stalking Horse Agreements or the rights and remedies of the parties under applicable bankruptcy law; or (2) except for their consent to the applicable Stalking Horse Agreement, to the extent forthcoming, constitute the consent of the applicable lenders under the Prepetition LP Credit Agreement, the DIP Credit Agreement, or the Prepetition Inc. Credit Agreement to any sale or disposition of their collateral.  Furthermore, nothing in these Bid Procedures or the Approval Order shall prohibit, restrict, or otherwise limit the ability of any party to file and prosecute any competing chapter 11 plan, including a plan that contemplates the retention by LightSquared, or the alternative disposition, of the Assets, or any ability of any party in interest to object to any plan or Sale, or contest any determinations made by LightSquared under these Bid Procedures.

n.    **Expenses.**  Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, except as provided in (i) the Expense Order or (ii) any Potential Stalking Horse Agreements.

15

# EXHIBIT E

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

## PURCHASE AGREEMENT

This Purchase Agreement, dated as of [    ], 2013, is made and entered into by and among (i) LightSquared LP, a Delaware limited partnership, ATC Technologies, LLC, a Delaware limited liability company, LightSquared Corp., a Nova Scotia unlimited liability company, LightSquared Inc. of Virginia., a Virginia corporation, LightSquared Subsidiary LLC, a Delaware limited liability company, LightSquared Finance Co., a Delaware corporation, LightSquared Network LLC, a Delaware limited liability company, LightSquared Bermuda Ltd., a Bermuda limited company, SkyTerra Holdings (Canada) Inc., an Ontario corporation, and SkyTerra (Canada) Inc., an Ontario corporation (each, a "Seller" and collectively, "Sellers"),(ii) L-Band Acquisition, LLC, a Delaware limited liability company ("Purchaser") and (iii) [_____] ("Parent") (solely for the purposes of Section 9.17).

## RECITALS

WHEREAS, Sellers are engaged in the business [of (a) operating a mobile and terrestrial wireless communications system based on integrated satellite and ground-based technology to provide mobile coverage throughout North America and (b) developing a 4th Generation Long Term Evolution (4G LTE) wireless broadband network (the "Business");]

WHEREAS, on May 14, 2012, LightSquared Inc. and certain of its affiliates, including the Sellers, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case No. 12-12080 (such cases, including the cases of the Sellers and their non-Seller affiliates, the "Bankruptcy Cases");

WHEREAS, on May 18, 2012, the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and the proceeding before the Canadian Court, the "CCAA Recognition Proceeding") granted orders under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36 (the "CCAA") that, among other things, recognized the Bankruptcy Cases as a "foreign main proceeding" pursuant to Part IV of the CCAA;

WHEREAS, on July [__], 2013, SP Special Opportunities, LLC, [LIST ADDITIONAL PLAN SPONSORS] (collectively, the "Plan Sponsors") filed the *Joint Chapter 11 Plan for LightSquared, LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc.* (as amended, modified and/or supplemented, the "Plan").

WHEREAS, the Plan provides for Purchaser to purchase and acquire from Sellers certain assets and rights used in the operation of the Business, and Sellers to sell, convey, assign and transfer such assets and rights to Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under sections 105, 363, 365, 1123(b)(4) and 1142(b) of the Bankruptcy Code; and

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

(m)     to the extent Transferable under Applicable Law, all rights to the telephone numbers (and related directory listings), Internet domain names, Internet sites and other electronic addresses used by, assigned or allocated to Sellers;

(n)     all prepaid expenses (excluding prepaid expenses related to Taxes) of Sellers relating to any portion of the Acquired Assets;

(o)     all advances, withholdings or similar prepayments relating to Transferred Employees;

(p)     third party cash held in any security deposits, earnest deposits, customer deposits and other deposits and all other forms of security, in each case, placed with Sellers for the performance of a contract or agreement which otherwise constitutes a portion of the Acquired Assets ("Third Party Deposits");

(q)     all Investments and any and all Cash and Cash Equivalents or revenues, in each case, received by the Sellers after the Funding Date in respect of the Acquired Assets;

(r)     proceeds received after the Funding Date under insurance policies of Sellers to the extent received or receivable with respect to the Business or the Acquired Assets and all rights of every nature and description under or arising out of such policies to the extent unexpired as of the Closing Date, in each case, other than (i) policies which relate to any Employee Benefit Plans of Sellers which are not being assumed by Purchaser and (ii) any policies relating to the liability of Sellers' directors and officers;

(s)     [all Accounts Receivable and Intercompany Receivables, whether or not reflected on the books of Sellers as of the Closing Date;]

(t)     customer relationships, goodwill and all other intangible assets relating to, symbolized by or associated with the Business;

(u)     each document relating to the Mobile Satellite System, including without limitation, any document relating to any actual or potential interference with Global Positioning Systems, the Radio Navigation Satellite Service, the Search and Rescue Service, the Global Maritime Distress and Safety Service, the Radio Astronomy Service, the Fixed Service, the Fixed Satellite Service, the Mobile Satellite Service, the Passive Space Research Service, the Aeronautical Mobile Routing Satellite Service®, and the Aeronautical Navigation Service;

(v)     all Cash and Cash Equivalents received by any Seller on and after the Funding Date arising from the operation of the Business or from any Acquired Assets, to the extent not used by Sellers to pay working capital expenses and other expenses incurred in connection with the operation and/or maintenance of the Acquired Assets after the Funding Date in accordance with Section 2.7 hereof;

(w)     all other rights of each Seller in the Assets owned by the Sellers necessary to or utilized in the operation of the Business as it is presently conducted other than the Retained Assets; and

-4-

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

(x)     all rights, privileges, claims, demands, choses in action, prepayments, deposits, refunds, indemnification rights, warranty claims, offsets and other claims of Sellers against (i) Third Parties ("Actions") relating to the Acquired Assets set forth in clauses (a) through (w) of this Section 2.1, including, without limitation, any Avoidance Actions relating to the Acquired Assets or (ii) the Purchaser and/or any of Purchaser's Affiliates or Subsidiaries.

Section 2.2     Retained Assets.  Notwithstanding anything in this Agreement to the contrary, the Acquired Assets shall not include the following Assets which are to be retained by Sellers and not sold or assigned to Purchaser (collectively, the "Retained Assets"), it being understood that the Retained Assets shall be limited to the following:

(a)     Cash and Cash Equivalents on hand of the Sellers as of the Funding Date other than as specifically provided for in Section 2.1(r) and net of Third Party Deposits;

(b)     all rights of Sellers in and to all Contracts other than the Designated Contracts;

(c)     all losses, loss carryforwards and rights to receive refunds, and credits with respect to any and all Taxes of Sellers (and/or of any of their Affiliates) that constitute Non-Assumed Liabilities;

(d)     all Tax Returns of Sellers;

(e)     all personnel files for employees who are not Transferred Employees and personnel files of Transferred Employees that may not be Transferred under Applicable Laws;

(f)     books and records that Sellers are required by Applicable Law to retain;

(g)     customer relationships, goodwill and other intangible assets directly and exclusively relating to the Retained Assets;

(h)     all Employee Benefit Plans and Canadian Plans, including rights and any assets under any Employee Benefit Plan or Canadian Plan of Sellers which are not being assumed by Purchaser;

(i)     any directors and officers liability insurance policies of Sellers and any claims thereunder and the rights of Sellers thereunder and any proceeds thereof;

(j)     all Actions, including Avoidance Actions, related to the Retained Assets set forth in clauses (a) through (i) of this Section 2.2; and

(k)     all right and claims of Sellers arising under this Agreement and the Ancillary Agreements.

Section 2.3     Assumption of Liabilities.

(a)     Purchaser shall (or shall cause its designated Subsidiaries or Affiliates to) assume, and become solely and exclusively liable for, the following liabilities of Sellers and no others

(collectively, the "<u>Assumed Liabilities</u>"): (i) all liabilities and obligations of Sellers under the Designated Contracts that arise exclusively after the Closing Date; (ii) all liabilities relating to, or arising in respect of the Acquired Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the Closing Date, or the operation of the Business or the Acquired Assets after the Closing Date; (iii) the Excess Cure Amounts; (iv) [all accrued liabilities with respect to the Employees and the Transferred Employees; including all accrued salary, vacation, and other compensation, and workers' compensation obligations (except for liabilities related to the Employee Benefit Plans and the Canadian Plans and such other non-assumed liabilities as are set forth in <u>Section 2.4</u>);] (v) all liabilities arising out of or resulting from a change of control, layoffs, or termination of the Employees and the Transferred Employees by any Seller prior to or on the Closing Date, including WARN Obligations, to the extent such liabilities arise solely as a consequence of the actions taken by or at the direction of Purchaser; and (vi) all liabilities and obligations of the Purchaser under <u>Section 6.7</u> herein (the liabilities and obligations described in <u>Sections 2.3(a)(iv)</u>, <u>2.3(a)(v)</u> and <u>2.3(a)(vi)</u>, collectively, the "<u>Employee Obligations</u>"); [provided, that Purchaser shall not assume the Employee Obligations to the extent they exceed $[  ] million in the aggregate.]

(b)      Nothing contained in this Agreement shall require Purchaser or any of its Affiliates to pay, perform or discharge any Assumed Liability so long as it shall in good faith contest or cause to be contested the amount or validity thereof.

(c)      Nothing contained in this <u>Section 2.3</u> or in any Instrument of Assumption or similar instrument, agreement or document executed by Purchaser at the Funding or the Closing shall release or relieve Sellers from their representations, warranties, covenants and agreements contained in this Agreement or any Ancillary Agreement or any certificate, schedule, instrument, agreement or document executed pursuant hereto or in connection herewith.

Section 2.4      <u>Non-Assumed Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume, and shall be deemed not to have assumed, any Seller Liabilities or any obligations or liabilities of any of their Subsidiaries or Affiliates or the Business, other than the Assumed Liabilities specified in <u>Section 2.3(a)</u> (collectively, the "<u>Non-Assumed Liabilities</u>").  For purposes of clarity, each of (a) any liabilities or obligations with respect to any Employee Benefit Plan, Canadian Plan, Canadian Union Plan, the Canada Pension Plan, the Quebec Pension Plan or other such plans created by an Applicable Law or administered by a Governmental Entity, (b) any Cure Amounts (other than Excess Cure Amounts), (c) any liabilities or obligations of Sellers with respect to Taxes with respect to Sellers, the Business, or the Acquired Assets (except as provided in <u>Section 6.9</u>), (d) other claims (including Taxes) against or relating to any of the Acquired Assets, Assumed Liabilities and/or the Business arising prior to the Closing Date, and (e) Employee Obligations in excess of $[  ] million in the aggregate, shall be Non-Assumed Liabilities.

Section 2.5      <u>The Purchase Price</u>.

(a)      <u>Purchase Price</u>.  The total purchase price ("<u>Purchase Price</u>") shall be $2,220,000,000 <u>plus</u> (i) the value of any Employee Obligations assumed by Purchaser <u>plus</u> (ii) Excess Cure Amounts paid by Purchaser, and shall consist of:  (i) $[CASH PURCHASE PRICE

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

MINUS], which shall be payable on or before the Funding Date (the "Funding Date Payment" or the "Funding Date Consideration"); (ii) the Purchaser's assumption of the Employee Obligations on the Closing Date; and (iii) the payment by Purchaser of any Cure Amounts in excess of $[___] million (such excess amounts, the "Excess Cure Amounts"); provided, that notwithstanding anything to the contrary in this Agreement, Purchaser shall not be responsible for, and the Excess Cure Amounts (and Cure Amounts) shall not include any amounts that represent obligations or liabilities that were incurred or accrued during the period May 14, 2012 through and including the Funding Date, regardless of when such amounts are paid.  The Purchase Price is payable as set forth in Section 2.5(b).

     (b)     Payment of Purchase Price and Other Sources of Funding.

     (i)     Simultaneously with the execution of this Agreement, the parties shall execute and deliver the Escrow Agreement and Purchaser shall contemporaneously deposit into the Escrow Account, by wire transfer of immediately available funds, cash in the amount of $100 million, which funds shall be held by the Escrow Agent and invested as provided for in the Escrow Agreement (such funds, the "Good Faith Deposit") and released by the Escrow Agent only in accordance with this Agreement and the Escrow Agreement.

     (ii)     On the Funding Date, the Good Faith Deposit shall be released from the Escrow Account pursuant to the Escrow Agreement and credited against the Funding Date Consideration portion of the Purchase Price payable to Sellers.

     (iii)     On the Funding Date, Purchaser shall cause the aggregate sum of Escrow Cure Amounts to be deposited into the Escrow Account.

     (iv)     At the Funding, Purchaser shall pay to Sellers the Funding Date Payment (net of the Good Faith Deposit released to Sellers from the Escrow Account) by wire transfer of immediately available funds to an account specified by Sellers in writing.

