Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**NOTICE OF FILING OF SPECIFIC DISCLOSURE STATEMENT**
**FOR DEBTORS' THIRD AMENDED JOINT PLAN**
**PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on December 31, 2013, LightSquared Inc. and certain of

its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors")

in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), filed the *Revised Specific*

*Disclosure Statement for Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of*

*Bankruptcy Code*  [Docket No. 1166] (the "Second Amended Disclosure Statement").

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax
or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc.
(0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra
Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited
Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC
(3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750),
LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd.
(7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC
Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston,
VA 20191.

**PLEASE TAKE FURTHER NOTICE** that, on December 31, 2013, the Court entered the *Order Authorizing LightSquared's Motion Seeking Approval of LightSquared's Revised Specific Disclosure Statement and Shortened Time To Object to Confirmation of LightSquared's Revised Second Amended Plan and Re-Solicitation Thereof* [Docket No. 1172].

**PLEASE TAKE FURTHER NOTICE** that LightSquared hereby files (i) the *Debtors' Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time, the "LightSquared Specific Disclosure Statement"), attached hereto as Exhibit A, and (ii) a blackline of the LightSquared Specific Disclosure Statement, marked to show changes against the Second Amended Specific Disclosure Statement, attached hereto as Exhibit B.  The LightSquared Specific Disclosure Statement includes as an exhibit thereto the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, modified, or supplemented, the "LightSquared Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that, concurrently with the filing of this notice, LightSquared also filed *LightSquared's Motion Seeking Approval of (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* (the "Limited Resolicitation Motion").

**PLEASE TAKE FURTHER NOTICE** that LightSquared hereby also files, as Exhibit C hereto, copies of the release, injunction, and related provisions contained in the LightSquared Plan.  Holders of Allowed Claims or Allowed Equity Interests who have the right to vote on the LightSquared Plan are advised and encouraged to read, in their entirety, the LightSquared Plan,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the (a) LightSquared Plan or (b) the Limited Resolicitation Motion (as defined below), as applicable.

the LightSquared Specific Disclosure Statement, and the General Disclosure Statement,

including, without limitation, the release, injunction, and related provisions set forth in the

LightSquared Plan.

**PLEASE TAKE FURTHER NOTICE that a hearing to consider the confirmation of
the LightSquared Plan (the "<u>Confirmation Hearing</u>") will commence on March 17, 2014 at
10:00 a.m. (prevailing Eastern time), or such other date and time as determined by the
Bankruptcy Court, before the Honorable Shelley C. Chapman, United States Bankruptcy
Judge, in the Bankruptcy Court.** Please be advised that the Confirmation Hearing may be

continued from time to time by the Bankruptcy Court without further notice other than by such

adjournment being announced in open court or by a notice of adjournment being filed with the

Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the

local rules of the Bankruptcy Court or otherwise.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the

LightSquared Plan must be made in writing, conform to the Federal Rules of Bankruptcy

Procedure and the Local Rules for the Bankruptcy Court for the Southern District of New York,

set forth the basis for the objection and the specific grounds therefor, and be filed with the

Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system,

electronically in accordance with General Order M 399 (which can be found at

http://nysb.uscourts.gov) and (b) by all other parties in interest, in text-searchable portable

document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399 and shall be served

in accordance with General Order M 399 upon each of the following: (i) LightSquared Inc.,

10802 Parkridge Boulevard, Reston, VA 20191, Attn: Marc R. Montagner and Curtis Lu, Esq.;

(ii) counsel to LightSquared, Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan

Plaza, New York, NY 10005, Attn:  Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen

Gartenberg, Esq.; (iii) counsel to the special committee of the boards of directors for

LightSquared Inc. and LightSquared GP Inc., Kirkland & Ellis LLP, 601 Lexington Avenue,

New York, NY 10022, Attn:  James H.M. Sprayregen, Esq., Paul M. Basta, Esq., and Joshua A.

Sussberg, Esq.; (iv) the Office of the United States Trustee for the Southern District of New

York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn:

Susan D. Golden, Esq.; (v) counsel to U.S. Bank National Association, as administrative agent

under the Prepetition Inc. Credit Agreement and administrative agent under the Inc. DIP credit

agreement, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036,

Attn:  Philip C. Dublin, Esq. and Kenneth A. Davis, Esq.; (vi) counsel to UBS AG, Stamford

Branch, as administrative agent under the Prepetition LP Credit Agreement, Latham & Watkins

LLP, 885 Third Avenue, New York, NY 10022, Attn:  Mark A. Broude, Esq.; (vii) counsel to the

ad hoc secured group of Prepetition LP Lenders, White & Case LLP, 1155 Avenue of the

Americas, New York, NY 10036, Attn:  Thomas E Lauria, Esq. and Andrew C. Ambruoso, Esq.;

and (viii) counsel to Harbinger Capital Partners, LLC, Kasowitz, Benson, Torres & Friedman

LLP, 1633 Broadway, New York, NY 10019, Attn: David M. Friedman, Esq. and Adam L. Shiff,

Esq., so as to be actually received no later than the date and time set forth in the Bankruptcy

Court's order granting the Limited Resolicitation Motion.  Only those responses or objections

that are timely filed, served, and received will be considered at the Confirmation Hearing.

    **PLEASE TAKE FURTHER NOTICE** that the LightSquared Specific Disclosure

Statement, the LightSquared Plan, and all exhibits thereto, may be viewed for free at the website

of LightSquared's Claims and Solicitation Agent, Kurtzman Carson Consultants LLC ("KCC"),

at http://www.kccllc.net/lightsquared or for a fee on the Bankruptcy Court's website at

www.nysb.uscourt.gov.  To access documents on the Bankruptcy Court's website, you will need

a PACER password and login, which can be obtained at http://www.pacer/psc/uscourt.gov.  To

obtain hard copies of the Plan Supplements, please contact KCC at (877) 499-4509 or by e-mail

at LightSquaredInfo@kccllc.com.

                                    Respectfully submitted,

New York, New York                  /s/ Matthew S. Barr
Dated:  February 14, 2014            Matthew S. Barr
                                     Steven Z. Szanzer
                                     Karen Gartenberg
                                     MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
                                     1 Chase Manhattan Plaza
                                     New York, NY  10005-1413
                                     (212) 530-5000

                                     *Counsel to Debtors and Debtors in Possession*

## Exhibit A

**LightSquared Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**SPECIFIC DISCLOSURE STATEMENT FOR**
**DEBTORS' THIRD AMENDED JOINT PLAN**
**PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE**

---

- Voting Record Date:  October 9, 2013
- Voting Deadline:  March [3], 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan Objection Deadline:  March [10], 2014 at 4:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  March [17], 2014 at 10:00 a.m. (prevailing Eastern time)

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1] The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "<u>VOTING DEADLINE</u>").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("<u>KCC</u>" OR THE "<u>CLAIMS AND SOLICITATION AGENT</u>"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT (THE "<u>DEBTORS' SPECIFIC DISCLOSURE STATEMENT</u>") FOR THE DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS <u>EXHIBIT A</u>, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "<u>PLAN</u>") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "<u>LIGHTSQUARED</u>" OR THE "<u>DEBTORS</u>") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "<u>CHAPTER 11 CASES</u>"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN.  LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "<u>BANKRUPTCY COURT</u>").  THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. 1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "<u>GENERAL DISCLOSURE STATEMENT</u>" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "<u>DISCLOSURE STATEMENT</u>"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  <u>SEE</u> 11 U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  **SEE ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH

FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING TO THE PLAN, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS. NOTHING CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT

(INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ..................................................................................1

    **A.**       **Overview of Plan** ....................................................................................1

           1.    Path to Value-Maximizing Transaction ..................................1

           2.    Previously Filed Plans and Path to Plan ................................2

           3.    General Structure of LightSquared and New LightSquared Entities ...........5

           4.    Administrative and Priority Claims ........................................8

           5.    Classes and Treatment .............................................................9

    **B.**       **Chapter 11 Cases** ..................................................................................14

           1.    Ergen Adversary Proceeding .................................................14

    **C.**       **Solicitation Process and Voting Procedures** .....................................18

    **D.**       **Plan Supplement** ..................................................................................20

    **E.**       **Confirmation Procedures** ....................................................................20

    **F.**       **Risk Factors** .........................................................................................21

    **G.**      **Identity of Persons to Contact for More Information** ......................21

    **H.**      **Disclaimer** ............................................................................................21

    **I.**       **Rules of Interpretation** .......................................................................22

**ARTICLE II SUMMARY OF PLAN** .........................................................................22

**ARTICLE III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** .................23

    **A.**       **Valuation of New LightSquared Entities' Assets** .............................23

    **B.**       **Valuation Methodologies** ....................................................................24

    **C.**       **Valuation Considerations** ....................................................................26

    **D.**       **Financial Projections** ..........................................................................26

**ARTICLE IV CERTAIN PLAN MATTERS** ...............................................................28

    **A.**       **Best Interests of Creditors Test** .........................................................28

    **B.**       **Feasibility** .............................................................................................29

    **C.**       **Confirmation-Related Claims and Remedies Against SPSO** ...........30

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND
CONSUMMATING PLAN** ....................................................................30

    **A.**       **Certain Bankruptcy Law Considerations** ........................................30

           1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests ....................30

           2.    Plan May Not Receive Requisite Acceptances .........................31

vi

3.    LightSquared May Not Be Able To Obtain Confirmation of Plan............31
4.    LightSquared May Not Obtain Recognition from Canadian Court...........31
5.    LightSquared May Not Be Able To Consummate Plan...........................32
6.    LightSquared May Object to Amount or Classification of Claim .............32
7.    Contingencies Not To Affect Votes of Impaired Classes To Accept
Plan ...................................................................................................32

B.    **Factors Affecting LightSquared** .........................................................................**32**

1.    Regulatory Risks.................................................................................32
2.    Business-Related Risks.......................................................................34
3.    Risks Related to New LightSquared Entities Shares .................................38

C.    **Litigation Risks** ...................................................................................................**39**

D.    **Certain Tax Matters** ............................................................................................**39**

**ARTICLE VI CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES** ...............................................................................................**39**

A.    **Certain United States Federal Income Tax Consequences of Plan to
LightSquared**........................................................................................................**40**

1.    Treatment of Transfers to NewCo .....................................................40
2.    Cancellation of Debt and Reduction of Tax Attributes .............................41
3.    Potential Limitations on NOLs and Other Tax Attributes........................41
4.    Alternative Minimum Tax ..................................................................43

B.    **Certain United States Federal Income Tax Consequences to Holders
of Claims and Holders of Equity Interests Under Plan**...................................**43**

1.    Consequences to Holders of Claims ...................................................44
2.    Consequences to Holders of Equity Interests ...........................................48
3.    Consequences of Holding NewCo Interests and Debt Obligations ...........49
4.    Information Reporting and Backup Withholding ......................................51

**ARTICLE VII CONCLUSION AND RECOMMENDATION**..............................................**51**

## EXHIBITS

**Exhibit A**    Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**Exhibit B**    Projections

**Exhibit C**    Plan Supplement for Plan

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (a) solicitation of votes to accept or reject their joint chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),[2] and (b) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (a) terms, provisions, and implications of the Plan and (b) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan.  The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases.  Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so.  While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[3]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

## A.    Overview of Plan

### 1.    Path to Value-Maximizing Transaction

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC.  Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested

---

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[3]    If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction. A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**." A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces. Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below), certain of LightSquared's stakeholders agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on approval of LightSquared's pending license modification applications.

### 2. Previously Filed Plans and Path to Plan

#### a. Prior LightSquared Plans

Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to exercise properly its fiduciary duty to all of its stakeholders in light of the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, it would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets. Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of LightSquared's assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties. In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

2

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets. In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders. After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates. Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO, multiple potential bidders were reluctant to participate in the Auction. Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases. No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize. LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal. LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders. Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108]. Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize the value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c) provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan. LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended*

3

*Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through the Alternative Transaction.

### b.    Termination of LBAC Bid

Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid").  On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC.  The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.  In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement).  LightSquared reserves all of its rights with respect to such matters in all respects.

### c.    Amended Alternative Transaction

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by LightSquared, certain key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders.  Importantly, effectiveness of the Plan is not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of LightSquared's significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition*

*Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan. To fund LightSquared's operations through the Effective Date and to indefeasibly repay in full on the New DIP Closing Date the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new debtor in possession credit facility. More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of LightSquared's litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. LightSquared and the Plan Support Parties accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer available to LightSquared. Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases. Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from a substantial portion of LightSquared's significant stakeholders.

Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.

For more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

### 3.    **General Structure of LightSquared and New LightSquared Entities**

As of the Petition Date, LightSquared maintained the following corporate organizational structure:

5

## PREPETITION DEBTOR ORGANIZATION CHART



In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities.  More specifically, Reorganized LightSquared Inc., Reorganized LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and Equity Interests (other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' Equity Interests in LightSquared LP, Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo will assume all obligations related thereto (including the payments to equityholders).  All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

As a result of the foregoing Plan Transactions, (a) NewCo will be the limited partner, and Reorganized LightSquared GP LLC will be the general partner, of Reorganized LightSquared

LP, (b) NewCo will wholly own Reorganized One Dot Six LLC, (c) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared Inc. will retain its 100% ownership of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.  In addition, NewCo will, among other things, issue several series of equity interests – including, the NewCo Series A-1 Preferred PIK Interests, NewCo Series A-2 Preferred PIK Interests, NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests – to Reorganized LightSquared Inc., certain Plan Support Parties, certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan.  Reorganized LightSquared Inc. will hold (v) 22.22% of loans under the Second Lien Exit Facility, (w) 22.22% of NewCo Series A-1 Preferred PIK Interests, (x) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (y) 22.22% of NewCo Class A Common Interests, and (z) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:

### REORGANIZED DEBTOR ORGANIZATION CHART



### 4.    Administrative and Priority Claims

#### a.    Treatment of Administrative and Priority Claims Generally

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan.  Such Claims shall be satisfied in full in accordance with the Plan. All other Claims and Equity Interests are classified under the Plan.

#### b.    Treatment of DIP Inc. Claims

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

#### c.    Treatment of DIP LP Claims

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

5.        **Classes and Treatment**

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote.  This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed | Unimpaired | No (Deemed To Accept) | 100% |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Inc. Other Secured Claim shall be rendered Unimpaired. | | | |
| 4 | LP Other Secured Claims | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | 100% |
| 5 | Prepetition Inc. Facility Non-Subordinated Claims | The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim,[4] shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class | Unimpaired | No (Deemed To Accept) | 100% |

---

[4]     Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (c) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors. | | | |
| 6 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors. | Impaired | Yes | 100% |
| 7A | Prepetition LP Facility Non-SPSO Claims | The legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:<br><br>(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim,[5] shall receive LP Plan | Impaired | Yes | 100% |

---

[5]      Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $1.0883 billion, calculated as follows:  (i) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (ii) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013; (iii) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (iv) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a per diem basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, plus (b) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), plus (c) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or<br><br>(ii)    each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.<br><br>For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors. | | | |
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive one of the following:<br><br>(i)    in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the | Impaired | Yes | 100% |

Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | New DIP Facility, the SPSO Option A Treatment; or<br><br>(ii)   in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.<br><br>For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors. | | | |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | Impaired | Yes | 100%[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | 100% |
| 10 | Existing LP Preferred Units Equity Interests | Each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests. | Impaired | Yes | 100% |
| 11A | Existing Inc. Series A Preferred Stock Equity Interests | Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C | Impaired | Yes | 100% |

---

[6]    LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Common Interests. | | | |
| 11B | Existing Inc. Series B Preferred Stock Equity Interests | Each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares. | Impaired | Yes | 100% |
| 12 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | TBD |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. | Unimpaired | No (Deemed To Accept) | 100% |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | 100% |

## B.    Chapter 11 Cases

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

### 1.    Ergen Adversary Proceeding

Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility

Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts. Since the filing of the General Disclosure Statement, the parties to the Ergen Adversary Proceeding have, among other things, engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable. In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined. The record in the Ergen Adversary Proceeding has closed. The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.

Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims. This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.

The Ad Hoc Secured Group intends to proceed as outlined herein. In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases. LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated. The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen, and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases. The parties further believe that the evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment. Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH. Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment

15

only on Hart-Scott-Rodino approval. The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized. This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction. In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest. To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013. In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced. The parties' agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.

- The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed. At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones. Despite this fact, the Ergen Entities refused at the time to amend the milestones, but repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.

- With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million. To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.

- Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids. Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable. Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen

16

Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court. The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction. The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction. Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.

- Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted. With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price. With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal. This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money." Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million). Thus, the Ergen Entities essentially converted the largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

- After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further. Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement. When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered

significant harm as a result of the Ergen Entities' continuing inequitable conduct. As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders. As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims. Among other relief, the Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.

**C.**     **Solicitation Process and Voting Procedures**

On February [__], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. _____] (the "Resolicitation Order"), which, among other things, approved the Debtors' Specific Disclosure Statement and the resolicitation of the Plan.

**1.**     **Solicitation Process**

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**."

**2.**     **Summary of Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes. If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class. Each ballot votes only your Claim or Equity Interest indicated on that Ballot. Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON MARCH [3], 2014 (THE "VOTING DEADLINE"). BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

3.    **Inquiries**

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d): (a) from the Claims and Solicitation Agent (i) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

## D.    Plan Supplement

The Plan Supplement documents for the Plan (the "<u>Plan Supplements</u>") are attached hereto as exhibits and incorporated herein by reference.  The Plan Supplement consists of the following documents:[7]

- <u>Exhibit C-1</u> - First Lien Exit Credit Agreement

- <u>Exhibit C-2</u> - Second Lien Exit Credit Agreement

- <u>Exhibit C-3</u> - Exit Intercreditor Agreement

- <u>Exhibit C-4</u> - Reorganized LightSquared Inc. Loan Agreement

- <u>Exhibit C-5</u> - SPSO Note Documents

- <u>Exhibit C-6</u> - New LightSquared Entities Corporate Governance Documents

- <u>Exhibit C-7</u> - Schedule of Assumed Agreements

- <u>Exhibit C-8</u> - Schedule of Retained Causes of Action

- <u>Exhibit C-9</u> - Liquidation Analysis

## E.    Confirmation Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Resolicitation Order, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation process:

- Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).

- Plan Objection Deadline: March [10], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: March [7], 2014 at 4:00 p.m. (prevailing Eastern time).

---

[7]    Exhibit C-1, Exhibit C-4, Exhibit C-5, and Exhibit C-6 contain form agreements and/or related documents with respect to the First Lien Exit Credit Agreement, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  To the extent not filed with this Specific Disclosure Statement (including the Second Lien Exit Credit Agreement and the NewCo LLC Operating Agreement), form or definitive documentation with respect to such items will be submitted prior to the hearing to approve the Disclosure Statement, and the Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Exit Credit Agreement will be filed prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

- Deadline to submit confirmation briefs in support of the Plan and in response to Plan Objections: March [13], 2014 at 4:00 p.m. (prevailing Eastern time).

- Confirmation Hearing: March [17], 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing. Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

**F.    Risk Factors**

Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement, including the risk factors described in Article V, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

**G.    Identity of Persons to Contact for More Information**

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

**H.    Disclaimer**

In formulating the Plan, LightSquared has relied on financial data derived from its books and records. LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge. LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests. However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a Claim and Interest is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein.  The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A.  The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the**

occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the New LightSquared Entities, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

## ARTICLE III
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    Valuation of New LightSquared Entities' Assets

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets.  Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view as of February 11, 2014, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of October 31, 2014, would be in a range between $6.2 billion and $9.1 billion with a midpoint of $7.7 billion.  Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims.  Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (i.e., February 11, 2014).  It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015.  Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.  Moelis' analysis is also based, at LightSquared's direction, on a number of other assumptions, including that (1) LightSquared will be reorganized in accordance with the Plan, which will be effective on or prior to October 31, 2014, (2) the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and the Disclosure Statement, and (3) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections (as defined below).  In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below.  The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein.  The actual

value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things:  (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including its spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including alleged GPS interference issues and LightSquared's pending license modification application), and general prospects of the New LightSquared Entities, including the Projections, furnished to Moelis by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan as of February 11, 2014; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate.  In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects.  Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future.  The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

## B.    Valuation Methodologies

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network.  Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions.  Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS. THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND**

**CIRCUMSTANCES, AND SUCH ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.**

1.      **Spectrum**

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP"). The term MHzPOP is defined as the amount of spectrum bandwidth, or capacity, measured in MHz multiplied by the population of the area the spectrum covers. Moelis' analysis is based on a United States population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion United States MHzPOPs (which takes into account potential coordination zones for certain of its spectrum where operations may be constrained) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation. Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors including (1) channel size, (2) spectrum depth, (3) frequency range/propagation quality, (4) geographic coverage, (5) equipment ecosystem, and (6) regulatory characteristics. In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for an additional 10 MHz of fully usable terrestrial spectrum in approximately seven years covering the United States.

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's United States or Canadian spectrum. The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed. Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's United States spectrum as of the assumed FCC approval effective dates and then discounted to present value as of the assumed Effective Date. The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum was discounted back seven (7) years. Moelis applied a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum. Moelis' analysis resulted in a total gross United States spectrum valuation range of $5.6 - $8.4 billion and a total gross spectrum valuation range of $5.8 - $8.7 billion as of the assumed Effective Date.

### 2.    Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network.  LightSquared's satellite network comprises two (2) satellites:  SkyTerra-1 is in orbit (accepted on February 11, 2011) and SkyTerra-2 is fully built and remains in storage. Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value.  Moelis considered a number of factors in determining its range of discounts including:  potential buyer universe, geographic patterning, cost to relocate, inability to offer services at other frequency bands, launch costs and associated risks, and remaining life span.  Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation.  Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $425 million for the satellite network.

### C.    Valuation Considerations

Moelis relied upon spectrum transaction precedents, government auctions, and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively.  Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies.  Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis.  Moelis did not view a DCF analysis as a relevant valuation methodology for LightSquared at this time because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation.  Depending on the actual financial results of the Debtors, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of October 31, 2014.  In addition, the market prices, to the extent there is a market, of New LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

### D.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  In connection with developing the Plan, and for the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections attached hereto as Exhibit B (the "Projections"), analyzed the New LightSquared Entities' ability to meet their obligations under

26

the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan.

LightSquared believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities.  In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities will be financially viable.  Indeed, LightSquared believes that the New LightSquared Entities, will have sufficient liquidity, assuming the availability of the Exit Facilities and the Reorganized LightSquared Inc. Loan, to fund obligations as they arise, thereby maintaining value.  Accordingly, LightSquared believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities.  Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts. Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies.  The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ability to achieve the projected results.  Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance.  The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments.  LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out.  The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants.  LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the**

**reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows. Accordingly, neither LightSquared nor the New LightSquared Entities intend to, and each disclaims any obligation to: (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) holders of claims under the Exit Facilities, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.**

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. In addition, the Projections have been presented in lieu of pro forma historical financial information. Reference should be made to Article V hereof, entitled "**Plan-Related Risk Factors To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the New LightSquared Entities.

## ARTICLE IV
## CERTAIN PLAN MATTERS

As mentioned, a description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures.**" LightSquared believes that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith. This section discusses certain specific requirements for confirmation of the Plan, including that the Plan is (y) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (z) feasible. In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.

### A.    Best Interests of Creditors Test

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or

Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under the Plan is attached hereto as Exhibit C-10.

Under the Plan, Prepetition Inc. Facility Subordinated Claims, Prepetition LP Facility Non-SPSO Claims, Prepetition LP Facility SPSO Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.[8]   Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan.  The Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared.  A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

**B.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or

---

[8]      Notwithstanding the foregoing, LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan." Under the Plan, all Holders of Claims or Equity Interests will be paid in full in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan. Moreover, LightSquared believes that the New LightSquared Entities, as applicable, will have sufficient liquidity to fund obligations as they arise. Accordingly, LightSquared believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## C.    Confirmation-Related Claims and Remedies Against SPSO

LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation. LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise. As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code. Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code.

## ARTICLE V
## PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. **Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (a) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (b) risks that information in the General Disclosure Statement may be inaccurate, and (c) risks related to liquidation under chapter 7 of the Bankruptcy Code.

## A.    Certain Bankruptcy Law Considerations

### 1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to

the other claims and equity interests in such class.  LightSquared believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, because each Class created by LightSquared contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, LightSquared intends to seek Confirmation of the Plan.  If the Plan does not receive the required support from the Voting Classes, LightSquared may elect to amend the Plan.

### 3.    LightSquared May Not Be Able To Obtain Confirmation of Plan

LightSquared cannot ensure that it will receive the requisite acceptances to confirm the Plan.  Even if LightSquared receives the requisite acceptances, LightSquared cannot ensure that the Bankruptcy Court will confirm the Plan.  A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code.  While LightSquared believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

LightSquared, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

As conditions precedent to the Effective Date, the Plan requires that the Canadian Court shall have entered the Confirmation Recognition Order and New DIP Recognition Order, and

such orders shall have become Final Orders.  LightSquared believes that such orders will be approved and entered by the Canadian Court and become Final Orders for all purposes under the Plan; however, there can be no guarantee as to such outcome.

### 5.    LightSquared May Not Be Able To Consummate Plan

Although LightSquared believes that it will be able to consummate the Plan and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date.  Consummation of the Plan is also subject to certain conditions set forth in the Plan itself.  If the Plan is not consummated, it is unclear what distributions Holders of Allowed Claims or Equity Interests (other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date) ultimately would receive with respect to their Claims and Equity Interests.

### 6.    LightSquared May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan, including with respect to the DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the Plan, LightSquared reserves the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

### 7.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not require resolicitation of the Impaired Classes.

## B.    Factors Affecting LightSquared

LightSquared is exposed to various factors and risks that include, without limitation, the following.

### 1.    Regulatory Risks

#### a.    LightSquared May Not Receive FCC Consents To Emerge From Chapter 11 in Timely Fashion

The effectiveness of the Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing

rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with the Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings.

### b.    LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access.  LightSquared believes that record evidence demonstrates that its proposed operations would serve the public interest.  Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

### c.    FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users.  It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared.  These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality.  Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

### d.    Transactions Contemplated by Plan May Require Various Other Regulatory Approvals

Various other regulatory approvals, including the expiry of certain statutory waiting periods, may be required to give effect to the transactions contemplated in the Plan, including

approvals and/or pre-merger filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada). There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all. In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

### 2.    Business-Related Risks

#### a.    LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit Facilities, the Reorganized LightSquared Inc. Loan, and the SPSO Note. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although certain of the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged. If LightSquared incurs additional indebtedness, the related risks could intensify.

#### b.    Exit Facilities and Reorganized LightSquared Inc. Loan Contemplated Under Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared May Incur Additional Future Debt

The Exit Facilities and the Reorganized LightSquared Inc. Loan contemplated by the Plan may contain covenants that, among other things, restrict LightSquared's ability to take specific actions, including restrictions that may limit LightSquared's ability to engage in actions or transactions that may be in LightSquared's long-term interest. In addition, as described above, LightSquared may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit Facilities and the Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates. These operating restrictions may adversely affect LightSquared's ability to finance future operations or capital needs, engage in transactions

with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities. LightSquared's ability to comply with any financial covenants may be affected by events beyond LightSquared's control, and there is no assurance that LightSquared will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's indebtedness could result in a default, which could allow LightSquared's lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared to apply all available cash to repay these borrowings. If LightSquared is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

      **c.**    **LightSquared May Not Be Able To Achieve Its Projected Financial Results**

The Projections set forth on <u>Exhibit B</u> attached hereto represent LightSquared's management's best estimate of LightSquared's future financial performance based on currently known facts and assumptions about LightSquared's future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared operates in particular. LightSquared's actual financial results may differ significantly from the Projections. If LightSquared does not achieve its projected financial results, the value of the New LightSquared Entities Shares may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

      **d.**    **LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings**

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America. There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all. If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

e.     **LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business.  Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

f.     **LightSquared Faces Significant Competition from Companies that Are Larger or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.

Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared. Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services. In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

### g.    Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network. Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets. However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices. If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

### h.    LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel. The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

### i.    Adverse Conditions in U.S. and Global Economies Could Impact LightSquared's Results of Operations

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services. In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies. Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic

decisions, including the rollout of new retail service offerings. Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

### 3.    Risks Related to New LightSquared Entities Shares

#### a.    There Is Currently No Trading Market for New LightSquared Entities Shares, Active Liquid Trading Market for New LightSquared Entities Shares May Not Develop, and New LightSquared Entities Shares Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements, as Applicable

There is currently no existing trading market for the New LightSquared Entities Shares. LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the New LightSquared Entities Shares and, even if one develops, such public trading market may not be maintained. If an active public trading market for the New LightSquared Entities Shares does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all. If any New LightSquared Entities Shares are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the New LightSquared Entities Shares, regardless of LightSquared's businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares. The New LightSquared Entities Shares may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements, as applicable. This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares.

C.    **Litigation Risks**

To the extent that distributions available to Holders of Allowed Claims or Equity Interests under the Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the New LightSquared Entities, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the Plan. Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

D.    **Certain Tax Matters**

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the New LightSquared Entities, see Article VI hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan. Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not

United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**A.      Certain United States Federal Income Tax Consequences of Plan to LightSquared**

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return. Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013. Some small portion of these NOLs may be subject to existing limitations.

**1.      Treatment of Transfers to NewCo**

Pursuant to the Plan, (a) Reorganized LightSquared Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized One Dot Six LLC, (b) Reorganized LightSquared Investors Holdings Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, (c) Reorganized TMI Communications Delaware, Limited Partnership will sell, assign, and transfer to NewCo its Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action as contemplated by Article IV.V of the Plan. In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain debt obligations from, and Equity Interests in, NewCo and Cash. The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and

other transactions contemplated by the Plan are not certain. The transactions, taken together, may give rise to net taxable income or gain for LightSquared. To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow in part or any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain. Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

### 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange. A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and Equity Interests of NewCo. Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date. Based on the terms of the Plan, LightSquared does not anticipate that there will be a significant amount of COD Income. To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the

Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation **immediately before** the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.56% for ownership changes occurring in February 2014). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately **after** (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business

requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.    Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases.  Moreover, if section 382(l)(5) applies and the debtor thereafter  undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it.  If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income. Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of the amount of any such gain.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor. Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

1.    **Consequences to Holders of Claims**

a.    **Holders of Prepetition Inc. Facility Subordinated Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim will receive NewCo Series A-2 Preferred PIK Interests and NewCo Class B Common Interests. A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest, which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

b.    **Holders of Prepetition LP Facility Non-SPSO Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP

Closing Date, except to the extent that a Holder agrees to any other treatment, each Holder will receive Cash for its Allowed Prepetition LP Facility Non-SPSO Claim unless the Holder elects to receive New DIP Tranche B Claims in exchange for all or a portion of its Allowed Prepetition LP Facility Non-SPSO Claim instead of Cash (subject to the New DIP Tranche B Cap). A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received and, if relevant, the "issue price" (as defined below) of the New DIP Tranche B Claims received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash. Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so. U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding). In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption. In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

### c.      Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note. A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d.    Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e.    Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash.  A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f.    Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange. If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.    Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been

previously included in the Holder's gross income for United States federal income tax purposes. If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.    Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

2.       **Consequences to Holders of Equity Interests**

    a.       **Consequences to Holders of Existing LP Preferred Units Equity Interests**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive Cash and NewCo Series A-2 Preferred PIK Interests.  Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash and the fair market value of NewCo Series A-2 Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests.  A Holder's tax basis in any NewCo Series A-2 Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for Cash and interest in NewCo in a wholly taxable transaction, it may be possible that a Holder will be treated as, in part, contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series A-2 Preferred PIK Interests in a non-taxable transaction.  In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for NewCo Series A-2 Preferred PIK Interests, its basis in the NewCo Series A-2 Preferred PIK Interests will equal its basis in its Existing LP Preferred Units Equity Interests exchanged therefor, and its holding period for its NewCo Series A-2 Preferred PIK Interests would include its holding period in its interests exchanged therefor.

    b.       **Consequences to Holders of Existing Inc. Series A Preferred Stock Equity Interests and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the "Specified Existing Inc. Preferred Stock Equity Interests"), except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Specified Existing Inc. Preferred Stock Equity Interest will receive (i) NewCo Series A-2 Preferred PIK Interests and (ii) NewCo Class C Common Interests.

Subject to the discussion below regarding accrued yield, a U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received and (ii) the Holder's adjusted tax basis in its Specified Existing Inc. Preferred Stock Equity Interests.  A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their fair market value as of the Effective Date,

and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Specified Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the U.S. federal consequences of the Plan to it in lights of its particular circumstances.

### c.    Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests. A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests. A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

### 3.    Consequences of Holding NewCo Interests and Debt Obligations

### a.    NewCo Class B Common Interests and NewCo Class C Common Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### b.        NewCo Series A-2 Preferred PIK Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources. In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving guaranteed payments under section 707(c) of the Tax Code. A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

A Holder of NewCo Series A-2 Preferred PIK Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### c.        SPSO Note

A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually. Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually. Accordingly, the SPSO Note will be treated as issued with OID.

A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will

increase the tax basis of the Holder in the SPSO Note.  A U.S. Holder of  the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### ARTICLE VII
### CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on March [3], 2014.**

New York, New York
Dated:  February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## **Exhibit A**

Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

**DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO**
**CHAPTER 11 OF BANKRUPTCY CODE**

---

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M[C]CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated: New York, New York
       February 14, 2014

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW ................................................................3

    A.    Defined Terms .................................................................3
    B.    Rules of Interpretation .......................................................32
    C.    Computation of Time.........................................................32
    D.    Governing Law .................................................................32
    E.    Reference to Monetary Figures............................................33

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
AND U.S. TRUSTEE FEES ................................................................33

    A.    Administrative Claims .......................................................33
    B.    Accrued Professional Compensation Claims.......................................34
    C.    DIP Inc. Claims................................................................35
    D.    DIP LP Claims .................................................................36
    E.    New DIP Claims ...............................................................36
    F.    Priority Tax Claims ...........................................................37
    G.    Payment of Statutory Fees ..................................................37

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ................................................................................37

    A.    Summary.........................................................................37
    B.    Classification and Treatment of Claims and Equity Interests................................38
    C.    Special Provision Governing Unimpaired Claims and Equity Interests...............47
    D.    Acceptance or Rejection of Plan............................................47
    E.    Elimination of Vacant Classes ..............................................48
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code...........................48
    G.    Controversy Concerning Impairment ...................................48

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ................................................49

    A.    Overview of Plan ..............................................................49
    B.    Plan Transactions.............................................................49
    C.    Sources of Consideration for Plan Distributions ...................................49
    D.    Certain Pre-Confirmation Date, Confirmation Date, and Effective Date
Plan Transactions.............................................................49
    E.    First Lien Exit Facility .......................................................55
    F.    Second Lien Exit Facility.....................................................55
    G.    Reorganized LightSquared Inc. Loan ................................................56

H.    [RESERVED] ........................................................................................57
I.    Issuance of New LightSquared Entities Shares; Reinstatement of
      Reinstated Intercompany Interests ..............................................................57
J.    Section 1145 and Other Exemptions.............................................................57
K.    Listing of New LightSquared Entities Shares; Reporting Obligations ..............58
L.    NewCo Interest Holders Agreement ............................................................58
M.    Indemnification Provisions in New LightSquared Entities Corporate
      Governance Documents ............................................................................58
N.    Management Incentive Plan.......................................................................59
O.    Corporate Governance .............................................................................59
P.    Vesting of Assets in Reorganized Debtors ...................................................59
Q.    Cancellation of Securities and Agreements .................................................60
R.    Corporate Existence ................................................................................60
S.    Corporate Action....................................................................................61
T.    Effectuating Documents; Further Transactions .............................................61
U.    Exemption from Certain Taxes and Fees ......................................................62
V.    Preservation, Transfer, and Waiver of Rights of Action ..................................62
W.    Assumption of D&O Liability Insurance Policies ...........................................63
X.    Employee and Retiree Benefits..................................................................64

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ...............................................................................................65

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........65
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases............66
C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
      Pursuant to Plan ....................................................................................66
D.    Pre-existing Obligations to Debtors Under Executory Contracts and
      Unexpired Leases....................................................................................67
E.    Intercompany Contracts, Contracts, and Leases Entered into After Petition
      Date, Assumed Executory Contracts, and Unexpired Leases...............................67
F.    Modifications, Amendments, Supplements, Restatements, or Other
      Agreements ...........................................................................................68
G.    Postpetition Contracts and Leases .............................................................68
H.    Reservation of Rights...............................................................................68
I.    Nonoccurrence of Effective Date................................................................68

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..............................................69

A.    Distribution Record Date ..........................................................................69
B.    Timing and Calculation of Amounts To Be Distributed....................................69
C.    Disbursing Agent ....................................................................................70
D.    Rights and Powers of Disbursing Agent .......................................................70

E.    Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date ..................................................................................71
F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions ..................................................................................71
G.    Compliance with Tax Requirements/Allocations ...................................73
H.    Setoffs .....................................................................................74
I.    Recoupment .............................................................................74
J.    Claims Paid or Payable by Third Parties .............................................74

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ..............................................................75

A.    Allowance of Claims and Equity Interests............................................75
B.    Claims and Equity Interests Administration Responsibilities ..............................75
C.    Estimation of Claims or Equity Interests .............................................76
D.    Expungement or Adjustment to Claims or Equity Interests Without Objection ..................................................................................77
E.    No Interest................................................................................77
F.    Deadline To File Objections to Claims or Equity Interests ......................77
G.    Disallowance of Claims or Equity Interests..........................................77
H.    Amendments to Claims..................................................................78

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................................................................78

A.    Discharge of Claims and Termination of Equity Interests....................78
B.    Subordinated Claims....................................................................79
C.    Compromise and Settlement of Claims and Controversies ..................79
D.    Releases by Debtors.....................................................................79
E.    Exculpation ..............................................................................80
F.    Third-Party Releases by Holders of Claims or Equity Interests ...........81
G.    Injunction ................................................................................82
H.    Release of Liens.........................................................................82

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ................................................83

A.    Conditions Precedent to Confirmation Date ........................................83
B.    Conditions Precedent to Effective Date ..............................................83
C.    Waiver of Conditions...................................................................86

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ...............86

A.    Modification and Amendments..............................................................................86
B.    Effect of Confirmation on Modifications ..............................................................86
C.    Revocation or Withdrawal of Plan........................................................................86
D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur.............87

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................87

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................89

A.    Immediate Binding Effect.....................................................................................89
B.    Additional Documents ...........................................................................................90
C.    Reservation of Rights.............................................................................................90
D.    Successors and Assigns..........................................................................................90
E.    Service of Documents ............................................................................................90
F.    Term of Injunctions or Stays.................................................................................92
G.    Plan Supplement ....................................................................................................92
H.    Entire Agreement ...................................................................................................92
I.    Non-severability of Plan Provisions ......................................................................93
J.    Votes Solicited in Good Faith................................................................................93
K.    Waiver or Estoppel ................................................................................................93
L.    Conflicts.................................................................................................................93

## INTRODUCTION

LightSquared Inc. and the other Debtors in the above-captioned chapter 11 cases hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532.  Reference is made to the Debtors' Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, with the consent of each Plan Support Party, prior to its substantial consummation.

The Debtors have always believed, and continue to believe, that resolution of the pending FCC proceedings will maximize the value of their assets and, accordingly, will continue their efforts with the FCC and other federal agencies in seeking approval of their pending license modification applications and related proceedings before the FCC.  Given the continuing nature of the FCC process and the facts and circumstances of these Chapter 11 Cases, the Debtors believed that it was necessary to take action to protect their Estates and the current value of their assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets.  Accordingly, on August 30, 2013, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed, on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of the Debtors' assets.  Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, the Debtors, in consultation with, and at the direction of, the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee"), (i) were always receptive to any potential alternative transactions that would provide greater value for the Estates and all of the Debtors' stakeholders, and (ii) as such, fully preserved their rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As further explained in the Debtors' Disclosure Statement, upon consideration of the various proposals received to date, the Debtors, in consultation with, and at the direction of, the Special Committee, determined that a reorganization of the Debtors that satisfied all Claims in full and provided a return to Holders of Equity Interests – and not a sale – was in the best interests of these Estates.  Accordingly, the Debtors initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of the Debtors through a series of restructuring transactions.  Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, the Debtors, at the direction of the Special Committee, and the Plan Support Parties discussed modifications of that plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of this further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place the Debtors in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by the Debtors, certain key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders. Importantly, effectiveness of the Plan is not conditioned on the Debtors' receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of the Debtors' significant stakeholders. Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with the Debtors' emergence from chapter 11 pursuant to this Plan. To fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing the Debtors a $1.65 billion new debtor in possession credit facility. More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of the Debtors' litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. The Debtors and the Plan Support Parties accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of the Debtors' creditors and equityholders and is currently the highest and best restructuring offer available to the Debtors. Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Debtors to successfully exit the Chapter 11 Cases. Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from a substantial portion of the Debtors' significant stakeholders.

Moreover, in light of the broad support for the Plan, the Debtors are not pursuing at this time confirmation of the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of this Plan and April 15, 2014.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DEBTORS' DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**1.5 Lien Loans**" has the meaning set forth in Article IV.F hereof.

2.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

3.    "**Ad Hoc Secured Group**" means that certain Ad Hoc Group of LightSquared LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude the SPSO Parties and their affiliates.

4.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) any Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms of a Stalking Horse Agreement and the Bid Procedures Order; provided, however, that no SPSO Party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; and (h) any fees and expenses that are earned and payable pursuant to the New DIP Facility, the First Lien Exit Facility, the Plan, and the other Plan Documents, including the Plan Support Party Break-Up Fee.

3

5.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

6.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the New LightSquared Entities and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or New LightSquared Entity, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

8.      "**Alternate Inc. Debtors Plan**" has the meaning set forth in the Second Amended Plan.

9.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

10.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

11.     "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

12.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

13.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

14.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

16.    "**Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

17.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

19.    "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

20.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

21.    "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

22.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

23.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.    "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

25.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

26.    "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

27.    "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

28.    "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

29.    "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

30.    "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.    "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

32.    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

36.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to each Plan Support Party.

37.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

38.    "**Consummation**" means the occurrence of the Effective Date.

39.    "**Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof); provided, that only Holders of Allowed Prepetition LP Facility Non-SPSO Claims that vote to accept the Plan may elect to exercise the foregoing right of conversion.

40.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

41.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

42.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

43.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

44.    "**Debtors' Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. [_____]] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of each Plan Support Party).

45.    "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agent.

46.    "**DIP Claim**" means a DIP Inc. Claim, a DIP LP Claim, or a New DIP Claim.

47.    "**DIP Facilities**" means the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facility.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

7

49.    "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

50.    "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all principal, interest, default interest, and exit fees provided for thereunder.

51.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

52.    "**DIP Inc. Facility**" means that certain $46.4 million debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

53.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

54.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

55.    "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

56.    "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

57.    "**DIP Lenders**" means the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders.

58.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

59.    "**DIP LP Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

60.    "**DIP LP Closing Date**" means February 5, 2014.

61.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents in the original aggregate principal amount of $33 million.

62.     "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

63.     "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

64.     "**DIP LP Obligors**" means the DIP LP Borrower and the DIP LP Guarantors.

65.     "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

66.     "**Disbursing Agent**" means, for Plan Distributions made prior to the Effective Date, the Debtors, and, for Plan Distributions made on or after the Effective Date, the New LightSquared Entities, or the Entity or Entities designated by the New LightSquared Entities to make or facilitate Plan Distributions pursuant to the Plan on or after the Effective Date.

67.     "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.     "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the New LightSquared Entities for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

69.     "**Distribution Record Date**" means (a) for all Claims and Equity Interests (other than the DIP LP Claims and New DIP Claims), the Voting Record Date, (b) for the DIP LP Claims, the DIP LP Closing Date, and (c) for the New DIP Claims, the New DIP Closing Date.

70.     "**Effective Date**" means the date selected by the Debtors, with the consent of each Plan Support Party, that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.B hereof have been satisfied or waived (in accordance with Article IX.C hereof).

71.     "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger Capital Partners, LLC, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

72.     "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

73.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

74.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

75.    "**Exculpated Party**" means a Released Party.

76.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

77.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock). For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

78.    "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

79.    "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

80.    "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

81.    "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

82.    "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

83.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

84.    "**Exit Agents**" means the First Lien Exit Agent and the Second Lien Exit Agent.

85.     "**Exit Credit Agreements**" means the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

86.     "**Exit Facilities**" means the First Lien Exit Facility and the Second Lien Exit Facility.

87.     "**Exit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated on or before the Effective Date, between the Exit Agents, the Exit Lenders, and the other relevant Entities governing, among other things, the respective rights, remedies, and priorities of claims and security interests held by the Exit Agents, the Exit Lenders, and the other relevant Entities under the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

88.     "**Exit Lenders**" means the First Lien Exit Lenders and the Second Lien Exit Lenders.

89.     "**Exit Obligors**" means the First Lien Exit Obligors and the Second Lien Exit Obligors.

90.     "**Expense Reimbursement**" has the meaning set forth in the Bid Procedures Order.

91.     "**FCC**" means the Federal Communications Commission.

92.     "**FCC Objectives**" means that (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding its possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

93.     "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

94.     "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95.     "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from

which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Debtors reserve the right to waive any appeal period, with the consent of each Plan Support Party.

96.    "**Financial Wherewithal Objection Deadline**" has the meaning set forth in Article V.C hereof.

97.    "**First Amended Plan**" has the meaning set forth in the Introduction hereof.

98.    "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

99.    "**First Lien Exit Agent**" means the administrative agent under the First Lien Exit Credit Agreement or any successor agent appointed in accordance with the First Lien Exit Credit Agreement.

100.    "**First Lien Exit Borrower**" means NewCo, as borrower under the First Lien Exit Credit Agreement.

101.    "**First Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the First Lien Exit Obligors, the First Lien Exit Agent, and the First Lien Exit Lenders.

102.    "**First Lien Exit Excess Amount**" means an amount equal to the aggregate principal amount that the First Lien Exit Facility exceeds $1 billion on the Effective Date.

103.    "**First Lien Exit Facility**" means that certain first lien credit facility in an original aggregate principal amount of not less than $1 billion provided in connection with the First Lien Exit Credit Agreement (which facility may be increased by an additional $500 million upon the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum as specified therein).

104.    "**First Lien Exit Guarantors**" means each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) required to be guarantors under the First Lien Exit Credit Agreement.

105.    "**First Lien Exit Lenders**" means the lenders party to the First Lien Exit Credit Agreement from time to time.

106.    "**First Lien Exit Obligors**" means the First Lien Exit Borrower and the First Lien Exit Guarantors.

107.    "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP

Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; or (i) Intercompany Claim.

108.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

109.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

110.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

111.    "**Inc./LP Lender Parties**" means the Ad Hoc Secured Group, the DIP Inc. Agent, and the Prepetition Inc. Non-Subordinated Parties.

112.    "**Inc./LP Lender Advisors Fee Cap**" means an aggregate amount equal to $500,000.

113.    "**Inc. Administrative Claim**" means any Administrative Claim asserted against an Inc. Debtor.

114.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

115.    "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

116.    "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

117.    "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

118.    "**Inc. Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the Inc. Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the Inc. Debtors, *plus* (iii) the Inc. Debtors' Cash on hand on the Effective Date, *plus* (iv) without duplication of clause (i), Cash from the Reorganized LightSquared Inc. Loan, if any, and *less* (v) the Inc. Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, and (d) loans under the Reorganized LightSquared Inc. Loan.

119.    "**Inc. Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the Inc. Debtors and (b) together with the LP Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

13

120.    "**Inc. Priority Tax Claim**" means any Priority Tax Claim asserted against an Inc. Debtor.

121.    "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

122.    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

123.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

124.    "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

125.    "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

126.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

127.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

128.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

129.    "**LightSquared Transfer**" means the sale, assignment, and/or transfer by the Reorganized Debtors to NewCo of certain of the Reorganized Debtors' Assets and Equity Interests, and the assumption by NewCo of certain liabilities related thereto, in accordance with the Plan, including as set forth in Article IV.D.3(b) hereof, in exchange for the consideration provided to the Reorganized Debtors under the Plan, including as set forth in Article IV.D.3(a) hereof.

130.    "**License Modification Application**" has the meaning set forth in the Debtors' Disclosure Statement.

131.    "**LP Administrative Claim**" means any Administrative Claim asserted against an LP Debtor.

132.    "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada)

Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

133.    "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

134.    "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

135.    "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

136.    "**LP Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the LP Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the LP Debtors, *plus* (iii) the LP Debtors' Cash on hand on the Effective Date, and *less* (iv) the LP Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, (d) loans under the New DIP Facility, and (e) the SPSO Note.

137.    "**LP Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the LP Debtors and (b) together with the Inc. Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

138.    "**LP Priority Tax Claim**" means any Priority Tax Claim asserted against an LP Debtor.

139.    "**Management Incentive Plan**" means that certain post-Effective Date management equity incentive plan, which provides that, among other things, up to 10% of NewCo Common Interests, on a fully diluted basis, shall be reserved for issuance by the NewCo Board after the Effective Date in accordance with the management equity incentive plan and the Plan; provided, that the foregoing shall be implemented in the discretion of the NewCo Board, subject to the terms of the NewCo Corporate Governance Documents, and shall remain subject to the agreement of each Plan Support Party.

140.    "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

141.    "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement or any successor agent appointed in accordance with the New DIP Credit Agreement.

142.    "**New DIP Borrowers**" means LightSquared Inc., LightSquared LP, and One Dot Six Corp., as borrowers under the New DIP Credit Agreement.

143.    "**New DIP Claim**" means a New DIP Tranche A Claim or a New DIP Tranche B Claim.

144.    "**New DIP Closing Date**" means the date upon which (a) the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, (b) all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and (c) the incurrence of obligations pursuant to the New DIP Facility shall have occurred, which shall be no later than the fifteenth (15th) day after the Confirmation Date, and (d) all (i) DIP Inc. Claims, (ii) DIP LP Claims, (iii) Prepetition Inc. Facility Non-Subordinated Claims, and (iv) Non-Converted Prepetition LP Facility Non-SPSO Claims have been indefeasibly paid in full in Cash.

145.    "**New DIP Commitment Letter**" means that certain commitment letter by and among the New DIP Commitment Parties, LightSquared Inc., LightSquared LP, and One Dot Six Corp., dated February 14, 2014.

146.    "**New DIP Commitment Parties**" means J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee), Melody Business Finance, LLC (together with any affiliate thereof as its designee), Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., as the commitment parties under the New DIP Commitment Letter.

147.    "**New DIP Credit Agreement**" means that certain Debtor in Possession Credit Agreement, dated as of the New DIP Closing Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders, in form and substance satisfactory to each Plan Support Party.

148.    "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the original aggregate principal amount of $1.65 billion.

149.    "**New DIP Guarantors**" means each New DIP Borrower, as a guarantor to each other New DIP Borrower, and all other Debtors that are not New DIP Borrowers, as guarantors to the New DIP Borrowers, in each case, in accordance with the New DIP Credit Agreement.

150.    "**New DIP Initial Lenders**" means, collectively, Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.

151.    "**New DIP Lenders**" means the New DIP Tranche A Lenders and the New DIP Tranche B Lenders.

152.    "**New DIP Obligors**" means the New DIP Borrowers and the New DIP Guarantors.

153.    "**New DIP Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

154.    "**New DIP Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the New DIP Order.

155.    "**New DIP Tranche A Accrued Interest**" means accrued interest, including interest paid in kind, on the New DIP Tranche A Facility as of the Effective Date.

156.    "**New DIP Tranche A Claim**" means a Claim held by the New DIP Agent or New DIP Tranche A Lenders arising under, or related to, the New DIP Tranche A Facility.

157.    "**New DIP Tranche A Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche A Lenders through the provision of new financing in accordance with the New DIP Credit Agreement and New DIP Order, in an original aggregate principal amount of $1.35 billion.

158.    "**New DIP Tranche A Lenders**" means the Plan Support Parties and the other lenders under the New DIP Tranche A Facility, in each case, as lenders party to the New DIP Credit Agreement.

159.    "**New DIP Tranche B Cap**" means $300 million.

160.    "**New DIP Tranche B Claim**" means a Claim held by the New DIP Agent or New DIP Tranche B Lenders arising under, or related to, the New DIP Tranche B Facility.

161.    "**New DIP Tranche B Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche B Lenders in the original aggregate principal amount of $300 million through either (a) the conversion of Converted Prepetition LP Facility Non-SPSO Claims into Claims under the New DIP Facility (as set forth in Article IV.D hereof) and/or (b) new financing provided by the Plan Support Parties or other lenders, in each case, in accordance with the Plan, New DIP Credit Agreement, and New DIP Order.

162.    "**New DIP Tranche B Lenders**" means (a) certain Holders of Converted Prepetition LP Facility Non-SPSO Claims that elect to convert such Claims into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof) up to the New DIP Tranche B Cap and/or (b) the Plan Support Parties or other lenders to the extent that they provide new financing under the New DIP Tranche B Facility, in each case, in accordance with the Plan, New DIP Credit Agreement, and the New DIP Order.

163.    "**New LightSquared Entities**" means, collectively, NewCo, Reorganized LightSquared Inc., and the Reorganized Subsidiaries.

164.    "**New LightSquared Entities Boards**" means, collectively, the NewCo Board, the Reorganized LightSquared Inc. Board, and each Reorganized Subsidiaries Board.

165.    "**New LightSquared Entities Bylaws**" means, collectively, the NewCo Bylaws, the Reorganized LightSquared Inc. Bylaws, and the Reorganized Subsidiaries Bylaws.

166.    "**New LightSquared Entities Charters**" means, collectively, the NewCo Charter, the Reorganized LightSquared Inc. Charter, and the Reorganized Subsidiaries Charters.

167.    "**New LightSquared Entities Corporate Governance Documents**" means, collectively, the NewCo Corporate Governance Documents, the Reorganized LightSquared Inc. Corporate Governance Documents, and the Reorganized Subsidiaries Corporate Governance Documents.

168.    "**New LightSquared Entities Shares**" means, collectively, the NewCo Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

169.    "**NewCo**" means a newly formed limited liability company in connection with the Plan Transactions contemplated by Article IV.D hereof.

170.    "**NewCo Board**" means the board of directors, board of managers, or equivalent governing body of NewCo, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable NewCo Corporate Governance Documents.

171.    "**NewCo Bylaws**" means the bylaws, partnership agreement, limited liability company membership agreement, or functionally equivalent document, as applicable, of NewCo.

172.    "**NewCo Charter**" means the charter, certificate of formation, certificate of partnership, or functionally equivalent document, as applicable, of NewCo.

173.    "**NewCo Class A Common Interests**" means those certain limited liability company class A common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

174.    "**NewCo Class B Common Interests**" means those certain limited liability company class B common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

175.    "**NewCo Class C Common Interests**" means those certain limited liability company class C common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

176.    "**NewCo Class D Common Interests**" means those certain limited liability company class D common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

177.    "**NewCo Common Interests**" means the NewCo Class A Common Interests, the NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests.

178.    "**NewCo Corporate Governance Documents**" means, as applicable, (a) the NewCo Charter, (b) the NewCo Bylaws, (c) the NewCo Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to NewCo.

179.    "**NewCo Interest Holders Agreement**" means that certain limited liability company operating agreement of NewCo with respect to the NewCo Interests, to be effective on the Effective Date and binding on all holders of the NewCo Interests.

180.    "**NewCo Interests**" means, collectively, the NewCo Common Interests and the NewCo Preferred Interests.

181.    "**NewCo Series A Preferred PIK Interests**" means the NewCo Series A-1 Preferred PIK Interests and the NewCo Series A-2 Preferred PIK Interests.

182.    "**NewCo Series A-1 Preferred PIK Interests**" means those certain limited liability company series A-1 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

183.    "**NewCo Series A-2 Preferred PIK Interests**" means those certain limited liability company series A-2 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

184.    "**Non-Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof do not elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof).

185.    "**Other Existing Inc. Series B Preferred Stock Holders**" means the Holders of the Existing Inc. Series B Preferred Stock Equity Interests other than SIG Holdings, Inc.

186.    "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

187.    "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

188.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

189.    "**Petition Date**" means May 14, 2012.

190.    "**Plan**" means this *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of each Plan Support Party and in accordance with the terms hereof), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

191.    "**Plan Consideration**" means, collectively, the Inc. Plan Consideration and the LP Plan Consideration.

192.    "**Plan Consideration Carve-Out**" means, collectively, the Inc. Plan Consideration Carve-Out and the LP Plan Consideration Carve-Out.

193.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

194.    "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to each Plan Support Party.

195.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to each Plan Support Party) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including: (a) executed commitment letters, form and/or definitive agreements, and related documents with respect to (i) the Exit Credit Agreements, (ii) the Reorganized LightSquared Inc. Loan Agreement, (iii) the SPSO Note Documents, and (iv) the Exit Intercreditor Agreement; (b) the New LightSquared Entities Corporate Governance Documents; (c) the Schedule of Assumed Agreements; and (d) the Schedule of Retained Causes of Action.

196.    "**Plan Supplement Date**" means February 14, 2014 or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Debtors reserve the right to File amended Plan Documents at any time prior to the Confirmation Hearing Date.

197.    "**Plan Support Parties**" means Plan Support Party A, Plan Support Party B, Plan Support Party C, and Plan Support Party D.

198.    "**Plan Support Party A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

199.    "**Plan Support Party ABC**" means Plan Support Party A, Plan Support Party B, and Plan Support Party C.

200.    "**Plan Support Party ABC Debt-Converted New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *less* (a) the Plan Support Party ABC Equity-Converted New DIP Claims and (b) Plan Support Party ABC's ratable share of the First Lien Exit Excess Amount.

201.    "**Plan Support Party ABC Equity-Converted New DIP Claims**" means $115 million of the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *plus* 11% of any New DIP Tranche A Accrued Interest attributed to Plan Support Party ABC's New DIP Tranche A Claims.

202.    "**Plan Support Party B**" means Melody Business Finance, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds.

203.    "**Plan Support Party Break-Up Fee**" means a break-up fee of $100 million for the ratable benefit of the New DIP Commitment Parties, irrevocably earned upon the New DIP Closing Date and payable in Cash on the earlier of the date (a) the Debtors propose or support any chapter 11 plan other than this Plan, (b) the Debtors withdraw this Plan or propose any modifications hereto pursuant to section 1127(b) of the Bankruptcy Code, in each case, without the prior written consent of each New DIP Initial Lender, or (c) the confirmation of any chapter 11 plan other than this Plan; <u>provided</u>, that the conditions to the effectiveness of the Plan set forth in Article IX.B hereof shall have been capable of being satisfied at the time of either clauses (a), (b), or (c) above, or such conditions shall have been capable of being satisfied but for the passage of time.

204.    "**Plan Support Party C**" means Harbinger Capital Partners, LLC or its designated affiliates.

205.    "**Plan Support Party C Call Option**" means a call option, exercisable by Plan Support Party C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests and NewCo Class D Common Interests in accordance with the NewCo Corporate Governance Documents.

206.    "**Plan Support Party Cashed-Out New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Parties that are not (a) Plan Support Party ABC Debt-Converted New DIP Claims, (b) Plan Support Party ABC Equity-Converted New DIP Claims, or (c) Plan Support Party D Debt-Converted New DIP Claims.

207.    "**Plan Support Party D**" means JPMorgan Chase & Co. or its designated affiliates.

208.    "**Plan Support Party D Debt-Converted New DIP Claims**" means $300 million of the Allowed New DIP Tranche A Claims held by Plan Support Party D, *plus* all New DIP Tranche A Accrued Interest thereon, *less* an amount equal to 22.22% of the First Lien Exit Excess Amount, which Claims shall be converted into loans under the Reorganized LightSquared Inc. Loan.

209.    "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to

effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the New LightSquared Entities determine are necessary or appropriate.

210.   "**Prepetition Agents**" means the Prepetition Inc. Agent and the Prepetition LP Agent.

211.   "**Prepetition Facilities**" means the Prepetition Inc. Facility and the Prepetition LP Facility.

212.   "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

213.   "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

214.   "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

215.   "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

216.   "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

217.   "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

218.   "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

219.   "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

220.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

221.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

222.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

223.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

224.    "**Prepetition Inc. Non-Subordinated Parties**" means the Prepetition Inc. Agent and the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims.

225.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

226.    "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

227.    "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

228.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

229.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

230.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

231.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

232.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

233.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO, its affiliates, or each of their successors or assigns.

234.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

235.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

236.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

237.    "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

238.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

239.    "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

240.    "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

241.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the New LightSquared Entities on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

242.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the New LightSquared Entities in the Professional Fee Escrow Account.

243.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

244.    "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

245.    "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

246.    "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

247.    "**Released Party**" means each of the following:  (a) the Debtors; (b) the New LightSquared Entities; (c) each Plan Support Party; (d) each DIP Agent,  each DIP Lender (other than any SPSO Party, subject to the proviso below), and each arranger and book runner of the DIP Facilities; (e) each Exit Agent, each Exit Lender, and each arranger and book runner of the Exit Facilities; (f) the Reorganized LightSquared Inc. Loan Holder and each agent, arranger, and book runner of the Reorganized LightSquared Inc. Loan; (g) each Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party, subject to the proviso below); and (h) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such); provided, that each SPSO Party shall be deemed a

Released Party if Class 7B votes to accept the Plan and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility.

248.    "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

249.    "**Reorganized Debtors**" means, collectively, the Reorganized Inc. Debtors and the Reorganized LP Debtors.

250.    "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

251.    "**Reorganized LightSquared GP LLC**" means LightSquared GP Inc., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

252.    "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

253.    "**Reorganized LightSquared Inc. Board**" means the board of directors, board of managers, or equivalent governing body of Reorganized LightSquared Inc., as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized LightSquared Inc. Corporate Governance Documents.

254.    "**Reorganized LightSquared Inc. Bylaws**" means the bylaws or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

255.    "**Reorganized LightSquared Inc. Call Option**" means a call option, exercisable by Reorganized LightSquared Inc. in its sole discretion, to purchase (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests from the Holders of Existing Inc. Series A Preferred Stock Equity Interests (or their successor and assigns) and (b) $1.76 million of NewCo Series A-2 Preferred PIK Interests from the Other Existing Inc. Series B Preferred Stock Holders (or their successors and assigns), in each case in accordance with the NewCo Corporate Governance Documents.

256.    "**Reorganized LightSquared Inc. Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

257.    "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

258.    "**Reorganized LightSquared Inc. Corporate Governance Documents**" means (a) the Reorganized LightSquared Inc. Charter, (b) the Reorganized LightSquared Inc. Bylaws, and (c) any other applicable organizational or operational documents with respect to Reorganized LightSquared Inc.

259.    "**Reorganized LightSquared Inc. Loan**" means that certain secured credit facility in the original aggregate principal amount of $300 million provided in connection with the Reorganized LightSquared Inc. Loan Agreement, subject to adjustment in accordance with the Reorganized LightSquared Inc. Loan Adjustment.

260.    "**Reorganized LightSquared Inc. Loan Adjustment**" means the amount, if any, the original aggregate principal amount of the Reorganized LightSquared Inc. Loan shall be (a) increased by the aggregate amount of New DIP Tranche A Accrued Interest attributed to Plan Support Party D's New DIP Tranche A Claims, and/or (b) decreased by an amount equal to the product of (i) the First Lien Exit Excess Amount and (ii) 22.22%, in each case, on a dollar-for-dollar basis.

261.    "**Reorganized LightSquared Inc. Loan Agreement**" means that certain agreement entered into between the Reorganized LightSquared Inc. Loan Holder and Reorganized LightSquared Inc. documenting, among other things, the terms of the Reorganized LightSquared Inc. Loan and the obligations with respect thereto.

262.    "**Reorganized LightSquared Inc. Loan Holder**" means Plan Support Party D.

263.    "**Reorganized LightSquared Investors Holdings Inc.**" means LightSquared Investors Holdings Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

264.    "**Reorganized LightSquared LP**" means Reorganized LightSquared LP, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

265.    "**Reorganized LP Debtors**" means the LP Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

266.    "**Reorganized One Dot Four Corp.**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

267.    "**Reorganized One Dot Six LLC**" means One Dot Six Corp., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

268.    "**Reorganized SkyTerra Investors LLC**" means SkyTerra Investors LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

269.    "**Reorganized SkyTerra Rollup LLC**" means SkyTerra Rollup LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

270.    "**Reorganized SkyTerra Rollup Sub LLC**" means SkyTerra Rollup Sub LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

271.    "**Reorganized Subsidiaries**" means, collectively, the Reorganized Debtors, other than Reorganized LightSquared Inc.

272.    "**Reorganized Subsidiaries Board**" means the board of directors, board of managers, or equivalent governing body of each of the Reorganized Subsidiaries, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Subsidiaries Corporate Governance Documents.

273.    "**Reorganized Subsidiaries Bylaws**" means the bylaws or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

274.    "**Reorganized Subsidiaries Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

275.    "**Reorganized Subsidiaries Corporate Governance Documents**" means (a) the Reorganized Subsidiaries Charter, (b) the Reorganized Subsidiaries Bylaws, (c) the Reorganized Subsidiaries Shareholders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Subsidiaries.

276.    "**Reorganized Subsidiaries Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of the Reorganized Subsidiaries, to be effective on the Effective Date.

277.    "**Reorganized TMI Communications Delaware, Limited Partnership**" means Reorganized TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

278.    "**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

279.    "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

280.    "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

281.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

282.    "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

283.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

284.    "**Second Amended Plan**" has the meaning set forth in the Introduction hereof.

285.    "**Second Lien Exit Adjustment**" means (a) an increase to the original aggregate principal amount of the Second Lien Exit Facility equal to the product of (i) the aggregate amount of any New DIP Tranche A Accrued Interest and (ii) 89%, and/or (b) a decrease to the original aggregate principal amount of the Second Lien Exit Facility equal to the First Lien Exit Excess Amount, in each case, on a dollar-for-dollar basis.

286.    "**Second Lien Exit Agent**" means the arranger and administrative agent under the Second Lien Exit Credit Agreement or any successor agent appointed in accordance with the Second Lien Exit Credit Agreement.

287.    "**Second Lien Exit Borrower**" means NewCo, as borrower under the Second Lien Exit Credit Agreement.

288.    "**Second Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Second Lien Exit Obligors, the Second Lien Exit Agent, and the Second Lien Exit Lenders.

289.    "**Second Lien Exit Facility**" means that certain second lien credit facility in the original aggregate principal amount of $1.20 billion provided in connection with the Second Lien Exit Credit Agreement, subject to adjustment in accordance with the Second Lien Exit Adjustment.

290.    "**Second Lien Exit Guarantors**" means the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), as guarantors under the Second Lien Exit Credit Agreement.

291.    "**Second Lien Exit Lenders**" means the lenders party to the Second Lien Exit Credit Agreement from time to time.

292.    "**Second Lien Exit Obligors**" means the Second Lien Exit Borrower and the Second Lien Exit Guarantors.

293.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

294.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

295.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

296.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

297.    "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof) and the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof).

298.    "**Special Committee**" has the meaning set forth in the Introduction hereof.

299.    "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Debtors' Disclosure Statement.

300.    "**SPSO**" means SP Special Opportunities, LLC.

301.    "**SPSO Note**" means a note issued by Reorganized LightSquared LP to the Holders of Allowed Prepetition LP Facility SPSO Claims, which note shall (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London Interbank Offered Rate floor of 1.00%), which interest shall be payable in kind, and (d) be secured or unsecured on the terms and conditions of, and subject to, the SPSO Option A Treatment or SPSO Option B Treatment, as applicable.

302.    "**SPSO Note Documents**" means the SPSO Note and any related indenture, agreements, or other documents, if any.

303.    "**SPSO Option A Treatment**" means the following treatment:  (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $1.1055 billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; <u>provided</u>, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 hereof.

304.    "**SPSO Option B Treatment**" means the following treatment:  (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; <u>provided</u>, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.

305.    "**SPSO Parties**" means SPSO, L-Band Acquisition, LLC, Charles W. Ergen, DISH Network Corporation, and EchoStar Corporation.

306.    "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

307.    "**Stalking Horse Bidder**" has the meaning set forth in the Bid Procedures Order.

308.    "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

309.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

310.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

311.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

312.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

313.    "**Voting Deadline**" means March [3], 2014 at 4:00 p.m. (prevailing Pacific time), or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court, which is the date by which all completed Ballots must be received by the Claims and Solicitation Agent.

314.    "**Voting Record Date**" means October 9, 2013.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents,

instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the New LightSquared Entities, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or New LightSquared Entity, as applicable.

E.     Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.     Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:   (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court.  For the avoidance of

doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the New LightSquared Entities no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.  Objections to such requests must be Filed and served on the New LightSquared Entities and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the New LightSquared Entities or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein (1) any claim by a New DIP Commitment Party for any Plan Support Party Break-Up Fee shall (a) be deemed an Allowed Administrative Claim, (b) be irrevocably earned by the New DIP Commitment Parties upon the New DIP Closing Date, (c) constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan, and (d) be payable in accordance with the terms of the New DIP Commitment Letter, (2) a Plan Support Party shall not be required to File any request for payment of such Administrative Claim, (3) any Plan Support Party Break-Up Fee shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (4) no SPSO Party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

## B.    *Accrued Professional Compensation Claims*

### 1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

### 2.    Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the New LightSquared Entities shall establish and fund the Professional Fee Escrow Account from the Plan

Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors or New LightSquared Entities. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the New LightSquared Entities. For the avoidance of doubt, the Inc. Debtors shall fund 15% of the Professional Fee Escrow Account from the Inc. Plan Consideration Carve-Out and the LP Debtors shall fund 85% of the Professional Fee Escrow Account from the LP Plan Consideration Carve-Out.

3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors and the Plan Support Parties no later than five (5) days prior to the anticipated Confirmation Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated and agreed to by the Debtors and the Plan Support Parties as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

4.    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or New LightSquared Entities, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or New LightSquared Entities, as applicable, on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or New LightSquared Entities, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

C.    DIP Inc. Claims

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything

contained herein, in the DIP Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

D.    *DIP LP Claims*

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

E.    *New DIP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Claim agrees to a less favorable or other treatment, the Holders of New DIP Claims shall receive the following, as applicable:

1.    Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

2.    Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78% of the NewCo Series A-1 Preferred PIK Interests and (b) 77.78% of the NewCo Class A Common Interests;

3.      Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Reorganized LightSquared Inc. Loan in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

4.      Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and

5.      Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration in the form of Cash in an amount equal to such New DIP Tranche B Facility Claim.

## F.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

## G.      *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

## A.      *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution

pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.     *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.     Class 1 – Inc. Other Priority Claims

   (a)   *Classification*: Class 1 consists of all Inc. Other Priority Claims.

   (b)   *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

   (c)   *Voting*: Class 1 is Unimpaired by the Plan. Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.     Class 2 – LP Other Priority Claims

   (a)   *Classification*: Class 2 consists of all LP Other Priority Claims.

   (b)   *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

(c)     *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.     Class 3 – Inc. Other Secured Claims

(a)     *Classification*:  Class 3 consists of all Inc. Other Secured Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.     Class 4 – LP Other Secured Claims

(a)     *Classification*:  Class 4 consists of all LP Other Secured Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such

Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*:  Class 4 is Unimpaired by the Plan.  Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.     Class 5 - Prepetition Inc. Facility Non-Subordinated Claims

(a)     *Classification*:   Class 5 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)     *Allowance*:  Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (iii) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

(c)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, the Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim, shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP

Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim. For the avoidance of doubt, the treatment provided to Class 5 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors.

(d)     *Voting:* Class 5 is Unimpaired by the Plan. Each Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

6.     Class 6 - Prepetition Inc. Facility Subordinated Claims

(a)     *Classification*:     Class 6 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests. For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.

(c)     *Voting:* Class 6 is Impaired by the Plan. Each Holder of a Class 6 Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.     Class 7A - Prepetition LP Facility Non-SPSO Claims

(a)     *Classification*: Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)     *Allowance*: Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $1.0883 billion, calculated as follows: (A) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (B) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31,

2013; (C) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (D) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (ii) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (iii) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

(c)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment:

(i)     the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim, shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or

(ii)     each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility

Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.

For the avoidance of doubt, the treatment provided to Class 7A herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.

(d)     *Voting*:  Class 7A is Impaired by the Plan.  Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.     Class 7B - Prepetition LP Facility SPSO Claims

(a)     *Classification*:   Class 7B consists of all Prepetition LP Facility SPSO Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)     in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or

(ii)     in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.

For the avoidance of doubt, the treatment provided to Class 7B herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by

the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors.

(c)  *Voting*:  Class 7B is Impaired by the Plan.  Each Holder of a Class 7B Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; <u>provided</u>, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court and treated in accordance with Article III.D.4 hereof.

9.  <u>Class 8 – Inc. General Unsecured Claims</u>

(a)  *Classification*:  Class 8 consists of all Inc. General Unsecured Claims.

(b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

(c)  *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.  <u>Class 9 – LP General Unsecured Claims</u>

(a)  *Classification*:  Class 9 consists of all LP General Unsecured Claims.

(b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)  *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Class 9 LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.  <u>Class 10 – Existing LP Preferred Units Equity Interests</u>

(a)  *Classification*:  Class 10 consists of all Existing LP Preferred Units Equity Interests.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests.

(c)     *Voting*:  Class 10 is Impaired by the Plan.  Each Holder of a Class 10 Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.     Class 11A – Existing Inc. Series A Preferred Stock Equity Interests

(a)     *Classification*:  Class 11A consists of all Existing Inc. Series A Preferred Stock Equity Interests.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series A Preferred Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.

(c)     *Voting*:  Class 11A is Impaired by the Plan.  Each Holder of a Class 11A Existing Inc. Series A Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.     Class 11B – Existing Inc. Series B Preferred Stock Equity Interests

(a)     *Classification*:  Class 11B consists of all Existing Inc. Series B Preferred Stock Equity Interests.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series B Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series B Preferred Stock Equity Interest agrees to any other treatment (including as described in the immediately following proviso), each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; <u>provided</u> that, in lieu

of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

(c)    *Voting*: Class 11B is Impaired by the Plan. Each Holder of a Class 11B Existing Inc. Series B Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.    <u>Class 12 – Existing Inc. Common Stock Equity Interests</u>

(a)    *Classification*: Class 12 consists of all Existing Inc. Common Stock Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

(c)    *Voting*: Class 12 is Impaired by the Plan. Each Holder of a Class 12 Existing Inc. Common Stock Equity Interests as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    <u>Class 13 – Intercompany Claims</u>

(a)    *Classification*: Class 13 consists of all Intercompany Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; <u>provided</u>, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

     (c)    *Voting*:  Class 13 is Unimpaired by the Plan.  Each Holder of a Class 13 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 13 Intercompany Claim is entitled to vote to accept or reject the Plan.

    16.    <u>Class 14 – Intercompany Interests</u>

     (a)    *Classification*:  Class 14 consists of all Intercompany Interests.

     (b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

     (c)    *Voting*:  Class 14 is Unimpaired by the Plan.  Each Holder of a Class 14 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 14 Intercompany Interest is entitled to vote to accept or reject the Plan.

**C.**    *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

**D.**    *Acceptance or Rejection of Plan*

    1.    <u>Voting Classes Under Plan</u>

Under the Plan, Classes 6, 7A, 7B, 8, 9, 10, 11A, 11B, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Debtors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

    2.    <u>Presumed Acceptance Under Plan</u>

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 13, and 14 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.    Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.    Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Debtors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code.  The Debtors reserve the right, with the consent of each Plan Support Party, to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary; provided, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.       *Overview of Plan*

The Plan contemplates, among other things, (1) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (2) first lien exit financing, including a facility of not less than $1 billion, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (6) the preservation of the Debtors' litigation claims.

B.       *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On and after the Confirmation Date or the Effective Date, as applicable,  the Debtors or the New LightSquared Entities, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Debtors or the New LightSquared Entities, as applicable, determine are necessary or appropriate.

C.       *Sources of Consideration for Plan Distributions*

All consideration necessary for the Debtors, the New LightSquared Entities, or the Disbursing Agent, as applicable, to make Plan Distributions shall be obtained from the Plan Consideration and the Plan Consideration Carve-Out.  After the satisfaction of all Allowed Claims and Allowed Equity Interests in accordance with the Plan, all remaining proceeds from the Exit Facilities shall be placed in a working capital reserve of NewCo.

D.       *Certain Pre-Confirmation Date, Confirmation Date, and Effective Date Plan Transactions*

1.       <u>Pre-Confirmation Date Plan Elections</u>.    Certain Plan Transactions require elections by certain Holders of Claims on their respective Ballots prior to the Confirmation Date, including the following:

    (a)      Each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall be entitled to elect on its respective Ballot to convert on the New DIP Closing Date any portion of its Allowed Prepetition LP Facility Non-SPSO Claim into a New DIP Tranche B Claim in full satisfaction of such Converted Prepetition LP Facility Non-SPSO Claim as set forth in Article III.B.7(c)(ii) hereof; <u>provided</u>, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims: (i) exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims; or (ii) is less than the New DIP Tranche B Cap, the Plan Support Parties shall provide new financing as part of the New DIP Tranche B Facility in an amount equal to the difference between the New DIP Tranche B Cap and the Converted Prepetition LP Facility Non-SPSO Claims.

2.    <u>Confirmation Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

    (a)      The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, the New DIP Lenders shall fund the New DIP Facility through the (i) conversion of Allowed Prepetition LP Facility Non-SPSO Claims into New DIP Tranche B Claims and/or (ii) provision of new financing by the Plan Support Parties as part of the New DIP Tranche A Facility and New DIP Tranche B Facility, as applicable, in each case, in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, and New DIP Order.

    (b)      The Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims.

3.    <u>Effective Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

    (a)      NewCo

        (i)      The Debtors, or a nominee thereof, shall have established NewCo.

        (ii)      NewCo, the other First Lien Exit Obligors, and the other relevant Entities shall enter into the First Lien Exit Credit Agreement.  The First Lien Exit Lenders shall fund the First Lien Exit Facility through the provision of new financing, in accordance with the

Plan, Confirmation Order, and First Lien Exit Credit Agreement. The proceeds of the First Lien Exit Facility shall be used to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repaying the New DIP Tranche B Facility, and provide post-Effective Date working capital. The proceeds of First Lien Exit Excess Amount shall be used to repay a portion of the New DIP Tranche A Facility.

(iii)     NewCo, the other Second Lien Exit Obligors, and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement. The Second Lien Exit Facility shall be funded through the (A) conversion of Plan Support Party ABC Debt-Converted New DIP Claims into loans under the Second Lien Exit Facility (which amount shall equal 77.78% of the original principal amount of the Second Lien Exit Facility) and (B) issuance of loans under the Second Lien Exit Facility (which amount shall equal 22.22% of the original principal amount of the Second Lien Exit Facility) to Reorganized LightSquared Inc. on account of the LightSquared Transfer, in each case, in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement. The proceeds of the Second Lien Exit Facility shall be used to, among other things, satisfy certain obligations under the Plan.

(iv)     NewCo shall issue NewCo Series A-1 Preferred PIK Interests, which shall be issued and allocated as follows: (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(v)     NewCo shall issue NewCo Series A-2 Preferred PIK Interests, which shall be issued and allocated as follows: (A) $75 million Pro Rata to Holders of Allowed Existing LP Preferred Units Equity Interests on account of such Allowed Equity Interests; (B) $209 million Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims; (C) $17.54 million Pro Rata to Holders of Allowed Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); (D) $1.76 million Pro Rata to Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); and (E) $51.7 million to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

      (vi)     NewCo shall issue NewCo Class A Common Interests, which shall be issued and allocated as follows:  (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

      (vii)    NewCo shall issue NewCo Class B Common Interests, which shall be issued and allocated as follows:  (A) 70% Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims and (B) 30% Pro Rata to the Holders of Allowed Existing Inc. Common Stock Equity Interests on account of such Allowed Equity Interests.

      (viii)   NewCo shall issue NewCo Class C Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated as follows:  (A) 90.9% Pro Rata to the Holders of Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests; and (B) 9.1% Pro Rata to the Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests.

      (ix)     NewCo shall issue NewCo Class D Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

      (x)      NewCo shall reserve for issuance up to 10% of NewCo Common Interests in connection with the Management Incentive Plan (subject to the agreement of each Plan Support Party).

      (xi)     Plan Support Party C shall be granted the Plan Support Party C Call Option.

  (b)    Reorganized Debtors

      (i)      One Dot Six Corp. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

      (ii)     Lightsquared Holdings GP Inc. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(iii)    LightSquared Inc. shall be reorganized as Reorganized LightSquared Inc. and the other Debtors shall be reorganized as the Reorganized Subsidiaries.

(iv)    Reorganized LightSquared Inc. shall sell, assign, and/or transfer to NewCo all of Reorganized LightSquared Inc.'s Assets and Equity Interests (other than Reorganized LightSquared Inc.'s tax attributes or its Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Inc.'s Equity Interests in Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(v)    Reorganized LightSquared Investors Holdings Inc. shall sell, assign, and transfer to NewCo all of Reorganized LightSquared Investors Holdings Inc.'s Assets and Equity Interests (other than its tax attributes and its Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vi)    Reorganized TMI Communications Delaware, Limited Partnership shall sell, assign, and transfer to NewCo all of Reorganized TMI Communications Delaware, Limited Partnership's Assets and Equity Interests (other than its tax attributes), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vii)    Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. shall sell, assign, and transfer to NewCo all of such Entities' Assets (other than their

tax attributes, Reorganized SkyTerra Rollup LLC's Equity Interests in Reorganized SkyTerra Rollup Sub LLC, and Reorganized SkyTerra Rollup Sub LLC's Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(viii)   All other Reorganized Subsidiaries shall sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

(ix)   As a result of the foregoing Plan Transactions, (A) NewCo shall be the limited partner, and Reorganized LightSquared GP LLC shall be the general partner, of Reorganized LightSquared LP, (B) NewCo shall wholly own Reorganized One Dot Six LLC, (C) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) shall have been sold, assigned, and transferred to NewCo and shall become subsidiaries of NewCo on the Effective Date, and (D) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., SkyTerra Rollup Sub LLC, and TMI Communications Delaware, Limited Partnership.

(x)   Reorganized LightSquared Inc. shall issue the Reorganized LightSquared Inc. Loan to Plan Support Party D in exchange for the Plan Support Party D Debt-Converted New DIP Claims in accordance with the Plan, Confirmation Order, and Reorganized LightSquared Inc. Loan Agreement.

(xi)   Reorganized LightSquared Inc. shall issue to SIG Holdings, Inc. (or its designee) 100% of the Reorganized LightSquared Common Shares on account of, and in exchange for the cancellation of, the Allowed Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc.

(xii)   Plan Support Party C shall be granted the Plan Support Party C Call Option.

(xiii)    Reorganized LightSquared Inc. shall be granted the Reorganized LightSquared Inc. Call Option.

(xiv)    As a result of, and in exchange for, the Plan Transactions (including the LightSquared Transfer), Reorganized LightSquared Inc. shall hold (A) 22.22% of loans under the Second Lien Exit Facility, (B) 22.22% of NewCo Series A-1 Preferred PIK Interests, (C) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (D) 22.22% of NewCo Class A Common Interests, and (E) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

E.    *First Lien Exit Facility*

On the Effective Date, the First Lien Exit Obligors and the other relevant Entities shall enter into the First Lien Exit Credit Agreement, and the First Lien Exit Facility shall be funded with new financing in accordance therewith. The applicable New LightSquared Entities shall use the First Lien Exit Facility for the purposes specified in the Plan, the First Lien Exit Credit Agreement, and the other governing documents, including to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repayment of the New DIP Tranche B Facility, and provide post-Effective Date working capital.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) authorization for the Debtors to enter into the commitment letter and fee letter related to the First Lien Exit Facility Filed by the Debtors with the Plan Supplement and to incur obligations thereunder and to pay fees, indemnities, and expenses provided for therein, (2) approval of the First Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the First Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (3) authorization for the First Lien Exit Obligors to enter into and execute the First Lien Exit Credit Agreement and such other documents as may be required or appropriate. On the Effective Date, the First Lien Exit Facility, together with any new promissory notes evidencing the obligation of the First Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the First Lien Exit Obligors pursuant to the First Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the First Lien Exit Credit Agreement and related documents. The liens securing the First Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

F.    *Second Lien Exit Facility*

On the Effective Date, the Second Lien Exit Obligors and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement, and the Second Lien Exit Facility shall be funded as set forth in Article IV.D.3(a) hereof. The Second Lien Exit Facility shall permit NewCo to incur a new debt facility of up to $500 million, which shall be secured by liens senior

to the liens under the Second Lien Exit Facility and junior to the liens under the First Lien Exit Facility (the "1.5 Lien Loans").  The Plan Support Parties shall have the right (but not the obligation) to purchase their *pro rata* share of any 1.5 Lien Loans based on their commitment percentages.  In the event that any Plan Support Party fails to purchase its entire share of the 1.5 Lien Loans, the other Plan Support Parties shall have the right (but not the obligation) to purchase the remaining 1.5 Lien Loans on a *pro rata* basis.  In the event that the Plan Support Parties do not exercise their right to purchase the entire principal amount of the 1.5 Lien Loans, NewCo may issue such remaining 1.5 Lien Loans to third parties.  The applicable New LightSquared Entities shall use the Second Lien Exit Facility for the purposes specified in the Plan, the Second Lien Exit Credit Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Second Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for the Second Lien Exit Obligors to enter into and execute the Second Lien Exit Credit Agreement and such other documents as may be required or appropriate.  On the Effective Date, the Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of the Second Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the Second Lien Exit Obligors pursuant to the Second Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Second Lien Exit Credit Agreement and related documents.  The liens securing the Second Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

G.    *Reorganized LightSquared Inc. Loan*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the Reorganized LightSquared Inc. Loan Agreement.  On the Effective Date, the Reorganized LightSquared Inc. Loan shall be funded by the Reorganized LightSquared Inc. Loan Holder converting its Plan Support Party D Debt-Converted New DIP Claims (inclusive of New DIP Tranche A Accrued Interest attributed thereto) into loans under the Reorganized LightSquared Inc. Loan, on a dollar-for-dollar basis, in full satisfaction of such Plan Support Party D Debt-Converted New DIP Claims (as set forth in Articles II.E and IV.D hereof) in accordance with the Reorganized LightSquared Inc. Loan Agreement.  Reorganized LightSquared Inc. shall use the Reorganized LightSquared Inc. Loan for the purposes specified in the Plan, the Reorganized LightSquared Inc. Loan Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Reorganized LightSquared Inc. Loan Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc.

Loan Agreement and such other documents as may be required or appropriate.  On the Effective Date, the Reorganized LightSquared Inc. Loan Agreement, together with the Reorganized LightSquared Inc. Loan evidencing the obligation of Reorganized LightSquared Inc., and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Loan Agreement and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Loan Agreement and related documents.

*H.*    [RESERVED]

*I.*    *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (b) reserve for issuance up to 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of each Plan Support Party), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof and treated in accordance with the Plan, as applicable.  The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The applicable New Corporate Governance Documents shall contain provisions necessary to (1) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable New Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the New LightSquared Entities.

*J.*    *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares (other than the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer), shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code, and the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the

LightSquared Transfer shall be similarly exempted pursuant to the private placement exemption under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New LightSquared Entities Corporate Governance Documents, and (4) applicable regulatory approval, if any.

K.    *Listing of New LightSquared Entities Shares; Reporting Obligations*

The New LightSquared Entities shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.  In order to prevent the New LightSquared Entities from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New LightSquared Entities Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the New LightSquared Entities Corporate Governance Documents.

L.    *NewCo Interest Holders Agreement*

On the Effective Date, NewCo shall enter into and deliver the NewCo Interest Holders Agreement.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the NewCo Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by NewCo, and (2) authorization for NewCo to enter into and execute the NewCo Interest Holders Agreement and such other documents as may be required or appropriate.  On the Effective Date, the NewCo Interest Holders Agreement, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by NewCo pursuant to the NewCo Interest Holders Agreement and related documents shall be satisfied pursuant to, and as set forth in, the NewCo Interest Holders Agreement and related documents.

M.    *Indemnification Provisions in New LightSquared Entities Corporate Governance Documents*

As of the Effective Date, the New LightSquared Entities Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and

limitation of liability of, and advancement of fees and expenses to, the New LightSquared Entities' current and former directors, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the New LightSquared Entities shall amend or restate the New LightSquared Entities Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the New LightSquared Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

N.      *Management Incentive Plan*

On or as soon as practicable following the Consummation of the Plan, the NewCo Board shall adopt the Management Incentive Plan.

O.      *Corporate Governance*

As shall be set forth in the New LightSquared Entities Charters and New LightSquared Entities Bylaws, the New LightSquared Entities Boards shall consist of a number of members, and appointed in a manner, to be agreed upon by each Plan Support Party or otherwise provided in the New LightSquared Entities Corporate Governance Documents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the New LightSquared Entities Boards or officer of the New LightSquared Entities and (2) the nature of compensation for any officer employed or retained by the New LightSquared Entities who is an "insider" under section 101(31) of the Bankruptcy Code.

P.      *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Exit Facilities and any rights of any of the parties under the Exit Credit Agreements or any of the related documents, (2) any Liens granted to secure the Reorganized LightSquared Inc. Loan and any rights of any of the parties under the Reorganized LightSquared Inc. Loan Agreement or any of the related documents, (3) any Liens granted to secure the SPSO Note or any of the related documents if Class 7B elects to receive the SPSO Option A Treatment, and (4) any rights of any of the parties under any of the New LightSquared Entities Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each New LightSquared Entity may operate its business and may use, acquire, or dispose of

property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Q.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility), except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the New LightSquared Entities shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, that (1) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the New LightSquared Entities and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

All Liens securing the Prepetition Facility Claims under the Prepetition Inc. Credit Agreement or the Prepetition LP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to the Effective Date of the Plan, at which time such Liens shall be terminated.

R.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents)

are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

S.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the New LightSquared Entities, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the Exit Credit Agreements, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New LightSquared Entities Corporate Governance Documents, the Management Incentive Plan, and commitment letters and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the New LightSquared Entities; (5) the issuance and distribution of the New LightSquared Entities Shares and the SPSO Note; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate:  (1) the Exit Credit Agreements; (2) the Reorganized LightSquared Inc. Loan Agreement; (3) the SPSO Note Documents; (4) the Exit Intercreditor Agreement; (5) the New LightSquared Entities Corporate Governance Documents; (6) the Management Incentive Plan; and (7) any and all other agreements, documents, securities, and instruments related to the foregoing.  The authorizations and approvals contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the New LightSquared Entities and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement,

and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the New LightSquared Entities, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

U.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a New LightSquared Entity or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the New LightSquared Entities, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

V.      *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary herein, on the Effective Date:    (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action, and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses in exchange for the treatment of Claims and Equity Interests held by Plan Support Party C as set forth in this Plan; (3) NewCo, through its authorized agents or representatives, shall retain and may exclusively enforce and pursue any and all such Causes of Action; (4) NewCo shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; and (5) NewCo reserves and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

Plan Support Party C shall not assert any unasserted claim or Cause of Action arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses on and after the Effective Date unless and until NewCo asserts any such unasserted claim or Cause of Action; provided, however, that on and after the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum, Plan Support Party C shall be deemed to have irrevocably waived the right to assert any such unasserted claims or Causes of Action.  Any proceeds of any rights of action contributed to NewCo from the Reorganized Debtors shall be payable to NewCo.

## W.    Assumption of D&O Liability Insurance Policies

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the New LightSquared Entities shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions

after the Effective Date.  As of the Effective Date, the Debtors or New LightSquared Entities, as applicable, anticipate purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

X.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable New LightSquared Entities shall assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Debtors' Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or New LightSquared Entities' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Article III.B.14 hereof; provided, that the applicable New LightSquared Entities Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable New LightSquared Entities awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the New LightSquared Entities Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the New LightSquared Entities' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.   Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein (including Article IV.X hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.   Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Debtors and the Plan Support Parties shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or

65

assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the New LightSquared Entities no later than thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.B.9 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 9 in Article III.B.10 hereof.

C.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Debtors or New LightSquared Entities, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & MᶜCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the New LightSquared Entities' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline").  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the

proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the New LightSquared Entities to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Debtors or New LightSquared Entities, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors and the New LightSquared Entities reserve the right to reject any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and New LightSquared Entities expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the New LightSquared Entities, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable New LightSquared Entity in the ordinary course of business.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Postpetition Contracts and Leases*

Each New LightSquared Entity shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable New LightSquared Entity after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or New LightSquared Entity, in each case, in accordance with, and subject to, the then applicable terms. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and the New LightSquared Entities, with the consent of each Plan Support Party, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New LightSquared Entities shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend their decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Agents, the Prepetition Agents, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors and the New LightSquared Entities, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors and the New LightSquared Entities, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.      *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims on the New DIP Closing Date, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, New LightSquared Entity, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Plan Support Parties, the eligible Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The New LightSquared Entities are authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the New LightSquared Entities shall reserve any applicable Plan Consideration from

Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.    *Disbursing Agent*

All Plan Distributions shall be made by the Debtors or the New LightSquared Entities as Disbursing Agent, or such other Entity designated by the Debtors or the New LightSquared Entities as Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Debtors or the New LightSquared Entities, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the New LightSquared Entities, as applicable, to the Disbursing Agent for the benefit of the Plan Support Parties, the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable. All Plan Distributions by the Disbursing Agent shall be at the discretion of the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.    *Rights and Powers of Disbursing Agent*

1.    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.    Expenses Incurred on or After Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by the New LightSquared Entities.

E.      *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

1.      Payments and Plan Distributions on Disputed Claims and Disputed Equity <u>Interests</u>

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

2.      Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed <u>Equity Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.      *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

1.      <u>Delivery of Plan Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' or the New LightSquared Entities' records as of the date of any such Plan Distribution; <u>provided</u>, <u>however</u>, that the manner of such Plan Distributions shall be determined at the discretion of the Debtors or the New LightSquared Entities; <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Articles VI.F.5 and VI.F.6 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.      <u>Delivery of Plan Distributions to Holders of Allowed DIP Inc. Claims</u>

The Plan Distributions provided for Allowed DIP Inc. Claims pursuant to Article II.C hereof and the New DIP Facility shall be made to the DIP Inc. Agent by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

3.      Delivery of Plan Distributions to Holders of Allowed DIP LP Claims

The Plan Distributions provided for Allowed DIP LP Claims pursuant to Article II.D hereof and the New DIP Facility shall be made to the DIP LP Lenders by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

4.      Delivery of Plan Distributions to Holders of Allowed New DIP Claims

The Plan Distributions provided for Allowed New DIP Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

5.      Delivery of Plan Distributions to Holders of Allowed Prepetition Inc. Facility Claims

The Plan Distributions provided for Allowed Prepetition Inc. Facility Non-Subordinated Claims by Article III.B.5 hereof shall be made to the Prepetition Inc. Agent by the Debtors, or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

The Plan Distribution provided by Article  III.B.6 hereof shall be made to the Prepetition Inc. Agent directly by the New LightSquared Entities or the Disbursing Agent to the Holders of Allowed Prepetition Inc. Subordinated Facility Claims.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Inc. Plan Consideration is eligible to be distributed to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims at the direction of the Prepetition Inc. Agent.

Notwithstanding anything to the contrary herein, (a) any Holder of a Disputed Prepetition Inc. Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b) no Holder of a Prepetition Inc. Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

6.      Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility Claims

The Plan Distributions provided for Allowed Prepetition LP Facility Claims by Articles III.B.7 and III.B.8 hereof shall be made to the Prepetition LP Agent.  Plan Distributions to be made on account of Non-Converted Prepetition LP Facility Non-SPSO Claims shall be made by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.  To the extent possible, the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall provide that the applicable LP Plan Consideration is eligible to be distributed to Prepetition LP Lenders at the direction of the Prepetition LP Agent.

Notwithstanding anything to the contrary herein, (a) any Holder of a Disputed Prepetition LP Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b) no Holder of a

Prepetition LP Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

7.    <u>Minimum Plan Distributions</u>

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.    The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

8.    <u>Undeliverable Plan Distributions and Unclaimed Property</u>

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the New LightSquared Entities (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the New LightSquared Entities shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the New LightSquared Entities and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The New LightSquared Entities reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.        *Setoffs*

Except with respect to any distributions on account of (1) DIP Inc. Claims, (2) DIP LP Claims, (3) Prepetition Inc. Facility Non-Subordinated Claims, or (4) Prepetition LP Facility Non-SPSO Claims, or as otherwise expressly provided for in the Plan, each Debtor or New LightSquared Entity, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Allowed Equity Interest and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Plan Distribution is made on account of such Allowed Claim or Equity Interest) any claims, rights, and Causes of Action of any nature that such Debtor or New LightSquared Entity, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or New LightSquared Entity, as applicable, of any such claims, rights, or Causes of Action that such New LightSquared Entity may possess against such Holder.  In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtor or New LightSquared Entity, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.        *Recoupment*

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the New LightSquared Entities, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.        *Claims Paid or Payable by Third Parties*

1.        Claims Paid by Third Parties

The Debtors or the New LightSquared Entities, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or New LightSquared Entity.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a New LightSquared Entity on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or

return the Plan Distribution to the applicable New LightSquared Entity, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable New LightSquared Entity annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

     2.    <u>Claims Payable by Third Parties</u>

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

     3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the New LightSquared Entities, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.    *Allowance of Claims and Equity Interests*

After the Effective Date, the New LightSquared Entities shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.V hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.7 hereof or the Bankruptcy Code.

B.    *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the New LightSquared Entities shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to

reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The New LightSquared Entities shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims. The Inc. Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 15% of the Disputed Claims and Equity Interests Reserve from the Inc. Plan Consideration Carve-Out and the LP Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 85% of the Disputed Claims and Equity Interests Reserve from the LP Plan Consideration Carve-Out. The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become Disallowed Claims or Disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims or Equity Interests*

Before the Effective Date, the Debtors, and after the Effective Date, the New LightSquared Entities, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Debtors or New LightSquared Entities may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities, and any Claim or Equity Interest that has been amended may be adjusted thereon by the New LightSquared Entities, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.    *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Debtors or New LightSquared Entities, (3) provided for in a postpetition agreement in writing between the Debtors or New LightSquared Entities and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.    *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date.

G.    *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.    *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the New LightSquared Entities, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the New LightSquared Entities in accordance with Article III.B.16 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial

determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or New LightSquared Entities, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable.  Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the New LightSquared Entities may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities.   In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the New DIP Closing Date.

D.    *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the**

Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good

faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; provided, however, that each present and former Holder of a Claim or Equity Interest abstaining from voting to accept or reject the Plan may reject the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release; provided, further, however, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.

**Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.**

G.    *Injunction*

**Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all

rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the New LightSquared Entities and their successors and assigns. The New LightSquared Entities shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.      *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

2.      The Confirmation Order shall be (a) in form and substance satisfactory to the Debtors and each Plan Support Party and (b) entered no later than March 31, 2014, or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan and the New DIP Facility and has taken such matters under advisement, April 15, 2014.

3.      The New DIP Order, in form and substance satisfactory to the Debtors and each other party to the New DIP Facility, shall have been entered contemporaneously with the Confirmation Order.

4.      The Debtors shall have received binding commitments with respect to the First Lien Exit Facility on terms and conditions satisfactory to the Debtors and each Plan Support Party.

B.      *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Confirmation Order, in form and in substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

2.      The New DIP Order, in form and substance satisfactory to the Debtors and each Plan Support Party, (a) shall have been entered and (b) shall each have become a Final Order.

3.      The New DIP Recognition Order, in form and substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

4.      The New DIP Facility shall have been funded, and there shall not be any default under the New DIP Credit Agreement or the New DIP Order that has not been waived in accordance with the terms of the New DIP Credit Agreement or the New DIP Order.

5.      The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)      the Exit Credit Agreements and any related documents, in forms and substance acceptable to the Debtors, each Plan Support Party, the Exit Agents, and the Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Exit Facilities shall have occurred;

(b)      the Reorganized LightSquared Inc. Loan Agreement and any related documents, in forms and substance acceptable to the Debtors and the Reorganized LightSquared Inc. Loan Holder, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Loan Agreement shall have occurred;

(c)      [Reserved];

(d)      the SPSO Note Documents and any related documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered (or be deemed executed and delivered) by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the SPSO Note Documents shall have occurred;

(e)      the Plan Documents relating to the LightSquared Transfer, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(f)    the New LightSquared Entities Corporate Governance Documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(g)    the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.    The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

7.    The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Debtors and each Plan Support Party, without prejudice to the New LightSquared Entities' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, that each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the New LightSquared Entities and each Plan Support Party.

8.    All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

10.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

C.      *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by the Debtors, with the consent of each Plan Support Party, without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of each Plan Support Party, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Debtors, with the consent of each Plan Support Party, expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.   Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

In addition, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors, with the consent of each Plan Support Party, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and

(3) nothing contained in the Plan or the Debtors' Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.

D.    *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the Exit Facilities, the Plan, or otherwise, including the Plan Support Party Break-Up Fee and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

**ARTICLE XI.
RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.    Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters relating to the following: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the New LightSquared Entities' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and

(d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.  Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.  Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Debtors' Disclosure Statement;

9.  To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Exit Facilities, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New Corporate Governance Documents, or any ancillary or related agreements thereto;

10. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional

amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

15.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    Determine any other matters that may arise in connection with or relate to the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Debtors' Disclosure Statement;

17.    Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.    Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    Enforce all orders previously entered by the Bankruptcy Court; and

22.    Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the New LightSquared Entities, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the New LightSquared Entities, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Debtors' Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the New LightSquared Entities, shall be served on:

| | |
|---|---|
| LightSquared Inc. | Milbank, Tweed, Hadley & M$^{c}$Cloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Plan Support Party D or Reorganized LightSquared Inc. Loan Holder, shall be served on:

JPMorgan Chase & Co.                Simpson Thacher & Bartlett LLP
Patrick Daniello                    Sandeep Qusba
383 Madison Ave.                    Elisha D. Graff
New York, NY 10179                  425 Lexington Avenue
                                    New York, NY 10017


Plan Support Party A, shall be served on:

Fortress Investment Group           Stroock & Stroock & Lavan LLP
1345 Avenue of the Americas         Kristopher M. Hansen
New York, NY 10105                  Frank A. Merola
                                    Jayme T. Goldstein
                                    180 Maiden Lane
                                    New York, NY 10038


the New DIP Agent or Plan Support Party B, shall be served on:

Melody Business Finance, LLC        Bingham McCutchen LLP
Andres Scaminaci                    Jeffrey S. Sabin
717 Fifth Avenue, 12th Floor        Julia Frost-Davies
New York, NY 10022                  399 Park Avenue
                                    New York, NY 10022


the Ad Hoc Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036


the Prepetition LP Agent, shall be served on:

Latham & Watkins LLP
Mark A. Broude
885 Third Avenue
New York, NY 10022


the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

Akin, Gump, Strauss, Hauer & Feld LLP
Philip C. Dublin
Meredith A. Lahaie
One Bryant Park

New York, NY 10036

Plan Support Party C, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

After the Effective Date, the New LightSquared Entities have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the New LightSquared Entities are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.     *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.     *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or New LightSquared Entities', as applicable, consent, and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.      *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Debtors' Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Debtors' Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:  February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## **Exhibit B**

Projections

**CONSOLIDATED**

| ($ in 000s) | 2014 | | | | 2015 | | | | 2016 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| **Beginning Cash** | $33,434 | $5,638 | $73,963 | $29,489 | $247,775 | $207,917 | $168,340 | $135,530 | $91,066 |
| Satellite Revenue | $3,946 | $4,910 | $5,249 | $4,925 | $4,653 | $4,863 | $5,231 | $4,942 | $4,572 |
| Interest Income | $6 | $27 | $36 | $39 | $146 | $130 | $113 | $94 | $67 |
| New Financing | $32,750 | $120,789 | $0 | $335,178 | $0 | $0 | $0 | $0 | $0 |
| **Total Sources** | $36,702 | $125,726 | $5,285 | $340,142 | $4,799 | $4,993 | $5,344 | $5,035 | $4,639 |
| Operating Expenses | $29,886 | $41,228 | $34,982 | $115,994 | $41,597 | $41,463 | $35,001 | $46,300 | $41,920 |
| Capital Expenditures | $2,594 | $4,055 | $8,450 | $850 | $3,060 | $3,106 | $3,153 | $3,200 | $3,249 |
| Restructuring Related Expenses | $32,019 | $12,118 | $6,327 | $5,012 | $0 | $0 | $0 | $0 | $0 |
| **Total Uses** | $64,499 | $57,401 | $49,759 | $121,856 | $44,657 | $44,569 | $38,154 | $49,500 | $45,168 |
| **Ending Cash Balance** | $5,638 | $73,963 | $29,489 | $247,775 | $207,917 | $168,340 | $135,530 | $91,066 | $50,536 |

## **Exhibit C**

Plan Supplement

**<u>Exhibit C-1</u>**

First Lien Exit Credit Agreement

**$[1,000,000,000]**

**CREDIT AGREEMENT**

**dated as of [          ], 2014,**

**among**

**[NEWCO],**

**as Borrower,**

**REORGANIZED LIGHTSQUARED LP,**

**and**

**THE OTHER GUARANTORS PARTY HERETO,**

**as Guarantors,**

**THE LENDERS PARTY HERETO**

**and**

**J.P. MORGAN SECURITIES LLC,**

**as Joint Lead Arranger and Joint Bookrunner**

**CREDIT SUISSE SECURITIES (USA) LLC,**

**as Joint Lead Arranger, Joint Bookrunner and Syndication Agent**

**and**

**JPMORGAN CHASE BANK, N.A.,**

**as Administrative Agent**

# TABLE OF CONTENTS

PAGE

ARTICLE 1
DEFINITIONS                                                     2

Section 1.01.    *Defined Terms.* ...................................................................2
Section 1.02.    *Terms Generally.* ...............................................................37
Section 1.03.    *Accounting Terms; GAAP.* ..................................................38
Section 1.04.    *Resolution of Drafting Ambiguities.* ...................................38
Section 1.05.    *Permitted Liens.* ................................................................38

ARTICLE 2
THE CREDITS                                                     39

Section 2.01.    *Commitments.* ....................................................................39
Section 2.02.    *Loans.* ................................................................................39
Section 2.03.    *Borrowing Procedure.* ......................................................39
Section 2.04.    *Evidence of Debt; Repayment of Loans.* ...........................40
Section 2.05.    *Fees.* ..................................................................................40
Section 2.06.    *Interest on Loans.* .............................................................41
Section 2.07.    *Termination of Commitments.* ...........................................44
Section 2.08.    *[Reserved].* ........................................................................44
Section 2.09.    *Repayment of Loans.* ........................................................44
Section 2.10.    *Optional and Mandatory Prepayments of Loans.* ..............44
Section 2.11.    *[Reserved].* ........................................................................46
Section 2.12.    *Yield Protection.* ................................................................46
Section 2.13.    *[Reserved].* ........................................................................47
Section 2.14.    *Payments Generally; Pro Rata Treatment; Sharing of Setoffs.* ........47
Section 2.15.    *Taxes.* .................................................................................49
Section 2.16.    *Mitigation Obligations; Replacement of Lenders.* .............53
Section 2.17.    *[Reserved].* ........................................................................55
Section 2.18.    *[Reserved].* ........................................................................55
Section 2.19.    *Defaulting Lenders.* ...........................................................55
Section 2.20.    *Increase in Commitments.* .................................................55
Section 2.21.    *Currency Indemnity.* ..........................................................57

ARTICLE 3
REPRESENTATIONS AND WARRANTIES                                  58

Section 3.01.    *Organization; Powers.* ......................................................58
Section 3.02.    *Authorization; Enforceability.* ...........................................58
Section 3.03.    *No Conflicts.* ......................................................................58
Section 3.04.    *Financial Statements; Projections.* ....................................59
Section 3.05.    *Properties.* .........................................................................59
Section 3.06.    *Intellectual Property.* .........................................................61
Section 3.07.    *Equity Interests and Subsidiaries; Reorganized LightSquared*

*Inc.* ...................................................................................................61
Section 3.08.    *Litigation; Compliance with Laws.* ...............................62
Section 3.09.    *Agreements.* ..........................................................................63
Section 3.10.    *Federal Reserve Regulations.* ...........................................63
Section 3.11.    *Investment Company Act.* ...................................................63
Section 3.12.    *. Use of Proceeds.* ................................................................64
Section 3.13.    *Taxes.* ......................................................................................64
Section 3.14.    *No Material Misstatements.* ...............................................64
Section 3.15.    *Labor Matters.* ......................................................................64
Section 3.16.    *Solvency.* .................................................................................65
Section 3.17.    *Employee Benefit Plans.* ....................................................65
Section 3.18.    *Environmental Matters.* ......................................................67
Section 3.19.    *Insurance.* ..............................................................................68
Section 3.20.    *Security Documents.* .............................................................68
Section 3.21.    *Intercompany Indebtedness; Affiliate Indebtedness.* ........70
Section 3.22.    *Anti-Terrorism Laws; Anti-Corruption Laws.* ................71
Section 3.23.    *Communications Licenses and Regulatory Matters.* ........71
Section 3.24.    *License Subsidiaries.* ..........................................................72

## ARTICLE 4

CONDITIONS TO CREDIT EXTENSIONS                                                 73

Section 4.01.    *Conditions to Making of the Loans.* ...................................73

## ARTICLE 5

AFFIRMATIVE COVENANTS                                                           79

Section 5.01.    *Financial Statements, Reports, etc.* ....................................79
Section 5.02.    *Litigation and Other Notices.* ...........................................81
Section 5.03.    *Existence; Businesses and Properties.* ..............................82
Section 5.04.    *Insurance.* ..............................................................................83
Section 5.05.    *Obligations and Taxes* ........................................................84
Section 5.06.    *Employee Benefits.* ..............................................................84
Section 5.07.    *Maintaining Records; Access to Properties and Inspections;*
                *Annual Meetings.* ..................................................................85
Section 5.08.    *Use of Proceeds.* ..................................................................86
Section 5.09.    *Compliance with Laws; Compliance with Environmental Laws;*
                *Environmental Reports* ........................................................86
Section 5.10.    *Compliance with Communications Laws and ITU Rules and*
                *Regulations.* ..........................................................................86
Section 5.11.    Additional Collateral; Additional Guarantors. ...................86
Section 5.12.    *Security Interests; Further Assurances.* ............................88
Section 5.13.    *Information Regarding Collateral.* .....................................89
Section 5.14.    *Post-Closing Collateral Matters.* .......................................89
Section 5.15.    *License Subsidiaries.* ..........................................................89

## ARTICLE 6

NEGATIVE COVENANTS                                                              90

Section 6.01.    *Indebtedness.* ....................................................................90
Section 6.02.    *Liens.* ..................................................................................91
Section 6.03.    *Sale and Leaseback Transactions.* ......................................94
Section 6.04.    *Investments, Loan, Advances and Acquisition.* .................94
Section 6.05.    *Mergers and Consolidations.* .............................................96
Section 6.06.    *Asset Sales.* ..........................................................................96
Section 6.07.    *Dividends.* ............................................................................98
Section 6.08.    *Transactions with Affiliates.* ..............................................98
Section 6.09.    *[Reserved].* ...........................................................................99
Section 6.10.    *Prepayments of Other Indebtedness; Modifications of*
                 *Organizational Documents and Other Documents, etc.* ..............99
Section 6.11.    *Limitation on Certain Restrictions on Subsidiaries.* ........100
Section 6.12.    *Limitation on Issuance of Capital Stock.* .........................101
Section 6.13.    *Limitation on Creation of Subsidiaries.* ...........................101
Section 6.14.    *Business.* .............................................................................101
Section 6.15.    *Capital Expenditure.* ..........................................................102
Section 6.16.    *Fiscal Year.* ........................................................................102
Section 6.17.    *No Further Negative Pledge.* ..............................................102
Section 6.18.    *Compliance with Anti-Terrorism Laws.* ............................102
Section 6.19.    *Canadian Pension Plans.* ...................................................103
Section 6.20.    Permitted Activities of License Subsidiaries.....................104
Section 6.21.    Communications Licenses....................................................104
Section 6.22.    *Financial Covenant.* ...........................................................105


ARTICLE 7
GUARANTEE                                                                      105

Section 7.01.    *The Guarantee.* ....................................................................105
Section 7.02.    *Obligations Unconditional.* ...............................................105
Section 7.03.    *Reinstatement.* ....................................................................107
Section 7.04.    *Subrogation; Subordination.* ............................................107
Section 7.05.    *Remedies.* ...........................................................................107
Section 7.06.    *Instrument for the Payment of Money.* ..............................107
Section 7.07.    *Continuing Guarantee.* .......................................................108
Section 7.08.    *General Limitation on Guarantee Obligations.* ...............108
Section 7.09.    *Release of Guarantors.* .......................................................108
Section 7.10.    *Right of Contribution.* ........................................................108


ARTICLE 8
EVENTS OF DEFAULT                                                              109

Section 8.01.    *Events of Default.* ...............................................................109
Section 8.02.    *Application of Proceeds.* ....................................................113
Section 8.03.    *Government Approval.* ........................................................114

ARTICLE 9

THE ADMINISTRATIVE AGENT                                                                115

ARTICLE 10

MISCELLANEOUS                                                                           117

Section 10.01.    *Notices.* ..............................................................................117
Section 10.02.    *Waivers; Amendment.* ......................................................119
Section 10.03.    *Expenses; Indemnity; Damage Waiver.* .........................122
Section 10.04.    *Successors and Assigns.* ..................................................124
Section 10.05.    *Survival of Agreement.* ....................................................129
Section 10.06.    *Counterparts; Integration; Effectiveness.* ......................129
Section 10.07.    *Severability.* ......................................................................130
Section 10.08.    *Right of Setoff.* .................................................................130
Section 10.09.    *Governing Law; Jurisdiction; Consent to Service of Process.* .......130
Section 10.10.    *Waiver of Jury Trial.* .......................................................131
Section 10.11.    *Headings.* ..........................................................................131
Section 10.12.    *Treatment of Certain Information; Confidentiality.* ........131
Section 10.13.    Material Non-Public Information. .....................................132
Section 10.14.    *Authorization to  Distribute Certain Materials to Public-Siders.* ....133
Section 10.15.    *USA PATRIOT Act Notice and Customer Verification.* ..................133
Section 10.16.    *Interest Rate Limitation.* ..................................................134
Section 10.17.    *Obligations Absolute.* ......................................................134
Section 10.18.    *AML Legislation.* .............................................................134

SCHEDULES

Schedule 1.01(a)        Disqualified Companies
Schedule 1.01(b)        Subsidiary Guarantors
Schedule 2.01           Commitments
Schedule 3.03           Governmental Approvals; Compliance with Laws
Schedule 3.06(c)        Violations or Proceedings
Schedule 3.07(c)        Organizational Chart
Schedule 3.08           Litigation and Government Proceedings
Schedule 3.09           Material Agreements
Schedule 3.18           Environmental Matters
Schedule 3.19           Insurance
Schedule 3.23(a)        Communications Licenses
Schedule 4.01(g)        Local Counsel
Schedule 5.14           Post-Closing Matters
Schedule 6.01(b)        Existing Indebtedness
Schedule 6.01(f)        Terms of Junior Lien Debt and Intercreditor Agreement
Schedule 6.02(c)        Existing Liens
Schedule 6.04(b)        Existing Investments
Schedule 6.06(g)        Asset Sales
Schedule 6.06(i)        Existing Agreements Pursuant to Which Assets May Be Sold

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B-1 | Form of Assignment and Assumption |
| Exhibit B-2 | Form of Assignment and Assumption for Affiliate Lenders |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Joinder Agreement |
| Exhibit G | Form of Landlord Access Agreement |
| Exhibit H | [Reserved] |
| Exhibit I | [Reserved] |
| Exhibit J | [Reserved] |
| Exhibit K | Form of Note |
| Exhibit L-1 | Form of Perfection Certificate |
| Exhibit L-2 | Form of Perfection Certificate Supplement |
| Exhibit M-1 | Form of U.S. Security Agreement |
| Exhibit M-2 | Form of Canadian Security Agreement |
| Exhibit M-3 | Form of U.S. Pledge Agreement |
| Exhibit N | Form of Intercreditor Agreement |
| Exhibit O | Form of Solvency Certificate |
| Exhibit P | Form of Intercompany Note |
| Exhibit Q | Form of Tax Compliance Certificates |
| Exhibit R | [Reserved] |

# CREDIT AGREEMENT

This CREDIT AGREEMENT (this "**Agreement**") dated as of [                ], 2014, among [NewCo], a Delaware limited liability company ("**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article 1), the Lenders, J.P MORGAN SECURITIES LLC, as joint lead arranger and joint bookrunner, (in such capacity, an "**Arranger**"), CREDIT SUISSE SECURITIES (USA) LLC, as joint lead arranger and joint bookrunner (in such capacity, an "**Arranger**"), and as syndication agent (in such capacity, "**Syndication Agent**") and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders.

## WITNESSETH:

WHEREAS, certain Subsidiaries (such term and each other capitalized term used but not otherwise defined in this introductory statement having the meaning specified in subsection 1.01) of the Borrower have been debtors in reorganization proceedings (the "**Bankruptcy Proceedings**") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, the Debtors filed on [      ], 2014 the Debtors' Third Amended Joint Plan pursuant to Chapter 11 of the Bankruptcy Code [Docket No. ___] (the "**Plan of Reorganization**") with the Bankruptcy Court pursuant to which the Borrower shall be formed and capitalized in accordance thereunder. The Plan of Reorganization is described in, and included as an exhibit to, the Debtors' Revised Specific Disclosure Statement (the "**Disclosure Statement**"), the final version of which was filed with and approved by the Bankruptcy Court on [          ], 2014.

WHEREAS, on [_____], 2014 the Bankruptcy Court entered the Plan Confirmation Order.

WHEREAS, Borrower has requested the Lenders to extend credit in the form of Loans on the Closing Date, in an aggregate principal amount not in excess of $[1,000,000,000].

WHEREAS, on the Closing Date the Borrower will enter into the Junior Lien Credit Agreement (as hereinafter defined) that will provide for term loans not in excess of $[1,200,000,000] (the "**Junior Lien Term Loans**"), subject to adjustment as more particularly described in the Plan of Reorganization and Section 6.01(k), hereof, contemporaneously with the extension of the Loans on the Closing Date.

WHEREAS, the proceeds of the Loans are to be used in accordance with Section 3.12.

NOW, THEREFORE, the Lenders are willing to extend such credit to Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.    *Defined Terms.*

As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Adjusted LIBO Rate**" shall mean, with respect to any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided* that the Adjusted LIBO Rate shall not be less than 1.00%.

"**Administrative Agent**" shall have the meaning assigned to such term in the recitals hereto and includes each other person appointed as the successor pursuant to Article 10.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of Exhibit A.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided, however*, that, for purposes of Section 6.08 and the proviso to the definition of "Affiliate Lender", the term "Affiliate" shall also include (x) any person that is an executive officer or director of the person specified and (y) the Equity Investors, except for any Equity Investor that ceases to own more than 5% of any class of Equity Interests in the Borrower and does not otherwise constitute an Affiliate pursuant to this definition.

"**Affiliate Lender**" shall mean each Lender that has or the Affiliates of which have, when all such Affiliates are considered in the aggregate with each other and with such Lender, beneficial ownership of more than 20.5% of the Voting Stock of the Borrower; *provided* that for purposes of Section 10.04(b)(ii)(F) and Section 10.04(f), "Affiliate Lender" shall mean each Lender who is an Affiliate of the Borrower.

"**Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**All-in Yield**" shall mean as to any Indebtedness, the effective interest rate hereon as reasonably determined by the Administrative Agent (consistent with generally accepted financial practices), taking into account the interest rate, margin, original issue discount and upfront fees; *provided* that original issue discount and upfront fees shall be equated to interest rate assuming a four-year life to maturity of such Indebtedness; *provided further* that "All-in Yield" shall not include arrangement, underwriting,

structuring or similar fees paid to arrangers or fees that are not paid ratably to the market with respect to such Indebtedness.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"**AML Legislation**" shall have the meaning assigned to such term in Section 10.18.

"**Anti-Terrorism Laws**" shall mean any Requirement of Law related to terrorism financing or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes the following Canadian requirements: Part II.1 of the Criminal Code, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act ("**PCTFA**"), the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" means, for any day, (i) with respect to any ABR Loan [     ]% and (ii) with respect to any Eurodollar Loan [     ]%

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage represented by the ratio of the amount of such Lender's Commitment to the aggregate Commitments at such time.  If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arrangers**" shall mean, collectively, J.P. Morgan Securities LLC and Credit Suisse Securities (USA) LLC.

"**Assets**" means all rights, titles, and interests of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy

Code.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible including rights under the Inmarsat Agreement), but excluding leases (and subleases) of capacity on any satellite in the ordinary course of business and dispositions of cash and Cash Equivalents in the ordinary course of business, by Borrower or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Borrower, in each case, to any person other than (i) Borrower, (ii) any Subsidiary Guarantor or (iii) other than for purposes of Section 6.06, any other Subsidiary.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B-1 (or in the case of an assignment to an Affiliate Lender, Exhibit B-2), or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligations".

"**Available Liquidity**" shall mean, at any date, Unrestricted Cash and Cash Equivalents of the Loan Parties.

"**Avoidance Actions**" shall have the meaning assigned to such term in the definition of Litigation Claims.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Proceedings**" shall have the meaning assigned to such term in the recitals hereto.

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the

United States.

"**Board of Directors**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such person, (iii) in the case of any partnership, the Board of Directors of the general partner of such person, (iv) in any other case, the functional equivalent of the foregoing and (vi) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" shall mean Boeing Satellite Systems, Inc.

"**Borrower**" shall have the meaning assigned to such term in the recitals hereto.

"**Borrowing**" shall mean Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" shall mean a request by Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the CCAA.

"**Canadian GAAP**" shall mean such generally accepted accounting principles in Canada as are used by the Canadian Loan Parties, applied on a consistent basis.

"**Canadian Income Tax Act**" means the *Income Tax Act* (Canada), as amended from time to time.

"**Canadian Loan Party**" means any Loan Party incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"**Canadian Pension Plan**" means a "**registered pension plan**", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Plan Event**" means any event prohibited by Section 6.19 hereof which could reasonably be expected to result in liability for any Company.

"**Canadian Radiocommunication Act**" shall mean the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Security Agreement**" shall mean a Canadian Security Agreement substantially in the form of Exhibit M-2 among the Loan Parties party thereto and Administrative Agent for the benefit of the Secured Parties.

"**Canadian Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Canadian Security Agreement.

"**Canadian Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" shall mean the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capital Assets**" shall mean, with respect to any person, any equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures made directly or indirectly by Borrower and its Subsidiaries during such period for Capital Assets (in each case, whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability)[; provided that payments to Inmarsat under the Inmarsat Agreement, lease payments in connection with the Master Agreement, dated as of July 16, 2007, among One Dot Six Corp. and Crown Castle MM Holdings LLC, and payments to NOAA in accordance with the business plan as described to the Lenders prior to the entry of the Plan Confirmation Order will not constitute "Capital Expenditures"].

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "**A**" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30

-6-

days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; and (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of Borrower or any of its Subsidiaries, in each case other than any such loss, damage, destruction, condemnation or taking the Net Cash Proceeds of which are less than $[___]. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)     [reserved];

(b)     at any time a change of control occurs under any Material Indebtedness;

(c)     a plan relating to the liquidation or dissolution of Borrower is adopted;

(d)     (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) other than any Permitted Holders or group consisting of Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Voting Stock of the Borrower representing a majority of the voting power of the total outstanding Voting Stock of the Borrower, or (ii) at any time prior to an IPO, the Permitted Holders (other than any future Permitted Holders approved by the Administrative Agent or the Required Lenders as provided in the definition thereof) no longer has the right to designate at least three of the members of the Borrower's Board of Directors under the terms of the Borrower's Operating Agreement or (iii) at any time prior

to an IPO, Fortress and its Affiliates shall no longer have the right under the Operating Agreement of the Borrower to designate at least one (1) member of the Borrower's Board of Directors;

(e)     upon and following an IPO, during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of Borrower (together with any new directors whose election to such Board of Directors or whose nomination for election was approved by a vote of a majority of the members of the Board of Directors of Borrower, which members comprising such majority are then still in office and were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Borrower; or

(f)     a "change of control" or any comparable term under, and as defined in the Junior Lien Credit Agreement (or any documentation governing any Permitted Refinancing in respect thereof).

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued

"**Charges**" shall have the meaning assigned to such term in Section 10.16.

"**CIPO**" shall mean the Canadian Intellectual Property Office.

"**Closing Date**" shall have the meaning assigned to such term in Section 2.07.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, collectively, all of the U.S. Security Agreement Collateral, the Canadian Security Agreement Collateral, the U.S. Pledge Agreement Collateral, the Mortgaged Property and all other property of whatever kind and nature

subject or purported to be subject from time to time to a Lien under any Security Document; *provided* that Collateral shall include Communications Licenses only to the maximum extent permitted by law but shall include the proceeds and right to receive proceeds from any Communications Licenses.

"**Collateral Agent**" shall mean [    ].

"**Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Loan hereunder on the Closing Date in the amount set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable.  The aggregate amount of the Commitments as of the Closing Date is $[1,000,000,000].

"**Commitment Letter**" shall mean that certain Commitment Letter dated as of [          ], 2014 by and among LightSquared Inc., the Arrangers, JPMorgan Chase Bank, N.A. (acting through such of its affiliates or branches as it deems appropriate) and Credit Suisse AG (acting through such of its affiliates or branches as it deems appropriate).

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Communications Act**" shall mean the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" shall mean the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications Licenses**" shall mean (i) the One Dot Six License and (ii) all other authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, Industry Canada and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" shall mean the Borrower and Borrower's Subsidiaries; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit D.

"**Confirmation Recognition Order**" means an order of the Canadian Court,

which shall be in form and substance acceptable to the Arrangers, recognizing the entry of the Plan Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, claims, charges, interests, or other encumbrances other than Permitted Liens, in accordance with applicable law.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided, however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto. Without limiting the generality of the foregoing, for purposes of Section 6.08 and the definition of "Harbinger", a person shall be deemed to be Controlled by another person if such other person possesses, directly or indirectly, power to vote 10% or more of the Voting Stock.

"**Control Agreement**" shall have the meaning assigned to such term in the U.S. Security Agreement and the Canadian Security Agreement.

"**Controlled Investment Affiliate**" shall mean, as to any person, any other person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such person and is organized primarily for making equity or debt investments in other portfolio companies.

-10-

"**Credit Extension**" shall mean the making of a Loan by a Lender.

"**Cooperation Agreement Order**" shall mean the final order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] authorizing the applicable Debtors' assumption and amendment of the Inmarsat Agreement on terms and conditions satisfactory to the Lenders, as such order may be amended, supplemented or otherwise modified from time to time with the consent of the Lenders.

"**CRTC**" shall mean the Canadian Radio-television and Telecommunications Commission, or any successor agency administering, among other things, the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Currency Due**" shall have the meaning assigned to such term in Section 2.21.

"**Debt Issuance**" shall mean the incurrence by Borrower or any of its Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtors**" shall mean, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd. and LightSquared GP Inc. each as debtors and debtors-in-possession in the Bankruptcy Proceeding.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(b).

"**Defaulting Lender**" shall mean any Lender, as determined by the Administrative Agent, that (a) has failed to fund any portion of its Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, any Lender and/or Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans or (d) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute.

"**Disclosure Statement**" shall have the meaning assigned to such term in the recitals hereto.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms

-11-

(or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Extended Term Loan Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is 180 days after the Extended Term Loan Maturity Date or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided, however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Extended Term Loan Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Disqualified Company**" means any company which is a competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), such additional companies which are competitors of the Borrower and the Affiliates of such companies, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided* that the addition of such persons shall not deem any Lender that is already a Lender as of the date of such designation to be a Disqualified Company, and such designation shall be effective two (2) Business Days after being notified to Lenders; *provided*, *further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption. A Disqualified Company will include any Affiliate thereof.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia.

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Affiliates or any other person, providing for access to data protected by passcodes or other security system.

"**Eligible Assignee**" shall mean any person to whom it is permitted to assign Loans and Commitments pursuant to Section 10.04(b); *provided* that "**Eligible Assignee**" shall not include (a) any natural person, (b) any Disqualified Company or (c) the Borrower or any of its Subsidiaries.

"**Embargoed Person**" shall mean any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (ii) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and in the case of each of (i) and (ii) shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law,

relating to protection of public health or the Environment, the Release or threatened Release of any Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the U.S. Security Agreement and the Canadian Security Agreement.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Investors**" shall mean each of (a) Fortress, (b) the Melody Investors, (c) Harbinger and (d) Reorganized LightSquared Inc., and in each case, their respective Controlled Investment Affiliates (other than the Borrower and its Subsidiaries).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code. For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any person who was, as to the time of such past event or period of time, an "ERISA Affiliate" within the meaning of the preceding sentence.

"**ERISA Event**" shall mean the occurrence of any one or more of the following: (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by Borrower, any Company or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than any required contributions to any Plans and non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA; (e) the receipt by the Borrower, any Company or any of their respective ERISA

Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by the Borrower, any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (k) the cessation of operations at a facility of the Companies or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; or (l) any other event or condition with respect to a Single Employer Plan or Multiemployer Plan that could result in liability of the Companies.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Swap Obligations**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes unlawful under the Commodity Exchange Act or any rule or regulation promulgated thereunder or order of the Commodity Futures Trading Commission (or the application or official interpretation of any provision thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest by such Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower or any Subsidiary Guarantor hereunder, (a) Taxes imposed on or measured by its net income or profits (however denominated), franchise taxes imposed on it (in lieu of net income taxes), and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of the recipient being organized under the laws of or having its

principal office or, in the case of any Lender, its applicable lending office in such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on payments pursuant to any Requirements of Law that are in effect on the date on which (i) such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from Borrower with respect to such withholding Tax pursuant to Section 2.15; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender acquired pursuant to Section 2.16(b), or (ii) such Lender designates a new lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from Borrower with respect to such withholding Tax pursuant to Section 2.15 or (c) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.15(e), (d) any U.S. federal withholding Taxes imposed under FATCA or (e) with respect to any payment to be made by any Canadian Loan Party hereunder, any taxes under the Canadian Income Tax Act payable by reason of the recipient being a person with whom the Canadian Loan Party does not deal at arm's length for purposes of the Canadian Income Tax Act at the time such payment was made.

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**Existing LP Preferred Units**" shall mean the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

"**Existing Inc. Preferred Equity Interest**" shall mean the outstanding shares of Convertible Series A Preferred Stock and Convertible Series B Preferred Stock issued by LightSquared Inc.

["**Extended Term Loan Maturity Date**" shall have the meaning assigned to such term in Section 2.09(b).]

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" shall mean the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**FCC Condition**" shall mean [TBD].

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by

the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean that certain Fee Letter dated as of [          ], 2014 by and among LightSquared, Inc., the Arrangers, JPMorgan Chase Bank, N.A. and Credit Suisse AG.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financial Statements**" means the financial statements to be furnished pursuant to Section 5.01.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Satellite**" shall mean the Boeing GEM-F1 (Serial #7984010-103-001) satellite.

"**Flood Insurance Requirements**" shall mean, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) ("**Flood Laws**"), the following documents: (A) a completed standard "life of loan" flood hazard determination form (a "Flood Determination Form"), (B) if any improvements to the applicable real property are located in a special flood hazard area, a notification to the Borrower ("**Borrower Notice**") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice, and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following: the flood insurance policy, the borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Administrative Agent (any of the foregoing being "**Evidence of Flood Insurance**").

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust. In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes, a Foreign Lender

shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof , but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof ) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding tax on payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) maintained or contributed to by any Company with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy or arrangement maintained or contributed to by any Company with respect to employees employed in Canada, other than a Canadian Pension Plan).

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia or Canada or any province or territory thereof.

"**Fortress**" shall mean Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

"**Fund**" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, Industry Canada and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any

Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, from, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article 7 by the Subsidiary Guarantors.

"**Guarantors**" shall mean the Subsidiary Guarantors.

"**Harbinger**" shall mean Harbinger Capital Partners, LLC and any of its Affiliates.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or hazardous or toxic chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" shall mean the orbital performance incentives and liquidated damages that may become due and payable under the Amendment, Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing, as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time so long as such amendment, supplement or other modification makes such contract more favorable to the Loan Parties compared to such contract as in effect on the date hereof.

"**Increase Effective Date**" shall have the meaning assigned to such term in Section 2.20(a).

"**Increase Joinder**" shall have the meaning assigned to such term in Section 2.20(c).

"**Incremental Loans**" shall have the meaning assigned to such term in Section 2.20(c).

"**Incremental Loan Commitment**" shall have the meaning assigned to such term in Section 2.20(a).

"**Incremental Loan Lender**" shall have the meaning assigned to such term in Section 2.20(a).

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (h) all Attributable Indebtedness of such person; (j) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (i) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.  For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03.

"**Industry Canada**" shall mean the Canadian federal government Department of Industry or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Information**" shall have the meaning assigned to such term in Section 10.12.

-20-

"**Initial Term Loan Maturity Date**" shall mean [_____].

"**Inmarsat Agreement**" shall mean the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among Reorganized LightSquared LP, SkyTerra (Canada) Inc., Reorganized LightSquared Inc. and Inmarsat Global Limited, as in effect on the date hereof, as amended, supplemented or otherwise modified from time to time prior to the date hereof, and as further amended, supplemented or otherwise modified from time to time to the extent permitted herein. "**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit P.

"**Intercreditor Agreement**" shall mean the Intercreditor Agreement in substantially the form of Exhibit N dated as of the Closing Date, among the Administrative Agent, as First Lien Representative for the First Lien Credit Agreement Secured Parties (each as defined therein), the Administrative Agent (as defined in the Junior Lien Credit Agreement), as Second Lien Representative for the Second Lien Credit Agreement Secured Parties (each as defined therein), the Loan Parties, and each additional representative party thereto from time to time.

"**Interest Election Request**" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.06.

"**Interest Payment Date**" shall mean (a) the last Business Day of each March, June, September and December to occur during any period in which such Loan is outstanding, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and (c) the Initial Term Loan Maturity Date [or the Extended Term Loan Maturity Date, if applicable].

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is three months thereafter.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**IPO**" shall mean the first underwritten public offering by the Equity Investors of their respective Equity Interests in the Borrower or any parent entity which owns a majority of the Equity Interests in the Borrower and Controls the Borrower and is formed to facilitate the underwritten public offering after the Closing Date pursuant to a registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act.

"**ITU**" shall mean the International Telecommunication Union, or any successor agency of the United Nations that develops standards and procedures concerning radiocommunications.

"**Joinder Agreement**" shall mean a joinder agreement substantially in the form of Exhibit F.

"**Judgment Currency**" shall have the meaning assigned to such term in Section 2.21.

"**Junior Lien Credit Agreement**" shall mean the [Junior Lien Credit Agreement], dated as of the Closing Date (as may be amended or modified to the extent permitted under Section 6.10), among the Borrower, the Guarantors, the lenders party thereto and [                    ], as administrative agent.[1]

"**Junior Lien Loan Documents**" shall mean the Junior Lien Credit Agreement, the Intercreditor Agreement and other Loan Documents (as defined in the Junior Lien Credit Agreement).

"**Junior Lien Initial Term Loans**" shall have the meaning provided in the recitals to this Agreement.

"**Junior Lien Term Loans**" shall have the meaning assigned to the term "Loans" in the Junior Lien Credit Agreement.

"**Landlord Access Agreement**" shall mean a Landlord Access Agreement, substantially in the form of Exhibit G, or such other form as may reasonably be acceptable to the Administrative Agent.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lenders**" shall mean (a) the financial institutions listed on Schedule 2.01

---

[1] NTD: Junior Lien Credit Agreement Admin Agent to be discuss.

hereto, (b) any Incremental Loan Lenders and (c) any financial institution that has become a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.  For purposes of Section 4.01, Section 10.02 and the definition of "Required Lenders", any person that, in connection with the primary syndication of the Term Loan, has entered into and remains a party to an agreement with the Administrative Agent or the Arrangers to become a Lender or to provide financing under this Agreement shall be deemed a Lender until such person becomes a party to this Agreement or such agreement with the Administrative Agent or the Arrangers is terminated.

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page) on such screen at approximately 11:00 a.m., London time, three Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits in the London interbank market with a maturity comparable to such Interest Period.  In the event that such rate does not appear on such page (or on any successor or substitute page on such screen or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying interest rates for dollar deposits in the London interbank market as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, three Business Days prior to the commencement of such Interest Period.

"**License Subsidiary**" shall mean each single purpose Subsidiary of the Borrower created solely to hold or lease Communications Licenses for one or more of its businesses.  As of the Closing Date, Reorganized LightSquared Subsidiary LLC is the only License Subsidiaries (for the avoidance of doubt, License Subsidiary shall not include Reorganized One Dot Six).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or PPSA or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Litigation Claims**" shall mean (x) all of the DIP Obligors' lawsuits or causes of action (including postpetition causes of action but excluding Avoidance Actions (as

defined below)) and proceeds thereof and (y) all proceeds of any of the DIP Obligors' avoidance actions or claims arising under chapter 5 of the Bankruptcy Code with respect to the DIP Obligors (the "**Avoidance Actions**").

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Documents, the Intercreditor Agreement, the Commitment Letter, the Fee Letter and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"**Loan Parties**" shall mean the Borrower and the Guarantors.

"**Loans**" shall mean the Term Loans and any Incremental Loans made pursuant to Section 2.20.

["**Make Whole Amount**" shall mean the present value, computed using a discount rate equal to the Treasury Rate plus one-half of one percent (0.50%), as of the date any voluntary prepayment under Section 2.10(a) or mandatory prepayment under Section 2.10(b), Section 2.10(c), or Section 2.10(d) occurs of the sum of (x) all required remaining scheduled interest payments due on the principal amount so prepaid through and including the first anniversary of the Closing Date *plus* (y) [       ]% of the principal amount so prepaid.]

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, assets, property, operations or condition, financial or otherwise, or material agreements of Borrower and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their material obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on a material portion of the Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans) or Hedging Obligations of Borrower or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $[___]. For purposes of determining Material Indebtedness, the "**principal amount**" in respect of any Hedging Obligations of Borrower or any Subsidiary at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Borrower or such Subsidiary would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material License**" shall mean, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies, including the One Dot Six License.

"**Material Regulatory Request**" shall mean any or all of the following: (i) the License Modification Application (as defined in the General Disclosure Statement to the

Plan); (ii) the Spectrum Allocation Petition for Rulemaking (as defined in the General Disclosure Statement to the Plan); (iii) the pending petition for rulemaking in RM-11683; (iv) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (v) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp's lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

"**Maturity Date**" shall mean the earlier of (a) the Initial Term Loan Maturity Date [or, if the conditions in Section 2.09(b) have been satisfied, the Extended Term Loan Maturity Date,] or, in each case, if such date is not a Business Day, the Business Day next preceding such date, and (b) the date upon which the Loans shall become due and payable pursuant to Article 8.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.16.

"**Melody Investors**" shall mean Melody Business Finance, LLC, Centaurus Capital LP, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Special Value Opportunities Fund, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, any Controlled Investment Affiliate of any of the foregoing and any person that is a participant in Melody Business Finance LLC's investment in the Borrower as of the date hereof that subsequently acquires direct ownership of the interest that was subject to the participation and, at the time such person acquires direct ownership of the interest, provides a representation that such persons is an "accredited investors" as defined in Rule 501 under the Securities Act and is not a Disqualified Company.

"**Minimum Liquidity**" shall mean $[___].

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean (a) each Real Property identified as a Mortgaged Property on Schedule 7(a) to the Perfection Certificate dated the Closing Date and (b) each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(c).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA to which any of the Companies or any of their respective ERISA Affiliates has, or at any time has ever had, an obligation to contribute.

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale (including any issuance or sale of

Equity Interests in subsidiaries of Borrower), the cash proceeds received (including lease payments or license fees) by Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Borrower or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Borrower's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (provided that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties sold in such Asset Sale or any remaining amounts payable to the manufacturer of the assets sold in such Asset Sale and, in each case, (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)      with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of (i) all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event and (ii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties that are the subject of such Casualty Event (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such Casualty Event) or any remaining amounts payable to the manufacturer of the assets subject to such Casualty Event and, in each case, which is repaid with such proceeds;

(c)      with respect to any Debt Issuance by any Company, the aggregate cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(d)      with respect to any Litigation Claims, the aggregate cash proceeds thereof, net of customary fees, costs and other expenses incurred in connection therewith.

"**Network**" shall mean the Terrestrial wireless broadband network being

developed by the Companies as of the Closing Date, which network is intended to provide 4G broadband services in the contiguous United States.

"**[NewCo] Operating Agreement**" shall mean [that certain limited liability company operating agreement of [NewCo] with respect to the [NewCo] equity interests, dated as of [      ] and binding on all holders of the [NewCo] equity interests].

"**New DIP Facility**" shall mean [that certain debtor in possession credit facility provided in connection with the certain Debtor in Possession Credit Agreement, dated as of [      ], among [          ], the [              ], and the lenders party thereto in the original aggregate principal amount of $1.65 billion].

"**NOAA**" shall mean National Oceanic and Atmospheric Administration, or any successor agency.

 "**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit K.

"**Obligations**" shall mean (a) obligations of Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning set forth in the definition of "**Embargoed Person.**"

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, one of the Financial Officers, or, in the case of a Canadian Subsidiary, the secretary, each in his or her official (and not individual) capacity.

"**One Dot Six Lease**" shall mean the Lease Purchase Agreement dated as of April 13, 2010, among One Dot Six, as purchaser, TVCC One Six Holdings LLC, as seller, and TVCC Holding Company, LLC (and all rights conveyed thereby to One Dot Six in that certain (a) Long-Term De Facto Transfer Lease Agreement dated as of July 23, 2007, between OP LLC, as lessor, and TVCC One Six Holdings, LLC, as lessee and (b) the Long-Term De Facto Transfer Sublease Agreement dated as of August 13, 2008, between OP LLC, as lessee, and TVCC One Six Holdings, LLC, as lessor), as renewed by One

Dot Six on April 2, 2013 and as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time to the extent permitted hereunder.

"**One Dot Six Lease Authorization**" shall mean the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000007295, or another FCC consent substantially replicating that initial consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" shall mean the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**One Dot Six TVCC Corp.**" shall mean One Dot Six TVCC Corp., a Delaware corporation and wholly owned Subsidiary of One Dot Six.

"**Organizational Documents**" shall mean, with respect to any person, (i) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such person, (v) in the case of the Borrower, the [NewCo] Operating Agreement and (vi) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean all present or future stamp or documentary Taxes or any other excise, property, filing or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(b)).

"**Participant**" shall have the meaning assigned to such term in Section 10.04(c).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(c).

["**Payment Premium**" shall mean, with respect to any prepayment, repayment, refinancing (including any repricing or effective refinancing through any Repricing Transaction) or replacement of any Loan (including at maturity and whether mandatory or voluntary) a premium payable on the amount so prepaid, repaid, refinanced (including repriced or effectively refinanced through any Repricing Transaction) or replaced equal to: (i) if such prepayment or repayment occurs after the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, [    ]% of such amount, (ii) if such prepayment or repayment occurs on or after the second anniversary of the Closing Date and prior to the third anniversary of the Closing Date, [    ]% of such amount and (iii) if such prepayment or repayment occurs on or after the third anniversary of the Closing Date, [    ]% of such amount.]

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**PCTFA**" shall have the meaning set forth in the definition of "**Anti-Terrorism Laws.**"

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit L-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit L-2 or any other form approved by the Administrative Agent.

"**Permitted Collateral Liens**" shall mean (a) in the case of Collateral other than Mortgaged Property, Permitted Liens and (b) in the case of Mortgaged Property, "Permitted Collateral Liens" shall mean the Liens described in clauses (a), (b), (d), (e), (f), (i), (p) and (s) of Section 6.02; *provided*, *however*, on the Closing Date or upon the date of delivery of each Mortgage under Section 5.11 or 5.12, Permitted Collateral Liens shall mean only those Liens set forth in Schedule B to the applicable Mortgage.

"**Permitted Holders**" shall mean [Fortress, the Melody Investors, Reorganized LightSquared Inc. (so long as the owners of Reorganized LightSquared Inc. as of the date hereof continue to hold at least a majority of the voting equity of Reorganized LightSquared Inc.) and any person that is an equityholder of Reorganized LightSquared Inc. as of the date hereof (other than Harbinger), any Controlled Investment Affiliates of the foregoing (other than the Borrower and its Subsidiaries) and any other institutional investors (other than Harbinger and its Affiliates) that are approved in advance to become "Permitted Holders" for purposes of this Agreement by the Required Lenders and, for the avoidance of doubt, no Permitted Holder shall be a Disqualified Company].

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Refinancing**" shall mean, with respect to any Indebtedness any modification, refinancing, refunding, renewal or extension of such Indebtedness; provided, that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so

modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder; (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended (except by virtue of amortization of or prepayment of Indebtedness prior to such date of determination); (c) at the time thereof, no Default or Event of Default shall have occurred and be continuing; (d) the original obligors in respect of such Indebtedness being modified, refinanced, refunded, renewed or extended remain the only obligors thereon; (e) the terms of such modification, refinancing, refunding, renewal or extension shall be, in the aggregate, no less favorable to the Borrower, taken as a whole, than those contained in the Indebtedness being renewed or refinanced or shall be consistent with terms available for similar debt then available; and (f) if such modification, refinancing, refunding, renewal or extension is secured then it may be secured only by liens on assets that secure such debt being refinanced.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.06(a).

"**Plan**" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any Company or with respect to which, the Borrower or any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Plan Confirmation Order**" shall mean the order entered by the Bankruptcy Court on [          ], 2014, confirming the Plan of Reorganization.

"**Plan Effective Date**" shall mean the effective date of the Plan of Reorganization

"**Plan of Reorganization**" shall have the meaning assigned to such term in the recitals hereto.

"**Plan Supplement**" shall mean the compilation of documents and forms of documents, schedules and exhibits to the Plan of Reorganization as filed with the Bankruptcy Court on [          ], 2014.

"**PPSA**" shall mean the Personal Property Security Act (Ontario), as amended from time to time, together with all regulations made thereunder; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or (ii) the Civil Code of Quebec, "**PPSA**"

means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank as its prime rate in effect at its office located at 270 Park Avenue, New York, New York; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Public-Sider**" means any representative of a Lender that does not want to receive material non-public information with the meaning of the federal and state securities laws.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Networks; *provided*, however, that (i) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Register**" shall have the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities

Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganized Debtors**" shall mean the Debtors as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc.**" shall mean LightSquared Inc., as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc. Common Shares**" shall mean those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan of Reorganization, the Plan Confirmation Order, and the Reorganized LightSquared Inc. Shareholders Agreement.

"**Reorganized LightSquared Inc. Credit Agreement**" shall mean that certain [$300.0 million first lien senior secured term loan agreement dated as of [        ], 2014 among Reorganized LightSquared Inc., the lenders from time to time party thereto, and JPMorgan Chase Bank, N.A. as administrative agent].

"**Reorganized LightSquared Inc. Shareholders Agreement**" shall mean that certain shareholders agreement or functionally equivalent document, as applicable, of Reorganized LightSquared Inc. with respect to the Reorganized LightSquared Inc. Common Shares, to be effective on the Plan Effective Date and binding on all holders of the Reorganized LightSquared Inc. Common Shares and holders of other capital stock of Reorganized LightSquared Inc.

"**Reorganized One Dot Six**" shall mean One Dot Six Corp. as reorganized under,

and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Repricing Transaction**" shall mean any repricing or refinancing through any waiver, consent, amendment or amendment and restatement, in each case, in connection with any waiver, consent, amendment or amendment and restatement to the Loans directed at, or the result of which would be, the lowering of the All-in Yield of the Loans or the incurrence of any Indebtedness having an All-in Yield that is less than the All-in Yield of the Loans (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced.

"**Required Lenders**" shall mean Lenders having more than 50% of the sum of all Loans outstanding; *provided* that the Loans held or deemed held by (x) any Defaulting Lender or (y) any Affiliate Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law (including, for the avoidance of doubt, FATCA).

"**Response**" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in Section 6.03.

"**Second Satellite**" shall mean the Boeing-GEM-F2 (Serial #7984010-103-002) satellite, together with the related ground-based beam formers and related calibration equipment.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Securities Collateral**" shall have the meaning assigned to such term in the U.S.

Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement.

"**Security Documents**" shall mean the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, the Mortgages and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as collateral for the Obligations, and all UCC, PPSA or other financing statements or instruments of perfection required by this Agreement, the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, the Intercreditor Agreement, any Mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, or any Mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Obligations.

"**Single Employer Plan**" shall mean any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is covered by Section 4021 of ERISA, and in respect of which the Borrower, any of the Borrower's Subsidiaries or any of their respective ERISA Affiliates is or, if such plan were terminated, would under Section 4069 of ERISA would be, deemed to be an "employer" as defined in Section 3(5) of ERISA.

"**SPSO Note**" has the meaning set forth in the Plan of Reorganization.

"**Statutory Reserve Rate**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentage shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (ii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of

which are the parent and/or one or more subsidiaries of the parent, and (iii) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of Borrower.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon) which is (i) prepared by a surveyor or engineer licensed to perform surveys in the jurisdiction where such Mortgaged Property is located, (ii) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property or any easement, right of way or other interest in the Mortgaged Property has been granted or become effective through operation of law or otherwise with respect to such Mortgaged Property which, in either case, can be depicted on a survey, in which events, as applicable, such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, or after the grant or effectiveness of any such easement, right of way or other interest in the Mortgaged Property, (iii) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent, the Collateral Agent and the Title Company, (iv) complying in all respects with the minimum detail requirements of the American Land Title Association or local equivalent in respect of Real Property not located within the United States as such requirements are in effect on the date of preparation of such survey and (v) sufficient for the Title Company to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue endorsements acceptable to the Administrative Agent.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under or in respect of any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Syndication Agent**" shall have the meaning assigned to such term in the recitals hereto.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loans**" shall mean the term loans made by the Lenders to Borrower

pursuant to Section 2.01.

"**Title Company**" shall mean any title insurance company as shall be retained by Borrower and reasonably acceptable to the Administrative Agent.

"**Transaction Documents**" shall mean the Loan Documents, the Plan of Reorganization and any ancillary agreements governing the transactions contemplated by the Plan of Reorganization and the Plan Confirmation Order and the Confirmation Recognition Order.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Transaction Documents, including (a) the execution, delivery and performance of the Loan Documents and the Borrowings hereunder, (b) the execution, delivery and performance of the Junior Lien Loan Documents and the borrowings thereunder; (c) the execution of the SPSO Note by LightSquared LP and (d) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Treasury Rate**" shall mean a rate equal to the then current yield to maturity on the most actively traded U.S. Treasury security having a duration equal to (or the nearest available tenor) the period from the date that payment is received to the date that falls on the one year anniversary of the Closing Date.

"**Treasury Services Agreement**" shall mean any agreement relating to treasury, depositary and cash management services or automated clearinghouse transfer of funds.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**Unrestricted Cash and Cash Equivalents**" shall mean cash or Cash Equivalents of the Loan Parties that would not appear as "restricted" on a consolidated balance sheet of such Loan Party, which cash and Cash Equivalents are not subject to any Lien, claim or interest (other than Liens arising by operation of law or under the Loan Documents).

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Pledge Agreement**" shall mean the U.S. Pledge Agreement substantially in

the form of Exhibit M-3 among the Borrower, Reorganized LightSquared Inc. and Administrative Agent for the benefit of the Secured Parties.

"**U.S. Pledge Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the U.S. Pledge Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**U.S. Security Agreement**" shall mean the U.S. Security Agreement substantially in the form of Exhibit M-1 among the Loan Parties party thereto and Administrative Agent for the benefit of the Secured Parties.

"**U.S. Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the U.S. Security Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**USA PATRIOT Act**" shall have the meaning set forth in the definition of "**Anti-Terrorism Laws.**"

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.  Except for purposes of the definitions of "Affiliate Lender" and "Control", any Equity Interests held by Harbinger that cannot be voted for the election of the Board of Directors of the Borrower will not be considered Voting Stock for purposes of this definition so long as these Equity Interests are held by Harbinger.

"**Weighted Average Yield**" shall mean with respect to any Loan, on any date of determination, the weighted average yield to maturity, in each case, based on the interest rate applicable to such Loan on such date and giving effect to all upfront or similar fees or original issue discount payable to all Lenders with respect to such Loan (other than customary arrangement, structuring, underwriting, amendment, commitment fees or other fees paid to the Arranger (or its Affiliates) or any other arranger or agent (or their respective Affiliates) with any such original issue discount being equated to interest based on an assumed four-year life to maturity).

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  *Terms Generally.*

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights (and for the avoidance of doubt any reference solely to "real property" shall not include Communications Licenses) and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

Section 1.03.  *Accounting Terms; GAAP.*

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by Borrower and the Required Lenders.

Section 1.04.  *Resolution of Drafting Ambiguities.*

Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.05.  *Permitted Liens.*

Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

ARTICLE 2

THE CREDITS

Section 2.01.  *Commitments*.

Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly to make a Term Loan to Borrower on the Closing Date in the principal amount not to exceed its Commitment. Amounts paid or prepaid in respect of Term Loans may not be reborrowed.

Section 2.02.  *Loans*.

(a)        Each Term Loan and each Incremental Loan shall be made by the Lenders ratably in accordance with their applicable Commitments; provided that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 (noon), New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by Borrower in the applicable Borrowing Request maintained with the Administrative Agent or, if a borrowing of a Loan shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.  Each Loan shall be made as a Eurodollar Loan, except as otherwise provided in Section 2.06(m).

Section 2.03.  *Borrowing Procedure*.

To request Loans, Borrower shall deliver, by hand delivery or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(a)        the aggregate amount of such Borrowing;

(b)        the date of such Borrowing, which shall be a Business Day;

(c)        the Interest Period to be applicable to such Borrowing, which shall be a period contemplated by the definition of the term "Interest Period";

(d)        the location and number of Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02(b); and

(e)        in the case of a borrowing of Incremental Loans, that the FCC Condition and the conditions set forth in Section 4.01 (z)-(bb) have been satisfied.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

Section 2.04. *Evidence of Debt; Repayment of Loans.*

(a)    Promise to Repay. Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

(b)    Lender and Administrative Agent Records. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)    Promissory Notes. Any Lender by written notice to Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note. In such event, Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit K. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to such payee and its registered assigns.

Section 2.05. *Fees.*

(a)    Administrative and Other Fees. Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between Borrower and the Administrative Agent.

(b)    Borrower shall on the Closing Date, pay to the Administrative Agent for the account of the Lenders making Term Loans an up-front fee equal to [    ]% of the aggregate amount of Term Loans made by such Lenders; *provided* that such up-front fee may take the form of original issue discount if so determined by the Arrangers. Once paid, none of the fees shall be refundable under any circumstances.

(c)    [Extended Term Loan Maturity Date Fee. If Borrower elects to extend the Initial Term Loan Maturity Date to [        ] pursuant to Section 2.09(b), Borrower shall pay to the Administrative Agent on behalf of the Lenders an extension fee equal to [        ]% of the aggregate principal amount of Term Loans outstanding on [        ].]

Section 2.06.    *Interest on Loans.*

(a)    Interest. Subject to the provisions of Section 2.06(b) and except as otherwise provided in Section 2.06(m), the Loans shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, payable in kind (the "**PIK Interest**") by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06). All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes.

(b)    Default Rate. Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on any Loan or any fee or other amount payable by Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to such Loan as provided in Section 2.06(a) (the "**Default Rate**").

(c)    Interest Payment Dates. Accrued interest on each Loan shall be payable in kind in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    Interest Calculation. All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)    Interest Act (Canada). For the purposes of the Interest Act (Canada) and disclosure thereunder, in any case in which an interest or fee rate is stated in this Agreement to be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate to which such interest or fee rate is equivalent is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation.

(f)    No Criminal Rate of Interest. If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Secured Party of "interest" at a "criminal

rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

> (i)    first, by reducing the amount or rate of interest required to be paid to the affected Secured Party; and

> (ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

(g)    Each Borrowing initially shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.06; *provided* that except as otherwise provided herein, a Loan may be continued or converted only on the last day of an Interest Period for such Loan.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(h)    To make an election pursuant to this Section 2.06, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(i)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

> (i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

> (ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

> (iii)    the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

(j)        If any such Interest Election Request is not timely delivered prior to the last day of the Interest Period applicable to such Borrowing or if any such Interest Election Request does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(k)        Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(l)        Break Funding Payments.  In the event of (a) the payment of any principal of any Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance therewith), or (c) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, then, in any such event, the Borrower shall compensate each Lender for the reasonable and documented loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.06(l) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof, absent a good-faith dispute.

(m)        Alternate Interest Rate.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing, the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period, then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, payable in kind by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06).

All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes. Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Section 2.07.    *Termination of Commitments.*

The Commitments shall automatically terminate at 5:00 p.m., New York City time, on the date that the initial Credit Extension is made hereunder (such date, the "**Closing Date**").

Section 2.08.    *[Reserved].*

Section 2.09.    *Repayment of Loans.*

(a)        Subject to Section 2.09(b), Borrower shall pay to the Administrative Agent, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans, together with accrued and unpaid interest thereon [plus the applicable Payment Premium].

(b)        [Extension of Maturity Date.  Borrower may, at its option, extend the Maturity Date from the Initial Term Loan Maturity Date by one year to [        ] (such later date, the "**Extended Term Loan Maturity Date**") if (i) no Default or Event of Default shall have occurred, (ii) Borrower's Available Liquidity as of [        ] is greater than the Minimum Liquidity after giving pro forma effect to payment of the fees required by Section 2.05(c), (iii) fees required by Section 2.05(c) shall have been paid, (iv) all representations and warranties contained in Article 3 are true and correct in all material respects (unless already qualified by materiality in which case they are true and correct in all respects) as of the Initial Term Loan Maturity Date to the same extent as though made on and as of the Initial Term Loan Maturity Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct on and as of such earlier date, (v) the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower dated as of the Initial Term Loan Maturity Date with reasonable supporting detail as to the satisfaction of the conditions in this Section 2.09(b) and (vi) irrevocable notice of the Borrower's intent to extend the Maturity Date shall be provided to the Administrative Agent by 12:00 (noon) New York City time thirty (30) Business Days prior to the Maturity Date.]

Section 2.10.    *Optional and Mandatory Prepayments of Loans.*

(a)        Optional Prepayments. Borrower shall have the right at any time (and from time to time) after the first anniversary of the Closing Date to prepay the Loans, in whole or in part, subject to the requirements of this Section 2.10; [*provided* that prepayments under this Section 2.10(a) shall be permitted prior to the first anniversary of the Closing Date subject to payment of the Make Whole Amount for the Loans so prepaid]; *provided further*

that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)    Debt Incurrence. Immediately following any Debt Incurrence by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(c)    Asset Sales. Not later than three (3) Business Days following the receipt of any Net Cash Proceeds in excess of $[___] of any Asset Sale by Borrower or any of its Subsidiaries, Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that no such prepayment shall be required under this Section 2.10(c) with respect to any Asset Sale permitted by Section 6.06(a) and Section 6.06(c).

(d)    Casualty Events. Not later than three (3) Business Days following the receipt of any Net Cash Proceeds in excess of $[___] from a Casualty Event by Borrower or any of its Subsidiaries, Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that so long as no Default shall then exist or arise therefrom, if such proceeds result from a Casualty Event involving (i) the First Satellite or (ii) assets that are being used or are contemplated to be used by the Borrower or any of its Subsidiaries in accordance with the business plan as described to the Lenders prior to the Closing Date, such proceeds shall not be required to be so applied on such date to the extent that Borrower on or prior to such date requests such proceeds to be used to repair, replace or restore the First Satellite or the assets described in clause (ii) above and does apply such proceeds to such repair or replacement or restoration, as applicable, no later than 12 months following the date of receipt of such proceeds (or such longer period as the Administrative Agent shall reasonably agree to).

(e)    Litigation Claims.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Litigation Claims contributed to the Borrower, Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(f)    Notice of Prepayment. Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than (A) 30 days before the date of prepayment, if such prepayment is an optional prepayment pursuant to Section 2.10(a) and (B) 11:00 a.m., New York City time, three Business Days before the date of prepayment, if such prepayment is a mandatory prepayment pursuant to Section 2.10(b), (c), (d) or (e). Each such notice shall be irrevocable; provided that a notice of prepayment so delivered, if delivered with respect to the entire outstanding principal amount of the Obligations, may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by Borrower (by notice to the Administrative Agent on or prior to the specified prepayment date) if such condition is not satisfied. Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each

partial prepayment of the Loans shall be in an amount that would be permitted in the case of a Credit Extension as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.

(g)        Application of Payments; Payment Premium. If Borrower prepays or repays, for any reason (including at maturity or any voluntary or mandatory prepayment pursuant to this Section 2.10, whether as a result of an acceleration following an Event of Default or otherwise), all or any part of the principal balance of any Loan (i) on or prior to the first anniversary of the Closing Date, Borrower shall pay the applicable Make Whole Amount and (ii) after the first anniversary of the Closing Date, Borrower shall pay the applicable Payment Premium, in each case to the Administrative Agent, for the benefit of all Lenders entitled to a portion of such prepayment or repayment. Each Make Whole Amount or Payment Premium payable hereunder shall be fully earned as a fee upon the effectiveness of the Closing Date. Each prepayment of Loans shall be applied ratably and otherwise in accordance with this Section 2.10. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

(h)        Declined Proceeds. Notwithstanding the foregoing, any Lender may elect, by notice to the Administrative Agent by telephone (confirmed by e-mail, facsimile or other electronic communication) at least two Business Days prior to the prepayment date in connection with any mandatory prepayment required pursuant to Section 2.10(b), (c), (d) or (e), to decline all or any portion of any prepayment required to be made pursuant to Section 2.10(b), (c), (d) or (e), in which case the aggregate amount of the proceeds so declined will be offered pro rata to other Lenders.  If all Lenders elect to decline all or any portion of any prepayment as described in this Section 2.10(h) (such amount, the "**Declined Proceeds**"), such Declined Proceeds may be applied by the Borrower to prepay Indebtedness outstanding under the Junior Lien Loan Documents and/or the definitive documentation governing any Indebtedness permitted to be incurred pursuant to Section 6.01(f)

Section 2.11.    *[Reserved].*

Section 2.12.    *Yield Protection.*

(a)        Increased Costs Generally. If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender; or

(ii)        subject any Lender to any Taxes of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for (i) Indemnified Taxes indemnifiable under Section 2.15 and (ii) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes payable by such Lender);

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any

other amount), then, upon request of such Lender, Borrower will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)        Capital Requirements. If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)        Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)        Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13.    *[Reserved]*.

Section 2.14.    *Payments Generally; Pro Rata Treatment; Sharing of Setoffs.*

(a)        Payments Generally. Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees [(including the Make Whole Amount, if any)], or of amounts payable under Sections 2.12, 2.15 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at New York City, except that payments pursuant to Sections 2.12, 2.15 or 10.03 shall be made directly to

the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

       (b)      Pro Rata Treatment.

          (i)     Except as provided in Section 2.10(b), each payment by Borrower of interest in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.

          (ii)    Except as provided in Section 2.10(b), each payment on account of principal of the Loans shall be allocated among the Lenders pro rata based on the principal amount of the Loans held by the Lenders.

       (c)      Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties. It is understood that the foregoing does not apply to any adequate protection payments under any federal, provincial, state or foreign bankruptcy, insolvency, receivership or similar proceeding, and that the Administrative Agent may, subject to any applicable federal, provincial, state or foreign bankruptcy, insolvency, receivership or similar orders, distribute any adequate protection payments it receives on behalf of the Lenders to the Lenders in its sole discretion (i.e., whether to pay the earliest accrued interest, all accrued interest on a pro rata basis or otherwise).

       (d)      Sharing of Set-Off. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e)     Borrower Default. Unless the Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, the Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.15.  *Taxes.*

(a)     Payments Free of Taxes. Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes [(but shall be inclusive of any Canadian Goods and Services Tax/Harmonized Sales Tax)]; provided that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including deductions applicable to additional sums

payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)        Payment of Other Taxes by Loan Parties. Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay any Other Taxes [(other than Canadian Goods and Services Tax/Harmonized Sales Tax)] to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)        Indemnification by Loan Parties. The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis and computation of such payment or liability, shall be conclusive absent manifest error; provided that, upon Borrower's timely written request, the Administrative Agent or Lender may, in its sole discretion, exercised in good faith, after consultation with Borrower, and at the Borrower's expense, contest the validity, applicability or amount of such Taxes by (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, or (iii) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; provided that (y) the Administrative Agent or such Lender will not be required to take any action or continue to pursue an action (or inaction) hereunder which, in its sole discretion, could cause the Administrative Agent or such Lender to suffer any disadvantage, and (z) on written demand from the Administrative Agent or the Lender, as the case may be, Borrower agrees to pay, and shall timely pay, to the Administrative Agent or such Lender all reasonable costs and expenses that the Administrative Agent or such Lender actually incurs in connection with and reasonably allocable to contesting such claim (including reasonable legal and accounting fees, penalties, interest, and additions to Tax) and any Indemnified Taxes that are paid by the Administrative Agent or the Lender.

(d)        Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)        Status of Lenders. (i)  Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other

Loan Document shall, to the extent it may lawfully do so, deliver to Borrower and to the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding (including any withholding under FATCA). In addition, any Lender, if requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(ii)     Without limiting the generality of the foregoing,

(A) any Foreign Lender shall, to the extent it may lawfully do so,  deliver to Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit Q-1, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(iv)     to the extent a Foreign Lender is not the beneficial owner executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, a certificate in substantially the form of Exhibit Q-2 or

Exhibit Q-3, Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit Q-4, on behalf of such direct and indirect partner or

(v)    any other form prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(B)  Each Foreign Lender shall, to the extent it is legally entitled to do so, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in withholding tax or (2) notify Administrative Agent and Borrower of its legal inability to deliver any such forms, certificates or other evidence.

(C)  Any Lender that is not a Foreign Lender shall deliver to Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of Borrower or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 certifying that it is not subject to backup withholding.

(D)  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of

this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender or in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes giving rise to such refund had never been imposed in the first instance.

(g)    Payments. For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from Borrower on behalf of such Lender shall be treated as a payment from Borrower to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrower.

(h)    Survival. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

Section 2.16.    *Mitigation Obligations; Replacement of Lenders.*

(a)    Designation of a Different Lending Office. If any Lender requests compensation under Section 2.12, or requires Borrower to pay any additional amount to any

Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to Borrower shall be conclusive absent manifest error.

(b)       Replacement of Lenders. If any Lender requests compensation under Section 2.12, or if Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender is a Defaulting Lender, or if Borrower exercises its replacement rights under Section 10.02(d), then Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)       Borrower shall have paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)       such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, assuming for this purpose (in the case of a Lender being replaced pursuant to Section 2.12, 2.15 or 10.02(d)) that the Loans of such Lender were being prepaid) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(iii)       in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)       such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

Each Lender agrees that, if Borrower elects to replace such Lender in accordance

with this Section 2.16(b), it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; provided that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

Section 2.17.   *[Reserved].*

Section 2.18.   *[Reserved].*

Section 2.19.   *Defaulting Lenders.*

Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then for so long as such Lender is a Defaulting Lender any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.14(d) but excluding Section 2.16(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by the Administrative Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder, (ii) second, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent, (iii) third, if so determined by the Administrative Agent and Borrower, held in such account as cash collateral for future funding obligations of the Defaulting Lender under this Agreement, (iv) fourth, pro rata, to the payment of any amounts owing to Borrower or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement and (v) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is (x) a prepayment of the principal amount of any Loans which a Defaulting Lender has funded its participation obligations and (y) made at a time when the conditions set forth in Section 4.01 are satisfied, such payment shall be applied solely to prepay the Loans of all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans owed to any Defaulting Lender. The rights and remedies against a Defaulting Lender under this Section 2.19 are in addition to other rights and remedies that Borrower, any other Loan Party, the Administrative Agent and the non-Defaulting Lenders may have against such Defaulting Lender. The arrangements permitted or required by this Section 2.19 shall be permitted under this Agreement, notwithstanding any limitation on Liens or the pro rata sharing provisions or otherwise.

Section 2.20.   *Increase in Commitments.*

(a)       Borrower Request. Borrower may by written notice to the Administrative Agent elect to request the establishment of one or more new term loan facilities (the

"**Incremental Loan Facilities**"), in an aggregate original principal amount that, when taken together with all other Incremental Loan Facilities, does not exceed $500,000,000 (excluding PIK Interest) and not less than $10,000,000 individually and integral multiples of $5,000,000 in excess of that amount. Each such notice shall specify (A) the date (each, an "**Increase Effective Date**") on which the Borrower proposes that the Incremental Loan Facilities, as applicable, shall be effective, which shall be a date not less than 10 Business Days after the date on which such notice is delivered to the Administrative Agent (or such earlier date as the Administrative Agent may agree) and (B) the identity of each Lender or other Person that is an Eligible Assignee (each, an "**Incremental Loan Lender**", as applicable) to whom the Borrower proposes any portion of such Incremental Loan Facilities, as applicable, be allocated and the amounts of such allocations; provided that any Lender approached to provide all or a portion of the Incremental Loan Facilities may elect or decline, in its sole discretion, to provide a commitment for an Incremental Loan Facility.

(b)     Conditions. The Commitments for the Incremental Loan Facilities shall become effective as of such Increase Effective Date; *provided* that:

(i)     the FCC Condition shall have been satisfied;

(ii)     each of the conditions set forth in Section 4.01 (y)-(bb) shall be satisfied; and

(iii)     Borrower shall deliver or cause to be delivered any customary legal opinions or other documents reasonably requested by the Administrative Agent in connection with any such transaction.

(c)     Terms of New Loans and Commitments. The terms and provisions of Loans made pursuant to the new Commitments shall be as follows:

(i)     terms and provisions of Loans made pursuant to Incremental Loan Facilities ("**Incremental Loans**") shall be, except as otherwise set forth in clauses (ii)-(iv) below to the extent specified in the applicable Increase Joinder, identical to the Term Loans;

(ii)     the weighted average life to maturity of any Incremental Loans shall be no shorter than the weighted average life to maturity of the existing Term Loans;

(iii)     the maturity date of Incremental Loans shall be no earlier than the Maturity Date; and

(iv)     the Weighted Average Yield applicable to the Incremental Loans of each series shall be determined by the Borrower and the applicable new Lenders and shall be set forth in each applicable Increase Joinder; provided, however, that the Weighted Average Yield applicable to the Incremental Loans shall not be greater than the Weighted Average Yield payable pursuant to the terms of this Agreement as amended through the date of such calculation with respect to Term Loans plus 0.50% per annum unless the interest rate with respect

to the Term Loans is increased so as to cause the then applicable Weighted Average Yield  then applicable under this Agreement on the Term Loans to equal the Weighted Average Yield  then applicable to the Incremental Loans minus 0.50%; *provided* further that if the Incremental Loans include an interest rate floor greater than the interest rate floor applicable to the Term Loans, the interest rate floor for such Incremental Loans shall be equated to interest rate for purposes of determining whether an increase to the applicable interest rate for the Term Loans shall be required, and in such case, the interest rate floor (but not the interest rate margin) applicable to the Term Loans shall be increased by such amount.

(d)    Making of New Loans. On any Increase Effective Date on which new Commitments for Incremental Loans are effective, subject to the satisfaction of the foregoing terms and conditions, each Lender of such new Commitment shall make an Incremental Loan to Borrower in an amount equal to its new Commitment.

(e)    Equal and Ratable Benefit. The Loans and Commitments established pursuant to this paragraph shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and security interests created by the Security Documents. The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Security Documents continue to be perfected under the UCC or otherwise after giving effect to the establishment of any such Loans or any such new Commitments.

Section 2.21.    *Currency Indemnity.*

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given. For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office in New York, New York. In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and

the Lenders harmless from and against all loss or damage arising as a result of such deficiency. This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders (with references to the Companies being references thereto after giving effect to the Transactions unless otherwise expressly stated) that:

Section 3.01.   *Organization; Powers.*

Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

Section 3.02.   *Authorization; Enforceability.*

The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.   *No Conflicts.*

[Except as set forth in Schedule 3.03,][2] the Transactions (a) do not require any

---

[2] Subject to review of Schedule 3.03.

-58-

consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

Section 3.04.   *Financial Statements; Projections.*

(a)        Historical Balance Sheets; Forecasted Cash Flows. Borrower has heretofore delivered to the Administrative Agent and the Lenders (i) an unaudited consolidated balance sheet for LightSquared Inc. as of and for the fiscal quarter ending immediately prior to the Closing Date, (ii) the unaudited consolidated monthly operating statements for the twelve fiscal months ending immediately prior to the Closing Date, (iii) Borrower's most recent consolidated forecasted cash flows in form reasonably acceptable to the Lenders for the four-year period beginning on the Plan Effective Date (set forth on a monthly basis for the first year and on an annual basis thereafter), and (iv) a balance sheet of the Borrower on a consolidated basis after giving pro forma effect to the Transactions.  The balance sheets and information referred to in clauses (i) through (iv) of this Section 3.04(a) have not been prepared in accordance with GAAP.  The financial statements delivered pursuant to Sections 5.01(a) and (b) have been prepared in accordance with GAAP and present fairly and accurately the financial condition and , if applicable, the results of operations and cash flows, of LightSquared Inc. or Borrower, as applicable, as of the dates and for the periods to which they relate.

(b)        No Liabilities. Except as set forth in the financial statements referred to in Section 3.04(a) (or, after the Closing Date, as set forth in the financial statements referred to in Section 5.01), there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents. Since December 31, 2013, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

(c)        Forecasts. The forecasts of financial performance of Borrower and its subsidiaries furnished to the Lenders have been prepared in good faith by Borrower and based on assumptions believed by Borrower at the time such forecasts were prepared and delivered to be reasonable.

Section 3.05.   *Properties.*

(a)      Generally. Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Collateral Liens and, in the case of all other material property, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)      Real Property. Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of each interest in Real Property, other than Canadian Real Property, and each interest in material Canadian Real Property, in each case (i) owned by the Borrower or any of its Subsidiaries as of the date hereof and describes the type of interest therein held and whether such owned Real Property is leased and if leased whether the underlying Lease contains any option to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by the Borrower or any of its Subsidiaries, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)      No Casualty Event. No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property. No Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04. No Mortgage encumbers improved Real Property that is located in an area that has been identified by an authority under the Conservation Authorities Act (Ontario) or similar legislation in any other Canadian jurisdiction as "hazardous lands" or as an area subject to regulation under Section 28 of that Act, unless approval from such authority has been obtained and the conditions of such approval, if any, have been complied with.

(d)      Collateral. Each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Loan Party's business as currently conducted. The use by each Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)        One Dot Six Lease. Each of the Loan Parties has complied in all material respects with all obligations under the One Dot Six Lease, which is in full force and effect. Reorganized One Dot Six enjoys peaceful and undisturbed possession under the One Dot Six Lease.

Section 3.06.    *Intellectual Property.*

(a)        Ownership/No Claims. Each Company owns, or is licensed to use, all patents, trademarks, trade names, service marks, copyrights (and all registrations and applications for registration of any of the foregoing), technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") material to the conduct of its business as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof). No claim by written notification addressed to any Company and in the possession of any Company has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that any Company is infringing, misappropriating or otherwise violating the Intellectual Property rights of any person, nor does any Company know of any valid basis for any such claim that in each case could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. The conduct of the business of each Company as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

(b)        Registrations. Except pursuant to licenses and other user agreements entered into by the Borrower and its Subsidiaries in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate, on and as of the date hereof (i) Borrower or its Subsidiaries, as indicated in Schedule 11(a) or 11(b) to the Perfection Certificate, owns and possesses the right to use, and has not licensed any other person to use, any copyright, patent, trademark or service mark (or any application for registration of any of the foregoing listed in Schedule 11(a) or 11(b) to the Perfection Certificate and (ii) to each Loan Party's knowledge, all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate are valid and in full force and effect.

(c)        No Violations or Proceedings. To each Loan Party's knowledge, on and as of the date hereof, there is no material violation by others of any right of the Borrower or its Subsidiaries with respect to any copyright, patent, trademark or service mark listed in Schedule 11(a) or 11(b) to the Perfection Certificate, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

Section 3.07.    *Equity Interests and Subsidiaries; Reorganized LightSquared Inc.*

(a)        Equity Interests. Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) all the Subsidiaries of the Borrower and their jurisdictions of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the

number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of Borrower, are owned by Borrower, directly or indirectly through Wholly Owned Subsidiaries. As of the Closing Date (and except as described in the Plan of Reorganization), all of the Equity Interests of Borrower are owned directly or indirectly by the Equity Investors and Reorganized LightSquared, Inc.. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the U.S. Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created by the U.S. Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement. As of the Closing Date (and except as described in the Plan of Reorganization), there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     No Consent of Third Parties Required. No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the U.S. Security Agreement, the Canadian Security Agreement, or the U.S. Pledge Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the U.S. Security Agreement, the Canadian Security Agreement, or the U.S. Pledge Agreement or the exercise of remedies in respect thereof, except for such FCC, Industry Canada or CRTC consents as may be required under the Communications Laws in connection with the exercise of such remedies.

(c)     Organizational Chart. An accurate organizational chart, showing the ownership structure of the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

(d)     Inactive Subsidiaries. Each of LightSquared Finance, Co., LightSquared (UK) Limited and SkyTerra Investors LLC has no assets and conducts no operations.

(e)     [Reorganized LightSquared Inc. shall (i) other than its Equity Interest in the Borrower, have only de minimis assets ancillary to its existence and as contemplated by the Plan of Reorganization and its rights hereunder and under the Reorganized LightSquared Inc. Loan Agreement, and in any event shall have no leases, spectrum or tangible assets and (ii) have no operations, except those incidental to ownership of the assets described in clause (i).][3]

Section 3.08.   *Litigation; Compliance with Laws.*

---
[3] To be discussed.

Except as set forth in Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. No Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

Section 3.09.   *Agreements.*

No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect. No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.09 accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 7(a) or 7(b) to the Perfection Certificate dated the Closing Date) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

Section 3.10.   *Federal Reserve Regulations.*

No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the U.S. Security Agreement does not violate such regulations.

Section 3.11.   *Investment Company Act.*

No Company is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12.   .   *Use of Proceeds.*

Borrower will use the proceeds of (a) the Loans made on the Closing Date (i) to make distributions to creditors of the Borrower and its Subsidiaries in accordance with the Plan of Reorganization, (ii) to pay related fees and expenses related to the Transactions and (iii) for general corporate purposes of the Borrower and its Subsidiaries and (b) any Incremental Loans for the purposes specified in the applicable Incremental Joinder.

Section 3.13.   *Taxes.*

Each Company has (a) timely filed or caused to be timely filed all material federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP) or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect and (c) satisfied all of its withholding tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Company has made adequate provision (after the Closing Date, in accordance with GAAP) for all material Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Except as could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "**participated**" in a "**listed transaction**" within the meaning of Treasury Regulation Section 1.6011-4.

Section 3.14.   *No Material Misstatements.*

No information, reports, financial statements, certificates, Borrowing Requests, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.15.   *Labor Matters.*

There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, the Canada Labour Code, as amended, or any other applicable Requirements of Law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.16.  *Solvency.*

Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of the Term Loan and after giving effect to the application of the proceeds of the Term Loan, (a) the fair value of the properties of Borrower (on a consolidated basis with its Subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of Borrower (on a consolidated basis with its Subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

Section 3.17.  *Employee Benefit Plans.*

With respect to each Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance could not reasonably be expected to result in a Material Adverse Effect. Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Plan, Single Employer Plan or Multiemployer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by any

-65-

Company or any of its ERISA Affiliates with respect to any Plan, Single Employer Plan or Multiemployer Plan, except where such liability could not reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates. The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on those assumptions used to fund such plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefit by a material amount. As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material. The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under a Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability could not reasonably be expected to result in a Material Adverse Effect.

To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. Except as could not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred which could reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect. The Canadian Pension Plans are in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Loan Parties (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect. All

contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect. There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans. None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act.

Section 3.18.  *Environmental Matters.*

(a)     Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(i)     The Companies and their businesses, operations and Real Property have been and are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)     The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)     To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability of or by the Companies under any applicable Environmental Law;

(iv)     There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could reasonably form the basis of such an Environmental Claim; and

(v)     No person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)     Except as set forth in Schedule 3.18:

(i)        No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)        No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)        No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)        The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)        The Companies have made available to the Lenders all material records and files in the possession, custody or control of the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.19.   *Insurance.*

Schedule 3.19 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date. All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the Premises, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement. Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.20.   *Security Documents.*

(a)        U.S. Security Agreement. The U.S. Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and

enforceable Liens on, and security interests in, the U.S. Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the U.S. Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Security Document), the Liens created by the U.S. Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the U.S. Security Agreement Collateral (other than such U.S. Security Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)    Canadian Security Agreement. The Canadian Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Canadian Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Canadian Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Security Document), the Liens created by the Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Canadian Security Agreement Collateral (other than such Canadian Security Agreement Collateral in which a security interest cannot be perfected under the PPSA as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(c)    U.S. Pledge Agreement. The U.S. Pledge Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the U.S. Pledge Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the U.S. Pledge Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Security Document), the Liens created by the U.S. Pledge Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the U.S. Pledge Agreement Collateral (other than such U.S. Pledge Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(d)    [Reserved].

(e)        PTO Filing; Copyright Office Filing. When the U.S. Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Liens created by such U.S. Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in all Patents and Trademarks (each as defined in the U.S. Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the U.S. Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Permitted Collateral Liens.

(f)        CIPO Filing. When the Canadian Security Agreement or a short form thereof is filed with CIPO the Liens created by such Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents, Copyrights and Trademarks (as each such term is defined in the Canadian Security Agreement) registered or applied for with CIPO, in each case subject to no Liens other than Permitted Collateral Liens.

(g)        Valid Liens. Each Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than the applicable Permitted Collateral Liens.

Section 3.21.   *Intercompany Indebtedness; Affiliate Indebtedness.*

(a)        Except for Indebtedness owed by any Canadian Subsidiary to the Borrower the proceeds of which were used to fund operations, no Company has outstanding any Indebtedness owing to an Affiliate of such Loan Party (except Indebtedness that is permitted under Section 6.01).

(b)        Neither the Borrower nor any of its Subsidiaries is party to or otherwise bound by any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets (except for Indebtedness permitted under Section 6.01, so long as such Indebtedness does not prohibit Liens on the Collateral in favor of the Administrative Agent and the Lenders), or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or

repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary.

Section 3.22.  *Anti-Terrorism Laws; Anti-Corruption Laws.*

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**").  No part of the proceeds of the loans will be used, directly or, to the Borrower's knowledge, indirectly for any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(c)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.23.  *Communications Licenses and Regulatory Matters.*

(a)    Schedule 3.23(a) accurately and completely lists all Communications Licenses, including Material Licenses.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies as presently conducted.  All such Material Licenses, except for those which have been applied for but have not been granted, are in good standing and in full force and effect and, except for the One Dot Six License, are

duly issued in the name of, or validly assigned to, the applicable Company. One Dot Six has been validly granted the right to use the spectrum covered by the One Dot Six License pursuant to the One Dot Six Lease and the One Dot Six Lease Authorization.

(b)     The Companies are in compliance in all material respects with all Communications Laws. No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.20(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect). Except as described in Schedule 3.20(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as could not, individually or in the aggregate, have a Material Adverse Effect.

(c)     Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, and remain, true, correct and complete in all material respects.

(d)     Except for any FCC or Industry Canada consents that may be required in connection with any enforcement against any Collateral. No consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)     Except as provided in Schedule 3.23(b), provided that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

Section 3.24.   *License Subsidiaries.*

No License Subsidiary holds any significant assets (other than the Communications Licenses held by it) or material liabilities (other than under the other Loan Documents to which it is a party and any documents related thereto to which it is a party) and other than the License Subsidiaries, Reorganized One Dot Six, and LightSquared Inc. of VA, none of the Companies holds any U.S. authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.

ARTICLE 4

CONDITIONS TO CREDIT EXTENSIONS

Section 4.01.    *Conditions to Making of the Loans.*

The obligation of each Lender to make the Credit Extension shall be subject to the satisfaction or waiver by each Lender of each of the conditions precedent set forth below.

(a)    Loan Documents. All legal matters incident to this Agreement, the Credit Extensions hereunder and the other Loan Documents shall be satisfactory to the Lenders and to the Administrative Agent and there shall have been delivered to the Administrative Agent an executed counterpart of each of the Loan Documents and the Perfection Certificate.

(b)    Corporate Documents. The Administrative Agent shall have received:

(i)    a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party organized in the United States) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i));

(ii)    a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority); and

(iii)    such other documents as the Lenders or the Administrative Agent may reasonably request.

(c)    Officers' Certificate. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of Borrower, confirming compliance with the conditions precedent set forth in this Section 4.01.

(d)    Financings and Other Transactions, etc.

(i)    No event of default shall have occurred and be continuing under the Existing DIP Credit Agreement nor shall the lenders thereunder (or any agent

thereof) have commenced the exercise of rights and remedies under the documentation governing the New DIP Facility or Applicable Law.

    (ii)    The Administrative Agent and the Lenders shall have received satisfactory evidence, including customary payoff letters, that all debt outstanding under the New DIP Facility has been (x) repaid in full in cash or (y) otherwise satisfied pursuant to the terms of the Existing DIP Credit Agreement and the Plan of Reorganization.

    (iii)    The pro forma capital and ownership structure of the Loan Parties shall be substantially as described in the Plan of Reorganization.

(e)    Financial Statements; Pro Forma Balance Sheet; Projections. The Lenders shall have received and shall be satisfied with the form of the information described in Section 3.04 and with the forecasts of the financial performance of Borrower and its Subsidiaries.

(f)    Indebtedness and Minority Interests. After giving effect to the Transactions and the other transactions contemplated hereby and the consummation of the Plan of Reorganization, no Company shall have outstanding any Indebtedness or preferred stock, except as expressly contemplated by the Plan of Reorganization and expressly permitted under the Loan Documents.

(g)    Opinions of Counsel. The Administrative Agent shall have received, on behalf of itself, the Collateral Agent, the Arranger and the Lenders, a favorable written opinion of (i) Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Loan Parties, (ii) Latham & Watkins LLP, FCC counsel for the Loan Parties and (iii) Dentons Canada LLP, Canadian counsel for SkyTerra (Canada) Inc., SkyTerra Holdings (Canada) Inc. and Reorganized LightSquared Corp. and Canadian radiocommunication and telecommunications regulatory counsel for the Loan Parties and (iv) each local and foreign counsel listed on Schedule 4.01(g), in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent, the Collateral Agent and the Lenders and (C) covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request.

(h)    Solvency Certificate. The Administrative Agent shall have received a solvency certificate in the form of Exhibit O, dated the Closing Date and signed by a Financial Officer of Borrower.

(i)    Requirements of Law. The Lenders shall be satisfied that the Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board, and shall have received satisfactory evidence of such compliance reasonably requested by them.

(j)    Minimum Unrestricted Cash and Cash Equivalents.  The Loan Parties shall collectively have not less than $[___] in Unrestricted Cash and Cash Equivalents on a pro forma basis after giving effect to the Transactions.

(k)        Consents. The Lenders shall be satisfied that after giving effect to the Plan Confirmation Order and the Confirmation Recognition Order, all requisite Governmental Authorities in all relevant jurisdictions, including, without limitation, the FCC, Industry Canada and any other relevant regulatory agency, and third parties shall have authorized, approved or consented to the Transactions, including as necessary in connection with the transfer, change of control, or assignment of FCC and Industry Canada licenses, (i) all relevant statutory waiting periods shall have expired, no appeals of any such approvals, authorizations or consents shall remain outstanding and (ii) except as set forth in Schedule 3.23(b), there shall be no governmental or judicial action, actual or threatened, in the case of each of (i) and (ii), (A) that has or would have, singly or in the aggregate, a reasonable likelihood of restraining, preventing or imposing burdensome conditions on the Transactions or the other transactions contemplated hereby, (B) that directly affects the credit facility hereunder or the financial strength of the Loan Parties or (C) that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders, in each case as determined by the Lenders in their sole discretion.

(l)        Junior Lien Financing.  The Borrower shall have incurred, or substantially simultaneously with the initial borrowing hereunder, shall incur $1,200,000,000 of Junior Lien Term Loans, which shall be issued to make distributions to creditors of the Borrower and its Subsidiaries in accordance with the Plan of Reorganization and as permitted in Section 6.01(k) hereof.

(m)        Fees. The Arrangers, Lenders and Administrative Agent shall have received all reasonable and documented invoiced fees and other amounts due and payable on or prior to the Closing Date hereunder and pursuant to the Fee Letter, including, to the extent invoiced, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including the legal fees and expenses of Davis Polk & Wardwell LLP, special counsel to the Administrative Agent, legal fees and expenses of Wiley Rein LLP, special regulatory counsel to the Administrative Agent and the fees and expenses of any local counsel, foreign counsel, appraisers, consultants and other advisors) required to be reimbursed or paid by Borrower hereunder or under any other Loan Document.

(n)        Personal Property Requirements. The Administrative Agent shall have received:

(i)        except as specified on Schedule 5.14, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)        [reserved];

(iii)        except as specified on Schedule 5.14 and subject to Section 5.03(c), all other certificates, agreements, including Control Agreements, or instruments necessary to perfect the Collateral Agent's security interest in all Chattel Paper, all Instruments, all Deposit Accounts and all Investment Property of Borrower and each Subsidiary Guarantor (as each such term is defined in the

U.S. Security Agreement or Canadian Security Agreement, as applicable, and to the extent required by such agreement);

(iv)    UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable, filings with the United States Patent and Trademark Office, United States Copyright Office and CIPO and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Administrative Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents;

(v)    certified copies of UCC, PPSA, Bank Act (Canada), United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches, execution searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those federal, state, provincial and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Collateral Liens, Liens released on or prior to the Closing Date or any other Liens acceptable to the Administrative Agent); and

(vi)    evidence acceptable to the Administrative Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

(o)    Insurance. The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and, in the case of general liability policies, shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent.

(p)    USA PATRIOT Act. The Lenders and the Administrative Agent shall have received the information required under Section 10.15 not less than five (5) Business Days prior to the Closing Date provided and to the extent that such information is requested not less than ten (10) Business Days prior to the Closing Date.

(q)    Plan Confirmation Order, Confirmation Recognition Order and the Cooperation Agreement Order. The Plan Confirmation Order and the Confirmation Recognition Order shall (i) contain provisions approving this Agreement and the Transactions that are satisfactory to the Lenders in their sole discretion and, (ii) be consistent

with the terms of this Agreement with respect to any terms therein reasonably related to this Agreement and the Transactions.  The Plan Confirmation Order, the Confirmation Recognition Order and the Cooperation Agreement Order shall (A) be in form and substance satisfactory to the Lenders in their sole discretion, (B) have been entered by the Bankruptcy Court and the Canadian Court, as applicable, and shall be in full force and effect, unstayed, final and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived by the Lenders in writing in their sole discretion; (C) not have been reversed, vacated or revoked; and (D) not have been amended, supplemented or otherwise modified in any manner without the prior written consent of the Lenders.

(r)    No Amendments to Plan of Reorganization. The Plan of Reorganization as of [        ], 2014 and the Disclosure Statement as in effect on [            ], 2014 shall not have been amended, modified or supplemented in any manner without the prior written consent of the Lenders.

(s)    Satisfaction of Conditions Precedent. (i) All conditions precedent to the effectiveness of the Plan of Reorganization shall have been (or shall be concurrently with the effectiveness of this Agreement) satisfied to the reasonable satisfaction of the Lenders and shall not be waived or modified without the prior written consent of the Lenders, (ii) the Plan Effective Date shall have occurred on or before the Closing Date and (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan of Reorganization in accordance with its terms shall occur substantially concurrently with the Closing Date.

(t)    FCC Matters.  Except as otherwise agreed by the Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any element of the FCC Condition.

(u)    License Subsidiaries.  All licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries.

(v)    Spectrum Leases.  All material spectrum leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(w)    Control Agreements.  Any deposit or securities accounts maintained by the Borrower or any Subsidiary Guarantor shall be subject to account control agreements.

(x)    No Material Adverse Effect.  There shall not have occurred since December 31, 2013 any change, circumstance, development or event (and the Arrangers shall not have discovered or otherwise become aware of facts or conditions not previously known to them),

which the Arrangers shall determine has had or could be reasonably expected to have a Material Adverse Effect.

(y)     Notice. The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03).

(z)     No Default. Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(aa)     Representations and Warranties. Each of the representations and warranties made by any Loan Party set forth in Article 3 hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(bb)     No Legal Bar. No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it. No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(cc)     Other Agreements.  Each of the One Dot Six Lease, the Material Licenses and the Inmarsat Agreement shall be in full force and effect and shall not have been terminated; *provided* that the Inmarsat Agreement shall have been amended in a manner acceptable to the Lenders, which amendment shall include an extension of the period for election of spectrum and corresponding deferral of payments in respect thereof acceptable to the Lenders.

Each of the delivery of a Borrowing Request and the acceptance by Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by Borrower and each other Loan Party that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the conditions contained in Sections 4.01(z)-(bb) have been satisfied. Borrower shall provide such information as the Administrative Agent may reasonably request to confirm that the conditions in Sections 4.01(z)-(bb) have been satisfied.

Without limiting the generality of the provisions of Article 9, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed or becomes a party to this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required

thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

ARTICLE 5
AFFIRMATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of its Subsidiaries to:

Section 5.01.   *Financial Statements, Reports, etc.*

Furnish to the Administrative Agent and each Lender:

(a)    Annual Reports. As soon as available and in any event within 90 days after the end of each fiscal year, beginning with the fiscal year ending December 31, 2014 (in the case of the fiscal year ended December 31, 2014, within 120 days after the end of the fiscal year unless the Closing Date occurs after October 31, 2014, in which case within 180 days after the end of the fiscal year), financial statements and a "Management's Discussion and Analysis of Financial Condition and Results of Operations substantially equivalent to that which would be required to be included in an Annual Report on Form 10-K of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The Borrower may satisfy its obligations under this Section 5.01(a) by furnishing financial information relating to any direct or indirect parent entity of the Borrower; provided that, if required by Regulation S-X under the Securities Act, the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and any of its subsidiaries other than the Borrower and its Subsidiaries, on the one hand, and the information relating to the Borrower, the Subsidiary Guarantors and the other Subsidiaries of the Borrower on a stand-alone basis, on the other hand. The filing by the Borrower or any direct or indirect parent entity of the Borrower, of its Form 10-K or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal year reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such year;

(b)    Quarterly Reports. As soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the first full fiscal quarter ending after the Closing Date (but not in any event required to be delivered sooner than 180 days after the Closing Date), financial statements and a "Management's Discussion and Analysis of Financial Condition and Results of Operations substantially equivalent to that which would be required to be included in a Quarterly Report on Form 10-Q of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The Borrower may satisfy its obligations under this

Section 5.01(b) by furnishing financial information relating to any direct or indirect parent entity of the Borrower; provided that, if required by Regulation S-X under the Securities Act, the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and any of its subsidiaries other than the Borrower and its Subsidiaries, on the one hand, and the information relating to the Borrower, the Subsidiary Guarantors and the other Subsidiaries of the Borrower on a stand-alone basis, on the other hand. The filing by the Borrower or any direct or indirect parent entity of the Borrower, of its Form 10-Q or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal quarter reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such quarter;

(c)     Financial Officer's Certificate. (i) Concurrently with any delivery of financial statements under Section 5.01(a) or (b), a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; and (ii) concurrently with any delivery of financial statements under Section 5.01(a) above, beginning with the fiscal year ending December 31, 2014, a report of the accounting firm opining on or certifying such financial statements and, so long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, stating that in the course of its regular audit of the financial statements of Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge that any Default insofar as it relates to financial or accounting matters has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof;

(d)     Financial Officer's Certificate Regarding Collateral. Concurrently with any delivery of financial statements under Section 5.01(a), (i) a certificate of a Financial Officer setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement and (ii) a certificate of a Financial Officer and the chief legal officer of Borrower certifying that all UCC and PPSA financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(e)     Organization. Concurrently with any delivery of financial statements under Section 5.01(a), an accurate organizational chart as required by Section 3.07(c), or confirmation that there are no changes to Schedule 9(a) to the Perfection Certificate;

(f)     Public Reports. Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding

to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(g)        Management Letters. Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

(h)        Budgets. Within 60 days after the beginning of each fiscal year, a cash-based budget for Borrower in reasonable detail for (i) each fiscal quarter of such fiscal year and (ii) each fiscal year thereafter, through and including the fiscal year in which the Initial Term Loan Maturity Date [or Extended Term Loan Maturity Date, if applicable,] occurs, prepared in summary form, in each case, with appropriate presentation and discussion of the principal assumptions upon which such budgets are based, accompanied by the statement of a Financial Officer of Borrower to the effect that the budget of Borrower is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such budget;

(i)        Organizational Documents. Promptly provide copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within 15 days after such Company gives or receives such notice; and

(j)        Other Information. Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Section 5.02.    *Litigation and Other Notices.*

Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five Business Days of the occurrence thereof):

(a)        any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)        the filing or commencement of, or any threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to be materially adverse to such Company or Affiliate or (ii) with respect to any Loan Document;

(c)        any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)    the occurrence of a Casualty Event;

(e)    the occurrence of a Change in Control; and

(f)    the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease, the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with any Material License, the One Dot Six Lease, and/or the Inmarsat Agreement, (iii) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, Industry Canada, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (iv) any material correspondence with the FCC or Industry Canada; provided that in relation to the notices required to be delivered under this Section 5.02(f), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.23(b) attached hereto.

Section 5.03.    *Existence; Businesses and Properties.*

(a)    Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Notwithstanding anything to the contrary contained in this Section 5.03, any of the Borrower and the Subsidiary Guarantors may change its partnership, corporate or other existence to another form of existence so long as the perfection and priority of the Liens of the Collateral Agent created by the Security Documents are not adversely affected.

(b)    Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, service marks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property

material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; provided that nothing in this Section 5.03(b) shall prevent (i) sales of property, consolidations, amalgamations or mergers by or involving any Company in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License), trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable, or (iv) the relinquishment of spectrum rights as contemplated by Schedule 6.06(g).

(c)       Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred thereby), the One Dot Six Lease and the Inmarsat Agreement; provided that Borrowers may take actions required in furtherance of the objective underlying any Material Regulatory Request.

(d)       From the Closing Date, the Borrower shall ensure that any deposit or securities accounts maintained by it or any Subsidiary Guarantors shall be subject to account control agreements.

Section 5.04.   *Insurance.*

(a)       Generally. Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to Mortgaged Properties and other properties material to the business of the Companies against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations.

(b)       Requirements of Insurance. All such insurance, except for insurance with respect to property subject to a Lien permitted under Section 6.02(i), shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days (or 15 days in the case of satellite insurance) after receipt by the Collateral Agent of written notice thereof, (ii) name the Collateral Agent as mortgagee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable and (iii) be reasonably satisfactory in all other respects to the Administrative Agent.

(c)       Notice to Administrative Agent and Collateral Agent. Notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be

maintained under this Section 5.04 is taken out by any Company; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

(d)     Flood Insurance. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)     Broker's Report. Deliver to the Administrative Agent and the Collateral Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent or the Collateral Agent may from time to time reasonably request.

Section 5.05.   *Obligations and Taxes*

(a)     Payment of Obligations. Pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; provided that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and (i) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)     Filing of Returns. Timely and correctly file all material Tax Returns required to be filed by it. Withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

Section 5.06.   *Employee Benefits.*

Comply in all material respects with the applicable provisions of ERISA and the Code (and any Requirements of Law applicable to any Foreign Plan or Canadian Pension Plan) and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know that, (i) any ERISA Event or similar event with respect to a Foreign Plan or Canadian Pension Plan has occurred, (ii) the imposition of a Lien with respect to any Plan, a Single Employer Plan or a Multiemployer Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan if such amendment results in a material increase in benefits or unfunded

liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan or Single Employer Plan, a statement of a Financial Officer of Borrower setting forth details as to such ERISA Event and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as practicable following any request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Single Employer Plan; (ii) the most recent actuarial valuation report for each Plan, Single Employer Plan and Multiemployer Plan; (iii) all notices received by any Company or any of its ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; (iv) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent shall reasonably request and (z) as soon as practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; provided that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

Section 5.07.   *Maintaining Records; Access to Properties and Inspections; Annual Meetings.*

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. The Borrower and each of its Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants).

(b)    Within 120 days after the end of each fiscal year of the Companies, at the request of the Administrative Agent or Required Lenders, hold a meeting (at a mutually agreeable time) by conference call (the costs of such call to be paid by Borrower) with all Lenders who choose to attend such meeting, at which meeting shall be reviewed the

financial results of the previous fiscal year and the financial condition of the Companies and the budgets presented for the current fiscal year of the Companies.

Section 5.08.    *Use of Proceeds.*

Use the proceeds of the Loans only for the purposes set forth in Section 3.12.

Section 5.09.    *Compliance with Laws; Compliance with Environmental Laws; Environmental Reports.*

(a)        Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)        Comply, and undertake all commercially reasonable efforts to cause all of its employees occupying Real Property owned, operated or leased by Borrower or any of its Subsidiaries to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, undertake, obtain, renew or conduct individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; provided that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10.    *Compliance with Communications Laws and ITU Rules and Regulations.*

(a)        Comply with all applicable Communications Laws and the terms and conditions of any Communications Licenses and the One Dot Six Lease, including but not limited to requirements applicable to the Companies pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)        Diligently prosecute all of the Material Regulatory Requests.

(c)        Comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except for instances of non-compliance with applicable Requirements of Law which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.11.    Additional Collateral; Additional Guarantors.

(a)        Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within 30 days

after the acquisition thereof) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Collateral Agent shall deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Collateral Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. Borrower shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties.

(b)        With respect to any person that is or becomes a Subsidiary after the Closing Date or if any applicable Subsidiary ceases to be an inactive Subsidiary as set forth in Section 3.07(d), promptly (and in any event within 30 days after such person becomes a Subsidiary or ceases to be an inactive Subsidiary) (i) deliver to the Collateral Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to Borrower or any Subsidiary Guarantor together with instruments of transfer executed and delivered in blank by a duly authorized officer of Borrower or such Subsidiary Guarantor and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the U.S. Security Agreement or Canadian Security Agreement, as applicable, substantially in the form annexed thereto or, in the case of a Foreign Subsidiary, execute a security agreement compatible with the laws of such Foreign Subsidiary's jurisdiction in form and substance reasonably satisfactory to the Administrative Agent, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent or the Collateral Agent to cause the Lien created by the U.S. Security Agreement or Canadian Security Agreement, as applicable, to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent or the Collateral Agent. Notwithstanding the foregoing, (1) the Equity Interests required to be delivered to the Collateral Agent pursuant to clause (i) of this Section 5.11(b) shall not include any Equity Interests of a Foreign Subsidiary created or acquired after the Closing Date and (2) no Foreign Subsidiary shall be required to take the actions specified in clause (ii) of this Section 5.11(b), if, in the case of either clause (1) or (2), doing so would constitute an investment of earnings in United States property under Section 956 (or a successor provision) of the Code, which investment would or could reasonably be expected to trigger a material increase in the net income of a United States shareholder of such Subsidiary pursuant to Section 951 (or a successor provision) of the Code, as reasonably determined by the Borrower; provided that this exception shall not apply to (A) Voting Stock of any Subsidiary which is a first-tier controlled foreign corporation (as defined in Section 957(a) of the Code) representing 66% of the total voting power of all outstanding Voting Stock of such Subsidiary and (B) 100% of the Equity Interests not constituting Voting Stock of any such Subsidiary, except that any such Equity Interests

constituting "stock entitled to vote" within the meaning of Treasury Regulation Section 1.956-2(c)(2) shall be treated as Voting Stock for purposes of this Section 5.11(b).

(c)        Promptly grant to the Collateral Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on each Real Property owned in fee by Borrower or any Subsidiary Guarantor as is acquired by Borrower or such Subsidiary Guarantor after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $[___], as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 6.02). Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent and shall constitute valid and enforceable perfected Liens subject only to Permitted Collateral Liens or other Liens acceptable to the Administrative Agent.  The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. Borrower or such Subsidiary Guarantor shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including a title policy, a Survey, where customary, a local counsel opinion (each in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent) and such documentation as is required by the Flood Insurance Requirements in respect of such Mortgage).

(d)        Upon the acquisition of any leased Real Property similar in size or type to the leased Real Property described in paragraph 1 of Schedule 5.14, use commercially reasonable efforts to provide to the Collateral Agent a Landlord Access Agreement in respect of such leased Real Property.

Section 5.12.  *Security Interests; Further Assurances.*

Promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or any Lender, at Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Collateral Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Security Document, or obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent as the Administrative Agent and the Collateral Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents. Upon

the exercise by the Administrative Agent, the Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lender may reasonably require. If the Administrative Agent, the Collateral Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of Borrower or any Subsidiary Guarantor constituting Collateral, Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance satisfactory to the Administrative Agent and the Collateral Agent.

Section 5.13.    *Information Regarding Collateral.*

Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Collateral Agent and the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Collateral Agent or the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent and the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent and the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

Section 5.14.    *Post-Closing Collateral Matters.*

Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule.

Section 5.15.    *License Subsidiaries.*

Hold and retain all Material Licenses issued by the FCC to any Company, and cause each Material License issued by the FCC and acquired by any Company after the date hereof to be held and retained, in one or more License Subsidiaries.

ARTICLE 6
NEGATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will not, nor will it cause or permit any Subsidiaries to:

Section 6.01.    *Indebtedness.*

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)        Indebtedness incurred under this Agreement and the other Loan Documents;

(b)        (i) Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b) and (ii) Permitted Refinancings thereof[4];

(c)        Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

(d)        [Indebtedness permitted by Section 6.04(d) and Section 6.04(e)];

(e)        Indebtedness of the Borrower in respect of Purchase Money Obligations, Capital Lease Obligations, and renewals and Permitted Refinancings thereof; *provided* that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(e) outstanding at any time shall not exceed $[___];

(f)        subject to the Intercreditor Agreement, Indebtedness secured by a lien permitted by Section 6.02(h), in aggregate original amount not to exceed $[500] million containing terms no less favorable to the Company than those of the Junior Lien Loan Documents; *provided* that no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(f);

(g)        Indebtedness and obligations of any Company in respect of letters of credit and bank guarantees, including without limitation, letters of credit in respect of bid, performance or surety bonds, workers' compensation claims, health, disability or other benefits to former employees or their families or property, casualty or liability or self-insurance obligations and completion guarantees and bankers acceptances issued for the account of any Company in the ordinary course of business *provided* that the aggregate

---

[4] NTD: Permitted Refinancing definition allows for an increased amount to cover fees and expenses in clause (a) thereof.

principal amount of Indebtedness pursuant to this Section 6.01(g) outstanding at any time shall not exceed $[___];

(h)    Contingent Obligations of any Loan Party in respect of Indebtedness of any other Loan Party otherwise permitted under this Section 6.01;

(i)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five Business Days of incurrence;

(j)    Indebtedness representing the financing of installments of insurance premiums;

(k)    subject to the Intercreditor Agreement, (i) Indebtedness arising under the Junior Lien Loan Documents and Permitted Refinancings thereof in an aggregate original principal amount not to exceed $1,200,000,000[5] and (ii) Indebtedness arising under the SPSO Note in an aggregate original principal amount not to exceed $[ ][6] and Permitted Refinancings thereof that comply with Section 6.10(b); *provided* that, notwithstanding any other provision herein to the contrary, no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(k);

(l)    Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business; and

(m)    other unsecured Indebtedness in an aggregate principal amount outstanding at any time not to exceed $[___].

Section 6.02.   *Liens.*

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)    Liens in respect of property of the Borrower or any Subsidiary imposed by Requirements of Law, which were incurred in the ordinary course of business and do not

---

[5] To conform to Plan of Reorganization.

[6] To conform to Plan of Reorganization

secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(c)      any Lien in existence on the Closing Date and set forth on Schedule 6.02(c) and any Lien granted as a replacement or substitute therefor; provided that any such replacement or substitute Lien (i) does not secure an aggregate amount of Indebtedness, if any, greater than that secured on the Closing Date, except as permitted pursuant to the definition of Permitted Refinancing and (ii) does not encumber any property other than the property subject thereto on the Closing Date (any such Lien, an "**Existing Lien**");

(d)      easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Borrower or its Subsidiaries at such Real Property;

(e)      Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)      Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeals bonds, letters of credit, statutory bonds, bids, leases, government contracts, trade contracts, deposits as security for contested taxes or import duties or for the payment of rent, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; provided that with respect to clauses (x), (y) and (z) of this paragraph (f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(g)      Leases and subleases of Real Property if Borrower or any Subsidiary granted by such Company to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or

its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(h)    [Liens on Collateral securing Indebtedness permitted by Section 6.01(f); *provided* that (i) the agent or representative under such Indebtedness has become a party to the Intercreditor Agreement and has agreed to subordinate such Liens on the Collateral securing such Indebtedness to the Liens on the Collateral securing the Loans and (ii) such Liens shall not extend to any assets of the Borrower or any Subsidiary thereof that do not constitute Collateral;];

(i)    Liens securing Indebtedness incurred pursuant to Section 6.01(e);

(j)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)    Liens granted pursuant to the Security Documents to secure the Obligations;

(l)    non-exclusive licenses of Intellectual Property granted by the Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Borrower and its Subsidiaries;

(m)    the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(n)    Liens on the Second Satellite securing the Incentive Payments;

(o)    Liens securing Indebtedness incurred pursuant to Section 6.01(k); *provided* that (x) such Liens do not extend to any assets that are not Collateral and (y) such Liens are subordinated to the Liens securing the Obligations in accordance with, and are otherwise subject to, the terms of the Intercreditor Agreement which subordinates such Liens to the Liens on the Collateral securing the Obligations;

(p)    [reserved];

(q)    [reserved];

(r)    Liens existing with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary securing cash management obligations not in excess of $[___] in the aggregate; and

(s)        Liens not otherwise permitted by this Section 6.02 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $[___] in the aggregate;

provided, however, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens permitted under Section 6.02(k).

Section 6.03.    *Sale and Leaseback Transactions.*

Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

Section 6.04.    *Investments, Loan, Advances and Acquisition.*

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person (other than to customers in the ordinary course of business), or purchase or acquire any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)        the Borrower and its Subsidiaries may consummate the Transactions and the Plan of Reorganization in accordance with the provisions of the Transaction Documents;

(b)        Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(c)        the Borrower and its Subsidiaries may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(d)        Investments made by the Borrower in any Subsidiary Guarantor and by any Subsidiary Guarantor in the Borrower or any other Subsidiary Guarantor;

(e)        [Investments by the Borrower or any Canadian Subsidiary which is a Guarantor in any Canadian Subsidiary that is a Guarantor in the form of a loan or advance for purposes of funding their operations in the ordinary course provided that such loan or advance shall be evidenced by an Intercompany Note, in either case pledged by such party as Collateral pursuant to the Security Documents];

(f)        Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(g)        mergers, amalgamations and consolidations in compliance with Section 6.05 (other than Section 6.05(b));

(h)        Investments made by Borrower or any Subsidiary received in connection with an Asset Sale made in compliance with Section 6.06;

(i)        Capital Expenditures made by the Borrower or any Subsidiary as would otherwise be permitted under Section 6.15;

(j)        purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business;

(k)        leases of real or personal property in the ordinary course of business and in accordance with the Security Documents;

(l)        [Investments necessary to satisfy any FCC condition in connection with relief granted in response to a Material Regulatory Request or substantively similar request];

(m)        Investments in Subsidiaries that are not organized in the United States or any state thereof or the District of Columbia in an amount outstanding not to exceed $[____] in the aggregate since the Closing Date;

(n)        [reserved];

(o)        Investments consisting of nonexclusive licensing of intellectual property pursuant to joint marketing arrangements with other persons, for which license or contribution the Borrower and the Subsidiary Guarantors receives fair market value;

(p)        Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(q)        Investments in loans or advances to employees made in the ordinary course of business consistent with past practices of the Borrower or such Subsidiary Guarantor not to exceed $[____] at any time outstanding;

(r)        other Investments in an aggregate amount not to exceed $[____] since the Closing Date; and

(s)        Investments consistent with the Borrower's business plan as described to the Lenders prior to the Closing Date and made using proceeds of Indebtedness incurred pursuant to Section 6.01(f) or the issuance of Qualified Capital Stock by the Borrower.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment to Borrower or any Subsidiary Guarantor.

Section 6.05.    *Mergers and Consolidations.*

Wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution) or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), except that the following shall be permitted:

(a)        Asset Sales in compliance with Section 6.06;

(b)        acquisitions in compliance with Section 6.04;

(c)        any Company may merge, amalgamate or consolidate with or into Borrower or any Subsidiary Guarantor (as long as Borrower is the surviving person in the case of any merger or consolidation involving Borrower and a Subsidiary Guarantor is the surviving person and remains a Wholly Owned Subsidiary of the Borrower in any other case); *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable;

(d)        any Subsidiary may dissolve, liquidate or wind up its affairs at any time; provided that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect; and

(e)        any Subsidiary that is not a Guarantor may merge or consolidate with or into another Subsidiary that is not a Guarantor.

Section 6.06.    *Asset Sales.*

Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)        (i) disposition of used, worn out, obsolete or surplus property by the Borrower or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Borrower and its Subsidiaries taken as a whole and (ii) Asset Sales (or a series of Asset Sales) for fair market value, the Net Cash Proceeds of which are less than $[___];

(b)        Asset Sales at fair market value; *provided* that (i) at the time of such Asset Sale, no Default shall exist or would result from such Asset Sale, (ii) the aggregate fair market value of assets disposed in respect of all Asset Sales pursuant to this clause (b) shall not exceed $[___] in any four consecutive fiscal quarters of Borrower and (iii) the purchase price for all property subject to such Asset Sale shall be paid to Borrower or such Subsidiary solely in cash and Cash Equivalents;

(c)        Asset Sale of the Second Satellite at fair market value, which shall be paid for in cash; *provided* that such sale is in compliance with all Communications Laws; *provided, further* that the consideration paid to the Borrower with respect to the sale of the Second Satellite may be set off against the amount owing to Boeing by the Borrower or its Subsidiaries that are Guarantors;

(d)        [reserved];

(e)        the licensing or sublicensing of Intellectual Property; provided, however, that such licensing or sublicensing shall not interfere in any material respect with the Borrower's continued use of such Intellectual Property in its business;

(f)        to the extent constituting an Asset Sale, the creation of a Lien permitted by Section 6.02 (but not any Asset Sale of the property subject to such Lien);

(g)        Asset Sales described in Schedule 6.06(g)[7];

(h)        [reserved];

(i)        [Asset Sales pursuant to the agreements outstanding on the date hereof and set forth on Schedule 6.06(i)[8] attached hereto];

(j)        leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(k)        [reserved]; and

(l)        to the extent constituting Asset Sales, mergers, consolidations and amalgamations in compliance with Section 6.05 (other than Section 6.05(a));

For the avoidance of doubt, nothing in this Section 6.06 (or any other provision of this Agreement) will permit directly or indirectly the Asset Sale of any spectrum associated with any Material License (including spectrum rights acquired pursuant to the Inmarsat Agreement) [or the First Satellite]. To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 6.06 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.06, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the Security Documents, and, so long as Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Section 6.06, the Administrative Agent shall take all actions it deems appropriate in order to effect the foregoing.

---

[7] NTD: Schedule to include Asset Sales required to satisfy conditions imposed in response to a Material Regulatory Request.

[8] NTD: Subject to review of Schedule 6.06(i).

Section 6.07.    *Dividends.*

Authorize, declare or pay, directly or indirectly, any Dividends with respect to Borrower or any of its Subsidiaries, except that the following shall be permitted:

(a)        Dividends by any Company to Borrower or any Guarantor that is a Wholly Owned Subsidiary of Borrower; and

(b)        so long as no Default or Event of Default then exists (or would result therefrom), other Dividends, in an amount not to exceed $[___] in the aggregate from and after the Closing Date;

Section 6.08.    *Transactions with Affiliates.*

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among Borrower and one or more Subsidiary Guarantors or among Subsidiary Guarantors), other than any transaction or series of related transactions on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)        Dividends permitted by Section 6.07;

(b)        [reserved];

(c)        Asset Sales at fair market value permitted by Section 6.06;

(d)        reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of Borrower;

(e)        the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organizational Document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date, and which has been disclosed to the Lenders in writing as in effect on the Closing Date, and similar agreements that it may enter into thereafter; provided, however, that the existence of, or the performance by any Loan Party of obligations under, any amendment to any such existing agreement or any such similar agreement entered into after the Closing Date shall only be permitted by this Section 6.08(e) to the extent not more adverse to the interest of the Lenders in any material respect, when taken as a whole, than any of such documents and agreements as in effect on the Closing Date;

(f)        [reserved];

(g)        [reserved];

(h)        (i) any issuance or sale of securities permitted under Section 6.12, and (ii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of the Borrower;

(i)        loans or advances to employees in the ordinary course of business in accordance with the past practices of the Borrower or the Subsidiary Guarantors, but in any event not to exceed $[___] in the aggregate outstanding at any one time;

(j)        the payment of reasonable and customary fees to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Borrower or the Subsidiary Guarantors;

(k)        the repayment on the Closing Date of amounts advanced to the Borrower by certain members of the Borrower prior to the Closing Date for purposes of paying certain fees and expenses relating to the formation of the Borrower, in an amount not to exceed $[      ]; and;

(l)        the Transactions and Plan of Reorganization as contemplated by the Transaction Documents.

Section 6.09.    *[Reserved].*

Section 6.10.    *Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc.*

Directly or indirectly:

(a)        make (or give any notice in respect thereof) any payment or prepayment of principal on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness incurred pursuant to Section 6.01(e), (f) or (k), except (i) any payment of principal at scheduled maturity, (ii) any repayment of such Indebtedness incurred pursuant to Section 6.01(e), (f) or (k) with the proceeds of a Permitted Refinancing thereof, or (iii) in the case of Section 6.01(e), with additional Indebtedness permitted under Section 6.01(e) with proceeds of an Asset Sale or Casualty Event with respect to property subject to a Lien securing such Indebtedness; *provided*, *however*, the Borrower may prepay Indebtedness incurred pursuant to Section 6.01(f) or (k)(i) in an amount not to exceed the amount of any Declined Proceeds;

(b)        (i) amend or modify, or permit the amendment or modification of, any provision of any Junior Lien Loan Document or the definitive documentation governing the Indebtedness permitted to be incurred under Section 6.01(f), in each case in violation of the Intercreditor Agreement, (ii) amend or modify, or permit the amendment or modification of the One Dot Six Lease or the SPSO Note in any manner that is materially adverse to the interests of the Lenders or that would make such agreements more restrictive to any Loan Party in any respect, (iii) amend or modify, or permit the amendment or modification of, any provision of any document governing any other Material Indebtedness in any manner that is materially adverse to the interests of the Lenders unless in the case of any Material

Indebtedness, such Indebtedness, as amended or modified, would be permitted to be incurred as Indebtedness under Section 6.01 at the time of such amendment or modification or (iii) amend or modify, or permit the amendment or modification of, any provision of the Plan Confirmation Order, the Confirmation Recognition Order or the Cooperation Agreement Order in any manner without the prior written consent of the Lenders;

(c)        (i) terminate, amend or modify any of its Organizational Documents (including (x) by the filing or modification of any certificate of designation and (y) any election to treat any Pledged Securities (as defined in the U.S. Security Agreement or Canadian Security Agreement, as applicable) as a "security" under Section 8-103 of the UCC or under the Securities Transfer Act (Ontario), as applicable, other than concurrently with the delivery of certificates representing such Pledged Securities to the Collateral Agent) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such amendments or modifications or such new agreements which are (x) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.05 or (y) not adverse in any material respect to the interests of the Lenders or (ii) amend or modify, or permit any amendment or modification of, any of its Organizational Documents or any agreement to which it is a party with respect to its Equity Interests to permit Harbinger to vote for the Board of Directors of the Borrower.

(d)        either individually or jointly, except as may be provided in the Cooperation Agreement Order, (i) terminate, amend or modify, or permit the amendment or modification of, or assume, or permit the assumption of, the Inmarsat Agreement or (ii) enter into any agreement or arrangement of any nature to sell, assign, allocate value and/or liabilities or otherwise dispose of, or agree to sell, assign, allocate value and/or liabilities or otherwise dispose of, any Company's rights and/or obligations under the Inmarsat Agreement, in the case of either clause (i) or (ii) above without the prior written consent of the Required Lenders.

Section 6.11.    *Limitation on Certain Restrictions on Subsidiaries.*

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by Borrower or any Subsidiary, or pay any Indebtedness owed to Borrower or a Subsidiary, (b) make loans or advances to Borrower or any Subsidiary or (c) transfer any of its properties to Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale;

(vii) any agreement in effect at the time such Subsidiary becomes a Subsidiary of Borrower, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of Borrower; (viii) without affecting the Loan Parties' obligations under Section 5.11, customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (x) in the case of any joint venture which is not a Loan Party in respect of any matters referred to in clauses (b) and (c) above, restrictions in such person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity; or (xi) any encumbrances or restrictions imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (vii) above; provided that such amendments or refinancings are no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

Section 6.12.   *Limitation on Issuance of Capital Stock.*

Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) issuances by the Borrower of common stock or Qualified Capital Stock; *provided* such issuance does not constitute a Change in Control, (ii) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of Borrower or any Subsidiaries in any class of the Equity Interest of such Subsidiary; (iii) Subsidiaries of Borrower formed after the Closing Date in accordance with Section 6.13 may issue Equity Interests to Borrower or the Subsidiary of Borrower which is to own such Equity Interests; and (iv) issuances of Equity Interests pursuant to the Plan of Reorganization and the Plan Confirmation Order. All Equity Interests issued in accordance with this Section 6.12 shall, to the extent required by Sections 5.11 and 5.12 or any Security Document, be delivered to the Collateral Agent as Pledged Collateral.

Section 6.13.   *Limitation on Creation of Subsidiaries.*

Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders; *provided* that, without such consent, Borrower may (i) establish or create one or more Wholly Owned Subsidiaries of Borrower or (ii) establish, create or acquire one or more Subsidiaries in connection with an Investment made pursuant to Section 6.04.

Section 6.14.   *Business.*

(a)        [Reserved].

(b)        With respect to Borrower and the Subsidiaries, engage (directly or indirectly) in any material respect in any business other than those businesses in which Borrower and its Subsidiaries are engaged in or contemplated to be engaged in on the Closing Date.

Section 6.15.   *Capital Expenditure.*

Make any Capital Expenditure in excess of [(i)] $[___] on or prior to the Initial Term Loan Maturity Date [or (ii) $[___] after the Initial Term Loan Maturity Date and on or prior to the Extended Term Loan Maturity Date].

Section 6.16.   *Fiscal Year.*

Change its fiscal year-end to a date other than December 31.

Section 6.17.   *No Further Negative Pledge.*

Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of the Borrower or any Subsidiary Guarantor to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement, the other Transaction Documents, and indebtedness issued under Sections 6.01(k) and/or (f); (2) covenants in documents creating Liens permitted by Sections 6.02(c), (h), (i), (k), (n), (o) and (r) prohibiting further Liens on the properties encumbered thereby; (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; or (4) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale, (c) restricts subletting or assignment of leasehold interests contained in any Lease governing a leasehold interest of Borrower or a Subsidiary, (d) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (3) or (5)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

Section 6.18.   *Compliance with Anti-Terrorism Laws.*

(a)        Directly or indirectly, in connection with the Loans, knowingly (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law, (ii) deal in, or otherwise engage in any transaction relating to, any

property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)        Directly or indirectly, in connection with the Loans, knowingly cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Anti-Terrorism Law.

(c)        Knowingly cause or permit (i) an Embargoed Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties in violation of any Anti-Terrorism Law or any other applicable law, (ii) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, an Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law or (iii) any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(d)        The Borrower shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming its compliance with this Section 6.18.

Section 6.19.  *Canadian Pension Plans.*

(a)        Terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan which could reasonably be expected to result in any material liability of a Loan Party.

(b)        Fail to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any agreement relating thereto or applicable Requirements of Law, the Borrower or any other Loan Party is required to pay as contributions thereto, except where the failure to make such payments could not reasonably be expected to have a Material Adverse Effect.

(c)        Permit to exist any accumulated funding deficiency, whether or not waived, with respect to any Canadian Pension Plan in an amount which could reasonably be expected to have a Material Adverse Effect.

(d)        Contribute to or assume an obligation to contribute to, or permit any other Loan Party to contribute to or assume an obligation to contribute to, any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario).

(e)        Acquire, or permit any other Loan Party to acquire, an interest in any Person if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario);

provided that, any Loan Party may acquire an interest in any such Person if such Person is acquired as a Permitted Acquisition and no Loan Party has any legal liability to perform such Person's obligations or assume such Person's liabilities.

(f)        Permit, or allow any other Loan Party to permit, the actuarial present value of the benefit liabilities (computed on an accumulated benefit obligation basis in accordance with GAAP and/or Canadian GAAP) under all Canadian Pension Plans in the aggregate to exceed the current value of the assets of all Canadian Pension Plans in the aggregate that are allocable to such benefit liabilities, in each case only to the extent such liabilities and assets relate to benefits to be paid to employees of the Loan Parties, by an amount that could reasonably be expected to cause a Material Adverse Effect.

Section 6.20.   Permitted Activities of License Subsidiaries.

With respect to any License Subsidiary, (a) incur, directly or indirectly, any Indebtedness other than the Indebtedness under this Agreement and the other Loan Documents; (b) create, or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the DIP Order; (c) engage in any business or activity or own any assets other than (i) holding the Communications Licenses, (ii) performing its obligations and activities incidental thereto under the Loan Documents and (iii) in the case of One Dot Six, managing the One Dot Six Lease, the One Dot Six Lease Authorization, the One Dot Six License and the associated terrestrial network; (d) consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets to, any person other than a License Subsidiary and in accordance the other provisions of this Agreement; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries other than to a License Subsidiary and in accordance with the other provisions of this Agreement; (f) create or acquire any Subsidiary or make or own any Investment in any person; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

Section 6.21.   Communications Licenses.

(a)        Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease in all material respects.  No Company shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial.  No Company shall take any action that reasonably could be expected to cause a Governmental Authority to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of any Material License or the One Dot Six Lease, or take or permit to be taken any other action within its control that reasonably could be expected to result in non-compliance with the requirements of Communications Laws in any material respect.

(b)        Advocate for or consent to any modification, termination, or withdrawal of a Material Regulatory Request, nor seek any new license modifications or file any new applications or petitions for rulemaking at the FCC, without the prior written consent of the

Required Lenders; provided that any Company may seek to modify or file any license modification, application, or petition for rulemaking that is either (i) in furtherance of the satisfaction of the FCC Objectives but does not modify any other aspect of a Material Regulatory Request, or (ii) unrelated to the satisfaction of the FCC Objectives and does not modify a Material Regulatory Request.

Section 6.22.    *Financial Covenant.*

[If the Maturity Date is extended pursuant to the terms of Section 2.09(b), then from and after the Initial Term Loan Maturity Date until the earlier of (a) the Extended Term Loan Maturity Date and (b) the date on which all Obligations are paid in full in cash, the Loan Parties shall maintain at all times an Available Liquidity of not less than $[___].  This Section 6.22 shall not apply prior to the Initial Term Loan Maturity Date.]

ARTICLE 7
GUARANTEE

Section 7.01.    *The Guarantee.*

The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) the Loans made by the Lenders to, and the Notes held by each Lender of, Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, that Excluded Swap Obligations in respect of any Guarantor shall at no time constitute Guaranteed Obligations of such Guarantor. The Guarantors hereby jointly and severally agree that if Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02.    *Obligations Unconditional.*

The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other

guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)     at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)     any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)     any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)     the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the

Secured Parties or any other person at any time of any right or remedy against Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03.   *Reinstatement.*

The obligations of the Guarantors under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 7.04.   *Subrogation; Subordination.*

Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(c) shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

Section 7.05.   *Remedies.*

The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06.   *Instrument for the Payment of Money.*

Each Guarantor hereby acknowledges that the guarantee in this Article 7 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action

under New York CPLR Section 3213.

Section 7.07.   *Continuing Guarantee.*

The guarantee in this Article 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08.   *General Limitation on Guarantee Obligations.*

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.09.   *Release of Guarantors.*

If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is Borrower or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and the pledge of such Equity Interests to the Collateral Agent pursuant to the U.S. Security Agreement or the Canadian Security Agreement shall be automatically released, and, so long as Borrower shall have provided the Administrative Agent and the Collateral Agent such certifications or documents as the Administrative Agent or the Collateral Agent shall reasonably request, the Collateral Agent shall take such actions as are necessary to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Security Documents, so long as Borrower shall have provided the Administrative Agent and the Collateral Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Agreement.

Section 7.10.   *Right of Contribution.*

Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this

Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

ARTICLE 8
EVENTS OF DEFAULT

Section 8.01.  *Events of Default.*

Upon the occurrence and during the continuance of the following events ("Events of Default"):

(a)        default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)        default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three (3) Business Days;

(c)        any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)        default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.02, 5.03(a) or 5.08 or in Article 6;

(e)        default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 30 days after written notice thereof from the Administrative Agent or any Lender to Borrower;

(f)        any Loan Party shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the

-109-

giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor; provided that it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds $[____] at any one time (provided that, in the case of Hedging Obligations, the amount counted for this purpose shall be the amount payable by all Loan Parties if such Hedging Obligations were terminated at such time);

(g)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Loan Party, or of a substantial part of the property or assets of any Loan Party, under Title 11 of the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA); (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Company; or (iii) the winding-up or liquidation of any Loan Party; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered or in respect of which such Loan Party files an answer admitting the material allegations of a petition filed against it in any such proceeding;

(h)     any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA); (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (g) above; (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Loan Party; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (vii) take any action for the purpose of effecting any of the foregoing; (viii) wind up or liquidate; or (ix) commit an act of bankruptcy under the BIA, or make an assignment of its property for the general benefit of its creditors under such Act, or make a proposal (or file a notice of its intention to do so) under such Act;

(i)     one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $[       ] shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Loan Party to enforce any such judgment;

(j)     one or more ERISA Events, Canadian Plan Events or similar events with respect to Foreign Plans shall have occurred that, when taken together with all other such ERISA Events, Canadian Plan Events and similar events with respect to Foreign Plans that

have occurred, could reasonably be expected to result in a Material Adverse Effect or in the imposition of a Lien on any properties of a Loan Party;

(k)        any security interest and Lien (other than a security interest or Lien on Collateral with a de minimis value) purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document (including a perfected first priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document)) in favor of the Collateral Agent, or shall be asserted by Borrower or any other Loan Party not to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby;

(l)        any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(m)        there shall have occurred under any one or more material agreements of any Company (i) the termination of, or the receipt by any Loan Party of notice of the termination of, such agreement (other than scheduled termination in accordance with its terms in effect as of [          ], 2014 or, for material agreements entered into after [          ], 2014, other than the scheduled termination in the ordinary course in accordance with its terms) or (ii) the occurrence of any event or condition which would, with the passage of time or the giving of notice or both, constitute an event of default under, permit the termination of or permit the taking of any remediate action against the Collateral under (and in the case of this clause (ii), such occurrence, event or condition either shall continue for the 30 days or the counterparty to such contract shall take any action with respect to such occurrence, event or condition) such agreement;

(n)        except as otherwise agreed by the Required Lenders, the FCC (i) issues a decision or order that is materially inconsistent with all or any portion of the FCC Objectives or (ii) denies relief requested in any Material Regulatory Request;

(o)        any Company shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(p)        [reserved];

(q)        (i) Reorganized One Dot Six shall be in material breach of or there shall be a material default under the One Dot Six Lease, (ii) the One Dot Six Lease shall be amended in any manner without the prior written consent of the Required Lenders or (iii) the One Dot

Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(r)    Reorganized LightSquared Inc. or any other Company party thereto shall be in material breach of or there shall be a material default under the Inmarsat Agreement, (ii) the Inmarsat Agreement shall be amended in any manner without the prior written consent of the Required Lenders or (iii) the Inmarsat Agreement shall have been terminated or any Loan Party shall have received notice of termination thereof;

(s)    any of the Loan Parties shall be in material breach of or there shall be a material default under any material agreement of any Company or Material License, (ii) any material agreement of any Company or any Material License shall be amended in any manner without the prior written consent of the Required Lenders or (v) any one or more material agreements of any Company or any Material Licenses shall be terminated, suspended, revoked or forfeited, or shall expire without the timely filing of an application for renewal thereof or the substantial replication of the rights thereunder without any materially adverse conditions;

(t)    [reserved];

(u)    Reorganized LightSquared Inc. shall (i) other than its Equity Interest in the Borrower, have more than de minimis assets ancillary to its existence and as contemplated by the Plan of Reorganization and its rights under the Reorganized LightSquared Inc. Credit Agreement, or shall have leases, spectrum or tangible assets or (ii) have operations, except those incidental to ownership of the assets described in clause (i).

(v)    [reserved]

(w)    a Change in Control shall have occurred; or

(x)    (i) the Plan Confirmation Order. the Confirmation Recognition Order or the Cooperation Agreement Order shall have been revoked, rescinded or otherwise cease to be in full force and effect, (ii) any Loan Party shall have challenged the effectiveness or validity of the Plan Confirmation Order, the Confirmation Recognition Order or the Cooperation Agreement Order, (iii) any Loan Party shall have violated the Plan Confirmation Order, the Confirmation Recognition Order or the Cooperation Agreement Order  or (iv) the Plan Confirmation Order, the Confirmation Recognition Order or the Cooperation Agreement Order shall have been amended, supplemented or otherwise modified (A) in any manner adversely impacting the Exit Facility or the capitalization of the Loan Parties or (B) in any other manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal

of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event, with respect to the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, [the Make Whole Amount (if any)] and any unpaid accrued fees and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.02.   *Application of Proceeds.*

The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

(a)      First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith and all amounts for which the Collateral Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)      Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties  and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)      Third, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)      Fourth, to the indefeasible payment in full in cash, pro rata, of principal amount of the Obligations and any premium thereon; and

(e)        Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

Section 8.03.    *Government Approval.*

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses or the One Dot Six Lease or any company holding the Communications Licenses shall be pursuant to Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority.  Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, Industry Canada, the CRTC or such other Governmental Authority.  Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Loan Party's commercially reasonable efforts to assist in obtaining any approval of the FCC, Industry Canada, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, without limitation, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for Industry Canada's Spectrum Direct online system and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or the Communications Licenses.

## ARTICLE 9
## THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person.  The Administrative Agent also may rely upon any statement made to

it orally or by telephone and believed by it to be made by the proper person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Notwithstanding anything to the contrary in this agreement, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower and such resignation shall become effective immediately upon delivery of such notice and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  Upon any such resignation, the retiring Administrative Agent may, on behalf of the Lenders and in consultation with the Borrower, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank, or the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loans and not investments in a business enterprise or securities. Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and  has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.  Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished

hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

The Administrative Agent is hereby authorized to enter into the Intercreditor Agreement to the extent contemplated by the terms hereof, and the parties hereto acknowledge that they have reviewed the Intercreditor Agreement and that the Intercreditor Agreement is binding upon them.  Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (b) hereby authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Lender hereby authorizes the Administrative Agent to enter into (i) any amendments to the Intercreditor Agreement, and (ii) any other intercreditor arrangements, in the case of clauses (i), and (ii) to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 6.02 of this Agreement.

Each Lender acknowledges and agrees that (i) [          ] (or one or more of their respective affiliates) is acting as a "Second Priority Representative" under the Intercreditor Agreement and (ii) any of the Agents (including [            ]) (or one or more of their respective affiliates) may (but are not obligated to) act as the "Representative" or like term for the holders of Indebtedness incurred as a Permitted Refinancing under the security agreements with respect thereto and/or under the Intercreditor Agreement or other intercreditor agreement entered into in accordance with the terms hereof.  Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against any Agent or any of its affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

ARTICLE 10
MISCELLANEOUS

Section 10.01. *Notices.*

(a)        Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Borrower, to it at LightSquared Inc., 10802 Parkridge Boulevard Reston, VA 20191, Attention of General Counsel (Telecopy No. [  ]), with a copy to Milbank, Tweed, Hadley & McCloy LLP, Matthew S. Barr, Steven Z. Szanzer, Karen Gartenberg, One Chase Manhattan Plaza, New York, NY 10005;

(ii)        if to the Administrative Agent, to JPMorgan Chase Bank, Loan and Agency Services Group, 1111 Fannin, 8th Floor, Houston, Texas 77002,

-117-

Attention of [  ] (Telecopy No. (713) ___-____), with a copy to JPMorgan Chase Bank, 270 Park Avenue, New York 10017, Attention of [  ]  (Telecopy No. [  ]);

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through Electronic Systems, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)    Electronic Systems.

(i)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

-118-

(ii)      Any Electronic System used by the Administrative Agent is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System.  "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 10.02. *Waivers; Amendment.*

(a)      Generally. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      Required Consents. Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document) and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; provided that no such agreement shall be effective if the effect thereof would:

(i)    increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)    reduce the principal amount or premium, if any, of any Loan (except in connection with a payment contemplated by clause (viii) below) or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(b)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii)    (A) change the scheduled final maturity of any Loan, or any scheduled date of payment (or permitted prepayment) of or the installment otherwise due on the principal or accrual amount of any Loan under Section 2.09, (B) postpone the date for payment of any interest, premium or fees payable hereunder or (C) reduce the amount of, waive or excuse any such payment or accrual (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby;

(iv)    permit the assignment or delegation by Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender;

(v)    release all or any material Subsidiary Guarantors from their Guarantee (except as expressly provided in Article VII), or limit their liability in respect of such Guarantee, without the written consent of each Lender;

(vi)    release all or a material portion of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents, in each case without the written consent of each Lender (it being understood that Incremental Loans pursuant to Section 2.20 may be equally and ratably secured by the Collateral with the then existing Obligations under the Security Documents);

(vii)    change Section 2.14(b), (c) or (d) in a manner that would alter the pro rata sharing of payments or setoffs required thereby or any other provision in a manner that would alter the pro rata allocation among the Lenders of Loan disbursements, including the requirements of Sections 2.02(a), without the written consent of each Lender; provided that this clause (vii) shall not apply to any change made to any of such Sections 2.14(b), (c) or (d) or any such other provision that allows Borrower or any Subsidiary to make payments (as consideration for an assignment, sale or participation or otherwise) on Loans without any Loan Party, the payor or the recipient of such payments complying with the pro rata sharing of payments and setoffs required by such Sections or provisions, so long as such change requires that (x) Borrower and its Subsidiaries

offer to make such payments to all Lenders on a pro rata basis based on the aggregate principal amount of Loans then outstanding, (y) such payments are actually allocated to the Loans whose holders have elected to make them subject to such offer on a pro rata basis based on the aggregate principal amount of all Loans that have been made so subject to such offer and (z) all Loans that are paid in any such offer are deemed fully repaid and extinguished for all purposes and may not be reborrowed.

(viii)   change any provision of this Section 10.02(b) or Section 10.02(c) or (d), without the written consent of each Lender directly affected thereby (except for additional restrictions on amendments or waivers for the benefit of Lenders of Incremental Loans pursuant to Section 2.20);

(ix)   change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(x)   subordinate the Obligations to any other obligation, without the written consent of each Lender; or

(xi)   change or waive any provision of Article 9 as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent.

Neither Borrower nor any of its Subsidiaries or Affiliates will, directly or indirectly, pay or cause to be paid any consideration, to or for the benefit of any Lender for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Agreement or any other Loan Document unless such consideration is offered to be paid to all Lenders and is paid to all Lenders that consent, waive or agree to amend in the time frame set forth in the documents relating to such consent, waiver or agreement.

Notwithstanding anything to the contrary herein:

(A)   no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except to the extent the consent of such Lender would be required under clause (i), (ii) or (iii) in the proviso to the first sentence of this Section 10.02(b);

(B)   no Affiliate Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder; and

(C)    any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrower and the Administrative Agent (without the consent of any Lender) solely to cure a defect or error, or to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property and, if required to consummate an issuance of Incremental Loans under Section 2.20, the interest rate applicable to the Loans may be increased with the consent of the Borrower and the Administrative Agent.

(c)    Collateral. Without the consent of any other person, the applicable Loan Party or Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)    Dissenting Lenders. If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 10.02(b), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then Borrower shall have the right (within five Business Days of obtaining such consent of the Required Lenders) to replace all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.16(b) so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination.

Section 10.03. *Expenses; Indemnity; Damage Waiver.*

(a)    The Borrower shall pay (i) all reasonable and documented out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of outside counsel for the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated thereby shall be consummated); and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such reasonable and documented out-of pocket expenses incurred during  any workout, restructuring or negotiations in respect of such Loans *provided* that the reimbursement of the charges of such counsel shall be limited to one counsel for the group (which shall be designated by the Administrative Agent) (and (i) appropriate local counsel in applicable local jurisdictions, but

limited to one local counsel for the group in each such jurisdiction (which shall be designated by the Administrative Agent) and (ii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction for each group similarly situated).

(b)     The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, in or from any property owned, leased, licensed or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, willful misconduct or a material breach of the obligations under Section 2.01 or Section 2.02 by such Indemnitee and (y) to the extent arising from any dispute solely among Indemnitees other than (i) any claims against the Administrative Agent or the Lead Arrangers acting in such capacity or in fulfilling such role or any similar role under this Agreement and (ii) any claims arising out of any act or omission on the part of the Borrower or its Subsidiaries. This Section 10.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that, nothing in this clause (d) shall relieve the Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)        All amounts due under this Section 10.03 shall be payable promptly after written demand therefor.

Section 10.04. *Successors and Assigns.*

(a)        The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

(i)        Subject to the conditions set forth in Section 10.04(b)(ii) below, any Lender may assign to one or more Eligible Assignees (and any attempted assignment or transfer to a person that is not an Eligible Assignee shall be null and void) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)        the Borrower, *provided* that, the Borrower shall be deemed to have consented to an assignment unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; *provided further* that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; *provided further* that the Borrower's consent shall not be required for an assignment by the Administrative Agent, the Arrangers or any Affiliate thereof during the primary syndication of the Term Loan; and

(B)        the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of

the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire in which the assignee designates one or more Credit Contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)      the Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company; and

(F)      no Loan may be assigned to an Affiliate Lender pursuant to this Section 10.04 if, after giving effect to such assignment, Affiliate Lenders in the aggregate would own Loans with a principal amount in excess of 25% of the principal amount of all Loans then outstanding.

For the purposes of this Section 10.04(b), the term "**Approved Fund**" has the following meanings:

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Eligible Assignee, the Administrative Agent shall have no liability with respect to any assignment made to a person that is not an Eligible Assignee and the Administrative Agent shall have no responsibility or obligation with respect to provisions concerning Affiliate Lenders, including without limitation Section 10.04(b)(ii)(F). Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.  The Administrative Agent and any Lender assigning all or a portion of its rights and obligations under this Agreement pursuant to this Section 10.04 may conclusively rely on the representation given by the assignee that it is not a Disqualified Company and that neither such Lender or Administrative Agent will have any liability for any breach by an assignee of such representation, and such Lender and Administrative Agent will be indemnified by the Borrower for any loss, cost or expense resulting thereof.

(iii)    Subject to acceptance and recording thereof pursuant to Section 10.04(b)(iv), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.15 and Section 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and

Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to, Section 2.02(b), Section 2.14(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)      Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "**Participant**") that are Eligible Assignees and not Affiliates of the Borrower in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged; (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12 and Section 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.16 as if it were an assignee

under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.12 or Section 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.14(d)as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or that such Participant is not a Disqualified Company.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to any person (other than a natural person or any Disqualified Company) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    If any assignment or participation under this Section 10.04 is made to a Disqualified Company and the portion of the loan so assigned or participated is still held by a Disqualified Company, then the Borrower (i) shall have the right to repurchase such portion of the Loan at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrower at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.

(f)    Notwithstanding anything to the contrary in this Agreement, the Administrative Agent may exclude (by prior notice to) Affiliate Lenders from (a) attending (including by telephone) any meeting or discussions (or portion thereof) among the

Administrative Agent or any Lender to which representatives of the Borrower are excluded or (b) receiving any information or material prepared by Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials are made available to the Borrower or their representatives; *provided*, that, in the case of clause (a) or (b), the Administrative Agent has been advised by counsel that a conflict of interest between the Affiliate Lenders and the other Lenders could exist.

Section 10.05. *Survival of Agreement.*

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 2.12, Section 2.15 and Section 10.03 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06. *Counterparts; Integration; Effectiveness.*

(a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any  document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in

electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07. *Severability.*

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08. *Right of Setoff.*

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09. *Governing Law; Jurisdiction; Consent to Service of Process.*

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any

such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)        The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10. *Waiver of Jury Trial.*

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11. *Headings.*

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12. *Treatment of Certain Information; Confidentiality.*

Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to

whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "**Information**" means all information received from the Debtors, the Borrower or any of its Subsidiaries relating to the Debtors, the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Debtors, the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13. <u>Material Non-Public Information</u>.

(a)  EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN Section 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)  ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY

RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14. *Authorization to Distribute Certain Materials to Public-Siders.*

(a)  None of the Parties currently has any publicly traded securities outstanding (including, but not limited to, 144A Securities, commercial paper notes or American Depositary Receipts); provided that the Borrower agrees that if any of the Parties issues any publicly traded securities at a future date, any of the information in the Loan Documents and the Financial Statements to be furnished pursuant to Section 5.01(a) and Section 5.01(b), to the extent then material, will be publicly disclosed or set forth in the related prospectus or other offering document for such issuance.

(b)  The Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents and Financial Statements to all Lenders, including their Public-Siders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of the United States federal and state securities laws if the Companies had publicly-traded securities outstanding.

(c)  If the Borrower issues any 144A Securities during the term of this Agreement and its Financial Statements are not filed with the Securities and Exchange Commission, the Borrower (i) agrees to deliver to the Administrative Agent, and authorizes their posting by the Administrative Agent to the public-side view site of the Agency Site, the Financial Statements and (iii) represents, warrants and agrees that the Financial Statements will not constitute information that, upon disclosure to Public-Siders, would restrict them or their firms from purchasing or selling any of the 144A Securities under United States federal and state securities laws.  The Borrower further agrees to clearly label such Financial Statements with a notice stating: "Confidential Financial Statements provided to 144A Holders" before delivering them to the Administrative Agent.

(d) The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the materials, documents and information distributed to them pursuant to the authorizations made herein.

Section 10.15. *USA PATRIOT Act Notice and Customer Verification.*

Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**") and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such

Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.16. *Interest Rate Limitation.*

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.17. *Obligations Absolute.*

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)      any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)      any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)      any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)      any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.18. *AML Legislation.*

(a)        The Borrower acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or else-where (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Secured Parties or any future assignee of a Secured Party may be required, now or hereafter, to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby. The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)        If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

    (i)        shall be deemed to have done so as an agent for each Secured Party (or any future assignee of a Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Secured Party (or any future assignee of a Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

    (ii)        shall provide to each Secured Party (or any future assignee of a Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Secured Party or any future assignee of a Secured Party, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.[9]

[NEWCO]

By: _____

    Name:

    Title:

LIGHTSQUARED LP

By: _____

    Name:

    Title:

[SUBSIDIARY GUARANTORS]

By: _____

    Name:

    Title:

---

[9] NTD: Guarantor entity names to be confirmed.

Signature Page to Credit Agreement

J.P. MORGAN SECURITIES LLC, as
   Arranger


By: _____
     Name:
     Title:


JPMORGAN CHASE BANK, N.A., as
   Administrative Agent


By: _____
     Name:
     Title:


CREDIT SUISSE SECURITIES (USA)
   LLC, as Arranger and Syndication Agent


By: _____
     Name:
     Title:

Signature Page to Credit Agreement

## **Exhibit C-2**

Second Lien Exit Credit Agreement

[To be filed subsequently]

## **Exhibit C-3**

Exit Intercreditor Agreement

[To be filed subsequently]

## **Exhibit C-4**

Reorganized LightSquared Inc. Loan Agreement

---

**SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT**

**dated as of [_____], 2014**

**among**

**LIGHTSQUARED INC.,**

**as the Borrower**

**and**

**The Lenders Party Hereto,**

**and**

**[____],**

**as Administrative Agent**

---

**J.P. MORGAN SECURITIES LLC,**

**as Sole Lead Arranger and Sole Bookrunner**

---

# Table of Contents

Page

**ARTICLE I** Definitions ........................................................................................ 1

    Section 1.01    Defined Terms ......................................................................... 1
    Section 1.02    Terms Generally ................................................................... 23
    Section 1.03    Accounting Terms; GAAP ................................................... 24
    Section 1.04    Rounding .............................................................................. 24
    Section 1.05    Times of Day ........................................................................ 24
    Section 1.06    Timing of Payment or Performance ..................................... 25
    Section 1.07    Certifications ........................................................................ 25

**ARTICLE II** The Loans ...................................................................................... 25

    Section 2.01    Loans ................................................................................... 25
    Section 2.02    Loans and Borrowing .......................................................... 25
    Section 2.03    Reserved .............................................................................. 25
    Section 2.04    Reserved .............................................................................. 25
    Section 2.05    Interest ................................................................................. 25
    Section 2.06    Repayment of Loans; Evidence of Debt .............................. 26
    Section 2.07    Prepayment of Loans ........................................................... 27
    Section 2.08    Fees ...................................................................................... 28
    Section 2.09    Increased Costs .................................................................... 28
    Section 2.10    Reserved .............................................................................. 29
    Section 2.11    Taxes.................................................................................... 29
    Section 2.12    Payments Generally; Pro Rata Treatment; Sharing of Setoffs ...... 33
    Section 2.13    Mitigation Obligations ........................................................ 34

**ARTICLE III** Representations and Warranties ................................................... 35

    Section 3.01    Organization; Powers .......................................................... 35
    Section 3.02    Authorization; Enforceability .............................................. 35
    Section 3.03    Governmental Approvals; No Conflicts ............................... 35
    Section 3.04    Financial Condition; No Material Adverse Effect ................ 36
    Section 3.05    Properties ............................................................................. 36
    Section 3.06    Litigation and Environmental Matters ................................. 37
    Section 3.07    Compliance with Laws and Agreements .............................. 37
    Section 3.08    Investment Company Status ................................................. 37
    Section 3.09    Taxes.................................................................................... 37
    Section 3.10    Employee Benefit Plans....................................................... 37
    Section 3.11    Disclosure ............................................................................ 38
    Section 3.12    Subsidiaries ......................................................................... 38
    Section 3.13    Insurance ............................................................................. 39
    Section 3.14    Labor Matters ...................................................................... 39
    Section 3.15    Security Documents.............................................................. 39
    Section 3.16    Federal Reserve Regulations ............................................... 41
    Section 3.17    Anti-Corruption Laws and Sanctions ................................... 41
    Section 3.18    Senior Indebtedness ............................................................ 41

Section 3.19    Regulation H ................................................................................. 41
Section 3.20    Solvency ....................................................................................... 41
Section 3.21    No Default .................................................................................... 41
Section 3.22    Real Estate ................................................................................... 42
Section 3.23    Communications Licenses and Regulatory Matters ...................... 42
Section 3.24    Agreements ................................................................................... 42

**ARTICLE IV** Conditions ....................................................................................... 43

Section 4.01    Closing Date ................................................................................ 43

**ARTICLE V** Affirmative Covenants ...................................................................... 45

Section 5.01    Financial Statements .................................................................... 46
Section 5.02    Certificates; Other Information ..................................................... 46
Section 5.03    Payment of Obligations ................................................................ 47
Section 5.04    Maintenance of Existence; Compliance ......................................... 48
Section 5.05    Maintenance of Property; Insurance ............................................. 48
Section 5.06    Inspection of Property; Books and Records; Discussions .............. 49
Section 5.07    Notices ......................................................................................... 49
Section 5.08    Environmental Laws ..................................................................... 50
Section 5.09    Compliance with Communications Laws and ITU Rules and Regulations .... 50
Section 5.10    Use of Proceeds ........................................................................... 50
Section 5.11    Additional Collateral, etc ............................................................. 50
Section 5.12    Further Assurances ...................................................................... 52

**ARTICLE VI** Negative Covenants ......................................................................... 52

Section 6.01    Reserved ...................................................................................... 52
.                52
Section 6.02    Indebtedness ................................................................................ 52
Section 6.03    Liens ............................................................................................ 52
Section 6.04    Fundamental Changes .................................................................. 54
Section 6.05    Disposition of Property ................................................................. 54
Section 6.06    Restricted Payments .................................................................... 55
Section 6.07    Investments .................................................................................. 55
Section 6.08    Optional Payments and Modifications of Certain Debt Instruments .......... 56
Section 6.09    Transactions with Affiliates .......................................................... 56
Section 6.10    Sales and Leasebacks .................................................................. 56
Section 6.11    Swap Agreements ........................................................................ 56
Section 6.12    Changes in Fiscal Periods ............................................................ 56
Section 6.13    Negative Pledge Clauses .............................................................. 56
Section 6.14    Clauses Restricting Subsidiary Distributions ................................ 56
Section 6.15    Lines of Business ......................................................................... 57
Section 6.16    Amendments to Material Documents ............................................. 57
Section 6.17    Use of Proceeds ........................................................................... 57
Section 6.18    Communications Laws .................................................................. 57
Section 6.19    Limitation on Creation of Subsidiaries ......................................... 58

**ARTICLE VII** Events of Default ............................................................................ 58

Section 7.01    Events of Default ......................................................................... 58

Section 7.02    Remedies Upon Event of Default ................................................... 60
Section 7.03    Application of Funds ............................................................................. 61
Section 7.04    Government Approval ........................................................................... 61

**ARTICLE VIII** The Administrative Agent ............................................................ 62

Section 8.01    Appointment and Administration by Administrative Agent ........................... 62
Section 8.02    Agreement of Applicable Lenders ...................................................... 62
Section 8.03    Liability of Administrative Agent ....................................................... 62
Section 8.04    Notice of Default ................................................................................ 63
Section 8.05    Credit Decisions ................................................................................. 64
Section 8.06    Reimbursement and Indemnification ................................................... 64
Section 8.07    Rights of Administrative Agent ........................................................... 65
Section 8.08    Notice of Transfer .............................................................................. 65
Section 8.09    Successor Agents ................................................................................ 65
Section 8.10    Relation Among the Lenders ............................................................... 65
Section 8.11    Reports and Financial Statements ...................................................... 66
Section 8.12    Agency for Perfection ......................................................................... 66
Section 8.13    Collateral and Guaranty Matters ........................................................ 67
Section 8.14    Syndication Agents; Documentation Agents; Arrangers..................... 67

**ARTICLE IX** Miscellaneous ................................................................................. 68

Section 9.01    Notices ................................................................................................ 68
Section 9.02    Waivers; Amendments ....................................................................... 69
Section 9.03    Expenses; Indemnity; Damage Waiver .............................................. 71
Section 9.04    Successors and Assigns ..................................................................... 73
Section 9.05    Survival ............................................................................................... 78
Section 9.06    Counterparts; Integration; Effectiveness ........................................... 78
Section 9.07    Severability ........................................................................................ 79
Section 9.08    Right of Setoff ................................................................................... 79
Section 9.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                PROCESS ............................................................................................ 79
Section 9.10    WAIVER OF JURY TRIAL ................................................................ 80
Section 9.11    Headings ............................................................................................. 80
Section 9.12    Confidentiality .................................................................................... 80
Section 9.13    Interest Rate Limitation ..................................................................... 81
Section 9.14    Patriot Act .......................................................................................... 81
Section 9.15    Additional Waivers ............................................................................. 81
Section 9.16    No Advisory or Fiduciary Responsibility............................................ 82

## SCHEDULES

Schedule 1.01(A)        Competitors
Schedule 1.01(B)        Mortgaged Properties
Schedule 2.01           Lenders and Commitments
Schedule 3.03           Governmental Approvals
Schedule 3.06           Litigation
Schedule 3.12           Subsidiaries
Schedule 3.13           Insurance
Schedule 3.15(a)        UCC Filings
Schedule 3.15(b)        Intellectual Property Filings
Schedule 3.23(b)        Communications Proceedings
Schedule 3.24           Material Agreements
Schedule 6.02(d)        Existing Indebtedness
Schedule 6.03(f)        Existing Liens
Schedule 7.01(k)        Judgments

## EXHIBITS

Exhibit A               Form of Assignment and Assumption
Exhibit B               Form of Closing Certificate
Exhibit C               Form of Security Agreement
Exhibit D               Form of Request for Borrowing
Exhibit E               Form of Promissory Note
Exhibit F               Forms of Tax Certificates
Exhibit G               Form of Solvency Certificate
Exhibit H               Form of Compliance Certificate

## SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT

This SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT (this "**Agreement**") dated as of [_____], 2014, among LIGHTSQUARED INC., a Delaware corporation which has been reorganized under the Plan of Reorganization (the "**Borrower**"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "**Lenders**") and [____], a national banking association, as administrative agent for the Lenders.[1]   The sole lead arranger and sole bookrunner for the credit facility provided under this Agreement is J.P. MORGAN SECURITIES LLC.

W I T N E S S E T H :

WHEREAS, on May 14, 2012 (the "**Petition Date**"), the Borrower and certain of its Affiliates filed voluntary petitions with the Bankruptcy Court initiating cases under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on [__], 2014 the Borrower filed the Plan of Reorganization;

WHEREAS, on [__], 2014, the Bankruptcy Court entered the Plan Confirmation Order confirming the Plan of Reorganization; and

WHEREAS, in connection with the Plan of Reorganization, the Borrower requires certain credit and other financial accommodations be made available to it, and the Lenders have agreed to extend credit in the form of the credit facility hereunder;

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

### ARTICLE I
DEFINITIONS

Section 1.01    *Defined Terms*.  As used in this Agreement, the following terms have the meanings specified below:

"**Account**" has the meaning set forth in the UCC.

"**Administrative Agent**" means [____], in its capacity as administrative agent for the Lenders hereunder, together with its permitted successors and assigns (including assignment of its agency role hereunder to a third party) in such capacity.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

---

[1]    TBD whether there will be an administrative agent for this facility.

**"Affiliate"** means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

**"Aggregate Commitments"** means, at any time, the sum of the Commitments at such time. As of the Closing Date, the Aggregate Commitments are $300,000,000 plus the amount of any unpaid accrued interest, paid in kind interest, and premium under the DIP Agreement.[2]

**"Aggregate Outstandings"** means, at any time, the aggregate outstanding principal balance of the Loans of all Lenders at such time.

**"Agreement"** has the meaning set forth in the preamble hereto.

**"Anti-Corruption Laws"** means all laws, rules and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

**"Applicable Law"** means, as to any Person, all statutes, rules, regulations, orders, or other requirements having the force of law and applicable to such Person, and all court orders and injunctions, and/or similar rulings and applicable to such Person, in each case of or by any Governmental Authority, or court, or tribunal which has jurisdiction over such Person, or any property of such Person.

**"Applicable Percentage"** means, with respect to any Lender at any time, the percentage (carried out to the fourth decimal place) of (i) prior to the funding of the Term Loans on the Closing Date, the amount of such Lender's Commitment at such time to the Aggregate Commitments at such time and (ii) thereafter, the outstanding principal balance of such Lender's Loan at such time to the Aggregate Outstandings at such time. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

**"Approved Fund"** means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

**"Asset Sale"** means any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by clause (a), (b), (c), (d) or (e) of Section 6.05) that yields gross proceeds (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) to the Borrower or any of its Subsidiaries.

---

[2]    The initial principal amount of the Exit Facility shall be reduced on a dollar-for-dollar basis by 22.22% of the amount that the First Lien Exit Facility exceeds $1,000,000,000, each in accordance with the Plan of Reorganization.

**"Assets"** means all rights, titles, and interests of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**"Assignee Group"** means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed or advised by the same investment advisor or investment manager or by affiliated investment advisors or investment managers.

**"Assignment and Assumption"** means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent and the Borrower.

**"Bankruptcy Code"** means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

**"Board"** means the Board of Governors of the Federal Reserve System of the United States of America.

**"Borrower"** has the meaning set forth in the preamble hereto.

**"Borrowing"** means a group of Loans made on the same date.

**"Business Day"** means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

**"Canadian Court"** means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the CCAA.

**"Canadian Recognition Order"** means an order of the Canadian Court, which shall be in form and substance acceptable to the Administrative Agent, recognizing the entry of the Plan Confirmation Order and giving full force and effect in Canada thereto.

**"Capital Lease Obligations"** means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

**"Cases"** means one or more cases under chapter 11 of the Bankruptcy Code with respect to which the Borrower and certain other Group Members were the debtors and the debtors-in-possession.

**"Cash Equivalents"** means: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Financial Services LLC ("**S&P**") or P-1 by Moody's Investors Service, Inc. ("**Moody's**"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

**"CCAA"** means the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

**"Change in Control"** means, at any time, (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934 (the **"Exchange Act"**), other than a Permitted Holder, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all shares that any such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of voting stock of the Borrower representing more than 35% of the voting power of all voting stock of the Borrower, (b) individuals who on the Closing Date constituted the board of directors of the Borrower (together with any new directors whose election by such board of directors or whose nomination for election by the Borrower's shareholders was approved by a vote of a majority of the Borrower's directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Borrower's directors then in office (excluding any directors from the numerator and denominator of such calculation to the extent such director is or was designated by a Permitted Holder or pursuant to a contractual agreement with the Borrower existing on the Closing Date), (c) a change of control occurs under any Material Indebtedness, (d) a change of control occurs under the First Lien Credit Agreement or

the Second Lien Credit Agreement or (e) a plan relating to the liquidation or dissolution of the Borrower is adopted; *provided further* that for the avoidance of doubt, none of the transactions contemplated or expressly authorized by the Plan of Reorganization to occur on the Effective Date thereof shall constitute, or be deemed to constitute, a Change in Control.

**"Change in Law"** means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any party hereto (or, for purposes of Section 2.09(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement. Notwithstanding the foregoing, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives promulgated thereunder and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to have been introduced or adopted after the Closing Date, regardless of the date enacted or adopted.

**"Chapter 11 Cases"** has the meaning set forth in the recitals hereto.

**"Charges"** has the meaning set forth in Section 9.13.

**"Closing Date"** means the date on which each of the conditions set forth in Section 4.01 were satisfied (or waived in accordance with Section 9.02), which date is [_____], 2014.

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**"Collateral"** means all the "Mortgaged Property" as defined in any Mortgage and all the "Collateral" as defined in any other Security Document.

**"Commitment"** means, with respect to each Lender, the commitment of such Lender hereunder set forth as its Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time.

**"Communications Act"** means the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations and published policies of the FCC thereunder, all as the same may be in effect from time to time.

**"Communications Laws"** means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services.

**"Communications Licenses"** means any authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or

conferred upon any Person, in each case by any Governmental Authority (including the FCC) with respect to the use of radio frequencies.

"**Compliance Certificate**" means a certificate duly executed by a Responsible Officer substantially in the form of Exhibit H.

"**Confirmation Order**" means the order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] confirming the Plan of Reorganization, as such order may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Lenders.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power or by contract. "Controlling" and "Controlled" have meanings correlative thereto.

"**Credit Party**" or "**Credit Parties**" means (a) individually, (i) each Lender, (ii) the Administrative Agent, (iii) the Lead Arranger, (iv) any other Person (including, if applicable, Affiliates of Lenders) to whom Obligations are owing and (v) the successors and permitted assigns of each of the foregoing and (b) collectively, all of the foregoing.

"**Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc., each in their capacity as debtors and debtors in possession in the Chapter 11 Cases.

"**Default**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived hereunder, become an Event of Default.

"**DIP Agreement**" means the Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of [__], 2014, by and among the Borrower, LightSquared LP and One Dot Six Corp., as borrowers, the guarantors party thereto, the lenders party thereto, and [___], as administrative agent and as collateral agent, as amended, amended and restated, supplemented and modified from time to time prior to the date hereof.

"**DIP Facility**" means the credit facility made available under the DIP Agreement.

**"Disclosure Statement"** means that certain [____] dated [__], 2014 [Docket No. ___], as amended, supplemented or otherwise modified from time to time in a manner that is not adverse (as determined by the Lenders in their sole discretion) to the rights and interests of the Lenders and their Affiliates.

**"Disposition" or "Dispose"** means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of related transactions, of any property (including any Equity Interests) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable.

**"Disqualified Company"** means any company which is a competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(A), and thereafter, upon the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), such additional companies which are competitors of the Borrower and the Affiliates of such companies, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided* that the addition of such persons shall not deem any Lender that is already a Lender as of the date of such designation to be a Disqualified Company, and such designation shall be effective two (2) Business Days after being notified to Lenders; *provided, further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption. A Disqualified Company will include any Affiliate thereof.

**"Dollars"** and the symbol "$" mean the lawful currency of the United States.

**"Eligible Assignee"** means (a) a Lender or any Affiliate of a Lender; (b) an Approved Fund; and (c) any other Person approved by (i) the Administrative Agent and (ii) unless an Event of Default has occurred and is continuing, the Borrower (each such approval under clauses (i) and (ii) not to be unreasonably withheld or delayed); *provided* that approval of the Borrower shall be deemed to have been given pursuant to clause (c)(ii) with respect to any potential assignee if it shall not have responded to an approval request with respect thereto within ten (10) Business Days of receipt thereof; *provided further* that notwithstanding the foregoing, **"Eligible Assignee"** shall not include (A) a Disqualified Company without the prior written consent of the Borrower, (B) a natural person, (C) the Borrower or any Subsidiaries of the Borrower or (D) NewCo or any Subsidiaries of NewCo.

**"Environmental Laws"** means all laws (statutory or common), rules, regulations, codes, ordinances, orders, decisions, decrees, judgments, injunctions, permits, or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating to the pollution or protection of the environment (including indoor air quality) or to human health and safety as it relates to Hazardous Material handling or exposure or to the preservation or reclamation of natural resources, including those relating to the management, Release or threatened Release of or exposure to any Hazardous Material.

**"Environmental Liability"** means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense or cost, contingent or otherwise (including any liability for costs of Remedial Actions, or natural resource damages, administrative oversight

costs, and indemnities), of or related to the Borrower or any Subsidiary (including any predecessor for whom the Borrower or any Subsidiary bears liability contractually or by operation of law) arising under or relating to any Environmental Law, including those resulting from or based upon (a) any compliance or noncompliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment (including as related to indoor air quality) or (e) any of the foregoing for which liability is assumed or imposed by any contract or agreement.

"**Equity Interests**" means, as to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, and any and all warrants, rights or options to purchase any of the foregoing, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means (a) any entity, whether or not incorporated, that is under common control with the Borrower and any Subsidiary within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which the Borrower or any Subsidiary is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which the Borrower or any Subsidiary is a member; and (d) with respect to the Borrower or an Subsidiary, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Borrower or Subsidiary, any corporation described in clause (b) above or any trade or business described in clause (c) above is a member. Any former ERISA Affiliate of the Borrower or a Subsidiary shall continue to be considered an ERISA Affiliate of the Borrower or the Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower or a Subsidiary and with respect to liabilities arising after such period for which the Borrower or Subsidiary could be liable under the Code or ERISA.

"**ERISA Event**" means (a) the failure of any Plan to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of the Borrower or any Subsidiary or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA; (e) a determination that any Pension Plan is, or

is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (h) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (i) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (j) the failure by the Borrower, a Subsidiary or any of their ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (k) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Pension Plan or Multiemployer Plan; (l) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower, any Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Section 431 or 432 of the Code or Sections 304 or 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA) or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (m) the failure by the Borrower, any Subsidiary or any of their ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA; (n) the withdrawal by the Borrower, any Subsidiary or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (o) the imposition of liability on the Borrower or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (p) the occurrence of an act or omission which could give rise to the imposition on the Borrower, any Subsidiary or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (q) the assertion of a material claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against the Borrower, any Subsidiary or any of their respective ERISA Affiliates in connection with any Plan; (r) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan (or any other Plan) to qualify for exemption from taxation under Section 501(a) of the Code; or (s) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" has the meaning set forth in Section 7.01.

"**Excluded Foreign Subsidiary**" means any Foreign Subsidiary in respect of which the pledge of all of the Equity Interests of such Subsidiary as Collateral would, in the good faith judgment of the Borrower, result in adverse tax consequences to the Borrower; *provided* that the following shall be deemed to be Excluded Foreign Subsidiaries: (i) a Subsidiary that is a

"controlled foreign corporation" within the meaning of Section 957(a) of the Code (a "**CFC**"), and (ii) a Subsidiary that is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of Equity Interests of a Subsidiary that is a CFC.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.11(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Exit Loan Documents**" means, collectively, the First Lien Loan Documents and the Second Lien Loan Documents.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" means the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**Federal Funds Effective Rate**" means, for any day, the weighted average (rounded upwards, if necessary, to the next one-one hundredth of one percent (1/100 of 1%)) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next one-one hundredth of one percent (1/100 of 1%)) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Financial Officer**" means, with respect to any Person (other than a natural person), the chief financial officer, president, chief executive officer, treasurer or controller or any other officer of such Person designated or authorized by any of the foregoing.

**"First Lien Credit Agreement"** means that certain [First Lien Credit Agreement], dated as of the Closing Date, by and among NewCo, as borrower, the subsidiaries of NewCo party thereto, JPMorgan Chase Bank, N.A., as administrative agent, the lenders identified therein and the other agents identified therein, as amended, restated, modified, or supplemented from time to time to the extent permitted by this Agreement.

**"First Lien Exit Facility"** means the credit facility made available pursuant to the First Lien Credit Agreement.

**"First Lien Lenders"** means the lenders under the First Lien Credit Agreement.

**"First Lien Loans"** means the loans made by the First Lien Lenders under the First Lien Credit Agreement.

**"First Lien Loan Documents"** means "Loan Documents" (or any comparable term) in the First Lien Credit Agreement.

**"Fiscal Month"** means each calendar month.

**"Fiscal Quarter"** means each three-month period of the Borrower ending on March 31, June 30, September 30 or December 31 of any calendar year.

**"Flood Insurance Laws"** means, collectively, the following (in each case as now or hereafter in effect or any successor statute thereto): (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994 and (iv) the Flood Insurance Reform Act of 2004.

**"Foreign Plan"** means each employee benefit plan (within the meaning of Section 3(3) of ERISA) that is not subject to US law and is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle maintained exclusively by a Governmental Authority) and is sponsored or maintained by the Borrower or any Subsidiary primarily for the benefit of employees who are employed outside the United States, or under which the Borrower or any Subsidiary could have any liability, contingent or otherwise.

**"Foreign Plan Event"** means, with respect to any Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Plan required to be registered; or (c) the failure of any Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Plan.

**"Foreign Subsidiary"** means any Subsidiary organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

**"Fund"** shall mean any Person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local or other, and any agency (including the FCC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Group Members**" means the collective reference to the Borrower and its Subsidiaries.

"**Guarantee Obligation**" means, as to any Person (the "**guaranteeing person**"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "**primary obligations**") of any other third Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however,* that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**Hazardous Materials**" means all explosive, radioactive, hazardous or toxic substances or materials, and all wastes, pollutants or contaminants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, lead, polychlorinated biphenyls, toxic mold, radon gas, infectious or medical wastes, and all other substances or materials of any nature regulated pursuant to any Environmental Law due to their hazardous, toxic or deleterious properties or characteristics.

"**Indebtedness**" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes,

bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Sections 7.01(f) and (g) only, all obligations of such Person in respect of Swap Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

**"Indemnified Taxes"** means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

**"Indemnitee"** has the meaning set forth in Section 9.03(b).

**"Insolvent"** means with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

**"Intellectual Property"** means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

**"Interest Payment Date"** means (a) the last Business Day of each calendar quarter to occur during any period in which such Loan is outstanding and (b) the Maturity Date, as the case may be.

**"Investments"** shall have the meaning set forth in Section 6.07.

**"IRS"** means the United States Internal Revenue Service.

**"ITU"** means the International Telecommunication Union, or any successor agency of the United Nations that develops standards and procedures concerning radiocommunications.

**"Lead Arranger"** means J.P. Morgan Securities LLC.

"**Lease**" means any agreement pursuant to which the Borrower is entitled to the use or occupancy of any real property for any period of time.

"**Lender**" shall have the meaning set forth in the preamble hereto.

"**Lender Insolvency Event**" means that (i) a Lender or its Parent Company is determined or adjudicated to be insolvent by a Governmental Authority, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; *provided* that a Lender Insolvency Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interest in any Lender or its Parent Company by a Governmental Authority or an instrumentality thereof.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"**Loan Documents**" means this Agreement, the Security Documents, and any other instrument or agreement now or hereafter executed and delivered by the Borrower in connection herewith, each as amended, restated, modified, replaced and supplemented and in effect from time to time.

"**Loan Transactions**" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the deemed borrowing of Loans and the use of the proceeds thereof.

"**Loans**" means the Term Loans and any other loans made hereunder.

"**Margin Stock**" shall have the meaning set forth in Regulation U.

"**Material Adverse Effect**" means (a) a material adverse effect on  the business, assets, property, operations or condition, financial or otherwise, or material agreements of the Borrower and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Borrower to fully and timely perform any of its material obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on a material portion of the Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" means Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $5,000,000 (or its equivalent); *provided*

that notwithstanding the foregoing, the Indebtedness incurred pursuant to the First Lien Exit Facility, the Second Lien Exit Facility and any permitted refinancing of the foregoing shall be deemed to be "Material Indebtedness."

"**Maturity Date**" means the eighth anniversary of the Closing Date.

"**Maximum Rate**" has the meaning set forth in Section 9.13.

"**Moody's**" has the meaning set forth in the definition of "Cash Equivalents".

"**Mortgage(s)**" means each and every fee mortgage or deed of trust, security agreement and assignment encumbering Real Estate by and between the Borrower in favor of the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent.

"**Mortgage Policies**" has the meaning set forth in the definition of Real Estate Requirements.

"**Mortgaged Properties**" means the owned Real Estate listed on Schedule 1.01(B) attached hereto and any Real Estate that becomes subject to a Mortgage pursuant to Section 5.11(b).

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, a Subsidiary or an ERISA Affiliate contributes or is obligated to contribute.

"**Multiple Employer Plan**" means a Plan which has two or more contributing sponsors (including any Subsidiary or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Proceeds**" means, with respect to any event (a) the gross cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) all costs, fees and out-of-pocket fees, commissions, charges and expenses (including fees, costs and expenses related to appraisals, surveys, brokerage, finder, underwriting, arranging, legal, investment banking, placement, printing, auditor, accounting, title, environmental (including remedial expenses), title exceptions and encumbrances, and finder's fees, success fees or similar fees and commissions) paid or payable by the Borrower and its Subsidiaries to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a casualty or a condemnation or similar proceeding), the amount of all payments required to be made (or required to be escrowed) by the Borrower and its Subsidiaries as a result of such event to repay (or establish an escrow, trust, defeasance, discharge or redemption account or similar arrangement for the repayment of) Indebtedness (other than the Obligations) secured by a Lien prior to the Lien of the Administrative Agent on such asset (*provided* that if any amounts in such accounts or subject to such agreements are released to the Borrower and its Subsidiaries, such amounts shall constitute Net Proceeds upon release), (iii) the amount of all taxes (including transfer tax and recording tax)

paid (or reasonably estimated to be payable) by the Borrower and its Subsidiaries, and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable that are directly attributable to such event (as determined reasonably and in good faith by the chief financial officer or other Financial Officer of the Borrower) and (iv) in respect of any casualty or condemnation, any amounts paid to the Borrower or any Subsidiary related to the casualty or condemnation or Recovery Event.

"**NewCo**" means [NewCo], a Delaware limited liability company.

"**Non-Consenting Lender**" has the meaning set forth in Section 9.02(c).

"**Non-U.S. Lender**" means a Lender that is not a U.S. Person.

"**Obligations**" means (a) obligations of the Borrower from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower under or pursuant to this Agreement and the other Loan Documents.

"**Organizational Documents**" shall mean, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are

Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.13).

**"Parent Company"** means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the economic or voting Equity Interests of such Lender.

**"Participant"** has the meaning set forth in Section 9.04(d); *provided* that in no circumstance shall a Disqualified Company be a Participant.

**"Participant Register"** has the meaning set forth in Section 9.04(e).

**"PBGC"** means the Pension Benefit Guaranty Corporation referred to and defined in Section 4002 of ERISA and any successor entity performing similar functions.

**"Pension Plan"** means any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is or was sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower, any Subsidiary or any of their respective ERISA Affiliates or (ii) with respect to which has the Borrower, any Subsidiary or any of their respective ERISA Affiliates has any actual or contingent liability.

**"Permitted Holders"** means J.P. Morgan Broker-Dealer Holdings Inc., Harbinger Capital Partners, LLC and any Affiliate of any of the foregoing.

**"Person"** means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

**"Petition Date"** has the meaning set forth in the recitals hereto.

**"PIK Interest"** has the meaning set forth in Section 2.05(b).

**"Plan"** means any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which the Borrower or any Subsidiary is (or, if such Plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, or in respect of which the Borrower or any Subsidiary has any actual or contingent liability.

**"Plan Effective Date"** means the "Effective Date" as defined in the Plan of Reorganization.

**"Plan of Reorganization"** means the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, as confirmed by the Confirmation Order, as amended, supplemented or otherwise modified from time to time in a manner that is not adverse (as

determined by the Lenders in their sole discretion) to the rights and interests of the Lenders and their Affiliates (it being understood that any amendment, modification or supplement to the Plan of Reorganization providing for the assumption or incurrence by the Borrower or its Subsidiaries of any material indebtedness or other material liability not otherwise contemplated by the Plan of Reorganization as of [___], 2014 (other than contracts or leases to be assumed in connection with the ongoing business of the Borrower upon reasonable prior notice to the Administrative Agent) and any modification to or waiver of the conditions to effectiveness of the Plan of Reorganization shall be deemed to be adverse to the rights and interests of the Lenders and their Affiliates).

**"Prohibited Transaction"** means as defined in Section 406 of ERISA and Section 4975(c) of the Code.

**"Projections"** has the meaning set forth in Section 5.02(c).

**"Real Estate"** means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by the Borrower, including all easements, rights-of-way, and similar rights relating thereto and all Leases, tenancies, and occupancies thereof.

**"Real Estate Requirements"** means, collectively, each of the following, unless waived by the Administrative Agent in its sole discretion:

(a)    The Borrower shall have executed and delivered to the Administrative Agent a Mortgage with respect to any owned Real Estate, together with an opinion of counsel in each state where such Real Estate is located and an opinion of counsel in the jurisdiction where the Borrower is organized, in form and substance reasonably satisfactory to the Administrative Agent;

(b)    For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to or concurrently with the recording of such Mortgage, the Administrative Agent shall have received fully paid American Land Title Association Lender's Extended Coverage title insurance policies or marked-up title insurance commitments having the effect of a policy of title insurance (the **"Mortgage Policies"**) in form and substance, with such endorsements and affirmative coverages as may reasonably be requested by the Administrative Agent (to the extent available at commercially reasonable rates) and in amounts reasonably acceptable to the Administrative Agent (*provided* that such amounts shall not exceed the estimated fair market value of the applicable mortgaged property, as reasonably estimated by the Borrower, unless otherwise reasonably agreed by the Borrower and the Administrative Agent), issued, coinsured and reinsured (to the extent reasonably required by the Administrative Agent) by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid first priority and subsisting Liens (other than any Liens permitted by Section 6.03) in favor of the Administrative Agent on the property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, other than any Liens permitted pursuant to Section 6.03 or otherwise reasonably acceptable to the Administrative Agent;

(c)       For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to or concurrently with the delivery of such Mortgage (or such later date, if any, as the Administrative Agent shall agree in writing in its reasonable discretion), the Administrative Agent shall have received American Land Title Association/American Congress on Surveying and Mapping form surveys, for which all necessary fees (where applicable) have been paid, certified to the Administrative Agent and the issuer of the Mortgage Policies in a manner reasonably satisfactory to the Administrative Agent by a land surveyor duly registered and licensed in the states in which the property described in such surveys is located and reasonably acceptable to the Administrative Agent, showing all buildings and other improvements, the location of any easements, parking spaces, rights of way, building set-back lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects reasonably acceptable to the Administrative Agent or such other form of survey with respect to which the title insurer providing the Mortgage Policies will agree to provide extended coverage; and

(d)       For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to delivery of such Mortgage, the Borrower shall have delivered to the Administrative Agent (i) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination and (ii) in the event any such Real Estate is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area, (A) a notice about special flood hazard area status and flood disaster assistance, duly executed by the Borrower and (B) evidence of flood insurance (which may be in the form of a blanket policy), with a financially sound and reputable insurer, naming the Administrative Agent, as mortgagee, in an amount and otherwise in form and substance reasonably satisfactory to the Administrative Agent and evidence of the payment of premiums in respect thereof.

"**Recovery Event**" means any payment in respect of any property or casualty insurance claim or any condemnation proceeding.

"**Register**" has the meaning set forth in Section 9.04(c).

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), including the migration of any Hazardous Material through the air, soil, surface water or groundwater.

"**Remedial Action**" means (a) all actions taken under any Environmental Law to (i) clean up, remove, remediate, contain, treat, monitor, assess or evaluate Hazardous Materials present in, or threatened to be Released into, the environment, (ii) perform pre-remedial studies

and investigations and post-remedial operation and maintenance activities or (b) any response actions authorized by 42 U.S.C. 9601 et. seq. or analogous state law.

**"Reorganization"** means with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

**"Reorganized Debtors"** means the Debtors as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

**"Reportable Event"** means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to 29 C.F.R. Section 4043 as in effect on the date hereof (no matter how such notice requirement may be changed in the future).

**"Required Lenders"** means, at any time, Lenders having Loans (and, prior to the making of the Loans pursuant to Section 2.01, Commitments), representing greater than fifty percent (50%) of the sum of all Loans outstanding (and, prior to the making of the Loans pursuant to Section 2.01, Commitments) at such time.

**"Responsible Officer"** of any Person means the chief executive officer, president, chief financial officer, general counsel and any executive vice president (or any substantially similar office to any of the foregoing) or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

**"Restricted Payment"** has the meaning set forth in Section 6.06.

**"S&P"** has the meaning set forth in the definition of "Cash Equivalents".

**"Sanctioned Country"** means, at any time, a country or territory that is the subject or target of any Sanctions.

**"Sanctioned Person"** means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

**"Sanctions"** means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

**"Second Lien Credit Agreement"** means that certain [Second Lien Credit Agreement], dated as of the Closing Date, by and among NewCo, as borrower, the subsidiaries of NewCo party thereto, [__], as administrative agent, the lenders identified therein and the other agents

identified therein, as amended, restated, modified, or supplemented from time to time to the extent permitted by this Agreement.

**"Second Lien Exit Facility"** means the credit facility made available pursuant to the Second Lien Credit Agreement.

**"Second Lien Lenders"** means the lenders under the Second Lien Credit Agreement.

**"Second Lien Loans"** means the loans made by the Second Lien Lenders under the Second Lien Credit Agreement.

**"Second Lien Loan Documents"** means "Loan Documents" (or any comparable term) in the Second Lien Credit Agreement.

**"Secured Parties"** means any of the Administrative Agent, the Lenders and any other holder of Obligations.

**"Security Agreement"** means the Security Agreement to be executed and delivered by the Borrower, dated as of the Closing Date, substantially in the form of Exhibit C, as such agreement may be amended, restated, supplemented and modified from time to time.

**"Security Documents"** means the Security Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by the Borrower to secure any of the Obligations.

**"Solvent"** means, with respect to the Borrower, on a particular date, that on such date (i) the sum of the debt and liabilities (including subordinated and contingent liabilities) of the Borrower and its Subsidiaries, taken as a whole, does not exceed the fair value of the present assets of the Borrower and its Subsidiaries, taken as a whole; (ii) the present fair saleable value of the assets of the Borrower and its Subsidiaries, taken as a whole, is greater than the total amount that will be required to pay the probable debt and liabilities (including subordinated and contingent liabilities) of the Borrower and its Subsidiaries as they become absolute and matured, (iii) the capital of the Borrower and its Subsidiaries, taken as a whole, is not unreasonably small to engage in the business of the Borrower and its Subsidiaries, taken as a whole, on the date hereof and as contemplated to be engaged following the Closing Date; and (iv) the Borrower and its Subsidiaries, taken as a whole, have not incurred, or believe that they will incur, debts or other liabilities including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

**"Specified Date"** means October 31, 2014.

**"SPV"** has the meaning set forth in Section 9.04(i).

**"Subordinated Indebtedness"** means any unsecured Indebtedness of the Borrower and its Subsidiaries that is subordinated in right of payment to the Obligations on subordination terms reasonably satisfactory to the Administrative Agent.

**"Subsidiary"** means, with respect to any Person (the **"parent"**) at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than fifty percent (50%) of the ordinary voting power to elect a majority of the board of directors or other managers thereof or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.  Unless otherwise specified, **"Subsidiary"** shall mean a Subsidiary of the Borrower, it being understood that neither NewCo nor any of its subsidiaries are, on the Closing Date, Subsidiaries of the Borrower.

**"Swap Agreement"** means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

**"Taxes"** means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**"Term Loan"** means a term loan made by a Lender pursuant to Section 2.01 on the Closing Date.

**"Termination Date"** means the earliest to occur of (a) the Maturity Date and (b) the acceleration of the Term Loans pursuant to Section 7.02.

**"Tranche A Loans"** has the meaning set forth in the DIP Agreement.

**"Tranche B Loans"** has the meaning set forth in the DIP Agreement.

**"Transferee"** means any Eligible Assignee or Participant.

**"Transactions"** means, collectively, (i) the Loan Transactions, (ii) the conversion of the Tranche A Loans into (x) the Loans under this Agreement, (y) the Loans under, as defined in, the Second Lien Exit Facility and (z) a portion of NewCo Series A-1 Preferred PIK Interests (as defined in the Plan of Reorganization) and the NewCo Class A Common Interests (as defined in the Plan of Reorganization), in each case in accordance with the Plan of Reorganization, (iii) the

repayment in full of the Tranche B Loans, (iv) the consummation of the Plan of Reorganization and (v) all other related transactions, including the payment of fees and expenses in connection with the foregoing.

**"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

**"USA PATRIOT Act"** means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

**"U.S. Person"** means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

**"U.S. Tax Compliance Certificate"** has the meaning set forth in Section 2.11(f)(ii)(B)(3).

**"Wholly Owned Subsidiary"** means as to any Person, any other Person all of the Equity Interests of which (other than directors' qualifying shares required by law) are owned by such Person directly and/or through other Wholly Owned Subsidiaries.

**"Withdrawal Liability"** means liability to a Multiemployer Plan as a result of a complete or partial withdrawal by the Borrower, a Subsidiary or any ERISA Affiliate after the Closing Date from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02    *Terms Generally*.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, modified, restated, replaced, refinanced, extended, renewed or restructured (subject to any restrictions on such supplements, amendments, modifications, replacements, refinancings, extensions, renewals, restatements or restructurings set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be

construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (f) all references to "knowledge" or "aware" of the Borrower or a Subsidiary of the Borrower means the actual knowledge of a Financial Officer or Responsible Officer (*provided* that the foregoing shall not include any knowledge of a legal officer of the Borrower or a Subsidiary to the extent such information is, in such legal officer's sole good faith judgment, subject to attorney-client or similar privilege and is not known to any other Financial Officer or Responsible Officer), (g) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law (including by succession of comparable successor laws), (h) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including" and (i) unless otherwise stated herein, all provisions herein within the discretion or to the satisfaction of a party shall be deemed to include a standard of reasonableness, good faith and fair dealing.

Section 1.03    *Accounting Terms; GAAP*.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that (a) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been affirmatively withdrawn by the Borrower (or, in the case of a request for an amendment under this Section by the Required Lenders, the Administrative Agent) or such provision amended in accordance herewith and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at **"fair value"**, as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof).

Section 1.04    *Rounding*.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05    *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06    *Timing of Payment or Performance*.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.07    *Certifications*.  All certifications to be made hereunder or under any other Loan Document by an officer or representative of the Borrower shall be made by such person in his or her capacity solely as an officer or a representative of the Borrower, on the Borrower's behalf and not in such Person's individual capacity.

## ARTICLE II
### THE LOANS

Section 2.01    *Loans*.  Subject to the terms and conditions set forth herein, each Lender shall be deemed to have made a Loan to the Borrower on the Closing Date in full satisfaction on a dollar-for-dollar basis of the amount of its Tranche A Loans that have not been repaid with the proceeds of the First Lien Loans on or prior to the Closing Date.

Section 2.02    *Loans and Borrowing*.  (a)    Each Loan shall be made by the Lenders ratably in accordance with their respective Applicable Percentages. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    The Borrowing shall be denominated in Dollars.

(c)    Any unutilized Commitments after giving effect to the Borrowing on the Closing Date shall be terminated.

Section 2.03    *Reserved*.

Section 2.04    *Reserved*.

Section 2.05    *Interest*.

(a)    <u>Interest</u>.  Subject to the provisions of Sections 2.05(b) and (c), the Loans shall bear interest at a rate per annum equal to 11.0%.[3]

(b)    <u>Payment of Interest</u>.  Accrued and unpaid interest shall be paid in kind on each Interest Payment Date by adding such accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (**"PIK Interest"**) (whereupon from and after any such date such additional amounts shall constitute Loans for all purposes hereunder and under the other Loan Documents and shall accrue interest pursuant to this Section 2.05); *provided* that, accrued and unpaid interest shall be paid in cash on the Maturity Date and on the date of any repayment or prepayment (whether pursuant to a voluntary prepayment or mandatory

---

[3]    LIBOR option TBD.

prepayment, acceleration or otherwise) of Loans, with respect to the principal amount of the Loans repaid or prepaid.  The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any promissory notes.

(c)    <u>Default Rate</u>.  Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on any Loan or any fee or other amount payable by Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to 2.0% *plus* the rate otherwise applicable to Loans as provided in Section 2.05(a) for as long as (i) such Event of Default shall be continuing or (ii) such payment obligation shall not have been satisfied.

(d)    <u>Interest Payment Dates</u>.  (i) Interest accrued pursuant to Section 2.05(c) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan of any Lender, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)    <u>Interest Calculation</u>.  All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.06    *Repayment of Loans; Evidence of Debt*.  (a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender on the Termination Date the aggregate principal amount of all Loans then outstanding.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder (including PIK Interest) and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the respective Lenders and each respective Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans and other Obligations in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it to the Borrower be evidenced by a promissory note. In such event, the Borrower shall promptly prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) substantially in the form attached hereto as Exhibit E. Thereafter, unless otherwise agreed by the applicable Lender, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to

Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.07    *Prepayment of Loans*.    (a)    <u>Voluntary</u>.    Subject to the payment of any amounts required under Section 2.10 the Borrower may, upon notice from the Borrower to the Administrative Agent, at any time or from time to time, voluntarily prepay Loans in whole or in part; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)    <u>Mandatory</u>.

(i)    Subject to clause (iv) below, not later than the fifth Business Day following receipt by the Borrower or any Subsidiary of any Net Proceeds in connection with any Asset Sale, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(ii)    Subject to clause (iv) below, not later than the fifth Business Day following receipt by the Borrower or any Subsidiary of any Net Proceeds in connection with any Recovery Event, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(iii)    Not later than the fifth Business Day following receipt of Net Proceeds by the Borrower or any Subsidiary from the issuance or incurrence of Indebtedness (other than any cash proceeds from the issuance of Indebtedness permitted pursuant to Section 6.02(a) through (f)) or Equity Interests, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(iv)    Notwithstanding the foregoing, subject, in each case, to the prior written consent of the Administrative Agent, the Borrower shall not be required to apply any Net Proceeds that are the subject of clauses (i) or (ii) above to prepay the Loans to the extent reinvested by the Borrower or any of its Subsidiaries in assets of a kind then used or usable in the business of the Borrower and its Subsidiaries (which assets shall principally consist of Collateral to the extent such Net Proceeds were generated from an Asset Sale or Recovery Event involving Collateral) within six months of receipt of such Net Proceeds (or, if the Borrower or any Subsidiary has contractually committed within six months following receipt of such Net Proceeds to reinvest such Net Proceeds, then twelve months from the date of the receipt of such Net Proceeds); *provided* that no Event of Default shall have occurred and shall be continuing at the time of the earlier of the (x) reinvestment of such proceeds and (y) entry into the contractual commitment to reinvest such Net Proceeds; *provided, further*, that any such Net Proceeds not actually reinvested in accordance with the foregoing, shall be promptly applied by the Borrower to prepay the Loans in accordance with this Section 2.07.

(c)    The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment under Section 2.07(a) or (b), not later than 11:00 a.m. (or such later time as the Administrative Agent may consent to in its reasonable discretion), New York, New York time, three (3) Business Days before the date of prepayment.  Such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the relevant Lenders of the contents thereof.  Prepayments under Section 2.07(a) and 2.07(b) shall be accompanied by accrued interest to the extent required by Section 2.05 and shall be subject to Section 2.10.

(d)    Each prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

Section 2.08    *Fees*.  The Borrower shall pay to the Administrative Agent, for its own account, the fees and other charges earned, due and payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.  All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the respective accounts of the Administrative Agent and other Lenders as provided herein. Once due, all fees shall be fully earned and shall not be refundable under any circumstances.

Section 2.09    *Increased Costs*.  (a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)    impose on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement, any Loans made by such Lender; or

(iii)    subject any Credit Party to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or the Administrative Agent of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or the Administrative Agent hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Administrative Agent, as the case may be, such additional amount or amounts as will compensate such Lender or the Administrative Agent, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's

holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered. A Lender may only submit a request for compensation in connection with the Changes in Law described in clauses (a) and (b) of this Section 2.09 if such Lender imposes such increased costs on borrowers similarly situated to the Borrower under syndicated credit facilities comparable to the Loans.

(c)    A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.09(b) shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.09 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Administrative Agent pursuant to this Section 2.09 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the Administrative Agent notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Administrative Agent's intention to claim compensation therefor; *provided further* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.10    *Reserved.*

Section 2.11    *Taxes.* (a)    Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.11), the amounts received with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)    In addition, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)    The Borrower shall indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or

asserted on or attributable to amounts payable under this Section) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(e) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)    As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.11, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    (i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.11(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed originals of IRS Form W-8ECI;

(3)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a **"U.S. Tax Compliance Certificate"**) and (y) executed originals of IRS Form W-8BEN; or

(4)      to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.11 (including by the payment of additional amounts pursuant to this Section 2.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving

rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)      Without prejudice to the survival of any other agreement contained herein, the agreements and obligations contained in this Section 2.11 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(i)      Nothing contained in this Section 2.11 shall require the Administrative Agent or any Lender to make available any of its tax returns (or any other information that it deems, in its sole discretion, to be confidential or proprietary).

(j)      For purposes of this Section 2.11, the term "Applicable Law" includes FATCA.

Section 2.12    *Payments Generally; Pro Rata Treatment; Sharing of Setoffs*.  (a)   The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or of amounts payable under Sections 2.09, 2.10 or 2.11, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York, New York time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at [__] except that payments pursuant to Sections 2.09, 2.10, 2.11 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents or as otherwise expressly provided herein shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Amounts prepaid or repaid on account of the Loans may not be reborrowed.  All payments under each Loan Document shall be made in Dollars.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder in respect of Obligations, then such funds shall be applied in the order and manner set forth in Section 7.03.

(c)      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and

accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower any rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment by the Borrower is due to the Administrative Agent for the account of any of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of such Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.04(b), 2.11(d), 2.12(d) or 9.03(c), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to it under such Section until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its reasonable discretion.

Section 2.13   *Mitigation Obligations*.  If any Lender requests compensation under Section 2.09, or if the Borrower is required to pay any additional amount or indemnification payment to any Lender, the Administrative Agent, or any Governmental Authority for the account of any Lender pursuant to Section 2.11, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or Section 2.11, as the case may be, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrower hereby agrees

to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment promptly following written demand (including documentation reasonably supporting such request) from such Lender.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

Until the Commitments have expired or been terminated and the principal of and interest on each Loan, all fees and other Obligations (other than contingent indemnification obligations not then due and owing) payable hereunder shall have been paid in full, the Borrower represents and warrants to the Administrative Agent and the Lenders as of the Closing Date:

Section 3.01    *Organization; Powers*.  (a)    Each of the Borrower and its Subsidiaries is duly organized, validly existing and in good standing (as applicable) under the laws of the jurisdiction of its organization, (b) (i) each Subsidiary has all requisite power and authority to carry on its business as now conducted, except to the extent that the failure to have any such power would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) the Borrower has all requisite power and authority to carry on its business as now conducted in all material respects and (c) except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each of the Borrower and its Subsidiaries is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    *Authorization; Enforceability*.  After giving effect to the Plan Confirmation Order and the Plan of Reorganization, the Transactions to be entered into by each Group Member are within such Group Member's corporate, limited liability or partnership powers, as applicable, and have been duly authorized by all necessary corporate, limited liability or partnership action, as applicable, and, if required, equityholder action. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document, when executed and delivered by the Borrower and after giving effect to the Plan Confirmation Order, will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    *Governmental Approvals; No Conflicts*.  After giving effect to the Plan Confirmation Order and the Plan of Reorganization[, and except as described on Schedule 3.03,][4] (a) the Transactions do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority with competent jurisdiction over the Borrower or any Subsidiary, except (i) such as have been obtained or made and are in full force and effect, (ii) any consent or approval of, registration or filings necessary to perfect Liens created under the Loan Documents (or release existing Liens) and (iii)  immaterial consents, approvals, registrations or filings, (b) the Loan Transactions will not violate any Applicable Law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of

---

[4] Subject to review of Schedule 3.03.

its Subsidiaries or any order of any Governmental Authority applicable to the Borrower or any Subsidiary, (c) the Loan Transactions will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, except with respect to any default, conflict, breach or contravention or payment, to the extent that such violation, conflict, breach, contravention or payment would not reasonably be expected to have a Material Adverse Effect and (d) the Transactions will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries, except Liens created under the Loan Documents and Liens permitted under the Loan Documents.

Section 3.04   *Financial Condition; No Material Adverse Effect*.  (a)  The Borrower has heretofore furnished to the Administrative Agent the debtor-in-possession monthly operating report filed with the Bankruptcy Court (which report is prepared on a non-GAAP basis) for the most recently ended month for which such report is available, in each case certified by a Financial Officer of the Borrower.  Such operating report presents fairly and accurately the financial condition and results of operations and cash flows of the Borrower as of the date and for the period to which it relates.

(b)      The unaudited consolidated balance sheet of the Borrower as at [_____, ____] (including the notes thereto), copies of which (the costs with respect to which were borne by the Lenders) have heretofore been furnished to each Lender, has been prepared in good faith based on the information available as of the date of delivery thereof in accordance with GAAP and presents fairly the financial position of Borrower and its consolidated Subsidiaries as at [_____, ____].

(c)      Since November 30, 2013, there has been no change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect, other than as a result of (i) events leading up to, resulting from and following the commencement of the Cases or the continuation or prosecution thereof (including the announcement of the filing) and (ii) any circumstances disclosed in the Disclosure Statement.

Section 3.05   *Properties*.  (a)  Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in or rights to use, all its real and personal property material to its business taken as a whole, except for Liens permitted by Section 6.03 or other Liens reasonably acceptable to the Administrative Agent.

(b)      Each of the Borrower and its Subsidiaries owns, or is licensed or otherwise has a right to use, all Intellectual Property material to the conduct of its business as currently conducted and as planned to be conducted.  No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower or any of its Subsidiaries know of any valid basis for any such claim.  The conduct of the business of the Borrower and each of its Subsidiaries as currently conducted and as planned to be conducted does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

Section 3.06    *Litigation and Environmental Matters*.  (a) [Except for the matters described in Schedule 3.06 and][5] after giving effect to the Plan Confirmation Order and the Plan of Reorganization, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending and unstayed against or, to the knowledge of the Borrower, threatened against or relating to the Borrower or any of its Subsidiaries that (i) could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Loan Transactions.

(b)    Except for matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) is or has become subject to, or to the knowledge of the Borrower is threatened with, any Environmental Liability or (iii) has received written notice of any claim with respect to any Environmental Liability or written notice of violation with respect to any Environmental Law.

Section 3.07    *Compliance with Laws and Agreements*.  After giving effect to the Plan Confirmation Order, each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.08    *Investment Company Status*.  Neither the Borrower nor any of its Subsidiaries is (or is required to be) an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09    *Taxes*.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP) or (b) in each case, to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10    *Employee Benefit Plans*.  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) each of the Borrower and each Subsidiary (and in the case of a Pension Plan or a Multiemployer Plan, each of their respective ERISA Affiliates) are in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations under each Plan and Pension Plan; (b) no ERISA Event or Foreign Plan Event (other than the commencement of the Chapter 11 Cases) has occurred or is reasonably expected to occur; (c) each Plan which is intended to qualify under Section 401(a) of the Code has

---

[5] Subject to review of Schedule 3.06.

received a favorable determination letter from the IRS covering such plan's most recently completed five-year remedial amendment cycle in accordance with Revenue Procedure 2007-44, I.R.B. 2007-28, indicating that such Plan is so qualified and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code or an application for such a determination is currently pending before the Internal Revenue Service, and to the knowledge of Borrower, nothing has occurred subsequent to the issuance of the most recent determination letter which would cause such Plan to lose its qualified status; (d) no liability to the PBGC (other than required premium payments), any Plan or Pension Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by the Borrower, any Subsidiary or any of their ERISA Affiliates; (e) each of the Borrower's and its Subsidiaries' ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan; (f) as of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, neither the Borrower, any Subsidiary, nor any of their respective ERISA Affiliates has any potential liability for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA; and (g) the present value of all accumulated benefit obligations under each Pension Plan, did not, as of the close of its most recent plan year, exceed the fair market value of the assets of such Pension Plan allocable to such accrued benefits(determined in both cases using the applicable assumptions under Section 430 of the Code and the Treasury Regulations promulgated thereunder).

Section 3.11    *Disclosure*.  None of the reports, financial statements, certificates or other written information (other than projections, pro forma financial information, estimates, budgets, other forward-looking information and information of a general economic or industry nature) furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (giving effect to all supplements thereto and other public filings with the Bankruptcy Court and the U.S. Securities and Exchange Commission) in connection with the Loan Documents contains, taken as a whole, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions by the Borrower believed to be reasonable at the time such projected financial information was furnished, it being understood that such projections are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from projected results (many of which factors are beyond the control of the Borrower and its Subsidiaries and their respective officers, representatives and advisors) and that such variances may be material and that no assurance can be given that the projected results will be realized.

Section 3.12    *Subsidiaries*.  Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower (or the Subsidiary of the Borrower that is the direct parent of such other Subsidiary of the Borrower) in, each Subsidiary of the Borrower, in each case as of the Closing Date.  All Equity Interests of each Group Member are duly and validly issued and are fully paid

and non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through wholly-owned Subsidiaries.  The Borrower is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Agreement.  As of the Closing Date (and except as described in the Plan of Reorganization), there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.  No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Security Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

Section 3.13    *Insurance*.  Schedule 3.13 sets forth a true, complete and correct description of all insurance maintained by the Borrower and its Subsidiaries as of the Closing Date.  All insurance maintained by the Borrower and its Subsidiaries is in full force and effect, all premiums have been duly paid and none of the Borrower or any of its Subsidiaries has received notice of violation or cancellation thereof.  Each of the Borrower and its Subsidiaries has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.14    *Labor Matters*.  There are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) the Borrower and its Subsidiaries are in compliance with the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with hours worked by or payments made to employees or any similar matters (including but not limited to the appropriate classification of employees as exempt or non-exempt), (b) the Borrower and its Subsidiaries have properly classified all individuals engaged as contractors as such under all applicable Federal, state, local or foreign law, (c) the Borrower and its Subsidiaries are in compliance with the Worker Adjustment and Retraining Notification Act and all other state, local or foreign laws relating to plant closings or mass layoffs and (d) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary. Neither the Borrower nor any Subsidiary is subject to any claims arising out of any employment matter, whether pending as of the Closing Date or to its knowledge threatened, which would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

Section 3.15    *Security Documents*.  (a)  The Security Agreement creates in favor of the Administrative Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security

Agreement) in accordance with and subject to the terms thereof, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and the Pledged Collateral (as defined in the Security Agreement), (together with stock powers or other appropriate instruments of transfer executed in blank form), have been delivered to the Administrative Agent. The financing statements, releases and other filings set forth on Schedule 3.15(a) are in appropriate form and have been or will be filed on the Closing Date in the offices reasonably acceptable to the Administrative Agent. Upon such filings (and payment of applicable fees) and/or the obtaining of "control," the Administrative Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the Borrower thereunder in all such Collateral (as defined in the Security Agreement) to the extent that it may be perfected by filing, recording or registering a financing statement or analogous document (including the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law).

(b)    When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings set forth on Schedule 3.15(b) in appropriate form are filed (which filings shall occur on or prior to the Closing Date) in the offices reasonably acceptable to the Administrative Agent, (and the applicable fees are paid), the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower in the Intellectual Property in accordance with and subject to the terms thereof to the extent a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on patents, patent applications, registered trademarks, trademark applications and copyrights (whether or not registered) acquired by the Borrower after the date hereof). Notwithstanding the foregoing, nothing in this Agreement shall require the Borrower to make any filings or take any other actions to record or perfect the Administrative Agent's Lien on and security interest in any Intellectual Property outside the United States (or to reimburse the Administrative Agent or any Lender for the same).

(c)    The Mortgages, when delivered, will create in favor of the Administrative Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Upon the filing of the Mortgages with the appropriate Governmental Authorities (and payment of the applicable fees), the Administrative

Agent will have a first priority perfected Lien and security interest in, to and under all right, title and interest of the Grantors thereunder in all Mortgaged Property that may be perfected by such filing (including the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law).

Section 3.16    *Federal Reserve Regulations*.  (a)  No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.

Section 3.17    *Anti-Corruption Laws and Sanctions*.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.18    *Senior Indebtedness*.  The Obligations are secured by a Lien in favor of the Administrative Agent for the benefit of the Secured Parties and rank and shall continue to rank at least senior in priority of payment to all Subordinated Indebtedness and all senior unsecured Indebtedness of Borrower and each of its Subsidiaries and constitute "Senior Indebtedness", "Designated Senior Indebtedness", "Guarantor Senior Indebtedness" or any comparable term for all Indebtedness that is subordinated in right of payment to the Obligations (if applicable).

Section 3.19    *Regulation H*.  No Mortgage, when delivered, will encumber improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless the Borrower has complied with clause (d) of the Real Estate Requirements with respect to such real property.

Section 3.20    *Solvency*.  On the Closing Date, after giving effect to the consummation of the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 3.21    *No Default*.  After giving effect to the consummation of the Transactions, neither the Borrower nor any Subsidiary will be in default under any indenture, agreement or

other instrument binding upon the Borrower or any of its Subsidiaries or its assets. No Default or Event of Default has occurred and is continuing.

Section 3.22    *Real Estate*.  Schedule 1.01(B) is an accurate and complete list of all Real Estate owned in fee simple by the Borrower on the Closing Date that has an estimated fair market value in excess of $1,000,000.

Section 3.23    *Communications Licenses and Regulatory Matters*.

(a)    No Communications Licenses have been issued to or conferred upon the Borrower or any of its Subsidiaries.  No Communications Licenses or spectrum leases are required in connection with the conduct by the Borrower and its Subsidiaries of their businesses as presently conducted (excluding, for the avoidance of doubt, the businesses of NewCo and its subsidiaries).

(b)    The Group Members are in compliance in all material respects with Communications Laws.  No Group Member has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Group Member, other than (i) proceedings relating to the wireless communications industry generally, (ii) proceedings described in Schedule 3.23(b) and (iii) proceedings that could not reasonably be expected to result in a Material Adverse Effect.

(c)    Each Group Member has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws, including substantial service showings and renewal applications, and all such filings were when made true, correct and complete in all material respects.

(d)    No consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws by any Group Member in connection with the execution or consummation of the transactions contemplated in the Loan Documents.

Section 3.24    *Agreements*.  No Group Member is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect. No Group Member is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.24 accurately and completely lists all material agreements (other than leases of real property) to which any Group Member is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

## ARTICLE IV
### CONDITIONS

Section 4.01    *Closing Date*.  The agreement of each Lender to make the Loans requested to be made by it on the Closing Date is subject to the satisfaction (or waiver in accordance with Section 9.02 or as otherwise set forth below), prior to or concurrently with the making of such Loans on the Closing Date of the following conditions precedent on or before the Specified Date:[6]

(a)    The Administrative Agent shall have received (i) from each party hereto either a counterpart of this Agreement signed on behalf of such party or written evidence reasonably satisfactory to the Administrative Agent (which may include telecopy or PDF electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) each of the following agreements, duly executed and delivered by each party thereto: (A) the Security Agreement and (B) each of the other Loan Documents required to be delivered prior to the Closing Date.

(b)    The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent and the Lenders, dated the Closing Date and in form and substance reasonably acceptable to the Administrative Agent covering certain matters relating to the Loan Documents as the Administrative Agent shall reasonably request) of (i) Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Borrower and (ii) Latham & Watkins LLP, FCC counsel for the Borrower.

(c)    The Administrative Agent shall have received a true and complete copy of the Borrower's organizational documents, an incumbency certificate for each Person authorized to execute Loan Documents on behalf of the Borrower and who will execute any Loan Documents on behalf of the Borrower, resolutions authorizing the due execution, delivery and performance of the Loan Documents and the Transactions and a good standing certificate from the Borrower's jurisdiction of organization (where such concept or a similar concept exists), all in form and substance reasonably acceptable to the Administrative Agent and its counsel.

(d)    The Administrative Agent shall have received a customary certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in this Section 4.01.

(e)    The Administrative Agent shall have received a certificate from a Financial Officer of the Borrower substantially in the form of Exhibit G certifying that the Borrower and its Subsidiaries, on a consolidated basis, after giving effect to the Transactions (including any Loans to be made on the Closing Date), are Solvent.

(f)    The Administrative Agent shall have received (i) the monthly operating report referred to in Section 3.04(a) and (ii) the unaudited consolidated balance sheet of the Borrower,

---

[6]    Parties to discuss *de minimis* funding for LightSquared Inc. to meet ordinary course corporate expenses.

prepared in accordance with GAAP, as of immediately prior to the Closing Date, with related costs to be borne by the Lenders.

(g)    [Reserved].

(h)    The Administrative Agent shall have received UCC searches conducted in the jurisdictions in which the Borrower and the other Group Members are incorporated or such other jurisdictions as the Administrative Agent may reasonably require, reflecting the absence of Liens on any of the Collateral other than Liens expressly permitted by Section 6.03 hereof or Liens which will be terminated on the Closing Date or post-closing as agreed by the Administrative Agent in its sole discretion.

(i)    The Administrative Agent shall be reasonably satisfied that all Uniform Commercial Code financing statements required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Loan Documents and all other such documents and instruments shall have been delivered to the Administrative Agent by the Borrower for filing, registration or recordation on the Closing Date.

(j)    The Administrative Agent shall have received, to the extent invoiced at least three Business Days prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable and documented fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(k)    The Closing Date (as defined in the First Lien Credit Agreement) shall have occurred, or shall occur substantially concurrently with the Closing Date.

(l)    The Closing Date (as defined in the Second Lien Credit Agreement) shall have occurred, or shall occur substantially concurrently with the Closing Date.

(m)    The Borrower shall be in compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

(n)    No event of default shall have occurred and be continuing under the DIP Agreement nor shall the lenders thereunder (or any agent thereof) have commenced the exercise of rights and remedies under the documentation governing the DIP Facility or Applicable Law.

(o)    Simultaneously with the funding of the Loans on the Closing Date, the DIP Facility shall have been (i) repaid in full in cash or (ii) otherwise satisfied pursuant to the terms of the DIP Agreement and the Plan of Reorganization and all commitments relating thereto shall have been terminated, and all liens and security interests related thereto shall have been terminated or released, with such payment in full, termination and release being evidenced by one or more payoff letters reasonably acceptable to the Administrative Agent

(p)    The Administrative Agent shall have received a complete and correct copy of the Exit Loan Documents, including any amendments, supplements or modifications with respect to any of the foregoing.

(q)      Each of the Plan Confirmation Order and the Canadian Recognition Order shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Lenders in their sole discretion.

(r)      All conditions precedent to effectiveness of the Plan of Reorganization shall have been satisfied, waived or modified to the sole satisfaction of the Administrative Agent, the Plan Effective Date shall have occurred on or before the Specified Date and the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan of Reorganization in accordance with its terms shall occur substantially contemporaneously with the Plan Effective Date.

(s)      The Administrative Agent shall have received evidence that all general liability and property insurance required to be maintained pursuant to Section 5.05 of this Agreement and [Section 10] of the Security Agreement has been obtained and is in effect and that the Administrative Agent has been named as loss payee or additional insured, as appropriate, under each liability and property insurance policy.

(t)      The Lenders shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, in each case at least five (5) Business Days prior to the Closing Date to the extent requested by the Administrative Agent ten (10) Business Days prior to the Closing Date.

(u)      The representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct in all material respects (or in all respects, if qualified by materiality) on and as of the Closing Date (unless a representation or warranty is made as of a specific date or for a specified period, in which case such representation or warranty shall be true and correct in all material respects as of such specified date or for such specified period).

(v)      At the time of and immediately after giving effect to the Closing Date and the Borrowing to be made on the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(w)      The Debtors not having supported any other Person's motion to withdraw the Plan of Reorganization or supported any other chapter 11 plan.

(x)      Clause (d) of the Real Estate Requirements shall have been satisfied with respect to all Mortgaged Property set forth on Schedule 1.01(B).

## ARTICLE V
### AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Subsidiaries to:

Section 5.01    *Financial Statements*.  Furnish to the Administrative Agent and each Lender:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower (in the case of the fiscal year ended December 31, 2014, within 120 days after the end of such fiscal year), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year;

(b)    as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower (but in no event earlier than 180 days after the Closing Date), the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Financial Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments).

All such financial statements referred to in clauses (a) and (b) above shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods; and

(c)    promptly upon receipt thereof, any and all information, documentation and notices furnished to the Borrower in its capacity as the holder of Equity Interests in NewCo or as a Second Lien Lender (including any information or documents furnished under Section 5.01 of the Second Lien Credit Agreement and any notices furnished under Section 5.02 of the Second Lien Credit Agreement).

Section 5.02    *Certificates; Other Information*.  Furnish to the Administrative Agent and each Lender (or, in the case of clause (h), to the relevant Lender):

(a)    concurrently with the delivery of the financial statements referred to in Section 5.01(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b)    concurrently with the delivery of any financial statements pursuant to Section 5.01, (i) a certificate of a Responsible Officer stating that, to the best of each such Responsible Officer's knowledge, during such period the Borrower has observed or performed all of its covenants and other agreements, and satisfied every condition contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) (x) a Compliance Certificate containing all information and calculations necessary for determining compliance by each Group Member with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the

Borrower, as the case may be, and (y) to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of the Borrower, (2) a list of any Intellectual Property acquired by the Borrower and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(c)       as soon as available, and in any event no later than 60 days after the beginning of each fiscal year of the Borrower, a cash-based budget (a "**Budget**") for the Borrower and its Subsidiaries on a consolidated basis in reasonable detail for (i) each fiscal quarter of such fiscal year and (ii) each fiscal year thereafter, through and including the fiscal year in which the latest possible Maturity Date occurs, prepared in summary form, in each case, with appropriate presentation and discussion of the principal assumptions upon which such Budget is based, accompanied by the statement of a Financial Officer of the Borrower to the effect that the Budget of the Borrower is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such Budget;

(d)       concurrently with the delivery of any financial statements pursuant to Section 5.01, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the portion of the Budget covering such periods and to the comparable periods of the previous year;

(e)       [Reserved];

(f)       within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(g)       promptly following receipt thereof, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Multiemployer Plan; *provided*, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof; and

(h)       promptly, such additional financial and other information as any Lender may from time to time reasonably request.

Section 5.03    *Payment of Obligations*.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

Section 5.04    *Maintenance of Existence; Compliance*. (a)  (i)  Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 6.04 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Applicable Laws except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with  Anti-Corruption Laws and applicable Sanctions.

Section 5.05    *Maintenance of Property; Insurance*.

(a)    Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)    Maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (ii) maintain such other insurance as may be required by law; and (iii) promptly following reasonable request by the Administrative Agent, which request need not be made in writing, furnish the Administrative Agent with certificates evidencing the insurance required by this paragraph. The Borrower shall require all property, casualty and liability insurance policies to be endorsed, which endorsement shall be reasonably satisfactory in form and substance to the Administrative Agent, to name the Administrative Agent for the benefit of the Lenders, as additional insured or loss payee, as appropriate; *provided* that the Borrower shall only be required to use its commercially reasonable efforts to obtain any notification endorsement.  The Borrower shall deliver to the Administrative Agent, within ten (10) Business Days after the cancellation of any such policy of insurance, a certificate of insurance for the replacement policy to the extent such insurance is required to be replaced pursuant to this Section 5.05.  In the event of the Borrower's failure to obtain or maintain the insurance required by this paragraph, without waiving any Event of Default occasioned thereby, the Administrative Agent shall have the right following thirty (30) days prior notice to the Borrower to obtain the required coverage and invoice the Borrower for the premium payments therefor.

(c)    If at any time the area in which any owned Real Estate on which a Mortgage has been granted is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency) with respect to which flood insurance has been made available under any of the Flood Insurance Laws, the Borrower shall (A) maintain, with a financially sound and reputable insurer, flood insurance (which may be in the form of a blanket policy) in such total amount as is reasonably acceptable to the Administrative Agent and otherwise sufficient to comply with applicable rules and regulations promulgated pursuant to the Flood Insurance Laws, and (B) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent or (ii) a "Zone 1" area, the Borrower shall obtain earthquake insurance in such total amount as is reasonably required by the Administrative Agent (but in any

event not to exceed the replacement cost or fair market value of the property, as reasonably estimated by the Borrower).  All premiums on any of the insurance referred to in this Section 5.05(c) shall be paid when due by the Borrower and, if requested by the Administrative Agent, summaries of the policies shall be provided to the Administrative Agent annually or as it may otherwise reasonably request.  Without limiting the rights of the Administrative Agent provided for above, if the Borrower fails to obtain or maintain any insurance required under the Flood Insurance Laws within thirty (30) days following written notice to the Borrower (or such shorter period as required by Applicable Law), the Administrative Agent may obtain it at the Borrower's expense.  By purchasing any of the insurance referred to in this Section 5.05(c), the Administrative Agent shall not be deemed to have waived any Default or Event of Default arising from the Borrower's failure to maintain such insurance or pay any such premiums in respect thereof.

(d)     The Borrower acknowledges and agrees that all income, payments and proceeds of a physical damage property insurance claim payable to it and relating to the Collateral will be received by the Borrower as agent hereunder for the benefit of the Lenders.  Unless an Event of Default has occurred and is continuing, the Administrative Agent shall cause any insurance proceeds for which it is loss payee for the benefit of the Secured Parties to be made available to the Borrower as promptly as practicable after receipt thereof by the Administrative Agent for application as required or otherwise permitted by the Loan Documents.

Section 5.06    *Inspection of Property; Books and Records; Discussions.*  (a)  Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Applicable Laws shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; *provided* that, so long as no Event of Default has occurred and is continuing, any such visits and inspections shall be limited to one in any fiscal quarter for the Administrative Agent and all Lenders.

Section 5.07    *Notices.*  Promptly give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     any litigation or proceeding affecting any Group Member (i) in which the amount involved is $1,000,000  or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(d)      the occurrence of any ERISA Event or Foreign Plan Event that, alone or together with any other ERISA Events and/or Foreign Plan Events that have occurred, could reasonably be expected to result in liability of any Group Member or any ERISA Affiliate in an aggregate amount exceeding a material amount, as soon as possible and in any event within 10 days after the Borrower knows or has reason to know thereof; and

(e)      any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.07 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

Section 5.08    *Environmental Laws*.  (a)  Comply with, and ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except for instances of non-compliance or failure to obtain and comply which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)      Conduct and complete all Remedial Actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except for instances of failure to complete Remedial Actions or non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.09    *Compliance with Communications Laws and ITU Rules and Regulations*. Comply in all material respects with all applicable Communications Laws, including but not limited to requirements applicable to the Group Members pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to be material.

Section 5.10    *Use of Proceeds*.  Use proceeds of the Loans to (a) refinance a portion of the Tranche A Loans in accordance with the Plan and (b) for the general corporate and working capital needs of the Borrower and its Subsidiaries.

Section 5.11    *Additional Collateral, etc*.  (a)  With respect to any property acquired after the Closing Date by the Borrower (other than any property described in paragraph (b), (c) or (d) below) as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions reasonably necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing

statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Administrative Agent.

(b)    With respect to any fee interest in any real property having a value (together with improvements thereof) of at least $1,000,000 acquired after the Closing Date by the Borrower (other than any such real property subject to a Lien expressly permitted by Section 6.03(i)), promptly (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Lenders, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)    With respect to any new Subsidiary (other than an Excluded Foreign Subsidiary) created or acquired after the Closing Date by the Borrower (which, for the purposes of this paragraph (c), shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary), promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Equity Interests of such new Subsidiary that are owned by the Borrower, (ii) deliver to the Administrative Agent the certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)    With respect to any new Excluded Foreign Subsidiary created or acquired after the Closing Date by the Borrower, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Equity Interests of such new Subsidiary that are owned by the Borrower (*provided* that in no event shall more than 66% of the total outstanding voting Equity Interests of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower, and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

Section 5.12    *Further Assurances*.  Promptly and from time to time, at the Borrower's expense, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, intellectual property filings, termination statements, fixture filings and other documents), which may be required under any Applicable Law, or which the Administrative Agent or the Required Lenders may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Liens.

## ARTICLE VI
### NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 6.01    *Reserved.*

Section 6.02    *Indebtedness*.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Group Member pursuant to any Loan Document;

(b)    [Reserved];

(c)    Guarantee Obligations incurred in the ordinary course of business by any Subsidiary of obligations of the Borrower;

(d)    Indebtedness outstanding on the date hereof and listed on Schedule 6.02(d) and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity of, the principal amount thereof except for amounts for reasonable fees and expenses incurred in connection with such refinancing, refunding, renewal or extension);

(e)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(f)    Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business; and

(g)    additional unsecured Indebtedness of the Borrower and its Subsidiaries in an aggregate principal amount (for the Borrower and all Subsidiaries) not to exceed $5,000,000 at any one time outstanding.

Section 6.03    *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)     Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     [Reserved];

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens in existence on the date hereof listed on Schedule 6.03(f), securing Indebtedness permitted by Section 6.02(d), *provided* that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)     Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(h)     Liens (other than any Lien imposed by ERISA) (x) imposed by Applicable Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, or (y) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x) and (y) of this paragraph (h), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable or delinquent, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(i)     leases and subleases of real property of the Borrower or any Subsidiary granted by such Group Member to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the real property subject thereto;

(j)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business in accordance with past practices of the Borrower or its Subsidiaries;

(k)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness.

(l)      the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or consignment of goods in the ordinary course of such Group Member's business;

(m)      Liens created pursuant to the Security Documents; and

(n)      any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased.

Section 6.04    *Fundamental Changes*.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)      any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (*provided* that the Borrower shall be the continuing or surviving corporation) or with or into any Wholly Owned Subsidiary of the Borrower;

(b)      any Subsidiary of the Borrower may Dispose of any or all of its assets (i) to the Borrower or any Wholly Owned Subsidiary of the Borrower (upon voluntary liquidation or otherwise) or (ii) pursuant to a Disposition permitted by Section 6.05;

(c)      any Subsidiary of the Borrower may liquidate or dissolve if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially adverse to the Lenders; and

(d)      any Investment expressly permitted by Section 6.07 may be structured as a merger, consolidation or amalgamation.

Section 6.05    *Disposition of Property*.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Equity Interests to any Person, except:

(a)      the Disposition of obsolete or worn out property in the ordinary course of business;

(b)      the sale of inventory in the ordinary course of business;

(c)      Dispositions permitted by clause (i) of Section 6.04(b);

(d)    the sale or issuance of any Subsidiary's Equity Interests to the Borrower;

(e)    the licensing or sublicensing of Intellectual Property of the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice; *provided, however*, that such licensing or sublicensing shall not interfere in any material respect with the Group Members' continued use of such Intellectual Property in their business; and

(f)    the Disposition of other property having a fair market value not to exceed $500,000 in the aggregate for any fiscal year of the Borrower.

Section 6.06    *Restricted Payments*.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, **"Restricted Payments"**), except that any Subsidiary may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary of the Borrower.

Section 6.07    *Investments*.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Equity Interests, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, **"Investments"**), except:

(a)    extensions of trade credit in the ordinary course of business;

(b)    investments in Cash Equivalents;

(c)    Guarantee Obligations permitted by Section 6.02;

(d)    loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $50,000 at any one time outstanding;

(e)    Investments in assets useful in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries pursuant to Section 2.07(b)(iv);

(f)    the Borrower and its Subsidiaries may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business; and

(g)    purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business.

Section 6.08    *Optional Payments and Modifications of Certain Debt Instruments*.  (a) Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily defease or segregate funds with respect to any Subordinated Indebtedness or any other Indebtedness (other than the Loans); (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any Subordinated Indebtedness or any other Indebtedness (other than the Loans) except for any such amendment, modification, waiver or other change that (i) would extend the maturity or reduce the amount of any payment of principal thereof or reduce the rate or extend any date for payment of interest thereon and (ii) does not involve the payment of a consent fee).

Section 6.09    *Transactions with Affiliates*.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

Section 6.10    *Sales and Leasebacks*.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

Section 6.11    *Swap Agreements*.  Enter into any Swap Agreement, except Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests).

Section 6.12    *Changes in Fiscal Periods*.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters other than as agreed to by the Administrative Agent.

Section 6.13    *Negative Pledge Clauses*.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, other than (a) this Agreement and the other Loan Documents and (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

Section 6.14    *Clauses Restricting Subsidiary Distributions*.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other

Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents and (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Equity Interests or assets of such Subsidiary.

Section 6.15    *Lines of Business*.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

Section 6.16    *Amendments to Material Documents*.

Directly or indirectly:

(a)    amend or modify, or permit the amendment or modification of, any provision of any document governing any Indebtedness of the Borrower or its Subsidiaries in any manner without the consent of the Lenders;

(b)    terminate, amend or modify any Organizational Documents of any Loan Party or any Subsidiary thereof or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such terminations, amendments or modifications or such new agreements which are (i) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.04 or (ii) not adverse in any material respect to the interests of the Lenders; or

(c)    amend, supplement, terminate or otherwise modify (pursuant to a waiver or otherwise) (i) the provisions of its certificate of incorporation, by-laws or other organizational documents (except to the extent provided by Section 6.04) or (ii) the terms and conditions of any Indebtedness, in each case, in a manner materially adverse to the Lenders.

Section 6.17    *Use of Proceeds*.  Use, and the respective directors, officers, employees and agents of the Borrower and its Subsidiaries shall not use, the proceeds of any Loan (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C)  in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.18    *Communications Laws*.  Operate its businesses other than in accordance with Communications Laws and the terms and conditions of any Communications Licenses held by the Borrower and its Subsidiaries.  No Group Member shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial.  No Group Member shall take or permit to be taken any other action within its control that could reasonably be expected result in non-compliance with the requirements of Communications Laws in any material respect.

Section 6.19    *Limitation on Creation of Subsidiaries*.  Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders.

## ARTICLE VII
### EVENTS OF DEFAULT

Section 7.01    *Events of Default*.  If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)    any representation or warranty made or deemed made by the Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Section 7.01), and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower (which notice may be given at the request of the Required Lenders);

(f)    the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure continues after the expiration of any applicable grace periods or cure periods and such Material Indebtedness is, or is permitted to be, accelerated such that all obligations thereunder shall become immediately due and payable;

(g)    any event or condition occurs (other than circumstances described in clause (f) above) that results in any Material Indebtedness becoming due prior to the scheduled maturity thereof or that enables or permits (after the giving of notice and/or the lapse of any applicable grace period) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to the scheduled maturity thereof in each case beyond the grace period, if any, provided therein;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for substantially all of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any corporate action for the purpose of authorizing any of the foregoing;

(j)    the Borrower or any Subsidiary shall become unable, admit in writing its general inability or fail generally, to pay its debts as they become due;

(k)    except as set forth on Schedule 7.01(k) (but solely to the extent that neither the Borrower nor any of its Subsidiaries has any obligation with respect to judgments relating to items listed on Schedule 7.01(k)), one or more judgments for the payment of money of a liability or debt in an aggregate amount in excess of $5,000,000 (or its equivalent) in excess of amounts covered by insurance shall be rendered against the Borrower, any Subsidiary or any combination thereof (including pursuant to a ruling that any claim previously found by the Bankruptcy Court to be subject to discharge is found, by subsequent order, to remain an ongoing liability of the Borrower or any Subsidiary) and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(l)    (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; and, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to result in a Material Adverse Effect;

(m)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except as expressly permitted hereunder or thereunder; or the Borrower contests in any manner the validity or enforceability of any provision of any Loan Document or any Lien granted under any Security Document; or the Borrower denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or any Lien granted under any Loan Document, except, in each case, (i) in accordance

with the terms of the Loan Documents (ii) to the extent that any absence of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or to file Uniform Commercial Code continuation statements and (iii) with respect to any Lien purported to be created on Collateral consisting of Real Estate that ceases to be a valid and perfected Lien on any material portion of such Collateral, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(n)      a Change in Control shall occur;

(o)      any Loan Document shall not be in full force and effect (other than in accordance with its terms);

(p)      the subordination provisions set forth in any Subordinated Indebtedness that is Material Indebtedness shall, in whole or in material part, cease to be, or shall be asserted by any Group Member not to be, effective or legally valid, binding and enforceable against the holders of such Subordinated Indebtedness;

(q)      the Plan Confirmation Order or the Canadian Recognition Order shall be revoked or rescinded or shall otherwise cease to be in full force and effect or the Borrower or any of its Subsidiaries shall challenge the effectiveness or validity of or violate the terms of the Plan Confirmation Order or the Canadian Recognition Order; or

(r)      the Plan Confirmation Order or the Canadian Recognition Order shall be amended, modified or supplemented in any manner without the prior written consent of the Lenders.

Section 7.02   *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(b)      whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, may (and at the direction of the Required Lenders, shall) proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

(c)      No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder

or now or hereafter existing at law or in equity or by statute or any other provision of Applicable Law.

Section 7.03    *Application of Funds*.  After the exercise of remedies provided for in Section 7.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent reimbursable under the Loan Documents and amounts payable under Article II payable to the Administrative Agent), each in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, and fees, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to payment of all other Obligations (including the cash collateralization of unliquidated indemnification obligations) to the Credit Parties, their Affiliates and the Related Parties of the foregoing; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Applicable Law.

Section 7.04    *Government Approval*.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Group Member or affect the ownership of any Communications License shall be pursuant to Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC or any other applicable Governmental Authority. Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of any Communications Licenses or transfer of control or voting rights of any Group Member if such assignment or transfer of control or voting rights would require, under then existing law (including Communications Laws), the prior approval of the FCC or any other applicable Governmental Authority, without first obtaining such approval of the FCC or such other Governmental Authority. The Borrower agrees to take any lawful action which Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Lenders by this Agreement, including specifically, after the occurrence and during

the continuance of an Event of Default, the use of the Borrower's commercially reasonable efforts to assist in obtaining any approval of the FCC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including the sale or transfer of Collateral. Such efforts shall include, to the extent permitted by the Communications Laws, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of any Communications Licenses, transfer of control of any Group Member required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or any Communications Licenses.

## ARTICLE VIII
### THE ADMINISTRATIVE AGENT

Section 8.01    *Appointment and Administration by Administrative Agent.*  Each Lender hereby irrevocably designates [___] as Administrative Agent under this Agreement and the other Loan Documents. The general administration of the Loan Documents shall be by the Administrative Agent. The Lenders each hereby (a) irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party, and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (b) agrees and consents to all of the provisions of the Security Documents. All Collateral shall be held or administered by the Administrative Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Credit Parties in their capacity as such and no Credit Party (other than the Administrative Agent) shall be required to execute any Security Documents as a party thereto.  The Administrative Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Credit Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.

Section 8.02    *Agreement of Applicable Lenders.*  Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Lenders, action shall be taken by the Administrative Agent, for and on behalf or for the benefit of all Credit Parties upon the direction of the requisite percentage of Lenders, and any such action shall be binding on all Credit Parties. No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of Section 9.02.

Section 8.03    *Liability of Administrative Agent.*  (a)  The Administrative Agent, when acting on behalf of the Credit Parties, may execute any of its duties under this Agreement by or through any of its officers, agents and employees, and neither the Administrative Agent nor its directors, officers, agents or employees shall be liable to any other Credit Party for any action taken or omitted to be taken in good faith, or be responsible to any other Credit Party for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any

liability imposed by law by reason of the Administrative Agent's own gross negligence, bad faith or willful misconduct. Neither the Administrative Agent nor its directors, officers, agents and employees shall in any event be liable to any other Credit Party for any action taken or omitted to be taken by it pursuant to instructions received by it from the requisite percentage of Lenders, or in reliance upon the advice of counsel selected by it. Without limiting the foregoing, neither the Administrative Agent nor any of its respective directors, officers, employees, or agents shall be: (i) responsible to any other Credit Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by the Borrower of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to any other Credit Party for the state or condition of any properties of the Borrower or any other obligor hereunder constituting Collateral for the Obligations or any information contained in the books or records of the Borrower; (iv) responsible to any other Credit Party for the validity, enforceability, collectability, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (v) responsible to any other Credit Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

(b)     The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through its agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the other Loan Documents. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(c)     Neither the Administrative Agent nor any of its directors, officers, employees, or agents shall have any responsibility to the Borrower on account of the failure or delay in performance or breach by any other Credit Party (other than by the Administrative Agent in its capacity as a Lender) of any of its respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

(d)     The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Borrower), independent accountants and other experts selected by the Borrower or any Credit Party. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the requisite percentage of the Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the other Credit Parties against any and all liability and expense which may be incurred by it by reason of the taking or failing to take any such action.

Section 8.04    *Notice of Default*.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless it has actual knowledge of the same or has received notice from a Credit Party or the Borrower referring to

this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent obtains such actual knowledge or receives such a notice, the Administrative Agent shall give prompt notice thereof to each of the other Credit Parties. Upon and during the occurrence of an Event of Default, the Administrative Agent shall (subject to the provisions of Section 9.02) take such action with respect to such Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

Section 8.05    *Credit Decisions.*  Each Credit Party (other than the Administrative Agent) acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Credit Party, and based on the financial statements prepared by the Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Borrower and has made its own decision to enter into this Agreement and the other Loan Documents. Each Credit Party (other than the Administrative Agent) also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Credit Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

Section 8.06    *Reimbursement and Indemnification.*  Each Credit Party (other than the Administrative Agent in such capacity) agrees to (a) reimburse the Administrative Agent and its Affiliates for such Credit Party's Applicable Percentage of (i) any expenses and fees incurred by the Administrative Agent for the benefit of Credit Parties under this Agreement and any of the other Loan Documents, including counsel fees and compensation of agents and employees paid for services rendered on behalf of the Credit Parties, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Borrower and (ii) any expenses of the Administrative Agent incurred for the benefit of the Credit Parties that the Borrower has agreed to reimburse pursuant to this Agreement or any other Loan Document and has failed to so reimburse and (b) indemnify and hold harmless the Administrative Agent and any of its Affiliates, directors, officers, employees, or agents, on demand, in the amount of such Credit Party's Applicable Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Credit Party in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents to the extent not reimbursed by the Borrower, including costs of any suit initiated by the Administrative Agent against any Credit Party (except such as shall have been determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent); *provided, however*, that the unreimbursed expense or indemnified loss, claim, damage, liability

or related expense, as the case may be, was incurred by or asserted against such Credit Party in its capacity as such. The provisions of this Section 8.06 shall survive the repayment of the Obligations and the termination of the Commitments.

Section 8.07    *Rights of Administrative Agent*.    It is understood and agreed that the Administrative Agent shall have the same rights and powers hereunder (including the right to give such instructions) as the other Lenders and may exercise such rights and powers, as well as its rights and powers under other agreements and instruments to which it is or may be party, and engage in other transactions with the Borrower and its Affiliates, as though it were not the Administrative Agent. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of commercial or investment banking, trust, advisory or other business with the Borrower and its Affiliates as if it were not the Administrative Agent hereunder.

Section 8.08    *Notice of Transfer*.    The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 9.04.

Section 8.09    *Successor Agents*.    The Administrative Agent may resign at any time by giving ten (10) Business Days' prior written notice thereof to the other Credit Parties and the Borrower. Upon any such resignation of the Administrative Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent, which, so long as there is no Event of Default continuing, shall be reasonably satisfactory to the Borrower (whose consent in any event shall not be unreasonably withheld or delayed). If no successor Administrative Agent shall have been so appointed by the Required Lenders and/or none shall have accepted such appointment within ten (10) Business Days after the retiring Administrative Agent's giving of notice of resignation, the retiring Administrative Agent may, on behalf of the other Credit Parties, appoint a successor Administrative Agent which shall be a Person capable of complying with all of the duties of the Administrative Agent hereunder (in the opinion of the retiring Administrative Agent and as certified to the other Credit Parties in writing by such successor Administrative Agent) which, so long as there is no Event of Default continuing, shall be reasonably satisfactory to the Borrower (whose consent shall not in any event be unreasonably withheld or delayed). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement.

After any retiring Administrative Agent's resignation hereunder, the provisions of this Article VIII and Section 9.03 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.

Section 8.10    *Relation Among the Lenders*.    The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.

Section 8.11    *Reports and Financial Statements*.  By signing this Agreement, each Lender:

1       is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Borrower hereunder (including those described in Section 5.01) and all examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the **"Reports"**);

2       expressly agrees and acknowledges that the Administrative Agent (i) makes no representation or warranty as to the accuracy of the Reports, and (ii) shall not be liable for any information contained in any Report;

3       expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Borrower and will rely significantly upon the Borrower's books and records, as well as on representations of the Borrower's personnel;

4       agrees to keep all Reports and other Information confidential in accordance with Section 9.12; and

5       without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Administrative Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Borrowing that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans of the Borrower; and (ii) to pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.12    *Agency for Perfection*.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States of America can be perfected only by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative

Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 8.13  *Collateral and Guaranty Matters*.  (a)  The Lenders irrevocably authorize the Administrative Agent to, and the Administrative Agent shall,

(i)  release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not then due and owing), (ii) that is sold or otherwise Disposed or to be sold or Disposed of as part of or in connection with any sale or Disposition permitted under the Loan Documents or (iii) if approved, authorized or ratified in writing in accordance with Section 9.02;

(ii)  subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.03;

(iii)  release any Lien on any property granted to or held by the Administrative Agent under any Loan Document on any assets that are excluded from the Collateral; and

(iv)  enter into or amend an intercreditor agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority, as applicable, to release or subordinate its interest in particular types or items of property pursuant to this Section 8.13. In each case as specified in this Section 8.13, the Administrative Agent will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, in each case in accordance with the terms of the Loan Documents and this Section 8.13.

(b)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Swap Agreement) take such actions as shall be reasonably requested by the Borrower as necessary or desirable to release, or document the release, by the Administrative Agent, of the security interest in any Collateral being sold, disposed of or transferred in a transaction permitted by the Loan Documents to the extent necessary to permit consummation of such sales or dispositions of assets in accordance with the Loan Documents.

Section 8.14  *Syndication Agents; Documentation Agents; Arrangers*.  Notwithstanding the provisions of this Agreement or any of the other Loan Documents, no Person who is or becomes a "syndication agent," a "documentation agent" or an "arranger" shall have any powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

# ARTICLE IX
### MISCELLANEOUS

Section 9.01    *Notices*.  (a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, e-mailed or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower, to it at:

[_____]

with a copy to:

[_____]

(ii)    if to the Administrative Agent, to:

[_____]

with a copy to:

[_____]

(iii)    if to a Lender, to it at its mail or e-mail address (or telecopy number) set forth in its Administrative Questionnaire.

Any e-mail notice to the Administrative Agent shall be in "pdf" format. Any party hereto may change its address, e-mail address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours

of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient; and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)        *The Platform*. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the **"Agent Parties"**) have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its Related Parties); *provided, however,* that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person, nor shall the Borrower have any liability to any Agent Party, any Lender or any other Person, for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided further* that this clause (c) shall not limit the indemnity obligations of the Borrower or any Subsidiary to the extent otherwise set forth in Section 9.03.

Section 9.02    *Waivers; Amendments*.  (a)  No failure or delay by the Administrative Agent, or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)        Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders,

or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Borrower, in each case with the consent of the Required Lenders (other than an amendment or modification (x) to correct, amend, cure any ambiguity, inconsistency, defect or correct any typographical error or other manifest error in this Agreement or any other Loan Document, (y) to comply with Applicable Law or advice of local counsel in respect of a Security Document or (z) to cause a Security Document to be consistent with this Agreement and the other Loan Documents, which may be amended or modified by the agreement of the Borrower and the Administrative Agent); *provided* that no such agreement shall:

(i)    increase the Commitment of any Lender without the written consent of such Lender,

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender whose principal amount of its Loan or rate of interest or fees payable would be reduced (it being understood and agreed that waivers of any Defaults, Events of Defaults or additional interest payable during the continuation of an Event of Default shall not be deemed to be a reduction in the rate of interest or any fees payable hereunder),

(iii)    postpone the scheduled date of payment of the principal amount of any Loan under Section 2.06 or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender whose payment would be so postponed, reduced, waived or excused or each Lender with Commitments for which the scheduled date of expiration would be postponed, as applicable,

(iv)    amend or modify Section 2.12(b), 2.12(c) or 7.03, without the written consent of each Lender adversely affected thereby,

(v)    amend or modify any of the provisions of this Section or reduce the percentage set forth in (x) the definition of "Required Lenders" or (y) any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, or

(vi)    release all or substantially all of the Collateral from the Liens of the Security Documents (except with respect to sales or transfers of, and other transactions relating to, Collateral permitted pursuant to the Loan Documents as of the Closing Date), without the written consent of each Lender;

*provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent, as the case may be.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.02 and any consent by any Lender pursuant to this Section 9.02 shall bind any successor or assignee of such Lender.

(c)     If any Lender refuses to consent to any amendment or modification to or waiver of any Loan Document requested by the Borrower that requires the consent of all Lenders or all affected Lenders in accordance with this Section 9.02, and such amendment, modification or waiver is consented to by the Required Lenders (a **"Non-Consenting Lender"**), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

Section 9.03    *Expenses; Indemnity; Damage Waiver*.  (a)  The Borrower agrees to pay (i) all reasonable and documented out-of-pocket expenses (including the reasonable fees and documented expenses of other advisors and professionals engaged by the Administrative Agent or the Lead Arranger) incurred by the Administrative Agent, the Lead Arranger and their respective Affiliates in connection with the preparation, execution, delivery and administration of the Loan Documents or any amendments, supplements, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel or other professional consultants for the Administrative Agent or any Lender, in connection with the enforcement or protection of their rights in connection with the Loan Documents, including their rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses (including the fees, charges and disbursements of any counsel or other professional consultants for the Administrative Agent or any Lender) incurred during any workout, restructuring or negotiations in respect of such Loans; *provided* that the Administrative Agent and Lenders shall be entitled to reimbursement for no more than one counsel representing all such parties as designated by the Administrative Agent (and appropriate local counsel and/or special counsel for each relevant jurisdiction or specialized area of law, but limited to one local and/or special counsel in each such jurisdiction or specialized area of law, as designated by the Administrative Agent) (absent any actual or perceived conflict of interest in which case the Administrative Agent and Lenders who are similarly situated may engage and be reimbursed for one additional primary counsel and one additional local and/or special counsel in each relevant jurisdiction or specialized area of law for group members who are similarly situated).

(b)     The Borrower agrees to indemnify the Administrative Agent, the Lead Arranger and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an **"Indemnitee"**) against, and hold each Indemnitee harmless (on an after-tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs and related expenses, including the reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of:

(i)      the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby,

(ii)      any Loan or the use of the proceeds therefrom,

(iii)      any actual or alleged presence or Release of or exposure to Hazardous Materials on or from any property currently or formerly owned, leased or operated by the Borrower or any Subsidiary (including any predecessor for whom the Borrower or any such Subsidiary bears liability contractually or by operation of law), or any Environmental Liability, or

(iv)      any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto;

*provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (A) are determined by a court of competent jurisdiction by final non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its affiliates, officers, directors, employees, advisors and agents), (B) relate to Hazardous Materials that are first placed at any property owned by the Borrower or any Subsidiary after such property is transferred to any Indemnitee or its successors and assigns by foreclosure, deed in lieu of foreclosure or similar transfer or (C) arise from a dispute solely among Indemnitees not involving any act or omission on the part of the Borrower or its Subsidiaries or Affiliates, other than any losses, claims, damages, liabilities or costs incurred by or asserted against the Administrative Agent or the Lead Arranger acting in such capacity under this Agreement or any Loan Document.

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Lead Arranger under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Lead Arranger, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Lead Arranger in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its Applicable Percentage.

(d)      To the extent permitted by Applicable Law, no party to this Agreement shall assert, and each party to this Agreement hereby waives, any claim against any other party to this Agreement, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that this clause (d) shall not limit the indemnity obligations of the Borrower or any Subsidiary to the extent otherwise set forth in Section 9.03(a) through (c).

(e)     All amounts due under this Section shall be payable within thirty (30) days after written demand therefor (including documentation reasonably supporting such request).

For the avoidance of doubt, this Section 9.03 shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

Section 9.04   *Successors and Assigns*.  (a)  <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document except to the extent otherwise permitted as a result of mergers or consolidations permitted hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower shall be null and void) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 9.04(b), (ii) by way of participation in accordance with the provisions of Section 9.04(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.04(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.04(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts*:

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided, however,* that concurrent assignments to members of an Assignee

Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    *Proportionate Amounts*. Each partial assignment by a Lender shall be made as an assignment of a *proportionate* part of all the assigning Lender's rights and obligations under this Agreement with respect to such Lender's Loan;

(iii)    *Required Consents*.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (i) an Event of Default has occurred and is continuing at the time of such assignment or (ii) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund of such Lender; *provided* that the Borrower shall be deemed to have consented to any such assignment (other than to a Disqualified Company) if it shall not have responded to a consent request with respect thereto within ten (10) Business Days of written receipt thereof; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments except if such assignment is to a Person that is a Lender, an Affiliate of such Lender or an Approved Fund of such Lender.

(iv)    *Assignment and Assumption*. The parties to each assignment (other than (i) assignments by a Lender to its Affiliate or an Approved Fund of such Lender or pursuant to Section 2.13 or 9.04(f) and (ii) the Borrower) shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500, *provided, however,* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire.  The Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.09, 2.10, 2.11 and 9.03 with respect to facts and circumstances occurring prior to the effective date of such

assignment. Promptly following request, the Borrower (at its expense) shall execute and deliver a promissory note to the assignee Lender (*provided* that such assignee Lender shall use its commercially reasonable efforts to cause the assignor Lender to deliver to the Borrower any promissory notes delivered to it by the Borrower hereunder). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(d).

(c)     *Register.* (i) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(ii)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 9.04(b) and any written consent to such assignment required by Section 9.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Assignment unless it has been recorded in the Register as provided in this paragraph.

(d)     *Participations*.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries or to any Disqualified Company) (each, a **"Participant"**) in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (x) such Lender's obligations under this Agreement shall remain unchanged, (y) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (z) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, supplement, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, supplement, modification or waiver described in the first proviso to Section 9.02(b) that requires the consent of each Lender or each affected Lender. Subject to Section 9.04(e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.09, 2.10 and 2.11 (subject to the requirements and limitations of such Sections, including the requirements under

Section 2.11(f) (it being understood that the documentation required under Section 2.11(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.12(c) as though it were a Lender.

(e)    *Limitations upon Participant Rights*.  A Participant shall not be entitled to receive any greater payment under Section 2.09 or 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, which shall not be unreasonably withheld or delayed, and except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.11 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.11(f) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the **"Participant Register"**); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or that such Participant is not a Disqualified Company. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.    For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    *Certain Pledges*.  Any Lender may at any time grant, pledge, hypothecate or assign a security interest in all or any portion of its rights under this Agreement (including under its promissory note, if any) to any Person (other than a natural person or any Disqualified Company) to secure obligations of such Lender, including any grant, pledge, hypothecation or assignment to secure obligations to a Federal Reserve Bank or other central bank, and none of the restrictions or conditions set forth in this Section 9.04 related to any grant, pledge, hypothecation or assignment shall apply to any such grant, pledge, hypothecation or assignment of a security interest; *provided* that no such grant, pledge, hypothecation or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such grantee, pledgee, hypothecatee or assignee for such Lender as a party hereto.

(g)    *Electronic Execution of Assignments*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of

a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    The Administrative Agent may conclusively rely on the written consent (or deemed consent under Section 9.04(b)(iii)(A)) of the Borrower to an assignment as evidence that the assignee is not a Disqualified Company for all purposes of this Agreement and the other Loan Documents, including in approving or declining to approve a person as an Eligible Assignee, executing and delivering any Assignment and Assumption, making any recording in the Register in respect of such Assignment and Assumption or otherwise.  The Administrative Agent shall have no responsibility or liability for monitoring Schedule 1.01(A) (as supplemented pursuant to the terms of this Agreement) or the identities of, or enforcing provisions relating to, Disqualified Companies.  The Administrative Agent shall have no liability of any kind to the Borrower or any Affiliate thereof, any Lender or any other person if such list of Disqualified Companies (or any supplement thereto) is incorrect or if any person is incorrectly identified in such list of Disqualified Companies (or any supplement thereto) as a person to whom no assignment is to be made.  The Administrative Agent and any assignor of a Commitment or a Loan or seller of a participation or grantor of a pledge under Section 9.04(f) hereunder may conclusively rely on a representation given by the assignee, purchaser or grantee in the relevant Assignment and Assumption or participation agreement or other agreement, as applicable, that such assignee, purchaser or grantee is not a Disqualified Company.  Neither the Administrative Agent nor any such assignor, seller or grantor shall have any liability arising from any breach by an assignee, purchaser or grantee of such representation, and the Administrative Agent and any such assignor, seller or grantor shall be indemnified by the Borrower for any loss, cost or expense resulting therefrom.  If any assignment, participation or pledge under this Section 9.04 is made to a Disqualified Company and the portion of the loan so assigned, participated or pledged is still held by a Disqualified Company, then the Borrower (i) shall have the right to repurchase such portion of the Loan at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrower at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.  Notwithstanding anything in this Agreement to the contrary, in no case shall the Administrative Agent, any assignor of a Commitment or a Loan, seller of a participation or grantor of a pledge under Section 9.04(f) have any liability of any kind to the Borrower or any Affiliate thereof, any Lender or any other person as a result of or in connection with any such assignment, participation or pledge being made to a Disqualified Company to the extent the Borrower has provided its written consent (or deemed consent under Section 9.04(b)(iii)(A)) to such assignment, participation or pledge.

(i)    Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles that are not Disqualified Companies (each, an **"SPV"**) all or any portion of its funded Loans (without the corresponding Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrower all or any part of any Loans that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights

which a Lender making or holding such Loans would have under this Agreement (subject to the requirements and limitations to which the Lender would subject under this Agreement) but no obligations; *provided* that the Lender shall make all determinations on behalf of the SPV with respect to any matters requiring the consent or approval of the SPV hereunder and the Administrative Agent and the Borrower shall be entitled to rely on such determination by the Lender, without further inquiry and notwithstanding any communication to the contrary by the SPV; *provided further* an SPV shall not be entitled to receive any greater payment under Section 2.09 or 2.11 than the applicable granting Lender would have been entitled to receive absent such grant, without the consent of the Borrower (such consent not to be unreasonably withheld or delayed). The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its Commitment (although the unused portion thereof shall be reduced by the principal amount of any Loans held by an SPV). Notwithstanding such assignment, the Administrative and the Borrower may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV.

Section 9.05   *Survival*.   All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid (other than any contingent indemnification obligations not then due and payable) and so long as the Commitments have not expired or terminated. The provisions of Sections 2.09, 2.10, 2.11 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06   *Counterparts; Integration; Effectiveness*.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07    *Severability*.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    *Right of Setoff*.  If one or more Events of Default shall have occurred and be continuing, each Lender shall have the right, in addition to and not in limitation of any right which any such Lender may have under Applicable Law or otherwise, to set off and apply any and all deposits (general or special, time or demand, provisional or final), at any time held and other obligations at any time owing by such Lender or its Affiliates to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. No Credit Party will, or will permit its Participant to, exercise its rights under this Section 9.08 without the consent of the Administrative Agent or the Required Lenders. ANY AND ALL RIGHTS TO REQUIRE THE ADMINISTRATIVE AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE OF THE SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

Section 9.09    *GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS*.  (a)  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property to the exclusive jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (and, to the extent necessary to enforce the Administrative Agent's or the Lenders' rights under the Loan Documents, courts where Collateral may be located or deemed to be located and any appellate court thereof), in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment relating to any Loan Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the

defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    *Headings*.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    *Confidentiality*.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by the Borrower or its Subsidiaries, the Administrative Agent or any Lender pursuant to or in connection with this Agreement unless such information is designated by the Borrower as non-confidential; *provided* that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Applicable Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, or (j) if agreed by the Borrower in its sole discretion, to any other Person.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

Section 9.13    *Interest Rate Limitation*.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under Applicable Law (collectively, the **"Charges"**), shall exceed the maximum lawful rate (the **"Maximum Rate"**) which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14    *Patriot Act*.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

Section 9.15    *Additional Waivers*.  (a)  To the fullest extent permitted by Applicable Law, the obligations of the Borrower hereunder shall not be affected by (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce or exercise any right or remedy against the Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release of the Borrower from, any of the terms or provisions of, this Agreement or any other Loan Document, (other than as expressly contemplated by such waiver, amendment or modification), (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Administrative Agent or any Lender or (iv) any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets.

(b)    The obligation of the Borrower to pay the Obligations in full hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of all Obligations and termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of the Borrower hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof (other than to the extent such waiver or modification so expressly waives or modifies such obligations or remedies), any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of the Borrower or that would otherwise operate as a discharge of the Borrower as a matter of law or equity (other than the payment in full in cash of all Obligations (other than contingent indemnification obligations not then due and payable) and termination of the Commitments).

(c)    To the fullest extent permitted by Applicable Law, the Borrower waives any defense based on or arising out of the unenforceability of the Obligations or any part thereof from any cause, other than the payment in full in cash of all the Obligations (other than contingent indemnification obligations not then due and payable) and termination of the Commitments. The Administrative Agent and the Lenders may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations without affecting or impairing in any way the liability of the Borrower hereunder except to the extent that all the Obligations have been paid in full in cash (other than contingent indemnification obligations not then due and payable) and the Commitments terminated. Pursuant to Applicable Law, the Borrower waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any security.

Section 9.16    *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, on the one hand, and the Administrative Agent and the Lenders, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the Administrative Agent and each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Administrative Agent or Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment,

waiver or other modification hereof or of any other Loan Document (irrespective of whether the Administrative Agent or any of the Lenders has advised or is currently advising the Borrower or any of its Affiliates on other matters) and none of the Administrative Agent or Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Administrative Agent and Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent or Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) none of the Administrative Agent and Lenders have provided or will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each of the Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

[SIGNATURE PAGES FOLLOW]

LIGHTSQUARED INC., as Borrower

By:    _____
       Name:
       Title:

[_____],
as Administrative Agent


By: _____
     Name:
     Title:

[_____],
as a Lender


By:    _____
       Name:
       Title:

**Exhibit C-5**

SPSO Notes Documents

### PROMISSORY NOTE

THIS SUBORDINATED UNSECURED PROMISSORY NOTE (THE "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. THIS NOTE MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, HYPOTHECATED OR OFFERED FOR SALE EXCEPT PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR A VALID EXEMPTION THEREFROM.

### SUBORDINATED UNSECURED PROMISSORY NOTE[1]

[_____], 2014

FOR VALUE RECEIVED, LightSquared LP (the "Maker") hereby promises to pay to the order of SP Special Opportunities, LLC (the "Payee"), the principal sum of [_____] MILLION DOLLARS ($[_____])[2] together with interest, in each case in the manner described herein.

1.     Payments of Principal.  Subject to the acceleration provisions of Section 7, all unpaid principal, fees, if any, and accrued and unpaid interest shall be due and payable in full on the Maturity Date.

2.     Interest.

(a)  The unpaid principal amount of this Note shall accrue interest on the basis of a 360-day year at the LIBO Rate plus 12.00% *per annum*, payable in kind (the "PIK Interest"), by adding accrued and unpaid interest to the unpaid principal amount of the Note on the applicable Interest Payment Date (whereupon from and after such date, such additional amounts shall also accrue interest pursuant to this Section 2). All such PIK Interest so added shall be treated as principal of the Note and the obligation of the Maker to pay all such PIK Interest so added shall be automatically evidenced by this Note.

(b)  Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of this Note and any accrued and unpaid interest and all other overdue amounts shall each bear interest until paid at the stated rate plus 2.00% *per annum*.

(c)  No Interest Period may extend beyond the Maturity Date, and any Interest Period which would, but for this sentence, end after the Maturity Date shall instead end on the Maturity Date with the Maturity Date being deemed to be the last day of such Interest Period for all purposes hereunder.  Payee's internal records of applicable interest rates shall be determinative in the absence of manifest error;

---

[1] If Bankruptcy Court determines Note shall be secured, Annex A contains the additional sections of the Note to be inserted.

[2] To be determined by Bankruptcy Court.

provided, that Payee shall notify Maker of the LIBO Rate as soon as practicable on (or prior to) the date of commencement of the applicable Interest Period.

(d)  Interest shall be payable (i) on each Interest Payment Date, (ii) on the Maturity Date and (iii) on any date of prepayment on a day other than an Interest Payment Date, on the principal amount so prepaid (subject to the limitations of Section 5).

3.    Prepayments.  Subject to Section 5, the Maker may at any time and from time to time prepay any principal amount of this Note in whole or in part without premium or penalty.

4.    Payment Terms.  All payments of principal of, and accrued and unpaid PIK Interest that has not yet been added to the principal amount of, this Note shall be made by the Maker to the Payee in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the Payee in writing from time to time. All payments under this Note shall be made to the Payee without withholding, defense, set-off, counterclaim or deduction.  Payments and prepayments made to the Payee by the Maker hereunder shall be applied first to unpaid PIK Interest not yet added to the principal amount of the Note and then to principal.

5.  Subordination.  Notwithstanding any other provision of this Note, Payee, by acceptance of this Note, for itself and its successors, legal representatives and assigns, acknowledges, covenants and agrees that:

(a)    Senior Obligations.  The Subordinated Obligations are hereby expressly made subordinate, and junior, and subject in right of payment and the exercise of remedies, to the Senior Obligations prior to the Discharge of the Senior Obligations, on the terms and conditions specified in this Section 5.  Such terms and conditions shall be for the benefit of the Senior Agents, any Senior Lender and any other holder of Senior Obligations, and shall be enforceable directly against, Maker and Payee by the Senior Agents and any Senior Lender.

(b)    No Payment of Note.  No Subordinated Obligations Payment shall be made by or on behalf of Maker unless and until the Discharge of the Senior Obligations shall have occurred, and Payee shall not take or receive from the Maker, directly or indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, any Subordinated Obligations Payment, until the Discharge of the Senior Obligations.  In the event that Payee shall have received any Subordinated Obligations Payment prohibited by the foregoing provision of this Section 5(b), including any such payment arising out of the exercise by Payee of a right of set off or counterclaim and any such payment received by reason of other indebtedness of Maker being subordinated to the obligations under this Note, then, and in any such event, such payment shall be held in trust for the benefit of the holders of Senior Obligations, and the Payee shall immediately pay over or deliver to the Senior Agents or their representative or representatives such payment, for application to the Senior Obligations in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations.

(c)    Payment of Proceeds Upon Dissolution.  In the event of any Insolvency Proceeding with respect to Maker, then and in any such event:

(i)    any and all holders of Senior Obligations shall be entitled to the Discharge of the Senior Obligations, before Payee shall be entitled to receive any payment on account of any amounts due or payable under or in respect of this Note;

2

(ii)        any Subordinated Obligations Payment, to which Payee would be entitled but for the provisions of this <u>Section 5</u>, including any such payment or distribution that may be payable or deliverable by reason of the payment of any other indebtedness of Maker being subordinated to the payment of the Subordinated Obligations, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the Senior Agents or their representative or representatives for application to the Senior Obligations, in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations; and

(iii)        in the event that, notwithstanding the foregoing provisions of this <u>Section 5(c)</u>, Payee shall have received, before the Discharge of the Senior Obligations, any Subordinated Obligations Payment or distribution received by reason of any other indebtedness of Maker being subordinated to the obligations under this Note, then, and in such event, such payment or distribution shall be held in trust for the benefit of the holders of Senior Obligations, and the Payee shall immediately pay over or deliver to the Senior Agents or their representative or representatives such payment or distribution, for application to the Senior Obligations in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations.

(d)        <u>PIK Interest</u>.  Nothing contained in this <u>Section 5</u> shall affect the obligation of Maker to make (or prevent Maker from making) payments of PIK Interest.

(e)        <u>No Waiver of Subordination Provisions</u>.  No right of any present or future holder of any Senior Obligation to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Maker or by any act or failure to act, in good faith, by such holder, or by any noncompliance by Maker or Payee with the terms, provisions and covenants of this <u>Section 5</u>, regardless of any knowledge thereof such holder may have or be otherwise charged with.  Without limiting the foregoing, any Senior Agent or the holder of Senior Obligations may, without the consent of or notice to Payee, without incurring any responsibility to Payee and without impairing or releasing the obligations of Maker under such Senior Obligations or this Note:

(i)        change the manner, place or terms of payment, or change or extend the time of payment of, or amend, restate, modify, replace, substitute, extend, renew or refinance any Senior Obligations;

(ii)        sell, exchange, release, or otherwise deal with any property by whomsoever at any time pledged or mortgaged to secure any Senior Obligations;

(iii)        release any person liable in any manner for the payment or collection of any Senior Obligations;

(iv)        exercise or refrain from exercising any rights against Maker or any other person liable in any manner for payment or collection of any Senior Obligations; and

(v)        apply any sum by whomsoever paid or however realized to the Senior Obligations in any manner or order determined by the applicable Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent).

3

(f)    <u>Certain Limitations on Actions by Payee</u>.  Payee shall not, without the prior written consent of each Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent) in its sole discretion,

(i) (A) accelerate, make demand, or otherwise make due and payable prior to the original Maturity Date the Subordinated Obligations or bring suit or institute any other actions or proceedings to enforce its rights or interests in respect of the Subordinated Obligations, (B) exercise any rights under or with respect to any guaranty of the Subordinated Obligations, if any or (C) exercise any rights to set-offs and counterclaims in respect of any indebtedness, liabilities, or obligations of the Payee to the Maker against any of the Subordinated Obligations.

(ii) seek to collect from any of the property of Maker securing amounts due under any Senior Obligations (by self-help or judicial or non-judicial action) upon an Event of Default by Maker under this Note;

(iii) initiate or prosecute or encourage any other person to initiate or prosecute any claim, action or other proceeding challenging the enforceability of the Senior Obligations, challenging the validity, perfection or enforceability of any liens securing the Senior Obligations or asserting any claims which Maker may hold with respect to the Senior Lenders; or

(iv) sell, or otherwise transfer, release, realize upon or enforce, or otherwise take action against or deal with any property of Maker securing amounts due under the Senior Obligations;

<u>provided</u> that, Payee shall, at the written direction of each Senior Agent (acting on behalf of the Senior Lenders), take any of the actions set forth above in clauses (i), (ii), (iii) or (iv) at the reasonable written request of all of the Senior Agents (acting on behalf of the Senior Lenders).

(g)    <u>Certain Matters Relating to Bankruptcy Events</u>.  Payee shall not, without the prior written consent of each Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent) in their sole discretion, institute against, or join any other person in instituting against, Maker any Insolvency Proceeding until at least one year and one day after the Discharge of the Senior Obligations.

(h)    <u>Subrogation</u>.  Until the Discharge of the Senior Obligations, Payee hereby waives any and all rights of subrogation, reimbursement, indemnity, or otherwise, whether arising by contract or operation of law (including any such rights arising under any Bankruptcy Laws) or otherwise by reason of any payment to the Senior Lenders pursuant to the provisions hereof.

(i)    This Note shall be considered a subordination agreement under section 510 of the Bankruptcy Code.

6.    <u>Events of Default</u>.  An "<u>Event of Default</u>" shall exist hereunder if any one or more of the following events shall occur:

(a)    the Maker shall fail to pay any principal or any portion thereof, when due; or

4

(b)    the Maker institutes or consents to any Insolvency Proceeding relating to it or to all or any part of its property, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of the Maker, as applicable; or any Insolvency Proceeding relating to the Maker or to all or any part of its property is instituted without its consent; or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against all or any material part of its property and is not released, vacated or fully bonded within ten calendar days after its issue or levy; or

(c)    the Maker shall contest the validity or enforceability of any part of this Note.

7.    Remedies.  Upon the occurrence of any Event of Default specified in Section 6(b) above and the Discharge of the Senior Obligations, the principal amount of this Note together with any PIK Interest not already included in the principal amount thereon shall become immediately and automatically due and payable, without presentment, demand, notice, protest or other requirements of any kind (all of which are hereby expressly waived by the Maker).  Upon the occurrence and during the continuance of any other Event of Default and the Discharge of the Senior Obligations, subject to Section 5 above, the Payee may, by written notice to the Maker, declare the principal amount of this Note together with any PIK Interest not already included in the principal amount thereon to be due and payable, and the principal amount of this Note together with any such interest not already included in the principal amount shall thereupon immediately become due and payable without presentment, further notice, protest or other requirements of any kind (all of which are hereby expressly waived by the Maker).

8.    Maker's Representations and Warranties.  The Maker represents and warrants that the Maker's obligations under this Note constitute its legal, valid and binding obligations, enforceable in accordance with its respective terms.

9.    Waiver.  No failure on the part of Maker or Payee to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Note preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

10.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial, Etc.  This Note shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Note in any court referred to in this Section 10.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an

5

inconvenient forum to the maintenance of such action or proceeding in any such court. Each party to this Note irrevocably consents to service of process in any action or proceeding arising out of or relating to this Note in the manner provided for notices in <u>Section 11</u>. Nothing in this Note will affect the right of any party to this Note to serve process in any other manner permitted by law. **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.** This Note may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Note. Delivery of an executed counterpart of a signature page to this Note by electronic transmission shall be as effective as delivery of an original executed counterpart of this Note. This <u>Section 10</u> shall survive the termination of this Note.

11.    <u>Amendments; Notices</u>. This Note may not be amended, modified or supplemented except by an instrument in writing signed by Payee and Maker and, prior to the Discharge of the Senior Obligations, the Senior Agents. All notices and other communications in respect of this Note shall be given or made in writing at the address as shall be designated by such party in a notice to the other party. Except as otherwise provided in this Note, all such communications shall be deemed to have been duly given when transmitted by electronic transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

12.    <u>Assignments</u>. No party hereto may assign its rights or obligations hereunder without the prior written consent of each other party hereto and, prior to the Discharge of the Senior Obligations, the Senior Agents. This Note shall be binding upon and inure to the benefit of the Payee and its heirs, legatees, legal representatives and assigns and Maker and its successors and assigns.

13.    <u>Counterparts</u>. This Note may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Note constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Note shall become effective when it shall have been executed by the Maker and Payor and when each party hereto shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Note by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

14.    <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such

6

Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Note and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, supplemented or otherwise modified from time to time.

15.    <u>Definitions</u>.  The following capitalized terms, when used in this Note, shall have the following meanings:

"<u>Bankruptcy Code</u>" or "<u>Bankruptcy Law</u>" shall mean Title 11 of the United States Code and any similar Federal, state or foreign law for the relief of debtors.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law, regulation or executive order to close; *provided*, however, that when used in connection with the LIBO Rate, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"<u>Discharge of the Senior Obligations</u>" means:

(a)    payment in full in cash of the principal of, reimbursement obligations with respect to, and fees, premium and interest (including interest accruing (or which would, absent the commencement of an Insolvency Proceeding, accrue) on or after the commencement of any Insolvency Proceeding, whether or not such interest would be allowed in such Insolvency Proceeding), on all indebtedness outstanding under the loan documentation for the Senior Obligations (whether or not any of the Senior Obligations shall have been voided, disallowed or subordinated pursuant to any provision of the Bankruptcy Law, any applicable state fraudulent conveyance law, any other law in connection with an Insolvency Proceeding or otherwise);

(b)    payment in full in cash of all other Senior Obligations that are due and payable or otherwise accrued at or prior to the time such principal and interest are paid, including all cash management obligations (if any);

(c)    termination or expiration of all commitments, if any, to extend credit that would constitute Senior Obligations; and

(d)    termination or cash collateralization (in an amount and manner reasonably satisfactory to the applicable Senior Agent) of all letters of credit issued under any loan documentation for the Senior Obligations.

"<u>Dollar</u>" and the sign "$" mean lawful money of the United States.

"<u>Event of Default</u>" shall have the meaning assigned to such term in <u>Section 6</u> of this Note.

"<u>First Lien Agent</u>" means [_____], in its capacity as administrative agent and collateral agent under the First Lien Facility, and its successors and assigns in such capacity.

"<u>First Lien Facility</u>" means that certain [First Lien Loan and Security Agreement] dated as of [_____], 2014 by and among, Parent and certain subsidiaries of Parent from time to time party thereto as guarantors, the lenders party thereto from time to time and the First Lien Agent (as amended from time to time).

"First Lien Lenders" means the lenders under the First Lien Facility.

"First Lien Obligations" means all obligations owing to the First Lien Lenders and the First Lien Agent under (a) the First Lien Facility and (b) any amendment, restatement, modification, replacement, substitution, extension, renewal or refinancing of the First Lien Facility, including, without limitation, any guarantee executed in connection therewith, whether for principal, interest (including interest accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such interest is allowed in any such proceeding), premiums, indemnities, fees, costs, expenses (including, without limitation, auditor, legal and other professional fees, costs and expenses, and including, without limitation, fees, costs and expenses accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such fees, costs and expenses is allowed in any such proceeding), or otherwise, in each case whether now existing or hereafter arising, absolute or contingent, joint or several, secured or unsecured, matured or unmatured, monetary or nonmonetary, liquidated or unliquidated, acquired outright, conditionally or as collateral security from another, all other obligations now or hereafter existing in favor of any of the First Lien Lenders or the First Lien Agent or the collateral agent under the First Lien Facility.

"Interest Payment Date" means (a) the last Business Day of each [June and December] to occur during any period in which any principal amount of the Note is outstanding and (b) the Maturity Date.

"Insolvency Proceeding" means  (i) any insolvency, bankruptcy, receivership, interim-receivership, liquidation, proposal, reorganization, readjustment, custodianship, composition or other similar proceeding or case relating to the Maker or any of its assets, (ii) any liquidation, dissolution, reorganization or winding up of the Maker whether voluntary or involuntary and whether or not involving an insolvency or bankruptcy case or (iii) any assignment for the benefit of creditors or any other marshaling of any assets of the Maker.

"Interest Period" means, (a) initially, the period commencing on the date hereof and ending on [_____] and (b) thereafter, each period commencing on each Interest Payment Date and ending on the day preceding the next succeeding Interest Payment Date.

"LIBO Rate" means the greater of (x) the offered rate per annum for deposits in Dollars equal to a [one-month] Interest Period, each as determined by the Payee at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of the relevant Interest Period by reference to the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays the rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters (if such page or service ceases to be available, the Payee may specify another page or service displaying the relevant rate); *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate *per annum* determined by the Payee to be the average of the rates *per annum* at which deposits in Dollars are offered for such [one-month] Interest Period to major banks in the London interbank market in London, England by the Payee at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of such Interest Period and (y) 1.00%.

"Maker" shall have the meaning assigned to such term in the preamble to this Note.

"Maturity Date" means [_____], 2021.

8

"Other Permitted Senior Agent" means any person acting as agent, trustee or lead lender from time to time under any facility constituting Other Permitted Senior Obligations.

"Other Permitted Senior Lenders" means the lenders under the First Lien Facility.

"Other Permitted Senior Obligations" means all obligations owing to the Other Permitted Senior Lenders and the Other Permitted Senior Agent under (a) any additional senior indebtedness permitted to be incurred by Maker or its subsidiaries or affiliates under the First Lien Facility (or any amendment, restatement, modification, replacement, substitution, extension or refinancing thereof), and the Second Lien Facility (or any amendment, restatement, modification, replacement, substitution, extension or refinancing thereof) and (b) any amendment, restatement, modification, replacement, substitution, extension or refinancing thereof, including, without limitation, any guarantee executed in connection therewith, whether for principal, interest (including interest accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such interest is allowed in any such proceeding), premiums, indemnities, fees, costs, expenses (including, without limitation, auditor, legal and other professional fees, costs and expenses, and including, without limitation, fees, costs and expenses accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such fees, costs and expenses is allowed in any such proceeding), or otherwise, in each case whether now existing or hereafter arising, absolute or contingent, joint or several, secured or unsecured, matured or unmatured, monetary or nonmonetary, liquidated or unliquidated, acquired outright, conditionally or as collateral security from another, all other obligations now or hereafter existing in favor of any of the Other Permitted Senior Lenders, the Other Permitted Senior Agent or the collateral agent under the Other Permitted Senior Obligations.

"Parent" means [NewCo]

"Payee" shall have the meaning assigned to such term in the preamble to this Note.

"PIK Interest" shall have the meaning assigned to such term in Section 2 of this Note.

"Second Lien Agent" means [_____], in its capacity as administrative agent and collateral agent under the Second Lien Facility, and its successors and assigns in such capacity.

"Second Lien Facility" means that certain [Second Lien Term Loan and Security Agreement] dated as of [_____], 2014 by and among Parent, certain subsidiaries of Parent from time to time party thereto as the guarantors, the lenders party thereto from time to time and the Second Lien Agent (as amended from time to time).

"Second Lien Lenders" means the lenders under the Second Lien Facility.

"Second Lien Obligations" means all obligations owing to the Second Lien Lenders and the Second Lien Agent under (a) the Second Lien Facility and (b) any amendment, restatement, modification, replacement, substitution, extension, renewal or refinancing of the Second Lien Facility, including, without limitation, any guarantee executed in connection therewith, whether for principal, interest (including interest accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such interest is allowed in any such proceeding), premiums, indemnities, fees, costs, expenses (including, without limitation, auditor, legal and other professional fees, costs and expenses, and including, without limitation, fees, costs and expenses accruing subsequent to the filing of any petition initiating any Insolvency Proceeding, whether or not a claim for such fees, costs and expenses is allowed in any such proceeding), or otherwise, in each case whether now existing or hereafter arising, absolute or contingent, joint or several, secured or unsecured, matured or unmatured, monetary or nonmonetary,

liquidated or unliquidated, acquired outright, conditionally or as collateral security from another, all other obligations now or hereafter existing in favor of any of the Second Lien Lenders, the Second Lien Agent or the collateral agent under the Second Lien Facility.

"<u>Senior Agents</u>" means the First Lien Agent, the Second Lien Agent and any Other Permitted Senior Agent.

"<u>Senior Lenders</u>" means the First Lien Lenders, the Second Lien Lenders and the Other Permitted Senior Lenders.

"<u>Senior Obligations</u>" means, collectively, the First Lien Obligations, the Second Lien Obligations, and the Other Permitted Senior Obligations.

"<u>Subordinated Obligations</u>" means all obligations and other liabilities of any kind or nature of the Maker in favor of the Payee in respect of this Note whether created directly or acquired by assignment or otherwise, all interest thereon and all fees, premiums, costs, expenses and other amounts payable in respect thereof, whether now existing or hereafter arising, absolute or contingent, joint or several, secured or unsecured, matured or unmatured, monetary or nonmonetary, liquidated or unliquidated, acquired outright, conditionally or as collateral security from another, including, without limitation, all such obligations and other liabilities of the Maker under or in respect of any subrogation rights under any guaranty or any other rights to be subrogated to the rights of the Senior Agents and the Senior Lenders in respect of payments or distributions of assets of, or ownership interests in, the Payee made on the Senior Obligations.

"<u>Subordinated Obligations Payment</u>" means any payment or distribution by or on behalf of the Maker, directly or indirectly, of any assets or property of the Maker of any kind or character, whether in cash, property, or securities, including on account of the purchase, redemption, or other acquisition of any of the Subordinated Obligations, as a result of any collection, sale, or other disposition of collateral, or by setoff, exchange, or in any other manner, for or on account of the Subordinated Obligations.

IN WITNESS WHEREOF, the Maker has caused this Note to be executed and delivered by their duly authorized officers, as of the date and year and at a place first above written.

LIGHTSQUARED LP

By: _____
Name:
Title:

SP Special Opportunities, LLC as the Payee, hereby accepts this Note.

SP SPECIAL OPPORTUNITIES, LLC

By: _____
Name:
Title:

11

**Annex A**

**Guarantee and Security Provisions**

[__].    Guarantee and Security Provisions

(a)    Guarantee. The Guarantors hereby jointly and severally guarantee to the Payee and its successors and assigns the prompt payment in full of the Subordinated Obligations (the "Guaranteed Subordinated Obligations"). The Guarantors hereby further jointly and severally agree that if the Maker shall fail to pay in full when due any of the Guaranteed Subordinated Obligations strictly in accordance with the terms of any document or agreement evidencing any such Guaranteed Subordinated Obligations, including in the amounts, in the currency and at the place expressly agreed to thereunder, irrespective of and without giving effect to any law, order, decree or regulation in effect from time to time of the jurisdiction where the Maker, any Guarantor or any other Person obligated on any such Guaranteed Subordinated Obligations is located, subject to clause (b) of this Section [   ], the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Subordinated Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal. The obligations of the Guarantors under this Section [__] are primary, absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Maker under this Note, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Subordinated Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section [__] that the obligations of the Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances and shall apply to any and all Guaranteed Subordinated Obligations now existing or in the future arising.   The guarantee in this Section [__] is a continuing guarantee and is a guaranty of payment and not merely of collection, and shall apply to all Guaranteed Subordinated Obligations whenever arising. [3]

(b)    Subordination. Each Guarantor, by agreeing to the guarantee in the preceding clause (a), for itself and its successors, legal representatives and assigns, acknowledges, covenants and agrees, and Payee, by acceptance of this Note, for itself and its successors, legal representatives and assigns, acknowledges, covenants and agrees that:

(i)    Senior Obligations. The Guaranteed Subordinated Obligations are hereby expressly made subordinate, and junior, and subject in right of payment and the exercise of remedies, to such Guarantor's guarantee of the Senior Obligations (the "Guaranteed Senior Obligations") prior to the Discharge of the Senior Obligations, on the terms and conditions specified in this Section [   ](b). Such terms and conditions shall be for the benefit of the Senior Agents, any Senior Lender and any other holders of Senor Obligations, and shall be enforceable directly against Maker and the Guarantors by the Senior Agents and any Senior Lender.

(ii)    No Payment of Note. No Guaranteed Subordinated Obligations Payment shall be made by or on behalf of a Guarantor unless and until the Discharge of the Senior Obligations shall have occurred, and Payee shall not take or receive from any Guarantor, directly or

---

[3] Guarantee and security granting clauses to match the guarantee and security granting clauses under the First Lien Facility documentation and the Second Lien Facility documentation by Maker and its subsidiaries.

indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, any Guaranteed Subordinated Obligations Payment, until the Discharge of the Senior Obligations.  In the event that Payee shall have received any Guaranteed Subordinated Obligations Payment prohibited by the foregoing provision of this Section [   ](b), including any such payment arising out of the exercise by Payee of a right of set off or counterclaim and any such payment received by reason of other indebtedness of a Guarantor being subordinated to the obligations under this Note, then, and in any such event, such payment shall be held in trust for the benefit of the holders of Guaranteed Senior Obligations, and shall be immediately paid over or delivered to the Senior Agents for application to the Senior Obligations, in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations.

(iii)    Payment of Proceeds Upon Dissolution.  In the event of any Insolvency Proceeding with respect to any Guarantor, then and in any such event:

(i)    any and all holders of Guaranteed Senior Obligations shall be entitled to the Discharge of the Senior Obligations, before Payee shall be entitled to receive any payment on account of any amounts due or payable under or in respect of such Guarantor's obligations in respect of the Guaranteed Subordination Obligations;

(ii)    any Guaranteed Subordinated Obligations Payment, to which Payee would be entitled but for the provisions of this Section [   ](b), including any such payment or distribution that may be payable or deliverable by reason of the payment of any other indebtedness of such Guarantor being subordinated to the payment of the Guaranteed Subordinated Obligations, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the Senior Agents or their representative or representatives for application to the Senior Obligations, in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations; and

(iii)    in the event that, notwithstanding the foregoing provisions of this Section [   ](c), Payee shall have received, before for the Discharge of the Senior Obligations, any Guaranteed Subordinated Obligations Payment or distribution received by reason of any other indebtedness of a Guarantor being subordinated to the obligations under this Note, then, and in such event, such payment or distribution shall be held in trust for the benefit of the holders of Senior Obligations, and the Payee shall immediately pay over or deliver to the Senior Agents or their representative or representatives such payment or distribution, for application to the Senior Obligations in accordance with the terms of the intercreditor agreement among the Senior Agents governing the relative priority of the Senior Obligations.

(c)    No Waiver of Subordination Provisions.  No right of any present or future holder of any Guaranteed Senior Obligation to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Maker or a Guarantor or by any act or failure to act, in good faith, by such holder, or by any noncompliance by Maker, a Guarantor or Payee with the terms, provisions and covenants of this Section [   ], regardless of any knowledge thereof such holder may have or be otherwise charged with.  Without limiting the foregoing, any Senior Agent or the holder of Guaranteed Senior Obligations may, without the consent of or notice to Payee, without incurring any responsibility to Payee and without impairing

or releasing the obligations of the Guarantors under such Guaranteed Senior Obligations or the Maker under this Note:

      (i)     change the manner, place or terms of payment, or change or extend the time of payment of, or amend, restate, modify, replace, substitute, extend, renew or refinance any Guaranteed Senior Obligations;

      (ii)    sell, exchange, release, or otherwise deal with any property by whomsoever at any time pledged or mortgaged to secure any Guaranteed Senior Obligations;

      (iii)   release any person liable in any manner for the payment or collection of any Guaranteed Senior Obligations;

      (iv)   exercise or refrain from exercising any rights against the Maker, any Guarantor or any other person liable in any manner for payment or collection of any Guaranteed Senior Obligations; and

      (v)    apply any sum by whomsoever paid or however realized to the Guaranteed Senior Obligations in any manner or order determined by the applicable Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent).

(d)    <u>Certain Limitations on Actions by Payee</u>.  Payee shall not, without the prior written consent of each Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent) in its sole discretion,

(i) (A) accelerate, make demand, or otherwise make due and payable prior to the original due date thereof the Guaranteed Subordinated Obligations or bring suit or institute any other actions or proceedings to enforce its rights or interests in respect of the Guaranteed Subordinated Obligations, (B) exercise any rights under or with respect to any guaranty of the Guaranteed Subordinated Obligations, if any or (C) exercise any rights to set-offs and counterclaims in respect of any indebtedness, liabilities, or obligations of the Payee to the Maker or any Guarantor against any of the Subordinated Obligations.

(ii) seek to collect from any of the property of any Guarantor securing amounts due under any Guaranteed Senior Obligations (by self-help or judicial or non-judicial action) upon an Event of Default under this Note;

(iii) initiate or prosecute or encourage any other person to initiate or prosecute any claim, action or other proceeding challenging the enforceability of the Guaranteed Senior Obligations, challenging the enforceability of any liens securing the Guaranteed Senior Obligations or asserting any claims which any Guarantor may hold with respect to the Senior Lenders; or

(iv) sell, or otherwise transfer, release, realize upon or enforce, or otherwise take action against or deal with any property of any Guarantor securing amounts due under the Guaranteed Senior Obligations;

<u>provided</u> that, such Guarantor shall, at the written direction of each Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent), take any of the actions set forth above in clauses (i), (ii),  (iii) or (iv).

(e)      Certain Matters Relating to Bankruptcy Events.  Payee shall not, without the prior written consent of each Senior Agent (acting on behalf of the Senior Lenders with respect to which such Senior Agent is acting as Senior Agent) in their sole discretion, institute against, or join any other person in instituting against, any Guarantor any Insolvency Proceeding until at least one year and one day after the Discharge of the Senior Obligations.

(f)      Security.  As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of all Obligations, each Obligor hereby pledges and grants to the Payee a security interest in all of such Obligor's right, title and interest in the following property, assets and revenues, whether now owned by such Obligor or hereafter acquired and whether now existing or hereafter coming into existence (all of the property, assets and revenues described in this Section [__] being collectively referred to herein as the "Collateral"):

[_____]⁴;

collectively, the "Collateral".

(g)      Relative Lien Priorities.Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any liens securing the Obligations granted on the Collateral or of any liens securing the Senior Obligations (which, for purposes of this clause (g), includes the Guaranteed Senior Obligations) granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the Note or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the liens securing the Senior Obligations or any other circumstance whatsoever (including modifications of any Senior Obligations or Obligations or the exchange of a security interest in any Collateral for a security interest in other Collateral), the Payee hereby agrees that, until the Discharge of the Senior Obligations:

(i)  any lien on the Collateral securing any Senior Obligations now or hereafter held by or on behalf of the Senior Agents or any Senior Lenders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in right, priority, operation, effect and all other respects to any lien on the Collateral securing any Obligations; and

(ii)  any lien on the Collateral securing any Obligations now or hereafter held by Payee or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in right, priority, operation, effect and all other respects to all liens on the Collateral securing any Senior Obligations.  All liens on the Collateral securing any Senior Obligations shall be and remain senior in right, priority, operation, effect and all other respects to all liens on the Collateral securing any Obligations for all purposes, whether or not such liens securing any Senior Obligations are subordinated to any lien securing any other obligation of the Maker, any other Obligor or any other Person.

(h)  Additional Limitations.  Until the Discharge of the Senior Obligations:

---

⁴ To include list of Collateral from the First Lien Facility security documentation of the assets of Maker and its subsidiaries.

(i)   the Payee shall have no right to exercise rights or remedies with respect to the Collateral (including setoff), institute any action with respect to the Collateral, take or receive any Collateral or any proceeds thereof or object to the exercise by the Senior Agents and Senior Lenders of any rights or remedies with respect to the Collateral;

(ii) the Senior Agents and Senior Lenders shall control all decisions related to the administration of the Collateral and the exercise of remedies without any consultation with, or the consent of, the Payee;

(iii) the Payee shall not take or receive any Collateral or proceeds of Collateral and will agree to pay over to the Senior Agents any such Collateral or any proceeds of any such Collateral that Payee may so receive;

(iv) the Payee shall not file any motion, take any position in any proceeding, or take any other action in respect of the Collateral, including any motion seeking relief from the automatic stay, any motion with respect to the determination of liens or claims held by the parties to the Senior Obligations (which, for purposes of this clause (h), includes the Guaranteed Senior Obligations) or the value of any claims of the parties to the Senior Obligations under section 506(a) of the Bankruptcy Code or otherwise any motion seeking adequate protection;

(v)  the Payee shall not directly or indirectly provide, propose or support debtor-in-possession financing for any Obligor;

(vi)  the Payee shall not oppose any sale of Collateral conducted in accordance with section 363 of the Bankruptcy Code and the Payee shall be deemed to have consented to any such sale and to have released their liens in such assets;

(vii)  the Payee shall not contest, object to or support any objection to (i) any request by the Senior Agents or the Senior Lenders for adequate protection or (ii) any objection by the Senior Agents or the Senior Lenders to any motion, etc. based on the Senior Agents or Senior Lenders claiming a lack of adequate protection or (iii) the payment of interest, fees, expenses or other amounts to or for the benefit of the Senior Agents or the Senior Lenders (including any claim made under section 506(b) of the bankruptcy code). However, in the event that the Payee is granted adequate protection in the form of additional collateral, then the Senior Agent and the Senior Lenders shall have a senior lien and claim on such additional collateral on the same basis as the other liens securing the Subordinated Obligations are so subordinated to the liens securing the Senior Obligations.  The Payee shall not assert or enforce any claim made under section 506(c) of the bankruptcy code. Notwithstanding anything to the contrary in the foregoing, if the Payee is granted adequate protection in any form, the Payee agrees in advance that it will waive enforcement of any claim to which it may be entitled under Section 507(b) of the Bankruptcy Code related to such adequate protection;

 (viii)  if any Senior Agent or any Senior Lender is required to disgorge or otherwise pay any amount to the estate of any Obligor for any reason (a "Recovery"), then such Senior Obligations shall be reinstated to the extent of such Recovery and the Discharge of the Senior Obligations shall be deemed not to have occurred.  In the event the Payee receives the proceeds of a Recovery, such proceeds shall be segregated and held in trust for, and shall be paid over to the Senior Agents for the benefit of the Senior Lenders in the same form received, with any necessary endorsement;

16

(ix)  The grants of liens for the Senior Obligations and the Obligations constitute three (or four, if applicable) separate and distinct grants of liens.  If it is held that the claims constitute only one secured claim, then all distributions shall be made as if there were separate classes of secured claims;

(x)  the Payee shall not oppose or seek to challenge or support any objection or challenge to any claim of any Senior Agent or Senior Lender for post-petition interest, fees or expenses to the extent of the value of any Senior Agent's or Senior Lender's lien;

(xi)  the Payee (a) shall not exercise its rights to vote in favor of or against a plan of reorganization and (b) hereby irrevocably constitutes and appoints the Second Lien Agent and any officer or agent of the Second Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Payee or in the Payee's own name to vote in favor of or against a plan of reorganization; and

(xii)  the Payee shall not (i) oppose, object to or contest the determination of the extent of any liens held by the Senior Agents or Senior Lenders or the value of any claims of the Senior Agents or Senior Lenders under section 506(a) of the Bankruptcy Code (including without limitation the scope of any assets or property excluded from the definition of collateral), (ii) challenge, dispute or object to any valuation of any grantor or its assets that is proposed by the Senior Agents or Senior Lenders, or otherwise take any position with respect to such valuation, that is proposed, supported or otherwise arises in the case, (iii) object to the validity and enforceability of the Senior Obligations.

(i)  <u>Release of Liens</u>.  Until the Discharge of Senior Obligations, the Payee agrees that, in the event of any sale, assignment, transfer, license, lease or other disposition of Collateral (including all or substantially all of the equity interests of any subsidiary of the Borrower) by an Obligor that is permitted by the terms of the documents governing the Senior Obligations, the Liens granted to the Payee upon such Collateral to secure the Junior Obligations shall terminate and be released, automatically and without any further action, concurrently with the termination and release of all Liens granted upon such Collateral to secure the Senior Obligations. The Payee will promptly execute, deliver or acknowledge, at the Obligors' sole cost and expense and release of the Liens.

<u>Additional Definitions</u>[5]:

"<u>Person</u>" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise, government or any agency or political subdivision thereof or any other entity.

"<u>Obligations</u>" means, collectively, (a) the Subordinated Obligations and (b) the Guaranteed Subordinated Obligations.

"<u>Obligors</u>" means the Maker and the Guarantors.

"<u>Guaranteed Subordinated Obligations Payment</u>" means any payment or distribution by or on behalf of a Guarantor, directly or indirectly, of any assets or property of the Guarantor of

---

[5] To be added to the Section 15 definitions section.

any kind or character, whether in cash, property, or securities, including on account of the purchase, redemption, or other acquisition of any of the Guaranteed Subordinated Obligations, as a result of any collection, sale, or other disposition of collateral, or by setoff, exchange, or in any other manner, for or on account of the Guaranteed Subordinated Obligations.

"Guarantors" each direct and indirect wholly-owned subsidiary of Maker.

**<u>Exhibit C-6</u>**

New LightSquared Entities Corporate Governance Documents

**AMENDED AND RESTATED ARTICLES OF ASSOCIATION**
**OF**
**LIGHTSQUARED CORP.[1]**

**INTERPRETATION**

1.      In these Articles, unless there be something in the subject or context inconsistent therewith:

(1)      "Act" means the *Companies Act* (Nova Scotia);

(2)      "Articles" means these Amended and Restated Articles of Association of the Company and all amendments hereto;

(3)      "Company" means the company named above;

(4)      "director" means a director of the Company;

(5)      "Memorandum" means the Memorandum of Association of the Company and all amendments thereto;

(6)      "month" means calendar month;

(7)      "Office" means the registered office of the Company;

(8)      "person" includes a body corporate;

(9)      "proxyholder" includes an alternate proxyholder;

(10)      "Register" means the register of members kept pursuant to the Act, and where the context permits includes a branch register of members;

(11)      "Registrar" means the Registrar as defined in the Act;

(12)      "Secretary" includes any person appointed to perform the duties of the Secretary temporarily;

(13)      "shareholder" means member as that term is used in the Act in connection with an unlimited company having share capital and as that term is used in the Memorandum;

(14)      "special resolution" has the meaning assigned by the Act;

(15)      "in writing" and "written" includes printing, lithography and other modes of representing or reproducing words in visible form;

---

[1]    This organizational document may be further revised prior to the Effective Date, in consultation with local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

(16)    words importing number or gender include all numbers and genders unless the context otherwise requires.

2.    The regulations in Table A in the First Schedule to the Act shall not apply to the Company.

3.    The directors may enter into and carry into effect or adopt and carry into effect any agreement made by the promoters of the Company on behalf of the Company and may agree to any modification in the terms of any such agreement, either before or after its execution.

4.    The directors may, out of the funds of the Company, pay all expenses incurred for the incorporation and organization of the Company.

5.    The Company may commence business on the day following incorporation or so soon thereafter as the directors think fit, notwithstanding that part only of the shares has been allotted.

## SHARES

6.    The capital of the company shall consist of 1,000 common shares without nominal or par value, with the power to divide the shares in the capital for the time being into classes or series and to attach thereto respectively any preferred, deferred or qualified rights, privileges or conditions, including restrictions on voting rights and including redemption, purchase and other acquisition of such shares, subject, however, to the provisions of the Act.

7.    The directors shall control the shares and, subject to the provisions of these Articles, may allot or otherwise dispose of them to such person at such times, on such terms and conditions and, if the shares have a par value, either at a premium or at par, as they think fit.

8.    The directors may pay on behalf of the Company a reasonable commission to any person in consideration of subscribing or agreeing to subscribe (whether absolutely or conditionally) for any shares in the Company, or procuring or agreeing to procure subscriptions (whether absolute or conditional) for any shares in the Company.  Subject to the Act, the commission may be paid or satisfied in shares of the Company.

9.    On the issue of shares the Company may arrange among the holders thereof differences in the calls to be paid and in the times for their payment.

10.    If the whole or part of the allotment price of any shares is, by the conditions of their allotment, payable in installments, every such installment shall, when due, be payable to the Company by the person who is at such time the registered holder of the shares.

11.     Shares may be registered in the names of joint holders not exceeding three in number.

12.     Joint holders of a share shall be jointly and severally liable for the payment of all installments and calls due in respect of such share.  On the death of one or more joint holders of shares the survivor or survivors of them shall alone be recognized by the Company as the registered holder or holders of the shares.

13.     Save as herein otherwise provided, the Company may treat the registered holder of any share as the absolute owner thereof and accordingly shall not, except as ordered by a court of competent jurisdiction or required by statute, be bound to recognize any equitable or other claim to or interest in such share on the part of any other person.

14.     The Company is a private company, and:

(1)     no transfer of any share or prescribed security of the Company shall be effective unless or until approved by the directors;

(2)     the number of holders of issued and outstanding prescribed securities or shares of the Company, exclusive of persons who are in the employment of the Company or in the employment of an affiliate of the Company and exclusive of persons who, having been formerly in the employment of the Company or the employment of an affiliate of the Company, were, while in that employment, and have continued after termination of that employment, to own at least one prescribed security or share of the Company, shall not exceed 50 in number, two or more persons or companies who are the joint registered owners of one or more prescribed securities or shares being counted as one holder; and

(3)     the Company shall not invite the public to subscribe for any of its securities.

In this Article, "private company" and "securities" have the meanings ascribed to those terms in the *Securities Act* (Nova Scotia), and "prescribed security" means any of the securities prescribed by the Nova Scotia Securities Commission from time to time for the purpose of the definition of "private company" in the *Securities Act* (Nova Scotia).

## CERTIFICATES

15.     Certificates of title to shares shall comply with the Act and may otherwise be in such form as the directors may from time to time determine.  Unless the directors otherwise determine, every certificate of title to shares shall be signed manually by at least one of the Chairman, President, Secretary, Treasurer, a vice-president, an assistant secretary, any other officer of the Company or any director of the Company or by or on behalf of a share registrar transfer agent or branch transfer agent appointed by the Company or by any other person whom the directors may

designate.  When signatures of more than one person appear on a certificate all but one may be printed or otherwise mechanically reproduced.  All such certificates when signed as provided in this Article shall be valid and binding upon the Company.  If a certificate contains a printed or mechanically reproduced signature of a person, the Company may issue the certificate, notwithstanding that the person has ceased to be a director or an officer of the Company and the certificate is as valid as if such person were a director or an officer at the date of its issue.  Any certificate representing shares of a class publicly traded on any stock exchange shall be valid and binding on the Company if it complies with the rules of such exchange whether or not it otherwise complies with this Article.

16.     Except as the directors may determine, each shareholder's shares may be evidenced by any number of certificates so long as the aggregate of the shares stipulated in such certificates equals the aggregate registered in the name of the shareholder.

17.     Where shares are registered in the names of two or more persons, the Company shall not be bound to issue more than one certificate or set of certificates, and such certificate or set of certificates shall be delivered to the person first named on the Register.

18.     Any certificate that has become worn, damaged or defaced may, upon its surrender to the directors, be cancelled and replaced by a new certificate.  Any certificate that has become lost or destroyed may be replaced by a new certificate upon proof of such loss or destruction to the satisfaction of the directors and the furnishing to the Company of such undertakings of indemnity as the directors deem adequate.

19.     The sum of one dollar or such other sum as the directors from time to time determine shall be paid to the Company for every certificate other than the first certificate issued to any holder in respect of any share or shares.

20.     The directors may cause one or more branch Registers of shareholders to be kept in any place or places, whether inside or outside of Nova Scotia.

### CALLS

21.     The directors may make such calls upon the shareholders in respect of all amounts unpaid on the shares held by them respectively and not made payable at fixed times by the conditions on which such shares were allotted, and each shareholder shall pay the amount of every call so made to the person and at the times and places appointed by the directors.  A call may be made payable by instalments.

22.     A call shall be deemed to have been made at the time when the resolution of the directors authorizing such call was passed.

23.    At least 14 days' notice of any call shall be given, and such notice shall specify the time and place at which and the person to whom such call shall be paid.

24.    If the sum payable in respect of any call or instalment is not paid on or before the day appointed for the payment thereof, the holder for the time being of the share in respect of which the call has been made or the instalment is due shall pay interest on such call or instalment at the rate of 9% per year or such other rate of interest as the directors may determine from the day appointed for the payment thereof up to the time of actual payment.

25.    At the trial or hearing of any action for the recovery of any amount due for any call, it shall be sufficient to prove that the name of the shareholder sued is entered on the Register as the holder or one of the holders of the share or shares in respect of which such debt accrued, that the resolution making the call is duly recorded in the minute book and that such notice of such call was duly given to the shareholder sued in pursuance of these Articles.  It shall not be necessary to prove the appointment of the directors who made such call or any other matters whatsoever and the proof of the matters stipulated shall be conclusive evidence of the debt.

## FORFEITURE OF SHARES

26.    If any shareholder fails to pay any call or instalment on or before the day appointed for payment, the directors may at any time thereafter while the call or instalment remains unpaid serve a notice on such shareholder requiring payment thereof together with any interest that may have accrued and all expenses that may have been incurred by the Company by reason of such non-payment.

27.    The notice shall name a day (not being less than 14 days after the date of the notice) and a place or places on and at which such call or instalment and such interest and expenses are to be paid.  The notice shall also state that, in the event of non-payment on or before the day and at the place or one of the places so named, the shares in respect of which the call was made or instalment is payable will be liable to be forfeited.

28.    If the requirements of any such notice are not complied with, any shares in respect of which such notice has been given may at any time thereafter, before payment of all calls or instalments, interest and expenses due in respect thereof, be forfeited by a resolution of the directors to that effect.  Such forfeiture shall include all dividends declared in respect of the forfeited shares and not actually paid before the forfeiture.

29.    When any share has been so forfeited, notice of the resolution shall be given to the shareholder in whose name it stood immediately prior to the forfeiture and an entry of the forfeiture shall be made in the Register.

30.    Any share so forfeited shall be deemed the property of the Company and the directors may sell, re-allot or otherwise dispose of it in such manner as they think fit.

31.    The directors may at any time before any share so forfeited has been sold, re-allotted or otherwise disposed of, annul the forfeiture thereof upon such conditions as they think fit.

32.    Any shareholder whose shares have been forfeited shall nevertheless be liable to pay and shall forthwith pay to the Company all calls, instalments, interest and expenses owing upon or in respect of such shares at the time of the forfeiture together with interest thereon at the rate of 9% per year or such other rate of interest as the directors may determine from the time of forfeiture until payment. The directors may enforce such payment if they think fit, but are under no obligation to do so.

33.    A certificate signed by the Secretary stating that a share has been duly forfeited on a specified date in pursuance of these Articles and the time when it was forfeited shall be conclusive evidence of the facts therein stated as against any person who would have been entitled to the share but for such forfeiture.

## LIEN ON SHARES

34.    The Company shall have a first and paramount lien upon all shares (other than fully paid-up shares) registered in the name of a shareholder (whether solely or jointly with others) and upon the proceeds from the sale thereof for debts, liabilities and other engagements of the shareholder, solely or jointly with any other person, to or with the Company, whether or not the period for the payment, fulfilment or discharge thereof has actually arrived, and such lien shall extend to all dividends declared in respect of such shares.  Unless otherwise agreed, the registration of a transfer of shares shall operate as a waiver of any lien of the Company on such shares.

35.    For the purpose of enforcing such lien the directors may sell the shares subject to it in such manner as they think fit, but no sale shall be made until the period for the payment, fulfilment or discharge of such debts, liabilities or other engagements has arrived, and until notice in writing of the intention to sell has been given to such shareholder or the shareholder's executors or administrators and default has been made by them in such payment, fulfilment or discharge for seven days after such notice.

36.    The net proceeds of any such sale after the payment of all costs shall be applied in or towards the satisfaction of such debts, liabilities or engagements and the residue, if any, paid to such shareholder.

## VALIDITY OF SALES

37.    Upon any sale after forfeiture or to enforce a lien in purported exercise of the powers given by these Articles the directors may cause the purchaser's name to be entered in the Register in respect of the shares sold, and the purchaser shall not be bound to see to the regularity of the proceedings or to the application of the purchase money, and after the purchaser's name has been entered in the Register in respect of such shares the validity of the sale shall not be impeached by any person and the remedy of any person aggrieved by the sale shall be in damages only and against the Company exclusively.

## TRANSFER OF SHARES

38.    The instrument of transfer of any share in the Company shall be signed by the transferor.  The transferor shall be deemed to remain the holder of such share until the name of the transferee is entered in the Register in respect thereof and shall be entitled to receive any dividend declared thereon before the registration of the transfer.

39.    The instrument of transfer of any share shall be in writing in the following form or to the following effect:

For value received, _____ hereby sell, assign, and transfer unto _____, _____ shares in the capital of the Company represented by the within certificate, and do hereby irrevocably constitute and appoint _____ attorney to transfer such shares on the books of the Company with full power of substitution in the premises.

Dated the _____ day of _____, _____

Witness:

40.    The directors may, without assigning any reason therefor, decline to register any transfer of shares

(1)    not fully paid-up or upon which the Company has a lien, or

(2)    the transfer of which is restricted by any agreement to which the Company is a party.

41.    Every instrument of transfer shall be left for registration at the Office of the Company, or at any office of its transfer agent where a Register is maintained, together with the certificate of the shares to be transferred and such other evidence as the Company may require to prove title to or the right to transfer the shares.

42.    The directors may require that a fee determined by them be paid before or after registration of any transfer.

43.     Every instrument of transfer shall, after its registration, remain in the custody of the Company.  Any instrument of transfer that the directors decline to register shall, except in case of fraud, be returned to the person who deposited it.

## TRANSMISSION OF SHARES

44.     The executors or administrators of a deceased shareholder (not being one of several joint holders) shall be the only persons recognized by the Company as having any title to the shares registered in the name of such shareholder.  When a share is registered in the names of two or more joint holders, the survivor or survivors or the executors or administrators of the deceased survivor, shall be the only persons recognized by the Company as having any title to, or interest in, such share.

45.     Notwithstanding anything in these Articles, if the Company has only one shareholder (not being one of several joint holders) and that shareholder dies, the executors or administrators of the deceased shareholder shall be entitled to register themselves in the Register as the holders of the shares registered in the name of the deceased shareholder whereupon they shall have all the rights given by these Articles and by law to shareholders.

46.     Any person entitled to shares upon the death or bankruptcy of any shareholder or in any way other than by allotment or transfer, upon producing such evidence of entitlement as the directors require, may be registered as a shareholder in respect of such shares, or may, without being registered, transfer such shares subject to the provisions of these Articles respecting the transfer of shares.  The directors shall have the same right to refuse registration as if the transferee were named in an ordinary transfer presented for registration.

## SURRENDER OF SHARES

47.     The directors may accept the surrender of any share by way of compromise of any question as to the holder being properly registered in respect thereof.  Any share so surrendered may be disposed of in the same manner as a forfeited share.

## INCREASE AND REDUCTION OF CAPITAL

48.     Subject to the Act, the shareholders may by special resolution amend these Articles to increase or alter the share capital of the Company as they think expedient.  Without prejudice to any special rights previously conferred on the holders of existing shares, any share may be issued with such preferred, deferred or other special rights, or with such restrictions, whether in regard to dividends, voting, return of share capital or otherwise, as the shareholders may from time to time determine by special resolution.  Except as otherwise provided by the conditions of issue, or by these Articles, any capital raised by the creation of new shares shall be considered part of the original capital and shall be subject to the provisions herein contained with reference to payment of calls and instalments, transfer and transmission, forfeiture, lien and otherwise.

49.     The Company may, by special resolution where required, reduce its share capital in any way and with and subject to any incident authorized and consent required by law.  Subject to the Act and any provisions attached to such shares, the Company may redeem, purchase or acquire any of its shares and the directors may determine the manner and the terms for redeeming, purchasing or acquiring such shares and may provide a sinking fund on such terms as they think fit for the redemption, purchase or acquisition of shares of any class or series.

### MEETINGS AND VOTING BY CLASS OR SERIES

50.     Where the holders of shares of a class or series have, under the Act, the terms or conditions attaching to such shares or otherwise, the right to vote separately as a class in respect of any matter then, except as provided in the Act, these Articles or such terms or conditions, all the provisions in these Articles concerning general meetings (including, without limitation, provisions respecting notice, quorum and procedure) shall, *mutatis mutandis,* apply to every meeting of holders of such class or series of shares convened for the purpose of such vote.

51.     Unless the rights, privileges, terms or conditions attached to a class or series of shares provide otherwise, such class or series of shares shall not have the right to vote separately as a class or series upon an amendment to the Memorandum or Articles to:

(1)     increase or decrease any maximum number of authorized shares of such class or series, or increase any maximum number of authorized shares of a class or series having rights or privileges equal or superior to the shares of such class or series;

(2)     effect an exchange, reclassification or cancellation of all or part of the shares of such class or series; or

(3)     create a new class or series of shares equal or superior to the shares of such class or series.

### BORROWING POWERS

52.     The directors on behalf of the Company may:

(1)     raise or borrow money for the purposes of the Company or any of them;

(2)     secure, subject to the sanction of a special resolution where required by the Act, the repayment of funds so raised or borrowed in such manner and upon such terms and conditions in all respects as they think fit, and in particular by the execution and delivery of mortgages of the Company's real or personal property, or by the issue of bonds, debentures or other securities of the Company secured by mortgage or other charge upon all or

any part of the property of the Company, both present and future including its uncalled capital for the time being;

(3)    sign or endorse bills, notes, acceptances, cheques, contracts, and other evidence of or securities for funds borrowed or to be borrowed for the purposes aforesaid;

(4)    pledge debentures as security for loans;

(5)    guarantee obligations of any person.

53.    Bonds, debentures and other securities may be made assignable, free from any equities between the Company and the person to whom such securities were issued.

54.    Any bonds, debentures and other securities may be issued at a discount, premium or otherwise and with special privileges as to redemption, surrender, drawings, allotment of shares, attending and voting at general meetings of the Company, appointment of directors and other matters.

## GENERAL MEETINGS

55.    Ordinary general meetings of the Company shall be held at least once in every calendar year at such time and place as may be determined by the directors and not later than 15 months after the preceding ordinary general meeting.  All other meetings of the Company shall be called special general meetings.  Ordinary or special general meetings may be held either within or without the Province of Nova Scotia.

56.    The President, a vice-president or the directors may at any time convene a special general meeting, and the directors, upon the requisition of shareholders in accordance with the Act shall forthwith proceed to convene such meeting or meetings to be held at such time and place or times and places as the directors determine.

57.    The requisition shall state the objects of the meeting requested, be signed by the requisitionists and deposited at the Office of the Company.  It may consist of several documents in like form each signed by one or more of the requisitionists.

58.    At least seven clear days' notice, or such longer period of notice as may be required by the Act, of every general meeting, specifying the place, day and hour of the meeting and, when special business is to be considered, the general nature of such business, shall be given to the shareholders entitled to be present at such meeting by notice given as permitted by these Articles.  With the consent in writing of all the shareholders entitled to vote at such meeting, a meeting may be

convened by a shorter notice and in any manner they think fit, or notice of the time, place and purpose of the meeting may be waived by all of the shareholders.

59.    When it is proposed to pass a special resolution, the two meetings maybe convened by the same notice, and it shall be no objection to such notice that it only convenes the second meeting contingently upon the resolution being passed by the requisite majority at the first meeting.

60.    The accidental omission to give notice to a shareholder, or non-receipt of notice by a shareholder, shall not invalidate any resolution passed at any general meeting.

## RECORD DATES

61.    (1)    The directors may fix in advance a date as the record date for the determination of shareholders

        (a)    entitled to receive payment of a dividend or entitled to receive any distribution;

        (b)    entitled to receive notice of a meeting; or

        (c)    for any other purpose.

    (2)    If no record date is fixed, the record date for the determination of shareholders

        (a)    entitled to receive notice of a meeting shall be the day immediately preceding the day on which the notice is given, or, if no notice is given, the day on which the meeting is held; and

        (b)    for any other purpose shall be the day on which the directors pass the resolution relating to the particular purpose.

## PROCEEDINGS AT GENERAL MEETINGS

62.    The business of an ordinary general meeting shall be to receive and consider the financial statements of the Company and the report of the directors and the report, if any, of the auditors, to elect directors in the place of those retiring and to transact any other business which under these Articles ought to be transacted at an ordinary general meeting.

63.    No business shall be transacted at any general meeting unless the requisite quorum is present at the commencement of the business.  A corporate shareholder of the Company that has a duly authorized agent or representative present at any

such meeting shall for the purpose of this Article be deemed to be personally present at such meeting.

64.  One person, being a shareholder, proxyholder or representative of a corporate shareholder, present and entitled to vote shall constitute a quorum for a general meeting, and may hold a meeting.

65.  The Chairman shall be entitled to take the chair at every general meeting or, if there be no Chairman, or if the Chairman is' not present within fifteen minutes after the time appointed for holding the meeting, the President or, failing the President, a vice-president shall be entitled to take the chair.  If the Chairman, the President or a vice-president is not present within 15 minutes after the time appointed for holding the meeting or if all such persons present decline to take the chair, the shareholders present entitled to vote at the meeting shall choose another director as chairman and if no director is present or if all the directors present decline to take the chair, then such shareholders shall choose one of their number to be chairman.

66.  If within half an hour from the time appointed for a general meeting a quorum is not present, the meeting, if it was convened pursuant to a requisition of shareholders, shall be dissolved; if it was convened in any other way, it shall stand adjourned to the same day, in the next week, at the same time and place.  If at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting, the shareholders present shall be a quorum and may hold the meeting.

67.  Subject to the Act, at any general meeting a resolution put to the meeting shall be decided by a show of hands unless, either before or on the declaration of the result of the show of hands, a poll is demanded by the chairman, a shareholder or a proxyholder; and unless a poll is so demanded, a declaration by the chairman that the resolution has been carried, carried by a particular majority, lost or not carried by a particular majority and an entry to that effect in the Company's book of proceedings shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour or against such resolution.

68.  When a poll is demanded, it shall be taken in such manner and at such time and place as the chairman directs, and either at once or after an interval or adjournment or otherwise.  The result of the poll shall be the resolution of the meeting at which the poll was demanded.  The demand of a poll may be withdrawn.  When any dispute occurs over the admission or rejection of a vote, it shall be resolved by the chairman and such determination made in good faith shall be final and conclusive.

69.  The chairman shall not have a casting vote in addition to any vote or votes that the Chairman has as a shareholder.

70.    The chairman of a general meeting may with the consent of the meeting adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting that was adjourned.

71.    Any poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith without adjournment.

72.    The demand of a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which a poll has been demanded.

## VOTES OF SHAREHOLDERS

73.    Subject to the Act and to any provisions attached to any class or series of shares concerning or restricting voting rights:

(1)    on a show of hands every shareholder present in person, every duly authorized representative of a corporate shareholder, and, if not prevented from voting by the Act, every proxyholder, shall have one vote; and

(2)    on a poll every shareholder present in person, every duly authorized representative of a corporate shareholder, and every proxyholder, shall have one vote for every share held;

whether or not such representative or proxyholder is a shareholder.

74.    Any person entitled to transfer shares upon the death or bankruptcy of any shareholder or in any way other than by allotment or transfer may vote at any general meeting in respect thereof in the same manner as if such person were the registered holder of such shares so long as the directors are satisfied at least 48 hours before the time of holding the meeting of such person's right to transfer such shares.

75.    Where there are joint registered holders of any share, any of such holders may vote such share at any meeting, either personally or by proxy, as if solely entitled to it.  If more than one joint holder is present at any meeting, personally or by proxy, the one whose name stands first on the Register in respect of such share shall alone be entitled to vote it.  Several executors or administrators of a deceased shareholder in whose name any share stands shall for the purpose of this Article be deemed joint holders thereof.

76.    Votes may be cast either personally or by proxy or, in the case of a corporate shareholder by a representative duly authorized under the Act.

77.    A proxy shall be in writing and executed in the manner provided in the Act.  A proxy or other authority of a corporate shareholder does not require its seal.

78.    A shareholder of unsound mind in respect of whom an order has been made by any court of competent jurisdiction may vote by guardian or other person in the nature of a guardian appointed by that court, and any such guardian or other person may vote by proxy.

79.    A proxy and the power of attorney or other authority, if any, under which it is signed or a notarially certified copy of that power or authority shall be deposited at the Office of the Company or at such other place as the directors may direct. The directors may, by resolution, fix a time not exceeding 48 hours excluding Saturdays and holidays preceding any meeting or adjourned meeting before which time proxies to be used at that meeting must be deposited with the Company at its Office or with an agent of the Company.  Notice of the requirement for depositing proxies shall be given in the notice calling the meeting.  The chairman of the meeting shall determine all questions as to validity of proxies and other instruments of authority.

80.    A vote given in accordance with the terms of a proxy shall be valid notwithstanding the previous death of the principal, the revocation of the proxy, or the transfer of the share in respect of which the vote is given, provided no intimation in writing of the death, revocation or transfer is received at the Office of the Company before the meeting or by the chairman of the meeting before the vote is given.

81.    Every form of proxy shall comply with the Act and its regulations and subject thereto may be in the following form:

> I, _____ of _____ being a shareholder of _____ hereby appoint _____ of _____ (or failing him/her _____ of _____) as my proxyholder to attend and to vote for me and on my behalf at the ordinary/special general meeting of the Company, to be held on the _____ day of _____ and at any adjournment thereof, or at any meeting of the Company which may be held prior to [insert specified date or event].
>
> [If the proxy is solicited by or behalf of the management of the Company, insert a statement to that effect.]
>
> Dated this _____ day of _____ ____.
>
> _____
>     Shareholder

82.    Subject to the Act, no shareholder shall be entitled to be present or to vote on any question, either personally or by proxy, at any general meeting or be reckoned in a

quorum while any call is due and payable to the Company in respect of any of the shares of such shareholder.

83.    Any resolution passed by the directors, notice of which has been given to the shareholders in the manner in which notices are hereinafter directed to be given and which is, within one month after it has been passed, ratified and confirmed in writing by shareholders entitled on a poll to three-fifths of the votes, shall be as valid and effectual as a resolution of a general meeting.  This Article shall not apply to a resolution for winding up the Company or to a resolution dealing with any matter that by statute or these Articles ought to be dealt with by a special resolution or other method prescribed by statute.

84.    A resolution, including a special resolution, in writing and signed by every shareholder who would be entitled to vote on the resolution at a meeting is as valid as if it were passed by such shareholders at a meeting and satisfies all of the requirements of the Act respecting meetings of shareholders.

## DIRECTORS

85.    Unless otherwise determined by resolution of shareholders, the number of directors shall not be less than one or more than twenty.

86.    Notwithstanding anything herein contained the subscribers to the Memorandum shall be the first directors of the Company.

87.    The directors may be paid out of the funds of the Company as remuneration for their service such sums, if any, as the Company may by resolution of its shareholders determine, and such remuneration shall be divided among them in such proportions and manner as the directors determine.  The directors may also be paid their reasonable travelling, hotel and other expenses incurred in attending meetings of directors and otherwise in the execution of their duties as directors.

88.    The continuing directors may act notwithstanding any vacancy in their body, but if their number falls below the minimum permitted, the directors shall not, except in emergencies or for the purpose of filling vacancies, act so long as their number is below the minimum.

89.    A director may, in conjunction with the office of director, and on such terms as to remuneration and otherwise as the directors arrange or determine, hold any other office or place of profit under the Company or under any company in which the Company is a shareholder or is otherwise interested.

90.    The office of a director shall *ipso facto* be vacated, if the director:

(1)    becomes bankrupt or makes an assignment for the benefit of creditors;

(2)     is, or is found by a court of competent jurisdiction to be, of unsound mind;

(3)     by notice in writing to the Company, resigns the office of director; or

(4)     is removed in the manner provided by these Articles.

91.   No director shall be disqualified by holding the office of director from contracting with the Company, either as vendor, purchaser, or otherwise, nor shall any such contract, or any contract or arrangement entered into or proposed to be entered into by or on behalf of the Company in which any director is in any way interested, either directly or indirectly, be avoided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realized by any such contract or arrangement by reason only of such director holding that office or of the fiduciary relations thereby established, provided the director makes a declaration or gives a general notice in accordance with the Act.  No director shall, as a director, vote in respect of any contract or arrangement in which the director is so interested, and if the director does so vote, such vote shall not be counted.  This prohibition may at any time or times be suspended or relaxed to any extent by a resolution of the shareholders and shall not apply to any contract by or on behalf of the Company to give to the directors or any of them any security for advances or by way of indemnity.

## ELECTION OF DIRECTORS

92.   At the dissolution of every ordinary general meeting at which their successors are elected, all the directors shall retire from office and be succeeded by the directors elected at such meeting.  Retiring directors shall be eligible for re-election.

93.   If at any ordinary general meeting at which an election of directors ought to take place no such election takes place, or if no ordinary general meeting is held in any year or period of years, the retiring directors shall continue in office until their successors are elected.

94.   The Company may by resolution of its shareholders elect any number of directors permitted by these Articles and may determine or alter their qualification.

95.   The Company may, by special resolution or in any other manner permitted by statute, remove any director before the expiration of such director's period of office and may, if desired, appoint a replacement to hold office during such time only as the director so removed would have held office.

96.   The directors may appoint any other person as a director so long as the total number of directors does not at any time exceed the maximum number permitted. No such appointment, except to fill a casual vacancy, shall be effective unless two-thirds of the directors concur in it.  Any casual vacancy occurring among the directors may be filled by the directors, but any person so chosen shall retain office only so long as the vacating director would have retained it if the vacating director had continued as director.

## CHAIRMAN OF THE BOARD

97.     The directors may elect one of their number to be Chairman and may determine the period during which the Chairman is to hold office.  The Chairman shall perform such duties and receive such special remuneration as the directors may provide.

## PRESIDENT AND VICE-PRESIDENTS

98.     The directors shall elect the President of the Company, who need not be a director, and may determine the period for which the President is to hold office. The President shall have general supervision of the business of the Company and shall perform such duties as may be assigned from time to time by the directors.

99.     The directors may also elect vice-presidents, who need not be directors, and may determine the periods for which they are to hold office.  A vice-president shall, at the request of the President or the directors and subject to the directions of the directors, perform the duties of the President during the absence, illness or incapacity of the President, and shall also perform such duties as may be assigned by the President or the directors.

## SECRETARY AND TREASURER

100.    The directors shall appoint a Secretary of the Company to keep minutes of shareholders' and directors' meetings and perform such other duties as may be assigned by the directors.  The directors may also appoint a temporary substitute for the Secretary who shall, for the purposes of these Articles, be deemed to be the Secretary.

101.    The directors may appoint a treasurer of the Company to carry out such duties as the directors may assign.

## OFFICERS

102.    The directors may elect or appoint such other officers of the Company, having such powers and duties, as they think fit.

103.    If the directors so decide the same person may hold more than one of the offices provided for in these Articles.

## PROCEEDINGS OF DIRECTORS

104.    The directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings and proceedings, as they think fit, and may

determine the quorum necessary for the transaction of business. Until otherwise determined, one director shall constitute a quorum and may hold a meeting.

105.   If all directors of the Company entitled to attend a meeting either generally or specifically consent, a director may participate in a meeting of directors or of a committee of directors by means of such telephone or other communications facilities as permit all persons participating in the meeting to hear each other, and a director participating in such a meeting by such means is deemed to be present at that meeting for purposes of these Articles.

106.   Meetings of directors may be held either within or without the Province of Nova Scotia and the directors may from time to time make arrangements relating to the time and place of holding directors' meetings, the notices to be given for such meetings and what meetings may be held without notice. Unless otherwise provided by such arrangements:

   (1)   A meeting of directors may be held at the close of every ordinary general meeting of the Company without notice.

   (2)   Notice of every other directors' meeting may be given as permitted by these Articles to each director at least 48 hours before the time fixed for the meeting.

   (3)   A meeting of directors may be held without formal notice if all the directors are present or if those absent have signified their assent to such meeting or their consent to the business transacted at such meeting.

107.   The President or any director may at any time, and the Secretary, upon the request of the President or any director, shall summon a meeting of the directors to be held at the Office of the Company. The President, the Chairman or a majority of the directors may at any time, and the Secretary, upon the request of the President, the Chairman or a majority of the directors, shall summon a meeting to be held elsewhere.

108.   (1)   Questions arising at any meeting of directors shall be decided by a majority of votes. The chairman of the meeting may vote as a director but shall not have a second or casting vote.

   (2)   At any meeting of directors the chairman shall receive and count the vote of any director not present in person at such meeting on any question or matter arising at such meeting whenever such absent director has indicated by telegram, letter or other writing lodged with the chairman of such meeting the manner in which the absent director desires to vote on such question or matter and such question or matter has been specifically mentioned in the notice calling the meeting as a question or matter to be discussed or decided thereat. In respect of any such question or matter so mentioned in such notice any director may give to any other director a proxy authorizing such other director to vote for such first named director

at such meeting, and the chairman of such meeting, after such proxy has been so lodged, shall receive and count any vote given in pursuance thereof notwithstanding the absence of the director giving such proxy.

109.   If no Chairman is elected, or if at any meeting of directors the Chairman is not present within five minutes after the time appointed for holding the meeting, or declines to take the chair, the President, if a' director, shall preside.  If the President is not a director, is not present at such time or declines to take the chair, a vice-president who is also a director shall preside.  If no person described above is present at such time and willing to take the chair, the directors present shall choose some one of their number to be chairman of the meeting.

110.   A meeting of the directors at which a quorum is present shall be competent to exercise all or any of the authorities, powers and discretions for the time being vested in or exercisable by the directors generally.

111.   The directors may delegate any of their powers to committees consisting of such number of directors as they think fit.  Any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on them by the directors.

112.   The meetings and proceedings of any committee of directors shall be governed by the provisions contained in these Articles for regulating the meetings and proceedings of the directors insofar as they are applicable and are not superseded by any regulations made by the directors.

113.   All acts done at any meeting of the directors or of a committee of directors or by any person acting as a director shall,, notwithstanding that it is afterwards discovered that there was some defect in the appointment of the director or person so acting, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a director.

114.   A resolution in writing and signed by every director who would be entitled to vote on the resolution at a meeting is as valid as if it were passed by such directors at a meeting.

115.   If any one or more of the directors is called upon to perform extra services or to make any special exertions in going or residing abroad or otherwise for any of the purposes of the Company or the business thereof, the Company may remunerate the director or directors so doing, either by a fixed sum or by a percentage of profits or otherwise.  Such remuneration shall be determined by the directors and may be either in addition to or in substitution for remuneration otherwise authorized by these Articles.

**REGISTERS**

116.    The directors shall cause to be kept at the Company's Office in accordance with the provisions of the Act a Register of the shareholders of the Company, a register of the holders of bonds, debentures and other securities of the Company and a register of its directors.  Branch registers of the shareholders and of the holders of bonds, debentures and other securities may be kept elsewhere, either within or without the Province of Nova Scotia, in accordance with the Act.

## MINUTES

117.    The directors shall cause minutes to be entered in books designated for the purpose:

(1)    of all appointments of officers;

(2)    of the names of directors present at each meeting of directors and of any committees of directors;

(3)    of all orders made by the directors and committees of directors; and

(4)    of all resolutions and proceedings of meetings of shareholders and of directors.

Any such minutes of any meeting of directors or of any committee of directors or of shareholders, if purporting to be signed by the chairman of such meeting or by the chairman of the next succeeding meeting, shall be receivable as prima facie evidence of the matters stated in such minutes.

## POWERS OF DIRECTORS

118.    The management of the business of the Company is vested in the directors who, in addition to the powers and authorities by these Articles or otherwise expressly conferred upon them, may exercise all such powers and do all such acts and things as may be exercised or done by the Company and are not hereby or by statute expressly directed or required to be exercised or done by the shareholders, but subject nevertheless to the provisions of any statute, the Memorandum or these Articles.  No modification of the Memorandum or these Articles shall invalidate any prior act of the directors that would have been valid if such modification had not been made.

119.    Without restricting the generality of the terms of any of these Articles and without prejudice to the powers conferred thereby, the directors may:

(1)    take such steps as they think fit to carry out any agreement or contract made by or on behalf of the Company;

(2)    pay costs, charges and expenses preliminary and incidental to the promotion, formation, establishment, and registration of the Company;

(3)     purchase or otherwise acquire for the Company any property, rights or privileges that the Company is authorized to acquire, at such price and generally on such terms and conditions as they think fit;

(4)     pay for any property, rights or privileges acquired by, or services rendered to the Company either wholly or partially in cash or in shares (fully paid-up or otherwise), bonds, debentures or other securities of the Company;

(5)     subject to the Act, secure the fulfilment of any contracts or engagements entered into by the Company by mortgaging or charging all or any of the property of the Company and its unpaid capital for the time being, or in such other manner as they think fit;.

(6)     appoint, remove or suspend at their discretion such experts, managers, secretaries, treasurers, officers, clerks, agents and servants for permanent, temporary or special services, as they from time to tune think fit, and determine their powers and duties and fix their salaries or emoluments and require security in such instances and to such amounts as they think fit;

(7)     accept a surrender of shares from any shareholder insofar as the law permits and on such terms and conditions as may be agreed;

(8)     appoint any person or persons to accept and hold in trust for the Company any property belonging to the Company, or in which it is interested, execute and do all such deeds and things as may be required in relation to such trust, and provide for the remuneration of such trustee or trustees;

(9)     institute, conduct, defend, compound or abandon any legal proceedings by and against the Company, its directors or its officers or otherwise concerning the affairs of the Company, and also compound and allow time for payment or satisfaction of any debts due and of any claims or demands by or against the Company;

(10)    refer any claims or demands by or against the Company to arbitration and observe and perform the awards;

(11)    make and give receipts, releases and other discharges for amounts payable to the Company and for claims and demands of the Company;

(12)    determine who may exercise the borrowing powers of the Company and sign on the Company's behalf bonds, debentures or other securities, bills, notes, receipts, acceptances, assignments, transfers, hypothecations, pledges, endorsements, cheques, drafts, releases, contracts, agreements and all other instruments and documents;

(13)    provide for the management of the affairs of the Company abroad in such manner as they think fit, and in particular appoint any person to be the

attorney or agent of the Company with such powers (including power to sub-delegate) and upon such terms as may be thought fit;

(14)    invest and deal with any funds of the Company in such securities and in such manner as they think fit; and vary or realize such investments;

(15)    subject to the Act, execute in the name and on behalf of the Company in favour of any director or other person who may incur or be about to incur any personal liability for the benefit of the Company such mortgages of the Company's property, present and future, as they think fit;

(16)    give any officer or employee of the Company a commission on the profits of any particular business or transaction or a share in the general profits of the Company;

(17)    set aside out of the profits of the Company before declaring any dividend such amounts as they think proper as a reserve fund to meet contingencies or provide for dividends, depreciation, repairing, improving and maintaining any of the property of the Company and such other purposes as the directors may in their absolute discretion think in the interests of the Company; and invest such amounts in such investments as they think fit, and deal with and vary such investments, and dispose of all or any part of them for the benefit of the Company, and divide the reserve fund into such special funds as they think fit, with full power to employ the assets constituting the reserve fund in the business of the Company without being bound to keep them separate from the other assets;

(18)    make, vary and repeal rules respecting the business of the Company, its officers and employees, the shareholders of the Company or any section or class of them;

(19)    enter into all such negotiations and contracts, rescind and vary all such contracts, and execute and do all such acts, deeds and things in the name and on behalf of the Company as they consider expedient for or in relation to any of the matters aforesaid or otherwise for the purposes of the Company;

(20)    provide for the management of the affairs of the Company in such manner as they think fit.

## SOLICITORS

120.    The Company may employ or retain solicitors any of whom may, at the request or on the instruction of the directors, the Chairman, the President or a managing director, attend meetings of the directors or shareholders, whether or not the solicitor is a shareholder or a director of the Company.  A solicitor who is also a

director may nevertheless charge for services rendered to the Company as a solicitor.

## THE SEAL

121.  The directors shall arrange for the safe custody of the common seal of the Company (the "Seal").  The Seal may be affixed to any instrument in the preßence of and contemporaneously with the attesting signature of (i) any director or officer acting within such person's authority or (ii) any person under the authority of a resolution of the directors or a committee thereof.  For the purpose of certifying documents or proceedings the Seal may be affixed by any director or the President, a vice-president, the Secretary, an assistant secretary or any other officer of the Company without the authorization of a resolution of the directors.

122.  The Company may have facsimiles of the Seal which may be used interchangeably with the Seal.

123.  The Company may have for use at any place outside the Province of Nova Scotia, as to all matters to which the corporate existence and capacity of the Company extends, an official seal that is a facsimile of the Seal of the Company with the addition on its face of the name of the place where it is to be used; and the Company may by writing under its Seal authorize any person to affix such official seal at such place to any document to which the Company is a party.

## DIVIDENDS

124.  The directors may from time to time declare such dividend as they deem proper upon shares of the Company according to the rights and restrictions attached to any class or series of shares, and may determine the date upon which such dividend will be payable and that it will be payable to the persons registered as the holders of the shares on which it is declared at the close of business upon a record date.  No transfer of such shares registered after the record date shall pass any right to the dividend so declared.

125.  Dividends may be paid as permitted by law and, without limitation, may be paid out of the profits, retained earnings or contributed surplus of the Company.  No interest shall be payable on any dividend except insofar as the rights attached to any class or series of shares provide otherwise.

126.  The declaration of the directors as to the amount of the profits, retained earnings or contributed surplus of the Company shall be conclusive.

127.  The directors may from time to time pay to the shareholders such interim dividends as in their judgment the position of the Company justifies.

128.    Subject to these Articles and the rights and restrictions attached to any class or series of shares, dividends may be declared and paid to the shareholders in proportion to the amount of capital paid-up on the shares (not including any capital paid-up bearing interest) held by them respectively.

129.    The directors may deduct from the dividends payable to any shareholder amounts due and payable by the shareholder to the Company on account of calls, instalments or otherwise, and may apply the same in or towards satisfaction of such amounts so due and payable.

130.    The directors may retain any dividends on which the Company has a lien, and may apply the same in or towards satisfaction of the debts, liabilities or engagements in respect of which the lien exists.

131.    The directors may retain the dividends payable upon shares to which a person is entitled or entitled to transfer upon the death or bankruptcy of a shareholder or in any way other than by allotment or transfer, until such person has become registered as the holder of such shares or has duly transferred such shares.

132.    When the directors declare a dividend on a class or series of shares and also make a call on such shares payable on or before the date on which the dividend is payable, the directors may retain all or part of the dividend and set off the amount retained against the call.

133.    The directors may declare that a dividend be paid by the distribution of cash, paid-up shares (at par or at a premium), debentures, bonds or other securities of the Company or of any other company or any other specific assets held or to be acquired by the Company or in any one or more of such ways.

134.    The directors may settle any difficulty that may arise in regard to the distribution of a dividend as they think expedient, and in particular without restricting the generality of the foregoing may issue fractional certificates, may fix the value for distribution of any specific assets, may determine that cash payments will be made to any shareholders upon the footing of the value so fixed or that fractions may be disregarded in order to adjust the rights of all parties, and may vest cash or specific assets in trustees upon such trusts for the persons entitled to the dividend as may seem expedient to the directors.

135.    Any person registered as .a joint holder of any share may give effectual receipts for all dividends and payments on account of dividends in respect of such share.

136.    Unless otherwise determined by the directors, any dividend may be paid by a cheque or warrant delivered to or sent through the post to the registered address of the shareholder entitled, or, when there are joint holders, to the registered address of that one whose name stands first on the register for the shares jointly held. Every cheque or warrant so delivered or sent shall be made payable to the order of

the person to whom it is delivered or sent. The mailing or other transmission to a shareholder at the shareholder's registered address (or, in the case of joint shareholders at the address of the holder whose name stands first on the register) of a cheque payable to the order of the person to whom it is addressed for the amount of any dividend payable in cash after the deduction of any tax which the Company has properly withheld, shall discharge the Company's liability for the dividend unless the cheque is not paid on due presentation. If any cheque for a dividend payable in cash is not received, the Company shall issue to the shareholder a replacement cheque for the same amount on such terms as to indemnity and evidence of non-receipt as the directors may impose. No shareholder may recover by action or other legal process against the Company any dividend represented by a cheque that has not been duly presented to a banker of the Company for payment or that otherwise remains unclaimed for 6 years from the date on which it was payable.

## ACCOUNTS

137.    The directors shall cause proper books of account to be kept of the amounts received and expended by the Company, the matters in respect of which such receipts and expenditures take place, all sales and purchases of goods by the Company, and the assets, credits and liabilities of the Company.

138.    The books of account shall be kept at the head office of the Company or at such other place or places as the directors may direct.

139.    The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions the accounts and books of the Company or any of them shall be open to inspection of the shareholders, and no shareholder shall have any right to inspect any account or book or document of the Company except as conferred by statute or authorized by the directors or a resolution of the shareholders.

140.    At the ordinary general meeting in every year the directors shall lay before the Company such financial statements and reports in connection therewith as may be required by the Act or other applicable statute or regulation thereunder and shall distribute copies thereof at such times and to such persons as may be required by statute or regulation.

## AUDITORS AND AUDIT

141.    Except in respect of a financial year for which the Company is exempt from audit requirements in the Act, the Company shall at each ordinary general meeting appoint an auditor or auditors to hold office until the next ordinary general meeting. If at any general meeting at which the appointment of an auditor or auditors is to take place and no such appointment takes place, or if no ordinary

general meeting is held in any year or period of years, the directors shall appoint an auditor or auditors to hold office until the next ordinary general meeting.

142.    The first auditors of the Company may be appointed by the directors at any time before the first ordinary general meeting and the auditors so appointed shall hold office until such meeting unless previously removed by a resolution of the shareholders, in which event the shareholders may appoint auditors.

143.    The directors may fill any casual vacancy in the office of the auditor but while any such vacancy continues the surviving or continuing auditor or auditors, if any, may act.

144.    The Company may appoint as auditor any person, including a shareholder, not disqualified by statute.

145.    An auditor may be removed or replaced in the circumstances and in the manner specified in the Act.

146.    The remuneration of the auditors shall be fixed by the shareholders, or by the directors pursuant to authorization given by the shareholders, except that the remuneration of an auditor appointed to fill a casual vacancy may be fixed by the directors.

147.    The auditors shall conduct such audit as may be required by the Act and their report, if any, shall be dealt with by the Company as required by the Act.

## NOTICES

148.    A notice (including any communication or document) shall be sufficiently given, delivered or served by the Company upon a shareholder, director, officer or auditor by personal delivery at such person's registered address (or, in the case of a director, officer or auditor, last known address) or by prepaid mail, telegraph, telex, facsimile machine or other electronic means of communication addressed to such person at such address.

149.    Shareholders having no registered address shall not be entitled to receive notice.

150.    All notices with respect to registered shares to which persons are jointly entitled may be sufficiently given to all joint holders thereof by notice given to whichever of such persons is named first in the Register for such shares.

151.    Any notice sent by mail shall be deemed to be given, delivered or served on the earlier of actual receipt and the third business day following that upon which it is mailed; and in proving such service it shall be sufficient to prove that the notice was properly addressed and mailed with the postage prepaid thereon.  Any notice given by electronic means of communication shall be deemed to be given when entered into the appropriate transmitting device for transmission.  A certificate in

writing signed on behalf of the Company that the^ notice was so addressed and mailed or transmitted shall be conclusive evidence thereof.

152.    Every person who by operation of law, transfer or other means whatsoever becomes entitled to any share shall be bound by every notice in respect of such share that prior to such person's name and address being entered on the Register was duly served in the manner hereinbefore provided upon the person from whom such person derived title to such share.

153.    Any notice delivered, sent or transmitted to the registered address of any shareholder pursuant to these Articles, shall, notwithstanding that such shareholder is then deceased and that the Company has notice thereof, be deemed to have been served in respect of any registered shares, whether held by such deceased shareholder solely or jointly with other persons, until some other person is registered as the holder or joint holder thereof, and such service shall for all purposes of these Articles be deemed a sufficient service of such notice on the heirs, executors or administrators of the deceased shareholder and all joint holders of such shares.

154.    Any notice may bear the name or signature, manual or reproduced, of the person giving the notice written or printed.

155.    When a given number of days' notice or notice extending over any other period is required to be given, the day of service and the day upon which such notice expires shall not, unless it is otherwise provided, be counted in such number of days or other period.

## INDEMNITY

156.    Every director, officer, employee or agent, former director, officer, employee or agent or person who acts or acted at the Company's request, as a director, officer, employee or agent of the Company, a body corporate, partnership or other association of which the Company is or was a shareholder, partner, member or creditor, and the heirs and legal representatives of such person, in the absence of any dishonesty on the part of such person, shall be indemnified by the Company against, and it shall be the duty of the directors out of the funds of the Company to pay, all costs, losses and expenses, including an amount paid to settle an action or claim or satisfy a judgment, that such director, officer, employee, agent or person may incur or become liable to pay in respect of any claim made against such person or civil, criminal or administrative action or proceeding to which such person is made a party by reason of being or having been a director, officer, employee or agent of the Company or such body corporate, partnership or other association, whether the Company is a claimant or party to such action or proceeding or otherwise; and the amount for which such indemnity is proved shall immediately attach as a lien on the property of the Company and have priority, as

- 28 -

against the shareholders over all other claims.  The Company shall pay all expenses (including attorneys' fees), judgments and fines incurred by a person seeking indemnification hereunder in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding in the manner provided herein upon receipt of an undertaking by or on behalf of the former or current director, officer, employee or agent to repay such amount if it shall be finally determined by a non-appealable judgment of a court of competent jurisdiction that he is not entitled to be indemnified by the Company as authorized in this section.  The indemnification and advancement of expenses provided for herein shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.  The Company may, to the full extent permitted by law, purchase and maintain insurance on behalf of any such person against any indemnifiable liability which may be asserted against such person.

157.    No director, officer, employee or agent, former director, officer, employee or agent or person who acts or acted at the Company's request, as a director, officer, employee or agent of the Company, a body corporate, partnership or other association of which the Company is or was a shareholder, partner, member or creditor, in the absence of any dishonesty on such person's part, shall be liable for the acts, receipts, neglects or defaults of any other director, officer, employee, agent or such person, or for joining in any receipt or other act for conformity, or for any loss, damage or expense happening to the Company through the insufficiency or deficiency of title to any property acquired for or on behalf of the Company, or through the insufficiency or deficiency of any security in or upon which any of the funds of the Company are invested, or for any loss or damage arising from the bankruptcy, insolvency or tortious acts of any person with whom any funds, securities or effects are deposited, or for any loss occasioned by error of judgment or oversight on the part of such person, or for any other loss, damage or misfortune whatsoever which happens in the execution of the duties of such person or in relation thereto.  The indemnification provided herein shall not be deemed to limit the right of the Company to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification from the Company may be entitled under any agreement, vote of shareholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

158.    Any alteration or amendment to these Articles shall not terminate or adversely affect any (i) rights or protections of any person entitled to indemnification under Section 156 or (ii) obligations of the Company to provide any indemnification rights as detailed above in Sections 156 and 157.


**REMINDERS**

159.    The directors shall comply with the following provisions of the Act or the
*Corporations Registration Act* (Nova Scotia) where indicated:

(1)    Keep a current register of shareholders (Section 42).

(2)    Keep a current register of directors, officers and managers, send to the
Registrar a copy thereof and notice of all changes therein (Section 98).

(3)    Keep a current register of holders of bonds, debentures and other securities
(Section 111 and Third Schedule).

(4)    Call a general meeting every year within the proper time (Section 83).
Meetings must be held not later than 15 months after the preceding general
meeting.

(5)    Send to the Registrar copies of all special resolutions (Section 88).

(6)    When shares are issued for a consideration other than cash, file a copy of
the contract with the Registrar on or before the date on which the shares
are issued (Section 109).

(7)    Send to the Registrar notice of the address of the Company's Office and of
all changes in such address (Section 79).

(8)    Keep proper minutes of all shareholders' meetings and directors' meetings
in the Company's minute book kept at the Company's Office (Sections 89
and 90).

(9)    Obtain a certificate under the *Corporations Registration Act* (Nova Scotia)
as soon as business is commenced.

(10)    Send notice of recognized agent to the Registrar under the *Corporations
Registration Act* (Nova Scotia).


**Name of Subscriber**


Dated at [_____] the [●] of [●], 2014.

Witness to above signature:

_____
[_____]

**BYE-LAWS**

**OF**

**Lightsquared Bermuda Ltd.**[1]

---

[1]  This organizational document may be further revised prior to the Effective Date, in consultation with
local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance
Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

# TABLE OF CONTENTS

## INTERPRETATION

1.  Definitions

## SHARES

2.  Power to Issue Shares
3.  Power of the Company to Purchase its Shares
4.  Rights Attaching to Shares
5.  Calls on Shares
6.  Forfeiture of Shares
7.  Share Certificates
8.  Fractional Shares

## REGISTRATION OF SHARES

9.  Register of Members
10. Registered Holder Absolute Owner
11. Transfer of Registered Shares
12. Transmission of Registered Shares

## ALTERATION OF SHARE CAPITAL

13. Power to Alter Capital
14. Variation of Rights Attaching to Shares

## DIVIDENDS AND CAPITALISATION

15. Dividends
16. Power to Set Aside Profits
17. Method of Payment
18. Capitalisation

## MEETINGS OF MEMBERS

19. Annual General Meetings
20. Special General Meetings
21. Requisitioned General Meetings
22. Notice
23. Giving Notice and Access
24. Postponement of General Meeting
25. Electronic Participation in Meetings
26. Quorum at General Meetings
27. Chairman to Preside at General Meetings

28.  Voting on Resolutions
29.  Power to Demand a Vote on a Poll
30.  Voting by Joint Holders of Shares
31.  Instrument of Proxy
32.  Representation of Corporate Member
33.  Adjournment of General Meeting
34.  Written Resolutions
35.  Directors Attendance at General Meetings

**DIRECTORS AND OFFICERS**

36.  Election of Directors
37.  Number of Directors
38.  Term of Office of Directors
39.  Alternate Directors
40.  Removal of Directors
41.  Vacancy in the Office of Director
42.  Remuneration of Directors
43.  Defect in Appointment
44.  Directors to Manage Business
45.  Powers of the Board of Directors
46.  Register of Directors and Officers
47.  Appointment of Officers
48.  Appointment of Secretary
49.  Duties of Officers
50.  Remuneration of Officers
51.  Conflicts of Interest
52.  Indemnification and Exculpation

**MEETINGS OF THE BOARD OF DIRECTORS**

53.  Board Meetings
54.  Notice of Board Meetings
55.  Electronic Participation in Meetings
56.  Representation of Corporate Director
57.  Quorum at Board Meetings
58.  Board to Continue in the Event of Vacancy
59.  Chairman to Preside
60.  Written Resolutions
61.  Validity of Prior Acts of the Board

**CORPORATE RECORDS**

62.  Minutes
63.  Place Where Corporate Records Kept
64.  Form and Use of Seal

**ACCOUNTS**

65.  Records of Account
66.  Financial Year End

**AUDITS**

67.  Annual Audit
68.  Appointment of Auditor
69.  Remuneration of Auditor
70.  Duties of Auditor
71.  Access to Records
72.  Financial Statements and the Auditor's Report
73.  Vacancy in the Office of Auditor

**VOLUNTARY WINDING-UP AND DISSOLUTION**

74.  Winding-Up

**CHANGES TO CONSTITUTION**

75.  Changes to Bye-laws
76.  Changes to the Memorandum of Association
77.  Discontinuance

**Lightsquared Bermuda Ltd.**

---

## INTERPRETATION

**1.    Definitions**

1.1    In these Bye-laws, the following words and expressions shall, where not inconsistent with the context, have the following meanings, respectively:

| | |
|---|---|
| Act | the Companies Act 1981; |
| Alternate Director | an alternate director appointed in accordance with these Bye-laws; |
| Auditor | includes an individual or partnership; |
| Board | the board of directors (including, for the avoidance of doubt, a sole director) appointed or elected pursuant to these Bye-laws and acting by resolution in accordance with the Act and these Bye-laws or the directors present at a meeting of directors at which there is a quorum; |
| Company | the company for which these Bye-laws are approved and confirmed; |
| Director | a director of the Company and shall include an Alternate Director; |
| Member | the person registered in the Register of Members as the holder of shares in the Company and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register of Members as one of such joint holders or all of such persons, as the context so requires; |
| notice | written notice as further provided in these Bye-laws unless otherwise specifically stated; |
| Officer | any person appointed by the Board to hold an office in the Company; |
| Register of Directors and Officers | the register of directors and officers referred to in these Bye-laws; |

1

**Lightsquared Bermuda Ltd.**

---

| | |
|---|---|
| Register of Members | the register of Members referred to in these Bye-laws; |
| Resident Representative | any person appointed to act as resident representative and includes any deputy or assistant resident representative; |
| Secretary | the person appointed to perform any or all of the duties of secretary of the Company and includes any deputy or assistant secretary and any person appointed by the Board to perform any of the duties of the Secretary; and |
| Treasury Share | a share of the Company that was or is treated as having been acquired and held by the Company and has been held continuously by the Company since it was so acquired and has not been cancelled. |

1.2    In these Bye-laws, where not inconsistent with the context:

(a)    words denoting the plural number include the singular number and *vice versa*;

(b)    words denoting the masculine gender include the feminine and neuter genders;

(c)    words importing persons include companies, associations or bodies of persons whether corporate or not;

(d)    the words:-

  (i)    "may" shall be construed as permissive; and

  (ii)    "shall" shall be construed as imperative;

(e)    a reference to statutory provision shall be deemed to include any amendment or re-enactment thereof;

(f)    the word "corporation" means a corporation whether or not a company within the meaning of the Act; and

(g)    unless otherwise provided herein, words or expressions defined in the Act shall bear the same meaning in these Bye-laws.

**Lightsquared Bermuda Ltd.**

1.3    In these Bye-laws expressions referring to writing or its cognates shall, unless the contrary intention appears, include facsimile, printing, lithography, photography, electronic mail and other modes of representing words in visible form.

## SHARES

### 2.    Power to Issue Shares

2.1    Subject to these Bye-laws and to any resolution of the Members to the contrary, and without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares, the Board shall have the power to issue any unissued shares on such terms and conditions as it may determine and any shares or class of shares may be issued with such preferred, deferred or other special rights or such restrictions, whether in regard to dividend, voting, return of capital, or otherwise as the Company may by resolution of the Members prescribe.

2.2    Subject to the Act, any preference shares may be issued or converted into shares that (at a determinable date or at the option of the Company or the holder) are liable to be redeemed on such terms and in such manner as may be determined by the Board (before the issue or conversion).

### 3.    Power of the Company to Purchase its Shares

3.1    The Company may purchase its own shares for cancellation or acquire them as Treasury Shares in accordance with the Act on such terms as the Board shall think fit.

3.2    The Board may exercise all the powers of the Company to purchase or acquire all or any part of its own shares in accordance with the Act.

### 4.    Rights Attaching to Shares

4.1    Subject to any resolution of the Members to the contrary (and without prejudice to any special rights conferred thereby on the holders of any other shares or class of shares), the share capital shall be divided into shares of a single class the holders of which shall, subject to these Bye-laws:

(a)    be entitled to one vote per share;

(b)    be entitled to such dividends as the Board may from time to time declare;

(c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purpose of a reorganisation or otherwise or upon any distribution of capital, be entitled to the surplus assets of the Company; and

3

**Lightsquared Bermuda Ltd.**

(d)    generally be entitled to enjoy all of the rights attaching to shares.

4.2    All the rights attaching to a Treasury Share shall be suspended and shall not be exercised by the Company while it holds such Treasury Share and, except where required by the Act, all Treasury Shares shall be excluded from the calculation of any percentage or fraction of the share capital, or shares, of the Company.

## 5.    Calls on Shares

5.1    The Board may make such calls as it thinks fit upon the Members in respect of any monies (whether in respect of nominal value or premium) unpaid on the shares allotted to or held by such Members and, if a call is not paid on or before the day appointed for payment thereof, the Member may at the discretion of the Board be liable to pay the Company interest on the amount of such call at such rate as the Board may determine, from the date when such call was payable up to the actual date of payment.  The Board may differentiate between the holders as to the amount of calls to be paid and the times of payment of such calls.

5.2    The joint holders of a share shall be jointly and severally liable to pay all calls and any interest, costs and expenses in respect thereof.

5.3    The Company may accept from any Member the whole or a part of the amount remaining unpaid on any shares held by him, although no part of that amount has been called up.

## 6.    Forfeiture of Shares

6.1    If any Member fails to pay, on the day appointed for payment thereof, any call in respect of any share allotted to or held by such Member, the Board may, at any time thereafter during such time as the call remains unpaid, direct the Secretary to forward such Member a notice in writing in the form, or as near thereto as circumstances admit, of the following:

**Lightsquared Bermuda Ltd.**

Notice of Liability to Forfeiture for Non-Payment of
Call Lightsquared Bermuda Ltd. (the "Company")

You have failed to pay the call of [amount of call] made on [date], in respect of the [number] share(s) [number in figures] standing in your name in the Register of Members of the Company, on [date], the day appointed for payment of such call.   You are hereby notified that unless you pay such call together with interest thereon at the rate of t ] per annum computed from the said [date] at the registered office of the Company the share(s) will be liable to be forfeited.

Dated this [date]

_____

[Signature of Secretary] By Order of the Board

6.2    If the requirements of such notice are not complied with, any such share may at any time thereafter before the payment of such call and the interest due in respect thereof be forfeited by a resolution of the Board to that effect, and such share shall thereupon become the property of the Company and may be disposed of as the Board shall determine.   Without limiting the generality of the foregoing, the disposal may take place by sale, repurchase, redemption or any other method of disposal permitted by and consistent with these Bye-laws and the Act.

6.3    A Member whose share or shares have been so forfeited shall, notwithstanding such forfeiture, be liable to pay to the Company all calls owing on such share or shares at the time of the forfeiture, together with all interest due thereon and any costs and expenses incurred by the Company in connection therewith.

6.4    The Board may accept the surrender of any shares which it is in a position to forfeit on such terms and conditions as may be agreed.   Subject to those terms and conditions, a surrendered share shall be treated as if it had been forfeited.

**7.    Share Certificates**

7.1    Every Member shall be entitled to a certificate under the common seal (or a facsimile thereof) of the Company or bearing the signature (or a facsimile thereof) of a Director or the Secretary or a person expressly authorised to sign specifying the number and, where appropriate, the class of shares held by such Member and whether the same are fully paid up and, if not, specifying the amount paid on such shares. The Board may by resolution determine, either generally or in a particular case, that any or all signatures on certificates may be printed thereon or affixed by mechanical means.

**Lightsquared Bermuda Ltd.**

7.2   The Company shall be under no obligation to complete and deliver a share certificate unless specifically called upon to do so by the person to whom the shares have been allotted.

7.3   If any share certificate shall be proved to the satisfaction of the Board to have been worn out, lost, mislaid, or destroyed the Board may cause a new certificate to be issued and request an indemnity for the lost certificate if it sees fit.

## 8.   Fractional Shares

The Company may issue its shares in fractional denominations and deal with such fractions to the same extent as its whole shares and shares in fractional denominations shall have in proportion to the respective fractions represented thereby all of the rights of whole shares including (but without limiting the generality of the foregoing) the right to vote, to receive dividends and distributions and to participate in a winding-up.

## REGISTRATION OF SHARES

## 9.   Register of Members

9.1   The Board shall cause to be kept in one or more books a Register of Members and shall enter therein the particulars required by the Act.

9.2   The Register of Members shall be open to inspection without charge at the registered office of the Company on every business day, subject to such reasonable restrictions as the Board may impose, so that not less than two hours in each business day be allowed for inspection.  The Register of Members may, after notice has been given in accordance with the Act, be closed for any time or times not exceeding in the whole thirty days in each year.

## 10.   Registered Holder Absolute Owner

The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise any equitable claim or other claim to, or interest in, such share on the part of any other person.

## 11.   Transfer of Registered Shares

11.1   An instrument of transfer shall be in writing in the form of the following, or as near thereto as circumstances admit, or in such other form as the Board may accept:

**Lightsquared Bermuda Ltd.**

---

Transfer of a Share or Shares
Lightsquared Bermuda Ltd. (the "Company")

FOR VALUE RECEIVED …………………… [amount], I, [name of transferor] hereby sell, assign and transfer unto [transferee] of [address], [number] shares of the Company.

DATED this [date]

Signed by:                                    In the presence of:


_____        _____
Transferor                                    Witness


Signed by:                                    In the presence of:


_____        _____
Transferee                                    Witness

11.2    Such instrument of transfer shall be signed by (or in the case of a party that is a corporation, on behalf of) the transferor and transferee, provided that, in the case of a fully paid share, the Board may accept the instrument signed by or on behalf of the transferor alone.  The transferor shall be deemed to remain the holder of such share until the same has been registered as having been transferred to the transferee in the Register of Members.

11.3    The Board may refuse to recognise any instrument of transfer unless it is accompanied by the certificate in respect of the shares to which it relates and by such other evidence as the Board may reasonably require showing the right of the transferor to make the transfer.

11.4    The joint holders of any share may transfer such share to one or more of such joint holders, and the surviving holder or holders of any share previously held by them jointly with a deceased Member may transfer any such share to the executors or administrators of such deceased Member.

11.5    The Board may in its absolute discretion and without assigning any reason therefor refuse to register the transfer of a share.  The Board shall refuse to register a transfer unless all applicable consents, authorisations and permissions of any governmental body or agency in Bermuda have been obtained.  If the Board refuses to register a transfer of any share the Secretary shall, within three months after the date on which the transfer was lodged with the Company, send to the transferor and transferee notice of the refusal.

7

**Lightsquared Bermuda Ltd.**

---

11.6   Notwithstanding anything to the contrary in these Bye-laws, shares that are listed or admitted to trading on an appointed stock exchange may be transferred in accordance with the rules and regulations of such exchange.

## 12.   Transmission of Registered Shares

12.1   In the case of the death of a Member, the survivor or survivors where the deceased Member was a joint holder, and the legal personal representatives of the deceased Member where the deceased Member was a sole holder, shall be the only persons recognised by the Company as having any title to the deceased Member's interest in the shares.  Nothing herein contained shall release the estate of a deceased joint holder from any liability in respect of any share which had been jointly held by such deceased Member with other persons.  Subject to the Act, for the purpose of this Bye-law, legal personal representative means the executor or administrator of a deceased Member or such other person as the Board may, in its absolute discretion, decide as being properly authorised to deal with the shares of a deceased Member.

12.2   Any person becoming entitled to a share in consequence of the death or bankruptcy of any Member may be registered as a Member upon such evidence as the Board may deem sufficient or may elect to nominate some person to be registered as a transferee of such share, and in such case the person becoming entitled shall execute in favour of such nominee an instrument of transfer in writing in the form, or as near thereto as circumstances admit, of the following:

Transfer by a Person Becoming Entitled<br>
on Death/Bankruptcy of a Member<br>
Lightsquared Bermuda Ltd. (the "Company")

I/We, having become entitled in consequence of the [death/bankruptcy] of [name and address of deceased/bankrupt Member] to [number] share(s) standing in the Register of Members of the Company in the name of the said [name of deceased/bankrupt Member] instead of being registered myself/ourselves, elect to have [name of transferee] (the "Transferee") registered as a transferee of such share(s) and I/we do hereby accordingly transfer the said share(s) to the Transferee to hold the same unto the Transferee, his or her executors, administrators and assigns, subject to the conditions on which the same were held at the time of the execution hereof; and the Transferee does hereby agree to take the said share(s) subject to the same conditions.

**Lightsquared Bermuda Ltd.**

DATED this [date]

Signed by:                          In the presence of:


_____            _____
Transferor                         Witness


Signed by:                          In the presence of:


_____            _____
Transferee                         Witness

12.3    On the presentation of the foregoing materials to the Board, accompanied by such evidence as the Board may require to prove the title of the transferor, the transferee shall be registered as a Member.  Notwithstanding the foregoing, the Board shall, in any case, have the same right to decline or suspend registration as it would have had in the case of a transfer of the share by that Member before such Member's death or bankruptcy, as the case may be.

12.4    Where two or more persons are registered as joint holders of a share or shares, then in the event of the death of any joint holder or holders the remaining joint holder or holders shall be absolutely entitled to such share or shares and the Company shall recognise no claim in respect of the estate of any joint holder except in the case of the last survivor of such joint holders.

## ALTERATION OF SHARE CAPITAL

**13.    Power to Alter Capital**

13.1    The Company may if authorised by resolution of the Members increase, divide, consolidate, subdivide, change the currency denomination of, diminish or otherwise alter or reduce its share capital in any manner permitted by the Act.

13.2    Where, on any alteration or reduction of share capital, fractions of shares or some other difficulty would arise, the Board may deal with or resolve the same in such manner as it thinks fit.

**14.    Variation of Rights Attaching to Shares**

If, at any time, the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound-up, be varied with the consent in writing of the holders of three-fourths of the issued shares of that class or with the sanction of a resolution passed by a majority of the votes cast at a separate general

**Lightsquared Bermuda Ltd.**

meeting of the holders of the shares of the class at which meeting the necessary quorum shall be two persons at least holding or representing by proxy one-third of the issued shares of the class.  The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking *pari passu* therewith.

## DIVIDENDS AND CAPITALISATION

### 15.    Dividends

15.1    The Board may, subject to these Bye-laws and in accordance with the Act, declare a dividend to be paid to the Members, in proportion to the number of shares held by them, and such dividend may be paid in cash or wholly or partly in specie in which case the Board may fix the value for distribution in specie of any assets. No unpaid dividend shall bear interest as against the Company.

15.2    The Board may fix any date as the record date for determining the Members entitled to receive any dividend.

15.3    The Company may pay dividends in proportion to the amount paid up on each share where a larger amount is paid up on some shares than on others.

15.4    The Board may declare and make such other distributions (in cash or in specie) to the Members as may be lawfully made out of the assets of the Company.  No unpaid distribution shall bear interest as against the Company.

### 16.    Power to Set Aside Profits

The Board may, before declaring a dividend, set aside out of the surplus or profits of the Company, such amount as it thinks proper as a reserve to be used to meet contingencies or for equalising dividends or for any other purpose.

### 17.    Method of Payment

17.1    Any dividend, interest, or other monies payable in cash in respect of the shares may be paid by cheque or draft sent through the post directed to the Member at such Member's address in the Register of Members, or to such person and to such address as the holder may in writing direct.

17.2    In the case of joint holders of shares, any dividend, interest or other monies payable in cash in respect of shares may be paid by cheque or draft sent through the post directed to the address of the holder first named in the Register of Members, or to such person and to such address as the joint holders may in writing direct.  If two or more persons are registered as joint holders of any shares

10

**Lightsquared Bermuda Ltd.**

any one can give an effectual receipt for any dividend paid in respect of such shares.

17.3    The Board may deduct from the dividends or distributions payable to any Member all monies due from such Member to the Company on account of calls or otherwise.

## 18.    Capitalisation

18.1    The Board may capitalise any amount for the time being standing to the credit of any of the Company's share premium or other reserve accounts or to the credit of the profit and loss account or otherwise available for distribution by applying such amount in paying up unissued shares to be allotted as fully paid bonus shares pro rata to the Members.

18.2    The Board may capitalise any amount for the time being standing to the credit of a reserve account or amounts otherwise available for dividend or distribution by applying such amounts in paying up in full, partly or nil paid shares of those Members who would have been entitled to such amounts if they were distributed by way of dividend or distribution.

## MEETINGS OF MEMBERS

## 19.    Annual General Meetings

Subject to an election made by the Company in accordance with the Act to dispense with the holding of annual general meetings, an annual general meeting shall be held in each year (other than the year of incorporation) at such time and place as the President or the Chairman (if any) or any two Directors or any Director and the Secretary or the Board shall appoint.

## 20.    Special General Meetings

The President or the Chairman (if any) or any two Directors or any Director and the Secretary or the Board may convene a special general meeting whenever in their judgment such a meeting is necessary.

## 21.    Requisitioned General Meetings

The Board shall, on the requisition of Members holding at the date of the deposit of the requisition not less than one-tenth of such of the paid-up share capital of the Company as at the date of the deposit carries the right to vote at general meetings, forthwith proceed to convene a special general meeting and the provisions of the Act shall apply.

**Lightsquared Bermuda Ltd.**

## 22.    Notice

22.1    At least five days' notice of an annual general meeting shall be given to each Member entitled to attend and vote thereat, stating the date, place and time at which the meeting is to be held, that the election of Directors will take place thereat, and as far as practicable, the other business to be conducted at the meeting.

22.2    At least five days' notice of a special general meeting shall be given to each Member entitled to attend and vote thereat, stating the date, time, place and the general nature of the business to be considered at the meeting.

22.3    The Board may fix any date as the record date for determining the Members entitled to receive notice of and to vote at any general meeting.

22.4    A general meeting shall, notwithstanding that it is called on shorter notice than that specified in these Bye-laws, be deemed to have been properly called if it is so agreed by (i) all the Members entitled to attend and vote thereat in the case of an annual general meeting; and (ii) by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than 95% in nominal value of the shares giving a right to attend and vote thereat in the case of a special general meeting.

22.5    The accidental omission to give notice of a general meeting to, or the non-receipt of a notice of a general meeting by, any person entitled to receive notice shall not invalidate the proceedings at that meeting.

## 23.    Giving Notice and Access

23.1    A notice may be given by the Company to a Member:

(a)    by delivering it to such Member in person, in which case the notice shall be deemed to have been served upon such delivery; or

(b)    by sending it by post to such Member's address in the Register of Members, in which case the notice shall be deemed to have been served seven days after the date on which it is deposited, with postage prepaid, in the mail; or

(c)    by sending it by courier to such Member's address in the Register of Members, in which case the notice shall be deemed to have been served two days after the date on which it is deposited, with courier fees paid, with the courier service; or

(d)    by transmitting it by electronic means (including facsimile and electronic mail, but not telephone) in accordance with such directions as may be

**Lightsquared Bermuda Ltd.**

given by such Member to the Company for such purpose, in which case the notice shall be deemed to have been served at the time that it would in the ordinary course be transmitted; or

(e)     by delivering it in accordance with the provisions of the Act pertaining to delivery of electronic records by publication on a website, in which case the notice shall be deemed to have been served at the time when the requirements of the Act in that regard have been met.

23.2    Any notice required to be given to a Member shall, with respect to any shares held jointly by two or more persons, be given to whichever of such persons is named first in the Register of Members and notice so given shall be sufficient notice to all the holders of such shares.

23.3    In proving service under paragraphs 23.1(b), (c) and (d), it shall be sufficient to prove that the notice was properly addressed and prepaid, if posted or sent by courier, and the time when it was posted, deposited with the courier, or transmitted by electronic means.

## 24.    Postponement of General Meeting

The Secretary may postpone any general meeting called in accordance with these Bye-laws (other than a meeting requisitioned under these Bye-laws) provided that notice of postponement is given to the Members before the time for such meeting. Fresh notice of the date, time and place for the postponed meeting shall be given to each Member in accordance with these Bye-laws.

## 25.    Electronic Participation in Meetings

Members may participate in any general meeting by such telephonic, electronic or other communication facilities or means as permit all persons participating in the meeting to communicate with each other simultaneously and instantaneously, and participation in such a meeting shall constitute presence in person at such meeting.

## 26.    Quorum at General Meetings

26.1    At any general meeting two or more persons present in person and representing in person or by proxy in excess of 50% of the total issued voting shares in the Company throughout the meeting shall form a quorum for the transaction of business, provided that if the Company shall at any time have only one Member, one Member present in person or by proxy shall form a quorum for the transaction of business at any general meeting held during such time.

26.2    If within half an hour from the time appointed for the meeting a quorum is not present, then, in the case of a meeting convened on a requisition, the meeting shall be deemed cancelled and, in any other case, the meeting shall stand adjourned to

**Lightsquared Bermuda Ltd.**

the same day one week later, at the same time and place or to such other day, time or place as the Secretary may determine. Unless the meeting is adjourned to a specific date, time and place announced at the meeting being adjourned, fresh notice of the resumption of the meeting shall be given to each Member entitled to attend and vote thereat in accordance with these Bye-laws.

## 27.    Chairman to Preside at General Meetings

Unless otherwise agreed by a majority of those attending and entitled to vote thereat, the Chairman, if there be one and if not the President, if there be one, shall act as chairman at all general meetings at which such person is present. In their absence a chairman shall be appointed or elected by those present at the meeting and entitled to vote.

## 28.    Voting on Resolutions

28.1    Subject to the Act and these Bye-laws, any question proposed for the consideration of the Members at any general meeting shall be decided by the affirmative votes of a majority of the votes cast in accordance with these Bye-laws and in the case of an equality of votes the resolution shall fail.

28.2    No Member shall be entitled to vote at a general meeting unless such Member has paid all the calls on all shares held by such Member.

28.3    At any general meeting a resolution put to the vote of the meeting shall, in the first instance, be voted upon by a show of hands and, subject to any rights or restrictions for the time being lawfully attached to any class of shares and subject to these Bye-laws, every Member present in person and every person holding a valid proxy at such meeting shall be entitled to one vote and shall cast such vote by raising his hand.

28.4    In the event that a Member participates in a general meeting by telephone, electronic or other communication facilities or means, the chairman of the meeting shall direct the manner in which such Member may cast his vote on a show of hands.

28.5    At any general meeting if an amendment is proposed to any resolution under consideration and the chairman of the meeting rules on whether or not the proposed amendment is out of order, the proceedings on the substantive resolution shall not be invalidated by any error in such ruling.

28.6    At any general meeting a declaration by the chairman of the meeting that a question proposed for consideration has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in a book containing the minutes of the proceedings of the Company shall, subject to these Bye-laws, be conclusive evidence of that fact.

**Lightsquared Bermuda Ltd.**

### 29.    Power to Demand a Vote on a Poll

29.1    Notwithstanding the foregoing, a poll may be demanded by any of the following persons:

(a)    the chairman of such meeting; or

(b)    at least three Members present in person or represented by proxy; or

(c)    any Member or Members present in person or represented by proxy and holding between them not less than one-tenth of the total voting rights of all the Members having the right to vote at such meeting; or

(d)    any Member or Members present in person or represented by proxy holding shares in the Company conferring the right to vote at such meeting, being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total amount paid up on all such shares conferring such right.

29.2    Where a poll is demanded, subject to any rights or restrictions for the time being lawfully attached to any class of shares, every person present at such meeting shall have one vote for each share of which such person is the holder or for which such person holds a proxy and such vote shall be counted by ballot as described herein, or in the case of a general meeting at which one or more Members are present by telephone, electronic or other communication facilities or means, in such manner as the chairman of the meeting may direct and the result of such poll shall be deemed to be the resolution of the meeting at which the poll was demanded and shall replace any previous resolution upon the same matter which has been the subject of a show of hands.  A person entitled to more than one vote need not use all his votes or cast all the votes he uses in the same way.

29.3    A poll demanded for the purpose of electing a chairman of the meeting or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time and in such manner during such meeting as the chairman (or acting chairman) of the meeting may direct.  Any business other than that upon which a poll has been demanded may be conducted pending the taking of the poll.

29.4    Where a vote is taken by poll, each person physically present and entitled to vote shall be furnished with a ballot paper on which such person shall record his vote in such manner as shall be determined at the meeting having regard to the nature of the question on which the vote is taken, and each ballot paper shall be signed or initialled or otherwise marked so as to identify the voter and the registered holder in the case of a proxy.  Each person present by telephone, electronic or other communication facilities or means shall cast his vote in such manner as the chairman shall direct.  At the conclusion of the poll, the ballot papers and votes

15

**Lightsquared Bermuda Ltd.**

cast in accordance with such directions shall be examined and counted by a committee of not less than two Members or proxy holders appointed by the chairman for the purpose and the result of the poll shall be declared by the chairman.

### 30.    Voting by Joint Holders of Shares

In the case of joint holders, the vote of the senior who tenders a vote (whether in person or by proxy) shall be accepted to the exclusion of the votes of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members.

### 31.    Instrument of Proxy

31.1    An instrument appointing a proxy shall be in writing in substantially the following form or such other form as the chairman of the meeting shall accept:

Proxy
Lightsquared Bermuda Ltd. (the "Company")

I/We, [insert names here], being a Member of the Company with [number] shares, HEREBY APPOINT [name] of [address] or failing him, [name] of [address] to be my/our proxy to vote for me/us at the meeting of the Members to be held on [date] and at any adjournment thereof.    [Any restrictions on voting to be inserted here.]

Signed this [date]

_____
Member(s)

31.2    The instrument appointing a proxy must be received by the Company at the registered office or at such other place or in such manner as is specified in the notice convening the meeting or in any instrument of proxy sent out by the Company in relation to the meeting at which the person named in the instrument appointing a proxy proposes to vote, and an instrument appointing a proxy which is not received in the manner so prescribed shall be invalid.

31.3    A Member who is the holder of two or more shares may appoint more than one proxy to represent him and vote on his behalf in respect of different shares.

31.4    The decision of the chairman of any general meeting as to the validity of any appointment of a proxy shall be final.

**Lightsquared Bermuda Ltd.**

### 32.    Representation of Corporate Member

32.1    A corporation which is a Member may, by written instrument, authorise such person or persons as it thinks fit to act as its representative at any meeting and any person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as that corporation could exercise if it were an individual Member, and that Member shall be deemed to be present in person at any such meeting attended by its authorised representative or

32.2    Notwithstanding the foregoing, the chairman of the meeting may accept such assurances as he thinks fit as to the right of any person to attend and vote at general meetings on behalf of a corporation which is a Member.

### 33.    Adjournment of General Meeting

The chairman of a general meeting may, with the consent of the Members at any general meeting at which a quorum is present, and shall if so directed by the meeting, adjourn the meeting.  Unless the meeting is adjourned to a specific date, place and time announced at the meeting being adjourned, fresh notice of the date, place and time for the resumption of the adjourned meeting shall be given to each Member entitled to attend and vote threat in accordance with these Bye-laws.

### 34.    Written Resolutions

34.1    Subject to these Bye-laws, anything which may be done by resolution of the Company in general meeting or by resolution of a meeting of any class of the Members may be done without a meeting by written resolution in accordance with this Bye-law.

34.2    Notice of a written resolution shall be given, and a copy of the resolution shall be circulated to all Members who would be entitled to attend a meeting and vote thereon.  The accidental omission to give notice to, or the non-receipt of a notice by, any Member does not invalidate the passing of a resolution.

34.3    A written resolution is passed when it is signed by (or in the case of a Member that is a corporation, on behalf of) the Members who at the date that the notice is given represent such majority of votes as would be required if the resolution was voted on at a meeting of Members at which all Members entitled to attend and vote threat were present and voting.

34.4    A resolution in writing may be signed in any number of counterparts.

34.5    A resolution in writing made in accordance with this Bye-law is as valid as if it had been passed by the Company in general meeting or by a meeting of the relevant class of Members, as the case may be, and any reference in any Bye-law

**Lightsquared Bermuda Ltd.**

to a meeting at which a resolution is passed or to Members voting in favour of a resolution shall be construed accordingly.

34.6   A resolution in writing made in accordance with this Bye-law shall constitute minutes for the purposes of the Act.

34.7   This Bye-law shall not apply to:

   (a)   a resolution passed to remove an Auditor from office before the expiration of his term of office; or

   (b)   a resolution passed for the purpose of removing a Director before the expiration of his term of office.

34.8   For the purposes of this Bye-law, the effective date of the resolution is the date when the resolution is signed by (or in the case of a Member that is a corporation, on behalf of) the last Member whose signature results in the necessary voting majority being achieved and any reference in any Bye-law to the date of passing of a resolution is, in relation to a resolution made in accordance with this Bye-law, a reference to such date.

## 35.   Directors Attendance at General Meetings

The Directors shall be entitled to receive notice of, attend and be heard at any general meeting.

## DIRECTORS AND OFFICERS

## 36.   Election of Directors

36.1   The Board shall be elected or appointed in the first place at the statutory meeting of the Company and thereafter, except in the case of a casual vacancy, at the annual general meeting or at any special general meeting called for that purpose.

36.2   At any general meeting the Members may authorise the Board to fill any vacancy in their number left unfilled at a general meeting.

## 37.   Number of Directors

The Board shall consist of not less than one Director or such number in excess thereof as the Members may determine.

## 38.   Term of Office of Directors

Directors shall hold office for such term as the Members may determine or, in the absence of such determination, until the next annual general meeting or until their successors are elected or appointed or their office is otherwise vacated.

**Lightsquared Bermuda Ltd.**

---

### 39.    Alternate Directors

39.1    At any general meeting, the Members may elect a person or persons to act as a Director in the alternative to any one or more Directors or may authorise the Board to appoint such Alternate Directors.

39.2    Unless the Members otherwise resolve, any Director may appoint a person or persons to act as a Director in the alternative to himself by notice deposited with the Secretary.

39.3    Any person elected or appointed pursuant to this Bye-law shall have all the rights and powers of the Director or Directors for whom such person is elected or appointed in the alternative, provided that such person shall not be counted more than once in determining whether or not a quorum is present.

39.4    An Alternate Director shall be entitled to receive notice of all Board meetings and to attend and vote at any such meeting at which a Director for whom such Alternate Director was appointed in the alternative is not personally present and generally to perform at such meeting all the functions of such Director for whom such Alternate Director was appointed.

39.5    An Alternate Director's office shall terminate –

(a)    in the case of an alternate elected by the Members:

(i)    on the occurrence in relation to the Alternate Director of any event which, if it occurred in relation to the Director for whom he was elected to act, would result in the termination of that Director; or

(ii)    if the Director for whom he was elected in the alternative ceases for any reason to be a Director, provided that the alternate removed in these circumstances may be re-appointed by the Board as an alternate to the person appointed to fill the vacancy; and

(b)    in the case of an alternate appointed by a Director:

(i)    on the occurrence in relation to the Alternate Director of any event which, if it occurred in relation to his appointor, would result in the termination of the appointor's directorship; or

(ii)    when the Alternate Director's appointor revokes the appointment by notice to the Company in writing specifying when the appointment is to terminate; or

(iii)    if the Alternate Director's appointor ceases for any reason to be a Director.

**Lightsquared Bermuda Ltd.**

### 40.   Removal of Directors

40.1   Subject to any provision to the contrary in these Bye-laws, the Members entitled to vote for the election of Directors may, at any special general meeting convened and held in accordance with these Bye-laws, remove a Director provided that the notice of any such meeting convened for the purpose of removing a Director shall contain a statement of the intention so to do and be served on such Director not less than 14 days before the meeting and at such meeting the Director shall be entitled to be heard on the motion for such Director's removal.

40.2   If a Director is removed from the Board under this Bye-law the Members may fill the vacancy at the meeting at which such Director is removed.  In the absence of such election or appointment, the Board may fill the vacancy.

### 41.   Vacancy in the Office of Director

41.1   The office of Director shall be vacated if the Director:

(a)   is removed from office pursuant to these Bye-laws or is prohibited from being a Director by law;

(b)   is or becomes bankrupt, or makes any arrangement or composition with his creditors generally;

(c)   is or becomes of unsound mind or dies; or

(d)   resigns his office by notice to the Company.

41.2   The Board shall have the power to appoint any person as a Director to fill a vacancy on the Board occurring as a result of the death, disability, disqualification or resignation of any Director and to appoint an Alternate Director to any Director so appointed.

### 42.   Remuneration of Directors

The remuneration (if any) of the Directors shall be determined by the Company in general meeting and shall be deemed to accrue from day to day.  The Directors may also be paid all travel, hotel and other expenses properly incurred by them (or in the case of a director that is a corporation, by its representative or representatives) in attending and returning from the Board meetings, any committee appointed by the Board, general meetings, or in connection with the business of the Company or their duties as Directors generally.

**Lightsquared Bermuda Ltd.**

### 43.    Defect in Appointment

All acts done in good faith by the Board, any Director, a member of a committee appointed by the Board, any person to whom the Board may have delegated any of its powers, or any person acting as a Director shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or person acting as aforesaid, or that he was, or any of them were, disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director or act in the relevant capacity.

### 44.    Directors to Manage Business

The business of the Company shall be managed and conducted by the Board.  In managing the business of the Company, the Board may exercise all such powers of the Company as are not, by the Act or by these Bye-laws, required to be exercised by the Company in general meeting.

### 45.    Powers of the Board of Directors

The Board may:

(a)    appoint, suspend, or remove any manager, secretary, clerk, agent or employee of the Company and may fix their remuneration and determine their duties;

(b)    exercise all the powers of the Company to borrow money and to mortgage or charge or otherwise grant a security interest in its undertaking, property and uncalled capital, or any part thereof, and may issue debentures, debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or any third party;

(c)    appoint one or more Directors to the office of managing director or chief executive officer of the Company, who shall, subject to the control of the Board, supervise and administer all of the general business and affairs of the Company;

(d)    appoint a person to act as manager of the Company's day-to-day business and may entrust to and confer upon such manager such powers and duties as it deems appropriate for the transaction or conduct of such business;

(e)    by power of attorney, appoint any company, firm, person or body of persons, whether nominated directly or indirectly by the Board, to be an attorney of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Board) and for such period and subject to such conditions as it may think fit and any such power of attorney may contain such provisions for

**Lightsquared Bermuda Ltd.**

the protection and convenience of persons dealing with any such attorney as the Board may think fit and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions so vested in the attorney;

(f)     procure that the Company pays all expenses incurred in promoting and incorporating the Company;

(g)     delegate any of its powers (including the power to sub-delegate) to a committee of one or more persons appointed by the Board which may consist partly or entirely of non-Directors, provided that every such committee shall conform to such directions as the Board shall impose on them and provided further that the meetings and proceedings of any such committee shall be governed by the provisions of these Bye-laws regulating the meetings and proceedings of the Board, so far as the same are applicable and are not superseded by directions imposed by the Board;

(h)     delegate any of its powers (including the power to sub-delegate) to any person on such terms and in such manner as the Board may see fit;

(i)     present any petition and make any application in connection with the liquidation or reorganisation of the Company;

(j)     in connection with the issue of any share, pay such commission and brokerage as may be permitted by law; and

(k)     authorise any company, firm, person or body of persons to act on behalf of the Company for any specific purpose and in connection therewith to execute any deed, agreement, document or instrument on behalf of the Company.

## 46.     Register of Directors and Officers

The Board shall cause to be kept in one or more books at the registered office of the Company a Register of Directors and Officers and shall enter therein the particulars required by the Act.

## 47.     Appointment of Officers

The Board may appoint such Officers (who may or may not be Directors) as the Board may determine for such terms as the Board deems fit.

## 48.     Appointment of Secretary

The Secretary shall be appointed by the Board from time to time for such term as the Board deems fit.

**Lightsquared Bermuda Ltd.**

### 49.    Duties of Officers

The Officers shall have such powers and perform such duties in the management, business and affairs of the Company as may be delegated to them by the Board from time to time.

### 50.    Remuneration of Officers

The Officers shall receive such remuneration as the Board may determine.

### 51.    Conflicts of Interest

51.1    Any Director, or any Director's firm, partner or any company with whom any Director is associated, may act in any capacity for, be employed by or render services to the Company on such terms, including with respect to remuneration, as may be agreed between the parties.  Nothing herein contained shall authorise a Director or a Director's firm, partner or company to act as Auditor to the Company.

51.2    A Director who is directly or indirectly interested in a contract or proposed contract with the Company (an "Interested Director") shall declare the nature of such interest as required by the Act.

51.3    An Interested Director who has complied with the requirements of the foregoing Bye-law may:

(a)    vote in respect such contract or proposed contract; and/or

(b)    be counted in the quorum for the meeting at which the contract or proposed contract is to be voted on,

and no such contract or proposed contract shall be void or voidable by reason only that the Interested Director voted on it or was counted in the quorum of the relevant meeting and the Interested Director shall not be liable to account to the Company for any profit realised thereby.

### 52.    Indemnification and Exculpation

52.1    The current or former Directors, Resident Representative, Secretary and other Officers (such term to include any person appointed to any committee by the Board), employees and agents acting in relation to any of the affairs of the Company or any subsidiary thereof and the liquidator or trustees (if any) acting in relation to any of the affairs of the Company or any subsidiary thereof and every one of them (whether for the time being or formerly), and their heirs, executors and administrators (each of which is referred to herein as an "indemnified party"), shall be indemnified and secured harmless out of the assets of the Company from

23

**Lightsquared Bermuda Ltd.**

and against all actions, costs, charges, losses, damages and expenses which they or any of them, their heirs, executors or administrators, shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty, or supposed duty, or in their respective offices or trusts, and no indemnified party shall be answerable for the acts, receipts, neglects or defaults of the others of them or for joining in any receipts for the sake of conformity, or for any bankers or other persons with whom any monies or effects belonging to the Company shall or may be lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any monies of or belonging to the Company shall be placed out on or invested, or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts, or in relation thereto, PROVIDED THAT this indemnity shall not extend to any matter in respect of any fraud or dishonesty in relation to the Company which may attach to any of the indemnified parties.  Each Member agrees to waive any claim or right of action such Member might have, whether individually or by or in the right of the Company, against any indemnified party on account of any action taken by such indemnified party, or the failure of such indemnified party to take any action in the performance of his duties with or for the Company or any subsidiary thereof, PROVIDED THAT such waiver shall not extend to any matter in respect of any fraud or dishonesty in relation to the Company which may attach to such indemnified party.

52.2    The Company may purchase and maintain insurance for the benefit of any indemnified party against any liability incurred by him under the Act in his capacity as a indemnified party or indemnifying such indemnified party in respect of any loss arising or liability attaching to him by virtue of any rule of law in respect of any negligence, default, breach of duty or breach of trust of which the indemnified party may be guilty in relation to the Company or any subsidiary thereof.

52.3    The Company may advance monies to an indemnified party for the costs, charges, fines, judgments and expenses incurred by such indemnified party in defending any civil or criminal proceedings against him, on condition that such indemnified party shall repay the advance if any allegation of fraud or dishonesty in relation to the Company is proved against him.

52.4    Neither the amendment, alteration nor repeal of this Bye-law 52, nor, to the fullest extent permitted by applicable law, any modification of law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of, or related to any event, act or omission that occurred prior, or at any time subsequent to, the time of such amendment, alteration, repeal or modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

**Lightsquared Bermuda Ltd.**

## MEETINGS OF THE BOARD OF DIRECTORS

### 53.    Board Meetings

The Board may meet for the transaction of business, adjourn and otherwise regulate its meetings as it sees fit.  A resolution put to the vote at a Board meeting shall be carried by the affirmative votes of a majority of the votes cast and in the case of an equality of votes the resolution shall fail.

### 54.    Notice of Board Meetings

A Director may, and the Secretary on the requisition of a Director shall, at any time summon a Board meeting.  Notice of a Board meeting shall be deemed to be duly given to a Director if it is given to such Director verbally (including in person or by telephone) or otherwise communicated or sent to such Director by post, electronic means or other mode of representing words in a visible form at such Director's last known address or in accordance with any other instructions given by such Director to the Company for this purpose.

### 55.    Electronic Participation in Meetings

Directors may participate in any meeting by such telephonic, electronic or other communication facilities or means as permit all persons participating in the meeting to communicate with each other simultaneously and instantaneously, and participation in such a meeting shall constitute presence in person at such meeting.

### 56.    Representation of Corporate Director

56.1    A Director which is a corporation may, by written instrument, authorise such person or persons as it thinks fit to act as its representative at any meeting and any person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as that corporation could exercise if it were an individual Director, and that Director shall be deemed to be present in person at any such meeting attended by its authorised representative or representatives.

56.2    Notwithstanding the foregoing, the chairman of the meeting may accept such assurances as he thinks fit as to the right of any person to attend and vote at Board meetings on behalf of a corporation which is a Director.

### 57.    Quorum at Board Meetings

The quorum necessary for the transaction of business at a Board meeting shall be two Directors, provided that if there is only one Director for the time being in office the quorum shall be one.

**Lightsquared Bermuda Ltd.**

---

### 58.    Board to Continue in the Event of Vacancy

The Board may act notwithstanding any vacancy in its number but, if and so long as its number is reduced below the number fixed by these Bye-laws as the quorum necessary for the transaction of business at Board meetings, the continuing Directors or Director may act for the purpose of (i) summoning a general meeting; or (ii) preserving the assets of the Company.

### 59.    Chairman to Preside

Unless otherwise agreed by a majority of the Directors attending, the Chairman, if there be one, and if not, the President, if there be one, shall act as chairman at all Board meetings at which such person is present.  In their absence a chairman shall be appointed or elected by the Directors present at the meeting.

### 60.    Written Resolutions

A resolution signed by (or in the case of a Director that is a corporation, on behalf of) all the Directors, which may be in counterparts, shall be as valid as if it had been passed at a Board meeting duly called and constituted, such resolution to be effective on the date on which the resolution is signed by (or in the case of a Director that is a corporation, on behalf of) the last Director.  For the purposes of this Bye-law only, "the Directors" shall not include an Alternate Director.

### 61.    Validity of Prior Acts of the Board

No regulation or alteration to these Bye-laws made by the Company in general meeting shall invalidate any prior act of the Board which would have been valid if that regulation or alteration had not been made.

## CORPORATE RECORDS

### 62.    Minutes

The Board shall cause minutes to be duly entered in books provided for the purpose:

(a)    of all elections and appointments of Officers;

(b)    of the names of the Directors present at each Board meeting and of any committee appointed by the Board; and

(c)    of all resolutions and proceedings of general meetings of the Members, Board meetings, meetings of managers and meetings of committees appointed by the Board.

**Lightsquared Bermuda Ltd.**

---

### 63.    Place Where Corporate Records Kept

Minutes prepared in accordance with the Act and these Bye-laws shall be kept by the Secretary at the registered office of the Company.

### 64.    Form and Use of Seal

64.1    The Company may adopt a seal in such form as the Board may determine.  The Board may adopt one or more duplicate seals for use in or outside Bermuda.

64.2    A seal may, but need not, be affixed to any deed, instrument or document, and if the seal is to be affixed thereto, it shall be attested by the signature of (i) any Director, or (ii) any Officer, or (iii) the Secretary, or (iv) any person authorised by the Board for that purpose.

64.3    A Resident Representative may, but need not, affix the seal of the Company to certify the authenticity of any copies of documents.

## ACCOUNTS

### 65.    Records of Account

65.1    The Board shall cause to be kept proper records of account with respect to all transactions of the Company and in particular with respect to:

(a)    all amounts of money received and expended by the Company and the matters in respect of which the receipt and expenditure relates;

(b)    all sales and purchases of goods by the Company; and

(c)    all assets and liabilities of the Company.

65.2    Such records of account shall be kept at the registered office of the Company or, subject to the Act, at such other place as the Board thinks fit and shall be available for inspection by the Directors during normal business hours.

65.3    Such records of account shall be retained for a minimum period of five years from the date on which they are prepared.

### 66.    Financial Year End

The financial year end of the Company may be determined by resolution of the Board and failing such resolution shall be 31st December in each year.

**Lightsquared Bermuda Ltd.**

---

## AUDITS

### 67.    Annual Audit

Subject to any rights to waive laying of accounts or appointment of an Auditor pursuant to the Act, the accounts of the Company shall be audited at least once in every year.

### 68.    Appointment of Auditor

68.1    Subject to the Act, the Members shall appoint an auditor to the Company to hold office for such term as the Members deem fit or until a successor is appointed.

68.2    The Auditor may be a Member but no Director, Officer or employee of the Company shall, during his continuance in office, be eligible to act as an Auditor of the Company.

### 69.    Remuneration of Auditor

69.1    The remuneration of an Auditor appointed by the Members shall be fixed by the Company in general meeting or in such manner as the Members may determine.

69.2    The remuneration of an Auditor appointed by the Board to fill a casual vacancy in accordance with these Bye-laws shall be fixed by the Board.

### 70.    Duties of Auditor

70.1    The financial statements provided for by these Bye-laws shall be audited by the Auditor in accordance with generally accepted auditing standards.  The Auditor shall make a written report thereon in accordance with generally accepted auditing standards.

70.2    The generally accepted auditing standards referred to in this Bye-law may be those of a country or jurisdiction other than Bermuda or such other generally accepted auditing standards as may be provided for in the Act.  If so, the financial statements and the report of the Auditor shall identify the generally accepted auditing standards used.

### 71.    Access to Records

The Auditor shall at all reasonable times have access to all books kept by the Company and to all accounts and vouchers relating thereto, and the Auditor may call on the Directors or Officers for any information in their possession relating to the books or affairs of the Company.

**Lightsquared Bermuda Ltd.**

---

72. **Financial Statements and the Auditor's Report**

72.1    Subject to the following bye-law, the financial statements and/or the auditor's report as required by the Act shall

    (a)    be laid before the Members at the annual general meeting; or

    (b)    be received, accepted, adopted, approved or otherwise acknowledged by the Members by written resolution passed in accordance with these Bye-laws; or

    (c)    in circumstances where the Company has elected to dispense with the holding of an annual general meeting, be made available to the Members in accordance with the Act in such manner as the Board shall determine.

72.2    If all Members and Directors shall agree, either in writing or at a meeting, that in respect of a particular interval no financial statements and/or auditor's report thereon need be made available to the Members, and/or that no auditor shall be appointed then there shall be no obligation on the Company to do so.

73. **Vacancy in the Office of Auditor**

The Board may fill any casual vacancy in the office of the auditor.

## VOLUNTARY WINDING-UP AND DISSOLUTION

74. **Winding-Up**

If the Company shall be wound up the liquidator may, with the sanction of a resolution of the Members, divide amongst the Members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Members or different classes of Members.  The liquidator may, with the like sanction, vest the whole or any part of such assets in the trustees upon such trusts for the benefit of the Members as the liquidator shall think fit, but so that no Member shall be compelled to accept any shares or other securities or assets whereon there is any liability.

## CHANGES TO CONSTITUTION

75. **Changes to Bye-laws**

No Bye-law may be rescinded, altered or amended and no new Bye-law may be made save in accordance with the Act and until the same has been approved by a resolution of the Board and by a resolution of the Members.

**Lightsquared Bermuda Ltd.**

---

### 76.    Changes to the Memorandum of Association

No alteration or amendment to the Memorandum of Association may be made save in accordance with the Act and until same has been approved by a resolution of the Board and by a resolution of the Members.

### 77.    Discontinuance

The Board may exercise all the powers of the Company to discontinue the Company to a jurisdiction outside Bermuda pursuant to the Act.

**Amended and Restated**

**Bylaws Of**

**LightSquared Finance Co.**

**A Delaware Corporation**

**PREAMBLE**

These Amended and Restated Bylaws are subject to, and governed by, the General Corporation Law of the State of Delaware (the "Delaware General Corporation Law") and the amended and restated certificate of incorporation (the "Certificate") of LightSquared Finance Co., a Delaware corporation (the "Corporation"). In the event of a direct conflict between the provisions of these Amended and Restated Bylaws and the mandatory provisions of the Delaware General Corporation Law or the provisions of the Certificate, such provisions of the Delaware General Corporation Law or the Certificate, as the case may be, will be controlling.

## ARTICLE I. OFFICES

1.1    Registered Office.  The registered office of the Corporation shall be established and maintained at the location of the registered agent of the Corporation.

1.2    Principal Office.  The principal office of the Corporation is located at 10802 Parkridge Boulevard, Reston, VA 20191.  The Corporation may have such other offices, either within or without the State of Delaware, as the business of the Corporation may require from time to time.

## ARTICLE II. MEETINGS OF STOCKHOLDERS

2.1    Annual Meeting.  An annual meeting of stockholders of the Corporation shall be held at such place, on such date, and at such time as the board of directors of the Corporation (the "Board") shall each year fix.  At such meeting, the stockholders shall elect directors and transact such other business as may properly be brought before the meeting.

2.2    Special Meetings.  Except as otherwise required by law, a special meeting of the stockholders of the Corporation may be called at any time by the stockholders holding a majority of the voting power of the Corporation or a majority of the Board.  A special meeting shall be held on such date and at such time as shall be designated by the person(s) calling the meeting and stated in the notice of the meeting or in a duly executed waiver of notice of such meeting.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting or in a duly executed waiver of notice of such meeting.

2.3    Place of Meetings.  An annual meeting of stockholders may be held at any place within or outside the State of Delaware, as designated by the Board.  A special meeting of stockholders may be held at any place within or outside the State of Delaware, as designated in the notice of the meeting or a duly executed waiver of notice of such meeting.  Meetings of

stockholders shall be held at the principal office of the Corporation unless another place is designated for meetings in the manner provided herein.

2.4    Notice of Meetings.  Written or printed notice stating the place, day, and time of each meeting of the stockholders and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be delivered pursuant to Section 9.1 not less than ten (10) nor more than 60 (sixty) days before the date of the meeting, by or at the direction of the President, the Secretary, or the officer or person(s) calling the meeting, to each stockholder of record entitled to vote at such meeting.  Notice of any meeting of stockholders shall not be required to be given to any stockholder who shall attend such meeting in person or by proxy and shall not, at the beginning of such meeting, object to the transaction of any business because the meeting is not lawfully called or convened, or who shall, either before or after the meeting, submit a signed waiver of notice, in person or by proxy.

2.5    Voting Lists.  At least ten (10) days before each meeting of stockholders, the Secretary or other officer of the Corporation who has charge of the Corporation's stock ledger, either directly or through another officer appointed by him or through a transfer agent appointed by the Board, shall prepare a complete list of stockholders entitled to vote thereat, arranged in alphabetical order and showing the address of each stockholder and number of shares registered in the name of each stockholder.  For a period of ten (10) days prior to such meeting, such list shall be kept on file at a place within the city where the meeting is to be held, which place shall be specified in the notice of meeting or a duly executed waiver of notice of such meeting or, if not so specified, at the place where the meeting is to be held and shall be open to examination by any stockholder during ordinary business hours.  Such list shall be produced at such meeting and kept at the meeting at all times during such meeting and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.6    Quorum and Adjournments.  The stockholders holding a majority of the voting power of the Corporation entitled to vote on a matter, present in person or by proxy, shall constitute a quorum at any meeting of stockholders, except as otherwise provided by law, the Certificate, or these Amended and Restated Bylaws.  If a quorum shall not be present, in person or by proxy, at any meeting of stockholders, the stockholders entitled to vote thereat who are present, in person or by proxy, or, if no stockholder entitled to vote is present, any officer of the Corporation may adjourn the meeting from time to time, without notice other than announcement at the meeting (unless the Board, after such adjournment, fixes a new record date for the adjourned meeting), until a quorum shall be present, in person or by proxy.  Subject to applicable law, if a quorum initially is present at any meeting of stockholders, the stockholders may continue to transact business until adjournment or recess, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, but if a quorum is not present at least initially, no business other than adjournment or recess may be transacted.  At any adjourned meeting at which a quorum shall be present, in person or by proxy, any business may be transacted which may have been transacted at the original meeting had a quorum been present; provided that, if the adjournment is for more than thirty (30) days or if after the

adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

2.7    Voting.

(a)    Except as provided in the Certificate, each outstanding share of capital stock having voting rights shall be entitled to one vote upon each matter submitted to a vote at a meeting of stockholders.

(b)    When a quorum is present at any meeting, the vote of the stockholders holding a majority of the voting power of the Corporation who are present, in person or by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of statute, the Certificate, or these Amended and Restated Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.8    Closing of Transfer Books or Fixing of Record Date.

(a)    For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders, or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, for any such determination of stockholders, such date in any case to be not more than sixty (60) days and not less than ten (10) days prior to such meeting nor more than sixty (60) days prior to any other action.  If no record date is fixed:

(i)    The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii)    The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(iii)    A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by law or these

3

Amended and Restated Bylaws, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office in the State of Delaware, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board and prior action by the Board is required by law or these Amended and Restated Bylaws, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

2.9    <u>Proxies</u>.   At all meetings of stockholders, a stockholder may vote by proxy executed in writing by the stockholder or by the stockholder's duly authorized attorney-in-fact. Such proxy shall be filed with the Secretary of the Corporation before or at the time of the meeting.  No proxy shall be valid after three (3) years from the date of its execution, unless otherwise provided in the proxy.  If no date is stated in a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power or unless otherwise made irrevocable by law. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or executed new proxy bearing a later date.

2.10    <u>Conduct of Meeting</u>.   The Chairman of the Board, if any, and if none or in the Chairman's absence, the President shall preside at all meetings of stockholders.  The Secretary shall keep the records of each meeting of stockholders.  In the absence or inability to act of any such officer, such officer's duties shall be performed by the officer given the authority to act for such absent or non-acting officer under these Amended and Restated Bylaws or by some person appointed by the meeting.

2.11    <u>Consent of Stockholders in Lieu of Meeting; Telephonic Meetings</u>.   Unless otherwise provided in the Certificate, any action required by law to be taken at any annual meeting or special meeting of stockholders of the Corporation, or any action which may be taken at any annual meeting or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  Every written consent of stockholders shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this <u>Section 2.11</u> to the Corporation,

written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  A telegram, telex, cablegram or similar transmission by a stockholder, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a stockholder, shall be regarded as signed by the stockholder for purposes of this section.  Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, stockholders may participate in a meeting by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

2.12    Inspectors.  The Board may, in advance of any meeting of stockholders, appoint one or more inspectors to act at such meeting or any adjournment thereof.  If any of the inspectors so appointed shall fail to appear or act, the chairman of the meeting shall, or if inspectors shall not have been appointed, the chairman of the meeting may, appoint one or more inspectors.  Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of such inspector's ability.  The inspectors shall determine the number of shares of capital stock of the Corporation outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the validity and effect of proxies and shall receive votes, ballots, or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots, or consents, determine the results, and do such acts as are proper to conduct the election or vote with fairness to all stockholders.  On request of the chairman of the meeting, the inspectors shall make a report in writing of any challenge, request, or matter determined by them and shall execute a certificate of any fact found by them.  No director or candidate for the office of director shall act as an inspector of an election of directors.  Inspectors need not be stockholders.

## ARTICLE III. DIRECTORS

3.1    Management.  The business and property of the Corporation shall be managed by the Board.  Subject to the restrictions imposed by law, the Certificate, or these Amended and Restated Bylaws, the Board may exercise all the powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate or these Amended and Restated Bylaws required to be exercised or done by the stockholders.

3.2    Number, Qualification, Election, Term.    Except as otherwise required by applicable law, the number of directors of the Corporation shall consist of the same number of directors as the number of managers comprising the Board of Managers of [Newco], LLC, a Delaware limited liability company and the ultimate parent of the Corporation (the "Parent"), pursuant to such Parent's Operating Agreement, as amended from time to time (the "Parent Operating Agreement").  Except as provided in Section 3.5 of this Article III, each of the directors of the Corporation shall be elected pursuant to the provisions set forth in the Parent's Operating Agreement.  Except as otherwise required by law, the Certificate, or these Amended

and Restated Bylaws, the directors shall be elected at an annual meeting of stockholders at which a quorum is present. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy and entitled to vote on the election of directors. Each director so chosen shall hold office until the next annual meeting of stockholders held after such director's election and until such director's successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. None of the directors need be a stockholder of the Corporation or a resident of the State of Delaware. Each director must have attained the age of majority.

3.3     <u>Change in Number</u>. No decrease in the number of directors constituting the entire Board shall have the effect of shortening the term of any incumbent director.

3.4     <u>Resignations and Removal</u>.

(a)     Any director may resign at any time upon notice given in writing to the Board, the Chairman of the Board, the President or the Secretary of the Corporation. Such resignation shall take effect upon delivery, unless the resignation specifies a later effective date or time or an effective date or time determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)     Except as otherwise provided in the Certificate, or these Amended and Restated Bylaws, directors may be removed in accordance with the provisions relating to removal of managers from the Board of Managers as set forth in Parent Operating Agreement.

3.5     <u>Vacancies</u>. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors shall be filled in accordance with the provisions relating to vacancies on the Board of Managers as set forth in Parent's Operating Agreement.

3.6     <u>Meetings of Directors</u>. The directors may hold their meetings and may have an office and keep the books of the Corporation, except as otherwise provided by statute, in such place or places within or without the State of Delaware as the Board may from time to time determine or as shall be specified in the notice of such meeting or duly executed waiver of notice of such meeting. The provisions set forth in the Parent Operating Agreement relating to the right of certain of the members of the Parent to observe meetings of the Board of Managers and committees thereof shall apply to the Corporation as if set forth herein *mutatis mutandis*.

3.7     <u>First Meeting</u>. Each newly elected Board may hold its first meeting for the purpose of organization and the transaction of business, if a quorum is present, immediately after and at the same place as the annual meeting of stockholders, and no notice of such meeting shall be necessary.

3.8     <u>Election of Officers</u>. At the first meeting of the Board after each annual meeting of stockholders at which a quorum shall be present, the Board shall elect the officers of the Corporation.

3.9    <u>Regular Meetings</u>.  Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board.  Notice of such regular meetings shall not be required.

3.10    <u>Special Meetings</u>.  Special meetings of the Board shall be held whenever called by the Chairman of the Board, any two directors (if four or more directors on the Board) or any one director (if three or less directors on the Board).

3.11    <u>Notice</u>.  The Secretary shall give written notice of each special meeting to each director at least 24 hours before the meeting.  Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of notice to him.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.12    <u>Quorum; Majority Vote.</u>  Except as otherwise required by law, the Certificate of Incorporation or these Amended and Restated Bylaws, at all meetings of the Board, two-thirds of the directors (and in the case of a committee of the Board, a majority of the directors) then in office shall constitute a quorum for the transaction of business.  If at any meeting of the Board or a committee of the Board there shall be less than a quorum present, a majority of those present or any director solely present may adjourn the meeting from time to time without further notice.  Unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws, the act of a majority of the directors present at a meeting at which a quorum is in attendance shall be the act of the Board.  At any time that the Certificate provides that directors elected by the holders of a class or series of stock shall have more or less than one vote per director on any matter, every reference in these Amended and Restated Bylaws to a majority or other proportion of directors shall refer to a majority or other proportion of the votes of such directors.

3.13    <u>Procedure</u>.  At meetings of the Board, business shall be transacted in such order as from time to time the Board may determine.  The Chairman of the Board, if any, or if none or in the Chairman's absence, the President shall preside at all meetings of the Board.  In the absence or inability to act of either such officer, a chairman shall be chosen by the Board from among the directors present.  The Secretary of the Corporation shall act as the secretary of each meeting of the Board unless the Board appoints another person to act as secretary of the meeting.  The Board shall keep regular minutes of its proceedings which shall be placed in the minute book of the Corporation.

3.14    <u>Presumption of Assent.</u>  A director of the Corporation who is present at the meeting of the Board at which action on any corporate matter is taken shall be presumed to have assented to the action unless such director's dissent shall be entered in the minutes of the meeting or unless such director shall file such director's written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall forward any dissent by certified or registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.

3.15    Action By Consent.    Unless otherwise restricted by the Certificate or by these Amended and Restated Bylaws, any action required or permitted to be taken at a meeting of the Board, or of any committee of the Board, may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all the directors or all the committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such directors or committee members, as the case may be, and may be stated as such in any certificate or document filed with the Secretary of State of the State of Delaware or in any certificate delivered to any person.    A telegram, telex, cablegram or similar transmission by a director, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a director, shall be regarded as signed by the director for purposes of this section.    Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.

3.16    Telephonic Meetings.    Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.17    Compensation.    The Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, paid to directors for attendance at regular or special meetings of the Board or any committee thereof; provided, that nothing contained herein shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor.

## ARTICLE IV. COMMITTEES OF THE BOARD

4.1    Designation.    The Board may, by resolution adopted by a majority of the Board, designate one or more committees.

4.2    Number; Qualification; Term.    Each committee shall consist of one or more directors appointed by resolution adopted by a majority of the Board.    The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the Board.    Each committee member shall serve as such until the earliest of (i) the expiration of such member's term as director, (ii) such member's resignation as a committee member or as a director upon written notice to the Board, the Chairman of the Board, the President, or the Secretary, or (iii) such member's removal as a committee member or as a director.

4.3    Authority.    Each committee, to the extent expressly provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board in the management of the business and property of the Corporation allocated to such committee by the Board or by its charter, except to the extent expressly restricted by law, the Certificate, or these Amended and Restated Bylaws.

4.4    Committee Changes.    The Board shall have the power at any time to fill vacancies on any committee.

4.5     Alternate Members of Committees.  The Board may designate one or more directors as alternate members of any committee.  Any such alternate member may replace any absent or disqualified member at any meeting of the committee.  If no alternate committee members have been so appointed to a committee or each such alternate committee member is absent or disqualified, the member or members of such committee present at any meeting and not disqualified from voting, whether or not such director or directors constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

4.6     Regular Meetings.  Regular meetings of any committee may be held without notice at such time and place as may be designated from time to time by the committee and communicated to all members thereof.

4.7     Special Meetings.  Special meetings of any committee may be held whenever called by any committee member.  The committee member calling any special meeting shall cause notice of such special meeting, including therein the time and place of such special meeting, to be given to each committee member at least two days before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.8     Quorum; Majority Vote.  At meetings of any committee, a majority of the number of members designated by the Board shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The act of a majority of the members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws.

4.9     Telephonic Meetings.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of a committee may participate in a meeting of the committee by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

4.10     Minutes.  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Corporation for placement in the minute books of the Corporation.

4.11     Compensation.  Committee members may, by resolution of the Board, be allowed a fixed sum and expenses of attendance, if any, for attending any committee meetings or a stated salary.

4.12     Responsibility.  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board or any director of any responsibility imposed upon it or such director by law.

9

## ARTICLE V. OFFICERS

5.1    <u>Number and Qualification</u>.  The Corporation shall have such officers as may be necessary or desirable for the business of the Corporation.  The officers of the Corporation shall consist of a President, a Secretary, and such other officers as the Board may from time to time elect or appoint, including a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, and a Treasurer.  Each officer shall hold office until such officer's successor shall have been duly elected and shall have qualified, until such officer's death, or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same person.  None of the officers need be a stockholder or a director of the Corporation or a resident of the State of Delaware.

5.2    <u>Removal</u>.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

5.3    <u>Resignations</u>.  Any officer may resign at any time by giving written notice to the Corporation; <u>provided</u>, <u>however</u>, that notice to the Board, President or Secretary shall be deemed to constitute notice to the Corporation.  Such resignation shall take effect upon receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.4    <u>Vacancies</u>.  Any vacancy among the officers, whether caused by death, resignation, removal or any other cause, shall be filled by the Board.

5.5    <u>Authority</u>.  Officers shall have such authority and perform such duties in the management of the Corporation as are provided in these Amended and Restated Bylaws or as may be determined by resolution of the Board not inconsistent with these Amended and Restated Bylaws; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the Corporation, on behalf of the Corporation, as such authority is hereby expressly reserved to the Board.

5.6    <u>Compensation</u>.  The compensation, if any, of officers and agents shall be fixed from time to time by the Board; <u>provided</u>, <u>however</u>, that the Board may delegate the power to determine the compensation of any officer and agent (other than the officer to whom such power is delegated) to the Chairman of the Board or the President.

5.7    <u>Chairman of the Board</u>.  The Chairman of the Board, if elected by the Board, shall have such powers and duties as may be prescribed by the Board.  Such officer shall preside at all meetings of the stockholders and of the Board, and shall also have all have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities, without diminishing the powers of the President outlined below.

5.8     President.  The President shall have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities.  The President shall also be the chief executive officer of the Corporation unless the Board otherwise provides.  If no chief executive officer shall have been appointed by the Board, all references herein to "chief executive officer" shall be to the President.   The President shall execute bonds, mortgages, and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Corporation.  If the Board has not elected a Chairman of the Board or in the absence or inability to act of the Chairman of the Board, the President shall exercise all of the powers and discharge all of the duties of the Chairman of the Board.  As between the Corporation and third parties, any action taken by the President in the performance of the duties of the Chairman of the Board shall be conclusive evidence that there is no Chairman of the Board or that the Chairman of the Board is absent or unable to act.  The President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.9     Vice-President.  Each Vice President shall have such powers and duties as may be assigned to him by the Board, the Chairman of the Board, or the President, and (in order of their seniority as determined by the Board or, in the absence of such determination, as determined by the length of time they have held the office of Vice President) shall exercise the powers of the President during that officer's absence or inability to act.  As between the Corporation and third parties, any action taken by a Vice President in the performance of the duties of the President shall be conclusive evidence of the absence or inability to act of the President at the time such action was taken.  The Vice President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.10     Treasurer.   The Treasurer shall have the responsibility for maintaining the financial records of the Corporation, shall have custody of the Corporation's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Corporation in such depository or depositories as may be designated by the Board, and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, or the President.  The Treasurer shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation, and may sign with the President or Vice-President, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.11     Secretary.  Except as otherwise provided in these Amended and Restated Bylaws, the Secretary shall keep the minutes of all meetings of the Board and of the stockholders in books provided for that purpose, and the Secretary shall attend to the giving and service of all notices.  The Secretary may sign with the President or Vice-President, all certificates for shares of stock of the Corporation, and the Secretary shall have charge of the certificate books, transfer books, and stock papers as the Board may direct, all of which shall at all reasonable times be

11

open to inspection by any director upon application at the office of the Corporation during business hours.  The Secretary shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board, the Chairman of the Board, and the President.

5.12    Assistant Treasurers and Assistant Secretaries.    The assistant Treasurers and assistant Secretaries, in general, shall perform such duties as shall be assigned to them by the Treasurer or the Secretary, respectively, or by the President or the Board, and in the absence of the Treasurer or Secretary, as the case may be, shall perform the duties and exercise the powers of the Treasurer or Secretary, as applicable.

5.13    Bonds of Officers.    If required by the Board, any officer of the Corporation shall give a bond for the faithful discharge of such officer's duties in such amount and with such surety or sureties as the Board may require.

## ARTICLE VI. CERTIFICATES FOR STOCK AND THEIR TRANSFER

6.1    Certificates of Stock.    Each stockholder shall be entitled to a certificate signed by, or in the name of the Corporation by the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him upon such stockholder's request.  Any or all of the signatures on the certificate may be by facsimile and may be sealed with the seal of the Corporation or a facsimile thereof.  If any officer, transfer agent, or registrar who has signed, or whose facsimile signature has been placed upon, a certificate has ceased to be such officer, transfer agent, or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if the signatory were such officer, transfer agent, or registrar at the date of issue.  The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

6.2    Replacement of Lost, Stolen or Destroyed Certificates.    The Board may direct a new certificate or certificates to be issued in place of a certificate or certificates theretofore issued by the Corporation and alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares to be lost or destroyed.  When authorizing such issue of a new certificate or certificates the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or such person's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any claim, or expense resulting from a claim, that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost or destroyed.

6.3    Transfers of Stock.    Transfers of stock shall be made only upon the transfer books of the Corporation maintained at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.  Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to

transfer, the Corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.

6.4    <u>Registered Stockholders</u>.  The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

6.5    <u>Regulations</u>.  The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board may establish.

6.6    <u>Legends</u>.  The Board shall have the power and authority to provide that certificates representing shares of stock bear such legends as the Board deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## ARTICLE VII. INDEMNIFICATION.

7.1    <u>Right to Indemnification</u>.

(a)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, manager, officer, employee, agent or other representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, manager, officer, employee, agent or representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of

another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former director, manager, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 7.1(a) or 7.1(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 7.1(a) or 7.1(b) above.

7.2    Good Faith Defined.    A person seeking indemnification hereunder shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of account of the Corporation or another enterprise, or on information supplied to such person by the officers of the Corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the Corporation or another enterprise or on information or records given or reports made to the Corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation or another enterprise. The provisions of this Section 7.2 shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 7.1 of this Article VII, as the case may be.

7.3    Indemnification by a Court.    Any person seeking indemnification hereunder may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Section 7.1.  The basis of such indemnification by a court shall be a determination by such court that indemnification of the director or officer is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 7.1.  The absence of any determination in respect of indemnification shall not be a defense to such application or create a presumption that the director or officer seeking indemnification has not met any applicable standard of conduct.  Notice of any application for indemnification pursuant to this Section 7.3 shall be given to the Corporation promptly upon the filing of such application.  If successful, in whole or in part, the director or officer seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

7.4    <u>Right to Advancement of Expenses</u>.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former director, officer, employee or agent of the Corporation in defending any actual or threatened claim, action, suit or proceeding, whether or not by, or in the right of, the Corporation, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by final non-appealable judicial decision that such person is not entitled to be indemnified by the Corporation as authorized by this <u>Article VII</u>.

7.5    <u>Insurance</u>.    The Corporation may, at its expense and to the full extent permitted by law, purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability which may be asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this Section.

7.6    <u>Non-Exclusivity of Rights</u>.  The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification or advancement of expenses from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.   Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, manager, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

7.7    <u>Amendments</u>.    Any alteration or amendment to these Amended and Restated Bylaws shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided in this <u>Article VII</u> or (ii) obligations of the Corporation to provide any such indemnification rights.

## ARTICLE VIII. CERTAIN TRANSACTIONS

8.1    <u>Transactions with Interested Parties; Business Opportunities</u>.  The provisions of <u>Section 8.10</u> of the Parent Operating Agreement relating to transactions with Interested Parties (as defined in the Parent Operating Agreement) and Investor Business Opportunities (as defined in the Parent Operating Agreement) shall apply to the Corporation as if set forth herein *mutatis mutandis*.

8.2    <u>Quorum</u>.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

# ARTICLE IX. NOTICES

9.1    Method.    Whenever by statute, the Certificate, or these Amended and Restated Bylaws, notice is required to be given to any committee member, director, or stockholder and no provision is made as to how such notice shall be given, personal notice shall not be required and any such notice may be given (a) in writing, by mail, postage prepaid, addressed to such committee member, director, or stockholder at such person's address as it appears on the books or (in the case of a stockholder) the stock transfer records of the Corporation, or (b) by any other method permitted by law (including but not limited to overnight courier service, electronic mail, telegram, telex, or telefax).    Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when the same is deposited in the United States mail as aforesaid.    Any notice required or permitted to be given by overnight courier service shall be deemed to be delivered and given at the time delivered to such service with all charges prepaid and addressed as aforesaid.    Any notice required or permitted to be given by electronic mail, telegram, telex, or telefax shall be deemed to be delivered and given at the time transmitted with all charges prepaid and addressed as aforesaid.

9.2    Waivers.    Whenever any notice is required to be given to any stockholder, director, or committee member of the Corporation by statute, the Certificate, or these Amended and Restated Bylaws, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.    Attendance of a stockholder, director, or committee member at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

# ARTICLE X. MISCELLANEOUS

10.1    Fiscal Year.    The fiscal year of the Corporation shall be fixed by the Board; provided, that if such fiscal year is not fixed by the Board and the selection of the fiscal year is not expressly deferred by the Board, the fiscal year shall be the calendar year.

10.2    Dividends.    Subject to provisions of applicable law and the Certificate, dividends may be declared by the Board at any regular or special meeting and may be paid in cash, in property, or in shares of stock of the Corporation.    Such declaration and payment shall be at the discretion of the Board.

10.3    Reserves.    There may be created by the Board out of funds of the Corporation legally available therefor such reserve or reserves as the directors from time to time, in their discretion, consider proper to provide for contingencies, to equalize dividends, or to repair or maintain any property of the Corporation, or for such other purpose as the Board shall consider beneficial to the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

10.4    Seal.    The seal of the Corporation shall be such as from time to time may be approved by the Board.

10.5    <u>Reliance Upon Books, Reports and Records</u>.  Each director, each member of any committee designated by the Board, and each officer of the Corporation shall, in the performance of such person's duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation

10.6    <u>Invalid Provisions</u>.  If any part of these Amended and Restated Bylaws shall be held invalid or inoperative for any reason, the remaining parts, so far as it is possible and reasonable, shall remain valid and operative.

10.7    <u>Mortgages, etc.</u>  With respect to any deed, deed of trust, mortgage, or other instrument executed by the Corporation through its duly authorized officer or officers, the attestation to such execution by the Secretary of the Corporation shall not be necessary to constitute such deed, deed of trust, mortgage, or other instrument a valid and binding obligation against the Corporation unless the resolutions, if any, of the Board authorizing such execution expressly state that such attestation is necessary.

10.8    <u>Headings</u>.  The headings used in these Amended and Restated Bylaws have been inserted for administrative convenience only and do not constitute matter to be construed in interpretation.

10.9    <u>References</u>.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender should include each other gender where appropriate.

10.10    <u>Amendments</u>.  Except as otherwise required by the Certificate or these Amended and Restated Bylaws, these Amended and Restated Bylaws may be altered, amended, or repealed or new bylaws may be adopted by the stockholders or by the Board at any regular meeting of the stockholders or the Board or at any special meeting of the stockholders or the Board if notice of such alteration, amendment, repeal, or adoption of new bylaws be contained in the notice of such special meeting.

AMENDED AND RESTATED BY-LAWS

of

[REORGANIZED LIGHTSQUARED INC.]

(hereinafter, the "Corporation")

## ARTICLE I

## OFFICES

Section 1. Registered Office. The registered office of the Corporation shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 2. Other Offices. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine.

## ARTICLE II

## MEETING OF STOCKHOLDERS

Section 1. Place of Meeting and Notice. Meetings of the stockholders of the Corporation shall be held at such place either within or without the State of Delaware as the Board of Directors may determine.

Section 2. Annual and Special Meetings. Annual meetings of stockholders shall be held, at a date, time and place fixed by the Board of Directors and stated in the notice of meeting, to elect a Board of Directors and to transact such other business as may properly come before the meeting.  Special meetings of the stockholders may be called by the President for any purpose and shall be called by the President or Secretary if directed by the Board of Directors or requested in writing by the holders of not less than a majority of the capital stock of the Corporation.  Each such stockholder request shall state the purpose of the proposed meeting.

Section 3. Notice. Except as otherwise provided by law, notice of an annual meeting or special meeting stating the place, date, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given by the Corporation either personally or by mail or by other lawful means not less than ten nor more than sixty days before the date of the meeting to each stockholder entitled to vote at such meeting.

Section 4. Quorum. At any meeting of stockholders, the holders of record, present in person or by proxy, of a majority of the Corporation's issued and outstanding capital stock shall constitute a quorum for the transaction of business, except as otherwise provided by law. In the absence of a quorum, any officer entitled to preside at or to act as secretary of the meeting shall have power to adjourn the meeting from time to time until a quorum is present.

Section 5. <u>Voting.</u> Except as otherwise provided by law, all matters submitted to a meeting of stockholders shall be decided by vote of the holders of record, present in person or by proxy, of a majority of the Corporation's issued and outstanding capital stock, including common stock.

Section 6. <u>Action by Consent.</u> Any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent shall be given by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that consents given by a sufficient number of holders to take the action were delivered to the Corporation.

ARTICLE III

DIRECTORS

Section 1. <u>Number, Election and Removal of Directors.</u> The number of directors that shall constitute the Board of Directors shall be not less than one nor more than fifteen. The first Board of Directors shall consist of [three] directors. Thereafter, within the limits specified above, the number of directors shall be determined by the Board of Directors or by the stockholders. The directors shall be elected by the stockholders at their annual meeting. Vacancies and newly created directorships resulting from any increase in the number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director or by the stockholders. A director may be removed with or without cause by the stockholders.

Section 2. <u>Meetings.</u> Regular meetings of the Board of Directors shall be held at such times and places as may from time to time be fixed by the Board of Directors or as may be specified in a notice of meeting. Special meetings of the Board of Directors may be held at any time upon the call of the President and shall be called by the President or Secretary if directed by the Board of Directors. Telegraphic, written, facsimile or other electronic means of notice of each special meeting of the Board of Directors shall be sent to each director not less than two hours before such meeting. A meeting of the Board of Directors may be held without notice immediately after the annual meeting of the stockholders. Notice need not be given of regular meetings of the Board of Directors.

Section 3. <u>Quorum.</u> A majority of the total number of Directors shall constitute a quorum for the transaction of business. If a quorum is not present at any meeting of the Board of Directors, the Directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until such a quorum is present. Except as otherwise provided by law, the Certificate of Incorporation of the Corporation, these by-laws or any

contract or agreement to which the Corporation is a party, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board of Directors.

Section 4. <u>Committees of Directors.</u> The Board of Directors may, by resolution adopted by a majority of the whole Board, designate one or more committees, including without limitation an Executive Committee, to have and exercise such power and authority as the Board of Directors shall specify.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he/she or they constitute a quorum, may unanimously appoint another Director to act at the meeting in place of any such absent or disqualified member.

ARTICLE IV

<u>OFFICERS</u>

The officers of the Corporation shall consist of one or more Presidents, a Secretary, a Treasurer, and such other additional officers with such titles as the Board of Directors shall determine, all of whom shall be chosen by and shall serve at the pleasure of the Board of Directors.  Such officers shall have the usual powers and shall perform all the usual duties incident to their respective offices.  All officers shall be subject to the supervision and direction of the Board of Directors.  The authority, duties or responsibilities of any officer of the Corporation may be suspended by the President with or without cause.  Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors with or without cause.

ARTICLE V

<u>INDEMNIFICATION</u>

The Corporation shall indemnify any current or former Director, officer, employee or agent, or any other applicable person, as set forth in the Certificate of Incorporation of the Corporation.

ARTICLE VI

<u>GENERAL PROVISIONS</u>

Section 1. <u>Notices.</u> Except as otherwise provided herein, whenever any statute, the Certificate of Incorporation or these by-laws require notice to be given to any Director or stockholder, such notice may be given in writing by mail, addressed to such Director or stockholder at his address as it appears on the records of the Corporation, with postage thereon prepaid.  Such notice shall be deemed to have been given when it is deposited in the United States mail.  Notice to directors may also be given personally or by telegram, telecopier, telephone or other means of electronic transmission.  Whenever any notice is required by law, the Certificate of Incorporation or these by-laws, to be given to any director or stockholder, a waiver thereof, given by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall

constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

Section 2. <u>Dividends and Distributions.</u> Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, may be declared by the Board of Directors at any regular or special meeting, and may be paid in cash, in property, or in shares of the capital stock. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any such reserve. Distributions on account of the common stock of the Corporation will be paid pro rata to all holders of the common stock.

Section 3. <u>Fiscal Year.</u> The fiscal year of the Corporation shall be the calendar year.

ARTICLE VII

<u>AMENDMENTS</u>

Section 1. <u>Amendments.</u> These by-laws may be altered, amended or repealed, in whole or in part, or new by-laws may be adopted, by the majority vote of the entire Board of Directors.

Section 2. <u>Entire Board of Directors.</u> As used in this Article VII and in these by-laws generally, the term "entire Board of Directors" means the total number of the directors which the Corporation would have if there were no vacancies or newly created directorships.

# AMENDED AND RESTATED BYLAWS

## OF

## LIGHTSQUARED INC. OF VIRGINIA[1]

A Virginia Corporation

## ARTICLE I.

### Offices

SECTION 1. ***Registered Office***. The registered office of LightSquared Inc. of Virginia (hereinafter called the "Corporation") shall be within the Commonwealth of Virginia as required by the Virginia Stock Corporation Act, as amended from time to time (the "Act").

SECTION 2. ***Other Offices***. The Corporation may also have offices at such place or places within and without the Commonwealth of Virginia as the Board of Directors shall from time to time determine or the business of the Corporation may require.

## ARTICLE II.

### The Sole Shareholder;

### Meetings of The Sole Shareholder

SECTION 1. ***The Sole Shareholder***. The sole shareholder of the Corporation shall be LightSquared LP.

SECTION 2. ***Place of Meetings***. All meetings of the sole shareholder shall be held at any such place, either within or without the Commonwealth of Virginia, but within the United

---

[1] This organizational document may be further revised prior to the Effective Date, in consultation with local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

States of America, as shall be designated from time to time by the Board of Directors and stated in the notice of meeting or in a duly executed waiver thereof.

SECTION 3.  ***Annual Meeting***.  The annual meeting of the sole shareholder for the election of directors and for the transaction of such other business as may come before the meeting shall be held at such time and place as shall be determined by the Board of Directors and stated in the notice of the meeting.

SECTION 4.  ***Special Meetings***.  Special meetings of the sole shareholder, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Board of Directors, by the sole shareholder or by the President.

SECTION 5.  ***Notice of Meetings***.  Notice of meetings of the sole shareholder shall be given as required by applicable law.

SECTION 6.  ***Organization***.  At every meeting of the sole shareholder, the President or, in his or her absence or inability to act, the person whom the President shall appoint shall act as chairman of the meeting.  The Secretary or, in his or her absence or inability to act, the person whom the chairman of the meeting shall appoint, shall act as secretary of the meeting and keep the minutes thereof.

SECTION 7.  ***Order of Business***.  The order of business at all meetings of the shareholder shall be as determined by the chairman of the meeting.

SECTION 8.  ***Action by Consent***.  Any action required or permitted to be taken at any annual or special meeting of the sole shareholder of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the sole shareholder.

2

# ARTICLE III.

## Board of Directors

SECTION 1.  ***General Powers***.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

SECTION 2.  ***Number, Qualifications, Election and Term of Office***.  Initially, the Board shall consist of five (5) members.  The sole shareholder, by resolution from time to time, may increase or decrease the number of directors to any number not less than three.  Members of the Board need not be residents of the Commonwealth of Virginia and need not be shareholders of the Corporation.  Except as set forth in these Amended and Restated Bylaws, directors shall be elected at the annual meeting of the sole shareholder.

SECTION 3.  ***Place of Meetings***.  Meetings of the Board of Directors shall be held at such place or places, within or without the Commonwealth of Virginia, as the Board of Directors may from time to time determine or as shall be specified in the notice of any such meeting.

SECTION 4.  ***Annual Meeting***.  The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of the sole shareholder, on the same day and at the same place where such annual meeting shall be held.  Notice of such meeting need not be given.  In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such other time or place (within or without the Commonwealth of Virginia) as shall be specified in a notice thereof given as hereinafter provided in Section 7 of this Article III.

SECTION 5.  ***Regular Meetings***.  Regular meetings of the Board of Directors shall be held at such time and place as the Board of Directors may fix.  Notice of regular meetings of the

Board of Directors need not be given except as otherwise required by statute or these Amended and Restated Bylaws.

SECTION 6.  ***Special Meetings***.  Special meetings of the Board of Directors may be called by the President or at the request of one-third of the directors.

SECTION 7.  ***Notice of Meetings***.  Notice of each special meeting of the Board of Directors (and of each regular meeting for which notice shall be required) shall be given by the Secretary as hereinafter provided in this Section 7, in which notice shall be stated the time and place of the meeting.  Except as otherwise required by these Amended and Restated Bylaws, such notice need not state the purposes of such meeting.  Notice of each such meeting shall be mailed, postage prepaid, to each director, addressed to his or her residence or usual place of business, by first class mail or by overnight courier, at least five (5) days before the day on which such meeting is to be held, or shall be sent addressed to such director at such place by telegraph, cable, telex, telecopier or other similar means, or be delivered to such director personally or be given to him or her by telephone or other similar means, at least seventy-two (72) hours before the time at which such meeting is to be held and if given by telephone or other similar means, shall be followed by a confirmation in writing by telegraph, cable, telex, telecopier or similar means within twenty-four (24) hours after such telephone or other similar means, but such confirmation shall not be necessary for the validity of the such notice.  Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting, except when he or she shall attend for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4

SECTION 8.  ***Quorum and Manner of Acting***.  A majority of the entire Board of Directors shall constitute a quorum for the transaction of business at any meeting of the Board of Directors and, except as otherwise expressly required by statute or the Articles of Incorporation or these Amended and Restated Bylaws, the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors; provided that such majority act shall not be effective unless the quorum present shall include at least two directors who are (i) not employees of LightSquared LP ("LightSquared") or any of its subsidiaries and (ii) also not representatives of the same shareholder, or group of affiliated shareholders, of LightSquared.  In the absence of a quorum at any meeting of the Board of Directors, a majority of the directors present thereat may adjourn such meeting to another time and place.  Notice of the time and place of any such adjourned meeting shall be given to all of the directors unless such time and place were announced at the meeting at which the adjournment was taken, in which case such notice shall only be given to the directors who were not present thereat.  At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called.  The directors shall act only as a Board and the individual directors shall have no power as such.

SECTION 9.  ***Organization***.  At each meeting of the Board of Directors, a director chosen by a majority of the directors present shall act as chairman of the meeting and preside thereat.  The person appointed by the chairman shall act as secretary of the meeting and keep the minutes thereof.

SECTION 10.  ***Resignations***.  Any director of the Corporation may resign at any time by giving written notice of his or her resignation to the Corporation, attention: President.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become

5

effective shall not be specified therein, immediately upon its receipt.  Unless otherwise specified

therein, the acceptance of such resignation shall not be necessary to make it effective.

SECTION 11.  ***Vacancies***.  Any vacancy in the Board of Directors, whether arising from

death, resignation, removal (with or without cause), an increase in the number of directors or any

other cause, shall be filled by the sole shareholder at the next annual meeting thereof or at a

special meeting thereof.  Each director so elected shall hold office until his or her successor shall

have been elected and qualified.

SECTION 12.  ***Removal of Directors***.  Any director may be removed, either with or

without cause, at any time, by the sole shareholder of the Corporation.

SECTION 13.  ***Compensation***.  The Corporation shall not compensate the directors for

serving as directors, nor shall it reimburse the directors for any expenses incurred in attending

the meetings of the Board of Directors or any committee thereof.

SECTION 14.  ***Committees***.  The Board of Directors may, by resolution passed by a

majority of the whole Board, designate one or more committees, each committee to consist of

three or more of the directors of the Corporation.  The Board may designate one or more

directors as alternate members of any committee, who may replace any absent or disqualified

member at any meeting of the committee.  In the absence or disqualification of a member of a

committee, the member or members thereof present at any meeting and not disqualified from

voting, whether or not the member or members constitute a quorum, may unanimously appoint

another member of the Board to act at the meeting in the place of any such absent or disqualified

member.  Any such committee, to the extent provided in the resolution of the Board and not

expressly prohibited under the provisions of the Act, shall have and may exercise all the powers

and authority of the Board in the management of the business and affairs of the Corporation, and

may authorize the seal of the Corporation to be affixed to all papers which may require it; but no

such committee shall have the power or authority in reference to amending the Articles of

Incorporation, adopting an agreement of merger or consolidation, recommending to the sole

shareholder the sale, lease or exchange of all or substantially all of the Corporation's property

and assets, recommending to the sole shareholder a dissolution of the Corporation or a

revocation of a dissolution, or amending these Amended and Restated Bylaws of the

Corporation; and, unless the resolution designating it expressly so provides, no such committee

shall have the power or authority to declare a dividend or to authorize the issuance of stock.

SECTION 15.  ***Action by Consent***.  Unless restricted by the Articles of Incorporation,

any action required or permitted to be taken by the Board of Directors or any committee thereof

may be taken without a meeting if all members of the Board of Directors or such committee, as

the case may be, consent thereto in writing, and the writing or writings are filed with the minutes

of the proceedings of the Board of Directors or such committee, as the case may be.

SECTION 16.  ***Telephonic Meeting***.  Unless restricted by the Articles of Incorporation,

any one or more members of the Board of Directors or any committee thereof may participate in

a meeting of the Board of Directors or such committee by means of a conference telephone or

similar communications equipment by means of which all persons participating in the meeting

can hear each other.  Participation by such means shall constitute presence in person at a

meeting.

## ARTICLE IV.

### Officers

SECTION 1.  ***Number and Qualifications***.  The officers of the Corporation shall be

elected by the Board of Directors and shall include the President, one or more Vice Presidents,

7

the Treasurer and the Secretary and such other officers and assistant officers as the Board of the Corporation may from time to time appoint, or authorize the President to appoint.

SECTION 2.  *Tenure*.  Officers and assistant officers of the Corporation may, but need not, also be members of the Board.  Each officer shall hold his or her office until a successor is elected and qualified or until his or her earlier death, resignation or removal in the manner specified in this Section 2 of Article IV of these Amended and Restated Bylaws.  Any officer elected or appointed by the Board may be removed by the Board with or without cause.  In addition, however, any officer or assistant officer appointed by the President and, if the President is so authorized by the Board, any officer or assistant officer appointed by the Board of the Corporation, may be removed from office by the President upon such terms as the President may specify in writing to such officer. The removal of an officer without cause shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer shall not of itself create contract rights. Should any vacancy occur among the officers by reason of any of the specified acts or events, the position shall be filled by appointment made by the Board or by the President, if he or she is so authorized by the Board.

SECTION 3.  *Duties*. The powers and duties of the several officers shall be as provided from time to time by resolution or other directive of the Board. In the absence of such provisions, the respective officers shall have the powers and shall discharge the duties customarily and usually held and performed by like officers of corporations similar in organization and business purposes to the Corporation.

SECTION 4.  *Compensation*. Officers may be paid such reasonable compensation as the Board may from time to time authorize and direct.

## ARTICLE V.

### Stock Certificates and Their Transfer

SECTION 1. ***Regulations***.  The Board of Directors may make such rules and

regulations, not inconsistent with these Amended and Restated Bylaws, as it may deem

expedient concerning the issue, transfer and registration of certificates for shares of stock of the

Corporation.

## ARTICLE VI.

### Indemnification

SECTION 1. ***Indemnification***.  The Corporation shall indemnify, in the manner and to

the full extent permitted by the Act or any other applicable laws of the Commonwealth of

Virginia, any person (or the estate of any person) who was or is a party to, or is threatened to be

made a party to, any threatened, pending or completed claim, action, suit or proceeding , whether

civil, criminal, administrative, investigative or otherwise, whether an action by or in the right of

the Corporation, by reason of the fact that such person is or was a director, officer, employee,

agent or representative of the Corporation, or is or was serving at the request of the Corporation

as a director, officer, employee or agent of another corporation, partnership, joint venture,

employee benefit plan, trust or other enterprise if such person conducted himself or herself in

good faith and believed: (i) in the case of conduct in his or her official capacity with the

Corporation, that his or her conduct was in the best interests of the Corporation or, in all other

cases, that his or her conduct was at least not opposed to the best interests of the Corporation (or

with respect to an employee benefit plan for a purpose he or she believed to be in the interests of

the participants in and beneficiaries of such plan); and (ii) in the case of any criminal proceeding,

he or she had no reasonable cause to believe his or her conduct was unlawful.  Where required

9

by law, the indemnification provided for herein shall be made only as authorized in the specific

case upon a determination, in the manner provided by law, that indemnification of the current or

former director, officer, employee or agent is proper in the circumstances.   The Corporation

shall indemnify a current or former director, officer, employee or agent who entirely prevails in

the defense of any claim, action, suit or proceeding to which he was a party because he is or was

a director, officer, employee or agent of the Corporation against reasonable expense incurred by

him in connection with such claim, action, suit or proceeding.

SECTION 2.  **_Insurance._**  The Corporation may, to the full extent permitted by the Act or

any other applicable laws of the Commonwealth of Virginia, purchase and maintain insurance at

its expense on behalf of an individual who is or was a director, officer, employee or agent of the

Corporation, or who, while a director, officer, employee or agent of the Corporation, is or was

serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent

of another foreign or domestic corporation, limited liability company, partnership, joint venture,

trust, employee benefit plan, or other entity, against liability asserted against or incurred by him

in that capacity or arising from his status as a director, officer, employee or agent, whether or not

the Corporation would have power to indemnify him against such liability under this Article VI.

SECTION 3.  **_Expenses._**  Expenses (including attorneys' fees), judgments, penalties and

fines  incurred by a current or former director, officer, employee or agent of the Corporation in

defending any claim, action, suit or proceeding, whether or not by, or in the right of, the

Corporation, and whether civil, criminal, administrative, investigative or otherwise shall be paid

by the Corporation in advance of the final disposition of such action, suit or proceeding upon

receipt of an undertaking by or on behalf of such person to repay such amount if it shall

10

ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized by this Article VI.

SECTION 4.  ***Non-Exclusivity of Rights***. The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

## ARTICLE VII.

### General Provisions

SECTION 1.  ***Dividends***. Subject to the provisions of statute and the Articles of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting. Dividends may be paid in cash, in property or in shares of stock of the Corporation, unless otherwise provided by statute or the Articles of Incorporation.

SECTION 2.  ***Reserves***. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors may, from time to time, in its absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation or for such other purpose as the Board of Directors may think conducive to the

11

interests of the Corporation. The Board of Directors may modify or abolish any such reserves in the manner in which it was created.

SECTION 3. **_Seal_**. The seal of the Corporation shall be in such form as shall be approved by the Board of Directors.

SECTION 4. **_Fiscal Year_**. The fiscal year of the Corporation shall end on December 31 of each year. The fiscal year of the Corporation may thereafter be changed, by resolution of the Board of Directors.

SECTION 5. **_Checks, Notes, Drafts, Etc_**. All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

SECTION 6. **_Execution of Contracts, Deeds, Etc_**. The Board may authorize any officer, employee or agent to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation. Such authority may be general or confined to specific instances, or otherwise limited, and if the Board so provides may be delegated by the person so authorized.

SECTION 7. **_Loans_**. No loans shall be contracted on behalf of the Corporation and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of the Board. Such authority may be general or confined to specific instances and if the Board so provides may be delegated by the person so authorized.

12

## ARTICLE VIII.

SECTION 1.  ***Amendments***.  Except as otherwise provided in the Articles of Incorporation or the Act, these Amended and Restated Bylaws may be amended or repealed or new bylaws adopted by the sole shareholder of the Corporation; provided, however, that any alteration or amendment to these Amended and Restated Bylaws shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided in Article VI or (ii) obligations of the Corporation to provide any such indemnification rights as detailed in Article VI.

SECTION 2.  ***Conflict with the Act or the Articles of Incorporation; Severability***.  In the event of a conflict between the Act or the Corporation's Articles of Incorporation and these Amended and Restated Bylaws, the Act or Articles of Incorporation, as the case may be, shall prevail to the extent of such conflict. Any provision of these Amended and Restated Bylaws, or any amendments hereto, which is determined to be in violation of the Act shall not in any way render the remaining provisions invalid.

13

**Amended and Restated**

**Bylaws Of**

**LightSquared Investors Holdings Inc.**

**A Delaware Corporation**

**PREAMBLE**

These Amended and Restated Bylaws are subject to, and governed by, the General Corporation Law of the State of Delaware (the "Delaware General Corporation Law") and the amended and restated certificate of incorporation (the "Certificate") of LightSquared Investors Holdings Inc., a Delaware corporation (the "Corporation"). In the event of a direct conflict between the provisions of these Amended and Restated Bylaws and the mandatory provisions of the Delaware General Corporation Law or the provisions of the Certificate, such provisions of the Delaware General Corporation Law or the Certificate, as the case may be, will be controlling.

## ARTICLE I. OFFICES

1.1    Registered Office.  The registered office of the Corporation shall be established and maintained at the location of the registered agent of the Corporation.

1.2    Principal Office.  The principal office of the Corporation is located at 10802 Parkridge Boulevard, Reston, VA 20191.  The Corporation may have such other offices, either within or without the State of Delaware, as the business of the Corporation may require from time to time.

## ARTICLE II. MEETINGS OF STOCKHOLDERS

2.1    Annual Meeting.  An annual meeting of stockholders of the Corporation shall be held at such place, on such date, and at such time as the board of directors of the Corporation (the "Board") shall each year fix.  At such meeting, the stockholders shall elect directors and transact such other business as may properly be brought before the meeting.

2.2    Special Meetings.  Except as otherwise required by law, a special meeting of the stockholders of the Corporation may be called at any time by the stockholders holding a majority of the voting power of the Corporation or a majority of the Board.  A special meeting shall be held on such date and at such time as shall be designated by the person(s) calling the meeting and stated in the notice of the meeting or in a duly executed waiver of notice of such meeting.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting or in a duly executed waiver of notice of such meeting.

2.3    Place of Meetings.  An annual meeting of stockholders may be held at any place within or outside the State of Delaware, as designated by the Board.  A special meeting of stockholders may be held at any place within or outside the State of Delaware, as designated in the notice of the meeting or a duly executed waiver of notice of such meeting.  Meetings of

stockholders shall be held at the principal office of the Corporation unless another place is designated for meetings in the manner provided herein.

      2.4   <u>Notice of Meetings</u>.  Written or printed notice stating the place, day, and time of each meeting of the stockholders and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be delivered pursuant to <u>Section 9.1</u> not less than ten (10) nor more than 60 (sixty) days before the date of the meeting, by or at the direction of the President, the Secretary, or the officer or person(s) calling the meeting, to each stockholder of record entitled to vote at such meeting.  Notice of any meeting of stockholders shall not be required to be given to any stockholder who shall attend such meeting in person or by proxy and shall not, at the beginning of such meeting, object to the transaction of any business because the meeting is not lawfully called or convened, or who shall, either before or after the meeting, submit a signed waiver of notice, in person or by proxy.

      2.5   <u>Voting Lists</u>.  At least ten (10) days before each meeting of stockholders, the Secretary or other officer of the Corporation who has charge of the Corporation's stock ledger, either directly or through another officer appointed by him or through a transfer agent appointed by the Board, shall prepare a complete list of stockholders entitled to vote thereat, arranged in alphabetical order and showing the address of each stockholder and number of shares registered in the name of each stockholder.  For a period of ten (10) days prior to such meeting, such list shall be kept on file at a place within the city where the meeting is to be held, which place shall be specified in the notice of meeting or a duly executed waiver of notice of such meeting or, if not so specified, at the place where the meeting is to be held and shall be open to examination by any stockholder during ordinary business hours.  Such list shall be produced at such meeting and kept at the meeting at all times during such meeting and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

      2.6   <u>Quorum and Adjournments</u>.  The stockholders holding a majority of the voting power of the Corporation entitled to vote on a matter, present in person or by proxy, shall constitute a quorum at any meeting of stockholders, except as otherwise provided by law, the Certificate, or these Amended and Restated Bylaws.  If a quorum shall not be present, in person or by proxy, at any meeting of stockholders, the stockholders entitled to vote thereat who are present, in person or by proxy, or, if no stockholder entitled to vote is present, any officer of the Corporation may adjourn the meeting from time to time, without notice other than announcement at the meeting (unless the Board, after such adjournment, fixes a new record date for the adjourned meeting), until a quorum shall be present, in person or by proxy.  Subject to applicable law, if a quorum initially is present at any meeting of stockholders, the stockholders may continue to transact business until adjournment or recess, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, but if a quorum is not present at least initially, no business other than adjournment or recess may be transacted.  At any adjourned meeting at which a quorum shall be present, in person or by proxy, any business may be transacted which may have been transacted at the original meeting had a quorum been present; <u>provided that</u>, if the adjournment is for more than thirty (30) days or if after the

adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

2.7    Voting.

(a)    Except as provided in the Certificate, each outstanding share of capital stock having voting rights shall be entitled to one vote upon each matter submitted to a vote at a meeting of stockholders.

(b)    When a quorum is present at any meeting, the vote of the stockholders holding a majority of the voting power of the Corporation who are present, in person or by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of statute, the Certificate, or these Amended and Restated Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.8    Closing of Transfer Books or Fixing of Record Date.

(a)    For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders, or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, for any such determination of stockholders, such date in any case to be not more than sixty (60) days and not less than ten (10) days prior to such meeting nor more than sixty (60) days prior to any other action. If no record date is fixed:

(i)    The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii)    The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(iii)    A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by law or these

3

Amended and Restated Bylaws, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office in the State of Delaware, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board and prior action by the Board is required by law or these Amended and Restated Bylaws, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

2.9    <u>Proxies</u>.    At all meetings of stockholders, a stockholder may vote by proxy executed in writing by the stockholder or by the stockholder's duly authorized attorney-in-fact. Such proxy shall be filed with the Secretary of the Corporation before or at the time of the meeting.  No proxy shall be valid after three (3) years from the date of its execution, unless otherwise provided in the proxy.  If no date is stated in a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power or unless otherwise made irrevocable by law. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or executed new proxy bearing a later date.

2.10    <u>Conduct of Meeting</u>.    The Chairman of the Board, if any, and if none or in the Chairman's absence, the President shall preside at all meetings of stockholders.  The Secretary shall keep the records of each meeting of stockholders.  In the absence or inability to act of any such officer, such officer's duties shall be performed by the officer given the authority to act for such absent or non-acting officer under these Amended and Restated Bylaws or by some person appointed by the meeting.

2.11    <u>Consent of Stockholders in Lieu of Meeting; Telephonic Meetings</u>.    Unless otherwise provided in the Certificate, any action required by law to be taken at any annual meeting or special meeting of stockholders of the Corporation, or any action which may be taken at any annual meeting or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  Every written consent of stockholders shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this <u>Section 2.11</u> to the Corporation,

4

written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  A telegram, telex, cablegram or similar transmission by a stockholder, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a stockholder, shall be regarded as signed by the stockholder for purposes of this section.  Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, stockholders may participate in a meeting by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

2.12    Inspectors.  The Board may, in advance of any meeting of stockholders, appoint one or more inspectors to act at such meeting or any adjournment thereof.  If any of the inspectors so appointed shall fail to appear or act, the chairman of the meeting shall, or if inspectors shall not have been appointed, the chairman of the meeting may, appoint one or more inspectors.  Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of such inspector's ability.  The inspectors shall determine the number of shares of capital stock of the Corporation outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the validity and effect of proxies and shall receive votes, ballots, or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots, or consents, determine the results, and do such acts as are proper to conduct the election or vote with fairness to all stockholders.  On request of the chairman of the meeting, the inspectors shall make a report in writing of any challenge, request, or matter determined by them and shall execute a certificate of any fact found by them.  No director or candidate for the office of director shall act as an inspector of an election of directors.  Inspectors need not be stockholders.

## ARTICLE III. DIRECTORS

3.1    Management.  The business and property of the Corporation shall be managed by the Board.  Subject to the restrictions imposed by law, the Certificate, or these Amended and Restated Bylaws, the Board may exercise all the powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate or these Amended and Restated Bylaws required to be exercised or done by the stockholders.

3.2    Number, Qualification, Election, Term.    The number of directors of the Corporation shall consist of one or more directors.  The number of directors which shall constitute the entire Board shall be determined by resolution of the Board.  Except as otherwise required by law, the Certificate, or these Amended and Restated Bylaws, the directors shall be elected at an annual meeting of stockholders at which a quorum is present.  Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy and entitled to vote on the election of directors.  Each director so chosen shall hold office until the next annual meeting of stockholders held after such director's election and until such director's

5

successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. None of the directors need be a stockholder of the Corporation or a resident of the State of Delaware. Each director must have attained the age of majority.

3.3    <u>Change in Number</u>. No decrease in the number of directors constituting the entire Board shall have the effect of shortening the term of any incumbent director.

3.4    <u>Resignations and Removal</u>.

(a)    Any director may resign at any time upon notice given in writing to the Board, the Chairman of the Board, the President or the Secretary of the Corporation. Such resignation shall take effect upon delivery, unless the resignation specifies a later effective date or time or an effective date or time determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)    Except as otherwise provided in the Certificate, or these Amended and Restated Bylaws, at any meeting of stockholders called expressly for that purpose, any director or the entire Board may be removed, with or without cause, by a vote of the stockholders holding a majority of the voting power of the Corporation on the election of directors.

3.5    <u>Vacancies</u>. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the Board, though less than a quorum, or by the sole remaining director, and each director so chosen shall hold office until the first annual meeting of stockholders held after such director's election and until such director's successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. If there are no directors in office, an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly-created directorship, the directors then in office shall constitute less than a majority of the Board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly-created directorships or to replace the directors chosen by the directors then in office. Except as otherwise provided in these Bylaws, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in these Amended and Restated Bylaws with respect to the filling of other vacancies.

3.6    <u>Meetings of Directors</u>. The directors may hold their meetings and may have an office and keep the books of the Corporation, except as otherwise provided by statute, in such place or places within or without the State of Delaware as the Board may from time to time determine or as shall be specified in the notice of such meeting or duly executed waiver of notice of such meeting.

3.7    <u>First Meeting</u>.  Each newly elected Board may hold its first meeting for the purpose of organization and the transaction of business, if a quorum is present, immediately after and at the same place as the annual meeting of stockholders, and no notice of such meeting shall be necessary.

3.8    Election of Officers.  At the first meeting of the Board after each annual meeting of stockholders at which a quorum shall be present, the Board shall elect the officers of the Corporation.

3.9    Regular Meetings.  Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board.  Notice of such regular meetings shall not be required.

3.10    Special Meetings.  Special meetings of the Board shall be held whenever called by the Chairman of the Board, any two directors (if four or more directors on the Board) or any one director (if three or less directors on the Board).

3.11    Notice.  The Secretary shall give written notice of each special meeting to each director at least 24 hours before the meeting.  Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of notice to him.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.12    Quorum; Majority Vote.  At all meetings of the Board or any committee of the Board, a majority of the directors then in office shall constitute a quorum for the transaction of business.  If at any meeting of the Board or a committee of the Board there shall be less than a quorum present, a majority of those present or any director solely present may adjourn the meeting from time to time without further notice.  Unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws, the act of a majority of the directors present at a meeting at which a quorum is in attendance shall be the act of the Board.  At any time that the Certificate provides that directors elected by the holders of a class or series of stock shall have more or less than one vote per director on any matter, every reference in these Amended and Restated Bylaws to a majority or other proportion of directors shall refer to a majority or other proportion of the votes of such directors.

3.13    Procedure.  At meetings of the Board, business shall be transacted in such order as from time to time the Board may determine.  The Chairman of the Board, if any, or if none or in the Chairman's absence, the President shall preside at all meetings of the Board.  In the absence or inability to act of either such officer, a chairman shall be chosen by the Board from among the directors present.  The Secretary of the Corporation shall act as the secretary of each meeting of the Board unless the Board appoints another person to act as secretary of the meeting.  The Board shall keep regular minutes of its proceedings which shall be placed in the minute book of the Corporation.

3.14    Presumption of Assent.  A director of the Corporation who is present at the meeting of the Board at which action on any corporate matter is taken shall be presumed to have

7

assented to the action unless such director's dissent shall be entered in the minutes of the meeting or unless such director shall file such director's written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall forward any dissent by certified or registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.

3.15    Action By Consent.  Unless otherwise restricted by the Certificate or by these Amended and Restated Bylaws, any action required or permitted to be taken at a meeting of the Board, or of any committee of the Board, may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all the directors or all the committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such directors or committee members, as the case may be, and may be stated as such in any certificate or document filed with the Secretary of State of the State of Delaware or in any certificate delivered to any person.  A telegram, telex, cablegram or similar transmission by a director, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a director, shall be regarded as signed by the director for purposes of this section.  Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.

3.16    Telephonic Meetings.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.17    Compensation.  The Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, paid to directors for attendance at regular or special meetings of the Board or any committee thereof; provided, that nothing contained herein shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor.

## ARTICLE IV. COMMITTEES OF THE BOARD

4.1    Designation.  The Board may, by resolution adopted by a majority of the Board, designate one or more committees.

4.2    Number; Qualification; Term.  Each committee shall consist of one or more directors appointed by resolution adopted by a majority of the Board.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the Board.  Each committee member shall serve as such until the earliest of (i) the expiration of such member's term as director, (ii) such member's resignation as a committee member or as a director upon written notice to the Board, the Chairman of the Board, the President, or the Secretary, or (iii) such member's removal as a committee member or as a director.

4.3    Authority.  Each committee, to the extent expressly provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board in the management of the business and property of the Corporation allocated to such committee by the Board or by its charter, except to the extent expressly restricted by law, the Certificate, or these Amended and Restated Bylaws.

4.4    Committee Changes.  The Board shall have the power at any time to fill vacancies on any committee.

4.5    Alternate Members of Committees.  The Board may designate one or more directors as alternate members of any committee.  Any such alternate member may replace any absent or disqualified member at any meeting of the committee.  If no alternate committee members have been so appointed to a committee or each such alternate committee member is absent or disqualified, the member or members of such committee present at any meeting and not disqualified from voting, whether or not such director or directors constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

4.6    Regular Meetings.  Regular meetings of any committee may be held without notice at such time and place as may be designated from time to time by the committee and communicated to all members thereof.

4.7    Special Meetings.  Special meetings of any committee may be held whenever called by any committee member.  The committee member calling any special meeting shall cause notice of such special meeting, including therein the time and place of such special meeting, to be given to each committee member at least two days before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.8    Quorum; Majority Vote.  At meetings of any committee, a majority of the number of members designated by the Board shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The act of a majority of the members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws.

4.9    Telephonic Meetings.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of a committee may participate in a meeting of the committee by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

4.10    Minutes.  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Corporation for placement in the minute books of the Corporation.

4.11    <u>Compensation</u>.  Committee members may, by resolution of the Board, be allowed a fixed sum and expenses of attendance, if any, for attending any committee meetings or a stated salary.

4.12    <u>Responsibility</u>.  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board or any director of any responsibility imposed upon it or such director by law.

## ARTICLE V. OFFICERS

5.1    <u>Number and Qualification</u>.  The Corporation shall have such officers as may be necessary or desirable for the business of the Corporation.  The officers of the Corporation shall consist of a President, a Secretary, and such other officers as the Board may from time to time elect or appoint, including a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, and a Treasurer.  Each officer shall hold office until such officer's successor shall have been duly elected and shall have qualified, until such officer's death, or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same person.  None of the officers need be a stockholder or a director of the Corporation or a resident of the State of Delaware.

5.2    <u>Removal</u>.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

5.3    <u>Resignations</u>.  Any officer may resign at any time by giving written notice to the Corporation; <u>provided</u>, <u>however</u>, that notice to the Board, President or Secretary shall be deemed to constitute notice to the Corporation.  Such resignation shall take effect upon receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.4    <u>Vacancies</u>.  Any vacancy among the officers, whether caused by death, resignation, removal or any other cause, shall be filled by the Board.

5.5    <u>Authority</u>.  Officers shall have such authority and perform such duties in the management of the Corporation as are provided in these Amended and Restated Bylaws or as may be determined by resolution of the Board not inconsistent with these Amended and Restated Bylaws; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the Corporation, on behalf of the Corporation, as such authority is hereby expressly reserved to the Board.

5.6    <u>Compensation</u>.  The compensation, if any, of officers and agents shall be fixed from time to time by the Board; <u>provided</u>, <u>however</u>, that the Board may delegate the power to determine the compensation of any officer and agent (other than the officer to whom such power is delegated) to the Chairman of the Board or the President.

5.7    Chairman of the Board.  The Chairman of the Board, if elected by the Board, shall have such powers and duties as may be prescribed by the Board.  Such officer shall preside at all meetings of the stockholders and of the Board, and shall also have all have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities, without diminishing the powers of the President outlined below.

5.8    President.  The President shall have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities.  The President shall also be the chief executive officer of the Corporation unless the Board otherwise provides.  If no chief executive officer shall have been appointed by the Board, all references herein to "chief executive officer" shall be to the President.  The President shall execute bonds, mortgages, and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Corporation.  If the Board has not elected a Chairman of the Board or in the absence or inability to act of the Chairman of the Board, the President shall exercise all of the powers and discharge all of the duties of the Chairman of the Board.  As between the Corporation and third parties, any action taken by the President in the performance of the duties of the Chairman of the Board shall be conclusive evidence that there is no Chairman of the Board or that the Chairman of the Board is absent or unable to act.  The President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.9    Vice-President.  Each Vice President shall have such powers and duties as may be assigned to him by the Board, the Chairman of the Board, or the President, and (in order of their seniority as determined by the Board or, in the absence of such determination, as determined by the length of time they have held the office of Vice President) shall exercise the powers of the President during that officer's absence or inability to act.  As between the Corporation and third parties, any action taken by a Vice President in the performance of the duties of the President shall be conclusive evidence of the absence or inability to act of the President at the time such action was taken.  The Vice President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.10    Treasurer.    The Treasurer shall have the responsibility for maintaining the financial records of the Corporation, shall have custody of the Corporation's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Corporation in such depository or depositories as may be designated by the Board, and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, or the President.  The Treasurer shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation, and

may sign with the President or Vice-President, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.11    Secretary.  Except as otherwise provided in these Amended and Restated Bylaws, the Secretary shall keep the minutes of all meetings of the Board and of the stockholders in books provided for that purpose, and the Secretary shall attend to the giving and service of all notices.  The Secretary may sign with the President or Vice-President, all certificates for shares of stock of the Corporation, and the Secretary shall have charge of the certificate books, transfer books, and stock papers as the Board may direct, all of which shall at all reasonable times be open to inspection by any director upon application at the office of the Corporation during business hours.  The Secretary shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board, the Chairman of the Board, and the President.

5.12    Assistant Treasurers and Assistant Secretaries.  The assistant Treasurers and assistant Secretaries, in general, shall perform such duties as shall be assigned to them by the Treasurer or the Secretary, respectively, or by the President or the Board, and in the absence of the Treasurer or Secretary, as the case may be, shall perform the duties and exercise the powers of the Treasurer or Secretary, as applicable.

5.13    Bonds of Officers.  If required by the Board, any officer of the Corporation shall give a bond for the faithful discharge of such officer's duties in such amount and with such surety or sureties as the Board may require.

## ARTICLE VI. CERTIFICATES FOR STOCK AND THEIR TRANSFER

6.1    Certificates of Stock.  Each stockholder shall be entitled to a certificate signed by, or in the name of the Corporation by the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him upon such stockholder's request.  Any or all of the signatures on the certificate may be by facsimile and may be sealed with the seal of the Corporation or a facsimile thereof.  If any officer, transfer agent, or registrar who has signed, or whose facsimile signature has been placed upon, a certificate has ceased to be such officer, transfer agent, or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if the signatory were such officer, transfer agent, or registrar at the date of issue.  The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

6.2    Replacement of Lost, Stolen or Destroyed Certificates.  The Board may direct a new certificate or certificates to be issued in place of a certificate or certificates theretofore issued by the Corporation and alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares to be lost or destroyed.  When authorizing such issue of a new certificate or certificates the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or such person's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any

claim, or expense resulting from a claim, that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost or destroyed.

6.3    <u>Transfers of Stock</u>.    Transfers of stock shall be made only upon the transfer books of the Corporation maintained at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.    Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.

6.4    <u>Registered Stockholders</u>.    The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

6.5    <u>Regulations</u>.    The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board may establish.

6.6    <u>Legends</u>.    The Board shall have the power and authority to provide that certificates representing shares of stock bear such legends as the Board deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## ARTICLE VII. INDEMNIFICATION.

7.1    <u>Right to Indemnification</u>.

(a)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, manager, officer, employee, agent or other representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and,

with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, manager, officer, employee, agent or representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former director, manager, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 7.1(a) or 7.1(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 7.1(a) or 7.1(b) above.

7.2    Good Faith Defined.    A person seeking indemnification hereunder shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of account of the Corporation or another enterprise, or on information supplied to such person by the officers of the Corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the Corporation or another enterprise or on information or records given or reports made to the Corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation or another enterprise. The term "another enterprise" as used in this Section 7.2 shall mean any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Corporation as a director, manager, officer, employee or agent. The provisions of this Section 7.2 shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 7.1 of this Article VII, as the case may be.

7.3    Indemnification by a Court.    Any person seeking indemnification hereunder may apply to the Court of Chancery of the State of Delaware or any other court of competent

jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under <u>Section 7.1</u>.  The basis of such indemnification by a court shall be a determination by such court that indemnification of the director or officer is proper in the circumstances because such person has met the applicable standard of conduct set forth in <u>Section 7.1</u>.  The absence of any determination in respect of indemnification shall not be a defense to such application or create a presumption that the director or officer seeking indemnification has not met any applicable standard of conduct.  Notice of any application for indemnification pursuant to this <u>Section 7.3</u> shall be given to the Corporation promptly upon the filing of such application.  If successful, in whole or in part, the director or officer seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

7.4    <u>Right to Advancement of Expenses</u>.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former director, officer, employee or agent of the Corporation in defending any actual or threatened claim, action, suit or proceeding, whether or not by, or in the right of, the Corporation, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by final non-appealable judicial decision that such person is not entitled to be indemnified by the Corporation as authorized by this <u>Article VII</u>.

7.5    <u>Insurance</u>.    The Corporation may, at its expense and to the full extent permitted by law, purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability which may be asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this Section.

7.6    <u>Non-Exclusivity of Rights</u>.  The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, manager, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

7.7    <u>Amendments</u>.    Any alteration or amendment to these Amended and Restated Bylaws shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided in this <u>Article VII</u> or (ii) obligations of the Corporation to provide any such indemnification rights.

## ARTICLE VIII. CERTAIN TRANSACTIONS

8.1    <u>Transactions with Interested Parties</u>.  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction or solely because such director or officer or their votes are counted for such purpose, if:

(a)    The material facts as to such interested director or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(b)    The material facts as to such interested director or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or

(c)    The contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board, a committee thereof, or the stockholders.

8.2    <u>Quorum</u>.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

## ARTICLE IX. NOTICES

9.1    <u>Method</u>.  Whenever by statute, the Certificate, or these Amended and Restated Bylaws, notice is required to be given to any committee member, director, or stockholder and no provision is made as to how such notice shall be given, personal notice shall not be required and any such notice may be given (a) in writing, by mail, postage prepaid, addressed to such committee member, director, or stockholder at such person's address as it appears on the books or (in the case of a stockholder) the stock transfer records of the Corporation, or (b) by any other method permitted by law (including but not limited to overnight courier service, electronic mail, telegram, telex, or telefax).  Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when the same is deposited in the United States mail as aforesaid.  Any notice required or permitted to be given by overnight courier service shall be deemed to be delivered and given at the time delivered to such service with all charges prepaid and addressed as aforesaid.  Any notice required or permitted to be given by electronic mail, telegram, telex, or telefax shall be deemed to be delivered and given at the time transmitted with all charges prepaid and addressed as aforesaid.

9.2    <u>Waivers</u>.  Whenever any notice is required to be given to any stockholder, director, or committee member of the Corporation by statute, the Certificate, or these Amended and Restated Bylaws, a waiver thereof in writing signed by the person or persons entitled to

16

such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.  Attendance of a stockholder, director, or committee member at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE X. MISCELLANEOUS

10.1    Fiscal Year.  The fiscal year of the Corporation shall be fixed by the Board; provided, that if such fiscal year is not fixed by the Board and the selection of the fiscal year is not expressly deferred by the Board, the fiscal year shall be the calendar year.

10.2    Dividends.  Subject to provisions of applicable law and the Certificate, dividends may be declared by the Board at any regular or special meeting and may be paid in cash, in property, or in shares of stock of the Corporation.  Such declaration and payment shall be at the discretion of the Board.

10.3    Reserves.  There may be created by the Board out of funds of the Corporation legally available therefor such reserve or reserves as the directors from time to time, in their discretion, consider proper to provide for contingencies, to equalize dividends, or to repair or maintain any property of the Corporation, or for such other purpose as the Board shall consider beneficial to the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

10.4    Seal.  The seal of the Corporation shall be such as from time to time may be approved by the Board.

10.5    Reliance Upon Books, Reports and Records.  Each director, each member of any committee designated by the Board, and each officer of the Corporation shall, in the performance of such person's duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation

10.6    Invalid Provisions.  If any part of these Amended and Restated Bylaws shall be held invalid or inoperative for any reason, the remaining parts, so far as it is possible and reasonable, shall remain valid and operative.

10.7    Mortgages, etc.  With respect to any deed, deed of trust, mortgage, or other instrument executed by the Corporation through its duly authorized officer or officers, the attestation to such execution by the Secretary of the Corporation shall not be necessary to constitute such deed, deed of trust, mortgage, or other instrument a valid and binding obligation against the Corporation unless the resolutions, if any, of the Board authorizing such execution expressly state that such attestation is necessary.

10.8    <u>Headings</u>.  The headings used in these Amended and Restated Bylaws have been inserted for administrative convenience only and do not constitute matter to be construed in interpretation.

10.9    <u>References</u>.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender should include each other gender where appropriate.

10.10    <u>Amendments</u>.  Except as otherwise required by the Certificate or these Amended and Restated Bylaws, these Amended and Restated Bylaws may be altered, amended, or repealed or new bylaws may be adopted by the stockholders or by the Board at any regular meeting of the stockholders or the Board or at any special meeting of the stockholders or the Board if notice of such alteration, amendment, repeal, or adoption of new bylaws be contained in the notice of such special meeting.

10.11    <u>Business Opportunities</u>.  To the fullest extent permitted by law, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any stockholder or director of the Corporation, except those stockholders or directors who are employees of the Corporation or its subsidiaries (collectively, the "<u>Business Opportunities Exempt Parties</u>").  The Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Business Opportunity Exempt Party.  No Business Opportunity Exempt Party who acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Corporation shall have any duty to communicate or offer such opportunity to the Corporation, and such Business Opportunity Exempt Party shall not be liable to the Corporation or to its stockholders for breach of any fiduciary or other duty by reason of the fact that such Business Opportunity Exempt Party pursues or acquires, or directs such opportunity to another Person or does not communicate such opportunity or information to the Corporation.  No amendment or repeal of this <u>Section 10.11</u> shall apply to or have any effect on the liability or alleged liability of any Business Opportunities Exempt Party for or with respect to any opportunities of which any such Business Opportunities Exempt Party becomes aware prior to such amendment or repeal.

**Amended and Restated**

**Bylaws Of**

**One Dot Four Corp.**

**A Delaware Corporation**

**PREAMBLE**

These Amended and Restated Bylaws are subject to, and governed by, the General Corporation Law of the State of Delaware (the "Delaware General Corporation Law") and the amended and restated certificate of incorporation (the "Certificate") of One Dot Four Corp., a Delaware corporation (the "Corporation"). In the event of a direct conflict between the provisions of these Amended and Restated Bylaws and the mandatory provisions of the Delaware General Corporation Law or the provisions of the Certificate, such provisions of the Delaware General Corporation Law or the Certificate, as the case may be, will be controlling.

## ARTICLE I. OFFICES

1.1    Registered Office.  The registered office of the Corporation shall be established and maintained at the location of the registered agent of the Corporation.

1.2    Principal Office.  The principal office of the Corporation is located at 10802 Parkridge Boulevard, Reston, VA 20191.  The Corporation may have such other offices, either within or without the State of Delaware, as the business of the Corporation may require from time to time.

## ARTICLE II. MEETINGS OF STOCKHOLDERS

2.1    Annual Meeting.  An annual meeting of stockholders of the Corporation shall be held at such place, on such date, and at such time as the board of directors of the Corporation (the "Board") shall each year fix.  At such meeting, the stockholders shall elect directors and transact such other business as may properly be brought before the meeting.

2.2    Special Meetings.  Except as otherwise required by law, a special meeting of the stockholders of the Corporation may be called at any time by the stockholders holding a majority of the voting power of the Corporation or a majority of the Board.  A special meeting shall be held on such date and at such time as shall be designated by the person(s) calling the meeting and stated in the notice of the meeting or in a duly executed waiver of notice of such meeting.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting or in a duly executed waiver of notice of such meeting.

2.3    Place of Meetings.  An annual meeting of stockholders may be held at any place within or outside the State of Delaware, as designated by the Board.  A special meeting of stockholders may be held at any place within or outside the State of Delaware, as designated in the notice of the meeting or a duly executed waiver of notice of such meeting.  Meetings of

stockholders shall be held at the principal office of the Corporation unless another place is designated for meetings in the manner provided herein.

2.4    <u>Notice of Meetings</u>.  Written or printed notice stating the place, day, and time of each meeting of the stockholders and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be delivered pursuant to <u>Section 9.1</u> not less than ten (10) nor more than 60 (sixty) days before the date of the meeting, by or at the direction of the President, the Secretary, or the officer or person(s) calling the meeting, to each stockholder of record entitled to vote at such meeting.  Notice of any meeting of stockholders shall not be required to be given to any stockholder who shall attend such meeting in person or by proxy and shall not, at the beginning of such meeting, object to the transaction of any business because the meeting is not lawfully called or convened, or who shall, either before or after the meeting, submit a signed waiver of notice, in person or by proxy.

2.5    <u>Voting Lists</u>.  At least ten (10) days before each meeting of stockholders, the Secretary or other officer of the Corporation who has charge of the Corporation's stock ledger, either directly or through another officer appointed by him or through a transfer agent appointed by the Board, shall prepare a complete list of stockholders entitled to vote thereat, arranged in alphabetical order and showing the address of each stockholder and number of shares registered in the name of each stockholder.  For a period of ten (10) days prior to such meeting, such list shall be kept on file at a place within the city where the meeting is to be held, which place shall be specified in the notice of meeting or a duly executed waiver of notice of such meeting or, if not so specified, at the place where the meeting is to be held and shall be open to examination by any stockholder during ordinary business hours.  Such list shall be produced at such meeting and kept at the meeting at all times during such meeting and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.6    <u>Quorum and Adjournments</u>.  The stockholders holding a majority of the voting power of the Corporation entitled to vote on a matter, present in person or by proxy, shall constitute a quorum at any meeting of stockholders, except as otherwise provided by law, the Certificate, or these Amended and Restated Bylaws.  If a quorum shall not be present, in person or by proxy, at any meeting of stockholders, the stockholders entitled to vote thereat who are present, in person or by proxy, or, if no stockholder entitled to vote is present, any officer of the Corporation may adjourn the meeting from time to time, without notice other than announcement at the meeting (unless the Board, after such adjournment, fixes a new record date for the adjourned meeting), until a quorum shall be present, in person or by proxy.  Subject to applicable law, if a quorum initially is present at any meeting of stockholders, the stockholders may continue to transact business until adjournment or recess, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, but if a quorum is not present at least initially, no business other than adjournment or recess may be transacted.  At any adjourned meeting at which a quorum shall be present, in person or by proxy, any business may be transacted which may have been transacted at the original meeting had a quorum been present; <u>provided that</u>, if the adjournment is for more than thirty (30) days or if after the

2

adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

2.7    <u>Voting</u>.

(a)    Except as provided in the Certificate, each outstanding share of capital stock having voting rights shall be entitled to one vote upon each matter submitted to a vote at a meeting of stockholders.

(b)    When a quorum is present at any meeting, the vote of the stockholders holding a majority of the voting power of the Corporation who are present, in person or by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of statute, the Certificate, or these Amended and Restated Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.8    <u>Closing of Transfer Books or Fixing of Record Date</u>.

(a)    For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders, or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, for any such determination of stockholders, such date in any case to be not more than sixty (60) days and not less than ten (10) days prior to such meeting nor more than sixty (60) days prior to any other action.  If no record date is fixed:

(i)    The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii)    The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(iii)    A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u>, <u>however</u>, that the Board may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by law or these

3

Amended and Restated Bylaws, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office in the State of Delaware, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board and prior action by the Board is required by law or these Amended and Restated Bylaws, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

2.9    Proxies.  At all meetings of stockholders, a stockholder may vote by proxy executed in writing by the stockholder or by the stockholder's duly authorized attorney-in-fact. Such proxy shall be filed with the Secretary of the Corporation before or at the time of the meeting.  No proxy shall be valid after three (3) years from the date of its execution, unless otherwise provided in the proxy.  If no date is stated in a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power or unless otherwise made irrevocable by law. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or executed new proxy bearing a later date.

2.10    Conduct of Meeting.  The Chairman of the Board, if any, and if none or in the Chairman's absence, the President shall preside at all meetings of stockholders.  The Secretary shall keep the records of each meeting of stockholders.  In the absence or inability to act of any such officer, such officer's duties shall be performed by the officer given the authority to act for such absent or non-acting officer under these Amended and Restated Bylaws or by some person appointed by the meeting.

2.11    Consent of Stockholders in Lieu of Meeting; Telephonic Meetings.  Unless otherwise provided in the Certificate, any action required by law to be taken at any annual meeting or special meeting of stockholders of the Corporation, or any action which may be taken at any annual meeting or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  Every written consent of stockholders shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 2.11 to the Corporation,

4

written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. A telegram, telex, cablegram or similar transmission by a stockholder, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a stockholder, shall be regarded as signed by the stockholder for purposes of this section. Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be. Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, stockholders may participate in a meeting by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

2.12    Inspectors.  The Board may, in advance of any meeting of stockholders, appoint one or more inspectors to act at such meeting or any adjournment thereof.  If any of the inspectors so appointed shall fail to appear or act, the chairman of the meeting shall, or if inspectors shall not have been appointed, the chairman of the meeting may, appoint one or more inspectors. Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of such inspector's ability. The inspectors shall determine the number of shares of capital stock of the Corporation outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the validity and effect of proxies and shall receive votes, ballots, or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots, or consents, determine the results, and do such acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the chairman of the meeting, the inspectors shall make a report in writing of any challenge, request, or matter determined by them and shall execute a certificate of any fact found by them. No director or candidate for the office of director shall act as an inspector of an election of directors. Inspectors need not be stockholders.

## ARTICLE III. DIRECTORS

3.1    Management.  The business and property of the Corporation shall be managed by the Board. Subject to the restrictions imposed by law, the Certificate, or these Amended and Restated Bylaws, the Board may exercise all the powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate or these Amended and Restated Bylaws required to be exercised or done by the stockholders.

3.2    Number, Qualification, Election, Term.    The number of directors of the Corporation shall consist of one or more directors. The number of directors which shall constitute the entire Board shall be determined by resolution of the Board. Except as otherwise required by law, the Certificate, or these Amended and Restated Bylaws, the directors shall be elected at an annual meeting of stockholders at which a quorum is present. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy and entitled to vote on the election of directors. Each director so chosen shall hold office until the next annual meeting of stockholders held after such director's election and until such director's

5

successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. None of the directors need be a stockholder of the Corporation or a resident of the State of Delaware. Each director must have attained the age of majority.

3.3    <u>Change in Number</u>. No decrease in the number of directors constituting the entire Board shall have the effect of shortening the term of any incumbent director.

3.4    <u>Resignations and Removal</u>.

(a)    Any director may resign at any time upon notice given in writing to the Board, the Chairman of the Board, the President or the Secretary of the Corporation. Such resignation shall take effect upon delivery, unless the resignation specifies a later effective date or time or an effective date or time determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)    Except as otherwise provided in the Certificate, or these Amended and Restated Bylaws, at any meeting of stockholders called expressly for that purpose, any director or the entire Board may be removed, with or without cause, by a vote of the stockholders holding a majority of the voting power of the Corporation on the election of directors.

3.5    <u>Vacancies</u>. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the Board, though less than a quorum, or by the sole remaining director, and each director so chosen shall hold office until the first annual meeting of stockholders held after such director's election and until such director's successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. If there are no directors in office, an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly-created directorship, the directors then in office shall constitute less than a majority of the Board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly-created directorships or to replace the directors chosen by the directors then in office. Except as otherwise provided in these Bylaws, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in these Amended and Restated Bylaws with respect to the filling of other vacancies.

3.6    <u>Meetings of Directors</u>. The directors may hold their meetings and may have an office and keep the books of the Corporation, except as otherwise provided by statute, in such place or places within or without the State of Delaware as the Board may from time to time determine or as shall be specified in the notice of such meeting or duly executed waiver of notice of such meeting.

6

3.7   <u>First Meeting</u>.   Each newly elected Board may hold its first meeting for the purpose of organization and the transaction of business, if a quorum is present, immediately after and at the same place as the annual meeting of stockholders, and no notice of such meeting shall be necessary.

3.8   <u>Election of Officers</u>.   At the first meeting of the Board after each annual meeting of stockholders at which a quorum shall be present, the Board shall elect the officers of the Corporation.

3.9   <u>Regular Meetings</u>.   Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board.   Notice of such regular meetings shall not be required.

3.10   <u>Special Meetings</u>.   Special meetings of the Board shall be held whenever called by the Chairman of the Board, any two directors (if four or more directors on the Board) or any one director (if three or less directors on the Board).

3.11   <u>Notice</u>.   The Secretary shall give written notice of each special meeting to each director at least 24 hours before the meeting.   Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of notice to him.   Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.12   <u>Quorum; Majority Vote</u>. At all meetings of the Board or any committee of the Board, a majority of the directors then in office shall constitute a quorum for the transaction of business.   If at any meeting of the Board or a committee of the Board there shall be less than a quorum present, a majority of those present or any director solely present may adjourn the meeting from time to time without further notice.   Unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws, the act of a majority of the directors present at a meeting at which a quorum is in attendance shall be the act of the Board. At any time that the Certificate provides that directors elected by the holders of a class or series of stock shall have more or less than one vote per director on any matter, every reference in these Amended and Restated Bylaws to a majority or other proportion of directors shall refer to a majority or other proportion of the votes of such directors.

3.13   <u>Procedure</u>.   At meetings of the Board, business shall be transacted in such order as from time to time the Board may determine.   The Chairman of the Board, if any, or if none or in the Chairman's absence, the President shall preside at all meetings of the Board.   In the absence or inability to act of either such officer, a chairman shall be chosen by the Board from among the directors present.   The Secretary of the Corporation shall act as the secretary of each meeting of the Board unless the Board appoints another person to act as secretary of the meeting.   The Board shall keep regular minutes of its proceedings which shall be placed in the minute book of the Corporation.

3.14   <u>Presumption of Assent</u>.   A director of the Corporation who is present at the meeting of the Board at which action on any corporate matter is taken shall be presumed to have

assented to the action unless such director's dissent shall be entered in the minutes of the meeting or unless such director shall file such director's written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall forward any dissent by certified or registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.

3.15    Action By Consent.  Unless otherwise restricted by the Certificate or by these Amended and Restated Bylaws, any action required or permitted to be taken at a meeting of the Board, or of any committee of the Board, may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all the directors or all the committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such directors or committee members, as the case may be, and may be stated as such in any certificate or document filed with the Secretary of State of the State of Delaware or in any certificate delivered to any person.  A telegram, telex, cablegram or similar transmission by a director, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a director, shall be regarded as signed by the director for purposes of this section.  Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.

3.16    Telephonic Meetings.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.17    Compensation.  The Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, paid to directors for attendance at regular or special meetings of the Board or any committee thereof; provided, that nothing contained herein shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor.

## ARTICLE IV. COMMITTEES OF THE BOARD

4.1    Designation.  The Board may, by resolution adopted by a majority of the Board, designate one or more committees.

4.2    Number; Qualification; Term.  Each committee shall consist of one or more directors appointed by resolution adopted by a majority of the Board.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the Board.  Each committee member shall serve as such until the earliest of (i) the expiration of such member's term as director, (ii) such member's resignation as a committee member or as a director upon written notice to the Board, the Chairman of the Board, the President, or the Secretary, or (iii) such member's removal as a committee member or as a director.

4.3     Authority.  Each committee, to the extent expressly provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board in the management of the business and property of the Corporation allocated to such committee by the Board or by its charter, except to the extent expressly restricted by law, the Certificate, or these Amended and Restated Bylaws.

4.4     Committee Changes.  The Board shall have the power at any time to fill vacancies on any committee.

4.5     Alternate Members of Committees.  The Board may designate one or more directors as alternate members of any committee.  Any such alternate member may replace any absent or disqualified member at any meeting of the committee.  If no alternate committee members have been so appointed to a committee or each such alternate committee member is absent or disqualified, the member or members of such committee present at any meeting and not disqualified from voting, whether or not such director or directors constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

4.6     Regular Meetings.  Regular meetings of any committee may be held without notice at such time and place as may be designated from time to time by the committee and communicated to all members thereof.

4.7     Special Meetings.  Special meetings of any committee may be held whenever called by any committee member.  The committee member calling any special meeting shall cause notice of such special meeting, including therein the time and place of such special meeting, to be given to each committee member at least two days before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.8     Quorum; Majority Vote.  At meetings of any committee, a majority of the number of members designated by the Board shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The act of a majority of the members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws.

4.9     Telephonic Meetings.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of a committee may participate in a meeting of the committee by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

4.10    Minutes.  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Corporation for placement in the minute books of the Corporation.

4.11    <u>Compensation</u>.  Committee members may, by resolution of the Board, be allowed a fixed sum and expenses of attendance, if any, for attending any committee meetings or a stated salary.

4.12    <u>Responsibility</u>.  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board or any director of any responsibility imposed upon it or such director by law.

## ARTICLE V. OFFICERS

5.1    <u>Number and Qualification</u>.  The Corporation shall have such officers as may be necessary or desirable for the business of the Corporation.  The officers of the Corporation shall consist of a President, a Secretary, and such other officers as the Board may from time to time elect or appoint, including a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, and a Treasurer.  Each officer shall hold office until such officer's successor shall have been duly elected and shall have qualified, until such officer's death, or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same person.  None of the officers need be a stockholder or a director of the Corporation or a resident of the State of Delaware.

5.2    <u>Removal</u>.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

5.3    <u>Resignations</u>.  Any officer may resign at any time by giving written notice to the Corporation; <u>provided</u>, <u>however</u>, that notice to the Board, President or Secretary shall be deemed to constitute notice to the Corporation.  Such resignation shall take effect upon receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.4    <u>Vacancies</u>.  Any vacancy among the officers, whether caused by death, resignation, removal or any other cause, shall be filled by the Board.

5.5    <u>Authority</u>.  Officers shall have such authority and perform such duties in the management of the Corporation as are provided in these Amended and Restated Bylaws or as may be determined by resolution of the Board not inconsistent with these Amended and Restated Bylaws; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the Corporation, on behalf of the Corporation, as such authority is hereby expressly reserved to the Board.

5.6    <u>Compensation</u>.  The compensation, if any, of officers and agents shall be fixed from time to time by the Board; <u>provided</u>, <u>however</u>, that the Board may delegate the power to determine the compensation of any officer and agent (other than the officer to whom such power is delegated) to the Chairman of the Board or the President.

5.7    Chairman of the Board.  The Chairman of the Board, if elected by the Board, shall have such powers and duties as may be prescribed by the Board.  Such officer shall preside at all meetings of the stockholders and of the Board, and shall also have all have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities, without diminishing the powers of the President outlined below.

5.8    President.  The President shall have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities.  The President shall also be the chief executive officer of the Corporation unless the Board otherwise provides.  If no chief executive officer shall have been appointed by the Board, all references herein to "chief executive officer" shall be to the President.  The President shall execute bonds, mortgages, and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Corporation.  If the Board has not elected a Chairman of the Board or in the absence or inability to act of the Chairman of the Board, the President shall exercise all of the powers and discharge all of the duties of the Chairman of the Board.  As between the Corporation and third parties, any action taken by the President in the performance of the duties of the Chairman of the Board shall be conclusive evidence that there is no Chairman of the Board or that the Chairman of the Board is absent or unable to act.  The President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.9    Vice-President.  Each Vice President shall have such powers and duties as may be assigned to him by the Board, the Chairman of the Board, or the President, and (in order of their seniority as determined by the Board or, in the absence of such determination, as determined by the length of time they have held the office of Vice President) shall exercise the powers of the President during that officer's absence or inability to act.  As between the Corporation and third parties, any action taken by a Vice President in the performance of the duties of the President shall be conclusive evidence of the absence or inability to act of the President at the time such action was taken.  The Vice President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.10    Treasurer.    The Treasurer shall have the responsibility for maintaining the financial records of the Corporation, shall have custody of the Corporation's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Corporation in such depository or depositories as may be designated by the Board, and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, or the President.  The Treasurer shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation, and

may sign with the President or Vice-President, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.11    Secretary.  Except as otherwise provided in these Amended and Restated Bylaws, the Secretary shall keep the minutes of all meetings of the Board and of the stockholders in books provided for that purpose, and the Secretary shall attend to the giving and service of all notices.  The Secretary may sign with the President or Vice-President, all certificates for shares of stock of the Corporation, and the Secretary shall have charge of the certificate books, transfer books, and stock papers as the Board may direct, all of which shall at all reasonable times be open to inspection by any director upon application at the office of the Corporation during business hours.  The Secretary shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board, the Chairman of the Board, and the President.

5.12    Assistant Treasurers and Assistant Secretaries.  The assistant Treasurers and assistant Secretaries, in general, shall perform such duties as shall be assigned to them by the Treasurer or the Secretary, respectively, or by the President or the Board, and in the absence of the Treasurer or Secretary, as the case may be, shall perform the duties and exercise the powers of the Treasurer or Secretary, as applicable.

5.13    Bonds of Officers.  If required by the Board, any officer of the Corporation shall give a bond for the faithful discharge of such officer's duties in such amount and with such surety or sureties as the Board may require.

## ARTICLE VI. CERTIFICATES FOR STOCK AND THEIR TRANSFER

6.1    Certificates of Stock.  Each stockholder shall be entitled to a certificate signed by, or in the name of the Corporation by the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him upon such stockholder's request.  Any or all of the signatures on the certificate may be by facsimile and may be sealed with the seal of the Corporation or a facsimile thereof.  If any officer, transfer agent, or registrar who has signed, or whose facsimile signature has been placed upon, a certificate has ceased to be such officer, transfer agent, or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if the signatory were such officer, transfer agent, or registrar at the date of issue.  The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

6.2    Replacement of Lost, Stolen or Destroyed Certificates.  The Board may direct a new certificate or certificates to be issued in place of a certificate or certificates theretofore issued by the Corporation and alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares to be lost or destroyed.  When authorizing such issue of a new certificate or certificates the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or such person's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any

claim, or expense resulting from a claim, that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost or destroyed.

6.3    Transfers of Stock.    Transfers of stock shall be made only upon the transfer books of the Corporation maintained at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.    Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.

6.4    Registered Stockholders.    The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

6.5    Regulations.    The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board may establish.

6.6    Legends.    The Board shall have the power and authority to provide that certificates representing shares of stock bear such legends as the Board deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## ARTICLE VII. INDEMNIFICATION.

7.1    Right to Indemnification.

(a)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, manager, officer, employee, agent or other representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and,

with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, manager, officer, employee, agent or representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former director, manager, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 7.1(a) or 7.1(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 7.1(a) or 7.1(b) above.

7.2    Right to Advancement of Expenses.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former director, officer, employee or agent of the Corporation in defending any actual or threatened claim, action, suit or proceeding, whether or not by, or in the right of, the Corporation, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by final non-appealable judicial decision that such person is not entitled to be indemnified by the Corporation as authorized by this Article VII.

7.3    Insurance.    The Corporation may, at its expense and to the full extent permitted by law, purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability which may be asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

14

7.4    <u>Non-Exclusivity of Rights</u>. The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, manager, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

7.5    <u>Amendments</u>.    Any alteration or amendment to these Amended and Restated Bylaws shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided in this <u>Article VII</u> or (ii) obligations of the Corporation to provide any such indemnification rights.

## ARTICLE VIII. CERTAIN TRANSACTIONS

8.1    <u>Transactions with Interested Parties</u>.   No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction or solely because such director or officer or their votes are counted for such purpose, if:

(a)    The material facts as to such interested director or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(b)    The material facts as to such interested director or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or

(c)    The contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board, a committee thereof, or the stockholders.

8.2    <u>Quorum</u>.   Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

## ARTICLE IX. NOTICES

9.1    <u>Method</u>.   Whenever by statute, the Certificate, or these Amended and Restated Bylaws, notice is required to be given to any committee member, director, or stockholder and no provision is made as to how such notice shall be given, personal notice shall not be required

15

and any such notice may be given (a) in writing, by mail, postage prepaid, addressed to such committee member, director, or stockholder at such person's address as it appears on the books or (in the case of a stockholder) the stock transfer records of the Corporation, or (b) by any other method permitted by law (including but not limited to overnight courier service, electronic mail, telegram, telex, or telefax).  Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when the same is deposited in the United States mail as aforesaid.  Any notice required or permitted to be given by overnight courier service shall be deemed to be delivered and given at the time delivered to such service with all charges prepaid and addressed as aforesaid.  Any notice required or permitted to be given by electronic mail, telegram, telex, or telefax shall be deemed to be delivered and given at the time transmitted with all charges prepaid and addressed as aforesaid.

9.2    Waivers.    Whenever any notice is required to be given to any stockholder, director, or committee member of the Corporation by statute, the Certificate, or these Amended and Restated Bylaws, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.  Attendance of a stockholder, director, or committee member at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE X. MISCELLANEOUS

10.1    Fiscal Year.    The fiscal year of the Corporation shall be fixed by the Board; provided, that if such fiscal year is not fixed by the Board and the selection of the fiscal year is not expressly deferred by the Board, the fiscal year shall be the calendar year.

10.2    Dividends.    Subject to provisions of applicable law and the Certificate, dividends may be declared by the Board at any regular or special meeting and may be paid in cash, in property, or in shares of stock of the Corporation.  Such declaration and payment shall be at the discretion of the Board.

10.3    Reserves.    There may be created by the Board out of funds of the Corporation legally available therefor such reserve or reserves as the directors from time to time, in their discretion, consider proper to provide for contingencies, to equalize dividends, or to repair or maintain any property of the Corporation, or for such other purpose as the Board shall consider beneficial to the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

10.4    Seal.    The seal of the Corporation shall be such as from time to time may be approved by the Board.

10.5    Reliance Upon Books, Reports and Records.    Each director, each member of any committee designated by the Board, and each officer of the Corporation shall, in the performance of such person's duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board so

designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation

10.6    Invalid Provisions.  If any part of these Amended and Restated Bylaws shall be held invalid or inoperative for any reason, the remaining parts, so far as it is possible and reasonable, shall remain valid and operative.

10.7    Mortgages, etc.  With respect to any deed, deed of trust, mortgage, or other instrument executed by the Corporation through its duly authorized officer or officers, the attestation to such execution by the Secretary of the Corporation shall not be necessary to constitute such deed, deed of trust, mortgage, or other instrument a valid and binding obligation against the Corporation unless the resolutions, if any, of the Board authorizing such execution expressly state that such attestation is necessary.

10.8    Headings.  The headings used in these Amended and Restated Bylaws have been inserted for administrative convenience only and do not constitute matter to be construed in interpretation.

10.9    References.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender should include each other gender where appropriate.

10.10    Amendments.  Except as otherwise required by the Certificate or these Amended and Restated Bylaws, these Amended and Restated Bylaws may be altered, amended, or repealed or new bylaws may be adopted by the stockholders or by the Board at any regular meeting of the stockholders or the Board or at any special meeting of the stockholders or the Board if notice of such alteration, amendment, repeal, or adoption of new bylaws be contained in the notice of such special meeting.

10.11    Business Opportunities.  To the fullest extent permitted by law, the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any stockholder or director of the Corporation, except those stockholders or directors who are employees of the Corporation or its subsidiaries (collectively, the "Business Opportunities Exempt Parties").  The Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to any Business Opportunity Exempt Party.  No Business Opportunity Exempt Party who acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Corporation shall have any duty to communicate or offer such opportunity to the Corporation, and such Business Opportunity Exempt Party shall not be liable to the Corporation or to its stockholders for breach of any fiduciary or other duty by reason of the fact that such Business Opportunity Exempt Party pursues or acquires, or directs such opportunity to another Person or does not communicate such opportunity or information to the Corporation.  No amendment or repeal of this Section 10.11 shall apply to or have any effect on the liability or alleged liability of any Business Opportunities Exempt Party for or with respect to any opportunities of which any such Business Opportunities Exempt Party becomes aware prior to such amendment or repeal.

**Amended and Restated**

**Bylaws Of**

**One Dot Six TVCC Corp.**

**A Delaware Corporation**

**PREAMBLE**

These Amended and Restated Bylaws are subject to, and governed by, the General Corporation Law of the State of Delaware (the "Delaware General Corporation Law") and the amended and restated certificate of incorporation (the "Certificate") of One Dot Six TVCC Corp., a Delaware corporation (the "Corporation").  In the event of a direct conflict between the provisions of these Amended and Restated Bylaws and the mandatory provisions of the Delaware General Corporation Law or the provisions of the Certificate, such provisions of the Delaware General Corporation Law or the Certificate, as the case may be, will be controlling.

## ARTICLE I. OFFICES

1.1    Registered Office.  The registered office of the Corporation shall be established and maintained at the location of the registered agent of the Corporation.

1.2    Principal Office.  The principal office of the Corporation is located at 10802 Parkridge Boulevard, Reston, VA 20191.  The Corporation may have such other offices, either within or without the State of Delaware, as the business of the Corporation may require from time to time.

## ARTICLE II. MEETINGS OF STOCKHOLDERS

2.1    Annual Meeting.  An annual meeting of stockholders of the Corporation shall be held at such place, on such date, and at such time as the board of directors of the Corporation (the "Board") shall each year fix.  At such meeting, the stockholders shall elect directors and transact such other business as may properly be brought before the meeting.

2.2    Special Meetings.  Except as otherwise required by law, a special meeting of the stockholders of the Corporation may be called at any time by the stockholders holding a majority of the voting power of the Corporation or a majority of the Board.  A special meeting shall be held on such date and at such time as shall be designated by the person(s) calling the meeting and stated in the notice of the meeting or in a duly executed waiver of notice of such meeting.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting or in a duly executed waiver of notice of such meeting.

2.3    Place of Meetings.  An annual meeting of stockholders may be held at any place within or outside the State of Delaware, as designated by the Board.  A special meeting of stockholders may be held at any place within or outside the State of Delaware, as designated in the notice of the meeting or a duly executed waiver of notice of such meeting.  Meetings of

stockholders shall be held at the principal office of the Corporation unless another place is designated for meetings in the manner provided herein.

2.4    <u>Notice of Meetings</u>.  Written or printed notice stating the place, day, and time of each meeting of the stockholders and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be delivered pursuant to <u>Section 9.1</u> not less than ten (10) nor more than 60 (sixty) days before the date of the meeting, by or at the direction of the President, the Secretary, or the officer or person(s) calling the meeting, to each stockholder of record entitled to vote at such meeting.  Notice of any meeting of stockholders shall not be required to be given to any stockholder who shall attend such meeting in person or by proxy and shall not, at the beginning of such meeting, object to the transaction of any business because the meeting is not lawfully called or convened, or who shall, either before or after the meeting, submit a signed waiver of notice, in person or by proxy.

2.5    <u>Voting Lists</u>.  At least ten (10) days before each meeting of stockholders, the Secretary or other officer of the Corporation who has charge of the Corporation's stock ledger, either directly or through another officer appointed by him or through a transfer agent appointed by the Board, shall prepare a complete list of stockholders entitled to vote thereat, arranged in alphabetical order and showing the address of each stockholder and number of shares registered in the name of each stockholder.  For a period of ten (10) days prior to such meeting, such list shall be kept on file at a place within the city where the meeting is to be held, which place shall be specified in the notice of meeting or a duly executed waiver of notice of such meeting or, if not so specified, at the place where the meeting is to be held and shall be open to examination by any stockholder during ordinary business hours.  Such list shall be produced at such meeting and kept at the meeting at all times during such meeting and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.6    <u>Quorum and Adjournments</u>.  The stockholders holding a majority of the voting power of the Corporation entitled to vote on a matter, present in person or by proxy, shall constitute a quorum at any meeting of stockholders, except as otherwise provided by law, the Certificate, or these Amended and Restated Bylaws.  If a quorum shall not be present, in person or by proxy, at any meeting of stockholders, the stockholders entitled to vote thereat who are present, in person or by proxy, or, if no stockholder entitled to vote is present, any officer of the Corporation may adjourn the meeting from time to time, without notice other than announcement at the meeting (unless the Board, after such adjournment, fixes a new record date for the adjourned meeting), until a quorum shall be present, in person or by proxy.  Subject to applicable law, if a quorum initially is present at any meeting of stockholders, the stockholders may continue to transact business until adjournment or recess, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, but if a quorum is not present at least initially, no business other than adjournment or recess may be transacted.  At any adjourned meeting at which a quorum shall be present, in person or by proxy, any business may be transacted which may have been transacted at the original meeting had a quorum been present; <u>provided that</u>, if the adjournment is for more than thirty (30) days or if after the

2

adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting.

2.7    <u>Voting</u>.

(a)    Except as provided in the Certificate, each outstanding share of capital stock having voting rights shall be entitled to one vote upon each matter submitted to a vote at a meeting of stockholders.

(b)    When a quorum is present at any meeting, the vote of the stockholders holding a majority of the voting power of the Corporation who are present, in person or by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of statute, the Certificate, or these Amended and Restated Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.8    <u>Closing of Transfer Books or Fixing of Record Date</u>.

(a)    For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders, or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, for any such determination of stockholders, such date in any case to be not more than sixty (60) days and not less than ten (10) days prior to such meeting nor more than sixty (60) days prior to any other action.  If no record date is fixed:

(i)    The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii)    The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(iii)    A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; <u>provided</u>, <u>however</u>, that the Board may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is required by law or these

3

Amended and Restated Bylaws, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office in the State of Delaware, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board and prior action by the Board is required by law or these Amended and Restated Bylaws, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

2.9    <u>Proxies</u>.   At all meetings of stockholders, a stockholder may vote by proxy executed in writing by the stockholder or by the stockholder's duly authorized attorney-in-fact. Such proxy shall be filed with the Secretary of the Corporation before or at the time of the meeting.  No proxy shall be valid after three (3) years from the date of its execution, unless otherwise provided in the proxy.  If no date is stated in a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power or unless otherwise made irrevocable by law. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or executed new proxy bearing a later date.

2.10    <u>Conduct of Meeting</u>.   The Chairman of the Board, if any, and if none or in the Chairman's absence, the President shall preside at all meetings of stockholders.  The Secretary shall keep the records of each meeting of stockholders.  In the absence or inability to act of any such officer, such officer's duties shall be performed by the officer given the authority to act for such absent or non-acting officer under these Amended and Restated Bylaws or by some person appointed by the meeting.

2.11    <u>Consent of Stockholders in Lieu of Meeting; Telephonic Meetings</u>.   Unless otherwise provided in the Certificate, any action required by law to be taken at any annual meeting or special meeting of stockholders of the Corporation, or any action which may be taken at any annual meeting or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office, principal place of business, or such officer or agent shall be by hand or by certified or registered mail, return receipt requested.  Every written consent of stockholders shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this <u>Section 2.11</u> to the Corporation,

4

written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. A telegram, telex, cablegram or similar transmission by a stockholder, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a stockholder, shall be regarded as signed by the stockholder for purposes of this section. Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be. Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, stockholders may participate in a meeting by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

2.12    Inspectors. The Board may, in advance of any meeting of stockholders, appoint one or more inspectors to act at such meeting or any adjournment thereof. If any of the inspectors so appointed shall fail to appear or act, the chairman of the meeting shall, or if inspectors shall not have been appointed, the chairman of the meeting may, appoint one or more inspectors. Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of such inspector's ability. The inspectors shall determine the number of shares of capital stock of the Corporation outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the validity and effect of proxies and shall receive votes, ballots, or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots, or consents, determine the results, and do such acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the chairman of the meeting, the inspectors shall make a report in writing of any challenge, request, or matter determined by them and shall execute a certificate of any fact found by them. No director or candidate for the office of director shall act as an inspector of an election of directors. Inspectors need not be stockholders.

## ARTICLE III. DIRECTORS

3.1    Management. The business and property of the Corporation shall be managed by the Board. Subject to the restrictions imposed by law, the Certificate, or these Amended and Restated Bylaws, the Board may exercise all the powers of the Corporation and do all such lawful acts and things as are not by law, the Certificate or these Amended and Restated Bylaws required to be exercised or done by the stockholders.

3.2    Number, Qualification, Election, Term. Except as otherwise required by applicable law, the number of directors of the Corporation shall consist of the same number of directors as the number of managers comprising the Board of Managers of [Newco], LLC, a Delaware limited liability company and the ultimate parent of the Corporation (the "Parent"), pursuant to such Parent's Operating Agreement, as amended from time to time (the "Parent Operating Agreement"). Except as provided in Section 3.5 of this Article III, each of the directors of the Corporation shall be elected pursuant to the provisions set forth in the Parent's Operating Agreement. Except as otherwise required by law, the Certificate, or these Amended

and Restated Bylaws, the directors shall be elected at an annual meeting of stockholders at which a quorum is present. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy and entitled to vote on the election of directors. Each director so chosen shall hold office until the next annual meeting of stockholders held after such director's election and until such director's successor is elected and qualified or, if earlier, until such director's death, resignation, or removal from office. None of the directors need be a stockholder of the Corporation or a resident of the State of Delaware. Each director must have attained the age of majority.

3.3    Change in Number. No decrease in the number of directors constituting the entire Board shall have the effect of shortening the term of any incumbent director.

3.4    Resignations and Removal.

(a)    Any director may resign at any time upon notice given in writing to the Board, the Chairman of the Board, the President or the Secretary of the Corporation. Such resignation shall take effect upon delivery, unless the resignation specifies a later effective date or time or an effective date or time determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)    Except as otherwise provided in the Certificate, or these Amended and Restated Bylaws, directors may be removed in accordance with the provisions relating to removal of managers from the Board of Managers as set forth in Parent Operating Agreement.

3.5    Vacancies. Vacancies and newly-created directorships resulting from any increase in the authorized number of directors shall be filled in accordance with the provisions relating to vacancies on the Board of Managers as set forth in Parent's Operating Agreement.

3.6    Meetings of Directors. The directors may hold their meetings and may have an office and keep the books of the Corporation, except as otherwise provided by statute, in such place or places within or without the State of Delaware as the Board may from time to time determine or as shall be specified in the notice of such meeting or duly executed waiver of notice of such meeting. The provisions set forth in the Parent Operating Agreement relating to the right of certain of the members of the Parent to observe meetings of the Board of Managers and committees thereof shall apply to the Corporation as if set forth herein *mutatis mutandis*.

3.7    First Meeting. Each newly elected Board may hold its first meeting for the purpose of organization and the transaction of business, if a quorum is present, immediately after and at the same place as the annual meeting of stockholders, and no notice of such meeting shall be necessary.

3.8    Election of Officers. At the first meeting of the Board after each annual meeting of stockholders at which a quorum shall be present, the Board shall elect the officers of the Corporation.

3.9    <u>Regular Meetings</u>.  Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by resolution of the Board.  Notice of such regular meetings shall not be required.

3.10    <u>Special Meetings</u>.  Special meetings of the Board shall be held whenever called by the Chairman of the Board, any two directors (if four or more directors on the Board) or any one director (if three or less directors on the Board).

3.11    <u>Notice</u>.  The Secretary shall give written notice of each special meeting to each director at least 24 hours before the meeting.  Notice of any such meeting need not be given to any director who shall, either before or after the meeting, submit a signed waiver of notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of notice to him.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

3.12    <u>Quorum; Majority Vote.</u>  Except as otherwise required by law, the Certificate of Incorporation or these Amended and Restated Bylaws, at all meetings of the Board, two-thirds of the directors (and in the case of a committee of the Board, a majority of the directors) then in office shall constitute a quorum for the transaction of business.  If at any meeting of the Board or a committee of the Board there shall be less than a quorum present, a majority of those present or any director solely present may adjourn the meeting from time to time without further notice. Unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws, the act of a majority of the directors present at a meeting at which a quorum is in attendance shall be the act of the Board.  At any time that the Certificate provides that directors elected by the holders of a class or series of stock shall have more or less than one vote per director on any matter, every reference in these Amended and Restated Bylaws to a majority or other proportion of directors shall refer to a majority or other proportion of the votes of such directors.

3.13    <u>Procedure</u>.  At meetings of the Board, business shall be transacted in such order as from time to time the Board may determine.  The Chairman of the Board, if any, or if none or in the Chairman's absence, the President shall preside at all meetings of the Board.  In the absence or inability to act of either such officer, a chairman shall be chosen by the Board from among the directors present.  The Secretary of the Corporation shall act as the secretary of each meeting of the Board unless the Board appoints another person to act as secretary of the meeting.  The Board shall keep regular minutes of its proceedings which shall be placed in the minute book of the Corporation.

3.14    <u>Presumption of Assent.</u>  A director of the Corporation who is present at the meeting of the Board at which action on any corporate matter is taken shall be presumed to have assented to the action unless such director's dissent shall be entered in the minutes of the meeting or unless such director shall file such director's written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall forward any dissent by certified or registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.

3.15   <u>Action By Consent</u>.   Unless otherwise restricted by the Certificate or by these Amended and Restated Bylaws, any action required or permitted to be taken at a meeting of the Board, or of any committee of the Board, may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all the directors or all the committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such directors or committee members, as the case may be, and may be stated as such in any certificate or document filed with the Secretary of State of the State of Delaware or in any certificate delivered to any person.   A telegram, telex, cablegram or similar transmission by a director, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a director, shall be regarded as signed by the director for purposes of this section.   Such consent or consents shall be filed with the minutes of proceedings of the board or committee, as the case may be.

3.16   <u>Telephonic Meetings</u>.   Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.17   <u>Compensation</u>.   The Board shall have the authority to fix the compensation, including fees and reimbursement of expenses, paid to directors for attendance at regular or special meetings of the Board or any committee thereof; <u>provided</u>, that nothing contained herein shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor.

**ARTICLE IV. COMMITTEES OF THE BOARD**

4.1   <u>Designation</u>.   The Board may, by resolution adopted by a majority of the Board, designate one or more committees.

4.2   <u>Number; Qualification; Term</u>.   Each committee shall consist of one or more directors appointed by resolution adopted by a majority of the Board.   The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the Board.   Each committee member shall serve as such until the earliest of (i) the expiration of such member's term as director, (ii) such member's resignation as a committee member or as a director upon written notice to the Board, the Chairman of the Board, the President, or the Secretary, or (iii) such member's removal as a committee member or as a director.

4.3   <u>Authority</u>.   Each committee, to the extent expressly provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board in the management of the business and property of the Corporation allocated to such committee by the Board or by its charter, except to the extent expressly restricted by law, the Certificate, or these Amended and Restated Bylaws.

4.4   <u>Committee Changes</u>.   The Board shall have the power at any time to fill vacancies on any committee.

4.5    <u>Alternate Members of Committees</u>.  The Board may designate one or more directors as alternate members of any committee.  Any such alternate member may replace any absent or disqualified member at any meeting of the committee.  If no alternate committee members have been so appointed to a committee or each such alternate committee member is absent or disqualified, the member or members of such committee present at any meeting and not disqualified from voting, whether or not such director or directors constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

4.6    <u>Regular Meetings</u>.  Regular meetings of any committee may be held without notice at such time and place as may be designated from time to time by the committee and communicated to all members thereof.

4.7    <u>Special Meetings</u>.  Special meetings of any committee may be held whenever called by any committee member.  The committee member calling any special meeting shall cause notice of such special meeting, including therein the time and place of such special meeting, to be given to each committee member at least two days before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.8    <u>Quorum; Majority Vote</u>.  At meetings of any committee, a majority of the number of members designated by the Board shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The act of a majority of the members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the act of a greater number is required by law, the Certificate, or these Amended and Restated Bylaws.

4.9    <u>Telephonic Meetings</u>.  Unless otherwise restricted by the Certificate or these Amended and Restated Bylaws, members of a committee may participate in a meeting of the committee by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

4.10    <u>Minutes</u>.  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Corporation for placement in the minute books of the Corporation.

4.11    <u>Compensation</u>.  Committee members may, by resolution of the Board, be allowed a fixed sum and expenses of attendance, if any, for attending any committee meetings or a stated salary.

4.12    <u>Responsibility</u>.  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board or any director of any responsibility imposed upon it or such director by law.

## ARTICLE V. OFFICERS

5.1    <u>Number and Qualification</u>.  The Corporation shall have such officers as may be necessary or desirable for the business of the Corporation.  The officers of the Corporation shall consist of a President, a Secretary, and such other officers as the Board may from time to time elect or appoint, including a Chairman of the Board, a Chief Executive Officer, one or more Vice Presidents, and a Treasurer.  Each officer shall hold office until such officer's successor shall have been duly elected and shall have qualified, until such officer's death, or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same person.  None of the officers need be a stockholder or a director of the Corporation or a resident of the State of Delaware.

5.2    <u>Removal</u>.  Any officer or agent elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

5.3    <u>Resignations</u>.  Any officer may resign at any time by giving written notice to the Corporation; <u>provided</u>, <u>however</u>, that notice to the Board, President or Secretary shall be deemed to constitute notice to the Corporation.  Such resignation shall take effect upon receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.4    <u>Vacancies</u>.  Any vacancy among the officers, whether caused by death, resignation, removal or any other cause, shall be filled by the Board.

5.5    <u>Authority</u>.  Officers shall have such authority and perform such duties in the management of the Corporation as are provided in these Amended and Restated Bylaws or as may be determined by resolution of the Board not inconsistent with these Amended and Restated Bylaws; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the Corporation, on behalf of the Corporation, as such authority is hereby expressly reserved to the Board.

5.6    <u>Compensation</u>.  The compensation, if any, of officers and agents shall be fixed from time to time by the Board; <u>provided</u>, <u>however</u>, that the Board may delegate the power to determine the compensation of any officer and agent (other than the officer to whom such power is delegated) to the Chairman of the Board or the President.

5.7    <u>Chairman of the Board</u>.  The Chairman of the Board, if elected by the Board, shall have such powers and duties as may be prescribed by the Board.  Such officer shall preside at all meetings of the stockholders and of the Board, and shall also have all have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities, without diminishing the powers of the President outlined below.

5.8    <u>President</u>.  The President shall have general executive charge, management, and control of the properties and operations of the Corporation in the ordinary course of its business, with all such powers with respect to such properties and operations as may be reasonably incident to such responsibilities.  The President shall also be the chief executive officer of the Corporation unless the Board otherwise provides.  If no chief executive officer shall have been appointed by the Board, all references herein to "chief executive officer" shall be to the President.    The President shall execute bonds, mortgages, and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Corporation.  If the Board has not elected a Chairman of the Board or in the absence or inability to act of the Chairman of the Board, the President shall exercise all of the powers and discharge all of the duties of the Chairman of the Board.  As between the Corporation and third parties, any action taken by the President in the performance of the duties of the Chairman of the Board shall be conclusive evidence that there is no Chairman of the Board or that the Chairman of the Board is absent or unable to act.  The President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.9    <u>Vice-President</u>.  Each Vice President shall have such powers and duties as may be assigned to him by the Board, the Chairman of the Board, or the President, and (in order of their seniority as determined by the Board or, in the absence of such determination, as determined by the length of time they have held the office of Vice President) shall exercise the powers of the President during that officer's absence or inability to act.  As between the Corporation and third parties, any action taken by a Vice President in the performance of the duties of the President shall be conclusive evidence of the absence or inability to act of the President at the time such action was taken.  The Vice President may sign, with the Treasurer or Secretary, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.10    <u>Treasurer</u>.    The Treasurer shall have the responsibility for maintaining the financial records of the Corporation, shall have custody of the Corporation's funds and securities, shall keep full and accurate account of receipts and disbursements, shall deposit all monies and valuable effects in the name and to the credit of the Corporation in such depository or depositories as may be designated by the Board, and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, or the President.  The Treasurer shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation, and may sign with the President or Vice-President, certificates for shares of the Corporation, the issue of which shall have been authorized by resolution of the Board.

5.11    <u>Secretary</u>.  Except as otherwise provided in these Amended and Restated Bylaws, the Secretary shall keep the minutes of all meetings of the Board and of the stockholders in books provided for that purpose, and the Secretary shall attend to the giving and service of all notices.  The Secretary may sign with the President or Vice-President, all certificates for shares of stock of the Corporation, and the Secretary shall have charge of the certificate books, transfer books, and stock papers as the Board may direct, all of which shall at all reasonable times be

open to inspection by any director upon application at the office of the Corporation during business hours. The Secretary shall in general perform all duties incident to the office of the Secretary, subject to the control of the Board, the Chairman of the Board, and the President.

5.12    Assistant Treasurers and Assistant Secretaries.    The assistant Treasurers and assistant Secretaries, in general, shall perform such duties as shall be assigned to them by the Treasurer or the Secretary, respectively, or by the President or the Board, and in the absence of the Treasurer or Secretary, as the case may be, shall perform the duties and exercise the powers of the Treasurer or Secretary, as applicable.

5.13    Bonds of Officers.    If required by the Board, any officer of the Corporation shall give a bond for the faithful discharge of such officer's duties in such amount and with such surety or sureties as the Board may require.

## ARTICLE VI. CERTIFICATES FOR STOCK AND THEIR TRANSFER

6.1    Certificates of Stock.    Each stockholder shall be entitled to a certificate signed by, or in the name of the Corporation by the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him upon such stockholder's request. Any or all of the signatures on the certificate may be by facsimile and may be sealed with the seal of the Corporation or a facsimile thereof. If any officer, transfer agent, or registrar who has signed, or whose facsimile signature has been placed upon, a certificate has ceased to be such officer, transfer agent, or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if the signatory were such officer, transfer agent, or registrar at the date of issue. The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

6.2    Replacement of Lost, Stolen or Destroyed Certificates.    The Board may direct a new certificate or certificates to be issued in place of a certificate or certificates theretofore issued by the Corporation and alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares to be lost or destroyed. When authorizing such issue of a new certificate or certificates the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or such person's legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any claim, or expense resulting from a claim, that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost or destroyed.

6.3    Transfers of Stock.    Transfers of stock shall be made only upon the transfer books of the Corporation maintained at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation. Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to

transfer, the Corporation or its transfer agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.

6.4    <u>Registered Stockholders</u>.  The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

6.5    <u>Regulations</u>.  The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board may establish.

6.6    <u>Legends</u>.    The Board shall have the power and authority to provide that certificates representing shares of stock bear such legends as the Board deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## ARTICLE VII. INDEMNIFICATION.

7.1    <u>Right to Indemnification</u>.

(a)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, manager, officer, employee, agent or other representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, manager, officer, employee, agent or representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of

another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a present or former director, manager, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 7.1(a) or 7.1(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 7.1(a) or 7.1(b) above.

7.2    Right to Advancement of Expenses.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former director, officer, employee or agent of the Corporation in defending any actual or threatened claim, action, suit or proceeding, whether or not by, or in the right of, the Corporation, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by final non-appealable judicial decision that such person is not entitled to be indemnified by the Corporation as authorized by this Article VII.

7.3    Insurance.    The Corporation may, at its expense and to the full extent permitted by law, purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability which may be asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this Section.

7.4    Non-Exclusivity of Rights.    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.    Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, manager, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

14

7.5    <u>Amendments</u>.    Any alteration or amendment to these Amended and Restated Bylaws shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided in this <u>Article VII</u> or (ii) obligations of the Corporation to provide any such indemnification rights.

## ARTICLE VIII. CERTAIN TRANSACTIONS

8.1    <u>Transactions with Interested Parties; Business Opportunities</u>.    The provisions of <u>Section 8.10</u> of the Parent Operating Agreement relating to transactions with Interested Parties (as defined in the Parent Operating Agreement) and Investor Business Opportunities (as defined in the Parent Operating Agreement) shall apply to the Corporation as if set forth herein *mutatis mutandis*.

8.2    <u>Quorum</u>.    Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

## ARTICLE IX. NOTICES

9.1    <u>Method</u>.    Whenever by statute, the Certificate, or these Amended and Restated Bylaws, notice is required to be given to any committee member, director, or stockholder and no provision is made as to how such notice shall be given, personal notice shall not be required and any such notice may be given (a) in writing, by mail, postage prepaid, addressed to such committee member, director, or stockholder at such person's address as it appears on the books or (in the case of a stockholder) the stock transfer records of the Corporation, or (b) by any other method permitted by law (including but not limited to overnight courier service, electronic mail, telegram, telex, or telefax).    Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when the same is deposited in the United States mail as aforesaid.    Any notice required or permitted to be given by overnight courier service shall be deemed to be delivered and given at the time delivered to such service with all charges prepaid and addressed as aforesaid.    Any notice required or permitted to be given by electronic mail, telegram, telex, or telefax shall be deemed to be delivered and given at the time transmitted with all charges prepaid and addressed as aforesaid.

9.2    <u>Waivers</u>.    Whenever any notice is required to be given to any stockholder, director, or committee member of the Corporation by statute, the Certificate, or these Amended and Restated Bylaws, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.    Attendance of a stockholder, director, or committee member at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE X. MISCELLANEOUS

10.1  Fiscal Year.  The fiscal year of the Corporation shall be fixed by the Board; provided, that if such fiscal year is not fixed by the Board and the selection of the fiscal year is not expressly deferred by the Board, the fiscal year shall be the calendar year.

10.2  Dividends.  Subject to provisions of applicable law and the Certificate, dividends may be declared by the Board at any regular or special meeting and may be paid in cash, in property, or in shares of stock of the Corporation.  Such declaration and payment shall be at the discretion of the Board.

10.3  Reserves.  There may be created by the Board out of funds of the Corporation legally available therefor such reserve or reserves as the directors from time to time, in their discretion, consider proper to provide for contingencies, to equalize dividends, or to repair or maintain any property of the Corporation, or for such other purpose as the Board shall consider beneficial to the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

10.4  Seal.  The seal of the Corporation shall be such as from time to time may be approved by the Board.

10.5  Reliance Upon Books, Reports and Records.  Each director, each member of any committee designated by the Board, and each officer of the Corporation shall, in the performance of such person's duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation

10.6  Invalid Provisions.  If any part of these Amended and Restated Bylaws shall be held invalid or inoperative for any reason, the remaining parts, so far as it is possible and reasonable, shall remain valid and operative.

10.7  Mortgages, etc.  With respect to any deed, deed of trust, mortgage, or other instrument executed by the Corporation through its duly authorized officer or officers, the attestation to such execution by the Secretary of the Corporation shall not be necessary to constitute such deed, deed of trust, mortgage, or other instrument a valid and binding obligation against the Corporation unless the resolutions, if any, of the Board authorizing such execution expressly state that such attestation is necessary.

10.8  Headings.  The headings used in these Amended and Restated Bylaws have been inserted for administrative convenience only and do not constitute matter to be construed in interpretation.

10.9  References.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender should include each other gender where appropriate.

16

10.10   <u>Amendments</u>.  Except as otherwise required by the Certificate or these Amended and Restated Bylaws, these Amended and Restated Bylaws may be altered, amended, or repealed or new bylaws may be adopted by the stockholders or by the Board at any regular meeting of the stockholders or the Board or at any special meeting of the stockholders or the Board if notice of such alteration, amendment, repeal, or adoption of new bylaws be contained in the notice of such special meeting.

BY-LAW NO. 3

a by-law relating generally to the transaction of the business and affairs of

# SKYTERRA (CANADA) INC.[1]

(the "Corporation")

## 1 - INTERPRETATION

### 1.1    Definitions

In this by-law and all other by-laws of the Corporation, unless the context requires otherwise:

(a)    "the Act" means the *Business Corporations Act* (Ontario), or any statute which may be substituted therefor, including the regulations made thereunder as amended from time to time;

(b)    "articles" means the original or restated articles of incorporation, articles of amendment, articles of amalgamation, articles of arrangement, articles of continuance, articles of dissolution, articles of re-organization, articles of revival, letters patent, supplementary letters patent, a special Act and any other instrument by which the Corporation is incorporated;

(c)    "board" means the board of directors of the Corporation; and "director" means a member of the board;

(d)    "meeting of shareholders" means an annual meeting of shareholders or a special meeting of shareholders;

(e)    "non-business day" means Saturday, Sunday and any other day that is a holiday as defined in the *Interpretation Act* (Ontario);

(f)    "person" includes an individual, sole proprietorship, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, and a natural person in the capacity of trustee, executor, administrator, or other legal representative;

(g)    "resident Canadian" means a Canadian citizen ordinarily resident in Canada or as otherwise defined in the Act;

---

[1]    This organizational document may be further revised prior to the Effective Date, in consultation with local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

(h)    "unanimous shareholder agreement" means a written agreement among all the shareholders of the Corporation, or among all such shareholders and one or more persons who are not shareholders, or a written declaration by a person who is the beneficial owner of all the issued shares of the Corporation, that restricts, in whole or in part, the powers of the directors to manage or supervise the management of the business and affairs of the Corporation, as may be from time to time amended;

(i)    words importing the singular number also include the plural and vice-versa; words importing the masculine gender include the feminine and neuter genders;

(j)    all words used in this by-law and defined in the Act shall have the meanings given to such words in the Act or in the related Parts thereof.

## 1.2    Execution in Counterpart and by Electronic Means

Subject to the Act, signatures on any notice, resolution, requisition, statement or other document required or permitted to be executed for the purposes of the Act may be obtained by means of facsimile or other electronic means or by execution of several documents of like form, each of which is executed by one or more persons, and such documents, when duly executed by all persons required or permitted, as the case may be, to do so, shall be deemed to constitute one document for the purposes of the Act.

## 2 - GENERAL BUSINESS

## 2.1    Registered Office

The registered office of the Corporation shall be in the municipality or geographical township within Ontario specified in the articles or in a special resolution and at such location therein as the board may from time to time determine.

## 2.2    Seal

The Corporation may have a seal which shall be adopted and may be changed by the board.

## 2.3    Financial Year

The financial year end of the Corporation shall be as determined by the directors.

## 2.4    Execution of Instruments

Deeds, transfers, assignments, contracts, obligations, certificates and other instruments shall be signed on behalf of the Corporation by any director or officer of the Corporation.  In addition, the board may from time to time direct the manner in which and the person or persons by whom any particular instrument or class of instruments may or shall be signed.

The secretary or any other officer or any director may sign certificates and similar instruments (other than share certificates) on the Corporation's behalf with respect to any factual matters

relating to the Corporation's business and affairs, including certificates verifying copies of the articles, by-laws, resolutions and minutes of meetings of the Corporation.

## 2.5    Banking Arrangements

The banking business of the Corporation, or any part thereof, shall be transacted with such bank, trust company or other firm or body corporate as the board may designate, appoint or authorize from time to time and all such banking business, or any part thereof, shall be transacted on the Corporation's behalf by such one or more officers or other persons as the board may designate, direct or authorize from time to time and to the extent thereby provided.

## 3 - BORROWING

### 3.1    Borrowing

Without limit to the powers of the board as provided in the Act, the board may from time to time on behalf of the Corporation:

(a)    borrow money upon the credit of the Corporation;

(b)    issue, reissue, sell or pledge debt obligations of the Corporation;

(c)    to the extent permitted by the Act, give, directly or indirectly, financial assistance to any person by means of a loan, a guarantee or otherwise to secure the performance of an obligation; and

(d)    mortgage, hypothecate, pledge or otherwise create a security interest in all or any property of the Corporation, owned or subsequently acquired, to secure any obligation of the Corporation.

### 3.2    Delegation

Subject to the Act, the articles, the by-laws and any unanimous shareholder agreement, the board may from time to time delegate to a director, a committee of directors or an officer of the Corporation or such other person or persons so designated by the board all or any of the powers conferred on the board by section 3.1 or by the Act to such extent and in such manner as the board shall determine at the time of each such delegation.

## 4 - DIRECTORS

### 4.1    Duties of Directors

Subject to any unanimous shareholder agreement, the board shall manage or supervise the management of the business and affairs of the Corporation.

### 4.2    Qualifications of Directors

At least twenty-five percent (25%) of the directors on the board shall be resident Canadians, but if the Corporation has less than four directors, at least one director shall be a resident Canadian.

No person shall be elected or appointed a director if that person is less than 18 years of age, of unsound mind and has been so found by a court in Canada or elsewhere, is not an individual, or has the status of bankrupt.  A director need not hold shares issued by the Corporation.  If the Corporation is an offering corporation then at least one-third (1/3) of the directors shall not be officers or employees of the Corporation or any of its affiliates.

## 4.3    Number of Directors

The board shall consist of such number of directors as shall be set out in the articles or as may from time to time be determined in accordance with the Act.  If the board is empowered by special resolution to determine the number of directors within a range set out in the articles:

(a)    the directors may appoint additional directors provided that after such appointment the total number of directors would not be greater than one and one-third times the number of directors required to have been elected at the last annual meeting nor greater than the maximum number set out above; and

(b)    the number of directors to be elected at the annual meeting shall be the number of directors last determined by the board.

## 4.4    Quorum

A majority of the number as determined from time to time in accordance with the Act shall constitute a quorum for the transaction of business.  Notwithstanding vacancies, a quorum of directors may exercise all the powers of the board.

## 4.5    Election and Term

Directors shall be elected by the shareholders at the first meeting of shareholders after the effective date of this by-law and at each succeeding annual meeting at which an election of directors is required and shall hold office until the next annual meeting of shareholders or, if elected for an expressly stated term, for a term expiring not later than the close of the third annual meeting of shareholders following the election.  The number of directors to be elected at any such meeting shall be that number most recently determined in the manner referred to in section 4.3.  The election need not be by ballot unless a ballot is demanded by any shareholder or required by the chairman in accordance with section 8.18.  If an election of directors is not held at an annual meeting of shareholders at which such election is required, the incumbent directors shall continue in office until their successors are elected.

## 4.6    Removal of Directors

Subject to the provisions of the Act and any unanimous shareholder agreement, the shareholders may, by ordinary resolution passed by a majority of the votes cast at a meeting of shareholders, remove any director and may at that meeting elect a qualified person in place of that director for the unexpired term of such director's predecessor.

**4.7    Ceasing to Hold Office**

A director may resign as director by delivering a written resignation to the Corporation and such resignation becomes effective at the time the resignation is received by the Corporation or the time specified in the resignation whichever is later.   A director shall forthwith cease to hold office as a director should the director cease to be qualified in accordance with the Act.  Any attempt to amend or terminate any unanimous shareholder agreement without written consent of all persons who are then directors of the Corporation shall constitute the immediately effective resignation of all such directors who have not so consented.

**4.8    Vacancies**

Subject to the provisions of the Act and any unanimous shareholder agreement, a quorum of directors (whether or not the majority of such quorum are resident Canadians) may fill a vacancy among the directors, except a vacancy resulting from,

(a)    an increase in the number of directors otherwise than an increase in the board of directors pursuant to a special resolution empowering the board to fix the number of directors within a range set out in the articles; or,

(b)    an increase in the maximum number of directors set out in the articles, as the case may be; or,

(c)    a failure to elect the number of directors required to be elected at any meeting of shareholders.

**4.9    Action by the Board**

Subject to any unanimous shareholder agreement, the board shall exercise its powers by or pursuant to a by-law or resolution either passed at a meeting of directors at which a quorum is present and at which a majority of the directors present are resident Canadians or consented to by the signatures of all the directors then in office if constituting a quorum.  If the Corporation has fewer than three directors, one of the directors present at a meeting of directors shall be a resident Canadian.  Subject to the Act, the board may transact business at a meeting of directors where a majority of resident Canadian directors is not present if a resident Canadian director who is unable to be present approves in writing or by telephone or other communications facilities the business transacted at the meeting, and a majority of resident Canadian directors would have been present had that director been present at the meeting.  If the Corporation has only one director, that director may constitute a meeting.

**4.10    Action in Writing**

A resolution in writing, signed by all the directors entitled to vote on that resolution at a meeting of directors or a committee of directors, is as valid as if it had been passed at a meeting of directors or a committee of directors.

**4.11    Meetings by Telephonic or Electronic Means**

Subject to the provisions of any unanimous shareholder agreement, if all the directors present at or participating in a meeting consent then any director may participate in such meeting by means of telephone, electronic or other communication facilities that permit all persons participating in the meeting to communicate simultaneously and instantaneously.

**4.12    Place of Meetings**

Meetings of the board may be held at the registered office of the Corporation or at any other place within or outside Ontario and in any financial year of the Corporation a majority of the meetings of the board need not be held in Canada.

**4.13    Calling of Meetings**

Subject to the provisions of any unanimous shareholder agreement, meetings of the board shall be held from time to time at such place, on such day and at such time as the board, the chairman of the board, the managing director, the president, the secretary or any two directors may determine.

**4.14    Notice of Meetings**

Notice of the time and place of each meeting of the board shall be given to each director not less than 48 hours before the time when the meeting is to be held and need not be in writing.

**4.15    First Meeting of New Board**

Provided a quorum of directors is present, each newly elected board may without notice hold its first meeting following the meeting of shareholders at which such board is elected.

**4.16    Adjourned Meeting**

Notice of an adjourned meeting of the directors is not required if the time and place of the adjourned meeting is announced at the original meeting.

**4.17    Regular Meetings**

Subject to the provisions of any unanimous shareholder agreement, the board may appoint a day or days in any month or months for regular meetings at a place and hour to be named.  A copy of any resolution by the board fixing the time and place of regular meetings of the board shall be sent to each director forthwith after being passed, but no other notice shall be required for any such regular meeting.

**4.18    Votes to Govern**

At all meetings of the board any question shall be decided by a majority of the votes cast on the question and in the case of an equality of votes the chairman of the meeting shall not be entitled

to a second or casting vote.  Any question at a meeting of the board shall be decided by a show of hands unless a ballot is required or demanded.

### 4.19    Chairman and Secretary

The chairman of the board or, in the absence of the chairman, the president if a director or, in the absence of the president, a vice-president who is a director shall be chairman of any meeting of the board.  If none of the said officers is present, the directors present shall choose one of their number to be chairman.  The secretary of the Corporation shall act as secretary at any meeting of the board and, if the secretary of the Corporation is absent, the chairman of the meeting shall appoint a person who need not be a director to act as secretary of the meeting.

### 4.20    Remuneration and Expenses

Subject to any unanimous shareholder agreement, the directors shall be paid such remuneration for their services as directors as the board may from time to time authorize.  The directors shall also be entitled to be paid in respect of travelling and other expenses properly incurred by them in attending meetings of the board or any committee thereof or in otherwise serving the Corporation.  Nothing herein contained shall preclude any director from serving the Corporation in any other capacity and receiving remuneration therefor.

### 4.21    Conflict of Interest

Subject to and in accordance with the provisions of the Act and any unanimous shareholder agreement, a director or officer of the Corporation who is a party to a material contract or transaction or proposed material contract or transaction with the Corporation, or is a director or an officer of or has a material interest in any person who is a party to a material contract or transaction or proposed material contract or transaction with the Corporation, shall disclose in writing to the Corporation or request to have entered in the minutes of meetings of directors the nature and extent of such interest, and any such director shall refrain from voting in respect thereof unless otherwise permitted by the Act.

## 5 - COMMITTEES

### 5.1    Committees of Directors

The board may appoint, from their number, a committee or committees of directors, however designated, and delegate to such committee or committees any of the powers of the board except powers to:

  (a)    submit to the shareholders any question or matter requiring the approval of the shareholders;

  (b)    fill a vacancy among the directors or in the office of auditor, or appoint or remove any of the chief executive officer, however designated, the chief financial officer, however designated, the chairman of the board or the president of the corporation;

  (c)    issue securities except in the manner and on the terms authorized by the directors;

(d)  declare dividends;

(e)  purchase, redeem or otherwise acquire shares issued by the Corporation;

(f)  pay a commission for the sale of shares of the Corporation;

(g)  approve a management information circular;

(h)  approve a take-over bid or directors' circular;

(i)  approve any annual financial statements; or

(j)  adopt, amend or repeal by-laws.

A majority of the members of any such committee shall be resident Canadians.

## 5.2    Transaction of Business

The powers of a committee of directors may be exercised by a meeting at which a quorum is present or by resolution in writing signed by all the members of such committee who would have been entitled to vote on that resolution at a meeting of the committee. Meetings of such committee may be held at any place in or outside Ontario and, subject to the provisions of section 4.11 which shall be applicable *mutatis mutandis*, may be held by means of telephone or other communications equipment.

## 5.3    Procedure

Unless otherwise determined by the board, each committee shall have the power to fix its quorum at not less than a majority of its members, to elect its chairman and to regulate its procedure.

## 6 - OFFICERS

## 6.1    Appointment of Officers

Subject to any unanimous shareholder agreement, the board may from time to time appoint a chairman of the board, a managing director (who shall be a resident Canadian), a president, one or more vice-presidents, a secretary, a treasurer and such other officers as the board may determine, including one or more assistants to any of the officers so appointed. The board may specify the duties of such officers and, in accordance with this by-law and subject to the provisions of the Act, delegate to such officers powers to manage the business and affairs of the Corporation other than any of the powers listed in section 5.1. Except for a managing director and a chairman of the board, an officer need not be a director and one person may hold more than one office. The president or such other officer as the board may designate shall be the chief executive officer of the Corporation.

### 6.2    Agents and Attorneys

The board shall have the power from time to time to appoint agents or attorneys for the Corporation in or out of Ontario with such powers of management or otherwise (including the power to sub-delegate) as the board may determine.

### 6.3    Conflict of Interest

An officer shall disclose an interest in any material contract or transaction or proposed material contract or transaction with the Corporation in accordance with section 4.21.

## 7 - PROTECTION OF DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS

### 7.1    Indemnity of Directors, Officers, Employees and Agents

The Corporation shall indemnify a director, officer, employee or agent of the Corporation, a former director, officer, employee or agent of the Corporation or a person who acts or acted at the Corporation's request as a director, officer, employee or agent of a body corporate of which the Corporation is or was a shareholder or creditor, and the heirs and legal representatives of any such person, against all costs, charges and expenses (including attorneys' fees), including an amount paid to settle an action or satisfy a judgment, reasonably incurred by such person in respect of any civil, criminal or administrative action or proceeding to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, if

(a)    the person acted honestly and in good faith with a view to the best interests of the Corporation; and

(b)    in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, the person had reasonable grounds for believing that the relevant conduct was lawful.

The Corporation may, with the approval of the court, indemnify a person referred to above in respect of an action by or on behalf of the Corporation or body corporate to procure a judgment in its favour, to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, against all costs, charges and expenses reasonably incurred by that person in connection with such action if the person fulfills the conditions set out in (a) and (b) above.  The Corporation shall pay all expenses (including attorneys' fees), judgments and fines incurred by a person seeking indemnification hereunder in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding in the manner provided herein upon receipt of an undertaking by or on behalf of the former or current director, officer, employee or agent to repay such amount if it shall be finally determined by a non-appealable judgment of a court of competent jurisdiction that he is not entitled to be indemnified by the Corporation as authorized in this section.  The indemnification and advancement of expenses provided for herein shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

The indemnification provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

Notwithstanding anything in this section, a person referred to above is entitled to indemnity from the Corporation in respect of all costs, charges and expenses reasonably incurred by that person in connection with the defence of any civil, criminal or administrative action or proceeding to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, if the person seeking indemnity,

(a)     was substantially successful on the merits in that person's defence of the action or proceeding; and

(b)     fulfills the conditions set out in (a) and (b) above.

## 7.2    Insurance

Subject to the Act, the Corporation may purchase and maintain insurance for the benefit of any person referred to above against any liability incurred by that person,

(a)     in the capacity as a current or former director, officer, employee or agent of the Corporation, except where the liability relates to that person's failure to act honestly and in good faith with a view to the best interests of the Corporation; or

(b)     in the capacity as a current or former director, officer, employee or agent of another body corporate where said person acts or acted in that capacity at the Corporation's request, except where the liability relates to that person's failure to act honestly and in good faith with a view to the best interests of the body corporate.

## 7.3    Amendment

Any alteration or amendment to these by-laws shall not terminate or adversely affect any (i) rights or protections of any person entitled to indemnification under this section 7 or (ii) obligations of the Corporation to provide any indemnification rights as detailed in this section 7.

## 8 - MEETINGS OF SHAREHOLDERS

## 8.1    Annual Meetings

The annual meeting of shareholders shall be held on such day and at such time in each year as the board, or the chairman of the board, or the president, in the absence of the chairman of the board, may from time to time determine, for the purpose of considering the financial statements and reports required by the Act to be placed before the annual meeting, electing directors,

appointing auditors and the transaction of such other business as may properly be brought before the meeting.

## 8.2    Special Meetings

The board shall have power to call a special meeting of shareholders at any time.

## 8.3    Resolution in Lieu of Meeting

Except where a written statement is submitted by a director or where representations in writing are submitted by an auditor in accordance with the provisions of the Act, a resolution in writing signed by all the shareholders entitled to vote on that resolution at a meeting of shareholders is as valid as if it had been passed at a meeting of the shareholders; and a resolution in writing dealing with all matters required to be dealt with at a meeting of shareholders, and signed by all the shareholders entitled to vote at such meeting, satisfies all the requirements of the Act relating to meetings of shareholders.

## 8.4    Place of Meetings

Subject to the articles and any unanimous shareholder agreement, a meeting of shareholders of the Corporation shall be held at such place in or outside Ontario as the directors determine or, in the absence of such a determination, at the place where the registered office of the Corporation is located.

## 8.5    Meeting by Electronic Means

Subject to the provisions of any unanimous shareholder agreement, a meeting of the shareholders may be held by telephonic or electronic means and a shareholder who, through such means, votes at the meeting or establishes a communications link to the meeting shall be deemed for the purposes of the Act to be present at the meeting.

## 8.6    Notices of Meetings

Notice of the time and place of every meeting of shareholders shall be sent in the case of an offering corporation, not less than 21 days and, in the case of any other corporation, not less than 10 days, but in either case, not more than 50 days before the meeting to each shareholder entitled to vote at the meeting, to each director and to the auditor of the Corporation.  Notice of a meeting of shareholders at which special business is to be transacted shall state or be accompanied by a statement of (i) the nature of that business in sufficient detail to permit the shareholder to form a reasoned judgment thereon and (ii) the text of any special resolution or by-law to be submitted to the meeting.  All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders, except consideration of the minutes of an earlier meeting, the financial statements and auditor's report, election of directors and reappointment of the incumbent auditor, is deemed to be special business.

**8.7     Record Date for Notice**

The board may fix in advance a record date, preceding the date of any meeting of shareholders by not more than 50 days and not less than 21 days, for the determination of the shareholders entitled to notice of the meeting, provided that notice of any such record date is given, not less than 7 days before such record date, by advertisement in a newspaper published or distributed in the place where the Corporation has its registered office and in each place in Canada where it has a transfer agent or where a transfer of the Corporation's shares may be recorded, and, where applicable, by written notice to each stock exchange in Canada on which the Corporation's shares are listed for trading unless notice of the record date is waived in writing by every holder of a share of the class or series affected whose name is set out in the securities register of the Corporation at the close of business on the day the directors fix the record date. If no record date is fixed the record date for the determination of the shareholders entitled to notice of the meeting shall be at the close of business on the day immediately preceding the day on which the notice is given.

**8.8     List of Shareholders Entitled to Notice**

For every meeting of shareholders, the Corporation shall prepare a list of shareholders entitled to receive notice of the meeting, arranged in alphabetical order and showing the number of shares entitled to be voted at the meeting held by each shareholder. If a record date for the meeting is fixed, such list shall be prepared as of such record date and not later than 10 days after such record date. If no record date is fixed, such list shall be prepared as of the close of business on the day immediately preceding the day on which the notice of the meeting is given and shall be prepared at such time. The list shall be available for examination by any shareholder during usual business hours at the registered office of the Corporation or at the place where its central securities register is maintained and at the meeting for which the list is prepared. Notwithstanding the foregoing, where no notice of meeting is given, such list shall be prepared as of the day on which the meeting is held and so that it is available at such meeting.

**8.9     Chairman and Secretary**

The chairman of the board or, in the absence of the chairman, the president or, in the absence of the president, a vice-president shall be chairman of any meeting of shareholders and, if none of the said officers be present within 15 minutes after the time appointed for holding the meeting, the shareholders present and entitled to vote shall choose a chairman from amongst themselves. The secretary of the Corporation shall act as secretary at any meeting of shareholders or, if the secretary of the Corporation be absent, the chairman of the meeting shall appoint some person, who need not be a shareholder, to act as secretary of the meeting. If desired, one or more scrutineers, who need not be shareholders, may be appointed by resolution or by the chairman with the consent of the meeting.

**8.10     Persons Entitled to be Present**

The only persons entitled to be present at a meeting of shareholders shall be those entitled to vote thereat, the directors and auditors of the Corporation and others who, although not entitled to vote, are entitled or required under any provision of the Act or the articles or by-laws to be

present at the meeting.  Any other person may be admitted only on the invitation of the chairman of the meeting or with the consent of the meeting.

**8.11    Quorum**

A quorum of shareholders is present at a meeting of shareholders irrespective of the number of persons actually present at the meeting, if the holders of a majority of the shares entitled to vote at the meeting are present in person or represented by proxy.  A quorum need not be present throughout the meeting provided that a quorum is present at the opening of the meeting.

**8.12    Right to Vote**

At any meeting of shareholders every person who is named in the list referred to in section 8.7, shall be entitled to vote the shares shown thereon opposite such person's name except to the extent that such person has transferred any of such shares and the transferee, upon producing properly endorsed certificates evidencing such shares or otherwise establishing that the transferee owns such shares, demands not later than the time at which the meeting commences that the transferred name be included on the list to vote the transferred shares at the meeting.

**8.13    Proxies and Representatives**

Every shareholder entitled to vote at a meeting of shareholders may, by means of a proxy, appoint a proxyholder, or one or more alternate proxyholders, who need not be shareholders, as that shareholder's nominee, to attend and act at the meeting in the manner, to the extent, and with the authority conferred by the proxy.  A proxy shall be signed in writing or by electronic signature by the shareholder or shareholder's attorney authorized in writing or by electronic signature.  A body corporate or association which is a shareholder of the Corporation may be represented at a meeting of shareholders by any individual authorized by a resolution of its directors or governing body of the body corporate or association and such individual may exercise on behalf of the body corporate or association represented all the powers it could exercise if it were an individual shareholder.  In the case of a proxy appointing a proxyholder to attend and act at a meeting or meetings of shareholders of an offering corporation, the proxy ceases to be valid one year from its date.

**8.14    Time for Deposit of Proxies**

The directors may by resolution fix a time not exceeding forty-eight hours, excluding non-business days, preceding any meeting or adjourned meeting of shareholders before which time proxies to be used at that meeting must be deposited with the Corporation or an agent thereof, and any period of time so fixed shall be specified in the notice calling the meeting.  A proxy may be used at the meeting only if, prior to the time so specified, it shall have been deposited with the Corporation or an agent thereof specified in such notice or, if no such time is specified in such notice, it shall have been received by the secretary of the Corporation or by the chairman of the meeting or adjournment thereof prior to the time of voting.

**8.15    Joint Shareholders**

Where two or more persons hold the same shares jointly, one of those holders present or represented by proxy at a meeting of shareholders may in the absence of the other or others vote such shares, but, if more than one of such persons are present or represented by proxy, that one of such persons whose name stands first on the securities register of the Corporation or that person's proxy shall alone be entitled to vote such shares.

**8.16    Votes to Govern**

Except as otherwise required by the Act, all questions proposed for the consideration of shareholders at a meeting of shareholders shall be determined by a majority of the votes cast, whether by a show of hands, or by ballot, as the case may be.

**8.17    Casting Vote**

In case of an equality of votes at any meeting of shareholders, regardless of the manner of voting, the chairman of the meeting shall not be entitled to a second or casting vote.

**8.18    Show of Hands**

Any question at a meeting of shareholders shall be decided by a show of hands, unless a ballot thereon is required or demanded as hereinafter provided.  Every person who is present and entitled to vote thereon shall have one vote.  Whenever a vote by any means other than by ballot is taken, a declaration by the chairman of the meeting that the vote upon the question has been carried or carried by a particular majority or not carried and an entry to that effect in the minutes of the meeting shall be *prima facie* evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against any resolution or other proceeding in respect of the said question, and the result of the vote so taken shall be the decision of the shareholders upon the said question.

**8.19    Ballots**

On any question proposed for consideration at a meeting of shareholders, and whether or not a show of hands has been taken thereon, the chairman may require, or any shareholder or proxyholder entitled to vote at the meeting may demand, a ballot.  A ballot so required or demanded shall be taken in such manner as the chairman shall direct.  A requirement or demand for a ballot may be withdrawn at any time prior to the taking of the ballot.  If a ballot is taken each person present shall be entitled, in respect of the shares which the person is entitled to vote at the meeting upon the question, to that number of votes provided by the Act or the articles, and the result of the ballot so taken shall be the decision of the shareholders upon the said question.

**8.20    Adjournment**

If a meeting of shareholders is adjourned for less than 30 days, it shall not be necessary to give notice of the adjourned meeting, other than by announcement at the earliest meeting that is adjourned.  If a meeting of shareholders is adjourned by one or more adjournments for an

- 15 -

aggregate of 30 days or more, notice of the adjourned meeting shall be given as for an original meeting.

**8.21    One Shareholder**

Where the Corporation has only one shareholder or only one holder of any class or series of shares, the shareholder present in person or by proxy constitutes a meeting.

## 9 - SECURITIES

**9.1    Options or Rights**

Subject to the provisions of the Act, the articles and any unanimous shareholder agreement, the board may from time to time issue or grant options to purchase or rights to acquire unissued shares of the Corporation at such times and to such persons and for such consideration as the board shall determine, provided that no share shall be issued until it is fully paid.

**9.2    Commissions**

The board may from time to time authorize the Corporation to pay a reasonable commission to any person in consideration of purchasing or agreeing to purchase shares of the Corporation, whether from the Corporation or from any other person, or procuring or agreeing to procure purchasers for any such shares.

**9.3    Securities Records**

The Corporation shall prepare and maintain, at its registered office or at any other place in Ontario designated by the board, a securities register in which it records the securities issued by it in registered form, showing with respect to each class or series of securities:

    (a)    the names, alphabetically arranged, of persons who,

        (i)    are or have been within six years registered as shareholders of the Corporation, the address including the street and number, if any, of every such person while a holder, and the number and class of shares registered in the name of such holder,

        (ii)    are or have been within six years registered as holders of debt obligations of the Corporation, the address including the street and number, if any, of every such person while a holder, and the class or series and principal amount of the debt obligations registered in the name of such holder, or

        (iii)    are or have been within six years registered as holders of warrants of the Corporation, other than warrants exercisable within one year from the date of issue, the address including the street and number, if any, of every such person while a registered holder, and the class or series and number of warrants registered in the name of such holder; and

(b)      the date and particulars of the issue of each security and warrant.

## 9.4    Register of Transfer

The Corporation shall cause to be kept a register of transfers in which all transfers of securities issued by the Corporation in registered form and the date and other particulars of each transfer shall be set out.

## 9.5    Registration of Transfer

Subject to the provisions of the Act, no transfer of shares shall be registered in a securities register except upon presentation of the certificate representing such shares with a transfer endorsed thereon or delivered therewith duly executed by the registered holder or by the holder's attorney or successor duly appointed, together with such reasonable assurance or evidence of signature, identification and authority to transfer as the board may from time to time prescribe, upon payment of all applicable taxes and any fees prescribed by the board or in accordance with the Act upon compliance with such restrictions on transfer as are authorized by the articles and upon satisfaction of any lien referred to in section 9.6.

## 9.6    Lien for Indebtedness

Except in the case of any class or series of shares of the Corporation listed on a stock exchange, the Corporation shall have a lien on the shares registered in the name of a shareholder who is indebted to the Corporation, to the extent of such indebtedness and such lien may be enforced, subject to any provision of the articles and to any unanimous shareholder agreement, by the sale of the shares thereby affected or by any other action, suit, remedy or proceeding authorized or permitted by law or by equity and, pending such enforcement, the Corporation may refuse to register a transfer of the whole or part of such shares.

## 9.7    Non-recognition of Trusts

Subject to the provisions of the Act, the Corporation may treat the registered owner of a share as the person exclusively entitled to vote, to receive notices, to receive any dividend or other payments in respect thereof and otherwise to exercise all the rights and powers of an owner of a share.

## 9.8    Security Instruments

Every holder of one or more securities of the Corporation shall be entitled, at the holder's option, to a security certificate in respect of the securities held by that person or to a non-transferable written acknowledgement of that person's right to obtain a security certificate, stating the number and class or series of shares held by that person as shown on the securities register. Security certificates and acknowledgements of a shareholder's right to a security certificate, respectively, shall be in such form as the board may from time to time approve.  Unless otherwise ordered by the board, security certificates shall be signed by any director or officer of the Corporation and need not be under corporate seal.  Signatures of signing officers may be printed or mechanically reproduced in facsimile upon security certificates and every such facsimile shall for all purposes be deemed to be the signature of the officer whose signature it

reproduces and shall be binding upon the Corporation; provided that at least one director or officer of the Corporation shall manually sign each certificate (other than a scrip certificate or a certificate representing a fractional share or a warrant or a promissory note that is not issued under a trust indenture) in the absence of a manual signature thereon of a duly appointed transfer agent, registrar, branch transfer agent or issuing or other authenticating agent of the Corporation or trustee who certifies it in accordance with a trust indenture.  A security certificate executed as aforesaid shall be valid notwithstanding that an officer whose facsimile signature appears thereon no longer holds office at the date of issue of the certificate.

### 9.9      Replacement of Security Certificates

Subject to the provisions of the Act, the board or any officer or agent designated by the board may in the discretion of the board or that person direct the issue of a new security certificate in lieu of and upon cancellation of a security certificate claimed to have been lost, apparently destroyed or wrongfully taken on payment of such fee, prescribed by or in accordance with the Act, and on such terms as to indemnity, reimbursement of expenses and evidence of loss and of title as the board may from time to time prescribe, whether generally or in any particular case.

### 9.10     Joint Shareholders

If two or more persons are registered as joint holders of any share, the Corporation shall not be bound to issue more than one certificate in respect thereof, and delivery of such certificate to one of such persons shall be sufficient delivery to all of them.  Any one of such persons may give effectual receipts for the certificate issued in respect thereof or for any dividend, bonus, return of capital or other money payable or warrant issuable in respect of such share.

### 9.11     Deceased Shareholders

In the event of the death of a holder, or of one of the joint holders, of any share, the Corporation shall not be required to make any entry in the securities register in respect thereof or to make payment of any dividends thereon except upon production of all such documents as may be required by the Act and upon compliance with the reasonable requirements of the Corporation or transfer agent.

## 10 - DIVIDENDS AND RIGHTS

### 10.1     Dividends

Subject to the provisions of the Act, the articles and any unanimous shareholder agreement, the board may from time to time declare dividends payable to the shareholders according to their respective rights and interests in the Corporation.  Dividends may be paid in money or property or by issuing fully paid shares or options or rights to acquire fully paid shares of the Corporation.

### 10.2     Dividend Cheques

A dividend payable in cash shall be paid by cheque drawn on the Corporation's bankers or one of them to the order of each registered holder of shares of the class or series in respect of which it has been declared and mailed by prepaid ordinary mail to such registered holder at the address

recorded in the Corporation's securities register, unless in each case such holder otherwise directs.  In the case of joint holders the cheque shall, unless such joint holders otherwise direct, be made payable to the order of all of such joint holders and, if more than one address is recorded in the Corporation's security register in respect of such joint holding, the cheque shall be mailed to the first address so appearing.  The mailing of such cheque as aforesaid, unless the same is not paid on due presentation, shall satisfy and discharge the liability for the dividend to the extent of the sum represented thereby plus the amount of any tax which the Corporation is required to and does withhold.

### 10.3    Non-receipt or Loss of Cheques

In the event of non-receipt or loss of any dividend cheque by the person to whom it is sent, the Corporation shall issue to such person a replacement cheque for a like amount on such terms as to indemnity, reimbursement of expenses and evidence of non-receipt and of title as the board may from time to time prescribe, whether generally or in any particular case.

### 10.4    Record Date for Dividends and Rights

The board may fix in advance a date as the record date for the determination of the shareholders entitled to receive payment of a dividend, entitled to participate in a liquidation or distribution, or for any other purpose except to receive notice of or to vote at a meeting, but the record date shall not precede by more than 50 days the particular action to be taken.  Notice of the record date shall be given, not less than 7 days before such record date, by advertisement in a newspaper published or distributed in the place where the Corporation has its registered office and in each place in Canada where it has a transfer agent or where a transfer of the Corporation's shares may be recorded and, where applicable, by written notice to each stock exchange in Canada on which the Corporation's shares are listed for trading, unless notice of the record date is waived in writing by every holder of a share of the class or series affected whose name is set out in the securities register of the Corporation at the close of business on the day the directors fix the record date.  If no such record date is fixed, such record date shall be the close of business on the day on which the directors pass the resolutions relating thereto.

### 10.5    Unclaimed Dividends

Any dividend unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Corporation.

## 11 - NOTICES

### 11.1    Method of Giving Notices

Subject to the provisions of any unanimous shareholder agreement, any notice, communication or document ("notice") to be given or sent pursuant to the Act, the articles, the by-laws or otherwise to or on a shareholder, director, officer, auditor or member of a committee of the board shall be sufficiently given or sent if given or sent by prepaid mail, prepaid transmitted, recorded, or electronic communication capable of providing a written copy of such notice, or delivered personally to such person's latest address as shown on the securities register of the Corporation or, in the case of a director, if more current, the address as shown in the most recent notice filed

under the *Corporations Information Act* (Ontario).   A notice shall be deemed to have been received on the date when it is delivered personally, or on the fifth day after mailing, or on the date of dispatch of a transmitted or recorded electronic communication.   The secretary may change or cause to be changed the recorded address of any shareholder, director, officer, auditor or member of a committee of the board in accordance with any information believed by the secretary to be reliable.

## 11.2    Notice to Joint Shareholders

If two or more persons are registered as joint holders of any share, any notice shall be addressed to all of such joint holders but notice to one of such persons shall be sufficient notice to all of them.

## 11.3    Computation of Time

Subject to the provisions of any unanimous shareholder agreement, in computing the date when notice must be sent under any provision requiring a specified period of days' notice of any meeting or other event, the period of days shall commence on the day following the sending of such notice and shall terminate on the day preceding the date of the meeting or other event provided that the last day of the period shall not be a non-business day.

## 11.4    Undelivered Notices

If any notice given or sent to a shareholder pursuant to section 11.1 is returned on three consecutive occasions because the person cannot be found, the Corporation shall not be required to give or send any further notice to such shareholder until the Corporation is informed in writing of the new address for such person.

## 11.5    Omissions and Errors

The accidental omission to give or send any notice to any shareholder, director, officer, auditor or member of a committee of the board or the non-receipt of any notice by any such person or any error in any notice not affecting the substance thereof shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise based thereon.

## 11.6    Persons Entitled by Death or Operation of Law

Every person who, by operation of law, transfer, death of a shareholder or any other means whatsoever, shall become entitled to any share, shall be bound by every notice in respect of such share which shall have been duly given or sent to the shareholder from whom the person derives title to such share prior to that person's name and address being entered on the securities register (whether such notice was given or sent before or after the happening of the event upon which that person becomes so entitled) and prior to that person furnishing to the Corporation the proof of authority or evidence of entitlement prescribed by the Act.

**11.7    Waiver of Notice**

Any shareholder (or shareholder's duly appointed proxyholder), director, officer, auditor or member of a committee of the board may at any time waive the giving or sending of any notice, or waive or abridge the time for any notice, required to be given to that person under any provision of the Act, the articles, the by-laws or otherwise and such waiver or abridgement shall cure any default in the giving or sending or in the time of such notice, as the case may be.  Any such waiver or abridgement shall be in writing or given by electronic signature except a waiver of notice of a meeting of shareholders or of the board which may be given in any manner. Attendance of a director at a meeting of directors or of a shareholder or any other person entitled to attend a meeting of shareholders is a waiver of notice of the meeting except where such director, shareholder or other person, as the case may be, attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

The foregoing By-law No. 3 is passed as evidenced by the signature of the director of the Corporation pursuant to the provisions of the *Business Corporations Act* (Ontario).

DATED [●], 2014.

_____
[_____]

**BY-LAW NO. 2**

a by-law relating generally to the transaction of the business and affairs of

## SKYTERRA HOLDINGS (CANADA) INC.[1]

(the "Corporation")

**1 - INTERPRETATION**

**1.1    Definitions**

In this by-law and all other by-laws of the Corporation, unless the context requires otherwise:

(a)    "the Act" means the *Business Corporations Act* (Ontario), or any statute which may be substituted therefor, including the regulations made thereunder as amended from time to time;

(b)    "articles" means the original or restated articles of incorporation, articles of amendment, articles of amalgamation, articles of arrangement, articles of continuance, articles of dissolution, articles of re-organization, articles of revival, letters patent, supplementary letters patent, a special Act and any other instrument by which the Corporation is incorporated;

(c)    "board" means the board of directors of the Corporation; and "director" means a member of the board;

(d)    "meeting of shareholders" means an annual meeting of shareholders or a special meeting of shareholders;

(e)    "non-business day" means Saturday, Sunday and any other day that is a holiday as defined in the *Interpretation Act* (Ontario);

(f)    "person" includes an individual, sole proprietorship, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, and a natural person in the capacity of trustee, executor, administrator, or other legal representative;

(g)    "resident Canadian" means a Canadian citizen ordinarily resident in Canada or as otherwise defined in the Act;

---

[1]    This organizational document may be further revised prior to the Effective Date, in consultation with local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

(h)     "unanimous shareholder agreement" means a written agreement among all the shareholders of the Corporation, or among all such shareholders and one or more persons who are not shareholders, or a written declaration by a person who is the beneficial owner of all the issued shares of the Corporation, that restricts, in whole or in part, the powers of the directors to manage or supervise the management of the business and affairs of the Corporation, as may be from time to time amended;

(i)     words importing the singular number also include the plural and vice-versa; words importing the masculine gender include the feminine and neuter genders;

(j)     all words used in this by-law and defined in the Act shall have the meanings given to such words in the Act or in the related Parts thereof.

## 1.2    Execution in Counterpart and by Electronic Means

Subject to the Act, signatures on any notice, resolution, requisition, statement or other document required or permitted to be executed for the purposes of the Act may be obtained by means of facsimile or other electronic means or by execution of several documents of like form, each of which is executed by one or more persons, and such documents, when duly executed by all persons required or permitted, as the case may be, to do so, shall be deemed to constitute one document for the purposes of the Act.

## 2 - GENERAL BUSINESS

## 2.1    Registered Office

The registered office of the Corporation shall be in the municipality or geographical township within Ontario specified in the articles or in a special resolution and at such location therein as the board may from time to time determine.

## 2.2    Seal

The Corporation may have a seal which shall be adopted and may be changed by the board.

## 2.3    Financial Year

The financial year end of the Corporation shall be as determined by the directors.

## 2.4    Execution of Instruments

Deeds, transfers, assignments, contracts, obligations, certificates and other instruments shall be signed on behalf of the Corporation by any director or officer of the Corporation.  In addition, the board may from time to time direct the manner in which and the person or persons by whom any particular instrument or class of instruments may or shall be signed.

The secretary or any other officer or any director may sign certificates and similar instruments (other than share certificates) on the Corporation's behalf with respect to any factual matters

relating to the Corporation's business and affairs, including certificates verifying copies of the articles, by-laws, resolutions and minutes of meetings of the Corporation.

## 2.5    Banking Arrangements

The banking business of the Corporation, or any part thereof, shall be transacted with such bank, trust company or other firm or body corporate as the board may designate, appoint or authorize from time to time and all such banking business, or any part thereof, shall be transacted on the Corporation's behalf by such one or more officers or other persons as the board may designate, direct or authorize from time to time and to the extent thereby provided.

## 3 - BORROWING

### 3.1    Borrowing

Without limit to the powers of the board as provided in the Act, the board may from time to time on behalf of the Corporation:

    (a)    borrow money upon the credit of the Corporation;

    (b)    issue, reissue, sell or pledge debt obligations of the Corporation;

    (c)    to the extent permitted by the Act, give, directly or indirectly, financial assistance to any person by means of a loan, a guarantee or otherwise to secure the performance of an obligation; and

    (d)    mortgage, hypothecate, pledge or otherwise create a security interest in all or any property of the Corporation, owned or subsequently acquired, to secure any obligation of the Corporation.

### 3.2    Delegation

Subject to the Act, the articles, the by-laws and any unanimous shareholder agreement, the board may from time to time delegate to a director, a committee of directors or an officer of the Corporation or such other person or persons so designated by the board all or any of the powers conferred on the board by section 3.1 or by the Act to such extent and in such manner as the board shall determine at the time of each such delegation.

## 4 - DIRECTORS

### 4.1    Duties of Directors

Subject to any unanimous shareholder agreement, the board shall manage or supervise the management of the business and affairs of the Corporation.

### 4.2    Qualifications of Directors

At least twenty-five percent (25%) of the directors on the board shall be resident Canadians, but if the Corporation has less than four directors, at least one director shall be a resident Canadian.

No person shall be elected or appointed a director if that person is less than 18 years of age, of unsound mind and has been so found by a court in Canada or elsewhere, is not an individual, or has the status of bankrupt. A director need not hold shares issued by the Corporation. If the Corporation is an offering corporation then at least one-third (1/3) of the directors shall not be officers or employees of the Corporation or any of its affiliates.

## 4.3    Number of Directors

The board shall consist of such number of directors as shall be set out in the articles or as may from time to time be determined in accordance with the Act. If the board is empowered by special resolution to determine the number of directors within a range set out in the articles:

(a)    the directors may appoint additional directors provided that after such appointment the total number of directors would not be greater than one and one-third times the number of directors required to have been elected at the last annual meeting nor greater than the maximum number set out above; and

(b)    the number of directors to be elected at the annual meeting shall be the number of directors last determined by the board.

## 4.4    Quorum

A majority of the number as determined from time to time in accordance with the Act shall constitute a quorum for the transaction of business. If the Corporation has fewer than three directors, all directors must be present at any meeting to constitute a quorum for the transaction of business. Notwithstanding vacancies, a quorum of directors may exercise all the powers of the board.

## 4.5    Election and Term

Directors shall be elected by the shareholders at the first meeting of shareholders after the effective date of this by-law and at each succeeding annual meeting at which an election of directors is required and shall hold office until the next annual meeting of shareholders or, if elected for an expressly stated term, for a term expiring not later than the close of the third annual meeting of shareholders following the election. The number of directors to be elected at any such meeting shall be that number most recently determined in the manner referred to in section 4.3. The election need not be by ballot unless a ballot is demanded by any shareholder or required by the chairman in accordance with section 8.18. If an election of directors is not held at an annual meeting of shareholders at which such election is required, the incumbent directors shall continue in office until their successors are elected.

## 4.6    Removal of Directors

Subject to the provisions of the Act, the shareholders may, by ordinary resolution passed by a majority of the votes cast at a meeting of shareholders, remove any director and may at that meeting elect a qualified person in place of that director for the unexpired term of such director's predecessor.

**4.7    Ceasing to Hold Office**

A director may resign as director by delivering a written resignation to the Corporation and such resignation becomes effective at the time the resignation is received by the Corporation or the time specified in the resignation whichever is later.   A director shall forthwith cease to hold office as a director should the director cease to be qualified in accordance with the Act.   Any attempt to amend or terminate any unanimous shareholder agreement without written consent of all persons who are then directors of the Corporation shall constitute the immediately effective resignation of all such directors who have not so consented.

**4.8    Vacancies**

Subject to the Act, a quorum of directors (whether or not the majority of such quorum are resident Canadians) may fill a vacancy among the directors, except a vacancy resulting from,

(a)    an increase in the number of directors otherwise than an increase in the board of directors pursuant to a special resolution empowering the board to fix the number of directors within a range set out in the articles; or,

(b)    an increase in the maximum number of directors set out in the articles, as the case may be; or,

(c)    a failure to elect the number of directors required to be elected at any meeting of shareholders.

**4.9    Action by the Board**

Subject to any unanimous shareholder agreement, the board shall exercise its powers by or pursuant to a by-law or resolution either passed at a meeting of directors at which a quorum is present and at which a majority of the directors present are resident Canadians or consented to by the signatures of all the directors then in office if constituting a quorum.   If the Corporation has fewer than three directors, one of the directors present at a meeting of directors shall be a resident Canadian.   Subject to the Act, the board may transact business at a meeting of directors where a majority of resident Canadian directors is not present if a resident Canadian director who is unable to be present approves in writing or by telephone or other communications facilities the business transacted at the meeting, and a majority of resident Canadian directors would have been present had that director been present at the meeting.   If the Corporation has only one director, that director may constitute a meeting.

**4.10    Action in Writing**

A resolution in writing, signed by all the directors entitled to vote on that resolution at a meeting of directors or a committee of directors, is as valid as if it had been passed at a meeting of directors or a committee of directors.

**4.11    Meetings by Telephonic or Electronic Means**

If all the directors present at or participating in a meeting consent then any director may participate in such meeting by means of telephone, electronic or other communication facilities that permit all persons participating in the meeting to communicate simultaneously and instantaneously.

**4.12    Place of Meetings**

Meetings of the board may be held at the registered office of the Corporation or at any other place within or outside Ontario and in any financial year of the Corporation a majority of the meetings of the board need not be held in Canada.

**4.13    Calling of Meetings**

Meetings of the board shall be held from time to time at such place, on such day and at such time as the board, the chairman of the board, the managing director, the president, the secretary or any two directors may determine.

**4.14    Notice of Meetings**

Notice of the time and place of each meeting of the board shall be given to each director not less than 48 hours before the time when the meeting is to be held and need not be in writing.

**4.15    First Meeting of New Board**

Provided a quorum of directors is present, each newly elected board may without notice hold its first meeting following the meeting of shareholders at which such board is elected.

**4.16    Adjourned Meeting**

Notice of an adjourned meeting of the directors is not required if the time and place of the adjourned meeting is announced at the original meeting.

**4.17    Regular Meetings**

The board may appoint a day or days in any month or months for regular meetings at a place and hour to be named.  A copy of any resolution by the board fixing the time and place of regular meetings of the board shall be sent to each director forthwith after being passed, but no other notice shall be required for any such regular meeting.

**4.18    Votes to Govern**

At all meetings of the board any question shall be decided by a majority of the votes cast on the question and in the case of an equality of votes the chairman of the meeting shall not be entitled to a second or casting vote.  Any question at a meeting of the board shall be decided by a show of hands unless a ballot is required or demanded.

**4.19    Chairman and Secretary**

The chairman of the board or, in the absence of the chairman, the president if a director or, in the absence of the president, a vice-president who is a director shall be chairman of any meeting of the board.  If none of the said officers is present, the directors present shall choose one of their number to be chairman.  The secretary of the Corporation shall act as secretary at any meeting of the board and, if the secretary of the Corporation is absent, the chairman of the meeting shall appoint a person who need not be a director to act as secretary of the meeting.

**4.20    Remuneration and Expenses**

Subject to any unanimous shareholder agreement, the directors shall be paid such remuneration for their services as directors as the board may from time to time authorize.  The directors shall also be entitled to be paid in respect of travelling and other expenses properly incurred by them in attending meetings of the board or any committee thereof or in otherwise serving the Corporation.  Nothing herein contained shall preclude any director from serving the Corporation in any other capacity and receiving remuneration therefor.

**4.21    Conflict of Interest**

Subject to and in accordance with the provisions of the Act, a director or officer of the Corporation who is a party to a material contract or transaction or proposed material contract or transaction with the Corporation, or is a director or an officer of or has a material interest in any person who is a party to a material contract or transaction or proposed material contract or transaction with the Corporation, shall disclose in writing to the Corporation or request to have entered in the minutes of meetings of directors the nature and extent of such interest, and any such director shall refrain from voting in respect thereof unless otherwise permitted by the Act.

## 5 - COMMITTEES

**5.1    Committees of Directors**

The board may appoint, from their number, a committee or committees of directors, however designated, and delegate to such committee or committees any of the powers of the board except powers to:

(a)    submit to the shareholders any question or matter requiring the approval of the shareholders;

(b)    fill a vacancy among the directors or in the office of auditor, or appoint or remove any of the chief executive officer, however designated, the chief financial officer, however designated, the chairman of the board or the president of the corporation;

(c)    issue securities except in the manner and on the terms authorized by the directors;

(d)    declare dividends;

(e)    purchase, redeem or otherwise acquire shares issued by the Corporation;

  (f)  pay a commission for the sale of shares of the Corporation;

  (g)  approve a management information circular;

  (h)  approve a take-over bid or directors' circular;

  (i)  approve any annual financial statements; or

  (j)  adopt, amend or repeal by-laws.

A majority of the members of any such committee shall be resident Canadians.

## 5.2  Transaction of Business

The powers of a committee of directors may be exercised by a meeting at which a quorum is present or by resolution in writing signed by all the members of such committee who would have been entitled to vote on that resolution at a meeting of the committee. Meetings of such committee may be held at any place in or outside Ontario and, subject to the provisions of section 4.11 which shall be applicable *mutatis mutandis*, may be held by means of telephone or other communications equipment.

## 5.3  Procedure

Unless otherwise determined by the board, each committee shall have the power to fix its quorum at not less than a majority of its members, to elect its chairman and to regulate its procedure.

## 6 - OFFICERS

## 6.1  Appointment of Officers

Subject to any unanimous shareholder agreement, the board may from time to time appoint a chairman of the board, a managing director (who shall be a resident Canadian), a president, one or more vice-presidents, a secretary, a treasurer and such other officers as the board may determine, including one or more assistants to any of the officers so appointed. The board may specify the duties of such officers and, in accordance with this by-law and subject to the provisions of the Act, delegate to such officers powers to manage the business and affairs of the Corporation other than any of the powers listed in section 5.1. Except for a managing director and a chairman of the board, an officer need not be a director and one person may hold more than one office. The president or such other officer as the board may designate shall be the chief executive officer of the Corporation.

## 6.2  Agents and Attorneys

The board shall have the power from time to time to appoint agents or attorneys for the Corporation in or out of Ontario with such powers of management or otherwise (including the power to sub-delegate) as the board may determine.

## 6.3    Conflict of Interest

An officer shall disclose an interest in any material contract or transaction or proposed material contract or transaction with the Corporation in accordance with section 4.21.

## 7 - PROTECTION OF DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS

## 7.1    Indemnity of Directors, Officers, Employees and Agents

The Corporation shall indemnify a director, officer, employee or agent of the Corporation, a former director, officer, employee or agent of the Corporation or a person who acts or acted at the Corporation's request as a director, officer, employee or agent of a body corporate of which the Corporation is or was a shareholder or creditor, and the heirs and legal representatives of any such person, against all costs, charges and expenses (including attorneys' fees), including an amount paid to settle an action or satisfy a judgment, reasonably incurred by such person in respect of any civil, criminal or administrative action or proceeding to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, if

(a)    the person acted honestly and in good faith with a view to the best interests of the Corporation; and

(b)    in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, the person had reasonable grounds for believing that the relevant conduct was lawful.

The Corporation may, with the approval of the court, indemnify a person referred to above in respect of an action by or on behalf of the Corporation or body corporate to procure a judgment in its favour, to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, against all costs, charges and expenses reasonably incurred by that person in connection with such action if the person fulfills the conditions set out in (a) and (b) above.  The Corporation shall pay all expenses (including attorneys' fees), judgments and fines incurred by a person seeking indemnification hereunder in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding in the manner provided herein upon receipt of an undertaking by or on behalf of the former or current director, officer, employee or agent to repay such amount if it shall be finally determined by a non-appealable judgment of a court of competent jurisdiction that he is not entitled to be indemnified by the Corporation as authorized in this section.  The indemnification and advancement of expenses provided for herein shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

The indemnification provided herein shall not be deemed to limit the right of the Corporation to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification from the Corporation may be entitled under any agreement, vote of stockholders or disinterested directors

or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

Notwithstanding anything in this section, a person referred to above is entitled to indemnity from the Corporation in respect of all costs, charges and expenses reasonably incurred by that person in connection with the defence of any civil, criminal or administrative action or proceeding to which the person is made a party by reason of being or having been a director, officer, employee or agent of the Corporation or body corporate, if the person seeking indemnity,

     (a)    was substantially successful on the merits in that person's defence of the action or proceeding; and

     (b)    fulfills the conditions set out in (a) and (b) above.

## 7.2    Insurance

Subject to the Act, the Corporation may purchase and maintain insurance for the benefit of any person referred to above against any liability incurred by that person,

     (a)    in the capacity as a current or former director, officer, employee or agent of the Corporation, except where the liability relates to that person's failure to act honestly and in good faith with a view to the best interests of the Corporation; or

     (b)    in the capacity as a current or former director, officer, employee or agent of another body corporate where said person acts or acted in that capacity at the Corporation's request, except where the liability relates to that person's failure to act honestly and in good faith with a view to the best interests of the body corporate.

## 7.3    Amendment

Any alteration or amendment to these by-laws shall not terminate or adversely affect any (i) rights or protections of any person entitled to indemnification under this section 7 or (ii) obligations of the Corporation to provide any indemnification rights as detailed in this section 7.

## 8 - MEETINGS OF SHAREHOLDERS

## 8.1    Annual Meetings

The annual meeting of shareholders shall be held on such day and at such time in each year as the board, or the chairman of the board, or the president, in the absence of the chairman of the board, may from time to time determine, for the purpose of considering the financial statements and reports required by the Act to be placed before the annual meeting, electing directors, appointing auditors and the transaction of such other business as may properly be brought before the meeting.

**8.2    Special Meetings**

The board shall have power to call a special meeting of shareholders at any time.

**8.3    Resolution in Lieu of Meeting**

Except where a written statement is submitted by a director or where representations in writing are submitted by an auditor in accordance with the provisions of the Act, a resolution in writing signed by all the shareholders entitled to vote on that resolution at a meeting of shareholders is as valid as if it had been passed at a meeting of the shareholders; and a resolution in writing dealing with all matters required to be dealt with at a meeting of shareholders, and signed by all the shareholders entitled to vote at such meeting, satisfies all the requirements of the Act relating to meetings of shareholders.

**8.4    Place of Meetings**

Subject to the articles and any unanimous shareholder agreement, a meeting of shareholders of the Corporation shall be held at such place in or outside Ontario as the directors determine or, in the absence of such a determination, at the place where the registered office of the Corporation is located.

**8.5    Meeting by Electronic Means**

A meeting of the shareholders may be held by telephonic or electronic means and a shareholder who, through such means, votes at the meeting or establishes a communications link to the meeting shall be deemed for the purposes of the Act to be present at the meeting.

**8.6    Notices of Meetings**

Notice of the time and place of every meeting of shareholders shall be sent in the case of an offering corporation, not less than 21 days and, in the case of any other corporation, not less than 10 days, but in either case, not more than 50 days before the meeting to each shareholder entitled to vote at the meeting, to each director and to the auditor of the Corporation.  Notice of a meeting of shareholders at which special business is to be transacted shall state or be accompanied by a statement of (i) the nature of that business in sufficient detail to permit the shareholder to form a reasoned judgment thereon and (ii) the text of any special resolution or by-law to be submitted to the meeting.   All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders, except consideration of the minutes of an earlier meeting, the financial statements and auditor's report, election of directors and reappointment of the incumbent auditor, is deemed to be special business.

**8.7    Record Date for Notice**

The board may fix in advance a record date, preceding the date of any meeting of shareholders by not more than 50 days and not less than 21 days, for the determination of the shareholders entitled to notice of the meeting, provided that notice of any such record date is given, not less than 7 days before such record date, by advertisement in a newspaper published or distributed in the place where the Corporation has its registered office and in each place in Canada where it has

a transfer agent or where a transfer of the Corporation's shares may be recorded, and, where applicable, by written notice to each stock exchange in Canada on which the Corporation's shares are listed for trading unless notice of the record date is waived in writing by every holder of a share of the class or series affected whose name is set out in the securities register of the Corporation at the close of business on the day the directors fix the record date. If no record date is fixed the record date for the determination of the shareholders entitled to notice of the meeting shall be at the close of business on the day immediately preceding the day on which the notice is given.

## 8.8    List of Shareholders Entitled to Notice

For every meeting of shareholders, the Corporation shall prepare a list of shareholders entitled to receive notice of the meeting, arranged in alphabetical order and showing the number of shares entitled to be voted at the meeting held by each shareholder. If a record date for the meeting is fixed, such list shall be prepared as of such record date and not later than 10 days after such record date. If no record date is fixed, such list shall be prepared as of the close of business on the day immediately preceding the day on which the notice of the meeting is given and shall be prepared at such time. The list shall be available for examination by any shareholder during usual business hours at the registered office of the Corporation or at the place where its central securities register is maintained and at the meeting for which the list is prepared. Notwithstanding the foregoing, where no notice of meeting is given, such list shall be prepared as of the day on which the meeting is held and so that it is available at such meeting.

## 8.9    Chairman and Secretary

The chairman of the board or, in the absence of the chairman, the president or, in the absence of the president, a vice-president shall be chairman of any meeting of shareholders and, if none of the said officers be present within 15 minutes after the time appointed for holding the meeting, the shareholders present and entitled to vote shall choose a chairman from amongst themselves. The secretary of the Corporation shall act as secretary at any meeting of shareholders or, if the secretary of the Corporation be absent, the chairman of the meeting shall appoint some person, who need not be a shareholder, to act as secretary of the meeting. If desired, one or more scrutineers, who need not be shareholders, may be appointed by resolution or by the chairman with the consent of the meeting.

## 8.10    Persons Entitled to be Present

The only persons entitled to be present at a meeting of shareholders shall be those entitled to vote threat, the directors and auditors of the Corporation and others who, although not entitled to vote, are entitled or required under any provision of the Act or the articles or by-laws to be present at the meeting. Any other person may be admitted only on the invitation of the chairman of the meeting or with the consent of the meeting.

## 8.11    Quorum

A quorum of shareholders is present at a meeting of shareholders irrespective of the number of persons actually present at the meeting, if the holders of a majority of the shares entitled to vote

at the meeting are present in person or represented by proxy. A quorum need not be present throughout the meeting provided that a quorum is present at the opening of the meeting.

### 8.12    Right to Vote

At any meeting of shareholders every person who is named in the list referred to in section 8.7, shall be entitled to vote the shares shown thereon opposite such person's name except to the extent that such person has transferred any of such shares and the transferee, upon producing properly endorsed certificates evidencing such shares or otherwise establishing that the transferee owns such shares, demands not later than the time at which the meeting commences that the transferred name be included on the list to vote the transferred shares at the meeting.

### 8.13    Proxies and Representatives

Every shareholder entitled to vote at a meeting of shareholders may, by means of a proxy, appoint a proxyholder, or one or more alternate proxyholders, who need not be shareholders, as that shareholder's nominee, to attend and act at the meeting in the manner, to the extent, and with the authority conferred by the proxy. A proxy shall be signed in writing or by electronic signature by the shareholder or shareholder's attorney authorized in writing or by electronic signature. A body corporate or association which is a shareholder of the Corporation may be represented at a meeting of shareholders by any individual authorized by a resolution of its directors or governing body of the body corporate or association and such individual may exercise on behalf of the body corporate or association represented all the powers it could exercise if it were an individual shareholder. In the case of a proxy appointing a proxyholder to attend and act at a meeting or meetings of shareholders of an offering corporation, the proxy ceases to be valid one year from its date.

### 8.14    Time for Deposit of Proxies

The directors may by resolution fix a time not exceeding forty-eight hours, excluding non-business days, preceding any meeting or adjourned meeting of shareholders before which time proxies to be used at that meeting must be deposited with the Corporation or an agent thereof, and any period of time so fixed shall be specified in the notice calling the meeting. A proxy may be used at the meeting only if, prior to the time so specified, it shall have been deposited with the Corporation or an agent thereof specified in such notice or, if no such time is specified in such notice, it shall have been received by the secretary of the Corporation or by the chairman of the meeting or adjournment thereof prior to the time of voting.

### 8.15    Joint Shareholders

Where two or more persons hold the same shares jointly, one of those holders present or represented by proxy at a meeting of shareholders may in the absence of the other or others vote such shares, but, if more than one of such persons are present or represented by proxy, that one of such persons whose name stands first on the securities register of the Corporation or that person's proxy shall alone be entitled to vote such shares.

**8.16    Votes to Govern**

Except as otherwise required by the Act, all questions proposed for the consideration of shareholders at a meeting of shareholders shall be determined by a majority of the votes cast, whether by a show of hands, or by ballot, as the case may be.

**8.17    Casting Vote**

In case of an equality of votes at any meeting of shareholders, regardless of the manner of voting, the chairman of the meeting shall not be entitled to a second or casting vote.

**8.18    Show of Hands**

Any question at a meeting of shareholders shall be decided by a show of hands, unless a ballot thereon is required or demanded as hereinafter provided.  Every person who is present and entitled to vote thereon shall have one vote.  Whenever a vote by any means other than by ballot is taken, a declaration by the chairman of the meeting that the vote upon the question has been carried or carried by a particular majority or not carried and an entry to that effect in the minutes of the meeting shall be *prima facie* evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against any resolution or other proceeding in respect of the said question, and the result of the vote so taken shall be the decision of the shareholders upon the said question.

**8.19    Ballots**

On any question proposed for consideration at a meeting of shareholders, and whether or not a show of hands has been taken thereon, the chairman may require, or any shareholder or proxyholder entitled to vote at the meeting may demand, a ballot.  A ballot so required or demanded shall be taken in such manner as the chairman shall direct.  A requirement or demand for a ballot may be withdrawn at any time prior to the taking of the ballot.  If a ballot is taken each person present shall be entitled, in respect of the shares which the person is entitled to vote at the meeting upon the question, to that number of votes provided by the Act or the articles, and the result of the ballot so taken shall be the decision of the shareholders upon the said question.

**8.20    Adjournment**

If a meeting of shareholders is adjourned for less than 30 days, it shall not be necessary to give notice of the adjourned meeting, other than by announcement at the earliest meeting that is adjourned.  If a meeting of shareholders is adjourned by one or more adjournments for an aggregate of 30 days or more, notice of the adjourned meeting shall be given as for an original meeting.

**8.21    One Shareholder**

Where the Corporation has only one shareholder or only one holder of any class or series of shares, the shareholder present in person or by proxy constitutes a meeting.

## 9 - SECURITIES

### 9.1    Options or Rights

Subject to the provisions of the Act, the articles and any unanimous shareholder agreement, the board may from time to time issue or grant options to purchase or rights to acquire unissued shares of the Corporation at such times and to such persons and for such consideration as the board shall determine, provided that no share shall be issued until it is fully paid.

### 9.2    Commissions

The board may from time to time authorize the Corporation to pay a reasonable commission to any person in consideration of purchasing or agreeing to purchase shares of the Corporation, whether from the Corporation or from any other person, or procuring or agreeing to procure purchasers for any such shares.

### 9.3    Securities Records

The Corporation shall prepare and maintain, at its registered office or at any other place in Ontario designated by the board, a securities register in which it records the securities issued by it in registered form, showing with respect to each class or series of securities:

    (a)    the names, alphabetically arranged, of persons who,

        (i)    are or have been within six years registered as shareholders of the Corporation, the address including the street and number, if any, of every such person while a holder, and the number and class of shares registered in the name of such holder,

        (ii)    are or have been within six years registered as holders of debt obligations of the Corporation, the address including the street and number, if any, of every such person while a holder, and the class or series and principal amount of the debt obligations registered in the name of such holder, or

        (iii)    are or have been within six years registered as holders of warrants of the Corporation, other than warrants exercisable within one year from the date of issue, the address including the street and number, if any, of every such person while a registered holder, and the class or series and number of warrants registered in the name of such holder; and

    (b)    the date and particulars of the issue of each security and warrant.

### 9.4    Register of Transfer

The Corporation shall cause to be kept a register of transfers in which all transfers of securities issued by the Corporation in registered form and the date and other particulars of each transfer shall be set out.

- 16 -

**9.5        Registration of Transfer**

Subject to the provisions of the Act, no transfer of shares shall be registered in a securities register except upon presentation of the certificate representing such shares with a transfer endorsed thereon or delivered therewith duly executed by the registered holder or by the holder's attorney or successor duly appointed, together with such reasonable assurance or evidence of signature, identification and authority to transfer as the board may from time to time prescribe, upon payment of all applicable taxes and any fees prescribed by the board or in accordance with the Act upon compliance with such restrictions on transfer as are authorized by the articles and upon satisfaction of any lien referred to in section 9.6.

**9.6        Lien for Indebtedness**

Except in the case of any class or series of shares of the Corporation listed on a stock exchange, the Corporation shall have a lien on the shares registered in the name of a shareholder who is indebted to the Corporation, to the extent of such indebtedness and such lien may be enforced, subject to any provision of the articles and to any unanimous shareholder agreement, by the sale of the shares thereby affected or by any other action, suit, remedy or proceeding authorized or permitted by law or by equity and, pending such enforcement, the Corporation may refuse to register a transfer of the whole or part of such shares.

**9.7        Non-recognition of Trusts**

Subject to the provisions of the Act, the Corporation may treat the registered owner of a share as the person exclusively entitled to vote, to receive notices, to receive any dividend or other payments in respect thereof and otherwise to exercise all the rights and powers of an owner of a share.

**9.8        Security Instruments**

Every holder of one or more securities of the Corporation shall be entitled, at the holder's option, to a security certificate in respect of the securities held by that person or to a non-transferable written acknowledgement of that person's right to obtain a security certificate, stating the number and class or series of shares held by that person as shown on the securities register. Security certificates and acknowledgements of a shareholder's right to a security certificate, respectively, shall be in such form as the board may from time to time approve.   Unless otherwise ordered by the board, security certificates shall be signed by any director or officer of the Corporation and need not be under corporate seal.   Signatures of signing officers may be printed or mechanically reproduced in facsimile upon security certificates and every such facsimile shall for all purposes be deemed to be the signature of the officer whose signature it reproduces and shall be binding upon the Corporation; provided that at least one director or officer of the Corporation shall manually sign each certificate (other than a scrip certificate or a certificate representing a fractional share or a warrant or a promissory note that is not issued under a trust indenture) in the absence of a manual signature thereon of a duly appointed transfer agent, registrar, branch transfer agent or issuing or other authenticating agent of the Corporation or trustee who certifies it in accordance with a trust indenture.   A security certificate executed as

aforesaid shall be valid notwithstanding that an officer whose facsimile signature appears thereon no longer holds office at the date of issue of the certificate.

## 9.9    Replacement of Security Certificates

Subject to the provisions of the Act, the board or any officer or agent designated by the board may in the discretion of the board or that person direct the issue of a new security certificate in lieu of and upon cancellation of a security certificate claimed to have been lost, apparently destroyed or wrongfully taken on payment of such fee, prescribed by or in accordance with the Act, and on such terms as to indemnity, reimbursement of expenses and evidence of loss and of title as the board may from time to time prescribe, whether generally or in any particular case.

## 9.10    Joint Shareholders

If two or more persons are registered as joint holders of any share, the Corporation shall not be bound to issue more than one certificate in respect thereof, and delivery of such certificate to one of such persons shall be sufficient delivery to all of them.   Any one of such persons may give effectual receipts for the certificate issued in respect thereof or for any dividend, bonus, return of capital or other money payable or warrant issuable in respect of such share.

## 9.11    Deceased Shareholders

In the event of the death of a holder, or of one of the joint holders, of any share, the Corporation shall not be required to make any entry in the securities register in respect thereof or to make payment of any dividends thereon except upon production of all such documents as may be required by the Act and upon compliance with the reasonable requirements of the Corporation or transfer agent.

## 10 - DIVIDENDS AND RIGHTS

## 10.1    Dividends

Subject to the provisions of the Act, the articles and any unanimous shareholder agreement, the board may from time to time declare dividends payable to the shareholders according to their respective rights and interests in the Corporation.   Dividends may be paid in money or property or by issuing fully paid shares or options or rights to acquire fully paid shares of the Corporation.

## 10.2    Dividend Cheques

A dividend payable in cash shall be paid by cheque drawn on the Corporation's bankers or one of them to the order of each registered holder of shares of the class or series in respect of which it has been declared and mailed by prepaid ordinary mail to such registered holder at the address recorded in the Corporation's securities register, unless in each case such holder otherwise directs.   In the case of joint holders the cheque shall, unless such joint holders otherwise direct, be made payable to the order of all of such joint holders and, if more than one address is recorded in the Corporation's security register in respect of such joint holding, the cheque shall be mailed to the first address so appearing.   The mailing of such cheque as aforesaid, unless the same is not paid on due presentation, shall satisfy and discharge the liability for the dividend to

the extent of the sum represented thereby plus the amount of any tax which the Corporation is required to and does withhold.

## 10.3    Non-receipt or Loss of Cheques

In the event of non-receipt or loss of any dividend cheque by the person to whom it is sent, the Corporation shall issue to such person a replacement cheque for a like amount on such terms as to indemnity, reimbursement of expenses and evidence of non-receipt and of title as the board may from time to time prescribe, whether generally or in any particular case.

## 10.4    Record Date for Dividends and Rights

The board may fix in advance a date as the record date for the determination of the shareholders entitled to receive payment of a dividend, entitled to participate in a liquidation or distribution, or for any other purpose except to receive notice of or to vote at a meeting, but the record date shall not precede by more than 50 days the particular action to be taken.  Notice of the record date shall be given, not less than 7 days before such record date, by advertisement in a newspaper published or distributed in the place where the Corporation has its registered office and in each place in Canada where it has a transfer agent or where a transfer of the Corporation's shares may be recorded and, where applicable, by written notice to each stock exchange in Canada on which the Corporation's shares are listed for trading, unless notice of the record date is waived in writing by every holder of a share of the class or series affected whose name is set out in the securities register of the Corporation at the close of business on the day the directors fix the record date.  If no such record date is fixed, such record date shall be the close of business on the day on which the directors pass the resolutions relating thereto.

## 10.5    Unclaimed Dividends

Any dividend unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Corporation.

## 11 - NOTICES

## 11.1    Method of Giving Notices

Any notice, communication or document ("notice") to be given or sent pursuant to the Act, the articles, the by-laws or otherwise to or on a shareholder, director, officer, auditor or member of a committee of the board shall be sufficiently given or sent if given or sent by prepaid mail, prepaid transmitted, recorded, or electronic communication capable of providing a written copy of such notice, or delivered personally to such person's latest address as shown on the securities register of the Corporation or, in the case of a director, if more current, the address as shown in the most recent notice filed under the *Corporations Information Act* (Ontario).  A notice shall be deemed to have been received on the date when it is delivered personally, or on the fifth day after mailing, or on the date of dispatch of a transmitted or recorded electronic communication. The secretary may change or cause to be changed the recorded address of any shareholder, director, officer, auditor or member of a committee of the board in accordance with any information believed by the secretary to be reliable.

**11.2    Notice to Joint Shareholders**

If two or more persons are registered as joint holders of any share, any notice shall be addressed to all of such joint holders but notice to one of such persons shall be sufficient notice to all of them.

**11.3    Computation of Time**

In computing the date when notice must be sent under any provision requiring a specified period of days' notice of any meeting or other event, the period of days shall commence on the day following the sending of such notice and shall terminate on the day preceding the date of the meeting or other event provided that the last day of the period shall not be a non-business day.

**11.4    Undelivered Notices**

If any notice given or sent to a shareholder pursuant to section 11.1 is returned on three consecutive occasions because the person cannot be found, the Corporation shall not be required to give or send any further notice to such shareholder until the Corporation is informed in writing of the new address for such person.

**11.5    Omissions and Errors**

The accidental omission to give or send any notice to any shareholder, director, officer, auditor or member of a committee of the board or the non-receipt of any notice by any such person or any error in any notice not affecting the substance thereof shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise based thereon.

**11.6    Persons Entitled by Death or Operation of Law**

Every person who, by operation of law, transfer, death of a shareholder or any other means whatsoever, shall become entitled to any share, shall be bound by every notice in respect of such share which shall have been duly given or sent to the shareholder from whom the person derives title to such share prior to that person's name and address being entered on the securities register (whether such notice was given or sent before or after the happening of the event upon which that person becomes so entitled) and prior to that person furnishing to the Corporation the proof of authority or evidence of entitlement prescribed by the Act.

**11.7    Waiver of Notice**

Any shareholder (or shareholder's duly appointed proxyholder), director, officer, auditor or member of a committee of the board may at any time waive the giving or sending of any notice, or waive or abridge the time for any notice, required to be given to that person under any provision of the Act, the articles, the by-laws or otherwise and such waiver or abridgement shall cure any default in the giving or sending or in the time of such notice, as the case may be.  Any such waiver or abridgement shall be in writing or given by electronic signature except a waiver of notice of a meeting of shareholders or of the board which may be given in any manner. Attendance of a director at a meeting of directors or of a shareholder or any other person entitled to attend a meeting of shareholders is a waiver of notice of the meeting except where such

- 20 -

director, shareholder or other person, as the case may be, attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

The foregoing By-law No. 2 is passed as evidenced by the signature of the directors of the Corporation pursuant to the provisions of the *Business Corporations Act* (Ontario).

DATED [●], 2014.

_____
[_____]

_____
[_____]

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## [REORGANIZED LIGHTSQUARED INC.]

The undersigned, being a natural person for the purpose of organizing a corporation under the General Corporation Law of the State of Delaware, hereby certifies that:

FIRST: The name of the corporation, which is hereinafter referred to as the "Corporation" is [Reorganized LightSquared Inc.]

SECOND: The name and address of the Corporation's registered agent in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as from time to time amended.

FOURTH: The total number of shares of capital stock which the Corporation shall have authority to issue is [1,000,000] all of which shares shall be common stock having a par value per share of [$0.001]. To the extent prohibited by Section 1123 of Chapter 11 of the Bankruptcy Code, as amended, the Corporation shall not issue non-voting equity securities; provided, however, that the foregoing (i) will have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123 is in effect and applicable to the Corporation and (iii) may be amended or eliminated in accordance with applicable law as from time to time in effect.

FIFTH: The name and mailing address of the sole incorporator is [_____], c/o Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017.

SIXTH: In furtherance and not in limitation of the powers conferred by law, bylaws of the Corporation may be adopted, amended or repealed by a majority of the board of directors of the Corporation, but any bylaws adopted by the board of directors may be amended or repealed by the stockholders entitled to vote thereon.    Election of directors need not be by written ballot.

SEVENTH: The following provisions are inserted to limit the liability of current and former directors, officers, employees and agents of the Corporation to the full extent of the law allowable and for the conduct of the affairs of the Corporation, and it is expressly provided that they are intended to be in furtherance and not in limitation or exclusion of the powers conferred by law:

(a)    No director shall be personally liable to the Corporation or its stockholders for monetary damages for breach of his or her fiduciary duty as a director, except (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) for paying a dividend or approving a stock repurchase which is illegal under section 174 of Title 8 of the Delaware Code relating to the Delaware General Corporation Law; or (iv) for any transaction from which the director derived an improper personal benefit.

(b)    No contract or other transaction between the Corporation and any other firm or corporation shall be affected or invalidated by reason of the fact that any one or more of the directors or officers of this Corporation is or are interested in, or is a member, stockholder, director or officer or are members, stockholders, directors or officers, individually or jointly, may be a party or parties to, or may be interested in, any contract or transaction of this Corporation or in which this Corporation with any person or persons, firm, association or corporation, shall be affected or invalidated by reason of the fact that any director or officer or officers of this Corporation is a party, or are parties to, or interested, such contract, act of transaction, or in any way connected, with such person or persons, firms, association or corporation, and each and every person who may become a director or officer of this Corporation is relieved from any liability that might otherwise exist from thus contracting with this Corporation for the benefit of himself or any firm, association, or corporation in which such person may be in any way interested.

(c)    Subject to such restrictions and regulations contained in the bylaws adopted by the stockholders, the board of directors may make, alter, amend and rescind the bylaws, and may provide therein for the appointment of an executive committee from their own members, to exercise all or any of the powers of the board, which may be amended or repealed, at any time, by the stockholders.

(d)    The board of directors shall have power, in its discretion, to provide for and to pay for directors rendering unusual or exceptional services to the Corporation special compensation appropriate to the value of such services.

(e)    By resolution duly adopted by the holders of not less than a majority of the shares of stock then issued and outstanding and entitled to vote at any regular or special meeting of the stockholders of the Corporation duly called and held as provided in the bylaws of the Corporation, any director or directors of the Corporation may be removed from office at any time or times, with or without cause, The board of directors may at any time remove any officers of the Corporation with or without cause.

(f)    The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, manager, officer, employee, agent or other representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

2

(g)      The Corporation shall indemnify, in the manner and to the fullest extent permitted by law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, manager, officer, employee, agent or representative of the Corporation, or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees), judgments, penalties, fines and other amounts paid in settlement actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(h)      To the extent that a present or former director, manager, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in clauses (f) and (g) of this Article SEVENTH, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in clauses (f) and (g) of this Article SEVENTH.

(i)      Any indemnification under paragraphs herein (unless ordered by a Court) shall be made by the Corporation upon a determination that indemnification of the former or current director, officer, manager, employee or agent is proper in the circumstances because such person has met the applicable standard of conduct set forth in said paragraphs. Such determination shall be made (1) by the board of directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, or (2) if such a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (3) by the stockholders.

(j)      The Corporation shall pay expenses incurred by defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding in the manner provided herein upon receipt of any undertaking by or on behalf of the former or current director, officer, manager, employee or agent to repay such amount if it shall be ultimately determined by final non-appealable judicial decision that such person is not entitled to be indemnified by the Corporation as authorized in this section. The indemnification and advancement of expenses provided for herein shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k)      The indemnification and advancement of expenses provided herein or granted pursuant to this provision shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any Bylaw, agreement, vote of stockholders or of any disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

3

(l)        The Corporation may purchase and maintain insurance at its expense on behalf of any person who is or was serving the Corporation in any capacity referred to hereinabove against any liability asserted against him and incurred by him in such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions herein.

(m)        The provisions herein shall be applicable to all claims, action, suits, or proceedings made or commenced before, on or after the adoption hereof, whether arising from acts or omissions to act occurring before or after the adoption hereof.

EIGHTH: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation. Notwithstanding the foregoing, the provisions contained under Article SEVENTH shall not be repealed or amended or modified in a manner that adversely affects any (i) rights of indemnification or protection of any person entitled to indemnification provided in Article SEVENTH or (ii) obligations of the Corporation to provide any such indemnification rights.

*[Signature page follows]*

4

IN WITNESS WHEREOF, the undersigned has signed this Amended and Restated Certificate of Incorporation on _____, 2014.


_____

[_____]
Incorporator

### AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### LIGHTSQUARED FINANCE CO.

**FIRST**: The name of the Corporation is LightSquared Finance Co. (the "Corporation"). The original certificate of incorporation was filed with the Secretary of State of the State of Delaware on March 9, 2006. This Amended and Restated Certificate of Incorporation was duly adopted in accordance with Section 245 of the General Corporation Law of the State of Delaware.

**SECOND**: The address of the Corporation's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**THIRD**: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH**: The total number of shares of stock which the Corporation has authority to issue is 100 shares of Common Stock, with a par value of $.001 per share.

**FIFTH**: Subject to any additional vote required by the Bylaws or restriction imposed by the Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH**: The number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH**: Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH**: Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH**: To the fullest extent permitted by law, a current or former director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article NINTH to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware as so amended.

Any repeal or modification of the foregoing provisions of this Article NINTH by the stockholders of the Corporation shall not adversely affect any right or protection of a current or former director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**: To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) current or former directors, officers, employees and agents of the Corporation (and any other persons to which the General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of the State of Delaware.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

**TWELFTH**: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.  Notwithstanding the foregoing, the provisions contained under Article TENTH shall not be amended, modified or repealed in any manner than adversely affects (i) any right or protection of any person entitled to indemnification thereunder or (ii) the obligations of the Corporation to provide any such indemnification rights described therein.

*[Signature page follows.]*

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Amended and Restated Certificate of Incorporation, and do certify that the facts stated herein are true, and I have accordingly have hereunto set my hand on the [_____ day of _____, 2014.]

_____
[_____]
Sole Incorporator

AMENDED AND RESTATED
ARTICLES OF INCORPORATION
OF
LIGHTSQUARED INC. OF VIRGINIA[1]

Pursuant to the provisions of Chapter 9 of Title 13.1 of the Code of Virginia of 1950, as amended (the "Code"), the undersigned does hereby submit these Amended and Restated Articles of Incorporation.

FIRST:        The name of the corporation (the "Corporation") shall be LightSquared Inc. of Virginia.

SECOND:       The address of the registered office of the Corporation in the Commonwealth of Virginia is LightSquared Inc. of Virginia, 10802 Parkridge Boulevard, Reston, Virginia 20191-4334.  The name of the Corporation's registered agent at such address is LightSquared Inc. of Virginia.

THIRD:        The Corporation is incorporated in the Commonwealth of Virginia.  The Corporation elects to be a Virginia Public Service Corporation in Virginia, as that term is defined under Title 56 of the Code. The Corporation is organized, among other purposes, for conducting the business as a Public Service Corporation, providing competitive telecommunications services to customers within the Commonwealth of Virginia and elsewhere, and shall have the powers and limitations of, a public service company in the Commonwealth of Virginia, which shall include the power to exercise any and all of the rights, privileges and powers of a public service company pursuant to Title 56 of the Code, or any subsequent amendment thereto, and any non-public service activities so far as may be related to or incidental to the Corporation's public service activities within the Commonwealth of Virginia.

FOURTH:       A further purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the Code.

FIFTH:        The number of shares of capital stock the Corporation is authorized to issue is 100 shares. These shares shall be all of one class, designated as common stock with a par value of $0.01 per share.

SIXTH:        Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its shareholders or any class of them, any court of equitable jurisdiction within the Commonwealth of Virginia may on the application in a summary way of the Corporation or of any creditor or shareholder thereof or on the application of any receiver or receivers appointed for the Corporation in accordance with the laws of Virginia or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation in accordance with the laws of Virginia order a meeting of the creditors or class of creditors,  to be summoned in such

---

[1]  This organizational document may be further revised prior to the Effective Date, in consultation with local counsel, to reflect the governance structure contemplated in the NewCo Corporate Governance Documents, or as otherwise may be necessary to effectuate the Plan Transactions.

manner as the said court directs if a .majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the shareholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the shareholders or class of shareholders, of the Corporation, as the case may be, and also on the Corporation.

SEVENTH:    A director of the Corporation shall, to the maximum extent permitted by the laws of Virginia, have no personal liability to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, provided that this Article SEVENTH shall not eliminate or reduce the liability of a director in any case where such elimination or reduction is not permitted by law.

EIGHTH:    To the fullest extent permitted by the Code and any other applicable law, the Corporation shall indemnify each person who is or was a director, officer, employee or agent of the Corporation through Bylaw provisions, agreements with such agents or other persons or otherwise. Without limiting the generality the effect of the foregoing, the Corporation may enter into one or more agreements with any person which provide for indemnification greater or different than that provided in this Article EIGHTH.

NINTH:    The Corporation reserves the right to amend, alter, change or repeal any provision contained in these Amended and Restated Articles of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon shareholders are granted subject to this reservation. Notwithstanding the foregoing, the provisions contained under Article EIGHTH shall not be amended, modified or repealed in any manner than adversely affects (i) any right or protection of any person entitled to indemnification thereunder or (ii) the obligations of the Corporation to provide any such indemnification rights described therein.

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

**LIGHTSQUARED INVESTORS HOLDINGS, INC.**

**FIRST**: The name of the Corporation is LIGHTSQUARED INVESTORS HOLDINGS, INC. (the "Corporation"). The original certificate of incorporation was filed with the Secretary of State of the State of Delaware on October 29, 2001. This Amended and Restated Certificate of Incorporation was duly adopted in accordance with Section 245 of the General Corporation Law of the State of Delaware.

**SECOND**: The address of the Corporation's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**THIRD**: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH**: The total number of shares of stock which the Corporation has authority to issue is 100 shares of Common Stock, with a par value of $.001 per share.

**FIFTH**: Subject to any additional vote required by the Bylaws or restriction imposed by the Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH**: The number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH**: Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH**: Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH**: To the fullest extent permitted by law, a current or former director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article NINTH to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware as so amended.

Any repeal or modification of the foregoing provisions of this Article NINTH by the stockholders of the Corporation shall not adversely affect any right or protection of a current or former director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**: To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) current or former directors, officers, employees and agents of the Corporation (and any other persons to which the General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of the State of Delaware.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

**TWELFTH**: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.  Notwithstanding the foregoing, the provisions contained under Article TENTH shall not be amended, modified or repealed in any manner than adversely affects (i) any right or protection of any person entitled to indemnification thereunder or (ii) the obligations of the Corporation to provide any such indemnification rights described therein.

*[Signature page follows.]*

2

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Amended and Restated Certificate of Incorporation, and do certify that the facts stated herein are true, and I have accordingly have hereunto set my hand on the [_____ day of _____, 2014.]

_____
[_____]
Sole Incorporator

### AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### ONE DOT FOUR CORP.

**FIRST**: The name of the Corporation is One Dot Four Corp. (the "Corporation").  The original certificate of incorporation was filed with the Secretary of State of the State of Delaware on August 25, 2009.  This Amended and Restated Certificate of Incorporation was duly adopted in accordance with Section 245 of the General Corporation Law of the State of Delaware.

**SECOND**: The address of the Corporation's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle.  The name of its registered agent at such address is Corporation Service Company.

**THIRD**: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH**: The total number of shares of stock which the Corporation has authority to issue is 100 shares of Common Stock, with a par value of $.001 per share.

**FIFTH**: Subject to any additional vote required by the Bylaws or restriction imposed by the Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH**: The number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH**: Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH**: Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH**: To the fullest extent permitted by law, a current or former director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article NINTH to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware as so amended.

Any repeal or modification of the foregoing provisions of this Article NINTH by the stockholders of the Corporation shall not adversely affect any right or protection of a current or former director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**: To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) current or former directors, officers, employees and agents of the Corporation (and any other persons to which the General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of the State of Delaware.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

**TWELFTH**: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.  Notwithstanding the foregoing, the provisions contained under Article TENTH shall not be amended, modified or repealed in any manner than adversely affects (i) any right or protection of any person entitled to indemnification thereunder or (ii) the obligations of the Corporation to provide any such indemnification rights described therein.

*[Signature page follows.]*

2

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Amended and Restated Certificate of Incorporation, and do certify that the facts stated herein are true, and I have accordingly have hereunto set my hand on the [_____ day of _____, 2014.]

_____
[_____]
Sole Incorporator

### AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### ONE DOT SIX TVCC CORP.

**FIRST**: The name of the Corporation is One Dot Six TVCC Corp. (the "Corporation"). The original certificate of incorporation was filed with the Secretary of State of State of Delaware on April 7, 2010. This Amended and Restated Certificate of Incorporation was duly adopted in accordance with Section 245 of the General Corporation Law of the State of Delaware.

**SECOND**: The address of the Corporation's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**THIRD**: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH**: The total number of shares of stock which the Corporation has authority to issue is 100 shares of Common Stock, with a par value of $.001 per share.

**FIFTH**: Subject to any additional vote required by the Bylaws or restriction imposed by the Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH**: The number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH**: Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH**: Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH**: To the fullest extent permitted by law, a current or former director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article NINTH to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware as so amended.

Any repeal or modification of the foregoing provisions of this Article NINTH by the stockholders of the Corporation shall not adversely affect any right or protection of a current or former director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**: To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) current or former directors, officers, employees and agents of the Corporation (and any other persons to which the General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law of the State of Delaware.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

**TWELFTH**: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.  Notwithstanding the foregoing, the provisions contained under Article TENTH shall not be amended, modified or repealed in any manner than adversely affects (i) any right or protection of any person entitled to indemnification thereunder or (ii) the obligations of the Corporation to provide any such indemnification rights described therein.

*[Signature page follows.]*

2

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Amended and Restated Certificate of Incorporation, and do certify that the facts stated herein are true, and I have accordingly have hereunto set my hand on the [_____ day of _____, 2014.]

_____
[_____]
Sole Incorporator

## THIRD AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF ATC TECHNOLOGIES, LLC

This Third Amended and Restated Agreement of Limited Liability Company of ATC Technologies, LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by LightSquared LP, a Delaware limited partnership (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on March 15, 2005;

WHEREAS, the Member entered into that Amended and Restated Agreement of Limited Liability Company of the LLC, dated as of March 15, 2005 (the "Amended and Restated LLC Agreement");

WHEREAS, the Member entered into that Second Amended and Restated Agreement of Limited Liability Company of the LLC, dated as of June 8, 2010 (the "Second Amended and Restated LLC Agreement");

WHEREAS, the Member entered into that Amendment No. 1 to the Second Amended and Restated LLC Agreement, dated as of May 14, 2012; and

WHEREAS, the Member wishes to amend and restate the Second Amended and Restated Limited Liability Company Agreement, as amended, to make certain revisions to the agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1. Name.  The name of the limited liability company is ATC Technologies, LLC.

2. Purpose and Powers.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3. Principal Business Office.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4. Registered Office and Registered Agent.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service

Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5.  <u>Sole Member</u>.  As of the date hereof, LightSquared LP is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6.  <u>Interest</u>.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "<u>Interest</u>" and if ever divided into more than one Interest, collectively, the "<u>Interests</u>") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.  Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7.  <u>Capital Contributions</u>.  The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8.  <u>Distributions</u>.  At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9.  <u>Management</u>.

(a)    The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "<u>Board</u>") as delineated further in this paragraph.  The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of [NewCo], LLC ("[<u>NewCo</u>]"), pursuant to NewCo's Operating Agreement, as the same may be amended from time to time (the "<u>Operating Agreement</u>").  Each of the managers shall be the same as the managers appointed to NewCo's Board of Managers under the Operating Agreement and the provisions of Article VIII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b)    The LLC shall have such officers as may be necessary or desirable for the business of the LLC.  Any number of offices may be held by the same person.  None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware.  Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. <u>Exculpation; Indemnification</u>.

2

(a)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

3

(d)    The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this <u>Section 10</u>.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this <u>Section 10</u>.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.    Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11.    <u>Assignments</u>.    Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.    The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.    Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.    Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12.    <u>Withdrawal</u>.    The Member may withdraw from the LLC at any time.    Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.    The Member shall not

4

cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13. <u>Additional Members</u>.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in <u>Section 11</u> hereof.

14. <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.  Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC deemed to be activities of the Member for such purposes.  All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status.

The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

LIGHTSQUARED LP

By: LightSquared GP LLC, its General Partner

By:_____

# AGREEMENT OF LIMITED LIABILITY COMPANY OF LIGHTSQUARED GP LLC

This Agreement of Limited Liability Company of LightSquared GP LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by [NewCo], LLC, a Delaware limited liability company (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the original Certificate of Incorporation of LightSquared GP Inc. (f/k/a SkyTerra GP Inc., f/k/a Mobile Satellite Ventures GP Inc.) (the "Corporation") was filed with the Secretary of State of the State of Delaware on October 17, 2001;

WHEREAS, the Corporation was converted into a Delaware limited liability company in accordance with the Certificate of Conversion and the Certificate of Formation of the LLC which were filed with the Secretary of State of the State of Delaware on [●], 2014;

WHEREAS, the Member desires to enter into a written limited liability company agreement, in accordance with the provisions of the Act.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1. Name. The name of the limited liability company is LightSquared GP LLC.

2. Purpose and Powers. The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware. The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3. Principal Business Office. The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4. Registered Office and Registered Agent. The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The Member may from time to time change the registered agent and registered office of the LLC.

5. Sole Member. As of the date hereof, [Newco] is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6. Interest. The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "Interest" and if ever divided into more than one Interest, collectively, the "Interests") including any and all benefits to which the holder of such

Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement. Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7. <u>Capital Contributions</u>. The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8. <u>Distributions</u>. At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9. <u>Management</u>.

(a) The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "<u>Board</u>") as delineated further in this paragraph. The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of [NewCo], LLC ("[<u>NewCo</u>]"), pursuant to NewCo's Operating Agreement, as the same may be amended from time to time (the "<u>Operating Agreement</u>"). Each of the managers shall be the same as the managers appointed to NewCo's Board of Managers under the Operating Agreement and the provisions of Article VIII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b) The LLC shall have such officers as may be necessary or desirable for the business of the LLC. Any number of offices may be held by the same person. None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware. Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. <u>Exculpation; Indemnification</u>.

(a) The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments,

2

penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)    The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10.  Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise

3

shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this <u>Section 10</u>.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11.  <u>Assignments</u>.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.  The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.  Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.  Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12.  <u>Withdrawal</u>.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13.  <u>Additional Members</u>.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in <u>Section 11</u> hereof.

14.  <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of

4

the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.   Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.   Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.   Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.   This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.   This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.   It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.   All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.   The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.   The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall

not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

[NewCo], LLC

By:_____

**AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY
OF LIGHTSQUARED NETWORK LLC**

This Amended and Restated Agreement of Limited Liability Company of LightSquared Network LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by LightSquared LP, a Delaware limited partnership (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on August 25, 2010;

WHEREAS, the Member formed the LLC pursuant to that Agreement of Limited Liability Company of the LLC, dated as of September 14, 2010 (the "Limited Liability Company Agreement");

WHEREAS, the Member entered into that Amendment No. 1 to the Limited Liability Company Agreement, dated as of May 14, 2012; and

WHEREAS, the Member wishes to amend and restate the Limited Liability Company Agreement, as amended, to make certain revisions to the agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1. <u>Name</u>.  The name of the limited liability company is LightSquared Network LLC.

2. <u>Purpose and Powers</u>.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3. <u>Principal Business Office</u>.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4. <u>Registered Office and Registered Agent</u>.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5. <u>Sole Member</u>.  As of the date hereof, LightSquared LP is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6.  Interest.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "Interest" and if ever divided into more than one Interest, collectively, the "Interests") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.  Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7.  Capital Contributions.  The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8.  Distributions.  At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9.  Management.

(a)    The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "Board") as delineated further in this paragraph.  The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of [NewCo], LLC ("[NewCo]"), pursuant to NewCo's Operating Agreement, as the same may be amended from time to time (the "Operating Agreement").  Each of the managers shall be the same as the managers appointed to NewCo's Board of Managers under the Operating Agreement and the provisions of Article VIII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b)    The LLC shall have such officers as may be necessary or desirable for the business of the LLC.  Any number of offices may be held by the same person.  None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware.  Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; provided, however, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10.  Exculpation; Indemnification.

(a)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or

agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)    The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10.    Expenses (including attorneys' fees), judgments,

3

penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this Section 10.

(e)     The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11.  Assignments.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.  The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.  Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.  Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12.  Withdrawal.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13.  Additional Members.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in Section 11 hereof.

14. <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.  Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.  All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty

or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

LIGHTSQUARED LP

By: LightSquared GP LLC, its General Partner

By:_____

## SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF LIGHTSQUARED SUBSIDIARY LLC

This Second Amended and Restated Agreement of Limited Liability Company of LightSquared Subsidiary LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by LightSquared LP, a Delaware limited partnership (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on October 12, 2001;

WHEREAS, the Member formed the LLC pursuant to that Agreement of Limited Liability Company of the LLC, dated as of October 22, 2001 (the "Limited Liability Company Agreement");

WHEREAS, the Member entered into that Amended and Restated Agreement of Limited Liability Company of the LLC, dated as of October 2, 2008 (the "Amended and Restated LLC Agreement");

WHEREAS, on November 13, 2008, the name of the LLC was changed from Mobile Satellite Ventures Subsidiary LLC to SkyTerra Subsidiary LLC;

WHEREAS, on July 20, 2010, the name of the LLC was changed from SkyTerra Subsidiary LLC to LightSquared Subsidiary LLC;

WHEREAS, the Member entered into that Amendment No. 1 to the Amended and Restated LLC Agreement, dated as of May 14, 2012; and

WHEREAS, the Member wishes to amend and restate the Amended and Restated Limited Liability Company Agreement, as amended, to make certain revisions to the agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1. Name.  The name of the limited liability company is LightSquared Subsidiary LLC.

2. Purpose and Powers.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3. Principal Business Office.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4.  <u>Registered Office and Registered Agent</u>.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5.  <u>Sole Member</u>.  As of the date hereof, LightSquared LP is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6.  <u>Interest</u>.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "<u>Interest</u>" and if ever divided into more than one Interest, collectively, the "<u>Interests</u>") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.  Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7.  <u>Capital Contributions</u>.  The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8.  <u>Distributions</u>.  At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9.  <u>Management</u>.

(a)     The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "<u>Board</u>") as delineated further in this paragraph.  The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of [NewCo], LLC ("[<u>NewCo</u>]"), pursuant to NewCo's Operating Agreement, as the same may be amended from time to time (the "<u>Operating Agreement</u>").  Each of the managers shall be the same as the managers appointed to NewCo's Board of Managers under the Operating Agreement and the provisions of Article VIII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b)     The LLC shall have such officers as may be necessary or desirable for the business of the LLC.  Any number of offices may be held by the same person.  None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware. Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other

2

persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. Exculpation; Indemnification.

(a)     The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)     The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys'

fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)    The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10. Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this Section 10.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office. Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11. Assignments.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law. The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest. Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons. Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12. <u>Withdrawal</u>.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13. <u>Additional Members</u>.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in <u>Section 11</u> hereof.

14. <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.  Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.  All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

LIGHTSQUARED LP

By: LightSquared GP LLC, its General Partner

By:_____

## AGREEMENT OF LIMITED LIABILITY COMPANY OF ONE DOT SIX LLC

This Agreement of Limited Liability Company of One Dot Six LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by [NewCo], LLC, a Delaware limited liability company (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the original Certificate of Incorporation of One Dot Six Inc. (the "Corporation") was filed with the Secretary of State of the State of Delaware on August 25, 2009;

WHEREAS, the Corporation was converted into a Delaware limited liability company in accordance with the Certificate of Conversion and the Certificate of Formation of the LLC which were filed with the Secretary of State of the State of Delaware on [●], 2014;

WHEREAS, the Member desires to enter into a written limited liability company agreement, in accordance with the provisions of the Act.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1.  Name.  The name of the limited liability company is One Dot Six LLC.

2.  Purpose and Powers.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3.  Principal Business Office.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4.  Registered Office and Registered Agent.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5.  Sole Member.  As of the date hereof, [Newco] is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6.  Interest.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "Interest" and if ever divided into more than one Interest, collectively, the "Interests") including any and all benefits to which the holder of such

Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement. Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7. <u>Capital Contributions</u>. The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8. <u>Distributions</u>. At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9. <u>Management</u>.

(a)    The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "Board") as delineated further in this paragraph. The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of [NewCo], LLC ("[NewCo]"), pursuant to NewCo's Operating Agreement, as the same may be amended from time to time (the "Operating Agreement"). Each of the managers shall be the same as the managers appointed to NewCo's Board of Managers under the Operating Agreement and the provisions of Article VIII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b)    The LLC shall have such officers as may be necessary or desirable for the business of the LLC. Any number of offices may be held by the same person. None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware. Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; provided, however, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. <u>Exculpation; Indemnification</u>.

(a)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments,

penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)     The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)     The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10. Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise

3

shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this Section 10.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11.  Assignments.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.  The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.  Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.  Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12.  Withdrawal.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13.  Additional Members.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in Section 11 hereof.

14.  Dissolution.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; provided, however, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of

the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. Distributions upon Dissolution.   Upon the occurrence of an event set forth in Section 14 above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. Article 8 Election.   Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. Limited Liability.   Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. Amendment.   This Agreement may be amended only in a writing signed by the Member; provided, however, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under Section 10 or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in Section 10.

19. Governing Law.   This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. Tax Characterization and Returns.   It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.   All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. Benefits of Agreement; No Third-Party Rights.   The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. Severability.   The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall

not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

[NewCo], LLC


By:_____

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF
## SKYTERRA INVESTORS LLC

This Amended and Restated Limited Liability Company Agreement of SkyTerra Investors LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by is entered into by [NewCo], LLC, a Delaware limited liability company (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on September 17, 2001;

WHEREAS, the Member (and other initial members) formed the LLC pursuant to that Limited Liability Company Agreement of the LLC, dated as of November 23, 2001 (the "Limited Liability Company Agreement");

WHEREAS, on May 6, 2006, the other initial members of the LLC entered into asset purchase agreements with the Member to relinquish their membership interests in the LLC to the Member;

WHEREAS, on November 13, 2008, the name of the LLC was changed from MSV Investors, LLC to SkyTerra Investors LLC;

WHEREAS, the Member entered into that Amendment No. 1 to the Limited Liability Company Agreement, dated as of May 14, 2012; and

WHEREAS, in accordance with the Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, dated December 31, 2013 (the "Plan"), the ownership of the LLC transferred to the Member and the Member of the LLC hereby wishes to amend and restate the Limited Liability Company Agreement, as amended, to make certain revisions to the Limited Liability Company Agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1.  Name.  The name of the limited liability company is SkyTerra Investors LLC.

2.  Purpose and Powers.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3.  Principal Business Office.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4.  <u>Registered Office and Registered Agent</u>.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5.  <u>Sole Member</u>.  As of the date hereof, [NewCo] is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6.  <u>Interest</u>.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "<u>Interest</u>" and if ever divided into more than one Interest, collectively, the "<u>Interests</u>") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.  Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7.  <u>Capital Contributions</u>.  The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8.  <u>Distributions</u>.  At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9.  <u>Management</u>.

(a)    The LLC shall be a "manager-managed company" within the meaning of the Act and shall be managed by a Board of Managers (the "<u>Board</u>") as delineated further in this paragraph.  The Board shall be comprised of the same number of members as the number of members comprising the Board of Managers of the Member, pursuant to the Member's Operating Agreement, as the same may be amended from time to time (the "<u>Operating Agreement</u>").  Each of the managers shall be the same as the managers appointed to the Member's Board of Managers under the Operating Agreement and the provisions of Article VII of the Operating Agreement shall apply to the LLC as if set forth herein *mutatis mutandis*.

(b)    The LLC shall have such officers as may be necessary or desirable for the business of the LLC.  Any number of offices may be held by the same person.  None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware. Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; <u>provided</u>, <u>however</u>, that no officer shall sign a consent or vote on any matter relating to any securities of other

persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. Exculpation; Indemnification.

(a)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys'

3

fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)     The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10.    Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this Section 10.

(e)     The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.    Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11. Assignments.    Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.    The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.    Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.    Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

4

12. <u>Withdrawal</u>.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13. <u>Additional Members</u>.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in <u>Section 11</u> hereof.

14. <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.  Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.   All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

[NewCo], LLC

By:_____

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF SKYTERRA ROLLUP LLC

This Amended and Restated Limited Liability Company Agreement of SkyTerra Rollup LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by Reorganized LightSquared Inc., a Delaware corporation (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on April 3, 2006;

WHEREAS, the Member formed the LLC pursuant to that Limited Liability Company Agreement of the LLC, dated as of Aril 3, 2006 (the "Limited Liability Company Agreement");

WHEREAS, on November 13, 2008, the name of the LLC was changed from MSV Rollup, LLC to SkyTerra Rollup LLC;

WHEREAS, the Member entered into that Amendment No. 1 to the Limited Liability Company Agreement, dated as of May 14, 2012; and

WHEREAS, the Member wishes to amend and restate the Limited Liability Company Agreement, as amended, to make certain revisions to the agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1.    Name.  The name of the limited liability company is SkyTerra Rollup LLC.

2.    Purpose and Powers.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3.    Principal Business Office.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4.    Registered Office and Registered Agent.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5. <u>Sole Member</u>.  As of the date hereof, Reorganized LightSquared Inc. is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6. <u>Interest</u>.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "<u>Interest</u>" and if ever divided into more than one Interest, collectively, the "<u>Interests</u>") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.  Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7. <u>Capital Contributions</u>.  The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8. <u>Distributions</u>.  At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9. <u>Management</u>.

(a)    The management of the LLC shall be vested solely in the Member, who shall have all powers to control and manage the business and affairs of the LLC and may exercise all powers of the LLC.  All instruments, contracts, agreements and documents relating to the LLC or its business or affairs shall be valid and binding on the LLC if executed by the Member.  The Member shall be an "authorized person" within the meaning of the Act and shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the LLC to do any and all other acts and things necessary, proper convenient or advisable to effectuate the purposes of this Agreement.

(b)    The LLC shall have such officers as may be necessary or desirable for the business of the LLC.  Any number of offices may be held by the same person.  None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware.  Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; provided, however, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. <u>Exculpation; Indemnification</u>.

(a)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party

2

to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)     The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)     The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or other representative of another corporation, partnership or,

joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this <u>Section 10</u>.  Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this <u>Section 10</u>.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11. <u>Assignments</u>.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.  The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.  Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.  Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12. <u>Withdrawal</u>.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

4

13. <u>Additional Members</u>.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in <u>Section 11</u> hereof.

14. <u>Dissolution</u>.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; <u>provided</u>, <u>however</u>, that ninety (90) days following any event terminating the continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.  Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.  All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

6

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.

REORGANIZED LIGHTSQUARED INC.

By:_____

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF
SKYTERRA ROLLUP SUB LLC**

This Amended and Restated Limited Liability Company Agreement of SkyTerra Rollup Sub LLC, a Delaware limited liability company (the "LLC"), dated as of [●], 2014 (the "Agreement"), is entered into by SkyTerra Rollup LLC, a Delaware limited liability company (the "Member"), as the LLC's sole member, pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq. (the "Act").

WHEREAS, the Certificate of Formation of the LLC was filed with the Secretary of State of the State of Delaware on December 13, 2006;

WHEREAS, the Member formed the LLC pursuant to that Limited Liability Company Agreement of the LLC, dated as of May 14, 2012 (the "Limited Liability Company Agreement");

WHEREAS, the Member, through its member-manager Reorganized LightSquared Inc., a Delaware corporation, wishes to amend and restate the Limited Liability Company Agreement to make certain revisions to the agreement.

NOW THEREFORE, the Member hereby declares the following to be the Agreement of such limited liability company, effective as of the date hereof:

1. <u>Name</u>.  The name of the limited liability company is SkyTerrra Rollup Sub LLC.

2. <u>Purpose and Powers</u>.  The purpose of the LLC is to engage in any lawful business, purpose or activity for which limited liability companies may be formed in the State of Delaware.  The LLC shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the LLC.

3. <u>Principal Business Office</u>.  The principal business office of the Company shall be located at 10802 Parkridge Boulevard, Reston, VA 20191, or at such other location as may hereafter be determined by the Member.

4. <u>Registered Office and Registered Agent</u>.  The registered office of the LLC in the State of Delaware will be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The name and address of the registered agent for the LLC will be Corporation Service Company and 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The Member may from time to time change the registered agent and registered office of the LLC.

5. <u>Sole Member</u>.  As of the date hereof, SkyTerra Rollup LLC is the sole member of the LLC in respect of the Interest (as hereinafter defined).

6. <u>Interest</u>.  The LLC shall be authorized to issue a single class of "limited liability company interest" (as defined in the Act, the "Interest" and if ever divided into more than one

Interest, collectively, the "Interests") including any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement. Each Interest shall be represented by a certificate which shall be imprinted with a legend indicating that the Interest has not been registered under the securities laws of any jurisdiction and cannot be disposed of unless it is subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the transfer of the Interest is subject to conditions and restrictions set forth in this Agreement.

7. <u>Capital Contributions</u>. The Member may contribute cash or other property to the LLC as it shall decide, from time to time.

8. <u>Distributions</u>. At such time as the Member shall determine, the Member may cause the LLC to distribute any cash held by it which is neither reasonably necessary for the operation of the LLC nor otherwise in violation of Sections 18-607 or 18-804 of the Act or any contractual restrictions on the payment of distributions by the LLC.

9. <u>Management</u>.

(a) The management of the LLC shall be vested solely in the Member, who shall have all powers to control and manage the business and affairs of the LLC and may exercise all powers of the LLC. All instruments, contracts, agreements and documents relating to the LLC or its business or affairs shall be valid and binding on the LLC if executed by the Member. The Member shall be an "authorized person" within the meaning of the Act and shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the LLC to do any and all other acts and things necessary, proper convenient or advisable to effectuate the purposes of this Agreement.

(b) The LLC shall have such officers as may be necessary or desirable for the business of the LLC. Any number of offices may be held by the same person. None of the officers need be a member or a manager of the LLC or a resident of the State of Delaware. Officers shall have such authority and perform such duties in the management of the LLC as are determined by resolution of the Board not inconsistent with this Agreement; provided, however, that no officer shall sign a consent or vote on any matter relating to any securities of other persons owned by the LLC, on behalf of the LLC, as such authority is hereby expressly reserved to the Board.

10. <u>Exculpation; Indemnification</u>.

(a) The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other (other than an action by or in the right of the LLC) by reason of the fact that such person is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or representative of another corporation, partnership, joint venture, employee

benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the LLC, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    The LLC shall indemnify, in the manner and to the fullest extent permitted by law if the LLC were a corporation organized under the Delaware General Corporation Law, any person (or the estate of any person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the LLC to procure a judgment in its favor by reason of the fact that the person is or was a manager, director, officer, employee, agent or other representative of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the LLC and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the LLC unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)    To the extent that a present or former manager, director, officer, employee or agent of the LLC has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 10(a) or 10(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 10(a) or 10(b) above.

(d)    The LLC may, to the full extent permitted by law, purchase and maintain insurance at its expense on behalf of any person who is or was a manager, director, officer, employee or agent of the LLC, or is or was serving at the request of the LLC as a manager, director, officer, employee, agent or other representative of another corporation, partnership or, joint venture against any liability which may be asserted against such person whether or not the LLC would have the power or the obligation to indemnify such person against such liability under the provisions of this Section 10.  Expenses (including attorneys' fees), judgments, penalties and fines incurred by a current or former manager, director, officer, employee or agent of the LLC in defending any actual or threatened action, suit or proceeding, whether or not by, or

3

in the right of, the LLC, and whether civil, criminal, administrative, investigative or otherwise shall be paid by the LLC in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined by a final non-appealable judicial decision that such person is not entitled to be indemnified by the LLC as authorized by this Section 10.

(e)    The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the LLC to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the LLC may be entitled under any agreement, vote of members or disinterested managers or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be manager, director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

11.  Assignments.  Interest of the Member in the LLC shall be transferable in whole or in part, either voluntarily or by operation of law.  The Member may at any time and from time to time sell, assign, convey, exchange, mortgage, pledge, grant security interests in and to and liens upon, and otherwise dispose of or transfer all or any portion of the Member's Interest.  Upon any transfer of all or any portion of the Member's Interest, the transferee thereof shall become a member of the LLC upon completion of such transfer without, in any case the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.  Without limiting any of the foregoing, upon any sale, disposition or other transfer by any pledgee or other secured party or lienholder of all or any portion of the Member's Interest pursuant to the exercise of foreclosure rights or any other rights or remedies as secured party under or in respect of any pledge of, or any grant of security interests or other liens on, all or any portion of the Interest so transferred, any transferee thereof shall, upon completion of such transfer, become a member of the LLC and shall acquire, to the extent of all or that portion of the Interest so transferred, all of the rights, title and interests of a member in the LLC, including all of the rights and obligations of a member of the LLC under this Agreement, without, in any such case, the approval or consent of, or any further action on the part of, the LLC, any of the other members or any other person or persons.

12.  Withdrawal.  The Member may withdraw from the LLC at any time.  Upon any such permitted withdrawal, the withdrawing Member shall receive the fair value of its Interest, determined as of the date the Member ceases to be a member of the LLC.  The Member shall not cease to be a member of the LLC if the Member (i) makes an assignment for the benefit of its creditors or (ii) files a voluntary petition in bankruptcy.

13.  Additional Members.  No additional persons may be admitted as Members in the LLC, except upon an assignment by the Member of all or any portion of its Interest, upon the terms and conditions set forth in Section 11 hereof.

14.  Dissolution.  The LLC shall dissolve, and its affairs shall be wound up, upon the earliest to occur of (a) the decision of the Member, or (b) an event of dissolution of the LLC under the Act; provided, however, that ninety (90) days following any event terminating the

continued membership of the Member, if the Personal Representative (as defined in the Act) of the Member agrees in writing to continue the LLC and to admit itself or some other person as a member of the LLC effective as of the date of the occurrence of the event that terminated the continued membership of the Member, then the LLC shall not be dissolved and its affairs shall not be wound up.

15. <u>Distributions upon Dissolution</u>.   Upon the occurrence of an event set forth in <u>Section 14</u> above, the Member shall be entitled to receive, after paying or making reasonable provision for all of the LLC's creditors to the extent required by Section 18-804 of the Act, the remaining funds of the LLC.

16. <u>Article 8 Election</u>.  Each Interest, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and to the extent permitted by applicable law and not inconsistent therewith, Article 8 of each other applicable jurisdiction.

17. <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall have no liability for any such debts, obligations and liabilities of the LLC.

18. <u>Amendment</u>.  This Agreement may be amended only in a writing signed by the Member; <u>provided</u>, <u>however</u>, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification under <u>Section 10</u> or (ii) obligations of the LLC to provide any such indemnification rights as detailed above in <u>Section 10</u>.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflicts of laws rule or principle that might refer the governance or construction of this Agreement to the law of another jurisdiction.

20. <u>Tax Characterization and Returns</u>.  It is the intention of the Member that the LLC be disregarded for federal and all relevant state tax purposes and that the activities of the LLC be deemed to be activities of the Member for such purposes.   All provisions of the LLC's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Member is hereby authorized to file any necessary elections, and shall be required to file any necessary tax returns, on behalf of the LLC with any such tax authorities.

21. <u>Benefits of Agreement; No Third-Party Rights</u>.  The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

22. <u>Severability</u>.  The invalidity of any one or more terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof, all of which are inserted conditionally on their being held valid in law; and in the event that one or more of the terms or provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid terms or provisions had not been inserted.  In addition, in the event that one or more of the terms or provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement should be invalid, the Member will use its best efforts to adopt an appropriate substitute for the invalidated terms or provisions consistent with the intent of the Member and to take all other necessary and appropriate actions to effectuate the intent of the Member as embodied in such invalidated provision, including, without limitation, amending the LLC's Certificate of Formation, as then in effect.

23. <u>Consent to Jurisdiction Provision</u>.  The Member hereby irrevocably submits to the non-exclusive jurisdiction of any Delaware State court or Federal court sitting in Wilmington, Delaware in any action arising out of this Agreement.  Nothing herein shall affect the right of any party to bring any action in any other court.

24. <u>Relationship between the Agreement and the Act</u>.  Regardless of whether any provision of this Agreement specifically refers to particular Default Rules, (a) if any provision of this Agreement conflicts with a Default Rule, the provision of this Agreement controls and the Default Rule is modified or negated accordingly, and (b) if it is necessary to construe a Default Rule as modified or negated in order to effectuate any provision of this Agreement, the Default Rule is modified or negated accordingly.  For purposes of this <u>Section 24</u>, "Default Rule" shall mean a rule stated in the Act which applies except to the extent it is negated or modified through the provisions of a limited liability company's Certificate of Formation or operating agreement.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed as of the date first written above.


SKYTERRA ROLLUP LLC

By: REORGANIZED LIGHTSQUARED INC.,
its Sole Member


By: _____
    Name:
    Title:

**THIRD AMENDED AND RESTATED**

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**LIGHTSQUARED LP**

Dated as of [_____]

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINED TERMS ........................................................................................2

    Section 1.1    Definitions.........................................................................................2

ARTICLE 2 CONTINUATION AND TERM ....................................................................6

    Section 2.1    Continuation......................................................................................6

    Section 2.2    Name................................................................................................6

    Section 2.3    Term.................................................................................................6

    Section 2.4    Registered Agent and Office...........................................................6

    Section 2.5    Principal Place of Business..............................................................6

    Section 2.6    Qualification in Other Jurisdictions ................................................7

    Section 2.7    Agreement........................................................................................7

ARTICLE 3 PURPOSE AND POWERS OF THE PARTNERSHIP ..................................7

    Section 3.1    Purpose............................................................................................7

    Section 3.2    Powers of the Partnership ...............................................................7

    Section 3.3    Limitations on Partnership Powers .................................................7

ARTICLE 4 CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS ............................7

    Section 4.1    Capital Contributions......................................................................7

    Section 4.2    Status of Capital Contributions.......................................................7

    Section 4.3    Limited Partnership Interest............................................................8

    Section 4.4    Capital Accounts.............................................................................8

ARTICLE 5 PARTNERS ....................................................................................................9

    Section 5.1    Powers of Limited Partners.............................................................9

    Section 5.2    No General Partner Liability............................................................9

    Section 5.3    Actions of the Limited Partners ......................................................9

    Section 5.4    Partition...........................................................................................9

    Section 5.5    Withdrawal.......................................................................................9

    Section 5.6    Removal of the General Partner by Limited Partners......................9

    Section 5.7    Bankruptcy, Resignation, Withdrawal, Etc. of General Partner .................9

ARTICLE 6 MANAGEMENT...........................................................................................10

i

Section 6.1      Management by the General Partner ...................................................... 10

Section 6.2      General Partner's Time ........................................................................ 10

Section 6.3      No Liability; Indemnity ........................................................................ 10

Section 6.4      Reliance by Third Parties ..................................................................... 11

Section 6.5      General Authority ................................................................................ 11

Section 6.6      Limited Liability ................................................................................. 11

Section 6.7      Special Purpose Provision .................................................................... 11

Section 6.8      Grant of Power of Attorney .................................................................. 11

Section 6.9      Terms of Grant ................................................................................... 12

Section 6.10     Separate Form .................................................................................... 12

ARTICLE 7 ALLOCATIONS ....................................................................................... 12

Section 7.1      Allocations ....................................................................................... 12

ARTICLE 8 DISTRIBUTIONS ..................................................................................... 13

Section 8.1      Distributions ...................................................................................... 13

Section 8.2      Dissolution ........................................................................................ 13

Section 8.3      Withholding Taxes .............................................................................. 13

Section 8.4      Limitations on Distribution .................................................................. 13

ARTICLE 9 ADDITIONAL ISSUANCES; TRANSFERS; REDEMPTIONS ........................... 13

Section 9.1      Additional Issuances of Units ............................................................... 13

Section 9.2      Transfer Restrictions ........................................................................... 14

Section 9.3      Admission of Additional Limited Partners ............................................... 14

ARTICLE 10 BOOKS AND RECORDS; Information Rights ................................................ 15

Section 10.1     Books, Records and Financial Statements ................................................ 15

ARTICLE 11 TAX MATTERS ...................................................................................... 15

Section 11.1     Tax Treatment .................................................................................... 15

Section 11.2     Cancellation of Indebtedness Income ...................................................... 15

ARTICLE 12 LIABILITY, EXCULPATION AND INDEMNIFICATION ................................. 16

Section 12.1     Liability ............................................................................................ 16

Section 12.2     Exculpation ....................................................................................... 16

Section 12.3     Indemnification .................................................................................. 16

ii

Section 12.4    Expenses ........................................................................17

Section 12.5    Insurance ........................................................................18

Section 12.6    Outside Businesses..........................................................18

ARTICLE 13 DISSOLUTION, LIQUIDATION AND TERMINATION....................................18

Section 13.1    Dissolution .......................................................................18

Section 13.2    Notice of Dissolution .......................................................19

Section 13.3    Liquidation .......................................................................19

Section 13.4    Final Reports....................................................................20

Section 13.5    Termination ......................................................................20

ARTICLE 14 AMENDMENTS .................................................................................20

Section 14.1    Amendments.....................................................................20

ARTICLE 15 MISCELLANEOUS ............................................................................20

Section 15.1    Further Assurances............................................................20

Section 15.2    Notices .............................................................................20

Section 15.3    Failure to Pursue Remedies ..............................................21

Section 15.4    Assignment ......................................................................21

Section 15.5    Binding Effect ..................................................................21

Section 15.6    No Third Party Beneficiaries ...........................................21

Section 15.7    Severability ......................................................................22

Section 15.8    Titles and Headings; Construction....................................22

Section 15.9    Entire Agreement .............................................................22

Section 15.10   Governing Law; Consent to Jurisdiction; Waiver of Jury Trial ...............22

Section 15.11   Process Agent...................................................................23

Section 15.12   Enforcement.....................................................................23

Section 15.13   Counterparts.....................................................................23

Schedule I – Limited Partners

# THIRD AMENDED AND RESTATED

## LIMITED PARTNERSHIP AGREEMENT

### OF

### LIGHTSQUARED LP

THIS THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF LIGHTSQUARED LP (the "Partnership"), dated [_____], is entered into by and among LightSquared GP LLC, a Delaware corporation, as reorganized in accordance to the Plan (defined below) (the "General Partner") and each of the limited partners whose names are set forth on the Schedule of Limited Partners attached as Schedule I hereto (each individually, a "Limited Partner," and collectively, together with any Additional Limited Partners hereafter admitted to the Partnership in accordance with this Agreement, the "Limited Partners"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings set forth in Section 1.1.

## RECITALS

WHEREAS, Motient Corporation, a Delaware corporation, as sole member, formed a limited liability company (the "LLC") pursuant to the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq., the "LLC Act") by filing a Certificate of Formation with the Secretary of State of the State of Delaware on June 16, 2000 and entering into a limited liability company operating agreement dated as of June 16, 2000;

WHEREAS, the operating agreement of the LLC was amended and restated effective as of June 29, 2000 by a certain First Amended and Restated Limited Liability Company Agreement (the "LLC Agreement");

WHEREAS, the members of the LLC and the General Partner approved the conversion of the LLC to a Delaware limited partnership in accordance with the terms and conditions set forth in the LLC Agreement and pursuant to Section 18-216 of the LLC Act and Section 17-217 of the Delaware Act, whereupon the members of the LLC and certain other Persons became Limited Partners of the Partnership and LightSquared GP LLC (f/k/a LightSquared GP Inc.) was admitted as general partner of the Partnership;

WHEREAS, the General Partner executed, delivered and filed (or caused to be delivered and filed) the certificate of conversion and the Certificate of Limited Partnership pursuant to the terms of Section 17-204 of the Delaware Act on November 26, 2001;

WHEREAS, certain of the partners of the Partnership were parties to that certain Limited Partnership Agreement of the Partnership, dated as of November 26, 2001, as amended on August 21, 2003 and April 2, 2004 (the "November 2001 Partnership Agreement");

WHEREAS, on November 12, 2004 the parties amended and restated the November 2001 Partnership Agreement to, among other things, (i) provide that the Partnership

1

shall have one class of limited partnership interests; (ii) eliminate all provisions relating to the class A preferred units of limited partnership of the Partnership; and (iii) make certain other changes as provided herein (the "November 2004 Partnership Agreement");

WHEREAS, (i) on December 20, 2004, the parties entered into Amendment No. 1 to the November 2004 Partnership Agreement and (ii) on January 5, 2007, the parties entered into Amendment No. 2 to the November 2004 Partnership Agreement; and

WHEREAS, on October 18, 2010, the Partnership amended and restated the November 2004 Partnership Agreement to incorporate certain amendments, admit certain additional preferred limited partners, and to reflect the change of the Partnership's name from SkyTerra LP to LightSquared LP, which occurred on July 20, 2010 and which was previously approved by the parties thereto for administrative convenience, (the "October 2010 Partnership Agreement");

WHEREAS, on [●], 2014, LightSquared Inc. and its affiliated debtors and debtors in possession (including the Partnership) (the "Debtors") filed their Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code (including all exhibits thereto and as subsequently amended, modified or supplemented, the "Plan") with the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in the chapter 11 cases of the Debtors pending before the Bankruptcy Court (the "Chapter 11 Cases");

WHEREAS, the Plan was confirmed by an order of the Bankruptcy Court entered on [_____], and became effective on [_____] (the "Effective Date"); and

WHEREAS, the Partnership wishes to amend and restate the October 2010 Partnership Agreement to incorporate certain amendments and changes as specified in the Plan.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Partners hereby agree as follows:

ARTICLE 1

DEFINED TERMS

Section 1.1    Definitions.    As used in this Agreement, the following terms have the respective meanings set forth below.

"Additional Limited Partner" means a Person admitted to the Partnership as a Limited Partner pursuant to Section 9.3.

"Affiliate" means, with respect to any Person, any other Person who or that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

2

"Agreement" means this Third Amended and Restated Limited Partnership Agreement of the Partnership, as amended, modified, supplemented or restated from time to time.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, injunctions, judgments, awards, decrees of, or agreements with any Governmental Authority.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York and Wilmington, Delaware are open for the general transaction of business.

"Capital Account" means, with respect to any Limited Partner, the account maintained for such Limited Partner in accordance with the provisions of Section 4.4.

"Capital Contribution" means, with respect to any Limited Partner, any contributions made to the Partnership pursuant to Section 4.1 by such Limited Partner with respect to the Limited Partnership Interest in the Partnership now or hereafter held or purchased by such Limited Partner.

"Certificate of Limited Partnership" means the Certificate of Limited Partnership of the Partnership and any and all amendments thereto and restatements thereof filed on behalf of the Partnership with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"Chapter 11 Cases" has the meaning set forth in the recitals

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section ("§") of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlled" and "Controlling" have meanings correlative thereto.

"Covered Person" means any Limited Partner, any Affiliate of a Limited Partner or any officers, directors, Representatives, shareholders, partners, employees, Representatives or agents of a Limited Partner or their respective Affiliates, or any current or former directors, officers, shareholders, partners, employees, Representatives or agents of the Partnership or its Affiliates or any Liquidator under Section 13.3.

3

"Debtors" has the meaning set forth in the recitals.

"Delaware Act" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101, et seq., as amended from time to time.

"Effective Date" has the meaning set forth in the recitals.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder.

"FCC" means the U.S. Federal Communications Commission.

"General Partner" has the meaning set forth in the preamble.

"Governmental Authority" means the government of the United States of America or any other government and, in each such case, any state, commonwealth, territory, county or municipality thereof, or the government of any political subdivision of any of the foregoing, or any authority, agency, ministry, court or other similar body exercising executive, legislative, judicial, regulatory or administrative authority of such government.

"HSR Act" means Section 7A of the Clayton Act (Title II of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), and the rules and regulations promulgated thereunder.

"Limited Partner" has the meaning set forth in the preamble.

"Limited Partnership Interest" means a Limited Partner's aggregate rights in the Partnership in accordance with this Agreement and the Delaware Act, including such Limited Partner's right to share in the profits and losses of the Partnership and right to receive distributions of the Partnership's assets.

"Liquidator" has the meaning set forth in Section 13.3.

"LLC" has the meaning set forth in the recitals.

"LLC Act" has the meaning set forth in the recitals.

"LLC Agreement" has the meaning set forth in the recitals.

"November 2001 Partnership Agreement" has the meaning set forth in the recitals.

"November 2004 Partnership Agreement" has the meaning set forth in the recitals.

"October 2010 Partnership Agreement" has the meaning set forth in the recitals.

"Parent" means NewCo, LLC a Delaware limited liability company.

4

"Partners" means the General Partner and the Limited Partners.

"Partnership" has the meaning set forth in the preamble.

"Percentage Interest" means with respect to any Limited Partner, the ratio (expressed as a percentage) of the Units actually held by such Limited Partner as of the date of determination to the aggregate Units actually held by all Limited Partners on such date.

"Person" means any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, cooperative, association or other business entity or Governmental Authority, or any group comprised of two or more of the foregoing.

"Plan" has the meaning set forth in the recitals.

"Process Agent" has the meaning set forth in Section 15.11.

"Representatives" means, with respect to any Person, any of such Person's, or its Affiliates', directors, officers, members, managers, employees, general partners, attorneys, accountants, financial and other advisers.

"SEC" means the U.S. Securities and Exchange Commission or any Governmental Authority succeeding to any or all of the functions of the SEC.

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. Notwithstanding the foregoing, a "Transfer" shall not include (a) a pledge or grant of a security interest in any Units or any interest (including a beneficial interest) therein or (b) a change of control transaction of the ultimate parent company of any Limited Partner where the interests in the Units does not constitute substantially all of the assets of such parent company, as reasonably determined in good faith by the board of directors or other governing body of such Limited Partner.

"Transferee" means any Person to whom any Limited Partner or any Transferee of any Limited Partner Transfers Units in accordance with the terms and conditions of this Agreement.

"Transferor" means the Person who Transfers Units to a Transferee in accordance with the terms and conditions of this Agreement.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unit" means a unit of interest in the Partnership, with the rights and privileges specified herein.

ARTICLE 2

CONTINUATION AND TERM

Section 2.1    Continuation.

(a)    The Partnership shall continue as a limited partnership under and pursuant to the provisions of the Delaware Act and the Partners agree that the rights, duties and liabilities of the Partners shall be as provided in the Delaware Act, except as otherwise provided herein.

(b)    As of the date hereof, the Partnership has authorized one class of limited partnership interests and such class of interests shall be designated as Units.

(c)    LightSquared GP LLC, as reorganized under the Plan, shall act as the general partner of the Partnership until such time as a Person is admitted as a successor to the General Partner or as an additional general partner.

(d)    The name and mailing address of each Limited Partner, the number of Units issued to such Limited Partner, the Percentage Interests represented thereby, and the amount of each Limited Partner's Capital Account as of the date of this Agreement are listed on Schedule I.  The General Partner shall update Schedule I from time to time as necessary to reflect accurately the information therein, including updates to reflect new issuances of Limited Partnership Interests or Transfers of all or any part of a Limited Partner's Limited Partnership Interest, in each case, in accordance with this Agreement and indicating the name and address of such new Limited Partner or Transferee along with an accurate description of the Limited Partnership Interest so issued or Transferred, and provide copies of the same to the Partners. Any amendment or revision to Schedule I made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule I and shall be deemed to be a reference to Schedule I as amended and in effect from time to time.

Section 2.2    Name.  The name of the limited partnership governed by this Agreement and by the Certificate of Limited Partnership is "LightSquared LP".  The business of the Partnership may be conducted upon compliance with all Applicable Laws under any other name designated, from time to time, by the General Partner.

Section 2.3    Term.  The term of the Partnership commenced on the date of the filing of the certificate of formation of the LLC in the office of the Secretary of State of the State of Delaware and shall continue until dissolved in accordance with this Agreement, or if sooner, in accordance with the Delaware Act.

Section 2.4    Registered Agent and Office.  The Partnership's registered agent and office in Delaware shall be Corporation Services Company, 2711 Centerville Road, Wilmington, Delaware 19808.  At any time, the General Partner may designate another registered agent and/or registered office, provided, that such new designation shall not adversely affect any Partner.

Section 2.5    Principal Place of Business.  The principal place of business of the Partnership shall be at 10802 Parkridge Boulevard, Reston, Virginia 20191.  The General Partner may change the location of the Partnership's principal place of business at any time.

6

Section 2.6    <u>Qualification in Other Jurisdictions</u>.  The General Partner shall cause the Partnership to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Partnership transacts business in which such qualification, formation or registration is required or desirable.

Section 2.7    <u>Agreement</u>.  This Agreement amends, restates and supersedes all prior partnership agreements of the Partnership in their entirety.

ARTICLE 3

PURPOSE AND POWERS OF THE PARTNERSHIP

Section 3.1    <u>Purpose</u>.  The Partnership is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Partnership is, engaging in any lawful act or activity in which limited partnerships may be engaged under the Delaware Act and engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing.

Section 3.2    <u>Powers of the Partnership</u>.  The Partnership shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purposes set forth in <u>Section 3.1</u>.

Section 3.3    <u>Limitations on Partnership Powers</u>.  Notwithstanding the foregoing provisions of <u>Section 3.2</u>, the Partnership shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Limited Partners under the Delaware Act or this Agreement in such jurisdiction or elsewhere.

ARTICLE 4

CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 4.1    <u>Capital Contributions</u>.

(a)    The General Partner shall not be required to make any Capital Contribution to the capital of the Partnership, shall have no capital account and shall not acquire a Percentage Interest or any Units, but shall nonetheless be obligated to serve as the general partner of the Partnership pursuant to Section 17-401(a) of the Delaware Act.

(b)    Capital Contributions may be made from time to time in cash or property in such amounts and at such times as the Partners shall agree.

(c)    No Limited Partner shall be required or permitted to contribute additional capital to the Partnership.

Section 4.2    <u>Status of Capital Contributions</u>.

(a)    Except as otherwise provided in this Agreement, no Limited Partner shall demand or receive a return of its Capital Contribution and no return of a Limited Partner's Capital Contribution shall be made hereunder if such distribution would violate Applicable Law. Under circumstances requiring a return of any Capital Contribution, no Limited Partner shall have the right to demand or receive property other than cash, except as may be specifically provided in this Agreement.

(b)    No Limited Partner shall receive any interest, salary or drawing with respect to its Capital Contribution or its Capital Account or for services rendered on behalf of the Partnership or otherwise in its capacity as a Limited Partner, except as otherwise specifically provided in this Agreement.  Nothing herein shall preclude any Limited Partner from serving the Partnership in another capacity, including as an employee, contractor or consultant, or otherwise dealing with the Partnership in its individual capacity and receiving compensation or consideration therefor.

(c)    Except as otherwise provided herein or by Applicable Law, the Partners shall be liable only to make Capital Contributions as provided in Section 4.1, and no Partner shall be required to lend any funds to the Partnership nor to make any additional Capital Contributions.  No Partner shall have any personal liability for the repayment of any Capital Contribution of any other Limited Partner.

Section 4.3    Limited Partnership Interest.  A Limited Partnership Interest shall for all purposes be personal property.  A Limited Partner has no interest in specific Partnership property.

Section 4.4    Capital Accounts.

(a)    An individual Capital Account shall be established and maintained for each Limited Partner.  Each Limited Partner's Capital Account as of the date of this Agreement is reflected on Schedule I, as applicable.

(b)    The Capital Account of each Limited Partner shall be maintained in accordance with the following provisions:

(i)    to such Limited Partner's Capital Account there shall be credited such Limited Partner's Capital Contribution, such Limited Partner's distributive share of profits and items of gross income and gain and the amount of any Partnership liabilities that are assumed by such Limited Partner or that are secured by any Partnership assets distributed to such Limited Partner;

(ii)    to such Limited Partner's Capital Account there shall be debited the amount of cash and the gross asset value of any Partnership assets distributed to such Limited Partner pursuant to any provision of this Agreement, such Limited Partner's distributive share of losses and items of gross deduction and loss and the amount of any liabilities of such Limited Partner that are assumed by the Partnership or that are secured by any property contributed by such Limited Partner to the Partnership; and

8

(iii)    in determining the amount of any liability for purposes of this Section 4.4(b), there shall be taken into account § 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

ARTICLE 5

PARTNERS

Section 5.1    Powers of Limited Partners.  Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Person other than the General Partner, including any Limited Partner acting in its capacity as such, (a) shall have any right to "participate in the control of the business" of the Partnership as such phrase is construed under Section 17-303(b) of the Delaware Act, (b) shall have the power to be an agent of the Partnership or (c) shall take any action or exercise any right with respect to the Partnership not permitted to be taken or exercised by a Limited Partner pursuant to this Agreement and Section 17-303 of the Delaware Act.  In no event shall any Person, other than the General Partner, have any right, power or authority (i) to transact any business in the name of the Partnership, (ii) to act for, or on behalf of, the Partnership or (iii) to bind the Partnership, such powers being vested solely and exclusively in the General Partner.

Section 5.2    No General Partner Liability.  The General Partner shall have no personal liability for the repayment of the Capital Contributions of the Limited Partners.

Section 5.3    Actions of the Limited Partners.  Any action of the Partnership requiring the consent or approval of the Limited Partners, or any percentage thereof, shall be taken by a consent in writing signed by Limited Partners holding not less than the Percentage Interests necessary to take such action pursuant to this Agreement.

Section 5.4    Partition.  Each Limited Partner waives any and all rights that it may have to maintain an action for partition of the Partnership's property.

Section 5.5    Withdrawal.  A Limited Partner may not withdraw from the Partnership prior to the dissolution and winding up of the Partnership except as set forth in this Agreement.  A Limited Partner attempting to resign in violation of this Agreement shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the fair value of its Limited Partnership Interest except as otherwise expressly provided for in this Agreement.  The withdrawal of any Limited Partner for any reason shall not result in the dissolution of the Partnership.

Section 5.6    Removal of the General Partner by Limited Partners.  The Limited Partners may at any time, through a majority vote, effect the removal of the General Partner with or without cause by delivering to the General Partner a notice of removal, such removal to become effective as provided in such notice of removal.

Section 5.7    Bankruptcy, Resignation, Withdrawal, Etc. of General Partner.  After the resignation, withdrawal, dissolution, bankruptcy or insolvency of the General Partner (other than any bankruptcy or insolvency of the General Partner occurring jointly or in connection with any similar action taken by the Partnership) which would otherwise result in the dissolution of the

Partnership by operation of law, the Partnership will be dissolved, unless, within ninety (90) days after the date of such resignation, withdrawal, dissolution, bankruptcy, or insolvency, a majority of the Limited Partners agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of withdrawal or removal, of one or more successor General Partners.  In no event shall the General Partner cease to be a general partner of the Partnership after any bankruptcy or insolvency of the General Partner occurring jointly or in connection with any similar action taken by the Partnership.

ARTICLE 6

MANAGEMENT

Section 6.1    <u>Management by the General Partner</u>.

(a)    Except as otherwise expressly provided herein and subject to the restrictions contained in <u>Sections 5.1</u>, <u>5.6</u>, <u>5.7</u> and <u>6.5</u>, management of the Partnership and control of its business shall be vested solely in the General Partner.  Except for situations in which the approval of the Limited Partners is required by this Agreement or by non-waivable provisions of Applicable Law, the General Partner shall have the exclusive right, power and discretion to manage, operate and control the Partnership, to do all things necessary or appropriate to carry on its business and purposes, including but not limited to, the right to incur and satisfy obligations relating to the formation and operation of the Partnership, and to exercise all rights and powers conferred upon the General Partner by the Delaware Act, in each case subject to the terms and conditions set forth in this Agreement.

(b)    The General Partner shall have the power to delegate authority to the officers and such other employees, agents and Representatives of the Partnership as it may from time to time deem appropriate and in accordance with this Agreement.  Any delegation of authority by the General Partner to take any action must be approved by the General Partner in the same manner as would be required for the General Partner to take such action directly.

(c)    Unless authorized to do so by this Agreement or by the General Partner, no attorney-in-fact, employee, Limited Partner or other agent of the Partnership shall have any power or authority to bind the Partnership in any way, to pledge its credit or to render it liable monetarily for any purpose.

(d)    Any vacancy in the position of General Partner shall be filled by the affirmative written consent of a majority of the Limited Partners.

Section 6.2    <u>General Partner's Time</u>.  The General Partner shall devote all of its time to the affairs of the Partnership.

Section 6.3    <u>No Liability; Indemnity</u>.  Neither the General Partner nor any of its officers, directors, employees or agents shall be liable, responsible or accountable to the Partnership or any Partner for any act or omission performed or omitted pursuant to the authority granted to it hereunder or by law, or for any claim, loss, cost, damage, liability, demand or expense (including, without limitation, attorneys' fees), resulting from the performance of their duties hereunder in accordance with the requirements of this Agreement; <u>provided</u>, <u>however</u>, that

10

any such Person shall be liable, accountable and responsible for their gross negligence, fraud, willful misconduct or breach of this Agreement. The Partnership shall indemnify the General Partner, its officers, directors, employees and agents and hold them harmless from any claim, loss, cost, damage, liability, demand or expense (including, without limitation, attorneys' fees and disbursements), incurred or sustained by them by reason of any act performed by them, or any omission by them for or on behalf of the Partnership and in furtherance of its interest, consistent with the requirements of this Agreement, but this indemnity shall not require the Partners to make any Capital Contribution therefor; provided, however, such indemnity shall not extend to the gross negligence, willful misconduct, fraud or breach of this Agreement of any such Person.

Section 6.4    Reliance by Third Parties. Third parties dealing with the Partnership may rely conclusively upon the power and authority of the General Partner to act as set forth herein and shall not be required to inquire into or ascertain the authority of the General Partner so to act.

Section 6.5    General Authority. The General Partner shall, except as otherwise provided in this Agreement, have all the rights and powers and shall be subject to all the restrictions and liabilities of a general partner in a limited partnership under the Delaware Act.

Section 6.6    Limited Liability. Performance of one or more of the acts described in Article 5 and this Article 6 with respect to the Partners shall not in any way impose any personal liability on any Limited Partner. No Partner or, in the appropriate case, former Partner shall be liable for any debts or obligations of the Partnership in excess of its Capital Contributions (subject to the obligation of a Limited Partner of the Partnership under the Delaware Act to repay any funds wrongfully distributed to it). All undistributed cash, which would otherwise be distributed to the Limited Partners, shall be available to creditors to satisfy the debts and obligations of the Partnership prior to the time of actual distribution.

Section 6.7    Special Purpose Provision. The General Partner, and any additional or substitute General Partner of the Partnership shall at all times have as its sole purpose to act as the General Partner of the Partnership, and shall be engaged in no other business or have any other purpose.

Section 6.8    Grant of Power of Attorney. Each Limited Partner, by its execution hereof, hereby irrevocably makes, constitutes and appoints the General Partner as its true and lawful attorney-in-fact, with power and authority in its name, place and stead, to make, execute, sign, acknowledge and file on behalf of such Limited Partner and on behalf of the Partnership:

(a)    Such amendments to the Certificate of Limited Partnership as the General Partner shall reasonably deem necessary, provided such amendments are not inconsistent with the provisions of this Agreement and would not adversely affect the rights of any Limited Partner;

(b)    All papers which may be deemed necessary or desirable by the General Partner to effect the termination of the Partnership after its dissolution as provided in this Agreement; and

(c)    All such other instruments, documents and certificates which may from time to time be required or permitted by the laws of any state, the United States of America, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid and subsisting existence, rights and property of the Partnership as a limited partnership and its power to carry out its purposes as set forth in this Agreement; provided, however, that any decisions other than administrative ones shall first have been approved by the applicable approvals as provided herein.

Section 6.9    Terms of Grant.  The foregoing appointment in Section 6.8:

(a)    Is irrevocable and shall be deemed to be a special power coupled with an interest in recognition of the fact that the General Partner will be relying upon such power of attorney to act as contemplated by this Agreement in such execution, acknowledgment and filing and such other actions by the General Partner on behalf of the Limited Partners and the Partnership;

(b)    Shall survive the dissolution or bankruptcy of any Limited Partner granting the same and the transfer, by operation of law or otherwise, by any Limited Partner of the whole or any part of its interest in and to the Partnership, its capital, profits or losses hereunder; and

(c)    May be exercised by the General Partner on behalf of any Limited Partner by a facsimile signature of the General Partner, as attorney-in-fact for such Limited Partner.

Section 6.10    Separate Form.    The foregoing appointment is self-operative but, in confirmation thereof, each Limited Partner hereby agrees to execute, acknowledge and deliver to the General Partner, promptly upon request therefor by the General Partner, a power of attorney in recordable form satisfactory to the General Partner evidencing the foregoing appointment.

ARTICLE 7

ALLOCATIONS

Section 7.1    Allocations.  In any jurisdiction in which the Partnership is treated as a partnership, or flow through, for tax purposes, all items of income, gain, loss, deduction and credit (including any taxes payable by the Partnership) shall be allocated to the Limited Partners pro rata in accordance with the number of Units they hold.  If the number of Units a Limited Partner holds changes during the taxable year (including, without limitation, by reason of a sale, exchange, redemption or liquidation of a Limited Partner's interest in the Partnership or the admission of a new partner to the Partnership), all allocations shall be made on an interim closing of the books method as if the taxable year of the Partnership ended at the close of the date of the change and the change occurred immediately thereafter, such that the Limited Partners immediately before the change would be allocated a portion of each relevant item of the Partnership through and including the date of the change pro rata in accordance with the number of Units they held immediately prior to the change.

ARTICLE 8

DISTRIBUTIONS

Section 8.1    Distributions.    Except as otherwise provided in Section 13.3, at the General Partner's sole discretion, the Partnership shall make distributions to the Limited Partners in proportion to their respective Percentage Interests, at such time or times and in such amounts as the General Partner may determine in its sole discretion.

Section 8.2    Dissolution.  Upon the dissolution and winding up of the Partnership, the assets of the Partnership shall be distributed to the Limited Partners as provided in Section 13.3.

Section 8.3    Withholding Taxes.  The Partnership is authorized to withhold and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state, local or foreign law as a result of a Partner's status as a Partner hereunder.   All such amounts shall be treated as amounts distributed to such Partner pursuant to Section 8.1 for all purposes of this Agreement.   To the extent such taxes exceed the amounts otherwise currently distributable hereunder, the excess shall be considered a loan from the Partnership to such Partner.  Such loan shall be repayable on demand or, at the election of the Partnership, discharged out of distributions to which such Partner would otherwise be entitled and shall, at the option of the General Partner, bear interest at the then "applicable federal short-term rate" under the Code and the regulations promulgated thereunder, from the date the loan is deemed to be made until its date of repayment or discharge. The withholdings referred to in this Section 8.3 shall be made at the maximum statutory rate under Applicable Law unless the General Partner has received an opinion of counsel or other evidence, satisfactory to the General Partner, that a lower rate is applicable, or that no withholding is applicable.   The provisions of this Section 8.3 regarding withholding by the Partnership shall survive the dissolution, winding up and termination of the Partnership.

Section 8.4    Limitations on Distribution.    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not make a distribution to the Limited Partners if such distribution in the aggregate would violate Section 17-607 of the Delaware Act or other Applicable Law.

ARTICLE 9

ADDITIONAL ISSUANCES; TRANSFERS; REDEMPTIONS

Section 9.1    Additional Issuances of Units.    In order to raise capital for the Partnership's operations or to acquire assets, to redeem or retire Partnership debt, or for any other valid Partnership purposes, the General Partner may from time to time determine that it is in the best interests of the Partnership to cause the Partnership to issue additional Units to the Limited Partners or other Persons and to admit such other Persons to the Partnership as Additional Limited Partners pursuant to Section 9.3.  The General Partner shall determine the consideration for, and the terms and conditions with respect to, any future issuance of Units.

13

Section 9.2    Transfer Restrictions.  No Limited Partner may Transfer all or any part of its Units to any Person, except in compliance with the following:

(a)    Any Transferee that after the date of this Agreement acquires Units shall, as a condition precedent to the Transfer of such Units to such Transferee, (i) become a party to this Agreement by completing and executing a counterpart signature page or joinder to this Agreement in a form satisfactory to the General Partner; (ii) execute all such other agreements or documents as may reasonably be requested by the General Partner; (iii) obtain any regulatory approvals needed in connection with such Transfer; and (iv) deliver such signature page and, if applicable, other agreements and documents to the Partnership at its address specified in Section 15.2.  Such Person shall, upon its satisfaction of such conditions and its acquisition of such Units in compliance with this Agreement, be a Partner for all purposes of this Agreement.

(b)    Notwithstanding anything to the contrary in this Agreement, no Transfers shall be permitted by any Limited Partner without the prior written consent of the General Partner if such Transfer would (i) violate any Applicable Law; (ii) impair a material license or regulatory approval of Parent (or any of its Subsidiaries) or cause a change of control of any such license without Parent and/or the Partnership having received all required approvals of Governmental Authorities and other required approvals; (iii) result , if applicable, in the termination of its status as a partnership under the Code or cause the Partnership to be a publicly traded partnership within the meaning of section 7704 of the Code; (iv) cause the Partnership to be in violation of any applicable state or federal securities Applicable Law; (v) result in an interest in the Partnership being held by a Person whose participation in the ownership of the Partnership would be detrimental to the Partnership; or (vi) cause the Partnership to be subject to the reporting requirements under the Exchange Act.

(c)    To the extent that any regulatory approval, notification or other submission or procedure is required or customarily provided in connection with the exercise of any right or obligations as set forth in this Agreement with respect to the Transfer of interests in the Partnership (including, but not limited to, FCC approvals (if required); filings under the HSR Act and securities Applicable Law), such Transfer pursuant to this Agreement will be delayed and will only take place after such approval, notification or other submission or procedure has been obtained, submitted or completed, as determined by General Partner.

(d)    Any Transfer of Limited Partnership Interests hereunder shall be made only by a Transfer of the Transferor's Units representing such Limited Partnership Interests and shall be deemed to include a proportional Transfer of the Transferor's Capital Account, adjusted for all prior allocations and distributions with respect to the Transferred Capital Account.

(e)    Any Transfer or attempted Transfer of Units in violation of any provision of this Agreement shall be void.

Section 9.3    Admission of Additional Limited Partners.  A Person (other than a current Limited Partner) who purchases interests from the Partnership issued pursuant to Section 9.1 shall be admitted to the Partnership as an Additional Limited Partner upon furnishing to the Partnership, (i) a subscription agreement or an accession agreement, as applicable, in form satisfactory to the General Partner, which agreement shall include an acceptance by such Person

of all the terms and conditions of this Agreement, and (ii) such other documents as the General Partner deems necessary or advisable.  Such admission shall become effective on the date that the General Partner determines that such conditions have been satisfied.

## ARTICLE 10

## BOOKS AND RECORDS; INFORMATION RIGHTS

Section 10.1    Books, Records and Financial Statements.

(a)    At all times during the continuance of the Partnership, the General Partner shall maintain separate books of account for the Partnership that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Partnership business, in accordance with generally accepted accounting principles consistently applied to the extent not inconsistent with this Agreement.  Such books of account, together with a copy of this Agreement and of the Certificate of Limited Partnership, shall at all times be maintained at the principal place of business of the Partnership (or at the place of business of the Person to whom the duty to maintain these books has been delegated in accordance herewith and identified in writing to the Limited Partners) and, to the extent required by Applicable Law, shall be open to inspection and examination at reasonable times by each Limited Partner and its duly authorized representative for any purpose reasonably related to such Limited Partner's interest as a Limited Partner of the Partnership.

(b)    The General Partner shall have the authority, responsibility and obligation to cause to be prepared, with the assistance of the Partnership's accountants, any reports or returns required to be filed for and on behalf of the Partnership.  All charges of the Partnership's accountants shall be borne by the Partnership.

## ARTICLE 11

## TAX MATTERS

Section 11.1    Tax Treatment.  The Partners intend that the Partnership will be treated as a disregarded entity for U.S. federal income tax purposes and, to the extent permitted under Applicable Law, all other income tax purposes and each Partner will take such action (or refrain from taking action), as is reasonably requested by the General Partner, to make all elections and perform all acts (or refrain from taking action) as are necessary to have the Partnership treated as such.

Section 11.2    Cancellation of Indebtedness Income.  Notwithstanding anything to the contrary contained in this Agreement, and for the avoidance of any doubt, all cancellation of indebtedness income realized by the Partnership as a result of the confirmation and effectiveness of the Plan shall be (i) treated as realized immediately before the effectiveness of this Agreement and (ii) allocated to the Common Limited Partners, as defined in the October 2010 Partnership Agreement.

ARTICLE 12

LIABILITY, EXCULPATION AND INDEMNIFICATION

Section 12.1    Liability.

(a)    Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Partnership, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Partnership, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Partnership solely by reason of being a Covered Person.

(b)    The Limited Partners agree that the Partnership extends, and is limited, to only the rights and obligations provided in this Agreement, and nothing herein shall be construed to constitute any Limited Partner as the agent or partner of the other Limited Partners in the conduct of its respective businesses or activities.

(c)    No Limited Partner shall be liable to the Partnership or to the other Partner for any act or omission of such Partner, except to the extent that such act or omission results from its gross negligence or fraud.

Section 12.2    Exculpation.

(a)    No Covered Person shall be liable to the Partnership or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed, or omitted to be performed, by such Covered Person in good faith on behalf of the Partnership and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct, fraud, gross negligence or breach of this Agreement.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Partnership and upon such information, opinions, reports or statements presented to the Partnership by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Partnership, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Limited Partners might properly be paid.

Section 12.3    Indemnification.

(a)    To the fullest extent permitted by Applicable Law, each Covered Person shall be entitled to indemnification from the Partnership for any loss, damage, claim or liability incurred by such Covered Person by reason of any act or omission performed, or omitted to be performed, by such Covered Person in good faith on behalf of the Partnership and within the

16

scope of authority conferred on such Covered Person by this Agreement; provided, however, that any indemnity under this Section 12.3 shall be provided out of and to the extent of Partnership assets only, and no Covered Person shall have any personal liability on account thereof.

(b)    If any claim shall be asserted against a Covered Person, in respect of which such Covered Person proposes to demand indemnification under this Section 12.3 from the Partnership, such Covered Person shall notify the General Partner to that effect with reasonable promptness after such assertion, and the General Partner on behalf of the Partnership shall have the right to assume the entire control of the defense or settlement of any such claim, through its own attorneys and at its expense, and in connection therewith, such Covered Person shall cooperate fully to make available to the Partnership and the General Partner all information under its control relating thereto.

(c)    To the extent that a present or former director, manager, officer, employee or agent of the Partnership has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 12.3(a) or 12.3(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 12.3(a) or 12.3(b) above.

(d)    All rights to indemnification provided herein shall survive the termination of this Agreement and the withdrawal, removal or insolvency of any Partner and shall inure to the benefit of the heirs, executors and administrators of such Partner; provided that a claim for indemnification hereunder is made by or on behalf of the Covered Person seeking such indemnification prior to the time distribution in liquidation of the assets of the Partnership is made pursuant to Article 13.

(e)    The Partnership may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 12.4 and containing such other procedures regarding indemnification as are appropriate.

(f)    The indemnification and  advancement of expenses provided herein shall not be deemed to limit the right of the Partnership to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Partnership may be entitled under any agreement, vote of partners or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

Section 12.4   Expenses.  To the fullest extent permitted by Applicable Law, expenses (including attorneys' fees) judgments, penalties and fines incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Partnership prior to the final disposition of such claim, demand, action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise, upon receipt by the Partner of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be

determined by a final non-appealable judicial decision that the Covered Person is not entitled to be indemnified as authorized in <u>Section 12.3</u>.

Section 12.5    <u>Insurance</u>.  The Partnership may purchase and maintain insurance at its expense, to the extent and in such amounts as the General Partner shall deem advisable, on behalf of Covered Persons and such other Persons as the General Partner shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Partnership or such indemnities, regardless of whether the Partnership would have the power to indemnify such Person against such liability under the provisions of this Agreement.

Section 12.6    <u>Outside Businesses</u>.

(a)    Any Limited Partner, as well as any of its respective Affiliates and partners, may engage in and possess an interest in other business ventures of every nature and description, whether or not in competition with or of a similar nature to the business of the Partnership, independently or with others, and neither the Partnership nor the other Partners shall have any rights in and to such independent ventures or the profits, losses, income or distributions relating thereto.  Each Limited Partner shall promptly notify the other Partners in writing should any conflict of interest arise.

(b)    Nothing herein is intended to or shall relieve any Partner or any of its Affiliates from any obligations pursuant to contracts or agreements with the Partnership.

Section 12.7    <u>Amendments</u>

.  Notwithstanding anything to the contrary contained in this Agreement, any alteration or amendment to this <u>Article 12</u> shall not terminate or adversely affect any (i) rights or protections of any Covered Person as set forth under <u>Article 12</u> or (ii) obligations of the Partnership to provide such rights or protections.

ARTICLE 13

<u>DISSOLUTION, LIQUIDATION AND TERMINATION</u>

Section 13.1    <u>Dissolution</u>.  The Partnership shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a)    the written consent of the General Partner; or

(b)    the occurrence of any of the events set forth in <u>Section 5.7</u> and the failure of the Limited Partners to agree to continue the Partnership as set forth therein;

(c)    any time there are no general partners of the Partnership, unless the Partnership is continued in accordance with the Act; or

(d)    the entry of a decree of judicial dissolution under Section 17-802 of the Delaware Act.

Section 13.2   <u>Notice of Dissolution</u>.   Upon the dissolution of the Partnership, the General Partner shall promptly notify the Limited Partners of such dissolution.

Section 13.3   <u>Liquidation</u>.   Upon dissolution of the Partnership, the General Partner shall appoint a liquidating trustee (the "<u>Liquidator</u>") who shall immediately commence to wind up the Partnership's affairs; <u>provided</u>, <u>however</u>, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the satisfaction of liabilities to creditors so as to enable the Limited Partners to minimize the normal losses attendant upon a liquidation. The Limited Partners shall continue to share profits and losses during liquidation in the same proportions, as specified in <u>Article 7</u>, as before liquidation.   The proceeds of liquidation shall be distributed, as realized, in accordance with the following:

(a)   first, to pay the costs and expenses of the winding up, liquidation and termination of the Partnership;

(b)   second, to creditors of the Partnership, in the order of priority provided by law, including fees, indemnification payments and reimbursements payable to the Partners or their Affiliates, but not including those liabilities (other than liabilities to the Partners for any expenses of the Partnership paid by the Partners or their Affiliates, to the extent the Partners are entitled to reimbursement hereunder) to the Partners in their capacity as Partners;

(c)   third, to establish reserves reasonably adequate to meet any and all contingent or unforeseen liabilities or obligations of the Partnership; <u>provided</u>, <u>however</u>, that at the expiration of such period of time as the Liquidator may deem advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided;

(d)   thereafter, to the Limited Partners in proportion to their respective Percentage Interests, at such time or times and in such amounts as the General Partner or Liquidator, as applicable, may determine in its sole discretion.

If the Liquidator, in its sole discretion, determines that Partnership assets other than cash are to be distributed, then the Liquidator shall cause the value of the assets not so liquidated to be determined.   Such assets shall be retained or distributed by the Liquidator as follows:

(i)   the Liquidator shall retain assets having a value, net of any liability related thereto, equal to the amount by which the cash net proceeds of liquidated assets are insufficient to satisfy the requirements of <u>clauses (a)</u>, <u>(b)</u>, and <u>(c)</u> of this <u>Section 13.3</u>; and

(ii)   the remaining assets shall be distributed to the Limited Partners in the manner specified in <u>clause (d)</u> of this <u>Section 13.3</u>.

If the Liquidator, in its sole discretion, deems it not feasible or desirable to distribute to each Limited Partner its allocable share of each asset, the Liquidator may allocate and distribute specific assets to one or more Limited Partners as the Liquidator shall reasonably determine to be fair and equitable, taking into consideration, *inter alia*, the value of such assets and the tax consequences of the proposed distribution upon each of the Limited Partners (including both

19

distributees and others, if any).  Any distributions in-kind shall be subject to such conditions relating to the disposition and management thereof as the Liquidator deems reasonable and equitable.

Section 13.4    Final Reports.  Within a reasonable time following the completion of the liquidation of the Partnership's assets, the Liquidator shall deliver to each of the Limited Partners a statement which shall set forth the assets and liabilities of the Partnership as of the date of complete liquidation and each Limited Partner's portion of distributions pursuant to Section 13.3.

Section 13.5    Termination.  The Partnership shall terminate when all of the assets of the Partnership have been distributed in the manner provided for in this Article 13, and the Certificate of Limited Partnership shall have been canceled in the manner required by the Delaware Act.

ARTICLE 14

AMENDMENTS

Section 14.1    Amendments.  Subject to Section 12.7, this Agreement and the provisions herein may be amended or waived (including by adding one or more Limited Partners hereto from time to time) only if any such amendment or waiver is in writing and has been approved by the General Partner and the Limited Partners; provided, that this Agreement may not be amended in a manner that materially and adversely reduces or eliminates the express rights or increases the express obligations of any Limited Partner under this Agreement in any material respect without the prior written consent of such Limited Partner.  A copy of each such amendment shall be sent to each Limited Partner and shall be binding upon each Limited Partner; provided, further, that the failure to deliver a copy of such amendment shall not impair or affect the validity of such amendment.  No delay or omission in the exercise of any right, power, or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power, or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission, or waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

ARTICLE 15

MISCELLANEOUS

Section 15.1    Further Assurances.  The Partners shall cooperate with each other and the Partnership and shall promptly execute, acknowledge and deliver any assurances, approvals or documents reasonably requested by a Limited Partner that is necessary for the requesting Partner or the Partnership to satisfy its obligations hereunder or obtain the benefits contemplated hereby.

Section 15.2    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally; (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service, or (c) five (5) days after deposit in the mail if mailed by

registered or certified mail, in each case if sent to the following addresses (or pursuant to such other instructions as may be designated in writing by the party to receive such notice.):

       (a)    If given to the Partnership, at the Partnership's mailing address set forth below:

> LightSquared LP
> 10802 Parkridge Boulevard
> Reston, Virginia 20191-5416
> Fax:  (703) 390-6113
> Attention:  General Counsel

       (b)    If given to the General Partner, at the General Partner's mailing address set forth below:

> LightSquared GP LLC
> 10802 Parkridge Boulevard
> Reston, Virginia 20191-5416
> Fax:  (703) 390-6113
> Attention:  General Counsel

with a copy to each Limited Partner as set forth in clause (c) below.

       (c)    If given to any Limited Partner, at the address set forth on <u>Schedule I</u> (or as modified from time to time by a Limited Partner upon written notice to the General Partner).

Section 15.3    <u>Failure to Pursue Remedies</u>.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation from having the effect of an original violation.  No waiver of any breach of any of the terms of this Agreement shall be effective unless such waiver is in writing and signed by the Partner against whom such waiver is claimed.

Section 15.4    <u>Assignment</u>.  Neither this Agreement nor any right or obligation arising under this Agreement may be assigned by any party, <u>provided</u>, <u>however</u>, that any Limited Partner may assign its rights and obligations hereunder (other than those expressly stated as rights of initial limited partners) in connection with a Transfer of Units pursuant to the terms hereof.  Any purported assignment in violation of this provision shall be void.

Section 15.5    <u>Binding Effect</u>.  This Agreement will be binding upon, and inure to the benefit of, each of the Partnership and the Partners, and their respective permitted assigns, including any successor by merger or otherwise.

Section 15.6    <u>No Third Party Beneficiaries</u>.  Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Partnership and the Partners and Persons entitled to indemnification pursuant to <u>Section 6.3</u> and <u>Section 12.3</u>, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

Section 15.7    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect. Notwithstanding the foregoing, upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

Section 15.8    <u>Titles and Headings; Construction</u>.    The titles, captions and table of contents in this Agreement or in the Schedules hereto are for reference purposes only, and shall not in any way define, limit, extend or describe the scope of this Agreement or otherwise affect the meaning or interpretation of this Agreement.  Whenever this Agreement provides for any authority, action, approval, consent, or determination that may be exercised, taken, or made by a party, except as otherwise expressly provided, such authority, action, approval, consent, or determination may be exercised, taken, or made based on such party's absolute and sole discretion.  Whenever this Agreement grants any party the right to consent to an action, such consent, if granted, does not imply any other consent in the future, and no reason need be given for the failure to consent at any time.  The definitions given for terms in <u>Article 1</u> and elsewhere in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  References in this Agreement to any contract or other document (including this Agreement) shall be deemed references to such contract or other document as it may be amended, restated, or otherwise revised from time to time.  Except where expressly specified to the contrary, whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  All references in this Agreement to "days" refer to calendar days, unless specified otherwise.  All references herein to "Articles", "Sections", "clauses", etc. shall refer to corresponding provisions of this Agreement, unless otherwise specified.

Section 15.9    <u>Entire Agreement</u>.  This Agreement, together with the attached Schedules and Exhibits constitutes the entire agreement, and supersedes all prior agreements, understandings, negotiations, and statements, both written and oral, among the parties hereto or any of their Affiliates with respect to the subject matter contained in this Agreement.

Section 15.10    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.  Each party agrees that, in connection with any legal suit or proceeding arising with respect to this Agreement, it shall submit to the non-exclusive jurisdiction of the United States District Courts for the District of Delaware and the Southern District of New York or the applicable Delaware or New York state court and agrees to venue in such courts.  EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Section 15.11  <u>Process Agent</u>.  Upon the request of the General Partner, a Limited Partner so requested shall designate, appoint and empower Corporation Service Company (the "<u>Process Agent</u>"), with offices as of the date of this Agreement at 2711 Centerville Road, Wilmington, DE 19808, or such other process agent as the General Partner may reasonably determine, as its authorized agent to receive for and on its behalf service of summons or other legal process in any such action, suit or proceeding in the State of Delaware.  Such service may be made by mailing or delivering a copy of such process to the relevant Limited Partner in case of the Process Agent at the Process Agent's above address, and such Limited Partner shall irrevocably authorize and direct the Process Agent to accept such service on its behalf.

Section 15.12  <u>Enforcement</u>.  The parties to this Agreement agree that irreparable damage would occur in the event that any of the provisions of this Agreement to be performed by the Partners were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each of the Partnership and each non-breaching Partner shall be entitled to an injunction or injunctions or such other equitable relief as may be deemed proper by a court of competent jurisdiction to prevent breaches by any Partner of this Agreement and to enforce specifically the terms and provisions of this Agreement applicable to any Partner, this being in addition to any other remedy or relief to which they are entitled at law or in equity, and that no Partner shall resist an application for such injunction, injunctions, or other equitable relief on the ground that the Partnership or any other Partner has an adequate remedy at law.  In the event that the Partnership or one or more Partners shall file suit to enforce the covenants contained in this Agreement (or obtain any other remedy in respect of any breach thereof), the prevailing party in the suit shall be entitled to recover, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, including reasonable attorney's fees and expenses.

Section 15.13  <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, including by facsimile, each of which shall be an original, but all of which together shall constitute one and the same instrument.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**LIGHTSQUARED GP LLC**


By: _____
        Name:
        Title:


**[NEWCO]**

By: _____
Name:
Title:

**SCHEDULE I**

**SCHEDULE OF LIMITED PARTNERS**

| Name | Address | Number of Units | Percentage Interest | Percentage Interest | Capital Account Balance[1] |
|---|---|---|---|---|---|
| [NEWCO] | [10802 Parkridge Blvd Reston, VA 20191] | [___] | 100 | 100 | [$2,145,268,000] |

---

[1] Capital account balance TBD.

SECOND AMENDED AND RESTATED

PARTNERSHIP AGREEMENT

OF

TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP

[●], 2014

## TABLE OF CONTENTS

ARTICLE I FORMATION, NAME, PURPOSE AND TERM ................................................... 1

Section 1.1.    *Formation, Name and Office* ........................................................ 1
Section 1.2.    *Purposes* ........................................................................... 1
Section 1.3.    *Term* ............................................................................... 1
Section 1.4.    *Tax Status* ........................................................................ 1

ARTICLE II CAPITAL CONTRIBUTIONS .............................................................. 1

ARTICLE III PERCENTAGE INTERESTS AND UNITS; DISTRIBUTIONS;
ALLOCATIONS; ADDITIONAL LIMITED PARTNERS.................................................... 2

Section 3.1.    *Percentage Interests and Units* .................................................. 2
Section 3.2.    *Distributions* ..................................................................... 2
Section 3.3.    *Allocations* ....................................................................... 2
Section 3.4.    *Additional Limited Partners* ...................................................... 3

ARTICLE IV MANAGEMENT ........................................................................ 3

ARTICLE V TERMINATION ........................................................................ 3

Section 5.1.    *Events of Termination* ............................................................ 3
Section 5.2.    *Voluntary Withdrawal Prohibited* .................................................. 4
Section 5.3.    *Winding Up* ........................................................................ 4
Section 5.4.    *Distributions* ..................................................................... 5
Section 5.5.    *Statements on Winding Up* ......................................................... 5

ARTICLE VI PARTITION ......................................................................... 5

ARTICLE VII BANK ACCOUNTS AND REPORTS ....................................................... 5

Section 7.1.    *Bank Accounts* ..................................................................... 5
Section 7.2.    *Reports* ........................................................................... 5

ARTICLE VIII OTHER INTERESTS OF THE PARTNERS ................................................ 6

ARTICLE IX MISCELLANEOUS ..................................................................... 6

Section 9.1.    *Liability* ......................................................................... 6
Section 9.2.    *Indemnification* ................................................................... 6
Section 9.3.    *Further Assurances* ................................................................ 7
Section 9.4.    *Integration* ....................................................................... 7
Section 9.5.    *Benefits and Obligations; Assignment of Partnership Interests and
Admission and Withdrawal of Partners* ........................................................... 8
Section 9.6.    *Severability* ...................................................................... 8

Section 9.7.    *Enforcement of Provisions* .............................................................................. 8

Section 9.8.    *Amendments* ..................................................................................................... 9

Section 9.9.    *Applicable Law* ................................................................................................ 9

Section 9.10.    *Counterparts* ................................................................................................... 9

Section 9.11.    *Headings* ........................................................................................................ 9

SECOND AMENDED AND RESTATED

PARTNERSHIP AGREEMENT

OF

TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP

THIS SECOND AMENDED AND RESTATED PARTNERSHIP AGREEMENT (this "Agreement") OF TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP (the "Partnership"), dated [●], 2014, is entered into by and between SkyTerra Rollup Sub LLC a Delaware limited liability company, as general partner of the Partnership (the "General Partner"), and LightSquared Investors Holdings Inc., a Delaware corporation, as limited partner of the Partnership (the "Limited Partner" and together with the General Partner, the "Partners").

WHEREAS, 3924505 Canada Inc. and TMI Communications and Company, Limited Partnership were parties to that certain Partnership Agreement of TMI Communications Delaware, Limited Partnership, dated as of November 2, 2001, as amended by Amendment No. 1 to Partnership Agreement of TMI Communications Delaware, Limited Partnership, dated as of September 30, 2006;

WHEREAS, SkyTerra Rollup Sub LLC and LightSquared Investors Holdings Inc. were parties to that certain First Amended and Restated Partnership Agreement of TMI Communications Delaware, Limited Partnership, dated as of October 28, 2010 (the "First Amended and Restated Partnership Agreement"), as amended by Amendment No. 1 to First Amended and Restated Partnership Agreement of TMI Communications Delaware, Limited Partnership, dated of as May 14, 2012;

WHEREAS, on the date hereof, the sole general partner of the Partnership is SkyTerra Rollup Sub LLC and the sole limited partner of the Partnership is LightSquared Investors Holdings Inc.;

WHEREAS, the Partnership was formed for the purposes of acquiring and holding interests and securities of such companies as the Partners may agree upon, holding cash and cash equivalents and making such other investments as the Partners may otherwise agree upon (collectively, the "Investments") and for any other purpose that the Partners may agree upon; and

WHEREAS, the Partnership wishes to amend and restate the First Amended and Restated Partnership Agreement, as amended.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Partners hereby agree as follows:

## ARTICLE I

## FORMATION, NAME, PURPOSE AND TERM

Section 1.1.    *Formation, Name and Office.*

(a)    TMI Communications Delaware, Limited Partnership, was established as a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act (as it may hereafter be amended from time to time, the "Act") § 17-201 on November 2, 2001.

(b)    A Partner's interest in the Partnership shall be personal property for all purposes.  All real and other property owned by the Partnership shall be deemed owned by the Partnership as an entity, and no Partner shall be deemed to own any of such property.

(c)    For the purposes of this Agreement only, the principal office of the Partnership shall be located at 10802 Parkridge Boulevard, Reston, Virginia, 20191.

(d)    The name and place of residence of the General Partner and the Limited Partner are as follows:

General Partner:
SkyTerra Rollup Sub LLC
10802 Parkridge Boulevard
Reston, Virginia, 20191

Limited Partner:
LightSquared Investors Holdings Inc.
10802 Parkridge Boulevard
Reston, Virginia, 20191

Section 1.2.    *Purposes*.  The purposes of the Partnership are to acquire and, ultimately, dispose of, the Investments, and to engage in any other activity incidental thereto.  The Partnership shall not engage in any other business or activity without the prior written consent of both Partners.

Section 1.3.    *Term*.    The term of the Partnership shall continue indefinitely, unless sooner terminated as hereinafter provided.

Section 1.4.    *Tax Status*.  The Partnership shall continue to be treated as an association taxable as a corporation for U.S. tax purposes.

## ARTICLE II

## CAPITAL CONTRIBUTIONS

Contributions may be made from time to time in cash or property in such amounts and at such times as the Partners shall agree.

ARTICLE III

PERCENTAGE INTERESTS AND UNITS; DISTRIBUTIONS;
ALLOCATIONS; ADDITIONAL LIMITED PARTNERS

Section 3.1.    *Percentage Interests and Units*.

(a)    Partnership interests in the Partnership are represented by units of partnership interest ("Units").  The percentage interest a limited partner has in the Partnership at any time is the percentage which the number of Units the limited partner then holds represents of all Units then outstanding.  Units are securities governed by Article 8 of the New York Uniform Commercial Code.  In order to simplify documentation, Units are not represented or evidenced by certificates.  Instead, ownership of Units (and changes of ownership of Units) will be recorded in the books and records of the Partnership.

(b)    As of the date of hereof, the Limited Partner holds 10,000 Units, which represents all of the issued and outstanding Units as of the date hereof.

(c)    If a limited partner makes a contribution after the date hereof pro rata in accordance with the number of Units it holds, then unless the General Partner otherwise provides, the number of Units it holds will not be changed, but if a limited partner makes a contribution after the date hereof that is not matched by contributions from other limited partners pro rata in accordance with the number of Units they hold, the number of Units the limited partners hold will be adjusted to reflect the disproportionate contributions so made in a manner determined in good faith by the General Partner, whose determination shall be absolute and binding on all Partners.

(d)    If the Partnership makes a distribution to limited partners in redemption of Units, then the distribution will be treated as in redemption of a percentage of the then outstanding Units equal to the percentage of the fair market value of the Partnership's net assets that the value of such distribution represents, as determined in good faith by the General Partner, whose determination shall be absolute and binding on all limited partners.

Section 3.2.    *Distributions*.  The Partnership may make distributions to limited partners in redemption of Units in any proportion determined in good faith by the General Partner, whose determination shall be absolute and binding on the limited partners.  The Partnership shall make all distributions to limited partners (other than distributions in redemption of Units) pro rata in accordance with the number of Units they hold.

Section 3.3.    *Allocations*.  In any jurisdiction in which the Partnership is treated as a partnership, or flow through, for tax purposes, all items of income, gain, loss,

2

deduction and credit (including any taxes payable by the Partnership) shall be allocated to the limited partners pro rata in accordance with the number of Units they hold. If the number of Units a limited partner holds changes during the taxable year (including, without limitation, by reason of a sale, exchange, redemption or liquidation of a Partner's interest in the Partnership or the admission of a new partner to the Partnership), all allocations shall be made on an interim closing of the books method as if the taxable year of the Partnership ended at the close of the date of the change and the change occurred immediately thereafter, such that the limited partners immediately before the change would be allocated a portion of each relevant item of the Partnership through and including the date of the change pro rata in accordance with the number of Units they held immediately prior to the change.

Section 3.4.    *Additional Limited Partners*.    Additional limited partners may be admitted to the Partnership on such terms and conditions as may be determined by the General Partner, in its sole discretion.

## ARTICLE IV

## MANAGEMENT

The General Partner shall be responsible for the management and conduct of the Partnership business. The General Partner shall have all rights and powers of a general partner under the Act, and shall have all authority, rights and powers in the management of the Partnership business to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement. Subject to the limitations provided in this Agreement, the General Partner shall have exclusive and complete authority and discretion to manage the operations and affairs of the Partnership and to make all decisions regarding the business of the Partnership. Any action taken by the General Partner shall constitute the act of and serve to bind the Partnership. In dealing with the General Partner acting on behalf of the Partnership no person shall be required to inquire into the authority of the General Partner to bind the Partnership. Persons dealing with the Partnership are entitled to rely conclusively on the power and authority of the General Partner as set forth in this Agreement.

## ARTICLE V

## TERMINATION

Section 5.1.    *Events of Termination*.    The Partnership shall be dissolved and its affairs wound up in the event that:

(a)    the term of the Partnership expires;

(b)    the Partners agree to terminate the Partnership; or

(c)    either of the following events occurs:

3

(i)    the General Partner makes an assignment for the benefit of creditors, admits in writing that it is unable to pay its debts as they become due, files a voluntary petition in bankruptcy or for an adjudication that it is bankrupt or insolvent, files any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, files any answer admitting (or failing to contest) the material allegations of a petition filed against it in any such proceeding, seeks or consents to or acquiesces in the judicial appointment of any trustee, fiscal agent, receiver or liquidator of it or of all or any substantial part of its properties, or takes any other action looking to its dissolution or liquidation; or

(ii)    within 45 days after the commencement of any action against the General Partner seeking any bankruptcy, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such action is not dismissed, or all orders or proceedings thereunder affecting its operations are not stayed, provided the stay of any such order or proceeding thereafter is not set aside, or, within 45 days after the judicial appointment without the consent or acquiescence of the General Partner of any trustee, fiscal agent, receiver or liquidator of it or of all or any substantial part of its properties, such appointment is not vacated.

Notwithstanding the provisions of this Subsection 5.1(c), the Partnership shall not be dissolved (and its affairs shall not be wound up) as a result of a voluntary liquidation or reorganization of a General Partner, provided that such liquidation or reorganization is not entered into because of insolvency or bankruptcy.

Any of the actions taken by the General Partner referenced in Section 5.1(c) taken jointly or in connection with any similar actions taken by the Partnership shall not (i) result in the dissolution of the Partnership or (ii) cause the General Partner to cease to be the general partner of the Partnership.

Section 5.2.    *Voluntary Withdrawal Prohibited.*    No Partner shall have the right to withdraw from the Partnership, nor shall either Partner have the right to withdraw any part of its contributions to the capital of the Partnership, except in accordance with the provisions of this Agreement.

Section 5.3.    *Winding Up.*    Upon dissolution of the Partnership, the Partnership shall wind up its affairs promptly and in accordance with the directions of the General Partner (or of such person as may be designated by a limited partner, if the event of termination is an event described in Section 5.1(c) with respect to the General Partner) (the person directing the winding up hereafter referred to as the "Liquidator"). The assets of the Partnership shall be sold within a reasonable period of time to the extent necessary to pay or provide for the debts and liabilities of the Partnership and the expenses of dissolution and liquidation, and may be sold to the extent deemed commercially feasible by the Liquidator and all assets of the Partnership shall be applied and distributed as provided in Section 5.4.

4

Section 5.4.    *Distributions*.    The proceeds of any dissolution of the Partnership shall be distributed in the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

(a)    first, to the payment of the debts and liabilities of the Partnership and the expenses of dissolution and liquidation;

(b)    then, to the establishment of any reserves which the Liquidator shall deem reasonably necessary for the payment of such other debts and liabilities of the Partnership (contingent or otherwise) as are specified by the Liquidator, and such reserves shall be held by a bank or trust company selected by the Liquidator, as escrow holder, to be disbursed as directed by the Liquidator in payment of any such specified debts and liabilities or, at the expiration of such period as the Liquidator may deem advisable, to be distributed in the manner hereinafter provided; and

(c)    then, to the limited partners as set forth in Section 3.2.

Section 5.5.    *Statements on Winding Up*.    Upon termination of the Partnership, a statement shall be prepared by the Partnership's independent public accountants, which shall set forth the assets and liabilities of the Partnership as of the date of termination.

## ARTICLE VI

## PARTITION

Unless the Partners agree as to the division of an asset, they shall have no right of partition with respect to any assets of the Partnership, now existing or hereafter acquired.

## ARTICLE VII

## BANK ACCOUNTS AND REPORTS

Section 7.1.    *Bank Accounts*.    All Partnership accounts shall be maintained in a bank which shall be a member of the Federal Deposit Insurance Corporation.    All income, receipts and amounts deposited by the Partnership in such accounts shall be and remain the property of the Partnership and shall be received, held and disbursed only for the purposes herein specified.

Section 7.2.    *Reports*.    The General Partner shall have the authority, responsibility and obligation to cause to be prepared, with the assistance of the Partnership's accountants, any reports or returns required to be filed for and on behalf of the Partnership.    All charges of the Partnership's accountants shall be borne by the Partnership.

5

ARTICLE VIII

OTHER INTERESTS OF THE PARTNERS

Either Partner, as well as any of its respective affiliates and partners, may engage in and possess an interest in other business ventures of every nature and description, whether or not in competition with or of a similar nature to the business of the Partnership, independently or with others, and neither the Partnership nor the other Partner shall have any rights in and to such independent ventures or the profits, losses, income or distributions relating thereto.  Each Partner shall promptly notify the other in writing should any conflict of interest arise.

ARTICLE IX

MISCELLANEOUS

Section 9.1.    *Liability.*

(a)    The Partners agree that the Partnership extends, and is limited, to only the rights and obligations provided in this Agreement, and nothing herein shall be construed to constitute any Partner as the agent or partner of the other Partner in the conduct of its respective businesses or activities.

(b)    Neither Partner shall be liable to the Partnership or to the other Partner for any act or omission of such Partner, except to the extent that such act or omission results from its gross negligence or fraud.

Section 9.2.    *Indemnification.*

(a)    Each Partner shall indemnify and hold the other Partner and, where applicable, its respective current or former officers, directors, managers, employees, agents and shareholders, harmless from and against all threatened and actual claims, demands, losses or damages, including, without limitation, reasonable attorneys' fees (collectively, "Losses") which shall or may arise by reason of the indemnifying party's breach (directly or by agents or other representatives) of a provision of this Agreement or of any action outside the scope of this Agreement.

(b)    Each Partner and the Partnership's current or former officers, directors, managers, employees, agents and shareholders shall be indemnified and held harmless by the Partnership from and against any Losses incurred by such person by reason of any act or omission performed or omitted by it or them, except to the extent that such act or omission is contrary to this Agreement or results from such Partner's gross negligence or fraud.  Expenses (including attorneys' fees), judgments, penalties and, fines incurred by each Partner and the Partnership's  current or former officers, directors, managers, employees, agents and shareholders in defending any actual or threatened claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise shall be paid by the Partnership in advance of the final disposition of any action, suit or proceeding upon receipt of an undertaking to repay such amount if it shall

6

ultimately be determined that such person is not entitled to be indemnified by the Partnership as authorized by this Agreement.

(c)     To the extent that a present or former director, manager, officer, employee or agent of the Partnership has been successful on the merits or otherwise in defense of any claim, action, suit or proceeding described in Section 9.2(a) or 9.2(b) above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without the necessity of determining whether such person has met the applicable standard of conduct set forth in Section 9.2(a) or 9.2(b) above.

(d)     Each party to be indemnified under Section 9.2 shall give each indemnifying party notice of any claim, demand, loss or damage subject to indemnification within thirty (30) days after it has received actual notice thereof, and the indemnifying party shall be entitled to participate in or direct the defense of any action or proceeding involving such claim, demand, loss or damage, provided that it employs counsel reasonably satisfactory to the indemnified party.  An indemnifying party shall not be liable to an indemnified party in respect of settlements effected by the indemnified party without the written consent of the indemnifying party.

(e)     The Partnership may purchase and maintain insurance at its expense, to the extent and in such amounts as the General Partner shall deem advisable, on behalf of current or former officers, directors, managers, employees, agents and shareholders and such other persons as the General Partner shall determine, against any liability that may be asserted against or expenses that may be incurred by any such person in connection with the activities of the Partnership or such indemnities, regardless of whether the Partnership would have the power to indemnify such Person against such liability under the provisions of this Agreement.

(f)     The indemnification and advancement of expenses provided herein shall not be deemed to limit the right of the Partnership to indemnify any other person for any such expenses to the full extent permitted by law, nor shall it be deemed exclusive of any other rights to which any person seeking indemnification and advancement of expenses from the Partnership may be entitled under any agreement, vote of partners or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.  Such indemnification and advancement of expenses shall continue as to a person who has ceased to be director, officer, manager, employee, agent or shareholder and shall inure to the benefit of the heirs, executors and administrators of such person.

Section 9.3.    *Further Assurances.*   The Partners agree to execute such further instruments and documents, and to take such further actions, as may be necessary in order to implement the intent and purposes of the provisions of this Agreement.

Section 9.4.    *Integration.*    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and no alteration or modification hereof shall be binding unless in writing and signed by both Partners.

7

Section 9.5.    *Benefits and Obligations; Assignment of Partnership Interests and Admission and Withdrawal of Partners.*

(a)    Except as otherwise specifically provided herein, this Agreement shall be binding upon and shall inure to the benefit of each of the Partners and their respective successors and assigns, and no other person shall have any legal or equitable right, remedy or claim under or in respect of this Agreement.

(b)    The General Partner may assign its general partnership interest in the Partnership and the Units comprising that interest, in whole but not in part, to any other entity that executes an instrument pursuant to which it acknowledges that it has become a general partner of the Partnership and agrees to be bound by this Agreement. Upon any such assignment the entity to which such partnership interest and Units have been assigned shall thereupon automatically be admitted as the general partner of the Partnership and immediately afterwards the entity that assigned such partnership interest and Units shall automatically withdraw as general partner of the Partnership, without the need for any further formalities, and thereafter the Partnership shall continue and the term "General Partner" as used in this Agreement shall refer to the newly admitted general partner rather than the withdrawing general partner.

(c)    A limited partner may assign its limited partnership interest in the Partnership and the Units comprising that interest, in whole or in part, to any other entity that executes an instrument pursuant to which it acknowledges that it has become a limited partner of the Partnership and agrees to be bound by this Agreement. Upon any such assignment the entity to which such partnership interest and Units have been assigned, if not already a limited partner of the Partnership, shall thereupon automatically be admitted as a limited partner of the Partnership and the entity that assigned such partnership interest, if it no longer continues to hold any Units, shall immediately afterwards automatically withdraw as a limited partner of the Partnership, without the need for any further formalities, and thereafter the Partnership shall continue and the term "limited partner" as used in this Agreement shall refer collectively to the entities that continue to be limited partners in the Partnership as their interests shall appear.

Section 9.6.    *Severability.*  If any provision of this Agreement or portion thereof, or the application thereof to any person or circumstance, is held to be invalid or unenforceable, then the remainder of this Agreement, or the application of the provision or portion thereof to other persons or circumstances, shall not be affected thereby, provided that if any provision or portion thereof, or its application, is held to be invalid or unenforceable, then a suitable or equitable provision shall be substituted therefor in order to carry out, so far as may be valid or enforceable, the intent and purpose of the invalid or unenforceable provision or portion thereof.

Section 9.7.    *Enforcement of Provisions.*  The failure to enforce any provision of this Agreement or to require performance by a party of any provision hereof shall in no way be construed to be a waiver of such provision or to affect either the validity of this Agreement, or any part hereof, or the right of any party thereafter to enforce each and every provision in accordance with the terms of this Agreement.

8

Section 9.8.    _Amendments_.    Amendments to this Agreement may be made only if embodied in an instrument signed by the General Partner and the limited partners; provided, however, that any alteration or amendment to this Agreement shall not terminate or adversely affect any (i) rights of indemnification or protection of any person entitled to indemnification provided above in Section 9.2 or (ii) obligations of the Partnership to provide any such rights or protections as detailed above in Section 9.2.

Section 9.9.    *Applicable Law.*    This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware applicable to agreements made and fully to be performed therein by residents thereof, and specifically, the Act.

Section 9.10.    *Counterparts.*    This Agreement may be executed in counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

Section 9.11.    *Headings.*    The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

**GENERAL PARTNER:**

**SKYTERRA ROLLLUP SUB LLC**

**By:    SKYTERRA ROLLUP LLC,**
**its Sole Member**

**By:    REORGANIZED LIGHTSQUARED**
**INC., its Sole Member**

By:    _____
        Name:
        Title:


**LIMITED PARTNER:**

**LIGHTSQUARED INVESTORS**
**HOLDINGS INC.**

By:    _____
        Name:
        Title:

## **Exhibit C-7**

Schedule of Assumed Agreements

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| 4G ACQUISITIONS LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | 4G ACQUISITIONS LLC - MSDA | $ - |
| ACCESS INTELLIGENCE LLC | AGREEMENT-SATELLITE CONFERENCE | LIGHTSQUARED LP | ACCESS INTELLIGENCE LLC-2014 SATELLITE CONFERENCE PURCHASE ORDER | $ - |
| ACE | INSURANCE | LIGHTSQUARED LP | INSURANCE- D&O POLICY | $ - |
| ADP INC. | AGREEMENT-PAYROLL | LIGHTSQUARED LP | ADP INC. PURCHASE ORDER | $4,403.01 |
| ADVANTA TECHNOLOGIES | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | ADVANTA TECHNOLOGIES - WHOLESALE | $ - |
| AGILYSYS | SOFTWARE AGREEMENT | LIGHTSQUARED LP | AGILYSYS - SOFTWARE LICENSE | $ - |
| AIG-CHARTIS | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| AIRCADO | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | AIRCADO - WHOLESALE AGREEMENT | $ - |
| AIRCOMM OF AVON LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | AIRCOMM OF AVON LLC - (CONNECTICUT I) AND ONE DOT SIX CORP. | $ - |
| AIRPLUS INTERNATIONAL, INC. | TRAVEL SERVICE AGREEMENT | LIGHTSQUARED LP | AIRPLUS INTERNATIONAL, INC. - MASTER AGREEMENT | $3,970.38 |
| AIRTOUCH | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | AIRTOUCH - WHOLESALE AGREEMENT | $ - |
| AIRTRAK INC. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | AIRTRAK INC. SERVICE PROVIDER AGREEMENT | $ - |
| ALASKA COMMUNICATIONS | TELCO AGREEMENT | LIGHTSQUARED CORP. | ALASKA COMMUNICATIONS- ACCT 1782229 | $24.66 |
| ALASKA PUBLIC MEDIA | SITE LEASE AGREEMENT - SCMS | LIGHTSQUARED LP | ALASKA PUBLIC TELECOMMUNICATIONS, INC. - LICENSE AGREEMENT | $ - |
| ALCATEL-LUCENT USA INC. | NEXT GEN DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | ALCATEL-LUCENT - RESTATED DEVELOPMENT AGREEMENT | $3,431,400 |
| ALCATEL-LUCENT USA INC. | NEXT GEN DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | ALCATEL-LUCENT USA INC. - SUPPLY & SERVICES AGREEMENT, INCLUDING AMENDMENTS 1-3 | $1,637,000 |
| ALIANI, MAQBOOL | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US- ALIANI, MAQBOOL | $ - |
| ALLIED WORLD | INSURANCE | LIGHTSQUARED LP | INSURANCE-SKYTERRA PUBLIC COMPANY RUN-OFF POLICY | $ - |
| ALLISON, STEPHEN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-ALLISON, STEPHEN | $ - |
| ALLSTREAM | TELCO AGREEMENT-ACCT 10000246454 | LIGHTSQUARED CORP. | ALLSTREAM- ACCT 10000246454 | $ - |

---

[1]  LightSquared seeks to assume, or assume and assign, the executory contracts and unexpired leases listed on this schedule pursuant to section 365 of the Bankruptcy Code and in connection with the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (the "Plan").  Any contract or lease on this schedule to which LightSquared Inc., LightSquared Investors Holdings Inc., SkyTerra Rollup LLC, One Dot Four Corp., SkyTerra Rollup Sub LLC, and/or TMI Communications Delaware, Limited Partnership is a party shall be assumed by each such Debtor and assigned to NewCo in connection with the Plan.  Neither the exclusion nor inclusion of any contract or lease on this schedule shall constitute an admission by LightSquared that any such contract or lease is, or is not, in fact, an executory contract or unexpired lease. LightSquared expressly reserves the right to alter, amend, modify, or supplement this schedule, with the consent of each Plan Support Party, at any time prior to the effective date of, and in accordance with, the Plan.  It should be noted that certain entries on this schedule include operating agreements for certain LightSquared entities that LightSquared intends to amend and restate in connection with the reorganization transactions contemplated by the Plan.  In addition, certain entries include non-Debtor affiliates in the Debtor(s) column.

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| ALLSTREAM | TELCO AGREEMENT - ACCT 10000249880 | LIGHTSQUARED CORP. | ALLSTREAM- ACCT 10000249880 | $ - |
| ALLSTREAM | TELCO AGREEMENT - ACCT 10000297971 | LIGHTSQUARED CORP. | ALLSTREAM- ACCT 10000297971 | $ - |
| ALLSTREAM | TELCO AGREEMENT - ACCT 3392961 | LIGHTSQUARED CORP. | ALLSTREAM- ACCT 3392961 | $ - |
| ALLSTREAM | TELCO AGREEMENT - ACCT CW0049744 | LIGHTSQUARED CORP. | ALLSTREAM- ACCT CW0049744 | $ - |
| AMAZON WEB SERVICES LLC | SOFTWARE AGREEMENT | LIGHTSQUARED LP | AMAZON WEB SERVICE - WEB SERVICE AGREEMENT & AMENDMENT NO. 2 | $14,395.02 |
| AMERICA 4-G INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | AMERICA 4-G INC. - WHOLESALE AGREEMENT | $ - |
| AMERICAN TOWERS INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | AMERICAN TOWERS INC. - SPECTRASITE COMMUNICATIONS LLC - MASTER TOWER SPACE LICENSE AGREEMENT, INCLUDING AMENDMENT 1 | $ - |
| AMES LYONS, LINDA | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-AMES LYONS, LINDA | $ - |
| AMPAC ISP (UK) LIMITED | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| AON RISK SERVICES NORTHEAST INC. | INSURANCE | LIGHTSQUARED LP | AON RISK SERVICES NORTHEAST INC. D&O POLICIES/EPLI | $ - |
| ARCH | INSURANCE | LIGHTSQUARED LP | D&O POLICIES | $ - |
| ARGO | INSURANCE | LIGHTSQUARED LP | D&O POLICIES | $ - |
| ARIZONA PUBLIC SERVICE COMPANY | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | ARIZONA PUBLIC SERVICE COMPANY - MASTER TERMS AND CONDITIONS FOR SITE LICENSE | $ - |
| ASTRUM COMUNICACIONES, SA DE CV | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | ASTRUM SERVICE PROVIDER AGREEMENT, INCLUDING AMENDMENT 1 | $ - |
| AT&T CORP. | TELCO AGREEMENT | LIGHTSQUARED LP | AT&T CORP. WHOLESALE MASTER SERVICE AGREEMENT | $14,415.60 |
| AT&T GLOBAL SERVICES CANADA CO. | TELCO AGREEMENT | LIGHTSQUARED CORP. | AT&T GLOBAL SERVICES CANADA CO. PURCHASE ORDER | $ - |
| ATC TECHNOLOGIES, LLC | ATC TECHNOLOGIES IP LICENSE | ATC TECHNOLOGIES, LLC; LIGHTSQUARED LP | AMENDED & RESTATED INTELLECTUAL PROPERTY ASSIGNMENT AND LICENSE AGREEMENT - ATC TECHNOLOGIES, LLC AND LIGHTSQUARED LP | $ - |
| ATLANTIC COAST COMMUNICATIONS | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | ATLANTIC COAST COMMUNICATIONS LLC - (NEW JERSEY II) AND ONE DOT SIX CORP. | $ - |

2

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| AUSTRALIAN ADMINISTRATION SATELLITE NETWORKS (AUSSAT) | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED LP | CONFIRMATION OF COORDINATION BETWEEN AUSSAT AND LIGHTSQUARED MSV-1A SATELLITE NETWORK | $ - |
| AUSTRALIAN ADMINISTRATION SATELLITE NETWORKS (AUSSAT) | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED BERMUDA LTD. | COORDINATION AGREEMENT, LIGHTSQUARED BERMUDA LTD., AUSTRALIAN ADMINISTRATION SATELLITE NETWORKS (AUSSAT) | $ - |
| BALFOUR, SCOTT | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-BALFOUR, SCOTT | $ - |
| BALTIMORE GAS AND ELECTRIC COMPANY | UTILITY | LIGHTSQUARED LP | BALTIMORE GAS AND ELECTRIC COMPANY PURCHASE ORDER | $919.96 |
| BARAN TELECOM, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | BARAN TELECOM, INC. - MSDA | $ - |
| BARRATT, JEFFREY | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-BARRATT, JEFFREY | $ - |
| BCI COMMUNICATIONS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | BCI COMMUNICATIONS, INC. - MSDA | $ - |
| BDC PARKRIDGE LLC | PROPERTY LEASE | LIGHTSQUARED LP | BDC PARKRIDGE LLC (FORMERLY APA PROPERTIES NO. 10, LP) - 10802 PARKRIDGE RESTON, VA OFFICE LEASE | $16,422.46 |
| BELANGER, ALAIN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-BELANGER, ALAIN | $ - |
| BELIVEAU, GREG | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-BELIVEAU,GREG | $ - |
| BELL CANADA | TELCO AGREEMENT | LIGHTSQUARED CORP. | BELL CANADA- ACCT 300005857 | $ - |
| BELL MOBILITY INC. | TELCO AGREEMENT | LIGHTSQUARED CORP. | BELL MOBILITY INC. - ACCT 515412297 | $ - |
| BENJAMIN, JAMES | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-BENJAMIN, JAMES | $ - |
| BERKSHIRE HATHAWAY | INSURANCE | LIGHTSQUARED LP | INSURANCE- INDEPENDENT DIRECTORS LIABILITY | $ - |
| BEST BUY | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | BEST BUY - 4G-LTE SCOPING PROJECT | $ - |
| BEST BUY | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | BEST BUY WHOLESALE DISTRIBUTION AGREEMENT, INCLUDING AMENDMENTS 1-6 | $ - |
| BIVIS INVESTMENTS LTD. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| BLOOMBERG FINANCE LP | SUBSCRIPTION AGREEMENT | LIGHTSQUARED LP | BLOOMBERG FINANCE LP PURCHASE ORDER | $506.66 |
| BOEING SATELLITE SYSTEMS INC. | SATELLITE AGREEMENT | LIGHTSQUARED LP | BOEING SATELLITE CONSTRUCTION CONTRACT - AS AMENDED & RESTATED IN AMENDMENT NO. 4 | $4,193,684.23 |

3

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| BOEING SATELLITE SYSTEMS INTERNATIONAL INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV1 MSV2 MSV3 AND MSV-SA TAA 2032-07 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL INC., AND INSURANCE UNDERWRITERS, INSURANCE BROKERS, AND INSURANCE CONSULTANTS | $ - |
| BOEING SATELLITE SYSTEMS INTERNATIONAL INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING OWNER OPERATORS CONFERENCE TAA 1958-06 AND AMENDMENT NO. 1 - BOEING SATELLITE SYSTEMS INTERNATIONAL INC. AND US AND FOREIGN SATELLITE OWNERS/ OPERATORS | $ - |
| BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA), INC., LIGHTSQUARED CORP. | BOEING MSAT1 2 ON ORBIT TA 2071-04 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., TELESAT CANADA, SKYTERRA (CANADA), INC., LIGHTSQUARED CORP., MACDONALD, DETTWILER AND ASSOCIATES CORPORATION, SIMON BIRCH, AND SED SYSTEMS, A DIVISION OF CALIAN LTD., | $ - |
| BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING TA 3373-03 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., AND ROGER BELANGER | $ - |
| BOUGHTON, BRENDAN | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-BOUGHTON, BRENDAN | $ - |
| BRATCHER, DENISE | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-BRATCHER, DENISE | $ - |
| BRIGHT HOUSE NETWORKS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | BRIGHT HOUSE NETWORKS, LLC - MSA | $ - |
| BRIGHTSTAR US INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | BRIGHTSTAR US INC. - PREFERRED DISTRIBUTOR PROGRAM | $ - |
| BROADCORE | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | BROADCORE - WHOLESALE AGREEMENT | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| BSSI SUBCONTRACTORS SED SYSTEMS | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| BUSINESS TECHNOLOGY SERVICES INC. | CONSULTING AGREEMENT | LIGHTSQUARED LP | BUSINESS TECHNOLOGY SERVICES, INC., (BIZTECH) - MASTER SERVICES AGREEMENT | $10,479.00 |
| C. DAVIS ASSOCIATES INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | C. DAVIS ASSOCIATES INC. - MSDA | $ - |
| CABLEVISION LIGHTPATH INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | CABLEVISION LIGHTPATH INC. - MSA | $ - |
| CALAMP (FORMERLY WIRELESS MATRIX) | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | CALAMP (FORMERLY WIRELESS MATRIX) AMENDED & RESTATED SERVICE PROVIDER AGREEMENT AND AMENDMENTS NO. 1-4 | $ - |
| CALLAHAN COMMUNICATION SERVICES | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | CALLAHAN COMMUNICATION SERVICES - MSDA | $ - |
| CAMERON, JULIEN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-CAMERON, JULIEN | $ - |
| CARLISLE, JEFFREY | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-CARLISLE, JEFFREY | $ - |
| CATANA, DIANA | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-CATANA, DIANA | $ - |
| CELLULAR PRODUCTS DISTRIBUTORS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | CELLULAR PRODUCTS DISTRIBUTORS - WHOLESALE AGREEMENT | $ - |
| CELLULAR SOUTH, INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | CELLULAR SOUTH ROAMING AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| CENTERBEAM INC. | SERVICE CONTRACT | LIGHTSQUARED LP | CENTERBEAM, INC., - CUSTOMER-FIRST AGREEMENT | $7,241.74 |
| CENX, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | CENX, INC. - MASTER SERVICES AGREEMENT | $ - |
| CERIDIAN LIFE WORKS SERVICES | HR BENEFITS | LIGHTSQUARED CORP. | CERIDIAN LIFE WORKS SERVICES PURCHASE ORDER | $94.56 |
| CERIDIAN LIFE WORKS SERVICES | HR BENEFITS | LIGHTSQUARED CORP. | CERIDIAN LIFE WORKS SERVICES PURCHASE ORDER | $108.12 |
| CHARLTON, THOMAS | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-CHARLTON, THOMAS | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- US PROPERTY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- FLOOD | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- EARTHQUAKE | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- US GENERAL LIABILITY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- INFORMATION & NETWORK TECHNOLOGY ERRORS AND OMISSIONS | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- HIRED/NON-OWNED AUTO | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- CANADIAN PACKAGE POLICY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- EXPORTERS PACKAGE | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE-WORKERS COMPENSATION | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- UMBRELLA LIABILITY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- FIDUCIARY LIABILITY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- SPECIAL COVERAGES | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- EMPLOYMENT PRACTICES LIABILITY | $ - |
| CHUBB | INSURANCE | LIGHTSQUARED LP | INSURANCE- SKYTERRA PUBLIC COMPANY RUN OFF POLICY | $ - |
| CINTAS CORP. | SERVICE AGREEMENT | LIGHTSQUARED LP | CINTAS CORP. FACILITIES | $646.45 |
| CITYSCAPE | SERVICE AGREEMENT | LIGHTSQUARED CORP. | CITYSCAPE FACILITIES | $1,073.50 |
| CIVIL SOLUTIONS INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | CIVIL SOLUTIONS INC. - MSDA | $ - |
| CNA | INSURANCE | LIGHTSQUARED LP | INSURANCE-CARGO | $ - |
| CNA | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| COLE INTERNATIONAL | SERVICE AGREEMENT | LIGHTSQUARED CORP. | COLE INTERNATIONAL- CUSTOMS CLEARANCE | $ - |
| COM DEV LTDINTERNATIONAL LTD. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| COMCAST BUSINESS COMMUNICATIONS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | COMCAST BUSINESS COMMUNICATIONS, LLC - MASTER SERVICES AGREEMENT | $ - |
| COMCAST CABLE COMMUNICATIONS MANAGEMENT LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | COMCAST CABLE COMMUNICATIONS MANAGEMENT LLC – MASTER SERVICES AGREEMENT AND AMENDMENT NO. 1 | $ - |
| COMCAST COMMUNICATIONS | TELCO AGREEMENT | LIGHTSQUARED LP | COMCAST COMMUNICATIONS PURCHASE ORDER | $451.71 |
| COMPASS TECHNOLOGY SERVICES, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | COMPASS TECHNOLOGY SERVICES, INC. - MSDA PURCHASE ORDER | $ - |
| CONCUR TECHNOLOGIES, INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | CONCUR TECHNOLOGIES, INC. SUCCESSOR IN INTEREST TO GELCO INFORMATION NETWORK INC. PURCHASE ORDER | $6,438.88 |

6

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| CONN, ROBERT | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-CONN, ROBERT | $ - |
| COUSINEAU, BERNARD | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-COUSINEAU, BERNARD | $ - |
| COX COMMUNICATIONS | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | COX COMMUNICATIONS - MASTER SERVICES AGREEMENT | $ - |
| COX COMMUNICATIONS | TELCO AGREEMENT | LIGHTSQUARED LP | COX COMMUNICATIONS- ACCT 001 3110 115698201 | $67.00 |
| CRANDALL, JENNY | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-CRANDALL, JENNY | $ - |
| CREARY, ELIZABETH | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-CREARY, ELIZABETH | $ - |
| CRICKET COMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | CRICKET COMMUNICATIONS ROAMING AGREEMENT, INCLUDING AMENDMENTS 1-5 | $ - |
| CROWN ATLANTIC COMPANY LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN ATLANTIC COMPANY LLC - (PHOENIX I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE GT COMPANY LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE GT COMPANY LLC - (AUSTIN I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE GT COMPANY LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE GT COMPANY LLC - (CHICAGO I ) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE GT COMPANY LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE GT COMPANY LLC - (CLEVELAND I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE MM HOLDING LLC | ONE DOT SIX - SPECTRUM LEASE | TVCC ONE SIX HOLDINGS LLC | MASTER AGREEMENT - CROWN CASTLE MM HOLDING LLC, OP LLC, TVCC ONE SIX HOLDINGS LLC | $ - |
| CROWN CASTLE MU LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE MU LLC - (LAS VEGAS I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE MU LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE MU LLC - (LOS ANGELES I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE NG NETWORKS INC. | LP LEASE AGREEMENT | LIGHTSQUARED LP | CROWN CASTLE NG NETWORKS INC. PURCHASE ORDER | $ - |
| CROWN CASTLE PR LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE PR LLC - (SAN JUAN I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE SOUTH LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE SOUTH LLC - (JACKSONVILLE) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE TOWERS | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN CASTLE TOWERS 06-2 LLC - (DETROIT I) AND ONE DOT SIX CORP. | $ - |
| CROWN CASTLE USA INC. | MASTER LICENSE AGREEMENT | ONE DOT SIX CORP., LIGHTSQUARED LP | MASTER LICENSE AGREEMENT - AMENDMENT 2 - CROWN CASTLE USA INC., LICENSORS, OP LLC, ONE DOT SIX CORP., LIGHTSQUARED LP | $ - |
| CROWN CASTLE USA INC. | MASTER LICENSE AGREEMENT | LIGHTSQUARED LP | MASTER LICENSE AGREEMENT - CROWN CASTLE USA INC., LICENSORS, LIGHTSQUARED INC., INCLUDING PRICING AGREEMENT (REASSIGNED TO LS LP) | $ - |
| CROWN CASTLE USA INC. | MASTER LICENSE AND MASTER SERVICES AGREEMENT | LIGHTSQUARED LP | MASTER LICENSE AGREEMENT AND MASTER SERVICES AGREEMENT - AMENDMENT 1 - CROWN CASTLE USA INC., LIGHTSQUARED LP | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| CROWN CASTLE USA INC. | MASTER SERVICES AGREEMENT | LIGHTSQUARED INC. | MASTER SERVICES AGREEMENT - CROWN CASTLE USA INC., LIGHTSQUARED INC. | $ - |
| CROWN CASTLE USA INC. | MASTER SERVICES AGREEMENT | LIGHTSQUARED LP, ONE DOT SIX CORP. | MASTER SERVICES AGREEMENT, AMENDMENT 2 - CROWN CASTLE USA INC., LIGHTSQUARED LP, ONE DOT SIX CORP. | $ - |
| CROWN CASTLE USA INC. | ONE DOT SIX - SPECTRUM LEASE | TVCC ONE SIX HOLDINGS LLC | TRANSITION SERVICES AGREEMENT - CROWN CASTLE USA INC., TVCC ONE SIX HOLDINGS LLC, INCLUDING AMENDMENT 1 AND PARTIAL TERMINATION LETTER | $ - |
| CROWN COMMUNICATION LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN COMMUNICATION LLC - (DALLAS I) AND ONE DOT SIX CORP. | $ - |
| CROWN COMMUNICATION LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN COMMUNICATION LLC - (PITTSBURGH I) AND ONE DOT SIX CORP. | $ - |
| CROWN COMMUNICATION LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN COMMUNICATION LLC - (PITTSBURGH II) AND ONE DOT SIX CORP. | $ - |
| CROWN COMMUNICATION LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | CROWN COMMUNICATION LLC - (SAINT LOUIS I) AND ONE DOT SIX CORP. | $ - |
| DATAWATCH SYSTEMS | PURCHASE ORDER | LIGHTSQUARED LP | DATAWATCH SYSTEMS PURCHASE ORDER | $985.86 |
| DAVIDSON, ROBERT | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-DAVIDSON, ROBERT | $ - |
| DEFAZIO, LUCY | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-DEFAZIO, LUCY | $ - |
| DEOBALD, BRIAN | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-DEOBALD, BRIAN | $ - |
| DEPARTMENT OF HOMELAND SECURITY | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | CALEA AGREEMENT – LIGHTSQUARED LP, US DEPARTMENT OF JUSTICE, DEPARTMENT OF HOMELAND SECURITY, FEDERAL BUREAU OF INVESTIGATION | $ - |
| DEPT OF INDUSTRY OF CANADA (CANADA) | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED LP; LIGHTSQUARED CORP. | MEXICO CITY MEMORANDUM OF UNDERSTANDING FOR THE INTERSYSTEM COORDINATION OF CERTAIN GEOSTATIONARY MOBILE SATELLITE SYSTEMS – DEPT OF INDUSTRY OF CANADA (CANADA), THE INTERNATIONAL MOBILE SATELLITE ORGANIZATION (INMARSAT), MINISTRY OF COMMUNICATIONS AND TRANSPORTATIONS OF THE UNITED MEXICAN STATES (MEXICO), FEDERAL COMMUNICATIONS COMMISSION OF THE UNITED STATES (US) | $ - |
| DIAL TONE SERVICES | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | DIAL TONE SERVICES SERVICE PROVIDER AGREEMENT | $ - |
| DIGITAL VOICE SYSTEM INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | VOICE CODEC LICENSE AGREEMENT - DIGITAL VOICE SYSTEMS, INC. (DVSI) AND LIGHTSQUARED CORP. (FKA TMI COMMUNCIATIONS AND COMPANY, LIMITED PARTNERSHIP | $ - |
| DIRECTV ENTERPRISED, LLC | COORDINATION/NON-INTERFERENCE AGREEMENT L-BAND | LIGHTSQUARED SUBSIDIARY LLC | SATELLITE CONFIGURATION AGREEMENT BETWEEN DIRECTV ENTERPRISED, LLC AND LIGHTSQUARED SUBSIDIARY LLC (FKA MOBILE SATELLITE VENTURES SUBSIDIARY LLC) | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| DOAN, TAI | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-DOAN, TAI | $ - |
| DOCTOR, MARIA | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-DOCTOR, MARIA | $ - |
| DR. RAJENDRA SINGH | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP | ASSIGNMENT AGREEMENT - TELCOM SATELLITE VENTURES INC., DR. RAJENDRA SINGH AND LIGHTSQUARED LP | $ - |
| DUKENET COMMUNICATIONS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | DUKENET COMMUNICATIONS, LLC - MASTER SERVICES AGREEMENT | $ - |
| DUTTA, SANTANU | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-DUTTA, SANTANU | $ - |
| EARTHCOMM SOLUTIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | EARTHCOMM SOLUTIONS - WHOLESALE AGREEMENT | $ - |
| EARTHLINK CARRIER | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | EARTHLINK CARRIER - MSA | $ - |
| EATEL | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | EATEL - WHOLESALE AGREEMENT | $ - |
| EATON INDUSTRIES (CANADA) COMPANY | MAINTENANCE AGREEMENT | LIGHTSQUARED CORP. | EATON INDUSTRIES (CANADA) COMPANY - SERVICE | $ - |
| ECO INTERIOR MAINTENANCE INC. | SERVICE AGREEMENT | LIGHTSQUARED LP | ECO INTERIOR MAINTENANCE INC. FACILITIES | $500.00 |
| ELECTRIC LIGHTWAVE, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | ELECTRIC LIGHTWAVE, LLC - CARRIER ACCOUNT MSA | $ - |
| ELEVATE INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | ELEVATE INC. - WHOLESALE AGREEMENT | $ - |
| EMS TECHNOLOGIES | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | EMS TECHNOLOGIES – SERVICE PROVIDER, INCLUDING AMENDMENTS 1-3 | $ - |
| EMS TECHNOLOGIES CANADA LTD. (HONEYWELL) | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | (HONEYWELL) EMS TECHNOLOGIES CANADA LTD. SERVICE PROVIDER AGREEMENT DATED 11/1/2007– INCLUDING AMENDMENTS 1-3 | $ - |
| ENBRIDGE | UTILITY | LIGHTSQUARED CORP. | ENBRIDGE PURCHASE ORDER | |
| ENDURANCE | INSURANCE | LIGHTSQUARED LP | INSURANCE-INDEPENDENT DIRECTOR LIABILITY | $ - |
| EPI-COLORSPACE | SERVICE AGREEMENT | LIGHTSQUARED LP | EPI-COLORSPACE MARKETING | $2,702.80 |
| EQUINIX OPERATING CO., INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | EQUINIX OPERATING CO., INC. - MSA | $ - |
| ESCO TECHNOLOGIES LLC | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | ESCO TECHNOLOGIES LLC - WHOLESALE AGREEMENT | $ - |
| EVEREST | INSURANCE | LIGHTSQUARED LP | INSURANCE- SKYTERRA PUBLIC COMPANY RUN-OFF | $ - |
| EXPERIS FINANCE US, LLC | CONSULTING AGREEMENT | LIGHTSQUARED LP | EXPERIS FINANCE US, LLC – CONSULTING AGREEMENT | $47,292.32 |
| FARNSWORTH, JOHN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-FARNSWORTH, JOHN | $ - |
| FEDERAL BUREAU OF INVESTIGATION | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | CALEA AGREEMENT – LIGHTSQUARED LP, US DEPARTMENT OF JUSTICE, DEPARTMENT OF HOMELAND SECURITY, FEDERAL BUREAU OF INVESTIGATION | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| FEDERAL BUREAU OF INVESTIGATION | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | GLENTEL AGREEMENT AMONG GLENTEL CORP., US DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION REGARDING BLANKET AUTHORITY TO OPERATE MOBILE EARTH TEMINALS TO COMMUNICATE WITH MSAT-1 (TRANSFERRING UNDER INFOSAT) | $ - |
| FEDEX | SERVICE AGREEMENT | LIGHTSQUARED LP | FEDEX SHIPPING | $426.68 |
| FEDEX TECHCONNECT, INC. | SERVICE AGREEMENT | LIGHTSQUARED LP | FEDEX TECHCONNECT, INC. SHIPPING | $5,606.33 |
| FERGUSON, JAMES | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-FERGUSON, JAMES | $ - |
| FIBERLIGHT | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FIBERLIGHT - MASTER SERVICES AGREEMENT | $ - |
| FIBERTOWER NETWORK SERVICES CORP. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FIBERTOWER NETWORK SERVICES CORP. - MASTER SERVICES AGREEMENT | $ - |
| FIELD, SEAN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-FIELD, SEAN | $ - |
| FIRST GROUP ENGINEERING, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FIRST GROUP ENGINEERING, INC. - MSDA | $ - |
| FLAT WIRELESS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | FLAT WIRELESS - CLEARTALK - ROAMING AGREEMENT | $ - |
| FMHC TELECOM GROUP, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FMHC TELECOM GROUP, INC. - MSDA | $ - |
| FORZA TELECOM NPC, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FORZA TELECOM NPC, INC. - MSDA | $ - |
| FPL FIBERNET, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | FPL FIBERNET, LLC - MASTER SERVICES AGREEMENT | $ - |
| FUGRO (FORMERLY OMNISTAR) PNC | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | FUGRO (FORMERLY OMNISTAR) PNC - PRIVATE NETWORK SATELLITE SERVICES AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| GATEWAY COMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | GATEWAY COMMUNICATIONS - WHOLESALE AGREEMENT | $ - |
| GE CAPITAL | SERVICE CONTRACT | LIGHTSQUARED LP | MERIDIAN - LEASE | $1,399.17 |
| GENESYS CONFERENCING | SERVICE AGREEMENT | LIGHTSQUARED LP | GENESYS CONFERENCING PURCHASE ORDER | $2,806.84 |
| GEPHARDT GROUP GOVERNMENT AFFAIRS LLC | REGULATORY CONSULTING | LIGHTSQUARED LP | GEPHARDT - GOVERNMENT AFFAIRS CONSULTING | $20.00 |
| GHADBAN, NAZEEH | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-GHADBAN, NAZEEH | $ - |
| GILBERT & ASSOCIATES INC. | REGULATORY CONSULTING | LIGHTSQUARED LP | GILBERT ASSOCIATES - CONSULTING AMENDMENT NO. 4 | $ - |
| GLENTEL CORP. | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | GLENTEL AGREEMENT AMONG GLENTEL CORP., US DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION REGARDING BLANKET AUTHORITY TO OPERATE MOBILE EARTH TEMINALS TO COMMUNICATE WITH MSAT-1 (TRANSFERRING UNDER INFOSAT) | $ - |
| GLENTEL INC. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | GLENTEL INC. - BSP SATELLITE SERVICES AGREEMENT | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| GLENTEL INC. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | GLENTEL INC. - RADIO PURCHASE AGREEMENT | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (DALLAS IV) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (DETROIT II) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (ERIE I) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (PHILADELPHIA II) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (SALT LAKE I) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (SAN ANTONIO II) AND ONE DOT SIX CORP. | $ - |
| GLOBAL SIGNAL ACQUISITIONS II LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | GLOBAL SIGNAL ACQUISITIONS II LLC - (SEATTLE I) AND ONE DOT SIX CORP. | $ - |
| GLOBAL TOWER LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | GLOBAL TOWER LLC - MASTER LEASE AGREEMENT | $ - |
| GUPTA, RAMESH | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-GUPTA, RAMESH | $ - |
| GVPL SATELLITE CONSULTING, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| HARBOR ENGINEERING INCORPORATED | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| HARRINGTON, ERIC | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-HARRINGTON, ERIC | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| HARRIS CORPORATION | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| HARRISON CORPORATION | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TA 9907-10 AND AMENDMENT NO. 1 AND 2 - LIGHTSQUARED LP, WILLIS INSPACE DIVISION OF WILLIS MARYLAND, WILLIS INSPACE DIVISION OF WILLIS NY INC., WILLIS LTD, FRANCE, WILLIS LTD. UK, HARRISON CORPORATION, LIGHTSQUARED CORP. AND INSURANCE PROVIDERS | $ - |
| HARVOR ENGINEERING INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING TA 3373-03 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., AND ROGER BELANGER | $ - |
| HARVOR ENGINEERING INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | VIASAT INC. GBBF SYSTEM TAA 2431-06 - VIASAT, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., ROGER BELANGER, SED SYSTEMS | $ - |
| HDMK LLC | REGULATORY CONSULTING | LIGHTSQUARED LP | HDMK LLC - AMENDMENT NO. 1 | $ - |
| HENSON DBA KVANT | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | HENSON DBA KVANT - WHOLESALE AGREEMENT | $ - |
| HEWITT,BELINDA | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-HEWITT, BELINDA | $ - |
| HOME TOWN INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | HOME TOWN INC. - WHOLESALE AGREEMENT | $ - |
| HOMETOWN TELECOM INC | WHOLESALE AGREEMENT | LIGHTSQUARED LP | HOMETOWN TELECOM INC- WHOLESALE | $ - |
| HONEYWELL (FORMERLY EMS SATCOM) | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | HONEYWELL (FORMERLY EMS SATCOM) SUBCONTRACT AGREEMENT - SUBCONTRACT AGREEMENT, INCLUDING AMENDMENTS 1-4 | $ - |
| HOUSTON CASUALTY | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| HOUSTON CASUALTY | INSURANCE | LIGHTSQUARED LP | INSURANCE-SKYTERRA PUBLIC COMPANY RUN OFF POLICY | $ - |
| HUGHES NETWORK SYSTEMS, LLC | DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | HUGHES NETWORK SYSTEMS, LLC. - DESIGN, DEVELOPMENT AND SUPPLY OF SATELLITE BASE TRANSCEIVER, INCLUDING AMENDMENTS 1-4, AND INCLUDING LETTER AGREEMENT | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| HUGHES NETWORKS LLC | DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | HUGHES NETWORKS LLC - DEVELOPMENT AND PRODUCTION OF TRANSCEIVER UNITS, INCLUDING AMENDMENTS 1-3 | $13,878.00 |
| HUNSUCKER, OLIVER | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-HUNSUCKER, OLIVER | $ - |
| HYATT CORPORATION DBA GRAND HYATT SAN FRANCISCO | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | HYATT CORPORATION, DBA GRAND HYATT SAN FRANCISCO - (NOCAL II) AND ONE DOT SIX CORP. | $ - |
| HYDRO OTTAWA LTD. | UTILITY | LIGHTSQUARED LP | HYDRO OTTAWA PURCHASE ORDER | $58,598.95 |
| ICO SATELLITE SERVICES G.P. | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP | MUTUAL NON-ASSERTION AGREEMENT - LIGHTSQUARED LP AND ICO SATELLITE SERVICES G.P. | $ - |
| IKON FINANCIAL SERVICES | SERVICE AGREEMENT | LIGHTSQUARED LP | IKON FINANCIAL SERVICES PURCHASE ORDER | $2,410.92 |
| IMPACT OFFICE PRODUCTS LLC | SERVICE AGREEMENT | LIGHTSQUARED LP | IMPACT OFFICE PRODUCTS LLC PURCHASE ORDER | $ - |
| IMPERIAL COFFEE AND SERVICES INC. | SERVICE CONTRACT | LIGHTSQUARED LP | IMPERIAL COFFEE AND SERVICES INC. | $ - |
| INDIAN HEALTH SERVICE | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | INDIAN HEALTH SERVICE | $ - |
| INFOSAT COMMUNICATIONS LP | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | INFOSAT COMMUNICATIONS LP SERVICE PROVIDER AGREEMENT | $ - |
| INMARSAT | COORDINATION AGREEMENT L-BAND | LIGHTSQUARED LP, SKYTERRA (CANADA) INC., LIGHTSQUARED INC. | AMENDED AND RESTATED COOPERATION AGREEMENT – INMARSAT, LIGHTSQUARED LP, SKYTERRA (CANADA) INC., LIGHTSQUARED INC., INCLUDING AMENDMENTS 1 AND 2 | $ - |
| INMARSAT (FORMERLY STRATOS) | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | INMARSAT (FORMERLY STRATOS) - MSAT-1 SERVICE PROVIDER AGREEMENT AND AMENDMENT NO. 1 | $ - |
| INMARSAT (FORMERLY STRATOS) | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | INMARSAT (FORMERLY STRATOS) - MSAT-2 SERVICE PROVIDER AGREEMENT AND AMENDMENT NO. 1 | $ - |
| INSURANCE UNDERWRITERS, INSURANCE BROKERS, AND INSURANCE CONSULTANTS | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV1 MSV2 MSV3 AND MSV-SA TAA 2032-07 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL INC., AND INSURANCE UNDERWRITERS, INSURANCE BROKERS, AND INSURANCE CONSULTANTS | $ - |
| INTEGRAL SYSTEMS, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP | INTEGRAL SYSTEMS TAA 2147-08 AND AMENDMENT NO. 1 - INTEGRAL SYSTEMS, INC., TELESAT CANADA, LIGHTSQUARED LP., SUSUMU FUJIMOTO | $ - |
| INTELLIGENT DISCOVERY SOLUTIONS INC. | CONSULTING AGREEMENT | LIGHTSQUARED LP | INTELLIGENT DISCOVERY SOLUTIONS INC. PURCHASE ORDER | $26,279.50 |
| INTELSAT CORP. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | ON ORBIT TAA 3169-12 (REBASELINE OF -TAA 0607-10 AND 0795-02) LIGHTSQUARED LP AND U.S. PARTIES MCKNIGHT ASSOCIATES, INC., SATELLITE CONSULTING, INC., INTELSAT CORP., AND FOREIGN PARTIES LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA | $ - |
| INTELSAT CORPORATION | PROPERTY LEASE (GATEWAY | LIGHTSQUARED LP | INTELSAT CORPORATION - CO-LOCATION FACILITIES INTEGRATION SERVICES AND LICENSE AGREEMENT. | $19,914.34 |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| INTERGLOBE COMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | INTERGLOBE COMMUNICATIONS - WHOLESALE | $ - |
| INTERNATIONAL SATELLITE SERVICES INC. | CUSTOMER AGREEMENT - SATELLITE SERVICE AGREEMENT | LIGHTSQUARED LP | INTERNATIONAL SATELLITE SOLUTIONS (ISS) SATELLITE SERVICE AGREEMENT | $ - |
| INTERNATIONAL SATELLITE SERVICES INC. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | ISS RADIO PURCHASE AGREEMENT AND AMENDMENT NO. 1 | $ - |
| INTRADO INC. | TELCO AGREEMENT | LIGHTSQUARED CORP. | INTRADO INC. PURCHASE ORDER | $4,258.06 |
| IRON MOUNTAIN - MSV | SERVICE AGREEMENT | LIGHTSQUARED LP | IRON MOUNTAIN - MSV PURCHASE ORDER | $503.35 |
| ISP STORE (THE) | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | ISP STORE (THE) - WHOLESALE AGREEMENT | $ - |
| ITC GLOBAL (FORMERLY BROADPOINT) | CUSTOMER AGREEMENT - SERVICE PROVIDER | TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP | ITC GLOBAL (FORMERLY BROADPOINT) SERVICE PROVIDER AGREEMENT | $ - |
| J. LEE ASSOCIATES, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | J. LEE ASSOCIATES, INC. - MSDA | $ - |
| JAK AND ASSOCIATES DBA NTP WIRELESS, INC. - MSDA | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | JAK AND ASSOCIATES DBA NTP WIRELESS, INC. - MSDA | $ - |
| JENA OPTRONIK GMBH | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| JOLT MOBILE INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | JOLT MOBILE INC. - WHOLESALE AGREEMENT | $ - |
| JOSEPH P. KENNEDY II | CONSULTING AGREEMENT | LIGHTSQUARED LP | JOSEPH P. KENNEDY – PSA | $ - |
| JULIEN, EDMOND | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-JULIEN, EDMOND | $ - |
| KARMA MOBILITY INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | KARMA MOBILITY INC. - WHOLESALE AGREEMENT | $ - |
| KASE, JAMIESON | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-KASE, JAMIESON | $ - |
| KCI TECHNOLOGIES, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | KCI TECHNOLOGIES, INC. - MSDA | $ - |
| LAFLAMME, MARC | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-LAFLAMME, MARC | $ - |
| LALONDE, RICHARD | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-LALONDE, RICHARD | $ - |
| LANDRIAULT, NICOLE | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-LANDRIAULT, NICOLE | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| LANDSAT SA DE CV | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | LANDSAT AGREEMENT SERVICE PROVIDER AGREEMENT | $ - |
| LEE,BEN | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-LEE, BEN | $ - |
| LEGAULT,JEAN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-LEGAULT, JEAN | $ - |
| LEVEL 3 COMMUNICATIONS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | LEVEL 3 COMMUNICATIONS, LLC – MSA | $86,209.13 |
| LIBERTY | INSURANCE | LIGHTSQUARED LP | INSURANCE-SKYTERRA PUBLIC COMPANY RUN-OFF POLICY | $ - |
| LIGHT TOWER FIBER LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | LIGHT TOWER FIBER LLC - MSA | $ - |
| LIGHTSQUARED CORP. | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED CORP. AND SKYTERRA (CANADA)INC. | LIGHTSQUARED CORP. AND SKYTERRA CANADA INC. - RIGHTS AND SERVICES AGREEMENT | $ - |
| LIGHTSQUARED CORP. | INTERCOMPANY AGREEMENT (SPECTRUM) | SKYTERRA (CANADA)INC.; LIGHTSQUARED CORP. | SKYTERRA CANADA AND LIGHTSQUARED CORP. CAPACITY LEASE AGREEMENT | $ - |
| LIGHTSQUARED LP | ATC TECHNOLOGIES IP LICENSE | ATC TECHNOLOGIES, LLC; LIGHTSQUARED LP | AMENDED & RESTATED INTELLECTUAL PROPERTY ASSIGNMENT AND LICENSE AGREEMENT - ATC TECHNOLOGIES, LLC AND LIGHTSQUARED LP | $ - |
| LIGHTSQUARED LP | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP; SKYTERRA (CANADA) INC. | AMENDED & RESTATED SUBLICENSE AGREEMENT - LIGHTSQUARED LP AND SKYTERRA (CANADA) INC. | $ - |
| LIGHTSQUARED LP | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED LP; SKYTERRA (CANADA) INC. | LETTER AGREEMENT RELATED TO INMARSAT COOPERATION AGREEMENT AND ALLOCATION OF SPECTRUM AMONG LIGHTSQUARED LP AND SKYTERRA (CANADA) INC. | $ - |
| LIGHTSQUARED LP | INTERCOMPANY AGREEMENT (SPECTRUM) | SKYTERRA (CANADA)INC.; LIGHTSQUARED LP | SKYTERRA CANADA AND LIGHTSQUARED LP - SATELLITE DELIVERY AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| LIGHTSQUARED SUBSIDIARY LLC | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED SUBSIDIARY LLC; SKYTERRA (CANADA) INC. | LETTER AGREEMENT RELATED TO THE USE OF MSV-1 AND MSV-2 AS IN-ORBIT SPARE SATELLITES - LIGHTSQUARED SUBSIDIARY LLC (FKA MOBILE SATELLITE VENTURES SUBSIDIARY LLC), SKYTERRA (CANADA) INC. (FKA MOBILE SATELLITE VENTURES (CANADA) INC.) | $ - |
| LINCOLN BENEFIT LIFE INSURANCE CO. | BENEFITS | LIGHTSQUARED LP | LINCOLN BENEFIT LIFE INSURANCE CO. PURCHASE ORDER | $ - |
| LU, CURTIS | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-LU, CURTIS | $ - |
| LYNDEN INTERNATIONAL | PURCHASE ORDER | LIGHTSQUARED LP | LYNDEN INTERNATIONAL PURCHASE ORDER | $789.41 |
| M.D.L, CONSULTING, INC. DBA MDL CONSULTING, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | M.D.L, CONSULTING, INC. DBA MDL CONSULTING, INC. - MSDA | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| MACDONALD, DETTWILER AND ASSOCIATES CORPORATION | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA), INC., LIGHTSQUARED CORP. | BOEING MSAT1 2 ON ORBIT TA 2071-04 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., TELESAT CANADA, SKYTERRA (CANADA), INC., LIGHTSQUARED CORP., MACDONALD, DETTWILER AND ASSOCIATES CORPORATION, SIMON BIRCH, AND SED SYSTEMS, A DIVISION OF CALIAN LTD., | $ - |
| MACDONALD, DONALD | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-MACDONALD, DONALD | $ - |
| MARSHALL, ROBERT | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-MARSHALL, ROBERT | $ - |
| MAXTON TECHNOLOGY INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | MAXTON TECHNOLOGY INC. - MSDA | $ - |
| M-BANCO | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | M-BANCO - WHOLESALE AGREEMENT | $ - |
| MCGRATH RENTCORP DBA TRS-RENTELCO | SERVICE AGREEMENT | LIGHTSQUARED LP | MCGRATH RENTCORP DBA TRS-RENTELCO PURCHASE ORDER | $20,141.71 |
| MCGRAW-HILL BROADCASTING COMPANY (KGTV) | SITE LEASE AGREEMENT - SCMS | LIGHTSQUARED LP | MCGRAW-HILL BROADCASTING COMPANY - CALIFORNIA LEASE | $500.00 |
| MCKNIGHT ASSOCIATES, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | ON ORBIT TAA 3169-12 (REBASELINE OF -TAA 0607-10 AND 0795-02) LIGHTSQUARED LP AND U.S. PARTIES MCKNIGHT ASSOCIATES, INC., SATELLITE CONSULTING, INC., INTELSAT CORP., AND FOREIGN PARTIES LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA | $ - |
| MCKNIGHT ASSOCIATES, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| MEHLMAN CAPITOL STRATEGIES | REGULATORY CONSULTING | LIGHTSQUARED LP | MEHLMAN CAPITOL  - CONSULTING | $20,000.00 |
| MELDRUM, ALEXANDER | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-MELDRUM, ALEXANDER | $ - |
| MERIDIAN IMAGING SOLUTIONS | SERVICE AGREEMENT | LIGHTSQUARED LP | MERIDIAN IMAGING SOLUTIONS PURCHASE ORDER | $54.56 |
| MEXCOM LTD. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | MEXCOM SERVICE PROVIDER SERVICE PROVIDER AGREEMENT | $ - |
| MEXICO CITY | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED LP | ARRANGEMENTS WITHIN THE FRAMEWORK ESTABLISHED BY THE MEXICO CITY MEMORANDUM OF UNDERSTANDING (SEE SECTION 4.17(A) OF THIS DISCLOSURE LETTER) | $ - |

16

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| MI FUTURE WIRELESS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | MI FUTURE WIRELESS - WHOLESALE AGREEMENT | $ - |
| MICHAEL T. LYONS | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| MINISTRY OF COMMUNICATIONS AND TRANSPORTATIONS OF THE UNITED MEXICAN STATES (MEXICO) | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED LP | MEXICO CITY MEMORANDUM OF UNDERSTANDING FOR THE INTERSYSTEM COORDINATION OF CERTAIN GEOSTATIONARY MOBILE SATELLITE SYSTEMS – DEPT OF INDUSTRY OF CANADA (CANADA), THE INTERNATIONAL MOBILE SATELLITE ORGANIZATION (INMARSAT), MINISTRY OF COMMUNICATIONS AND TRANSPORTATIONS OF THE UNITED MEXICAN STATES (MEXICO), FEDERAL COMMUNICATIONS COMMISSION OF THE UNITED STATES (US) | $ - |
| MODUS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | MODUS, INC. – MSDA | $ - |
| MONTAGNER, MARC | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-MONTAGNER, MARC | $ - |
| MOORE, ERIC | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-MOORE, ERIC | $ - |
| MORENO, GONZALO | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-MORENO, GONZALO | $ - |
| MS. ELIZABETH ANNE CREARY | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP | TA 0720-05  AND AMENDMENT NO. 1 LIGHTSQUARED LP AND MS. ELIZABETH ANNE CREARY | $ - |
| MSA ARCHITECTURE AND PLANNING INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | MSA ARCHITECTURE AND PLANNING INC. – MSDA | $ - |
| MSH TECHNOLOGIES INC. | NEXT GEN DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | MSH TECHNOLOGIES, INC. - AMENDMENT NO. 5 | $ - |
| MTSAT OPERATOR (JAPAN) | COORDINATION AGREEMENT L-BAND | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TRI-PARTITE MOBILE SATELLITE OPERATORS' COORDINATION AGREEMENT – MTSAT OPERATOR (JAPAN), LIGHTSQUARED US AND LIGHTSQUARED CANADA | $ - |
| N/A | LIMITED LIABILITY COMPANY AGREEMENT | ATC TECHNOLOGIES, LLC | SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF ATC TECHNOLOGIES, LLC DATED AS OF JUNE 8, 2010; AMENDMENT NO. 1 TO SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF ATC TECHNOLOGIES, LLC, DATED AS OF MAY 14, 2012 | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| N/A | PARTNERSHIP AGREEMENT | LIGHTSQUARED LP | SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF LIGHTSQUARED LP DATED OCTOBER 18, 2010;<br><br>AMENDMENT NO. 1 TO SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF LIGHTSQUARED LP DATED AS OF MAY 14, 2012 | $ - |
| N/A | LIMITED LIABILITY COMPANY AGREEMENT | LIGHTSQUARED NETWORK LLC | AGREEMENT OF LIMITED LIABILITY COMPANY OF LIGHTSQUARED NETWORK LLC DATED AS OF SEPTEMBER 14, 2010;<br><br>AMENDMENT NO. 1 TO AGREEMENT OF LIMITED LIABILITY COMPANY OF LIGHTSQUARED NETWORK LLC DATED AS OF MAY 14, 2010 | $ - |
| N/A | LIMITED LIABILITY COMPANY | LIGHTSQUARED SUBSIDIARY LLC | AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF SKYTERRA SUBSIDIARY LLC DATED AS OF OCTOBER 22, 2001 (AS FURTHER REVISED ON OCTOBER 2, 2008 TO UPDATE THE CORPORATE NAME);<br><br>AMENDMENT NO. 1 TO AMENDED AND RESTATED AGREEMENT OF LIMITED LIABILITY COMPANY OF LIGHTSQUARED SUBSIDIARY LLC DATED AS OF MAY 14, 2012 | $ - |
| N/A | LIMITED LIABILITY COMPANY AGREEMENT | SKYTERRA INVESTORS LLC | LIMITED LIABILITY COMPANY AGREEMENT OF MSV INVESTORS, LLC DATED AS OF NOVEMBER 23, 2001;<br><br>AMENDMENT NO. 1 TO LIMITED LIABILITY COMPANY AGREEMENT OF SKYTERRA INVESTORS LLC DATED AS OF MAY 14, 2012 | $ - |
| N/A | LIMITED LIABILITY COMPANY AGREEMENT | SKYTERRA ROLLUP LLC | LIMITED LIABILITY COMPANY AGREEMENT OF MSV ROLLUP, LLC DATED AS OF APRIL 3, 2006;<br><br>AMENDMENT NO. 1 TO LIMITED LIABILITY COMPANY AGREEMENT OF SKYTERRA ROLLUP LLC DATED AS OF MAY 14, 2012 | $ - |
| N/A | LIMITED LIABILITY COMPANY AGREEMENT | SKYTERRA ROLLUP SUB LLC | LIMITED LIABILITY COMPANY AGREEMENT OF SKYTERRA ROLLUP SUB LLC, DATED AS OF MAY 14, 2012 | $ - |
| N/A | PARTNERSHIP AGREEMENT | TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP | FIRST AMENDED AND RESTATED PARTNERSHIP AGREEMENT OF TMI COMMUNICATIONS DELAWARE LP, DATED AS OF OCTOBER 28, 2010, BY AND BETWEEN SKYTERRA ROLLUP SUB LLC AND LIGHTSQUARED INVESTORS HOLDINGS INC.;<br><br>AMENDMENT NO. 1 TO FIRST AMENDED AND RESTATED PARTNERSHIP AGREEMENT OF TMI COMMUNICATIONS DELAWARE LP, DATED AS OF MAY 14, 2012, BY AND BETWEEN SKYTERRA ROLLUP SUB LLC AND LIGHTSQUARED INVESTORS HOLDINGS INC. | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| NADEAU, ALAIN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-NADEAU,  ALAIN | $ - |
| NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION | COORDINATION AND TESTING AGREEMENT S-BAND | LIGHTSQUARED SUBSIDIARY LLC | NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION AND LIGHTSQUARED SUBSIDIARY LLC | $ - |
| NATIONAL WIRELESS VENTURES, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | NATIONAL WIRELESS VENTURES , LLC – MSDA | $ - |
| NAVIGATORS | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| NAVIGATORS | INSURANCE | LIGHTSQUARED LP | INSURANCE-INDEPENDENT DIRECTORS LIABILITY | $ - |
| NAVIGATORS | INSURANCE | LIGHTSQUARED LP | INSURANCE-SKYTERRA PUBLIC COMPANY RUN-OFF POLICY | $ - |
| NEC CORPORATION | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| NEC TOSHIBA SPACE SYSTEMS, LTD. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| NETTALK.COM INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | NETTALK.COM INC. - WHOLESALE AGREEMENT | $ - |
| NETWORK INNOVATIONS | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED CORP. | NETWORK INNOVATIONS – SERVICE PROVIDER AGREEMENT | $ - |
| NETWORK INNOVATIONS INC. | SERVICE AGREEMENT | LIGHTSQUARED LP | NETWORK INNOVATIONS INC. PURCHASE ORDER | $ - |
| NEUSTAR INC. | TELCO AGREEMENT | LIGHTSQUARED LP | NEUSTAR INC. PURCHASE ORDER | $3,171.00 |
| NEWFOUNDLAND BROADCASTING CO LTD. | SITE LEASE AGREEMENT - SCMS | LIGHTSQUARED LP | NEWFOUNDLAND BROADCASTING CO. LTD. - LEASE AGREEMENT | $1,363.29 |
| NEXTG NETWORKS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | NEXTG NETWORKS, INC. – MASTER RF TRANSPORT AGREEMENT | $ - |
| NI GOVERNMENT SERVICES | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | NI GOVERNMENT SERVICES - SERVICE PROVIDER AGREEMENT | $1,120.96 |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| NI SATELLITE INC. | CUSTOMER AGREEMENT - SERVICE PROVIDER | LIGHTSQUARED LP | NI SATELLITE INC. - SERVICE PROVIDER AGREEMENT | $ 92.15 |
| NORTEC COMMUNICATIONS INC. | SERVICE CONTRACT | LIGHTSQUARED LP | NORTEC COMMUNICATIONS INC. - IT SUPPORT – SOW | $9,273.50 |
| NORTEC COMMUNICATIONS INC. | SERVICE CONTRACT | LIGHTSQUARED LP | NORTEC COMMUNICATIONS INC. - SHORETEL PHONES | $ - |
| NSA WIRELESS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | NSA WIRELESS, INC. - MSDA | $ - |
| ONE DOT SIX CORP. | ONE DOT SIX - SPECTRUM LEASE | ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | LEASE PURCHASE AGREEMENT - ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | $ - |
| OP LLC | MASTER LICENSE AGREEMENT | ONE DOT SIX CORP., LIGHTSQUARED LP | MASTER LICENSE AGREEMENT - AMENDMENT 2 - CROWN CASTLE USA INC., LICENSORS, OP LLC, ONE DOT SIX CORP., LIGHTSQUARED LP | $ - |
| OP LLC | ONE DOT SIX - SPECTRUM LEASE | TVCC ONE SIX HOLDINGS, LLC | LONG TERM DE FACTO TRANSFER LEASE AGREEMENT - OP LLC, TVCC ONE SIX HOLDINGS, LLC | $ - |
| OP LLC | ONE DOT SIX - SPECTRUM LEASE | TVCC ONE SIX HOLDINGS LLC | MASTER AGREEMENT - CROWN CASTLE MM HOLDING LLC, OP LLC, TVCC ONE SIX HOLDINGS LLC | $ - |
| OP LLC (MODEO) | COORDINATION/NON-INTERFERENCE AGREEMENT L-BAND | LIGHTSQUARED SUBSIDIARY LLC | RESOLUTION AGREEMENT BETWEEN LIGHTSQUARED SUBSIDIARY LLC (FKA MOBILE SATELLITE VENTURES SUBSIDIARY LLC) AND OP LLC (MODEO) | $ - |
| OPENRANGE COMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | OPENRANGE COMMUNICATIONS - INITIAL NETWORK AGREEMENT | $ - |
| OPENSOURCE INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | OPENSOURCE - APPLICATION SERVICE PROVIDER AGREEMENT | $ - |
| ORACLE AMERICA, INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | ORACLE AMERICA INC. - COMPUTER AND ADMINISTRATION SERVICES | $ - |
| ORACLE AMERICA, INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | ORACLE AMERICA INC. - LICENSE AND SERVICES AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| ORACLE AMERICA, INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | ORACLE AMERICA, INC. - ORDERING DOCUMENT EXHIBIT AMENDMENT THREE | $ - |
| ORACLE AMERICA, INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | ORACLE AMERICA, INC. - ORDERING DOCUMENT/EXHIBIT AMENDMENT FOUR | $ - |
| ORBIT LOGISTICS | SERVICE AGREEMENT | LIGHTSQUARED LP | ORBIT LOGISTICS A/K/A CLEMONS COURIER SERVICE, INC. - SERVICES AGREEMENT | $15,632.27 |
| OUTERLINK CORPORATION | CUSTOMER AGREEMENT - SATELLITE CAPACITY | LIGHTSQUARED LP | OUTERLINK SECOND AMENDED AND RESTATED PNC AGREEMENT, INCLUDING AMENDMENTS 1-7 | $ - |
| P. MARSHALL & ASSOCIATES, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | P. MARSHALL & ASSOCIATES, LLC – MSDA | $ - |
| PACKER, CLIVE | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-PACKER, CLIVE | $ - |
| PAPPAJOHN, JOHN | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-PAPPAJOHN, JOHN | $ - |
| PARIKH, AJAY | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-PARIKH, AJAY | $ - |

20

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| PENSIONFUND REALTY LIMITED | PROPERTY LEASE | LIGHTSQUARED CORP. | PENSIONFUND REALTY LIMITED - LEASE OF OTTAWA OFFICE SPACE | $ - |
| PENSIONFUND REALTY LIMITED | PROPERTY LEASE | LIGHTSQUARED CORP. | PENSIONFUND REALTY LIMITED - PARKING LICENSE AGREEMENT | $ - |
| PENSIONFUND REALTY LIMITED | PROPERTY LEASE (GATEWAY) | LIGHTSQUARED CORP. | PENSIONFUND REALTY LIMITED - GROUND LEASE & AMENDMENT 1 | $ - |
| PICKERING,ERIC | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-PICKERING, ERIC | $ - |
| PINNACLE TOWERS ASSET HOLDING LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS ASSET HOLDING LLC - (ATLANTA I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS ASSET HOLDING LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS ASSET HOLDING LLC - (KANSAS CITY I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS ASSET HOLDING LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS ASSET HOLDING LLC - (MINNESOTA I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS III LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS III LLC - (ATLANTA II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS III LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS III LLC - (MIAMI II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS INC. – (CHICAGO III) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS INC. - (CHICAGO IV) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (BALTIMORE) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (CHARLOTTE) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (CHICAGO II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (COLUMBIA) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (DALLAS II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (DALLAS III) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (DENVER II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (DENVER III) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (DES MOINES) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (GREENSBORO) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (HOUSTON I) AND ONE DOT SIX CORP. | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (LOS ANGELES II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (MIAMI I ) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (MILWAUKEE I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (MILWAUKEE II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NEW ORLEANS I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NEW YORK I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NEW YORK II ) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NEW YORK III) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NOCAL I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NOCAL III) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (NORFOLK) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (OKLAHOMA I ) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (OREGON I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (ORLANDO I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (PHILADELPHIA II) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (SAN ANTONIO I ) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (SAN DIEGO I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (TAMPA I) AND ONE DOT SIX CORP. | $ - |
| PINNACLE TOWERS LLC | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | PINNACLE TOWERS LLC - (TAMPA II) AND ONE DOT SIX CORP. | $ - |
| PITNEY BOWES | SERVICE AGREEMENT | LIGHTSQUARED LP | PITNEY BOWES PURCHASE ORDER | $ - |
| PNG TELECOMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | PNG TELECOMMUNICATIONS - WHOLESALE AGREEMENT | $ - |
| POLARIS LOGISTICS | SERVICE AGREEMENT | LIGHTSQUARED LP | POLARIS LOGISTICS PURCHASE ORDER | $8,416.00 |
| POLARIS LOGISTICS | SERVICE AGREEMENT | ONE DOT SIX CORP. | POLARIS LOGISTICS PURCHASE ORDER | $4,512.54 |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| PREVOST, NICHOLAS | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-PREVOST, NICHOLAS | $ - |
| PRINCETON TOWER DEVELOPMENT CORP. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | PRINCETON TOWER DEVELOPMENT CORP. – MSDA | $ - |
| PROXIMITY MOBILITY INC | WHOLESALE AGREEMENT | LIGHTSQUARED LP | PROXIMITY MOBILITY- WHOLESALE | $ - |
| PTACCESS NETWORKS - MSA | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | PTACCESS NETWORKS - MSA | $ - |
| PUBLIC SERVICE COMPANY OF COLORADO DBA XCEL ENERGY | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | PUBLIC SERVICE COMPANY OF COLORADO DBA XCEL ENERGY - MASTER LICENSE AGREEMENT | $ - |
| PURCELL,THOMAS | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-PURCELL, THOMAS | $ - |
| PYRAMID NETWORK SERVICES, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | PYRAMID NETWORK SERVICES, LLC – MSDA | $ - |
| QUALCOMM INCORPORATED | NEXT GEN DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | QUALCOMM INCORPORATED AMENDED & RESTATED TECHNOLOGY AGREEMENT, INCLUDING AMENDMENTS 1-6 | $380,000.00 |
| QUANTUM NETWORKS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | QUANTUM NETWORKS - WHOLESALE AGREEMENT | $ - |
| QWEST COMMUNICATIONS COMPANY DBA CENTURYLINK | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | QWEST COMMUNICATIONS COMPANY DBA CENTURYLINK - WHOLESALE SERVICES AGREEMENT | $ - |
| QWEST CORPORATION | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | QWEST CORPORATION - WHOLESALE DATA SERVICES AGREEMENT | $ - |
| RAVEN | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | RAVEN MOU INCLUDING AMENDMENT 1 | $ - |
| RED POCKET INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | RED POCKET MOBILE WHOLESALE AGREEMENT | $ - |
| RG PARTNERS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | RG PARTNERS, INC. - MSDA | $ - |
| RICOH CANADA INC. | SERVICE CONTRACT | LIGHTSQUARED CORP. | RICOH CANADA - BILL OF SALE | $ - |
| RICOH USA | SERVICE AGREEMENT | LIGHTSQUARED LP | RICOH USA PURCHASE ORDER | $2,197.56 |
| RKF ENGINEERING SOLUTIONS LLC | PRODUCT DEVELOPMENT | LIGHTSQUARED LP | RKF-PROFESSIONAL SERVICES AND PRODUCT DEVELOPMENT | $98,280.00 |
| ROGER BELANGER | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| ROGER BELANGER | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING TA 3373-03 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., AND ROGER BELANGER | $ - |
| ROGER BELANGER | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| ROGER BELANGER | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | VIASAT INC. GBBF SYSTEM TAA 2431-06 - VIASAT, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., ROGER BELANGER, SED SYSTEMS | $ - |
| ROGERS BUSINESS SOLUTIONS | TELCO AGREEMENT | LIGHTSQUARED CORP. | ROGERS BUSINESS SOLUTIONS PURCHASE ORDER | $2,333.74 |
| ROGERS COMMUNICATIONS | TELCO AGREEMENT | LIGHTSQUARED CORP. | ROGERS COMMUNICATIONS PURCHASE ORDER | $ - |
| ROSSEAU, HELEN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-ROSSEAU, HELEN | $ - |
| RSUI INDEMNITY CO | INSURANCE | LIGHTSQUARED LP | INSURANCE- EXCESS LIABILITY | $ - |
| RUAG SPACE AB | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| RUSSIAN SATELLITE COMMUNICATIONS COMPANY | COORDINATION AGREEMENTL-BAND | LIGHTSQUARED LP, SKYTERRA (CANADA) INC. | AGREEMENT ON COOPERATION IN THE OPERATION OF MOBILE SATELLITE NETWORKS – LIGHTSQUARED LP, SKYTERRA (CANADA) INC., RUSSIAN SATELLITE COMMUNICATIONS COMPANY, INCLUDING DEEDS OF AMENDMENT 1 AND 2 | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| SAAB SPACE AB | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| SAC WIRELESS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SAC WIRELESS, LLC - MSDA | $ - |
| SAFEGUARD DOCUMENT DESTRUCTION | SERVICE AGREEMENT | LIGHTSQUARED LP | SAFEGUARD DOCUMENT DESTRUCTION PURCHASE ORDER | $51.70 |
| SAFT | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| SAFT | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 - 8 - LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD., AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| SATELLITE CONSULTING, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | ON ORBIT TAA 3169-12 (REBASELINE OF -TAA 0607-10 AND 0795-02) LIGHTSQUARED LP AND U.S. PARTIES MCKNIGHT ASSOCIATES, INC., SATELLITE CONSULTING, INC., INTELSAT CORP., AND FOREIGN PARTIES LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA | $ - |
| SATNEWS PUBLISHERS | SUBSCRIPTION | LIGHTSQUARED LP | SATNEWS PUBLISHERS PURCHASE ORDER | $3,000.00 |
| SBA NETWORK SERVICES, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SBA NETWORK SERVICES, INC. - MSDA | $ - |
| SDC CONSULTING SOLUTIONS | CONSULTING AGREEMENT | LIGHTSQUARED LP | SDC CONSULTING SOLUTIONS - AMENDMENT NO. 1 TO CONSULTING AGREEMENT  S/B AMENDMENT NO. 4 TO CONSULTING AGREEMENT | $ - |
| SED SYSTEMS | PROPERTY LEASE (GATEWAY) | LIGHTSQUARED CORP. | SED SYSTEMS, A DIVISION OF CALIAN LTD. - SATELLITE FACILITIES LEASE AGREEMENT | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| SED SYSTEMS | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | VIASAT INC. GBBF SYSTEM TAA 2431-06 - VIASAT, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., ROGER BELANGER, SED SYSTEMS | $ - |
| SED SYSTEMS, A DIVISION OF CALIAN LTD. | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA), INC., LIGHTSQUARED CORP. | BOEING MSAT1 2 ON ORBIT TA 2071-04 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., TELESAT CANADA, SKYTERRA (CANADA), INC., LIGHTSQUARED CORP., MACDONALD, DETTWILER AND ASSOCIATES CORPORATION, SIMON BIRCH, AND SED SYSTEMS, A DIVISION OF CALIAN LTD., | $ - |
| SED SYSTEMS, DIVISION OF CALIAN LTD. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| SELECTIVE SITE CONSULTANTS, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SELECTIVE SITE CONSULTANTS, INC. – MSDA | $ - |
| SERVICE MASTER OF CANADA | SERVICE AGREEMENT | LIGHTSQUARED CORP. | SERVICE MASTER OF CANADA PURCHASE ORDER | $ - |
| SES AMERICOM, INC. | COORDINATION/NON-INTERFERENCE AGREEMENT L-BAND | LIGHTSQUARED SUBSIDARY LLC; SKYTERRA (CANADA) INC. | MSAT-2 TT&C AGREEMENT BETWEEN SES AMERICOM, INC., LIGHTSQUARED SUBSIDARY LLC (FKA SKYTERRA SUBSIDIARY LLC) AND SKYTERRA (CANADA) INC. | $ - |
| SES AMERICOM, INC. | COORDINATION/NON-INTERFERENCE AGREEMENT L-BAND | LIGHTSQUARED SUBSIDIARY LLC | SES AMERICOM, INC. - LIGHTSQUARED SUBSIDIARY LLC (FKA SKYTERRA SUBSIDIARY LLC) TECHNICAL COORDINATION FOR COLLOCATED GEOSTATIONARY SATELLITE NETWORKS OPERATING IN THE STANDARD KU FREQUENCY BANDS INCLUDING AMENDMENTS 1 – 3 | $ - |
| SES AMERICOM, INC. | COORDINATION/NON-INTERFERENCE AGREEMENT L-BAND | SKYTERRA (CANADA) INC. | SES AMERICOM, INC. - SKYTERRA (CANADA) INC. TECHNICAL COORDINATION FOR COLLOCATED GEOSTATIONARY SATELLITE NETWORKS OPERATING IN THE STANDARD KU FREQUENCY BANDS, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| SHANK COMMUNICATION CO. | SERVICE AGREEMENT | LIGHTSQUARED LP | SHANK COMMUNICATION CO. PURCHASE ORDER | $ - |
| SHARED SERVICES CANADA (FORMERLY PWGSC) | CUSTOMER AGREEMENT - SERVICE PROVIDER (GOVERNMENT CONTRACT) | LIGHTSQUARED CORP. | SHARED SERVICES CANADA – SERVICE PROVIDER AGREEMENT, INCLUDING AMENDMENTS 1-7 | $ - |
| SHARP CORPORATION | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | SHARP CORPORATION INITIAL AGREEMENT | $ - |
| SHRED-IT OTTAWA | SERVICE AGREEMENT | LIGHTSQUARED CORP. | SHRED-IT OTTAWA PURCHASE ORDER | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| SHRED-IT WASHINGTON DC | SERVICE AGREEMENT | LIGHTSQUARED LP | SHRED-IT WASHINGTON DC PURCHASE ORDER | $120.06 |
| SI WIRELESS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | SI WIRELESS ROAMING AGREEMENT | $ - |
| SIDERA NETWORKS | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SIDERA NETWORKS - MSA | $ - |
| SIMON BIRCH | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA), INC., LIGHTSQUARED CORP. | BOEING MSAT1 2 ON ORBIT TA 2071-04 AND AMENDMENTS - BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., TELESAT CANADA, SKYTERRA (CANADA), INC., LIGHTSQUARED CORP., MACDONALD, DETTWILER AND ASSOCIATES CORPORATION, SIMON BIRCH, AND SED SYSTEMS, A DIVISION OF CALIAN LTD., | $ - |
| SIMPLEXITY MVNO SERVICES LLC | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | SIMPLEXITY AGREEMENTS – WHOLESALE | $ - |
| SITE LINK WIRELESS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SITE LINK WIRELESS, LLC - MSDA | $ - |
| SKYBASE COMMUNICATION LLC | SERVICE AGREEMENT | LIGHTSQUARED LP | SKYBASE COMMUNICATION LLC PURCHASE ORDER | $275.00 |
| SKYBITZ INC. | CUSTOMER AGREEMENT - SATELLITE CAPACITY | LIGHTSQUARED LP | SKYBITZ PNC AGREEMENT, INCLUDING AMENDMENT NO. 1 | $ - |
| SKYMIRA LLC | SOFTWARE AGREEMENT | LIGHTSQUARED LP | SKYMIRA - GPS APPLICATION SERVICE AGREEMENT | $3,380.96 |
| SKYTERRA (CANADA) INC. | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP; SKYTERRA (CANADA) INC. | AMENDED & RESTATED SUBLICENSE AGREEMENT - LIGHTSQUARED LP AND SKYTERRA (CANADA) INC. | $ - |
| SKYTERRA (CANADA) INC. | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED LP; SKYTERRA (CANADA) INC. | LETTER AGREEMENT RELATED TO INMARSAT COOPERATION AGREEMENT AND ALLOCATION OF SPECTRUM AMONG LIGHTSQUARED LP AND SKYTERRA (CANADA) INC. | $ - |
| SKYTERRA (CANADA) INC. | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED SUBSIDIARY LLC; SKYTERRA (CANADA) INC. | LETTER AGREEMENT RELATED TO THE USE OF MSV-1 AND MSV-2 AS IN-ORBIT SPARE SATELLITES - LIGHTSQUARED SUBSIDIARY LLC (FKA MOBILE SATELLITE VENTURES SUBSIDIARY LLC), SKYTERRA (CANADA) INC. (FKA MOBILE SATELLITE VENTURES (CANADA) INC.) | $ - |
| SKYTERRA (CANADA) INC. | INTERCOMPANY AGREEMENT (SPECTRUM) | LIGHTSQUARED CORP.; SKYTERRA (CANADA)INC. | LIGHTSQUARED CORP. AND SKYTERRA CANADA INC. - RIGHTS AND SERVICES AGREEMENT | $ - |
| SKYTERRA (CANADA) INC. | INTERCOMPANY AGREEMENT (SPECTRUM) | SKYTERRA CANADA; LIGHTSQUARED CORP. | SKYTERRA CANADA AND LIGHTSQUARED CORP. CAPACITY LEASE AGREEMENT | $ - |
| SKYTERRA (CANADA) INC. | INTERCOMPANY AGREEMENT (SPECTRUM) | SKYTERRA CANADA; LIGHTSQUARED LP | SKYTERRA CANADA AND LIGHTSQUARED LP - SATELLITE DELIVERY AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| SMARTERCAR | CUSTOMER AGREEMENT – WHOLESALE | LIGHTSQUARED LP | SMARTERCAR – WHOLESALE AGREEMENT | $ - |
| SMITH, DOUGLAS | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-SMITH, DOUGLAS | $ - |
| SMJ INTERNATIONAL | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SMJ INTERNATIONAL – MSDA | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| SNYDER, JEFFREY | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-SNYDER, JEFFREY | $ - |
| SOLVASON-BROWN, KRISTJAN | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-SOLVASON-BROWN, KRISTJAN | $ - |
| SOMMERFELD, ROY | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-SOMMERFELD, ROY | $ - |
| SOUNDTRACKER | CUSTOMER AGREEMENT – WHOLESALE | LIGHTSQUARED LP | SOUNDTRACKER – WHOLESALE AGREEMENT | $ - |
| SPACECOM | DEVELOPMENT AGREEMENT | LIGHTSQUARED LP | SPACECOM A/S DEVELOPMENT & SUPPLY AGREEMENT, INCLUDING AMENDMENTS 1 AND 2 | $ - |
| SPARKS PERSONNEL | STAFFING SERVICE AGREEMENT | LIGHTSQUARED LP | SPARKS PERSONNEL – STAFFING SERVICES | $ - |
| SPECTRASITE COMMUNICATIONS LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | AMERICAN TOWERS INC. – SPECTRASITE COMMUNICATIONS LLC – MASTER TOWER SPACE LICENSE AGREEMENT, INCLUDING AMENDMENT 1 | $ - |
| SPRINT | TELCO AGREEMENT | LIGHTSQUARED LP | SPRINT PURCHASE ORDER | $510.76 |
| STARR | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| STEARN, GEOFFREY | EMPLOYMENT AGREEMENT-US | LIGHTSQUARED LP | EMPLOYMENT AGREEMENT-US-STEARN, GEOFFREY | $ - |
| STS MEDIA | CUSTOMER AGREEMENT – WHOLESALE | LIGHTSQUARED LP | STS MEDIA – WHOLESALE AGREEMENT | $ - |
| SURESITE CONSULTING GROUP, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | SURESITE CONSULTING GROUP, LLC – MSDA | $ - |
| SUSUMU FUJIMOTO | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP | INTEGRAL SYSTEMS TAA 2147-08 AND AMENDMENT NO. 1 – INTEGRAL SYSTEMS, INC., TELESAT CANADA, LIGHTSQUARED LP., SUSUMU FUJIMOTO | $ - |
| TELCOM SATELLITE VENTURES INC. | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP | ASSIGNMENT AGREEMENT – TELCOM SATELLITE VENTURES INC., DR. RAJENDRA SINGH AND LIGHTSQUARED LP | $ - |
| TELCOM VENTURES LLC | ONE DOT SIX – SPECTRUM LEASE | TVCC ONE SIX HOLDINGS LLC, CCTV ONE FOUR HOLDINGS LLC | OBE PATENT LICENSE AGREEMENT – TELCOM VENTURES LLC, TVCC ONE SIX HOLDINGS LLC, CCTV ONE FOUR HOLDINGS LLC | $ - |
| TELECOM VENTURES | CUSTOMER AGREEMENT – WHOLESALE | LIGHTSQUARED LP | TELECOM VENTURES – WHOLESALE AGREEMENT | $ - |
| TELESAT CANADA | SATELLITE OPERATIONAL AGREEMENT | LIGHTSQUARED CORP. | TELESAT – MIT FEE FOR SPACE DEBRIS TRACKING | $ - |
| TELESAT CANADA | SATELLITE OPERATIONAL AGREEMENT | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TELESAT CANADA – OPERATIONAL SERVICES FOR MSAT-1 AGREEMENT NO. 705-M-155-14 | $ - |
| TELESAT CANADA | SATELLITE OPERATIONAL AGREEMENT | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TELESAT CANADA – OPERATIONAL SERVICES FOR MSAT-2 AGREEMENT NO. 705-M-155-15 | $ - |
| TELESAT CANADA | SATELLITE OPERATIONAL AGREEMENT | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TELESAT CANADA – OPERATIONAL SERVICES FOR MSV-1 AND MSV-2 SATELLITES, INCLUDING AMENDMENT 1 | $ - |
| TELESAT CANADA | SERVICE CONTRACT | LIGHTSQUARED LP | TELESAT CANADA – ADMINISTRATIVE SERVICES AGREEMENT (OTTAWA FACILITIES) | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| TELESAT CANADA | SITE LEASE AGREEMENT – SCMS | LIGHTSQUARED LP | TELESAT CANADA – RACK SPACE AGREEMENT – CALGARY | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA) INC.; LIGHTSQUARED CORP. | BOEING 10061-10A AND AMENDMENT – THE BOEING COMPANY, SKYTERRA (CANADA) INC., TELESAT CANADA AND LIGHTSQUARED CORP. | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA), INC., LIGHTSQUARED CORP. | BOEING MSAT1 2 ON ORBIT TA 2071-04 AND AMENDMENTS – BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., TELESAT CANADA, SKYTERRA (CANADA), INC., LIGHTSQUARED CORP., MACDONALD, DETTWILER AND ASSOCIATES CORPORATION, SIMON BIRCH, AND SED SYSTEMS, A DIVISION OF CALIAN LTD., | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING MSV COMMERCIAL PROCUREMENT TAA 1142-06 AND AMENDMENT NO. 1, BOEING SATELLITE SYSTEMS INTERNATIONAL, INC. LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, GVPL SATELLITE CONSULTING, INC., HARBOR ENGINEERING INCORPORATED, ROGER BELANGER, SAFT, SED SYSTEMS, DIVISION OF CALIAN LTD., NEC TOSHIBA SPACE SYSTEMS, LTD., AND SAAB SPACE AB | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING TA 3373-03 AND AMENDMENTS – BOEING SATELLITE SYSTEMS INTERNATIONAL, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., AND ROGER BELANGER | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP | INTEGRAL SYSTEMS TAA 2147-08 AND AMENDMENT NO. 1 – INTEGRAL SYSTEMS, INC., TELESAT CANADA, LIGHTSQUARED LP., SUSUMU FUJIMOTO | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 – 8 – LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | ON ORBIT TAA 3169-12 (REBASELINE OF –TAA 0607-10 AND 0795-02) LIGHTSQUARED LP AND U.S. PARTIES MCKNIGHT ASSOCIATES, INC., SATELLITE CONSULTING, INC., INTELSAT CORP., AND FOREIGN PARTIES LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| TELESAT CANADA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | VIASAT INC. GBBF SYSTEM TAA 2431-06 – VIASAT, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., ROGER BELANGER, SED SYSTEMS | $ - |
| TELIASONERA INTERNATIONAL CARRIER, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TELIASONERA INTERNATIONAL CARRIER, INC. – MSA | $ - |
| TELUS | TELCO AGREEMENT | LIGHTSQUARED CORP. | TELUS PURCHASE ORDER | $ - |
| TELX ENTITIES | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TELX ENTITIES – MASTER TERMS AND CONDITION AGREEMENT | $ - |
| TERRAPIN GEOGRAPHIC INC. | SOFTWARE AGREEMENT | LIGHTSQUARED LP | TERRAPIN GEOGRAPHIC, INC. – END USER LICENSE AGREEMENT | $ - |
| TERRESTAR NETWORKS [DISH] | ATC TECHNOLOGIES IP LICENSE | ATC TECHNOLOGIES, LLC | SECOND AMENDED & RESTATED INTELLECTUAL PROPERTY ASSIGNMENT AND LICENSE AGREEMENT – ATC TECHNOLOGIES, LLC AND TERRESTAR NETWORKS INC. (NOW DISH NETWORKS) | $ - |
| TERRESTAR NETWORKS) [DISH] | ATC TECHNOLOGIES IP LICENSE | LIGHTSQUARED LP; ATC TECHNOLOGIES, LLC | TERMINATION IP COST SHARING AGREEMENT-TERRESTAR NETWORKS [DISH] – TERMINATION AGREEMENT | $ - |
| TESAT-SPACECOM GMBH & CO | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 – 8 – LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| THALES ALENIA SPACE ITALIA SPA | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP.; SKYTERRA (CANADA) INC. | MSV ENTITIES PROCUREMENT DESIGN TAA 2088-06 AND AMENDMENTS NO. 1 – 8 – LIGHTSQUARED LP, MICHAEL T. LYONS, LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, MCKNIGHT ASSOCIATES, INC., ROGER BELANGER, BIVIS INVESTMENTS LTD.,  AND BSSI SUBCONTRACTORS SED SYSTEMS, JENA OPTRONIK GMBH, SAFT, NEC CORPORATION, RUAG SPACE AB, THALES ALENIA SPACE ITALIA SPA, AMPAC ISP (UK) LIMITED, COM DEVE INTERNATIONAL LTD., TESAT-SPACECOM GMBH & CO., HARRIS CORPORATION | $ - |
| THE BOEING COMPANY | TECHNICAL ASSISTANCE AGREEMENTS | SKYTERRA (CANADA) INC.; LIGHTSQUARED CORP. | BOEING 10061-10A AND AMENDMENT – THE BOEING COMPANY, SKYTERRA (CANADA) INC., TELESAT CANADA AND LIGHTSQUARED CORP. | $ - |
| THE CELERIS GROUP, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | THE CELERIS GROUP, INC. – MSDA | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| THE INTERNATIONAL MOBILE SATELLITE ORGANIZATION (INMARSAT) | COORDINATION DOCUMENT L-BAND | LIGHTSQUARED LP | MEXICO CITY MEMORANDUM OF UNDERSTANDING FOR THE INTERSYSTEM COORDINATION OF CERTAIN GEOSTATIONARY MOBILE SATELLITE SYSTEMS – DEPT OF INDUSTRY OF CANADA (CANADA), THE INTERNATIONAL MOBILE SATELLITE ORGANIZATION (INMARSAT), MINISTRY OF COMMUNICATIONS AND TRANSPORTATIONS OF THE UNITED MEXICAN STATES (MEXICO), FEDERAL COMMUNICATIONS COMMISSION OF THE UNITED STATES (US) | $ - |
| THE ISP STORE LLC | SERVICE AGREEMENT | LIGHTSQUARED LP | THE ISP STORE LLC- VALUE ADDED WIRELESS ACTIVATION SERVICES AGREEMENT | $ - |
| THOMAS S MOORMAN JR | REGULATORY CONSULTING | LIGHTSQUARED LP | MOORMAN THOMAS S. JR. – PROFESSIONAL SERVICES AGREEMENT | $ - |
| THOMAS, MARK | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-THOMAS, MARK | $ - |
| THORPE, JAMES | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-THORPE, JAMES | $ - |
| T-MOBILE USA, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | T-MOBILE USA, INC. – MASTER LICENSE AGREEMENT | $ - |
| TOWER CLOUD | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TOWER CLOUD - MSA | $ - |
| TOWER QUEST, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TOWER QUEST, INC. - MSDA | $ - |
| TOWER RESOURCE MANAGEMENT, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TOWER RESOURCE MANAGEMENT, INC. - MSDA | $ - |
| TOWERCO ASSETS LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TOWERCO ASSETS LLC – MASTER TOWER LICENSE AGREEMENT | $ - |
| TRA-CAL LLC | SERVICE AGREEMENT | LIGHTSQUARED LP | TRA-CAL LLC PURCHASE ORDER | $680.00 |
| TRANSCEND WIRELESS LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TRANSCEND WIRELESS LLC - MSDA | $ - |
| TRITON SECURITY INC. | SERVICE AGREEMENT | LIGHTSQUARED LP | TRITON SECURITY INC. FACILITIES | $4,922.25 |
| TVCC HOLDING COMPANY, LLC | ONE DOT SIX - SPECTRUM LEASE | ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | LEASE PURCHASE AGREEMENT - ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | $ - |
| TVCC ONE SIX HOLDINGS LLC | ONE DOT SIX - SPECTRUM LEASE | ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | LEASE PURCHASE AGREEMENT - ONE DOT SIX CORP., TVCC ONE SIX HOLDINGS LLC, TVCC HOLDING COMPANY, LLC | $ - |
| TWC COMMUNICATIONS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | TWC COMMUNICATIONS, LLC - MSA | $ - |
| UNION SQUARE 456 | SERVICE AGREEMENT | LIGHTSQUARED LP | UNION SQUARE 456 MARKETING | $375.00 |
| UNITED PARCEL SERVICE | SERVICE AGREEMENT | LIGHTSQUARED LP | UNITED PARCEL SERVICE SHIPPING | $40.00 |
| US AND FOREIGN SATELLITE OWNERS/ OPERATORS | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | BOEING OWNER OPERATORS CONFERENCE TAA 1958-06 AND AMENDMENT NO. 1 - BOEING SATELLITE SYSTEMS INTERNATIONAL INC. AND US AND FOREIGN SATELLITE OWNERS/ OPERATORS | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| US DEPARTMENT OF DEFENSE | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | AGREEMENT FOR SHARING SPACE SITUATIONAL AWARENESS SERVICES BETWEEN LIGHTSQUARED LP AND US DEPARTMENT OF DEFENSE | $ - |
| US DEPARTMENT OF JUSTICE | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | CALEA AGREEMENT – LIGHTSQUARED LP, US DEPARTMENT OF JUSTICE, DEPARTMENT OF HOMELAND SECURITY, FEDERAL BUREAU OF INVESTIGATION | $ - |
| US DEPARTMENT OF JUSTICE | GOVERNMENT AGREEMENT | LIGHTSQUARED LP | GLENTEL AGREEMENT AMONG GLENTEL CORP., US DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION REGARDING BLANKET AUTHORITY TO OPERATE MOBILE EARTH TEMINALS TO COMMUNICATE WITH MSAT-1 (TRANSFERRING UNDER INFOSAT) | $ - |
| VCI GROUP, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | VCI GROUP, INC. - MSDA | $ - |
| VELOCITEL, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | VELOCITEL, INC. - MSDA | $ - |
| VELOCITY TELECOM | SERVICE AGREEMENT | LIGHTSQUARED LP | VELOCITY TELECOM PURCHASE ORDER | $1,130.00 |
| VERIZON | TELCO AGREEMENT | LIGHTSQUARED LP | VERIZON- ACCT 015243915111Y | $12,399.01 |
| VIASAT, INC. | CUSTOMER AGREEMENT - SATELLITE CAPACITY | LIGHTSQUARED LP | VIASAT, INC. - SATELLITE CAPACITY SERVICES AGREEMENT, INCLUDING AMENDMENT 1 | $ - |
| VIASAT, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP., SKYTERRA (CANADA) INC. | VIASAT INC. GBBF SYSTEM TAA 2431-06 - VIASAT, INC., LIGHTSQUARED CORP., SKYTERRA (CANADA) INC., TELESAT CANADA, HARVOR ENGINEERING INC., ROGER BELANGER, SED SYSTEMS | $ - |
| VIASAT, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP. | VIASAT INC. TAA 3678-12 - VIASAT, INC., AND LIGHTSQUARED CORP. | $ - |
| VIASAT, INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED CORP. | VIASAT, INC. TA 1971-12 - VIASAT, INC., AND LIGHTSQUARED CORP., | $ - |
| VINETTE, MATHIEU | EMPLOYMENT AGREEMENT-CAN | LIGHTSQUARED CORP. | EMPLOYMENT AGREEMENT-CAN-VINETTE, MATHIEU | $ - |
| VLADIMIR TAMARKIN | REGULATORY CONSULTING | LIGHTSQUARED CORP. | TSAT CONSULTING INC. - CONSULTING | $ - |
| VOX COMMUNICATIONS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | VOX COMMUNICATIONS - WHOLESALE AGREEMENT | $ - |
| WAVE WIRELESS, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | WAVE WIRELESS, LLC - MSDA | $ - |
| WAVEBURST | CUSTOMER AGREEMENT - SERVICE PROVIDER | TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP | WAVEBURST - SERVICE PROVIDER AGREEMENT, INCLUDING AMENDMENTS NO. 1-3 | $ - |
| WESTAR SATELLITE SERVICES LP | PROPERTY LEASE (GATEWAY) | LIGHTSQUARED LP | WESTAR SATELLITE SERVICES LP - CO-LOCATION, FACILITIES INTEGRATION, SERVICES AND LEASE AGREEMENT | $92,359.10 |
| WESTOWER COMMUNICATIONS INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | WESTOWER COMMUNICATIONS INC. - MSDA | $ - |
| WILDFIRE HOTSPOTS | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | WILDFIRE HOTSPOTS - WHOLESALE AGREEMENT | $ - |

| COUNTER PARTY[1] | CONTRACT TYPE | DEBTOR(S) | AGREEMENT NAME | CURE OBLIGATIONS |
|---|---|---|---|---|
| WILLIS INSPACE DIVISION OF WILLIS MARYLAND | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TA 9907-10 AND AMENDMENT NO. 1 AND 2 -  LIGHTSQUARED LP, WILLIS INSPACE DIVISION OF WILLIS MARYLAND, WILLIS INSPACE DIVISION OF WILLIS NY INC., WILLIS LTD, FRANCE, WILLIS LTD. UK, HARRISON CORPORATION, LIGHTSQUARED CORP. AND INSURANCE PROVIDERS | $ - |
| WILLIS INSPACE DIVISION OF WILLIS NY INC. | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TA 9907-10 AND AMENDMENT NO. 1 AND 2 -  LIGHTSQUARED LP, WILLIS INSPACE DIVISION OF WILLIS MARYLAND, WILLIS INSPACE DIVISION OF WILLIS NY INC., WILLIS LTD, FRANCE, WILLIS LTD. UK, HARRISON CORPORATION, LIGHTSQUARED CORP. AND INSURANCE PROVIDERS | $ - |
| WILLIS LTD. UK | TECHNICAL ASSISTANCE AGREEMENTS | LIGHTSQUARED LP; LIGHTSQUARED CORP. | TA 9907-10 AND AMENDMENT NO. 1 AND 2 -  LIGHTSQUARED LP, WILLIS INSPACE DIVISION OF WILLIS MARYLAND, WILLIS INSPACE DIVISION OF WILLIS NY INC., WILLIS LTD, FRANCE, WILLIS LTD. UK, HARRISON CORPORATION, LIGHTSQUARED CORP. AND INSURANCE PROVIDERS | $ - |
| WILLIS OF MARYLAND | INSURANCE | LIGHTSQUARED LP | INSURANCE-SPACE/SATELLITE BROKER | $ - |
| WINBURN INC/PALMETTO GROUP | REGULATORY CONSULTING | LIGHTSQUARED LP | WINBURN PALMETTO GROUP  (NOW PALMETTO) - AMENDMENT NO. 1 | $ - |
| WIPRO LIMITED | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | WIPRO LIMITED - MSA | $ - |
| WIRELESS FACILITIES, INC. | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | WIRELESS FACILITIES, INC. - MSDA | $ - |
| XATA CORPORATION | CUSTOMER AGREEMENT - SATELLITE CAPACITY | LIGHTSQUARED LP | XATA CORPORATION - PNSS AGREEMENT FOR EMULATION SERVICES | $ - |
| XL | INSURANCE | LIGHTSQUARED LP | INSURANCE-SKYTERRA PUBLIC COMPANY RUN OFF POLICY | $ - |
| XL | INSURANCE | LIGHTSQUARED LP | INSURANCE-D&O POLICY | $ - |
| XO COMMUNICATIONS SERVICES, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | XO COMMUNICATIONS SERVICES, LLC - CARRIER SERVICES AGREEMENT | $ - |
| YOURTEL AMERICA INC. | CUSTOMER AGREEMENT - WHOLESALE | LIGHTSQUARED LP | YOURTEL AMERICA INC. - WHOLESALE AGREEMENT | $ - |
| ZAYO BANDWIDTH, LLC | LTE NETWORK BUILD AGREEMENT | LIGHTSQUARED LP | ZAYO BANDWIDTH, LLC - THERNET CELL SITE BACKHAUL SERVICE AGREEMENT | $ - |
| ZURICH AMERICAN INSURANCE COMPANY | ONE DOT SIX LEASE AGREEMENT | ONE DOT SIX CORP. | ZURICH AMERICAN INSURANCE COMPANY (CHICAGO V) AND ONE DOT SIX CORP. | $ - |

## **Exhibit C-8**

Schedule of Retained Causes of Action

## **Schedule of Retained Causes of Action**[1]

This schedule represents the most current list of Causes of Action to be retained in connection with the Plan. The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this schedule, with the consent of each Plan Support Party, at any time in accordance with the Plan.

As set forth in Article IV.V of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary in the Plan, on the Effective Date: (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action, and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses; (3) NewCo, through its authorized agents or representatives, shall retain and may exclusively enforce and pursue any and all such Causes of Action; (4) NewCo shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; and (5) NewCo reserves and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

---

[1]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (the "Plan").

**Certain Categories of Causes of Action**

The categories and particular Causes of Action listed below are indicative, but are in no way exclusive, of the Causes of Action retained in connection with the Plan.

<u>Pending Causes of Action</u>

1.  *LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013).

2.  *LightSquared Inc. v. Deere & Company*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013).

3.  *LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013).

<u>Other Causes of Action</u>

1.  Causes of Action in connection with asserting or exercising rights of setoff, counterclaim, or recoupment.

2.  Causes of Action in connection with asserting or exercising claims on contracts or for breaches of duties imposed by law or in equity.

3.  Causes of Action in connection with Executory Contracts and Unexpired Leases, including in connection with disputes regarding Cure Costs.

4.  Causes of Action in connection with asserting or exercising the right to object to Claims or Equity Interests.

5.  Causes of Action in connection with asserting or exercising any and all claims pursuant to section 362 of the Bankruptcy Code.

6.  Causes of Action in connection with asserting or exercising claims or defenses, including, without limitation, fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

7.  Causes of Action in connection with Avoidance Actions.

8.  Causes of Action in connection with asserting or exercising claims or causes of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date.

9.  Causes of Action in connection with asserting or exercising claims, causes of action, controversies, demands, rights, actions, Liens, indemnities, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever,

known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

**Exhibit C-9**

Liquidation Analysis

## COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

Below is a summary of the proposed treatment to be received by Holders of Allowed Claims against, and Allowed Equity Interests in, the Debtors pursuant to the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (the "Plan")[1] as compared to potential recoveries in a hypothetical chapter 7 liquidation:

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|---|---|---|---|---|---|
| 1 | Administrative Claims | A | Cash payment | 100% recovery; unimpaired | 0% |
| 2 | TIP Facility Claims[3] | N/A | N/A | N/A | 100% |
| 3 | DIP Inc. Facility Claims | B | Cash payment | 100% recovery; unimpaired | 100% |
| 4 | DIP LP Facility Claims | C | Cash payment | 100% recovery; unimpaired | 100% |
| 5A | Plan Support Party ABC Debt-Converted New DIP Claims[4] | D | Loans under Second Lien Exit Facility | 100% recovery; unimpaired | N/A |
| 5B | Plan Support Party ABC Equity-Converted New | D | Pro Rata share of (a) 77.78% of NewCo Series A-1 Preferred PIK Interests and | 100% recovery; | N/A |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]   The estimates of recoveries in the hypothetical chapter 7 liquidation set forth herein assume that the Debtors do not receive FCC approval of their license modification applications.  The Debtors reserve all of their rights regarding the impact of such valuations in respect of the Plan.

[3]   The hypothetical chapter 7 liquidation set forth herein assumes that the chapter 7 trustee will be required to secure a $40 million trustee in possession ("TIP") loan to provide adequate liquidity to enable the existing satellite operating business to continue to operate plus provide additional liquidity to cover some of his professional fees to be incurred during the pendency of the hypothetical chapter 7 case.

[4]   The New DIP Claims arise in connection with the New DIP Closing Date.

COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT
TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|---|---|---|---|---|---|
| | DIP Claims | | (b) 77.78% of NewCo Class A Common Interests | unimpaired | |
| 5C | Plan Support Party D Debt-Converted New DIP Claims | D | Loans under Reorganized LightSquared Inc. Loan | 100% recovery, unimpaired | N/A |
| 5D | Plan Support Party Cashed-Out New DIP Claims | D | Cash (from First Lien Exit Excess Amount) | 100% recovery, unimpaired | N/A |
| 5E | New DIP Tranche B Facility Claims | D | Cash payment | 100% recovery, unimpaired | N/A |
| 6 | Priority Tax Claims | E | Cash payment | 100% recovery; unimpaired | 0% |
| 7 | Statutory Fees | F | Cash payment | 100% recovery; unimpaired | 100% |
| Class 1 | Inc. Other Priority Claims | G | Cash payment | 100% recovery; unimpaired | 0% |
| Class 2 | LP Other Priority Claims | H | Cash payment | 100% recovery; unimpaired | 0% |
| Class 3 | Inc. Other Secured Claims | I | Cash payment; collateral return *plus* allowed interest under section 506(b); other unimpaired treatment | 100% recovery; unimpaired | 0% |
| Class 4 | LP Other Secured Claims | J | Cash payment; collateral return *plus* allowed interest under section 506(b); | 100% recovery; | 0% |

2

## COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|---|---|---|---|---|---|
| | | | other unimpaired treatment | unimpaired | |
| Class 5 | Prepetition Inc. Facility Non-Subordinated Claims[5] | K | Cash payment | 100% recovery; unimpaired | 69.1% |
| Class 6 | Prepetition Inc. Facility Subordinated Claims | L | $209 million of NewCo Series A-2 Preferred PIK Interests and 70% of NewCo Class B Common Interests | 100% recovery; impaired | 0.0% |
| Class 7A | Prepetition LP Facility Non-SPSO Claims | M | (a) Cash payment (for Non-Converted Prepetition LP Facility Non-SPSO Claims), or<br><br>(b) New DIP Tranche B Claims (for Converted Prepetition LP Facility Non-SPSO Claim) | 100% recovery; impaired | 100% |
| Class 7B | Prepetition LP Facility SPSO Claims[6] | N | (a) SPSO Option A Treatment (if (i) Class 7B votes to accept Plan | 100% recovery; impaired | 42.0% |

---

[5]    As set forth in the Plan, the treatments provided to Class 5, Class 6, Class 7A, and Class 7B of the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Claims in such Classes against any and all Debtors.

[6]    The outcome of the Ergen Adversary Proceeding, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims.  Among other relief, the Bankruptcy Court may determine that SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code.  The estimates of recoveries in the hypothetical chapter 7 liquidation set forth herein assume that the Prepetition LP Facility SPSO Claims will be determined as of March 31, 2014, with interest accrued at the default rate through the pendency of the Chapter 11 Cases, less any cash interest received through adequate protection payments, but will be subordinated by ruling of the Bankruptcy Court.  If the Bankruptcy Court does not subordinate the Prepetition LP Facility SPSO Claims, the Prepetition

**COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|----------------------|
| | | | and (B) SPSO Parties and affiliates withdraw all objections to Plan and New DIP Facility),[7] or<br><br>(b) SPSO Option B Treatment (if (i) Class 7B votes to reject Plan, (ii) SPSO Parties or affiliates do not withdraw all objections to Plan or New DIP Facility, or (iii) any vote to reject by Class 7B is designated by Bankruptcy Court pursuant to section 1126(e) of Bankruptcy Code)[8] | | |

LP Facility SPSO Claims will receive a higher cash return by virtue of the treatment of their claims on a *pari passu* basis with the Prepetition LP Facility Non-SPSO Claims.

[7]    As set forth in the Plan, "SPSO Option A Treatment" means the following treatment:  (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $1.1055 billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; provided, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 of the Plan.

[8]    As set forth in the Plan, "SPSO Option B Treatment" means the following treatment:  (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; provided, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.

## COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|---|---|---|---|---|---|
| Class 8 | Inc. General Unsecured Claims | O | Cash payment of principal amount | 100% recovery; impaired | 0% |
| Class 9 | LP General Unsecured Claims | P | Cash payment of principal amount | 100% recovery; impaired | 0% |
| Class 10 | Existing LP Preferred Units Equity Interests | Q | $223 million cash payment and $75 million of NewCo Series A-2 Preferred PIK Interests | 100% recovery; impaired | 0% |
| Class 11A | Existing Inc. Series A Preferred Stock Equity Interests | R | Pro Rata share of (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (b) 90.9% of the NewCo Class C Common Interests | 100% recovery; impaired | 0% |
| Class 11B | Existing Inc. Series B Preferred Stock Equity Interests | S | Pro Rata share of (a) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (b) 9.1% of the NewCo Class C Common Interests; provided, SIG Holdings Inc. shall receive 100% of the Reorganized LightSquared Inc. Common Shares | 100% recovery; impaired | 0% |
| Class 12 | Existing Inc. Common Stock Equity Interests | T | 30% of NewCo Class B Common Interests | TBD | 0% |
| Class 13 | Intercompany Claims | U | Reinstated[9] | 100% recovery; | 0% |

---

[9]    As provided under the Plan, LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc.

COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT
TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|-----------------------|
| | | | | unimpaired | |
| Class 14 | Intercompany Interests | V | Reinstated | 100% recovery; unimpaired | 0% |

A.  Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court.  For the avoidance of doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

B.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

6

**COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT
TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION**

C.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

D.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Claim agrees to a less favorable or other treatment, the Holders of New DIP Claims shall receive the following, as applicable:

   1.  Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

   2.  Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78% of the NewCo Series A-1 Preferred PIK Interests and (b) 77.78% of the NewCo Class A Common Interests;

   3.  Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Reorganized LightSquared Inc. Loan in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

   4.  Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and

   5.  Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration in the form of Cash in an amount equal to such New DIP Tranche B Facility Claim.

E.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable: (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority

## COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION

Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

F. On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

G. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

H. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

I. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (1) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (2) delivery of the Collateral securing such Allowed Inc. Other

8

**COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION**

Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (3) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

J.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (1) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (2) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (3) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

K.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the New DIP Closing Date, (1) the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (2) except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, the Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim, shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.

L.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (1) $209 million of NewCo Series A-2 Preferred PIK Interests and (2) 70% of the NewCo Class B Common Interests.

M.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, (1) the legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of

9

**COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION**

the Plan) and (2) except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment:

1. the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim, shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or

2. each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) thereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.

N. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

1. in the event that (a) Class 7B votes to accept the Plan and (b) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or

2. in the event that (a) Class 7B votes to reject the Plan, (b) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (c) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.

O. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against

an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

P.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

Q.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (1) Cash in an amount equal to $223 million and (2) $75 million of NewCo Series A-2 Preferred PIK Interests.

R.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series A Preferred Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (1) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (2) 90.9% of the NewCo Class C Common Interests.

S.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series B Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series B Preferred Stock Equity Interest agrees to any other treatment (including as described in the immediately following proviso), each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (1) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (2) 9.1% of the NewCo Class C Common Interests; provided that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

T.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing

**COMPARISON OF PROPOSED TREATMENT UNDER DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE TO RECOVERIES IN A LIQUIDATION**

Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

U.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc.  After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

V.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

12

## Exhibit B

**Blackline of LightSquared Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | Case No. 12-12080 (SCC) |
| Debtors.[1] | Jointly Administered |

<del>REVISED</del> SPECIFIC DISCLOSURE STATEMENT FOR
DEBTORS' <del>REVISED SECOND</del>THIRD AMENDED JOINT PLAN

PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE[2]

- Voting Record Date:  October 9, 2013
- <del>Plan Objection</del>**Voting** Deadline:  <del>January 15</del>**March [3]**, 2014 at 4:00 p.m. (prevailing <del>Eastern</del>**Pacific** time)
- <del>Voting</del>**Plan Objection** Deadline:  <del>January 15</del>**March [10]**, 2014 at 4:00 p.m. (prevailing <del>Pacific</del>**Eastern** time)
- Confirmation Hearing:  <del>January 21</del>**March [17]**, 2014 at 10:00 a.m. (prevailing Eastern time)

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]    The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]    <del>The dates and deadlines relating to the plan solicitation and confirmation process referenced throughout this Debtors' Specific Disclosure Statement are subject to extension pursuant to the *Order Modifying Previously Scheduled Hearing Dates and Deadlines in Connection with Chapter 11 Plan Process* [Docket No. 1061] (the "Scheduling Order").</del>

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated:  New York, New York
        December 31, 2013

> **THE DEADLINE TO ACCEPT OR REJECT THE PLAN ~~AND ALTERNATE INC.~~ ~~DEBTORS PLAN~~ IS ~~JANUARY 15~~MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME)~~, UNLESS OTHERWISE EXTENDED PURSUANT TO THE~~ ~~SCHEDULING ORDER~~ (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS ~~REVISED~~ SPECIFIC DISCLOSURE STATEMENT (THE "DEBTORS' SPECIFIC DISCLOSURE STATEMENT") FOR THE DEBTORS' ~~REVISED SECOND~~THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT"). THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ~~THE~~ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' ~~FIRST~~REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. ~~921~~1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT

CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  SEE 11
U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO
PROVIDE (A) INFORMATION CONCERNING THE PLAN AND THE ALTERNATE INC.
DEBTORS PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY
INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN AND THE
ALTERNATE INC. DEBTORS PLAN, AND (C) INFORMATION TO ASSIST THE
BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN AND THE
ALTERNATE INC. DEBTORS PLAN COMPLY COMPLIES WITH THE PROVISIONS OF
CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532
(AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS,
THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF
THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN.  PLAN SUMMARIES AND
STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE
QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE ALTERNATE
INC. DEBTORS PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN AND THE
ALTERNATE INC. DEBTORS PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN
THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN OR THE
ALTERNATE INC. DEBTORS PLAN, THE GENERAL DISCLOSURE STATEMENT, AND
THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN
OR THE ALTERNATE INC. DEBTORS PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE
GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING
THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE
RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE
SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL
CONDITION OR ANY ASPECT OF THE PLAN OR THE ALTERNATE INC. DEBTORS
PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN
THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND
OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR
INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE
PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE
STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER
ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN
ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND
ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE
STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER
ACCOMPANYING DOCUMENTS) AND THE PLAN AND THE ALTERNATE INC.
DEBTORS PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY

iv

INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~.  **SEE ~~ARTICLE VI~~ ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE ~~DEBTORS' SPECIFIC~~ DISCLOSURE STATEMENT AND THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~ IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, ~~THE ALTERNATE INC. DEBTORS PLAN,~~ STATUTORY PROVISIONS, DOCUMENTS ~~RELATED~~ RELATING TO THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN CONTAIN~~ CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS~~," AND ARTICLE VIII OF THE ALTERNATE INC.~~**

~~DEBTORS PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS~~."

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND ~~THE ALTERNATE INC. DEBTORS PLAN AND~~ MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE

PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AS PROMPTLY AS POSSIBLE. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AND THE EFFECTIVE DATE OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ TO VOTE TO ACCEPT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** — **1**

    **A.**    **Overview of Plan** — **1**

        1.    Path to Value-Maximizing Transaction — 1

        2.    ~~General Terms of Plan and New LightSquared Entities 3~~**Previously Filed Plans and Path to Plan** — **2**

        3.    General Structure of LightSquared and New LightSquared Entities — ~~4~~**5**

        4.    ~~Classes~~**Administrative** and ~~Treatment 6~~**Priority Claims** — **8**

        ~~B~~**5**.    Classes and Treatment ~~for Alternate Inc. Debtors Plan~~ — 9

    **B.**    **Chapter 11 Cases** — **14**

        **1.**    **Ergen Adversary Proceeding** — **14**

    **C.**    **Solicitation Process and Voting Procedures** — **~~12~~18**

    **D.**    **Plan ~~Supplements~~Supplement** — **~~13~~20**

    **E.**    **Confirmation Procedures** — **~~14~~20**

    **F.**    **Risk Factors** — **~~15~~21**

    **G.**    **Identity of Persons to Contact for More Information** — **~~15~~21**

    **H.**    **Disclaimer** — **~~15~~21**

    **I.**    **Rules of Interpretation** — **~~16~~22**

**ARTICLE II SUMMARY OF PLAN** — **~~17~~22**

~~**ARTICLE III SUMMARY OF ALTERNATE INC. DEBTORS PLAN**~~ — ~~**17**~~

**ARTICLE ~~IV~~III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** — **~~18~~23**

    **A.**    **Valuation of ~~Reorganized Debtors~~New LightSquared Entities' Assets** — **~~18~~23**

    **B.**    **Valuation Methodologies** — **~~20~~24**

    **C.**    **Valuation Considerations** — **~~21~~26**

    **D.**    **Financial Projections** — **~~21~~26**

**ARTICLE ~~V~~IV CERTAIN PLAN ~~REQUIREMENTS~~MATTERS** — **~~23~~28**

    **A.**    **Best Interests of Creditors Test** — **~~24~~28**

    **B.**    **Feasibility** — **~~25~~29**

    **C.**    **Confirmation-Related Claims and Remedies Against SPSO** — **30**

**ARTICLE ~~VI~~V PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN** — **~~25~~30**

    **A.**    **Certain Bankruptcy Law Considerations** — **~~25~~30**

1.    Parties in Interest May Object To LightSquared's or the Inc. Debtors' Classification of Claims and Equity Interests ............... 2530

2.    Plan or Alternate Inc. Debtors Plan May Not Receive Requisite Acceptances ............... 2631

3.    LightSquared or Inc. Debtors May Not Be Able To Obtain Confirmation of Plan or Alternate Inc. Debtors Plan 26 ............... 31

4.    LightSquared May Not Obtain Recognition from Canadian Court ............... 2731

5.    LightSquared or Inc. Debtors May Not Be Able To Consummate Plan or Alternate Inc. Debtors Plan 27 ............... 32

6.    Alternate Inc. Debtors Plan May Not Go Effective ............... 27

76.    LightSquared and Inc. Debtors May Object to Amount or Classification of Claim ............... 2732

87.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan ............... 2732

B.    **Factors Affecting LightSquared** ............... 2832

1.    Regulatory Risks ............... 2832
2.    Business-Related Risks ............... 3534
3.    Risks Related to New LightSquared Entities Shares and Reorganized Debtors Equity Interests 39 ............... 38

C.    **Litigation Risks** ............... 4039

D.    **Certain Tax Matters** ............... 4139

**ARTICLE VII VI   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ............... 4139

A.    **Certain United States Federal Income Tax Consequences of Plan to LightSquared** ............... 4240

1.    Treatment of Transfers to NewCo ............... 4240
2.    Cancellation of Debt and Reduction of Tax Attributes ............... 4241
3.    Potential Limitations on NOLs and Other Tax Attributes ............... 4341
4.    Alternative Minimum Tax ............... 4543

B.    **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** ............... 4543

1.    Consequences to Holders of Claims ............... 4644
2.    Consequences to Holders of Equity Interests ............... 48
3.    Consequences of Holding NewCo Interests 50 and Debt Obligations 49
4.    Information Reporting and Backup Withholding ............... 51

C.    **Certain Consequences of the Alternate Inc. Debtors Plan** ............... 51

1.    Treatment of Transactions under the Alternate Inc. Debtors Plan ............... 52
2.    Cancellation of Debt and Reduction of Tax Attributes ............... 52
3.    Potential Limitations on NOLs and Other Tax Attributes ............... 53
4.    Alternative Minimum Tax ............... 55

D.    Certain United States Federal Income Tax Consequences to Holders of
      Claims and Holders of Equity Interests Under Alternate Inc.
      Debtors Plan                                                              55

      1.    Consequences to Holders of Claims                                   55
      2.    Consequences to Holders of Equity Interests                         57
      3.    Tax Treatment of Trust and Consequences of Holding Trust Interests  58
      4.    Information Reporting and Backup Withholding                        59

**ARTICLE VIIIVII CONCLUSION AND RECOMMENDATION**                          6051

# EXHIBITS

**Exhibit A**    Debtors' SecondThird Amended Joint Plan Pursuant to Chapter 11 of
                 Bankruptcy Code

**Exhibit B**    Projections

**Exhibit C**    Plan Supplement for Plan

                 Exhibit C-1 — Exit Financing Agreement

                 Exhibit C-2 — New Equity Contribution Agreement

                 Exhibit C-3 — Reorganized LightSquared Inc. Loan Agreement

                 Exhibit C-4 — Rights Offering Documents

                 Exhibit C-5 — Litigation Trust Agreement

                 Exhibit C-6 — New LightSquared Entities Corporate Governance Documents

                 Exhibit C-7 — Schedule of Assumed Agreements

                 Exhibit C-8 — Schedule of Retained Causes of Action

                 Exhibit C-9 — Liquidation Analysis

**Exhibit D**    Plan Supplement for Alternate Inc. Debtors Plan

                 Exhibit D-1 — Inc. Exit Financing Agreement

                 Exhibit D-2 — One Dot Six Exit Financing Agreement

                 Exhibit D-3 — New Equity Contribution Agreement

Exhibit D-4 — Rights Offering Documents

Exhibit D-5 — Litigation Trust Agreement

Exhibit D-6 — Reorganized Debtors Corporate Governance Documents

Exhibit D-7 — Schedule of Assumed Agreements

Exhibit D-8 — Schedule of Retained Causes of Action

Exhibit D-9 — Liquidation Analysis

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this ~~Revised~~ Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (i**a**) solicitation of votes to accept or reject their joint ~~chapter 11 plan or alternate~~ chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),³² and (ii**b**) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (i**a**) terms, provisions, and implications of the Plan and (ii**b**) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan. The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases. Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so. While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.⁴³

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan ~~(including the Alternate Inc. Debtors' Plan)~~, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

---

³² Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~.

⁴³ If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

A.    **Overview of Plan**

1.    **Path to Value-Maximizing Transaction**

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC. Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction. A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**." A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces. ~~Hand in hand with such awareness was the recognition that, to properly~~ **Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below),** certain of LightSquared's stakeholders **agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on** approval of LightSquared's pending license modification applications.

2.    **Previously Filed Plans and Path to Plan**

a.    **Prior LightSquared Plans**

**Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to** exercise **properly** its fiduciary duty to all of its stakeholders ~~given~~**in light of** the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, ~~LightSquared~~**it** would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets. Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, ~~contemplates~~**contemplated** the sale of LightSquared's assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential

2

alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties.  In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets.  In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders.  After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates.  Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by ~~LBAC~~**L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO**, multiple potential bidders were reluctant to participate in the Auction ~~and noted their belief that the sale process and Auction would not lead to a transaction for LightSquared's Estates that would optimize value and recoveries~~.  Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases.  No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize.  LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal.  LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new

value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders. Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108]. Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize **the** value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c) provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan ~~as reflected in the Plan to incorporate the terms of~~. **LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through** the Alternative Transaction.

   **b.**  **Termination of LBAC Bid**

   **Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid. On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid"). On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC. The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects. In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement). LightSquared reserves all of its rights with respect to such matters in all respects.**
~~2. General Terms of Plan and New LightSquared Entities~~

4

### c.    Amended Alternative Transaction

**After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.**

The Plan represents the culmination of significant negotiations and efforts by LightSquared ~~and~~**,** certain key constituents **in the Chapter 11 Cases,** and **certain third party** investors to develop a restructuring plan that will achieve maximum returns for ~~LightSquared's~~**the** Estates and stakeholders.  ~~As~~**Importantly,** effectiveness of the Plan is **not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial** spectrum rights **(i.e., among other approvals, the license modification), thereby addressing a key concern of certain** of LightSquared's **significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan.**  To fund LightSquared's operations through the Effective Date **and to indefeasibly** repay in full **on the New DIP Closing Date the Allowed** DIP Inc. **Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO** Claims, and Prepetition Inc. **Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new** debtor in possession **credit facility.  More specifically, as** set forth ~~therein~~**herein**, the Plan contemplates, among other things, (~~a~~**i**) ~~up to $2.5~~**$1.65** billion in ~~senior secured exit facility~~**new debtor in possession financing (approximately $930 million of which will be converted into second lien exit** financing, ~~(b) a~~ ~~$250~~**300** million ~~senior secured loan~~**of which will be converted into** the Reorganized LightSquared Inc. **Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan)**, (~~c~~**ii**) ~~at least $1.25~~**first lien exit financing, including a facility of not less than $1** billion ~~in new equity contributions~~, (~~d~~**iii**) the issuance of new debt and equity instruments, (~~e~~**iv**) the assumption of certain liabilities, (~~f~~**v**) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with ~~cash~~**Cash** and other consideration, as applicable, and (~~g~~**vi**) the preservation ~~of value of certain~~**of** LightSquared's litigation claims ~~for the benefit of certain of LightSquared's stakeholders~~.

~~Effectiveness of the Plan is conditioned on the FCC's approval of LightSquared's license modification applications and grant of additional relief discussed in more detail below.  To fund LightSquared's operations from Confirmation through the Effective Date (and to repay in full the DIP Inc. Facility), a debtor in possession facility in an amount of not less than $285 million has been made available to LightSquared by Melody Capital Advisors, LLC, subject to negotiation and definitive documentation.  Upon its~~**Upon their** emergence from bankruptcy, **the New** LightSquared **Entities** will have a sustainable capital structure and will

be stronger and better positioned to avail ~~itself of the~~**themselves of** significant upside value ~~resulting from approval~~ of the pending spectrum license modification ~~application~~**applications**. LightSquared~~,~~ **and the Plan Support Parties** accordingly~~, believes~~ **believe** that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer ~~received by~~**available to** LightSquared ~~to date~~.  Moreover, ~~the Plan~~**it** is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates **and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases**.  Given the undeniable benefits of the contemplated restructuring, **it is therefore not surprising that** the Plan has received overwhelming consensus and support from a substantial portion of LightSquared's significant stakeholders ~~subject to required approvals and definitive documentation in form and substance satisfactory to such stakeholders and the satisfaction of the conditions herein and therein~~.

**Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of** the Alternate Inc. Debtors Plan.  The Alternate Inc. Debtors Plan**, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.**

For ~~a~~ more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

### 3.    General Structure of LightSquared and New LightSquared Entities

As of the Petition Date, LightSquared maintained the following corporate organizational structure:

## Prepetition Debtor Organization Chart



In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities. **More specifically,** Reorganized LightSquared Inc. ~~and certain~~**,** Reorganized ~~Subsidiaries will contribute their~~ **LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and** Equity Interests (other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' Equity Interests in LightSquared LP, **Reorganized SkyTerra Investors LLC, Reorganized** LightSquared GP ~~, Inc.~~ **LLC,** and **Reorganized** One Dot Six ~~Corp. to NewCo.~~ **LLC, intellectual property, contractual rights, and** Retained Causes of Action**, and NewCo will assume all obligations related thereto (including the payments to equityholders). All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.**

7

As a result **of the foregoing Plan Transactions**, (a) NewCo will be the limited partner~~,~~ and Reorganized LightSquared GP ~~Inc.~~**LLC** will be the general partner~~,~~ of Reorganized LightSquared LP, (b) NewCo will wholly own Reorganized One Dot Six ~~Corp.~~**LLC**, ~~and~~ (c) **each of the Reorganized Subsidiaries (other than** LightSquared ~~Inc. will retain its 100% ownership of Reorganized~~ Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.

**) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared** Inc. will retain its 100% ownership of Reorganized **LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC,** and Reorganized One Dot **Four Corp.  In addition,** NewCo will, among other things, issue several series of equity interests – including, the NewCo Series **A-**1 Preferred PIK Interests, NewCo Series **A-2 Preferred PIK Interests,** NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, ~~NewCo Series A Preferred PIK Interests, NewCo Series B-1 Preferred PIK Interests, NewCo Series B-2 Preferred Non-PIK Interests,~~ and NewCo ~~EAR~~**Class D Common Interests –** to Reorganized LightSquared Inc., ~~the New Equity Contributors~~**certain Plan Support Parties**, certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan.  Reorganized LightSquared Inc. will hold (i~~v~~) ~~20~~**22.22% of loans under the Second Lien Exit Facility, (w) 22.22**% of NewCo Series A~~A-1~~ Preferred PIK Interests, (ii~~x~~) ~~20~~**$51.7 million of the** NewCo Series **A-2** Preferred PIK Interests, **(y) 22.22**% of NewCo Class A Common Interests, and (iii~~z~~) 100% of ~~the~~ NewCo Class C~~D~~ Common Interests (subject to ~~a call option, exercisable by New Equity Contributor C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests for $250 million).  Further, Reorganized LightSquared Inc. will, among other things, issue the Reorganized LightSquared Inc. Common Shares to the Holders of Allowed Existing Inc. Preferred Stock Equity Interests and Rights Offering participants.~~**the Plan Support Party C Call Option).**

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:

8

## REORGANIZED DEBTOR ORGANIZATION CHART



**4.**    ~~Classes~~<u>Administrative</u> and ~~Treatment~~<u>Priority Claims</u>

    **a.**    **Treatment of Administrative and Priority Claims Generally**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP ~~Facility~~ Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan. **Such Claims shall be satisfied in full in accordance with the Plan.** All other Claims and Equity Interests are classified under the Plan.

    **b.**    **Treatment of DIP Inc. Claims**

**All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all**

9

reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

### c.    Treatment of DIP LP Claims

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

### 5.    Classes and Treatment

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote.  This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest

under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | **Estimated Percentage Recovery of Allowed Claims or Equity Interests** |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | **100%** |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | **100%** |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | **100%** |
| 4 | LP Other Secured Claims | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy | Unimpaired | No (Deemed To Accept) | **100%** |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | **Estimated Percentage Recovery of Allowed Claims or Equity Interests** |
|---|---|---|---|---|---|
| | | Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | | | |
| 5 | Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claims | ~~Each~~**The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each** Holder of an Allowed Prepetition Inc. ~~Non-Subordinated~~ Facility **Non-Subordinated** Claim,**[4]** shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the ~~Reorganized LightSquared Inc.~~ ~~Loan~~**New DIP Facility**) in an amount equal to such Allowed Prepetition Inc. ~~Non-Subordinated~~ Facility ~~Claim~~**Non-Subordinated Claim. For the avoidance of doubt, the treatment provided to Class 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of** | Unimpaired | No (Deemed To Accept) | **100%** |

---

**[4]** **Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (c) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | **Estimated Percentage Recovery of Allowed Claims or Equity Interests** |
|---|---|---|---|---|---|
| | | **Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors**. | | | |
| 6 | Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims | Each Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) ~~the~~ **$209 million of** NewCo Series ~~B~~ **A**-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests. **For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.** | Impaired | Yes | **100%** |
| 7A | Prepetition LP Facility Non-SPSO Claims | **The legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:** <br><br> ~~Each~~**the Prepetition LP Agent, for the benefit of each** Holder of an Allowed **Non-Converted** Prepetition LP Facility Non-SPSO Claim,[5] shall | Impaired | Yes | **100%** |

---

[5]     **Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $1.0883 billion, calculated as follows:  (i) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (ii) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013; (ii) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (iv) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (b) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (c) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | receive ~~one of the following:~~ | | | |

receive ~~one of the following:~~

(i) **LP** ~~in the event that Class 7A votes to accept the Plan, its Pro Rata share of LP~~ Plan Consideration in the form of ~~(a) $1.7 billion in~~ Cash~~, (b) the NewCo Additional Interests, and (c) NewCo EARs~~ in an amount equal to ~~the difference between (1) the~~**such** Allowed **Non-Converted** Prepetition LP Facility Non-SPSO ~~Claims *plus* unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed~~**Claim; provided, that for the avoidance of doubt, any Holder of a** Prepetition LP Facility Non-SPSO ~~Claims through the Effective Date, *less* (2) the aggregate principal amount of distributions provided for in subsections (a) and (b) above; or;~~**Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or**

(ii) ~~in the event that Class 7A votes to reject the Plan,~~ **each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive** LP Plan Consideration in the form of ~~Cash~~**a New DIP Tranche B Claim** in an amount equal to such ~~Allowed~~**Holder's Converted** Prepetition LP Facility Non-SPSO Claim ~~plus unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed~~**; provided, that in the event that the amount of Converted** Prepetition LP Facility Non-SPSO ~~Claim through the Effective Date.~~**Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata**

**legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | **basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.**<br><br>~~(ii)~~ **For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.** | | | |
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an ~~Allowed Prepetition Facility SPSO Claim shall receive (i) LP Plan Consideration in the form of Cash in an amount equal to such~~ Allowed Prepetition LP Facility SPSO Claim *~~plus~~ ~~unpaid postpetition interest~~* **shall receive** one of the following:<br><br>(i)    **in the event that (A) Class 7B** votes to accept the Plan **and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or**<br><br>(ii)    ~~(at a rate determined~~ **in the event that (A) Class 7B** votes to reject the Plan, | ~~Unimpaired~~**Impaired** | ~~No (Deemed To Accept)~~**Yes** | **100%** |

15

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
|  |  | **(B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated** by the Bankruptcy Court~~) accrued on account of such Allowed~~ ~~Prepetition LP Facility SPSO Claim through the Effective Date or (ii) such other treatment the Bankruptcy Court deems appropriate after considering the facts and circumstances under~~**pursuant to** section 1126~~(~~**(e)** of the Bankruptcy Code~~.~~**, the SPSO Option B Treatment.**<br><br>**For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of** ~~Prepetition LP Facility SPSO~~ **Claims against any and all Debtors.** |  |  |  |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form | Impaired | Yes |  |

16

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | **Estimated Percentage Recovery of Allowed Claims or Equity Interests** |
|---|---|---|---|---|---|
| | | of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | | | **100%**[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | **100%** |
| 10 | Existing LP Preferred Units Equity Interests | Each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) 15.33% of the NewCo Series A Preferred PIK Interests and 15.33% of the NewCo Class A Common Interests (on account of the cancellation of $230 Cash in an amount equal to $223 million of Allowed Prepetition LP Preferred Units Equity Interests and (ii) the $75 million of NewCo Series B-1 A-2 Preferred PIK Interests. | Impaired | Yes | **100%** |
| **11A** | **Existing Inc. Series A Preferred Stock Equity Interests** | **Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.** | **Impaired** | **Yes** | **100%** |
| 11B | Existing Inc. Series B Preferred Stock Equity Interests | Each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of (i) its Pro Rata share of 51 (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares and (ii) the right to participate in the Rights | Impaired | Yes | **100%** |

[6]    **LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | ~~Offering for its Pro Rata share of the Rights Offering Shares~~. | | | |
| 12 | Existing Inc. Common Stock Equity Interests | Each ~~Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each~~ Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | **TBD** |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof**; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc**. | Unimpaired | No (Deemed To Accept) | **100%** |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | **100%** |

**B.    Chapter 11 Cases**

**Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the** Chapter 11 Cases**, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.**

~~B. CLASSES AND TREATMENT FOR ALTERNATE INC. DEBTORS PLAN~~

~~Although LightSquared fully endorses the Plan and believes that it is preferable to any other restructuring transaction, LightSquared recognizes that additional considerations or issues may arise that could lead the Bankruptcy Court to conclude that an alternate plan is preferable.~~

Accordingly, to provide the Bankruptcy Court with maximum optionality at the Confirmation Hearing, the Plan is a "toggle" plan, contemplating either (1) the confirmation of the Plan or (2) to the extent the Bankruptcy Court does not approve and confirm the transactions embodied in the Plan, the confirmation of an alternate separate chapter 11 plan (the "Alternate Inc. Debtors Plan") for the Inc. Debtors (for purposes of this Debtors' Specific Disclosure Statement, the term "Inc. Debtors" shall have the meaning provided in the Alternate Inc. Debtors Plan), which is attached to the Plan as Exhibit A.

As set forth therein, the Alternate Inc. Debtors Plan contemplates, among other things, (a) $300 million in senior secured exit facility financing (including a $50 million working capital facility), (b) $100 million in new equity contributions, (c) the conversion of $50 million of existing claims into new equity securities, (d) the issuance of new equity instruments, (e) the assumption of approximately $160 million in liabilities, and (f) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with cash and other consideration, as applicable. Upon their emergence from bankruptcy, the Inc. Debtors will have a sustainable capital structure and will be stronger and better positioned to avail themselves of upside value.

The chart below summarizes the Classes of Claims and Equity Interests under the Alternate Inc. Debtors Plan, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote. This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution. Unless otherwise provided in the Alternate Inc. Debtors Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Alternate Inc. Debtors Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

For more details, refer to the Alternate Inc. Debtors Plan, attached to the Plan as Exhibit A.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote |
|-------|---------------------------|-----------|-------------------|---------------------|
| 1 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim against an individual Inc. Debtor shall receive Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Priority Claim. | Unimpaired | No (Deemed To Accept) |

19

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote |
|---|---|---|---|---|
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable: (i) Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) |
| 3 | Prepetition Inc. Facility Non-Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Non Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash in an amount equal to the Allowed Prepetition Inc. Facility Non Subordinated Claims. | Unimpaired | No (Deemed To Accept) |
| 4 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall (i) have the right to contribute its Pro Rata share of $50 million of the Allowed Prepetition Inc. Facility Subordinated Claims to Reorganized One Dot Six in exchange for a Pro Rata share of (a) $50 million of Reorganized One Dot Six Preferred Shares and (b) 10% of the Reorganized One Dot Six Common Shares and (ii) in consideration for the remainder of its Allowed Prepetition Inc. Facility Subordinated Claim, receive such Holder's Pro Rata share of 20% of the Reorganized One Dot Six Common Shares. | Impaired | Yes |
| 5 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed General Unsecured Claim with no payment on account of any accrued interest. | Impaired | Yes |
| 6 | Existing Inc. Preferred Stock Equity Interests | Each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive (i) its Pro Rata share of 51% of the Reorganized LightSquared Inc. Common Shares and (ii) the right to participate in the Rights Offering for its Pro Rata share of the Rights Offering Shares. | Impaired | Yes |
| 7 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of 60% of the residual interests in the Litigation Trust and 60% of the interests in the Liquidation Trust. | Impaired | Yes |

| ~~Class~~ | ~~Claims or Equity Interests~~ | ~~Treatment~~ | ~~Impairment Status~~ | ~~Entitlement to Vote~~ |
|---|---|---|---|---|
| ~~8~~ | ~~Intercompany Interests~~ | ~~Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof, provided the existing Intercompany Interest in One Dot Six shall be contributed to Reorganized One Dot Six pursuant to the Alternate Inc. Debtors Plan in exchange for the consideration set forth therein.~~ | ~~Unimpaired~~ | ~~No (Deemed To Accept)~~ |
| ~~9~~ | ~~Intercompany Claims~~ | ~~Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof. After the Effective Date, the Reorganized Debtors, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.~~ | ~~Unimpaired~~ | ~~No (Deemed To Accept)~~ |

**1.    Ergen Adversary Proceeding**

**Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts.  Since the filing of** the General Disclosure Statement, **the parties to the Ergen Adversary Proceeding have**, among other things, **engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable.  In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined.  The record in the Ergen Adversary Proceeding has closed.  The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.**

**Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims.  This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.**

**The Ad Hoc Secured Group intends to proceed as outlined herein.  In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases.  LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated.  The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen,**

and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases. The parties further believe that the evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment. Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH. Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment only on Hart-Scott-Rodino approval. The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized. This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction. In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest. To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013. In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced. The parties'

agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.

- The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed.  At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones.  Despite this fact, the Ergen Entities refused at the time to amend the milestones, but repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.

- With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million.  To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.

- Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids.  Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable.  Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court.  The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction.  The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction.  Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.

- Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted.  With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price.  With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy

that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal.  This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money."  Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million).  Thus, the Ergen Entities essentially converted the largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

- After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further.  Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement.  When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered significant harm as a result of the Ergen Entities' continuing inequitable conduct.  As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders.  As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims.  Among other relief, the

**Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.**

**C.     Solicitation Process and Voting Procedures**

**On February [__], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. ____] (the "Resolicitation Order"), which, among other things, approved the** Debtors' Specific Disclosure Statement **and the resolicitation of the Plan.**

**1.     Solicitation Process**

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**."

**2.     Summary of Voting Procedures**

If you are entitled to vote to accept or reject the Plan ~~or Alternate Inc. Debtors Plan (each, an "Alternate Plan")~~, a ballot providing for voting on ~~each such Alternate~~**the** Plan is enclosed for voting purposes. If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class. Each ballot votes only your Claim or Equity Interest indicated on that Ballot. Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF ~~AN ALTERNATE~~**THE** PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON ~~JANUARY 15~~**MARCH [3]**, 2014 (THE "VOTING DEADLINE"). BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE

EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE ~~ALTERNATE~~ PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE ~~ALTERNATE~~ PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

3.    **Inquiries**

If you are a Holder of a Claim or Equity Interest entitled to vote on ~~an Alternate~~**the** Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the ~~Alternate Plan(s)~~**Plan**, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d):  (a) from the Claims and Solicitation Agent (i) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

D.    **Plan ~~Supplements~~Supplement**

The Plan Supplement documents for the Plan ~~and the Alternate Inc. Debtors Plan (together,~~(the "Plan Supplements") are attached hereto as exhibits and incorporated herein by reference.  The Plan ~~Supplements consist~~**Supplement consists** of the following documents:[7]

---

[7]    Exhibit C-1, Exhibit C-**4**, Exhibit C-**5**, and Exhibit C-6 contain **form agreements and/or related documents with respect to the First Lien Exit Credit Agreement**, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  **To the extent not filed with this Specific Disclosure Statement (including the Second Lien Exit Credit Agreement**

**1. Plan Supplement for Plan:**[5]

- Exhibit C-1 - **First Lien** Exit ~~Financing~~**Credit** Agreement~~;~~

- Exhibit C-2 - ~~New Equity Contribution~~**Second Lien Exit Credit** Agreement~~;~~

- Exhibit C-3 - **Exit Intercreditor Agreement**

- Exhibit C-4 - Reorganized LightSquared Inc. Loan Agreement~~;~~

- Exhibit C-4**5** - ~~Rights Offering~~**SPSO Note** Documents~~;~~

  - ~~Exhibit C-5 - Litigation Trust Agreement;~~

- Exhibit C-6 - New LightSquared Entities Corporate Governance Documents~~;~~

- Exhibit C-7 - Schedule of Assumed Agreements~~;~~[6]

- Exhibit C-8 - Schedule of Retained Causes of Action~~; and~~

- Exhibit C-9 - Liquidation Analysis~~.~~

**2. Plan Supplement for Alternate Inc. Debtors Plan:**[7]

  - ~~Exhibit D-1 - Inc. Exit Financing Agreement;~~

---

**and the NewCo LLC Operating Agreement), form or definitive** documentation with respect to **such** items will be submitted **prior to the hearing to approve the Disclosure Statement, and the Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Credit Agreement will be filed** prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

[5] ~~Exhibit C-1, Exhibit C-2, Exhibit C-3, Exhibit C-4, and Exhibit C-6 contain executed commitment letters, term sheets, and/or form agreements with respect to the Exit Financing, New Equity Contribution, Reorganized LightSquared Inc. Loan, Rights Offering, and New LightSquared Entities Corporate Governance Documents, respectively.  Definitive documentation with respect to the foregoing items will be submitted prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.~~

[6] ~~On December 24, 2013, LightSquared filed the Schedule of Assumed Agreements for the Plan. LightSquared hereby attaches an amended Schedule of Assumed Agreements for the Plan.~~

[7] ~~Exhibit D-1, Exhibit D-2, Exhibit D-3, Exhibit D-4, and Exhibit D-6 contain executed commitment letters, term sheets, and/or form agreements with respect to the Inc. Exit Financing, One Dot Six Exit Financing, New Equity Contribution Agreement, Rights Offering, and Reorganized Debtors Corporate Governance Documents, respectively.  Definitive documentation with respect to the foregoing items will be submitted prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.~~

- Exhibit D-2    One Dot Six Exit Financing Agreement;

- Exhibit D-3    New Equity Contribution Agreement;

- Exhibit D-4    Rights Offering Documents;

- Exhibit D-5    Litigation Trust Agreement;

- Exhibit D-6    Reorganized Debtors Corporate Governance Documents;

- Exhibit D-7    Schedule of Assumed Agreements;[8]

- Exhibit D-8    Schedule of Retained Causes of Action; and

- Exhibit D-9    Liquidation Analysis.

## E.    Confirmation Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, **pursuant to the Resolicitation Order,** the Bankruptcy Court approved the following adjustments to the relevant dates and deadlines with respect to the confirmation process:

- **Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).**

- Plan Objection Deadline and Financial Wherewithal Objection Deadline: January 15**: March [10]**, 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: January 17**March [7]**, 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit confirmation briefs in support of chapter 11 plan(s)**the Plan** and in response to Plan Objections and Financial Wherewithal Objections: January 19**: March [13]**, 2014 at 5:00**4:00** p.m. (prevailing Eastern time).

- Confirmation Hearing: January 21**March [17]**, 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned

---

[8]    On December 24, 2013, LightSquared filed the Schedule of Assumed Agreements for the Alternate Inc. Debtors Plan.  LightSquared hereby attaches an amended Schedule of Assumed Agreements for the Alternate Inc. Debtors Plan.

Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## F.    Risk Factors

Prior to deciding whether and how to vote on the ~~Plan or the Alternate Inc. Debtors~~ Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the ~~Plan, the Alternate Inc. Debtors~~ Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement, including the risk factors described in ~~Article VI~~**Article V**, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

## G.    Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

## H.    Disclaimer

In formulating the ~~Plan and the Alternate Inc. Debtors~~ Plan, LightSquared has relied on financial data derived from its books and records.  LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge.  LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan ~~or the Alternate Inc. Debtors Plan~~ is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan ~~or the Alternate Inc. Debtors Plan~~.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests.  However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a ~~claim~~**Claim** and ~~interest~~**Interest** is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the

singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan ~~or Alternate Inc. Debtors Plan, as applicable~~, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein.  The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A.  The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the ~~Reorganized Debtors~~New LightSquared Entities, all parties receiving property under the Plan, and other parties in**

interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

### ARTICLE III
### SUMMARY OF ALTERNATE INC. DEBTORS PLAN

The terms of the Alternate Inc. Debtors Plan are incorporated by reference herein.  The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Alternate Inc. Debtors Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Alternate Inc. Debtors Plan (as well as the exhibits thereto and definitions therein), which is attached to the Plan as Exhibit A.  The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Alternate Inc. Debtors Plan or documents referred to therein, and reference is made to the Alternate Inc. Debtors Plan and to such documents for the full and complete statement of such terms and provisions of the Alternate Inc. Debtors Plan or documents referred to therein.

**The Alternate Inc. Debtors Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, the Inc. Debtors under the Alternate Inc. Debtors Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, the Inc. Debtors, the Inc. Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Alternate Inc. Debtors Plan, and other parties in interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Alternate Inc. Debtors Plan or any other operative document, the terms of the Alternate Inc. Debtors Plan and/or such other operative document shall control.**

### ARTICLE IV
### VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

A.    **Valuation of ~~Reorganized Debtors~~New LightSquared Entities' Assets**

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets.  Based upon~~,~~ and subject to~~,~~ the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view~~,~~ as of ~~December 24, 2013~~**February 11, 2014**, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of ~~September 30~~**October 31**, 2014, would be in a range between $~~6.7~~**6.2** billion and $~~10.0~~**9.1** billion with a midpoint of $~~8.4~~**7.7** billion.  Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims. Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (~~December 24, 2013~~**i.e., February 11, 2014**).  It should be understood that, although subsequent

developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

**LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015.  Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.**  Moelis' analysis is **also** based, at LightSquared's direction, on a number of **other** assumptions, including ~~, among other assumptions,~~ that (1) LightSquared will be reorganized in accordance with the Plan**,** which will be effective on or prior to ~~September 30~~**October 31**, 2014 ~~and all precedent conditions will be met, including FCC approval of LightSquared's pending license modification application as filed, resulting in 30 MHz of spectrum usable for terrestrial mobile broadband services in accordance therewith, (2) LightSquared will receive FCC clearance to use an additional 10 MHz of spectrum for terrestrial mobile broadband services at a future date (valuation analysis assumes seven years from the assumed Effective Date) resulting in a total of 40 MHz of spectrum authorized for terrestrial mobile broadband services, (3) LightSquared will opt to sell the SkyTerra 2 satellite, which is currently held in storage, prior to the Effective Date, (4~~**, (2**) the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and ~~this Debtors' Specific~~**the** Disclosure Statement, and (~~5~~**3**) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections **(as defined below)**.  In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below.  The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein.  The actual value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things: (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including ~~their~~**its** spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including ~~concerns about GPS receiver incompatibility~~**alleged GPS interference issues**)**,** and LightSquared's pending license modification application)**,** and general prospects of the New LightSquared Entities, including the Projections, furnished to ~~us~~**Moelis** by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan~~, dated December 24, 2013~~ **as of February 11, 2014**; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of ~~LightSquared~~**the Debtors**, relied on such information being complete and accurate in all material respects. Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim ~~or Equity Interest~~ as to how such ~~Holder~~**person** should vote or otherwise act with respect to the Plan. Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

**B.    Valuation Methodologies**

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network. Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions. Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS. THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND CIRCUMSTANCES, AND SUCH**

ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

1.    **Spectrum**

**LightSquared directed** Moelis ~~' spectrum valuation~~ **(based on opinions of LightSquared and its FCC experts) to conduct its** analysis ~~assumes~~**, and Moelis has conducted its analysis, assuming LightSquared receives** FCC approval of ~~LightSquared's~~**its** pending license modification application ~~as filed,~~ resulting in ~~, initially,~~ 30 MHz of spectrum **fully** usable for terrestrial mobile broadband services ~~and~~**effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of** an additional 10 MHz **of fully** usable ~~for such purposes~~**terrestrial spectrum** in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP").  The term MHzPOP is defined as the amount of spectrum bandwidth, or ~~potential network~~ capacity, measured in MHz multiplied by the population of the area ~~over which use of~~ the spectrum ~~is authorized~~**covers**.  Moelis' analysis is based on a ~~U.S.~~**United States** population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion **United States** MHzPOPs (which takes into account potential ~~exclusion~~**coordination** zones for certain ~~portions of LightSquared's~~**of its** spectrum **where operations may be constrained**) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation.  Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors~~,~~ including (~~a~~**1**) channel size, (~~b~~**2**) spectrum depth, (~~c~~**3**) frequency range/propagation quality, (~~d~~**4**) geographic coverage, (~~e~~**5**) equipment ecosystem, and (~~f~~**6**) regulatory characteristics.  **In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application** resulting in 30 MHz of spectrum **fully** usable for terrestrial mobile broadband services **effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for** an additional 10 MHz of **fully usable terrestrial spectrum in approximately** seven years **covering the United States.**

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's ~~U.S.~~**United States** or Canadian spectrum.  The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed.  Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's ~~U.S.~~**United States** spectrum **(as of the assumed FCC approval effective dates and then** discounted to present value ~~where appropriate)~~**and as of the assumed Effective Date.  The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum**

**was discounted back seven (7) years.  Moelis applied** a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum~~, resulting~~**.  Moelis' analysis resulted** in a total gross ~~U.S.~~**United States** spectrum valuation range of $6.3**5.6** - $9.4**8.4** billion and a total gross spectrum valuation range of $6.5**5.8** - $9.7**8.7** billion **as of the assumed Effective Date**.

### 2.    Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network.  LightSquared's satellite network comprises two **(2)** satellites: ~~Skyterra~~ **SkyTerra-**1 is in orbit (accepted on February 11, 2011)~~,~~ and SkyTerra-2 is fully built and remains in storage.  Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value. Moelis considered a number of factors in determining its range of discounts~~, including~~ ~~(a)~~**:** potential buyer universe, ~~(b)~~ geographic patterning ~~and~~**,** cost to relocate, ~~(c)~~ inability to offer services at other frequency bands, ~~(d)~~ launch costs and associated risks, and ~~(e)~~ remaining life span.  ~~Moelis assumed that LightSquared will opt to sell the SkyTerra 2 satellite prior to the Effective Date, and therefore, is not included in the valuation of the satellite network. However,~~ Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation.  Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $250**425** million for ~~SkyTerra 1~~**the satellite network**.

## C.    Valuation Considerations

Moelis relied upon spectrum transaction precedents ~~and~~**,** government auctions**,** and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively.  Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies.  Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis.  Moelis did not view a DCF ~~Analysis~~**analysis** as a relevant valuation methodology for LightSquared at this time~~.~/ because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation.  Depending on the actual financial results of ~~LightSquared~~**the Debtors**, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of ~~September 30~~**October 31**, 2014.  In addition, the market prices, to the extent there is a market, of ~~the Reorganized~~**New** LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

### D.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  In connection with developing the Plan and the Alternate Inc. Debtors Plan, and for the purposes of determining whether the Plan and the Alternate Inc. Debtors Plan each satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections attached hereto as Exhibit B (the "Projections"), analyzed the New LightSquared Entities' and Reorganized Debtors', as applicable, ability to meet their obligations under the Plan and the Alternate Inc. Debtors Plan, as applicable, and to maintain sufficient liquidity and capital resources to conduct their businesses.  The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan or the Alternate Inc. Debtors Plan.

LightSquared believes that each of the Plan and the Alternate Inc. Debtors**the** Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities or the Reorganized Debtors, as applicable.  In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities and the Reorganized Debtors, as applicable, will be financially viable.  Indeed, LightSquared believes that the New LightSquared Entities and the Reorganized Debtors, as applicable, will have sufficient liquidity, assuming the availability of the Exit Financing**Facilities and the Reorganized LightSquared Inc. Loan**, to fund obligations as they arise, thereby maintaining value.  Accordingly, LightSquared believes that each of the Plan and the Alternate Inc. Debtors**the** Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities and the Reorganized Debtors, as applicable.  Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan or the Alternate Inc. Debtors Plan, as applicable, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts.  Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies.  The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and

projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ~~or Reorganized Debtors', as applicable,~~ ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows. Accordingly, neither LightSquared nor the New LightSquared Entities ~~or the Reorganized Debtors, as applicable,~~ intend to, and each disclaims any obligation to: (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) ~~Holders of Exit Financing Claims,~~ holders of claims under the Exit Facilities, the New LightSquared Entities Shares, ~~or~~ the Reorganized ~~Debtors Equity Interests~~ LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.**

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan ~~and the Alternate Inc. Debtors Plan, as applicable~~. In addition, the Projections have been presented in lieu of pro forma historical financial information. Reference should be made to ~~ARTICLE VI~~**Article V** hereof, entitled "**Plan-Related Risk Factors ~~And Alternatives~~ To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan ~~or the Alternate Inc. Debtors Plan~~.

The Projections assume that the ~~Plan or the Alternate Inc. Debtors~~ Plan will be consummated in accordance with ~~their~~**its** terms and that all transactions contemplated by the ~~Plan or the Alternate Inc. Debtors~~ Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan ~~or the Alternate Inc. Debtors~~

~~Plan~~ may have a significant negative impact on the operations and financial performance of the New LightSquared Entities ~~and the Reorganized Debtors, as applicable~~.

**ARTICLE IV**~~ARTICLE V~~
**CERTAIN PLAN ~~REQUIREMENTS~~MATTERS**

As mentioned, a description of the procedures and requirements to achieve Confirmation of the ~~Plan or the Alternate Inc. Debtors~~ Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  LightSquared believes that:  (i~~a~~) the Plan ~~and the Alternate Inc. Debtors Plan satisfy~~**satisfies** or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii~~b~~) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii~~c~~) the Plan ~~and the Alternate Inc. Debtors Plan have~~**has** been proposed in good faith.  This section discusses certain specific requirements for confirmation of the Plan ~~and the Alternate Inc. Debtors Plan, as applicable~~, including that ~~each of the Plan and the Alternate Inc. Debtors~~**the** Plan is (i~~y~~) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (ii~~z~~) feasible.  **In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.**

A.    **Best Interests of Creditors Test**

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under ~~each of~~ the Plan ~~and the Alternate Inc. Debtors Plan are~~**is** attached hereto as Exhibit C-10 ~~and Exhibit D-11, respectively~~.

Under the Plan, Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims, Prepetition LP Facility **Non-SPSO Claims, Prepetition LP Facility SPSO** Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.  ~~Under the Alternate Inc. Debtors Plan, Prepetition Inc. Facility Subordinated Claims, General Unsecured Claims, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Alternate Inc. Debtors Plan.~~  [8]   Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity

---

[8]   **Notwithstanding the foregoing, LightSquared is not resoliciting votes from the** Holders of Inc. General Unsecured Claims **or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.**

Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan ~~or the Alternate Inc. Debtors Plan~~ is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan ~~or the Alternate Inc. Debtors Plan, as applicable.  The Plan or the Alternate Inc. Debtors__, The__ Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the ~~Plan or the Alternate Inc. Debtors~~ Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the ~~Plan or the Alternate Inc. Debtors~~ Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared.  A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the conclusion that recoveries under the Plan ~~or the Alternate Inc. Debtors Plan~~ would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan ~~and the Alternate Inc. Debtors Plan~~ ~~meet~~__meets__ the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  Under the Plan ~~and the Alternate Inc. Debtors Plan, the__, all__ Holders of ~~Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and Prepetition Inc. Non-Subordinated Facility Claims__Claims or Equity Interests__ will be paid in full __in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan__.  Moreover, LightSquared believes that the New LightSquared Entities ~~or the Reorganized Debtors~~, as applicable, will have sufficient liquidity to fund obligations as they arise.  Accordingly, LightSquared believes that the Plan ~~and the~~

Alternate Inc. Debtors Plan satisfy**satisfies** the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**C.**     **Confirmation-Related Claims and Remedies Against SPSO**

**LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation.  LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise.  As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code.  Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code.**

**ARTICLE V~~ARTICLE VI~~**
**PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN**

The following provides a summary of various important considerations and risk factors associated with the ~~Plan and/or the Alternate Inc. Debtors~~ Plan; however, it is not exhaustive. **Prior to deciding whether and how to vote on the ~~Plan or the Alternate Inc. Debtors~~ Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the ~~Plan, the Alternate Inc. Debtors~~ Plan, the General Disclosure Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (~~i~~**a**) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (~~ii~~**b**) risks that information in the General Disclosure Statement may be inaccurate, and (~~iii~~**c**) risks related to liquidation under chapter 7 of the Bankruptcy Code.

**A.**     **Certain Bankruptcy Law Considerations**

**1.**     **Parties in Interest May Object To LightSquared's ~~or the Inc. Debtors'~~ Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class.  LightSquared ~~and the Inc. Debtors, as applicable, believe~~**believes** that the classification of Claims and Equity Interests under the ~~Plan and the Alternate Inc. Debtors~~ Plan complies with the requirements set forth in

the Bankruptcy Code, because each Class created by LightSquared ~~or the Inc. Debtors, as applicable,~~ contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. ~~Plan or Alternate Inc. Debtors~~ Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~, LightSquared ~~and the Inc. Debtors, as applicable, intend~~**intends** to seek Confirmation of the Plan ~~or the Alternate Inc. Debtors Plan~~. If ~~either~~ the ~~Plan or Alternate Inc. Debtors~~ Plan does not receive the required support from the Voting Classes, LightSquared ~~and the Inc. Debtors, as applicable,~~ may elect to amend the Plan ~~or Alternate Inc. Debtors Plan, as applicable~~.

### 3. LightSquared ~~or Inc. Debtors~~ May Not Be Able To Obtain Confirmation of Plan ~~or Alternate Inc. Debtors Plan~~

LightSquared ~~and the Inc. Debtors, as applicable,~~ cannot ensure that ~~they~~**it** will receive the requisite acceptances to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~.  Even if LightSquared ~~and the Inc. Debtors receive~~**receives** the requisite acceptances, LightSquared ~~and the Inc. Debtors~~ cannot ensure that the Bankruptcy Court will confirm the ~~Plan or the Alternate Inc. Debtors~~ Plan.  A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~ if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in **Article IV of** the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes **under section 1129(b) of the Bankruptcy Code**; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization~~;~~**" under section 1129(a)(11) of the Bankruptcy Code;** and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code **pursuant to section 1129(a)(7) of the Bankruptcy Code**. While LightSquared ~~and the Inc. Debtors believe~~**believes** that the Plan ~~and the Alternate Inc. Debtors Plan, as applicable, comply~~**complies** with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

LightSquared~~, and the Inc. Debtors, as applicable,~~ subject to the terms and conditions of the Plan ~~and the Alternate Inc. Debtors Plan, reserve~~**, reserves** the right to modify the terms of the ~~Plan and the Alternate Inc. Debtors~~ Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan ~~or the Alternate Inc. Debtors Plan~~.  Such a less favorable treatment could

include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or ~~the Alternate Inc. Debtors Plan or~~ no distribution of property whatsoever under the Plan ~~or the Alternate Inc. Debtors Plan~~.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

~~The~~**As conditions precedent to the Effective Date, the** Plan requires that the Canadian Court **shall** have entered the Confirmation Recognition Order ~~as a condition to the Effective Date~~**and New DIP Recognition Order, and such orders shall have become Final Orders**.  LightSquared believes that such ~~order~~**orders** will be approved and entered by the Canadian Court **and become Final Orders for all purposes under the Plan**; however, there can be no guarantee ~~that such order is entered by the Canadian Court~~**as to such outcome**.

### 5.    LightSquared ~~or Inc. Debtors~~ May Not Be Able To Consummate Plan ~~or Alternate Inc. Debtors Plan~~

Although LightSquared ~~and the Inc. Debtors believe that they~~**believes that it** will be able to consummate the Plan ~~or the Alternate Inc. Debtors Plan, as applicable,~~ and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date.  Consummation of the Plan ~~and the Alternate Inc. Debtors Plan~~ is also subject to certain conditions set forth in the Plan ~~and the Alternate Inc. Debtors Plan themselves.  If the Plan or the Alternate Inc. Debtors~~**itself.  If the** Plan is not consummated, it is unclear what distributions Holders of **Allowed** Claims ~~and~~**or** Equity Interests **(other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date)** ultimately would receive with respect to their Claims and Equity Interests.

### ~~6. Alternate Inc. Debtors Plan May Not Go Effective~~

~~The Alternate Inc. Debtors Plan is, in part, premised upon financing that contemplates a priming lien on the Assets securing the Prepetition Inc. Facility.  There can be no assurance that the Court will approve such financing and the attendant priming lien.  Because the feasibility of the Alternate Inc. Debtors Plan is dependent upon this financing, the Alternate Inc. Debtors Plan may never go effective if the Court does not approve the financing and priming lien.~~

### **6.** ~~7.~~ LightSquared ~~and Inc. Debtors~~ May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan ~~or~~**, including with respect to** the ~~Alternate~~**DIP** Inc. ~~Debtors~~**Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the** Plan, LightSquared ~~and the Inc. Debtors~~ ~~reserve~~**reserves** the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is

subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

### 7. 8. Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the ~~Plan or the Alternate Inc. Debtors~~ Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan ~~or the Alternate Inc. Debtors Plan~~, however, will not ~~affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or the Alternate Inc. Debtors Plan or~~ require ~~re-solicitation~~**resolicitation** of the Impaired Classes.

## B.    Factors Affecting LightSquared

LightSquared is exposed to various factors and risks that include, without limitation, the following.

### 1.    Regulatory Risks

#### a.    LightSquared May Not Receive FCC Consents ~~and Related Relief Necessary~~ To Emerge ~~from~~From Chapter 11 ~~May Not Be Obtained on a~~in Timely ~~Basis~~Fashion

~~The effectiveness of the Plan and the Alternate Inc. Debtors Plan is contingent upon the FCC's issuance of certain consents and grant of certain other relief on or prior to the Effective Date in the case of the Alternate Inc. Debtors Plan or December 31, 2014 in the case of the Plan.  The Exit Financing is contingent upon, and specific regulatory risks are associated with, each such consent and grant, including (but not necessarily limited to) the following:~~

~~(i) FCC Consent to Emergence from Chapter 11.~~   The effectiveness of ~~either the Plan or the Alternate Inc. Debtors~~**the** Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with ~~either the Plan or the Alternate Inc. Debtors~~**the** Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings~~, and the FCC can take nine (9) twelve (12) months or longer to review a proposed transaction, particularly where it~~

~~raises or is intertwined with unresolved substantive issues. There can be no assurance that the FCC will grant all required applications and act upon related filings in a manner conducive to emergence from chapter 11 on or prior to the Effective Date in the case of the Alternate Inc. Debtors Plan or December 31, 2014 in the case of the Plan~~**.**

### **b. LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan**

*~~(ii) LightSquared Access to 20 MHz of Uplink Spectrum in the United States.~~* ~~The~~**Although not a condition to the** effectiveness of the Plan**, the implementation of LightSquared's business plan, post-Effective Date,** is contingent upon LightSquared holding ~~terrestrial-based~~**certain** spectrum rights in ~~20~~**30** MHz of ~~L-band uplink~~ spectrum in the United States~~, comprised of 10 MHz nominally at 1627-1637 MHz and 10 MHz nominally at 1646-1656 MHz.~~ ~~.~~ **As described** in the General Disclosure Statement, LightSquared's License Modification Application seeks~~, among other things, confirmation that LightSquared can proceed to implement a 4G terrestrial wireless network using its existing spectrum rights in those bands to support uplink operations~~ **to modify certain** of LightSquared's FCC licenses **and authorizations so as to secure such access**. LightSquared believes that record evidence demonstrates that ~~such~~**its proposed** operations would serve the public interest. Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief ~~in a timely fashion~~, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to ~~satisfy the conditions precedent to the effectiveness of the Plan~~**implement its business plan, post-Effective Date**.

*~~(iii) LightSquared Access to 10 MHz of Downlink Spectrum in the United States.~~* ~~The effectiveness of the Plan is contingent upon LightSquared holding terrestrial-based spectrum rights in 10 MHz of downlink spectrum for the United States, comprised of 5 MHz at 1670-1675 MHz and 5 MHz at 1675-1680 MHz.~~

~~a) 1670-1675 MHz. As discussed in the General Disclosure Statement, LightSquared (through its subsidiary, One Dot Six Corp.) currently leases spectrum rights in the 1670-1675 MHz band from OP LLC (a subsidiary of Crown Castle). OP LLC recently filed an application with the FCC seeking renewal of the FCC license through which OP LLC holds those spectrum rights. In connection with that application, OP LLC also notified the FCC that those spectrum rights were being used (by One Dot Six Corp.) to provide "substantial service" to the public in a manner it believes are consistent with the FCC's rules and requirements. While LightSquared expects the FCC to accept OP LLC's substantial service showing and renew its license in due course, LightSquared can provide no assurance that the FCC will do so. If the FCC instead were to reject OP LLC's substantial service showing, terminate OP LLC's rights in the 1670-1675 MHz band, and/or impose adverse conditions on the renewal of such license, LightSquared~~

might be unable to use that spectrum to support its operations and satisfy the conditions precedent to the effectiveness of the Plan.

b) 1675-1680 MHz.  As discussed in the General Disclosure Statement, LightSquared has filed: (i) the License Modification Application, which requests, among other things, that the FCC modify various of LightSquared's FCC licenses and authorizations to permit LightSquared to operate in the 1675-1680 MHz band currently used by the National Oceanic and Atmospheric Administration ("NOAA") and (ii) the Spectrum Allocation Petition for Rulemaking, which asks the FCC to amend the U.S. Table of Frequency Allocations to modify the primary non-federal allocation in the 1675-1680 MHz band to allow commercial terrestrial mobile service. The FCC may not act on the License Modification Application until it conducts a rulemaking proceeding as proposed in the Spectrum Allocation Petition for Rulemaking. In connection with such a rulemaking, and prior to grant of the License Modification Application, the FCC may address related matters including: (i) the service rules that will govern the use of the 1675-1680 MHz band (e.g., the terms for sharing with NOAA earth station facilities, other technical parameters for the operation of mobile wireless base stations, license term, etc.); (ii) the manner in which the Commission intends to award license rights in the 1675-1680 MHz band (e.g., award directly to LightSquared, hold an auction, etc.); and (iii) obligations to relocate existing NOAA radiosondes operations to another frequency band.  There is no set timetable for the completion of rulemaking proceedings.  As such, LightSquared can provide no assurance that these matters will be resolved in a timely fashion.  For similar reasons, LightSquared can provide no assurance that the Downlink Spectrum Petition for Rulemaking, discussed in the General Disclosure Statement, will be resolved in less than seven (7) years so as to facilitate LightSquared's ability to use an additional 10 MHz of downlink spectrum in the 1526-1536 MHz band for terrestrial mobile broadband services, a result assumed by Moelis in its valuation of LightSquared (see Article IV hereof) but not required as a condition precedent to the effectiveness of the Plan.

c) Furthermore, LightSquared can provide no assurance that the FCC ultimately will grant LightSquared access to the 1675-1680 MHz band at all, or in a manner favorable to LightSquared.  Preliminary assessments suggest that it should be possible for LightSquared to share the 1675-1680 MHz

band with certain NOAA-related operations that are expected to remain in the band if LightSquared limits or foregoes operations in "exclusion zones" surrounding certain earth station facilities, but the scope of relevant "exclusion zones" has not yet been defined.  LightSquared can provide no assurance that any "exclusion zones" — or other terms of sharing — ultimately reflected in any FCC approval(s) will be consistent with LightSquared's business needs or ability to satisfy other conditions to the effectiveness of the Plan.  For example, an expansive definition of relevant "exclusion zones" could preclude LightSquared's access to spectrum rights sufficient to provide signal coverage to 270 million POPs in the 1675-1680 MHz band as required by the "Terrestrial Coverage" condition discussed below.

d) It will be necessary for NOAA to relocate its existing radiosonde operations to alternative spectrum to  facilitate LightSquared's ability to utilize the 1675-1680 MHz band for its own business purposes.  LightSquared has offered to be responsible for the costs incurred by NOAA in connection with such relocation, which LightSquared expects will be feasible as a technical matter.  That commitment must be satisfied in a manner consistent with the requirements of relevant appropriations law.  While LightSquared believes that its relocation plan is consistent with such requirements, LightSquared can provide no assurance that the FCC and other government stakeholders will adopt this view or approve this relocation.  If LightSquared is not allowed to cover NOAA's relocation costs, and NOAA does not otherwise effect such relocation, LightSquared could be prevented from using the 1675-1680 MHz band as it proposes.

e) It also is possible that LightSquared will be granted access to the 1675-1680 MHz band subject to making significant payments to or on behalf of the federal government.  In this respect, LightSquared notes that provisions of the U.S. President's budgetary proposal for FY 2014 that have not been adopted assume that the commercial user of this spectrum would pay approximately $70 million in relocation costs as well as and approximately $230 million in either auction payments or spectrum user fees.

*(iv) Relief from "ATC" Requirements*.  To the extent the spectrum access conditions to the effectiveness of the Plan require LightSquared to have the right to provide terrestrial wireless service on a "stand-alone" basis, this would require that the FCC

relax, waive the application of, or eliminate the "ATC" or "ancillary terrestrial component" rules that currently govern LightSquared's terrestrial operations. As discussed in the General Disclosure Statement, in 2003, the FCC adopted rules permitting LightSquared and other Mobile Satellite Service ("MSS") licensees to incorporate an "ancillary terrestrial component" into their networks, and thereby use MSS spectrum to support terrestrial operations subject to technical and service-related "ATC" requirements. Recently, the FCC eliminated these requirements to permit MSS licensees in the 2 GHz band (i.e., DBSD and TerreStar—both subsidiaries of DISH Network Corporation) to conduct "stand-alone" terrestrial operations in the redesignated "AWS-4" band. Neither the License Modification Application nor Spectrum Allocation Petition for Rulemaking asks the FCC to grant such relief. LightSquared can provide no assurance that such relief, once requested, would be granted. Furthermore, there is no set timetable for the completion of such a proceeding. As such, LightSquared can provide no assurance that this matter will be resolved in a timely fashion.

(v) *Other Conditions.* The effectiveness of the Plan is contingent upon the satisfaction of a number of other conditions, which are discussed below.

a) *Terrestrial Coverage of at Least 270 Million POPs.* The Plan provides that LightSquared's terrestrial-based spectrum rights must allow LightSquared to provide signal coverage to a total U.S. population of at least 270 million. LightSquared anticipates that the spectrum rights conferred by its existing licenses and authorizations, coupled with those that would be made available through grant of the License Modification Application, would be sufficient to satisfy this requirement.

b) *Power Levels Commensurate with Other 4G LTE Networks.* The Plan provides that LightSquared must be allowed to operate at power levels commensurate with existing terrestrial-based 4G LTE wireless communications networks. LightSquared believes that the power levels authorized under its existing licenses, as modified by the License Modification Application, are consistent with this requirement.

c) *Build-Out Conditions Consistent with Those Imposed on DISH Network Corporation.* The Plan provides that the FCC must approve build-out conditions for LightSquared that are no more onerous than those in effect in connection with the "AWS-4" rights held by DISH Network Corporation's 2 GHz MSS licensee subsidiaries (i.e., DBSD and TerreStar) as of

December 2012, which require DISH Network Corporation to provide terrestrial signal coverage and offer terrestrial service to at least 40 percent (40%) of the U.S. population within four (4) years of that date, and to at least 70 percent (70%) of the U.S. population within seven (7) years of that date. As discussed in the General Disclosure Statement, the FCC conditioned its approval of the 2010 acquisition of LightSquared by Harbinger on the FCC meeting a network build-out schedule requiring coverage of at least 100 million people by December 31, 2012, at least 145 million people by December 31, 2013, and at least 260 million people by December 31, 2015. On December 20, 2012, the FCC issued an order tolling these deadlines indefinitely pending the resolution of ongoing proceedings that had precluded LightSquared's ability to implement its network. LightSquared has not yet proposed any new build-out deadlines and the FCC may impose a new set of build-out conditions in connection with a grant of the License Modification Application or in the context of another proceeding.

d) *Restrictions on Future Sale of LightSquared to Certain Buyers.* The Plan provides that any specific FCC restrictions on the sale of LightSquared to future buyers must not preclude a future sale to AT&T, Verizon, T Mobile, or Sprint. In the 2010 FCC Change of Control Order, the FCC conditioned its approval of the acquisition of LightSquared by Harbinger on LightSquared obtaining FCC consent (i) before making its spectrum available to either of the two largest terrestrial providers of commercial mobile wireless and broadband services (which currently includes AT&T and Verizon), or (ii) before traffic to these largest terrestrial providers accounts for more than twenty-five percent (25%) of the total traffic on the LightSquared terrestrial network in any Economic Area. The receipt of prior FCC consent is a requirement to the sale of any FCC licensed entity, and nothing in the 2010 FCC Change of Control Order restricts Harbinger's ability to sell LightSquared to any wireless provider. As such, LightSquared believes that this condition precedent to the effectiveness of the Plan will be satisfied in the absence of the FCC imposing a further condition on LightSquared or its future owners.

e) Except as discussed above, LightSquared believes that each of these FCC-related conditions to the effectiveness of the Plan already has been satisfied (e.g., the "Power Levels" condition) and/or LightSquared has no reason to believe that the FCC

~~will impose requirements that would preclude the satisfaction of such condition (e.g., the "Future Sale" and "Build-Out" conditions). That said, legislative and regulatory processes are unpredictable. As such, LightSquared can provide no assurance with respect to the absence of further legislative or regulatory conditions that would preclude the satisfaction of the conditions precedent to the effectiveness of the Plan. Nor can LightSquared provide any assurance that the prior FCC consent(s) under the Communications Act and the FCC's implementing rules required to effectuate the Plan will be obtained.~~

### **c.** ~~b.~~ FCC May Protect Spectrum Operations in ~~a~~ Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users. LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users. It is possible that the FCC could impose restrictions on LightSquared's operations designed to ~~protectspectrum~~**protect spectrum** operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection ~~vis-a-vis~~**vis-à-vis** LightSquared. These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality. Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within ~~the~~ LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

### ~~c. LightSquared Cannot Predict Impact of Possible Sale of SkyTerra-2~~

~~LightSquared is contemplating the possible sale of the SkyTerra-2 spacecraft. LightSquared's terrestrial spectrum rights currently derive from, and depend on, the maintenance of its satellite spectrum rights. Those satellite spectrum rights, in turn, are based and depend, on the continued effectiveness of (i) separate spacecraft licenses that LightSquared holds from the FCC and from Industry Canada, and (ii) various negotiated spectrum coordination agreements that provide LightSquared with spectrum priority rights over spacecraft licensed by other nations. If LightSquared does not continue operating its spacecraft or does not promptly replace its spacecraft after they cease to operate, its spectrum rights could be compromised or lost. The SkyTerra-1 spacecraft, licensed by the United States, was launched in 2011. The MSAT-1 spacecraft, licensed by Canada, was slated to be replaced by SkyTerra-2, a Canadian-licensed spacecraft that has been fully constructed but is currently in storage. If MSAT-1 should cease to operate, LightSquared would have up to three years to replace it under ITU regulations and still maintain the ITU spectrum rights that MSAT-1 currently enjoys. Alternatively, LightSquared could launch SkyTerra-2 in accordance with the February 2016 date for implementing that network under ITU rules, and the~~

September 30, 2014 milestone for placing the SkyTerra 2 satellite in its assigned orbital position established by Industry Canada.

If SkyTerra-2 is sold, LightSquared would no longer have a replacement satellite ready to launch in the event of a failure, or the end of the useful life, of MSAT-1, and LightSquared might not be able to launch another spacecraft as a substitute for SkyTerra-2 in accordance with the ITU and Industry Canada deadlines for that satellite.  Should MSAT-1 cease to operate, there can be no assurances that LightSquared could implement a replacement satellite within three (3) years under ITU rules, or that Industry Canada would provide LightSquared with additional time to replace MSAT-1 or to deploy a substitute for SkyTerra-2.  Moreover, LightSquared cannot predict the impact of such possible adverse developments on its satellite spectrum rights, its spectrum coordination agreements, or the associated negotiations regarding other satellite networks, or its derivative terrestrial spectrum rights.

> **d.    Transactions Contemplated by Plan May Require Various Other Regulatory Approvals**

Various **other** regulatory approvals, including the expiry of certain statutory waiting periods, may be required ~~in order~~ to give effect to the transactions contemplated in the Plan, including approvals and/or ~~premerger~~**pre-merger** filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada).  There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all.  In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

> **2.    Business-Related Risks**

> > **a.    LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business**

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit ~~Financing and~~**Facilities,** the Reorganized LightSquared Inc. Loan**, and the SPSO Note**.  LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness.  LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations.  LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although **certain of** the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur

substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged.  If LightSquared incurs additional indebtedness, the related risks could intensify.

      **b.**      **Exit ~~Financing~~ Facilities and Reorganized LightSquared Inc. Loan Contemplated Under ~~Plan and Alternate Inc. Debtors~~ Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared ~~or Inc. Debtors~~ May Incur Additional Future Debt**

      The Exit ~~Financing~~ Facilities and the Reorganized LightSquared Inc. Loan contemplated by ~~each of~~ the ~~Plan and Alternate Inc. Debtors~~ Plan may contain covenants that, among other things, restrict LightSquared's ~~or the Inc. Debtors'~~ ability to take specific actions, including restrictions that may limit LightSquared's ~~or the Inc. Debtors'~~ ability to engage in actions or transactions that may be in LightSquared's ~~or the Inc. Debtors'~~ long-term interest. In addition, as described above, LightSquared ~~or the Inc. Debtors, as applicable,~~ may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit ~~Financing~~ Facilities and the Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ~~or the Inc. Debtors', as applicable,~~ ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates.  These operating restrictions may adversely affect LightSquared's ~~or the Inc. Debtors, as applicable,~~ ability to finance future operations or capital needs, engage in transactions with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities.  LightSquared's ~~or the Inc. Debtors'~~ ability to comply with any financial covenants may be affected by events beyond LightSquared's ~~or the Inc. Debtors'~~ control, and there is no assurance that LightSquared ~~or the Inc. Debtors, as applicable,~~ will satisfy those requirements.

      A breach of any of the restrictive covenants in the agreements governing LightSquared's ~~or the Inc. Debtors'~~ indebtedness could result in a default, which could allow LightSquared's ~~or the Inc. Debtors'~~ lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared ~~or the Inc. Debtors, as applicable,~~ to apply all available cash to repay these borrowings.  If LightSquared ~~or the Inc. Debtors, as applicable, are~~ is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

      **c.**      **LightSquared ~~or Inc. Debtors~~ May Not Be Able To Achieve Its Projected Financial Results**

      The Projections set forth on <u>Exhibit B</u> attached hereto represent LightSquared's management's best estimate of LightSquared's ~~and the Inc. Debtors'~~ future financial performance based on currently known facts and assumptions about LightSquared's ~~and the Inc. Debtors, as applicable,~~ future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared ~~or the Inc. Debtors operate~~ operates in particular.  LightSquared's ~~and the Inc. Debtors, as applicable,~~

actual financial results may differ significantly from the Projections. If LightSquared ~~or the Inc. debtors, as applicable, do~~**does** not achieve ~~their~~**its** projected financial results, the value of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

### ~~d. LightSquared May Not Be Able To Consummate Sale of SkyTerra-2, Which Could Negatively Impact Its Financial Position~~

~~LightSquared is contemplating the sale of SkyTerra-2. Such sale is reflected in the Projections, and the proceeds of the sale are expected to provide needed liquidity. Although LightSquared is hopeful that it will be able to consummate the sale as expected, there can be no assurance that it will be able to find a willing buyer, that the purchase price will fall within expected values, that the sale will not adversely impact LightSquared's spectrum rights or value of those rights, or that the transaction will close in a timely fashion so as to satisfy LightSquared's liquidity requirements.~~

### **d.** ~~e.~~ **LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings**

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America. There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all. If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

**e.    f. LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched over during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business.  Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

**f.    g. LightSquared Faces Significant Competition from Companies that Are Larger or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed

competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.  Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared.  Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services.  In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

### g. ~~h.~~ Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network.  Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets.  However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices.  If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

### h. ~~i.~~ LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel.  The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

**i.**    ~~j.~~ Adverse Conditions in ~~the~~ U.S. and Global Economies Could Impact LightSquared's Results of Operations

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services.  In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies.  Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic decisions, including the rollout of new retail service offerings.  Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

3.    **Risks Related to New LightSquared Entities Shares** ~~and Reorganized Debtors Equity Interests~~

a.    **There Is Currently No Trading Market for New LightSquared Entities Shares** ~~or Reorganized Debtors Equity Interests~~**, Active Liquid Trading Market for New LightSquared Entities Shares** ~~or Reorganized Debtors Equity Interests~~ **May Not Develop, and New LightSquared Entities Shares** ~~and Reorganized Debtors Equity Interests~~ **Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements** ~~or Reorganized Debtors Shareholder Agreements~~**, as Applicable**

There is currently no existing trading market for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~.  LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ on any securities exchange or for quotation of such securities on any automated dealer quotation system.  An active public trading market may not develop for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ and, even if one develops, such public trading market may not be maintained.  If an active public trading market for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all.  If any New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's ~~or the Inc. Debtors', as applicable,~~ businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~, regardless of LightSquared's ~~or the Inc. Debtors'~~ businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares ~~and the Reorganized Debtors Equity Interests~~ have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~. The New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~ may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements ~~or Reorganized Debtors Shareholders Agreements~~, as applicable. This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~.

## C.    Litigation Risks

To the extent that distributions available to Holders of Allowed Claims ~~and~~**or** Equity Interests under the ~~Plan or the Alternate Inc. Debtors~~ Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the ~~Inc. Debtors, as applicable, or the~~ New LightSquared Entities ~~or the Reorganized Debtors~~, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the ~~Plan or the Alternate Inc. Debtors~~ Plan. Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

## D.    Certain Tax Matters

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the ~~Reorganized Debtors, see Article VII~~ **New LightSquared Entities, see Article VI** hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the ~~Plan or the Alternate Inc. Debtors~~ Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI~~ARTICLE VII~~
### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan. Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan ~~or the Alternate Inc. Debtors Plan~~ (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN

EQUITY INTEREST.  ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Certain United States Federal Income Tax Consequences of Plan to LightSquared

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return.  Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013.  Some small portion of these NOLs may be subject to existing limitations.

### 1.    Treatment of Transfers to NewCo

Pursuant to the Plan, (a) **Reorganized** LightSquared Inc. will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** One Dot Six ~~Corp.~~**LLC**, (b) **Reorganized** LightSquared Investors Holdings Inc. will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** SkyTerra Investors LLC, **Reorganized** LightSquared GP ~~Inc.~~**LLC,** and **Reorganized** LightSquared LP, ~~and~~ (c) **Reorganized** TMI Communications Delaware, Limited Partnership will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** LightSquared GP ~~Inc.~~**LLC** and **Reorganized** LightSquared LP**, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the** Retained Causes of Action **as contemplated by Article IV.V of the Plan**.  In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain **debt obligations from, and** Equity Interests in**,** NewCo **and Cash**.  The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and other transactions contemplated by the Plan are not certain.  The transactions, taken together, may give rise to net taxable income or gain for LightSquared.  To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow **in part or** any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain.  Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

### 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is

under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash**, debt obligations,** and Equity Interests of NewCo. Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date. Based on the terms of the Plan, LightSquared does not anticipate that there will be a significant amount of COD Income. To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation ***immediately before*** the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., ~~3.50~~**3.56**% for ownership changes occurring in ~~December 2013~~**February 2014**). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately ***after*** (rather than before) the ownership change after

giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.      Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the

60

extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it.  If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income.  Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of **the amount of** any such gain.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the

status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.  Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

      **1.**      **Consequences to Holders of Claims**

           **a.**      **Holders of Prepetition Inc. Facility Subordinated ~~Facility~~ Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. ~~Subordinated~~ Facility **Subordinated** Claim**, on the Effective Date or as soon thereafter as reasonably practicable**, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim will receive NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and NewCo Class B Common Interests.  A U.S. Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest**,** which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

           **b.**      **Holders of Prepetition LP Facility Non-SPSO Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, **on the New DIP Closing Date,** except to the extent that a Holder agrees to any other treatment, each Holder ~~of an~~ **will receive Cash for its** Allowed Prepetition LP Facility Non-SPSO Claim ~~will~~ **unless the Holder elects to** receive ~~Cash and, if the Holders as a Class vote to approve the Plan, Holders of~~ **New DIP Tranche B Claims in exchange for all or a portion of its** Allowed Prepetition LP Facility Non-SPSO ~~Claims will also receive NewCo Additional Interests and NewCo EARs~~ **Claim instead of Cash (subject to the New DIP Tranche B Cap)**.  A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received ~~in the exchange~~ and, if relevant, the ~~fair market value of the NewCo Additional Interests and NewCo EARs~~ **"issue price" (as defined below) of the New DIP Tranche B Claims received** (other than to the extent amounts are allocable to accrued but unpaid interest**,** which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  ~~However, while uncertain, a portion of the gain recognized on the exchange of an Allowed Prepetition LP Facility Non-SPSO Claim for~~

NewCo EARs may be deferred pursuant to the installment sale rules under the Tax Code. Holders of Allowed Prepetition LP Facility Non-SPSO Claims should consult their own tax advisors regarding the potential application of the installment sale rules and the option to elect out of such treatment if it applies.

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash. Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so. U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding). In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption. In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

c.        Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note. A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d.        ~~c.~~ Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e.        ~~d.~~ Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash.  A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f.        Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange.  If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.    e. Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.    f. Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were

considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 2. Consequences to Holders of Equity Interests

#### a. Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive ~~NewCo Series A Preferred PIK Interests, NewCo Class A Common Interests,~~**Cash** and NewCo Series ~~B-1~~**A-2** Preferred PIK Interests.  Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the **amount of Cash and the** fair market value of NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests.  A Holder's tax basis in any NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for **Cash and** interest in NewCo in a **wholly** taxable transaction, it may be possible that a Holder will be treated as**, in part,** contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests in a non-taxable transaction.  In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for ~~Plan consideration~~**NewCo Series A-2 Preferred PIK Interests**, its basis in the NewCo Series ~~A~~**A-2** Preferred PIK Interests~~, NewCo Class A Common Interests, and NewCo Series B-1 Preferred PIK Interests received~~ will equal its basis in its Existing LP Preferred Units Equity Interests **exchanged therefor**, and its holding period for its NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests would include its holding period in its interests exchanged therefor.

#### b. Consequences to Holders of Existing Inc. **Series A** Preferred Stock Equity Interests **and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. **Series A** Preferred Stock Equity Interest **and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the**

**"Specified** Existing Inc. Preferred Stock Equity Interests**")**, except to the extent that a Holder agrees to any other treatment, each **Holder of an** Allowed **Specified** Existing Inc. Preferred Stock Equity Interest will receive (i) ~~its Pro Rata share of 51% of the Reorganized LightSquared Inc. Common Shares,~~**NewCo Series A-2 Preferred PIK Interests** and (ii) ~~the right to participate in the Rights Offering for its Pro Rata share of the Rights Offering Shares~~**NewCo Class C Common Interests**.

~~Assuming that the right to participate in the Rights Offering does not have any independent value, a Holder should be treated as exchanging stock in LightSquared Inc. for stock of the same entity in a transaction that qualifies as a recapitalization under the Tax Code. In that case, subject to the discussion below regarding accrued yield, the Holder would not recognize gain or loss as a result of the exchange, and the Holder's basis in the Reorganized LightSquared Inc. Common Shares received in exchange for its Allowed Existing Inc. Preferred Stock Equity Interest will equal its basis in its Allowed Existing Inc. Preferred Stock Equity Interests. A Holder's holding period for its Reorganized LightSquared Inc. Common Shares would include its holding period in the Allowed Existing Inc. Preferred Stock Equity Interest exchanged therefor.~~

**Subject to the discussion below regarding accrued yield, a** U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) **fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received** and (ii) the Holder's adjusted tax basis in **its Specified** Existing Inc. Preferred Stock Equity Interests**, A** Holder's **tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their** fair market value **as of** the Effective Date, and the Holder's holding period for the **NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received** should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the **Specified** Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

**SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the** U.S. federal **consequences of the Plan to it in lights of its particular circumstances.**

> c.    **Consequences to Holders of Existing Inc. Common Stock Equity Interests**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the

extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests.  A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests.  A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

### 3.    Consequences of Holding NewCo Interests and Debt Obligations

#### a.    NewCo Class B Common Interests and NewCo Class C Common Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation.  Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax.  Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules.  Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo.  In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

#### b.    NewCo Series ~~A~~A-2 Preferred PIK Interests, ~~NewCo Series B-1 Preferred PIK Interests, and NewCo Series B-2 Preferred Non-PIK Interests (together, the "NewCo Preferred Interests")~~

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation.  Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax.  Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules.  Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo.  In that case, a Holder would be required to fund any such taxes from other sources.  In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving guaranteed payments under section 707(c) of the Tax Code.  A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

68

A Holder of NewCo **Series A-2** Preferred **PIK** Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

**4. Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**C. Certain Consequences of the Alternate Inc. Debtors Plan[9]**

If the Plan is not consummated, the Inc. Debtors may consummate the Alternate Inc. Debtors Plan. The following is a discussion of certain United States federal income tax consequences of the Alternate Inc. Debtors Plan to the Inc. Debtors and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Alternate Inc. Debtors Plan.

---

[9] Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the Alternate Inc. Debtors Plan.

ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE ALTERNATE INC. DEBTORS PLAN.

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Inc. Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Alternate Inc. Debtors Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Alternate Inc. Debtors Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons, as such term is defined in the Tax Code (except to the limited extent specifically noted herein), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to Inc. Debtors and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE ALTERNATE INC. DEBTORS PLAN.

### 1. Treatment of Transactions under the Alternate Inc. Debtors Plan

The transactions contemplated by the Alternate Inc. Debtors Plan, and the implementation of any transactions with respect to the LP Debtors, may give rise to net taxable income or gain for the Inc. Debtors. Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to

offset net tax gains, if any, recognized as a result of the consummation of the Alternate Inc. Debtors Plan.

### 2. Cancellation of Debt and Reduction of Tax Attributes

Under the Alternate Inc. Debtors Plan, most of the Claims will be satisfied for cash and/or certain equity interests of One Dot Six Corp. Whether the Inc. Debtors will recognize COD Income will depend, in part, on the amount that the Inc. Debtors are considered to owe on the Claims against them for United States federal income tax purposes and the value of the Equity Interests and/or other rights transferred in satisfaction of the Claims, in each case, as of the Effective Date. Based on the terms of the Alternate Inc. Debtors Plan, the Inc. Debtors do not anticipate that there will be a significant amount of COD Income. To the extent the Inc. Debtors recognize COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc.

### 3. Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of the Inc. Debtors that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Alternate Inc. Debtors Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Alternate Inc. Debtors Plan are expected to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for purposes of section 382 of the Tax Code.

#### a. General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.50% for ownership changes occurring in December 2013). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the

discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built in gain or loss. If the loss corporation has a net unrealized built-in-gain at the time of an ownership change, any built-in-gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of the existing NOLs subject to the limitations described above.

**b. Section 382(l)(5) Bankruptcy Exception**

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be

subject to a section 382 limitation of zero, which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to an ownership change that occurs as a result of the consummation of the Alternate Inc. Debtors Plan. Furthermore, if it did apply, it is not certain whether Reorganized LightSquared Inc. will elect not to apply it.

**4. Alternative Minimum Tax**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, only 90% of a corporation's AMTI generally may be offset by available NOLs. The effect of this rule could cause the Inc. Debtors to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Alternate Inc. Debtors Plan, even if there are NOLs in excess of any such gain.

**D. Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Alternate Inc. Debtors Plan**

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor. Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss

will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

**1. Consequences to Holders of Claims**

### a. Holders of Subordinated Prepetition Term Loan Claims

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Subordinated Facility Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Subordinated Facility Claim will receive Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares.   A U.S. Holder of an Allowed Subordinated Prepetition Term Loan Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares received in the exchange (other than amounts allocable to accrued but unpaid interest which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares should equal the fair market value of Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares on the Effective Date, and the Holder's holding period for the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares should begin on the day following the Effective Date.

### b. Holders of Inc. General Unsecured Claims

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

c.    ~~Accrued but Untaxed Interest~~ **SPSO Note**

**A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID")** for U.S. federal income tax purposes **if its issue price is less than its stated redemption price at maturity by at least a _de minimis_ amount. A debt instrument**'s stated redemption price at maturity **includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually. Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually. Accordingly, the SPSO Note will be treated as issued with OID.**

**A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the Holder in the SPSO Note. A U.S. Holder of the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.**

~~A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims. Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear. Under the Alternate Inc. Debtors Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes. The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Alternate Inc. Debtors Plan. A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full. A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Alternate Inc. Debtors Plan.~~

#### d. Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code. Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 2. Consequences to Holders of Equity Interests

#### a. Consequences to Holders of Existing Inc. Preferred Stock Equity Interests

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing Inc. Preferred Stock Equity Interest will receive its Pro Rata share of the Reorganized LightSquared Common Stock. Except as noted below, a Holder of Allowed Existing Inc. Preferred Stock Equity Interests should be treated as exchanging their preferred stock for Reorganized LightSquared Common Stock in a tax-free recapitalization for U.S. federal income tax purposes. In that case, subject to the discussion below addressing accrued yield, a Holder would not recognize gain or loss on the exchange of its Existing Inc. Preferred Stock Equity Interests for Alternate Inc. Debtors Plan consideration, its basis in the Reorganized LightSquared Common Stock received will equal its basis in its Existing Inc. Preferred Stock Equity Interests, and its holding period for its Reorganized LightSquared Common Stock would include its holding period in its Existing Inc. Preferred Stock Equity Interests exchanged therefor.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated

earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield may be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

### b. Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive interests in the Liquidation Trust (the "Trust" and, the interests therein, the "Trust Interests") and a residual interest in the Litigation Trust. A Holder of Existing Inc. Common Stock Equity Interests should recognize gain or loss in an amount equal to the difference, if any, between (i) the value of the Trust Interests and interests in the Litigation Trust received and (ii) the Holder's adjusted tax basis in the Existing Inc. Common Stock Equity Interests exchanged therefor. A Holder's tax basis in its share of the underlying Assets of the Trust and its interest in the Litigation Trust should equal the fair market value of Trust Interests and Litigation Trust interests received on the Effective Date and the Holder's holding period in its share of such Assets and its interest in the Litigation Trust should begin on the day following the Effective Date. It is not clear how residual interests in the Litigation Trust will be treated for federal income tax purposes. They may be interests in a liquidating trust, in which case the treatment of the Trust below would be applicable for the Litigation Trust and the interests therein. Alternatively, the interests in the Litigation Trust may be treated as equity interests in Reorganized One Dot Six, which will likely be treated as a partnership for United States federal income tax purposes. Holders of interests in the Litigation Trust should contact their own tax advisors regarding the tax consequences of holding such interests, including reporting income, gain, loss, or deduction and receiving any payments with respect thereto.

### 3. Tax Treatment of Trust and Consequences of Holding Trust Interests

### a. Treatment of Trust

Each Holder that is a beneficiary of the Trust Interests agrees to treat the Trust as a grantor trust for United States federal income tax purposes and to be treated as the owner of the Assets of the Trust in accordance with its beneficial interest. This discussion assumes that the Trust and the Holders of Trust Interests are properly characterized in this manner for United States federal income tax purposes. Consequently, transfers to the Trust of Assets are treated as transfers of such Assets to the Holders receiving Trust Interests (in accordance with such Holders' beneficial interests in the Trust), followed by the transfer of such Assets to the Trust in exchange for their Trust Interests.

According to the Plan, as soon as possible after the Effective Date, the Trustee shall make a good faith valuation of the Trust's Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties for all federal income tax purposes.

The Trust is intended to be treated as a liquidating trust, as defined in Treasury Regulations section 301.7701-4(d) and has been structured to conform to the requirements set forth in Revenue Procedure 94-45, 1994-2 C.B. 684, in which the Internal Revenue Service set forth general criteria for obtaining a ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. At this time, it is not clear whether the Trustee will file a request for such a ruling with the Internal Revenue Service. Therefore, there can be no assurance as to whether the Internal Revenue Service or the courts would agree with the characterization of the Trust. Holders are urged to consult their tax advisors regarding the proper characterization of the Trust.

**b. Treatment of Holders of Trust Interests**

Each Holder receiving a beneficial interest in the Trust as part of the Alternate Inc. Debtors Plan will be treated as owning a proportionate undivided interest in the Assets of the Trust to the extent of its interest therein. Accordingly, each such Holder will be required to report on its United States federal income tax return the share of any income, gain, loss, deduction, or credit recognized or incurred by the Trust that is allocable to its Trust Interest and should treat such items as derived on its Trust Interest, not in satisfaction of the interests for which it received such Trust Interest. The character of any such items to a beneficiary of the Trust and the ability of such beneficiary to benefit from any loss, deduction, or credit allocable to its Trust Interest will depend on the particular circumstances of such beneficiary and the nature of the Assets held by the Trust.

According to the Alternate Inc. Debtors Plan, and unless otherwise determined by any taxing authority, allocations of the Trust's taxable income among the Trust's beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed if, immediately prior to such deemed distribution, the Trust had distributed all its other Assets (valued at their tax book value) to the Holders of the Trust Interests, in each case up to the tax book value of the assets treated as contributed by such Holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust. Similarly, taxable loss of the Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Trust's assets. The tax book value of the Trust's assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.

Holders of Trust Interests may be required to pay tax on the income of the Trust even if they have not yet received any distributions from the Trust. Any distributions a Holder receives on account of its Trust Interests should not give rise to gain or loss to such Holder for United States federal income tax consequences.

78

### 4.        Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the ~~Alternate Inc. Debtors~~ Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the ~~Alternate Inc. Debtors~~ Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND ~~HOLDERS OF~~HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### ARTICLE VII~~ARTICLE VIII~~
### CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on ~~January 15~~March [3], 2014.**

New York, New York
Dated:   ~~December 31, 2013~~February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

**<u>Exhibit A</u>**

Debtors' ~~Second~~**<u>Third</u>** Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

## **Exhibit B**

Projections

**Exhibit C**

~~Plan Supplement for Plan~~

**Exhibit D**
Plan Supplement for Alternate Inc. Debtors Plan

**Exhibit C**

**Release, Injunction, and Related Provisions in LightSquared Plan**

*Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.**

*Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection**

with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; **provided**, **however**, that each present and former Holder of a Claim or Equity

**Interest abstaining from voting to accept or reject the Plan may reject the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release; provided, further, however, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.**

**Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.**

*Injunction*

**Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**