Matthew S. Barr
Alan J. Stone
Karen Gartenberg
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | Case No. 12-12080 (SCC) |
| Debtors.[1] | Jointly Administered |

**LIGHTSQUARED'S MOTION FOR ENTRY OF ORDER APPROVING (A) LIGHTSQUARED'S THIRD AMENDED SPECIFIC DISCLOSURE STATEMENT AND (B) SHORTENED TIME TO OBJECT TO CONFIRMATION OF LIGHTSQUARED'S THIRD AMENDED PLAN AND STREAMLINED RESOLICITATION THEREOF**

---

[1]     The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................2

Jurisdiction ...............................................................................................................6

Background ...............................................................................................................6

Background to Motion ..............................................................................................7

      A.  First Amended Plan .......................................................................................7

      B.  Second Amended Plan ...................................................................................8

      C.  Termination of LBAC Bid .............................................................................8

      D.  LightSquared Plan .........................................................................................9

Relief Requested .......................................................................................................9

Basis for Relief .......................................................................................................10

      A.  LightSquared Specific Disclosure
          Statement Should Be Approved ..................................................................10

      B.  Time To Vote on, and Object to, Confirmation
          of LightSquared Plan Should be Shortened ..............................................11

      C.  Court Should Approve Streamlined
          Resolicitation of LightSquared Plan .........................................................12

Notice .....................................................................................................................13

Motion Practice ......................................................................................................13

No Previous Request ...............................................................................................13

# TABLE OF AUTHORITIES

Page(s)

CASES

In re Enron Corp.,
    Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 ...........................................................10

STATUTES

11 U.S.C. § 105 ...............................................................................................................1, 6, 9

11 U.S.C. § 1107(a) .................................................................................................................6

11 U.S.C. § 1108 .....................................................................................................................6

11 U.S.C. § 1125 ............................................................................................................ passim

11 U.S.C. § 1126 ...........................................................................................................1, 6, 9

11 U.S.C. § 1127 ...........................................................................................................1, 6, 9

28 U.S.C. § 157(b)(2) .............................................................................................................6

28 U.S.C. § 1334 .....................................................................................................................6

28 U.S.C. § 1408 .....................................................................................................................6

28 U.S.C. § 1409 .....................................................................................................................6

FED. R. BANKR. P. 1007(d)....................................................................................................13

FED. R. BANKR. P. 2002 ................................................................................................. passim

FED. R. BANKR. P. 3017 ................................................................................................. passim

FED. R. BANKR. P. 3018-1 .......................................................................................................5

FED. R. BANKR. P. 3019 .....................................................................................................6, 9

FED. R. BANKR. P. 9006 .............................................................................................1, 6, 9, 12

S.D.N.Y. Local Rule 3017-1...............................................................................................1, 6, 9

S.D.N.Y. Local Rule 9013-1................................................................................................13

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), at the request and direction of the special committee of the boards of directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., file this motion (the "Motion"),[2] pursuant to sections 105, 1125, 1126, and 1127 of title 11 of the United States Code, §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 3017, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 3017-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") approving (a) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated February 14, 2014 [Docket No. 1308] (the "LightSquared Specific Disclosure Statement"), and (b) shortened time to object to confirmation of the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated February 14, 2014 [Docket No. 1308] (as may be amended in accordance with the terms thereof, the "LightSquared Plan") and the streamlined resolicitation thereof.  In support of the Motion, LightSquared attaches the following exhibits:

- Exhibit B:  The LightSquared Plan,

- Exhibit C:  A blackline of the LightSquared Plan compared against the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated December 31, 2013 [Docket No. 1166] (the "Second Amended Plan"),

- Exhibit D:  The LightSquared Specific Disclosure Statement, and

- Exhibit E:  A blackline of the LightSquared Specific Disclosure Statement compared against the *Specific Disclosure Statement for Debtors' Revised*

---

[2]    Capitalized terms used but not otherwise defined shall having the meanings set forth in the (a) LightSquared Plan, (b) LightSquared Specific Disclosure Statement, or (c) New DIP Motion (each, as defined below), as applicable.

*Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated December 31, 2013 [Docket No. 1166] (the "Second Amended Specific Disclosure Statement").

In further support of this Motion, LightSquared respectfully states as follows:

**Preliminary Statement**

1.        LightSquared, at the direction of the Special Committee, has remained focused on both achieving broad consensus among all of its stakeholders and maximizing value for the benefit of all its estates.  With these principles in mind, LightSquared filed the Second Amended Plan – a plan that contemplated the reorganization of LightSquared through the provision of new financing and equity investments from the certain of LightSquared's existing stakeholders as well as third party investors (collectively, the "Plan Support Parties").[3]  The Second Amended Plan was the first step toward a broad consensus in the Chapter 11 Cases and, at the time of its filing, represented the best path for LightSquared to emerge from chapter 11 and satisfy all claims and interests in full.

2.        Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, including the termination of the LBAC Bid,[4] LightSquared and the Plan Support Parties re-engaged with LightSquared's key stakeholders with the goal of garnering as much support as possible for a value-maximizing reorganization with minimal conditionality. These efforts culminated in the development and filing of the LightSquared Plan, which enjoys overwhelming consensus and support from a substantial portion of LightSquared's existing

---

[3]        The "Plan Support Parties" include (a) Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts, (b) Melody Capital Advisors, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds, (c) Harbinger Capital Partners, LLC or its designated affiliates, and (d) JPMorgan Chase & Co. or its designated affiliates, each of which is (a) a significant stakeholder of LightSquared and/or a new investor and (b) providing substantial funding and support to LightSquared in connection with the Plan and LightSquared's emergence from bankruptcy.

[4]        The LBAC Bid refers to the bid submitted by L-Band Acquisition, LLC ("LBAC") for substantially all of the LP Debtors' assets.

2

stakeholders, enhances the transactions previously proposed under the Second Amended Plan, and places LightSquared in an even better position to reorganize and maximize value. Most significantly, under the LightSquared Plan, (a) LightSquared's emergence from chapter 11 is ***no longer contingent*** on LightSquared obtaining approval of its pending license modification applications, and (b) the majority of LightSquared's creditors will receive ***accelerated distributions*** shortly following confirmation of the LightSquared Plan. Against the backdrop of the Chapter 11 Cases – which involve complex facts and circumstances and an ever-changing intercreditor dynamic – this result is nothing short of remarkable.

3.      Specifically, the LightSquared Plan contemplates, among other things: (a) the provision of a $1.65 billion new debtor in possession facility (the "New DIP Facility")[5] by the Plan Support Parties (approximately $930 million of which will be converted into second lien exit financing (the "Second Lien Exit Facility"), $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the LightSquared Plan); (b) first lien exit financing, including a facility of not less than $1.0 billion (the "First Lien Exit Facility" and, together with the Second Lien Facility, the "Exit Facilities"); (c) the issuance of new debt and equity instruments; (d) the assumption of certain liabilities; (e) the satisfaction in full of all allowed claims and equity interests with cash and other consideration, as applicable; and (f) the preservation of LightSquared's litigation claims.

---

[5]      The terms of the New DIP Facility are described in *LightSquared's Motion for Order (A) Approving Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, and (E) Modifying Automatic Stay* (the "New DIP Motion"), which is being filed concurrently with this Motion.

4.    In summary, the LightSquared Plan incorporates the following modifications to

the Second Amended Plan (the "Modifications"):[6] (a) LightSquared's emergence from chapter

11 is no longer conditioned on the FCC regulatory approvals related to terrestrial spectrum rights

(i.e., among other approvals, the license modification);[7] (b) the "toggle" option with respect to

the Alternate Inc. Debtors Plan (as defined in the Second Amended Plan) has been removed;

(c) shortly following confirmation of the LightSquared Plan, LightSquared will enter into the

New DIP Facility,[8] the proceeds of which will be used to (i) fund LightSquared's operations

through the Effective Date and (ii) make pre-Effective Date distributions to holders of (A) DIP

Inc. Facility Claims, (B) LP DIP Claims, (C) Prepetition LP Facility Non-SPSO Claims (other

than those claims converted into Tranche B of the New DIP Facility), and (D) Prepetition Inc.

Facility Non-Subordinated Claims; (d) LightSquared's entry on the Effective Date into the Exit

Facilities; (e) the satisfaction of the New DIP Claims by some combination of (i) loans under the

Second Lien Exit Facility, (ii) loans under the Reorganized LightSquared Inc. Loan,

(iii) equity interests in NewCo, and/or (iv) cash;[9] and (f) the satisfaction in full of the Prepetition

LP Facility SPSO Claims through the provision of a new note issued by Reorganized

LightSquared LP (the "SPSO Note"),[10] with the amount, priority, and terms of such note subject

---

[6]    This summary is qualified in its entirety be reference to the provisions of the LightSquared Plan.  To the extent that there is any conflict between the summary contained in this Motion and the LightSquared Plan, the LightSquared Plan shall control.

[7]    The only regulatory approvals that will be required in advance of the Effective Date are the customary consents and approvals by the FCC, Industry Canada,  and other governmental authorities and the expiry of any statutory waiting periods that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the LightSquared Plan.

[8]    The New DIP Facility will be comprised of two separate tranches:  (a) Tranche A will consist of $1.35 billion to be provided by the Plan Support Parties; and  (b) Tranche B will consist of $300 million to be provided by (i) the refinancing (i.e., roll-up) of a portion of the Prepetition LP Facility Non-SPSO Claims into the New DIP Facility, and/or (ii) new money provided by the Plan Support Parties or other lenders.

[9]    Tranche B of the New DIP Facility will be repaid in full in cash on the Effective Date.

[10]    The SPSO Note will (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London

4

to variation depending on certain determinations by the Court, as well as how such holders, as a class, vote on the LightSquared Plan.[11]

5.        As a threshold matter, LightSquared believes that implementing the LightSquared Plan ***does not*** require a complete resolicitation of votes on such plan because, among other things, like the Second Amended Plan, the LightSquared Plan provides for the satisfaction in full of all classes of claims and equity interests.  Unlike the Second Amended Plan, however, all holders of claims and equity interests – including holders of Prepetition LP Facility SPSO Claims – benefit further under the LightSquared Plan, since plan distributions will be made prior to LightSquared's receipt of the license modification approval.

6.        LightSquared is cognizant, however, that some level of additional disclosure and resolicitation may be required in connection with the LightSquared Plan.[12]  Accordingly, out of an abundance of caution, LightSquared is seeking approval of (a) the adequacy of the LightSquared Specific Disclosure Statement and (b) the streamlined resolicitation of the LightSquared Plan (such process, the "Streamlined Resolicitation").  Additionally, given LightSquared's extraordinary time and liquidity constraints, LightSquared also respectfully requests that the Court shorten Bankruptcy Rule 2002(b)'s twenty-eight (28)-day timeframe for

---

Interbank Offered Rate floor of 1.00%) and payable in kind, and (d) be secured or unsecured (as described below).

[11]    If such class votes to accept the LightSquared Plan:  (a) the SPSO Note will be (i) issued in the amount of $1.1055 billion and  (ii) secured on a third priority basis by the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the Exit Facilities; and (b) SPSO and certain of its affiliates will be granted releases under the LightSquared Plan.  If such class votes to reject the LightSquared Plan, however (or if any vote to reject by such class is designated by the Court):  (a) the SPSO Note will (i) be issued in the amount equal to the original principal amount of such claims or as otherwise determined by the Court, (ii) be issued on either an unsecured or secured basis, as determined by the Court, (iii) if issued on a secured basis, be secured on a third priority basis by the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the Exit Facilities, and (iv) prohibit the exercise of rights or remedies until the obligations under the Exit Facilities are repaid in full in cash; and (b) SPSO and its affiliates will not be granted any releases under the LightSquared Plan.

[12]    Indeed, LightSquared recognizes that because of the election afforded to holders of Prepetition LP Facility Non-SPSO Claims and holders of Prepetition LP Facility SPSO Claims under the LightSquared Plan, such holders necessarily need to receive and complete new ballots.

objecting to a chapter 11 plan so as to require objections to the LightSquared Plan be submitted by March 10, 2014 at 4:00 p.m. (prevailing Eastern time) (or such other date ordered by the Court) and votes on the LightSquared Plan be submitted by March 3, 2014 at 4:00 p.m. (prevailing Pacific time) (or such other date ordered by the Court).  Such a fast-track process with respect to the LightSquared Plan will not prejudice existing parties in light of the vast amounts of information that have already been made available to the significant stakeholders in these Chapter 11 Cases through the various permutations of LightSquared's filed plans as well as the ongoing Ergen Adversary Proceeding.

### Jurisdiction

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105, 1125, 1126, and 1127 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3019, and 9006, and Local Rule 3017-1.

### Background

10.      On May 14, 2012 (the "Petition Date"), LightSquared filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.      LightSquared continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in the Chapter 11 Cases.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**Background To Motion**

A.    **First Amended Plan**

12.    As discussed in further detail in the LightSquared Specific Disclosure

Statement,[13] LightSquared recognized that, to properly exercise its fiduciary duty to all of its

stakeholders in light of the continuing nature of the FCC process, the facts and circumstances of

the Chapter 11 Cases, and the potentially disparate timing between its bankruptcy and regulatory

processes, it would need to take action to protect the current value of its assets.  Accordingly, on

August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of*

*Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced

the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of*

*Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things,

contemplated the sale of LightSquared's assets.

13.    After engaging in a sale process and thoroughly marketing its assets, however,

LightSquared realized that an auction was not the appropriate forum to render a value-

maximizing result for LightSquared's estates.  Indeed, no qualified bids were received from third

parties outside of its capital structure.  Accordingly, at the direction of the Special Committee,

LightSquared did not hold the Court-scheduled auction for LightSquared's assets, or any

grouping or subset thereof, under the First Amended Plan and did not deem any bid received for

the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan

[Docket Nos. 1086 and 1108].

---

[13]    A more detailed discussion of the events leading up to the formulation and filing of the LightSquared Plan
is included in the LightSquared Specific Disclosure Statement.

B.    **Second Amended Plan**

14.    Following the termination of the sale process contemplated by the First Amended

Plan, LightSquared and its advisors worked diligently with both existing stakeholders and third

parties over the course of two (2) months to solidify a new value reorganization proposal.

LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties –

nearly all existing stakeholders in LightSquared's capital structure and certain independent third

parties that believe in the future viability and value of LightSquared – to support a plan of

reorganization based on new financing and equity investments.  This proposal ultimately led to

the filing of the Second Amended Plan.

C.    **Termination of LBAC Bid**

15.    Following the filing of the Second Amended Plan, on January 7, 2014, LBAC,

through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the

Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the

Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set

forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the

LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc*

*Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation*

*of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC,*

*LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared*

*Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings*

*(Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of*

*LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in

which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors'

assets.

16.    On January 22, 2014, following contested motion practice between LBAC and the Ad Hoc Secured Group regarding LBAC's ability to terminate the LBAC Bid and Plan Support Agreement, the Court issued a preliminary ruling finding that the Plan Support Agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC. The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.

**D.    LightSquared Plan**

17.    After the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support for LightSquared's reorganization as possible. These discussions led to the development and filing of the LightSquared Plan, which represents consensus among substantially all of the key constituents in the Chapter 11 Cases, no longer conditions LightSquared's emergence from chapter 11 on the receipt of regulatory approvals from the FCC related to terrestrial spectrum rights, and will help achieve maximum returns for LightSquared's estates and stakeholders.

18.    The transactions embodied in the LightSquared Plan will ensure that LightSquared emerges with a sustainable capital structure in a stronger position to avail itself of the significant upside value when the FCC approves the pending spectrum license modification applications. LightSquared accordingly believes that the LightSquared Plan will maximize the value of the estates for the benefit of all of LightSquared's creditors and equity holders and is currently the highest and best restructuring offer received by LightSquared to date.

<u>**Relief Requested**</u>

19.    By this Motion, LightSquared respectfully requests, pursuant to sections 105, 1125, 1126, and 1127 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3019, and 9006, and Local Rule 3017-1, entry of an order (a) approving the adequacy of the LightSquared

Specific Disclosure Statement, and (b) approving certain shortened deadlines to object to

confirmation of the LightSquared Plan and the streamlined resolicitation thereof.

## Basis For Relief

20.     LightSquared does not believe that any resolicitation is required in connection the

LightSquared Plan because the Modifications do not "materially and adversely" impact any

claimant's treatment.[14]  Indeed, the LightSquared Plan provides (a) for the satisfaction in full of

all claims and equity interests, and (b) distributions to all holders of claims and interests

(including holders of Prepetition LP Facility SPSO Claims) in advance of the approval of

LightSquared's pending spectrum license modification applications, with the majority of

LightSquared's creditors receiving accelerated distributions prior to the effectiveness of the

LightSquared Plan.

21.     Notwithstanding the foregoing, LightSquared recognizes that some form of

resolicitation is required in connection with the LightSquared Plan, primarily because holders of

Prepetition LP Facility SPSO Claims were previously not entitled to vote.  LightSquared

respectfully requests, therefore, that the Court (a) approve the LightSquared Specific Disclosure

Statement as containing "adequate information" under section 1125(a) of the Bankruptcy Code,

(b) shorten the time for parties to file objections to the LightSquared Plan, and (c) approve the

Streamlined Resolicitation with respect to the LightSquared Plan.

**A.      LightSquared Specific Disclosure Statement Should Be Approved**

22.     Section 1125(a) of the Bankruptcy Code requires that, before a proponent may

solicit votes on a chapter 11 plan of reorganization, such plan proponent must provide creditors

---

[14]     See, e.g., In re Enron Corp., Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, **259-60) (Bankr.
S.D.N.Y. July 15, 2004) ("The best test is whether the modification so affects any creditor or interest
holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider
its acceptance.") (quoting 9 COLLIER ON BANKRUPTCY 113019.01 (15th ed. Rev. 2004)).

with a disclosure statement that is "approved, after notice and a hearing, by the court as

containing adequate information." 11 U.S.C. § 1125(a).

23.     LightSquared respectfully submits that the LightSquared Specific Disclosure

Statement, like the prior disclosure statements approved in these Chapter 11 Cases, contains

ample and adequate information that clearly and succinctly will allow parties in interest to make

informed judgments to vote, to the extent appropriate, on the LightSquared Plan.  In particular,

the LightSquared Specific Disclosure Statement provides parties in interest with (a) a detailed

summary of the events leading up to the development of the LightSquared Plan, (b) an overview

of the terms of the LightSquared Plan, (c) a description of the specific treatment and estimated

recovery to each class of creditors and interests under the LightSquared Plan, and (d) the relevant

risk factors associated with the LightSquared Plan.  The LightSquared Specific Disclosure

Statement thus provides adequate information and should be approved.

**B.      Time To Vote on, and Object to, Confirmation of LightSquared Plan Should Be Shortened**

24.     Bankruptcy Rule 2002(b) requires "not less than 28 days' notice . . . of the time

fixed (1) for filing objections and the hearing to consider approval of a disclosure statement . . .

and (2) for filing objections and the hearing to consider confirmation of a . . . chapter 11 . . .

plan."  FED. R. BANKR. P. 2002(b).  Additionally, Bankruptcy Rule 3017(a) states:

> [A]fter a disclosure statement is filed . . . the court shall hold a
> hearing on at least 28 days' notice to the debtor, creditors, equity
> security holders and other parties in interest as provided in
> Rule 2002 to consider the disclosure statement and any objections
> or modifications thereto . . . .  Objections to the disclosure
> statement shall be filed and served . . . at any time before the
> disclosure statement is approved or by an earlier date as the court
> may fix.

FED. R. BANKR. P. 3017(a).

11

25.    Notwithstanding the foregoing, courts have the discretion to shorten time periods

where the circumstances require.  Bankruptcy Rule 9006(c)(1) provides that:

> Except as provided in paragraph (2) of this subdivision, when an
> act is required or allowed to be done at or within a specified time
> by these rules or by a notice given thereunder or by order of court,
> the court for cause shown may in its discretion with or without
> motion or notice order the period reduced.

FED. R. BANKR. P. 9006(c)(1).  Notably, while Bankruptcy Rule 9006(c)(2) limits 9006(c)(1) by

providing that courts may not shorten time with respect to certain Bankruptcy Rules, neither

Bankruptcy Rule 2002(b) nor Bankruptcy Rule 3017 is among such exceptions.  See FED. R.

BANKR. P. 9006(C)(2).

26.    LightSquared respectfully submits that good cause exists to set (a) March 3, 2014

at 4:00 (prevailing Pacific time) as the deadline for voting to accept or reject the LightSquared

Plan and (b) March 10, 2014 at 4:00 p.m. (prevailing Eastern time) as the deadline to object to

confirmation of the LightSquared Plan.  *First*, the Modifications continue to provide for the

satisfaction in full of all claims and equity interests.  *Second*, the LightSquared Plan is supported

by a substantial portion of LightSquared's stakeholders.  *Third*, the vast majority of creditors,

stakeholders, and interested parties are well aware of the compressed timeline in, and fast-track

nature of, these Chapter 11 Cases.  *Fourth*, the expedited timeline is critical in light of

LightSquared's limited available cash.

## C.    Court Should Approve Streamlined Resolicitation of LightSquared Plan

27.    Additionally, LightSquared respectfully requests that, if any further solicitation of

the LightSquared Plan is deemed necessary, the Court approve the Streamlined Resolicitation of

all parties who previously received solicitation materials in connection with the First Amended

Plan and the Second Amended Plan (other than holders of Inc. General Unsecured Claims and

LP General Unsecured Claims, which holders overwhelmingly voted to accept the Second

Amended Plan and are not impacted in any way by the terms of the LightSquared Plan).

28.    The Streamlined Resolicitation package will include copies of (a) the

LightSquared Plan, (b) the LightSquared Specific Disclosure Statement, (c) blacklines

comparing the foregoing to their prior versions, and (d) any other related documents.

LightSquared submits that the proposed Streamlined Resolicitation process is appropriately

tailored to save significant time and resources while imposing no prejudice on any party.

## Notice

29.    Notice of this Motion will be provided by electronic mail, facsimile, regular or

overnight mail, and/or hand delivery to (a) the U.S. Trustee, (b) the entities listed on the

Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to

Bankruptcy Rule 1007(d), (c) counsel to the Special Committee, (d) counsel to the Prepetition

Agents, (e) counsel to the Existing DIP Agents and Existing DIP Lenders,[15] (f) counsel to the

Plan Support Parties, (g) counsel to the Ad Hoc Secured Group, (h) counsel to Harbinger,

(i) counsel to SPSO, (j) the Internal Revenue Service, (k) the United States Attorney for the

Southern District of New York, (l) the Federal Communications Commission, (m) Industry

Canada, and (n) all parties who have filed a notice of appearance in the Chapter 11 Cases.

LightSquared respectfully submits that no other or further notice is required or necessary.

## Motion Practice

30.    This Motion includes citations to the applicable rules and statutory authorities

upon which the relief requested herein is predicated and a discussion of their application to this

Motion.  Accordingly, LightSquared submits that this Motion satisfies Local Rule 9013-1(a).

---

[15]    For the avoidance of doubt, LightSquared views White & Case LLP, Stroock & Stroock & Lavan LLP, and
Willkie Farr & Gallagher as the only counsel for LP DIP Lenders.

**<u>No Previous Request</u>**

31.     Other than as provided in the (a) *Motion for Entry of Order Approving Adequacy of LightSquared Disclosure Statement* [Docket No. 819] and (b) *Motion Seeking Approval of (A) Modifications to LightSquared's First Amended Plan Pursuant to Chapter 11 of Bankruptcy Code Without Need for Further Solicitation of Votes, or, In the Alternative, (B) LightSquared's Second Amended Specific Disclosure Statement and Shortened Time To Object to Confirmation of LightSquared's Second Amended Plan and Streamlined Re-Solicitation Thereof* [Docket No. 1137],  no prior motion for the relief requested herein has been made by LightSquared to this or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**WHEREFORE**, LightSquared respectfully requests entry of (i) the Order,

substantially in the form attached hereto as <u>Exhibit A</u>, and (ii) any other and further relief as this

Court deems just and proper.

New York, New York                          /s/ Matthew S. Barr
Dated:  February 14, 2014                   Matthew S. Barr
                                            Alan J. Stone
                                            Karen Gartenberg
                                            MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
                                            1 Chase Manhattan Plaza
                                            New York, NY  10005-1413
                                            (212) 530-5000

                                            *Counsel to Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**ORDER APPROVING (A) LIGHTSQUARED'S THIRD AMENDED SPECIFIC**
**DISCLOSURE STATEMENT AND (B) SHORTENED TIME TO OBJECT TO**
**CONFIRMATION OF LIGHTSQUARED'S THIRD AMENDED PLAN**
**AND STREAMLINED RESOLICITATION THEREOF**

Upon the motion (the "Motion")[2] of LightSquared Inc. and certain of its

affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the

"Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), at the request

and direction of the special committee of the boards of directors (the "Special Committee")

for LightSquared Inc. and LightSquared GP Inc., for entry of an order (the "Order"),

pursuant to sections 105, 1125, and 1126 of title 11 of the United States Code, §§ 101-1532

(as amended, the "Bankruptcy Code"), rules 2002, 3017, and 9006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 3017-1 of the Local Bankruptcy

Rules for the Southern District of New York (the "Local Rules"), among other things,

approving (a) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan*

---

[1]    The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each
debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845),
LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763),
SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI
Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared
LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co.
(6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared
Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631),
SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors'
corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]    Capitalized terms used but not otherwise defined shall having the meanings set forth in the Motion.

*Pursuant to Chapter 11 of Bankruptcy Code*, dated February 14, 2014 [Docket No. 1308] (as amended, supplemented, or modified from time to time, the "LightSquared Specific Disclosure Statement"), and (b) shortened time to object to confirmation the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated February 14, 2014 [Docket No. 1308] (the "LightSquared Plan") and the streamlined resolicitation thereof; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion appearing adequate and appropriate under the circumstances; and the Court having found that no other or further notice is needed or necessary; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and it appearing, and the Court having found, that the relief requested in the Motion is in the best interests of LightSquared, its estates, its creditors, and other parties in interest; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

  A. The notice of the Motion and Hearing was adequate under the circumstances and no other or further notice is required.

---

[3] Regardless of the heading under which they appear, any (a) findings of fact that constitute conclusions of law shall be conclusions of law and (b) conclusions of law that constitute findings of fact shall be findings of fact. All findings of fact and conclusions of law announced by the Court at the Hearing in relation to the Motion are incorporated herein to the extent not inconsistent herewith.

B.      The entry of this Order is in the best interests of LightSquared and its

estates, creditors, interest holders, and other parties in interest herein.

**IT IS HEREBY ORDERED AND DETERMINED THAT:**

1.      The Motion is granted as provided herein.

2.      Pursuant to section 1127 of the Bankruptcy Code, LightSquared's proposed

modifications, as set forth in the LightSquared Plan and reflected in the blackline attached to

the Motion as Exhibit C (the "Modifications"), are hereby approved.  The LightSquared

Plan incorporating LightSquared's proposed Modifications is deemed LightSquared's

chapter 11 plan.

3.      The LightSquared Specific Disclosure Statement contains adequate

information within the meaning of section 1125(a) of the Bankruptcy Code and, therefore, is

approved pursuant to section 1125(a)(1) of the Bankruptcy Code and Bankruptcy Rule

3017(b).  To the extent not withdrawn, settled, or otherwise resolved, any objection to the

Motion or approval of the Revised Specific Disclosure Statement is overruled.

4.      Promptly upon entry of this Order, the Claims and Solicitation Agent shall

distribute, or cause to be distributed, to all entities entitled to vote to accept or reject the

LightSquared Plan (other than holders of Inc. General Unsecured Claims and LP General

Unsecured Claims):  (i) the LightSquared Specific Disclosure Statement (with all exhibits

thereto, including the LightSquared Plan and the exhibits thereto), (ii) this Order, (iii) an

appropriate number of Ballots (with voting instructions with respect thereto), (iv) a notice

addressing the revised plan documents and amended deadlines and hearing dates with

respect thereto (the "Notice of LightSquared Specific Disclosure Statement"), and (v) any

other related documents (collectively with the LightSquared Specific Disclosure Statement,

LightSquared Plan, Notice of LightSquared Specific Disclosure Statement, Ballots, and all exhibits thereto, the "Solicitation Materials").

5.      The solicitation of the LightSquared Plan and the Ballots submitted therefor (other than those Ballots cast by the holders of Inc. General Unsecured Claims and LP General Unsecured Claims in connection with the Second Amended Plan) shall be deemed to supersede and revoke all prior solicitations of prior chapter 11 plans filed by the Debtors and all Ballots submitted therefor.

6.      The amended dates and deadlines with respect to the LightSquared Plan shall be as follows:

- Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).

- Plan Objection Deadline: March [10], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: March [7], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit confirmation briefs in support of the Plan and in response to Plan Objections: March [13], 2014 at 4:00 p.m. (prevailing Eastern time).

- Confirmation Hearing: March [17], 2014 at 10:00 a.m. (prevailing Eastern time).

7.      The Debtors shall be deemed to have provided, in accordance with Bankruptcy Rules 2002, 3017, and 9006 and Local Bankruptcy Rules 2002-1 and 3017-1, adequate notice of the foregoing dates and deadlines, the Ballots, the LightSquared Specific Disclosure Statement, and the LightSquared Plan in connection with the Notice of LightSquared Specific Disclosure Statement and all other notice already provided by the Debtors; provided, further, (a) the time prescribed by Bankruptcy Rule 2002(b) for objecting to the LightSquared Plan shall be shortened so as to require objections by the deadline set

forth herein (i.e., March [10], 2014 at 4:00 p.m. (prevailing Eastern time)) and the Debtors'

deadline to resolicit votes on the LightSquared Plan shall be shortened and the voting

deadline shall be March [3], 2014 at 4:00 p.m. (prevailing Pacific time), and (b) the Court

hereby (i) waives the requirement in Local Bankruptcy Rule 3018-1 that the Voting Report

for the LightSquared Plan be filed at least seven (7) days prior to the Confirmation Hearing,

and (ii) shortens the time period to file the Voting Report with respect to the Third

Amended Plan.

    8.    The Solicitation Materials and the distribution thereof as set forth herein

(a) provide all holders of claims or equity interests entitled to vote on the LightSquared Plan

with the requisite materials and sufficient time to make an informed decision with respect to

the LightSquared Plan, (b) satisfy the requirements of the Bankruptcy Code, the Bankruptcy

Rules, and the Local Bankruptcy Rules, and (c) are approved in their entirety.

    9.    The terms of, and relief granted in, the Disclosure Statement Order are

incorporated herein by reference and shall be deemed part of this Order; provided, to the

extent the terms of the Disclosure Statement Order conflict with the terms of this Order, the

terms of this Order shall control.

    10.    LightSquared and the Claims and Solicitation Agent are authorized to take all

actions necessary to effectuate the relief granted pursuant to this Order in accordance with

the Motion.

    11.    The Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated:_____, 2014

                                        _____
                                        HONORABLE SHELLEY C. CHAPMAN
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**LightSquared Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO**
**CHAPTER 11 OF BANKRUPTCY CODE**

---

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M[C]CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated: New York, New York
February 14, 2014

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
   OF TIME, AND GOVERNING LAW ...................................................................3

  A.  Defined Terms .........................................................................3
  B.  Rules of Interpretation ...........................................................32
  C.  Computation of Time.............................................................32
  D.  Governing Law ......................................................................32
  E.  Reference to Monetary Figures...............................................33

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
   COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
   AND U.S. TRUSTEE FEES .....................................................................33

  A.  Administrative Claims ...........................................................33
  B.  Accrued Professional Compensation Claims............................34
  C.  DIP Inc. Claims.....................................................................35
  D.  DIP LP Claims ......................................................................36
  E.  New DIP Claims ....................................................................36
  F.  Priority Tax Claims ...............................................................37
  G.  Payment of Statutory Fees .....................................................37

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
   INTERESTS .......................................................................37

  A.  Summary...............................................................................37
  B.  Classification and Treatment of Claims and Equity Interests................38
  C.  Special Provision Governing Unimpaired Claims and Equity Interests...............47
  D.  Acceptance or Rejection of Plan..............................................47
  E.  Elimination of Vacant Classes ...............................................48
  F.  Confirmation Pursuant to Section 1129(b) of Bankruptcy Code...........................48
  G.  Controversy Concerning Impairment ......................................48

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN .................................................49

  A.  Overview of Plan ..................................................................49
  B.  Plan Transactions ..................................................................49
  C.  Sources of Consideration for Plan Distributions ......................49
  D.  Certain Pre-Confirmation Date, Confirmation Date, and Effective Date
    Plan Transactions .................................................................49
  E.  First Lien Exit Facility...........................................................55
  F.  Second Lien Exit Facility.......................................................55
  G.  Reorganized LightSquared Inc. Loan ......................................56

H.    [RESERVED] ........................................................................................57
I.    Issuance of New LightSquared Entities Shares; Reinstatement of
      Reinstated Intercompany Interests ...................................................57
J.    Section 1145 and Other Exemptions .................................................57
K.    Listing of New LightSquared Entities Shares; Reporting Obligations .................58
L.    NewCo Interest Holders Agreement ................................................58
M.    Indemnification Provisions in New LightSquared Entities Corporate
      Governance Documents ...................................................................58
N.    Management Incentive Plan ..............................................................59
O.    Corporate Governance .....................................................................59
P.    Vesting of Assets in Reorganized Debtors ......................................59
Q.    Cancellation of Securities and Agreements .....................................60
R.    Corporate Existence .........................................................................60
S.    Corporate Action ..............................................................................61
T.    Effectuating Documents; Further Transactions ...............................61
U.    Exemption from Certain Taxes and Fees .........................................62
V.    Preservation, Transfer, and Waiver of Rights of Action .................62
W.    Assumption of D&O Liability Insurance Policies ...........................63
X.    Employee and Retiree Benefits ........................................................64

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ..............................................................................................65

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........65
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............66
C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
      Pursuant to Plan ...............................................................................66
D.    Pre-existing Obligations to Debtors Under Executory Contracts and
      Unexpired Leases ..............................................................................67
E.    Intercompany Contracts, Contracts, and Leases Entered into After Petition
      Date, Assumed Executory Contracts, and Unexpired Leases ...............................67
F.    Modifications, Amendments, Supplements, Restatements, or Other
      Agreements .......................................................................................68
G.    Postpetition Contracts and Leases ...................................................68
H.    Reservation of Rights ........................................................................68
I.    Nonoccurrence of Effective Date .....................................................68

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................69

A.    Distribution Record Date ..................................................................69
B.    Timing and Calculation of Amounts To Be Distributed ..................69
C.    Disbursing Agent ..............................................................................70
D.    Rights and Powers of Disbursing Agent ..........................................70

E.      Plan Distributions on Account of Claims and Equity Interests Allowed
        After Effective Date ............................................................................71
F.      Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
        Distributions......................................................................................71
G.      Compliance with Tax Requirements/Allocations ...................................73
H.      Setoffs ..............................................................................................74
I.      Recoupment ......................................................................................74
J.      Claims Paid or Payable by Third Parties ..............................................74

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED
        EQUITY INTERESTS........................................................................75

A.      Allowance of Claims and Equity Interests.............................................75
B.      Claims and Equity Interests Administration Responsibilities .................75
C.      Estimation of Claims or Equity Interests ..............................................76
D.      Expungement or Adjustment to Claims or Equity Interests Without
        Objection...........................................................................................77
E.      No Interest.........................................................................................77
F.      Deadline To File Objections to Claims or Equity Interests .....................77
G.      Disallowance of Claims or Equity Interests...........................................77
H.      Amendments to Claims.......................................................................78

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
        PROVISIONS ...................................................................................78

A.      Discharge of Claims and Termination of Equity Interests.....................78
B.      Subordinated Claims..........................................................................79
C.      Compromise and Settlement of Claims and Controversies ...................79
D.      Releases by Debtors...........................................................................79
E.      Exculpation .......................................................................................80
F.      Third-Party Releases by Holders of Claims or Equity Interests ............81
G.      Injunction .........................................................................................82
H.      Release of Liens.................................................................................82

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
        EFFECTIVE DATE OF PLAN ...........................................................83

A.      Conditions Precedent to Confirmation Date .........................................83
B.      Conditions Precedent to Effective Date ................................................83
C.      Waiver of Conditions..........................................................................86

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ...............86

A.    Modification and Amendments...........................................................................86

B.    Effect of Confirmation on Modifications .........................................................86

C.    Revocation or Withdrawal of Plan....................................................................86

D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur.............87

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................87

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................89

A.    Immediate Binding Effect.................................................................................89

B.    Additional Documents ......................................................................................90

C.    Reservation of Rights........................................................................................90

D.    Successors and Assigns.....................................................................................90

E.    Service of Documents .......................................................................................90

F.    Term of Injunctions or Stays.............................................................................92

G.    Plan Supplement ...............................................................................................92

H.    Entire Agreement ..............................................................................................92

I.    Non-severability of Plan Provisions .................................................................93

J.    Votes Solicited in Good Faith...........................................................................93

K.    Waiver or Estoppel ...........................................................................................93

L.    Conflicts............................................................................................................93

## INTRODUCTION

LightSquared Inc. and the other Debtors in the above-captioned chapter 11 cases hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Reference is made to the Debtors' Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, with the consent of each Plan Support Party, prior to its substantial consummation.

The Debtors have always believed, and continue to believe, that resolution of the pending FCC proceedings will maximize the value of their assets and, accordingly, will continue their efforts with the FCC and other federal agencies in seeking approval of their pending license modification applications and related proceedings before the FCC. Given the continuing nature of the FCC process and the facts and circumstances of these Chapter 11 Cases, the Debtors believed that it was necessary to take action to protect their Estates and the current value of their assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets. Accordingly, on August 30, 2013, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed, on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of the Debtors' assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, the Debtors, in consultation with, and at the direction of, the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee"), (i) were always receptive to any potential alternative transactions that would provide greater value for the Estates and all of the Debtors' stakeholders, and (ii) as such, fully preserved their rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As further explained in the Debtors' Disclosure Statement, upon consideration of the various proposals received to date, the Debtors, in consultation with, and at the direction of, the Special Committee, determined that a reorganization of the Debtors that satisfied all Claims in full and provided a return to Holders of Equity Interests – and not a sale – was in the best interests of these Estates. Accordingly, the Debtors initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of the Debtors through a series of restructuring transactions. Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, the Debtors, at the direction of the Special Committee, and the Plan Support Parties discussed modifications of that plan to garner as much support as possible for LightSquared's reorganization. These discussions led to the filing of this further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place the Debtors in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by the Debtors, certain key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders. Importantly, effectiveness of the Plan is not conditioned on the Debtors' receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of the Debtors' significant stakeholders.   Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with the Debtors' emergence from chapter 11 pursuant to this Plan.  To fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing the Debtors a $1.65 billion new debtor in possession credit facility.  More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of the Debtors' litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications.  The Debtors and the Plan Support Parties accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of the Debtors' creditors and equityholders and is currently the highest and best restructuring offer available to the Debtors.   Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Debtors to successfully exit the Chapter 11 Cases.  Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from a substantial portion of the Debtors' significant stakeholders.

Moreover, in light of the broad support for the Plan, the Debtors are not pursuing at this time confirmation of the Alternate Inc. Debtors Plan.  The Alternate Inc. Debtors Plan.  The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of this Plan and April 15, 2014.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DEBTORS' DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**1.5 Lien Loans**" has the meaning set forth in Article IV.F hereof.

2.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

3.    "**Ad Hoc Secured Group**" means that certain Ad Hoc Group of LightSquared LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude the SPSO Parties and their affiliates.

4.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) any Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms of a Stalking Horse Agreement and the Bid Procedures Order; provided, however, that no SPSO Party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; and (h) any fees and expenses that are earned and payable pursuant to the New DIP Facility, the First Lien Exit Facility, the Plan, and the other Plan Documents, including the Plan Support Party Break-Up Fee.

3

5.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

6.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the New LightSquared Entities and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or New LightSquared Entity, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

8.      "**Alternate Inc. Debtors Plan**" has the meaning set forth in the Second Amended Plan.

9.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

10.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

11.     "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

12.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

13.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

14.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

16.    "**Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

17.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

19.    "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

20.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

21.    "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

22.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

23. "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24. "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

25. "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

26. "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

27. "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

28. "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

29. "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

30. "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31. "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

32. "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33. "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35. "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

36.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to each Plan Support Party.

37.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

38.    "**Consummation**" means the occurrence of the Effective Date.

39.    "**Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof); provided, that only Holders of Allowed Prepetition LP Facility Non-SPSO Claims that vote to accept the Plan may elect to exercise the foregoing right of conversion.

40.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

41.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

42.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

43.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

44.    "**Debtors' Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. [_____]] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of each Plan Support Party).

45.    "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agent.

46.    "**DIP Claim**" means a DIP Inc. Claim, a DIP LP Claim, or a New DIP Claim.

47.    "**DIP Facilities**" means the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facility.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

49.   "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

50.   "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all principal, interest, default interest, and exit fees provided for thereunder.

51.   "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

52.   "**DIP Inc. Facility**" means that certain $46.4 million debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

53.   "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

54.   "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

55.   "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

56.   "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

57.   "**DIP Lenders**" means the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders.

58.   "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

59.   "**DIP LP Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

60.   "**DIP LP Closing Date**" means February 5, 2014.

61.   "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents in the original aggregate principal amount of $33 million.

62.    "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

63.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

64.    "**DIP LP Obligors**" means the DIP LP Borrower and the DIP LP Guarantors.

65.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

66.    "**Disbursing Agent**" means, for Plan Distributions made prior to the Effective Date, the Debtors, and, for Plan Distributions made on or after the Effective Date, the New LightSquared Entities, or the Entity or Entities designated by the New LightSquared Entities to make or facilitate Plan Distributions pursuant to the Plan on or after the Effective Date.

67.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.    "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the New LightSquared Entities for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

69.    "**Distribution Record Date**" means (a) for all Claims and Equity Interests (other than the DIP LP Claims and New DIP Claims), the Voting Record Date, (b) for the DIP LP Claims, the DIP LP Closing Date, and (c) for the New DIP Claims, the New DIP Closing Date.

70.    "**Effective Date**" means the date selected by the Debtors, with the consent of each Plan Support Party, that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.B hereof have been satisfied or waived (in accordance with Article IX.C hereof).

71.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger Capital Partners, LLC, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

72.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

73.     "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

74.     "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

75.     "**Exculpated Party**" means a Released Party.

76.     "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

77.     "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

78.     "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

79.     "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

80.     "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

81.     "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

82.     "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

83.     "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

84.     "**Exit Agents**" means the First Lien Exit Agent and the Second Lien Exit Agent.

85.    "**Exit Credit Agreements**" means the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

86.    "**Exit Facilities**" means the First Lien Exit Facility and the Second Lien Exit Facility.

87.    "**Exit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated on or before the Effective Date, between the Exit Agents, the Exit Lenders, and the other relevant Entities governing, among other things, the respective rights, remedies, and priorities of claims and security interests held by the Exit Agents, the Exit Lenders, and the other relevant Entities under the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

88.    "**Exit Lenders**" means the First Lien Exit Lenders and the Second Lien Exit Lenders.

89.    "**Exit Obligors**" means the First Lien Exit Obligors and the Second Lien Exit Obligors.

90.    "**Expense Reimbursement**" has the meaning set forth in the Bid Procedures Order.

91.    "**FCC**" means the Federal Communications Commission.

92.    "**FCC Objectives**" means that (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding its possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

93.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

94.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from

which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Debtors reserve the right to waive any appeal period, with the consent of each Plan Support Party.

96.     "**Financial Wherewithal Objection Deadline**" has the meaning set forth in Article V.C hereof.

97.     "**First Amended Plan**" has the meaning set forth in the Introduction hereof.

98.     "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

99.     "**First Lien Exit Agent**" means the administrative agent under the First Lien Exit Credit Agreement or any successor agent appointed in accordance with the First Lien Exit Credit Agreement.

100.     "**First Lien Exit Borrower**" means NewCo, as borrower under the First Lien Exit Credit Agreement.

101.     "**First Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the First Lien Exit Obligors, the First Lien Exit Agent, and the First Lien Exit Lenders.

102.     "**First Lien Exit Excess Amount**" means an amount equal to the aggregate principal amount that the First Lien Exit Facility exceeds $1 billion on the Effective Date.

103.     "**First Lien Exit Facility**" means that certain first lien credit facility in an original aggregate principal amount of not less than $1 billion provided in connection with the First Lien Exit Credit Agreement (which facility may be increased by an additional $500 million upon the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum as specified therein).

104.     "**First Lien Exit Guarantors**" means each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) required to be guarantors under the First Lien Exit Credit Agreement.

105.     "**First Lien Exit Lenders**" means the lenders party to the First Lien Exit Credit Agreement from time to time.

106.     "**First Lien Exit Obligors**" means the First Lien Exit Borrower and the First Lien Exit Guarantors.

107.     "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:   (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP

Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; or (i) Intercompany Claim.

108.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

109.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

110.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

111.    "**Inc./LP Lender Parties**" means the Ad Hoc Secured Group, the DIP Inc. Agent, and the Prepetition Inc. Non-Subordinated Parties.

112.    "**Inc./LP Lender Advisors Fee Cap**" means an aggregate amount equal to $500,000.

113.    "**Inc. Administrative Claim**" means any Administrative Claim asserted against an Inc. Debtor.

114.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

115.    "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

116.    "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

117.    "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

118.    "**Inc. Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the Inc. Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the Inc. Debtors, *plus* (iii) the Inc. Debtors' Cash on hand on the Effective Date, *plus* (iv) without duplication of clause (i), Cash from the Reorganized LightSquared Inc. Loan, if any, and *less* (v) the Inc. Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, and (d) loans under the Reorganized LightSquared Inc. Loan.

119.    "**Inc. Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the Inc. Debtors and (b) together with the LP Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

120.    "**Inc. Priority Tax Claim**" means any Priority Tax Claim asserted against an Inc. Debtor.

121.    "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

122.    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

123.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

124.    "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

125.    "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

126.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

127.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

128.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

129.    "**LightSquared Transfer**" means the sale, assignment, and/or transfer by the Reorganized Debtors to NewCo of certain of the Reorganized Debtors' Assets and Equity Interests, and the assumption by NewCo of certain liabilities related thereto, in accordance with the Plan, including as set forth in Article IV.D.3(b) hereof, in exchange for the consideration provided to the Reorganized Debtors under the Plan, including as set forth in Article IV.D.3(a) hereof.

130.    "**License Modification Application**" has the meaning set forth in the Debtors' Disclosure Statement.

131.    "**LP Administrative Claim**" means any Administrative Claim asserted against an LP Debtor.

132.    "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada)

Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

133.    "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

134.    "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

135.    "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

136.    "**LP Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the LP Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the LP Debtors, *plus* (iii) the LP Debtors' Cash on hand on the Effective Date, and *less* (iv) the LP Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, (d) loans under the New DIP Facility, and (e) the SPSO Note.

137.    "**LP Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the LP Debtors and (b) together with the Inc. Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

138.    "**LP Priority Tax Claim**" means any Priority Tax Claim asserted against an LP Debtor.

139.    "**Management Incentive Plan**" means that certain post-Effective Date management equity incentive plan, which provides that, among other things, up to 10% of NewCo Common Interests, on a fully diluted basis, shall be reserved for issuance by the NewCo Board after the Effective Date in accordance with the management equity incentive plan and the Plan; underlined, that the foregoing shall be implemented in the discretion of the NewCo Board, subject to the terms of the NewCo Corporate Governance Documents, and shall remain subject to the agreement of each Plan Support Party.

140.    "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

141.    "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement or any successor agent appointed in accordance with the New DIP Credit Agreement.

142.    "**New DIP Borrowers**" means LightSquared Inc., LightSquared LP, and One Dot Six Corp., as borrowers under the New DIP Credit Agreement.

143.    "**New DIP Claim**" means a New DIP Tranche A Claim or a New DIP Tranche B Claim.

144.    "**New DIP Closing Date**" means the date upon which (a) the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, (b) all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and (c) the incurrence of obligations pursuant to the New DIP Facility shall have occurred, which shall be no later than the fifteenth (15th) day after the Confirmation Date, and (d) all (i) DIP Inc. Claims, (ii) DIP LP Claims, (iii) Prepetition Inc. Facility Non-Subordinated Claims, and (iv) Non-Converted Prepetition LP Facility Non-SPSO Claims have been indefeasibly paid in full in Cash.

145.    "**New DIP Commitment Letter**" means that certain commitment letter by and among the New DIP Commitment Parties, LightSquared Inc., LightSquared LP, and One Dot Six Corp., dated February 14, 2014.

146.    "**New DIP Commitment Parties**" means J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee), Melody Business Finance, LLC (together with any affiliate thereof as its designee), Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., as the commitment parties under the New DIP Commitment Letter.

147.    "**New DIP Credit Agreement**" means that certain Debtor in Possession Credit Agreement, dated as of the New DIP Closing Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders, in form and substance satisfactory to each Plan Support Party.

148.    "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the original aggregate principal amount of $1.65 billion.

149.    "**New DIP Guarantors**" means each New DIP Borrower, as a guarantor to each other New DIP Borrower, and all other Debtors that are not New DIP Borrowers, as guarantors to the New DIP Borrowers, in each case, in accordance with the New DIP Credit Agreement.

150.    "**New DIP Initial Lenders**" means, collectively, Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.

151.    "**New DIP Lenders**" means the New DIP Tranche A Lenders and the New DIP Tranche B Lenders.

152.    "**New DIP Obligors**" means the New DIP Borrowers and the New DIP Guarantors.

153.    "**New DIP Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

154.    "**New DIP Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the New DIP Order.

155.    "**New DIP Tranche A Accrued Interest**" means accrued interest, including interest paid in kind, on the New DIP Tranche A Facility as of the Effective Date.

156.    "**New DIP Tranche A Claim**" means a Claim held by the New DIP Agent or New DIP Tranche A Lenders arising under, or related to, the New DIP Tranche A Facility.

157.    "**New DIP Tranche A Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche A Lenders through the provision of new financing in accordance with the New DIP Credit Agreement and New DIP Order, in an original aggregate principal amount of $1.35 billion.

158.    "**New DIP Tranche A Lenders**" means the Plan Support Parties and the other lenders under the New DIP Tranche A Facility, in each case, as lenders party to the New DIP Credit Agreement.

159.    "**New DIP Tranche B Cap**" means $300 million.

160.    "**New DIP Tranche B Claim**" means a Claim held by the New DIP Agent or New DIP Tranche B Lenders arising under, or related to, the New DIP Tranche B Facility.

161.    "**New DIP Tranche B Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche B Lenders in the original aggregate principal amount of $300 million through either (a) the conversion of Converted Prepetition LP Facility Non-SPSO Claims into Claims under the New DIP Facility (as set forth in Article IV.D hereof) and/or (b) new financing provided by the Plan Support Parties or other lenders, in each case, in accordance with the Plan, New DIP Credit Agreement, and New DIP Order.

162.    "**New DIP Tranche B Lenders**" means (a) certain Holders of Converted Prepetition LP Facility Non-SPSO Claims that elect to convert such Claims into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof) up to the New DIP Tranche B Cap and/or (b) the Plan Support Parties or other lenders to the extent that they provide new financing under the New DIP Tranche B Facility, in each case, in accordance with the Plan, New DIP Credit Agreement, and the New DIP Order.

163.    "**New LightSquared Entities**" means, collectively, NewCo, Reorganized LightSquared Inc., and the Reorganized Subsidiaries.

164.    "**New LightSquared Entities Boards**" means, collectively, the NewCo Board, the Reorganized LightSquared Inc. Board, and each Reorganized Subsidiaries Board.

165.    "**New LightSquared Entities Bylaws**" means, collectively, the NewCo Bylaws, the Reorganized LightSquared Inc. Bylaws, and the Reorganized Subsidiaries Bylaws.

166.    "**New LightSquared Entities Charters**" means, collectively, the NewCo Charter, the Reorganized LightSquared Inc. Charter, and the Reorganized Subsidiaries Charters.

167.    "**New LightSquared Entities Corporate Governance Documents**" means, collectively, the NewCo Corporate Governance Documents, the Reorganized LightSquared Inc. Corporate Governance Documents, and the Reorganized Subsidiaries Corporate Governance Documents.

168.    "**New LightSquared Entities Shares**" means, collectively, the NewCo Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

169.    "**NewCo**" means a newly formed limited liability company in connection with the Plan Transactions contemplated by Article IV.D hereof.

170.    "**NewCo Board**" means the board of directors, board of managers, or equivalent governing body of NewCo, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable NewCo Corporate Governance Documents.

171.    "**NewCo Bylaws**" means the bylaws, partnership agreement, limited liability company membership agreement, or functionally equivalent document, as applicable, of NewCo.

172.    "**NewCo Charter**" means the charter, certificate of formation, certificate of partnership, or functionally equivalent document, as applicable, of NewCo.

173.    "**NewCo Class A Common Interests**" means those certain limited liability company class A common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

174.    "**NewCo Class B Common Interests**" means those certain limited liability company class B common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

175.    "**NewCo Class C Common Interests**" means those certain limited liability company class C common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

176.    "**NewCo Class D Common Interests**" means those certain limited liability company class D common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

177.    "**NewCo Common Interests**" means the NewCo Class A Common Interests, the NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests.

178.    "**NewCo Corporate Governance Documents**" means, as applicable, (a) the NewCo Charter, (b) the NewCo Bylaws, (c) the NewCo Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to NewCo.

179.    "**NewCo Interest Holders Agreement**" means that certain limited liability company operating agreement of NewCo with respect to the NewCo Interests, to be effective on the Effective Date and binding on all holders of the NewCo Interests.

180.    "**NewCo Interests**" means, collectively, the NewCo Common Interests and the NewCo Preferred Interests.

181.    "**NewCo Series A Preferred PIK Interests**" means the NewCo Series A-1 Preferred PIK Interests and the NewCo Series A-2 Preferred PIK Interests.

182.    "**NewCo Series A-1 Preferred PIK Interests**" means those certain limited liability company series A-1 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

183.    "**NewCo Series A-2 Preferred PIK Interests**" means those certain limited liability company series A-2 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

184.    "**Non-Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof do not elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof).

185.    "**Other Existing Inc. Series B Preferred Stock Holders**" means the Holders of the Existing Inc. Series B Preferred Stock Equity Interests other than SIG Holdings, Inc.

186.    "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

187.    "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

188.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

189.    "**Petition Date**" means May 14, 2012.

190.    "**Plan**" means this *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of each Plan Support Party and in accordance with the terms hereof), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

191.    "**Plan Consideration**" means, collectively, the Inc. Plan Consideration and the LP Plan Consideration.

192.    "**Plan Consideration Carve-Out**" means, collectively, the Inc. Plan Consideration Carve-Out and the LP Plan Consideration Carve-Out.

193.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

194.    "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to each Plan Support Party.

195.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to each Plan Support Party) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including:  (a) executed commitment letters, form and/or definitive agreements, and related documents with respect to (i) the Exit Credit Agreements, (ii) the Reorganized LightSquared Inc. Loan Agreement, (iii) the SPSO Note Documents, and (iv) the Exit Intercreditor Agreement; (b) the New LightSquared Entities Corporate Governance Documents; (c) the Schedule of Assumed Agreements; and (d) the Schedule of Retained Causes of Action.

196.    "**Plan Supplement Date**" means February 14, 2014 or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Debtors reserve the right to File amended Plan Documents at any time prior to the Confirmation Hearing Date.

197.    "**Plan Support Parties**" means Plan Support Party A, Plan Support Party B, Plan Support Party C, and Plan Support Party D.

198.    "**Plan Support Party A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

199.    "**Plan Support Party ABC**" means Plan Support Party A, Plan Support Party B, and Plan Support Party C.

200.    "**Plan Support Party ABC Debt-Converted New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *less* (a) the Plan Support Party ABC Equity-Converted New DIP Claims and (b) Plan Support Party ABC's ratable share of the First Lien Exit Excess Amount.

201.    "**Plan Support Party ABC Equity-Converted New DIP Claims**" means $115 million of the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *plus* 11% of any New DIP Tranche A Accrued Interest attributed to Plan Support Party ABC's New DIP Tranche A Claims.

202.    "**Plan Support Party B**" means Melody Business Finance, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds.

203.    "**Plan Support Party Break-Up Fee**" means a break-up fee of $100 million for the ratable benefit of the New DIP Commitment Parties, irrevocably earned upon the New DIP Closing Date and payable in Cash on the earlier of the date (a) the Debtors propose or support any chapter 11 plan other than this Plan, (b) the Debtors withdraw this Plan or propose any modifications hereto pursuant to section 1127(b) of the Bankruptcy Code, in each case, without the prior written consent of each New DIP Initial Lender, or (c) the confirmation of any chapter 11 plan other than this Plan; underlined, that the conditions to the effectiveness of the Plan set forth in Article IX.B hereof shall have been capable of being satisfied at the time of either clauses (a), (b), or (c) above, or such conditions shall have been capable of being satisfied but for the passage of time.

204.    "**Plan Support Party C**" means Harbinger Capital Partners, LLC or its designated affiliates.

205.    "**Plan Support Party C Call Option**" means a call option, exercisable by Plan Support Party C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests and NewCo Class D Common Interests in accordance with the NewCo Corporate Governance Documents.

206.    "**Plan Support Party Cashed-Out New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Parties that are not (a) Plan Support Party ABC Debt-Converted New DIP Claims, (b) Plan Support Party ABC Equity-Converted New DIP Claims, or (c) Plan Support Party D Debt-Converted New DIP Claims.

207.    "**Plan Support Party D**" means JPMorgan Chase & Co. or its designated affiliates.

208.    "**Plan Support Party D Debt-Converted New DIP Claims**" means $300 million of the Allowed New DIP Tranche A Claims held by Plan Support Party D, *plus* all New DIP Tranche A Accrued Interest thereon, *less* an amount equal to 22.22% of the First Lien Exit Excess Amount, which Claims shall be converted into loans under the Reorganized LightSquared Inc. Loan.

209.    "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to

21

effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the New LightSquared Entities determine are necessary or appropriate.

210. "**Prepetition Agents**" means the Prepetition Inc. Agent and the Prepetition LP Agent.

211. "**Prepetition Facilities**" means the Prepetition Inc. Facility and the Prepetition LP Facility.

212. "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

213. "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

214. "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

215. "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

216. "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

217. "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

218. "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

219. "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

220.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

221.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

222.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

223.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

224.    "**Prepetition Inc. Non-Subordinated Parties**" means the Prepetition Inc. Agent and the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims.

225.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

226.    "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

227.    "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

228.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

229.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

230.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

231.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

232.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

233.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO, its affiliates, or each of their successors or assigns.

234.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

235.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

236.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

237.    "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

238.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

239.    "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

240.    "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

241.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the New LightSquared Entities on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

242.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the New LightSquared Entities in the Professional Fee Escrow Account.

243.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

244.    "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

245.    "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

246.    "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

247.    "**Released Party**" means each of the following:  (a) the Debtors; (b) the New LightSquared Entities; (c) each Plan Support Party; (d) each DIP Agent,  each DIP Lender (other than any SPSO Party, subject to the proviso below), and each arranger and book runner of the DIP Facilities; (e) each Exit Agent, each Exit Lender, and each arranger and book runner of the Exit Facilities; (f) the Reorganized LightSquared Inc. Loan Holder and each agent, arranger, and book runner of the Reorganized LightSquared Inc. Loan; (g) each Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party, subject to the proviso below); and (h) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such); provided, that each SPSO Party shall be deemed a

Released Party if Class 7B votes to accept the Plan and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility.

248.    "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

249.    "**Reorganized Debtors**" means, collectively, the Reorganized Inc. Debtors and the Reorganized LP Debtors.

250.    "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

251.    "**Reorganized LightSquared GP LLC**" means LightSquared GP Inc., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

252.    "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

253.    "**Reorganized LightSquared Inc. Board**" means the board of directors, board of managers, or equivalent governing body of Reorganized LightSquared Inc., as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized LightSquared Inc. Corporate Governance Documents.

254.    "**Reorganized LightSquared Inc. Bylaws**" means the bylaws or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

255.    "**Reorganized LightSquared Inc. Call Option**" means a call option, exercisable by Reorganized LightSquared Inc. in its sole discretion, to purchase (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests from the Holders of Existing Inc. Series A Preferred Stock Equity Interests (or their successor and assigns) and (b) $1.76 million of NewCo Series A-2 Preferred PIK Interests from the Other Existing Inc. Series B Preferred Stock Holders (or their successors and assigns), in each case in accordance with the NewCo Corporate Governance Documents.

256.    "**Reorganized LightSquared Inc. Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

257.    "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

258.    "**Reorganized LightSquared Inc. Corporate Governance Documents**" means (a) the Reorganized LightSquared Inc. Charter, (b) the Reorganized LightSquared Inc. Bylaws, and (c) any other applicable organizational or operational documents with respect to Reorganized LightSquared Inc.

259.    "**Reorganized LightSquared Inc. Loan**" means that certain secured credit facility in the original aggregate principal amount of $300 million provided in connection with the Reorganized LightSquared Inc. Loan Agreement, subject to adjustment in accordance with the Reorganized LightSquared Inc. Loan Adjustment.

260.    "**Reorganized LightSquared Inc. Loan Adjustment**" means the amount, if any, the original aggregate principal amount of the Reorganized LightSquared Inc. Loan shall be (a) increased by the aggregate amount of New DIP Tranche A Accrued Interest attributed to Plan Support Party D's New DIP Tranche A Claims, and/or (b) decreased by an amount equal to the product of (i) the First Lien Exit Excess Amount and (ii) 22.22%, in each case, on a dollar-for-dollar basis.

261.    "**Reorganized LightSquared Inc. Loan Agreement**" means that certain agreement entered into between the Reorganized LightSquared Inc. Loan Holder and Reorganized LightSquared Inc. documenting, among other things, the terms of the Reorganized LightSquared Inc. Loan and the obligations with respect thereto.

262.    "**Reorganized LightSquared Inc. Loan Holder**" means Plan Support Party D.

263.    "**Reorganized LightSquared Investors Holdings Inc.**" means LightSquared Investors Holdings Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

264.    "**Reorganized LightSquared LP**" means Reorganized LightSquared LP, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

265.    "**Reorganized LP Debtors**" means the LP Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

266.    "**Reorganized One Dot Four Corp.**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

267.    "**Reorganized One Dot Six LLC**" means One Dot Six Corp., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

268. "**Reorganized SkyTerra Investors LLC**" means SkyTerra Investors LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

269. "**Reorganized SkyTerra Rollup LLC**" means SkyTerra Rollup LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

270. "**Reorganized SkyTerra Rollup Sub LLC**" means SkyTerra Rollup Sub LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

271. "**Reorganized Subsidiaries**" means, collectively, the Reorganized Debtors, other than Reorganized LightSquared Inc.

272. "**Reorganized Subsidiaries Board**" means the board of directors, board of managers, or equivalent governing body of each of the Reorganized Subsidiaries, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Subsidiaries Corporate Governance Documents.

273. "**Reorganized Subsidiaries Bylaws**" means the bylaws or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

274. "**Reorganized Subsidiaries Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

275. "**Reorganized Subsidiaries Corporate Governance Documents**" means (a) the Reorganized Subsidiaries Charter, (b) the Reorganized Subsidiaries Bylaws, (c) the Reorganized Subsidiaries Shareholders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Subsidiaries.

276. "**Reorganized Subsidiaries Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of the Reorganized Subsidiaries, to be effective on the Effective Date.

277. "**Reorganized TMI Communications Delaware, Limited Partnership**" means Reorganized TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

278. "**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

279.    "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

280.    "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

281.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

282.    "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

283.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

284.    "**Second Amended Plan**" has the meaning set forth in the Introduction hereof.

285.    "**Second Lien Exit Adjustment**" means (a) an increase to the original aggregate principal amount of the Second Lien Exit Facility equal to the product of (i) the aggregate amount of any New DIP Tranche A Accrued Interest and (ii) 89%, and/or (b) a decrease to the original aggregate principal amount of the Second Lien Exit Facility equal to the First Lien Exit Excess Amount, in each case, on a dollar-for-dollar basis.

286.    "**Second Lien Exit Agent**" means the arranger and administrative agent under the Second Lien Exit Credit Agreement or any successor agent appointed in accordance with the Second Lien Exit Credit Agreement.

287.    "**Second Lien Exit Borrower**" means NewCo, as borrower under the Second Lien Exit Credit Agreement.

288.    "**Second Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Second Lien Exit Obligors, the Second Lien Exit Agent, and the Second Lien Exit Lenders.

289.    "**Second Lien Exit Facility**" means that certain second lien credit facility in the original aggregate principal amount of $1.20 billion provided in connection with the Second Lien Exit Credit Agreement, subject to adjustment in accordance with the Second Lien Exit Adjustment.

290.    "**Second Lien Exit Guarantors**" means the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), as guarantors under the Second Lien Exit Credit Agreement.

291.    "**Second Lien Exit Lenders**" means the lenders party to the Second Lien Exit Credit Agreement from time to time.

292.    "**Second Lien Exit Obligors**" means the Second Lien Exit Borrower and the Second Lien Exit Guarantors.

293.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

294.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

295.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

296.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

297.    "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof) and the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof).

298.    "**Special Committee**" has the meaning set forth in the Introduction hereof.

299.    "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Debtors' Disclosure Statement.

300.    "**SPSO**" means SP Special Opportunities, LLC.

301.    "**SPSO Note**" means a note issued by Reorganized LightSquared LP to the Holders of Allowed Prepetition LP Facility SPSO Claims, which note shall (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London Interbank Offered Rate floor of 1.00%), which interest shall be payable in kind, and (d) be secured or unsecured on the terms and conditions of, and subject to, the SPSO Option A Treatment or SPSO Option B Treatment, as applicable.

302.    "**SPSO Note Documents**" means the SPSO Note and any related indenture, agreements, or other documents, if any.

303.    "**SPSO Option A Treatment**" means the following treatment:  (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $1.1055 billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; <u>provided</u>, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 hereof.

304.    "**SPSO Option B Treatment**" means the following treatment:  (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; <u>provided</u>, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.

305.    "**SPSO Parties**" means SPSO, L-Band Acquisition, LLC, Charles W. Ergen, DISH Network Corporation, and EchoStar Corporation.

306.    "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

307.    "**Stalking Horse Bidder**" has the meaning set forth in the Bid Procedures Order.

308.    "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

309.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

310.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

311.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

312.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

313. "**Voting Deadline**" means March [3], 2014 at 4:00 p.m. (prevailing Pacific time), or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court, which is the date by which all completed Ballots must be received by the Claims and Solicitation Agent.

314.    "**Voting Record Date**" means October 9, 2013.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents,

instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the New LightSquared Entities, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or New LightSquared Entity, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:   (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court.  For the avoidance of

doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the New LightSquared Entities no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date. Objections to such requests must be Filed and served on the New LightSquared Entities and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the New LightSquared Entities or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein (1) any claim by a New DIP Commitment Party for any Plan Support Party Break-Up Fee shall (a) be deemed an Allowed Administrative Claim, (b) be irrevocably earned by the New DIP Commitment Parties upon the New DIP Closing Date, (c) constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan, and (d) be payable in accordance with the terms of the New DIP Commitment Letter, (2) a Plan Support Party shall not be required to File any request for payment of such Administrative Claim, (3) any Plan Support Party Break-Up Fee shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (4) no SPSO Party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the New LightSquared Entities shall establish and fund the Professional Fee Escrow Account from the Plan

Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors or New LightSquared Entities. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the New LightSquared Entities. For the avoidance of doubt, the Inc. Debtors shall fund 15% of the Professional Fee Escrow Account from the Inc. Plan Consideration Carve-Out and the LP Debtors shall fund 85% of the Professional Fee Escrow Account from the LP Plan Consideration Carve-Out.

       3.     <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors and the Plan Support Parties no later than five (5) days prior to the anticipated Confirmation Date; <u>provided</u>, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated and agreed to by the Debtors and the Plan Support Parties as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

       4.     <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or New LightSquared Entities, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or New LightSquared Entities, as applicable, on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or New LightSquared Entities, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

*C.*     *DIP Inc. Claims*

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything

contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

D.    DIP LP Claims

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

E.    New DIP Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Claim agrees to a less favorable or other treatment, the Holders of New DIP Claims shall receive the following, as applicable:

1.    Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

2.    Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78% of the NewCo Series A-1 Preferred PIK Interests and (b) 77.78% of the NewCo Class A Common Interests;

3.      Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Reorganized LightSquared Inc. Loan in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

4.      Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and

5.      Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration in the form of Cash in an amount equal to such New DIP Tranche B Facility Claim.

*F.      Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

*G.      Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

*A.      Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution

37

pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    <u>Class 1 – Inc. Other Priority Claims</u>

(a)    *Classification*:  Class 1 consists of all Inc. Other Priority Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

(c)    *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – LP Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of all LP Other Priority Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

38

(c)    *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Inc. Other Secured Claims

(a)    *Classification*:  Class 3 consists of all Inc. Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 – LP Other Secured Claims

(a)    *Classification*:  Class 4 consists of all LP Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such

Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 4 is Unimpaired by the Plan.  Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.    Class 5 - Prepetition Inc. Facility Non-Subordinated Claims

(a)    *Classification*:  Class 5 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)    *Allowance*:  Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (iii) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

(c)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, the Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim, shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP

Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim. For the avoidance of doubt, the treatment provided to Class 5 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors.

(d)    *Voting:* Class 5 is Unimpaired by the Plan. Each Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

6.    Class 6 - Prepetition Inc. Facility Subordinated Claims

(a)    *Classification*:    Class 6 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests. For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.

(c)    *Voting:* Class 6 is Impaired by the Plan. Each Holder of a Class 6 Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.    Class 7A - Prepetition LP Facility Non-SPSO Claims

(a)    *Classification*: Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)    *Allowance*: Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $1.0883 billion, calculated as follows: (A) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (B) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31,

2013; (C) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (D) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, on a *per diem* basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (ii) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (iii) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

(c)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment:

(i)     the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim, shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or

(ii)     each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility

Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.

For the avoidance of doubt, the treatment provided to Class 7A herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.

(d)     *Voting*:  Class 7A is Impaired by the Plan.  Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.    Class 7B - Prepetition LP Facility SPSO Claims

(a)     *Classification*:   Class 7B consists of all Prepetition LP Facility SPSO Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)      in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or

(ii)      in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.

For the avoidance of doubt, the treatment provided to Class 7B herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by

the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors.

(c)   *Voting*:  Class 7B is Impaired by the Plan.  Each Holder of a Class 7B Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court and treated in accordance with Article III.D.4 hereof.

9.   Class 8 – Inc. General Unsecured Claims

(a)   *Classification*:  Class 8 consists of all Inc. General Unsecured Claims.

(b)   *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

(c)   *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.   Class 9 – LP General Unsecured Claims

(a)   *Classification*:  Class 9 consists of all LP General Unsecured Claims.

(b)   *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)   *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Class 9 LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.   Class 10 – Existing LP Preferred Units Equity Interests

(a)   *Classification*:  Class 10 consists of all Existing LP Preferred Units Equity Interests.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests.

(c) *Voting*: Class 10 is Impaired by the Plan. Each Holder of a Class 10 Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.    Class 11A – Existing Inc. Series A Preferred Stock Equity Interests

(a) *Classification*: Class 11A consists of all Existing Inc. Series A Preferred Stock Equity Interests.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series A Preferred Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.

(c) *Voting*: Class 11A is Impaired by the Plan. Each Holder of a Class 11A Existing Inc. Series A Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.    Class 11B – Existing Inc. Series B Preferred Stock Equity Interests

(a) *Classification*: Class 11B consists of all Existing Inc. Series B Preferred Stock Equity Interests.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series B Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series B Preferred Stock Equity Interest agrees to any other treatment (including as described in the immediately following proviso), each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided that, in lieu

45

of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

(c)    *Voting*: Class 11B is Impaired by the Plan. Each Holder of a Class 11B Existing Inc. Series B Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.    <u>Class 12 – Existing Inc. Common Stock Equity Interests</u>

(a)    *Classification*:   Class 12 consists of all Existing Inc. Common Stock Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

(c)    *Voting*:   Class 12 is Impaired by the Plan.   Each Holder of a Class 12 Existing Inc. Common Stock Equity Interests as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    <u>Class 13 – Intercompany Claims</u>

(a)    *Classification*: Class 13 consists of all Intercompany Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; <u>provided</u>, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

46

(c)    *Voting*:  Class 13 is Unimpaired by the Plan.  Each Holder of a Class 13 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 13 Intercompany Claim is entitled to vote to accept or reject the Plan.

16.    <u>Class 14 – Intercompany Interests</u>

(a)    *Classification*:  Class 14 consists of all Intercompany Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

(c)    *Voting*:  Class 14 is Unimpaired by the Plan.  Each Holder of a Class 14 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 14 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.    *Acceptance or Rejection of Plan*

1.    <u>Voting Classes Under Plan</u>

Under the Plan, Classes 6, 7A, 7B, 8, 9, 10, 11A, 11B, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Debtors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    <u>Presumed Acceptance Under Plan</u>

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 13, and 14 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.      Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.      Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Debtors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code.  The Debtors reserve the right, with the consent of each Plan Support Party, to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary; provided, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF PLAN**

A.      *Overview of Plan*

The Plan contemplates, among other things, (1) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (2) first lien exit financing, including a facility of not less than $1 billion, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (6) the preservation of the Debtors' litigation claims.

B.      *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On and after the Confirmation Date or the Effective Date, as applicable,  the Debtors or the New LightSquared Entities, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Debtors or the New LightSquared Entities, as applicable, determine are necessary or appropriate.

C.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Debtors, the New LightSquared Entities, or the Disbursing Agent, as applicable, to make Plan Distributions shall be obtained from the Plan Consideration and the Plan Consideration Carve-Out.  After the satisfaction of all Allowed Claims and Allowed Equity Interests in accordance with the Plan, all remaining proceeds from the Exit Facilities shall be placed in a working capital reserve of NewCo.

D.      *Certain Pre-Confirmation Date, Confirmation Date, and Effective Date Plan Transactions*

1.      <u>Pre-Confirmation Date Plan Elections</u>.    Certain Plan Transactions require elections by certain Holders of Claims on their respective Ballots prior to the Confirmation Date, including the following:

(a)    Each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall be entitled to elect on its respective Ballot to convert on the New DIP Closing Date any portion of its Allowed Prepetition LP Facility Non-SPSO Claim into a New DIP Tranche B Claim in full satisfaction of such Converted Prepetition LP Facility Non-SPSO Claim as set forth in Article III.B.7(c)(ii) hereof; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims:  (i) exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims; or (ii) is less than the New DIP Tranche B Cap, the Plan Support Parties shall provide new financing as part of the New DIP Tranche B Facility in an amount equal to the difference between the New DIP Tranche B Cap and the Converted Prepetition LP Facility Non-SPSO Claims.

2.    Confirmation Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)    The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, the New DIP Lenders shall fund the New DIP Facility through the (i) conversion of Allowed Prepetition LP Facility Non-SPSO Claims into New DIP Tranche B Claims and/or (ii) provision of new financing by the Plan Support Parties as part of the New DIP Tranche A Facility and New DIP Tranche B Facility, as applicable, in each case, in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, and New DIP Order.

(b)    The Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims.

3.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    NewCo

(i)    The Debtors, or a nominee thereof, shall have established NewCo.

(ii)    NewCo, the other First Lien Exit Obligors, and the other relevant Entities shall enter into the First Lien Exit Credit Agreement.  The First Lien Exit Lenders shall fund the First Lien Exit Facility through the provision of new financing, in accordance with the

Plan, Confirmation Order, and First Lien Exit Credit Agreement. The proceeds of the First Lien Exit Facility shall be used to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repaying the New DIP Tranche B Facility, and provide post-Effective Date working capital. The proceeds of First Lien Exit Excess Amount shall be used to repay a portion of the New DIP Tranche A Facility.

(iii) NewCo, the other Second Lien Exit Obligors, and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement. The Second Lien Exit Facility shall be funded through the (A) conversion of Plan Support Party ABC Debt-Converted New DIP Claims into loans under the Second Lien Exit Facility (which amount shall equal 77.78% of the original principal amount of the Second Lien Exit Facility) and (B) issuance of loans under the Second Lien Exit Facility (which amount shall equal 22.22% of the original principal amount of the Second Lien Exit Facility) to Reorganized LightSquared Inc. on account of the LightSquared Transfer, in each case, in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement. The proceeds of the Second Lien Exit Facility shall be used to, among other things, satisfy certain obligations under the Plan.

(iv) NewCo shall issue NewCo Series A-1 Preferred PIK Interests, which shall be issued and allocated as follows: (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(v) NewCo shall issue NewCo Series A-2 Preferred PIK Interests, which shall be issued and allocated as follows: (A) $75 million Pro Rata to Holders of Allowed Existing LP Preferred Units Equity Interests on account of such Allowed Equity Interests; (B) $209 million Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims; (C) $17.54 million Pro Rata to Holders of Allowed Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); (D) $1.76 million Pro Rata to Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); and (E) $51.7 million to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(vi)    NewCo shall issue NewCo Class A Common Interests, which shall be issued and allocated as follows:  (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(vii)   NewCo shall issue NewCo Class B Common Interests, which shall be issued and allocated as follows:  (A) 70% Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims and (B) 30% Pro Rata to the Holders of Allowed Existing Inc. Common Stock Equity Interests on account of such Allowed Equity Interests.

(viii)  NewCo shall issue NewCo Class C Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated as follows:  (A) 90.9% Pro Rata to the Holders of Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests; and (B) 9.1% Pro Rata to the Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests.

(ix)    NewCo shall issue NewCo Class D Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(x)     NewCo shall reserve for issuance up to 10% of NewCo Common Interests in connection with the Management Incentive Plan (subject to the agreement of each Plan Support Party).

(xi)    Plan Support Party C shall be granted the Plan Support Party C Call Option.

(b)    Reorganized Debtors

(i)     One Dot Six Corp. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(ii)    Lightsquared Holdings GP Inc. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(iii)    LightSquared Inc. shall be reorganized as Reorganized LightSquared Inc. and the other Debtors shall be reorganized as the Reorganized Subsidiaries.

(iv)    Reorganized LightSquared Inc. shall sell, assign, and/or transfer to NewCo all of Reorganized LightSquared Inc.'s Assets and Equity Interests (other than Reorganized LightSquared Inc.'s tax attributes or its Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Inc.'s Equity Interests in Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(v)    Reorganized LightSquared Investors Holdings Inc. shall sell, assign, and transfer to NewCo all of Reorganized LightSquared Investors Holdings Inc.'s Assets and Equity Interests (other than its tax attributes and its Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vi)    Reorganized TMI Communications Delaware, Limited Partnership shall sell, assign, and transfer to NewCo all of Reorganized TMI Communications Delaware, Limited Partnership's Assets and Equity Interests (other than its tax attributes), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vii)    Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. shall sell, assign, and transfer to NewCo all of such Entities' Assets (other than their

tax attributes, Reorganized SkyTerra Rollup LLC's Equity Interests in Reorganized SkyTerra Rollup Sub LLC, and Reorganized SkyTerra Rollup Sub LLC's Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(viii)    All other Reorganized Subsidiaries shall sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

(ix)    As a result of the foregoing Plan Transactions, (A) NewCo shall be the limited partner, and Reorganized LightSquared GP LLC shall be the general partner, of Reorganized LightSquared LP, (B) NewCo shall wholly own Reorganized One Dot Six LLC, (C) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) shall have been sold, assigned, and transferred to NewCo and shall become subsidiaries of NewCo on the Effective Date, and (D) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., SkyTerra Rollup Sub LLC, and TMI Communications Delaware, Limited Partnership.

(x)    Reorganized LightSquared Inc. shall issue the Reorganized LightSquared Inc. Loan to Plan Support Party D in exchange for the Plan Support Party D Debt-Converted New DIP Claims in accordance with the Plan, Confirmation Order, and Reorganized LightSquared Inc. Loan Agreement.

(xi)    Reorganized LightSquared Inc. shall issue to SIG Holdings, Inc. (or its designee) 100% of the Reorganized LightSquared Common Shares on account of, and in exchange for the cancellation of, the Allowed Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc.

(xii)    Plan Support Party C shall be granted the Plan Support Party C Call Option.

(xiii)    Reorganized LightSquared Inc. shall be granted the Reorganized LightSquared Inc. Call Option.

(xiv)    As a result of, and in exchange for, the Plan Transactions (including the LightSquared Transfer), Reorganized LightSquared Inc. shall hold (A) 22.22% of loans under the Second Lien Exit Facility, (B) 22.22% of NewCo Series A-1 Preferred PIK Interests, (C) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (D) 22.22% of NewCo Class A Common Interests, and (E) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

E.    *First Lien Exit Facility*

On the Effective Date, the First Lien Exit Obligors and the other relevant Entities shall enter into the First Lien Exit Credit Agreement, and the First Lien Exit Facility shall be funded with new financing in accordance therewith.  The applicable New LightSquared Entities shall use the First Lien Exit Facility for the purposes specified in the Plan, the First Lien Exit Credit Agreement, and the other governing documents, including to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repayment of the New DIP Tranche B Facility, and provide post-Effective Date working capital.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) authorization for the Debtors to enter into the commitment letter and fee letter related to the First Lien Exit Facility Filed by the Debtors with the Plan Supplement and to incur obligations thereunder and to pay fees, indemnities, and expenses provided for therein, (2) approval of the First Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the First Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (3) authorization for the First Lien Exit Obligors to enter into and execute the First Lien Exit Credit Agreement and such other documents as may be required or appropriate.  On the Effective Date, the First Lien Exit Facility, together with any new promissory notes evidencing the obligation of the First Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the First Lien Exit Obligors pursuant to the First Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the First Lien Exit Credit Agreement and related documents.  The liens securing the First Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

F.    *Second Lien Exit Facility*

On the Effective Date, the Second Lien Exit Obligors and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement, and the Second Lien Exit Facility shall be funded as set forth in Article IV.D.3(a) hereof.  The Second Lien Exit Facility shall permit NewCo to incur a new debt facility of up to $500 million, which shall be secured by liens senior

to the liens under the Second Lien Exit Facility and junior to the liens under the First Lien Exit Facility (the "1.5 Lien Loans"). The Plan Support Parties shall have the right (but not the obligation) to purchase their *pro rata* share of any 1.5 Lien Loans based on their commitment percentages. In the event that any Plan Support Party fails to purchase its entire share of the 1.5 Lien Loans, the other Plan Support Parties shall have the right (but not the obligation) to purchase the remaining 1.5 Lien Loans on a *pro rata* basis. In the event that the Plan Support Parties do not exercise their right to purchase the entire principal amount of the 1.5 Lien Loans, NewCo may issue such remaining 1.5 Lien Loans to third parties. The applicable New LightSquared Entities shall use the Second Lien Exit Facility for the purposes specified in the Plan, the Second Lien Exit Credit Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Second Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for the Second Lien Exit Obligors to enter into and execute the Second Lien Exit Credit Agreement and such other documents as may be required or appropriate. On the Effective Date, the Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of the Second Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the Second Lien Exit Obligors pursuant to the Second Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Second Lien Exit Credit Agreement and related documents. The liens securing the Second Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

G.    *Reorganized LightSquared Inc. Loan*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the Reorganized LightSquared Inc. Loan Agreement. On the Effective Date, the Reorganized LightSquared Inc. Loan shall be funded by the Reorganized LightSquared Inc. Loan Holder converting its Plan Support Party D Debt-Converted New DIP Claims (inclusive of New DIP Tranche A Accrued Interest attributed thereto) into loans under the Reorganized LightSquared Inc. Loan, on a dollar-for-dollar basis, in full satisfaction of such Plan Support Party D Debt-Converted New DIP Claims (as set forth in Articles II.E and IV.D hereof) in accordance with the Reorganized LightSquared Inc. Loan Agreement. Reorganized LightSquared Inc. shall use the Reorganized LightSquared Inc. Loan for the purposes specified in the Plan, the Reorganized LightSquared Inc. Loan Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Reorganized LightSquared Inc. Loan Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc.

Loan Agreement and such other documents as may be required or appropriate.  On the Effective Date, the Reorganized LightSquared Inc. Loan Agreement, together with the Reorganized LightSquared Inc. Loan evidencing the obligation of Reorganized LightSquared Inc., and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Loan Agreement and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Loan Agreement and related documents.

H.      [RESERVED]

I.      *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (b) reserve for issuance up to 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of each Plan Support Party), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof and treated in accordance with the Plan, as applicable.  The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The applicable New Corporate Governance Documents shall contain provisions necessary to (1) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable New Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the New LightSquared Entities.

J.      *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares (other than the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer), shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code, and the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the

LightSquared Transfer shall be similarly exempted pursuant to the private placement exemption under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New LightSquared Entities Corporate Governance Documents, and (4) applicable regulatory approval, if any.

K.    *Listing of New LightSquared Entities Shares; Reporting Obligations*

The New LightSquared Entities shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date. In order to prevent the New LightSquared Entities from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New LightSquared Entities Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the New LightSquared Entities Corporate Governance Documents.

L.    *NewCo Interest Holders Agreement*

On the Effective Date, NewCo shall enter into and deliver the NewCo Interest Holders Agreement.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the NewCo Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by NewCo, and (2) authorization for NewCo to enter into and execute the NewCo Interest Holders Agreement and such other documents as may be required or appropriate. On the Effective Date, the NewCo Interest Holders Agreement, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by NewCo pursuant to the NewCo Interest Holders Agreement and related documents shall be satisfied pursuant to, and as set forth in, the NewCo Interest Holders Agreement and related documents.

M.    *Indemnification Provisions in New LightSquared Entities Corporate Governance Documents*

As of the Effective Date, the New LightSquared Entities Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and

limitation of liability of, and advancement of fees and expenses to, the New LightSquared Entities' current and former directors, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the New LightSquared Entities shall amend or restate the New LightSquared Entities Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the New LightSquared Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

N.    *Management Incentive Plan*

On or as soon as practicable following the Consummation of the Plan, the NewCo Board shall adopt the Management Incentive Plan.

O.    *Corporate Governance*

As shall be set forth in the New LightSquared Entities Charters and New LightSquared Entities Bylaws, the New LightSquared Entities Boards shall consist of a number of members, and appointed in a manner, to be agreed upon by each Plan Support Party or otherwise provided in the New LightSquared Entities Corporate Governance Documents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the New LightSquared Entities Boards or officer of the New LightSquared Entities and (2) the nature of compensation for any officer employed or retained by the New LightSquared Entities who is an "insider" under section 101(31) of the Bankruptcy Code.

P.    *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Exit Facilities and any rights of any of the parties under the Exit Credit Agreements or any of the related documents, (2) any Liens granted to secure the Reorganized LightSquared Inc. Loan and any rights of any of the parties under the Reorganized LightSquared Inc. Loan Agreement or any of the related documents, (3) any Liens granted to secure the SPSO Note or any of the related documents if Class 7B elects to receive the SPSO Option A Treatment, and (4) any rights of any of the parties under any of the New LightSquared Entities Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each New LightSquared Entity may operate its business and may use, acquire, or dispose of

property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Q.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the New LightSquared Entities shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, that (1) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the New LightSquared Entities and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

All Liens securing the Prepetition Facility Claims under the Prepetition Inc. Credit Agreement or the Prepetition LP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to the Effective Date of the Plan, at which time such Liens shall be terminated.

R.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents)

are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

S.        *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the New LightSquared Entities, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the Exit Credit Agreements, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New LightSquared Entities Corporate Governance Documents, the Management Incentive Plan, and commitment letters and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the New LightSquared Entities; (5) the issuance and distribution of the New LightSquared Entities Shares and the SPSO Note; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate:  (1) the Exit Credit Agreements; (2) the Reorganized LightSquared Inc. Loan Agreement; (3) the SPSO Note Documents; (4) the Exit Intercreditor Agreement; (5) the New LightSquared Entities Corporate Governance Documents; (6) the Management Incentive Plan; and (7) any and all other agreements, documents, securities, and instruments related to the foregoing.  The authorizations and approvals contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.        *Effectuating Documents; Further Transactions*

On and after the Effective Date, the New LightSquared Entities and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement,

and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the New LightSquared Entities, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

U.     *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a New LightSquared Entity or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the New LightSquared Entities, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

V.     *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary herein, on the Effective Date: (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action, and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses in exchange for the treatment of Claims and Equity Interests held by Plan Support Party C as set forth in this Plan; (3) NewCo, through its authorized agents or representatives, shall retain and may exclusively enforce and pursue any and all such Causes of Action; (4) NewCo shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; and (5) NewCo reserves and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

Plan Support Party C shall not assert any unasserted claim or Cause of Action arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses on and after the Effective Date unless and until NewCo asserts any such unasserted claim or Cause of Action; provided, however, that on and after the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum, Plan Support Party C shall be deemed to have irrevocably waived the right to assert any such unasserted claims or Causes of Action. Any proceeds of any rights of action contributed to NewCo from the Reorganized Debtors shall be payable to NewCo.

W.    *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the New LightSquared Entities shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions

after the Effective Date.  As of the Effective Date, the Debtors or New LightSquared Entities, as applicable, anticipate purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

X.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable New LightSquared Entities shall assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Debtors' Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or New LightSquared Entities' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Article III.B.14 hereof; provided, that the applicable New LightSquared Entities Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable New LightSquared Entities awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the New LightSquared Entities Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the New LightSquared Entities' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein (including Article IV.X hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.      Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Debtors and the Plan Support Parties shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or

assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the New LightSquared Entities no later than thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.B.9 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 9 in Article III.B.10 hereof.

C.     *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Debtors or New LightSquared Entities, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the New LightSquared Entities' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline").  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the

proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the New LightSquared Entities to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Debtors or New LightSquared Entities, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors and the New LightSquared Entities reserve the right to reject any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and New LightSquared Entities expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the New LightSquared Entities, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable New LightSquared Entity in the ordinary course of business.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Postpetition Contracts and Leases*

Each New LightSquared Entity shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable New LightSquared Entity after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or New LightSquared Entity, in each case, in accordance with, and subject to, the then applicable terms.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and the New LightSquared Entities, with the consent of each Plan Support Party, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New LightSquared Entities shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend their decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Agents, the Prepetition Agents, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors and the New LightSquared Entities, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors and the New LightSquared Entities, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.     *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims on the New DIP Closing Date, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, New LightSquared Entity, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Plan Support Parties, the eligible Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The New LightSquared Entities are authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the New LightSquared Entities shall reserve any applicable Plan Consideration from

Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.      *Disbursing Agent*

All Plan Distributions shall be made by the Debtors or the New LightSquared Entities as Disbursing Agent, or such other Entity designated by the Debtors or the New LightSquared Entities as Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Debtors or the New LightSquared Entities, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the New LightSquared Entities, as applicable, to the Disbursing Agent for the benefit of the Plan Support Parties, the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.      *Rights and Powers of Disbursing Agent*

1.      Powers of Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.      Expenses Incurred on or After Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by the New LightSquared Entities.

E.    *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

    1.    Payments and Plan Distributions on Disputed Claims and Disputed Equity Interests

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

    2.    Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed Equity Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

    1.    Delivery of Plan Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' or the New LightSquared Entities' records as of the date of any such Plan Distribution; provided, however, that the manner of such Plan Distributions shall be determined at the discretion of the Debtors or the New LightSquared Entities; provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Articles VI.F.5 and VI.F.6 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

    2.    Delivery of Plan Distributions to Holders of Allowed DIP Inc. Claims

The Plan Distributions provided for Allowed DIP Inc. Claims pursuant to Article II.C hereof and the New DIP Facility shall be made to the DIP Inc. Agent by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

3. <u>Delivery of Plan Distributions to Holders of Allowed DIP LP Claims</u>

The Plan Distributions provided for Allowed DIP LP Claims pursuant to Article II.D hereof and the New DIP Facility shall be made to the DIP LP Lenders by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

4. <u>Delivery of Plan Distributions to Holders of Allowed New DIP Claims</u>

The Plan Distributions provided for Allowed New DIP Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

5. Delivery of Plan Distributions to Holders of Allowed Prepetition Inc. Facility <u>Claims</u>

The Plan Distributions provided for Allowed Prepetition Inc. Facility Non-Subordinated Claims by Article III.B.5 hereof shall be made to the Prepetition Inc. Agent by the Debtors, or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

The Plan Distribution provided by Article  III.B.6 hereof shall be made to the Prepetition Inc. Agent directly by the New LightSquared Entities or the Disbursing Agent to the Holders of Allowed Prepetition Inc. Subordinated Facility Claims.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Inc. Plan Consideration is eligible to be distributed to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims at the direction of the Prepetition Inc. Agent.

Notwithstanding anything to the contrary herein, (a) any Holder of a Disputed Prepetition Inc. Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b) no Holder of a Prepetition Inc. Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

6. Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility <u>Claims</u>

The Plan Distributions provided for Allowed Prepetition LP Facility Claims by Articles III.B.7 and III.B.8 hereof shall be made to the Prepetition LP Agent.  Plan Distributions to be made on account of Non-Converted Prepetition LP Facility Non-SPSO Claims shall be made by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.  To the extent possible, the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall provide that the applicable LP Plan Consideration is eligible to be distributed to Prepetition LP Lenders at the direction of the Prepetition LP Agent.

Notwithstanding anything to the contrary herein, (a) any Holder of a Disputed Prepetition LP Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b) no Holder of a

Prepetition LP Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

7.    <u>Minimum Plan Distributions</u>

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.    The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

8.    <u>Undeliverable Plan Distributions and Unclaimed Property</u>

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.    After such date, all unclaimed property or interests in property shall revert to the New LightSquared Entities (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the New LightSquared Entities shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements.    Notwithstanding any provision in the Plan to the contrary, the New LightSquared Entities and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.    The New LightSquared Entities reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      Setoffs

Except with respect to any distributions on account of (1) DIP Inc. Claims, (2) DIP LP Claims, (3) Prepetition Inc. Facility Non-Subordinated Claims, or (4) Prepetition LP Facility Non-SPSO Claims, or as otherwise expressly provided for in the Plan, each Debtor or New LightSquared Entity, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Allowed Equity Interest and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Plan Distribution is made on account of such Allowed Claim or Equity Interest) any claims, rights, and Causes of Action of any nature that such Debtor or New LightSquared Entity, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or New LightSquared Entity, as applicable, of any such claims, rights, or Causes of Action that such New LightSquared Entity may possess against such Holder. In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtor or New LightSquared Entity, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.      Recoupment

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the New LightSquared Entities, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      Claims Paid or Payable by Third Parties

        1.      Claims Paid by Third Parties

The Debtors or the New LightSquared Entities, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or New LightSquared Entity. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a New LightSquared Entity on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or

74

return the Plan Distribution to the applicable New LightSquared Entity, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable New LightSquared Entity annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the New LightSquared Entities, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.    *Allowance of Claims and Equity Interests*

After the Effective Date, the New LightSquared Entities shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.V hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.7 hereof or the Bankruptcy Code.

B.    *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the New LightSquared Entities shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to

reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The New LightSquared Entities shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims. The Inc. Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 15% of the Disputed Claims and Equity Interests Reserve from the Inc. Plan Consideration Carve-Out and the LP Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 85% of the Disputed Claims and Equity Interests Reserve from the LP Plan Consideration Carve-Out. The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become Disallowed Claims or Disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions.

## C.    Estimation of Claims or Equity Interests

Before the Effective Date, the Debtors, and after the Effective Date, the New LightSquared Entities, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Debtors or New LightSquared Entities may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.     *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities, and any Claim or Equity Interest that has been amended may be adjusted thereon by the New LightSquared Entities, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.     *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Debtors or New LightSquared Entities, (3) provided for in a postpetition agreement in writing between the Debtors or New LightSquared Entities and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.     *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date.

G.     *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.      *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the New LightSquared Entities, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the New LightSquared Entities in accordance with Article III.B.16 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial

determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or New LightSquared Entities, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the New LightSquared Entities may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities. In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the New DIP Closing Date.

D.    *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the**

Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.   Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good

faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; provided, however, that each present and former Holder of a Claim or Equity Interest abstaining from voting to accept or reject the Plan may reject the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release; provided, further, however, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.

**Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.**

G.    *Injunction*

**Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all

rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the New LightSquared Entities and their successors and assigns.  The New LightSquared Entities shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

2.    The Confirmation Order shall be (a) in form and substance satisfactory to the Debtors and each Plan Support Party and (b) entered no later than March 31, 2014, or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan and the New DIP Facility and has taken such matters under advisement, April 15, 2014.

3.    The New DIP Order, in form and substance satisfactory to the Debtors and each other party to the New DIP Facility, shall have been entered contemporaneously with the Confirmation Order.

4.    The Debtors shall have received binding commitments with respect to the First Lien Exit Facility on terms and conditions satisfactory to the Debtors and each Plan Support Party.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, in form and in substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

2.    The New DIP Order, in form and substance satisfactory to the Debtors and each Plan Support Party, (a) shall have been entered and (b) shall each have become a Final Order.

3.      The New DIP Recognition Order, in form and substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

4.      The New DIP Facility shall have been funded, and there shall not be any default under the New DIP Credit Agreement or the New DIP Order that has not been waived in accordance with the terms of the New DIP Credit Agreement or the New DIP Order.

5.      The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)     the Exit Credit Agreements and any related documents, in forms and substance acceptable to the Debtors, each Plan Support Party, the Exit Agents, and the Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Exit Facilities shall have occurred;

(b)     the Reorganized LightSquared Inc. Loan Agreement and any related documents, in forms and substance acceptable to the Debtors and the Reorganized LightSquared Inc. Loan Holder, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Loan Agreement shall have occurred;

(c)     [Reserved];

(d)     the SPSO Note Documents and any related documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered (or be deemed executed and delivered) by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the SPSO Note Documents shall have occurred;

(e)     the Plan Documents relating to the LightSquared Transfer, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(f)     the New LightSquared Entities Corporate Governance Documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(g)     the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.     The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

7.     The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Debtors and each Plan Support Party, without prejudice to the New LightSquared Entities' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, that each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the New LightSquared Entities and each Plan Support Party.

8.     All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.     Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

10.     The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

C.      *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by the Debtors, with the consent of each Plan Support Party, without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of each Plan Support Party, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Debtors, with the consent of each Plan Support Party, expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

In addition, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors, with the consent of each Plan Support Party, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and

(3) nothing contained in the Plan or the Debtors' Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.

D.      *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the Exit Facilities, the Plan, or otherwise, including the Plan Support Party Break-Up Fee and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters relating to the following: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the New LightSquared Entities' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and

(d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.    Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.    Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.    Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Debtors' Disclosure Statement;

9.    To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Exit Facilities, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New Corporate Governance Documents, or any ancillary or related agreements thereto;

10.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional

amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

15.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     Determine any other matters that may arise in connection with or relate to the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Debtors' Disclosure Statement;

17.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.     Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Enforce all orders previously entered by the Bankruptcy Court; and

22.     Hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the New LightSquared Entities, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.       *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the New LightSquared Entities, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.       *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Debtors' Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.       *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.       *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the New LightSquared Entities, shall be served on:

| | |
|---|---|
| LightSquared Inc. | Milbank, Tweed, Hadley & M$^c$Cloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Plan Support Party D or Reorganized LightSquared Inc. Loan Holder, shall be served on:

| | |
|---|---|
| JPMorgan Chase & Co. | Simpson Thacher & Bartlett LLP |
| Patrick Daniello | Sandeep Qusba |
| 383 Madison Ave. | Elisha D. Graff |
| New York, NY 10179 | 425 Lexington Avenue |
| | New York, NY 10017 |

Plan Support Party A, shall be served on:

| | |
|---|---|
| Fortress Investment Group | Stroock & Stroock & Lavan LLP |
| 1345 Avenue of the Americas | Kristopher M. Hansen |
| New York, NY 10105 | Frank A. Merola |
| | Jayme T. Goldstein |
| | 180 Maiden Lane |
| | New York, NY 10038 |

the New DIP Agent or Plan Support Party B, shall be served on:

| | |
|---|---|
| Melody Business Finance, LLC | Bingham McCutchen LLP |
| Andres Scaminaci | Jeffrey S. Sabin |
| 717 Fifth Avenue, 12th Floor | Julia Frost-Davies |
| New York, NY 10022 | 399 Park Avenue |
| | New York, NY 10022 |

the Ad Hoc Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

the Prepetition LP Agent, shall be served on:

Latham & Watkins LLP
Mark A. Broude
885 Third Avenue
New York, NY 10022

the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

Akin, Gump, Strauss, Hauer & Feld LLP
Philip C. Dublin
Meredith A. Lahaie
One Bryant Park

New York, NY 10036

Plan Support Party C, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

After the Effective Date, the New LightSquared Entities have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the New LightSquared Entities are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or New LightSquared Entities', as applicable, consent, and (3) non-severable and mutually dependent.

J.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.    *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Debtors' Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Debtors' Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:  February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## Exhibit C

**Blackline of LightSquared Plan Compared Against Second Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| ) | |
| In re: | ) | Chapter 11 |
| ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| ) | |
| Debtors.[1] | ) | Jointly Administered |
| ) | |

---

---

**DEBTORS' ~~REVISED SECOND~~THIRD AMENDED JOINT PLAN PURSUANT TO
CHAPTER 11 OF BANKRUPTCY CODE**

---

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<u>C</u>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated:  New York, New York
~~December 31~~**February 14**, ~~2013~~**2014**

---

[1]       The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................... 2̶3̶

    A.    Defined Terms ........................................................................................ 2̶3̶
    B.    Rules of Interpretation .......................................................................... 2̶6̶32
    C.    Computation of Time ............................................................................ 2̶7̶32
    D.    Governing Law ...................................................................................... 2̶7̶32
    E.    Reference to Monetary Figures ............................................................. 2̶7̶33

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP ~~FACILITY~~ CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES .......................................... 2̶8̶33

    A.    Administrative Claims ........................................................................... 2̶8̶33
    B.    Accrued Professional Compensation Claims ........................................ 2̶9̶34
    C.    DIP Inc. ~~Facility~~ Claims .......................................................................... 3̶0̶35
    D.    ~~New~~ DIP ~~Facility~~**LP** Claims ................................................................. 3̶0̶36
    **E.**    **New DIP Claims** ................................................................................... **36**
    ~~E~~**F**.    Priority Tax Claims ................................................................................ 3̶0̶37
    ~~F~~**G**.    Payment of Statutory Fees ..................................................................... 3̶1̶37

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................................................................ 3̶1̶37

    A.    Summary ................................................................................................ 3̶1̶37
    B.    Classification and Treatment of Claims and Equity Interests ............... 3̶1̶38
    C.    Special Provision Governing Unimpaired Claims and Equity Interests .. 3̶8̶47
    D.    Acceptance or Rejection of Plan ........................................................... 3̶8̶47
    E.    Elimination of Vacant Classes .............................................................. 3̶9̶48
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code .......... 3̶9̶48
    G.    Controversy Concerning Impairment ................................................... 4̶0̶48

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ............................... 4̶0̶49

    A.    Overview of Plan .................................................................................. 4̶0̶49
    B.    Plan Transactions .................................................................................. 4̶0̶49
    C.    Sources of Consideration for Plan Distributions .................................. 4̶0̶49
    D.    ~~NewCo and Reorganized Debtors~~**Certain Pre-Confirmation Date, Confirmation Date, and Effective Date** Plan Transactions .................. 4̶1̶49
    E.    **First Lien** Exit ~~Financing~~**Facility** ...................................................... 4̶4̶55
    F.    ~~Rights Offering 44~~**Second Lien Exit Facility** .................................... **55**
    G.    ~~New Equity Contribution 45~~Reorganized LightSquared Inc. Loan ...... **56**

H.      [RESERVED]                                                                          57
HI.     Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated
        Intercompany Interests                                                          4557
IJ.     Issuance of Reorganized LightSquared Inc. Loan 45Section 1145 and Other
        Exemptions                                                                          57
LK.     Listing of New LightSquared Entities Shares; Reporting Obligations              4858
ML.     New LightSquared Entities Shareholders Agreements 49NewCo Interest
        Holders Agreement                                                                  58
NM.     Indemnification Provisions in New LightSquared Entities Corporate
        Governance Documents                                                           5058
ON.     Management Incentive Plan                                                       5059
PO.     Corporate Governance                                                           5059
QP.     Vesting of Assets in Reorganized Debtors                                        5059
RQ.     Cancellation of Securities and Agreements                                       5160
SR.     Corporate Existence                                                            5160
TS.     Corporate Action                                                               5261
UT.     Effectuating Documents; Further Transactions                                    5261
VU.     Exemption from Certain Taxes and Fees                                           5362
WV.     Preservation, Transfer, and Waiver of Rights of Action                          5362
XW.     Assumption of D&O Liability Insurance Policies                                  5463
YX.     Employee and Retiree Benefits                                                  5464
Z.      Toggle to Alternate Plan                                                          55

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES                                                                         5565

        A.      Assumption and Rejection of Executory Contracts and Unexpired Leases    5565
        B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases     5666
        C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
                Pursuant to Plan                                                        5766
        D.      Pre-existing Obligations to Debtors Under Executory Contracts and
                Unexpired Leases                                                        5867
        E.      Intercompany Contracts, Contracts, and Leases Entered into After Petition
                Date, Assumed Executory Contracts, and Unexpired Leases                 5867
        F.      Modifications, Amendments, Supplements, Restatements, or Other
                Agreements                                                             5868
        G.      Postpetition Contracts and Leases                                      5868
        H.      Reservation of Rights                                                   5968
        I.      Nonoccurrence of Effective Date                                         5968

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS                                          5969

        A.      Distribution Record Date                                                5969

ii

B.    Timing and Calculation of Amounts To Be Distributed .................... 5969

C.    Disbursing Agent .................................................................... 6070

D.    Rights and Powers of Disbursing Agent ...................................... 6170

E.    Plan Distributions on Account of Claims and Equity Interests Allowed After
      Effective Date ........................................................................ 6171

F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
      Distributions ......................................................................... 6271

G.    Compliance with Tax Requirements/Allocations ........................... 6373

H.    Setoffs .................................................................................. 6474

I.    Recoupment ........................................................................... 6474

J.    Claims Paid or Payable by Third Parties ...................................... 6574

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
           UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED
           EQUITY INTERESTS ....................................................... 6575

A.    Allowance of Claims and Equity Interests .................................... 6575

B.    Claims and Equity Interests Administration Responsibilities ............ 6675

C.    Estimation of Claims or Equity Interests ...................................... 6676

D.    Expungement or Adjustment to Claims or Equity Interests Without Objection 6777

E.    No Interest ............................................................................. 6777

F.    Deadline To File Objections to Claims or Equity Interests ............... 6877

G.    Disallowance of Claims or Equity Interests .................................. 6877

H.    Amendments to Claims ............................................................. 6878

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
            PROVISIONS ................................................................ 6878

A.    Discharge of Claims and Termination of Equity Interests ............... 6878

B.    Subordinated Claims ................................................................ 6979

C.    Compromise and Settlement of Claims and Controversies ............... 6979

D.    Releases by Debtors ................................................................. 7079

E.    Exculpation ............................................................................ 7080

F.    Third-Party Releases by Holders of Claims or Equity Interests ........ 7181

G.    Injunction .............................................................................. 7282

H.    Release of Liens ...................................................................... 7282

ARTICLE IX. CONDITIONS PRECEDENT TO **CONFIRMATION DATE AND**
           EFFECTIVE DATE OF PLAN ........................................... 7383

A.    Conditions Precedent to ~~Effective~~**Confirmation** Date ................... 7383

**B.    Conditions Precedent to Effective Date** ........................................ **83**

~~B~~**C**.    Waiver of Conditions ............................................................... 7586

~~C.    Deadline for Occurrence of Effective Date~~ ................................... ~~75~~

iii

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN .............. 75 86

    A.    Modification and Amendments ............................................. 75 86
    B.    Effect of Confirmation on Modifications ............................... 75 86
    C.    Revocation or Withdrawal of Plan ...................................... 76 86
    **D.**    **Validity of Certain Plan Transactions If Effective Date Does Not Occur** ... **87**

ARTICLE XI. RETENTION OF JURISDICTION .............................................. 76 87

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................ 78 89

    A.    Immediate Binding Effect .................................................. 78 89
    B.    Additional Documents ...................................................... 78 90
    C.    Reservation of Rights ....................................................... 79 90
    D.    Successors and Assigns ..................................................... 79 90
    E.    Service of Documents ....................................................... 79 90
    F.    Term of Injunctions or Stays ............................................. 81 92
    G.    Plan Supplement ............................................................ 81 92
    H.    Entire Agreement ........................................................... 81 92
    I.    Non-severability of Plan Provisions ..................................... 81 93
    J.    Votes Solicited in Good Faith ............................................ 82 93
    K.    Waiver or Estoppel ......................................................... 82 93
    L.    Conflicts ..................................................................... 82 93

**EXHIBIT**

**Exhibit A**    Inc. Debtors Revised Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

## INTRODUCTION

LightSquared Inc. and the other Debtors in the above-captioned chapter 11 cases hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532.  Reference is made to the Debtors' Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters.    The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan**, with the consent of each Plan Support Party,** prior to its substantial consummation.

The Debtors have always believed, and continue to believe, that resolution of the pending FCC proceedings will maximize the value of their assets and, accordingly, will continue their efforts with the FCC and other federal agencies in seeking approval of their pending license modification applications and related proceedings before the FCC.  Given the continuing nature of the FCC process and the facts and circumstances of these Chapter 11 Cases, the Debtors believed that it was necessary to take action to protect their Estates and the current value of their assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets.  Accordingly, on August 30, 2013, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed, on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, ~~contemplates~~**contemplated** the sale of the Debtors' assets.  Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, the Debtors, in consultation with, and at the direction of, the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee"), (i) were always receptive to any potential alternative transactions that would provide greater value for the Estates and all of the Debtors' stakeholders, and (ii) as such, fully preserved their rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

~~Since the entry of the Disclosure Statement Order, a number of parties have submitted substantial proposals to the Debtors — some in the form of bids pursuant to the Bid Procedures Order and others in the form of new value reorganization proposals.~~  As further explained in the Debtors' Disclosure Statement, upon consideration of the various proposals received to date, the Debtors, in consultation with, and at the direction of, the Special Committee, ~~have~~ determined that ~~the~~**a** reorganization of the Debtors ~~on the terms set forth herein is~~ **that satisfied** all Claims in full **and provided a** return to Holders of Equity Interests **– and not a sale – was** in the best interests of these Estates ~~because such reorganization maximizes the value of all of the Estates, satisfies all Claims in full, and provides the greatest~~ ~~return to Holders of Equity Interests.  Accordingly~~**.  Accordingly, the Debtors initially filed, on December 24, 2013, the** *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* **[Docket No. 1133] and subsequently filed, on December 31, 2013, the** *Debtors' Revised* ***Second Amended*** *Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* **[Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated**

the reorganization of the Debtors through a series of restructuring transactions. Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, the Debtors, at the direction of the Special Committee, modified and supplemented the First Amended Plan as reflected herein to integrate the reorganization transactions.and the Plan Support Parties discussed modifications of that plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of this further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place the Debtors in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by the Debtors and, certain key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Debtors' Estates and stakeholders.  As Importantly, effectiveness of the Plan is not conditioned on the Debtors' receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of the Debtors' significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with the Debtors' emergence from chapter 11 pursuant to this Plan.  To fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing the Debtors a $1.65 billion new debtor in possession credit facility.  More specifically, as set forth herein, the Plan contemplates, among other things, (i) up to $2.5$1.65 billion in senior secured exit facility financingnew debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) a $250 million senior secured loan, (iii) at least $1.25 billion in new equity contributions, (ivfirst lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (viv) the assumption of certain liabilities, (viv) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (viivi) the preservation of value of certain of the Debtors' litigation claims for the benefit of certain of the Debtors' stakeholders.

Effectiveness of the Plan is conditioned on the FCC's approval of the Debtors' license modification application.  To fund the Debtors' operations from Confirmation through the Effective Date (and to repay in full the DIP Inc. Facility), a debtor in possession facility in an amount of not less than $285 million has been made available to the Debtors by Melody Capital Advisors, LLC.   Upon their emergence from bankruptcy, the DebtorsNew LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of the significant upside value after the FCC approvesof the pending spectrum license modification applications.  The Debtors and the Plan Support

2

**Parties** accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of the Debtors' creditors and equityholders and is currently the highest and best restructuring offer ~~received by~~**available to** the Debtors ~~to date~~.  Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates **and is thus – compared to a value-minimizing liquidation – the only path available for all of the Debtors to successfully exit the Chapter 11 Cases**.  Given the undeniable benefits of the contemplated restructuring, **it is therefore not surprising that** the Plan has received overwhelming consensus and support from a substantial portion of the Debtors' significant stakeholders ~~subject to required approvals and definitive documentation~~ ~~in form and substance satisfactory to such stakeholders and the satisfaction of the conditions~~ ~~herein and therein~~.

~~Although the Debtors fully endorse the Plan and believe that it is preferable to any other restructuring transaction, the Debtors recognize that additional considerations or issues may arise that could lead the Bankruptcy Court to conclude that an alternate plan is preferable. Accordingly, to provide the Bankruptcy Court with maximum optionality at the Confirmation Hearing, the Plan is a "toggle" plan, contemplating either (i) the confirmation of the Plan or (ii) to the extent the Bankruptcy Court does not approve and confirm the transactions embodied by this Plan, the confirmation of an alternate chapter 11 plan for the Inc. Debtors – the Alternate Inc. Debtors Plan – which is attached hereto as Exhibit A.~~

**Moreover, in light of the broad support for the Plan, the Debtors are not pursuing at this time confirmation of** the Alternate Inc. Debtors Plan**.  The** Alternate Inc. Debtors Plan**, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of this Plan and April 15, 2014.**

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DEBTORS' DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

**1.**    **"1.5 Lien Loans" has the meaning set forth in Article IV.F hereof.**

**2.**    ~~1.~~ "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To

the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

**3.**   **"Ad Hoc Secured Group" means that certain Ad Hoc Group of LightSquared LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude the SPSO Parties and their affiliates.**

**4.**   ~~2.~~ "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP ~~Facility~~ Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) any Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms of a Stalking Horse Agreement and the Bid Procedures Order; ~~or~~**provided, however, that no SPSO Party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; and** (h) any fees and expenses ~~of the Plan Support Parties to the extent~~**that are** earned and payable pursuant to ~~a Plan Document or an order of the Bankruptcy Court~~**the New DIP Facility, the First Lien Exit Facility, the Plan, and the other Plan Documents, including the Plan Support Party Break-Up Fee**.

**5.**   ~~3.~~ "**Administrative ~~Claim~~Claims** Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

**6.**   ~~4.~~ "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

**7.**   ~~5.~~ "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, **that** with respect to any Claim described in clauses (a) or (b) above, such Claim

shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the New LightSquared Entities and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or New LightSquared Entity, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

**8.**    6.  "**Alternate Inc. Debtors Plan**" means the *Inc. Debtors' Revised Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time), attached hereto as Exhibit A**has the meaning set forth in the Second Amended Plan**.

**9.**    7.  "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**10.**    8.  "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

**11.**    9.  "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

**12.**    10.  "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

**13.**    11.  "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

**14.**    12.  "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.    13.   "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

16.    14.  "**Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

17.    15.  "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    16.   "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

19.    17.  "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

20.    18.  "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

21.    19.  "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

22.    20.  "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

23.    21.  "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

**24.** ~~22.~~ "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

**25.** ~~23.~~ "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

**26.** ~~24.~~ "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

**27.** ~~25.~~ "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

**28.** ~~26.~~ "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

**29.** ~~27.~~ "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

**30.** ~~28.~~ "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

**31.** ~~29.~~ "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

**32.** ~~30.~~ "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

**33.** ~~31.~~ "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**34.** ~~32.~~ "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

**35.** ~~33.~~ "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

**36.** ~~34.~~ "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code**, in form and substance satisfactory to each Plan Support Party**.

**37.** ~~35.~~ "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors **and each Plan Support Party**, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

**38.** ~~36.~~ "**Consummation**" means the occurrence of the Effective Date.

**39.** "**Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof); provided, that only Holders of Allowed Prepetition LP Facility Non-SPSO Claims that vote to accept the Plan may elect to exercise the foregoing right of conversion.

**40.** ~~37.~~ "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

**41.** ~~38.~~ "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

**42.** ~~39.~~ "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

**43.** ~~40.~~ "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

**44.** ~~41.~~ "**Debtors' Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918]~~,~~ and (b) the *~~Revised~~ Specific Disclosure Statement for Debtors' ~~Revised Second~~Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. **[_____]**] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan**, in each case, subject to the prior consent of each Plan Support Party**).

**45.** ~~42.~~ "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agent.

**46.** "**DIP Claim**" means a DIP Inc. **Claim, a DIP LP Claim,** or a New DIP Claim.

**47.** ~~43.~~ "**DIP Facilities**" means the DIP Inc. Facility**, the DIP LP Facility,** and the New DIP Facility.

~~44. "DIP Facility Claim" means a DIP Inc. Facility Claim or a New DIP Facility Claim.~~

**48.** ~~45.~~ "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

**49.** ~~46.~~ "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

**50.** "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility**, including, without limitation, all principal, interest, default interest, and exit fees provided for thereunder.**

**51.** ~~47.~~ "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

**52.** ~~48.~~ "**DIP Inc. Facility**" means that certain $~~56.4~~**46.4** million debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

~~49. "DIP Inc. Facility Claim" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility.~~

**53.** ~~50.~~ "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

**54.** ~~51.~~ "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

**55.** ~~52.~~ "**DIP Inc. Obligors**" means the DIP Inc. Borrower and **the** DIP Inc. Guarantors.

**56.** ~~53.~~ "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time **in accordance with the terms thereof**).

**57.** ~~54.~~ "**DIP Lenders**" means the DIP Inc. Lenders**, the DIP LP Lenders,** and the New DIP Lenders.

**58.** **"DIP LP Borrower" means LightSquared LP, as borrower under the DIP LP Facility.**

**59.** **"DIP LP Claim" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.**

**60.** **"DIP LP Closing Date" means February 5, 2014.**

**61.** **"DIP LP Facility" means that certain debtor in possession** credit facility provided in connection with the **DIP LP Order and related documents in the original aggregate principal amount of $33 million.**

**62.** **"DIP LP Guarantors" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.**

**63.** **"DIP LP Lenders" means the lenders under the DIP LP Facility from time to time.**

**64.** **"DIP LP Obligors" means the DIP LP Borrower and the DIP LP Guarantors.**

**65.** **"DIP LP Order" means the** *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. **1291**] (as amended, supplemented, or modified from time to time **in accordance with the terms thereof).**

**66.** ~~55.~~ "**Disbursing Agent**" means**, for Plan Distributions made prior to the Effective Date, the Debtors, and, for Plan Distributions made on or after the Effective Date,** the New LightSquared Entities, or the Entity or Entities designated by the New LightSquared Entities to make or facilitate Plan Distributions pursuant to the Plan **on or after the Effective Date**.

~~56. "**Disclosure Statement Order**" means the *Order (I) Approving Disclosure Statements, (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of Competing Plans, (III) Approving Forms of Various Ballots and Notices in Connection Therewith, (IV) Approving Scheduling of Certain Dates in Connection with Confirmation of Competing Plans, and (V) Granting Related Relief* [Docket No. 936] (as amended, supplemented, or modified from time to time).~~

**67.** ~~57.~~ "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

**68.** ~~58.~~ "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the New LightSquared Entities for the benefit of each Holder of a Disputed Claim or Equity Interest, in

an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

**69.** 59. "**Distribution Record Date**" means (a) for all Claims and Equity Interests (other than the **DIP LP Claims and** New DIP ~~Facility~~ Claims), the Voting Record Date ~~and~~**,** (b**) for the DIP LP Claims, the DIP LP Closing Date, and (c**) for the New DIP ~~Facility~~ Claims, the New DIP ~~Facility~~ Closing Date.

**70.** 60. "**Effective Date**" means the date selected by the Debtors**, with the consent of each Plan Support Party,** that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.~~A~~**B** hereof have been satisfied or waived (in accordance with Article IX.~~B~~**C** hereof).

**71.** 61. "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger Capital Partners, LLC, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

**72.** 62. "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

**73.** 63. "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

**74.** 64. "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**75.** 65. "**Exculpated Party**" means a Released Party.

**76.** 66. "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

11

**77.** ~~67.~~ "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock). For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

**78.** "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

**79.** ~~68.~~ "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock ~~and Convertible Series B Preferred Stock~~ issued by LightSquared Inc.

**80.** "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock **issued by LightSquared Inc.**

**81.** ~~69.~~ "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

**82.** ~~70.~~ "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

**83.** ~~71.~~ "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

~~72. "**Exit Agent**" means the arranger and administrative agent under the Exit Financing Agreement, or any successor agent appointed in accordance with the Exit Financing Agreement.~~

**84.** "**Exit Agents**" means the First Lien Exit Agent and the Second Lien Exit Agent.

**85.** ~~73.~~ "**Exit ~~Borrower~~Credit Agreements**" means ~~NewCo, as borrower under~~ the **First Lien** Exit ~~Financing~~**Credit Agreement and the Second Lien Exit Credit** Agreement.

~~74. "**Exit Financing**" means that certain up to $2.5 billion credit facility provided in connection with the Exit Financing Agreement.~~

~~75. "**Exit Financing Agreement**" means that certain credit agreement to be entered into among the Exit Obligors, the Exit Agent, and the Exit Lenders on the Effective Date.~~

**86.** ~~76.~~ "**Exit ~~Guarantors~~**" means ~~the guarantors under the Exit Financing Agreement~~**Facilities" means the First Lien Exit Facility and the Second Lien Exit Facility**.

**87.** "**Exit Intercreditor Agreement**" means that certain **Intercreditor Agreement, dated on** or before the Effective Date, **between the Exit Agents, the Exit Lenders, and the other relevant Entities governing,** among other things, the **respective rights, remedies, and priorities of claims and security interests held by the Exit Agents, the Exit Lenders, and**

**the other relevant Entities under the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.**

**88.** 77. "**Exit Lenders**" means the ~~lenders party to the Exit Financing Agreement from time to time~~**First Lien Exit Lenders and the Second Lien Exit Lenders**.

**89.** 78. "**Exit Obligors**" means the **First Lien** Exit ~~Borrower~~**Obligors** and **the Second Lien** Exit ~~Guarantors~~**Obligors**.

**90.** 79. "**Expense Reimbursement**" has the meaning set forth in the Bid Procedures Order.

**91.** 80. "**FCC**" means the Federal Communications Commission.

**92.** 81. "**FCC ~~Exit Condition~~**" ~~means the condition precedent to the Exit Financing that the FCC shall have approved, among other things: (a)~~**Objectives" means that (a) the Companies shall have FCC authority to (i) provide** terrestrial ~~based communication rights~~**communications** in the United States on 20 MHz of uplink spectrum comprised of 10 MHz **nominally** between 1627-1637 MHz and 10 MHz **nominally** between 1646-1656 MHz~~;~~ ~~(b) terrestrial based communications rights in the United States on~~**, and** 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz ~~of National Oceanic and Atmospheric Administration spectrum~~ at 1675-1680 MHz~~;~~**, (ii)** ~~(c)~~**operate at transmit** power levels commensurate with existing terrestrially-based 4th ~~Generation~~**generation** LTE wireless communications networks~~; (d)~~**, and (iii) provide** terrestrial ~~rights to include ability to provide~~signal coverage of **250 million** total POPs~~of 270 million~~; (~~e~~**b**) **any** build out conditions **that may be imposed by the FCC on the Companies shall be** no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (~~f~~**c**) **any** specific restrictions ~~on sale of the Reorganized Debtors~~**that may be imposed by the FCC on the Companies regarding its possible sale** to future buyers ~~that~~ must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile ~~US~~**USA**, Inc., or Sprint Corporation.

**93.** 82. "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

**94.** 83. "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**95.** 84. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, **that** the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being

a Final Order; provided, further, **that** the Debtors reserve the right to waive any appeal period**, with the consent of each Plan Support Party**.

**96.** 85. "**Financial Wherewithal Objection Deadline**" has the meaning set forth in Article V.C hereof.

**97.    "First Amended Plan" has the meaning set forth in the Introduction hereof.**

**98.** 86. "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

**99.    "First Lien Exit Agent" means the administrative agent under the First Lien Exit Credit Agreement or any successor agent appointed in accordance with the First Lien Exit Credit Agreement.**

**100.    "First Lien Exit Borrower" means NewCo, as borrower under the First Lien Exit Credit Agreement.**

**101.    "First Lien Exit Credit** Agreement" means that certain credit agreement**, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the First Lien** Exit Obligors, the **First Lien** Exit Agent, and the **First Lien** Exit Lenders**,**

**102.    "First Lien Exit Excess Amount" means an amount equal to the aggregate principal amount that the First Lien Exit Facility exceeds $1 billion** on the Effective Date.

**103.    "First Lien Exit Facility" means that certain first lien credit facility in an original aggregate principal** amount of not less than $**1** billion provided in connection with the First Lien Exit Credit Agreement (which facility may be increased by an additional $500 million upon the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum as specified therein).**

**104.    "First Lien Exit Guarantors" means each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) required to be guarantors under the First Lien Exit Credit Agreement.**

**105.    "First Lien Exit Lenders" means the** lenders party to the **First Lien Exit Credit** Agreement from time to time**.**

**106.    "First Lien Exit Obligors" means the First Lien Exit Borrower and the First Lien Exit Guarantors.**

**107.** 87. "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Facility Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition **Inc.**

Facility **Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO** Claim; or (~e~i) Intercompany Claim.

**110.** ~88.~ "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

**109.** ~89.~ "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

**110.** ~90.~ "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

**111.** "**Inc./LP Lender Parties**" means the Ad Hoc Secured Group, the DIP Inc. Agent, and the Prepetition Inc. Non-Subordinated Parties.

**112.** "**Inc./LP Lender Advisors Fee Cap**" means an aggregate amount equal to $500,000.

**113.** ~91.~ "**Inc. Administrative Claim**" means any Administrative Claim asserted against an Inc. Debtor.

**114.** ~92.~ "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

**115.** ~93.~ "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

**116.** ~94.~ "**Inc. Other Priority ~Clam~Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

**117.** ~95.~ "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

**118.** ~96.~ "**Inc. Plan Consideration**" means, as applicable, (a) (i) Cash from the ~Exit Financing~**New DIP Facility** allocated and attributed to the Inc. Debtors, *plus* (ii) **without duplication of clause (i),** Cash from the ~New Equity Contribution~**Exit Facilities** allocated and attributed to the Inc. Debtors, *plus* (iii) the Inc. Debtors' Cash on hand on the Effective Date, *plus* (iv) **without duplication of clause (i), Cash from** the Reorganized LightSquared Inc. Loan**, if any**, and *less* (v) the Inc. Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, ~and~ (c) ~certain Retained Causes of Action Proceeds allocated and attributed to the~**loans under the Second Lien Exit Facility, and (d) loans under the Reorganized LightSquared** Inc. ~Debtors~**Loan**.

**119.** ~97.~ "**Inc. Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the Inc. Debtors and (b) together with the LP

Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

**120.** 98. "**Inc. Priority Tax Claim**" means any Priority Tax Claim asserted against an Inc. Debtor.

**121.** 99. "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

**122.** 100. "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

**123.** 101. "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

**124.** 102. "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

**125.** 103. "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

104. "**JPMorgan**" means JPMorgan Chase & Co. or its designated affiliates.

**126.** 105. "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

**127.** 106. "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

**128.** 107. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

**129. "LightSquared Transfer"** means the sale, assignment, and/or transfer by the Reorganized Debtors to NewCo of certain of the Reorganized Debtors' Assets and Equity Interests, and the assumption by NewCo of certain liabilities related thereto, in accordance with the Plan, including as set forth in Article IV.D.3(b) hereof, in exchange for the consideration provided to the Reorganized Debtors under the Plan, including as set forth in Article IV.D.3(a) hereof.

**130.** "**License Modification Application**" has the meaning set forth in the Debtors' Disclosure Statement.

108. "**LightSquared Equity Interests Contribution**" means the following contributions to NewCo: (a) Reorganized LightSquared Inc.'s Equity Interests in One Dot Six Corp.; (b) Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared LP, and Reorganized LightSquared GP Inc.; and (c) Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP Inc. and Reorganized LightSquared LP, collectively in exchange for the following issuances by NewCo to Reorganized LightSquared Inc.: (x) 20% of NewCo Class A Common Interests; (y) 20% of NewCo Series A Preferred PIK Interests; and (z) 100% of the NewCo Class C Common Interests (subject to the right of New Equity Contributor C to purchase the NewCo Class C Common Interests from Reorganized LightSquared Inc. for $250 million).

109. "**Litigation Trust**" means the trust to be established on the Effective Date pursuant to the Litigation Trust Agreement to hold the Litigation Trust Assets and to be administered by the Litigation Trustee.

110. "**Litigation Trust Actions**" means the Retained Causes of Action relating to the adversary proceedings captioned: *Litigation Trust. LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013) and *LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013), which shall be transferred to the Litigation Trust.

111. "**Litigation Trust Agreement**" means that certain agreement between the Litigation Trustee and the Debtors governing the Litigation Trust.

112. "**Litigation Trust Assets**" means the Litigation Trust Actions, the Litigation Trust Funding, and all proceeds thereof.

113. "**Litigation Trust Interests**" means those certain beneficial interests in the Litigation Trust.

114. "**Litigation Trust Funding**" means an amount to be agreed upon by all of the Plan Support Parties that will be provided to the Litigation Trust to fund the administration thereof.

115. "**Litigation Trustee**" means the trustee of the Litigation Trust appointed in accordance with the terms of the Litigation Trust Agreement.

**131.** 116. "**LP Administrative Claim**" means any Administrative Claim asserted against an LP Debtor.

**132.** 117. "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra

17

Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

**133.** ~~118.~~ "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

**134.** ~~119.~~ "**LP Other Priority ~~Clam~~Claim**" means any Other Priority Claim asserted against an LP Debtor.

**135.** ~~120.~~ "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

**136.** ~~121.~~ "**LP Plan Consideration**" means, as applicable, (a) (i) Cash from the ~~Exit Financing~~**New DIP Facility** allocated and attributed to the LP Debtors, *plus* (ii) **without duplication of clause (i),** Cash from the ~~New Equity Contribution~~**Exit Facilities** allocated and attributed to the LP Debtors, *plus* (iii) the LP Debtors' Cash on hand on the Effective Date, and *less* (~~v~~**iv**) the LP Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, ~~and~~ (c) ~~certain Retained Causes of Action Proceeds allocated and attributed to the LP Debtors~~**loans under the Second Lien Exit Facility, (d) loans under the New DIP Facility, and (e) the SPSO Note**.

**137.** ~~122.~~ "**LP Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the LP Debtors and (b) together with the Inc. Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

**138.** ~~123.~~ "**LP Priority Tax Claim**" means any Priority Tax Claim asserted against an LP Debtor.

**139.** ~~124.~~ "**Management Incentive Plan**" means that certain post-Effective Date management equity incentive plan, which provides that, among other things, up to 10% of NewCo Common Interests, on a fully diluted basis, shall be reserved for issuance **by the NewCo Board after the Effective Date** in accordance with the management equity incentive plan ~~(Filed prior to the Confirmation Hearing Date)~~ and the Plan; provided, **that** the foregoing shall be implemented in the discretion of the NewCo Board, subject to the terms of the NewCo Corporate Governance Documents, and **shall** remain subject to the agreement of ~~all of the~~**each** Plan Support ~~Parties~~**Party**.

**140.** "**Material Regulatory Request" means any of the following: (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and** One Dot Six **Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.**

**141.** ~~125.~~ "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement~~,~~ or any successor agent appointed in accordance with the New DIP Credit Agreement.

**142.** ~~126.~~ "**New DIP Borrowers**" means ~~the~~**LightSquared Inc., LightSquared LP, and One Dot Six Corp., as** borrowers under the New DIP Credit Agreement.

**143.** **"New DIP Claim" means a New DIP Tranche A Claim or a New DIP Tranche B Claim.**

**144.** **"New DIP** Closing Date" means the date upon which **(a)** the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, **(b)** all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and **(c)** the incurrence of obligations pursuant **to the New DIP Facility shall have occurred, which shall be no later than the fifteenth (15th) day after the Confirmation Date, and (d) all (i) DIP Inc. Claims, (ii) DIP LP Claims, (iii) Prepetition Inc. Facility Non-Subordinated Claims, and (iv) Non-Converted Prepetition LP Facility Non-SPSO Claims have been indefeasibly paid in full in Cash.**

**145.** **"New DIP Commitment Letter" means that certain commitment letter by and among the New DIP Commitment Parties, LightSquared Inc., LightSquared LP, and One Dot Six Corp., dated February 14, 2014.**

**146.** **"New DIP Commitment Parties" means J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee), Melody Business Finance, LLC (together with any affiliate thereof as its designee), Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., as the commitment** parties under the New **DIP Commitment Letter.**

**147.** ~~127.~~ "**New DIP Credit Agreement**" means that certain Debtor in Possession Credit Agreement, dated as of ~~or around~~ the ~~Confirmation~~**New DIP Closing** Date (as amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**), among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders**, in form and substance satisfactory to each Plan Support Party**.

**148.** ~~128.~~ "**New DIP Facility**" means that certain ~~$285 million~~debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order **in the original** aggregate principal amount of $**1.65 billion**.

~~129. "**New DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New DIP Facility.~~

**149.** ~~130.~~ "**New DIP ~~Facility~~ Closing Date**" ~~means the date upon which the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto,~~

~~and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant~~ **Guarantors" means each New DIP Borrower, as a guarantor to each other New DIP Borrower, and all other Debtors that are not New DIP Borrowers, as guarantors** to the New DIP ~~Facility shall have occurred~~**Borrowers, in each case, in accordance with the New DIP Credit Agreement**.

**150.** ~~131.~~ "**New DIP** ~~Guarantors" means the guarantors under the New DIP Credit Agreement.~~**Initial Lenders" means, collectively, Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.**

**151.** ~~132.~~ "**New DIP Lenders**" means the ~~lenders party to~~**New DIP Tranche A Lenders and** the New DIP ~~Credit Agreement from time to time~~**Tranche B Lenders**.

**152.** ~~133.~~ "**New DIP Obligors**" means the New DIP Borrowers and the New DIP Guarantors.

**153.** ~~134.~~ "**New DIP Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A)* ~~*Authorizing New DIP Obligors To Obtain*~~***Approving*** *Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* (as amended, supplemented, or modified from time to time **in accordance with the terms thereof**).

~~135. "**New Equity Contribution**" means the New Equity Contributors' funding of $1.25 billion in new equity contributions to NewCo in exchange for a portion of NewCo's issuance of the NewCo Series A Preferred PIK Interests and NewCo Class A Common Interests, as applicable, to the New Equity Contributors pursuant to, and in accordance with, the terms of the New Equity Contribution Agreement.~~

~~136. "**New Equity Contribution Agreement**" means that certain agreement to be entered into among NewCo and the New Equity Contributors documenting, among other things, the (a) obligations of the New Equity Contributors to fund, in the aggregate, $1.25 billion of new equity contributions to NewCo on the Effective Date and (b) obligation of NewCo to issue the NewCo Series A Preferred PIK Interests and NewCo Class A Common Interests, as applicable.~~

~~137. "**New Equity Contributor A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.~~

**154.** "**New DIP Recognition Order" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the New DIP Order.**

155.    "New DIP Tranche A Accrued Interest" means accrued interest, including interest paid in kind, on the New DIP Tranche A Facility as of the Effective Date.

156.    "New DIP Tranche A Claim" means a Claim held by the New DIP Agent or New DIP Tranche A Lenders arising under, or related to, the New DIP Tranche A Facility.

157.    "New DIP Tranche A Facility" means that portion of the New DIP Facility funded by the New DIP Tranche A Lenders through the provision of new financing in accordance with the New DIP Credit Agreement and New DIP Order, in an original aggregate principal amount of $1.35 billion.

158.    "New DIP Tranche A Lenders" means the Plan Support Parties and the other lenders under the New DIP Tranche A Facility, in each case, as lenders party to the New DIP Credit Agreement.

159.    138. "New Equity Contributor B" means Melody Capital Advisors, LLC or its designated affiliates DIP Tranche B Cap" means $300 million.

139. "New Equity Contributor C" means Harbinger Capital Partners, LLC or its designated affiliates.

140. "New Equity Contributors" means New Equity Contributor A, New Equity Contributor B, and New Equity Contributor C, as parties to the New Equity Contribution Agreement that provide New Equity Contributions to NewCo.

160.    "New DIP Tranche B Claim" means a Claim held by the New DIP Agent or New DIP Tranche B Lenders arising under, or related to, the New DIP Tranche B Facility.

161.    "New DIP Tranche B Facility" means that portion of the New DIP Facility funded by the New DIP Tranche B Lenders in the original aggregate principal amount of $300 million through either (a) the conversion of Converted Prepetition LP Facility Non-SPSO Claims into Claims under the New DIP Facility (as set forth in Article IV.D hereof) and/or (b) new financing provided by the Plan Support Parties or other lenders, in each case, in accordance with the Plan, New DIP Credit Agreement, and New DIP Order.

162.    "New DIP Tranche B Lenders" means (a) certain Holders of Converted Prepetition LP Facility Non-SPSO Claims that elect to convert such Claims into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof) up to the New DIP Tranche B Cap and/or (b) the Plan Support Parties or other lenders to the extent that they provide new financing under the New DIP Tranche B Facility, in each case, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

163.    141. "New LightSquared Entities" means, collectively, NewCo, Reorganized LightSquared Inc., and the Reorganized Subsidiaries.

**164.** ~~142.~~ "**New LightSquared Entities Boards**" means, collectively, the NewCo Board, the Reorganized LightSquared Inc. Board, and ~~the~~**each** Reorganized Subsidiaries Board.

**165.** ~~143.~~ "**New LightSquared Entities Bylaws**" means, collectively, the NewCo Bylaws, the Reorganized LightSquared Inc. Bylaws, and the Reorganized Subsidiaries Bylaws.

**166.** ~~144.~~ "**New LightSquared Entities Charters**" means, collectively, the NewCo Charter, the Reorganized LightSquared Inc. Charter, and the Reorganized Subsidiaries Charters.

**167.** ~~145.~~ "**New LightSquared Entities Corporate Governance Documents**" means, collectively, the NewCo Corporate Governance Documents, the Reorganized LightSquared Inc. Corporate Governance Documents, and the Reorganized Subsidiaries Corporate Governance Documents.

**168.** ~~146.~~ "**New LightSquared Entities Shares**" means, collectively, the NewCo Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

~~147. "**New LightSquared Entities Shareholders Agreements**" means, collectively, the NewCo Interest Holders Agreement and the Reorganized LightSquared Inc. Shareholders Agreement.~~

**169.** ~~148.~~ "**NewCo**" means a newly formed limited liability company in connection with the Plan Transactions contemplated by Article IV.D hereof.

~~149. "**NewCo Additional Interests**" means up to $400 million of NewCo Series A Preferred PIK Interests issued by NewCo at plan value to the Holders of Prepetition LP Facility Non-SPSO Claims in the event that Class 7A votes to accept the Plan and all of the Plan Support Parties provide their consent to such issuance.~~

**170.** ~~150.~~ "**NewCo Board**" means the board of directors, board of managers, or equivalent governing body of NewCo, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable NewCo Corporate Governance Documents.

**171.** ~~151.~~ "**NewCo Bylaws**" means the bylaws, partnership agreement, limited liability company membership agreement, or functionally equivalent document, as applicable, of NewCo.

**172.** ~~152.~~ "**NewCo Charter**" means the charter, certificate of formation, certificate of partnership, or functionally equivalent document, as applicable, of NewCo.

**173.** ~~153.~~ "**NewCo Class A Common Interests**" means those certain limited liability company class A common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**174.** ~~154.~~ "**NewCo Class B Common Interests**" means those certain limited liability company class B common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**175.** ~~155.~~ "**NewCo Class C Common Interests**" means those certain limited liability company class C common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**176.** "**NewCo Class D Common Interests**" means those certain limited liability company **class D common interests** issued by NewCo in connection with, and subject to, **the** Plan, the Confirmation Order, and the NewCo **Interest Holders Agreement.**

**177.** ~~156.~~ "**NewCo Common Interests**" means the NewCo Class A Common Interests, the NewCo Class B Common Interests, ~~and~~ NewCo Class C Common Interests**, and NewCo Class D Common Interests**.

**178.** ~~157.~~ "**NewCo Corporate Governance Documents**" means, as applicable, (a) the NewCo Charter, (b) the NewCo Bylaws, (c) the NewCo Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to NewCo.

~~158.   "NewCo  EAR"  means  the  equity  appreciation  right  issued  by  NewCo  in connection  with,  and  subject  to,  this  Plan,  the  Confirmation  Order,  and  the  NewCo  Common Shareholders Agreement in the event that Class 7A votes to accept the Plan and all of the Plan Support Parties provide their consent to such issuance.~~

**179.** ~~159.~~ "**NewCo Interest Holders Agreement**" means that certain limited liability company **operating** agreement of NewCo with respect to the NewCo Interests, to be effective on the Effective Date and binding on all holders of the NewCo Interests.

**180.** ~~160.~~ "**NewCo Interests**" means, collectively, the NewCo Common Interests, **and** the NewCo Preferred Interests~~, and the NewCo EAR~~.

**181.** ~~161.~~ "**NewCo Series A Preferred PIK Interests**" means the NewCo Series ~~A Preferred PIK Interests, the NewCo Series B~~ **A-**1 Preferred PIK Interests~~,~~ and the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests.

**182.** ~~162.~~ "**NewCo Series ~~A~~A-1 Preferred PIK Interests**" means those certain limited liability company series ~~A~~**A-1** preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**183.** ~~163.~~ "**NewCo Series ~~B-1~~A-2 Preferred PIK Interests**" means those certain limited liability company series ~~B-1~~**A-2** preferred payable-in-kind interests issued by NewCo ~~in the aggregate principal amount of $120 million~~ in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement. ~~The NewCo Series B-1 Preferred PIK Interests shall accrue at a rate of 9.75% per annum.~~

**184.** 164. "NewCo Series B-2 Preferred PIK Interests" means those certain limited liability company series B-2 preferred payable-in-kind interests issued by NewCo in the aggregate principal amount of $225 million (which amount is comprised of (a) the outstanding principal amount of Allowed Prepetition Inc. Facility Subordinated Claims, (b) expense reimbursements under the Prepetition Inc. Facility in the amount of $50 million, and (c) unpaid postpetition interest accrued on account **"Non-Converted Prepetition LP Facility Non-SPSO Claims" means that portion** of the Allowed Prepetition Inc. **LP** Facility Subordinated Claims through the Effective Date) in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest **Non-SPSO Claims that Holders thereof do not elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof).**

**185.** Holders Agreement. The NewCo **"Other Existing Inc.** Series B-2 **B** Preferred PIK **Stock Holders" means the Holders of the Existing Inc. Series B Preferred Stock Equity** Interests shall accrue at a rate of 11% per annum **other than SIG Holdings, Inc**.

165. "One Dot Six Lease" has the meaning set forth in the Debtors' Disclosure Statement.

**186.** 166. "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

**187.** 167. "**Other Secured Claim**" means any Secured Claim that is not a DIP Facility Claim or Prepetition Facility Claim.

**188.** 168. "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

**189.** 169. "**Petition Date**" means May 14, 2012.

**190.** 170. "**Plan**" means this *Debtors' Revised Second Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time **with the prior consent of each Plan Support Party and in accordance with the terms hereof**), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

**191.** 171. "**Plan Consideration**" means, collectively, the Inc. Plan Consideration and the LP Plan Consideration.

**192.** 172. "**Plan Consideration Carve-Out**" means, collectively, the Inc. Plan Consideration Carve-Out and the LP Plan Consideration Carve-Out.

**193.** 173. "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

194. 174. "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to each Plan Support Party.

195. 175. "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to each Plan Support Party) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including: (a) an executed commitment letter, term sheetletters, form and/or definitive agreements, and related documents with respect to (i) the Exit Financing Agreement, (ii) the New Equity Contribution Agreement, (iiiCredit Agreements, (ii) the Reorganized LightSquared Inc. Loan Agreement, (iv) the Rights Offering, (v) the Litigation Trustiii) the SPSO Note Documents, and (iv) the Exit Intercreditor Agreement, and; (vib) the New LightSquared Entities Corporate Governance Documents; (bc) the Schedule of Assumed Agreements; and (ed) the Schedule of Retained Causes of Action.

196. 176. "**Plan Supplement Date**" means December 30, 2013 at 4:00 p.m. (prevailing Eastern time).February 14, 2014 or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Debtors reserve the right to File amended Plan Documents at any time prior to the Confirmation Hearing Date.

197. 177. "**Plan Support Parties**" means the New Equity Contributors and the Reorganized LightSquared Inc. Loan HolderPlan Support Party A, Plan Support Party B, Plan Support Party C, and Plan Support Party D.

198. "**Plan Support Party A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

199. "**Plan Support Party ABC**" means Plan Support Party A, Plan Support Party B, and Plan Support Party C.

200. "**Plan Support Party ABC Debt-Converted New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *less* (a) the Plan Support Party ABC Equity-Converted New DIP Claims and (b) Plan Support Party ABC's ratable share of the First Lien Exit Excess Amount.

201. "**Plan Support Party ABC Equity-Converted New DIP Claims**" means $115 million of the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *plus* 11% of any New DIP Tranche A Accrued Interest attributed to Plan Support Party ABC's New DIP Tranche A Claims.

**202.** **"Plan Support Party B"** means Melody Business Finance, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds.

**203.** **"Plan Support Party Break-Up Fee"** means a break-up fee of $100 million for the ratable benefit of the New DIP Commitment Parties, irrevocably earned upon the New DIP Closing Date and payable in Cash on the earlier of the date (a) the Debtors propose or support any chapter 11 plan other than this Plan, (b) the Debtors withdraw this Plan or propose any modifications hereto pursuant to section 1127(b) of the Bankruptcy Code, in each case, without the prior written consent of each New DIP Initial Lender, or (c) the confirmation of any chapter 11 plan other than this Plan; provided, that the conditions to the effectiveness of the Plan set forth in Article IX.B hereof shall have been capable of being satisfied at the time of either clauses (a), (b), or (c) above, or such conditions shall have been capable of being satisfied but for the passage of time.

**204.** **"Plan Support Party C"** means Harbinger Capital Partners, LLC or its designated affiliates.

**205.** **"Plan Support Party C Call Option"** means a call option, exercisable by **Plan Support Party** C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests **and NewCo Class D Common Interests in accordance with the NewCo Corporate Governance Documents.**

**206.** **"Plan Support Party Cashed-Out New DIP Claims"** means the Allowed New DIP Tranche A Claims held by Plan Support Parties that are not (a) Plan Support Party ABC Debt-Converted New DIP Claims, (b) Plan Support Party ABC Equity-Converted New DIP Claims, or (c) Plan Support Party D Debt-Converted New DIP Claims.

**207.** **"Plan Support Party D"** means JPMorgan Chase & Co. or its designated affiliates.

**208.** **"Plan Support Party D Debt-Converted New DIP Claims"** means $300 million of the Allowed New DIP Tranche A Claims held by Plan Support Party D, *plus* all New DIP Tranche A Accrued Interest thereon, *less* an amount equal to 22.22% of the First Lien Exit Excess Amount, which Claims shall be converted into loans under the Reorganized LightSquared Inc. Loan.

**209.** ~~178.~~ "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or

delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the New LightSquared Entities determine are necessary or appropriate.

**210.** ~~179.~~ "**Prepetition Agents**" means the Prepetition Inc. Agent and the Prepetition LP Agent.

**211.** **"Prepetition Facilities" means the Prepetition Inc. Facility and the Prepetition LP Facility.**

**212.** "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

**213.** ~~180.~~ "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

**214.** ~~181.~~ "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

**215.** ~~182.~~ "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

**216.** ~~183.~~ "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

**217.** ~~184.~~ "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

**218.** ~~185.~~ "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

**219.** ~~186.~~ "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

**220.** ~~187.~~ "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

**221.** ~~188.~~ "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

**222.** ~~189.~~ "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

**223.** ~~190.~~ "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**).

**224.** ~~191.~~ "**Prepetition Inc. ~~Obligors~~Non-Subordinated Parties**" means the Prepetition Inc. ~~Borrower and~~**Agent and the Holders of Allowed** Prepetition Inc. ~~Guarantors~~**Facility Non-Subordinated Claims**.

**225.** ~~192.~~ "**Prepetition ~~Facilities~~Inc. Obligors**" means the Prepetition Inc. ~~Facility~~**Borrower** and the Prepetition ~~LP Facility~~**Inc. Guarantors**.

~~193.~~ "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

**226.** ~~194.~~ "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

**227.** ~~195.~~ "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

**228.** ~~196.~~ "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

**229.** ~~197.~~ "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

**230.** ~~198.~~ "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

**231.** ~~199.~~ "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

**232.** ~~200.~~ "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

**233.** ~~201.~~ "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by ~~SP Special Opportunities, LLC or~~**SPSO,** its affiliates**, or each of their successors or assigns**.

**234.** ~~202.~~ "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

**235.** ~~203.~~ "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

**236.** ~~204.~~ "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time **in accordance with the terms thereof**).

**237.** ~~205.~~ "**Prepetition LP Obligors**" means the Prepetition LP Borrower and **the** Prepetition LP Guarantors.

**238.** ~~206.~~ "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**239.** ~~207.~~ "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

**240.** ~~208.~~ "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy

Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

**241.** ~~209.~~ "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the New LightSquared Entities on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

**242.** ~~210.~~ "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the New LightSquared Entities in the Professional Fee Escrow Account.

**243.** ~~211.~~ "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

**244.** ~~212.~~ "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

**245.** ~~213.~~ "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

**246.** ~~214.~~ "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

**247.** ~~215.~~ "**Released Party**" means each of the following:  (a) the Debtors; (b) the New LightSquared Entities; (c) each ~~New Equity Contributor; (d~~**Plan Support Party; (d) each DIP Agent,  each DIP Lender (other than any SPSO Party, subject to the proviso below), and each arranger and book runner of the DIP Facilities; (e) each Exit Agent, each Exit Lender, and each arranger and book runner of the Exit Facilities; (f)** the

Reorganized LightSquared Inc. Loan Holder; (e) the New DIP Agent and each New DIP Lender**agent, arranger, and book runner of the** Reorganized LightSquared Inc. Loan; (f**g**) the Exit Agent and each Exit Lender**Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party, subject to the proviso below)**; and (g**h**) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such)**; provided, that each SPSO Party shall be deemed a Released Party if Class 7B** votes to accept the Plan **and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility**.

**248.** 216. "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

**249.** 217. "**Reorganized Debtors**" means, collectively, the Reorganized Inc. Debtors and the Reorganized LP Debtors.

**250.** 218. "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**251.** 219. "**Reorganized LightSquared GP** Inc.**LLC**" means Reorganized LightSquared GP Inc., as **reconstituted and** reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**252.** 220. "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**253.** 221. "**Reorganized LightSquared Inc. Board**" means the board of directors, board of managers, or equivalent governing body of Reorganized LightSquared Inc., as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized LightSquared Inc. Corporate Governance Documents.

**254.** 222. "**Reorganized LightSquared Inc. Bylaws**" means the bylaws or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

**255. "Reorganized LightSquared Inc. Call Option" means a call option, exercisable by Reorganized LightSquared Inc.** in its sole discretion, to purchase (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests from the Holders of Existing Inc. Series A Preferred Stock Equity Interests (or their successor and assigns) and (b) $1.76 million of NewCo Series A-2 Preferred PIK Interests from the Other Existing Inc. Series

**B Preferred Stock Holders (or their successors and assigns), in each case in accordance with the NewCo Corporate Governance Documents.**

**256.** ~~223.~~ "**Reorganized LightSquared Inc. Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

**257.** ~~224.~~ "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan~~,~~ **and** the Confirmation Order~~, and the Reorganized LightSquared Inc. Shareholders Agreement~~.

**258.** ~~225.~~ "**Reorganized LightSquared Inc. Corporate Governance Documents**" means (a) the Reorganized LightSquared Inc. Charter, (b) the Reorganized LightSquared Inc. Bylaws, **and** (c)~~ the Reorganized LightSquared Inc. Shareholders Agreement, and (d)~~ any other applicable organizational or operational documents with respect to Reorganized LightSquared Inc.

**259.** ~~226.~~ "**Reorganized LightSquared Inc. Loan**" means that certain ~~$250 million senior~~ secured ~~loan made by~~**credit facility in the original aggregate principal amount of $300 million provided in connection with the** Reorganized LightSquared Inc. Loan ~~Holder to~~**Agreement, subject to adjustment in accordance with the** Reorganized LightSquared Inc.~~,~~ ~~as borrower~~ **Loan Adjustment**.

**260.** **"Reorganized LightSquared Inc. Loan Adjustment" means the amount, if any, the original aggregate principal amount** of the Reorganized LightSquared Inc. **Loan shall be (a) increased by the aggregate amount of New DIP Tranche A Accrued Interest attributed to Plan Support Party D's New DIP Tranche A Claims, and/or (b) decreased by an amount equal to the product of (i) the First Lien Exit Excess Amount and (ii) 22.22%, in each case, on a dollar-for-dollar basis.**

**261.** ~~227.~~ "**Reorganized LightSquared Inc. Loan Agreement**" means that certain agreement entered into between **the** Reorganized LightSquared Inc. Loan Holder and Reorganized LightSquared Inc. documenting, among other things, the terms of the Reorganized LightSquared Inc. Loan and the obligations with respect thereto.

**262.** ~~228.~~ "**Reorganized LightSquared Inc. Loan Holder**" means ~~JPMorgan~~**Plan Support Party D**.

~~229. "**Reorganized LightSquared Inc. Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of Reorganized LightSquared Inc. with respect to the Reorganized LightSquared Inc. Common Shares, to be effective on the Effective Date and binding on all holders of the Reorganized LightSquared Inc. Common Shares.~~

**263.** ~~230.~~ "**Reorganized LightSquared Investors Holdings Inc.**" means LightSquared Investors Holdings Inc., as reorganized under, and pursuant to, the Plan, or any

successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**264.** 231. "**Reorganized LightSquared LP**" means Reorganized LightSquared LP, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**265.** 232. "**Reorganized LP Debtors**" means the LP Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**266.** 233. "**Reorganized One Dot Four Corp.**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**267.** 234. "**Reorganized One Dot Six Corp.LLC**" means One Dot Six Corp., as **reconstituted and** reorganized  under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**268.** 235. "**Reorganized SkyTerra Investors LLC**" means SkyTerra Investors LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**269.** 236. "**Reorganized SkyTerra Rollup LLC**" means SkyTerra Rollup LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**270. "Reorganized SkyTerra Rollup Sub LLC" means SkyTerra Rollup Sub LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.**

**271.** 237. "**Reorganized Subsidiaries**" means, collectively, the Reorganized Debtors, other than Reorganized LightSquared Inc.

**272.** 238. "**Reorganized Subsidiaries Board**" means the board of directors, board of managers, or equivalent governing body **of each** of the Reorganized Subsidiaries, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Subsidiaries Corporate Governance Documents.

**273.** ~~239.~~ "**Reorganized Subsidiaries Bylaws**" means the bylaws or functionally equivalent document, as applicable, of **each of** the Reorganized Subsidiaries.

**274.** ~~240.~~ "**Reorganized Subsidiaries Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of **each of** the Reorganized Subsidiaries.

**275.** ~~241.~~ "**Reorganized Subsidiaries Corporate Governance Documents**" means (a) the Reorganized Subsidiaries Charter, (b) the Reorganized Subsidiaries Bylaws, (c) the Reorganized Subsidiaries Shareholders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Subsidiaries.

**276.** ~~242.~~ "**Reorganized Subsidiaries Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of the Reorganized Subsidiaries, to be effective on the Effective Date.

**277.** ~~243.~~ "**Reorganized TMI Communications Delaware, Limited Partnership**" means Reorganized TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**278.** **"Required Lenders" has the meaning set forth in the First Lien Credit Agreement.**

**279.** ~~244.~~ "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

**280.** ~~245.~~ "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

~~246. "**Rights Offering**" means the rights offering to purchase the Rights Offering Shares for an aggregate purchase price of $50 million in accordance with the Rights Offering Procedures.~~

~~247. "**Rights Offering Backstop Party**" means JPMorgan.~~

~~248. "**Rights Offering Procedures**" means the procedures with respect to the Rights Offering which will be Filed as part of the Plan Supplement.~~

~~249. "**Rights Offering Shares**" means 49% of the Reorganized LightSquared Inc. Common Shares issued and outstanding as of the Effective Date.~~

~~250. "**Rights Offering Share Price**" means $50.00 per share of Reorganized LightSquared Inc. Common Shares.~~

281. 251. "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time **with the consent of each Plan Support Party**).

282. 252. "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time **with the consent of each Plan Support Party**).

283. 253. "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

**284. "Second Amended Plan" has the meaning set forth in the Introduction hereof.**

**285. "Second Lien Exit Adjustment" means (a) an increase to the original** aggregate principal amount of **the Second Lien Exit Facility equal to the product of (i) the aggregate amount of any New DIP Tranche A Accrued Interest and (ii) 89%, and/or (b) a decrease to the original aggregate principal amount of the Second Lien Exit Facility equal to the First Lien Exit Excess Amount, in each case, on a dollar-for-dollar basis.**

**286. "Second Lien Exit Agent"** means the arranger and administrative agent under the **Second Lien Exit Credit Agreement** or any successor agent appointed in accordance with the **Second Lien Exit Credit** Agreement.

**287. "Second Lien Exit Borrower" means** NewCo, as borrower under **the Second Lien Exit Credit Agreement.**

**288. "Second Lien Exit Credit Agreement" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Second Lien Exit Obligors, the Second Lien Exit Agent, and the Second Lien Exit Lenders.**

**289. "Second Lien Exit Facility" means that certain second lien credit facility in the original aggregate principal amount of $1.20 billion provided in connection with the Second Lien Exit Credit Agreement, subject to adjustment in accordance with the Second Lien Exit Adjustment.**

**290. "Second Lien Exit Guarantors" means the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), as guarantors under the Second Lien Exit Credit Agreement.**

**291.** **"Second Lien Exit Lenders" means the lenders party to the Second Lien Exit** Credit Agreement from time to time**.**

**292.** **"Second Lien Exit Obligors" means the Second Lien Exit Borrower and the Second Lien Exit Guarantors.**

**293.** 254. **"Secured"** means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

**294.** 255. **"Securities Act"** means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

**295.** 256. **"Securities Exchange Act"** means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

**296.** 257. **"Security"** has the meaning set forth in section 2(a)(1) of the Securities Act.

**297.** 258. **"Sharing Provision"** means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof) and the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof).

**298.** **"Special Committee" has the meaning set forth in the Introduction hereof.**

**299.** **"Spectrum Allocation Petition for Rulemaking" has the meaning set forth in the Debtors' Disclosure Statement.**

**300.** **"SPSO" means** SP Special Opportunities, LLC**.**

**301.** **"SPSO Note" means a note issued by Reorganized LightSquared LP to the Holders of Allowed Prepetition LP Facility SPSO Claims, which note shall (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London Interbank Offered Rate floor of 1.00%), which interest shall be payable in kind, and (d) be secured or unsecured on the terms and conditions of, and subject to, the SPSO Option A Treatment or SPSO Option B Treatment, as applicable.**

**302.** **"SPSO Note Documents" means the SPSO Note and any related indenture, agreements, or other documents, if any.**

**303.** **"SPSO Option A Treatment" means the following treatment:  (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal**

**$1.1055 billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to** its Pro Rata share of the **foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; provided, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 hereof.**

**304.    "SPSO Option B Treatment" means the following treatment:    (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to** its Pro Rata share of the **foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured,** as determined by the Bankruptcy Court**; provided, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.**

**305.    "SPSO Parties" means SPSO, L-Band Acquisition, LLC, Charles W. Ergen, DISH Network Corporation, and EchoStar Corporation.**

**306.** ~~259.~~ "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

**307.** ~~260.~~ "**Stalking Horse Bidder**" has the meaning set forth in the Bid Procedures Order.

**308.    "Standing Motion" means that certain** *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* **[Docket No. 323].**

**309.** ~~261.~~ "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

**310.** ~~262.~~ "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**311.** ~~263.~~ "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

**312.** ~~264.~~ "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**313.** ~~265.~~ "**Voting Deadline**" means ~~December 30, 2013 at 4:00 p~~**March [3], 2014 at 4:00  p**.m. (prevailing Pacific time) ~~(unless otherwise extended pursuant to the Disclosure Statement Order)~~**, or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court**, which is the date by which all completed Ballots must be received by the Claims and Solicitation Agent.

**314.** ~~266.~~ "**Voting Record Date**" means October 9, 2013.

*B.      Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

*C.      Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the New LightSquared Entities, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or New LightSquared Entity, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP ~~FACILITY~~ CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP ~~Facility~~ Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof. In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP ~~Facility~~ Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP ~~Facility~~ Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative

39

Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order **(including, without limitation, the Confirmation Order and the New DIP Order)** of the Bankruptcy Court.  For the avoidance of doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

Except for Claims of Professionals, DIP ~~Facility~~ Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the New LightSquared Entities no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.  Objections to such requests must be Filed and served on the New LightSquared Entities and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the New LightSquared Entities or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein ~~and without waiving any party in interest's rights,~~ (1) any claim by a ~~Stalking Horse Bidder for any~~**New DIP Commitment Party for any Plan Support Party** Break-Up Fee ~~or Expense Reimbursement~~ shall **(a)** be deemed an Allowed Administrative Claim**, (b) be irrevocably earned by the New DIP Commitment Parties upon the New DIP Closing Date, (c) constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan, and (d) be payable** in accordance with ~~and to the extent provided in the Bid Procedures Order~~**the terms of the New DIP Commitment Letter**, (2) a ~~Stalking Horse Bidder~~**Plan Support Party** shall not be required to File any request for payment of such Administrative Claim, ~~and~~ (3) any **Plan Support Party** Break-Up Fee ~~or Expense Reimbursement~~ shall be paid in accordance with the terms of the ~~relevant Stalking Horse Agreement and the Bid Procedures Order~~**Plan or other applicable governing documents, and (4) no SPSO Party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement**.

B.    *Accrued Professional Compensation Claims*

    1.    <u>Final Fee Applications</u>

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

    2.    <u>Professional Fee Escrow Account</u>

In accordance with Article II.B.3 hereof, on the Effective Date, the New LightSquared Entities shall establish and fund the Professional Fee Escrow Account from the Plan Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors or New LightSquared Entities.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the New LightSquared Entities ~~for distribution in accordance with the Plan~~.  For the avoidance of doubt, the Inc. Debtors shall fund 15% of the Professional Fee Escrow Account from the Inc. Plan Consideration Carve-Out and the LP Debtors shall fund 85% of the Professional Fee Escrow Account from the LP Plan Consideration Carve-Out.

    3.    <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors **<u>and the Plan Support Parties</u>** no later than five (5) days prior to the anticipated Confirmation Date; <u>provided</u>, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated **<u>and agreed to by the Debtors and the Plan Support Parties</u>** as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

    4.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or New LightSquared Entities, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or New LightSquared Entities, as applicable, on or after the Confirmation Date.  Upon the Confirmation Date, any

requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or New LightSquared Entities, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

C.    *DIP Inc. ~~Facility~~ Claims*

**All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.** In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. ~~Facility~~ Claim~~, on the Confirmation Date or as soon thereafter as reasonably practicable~~ **and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date**, except to the extent that a Holder of a DIP Inc. ~~Facility~~ Claim agrees to a less favorable or other treatment, **the DIP Inc. Agent, for the benefit of** each Holder of a DIP Inc. ~~Facility~~ Claim**,** shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. ~~Obligor Debtors~~**Obligors** in the form of Cash **(from the proceeds of the New DIP Facility)** in an amount equal to such Allowed DIP Inc. ~~Facility~~ Claim.

D.    *~~New~~ DIP ~~Facility~~LP Claims*

**All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP** Plan Consideration allocated and attributed to the **DIP LP Obligors in the form of Cash (from the proceeds of the** New DIP **Facility)** in an amount equal to such Allowed **DIP LP Claim.**

## E.    *New DIP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP ~~Facility~~ Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP ~~Facility~~ Claim agrees to a less favorable or other treatment, ~~each Holder~~**the Holders** of ~~a~~ New DIP ~~Facility Claim~~**Claims** shall receive ~~Plan Consideration allocated and attributed to the New DIP Obligors~~**the following, as applicable:**

1. **Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);**

2. **Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78**% of the NewCo Series **A-1** Preferred PIK Interests and **(b) 77.78% of the** NewCo Class A Common Interests**;**

3. **Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under** the Reorganized LightSquared Inc. Loan **in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);**

4. **Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and**

5. **Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration** in the form of Cash in an amount equal to such ~~Allowed~~ New DIP **Tranche B** Facility Claim.

## F.    ~~E.~~ *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the

New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

**G.**     ~~F.~~ *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

*A.     Summary*

The categories listed in Article III.~~C~~**B** hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

*B.     Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.     <u>Class 1 – Inc. Other Priority Claims</u>

(a)     *Classification*:  Class 1 consists of all Inc. Other Priority Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive

Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

(c)    *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    Class 2 – LP Other Priority Claims

(a)    *Classification*:  Class 2 consists of all LP Other Priority Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

(c)    *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Inc. Other Secured Claims

(a)    *Classification*:  Class 3 consists of all Inc. Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:    (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 – LP Other Secured Claims

(a)    *Classification*:  Class 4 consists of all LP Other Secured Claims.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 4 is Unimpaired by the Plan.  Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.    Class 5 - Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claims

(a)    *Classification*:    Class 5 consists of all Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claims.

(b) ***Allowance*: Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (iii) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**

(c) (b) *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. **Facility** Non-Subordinated Facility Claim, on the Effective Date or as soon thereafter as reasonably practicable, **New DIP Closing Date, (i) the legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) hereof) and (ii)** except to the extent that a Holder of an Allowed Prepetition Inc. **Facility** Non-Subordinated Facility Claim agrees to any other treatment, **the Prepetition Inc. Agent, for the benefit of** each Holder of an Allowed Prepetition Inc. Non-Subordinated Facility **Non-Subordinated** Claim**,** shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the Reorganized LightSquared Inc. Loan**New DIP Facility**) in an amount equal to such Allowed Prepetition Inc. **Facility** Non-Subordinated Facility Claim.  **For the avoidance of doubt, the treatment provided to Class 5 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors.**

(d) (c) *Voting:*  Class 5 is Unimpaired by the Plan.  Each Holder of a Class 5 Prepetition Inc. **Facility** Non-Subordinated Facility Claim is

conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 5 Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claim is entitled to vote to accept or reject the Plan.

6. <u>Class 6 - Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims</u>

    (a)   *Classification*: Class 6 consists of all Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims.

    (b)   *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. ~~Subordinated~~ Facility **Subordinated** Claim **and the termination of Liens securing such Claims**, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) ~~the~~**$209 million of** NewCo Series ~~B~~ **A**-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests. **For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of** Prepetition Inc. Facility Subordinated Claims **against any and all Debtors.**

    (c)   *Voting:* Class 6 is Impaired by the Plan. Each Holder of a Class 6 Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7. <u>Class 7A - Prepetition LP Facility Non-SPSO Claims</u>

    (a)   *Classification*: Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)     ***Allowance*: Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $1.0883 billion, calculated as follows: (A) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (B) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013; (C) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (D) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (ii) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (iii) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.***

(c)     ~~(b)~~ *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the ~~Effective Date or as soon thereafter as reasonably practicable,~~**New DIP Closing Date, (i) the legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) hereof) and (ii)** except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment**:**

~~(b)~~ **,the Prepetition LP Agent, for the benefit of** each Holder of an Allowed **Non-Converted** Prepetition LP Facility Non-SPSO Claim**,** shall receive ~~one of the following:~~

**(i)** (1) in the event that Class 7A votes to accept the Plan, its Pro Rata share of LP Plan Consideration in the form of (A) $1.7 billion in Cash, (B) the NewCo Additional Interests, and (C) NewCo EARs in an amount equal to the difference between (i) thesuch Allowed **Non-Converted** Prepetition LP Facility Non-SPSO Claims *plus* unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed**Claim; provided, that for the avoidance of doubt, any Holder of a** Prepetition LP Facility Non-SPSO Claims through the Effective Date, *less* (ii) the aggregate principal amount of distributions provided for in subsections (A) and (B) above; or**Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or**

**(ii)** in the event that Class 7A votes to reject this Plan,**each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive** LP Plan Consideration in the form of Casha **New DIP Tranche B Claim** in an amount equal to such Allowed**Holder's Converted** Prepetition LP Facility Non-SPSO Claim *plus* unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed**; provided, that in the event that the amount of Converted** Prepetition LP Facility Non-SPSO Claim through the Effective Date.**Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on** a Pro Rata basis **(based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.**

**For the avoidance of doubt, the treatment provided to Class 7A herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.**

**(d)** (c) *Voting*: Class 7A is Impaired by the Plan. Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan. Notwithstanding anything to the contrary herein, in the event Class 7A votes to reject the Plan, Class 7A shall be deemed Unimpaired by the Plan and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

8.    <u>Class 7B - Prepetition LP Facility SPSO Claims</u>

(a)    *Classification*:  Class 7B consists of all Prepetition LP Facility SPSO Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim **and the termination of Liens securing such Claims**, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive ~~(i) LP Plan Consideration in the form of Cash in an amount equal to such Allowed Prepetition LP Facility SPSO Claim *plus* unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed Prepetition LP Facility SPSO Claim through the Effective Date or (ii) such other treatment the Bankruptcy Court deems appropriate after considering the facts and circumstances under section 1126 of the Bankruptcy Code.~~**:**

(i)    **in the event that (A) Class 7B** votes to accept the Plan and **(B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or**

(ii)    **in the event that (A) Class 7B** votes to reject the Plan, **(B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court** pursuant to section 1126(**e**) of the Bankruptcy Code**, the SPSO Option B Treatment.**

**For the avoidance of doubt, the treatment provided to Class 7B herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors.**

(c)    *Voting*:  Class 7B is ~~Unimpaired~~**Impaired** by the Plan.  Each Holder of a Class 7B Prepetition LP Facility SPSO Claim ~~is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   No Holder of a Class 7B Prepetition LP Facility SPSO Claim~~**as of the Voting Record Date** is entitled to vote to accept or reject the Plan**; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to** an order of the

Bankruptcy Court **and treated in accordance with Article III.D.4 hereof.**

9.    Class 8 – Inc. General Unsecured Claims

(a)    *Classification*:  Class 8 consists of all Inc. General Unsecured Claims.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

(c)    *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.    Class 9 – LP General Unsecured Claims

(a)    *Classification*:  Class 9 consists of all LP General Unsecured Claims.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)    *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Class 9 LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.    Class 10 – Existing LP Preferred Units Equity Interests

(a)    *Classification*:   Class 10 consists of all Existing LP Preferred Units Equity Interests.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed

Existing LP Preferred Units Equity Interest agrees to any other treatment, each **Holder of an** Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) ~~15.33% of the NewCo Series A Preferred PIK Interests and 15.33% of the NewCo Class A Common Interests (on account of the cancellation of $230~~**Cash in an amount equal to $223** million ~~of Allowed Prepetition LP Preferred Units Equity Interests)~~ and (ii) ~~the~~**$75 million of** NewCo Series ~~B-1~~**A-2** Preferred PIK Interests.

(c)     ***Voting*: Class 10 is Impaired by the Plan. Each Holder of a Class 10 Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.**

**12.     Class 11A – Existing Inc. Series A Preferred Stock Equity Interests**

(a)     ***Classification*: Class 11A consists of all Existing Inc. Series A Preferred Stock Equity Interests.**

(b)     ***Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the** Effective Date or as soon thereafter as reasonably practicable, **except to the extent that a Holder of an Allowed Existing Inc.** Series A Preferred **Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of (i) $17.54 million of NewCo Series A-2 Preferred** PIK Interests **and (ii) 90.9**% of the NewCo Class C Common Interests**.**

(c)     *Voting*: Class ~~10~~**11A** is Impaired by the Plan. Each Holder of a Class ~~10~~**11A** Existing ~~LP~~**Inc. Series A** Preferred ~~Units~~**Stock** Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

**13.**     ~~12.~~ Class 11**B** – Existing Inc. **Series B** Preferred Stock Equity Interests

(a)     *Classification*: Class 11**B** consists of all Existing Inc. **Series B** Preferred Stock Equity Interests.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. **Series B** Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. **Series B** Preferred Stock Equity Interest agrees to any other treatment **(including as described in the immediately following proviso)**, each Allowed Existing Inc. **Series B** Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of ~~(i)~~ its Pro Rata share of ~~51~~**(i) $1.76 million of NewCo Series A-**2 Preferred

PIK **Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100**% of the Reorganized LightSquared Inc. Common Shares and (ii) the right to participate in the Rights Offering for its Pro Rata share of the Rights Offering Shares.

(c)  *Voting*:    Class 11**B** is Impaired by the Plan.    Each Holder of a Class 11**B** Existing Inc. **Series B** Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

**14.**    13. Class 12 – Existing Inc. Common Stock Equity Interests

(a)  *Classification*:    Class 12 consists of all Existing Inc. Common Stock Equity Interests.

(b)  *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

(c)  *Voting*:    Class 12 is Impaired by the Plan.    Each Holder of a Class 12 Existing Inc. Common Stock Equity Interests as of the Voting Record Date is entitled to vote to accept or reject the Plan.

**15.**    14. Class 13 – Intercompany Claims

(a)  *Classification*:    Class 13 consists of all Intercompany Claims.

(b)  *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof**; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc**. After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed

Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

(c) *Voting*:  Class 13 is Unimpaired by the Plan.  Each Holder of a Class 13 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 13 Intercompany Claim is entitled to vote to accept or reject the Plan.

**16.**   ~~15.~~ Class 14 – Intercompany Interests

(a) *Classification*:  Class 14 consists of all Intercompany Interests.

(b) *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof **and treated in accordance with the Plan, as applicable**.

(c) *Voting*:  Class 14 is Unimpaired by the Plan.  Each Holder of a Class 14 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 14 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.   *Acceptance or Rejection of Plan*

1.   Voting Classes Under Plan

Under the Plan, Classes 6, 7A, **7B,** 8, 9, 10, 11**A, 11B**, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; provided, however, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Debtors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.        Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 5, ~~7B~~, 13, and 14 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.        Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.        Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Debtors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code**; provided, that the Debtors shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code**.  The Debtors reserve the right**, with the consent of each Plan Support Party,** to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary~~.~~**; provided, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment**

**of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).**

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF PLAN**

A.    *Overview of Plan*

The Plan contemplates, among other things, (1) ~~up to $2.5~~**$1.65** billion in ~~senior secured exit facility financing~~**new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan)**, (2) ~~a $250 million senior secured loan, (3) $1.25 billion in new equity contributions, (4~~**first lien exit financing, including a facility of not less than $1 billion, (3**) the issuance of new debt and equity instruments, (~~5~~**4**) the assumption of certain liabilities, (~~6~~**5**) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (~~7~~**6**) the preservation ~~of value of certain~~ of the Debtors' litigation claims ~~for the benefit of certain of the Debtors' stakeholders.  As provided by Article IV.Z hereof, to the extent that the Bankruptcy Court does not approve and confirm the transactions embodied by this Plan, the Plan contemplates confirmation of the Alternate Inc. Debtors Plan, which is attached hereto as~~ ~~Exhibit A~~**.**

B.    *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.   On **and after the Confirmation Date or** the Effective Date ~~or as soon thereafter as reasonably practicable~~**, as applicable,  the Debtors or** the New LightSquared Entities**, as applicable,** may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, **conversion, reconstitution,** or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the **Debtors or the** New LightSquared Entities**, as applicable,** determine are necessary or appropriate.

C.    *Sources of Consideration for Plan Distributions*

All consideration necessary for the **Debtors, the** New LightSquared Entities**, or the** Disbursing Agent**, as applicable,** to make Plan Distributions shall be obtained from the Plan Consideration and the Plan Consideration Carve-Out.  After the satisfaction of all Allowed Claims and Allowed Equity Interests in accordance with the Plan, all remaining proceeds from the Exit ~~Financing and New Equity Contribution~~**Facilities** shall be placed in a working capital reserve of NewCo.

D.    ~~*NewCo and Reorganized Debtors*~~***Certain Pre-Confirmation Date, Confirmation Date, and Effective Date*** *Plan Transactions*

1.    **Pre-Confirmation Date Plan Elections.  Certain Plan Transactions require elections by certain Holders of Claims on their respective Ballots prior to the Confirmation Date, including the following:**

(a)    **Each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall be entitled to elect on its respective Ballot to convert on the New DIP Closing Date any portion of its Allowed Prepetition LP Facility Non-SPSO Claim into a New DIP Tranche B Claim in full satisfaction of such Converted Prepetition LP Facility Non-SPSO Claim as set forth in Article III.B.7(c)(ii) hereof; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims:  (i) exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims; or (ii) is less than the New DIP Tranche B Cap, the Plan Support Parties shall provide new financing as part of the New DIP Tranche B Facility in an amount equal to the difference between the New DIP Tranche B Cap and the Converted Prepetition LP Facility Non-SPSO Claims.**

2.    ~~The~~**Confirmation Date** Plan Transactions ~~with respect to NewCo and the Reorganized Debtors~~**.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date** shall include, without limitation, the following ~~actions on the Effective Date~~:

(a)    **The** New DIP Obligors and the other relevant Entities shall enter into the New **DIP Credit Agreement.  On the New DIP Closing Date, the New DIP Lenders shall fund the New DIP Facility through the (i) conversion of Allowed Prepetition LP Facility Non-SPSO Claims into New DIP Tranche B Claims and/or (ii) provision of new financing by the Plan Support Parties as part of the New DIP Tranche A Facility and New DIP Tranche B Facility, as applicable,**

**in each case, in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, and New DIP Order.**

**(b)** **The Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims.**

**3.** **Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:**

**(a)** ~~1.~~ NewCo

**(i)** ~~(a) A~~**The Debtors, or a** nominee ~~of the New Equity Contributors shall establish~~**thereof, shall have established** NewCo.

**(ii)** ~~(b)~~ NewCo, the other **First Lien** Exit Obligors, and the other relevant Entities shall enter into the **First Lien** Exit ~~Financing~~**Credit** Agreement~~, and the~~**.  The First Lien** Exit Lenders shall ~~provide~~**fund** the **First Lien** Exit ~~Financing to NewCo.~~**Facility through the provision of new financing, in accordance with the Plan, Confirmation Order, and First Lien Exit Credit Agreement.  The proceeds of the First Lien Exit Facility shall be used to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repaying the New DIP Tranche B Facility, and provide post-Effective Date working capital.  The proceeds of First Lien Exit Excess Amount shall be used to repay a portion of the New DIP Tranche A Facility.**

**(iii)** **NewCo, the other Second Lien Exit Obligors**, and the other relevant Entities shall **enter into the Second Lien Exit Credit Agreement.  The Second Lien Exit Facility shall be funded through the (A) conversion of Plan Support Party ABC Debt-Converted New DIP Claims into loans under the Second Lien Exit Facility (which amount shall equal 77.78% of the original principal amount of the Second Lien Exit Facility) and (B) issuance of loans under the Second Lien Exit Facility (which amount shall equal 22.22% of the original principal amount of the Second Lien Exit Facility)** to Reorganized LightSquared Inc. **on account of the LightSquared Transfer, in each case, in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement.  The proceeds of**

**the Second Lien Exit Facility shall be used to, among other things, satisfy certain obligations under the Plan.**

**(iv)**   **NewCo shall issue** NewCo Series **A-**1 Preferred PIK Interests**,** which shall be issued and allocated as follows:  **(A) 77.78%** Pro Rata **to Plan Support Party A, Plan Support Party B, and Plan Support Party** C on account of**, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22**% to Reorganized LightSquared Inc. on account of the LightSquared **Transfer.**

(c) NewCo, the New Equity Contributors, and the other relevant Entities shall enter into the New Equity Contribution Agreement, and the New Equity Contributors shall provide the New Equity Contribution to NewCo.

(d) NewCo shall issue 1.5 billion of NewCo Series A Preferred PIK Interests (which shall be issued and allocated as follows:  (i) 15.33% to Holders of Allowed Prepetition LP Preferred Units Equity Interests on a Pro Rata basis, on account of the cancellation of $230 million of Allowed Prepetition LP Preferred Units Equity Interests; (ii) 13.33% to New Equity Contributor A on account of its New Equity Contribution; (iii) 36.67% to New Equity Contributor B partially on account of its New Equity Contribution; (iv) 10% to New Equity Contributor C on account of its New Equity Contribution; (v) 20% to Reorganized LightSquared Inc. partially on account of the LightSquared Equity Interests Contribution; and (vi) 4.67% Pro Rata to others to be identified in exchange for a New Equity Contribution in the amount of $70 million (subject to the agreement of all of the Plan Support Parties).

**(v)**   (e)  NewCo shall issue NewCo Class A Common **Series A-2 Preferred PIK** Interests (**,** which shall be issued and allocated as follows:   (i**A**)  15.33%**$75 million Pro Rata** to Holders of Allowed Prepetition**Existing** LP Preferred Units Equity Interests on a Pro Rata basis, account of the cancellation of $230 million of**such** Allowed Prepetition LP Preferred Units Equity Interests; (ii) 13.33% to New Equity Contributor A on account of its New Equity Contribution; (iii) 36.67% to New Equity Contributor B partially on account of its New Equity Contribution; (iv) 10% to New Equity Contributor C on account of its New Equity Contribution; (v) 20% **B) $209 million Pro Rata to** the Holders of Allowed Prepetition Inc. Facility Subordinated Claims **on account of such Allowed Claims; (C) $17.54 million Pro Rata to Holders of Allowed Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests (subject** to the Reorganized LightSquared Inc. **Call Option); (D) $1.76 million Pro Rata to Other Existing Inc. Series B**

**Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests (subject to** the Reorganized LightSquared Inc. **Call Option); and (E) $51.7 million** to Reorganized LightSquared Inc. partially on account of the LightSquared Equity Interests Contribution; and (vi) 4.67% Pro Rata to others to be identified in exchange for a New Equity Contribution in the amount of $70 million (subject to the agreement of all of the Plan Support Parties). The NewCo Class A Common Interests shall comprise 60% of all NewCo Common Interests issued in the aggregate. The NewCo Common Interests will be entitled to 100% of the Cash flow distributions and/or capital proceeds (subject, in the case of the NewCo Class B Common Interests, to the prior payment in full and in Cash of the NewCo Series B-1 Preferred PIK Interests and the NewCo Series B-2 Preferred PIK Interests) after satisfaction of the NewCo Series A PIK Preferred Interests' liquidation preference (which liquidation preference shall equal the higher of (i) 1.52 times par or (ii) par plus accrued at 20% per annum).**Transfer.**

(f) NewCo shall issue $120 million NewCo Series B-1 Preferred PIK Interests (100% of which shall be issued Pro Rata to the Holders of Allowed Existing LP Preferred Units Equity Interests partially on account of such Holders' Allowed Equity Interests).

**(vi)** (g) NewCo shall issue $225 million NewCo Series B-2 Preferred PIK Class A Common Interests, which amount is equal to (i) the outstanding principal amount of Allowed Prepetition Inc. Facility Subordinated Claims, (ii) expense reimbursements under the Prepetition Inc. Facility in the amount of $50 million, and (iii) unpaid postpetition interest accrued on account of the Allowed Prepetition Inc. Facility Subordinated Claims through the Effective Date (100% of which shall be issued **and allocated as follows: (A) 77.78%** Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims).**Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.**

**(vii)** (h) NewCo shall issue NewCo Class B Common Interests (, which shall be issued and allocated as follows: (i**A**) 70% Pro Rata to the Holders of Allowed Prepetition Inc. Subordinated Facility **Subordinated Claims on account of such Allowed** Claims and (ii**B**) 30% Pro Rata to the Holders of Allowed

61

Existing Inc. Common Stock Equity Interests ~~partially~~ on account of such ~~Holders'~~ Allowed Equity Interests**,**.

**(viii)** ~~). The~~**NewCo shall issue** NewCo Class ~~B~~**C** Common Interests ~~shall comprise 32% of all NewCo Common Interests issued in the aggregate. Distributions from Cash flow and/or capital proceeds on account of the NewCo Class B Common Interests shall be subject to the prior payment in full and in Cash of the NewCo~~**(subject to the Plan Support Party C Call Option), which shall be issued and allocated as follows: (A) 90.9% Pro Rata to the Holders of Existing Inc.** Series ~~B-1~~**A** Preferred ~~PIK~~**Stock Equity** Interests ~~and the NewCo~~**on account of such Allowed Equity Interests; and (B) 9.1% Pro Rata to the Other Existing Inc.** Series ~~B-2~~**B** Preferred ~~PIK~~**Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity** Interests.

**(ix)** ~~(i)~~ NewCo shall issue NewCo Class ~~C~~**D** Common Interests **(subject to the Plan Support Party C Call Option), which shall be issued and allocated** to Reorganized LightSquared Inc. ~~partially~~ on account of the ~~Reorganized~~ LightSquared ~~Inc. Equity Interests Contribution. The NewCo Class C Common Interests shall comprise 8% of all NewCo Common Interests issued in the aggregate. The NewCo Class C Common Interests issued to Reorganized LightSquared Inc. shall be subject to a call option, exercisable by New Equity Contributor C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests for $250 million.~~**Transfer.**

~~(j) NewCo shall issue the NewCo Additional Interests and NewCo EARs to the Holders of Prepetition LP Facility Non-SPSO Claims in the event that Class 7A votes to accept the Plan and all of the Plan Support Parties consent to such issuances.~~

**(x)** ~~(k)~~ NewCo shall reserve for issuance ~~of~~ up to 10% of NewCo Common Interests in connection with the Management Incentive Plan (subject to the agreement of ~~all of the~~**each** Plan Support ~~Parties~~**Party**).

**(xi)** **Plan Support Party C shall be granted the Plan Support Party C Call Option.**

**(b)** ~~2.~~ Reorganized Debtors

**(i)** **One Dot Six Corp. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes**,.

    **(ii)**    **Lightsquared Holdings GP Inc. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.**

    **(iii)**    ~~(a)~~ LightSquared Inc. shall be reorganized as Reorganized LightSquared Inc. and the other Debtors shall be reorganized as the Reorganized Subsidiaries.

    **(iv)**    ~~(b)~~ Reorganized LightSquared Inc. shall ~~contribute~~**sell, assign, and/or transfer** to NewCo all of Reorganized LightSquared Inc**.'s Assets and Equity Interests (other than** Reorganized LightSquared Inc.**'s tax attributes or its Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Inc**.'s Equity Interests in Reorganized One Dot Six ~~Corp~~**LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders)**.

    **(v)**    ~~(c)~~ Reorganized LightSquared Investors Holdings Inc. shall ~~contribute~~**sell, assign, and transfer** to NewCo all of Reorganized LightSquared Investors Holdings Inc.'s **Assets and Equity Interests (other than its tax attributes and its** Equity Interests in Reorganized **TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all** Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared ~~LP~~**GP LLC**, and Reorganized LightSquared ~~GP Inc~~**LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders)**.

    **(vi)**    ~~(d)~~ Reorganized TMI Communications Delaware, Limited Partnership shall ~~contribute~~**sell, assign, and transfer** to NewCo **all of** Reorganized TMI Communications Delaware, Limited Partnership's **Assets and** Equity Interests **(other than its tax attributes), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation,** all of Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP ~~Inc.~~**LLC** and Reorganized LightSquared LP**, intellectual property, contractual rights, and Retained Causes**

of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vii) Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. shall sell, assign, and transfer to NewCo all of such Entities' Assets (other than their tax attributes, Reorganized SkyTerra Rollup LLC's Equity Interests in Reorganized SkyTerra Rollup Sub LLC, and Reorganized SkyTerra Rollup Sub LLC's Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(viii) All other Reorganized Subsidiaries shall sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

(ix) (e) As a result of the foregoing Plan Transactions, (iA) NewCo shall be the limited partner, and Reorganized LightSquared GP Inc.LLC shall be the general partner, of Reorganized LightSquared LP, (iiB) NewCo shall wholly own Reorganized One Dot Six Corp.LLC, and (iii)C) each of the Reorganized LightSquared Inc. shall retain its 100% ownership ofSubsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) shall have been sold, assigned, and transferred to NewCo and shall become subsidiaries of NewCo on the Effective Date, and (D) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., SkyTerra Rollup Sub LLC, and TMI Communications Delaware, Limited Partnership.

(x) (f) Reorganized LightSquared Inc. shall issue to the Reorganized LightSquared Inc. Loan Holder theto Plan Support Party D in exchange for the Plan Support Party D Debt-Converted New DIP Claims in accordance with the Plan, Confirmation Order, and Reorganized LightSquared Inc. Loan in exchange for a $250 million loan provided to Reorganized LightSquared Inc. by the Reorganized LightSquared Inc. Loan Holder (the proceeds

of which shall be used to pay the Allowed Prepetition Inc. Facility Non-Subordinated Claims)**Agreement.**

(xi)    (g) Reorganized LightSquared Inc. shall issue 51**to SIG Holdings, Inc. (or its designee) 100**% of the Reorganized LightSquared Inc. Common Shares to the Holders of**on account of, and in exchange for the cancellation of, the Allowed** Existing Inc. **Series B** Preferred Stock Equity Interests **held by SIG Holdings, Inc**.

(xii)    **Plan Support Party C shall be granted the Plan Support Party C Call Option.**

(xiii)    (h) Reorganized LightSquared Inc. shall issue 49% of**be granted** the Reorganized LightSquared Inc. Common Shares to the participants in the Rights Offering or, as necessary, to the Rights Offering Backstop Party, in exchange for an aggregate contribution of $50 million**Call Option**

(xiv)    (i) As a result of the foregoing transactions**, and in exchange for, the Plan Transactions (including the LightSquared Transfer)**, Reorganized LightSquared Inc. shall hold (i**A**) 20**22.22% of loans under the Second Lien Exit Facility, (B) 22.22**% of NewCo Series A**A-1** Preferred PIK Interests, (ii**C**) 20**$51.7 million of the NewCo Series A-2** Preferred PIK Interests, **(D) 22.22**% of NewCo Class A Common Interests, and (iii**E**) 100% of the NewCo Class C**D** Common Interests (subject to a call option, exercisable by New Equity Contributor C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests for $250 million**the Plan Support Party C Call Option**).

E.    *First Lien* Exit *Financing***Facility**

On the Effective Date, the **First Lien** Exit Obligors and the other relevant Entities shall enter into the **First Lien** Exit *Financing***Credit** Agreement**, and the First Lien Exit Facility shall be funded with new financing in accordance therewith**.  The applicable New LightSquared Entities shall use the **First Lien** Exit *Financing***Facility** for the purposes specified in the Plan, the **First Lien** Exit *Financing***Credit** Agreement, and the other governing documents**, including to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repayment of the New DIP Tranche B Facility, and provide post-Effective Date working capital**.

Confirmation of the Plan shall constitute (1**, upon the occurrence of the New DIP Closing Date, (1) authorization for the Debtors to enter into the commitment letter and fee letter related to the First Lien Exit Facility Filed by the Debtors with the Plan Supplement and to incur obligations thereunder and to pay fees, indemnities, and**

**expenses provided for therein, (2**) approval of the **First Lien** Exit ~~Financing~~**Facility** and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the **First Lien** Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2**3**) authorization for the **First Lien** Exit Obligors to enter into and execute the **First Lien** Exit ~~Financing~~**Credit** Agreement and such other documents as may be required or appropriate. On the Effective Date, the **First Lien** Exit ~~Financing~~**Facility**, together with any new promissory notes evidencing the obligation of the **First Lien** Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the **First Lien** Exit Obligors pursuant to the **First Lien** Exit ~~Financing~~**Facility** and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the **First Lien** Exit ~~Financing~~**Credit** Agreement and related documents. **The liens securing the First Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.**

F.    ~~*Rights Offering*~~*Second Lien Exit Facility*

~~On the Effective Date, Reorganized LightSquared Inc., the Rights Offering Backstop Party, and the other relevant Entities shall implement the Rights Offering Procedures. Each Holder of an Existing Inc. Preferred Stock Equity Interest shall have the right to participate in the Rights Offering to purchase its Pro Rata share of the Rights Offering Shares at a price per share equal to the Rights Offering Share Price. The Rights Offering Backstop Party shall purchase any Rights Offering Shares that remain unsubscribed after the completion of the Rights Offering at a price per share equal to the Rights Offering Share Price.~~

**On the Effective Date, the Second Lien Exit Obligors** and the other relevant Entities shall enter into the **Second Lien Exit Credit Agreement, and the Second Lien Exit Facility shall be funded as set forth in Article IV.D.3(a) hereof. The Second Lien Exit Facility shall permit NewCo to incur a new debt facility of up to $500 million, which shall be secured by liens senior to the liens under the Second Lien Exit Facility and junior to the liens under the First Lien Exit Facility (the "1.5 Lien Loans").** The Plan Support Parties shall **have the right (but not the obligation) to purchase their *pro rata* share of any 1.5 Lien Loans based on their commitment percentages. In the event that any Plan Support Party fails to purchase its entire share of the 1.5 Lien Loans, the other Plan Support Parties shall have the right (but not the obligation) to purchase the remaining 1.5 Lien Loans on a *pro rata* basis. In the event that the Plan Support Parties do not exercise their right to purchase the entire principal amount of the 1.5 Lien Loans, NewCo may issue such remaining 1.5 Lien Loans to third parties. The** applicable New LightSquared Entities shall use the **Second Lien Exit Facility** for the purposes specified in the Plan, the **Second Lien Exit Credit** Agreement, and the other governing documents.

~~Confirmation of the Plan shall constitute (1) approval of the Rights Offering, the Rights Offering Procedures, and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Rights Offering Backstop Party, and the applicable Debtors and New LightSquared Entities in connection therewith and (2) authorization for each participant in the Rights Offering, the Rights Offering Backstop Party, and the applicable Debtors and New LightSquared Entities to~~

enter into and execute all documents, agreements, and other instruments as may be required or appropriate.

*G. New Equity Contribution*

On the Effective Date, NewCo and the other relevant Entities shall enter into the New Equity Contribution Agreement. NewCo and the other applicable New LightSquared Entities shall use the proceeds from the New Equity Contribution for the purposes specified in the Plan, the New Equity Contribution Agreement, and the other governing documents.

Confirmation of the Plan shall constitute**, upon the occurrence of the New DIP Closing Date,** (1) approval of the ~~New Equity Contribution~~**Second Lien Exit Facility** and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by ~~NewCo~~**the Second Lien Exit Obligors** in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, **and** (2) authorization for ~~NewCo~~**the Second Lien Exit Obligors** to enter into and execute the ~~New Equity Contribution~~**Second Lien Exit Credit** Agreement and such other documents as may be required or appropriate~~, and (3) approval of the LightSquared Equity Interests Contribution and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by NewCo in connection therewith~~. On the Effective Date, the ~~New Equity Contribution Agreement~~**Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of the Second Lien Exit Obligors,** and all other documents, instruments**, mortgages**, and agreements to be entered into, delivered, or confirmed thereunder**,** shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by ~~NewCo~~**the Second Lien Exit Obligors** pursuant to the ~~New Equity Contribution Agreement~~**Second Lien Exit Facility** and related documents shall be **secured and paid or otherwise** satisfied pursuant to, and as set forth in, the ~~New Equity Contribution~~**Second Lien Exit Credit** Agreement and related documents. **The liens securing the Second Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.**

*H. Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the New Equity Contributors, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the New Equity Contribution Agreement and the Plan, and (b) reserve for issuance 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of all of the Plan Support Parties), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof. The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

**G.**    *I. Issuance of* Reorganized LightSquared Inc. Loan

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into **the** Reorganized LightSquared Inc. **Loan Agreement.** On the Effective Date, **the** Reorganized LightSquared Inc. **Loan shall be funded** by the Reorganized LightSquared Inc. Loan Holder **converting its Plan Support Party D Debt-Converted New DIP Claims (inclusive of New DIP Tranche A Accrued Interest attributed thereto) into loans under the Reorganized LightSquared Inc. Loan, on a dollar-for-dollar basis, in full satisfaction of such Plan Support Party D Debt-Converted New DIP Claims (as set forth in Articles II.E and IV.D hereof) in accordance with** the Reorganized LightSquared Inc. Loan Agreement. Reorganized LightSquared Inc. shall use the Reorganized LightSquared Inc. Loan for the purposes specified in the Plan, the Reorganized LightSquared Inc. Loan Agreement, and the other governing documents.

Confirmation of the Plan shall constitute**, upon the occurrence of the New DIP Closing Date,** (1) approval of the Reorganized LightSquared Inc. Loan Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc. Loan Agreement and such other documents as may be required or appropriate. On the Effective Date, the Reorganized LightSquared Inc. Loan Agreement, together with the Reorganized LightSquared Inc. Loan evidencing the obligation of Reorganized LightSquared Inc., and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Loan Agreement and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Loan Agreement and related documents.

*H.*    ~~*J. Litigation Trust*~~**[RESERVED]**

*I.*    *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the **Plan Support Parties**, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the **Plan and other governing documents**, and (b) reserve for issuance **up to** 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of **each** Plan Support **Party**), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof **and treated in accordance with the Plan, as applicable**. The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable. ~~1. Execution of Litigation Trust Agreement~~

~~On or before the Effective Date, the Litigation Trust Agreement shall be executed by the Debtors and the Litigation Trustee, and all other necessary steps shall be taken to establish the Litigation Trust and allocate the beneficial interests therein to the Holders of Allowed Existing Inc. Common Equity Interests, as provided in the Plan. The Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein.~~

~~2. Purpose of the Litigation Trust~~

~~The Litigation Trust shall be established for the purpose of realizing the value of the Litigation Trust Assets.~~

~~3. Litigation Trust Assets~~

~~On the Effective Date, (a) the Litigation Trust Assets shall be transferred (and deemed transferred) to the Litigation Trust without the need for any person or entity to take any further action or obtain any approval and (b) LightSquared Inc. shall deposit the Litigation Trust Funding into the Litigation Trust by wire transfer in accordance with wire transfer instructions provided by the Litigation Trust prior to the Effective Date. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.~~

~~4. Governance of the Litigation Trust~~

~~The Litigation Trustee shall govern the Litigation Trust.~~

5. The Litigation Trustee

The Plan Support Parties shall designate the Litigation Trustee.  In the event the then appointed Litigation Trustee dies, is terminated, or resigns for any reason, New Equity Contributor C shall promptly designate a successor trustee.

6. Role of the Litigation Trustee

In furtherance of, and consistent with, the purpose of the Litigation Trust and the Plan, the Litigation Trustee shall (a) have the power and authority to hold, manage, convert to Cash, and distribute the Litigation Trust Assets, including prosecuting and resolving the Litigation Trust Actions, (b) hold the Litigation Trust Assets for the benefit of its beneficiaries, and (c) have the power and authority to hold, manage, and distribute Cash or non-Cash assets obtained through the exercise of its power and authority.  In all circumstances, the Litigation Trustee shall act in the best interests of all beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust.

7. Transferability of Litigation Trust Interests

Litigation Trust Interests are not transferable or assignable, provided that the Litigation Trust Interests may be transferred pursuant to a transfer of the corresponding NewCo Interests in respect of which such Litigation Trust Interests were issued, and provided further that such transfer of NewCo Interests is permitted under the New LightSquared Entities Corporate Governance Documents.

8. Cash
**The applicable New Corporate Governance Documents shall contain provisions necessary to (1) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable New Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the New LightSquared Entities.**
The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code.

9. Litigation Trust Distributions

The Litigation Trustee shall make distributions to the beneficiaries of the Litigation Trust of all Cash on hand in accordance with the Litigation Trust Agreement.

10. Costs and Expenses of the Litigation Trust

The costs and expenses of the Litigation Trust, including the fees and expenses of the Litigation Trustee and its retained professionals, shall be paid from the Litigation Trust with the Litigation Trust Assets.

70

11. Compensation of the Litigation Trustee

The Litigation Trustee shall be entitled to reasonable compensation approved by the Plan Support Parties and paid by the Litigation Trust with the Litigation Trust Assets in an amount consistent with that of similar functionaries in similar roles.

12. Retention of Professionals by the Litigation Trustee

The Litigation Trustee may retain and compensate attorneys and other professionals to assist in its duties as Litigation Trustee on such terms as the Litigation Trustee deems appropriate without Bankruptcy Court approval.

13. Federal Income Tax Treatment of the Litigation Trust

For all federal income tax purposes, all parties (including Reorganized LightSquared Inc., the Litigation Trustee, and the beneficiaries of the Litigation Trust) shall treat the Litigation Trust Assets as owned by NewCo.

14. Dissolution
The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Trustee and Plan Support Parties determine that the administration of the Litigation Trust is not likely to yield sufficient additional proceeds to justify further pursuit of the Litigation Trust Actions and (b) all Distributions required to be made by the Litigation Trustee under the Plan and the Litigation Trust Agreement have been made.

***J.*** ~~K.~~ *Section 1145 and Other Exemptions*

~~Pursuant to section 1145 of the Bankruptcy Code, the~~**The** offering, issuance, and distribution of the **securities contemplated by the Plan and any and all agreements incorporated therein, including the** New LightSquared Entities Shares **(other than the NewCo Interests being** issued to Reorganized LightSquared Inc. **on account of the LightSquared Transfer),** shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. ~~In addition, under~~**, pursuant to** section 1145 of the Bankruptcy Code**, and the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer shall be similarly exempted pursuant to the private placement exemption under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  In addition**, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares ~~and Reorganized LightSquared Inc. Loan~~, shall be subject to (1) **if issued pursuant** to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set

forth in the New LightSquared Entities Corporate Governance Documents, and (4) applicable regulatory approval, if any.

**K.** ~~L.~~ *Listing of New LightSquared Entities Shares; Reporting Obligations*

The New LightSquared Entities shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.  In order to prevent the New LightSquared Entities from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New LightSquared Entities Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the New LightSquared Entities Corporate Governance Documents.

~~M. New LightSquared Entities Shareholders Agreements~~

**L.** *NewCo Interest Holders Agreement*

On the Effective Date, ~~the New LightSquared Entities~~ **NewCo** shall enter into and deliver the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement**.

Confirmation of the Plan shall constitute**, upon the occurrence of the New DIP Closing Date,** (1) approval of the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement** and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by ~~the New LightSquared Entities~~**NewCo,** and (2) authorization for ~~the New LightSquared Entities~~**NewCo** to enter into and execute the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement** and such other documents as may be required or appropriate. On the Effective Date, the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement**, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by ~~the New LightSquared Entities~~**NewCo** pursuant to the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement** and related documents shall be satisfied pursuant to, and as set forth in, the ~~New LightSquared Entities Shareholders Agreements~~**NewCo Interest Holders Agreement** and related documents.

For the avoidance of doubt, the New LightSquared Entities Shareholders Agreements shall provide the rights and priorities of the holders of New LightSquared Entities Shares, including the following:

1. The Reorganized LightSquared Inc. Shareholders Agreement shall provide for rights of first refusal, buy-sell provisions, and put/call rights.  JPMorgan shall have the right, exercisable in its sole discretion, to purchase in Cash the shares of other holders of Reorganized LightSquared Inc. Common Shares at fair market value if required by applicable

authority or as JPMorgan may reasonably determine is necessary or appropriate for regulatory compliance.

2. The NewCo Class A Common Interests shall control the governance of NewCo. Any equity held by New Equity Contributor C shall be non-voting (or covered by an irrevocable voting proxy on behalf of Reorganized LightSquared Inc.), which voting restrictions may be lifted if New Equity Contributor C transfers its equity to a buyer acceptable to Reorganized LightSquared Inc.

3. Distributions from Cash flow and/or capital proceeds on account of the NewCo Class B Common Interests shall be subject to the prior payment in full and in Cash of the NewCo Series B-1 Preferred PIK Interests and the NewCo Series B-2 Preferred PIK Interests.

4. The NewCo Series B-1 Preferred PIK Interests shall be contractually senior to the NewCo Series B-2 Preferred PIK Interests.

5. The NewCo Class C Common Interests issued to Reorganized LightSquared Inc. shall be subject to a call option, exercisable by New Equity Contributor C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests for $250 million.

**M.**    ~~N.~~ *Indemnification Provisions in New LightSquared Entities Corporate Governance Documents*

As of the Effective Date, the New LightSquared Entities Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the New LightSquared Entities' current and former directors, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the New LightSquared Entities shall amend or restate the New LightSquared Entities Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the New LightSquared Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

**N.**    ~~O.~~ *Management Incentive Plan*

On or as soon as practicable following the Consummation of the Plan, the ~~New LightSquared Entities Boards~~**NewCo Board** shall adopt the Management Incentive Plan.

**O.**    ~~P.~~ *Corporate Governance*

As shall be set forth in the New LightSquared Entities Charters and New LightSquared Entities Bylaws, the New LightSquared Entities Boards shall consist of a number of members, and appointed in a manner, to be agreed upon by ~~all of the~~**each** Plan Support ~~Parties~~**Party** or otherwise provided in the New LightSquared Entities Corporate Governance Documents.  In

accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the New LightSquared Entities Boards or officer of the New LightSquared Entities and (2) the nature of compensation for any officer employed or retained by the New LightSquared Entities who is an "insider" under section 101(31) of the Bankruptcy Code.

**P.**    ~~Q.~~ *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Exit ~~Financing~~**Facilities** and any rights of any of the parties under the Exit ~~Financing Agreement~~**Credit Agreements** or any of the related documents, (2~~) any rights of any of the parties under the New Equity Contribution Agreement or any of the related documents, (3~~) any Liens granted to secure the Reorganized LightSquared Inc. Loan and any rights of any of the parties under the Reorganized LightSquared Inc. Loan Agreement or any of the related documents**, (3) any Liens granted to secure the SPSO Note or any of the related documents if Class 7B elects to receive the SPSO Option A Treatment**, and (4) any rights of any of the parties under any of the New LightSquared Entities Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each New LightSquared Entity may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*Q.*    ~~R.~~ *Cancellation of Securities and Agreements*

On the Effective Date **(or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility)**, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the New LightSquared Entities shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, **that** any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, **that (1)** the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the New LightSquared Entities **and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan**.

**All Liens securing the Prepetition Facility Claims under the Prepetition Inc. Credit Agreement or the Prepetition LP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to** the Effective Date of the Plan**, at which time such Liens shall be terminated.**

**R.**    ~~S.~~ *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

75

**_S._**    ~~T.~~  *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the New LightSquared Entities, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the Exit ~~Financing~~**Credit Agreements, the Reorganized LightSquared Inc. Loan** Agreement, the ~~New Equity Contribution~~**SPSO Note Documents, the Exit Intercreditor** Agreement, the New LightSquared Entities Corporate Governance Documents, the ~~Reorganized LightSquared Inc. Loan Agreement, the~~ Management Incentive Plan, ~~the Litigation Trust Agreement, the Rights Offering Procedures, and term sheets,~~**and** commitment letters~~,~~ and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the New LightSquared Entities; (5) the issuance and distribution of the New LightSquared Entities Shares and the ~~Reorganized LightSquared Inc. Loan~~**SPSO Note**; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate:  (1) the Exit ~~Financing Agreement~~**Credit Agreements**; (2) the ~~New Equity Contribution~~**Reorganized LightSquared Inc. Loan** Agreement; **(3) the SPSO Note Documents; (4) the Exit Intercreditor Agreement; (5)** the New LightSquared Entities Corporate Governance Documents; ~~(4) the Reorganized LightSquared Inc. Loan Agreement; (5~~**6**) the Management Incentive Plan; ~~(6) the Litigation Trust Agreement;~~**and** (7~~) the Rights Offering Procedures; and (8)~~ any and all other agreements, documents, securities, and instruments related to the foregoing.  The authorizations and approvals contemplated by this Article IV.~~T~~**S** shall be effective notwithstanding any requirements under non-bankruptcy law.

**_T._**    ~~U.~~  *Effectuating Documents; Further Transactions*

On and after the Effective Date, the New LightSquared Entities and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or

documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the New LightSquared Entities, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

**_U._**        ~~_V._~~ _Exemption from Certain Taxes and Fees_

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a New LightSquared Entity or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the New LightSquared Entities, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**_V._**        ~~_W._~~ _Preservation**, Transfer, and Waiver** of Rights of Action_

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the ~~New LightSquared Entities~~**Reorganized Debtors** shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement ~~and the Litigation Trust Actions~~, and the ~~New LightSquared Entities~~**Reorganized Debtors**' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date~~.  The New LightSquared Entities may pursue such Causes of Action, as appropriate, in accordance with the best interests of the New LightSquared Entities~~.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the ~~New LightSquared Entities~~**Reorganized Debtors**, as applicable, shall not pursue any and all available Causes of Action against them.  The Debtors or the ~~New LightSquared Entities~~**Reorganized Debtors**, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the ~~New LightSquared Entities~~**Reorganized Debtors** expressly reserve all Causes of Action, for later adjudication, and, therefore, no

77

preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the ~~New LightSquared Entities~~**Reorganized Debtors**, as applicable. ~~The New LightSquared Entities~~

Notwithstanding anything to the contrary herein, **on the Effective Date: (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of** the Retained Causes of Action, **and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses in exchange for the treatment of Claims and Equity Interests held by Plan Support Party C as set forth in this Plan; (3) NewCo**, through its authorized agents or representatives, shall retain and may exclusively enforce **and pursue** any and all such Causes of Action. ~~The New LightSquared Entities~~**; (4) NewCo** shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. ~~The New LightSquared Entities reserve~~**; and (5) NewCo reserves** and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

**Plan Support Party C shall not assert any unasserted claim or Cause of Action arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses on and after the Effective Date unless and until NewCo asserts any such unasserted claim or Cause of Action; provided, however, that on and after the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum, Plan Support Party C shall be deemed to have irrevocably waived the right to assert any such unasserted claims or Causes of Action. Any proceeds of any rights of action contributed to NewCo from the Reorganized Debtors shall be payable to NewCo.**

**_W._** ~~_X._~~ _Assumption of D&O Liability Insurance Policies_

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order shall constitute**, subject to the occurrence of the Effective Date,** the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and

each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the New LightSquared Entities shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.  As of the Effective Date, the Debtors or New LightSquared Entities, as applicable, anticipate purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

### X.  ~~Y.~~ Employee and Retiree Benefits

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable New LightSquared Entities shall assume and continue to perform the Debtors' obligations to:  (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case**,** to the extent disclosed in the Debtors' Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, **that** the Debtors' or New LightSquared Entities' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Article III.B.~~13~~**14** hereof; provided, **that** the applicable New LightSquared Entities Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable New LightSquared Entities awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the New LightSquared Entities Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the New LightSquared Entities' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as

that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

*Z. Toggle to Alternate Plan*

To the extent that the Bankruptcy Court does not approve and confirm all of the terms and transactions set forth in this Plan, the Plan shall toggle to the Alternate Inc. Debtors Plan, and the Debtors shall proceed to Confirmation and Consummation of the Alternate Inc. Debtors Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1. <u>Rejection of Executory Contracts and Unexpired Leases</u>

Except as otherwise provided herein (including Article IV.~~Y~~**X** hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease~~:~~ (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement~~:~~**,** (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date~~:~~**,** (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date~~:~~**,** (d) is an Intercompany Contract~~:~~**,** or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, **<u>that</u>** the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2. <u>Assumption of Executory Contracts and Unexpired Leases</u>

In connection with the Confirmation and Consummation of the Plan, the Debtors and the Plan Support Parties shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the New LightSquared Entities no later than thirty (30) days after the Effective Date.   All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.C̶**B**.9 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 9 in Article III.C̶**B**.10 hereof.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Debtors or New LightSquared Entities, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract

or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the New LightSquared Entities' financial wherewithal must be**have been** Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline").  Any counterparty to an Executory Contract or Unexpired Lease that has failed or fails, as applicable, to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the New LightSquared Entities to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, **that** the Debtors or New LightSquared Entities, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, **that** notwithstanding anything to the contrary herein, prior to the Effective Date or such other date as determined by the Bankruptcy Court and prior to the entry of a Final Order resolving any dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the Debtors and the New LightSquared Entities reserve the right to reject any Executory Contract or Unexpired Lease which is subject to dispute.**; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.**

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors

under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and New LightSquared Entities expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the New LightSquared Entities, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable New LightSquared Entity in the ordinary course of business.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Postpetition Contracts and Leases*

Each New LightSquared Entity ~~will~~**shall** perform its obligations under each contract and lease entered into by the respective Debtor or applicable New LightSquared Entity after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or New LightSquared Entity, in each case, in accordance with, and subject to, the then applicable terms.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) ~~will~~**shall** survive, and remain unaffected by, entry of the Confirmation Order.

H.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not, in fact, an Executory

83

Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and the New LightSquared Entities, with the consent of ~~the~~**each** Plan Support ~~Parties~~**Party**, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, **that** if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New LightSquared Entities shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend their decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Agents, the Prepetition Agents, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests.   The Debtors and the New LightSquared Entities, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date.   The Debtors and the New LightSquared Entities, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.    *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan**, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims on the New DIP Closing Date**, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, **that** Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the ~~New Equity Contributors~~**Plan Support Parties**, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, New LightSquared Entity, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable.  Except as otherwise provided herein, the ~~New Equity Contributors~~**Plan Support Parties**, the eligible Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The New LightSquared Entities are authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the New LightSquared Entities shall reserve any applicable Plan Consideration from Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.    *Disbursing Agent*

All Plan Distributions shall be made by the **Debtors or the** New LightSquared Entities as Disbursing Agent**,** or such other Entity designated by the **Debtors or the** New LightSquared Entities as ~~a~~ Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as

agreed by and between the **Debtors or the** New LightSquared Entities**, as applicable,** and such Disbursing Agent.

**Except as otherwise provided herein,** Plan Distributions of Plan Consideration under the Plan shall be made by the **Debtors or the** New LightSquared Entities**, as applicable,** to the Disbursing Agent for the benefit of the ~~New Equity Contributors~~**Plan Support Parties**, the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the **Debtors or the** New LightSquared Entities**, as applicable**, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.    *Rights and Powers of Disbursing Agent*

1.    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.    Expenses Incurred on or After Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by the New LightSquared Entities.

E.    *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

1.    Payments and Plan Distributions on Disputed Claims and Disputed Equity Interests

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

2.    Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed Equity Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties~~:~~**,** (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in

connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order;, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

1.    Delivery of Plan Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the **Debtors' or the** New LightSquared Entities' records as of the date of any such Plan Distribution; provided, however, **that** the manner of such Plan Distributions shall be determined at the discretion of the **Debtors or the** New LightSquared Entities; provided, further, **that** the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Articles VI.F.4**5** and VI.F.5**6 hereof**, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    Delivery of Plan Distributions to Holders of Allowed DIP Inc. ~~Facility~~ Claims

The Plan Distributions provided for Allowed DIP Inc. ~~Facility~~ Claims pursuant to Article II.C hereof and ~~pursuant to~~ the New DIP Facility shall be made to the DIP Inc. Agent. ~~To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the~~ **by the Debtors or the New** DIP ~~Inc.~~ Lenders ~~at the direction~~**, on behalf** of the **Debtors, on the New** DIP ~~Inc. Agent~~**Closing Date**.

**3.    Delivery of Plan Distributions to Holders of Allowed DIP LP Claims**

**The Plan Distributions provided for Allowed DIP LP Claims pursuant to Article II.D hereof and the New DIP Facility shall be made to the DIP LP Lenders by the Debtors or the** New DIP Lenders, **on behalf of the Debtors, on the New DIP Closing Date.**

**4.**    ~~3.~~ Delivery of Plan Distributions to Holders of Allowed New DIP ~~Facility~~ Claims

The Plan Distributions provided for Allowed New DIP ~~Facility~~ Claims pursuant to Article II.~~D~~E hereof shall be made to the New DIP Agent. To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

**5.**    ~~4.~~Delivery of Plan Distributions to Holders of Allowed Prepetition Inc. Facility Claims

**The Plan Distributions provided for Allowed Prepetition Inc. Facility Non-Subordinated Claims by Article III.B.5 hereof shall be made to the Prepetition Inc. Agent by the Debtors, or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.**

The Plan Distribution provided by ~~Articles~~**Article** III.~~C.5 and III.C~~B.6 hereof shall be made to the Prepetition Inc. Agent **directly by** the New LightSquared Entities **or the Disbursing Agent to the Holders of Allowed Prepetition Inc. Subordinated Facility Claims**. To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Inc. Plan Consideration is eligible to be distributed to the **Holders of Allowed** Prepetition Inc. ~~Lenders~~**Facility Subordinated Claims** at the direction of the Prepetition Inc. Agent.

Notwithstanding anything to the contrary herein, **(a)** any Holder of a Disputed Prepetition Inc. Facility Claim shall not ~~(a)~~ receive any Plan Distribution ~~or (b) be entitled to invoke any rights or remedies under the applicable Sharing Provision,~~ until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof**, and (b) no Holder of a Prepetition Inc. Facility Claim shall** be entitled to invoke any rights or remedies under the applicable Sharing Provision.

**6.**    ~~5.~~Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility Claims

The Plan ~~Distribution~~**Distributions** provided **for Allowed Prepetition LP Facility Claims** by Articles III.~~C~~B.7 and III.~~C~~B.8 hereof shall be made to the Prepetition LP Agent. **Plan Distributions to be made on account of Non-Converted Prepetition LP Facility Non-SPSO Claims shall be made by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.** To the extent possible, the **Debtors or the** New LightSquared Entities**, as applicable,** and the Disbursing Agent shall provide that the applicable LP Plan Consideration is eligible to be distributed to Prepetition LP Lenders at the direction of the Prepetition LP Agent.

Notwithstanding anything to the contrary herein, **(a)** any Holder of a Disputed Prepetition LP Facility Claim shall not ~~(a)~~ receive any Plan Distribution ~~or (b)~~ until any such Disputed Prepetition **Inc.** Facility Claim is Allowed in accordance with Article VII hereof**, and (b) no Holder of a Prepetition LP Facility Claim shall** be entitled to invoke any rights

or remedies under the applicable Sharing Provision, until any such Disputed Prepetition LP Facility Claim is Allowed in accordance with Article VII hereof.

**7.** 6. Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down. The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

**8.** 7. Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, **that** such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the New LightSquared Entities (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

*G.*    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the New LightSquared Entities shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the New LightSquared Entities and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The New LightSquared Entities reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *Setoffs*

Except **with respect to any distributions on account of (1) DIP Inc. Claims, (2) DIP LP Claims, (3) Prepetition Inc. Facility Non-Subordinated Claims, or (4) Prepetition LP Facility Non-SPSO Claims, or** as otherwise expressly provided for in the Plan, each Debtor or New LightSquared Entity, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Allowed Equity Interest and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Plan Distribution is made on account of such Allowed Claim or Equity Interest) any claims, rights, and Causes of Action of any nature that such Debtor or New LightSquared Entity, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, **that** neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or New LightSquared Entity, as applicable, of any such claims, rights, or Causes of Action that such New LightSquared Entity may possess against such Holder.  In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtor or New LightSquared Entity, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.    *Recoupment*

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the New LightSquared Entities, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the New LightSquared Entities, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or New LightSquared Entity.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a New

LightSquared Entity on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable New LightSquared Entity, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable New LightSquared Entity annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the New LightSquared Entities, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS**

A.      *Allowance of Claims and Equity Interests*

After the Effective Date, the New LightSquared Entities shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.~~W~~**V** hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.~~5~~**7** hereof or the Bankruptcy Code.

B.      *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the New LightSquared Entities shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any

Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The New LightSquared Entities shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims. The Inc. Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 15% of the Disputed Claims and Equity Interests Reserve from the Inc. Plan Consideration Carve-Out and the LP Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 85% of the Disputed Claims and Equity Interests Reserve from the LP Plan Consideration Carve-Out. The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become Disallowed Claims or Disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims or Equity Interests*

Before the Effective Date, the Debtors, and after the Effective Date, the New LightSquared Entities, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, **that** the Debtors or New LightSquared Entities may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or

otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities, and any Claim or Equity Interest that has been amended may be adjusted thereon by the New LightSquared Entities, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Debtors or New LightSquared Entities, (3) provided for in a postpetition agreement in writing between the Debtors or New LightSquared Entities and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date.

G.      *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the

Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.    *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the New LightSquared Entities, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the New LightSquared Entities in accordance with Article III.C̶B.1̶5̶16 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed

pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or New LightSquared Entities, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto. **For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.**

C.      *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the New LightSquared Entities may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities. **In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the New DIP Closing Date.**

D.    *Releases by Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit ~~Financing, the New Equity Contribution~~Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, ~~the Litigation Trust Agreement,~~ or the ~~Rights Offering~~SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit ~~Financing~~Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, ~~the New Equity Contribution~~SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or

omitted to be taken in connection with, or in contemplation of, the restructuring of the **Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

**Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit ~~Financing, the New Equity Contribution~~Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the ~~Litigation Trust Agreement, the Rights Offering Procedures~~SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other**

than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; **provided**, **however**, **that** each present and former Holder of a Claim or Equity Interest abstaining from voting to accept or reject the Plan may reject the ~~releases~~**third-party release** provided in ~~the Plan~~**this Article VIII.F** by checking the box on the applicable Ballot indicating that such Holder opts not to grant ~~the releases~~**such third-party release; provided** ~~in the Plan.~~ **, further, however, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.**

Notwithstanding anything contained herein to the contrary, the ~~foregoing~~**third-party** release **herein** does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit ~~Financing~~**Credit Agreements, Reorganized LightSquared Inc. Loan** Agreement, ~~the New Equity Contribution~~**SPSO Note Documents, Exit Intercreditor** Agreement**, New LightSquared Entities Corporate Governance Documents**, and the Plan Supplement) executed to implement the Plan.

G.    *Injunction*

Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the New LightSquared Entities and their successors and assigns.  The New LightSquared Entities shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE**
**OF PLAN**

A.    *Conditions Precedent to ~~Effective~~Confirmation Date*

It shall be a condition to the ~~Effective~~**Confirmation** Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.~~B~~**C** hereof:

1.  **Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.**

2.  **The Confirmation Order shall be (a) in form and substance satisfactory to the Debtors and each Plan Support Party and (b) entered no later than March 31, 2014, or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan and the New DIP Facility and has taken such matters under advisement, April 15, 2014.**

3.  **The New DIP Order, in form and substance satisfactory to the Debtors and each other party to the New DIP Facility, shall have been entered contemporaneously with the Confirmation Order.**

4.  **The Debtors shall have received binding commitments with respect to the First Lien Exit Facility on terms and conditions satisfactory to the Debtors and each Plan Support Party.**

B.    *Conditions Precedent to Effective Date*

**It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:**

1.  The Confirmation Order ~~shall have been entered in a~~**, in** form and in substance satisfactory to the Debtors and ~~the~~**each** Plan Support ~~Parties and~~**Party,** shall have become a Final Order.

2.  **The New DIP Order,** in form and substance satisfactory to **the Debtors and each Plan Support Party, (a) shall have been entered and (b) shall have become a Final Order.**

100

**3.** **The New DIP Recognition Order, in form and substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.**

**4.** **The New DIP Facility shall have been funded, and there shall not be any default** under the New DIP Credit Agreement **or the New DIP Order that has not been waived** in accordance with the terms of the **New DIP Credit Agreement or the New DIP Order.**

**5.** ~~2.~~ The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)    the Exit ~~Financing Agreement~~**Credit Agreements** and any related documents, in forms and substance acceptable to the Debtors, **each** Plan Support ~~Parties,~~**Party, the** Exit ~~Agent~~**Agents**, and **the** Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof~~, including the FCC Exit Condition,~~ shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Exit ~~Financing~~**Facilities** shall have occurred;

~~(b)  the New Equity Contribution Agreement and any related documents, in forms and substance acceptable to the Debtors and Plan Support Parties, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the New Equity Contribution Agreement shall have occurred;~~

~~(c)  the New LightSquared Entities Corporate Governance Documents, in forms and substance acceptable to the Debtors and Plan Support Parties, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof;~~

**(b)**    ~~(d)~~ the Reorganized LightSquared Inc. Loan Agreement and any related documents, in forms and substance acceptable to the Debtors and **the** Reorganized LightSquared Inc. Loan Holder, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Loan Agreement shall have occurred;

**(c)**    **[Reserved];**

**(d)**    (e) the Litigation Trust Agreement**SPSO Note Documents** and any related documents, in forms and substance acceptable to the Debtors and all of the**each** Plan Support Parties**Party**, shall have been executed and delivered **(or be deemed executed and delivered)** by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Litigation Trust Agreement**SPSO Note Documents** shall have occurred;

**(e)**    (f) the Rights Offering Procedures and any related documents**Plan Documents relating to the LightSquared Transfer**, in forms and substance acceptable to the Debtors and Rights Offering Backstop**each Plan Support** Party, shall have been executed and delivered by all of the Entities that are parties thereto, **and** all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof**;** and the incurrence of obligations pursuant to the Rights Offering and Rights Offering Procedures shall have occurred;

**(f)**    (g) the Management Incentive Plan, in form New LightSquared Entities Corporate Governance Documents**, in forms** and substance acceptable to the Debtors and **each** Plan Support Parties**Party**, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

**(g)**    (h) the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

**6.**    3. The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

**7.**    4. The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Debtors and **each** Plan Support Parties**Party**, without prejudice to the New LightSquared Entities' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, **that** each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the New LightSquared Entities and **each** Plan Support Parties**Party**.

**8.**    5. All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the

required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

~~6. All authorizations, consents, and regulatory approvals, including the expiry of statutory waiting periods, required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from~~ the FCC, Industry Canada, ~~or any other regulatory agency including, without limitation, any approvals required in connection with the transfer, change of control, or assignment of FCC and Industry Canada licenses, and no appeals of such approvals remain outstanding.~~

**9.** **Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.**

**10.** **The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).**

**C.** ~~*B.*~~ *Waiver of Conditions*

The conditions to **the Confirmation Date and/or** the Effective Date of the Plan set forth in this Article IX.~~A~~ may be waived by the Debtors, with the consent of ~~the~~**each** Plan Support ~~Parties~~**Party**, without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

~~*C. Deadline for Occurrence of Effective Date*~~

~~If the Effective Date of the Plan does not occur on or before December 31, 2014, (1) the Plan shall be null and void and of no further effect and (2) the Confirmation Order shall be deemed vacated.~~

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of ~~the~~**each** Plan Support ~~Parties~~**Party**, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Debtors, with the consent of ~~the~~**each** Plan Support ~~Parties~~**Party**, expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

**In addition, that the consent of the Holders of an (1) Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) Allowed DIP Inc. Claim, or (3) Allowed Prepetition LP Facility Non-SPSO Claim shall be required with respect to any amendment or modification to the Plan that affects the (a) treatment and repayment of such Holders' Allowed Claims or (b) timing of such repayment (in each case, solely to the extent such Holders vote to accept the Plan).**

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors, with the consent of ~~the~~**each** Plan Support ~~Parties~~**Party**, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.   If the Debtors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Debtors' Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other

104

Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.

### D.    *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

**If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the Exit Facilities, the Plan, or otherwise, including the Plan Support Party Break-Up Fee and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.**

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2. Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the New LightSquared Entities' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Debtors' Disclosure Statement;

9.      To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Exit ~~Financing, New Equity Contribution Agreement~~**Facilities**, the Reorganized LightSquared Inc. Loan Agreement, the ~~Litigation Trust~~**SPSO Note Documents, the Exit Intercreditor** Agreement, the ~~Rights Offering Procedures~~**New Corporate Governance Documents**, or any ancillary or related agreements thereto;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

15.   Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.   Determine any other matters that may arise in connection with or relate to the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Debtors' Disclosure Statement;

17.   Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.   Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.   Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.   Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.   Enforce all orders previously entered by the Bankruptcy Court; and

22.   Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.    Immediate Binding Effect*

Subject to Article IX.~~A~~**B** hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the New LightSquared Entities, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the New LightSquared Entities, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Debtors' Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the New LightSquared Entities, shall be served on:

| | |
|---|---|
| LightSquared Inc. | Milbank, Tweed, Hadley & McCloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the ~~special committee of the Debtors' board of directors~~**Special Committee**, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

the**Plan Support Party D or** Reorganized LightSquared Inc. Loan Holder, shall be served on:

| | |
|---|---|
| JPMorgan Chase & Co. | Simpson Thacher & Bartlett LLP |
| Patrick Daniello | Sandeep Qusba |
| 383 Madison Ave. | Elisha D. Graff |
| New York, NY 10179 | 425 Lexington Avenue |
| | New York, NY 10017 |

New Equity Contributor**Plan Support Party** A, shall be served on:

| | |
|---|---|
| Fortress Investment Group | Stroock & Stroock & Lavan LLP |
| 1345 Avenue of the Americas | Kristopher M. Hansen |
| New York, NY 10105 | Frank A. Merola |
| | Jayme T. Goldstein |
| | 180 Maiden Lane |
| | New York, NY 10038 |

the New DIP Agent, New DIP Lenders, and New Equity Contributor**or Plan Support Party** B, shall be served on:

| | |
|---|---|
| Melody Capital Partners**Business Finance, LLC** | Bingham McCutchen LLP |
| Andres Scaminaci | Jeffrey S. Sabin |
| 717 Fifth Avenue, 12th Floor | Julia Frost-Davies |
| New York, NY 10022 | 399 Park Avenue |
| | New York, NY 10022 |

the Ad Hoc Secured Group of Prepetition LP Lenders or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

**the Prepetition LP Agent, shall be served on:**

**Latham & Watkins LLP**
**Mark A. Broude**
**885 Third Avenue**
**New York, NY 10022**

the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

Akin, Gump, Strauss, Hauer & Feld LLP
Philip C. Dublin
~~Kenneth~~**Meredith** A. ~~Davis~~**Lahaie**
One Bryant Park
New York, NY 10036

~~Harbinger Capital Partners, LLC or its affiliates~~**Plan Support Party C**, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

After the Effective Date, the New LightSquared Entities have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the New LightSquared Entities are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement **(which, for the avoidance of doubt, shall not include the New DIP Order)** supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### I.    Non-severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or New LightSquared Entities', as applicable, consent, and (3) non-severable and mutually dependent.

### J.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

### K.    Waiver or Estoppel

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Debtors' Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

### L.    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Debtors' Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation

Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:    ~~December 31, 2013~~**February 14, 2014**

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

**EXHIBIT A**

Inc. Debtors Revised Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**<u>Exhibit D</u>**

**LightSquared Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**SPECIFIC DISCLOSURE STATEMENT FOR**
**DEBTORS' THIRD AMENDED JOINT PLAN**
**PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE**

- Voting Record Date:  October 9, 2013
- Voting Deadline:  March [3], 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan Objection Deadline:  March [10], 2014 at 4:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  March [17], 2014 at 10:00 a.m. (prevailing Eastern time)

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**
> **ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE**
> **DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY**
> **COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR**
> **APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY**
> **THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]     The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

> **THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT (THE "DEBTORS' SPECIFIC DISCLOSURE STATEMENT") FOR THE DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN.  LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT").  THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. 1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  SEE 11 U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  **SEE ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH

FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING TO THE PLAN, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS. NOTHING CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT

(INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ..................................................................................... 1

    **A.**     **Overview of Plan** ................................................................................. 1

          1.    Path to Value-Maximizing Transaction ................................... 1
          2.    Previously Filed Plans and Path to Plan ................................. 2
          3.    General Structure of LightSquared and New LightSquared Entities .......... 5
          4.    Administrative and Priority Claims ........................................ 8
          5.    Classes and Treatment ............................................................ 9

    **B.**     **Chapter 11 Cases** ............................................................................. 14

          1.    Ergen Adversary Proceeding .................................................. 14

    **C.**     **Solicitation Process and Voting Procedures** .................................. 18

    **D.**     **Plan Supplement** .............................................................................. 20

    **E.**     **Confirmation Procedures** ................................................................ 20

    **F.**     **Risk Factors** .................................................................................... 21

    **G.**     **Identity of Persons to Contact for More Information** .................... 21

    **H.**     **Disclaimer** ....................................................................................... 21

    **I.**     **Rules of Interpretation** ................................................................... 22

**ARTICLE II SUMMARY OF PLAN** .......................................................................... 22

**ARTICLE III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ................. 23

    **A.**     **Valuation of New LightSquared Entities' Assets** ........................... 23

    **B.**     **Valuation Methodologies** ................................................................ 24

    **C.**     **Valuation Considerations** ................................................................ 26

    **D.**     **Financial Projections** ...................................................................... 26

**ARTICLE IV CERTAIN PLAN MATTERS** ................................................................ 28

    **A.**     **Best Interests of Creditors Test** ..................................................... 28

    **B.**     **Feasibility** ........................................................................................ 29

    **C.**     **Confirmation-Related Claims and Remedies Against SPSO** ......... 30

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN** ........................................................................ 30

    **A.**     **Certain Bankruptcy Law Considerations** ...................................... 30

          1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests ........................ 30
          2.    Plan May Not Receive Requisite Acceptances ....................... 31

3.      LightSquared May Not Be Able To Obtain Confirmation of Plan............31
4.      LightSquared May Not Obtain Recognition from Canadian Court...........31
5.      LightSquared May Not Be Able To Consummate Plan...........................32
6.      LightSquared May Object to Amount or Classification of Claim.............32
7.      Contingencies Not To Affect Votes of Impaired Classes To Accept
Plan ...................................................................................................32

B.      **Factors Affecting LightSquared** ........................................................................**32**
1.      Regulatory Risks....................................................................................32
2.      Business-Related Risks...........................................................................34
3.      Risks Related to New LightSquared Entities Shares ................................38

C.      **Litigation Risks** .................................................................................................**39**

D.      **Certain Tax Matters** ..........................................................................................**39**

**ARTICLE VI CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES** ...........................................................................................**39**

A.      **Certain United States Federal Income Tax Consequences of Plan to
LightSquared**.....................................................................................................**40**
1.      Treatment of Transfers to NewCo ..........................................................40
2.      Cancellation of Debt and Reduction of Tax Attributes ............................41
3.      Potential Limitations on NOLs and Other Tax Attributes........................41
4.      Alternative Minimum Tax .......................................................................43

B.      **Certain United States Federal Income Tax Consequences to Holders
of Claims and Holders of Equity Interests Under Plan**....................................**43**
1.      Consequences to Holders of Claims ........................................................44
2.      Consequences to Holders of Equity Interests ...........................................48
3.      Consequences of Holding NewCo Interests and Debt Obligations ...........49
4.      Information Reporting and Backup Withholding ......................................51

**ARTICLE VII CONCLUSION AND RECOMMENDATION**...............................................**51**

## EXHIBITS

**Exhibit A**      Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**Exhibit B**      Projections

**Exhibit C**      Plan Supplement for Plan

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (a) solicitation of votes to accept or reject their joint chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),[2] and (b) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (a) terms, provisions, and implications of the Plan and (b) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan. The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases. Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so. While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[3]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

## A.    Overview of Plan

### 1.    Path to Value-Maximizing Transaction

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC. Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested

---

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[3]    If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction.  A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**."  A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces.  Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below), certain of LightSquared's stakeholders agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on approval of LightSquared's pending license modification applications.

### 2.    Previously Filed Plans and Path to Plan

#### a.    Prior LightSquared Plans

Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to exercise properly its fiduciary duty to all of its stakeholders in light of the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, it would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets.  Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of LightSquared's assets.  Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties.  In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

2

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets.  In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders.  After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates.  Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO, multiple potential bidders were reluctant to participate in the Auction.  Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases.  No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize.  LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal.  LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders.  Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108].  Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize the value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c) provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan.  LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended*

3

*Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through the Alternative Transaction.

### b.   Termination of LBAC Bid

Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid").  On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC.  The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.  In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement).  LightSquared reserves all of its rights with respect to such matters in all respects.

### c.   Amended Alternative Transaction

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by LightSquared, certain key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders.  Importantly, effectiveness of the Plan is not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of LightSquared's significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition*

4

*Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan. To fund LightSquared's operations through the Effective Date and to indefeasibly repay in full on the New DIP Closing Date the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new debtor in possession credit facility. More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of LightSquared's litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. LightSquared and the Plan Support Parties accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer available to LightSquared. Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases. Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from a substantial portion of LightSquared's significant stakeholders.

Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.

For more details, refer to the Plan, attached hereto as Exhibit A.

### 3.    General Structure of LightSquared and New LightSquared Entities

As of the Petition Date, LightSquared maintained the following corporate organizational structure:



PREPETITION DEBTOR ORGANIZATION CHART

   In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities.  More specifically, Reorganized LightSquared Inc., Reorganized LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and Equity Interests (other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' Equity Interests in LightSquared LP, Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo will assume all obligations related thereto (including the payments to equityholders).  All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

   As a result of the foregoing Plan Transactions, (a) NewCo will be the limited partner, and Reorganized LightSquared GP LLC will be the general partner, of Reorganized LightSquared

LP, (b) NewCo will wholly own Reorganized One Dot Six LLC, (c) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared Inc. will retain its 100% ownership of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.  In addition, NewCo will, among other things, issue several series of equity interests – including, the NewCo Series A-1 Preferred PIK Interests, NewCo Series A-2 Preferred PIK Interests, NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests – to Reorganized LightSquared Inc., certain Plan Support Parties, certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan.  Reorganized LightSquared Inc. will hold (v) 22.22% of loans under the Second Lien Exit Facility, (w) 22.22% of NewCo Series A-1 Preferred PIK Interests, (x) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (y) 22.22% of NewCo Class A Common Interests, and (z) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:

## REORGANIZED DEBTOR ORGANIZATION CHART



4.      **Administrative and Priority Claims**

a.      **Treatment of Administrative and Priority Claims Generally**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan.  Such Claims shall be satisfied in full in accordance with the Plan.  All other Claims and Equity Interests are classified under the Plan.

b.      **Treatment of DIP Inc. Claims**

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

c.      **Treatment of DIP LP Claims**

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

### 5.    Classes and Treatment

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote.  This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed | Unimpaired | No (Deemed To Accept) | 100% |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Inc. Other Secured Claim shall be rendered Unimpaired. | | | |
| 4 | LP Other Secured Claims | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | 100% |
| 5 | Prepetition Inc. Facility Non-Subordinated Claims | The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim,[4] shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class | Unimpaired | No (Deemed To Accept) | 100% |

---

[4]    Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (c) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors. | | | |
| 6 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors. | Impaired | Yes | 100% |
| 7A | Prepetition LP Facility Non-SPSO Claims | The legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:<br><br>(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim,[5] shall receive LP Plan | Impaired | Yes | 100% |

[5]    Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $1.0883 billion, calculated as follows:  (i) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (ii) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013; (ii) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (iv) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a per diem basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, plus (b) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), plus (c) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the

11

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or<br><br>(ii) each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.<br><br>For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors. | | | |
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive one of the following:<br><br>(i) in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the | Impaired | Yes | 100% |

Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | New DIP Facility, the SPSO Option A Treatment; or<br><br>(ii)  in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.<br><br>For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors. | | | |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | Impaired | Yes | 100%[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | 100% |
| 10 | Existing LP Preferred Units Equity Interests | Each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests. | Impaired | Yes | 100% |
| 11A | Existing Inc. Series A Preferred Stock Equity Interests | Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C | Impaired | Yes | 100% |

---

[6]    LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Common Interests. | | | |
| 11B | Existing Inc. Series B Preferred Stock Equity Interests | Each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares. | Impaired | Yes | 100% |
| 12 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | TBD |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. | Unimpaired | No (Deemed To Accept) | 100% |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | 100% |

## B.    Chapter 11 Cases

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

### 1.    Ergen Adversary Proceeding

Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility

14

Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts. Since the filing of the General Disclosure Statement, the parties to the Ergen Adversary Proceeding have, among other things, engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable. In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined. The record in the Ergen Adversary Proceeding has closed. The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.

Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims. This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.

The Ad Hoc Secured Group intends to proceed as outlined herein. In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases. LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated. The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen, and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases. The parties further believe that the evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment. Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH. Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment

only on Hart-Scott-Rodino approval. The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized. This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction. In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest. To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013. In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced. The parties' agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.

- The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed. At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones. Despite this fact, the Ergen Entities refused at the time to amend the milestones, but repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.

- With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million. To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.

- Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids. Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable. Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen

Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court. The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction. The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction. Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.

- Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted. With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price. With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal. This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money." Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million). Thus, the Ergen Entities essentially converted the largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

- After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further. Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement. When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered

significant harm as a result of the Ergen Entities' continuing inequitable conduct.  As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders.  As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims.  Among other relief, the Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.

## C.    Solicitation Process and Voting Procedures

On February [__], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. ____] (the "Resolicitation Order"), which, among other things, approved the Debtors' Specific Disclosure Statement and the resolicitation of the Plan.

### 1.    Solicitation Process

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**."

### 2.    Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON MARCH [3], 2014 (THE "VOTING DEADLINE").  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

### 3.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d): (a) from the Claims and Solicitation Agent (i) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

### D.    Plan Supplement

The Plan Supplement documents for the Plan (the "Plan Supplements") are attached hereto as exhibits and incorporated herein by reference.  The Plan Supplement consists of the following documents:[7]

- Exhibit C-1 - First Lien Exit Credit Agreement

- Exhibit C-2 - Second Lien Exit Credit Agreement

- Exhibit C-3 - Exit Intercreditor Agreement

- Exhibit C-4 - Reorganized LightSquared Inc. Loan Agreement

- Exhibit C-5 - SPSO Note Documents

- Exhibit C-6 - New LightSquared Entities Corporate Governance Documents

- Exhibit C-7 - Schedule of Assumed Agreements

- Exhibit C-8 - Schedule of Retained Causes of Action

- Exhibit C-9 - Liquidation Analysis

### E.    Confirmation Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Resolicitation Order, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation process:

- Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).

- Plan Objection Deadline: March [10], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: March [7], 2014 at 4:00 p.m. (prevailing Eastern time).

---

[7]    Exhibit C-1, Exhibit C-4, Exhibit C-5, and Exhibit C-6 contain form agreements and/or related documents with respect to the First Lien Exit Credit Agreement, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  To the extent not filed with this Specific Disclosure Statement (including the Second Lien Exit Credit Agreement and the NewCo LLC Operating Agreement), form or definitive documentation with respect to such items will be submitted prior to the hearing to approve the Disclosure Statement, and the Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Exit Credit Agreement will be filed prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

- Deadline to submit confirmation briefs in support of the Plan and in response to Plan Objections: March [13], 2014 at 4:00 p.m. (prevailing Eastern time).

- Confirmation Hearing: March [17], 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing. Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## F.    Risk Factors

Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement, including the risk factors described in Article V, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

## G.    Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

## H.    Disclaimer

In formulating the Plan, LightSquared has relied on financial data derived from its books and records. LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge. LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests. However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a Claim and Interest is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein.  The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A.  The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the**

occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the New LightSquared Entities, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

## ARTICLE III
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    Valuation of New LightSquared Entities' Assets

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets.  Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view as of February 11, 2014, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of October 31, 2014, would be in a range between $6.2 billion and $9.1 billion with a midpoint of $7.7 billion.  Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims.  Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (i.e., February 11, 2014).  It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015.  Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.  Moelis' analysis is also based, at LightSquared's direction, on a number of other assumptions, including that (1) LightSquared will be reorganized in accordance with the Plan, which will be effective on or prior to October 31, 2014, (2) the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and the Disclosure Statement, and (3) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections (as defined below).  In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below.  The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein.  The actual

value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things: (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including its spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including alleged GPS interference issues and LightSquared's pending license modification application), and general prospects of the New LightSquared Entities, including the Projections, furnished to Moelis by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan as of February 11, 2014; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

## B.    Valuation Methodologies

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network. Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions. Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS. THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND**

**CIRCUMSTANCES, AND SUCH ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.**

### 1.    Spectrum

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP"). The term MHzPOP is defined as the amount of spectrum bandwidth, or capacity, measured in MHz multiplied by the population of the area the spectrum covers. Moelis' analysis is based on a United States population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion United States MHzPOPs (which takes into account potential coordination zones for certain of its spectrum where operations may be constrained) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation. Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors including (1) channel size, (2) spectrum depth, (3) frequency range/propagation quality, (4) geographic coverage, (5) equipment ecosystem, and (6) regulatory characteristics. In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for an additional 10 MHz of fully usable terrestrial spectrum in approximately seven years covering the United States.

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's United States or Canadian spectrum. The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed. Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's United States spectrum as of the assumed FCC approval effective dates and then discounted to present value as of the assumed Effective Date. The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum was discounted back seven (7) years. Moelis applied a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum. Moelis' analysis resulted in a total gross United States spectrum valuation range of $5.6 - $8.4 billion and a total gross spectrum valuation range of $5.8 - $8.7 billion as of the assumed Effective Date.

### 2.    Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network.  LightSquared's satellite network comprises two (2) satellites:  SkyTerra-1 is in orbit (accepted on February 11, 2011) and SkyTerra-2 is fully built and remains in storage.  Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value.  Moelis considered a number of factors in determining its range of discounts including:  potential buyer universe, geographic patterning, cost to relocate, inability to offer services at other frequency bands, launch costs and associated risks, and remaining life span.  Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation.  Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $425 million for the satellite network.

## C.    Valuation Considerations

Moelis relied upon spectrum transaction precedents, government auctions, and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively.  Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies.  Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis.  Moelis did not view a DCF analysis as a relevant valuation methodology for LightSquared at this time because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.  Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation.  Depending on the actual financial results of the Debtors, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of October 31, 2014.  In addition, the market prices, to the extent there is a market, of New LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## D.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  In connection with developing the Plan, and for the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections attached hereto as Exhibit B (the "Projections"), analyzed the New LightSquared Entities' ability to meet their obligations under

the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan.

LightSquared believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities. In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities will be financially viable. Indeed, LightSquared believes that the New LightSquared Entities, will have sufficient liquidity, assuming the availability of the Exit Facilities and the Reorganized LightSquared Inc. Loan, to fund obligations as they arise, thereby maintaining value. Accordingly, LightSquared believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities. Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts. Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies. The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the**

**reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows. Accordingly, neither LightSquared nor the New LightSquared Entities intend to, and each disclaims any obligation to: (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) holders of claims under the Exit Facilities, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.**

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. In addition, the Projections have been presented in lieu of pro forma historical financial information. Reference should be made to Article V hereof, entitled "**Plan-Related Risk Factors To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the New LightSquared Entities.

**ARTICLE IV**
**CERTAIN PLAN MATTERS**

As mentioned, a description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**." LightSquared believes that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith. This section discusses certain specific requirements for confirmation of the Plan, including that the Plan is (y) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (z) feasible. In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.

**A.      Best Interests of Creditors Test**

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or

Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under the Plan is attached hereto as Exhibit C-10.

Under the Plan, Prepetition Inc. Facility Subordinated Claims, Prepetition LP Facility Non-SPSO Claims, Prepetition LP Facility SPSO Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.[8]  Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan.  The Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared.  A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or

---

[8]     Notwithstanding the foregoing, LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan." Under the Plan, all Holders of Claims or Equity Interests will be paid in full in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan. Moreover, LightSquared believes that the New LightSquared Entities, as applicable, will have sufficient liquidity to fund obligations as they arise. Accordingly, LightSquared believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## C.     Confirmation-Related Claims and Remedies Against SPSO

LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation. LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise. As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code. Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code.

## ARTICLE V
## PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. **Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (a) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (b) risks that information in the General Disclosure Statement may be inaccurate, and (c) risks related to liquidation under chapter 7 of the Bankruptcy Code.

## A.     Certain Bankruptcy Law Considerations

### 1.     Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to

the other claims and equity interests in such class.  LightSquared believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, because each Class created by LightSquared contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, LightSquared intends to seek Confirmation of the Plan.  If the Plan does not receive the required support from the Voting Classes, LightSquared may elect to amend the Plan.

### 3.    LightSquared May Not Be Able To Obtain Confirmation of Plan

LightSquared cannot ensure that it will receive the requisite acceptances to confirm the Plan.  Even if LightSquared receives the requisite acceptances, LightSquared cannot ensure that the Bankruptcy Court will confirm the Plan.  A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code.  While LightSquared believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

LightSquared, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

As conditions precedent to the Effective Date, the Plan requires that the Canadian Court shall have entered the Confirmation Recognition Order and New DIP Recognition Order, and

such orders shall have become Final Orders. LightSquared believes that such orders will be approved and entered by the Canadian Court and become Final Orders for all purposes under the Plan; however, there can be no guarantee as to such outcome.

### 5.    LightSquared May Not Be Able To Consummate Plan

Although LightSquared believes that it will be able to consummate the Plan and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date. Consummation of the Plan is also subject to certain conditions set forth in the Plan itself. If the Plan is not consummated, it is unclear what distributions Holders of Allowed Claims or Equity Interests (other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date) ultimately would receive with respect to their Claims and Equity Interests.

### 6.    LightSquared May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan, including with respect to the DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the Plan, LightSquared reserves the right to object to the amount or classification of any Claim or Equity Interest. The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

### 7.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not require resolicitation of the Impaired Classes.

## B.    Factors Affecting LightSquared

LightSquared is exposed to various factors and risks that include, without limitation, the following.

### 1.    Regulatory Risks

#### a.    LightSquared May Not Receive FCC Consents To Emerge From Chapter 11 in Timely Fashion

The effectiveness of the Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing

rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with the Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings.

### b.      LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access.  LightSquared believes that record evidence demonstrates that its proposed operations would serve the public interest.  Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

### c.      FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users.  It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared.  These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality.  Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

### d.      Transactions Contemplated by Plan May Require Various Other Regulatory Approvals

Various other regulatory approvals, including the expiry of certain statutory waiting periods, may be required to give effect to the transactions contemplated in the Plan, including

approvals and/or pre-merger filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada). There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all. In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

### 2.    Business-Related Risks

#### a.    LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit Facilities, the Reorganized LightSquared Inc. Loan, and the SPSO Note. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although certain of the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged. If LightSquared incurs additional indebtedness, the related risks could intensify.

#### b.    Exit Facilities and Reorganized LightSquared Inc. Loan Contemplated Under Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared May Incur Additional Future Debt

The Exit Facilities and the Reorganized LightSquared Inc. Loan contemplated by the Plan may contain covenants that, among other things, restrict LightSquared's ability to take specific actions, including restrictions that may limit LightSquared's ability to engage in actions or transactions that may be in LightSquared's long-term interest. In addition, as described above, LightSquared may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit Facilities and the Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates. These operating restrictions may adversely affect LightSquared's ability to finance future operations or capital needs, engage in transactions

with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities. LightSquared's ability to comply with any financial covenants may be affected by events beyond LightSquared's control, and there is no assurance that LightSquared will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's indebtedness could result in a default, which could allow LightSquared's lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared to apply all available cash to repay these borrowings. If LightSquared is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

> **c.**  **LightSquared May Not Be Able To Achieve Its Projected Financial Results**

The Projections set forth on <u>Exhibit B</u> attached hereto represent LightSquared's management's best estimate of LightSquared's future financial performance based on currently known facts and assumptions about LightSquared's future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared operates in particular. LightSquared's actual financial results may differ significantly from the Projections. If LightSquared does not achieve its projected financial results, the value of the New LightSquared Entities Shares may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

> **d.**  **LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings**

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America. There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all. If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

e.      **LightSquared May Be Unable To Deploy Its Terrestrial Wireless
Network in Appropriate Timeframe and at Appropriate Cost, Which
Would Have Material Effect on Its Financial Condition and Ability
To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business. Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

f.      **LightSquared Faces Significant Competition from Companies that
Are Larger or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.

Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared.  Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services.  In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

> **g.    Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network**

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network.  Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets.  However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices.  If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

> **h.    LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers**

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel.  The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

> **i.    Adverse Conditions in U.S. and Global Economies Could Impact LightSquared's Results of Operations**

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services.  In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies.  Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic

decisions, including the rollout of new retail service offerings.  Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

### 3. Risks Related to New LightSquared Entities Shares

#### a. There Is Currently No Trading Market for New LightSquared Entities Shares, Active Liquid Trading Market for New LightSquared Entities Shares May Not Develop, and New LightSquared Entities Shares Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements, as Applicable

There is currently no existing trading market for the New LightSquared Entities Shares. LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares on any securities exchange or for quotation of such securities on any automated dealer quotation system.  An active public trading market may not develop for the New LightSquared Entities Shares and, even if one develops, such public trading market may not be maintained.  If an active public trading market for the New LightSquared Entities Shares does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all.  If any New LightSquared Entities Shares are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control.  Historically, the market for equity securities has been volatile.  Market volatility could materially and adversely affect the New LightSquared Entities Shares, regardless of LightSquared's businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares.  The New LightSquared Entities Shares may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements, as applicable.  This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares.

C.      **Litigation Risks**

To the extent that distributions available to Holders of Allowed Claims or Equity Interests under the Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the New LightSquared Entities, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the Plan. Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

D.      **Certain Tax Matters**

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the New LightSquared Entities, see Article VI hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

**ARTICLE VI**
**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan. Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not

United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income tax taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**A.    Certain United States Federal Income Tax Consequences of Plan to LightSquared**

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return. Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013. Some small portion of these NOLs may be subject to existing limitations.

**1.    Treatment of Transfers to NewCo**

Pursuant to the Plan, (a) Reorganized LightSquared Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized One Dot Six LLC, (b) Reorganized LightSquared Investors Holdings Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, (c) Reorganized TMI Communications Delaware, Limited Partnership will sell, assign, and transfer to NewCo its Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action as contemplated by Article IV.V of the Plan. In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain debt obligations from, and Equity Interests in, NewCo and Cash. The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and

other transactions contemplated by the Plan are not certain. The transactions, taken together, may give rise to net taxable income or gain for LightSquared. To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow in part or any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain. Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

### 2. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange. A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and Equity Interests of NewCo. Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date. Based on the terms of the Plan, LightSquared does not anticipate that there will be a significant amount of COD Income. To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3. Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the

Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.56% for ownership changes occurring in February 2014).  As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.  Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss.  If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.  Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business

requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.    Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases.  Moreover, if section 382(l)(5) applies and the debtor thereafter  undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it.  If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income. Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of the amount of any such gain.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor. Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

### 1.    Consequences to Holders of Claims

#### a.    Holders of Prepetition Inc. Facility Subordinated Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim will receive NewCo Series A-2 Preferred PIK Interests and NewCo Class B Common Interests. A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest, which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

#### b.    Holders of Prepetition LP Facility Non-SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP

Closing Date, except to the extent that a Holder agrees to any other treatment, each Holder will receive Cash for its Allowed Prepetition LP Facility Non-SPSO Claim unless the Holder elects to receive New DIP Tranche B Claims in exchange for all or a portion of its Allowed Prepetition LP Facility Non-SPSO Claim instead of Cash (subject to the New DIP Tranche B Cap).  A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received and, if relevant, the "issue price" (as defined below) of the New DIP Tranche B Claims received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash.  Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so.  U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding).  In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption.  In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

### c.  Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note.  A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d.    Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e.    Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash.  A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f.    Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange. If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.    Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been

previously included in the Holder's gross income for United States federal income tax purposes. If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.    Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

####    2.      Consequences to Holders of Equity Interests

#####        a.      Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive Cash and NewCo Series A-2 Preferred PIK Interests. Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash and the fair market value of NewCo Series A-2 Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests. A Holder's tax basis in any NewCo Series A-2 Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for Cash and interest in NewCo in a wholly taxable transaction, it may be possible that a Holder will be treated as, in part, contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series A-2 Preferred PIK Interests in a non-taxable transaction. In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for NewCo Series A-2 Preferred PIK Interests, its basis in the NewCo Series A-2 Preferred PIK Interests will equal its basis in its Existing LP Preferred Units Equity Interests exchanged therefor, and its holding period for its NewCo Series A-2 Preferred PIK Interests would include its holding period in its interests exchanged therefor.

#####        b.      Consequences to Holders of Existing Inc. Series A Preferred Stock Equity Interests and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the "Specified Existing Inc. Preferred Stock Equity Interests"), except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Specified Existing Inc. Preferred Stock Equity Interest will receive (i) NewCo Series A-2 Preferred PIK Interests and (ii) NewCo Class C Common Interests.

Subject to the discussion below regarding accrued yield, a U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received and (ii) the Holder's adjusted tax basis in its Specified Existing Inc. Preferred Stock Equity Interests. A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their fair market value as of the Effective Date,

and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Specified Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the U.S. federal consequences of the Plan to it in lights of its particular circumstances.

<strong>c.      Consequences to Holders of Existing Inc. Common Stock Equity Interests</strong>

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests. A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests. A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

<strong>3.      Consequences of Holding NewCo Interests and Debt Obligations</strong>

<strong>a.      NewCo Class B Common Interests and NewCo Class C Common Interests</strong>

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### b.    NewCo Series A-2 Preferred PIK Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources. In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving guaranteed payments under section 707(c) of the Tax Code. A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

A Holder of NewCo Series A-2 Preferred PIK Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### c.    SPSO Note

A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually. Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually. Accordingly, the SPSO Note will be treated as issued with OID.

A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will

increase the tax basis of the Holder in the SPSO Note.  A U.S. Holder of  the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.

## 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on March [3], 2014.**

New York, New York
Dated:  February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## Exhibit E

**Blackline of LightSquared Specific Disclosure Statement Compared Against Second
Amended Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | Case No. 12-12080 (SCC) |
| Debtors.[1] | Jointly Administered |

~~REVISED~~ SPECIFIC DISCLOSURE STATEMENT FOR
DEBTORS' ~~REVISED SECOND~~ THIRD AMENDED JOINT PLAN
PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE[2]

- Voting Record Date:  October 9, 2013
- ~~Plan Objection~~ **Voting** Deadline:  ~~January 15~~ **March [3]**, 2014 at 4:00 p.m. (prevailing ~~Eastern~~ **Pacific** time)
- ~~Voting~~ **Plan Objection** Deadline:  ~~January 15~~ **March [10]**, 2014 at 4:00 p.m. (prevailing ~~Pacific~~ **Eastern** time)
- Confirmation Hearing:  ~~January 21~~ **March [17]**, 2014 at 10:00 a.m. (prevailing Eastern time)

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]     The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]     ~~The dates and deadlines relating to the plan solicitation and confirmation process referenced throughout this Debtors' Specific Disclosure Statement are subject to extension pursuant to the *Order Modifying Previously Scheduled Hearing Dates and Deadlines in Connection with Chapter 11 Plan Process* [Docket No. 1061] (the "Scheduling Order").~~

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated:  New York, New York
        December 31, 2013

THE DEADLINE TO ACCEPT OR REJECT THE PLAN AND ALTERNATE INC. DEBTORS PLAN IS JANUARY 15 MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME), UNLESS OTHERWISE EXTENDED PURSUANT TO THE SCHEDULING ORDER (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.

THE STATEMENTS CONTAINED IN THIS REVISED SPECIFIC DISCLOSURE STATEMENT (THE "DEBTORS' SPECIFIC DISCLOSURE STATEMENT") FOR THE DEBTORS' REVISED SECOND THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT"). THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES THE ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' FIRST REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. 921 1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT

CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  SEE 11 U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN COMPLY**COMPLIES** WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE ALTERNATE INC. DEBTORS PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN OR THE ALTERNATE INC. DEBTORS PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE ALTERNATE INC. DEBTORS PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN OR THE ALTERNATE INC. DEBTORS PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN AND THE ALTERNATE INC. DEBTORS PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY

INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~.  **SEE ~~ARTICLE VI~~ ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE ~~DEBTORS' SPECIFIC~~ DISCLOSURE STATEMENT AND THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~ IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, ~~THE ALTERNATE INC. DEBTORS PLAN,~~ STATUTORY PROVISIONS, DOCUMENTS ~~RELATED~~ RELATING TO THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN CONTAIN~~ CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS~~," AND ARTICLE VIII OF THE ALTERNATE INC.~~**

**~~DEBTORS PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS~~."**

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND ~~THE ALTERNATE INC. DEBTORS PLAN AND~~ MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE

PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AS PROMPTLY AS POSSIBLE.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ AND THE EFFECTIVE DATE OF THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN ~~AND THE ALTERNATE INC. DEBTORS PLAN~~.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~ TO VOTE TO ACCEPT THE PLAN ~~OR THE ALTERNATE INC. DEBTORS PLAN~~.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ........................................................................ **1**

    **A.**     **Overview of Plan** ........................................................................ **1**

        1.     Path to Value-Maximizing Transaction ........................... 1

        2.     ~~General Terms of Plan and New LightSquared Entities 3~~**Previously Filed Plans and Path to Plan** ........................... **2**

        3.     General Structure of LightSquared and New LightSquared Entities ~~4~~**5**

        4.     ~~Classes~~**Administrative** and ~~Treatment 6~~**Priority Claims** ............ **8**

        ~~B~~**5**.     Classes and Treatment ~~for Alternate Inc. Debtors Plan~~ ............ 9

    **B.**     **Chapter 11 Cases** ........................................................................ **14**

        **1.**     **Ergen Adversary Proceeding** ........................................ **14**

    **C.**     **Solicitation Process and Voting Procedures** ........................... ~~12~~**18**

    **D.**     **Plan ~~Supplements~~Supplement** ...................................................... ~~13~~**20**

    **E.**     **Confirmation Procedures** ........................................................ ~~14~~**20**

    **F.**     **Risk Factors** ........................................................................ ~~15~~**21**

    **G.**     **Identity of Persons to Contact for More Information** ............ ~~15~~**21**

    **H.**     **Disclaimer** ........................................................................ ~~15~~**21**

    **I.**     **Rules of Interpretation** ............................................................ ~~16~~**22**

**ARTICLE II SUMMARY OF PLAN** ................................................................ ~~17~~**22**

~~**ARTICLE III SUMMARY OF ALTERNATE INC. DEBTORS PLAN**~~ ............ ~~**17**~~

**ARTICLE ~~IV~~III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ...... ~~18~~**23**

    **A.**     **Valuation of ~~Reorganized Debtors~~New LightSquared Entities' Assets** ...... ~~18~~**23**

    **B.**     **Valuation Methodologies** ........................................................ ~~20~~**24**

    **C.**     **Valuation Considerations** ........................................................ ~~21~~**26**

    **D.**     **Financial Projections** ............................................................ ~~21~~**26**

**ARTICLE ~~V~~IV CERTAIN PLAN ~~REQUIREMENTS~~MATTERS** ...................... ~~23~~**28**

    **A.**     **Best Interests of Creditors Test** ............................................ ~~24~~**28**

    **B.**     **Feasibility** ........................................................................ ~~25~~**29**

    **C.**     **Confirmation-Related Claims and Remedies Against SPSO** ............ **30**

**ARTICLE ~~VI~~V PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN** ........................................................ ~~25~~**30**

    **A.**     **Certain Bankruptcy Law Considerations** ............................... ~~25~~**30**

1.    Parties in Interest May Object To LightSquared's ~~or the Inc. Debtors'~~ Classification of Claims and Equity Interests ................. ~~25~~**30**

2.    ~~Plan or Alternate Inc. Debtors~~ Plan May Not Receive Requisite Acceptances ......................... ~~26~~**31**

3.    LightSquared ~~or Inc. Debtors~~ May Not Be Able To Obtain Confirmation of Plan ~~or Alternate Inc. Debtors Plan 26~~ .......... **31**

4.    LightSquared May Not Obtain Recognition from Canadian Court ...... ~~27~~**31**

5.    LightSquared ~~or Inc. Debtors~~ May Not Be Able To Consummate Plan ~~or Alternate Inc. Debtors Plan 27~~ ............ **32**

~~6.    Alternate Inc. Debtors Plan May Not Go Effective~~ ...... ~~27~~

~~7~~**6**.    LightSquared ~~and Inc. Debtors~~ May Object to Amount or Classification of Claim ................. ~~27~~**32**

~~8~~**7**.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan ......................... ~~27~~**32**

**B.    Factors Affecting LightSquared** ................. ~~28~~**32**

1.    Regulatory Risks ..................... ~~28~~**32**
2.    Business-Related Risks ................. ~~35~~**34**
3.    Risks Related to New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests 39~~ ........... **38**

**C.    Litigation Risks** ...................... ~~40~~**39**

**D.    Certain Tax Matters** ................... ~~41~~**39**

**ARTICLE ~~VII~~VI CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...................... ~~41~~**39**

**A.    Certain United States Federal Income Tax Consequences of Plan to LightSquared** ...................... ~~42~~**40**

1.    Treatment of Transfers to NewCo ........... ~~42~~**40**
2.    Cancellation of Debt and Reduction of Tax Attributes .... ~~42~~**41**
3.    Potential Limitations on NOLs and Other Tax Attributes .. ~~43~~**41**
4.    Alternative Minimum Tax ................ ~~45~~**43**

**B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** ..... ~~45~~**43**

1.    Consequences to Holders of Claims ......... ~~46~~**44**
2.    Consequences to Holders of Equity Interests ....... 48
3.    Consequences of Holding NewCo Interests ~~50~~ **and Debt Obligations** **49**
4.    Information Reporting and Backup Withholding ...... 51

~~C.    Certain Consequences of the Alternate Inc. Debtors Plan~~ ..... ~~51~~

~~1.    Treatment of Transactions under the Alternate Inc. Debtors Plan~~ .... ~~52~~
~~2.    Cancellation of Debt and Reduction of Tax Attributes~~ .... ~~52~~
~~3.    Potential Limitations on NOLs and Other Tax Attributes~~ .. ~~53~~
~~4.    Alternative Minimum Tax~~ ............... ~~55~~

D.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Alternate Inc. Debtors Plan .............................................. 55

    1.    Consequences to Holders of Claims ............................ 55
    2.    Consequences to Holders of Equity Interests ................. 57
    3.    Tax Treatment of Trust and Consequences of Holding Trust Interests ... 58
    4.    Information Reporting and Backup Withholding .............. 59

**ARTICLE VIIIVII CONCLUSION AND RECOMMENDATION** .......... 6051

**EXHIBITS**

**Exhibit A**    Debtors' SecondThird Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**Exhibit B**    Projections

**Exhibit C**    Plan Supplement for Plan

    Exhibit C-1 — Exit Financing Agreement

    Exhibit C-2 — New Equity Contribution Agreement

    Exhibit C-3 — Reorganized LightSquared Inc. Loan Agreement

    Exhibit C-4 — Rights Offering Documents

    Exhibit C-5 — Litigation Trust Agreement

    Exhibit C-6 — New LightSquared Entities Corporate Governance Documents

    Exhibit C-7 — Schedule of Assumed Agreements

    Exhibit C-8 — Schedule of Retained Causes of Action

    Exhibit C-9 — Liquidation Analysis

**Exhibit D**    Plan Supplement for Alternate Inc. Debtors Plan

    Exhibit D-1 — Inc. Exit Financing Agreement

    Exhibit D-2 — One Dot Six Exit Financing Agreement

    Exhibit D-3 — New Equity Contribution Agreement

Exhibit D-4   Rights Offering Documents

Exhibit D-5   Litigation Trust Agreement

Exhibit D-6   Reorganized Debtors Corporate Governance Documents

Exhibit D-7   Schedule of Assumed Agreements

Exhibit D-8   Schedule of Retained Causes of Action

Exhibit D-9   Liquidation Analysis

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this ~~Revised~~ Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (i**a**) solicitation of votes to accept or reject their joint ~~chapter 11 plan or alternate~~ chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),[32] and (ii**b**) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (i**a**) terms, provisions, and implications of the Plan and (ii**b**) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan.  The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases.  Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so.  While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[43]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan ~~(including the Alternate Inc. Debtors' Plan)~~, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

---

[32]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~.

[43]    If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

A.    **Overview of Plan**

1.    **Path to Value-Maximizing Transaction**

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC.  Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction.  A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**."  A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces.  ~~Hand in hand with such awareness was the recognition that, to properly~~ **Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below),** certain of LightSquared's stakeholders **agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on** approval of LightSquared's pending license modification applications.

2.    **Previously Filed Plans and Path to Plan**

a.    **Prior LightSquared Plans**

**Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to** exercise **properly** its fiduciary duty to all of its stakeholders ~~given~~**in light of** the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, ~~LightSquared~~**it** would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets.  Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, ~~contemplates~~**contemplated** the sale of LightSquared's assets.  Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential

2

alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties. In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets. In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders. After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates. Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by ~~LBAC~~**L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO**, multiple potential bidders were reluctant to participate in the Auction ~~and noted their belief that the sale process and Auction would not lead to a transaction for LightSquared's Estates that would optimize value and recoveries~~. Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases. No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize. LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal. LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new

3

value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders.  Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108].  Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize **the** value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c) provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan ~~as reflected in the Plan to incorporate the terms of~~.  **LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through** the Alternative Transaction.

> **b.    Termination of LBAC Bid**

**Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid").  On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC.  The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.  In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement).  LightSquared reserves all of its rights with respect to such matters in all respects.**
~~2.  General Terms of Plan and New LightSquared Entities~~

4

### c.   Amended Alternative Transaction

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by LightSquared ~~and~~, certain key constituents **in the Chapter 11 Cases,** and **certain third party** investors to develop a restructuring plan that will achieve maximum returns for ~~LightSquared's~~**the** Estates and stakeholders.  ~~As~~**Importantly,** effectiveness of the Plan is **not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial** spectrum rights **(i.e., among other approvals, the license modification), thereby addressing a key concern of certain** of LightSquared's **significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan.**  To fund LightSquared's operations through the Effective Date **and to indefeasibly** repay in full **on the New DIP Closing Date the Allowed** DIP Inc. **Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO** Claims, and Prepetition Inc. **Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new** debtor in possession **credit facility.  More specifically, as** set forth ~~therein~~**herein**, the Plan contemplates, among other things, (~~a~~**i**) ~~up to $2.5~~**$1.65** billion in ~~senior secured exit facility~~**new debtor in possession financing (approximately $930 million of which will be converted into second lien exit** financing, ~~(b) a~~ ~~$250~~**300** million ~~senior secured loan~~**of which will be converted into** the Reorganized LightSquared Inc. **Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan)**, (~~c~~**ii**) ~~at least $1.25~~**first lien exit financing, including a facility of not less than $1** billion ~~in new equity contributions~~, (~~d~~**iii**) the issuance of new debt and equity instruments, (~~e~~**iv**) the assumption of certain liabilities, (~~f~~**v**) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with ~~cash~~**Cash** and other consideration, as applicable, and (~~g~~**vi**) the preservation ~~of value of certain~~of LightSquared's litigation claims ~~for the benefit of certain of LightSquared's stakeholders~~.

~~Effectiveness of the Plan is conditioned on the FCC's approval of LightSquared's license modification applications and grant of additional relief discussed in more detail below. To fund LightSquared's operations from Confirmation through the Effective Date (and to repay in full the DIP Inc. Facility), a debtor in possession facility in an amount of not less than $285 million has been made available to LightSquared by Melody Capital Advisors, LLC, subject to negotiation and definitive documentation.  Upon its~~**Upon their** emergence from bankruptcy, **the New** LightSquared **Entities** will have a sustainable capital structure and will

be stronger and better positioned to avail ~~itself of the~~**themselves of** significant upside value ~~resulting from approval~~ of the pending spectrum license modification ~~application~~**applications**. LightSquared~~,~~ **and the Plan Support Parties** accordingly~~, believes~~ **believe** that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer ~~received by~~**available to** LightSquared ~~to date~~. Moreover, ~~the Plan~~**it** is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates **and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases**. Given the undeniable benefits of the contemplated restructuring, **it is therefore not surprising that** the Plan has received overwhelming consensus and support from a substantial portion of LightSquared's significant stakeholders ~~subject to required approvals and definitive documentation in form and substance satisfactory to such stakeholders and the satisfaction of the conditions herein and therein~~.

**Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of** the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan**, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.**

For ~~a~~ more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

### 3.    General Structure of LightSquared and New LightSquared Entities

As of the Petition Date, LightSquared maintained the following corporate organizational structure:

6

## PREPETITION DEBTOR ORGANIZATION CHART



In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities.  **More specifically,** Reorganized LightSquared Inc. ~~and certain~~**,** Reorganized ~~Subsidiaries will contribute their~~ **LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and** Equity Interests **(other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC),** including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, **all of such Entities'** Equity Interests in LightSquared LP, **Reorganized SkyTerra Investors LLC, Reorganized** LightSquared GP~~, Inc.~~ **LLC,** and **Reorganized** One Dot Six ~~Corp. to NewCo.~~ **LLC, intellectual property, contractual rights, and** Retained Causes of Action**, and NewCo will assume all obligations related thereto (including the payments to equityholders).  All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.**

As a result **of the foregoing Plan Transactions**, (a) NewCo will be the limited partner~~,~~ and Reorganized LightSquared GP ~~Inc.~~**LLC** will be the general partner**,** of Reorganized LightSquared LP, (b) NewCo will wholly own Reorganized One Dot Six ~~Corp.~~**LLC,** ~~and~~ (c) **each of the Reorganized Subsidiaries (other than** Reorganized LightSquared ~~Inc. will retain its 100% ownership of Reorganized~~ Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.

**) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared** Inc. will retain its 100% ownership of Reorganized **LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC,** and Reorganized One Dot **Four Corp. In addition,** NewCo will, among other things, issue several series of equity interests – including, the **NewCo Series A-1 Preferred PIK Interests, NewCo Series A-2 Preferred PIK Interests,** NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, ~~NewCo Series A Preferred PIK Interests, NewCo Series B-1 Preferred PIK Interests, NewCo Series B-2 Preferred Non-PIK Interests,~~ and NewCo ~~EAR~~**Class D Common Interests –** to Reorganized LightSquared Inc., ~~the New Equity Contributors~~**certain Plan Support Parties,** certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan. Reorganized LightSquared Inc. will hold (i~~v~~) ~~20~~**22.22% of loans under the Second Lien Exit Facility, (w) 22.22**% of NewCo Series A**A-1** Preferred PIK Interests, (ii~~x~~) ~~20~~**$51.7 million of the** NewCo Series **A-2** Preferred PIK Interests, **(y) 22.22**% of NewCo Class A Common Interests, and (iii**z**) 100% of ~~the~~ NewCo Class ~~C~~**D** Common Interests (subject to ~~a call option, exercisable by New Equity Contributor C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests for $250 million). Further, Reorganized LightSquared Inc. will, among other things, issue the Reorganized LightSquared Inc. Common Shares to the Holders of Allowed Existing Inc. Preferred Stock Equity Interests and Rights Offering participants.~~**the Plan Support Party C Call Option).**

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:



**4.** ~~Classes~~**Administrative** and ~~Treatment~~**Priority Claims**

    **a.**     **Treatment of Administrative and Priority Claims Generally**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP ~~Facility~~ Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan. **Such Claims shall be satisfied in full in accordance with the Plan.** All other Claims and Equity Interests are classified under the Plan.

    **b.**     **Treatment of DIP Inc. Claims**

**All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $72,366,120.36 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all**

**reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.  In** full and final satisfaction, settlement, release, and discharge of, and in exchange for, each **DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims), on the New DIP Closing Date**, except to the extent that a Holder **of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.**

### c.    Treatment of DIP LP Claims

**All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.**

### 5.    Classes and Treatment

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote.  This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest

under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | **100%** |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | **100%** |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | **100%** |
| 4 | LP Other Secured Claims | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy | Unimpaired | No (Deemed To Accept) | **100%** |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | | | |
| 5 | Prepetition Inc. **Facility** Non-Subordinated ~~Facility~~ Claims | ~~Each~~**The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each** Holder of an Allowed Prepetition Inc. ~~Non-Subordinated~~ Facility **Non-Subordinated** Claim,**[4]** shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the ~~Reorganized LightSquared Inc.~~ ~~Loan~~**New DIP Facility**) in an amount equal to such Allowed Prepetition Inc. ~~Non-Subordinated~~ Facility ~~Claim~~**Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of** | Unimpaired | No (Deemed To Accept) | **100%** |

_____

[4]    **Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a _per diem_ basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, _plus_ (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, _plus_ (c) notwithstanding anything contained herein, in the Prepetition Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the Prepetition Inc. Non-Subordinated Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**

12

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | **Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors**. | | | |
| 6 | Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims | Each Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) ~~the~~ **$209 million of** NewCo Series ~~B-A-~~2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests**. For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.** | Impaired | Yes | **100%** |
| 7A | Prepetition LP Facility Non-SPSO Claims | **The legal and financial advisors for the Ad Hoc Secured Group shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:**<br><br>~~Each~~**the Prepetition LP Agent, for the benefit of each** Holder of an Allowed **Non-Converted** Prepetition LP Facility Non-SPSO Claim,[5] shall | Impaired | Yes | **100%** |

---

[5] **Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $1.0883 billion, calculated as follows: (i) the face amount of debt under the Prepetition LP Loan Documents held by SPSO is $844.3 million; (ii) adequate protection payments totaling $95.7 million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013; (ii) an estimated $16.0 million of adequate protection payments during January, February, and March 2014; and (iv) the payment of the claims on March 31, 2014; provided, that the aggregate Allowed amount shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (b) all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (c) notwithstanding anything contained herein, in the Prepetition LP Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all reasonable and documented fees and expenses of the Ad Hoc Secured Group and its**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | receive ~~one of the following:~~ | | | |

(i) **LP** ~~in the event that Class 7A votes to accept the Plan, its Pro Rata share of LP~~ Plan Consideration in the form of ~~(a) $1.7 billion in~~ Cash~~, (b) the NewCo Additional Interests, and (c) NewCo EARs~~ in an amount equal to ~~the difference between (1) the~~**such** **Non-Converted** Prepetition LP Facility Non-SPSO ~~Claims *plus* unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed~~**Claim;** **provided, that for the avoidance of doubt, any Holder of a** Prepetition LP Facility Non-SPSO ~~Claims through the Effective Date, *less* (2) the aggregate principal amount of distributions provided for in subsections (a) and (b) above; or;~~**Claim that votes to reject the** **Plan shall have such Claim treated as** **a Non-Converted Prepetition LP** **Facility Non-SPSO Claim; or**

(ii) ~~in the event that Class 7A votes to reject the Plan,~~ **each Holder of an Allowed** **Converted Prepetition LP Facility** **Non-SPSO Claim shall receive** LP Plan Consideration in the form of ~~Cash~~**a New** **DIP Tranche B Claim** in an amount equal to such ~~Allowed~~**Holder's** **Converted** Prepetition LP Facility Non-SPSO Claim~~ plus unpaid postpetition interest (at a rate determined by the Bankruptcy Court) accrued on account of such Allowed~~**; provided, that in the** **event that the amount of Converted** Prepetition LP Facility Non-SPSO ~~Claim through the Effective Date.~~**Claims** **exceeds the New DIP Tranche B Cap,** **the amount of Converted Prepetition** **LP Facility Non-SPSO Claims** **exceeding such New DIP Tranche B** **Cap shall be converted on a Pro Rata**

**legal and financial advisors incurred from the date after the New DIP Closing Date through and** **including the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's** **share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | **Estimated Percentage Recovery of Allowed Claims or Equity Interests** |
|---|---|---|---|---|---|
| | | **basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.**<br><br>~~(ii)~~ **For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.** | | | |
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an ~~Allowed Prepetition Facility SPSO Claim shall receive (i) LP Plan Consideration in the form of Cash in an amount equal to such~~ Allowed Prepetition LP Facility SPSO Claim *~~plus~~* ~~unpaid postpetition interest~~ **shall receive** one of the following:<br><br>**(i)    in the event that (A) Class 7B** ~~votes to~~ accept the Plan **and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or**<br><br>**(ii)** ~~(at a rate determined~~ **in the event that (A) Class 7B** ~~votes to reject the Plan,~~ | ~~Unimpaired~~**Impaired** | ~~No (Deemed To Accept)~~**Yes** | **100%** |

15

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | **(B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated** by the Bankruptcy Court) accrued on account of such Allowed Prepetition LP Facility SPSO Claim through the Effective Date or (ii) such other treatment the Bankruptcy Court deems appropriate after considering the facts and circumstances under**pursuant to** section 1126(**e**) of the Bankruptcy Code., **the SPSO Option B Treatment.**<br><br>**For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of** Prepetition LP Facility SPSO **Claims against any and all Debtors.** | | | |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form | Impaired | Yes | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | | | **100%**[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | **100%** |
| 10 | Existing LP Preferred Units Equity Interests | Each **Holder of an** Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) ~~15.33% of the NewCo Series A Preferred PIK Interests and 15.33% of the NewCo Class A Common Interests (on account of the cancellation of $230~~ Cash in an amount equal to $223 million ~~of Allowed Prepetition LP Preferred Units Equity Interests~~ and (ii) the **$75 million of** NewCo Series ~~B-1~~ **A-2** Preferred PIK Interests. | Impaired | Yes | **100%** |
| **11A** | **Existing Inc. Series A Preferred Stock Equity Interests** | **Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.** | **Impaired** | **Yes** | **100%** |
| 11**B** | Existing Inc. **Series B** Preferred Stock Equity Interests | Each Allowed Existing Inc. **Series B** Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of ~~(i)~~ its Pro Rata share of ~~51~~ **(i) $1.76 million of** NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class **C** Common Interests**; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its** Allowed Existing Inc. **Series B Preferred** Stock Equity Interest, **shall receive 100**% of the Reorganized LightSquared Inc. Common Shares ~~and (ii) the right to participate in the Rights~~ | Impaired | Yes | **100%** |

---

[6]    **LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Offering for its Pro Rata share of the Rights Offering Shares. | | | |
| 12 | Existing Inc. Common Stock Equity Interests | Each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | TBD |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. | Unimpaired | No (Deemed To Accept) | 100% |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | 100% |

**B.    Chapter 11 Cases**

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

B. CLASSES AND TREATMENT FOR ALTERNATE INC. DEBTORS PLAN

Although LightSquared fully endorses the Plan and believes that it is preferable to any other restructuring transaction, LightSquared recognizes that additional considerations or issues may arise that could lead the Bankruptcy Court to conclude that an alternate plan is preferable.

Accordingly, to provide the Bankruptcy Court with maximum optionality at the Confirmation Hearing, the Plan is a "toggle" plan, contemplating either (1) the confirmation of the Plan or (2) to the extent the Bankruptcy Court does not approve and confirm the transactions embodied in the Plan, the confirmation of an alternate separate chapter 11 plan (the "Alternate Inc. Debtors Plan") for the Inc. Debtors (for purposes of this Debtors' Specific Disclosure Statement, the term "Inc. Debtors" shall have the meaning provided in the Alternate Inc. Debtors Plan), which is attached to the Plan as Exhibit A.

As set forth therein, the Alternate Inc. Debtors Plan contemplates, among other things, (a) $300 million in senior secured exit facility financing (including a $50 million working capital facility), (b) $100 million in new equity contributions, (c) the conversion of $50 million of existing claims into new equity securities, (d) the issuance of new equity instruments, (e) the assumption of approximately $160 million in liabilities, and (f) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with cash and other consideration, as applicable. Upon their emergence from bankruptcy, the Inc. Debtors will have a sustainable capital structure and will be stronger and better positioned to avail themselves of upside value.

The chart below summarizes the Classes of Claims and Equity Interests under the Alternate Inc. Debtors Plan, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote. This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution. Unless otherwise provided in the Alternate Inc. Debtors Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Alternate Inc. Debtors Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

For more details, refer to the Alternate Inc. Debtors Plan, attached to the Plan as Exhibit A.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim against an individual Inc. Debtor shall receive Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Priority Claim. | Unimpaired | No (Deemed To Accept) |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote |
|---|---|---|---|---|
| 2 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable:  (i) Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) |
| 3 | Prepetition Inc. Facility Non-Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Non Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash in an amount equal to the Allowed Prepetition Inc. Facility Non Subordinated Claims. | Unimpaired | No (Deemed To Accept) |
| 4 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall (i) have the right to contribute its Pro Rata share of $50 million of the Allowed Prepetition Inc. Facility Subordinated Claims to Reorganized One Dot Six in exchange for a Pro Rata share of (a) $50 million of Reorganized One Dot Six Preferred Shares and (b) 10% of the Reorganized One Dot Six Common Shares and (ii) in consideration for the remainder of its Allowed Prepetition Inc. Facility Subordinated Claim, receive such Holder's Pro Rata share of 20% of the Reorganized One Dot Six Common Shares. | Impaired | Yes |
| 5 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed General Unsecured Claim with no payment on account of any accrued interest. | Impaired | Yes |
| 6 | Existing Inc. Preferred Stock Equity Interests | Each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive (i) its Pro Rata share of 51% of the Reorganized LightSquared Inc. Common Shares and (ii) the right to participate in the Rights Offering for its Pro Rata share of the Rights Offering Shares. | Impaired | Yes |
| 7 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of 60% of the residual interests in the Litigation Trust and 60% of the interests in the Liquidation Trust. | Impaired | Yes |

20

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote |
|---|---|---|---|---|
| 8 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof, provided the existing Intercompany Interest in One Dot Six shall be contributed to Reorganized One Dot Six pursuant to the Alternate Inc. Debtors Plan in exchange for the consideration set forth therein. | Unimpaired | No (Deemed To Accept) |
| 9 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof. After the Effective Date, the Reorganized Debtors, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court. | Unimpaired | No (Deemed To Accept) |

    **1.**    **Ergen Adversary Proceeding**

    **Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts.  Since the filing of the General Disclosure Statement, the parties to the Ergen Adversary Proceeding have, among other things, engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable.  In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined.  The record in the Ergen Adversary Proceeding has closed.  The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.**

    **Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims.  This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.**

    **The Ad Hoc Secured Group intends to proceed as outlined herein.  In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases.  LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated.  The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen,**

and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases.  The parties further believe that the evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment.  Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH.  Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment only on Hart-Scott-Rodino approval.  The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized.  This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction.  In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest.  To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013.  In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced.  The parties'

**agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.**

- **The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed. At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones. Despite this fact, the Ergen Entities refused at the time to amend the milestones, but repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.**

- **With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million. To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.**

- **Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids. Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable. Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court. The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction. The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction. Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.**

- **Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted. With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price. With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy**

that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal.  This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money."  Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million).  Thus, the Ergen Entities essentially converted the largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

• After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further.  Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement.  When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered significant harm as a result of the Ergen Entities' continuing inequitable conduct.  As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders.  As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims.  Among other relief, the

**Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.**

**C.      Solicitation Process and Voting Procedures**

**On February [___], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. _____] (the "Resolicitation Order"), which, among other things, approved the** Debtors' Specific Disclosure Statement **and the resolicitation of the Plan.**

**1.      Solicitation Process**

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures.**"

**2.      Summary of Voting Procedures**

If you are entitled to vote to accept or reject the Plan ~~or Alternate Inc. Debtors Plan (each, an "Alternate Plan")~~, a ballot providing for voting on ~~each such Alternate~~**the** Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF ~~AN ALTERNATE~~**THE** PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON ~~JANUARY 15~~**MARCH [3]**, 2014 (THE "VOTING DEADLINE").  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE

EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE ~~ALTERNATE~~ PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE ~~ALTERNATE~~ PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

**3.    Inquiries**

If you are a Holder of a Claim or Equity Interest entitled to vote on ~~an Alternate~~**the** Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the ~~Alternate Plan(s)~~**Plan**, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d):  (a) from the Claims and Solicitation Agent (i) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

**D.    Plan ~~Supplements~~Supplement**

The Plan Supplement documents for the Plan ~~and the Alternate Inc. Debtors Plan (together,~~(the "Plan Supplements") are attached hereto as exhibits and incorporated herein by reference.  The Plan ~~Supplements consist~~**Supplement consists** of the following documents:[7]

---

[7]    Exhibit C-1, Exhibit C-**4**, Exhibit C-**5**, and Exhibit C-6 contain **form agreements and/or related documents with respect to the First Lien Exit Credit Agreement**, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  **To the extent not filed with this Specific Disclosure Statement (including the Second Lien Exit Credit Agreement**

**1. Plan Supplement for Plan:**[5]

- —Exhibit C-1 - **First Lien** Exit ~~Financing~~**Credit** Agreement~~;~~

- —Exhibit C-2 - ~~New Equity Contribution~~**Second Lien Exit Credit** Agreement;

- —Exhibit C-3 - **Exit Intercreditor Agreement**

- Exhibit C-4 - Reorganized LightSquared Inc. Loan Agreement~~;~~

- —Exhibit C-4**5** - ~~Rights Offering~~**SPSO Note** Documents~~;~~

    - —Exhibit C-5 — ~~Litigation Trust Agreement;~~

- —Exhibit C-6 - New LightSquared Entities Corporate Governance Documents~~;~~

- —Exhibit C-7 - Schedule of Assumed Agreements;[6]

- —Exhibit C-8 - Schedule of Retained Causes of Action~~; and~~

- —Exhibit C-9 - Liquidation Analysis~~.~~

**2. Plan Supplement for Alternate Inc. Debtors Plan:**[7]

    - ~~Exhibit D-1 — Inc. Exit Financing Agreement;~~

---

**and the NewCo LLC Operating Agreement), form or definitive** documentation with respect to **such items will be submitted prior to the hearing to approve the Disclosure Statement, and the Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Exit Credit Agreement will be filed** prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

[5] ~~Exhibit C-1, Exhibit C-2, Exhibit C-3, Exhibit C-4, and Exhibit C-6 contain executed commitment letters, term sheets, and/or form agreements with respect to the Exit Financing, New Equity Contribution, Reorganized LightSquared Inc. Loan, Rights Offering, and New LightSquared Entities Corporate Governance Documents, respectively.  Definitive documentation with respect to the foregoing items will be submitted prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.~~

[6] ~~On December 24, 2013, LightSquared filed the Schedule of Assumed Agreements for the Plan. LightSquared hereby attaches an amended Schedule of Assumed Agreements for the Plan.~~

[7] ~~Exhibit D-1, Exhibit D-2, Exhibit D-3, Exhibit D-4, and Exhibit D-6 contain executed commitment letters, term sheets, and/or form agreements with respect to the Inc. Exit Financing, One Dot Six Exit Financing, New Equity Contribution Agreement, Rights Offering, and Reorganized Debtors Corporate Governance Documents, respectively.  Definitive documentation with respect to the foregoing items will be submitted prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.~~

- Exhibit D-2 — One Dot Six Exit Financing Agreement;

- Exhibit D-3 — New Equity Contribution Agreement;

- Exhibit D-4 — Rights Offering Documents;

- Exhibit D-5 — Litigation Trust Agreement;

- Exhibit D-6 — Reorganized Debtors Corporate Governance Documents;

- Exhibit D-7 — Schedule of Assumed Agreements;[8]

- Exhibit D-8 — Schedule of Retained Causes of Action; and

- Exhibit D-9 — Liquidation Analysis.

### E.    Confirmation Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, **pursuant to the Resolicitation Order,** the Bankruptcy Court approved the following adjustments to the relevant dates and deadlines with respect to the confirmation process:

- **Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).**

- Plan Objection Deadline and Financial Wherewithal Objection Deadline: January 15**: March [10]**, 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: January 17**March [7]**, 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit confirmation briefs in support of chapter 11 plan(s)**the Plan** and in response to Plan Objections and Financial Wherewithal Objections: January 19**: March [13]**, 2014 at 5:00**4:00** p.m. (prevailing Eastern time).

- Confirmation Hearing: January 21**March [17]**, 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned

---

[8]    On December 24, 2013, LightSquared filed the Schedule of Assumed Agreements for the Alternate Inc. Debtors Plan.  LightSquared hereby attaches an amended Schedule of Assumed Agreements for the Alternate Inc. Debtors Plan.

Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## F.    Risk Factors

Prior to deciding whether and how to vote on the ~~Plan or the Alternate Inc. Debtors~~ Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the ~~Plan, the Alternate Inc. Debtors~~ Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement, including the risk factors described in ~~Article VI~~**Article V**, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

## G.    Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

## H.    Disclaimer

In formulating the ~~Plan and the Alternate Inc. Debtors~~ Plan, LightSquared has relied on financial data derived from its books and records.  LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge.  LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan ~~or the Alternate Inc. Debtors Plan~~ is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan ~~or the Alternate Inc. Debtors Plan~~.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests.  However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a ~~claim~~**Claim** and ~~interest~~**Interest** is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the

singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan ~~or Alternate Inc. Debtors Plan, as applicable~~, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein. The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A. The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the ~~Reorganized Debtors~~New LightSquared Entities, all parties receiving property under the Plan, and other parties in**

interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

### ARTICLE III
### SUMMARY OF ALTERNATE INC. DEBTORS PLAN

The terms of the Alternate Inc. Debtors Plan are incorporated by reference herein.  The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Alternate Inc. Debtors Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Alternate Inc. Debtors Plan (as well as the exhibits thereto and definitions therein), which is attached to the Plan as Exhibit A.  The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Alternate Inc. Debtors Plan or documents referred to therein, and reference is made to the Alternate Inc. Debtors Plan and to such documents for the full and complete statement of such terms and provisions of the Alternate Inc. Debtors Plan or documents referred to therein.

**The Alternate Inc. Debtors Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, the Inc. Debtors under the Alternate Inc. Debtors Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, the Inc. Debtors, the Inc. Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Alternate Inc. Debtors Plan, and other parties in interest.  In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Alternate Inc. Debtors Plan or any other operative document, the terms of the Alternate Inc. Debtors Plan and/or such other operative document shall control.**

### ARTICLE IV
### VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

**A.**    **Valuation of** ~~Reorganized Debtors~~**New LightSquared Entities'** Assets

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets.  Based upon, and subject to, the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view, as of ~~December 24, 2013~~**February 11, 2014**, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of ~~September 30~~**October 31**, 2014, would be in a range between $~~6.7~~**6.2** billion and $~~10.0~~**9.1** billion with a midpoint of $~~8.4~~**7.7** billion.  Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims.  Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (~~December 24, 2013~~**i.e., February 11, 2014**).  It should be understood that, although subsequent

31

developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

**LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.** Moelis' analysis is **also** based, at LightSquared's direction, on a number of **other** assumptions, including~~, among other assumptions,~~ that (1) LightSquared will be reorganized in accordance with the Plan**,** which will be effective on or prior to ~~September 30~~**October 31**, 2014 ~~and all precedent conditions will be met, including FCC approval of LightSquared's pending license modification application as filed, resulting in 30 MHz of spectrum usable for terrestrial mobile broadband services in accordance therewith, (2) LightSquared will receive FCC clearance to use an additional 10 MHz of spectrum for terrestrial mobile broadband services at a future date (valuation analysis assumes seven years from the assumed Effective Date) resulting in a total of 40 MHz of spectrum authorized for terrestrial mobile broadband services, (3) LightSquared will opt to sell the SkyTerra 2 satellite, which is currently held in storage, prior to the Effective Date, (4~~**, (2)** the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and ~~this Debtors' Specific~~**the** Disclosure Statement, and (~~5~~**3**) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections **(as defined below)**. In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below. The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein. The actual value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things:  (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including ~~their~~**its** spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including ~~concerns about GPS receiver incompatibility~~**alleged GPS interference issues**)**,** and LightSquared's pending license modification application)**,** and general prospects of the New LightSquared Entities, including the Projections, furnished to ~~us~~**Moelis** by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan~~, dated December 24, 2013~~ **as of February 11, 2014**; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate.  In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of ~~LightSquared~~**the Debtors**, relied on such information being complete and accurate in all material respects.  Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim ~~or Equity Interest~~ as to how such ~~Holder~~**person** should vote or otherwise act with respect to the Plan.  Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future.  The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

**B.    Valuation Methodologies**

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network.  Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions.  Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS.  THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND CIRCUMSTANCES, AND SUCH**

ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

1.      **Spectrum**

**LightSquared directed** Moelis~~' spectrum valuation~~ **(based on opinions of LightSquared and its FCC experts) to conduct its** analysis ~~assumes~~**, and Moelis has conducted its analysis, assuming LightSquared receives** FCC approval of ~~LightSquared's~~**its** pending license modification application ~~as filed,~~ resulting in ~~, initially,~~ 30 MHz of spectrum **fully** usable for terrestrial mobile broadband services and~~effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of~~ an additional 10 MHz **of fully** usable ~~for such purposes~~**terrestrial spectrum** in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP").  The term MHzPOP is defined as the amount of spectrum bandwidth, or ~~potential network~~ capacity, measured in MHz multiplied by the population of the area ~~over which use of~~ the spectrum ~~is authorized~~**covers**.  Moelis' analysis is based on a ~~U.S.~~**United States** population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion **United States** MHzPOPs (which takes into account potential ~~exclusion~~**coordination** zones for certain ~~portions of LightSquared's~~**of its** spectrum **where operations may be constrained**) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation.  Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors~~,~~ including (~~a~~**1**) channel size, (~~b~~**2**) spectrum depth, (~~c~~**3**) frequency range/propagation quality, (~~d~~**4**) geographic coverage, (~~e~~**5**) equipment ecosystem, and (~~f~~**6**) regulatory characteristics.  **In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application** resulting in 30 MHz of spectrum **fully** usable for terrestrial mobile broadband services **effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for** an additional 10 MHz of **fully usable terrestrial spectrum in approximately** seven years **covering the United States.**

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's ~~U.S.~~**United States** or Canadian spectrum.  The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed.  Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's ~~U.S.~~**United States** spectrum ~~(~~**(as of the assumed FCC approval effective dates and then** discounted to present value ~~where appropriate)~~ and~~**as of the assumed Effective Date.  The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum**

34

**was discounted back seven (7) years.  Moelis applied** a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum~~, resulting~~**.  Moelis' analysis resulted** in a total gross ~~U.S.~~**United States** spectrum valuation range of $6.3**5.6** - $9.4**8.4** billion and a total gross spectrum valuation range of $6.5**5.8** - $9.7**8.7** billion **as of the assumed Effective Date**.

### 2.     Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network.  LightSquared's satellite network comprises two **(2)** satellites: ~~Skyterra~~ **SkyTerra-**1 is in orbit (accepted on February 11, 2011)~~,~~ and SkyTerra-2 is fully built and remains in storage.  Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value.  Moelis considered a number of factors in determining its range of discounts~~, including~~ ~~(a)~~**:** potential buyer universe, ~~(b)~~ geographic patterning ~~and~~**,** cost to relocate, ~~(c)~~ inability to offer services at other frequency bands, ~~(d)~~ launch costs and associated risks, and ~~(e)~~ remaining life span.  ~~Moelis assumed that LightSquared will opt to sell the SkyTerra 2 satellite prior to the Effective Date, and therefore, is not included in the valuation of the satellite network. However,~~ Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation.  Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $~~250~~**425** million for ~~SkyTerra 1~~**the satellite network**.

## C.     Valuation Considerations

Moelis relied upon spectrum transaction precedents ~~and~~**,** government auctions**,** and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively.  Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies.  Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis.  Moelis did not view a DCF ~~Analysis~~**analysis** as a relevant valuation methodology for LightSquared at this time~~.~~**;** because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.  Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation.  Depending on the actual financial results of ~~LightSquared~~**the Debtors**, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of ~~September 30~~**October 31**, 2014.  In addition, the market prices, to the extent there is a market, of ~~the Reorganized~~**New** LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

D.      **Financial Projections**

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  In connection with developing the Plan ~~and the Alternate Inc. Debtors Plan~~, and for the purposes of determining whether the Plan ~~and the Alternate Inc. Debtors Plan each~~ satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections attached hereto as Exhibit B (the "Projections"), analyzed the New LightSquared Entities' ~~and Reorganized Debtors', as applicable,~~ ability to meet their obligations under the Plan ~~and the Alternate Inc. Debtors Plan, as applicable,~~ and to maintain sufficient liquidity and capital resources to conduct their businesses.  The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan ~~or the Alternate Inc. Debtors Plan~~.

LightSquared believes that ~~each of the Plan and the Alternate Inc. Debtors__the__ Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities ~~or the Reorganized Debtors, as applicable~~.  In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities ~~and the Reorganized Debtors, as applicable,~~ will be financially viable.  Indeed, LightSquared believes that the New LightSquared Entities ~~and the Reorganized Debtors, as applicable~~, will have sufficient liquidity, assuming the availability of the Exit ~~Financing__Facilities and the Reorganized LightSquared Inc. Loan__, to fund obligations as they arise, thereby maintaining value.  Accordingly, LightSquared believes that ~~each of the Plan and the Alternate Inc. Debtors__the__ Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities ~~and the Reorganized Debtors, as applicable~~.  Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts.  Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies.  The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and

projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ~~or Reorganized Debtors', as applicable,~~ ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows. Accordingly, neither LightSquared nor the New LightSquared Entities ~~or the Reorganized Debtors, as applicable,~~ intend to, and each disclaims any obligation to: (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) ~~Holders of Exit Financing Claims,~~ holders of claims under the Exit Facilities, the New LightSquared Entities Shares, ~~or~~ the Reorganized ~~Debtors Equity Interests~~ LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.**

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan ~~and the Alternate Inc. Debtors Plan, as applicable~~. In addition, the Projections have been presented in lieu of pro forma historical financial information. Reference should be made to ~~ARTICLE VI~~ Article V hereof, entitled "**Plan-Related Risk Factors ~~And Alternatives~~ To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan ~~or the Alternate Inc. Debtors Plan~~.

The Projections assume that the ~~Plan or the Alternate Inc. Debtors~~ Plan will be consummated in accordance with ~~their~~ its terms and that all transactions contemplated by the ~~Plan or the Alternate Inc. Debtors~~ Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan ~~or the Alternate Inc. Debtors~~

Plan may have a significant negative impact on the operations and financial performance of the New LightSquared Entities and the Reorganized Debtors, as applicable.

# ARTICLE IV ~~ARTICLE V~~
## CERTAIN PLAN ~~REQUIREMENTS~~ MATTERS

As mentioned, a description of the procedures and requirements to achieve Confirmation of the ~~Plan or the Alternate Inc. Debtors~~ Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  LightSquared believes that:  (i**a**) the Plan ~~and the Alternate Inc. Debtors Plan satisfy~~**satisfies** or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii**b**) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii**c**) the Plan ~~and the Alternate Inc. Debtors Plan have~~**has** been proposed in good faith.  This section discusses certain specific requirements for confirmation of the Plan ~~and the Alternate Inc. Debtors Plan, as applicable~~, including that ~~each of the Plan and the Alternate Inc. Debtors~~**the** Plan is (i**y**) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (ii**z**) feasible.  **In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.**

## A.    Best Interests of Creditors Test

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under ~~each of~~ the Plan ~~and the Alternate Inc. Debtors Plan are~~**is** attached hereto as Exhibit C-10 ~~and Exhibit D-11, respectively~~.

Under the Plan, Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims, Prepetition LP Facility **Non-SPSO Claims, Prepetition LP Facility SPSO** Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.  ~~Under the Alternate Inc. Debtors Plan, Prepetition Inc. Facility Subordinated Claims, General Unsecured Claims, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Alternate Inc. Debtors Plan.~~  [8]  Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity

---

[8]  **Notwithstanding the foregoing, LightSquared is not resoliciting votes from the** Holders of Inc. General Unsecured Claims **or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.**

Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan ~~or the Alternate Inc. Debtors Plan~~ is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan ~~or the Alternate Inc. Debtors Plan, as applicable.  The Plan or the Alternate Inc. Debtors~~**, The** Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan ~~or the Alternate Inc. Debtors Plan, as applicable~~.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the ~~Plan or the Alternate Inc. Debtors~~ Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the ~~Plan or the Alternate Inc. Debtors~~ Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared.  A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the conclusion that recoveries under the Plan ~~or the Alternate Inc. Debtors Plan~~ would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan ~~and the Alternate Inc. Debtors Plan meet~~**meets** the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

**B.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  Under the Plan ~~and the Alternate Inc. Debtors Plan, the~~**, all** Holders of ~~Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured~~ Claims, ~~and Prepetition Inc. Non-Subordinated Facility Claims~~**Claims or Equity Interests** will be paid in full **in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan**.  Moreover, LightSquared believes that the New LightSquared Entities ~~or the Reorganized Debtors~~, as applicable, will have sufficient liquidity to fund obligations as they arise.  Accordingly, LightSquared believes that the Plan ~~and the~~

Alternate Inc. Debtors Plan satisfy**satisfies** the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**C.      Confirmation-Related Claims and Remedies Against SPSO**

**LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation.  LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise.  As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code.  Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code.**

**ARTICLE V**~~ARTICLE VI~~
**PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN**

The following provides a summary of various important considerations and risk factors associated with the ~~Plan and/or the Alternate Inc. Debtors~~ Plan; however, it is not exhaustive. **Prior to deciding whether and how to vote on the ~~Plan or the Alternate Inc. Debtors~~ Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the ~~Plan, the Alternate Inc. Debtors~~ Plan, the General Disclosure Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (i**a**) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (ii**b**) risks that information in the General Disclosure Statement may be inaccurate, and (iii**c**) risks related to liquidation under chapter 7 of the Bankruptcy Code.

**A.      Certain Bankruptcy Law Considerations**

**1.      Parties in Interest May Object To LightSquared's ~~or the Inc. Debtors'~~ Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class.  LightSquared ~~and the Inc. Debtors, as applicable, believe~~**believes** that the classification of Claims and Equity Interests under the ~~Plan and the Alternate Inc. Debtors~~ Plan complies with the requirements set forth in

the Bankruptcy Code, because each Class created by LightSquared ~~or the Inc. Debtors, as applicable,~~ contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

  **2.** **~~Plan or Alternate Inc. Debtors~~ Plan May Not Receive Requisite Acceptances**

   If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~, LightSquared ~~and the Inc. Debtors, as applicable, intend~~**intends** to seek Confirmation of the Plan ~~or the Alternate Inc. Debtors Plan~~. If ~~either~~ the ~~Plan or the Alternate Inc. Debtors~~ Plan does not receive the required support from the Voting Classes, LightSquared ~~and the Inc. Debtors, as applicable,~~ may elect to amend the Plan ~~or Alternate Inc. Debtors Plan, as applicable~~.

  **3.** **LightSquared ~~or Inc. Debtors~~ May Not Be Able To Obtain Confirmation of Plan ~~or Alternate Inc. Debtors Plan~~**

   LightSquared ~~and the Inc. Debtors, as applicable,~~ cannot ensure that ~~they~~**it** will receive the requisite acceptances to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~.  Even if LightSquared ~~and the Inc. Debtors receive~~**receives** the requisite acceptances, LightSquared ~~and the Inc. Debtors~~ cannot ensure that the Bankruptcy Court will confirm the ~~Plan or the Alternate Inc. Debtors~~ Plan.  A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan ~~or the Alternate Inc. Debtors Plan~~ if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in **Article IV of** the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes **under section 1129(b) of the Bankruptcy Code**; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization~~;~~**" under section 1129(a)(11) of the Bankruptcy Code;** and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code **pursuant to section 1129(a)(7) of the Bankruptcy Code**. While LightSquared ~~and the Inc. Debtors believe~~**believes** that the Plan ~~and the Alternate Inc. Debtors Plan, as applicable, comply~~**complies** with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

   LightSquared~~, and the Inc. Debtors, as applicable,~~ subject to the terms and conditions of the Plan ~~and the Alternate Inc. Debtors Plan, reserve~~**, reserves** the right to modify the terms of the ~~Plan and the Alternate Inc. Debtors~~ Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan ~~or the Alternate Inc. Debtors Plan~~.  Such a less favorable treatment could

41

include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or ~~the Alternate Inc. Debtors Plan or~~ no distribution of property whatsoever under the Plan ~~or the Alternate Inc. Debtors Plan~~.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

~~The~~**As conditions precedent to the Effective Date, the** Plan requires that the Canadian Court **shall** have entered the Confirmation Recognition Order ~~as a condition to the Effective Date~~**and New DIP Recognition Order, and such orders shall have become Final Orders**.  LightSquared believes that such ~~order~~**orders** will be approved and entered by the Canadian Court **and become Final Orders for all purposes under the Plan**; however, there can be no guarantee ~~that such order is entered by the Canadian Court~~**as to such outcome**.

### 5.    LightSquared ~~or Inc. Debtors~~ May Not Be Able To Consummate Plan ~~or Alternate Inc. Debtors Plan~~

Although LightSquared ~~and the Inc. Debtors believe that they~~**believes that it** will be able to consummate the Plan ~~or the Alternate Inc. Debtors Plan, as applicable,~~ and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date.  Consummation of the Plan ~~and the Alternate Inc. Debtors Plan~~ is also subject to certain conditions set forth in the Plan ~~and the Alternate Inc. Debtors Plan themselves.  If the Plan or the Alternate Inc. Debtors~~**itself.  If the** Plan is not consummated, it is unclear what distributions Holders of **Allowed** Claims ~~and~~**or** Equity Interests **(other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date)** ultimately would receive with respect to their Claims and Equity Interests.

### ~~6. Alternate Inc. Debtors Plan May Not Go Effective~~

~~The Alternate Inc. Debtors Plan is, in part, premised upon financing that contemplates a priming lien on the Assets securing the Prepetition Inc. Facility.  There can be no assurance that the Court will approve such financing and the attendant priming lien.  Because the feasibility of the Alternate Inc. Debtors Plan is dependent upon this financing, the Alternate Inc. Debtors Plan may never go effective if the Court does not approve the financing and priming lien.~~

### **6.** ~~7.~~ LightSquared ~~and Inc. Debtors~~ May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan ~~or~~**, including with respect to** the ~~Alternate~~**DIP** Inc. ~~Debtors~~**Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the** Plan, LightSquared ~~and the Inc. Debtors~~ ~~reserve~~**reserves** the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is

subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

### 7.   8. Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan or the Alternate Inc. Debtors Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan or the Alternate Inc. Debtors Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or the Alternate Inc. Debtors Plan or require re-solicitation**resolicitation** of the Impaired Classes.

## B.   Factors Affecting LightSquared

LightSquared is exposed to various factors and risks that include, without limitation, the following.

### 1.   Regulatory Risks

#### a.   **LightSquared May Not Receive** FCC Consents and Related Relief Necessary To Emerge fromFrom Chapter 11 May Not Be Obtained on ain Timely BasisFashion

The effectiveness of the Plan and the Alternate Inc. Debtors Plan is contingent upon the FCC's issuance of certain consents and grant of certain other relief on or prior to the Effective Date in the case of the Alternate Inc. Debtors Plan or December 31, 2014 in the case of the Plan.  The Exit Financing is contingent upon, and specific regulatory risks are associated with, each such consent and grant, including (but not necessarily limited to) the following:

(i) FCC Consent to Emergence from Chapter 11.  The effectiveness of either the Plan or the Alternate Inc. Debtors**the** Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with either the Plan or the Alternate Inc. Debtors**the** Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings, and the FCC can take nine (9) twelve (12) months or longer to review a proposed transaction, particularly where it

~~raises or is intertwined with unresolved substantive issues. There can be no assurance that the FCC will grant all required applications and act upon related filings in a manner conducive to emergence from chapter 11 on or prior to the Effective Date in the case of the Alternate Inc. Debtors Plan or December 31, 2014 in the case of the Plan~~**.**

       **b.**    **LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan**

    ~~*(ii) LightSquared Access to 20 MHz of Uplink Spectrum in the United States.*~~ ~~The~~**Although not a condition to the** effectiveness of the Plan**, the implementation of LightSquared's business plan, post-Effective Date,** is contingent upon LightSquared holding ~~terrestrial-based~~**certain** spectrum rights in ~~20~~**30** MHz of ~~L-band uplink~~ spectrum in the United States~~, comprised of 10 MHz nominally at 1627-1637 MHz and 10 MHz nominally at 1646-1656 MHz.~~ ~~.~~ **As described** in the General Disclosure Statement, LightSquared's License Modification Application seeks~~, among other things, confirmation that LightSquared can proceed to implement a 4G terrestrial wireless network using its existing spectrum rights in those bands to support uplink operations~~ **to modify certain** of LightSquared's FCC licenses **and authorizations so as to secure such access**. LightSquared believes that record evidence demonstrates that ~~such~~**its proposed** operations would serve the public interest. Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief ~~in a timely fashion~~, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to ~~satisfy the conditions precedent to the effectiveness of the Plan~~**implement its business plan, post-Effective Date**.

      ~~*(iii) LightSquared Access to 10 MHz of Downlink Spectrum in the United States.* The effectiveness of the Plan is contingent upon LightSquared holding terrestrial-based spectrum rights in 10 MHz of downlink spectrum for the United States, comprised of 5 MHz at 1670-1675 MHz and 5 MHz at 1675-1680 MHz.~~

        ~~a) 1670-1675 MHz. As discussed in the General Disclosure Statement, LightSquared (through its subsidiary, One Dot Six Corp.) currently leases spectrum rights in the 1670-1675 MHz band from OP LLC (a subsidiary of Crown Castle). OP LLC recently filed an application with the FCC seeking renewal of the FCC license through which OP LLC holds those spectrum rights. In connection with that application, OP LLC also notified the FCC that those spectrum rights were being used (by One Dot Six Corp.) to provide "substantial service" to the public in a manner it believes are consistent with the FCC's rules and requirements. While LightSquared expects the FCC to accept OP LLC's substantial service showing and renew its license in due course, LightSquared can provide no assurance that the FCC will do so. If the FCC instead were to reject OP LLC's substantial service showing, terminate OP LLC's rights in the 1670-1675 MHz band, and/or impose adverse conditions on the renewal of such license, LightSquared~~

might be unable to use that spectrum to support its operations and satisfy the conditions precedent to the effectiveness of the Plan.

b) 1675-1680 MHz.  As discussed in the General Disclosure Statement, LightSquared has filed: (i) the License Modification Application, which requests, among other things, that the FCC modify various of LightSquared's FCC licenses and authorizations to permit LightSquared to operate in the 1675-1680 MHz band currently used by the National Oceanic and Atmospheric Administration ("NOAA") and (ii) the Spectrum Allocation Petition for Rulemaking, which asks the FCC to amend the U.S. Table of Frequency Allocations to modify the primary non-federal allocation in the 1675-1680 MHz band to allow commercial terrestrial mobile service. The FCC may not act on the License Modification Application until it conducts a rulemaking proceeding as proposed in the Spectrum Allocation Petition for Rulemaking. In connection with such a rulemaking, and prior to grant of the License Modification Application, the FCC may address related matters including: (i) the service rules that will govern the use of the 1675-1680 MHz band (e.g., the terms for sharing with NOAA earth station facilities, other technical parameters for the operation of mobile wireless base stations, license term, etc.); (ii) the manner in which the Commission intends to award license rights in the 1675-1680 MHz band (e.g., award directly to LightSquared, hold an auction, etc.); and (iii) obligations to relocate existing NOAA radiosondes operations to another frequency band.  There is no set timetable for the completion of rulemaking proceedings.  As such, LightSquared can provide no assurance that these matters will be resolved in a timely fashion.  For similar reasons, LightSquared can provide no assurance that the Downlink Spectrum Petition for Rulemaking, discussed in the General Disclosure Statement, will be resolved in less than seven (7) years so as to facilitate LightSquared's ability to use an additional 10 MHz of downlink spectrum in the 1526-1536 MHz band for terrestrial mobile broadband services, a result assumed by Moelis in its valuation of LightSquared (see Article IV hereof) but not required as a condition precedent to the effectiveness of the Plan.

c) Furthermore, LightSquared can provide no assurance that the FCC ultimately will grant LightSquared access to the 1675-1680 MHz band at all, or in a manner favorable to LightSquared.  Preliminary assessments suggest that it should be possible for LightSquared to share the 1675-1680 MHz

band with certain NOAA-related operations that are expected to remain in the band if LightSquared limits or foregoes operations in "exclusion zones" surrounding certain earth station facilities, but the scope of relevant "exclusion zones" has not yet been defined.  LightSquared can provide no assurance that any "exclusion zones" — or other terms of sharing — ultimately reflected in any FCC approval(s) will be consistent with LightSquared's business needs or ability to satisfy other conditions to the effectiveness of the Plan.  For example, an expansive definition of relevant "exclusion zones" could preclude LightSquared's access to spectrum rights sufficient to provide signal coverage to 270 million POPs in the 1675-1680 MHz band as required by the "Terrestrial Coverage" condition discussed below.

d) It will be necessary for NOAA to relocate its existing radiosonde operations to alternative spectrum to facilitate LightSquared's ability to utilize the 1675-1680 MHz band for its own business purposes.  LightSquared has offered to be responsible for the costs incurred by NOAA in connection with such relocation, which LightSquared expects will be feasible as a technical matter.  That commitment must be satisfied in a manner consistent with the requirements of relevant appropriations law.  While LightSquared believes that its relocation plan is consistent with such requirements, LightSquared can provide no assurance that the FCC and other government stakeholders will adopt this view or approve this relocation.  If LightSquared is not allowed to cover NOAA's relocation costs, and NOAA does not otherwise effect such relocation, LightSquared could be prevented from using the 1675-1680 MHz band as it proposes.

e) It also is possible that LightSquared will be granted access to the 1675-1680 MHz band subject to making significant payments to or on behalf of the federal government.  In this respect, LightSquared notes that provisions of the U.S. President's budgetary proposal for FY 2014 that have not been adopted assume that the commercial user of this spectrum would pay approximately $70 million in relocation costs as well as and approximately $230 million in either auction payments or spectrum user fees.

*(iv) Relief from "ATC" Requirements.*  To the extent the spectrum access conditions to the effectiveness of the Plan require LightSquared to have the right to provide terrestrial wireless service on a "stand-alone" basis, this would require that the FCC

46

relax, waive the application of, or eliminate the "ATC" or "ancillary terrestrial component" rules that currently govern LightSquared's terrestrial operations. As discussed in the General Disclosure Statement, in 2003, the FCC adopted rules permitting LightSquared and other Mobile Satellite Service ("MSS") licensees to incorporate an "ancillary terrestrial component" into their networks, and thereby use MSS spectrum to support terrestrial operations subject to technical and service-related "ATC" requirements. Recently, the FCC eliminated these requirements to permit MSS licensees in the 2 GHz band (i.e., DBSD and TerreStar—both subsidiaries of DISH Network Corporation) to conduct "stand-alone" terrestrial operations in the redesignated "AWS-4" band. Neither the License Modification Application nor Spectrum Allocation Petition for Rulemaking asks the FCC to grant such relief. LightSquared can provide no assurance that such relief, once requested, would be granted. Furthermore, there is no set timetable for the completion of such a proceeding. As such, LightSquared can provide no assurance that this matter will be resolved in a timely fashion.

(v) *Other Conditions.* The effectiveness of the Plan is contingent upon the satisfaction of a number of other conditions, which are discussed below.

   a) *Terrestrial Coverage of at Least 270 Million POPs.* The Plan provides that LightSquared's terrestrial-based spectrum rights must allow LightSquared to provide signal coverage to a total U.S. population of at least 270 million. LightSquared anticipates that the spectrum rights conferred by its existing licenses and authorizations, coupled with those that would be made available through grant of the License Modification Application, would be sufficient to satisfy this requirement.

   b) *Power Levels Commensurate with Other 4G LTE Networks.* The Plan provides that LightSquared must be allowed to operate at power levels commensurate with existing terrestrial-based 4G LTE wireless communications networks. LightSquared believes that the power levels authorized under its existing licenses, as modified by the License Modification Application, are consistent with this requirement.

   c) *Build-Out Conditions Consistent with Those Imposed on DISH Network Corporation.* The Plan provides that the FCC must approve build-out conditions for LightSquared that are no more onerous than those in effect in connection with the "AWS-4" rights held by DISH Network Corporation's 2 GHz MSS licensee subsidiaries (i.e., DBSD and TerreStar) as of

December 2012, which require DISH Network Corporation to provide terrestrial signal coverage and offer terrestrial service to at least 40 percent (40%) of the U.S. population within four (4) years of that date, and to at least 70 percent (70%) of the U.S. population within seven (7) years of that date. As discussed in the General Disclosure Statement, the FCC conditioned its approval of the 2010 acquisition of LightSquared by Harbinger on the FCC meeting a network build-out schedule requiring coverage of at least 100 million people by December 31, 2012, at least 145 million people by December 31, 2013, and at least 260 million people by December 31, 2015. On December 20, 2012, the FCC issued an order tolling these deadlines indefinitely pending the resolution of ongoing proceedings that had precluded LightSquared's ability to implement its network. LightSquared has not yet proposed any new build-out deadlines and the FCC may impose a new set of build-out conditions in connection with a grant of the License Modification Application or in the context of another proceeding.

d) *Restrictions on Future Sale of LightSquared to Certain Buyers.* The Plan provides that any specific FCC restrictions on the sale of LightSquared to future buyers must not preclude a future sale to AT&T, Verizon, T-Mobile, or Sprint. In the 2010 FCC Change of Control Order, the FCC conditioned its approval of the acquisition of LightSquared by Harbinger on LightSquared obtaining FCC consent (i) before making its spectrum available to either of the two largest terrestrial providers of commercial mobile wireless and broadband services (which currently includes AT&T and Verizon), or (ii) before traffic to these largest terrestrial providers accounts for more than twenty-five percent (25%) of the total traffic on the LightSquared terrestrial network in any Economic Area. The receipt of prior FCC consent is a requirement to the sale of any FCC-licensed entity, and nothing in the 2010 FCC Change of Control Order restricts Harbinger's ability to sell LightSquared to any wireless provider. As such, LightSquared believes that this condition precedent to the effectiveness of the Plan will be satisfied in the absence of the FCC imposing a further condition on LightSquared or its future owners.

e) Except as discussed above, LightSquared believes that each of these FCC-related conditions to the effectiveness of the Plan already has been satisfied (e.g., the "Power Levels" condition) and/or LightSquared has no reason to believe that the FCC

48

~~will impose requirements that would preclude the satisfaction of such condition (e.g., the "Future Sale" and "Build-Out" conditions). That said, legislative and regulatory processes are unpredictable. As such, LightSquared can provide no assurance with respect to the absence of further legislative or regulatory conditions that would preclude the satisfaction of the conditions precedent to the effectiveness of the Plan. Nor can LightSquared provide any assurance that the prior FCC consent(s) under the Communications Act and the FCC's implementing rules required to effectuate the Plan will be obtained.~~

### **c.** ~~b.~~ FCC May Protect Spectrum Operations in ~~a~~ Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users. LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users. It is possible that the FCC could impose restrictions on LightSquared's operations designed to ~~protectspectrum~~**protect spectrum** operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection ~~vis-a-vis~~**vis-à-vis** LightSquared. These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality. Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within ~~the~~ LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

### ~~c. LightSquared Cannot Predict Impact of Possible Sale of SkyTerra-2~~

~~LightSquared is contemplating the possible sale of the SkyTerra 2 spacecraft. LightSquared's terrestrial spectrum rights currently derive from, and depend on, the maintenance of its satellite spectrum rights. Those satellite spectrum rights, in turn, are based, and depend, on the continued effectiveness of (i) separate spacecraft licenses that LightSquared holds from the FCC and from Industry Canada, and (ii) various negotiated spectrum coordination agreements that provide LightSquared with spectrum priority rights over spacecraft licensed by other nations. If LightSquared does not continue operating its spacecraft or does not promptly replace its spacecraft after they cease to operate, its spectrum rights could be compromised or lost. The SkyTerra-1 spacecraft, licensed by the United States, was launched in 2011. The MSAT-1 spacecraft, licensed by Canada, was slated to be replaced by SkyTerra 2, a Canadian-licensed spacecraft that has been fully constructed but is currently in storage. If MSAT-1 should cease to operate, LightSquared would have up to three years to replace it under ITU regulations and still maintain the ITU spectrum rights that MSAT-1 currently enjoys. Alternatively, LightSquared could launch SkyTerra-2 in accordance with the February 2016 date for implementing that network under ITU rules, and the~~

September 30, 2014 milestone for placing the SkyTerra 2 satellite in its assigned orbital position established by Industry Canada.

If SkyTerra-2 is sold, LightSquared would no longer have a replacement satellite ready to launch in the event of a failure, or the end of the useful life, of MSAT-1, and LightSquared might not be able to launch another spacecraft as a substitute for SkyTerra 2 in accordance with the ITU and Industry Canada deadlines for that satellite. Should MSAT-1 cease to operate, there can be no assurances that LightSquared could implement a replacement satellite within three (3) years under ITU rules, or that Industry Canada would provide LightSquared with additional time to replace MSAT-1 or to deploy a substitute for SkyTerra 2. Moreover, LightSquared cannot predict the impact of such possible adverse developments on its satellite spectrum rights, its spectrum coordination agreements, or the associated negotiations regarding other satellite networks, or its derivative terrestrial spectrum rights.

> **d.    Transactions Contemplated by Plan May Require Various Other Regulatory Approvals**

Various **other** regulatory approvals, including the expiry of certain statutory waiting periods, may be required ~~in order~~ to give effect to the transactions contemplated in the Plan, including approvals and/or ~~premerger~~**pre-merger** filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada). There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all. In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

> **2.    Business-Related Risks**

>> **a.    LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business**

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit ~~Financing and~~**Facilities,** the Reorganized LightSquared Inc. Loan**, and the SPSO Note**. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although **certain of** the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur

substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged.  If LightSquared incurs additional indebtedness, the related risks could intensify.

> **b.**    **Exit ~~Financing~~ Facilities and Reorganized LightSquared Inc. Loan Contemplated Under ~~Plan and Alternate Inc. Debtors~~ Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared ~~or Inc. Debtors~~ May Incur Additional Future Debt**

The Exit ~~Financing~~ **Facilities and the** Reorganized LightSquared Inc. **Loan** contemplated by ~~each of~~ the ~~Plan and Alternate Inc. Debtors~~ Plan may contain covenants that, among other things, restrict LightSquared's ~~or the Inc. Debtors'~~ ability to take specific actions, including restrictions that may limit LightSquared's ~~or the Inc. Debtors'~~ ability to engage in actions or transactions that may be in LightSquared's ~~or the Inc. Debtors'~~ long-term interest. In addition, as described above, LightSquared ~~or the Inc. Debtors, as applicable,~~ may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit ~~Financing~~ **Facilities and the** Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ~~or the Inc. Debtors', as applicable,~~ ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates.  These operating restrictions may adversely affect LightSquared's ~~or the Inc. Debtors, as applicable,~~ ability to finance future operations or capital needs, engage in transactions with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities.  LightSquared's ~~or the Inc. Debtors'~~ ability to comply with any financial covenants may be affected by events beyond LightSquared's ~~or the Inc. Debtors'~~ control, and there is no assurance that LightSquared ~~or the Inc. Debtors, as applicable,~~ will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's ~~or the Inc. Debtors'~~ indebtedness could result in a default, which could allow LightSquared's ~~or the Inc. Debtors'~~ lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared ~~or the Inc. Debtors, as applicable,~~ to apply all available cash to repay these borrowings.  If LightSquared ~~or the Inc. Debtors, as applicable, are~~ **is** unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

> **c.**    **LightSquared ~~or Inc. Debtors~~ May Not Be Able To Achieve Its Projected Financial Results**

The Projections set forth on <u>Exhibit B</u> attached hereto represent LightSquared's management's best estimate of LightSquared's ~~and the Inc. Debtors'~~ future financial performance based on currently known facts and assumptions about LightSquared's ~~and the Inc. Debtors, as applicable,~~ future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared ~~or the Inc. Debtors operate~~ **operates** in particular.  LightSquared's ~~and the Inc. Debtors, as applicable,~~

actual financial results may differ significantly from the Projections.  If LightSquared ~~or the Inc. debtors, as applicable, do~~**does** not achieve ~~their~~**its** projected financial results, the value of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

### ~~d. LightSquared May Not Be Able To Consummate Sale of SkyTerra-2, Which Could Negatively Impact Its Financial Position~~

~~LightSquared is contemplating the sale of SkyTerra 2.  Such sale is reflected in the Projections, and the proceeds of the sale are expected to provide needed liquidity.  Although LightSquared is hopeful that it will be able to consummate the sale as expected, there can be no assurance that it will be able to find a willing buyer, that the purchase price will fall within expected values, that the sale will not adversely impact LightSquared's spectrum rights or value of those rights, or that the transaction will close in a timely fashion so as to satisfy LightSquared's liquidity requirements.~~

### **d.** ~~e.~~ **LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings**

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America.  There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all.  If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

### e. f. LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched over during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business.  Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

### f. g. LightSquared Faces Significant Competition from Companies that Are Larger or Have Greater Resources

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed

competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared. Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared. Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services. In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

### g. h. Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network. Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets. However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices. If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

### h. i. LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel. The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

### i. ~~j.~~ Adverse Conditions in ~~the~~ U.S. and Global Economies Could Impact LightSquared's Results of Operations

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services. In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies. Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic decisions, including the rollout of new retail service offerings. Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

### 3. Risks Related to New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~

#### a. There Is Currently No Trading Market for New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~, Active Liquid Trading Market for New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ May Not Develop, and New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~ Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements ~~or Reorganized Debtors Shareholder Agreements~~, as Applicable

There is currently no existing trading market for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~. LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ and, even if one develops, such public trading market may not be maintained. If an active public trading market for the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all. If any New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~ will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's ~~or the Inc. Debtors', as applicable,~~ businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control.  Historically, the market for equity securities has been volatile.  Market volatility could materially and adversely affect the New LightSquared Entities Shares ~~or Reorganized Debtors Equity Interests~~, regardless of LightSquared's ~~or the Inc. Debtors'~~ businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares ~~and the Reorganized Debtors Equity Interests~~ have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~.  The New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~ may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements ~~or Reorganized Debtors Shareholders Agreements~~, as applicable.  This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares ~~and Reorganized Debtors Equity Interests~~.

## C.    Litigation Risks

To the extent that distributions available to Holders of Allowed Claims ~~and~~or Equity Interests under the ~~Plan or the Alternate Inc. Debtors~~ Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the ~~Inc. Debtors, as applicable, or the~~ New LightSquared Entities ~~or the Reorganized Debtors~~, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the ~~Plan or the Alternate Inc. Debtors~~ Plan.  Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

## D.    Certain Tax Matters

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the ~~Reorganized Debtors, see Article VII~~ New LightSquared Entities**, see Article VI** hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the ~~Plan or the Alternate Inc. Debtors~~ Plan (if any) to the Holders of Claims and Equity Interests.  Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI~~ARTICLE VII~~
### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan.  Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan ~~or the Alternate Inc. Debtors Plan~~ (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below.  There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan.  This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)).  The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances.  Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN

EQUITY INTEREST.  ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Certain United States Federal Income Tax Consequences of Plan to LightSquared

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return.  Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013.  Some small portion of these NOLs may be subject to existing limitations.

### 1.    Treatment of Transfers to NewCo

Pursuant to the Plan, (a) **Reorganized** LightSquared Inc. will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** One Dot Six ~~Corp.~~**LLC**, (b) **Reorganized** LightSquared Investors Holdings Inc. will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** SkyTerra Investors LLC, **Reorganized** LightSquared GP ~~Inc.~~**LLC,** and **Reorganized** LightSquared LP, ~~and~~ (c) **Reorganized** TMI Communications Delaware, Limited Partnership will ~~contribute~~**sell, assign, and transfer** to NewCo its Equity Interests in **Reorganized** LightSquared GP ~~Inc.~~**LLC** and **Reorganized** LightSquared LP**, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the** Retained Causes of Action **as contemplated by Article IV.V of the Plan**.  In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain **debt obligations from, and** Equity Interests in**,** NewCo **and Cash**.  The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and other transactions contemplated by the Plan are not certain.  The transactions, taken together, may give rise to net taxable income or gain for LightSquared.  To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow **in part or** any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain.  Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

### 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is

under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash**, debt obligations,** and Equity Interests of NewCo. Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date. Based on the terms of the Plan, LightSquared does not anticipate that there will be a significant amount of COD Income. To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.50**3.56**% for ownership changes occurring in ~~December 2013~~**February 2014**). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after

giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.    Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter  undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the

extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it.  If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income.  Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of **the amount of** any such gain.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the

status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor. Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

### 1.    Consequences to Holders of Claims

#### a.    Holders of Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. ~~Subordinated~~ Facility **Subordinated** Claim**, on the Effective Date or as soon thereafter as reasonably practicable**, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim will receive NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and NewCo Class B Common Interests. A U.S. Holder of an Allowed Prepetition Inc. **Facility** Subordinated ~~Facility~~ Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest**,** which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series ~~B~~ **A-**2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

#### b.    Holders of Prepetition LP Facility Non-SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, **on the New DIP Closing Date,** except to the extent that a Holder agrees to any other treatment, each Holder ~~of an~~**will receive Cash for its** Allowed Prepetition LP Facility Non-SPSO Claim ~~will~~**unless the Holder elects to** receive ~~Cash and, if the Holders as a Class vote to approve the Plan, Holders of~~**New DIP Tranche B Claims in exchange for all or a portion of its** Allowed Prepetition LP Facility Non-SPSO ~~Claims will also receive NewCo Additional Interests and NewCo EARs~~**Claim instead of Cash (subject to the New DIP Tranche B Cap)**. A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received ~~in the exchange~~ and, if relevant, the ~~fair market value of the NewCo Additional Interests and NewCo EARs~~**"issue price" (as defined below) of the New DIP Tranche B Claims received** (other than to the extent amounts are allocable to accrued but unpaid interest**,** which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). ~~However, while uncertain, a portion of the gain recognized on the exchange of an Allowed Prepetition LP Facility Non-SPSO Claim for~~

NewCo EARs may be deferred pursuant to the installment sale rules under the Tax Code. Holders of Allowed Prepetition LP Facility Non-SPSO Claims should consult their own tax advisors regarding the potential application of the installment sale rules and the option to elect out of such treatment if it applies.

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash. Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so. U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding). In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption. In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

### c.    Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note. A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d. ~~c.~~ Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e. ~~d.~~ Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash.  A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f. Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange.  If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.   ~~e.~~ Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.   ~~f.~~ Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were

considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 2.    Consequences to Holders of Equity Interests

#### a.    Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive ~~NewCo Series A Preferred PIK Interests, NewCo Class A Common Interests,~~**Cash** and NewCo Series ~~B-1~~**A-2** Preferred PIK Interests.  Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the **amount of Cash and the** fair market value of NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests.  A Holder's tax basis in any NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for **Cash and** interest in NewCo in a **wholly** taxable transaction, it may be possible that a Holder will be treated as**, in part,** contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests in a non-taxable transaction.  In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for ~~Plan consideration~~**NewCo Series A-2 Preferred PIK Interests**, its basis in the NewCo Series ~~A~~**A-2** Preferred PIK Interests~~, NewCo Class A Common Interests, and NewCo Series B-1 Preferred PIK Interests received~~ will equal its basis in its Existing LP Preferred Units Equity Interests **exchanged therefor**, and its holding period for its NewCo Series ~~A Preferred PIK Interests, NewCo Class A Common Interests, and NewCo Series B-1~~**A-2** Preferred PIK Interests would include its holding period in its interests exchanged therefor.

#### b.    Consequences to Holders of Existing Inc. **Series A** Preferred Stock Equity Interests **and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. **Series A** Preferred Stock Equity Interest **and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the**

**"Specified** Existing Inc. Preferred Stock Equity Interests**"**), except to the extent that a Holder agrees to any other treatment, each **Holder of an** Allowed **Specified** Existing Inc. Preferred Stock Equity Interest will receive (i) ~~its Pro Rata share of 51% of the Reorganized LightSquared Inc. Common Shares,~~**NewCo Series A-2 Preferred PIK Interests** and (ii) ~~the right to participate in the Rights Offering for its Pro Rata share of the Rights Offering Shares~~**NewCo Class C Common Interests**.

~~Assuming that the right to participate in the Rights Offering does not have any independent value, a Holder should be treated as exchanging stock in LightSquared Inc. for stock of the same entity in a transaction that qualifies as a recapitalization under the Tax Code. In that case, subject to the discussion below regarding accrued yield, the Holder would not recognize gain or loss as a result of the exchange, and the Holder's basis in the Reorganized LightSquared Inc. Common Shares received in exchange for its Allowed Existing Inc. Preferred Stock Equity Interest will equal its basis in its Allowed Existing Inc. Preferred Stock Equity Interests. A Holder's holding period for its Reorganized LightSquared Inc. Common Shares would include its holding period in the Allowed Existing Inc. Preferred Stock Equity Interest exchanged therefor.~~

**Subject to the discussion below regarding accrued yield, a** U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) **fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received** and (ii) the Holder's adjusted tax basis in **its Specified** Existing Inc. Preferred Stock Equity Interests**. A** Holder's **tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their** fair market value **as of** the Effective Date, and the Holder's holding period for the **NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received** should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the **Specified** Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

**SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the** U.S. federal **consequences of the Plan to it in lights of its particular circumstances.**

    c.    **Consequences to Holders of Existing Inc. Common Stock Equity Interests**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the

extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests. A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests. A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

### 3. Consequences of Holding NewCo Interests and Debt Obligations

#### a. NewCo Class B Common Interests and NewCo Class C Common Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

#### b. NewCo Series A A-2 Preferred PIK Interests, NewCo Series B-1 Preferred PIK Interests, and NewCo Series B-2 Preferred Non-PIK Interests (together, the "NewCo Preferred Interests")

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources. In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving guaranteed payments under section 707(c) of the Tax Code. A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

A Holder of NewCo **Series A-2** Preferred **PIK** Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

## 4. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## C. Certain Consequences of the Alternate Inc. Debtors Plan[9]

If the Plan is not consummated, the Inc. Debtors may consummate the Alternate Inc. Debtors Plan. The following is a discussion of certain United States federal income tax consequences of the Alternate Inc. Debtors Plan to the Inc. Debtors and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Alternate Inc. Debtors Plan.

---

[9] Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the Alternate Inc. Debtors Plan.

ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE ALTERNATE INC. DEBTORS PLAN.

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Inc. Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Alternate Inc. Debtors Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Alternate Inc. Debtors Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons, as such term is defined in the Tax Code (except to the limited extent specifically noted herein), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to Inc. Debtors and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE ALTERNATE INC. DEBTORS PLAN.

### 1. Treatment of Transactions under the Alternate Inc. Debtors Plan

The transactions contemplated by the Alternate Inc. Debtors Plan, and the implementation of any transactions with respect to the LP Debtors, may give rise to net taxable income or gain for the Inc. Debtors. Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to

offset net tax gains, if any, recognized as a result of the consummation of the Alternate Inc. Debtors Plan.

### 2. Cancellation of Debt and Reduction of Tax Attributes

Under the Alternate Inc. Debtors Plan, most of the Claims will be satisfied for cash and/or certain equity interests of One Dot Six Corp.  Whether the Inc. Debtors will recognize COD Income will depend, in part, on the amount that the Inc. Debtors are considered to owe on the Claims against them for United States federal income tax purposes and the value of the Equity Interests and/or other rights transferred in satisfaction of the Claims, in each case, as of the Effective Date.  Based on the terms of the Alternate Inc. Debtors Plan, the Inc. Debtors do not anticipate that there will be a significant amount of COD Income.  To the extent the Inc. Debtors recognize COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc.

### 3. Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of the Inc. Debtors that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Alternate Inc. Debtors Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Alternate Inc. Debtors Plan are expected to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for purposes of section 382 of the Tax Code.

#### a. General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.50% for ownership changes occurring in December 2013). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the

discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of the existing NOLs subject to the limitations described above.

**b. Section 382(l)(5) Bankruptcy Exception**

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be

subject to a section 382 limitation of zero, which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to an ownership change that occurs as a result of the consummation of the Alternate Inc. Debtors Plan. Furthermore, if it did apply, it is not certain whether Reorganized LightSquared Inc. will elect not to apply it.

**4. Alternative Minimum Tax**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause the Inc. Debtors to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Alternate Inc. Debtors Plan, even if there are NOLs in excess of any such gain.

**D. Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Alternate Inc. Debtors Plan**

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.  Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss

will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

**1. Consequences to Holders of Claims**

### a. Holders of Subordinated Prepetition Term Loan Claims

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Subordinated Facility Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Subordinated Facility Claim will receive Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares.  A U.S. Holder of an Allowed Subordinated Prepetition Term Loan Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares received in the exchange (other than amounts allocable to accrued but unpaid interest which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares should equal the fair market value of Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares on the Effective Date, and the Holder's holding period for the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares should begin on the day following the Effective Date.

### b. Holders of Inc. General Unsecured Claims

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

c.    ~~Accrued but Untaxed Interest~~SPSO Note

A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a *de minimis* amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."  Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually.  Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually.  Accordingly, the SPSO Note will be treated as issued with OID.

A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting).  Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.  Any OID that a U.S. Holder includes in income will increase the tax basis of the Holder in the SPSO Note.  A U.S. Holder of  the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.

~~A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Alternate Inc. Debtors Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Alternate Inc. Debtors Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Alternate Inc. Debtors Plan.~~

#### d. Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code. Under these provisions, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 2. Consequences to Holders of Equity Interests

#### a. Consequences to Holders of Existing Inc. Preferred Stock Equity Interests

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing Inc. Preferred Stock Equity Interest will receive its Pro Rata share of the Reorganized LightSquared Common Stock. Except as noted below, a Holder of Allowed Existing Inc. Preferred Stock Equity Interests should be treated as exchanging their preferred stock for Reorganized LightSquared Common Stock in a tax-free recapitalization for U.S. federal income tax purposes. In that case, subject to the discussion below addressing accrued yield, a Holder would not recognize gain or loss on the exchange of its Existing Inc. Preferred Stock Equity Interests for Alternate Inc. Debtors Plan consideration, its basis in the Reorganized LightSquared Common Stock received will equal its basis in its Existing Inc. Preferred Stock Equity Interests, and its holding period for its Reorganized LightSquared Common Stock would include its holding period in its Existing Inc. Preferred Stock Equity Interests exchanged therefor.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated

earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield may be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

### b. Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Alternate Inc. Debtors Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive interests in the Liquidation Trust (the "Trust" and, the interests therein, the "Trust Interests") and a residual interest in the Litigation Trust. A Holder of Existing Inc. Common Stock Equity Interests should recognize gain or loss in an amount equal to the difference, if any, between (i) the value of the Trust Interests and interests in the Litigation Trust received and (ii) the Holder's adjusted tax basis in the Existing Inc. Common Stock Equity Interests exchanged therefor. A Holder's tax basis in its share of the underlying Assets of the Trust and its interest in the Litigation Trust should equal the fair market value of Trust Interests and Litigation Trust interests received on the Effective Date and the Holder's holding period in its share of such Assets and its interest in the Litigation Trust should begin on the day following the Effective Date. It is not clear how residual interests in the Litigation Trust will be treated for federal income tax purposes. They may be interests in a liquidating trust, in which case the treatment of the Trust below would be applicable for the Litigation Trust and the interests therein. Alternatively, the interests in the Litigation Trust may be treated as equity interests in Reorganized One Dot Six, which will likely be treated as a partnership for United States federal income tax purposes. Holders of interests in the Litigation Trust should contact their own tax advisors regarding the tax consequences of holding such interests, including reporting income, gain, loss, or deduction and receiving any payments with respect thereto.

### 3. Tax Treatment of Trust and Consequences of Holding Trust Interests

### a. Treatment of Trust

Each Holder that is a beneficiary of the Trust Interests agrees to treat the Trust as a grantor trust for United States federal income tax purposes and to be treated as the owner of the Assets of the Trust in accordance with its beneficial interest. This discussion assumes that the Trust and the Holders of Trust Interests are properly characterized in this manner for United States federal income tax purposes. Consequently, transfers to the Trust of Assets are treated as transfers of such Assets to the Holders receiving Trust Interests (in accordance with such Holders' beneficial interests in the Trust), followed by the transfer of such Assets to the Trust in exchange for their Trust Interests.

According to the Plan, as soon as possible after the Effective Date, the Trustee shall make a good faith valuation of the Trust's Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties for all federal income tax purposes.

The Trust is intended to be treated as a liquidating trust, as defined in Treasury Regulations section 301.7701-4(d) and has been structured to conform to the requirements set forth in Revenue Procedure 94-45, 1994-2 C.B. 684, in which the Internal Revenue Service set forth general criteria for obtaining a ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. At this time, it is not clear whether the Trustee will file a request for such a ruling with the Internal Revenue Service. Therefore, there can be no assurance as to whether the Internal Revenue Service or the courts would agree with the characterization of the Trust. Holders are urged to consult their tax advisors regarding the proper characterization of the Trust.

**b. Treatment of Holders of Trust Interests**

Each Holder receiving a beneficial interest in the Trust as part of the Alternate Inc. Debtors Plan will be treated as owning a proportionate undivided interest in the Assets of the Trust to the extent of its interest therein. Accordingly, each such Holder will be required to report on its United States federal income tax return the share of any income, gain, loss, deduction, or credit recognized or incurred by the Trust that is allocable to its Trust Interest and should treat such items as derived on its Trust Interest, not in satisfaction of the interests for which it received such Trust Interest. The character of any such items to a beneficiary of the Trust and the ability of such beneficiary to benefit from any loss, deduction, or credit allocable to its Trust Interest will depend on the particular circumstances of such beneficiary and the nature of the Assets held by the Trust.

According to the Alternate Inc. Debtors Plan, and unless otherwise determined by any taxing authority, allocations of the Trust's taxable income among the Trust's beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed if, immediately prior to such deemed distribution, the Trust had distributed all its other Assets (valued at their tax book value) to the Holders of the Trust Interests, in each case up to the tax book value of the assets treated as contributed by such Holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust. Similarly, taxable loss of the Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Trust's assets. The tax book value of the Trust's assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.

Holders of Trust Interests may be required to pay tax on the income of the Trust even if they have not yet received any distributions from the Trust. Any distributions a Holder receives on account of its Trust Interests should not give rise to gain or loss to such Holder for United States federal income tax consequences.

78

4.        Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the ~~Alternate Inc. Debtors~~ Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the ~~Alternate Inc. Debtors~~ Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND ~~HOLDERS OF~~HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE VII~~ARTICLE VIII~~
## CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on ~~January 15~~March [3], 2014.**

New York, New York
Dated:    ~~December 31, 2013~~February 14, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

**Exhibit A**

Debtors' ~~Second~~**Third** Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

## **Exhibit B**

Projections

**<u>Exhibit C</u>**

Plan Supplement for Plan

**Exhibit D**

Plan Supplement for Alternate Inc. Debtors Plan