**Hearing Date: March 17, 2014 at 10:00 a.m. (prevailing Eastern time),
or such other date and time as ordered by the Bankruptcy Court**

**Objection Deadline: March 10, 2014 at 4:00 p.m. (prevailing Eastern time),
or such other date and time as ordered by the Bankruptcy Court**

Matthew S. Barr
Alan J. Stone
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | Case No. 12-12080 (SCC) |
| Debtors.[1] | Jointly Administered |

**NOTICE OF LIGHTSQUARED'S CONFIRMATION-RELATED MOTION FOR
ORDER (A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF
CASH COLLATERAL, IF ANY, (C) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING
ADEQUATE PROTECTION, AND (E) MODIFYING AUTOMATIC STAY**

**PLEASE TAKE NOTICE** that LightSquared Inc. and certain of its affiliates, as

debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-

captioned chapter 11 cases, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

---

[1]     The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's
federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared
Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup
LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications
Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC
Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared
Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821),
Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc.
(0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802
Parkridge Boulevard, Reston, VA 20191.

amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules" or "Rules"), and Rule 4001-2 of the Local Rules

for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"

or "LBRs"), at the direction, and with the support, of the special committee of the boards of

directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., in

connection with the confirmation of the LightSquared Plan,[2] submit the motion (the "Motion")

for entry of an order (a) approving postpetition financing, (b) authorizing use of cash collateral,

if any, (c) granting liens and providing superpriority administrative expense status, (d) granting

adequate protection, and (e) modifying the automatic stay.

   **PLEASE TAKE FURTHER NOTICE** that a hearing (the "Hearing") on the

Motion will be held before the Honorable Shelley C. Chapman, Judge of the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in connection

with the Confirmation Hearing scheduled to commence on **March 17, 2014 at 10:00 a.m.**

**(prevailing Eastern time), or such other date and time as ordered by the Bankruptcy**

**Court**.

   **PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to

the Motion and the relief requested therein must be made in writing, conform to the Federal

Rules of Bankruptcy Procedure and the Local Rules for the Bankruptcy Court for the Southern

District of New York, set forth the basis for the objection and the specific grounds therefor, and

be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing

system, electronically in accordance with General Order M-399 (which can be found at

http://nysb.uscourts.gov) and (b) by all other parties in interest, in text-searchable portable

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
      Motion.

document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399 and shall be served

in accordance with General Order M-399 upon each of the following: (i) LightSquared Inc.,

10802 Parkridge Boulevard, Reston, VA 20191, Attn: Marc R. Montagner and Curtis Lu, Esq.,

(ii) counsel to LightSquared, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan

Plaza, New York, NY 10005, Attn: Matthew S. Barr, Esq. and Karen Gartenberg, Esq.,

(iii) counsel to the Special Committee, Kirkland & Ellis LLP, 601 Lexington Avenue, New

York, NY 10022, Attn: James H.M. Sprayregen, Esq., Paul M. Basta, Esq., and Joshua A.

Sussberg, Esq., (iv) the Office of the United States Trustee for the Southern District of New

York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn:

Susan D. Golden, Esq., (v) counsel to U.S. Bank National Association, as administrative agent

under the Prepetition Inc. Credit Agreement and administrative agent under the Inc. DIP Credit

Agreement, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036,

Attn: Philip C. Dublin, Esq. and Kenneth A. Davis, Esq., (vi) counsel to UBS AG, Stamford

Branch, as administrative agent under the Prepetition LP Credit Agreement, Latham & Watkins

LLP, 885 Third Avenue, New York, NY 10022, Attn: Mark A. Broude, Esq., (vii) counsel to the

ad hoc secured group of Prepetition LP Lenders, White & Case LLP, 1155 Avenue of the

Americas, New York, NY 10036, Attn: Thomas E Lauria, Esq. and Andrew C. Ambruoso, Esq.,

(viii) counsel to Harbinger Capital Partners, LLC, Kasowitz, Benson, Torres & Friedman LLP,

1633 Broadway, New York, NY 10019, Attn: David M. Friedman, Esq. and Adam L. Shiff, Esq.,

(ix) counsel to Melody Business Finance, LLC, Bingham McCutchen LLP, 399 Park Avenue,

New York, NY 10022, Attn: Jeffrey Sabin, Esq. and Julia Frost-Davies, Esq., (x) counsel to

JPMorgan Chase Bank, N.A., Simpson Thacher & Bartlett LLP, 425 Lexington Avenue New

York, NY 10017, Attn:  Sandeep Qusba, Esq. and Terry Sanders, Esq., and (xi) counsel to

Fortress Credit Corp., Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY

10038, Attn:  Kristopher M. Hansen Esq., Frank A. Merola Esq., and Jayme T. Goldstein, Esq.,

so as to be actually received **no later than March 10, 2014 at 4:00 p.m. (prevailing Eastern**

**time), or such other date and time as ordered by the Bankruptcy Court**.  Only those

responses or objections that are timely filed, served, and received will be considered at the

Hearing.

PLEASE TAKE FURTHER NOTICE that if you do not timely file and serve a

written objection to the relief requested in the Motion, the Bankruptcy Court may deem any

opposition waived, treat the Motion as conceded, and enter an order granting the relief requested

in the Motion without further notice or hearing.

PLEASE TAKE FURTHER NOTICE that a copy of the Motion may be

obtained at no charge at http://www.kccllc.net/LightSquared or for a fee via PACER at

http://www.nysb.uscourts.gov.

New York, New York                     Respectfully submitted,
Dated:  February 14, 2014

                                        /s/ Matthew S. Barr
                                        Matthew S. Barr
                                        Alan J. Stone
                                        Karen Gartenberg
                                        MILBANK, TWEED, HADLEY & McCLOY LLP
                                        One Chase Manhattan Plaza
                                        New York, NY 10005-1413
                                        (212) 530-5000

                                        *Counsel to Debtors and Debtors in Possession*

**Hearing Date: March 17, 2014 at 10:00 a.m. (prevailing Eastern time),**
**or such other date and time as ordered by the Bankruptcy Court**

**Objection Deadline: March 10, 2014 at 4:00 p.m. (prevailing Eastern time),**
**or such other date and time as ordered by the Bankruptcy Court**

Matthew S. Barr
Alan J. Stone
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | Case No. 12-12080 (SCC) |
| Debtors.[3] | Jointly Administered |

**LIGHTSQUARED'S CONFIRMATION-RELATED MOTION FOR ORDER**
**(A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF CASH**
**COLLATERAL, IF ANY, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE**
**PROTECTION, AND (E) MODIFYING AUTOMATIC STAY**

---

[3]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................................................................3

Jurisdiction ...................................................................................................................................5

Summary of Relief Requested ......................................................................................................5

Background ..................................................................................................................................13

    A.    Introduction ..................................................................................................13

    B.    Prepetition Credit Facilities .........................................................................13

    C.    Existing DIP Facilities .................................................................................17

    D.    Consensual Use of Cash Collateral ..............................................................20

    E.    Previously Filed Plans and Path to LightSquared Plan ..........................................22

Debtor in Possession Financing ..................................................................................................23

    A.    Need To Obtain DIP Facility .......................................................................23

    B.    Decision To Enter into DIP Facility ............................................................24

    C.    Refinancing, Roll-Up, and Conversion into Exit Facilities .....................................26

    D.    Use of Prepetition Collateral and Adequate Protection ..........................................27

Relief Requested .........................................................................................................................30

Basis for Relief ...........................................................................................................................30

    A.    LightSquared Should Be Authorized To Obtain Postpetition Financing
           Under Section 364 of Bankruptcy Code ......................................................30

        (i)    DIP Facility Was Negotiated in Good Faith, Is in Best Interests of
                  LightSquared's Estates, Is Necessary To Preserve Assets, and Is
                  Exercise of Sound and Reasonable Business Judgment ...........................32

        (ii)    Terms of DIP Facilities Are Fair, Reasonable, and Appropriate in
                  Light of LightSquared's Needs and Current Market Environment ..........35

               (a)    Economic Terms Are Fair and Appropriate...................................35

               (b)    Scope of Carve-Out Is Appropriate ..............................................36

               (c)    Payment of Applicable Fees to DIP Lenders Is Appropriate.........36

               (d)    DIP Liens Are Appropriate ...........................................................37

               (e)    Proposed Refinancing, Roll-Up, and Post-Effective Date
                   Conversion Are Appropriate ..........................................................38

    B.    DIP Facility Was Negotiated in Good Faith and Should Be Afforded
           Protection of Section 364(e) of Bankruptcy Code .................................................39

C.      DIP Order Should Replace and/or Supersede Existing DIP Orders and
Cash Collateral Order, as Applicable ....................................................................41

D.      No Authorization of Adequate Protection Is Required ..........................................41

E.      Modification of Automatic Stay Provided Under Section 362 of
Bankruptcy Code Is Appropriate Under Circumstances ........................................43

Notice ...........................................................................................................................................44

Motion Practice ............................................................................................................................44

No Previous Request .....................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Contrarian Funds LLC v. Aretex LLC (In re Westpoint Stevens, Inc.),
  600 F.3d 231 (2d Cir. 2010)....................................................................................................42

In re Ames Dep't Stores, Inc.,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) .............................................................................32, 36

In re Aqua Assocs.,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) ..................................................................................31

In re Barbara K. Enters. Inc.,
  No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ..............30, 32, 36

In re Blockbuster Inc.,
  Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Oct. 27, 2010) .................................................39

In re Brooklyn Hosp. Ctr. & Caledonian Health Ctr., Inc.,
  341 B.R. 405 (Bankr. E.D.N.Y. 2006)..................................................................................33

In re Calpine Corp.,
  Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 7, 2007) .................................................39

In re Chemtura Corp.,
  Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) ................................................43

In re Delphi Corp.,
  Case No. 05-44482 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2007)................................................39

In re Dura Auto. Sys., Inc.,
  No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) .................32

In re Farmland Indus., Inc.,
  294 B.R. 855 (Bankr. W.D. Mo. 2003)............................................................................31, 35

In re Gen. Growth Props. Inc.,
  Case No. 09-1197 (ALG) (Bankr. S.D.N.Y. May 14, 2009).................................................43

In re Gross,
  Case No. 84-794-W, 1988 Bankr. LEXIS 2766 (Bankr. S.D. Iowa May 27, 1988) ..............42

In re Innkeepers USA Trust,
  Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 2, 2010)................................................43

In re Lyondell Chem. Co.,
  Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009)......................................................33, 40

iii

In re Lyondell Chem. Co.,
    Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009)..................................................32

In re Patriot Coal Corp.,
    Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) .................................................39

In re RDA Holding Co.,
    Case No. 13-22233 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) ...............................................38

In re Simasko Prod. Co.,
    47 B.R. 444 (Bankr. D. Colo. 1985) .....................................................................................32

In re Stanley,
    185 B.R. 417 (Bankr. D. Conn. 1995) ...................................................................................42

In re Tronox Inc.,
    Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 15, 2010) ...............................................43

In re Uno Restaurant Holdings Corp.,
    Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) .................................................39

In re YL W. 87th Holdings I LLC,
    423 B.R. 421 (Bankr. S.D.N.Y. 2010)...................................................................................31

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
    Res., Inc.),
    147 B.R. 650 (S.D.N.Y. 1992)...............................................................................................33

Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug
    Stores, Inc.),
    145 B.R. 312 (B.A.P. 9th Cir. 1992)......................................................................................36

TWA, Inc. v. Travellers Int'l AG (In re TWA, Inc.),
    163 B.R. 964 (Bankr. D. Del. 1994) ......................................................................................32

Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re
    Ellingsen MacLean Oil Co., Inc.),
    65 B.R. 358 (W.D. Mich. 1986) ............................................................................................35

Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean
    Oil Co.),
    834 F.2d 599 (6th Cir. 1987) .................................................................................................40

## STATUTES

11 U.S.C. § 105................................................................................................................1, 5, 29, 30

11 U.S.C. § 326....................................................................................................................29, 30

11 U.S.C. § 327 ...................................................................................................................10

11 U.S.C. § 328 .......................................................................................................10, 29, 30

11 U.S.C. § 330 .............................................................................................................29, 30

11 U.S.C. § 331 .............................................................................................................29, 30

11 U.S.C. § 361 .............................................................................................................1, 5, 42

11 U.S.C. § 362 ........................................................................................................... passim

11 U.S.C. § 363 ........................................................................................................... passim

11 U.S.C. § 364 ........................................................................................................... passim

11 U.S.C. § 365 .............................................................................................................29, 30

11 U.S.C. § 503(a) .......................................................................................................29, 30

11 U.S.C. § 503(b) .......................................................................................................29, 30

11 U.S.C. § 506(c) ...............................................................................................9, 12, 29, 30

11 U.S.C. § 552(b) ...............................................................................................................12

11 U.S.C. § 507 ........................................................................................................... passim

11 U.S.C. § 726 .............................................................................................................10, 30

11 U.S.C. § 1107(a) .............................................................................................................13

11 U.S.C. § 1108 ..................................................................................................................13

11 U.S.C. § 1112 ....................................................................................................................9

11 U.S.C. § 1113 ..................................................................................................................30

11 U.S.C. § 1114 ..................................................................................................................30

11 U.S.C. § 1141(a) .............................................................................................................42

11 U.S.C. § 1141(d) .............................................................................................................10

28 U.S.C. § 157(b)(2) ...........................................................................................................5

28 U.S.C. § 1334 ...................................................................................................................5

28 U.S.C. § 1408 ...................................................................................................................5

28 U.S.C. § 1409 .................................................................................................................5

28 U.S.C. § 1930(a) ...........................................................................................................10

RULES

FED. R. BANKR. P. 2002 ...................................................................................................1, 5

FED. R. BANKR. P. 4001 ................................................................................................ passim

FED. R. BANKR. P. 9014 ...................................................................................................1, 5

S.D.N.Y Local Rule 4001-2................................................................................................ passim

S.D.N.Y Local Rule 9013-1(a) ...........................................................................................44

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession

(collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the

"Chapter 11 Cases"), file this motion (the "Motion") in connection with the confirmation of the

*Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as may be

amended in accordance with the terms thereof, the "LightSquared Plan"),[4] at the direction, and

with the support, of the special committee of the boards of directions (the "Special Committee")

for LightSquared Inc. and LightSquared GP Inc., for entry of an order substantially in the form

attached hereto as Exhibit A (the "DIP Order"), under sections 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules" or "Rules"), and Rule 4001-2 of the Local Rules

for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"

or "LBRs"), (a) approving postpetition financing, (b) authorizing use of cash collateral, if any,

(c) granting liens and providing superpriority administrative expense status, (d) granting

adequate protection, and (e) modifying the automatic stay, as more fully described below:

> (i)     in connection with the LightSquared Plan, authorizing LightSquared Inc., LightSquared LP, and One Dot Six Corp. (collectively, the "DIP Borrowers") to obtain, and LightSquared Corp., SkyTerra Holdings (Canada) Inc. and SkyTerra (Canada) Inc. (together, the "Canadian Guarantors") and each of the direct and indirect subsidiaries of LightSquared Inc. (other than a DIP Borrower) that are debtors and debtors in possession in these Chapter 11 Cases (together with the Canadian Guarantors, the "DIP Guarantors" and, together with the DIP Borrowers, the "DIP Obligors") to unconditionally guarantee, on a joint and several basis, the DIP Obligors' obligations in respect of, (a) $1,350,000 original aggregate principal amount of new money loans (the "Tranche A DIP Loans") and (b) $300,000 original aggregate

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the (a) LightSquared Plan, (b) DIP Agreement, or (c) DIP Order (each as defined below), as applicable.

principal amount (the "Tranche B DIP Loans" and, together with the Tranche A DIP Loans, the "DIP Loans," and the financing facility under which the Tranche A DIP Loans and Tranche B DIP Loans are being made, the "DIP Facility"), which may consist of new money loans and/or loans deemed made to the DIP Borrowers in exchange for a like amount of obligations outstanding under the Prepetition LP Credit Facility (as defined below), pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, substantially in the form attached hereto as Exhibit B (as may be further amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement"), by and among the DIP Borrowers and the other DIP Obligors, [_____] (or such other institution reasonably acceptable to the parties to the DIP Agreement as may have agreed to serve in such capacity), as Administrative Agent and Collateral Agent (in such capacity, together with its successors in such capacity, the "DIP Agent"), for and on behalf of itself, and the other lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties");

(ii)     authorizing the DIP Obligors to execute and deliver, and perform under, the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the DIP Budget (as defined below), and all other related loan and security documents, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    granting to the DIP Secured Parties allowed superpriority administrative expense claims in each of the DIP Obligors' Chapter 11 Cases and any of the DIP Obligors' Successor Cases (as defined in the DIP Order) for the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations"), subject to the limitations and priorities set forth herein and in the DIP Order;

(iv)     granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected priming security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral"), if any, which liens shall be subject to the liens and priorities set forth in the DIP Order;

(v)      authorizing and directing the DIP Obligors to pay the principal, interest, fees, expenses, and other amounts and compensation payable under each of the DIP Documents as they become due, including, without limitation, administrative agent's fees and such professional fees as may be agreed among the DIP Lenders, all to the extent provided by, and in accordance with, the terms of the DIP Order and the DIP Documents;

(vi)    providing  adequate protection to (a) SP Special Opportunities, LLC ("SPSO") for any diminution in value of its interests in the Prepetition LP Collateral (as defined below)[5] and (b) the affiliates of Harbinger Capital Partners, LLC (collectively, "Harbinger") for any diminution in value of its interests in the Prepetition Inc. Collateral (as defined below); and

(vii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Order.

In support of this Motion, LightSquared respectfully states as follows:

## Preliminary Statement

1.        Concurrently with the filing of this Motion, LightSquared filed the LightSquared Plan, representing the culmination of significant negotiations and efforts by LightSquared, certain key constituents in these Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for LightSquared's estates and stakeholders.  The LightSquared Plan – which enhances transactions previously proposed under LightSquared's Second Amended Plan (as defined below) – contemplates, among other things, (a) the $1.65 billion DIP Facility (approximately $930 million of which will be converted into second lien exit financing (the "Second Lien Exit Facility"), $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the LightSquared Plan), (b) first lien exit financing, including a facility of not less than $1 billion (the "First Lien Exit Facility" and, together with the Second Lien Exit Facility, the "Exit Facilities"), (c) the issuance of new debt and equity instruments, (d) the assumption of certain liabilities, (e) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with

---

[5]    For the avoidance of doubt, the adequate protection provided to SPSO in the DIP Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien.  Should an order be entered finding that SPSO does not have a valid lien, the DIP Order shall be modified to remove the grant of adequate protection to SPSO.

cash and other consideration, as applicable, and (f) the preservation of the Debtors' litigation

claims (collectively, the "Global Restructuring").

    2.  The LightSquared Plan maximizes the value of all of LightSquared's

estates for the benefit of all of its creditors and equityholders.  Moreover, it is the only all-

inclusive restructuring proposal that envisions value being obtained for, and provided to, all of

LightSquared's estates and is thus – compared to a value-destructive liquidation – the only path

available for all of the Debtors to successfully exit the Chapter 11 Cases.  Given the undeniable

benefits of the contemplated restructuring, it is therefore not surprising that the LightSquared

Plan has received overwhelming consensus and support from a substantial portion of

LightSquared's significant stakeholders.

    3.  The DIP Facility is a key element of the LightSquared Plan.  It supplies

LightSquared with the funds necessary to satisfy certain of its Prepetition Obligations (as defined

below), thereby allowing LightSquared to dispose of obligations that otherwise would be

continuing to accrete at a much higher rate than those obligations under the DIP Facility.  The

DIP Facility also provides LightSquared with liquidity for the ongoing operations of

LightSquared's estates from confirmation (the "Confirmation") to consummation of a successful

reorganization under the LightSquared Plan.  Indeed, shortly after Confirmation, the proceeds of

the DIP Facility will be used to (a) refinance in full the Existing DIP Facilities (as defined

below), (b) pay in full in cash all specified Prepetition Inc. Obligations (as defined in the DIP

Order) other than the Harbinger Prepetition Inc. Claims (as defined in the DIP Order) (such

outstanding obligations, the "Specified Prepetition Inc. Claims"), (c) pay in full in cash specified

Prepetition LP Obligations (as defined in the DIP Order) (the "Specified Prepetition LP Claims"

and, together with the Specified Prepetition Inc. Claims, the "Specified Prepetition Claims") to

the extent such Prepetition LP Obligations are not (i) converted into Tranche B DIP Loans or (ii)

obligations held by, or for the benefit of, SPSO, (d) pay expenses in connection with the DIP

Facility, and (e) maintain operations, make certain capital expenditures, continue the regulatory

approval process, and administer and preserve the value of LightSquared's estates post-

Confirmation pending the effective date (the "Effective Date") of the LightSquared Plan.

4.        Accordingly, LightSquared respectfully submits that the Court approve

the DIP Facility – which serves as one of the cornerstones of the LightSquared Plan – so that

LightSquared may pursue the path that enables the satisfaction in full of all claims and equity

interests and maximizes the value of all of LightSquared's estates.

## Jurisdiction

5.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.        Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.        The statutory bases for the relief requested herein are sections 105, 361,

362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code, Bankruptcy

Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## Summary of Relief Requested[6]

8.        Pursuant to Bankruptcy Rules 4001(b), (c), and (d) and Local Rule 4001-

2, the following are concise statements and summaries of the proposed material terms of the DIP

Documents and the DIP Order:

---

[6]        This statement is qualified in its entirety by reference to the provisions of the applicable DIP Documents.
To the extent that there is any conflict between this Motion and the applicable DIP Documents, the
applicable DIP Documents shall control.  Capitalized terms used in this summary of DIP Documents and
DIP Order and not otherwise defined shall have the meanings set forth in the DIP Documents and the DIP
Order, as applicable.

| Summary of DIP Documents and DIP Order | |
|---|---|
| **DIP Facility Parties**<br>*Rule 4001(c)(1)(B)* | *DIP Borrowers*: LightSquared Inc., One Dot Six Corp., and LightSquared LP<br><br>*DIP Guarantors*: LightSquared Corp., SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., and each of the direct and indirect subsidiaries of LightSquared Inc. (other than a DIP Borrower) that are debtors and debtors in possession in the Chapter 11 Cases<br><br>*DIP Agent*: [_____] (or such other institution reasonably acceptable to the parties to the DIP Agreement as may have agreed to serve in such capacity)<br><br>*Lead Arranger and Bookrunner*: J.P. Morgan Securities LLC<br><br>(DIP Agreement at 1, Schedule 1.01(b) to DIP Agreement.) |
| **DIP Facility Amount**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(1)* | *Amounts Approved on Entry of DIP Order*: (a) $1,350,000 original aggregate principal amount of new money loans and (b) $300,000,000 original aggregate principal amount, which may consist of new money loans and/or loans deemed made to the DIP Borrowers in exchange for a like amount of obligations outstanding under the Prepetition LP Credit Facility.  (DIP Agreement at §§ 1.01, 2.01.) |
| **Maturity**<br>*Rule 4001(c)(1)(B)* | The earliest to occur of (a) the date on which all of the DIP Obligations have been indefeasibly repaid in full, (b) October 31, 2014, (c) the date of the closing of a sale of all or substantially all of the DIP Obligors' assets or stock under section 363 of the Bankruptcy Code, (d) the Effective Date, and (e) the date of termination of the commitments and/or acceleration of the Obligations following an Event of Default pursuant to Article VIII of the DIP Agreement.  (DIP Agreement at § 1.01.) |
| **Limits on Use of DIP Facility and Refinancing**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(6)-(a)(7), (a)(9)* | The cash proceeds of the DIP Facility shall be used in accordance with the LightSquared Plan to (i) on the Closing Date (as defined in the DIP Agreement), (a) indefeasibly repay in full in cash the Existing DIP Obligations and Specified Prepetition Claims and (b) pay costs and expenses incurred in connection with the DIP Facility; (ii) pay operating expenses solely in accordance with the terms of the DIP Budget (subject to the Permitted Variance (as defined below)); (iii) finance Capital Expenditures (as defined in the DIP Agreement) solely in accordance with the Capital Expenditure Covenant (as defined below); and (iv) pay Restructuring Costs (as defined in the DIP Agreement) solely in accordance with the Restructuring Cost Covenant (as defined below).  (DIP Agreement at § 3.12; DIP Order at ¶ 10.) |
| **Exit Facilities**<br>*Rule 4001(c)(1)(B)* | If the Maturity Date occurs as a result of the occurrence of the Effective Date, the DIP Obligations in respect of the Tranche A DIP Loans shall, in lieu of being immediately repaid as otherwise required under the DIP Agreement, convert, in the amounts set forth in the LightSquared Plan, into (a) equity and (b) loans under the (i) Reorganized LightSquared Inc. Loan and (ii) Second Lien Exit Facility, in each case subject to the satisfaction of the conditions precedent to the effectiveness of the LightSquared Plan and the documentation for each of the foregoing.<br><br>(DIP Agreement at § 2.16.) |
| **Interest Rate on DIP Facility**<br>*Rule 4001(c)(1)(B),*<br>*LBR 4001-2(a)(3)* | The DIP Loans may from time to time be Eurodollar Loans or ABR Loans (each as defined in the DIP Agreement), as determined by the Borrower Agent (as defined in the DIP Agreement) and notified to the DIP Agent in accordance with the DIP Agreement.<br><br>*Eurodollar Loans*: Eurodollar Rate plus 11%.  "Eurodollar Rate" means, with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:<br><br>$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$<br><br>; provided that in no event shall the Eurodollar Rate be less than 1.00%.<br><br>*ABR Loans*: Alternative Base rate plus 10%.  "Alternative Base Rate" or "ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest |

| Summary of DIP Documents and DIP Order | |
|---|---|
| | of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the next preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.<br><br>(DIP Agreement at §§ 1.01, 2.06.)<br><br>*Default Interest Rate*: 2.00% per annum plus the Eurodollar Rate plus 11% after an Event of Default occurs and is continuing.  (DIP Agreement at § 2.06.) |
| **Fees and Expenses**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)* | If the Closing Date occurs, reimbursement of all reasonable and documented out-of-pocket expenses (if any), as agreed between the Initial Lenders (as defined in the DIP Agreement) and LightSquared, incurred in connection with each of the DIP Facility and any related documentation, all as set forth in detail in the Commitment Letter[7] and DIP Documents. (Commitment Letter at ¶ 6.)<br><br>Notwithstanding anything contained in the DIP Order, in the Prepetition Credit Documents or any other  agreement, or in any order entered in these Chapter 11 Cases (including, without limitation, this Final Order or the Confirmation Order), the Debtors shall remain obligated to pay all reasonable fees and expenses, subject to a cap of $500,000 in the aggregate, incurred by (a) the DIP Inc. Agent and each DIP Inc. Lender, including all reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (b) the Prepetition Inc. Agent and each holder of a Prepetition Inc. Facility Non-Subordinated Claim (as defined in the Plan), including all reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (c) the Prepetition LP Agent, and (d) the Ad Hoc Secured Group and all reasonable and documented fees and expenses of the Ad Hoc Secured Group's legal and financial advisors, in each case through and including the effective date of the Plan.  For the avoidance of doubt, the financial and legal advisors covered by paragraph 41 of the DIP Order and subject to the aggregate cap of $500,000 include (t) Akin Gump Strauss Hauer & Feld LLP, (u) Houlihan Lokey, (v) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, (w) White & Case LLP, (x) The Blackstone Group, (y) Latham & Watkins LLP, and (z) Bennett Jones LLP.  (DIP Order at § 41.) |
| **Mandatory Prepayments;**<br>**Optional Prepayments**<br>*Rule 4001(c)(1)(B)* | Mandatory prepayments shall be required to be made from net cash proceeds received by any of the DIP Obligors from certain asset sales, casualty events, debt issuances, and equity issuances, subject to the requirements set forth in the DIP Agreement.<br><br>The DIP Borrowers may at any time optionally prepay the loans under the DIP Facility, in whole or in part and without a makewhole or other premium, subject to the requirements set forth in the DIP Agreement.<br><br>(DIP Agreement at § 2.09.) |
| **Agreed Budget**<br>*Rule 4001(c)(1)(B)* | So long as the DIP Obligations remain outstanding, the DIP Obligors must operate within the DIP Budget, which shall (a) be tested on a monthly basis for trailing two (2)-month periods and (b) provide for withdrawals from the Collateral Account (as defined below) to finance operating expenses for the purposes and in the amounts described therein, subject to a variance cushion of 15% in the aggregate for all such operating expenses (the "Permitted Variance").  The DIP Budget shall not be amended, supplemented, or otherwise modified in a manner adverse to the DIP Lenders without the approval of the Required DIP Lenders.  (DIP Order at ¶ 10.) |

---

[7]     "Commitment Letter" means that certain that certain letter dated February 14, 2014 among the Borrower Agent, the Lead Arranger, the Initial Lenders, and certain other lenders party thereto in respect of the DIP Facility.

| Summary of DIP Documents and DIP Order | |
|---|---|
| **Covenants**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(8)* | *Financial Covenants*:  The DIP Facility includes the following financial covenants: (a) compliance with the DIP Budget, subject to Permitted Variance, (b) compliance with the Capital Expenditure Covenant (as defined in the DIP Agreement), and (c) compliance with the Restructuring Costs Covenant (as defined in the DIP Agreement).  (DIP Agreement at § 6.09.)<br><br>*Affirmative Covenants*:  The DIP Facility includes, without limitation, the following affirmative covenants:  (a) monthly preparation of, and reporting as to, the DIP Budget; (b) weekly status calls relating to matters set forth in detail in the DIP Agreement; (c) distribution of documents constituting public reports, Bankruptcy Court documents, organizational documents, FCC submissions,[8] and Industry Canada proceedings, all as set forth in the DIP Order; (d) notification of (i) any Default under the DIP Agreement, (ii) filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation, or proceeding against any of the DIP Obligors, or any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect or with respect to any Loan Document (each as defined in the DIP Agreement) (iii) occurrence of a casualty event or change in control, or (iv) notification of receipt by any DIP Obligor of any material correspondence with the FCC or Industry Canada (as set forth in detail in the DIP Agreement); (e) maintenance of existence, businesses, properties, and insurance; (f) payment of material obligations and taxes; (g) ERISA covenants; (h) rights of lenders to access information and inspect properties and periodic lender meetings; (i) compliance with environmental and communications laws, contracts, and permits; and (j) compliance with the use of proceeds provisions (as set forth in detail in the DIP Agreement); and (k) additional customary provisions in connection with the creation, preservation, and protection of the DIP Lenders' security interest in the DIP Collateral. (DIP Agreement at §§ 5.01-5.15.; DIP Order at ¶¶ 11, 12.)<br><br>*Negative Covenants*:  The DIP Facility includes, without limitation, the following negative covenants:  (a) limitations on indebtedness, liens, sale and leaseback transactions, investments, loans, advances, and acquisitions, and mergers and consolidations; (b) limitations on sales and other dispositions of assets; <u>provided</u>, that, for the avoidance of doubt, nothing in the DIP Agreement will permit directly or indirectly the Asset Sale of any spectrum associated with any Material License or the First Satellite (each as defined in the DIP Agreement); (c) restrictions on dividends by DIP Obligors; (d) limitations on transactions with affiliates; (e) restrictions on modifications of organizational documents and other documents, including restrictions on termination or modifications to the Inmarsat Agreement (as defined in the DIP Agreement), the One Dot Six Lease (as defined in the DIP Agreement), and contracts with Boeing; (f)  restrictions on subsidiaries in connection with (i) the payment of dividends and other distributions of capital stock or other interests, (ii) certain loans or advances, and (iii) certain transfers of property; (g) limitations on issuance of capital stock; (h) limitations on creation of subsidiaries; (i) limitations on business activities, accounting, and fiscal year changes; (j) no further negative pledge; (k) restrictions on use of proceeds in connection with Anti-Corruption Laws and Anti-Terrorism Laws (each as defined in the DIP Agreement); (l) restrictions on actions taken in connection Canadian pension plans; (m) restrictions on certain activities of License Subsidiaries (as defined in the DIP Agreement); (n) limitations on the modification, termination, or withdrawal, or the seeking of any new license modifications or filing of any new applications or petitions for rulemaking of the Communications Licenses (as defined in the DIP Agreement) and the One Dot Six Lease; and (o) limitations in connection with certain labor matters.  (DIP Agreement at §§ 6.01-6.22.) |

---

[8]    With respect to Material Regulatory Requests, the Transfer Proceedings, and/or the FCC Objectives, the DIP Borrowers shall provide promptly to the Initial Lenders (a) copies of all filings, notices, orders, and any other correspondence between the FCC in respect thereof, and (b) after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company to the FCC.  (DIP Order at ¶ 13.)

| Summary of DIP Documents and DIP Order | |
|---|---|
| **Liens and Priorities**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(4),*<br>*4001-2(a)(6)* | Subject to the Carve-Out and Permitted Prior Liens, all DIP Obligations will be entitled to (a) super priority claim status and (b) (i) a valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien on, or claim to, all presently owned or hereafter acquired unencumbered assets (whether currently or hereafter unencumbered) of all DIP Obligors, and (ii) a valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien on, or claim to, all presently owned or hereafter acquired encumbered assets of the DIP Obligors (collectively, the "DIP Liens").<br><br>**The DIP Collateral shall include the DIP Obligors' claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof, subject to the preexisting rights of other creditors in accordance with existing Court orders.**<br><br>(DIP Order at ¶¶ 6-8.) |
| **Events of Default**<br>*Rules 4001(c)(1)(B),*<br>*4001(c)(1)(B)(v),*<br>*4001(c)(1)(B)(vi),*<br>*LBR 4001-2(a)(10)* | Each of the following constitutes an event of default under the DIP Facility, unless expressly waived in accordance with the consents required in the DIP Documents: (a) dismissal of a Chapter 11 Case of a DIP Obligor with material assets; (b) appointment in the Chapter 11 Case of a DIP Obligor with material assets of a chapter 11 trustee; (c) Court enters an order (i) staying, reversing, modifying, or vacating this DIP Order or (ii) amending the DIP Order, including, without limitation, the provision of additional or different adequate protection to Harbinger or SPO; (d) Court enters an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases of the DIP Obligors, or any DIP Obligor shall file a motion or other pleading seeking the dismissal of its Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise; (e) except as expressly allowed in the DIP Order, Court enters an order granting any lien on, or security interest in, any DIP Collateral in favor of any party other than the DIP Agent on behalf of the DIP Lenders, or granting an administrative claim payable by a DIP Obligor to any party other than the DIP Agent on behalf of the DIP Lenders (other than administrative claims incurred in the ordinary course of business that are not senior to or *pari passu* with the superiority administrative claim granted to the DIP Agent and the DIP Lenders pursuant to the DIP Order); (f) Court enters an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any DIP Collateral; (g) Court enters an order granting relief from the automatic stay under section 362 of the Bankruptcy Code with respect to all or any material portion of the property of the DIP Obligors' estates; (h) any DIP Obligor makes any payment on or in respect of any prepetition indebtedness or prepetition obligations of a DIP Obligor other than as set forth in the DIP Order; (i) any DIP Obligor shall fail to comply with the terms of the DIP Order in any material respect (non-compliance with the DIP Budget within the Permitted Variance, or any violation of the Restructuring Costs Covenant or the Capital Expenditure Covenant shall constitute material non-compliance with DIP Order); (j) occurrence of certain events (as set forth in detail in the DIP Agreement) in connection with the One Dot Six Lease; (k) Court enters an order approving the sale of any substantial DIP Collateral that does not provide for the payment in respect thereof to be remitted to the DIP Agent consistent with the priorities set forth in the DIP Order; (l) any DIP Obligor seeks, or supports any other person's motion as to, any of the matters set forth in paragraph 28 of the DIP Order; (m) certain events have occurred would result in a Material Adverse Effect or in the imposition of a Lien on any properties of the DIP Obligors; (n) any security interest in connection with the DIP Facility ceases to be in full force or effect; (o) any DIP Document or any material provision thereof is determined by a court of competent jurisdiction to be null and void; (p) DIP Obligors are prohibited from conducting the business theretofore conducted; and (q) any other Event of Default (as defined in the DIP Agreement) occurs, which includes, but is not limited to, defaults in connection with (i) failure to make payments of principal and/or interest of any DIP Loan in accordance with the DIP Agreement, (ii) false or misleading representations or warranties, (iii) default in the due observance or performance by any DIP Obligor of any covenant, condition, or agreement in the DIP Agreement, (iv) FCC (A) issues a decision or order that is materially inconsistent with all or any portion of the FCC Objectives or (B) denies relief requested in any Material Regulatory Request, (v) breaches |

9

| Summary of DIP Documents and DIP Order | |
|---|---|
| | of, defaults under, certain amendments made to, or rejection of the Inmarsat Agreement, One Dot Six Lease, and/or any Material License, and (vi) a change in control (except as provided for in the LightSquared Plan).  (DIP Order at ¶ 22, DIP Agreement at § 8.01.) |
| **Carve-Out**<br>*LBR 4001-2(a)(5),*<br>*4001-2(d)* | "Carve-Out" means the Inc. Carve-Out and the LP Carve-Out:<br><br>*Inc. Carve-Out*.  "Inc. Carve-Out" means, upon the occurrence of the Termination Date  (as defined in the DIP Agreement), the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the Inc. Obligors; (ii) all reasonable fees and expenses incurred by a trustee for the Inc. Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; and (iii) the allowed and unpaid professional fees, expenses, and disbursements allocable to the Inc. Obligors incurred on or after the Termination Date by the Debtors for any professionals retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) by the Debtors under sections 327, 328, or 1103(a) of the Bankruptcy Code (the "Chapter 11 Case Professionals") in an aggregate amount not to exceed $1.5 million plus such allowed fees, expenses, and disbursements allocable to the Inc. Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (collectively, the "Allowed Inc. Professional Fees").  (DIP Order at ¶ 27(a).)<br><br>*LP Carve-Out*.  "LP Carve-Out" means, upon the occurrence of the Termination Date, the following expenses:  (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) for the LP Obligors; (ii) with respect to the information officer (the "Information Officer") appointed by the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court") in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended, in the Canadian Court (the "Canadian Proceedings"), all fees and expenses required to be paid to the Information Officer and its counsel in connection with the Canadian Proceedings, which fees and expenses may be secured by a charging lien granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $200,000, (iii) all reasonable fees and expenses incurred by a trustee for the LP Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; and (iv) the allowed and unpaid professional fees, expenses, and disbursements allocable to the LP Obligors incurred on or after the Termination Date by the Debtors for any Chapter 11 Case Professionals (which are restructuring professionals) in an aggregate amount not to exceed $4 million, plus such allowed fees, expenses, and disbursements allocable to the LP Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (the "Allowed LP Professional Fees" and, together with the Allowed Inc. Professional Fees, the "Allowed Professional Fees").  (DIP Order at ¶ 27(b).) |
| **Waiver of Rights/Limitations**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(8)* | *Discharge Waiver*:  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations.  (DIP Order at ¶ 34.)<br><br>*Release*:  Subject to the limitations set forth in the DIP Order, the Debtors (a) release, discharge, waive, and acquit the DIP Secured Parties, and each of their respective participants and each of their respective affiliates, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Released Parties"), of and from any and all claims, demands, |

10

| Summary of DIP Documents and DIP Order | |
|---|---|
| | liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations existing as of the date of this Final Order, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, DIP Facility, as applicable, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent or DIP Lenders and (b) waive any and all claims (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations, DIP Liens, Prepetition Inc. Obligations, Prepetition LP Obligations (other than Obligations held by, or for the benefit of, SPSO) and the Prepetition Liens (other than Prepetition Liens held for the benefit of SPSO.  For the avoidance of doubt, nothing contained in the DIP Order shall constitute a release of SPSO or any related person or entity (including, without limitation, EchoStar Corporation ("EchoStar"), Charles Ergen, or DISH Network Corporation ("DISH")), and all claims, rights, and defenses of the Debtors and their estates against SPSO, EchoStar, Mr. Ergen, and DISH are expressly retained.  (DIP Order at ¶ 29.) |
| | *Assignments*:  Any DIP Lender may at any time assign to (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a Participant (each as defined in the DIP Agreement), and (e) any other person, all or a portion of its rights and obligations under the DIP Agreement with the prior written consent (such consent not to be unreasonably withheld or delayed) of the DIP Agent and each Initial Lender; provided, that no consent of the DIP Agent shall be required for an assignment of all or any portion of a DIP Loan to a Lender, an Affiliate of a Lender, an Approved Fund or a Participant.  In addition to certain other restrictions set forth in the DIP Agreement, no assignment or participation shall be permitted to a Disqualified Company (as defined in the DIP Agreement) (DIP Agreement at § 10.04.) |
| | *Voting Rights:*  The consent of Required DIP Lenders shall be required for certain amendments and waivers, and certain other items set forth in the DIP Agreement, shall require the consent of all DIP Lenders directly affected thereby.  (DIP Agreement at § 10.02) |
| **Conditions to Funding and Withdrawals from Collateral Account**<br>*Rule 4001(c)(1)(B), 4001(c)(1)(B)(v), LBR 4001-2(a)(2), 4001-2(h)* | *Conditions to Funding*:  The obligation of each DIP Lender to fund the DIP Facility is subject to prior or concurrent satisfaction of certain conditions precedent on or before the date that is fifteen (15) days after entry of an order confirming the LightSquared Plan, which conditions include, but are not limited to:  (a) Loan Documents are satisfactory to the DIP Lenders and the DIP Agent and have been executed; (b) DIP Agent has received certain corporate documents, officers' certificate, confirmation of applicable insurance, and any other documents and information reasonably requested from the Debtors; (c) DIP Agent has received a Borrowing Request (as defined in the DIP Agreement); (d) transactions contemplated under the DIP Facility are in full compliance with all material requirements of applicable laws and regulations; (e) other than as scheduled to the DIP Agreement, no litigation materially adversely affecting the ability of the DIP Obligors to consummate the transactions contemplated under the DIP Facility; (f) DIP Lenders, Lead Arranger, and DIP Agent have received all fees and other amounts due and payable on or prior to the Closing Date; (g) delivery of information in connection with USA Patriot Act; (h) entry into a Canadian security agreement; (i) Bankruptcy Court shall have entered the Confirmation Order and DIP Order (collectively, the "Orders") by no later than March 31, 2014 (or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the LightSquared Plan and has taken the matter under advisement, on or before April 15, 2014) in form and substance reasonably satisfactory to DIP Agent and the Required Lenders and, pursuant to the terms of the DIP Order, the automatic stay shall have been modified to permit the creation and perfection of the DIP Agent's Liens and security interests and shall have been automatically vacated to permit enforcement of the Collateral Agent's rights and remedies under the DIP Agreement and DIP Documents; (j) at the time of funding, the Orders are effective, each of the DIP Obligors support the LightSquared Plan, and the First Lien Exit Commitment Letter (as defined in the DIP Agreement) is in full force and effect; (k) delivery of DIP Budget and Operating Reports; (l) no material adverse effect, (m) no indebtedness (other than the DIP Facility), claims in connection with Existing DIP Obligations and Specified Prepetition Claims deemed satisfied and discharged |

11

| Summary of DIP Documents and DIP Order | |
|---|---|
| | (n) FCC has not denied any pending license or rule-making request of any Debtor or OP LLC (as defined in the DIP Agreement); (o) representations and warranties true and correct; (p) no Event of Default or Default (each as defined in the DIP Agreement) has occurred and is continuing; (q) no legal bar to Loans under the DIP Facility being made; (r) the Debtors have not compromised, impaired the value of, or released the Retained Causes of Action (as defined in the LightSquared Plan), other than, solely in respect of Retained Causes of Action relating to SPSO, to the extent SPSO has voted in favor of the LightSquared Plan and SPSO and all of its Affiliates have withdrawn any objections to the Plan of Reorganization and the DIP Facility; and (s) each of the One Dot Six Lease, the Material Licenses, and the Inmarsat Agreement shall be in full force and effect and shall not have been terminated; _provided_, that the Inmarsat Agreement shall have been amended in a manner acceptable to each of the Initial Lenders.  (DIP Agreement at § 4.01.)<br><br>_Conditions to Withdrawals from Collateral Account_:  The transfer of funds by the DIP Agent is subject to the following conditions:  (a) no default or event of default shall have occurred and be continuing; (b) representations and warranties shall be true and correct in all material respects at the date of each withdrawal; (c) in the case of a withdrawal, receipt of a notice of withdrawal from the DIP Borrowers; (d) no stipulation shall have been approved, or order shall have been entered, by the Court that is adverse to the interests of the DIP Lenders, as determined by the Required DIP Lenders in their sole and absolute discretion; and (e) the Orders shall be in full force and effect.  (DIP Agreement at § 4.02.) |
| **Adequate Protection for Certain Prepetition Lenders, if applicable** _Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) LBR 4001-2(a)(4)_ | As described in more detail in this Motion, the Harbinger Adequate Protection Liens, Harbinger Adequate Protection Superpriority Claims, SPSO Adequate Protection Liens, and SPSO Adequate Protection Superpriority Claims.  (DIP Order at ¶¶ L, 15-16.) |
| **Waiver or Modification of the Automatic Stay** _Rule 4001(c)(1)(B) LBR 4001-2(a)(10)_ | The automatic stay imposed under section 362(a) of the Bankruptcy Code will be modified by the DIP Order as necessary to effectuate all of the terms and provisions of the DIP Order.  (DIP Order at ¶ 17.) |
| **Waivers/Modification Regarding Perfection or Enforcement of a Lien** _Rule 4001(c)(1)(B)(viii)_ | The DIP Order will be effective to (a) create in favor of the DIP Agent and the DIP Lenders legal, valid, enforceable, and fully perfected security interests in, and liens on, the DIP Collateral, (b) create in favor of Harbinger legal, valid, enforceable, and fully perfected security interests and liens in connection with the Harbinger Adequate Protection Liens, and (c) create in favor of SPSO legal, valid, enforceable, and fully perfected security interests and liens in connection with the SPSO Adequate Protection Liens, each of the foregoing pursuant to the priorities set forth in the DIP Documents.  (DIP Order at ¶ 18.) |
| **Joint Liability** _LBR 4001-2(a)(14); 4001-2(e)_ | The DIP Obligors shall be jointly and severally liable for the obligations under the DIP Order and in accordance with the terms of the DIP Facility and the DIP Documents.  (DIP Order at ¶ 33.) |
| **Indemnification** _Rule 4001(c)(1)(B)(ix)_ | The DIP Obligors shall indemnify the DIP Agent, each DIP Lender, and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives pursuant to customary indemnification provisions.  (DIP Order at ¶ 25.) |
| **Section 506(c) and 552(b) Waivers** _Rule 4001(c)(1)(B)(x)_ | **Upon entry of the DIP Order, the DIP Obligors waive (a) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) the provisions of section 506(c) of the Bankruptcy Code, in each case, vis-à-vis the DIP Agent, DIP Lenders, Harbinger, and SPSO.  (DIP Order at ¶¶ M, 32.)** |

## Background

### A.    Introduction

9.      On May 14, 2012 (the "Petition Date"), LightSquared filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.

10.      LightSquared continues to operate its businesses and manage its

properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

### B.    Prepetition Credit Facilities

11.      ***Prepetition Inc. Credit Facility.***  Certain of the Debtors are party to that

certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, amended and

restated, or otherwise modified from time to time, the "Prepetition Inc. Credit Agreement"),

between LightSquared Inc., as borrower, the subsidiary guarantors party thereto, namely One

Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. (collectively, the "Prepetition

Inc. Subsidiary Guarantors"), the lenders party thereto, including Harbinger Capital Partners,

LLC (collectively, the "Prepetition Inc. Lenders"), and U.S. Bank National Association, as

successor administrative agent to UBS AG, Stamford Branch (in such capacity, the "Prepetition

Inc. Agent" and, together with the Prepetition Inc. Lenders, the "Prepetition Inc. Secured

Parties").  The Prepetition Inc. Lenders provided term loans in the original aggregate principal

amount of $263,750,000 (the "Prepetition Inc. Credit Facility").  Pursuant to that certain Waiver

and Second Amendment to Credit Agreement, dated as of March 15, 2012 (the "Inc. Waiver and

Amendment"), between LightSquared Inc., the Prepetition Inc. Subsidiary Guarantors, the

Prepetition Inc. Lenders, and the Prepetition Inc. Agent, the maturity date for the Prepetition Inc.

Credit Facility was extended from July 1, 2012 to December 31, 2012.

12.    Amounts outstanding under the Prepetition Inc. Credit Facility are secured by a first-priority security interest in (a) the One Dot Six Lease, (b) the capital stock of each Prepetition Inc. Subsidiary Guarantor (i.e., One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp.), and (c) all proceeds and products of each of the foregoing (collectively, the "Prepetition Inc. Collateral").

13.    Pursuant to a certain Lender Subordination Agreement, dated as of March 29, 2012 (the "Inc. Lender Subordination Agreement"), between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined in the Inc. Lender Subordination Agreement), Harbinger Capital Partners, LLC ("Harbinger") agreed to subordinate its Liens (as such term is used in the Inc. Lender Subordination Agreement) and Claims to those of the other Prepetition Inc. Lenders under the Prepetition Inc. Credit Facility.

14.    On September 15, 2012, the ad hoc secured group of Prepetition LP Lenders (the "Ad Hoc LP Secured Group") filed the Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates [Docket No. 323 (the "STN Motion").  The STN Motion sought derivative standing for the Ad Hoc LP Secured Group to bring an adversary proceeding on behalf of LightSquared Inc., One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. against certain Prepetition Inc. Lenders, Harbinger Capital Partners SP Inc., Blue Line DMZ Corp., Mast AK Fund LP, Mast Credit Opportunities I Master Fund Limited, Mast OC I Master Fund, Mast PC Fund LP, Mast Select Opportunities Master Fund, Seawall Credit Value Master Fund, Ltd., Seawall OC Fund, Ltd., and the Prepetition Inc. Agent.  No party other than the Ad Hoc Secured Group commenced a challenge to the Prepetition Inc. Liens or the Prepetition Inc. Obligations within the Challenge Period (as

14

defined in the Inc. DIP Order (as defined below)).  As set forth in the LightSquared Plan, entry

of the Confirmation Order shall operate to settle all claims and causes of action alleged against

the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the

Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the Closing

Date of the DIP Facility.

15.    As of the Petition Date, an aggregate amount of approximately

$322,203,486.02 was outstanding under the Prepetition Inc. Credit Facility.  As of July 31, 2013,

an aggregate amount of $397,382,973.01 in principal and accrued interest, excluding prepayment

fees, was outstanding under the Prepetition Inc. Credit Facility.

16.    ***Prepetition LP Credit Facility.***  Certain of the Debtors are also party to

that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, amended

and restated, or otherwise modified from time to time, the "Prepetition LP Credit Agreement"),

between LightSquared LP, as borrower, LightSquared Inc. and the other parent guarantors party

thereto, namely LightSquared Investors Holdings Inc., LightSquared GP Inc., and TMI

Communications Delaware, Limited Partnership (collectively, the "Prepetition LP Parent

Guarantors"), the subsidiary guarantors party thereto, namely ATC Technologies, LLC,

LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra

Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (collectively, the "Prepetition LP Subsidiary

Guarantors" and, collectively with LightSquared LP, LightSquared Inc., and the Prepetition LP

Parent Guarantors, the "LP Obligors"), the lenders party thereto (the "Prepetition LP Lenders"

and, together with the Prepetition Inc. Lenders, the "Prepetition Lenders"), UBS AG, Stamford

Branch, as administrative agent (in such capacity, and together with Wilmington Trust FSB,[9] the

---

[9]    Wilmington Trust FSB serves as collateral trustee pursuant to that certain Collateral Trust Agreement,
dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from

"Prepetition LP Agent" and, together with the Prepetition Lenders, the "Prepetition LP Secured Parties"),[10] and other parties thereto, under which the Prepetition LP Lenders provided term loans in the aggregate principal amount of $1,500,000,000 (the "Prepetition LP Credit Facility" and, together with the Prepetition Inc. Credit Facility, the "Prepetition Credit Facilities").

17.    Amounts outstanding under the Prepetition LP Credit Facility are secured by a first-priority security interest in (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP and the Prepetition LP Parent Guarantors (except LightSquared Inc.), (c) the equity interests of the Prepetition LP Subsidiary Guarantors, and (d) the rights of LightSquared Inc. under and arising out of the Inmarsat Cooperation Agreement (collectively, the "Prepetition LP Collateral" and, together with the Prepetition Inc. Collateral, the "Prepetition Collateral").[11]   No party commenced a challenge to the Prepetition LP Liens or Prepetition LP Obligations by the Investigation Termination Date (as defined in the Cash Collateral Order (as defined below)).

18.    As of the Petition Date, an aggregate amount of approximately $1,700,571,106 was outstanding under the Prepetition LP Credit Facility.

---

time to time, the "LP Collateral Trust Agreement"), between LightSquared LP, UBS AG, Stamford Branch, and Wilmington Trust FSB.

[10]   The Prepetition LP Agent, together with the Prepetition Inc. Agent, are the "Prepetition Agents" and, together with the Prepetition Lenders, are the "Prepetition Secured Parties."

[11]   The Prepetition LP Collateral does not include the following:  (a) any permit or license issued by a Governmental Authority (as defined in the Prepetition LP Credit Agreement) or other agreement to the extent the terms thereof validly prohibit the creation by the pledgor thereof of a security interest in such permit, license, or other agreement; (b) property subject to any purchase money or vendor financing if the contract or other agreement in which such lien is granted validly prohibits the creation of any other lien on such property; (c) property subject to any capital lease; (d) any intent-to-use trademark application to the extent a security interest therein would result in the loss by the pledgor thereof of any material rights therein; (e) certain deposit and securities accounts securing currency hedging or credit card vendor programs or letters of credit provided to vendors in the ordinary course of business; (f) equity interests in (i) excess of 66% in non-U.S. subsidiaries held by a U.S. subsidiary, (ii) LightSquared Network LLC, and (iii) any joint venture or similar entity to the extent the terms of such investment restrict such security interest; and (g) any consumer goods subject to the Canadian Security Agreement (as defined in the Prepetition LP Credit Agreement) (collectively, the "Prepetition LP Excluded Collateral").

16

C.      **Existing DIP Facilities**

19.      ***Inc. DIP Facility.***  Since the Petition Date, One Dot Six Corp.,

LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp. (the "Inc. DIP Obligors")

temporarily funded their businesses through the use of certain unencumbered cash.

Notwithstanding such use, the Inc. DIP Obligors did not have sufficient available sources of

working capital and financing to operate their businesses and maintain their properties in the

ordinary course of business throughout the Chapter 11 Cases.  Accordingly, on July 17, 2012, the

Bankruptcy Court, pursuant to the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,*

*364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting*

*Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate*

*Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented,

amended and restated, or otherwise modified from time to time, the "Inc. DIP Order"),

authorized the Inc. DIP Obligors to enter into that certain Senior Secured, Super-Priority Debtor-

in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated,

or otherwise modified from time to time, the "DIP Inc. Credit Agreement"), with the DIP Inc.

Agent and the DIP Inc. Lenders.  The DIP Inc. Lenders provided term loans to the DIP Inc.

Obligors in the original aggregate principal amount of $41.4 million, which was subsequently

increased to $46.4 million (the "Inc. DIP Facility"), and was to be used to finance certain build-

out requirements, make necessary lease payments, and administer the Chapter 11 Cases of the

Inc. DIP Obligors.

20.      Amounts outstanding under the Inc. DIP Facility (the "Inc. DIP

Obligations") were, and continue to be, secured by continuing, valid, binding, enforceable, non-

avoidable, and automatically and properly perfected priming, postpetition security interests in

and liens on any and all presently owned or hereafter acquired personal property, real property,

and other assets of the Inc. DIP Obligors (including proceeds of avoidance actions of the Inc.

DIP Obligors, whether owned, consigned by or to, or leased from or to the Inc. DIP

Obligors; provided, however, that the (a) liens provided for under the Inc. DIP Order (the "Inc.

DIP Liens") only attach to the assets of LightSquared Inc. in an amount equal to the amount of

the proceeds of the Inc. DIP Facility distributed, lent, or otherwise provided to LightSquared Inc.

by One Dot Six Corp., One Dot Four Corp., or One Dot Six TVCC Corp., (b) collateral under the

Existing DIP Facility does not include assets of LightSquared Inc. in excess of the amount of the

proceeds of the Existing DIP Facility distributed, lent, or otherwise provided to LightSquared

Inc., and (c) Inc. DIP Agent and Inc. DIP Lenders will only have recourse to such proceeds if the

collateral of the Inc. DIP Lenders is insufficient to repay the Existing DIP Obligations.

21.     On March 13, 2013, LightSquared amended the Inc. DIP Order [Docket

No. 579] to provide, among other things, that all default interest owing to each Prepetition Debt

Holder (as defined in the Inc. DIP Credit Agreement) that is also an Inc. DIP Lender and

accruing on the Prepetition Inc. Obligations, from and after the Petition Date until entry of the

Inc. DIP Order, would be added to and become Inc. DIP Obligations under the Inc. DIP Facility

(the "Inc. DIP Roll-Up").  The Inc. DIP Roll-Up constitutes an Inc. DIP Obligation, entitled to

the same treatment as all other Inc. DIP Obligations.

22.     Pursuant to this Court's orders entered on December 23, 2013 and January

31, 2014 further amending the Inc. DIP Order [Docket Nos. 1126 and 1286], the Inc. DIP

Facility matures upon the earliest to occur of (a) the date on which all of the Inc. DIP Obligations

(as defined in the Inc. DIP Order) have been indefeasibly repaid in full, (b) the earlier of (i) entry

of an order confirming a chapter 11 plan for any of the Inc. DIP Obligors and (ii) March 31,

2014, (c) the date of the closing of a sale of all or substantially all of the Inc. DIP Obligors'

assets or stock under section 363 of the Bankruptcy Code, (d) the effective date of a confirmed

plan of reorganization in any Chapter 11 Case of an Inc. DIP Obligor pursuant to chapter 11 of

the Bankruptcy Code, and (e) the date of termination of the Inc. DIP Facility commitments

and/or acceleration of the Inc. DIP Obligations following an Event of Default under the Inc. DIP

Credit Agreement.  Upon maturity, in addition to the other Inc. DIP Obligations, the Inc. DIP

Obligors are obligated to pay an exit fee to the Inc. DIP Agent equal to 2% of the aggregate

principal amount of the Inc. DIP Obligations repaid at such time.

23.    As of July 31, 2013, interest has accrued on the Inc. DIP Obligations in an

amount of approximately $5,051,317.89, excluding up-front and amendment fees.  This amount

includes interest accrued on the Inc. DIP Roll-Up loans, which became part of the Inc. DIP

Obligations in the amount of approximately $8,429,469.57 on or about March 13, 2013 pursuant

to the terms of the third amendment to the Inc. DIP Credit Agreement.

24.    The aggregate amount of all principal and accrued interest due on the

Inc. DIP Facility as of July 31, 2013 is approximately $61,804,787.46.  The aggregate amount of

all principal and interest due on the Prepetition Inc. Credit Facility and the Inc. DIP Facility as of

July 31, 2013 is approximately $459,187,760.47.

25.    ***LP DIP Facility.***  Since the Petition Date, the LP Obligors have been

funding their businesses through the use of the Prepetition LP Collateral, including Cash

Collateral.  However, the LP Obligors required additional cash to fund the ongoing operations of

its estates until April 15, 2014 and completion of a confirmation process that was anticipated to

extend into March 2014.  Accordingly, on February 4, 2014, the Bankruptcy Court, pursuant to

the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured*

*Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority*

*Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "LP DIP Order" and, together with the Inc. DIP Order, the "Existing DIP Orders"), authorized the LP Obligors to obtain postpetition financing in the aggregate principal amount of $33 million (the "LP DIP Facility" and, together with the Inc. DIP Facility, the "Existing DIP Facilities") from certain members of the ad hoc secured group of Prepetition LP Lenders (the "Ad Hoc Secured Group"), including Capital Research and Management Company, Cyrus Capital Partners, L.P., on behalf of its affiliates' managed funds and/or accounts, and Intermarket Corp., as well as by Solus Alternative Asset Management LP, Fortress Credit Corp., on behalf of its affiliates' managed funds and/or accounts, fund entities managed by Aurelius Capital Management, LP, and SP Special Opportunities, LLC (each of the foregoing, an "LP DIP Lender" and, collectively, the "LP DIP Lenders" and, together with the Inc. DIP Lenders, the "Existing DIP Lenders"), pursuant to the terms and conditions of the LP DIP Order.  The proceeds from the LP DIP Facility were to be used to finance the general corporate and working capital purposes of the LP Obligors.

26.     Amounts outstanding under the LP DIP Facility (the "LP DIP Obligations" and, together with the Inc. DIP Obligations, the "Existing DIP Obligations") were, and continue to be, secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected priming, postpetition security interests in and liens on any and all presently owned or hereafter acquired personal property, real property, and other assets of the LP Obligors.

**D.     Consensual Use of Cash Collateral**

27.     On June 13, 2012, LightSquared sought, negotiated, and received approval to (a) consensually use, through June 13, 2013, (i) cash collateral of the Prepetition LP

20

Lenders for working capital and general corporate purposes, permitted payments of costs of administration of the Chapter 11 Cases, and payment of certain prepetition expenses as approved by the Bankruptcy Court and (ii) the Prepetition Inc. Collateral and (b) grant certain adequate protection to the Prepetition LP Lenders and the Prepetition Inc. Lenders in exchange therefor [Docket No. 136] (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Cash Collateral Order").  The Cash Collateral Order was subsequently amended on February 19, 2013, December 20, 2013, and February 4, 2014 to, among other things, permit consensual use of the Prepetition LP Lenders' cash collateral through April 15, 2014 [Docket Nos. 544, 1118, and 1292].

                28.        As part of the adequate protection granted to the Prepetition LP Lenders and Prepetition Inc. Lenders, the Cash Collateral Order and the Existing DIP Orders provide that (a) the Inc. Obligors shall pay all reasonable, actual, and documented fees and expenses incurred and accrued by the Prepetition Inc. Agent, (b) the Prepetition Inc. Obligations shall accrue postpetition interest at the default rate, and (c) the LP Obligors shall pay the Prepetition LP Agent for the benefit of the Prepetition LP Lenders a monthly payment in the amount of $6,250,000 to be applied to interest and payment of the LP Professional Fees.  The Prepetition Inc. Obligations have accrued postpetition interest in an amount of approximately $75,179,486.99 million through July 31, 2013 (excluding the Roll-Up transferred to the Existing DIP Facility), and the LP Obligors have made monthly payments to the Prepetition LP Agent totaling $87.5 million through August 1, 2013 (with $76.81 million paid on account of interest on the Prepetition LP Credit Facility).  The foregoing relief was necessary to ensure that LightSquared could continue to operate in the ordinary course during the Chapter 11 Cases.

**E.**      **Previously Filed Plans and Path to LightSquared Plan**

29.      LightSquared and its advisors, at the direction of the Special Committee, have worked diligently with third parties over the course of several months to solidify a new value reorganization proposal.  Such efforts have been rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (i.e., the Global Restructuring).  After expending considerable time and effort evaluating all options, LightSquared, at the direction of the Special Committee ultimately determination that the Global Restructuring would (a) maximize value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c) provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases.  Thus, on December 24, 2013, LightSquared filed the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through the Global Restructuring.

30.      After the filing of the Second Amended Plan, LightSquared, at the direction of the Special Committee, and the Plan Support Parties continued to discuss modifications to the Second Amended Plan to improve upon the Global Restructuring contemplated therein.  These discussions led to the filing of the further amended LightSquared

Plan to enhance the Global Restructuring, thereby placing LightSquared in an even better position to reorganize and maximize value for all of its estates and stakeholders.

<u>Debtor in Possession Financing</u>

**A.      Need To Obtain DIP Facility**

31.      Prior to the Petition Date, LightSquared's operations were sustained by extensions of credit from the Prepetition Inc. Secured Parties under the Prepetition Inc. Credit Facility as well as ordinary course funding consistent with the Cash Collateral Order.  Since the Petition Date, LightSquared has been funding its businesses through the use of the Prepetition Collateral, including Cash Collateral, and proceeds from the Existing DIP Facilities.

32.      As discussed above, LightSquared, at the direction of the Special Committee, has filed the LightSquared Plan.  Under the LightSquared Plan, it is contemplated that, among other things, the cash proceeds from the DIP Facility shall be used in accordance with the LightSquared Plan to (a) indefeasibly repay in full in cash the outstanding amounts under the Existing DIP Facilities, (b) repay in full in cash the Specified Prepetition Claims, (c) pay the fees and expenses of the transactions contemplated in connection with the DIP Facility, and (d) provide working capital for the Debtors.  Thus, the DIP Lenders have agreed to provide the DIP Facility to refinance in full all obligations under the Existing DIP Facilities, refinance in full all obligations under the Prepetition Facilities that are Specified Prepetition Claims, and fund LightSquared's operations from Confirmation through the Effective Date, <u>provided</u> that the LightSquared Plan is selected as the path forward in these Chapter 11 Cases.

33.      If confirmed and consummated, the LightSquared Plan satisfies obligations owing to ***all*** of LightSquared's creditors in full, while also preserving tremendous value to all stakeholders and providing working capital – in the form of the DIP Facility – to LightSquared as it transitions out of chapter 11 protection.  Thus, the ability of LightSquared to

23

ensure a value-maximizing reorganization of its businesses, as provided for under the

LightSquared Plan, requires the availability of capital from the DIP Facility. Without such

funds, LightSquared will not have the sufficient available sources of capital and financing to

operate its businesses and maintain its properties in the ordinary course of business through to

the Effective Date and thus complete its contemplated reorganization and exit from these

Chapter 11 Cases.

34.     To prevent the unfettered use of the proceeds of the DIP Facility for

purposes other than those set forth above and in the DIP Order and DIP Agreement, the DIP

Obligors have agreed to use such proceeds in accordance with the budget attached as <u>Schedule 1</u>

to the DIP Order (the "<u>DIP Budget</u>"), developed by the DIP Obligors and their financial

advisors. The DIP Obligors believe that the DIP Budget is achievable and will allow the DIP

Obligors to operate without the accrual of unpaid administrative expenses.

**B.     Decision To Enter into DIP Facility**

35.     Before determining to enter into the DIP Facility, LightSquared

considered a number of factors. *First*, and most importantly, the successful negotiation of the

DIP Facility enabled the development of the Global Resolution and is thus the foundation of the

LightSquared Plan – a plan that has support from a substantial portion of LightSquared's

significant stakeholders. Additionally, closing of the DIP Facility will only occur upon, among

other things, Confirmation of the LightSquared Plan and, to the extent the LightSquared Plan is

not confirmed, LightSquared shall not incur the DIP Obligations described herein. *Second*,

proceeds from the DIP Facility will be used to pay or otherwise satisfy the Existing DIP

Obligations and all Prepetition Obligations that are Specified Prepetition Claims in full in cash,

thereby addressing the needs of key stakeholders as well as refinancing certain of such

obligations at a lower rate of interest. *Third*, the DIP Obligors are providing SPSO and

Harbinger with adequate protection in the form of liens and claims.  This agreement by the DIP

Lenders to the provision of such adequate protection measures – which adequate protection

LightSquared submits (and the DIP Lenders ultimately believe) is not required after confirmation

of a chapter 11 plan – was an important factor to the DIP Obligors' decision to enter into the DIP

Facility.  **Fourth**, the DIP Lenders have agreed to accept consideration that includes, among

other things, (a) interest payments paid in kind, (b) for those DIP Lenders providing the Tranche

A Loans, the ability to convert their loans into loans under the Second Lien Exit Facility and the

Reorganized LightSquared Inc. Loan as well as equity, and (c) for those DIP Lenders providing

the Tranche B DIP Loans, the ability to roll up certain of their Prepetition LP Obligations into

the DIP Facility, thereby staving off immediate repayment of such Prepetition LP Obligations.

Considering the DIP Obligors' current liquidity situation, the ability to obtain the DIP Facility by

implementing the foregoing cashless provisions was crucial to the DIP Obligors' decision to

enter into the DIP Facility.  **Fifth**, the DIP Obligors conducted arm's-length, good-faith

negotiations with the DIP Agent and the DIP Lenders, during which the DIP Agent and the DIP

Lenders agreed to various accommodations and favorable changes to the DIP Facility.  However,

LightSquared does not believe that it can obtain postpetition financing without priming liens and

the refinancing, roll-up, and conversion features discussed herein.  Thus, the DIP Obligors

ultimately decided that the proposal for the debtor in possession financing by the DIP Lenders

(including the various fees and charges required by the DIP Agent and the DIP Lenders) was the

most favorable under the circumstances and adequately addressed the DIP Obligors' reasonably

foreseeable liquidity needs, while maintaining the going concern value of their businesses.

25

36.     For the foregoing reasons, LightSquared respectfully submits that entry into the DIP Facility is in the best interests of LightSquared's estates, stakeholders, and other parties in interest.

**C.     Refinancing, Roll-Up, and Conversion into Exit Facilities**

37.     Upon the closing and funding of the DIP Facility, and subject to entry of the Final DIP Order and Confirmation of the LightSquared Plan, (a) certain proceeds shall be used in accordance with the LightSquared Plan to refinance in full the allowed outstanding amounts under the Existing DIP Facilities (the "Existing DIP Refinancing"), (b) certain proceeds constituting the Tranche A Loans under the DIP Facility will be used to repay in full in cash the Specified Prepetition Claims (the "Prepetition Debt Refinancing" and, together with the Existing DIP Refinancing, the "Refinancing"), and (c) certain proceeds constituting the Tranche B DIP Loans under the DIP Facility shall be provided in the form of loans deemed issued in exchange for a like amount of obligations outstanding under the Prepetition LP Credit Agreement (the "Roll-Up").  Additionally, if the Maturity Date occurs as a result of the occurrence of the Effective Date of the LightSquared Plan, the obligations in respect of the Tranche A Loans under the DIP Facility shall, in lieu of being immediately repaid as otherwise required under the DIP Agreement, convert into loans under the Second Lien Exit Facility and the Reorganized LightSquared Inc. Loan, as well as equity, all as set forth in the LightSquared Plan (the "Conversion").  Under the proposed Refinancing, Roll-Up, and Conversion, not only are all amounts outstanding under the Existing DIP Facilities and the Prepetition Credit Agreements that are Specified Prepetition Claims to be paid off with proceeds from the DIP Facility, this robust new source of liquidity for LightSquared continues to be preserved even following the Effective Date such that LightSquared is fully able to continue operating its businesses going forward.

38.      The Refinancing, Roll-Up, and Conversion are material conditions to approval of the DIP Facility and, indeed, were necessary to obtain the consensus that currently exists around the Global Restructuring and LightSquared Plan.  Without the Refinancing, Roll-Up, and Conversion, certain parties would not have supported the Global Restructuring nor would they have committed to providing the DIP Facility or the Exit Facilities (pursuant to the terms set forth in the LightSquared Plan).  Without such consent and support, LightSquared would have been in the untenable position of having to liquidate.

**D.      Use of Prepetition Collateral and Adequate Protection**

39.      Moreover, to successfully reorganize, LightSquared must also continue to use the Prepetition Collateral.  As noted above, the Cash Collateral Order currently provides consensual use of the Prepetition Inc. Collateral through March 31, 2014 and the Prepetition LP Cash Collateral through April 15, 2014.  In an effort to condense all financing matters into one governing order, LightSquared proposes that the DIP Order replace and/or supersede the Existing DIP Orders and Cash Collateral Order in their entirety.  Although LightSquared respectfully submits that it is not obligated under the Bankruptcy Code or applicable law to provide any adequate protection to the Prepetition Secured Parties for any diminution in the value of their interests in the Prepetition Collateral following Confirmation, it nevertheless seeks to continue to provide Harbinger and SPSO with such protection (collectively, the "Adequate Protection Obligations") pursuant to the following terms contained in the DIP Order.

(i)      Adequate Protection Liens

(a)      *Harbinger Adequate Protection Liens.*  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of Harbinger's interests in the Prepetition Inc. Collateral, the DIP Obligors propose to grant to Harbinger, effective and perfected as of the Petition Date and without the necessity of the execution by the DIP Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding,

27

enforceable, and perfected postpetition security interest in and liens on the Prepetition Inc. Collateral, the ("Harbinger Adequate Protection Liens" and, together with the SPSO Adequate Protection Liens, the "Adequate Protection Liens").  For avoidance of doubt, the Harbinger Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition LP Guarantors to the extent not Prepetition Inc. Collateral, or (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action.  The Harbinger Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the LightSquared Plan and Confirmation Order.

(b)   *SPSO Adequate Protection Liens*.  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of SPSO's interests in the Prepetition LP Collateral, the DIP Obligors propose to grant to SPSO, effective and perfected as of the Petition Date and without the necessity of the execution by the DIP Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition LP Collateral (the "SPSO Adequate Protection Liens").  For avoidance of doubt, the SPSO Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition Inc. Subsidiary Guarantors, (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action, or (iv) the SkyTerra-2 satellite while title remains with BSSI or those ground segment assets related to the SkyTerra-2 satellite while title remains with BSSI.[12]  The SPSO Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the LightSquared Plan and Confirmation Order.

(c)   *Priority of Adequate Protection Liens*.  The Harbinger Adequate Protection Liens shall be junior only to (i) the Carve-Out, (ii) the DIP Liens, and (iii) the Permitted Prior Liens.  The Harbinger Adequate Protection Liens shall otherwise be senior to all other security interests in, or liens on, any of the Prepetition Inc. Collateral.  The SPSO Adequate Protection Liens shall be junior only to (i) the Carve-Out, (ii) the DIP Liens, and (iii) the Permitted Prior Liens.  The SPSO Adequate Protection Liens shall otherwise be senior to all other security interests in, or liens on, any of the Prepetition LP Collateral.

---

[12]   For the avoidance of doubt, the Prepetition LP Collateral includes all General Intangibles (as defined in the Prepetition LP Credit Documents) to include, among other things, contract rights relating to that certain Amended and Restated Contract between LightSquared and BSSI, dated November 10, 2010 (as amended, modified, supplemented, or amended and restated through the date hereof).

(ii)    Adequate Protection Superpriority Claims.

(a)    *Harbinger Adequate Protection Superpriority Claim*.  As further adequate protection of the interests of Harbinger in the Prepetition Inc. Collateral against any Diminution in Value of such interests in the Prepetition Inc. Collateral, LightSquared proposes to grant Harbinger, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Harbinger Adequate Protection Superpriority Claim" and, together with the SPSO Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims") in each of the Inc. Obligors' Chapter 11 Cases and Successor Cases.  The Harbinger Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the LightSquared Plan and Confirmation Order.

(b)    *SPSO Adequate Protection Superpriority Claim*. As further adequate protection of the interests of SPSO in the Prepetition LP Collateral against any Diminution in Value of such interests in the Prepetition LP Collateral, LightSquared proposes to grant SPSO, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "SPSO Adequate Protection Superpriority Claim") in each of the LP Obligors' Chapter 11 Cases and Successor Cases.  The SPSO Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the LightSquared Plan and Confirmation Order.

(c)    *Priority of Adequate Protection Superpriority Claims.*

(1)    The Harbinger Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the Harbinger Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Inc. Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the Harbinger Adequate Protection Superpriority Claim shall be *pari passu* with the SPSO Adequate Protection Superpriority Claim against LightSquared Inc.

(2) The SPSO Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out. For the avoidance of doubt, except as set forth herein, the SPSO Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the LP Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the SPSO Adequate Protection Superpriority Claim against LightSquared Inc. shall be *pari passu* with the Harbinger Adequate Protection Superpriority Claim against LightSquared Inc.

## Relief Requested

40.      By this Motion, LightSquared, at the direction of the Special Committee, respectfully requests that the Court enter the DIP Order granting the relief requested herein on a final basis.

## Basis for Relief

**A.    LightSquared Should Be Authorized To Obtain Postpetition Financing Under Section 364 of Bankruptcy Code**

41.      Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority, or secured solely by junior liens on the debtor's assets.  See 11 U.S.C. § 364(c);[13] see also In re Barbara K. Enters. Inc., No. 08-11474 (MG),

---

[13]      Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt - (1) with priority over any or all administrative expenses of the

2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (in order for debtor to obtain

postpetition secured credit under section 364, debtor must prove it was unable to reasonably

obtain secure credit elsewhere).

42.    Courts in this jurisdiction and others have fashioned guidelines in

applying these statutory requirements.  Generally, courts advocate using a "holistic approach" to

evaluate superpriority postpetition financing agreements, which focuses on the transaction as a

whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not
> available elsewhere, which could suggest the unsoundness of the
> basis for use of the funds generated by credit, but also because the
> credit acquired is of significant benefit to the debtor's estate and
> . . . the terms of the proposed loan are within the bounds of reason,
> irrespective [of] the inability of the debtor to obtain comparable
> credit elsewhere.

In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); see also In re YL W. 87th

Holdings I LLC, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

43.    More specifically, in evaluating a debtor's proposed postpetition

financing, courts consider whether the postpetition financing:  (a) is necessary to preserve the

assets of the estate and is necessary, essential, and appropriate for continued operation of the

debtor's business, (b) is in the best interests of the debtor's creditors and estates, (c) is an

exercise of the debtor's sound and reasonable business judgment, (d) was negotiated in good

faith and at arm's length between the debtor, on the one hand, and the agents and the lenders, on

the other, and (e) contains terms that are fair, reasonable, and adequate given the circumstances

of the debtor and the proposed postpetition lender.  See In re Farmland Indus., Inc., 294 B.R.

---

kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate
that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject
to a lien.

11 U.S.C. § 364(c).

855, 881 (Bankr. W.D. Mo. 2003) (cited in Transcript of Record at 733:3-7, In re Lyondell

Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) [Docket No. 3740]; see

also In re Barbara K. Enters., Inc., 2008 WL 2439649, at *10; In re Ames Dep't Stores, Inc., 115

B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  For the reasons set forth below, LightSquared submits that

entry into the DIP Facility satisfies each of these factors.

> (i)    DIP Facility Was Negotiated in Good Faith, Is in Best Interests of
> LightSquared's Estates, Is Necessary To Preserve Assets, and Is Exercise
> of Sound and Reasonable Business Judgment

44.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re

Barbara K. Enters., Inc., 2008 WL 2439649, at *14 (explaining that courts defer to debtor's

business judgment); In re Ames Dep't Stores, Inc., 115 B.R. at 38 (noting that financing

decisions under section 364 of Bankruptcy Code must reflect debtor's business judgment).

Courts grant a debtor considerable deference in acting in accordance with its sound business

judgment.  See, e.g., In re Barbara K. Enters., Inc., 2008 WL 2439649, at *14 (explaining that

courts defer to debtor's business judgment "so long as a request for financing does not 'leverage

the bankruptcy process' and unfairly cede control of the reorganization to one party in

interest"); TWA, Inc. v. Travellers Int'l AG (In re TWA, Inc.), 163 B.R. 964, 974 (Bankr. D.

Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed]

sound and prudent business judgment"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D.

Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the

debtor's power.")  (citations omitted).

45.    Specifically, to determine whether the business judgment standard is met,

a court is "required to examine whether a reasonable business person would make a similar

decision under similar circumstances."  In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007

Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (internal citations omitted); In re

Brooklyn Hosp. Ctr. & Caledonian Health Ctr., Inc., 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006)

(business judgment rule "'is a presumption that in making a business decision, the directors of a

corporation acted on an informed basis, in good faith, and in the honest belief that the action

taken was in the best interests of the company'") (quoting Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y.

1992)).

        46.      Furthermore, in determining whether LightSquared has exercised sound

business judgment in deciding to enter into the DIP Documents, the Court should consider the

economic terms of the DIP Facility in light of current market conditions.  See, e.g., Transcript of

Record, 734:23 -735:4, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5,

2009)[14] (recognizing "the terms that are now available for DIP financing in the current economic

environment aren't as desirable" as in past).  Moreover, it is appropriate for the Court to consider

non-economic benefits to the debtors offered by a proposed postpetition financing facility.  For

example, in In re ION Media Networks, Inc., the Bankruptcy Court for the Southern District of

New York held that:

> Although all parties . . . are naturally motivated to obtain financing
> on the best possible terms, the business decision to obtain credit
> from a particular lender is almost never based purely on economic
> terms.  Relevant features of the financing must be evaluated,
> including non-economic factors. . . .  This is particularly true in a
> bankruptcy setting where cooperation and established alliances
> with creditor groups can be a vital part of building support for a
> restructuring that ultimately may lead to a confirmable
> reorganization plan.  That which helps to foster consensus may be
> preferable to a notionally better transaction that carries the risk of
> promoting unwanted conflict.

---

[14]    Because of the voluminous nature of the orders and transcripts cited, they are not attached to the DIP
Motion.  Copies of all orders and transcripts cited herein are available on request of LightSquared's
counsel.

Case No. 09-13125 (JMP) (Bankr. S.D.N.Y. July 6, 2009) [Docket No. 143].

47.    The DIP Obligors, at the direction of the Special Committee and with the assistance of their advisors, have determined in their sound business judgment that the DIP Facility is the most favorable financing option under the circumstances.  In the context of the Global Restructuring under the LightSquared Plan, the DIP Obligors were unable to obtain postpetition financing on an unsecured basis or on a secured basis junior to, or *pari passu* with, that of the Prepetition Secured Parties in an amount, nature, and within the timeframe that the DIP Obligors' liquidity situation mandated.  As noted above, the circumstances of these Chapter 11 Cases required that the DIP Obligors obtain additional financing and use of Prepetition Collateral to ensure, among other things, that they have sufficient funds to implement the Refinancing and sufficient working capital and liquidity to operate and maintain the going concern value of their estates from the Confirmation Date to the Effective Date.  Indeed, the DIP Obligors will not have sufficient available resources of working capital and financing to operate their business or maintain their properties in the ordinary course of business, will suffer irreparable harm, and their reorganization efforts will be jeopardized without the financing provided for in the DIP Agreement.  The credit provided under the DIP Facility will enable the DIP Obligors – should the LightSquared Plan be pursued as the path forward – to execute the Global Restructuring and continue to operate in the ordinary course to preserve and enhance the value of their estates for the benefit of all parties in interest.

48.    Furthermore, the DIP Obligors negotiated the DIP Agreement at arm's length and in good faith and have negotiated the best terms available for the financing they need to effectuate the Refinancing and maintain sufficient liquidity to preserve their assets over the

course of these Chapter 11 Cases.  The DIP Obligors were unable to obtain financing on more favorable terms.

49.     Thus, LightSquared submits that the DIP Facility (a) was negotiated in good faith, (b) is in the best interests of all of LightSquared's estates and stakeholders, (c) preserves valuable assets, and (d) reflects the exercise of their sound business judgment.

   *(ii) Terms of DIP Facility Are Fair, Reasonable, and Appropriate in Light of LightSquared's Needs and Current Market Environment*

50.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  See In re Farmland, 294 B.R. at 886; see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing debtor may have to enter into hard bargains to acquire funds for reorganization).

   *(a) Economic Terms Are Fair and Appropriate*

51.     The DIP Obligors believe that the terms that they have negotiated in the DIP Facility are fair and appropriate.  **First and foremost**, interest accruing under the DIP Facility is not paid in cash (meaning the DIP Obligors are able to continue to conserve liquidity during the Chapter 11 Cases).  Additionally such rate of interest is lower than the rates at which certain of LightSquared's current debt obligations are accruing, thereby allowing LightSquared to further preserve the value of its assets.  **Second**, there are no upfront fees associated with the funding of the DIP Facility.  **Third**, the amount to be lent is appropriately tailored to the DIP Obligors' needs – just enough to cover the DIP Obligors' basic cash requirements to the end of the Chapter 11 Cases and a value-maximizing restructuring process; thus, not incurring

unnecessary expenses and costs. Therefore, in light of the foregoing, the DIP Obligors believe

that the best liquidity available at this time is that afforded by the DIP Facility.

(b)    <em>Scope of Carve-Out Is Appropriate</em>

52.    The proposed DIP Facility subjects the security interests and

administrative expense claims of the DIP Lenders to the applicable Carve-Out. Such carve-outs

for, among other things, fees of the Office of the United States Trustee and professional fees

have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory

committee can retain assistance from counsel. See In re Barbara K. Enters., Inc., 2008

WL 2439649, at *8 (citing In re Ames Dep't Stores, Inc., 115 B.R. at 37). The DIP Facilities do

not directly or indirectly deprive the applicable LightSquared estates or other parties in interest

of possible rights and powers by restricting the services for which professionals may be paid in

these Chapter 11 Cases. See In re Ames Dep't Stores, Inc., 115 B.R. at 38 (observing that courts

insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

Additionally, the Carve-Out protects against administrative insolvency during the course of the

applicable Chapter 11 Cases by ensuring that adequate assets remain for the payment of

U.S. Trustee fees, chapter 7 trustee fees, and professional fees notwithstanding the grant of

superpriority and administrative liens and claims under the applicable DIP Facility.

(c)    <em>Payment of Applicable Fees to DIP Lenders Is Appropriate</em>

53.    The various fees and charges to be paid to the DIP Lenders pursuant to

the applicable DIP Facility, as described in the overview of the proposed DIP Facility and

provided in the DIP Documents, are reasonable and appropriate under the circumstances. Courts

routinely authorize similar lender incentives beyond the explicit liens and rights specified in

section 364 of the Bankruptcy Code. See Resolution Trust Co. v. Official Unsecured Creditors

36

Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of Bankruptcy Code that included lender "enhancement fee").

54.      More specifically, the DIP Obligors believe that interest paid-in-kind and no upfront cash fees are appropriate and allow the DIP Obligors to conserve cash during the Chapter 11 Cases.

*(d)      DIP Liens Are Appropriate*

55.      A priming lien can be granted in one of two ways – first, with the consent of the secured creditor who is being primed or second, if the debtors are able to show that the requirements of section 364(d) of the Bankruptcy Code have been satisfied.

56.      Under the DIP Agreement, the DIP Agent, on behalf of the DIP Lenders, is being granted a priming lien on, and security interest in, the DIP Collateral – which includes the Prepetition Collateral.  To be clear, while the DIP Liens on the DIP Collateral will prime, and be senior in all respects to, the security interests in, and liens on, the Prepetition Collateral, they will be junior to the Carve-Out.

57.      Because all holders of Specified Prepetition Claims shall be paid in full with proceeds from the DIP Facility pursuant to the LightSquared Plan, the only parties affected by the DIP Liens are the Prepetition Lenders that do not hold Specified Prepetition Claims (i.e., Harbinger and SPSO).  Harbinger has consented to the terms of the DIP Facility.  The Prepetition LP Obligations held by SPSO will be satisfied in full under the LightSquared Plan and, in any event, will be adequately protected by the incurrence of the Adequate Protection Obligations described above for purposes of section 364(d).

58.    Accordingly, LightSquared submits that no showing under section 364(d) of the Bankruptcy Code is required and requests that the Court approve the grant of the DIP Liens.

(e)    *Proposed Refinancing, Roll-Up, and Post-Effective Date Conversion Are Appropriate*

59.    The terms of the proposed Refinancing and Conversion are being disclosed in this Motion pursuant to Local Rule 4001-2(a)(7).  As conditions to providing the DIP Obligors with the funding they need to operate their businesses, the DIP Lenders required LightSquared to refinance in full its Existing DIP Obligations, partially refinance its Prepetition Obligations – which obligations will now accrue interest at a lower rate than was previously applied, and roll up certain of the Prepetition LP Obligations into the DIP Obligations.  Certain of the DIP Lenders also required that, upon the Effective Date of the LightSquared Plan and pursuant to such plan, a portion of the DIP Obligations be converted into the Second Lien Exit Facility, the Reorganized LightSquared Inc. Loan, and equity.  Taking into account the nature of the Refinancing, Roll-Up, and Conversion and their implications for creditors, LightSquared carefully considered the terms proposed in connection therewith and determined, in its sound business judgment, that the proposed Refinancing, Roll-Up, and Conversion are reasonable, fair, and entirely appropriate given the circumstances in these Chapter 11 Cases.  As discussed above, the Refinancing, Roll-Up, and Conversion were material components of the negotiation process and were critical elements necessary to not only obtain the DIP Facility, but to also induce consensus around the Global Restructuring and LightSquared Plan.

60.    Moreover, refinancings of prepetition and postpetition debt, roll-ups of prepetition debt into postpetition debt, and conversions of postpetition debt into exit financing are commonly approved by Courts in this District.  See, e.g., In re RDA Holding Co., Case No.

13-22233 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2013) [Docket No. 163] (approving "roll-up

facility" made up of refinancing term loan and letter of credit facility and which contemplated,

among other things, that certain of such loans would be continued as, or converted into, exit

financing of reorganized debtors); In re Patriot Coal Corp., Case No. 12-12900 (SCC) (Bankr.

S.D.N.Y. Aug. 3, 2012) [Docket No. 275] (approving roll-up of lenders holding outstanding but

undrawn letters of credit); In re Blockbuster Inc., Case No. 10-14997 (BRL) (Bankr. S.D.N.Y.

Oct. 27, 2010) [Docket No. 432] (approving roll-up of senior secured notes); In re Uno

Restaurant Holdings Corp., Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010)

(approving debtors' motion to roll up new lenders and prepetition lenders who provided

additional funds); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 7,

2007) [Docket No. 3913] (authorizing replacement DIP financing); In re Delphi Corp., Case No.

05-44482 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2007) [Docket Nos. 6461, 6589] (authorizing

replacement DIP financing and entry into equity purchase and commitment agreement and plan

framework support agreement in connection with refinancing of postpetition secured debt).

Consistent with the foregoing authority, LightSquared respectfully submits that the Court

approve LightSquared's decision to accept and enter into the DIP Facility, which includes the

proposed Refinancing and Conversion.

**B.      DIP Facility Was Negotiated in Good Faith and Should Be Afforded Protection of
          Section 364(e) of Bankruptcy Code**

61.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's

right to collect on loans extended to a debtor and its right in any lien securing those loans, even if

the authority of the debtor to obtain such loans or grant such liens is later reversed or modified

on appeal.  Specifically, section 364(e) of the Bankruptcy Code provides that any "reversal or

modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a

lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred

or priority or lien granted as long as the entity that extended credit "extended such credit in good

faith."  11 U.S.C. § 364(e).

62.    Courts generally hold that "good faith" in the context of postpetition

financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct

or transaction concerned.  See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In

re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

Additionally, good faith is measured with respect to the good faith of the lender as contrasted to

that of the borrower.  Transcript of Record at 736:24-25, In re Lyondell Chem. Co., Case No. 09-

10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to

make money on interest and fees, and to protect prepetition positions are understandable and

acceptable motivations for a postpetition lender in negotiating a deal.  Id. at 737:10-14.

63.    As explained in detail above, the terms of the DIP Facility were

negotiated in good faith and at arm's length between the DIP Obligors, the DIP Agent, and the

DIP Lenders with respect to the DIP Facility.  All of the DIP Obligations will be extended by the

DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No

consideration is being provided to any party to, or guarantor of, obligations arising under the DIP

Facility, other than as set forth herein.  Moreover, the DIP Facility has been extended in express

reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP

Agent and the DIP Lenders should be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that the Order or any provision thereof is vacated, reversed, or

modified on appeal or otherwise.

**C.     DIP Order Should Replace and/or Supersede Existing DIP Orders and Cash Collateral Order, as Applicable**

64.     The DIP Facility will refinance and replace the Existing DIP Facilities in their entirety.  Additionally, the DIP Obligors require use of the Prepetition Collateral to be able to successfully reorganize.  As noted above, the Cash Collateral Order currently provides for the consensual use of the Prepetition Inc. Collateral through March 31, 2014 and the Prepetition LP Cash Collateral through April 15, 2014.  Thus, the DIP Obligors propose that all financing matters for the DIP Obligors be condensed into one governing order, and that the DIP Order replace and/or supersede the Existing DIP Orders and Cash Collateral Order in their entirety and provide, among other things, the adequate protection as described herein and as set forth in the DIP Order.  It is intended that the DIP Facility shall serve to refinance the Existing DIP Obligations in their entirety and that the terms of the DIP Order supersede the terms of the Cash Collateral Order with respect to the Prepetition LP Lenders and the Inc. DIP Order with respect to the Prepetition Inc. Lenders.  The parties therefore notably tried to mirror many of the provisions in the DIP Order to those contained in the Existing DIP Orders and Cash Collateral Order, where appropriate.

65.     Based upon the foregoing, LightSquared respectfully requests that the DIP Order replace and supersede the Existing DIP Orders and Cash Collateral Order in all respects and as applicable.

**D.     No Authorization of Adequate Protection Is Required**

66.     A debtor may borrow money under section 364(d)(1)(B) and (2) of the Bankruptcy Code if the debtor meets its burden of establishing that the holder of the lien to be primed is adequately protected.  11 U.S.C. § 364(d)(1)(B) and (2).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . .

or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code, which governs adequate protection, makes clear that adequate protection guards against "a decrease in the value of . . . [a lienholders'] interest in" its collateral.  11 U.S.C. § 361.

67.     However, creditors are only entitled to the type of adequate protection outlined under section 361 of the Bankruptcy Code if it is sought and approved *prior* to confirmation of a debtor's chapter 11 plan.  Courts, including those in the Second Circuit, have recognized that "[a]dequate protection is generally defined as a method by which a secured creditor may apply to the Bankruptcy Court to protect 'its interests against the diminution in value of [its] security *during* a bankruptcy proceeding.'"  <u>Contrarian Funds LLC v. Aretex LLC</u> <u>(In re Westpoint Stevens, Inc.)</u>, 600 F.3d 231, 257 (2d Cir. 2010) (internal quotations and citations omitted) (emphasis added).  However, once a chapter 11 plan has been confirmed, creditors are no longer entitled to adequate protection because the "the provisions of a confirmed plan bind the debtor, . . . any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor . . ."  <u>See</u> 11 U.S.C. § 1141(a); <u>see also</u> <u>In re</u> <u>Gross</u>, Case No. 84-794-W, 1988 Bankr. LEXIS 2766, at *9 (Bankr. S.D. Iowa May 27, 1988) (". . . section 363 does not apply after a Chapter 11 plan is confirmed. . . .  Therefore, since the adequate protection requirements of section 363(e) are no longer applicable, and since Debtor's confirmed plan does not provide for post-confirmation adequate protection, [creditor] is not entitled to any post-confirmation adequate protection."); <u>In re Stanley</u>, 185 B.R. 417, 424 (Bankr. D. Conn. 1995) ("[a]dequate protection payments are designed to compensate a secured creditor for any decline in the value of its collateral post-petition and pre-confirmation").

68.     The DIP Obligors propose to incur the Adequate Protection Obligations even though they are not obligated under applicable law to continue providing adequate protection to any party after Confirmation.  Under the DIP Order and as contemplated under the LightSquared Plan, Harbinger and SPSO will be furnished with the (a) Harbinger Adequate Protection Liens and Harbinger Adequate Protection Superpriority Claim and (b) SPSO Adequate Protection Liens and SPSO Adequate Protection Superpriority Claim, respectively. Accordingly, the DIP Obligors respectfully request that the Court enter the DIP Order, which grants certain protections on account of such Prepetition Secured Parties' interests in the Prepetition Collateral.

69.     Based upon the foregoing, LightSquared respectfully requests that the Court reaffirm its grant to Prepetition Secured Parties of adequate protection in accordance with the terms set forth herein and in the applicable DIP Order.

**E.     Modification of Automatic Stay Provided Under Section 362 of Bankruptcy Code Is Appropriate Under Circumstances**

70.     The DIP Order contemplates modification of the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent applicable and necessary to effectuate all of the terms and provisions of the DIP Order.  Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in LightSquared's business judgment, are reasonable under the present circumstances.  See, e.g., In re Innkeepers USA Trust, Case No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 2, 2010) [Docket No. 400]; In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 1115]; In re Gen. Growth Props. Inc., Case No. 09-1197 (ALG) (Bankr. S.D.N.Y. May 14, 2009) [Docket No. 527]; In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009)

[Docket No. 281].  Accordingly, LightSquared respectfully requests that the Court authorize the modification of the automatic stay, as set forth in the DIP Order.

## Notice

71.        Notice of this Motion will be provided by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to (a) the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (c) counsel to the Special Committee, (d) counsel to the Prepetition Agents, (e) counsel to the Existing DIP Agents and Existing DIP Lenders,[15] (f) counsel to the DIP Agent; (g) counsel to the DIP Lenders, (h) counsel to the Ad Hoc Secured Group, (i) counsel to Harbinger, (j) counsel to SPSO, (k) the Internal Revenue Service, (l) the United States Attorney for the Southern District of New York, (m) the Federal Communications Commission, (n) Industry Canada, and (o) all parties who have filed a notice of appearance in the Chapter 11 Cases.  LightSquared respectfully submits that no other or further notice is required or necessary.

## Motion Practice

72.        This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.  Accordingly, LightSquared submits that this Motion satisfies Local Rule 9013-1(a).

## No Previous Request

73.        Other than as provided in the (a) *Motion for Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To*

---

[15]        For the avoidance of doubt, LightSquared views White & Case LLP, Stroock & Stroock & Lavan LLP, and Willkie Farr & Gallagher LLP as the only counsel for the LP DIP Lenders.

*Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative*

*Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, and*

*(E)  Scheduling a Final Hearing* [Docket No. 147] and the related notices amending the Inc. DIP

Agreement and notices of presentment of order amending the Inc. DIP Order [Docket Nos. 446,

518, 574, 1091, and 1256], (b) *Motion of Debtors for Interim and Final Orders (A) Authorizing*

*Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured*

*Parties, (C) Modifying Automatic Stay and (D) Scheduling Interim and Final Hearings* [Docket

No. 13], and the related notices amending the Cash Collateral Order and notices of presentment

of order amending the Cash Collateral Order [Docket Nos. 136, 528], (c) *LightSquared's Motion*

*for Entry of Order Extending Use of Prepetition LP Lenders' Cash Collateral* [Docket No.

1071], (d) *LightSquared's Motion for Order (A) Authorizing LightSquared To Obtain*

*Postpetition Financing in Connection with Confirmation of Chapter 11 Plans Pending*

*Consummation, (B) Authorizing Use of Cash Collateral, (C) Granting Superpriority Liens and*

*Providing Administrative Expense Status, (D) Granting Adequate Protection, and (E) Modifying*

*Automatic Stay* [Docket No. 1169] , and (e) *LightSquared's Motion for Order (A) Authorizing LP*

*DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing,*

*(B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status,*

*(C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1237] no

prior motion for the relief requested herein has been made by LightSquared to this or any other

court.

WHEREFORE, for the reasons set forth above, LightSquared respectfully

requests that the Court (a) enter the DIP Order granting the relief requested herein and (b) grant

such other and further relief as the Court may deem just and proper.

New York, New York                */s/* Matthew S. Barr
Dated:  February 14, 2014        Matthew S. Barr
                                       Alan J. Stone
                                       Karen Gartenberg
                                       MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
                                       1 Chase Manhattan Plaza
                                       New York, NY  10005-1413
                                       (212) 530-5000

                                       *Counsel to Debtors and Debtors in Possession*

## Exhibit A

**Proposed DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
|  | ) |
| Debtors.[1] | ) Jointly Administered |
|  | ) |

_____

**FINAL ORDER, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507,
(A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF
CASH COLLATERAL, IF ANY, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION,
AND (E) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion") of LightSquared Inc. and certain of its affiliates, as debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter

11 Cases"), seeking entry of a final order (this "Final Order") under sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United

States Bankruptcy Court for the Southern District of New York (the "Local Rules"), *inter alia*:

(i)      authorizing LightSquared Inc., LightSquared LP, and One Dot Six Corp.

("One Dot Six" and, collectively with LightSquared Inc. and LightSquared LP, the "DIP Borrowers") to

obtain secured, superpriority postpetition financing in the aggregate amount of $1,650,000,000 (the "DIP

Facility") on a joint and several basis, pursuant to the terms and conditions of that certain Senior Secured

Super-Priority Debtor-in-Possession Loan Agreement, substantially in the form attached as Exhibit B to

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

the Motion (as may be further amended, supplemented, restated, or otherwise modified from time to time,

the "DIP Agreement"), by and among the DIP Borrowers and the other DIP Obligors (as defined herein),

[_____] (or such other institution reasonably acceptable to the parties to the DIP Agreement as

may have agreed to serve in such capacity), as Administrative Agent and Collateral Agent (in such

capacity, together with its successors in such capacity, the "DIP Agent"), for and on behalf of itself and

the other lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the

"DIP Secured Parties"), which DIP Facility shall be made up of (a) $1,350,000,000 original aggregate

principal amount of new money loans (the "Tranche A DIP Loans") and (b) $300,000,000 original

aggregate principal amount (the "Tranche B DIP Loans"), which may consist of new money loans and/or

of loans deemed made to the DIP Borrowers in exchange for a like amount of obligations outstanding

under the Prepetition LP Credit Facility (as defined below);

(ii)    authorizing (a) LightSquared Corp., SkyTerra Holdings (Canada) Inc.,

and SkyTerra (Canada) Inc. (together, the "Canadian Guarantors") and each of the direct and indirect

domestic subsidiaries of LightSquared Inc. (other than a DIP Borrower) that are debtors and debtors in

possession in the Chapter 11 Cases (together with the Canadian Guarantors, the "DIP Guarantors") to

unconditionally guarantee, jointly and severally, all obligations of the DIP Borrowers under the DIP

Facility pursuant to the terms and conditions of the DIP Agreement and (b) each of the DIP Borrowers to

unconditionally guarantee, jointly and severally, all obligations of the other DIP Borrowers under the DIP

Facility pursuant to the terms and conditions of the DIP Agreement;

(iii)    authorizing the DIP Borrowers and DIP Guarantors (collectively, the

"DIP Obligors") to execute and deliver, and perform under, the DIP Agreement and other related loan

documents (collectively with all documents comprising the DIP Facility, the DIP Budget (as defined

herein), and all other related loan and security documents, the "DIP Documents") and to perform such

other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)    granting to the DIP Secured Parties allowed superpriority administrative

expense claims in each of the DIP Obligors' Chapter 11 Cases and any of the DIP Obligors' Successor

Cases (as defined herein) for the DIP Facility and all obligations owing thereunder and under the DIP

Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP

Obligations"), subject to the limitations and priorities set forth herein;

      (v)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders,

automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein),

including, without limitation, all property constituting "cash collateral" (as defined in Bankruptcy Code

section 363(a), "Cash Collateral"), if any, which liens shall be subject to the priorities set forth herein;

      (vi)    authorizing and directing the DIP Obligors to pay the principal, interest,

fees, expenses, and other amounts and compensation payable under each of the DIP Documents as they

become due, including, without limitation, administrative agent's fees, and such professional fees as may

be agreed among the DIP Lenders, all to the extent provided by, and in accordance with, the terms of this

Final Order and the DIP Documents;

      (vii)    providing adequate protection to (a) SP Special Opportunities, LLC

("SPSO") for any diminution in value of its interests in the Prepetition LP Collateral (as defined herein)[2],

and (b) the affiliates of Harbinger Capital Partners, LLC (collectively, "Harbinger")[3] for any diminution

in value of its interests in the Prepetition Inc. Collateral (as defined herein); and

      (viii)    vacating and modifying the automatic stay imposed by Bankruptcy Code

section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP

Documents and this Final Order.

    The Court having considered the Motion, the exhibits and schedules attached thereto, and the

evidence submitted or proffered and the arguments of counsel made at the hearing on the Motion held in

connection with the confirmation hearing commencing on March [___], 2014 (the "Hearing"); and

---

[2]    The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien. Should an order be entered finding that SPSO does not have a valid lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

[3]    [This draft will be revised in all applicable places to reflect that the adequate protection liens are granted to the Prepetition Agents on behalf of Harbinger and SPSO.]

adequate notice of the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014; and the Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Final Order approving the Motion and the DIP Documents having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, and their stakeholders, and is essential for the continued operation of the Debtors' businesses; and adequate protection being provided on account of the interests in and liens on property of the estates on which liens are granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      *Petition Date.* On May 14, 2012 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Court").

B.      *Debtors in Possession*.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the Chapter 11 Cases and property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      *Committee Formation*.  As of the date hereof, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed a statutory committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.      *Existing Cash Collateral Order.*  By the *Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 544] (as amended by the *Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 1118] and the *Second Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 1292], the "Existing Cash Collateral Order"), the Court authorized the use of cash and other collateral subject to the liens and claims of certain Prepetition Secured Parties (as defined herein) and provided adequate protection to those parties.

F.      *Inc. DIP Facility*.  By the *Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 224] (as amended by the *Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 579] ("First Order Amending Inc. DIP Order"), *Second Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 1126], and *Third Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 1286], the "Inc. DIP Order"), the Court authorized the parties thereto to enter into that certain Senior Secured Super-Priority Debtor in Possession Credit Agreement, dated as of July 19, 2012, as amended and in effect on the date hereof, among One Dot

Six, the guarantors party thereto, the lenders party thereto (the "Inc. DIP Lenders"), and U.S. Bank

National Association, as administrative and collateral agent (together with all related documents, the "Inc.

DIP Facility").

G.      *LP DIP Facility*.    By the *Final Order (A) Authorizing LP DIP Obligors To Obtain*

*Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and*

*Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D)*

*Modifying Automatic Stay* [Docket No. 1291] (the "LP DIP Order"), the Court authorized the parties

thereto to perform under the terms of the LP DIP Facility (as defined in the LP DIP Order) (together with

the Inc. DIP Facility, the "Existing DIP Facilities").

H.      *Debtors' Stipulations*. The Debtors (on behalf of and for themselves and their estates)

admit, stipulate, acknowledge, and agree that (collectively, paragraphs H(i) through H(viii) below are

referred to herein as the "Debtors' Stipulations"):

(i)      *Prepetition Inc. Credit Facility*.    Pursuant to that certain Credit

Agreement, dated as of July 1, 2011 (as amended, supplemented, and restated, or otherwise modified

from time to time, the "Prepetition Inc. Credit Agreement" and, together with all related credit and

security documents, the "Prepetition Inc. Credit Documents"), between LightSquared Inc., as borrower,

the subsidiary guarantors party thereto, namely One Dot Four Corp., One Dot Six Corp., and One Dot Six

TVCC Corp. (collectively, the "Prepetition Inc. Subsidiary Guarantors" and, with LightSquared Inc., the

"Inc. Obligors"), the lenders party thereto (collectively, the "Prepetition Inc. Lenders"), and U.S. Bank

National Association, as successor administrative agent to UBS AG, Stamford Branch (in such capacity,

the "Prepetition Inc. Agent" and, together with the Prepetition Inc. Lenders, the "Prepetition Inc. Secured

Parties"), the Prepetition Inc. Lenders provided term loans to or for the benefit of LightSquared Inc. (the

"Prepetition Inc. Credit Facility").

(ii)      *Prepetition Inc. Obligations*.    The Prepetition Inc. Credit Facility

provided LightSquared Inc. with term loans in the aggregate principal amount of $263,750,000.  As of the

-6-

Petition Date, an aggregate principal amount of approximately $322,203,486.02 was outstanding under the Prepetition Inc. Credit Documents (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition Inc. Credit Documents (including unpaid principal, accrued and unpaid interest, including default interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Inc. Obligors' obligations pursuant to the Prepetition Inc. Credit Documents, including all "Obligations" as described in the Prepetition Inc. Credit Agreement, the "Prepetition Inc. Obligations").  Interest on the Prepetition Inc. Obligations shall be deemed to have accrued from the Petition Date to July 12, 2012 at the default rate of 17% and, from and after July 13, 2012, at the default rate of 20%.  On or about March 13, 2013, approximately $8,429,469.57 of interest owing only to each Prepetition Inc. Lender that is also an Inc. DIP Lender and accruing on the Prepetition Inc. Obligations at the default rate set forth in paragraph 16(b) of the Inc. DIP Order, from and after the Petition Date and entry of the First Order Amending Inc. DIP Order, was added and became DIP Obligations under the Inc. DIP Facility, subject to the Ad Hoc Secured Group's Challenge (as defined in the Inc. DIP Order) to the Prepetition Inc. Obligations in accordance with the Inc. DIP Order.

(iii)    *Prepetition Inc. Collateral.*  To secure the Prepetition Inc. Obligations, the Inc. Obligors granted to the Prepetition Inc. Agent, for the benefit of itself and the Prepetition Inc. Lenders, first priority security interests in and liens (the "Prepetition Inc. Liens") on (a) the One Dot Six Lease (as defined in the Prepetition Inc. Credit Documents), (b) the One Dot Four Lease (as defined in the Prepetition Inc. Credit Documents),[4] (c) the capital stock of each Prepetition Inc. Subsidiary Guarantor, and (d) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any Debtor with respect to any of the foregoing,

---

[4]    Although the One Dot Four Lease was terminated, the Prepetition Inc. Agent retained a first priority security interest in any rights and benefits that may have accrued thereunder.

whether obtained prepetition or postpetition (collectively, the "Prepetition Inc. Collateral").    The Prepetition Inc. Collateral does not include cash other than proceeds of the Prepetition Inc. Collateral.

(iv)    *Validity, Perfection, and Priority of Prepetition Inc. Liens and Prepetition Inc. Obligations.*  (a) As of the Petition Date, the Prepetition Inc. Liens on the Prepetition Inc. Collateral were valid, binding, enforceable, non-avoidable, and properly perfected, subject only to certain liens otherwise permitted by the Prepetition Inc. Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Inc. Liens as of the Petition Date, the "Permitted Prior Liens"),[5] (b) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Inc. Liens or the Prepetition Inc. Obligations exist, and no portion of the Prepetition Inc. Liens or Prepetition Inc. Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (except as provided in the subordination agreement among the Prepetition Inc. Lenders) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Inc. Agent, the Prepetition Inc. Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees in respect of the Prepetition Inc. Obligations or Prepetition Inc. Liens, (d) as of the Petition Date, the value of the Prepetition Inc. Collateral securing the Prepetition Inc. Obligations exceeded the amount of those obligations, and accordingly the Prepetition Inc. Obligations are allowed secured claims within the meaning of Bankruptcy Code section 506, in a principal amount of not less than $322,203,486.02, together with accrued and unpaid interest, fees (including, without limitation, attorneys' fees and related expenses), and any and all

---

[5]    The Permitted Prior Liens are liens otherwise permitted by the Prepetition Credit Documents (as defined herein), to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date.  Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected, and non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest to challenge the validity, priority, perfection, or extent of any such Permitted Prior Liens and/or security interest.

other charges of whatever nature owing in respect of such Prepetition Inc. Obligations, and (e) any payments made on account of the Prepetition Inc. Obligations to or for the benefit of the Prepetition Inc. Agent or the Prepetition Inc. Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Inc. Agent and the Prepetition Inc. Lenders were oversecured, were payments out of the Prepetition Inc. Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(v)    *Challenge by Certain Prepetition LP Lenders to Prepetition Inc. Liens*. On September 15, 2012, the Ad Hoc Secured Group of Prepetition LP Lenders (the "Ad Hoc Secured Group") filed the *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323] (the "STN Motion").  The STN Motion sought derivative standing for the Ad Hoc Secured Group to bring an adversary proceeding on behalf of LightSquared Inc., One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. against certain Prepetition Inc. Lenders, Harbinger Capital Partners SP Inc., Blue Line DZM Corp., Mast AK Fund LP, Mast Credit Opportunities I Master Fund Limited, Mast OC I Master Fund, Mast PC Fund LP, Mast Select Opportunities Master Fund, Seawall Credit Value Master Fund, Ltd., Seawall OC Fund, Ltd., and the Prepetition Inc. Agent. No party other than the Ad Hoc Secured Group commenced a challenge to the Prepetition Inc. Liens or Prepetition Inc. Obligations within the Challenge Period (as defined in the Inc. DIP Order).  Pursuant to Article VIII.C of the Plan, entry of the Confirmation Order (as defined herein) shall operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the STN Motion, and the STN Motion shall be deemed withdrawn upon the occurrence of the Closing Date (as defined in the DIP Agreement).  As a result, the Inc. DIP Order's findings and stipulations as to the priority, extent, and validity of the Prepetition Inc. Liens and Prepetition Inc. Obligations shall be deemed to be of full force and effect and forever binding upon the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interests in the Debtors' Chapter 11 Cases and any Successor Cases.

(vi)    *Prepetition LP Credit Facility*.    Pursuant to that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Prepetition LP Credit Agreement" and, together with all related credit and security documents, the "Prepetition LP Credit Documents" and, together with the Prepetition Inc. Credit Documents, the "Prepetition Credit Documents"), between LightSquared LP, as borrower, LightSquared Inc. and the other parent guarantors party thereto, namely LightSquared Investors Holdings Inc., LightSquared GP Inc., and TMI Communications Delaware, Limited Partnership (collectively, the "Prepetition LP Parent Guarantors"), the subsidiary guarantors party thereto, namely ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (collectively, the "Prepetition LP Subsidiary Guarantors" and, collectively with the Prepetition LP Parent Guarantors and LightSquared LP, the "LP Obligors"), the lenders party thereto (the "Prepetition LP Lenders" and, together with the Prepetition Inc. Lenders, the "Prepetition Lenders"), UBS AG, Stamford Branch, as administrative agent (in such capacity, and together with Wilmington Trust FSB,[6] the "Prepetition LP Agent" and, together with the Prepetition LP Lenders, the "Prepetition LP Secured Parties")[7], and other parties thereto, the Prepetition LP Lenders provided term loans to or for the benefit of LightSquared LP (the "Prepetition LP Credit Facility" and, together with the Prepetition Inc. Facility, the "Prepetition Facilities").

(vii)    *Prepetition LP Obligations*.    The Prepetition LP Credit Facility provided LightSquared LP with term loans in the aggregate principal amount of $1,500,000,000.  As of the Petition Date, an aggregate principal amount of approximately $1,700,571,106 was outstanding under the Prepetition LP Credit Agreement (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition LP Credit Documents (including unpaid principal,

---

[6]    Wilmington Trust FSB serves as collateral trustee pursuant to that certain Collateral Trust Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time), between LightSquared LP, UBS AG, Stamford Branch, and Wilmington Trust FSB.

[7]    The Prepetition LP Agent, together with the Prepetition Inc. Agent, are the "Prepetition Agents" and, together with the Prepetition Lenders, the "Prepetition Secured Parties."

accrued and unpaid interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the LP Obligors' obligations pursuant to the Prepetition LP Credit Documents, including all "Obligations" as described in the Prepetition LP Credit Agreement, the "Prepetition LP Obligations" and, together with the Prepetition Inc. Obligations, the "Prepetition Obligations").

        (viii)   *Prepetition LP Collateral.*  To secure the Prepetition LP Obligations, the LP Obligors granted to the Prepetition LP Agent, for the benefit of the Prepetition LP Lenders, first priority security interests in and liens (the "Prepetition LP Liens" and, together with the Prepetition Inc. Liens, the "Prepetition Liens") on (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP and the Prepetition LP Parent Guarantors (except LightSquared Inc.), (c) certain equity interests owned by the Pledgors (as defined in the Prepetition LP Credit Documents), (d) the Intercompany Notes (as defined in the Prepetition LP Credit Documents), and (e) the rights of LightSquared Inc. under and arising out of that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Inmarsat Cooperation Agreement"), by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited (collectively, the "Prepetition LP Collateral" and, together with the Prepetition Inc. Collateral, the "Prepetition Collateral").  As of the Petition Date, the Prepetition LP Liens were subject only to the Permitted Prior Liens.  For the avoidance of doubt, the Prepetition LP Collateral includes any proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).[8]  No

---

[8]    The Prepetition LP Collateral does not include the following: (a) any permit or license issued by a Governmental Authority (as defined in the Prepetition LP Credit Agreement) or other agreement to the extent and for so long as the terms thereof validly prohibit the creation by the pledgor thereof of a security interest in such permit, license, or other agreement; (b) property subject to any Purchase Money Obligation, Vendor Financing Indebtedness, or Capital Lease Obligations (in each case, as such term is defined in the Prepetition LP Credit Agreement) if the contract or other agreement in which such lien is granted validly

party commenced a challenge to the Prepetition LP Liens or Prepetition LP Obligations by the Investigation Termination Date (as defined in the Existing Cash Collateral Order). As a result, the Debtors' stipulations set forth in the Existing Cash Collateral Order regarding the Prepetition LP Liens and Prepetition LP Obligations are binding on all parties in interest.[9]

I.    _Plan of Reorganization_.

On March [__], 2014, the Court entered an order (the "Confirmation Order") [Docket No. _____] confirming the _Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code_ (the "Plan") [Docket No. _____].

J.    _Findings Regarding the Postpetition Financing_.

(i)    _Postpetition Sources of Funding_.    Since the Petition Date, the DIP Obligors have been funding their businesses, administering their Chapter 11 Cases, and pursuing a reorganization through a combination of unencumbered cash, advances under the Existing DIP Facilities, and cash (the "LP Cash Collateral") that is subject to liens and claims of the Prepetition LP Agent and Prepetition LP Lenders. The Debtors require additional postpetition financing to (a) indefeasibly repay in full in cash the Existing DIP Facilities, (b) indefeasibly repay in full in cash all outstanding Prepetition Inc. Obligations other than the Harbinger Prepetition Inc. Claims (as defined below) (such outstanding obligations, the "Specified Prepetition Inc. Claims"), (c) indefeasibly repay in full in cash specified Prepetition LP Obligations (the "Specified Prepetition LP Claims" and, together with the Specified

---

prohibits the creation of any other lien on such property; (c) the SkyTerra-2 satellite, while title remains with Boeing Satellite Systems, Inc. ("BSSI"), and those ground segment assets related to the SkyTerra-2 satellite, while title remains with BSSI; (d) any intent-to-use trademark application to the extent and for so long as a security interest therein would result in the loss by the pledgor thereof of any material rights therein; (e) certain deposit and securities accounts securing currency hedging or credit card vendor programs or letters of credit provided to vendors in the ordinary course of business; (f) equity interests in (i) excess of 66% in non-U.S. subsidiaries (other than the Canadian Subsidiaries (as defined in the Prepetition LP Credit Agreement)) held by a U.S. subsidiary, (ii) LightSquared Network LLC, and (iii) any joint venture or similar entity to the extent and for so long as the terms of such investment restrict such security interest; and (g) any consumer goods subject to the Canadian Security Agreement (as defined in the Prepetition LP Credit Agreement). For the avoidance of doubt, the Prepetition LP Collateral includes any proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).

[9]    For the avoidance of doubt, this finding does not apply to any claims, rights, or interests held or asserted by SPSO as a result of its acquisition of interests in the Prepetition LP Facility.

Prepetition Inc. Claims, the "Specified Prepetition Claims") to the extent that such Prepetition LP

Obligations are not (i) converted into Tranche B DIP Loans or (ii) obligations held by, or for the benefit

of, SPSO, (d) pay expenses in connection with the DIP Facility, and (e) maintain operations, make certain

capital expenditures, continue the regulatory approval process, and administer and preserve the value of

their estates post-confirmation pending the effective date (the "Effective Date") of the Plan.  The ability

of the Debtors to maintain their businesses pending occurrence of the Effective Date and complete a

successful reorganization that will maximize value for all stakeholders requires the availability of

working capital from the DIP Facility, the absence of which would immediately and irreparably harm the

Debtors, their estates, their creditors, and equity holders.

> (ii)    *No Credit Available on More Favorable Terms*.  The Debtors have

engaged in a lengthy process of evaluating various competing plans of reorganization and sale proposals

in their Chapter 11 Cases and, after significant negotiations and efforts by the Debtors and certain key

constituents and investors to develop a restructuring plan, have successfully obtained confirmation of the

Plan.  As part of these efforts, the Debtors diligently sought debtor in possession financing and equity

sponsors in connection with formulation of the Plan.  Given their current financial condition, financing

arrangements, and capital structure, the DIP Obligors have been unable to obtain financing from sources

other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors have been unable

to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense.   The Debtors have also been unable to obtain credit (a) having priority over that of

administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy

Code; (b) secured by a lien on property of the DIP Obligors and their estates that is not otherwise subject

to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to

a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for

the benefit of itself and the DIP Lenders, (1) perfected security interests in and senior, first priority

priming liens on (each as provided herein) all of the DIP Obligors' existing and after-acquired assets with

the priorities set forth in paragraph 8 below, (2) superpriority administrative expense claims and liens

with the priorities set forth in paragraph 9 below, and (3) the other protections set forth in this Final Order.

(iii)    *Continued Use of Prepetition Collateral.*    The continued use of the Prepetition Collateral will enable the DIP Obligors to continue to operate their businesses for the benefit of their estates and creditors and to obtain the DIP Facility.  Harbinger, in its capacity as a Prepetition Inc. Lender, has agreed to subordinate its rights in connection with the Prepetition Inc. Liens and all other rights and benefits (including, without limitation, the right of payment) in connection with the Prepetition Inc. Facility (collectively, the "Harbinger Prepetition Inc. Claims") to the rights of the DIP Agent and DIP Lenders under the DIP Facility.  In exchange, Harbinger will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any diminution in the value (the "Diminution in Value") of its interests in the Prepetition Inc. Collateral resulting from, among other things, the subordination to the Carve-Out (as defined herein) and the DIP Facility, the use, sale, or lease of the Prepetition Inc. Collateral, and the imposition of the automatic stay.  In addition, SPSO will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any Diminution in Value of its interests in the Prepetition LP Collateral resulting from, among other things, the subordination to the Carve-Out and the DIP Facility, the use, sale, or lease of the Prepetition LP Collateral, and the imposition of the automatic stay.

(iv)    *Use of Proceeds of the DIP Facility.*    As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facility, the DIP Agent and DIP Lenders required, and the DIP Obligors agreed, that the proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Documents, including the covenant (the "DIP Budget Covenant") contained therein pertaining to compliance (subject to the Permitted Variance (as defined herein)) with the budget attached hereto as Schedule 1 (the "DIP Budget"), the covenant (the "Capital Expenditure Covenant") contained therein pertaining to compliance with the agreed maximum amount of capital expenditures, and the covenant (the "Restructuring Costs Covenant") contained therein pertaining to compliance with the agreed maximum amount of restructuring costs.

K.      _Application of Proceeds of Collateral_.    As a condition to the entry into the DIP

Documents, the extension of credit under the DIP Facility, and the authorization to use the Prepetition

Collateral, the DIP Obligors agreed to apply the proceeds of DIP Collateral as set forth in the DIP

Documents.

L.      _Adequate Protection_.

(i)      *Harbinger Adequate Protection Liens and Claims.*    Harbinger will

receive adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for

any Diminution in Value of its interests in the Prepetition Inc. Collateral.    As adequate protection,

Harbinger will receive (a) the Harbinger Adequate Protection Liens (as defined herein) and (b) the

Harbinger Adequate Protection Superpriority Claims (as defined herein), each against the Prepetition Inc.

Collateral and the Inc. Obligors only.

(ii)      *SPSO Adequate Protection Liens and Claims.*  SPSO will receive

adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for any

Diminution in Value of its interests in the Prepetition LP Collateral.    As adequate protection, SPSO will

receive (a) the SPSO Adequate Protection Liens (as defined herein) and (b) the SPSO Adequate

Protection Superpriority Claims (as defined herein), each against the Prepetition LP Collateral and the LP

Obligors only.

M.      _Sections 506(c) and 552(b)_.    In light of (a) the DIP Agent's and DIP Lenders' agreement

to subordinate their liens and superpriority claims to the Carve-Out and the current payment of

administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the

Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Prepetition

Inc. Liens, Harbinger Adequate Protection Liens, and Harbinger Adequate Protection Superpriority

Claims to the Carve-Out and DIP Facility, and (c) the subordination of the Prepetition LP Liens, SPSO

Adequate Protection Liens, and SPSO Adequate Protection Superpriority Claims to the Carve-Out and

DIP Facility, each of the DIP Agent, the DIP Lenders, SPSO, and Harbinger are entitled to a waiver of

(i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (ii) the provisions of section 506(c) of the Bankruptcy Code.

      N.      *Good Faith of DIP Agent and DIP Lenders.*

      (i)      *Willingness To Provide Financing*. The DIP Lenders each have indicated a willingness to provide financing to the DIP Obligors subject to (a) the Confirmation Order having been entered by this Court and the time for seeking a stay thereof has expired, (b) the entry of this Final Order, (c) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (d) entry of findings by this Court that such financing is essential to the DIP Obligors' estates, that the DIP Agent and DIP Lenders are extending credit to the DIP Obligors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

      (ii)      *Business Judgment and Good Faith Pursuant to Bankruptcy Code Section 364(e)*. The terms and conditions of the DIP Facility and the DIP Documents, and the fees and other compensation paid and to be paid thereunder, are fair, reasonable, and the best available to the DIP Obligors under the circumstances, reflect the DIP Obligors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the use of the Prepetition Collateral were negotiated in good faith and at arms' length among the DIP Agent, the DIP Lenders, and the DIP Obligors. All extensions of credit under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Secured Parties are entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order, and the DIP Secured Parties' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP

Documents will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order, the Confirmation Order, or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

O.      *Good Cause; Immediate Entry*.  The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the DIP Obligors, their estates, and their creditors and equity holders, as its implementation will, *inter alia*, provide the DIP Obligors with the necessary liquidity to (a) move forward with consummation of the confirmed Plan, (b) minimize the disruption to the DIP Obligors' businesses and ongoing operations, (c) preserve and maximize the value of the DIP Obligors' estates for the benefit of all the DIP Obligors' creditors and equity holders, and (d) avoid irreparable harm to the DIP Obligors, their estates, their creditors, equity holders, their businesses, their employees, and their assets pending occurrence of the Effective Date.

P.      *Notice*.  Notice of the Hearing and the relief requested in the Motion has been provided by the Debtors by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to (a) the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (c) counsel to the special committee for the board of directors for LightSquared Inc. and LightSquared GP Inc., (d) counsel to the Prepetition Inc. Agent and Prepetition LP Agent, (e) counsel to the agent under the Inc. DIP Facility, (f) counsel to the LP DIP Lenders (as defined in the LP DIP Order); (g) counsel to the Ad Hoc Secured Group, (h) counsel to Harbinger, (i) counsel to SPSO, (j) the Internal Revenue Service, (k) the United States Attorney for the Southern District of New York, (l) the Federal Communications Commission (the "FCC"), (m) Industry Canada, and (n) all parties having filed a request for notice under Bankruptcy Rule 2002.  Under the circumstances, such notice of the Motion, the relief requested therein, and the Hearing complies with Bankruptcy Rule 4001(c) and (d) and the Local Rules, and no other notice need be provided for entry of this Final Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>Motion Approved</u>.  The Motion is granted on a final basis as set forth herein, the DIP Facility is authorized and approved, and the grant of adequate protection to SPSO and Harbinger for the use of the Prepetition Collateral is authorized, subject to the terms and conditions set forth in this Final Order.

2.     <u>Objections Overruled</u>.  All objections to the Motion and entry of this Final Order, to the extent not withdrawn or resolved, are hereby overruled.

**DIP Facility Authorization**

3.     <u>Authorization of DIP Financing and DIP Documents</u>.  The DIP Documents are hereby approved on a final basis.  The DIP Obligors are expressly and immediately authorized and empowered on a final basis to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and, to the extent applicable, execute and deliver any and all instruments and documents which may be necessary or appropriate for the performance by the DIP Obligors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in, and provided for by, this Final Order and the DIP Documents.  Contemporaneously with the indefeasible repayment in full in cash of all Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors are authorized and directed on a final basis to indefeasibly pay, in accordance with this Final Order, the principal, interest, fees, out-of-pocket expenses, and other amounts and compensation described in the DIP Documents as such become due and payable without need to obtain further Court approval, all to the extent provided in the DIP Documents, including, without limitation, administrative agent's fees and such professional fees as may be agreed among the DIP Lenders.  None of the fees and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Subject to any *bona fide* dispute as to the reasonableness of such fees and expenses, the DIP Obligors shall pay the reasonable, actual, and documented fees and expenses provided for in this section promptly

-18-

(but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors and the U.S. Trustee. Any and all payments or proceeds remitted to the DIP Agent or DIP Lenders pursuant to the provisions of this Final Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability. All collections and proceeds of the DIP Collateral or Prepetition Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Final Order and the DIP Documents. The DIP Documents evidence the valid and binding obligations of the DIP Obligors, which obligations shall be enforceable against each of the DIP Obligors and their estates in accordance with the terms of the DIP Documents. The failure specifically to include any particular provisions of the DIP Documents in this Final Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the DIP Documents be authorized and approved in their entirety.

4.        Indefeasible Repayment of Existing DIP Facilities and Specified Prepetition Claims. Proceeds of the DIP Loan shall be used to, among other things, indefeasibly repay in full in cash all Existing DIP Facilities and the Specified Prepetition Claims. For the avoidance of doubt, the amount of obligations outstanding as of March 31, 2014, which amount shall be increased to the extent the DIP Loans are funded after March 31, 2014 and decreased to the extent that the DIP Loans are funded before March 31, 2014, is (i) $72,366,120.36 under the DIP Inc. Facility, (ii) [_____] under the DIP LP Facility, (iii) $295,091,178.04 with respect to the Specified Prepetition Inc. Claims and (iv) [_____] with respect to the Specified Prepetition LP Claims.

5.        Authorization To Borrow. Until the earlier of the (a) Effective Date, (b) Maturity Date (as defined in the DIP Agreement), and (c) termination of obligations under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default (as defined herein) (such earlier date, the "Termination Date"), and subject to the terms, conditions, and limitations on availability, set forth in the DIP Documents, DIP Facility, and this Final Order, the DIP Borrowers are authorized and directed to request extensions of credit under the DIP Facility of up to the principal

-19-

amount of $1,650,000,000 (the "Loans").  The Loans shall be funded in a single draw (by advance and, if applicable, conversion) on the Closing Date, and all proceeds thereof not used on the Closing Date to indefeasibly repay in full in cash the Existing DIP Facilities, and the Specified Prepetition Claims, or, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, to pay fees and expenses in connection with the DIP Facility, shall be deposited into a collateral account under the control of the DIP Agent (the "Collateral Account"), from which, subject to satisfaction of the conditions set forth in the DIP Agreement, the DIP Borrowers may withdraw funds in accordance with the DIP Budget, the DIP Budget Covenant, the Restructuring Costs Covenant, or the Capital Expenditure Covenant, as applicable, and in each case subject to the DIP Agreement.  The Collateral Account shall be subject to a first priority security interest and lien in favor of the DIP Agent for the benefit of the DIP Secured Parties, subject to the terms of the DIP Documents and this Final Order.

6.      DIP Obligations.  The DIP Documents and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligors' DIP Obligations, which DIP Obligations shall be enforceable against the DIP Obligors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  The DIP Obligations will include all loans, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Obligors to the DIP Agent or any of the DIP Lenders under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Documents.  The DIP Obligations shall be due and payable without notice or demand on the Termination Date, subject to the Exit Conversion (as defined herein).

7.      DIP Liens and DIP Collateral.  Pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and

the DIP Lenders, on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (the "DIP Liens") any and all presently owned and hereafter acquired personal property, real property, and other assets of the DIP Obligors, whether owned, consigned by or to, or leased from or to the DIP Obligors (collectively, the "DIP Collateral")[10], including, without limitation, all (a) Prepetition Collateral, (b) accounts, (c) books, (d) chattel paper, (e) deposit accounts, (f) equipment and fixtures, (g) general intangibles, (h) inventory, (i) investment related property, (j) negotiable collateral, (k) supporting obligations, (l) commercial tort claims, (m) money, cash, and cash equivalents, (n) all leases and leasehold interests, (o) owned real property, (p) all unencumbered assets, including postpetition lawsuits or causes of action and proceeds thereof, (q) all proceeds of any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code with respect to the DIP Obligors (the "Avoidance Actions"), (r) patents, (s) trademarks, (t) copyrights, (u) equity interests, (v) contract rights, (w) network and other equipment, (x) proceeds, and (y) all rights and interests of the Debtors in NOAA spectrum, if, when and to the extent obtained.

8.      DIP Lien Priority.  The DIP Liens securing the DIP Obligations shall be junior only to the Carve-Out and Permitted Prior Liens and shall otherwise be (a) valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired unencumbered assets (whether currently or hereafter unencumbered) of all DIP Obligors, and (b) valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired encumbered assets of the DIP Obligors.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior at all times to (a) the Prepetition Inc. Liens, (b) the Prepetition LP Liens, (c) the Harbinger Adequate Protection Liens, and (d) the SPSO Adequate Protection Liens.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the DIP Obligors' Chapter 11 Cases or any

---

[10]      All terms not specifically defined in the description of DIP Collateral shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

Successor Cases.   The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the DIP Obligors' Chapter 11 Cases or any Successor Cases, upon the conversion of any of the DIP Obligors' Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the DIP Obligors' Chapter 11 Cases or Successor Cases.   The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.   No lien or interest avoided and preserved for the benefit of any DIP Obligor's estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

9.    <u>DIP Superpriority Claims</u>.   Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and the DIP Lenders, an allowed superpriority administrative expense claim in each of the DIP Obligors' Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations.   For the avoidance of doubt, the DIP Superpriority Claims shall extend to proceeds of any Avoidance Actions. The DIP Superpriority Claims shall be subordinate only to the Carve-Out and shall (a) otherwise have priority over any and all administrative expenses and claims against the DIP Obligors or their estates in any of their Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the DIP Obligors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

10.    <u>No Obligation To Extend Credit</u>.   None of the DIP Agent or DIP Lenders shall have any obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Documents and this Final Order have been satisfied in full or waived by the DIP Agent and the DIP Lenders, each in its sole discretion.

11.    <u>Use of DIP Facility Proceeds</u>.  The Loans shall be used, and the Debtors are hereby authorized, to indefeasibly repay in full in cash the Existing DIP Facilities and the Specified Prepetition Claims, to, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, pay expenses in connection with the DIP Facility, to finance capital expenditures in accordance with the Capital Expenditure Covenant, to finance restructuring costs in accordance with the Restructuring Costs Covenant, and to finance operating expenses in accordance with the DIP Budget, which DIP Budget shall (a) be tested on a monthly basis for a trailing two (2)-month period and (b) provide for withdrawals from the Collateral Account to finance operating expenses for the purposes and in the amounts described therein, subject to a variance cushion of 15% in the aggregate for all such operating expenses, in each case as set forth in the DIP Agreement or the DIP Budget, as applicable (the "<u>Permitted Variance</u>").  The DIP Budget shall not be amended, supplemented, or otherwise modified in a manner adverse to the DIP Lenders without the approval of the Required DIP Lenders.

12.    <u>Weekly Status Calls</u>.  Commencing on the first Wednesday following issuance of the Confirmation Order, and continuing on each Wednesday (or at such other time as may be agreed to by the Required DIP Lenders in their reasonable discretion) thereafter until the Maturity Date, the DIP Borrowers will hold a status call with the DIP Agent and the DIP Lenders, relating to (a) the Plan process, regulatory updates, contemplated asset sales, assignments, allocations, and other dispositions and the Chapter 11 Cases generally, (b) the Transfer Proceedings (as defined in the DIP Agreement), (c) the Material Regulatory Requests (as defined in the DIP Agreement), and (d) the FCC Objectives (as defined in the DIP Agreement), which shall include (i) an update on, and summary of, related meetings and discussions with the FCC and other Governmental Authorities and/or FCC or other Governmental Authority (as defined in the DIP Agreement) actions since the prior briefing, (ii) an identification of FCC or other Governmental Authority meetings and other contacts with the FCC or other Governmental Authorities by the Debtors or their representatives or advisors planned or anticipated to occur within the next two-week period and the topics to be covered at such meetings or contacts, (iii) notice of any hearing

planned or anticipated to occur within the next two week period before the FCC or other Governmental Authorities related to the efforts of the Companies, (iv) notice of and information regarding any written submissions expected to be made by the Debtors to the FCC or other Governmental Authorities within the next two week period, and (v) an opportunity for the Initial Lenders (as defined in the DIP Agreement) to provide consultation and input to the Debtors with respect to such efforts, submissions, and meetings.

13.    <u>FCC Submissions</u>.   With respect to the Material Regulatory Requests, the Transfer Proceedings, and/or the FCC Objectives, the DIP Borrowers shall provide promptly to the Specified Lenders (as defined in the DIP Agreement) (i) copies of all filings, notices, orders, and any other correspondence between the FCC and the Debtors, including copies of all documentation received from, or submitted to, the FCC in respect thereof, and (ii) after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company to the FCC.

14.    <u>Amendment of the DIP Documents</u>.   The DIP Obligors and DIP Secured Parties are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents if (a) the amendment, modification, supplement, or waiver is (i) in accordance with the DIP Documents, (ii) beneficial to the DIP Obligors, and (iii) not prejudicial in any material respect to the rights of third parties, (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, supplement, or waiver is provided to counsel for the Debtors, counsel for SPSO, counsel for Harbinger, and the U.S. Trustee (collectively, the "<u>Notice Parties</u>") upon five (5) business days' notice and an opportunity to object, and (c) the amendment, modification, supplement, or waiver is filed with the Court; <u>provided</u>, <u>however</u>, that consent of the Notice Parties, and approval of the Court is not necessary to effectuate any such amendment, modification, or supplement.   Except as otherwise provided in this paragraph 14, no waiver, amendment, modification, supplement, or waiver of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the DIP Obligors, and with the necessary consents required under, and executed in accordance with, the DIP Documents, and approved by the Court on notice.

15.    <u>Use of Prepetition Collateral</u>.  Subject to the terms and conditions of this Final Order and the DIP Documents, the DIP Obligors' use of Prepetition Collateral is approved until the Termination Date or as otherwise ordered by the Court.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any DIP Obligor's use of any Prepetition Collateral or other proceeds resulting therefrom, except as permitted in this Final Order and the DIP Documents.

16.    <u>Adequate Protection Liens</u>.

(a)    *Harbinger Adequate Protection Liens.*  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of Harbinger's interests in the Prepetition Inc. Collateral, the Inc. Obligors hereby grant to Harbinger, effective and perfected as of the Petition Date and without the necessity of the execution by the Inc. Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition Inc. Collateral (the "<u>Harbinger Adequate Protection Liens</u>").  For avoidance of doubt, the Harbinger Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition LP Guarantors to the extent not Prepetition Inc. Collateral, or (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action.  The Harbinger Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)    *SPSO Adequate Protection Liens.*[11]  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of SPSO's interests in the Prepetition LP Collateral, the LP Obligors hereby grant to SPSO, effective and perfected as of the Petition Date and without the necessity of the execution by the LP Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and

---

[11]    The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien.  Should an order be entered finding that SPSO does not have a valid prepetition lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

perfected postpetition security interest in and liens on the Prepetition LP Collateral (the "SPSO Adequate Protection Liens").  For avoidance of doubt, the SPSO Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition Inc. Subsidiary Guarantors, (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action, or (iv) the SkyTerra-2 satellite while title remains with BSSI or those ground segment assets related to the SkyTerra-2 satellite while title remains with BSSI.[12]  The SPSO Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

(c)      *Priority of Adequate Protection Liens.*

(i)      The Harbinger Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The Harbinger Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Inc. Collateral.

(ii)      The SPSO Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The SPSO Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition LP Collateral.

17.    Adequate Protection Superpriority Claims.

(a)      *Harbinger Adequate Protection Superpriority Claim.*  As further adequate protection of the interests of Harbinger in the Prepetition Inc. Collateral against any Diminution in Value of such interests in the Prepetition Inc. Collateral, Harbinger is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Harbinger Adequate Protection Superpriority Claim") in each of the Inc. Obligors' Chapter 11 Cases and Successor Cases.  The Harbinger Adequate Protection Superpriority Claim shall be deemed

---

[12]      For the avoidance of doubt, the Prepetition LP Collateral includes all General Intangibles (as defined in the Prepetition LP Credit Documents) to include, among other things, contract rights relating to that certain Amendment 4 Amended and Restated Contract between LightSquared and BSSI, dated November 10, 2010 (as amended, modified, supplemented, or amended and restated through the date hereof).

satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)      *SPSO Adequate Protection Superpriority Claim.* As further adequate protection of the interests of SPSO in the Prepetition LP Collateral against any Diminution in Value of such interests in the Prepetition LP Collateral, SPSO is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "SPSO Adequate Protection Superpriority Claim") in each of the LP Obligors' Chapter 11 Cases and Successor Cases.  The SPSO Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

(c)      *Priority of Adequate Protection Superpriority Claims.*

(i)      The Harbinger Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the Harbinger Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Inc. Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the Harbinger Adequate Protection Superpriority Claim shall be *pari passu* with the SPSO Adequate Protection Superpriority Claim against LightSquared Inc.

(ii)      The SPSO Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the SPSO Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the LP Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative

expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the SPSO Adequate Protection Superpriority Claim against LightSquared Inc. shall be *pari passu* with the Harbinger Adequate Protection Superpriority Claim against LightSquared Inc.

**Provisions Common to DIP Financing and Use of Prepetition Collateral**

18.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to (a) permit the DIP Obligors to grant the DIP Liens, Harbinger Adequate Protection Liens, SPSO Adequate Protection Liens, DIP Superpriority Claims, Harbinger Adequate Protection Superpriority Claim, and SPSO Adequate Protection Superpriority Claim; (b) permit the DIP Obligors to perform such acts as the DIP Agent in is sole discretion, and the Required DIP Lenders in their sole discretion, may request to assure the perfection and priority of the liens granted herein; (c) permit the DIP Obligors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, Harbinger, and SPSO under the DIP Documents, the DIP Facility, and this Final Order; and (d) contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, authorize the DIP Obligors to pay the DIP Agent and the DIP Lenders in accordance with the terms of this Final Order.

19.     Perfection of DIP Liens and Adequate Protection Liens.

(a)     This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, the Harbinger Adequate Protection Liens, and the SPSO Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law), the DIP Liens, the Harbinger Adequate Protection

-28-

Liens, and the SPSO Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, Harbinger, and SPSO the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, Harbinger, and SPSO are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction (and the DIP Agent is hereby authorized, but not required, to take possession of or control over, or take any other action with respect to the DIP Collateral) in order to validate and perfect the liens and security interests granted to them hereunder, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date.  Whether or not the DIP Agent on behalf of the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, as applicable, shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments (or, in the case of the DIP Agent, to take possession of or control over any DIP Collateral), or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of this Final Order.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agent, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, respectively, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)    The DIP Obligors are authorized and directed to execute and deliver promptly to the DIP Agent and the Prepetition Agents all such agreements, financing statements, instruments, and other documents as the DIP Agent or the Prepetition Agents may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and Adequate Protection Liens, respectively.

(d)    In furtherance of the foregoing and without further approval of this Court, each DIP Obligor is authorized to do and perform all acts to make, execute, and deliver all instruments and

-29-

documents and to pay all fees that may be reasonably required or necessary for such DIP Obligor's performance hereunder.

20.    <u>Maintenance of DIP Collateral</u>.  Until the (a) Effective Date and satisfaction of all DIP Obligations pursuant to the terms of the Plan or (b) indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the DIP Obligors shall (a) insure the DIP Collateral as required under the DIP Documents and (b) maintain the cash management system as set forth in the *Final Order (A) Authorizing Debtors To (I) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms and (II) Continue Intercompany Transactions, (B) Providing Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Debtors' Banks to Honor All Related Payment Requests, and (D) Waiving Investment Guidelines of Section 345(b) of Bankruptcy Code* [Docket No. 115] (the "<u>Cash Management Order</u>") or as otherwise required by the DIP Documents.  This Final Order shall be deemed to modify the Cash Management Order as necessary to permit the DIP Obligors to comply with the provisions of this Final Order and the DIP Documents.

21.    <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  The DIP Obligors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents without the prior written consents as required under the DIP Documents (and, no such consent shall be implied, from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or from any order of this Court).

22.    <u>Exit Conversion; Payment of Tranche B DIP Obligations</u>.  Upon the occurrence of the Effective Date, (a) the Tranche A DIP Obligations shall be treated in accordance with the terms of the Plan (the "<u>Exit Conversion</u>"), and (b) the Tranche B DIP Obligations shall be indefeasibly paid in full in cash in accordance with the terms of the Plan.

23.    <u>Events of Default</u>.  Unless expressly waived in writing in accordance with the consents required in the DIP Documents, each of the following shall constitute an event of default (each, an "<u>Event of Default</u>" and, collectively, the "<u>Events of Default</u>"):

(a)    This Court enters an order dismissing any of the Chapter 11 Cases of the DIP Obligors with material assets or converting any such Chapter 11 Cases to cases under chapter 7;

(b)    This Court enters an order appointing a chapter 11 trustee in any of the Chapter 11 Cases of the DIP Obligors with material assets that is not stayed following entry;

(c)    This Court enters an order (i) staying, reversing, modifying, or vacating this Final Order or (ii) amending this Final Order, including, without limitation, any modification on the ability of the DIP Obligors to use Prepetition Collateral and/or the provision of additional or different adequate protection to Harbinger or SPSO;

(d)    This Court enters an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases of the DIP Obligors, or any DIP Obligor shall file a motion or other pleading seeking the dismissal of its Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(e)    Except as expressly allowed in this Final Order, this Court enters an order granting any lien on, or security interest in, any DIP Collateral in favor of any party other than the DIP Agent on behalf of the DIP Lenders, or granting an administrative claim payable by a DIP Obligor to any party other than the DIP Agent on behalf of the DIP Lenders (other than administrative claims incurred in the ordinary course of business that are not senior to or *pari passu* with the superpriority administrative claim granted to the DIP Agent and the DIP Lenders pursuant to this Final Order);

(f)    This Court enters an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any DIP Collateral;

(g)     This Court enters an order granting relief from the automatic stay under section 362 of the Bankruptcy Code with respect to all or any material portion of the property of the DIP Obligors' estates;

(h)     Any DIP Obligor shall make any payment on or in respect of any prepetition indebtedness or prepetition obligations of a DIP Obligor other than (i) as permitted by an order of this Court (A) entered prior to the date of the filing of the Motion or (B) upon effectiveness of the Plan or otherwise in connection with the DIP Obligors' assumption or assumption and assignment of any executory contract, (ii) payment in accordance with the Restructuring Costs Covenant, or (iii) to the extent expressly permitted by the DIP Agreement and approved by an order of this Court;

(i)     Any DIP Obligor shall fail to comply with the terms of this Final Order in any material respect, it being understood that non-compliance with the DIP Budget Covenant, or any violation of the Restructuring Costs Covenant or the Capital Expenditure Covenant,  shall constitute material non-compliance with this Final Order;

(j)     (i) One Dot Six shall be in material breach of, or there shall be a material default under, the One Dot Six Lease, (ii) the One Dot Six Lease shall be rejected (within the meaning of the Bankruptcy Code) by One Dot Six or the One Dot Six Lease shall be removed from the schedule of assumed agreements filed in connection with the Plan of Reorganization, (iii) there shall have occurred any event or condition which results in One Dot Six no longer having the right to assume (within the meaning of the Bankruptcy Code) the One Dot Six Lease, (iv) the One Dot Six Lease shall be amended in any manner without the prior written consent of the Required DIP Lenders, or (v) the One Dot Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(k)     This Court enters an order approving the sale of any substantial DIP Collateral that does not provide for the payment in respect thereof to be remitted to the DIP Agent consistent with the priorities set forth in this Final Order;

(l)     Any DIP Obligor files any pleading seeking, or otherwise consenting to, or supporting or acquiescing in any other person's motion as to, any of the matters set forth in paragraph 29; and

(m)     An Event of Default as defined in the DIP Agreement occurs.

24.     <u>Rights and Remedies Upon Event of Default; Specific Performance</u>.  Immediately upon the occurrence of and during the continuation of an Event of Default, the DIP Agent may, and as directed by the Required DIP Lenders, shall, as provided in the DIP Documents, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the DIP Obligors to the extent any such commitment remains, and/or (c) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Agent shall be referred to herein as a "<u>Termination Declaration</u>").   The Termination Declaration shall be given by email (or other electronic means) to counsel to the DIP Obligors, counsel to SPSO, counsel to Harbinger, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "<u>Termination Declaration Date</u>").  Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that seven (7) business days after the Termination Declaration Date (the "<u>Remedies Notice Period</u>"), the DIP Agent and DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral permitted by, and in accordance with, the DIP Documents, this Final Order, and applicable nonbankruptcy law, and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to prior satisfaction of the Carve-Out.  Notwithstanding anything to the contrary, during the Remedies Notice Period, the DIP Obligors shall be entitled to use proceeds of the DIP Facility and Cash Collateral, if any, solely as permitted in the DIP Documents and to seek an emergency hearing with the Court solely for the purposes of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be

-33-

terminated at the end of the Remedies Notice Period without further notice or order, and the DIP Obligors

shall no longer have the right to use or seek to use DIP Collateral.  The DIP Agent and DIP Lenders shall

be permitted to exercise all remedies set forth herein and in the DIP Documents and as otherwise

available at law against the DIP Collateral, without any further order of or application or motion to the

Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code,

or otherwise, against the enforcement of the liens and security interest in the DIP Collateral, or any other

rights and remedies granted to the DIP Agent and DIP Lenders with respect thereto pursuant to the DIP

Documents or this Final Order.  The DIP Secured Parties shall have the right to specific performance of

all obligations of the DIP Obligors under the DIP Agreement, the DIP Documents, and this Final Order.

The DIP Secured Parties shall have the right to submit a credit bid for up to the full face amount of the

DIP Obligations in respect of any sale of DIP Collateral, whether pursuant to a plan or otherwise, which

amount shall not be limited, capped, or reduced pursuant to section 363(k) of the Bankruptcy Code for

cause or otherwise.

25.     Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this
Final Order.  The DIP Secured Parties each have acted in good faith in connection with negotiating the

DIP Documents and extending credit under the DIP Facility, and their reliance on this Final Order is in

good faith.  Based on the findings set forth in this Final Order and the record made during the Hearing,

and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this

Final Order are hereafter appealed, reargued, reconsidered, reversed, modified, amended, or vacated by a

subsequent order of this Court or any other court, the DIP Secured Parties are each entitled to the full

protections provided in section 364(e) of the Bankruptcy Code and this Final Order.  Any such appeal,

reconsideration, reargument, reversal, modification, amendment, or vacatur shall not affect the validity,

perfection, priority, allowability, enforceability, or non-avoidability of any advances previously made or

made hereunder, or lien, claim, priority, or protection authorized or created previously or hereby.  Any

liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of

any such appeal, reconsideration, reargument, reversal, modification, amendment, or vacatur of this Final

Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, benefits, and protections granted herein.

26.    <u>Indemnification of DIP Secured Parties</u>.  The indemnification provisions set forth in the DIP Agreement, as modified by this Final Order, are hereby approved in their entirety.  Without limiting the generality of the foregoing, subject to the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors shall indemnify and hold harmless the DIP Secured Parties and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of, or related to, the DIP Documents, the DIP Facility, or the transactions contemplated thereby and by this Final Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agent's and each other DIP Lender's exercise of discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation therefor, the DIP Agent and each other DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the DIP Obligors agree to promptly pay the reasonable fees and expenses of such counsel.

27.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent and DIP Lenders under the DIP Documents, the DIP Obligors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent and DIP Lenders reasonable access to the DIP Obligors' premises and their books and records in accordance with the DIP Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the DIP Obligors authorize their independent

certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and DIP Lenders all such information as may be reasonably requested with respect to the business, results of operations, and financial condition of any DIP Obligor. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent or the DIP Lenders, or their respective independent certified public accountants, financial advisors, investment bankers, and consultants, with any information subject to attorney-client privilege or consisting of attorney work product.

28.    <u>Carve-Out</u>.  As used in this Final Order, "<u>Carve-Out</u>" shall mean the Inc. Carve-Out and the LP Carve-Out.

(a)    *Inc. Carve-Out*.  As used in this Final Order, the "<u>Inc. Carve-Out</u>" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the Inc. Obligors; (ii) all reasonable fees and expenses incurred by a trustee for the Inc. Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; and (iii) the allowed and unpaid professional fees, expenses, and disbursements allocable to the Inc. Obligors incurred on or after the Termination Date by the Debtors for any professionals retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) by the Debtors under sections 327, 328, or 1103(a) of the Bankruptcy Code (the "<u>Chapter 11 Case Professionals</u>") in an aggregate amount not to exceed $1.5 million plus such allowed fees, expenses, and disbursements allocable to the Inc. Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (collectively, the "<u>Allowed Inc. Professional Fees</u>").

(b)    *LP Carve-Out*.  As used in this Final Order, the "<u>LP Carve-Out</u>" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the LP Obligors; (ii) with

respect to the information officer (the "Information Officer") appointed by the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court") in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended, in the Canadian Court (the "Canadian Proceedings"), all fees and expenses required to be paid to the Information Officer and its counsel in connection with the Canadian Proceedings, which fees and expenses may be secured by a charging lien granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $200,000, (iii) all reasonable fees and expenses incurred by a trustee for the LP Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; and (iv) the allowed and unpaid professional fees, expenses, and disbursements allocable to the LP Obligors incurred on or after the Termination Date by the Debtors for any Chapter 11 Case Professionals (which are restructuring professionals) in an aggregate amount not to exceed $4 million, plus such allowed fees, expenses, and disbursements allocable to the LP Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (the "Allowed LP Professional Fees" and, together with the Allowed Inc. Professional Fees, the "Allowed Professional Fees").

   (c) *Payment of Allowed Professional Fees Prior to Termination Date*.  Prior to the occurrence of the Termination Date, the DIP Obligors shall be permitted to pay Allowed Professional Fees in accordance with the Restructuring Costs Covenant.  The amounts paid shall not reduce the Carve-Out.

   (d) *No Direct Obligation To Pay Professional Fees; No Waiver of Right To Object to Fees*.  Neither the DIP Agent nor the DIP Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the DIP Obligors' Chapter 11 Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be construed (i) to obligate the DIP Agent or DIP Lenders in any way to pay compensation to, or to reimburse expenses of, any professionals retained by the DIP Obligors, or to guarantee that the DIP

Obligors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out if actual Allowed Professional Fees incurred after the Termination Date exceed the Carve-Out; (iii) as consent to the allowance of any professional fees or expenses of any professionals retained by the DIP Obligors; or (iv) to affect the right of the DIP Agent or DIP Lenders to object to the allowance and payment of such fees and expenses.

29.    <u>Limitations on DIP Facility, DIP Collateral, and Carve-Out</u>.   The DIP Facility, DIP Collateral, and Carve-Out may not be used: (a) in connection with, or to finance in any way, any action, suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to the interests of the DIP Agent or DIP Lenders with respect to their respective collateral or their rights and remedies under the DIP Documents or this Final Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors in connection with the assertion of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations; (iii) for monetary, injunctive, or other affirmative relief against any DIP Agent or DIP Lender or DIP Collateral; or (iv) except to contest the occurrence or continuation of any Event of Default as permitted in paragraph 24, preventing, hindering, or otherwise delaying the exercise by the DIP Agent or any DIP Lender of any rights and/or remedies under this Final Order, the DIP Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the DIP Agent or DIP Lenders upon any of the DIP Collateral, <u>provided</u>, that any fees, costs, and expenses incurred pursuant to this provision shall be payable solely from the Carve-Out; (b) to make any payment in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consents required under the DIP Documents; (c) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the DIP Obligors without the prior written consents required under the DIP Documents; (d) except to contest the occurrence or continuation

of any Event of Default as permitted in paragraph 24, object to, contest, or interfere with in any way the DIP Agent's or DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, <u>provided</u>, that any fees, costs, and expenses incurred pursuant to this provision shall be payable solely from the Carve-Out; (e) to sell or otherwise dispose of DIP Collateral without the consents required under the DIP Documents; (f) with respect to any insurance proceeds constituting DIP Collateral, without the consents required under the DIP Documents; (g) to incur Indebtedness (as defined in the DIP Agreement) outside the ordinary course of business without the prior consents required under the DIP Documents; (h) to object to or challenge in any way the claims, liens, or interests (including interests in the DIP Collateral) held by or on behalf of any DIP Agent or DIP Lender; (i) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent or DIP Lender; (j) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, or DIP Liens, or any other rights or interests of any of the DIP Agent or DIP Lenders; or (k) to prevent, hinder, or otherwise delay the exercise by any DIP Agent or DIP Lender of any rights and remedies granted under this Final Order.

30.    <u>Release</u>.  Subject to the limitations contained herein and the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the DIP Obligors' Chapter 11 Cases or Successor Cases) and any party acting by, through, or under the Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the DIP Secured Parties, and each of their respective participants and each of their respective affiliates, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations existing as of the date of this Final Order, including, without limitation, any so-called "lender

liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, and DIP Facility, as applicable, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent or DIP Lenders and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations, DIP Liens, Prepetition Inc. Obligations, Prepetition LP Obligations (other than Obligations held by, or for the benefit of, SPSO) and the Prepetition Liens (other than Prepetition Liens held for the benefit of SPSO). For the avoidance of doubt, nothing contained in this paragraph 30 or any other provision of this Final Order shall constitute a release of SPSO or any related person or entity (including, without limitation, EchoStar Corporation ("EchoStar"), Charles Ergen, or DISH Network Corporation ("DISH")), and all claims, rights, and defenses of the Debtors and their estates against SPSO, EchoStar, Mr. Ergen, and DISH are expressly retained.

31.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

32.     <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of the Carve-Out, no costs or expenses of administration of the DIP Obligors' Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Secured Parties or any of their respective claims, (b) the DIP Collateral, (c) Harbinger or the Harbinger Adequate Protection Superpriority Claims, or (d) SPSO or the SPSO Adequate Protection Superpriority Claims pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law or in equity, without the prior written consent of the Initial Lenders, and no such consent shall be implied from any other action or inaction by the Initial Lenders.

33.     <u>Equities of the Case</u>.  Effective upon entry of this Final Order and in light of (a) the DIP Agent's and DIP Lenders' agreement to subordinate their liens to the Carve-Out and the Permitted Prior Liens and superpriority claims to the Carve-Out, and the current payment of administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Harbinger Adequate Protection Liens and Harbinger Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, and (c) the subordination of the SPSO Adequate Protection Liens and SPSO Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, each of the DIP Agent, the DIP Lenders, Harbinger, and SPSO shall be entitled to all benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, product, offspring, or profits of any of their collateral and proceeds shall be received and applied pursuant to the DIP Documents.  The DIP Agent, the DIP Lenders, Harbinger, and SPSO shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, Prepetition Inc. Collateral, or Prepetition LP Collateral, and proceeds shall be received and applied pursuant to the DIP Documents.

34.     <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

35.     <u>Discharge Waiver</u>.  The Debtors expressly stipulate, and the Court finds and adjudicates, that the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not

conditioned upon the indefeasible payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations.

36.    <u>Rights Preserved</u>.  Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Agent and DIP Lenders are preserved.

37.    <u>No Waiver by Failure To Seek Relief</u>.  The failure of any DIP Agent or DIP Lender, to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable DIP Agent or DIP Lender.

38.    <u>Binding Effect of Final Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, all other creditors of any of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the DIP Obligors' Chapter 11 Cases, any Successor Cases, or upon dismissal or conversion of any Chapter 11 Case or Successor Case.

39.    <u>No Modification of Final Order</u>.  Until and unless the DIP Obligations and DIP Superpriority Claims have been indefeasibly paid in full in cash (such payment or conversion being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the DIP Obligors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) except as permitted under the DIP Documents and with the prior written consent of each of the Initial Lenders (i) any appeal, reconsideration, reargument, reversal, modification, stay, vacatur, or amendment to this Final Order; (ii) a priority claim for any administrative expense or unsecured claim against the DIP Obligors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b)) of the

Bankruptcy Code in any of the DIP Obligors' Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims, other than the Carve-Out, or (iii) any other order allowing use of the DIP Collateral, and (b) except as permitted under the DIP Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The DIP Obligors irrevocably waive any right to seek any amendment, modification, or extension of this Final Order without the prior written consent, as provided in the foregoing, of each of the Initial Lenders, and no such consent shall be implied by any other action, inaction, or acquiescence of any of the Initial Lenders.

40.    <u>Final Order Controls</u>.  This Final Order supersedes the Inc. DIP Order, the LP DIP Order, and the Existing Cash Collateral Order in all respects.  In the event of any inconsistency between the terms and conditions of the DIP Documents or this Final Order, the provisions of this Final Order shall govern and control.

41.    <u>Repayment of Fees and Expenses</u>.  Notwithstanding anything contained herein, in the Prepetition Credit Documents or any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary (including, without limitation, this Final Order or the Confirmation Order), the Debtors shall remain obligated to pay all reasonable fees and expenses, subject to a cap of $500,000 in the aggregate, incurred by (a) the DIP Inc. Agent and each DIP Inc. Lender, including all reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (b) the Prepetition Inc. Agent and each holder of a Prepetition Inc. Facility Non-Subordinated Claim (as defined in the Plan), including all reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (c) the Prepetition LP Agent, and (d) the Ad Hoc Secured Group and all reasonable and documented fees and expenses of the Ad Hoc Secured Group's legal and financial advisors, in each case through and including the effective date of the Plan.  For the avoidance of doubt, the financial and legal advisors covered by this paragraph 41 and subject to the aggregate cap of $500,000 include (t) Akin Gump Strauss Hauer & Feld LLP, (u) Houlihan Lokey, (v) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, (w) White & Case LLP, (x) The Blackstone Group, (y) Latham & Watkins LLP, and (z) Bennett Jones LLP.

-43-

42.    <u>No Control.</u>  Neither the DIP Agent nor any of the DIP Lenders shall be deemed control persons or insiders of the Debtors or any of their affiliates solely by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Agreement, DIP Documents, or this Final Order.

43.    <u>Survival.</u>  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the DIP Obligors' Chapter 11 Cases other than the Plan; (b) converting any of the DIP Obligors' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the DIP Obligors' Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the DIP Obligors' Chapter 11 Cases or Successor Cases.  The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, and the Prepetition LP Agent on behalf of SPSO pursuant to this Final Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, or following dismissal of the DIP Obligors' Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until all DIP Obligations have been indefeasibly paid in full in accordance with the terms thereof and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Agent and/or DIP Lenders shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, following dismissal of the DIP Obligors' Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

44.    <u>Effect of this Final Order</u>. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  The fourteen (14)-day stay otherwise imposed pursuant to Bankruptcy Rule 6004(h) is hereby expressly waived, and the terms of this Final Order and shall take effect immediately upon execution thereof.

45.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final

Order according to its terms.

SO ORDERED by the Court this _____ day of _____, 2014.


_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**<u>Schedule 1</u>**

**Proposed DIP Budget**

Dollars in thousands

| Quarter | | Mar-14 | 2Q14 | | | 3Q14 | | | Oct-14 |
|---|---|---|---|---|---|---|---|---|---|
| Month | | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 |
| **LP Group Beginning Cash Balance (excluding Cash at TMI)** | | 18,540 | - | 92,725 | 83,804 | 59,041 | 46,761 | 42,349 | 17,906 |
| **Sources** | | | | | | | | | |
| | Satellite Revenue | 1,339 | 2,165 | 1,414 | 1,331 | 2,233 | 1,642 | 1,374 | 2,146 |
| | Interest Income | 2 | - | 7 | 15 | 12 | 9 | 8 | 6 |
| | Equity Financing | - | - | - | - | - | - | - | - |
| | Net Debt Financing (Post fees, post paydown of existing DIP) [1] | - | 95,789 | - | - | - | - | - | - |
| | Other | - | - | - | - | - | - | - | - |
| | **Total Sources** | 1,341 | 97,954 | 1,422 | 1,346 | 2,245 | 1,651 | 1,382 | 2,152 |
| Uses (OPEX) | In-Orbit / Launch Insurance | - | - | - | - | - | - | - | - |
| | ISAT Coop Agmt | 5,000 | - | - | 17,500 | - | - | 17,500 | - |
| | L-Band network infrastructure | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | ERP | 22 | 22 | 89 | 22 | 22 | 141 | 22 | 22 |
| | Spectrum Management | - | - | - | - | - | - | - | - |
| | Staffing Related (entire company) | 1,766 | 1,754 | 1,744 | 1,774 | 2,498 | 1,717 | 1,710 | 1,710 |
| | Legal / Regulatory / Lobbying / International | 1,045 | 932 | 888 | 1,516 | 1,033 | 964 | 1,152 | 1,592 |
| | Facilities/Telecom | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 |
| | G&A | 4,706 | 336 | 336 | 336 | 336 | 336 | 336 | 471 |
| | Travel Expenses (entire company) | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| | Other Items | 948 | 1,499 | 978 | 701 | 1,342 | 863 | 1,661 | 1,290 |
| | **Subtotal - USES (OPEX)** | 14,206 | 5,263 | 4,753 | 22,568 | 5,950 | 4,739 | 23,100 | 5,804 |
| Uses (CAPEX) | Boeing Payments | 2,025 | - | 3,425 | - | - | - | - | - |
| | Qualcomm | - | 380 | - | - | - | - | - | - |
| | Alcatel Lucent S-BTS | - | - | - | - | 6,400 | - | 1,300 | - |
| | Current Network Maintenance/Capex | - | 250 | - | - | 750 | - | - | 850 |
| | **Subtotal - USES (CAPEX)** | 2,025 | 630 | 3,425 | - | 7,150 | - | 1,300 | 850 |
| Debt Service | Cash Interest | | | | | | | | |
| Restructuring Related | Restructuring Prof exclud W&C / Blackstone | 5,329 | 2,865 | 2,165 | 3,541 | 1,425 | 1,325 | 1,425 | 2,365 |
| | LP Adequate Protection Payments | 6,250 | - | - | - | - | - | - | - |
| | **Total Uses** | 27,809 | 8,757 | 10,342 | 26,109 | 14,525 | 6,064 | 25,824 | 9,019 |
| | **Net Uses (Total Sources - Total Uses)** | (26,469) | 89,196 | (8,921) | (24,763) | (12,280) | (4,412) | (24,443) | (6,867) |
| | **LP Group Ending Cash Balance (excluding Cash at TMI)** | (7,928) | 89,196 | 83,804 | 59,041 | 46,761 | 42,349 | 17,906 | 11,039 |
| | TMI Beginning Cash Balance | 11,457 | 3,529 | - | - | - | - | - | - |
| | Use of TMI Cash | (7,928) | (3,529) | - | - | - | - | - | - |
| | **TMI Ending Cash Balance** | 3,529 | - | - | - | - | - | - | - |
| | **LP Group Ending Cash Balance including Cash at TMI** | 3,529 | 92,725 | 83,804 | 59,041 | 46,761 | 42,349 | 17,906 | 11,039 |
| | **Inc Group Ending Cash Balance** | 2,109 | 17,492 | 16,290 | 14,922 | 13,607 | 12,479 | 11,583 | 2,995 |
| | **Consolidated Ending Cash Balance including Cash at TMI** | 5,638 | 110,217 | 100,093 | 73,963 | 60,367 | 54,828 | 29,489 | 14,034 |

[1] Net of estimated fees of $7.0 for Ad Hoc Group Advisors
Note: Budget does not capture fees that could potentially be incurred in connection with the First Lien Loan Facility

# Global Plan DIP Budget Financial Forecast Inc Group

Dollars in thousands

| Quarter | | 2Q14 | | | 3Q14 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Month | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 |
| **Beginning Cash Balance** | 5,029 | 2,109 | 17,492 | 16,290 | 14,922 | 13,607 | 12,479 | 11,583 |
| **Sources** | | | | | | | | |
| Satellite Revenue | - | - | - | - | - | - | - | - |
| Interest Income | 1 | 1 | 2 | 3 | 3 | 2 | 2 | 2 |
| Equity Financing | - | - | - | - | - | - | - | - |
| Net Debt Financing (Post fees, post paydown of existing DIP) [1] | - | 25,000 | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - |
| **Total Sources** | 1 | 25,001 | 2 | 3 | 3 | 2 | 2 | 2 |
| **Uses (OPEX)** In-Orbit / Launch Insurance | - | - | - | - | - | - | - | - |
| ISAT Coop Agmt | - | - | - | - | - | - | - | - |
| 1.6 GHz Lease & Related Payments | 60 | 7,444 | 180 | 75 | 294 | 75 | 75 | 7,444 |
| L-Band network infrastructure | - | - | - | - | - | - | - | - |
| Spectrum Management | - | - | - | - | - | - | - | - |
| Staffing Related (entire company) | - | - | - | - | - | - | - | - |
| Legal / Regulatory / Lobbying / International | 48 | 26 | 26 | 52 | 26 | 26 | 26 | 52 |
| Facilities/Telecom | - | - | - | - | - | - | - | - |
| G&A | 923 | 80 | 80 | 80 | 80 | 111 | 80 | 80 |
| Auditing / Tax Professionals | 200 | 200 | 200 | 200 | 200 | 200 | - | - |
| Travel Expenses | - | - | - | - | - | - | - | - |
| Other Items | - | - | - | - | - | - | - | - |
| **Subtotal - USES (OPEX)** | 1,231 | 7,750 | 486 | 407 | 600 | 412 | 181 | 7,576 |
| **Uses (CAPEX)** Boeing Payments | - | - | - | - | - | - | - | - |
| Qualcomm | - | - | - | - | - | - | - | - |
| Alcatel Lucent S-BTS | - | - | - | - | - | - | - | - |
| 1.6 GHz related (other than spectrum) | 15 | - | - | - | - | - | - | - |
| Current Network Maintenance/CapEx | - | - | - | - | - | - | - | - |
| **Subtotal - USES (CAPEX)** | 15 | - | - | - | - | - | - | - |
| **Debt Service** Cash Interest | - | - | - | - | - | - | - | - |
| **Restructuring Related** Restructuring Professionals | 1,674 | 1,868 | 718 | 963 | 718 | 718 | 718 | 1,013 |
| **Total Uses** | 2,921 | 9,618 | 1,204 | 1,371 | 1,318 | 1,130 | 899 | 8,590 |
| **Net Uses (Total Sources - Total Uses)** | (2,920) | 15,383 | (1,202) | (1,368) | (1,315) | (1,127) | (897) | (8,587) |
| **Inc Group Ending Cash Balance (excl. Cash at TMI)** | 2,109 | 17,492 | 16,290 | 14,922 | 13,607 | 12,479 | 11,583 | 2,995 |

[1] Net of estimated total fees of $3.5mm for Inc Group Advisors
Note: Budget does not capture fees that could potentially be incurred in connection with the First Lien Loan Facility

## Exhibit B

**Proposed DIP Agreement**

EXECUTION COPY

February 14, 2014

LightSquared Inc.
10802 Parkridge Boulevard
Reston, Virginia 20191-5416

$1,650,000,000 Debtor-in-Possession
Commitment Letter
(Amended Global Plan)

Ladies and Gentlemen:

You have advised J.P. Morgan Securities LLC ("JPMorgan"), Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee, the "JPM DIP Lender"), Melody Business Finance, LLC (together with any affiliate thereof as its designee, "Melody Finance"), Centaurus Capital LP ("Centaurus"), Special Value Opportunities Fund, LLC ("SVF"), Tennenbaum Opportunities Partners V, LP ("TOP V"), Tennenbaum Opportunities Fund VI, LLC ("TOF VI"), Tennenbaum Senior Loan SPV IV-A, LLC ("SPV"), Tennenbaum Senior Loan Fund IV-B, LP ("IV-B" and, together with SVF, TOP V, TOF VI and SPV, "Tennenbaum"), LSQ Acquisition Co LLC (collectively, "LSQ") and Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and Credit Distressed Blue Line Master Fund, Ltd. (collectively, "Harbinger"; together with JPMorgan, JPM DIP Lender, Melody Finance, Centaurus and Tennenbaum and LSQ, the "Commitment Parties" or "us") that on or about May 14, 2012 LightSquared Inc., a Delaware corporation ("you" or "LightSquared") and certain of its subsidiaries (collectively, the "Debtors"), including LightSquared LP ("LP") and One Dot Six Corp. ("1.6") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing the chapter 11 cases (the "Chapter 11 Cases"), which Chapter 11 Cases have been recognized as foreign main proceedings by the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to part IV of the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings").

In connection with the Debtors' Third Amended Joint Plan, dated February 14, 2014 (including the Plan Supplement and Plan Documents as such terms are defined therein, as amended, waived or supplemented with the prior written consent of the JPM DIP Lender, Melody Finance, Harbinger and LSQ Acquisition Co LLC (collectively, the "Initial Lenders") (the "Plan")), the Lead Arranger (as defined below) has agreed to arrange and (a) the Commitment Parties have agreed to provide, $1,350,000,000 of

new money loans (the "<u>Tranche A DIP Loans</u>") to LightSquared, LP and 1.6 (collectively, the "<u>Borrowers</u>") and (b) Lenders under the Prepetition LP Agreement (as defined below) and/or the Commitment Parties have agreed to provide $300,000,000 of loans to the Borrowers (the "<u>Tranche B DIP Loans</u>") consisting of, as applicable, "rolled-up" loans deemed issued in exchange for a like amount of obligations outstanding under the Prepetition LP Agreement or new money loans.  The financing facility under which the Tranche A DIP Loans and the Tranche B DIP Loans are made shall be referred to as the "<u>DIP Facility</u>".

The cash proceeds of the DIP Facility shall be used in accordance with the Plan to (i) refinance in full the allowed outstanding amounts under the debtor in possession financing facility for LP approved by the Bankruptcy Court on February 2, 2014 (such financing facility, the "<u>Existing LP DIP Facility</u>"), (ii) refinance in full the allowed outstanding amounts under the debtor in possession financing facility under the Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012, as heretofore amended, supplemented or otherwise modified (such financing facility, the "<u>Existing 1.6 DIP Facility</u>", together with the Existing LP DIP Facility, the "<u>Existing DIP Facilities</u>"), among 1.6, as borrower, the subsidiary and parent guarantors party thereto, the lenders party thereto and U.S. Bank National Association, as administrative agent, (iii) refinance in full the outstanding amounts under the Credit Agreement, dated as of October 1, 2010 (as heretofore amended, supplemented or otherwise modified, the "<u>Prepetition LP Agreement</u>", and the financing facility thereunder, the "<u>Prepetition LP Facility</u>"), among LP, as borrower, the subsidiary and parent guarantors party thereto, the lenders party thereto and UBS AG, Stamford Branch, as administrative agent, that are not (x) converted into Tranche B DIP Loans or (y) Prepetition LP Facility SPSO Claims (such outstanding amounts, the "<u>Specified Prepetition LP Claims</u>"), (iv) refinance in full the allowed outstanding amounts (other than the Prepetition Inc. Facility Subordinated Claims) under the Credit Agreement, dated as of July 1, 2011 (as heretofore amended, supplemented or otherwise modified, the "<u>Prepetition Inc. Agreement</u>", and the financing facility thereunder, the "<u>Prepetition Inc. Facility</u>", together with the Prepetition LP Facility, the "<u>Prepetition Credit Facilities</u>"), among LightSquared, as borrower, the subsidiary guarantors party thereto, the lenders party thereto and U.S. Bank National Association, as administrative agent (such outstanding amounts, the "<u>Specified Prepetition Inc. Claims</u>"), (v) pay the fees and expenses of the transactions contemplated by this Commitment Letter and (vi) provide working capital for the Debtors.  Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exhibits and Schedules attached hereto (such Exhibits and Schedules, together with this letter, collectively, this "<u>Commitment Letter</u>") and, to the extent not defined in this Commitment Letter, the Plan.

The terms and conditions for each of the DIP Facility, the LightSquared Exit Facility (as defined below) and the Second Lien Exit Facility (as defined below) (collectively, the "<u>Credit Facilities</u>") shall be substantially as set forth in the form of the loan agreements attached hereto or to be attached as <u>Exhibit A</u> (the "<u>DIP Agreement</u>"), <u>Exhibit B</u> and <u>Exhibit C</u>[1], respectively, and shall constitute a part of the Plan Supplement and Plan Documents subject to the terms of Plan.

1.  Commitments

In connection with the transactions described above and in the Plan (the "<u>Transactions</u>"), the Commitment Parties are pleased to advise you of their several commitments to provide 100% of the aggregate amount of the Tranche A DIP Loans and, in the event and to the extent the lenders under the Prepetition LP Agreement do not "roll-up" into the full amount of the Tranche B DIP Loans, the Tranche B DIP Loans, according to their respective commitment percentages set forth on <u>Schedule I</u> hereto, upon the terms and conditions set forth in this Commitment Letter (<u>provided</u> that the individual Harbinger

---

[1]         To be filed.

2

affiliates' share of their aggregate liability shall be based further on the value of each Harbinger affiliate's aggregate investments in LightSquared as determined by Harbinger).

2.   Titles and Roles

It is agreed that JPMorgan will act as sole lead arranger and sole bookrunner for the Credit Facilities (acting in such capacities, the "Lead Arranger").

It is further agreed that JPMorgan will have "left" placement in any marketing materials or other documentation used in connection with the Credit Facilities.  You agree that no agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than with respect to any administrative agent for each Credit Facility and as expressly contemplated by Section 4 hereof) will be paid in connection with the Credit Facilities unless you and we shall so reasonably agree.

3.   Information

You hereby represent and warrant that (a) all information and materials, other than the Projections and information of a general economic or industry-specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto and made available to us) and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by such preparer to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material).  You agree that if, at any time prior to the closing date of the DIP Facility (the "Closing Date"), you become aware that any of the representations in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances.  You understand that in arranging the DIP Facility we may use and rely on the Information and Projections without independent verification thereof.

4.   Break-Up Fee

As consideration for the commitments of the Commitment Parties hereunder and in connection with the Plan, the Debtors hereby agree to pay, only in the circumstances described in the following sentence, a break-up fee in the aggregate amount of $100,000,000 (the "Break-Up Fee") for the ratable benefit of the Commitment Parties in accordance with their commitment percentages set forth on Schedule I.  The Break-Up Fee shall be irrevocably earned by the Commitment Parties on the Closing Date, shall constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan and shall be payable in U.S. dollars in immediately available funds to accounts designated by each of the Commitment Parties in writing to you on the earliest of the date (i) the Debtors propose or support any plan in the Chapter 11 Cases other than the Plan without the prior written consent of each of the Initial Lenders, (ii) the Debtors withdraw the Plan or propose any modifications thereto pursuant to section 1127(b) of the

Bankruptcy Code without the prior written consent of each of the Initial Lenders and (iii) the confirmation of any plan in the Chapter 11 Cases other than the Plan; provided in the case of clauses (i), (ii) and (iii) that the conditions to the effectiveness of the Plan were capable of being satisfied at the times set forth in clauses (i), (ii) or (iii), or such conditions would have been capable of being satisfied but for the passage of time.

You agree that, once paid, the Break-Up Fee or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed by you and each of the Initial Lenders in writing.  The Break-Up Fee shall be in addition to any reimbursement of the out-of-pocket expenses as provided for in Section 6.  You and the Commitment Parties expressly agree and acknowledge that the right of the Commitment Parties to receive payment of the Break-Up Fee (and not the mere obligation of the Debtors to seek approval from the Bankruptcy Court of such right), is actually necessary to (x) preserve the value of the Debtors' estates and (y) induce the Commitment Parties to execute and deliver this Commitment Letter and to enter into the transactions contemplated hereby, and that the Commitment Parties would not have done so without receiving such right.

5.   Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 5 and in Article IV of the DIP Agreement.

Each Commitment Party's commitments and agreements hereunder are further subject to (a) the Initial Lenders' reasonable satisfaction with, and approval by the Bankruptcy Court of, (i) this Commitment Letter and the DIP Facility, including without limitation, the superpriority administrative expense priority of, and the senior priming and other liens to be granted to secure, the Break-Up Fee, the indemnification and other obligations and the DIP Facility, and all definitive documentation in connection therewith substantially consistent with the Exhibits hereto and (ii) all actions to be taken, undertakings to be made and obligations to be incurred by the Loan Parties (as defined in the DIP Agreement) in connection with the DIP Facility and all liens or other security to be granted by the Loan Parties in connection with the DIP Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court reasonably satisfactory in form and substance to each of the Initial Lenders, which orders shall, among other things, approve the terms of this Commitment Letter and the definitive documentation); (b) since January 31, 2014, there not having been any change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of LightSquared and its subsidiaries, taken as a whole, other than customary events leading up to, resulting from and following the commencement of proceedings under chapter 11 of the Bankruptcy Code; (c) the Initial Lenders not becoming aware after the date hereof of any information or other matter (including any matter relating to assumptions for the Projections) affecting you, your subsidiaries or the Transactions that in the Initial Lenders' judgment is inconsistent in a material and adverse manner with any such information or other matter disclosed to the Initial Lenders prior to the date hereof; (d) your performance of  your obligations hereunder in all material respects; (e) entry, on or before March 31, 2014 (or if as of March 31, 2014 the Bankruptcy Court has completed hearings on the Plan and the DIP Facility, and has taken the matter under advisement, on or before April 15, 2014 (the "Outside Date")), by the Bankruptcy Court of (i) a final order approving the DIP Facility as described in clause (a) above (the "DIP Order") and (ii) an order confirming the Plan (the "Confirmation Order"), which orders shall (i) be in form and substance satisfactory to each of the Initial Lenders in their sole discretion, (ii) be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Initial Lenders in their sole discretion, (iii) not have been reversed, vacated, amended, supplemented or otherwise modified in any manner without the written consent of the Initial Lenders and (iv) be recognized and given full

4

force and effect by the Canadian Court in the Canadian Proceedings; (f) on and after the date hereof, the Debtors not having withdrawn (or supported any other person's motion to withdraw) the Plan or supported any plan in the Chapter 11 Cases other than the Plan; (g) the commitment letter, dated the date hereof, between JPMorgan, one or more of its affiliates and you in respect of first lien exit financing for Newco (including any definitive documentation in respect thereof, the "First Lien Exit Documents") shall (x) be in form and substance reasonably satisfactory to each of the Initial Lenders in their sole discretion, (y) have been executed and delivered on the date hereof by the parties providing such commitments and agreements and (z) not have been terminated and be in full force and effect, (h) the form of each of the (i) definitive documentation in respect of exit financing for reorganized LightSquared (the facility that is the subject thereof, the "LightSquared Exit Facility"), (ii) definitive documentation in respect of second lien exit financing for Newco (the facility that is the subject thereof, the "Second Lien Exit Facility") and (iii) purchase and sale agreement between LightSquared and Newco, pursuant to which LightSquared will agree to sell to Newco, and Newco will agree to purchase, all of the equity interests and assets owned by LightSquared as more particularly set forth in the Plan shall be in form and substance reasonably satisfactory to each of the Initial Lenders in their sole discretion; and (i) the consummation of the transactions contemplated by the DIP Facility on or before the earlier to occur of the 15th day after entry of the Confirmation Order and April 30, 2014.

6.    Indemnification and Expenses

You agree (a) to indemnify and hold harmless each Commitment Party, its affiliates and each Commitment Party's directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, or the use of the proceeds thereof, and the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to (i) legal fees and expenses or (ii) losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such indemnified person or its control affiliates, directors, officers or employees (collectively, the "Related Parties") and (b) if the Closing Date occurs, to reimburse certain reasonable and documented out-of-pocket expenses (if any) as agreed between the Initial Lenders and you that have been invoiced prior to the Closing Date (including due diligence expenses, fees and expenses of consultants (so long as approved by you), travel expenses (so long as approved by you), and the fees, charges and disbursements of counsel) incurred in connection with each of the DIP Facility and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof.  It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facility on a several, and not joint, basis with any other Commitment Party (or any of its Related Parties).  No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of such indemnified person.  None of the indemnified persons or you or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facility or the transactions

5

contemplated hereby, <u>provided</u> that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6.

7.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, your affiliates and of other companies that may be the subject of, or may affect, the transactions contemplated by this Commitment Letter. In addition, each Commitment Party will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you and your affiliates, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and none of the Commitment Parties had an obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

8.   Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) you and your officers, directors, employees, affiliates, members, partners (limited or general), stockholders, subsidiaries, parent entities, attorneys, accountants, agents and advisors (including financial advisors and valuation or appraisal firms), other representatives, or current or prospective financing sources or to any person holding a participation interest in all or part of your rights and obligations hereunder or to any transferee or potential transferee (solely to the extent permitted herein), in each case on a confidential and need-to-know basis, (b) to the extent required in any legal, judicial or administrative proceeding (including, without limitation, in the Bankruptcy Court and the Canadian Court) or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (c) in a Bankruptcy Court filing in order to implement the transactions contemplated hereunder and (d) upon notice to the Commitment Parties, in connection with any public filing requirement.

The Commitment Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to any Lenders or participants or prospective Lenders or participants and such prospective Lenders' and participants' Representatives (as defined below), (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions and any related transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense; provided that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with customary market standards for dissemination of such type of information. The provisions of this paragraph shall automatically terminate one year following the date of this Commitment Letter.

9.   Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including without limitation, any other parties in interest in the Chapter 11 Cases, any supporters of the Plan or any other plan of reorganization or any other provider of equity or debt financing) other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree. The Commitment Parties may at any time and from time to time in their discretion assign all or any portion of their commitments to one or more of their controlled affiliates, provided that such affiliates are creditworthy or have been consented to by each of the JPM DIP Lender, Melody Finance and LSQ. Except as provided in the immediately preceding sentence, other than as previously disclosed to the Initial Lenders on or prior to the date hereof (and in the amounts set forth in such disclosure) and other than participations granted on or prior to February 14, 2014 (which participations shall have no right of elevation and shall not be elevated to a direct holding or assignment and shall have no direct or indirect voting or consent rights hereunder but, for the avoidance of doubt, such participations may be assigned (but not elevated) to one or more controlled affiliates of the initial participant thereof that are creditworthy or have been consented to by each of the JPM DIP Lender, Melody Finance and LSQ), the Commitment Parties may not assign, or create participating interests in, their rights or obligations under this Commitment Letter (and any purported assignment or participation shall be null and void). In no event may any assignee or participant at any time, directly or indirectly, hold rights or obligations hereunder in an aggregate amount in excess of the amount disclosed to the Initial Lenders in connection with the consent granted with respect to such assignment or participation.

7

This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Initial Lender; <u>provided</u> that, to the extent any waiver or amendment disproportionately affects any other Commitment Party, such Commitment Parties so affected shall also be required to sign such instrument. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the documents referred to herein and in the Plan are the only agreements that have been entered into among us and you with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court over any suit, action or proceeding arising out of or relating to transactions contemplated by this Commitment Letter or the performance of services hereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the performance of services hereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>"), it is required to obtain, verify and record information that identifies the Borrowers and each other Loan Party, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrowers and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each Commitment Party and each Lender.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; <u>provided</u> that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Loan Documents (as defined in the DIP Agreement) upon the initial funding thereunder, and you shall automatically be released from all liability in connection herewith at such time, in each case to the extent the DIP Documentation has comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than 5:00 p.m., New York City time, on the earlier of (a) the Outside Date and (b) the date of entry of the Confirmation Order. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the conditions precedent set forth in Section 5 above cannot be satisfied, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension.

8

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By: _____

Name: Joshua Kramer

Title: Executive Director

CHASE LINCOLN FIRST COMMERCIAL
CORPORATION

By: _____

Name: Holly Santoro

Title: Attorney-in-fact

*Commitment Letter Signature Page*

MELODY BUSINESS FINANCE, LLC

By: _____

Name: _____

Title: _____

CENTAURUS CAPITAL LP

By: CENTAURUS HOLDINGS LLC, its General Partner

By:_____

    Name:  John. D. Arnold
    Title:  Manager

SPECIAL VALUE OPPORTUNITIES FUND, LLC
TENNENBAUM OPPORTUNITIES PARTNERS V, LP
TENNENBAUM OPPORTUNITIES FUND VI, LLC
TENNENBAUM SENIOR LOAN SPV IV-A, LLC
TENNENBAUM SENIOR LOAN FUND IV-B, LP

On behalf of each of the above entities:


By: TENNENBAUM CAPITAL PARTNERS, LLC, its
    Investment Manager

By:_____
    Name: Michael Leitner
    Title: Managing Partner

*Commitment Letter Signature Page*

LSQ ACQUISITION CO LLC

By:_____

    Name:            MARC K. FURSTEIN
    Title:            AUTHORIZED SIGNATORY

*Commitment Letter Signature Page*

HARBINGER CAPITAL PARTNERS MASTER FUND
I, LTD.
By: Harbinger Capital Partners LLC, its investment
manager

By: _____

    Name:  Philip Falcone
    Title:   President


HARBINGER CAPITAL PARTNERS SPECIAL
SITUATIONS FUND, L.P.
By: Harbinger Capital Partners Special Situations GP,
LLC, its general partner

By: _____

    Name:  Philip Falcone
    Title:   President


CREDIT DISTRESSED BLUE LINE MASTER FUND,
LTD.
By: Harbinger Capital Partners II LP, its investment
manager

By: _____

    Name:  Philip Falcone
    Title:   President


*Commitment Letter Signature Page*

Accepted and agreed to as of the date first written above:

LIGHTSQUARED INC., as Debtor and Debtor in Possession

By: _____

    Name:

    Title:

ONE DOT SIX CORP., as Debtor and Debtor in Possession

By: _____

    Name:

    Title:

LIGHTSQUARED LP, as Debtor and Debtor in Possession

By: _____

    Name:

    Title:

Schedule I to
Commitment Letter

### **Tranche A DIP Loan Commitments**

| Commitment Party | Commitment Percentage |
|---|---|
| Harbinger | 11.11% |
| JPM DIP Lender | 22.22% |
| LSQ | 25.93% |
| Melody Finance | 28.74% |
| SVF | 0.37% |
| TOP V | 1.11% |
| TOP VI | 1.48% |
| SPV | 1.43% |
| IV-B | 0.57% |
| Centaurus | 7.04% |

**Exhibit A**

================================================================

**$1,650,000,000**

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION LOAN AGREEMENT**

**dated as of [_____], 2014**

**among**

**LIGHTSQUARED INC.,**
**LIGHTSQUARED LP and**
**ONE DOT SIX CORP.,**
**as Borrowers,**

**THE GUARANTORS PARTY HERETO,**

**THE LENDERS PARTY HERETO,**

**and**

**[_____],**
**as Administrative Agent and Collateral Agent**

================================================================

**J.P. MORGAN SECURITIES LLC,**
**as Sole Lead Arranger and Sole Bookrunner**

[Table of Contents]

SCHEDULES

| | |
|---|---|
| Schedule 1.01(a) | Disqualified Companies |
| Schedule 1.01(b) | Guarantors |
| Schedule 2.01 | Commitments; Applicable Percentages |
| Schedule 3.03 | Governmental Approvals; Compliance with Laws |
| Schedule 3.05(b) | Real Property |
| Schedule 3.07(a) | Outstanding Warrants, Options, Etc. |
| Schedule 3.07(c) | Organizational Chart |
| Schedule 3.08 | Litigation |
| Schedule 3.09 | Material Agreements |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.18 | Insurance |
| Schedule 3.20(a) | Communications Licenses |
| Schedule 3.20(b) | FCC Proceedings |
| Schedule 6.01(b) | Existing Indebtedness |
| Schedule 6.02(c) | Existing Liens |
| Schedule 6.04(a) | Existing Investments |
| Schedule 6.06(f) | Contemplated Asset Sales |
| Schedule 6.08(d) | Transactions with Affiliates |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption |
| Exhibit B-1 | Form of Borrowing Request |
| Exhibit B-2 | Form of Withdrawal Notice |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Note |
| Exhibits E-1 - E-4 | Forms of U.S. Tax Compliance Certificate |

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION LOAN AGREEMENT**

   This **SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "**Agreement**") dated as of [_____], 2014, among LightSquared Inc., a Delaware corporation ("**LightSquared Inc.**"), LightSquared LP, a Delaware limited partnership ("**Partnership**"), One Dot Six Corp., a Delaware corporation ("**One Dot Six**", together with LightSquared Inc. and Partnership, each individually a "**Borrower**" and collectively, the "**Borrowers**"), each such Borrower a debtor and debtor-in-possession in a Chapter 11 Case, LightSquared Inc., as the Borrower Agent, the Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), the Lenders and [_____], as administrative agent for the Lenders (in such capacity, "**Administrative Agent**") and as collateral agent (in such capacity, "**Collateral Agent**").

**WITNESSETH:**

   WHEREAS, on May 14, 2012 (the "**Petition Date**"), the Loan Parties commenced Chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

   WHEREAS, from and after the Petition Date, each of the Loan Parties continues to operate its business and manage its property as a debtor and a debtor-in-possession pursuant to the Bankruptcy Code; and

   WHEREAS, the Borrowers have requested, among other things, to refinance all allowed claims under the Existing LP DIP Credit Documents and the Existing 1.6 DIP Credit Agreement and refinance in part the claims under the Prepetition LP Credit Agreement and the Prepetition Inc. Credit Agreement with a new debtor-in-possession facility in an aggregate principal amount of $1,650,000,000 which shall, to the extent of any excess, be used to fund the working capital requirements and other expenses of the Borrowers during the pendency of the Chapter 11 Cases and in accordance with Section 3.12 hereto.

   NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

**ARTICLE I**

**DEFINITIONS**

**SECTION 1.01  Defined Terms**.

   As used in this Agreement, the following terms shall have the meanings specified below:

   "**ABR Loan**" shall mean a Loan bearing interest at a rate determined by reference to the Alternate Base Rate.

-1-

"**Accepting Lenders**" shall have the meaning assigned to such term in <u>Section 2.19(a)</u>.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as a successor pursuant to <u>Article IX</u>.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"**Affected Tranche**" shall have the meaning assigned to such term in <u>Section 2.19(a)</u>.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided, however*, that, for purposes of <u>Section 6.08</u>, the term "**Affiliate**" shall also include (a) any person that directly or indirectly owns more than 10% of the Equity Interests of the person specified or (b) any person that is an executive officer or director of such specified person.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "**Agent**" shall mean either of them as the context requires.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Allowed Non-Converted Prepetition LP Facility Non-SPSO Claims**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Allowed Prepetition Inc. Facility Non-Subordinated Claims**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day *plus* ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month *plus* 1.0%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"**AML Legislation**" shall have the meaning assigned to such term in <u>Section 10.17</u>.

"**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction applicable to the Borrowers or their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

2

"**Anti-Terrorism Laws**" shall mean any Requirement of Law related to terrorism financing or money laundering including the USA PATRIOT Act, The Currency and Foreign Transactions Reporting Act, 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes the following Canadian requirements: Part II.1 of the Criminal Code, the PCTFA, the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism, the Special Economic Measures Act (Canada) and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" shall mean, at any time, (a) 10.00% per annum, in the case of ABR Loans and (b) 11.00% per annum, in the case of Eurodollar Loans.

"**Approved Electronic Communications**" shall mean any notice, demand, communication, information, document or other material that any Loan Party provides to the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Agents or the Lenders by means of electronic communications pursuant to Section 10.01(b).

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" shall mean (a) any allocation, conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible, including rights under the Inmarsat Agreement but excluding leases (or subleases) of capacity on any satellite in the ordinary course of business and dispositions of cash and Cash Equivalents by any Company in the ordinary course of business in accordance with the DIP Budget (subject to the Maximum Variance)) whether pursuant to Section 363 of the Bankruptcy Code, a plan under Section 1129 of the Bankruptcy Code or otherwise and (b) any issuance, sale or other disposition of any Equity Interests of any Company.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A, or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrowers' then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "**Capital Lease Obligations**".

3

"**Bankruptcy Code**" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, 11 U.S.C. §§ 101 et seq, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (a) in the case of any corporation, the board of directors of such person, (b) in the case of any limited liability company, the board of directors or board of managers of such person, as the case may be, (c) in the case of any partnership, the Board of Directors of the general partner of such person, (d) in any other case, the functional equivalent of the foregoing and (e) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" shall mean Boeing Satellite Systems, Inc.

"**Borrower**" or "**Borrowers**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower Agent**" shall have the meaning assigned to such term in Section 2.18(h).

"**Borrowing Request**" shall mean a request by the Borrower Agent in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B-1, or such other form as shall be approved by the Administrative Agent.

"**Budget Variance**" shall mean the percentage deviation for all operating expense items during any Testing Period, in the aggregate for all operating expense items, from the amount set forth in the DIP Budget for all operating expense items for such Testing Period; *provided* that no deviation in respect of the budgeted amount for payments under the One Dot Six Lease set forth in the DIP Budget shall be permitted hereunder.

"**Business Day**" shall mean (a) any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close and (b) with respect to all notices, determinations, fundings and payments in connection with the Eurodollar Rate or any Eurodollar Loans, the term "**Business Day**" means any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in dollar deposits in the London interbank market.

"**Canadian Court**" shall mean the Ontario Superior Court of Justice (Commercial List).

4

"**Canadian GAAP**" shall mean such generally accepted accounting principles in Canada as are used by the Canadian Loan Parties, applied on a consistent basis.

"**Canadian Income Tax Act**" means the *Income Tax Act* (Canada), and the regulations thereunder, as amended from time to time.

"**Canadian Loan Party**" means any Loan Party incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"**Canadian Pension Plan**" means a "registered pension plan", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Plan Event**" means any event prohibited by Section 6.19 hereof which could reasonably be expected to result in liability for any Company.

"**Canadian Radiocommunication Act**" shall mean the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Security Agreement**" shall mean a Canadian Security Agreement among the Loan Parties party thereto for the benefit of the Collateral Agent and the Secured Parties.

"**Canadian Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" shall mean the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capital Assets**" shall mean, with respect to any person, any equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with the DIP Budget, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Expenditure Covenant**" shall have the meaning assigned to such term in Section 6.09(b).

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures made directly or indirectly by the Borrowers and their Subsidiaries during such period for Capital Assets (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability).  For the avoidance of doubt, Capital Expenditures shall not be treated as operating expenditures for purposes of calculating compliance with Section 6.09(a).

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be

5

classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" shall have the meaning given to such term in the DIP Order.

"**Cash Collateral**" shall mean all cash, negotiable instruments, documents of title, securities, deposit accounts, or other Cash Equivalents whenever acquired which constitutes DIP Collateral, including all proceeds, products, offspring, rents, or profits relating to same.

"**Cash Collateral Order**" shall mean the Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay [Docket No. 544], as amended by Orders of the Bankruptcy Court dated December 20, 2013, February 4, 2014, and as further amended, supplemented or otherwise modified from time to time.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $1,000,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-2 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-2 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of any Company. "**Casualty Event**" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)   a change of control occurs under any Material Indebtedness (the enforcement of which is not stayed by the Chapter 11 Cases);

(b)   any plan relating to the liquidation or dissolution of any Loan Party is adopted;

(c)   the Permitted Holders (collectively) shall fail, directly or indirectly, (i) to own, or to have the power to vote or direct the voting of, a majority of the Voting Stock of any Borrower or (ii) to own Equity Interests representing a majority of the total economic interests of the Equity Interests of any Borrower; or

(d)   LightSquared Inc. shall fail, directly or indirectly, to own Equity Interests representing 100% of the Equity Interests of One Dot Six or the Partnership (other than any existing Preferred Stock of the Partnership).

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking into effect of any law, treaty, order, policy, rule or regulation, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Change in Law**", regardless of the date enacted, adopted or issued.

"**Chapter 11 Cases**" shall have the meaning assigned to such term in the recitals hereto.

"**Charges**" shall have the meaning assigned to such term in <u>Section 10.14</u>.

"**Claim**" shall have the meaning assigned to such term in <u>Section 10.03(b)</u>.

7

"**Closing Date**" shall mean the date on which the conditions specified in Article IV have been satisfied (or waived in accordance with Section 10.02(b)).

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral Account**" shall have the meaning assigned to such term in Section 2.02(b).

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as a successor pursuant to Article IX.

"**Commitments**" shall mean, collectively, the Tranche A Commitments and the Tranche B Commitments. The aggregate amount of the Lenders' Commitments as of the Closing Date is $1,650,000,000.

"**Communications**" shall have the meaning assigned to such term in Section 10.01(b).

"**Communications Act**" shall mean the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" shall mean the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications Licenses**" shall mean (1) the One Dot Six License and (ii) all other authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, Industry Canada and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" shall mean LightSquared Inc. and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit C.

"**Confirmation Order**" shall mean [___] [Docket No. ____], which shall be a final order, together with all extensions, modifications and amendments thereto to the extent permitted herein.

8

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties but shall include agreements which purport to make any person primarily liable for Indebtedness or other obligations of the primary obligor so long as such primary obligor has a corresponding primary obligation with respect to such Indebtedness or other obligation. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Controlled Investment Affiliate**" shall mean, as to any person, any other person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such person and is organized primarily for making equity or debt investments in any Borrower or other portfolio companies.

"**Cooperation Agreement Order**" shall mean the final order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] authorizing the applicable Debtors' assumption and amendment of the Inmarsat Agreement on terms and conditions reasonably satisfactory to each of the Initial Lenders, as such order may be amended, supplemented or otherwise modified from time to time with the consent of each of the Initial Lenders.

"**CRTC**" shall mean the Canadian Radio-television and Telecommunications Commission, or any successor agency administering the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Currency Due**" shall have the meaning assigned to such term in Section 2.17.

9

"**Debt Issuance**" shall mean the incurrence by any Company of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor Relief Laws**" shall mean the Bankruptcy Code, BIA, CCAA, Winding Up Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, Canada or other applicable jurisdictions from time to time in effect.

"**Debtors**" shall mean, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc., each as debtor and debtor-in-possession in the Chapter 11 Cases.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(c).

"**DIP Budget**" shall mean the monthly cash flow forecast for the Borrowers and their Subsidiaries for the period from the Closing Date through December 31, 2014, in form, substance and detail reasonably satisfactory to each of the Initial Lenders.

"**DIP Collateral**" shall have the meaning assigned to such term in the DIP Order and shall, for the avoidance of doubt, include (x) all of the Loan Parties' lawsuits or causes of action (including post-petition causes of action but excluding Avoidance Actions (as defined below)) and all proceeds thereof and (y) all proceeds of any of the Loan Parties' avoidance actions or claims arising under chapter 5 of the Bankruptcy Code with respect to the Loan Parties (the "**Avoidance Actions**").

"**DIP Liens**" shall have the meaning assigned to such term in the DIP Order.

"**DIP Order**" shall mean the final order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] approving, among other things, the credit facility hereunder, as such order may be amended, supplemented or otherwise modified from time to time with the consent of each of the Initial Lenders.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is

10

180 days after the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Disqualified Company**" shall mean any company which is a competitor of the Borrowers identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), such additional companies which are competitors of the Borrowers and the Affiliates of such companies, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided* that the addition of such persons shall not deem any Lender that is already a Lender, or any Participant that has previously acquired a participation interest in the Loans that was otherwise permitted hereunder, as of the date of such designation to be a Disqualified Company, and such designation shall be effective two (2) Business Days after being notified to Lenders; *provided*, *further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption.  A Disqualified Company will include any Affiliate thereof.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests).  Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "$" shall mean lawful money of the United States.

"**Effective Date**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Eligible Assignee**" shall mean any person to whom it is permitted to assign Loans and Commitments pursuant to Section 10.04(b)(i); *provided* that "**Eligible Assignee**" shall not include (a) any Company or any of its Subsidiaries, (b) any natural person or (c) any Disqualified Company.

"**Embargoed Person**" shall mean any party that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC or resides, is organized or chartered, or has a place of business in a country or territory subject to sanctions or embargo programs administered by OFAC or any other Governmental Authorities under Anti-Terrorism Laws or (b) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (b) any violation or alleged violation of any Environmental Law, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to the Environment or, with respect to Hazardous Materials, human health and safety.

"**Environmental Law**" shall mean any and all present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or, with respect to Hazardous Materials, occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean any issuance of Equity Interests by any Company after the Closing Date, other than Equity Interests issued pursuant to Section 6.12 or stock option plans or other benefit plans or agreements for directors, officers or employees of any Company.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code or under common control within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate of the Companies shall continue to be considered an ERISA Affiliate of the Companies within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Companies and with respect to liabilities arising after such period for which the Companies could be liable under the Code or ERISA.

"**ERISA Event**" shall mean the occurrence of any one or more of the following: (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Single Employer Plan; (e) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by any Company or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; or (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan.

"**Eurocurrency Reserve Requirements**" shall mean, for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Eurodollar Base Rate**" shall mean, with respect to any Eurodollar Loan for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for dollars

13

for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case, the "**Screen Rate**") at approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period; provided, that, if the Screen Rate shall not be available at such time for such Interest Period (an "**Impacted Interest Period**") with respect to dollars, then the Eurodollar Base Rate shall be the Interpolated Rate at such time. "**Interpolated Rate**" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"**Eurodollar Loan**" shall mean a Loan bearing interest at a rate determined by reference to the Eurodollar Rate.

"**Eurodollar Rate**" shall mean, with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; *provided* that in no event shall the Eurodollar Rate be less than 1.00%.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers or any Guarantor hereunder, (a) Taxes imposed on or measured by its net income or branch profits and franchise Taxes imposed on it (in lieu of net income Taxes), however denominated, by a jurisdiction (i) as a result of the recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction or (ii) that are Other Connection Taxes, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower Agent under Section 2.15), any U.S. federal withholding Tax that is imposed on payments pursuant to any Requirements of Law that are in effect at the time such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from the Loan Parties with respect to such withholding Tax pursuant to Section 2.14; *provided* that this subclause (b) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender acquired pursuant to Section 2.15(b), (c) in the case of a Lender who designates a new lending office, any

14

U.S. federal withholding Tax that is imposed on payments pursuant to any Requirements of Law that are in effect at the time of such change in lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from the Loan Parties with respect to such withholding Tax pursuant to Section 2.14, (d) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.14(e), (e) any U.S. federal withholding Taxes imposed under FATCA, or (f) with respect to any payment to be made by any Canadian Loan Party hereunder, any taxes under the Canadian Income Tax Act payable by reason of the recipient being a person with whom the Canadian Loan Party does not deal at arms-length for purposes of the Canadian Income Tax Act at the time of such payment.

"**Existing DIP Obligations**" shall mean an amount equal to the sum of (a) the aggregate amount of all outstanding (i) "Obligations" under (and as defined in) the Existing 1.6 DIP Credit Agreement and (ii) "LP DIP Obligations" under (and as defined in) the Existing LP DIP Credit Documents, in each case, including all principal and interest outstanding thereunder or under the "Loan Documents" (as defined in the Existing 1.6 DIP Credit Agreement) and under the Existing LP DIP Credit Documents) and (b) the aggregate amount of all fees and expenses of the lenders and agents under the Existing 1.6 DIP Credit Agreement and the Existing LP DIP Credit Documents, including all fees and expenses of professionals and advisors, incurred in connection with the refinancing of the Existing 1.6 DIP Credit Agreement and the Existing LP DIP Credit Documents and the Transactions.

"**Existing DIP Orders**" shall mean, collectively, the Existing Inc. DIP Order and the Existing LP DIP Order.

"**Existing Inc. DIP Order**" means the Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay [Docket No. 224], as amended by Orders of the Bankruptcy Court dated March 13, 2013 and December 23, 2013, and as further amended, supplemented or otherwise modified prior to the date hereof.

"**Existing LP DIP Credit Documents**" shall have the meaning assigned to the term "LP DIP Credit Documents" in the Existing LP DIP Order.

"**Existing LP DIP Order**" means the Final Order (A) Authorizing LP DIP Obligors to Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay  [Docket No. 1291], as amended, supplemented or otherwise modified prior to the date hereof.

"**Existing 1.6 DIP Credit Agreement**" shall mean the Senior, Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012, among One Dot Six, as borrower, certain Affiliates of One Dot Six, as guarantors, the lenders party thereto from time to time, and U.S. Bank National Association, as administrative agent and as collateral agent, as amended, supplemented or otherwise modified prior to the date hereof.

"**Exit Agents**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Exit Lenders**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" shall mean the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**FCC Objectives**" shall mean (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding their possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**First Lien Exit Commitment Letter**" shall mean the commitment letter, dated as of [_____], 2014, among J.P. Morgan Securities LLC, JPMorgan Chase Bank, N.A., Credit Suisse Securities (USA) LLC, Credit Suisse AG and LightSquared Inc. in respect of the First Lien Exit Facility, in form and substance reasonably satisfactory to each of the Initial Lenders in their sole discretion.

"**First Lien Exit Facility**" shall have the meaning assigned to such term in the Plan of Reorganization.

16

"**First Satellite**" shall mean the Boeing GEM-F1 (Serial #7984010-103-001) satellite launched on November 14, 2010.

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (a) an individual who is a citizen or resident of the United States, (b) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) maintained or contributed to by any Company or its ERISA Affiliates with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy or arrangement maintained or contributed to by any Company or its ERISA Affiliates with respect to employees employed in Canada, other than a Canadian Pension Plan) or under which any Company could have any liability, contingent or otherwise.

"**Fund**" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, Industry Canada and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development with jurisdiction over any Company).

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantee**" shall mean the guarantee issued pursuant to Article VII by the Guarantors.

"**Guarantor**" shall mean each Borrower (as to the other Borrowers), each Subsidiary of LightSquared Inc. listed on Schedule 1.01(b) [1] and signatory hereto as a

---

[1]    Schedule 1.01(b) to list all of LightSquared Inc.'s direct and indirect subsidiaries, other than the Borrowers.

"Guarantor", and each other Subsidiary of LightSquared Inc. that becomes a party to this Agreement pursuant to Section 5.11.

"**Harbinger**" shall mean, collectively, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and Credit Distressed Blue Line Master Fund, Ltd.

"**Harbinger Entity**" shall mean Harbinger Capital Partners, LLC and any Affiliate thereof.

"**Hazardous Materials**" shall mean the following:  hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" shall mean the orbital performance incentives and liquidated damages that may become due and payable under the Amendment, Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing, as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time to the extent permitted herein.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (h) all Attributable Indebtedness of such person; (i) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (j) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i)

18

above.  The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.  For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Industry Canada**" shall mean the Canadian federal government Department of Industry or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Initial Lenders**" shall mean Melody Business Finance, LLC, LSQ Acquisition Co LLC, Chase Lincoln First Commercial Corporation and Harbinger.

"**Inmarsat Agreement**" shall mean the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among the Partnership, SkyTerra (Canada) Inc., the Borrower Agent and Inmarsat Global Limited, as in effect on the date hereof, as amended, supplemented or otherwise modified from time to time prior to the date hereof, and as further amended, supplemented or otherwise modified from time to time to the extent permitted herein.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Interest Payment Date**" shall mean (a) (i) with respect to any ABR Loan, the last Business Day of each fiscal quarter to occur during any period in which such ABR Loan is outstanding and (ii) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to such Eurodollar Loan, and (b) with respect to any Loan, the Maturity Date.

"**Interest Period**" shall mean, as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower Agent in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower Agent by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; *provided* that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)      if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless

19

the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    the Borrower may not select an Interest Period under a particular tranche that would extend beyond the Maturity Date; and

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"**Investments**" shall have the meaning assigned to such term in <u>Section 6.04</u>.

"**ITU**" shall mean the International Telecommunication Union, or any successor supranational agency that develops standards and procedures concerning radiocommunications.

"**Judgment Currency**" shall have the meaning assigned to such term in <u>Section 2.17</u>.

"**Lead Arranger**" shall mean J.P. Morgan Securities LLC in its capacity as sole lead arranger and sole bookrunner for the loan facilities provided under this Agreement.

"**Lenders**" shall mean (a) the banks, financial institutions, trusts, funds or other entities that are signatories hereto as Lenders and (b) any banks, financial institutions, trusts, funds or other entities that become parties hereto pursuant to an Assignment and Assumption, other than, in each case, any such bank, financial institution, trust, fund or other entity that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**License Subsidiary**" shall mean (a) One Dot Six and (b) each single purpose Subsidiary of the Partnership created solely to hold or lease Communications Licenses for one or more of its businesses.  As of the Closing Date, LightSquared Subsidiary LLC and One Dot Six are the only License Subsidiaries.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or PPSA or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the DIP Order, the Confirmation Order, the Recognition Order and any other instrument or agreement now or

20

hereafter executed and delivered to the Administrative Agent or the Lenders in connection herewith, each as amended and in effect from time to time.

"**Loan Modification Agreement**" shall mean a loan modification agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Borrower Agent, the Administrative Agent and one or more Accepting Lenders, effecting one or more Permitted Amendments and such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.19.

"**Loan Modification Offer**" shall have the meaning assigned to such term in Section 2.19(a).

"**Loan Parties**" shall mean the Borrowers and the Guarantors.

"**Loans**" shall mean the Tranche A Loans and the Tranche B Loans made by the Lenders to the Borrowers pursuant to Section 2.02.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, property, results of operations or condition, financial or otherwise, or material agreements of the Companies, taken as a whole, or the Loan Parties, taken as a whole; (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their material obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Secured Parties under any Loan Document; or (d) a material adverse effect on a material portion of the DIP Collateral or the Liens in favor of the Collateral Agent on the DIP Collateral or the priority of such Liens; *provided* that (i) the events leading up to the filing of the Chapter 11 Cases that have been disclosed to the Lenders on or prior to the Closing Date and (ii) the filing of the Chapter 11 Cases shall not be deemed to constitute or give rise to a Material Adverse Effect.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans) or Hedging Obligations of any Company in an aggregate outstanding principal amount exceeding $1,000,000. For purposes of determining Material Indebtedness, the "principal amount" in respect of any Hedging Obligations of any Company at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Company would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material License**" shall mean, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies.

"**Material Regulatory Request**" shall mean any or all of the following: (a) the License Modification Application (as defined in the General Disclosure Statement to the Plan); (b) the Spectrum Allocation Petition for Rulemaking (as defined in the General Disclosure Statement to the Plan); (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp's lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

"**Maturity Date**" shall mean the earliest to occur of (a) the date on which all of the Obligations have been indefeasibly repaid in full, (b) October 31, 2014, (c) the date of the closing of a sale of all or substantially all of the Loan Parties' assets or stock under Section 363 of the Bankruptcy Code, (d) the Effective Date and (e) the date of termination of the Commitments and/or acceleration of the Obligations following an Event of Default pursuant to Article VIII.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.14.

"**Maximum Variance**" shall mean 15%.

"**MNPI**" shall mean material non-public information (within the meaning of United States federal securities laws) with respect to Borrowers, their Affiliates and any of their respective securities.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA.

"**Net Cash Proceeds**" shall mean:

(a)      with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received (including lease payments or license fees) by any Company (including cash proceeds subsequently received (as and when received by any Company) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Borrower Agent's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by any Company associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) or any remaining amounts payable to the manufacturer of the assets sold in such Asset Sale and, in each case, which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)      with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of (i) all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event and (ii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties that are the subject of such Casualty Event (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such Casualty Event) or any remaining amounts payable to the manufacturer of the assets that are the subject of such Casualty Event and which is repaid with such proceeds; and

(c)    with respect to any Debt Issuance or Equity Issuance by any Company, the aggregate cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith.

"**Network**" shall mean the Terrestrial wireless broadband network being developed by the Companies as of the Closing Date, which network is intended to provide 4G broadband services in the contiguous United States.

"**NewCo Class A Common Interests**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**NewCo Series A-1 Preferred PIK Interests**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**NOAA**" shall mean the National Oceanic and Atmospheric Administration, or any successor agency.

"**NOAA Spectrum**" shall mean the radio frequencies 1675-1680 MHz currently authorized for use by NOAA in the United States.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit D.

"**Obligations**" shall mean (a) obligations of the Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including PIK Interest and interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrowers and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrowers and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents, in each case whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, or one of the Financial Officers, each in his or her official (and not individual) capacity.

"**One Dot Four Corp.**" shall mean One Dot Four Corp., a Delaware corporation.

"**One Dot Six**" shall have the meaning assigned to such term in the preamble hereto.

"**One Dot Six Lease**" shall mean the Lease Purchase Agreement dated as of April 13, 2010, among One Dot Six, as purchaser, TVCC One Six Holdings LLC, as seller, and TVCC Holding Company, LLC (and all rights conveyed thereby to One Dot Six in that certain (a) Long-Term De Facto Transfer Lease Agreement dated as of July 23, 2007, between OP LLC, as lessor, and TVCC One Six Holdings, LLC, as lessee and (b) the Long-Term De Facto Transfer Sublease Agreement dated as of August 13, 2008, between OP LLC, as lessee, and TVCC One Six Holdings, LLC, as lessor), as renewed by One Dot Six on April 2, 2013 and as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time to the extent permitted hereunder.

"**One Dot Six Lease Authorization**" shall mean the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000007295, or another FCC consent substantially replicating that initial consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" shall mean the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**One Dot Six TVCC Corp.**" shall mean One Dot Six TVCC Corp., a Delaware corporation and wholly owned Subsidiary of One Dot Six.

"**Orders**" shall mean the DIP Order, the Confirmation Order, the Recognition Order and, if not otherwise included within the Confirmation Order, the Cooperation Agreement Order.

"**Organizational Documents**" shall mean, with respect to any person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

24

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise, property or similar taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document (and any interest, additions to tax or penalties applicable thereto), except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.15 hereof).

"**Participant**" shall have the meaning assigned to such term in Section 10.04(d).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**Partnership**" shall have the meaning assigned to such term in the preamble hereto.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**PCTFA**" shall mean the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada).

"**Permitted Amendment**" shall mean an amendment to this Agreement and the other Loan Documents, effected in connection with a Loan Modification Offer pursuant to Section 2.19, providing for an extension of the Maturity Date applicable to the Loans of the Accepting Lenders and, in connection therewith (a) a change in the Applicable Margin with respect to the Loans of the Accepting Lenders, (b) a change in the fees payable to, or the inclusion of new fees to be payable to, the Accepting Lenders and/or (c) prepayments of, or changes in amortization or maturity of, Loans of Accepting Lenders.

"**Permitted Holders**" shall mean Sponsor and its Controlled Investment Affiliates.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall have the meaning assigned to such term in the recitals hereto.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.06(b).

"**Plan**" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, any Company or

25

with respect to which, any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Plan of Reorganization**" shall mean the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code dated February [__], 2014, as confirmed by the Confirmation Order,  as amended, supplemented or otherwise modified from time to time in accordance therewith with the consent of the Plan Support Parties.

"**Plan Support Parties**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Platform**" shall mean IntraLinks, SyndTrak or a substantially similar electronic transmission system.

"**PPSA**" shall mean the *Personal Property Security Act* (Ontario), as amended from time to time, together with all regulations made thereunder; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any DIP Collateral is governed by (a) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or (b) the Civil Code of Québec, "**PPSA**" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such DIP Collateral.

"**Preferred Stock**" shall mean, with respect to any person, any and all preferred or preference Equity Interests (however designated) of such person whether now outstanding or issued after the date hereof that is Qualified Capital Stock.

"**Prepetition Inc. Credit Agreement**" shall mean the Credit Agreement dated as of July 1, 2011, among LightSquared Inc., One Dot Six, as a subsidiary guarantor, certain other subsidiary guarantors party thereto, the lenders from time to time party thereto and U.S. Bank National Association, as administrative agent and collateral agent, as amended, supplemented or otherwise modified from time to time prior to the Closing Date.

"**Prepetition Inc. Facility Subordinated Claims**" shall have the meaning set forth in the Plan of Reorganization.

"**Prepetition LP Credit Agreement**" shall mean the Credit Agreement dated as of October 1, 2010 among the Partnership, the other guarantors from time to time party thereto, the lenders from time to time party thereto and UBS AG, Stamford Branch, as administrative agent, as amended, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Prepetition LP Facility Claim**" shall mean, as to any holder thereof, the aggregate principal amount of loans held by such holder under the Prepetition LP Credit Agreement, together with all accrued and unpaid default interest and prepayment premiums on such principal amount through and including the date on which the Bankruptcy Court enters the Confirmation Order.

26

"**Prepetition LP Loan Documents**" shall mean "Loan Documents" as defined in the Prepetition LP Credit Agreement.

"**Prime Rate**" shall mean the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by the Administrative Agent in connection with extensions of credit to debtors).

"**Private Side Communications**" shall have the meaning assigned to such term in Section 10.01(d).

"**Private Siders**" shall have the meaning assigned to such term in Section 10.01(d).

"**Professional Fees**" shall mean the allowed, reasonable, actual, and documented fees and expenses or disbursements of any professionals retained by the Loan Parties incurred in connection with the Chapter 11 Cases.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Public Siders**" shall have the meaning assigned to such term in Section 10.01(d).

"**Purchase and Sale Agreement**" shall mean the purchase and sale agreement, dated as of [_____], 2014, among LightSquared Inc. and certain of its subsidiaries, as sellers, and NewCo (as defined in the Plan of Reorganization), as buyer, in form and substance reasonably satisfactory to each of the Initial Lenders in their sole discretion.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Network; *provided*, *however*, that (a) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such person and (b) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other

27

property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Recognition Order**" shall mean an order or orders of the Canadian Court in the Recognition Proceedings recognizing and giving full force and effect in Canada to among other things, the Confirmation Order, the DIP Order and the Cooperation Agreement Order and granting a super priority Lien over the Canadian assets of the Loan Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, in form and substance reasonably satisfactory to each of the Initial Lenders.

"**Recognition Proceedings**" shall mean the proceedings in the Canadian Court under Part IV of the CCAA recognizing the Chapter 11 Cases as foreign main proceedings.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Remedies Notice Period**" shall have the meaning assigned to such term in Section 8.01.

"**Reorganized LightSquared Inc. Loans**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Required Lenders**" shall mean Lenders holding or having more than 50% of the outstanding principal amount of the Voting Interests.

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law.

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(25), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any

28

Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Restructuring Costs**" shall mean (a) Professional Fees and (b) fees and expenses of the Administrative Agent, the Collateral Agent and the Lenders with respect to the Loans and the Chapter 11 Cases, including, without limitation, attorneys' fees and fees of professional advisors.  For the avoidance of doubt, Restructuring Costs shall not be treated as operating expenditures for purposes of calculating compliance with Section 6.09(a).

"**Restructuring Costs Covenant**" shall have the meaning assigned to such term in Section 6.09(c).

"**Retained Causes of Action**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Sanctioned Country**" shall mean, at any time, a country or territory which is the subject or target of any Sanctions.

"**Sanctioned Person**" shall mean, at any time, (a) any person  listed in any Sanctions-related list of designated persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or by the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a Sanctioned Country or (c) any person controlled by any such person.

"**Sanctions**" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Second Satellite**" shall mean the Boeing-GEM-F2 (Serial #7984010-103-002) satellite in storage as of the date hereof, together with the related ground-based beam formers and related calibration equipment.

"**Second Lien Exit Facility**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Secured Parties**" shall mean, collectively, the Agents and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Single Employer Plan**" shall mean any "**employee benefit plan**" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans)

29

which is sponsored, maintained or contributed to by, or required to be contributed to by, any Company or any of the ERISA Affiliates or with respect to which any Company or any of the ERISA Affiliates has liability that is covered by Title IV of ERISA (but which is not a Multiemployer Plan).

"**Specified Lenders**" shall mean, collectively, Melody Business Finance, LLC, LSQ Acquisition Co LLC and Chase Lincoln First Commercial Corporation.

"**Sponsor**" shall mean collectively, Harbinger Capital Partners LLC and Harbinger Capital Partners LLC II, each a Delaware limited liability company.

"**Sponsor Affiliated Lender**" shall mean the Sponsor and any of its Affiliates, in their capacity as a Lender hereunder.

"**SPSO Claims**" shall mean the Prepetition LP Facility SPSO Claims as defined in the Plan of Reorganization.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (a) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (b) any partnership (i) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (ii) the only general partners of which are the parent and/or one or more subsidiaries of the parent, and (c) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of the Borrower Agent.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Terrestrial**" shall mean, involving only points of communication on earth or within the earth's atmosphere.

"**Testing Date**" shall mean the end of each month, commencing with the end of the first Testing Period.

"**Testing Period**" shall mean the period from the date of the entry of the DIP Order to [_____], 2014, and each trailing two calendar month period thereafter.

"**Tranche A Commitment**" shall mean, as to any Lender, the obligation of such Lender, if any, to make a Tranche A Loan to the Borrowers in a principal amount not to exceed

the amount set forth under the heading "Tranche A Commitment" opposite such Lender's name on Schedule 2.01.    The original aggregate amount of the Tranche A Commitments is $1,350,000,000.

"**Tranche A Lender**" shall mean each Lender that has a Tranche A Commitment or holds a Tranche A Loan.

"**Tranche A Loans**" shall have the meaning assigned to such term in Section 2.01.

"**Tranche B Commitment**" shall mean, as to any Lender, the obligation of such Lender to convert its Prepetition LP Facility Claim into a Tranche B Loan to the Borrowers in a principal amount set forth under the heading "Tranche B Commitment" opposite such Lender's name on Schedule 2.01 in accordance with Section 2.02(c).    The original aggregate amount of the Tranche B Commitments is $300,000,000.

"**Tranche B Lender**" shall mean each Lender that has a Tranche B Commitment or holds a Tranche B Loan.

"**Tranche B Loans**" shall have the meaning assigned to such term in Section 2.01.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Loan Documents, including (a) the execution, delivery and performance of the Loan Documents and the initial borrowings hereunder; (b) the repayment of all allowed Existing DIP Obligations; (c) the repayment in full of the Allowed Prepetition Inc. Facility Non-Subordinated Claims and the Allowed Non-Converted Prepetition LP Facility Non-SPSO Claims; (d) the conversion of a portion of the Tranche B Lenders' Prepetition LP Facility Claims into Tranche B Loans; and (e) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Transfer Proceedings**" shall have the meaning assigned to such term in Section 5.10(d).

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Treasury Rate**" shall mean shall mean, as of any date of determination, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)).

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

31

"**USA PATRIOT Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56).

"**Voting Interests**" shall mean, at any time, all Commitments and/or Loans then outstanding that are not held by a Harbinger Entity; *provided*, *however*, that any Commitments and/or Loans that are not considered Voting Interests due to such Commitments and/or Loans being held by a Harbinger Entity shall become Voting Interests at the time that such Commitments and/or Loans are assigned by any Harbinger Entity to any person (other than another Harbinger Entity) in accordance with Section 10.04.

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Withdrawal Notice**" shall mean a notice delivered by the Borrower Agent to the Administrative Agent in substantially the form of Exhibit B-2, requesting a withdrawal of funds from the applicable Collateral Account.

## SECTION 1.02  Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 1.03   Accounting Terms; GAAP**.

Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by Borrowers and the Required Lenders.

**SECTION 1.04   Resolution of Drafting Ambiguities**.

Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

**SECTION 1.05   Permitted Liens**.

Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

# ARTICLE II

# THE CREDITS

**SECTION 2.01   Commitments**.

Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, (a) each Tranche A Lender agrees, severally and not jointly, to make a term loan (a "**Tranche A Loan**") to the Borrowers on the Closing Date in an amount not to exceed such Lender's Tranche A Commitment and (b) each Tranche B Lender agrees, severally and not jointly, to make a term loan and/or convert a portion of its Prepetition LP Facility Claim into a term loan (a "**Tranche B Loan**") to the Borrowers on the Closing Date in an amount not to exceed such Lender's Tranche B Commitment.  The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower Agent and notified to the Administrative Agent in accordance with Sections 2.02 and 2.10, and each of the Tranche A Loans and Tranche B Loans may consist simultaneously of Eurodollar Loans and ABR Loans. Amounts paid or prepaid in respect of the Loans may not be reborrowed.

**SECTION 2.02   Loans**.

(a)      Each Loan shall be made (or deemed made) by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

33

(b)     Each Tranche A Lender shall make the Tranche A Loan to be made by it hereunder on the Closing Date by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 (noon), New York City time.  On the Closing Date, the Administrative Agent shall promptly credit the amounts so received as follows: (i) amounts to be used on the Closing Date in accordance with Section 3.12(a)(i) shall be deposited in accounts designated by the Borrower Agent in writing to the Administrative Agent in accordance with a funds flow memorandum reasonably satisfactory to each of the Initial Lenders and (ii) the remainder of the Loan proceeds shall be deposited in blocked deposit account number [_____], held at [_____] by the Borrowers and controlled by the Collateral Agent (the "**Collateral Account**"); *provided* that the foregoing is not intended to restrict Investments between the Loan Parties to the extent Loan proceeds are used in accordance with the covenants in Section 6.09.  If a borrowing of the Tranche A Loans shall not occur on such date because any condition precedent herein specified shall not have been met, the Administrative Agent shall return the amounts so received to the respective Lenders.

(c)     Each Tranche B Lender shall be deemed to have made a Tranche B Loan on the Closing Date in full satisfaction on a dollar-for-dollar basis of the amount of such Tranche B Lender's Prepetition LP Facility Claim equal to its Tranche B Commitment.

(d)     Unless the Administrative Agent shall have received written notice from a Lender prior to the Closing Date that such Lender will not make available to the Administrative Agent such Lender's portion of the Loans, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the Closing Date in accordance with Section 2.02(b), and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrowers severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation, and (ii) in the case of Borrowers, the interest rate applicable to such Loans.  If such Lender shall subsequently repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's portion of such Loans for purposes of this Agreement, and Borrowers' obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(d) shall cease and any amounts previously so paid by Borrowers shall be returned to Borrowers.

(e)     Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request any Interest Period for a Eurodollar Loan that would end after the Maturity Date.

(f)     All proceeds of Loans shall be held in the Collateral Account at all times until such proceeds are applied in accordance with Section 2.03(b) for purposes permitted under Section 5.08.

**SECTION 2.03   Borrowing Request; Withdrawals**.

(a)      Borrowing Request.   To request the Loans, the Borrower Agent shall deliver, by hand delivery, e-mail or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent not later than 1:00 p.m., New York City time, three (3) Business Days before the proposed Closing Date; *provided* that at all times, the aggregate amount of (x) ABR Loans and (b) Eurodollar Loans shall, in each case, be ratable between the Tranche A Loans and the Tranche B Loans.   The Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(i)      the aggregate amount of such requested Loans and the aggregate amount of proceeds of the Loans to be deposited in the Collateral Account in accordance with a funds flow memorandum reasonably satisfactory to each of the Initial Lenders;

(ii)      the date of such requested Loans, which shall be a Business Day;

(iii)      in the case of a request for Eurodollar Loans, the length of the initial Interest Period therefor; and

(iv)      that the conditions set forth in Article IV will be satisfied as of the date of the proposed Closing Date.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

(b)      Withdrawal Notices.    The Borrower Agent may deliver to the Administrative Agent a Withdrawal Notice no later than 12:00 (noon), New York City time, on the last Business Day of each fiscal month of the Borrowers or more frequently as the Borrower Agent may request from time to time.   Upon the receipt of a Withdrawal Notice and the satisfaction of the conditions set forth Section 4.02 as determined by the Required Lenders, the Administrative Agent, at the direction of the Required Lenders (which direction the Required Lenders shall give if the conditions set forth herein are satisfied), shall transfer funds from the Collateral Account in an aggregate principal amount equal to the amount specified in such Withdrawal Notice to be drawn from the Collateral Account as the amount necessary to fund the Loan Parties' expenses of the following 30 days in accordance with the DIP Budget (subject to the Maximum Variance), the Capital Expenditure Covenant or the Restructuring Costs Covenant, as the case may be, to an account of the Borrower Agent controlled by the Collateral Agent; *provided* that (x) all cash on hand at TMI Communications Delaware Limited Partnership shall be applied in full in accordance with the DIP Budget prior to the application of any proceeds of the Loans and (y) funds withdrawn from Collateral Account shall be used solely to finance operating expenses, Capital Expenditures and Restructuring Costs in accordance with the DIP Budget (subject to the Maximum Variance) and in compliance with the Capital Expenditure Covenant and the Restructuring Costs Covenant, as applicable.   Each Withdrawal Notice shall contain a certification by the Borrower Agent (I) as to clauses (x) and (y) above and that the withdrawal request pursuant thereto complies, and the application of the funds so withdrawn will comply, with clauses (x) and (y) above and otherwise with the terms of this Agreement in all

35

respects, and (II) that the conditions set forth in <u>Section 4.02</u> have been satisfied, and in each case the Administrative Agent shall be entitled to conclusively rely on such certification.

## SECTION 2.04  <u>Evidence of Debt; Repayment of Loans</u>.

(a)  <u>Promise to Repay</u>.  Each Borrower hereby unconditionally promises, jointly and severally, to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in <u>Section 2.08</u>.

(b)  <u>Lender and Administrative Agent Records</u>.  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.  The Administrative Agent shall maintain records (including the Register maintained pursuant to <u>Section 10.04(c)</u>) including (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.  The entries made in the records maintained by the Administrative Agent (including the Register maintained pursuant to <u>Section 10.04(c)</u>) and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Loans in accordance with their terms.  In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent (including the Register maintained pursuant to <u>Section 10.04(c)</u>) shall control in the absence of manifest error.

(c)  <u>Promissory Notes</u>.  Any Lender by written notice to the Borrower Agent (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns substantially in the form of <u>Exhibit D</u>.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 10.04</u>) be represented by one or more promissory notes in such form payable to such payee and its registered assigns.

## SECTION 2.05  <u>Fees</u>.

(a)  <u>Administrative and Other Fees</u>.  The Borrowers agree, jointly and severally, to pay to the Administrative Agent, for its own account, any administrative and other fees payable in the amounts and at the times separately agreed upon among the Borrowers and the Administrative Agent.

(b)  <u>Fees Generally</u>.  All fees shall be paid on the dates due, in immediately available funds in dollars, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the fees shall be refundable under any circumstances.

**SECTION 2.06    Interest on Loans**.

(a)    Interest on Loans.    Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin.    All Eurodollar Loans shall have the same Interest Period.    Each ABR Loan shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b)    Payment of Interest.    Subject to Section 2.06(d), accrued and unpaid interest on the Loans shall be paid in kind on each Interest Payment Date by adding such accrued and unpaid interest to the unpaid principal amount of the Loans on such Interest Payment Date ("**PIK Interest**") (whereupon from and after any such date such additional amounts shall constitute Loans for all purposes hereunder and under the other Loan Documents and shall accrue interest pursuant to this Section 2.06); *provided* that (i) subject to, and automatically upon, the occurrence of the Effective Date, accrued and unpaid interest (A) in respect of the Tranche A Loans shall convert into, or be exchanged for, in the amounts set forth in the Plan of Reorganization, NewCo Class A Common Interests, NewCo Series A-1 Preferred PIK Interests, Reorganized LightSquared Inc. Loans and/or loans under the Second Lien Exit Facility, as applicable, (B) in respect of the Tranche B Loans shall be paid in cash from the proceeds of the First Lien Exit Facility and (ii) except as described in clause (i), accrued and unpaid interest in respect of any other repayment or prepayment (whether pursuant to a voluntary prepayment, mandatory prepayment, acceleration or otherwise) of any Loan, with respect to the principal amount of the Loan so repaid or prepaid, shall be paid in cash on the Maturity Date and on the date of any such repayment or prepayment.    The obligation of the Borrowers to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any Notes.

(c)    Default Rate.    Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal (including, without limitation, all PIK Interest that has been added to the principal amount) of or interest on any Loan or any fee or other amount payable by any Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum (the "**Default Rate**") equal to 2.0% plus the Eurodollar Rate plus the Applicable Margin for so long as (i) such Event of Default shall be continuing or (ii) such payment obligation is not satisfied.

(d)    Default Interest Payment Dates.    Interest accrued pursuant to Section 2.06(c) shall be payable on demand.

(e)    Interest Calculation.    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to clause (a) of the definition of the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day); *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.13, bear interest for one day.    The applicable Alternate Base Rate or Eurodollar Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive

37

absent manifest error.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

(f)     _Interest Act_ (Canada).  For the purposes of the _Interest Ac_t (Canada) and disclosure thereunder, in any case in which an interest or fee rate is stated in this Agreement to be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate to which such interest or fee rate is equivalent is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation.

(g)     No Criminal Rate of Interest.  If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the _Criminal Code_ (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)     first, by reducing the amount or rate of interest required to be paid to the affected Secured Party; and

(ii)     thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of Section 347 of the _Criminal Code_ (Canada).

### SECTION 2.07   Termination of Commitments.

The Commitments shall automatically terminate upon the funding of the Loans on the Closing Date or as otherwise provided in the commitment letter, dated as of February 14, 2014, among the Borrower Agent, the Lead Arranger, the Initial Lenders and certain other Lenders party thereto in respect of the loan facility to be provided under this Agreement.

### SECTION 2.08   Repayment of Loans.

The Borrowers shall, jointly and severally, pay to the Administrative Agent, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans (including, without limitation, all PIK Interest that has been added to the principal amount), together with accrued and unpaid interest thereon; _provided_ that subject to, and automatically upon, the occurrence of the Effective Date, the Tranche A Loans shall convert into, or be exchanged for, NewCo Class A Common Interests, NewCo Series A-1 Preferred PIK Interests, Reorganized LightSquared Inc. Loans and loans under the Second Lien Exit Facility, each in the amounts set forth, and as further provided, in the Plan of Reorganization.

**SECTION 2.09   Optional and Mandatory Prepayments of Loans**.

(a)   Optional Prepayments.   The Borrowers shall have the right at any time (and from time to time) to prepay the Loans, in whole or in part subject to the requirements of this Section 2.09, without a make-whole or premium; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)   Asset Sales.   Not later than five (5) Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by any Company, the Borrowers shall make prepayments in an aggregate amount equal to 100% of such Net Cash Proceeds, which shall be applied in accordance with Section 2.09(g); *provided* that no such prepayment shall be required under this Section 2.09(b) with respect to (i) Net Cash Proceeds in an aggregate amount not to exceed $500,000 received in respect of Asset Sales permitted by Section 6.06(a) or (g), (ii) the disposition of property which constitutes a Casualty Event or (iii) Net Cash Proceeds received in respect of Asset Sales permitted by Section 6.06(g).

(c)   Casualty Events.   Not later than five (5) Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by any Company, the Borrowers shall make prepayments in an aggregate amount equal to 100% of such Net Cash Proceeds, which shall be applied in accordance with Section 2.09(g); *provided* that:

(i)   so long as no Default or Event of Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date if (x) the Borrower Agent on or prior to such date notifies the Administrative Agent in writing that such proceeds will be used to repair, replace or restore any property in respect of which such Net Cash Proceeds were paid in an aggregate amount not to exceed $5,000,000 or (y) such Casualty Event relates to the First Satellite and the Borrower Agent on or prior to such date notifies the Administrative Agent in writing that such proceeds will be used to pay fees or replacement expenses required to meet license or other regulatory obligations arising out of such Casualty Event, in each case, no later than three (3) months following the date of receipt of such proceeds; *provided*, *further*, that if the property subject to such Casualty Event constituted DIP Collateral, then all property purchased with the Net Cash Proceeds thereof pursuant to this clause (i) shall be made subject to the DIP Liens; and

(ii)   if any portion of such Net Cash Proceeds shall not be so applied within the period specified in clause (i) above, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.09(c).

(d)   Debt Issuance.   Not later than three (3) Business Days following the receipt by any Company of any Net Cash Proceeds of any Debt Issuance by any Company, the Borrowers shall make prepayments in an aggregate amount equal to 100% of such Net Cash Proceeds, which shall be applied in accordance with Section 2.09(g).

(e)   Equity Issuance.   Not later than three (3) Business Days following the receipt by any Company of any Net Cash Proceeds of any Equity Issuance by any Company, the

39

Borrowers shall make prepayments in an aggregate amount equal to 100% of such Net Cash Proceeds, which shall be applied in accordance with Section 2.09(g).

(f)     Notice of Prepayment.     The Borrower Agent shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, (i) one Business Day before the date of prepayment, if such prepayment is an optional prepayment pursuant to Section 2.09(a) and (ii) three Business Days before the date of prepayment, if such prepayment is a mandatory prepayment pursuant to Section 2.09(b), (c), (d) or (e).  Each such notice shall be irrevocable; *provided* that a notice of prepayment so delivered may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by the Borrower Agent (by notice to the Administrative Agent on or prior to the specified prepayment date) if such condition is not satisfied.  Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

(g)     Application of Payments.  Each prepayment of Loans shall be applied ratably among the Loans and otherwise in accordance with this Section 2.09.  Prepayments shall be accompanied by accrued interest.

## SECTION 2.10  Conversion and Continuation Options.

(a)     The Borrower Agent may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, *provided* that (i) any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto and (ii) at all times, the aggregate amount of (A) ABR Loans and (B) Eurodollar Loans shall, in each case, be ratable between the Tranche A Loans and the Tranche B Loans.  The Borrower Agent may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Required Lenders have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower Agent giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.01, of the length of the next Interest Period to be applicable to such Loans, *provided* that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations, and *provided, further,* that (i) if the Borrower Agent shall fail to give any required notice as described above in this

paragraph, any Eurodollar Loan shall automatically continue as such with a one-month Interest Period upon the expiration of the then current Interest Period with respect thereto, or (ii) if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

## SECTION 2.11   Yield Protection.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender (except any such reserve requirement reflected in the Eurodollar Rate);

(ii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes indemnifiable under Section 2.14 and the imposition of, or any change in the rate of, any Taxes described in clauses (b) through (f) of the definition of Excluded Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, Borrowers will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.11 and delivered to the Borrower Agent (with a copy to the Administrative Agent) shall be conclusive absent manifest error.  The

41

Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.11 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.11 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Unlawful Eurodollar Loan.  Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower Agent and to the Administrative Agent:

(i)     such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness (as determined in good faith by such Lender)) be continued for additional Interest Periods; and

(ii)    such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in Section 2.11(f).

In the event any Lender shall exercise its rights under clause (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(f)     Notice to Borrower Agent.  For purposes of Section 2.11(e), a notice to the Borrower Agent by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower Agent.

**SECTION 2.12  Breakage Payments**.

In the event of (a) the payment of any principal of any Eurodollar Loan earlier than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to borrow, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto or (c) the assignment of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto as a result of a request by the Borrower Agent pursuant to Section 2.15, then, in any such event, Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal

amount of such Loan had such event not occurred, at the Eurodollar Rate, over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.12 shall be delivered to the Borrower Agent (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error. Borrowers shall pay such Lender the amount shown as due on any such certificate within three Business Days after receipt thereof.

## SECTION 2.13   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)   Payments Generally.  The Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, premium or fees, or of amounts payable under Section 2.11, 2.14 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at [_____], except that payments pursuant to Sections 2.11, 2.14 and 10.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)   Pro Rata Treatment.

(i)   Each payment by the Borrowers of interest in respect of the Loans (including PIK Interest) shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.

(ii)   Each payment on account of principal of the Loans shall be allocated among the Lenders *pro rata* based on the aggregate principal amount of the Loans then held by the Lenders.

(c)   Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, toward payment of principal then due

43

hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(d)     Sharing of Set-Off.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans (including, without limitation, all PIK Interest that has been added to the principal amount) and accrued interest thereon or other Obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal (including, without limitation, all PIK Interest that has been added to the principal amount) of and accrued interest on their respective Loans and other amounts owing them, *provided* that:

(i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to any Borrower or any Subsidiary or Affiliate thereof (other than any Sponsor Affiliated Lender) (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.13(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.13(d) to share in the benefits of the recovery of such secured claim.

(e)     Borrower Default.  Unless the Administrative Agent shall have received notice from the Borrower Agent prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrowers will not make such payment, the Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the

44

Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

### SECTION 2.14  Taxes.

(a)      Payments Free of Taxes.  Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes; *provided* that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Taxes from such payments, then the applicable withholding agent shall be entitled to make such deductions and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes (including any Other Taxes) then the sum payable by the Loan Parties shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 2.14) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made.

(b)      Payment of Other Taxes by Loan Parties.  Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or, at the option of the Administrative Agent, timely reimburse it for payment of, any Other Taxes.

(c)      Indemnification by Loan Parties.  The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14) paid or payable by the Administrative Agent or such Lender, as the case may be, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower Agent by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)      Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the Borrower Agent and to the Administrative Agent, at the time or times reasonably requested by the Borrower Agent or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Agent or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower Agent or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower Agent or the Administrative Agent as will enable Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(e)(ii)(A), (B) and (D) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrowers are U.S. Borrowers (any person that is a "United States Person" as defined in Section 7701(a)(30) of the Code),

(A)          any Lender that is not a Foreign Lender shall deliver to the Borrower Agent and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower Agent or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 certifying that it is not subject to backup withholding;

(B)          any Foreign Lender shall, to the extent it may lawfully do so, deliver to the Borrower Agent and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Agent or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)   in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States of America is a party, (x) with respect to payments of interest under any Loan Document, duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, duly completed copies of Internal Revenue

46

Service Form W-8BEN (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(ii) duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit E, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower Agent within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms), or

(iv) to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, a certificate in substantially the form of Exhibit E, Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit E, on behalf of such beneficial owner(s);

(C)         Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Agent and the Administrative Agent (in such number of copies as shall be requested by the Borrower Agent or the Administrative Agent) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Agent or the Administrative Agent) duly completed copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrowers and the Administrative Agent to determine the withholding or deduction required to be made; and

(D)         If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Agent and the Administrative Agent at the time or times prescribed by law and at such time or

47

times reasonably requested by the Borrower Agent or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Agent or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Solely for purposes of this paragraph, "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender shall, from time to time after the initial delivery by such Lender of the forms described above, whenever a lapse in time or change in such Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower Agent and the Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Lender's status or that such Lender is entitled to an exemption from or reduction in withholding tax or (2) notify Administrative Agent and the Borrower Agent of its inability to deliver any such forms, certificates or other evidence.

(f)      Treatment of Certain Refunds.   If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, shall repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender or in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.   This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax Returns (or any other information relating to its taxes that it deems confidential) to Borrowers or any other person.   Notwithstanding anything to the contrary in this Section 2.14(f), in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Taxes giving rise to such refund had never been imposed in the first instance and the indemnification payments or additional amounts with respect to such Taxes had never been paid.

(g)      Payments.   For purposes of this Section 2.14, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from the

Loan Parties on behalf of such Lender shall be treated as a payment from the Loan Parties to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Loan Parties.

(h)     Defined Terms.   For the avoidance of doubt, for purposes of this Section 2.14, the term "**Requirements of Law**" includes FATCA.

(i)     Survival.   Each party's obligations under this Section 2.14 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

### SECTION 2.15   Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office.   If any Lender requests compensation under Section 2.11, or requires Borrowers to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall (at the request of the Borrower Agent) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 or Section 2.14 or permit it to make or maintain a Eurodollar Loan, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.   Each Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.   A certificate setting forth such costs and expenses submitted by such Lender to the Borrower Agent shall be conclusive absent manifest error.

(b)     Replacement of Lenders.   If any Lender requests compensation under Section 2.11, or gives notice that it is unlawful for it to make or maintain Eurodollar Loans, if any Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.14(a), or if any Lender is a Defaulting Lender, or if any Borrower exercises its replacement rights under Section 10.02(d), then Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.11 or Section 2.14) and obligations under this Agreement and the other Loan Documents to an Eligible Assignee which shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)    The Borrower Agent shall have received the prior written consent of the Administrative Agent and paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans (including, without limitation, all PIK Interest that has been added to the principal amount), accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.11), assuming for this purpose (in the case of a Lender being replaced pursuant to Section 2.11, 2.14 or 10.02(d)) that the Loans of such Lender were being prepaid) from the assignee (to the extent of such outstanding principal (including, without limitation, all PIK Interest that has been added to the principal amount) and accrued interest and fees) or Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.11 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    no Event of Default shall have occurred and be continuing; and

(v)    such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Each Lender agrees that, if Borrowers elect to replace such Lender in accordance with this Section 2.15(b), it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

**SECTION 2.16  Bankruptcy Matters**.

(a)    All Obligations shall be secured by a senior priming Lien (pursuant to Section 364(c) and 364(d) of the Bankruptcy Code) on the DIP Collateral with the priority set forth in the DIP Order and the Recognition Order.

(b)    All Obligations shall constitute allowed super-priority administrative expenses (pursuant to Section 364(c) of the Bankruptcy Code) of the Loan Parties in the Chapter 11 Cases as set forth in the DIP Order and the Recognition Order, with the priority set forth in the DIP Order and the Recognition Order.

(c)    Upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the

Bankruptcy Court or the Canadian Court; *provided* that if the Maturity Date occurs as a result of the occurrence of the Effective Date, the Obligations in respect of the Tranche A Loans shall, in lieu of being immediately repaid as otherwise required by this Section 2.16(c), convert into, or be exchanged for, in the amounts set forth in the Plan of Reorganization, NewCo Class A Common Interests, NewCo Series A-1 Preferred PIK Interests, Reorganized LightSquared Inc. Loans and/or loans under the Second Lien Exit Facility, as applicable.

(d)      Each Loan Party agrees that (i) the Obligations hereunder shall not be discharged by the entry of the Confirmation Order or the Recognition Order or any other order confirming or recognizing a plan in the Chapter 11 Cases and (ii) the Lien and super-priority administrative claim granted to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the DIP Order and the Recognition Order and described in clauses (a) and (b) above shall not be affected in any manner by the Confirmation Order or the Recognition Order or any other order confirming or recognizing a chapter 11 plan.

### SECTION 2.17   Currency Indemnity.

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given. For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office in New York, New York. In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrowers will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrowers shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency. This indemnity shall constitute a secured obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

**SECTION 2.18    Joint and Several Obligations; Designated Financial Officers**.

(a)    Each of the Borrowers is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Secured Parties under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

(b)    Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.18), it being the intention of the parties hereto that all of the Obligations shall be the joint and several Obligations of each of the Borrowers without preferences or distinction among them.

(c)    If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)    The Obligations of each of the Borrowers under the provisions of this Section 2.18 constitute full recourse Obligations of each of the Borrowers enforceable against each such person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each of the Borrowers hereby waives notice of acceptance of its joint and several liability, notice of any Loans made under this Agreement, notice of any action at any time taken or omitted by the Secured Parties under or in respect of any of the Obligations, and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement. Each of the Borrowers hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Secured Parties at any time or times in respect of any default by any of the Borrowers in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Secured Parties in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any of the Borrowers. Without limiting the generality of the foregoing, each of the Borrowers assents to any other action or delay in acting or failure to act on the part of the Secured Parties with respect to the failure by any of the Borrowers to comply with any of its respective Obligations, including, without limitation, any failure to strictly or diligently assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.18, afford grounds for terminating, discharging or relieving any of the Borrowers, in whole or in part, from any of its Obligations under this Section 2.18, it being

52

the intention of each of the Borrowers that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrowers under this <u>Section 2.18</u> shall not be discharged except by performance and then only to the extent of such performance.  The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any of the Borrowers or the Secured Parties.

(f)     The provisions of this <u>Section 2.18</u> are made for the benefit of the Secured Parties and their successors and assigns, and may be enforced in good faith by them from time to time against any or all of the Borrowers as often as the occasion therefor may arise and without requirement on the part of the Secured Parties first to marshal any of their claims or to exercise any of their rights against any other Borrower or to exhaust any remedies available to them against any other Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this <u>Section 2.18</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, for any reason, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Secured Parties, the provisions of this <u>Section 2.18</u> will forthwith be reinstated in effect, as though such payment had not been made.

(g)     Any notice, request, waiver, consent or other action made, given or taken by any Borrower in connection with the Transaction Documents shall bind all Borrowers.

(h)     LightSquared Inc. hereby (i) is designated and appointed by each Borrower as its representative and agent on its behalf (the "**Borrower Agent**") and (ii) accepts such appointment as Borrower Agent, in each case, for the purposes of issuing Borrowing Requests, Withdrawal Notices, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents.  Administrative Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Agent as a notice or communication from all Borrowers.  Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by the Borrower Agent shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

## SECTION 2.19   <u>Loan Modification Offers</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, the Borrower Agent may on one or more occasions, by written notice to the Administrative Agent, make one or more offers (each, a "**Loan Modification Offer**") to all the Lenders of one or more tranches (each tranche subject to such a Loan Modification Offer, an "**Affected Tranche**") to effect one or more Permitted Amendments relating to such Affected Tranche pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrower Agent.  Such notice shall set forth (i) the terms and conditions of the requested Permitted Amendment and (ii) the date on which such Permitted Amendment is requested to become

effective.  Permitted Amendments shall become effective only with respect to the Loans of the Lenders of the Affected Tranche that accept the applicable Loan Modification Offer (such Lenders, the "**Accepting Lenders**") and, in the case of any Accepting Lender, only with respect to such Lender's Loans of such Affected Tranche as to which such Lender's acceptance has been made.

(b)   A Permitted Amendment shall be effected pursuant to a Loan Modification Agreement executed and delivered by the Borrower Agent, each applicable Accepting Lender and the Administrative Agent; *provided* that no Permitted Amendment shall become effective unless the Borrower Agent shall have delivered to the Administrative Agent such legal opinions, board resolutions, secretary's certificates, officer's certificates and other documents as shall be reasonably requested by the Administrative Agent in connection therewith.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement.  Each Loan Modification Agreement may, without the consent of any Lender other than the applicable Accepting Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent and the Borrower Agent, to give effect to the provisions of this Section 2.19, including any amendments necessary to treat the applicable Loans of the Accepting Lenders as a new tranche of loans hereunder.  The Administrative Agent and the Lenders hereby acknowledge that the pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement are not intended to apply to the transactions effected pursuant to this Section 2.19.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Loan Party, jointly and severally, represents and warrants to the Agents and each of the Lenders that:

### SECTION 3.01   Organization; Powers.

Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) except as a result of the filing of the Chapter 11 Cases or Recognition Proceedings, is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

### SECTION 3.02   Authorization; Enforceability.

Upon the entry of the DIP Order by the Bankruptcy Court and the Recognition Order by the Canadian Court, the Transactions to be entered into by each Loan Party are within

such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party. Subject to the entry of the DIP Order by the Bankruptcy Court and the Recognition Order by the Canadian Court, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03   <u>No Conflicts</u>.

The Transactions (a) subject to the entry of the DIP Order and Recognition Order in the case of the Debtors, do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any Requirement of Law, (d) will not violate or result in a default or require any consent or approval under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect, and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the DIP Order, the Recognition Order or the Loan Documents.

SECTION 3.04   <u>Financial Statements; Projections</u>.

(a)      <u>Operating Reports</u>.  The Borrower Agent has heretofore delivered to the Administrative Agent and the Lenders the debtor-in-possession monthly operating reports for the months ended November 30, 2013, December 31, 2013 and January 31, 2014, each case certified by a Financial Officer of the Borrower Agent.  The monthly operating reports delivered to the Administrative Agent and each Lender in connection with the Bankruptcy Cases present fairly and accurately the financial condition and results of operations and cash flows of the Borrower Agent and its Subsidiaries covered thereby as of the dates and for the periods to which they relate.

(b)      <u>No Liabilities</u>.   Except as set forth in the monthly operating reports referred to in <u>Section 3.04(a)</u>, there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents.  Since January 31, 2014, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

(c)    DIP Budget. The DIP Budget and any update thereto permitted hereunder or under the DIP Order represents the good faith estimates of each Borrower and its senior management concerning the operating expenses of the Borrowers and their Subsidiaries for the period set forth therein and the probable course of the Borrowers' and their Subsidiaries' business.

### SECTION 3.05   Properties.

(a)    Generally.  Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for Permitted Liens (including pursuant to the DIP Order and Recognition Order) and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)    Real Property.  Except as listed on Schedule 3.05(b), as of the Closing Date, no Company owns any material interest in any Real Property.

(c)    No Casualty Event.  As of the date hereof, no Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property.

(d)    One Dot Six Lease. Each of the Loan Parties has complied in all material respects with all obligations under the One Dot Six Lease, which is in full force and effect. One Dot Six enjoys peaceful and undisturbed possession under the One Dot Six Lease.

### SECTION 3.06   Intellectual Property.

(a)    Ownership/No Claims.  Each Company owns, or is licensed to use, all patents, patent applications, trademarks, trade names, service marks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") necessary for the conduct of its business as currently conducted (as reflected in each Company's written public statements made prior to the Closing Date).  No claim has been asserted and is pending (or to the knowledge of any Loan Party, is threatened in writing) by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Loan Party know of any valid basis for any such claim which can reasonably be expected to have a Material Adverse Effect.  The conduct of the business of each Company as currently conducted (as reflected in each Loan Party's written public statements made prior to the Closing Date) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

(b)    Registrations.  Except pursuant to non-exclusive licenses and other user agreements entered into by any Company in the ordinary course of business, the Companies own and possess the right to use, and have not licensed any other person to use, any copyright, patent or trademark or other Intellectual Property. All registrations and applications for Intellectual

56

Property in the name of any Loan Party are owned solely by such person, free and clear of all Liens (other than Permitted Liens), and are subsisting and unexpired, and to each Loan Party's knowledge, valid and in full force and effect.

(c)    No Violations or Proceedings.  To each Loan Party's knowledge, on and as of the Closing Date, there is no material violation by others of any right of any Company with respect to any copyright, patent or trademark or other Intellectual Property held by it.

### SECTION 3.07   Equity Interests and Subsidiaries.

(a)    Equity Interests.  All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of the Borrower Agent and the Preferred Stock of the Partnership outstanding on the date hereof, are owned by the Borrower Agent, directly or indirectly through Wholly Owned Subsidiaries.  Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the DIP Order and Recognition Order, free of any and all rights or claims of other persons and Liens, other than Permitted Liens.  Except as set forth on Schedule 3.07(a) as of the date hereof, there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No Consent of Third Parties Required.  No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties or the exercise by the Collateral Agent of the voting or other rights provided for in the DIP Order and Recognition Order or the exercise of remedies in respect thereof, except for such FCC, Industry Canada or CRTC consents as may be required under the Communications Laws in connection with the exercise of such remedies.

(c)    Organizational Chart.  An accurate organizational chart showing the ownership structure of the Borrowers and each Subsidiary as of the Closing Date is set forth on Schedule 3.07(c).

(d)    Inactive Subsidiaries.  None of the Subsidiaries of LightSquared Inc. that are not Loan Parties have material assets or conduct material operations.

### SECTION 3.08   Litigation; Compliance with Laws.

Except for the Chapter 11 Cases, the Recognition Proceedings, litigation that is stayed by the commencement of the Chapter 11 Cases and the items set forth on Schedule 3.08 hereto, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company (a) that involve any Loan Document or any of the Transactions or (b) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected,

57

individually or in the aggregate, to result in a Material Adverse Effect.  Except for matters covered by Section 3.17, no Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

### SECTION 3.09   Agreements.

No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.  No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound (including after giving effect to the Transactions), in each case entered into after the Petition Date, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.  Schedule 3.09 accurately and completely lists all material agreements to which any Company is a party which are in effect on the Closing Date in connection with the operation of the business conducted thereby and the Borrower Agent has delivered to the Administrative Agent and the Lenders complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

### SECTION 3.10   Federal Reserve Regulations.

No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, Regulation U or Regulation X.

### SECTION 3.11   Investment Company Act.

No Company (a) is required to register as an "**investment company**" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) subject to regulation under any Requirements of Law (other than Regulation X) that limits its ability to incur, create, assume or permit to exist Indebtedness or grant any Contingent Obligation in respect of Indebtedness.

### SECTION 3.12   Use of Proceeds.

(a)      The Borrowers will use the proceeds of the Loans (i) on the Closing Date, (A) to repay in full all allowed Existing DIP Obligations, (B) to repay in full the Allowed Prepetition Inc. Facility Non-Subordinated Claims and the Allowed Non-Converted Prepetition LP Facility Non-SPSO Claims and (C) to pay costs and expenses incurred in connection with the

58

loan facility provided under this Agreement, (ii) to pay operating expenses solely in accordance with the terms of the DIP Budget (subject to the Maximum Variance), (iii) to finance Capital Expenditures solely in accordance with the Capital Expenditure Covenant, and (iv) to pay Restructuring Costs solely in accordance with the Restructuring Costs Covenant.

(b)    The proceeds of the Loans shall not be transferred to, or used by, any entity other than the Borrowers for themselves or the other Loan Parties to the extent permitted hereunder.

(c)    No portion of the Loans or the Carve-Out shall be used to assert any claim, cause of action or objection against any Agent, the Lenders or their advisors, agents, or subagents.

**SECTION 3.13  Taxes**.

Except to the extent not required as a result of the Chapter 11 Cases, each Company has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves in accordance with GAAP and (c) satisfied all of its withholding tax obligations, except, in each case, for failures that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.  Except to the extent not required as a result of the Chapter 11 Cases or, in the case of the Canadian Loan Parties, the Recognition Proceedings, each Company has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  No Company has ever "participated" in a "listed transaction" or a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4.  No Company is party to any Tax sharing or similar agreement.

**SECTION 3.14  No Material Misstatements**.

Each Company has disclosed to the Lenders all agreements, instruments and corporate and other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.  No information, reports, financial statements, certificates, Borrowing Request, Withdrawal Notice, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon

59

or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

### SECTION 3.15   Labor Matters.

No trade union, council of trade unions or employee bargaining agency holds any bargaining rights in respect of any employees of any Company and no trade union, council of trade unions or employee bargaining agency has applied or threatened to apply to be certified as the bargaining agent of any of the employees of any Company in the last two years.  There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened.  The hours worked by and payments made to employees of any Company have not been in violation of the *Fair Labor Standards Act of 1938*, as amended, the *Canada Labour Code*, as amended, or any other applicable Requirements of Law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect.  All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.  Any individual who performs services for any Company (other than through a contract with an organization other than such individual) and who is not treated as an employee of such Company for any purpose, including, but not limited to, income tax, withholding and remittances purposes has been properly classified as an independent contractor and if such characterization is incorrect it could not individually or in the aggregate, be expected to have a Material Adverse Effect.

### SECTION 3.16   Employee Benefit Plans.

(a)     With respect to each Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance could not reasonably be expected to result in a Material Adverse Effect.  Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Plan to lose its qualified status.  No liability to the PBGC, the Internal Revenue Service, any Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by any Company or any of its ERISA Affiliate with respect to any Plan, except where such liability could not reasonably be expected to result in a Material Adverse Effect.  No ERISA Event (other than the commencement of the Chapter 11 Cases) has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates.  The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on the applicable assumptions under Section 430 of the Code and the

60

Treasury Regulations promulgated thereunder) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefits by a material amount.  As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material.  The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under a Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability could not reasonably be expected to result in a Material Adverse Effect.

(b)     To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities.  No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.  Except as could not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

(c)     The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred which could reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect.  With respect to each Canadian Pension Plan, each Loan Party is in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Loan Parties (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect.  All contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws.  There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans by the Companies.  None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act.

**SECTION 3.17   Environmental Matters**.

(a)     Except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(i)     Each of the Companies and its business, operations and Real Property is in compliance with, and no Company has liability under, any applicable Environmental Law; and under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)     Each of the Companies has obtained all Environmental Permits required for the conduct of its business and operations, and the ownership, operation and use of its property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next four years;

(iii)     To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased, operated, managed or controlled by any Company or its predecessors in interest that could result in liability of any Company under any applicable Environmental Law;

(iv)     There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against any Company, or relating to the Real Property currently or formerly owned, leased, operated, managed or controlled by any Company or its predecessors in interest or relating to the operations of any Company, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim; and

(v)     No person with an indemnity or contribution obligation to any Company relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)     Except as set forth in Schedule 3.17 or as otherwise would result in the occurrence of a Material Adverse Effect:

(i)     No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)     No Real Property or facility owned, operated or leased by any Company and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by any Company or any of their predecessors in interest is (x) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA, (y) listed on the

Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (z) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)   No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of any Company;

(iv)   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any applicable Environmental Law; and

(v)   The Companies have made available to the Lenders all material records and files in the possession, custody or control of any Company concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by any Company.

### SECTION 3.18   Insurance.

As of the date hereof, Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by each Company.  All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, and no Company has received notice of violation or cancellation thereof.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

### SECTION 3.19   Anti-Corruption Laws; Anti-Terrorism Laws.

(a)   The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance by the Borrowers, their respective Subsidiaries and the respective directors, officers, employees and agents of the foregoing with Anti-Corruption Laws and applicable Sanctions, and the Borrowers, their respective Subsidiaries and the respective officers and employees of the foregoing, and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.   None of (a) the Borrowers, any of their respective Subsidiaries or any of the respective directors, officers or employees of the foregoing, or (b) to the knowledge of the Borrowers, any agent of the Borrowers or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by the Credit Agreement will violate Anti-Corruption Laws or applicable Sanctions.

(b)   No Company and, to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Company (i) has violated or is in violation of Anti-Terrorism Laws or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by

the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(c) No Company and to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Company acting or benefiting in any capacity in connection with the Loans is currently subject to any sanctions administered by OFAC or any other Governmental Authority under Anti-Terrorism Laws. No Borrower will directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any person, for the purpose of financing the activities of any person currently subject to any sanctions administered by OFAC or any other Governmental Authority under Anti-Terrorism Laws.

(d) No Company and, to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Company acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 3.19(b), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**SECTION 3.20  Communications Licenses and Regulatory Matters**.

(a)    Schedule 3.20(a) accurately and completely lists all Communications Licenses, including a separate designation of Communications Licenses deemed to be Material Licenses as of the date hereof.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies as presently conducted.   All Material Licenses identified in Schedule 3.20(a) are in good standing and in full force and effect and, except for the One Dot Six License, are duly issued in the name of, or validly assigned to, the applicable Company.  One Dot Six has been validly granted the right to use the spectrum covered by the One Dot Six License pursuant to the One Dot Six Lease and the One Dot Six Lease Authorization.

(b)    The Companies are in compliance in all material respects with all Communications Laws.  No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.20(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect).  Except as described in Schedule 3.20(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as could not, individually or in the aggregate, have a Material Adverse Effect.

(c)    Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, true, correct and complete in all material respects.

(d)    Except for any FCC or Industry Canada consents that may be required in connection with any enforcement against any DIP Collateral, no consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)    Except as provided in Schedule 3.20(b), provided that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

### SECTION 3.21   License Subsidiaries.

Each License Subsidiary has no significant assets (other than the Communications Licenses held by it) or material liabilities (other than under the other Loan Documents to which it is a party and any documents related thereto to which it is a party) and other than the License Subsidiaries, none of the Companies hold any U.S. authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.

### SECTION 3.22   DIP Order.

The DIP Order with the Recognition Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the DIP Collateral and constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such DIP Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other person (except as otherwise set forth in the DIP Order and the Recognition Order).

### SECTION 3.23   Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof.  The proper notice for (i) the motion seeking approval of the Loan Documents and the DIP Order and (ii) the hearing for the approval of the DIP Order has been given. The Borrower Agent shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(b)    Upon entry of the DIP Order and, with respect to the Canadian assets of the Loan Parties, the Recognition Order, the Obligations will constitute allowed administrative

65

expense claims in the Chapter 11 Cases having priority over all administrative expense claims and claims against each Loan Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 326, 330, 331, 503(b), 507(a), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out and as otherwise provided in the DIP Order.

(c)     The DIP Order and the Recognition Order are in full force and effect and have not been reversed, stayed, modified or amended, except as permitted by this Agreement.

(d)     Immediately upon entry of the DIP Order and, with respect to Canadian assets, upon entry of the Recognition Order, on the Closing Date the Obligations will be secured by a valid and perfected first priority Lien on all of the DIP Collateral, subject, as to priority only, to the Carve-Out and the Permitted Liens.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the DIP Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court or Canadian Court, subject to the terms of the Loan Documents, the DIP Order and the Recognition Order; *provided* that if the Maturity Date occurs as a result of the occurrence of the Effective Date, the Obligations in respect of the Tranche A Loans shall, in lieu of being immediately repaid as otherwise required by this clause (e), convert into, or be exchanged for, in the amounts set forth in the Plan of Reorganization, NewCo Class A Common Interests, NewCo Series A-1 Preferred PIK Interests, Reorganized LightSquared Inc. Loans and/or loans under the Second Lien Exit Facility, as applicable.

## ARTICLE IV

## CONDITIONS TO FUNDING LOANS; WITHDRAWALS

### SECTION 4.01   Conditions to Funding Loans.

The obligation of each Lender to fund (or be deemed to fund) the Loans requested to be made (or deemed made) by it on the Closing Date shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.01 on or before the date that is fifteen days after entry of the Confirmation Order.

(a)     Loan Documents.  All legal matters incident to this Agreement, the Loans hereunder and the other Loan Documents shall be satisfactory to the Lenders and to the Administrative Agent and there shall have been delivered to the Administrative Agent and the Lenders an executed counterpart of each of the Loan Documents.

(b)     Corporate Documents.  The Administrative Agent shall have received:

(i)     a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each

Organizational Document of such Loan Party certified (in the case of a Loan Party organized in the United States) as of a recent date by the Secretary of State, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrowers, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i)); and

(ii)    to the extent such concept exists in each applicable jurisdiction, a certificate as to the good standing of each Loan Party (in so-called "long-form" if available) as of a recent date, from such Secretary of State (or other applicable Governmental Authority).

(c)    Officers' Certificate.  The Administrative Agent shall have received a certificate in form and substance reasonably satisfactory to each of the Initial Lenders, dated the Closing Date and signed by the chief financial officer of the Borrower Agent, confirming compliance with the conditions precedent set forth in this Article IV and attaching, and certifying as being true, complete and correct, copies of the consents referenced in clause (e) below.

(d)    [Reserved].

(e)    Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(f)    Requirements of Law; Consents.  Each of the Initial Lenders shall be satisfied that (i) each Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulation T, Regulation U and Regulation X of the Board, and shall have received satisfactory evidence of such compliance reasonably requested by them and (ii) each Borrower and its Subsidiaries have received all required approvals and consents of all Governmental Authorities and other third parties with respect to the consummation of the Transactions.

(g)    Litigation. Other than the commencement of the Chapter 11 Cases and the Recognition Proceedings, there shall be no litigation, public or private, or administrative proceedings, governmental investigation or other legal or regulatory developments, actual or threatened, that, singly or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or could materially and adversely affect the ability of Borrowers and the Subsidiaries to fully and timely consummate the Transactions, or the ability of the parties to consummate the financings contemplated hereby or the other Transactions, except for litigation, administrative proceedings, governmental investigations and/or regulatory developments identified on Schedule 3.20(b).

(h)    Fees. The Administrative Agent and the Collateral Agent shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be

reimbursed or paid by the Borrowers hereunder or under any other Loan Document. [[_____] shall have received, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including the fees and expenses of counsel to [_____]) required to be reimbursed or paid by the Borrowers hereunder or under any other Loan Document.]

(i)     Insurance. The Collateral Agent and the Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable or mortgagee endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured.

(j)     USA PATRIOT Act. The Borrowers shall have delivered to the Administrative Agent and the Lenders the information required under Section 10.13 at least five Business Days prior to the Closing Date.

(k)     Chapter 11 Case Administration. The Bankruptcy Court and the Canadian Court, as applicable shall have entered the Orders by no later than March 31, 2014 (or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan of Reorganization and has taken the matter under advisement, on or before April 15, 2014) in form and substance satisfactory to each of the Initial Lenders in their sole discretion (including provisions in the DIP Order limiting sales, assignments, allocations and other dispositions of any Loan Party's assets solely to those in connection with the Plan of Reorganization). Pursuant to the terms of the DIP Order, the automatic stay shall have been modified to permit the creation and perfection of the Collateral Agent's Liens and security interests and shall have been automatically vacated to permit enforcement of the Collateral Agent's rights and remedies under this Agreement and the Loan Documents.

(l)     Bankruptcy Matters.

(i)     At the time of the funding (or deemed funding) of the Loans, (v) the Orders shall be effective, and no Order shall have terminated or expired, (w) no Order shall have been vacated, reversed or stayed, (x) no Order shall have been amended, supplemented or otherwise modified in any manner without the prior written consent of each of the Initial Lenders, (y) no motion for reconsideration of either Order shall be pending, and (z) no appeal of either Order shall be pending and no Order shall be the subject of a stay pending appeal or a motion for a stay pending appeal.

(ii)     Each of the Loan Parties shall have at all times supported the Plan of Reorganization.

(iii)     The First Lien Exit Commitment Letter and the Purchase and Sale Agreement shall each be in full force and effect and shall not have been terminated and no Commitment Party (as defined in the First Lien Exit Commitment Letter) in respect of the First Lien Exit Facility shall have terminated, repudiated or denied any portion of its commitments or obligations thereunder.

68

(m)    <u>DIP Budget</u>.  The Agents and the Lenders shall have received a copy of the DIP Budget.

(n)    <u>Operating Reports</u>.  The Administrative Agent and the Lenders shall have received and be satisfied with the form and substance of the operating reports described in <u>Section 3.04</u>.

(o)    <u>Material Adverse Effect</u>.  Since January 31, 2014, there shall not have occurred any Material Adverse Effect.

(p)    <u>Indebtedness</u>.  (i) After giving effect to the incurrence and funding (or deemed funding) of the Loans hereunder, none of the Borrowers nor any of their respective Subsidiaries shall have any material Indebtedness other than the Loans or as otherwise permitted hereunder, (ii) all claims under the Prepetition LP Credit Agreement (other than the SPSO Claims) shall have been deemed satisfied and discharged, (iii) all claims under the Prepetition Inc. Credit Agreement (other than the Prepetition Inc. Facility Subordinated Claims) shall have been satisfied and discharged and (iv) all claims under the Existing DIP Orders shall be deemed satisfied (it being understood that the conditions in clauses (ii), (iii) and (iv) may be satisfied by a conclusion of law in the DIP Order that so provides).

(q)    <u>Licenses</u>.  Except as otherwise agreed by the Initial Lenders, the FCC shall have not (i) denied any Material Regulatory Request in writing on material substantive grounds; (ii) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (iii) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

(r)    <u>Representations and Warranties</u>.   Each of the representations and warranties made by any Loan Party set forth in Article III hereof or in any other Loan Document shall be true and correct on and as of the Closing Date, unless such representation or warranty specifically refers to an earlier date, in which case such representation or warranty shall be true and correct as of such earlier date.

(s)    <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing on such date of after giving effect to the extensions of credit requested to be made on such date.

(t)    <u>No Legal Bar</u>.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.  No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(u)    <u>Retained Causes of Action</u>.  The Debtors shall not have compromised, impaired the value of or released the Retained Causes of Action, other than, solely in respect of Retained Causes of Action relating to SPSO, to the extent that SPSO has voted in favor of the

69

Plan of Reorganization and SPSO and all of its Affiliates have withdrawn any objections to the Plan of Reorganization and the credit facility hereunder.

(v)    Other Agreements.  Each of the One Dot Six Lease, the Material Licenses and the Inmarsat Agreement shall be in full force and effect and shall not have been terminated; *provided* that the Inmarsat Agreement shall have been amended in a manner acceptable to each of the Initial Lenders.

(w)    Canadian Security Agreement.  The Administrative Agent shall have received the Canadian Security Agreement and PPSA financing statements in appropriate form for filing under the PPSA and such other documents as may be necessary or appropriate or desirable to perfect the Liens created, or purported to be created, by the Canadian Security Agreement.

(x)    Other Documents. The Administrative Agent and the Lenders shall have received all other documents and information reasonably requested by them.

**SECTION 4.02   Conditions to Withdrawals from Collateral Account.**

The obligation of the Administrative Agent to transfer funds in accordance with any Withdrawal Notice shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.02.

(a)    Notice.  The Administrative Agent shall have received a Withdrawal Notice as required by Section 2.03.

(b)    No Default; Event of Default.  The Borrowers and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such withdrawal, as the case may be, and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing.

(c)    No Stipulation.  No stipulation shall have been approved by the Bankruptcy Court and no order shall have been entered by the Bankruptcy Court in connection with the Chapter 11 Cases that is adverse to the interests of the Lenders as determined by each of the Initial Lenders in their sole and absolute discretion.

(d)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party set forth in Article III hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such withdrawal from the Collateral Account, unless such representation or warranty specifically refers to an earlier date, in which case such representation or warranty shall be true and correct as of such earlier date.

(e)    Bankruptcy Matters. The Orders shall be in full force and effect and such Orders shall not have been amended, supplemented or otherwise modified from the date of entry

70

on the docket of the Chapter 11 Cases without the prior written consent of each of the Initial Lenders.

Each of the delivery of a Borrowing Request or a Withdrawal Notice and the acceptance by the Borrowers of the proceeds of the Loans or such withdrawal shall constitute a representation and warranty by each Borrower and each other Loan Party that on the Closing Date or date of such withdrawal (both immediately before and after giving effect to such Loans or such withdrawal and the application of the proceeds thereof) the conditions contained in this Article IV have been satisfied.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with each Lender, that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, each Loan Party will, and will cause each of its Subsidiaries to:

### SECTION 5.01   Financial Statements, Reports, etc.

Furnish to the Administrative Agent and each Lender (or, in the case of paragraphs (b)(ii)-(iv), paragraphs (h)(ii) and (iii) and paragraph (i) below, to each Initial Lender):

(a)      Monthly Reconciliations; DIP Budget Updates. On or before the tenth (10th) day of each month, commencing with the first month after the Closing Date, (i) the cash balances of each of the Loan Parties as of the last day of the preceding month, (ii) a reconciliation of revenues generated and expenditures made (x) during such preceding month and (y) cumulatively since the Closing Date, in each case, together with a comparison of such amounts to the amounts projected in the DIP Budget for such month and cumulative period, (iii) a reconciliation of Professional Fees paid and, separately, Capital Expenditures made, in each case (x) during the prior month and (y) cumulatively since the Closing Date, in each case, together with a comparison of such amounts to the amounts project in the DIP Budget and (iv) an updated, roll-forward DIP Budget (for forecasting and informational purposes only and not for purposes of calculating the Budget Variance).

(b)      Weekly Status Call.  Commencing on the first Wednesday following issuance of the Confirmation Order and continuing on each Wednesday (or at such other time as may be agreed to by each of the Initial Lenders in their reasonable discretion) thereafter until the Maturity Date, updates, via a status call with the Administrative Agent and the Lenders, relating to (i) the Plan of Reorganization process, regulatory updates, contemplated asset sales, assignments, allocations and other dispositions and the Chapter 11 Cases generally, (ii) the Transfer Proceedings, (iii) the Material Regulatory Requests and (iv) the FCC Objectives, which shall include (A) an update on, and summary of, related meetings and discussions with the FCC or other Governmental Authorities and/or FCC or other Governmental Authority actions since

the prior briefing, (B) an identification of FCC meetings and other contacts with the FCC or other Governmental Authorities by any Company or its representatives or advisors planned or anticipated to occur within the next two-week period and the topics to be covered at such meetings or contacts, (C) notice of any hearing planned or anticipated to occur within the next two-week period before the FCC or other Governmental Authorities related to the efforts of the Companies, (D) notice of and information regarding any written submissions expected to be made by any Company to the FCC or other Governmental Authorities within the next two-week period and (E) an opportunity for each of the Initial Lenders to provide consultation and input to the Companies with respect to such efforts, submissions and meetings;

(c)     <u>Financial Officer's Certificate</u>.   As soon as available, and in any event within ten (10) days after the end of each fiscal month of each fiscal year, commencing with the fiscal month during which the Closing Date occurs, a Compliance Certificate certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(d)     <u>Public Reports</u>.   Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Material Indebtedness pursuant to the terms of the documentation governing such Material Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(e)     <u>Management Letters</u>.   Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

(f)     <u>Bankruptcy Court Documents</u>.   Promptly, upon their being filed with the Bankruptcy Court, copies of all monthly reports as well as all pleadings, motions, applications, judicial information or other information filed by or on behalf of each Debtor with the Bankruptcy Court or provided or served by a Debtor to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any statutory appointed committee, at the time such document is filed with the Bankruptcy Court, or provided or served by a Debtor to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or any statutory appointed committee, to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise;

(g)     <u>Organizational Documents</u>.   Promptly, copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within 15 days after such Company gives or receives such notice;

(h)     <u>Industry Canada Proceedings</u>. With respect to material Industry Canada proceedings, (i) promptly, information relating to such proceedings and any other matters

required by the DIP Order, (ii) written notice of all correspondence from Industry Canada, including copy sets of all documentation received from Industry Canada in respect thereof, and (iii) advance notice where reasonable of each meeting, hearing or other appearance of any of the Loan Parties or their Subsidiaries before Industry Canada;

(i)    <u>FCC Submissions</u>.  With respect to the Material Regulatory Requests, the Transfer Proceedings and/or the FCC Objectives, (i) promptly, copies of all filings, notices, orders and any other correspondence between the FCC and the Debtors, including copies of all documentation received from, or submitted to, the FCC in respect thereof, and (ii) promptly after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company to the FCC;

(j)    <u>Compliance with Section 6.18</u>.  Any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming compliance with <u>Section 6.18</u>; and

(k)    <u>Additional Information</u>.  Any additional information that the Administrative Agent or any Lender may reasonably request from time to time.

**SECTION 5.02  <u>Litigation and Other Notices</u>**.

Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five Business Days of the occurrence thereof):

(a)    any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)    any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)    the occurrence of a Casualty Event;

(e)    the occurrence of a Change in Control or the entry into any agreement or instrument that would result in a Change in Control; and

(f)    the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease, the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in

73

connection with any Material License, the One Dot Six Lease and/or the Inmarsat Agreement, (iii) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, Industry Canada, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (iv) any material correspondence with the FCC or Industry Canada; provided that in relation to the notices required to be delivered under this Section 5.02(f), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.20(b) attached hereto.

## SECTION 5.03   Existence; Businesses and Properties.

(a)     Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06.

(b)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred upon the Companies thereunder), the One Dot Six Lease and the Inmarsat Agreement; *provided* that the Borrowers may take actions required in furtherance of the objective underlying any Material Regulatory Request.

(c)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks and trade names and other Intellectual Property material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; maintain the roles and functions performed by its current officers and employees and preserve its material relationships with customers, suppliers, distributors, licensors, licensees and others having business dealings with it; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(c) shall prevent (i) sales of property, consolidations or mergers by or involving any Company permitted under Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License), trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable.

74

**SECTION 5.04**   **Insurance**.

Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations.

**SECTION 5.05**   **Obligations and Taxes**.

(a)      **Payment of Obligations**.  Unless payment is prohibited or not required under the Bankruptcy Code or the CCAA, pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)      **Filing of Returns**.  Unless compliance is not required or enforcement is stayed during the pendency of the Chapter 11 Cases pursuant to the Requirements of Law, timely and correctly file all Tax Returns required to be filed by it.  Withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

**SECTION 5.06**   **Employee Benefits**.

(a)      Unless compliance is not required or enforcement is stayed during the pendency of the Chapter 11 Cases pursuant to the Requirements of Law, comply in all material respects with the applicable provisions of ERISA, the Code, the Canadian Income Tax Act and applicable Canadian pension laws.

(b)      Furnish to the Administrative Agent (for further delivery to the Lenders) (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know that, (i) any ERISA Event, Canadian Plan Event or similar event with respect to a Foreign Plan has occurred or is reasonably expected to occur, (ii) the imposition of a Lien with respect to any Plan or Canadian Pension Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan or Canadian Pension Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan or Canadian Pension Plan if such amendment results in a material increase in benefits or unfunded liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan, Single Employer Plan or Canadian Pension Plan, a statement of a Financial

75

Officer of Borrower Agent setting forth details as to such ERISA Event or Canadian Plan Event and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as reasonably practicable following any request by the Administrative Agent or any Lender, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Single Employer Plan or each annual information report for any Canadian Pension Plan; (ii) the most recent actuarial valuation report for each Plan or Canadian Pension Plan; (iii) all notices received by any Company or any of its ERISA Affiliates from a Canadian Pension Plan or Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event or Canadian Pension Plan; (iv) the aggregate amount of payments made under any employee welfare benefit plan (including a plan as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Plan or Canadian Pension Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent or any Lender shall reasonably request and (z) as soon as reasonably practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; *provided* that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

> **SECTION 5.07**  **Maintaining Records; Access to Properties and Inspections; Annual Meetings**.

> Keep proper books of record and account in which full, true and correct entries in conformity with all Requirements of Law are made of all dealings and transactions in relation to its business and activities.   At the Borrowers' expense, each Company will permit any representatives designated by any Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by any Agent or any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants), and cause such officers and employees to cooperate with such representatives.   At the Borrowers' expense, upon written notice to the Borrower Agent, the Borrower Agent will permit any Initial Lender or any representatives designated by any Initial Lender to attend and participate in all meetings of the Board of Directors of the Borrower Agent or any committee thereof in a nonvoting, observer capacity, and in this respect, following such notice the Borrower Agent shall concurrently provide each such Initial Lender and/or its designee with copies of notices, minutes, consents, and other materials that the Borrower Agent provides to the Board of Directors of the Borrower Agent or to any committee thereof, and shall provide such notices, minutes, consents and other materials to each such Initial Lender and/or its

designee simultaneously with its provision thereof to the Board of Directors of the Borrower Agent or to any committee thereof.

**SECTION 5.08   Use of Proceeds**.

Use the proceeds of the Loans only for the purposes set forth in Section 3.12.

**SECTION 5.09   Compliance with Environmental Laws; Environmental Reports**.

Comply, and undertake all commercially reasonable efforts to cause all of its employees, lessees, and any other person occupying Real Property owned, operated or leased by any Company to comply, with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

**SECTION 5.10   Compliance with Communications Laws and ITU Rules and Regulations; Requirements of Law**.

(a)     Comply with all applicable Communications Laws and the terms and conditions of any Communications Licenses and the One Dot Six Lease, including but not limited to requirements applicable to the Companies pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Diligently prosecute all of the Material Regulatory Requests.

(c)     Comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except for instances of non-compliance with applicable Requirements of Law which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)     Make all required filings and diligently pursue all required regulatory approvals, waivers and other consents necessary to effectuate the Plan of Reorganization (the "**Transfer Proceedings**").

**SECTION 5.11   Additional Guarantors**.

With respect to any person that becomes a Subsidiary of the Borrower Agent after the Closing Date, promptly (and in any event within 30 days after such person becomes a Subsidiary) cause such new Subsidiary to execute a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent to become a Guarantor hereunder.

77

**SECTION 5.12   Further Assurances**.

Promptly and from time to time take at its own expense such further actions, and execute and/or deliver to the Administrative Agent and the Collateral Agent such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as may be necessary or as the Administrative Agent or the Collateral Agent shall request in order to create, perfect, preserve and protect the security interest in the DIP Collateral as provided herein and in the DIP Order and the Recognition Order and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm the validity, enforceability and priority of the Collateral Agent's security interest in the DIP Collateral or permit the Collateral Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any DIP Collateral.

**SECTION 5.13   Information Regarding DIP Collateral**.

Not effect any change (a) in any Loan Party's legal name, (b) in the location of any Loan Party's chief executive office, (c) in any Loan Party's identity or organizational structure, (d) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (e) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (i) it shall have given the Collateral Agent and the Administrative Agent prior written notice (in the form of an Officers' Certificate) of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Collateral Agent or the Administrative Agent may reasonably request and (ii) it shall have taken all action necessary to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the DIP Collateral, if applicable.  Each Loan Party agrees to promptly provide the Administrative Agent and the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

**SECTION 5.14   License Subsidiaries**.

Cause each Communications License issued by the FCC to be held and retained in one or more License Subsidiaries.

**SECTION 5.15   Anti-Corruption Laws**.

Maintain in effect and enforce policies and procedures designed to ensure compliance by the Companies and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**ARTICLE VI**

**NEGATIVE COVENANTS**

Each Loan Party warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable

78

under any Loan Document have been paid in full, no Loan Party will, nor will it cause or permit any Subsidiaries to:

### SECTION 6.01    Indebtedness.

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)    Indebtedness incurred under this Agreement and the other Loan Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b);

(c)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(d)    Indebtedness representing the financing of installments of insurance premiums in accordance with the DIP Budget;

(e)    Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business; and

(f)    unsecured Indebtedness of the Borrowers in an aggregate principal amount not to exceed $1,000,000.

### SECTION 6.02    Liens.

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)    Liens in respect of property of any Company imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been

79

established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(c)    any Lien in existence on the Closing Date and set forth on <u>Schedule 6.02(c)</u>;

(d)    easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Companies at such Real Property;

(e)    Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which such Company shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)    Liens (other than any Lien imposed by ERISA) (i) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (ii) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, letters of credit, statutory bonds, bids, leases, government contracts, trade contracts, deposits as security for contested taxes or import duties or for the payment of rent, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (iii) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provide*d that with respect to clauses (i), (ii) and (iii) of this paragraph (f), such Liens are for amounts set forth in the DIP Budget and such amounts are not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(g)    Leases and subleases of Real Property of any Company granted by such Company to third parties in the ordinary course of business that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of any Company or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(h)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of equipment entered into by any Company in the ordinary course of business in accordance with past practices of such Company and to the extent such transactions are permitted hereunder;

(i)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(j)      non-exclusive licenses of Intellectual Property granted by any Company in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Companies;

(k)      the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods in the ordinary course of such Company's business; and

(l)      Liens on the Second Satellite securing the Incentive Payments.

**SECTION 6.03   Sale and Leaseback Transactions**.

Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

**SECTION 6.04   Investments, Loans, Advances and Acquisitions**.

Directly or indirectly, lend money or credit (by way of guarantee, assumption of debt or otherwise) or make advances to any person (other than to customers in the ordinary course of business), or purchase or acquire any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted, in each case solely to the extent set forth in, and in compliance with, the DIP Budget, subject to the Maximum Variance:

(a)      Investments outstanding on the Closing Date and identified on Schedule 6.04(a);

(b)      the Loan Parties may (i) acquire and hold accounts receivable owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the

81

ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c)     Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(d)     Investments made by Borrowers or any Subsidiary in the form of non-cash consideration received in connection with an Asset Sale made in compliance with Section 6.06;

(e)     purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business;

(f)     leases of real or personal property of the Loan Parties in the ordinary course of business;

(g)     Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses of the Borrowers and their Subsidiaries for accounting purposes and that are made in the ordinary course of business;

(h)     Investments by the Borrowers or any Canadian Subsidiary which is a Guarantor in any Canadian Subsidiary that is a Guarantor in the form of a loan or advance for purposes of funding their operations in the ordinary course; and

(i)     Investments among the Loan Parties.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment to any Company.

### SECTION 6.05   Mergers and Consolidations.

Wind up, liquidate or dissolve its affairs or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), except Asset Sales in compliance with Section 6.06.

### SECTION 6.06   Asset Sales.

Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)     dispositions of used, worn out, obsolete or surplus property by any Company in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable judgment of such Company, no longer economically practicable to maintain or useful in the conduct of the business of the Borrowers and their Subsidiaries taken as a whole;

(b)     the non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business and consistent with past practices; *provided*, *however*, that such licensing or sublicensing shall not interfere in any material respect with the Companies' continued use of such Intellectual Property in their businesses;

(c)     to the extent constituting an Asset Sale, the creation of a Lien permitted by Section 6.02 (but not any Asset Sale of the property subject to such Lien);

(d)     leases of real or personal property (other than Sale and Leaseback Transactions) of the Loan Parties in the ordinary course of business;

(e)     to the extent constituting Asset Sales, Investments in compliance with Section 6.04;

(f)     so long as no Default or Event of Default exists or would result therefrom, Asset Sales set forth on Schedule 6.06(f)[2]; and

(g)     the sale of the Second Satellite (including any related gateway equipment), so long as (i) no Default or Event of Default exists or would result therefrom, (ii) the proceeds from such sale are in cash (which may include offset of amounts owed to Boeing), (iii) such sale is in compliance with all Communications Laws, (iv) continued ownership of the Second Satellite is not a prerequisite to maintaining rights to conduct terrestrial operations under any Communications License and (v) such sale is for fair market value to a third party pursuant to an arm's-length transaction.

For the avoidance of doubt, nothing in this Section 6.06 (or any other provision of this Agreement) will permit directly or indirectly the Asset Sale of any spectrum associated with any Material License (including spectrum rights acquired pursuant to the Inmarsat Agreement or the One Dot Six Lease) or the First Satellite. To the extent that each of the Initial Lenders waive the provisions of this Section 6.06 with respect to the sale of any DIP Collateral, or any DIP Collateral is sold as permitted by this Section 6.06, such DIP Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the DIP Order, and, so long as the Borrower Agent shall have provided the Administrative Agent and the Collateral Agent such certifications or documents as the Administrative Agent or the Collateral Agent shall reasonably request in order to demonstrate compliance with this Section 6.06, the Collateral Agent shall take all actions it deems appropriate in order to effect the foregoing.

### SECTION 6.07   Dividends.

Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Borrower or any Subsidiaries of any Borrower who are Guarantors.

---

[2]     Schedule 6.06(f) will reflect spectrum conveyances potentially required in connection with the License Modification Proceeding.

**SECTION 6.08    Transactions with Affiliates**.

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Loan Parties), other than any transaction or series of related transactions on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted, in each case solely to the extent provided in the DIP Budget (subject to the Maximum Variance):

(a)    reasonable and customary director, officer and employee compensation (including bonuses), retention arrangements and other benefits (including retirement, health and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of the applicable Company;

(b)    the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organizational Document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date, and which has been disclosed to the Lenders in writing as in effect on the Closing Date;

(c)    the payment of reasonable and customary fees to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Loan Parties; and

(d)    any agreement or arrangement as in effect on the Closing Date and listed and described on Schedule 6.08(d).

**SECTION 6.09    Financial Covenants**.

(a)    Permit the Budget Variance on any Testing Date to exceed the Maximum Variance.

(b)    Make or become legally obligated to make any Capital Expenditure, except for Capital Expenditures in the ordinary course of business and described in the DIP Budget not to exceed, in the aggregate for the Borrowers and their Subsidiaries (i) $[_____] in respect of payments owing to Boeing, which amounts shall solely be used for such purpose, (ii) $[_____] in respect of payments owing to Alcatel-Lucent USA Inc., (iii) $[_____] in respect of payments owing to Qualcomm Incorporated, (iv) $[_____] in respect of Capital Expenditures relating to the One Dot Six Lease, and (v) $[_____] in respect of all other Capital Expenditures described in the DIP Budget, in each case during the term of this Agreement (the "**Capital Expenditure Covenant**").[3]

---

[3] Covenant levels TBD.

(c)     Pay any Restructuring Costs in excess of $[_____] in the aggregate during the term of this Agreement (the "**Restructuring Costs Covenant**").[4]

(d)     For purposes of calculating compliance with clauses (a) and (b) above, the Budget Variance and the Capital Expenditures Covenant shall be calculated by comparing the actual amount of each applicable operating expense or Capital Expenditure, as applicable, for the applicable period, to the amount set forth in the DIP Budget for such operating expense or Capital Expenditure, respectively, for the applicable period, regardless of how such operating expense or Capital Expenditure is classified and accounted for under GAAP.

### SECTION 6.10   Modifications of Organizational Documents and Other Documents, etc.

Directly or indirectly:

(a)     amend or modify, or permit the amendment or modification of, any provision of (i) any document governing any Material Indebtedness or the One Dot Six Lease (other than any contract or other agreement with Boeing or the Inmarsat Agreement, which are addressed separately in clauses (a)(iii) and (c) below) in any manner without the consent of each of the Initial Lenders, (ii) the First Lien Exit Commitment Letter in any manner without the prior written consent of each of the Initial Lenders or (iii) any contract or other agreement, or reject, assume or terminate any such contract or agreement, with Boeing in any manner without the prior written consent of each of the Initial Lenders; [*provided* that each Loan Party shall be permitted to amend or modify, or permit the amendment or modification of, any provision of any other agreement listed on Schedule 3.09 without the consent of the Required Lenders unless such amendment or modification would be adverse to the interests of the Lenders;][5]

(b)     terminate, amend or modify any Organizational Documents of any Loan Party or any Subsidiary thereof or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such terminations, amendments or modifications or such new agreements which are (i) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.05 or (ii) not adverse in any material respect to the interests of the Lenders; or

(c)     either individually or jointly, (i) (x) reject or terminate or (y) except as may be provided in the Cooperation Agreement Order, amend, modify or assume, or permit the amendment, modification or assumption of, the Inmarsat Agreement or (ii) enter into any agreement or arrangement of any nature to sell, assign, allocate value and/or liabilities or otherwise dispose of, or agree to sell, assign, allocate value and/or liabilities or otherwise dispose of, any Company's rights and/or obligations under the Inmarsat Agreement, in the case of either clause (i) or (ii) above without the prior written consent of each of the Initial Lenders.

---

[4] Covenant levels TBD.
[5] Subject to review of Schedule 3.09.

### SECTION 6.11   Limitation on Certain Restrictions on Subsidiaries.

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by any Borrower or any Subsidiary, or pay any Indebtedness owed to a Borrower or a Subsidiary, (b) make loans or advances to any Borrower or any Subsidiary or (c) transfer any of its properties to any Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale, lease or license of any property permitted under Section 6.06 pending the consummation of such sale, lease or license; (vii) the Prepetition LP Loan Documents, (viii) any agreement in effect at the time such Subsidiary becomes a Subsidiary of a Borrower, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of a Borrower; (ix) customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person, but only to the extent such provisions were in effect on the Petition Date; (x) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (xi) in the case of any joint venture which is not a Loan Party in respect of any matters referred to in clauses (b) and (c) above, restrictions in such person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity, but only to the extent such restrictions were in effect on the Petition Date; or (xii) any encumbrances or restrictions imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (viii) above; *provided* that such amendments are no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment.

### SECTION 6.12   Limitation on Issuance of Capital Stock.

(a)      With respect to the Borrower Agent, issue any Equity Interest that is Disqualified Capital Stock; *provided* that, the Borrower Agent shall be permitted to issue any Equity Interests of the Borrower Agent issued pursuant to a valid exercise of any existing options or warrants to purchase Equity Interests or as otherwise provided in the Plan of Reorganization; *provided, further* that any Equity Interests issued under this Section 6.12(a) shall be cancelled and extinguished on the Effective Date in accordance with the terms of the Plan of Reorganization.

(b)      With respect to any Subsidiary of the Borrower Agent, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or

securities convertible into, any Equity Interest, except any Equity Interests of the Borrower Agent issued pursuant to a valid exercise of any existing options or warrants to purchase Equity Interests; *provided* that any Equity Interests issued under this <u>Section 6.12(b)</u> shall be cancelled and extinguished on the Effective Date in accordance with the terms of the Plan of Reorganization.

### SECTION 6.13   <u>Limitation on Creation of Subsidiaries</u>.

Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders.

### SECTION 6.14   <u>Business</u>.

(a)   With respect to the Borrower Agent, engage in any business activities or have any properties or liabilities, other than (i) ownership of the Equity Interests of its Subsidiaries as of the Closing Date, (ii) obligations under the Loan Documents and the Inmarsat Agreement, (iii) issuance of Indebtedness and making of Investments as permitted under <u>Section 6.01</u> or <u>6.04</u>, as the case may be and (iv) activities and properties incidental to the foregoing clauses (i), (ii) and (iii).

(b)   With respect to any other Company, engage (directly or indirectly) in any material respect in any business, other than those businesses in which such Company is engaged in or contemplated to be engaged in on the Closing Date.

### SECTION 6.15   <u>Limitation on Accounting Changes</u>.

Make or permit, any change in accounting policies or reporting practices, without the consent of the Required Lenders, which consent shall not be unreasonably withheld, except changes that are required by GAAP.

### SECTION 6.16   <u>Fiscal Year</u>.

Change its fiscal year-end to a date other than December 31.

### SECTION 6.17   <u>No Further Negative Pledge</u>.

Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Company to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (a) this Agreement and the other Loan Documents; (b) covenants in documents creating Liens permitted by <u>Section 6.02</u> prohibiting further Liens on the properties encumbered thereby; (c) any other agreement that does not restrict in any manner (directly or indirectly) Liens to secure the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; and (d) any prohibition or limitation that (i) exists pursuant to applicable Requirements of Law, (ii) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the

consummation of such sale; *provided* that such restrictions apply only to the property to be sold and such sale is permitted hereunder, (iii) restricts subletting or assignment of leasehold interests contained in any lease governing a leasehold interest of a Borrower or a Subsidiary, (iv) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of a Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary or (v) is imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (c) or (d)(iv); *provided* that such amendments are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment.

### SECTION 6.18   Compliance with <u>Anti-Corruption Laws; Anti-Terrorism Laws</u>.

(a)     Use, and the respective directors, officers, employees and agents of the Companies shall not use, the proceeds of any Loan (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

(b)     Directly or indirectly, in connection with the Loans, knowingly (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of any Anti-Terrorism Law or any other applicable Requirements of Law, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(c)     Directly or indirectly, in connection with the Loans, knowingly cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Anti-Terrorism Law or any other applicable Requirements of Law.

(d)     Cause or permit (i) an Embargoed Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties in violation of any Anti-Terrorism Law or any other applicable Requirements of Law, (ii) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, an Embargoed Person in violation of any Anti-Terrorism Law or any other applicable Requirements of Law or (iii) any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the U.S. Foreign Corrupt Practices Act of 1977 or the Corruption of Foreign Public Officials Act (Canada).

**SECTION 6.19   <u>Canadian Pension Plans</u>**.

(a)     Terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan which could reasonably be expected to result in any material liability of a Loan Party.

(b)     Fail to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any agreement relating thereto or applicable Requirements of Law, any Borrower or any other Loan Party is required to pay as contributions thereto.

(c)     Permit to exist any accumulated funding deficiency, whether or not waived, with respect to any Canadian Pension Plan in an amount which could reasonably be expected to have a Material Adverse Effect.

(d)     Contribute to or assume an obligation to contribute to, or permit any other Loan Party to contribute to or assume an obligation to contribute to, any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario).

(e)     Acquire, or permit any other Loan Party to acquire, an interest in any person if such person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario); *provided* that, any Loan Party may acquire an interest in any such person if such person is acquired as a Permitted Acquisition and no Loan Party has any legal liability to perform such person's obligations or assume such person's liabilities.

**SECTION 6.20   <u>Permitted Activities of License Subsidiaries</u>**.

With respect to any License Subsidiary, (a) incur, directly or indirectly, any Indebtedness other than the Indebtedness under this Agreement and the other Loan Documents; (b) create, or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the DIP Order; (c) engage in any business or activity or own any assets other than (i) holding the Communications Licenses, (ii) performing its obligations and activities incidental thereto under the Loan Documents and (iii) in the case of One Dot Six, managing the One Dot Six Lease, the One Dot Six Lease Authorization, the One Dot Six License and the associated terrestrial network; (d) consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets to, any person other than a License Subsidiary and in accordance the other provisions of this Agreement; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries other than to a License Subsidiary and in accordance with the other provisions of this Agreement; (f) create or acquire any Subsidiary or make or own any Investment in any person; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

**SECTION 6.21   <u>Communications Licenses</u>**.

(a)     Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease

89

in all material respects.  No Company shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial.  No Company shall take any action that reasonably could be expected to cause a Governmental Authority to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of any Material License or the One Dot Six Lease, or take or permit to be taken any other action within its control that reasonably could be expected to result in non-compliance with the requirements of Communications Laws in any material respect.

(b)     Advocate for or consent to any modification, termination, or withdrawal of a Material Regulatory Request, nor seek any new license modifications or file any new applications or petitions for rulemaking at the FCC, without the prior written consent of each of the Initial Lenders; *provided* that any Company may seek to modify or file any license modification, application, or petition for rulemaking that is either (i) in furtherance of the satisfaction of the FCC Objectives but does not modify any other aspect of a Material Regulatory Request, or (ii) unrelated to the satisfaction of the FCC Objectives and does not modify a Material Regulatory Request.

### SECTION 6.22  Labor Matters.

(a)     Enter into any or assume any employment contract for any employee of a Company which would provide for any increase in compensation or benefits or stipulate a length of notice or severance payment required upon termination of employment.

(b)     Terminate the employment of any employee where the amount of any severance or notice pay, whether arising by way of contract, statute or common law, could reasonably be expected to cause a Material Adverse Effect.

## ARTICLE VII

## GUARANTEE

### SECTION 7.01  The Guarantee.

Subject to the DIP Order, the Recognition Order and Section 2.18, the Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and its successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, acceleration or otherwise) of the principal of and interest on (including any interest, fees, premiums, costs or charges that would accrue but for the provisions of Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code, including the commencement of the Chapter 11 Cases) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrowers, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Guarantors

hereby jointly and severally agree that if the Borrowers or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, acceleration or otherwise) in accordance with the terms of such extension or renewal.

**SECTION 7.02   Obligations Unconditional**.

The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full of the Guaranteed Obligations). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i) at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii) any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(iv) the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against any Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or

acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto, and each Guarantor hereby expressly renounces all benefit of division or discussion. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**SECTION 7.03   Reinstatement**.

The obligations of the Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of the Chapter 11 Cases or otherwise.

**SECTION 7.04   Subrogation; Subordination**.

Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

**SECTION 7.05   Remedies**.

The Guarantors jointly and severally agree that, for purposes of Section 7.01, as between the Guarantors and the Lenders, the obligations of the Borrowers under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

**SECTION 7.06   Instrument for the Payment of Money**.

Each Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Lender or any Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

**SECTION 7.07   Continuing Guarantee**.

The guarantee in this Article VII is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**SECTION 7.08   General Limitation on Guarantee Obligations**.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of subrogation and contribution established in Sections 7.04 and 7.10, respectively) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**SECTION 7.09   Release of Guarantors**.

If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Guarantor are sold or otherwise transferred in a transaction permitted hereunder or consented to by the requisite Lenders pursuant to Section 10.02 (a "**Transferred Guarantor**") to a person or persons (other than any Company or an Affiliate thereof), such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof), and, so long as the Borrower Agent shall have provided the Administrative Agent and the Collateral Agent such certifications or documents as the Administrative Agent or the Collateral Agent shall reasonably request, the Collateral Agent shall, at the sole expense of the Borrowers, take such actions as are necessary to effect each release described in this Section 7.09.

**SECTION 7.10   Right of Contribution**.

Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10

93

shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent, the Collateral Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent, the Collateral Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

# ARTICLE VIII

# EVENTS OF DEFAULT

## SECTION 8.01   Events of Default.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court, upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document when and as the same shall become due and payable, whether at the due date thereof (including an Interest Payment Date) or at a date fixed for payment (whether voluntary or mandatory) or by acceleration or demand thereof or otherwise and such default shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings or withdrawals hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)     default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Sections 2.08, 5.02, 5.03(a) or (b), 5.07 or 5.08 or in Article VI;

(e)     default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Sections 5.01(a)-(c), (f) or (h) or 5.04 and such default shall continue unremedied or shall not be waived for a period of five (5) days after the earlier to occur of (x) the date upon which a Financial Officer of any Loan Party becomes aware of such default and (y) written notice thereof from the Administrative Agent or any Lender to the Borrower Agent;

(f)     default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document to which it is a party (other than those specified in paragraphs (a), (b), (c), (d) or (e) immediately above) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days

94

after the earlier to occur of (i) the date upon which a Financial Officer of any Loan Party becomes aware of such default and (ii) written notice thereof from the Administrative Agent or any Lender to the Borrower Agent;

(g)      any Loan Party shall fail to (i) make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness (other than the Obligations or any Indebtedness the enforcement of which has been stayed by the Chapter 11 Cases or, the Recognition Proceedings), when and as the same shall become due and payable beyond any applicable grace period or (ii) observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness, and such Indebtedness in either case is, or is permitted to be, accelerated such that the obligations thereunder shall become due and payable prior to stated maturity thereof or subject to a mandatory offer purchase by the obligor; *provided* that any event described in clause (i) and (ii) above shall not constitute an Event of Default if such events were occasioned by the filing of the Chapter 11 Cases or, the Recognition Proceedings (*provided* that, in the case of Hedging Obligations, the amount counted for this purpose shall be the amount payable by all Companies if such Hedging Obligations were terminated at such time);

(h)      except as otherwise agreed by each of the Initial Lenders, the FCC shall have (i) denied any Material Regulatory Request in writing on material substantive grounds; (ii) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (iii) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective;

(i)      (i) any of the Orders or any provision thereof shall be reversed, revoked, vacated or stayed, or modified in any manner or (ii) the Bankruptcy Court (or any other court of competent jurisdiction) shall have entered an order adversely affecting (as determined by each of the Initial Lenders in their sole discretion) the Lenders (including in their respective capacities as Plan Support Parties), the Loans provided hereunder or the Plan of Reorganization;

(j)      unless arising as a result of the filing of the Chapter 11 Cases or, in the the Recognition Proceedings, one or more ERISA Events, Canadian Plan Events or similar events with respect to Foreign Plans shall have occurred that, when taken together with all other such ERISA Events, Canadian Plan Events and similar events with respect to Foreign Plans that have occurred, could reasonably be expected to result in a Material Adverse Effect or in the imposition of a Lien on any properties of a Loan Party;

(k)      except as expressly permitted hereunder, under the Loan Documents or under the DIP Order or the Recognition Order, any security interest and Lien purported to be created by the DIP Order or recognized by the Recognition Order, as applicable, shall cease to be in full force and effect, or shall cease to give the Collateral Agent for the benefit of the Secured Parties, the Liens, rights, powers and privileges created and granted under this Agreement and the DIP Order in favor of the Collateral Agent, or shall be asserted by any Loan Party not to be a valid, perfected security interest in or Lien on the DIP Collateral with the priority set forth in the DIP Order;

(l)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(m)      (i) One Dot Six shall be in material breach of or there shall be a material default under the One Dot Six Lease, (ii) the One Dot Six Lease shall be rejected (within the meaning of the Bankruptcy Code) by One Dot Six or the One Dot Six Lease shall be removed from the schedule of assumed agreements filed in connection with the Plan of Reorganization, (iii) there shall have occurred any event or condition which results in One Dot Six no longer having the right to assume (within the meaning of the Bankruptcy Code) the One Dot Six Lease, (iv) the One Dot Six Lease shall be amended in any manner without the prior written consent of each of the Initial Lenders or (v) the One Dot Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(n)      (i) LightSquared Inc. or any other Debtor party thereto shall be in material breach of or there shall be a material default under the Inmarsat Agreement, (ii) the Inmarsat Agreement shall be rejected (within the meaning of the Bankruptcy Code) by LightSquared Inc. or any other Debtor party thereto, (iii) the Inmarsat Agreement shall be amended in any manner without the prior written consent of each of the Initial Lenders or (iv) the Inmarsat Agreement shall have been terminated or any Loan Party shall have received notice of termination thereof;

(o)      (i) any of the Loan Parties shall be in material breach of or there shall be a material default under any material agreement of any Company or Material License, (ii) any material agreement of any Company or any Material License shall be rejected (within the meaning of the Bankruptcy Code) by the applicable Loan Party or any material agreement of any Company or any Material License shall be removed from the schedule of assumed agreements filed in connection with the Plan of Reorganization, (iii) there shall have occurred any event or condition which results in the Loan Parties no longer having the right to assume (within the meaning of the Bankruptcy Code) any material agreement of any Company or any Material License, (iv) except as otherwise permitted pursuant to Section 6.10, any material agreement of any Company or any Material License shall be amended in any manner without the prior written consent of each of the Initial Lenders or (v) any one or more material agreements of any Company or any Material Licenses shall be terminated, suspended, revoked or forfeited, or shall expire without the timely filing of an application for renewal thereof or the substantial replication of the rights thereunder without any materially adverse conditions;

(p)      any Company shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(q)      the occurrence of a Change in Control, except as provided for under the Plan of Reorganization;

(r)      an Event of Default as defined in the DIP Order occurs;

(s)      except as provided in Section 6.06, any Loan Party (i) files a motion seeking to sell, assign, allocate or otherwise dispose of any DIP Collateral other than pursuant to the Plan of Reorganization or (ii) consents to a motion seeking relief from the automatic stay with respect to any DIP Collateral;

(t)      (i) the Bankruptcy Court enters an order (x) dismissing any of the Chapter 11 Cases of the Loan Parties with material assets or converting any such Chapter 11 Cases to cases under Title 7 of the Bankruptcy Code, (y) appointing a chapter 11 trustee in any of the Chapter 11 Cases of the Loan Parties with material assets that is not stayed following entry, or (z) appointing an examiner with enlarged powers in any of the Chapter 11 Cases of the Loan Parties; or (ii) any Loan Party files a motion or other pleading seeking dismissal of its Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(u)      (i) any Borrower or any other Loan Party or any Affiliate thereof shall amend or otherwise modify, or withdraw, the Plan of Reorganization, (ii) any Borrower or any other Loan Party fails at any time to support the Plan of Reorganization (including any determination by the Special Committee (as defined in the Plan of Reorganization) to pursue any other plan of reorganization or other transaction other than the Plan of Reorganization), (iii) any of the Plan Support Parties, the Exit Agents or the Exit Lenders fails at any time to support the Plan of Reorganization, (iv) the First Lien Exit Commitment Letter (x) shall terminate or be withdrawn or any lender with commitments thereunder shall terminate, repudiate or deny any portion of its commitments or obligations thereunder or (y) shall be amended or otherwise modified in a manner adverse to the Lenders (as determined by each of the Initial Lenders in their sole discretion) or (v) the Purchase and Sale Agreement (x) shall terminate or be withdrawn or any party thereto shall terminate, repudiate or deny any portion of its obligations thereunder or (y) shall be amended or otherwise modified in a manner adverse to the Lenders (as determined by each of the Initial Lenders in their sole discretion);

(v)      the Bankruptcy Court enters an order granting any Lien on, or security interest in, any DIP Collateral in favor of any party other than the Collateral Agent on behalf of the Secured Parties, or granting an administrative claim payable by a Loan Party to any party other than an Agent on behalf of the Secured Parties (other than those outstanding on the Closing Date as permitted hereunder or under the DIP Order or the Recognition Order);

(w)      one or more judgments, orders or decrees (i) for the payment of money in an aggregate amount in excess of $500,000 or (ii) which would operate to divest any Loan Party of any material assets shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Loan Party to enforce any such judgment;

(x)      the occurrence of any material uninsured loss of, damage to or any destruction of, any property or asset of any Company;

(y)      [Reserved]; or

97

(z)   the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Loan Party in excess of $500,000;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower Agent, take any of the following actions, at the same or different times, subject in all cases to the terms of and in accordance with the DIP Order: (i) terminate forthwith the Commitments; (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon, any premium and any unpaid accrued fees and all other Obligations of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; (iii) pursue any available remedy by proceeding at law or in equity to collect the payment of principal of or premium, if any, and interest on the Loans or to enforce the performance of any provision of this Agreement; (iv) take any necessary action requested of it as Administrative Agent to settle, compromise, adjust or otherwise conclude any proceedings to which they are parties; and/or (v) instruct the Collateral Agent to exercise any available remedies under the Loan Documents upon seven (7) Business Days prior written notice to counsel to Borrower Agent (such seven Business Day period, the "**Remedies Notice Period**"), counsel to the Prepetition LP Agent (as defined in the DIP Order), counsel to the Committee (as defined in the DIP Order) (or if no Committee is appointed, the 20 largest creditors of the Inc. Obligors (as defined in the DIP Order), counsel to Harbinger Capital Partners LLC, counsel to the Ad Hoc Secured Group, and the United States Trustee (via email or facsimile) specifying the Event of Default and the basis therefor and informing such parties that the Administrative Agent, the Collateral Agent and the Lenders intend to exercise their remedies under the DIP Order and hereunder seven (7) Business Days after the Borrower Agent's receipt of such notice. During the Remedies Notice period, the Borrowers, the Prepetition Secured Parties (as defined in the DIP Order) and/or the Committee (if any) have the right to seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred. Unless during the Remedies Notice Period, the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of the Remedies Notice Period, (A) the Administrative Agent, the Collateral Agent and the Secured Parties automatically shall have relief from the automatic stay and the Collateral Agent (with the consent of the Required Lenders) may foreclose on all or any portion of the DIP Collateral or otherwise exercise remedies against the DIP Collateral permitted by this Agreement, the DIP Order, and other nonbankruptcy law, including, without limitation, the exercise of rights of setoff and all rights and remedies of a secured party under the UCC, and (B) any right of any of the Loan Parties to use proceeds from the Loans or DIP Collateral shall cease. The Loan Parties hereby grant the Administrative Agent and the Collateral Agent an irrevocable power of attorney to take all actions on their behalf to complete any sale or conveyance under and in accordance with Section 363 of the Bankruptcy Code and applicable orders of the Bankruptcy Court. Each Loan Party further agrees that a breach of any of the covenants contained herein (including, without limitation, covenants relating to the Inmarsat Agreement, asset sales, assignments, allocations and other dispositions, and affiliate transactions) will cause irreparable injury to the Administrative Agent and the Lenders Parties, that the Administrative Agent and

the Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every such covenant shall be specifically enforceable against such Loan Party by the Administrative Agent and the Secured Parties and such Loan Party waives and agrees not to assert any defenses against an action for specific performance of such covenants.

**SECTION 8.02   Application of Proceeds**.

Subject to prior satisfaction of the Carve-Out, the proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the DIP Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

(a)    *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Collateral Agent and the Administrative Agent and their respective agents and counsel, and all expenses, liabilities and advances made or incurred by the Collateral Agent or the Administrative Agent in connection therewith and all amounts for which the Collateral Agent or the Administrative Agent are entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)    *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest, premium and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)    *Fourth*, to the indefeasible payment in full in cash, pro rata, of principal amount of the Obligations and any premium thereon; and

(e)    *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

**SECTION 8.03   Government Approval**.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any DIP Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses or the One Dot Six Lease or any company holding the Communications Licenses shall be pursuant to Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority. Notwithstanding anything to the contrary contained herein, the Administrative Agent, the Collateral Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, Industry Canada, the CRTC or such other Governmental Authority. Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Loan Party's commercially reasonable efforts to assist in obtaining any approval of the FCC, Industry Canada, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of DIP Collateral. Such efforts shall include, without limitation, sharing with Administrative Agent and Collateral Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for Industry Canada's Spectrum Direct online system and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of DIP Collateral and/or the Communications Licenses.

# ARTICLE IX

# THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

**SECTION 9.01   Appointment and Authority**.

(a)      Each of the Lenders hereby irrevocably appoints [_____] to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents. Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take or refrain from taking such actions on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated to

100

such Agent by the terms hereof or thereof, together with all actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any of such provisions. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the DIP Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents; *provided* that notwithstanding anything in this Agreement to the contrary, the Agents are not authorized by this Agreement to sign any FCC or Industry Canada document on behalf of any Company. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower Agent or any of its Subsidiaries. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Requirements of Law a security interest can be perfected by possession or control. Should any Lender obtain possession or control of any such DIP Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor, shall deliver such DIP Collateral to the Collateral Agent or otherwise deal with such DIP Collateral in accordance with the Collateral Agent's instructions.

**SECTION 9.02   Rights as a Lender**.

Each person serving as an Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the person serving as an Agent hereunder in its individual capacity. Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Company or Affiliate thereof as if it were not an Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 9.03   Exculpatory Provisions**.

(a)     No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing,

(i)     no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)     no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that no Agent shall be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law including, for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy, insolvency or similar proceeding or that may effect a foreclosure, modification or termination of property of a Defaulting Lender under any Debtor Relief Law; and

(iii)    except as expressly set forth herein and in the other Loan Documents, no Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Company or any of its Affiliates that is communicated to or obtained by the person serving as such Agent or any of its Affiliates in any capacity.

(b)     No Agent shall be liable to any Secured Party, any Loan Party or any other person for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.02) or in reliance upon the advice of counsel selected by it or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has actual knowledge of the same or has received written notice from a Lender or Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that any Agent obtains such actual knowledge or receives such a notice, such Agent shall give prompt notice thereof to each of the Lenders. Upon and during the occurrence of an Event of Default, the Administrative Agent shall (subject to the provisions of Section 10.02) take such action with respect to such Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Event of Default as it shall deem advisable in the best interest of the Lenders. In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

(c)     No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the due execution, validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent, (vi) the state or condition of any properties of the Loan Parties

102

constituting collateral for the Obligations or any information contained in the books and records of the Loan Parties or (vii) the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any collateral.  Neither any Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents.

(d)     No Agent nor any of their respective directors, officers, employees, or agents shall have any responsibility to any Loan Party on account of the failure or delay in performance or breach by any other Agent or Lender of any of their respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

### SECTION 9.04   Reliance by the Agents.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for Borrowers), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the requisite percentage of the Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by them by reason of the taking or failing to take any such action.

### SECTION 9.05   Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory, indemnification and other provisions of this Article shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as an Agent.  The Agents shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

**SECTION 9.06   <u>Resignation of any Agent</u>**.

Each Agent may at any time give notice of its resignation to the Lenders and the Borrower Agent.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower Agent, and so long as no Event of Default has occurred or is continuing, subject to the consent of the Borrower Agent, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above *provided* that if the retiring Agent shall notify the Borrower Agent and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the retiring Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Article IX</u> and <u>Section 10.03</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as such Agent.

**SECTION 9.07   <u>Non-Reliance on Agents and Other Lenders</u>**.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of the Loan Parties and their Subsidiaries and made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has had the opportunity to review each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto).  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

104

**SECTION 9.08**   <u>Withholding Tax</u>.

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Without limiting the provisions of <u>Section 2.14(a)</u> or <u>(c)</u>, each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes (including any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 10.04(d)</u> relating to the maintenance of a Participant Register), but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so, and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Section 9.08</u>. The agreements in this <u>Section 9.08</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**SECTION 9.09**   <u>No Other Duties, etc</u>.

Notwithstanding anything herein to the contrary, the parties hereto acknowledge that the Lead Arranger shall not any have any duties or obligations under this Agreement or any other Loan Document (except in its capacity, as applicable, as a Lender), but the Lead Arranger shall have the benefit of the indemnities and exculpation as set forth in <u>Section 10.03</u>.

**SECTION 9.10**   <u>Guarantee</u>.

(a)   <u>Agents under Security Documents and Guarantee</u>. Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the DIP Collateral and the Loan Documents; *provided* that neither the Administrative Agent nor the Collateral Agent shall owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations with respect to any Hedging Obligation. Subject to <u>Section 10.02</u>, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of DIP Collateral that is the subject of such sale or other disposition of assets or to which the Required Lenders (or such other Lenders as may be required to give such

105

consent under <u>Section 10.02</u>) have otherwise consented or (ii) release any Guarantor from the Guarantee pursuant to <u>Section 7.09</u> or with respect to which the Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.02</u>) have otherwise consented.

(b)    <u>Right to Realize on DIP Collateral and Enforce Guarantee</u>.  Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrowers, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the DIP Collateral or to enforce the Guarantee hereunder, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent as applicable, for the benefit of the Secured Parties, in accordance with the terms hereof and thereof and all powers, rights and remedies hereunder and under the DIP Order may be exercised solely by the applicable Agent for the benefit of the Secured Parties in accordance with the terms thereof.

(c)    <u>Release of DIP Collateral and Guarantee, Termination of Loan Documents</u>.

(i)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Hedging Agreement) take such actions as shall be required to release its security interest in any DIP Collateral subject to any disposition permitted by the Loan Documents, and to release any guarantee obligations under any Loan Document of any person subject to such disposition, to the extent necessary to permit consummation of such disposition in accordance with the Loan Documents.

(ii)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than obligations in respect of any Hedging Agreement) have been paid in full and all Commitments have terminated or expired, upon request of the Borrower Agent, the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Hedging Agreement) take such actions as shall be required to release its security interest in all DIP Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Hedging Agreements.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Loan Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

(iii)    The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the DIP Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the

Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the DIP Collateral.

### SECTION 9.11   Enforcement.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement, including the right to credit bid the Obligations in accordance with Section 363(k) of the Bankruptcy Code, shall be instituted and maintained exclusively by, the Administrative Agent or the Collateral Agent, as applicable, or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders; *provided, however*, that the foregoing shall not prohibit (a) the Administrative Agent or the Collateral Agent, as applicable, from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent or Collateral Agent, as applicable) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

### SECTION 9.12   Actions in Concert.

Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement (including exercising any rights of setoff) without first obtaining the prior written consent of the Administrative Agent or the Collateral Agent, as applicable, and the Required Lenders, it being the intent of the Lenders that any such action to protect or enforce rights under this Agreement shall be taken in concert and at the direction or with the consent of the Administrative Agent or the Collateral Agent, as applicable, or the Required Lenders.

### SECTION 9.13   Notices of Transfer.

The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.04.

### SECTION 9.14   Reimbursement and Indemnification.

Each Lender agrees to (a) reimburse the Administrative Agent and the Collateral Agent and their respective Affiliates for such Lender Party's ratable share of (i) any expenses and fees incurred by any Agent for the benefit of the Lenders under this Agreement and any of the other Loan Documents, including counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Loan Parties and (ii) any expenses of the Administrative Agent or the Collateral Agent incurred for the benefit of the Lenders that the Loan Parties have agreed to reimburse pursuant to this Agreement or any other Loan Document and have failed to so reimburse and (b) indemnify and hold harmless the

Administrative Agent and the Collateral Agent and any of their respective Affiliates, directors, officers, employees, or agents, on demand, in the amount of such Lender's ratable share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Lender in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents to the extent not reimbursed by the Loan Parties, including costs of any suit initiated by the Administrative Agent and the Collateral Agent against any Lender (except such as shall have been determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent or the Collateral Agent, as the case may be); *provided, however*, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Lender in its capacity as such. The provisions of this Section shall survive the repayment of the Obligations and the termination of the Commitments.

## ARTICLE X

## MISCELLANEOUS

### SECTION 10.01 <u>Notices</u>.

(a)  <u>Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)  if to any Loan Party, to the Borrower Agent at:

LightSquared Inc.
10802 Parkridge Boulevard
Reston, Virginia 20191-5416
Attention:  General Counsel
Telephone: [_____]
Fax:  (703) 390-6113
Email: [_____]

(ii)  if to the Administrative Agent or the Collateral Agent, to it at:

[_____]
[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Fax:  [_____]
Email: [_____]

(iii)    if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b). Any party hereto may change its address or telecopier number for notices and other communications hereunder by written notice to the Borrower Agent and the Administrative Agent.

(b)    Electronic Communications. Notices and other communications to the Lenders hereunder may (subject to the provisions of this Section 10.01) be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including pursuant to the provisions of this Section 10.01); *provided* that approval of such procedures may be limited to particular notices or communications.

Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent or the Lenders pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials (the "**Communications**"), by transmitting them in an electronic medium in a format reasonably acceptable to the Administrative Agent at [_____] or at such other e-mail address(es) provided to the Borrower Agent from time to time or in such other form as the Administrative Agent shall require. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form as the Administrative Agent shall require. Nothing in this Section 10.01 shall prejudice the right of the Administrative Agent, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as the Administrative Agent shall require.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at

its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications (other than any such Communication that (i) relates to a request for a Loan or other extension of credit, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder) by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(c)     Platform.  Each Loan Party further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on a Platform.  The Platform and any Approved Electronic Communications is provided "as is" and "as available." The Administrative Agent does not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Platform and the Approved Electronic Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Administrative Agent in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Each Loan Party, each Lender and each Agent agrees that the Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies.

110

(d)    Public/Private.    Each Loan Party hereby authorizes the Administrative Agent to distribute (i) to Private Siders all Communications, including any Communication that the Borrower Agent identifies in writing is to be distributed to Private Siders only ("**Private Side Communications**"), and (ii) to Public Siders all Communications other than any Private Side Communication.    Each Borrower represents and warrants that no Communication (other than Private Side Communications) contains any MNPI.    Each Borrower agrees to designate as Private Side Communications only those Communications or portions thereof that it reasonably believes in good faith constitute MNPI, and agrees to use all commercially reasonably efforts not to designate any Communications provided under Sections 5.01(a), (b), (c) and (d) as Private Side Communications.    "**Private Siders**" shall mean Lenders' employees and representatives who have declared that they are authorized to receive MNPI.    "**Public Siders**" shall mean Lenders' employees and representatives who have not declared that they are authorized to receive MNPI; it being understood that Public Siders may be engaged in investment and other market-related activities with respect to the Borrowers' or their affiliates' securities or loans.

Each Lender acknowledges that United States federal and state securities laws prohibit any person from purchasing or selling securities on the basis of material, non-public information concerning the issuer of such securities or, subject to certain limited exceptions, from communicating such information to any other person.    Each Lender confirms that it has developed procedures designed to ensure compliance with these securities laws.

Each Lender acknowledges that circumstances may arise that require it to refer to Communications that may contain MNPI.    Accordingly, each Lender agrees that it will use commercially reasonable efforts to designate at least one individual to receive Private Side Communications on its behalf in compliance with its procedures and applicable law and identify such designee (including such designee's contact information) on such Lender's Administrative Questionnaire.    Each Lender agrees to notify the Administrative Agent in writing from time to time of such Lender's designee's e-mail address to which notice of the availability of Private Side Communications may be sent by electronic transmission.

Each Lender that elects not to be given access to Private Side Communications does so voluntarily and, by such election, (i) acknowledges and agrees that the Administrative Agent and other Lenders may have access to Private Side Communications that such electing Lender does not have and (ii) takes sole responsibility for the consequences of, and waives any and all claims based on or arising out of, not having access to Private Side Communications.

### SECTION 10.02 Waivers; Amendment.

(a)    Generally.    No failure or delay by the Administrative Agent, Collateral Agent, or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.    The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.    No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by

this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower Agent in any case shall entitle the Borrower Agent or the Borrowers to any other or further notice or demand in similar or other circumstances.

(b)    Required Consents. Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified (including any forbearance) except pursuant to an agreement or agreements in writing entered into by the Borrower Agent or the applicable Loan Party or Loan Parties, as the case may be, and the Administrative Agent or Collateral Agent, as applicable, with the written consent of the Required Lenders (or, with respect to any amendment, modification, supplement or waiver of or relating to this Agreement or any other Loan Document that by its terms directly affects the rights of only one tranche of Loans may be effected with the written consent of Lenders holding or having more than 50% of the outstanding principal amount of the Voting Interests under such tranche); *provided* that no such agreement shall be effective if the effect thereof would:

(i)    increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)    reduce the principal amount or premium, if any, of any Loan (except in connection with a payment contemplated by clause (viii) below) or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(c)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly and adversely affected thereby);

(iii)    (A) change the scheduled final maturity of any Loan, or any scheduled date of payment (or permitted prepayment) of or the installment otherwise due on the principal amount of any Loan under Section 2.08, (B) postpone the date for payment of any interest, premium or fees payable hereunder or (C) reduce the amount of, waive or excuse any such payment (other than waiver of any increase in the interest rate pursuant to Section 2.06(c)), in any case, without the written consent of each Lender directly and adversely affected thereby;

(iv)    permit the assignment or delegation by the Borrowers of any of their rights or obligations under any Loan Document, without the written consent of each Lender;

(v)    release all or a material portion of the DIP Collateral from the Liens granted pursuant to the DIP Order or Recognition Order or alter the relative priorities of the Obligations entitled to the Liens granted pursuant to the DIP Order or Recognition Order or release any Guarantor from its Guarantee (except as expressly provided in Article VII), or limit its liability in respect of such Guarantee, without the written consent of each Lender;

(vi)    change <u>Section 2.13(b)</u>, <u>(c)</u> or <u>(d)</u> in a manner that would alter the *pro rat*a sharing of payments or setoffs required thereby or any other provision in a manner that would alter the *pro rata* allocation among the Lenders of Loan disbursements, including the requirements of <u>Sections 2.02(a)</u>, without the written consent of each Lender directly and adversely affected thereby; *provided* that this clause (vi) shall not apply to any change made to any of such <u>Sections 2.13(b)</u>, <u>(c)</u> or <u>(d)</u> or any such other provision that allows any Loan Party to make payments (as consideration for an assignment, sale or participation or otherwise) on Loans without any Loan Party, the payor or the recipient of such payments complying with the *pro rata* sharing of payments and setoffs required by such Sections or provisions, so long as such change requires that (x) the Borrowers and their Subsidiaries offer to make such payments to all Lenders on a *pro rata* basis based on the aggregate principal amount of Loans then outstanding, (y) such payments are actually allocated to the Loans whose holders have elected to make them subject to such offer on a *pro rata* basis based on the aggregate principal amount of all Loans that have been made so subject to such offer and (z) all Loans that are paid in any such offer are deemed fully repaid and extinguished for all purposes and may not be reborrowed;

(vii)    amend, modify or waive any provision of this <u>Section 10.02(b)</u> or <u>Sections 10.02(c) or (d)</u>, without the written consent of each Lender directly affected thereby (except for additional restrictions on amendments or waivers consented to by the Required Lenders);

(viii)    change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(ix)    subordinate the Obligations to any other obligation, without the written consent of each Lender;

(x)    change or waive any provision of <u>Article IX</u> as the same applies to the Administrative Agent or the Collateral Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent or the Collateral Agent, in each case without the written consent of the Administrative Agent or the Collateral Agent, as applicable;

(xi)    change <u>Sections 2.16</u>, <u>5.12</u> or <u>5.13</u> without the written consent of the Collateral Agent;

(xii)    waive a Default or Event of Default occurring under <u>Section 8.01(h)</u>, <u>(i)</u>, <u>(m)</u>, <u>(n)</u>, <u>(s)</u>, <u>(o)</u>, <u>(t)</u>, <u>(u)</u>, or <u>(v)</u> without the written consent of each of the Initial Lenders;

(xiii)    change or waive (A) any provision of <u>Section 10.04(j)</u> or the application thereof, (B) any provision of this Agreement requiring the consent or approval of the Initial Lenders or (C) the definition of Initial Lenders, in each case, without the written consent of each Initial Lender; or

(xiv)   change or waive (A) any provision of this Agreement requiring the consent or approval of the Specified Lenders or (B) the definition of Specified Lenders, in each case, without the written consent of each Specified Lender.

Notwithstanding the foregoing, this Agreement and the other Loan Documents may be amended in accordance with Section 2.19.

Neither the Borrowers nor any of their Subsidiaries or Affiliates will, directly or indirectly, pay or cause to be paid any consideration, to or for the benefit of any Lender for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Agreement or any other Loan Document unless such consideration is offered to be paid to all Lenders and is paid to all Lenders that consent, waive or agree to amend in the time frame set forth in the documents relating to such consent, waiver or agreement.

Notwithstanding anything to the contrary herein, any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by the Borrower Agent and the Administrative Agent (without the consent of any Lender) solely to cure a defect or error or to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property.

(c)     DIP Collateral.  Without the consent of any Lender or any other person, the applicable Loan Party or Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any DIP Collateral or additional property to become DIP Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)     Dissenting Lenders.  If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 10.02(b), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower Agent shall have the right (within five Business Days of obtaining such consent of the Required Lenders) to replace all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.15(b) so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination.

**SECTION 10.03  Expenses; Indemnity; Damage Waiver**.

(a)     Costs and Expenses.  The Borrowers shall pay (i) all reasonable out of pocket expenses incurred by [_____], the Administrative Agent, the Collateral Agent and their respective Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, the Collateral Agent and [_____]) in connection with (x) the syndication of the credit facilities provided for herein (including the obtaining and

114

maintaining of CUSIP numbers for the Loans), the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (y) the enforcement and protection of their rights in, and monitoring of, the Chapter 11 Cases and related matters, (ii) all out of pocket expenses incurred by the Administrative Agent or the Collateral Agent (including the fees, charges and disbursements of any counsel for the Administrative Agent or the Collateral Agent) in connection with any action, claim, suit, litigation, investigation, inquiry or proceeding to which the Administrative Agent or the Collateral Agent is made a party or participates or in which the rights to use the DIP Collateral or any part thereof is threatened, or in which it becomes necessary in the judgment of the Administrative Agent or the Collateral Agent to defend or uphold the Liens granted by the DIP Order (including any action, claim, suit, litigation, investigation, inquiry or proceeding to establish or uphold the compliance of the DIP Collateral with any Requirements of Law), (iii) all out-of-pocket expenses incurred by the Lead Arranger, the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of any counsel for the Lead Arranger, the Administrative Agent, the Collateral Agent or any Lender, in any matter related to this Agreement and the other Loan Documents, including, without limitation, in connection with (A) the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03, and (B) in connection with the Loans made hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or the Obligations and (iv) all documentary and similar taxes and charges in respect of the Loan Documents.

(b)     Indemnification by Borrowers.    The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), the Lead Arranger, and each Lender, and each Related Party of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) (collectively, "**Claims**") incurred by, imposed on, or asserted against an Indemnitee, directly or indirectly, by any party hereto or any third party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release or threatened Release of Hazardous Materials on, at, under or from any property owned, leased, operated, managed or controlled by any Company at any time, or any Environmental Claim related in any way to any Company, (iv) any past, present or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Company, or any Company's business, or any property presently or formerly owned, leased, operated, managed or controlled by any Company or their predecessors in interest, (v) the environmental condition of any property owned, leased, or operated by any Company at any time, or the applicability of any Requirements of Law relating to such property, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Company, (vi) the

115

imposition of any environmental Lien encumbering any Real Property, (vii) the consummation of the Transactions and the other transactions contemplated hereby (including the syndication of the credit facilities provided for herein) or (viii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)      Reimbursement by Lenders.   To the extent that any Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section 10.03 to be paid by it to the Agents (or any sub-agent thereof) or any of its Related Parties, in accordance with Section 9.09, each Lender severally agrees to pay to the Agents (or any such sub-agent) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); *provided* that the unreimbursed Claim was incurred by or asserted against any of the Agents (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agents (or any such sub-agent) in connection with such capacity.  For purposes hereof, a Lender's "*pro rata* share" shall be determined based upon its share of the outstanding Loans at the time.

(d)      Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Requirements of Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)      Payments.  All amounts due under this Section shall be payable not later than three (3) Business Days after demand therefor.

(f)      Settlement of Claims.  Each Borrower agrees that, without the prior written consent of the Administrative Agent and any affected Lender, which consent(s) will not be unreasonably withheld, Borrowers will not enter into any settlement of a Claim in respect of

116

the subject matter of Section 10.03(b) unless such settlement includes an explicit and unconditional release from the party bringing such Claim of all Indemnitees.

(g)    Survival.  The provisions of this Section 10.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, the release of any Guarantor or of all or any portion of the DIP Collateral, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents or any Lender.  All amounts due under this Section 10.03 shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

## SECTION 10.04 Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any other attempted assignment or transfer by any Loan Party without such consent shall be null and void). Subject in all cases to Section 10.04(j), no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this Section 10.04, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section 10.04 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any Lender shall be null and void).  Nothing in this Agreement or any other Loan Document, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document.

(b)    Assignments by Lenders.

(i)    Subject to Section 10.04(j) and to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to (A) a Lender, (B) an Affiliate of a Lender, (C) an Approved Fund, (D) a Participant, and (E) any other person, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), in each case, with the prior written consent (such consent not to be unreasonably withheld or delayed) of (i) the Administrative Agent and (ii) each Specified Lender; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender, an Approved Fund or a Participant.

(ii)    Assignments shall be subject to the following additional conditions:

(A)      except in the case of (x) an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or a Participant or (y) an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the aggregate amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (B) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate tranches on a non-pro rata basis;

(D)      the parties to each assignment shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire;

(E)      each Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company; and

(F)      any person approved by each Specified Lender may not acquire Loans, directly or indirectly, in an amount in excess of the amount consented to by the Specified Lenders.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 10.04, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.12, 2.14 and 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment.   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(d).

(c)      Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain a copy of each Assignment and Assumption

118

delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent, the Collateral Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register, each Assignment and Assumption and each Administrative Questionnaire shall be available for inspection by the Borrowers and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice. Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 10.04(c).

(d)     Participations.  Subject to Section 10.04(j), any Lender may at any time, without the consent of, or notice to, the Borrower Agent or the Administrative Agent, but with the prior written consent (such consent not to be unreasonably withheld or delayed) of each Initial Lender (following disclosure to each Specified Lender of the identity of the proposed participant and the amount of the proposed participation), sell participations to any person (other than a natural person, any Borrower or any of their Affiliates or any Disqualified Company) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it), in any event not to exceed the amount disclosed to each of the Initial Lenders (and any purported participation in excess of such amount shall be null and void); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrowers, the Administrative Agent, the Collateral Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement..

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that (i) the relevant participant shall not be permitted to transfer the participation, or sell sub-participations, to any natural person, the Borrowers or any of their Affiliates or any Disqualified Company and (ii) such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver (1) described in clause (i), (ii), (iii) or (v) of the first proviso to Section 10.02(b) and (2) that directly affects such Participant.  Each Borrower agrees that any breach by any Lender or participant or sub-participant of the restrictions on assignment hereunder (including, without limitation, to Disqualified Companies) shall not excuse, in any respect, performance by the Borrowers under the Loan Documents.  Subject to Section 10.04(e), each Borrower further agrees that each Participant shall be entitled to the benefits of Sections 2.11, 2.12 and 2.14 (subject to the requirements of those Sections, including the requirements under Section 2.14(e),

119

it being understood that the documentation required under Section 2.14(e) shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* such Participant agrees to be subject to Section 2.13 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender (and the Borrowers, to the extent that the Participant requests payment from the Borrowers) shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Limitations on Participant Rights.  A Participant shall not be entitled to receive any greater payment under Sections 2.11, 2.12 and 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower Agent's prior written consent (not to be unreasonably withheld, delayed or conditioned) or entitlement to receive a greater payment results from a Change in Law that occurs after the date the participation is sold to the Participant.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment be made to a natural person or any Disqualified Company; *provided*, *further*, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  Without limiting the foregoing, in the case of any Lender that is a fund that invests in bank loans, such Lender may, without the consent of the Borrower Agent or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Requirement of Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar laws, domestic or foreign, federal, state, provincial or otherwise, based on or analogous or similar to the *Uniform Electronic Transactions Act*.

120

(h)     Disqualified Company.  The Administrative Agent may conclusively rely on the written consent of the Borrower Agent to an assignment as evidence that the assignee is not a Disqualified Company for all purposes of this Agreement and the other Loan Documents, including in approving or declining to approve a person as an Eligible Assignee, executing and delivering any Assignment and Assumption, making any recording in the Register in respect of such Assignment and Assumption or otherwise.   The Administrative Agent shall have no responsibility or liability for monitoring Schedule 1.01(a) (as supplemented pursuant to the terms of this Agreement) or identities of, or enforcing provisions relating to, Disqualified Companies. The Administrative Agent shall have no liability of any kind to any Loan Party or any Affiliate thereof, any Lender or any other person if such list of Disqualified Companies (or any supplement thereto) is incorrect or if any person is incorrectly identified in such list of Disqualified Companies (or any supplement thereto) as a person to whom no assignment is to be made.   The Administrative Agent and any assignor of a Commitment or a Loan or seller of a participation or grantor of a pledge under Section 10.04(f) hereunder may conclusively rely on a representation given by the assignee, purchaser or grantee in the relevant Assignment and Assumption or participation agreement or other agreement, as applicable, that such assignee, purchaser or grantee is not a Disqualified Company.  Neither the Administrative Agent nor any such assignor, seller or grantor shall have any liability arising from any breach by an assignee, purchaser or grantee of such representation, and the Administrative Agent and any such assignor, seller or grantor shall be indemnified by the Borrowers for any loss, cost or expense resulting therefrom.  If any assignment, participation or pledge under this Section 10.04 is made to a Disqualified Company and the portion of the loan so assigned or participated is still held by a Disqualified Company, then the Borrowers (i) shall have the right to repurchase such portion of the Loan at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrowers at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.  Notwithstanding anything in this Agreement to the contrary, in no case shall the Administrative Agent, any assignor of a Commitment or a Loan, seller of a participation or grantor of a pledge under Section 10.04(f) have any liability of any kind to any Loan Party or any Affiliate thereof, any Lender or any other person as a result of or in connection with any such assignment, participation or pledge being made to a Disqualified Company to the extent the Borrower Agent has provided its written consent to such assignment, participation or pledge.

(i)     Limitation on Assignments to and Participations by Affiliates.  Notwithstanding anything to the contrary in this Section 10.04, no Borrower nor any of its Subsidiaries or Affiliates (other than any Sponsor Affiliated Lender) may be an assignee of a Loan or Commitment or a Participant.

(j)     Prohibition on Assignments and Participations.  Notwithstanding anything to the contrary in this Section 10.04, no Lender may assign, or sell or create participating interests in, any portion of its rights or obligations under this Agreement (and any purported assignment or participation shall be null and void) without the prior written consent of the Specified Lenders; *provided* that (i) participations granted on or prior to February 14, 2014 (which participations (x) shall have no right of elevation and shall not be elevated to a direct holding or assignment, (y) shall have no direct or indirect voting or consent rights hereunder

(other than as set forth in Section 10.04(d)) and (z) but may, for the avoidance of doubt, be assigned (but not elevated) to controlled affiliates of the initial participant thereof) shall be permitted and (ii) participations granted on or prior to February 14, 2014, or assignments to a Participant the name and participation amount of which was disclosed to each of the Initial Lenders on or prior to February 14, 2014 shall be permitted so long as the participation amount or assigned amount of Commitments and/or Loans, as the case may be, does not exceed the amount so disclosed.

### SECTION 10.05 <u>Survival of Agreement</u>.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lead Arranger, the Administrative Agent, Collateral Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of (including, without limitation, all PIK Interest that has been added to the principal amount) or any accrued interest on any Loan or any fee, premium or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of <u>Sections 2.11</u>, <u>2.12</u>, <u>2.13</u>, <u>2.14</u>, <u>Article IX</u>, and <u>Sections 10.03</u>, <u>10.08</u>, <u>10.09</u> and <u>10.10</u> shall survive and remain in full force and effect regardless of the consummation of the Transactions and the other transactions contemplated hereby, the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the repayment, satisfaction or discharge of all Obligations under any Loan Documents, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

### SECTION 10.06 <u>Counterparts; Integration; Effectiveness</u>.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent and the Collateral Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e. a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 10.07 <u>Severability</u>**.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.08 <u>Right of Setoff; Marshalling; Payments Set Aside</u>**.

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion to, hearing before, or order from, the Bankruptcy Court), but subject in all cases to the provisions of the DIP Order and the Recognition Order) at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the obligations of any Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower Agent and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application. Neither the Administrative Agent, the Collateral Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to Administrative Agent or any Lenders (or to Administrative Agent, on behalf of Lenders), or the Administrative Agent, the Collateral Agent or any Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**SECTION 10.09 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>**.

(a)      <u>Governing Law</u>. This Agreement and the other Loan Documents and the transactions contemplated hereby and thereby, and any claims, controversy, dispute or cause of action whether in contract, tort or otherwise, based upon, arising out of or relating to this

123

Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein), shall be construed in accordance with and governed by the laws (including statutes of limitation) of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)     Submission to Jurisdiction.   Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and with respect to the Canadian assets of the Loan Parties, the Canadian Court; *provided*, that each party hereto acknowledges that any appeals from the Bankruptcy Court or the Canadian Court, as applicable, may have to be heard by a court other than the Bankruptcy Court or the Canadian Court, as applicable.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Requirements of Law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent, the Collateral Agent, the Lead Arranger or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)     Venue.   Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Requirements of Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 10.09(b).   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Requirements of Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process.   Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier or email) in Section 10.01.   Nothing in this Agreement or any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by applicable Requirements of Law.

**SECTION 10.10 Waiver of Jury Trial**.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

**SECTION 10.11 <u>Headings</u>**.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 10.12 <u>Treatment of Certain Information; Confidentiality</u>**.

Each of the Administrative Agent, the Collateral Agent, the Lead Arranger and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and Approved Funds and to its and its Affiliates' and Approved Funds' respective current or prospective partners (limited or general), directors, officers, employees, agents, advisors, members, stockholders, subsidiaries, parent entities, and other representatives, including accountants, legal counsel and other advisors, including financial advisors and valuation or appraisal firms (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 10.12</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement and to such assignee's or Participant's partners, directors, officers, employees, agents, advisors and other representatives, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations or (iii) any rating agency for the purpose of obtaining a credit rating applicable to any Lender, (g) with the consent of the Borrower Agent, (h) to an investor or prospective investor in securities issued by an Approved Fund of any Lender that also agrees that Information shall be used solely for the purpose of evaluating an investment in such securities issued by an Approved Fund of any Lender or to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in securities issued by an Approved Fund of any Lender in connection with the administration, servicing and reporting on the assets serving as collateral for securities issued by such Approved Fund (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof) or (i) to the extent such Information (x) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this <u>Section 10.12</u> or (y) becomes available to the Administrative Agent, the Collateral Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than a Loan Party; *provided* that in no event shall any Information knowingly be provided to a Disqualified Company.  For purposes of this Section, "**Information**" means all information received from the Borrowers or any of their Subsidiaries relating to the Borrowers or

125

any of their Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent, the Collateral Agent, the Lead Arranger or any Lender on a nonconfidential basis prior to disclosure by the Borrowers or any of their Subsidiaries; *provided* that, in the case of information received from the Borrowers or any of their Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord to its own confidential information.

**SECTION 10.13 <u>USA PATRIOT Act Notice and Customer Verification</u>**.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notify Borrowers that pursuant to the "know your customer" regulations and the requirements of the USA PATRIOT Act, they are required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number (and other identifying information in the event this information is insufficient to complete verification) that will allow such Lender or the Administrative Agent, as applicable, to verify the identity of each Loan Party. This information must be delivered to the Lenders and the Administrative Agent no later than five days prior to the Closing Date and thereafter promptly upon request.  This notice is given in accordance with the requirements of the USA PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

**SECTION 10.14 <u>Interest Rate Limitation</u>**.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**SECTION 10.15 <u>Obligations Absolute</u>**.

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

126

(b)     any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)     any exchange, release or non-perfection of any other DIP Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)     any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**SECTION 10.16 <u>Waiver of Defenses; Absence of Fiduciary Duties</u>**.

(a)     Each of the Loan Parties hereby waives any and all suretyship defenses available to it as a Guarantor arising out of the joint and several nature of its respective duties and obligations hereunder (including any defense contained in <u>Section 2.18</u> or <u>Article VII</u>).

(b)     Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other person.  Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

**SECTION 10.17 <u>AML Legislation</u>**.

(a)    Each Borrower acknowledges that, pursuant to the PCTFA and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Secured Parties or any future assignee of a Secured Party may be required, now or hereafter, to obtain, verify and record information regarding any Borrower, its directors, authorized signing officers, direct or indirect shareholders or other persons in control of any Borrower, and the transactions contemplated hereby.  Each Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)    If the Administrative Agent has ascertained the identity of any Borrower or any authorized signatories of any Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

(i)    shall be deemed to have done so as an agent for each Secured Party (or any future assignee of a Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Secured Party (or any future assignee of a Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

(ii)    shall provide to each Secured Party (or any future assignee of a Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of any Borrower or any authorized signatories of any Borrower on behalf of any Secured Party or any future assignee of a Secured Party, or to confirm the completeness or accuracy of any information it obtains from any Borrower or any such authorized signatory in doing so.

**SECTION 10.18 <u>Conduct of the Lenders</u>**.

As long as this Agreement shall remain in effect, except to the extent that the Borrower Agent shall otherwise consent in writing, each of the Lenders shall (a) pursue the Plan of Reorganization diligently and in good faith and (b) not, whether on their own or in conjunction with the Borrower Agent, any other Lender or any other person, (i) engage in any communication (whether written, oral or otherwise) or (ii) permit any officer, employee, director or other representative of such Lender to attend or otherwise participate in any hearing, meeting or other appearance, in each case, with the FCC or Industry Canada in any way relating to the Debtors, including, without limitation, the Borrower Agent's efforts to satisfy the Material Regulatory Requests, the Transfer Proceedings or the FCC Objectives, unless (x) expressly so authorized in writing by each of the Specified Lenders upon consultation with the Borrower Agent, (y) requested by the FCC or Industry Canada, as the case may be, or (z) directly related

128

and necessary to the Transfer Proceedings; *provided*, *however*, that an officer, employee, director or other representative of a Lender shall not be precluded from attending any hearing before the FCC or Industry Canada (x) that is open to the general public so long as such officer, employee, director or other representative does not participate in such hearing or (y) if such officer, employee, director or other representative of a Lender is also an officer, employee or director of a Company.

### SECTION 10.19 Conflict.

In the case of any inconsistency between this Agreement and the DIP Order, the DIP Order shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWERS:**

LIGHTSQUARED INC.

By:    _____
　　　　　Name:
　　　　　Title:

LIGHTSQUARED LP

By: LightSquared GP Inc., its General Partner

By:    _____
　　　　　Name:
　　　　　Title:

ONE DOT SIX CORP.

By:    _____
　　　　　Name:
　　　　　Title:

[Signature Page to DIP Credit Agreement]

**GUARANTORS:**[6]

LIGHTSQUARED INVESTORS HOLDINGS INC.

By:    _____
       Name:
       Title:

LIGHTSQUARED GP INC.

By:    _____
       Name:
       Title:

TMI COMMUNICATIONS DELAWARE,
LIMITED PARTNERSHIP

By:    LightSquared Investors Holdings Inc., its
       General Partner

By:    _____
       Name:
       Title:

ATC TECHNOLOGIES, LLC

By:    LightSquared LP, its Managing Member

By:    LightSquared GP Inc., the General Partner
       of LightSquared LP

By:    _____
       Name:
       Title:

---

[6] List of Guarantors to be updated.

[Signature Page to DIP Credit Agreement]

LIGHTSQUARED INC. OF VIRGINIA

By:    _____
       Name:
       Title:

LIGHTSQUARED SUBSIDIARY LLC

By:    LightSquared LP, its Managing Member

By:    LightSquared GP Inc., the General Partner
       of LightSquared LP

By:    _____
       Name:
       Title:

ONE DOT FOUR CORP.

By:    _____
       Name:
       Title:

LIGHTSQUARED NETWORK LLC

By:    _____
       Name:
       Title:

LIGHTSQUARED CORP.

By:    _____
       Name:
       Title:

[Signature Page to DIP Credit Agreement]

SKYTERRA HOLDINGS (CANADA) INC.

By:    _____
       Name:
       Title:

SKYTERRA (CANADA) INC.

By:    _____
       Name:
       Title:

ONE DOT SIX TVCC CORP.

By:    _____
       Name:
       Title:

[Signature Page to DIP Credit Agreement]

[_____],
as Administrative Agent and Collateral Agent


By:      _____
         Name:
         Title:

**LENDERS:**

MELODY BUSINESS FINANCE, LLC,
as a Lender


By: _____
        Name:
        Title:

CHASE LINCOLN FIRST COMMERCIAL
CORPORATION, as a Lender

By:       _____
                   Name:
                   Title:

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.,
as a Lender


By: _____
      Name:
      Title:



HARBINGER CAPITAL PARTNERS SPECIAL
SITUATIONS FUND, L.P.,
as a Lender


By: _____
      Name:
      Title:



CREDIT DISTRESSED BLUE LINE MASTER
FUND, LTD.,
as a Lender


By: _____
      Name:
      Title:

[Signature Page to DIP Credit Agreement]

LSQ ACQUISITION CO LLC,
as a Lender


By:    _____
       Name:
       Title:

CENTAURUS CAPITAL LP,
as a Lender

By: CENTAURUS HOLDINGS LLC, its General
Partner

By:     _____
                 Name:
                 Title:

SPECIAL VALUE OPPORTUNITIES FUND, LLC,
TENNENBAUM OPPORTUNITIES PARTNERS V, LP,
TENNENBAUM OPPORTUNITIES FUND VI, LLC,
TENNENBAUM SENIOR LOAN SPV IV-A, LLC and
TENNENBAUM SENIOR LOAN FUND IV-B, LP
as Lenders

On behalf of each of the above entities:

By: TENNENBAUM CAPITAL PARTNERS, LLC, its
Investment Manager


By: _____
        Name:
        Title:

### Schedule 2.01

### Commitments and Applicable Percentages

Tranche A Commitments

| Lender | Tranche A Commitment | Applicable Percentage |
|---|---|---|
| Melody Business Finance LLC | $388,000,000 | 28.74% |
| LSQ Acquisition Co LLC | $350,000,000 | 25.93% |
| J.P. Morgan Broker-Dealer Holdings Inc. | $300,000,000 | 22.22% |
| Harbinger Capital Partners Master Fund I, Ltd. | $[106,622,657][7] | [7.90]% |
| Harbinger Capital Partners Special Situations Fund, L.P. | $[38,380,386] | [2.87]% |
| Credit Distressed Blue Line Master Fund, Ltd. | $[4,576,957] | [0.34]% |
| Centaurus Capital LP | $95,000,000 | 7.04% |
| Tennenbaum Opportunities Fund VI, LLC | $20,000,000 | 1.48% |
| Tennenbaum Senior Loan SPV IV-A, LLC | $19,339,328.27 | 1.43% |
| Tennenbaum Opportunities Partners V, LP | $15,000,000 | 1.11% |
| Tennenbaum Senior Loan Fund IV-B, LP | $7,660,671.73 | 0.57% |
| Special Value Opportunities Fund, LLC | $5,000,000 | 0.37% |
| Total: | $1,350,000,000 | 100.00% |

Tranche B Commitments

| Lender | Tranche B Commitment | Applicable Percentage |
|---|---|---|
|  | $ | % |
|  | $ | % |
|  | $ | % |
|  | $ | % |
| Total: | $300,000,000 | 100.00% |

---

[7]    Allocation of Tranche A Commitments among Harbinger funds to be confirmed prior to the Closing Date.

**Exhibit B**

———————————————————————————————————————

**SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT**

**dated as of [_____], 2014**

**among**


**LIGHTSQUARED INC.,**

**as the Borrower**

**and**

**The Lenders Party Hereto,**

**and**

**[____],**

**as Administrative Agent**

———————————————————————————————————

**J.P. MORGAN SECURITIES LLC,**

**as Sole Lead Arranger and Sole Bookrunner**

———————————————————————————————————————

# Table of Contents

Page

**ARTICLE I** Definitions ................................................................................................ 1

    Section 1.01    Defined Terms ...................................................................... 1
    Section 1.02    Terms Generally .................................................................. 23
    Section 1.03    Accounting Terms; GAAP .................................................. 24
    Section 1.04    Rounding ............................................................................. 24
    Section 1.05    Times of Day ...................................................................... 24
    Section 1.06    Timing of Payment or Performance .................................... 25
    Section 1.07    Certifications ...................................................................... 25

**ARTICLE II** The Loans ............................................................................................... 25

    Section 2.01    Loans .................................................................................. 25
    Section 2.02    Loans and Borrowing ......................................................... 25
    Section 2.03    Reserved ............................................................................. 25
    Section 2.04    Reserved ............................................................................. 25
    Section 2.05    Interest ............................................................................... 25
    Section 2.06    Repayment of Loans; Evidence of Debt ............................. 26
    Section 2.07    Prepayment of Loans .......................................................... 27
    Section 2.08    Fees .................................................................................... 28
    Section 2.09    Increased Costs ................................................................... 28
    Section 2.10    Reserved ............................................................................. 29
    Section 2.11    Taxes .................................................................................. 29
    Section 2.12    Payments Generally; Pro Rata Treatment; Sharing of Setoffs ...... 33
    Section 2.13    Mitigation Obligations ....................................................... 34

**ARTICLE III** Representations and Warranties ............................................................ 35

    Section 3.01    Organization; Powers ......................................................... 35
    Section 3.02    Authorization; Enforceability ............................................. 35
    Section 3.03    Governmental Approvals; No Conflicts .............................. 35
    Section 3.04    Financial Condition; No Material Adverse Effect ............... 36
    Section 3.05    Properties ............................................................................ 36
    Section 3.06    Litigation and Environmental Matters ................................ 37
    Section 3.07    Compliance with Laws and Agreements ............................. 37
    Section 3.08    Investment Company Status ................................................ 37
    Section 3.09    Taxes .................................................................................. 37
    Section 3.10    Employee Benefit Plans ...................................................... 37
    Section 3.11    Disclosure .......................................................................... 38
    Section 3.12    Subsidiaries ........................................................................ 38
    Section 3.13    Insurance ............................................................................ 39
    Section 3.14    Labor Matters ..................................................................... 39
    Section 3.15    Security Documents ............................................................ 39
    Section 3.16    Federal Reserve Regulations .............................................. 41
    Section 3.17    Anti-Corruption Laws and Sanctions ................................. 41
    Section 3.18    Senior Indebtedness ............................................................ 41

Section 3.19     Regulation H ........................................................................ 41
Section 3.20     Solvency ............................................................................... 41
Section 3.21     No Default ............................................................................ 41
Section 3.22     Real Estate ........................................................................... 42
Section 3.23     Communications Licenses and Regulatory Matters ................. 42
Section 3.24     Agreements ........................................................................... 42

**ARTICLE IV** Conditions ........................................................................ 43

Section 4.01     Closing Date ......................................................................... 43

**ARTICLE V** Affirmative Covenants ........................................................ 45

Section 5.01     Financial Statements .............................................................. 45
Section 5.02     Certificates; Other Information ............................................... 46
Section 5.03     Payment of Obligations .......................................................... 47
Section 5.04     Maintenance of Existence; Compliance .................................... 47
Section 5.05     Maintenance of Property; Insurance ......................................... 48
Section 5.06     Inspection of Property; Books and Records; Discussions ............ 49
Section 5.07     Notices ................................................................................. 49
Section 5.08     Environmental Laws ............................................................... 50
Section 5.09     Compliance with Communications Laws and ITU Rules and Regulations .... 50
Section 5.10     Use of Proceeds .................................................................... 50
Section 5.11     Additional Collateral, etc ........................................................ 50
Section 5.12     Further Assurances ................................................................ 51

**ARTICLE VI** Negative Covenants ........................................................... 52

Section 6.01     Reserved ............................................................................... 52
.                52
Section 6.02     Indebtedness ......................................................................... 52
Section 6.03     Liens .................................................................................... 52
Section 6.04     Fundamental Changes ............................................................ 54
Section 6.05     Disposition of Property ........................................................... 54
Section 6.06     Restricted Payments .............................................................. 55
Section 6.07     Investments ........................................................................... 55
Section 6.08     Optional Payments and Modifications of Certain Debt Instruments ............... 55
Section 6.09     Transactions with Affiliates .................................................... 56
Section 6.10     Sales and Leasebacks ............................................................ 56
Section 6.11     Swap Agreements .................................................................. 56
Section 6.12     Changes in Fiscal Periods ....................................................... 56
Section 6.13     Negative Pledge Clauses ........................................................ 56
Section 6.14     Clauses Restricting Subsidiary Distributions ............................. 56
Section 6.15     Lines of Business .................................................................. 57
Section 6.16     Amendments to Material Documents ........................................ 57
Section 6.17     Use of Proceeds .................................................................... 57
Section 6.18     Communications Laws ............................................................ 57
Section 6.19     Limitation on Creation of Subsidiaries ...................................... 57

**ARTICLE VII** Events of Default ............................................................. 58

Section 7.01     Events of Default ................................................................... 58

Section 7.02    Remedies Upon Event of Default .................................................. 60
Section 7.03    Application of Funds ................................................................. 61
Section 7.04    Government Approval ............................................................... 61
**ARTICLE VIII** The Administrative Agent .................................................. 62
Section 8.01    Appointment and Administration by Administrative Agent ........... 62
Section 8.02    Agreement of Applicable Lenders ............................................... 62
Section 8.03    Liability of Administrative Agent ............................................... 62
Section 8.04    Notice of Default .................................................................... 63
Section 8.05    Credit Decisions ..................................................................... 64
Section 8.06    Reimbursement and Indemnification .......................................... 64
Section 8.07    Rights of Administrative Agent .................................................. 65
Section 8.08    Notice of Transfer .................................................................. 65
Section 8.09    Successor Agents ................................................................... 65
Section 8.10    Relation Among the Lenders ..................................................... 65
Section 8.11    Reports and Financial Statements .............................................. 66
Section 8.12    Agency for Perfection .............................................................. 66
Section 8.13    Collateral and Guaranty Matters ............................................... 67
Section 8.14    Syndication Agents; Documentation Agents; Arrangers ................. 67
**ARTICLE IX** Miscellaneous ................................................................... 68
Section 9.01    Notices ................................................................................. 68
Section 9.02    Waivers; Amendments ............................................................. 69
Section 9.03    Expenses; Indemnity; Damage Waiver ....................................... 71
Section 9.04    Successors and Assigns ........................................................... 73
Section 9.05    Survival ................................................................................ 78
Section 9.06    Counterparts; Integration; Effectiveness ..................................... 78
Section 9.07    Severability ........................................................................... 79
Section 9.08    Right of Setoff ....................................................................... 79
Section 9.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                PROCESS ............................................................................... 79
Section 9.10    WAIVER OF JURY TRIAL ....................................................... 80
Section 9.11    Headings .............................................................................. 80
Section 9.12    Confidentiality ...................................................................... 80
Section 9.13    Interest Rate Limitation ........................................................... 81
Section 9.14    Patriot Act ............................................................................ 81
Section 9.15    Additional Waivers ................................................................. 81
Section 9.16    No Advisory or Fiduciary Responsibility .................................... 82

## SCHEDULES

| | |
|---|---|
| Schedule 1.01(A) | Competitors |
| Schedule 1.01(B) | Mortgaged Properties |
| Schedule 2.01 | Lenders and Commitments |
| Schedule 3.03 | Governmental Approvals |
| Schedule 3.06 | Litigation |
| Schedule 3.12 | Subsidiaries |
| Schedule 3.13 | Insurance |
| Schedule 3.15(a) | UCC Filings |
| Schedule 3.15(b) | Intellectual Property Filings |
| Schedule 3.23(b) | Communications Proceedings |
| Schedule 3.24 | Material Agreements |
| Schedule 6.02(d) | Existing Indebtedness |
| Schedule 6.03(f) | Existing Liens |
| Schedule 7.01(k) | Judgments |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption |
| Exhibit B | Form of Closing Certificate |
| Exhibit C | Form of Security Agreement |
| Exhibit D | Form of Request for Borrowing |
| Exhibit E | Form of Promissory Note |
| Exhibit F | Forms of Tax Certificates |
| Exhibit G | Form of Solvency Certificate |
| Exhibit H | Form of Compliance Certificate |

SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT

This SENIOR SECURED FIRST LIEN TERM LOAN AGREEMENT (this "**Agreement**") dated as of [_____], 2014, among LIGHTSQUARED INC., a Delaware corporation which has been reorganized under the Plan of Reorganization (the "**Borrower**"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "**Lenders**") and [___], a national banking association, as administrative agent for the Lenders.[1]  The sole lead arranger and sole bookrunner for the credit facility provided under this Agreement is J.P. MORGAN SECURITIES LLC.

W I T N E S S E T H:

WHEREAS, on May 14, 2012 (the "**Petition Date**"), the Borrower and certain of its Affiliates filed voluntary petitions with the Bankruptcy Court initiating cases under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on [__], 2014 the Borrower filed the Plan of Reorganization;

WHEREAS, on [__], 2014, the Bankruptcy Court entered the Plan Confirmation Order confirming the Plan of Reorganization; and

WHEREAS, in connection with the Plan of Reorganization, the Borrower requires certain credit and other financial accommodations be made available to it, and the Lenders have agreed to extend credit in the form of the credit facility hereunder;

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01    *Defined Terms*.  As used in this Agreement, the following terms have the meanings specified below:

"**Account**" has the meaning set forth in the UCC.

"**Administrative Agent**" means [___], in its capacity as administrative agent for the Lenders hereunder, together with its permitted successors and assigns (including assignment of its agency role hereunder to a third party) in such capacity.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

---

[1]    TBD whether there will be an administrative agent for this facility.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Aggregate Commitments**" means, at any time, the sum of the Commitments at such time. As of the Closing Date, the Aggregate Commitments are $300,000,000 plus the amount of any unpaid accrued interest, paid in kind interest, and premium under the DIP Agreement.[2]

"**Aggregate Outstandings**" means, at any time, the aggregate outstanding principal balance of the Loans of all Lenders at such time.

"**Agreement**" has the meaning set forth in the preamble hereto.

"**Anti-Corruption Laws**" means all laws, rules and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Applicable Law**" means, as to any Person, all statutes, rules, regulations, orders, or other requirements having the force of law and applicable to such Person, and all court orders and injunctions, and/or similar rulings and applicable to such Person, in each case of or by any Governmental Authority, or court, or tribunal which has jurisdiction over such Person, or any property of such Person.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage (carried out to the fourth decimal place) of (i) prior to the funding of the Term Loans on the Closing Date, the amount of such Lender's Commitment at such time to the Aggregate Commitments at such time and (ii) thereafter, the outstanding principal balance of such Lender's Loan at such time to the Aggregate Outstandings at such time. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Asset Sale**" means any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by clause (a), (b), (c), (d) or (e) of Section 6.05) that yields gross proceeds (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) to the Borrower or any of its Subsidiaries.

---

[2]    The initial principal amount of the Exit Facility shall be reduced on a dollar-for-dollar basis by 22.22% of the amount that the First Lien Exit Facility exceeds $1,000,000,000, each in accordance with the Plan of Reorganization.

**"Assets"** means all rights, titles, and interests of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**"Assignee Group"** means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed or advised by the same investment advisor or investment manager or by affiliated investment advisors or investment managers.

**"Assignment and Assumption"** means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent and the Borrower.

**"Bankruptcy Code"** means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

**"Board"** means the Board of Governors of the Federal Reserve System of the United States of America.

**"Borrower"** has the meaning set forth in the preamble hereto.

**"Borrowing"** means a group of Loans made on the same date.

**"Business Day"** means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

**"Canadian Court"** means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the CCAA.

**"Canadian Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Administrative Agent, recognizing the entry of the Plan Confirmation Order and giving full force and effect in Canada thereto.

**"Capital Lease Obligations"** means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

**"Cases"** means one or more cases under chapter 11 of the Bankruptcy Code with respect to which the Borrower and certain other Group Members were the debtors and the debtors-in-possession.

4

"**Cash Equivalents**" means: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Financial Services LLC ("**S&P**") or P-1 by Moody's Investors Service, Inc. ("**Moody's**"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

"**Change in Control**" means, at any time, (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934 (the "**Exchange Act**"), other than a Permitted Holder, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all shares that any such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of voting stock of the Borrower representing more than 35% of the voting power of all voting stock of the Borrower, (b) individuals who on the Closing Date constituted the board of directors of the Borrower (together with any new directors whose election by such board of directors or whose nomination for election by the Borrower's shareholders was approved by a vote of a majority of the Borrower's directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Borrower's directors then in office (excluding any directors from the numerator and denominator of such calculation to the extent such director is or was designated by a Permitted Holder or pursuant to a contractual agreement with the Borrower existing on the Closing Date), (c) a change of control occurs under any Material Indebtedness, (d) a change of control occurs under the First Lien Credit Agreement or

the Second Lien Credit Agreement or (e) a plan relating to the liquidation or dissolution of the Borrower is adopted; *provided further* that for the avoidance of doubt, none of the transactions contemplated or expressly authorized by the Plan of Reorganization to occur on the Effective Date thereof shall constitute, or be deemed to constitute, a Change in Control.

"**Change in Law**" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any party hereto (or, for purposes of Section 2.09(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement. Notwithstanding the foregoing, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives promulgated thereunder and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to have been introduced or adopted after the Closing Date, regardless of the date enacted or adopted.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Charges**" has the meaning set forth in Section 9.13.

"**Closing Date**" means the date on which each of the conditions set forth in Section 4.01 were satisfied (or waived in accordance with Section 9.02), which date is [_____], 2014.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all the "Mortgaged Property" as defined in any Mortgage and all the "Collateral" as defined in any other Security Document.

"**Commitment**" means, with respect to each Lender, the commitment of such Lender hereunder set forth as its Commitment opposite its name on Schedule 2.01 hereto or as may subsequently be set forth in the Register from time to time.

"**Communications Act**" means the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services.

"**Communications Licenses**" means any authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or

6

conferred upon any Person, in each case by any Governmental Authority (including the FCC) with respect to the use of radio frequencies.

**"Compliance Certificate"** means a certificate duly executed by a Responsible Officer substantially in the form of Exhibit H.

**"Confirmation Order"** means the order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] confirming the Plan of Reorganization, as such order may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Lenders.

**"Connection Income Taxes"** means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

**"Contractual Obligation"** means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power or by contract. "Controlling" and "Controlled" have meanings correlative thereto.

**"Credit Party"** or **"Credit Parties"** means (a) individually, (i) each Lender, (ii) the Administrative Agent, (iii) the Lead Arranger, (iv) any other Person (including, if applicable, Affiliates of Lenders) to whom Obligations are owing and (v) the successors and permitted assigns of each of the foregoing and (b) collectively, all of the foregoing.

**"Debtors"** means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc., each in their capacity as debtors and debtors in possession in the Chapter 11 Cases.

**"Default"** means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived hereunder, become an Event of Default.

**"DIP Agreement"** means the Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of [__], 2014, by and among the Borrower, LightSquared LP and One Dot Six Corp., as borrowers, the guarantors party thereto, the lenders party thereto, and [___], as administrative agent and as collateral agent, as amended, amended and restated, supplemented and modified from time to time prior to the date hereof.

**"DIP Facility"** means the credit facility made available under the DIP Agreement.

**"Disclosure Statement"** means that certain [___] dated [__], 2014 [Docket No. ___], as amended, supplemented or otherwise modified from time to time in a manner that is not adverse (as determined by the Lenders in their sole discretion) to the rights and interests of the Lenders and their Affiliates.

**"Disposition" or "Dispose"** means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of related transactions, of any property (including any Equity Interests) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable.

**"Disqualified Company"** means any company which is a competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(A), and thereafter, upon the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), such additional companies which are competitors of the Borrower and the Affiliates of such companies, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided* that the addition of such persons shall not deem any Lender that is already a Lender as of the date of such designation to be a Disqualified Company, and such designation shall be effective two (2) Business Days after being notified to Lenders; *provided, further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption. A Disqualified Company will include any Affiliate thereof.

**"Dollars"** and the symbol "$" mean the lawful currency of the United States.

**"Eligible Assignee"** means (a) a Lender or any Affiliate of a Lender; (b) an Approved Fund; and (c) any other Person approved by (i) the Administrative Agent and (ii) unless an Event of Default has occurred and is continuing, the Borrower (each such approval under clauses (i) and (ii) not to be unreasonably withheld or delayed); *provided* that approval of the Borrower shall be deemed to have been given pursuant to clause (c)(ii) with respect to any potential assignee if it shall not have responded to an approval request with respect thereto within ten (10) Business Days of receipt thereof; *provided further* that notwithstanding the foregoing, **"Eligible Assignee"** shall not include (A) a Disqualified Company without the prior written consent of the Borrower, (B) a natural person, (C) the Borrower or any Subsidiaries of the Borrower or (D) NewCo or any Subsidiaries of NewCo.

**"Environmental Laws"** means all laws (statutory or common), rules, regulations, codes, ordinances, orders, decisions, decrees, judgments, injunctions, permits, or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating to the pollution or protection of the environment (including indoor air quality) or to human health and safety as it relates to Hazardous Material handling or exposure or to the preservation or reclamation of natural resources, including those relating to the management, Release or threatened Release of or exposure to any Hazardous Material.

**"Environmental Liability"** means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense or cost, contingent or otherwise (including any liability for costs of Remedial Actions, or natural resource damages, administrative oversight

costs, and indemnities), of or related to the Borrower or any Subsidiary (including any predecessor for whom the Borrower or any Subsidiary bears liability contractually or by operation of law) arising under or relating to any Environmental Law, including those resulting from or based upon (a) any compliance or noncompliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment (including as related to indoor air quality) or (e) any of the foregoing for which liability is assumed or imposed by any contract or agreement.

"**Equity Interests**" means, as to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, and any and all warrants, rights or options to purchase any of the foregoing, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means (a) any entity, whether or not incorporated, that is under common control with the Borrower and any Subsidiary within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which the Borrower or any Subsidiary is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which the Borrower or any Subsidiary is a member; and (d) with respect to the Borrower or an Subsidiary, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Borrower or Subsidiary, any corporation described in clause (b) above or any trade or business described in clause (c) above is a member. Any former ERISA Affiliate of the Borrower or a Subsidiary shall continue to be considered an ERISA Affiliate of the Borrower or the Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Borrower or a Subsidiary and with respect to liabilities arising after such period for which the Borrower or Subsidiary could be liable under the Code or ERISA.

"**ERISA Event**" means (a) the failure of any Plan to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of the Borrower or any Subsidiary or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA; (e) a determination that any Pension Plan is, or

is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (h) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (i) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (j) the failure by the Borrower, a Subsidiary or any of their ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (k) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Pension Plan or Multiemployer Plan; (l) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower, any Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Sections 431 or 432 of the Code or Sections 304 or 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA) or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (m) the failure by the Borrower, any Subsidiary or any of their ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA; (n) the withdrawal by the Borrower, any Subsidiary or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (o) the imposition of liability on the Borrower or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (p) the occurrence of an act or omission which could give rise to the imposition on the Borrower, any Subsidiary or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (q) the assertion of a material claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against the Borrower, any Subsidiary or any of their respective ERISA Affiliates in connection with any Plan; (r) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan (or any other Plan) to qualify for exemption from taxation under Section 501(a) of the Code; or (s) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" has the meaning set forth in Section 7.01.

"**Excluded Foreign Subsidiary**" means any Foreign Subsidiary in respect of which the pledge of all of the Equity Interests of such Subsidiary as Collateral would, in the good faith judgment of the Borrower, result in adverse tax consequences to the Borrower; *provided* that the following shall be deemed to be Excluded Foreign Subsidiaries: (i) a Subsidiary that is a

"controlled foreign corporation" within the meaning of Section 957(a) of the Code (a "**CFC**"), and (ii) a Subsidiary that is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of Equity Interests of a Subsidiary that is a CFC.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.11(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Exit Loan Documents**" means, collectively, the First Lien Loan Documents and the Second Lien Loan Documents.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" means the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**Federal Funds Effective Rate**" means, for any day, the weighted average (rounded upwards, if necessary, to the next one-one hundredth of one percent (1/100 of 1%)) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next one-one hundredth of one percent (1/100 of 1%)) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Financial Officer**" means, with respect to any Person (other than a natural person), the chief financial officer, president, chief executive officer, treasurer or controller or any other officer of such Person designated or authorized by any of the foregoing.

11

"**First Lien Credit Agreement**" means that certain [First Lien Credit Agreement], dated as of the Closing Date, by and among NewCo, as borrower, the subsidiaries of NewCo party thereto, JPMorgan Chase Bank, N.A., as administrative agent, the lenders identified therein and the other agents identified therein, as amended, restated, modified, or supplemented from time to time to the extent permitted by this Agreement.

"**First Lien Exit Facility**" means the credit facility made available pursuant to the First Lien Credit Agreement.

"**First Lien Lenders**" means the lenders under the First Lien Credit Agreement.

"**First Lien Loans**" means the loans made by the First Lien Lenders under the First Lien Credit Agreement.

"**First Lien Loan Documents**" means "Loan Documents" (or any comparable term) in the First Lien Credit Agreement.

"**Fiscal Month**" means each calendar month.

"**Fiscal Quarter**" means each three-month period of the Borrower ending on March 31, June 30, September 30 or December 31 of any calendar year.

"**Flood Insurance Laws**" means, collectively, the following (in each case as now or hereafter in effect or any successor statute thereto): (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994 and (iv) the Flood Insurance Reform Act of 2004.

"**Foreign Plan**" means each employee benefit plan (within the meaning of Section 3(3) of ERISA) that is not subject to US law and is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle maintained exclusively by a Governmental Authority) and is sponsored or maintained by the Borrower or any Subsidiary primarily for the benefit of employees who are employed outside the United States, or under which the Borrower or any Subsidiary could have any liability, contingent or otherwise.

"**Foreign Plan Event**" means, with respect to any Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Plan required to be registered; or (c) the failure of any Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Plan.

"**Foreign Subsidiary**" means any Subsidiary organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"**Fund**" shall mean any Person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local or other, and any agency (including the FCC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Group Members**" means the collective reference to the Borrower and its Subsidiaries.

"**Guarantee Obligation**" means, as to any Person (the "**guaranteeing person**"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "**primary obligations**") of any other third Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however,* that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**Hazardous Materials**" means all explosive, radioactive, hazardous or toxic substances or materials, and all wastes, pollutants or contaminants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, lead, polychlorinated biphenyls, toxic mold, radon gas, infectious or medical wastes, and all other substances or materials of any nature regulated pursuant to any Environmental Law due to their hazardous, toxic or deleterious properties or characteristics.

"**Indebtedness**" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes,

bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Sections 7.01(f) and (g) only, all obligations of such Person in respect of Swap Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"**Indemnitee**" has the meaning set forth in Section 9.03(b).

"**Insolvent**" means with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intellectual Property**" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interest Payment Date**" means (a) the last Business Day of each calendar quarter to occur during any period in which such Loan is outstanding and (b) the Maturity Date, as the case may be.

"**Investments**" shall have the meaning set forth in Section 6.07.

"**IRS**" means the United States Internal Revenue Service.

"**ITU**" means the International Telecommunication Union, or any successor agency of the United Nations that develops standards and procedures concerning radiocommunications.

"**Lead Arranger**" means J.P. Morgan Securities LLC.

**"Lease"** means any agreement pursuant to which the Borrower is entitled to the use or occupancy of any real property for any period of time.

**"Lender"** shall have the meaning set forth in the preamble hereto.

**"Lender Insolvency Event"** means that (i) a Lender or its Parent Company is determined or adjudicated to be insolvent by a Governmental Authority, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, or (ii) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; *provided* that a Lender Insolvency Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interest in any Lender or its Parent Company by a Governmental Authority or an instrumentality thereof.

**"Lien"** means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

**"Loan Documents"** means this Agreement, the Security Documents, and any other instrument or agreement now or hereafter executed and delivered by the Borrower in connection herewith, each as amended, restated, modified, replaced and supplemented and in effect from time to time.

**"Loan Transactions"** means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the deemed borrowing of Loans and the use of the proceeds thereof.

**"Loans"** means the Term Loans and any other loans made hereunder.

**"Margin Stock"** shall have the meaning set forth in Regulation U.

**"Material Adverse Effect"** means (a) a material adverse effect on the business, assets, property, operations or condition, financial or otherwise, or material agreements of the Borrower and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Borrower to fully and timely perform any of its material obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on a material portion of the Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

**"Material Indebtedness"** means Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $5,000,000 (or its equivalent); *provided*

that notwithstanding the foregoing, the Indebtedness incurred pursuant to the First Lien Exit Facility, the Second Lien Exit Facility and any permitted refinancing of the foregoing shall be deemed to be "Material Indebtedness."

"**Maturity Date**" means the eighth anniversary of the Closing Date.

"**Maximum Rate**" has the meaning set forth in Section 9.13.

"**Moody's**" has the meaning set forth in the definition of "Cash Equivalents".

"**Mortgage(s)**" means each and every fee mortgage or deed of trust, security agreement and assignment encumbering Real Estate by and between the Borrower in favor of the Administrative Agent, and in form and substance reasonably satisfactory to the Administrative Agent.

"**Mortgage Policies**" has the meaning set forth in the definition of Real Estate Requirements.

"**Mortgaged Properties**" means the owned Real Estate listed on Schedule 1.01(B) attached hereto and any Real Estate that becomes subject to a Mortgage pursuant to Section 5.11(b).

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, a Subsidiary or an ERISA Affiliate contributes or is obligated to contribute.

"**Multiple Employer Plan**" means a Plan which has two or more contributing sponsors (including any Subsidiary or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Proceeds**" means, with respect to any event (a) the gross cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) all costs, fees and out-of-pocket fees, commissions, charges and expenses (including fees, costs and expenses related to appraisals, surveys, brokerage, finder, underwriting, arranging, legal, investment banking, placement, printing, auditor, accounting, title, environmental (including remedial expenses), title exceptions and encumbrances, and finder's fees, success fees or similar fees and commissions) paid or payable by the Borrower and its Subsidiaries to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a casualty or a condemnation or similar proceeding), the amount of all payments required to be made (or required to be escrowed) by the Borrower and its Subsidiaries as a result of such event to repay (or establish an escrow, trust, defeasance, discharge or redemption account or similar arrangement for the repayment of) Indebtedness (other than the Obligations) secured by a Lien prior to the Lien of the Administrative Agent on such asset (*provided* that if any amounts in such accounts or subject to such agreements are released to the Borrower and its Subsidiaries, such amounts shall constitute Net Proceeds upon release), (iii) the amount of all taxes (including transfer tax and recording tax)

paid (or reasonably estimated to be payable) by the Borrower and its Subsidiaries, and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable that are directly attributable to such event (as determined reasonably and in good faith by the chief financial officer or other Financial Officer of the Borrower) and (iv) in respect of any casualty or condemnation, any amounts paid to the Borrower or any Subsidiary related to the casualty or condemnation or Recovery Event.

"**NewCo**" means [NewCo], a Delaware limited liability company.

"**Non-Consenting Lender**" has the meaning set forth in Section 9.02(c).

"**Non-U.S. Lender**" means a Lender that is not a U.S. Person.

"**Obligations**" means (a) obligations of the Borrower from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower under or pursuant to this Agreement and the other Loan Documents.

"**Organizational Documents**" shall mean, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are

Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.13).

**"Parent Company"** means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the economic or voting Equity Interests of such Lender.

**"Participant"** has the meaning set forth in Section 9.04(d); *provided* that in no circumstance shall a Disqualified Company be a Participant.

**"Participant Register"** has the meaning set forth in Section 9.04(e).

**"PBGC"** means the Pension Benefit Guaranty Corporation referred to and defined in Section 4002 of ERISA and any successor entity performing similar functions.

**"Pension Plan"** means any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is or was sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower, any Subsidiary or any of their respective ERISA Affiliates or (ii) with respect to which has the Borrower, any Subsidiary or any of their respective ERISA Affiliates has any actual or contingent liability.

**"Permitted Holders"** means J.P. Morgan Broker-Dealer Holdings Inc., Harbinger Capital Partners, LLC and any Affiliate of any of the foregoing.

**"Person"** means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

**"Petition Date"** has the meaning set forth in the recitals hereto.

**"PIK Interest"** has the meaning set forth in Section 2.05(b).

**"Plan"** means any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which the Borrower or any Subsidiary is (or, if such Plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, or in respect of which the Borrower or any Subsidiary has any actual or contingent liability.

**"Plan Effective Date"** means the "Effective Date" as defined in the Plan of Reorganization.

**"Plan of Reorganization"** means the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, as confirmed by the Confirmation Order, as amended, supplemented or otherwise modified from time to time in a manner that is not adverse (as

determined by the Lenders in their sole discretion) to the rights and interests of the Lenders and their Affiliates (it being understood that any amendment, modification or supplement to the Plan of Reorganization providing for the assumption or incurrence by the Borrower or its Subsidiaries of any material indebtedness or other material liability not otherwise contemplated by the Plan of Reorganization as of [___], 2014 (other than contracts or leases to be assumed in connection with the ongoing business of the Borrower upon reasonable prior notice to the Administrative Agent) and any modification to or waiver of the conditions to effectiveness of the Plan of Reorganization shall be deemed to be adverse to the rights and interests of the Lenders and their Affiliates).

"**Prohibited Transaction**" means as defined in Section 406 of ERISA and Section 4975(c) of the Code.

"**Projections**" has the meaning set forth in Section 5.02(c).

"**Real Estate**" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by the Borrower, including all easements, rights-of-way, and similar rights relating thereto and all Leases, tenancies, and occupancies thereof.

"**Real Estate Requirements**" means, collectively, each of the following, unless waived by the Administrative Agent in its sole discretion:

(a)      The Borrower shall have executed and delivered to the Administrative Agent a Mortgage with respect to any owned Real Estate, together with an opinion of counsel in each state where such Real Estate is located and an opinion of counsel in the jurisdiction where the Borrower is organized, in form and substance reasonably satisfactory to the Administrative Agent;

(b)      For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to or concurrently with the recording of such Mortgage, the Administrative Agent shall have received fully paid American Land Title Association Lender's Extended Coverage title insurance policies or marked-up title insurance commitments having the effect of a policy of title insurance (the "**Mortgage Policies**") in form and substance, with such endorsements and affirmative coverages as may reasonably be requested by the Administrative Agent (to the extent available at commercially reasonable rates) and in amounts reasonably acceptable to the Administrative Agent (*provided* that such amounts shall not exceed the estimated fair market value of the applicable mortgaged property, as reasonably estimated by the Borrower, unless otherwise reasonably agreed by the Borrower and the Administrative Agent), issued, coinsured and reinsured (to the extent reasonably required by the Administrative Agent) by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid first priority and subsisting Liens (other than any Liens permitted by Section 6.03) in favor of the Administrative Agent on the property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, other than any Liens permitted pursuant to Section 6.03 or otherwise reasonably acceptable to the Administrative Agent;

(c)      For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to or concurrently with the delivery of such Mortgage (or such later date, if any, as the Administrative Agent shall agree in writing in its reasonable discretion), the Administrative Agent shall have received American Land Title Association/American Congress on Surveying and Mapping form surveys, for which all necessary fees (where applicable) have been paid, certified to the Administrative Agent and the issuer of the Mortgage Policies in a manner reasonably satisfactory to the Administrative Agent by a land surveyor duly registered and licensed in the states in which the property described in such surveys is located and reasonably acceptable to the Administrative Agent, showing all buildings and other improvements, the location of any easements, parking spaces, rights of way, building set-back lines and other dimensional regulations and the absence of encroachments, either by such improvements or on to such property, and other defects, other than encroachments and other defects reasonably acceptable to the Administrative Agent or such other form of survey with respect to which the title insurer providing the Mortgage Policies will agree to provide extended coverage; and

(d)      For any Real Estate with respect to which a Mortgage is recorded in accordance with clause (a) hereof, prior to delivery of such Mortgage, the Borrower shall have delivered to the Administrative Agent (i) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination and (ii) in the event any such Real Estate is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area, (A) a notice about special flood hazard area status and flood disaster assistance, duly executed by the Borrower and (B) evidence of flood insurance (which may be in the form of a blanket policy), with a financially sound and reputable insurer, naming the Administrative Agent, as mortgagee, in an amount and otherwise in form and substance reasonably satisfactory to the Administrative Agent and evidence of the payment of premiums in respect thereof.

"**Recovery Event**" means any payment in respect of any property or casualty insurance claim or any condemnation proceeding.

"**Register**" has the meaning set forth in Section 9.04(c).

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), including the migration of any Hazardous Material through the air, soil, surface water or groundwater.

"**Remedial Action**" means (a) all actions taken under any Environmental Law to (i) clean up, remove, remediate, contain, treat, monitor, assess or evaluate Hazardous Materials present in, or threatened to be Released into, the environment, (ii) perform pre-remedial studies

and investigations and post-remedial operation and maintenance activities or (b) any response actions authorized by 42 U.S.C. 9601 et. seq. or analogous state law.

**"Reorganization"** means with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

**"Reorganized Debtors"** means the Debtors as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

**"Reportable Event"** means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to 29 C.F.R. Section 4043 as in effect on the date hereof (no matter how such notice requirement may be changed in the future).

**"Required Lenders"** means, at any time, Lenders having Loans (and, prior to the making of the Loans pursuant to Section 2.01, Commitments), representing greater than fifty percent (50%) of the sum of all Loans outstanding (and, prior to the making of the Loans pursuant to Section 2.01, Commitments) at such time.

**"Responsible Officer"** of any Person means the chief executive officer, president, chief financial officer, general counsel and any executive vice president (or any substantially similar office to any of the foregoing) or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

**"Restricted Payment"** has the meaning set forth in Section 6.06.

**"S&P"** has the meaning set forth in the definition of "Cash Equivalents".

**"Sanctioned Country"** means, at any time, a country or territory that is the subject or target of any Sanctions.

**"Sanctioned Person"** means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

**"Sanctions"** means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

**"Second Lien Credit Agreement"** means that certain [Second Lien Credit Agreement], dated as of the Closing Date, by and among NewCo, as borrower, the subsidiaries of NewCo party thereto, [__], as administrative agent, the lenders identified therein and the other agents

identified therein, as amended, restated, modified, or supplemented from time to time to the extent permitted by this Agreement.

**"Second Lien Exit Facility"** means the credit facility made available pursuant to the Second Lien Credit Agreement.

**"Second Lien Lenders"** means the lenders under the Second Lien Credit Agreement.

**"Second Lien Loans"** means the loans made by the Second Lien Lenders under the Second Lien Credit Agreement.

**"Second Lien Loan Documents"** means "Loan Documents" (or any comparable term) in the Second Lien Credit Agreement.

**"Secured Parties"** means any of the Administrative Agent, the Lenders and any other holder of Obligations.

**"Security Agreement"** means the Security Agreement to be executed and delivered by the Borrower, dated as of the Closing Date, substantially in the form of Exhibit C, as such agreement may be amended, restated, supplemented and modified from time to time.

**"Security Documents"** means the Security Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by the Borrower to secure any of the Obligations.

**"Solvent"** means, with respect to the Borrower, on a particular date, that on such date (i) the sum of the debt and liabilities (including subordinated and contingent liabilities) of the Borrower and its Subsidiaries, taken as a whole, does not exceed the fair value of the present assets of the Borrower and its Subsidiaries, taken as a whole; (ii) the present fair saleable value of the assets of the Borrower and its Subsidiaries, taken as a whole, is greater than the total amount that will be required to pay the probable debt and liabilities (including subordinated and contingent liabilities) of the Borrower and its Subsidiaries as they become absolute and matured, (iii) the capital of the Borrower and its Subsidiaries, taken as a whole, is not unreasonably small to engage in the business of the Borrower and its Subsidiaries, taken as a whole, on the date hereof and as contemplated to be engaged following the Closing Date; and (iv) the Borrower and its Subsidiaries, taken as a whole, have not incurred, or believe that they will incur, debts or other liabilities including current obligations beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

**"Specified Date"** means October 31, 2014.

**"SPV"** has the meaning set forth in Section 9.04(i).

**"Subordinated Indebtedness"** means any unsecured Indebtedness of the Borrower and its Subsidiaries that is subordinated in right of payment to the Obligations on subordination terms reasonably satisfactory to the Administrative Agent.

**"Subsidiary"** means, with respect to any Person (the **"parent"**) at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than fifty percent (50%) of the ordinary voting power to elect a majority of the board of directors or other managers thereof or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.  Unless otherwise specified, **"Subsidiary"** shall mean a Subsidiary of the Borrower, it being understood that neither NewCo nor any of its subsidiaries are, on the Closing Date, Subsidiaries of the Borrower.

**"Swap Agreement"** means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

**"Taxes"** means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**"Term Loan"** means a term loan made by a Lender pursuant to Section 2.01 on the Closing Date.

**"Termination Date"** means the earliest to occur of (a) the Maturity Date and (b) the acceleration of the Term Loans pursuant to Section 7.02.

**"Tranche A Loans"** has the meaning set forth in the DIP Agreement.

**"Tranche B Loans"** has the meaning set forth in the DIP Agreement.

**"Transferee"** means any Eligible Assignee or Participant.

**"Transactions"** means, collectively, (i) the Loan Transactions, (ii) the conversion of the Tranche A Loans into (x) the Loans under this Agreement, (y) the Loans under, as defined in, the Second Lien Exit Facility and (z) a portion of NewCo Series A-1 Preferred PIK Interests (as defined in the Plan of Reorganization) and the NewCo Class A Common Interests (as defined in the Plan of Reorganization), in each case in accordance with the Plan of Reorganization, (iii) the

23

repayment in full of the Tranche B Loans, (iv) the consummation of the Plan of Reorganization and (v) all other related transactions, including the payment of fees and expenses in connection with the foregoing.

**"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect in the State of New York; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

**"USA PATRIOT Act"** means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

**"U.S. Person"** means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

**"U.S. Tax Compliance Certificate"** has the meaning set forth in Section 2.11(f)(ii)(B)(3).

**"Wholly Owned Subsidiary"** means as to any Person, any other Person all of the Equity Interests of which (other than directors' qualifying shares required by law) are owned by such Person directly and/or through other Wholly Owned Subsidiaries.

**"Withdrawal Liability"** means liability to a Multiemployer Plan as a result of a complete or partial withdrawal by the Borrower, a Subsidiary or any ERISA Affiliate after the Closing Date from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02   *Terms Generally*.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, modified, restated, replaced, refinanced, extended, renewed or restructured (subject to any restrictions on such supplements, amendments, modifications, replacements, refinancings, extensions, renewals, restatements or restructurings set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be

construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (f) all references to "knowledge" or "aware" of the Borrower or a Subsidiary of the Borrower means the actual knowledge of a Financial Officer or Responsible Officer (*provided* that the foregoing shall not include any knowledge of a legal officer of the Borrower or a Subsidiary to the extent such information is, in such legal officer's sole good faith judgment, subject to attorney-client or similar privilege and is not known to any other Financial Officer or Responsible Officer), (g) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law (including by succession of comparable successor laws), (h) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including" and (i) unless otherwise stated herein, all provisions herein within the discretion or to the satisfaction of a party shall be deemed to include a standard of reasonableness, good faith and fair dealing.

Section 1.03    *Accounting Terms; GAAP*.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that (a) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been affirmatively withdrawn by the Borrower (or, in the case of a request for an amendment under this Section by the Required Lenders, the Administrative Agent) or such provision amended in accordance herewith and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at **"fair value"**, as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof).

Section 1.04    *Rounding*.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05    *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06   *Timing of Payment or Performance*.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.07   *Certifications*.  All certifications to be made hereunder or under any other Loan Document by an officer or representative of the Borrower shall be made by such person in his or her capacity solely as an officer or a representative of the Borrower, on the Borrower's behalf and not in such Person's individual capacity.

# ARTICLE II
## THE LOANS

Section 2.01   *Loans*.  Subject to the terms and conditions set forth herein, each Lender shall be deemed to have made a Loan to the Borrower on the Closing Date in full satisfaction on a dollar-for-dollar basis of the amount of its Tranche A Loans that have not been repaid with the proceeds of the First Lien Loans on or prior to the Closing Date.

Section 2.02   *Loans and Borrowing*.  (a)   Each Loan shall be made by the Lenders ratably in accordance with their respective Applicable Percentages. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)   The Borrowing shall be denominated in Dollars.

(c)   Any unutilized Commitments after giving effect to the Borrowing on the Closing Date shall be terminated.

Section 2.03   *Reserved*.

Section 2.04   *Reserved*.

Section 2.05   *Interest*.

(a)   Interest.  Subject to the provisions of Sections 2.05(b) and (c), the Loans shall bear interest at a rate per annum equal to 11.0%.[3]

(b)   Payment of Interest.  Accrued and unpaid interest shall be paid in kind on each Interest Payment Date by adding such accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (**"PIK Interest"**) (whereupon from and after any such date such additional amounts shall constitute Loans for all purposes hereunder and under the other Loan Documents and shall accrue interest pursuant to this Section 2.05); *provided* that, accrued and unpaid interest shall be paid in cash on the Maturity Date and on the date of any repayment or prepayment (whether pursuant to a voluntary prepayment or mandatory

---

[3]   LIBOR option TBD.

prepayment, acceleration or otherwise) of Loans, with respect to the principal amount of the Loans repaid or prepaid.  The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any promissory notes.

(c)    Default Rate.  Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on any Loan or any fee or other amount payable by Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to 2.0% *plus* the rate otherwise applicable to Loans as provided in Section 2.05(a) for as long as (i) such Event of Default shall be continuing or (ii) such payment obligation shall not have been satisfied.

(d)    Interest Payment Dates.  (i) Interest accrued pursuant to Section 2.05(c) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan of any Lender, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)    Interest Calculation.  All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.06    *Repayment of Loans; Evidence of Debt.*  (a)  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender on the Termination Date the aggregate principal amount of all Loans then outstanding.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder (including PIK Interest) and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the respective Lenders and each respective Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans and other Obligations in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it to the Borrower be evidenced by a promissory note. In such event, the Borrower shall promptly prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) substantially in the form attached hereto as Exhibit E. Thereafter, unless otherwise agreed by the applicable Lender, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to

27

Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.07    *Prepayment of Loans*.  (a)    Voluntary.  Subject to the payment of any amounts required under Section 2.10 the Borrower may, upon notice from the Borrower to the Administrative Agent, at any time or from time to time, voluntarily prepay Loans in whole or in part; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)    Mandatory.

(i)    Subject to clause (iv) below, not later than the fifth Business Day following receipt by the Borrower or any Subsidiary of any Net Proceeds in connection with any Asset Sale, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(ii)    Subject to clause (iv) below, not later than the fifth Business Day following receipt by the Borrower or any Subsidiary of any Net Proceeds in connection with any Recovery Event, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(iii)    Not later than the fifth Business Day following receipt of Net Proceeds by the Borrower or any Subsidiary from the issuance or incurrence of Indebtedness (other than any cash proceeds from the issuance of Indebtedness permitted pursuant to Section 6.02(a) through (f)) or Equity Interests, the Borrower shall apply 100% of the Net Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.07(c).

(iv)    Notwithstanding the foregoing, subject, in each case, to the prior written consent of the Administrative Agent, the Borrower shall not be required to apply any Net Proceeds that are the subject of clauses (i) or (ii) above to prepay the Loans to the extent reinvested by the Borrower or any of its Subsidiaries in assets of a kind then used or usable in the business of the Borrower and its Subsidiaries (which assets shall principally consist of Collateral to the extent such Net Proceeds were generated from an Asset Sale or Recovery Event involving Collateral) within six months of receipt of such Net Proceeds (or, if the Borrower or any Subsidiary has contractually committed within six months following receipt of such Net Proceeds to reinvest such Net Proceeds, then twelve months from the date of the receipt of such Net Proceeds); *provided* that no Event of Default shall have occurred and shall be continuing at the time of the earlier of the (x) reinvestment of such proceeds and (y) entry into the contractual commitment to reinvest such Net Proceeds; *provided, further*, that any such Net Proceeds not actually reinvested in accordance with the foregoing, shall be promptly applied by the Borrower to prepay the Loans in accordance with this Section 2.07.

28

(c)      The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment under Section 2.07(a) or (b), not later than 11:00 a.m. (or such later time as the Administrative Agent may consent to in its reasonable discretion), New York, New York time, three (3) Business Days before the date of prepayment.  Such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the relevant Lenders of the contents thereof.  Prepayments under Section 2.07(a) and 2.07(b) shall be accompanied by accrued interest to the extent required by Section 2.05 and shall be subject to Section 2.10.

(d)      Each prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

Section 2.08    *Fees*.  The Borrower shall pay to the Administrative Agent, for its own account, the fees and other charges earned, due and payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.  All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the respective accounts of the Administrative Agent and other Lenders as provided herein. Once due, all fees shall be fully earned and shall not be refundable under any circumstances.

Section 2.09    *Increased Costs*.  (a)    If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)     impose on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement, any Loans made by such Lender; or

(iii)    subject any Credit Party to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or the Administrative Agent of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or the Administrative Agent hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Administrative Agent, as the case may be, such additional amount or amounts as will compensate such Lender or the Administrative Agent, as the case may be, for such additional costs incurred or reduction suffered.

(b)      If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's

holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered. A Lender may only submit a request for compensation in connection with the Changes in Law described in clauses (a) and (b) of this Section 2.09 if such Lender imposes such increased costs on borrowers similarly situated to the Borrower under syndicated credit facilities comparable to the Loans.

(c)     A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.09(b) shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.09 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Administrative Agent pursuant to this Section 2.09 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the Administrative Agent notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Administrative Agent's intention to claim compensation therefor; *provided further* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.10     *Reserved.*

Section 2.11     *Taxes.* (a)     Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.11), the amounts received with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)     In addition, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)     The Borrower shall indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or

30

asserted on or attributable to amounts payable under this Section) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(e) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)      As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.11, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)      (i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.11(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed originals of IRS Form W-8ECI;

(3)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a **"U.S. Tax Compliance Certificate"**) and (y) executed originals of IRS Form W-8BEN; or

(4)      to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

32

(C)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)      If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.11 (including by the payment of additional amounts pursuant to this Section 2.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving

33

rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Without prejudice to the survival of any other agreement contained herein, the agreements and obligations contained in this Section 2.11 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(i)     Nothing contained in this Section 2.11 shall require the Administrative Agent or any Lender to make available any of its tax returns (or any other information that it deems, in its sole discretion, to be confidential or proprietary).

(j)     For purposes of this Section 2.11, the term "Applicable Law" includes FATCA.

Section 2.12   *Payments Generally; Pro Rata Treatment; Sharing of Setoffs*.  (a)  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or of amounts payable under Sections 2.09, 2.10 or 2.11, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York, New York time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at [__] except that payments pursuant to Sections 2.09, 2.10, 2.11 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents or as otherwise expressly provided herein shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Amounts prepaid or repaid on account of the Loans may not be reborrowed.  All payments under each Loan Document shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder in respect of Obligations, then such funds shall be applied in the order and manner set forth in Section 7.03.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and

accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower any rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment by the Borrower is due to the Administrative Agent for the account of any of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of such Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.04(b), 2.11(d), 2.12(d) or 9.03(c), then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to it under such Section until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its reasonable discretion.

Section 2.13  *Mitigation Obligations*.  If any Lender requests compensation under Section 2.09, or if the Borrower is required to pay any additional amount or indemnification payment to any Lender, the Administrative Agent, or any Governmental Authority for the account of any Lender pursuant to Section 2.11, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or Section 2.11, as the case may be, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrower hereby agrees

to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment promptly following written demand (including documentation reasonably supporting such request) from such Lender.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Until the Commitments have expired or been terminated and the principal of and interest on each Loan, all fees and other Obligations (other than contingent indemnification obligations not then due and owing) payable hereunder shall have been paid in full, the Borrower represents and warrants to the Administrative Agent and the Lenders as of the Closing Date:

Section 3.01   *Organization; Powers*. (a)   Each of the Borrower and its Subsidiaries is duly organized, validly existing and in good standing (as applicable) under the laws of the jurisdiction of its organization, (b) (i) each Subsidiary has all requisite power and authority to carry on its business as now conducted, except to the extent that the failure to have any such power would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) the Borrower has all requisite power and authority to carry on its business as now conducted in all material respects and (c) except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each of the Borrower and its Subsidiaries is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02   *Authorization; Enforceability*.  After giving effect to the Plan Confirmation Order and the Plan of Reorganization, the Transactions to be entered into by each Group Member are within such Group Member's corporate, limited liability or partnership powers, as applicable, and have been duly authorized by all necessary corporate, limited liability or partnership action, as applicable, and, if required, equityholder action. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document, when executed and delivered by the Borrower and after giving effect to the Plan Confirmation Order, will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03   *Governmental Approvals; No Conflicts*.  After giving effect to the Plan Confirmation Order and the Plan of Reorganization[, and except as described on Schedule 3.03,][4] (a) the Transactions do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority with competent jurisdiction over the Borrower or any Subsidiary, except (i) such as have been obtained or made and are in full force and effect, (ii) any consent or approval of, registration or filings necessary to perfect Liens created under the Loan Documents (or release existing Liens) and (iii)  immaterial consents, approvals, registrations or filings, (b) the Loan Transactions will not violate any Applicable Law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of its

---

[4] Subject to review of Schedule 3.03.

Subsidiaries or any order of any Governmental Authority applicable to the Borrower or any Subsidiary, (c) the Loan Transactions will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries, except with respect to any default, conflict, breach or contravention or payment, to the extent that such violation, conflict, breach, contravention or payment would not reasonably be expected to have a Material Adverse Effect and (d) the Transactions will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries, except Liens created under the Loan Documents and Liens permitted under the Loan Documents.

Section 3.04   *Financial Condition; No Material Adverse Effect*. (a) The Borrower has heretofore furnished to the Administrative Agent the debtor-in-possession monthly operating report filed with the Bankruptcy Court (which report is prepared on a non-GAAP basis) for the most recently ended month for which such report is available, in each case certified by a Financial Officer of the Borrower.  Such operating report presents fairly and accurately the financial condition and results of operations and cash flows of the Borrower as of the date and for the period to which it relates.



(b)      The unaudited consolidated balance sheet of the Borrower as at [_____, ____] (including the notes thereto), copies of which (the costs with respect to which were borne by the Lenders) have heretofore been furnished to each Lender, has been prepared in good faith based on the information available as of the date of delivery thereof in accordance with GAAP and presents fairly the financial position of Borrower and its consolidated Subsidiaries as at [_____, ____].

(c)      Since November 30, 2013, there has been no change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect, other than as a result of (i) events leading up to, resulting from and following the commencement of the Cases or the continuation or prosecution thereof (including the announcement of the filing) and (ii) any circumstances disclosed in the Disclosure Statement.

Section 3.05   *Properties*. (a) Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in or rights to use, all its real and personal property material to its business taken as a whole, except for Liens permitted by Section 6.03 or other Liens reasonably acceptable to the Administrative Agent.

(b)      Each of the Borrower and its Subsidiaries owns, or is licensed or otherwise has a right to use, all Intellectual Property material to the conduct of its business as currently conducted and as planned to be conducted.  No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower or any of its Subsidiaries know of any valid basis for any such claim.  The conduct of the business of the Borrower and each of its Subsidiaries as currently conducted and as planned to be conducted does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

37

Section 3.06   *Litigation and Environmental Matters*.  (a)  [Except for the matters described in Schedule 3.06 and][5] after giving effect to the Plan Confirmation Order and the Plan of Reorganization, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending and unstayed against or, to the knowledge of the Borrower, threatened against or relating to the Borrower or any of its Subsidiaries that (i) could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Loan Transactions.

(b)      Except for matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) is or has become subject to, or to the knowledge of the Borrower is threatened with, any Environmental Liability or (iii) has received written notice of any claim with respect to any Environmental Liability or written notice of violation with respect to any Environmental Law.

Section 3.07   *Compliance with Laws and Agreements*.  After giving effect to the Plan Confirmation Order, each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.08   *Investment Company Status*.  Neither the Borrower nor any of its Subsidiaries is (or is required to be) an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09   *Taxes*.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP) or (b) in each case, to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10   *Employee Benefit Plans*.  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) each of the Borrower and each Subsidiary (and in the case of a Pension Plan or a Multiemployer Plan, each of their respective ERISA Affiliates) are in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations under each Plan and Pension Plan; (b) no ERISA Event or Foreign Plan Event (other than the commencement of the Chapter 11 Cases) has occurred or is reasonably expected to occur; (c) each Plan which is intended to qualify under Section 401(a) of the Code has

---

[5] Subject to review of Schedule 3.06.

38

received a favorable determination letter from the IRS covering such plan's most recently completed five-year remedial amendment cycle in accordance with Revenue Procedure 2007-44, I.R.B. 2007-28, indicating that such Plan is so qualified and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code or an application for such a determination is currently pending before the Internal Revenue Service, and to the knowledge of Borrower, nothing has occurred subsequent to the issuance of the most recent determination letter which would cause such Plan to lose its qualified status; (d) no liability to the PBGC (other than required premium payments), any Plan or Pension Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by the Borrower, any Subsidiary or any of their ERISA Affiliates; (e) each of the Borrower's and its Subsidiaries' ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan; (f) as of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, neither the Borrower, any Subsidiary, nor any of their respective ERISA Affiliates has any potential liability for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA; and (g) the present value of all accumulated benefit obligations under each Pension Plan, did not, as of the close of its most recent plan year, exceed the fair market value of the assets of such Pension Plan allocable to such accrued benefits(determined in both cases using the applicable assumptions under Section 430 of the Code and the Treasury Regulations promulgated thereunder).

Section 3.11   *Disclosure*.  None of the reports, financial statements, certificates or other written information (other than projections, pro forma financial information, estimates, budgets, other forward-looking information and information of a general economic or industry nature) furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (giving effect to all supplements thereto and other public filings with the Bankruptcy Court and the U.S. Securities and Exchange Commission) in connection with the Loan Documents contains, taken as a whole, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions by the Borrower believed to be reasonable at the time such projected financial information was furnished, it being understood that such projections are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from projected results (many of which factors are beyond the control of the Borrower and its Subsidiaries and their respective officers, representatives and advisors) and that such variances may be material and that no assurance can be given that the projected results will be realized.

Section 3.12   *Subsidiaries*.  Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower (or the Subsidiary of the Borrower that is the direct parent of such other Subsidiary of the Borrower) in, each Subsidiary of the Borrower, in each case as of the Closing Date.  All Equity Interests of each Group Member are duly and validly issued and are fully paid

and non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through wholly-owned Subsidiaries.  The Borrower is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Agreement.  As of the Closing Date (and except as described in the Plan of Reorganization), there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.  No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Security Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

Section 3.13   *Insurance*.  Schedule 3.13 sets forth a true, complete and correct description of all insurance maintained by the Borrower and its Subsidiaries as of the Closing Date.  All insurance maintained by the Borrower and its Subsidiaries is in full force and effect, all premiums have been duly paid and none of the Borrower or any of its Subsidiaries has received notice of violation or cancellation thereof.  Each of the Borrower and its Subsidiaries has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.14   *Labor Matters*.  There are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) the Borrower and its Subsidiaries are in compliance with the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with hours worked by or payments made to employees or any similar matters (including but not limited to the appropriate classification of employees as exempt or non-exempt), (b) the Borrower and its Subsidiaries have properly classified all individuals engaged as contractors as such under all applicable Federal, state, local or foreign law, (c) the Borrower and its Subsidiaries are in compliance with the Worker Adjustment and Retraining Notification Act and all other state, local or foreign laws relating to plant closings or mass layoffs and (d) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary. Neither the Borrower nor any Subsidiary is subject to any claims arising out of any employment matter, whether pending as of the Closing Date or to its knowledge threatened, which would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

Section 3.15   *Security Documents*.  (a)  The Security Agreement creates in favor of the Administrative Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security

Agreement) in accordance with and subject to the terms thereof, the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and the Pledged Collateral (as defined in the Security Agreement), (together with stock powers or other appropriate instruments of transfer executed in blank form), have been delivered to the Administrative Agent.  The financing statements, releases and other filings set forth on Schedule 3.15(a) are in appropriate form and have been or will be filed on the Closing Date in the offices reasonably acceptable to the Administrative Agent.  Upon such filings (and payment of applicable fees) and/or the obtaining of "control," the Administrative Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the Borrower thereunder in all such Collateral (as defined in the Security Agreement) to the extent that it may be perfected by filing, recording or registering a financing statement or analogous document (including the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law).

(b)     When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings set forth on Schedule 3.15(b) in appropriate form are filed (which filings shall occur on or prior to the Closing Date) in the offices reasonably acceptable to the Administrative Agent, (and the applicable fees are paid), the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower in the Intellectual Property in accordance with and subject to the terms thereof to the extent a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on patents, patent applications, registered trademarks, trademark applications and copyrights (whether or not registered) acquired by the Borrower after the date hereof). Notwithstanding the foregoing, nothing in this Agreement shall require the Borrower to make any filings or take any other actions to record or perfect the Administrative Agent's Lien on and security interest in any Intellectual Property outside the United States (or to reimburse the Administrative Agent or any Lender for the same).

(c)     The Mortgages, when delivered, will create in favor of the Administrative Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable Lien in the Mortgaged Property (as defined in the Mortgages), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. Upon the filing of the Mortgages with the appropriate Governmental Authorities (and payment of the applicable fees), the Administrative

Agent will have a first priority perfected Lien and security interest in, to and under all right, title and interest of the Grantors thereunder in all Mortgaged Property that may be perfected by such filing (including the proceeds of such Mortgaged Property), in each case prior and superior in right to any other Person (other than to the extent any Lien permitted under Section 6.03 would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law).

Section 3.16 *Federal Reserve Regulations*. (a) No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.

Section 3.17 *Anti-Corruption Laws and Sanctions*. The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.18 *Senior Indebtedness*. The Obligations are secured by a Lien in favor of the Administrative Agent for the benefit of the Secured Parties and rank and shall continue to rank at least senior in priority of payment to all Subordinated Indebtedness and all senior unsecured Indebtedness of Borrower and each of its Subsidiaries and constitute "Senior Indebtedness", "Designated Senior Indebtedness", "Guarantor Senior Indebtedness" or any comparable term for all Indebtedness that is subordinated in right of payment to the Obligations (if applicable).

Section 3.19 *Regulation H*. No Mortgage, when delivered, will encumber improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless the Borrower has complied with clause (d) of the Real Estate Requirements with respect to such real property.

Section 3.20 *Solvency*. On the Closing Date, after giving effect to the consummation of the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 3.21 *No Default*. After giving effect to the consummation of the Transactions, neither the Borrower nor any Subsidiary will be in default under any indenture, agreement or

42

other instrument binding upon the Borrower or any of its Subsidiaries or its assets. No Default or Event of Default has occurred and is continuing.

Section 3.22    *Real Estate*.  Schedule 1.01(B) is an accurate and complete list of all Real Estate owned in fee simple by the Borrower on the Closing Date that has an estimated fair market value in excess of $1,000,000.

Section 3.23    *Communications Licenses and Regulatory Matters*.

(a)    No Communications Licenses have been issued to or conferred upon the Borrower or any of its Subsidiaries.  No Communications Licenses or spectrum leases are required in connection with the conduct by the Borrower and its Subsidiaries of their businesses as presently conducted (excluding, for the avoidance of doubt, the businesses of NewCo and its subsidiaries).

(b)    The Group Members are in compliance in all material respects with Communications Laws.  No Group Member has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Group Member, other than (i) proceedings relating to the wireless communications industry generally, (ii) proceedings described in Schedule 3.23(b) and (iii) proceedings that could not reasonably be expected to result in a Material Adverse Effect.

(c)    Each Group Member has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws, including substantial service showings and renewal applications, and all such filings were when made true, correct and complete in all material respects.

(d)    No consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws by any Group Member in connection with the execution or consummation of the transactions contemplated in the Loan Documents.

Section 3.24    *Agreements*.  No Group Member is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect. No Group Member is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.24 accurately and completely lists all material agreements (other than leases of real property) to which any Group Member is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

43

## ARTICLE IV
### CONDITIONS

Section 4.01   *Closing Date*.  The agreement of each Lender to make the Loans requested to be made by it on the Closing Date is subject to the satisfaction (or waiver in accordance with Section 9.02 or as otherwise set forth below), prior to or concurrently with the making of such Loans on the Closing Date of the following conditions precedent on or before the Specified Date:[6]

(a)      The Administrative Agent shall have received (i) from each party hereto either a counterpart of this Agreement signed on behalf of such party or written evidence reasonably satisfactory to the Administrative Agent (which may include telecopy or PDF electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) each of the following agreements, duly executed and delivered by each party thereto: (A) the Security Agreement and (B) each of the other Loan Documents required to be delivered prior to the Closing Date.

(b)      The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent and the Lenders, dated the Closing Date and in form and substance reasonably acceptable to the Administrative Agent covering certain matters relating to the Loan Documents as the Administrative Agent shall reasonably request) of (i) Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Borrower and (ii) Latham & Watkins LLP, FCC counsel for the Borrower.

(c)      The Administrative Agent shall have received a true and complete copy of the Borrower's organizational documents, an incumbency certificate for each Person authorized to execute Loan Documents on behalf of the Borrower and who will execute any Loan Documents on behalf of the Borrower, resolutions authorizing the due execution, delivery and performance of the Loan Documents and the Transactions and a good standing certificate from the Borrower's jurisdiction of organization (where such concept or a similar concept exists), all in form and substance reasonably acceptable to the Administrative Agent and its counsel.

(d)      The Administrative Agent shall have received a customary certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in this Section 4.01.

(e)      The Administrative Agent shall have received a certificate from a Financial Officer of the Borrower substantially in the form of Exhibit G certifying that the Borrower and its Subsidiaries, on a consolidated basis, after giving effect to the Transactions (including any Loans to be made on the Closing Date), are Solvent.

(f)      The Administrative Agent shall have received (i) the monthly operating report referred to in Section 3.04(a) and (ii) the unaudited consolidated balance sheet of the Borrower, prepared in accordance with GAAP, as of immediately prior to the Closing Date, with related costs to be borne by the Lenders.

---

[6]      *De minimis* liquidity for LightSquared Inc. to meet ordinary course corporate expenses.

44

(g)     [Reserved].

(h)     The Administrative Agent shall have received UCC searches conducted in the jurisdictions in which the Borrower and the other Group Members are incorporated or such other jurisdictions as the Administrative Agent may reasonably require, reflecting the absence of Liens on any of the Collateral other than Liens expressly permitted by Section 6.03 hereof or Liens which will be terminated on the Closing Date or post-closing as agreed by the Administrative Agent in its sole discretion.

(i)     The Administrative Agent shall be reasonably satisfied that all Uniform Commercial Code financing statements required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Loan Documents and all other such documents and instruments shall have been delivered to the Administrative Agent by the Borrower for filing, registration or recordation on the Closing Date.

(j)     The Administrative Agent shall have received, to the extent invoiced at least three Business Days prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable and documented fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(k)     The Closing Date (as defined in the First Lien Credit Agreement) shall have occurred, or shall occur substantially concurrently with the Closing Date.

(l)     The Closing Date (as defined in the Second Lien Credit Agreement) shall have occurred, or shall occur substantially concurrently with the Closing Date.

(m)     The Borrower shall be in compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

(n)     No event of default shall have occurred and be continuing under the DIP Agreement nor shall the lenders thereunder (or any agent thereof) have commenced the exercise of rights and remedies under the documentation governing the DIP Facility or Applicable Law.

(o)     Simultaneously with the funding of the Loans on the Closing Date, the DIP Facility shall have been (i) repaid in full in cash or (ii) otherwise satisfied pursuant to the terms of the DIP Agreement and the Plan of Reorganization and all commitments relating thereto shall have been terminated, and all liens and security interests related thereto shall have been terminated or released, with such payment in full, termination and release being evidenced by one or more payoff letters reasonably acceptable to the Administrative Agent

(p)     The Administrative Agent shall have received a complete and correct copy of the Exit Loan Documents, including any amendments, supplements or modifications with respect to any of the foregoing.

(q)     Each of the Plan Confirmation Order and the Canadian Recognition Order shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any

appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Lenders in their sole discretion.

(r)     All conditions precedent to effectiveness of the Plan of Reorganization shall have been satisfied, waived or modified to the sole satisfaction of the Administrative Agent, the Plan Effective Date shall have occurred on or before the Specified Date and the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan of Reorganization in accordance with its terms shall occur substantially contemporaneously with the Plan Effective Date.

(s)     The Administrative Agent shall have received evidence that all general liability and property insurance required to be maintained pursuant to Section 5.05 of this Agreement and [Section 10] of the Security Agreement has been obtained and is in effect and that the Administrative Agent has been named as loss payee or additional insured, as appropriate, under each liability and property insurance policy.

(t)     The Lenders shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, in each case at least five (5) Business Days prior to the Closing Date to the extent requested by the Administrative Agent ten (10) Business Days prior to the Closing Date.

(u)     The representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct in all material respects (or in all respects, if qualified by materiality) on and as of the Closing Date (unless a representation or warranty is made as of a specific date or for a specified period, in which case such representation or warranty shall be true and correct in all material respects as of such specified date or for such specified period).

(v)     At the time of and immediately after giving effect to the Closing Date and the Borrowing to be made on the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(w)     The Debtors not having supported any other Person's motion to withdraw the Plan of Reorganization or supported any other chapter 11 plan.

(x)     Clause (d) of the Real Estate Requirements shall have been satisfied with respect to all Mortgaged Property set forth on Schedule 1.01(B).

## ARTICLE V
### AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Subsidiaries to:

Section 5.01   *Financial Statements*.  Furnish to the Administrative Agent and each Lender:

46

(a)      as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower (in the case of the fiscal year ended December 31, 2014, within 120 days after the end of such fiscal year), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year;

(b)      as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower (but in no event earlier than 180 days after the Closing Date), the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Financial Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments).

All such financial statements referred to in clauses (a) and (b) above shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods; and

(c)      promptly upon receipt thereof, any and all information, documentation and notices furnished to the Borrower in its capacity as the holder of Equity Interests in NewCo or as a Second Lien Lender (including any information or documents furnished under Section 5.01 of the Second Lien Credit Agreement and any notices furnished under Section 5.02 of the Second Lien Credit Agreement).

Section 5.02   *Certificates; Other Information*.  Furnish to the Administrative Agent and each Lender (or, in the case of clause (h), to the relevant Lender):

(a)      concurrently with the delivery of the financial statements referred to in Section 5.01(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b)      concurrently with the delivery of any financial statements pursuant to Section 5.01, (i) a certificate of a Responsible Officer stating that, to the best of each such Responsible Officer's knowledge, during such period the Borrower has observed or performed all of its covenants and other agreements, and satisfied every condition contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) (x) a Compliance Certificate containing all information and calculations necessary for determining compliance by each Group Member with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be, and (y) to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of the Borrower, (2) a list of any Intellectual Property acquired by the Borrower and (3) a description of

47

any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(c)     as soon as available, and in any event no later than 60 days after the beginning of each fiscal year of the Borrower, a cash-based budget (a "**Budget**") for the Borrower and its Subsidiaries on a consolidated basis in reasonable detail for (i) each fiscal quarter of such fiscal year and (ii) each fiscal year thereafter, through and including the fiscal year in which the latest possible Maturity Date occurs, prepared in summary form, in each case, with appropriate presentation and discussion of the principal assumptions upon which such Budget is based, accompanied by the statement of a Financial Officer of the Borrower to the effect that the Budget of the Borrower is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such Budget;

(d)     concurrently with the delivery of any financial statements pursuant to Section 5.01, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the portion of the Budget covering such periods and to the comparable periods of the previous year;

(e)     [Reserved];

(f)     within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(g)     promptly following receipt thereof, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Multiemployer Plan; *provided*, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof; and

(h)     promptly, such additional financial and other information as any Lender may from time to time reasonably request.

Section 5.03   *Payment of Obligations*.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

Section 5.04   *Maintenance of Existence; Compliance*.  (a)   (i)  Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its

48

business, except, in each case, as otherwise permitted by Section 6.04 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Applicable Laws except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.05   *Maintenance of Property; Insurance.*

(a)      Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)      Maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (ii) maintain such other insurance as may be required by law; and (iii) promptly following reasonable request by the Administrative Agent, which request need not be made in writing, furnish the Administrative Agent with certificates evidencing the insurance required by this paragraph. The Borrower shall require all property, casualty and liability insurance policies to be endorsed, which endorsement shall be reasonably satisfactory in form and substance to the Administrative Agent, to name the Administrative Agent for the benefit of the Lenders, as additional insured or loss payee, as appropriate; *provided* that the Borrower shall only be required to use its commercially reasonable efforts to obtain any notification endorsement.  The Borrower shall deliver to the Administrative Agent, within ten (10) Business Days after the cancellation of any such policy of insurance, a certificate of insurance for the replacement policy to the extent such insurance is required to be replaced pursuant to this Section 5.05.  In the event of the Borrower's failure to obtain or maintain the insurance required by this paragraph, without waiving any Event of Default occasioned thereby, the Administrative Agent shall have the right following thirty (30) days prior notice to the Borrower to obtain the required coverage and invoice the Borrower for the premium payments therefor.

(c)      If at any time the area in which any owned Real Estate on which a Mortgage has been granted is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency) with respect to which flood insurance has been made available under any of the Flood Insurance Laws, the Borrower shall (A) maintain, with a financially sound and reputable insurer, flood insurance (which may be in the form of a blanket policy) in such total amount as is reasonably acceptable to the Administrative Agent and otherwise sufficient to comply with applicable rules and regulations promulgated pursuant to the Flood Insurance Laws, and (B) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent or (ii) a "Zone 1" area, the Borrower shall obtain earthquake insurance in such total amount as is reasonably required by the Administrative Agent (but in any event not to exceed the replacement cost or fair market value of the property, as reasonably estimated by the Borrower).  All premiums on any of the insurance referred to in this Section 5.05(c) shall be paid when due by the Borrower and, if requested by the Administrative Agent,

summaries of the policies shall be provided to the Administrative Agent annually or as it may otherwise reasonably request.  Without limiting the rights of the Administrative Agent provided for above, if the Borrower fails to obtain or maintain any insurance required under the Flood Insurance Laws within thirty (30) days following written notice to the Borrower (or such shorter period as required by Applicable Law), the Administrative Agent may obtain it at the Borrower's expense.  By purchasing any of the insurance referred to in this Section 5.05(c), the Administrative Agent shall not be deemed to have waived any Default or Event of Default arising from the Borrower's failure to maintain such insurance or pay any such premiums in respect thereof.

(d)    The Borrower acknowledges and agrees that all income, payments and proceeds of a physical damage property insurance claim payable to it and relating to the Collateral will be received by the Borrower as agent hereunder for the benefit of the Lenders.  Unless an Event of Default has occurred and is continuing, the Administrative Agent shall cause any insurance proceeds for which it is loss payee for the benefit of the Secured Parties to be made available to the Borrower as promptly as practicable after receipt thereof by the Administrative Agent for application as required or otherwise permitted by the Loan Documents.

Section 5.06    *Inspection of Property; Books and Records; Discussions*.  (a)  Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Applicable Laws shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; *provided* that, so long as no Event of Default has occurred and is continuing, any such visits and inspections shall be limited to one in any fiscal quarter for the Administrative Agent and all Lenders.

Section 5.07    *Notices*.  Promptly give notice to the Administrative Agent and each Lender of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation or proceeding affecting any Group Member (i) in which the amount involved is $1,000,000  or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(d)    the occurrence of any ERISA Event or Foreign Plan Event that, alone or together with any other ERISA Events and/or Foreign Plan Events that have occurred, could reasonably be expected to result in liability of any Group Member or any ERISA Affiliate in an aggregate

amount exceeding a material amount, as soon as possible and in any event within 10 days after the Borrower knows or has reason to know thereof; and

(e)     any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.07 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

Section 5.08    *Environmental Laws*.  (a)  Comply with, and ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except for instances of non-compliance or failure to obtain and comply which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     Conduct and complete all Remedial Actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except for instances of failure to complete Remedial Actions or non-compliance which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.09    *Compliance with Communications Laws and ITU Rules and Regulations*. Comply in all material respects with all applicable Communications Laws, including but not limited to requirements applicable to the Group Members pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to be material.

Section 5.10    *Use of Proceeds*.  Use proceeds of the Loans to (a) refinance a portion of the Tranche A Loans in accordance with the Plan and (b) for the general corporate and working capital needs of the Borrower and its Subsidiaries.

Section 5.11    *Additional Collateral, etc*.  (a)  With respect to any property acquired after the Closing Date by the Borrower (other than any property described in paragraph (b), (c) or (d) below) as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions reasonably necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Administrative Agent.

(b)     With respect to any fee interest in any real property having a value (together with improvements thereof) of at least $1,000,000 acquired after the Closing Date by the Borrower

(other than any such real property subject to a Lien expressly permitted by Section 6.03(i)), promptly (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Lenders, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)      With respect to any new Subsidiary (other than an Excluded Foreign Subsidiary) created or acquired after the Closing Date by the Borrower (which, for the purposes of this paragraph (c), shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary), promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Equity Interests of such new Subsidiary that are owned by the Borrower, (ii) deliver to the Administrative Agent the certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)      With respect to any new Excluded Foreign Subsidiary created or acquired after the Closing Date by the Borrower, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Equity Interests of such new Subsidiary that are owned by the Borrower (*provided* that in no event shall more than 66% of the total outstanding voting Equity Interests of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower, and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

Section 5.12   *Further Assurances*.  Promptly and from time to time, at the Borrower's expense, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, intellectual property filings, termination statements, fixture filings and other documents), which may be required under any Applicable Law, or which the Administrative

52

Agent or the Required Lenders may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Liens.

## ARTICLE VI
### NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 6.01   *Reserved.*

Section 6.02   *Indebtedness.*  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Group Member pursuant to any Loan Document;

(b)     [Reserved];

(c)     Guarantee Obligations incurred in the ordinary course of business by any Subsidiary of obligations of the Borrower;

(d)     Indebtedness outstanding on the date hereof and listed on Schedule 6.02(d) and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity of, the principal amount thereof except for amounts for reasonable fees and expenses incurred in connection with such refinancing, refunding, renewal or extension);

(e)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(f)     Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business; and

(g)     additional unsecured Indebtedness of the Borrower and its Subsidiaries in an aggregate principal amount (for the Borrower and all Subsidiaries) not to exceed $5,000,000 at any one time outstanding.

Section 6.03   *Liens.*  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)     Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

53

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     [Reserved];

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens in existence on the date hereof listed on Schedule 6.03(f), securing Indebtedness permitted by Section 6.02(d), *provided* that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)     Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(h)     Liens (other than any Lien imposed by ERISA) (x) imposed by Applicable Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, or (y) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x) and (y) of this paragraph (h), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable or delinquent, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(i)     leases and subleases of real property of the Borrower or any Subsidiary granted by such Group Member to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the real property subject thereto;

(j)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business in accordance with past practices of the Borrower or its Subsidiaries;

(k)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with

54

respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(l)       the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or consignment of goods in the ordinary course of such Group Member's business;

(m)       Liens created pursuant to the Security Documents; and

(n)       any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased.

Section 6.04    *Fundamental Changes*.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)       any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (*provided* that the Borrower shall be the continuing or surviving corporation) or with or into any Wholly Owned Subsidiary of the Borrower;

(b)       any Subsidiary of the Borrower may Dispose of any or all of its assets (i) to the Borrower or any Wholly Owned Subsidiary of the Borrower (upon voluntary liquidation or otherwise) or (ii) pursuant to a Disposition permitted by Section 6.05;

(c)       any Subsidiary of the Borrower may liquidate or dissolve if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially adverse to the Lenders; and

(d)       any Investment expressly permitted by Section 6.07 may be structured as a merger, consolidation or amalgamation.

Section 6.05    *Disposition of Property*.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Equity Interests to any Person, except:

(a)       the Disposition of obsolete or worn out property in the ordinary course of business;

(b)       the sale of inventory in the ordinary course of business;

(c)       Dispositions permitted by clause (i) of Section 6.04(b);

(d)       the sale or issuance of any Subsidiary's Equity Interests to the Borrower;

(e)       the licensing or sublicensing of Intellectual Property of the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice; *provided,*

55

*however*, that such licensing or sublicensing shall not interfere in any material respect with the Group Members' continued use of such Intellectual Property in their business; and

(f)      the Disposition of other property having a fair market value not to exceed $500,000 in the aggregate for any fiscal year of the Borrower.

Section 6.06   *Restricted Payments*.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, **"Restricted Payments"**), except that any Subsidiary may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary of the Borrower.

Section 6.07   *Investments*.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Equity Interests, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, **"Investments"**), except:

(a)      extensions of trade credit in the ordinary course of business;

(b)      investments in Cash Equivalents;

(c)      Guarantee Obligations permitted by Section 6.02;

(d)      loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $50,000 at any one time outstanding;

(e)      Investments in assets useful in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries pursuant to Section 2.07(b)(iv);

(f)      the Borrower and its Subsidiaries may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business; and

(g)      purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business.

Section 6.08   *Optional Payments and Modifications of Certain Debt Instruments*.  (a) Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily defease or segregate funds with respect to any Subordinated Indebtedness or any other Indebtedness (other than the Loans); (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver

56

or other change to, any of the terms of any Subordinated Indebtedness or any other Indebtedness (other than the Loans) except for any such amendment, modification, waiver or other change that (i) would extend the maturity or reduce the amount of any payment of principal thereof or reduce the rate or extend any date for payment of interest thereon and (ii) does not involve the payment of a consent fee).

Section 6.09   *Transactions with Affiliates*.   Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

Section 6.10   *Sales and Leasebacks*.   Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

Section 6.11   *Swap Agreements*.   Enter into any Swap Agreement, except Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests).

Section 6.12   *Changes in Fiscal Periods*.   Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters other than as agreed to by the Administrative Agent.

Section 6.13   *Negative Pledge Clauses*.   Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, other than (a) this Agreement and the other Loan Documents and (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

Section 6.14   *Clauses Restricting Subsidiary Distributions*.   Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents and (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Equity Interests or assets of such Subsidiary.

Section 6.15    *Lines of Business*.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

Section 6.16    *Amendments to Material Documents*.

Directly or indirectly:

(a)    amend or modify, or permit the amendment or modification of, any provision of any document governing any Indebtedness of the Borrower or its Subsidiaries in any manner without the consent of the Lenders;

(b)    terminate, amend or modify any Organizational Documents of any Loan Party or any Subsidiary thereof or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such terminations, amendments or modifications or such new agreements which are (i) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.04 or (ii) not adverse in any material respect to the interests of the Lenders; or

(c)    amend, supplement, terminate or otherwise modify (pursuant to a waiver or otherwise) (i) the provisions of its certificate of incorporation, by-laws or other organizational documents (except to the extent provided by Section 6.04) or (ii) the terms and conditions of any Indebtedness, in each case, in a manner materially adverse to the Lenders.

Section 6.17    *Use of Proceeds*.  Use, and the respective directors, officers, employees and agents of the Borrower and its Subsidiaries shall not use, the proceeds of any Loan (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.18    *Communications Laws*.  Operate its businesses other than in accordance with Communications Laws and the terms and conditions of any Communications Licenses held by the Borrower and its Subsidiaries.  No Group Member shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial.  No Group Member shall take or permit to be taken any other action within its control that could reasonably be expected result in non-compliance with the requirements of Communications Laws in any material respect.

Section 6.19    *Limitation on Creation of Subsidiaries*.  Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders.

58

## ARTICLE VII
### Events of Default

Section 7.01    *Events of Default*.  If any of the following events ("Events of Default") shall occur:

(a)      the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable;

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)      any representation or warranty made or deemed made by the Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)      the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)      the Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Section 7.01), and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower (which notice may be given at the request of the Required Lenders);

(f)      the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure continues after the expiration of any applicable grace periods or cure periods and such Material Indebtedness is, or is permitted to be, accelerated such that all obligations thereunder shall become immediately due and payable;

(g)      any event or condition occurs (other than circumstances described in clause (f) above) that results in any Material Indebtedness becoming due prior to the scheduled maturity thereof or that enables or permits (after the giving of notice and/or the lapse of any applicable grace period) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to the scheduled maturity thereof in each case beyond the grace period, if any, provided therein;

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign

bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)      the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for substantially all of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any corporate action for the purpose of authorizing any of the foregoing;

(j)      the Borrower or any Subsidiary shall become unable, admit in writing its general inability or fail generally, to pay its debts as they become due;

(k)      except as set forth on Schedule 7.01(k) (but solely to the extent that neither the Borrower nor any of its Subsidiaries has any obligation with respect to judgments relating to items listed on Schedule 7.01(k)), one or more judgments for the payment of money of a liability or debt in an aggregate amount in excess of $5,000,000 (or its equivalent) in excess of amounts covered by insurance shall be rendered against the Borrower, any Subsidiary or any combination thereof (including pursuant to a ruling that any claim previously found by the Bankruptcy Court to be subject to discharge is found, by subsequent order, to remain an ongoing liability of the Borrower or any Subsidiary) and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(l)      (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; and, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to result in a Material Adverse Effect;

(m)      any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except as expressly permitted hereunder or thereunder; or the Borrower contests in any manner the validity or enforceability of any provision of any Loan Document or any Lien granted under any Security Document; or the Borrower denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or any Lien granted under any Loan Document, except, in each case, (i) in accordance with the terms of the Loan Documents (ii) to the extent that any absence of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or to file

Uniform Commercial Code continuation statements and (iii) with respect to any Lien purported to be created on Collateral consisting of Real Estate that ceases to be a valid and perfected Lien on any material portion of such Collateral, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(n)      a Change in Control shall occur;

(o)      any Loan Document shall not be in full force and effect (other than in accordance with its terms);

(p)      the subordination provisions set forth in any Subordinated Indebtedness that is Material Indebtedness shall, in whole or in material part, cease to be, or shall be asserted by any Group Member not to be, effective or legally valid, binding and enforceable against the holders of such Subordinated Indebtedness;

(q)      the Plan Confirmation Order or the Canadian Recognition Order shall be revoked or rescinded or shall otherwise cease to be in full force and effect or the Borrower or any of its Subsidiaries shall challenge the effectiveness or validity of or violate the terms of the Plan Confirmation Order or the Canadian Recognition Order; or

(r)      the Plan Confirmation Order or the Canadian Recognition Order shall be amended, modified or supplemented in any manner without the prior written consent of the Lenders.

Section 7.02   *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(b)      whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, may (and at the direction of the Required Lenders, shall) proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

(c)      No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Applicable Law.

61

Section 7.03    *Application of Funds*.  After the exercise of remedies provided for in Section 7.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent reimbursable under the Loan Documents and amounts payable under Article II payable to the Administrative Agent), each in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, and fees, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to payment of all other Obligations (including the cash collateralization of unliquidated indemnification obligations) to the Credit Parties, their Affiliates and the Related Parties of the foregoing; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Applicable Law.

Section 7.04    *Government Approval*.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Group Member or affect the ownership of any Communications License shall be pursuant to Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC or any other applicable Governmental Authority. Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of any Communications Licenses or transfer of control or voting rights of any Group Member if such assignment or transfer of control or voting rights would require, under then existing law (including Communications Laws), the prior approval of the FCC or any other applicable Governmental Authority, without first obtaining such approval of the FCC or such other Governmental Authority. The Borrower agrees to take any lawful action which Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Lenders by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of the Borrower's commercially reasonable efforts to assist in obtaining any approval of the FCC and any other Governmental Authority that

is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including the sale or transfer of Collateral. Such efforts shall include, to the extent permitted by the Communications Laws, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of any Communications Licenses, transfer of control of any Group Member required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or any Communications Licenses.

## ARTICLE VIII
### THE ADMINISTRATIVE AGENT

Section 8.01   *Appointment and Administration by Administrative Agent*.  Each Lender hereby irrevocably designates [___] as Administrative Agent under this Agreement and the other Loan Documents. The general administration of the Loan Documents shall be by the Administrative Agent. The Lenders each hereby (a) irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party, and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (b) agrees and consents to all of the provisions of the Security Documents. All Collateral shall be held or administered by the Administrative Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Credit Parties in their capacity as such and no Credit Party (other than the Administrative Agent) shall be required to execute any Security Documents as a party thereto.  The Administrative Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Credit Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.

Section 8.02   *Agreement of Applicable Lenders*.  Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Lenders, action shall be taken by the Administrative Agent, for and on behalf or for the benefit of all Credit Parties upon the direction of the requisite percentage of Lenders, and any such action shall be binding on all Credit Parties. No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of Section 9.02.

Section 8.03   *Liability of Administrative Agent*.  (a)  The Administrative Agent, when acting on behalf of the Credit Parties, may execute any of its duties under this Agreement by or through any of its officers, agents and employees, and neither the Administrative Agent nor its directors, officers, agents or employees shall be liable to any other Credit Party for any action taken or omitted to be taken in good faith, or be responsible to any other Credit Party for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of the Administrative Agent's own gross negligence, bad faith or willful misconduct. Neither the Administrative Agent nor its directors, officers, agents and

employees shall in any event be liable to any other Credit Party for any action taken or omitted to be taken by it pursuant to instructions received by it from the requisite percentage of Lenders, or in reliance upon the advice of counsel selected by it. Without limiting the foregoing, neither the Administrative Agent nor any of its respective directors, officers, employees, or agents shall be: (i) responsible to any other Credit Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by the Borrower of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to any other Credit Party for the state or condition of any properties of the Borrower or any other obligor hereunder constituting Collateral for the Obligations or any information contained in the books or records of the Borrower; (iv) responsible to any other Credit Party for the validity, enforceability, collectability, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (v) responsible to any other Credit Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

(b)     The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through its agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the other Loan Documents. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(c)     Neither the Administrative Agent nor any of its directors, officers, employees, or agents shall have any responsibility to the Borrower on account of the failure or delay in performance or breach by any other Credit Party (other than by the Administrative Agent in its capacity as a Lender) of any of its respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

(d)     The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Borrower), independent accountants and other experts selected by the Borrower or any Credit Party. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the requisite percentage of the Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the other Credit Parties against any and all liability and expense which may be incurred by it by reason of the taking or failing to take any such action.

Section 8.04   *Notice of Default*.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless it has actual knowledge of the same or has received notice from a Credit Party or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent obtains such actual knowledge or

receives such a notice, the Administrative Agent shall give prompt notice thereof to each of the other Credit Parties. Upon and during the occurrence of an Event of Default, the Administrative Agent shall (subject to the provisions of Section 9.02) take such action with respect to such Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

Section 8.05   *Credit Decisions*.  Each Credit Party (other than the Administrative Agent) acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Credit Party, and based on the financial statements prepared by the Borrower and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Borrower and has made its own decision to enter into this Agreement and the other Loan Documents. Each Credit Party (other than the Administrative Agent) also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Credit Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

Section 8.06   *Reimbursement and Indemnification*.  Each Credit Party (other than the Administrative Agent in such capacity) agrees to (a) reimburse the Administrative Agent and its Affiliates for such Credit Party's Applicable Percentage of (i) any expenses and fees incurred by the Administrative Agent for the benefit of Credit Parties under this Agreement and any of the other Loan Documents, including counsel fees and compensation of agents and employees paid for services rendered on behalf of the Credit Parties, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Borrower and (ii) any expenses of the Administrative Agent incurred for the benefit of the Credit Parties that the Borrower has agreed to reimburse pursuant to this Agreement or any other Loan Document and has failed to so reimburse and (b) indemnify and hold harmless the Administrative Agent and any of its Affiliates, directors, officers, employees, or agents, on demand, in the amount of such Credit Party's Applicable Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Credit Party in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents to the extent not reimbursed by the Borrower, including costs of any suit initiated by the Administrative Agent against any Credit Party (except such as shall have been determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent); *provided, however*, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Credit Party in

its capacity as such. The provisions of this Section 8.06 shall survive the repayment of the Obligations and the termination of the Commitments.

Section 8.07   *Rights of Administrative Agent*.  It is understood and agreed that the Administrative Agent shall have the same rights and powers hereunder (including the right to give such instructions) as the other Lenders and may exercise such rights and powers, as well as its rights and powers under other agreements and instruments to which it is or may be party, and engage in other transactions with the Borrower and its Affiliates, as though it were not the Administrative Agent. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of commercial or investment banking, trust, advisory or other business with the Borrower and its Affiliates as if it were not the Administrative Agent hereunder.

Section 8.08   *Notice of Transfer*.  The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 9.04.

Section 8.09   *Successor Agents*.  The Administrative Agent may resign at any time by giving ten (10) Business Days' prior written notice thereof to the other Credit Parties and the Borrower. Upon any such resignation of the Administrative Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent, which, so long as there is no Event of Default continuing, shall be reasonably satisfactory to the Borrower (whose consent in any event shall not be unreasonably withheld or delayed). If no successor Administrative Agent shall have been so appointed by the Required Lenders and/or none shall have accepted such appointment within ten (10) Business Days after the retiring Administrative Agent's giving of notice of resignation, the retiring Administrative Agent may, on behalf of the other Credit Parties, appoint a successor Administrative Agent which shall be a Person capable of complying with all of the duties of the Administrative Agent hereunder (in the opinion of the retiring Administrative Agent and as certified to the other Credit Parties in writing by such successor Administrative Agent) which, so long as there is no Event of Default continuing, shall be reasonably satisfactory to the Borrower (whose consent shall not in any event be unreasonably withheld or delayed). Upon the acceptance of any appointment as Administrative Agent by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement.

After any retiring Administrative Agent's resignation hereunder, the provisions of this Article VIII and Section 9.03 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.

Section 8.10   *Relation Among the Lenders*.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.

Section 8.11    *Reports and Financial Statements*.  By signing this Agreement, each Lender:

1    is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Borrower hereunder (including those described in Section 5.01) and all examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the **"Reports"**);

2    expressly agrees and acknowledges that the Administrative Agent (i) makes no representation or warranty as to the accuracy of the Reports, and (ii) shall not be liable for any information contained in any Report;

3    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Borrower and will rely significantly upon the Borrower's books and records, as well as on representations of the Borrower's personnel;

4    agrees to keep all Reports and other Information confidential in accordance with Section 9.12; and

5    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Administrative Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Borrowing that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans of the Borrower; and (ii) to pay and protect, and indemnify, defend, and hold the Administrative Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 8.12    *Agency for Perfection*.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States of America can be perfected only by possession or control. Should any Lender (other than the Administrative Agent) obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative

Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 8.13   *Collateral and Guaranty Matters*.  (a)  The Lenders irrevocably authorize the Administrative Agent to, and the Administrative Agent shall,

(i)       release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not then due and owing), (ii) that is sold or otherwise Disposed or to be sold or Disposed of as part of or in connection with any sale or Disposition permitted under the Loan Documents or (iii) if approved, authorized or ratified in writing in accordance with Section 9.02;

(ii)      subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.03;

(iii)     release any Lien on any property granted to or held by the Administrative Agent under any Loan Document on any assets that are excluded from the Collateral; and

(iv)     enter into or amend an intercreditor agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority, as applicable, to release or subordinate its interest in particular types or items of property pursuant to this Section 8.13. In each case as specified in this Section 8.13, the Administrative Agent will, at the Borrower's expense, execute and deliver to the Borrower such documents as the Borrower may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, in each case in accordance with the terms of the Loan Documents and this Section 8.13.

(b)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Swap Agreement) take such actions as shall be reasonably requested by the Borrower as necessary or desirable to release, or document the release, by the Administrative Agent, of the security interest in any Collateral being sold, disposed of or transferred in a transaction permitted by the Loan Documents to the extent necessary to permit consummation of such sales or dispositions of assets in accordance with the Loan Documents.

Section 8.14   *Syndication Agents; Documentation Agents; Arrangers*.  Notwithstanding the provisions of this Agreement or any of the other Loan Documents, no Person who is or becomes a "syndication agent," a "documentation agent" or an "arranger" shall have any powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

68

# ARTICLE IX
## MISCELLANEOUS

Section 9.01    *Notices*.  (a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, e-mailed or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower, to it at:

[_____]

with a copy to:

[_____]

(ii)    if to the Administrative Agent, to:

[_____]

with a copy to:

[_____]

(iii)    if to a Lender, to it at its mail or e-mail address (or telecopy number) set forth in its Administrative Questionnaire.

Any e-mail notice to the Administrative Agent shall be in "pdf" format. Any party hereto may change its address, e-mail address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours

of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient; and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    *The Platform.* THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the **"Agent Parties"**) have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its Related Parties); *provided, however,* that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person, nor shall the Borrower have any liability to any Agent Party, any Lender or any other Person, for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided further* that this clause (c) shall not limit the indemnity obligations of the Borrower or any Subsidiary to the extent otherwise set forth in Section 9.03.

Section 9.02    *Waivers; Amendments.* (a)  No failure or delay by the Administrative Agent, or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders,

70

or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Borrower, in each case with the consent of the Required Lenders (other than an amendment or modification (x) to correct, amend, cure any ambiguity, inconsistency, defect or correct any typographical error or other manifest error in this Agreement or any other Loan Document, (y) to comply with Applicable Law or advice of local counsel in respect of a Security Document or (z) to cause a Security Document to be consistent with this Agreement and the other Loan Documents, which may be amended or modified by the agreement of the Borrower and the Administrative Agent); *provided* that no such agreement shall:

> (i)     increase the Commitment of any Lender without the written consent of such Lender,

> (ii)     reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender whose principal amount of its Loan or rate of interest or fees payable would be reduced (it being understood and agreed that waivers of any Defaults, Events of Defaults or additional interest payable during the continuation of an Event of Default shall not be deemed to be a reduction in the rate of interest or any fees payable hereunder),

> (iii)     postpone the scheduled date of payment of the principal amount of any Loan under Section 2.06 or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender whose payment would be so postponed, reduced, waived or excused or each Lender with Commitments for which the scheduled date of expiration would be postponed, as applicable,

> (iv)     amend or modify Section 2.12(b), 2.12(c) or 7.03, without the written consent of each Lender adversely affected thereby,

> (v)     amend or modify any of the provisions of this Section or reduce the percentage set forth in (x) the definition of "Required Lenders" or (y) any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, or

> (vi)     release all or substantially all of the Collateral from the Liens of the Security Documents (except with respect to sales or transfers of, and other transactions relating to, Collateral permitted pursuant to the Loan Documents as of the Closing Date), without the written consent of each Lender;

*provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent, as the case may be.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.02 and any consent by any Lender pursuant to this Section 9.02 shall bind any successor or assignee of such Lender.

71

(c)      If any Lender refuses to consent to any amendment or modification to or waiver of any Loan Document requested by the Borrower that requires the consent of all Lenders or all affected Lenders in accordance with this Section 9.02, and such amendment, modification or waiver is consented to by the Required Lenders (a **"Non-Consenting Lender"**), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

Section 9.03   *Expenses; Indemnity; Damage Waiver.*  (a)  The Borrower agrees to pay (i) all reasonable and documented out-of-pocket expenses (including the reasonable fees and documented expenses of other advisors and professionals engaged by the Administrative Agent or the Lead Arranger) incurred by the Administrative Agent, the Lead Arranger and their respective Affiliates in connection with the preparation, execution, delivery and administration of the Loan Documents or any amendments, supplements, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel or other professional consultants for the Administrative Agent or any Lender, in connection with the enforcement or protection of their rights in connection with the Loan Documents, including their rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses (including the fees, charges and disbursements of any counsel or any other professional consultants for the Administrative Agent or any Lender) incurred during any workout, restructuring or negotiations in respect of such Loans; *provided* that the Administrative Agent and Lenders shall be entitled to reimbursement for no more than one counsel representing all such parties as designated by the Administrative Agent (and appropriate local counsel and/or special counsel for each relevant jurisdiction or specialized area of law, but limited to one local and/or special counsel in each such jurisdiction or specialized area of law, as designated by the Administrative Agent) (absent any actual or perceived conflict of interest in which case the Administrative Agent and Lenders who are similarly situated may engage and be reimbursed for one additional primary counsel and one additional local and/or special counsel in each relevant jurisdiction or specialized area of law for group members who are similarly situated).

(b)      The Borrower agrees to indemnify the Administrative Agent, the Lead Arranger and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an **"Indemnitee"**) against, and hold each Indemnitee harmless (on an after-tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs and related expenses, including the reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of:

72

   (i)  the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby,

   (ii)  any Loan or the use of the proceeds therefrom,

   (iii)  any actual or alleged presence or Release of or exposure to Hazardous Materials on or from any property currently or formerly owned, leased or operated by the Borrower or any Subsidiary (including any predecessor for whom the Borrower or any such Subsidiary bears liability contractually or by operation of law), or any Environmental Liability, or

   (iv)  any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto;

*provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (A) are determined by a court of competent jurisdiction by final non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its affiliates, officers, directors, employees, advisors and agents), (B) relate to Hazardous Materials that are first placed at any property owned by the Borrower or any Subsidiary after such property is transferred to any Indemnitee or its successors and assigns by foreclosure, deed in lieu of foreclosure or similar transfer or (C) arise from a dispute solely among Indemnitees not involving any act or omission on the part of the Borrower or its Subsidiaries or Affiliates, other than any losses, claims, damages, liabilities or costs incurred by or asserted against the Administrative Agent or the Lead Arranger acting in such capacity under this Agreement or any Loan Document.

   (c)  To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Lead Arranger under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Lead Arranger, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Lead Arranger in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its Applicable Percentage.

   (d)  To the extent permitted by Applicable Law, no party to this Agreement shall assert, and each party to this Agreement hereby waives, any claim against any other party to this Agreement, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that this clause (d) shall not limit the indemnity obligations of the Borrower or any Subsidiary to the extent otherwise set forth in Section 9.03(a) through (c).

(e)    All amounts due under this Section shall be payable within thirty (30) days after written demand therefor (including documentation reasonably supporting such request).

For the avoidance of doubt, this Section 9.03 shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

Section 9.04    *Successors and Assigns*. (a) Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document except to the extent otherwise permitted as a result of mergers or consolidations permitted hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower shall be null and void) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 9.04(b), (ii) by way of participation in accordance with the provisions of Section 9.04(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.04(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.04(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    *Minimum Amounts*:

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided, however,* that concurrent assignments to members of an Assignee

Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     *Proportionate Amounts*. Each partial assignment by a Lender shall be made as an assignment of a *proportionate* part of all the assigning Lender's rights and obligations under this Agreement with respect to such Lender's Loan;

(iii)     *Required Consents*.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (i) an Event of Default has occurred and is continuing at the time of such assignment or (ii) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund of such Lender; *provided* that the Borrower shall be deemed to have consented to any such assignment (other than to a Disqualified Company) if it shall not have responded to a consent request with respect thereto within ten (10) Business Days of written receipt thereof; and

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments except if such assignment is to a Person that is a Lender, an Affiliate of such Lender or an Approved Fund of such Lender.

(iv)     *Assignment and Assumption*. The parties to each assignment (other than (i) assignments by a Lender to its Affiliate or an Approved Fund of such Lender or pursuant to Section 2.13 or 9.04(f) and (ii) the Borrower) shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500, *provided, however,* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire.  The Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.09, 2.10, 2.11 and 9.03 with respect to facts and circumstances occurring prior to the effective date of such

assignment. Promptly following request, the Borrower (at its expense) shall execute and deliver a promissory note to the assignee Lender (*provided* that such assignee Lender shall use its commercially reasonable efforts to cause the assignor Lender to deliver to the Borrower any promissory notes delivered to it by the Borrower hereunder). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(d).

(c)     *Register*.  (i)  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(ii)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 9.04(b) and any written consent to such assignment required by Section 9.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Assignment unless it has been recorded in the Register as provided in this paragraph.

(d)     *Participations*.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries or to any Disqualified Company) (each, a **"Participant"**) in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (x) such Lender's obligations under this Agreement shall remain unchanged, (y) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (z) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, supplement, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, supplement, modification or waiver described in the first proviso to Section 9.02(b) that requires the consent of each Lender or each affected Lender. Subject to Section 9.04(e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.09, 2.10 and 2.11 (subject to the requirements and limitations of such Sections, including the requirements under

Section 2.11(f) (it being understood that the documentation required under Section 2.11(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.12(c) as though it were a Lender.

(e)     *Limitations upon Participant Rights*.  A Participant shall not be entitled to receive any greater payment under Section 2.09 or 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, which shall not be unreasonably withheld or delayed, and except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.11 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.11(f) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the **"Participant Register"**); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or that such Participant is not a Disqualified Company. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     *Certain Pledges*.  Any Lender may at any time grant, pledge, hypothecate or assign a security interest in all or any portion of its rights under this Agreement (including under its promissory note, if any) to any Person (other than a natural person or any Disqualified Company) to secure obligations of such Lender, including any grant, pledge, hypothecation or assignment to secure obligations to a Federal Reserve Bank or other central bank, and none of the restrictions or conditions set forth in this Section 9.04 related to any grant, pledge, hypothecation or assignment shall apply to any such grant, pledge, hypothecation or assignment of a security interest; *provided* that no such grant, pledge, hypothecation or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such grantee, pledgee, hypothecatee or assignee for such Lender as a party hereto.

(g)     *Electronic Execution of Assignments*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of

a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     The Administrative Agent may conclusively rely on the written consent (or deemed consent under Section 9.04(b)(iii)(A)) of the Borrower to an assignment as evidence that the assignee is not a Disqualified Company for all purposes of this Agreement and the other Loan Documents, including in approving or declining to approve a person as an Eligible Assignee, executing and delivering any Assignment and Assumption, making any recording in the Register in respect of such Assignment and Assumption or otherwise.  The Administrative Agent shall have no responsibility or liability for monitoring Schedule 1.01(A) (as supplemented pursuant to the terms of this Agreement) or the identities of, or enforcing provisions relating to, Disqualified Companies.  The Administrative Agent shall have no liability of any kind to the Borrower or any Affiliate thereof, any Lender or any other person if such list of Disqualified Companies (or any supplement thereto) is incorrect or if any person is incorrectly identified in such list of Disqualified Companies (or any supplement thereto) as a person to whom no assignment is to be made.  The Administrative Agent and any assignor of a Commitment or a Loan or seller of a participation or grantor of a pledge under Section 9.04(f) hereunder may conclusively rely on a representation given by the assignee, purchaser or grantee in the relevant Assignment and Assumption or participation agreement or other agreement, as applicable, that such assignee, purchaser or grantee is not a Disqualified Company.  Neither the Administrative Agent nor any such assignor, seller or grantor shall have any liability arising from any breach by an assignee, purchaser or grantee of such representation, and the Administrative Agent and any such assignor, seller or grantor shall be indemnified by the Borrower for any loss, cost or expense resulting therefrom.  If any assignment, participation or pledge under this Section 9.04 is made to a Disqualified Company and the portion of the loan so assigned, participated or pledged is still held by a Disqualified Company, then the Borrower (i) shall have the right to repurchase such portion of the Loan at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrower at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.  Notwithstanding anything in this Agreement to the contrary, in no case shall the Administrative Agent, any assignor of a Commitment or a Loan, seller of a participation or grantor of a pledge under Section 9.04(f) have any liability of any kind to the Borrower or any Affiliate thereof, any Lender or any other person as a result of or in connection with any such assignment, participation or pledge being made to a Disqualified Company to the extent the Borrower has provided its written consent (or deemed consent under Section 9.04(b)(iii)(A)) to such assignment, participation or pledge.

(i)     Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles that are not Disqualified Companies (each, an **"SPV"**) all or any portion of its funded Loans (without the corresponding Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrower all or any part of any Loans that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights

which a Lender making or holding such Loans would have under this Agreement (subject to the requirements and limitations to which the Lender would subject under this Agreement) but no obligations; *provided* that the Lender shall make all determinations on behalf of the SPV with respect to any matters requiring the consent or approval of the SPV hereunder and the Administrative Agent and the Borrower shall be entitled to rely on such determination by the Lender, without further inquiry and notwithstanding any communication to the contrary by the SPV; *provided further* an SPV shall not be entitled to receive any greater payment under Section 2.09 or 2.11 than the applicable granting Lender would have been entitled to receive absent such grant, without the consent of the Borrower (such consent not to be unreasonably withheld or delayed). The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its Commitment (although the unused portion thereof shall be reduced by the principal amount of any Loans held by an SPV). Notwithstanding such assignment, the Administrative and the Borrower may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV.

Section 9.05   *Survival*.  All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid (other than any contingent indemnification obligations not then due and payable) and so long as the Commitments have not expired or terminated. The provisions of Sections 2.09, 2.10, 2.11 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06   *Counterparts; Integration; Effectiveness*.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07  *Severability*.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08  *Right of Setoff*.  If one or more Events of Default shall have occurred and be continuing, each Lender shall have the right, in addition to and not in limitation of any right which any such Lender may have under Applicable Law or otherwise, to set off and apply any and all deposits (general or special, time or demand, provisional or final), at any time held and other obligations at any time owing by such Lender or its Affiliates to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. No Credit Party will, or will permit its Participant to, exercise its rights under this Section 9.08 without the consent of the Administrative Agent or the Required Lenders. ANY AND ALL RIGHTS TO REQUIRE THE ADMINISTRATIVE AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE OF THE SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

Section 9.09  *GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS*.  (a)  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property to the exclusive jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (and, to the extent necessary to enforce the Administrative Agent's or the Lenders' rights under the Loan Documents, courts where Collateral may be located or deemed to be located and any appellate court thereof), in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment relating to any Loan Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the

80

defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10   *WAIVER OF JURY TRIAL.*  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11   *Headings*.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12   *Confidentiality*.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by the Borrower or its Subsidiaries, the Administrative Agent or any Lender pursuant to or in connection with this Agreement unless such information is designated by the Borrower as non-confidential; *provided* that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Applicable Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, or (j) if agreed by the Borrower in its sole discretion, to any other Person.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

Section 9.13   *Interest Rate Limitation*.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under Applicable Law (collectively, the **"Charges"**), shall exceed the maximum lawful rate (the **"Maximum Rate"**) which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14   *Patriot Act*.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

Section 9.15   *Additional Waivers*.  (a)  To the fullest extent permitted by Applicable Law, the obligations of the Borrower hereunder shall not be affected by (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce or exercise any right or remedy against the Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release of the Borrower from, any of the terms or provisions of, this Agreement or any other Loan Document, (other than as expressly contemplated by such waiver, amendment or modification), (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Administrative Agent or any Lender or (iv) any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets.

(b)     The obligation of the Borrower to pay the Obligations in full hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of all Obligations and termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of the Borrower hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof (other than to the extent such waiver or modification so expressly waives or modifies such obligations or remedies), any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of the Borrower or that would otherwise operate as a discharge of the Borrower as a matter of law or equity (other than the payment in full in cash of all Obligations (other than contingent indemnification obligations not then due and payable) and termination of the Commitments).

(c)     To the fullest extent permitted by Applicable Law, the Borrower waives any defense based on or arising out of the unenforceability of the Obligations or any part thereof from any cause, other than the payment in full in cash of all the Obligations (other than contingent indemnification obligations not then due and payable) and termination of the Commitments. The Administrative Agent and the Lenders may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations without affecting or impairing in any way the liability of the Borrower hereunder except to the extent that all the Obligations have been paid in full in cash (other than contingent indemnification obligations not then due and payable) and the Commitments terminated. Pursuant to Applicable Law, the Borrower waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any security.

Section 9.16   *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, on the one hand, and the Administrative Agent and the Lenders, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the Administrative Agent and each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Administrative Agent or Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment,

83

waiver or other modification hereof or of any other Loan Document (irrespective of whether the Administrative Agent or any of the Lenders has advised or is currently advising the Borrower or any of its Affiliates on other matters) and none of the Administrative Agent or Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Administrative Agent and Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent or Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) none of the Administrative Agent and Lenders have provided or will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each of the Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

[SIGNATURE PAGES FOLLOW]

LIGHTSQUARED INC., as Borrower

By:     _____
        Name:
        Title:

[_____],
as Administrative Agent

By:    _____
          Name:
          Title:

[_____],
as a Lender

By:    _____

           Name:

           Title:

**Exhibit C**