     (v)     Purchaser shall be entitled to withhold from any amount payable pursuant to this Agreement, such amounts as Purchaser is required to deduct and withhold with respect to the making of such payment under any provision of applicable federal, state, local or foreign Tax law.  To the extent that amounts are so withheld and paid over to the appropriate Tax Authority by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sellers.  To the extent Purchaser believes a withholding tax will apply, Purchaser shall give Seller notice thereof and shall work with Seller in good faith in an effort to mitigate such withholding.

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

(c)    Allocation of Purchase Price.  Within ninety (90) days of the Closing Date, Purchaser shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder and the Income Tax Act and upon reasonable consultation with Sellers (such statement, the "Allocation Statement").  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Sellers or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 2.5(c); and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 2.5(c) in any Tax Return, in any refund claim, in any litigation or otherwise.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed and the Sellers reserve the right on their behalf and on behalf of the Sellers' estates, to the extent not prohibited by Applicable Law and accounting rules, for purposes of any plan of reorganization or liquidation, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to different Sellers in the event of, or in order to resolve, inter-estate creditor disputes in the Bankruptcy Cases.

Section 2.6    Sale Free and Clear.  Sellers acknowledge and agree and the Sale Order and the Sale Recognition Order shall provide that, on the Funding Date and concurrently with the Funding, all then existing or thereafter arising Seller Liabilities, Claims, Interests and Liens (other than those in favor of Purchaser created under this Agreement and/or any Ancillary Agreement, the Assumed Permitted Liens, if any, and Assumed Liabilities) of, against or created by any of Sellers or their bankruptcy estates, to the fullest extent permitted by Section 363 or 1123(a)(5) of the Bankruptcy Code and other Applicable Law, shall be fully released from and with respect to the Acquired Assets and thereupon shall attach to the Purchase Price with the same force, effect, validity, enforceability, and priority as such Seller Liabilities, Claims, Interests and Liens had attached to the Acquired Assets as of the Funding Date. Following receipt of the Specified Regulatory Approvals, on the Closing Date in accordance with Section 3.1(c)(i) of this Agreement, the Acquired Assets shall be Transferred to Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, to the fullest extent permitted by Section 363 or 1123(a)(5) of the Bankruptcy Code, free and clear of all Seller Liabilities, Claims, Interests, Liens, and rights of first refusal or offer, other than the Assumed Permitted Liens, if any, and the Assumed Liabilities or, in the event of an Alternative Sale to a Third Party purchaser under Section 3.5 of this Agreement, the Acquired Assets shall be Transferred to such Third Party purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, free and clear

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

provided, however, that such representative shall agree to hold in confidence all information so provided, and provided, further, that Sellers shall not be required to provide such representative with any information that Sellers (1) reasonably believe to be protected by attorney-client privilege in circumstances where such privilege would be breached by providing information to such representative, after taking into account ameliorative actions (including, without limitation and by way of example, joint defense arrangements), or (2) reasonably determine is a matter as to which there is a conflict of interest between Purchaser or its Affiliates, on the one hand, and such Seller, on the other hand. The Purchaser representative shall be required to leave any board meeting for any discussion that Sellers (1) reasonably believe to be protected by attorney-client privilege in circumstances where such privilege would be breached by such representative's participation in the discussion, after taking into account ameliorative actions (including, without limitation and by way of example, joint defense arrangements), or (2) reasonably determine involves a matter as to which there is a conflict of interest between Purchaser or its Affiliates, on the one hand, and such Seller, on the other hand; provided, that, in the event the Purchaser representative is required to leave any board meeting in accordance with the foregoing, the applicable board shall discuss only the foregoing matters (and discuss such matters only to the extent necessary in respect of the circumstances requiring the Purchaser representative to leave the meeting), and shall not discuss any other matters, in the absence of the Purchaser representative. In the event that any Seller or Seller Successor does not have a Board of Directors, then, with respect to such Seller or Seller Successor, Purchaser's representative shall be provided with the rights set forth herein with respect to any comparable governing body; provided, that to the extent any such Seller or Seller Successor does not have a governing body comparable to a Board of Directors, such Seller shall establish such a comparable governing body (a "New Governing Body") on or before the Funding Date and Purchaser shall be provided with the rights set forth herein with respect to such New Governing Body; provided, further, that to the extent a New Governing Body is established, any individual that is appointed, elected or otherwise selected to serve as a director for such New Governing Body shall be (x) mutually agreeable to each of the Sellers (or Seller Successors, if applicable) and Purchaser, and (y) immediately prior to such appointment, an Independent Person.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller with respect to itself only, hereby represents and warrants to Purchaser that the statements contained in this Article IV are true and correct as of the date of

this Agreement, (i) except as otherwise stated in this Article IV, and (ii) except as set forth in the corresponding sections or subsections of the Disclosure Letter delivered by Sellers to Purchaser concurrently with the execution and delivery hereof (it being agreed that disclosure of any information in a particular section or subsection of the Disclosure Letter shall be deemed disclosure with respect to any other section or subsection only to the extent that the relevance of such item is readily apparent from such disclosure).

Section 4.1    Organization.  Each of the Sellers has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation or organization, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Sellers has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2    Financial Statements.

(a)    [The audited consolidated balance sheet as of December 31, 2012 and related consolidated statements of income and cash flow of LightSquared LP (including the notes thereto) for the year ended December 31, 2012, reported on and accompanied by a report from [____] (the "Audited Financial Statements"), copies of which have heretofore been furnished to Purchaser, were prepared in accordance with GAAP and present fairly in all material respects the consolidated financial position of LightSquared LP as at such date and the consolidated results of operations and cash flows of LightSquared LP for the period then ended.

(b)    The unaudited consolidated balance sheet as of June 30, 2013 (the "Balance Sheet") and the related unaudited consolidated statements of income and cash flow of LightSquared LP (including the notes thereto) for the six month period ended June 30, 2013 (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Historical Financial Statements"), copies of which have heretofore been furnished to Purchaser, were prepared in accordance with Sellers' internal accounting practices applied consistently with those used in the Audited Financial Statements and in accordance with GAAP and present fairly in all material respects the consolidated financial position of LightSquared LP as at such dates and the consolidated results of operations and cash flows of LightSquared LP for the applicable periods.]

Section 4.3    Real and Personal Property.

(a)    Each of the Sellers has good and insurable fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all of its Real Properties constituting Acquired Assets and has good and marketable title to its personal property and Assets constituting Acquired Assets, in each case, except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and Assets for their intended purposes.  All such Acquired Assets are free and clear of Liens, other

-17-

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

than  as (i) are described in the consolidated balance sheets included in the Historical Financial Statements or (ii) are Permitted Liens.

(b)     Each of the Sellers has complied with all obligations under all leases relating to Acquired Assets to which it is a party.  All such leases may be assumed or rejected in the Bankruptcy Cases and otherwise are in full force and effect, except as set forth in Section 4.3(b) of the Disclosure Letter.  Except as set forth in Section 4.3(b) of the Disclosure Letter, each Seller enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Section 4.3(c) of the Disclosure Letter is a true and correct list, as of the date of this Agreement, of all Real Property constituting Acquired Assets owned by Sellers and the addresses thereof.

(d)     Section 4.3(d) of the Disclosure Letter is a true and correct list, as of the date of this Agreement, of all Real Property constituting Acquired Assets leased by Sellers and the addresses thereof.

(e)     As of the date of this Agreement, no Seller has received any written notice of any pending or contemplated condemnation proceeding affecting any of its owned Real Property constituting Acquired Assets or any sale or disposition thereof in lieu of condemnation that remains unresolved.

Section 4.4     <u>Authorization; Enforceability</u>.  Subject to the entry of the Sale Order and the Sale Recognition Order, each Seller has all requisite corporate power and authority to enter into, execute and deliver this Agreement and the other Ancillary Agreements to which it is or is to be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by each Seller of this Agreement and each of the other Ancillary Agreements to which it is or is to be a party, and the consummation by each Seller of the Transactions, have been duly authorized by all necessary corporate action on the part of each Seller.  The Board of Directors (or other governing body or entity, including any New Governing Body) of each Seller has resolved to recommend that the Bankruptcy Court approve this Agreement, the Ancillary Agreements and the Transactions.  This Agreement has been and, when executed and delivered, each other Ancillary Agreement to which each of them is to be a party, will be, duly and validly executed and delivered by each Seller and, subject to the entry of the Sale Order and the Sale Recognition Order, constitutes (in the case of this Agreement) and will constitute (in the case of each of the Ancillary Agreements) the valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms.

Section 4.5     <u>No Conflicts</u>.  Except as set forth in Section 4.5 of the Disclosure Letter, subject to the entry of the Sale Order and the Sale Recognition Order, the execution, delivery and performance of this Agreement and each other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a violation of the certificate of incorporation, certificate of formation or bylaws or similar organizational document of any Seller, (b) assuming receipt of all required consents and approvals from Governmental Entities in

-18-

accordance with Section 7.1(a)(iii), result in a violation of any Applicable Law, or (c) result in the creation or imposition of any Lien upon or with respect to any Acquired Asset, other than the Permitted Liens. No Seller is in violation of its certificate of incorporation, articles of organization or bylaws or similar organizational document (as applicable in each case).

Section 4.6    Consents and Approvals.  Except as set forth in Section 4.6 of the Disclosure Letter or otherwise in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Sellers or any of their properties is required for the execution and delivery by Sellers of the Agreement and the Ancillary Agreements and performance of and compliance by Sellers with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, and the entry of the Sale Recognition Order and the expiry of any appeal periods in respect thereof, (b) filings with respect to and any consents, approvals or expiration or termination of any waiting period, required under any United States or foreign antitrust or investment laws which may include the Competition Act, the Investment Canada Act, the HSR Act and any other Regulatory Approvals required, (c) the prior approval of the FCC for the assignment of the FCC licenses, letters of intent, reservations of spectrum, permits and authorizations (including any related agreements with the United States Department of Justice, the United States Department of Homeland Security, and the Federal Bureau of Investigation regarding national security, law enforcement, defense or public safety issues, or any agreements related to the shared use of U.S. government Spectrum required in connection with such prior approval of the FCC) (the "FCC Licenses") held by Sellers or (d) the Industry Canada Approval, and (e) such other consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Intellectual Property.

(a)    Section 4.7(a) of the Disclosure Letter sets forth a complete and accurate list of all (i) United States and non-United States Patents and Patent applications owned by Sellers; (ii) United States and non-United States Trademark registrations (including Internet domain registrations), Trademark applications, and material unregistered Trademarks owned by Sellers; (iii) United States and non-United States Copyright and mask work registrations, and material unregistered Copyrights owned by Sellers; and (iv) Software (other than readily available commercial software programs having an acquisition price of less than $10,000) that is owned, licensed, leased, by Sellers, describing which Software is owned, licensed, or leased, as the case may be, and the applicable owner, licensor or lessor.  All of the Intellectual Property set forth in Section 4.7(a) of the Disclosure Letter constitutes Acquired Assets, except as otherwise stated therein.

(b)    Section 4.7(b) of the Disclosure Letter sets forth a complete and accurate list of all Contracts (whether oral or written, and whether between any Seller and Third Parties or inter-corporate) to which a Seller is a party or otherwise bound, (i) granting or obtaining any right to use or practice any rights under any Intellectual Property (other than licenses for readily available commercial software programs having an acquisition price of less than $10,000), or

(ii) restricting any Seller's rights to use any Intellectual Property, including license agreements, development agreements, distribution agreements, settlement agreements, consent to use agreements, and covenants not to sue (collectively, the "License Agreements"). Each License Agreement constitutes a Designated Contract except as otherwise indicated in Section 4.7(b) of the Disclosure Letter. No Seller has licensed or sublicensed its rights in any Intellectual Property other than pursuant to the License Agreements and, as of the Funding Date, pursuant to the Ancillary Agreements.

(c)        Sellers and the Sold Companies own or possess valid and enforceable rights to use all Intellectual Property used in the conduct of the Business, the failure to own or possess which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All registrations with and applications to Governmental Entities in respect of such Intellectual Property are valid and in full force and effect, have not, except in accordance with the ordinary course practices of Sellers, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry. The consummation of the Transactions will not result in the loss or impairment of any rights to use such Intellectual Property or obligate Purchaser to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Sellers absent the consummation of the Transactions.

(d)        Each Seller has taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)        No present or former employee, officer or director of any Seller, or agent, outside contractor or consultant of any Seller, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Intellectual Property. Other than with respect to copyrightable works Sellers hereby represent to be "works made for hire" within the meaning of Section 101 of the Copyright Act of 1976 owned by Sellers, each Seller has obtained from all individuals who participated in any respect in the invention or authorship of any Intellectual Property created by or for such Seller (the "Owned Intellectual Property"), as consultants, as employees of consultants or otherwise, effective waivers of any and all ownership rights of such individuals in the Owned Intellectual Property and written assignments to Sellers of all rights with respect thereto. No officer or employee of any Seller is subject to any agreement with any third party that requires such officer or employee to assign any interest in inventions or other Intellectual Property or to keep confidential any trade secrets, proprietary data, customer lists or other business information or that restricts such officer or employee from engaging in competitive activities or solicitation of customers.

(f)        No Seller has (i) incorporated open source materials into, or combined open source materials with, Intellectual Property or Software, (ii) distributed open source materials in conjunction with Intellectual Property or Software, or (iii) used open source materials that create,

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

or purport to create, obligations for any Seller with respect to any Intellectual Property or grant,
or purport to grant to any Third Party, rights or immunities under any Intellectual Property
(including, but not limited to, using open source materials that require, as a condition of use,
modification and/or distribution that other Software incorporated into, derived from or
distributed with such open source materials be (A) disclosed or distributed in source code form,
(B) be licensed for the purpose of making derivative works, or (C) redistributable at no charge).
No Seller has disclosed, or is under an obligation to disclose, any material Software in source
code form, except to parties that have executed written obligations to preserve the confidentiality
of such source code.

(g)     No Seller has received any notice that it is, or they are, in default (or with the
giving of notice or lapse of time or both, would be in default) under any contract relating to such
Intellectual Property.  No Intellectual Property rights of any Seller are being infringed by any
other Person, except to the extent that such infringement has not had and would not have,
individually or in the aggregate, a Material Adverse Effect.  The conduct of the Business does
not conflict in any material respect with any Intellectual Property rights of others, and no Seller
has received any notice of any claim of infringement or conflict with any such rights of others.

Section 4.8     Material Contracts.

(a)     Section 4.8(a) of the Disclosure Letter sets forth a complete and accurate list of
Contracts that relate to the conduct and operations of the Business or the Acquired Assets (each a
"Material Contract"), including:

(i)     any Contract that would be required to be filed by a Seller as a "material
contract" pursuant to Item 601(b)(10) of Regulation S-K under the
Exchange Act, were such law applicable to it;

(ii)    any Contract containing covenants that purport to (1) restrict the business
activity or ability of a Seller to compete (and which, following the
consummation of the Transactions, purport to prohibit a Seller or
Purchaser or its Affiliates from competing) in any business or geographic
area or with any Person or limit the freedom of a Seller or to solicit any
Person, or (2) grant "most favored nation" status to the counterparty
following consummation of the Transactions;

(iii)   each lease, rental or occupancy agreement, easement, right of way,
license, installment and conditional sale agreement, and other contract
affecting a Seller's ownership of, leasing of, title to, use of, or any
leasehold or other interest in, any real or personal property (except
personal property leases and installment and conditional sales agreements
having a value per item or aggregate payments of less than $100,000 and
with terms of less than one (1) year);

(iv)    each joint venture, partnership, and other Contract involving a sharing of
profits, losses, costs or liabilities by a Seller with any other Person;

-21-

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

(v)     each Contract providing for capital expenditures by a Seller or with remaining obligations in excess of $100,000 and which relates to the Acquired Assets;

(vi)     each Contract under which a Seller has created, incurred, assumed or guaranteed (or may create, incur, assume or guarantee) Indebtedness or under which a Seller has imposed (or may impose) a security interest or other Lien upon any Acquired Assets to secure Indebtedness;

(vii)     each employment, severance, management, consulting or other Contract of a Seller involving compensation for services rendered or to be rendered, in each case involving payments of more than $100,000 per year or $200,000 in the aggregate;

(viii)     each lease of satellite capacity or other Contract of a Seller for the provision of satellite services;

(ix)     each Contract relating to handset development;

(x)     each Contract relating to software or chipset development;

(xi)     each Contract to which a Governmental Entity is a party;

(xii)     each lease of terrestrial or satellite radio frequencies or Contract granting any Seller any rights in frequencies licenses for terrestrial use;

(xiii)     each mobile communications services Contract of a Seller;

(xiv)     each Contract related to the siting, buildout, and servicing of any mobile communications service network to be provided with the Spectrum;

(xv)     each Contract or other agreement relating to Sellers' use of the Spectrum, including any Contract or other agreement purporting to restrict, constrain, or direct Seller's emissions in the Spectrum or construction or design of Seller's mobile communications services and related equipment;

(xvi)     each Coordination Agreement and all relevant supporting documentation;

(xvii)     each Concession Agreement;

(xviii)     each Contract relating to a Seller's or Third Party's rights with respect to the use of the satellite capacity of any Company Satellite, or affecting the use of the satellite capacity of any Company Satellite or its associated feeder links;

(xix)     each Contract for or related to the design, construction, launch, orbit, operation or licensing of any Company Satellite;

(xx)    each license agreement or distributor, dealer, sales representative or other
sales agency Contract of a Seller involving annual payments in excess of
$50,000 per year or $100,000 in the aggregate;

(xxi)    every customer Contract of any Seller executed during the period from
January 1, 2013 to the date hereof, other than customer Contracts in the
standard forms previously provided by Sellers to Purchaser or its
representatives; and

(xxii)    each amendment, supplement, or modification (whether oral or written) in
respect of any of the foregoing, except as would not, individually or in the
aggregate, reasonably be likely to result in a Material Adverse Effect.

Except as may have occurred solely as a result of the commencement of the Bankruptcy Cases
(or any other action taken by Sellers during the Bankruptcy Cases), each Material Contract is in
full force and effect and, to the Knowledge of Sellers, there are no material defaults thereunder
on the part of any other party thereto which are not subject to an automatic stay.  None of the
Sellers is in default in any material respect in the performance, observance or fulfillment of any
of its obligations, covenants or conditions contained in any Material Contract to which it is a
party or by which it or its property is bound which are not subject to an automatic stay.

(b)    No Seller is subject to any oral agreements that if binding would be Material
Contracts.  No Seller has assumed, rejected, or assigned any Material Contract without the
express written consent of Purchaser.

Section 4.9    <u>Absence of Certain Developments</u>.  Except as set forth in
Section 4.9 of the Disclosure Letter, since [_____], 20[__],(i) no Seller has suffered any
change or development which has had or would be reasonably likely to have a Material Adverse
Effect, (ii) no Seller has Transferred ownership of any of its Assets to any of its Subsidiaries or
Affiliates that is not a Seller, (iii) no Seller has in any way modified its or their collection
policies or practices and (iv) no Seller has abandoned or waived, voluntarily or involuntarily, the
collection of any Accounts Receivable and have not in any way modified their policies or
practices with respect to Accounts Receivable.

Section 4.10    <u>No Undisclosed Liabilities</u>.  Except (a) as disclosed or
reflected in the Historical Financial Statements, (b) as incurred in the ordinary course of business
consistent with past practice since December 31, 2012 in an aggregate amount not in excess of
$100,000, and (c) professional fees and expenses accrued in the Bankruptcy Cases or the CCAA
Recognition Proceeding, no Seller has any liabilities or obligations of any nature (whether
accrued, absolute, contingent or otherwise) that are or would reasonably be expected to be,
individually or in the aggregate, material in relation to the total liabilities reported in the
Historical Financial Statements.

Section 4.11    <u>Litigation</u>.  Except as set forth in Section 4.11 of the
Disclosure Letter, there are no legal, governmental or regulatory actions, suits, proceedings or
investigations pending or, to the Knowledge of Sellers, threatened to which any Seller is or may

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

be a party or to which any property of any Seller, any director or officer of a Seller in their
capacities as such, or the Business, Assumed Liabilities or Acquired Assets is or may be the
subject that, individually or in the aggregate, has had or, if determined adversely to Sellers,
would reasonably be expected to have a Material Adverse Effect.

<p style="text-align:center">Section 4.12 <u>Permits and Compliance with Laws</u>.</p>

(a) No Seller is, or has been at any time since January 1, 2010, in violation of any
Applicable Law except for any such violation that has not had and would not reasonably be
expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) Except as set forth in Section 4.12 of the Disclosure Letter, no Seller has received
written notification from any Governmental Entity (i) asserting a violation of any Applicable
Law regarding the conduct of the Business; (ii) threatening to revoke any Permit; or (iii)
restricting or in any way limiting its operations as currently conducted.

(c) Sellers possess all Permits issued by, and have made all declarations and filings
with, the appropriate Governmental Entities that are necessary for the ownership, lease, use and
operation of the Acquired Assets (collectively, the "<u>Seller Permits</u>"), except any such Permits the
absence of which would not reasonably be expected to have, individually or in the aggregate, a
Material Adverse Effect. Section 4.12(c) of the Disclosure Letter sets forth a true and correct list
of all Seller Permits as presently in effect and a true and correct list of all material pending
applications for Permits, that would be Seller Permits if issued or granted and all material
pending applications by Sellers for modification, extension or renewal of the Seller Permits.
Except as set forth in Section 4.12(c) of the Disclosure Letter, all Seller Permits constitute
Acquired Assets. Sellers have operated the Business in compliance with the terms and
conditions of the Seller Permits except where the failure to comply would not reasonably be
likely to have a Material Adverse Effect, and no Seller has received any written notice alleging
any such failure to comply. No Seller has received notice of any revocation or modification of
any such Permit or has any reason to believe that any such Permit will not be renewed in the
ordinary course.

(d) Each Seller, to the extent applicable, is in compliance with all relevant
Communications Laws, the international radio regulations, rules, published decisions and written
policies of the International Telecommunication Union (the "<u>ITU</u>"), except for any such
violation that has not had and would not reasonably be expected to have, individually or in the
aggregate, a Material Adverse Effect. There is no claim, action, suit, investigation, litigation or
proceeding regarding any Seller's compliance with any provision of the Communications Laws
or the international radio regulations, rules, published decisions and written policies of the ITU,
pending or to any Seller's Knowledge, threatened in the FCC, ITU, Industry Canada, any court
or before any arbitrator or governmental instrumentality, except for any such claims, actions,
suits, investigations, litigation or proceedings that if determined adversely to Sellers would not
have and would not reasonably be expected to have, individually or in the aggregate, a Material
Adverse Effect.

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

Section 4.13    Taxes.

(a)    Each Seller has timely filed or caused to be filed all United States federal, state, local and non-United States Tax Returns required to have been filed that are material to such companies, taken as a whole, and each such Tax Return is true, complete and correct in all material respects.

(b)    Each Seller has timely paid or caused to be timely paid all Taxes shown to be due and payable by it or them on the returns referred to in Section 4.13(a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which any Seller has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as set forth in Section 4.13(c) of the Disclosure Letter to Sellers' Knowledge, no material United States federal, state, local or non-United States federal, provincial, local or other audits, examinations, investigations or other administrative proceedings or court proceedings have been commenced or are presently pending or threatened in writing with regard to any Taxes or Tax Returns with respect to the Acquired Assets.  There is no material unresolved dispute or claim concerning any Tax liability with respect to the Acquired Assets either claimed or raised by any Tax Authority in writing.

(d)    All material Taxes with respect to the Acquired Assets that any Seller is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable, except to the extent that Purchaser will not have liability following the Closing with respect to any of the foregoing.

(e)    Except as set forth in Section 4.13(d) of the Disclosure Letter, there are no statutory Liens for Taxes upon any of the Acquired Assets or the Business.

(f)    [No Seller, other than the Canadian Sellers, is selling property that is taxable property for purposes of the Income Tax Act.

(g)    The Canadian Sellers are registered under Part IX of the Excise Tax Act (Canada) and Chapter VIII of an Act Respecting the Quebec Sales Tax (Quebec), and have provided Purchaser with their respective registration numbers.

(h)    The Canadian Sellers are not non-residents of Canada for purposes of the Income Tax Act.]

Section 4.14    Employees.  Section 4.14 of the Disclosure Letter (i) contains a complete and accurate list of all current employees and independent contractors of

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

Sellers and each such employee's or independent contractor's respective positions, dates of hire or engagement, current annual salary and any other relevant compensation and benefits, (ii) indicates which employees and/or independent contractors are parties to a written or oral agreement with Sellers (including confidentiality, non-competition, non-solicitation and other restrictive covenant agreements) and (iii) indicates whether each employee or independent contractor is on short-term or long-term disability, pregnancy or parental leave, temporary lay-off, workers' compensation or other leave of absence.  Except as disclosed in Section 4.14 of the Disclosure Letter, no Seller is party to any currently in effect agreement(s) with past or present employees, agents or independent contractors in connection with the Business.  The Sellers have properly characterized retained individuals as either employees or independent contractors for the purposes of Tax and other Applicable Laws.

<p style="text-align:center">Section 4.15    Compliance With ERISA and Canadian Plans.</p>

(a)      Section 4.15(a) of the Disclosure Letter contains a complete and accurate list of all material Employee Benefit Plans and Canadian Plans of Sellers.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Seller and any trade or business (whether or not incorporated) that, together with a Seller, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA, and Section 412 of the Code, is treated as a single employer under Section 414 of the Code (the "ERISA Affiliates"), are in compliance with the applicable provisions of ERISA, the Code and other Applicable Laws, and each Employee Benefit Plan complies in form and has been established, maintained, operated and funded in compliance with its terms and the applicable provisions of ERISA, the Code and other Applicable Laws.  No "employee benefit plan" (as defined in Section 3(3) of ERISA) maintained by Sellers or any of their ERISA Affiliates within the preceding six years is (i) a "multiemployer plan" (as defined in Section 3(37) of ERISA), (ii) subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code or (iii) a plan described in Section 4063(a) of ERISA and no event has occurred and no condition exists that would be reasonably expected to subject the Sellers, either directly or by reason of their affiliation with any ERISA Affiliate, to any tax, lien, penalty or other liability imposed by ERISA, the Code or other Applicable Law.  Each Employee Benefit Plan that is intended to be tax-qualified under Section 401(a) of the Code has received a favorable determination or opinion letter (as applicable) from the IRS as to the tax-qualified status of such Employee Benefit Plan, and no event has occurred that could reasonably be expected to adversely affect the tax-qualified status of such Benefit Plan or the trusts created thereunder.

(b)      Each Seller is in compliance (A) with all Applicable Laws with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (B) with the terms of any such plan, except, in each case, for such noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      (i) Each of the Canadian Plans is and has been established, maintained, funded, invested and administered in compliance in all material respects with its terms, all employee plan summaries and booklets and with Applicable Laws, (ii) current and complete copies of all written Canadian Plans (or, where oral, written summaries of the material terms thereof) have

<p style="text-align:center">-26-</p>

been provided or made available to Purchaser, (iii) except as set forth in Section 4.5(c) of the Disclosure Letter, no  Seller currently sponsors, maintains, contributes to or has any liability, nor has ever sponsored, maintained, contributed to or incurred any liability under a "registered pension plan" or a "retirement compensation arrangement" or a "deferred profit sharing plan", each as defined  under the Income Tax Act, a "pension plan" as defined under applicable pension standards legislation, or any other plan organized and administered to provide pensions for employees, (iv) no amendments or promises of benefit improvements under the Canadian Plans have been made or will be made prior to the Funding Date by any Seller to its or their Canadian employees or former Canadian employees, except as required by the terms of such plans or Applicable Laws (and any such amendments shall be communicated to Purchaser in writing before the Funding), (v) no Seller currently sponsors, maintains, contributes to or has any liability, nor has ever sponsored, maintained, contributed to or incurred any liability under a Defined Benefit Plan or a Canadian Union Plan, and (vi) no Canadian Plan promises or provides retiree welfare benefits (except as required by Applicable Law) or retiree life insurance benefits or any other non-pension post retirement benefits to any Person.  In addition, no Canadian Plan is presently or will, at any time prior to or on the Closing Date, be in the process of being wound-up, except where such wind-up has been consented to in advance in writing by the Purchaser.

(d)      Except as set forth in Section 4.15(d) of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of Transactions contemplated by this Agreement, will (either alone or in conjunction with any other event) result in, cause the accelerated vesting or delivery of, or increase the amount or value of, any payment or benefit to any Employee, entitle any Employee to notice of termination or pay in lieu of notice, severance pay, unemployment compensation or any other payment or result in any breach or violation of, or a default under, any of the Employee Benefit Plans or Canadian Plans.

(e)      To the Knowledge of Sellers, no Employee who is a manager, director, officer or in a position or having responsibility to perform management functions similar to a manager or officer, has given, or has been given by any of the Sellers, notice of intent to terminate employment, directorship or other service relationship with the Sellers.

Section 4.16    Communications Matters.

(a)      Sellers hold all the material licenses, permits, authorizations, orders and approvals issued by a Governmental Entity under the Communications Laws (collectively, "Communications Licenses") and Coordination Agreements, in each case, necessary for the lawful conduct of the Business as currently conducted.  Section 4.16(a) of the Disclosure Letter sets forth a true and correct list of all Communications Licenses held by each Seller.

(b)      Except as set forth in Section 4.16(a) of the Disclosure Letter, (i) each Communications License identified on Section 4.16(a) of the Disclosure Letter is in full force and effect; (ii) Sellers are operating or preparing to operate the facilities authorized by the Communications Licenses identified on Section 4.16(a) of the Disclosure Letter in accordance with their terms and such operation is in substantial compliance with the Communications Laws; (iii) each Seller is operating in compliance in all material respects with Communications Laws; and (iv) to the Knowledge of Sellers, no action or proceeding is pending or threatened to revoke,

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

suspend, cancel, or refuse to renew or modify in any material respect any of the Communications Licenses identified on Section 4.16(a) of the Disclosure Letter or any ITU registration.

(c)        Except for the representations and warranties contained in <u>Section 4.12</u> and this <u>Section 4.16</u>, Sellers makes no other express or implied representation or warranty with respect to Communications Laws.

Section 4.17   <u>Company Satellites</u>.

(a)        All information previously made available by Sellers to Purchaser in connection with the Transactions with respect to the orbital location, data transmission capabilities and the remaining useful life of the Company Satellites is accurate in all material respects.  No Material Satellite Event or, to the Knowledge of Sellers, conditions that would reasonably be expected to result in a Material Satellite Event have been observed on the Company Satellites since their respective launches.  Sellers have previously made available to Purchaser copies of all applicable status reports.  No Seller has waived or modified or agreed to waive any provision of any Contract in a manner that could reasonably be expected to impair the ability of the Company Satellites to perform in accordance with its respective agreed operating Satellite Performance Specifications.

(b)        Section 4.17(b) of the Disclosure Letter contains a summary, by orbital location, of the status of frequency registration at the ITU, of the Company Satellites and each advanced published satellite filed on behalf of any Seller, including the identity of the sponsoring administration and the frequency  bands covered.  Except as set forth in Section 4.17(b) of the Disclosure Letter, as of the date hereof, Sellers have no Knowledge of any material claims(s) with respect to any Seller's use of the frequency assignment(s) described in their ITU filings at any such orbital locations(s).

(c)        Section 4.17(c) of the Disclosure Letter contains a summary, to the Knowledge of Sellers, of prejudicial interferences to the Company Satellites.

Section 4.18   <u>Coordination Agreements</u>.  As of the date of this Agreement, to the Knowledge of Sellers, the relevant coordination rights are perfected and there are no pending claim(s) with respect to any Seller's use of the frequency and orbital location assignment(s) described in any Coordination Agreement other than any such coordination rights or claim(s) that are resolved by operation of the relevant Coordination Agreement.  As of the date of this Agreement, to the Knowledge of Sellers, there are no pending requests for use or material claim(s) with respect to any Seller's use of the frequency and orbital location assignment(s) whether or not described in any Concession Agreement.

Section 4.19   <u>Company Earth Stations</u>.  To the Knowledge of Sellers, the material improvements to each Company Earth Station and all material items of equipment used in connection therewith are in good operating condition and repair and are suitable for their intended purposes, subject to normal wear and tear.  To the Knowledge of Sellers, as of the date hereof, no other radio communications facility is causing interference to the transmissions from or the receipt of signals by any Company Satellite or Company Earth Station, except for any

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

instances of interference that, individually or in the aggregate, have not had, and would not
reasonably be expected to be material to the operation of and provisions of services from any
Company Satellite.

Section 4.20  U.S. Labor Relations.  To the Knowledge of Sellers, except
as set forth in Section 4.20 of the Disclosure Letter:  (i) there are no pending or threatened strikes
or other labor disputes against any Seller; (ii) no Seller has received written notice of any claim
for a material violation of any applicable federal, state, or local civil rights law, the Fair Labor
Standards Act, as amended, the Age Discrimination in Employment Act, as amended, the
National Labor Relations Act, as amended, the Occupational Safety and Health Act, as amended,
the Americans with Disabilities Act, as amended, or the Vocational Rehabilitation Act of 1973, as
amended, any applicable state or local laws analogous to the United States federal laws listed
above; and (iii) all payments due from any Seller or for which any claim may be made against
any Seller, on account of wages and employee health and welfare insurance and other benefits,
have been paid or accrued as a liability on the books of Sellers to the extent required by GAAP.
Except as set forth in the Disclosure Letter, the consummation of the Transactions will not give
rise to a right of termination or renegotiation of any material collective bargaining agreement
governing employees located in the United States to which any Seller (or any predecessor
thereof) is a party or by which any Seller (or any predecessor thereof) is bound.

Section 4.21  Canada Labor Relations.  To the Knowledge of Sellers,
except as set forth in Section 4.21 of the Disclosure Letter, (i) no Seller has made any
agreements, whether directly or indirectly, with any labor union, employee association or any
similar entity or made any commitments to or conducted negotiations with any labor union or
employee association or other similar entity with respect to any future agreements, (ii) no trade
union, employee association or other similar entity has any bargaining rights acquired either by
certification or voluntary recognition with respect to any employees of any Seller, (iii) no Seller
is aware of any attempt to organize or establish any labor union, employee association or other
similar entity affecting the Business, (iv) there are no outstanding labor relations tribunal
proceedings of any kind, including any proceedings which could result in certification of a trade
union as bargaining agent for the employees, and there have not been any such proceedings
within the last two years, (v) there are no threatened or apparent union organizing activities
involving employees of any Seller, and (vi) there is no labor strike, dispute, slowdown, stoppage,
refusal to work or other labor difficulty pending, involving, threatened against or affecting the
Sellers or the Business.

Section 4.22  Brokers.  Except with respect to fees payable to [Moelis &
Company, LLC and Blackstone Advisory Partners, L.P.], no Seller is a party to any contract,
agreement or understanding with any Person that would give rise to a valid claim against
Purchaser for a brokerage commission, finder's fee or like payment in connection with the
Transactions.

Section 4.23  Environmental Matters.  Except as disclosed in
Section 4.23 of the Disclosure Letter:  (i) no written notice, request for information, claim,
demand, order, complaint or penalty has been received by any Seller, and there are no judicial,
administrative or other actions, suits or proceedings pending or, to any Seller's Knowledge,

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

threatened, which allege a violation of or liability under any Environmental Laws, in each case relating to any Seller or any of the Acquired Assets, (ii) except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Seller has all Permits necessary for its or their operations to comply with all applicable Environmental Laws and are, and during the term of all applicable statutes of limitation, have been, in compliance with the terms of such Permits and with all other applicable Environmental Laws, and (iii) except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, no pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation or which would reasonably be likely to give rise to liability under any Environmental Law, including Hazardous Material, is located at, in, or under any property currently or formerly owned, operated or leased by any Seller that would reasonably be expected to give rise to any liability or obligation of any Seller under any Environmental Laws, and no Hazardous Material has been generated, owned or controlled by any Seller and has been transported to or released at any location in a manner that would reasonably be expected to give rise to any liability or obligation on any Seller under any Environmental Laws.

Section 4.24    Title to Assets; Sufficiency of Assets.

(a)    Sellers hold, and subject to the entry of the Sale Order and the Sale Recognition Order, at the Closing shall cause to be delivered to Purchaser (or, in the case of an Alternative Sale, a Third Party purchaser), good and valid title to or, in the case of leased or licensed Assets, a valid and binding leasehold interest in or license to or rights under (as the case may be), all of the Acquired Assets, free and clear of all Liens, other than Assumed Permitted Liens and Permitted Liens.

(b)    The Acquired Assets include all tangible Assets, intangible Assets and Intellectual Property that are used in the conduct of the Business immediately following the Closing Date in substantially the same manner as conducted by Sellers prior to the commencement of the Bankruptcy Cases, except for (i) Employees that are not Transferred Employees and (ii) the Retained Assets.

(c)    No Assets owned or held by any Affiliate of any Seller are used in the operation of the Business, other than any such Assets that constitute Acquired Assets or Retained Assets.

Section 4.25    Insurance.  Section 4.25 of the Disclosure Letter sets forth a true, complete and correct description of all material insurance maintained by or on behalf of any Seller as of the date of this Agreement other than those relating to any Employee Benefit Plan. As of such date, such insurance is in full force and effect.

Section 4.26    Customer Information.  No Seller holds any customer information, received by Sellers through their websites or otherwise, other than the customer information that forms part of the Acquired Assets to be Transferred to Purchaser hereunder.

Section 4.27    Related Party Transactions.  Except as set forth on Schedule 4.27, no Seller is a party to any contract or arrangement with any equityholder, officer,

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

director or Affiliate of any Seller (other than another Seller) related to the Acquired Assets or the
conduct of the Business.

<div align="center">ARTICLE V.

REPRESENTATIONS AND WARRANTIES
OF PURCHASER</div>

Purchaser hereby represents and warrants to Sellers that the statements contained
in this Article V are true and correct as of the date of this Agreement.

Section 5.1    Organization.  Purchaser is a limited liability company duly
organized, validly existing and in good standing under the laws of the State of Delaware.
Purchaser is duly qualified to do business as a foreign corporation and is in good standing in
each jurisdiction where the nature of the property owned or leased by it or the nature of the
business conducted by it makes such qualification necessary, except where the failure to be so
qualified would not have a Purchaser Material Adverse Effect.

Section 5.2    Authorization; Enforceability.  Purchaser has all requisite
corporate power and authority to enter into this Agreement and the other Ancillary Agreements to
which Purchaser is a party.  The execution, delivery and performance by Purchaser of this
Agreement and each of the other Ancillary Agreements to which Purchaser is a party, and the
consummation by Purchaser of the Transactions, have been duly authorized by all necessary
corporate action on the part of Purchaser.  Subject to the entry of the Sale Order and the Sale
Recognition Order, this Agreement and, when executed, each other Ancillary Agreement to
which Purchaser is a party, have been duly and validly executed and delivered by Purchaser and,
assuming due and valid execution and delivery by Sellers, constitute the valid and binding
obligation of Purchaser, enforceable against them in accordance with its terms, subject to laws of
general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of
general application affecting enforcement of creditors' rights generally, rules of law governing
specific performance, injunctive relief and other equitable remedies.

Section 5.3    No Conflicts.  Subject to the entry of the Sale Order and the
Sale Recognition Order, the execution, delivery and performance of this Agreement and each
other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a
violation of the certificate of incorporation, certificate of formation or bylaws or similar
organizational document of Purchaser or (b) assuming receipt of all required consents and
approvals from Governmental Entities in accordance with Section 7.1(b)(i), result in a violation
of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any
court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by
which any property or asset of Purchaser is bound, except for violations which, individually or in
the aggregate, has not had and would not reasonably be likely to have a Purchaser Material
Adverse Effect.

Section 5.4    Consents and Approvals.  Except as set forth in this
Agreement, no consent, approval, authorization, order, registration or qualification of or with any

<div align="center">-31-</div>

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

Section 6.2    Access; Confidentiality.

(a)    From the date hereof until the earlier of (i) termination of this Agreement and (ii) the Closing, Sellers will, (w) upon reasonable notice, give Purchaser and its employees, accountants, financial advisors, counsel and other representatives reasonable access during normal business hours to the offices, properties, books and records of Sellers relating to the Acquired Assets, the Assumed Liabilities, and the Business; (x) furnish to Purchaser such financial and operating data and other information relating to the Acquired Assets, the Assumed Liabilities, and the Business and the financial condition, prospects and corporate affairs of Sellers as may be reasonably requested; and (y) instruct the executive officers and senior business managers, employees, counsel, auditors and financial advisors of Sellers to cooperate with Purchaser's employees, accountants, counsel and other representatives; provided (A) all activities covered by this Section 6.2(a) shall be at the sole cost and expense of Purchaser and (B) that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Sellers.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information, (i) subject to attorney-client privilege, (ii) in violation of any competition or anti-trust laws or (iii) that conflicts with any confidentiality obligations to which Sellers are bound.

(b)    Purchaser shall cooperate with Sellers and make available to Sellers such documents, books, records or information Transferred to Purchaser and relating to activities of the Business prior to the Closing as Sellers may reasonably require after the Funding in connection with any Tax determination or contractual obligations to Third Parties or to defend or prepare for the defense of any claim against Sellers or to prosecute or prepare for the prosecution of claims against Third Parties by Sellers relating to the conduct of the Business by Sellers prior to the Closing or in connection with any governmental investigation of Sellers or any of its Affiliates; provided that any such activities pursuant to this provision shall be at the sole cost and expense of Sellers and shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Purchaser.

(c)    No party shall destroy any files or records which are subject to this Section 6.2 without giving reasonable notice to the other parties, and within 15 days of receipt of such notice, any such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

Section 6.3    Efforts and Actions to Cause Closing to Occur.

(a)    At all times prior to the Closing, upon the terms and subject to the conditions of this Agreement, Sellers and Purchaser shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any Applicable Laws) to cause the Funding Date to occur and consummate the Closing and the other Transactions as promptly as practicable including, (i) the preparation and filing of all forms, registrations and notices required to be filed to cause the Funding Date to occur and consummate the Closing and the other Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, consents, releases, orders,

licenses, Permits, qualifications, exemptions or waivers by any Third Party or Governmental Entity, including the FCC Consent and the Industry Canada Consent; and (ii) at the sole cost of Purchaser, the preparation of any documents reasonably requested by Purchaser in order to facilitate financing (if any) of any of the Transactions.  In addition, subject to the terms of this Agreement, no party hereto shall take any action after the date hereof that would reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Entity or other Person required to be obtained prior to the Closing as applicable; provided, however, that nothing herein shall be construed to prevent, limit, or restrict Purchaser from initiating or participating in any proceeding with any Governmental Entity that either (x) does not specifically pertain to the Spectrum, or (y) relates to the use of the Spectrum in conjunction with any other radio frequencies.  Each of Purchaser and Sellers shall bear their own costs, fees and expenses relating to the obtaining of any approvals, authorizations, consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers referred to in this Section 6.3(a) except that the filing fee required by the Competition Bureau in relation to any pre-notification filing or any filing of a request for an Advance Ruling Certificate made under the Competition Act, and any filing fees associated with the filings related to the FCC Consent and Industry Canada Approval, shall be paid by Purchaser.

(b)　　Prior to the Closing, other than with respect to the Investment Canada Approval, each of Sellers, on the one hand, and Purchaser, on the other hand, shall promptly consult with the other with respect to, provide any necessary information with respect to, and provide the other (or its counsel) with copies of, all filings made by such party with any Governmental Entity or any other information supplied by such party to a Governmental Entity in connection with this Agreement and the Transactions.  Each of Sellers, on the one hand, and Purchaser, on the other hand, shall promptly provide the other with copies of any written communication received by it from any Governmental Entity regarding any of the Transactions.  If any of Sellers or their respective Affiliates, on the one hand, and Purchaser or its Affiliate, on the other hand, thereof receives a request for additional information or documentary material from any such Governmental Entity with respect to any of the Transactions, then such party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other, an appropriate response in compliance with such request.  To the extent that Transfers, amendments or modifications of Permits are required as a result of the execution of this Agreement or consummation of any of the Transactions, Sellers shall use their reasonable best efforts to effect such Transfers, amendments or modifications.

(c)　　In addition to and without limiting the agreements of the parties contained above, Sellers and Purchaser shall, other than with respect to the Investment Canada Approval:

(i)　　(A) take promptly, but in no event more than twenty (20) Business Days after the execution of this Agreement, all actions necessary to make any filings required of them or any of their Affiliates in connection with obtaining any required approvals or consents other than the FCC Consent, Industry Canada Approval, [Investment Canada Approval,] Controlled Goods Directorate Consent, [Export Control Authorizations, or any approvals or consents required to effect the Transfer to Purchaser of all Export Control Authorizations,] (B) take promptly, but in no event later

-37-

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

than [ ], all actions necessary to make any filings required of them or any of their Affiliates in connection with obtaining the Controlled Goods Directorate Consent; (D) take promptly, but in no event later than [ ], all actions necessary to make any filings required of them or any of their Affiliates in connection with obtaining the FCC Consent or the Industry Canada Approval; and (E) take promptly, but in no event later than [ ], all actions necessary to assign all Coordination Agreements that are material to the Business;

(ii)     comply at the earliest practicable date with any request for additional information or documentary material received by Sellers or Purchaser or any of their Affiliates from the FCC or Industry Canada or other Governmental Entity in connection with the FCC Consent, the Industry Canada Consent or any other required approvals or consents;

(iii)    reasonably cooperate with each other in connection with any filing in connection with the FCC Consent, the Industry Canada Consent or any other required approvals or consents;

(iv)     use their respective reasonable best efforts to oppose any petitions to deny or other objections that may be filed with respect to the FCC Consent application or the Industry Canada Consent applications and any requests for reconsideration or review of the grant of the FCC Consent or the Industry Canada Consent, provided, however, that the parties shall have no obligation to participate in any evidentiary hearing before the FCC on the FCC Consent application. Neither Sellers nor Purchaser shall take any action that it knows or should know would materially adversely affect or delay the grant of FCC Consent or the Industry Canada Consent;

(v)      use reasonable best efforts to resolve such objections, if any, as may be asserted in connection with the FCC Consent, Industry Canada Consent, under any antitrust law or otherwise in connection with any other required approvals or consents;

(vi)     advise the other party promptly of any material communication received by such party from the FCC in connection with the FCC Consent, from Industry Canada or the Commissioner of Competition in connection with the Industry Canada Consent or from any Governmental Entity in connection with any of the Transactions;

(vii)    advise the other party promptly of any material communication received from a party to a Coordination Agreement, the ITU or any other party as to a Coordination Agreement or matters relating to a Coordination Agreement;

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

(viii) not make any submission or filings, and to the extent permitted by such Governmental Entity, participate in any meetings or any material conversations with Governmental Entities in respect of any required FCC Consent, Industry Canada Approval, Competition Act Approval, ITU action or Coordination Agreement, unless the party consults with the other party in advance and gives the other party the opportunity to review drafts of any submissions or filings, and attend and participate in any communications or meetings;

(ix) where a party seeks not to provide the other party with any information under this Section 6.3 on grounds that such information is competitively sensitive, such party will be required to provide the information to the other party's external counsel (except for information that relates to a party's valuation of the transactions contemplated by this Agreement) and such external counsel will not provide the information to its client; and

(x) cooperate in all proceedings before any Governmental Entity related to the use or conditions of use of the Spectrum or any radio frequencies proposed to be used in conjunction with the Spectrum to provide communications services, including without limitation making a joint petition and fully participating in any such proceedings to promote the interests of the Business.

(d) Notwithstanding the foregoing or any other covenant herein contained, nothing in this Agreement shall be deemed to require Purchaser or Sellers to (i) commence any litigation against any Person in order to facilitate the consummation of any of the Transactions; (ii) take or agree to take any other action or agree to any limitation that would reasonably be expected to have a Purchaser Material Adverse Effect on the one hand, or a Material Adverse Effect on the other hand; (iii) agree to sell or hold separate any material assets, businesses, or interest in any material assets or businesses of Purchaser or Sellers, or to agree to any material changes or restrictions in the operation of any assets or businesses of Purchaser or Sellers; (iv) defend against any litigation brought by any Governmental Entity seeking to prevent the consummation of, or impose limitations on, any of the Transactions; or (v) participate in an evidentiary hearing before the FCC in order to facilitate the consummation of any of the Transactions.

(e) Purchaser shall in no event later than [ ], prepare and file with the Investment Review Division of Industry Canada an application for review under Part IV of the Investment Canada Act (the "Investment Canada Filing") and, as promptly as reasonably practicable following such filing, submit to the Director of Investments under the Investment Canada Act draft written undertakings to Her Majesty in Right of Canada, on terms and conditions satisfactory to Purchaser in its reasonable discretion, and shall, in a timely manner, submit executed undertakings in connection with the Investment Canada Approval. With respect to the Investment Canada Approval, Sellers shall use commercially reasonable efforts to assist Purchaser in obtaining the Investment Canada Approval as Purchaser may reasonably request from time to time including, promptly providing such information and assistance as may be reasonably requested by Purchaser to assist in preparing the Investment Canada Act Filing and to

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

satisfy, as promptly as reasonably practicable, any requests for information and documentation
Purchaser receives from any Governmental Entity in respect of the Investment Canada Approval.
Purchaser shall keep Sellers reasonably informed as to the status of the Investment Canada
Approval proceedings and shall promptly advise Sellers of any material written or verbal
communications Purchaser has with the Investment Review Division of Investment Canada staff
or the Minister of Industry or his designee relating to the Investment Canada Approval.
Information and documentation may be provided to counsel to Sellers on an external counsel
basis, in which case such information and documentation shall not be communicated to Sellers.

(f)     If reasonably requested by Purchaser, Sellers shall make, and shall collaborate
with Purchaser in making, at such time as requested by Purchaser, all submissions and
notifications required to effect the Transfer to Purchaser of all Export Control Authorizations or,
only if so directed by Purchaser, for Purchaser or any of its Affiliates or Subsidiaries to
otherwise obtain the Export Control Authorizations, and shall promptly supply Purchaser with all
information required for such submissions and notifications.

(g)     Sellers and Purchasers shall use their reasonable best efforts to (i) prosecute and
pursue to a successful conclusion for the Business all applications, modifications, petitions, or
other requests for action filed with any Governmental Entity in relation to the FCC Licenses or
the Industry Canada Licenses either by the Sellers or any third party, and (ii) ensure that, upon
receipt of the FCC Consent and the Industry Canada Consent, the Purchaser or its designated
Affiliate or Subsidiary shall be the operator on behalf of whom the United States and Canadian
administrations coordinate the Spectrum pursuant to ITU rules.

(h)     Sellers and Purchaser shall consult with each other and use their respective
commercially reasonable efforts to accommodate the other's suggestions and concerns prior to
requesting or advising any Governmental Entity or other party to a Coordination Agreement that
the U.S. or Canadian administrations or such party take any action in relation to any
Coordination Agreement that may affect the Business' access to or use of the Spectrum. Sellers
shall use commercially reasonable efforts to  ensure that, upon receipt of the FCC Consent and
the Industry Canada consent,  the Purchaser or its designated Affiliate or Subsidiary shall be the
operator, on behalf of whom the United States and Canadian administrations coordinate the
Spectrum pursuant to ITU rules.

Section 6.4     Notification of Certain Matters.  Sellers shall give written
notice to Purchaser promptly after becoming aware of (i) the occurrence of any event, which
would be likely to cause any condition set forth in Article VII to be unsatisfied at any time from
the date hereof to the Closing Date, (ii) any notice or other communication from (x) any Person
alleging that the consent of such Person is or may be required in connection with any of the
Transactions or (y) any Governmental Entity in connection with any of the Transactions or
(iii) any actions, suits, claims, investigations, proceedings or written inquiries commenced
relating to Sellers, the Acquired Assets or the Business that, if pending on the date of this
Agreement, would have been required to be disclosed pursuant to Section 4.9 or, if determined
adversely to Sellers, could materially and adversely affect any Seller, the Acquired Assets or the
Business; provided, however, that the delivery of any notice pursuant to this Section 6.4 shall not
limit or otherwise affect the remedies available hereunder to Purchaser.

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

Section 6.5     Submission for Court Approvals.

(a)     At least 24 hours prior to serving or filing any material motion, application, pleading, schedule, report and other paper (including memoranda, exhibits, supporting affidavits and evidence and other supporting documentation) in their Bankruptcy Cases or in the CCAA Recognition Proceedings relating to or affecting the Transactions, including any pleading seeking relief related to the Sale, Sellers shall provide a draft thereof to Purchaser and its counsel, and provide Purchaser (and its advisors and counsel) with a reasonable opportunity to consult within such 48 hour period with Sellers with respect to any and all such motions, applications, pleadings, schedules, reports and other papers.

(b)     Sellers shall take all actions reasonably required to assume and assign the Designated Contracts to Purchaser, including taking all actions reasonably required to (i) obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Designated Contracts to Purchaser satisfies all applicable requirements of section 365 or 1123(b)(2) of the Bankruptcy Code, and (ii) obtain an order of the Canadian Court recognizing such order of the Bankruptcy Court.

(c)     Sellers shall use reasonable best efforts to obtain, on or prior to the Funding Date, entry of (i) a Final Order of the Bankruptcy Court providing that the Bankruptcy Court shall retain jurisdiction to hear and determine a motion to assign the Designated Contracts to a Third Party purchaser in an Alternative Sale, pursuant to section 365 or 1123(b)(2) of the Bankruptcy Code, including, without limitation, to determine whether the Sellers have provided "adequate assurance" to counterparties to the Designated Contracts within the meaning of, and as required by, sections 365(b) and 365(f) of the Bankruptcy Code, and (ii) a Final Order of the Canadian Court recognizing such order of the Bankruptcy Court.

(d)     Promptly upon the execution of this Agreement, Sellers shall use reasonable best efforts to obtain as soon as possible, but subject to the notice requirements of the Bankruptcy Code and Bankruptcy Rules, the requirements of the Purchaser Protections Order (and the bidding procedures contained therein), the Exclusivity Stipulation, and the Bankruptcy Court's availability, the Bankruptcy Court's entry of the Sale Order, and thereafter the Canadian Court's entry of the Sale Recognition Order.  Each of the Sale Order and the Sale Recognition Order shall be in form and substance reasonably satisfactory to Purchaser.

(e)     If the Sale Order or the Sale Recognition Order shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, reargument or leave to appeal shall be filed with respect to any such order), Sellers and Purchaser will cooperate in taking steps to reasonably diligently defend such appeal, petition or motion and use reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

Section 6.6     Employee Matters.

(a)     Prior to the Closing Date, Purchaser may, or may cause an Affiliate to, offer to employ, such employment to be effective on the Closing Date, each of the employees of Sellers

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

listed in the [  ] (each such employee who accepts an offer and commences working for Purchaser or its Affiliate on the Closing Date, a "Transferred Employee") on terms and conditions that are substantially similar to the terms and conditions that are in effect for those employees immediately prior to the Closing Date.  Purchaser shall assume all Employee Obligations with respect to both Transferred Employees and the Sellers' other employees; provided, that Purchaser shall not assume the Employee Obligations to the extent they exceed $[ ] million in the aggregate.  Sellers shall use reasonable efforts to cooperate with Purchaser in Purchaser's recruitment of and offer to employ the Transferred Employees.

(b)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain, and Purchaser shall not assume, any Employee Benefit Plans or Canadian Plans or any other arrangement or agreements with any employees of any Seller or any other Person. Specifically and without limiting the foregoing, Sellers shall retain and Purchaser does not assume any retention or sale bonus arrangements of  any Seller with any such employee even if that employee is employed by Purchaser whether under Section 6.7(a) or otherwise.  All Seller Liabilities to, or relating to, the Employee Benefit Plans or Canadian Plans, and all Seller Liabilities to, or relating to, any employee under such plans shall be Non-Assumed Liabilities, and Purchaser shall have no obligation or liability with respect to such Employee Benefit Plans and Canadian Plans.  Purchaser and Sellers shall take all actions necessary to cause the retention by Sellers of all such Employee Benefit Plans and Canadian Plans.

(c)    Sellers shall pay in the ordinary course of business pursuant to the Operating Budget all material Employee Obligations in respect of each Employee prior to the Closing Date, or, if applicable, the date upon which the Employee commences employment with Purchaser as a Transferred Employee pursuant to Section 6.1(a)(iii), including premium contributions, remittance and assessments for unemployment insurance, employer health tax, Canada Pension Plan, Quebec Pension Plan, income tax, workers' compensation and any other employment related legislation, accrued wages, taxes, salaries, commissions and employee benefit plan payments.  Sellers shall have no obligation to reinstate any employees in connection with the Business.

(d)    To the extent that any obligations might arise under the Worker Adjustment Retraining Notification Act ("WARN"), 29 U.S.C. Section 2101 et seq., or under any similar provision of any United States federal, state, regional, non-United States or local law, rule or regulation (hereinafter referred to collectively at "WARN Obligations") solely as a consequence of the actions taken by or at the direction of Purchaser, Purchaser shall be responsible for such WARN Obligations.

(e)    From the date of this Agreement through the Closing Date, Sellers shall allow Purchaser reasonable access to meet with and interview Employees during normal business hours and Sellers shall provide reasonable cooperation and information to Purchaser as reasonably requested by Purchaser with respect to its determination of appropriate terms and conditions of employment for any Employee to whom it is making, or causing an Affiliate to make, an offer of employment with Purchaser or its Affiliate.

(f)     At Purchaser's request, as of immediately prior to the Closing Date (but conditioned upon the occurrence of the Closing), Sellers shall take all actions necessary or appropriate to terminate or cause to be terminated any or all of the Employee Benefit Plans that are intended to be tax-qualified within the meaning of Section 401(a) of the Code.  Sellers and Purchaser shall cooperate in good faith prior to the Closing with respect to the preparation and execution of all documentation necessary to effect the foregoing termination, and Sellers shall provide Purchaser a reasonable opportunity to review and comment on all such documentation.

Section 6.7     <u>Subsequent Actions</u>.  If at any time after the Closing Date, Purchaser or Sellers consider or are advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, its right, title or interest in, to or under any or all of the Acquired Assets or otherwise to carry out this Agreement, including the assumption of the Assumed Liabilities, Purchaser or Sellers shall at Purchaser's expense, execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances and take and do all such other actions and things as may be requested by the other party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or otherwise to carry out this Agreement.

For the avoidance of doubt, this <u>Section 6.8 </u>shall survive the Closing.

Section 6.8     <u>Publicity</u>.  Prior to the Closing and without limiting or restricting any party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions, no party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by Applicable Law, the Bankruptcy Code or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser lists securities, provided that the party intending to make such release shall use its reasonable best efforts consistent with such Applicable Law, the Bankruptcy Code or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

Section 6.9     <u>Tax Matters</u>.

(a)     The Purchaser and the Sellers agree that the Purchase Price is exclusive of any Transfer Taxes.  The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions provided that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller, such Transfer Taxes shall be paid by the Purchaser to such Seller at such time as such Transfer Taxes are required to be paid under Applicable Law.

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

(e)     The Canadian Sellers and Purchaser shall jointly execute an election, where such
election is available, under Section 22 of the Income Tax Act and the corresponding sections
of any other applicable provincial statute and any regulations under such statutes with respect to
the sale, assignment, transfer and conveyance of the Accounts Receivable.  The Canadian Sellers
and Purchaser further agree to make jointly the necessary elections and execute and file, within
the prescribed delays, the prescribed election forms and any other documents required to give
effect to the foregoing and shall also prepare and file all of their respective Tax Returns
in a manner consistent with the aforesaid allocations.

(f)     Canadian Sellers and Purchaser shall, where such election is available, jointly
execute an election under Section 167 of the Excise Tax Act (Canada) and the corresponding
provisions of any applicable provincial statute and any regulations under such statutes on the
forms prescribed for such purposes along with any documentation necessary or desirable in order
to effect the transfer of the Acquired Assets by Canadian Sellers without payment of any
GST/HST or any other applicable provincial tax. Purchaser shall file the election forms referred
to above, along with any documentation necessary or desirable to give effect to such, with the tax
authorities, together with Purchaser's GST/HST or any other applicable provincial tax returns for
the reporting period in which the transactions contemplated herein are consummated.
Notwithstanding such election, in the event that it is determined by the tax authorities that there
is GST/HST or any other provincial tax liability of Purchaser to pay GST/HST or any other
provincial tax on all or part of the Acquired Assets, the Canadian Sellers and Purchaser agree
that such GST/HST or any other provincial tax shall, unless already collected from Purchaser
and remitted by the Canadian Sellers, be forthwith remitted by Purchaser to the Canadian Sellers
or to the tax authorities as required by the tax authorities, and Purchaser shall indemnify and save
the Canadian Sellers harmless with respect to any such GST/HST or any other provincial tax
liability arising herein, as well as any interest and penalties related thereto.

(g)     Prior to the Closing Date, the Canadian Sellers shall obtain all clearance
certificates that are required to be obtained under applicable Provincial Sales Tax Laws and shall
provide the Purchaser with such certificates, or the Canadian Sellers shall provide the Purchaser
with evidence satisfactory to the Purchaser that the Canadian Sellers have complied with the
requirements to obtain clearance certificates under applicable Provincial Sales Tax Laws.

(h)     The Canadian Sellers shall comply with the provisions of section 99 of the Social
Services Tax Act (British Columbia) prior to the Closing and shall deliver to Purchaser all
documents necessary in the opinion of the Purchaser for compliance with that Act.  The
Canadian Sellers shall comply with the provisions of section 51 of the Revenue and Financial
Services Act (Saskatchewan) prior to the Closing and shall deliver to Purchaser all documents
necessary in the opinion of the Purchaser for compliance with such Provincial Sales Tax Laws.

(i)     At the Funding Date, Purchaser shall be registered under Part IX of the *Excise
Tax Act* (Canada) and, if applicable, Chapter VIII of An Act Respecting the Quebec Sales Tax
(Quebec) and shall provide its registration number to the Canadian Seller.

Section 6.10   Designation Dates. [On or prior to the date of the hearing
with regard to entry of the Sale Order, Purchaser shall make its final designations of all contracts,

-45-

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE LP LENDERS (AS DEFINED HEREIN)

in accordance with Section 2.1(c) hereof, and may, prior to the Effective Date of the Plan, revise Section 2.1(c) of the Disclosure Letter to exclude from the definition of Designated Contracts and to include in the definition of Retained Assets, any Contract previously included in the definition of Designated Contracts and not otherwise included in the definition of Retained Assets; <u>provided</u>, that no such final designation or revision shall reduce the amount of the Purchase Price; <u>provided</u> further, that any Cure Amounts associated with any Contract so excluded from the definition of Designated Contracts shall reduce the Excess Cure Amounts payable by Purchaser under Section 6.11(a) hereof.]

Section 6.11     Prompt Payment of Cure Amounts; Prepayment of Designated Customer Contracts.

(a)     [With respect to each Designated Contract, Sellers shall:  (i) no later than five (5) calendar days after entry of the Purchaser Protections Order and the Purchaser Protections Recognition Order, serve each counterparty to a proposed Designated Contract as of such date with notice of the proposed Cure Amount for such Contract; and (ii) pay, as soon as practicable after the Effective Date of the Plan, all amounts (the "Cure Amounts") that (x) are required to be paid under section 365(b)(1)(A) or (b)(1)(B) of the Bankruptcy Code in order to assume and assign such contract, or (y) are due pursuant to order of the Bankruptcy Court as a condition to assuming and assigning such Designated Contracts (in each case excluding any amounts that represent obligations or liabilities that were incurred or accrued by the Sellers during the period May 14, 2012 through and including the Funding Date, regardless of when such amounts are paid); provided, that, notwithstanding the foregoing, Seller shall not be responsible for paying any Excess Cure Amounts, which Excess Cure Amounts shall be deposited by Purchaser into the Escrow Account on the Funding Date; provided, further, that to the extent that, on or prior to the Effective Date, the Purchaser determines to exclude one or more Contracts from the definition of Designated Contracts and to include such Contracts in the definition of Retained Assets, (A) any Excess Cure Amounts deposited in the Escrow Account in respect of such Contracts shall be returned to Purchaser and (B) the threshold for determining Excess Cure Amounts (i.e., Cure Amounts in excess of $[___] million) shall be reduced on a dollar-for-dollar basis in an amount equal to the return(s) specified in clause (A); provided, further, that Cure Amounts that are the subject of a bona fide dispute shall be paid by Sellers within two (2) Business Days of the effectiveness of a settlement or order of the Bankruptcy Court, as the case may be, with respect thereto.  All Cure Amounts deposited into the Escrow Account shall be thereafter held, invested and released by the Escrow Agent only in accordance with this Agreement and the Escrow Agreement.]

(b)     If there are any payments under any Designated Customer Contract invoiced and collected during the month ending on the Funding Date for services to be rendered under such Designated Customer Contract after the Funding Date, Sellers shall provide to Purchaser, no later than the third (3rd) Business Day after the Funding Date, a statement setting forth the amounts of such prepayments and the Designated Customer Contracts to which they relate. Sellers shall, concurrently with the delivery of the statement referred to in the preceding sentence, pay over to Purchaser an amount equal to such prepayments.

DRAFT – SUBJECT IN ALL RESPECTS TO FURTHER NEGOTIATION AND APPROVAL
BY PURCHASER (AS DEFINED HEREIN) AND THE MAJORITY IN INTEREST OF THE
LP LENDERS (AS DEFINED HEREIN)

condition or otherwise make any determination as to whether any such condition has been satisfied without first consulting with, and obtaining the prior written consent of, the LP Lenders, which consent shall not be unreasonably withheld.  The failure by Sellers at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

ARTICLE VIII.

TERMINATION

Section 8.1    Termination.  This Agreement may be terminated or abandoned at any time prior to the Funding Date as follows:

(a)    By the mutual written consent of Purchaser and Sellers;

(b)    By either Purchaser or Sellers upon written notice given to the other, if the Bankruptcy Court, Canadian Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable best efforts to prevent the entry of and remove), which permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions and such order, decree, ruling or other action shall have become a Final Order;

(c)    By either Purchaser or Sellers upon written notice given to the other, if the Funding Date shall not have taken place on or before [_____] (the "Termination Date").  The initial Termination Date may be extended by Purchaser by written notice to each other Party privy to the then-scheduled Termination Date up to but not beyond [   ]; provided, that Purchasers may only extend the initial Termination Date on one occasion and only if, simultaneously with the delivery of the notice to extend, Purchaser deposits into the Escrow Account additional funding to Sellers in order to operate the Business and, to the extent necessary for payment of Sellers' expenses in connection with the Bankruptcy Cases, which amount shall be released to Purchaser pursuant to the terms of the Escrow Agreement, and such later date shall thereafter be deemed to be the Termination Date; provided, further that the failure of the Funding to occur on or before such date is not the result of a material breach of any covenant, agreement, representation or warranty hereunder by the party seeking such termination; provided, further, that notwithstanding the foregoing, the Sellers may not terminate this Agreement pursuant to this Section 8.1(c) if that the failure of the Funding Date to occur on or prior to the Termination Date arises primarily from litigation commenced by the Sellers in the Bankruptcy Court or the Canadian Court; and

(d)    By Sellers upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.2 and (ii) cannot be cured by the date that is the earlier of (A) ten (10) Business Days after Sellers notify Purchaser of such breach and (B) the third Business Day prior to the Funding Date.

(e)     By Purchaser or Sellers upon written notice given to Purchaser, if:

(i)     the Sale Hearing has been completed and Purchaser is not determined by the Bankruptcy Court to be the successful bidder; or

(ii)    the Bankruptcy Court enters any order approving an Alternative Transaction.

For the avoidance of doubt, Purchaser shall not be required to act as the Back-Up Bidder in any auction for the Acquired Assets, except to the extent Purchaser consents in writing to act as the Back-Up Bidder.

(f)     By Purchaser upon written notice given to Sellers, if any Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.1 and (ii) cannot be cured by the date that is the earlier of (A) ten (10) Business Days after Purchaser notifies Sellers of such breach and (B) the third Business Day prior to the Funding Date;

(g)     By Purchaser upon written notice given to Sellers:

(i)     unless, on or prior to [_____], (A) the Bankruptcy Court has entered the Sale Order and (B) the Canadian Court has subsequently entered the Sale Recognition Order no longer than 21 days after (A);

(ii)    if any Seller seeks to have the Bankruptcy Court enter an order dismissing a Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and such order is not reversed or vacated within three Business Days after the entry thereof; or

(iii)   if the Purchaser Protections Order, the Sale Order, the Purchaser Protections Recognition Order or the Sale Recognition Order has been revoked, rescinded or modified in any material respect and the order revoking, rescinding or modifying such order(s) shall not be reversed or vacated within thirty Business Days after the entry thereof; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion.

After the Funding Date, this Agreement may not be terminated for any reason other than pursuant to and strictly in compliance with the terms of Section 3.5 hereof.  Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made

and the effective date of such termination being the date of such notice.  Notwithstanding anything to the contrary contained in this Article VIII, the Sellers shall not be permitted to terminate this Agreement without the prior written consent, which consent shall not be unreasonably withheld, of the Ad Hoc Group of LightSquared LP Lenders, which is comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority or voting authority, of loans made pursuant to that certain Credit Agreement, dated as of October 1, 2010, by and among LightSquared LP, as borrower, LightSquared Inc. and certain of its subsidiaries as guarantors, the lenders from time to time party thereto, and certain other parties (the "LP Lenders").

Section 8.2    Effect of Termination.  If this Agreement is terminated by either party in accordance with and pursuant to Section 8.1, then, except as otherwise provided in Section 8.3 and Section 9.10, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party; provided, however, that nothing herein shall relieve any party from liability for fraud or willful breach of any provision of this Agreement prior to such termination; provided, further, however, that the provisions of this Article VIII, Article IX or any provision requiring any party to pay or reimburse another party's expenses shall survive any termination.

Section 8.3    Good Faith Deposit; Break-Up Fee; Expense Reimbursement.

(a)    Solely in the event that this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Good Faith Deposit shall be paid to Sellers in accordance with a Certificate of Instruction delivered pursuant to the Escrow Agreement.

(b)    Except as described in Section 8.3(a), in all other cases under Section 8.1, upon the termination or abandonment of this Agreement by any party, the Good Faith Deposit shall be returned to Purchaser by wire transfer in immediately available funds or applied as Purchaser may in its sole discretion direct the Escrow Agent, in each case without withholding, set-off or deduction and so as to be received not later than two (2) Business Days following the date of such termination or abandonment.

(c)    Notwithstanding Section 8.2 of this Agreement: (i) in the event that this Agreement is terminated by either Purchaser or Sellers pursuant to Section 8.1(c), (f) (except as set forth in Section 8.3(c)(ii) below) or (g) of this Agreement, then Purchaser shall have an Allowed Termination Claim equal to the amount of the Expense Reimbursement, and Sellers shall pay the Expense Reimbursement to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination; (ii) notwithstanding Section 8.3(c)(i), in the event that this Agreement is terminated by Purchaser pursuant to Section 8.1(f) due to a willful breach by Sellers of their covenants contained in this Agreement, then Purchaser shall have an Allowed Termination Claim equal to the amount of the sum of the Break-Up Fee plus the Expense Reimbursement, and Sellers shall pay the Break-Up Fee plus the Expense Reimbursement to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination; and (iii) in the event that this Agreement is terminated by Purchaser or Sellers pursuant to Section 8.1(e) of this Agreement, then Purchaser

# **EXHIBIT F**

PURCHASE AGREEMENT

by and among

LIGHTSQUARED LP,

ATC TECHNOLOGIES, LLC,

LIGHTSQUARED CORP.,

LIGHTSQUARED INC. OF VIRGINIA,

LIGHTSQUARED SUBSIDIARY LLC,

LIGHTSQUARED FINANCE CO.,

LIGHTSQUARED NETWORK LLC,

LIGHTSQUARED BERMUDA LTD.,

SKYTERRA HOLDINGS (CANADA) INC.,

SKYTERRA (CANADA) INC.,

L-BAND ACQUISITION, LLC,

[CANADIAN PURCHASER]

AND

DISH NETWORK CORPORATION
(Solely for the Purposes of Section 9.19)

dated as of [  ], 2013

reformed or deleted, in each case in a manner that comes closest to expressing the intention of the violative term or provision, solely to the extent necessary to cause such term or provision to comply with the Communications Laws of the United States and Canada.

Section 6.14    Insurance; Risk of Loss.   Until the Funding Date, Sellers shall bear the risk of any loss or damage to the Acquired Assets from fire, casualty or any other occurrence.  Sellers shall maintain insurance coverage substantially similar to Sellers' policies in effect as of the date hereof for the period from the date hereof until the Closing Date with respect to the Business and the Acquired Assets for events occurring, circumstances existing and Seller Liabilities accruing before the Closing Date.  Following the Funding Date, Purchaser shall have the benefit of any unexpired portion of Sellers' insurance coverage.  Sellers will use commercially reasonable efforts to, on or prior to the Funding Date, cause Purchaser to be named as the insured party or loss payee under all insurance policies maintained by Sellers relating to the Acquired Assets to the extent unexpired, and in the event any proceeds become payable under such unexpired insurance policies relating to occurrences or events after the Funding Date and are not paid to Purchaser, Sellers shall hold such proceeds in trust for the benefit of Purchaser, and shall pay over such proceeds without any deduction to Purchaser promptly after receipt thereof.  Nothing herein shall require Sellers to maintain insurance coverage in respect of any Acquired Asset after the Closing Date.

## ARTICLE VII.

## CONDITIONS

Section 7.1    Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the Funding and the Closing shall be subject to the satisfaction (or waiver by Purchaser) on the Funding Date or the Closing Date, respectively, of the following conditions:

(a)    Conditions to the Funding:

(i)    Government Action.  There shall be no injunction, restraining order, notice, decree or other action of any Governmental Entity in connection with the Bankruptcy Cases or the Canadian Recognition Proceedings:

(1)    prohibiting or imposing any material limitations on Purchaser's ownership or operation (or that of any of its Subsidiaries or Affiliates) of all or a material portion of its businesses or assets or the Acquired Assets, or compelling Purchaser or any of its Subsidiaries or Affiliates to dispose of or hold separate any material portion of the Acquired Assets or the business or assets of Purchaser or any of its Subsidiaries or Affiliates;

(2)    restraining or prohibiting the consummation of the Funding or the performance of any of the other Transactions, or imposing upon

-55-

Purchaser or any of its Subsidiaries or Affiliates any damages or payments in connection with the Transactions that are material;

(3)     imposing material limitations on the ability of Purchaser, its Subsidiaries or its Affiliates, or rendering Purchaser, its Subsidiaries or its Affiliates unable, to accept for payment or pay for or purchase a material portion of the Acquired Assets or otherwise to consummate the Funding;

(4)     imposing material limitations on the ability of Purchaser, its Subsidiaries or its Affiliates to exercise effectively full rights of ownership of the Acquired Assets; or

(5)     otherwise having a Material Adverse Effect.

(ii)     <u>Regulatory Action</u>.  There shall be no injunction, restraining order or decree by the FCC or Industry Canada in effect prohibiting the consummation of the Funding or the performance of any material aspect of the Transactions, taken as a whole, or having any of the effects listed in Section 7.1(a)(i)(1) through (5) above, including without limitation any decree, order, or other action purporting to suspend, revoke, or cancel any of the FCC Licenses or Industry Canada Licenses or any portions thereof or material rights granted thereunder.

(iii)     <u>Consents and Approvals</u>.  Other than the Specified Regulatory Approvals, Export Control Authorizations, Regulatory Approvals under Antitrust Laws and any approvals or consents required to effect the Transfer to Purchaser of all Export Control Authorizations: (A) consents and approvals identified in Section 4.6 of the Disclosure Letter shall have been obtained except where the failure to obtain would not constitute a Material Adverse Effect; and (B) all consents and approvals of any Person set forth in Section 7.1(a)(iii) of the Disclosure Letter, shall have been obtained and shall be in effect, except (x) to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court or the Canadian Court, if applicable, or (y) in the case of any Nonassignable Designated Contract other than a Required Contract.  For the avoidance of doubt, the Investment Canada Approval (if required under the Investment Canada Act), the Competition Act Approval (if required under the Competition Act), and the Controlled Goods Directorate Consent (if required under the Defence Production Act (Canada)) shall be in effect at the Funding and shall not have been revoked or rescinded.

(iv)    <u>Antitrust Approvals</u>.  Other than the Specified Regulatory Approvals, all Regulatory Approvals under Antitrust Laws set forth in Section 7.1(a)(iv) of the Disclosure Letter shall have occurred.

(v)    <u>Material Adverse Effect</u>.  Since the date of this Agreement, there shall not have occurred and be continuing any Material Adverse Effect, or any facts, events or circumstances that would reasonably be expected to have such a Material Adverse Effect.

(vi)    <u>Sellers' Representations and Warranties</u>.  Each of the representations and warranties set forth in <u>Article IV</u> disregarding all materiality and Material Adverse Effect qualifications contained therein (other than with respect to <u>Section 4.9(i)</u>) shall be true and correct (i) as of the date hereof and as of the Funding Date (as though made on the Funding Date) or (ii) if made as of a date specified therein, as of such date, except (with respect to all representations and warranties set forth in <u>Article IV</u> other than the first sentence of <u>Section 4.1</u>, and <u>Section 4.4</u> and <u>Section 4.22</u>) for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(vii)    <u>Sellers' Performance of Covenants</u>.  Sellers shall not have failed to perform in any material respect any material obligation or to comply in any material respect with any material agreement or material covenant of Sellers to be performed or complied with by them under this Agreement.

(viii)    <u>Certificate of Sellers' Officers</u>.  Purchaser shall have received from Sellers a certificate, dated the Funding Date, duly executed by the Chief Executive Officer, and the Chief Financial Officers, or if no such officers exist, an equivalent officer of each individual Seller, reasonably satisfactory in form to Purchaser, to the effect of paragraph (<u>v</u>) through (<u>vii</u>) above.

(ix)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall have become a Final Order and the Sale Order shall not have been reversed, stayed, modified or amended in any manner adverse to Purchaser.

(x)    <u>Sale Recognition Order</u>.  The Canadian Court shall have entered the Sale Recognition Order, the Sale Recognition Order shall be a Final Order and the Sale Recognition Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Purchaser without Purchaser's consent.

Applicable Law the Canadian Court shall have entered an order recognizing any such order.

(b)    <u>Conditions to Closing</u>.

    (i)    <u>FCC Consent</u>.  The FCC Consent shall have been issued and shall not have been amended, reconsidered, modified, revoked or rescinded.

    (ii)    <u>Industry Canada Approval</u>.  The Industry Canada Approval shall have been issued and shall not have been amended, reconsidered, modified, revoked or rescinded.

    (iii)    <u>Transition Services Agreement</u>.  Purchaser shall have duly executed the Transition Services Agreement.

    (iv)    <u>Assumption of Designated Contracts</u>.  Purchaser shall have executed an Instrument of Assumption for the Designated Contracts.

The foregoing conditions in <u>Section 7.2(a)</u> and <u>7.2(b)</u> are for the sole benefit of Sellers and may be waived by Sellers, in whole or in part, at any time and from time to time in its sole discretion; <u>provided</u>, <u>however</u>, that Sellers shall not be permitted to waive any such condition or otherwise make any determination as to whether any such condition has been satisfied without first consulting with, and obtaining the prior written consent of, the LP Lenders, which consent shall not be unreasonably withheld.  The failure by Sellers at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

## ARTICLE VIII.

## TERMINATION

Section 8.1    <u>Termination</u>.  This Agreement may be terminated or abandoned at any time prior to the Funding Date as follows:

(a)    By the mutual written consent of Purchaser and Sellers.

(b)    By either Purchaser or Sellers upon written notice given to the other, if the Bankruptcy Court, Canadian Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their commercially reasonable efforts to prevent the entry of and remove), which permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions and such order, decree, ruling or other action shall have become a Final Order.

(c)    By either Purchaser or Sellers upon written notice given to the other, if the Funding Date shall not have taken place on or before December 31, 2014 (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that the failure of the Funding to occur on or before such date (as it

may be extended) is not the result of a material breach of any covenant, agreement, representation or warranty hereunder by the party seeking such termination; provided, further, that notwithstanding the foregoing, Sellers may not terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Funding Date to occur on or prior to the Termination Date (as it may be extended) arises primarily from litigation commenced by Sellers in the Bankruptcy Court or the Canadian Court.  Purchaser may extend the initial Termination Date on two separate occasions, each for up to an additional six months from the then-scheduled Termination Date, by written notice to each other Party privy to the then-scheduled Termination Date, provided, that under no circumstances shall the final Termination Date, as extended, take place later than December 31, 2015; provided, however, that Purchaser may only extend the Termination Date if, simultaneous with the delivery of any notice to extend, Purchaser deposits into the Escrow Account funds sufficient to operate the Business through such extended Termination Date in accordance with the Operating Budget and, to the extent necessary for payment of Sellers' expenses in connection with the Bankruptcy Cases and the CCAA Recognition Proceedings, which amount (or remaining portion thereof, if any) shall be released to Purchaser pursuant to the terms of the Escrow Agreement, and such later date, in each case, shall thereafter be deemed to be the Termination Date.

(d)     By Sellers upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.2 and (ii) is not curable or, if curable, is not cured by the date that is the earlier of (A) thirty (30) days after Sellers notify Purchaser of such breach and (B) the third Business Day prior to the Funding Date.

(e)     By Purchaser or Sellers upon written notice if:

(i)     the Sale Hearing has been completed and Purchaser is not determined by the Bankruptcy Court to be the successful bidder; or

(ii)     the Bankruptcy Court enters any order approving an Alternative Transaction.

For the avoidance of doubt, Purchaser shall be required to act as the Second-Highest Bidder in any auction for the Acquired Assets solely to the extent required by the Purchaser Protections Order.

(f)     By Purchaser upon written notice given to Sellers, if any Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in <u>Section 7.1</u> and (ii) is not curable or, if curable, is not cured by the date that is the earlier of (A) thirty (30) days after Purchaser notifies Sellers of such breach and (B) the third Business Day prior to the Funding Date.

(g)     By Purchaser upon written notice given to Sellers:

(i)      unless, on or prior to December 11, 2013, (A) the Bankruptcy Court has entered the Sale Order and (B) the Canadian Court has subsequently entered the Sale Recognition Order no longer than 21 days after (A);

(ii)     if any Seller seeks to have the Bankruptcy Court enter an order dismissing a Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and such order is not reversed or vacated within three Business Days after the entry thereof, or if any Seller seeks to have the CCAA Recognition Proceeding converted to another form of insolvency proceedings under Applicable Law or to initiate any other form of insolvency proceedings under Applicable Law; or

(iii)    if the Purchaser Protections Order, the Purchaser Protections Recognition Order, Sale Order or the Sale Recognition Order has been revoked, rescinded or modified in any material respect and the order revoking, rescinding or modifying such order(s) shall not be reversed or vacated within thirty Business Days after the entry thereof; <u>provided</u> that Purchaser shall have the right to designate any later date for this purpose in its sole discretion.

After the Funding Date, this Agreement may not be terminated for any reason other than pursuant to and strictly in compliance with the terms of <u>Section 3.5</u> hereof.  Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.  Notwithstanding anything to the contrary contained in this Article VIII, Sellers shall not be permitted to terminate this Agreement without LP Lender Consent.

Section 8.2     <u>Effect of Termination</u>.  If this Agreement is terminated by either party in accordance with and pursuant to <u>Section 8.1</u>, then, except as otherwise provided in <u>Section 8.3</u> and <u>Section 9.10</u>, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party; <u>provided</u>, <u>however</u>, that nothing

-63-

with a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005
Facsimile: 212-530-5219
Attention:  Matthew S. Barr, Esq.
                    Roland Hlawaty, Esq.

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Facsimile:  212-446-4900
Attention:  Paul M. Basta, Esq.
                    Joshua A. Sussberg, Esq.

or to such other address as a party may from time to time designate in writing in accordance with this <u>Section 9.3</u>.  Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the day it is sent, if sent by facsimile, or (ii) on the first Business Day after sending, if sent by overnight courier service, or (iii) upon receipt, if sent by first-class certified mail; <u>provided, however</u>, that notice of change of address shall be effective only upon receipt.  The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this <u>Section 9.3</u>, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 9.4     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 9.5     <u>Entire Agreement; No Third Party Beneficiaries</u>.  This Agreement, the Disclosure Letter, Purchaser Disclosure Letter and other schedules, annexes, and exhibits hereto, the Ancillary Agreements, the Conveyance Documents, the Sale Order, and the Sale Recognition Order (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights or remedies hereunder; <u>provided</u>, that the LP Lenders are intended third party beneficiaries of the second to last sentence of <u>Section 7.2</u>, the last sentence of <u>Section 8.1</u>, <u>Section 9.2</u> and this <u>Section 9.5</u>.

-67-

Section 9.6 <u>Severability</u>. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 9.7 <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 9.8 <u>Exclusive Jurisdiction; Waiver of Right to Trial by Jury</u>. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the Southern District of New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in <u>Section 9.3</u> (<u>provided</u> <u>that</u> nothing herein shall affect the right to effect service of process in any other manner permitted by New York law). Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any Ancillary Agreement.

Section 9.9 <u>Remedies</u>. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity. For the avoidance of doubt, nothing in this Agreement, including, without limitation, <u>Section 3.1(e)</u> hereof, shall limit any party's right to seek monetary damages in the event of a breach of this Agreement by the other party; <u>provided</u>, that in no event shall Purchaser be entitled to recover from any LP Lender the Funding Date Consideration or any portion thereof that has been distributed by Sellers to such LP Lender (in accordance with the Plan or an order of the Bankruptcy Court) based on a breach of this Agreement by any Seller.

Section 9.10 <u>Specific Performance</u>. Sellers and Purchaser hereby acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly

agree that, in addition to any other remedies, Sellers and Purchaser or their respective successors or assigns shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

      Section 9.11 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party. Any purported assignment in violation of this clause shall be void. Any permitted assignment by a party of its rights hereunder shall not relieve it of its obligations hereunder. Subject to the first sentence of this <u>Section 9.11</u>, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

      Section 9.12 <u>Headings</u>. The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

      Section 9.13 <u>No Consequential or Punitive Damages</u>. NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY (IT BEING UNDERSTOOD THAT NOTHING HEREIN SHALL RESTRICT OR PROHIBIT ANY PARTY HERETO FROM SEEKING OR, IF AWARDED BY A COURT OF COMPETNENT JURISDICTION IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, RECOVERING ACTUAL DAMAGES SUFFERED BY SUCH PARTY DUE TO ANY BREACH OF THIS AGREEMENT BY ANY OTHER PARTY HERETO, INCLUDING, IF AWARDED BY A COURT OF COMPETENT JURISDICTION AS DAMAGES FOR WHICH SUCH OTHER PARTY WAS LIABLE AS A RESULT OF SUCH BREACH, (I) THE AMOUNT, IF ANY, BY WHICH THE AGGREGATE CONSIDERATION THAT WOULD HAVE OTHERWISE BEEN PAYABLE BY PURCHASER AND CANADIAN PURCHASER TO ACQUIRE THE ACQUIRED ASSETS HEREUNDER EXCEEDS THE CONSIDERATION RECEIVED BY SELLERS IN CONNECTION WITH ANY ALTERNATIVE TRANSACTION CONSUMMATED BY SELLERS FOLLOWING SUCH BREACH BY PURCHASER OR CANADIAN PURCHASER, (II) THE AMOUNT, IF ANY, BY WHICH THE AGGREGATE CONSIDERATION PAID BY PURCHASER AND CANADIAN PURCHASER TO ACQUIRE THE ACQUIRED ASSETS HEREUNDER AND PAID PURSUANT TO <u>SECTION 2.7</u> HEREOF EXCEEDS THE CONSIDERATION RECEIVED BY PURCHASER AND CANADIAN PURCHASER IN CONNECTION WITH ANY ALTERNATIVE SALE PURSUANT TO SECTION 3.5 HEREOF), OR (III) IN CONNECTION WITH A BREACH BY ANY SELLER OF ITS OBLIGATIONS UNDER <u>SECTION 3.5</u> HEREOF AFTER THE

-69-