Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**NOTICE OF FILING OF PLAN SUPPLEMENT DOCUMENTS FOR
DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO
CHAPTER 11 OF BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on February 14, 2014, LightSquared Inc. and certain of

its affiliates (collectively, "LightSquared"), as debtors and debtors in possession in the above-

captioned chapter 11 cases, filed the (a) *Debtors' Third Amended Joint Plan Pursuant to Chapter*

*11 of Bankruptcy Code* [Docket No. 1308] (as amended, modified, or supplemented, the "Plan")

and (b) *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax
or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc.
(0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra
Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited
Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC
(3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750),
LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd.
(7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC
Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston,
VA 20191.

*Chapter 11 of Bankruptcy Code* (as amended, modified, or supplemented, the "Specific

Disclosure Statement") [Docket No. 1308].[2]

     **PLEASE TAKE FURTHER NOTICE** that the Specific Disclosure Statement

contemplates the submission of certain Plan Supplement documents for the Plan in advance of

the hearing to approve the Specific Disclosure Statement.

     **PLEASE TAKE FURTHER NOTICE** that LightSquared hereby files the following

Plan Supplement documents (the "Plan Supplement"):

- Exhibit C-2 – Second Lien Exit Credit Agreement; and

- Exhibit C-6 – NewCo Interest Holders Agreement.

     **PLEASE TAKE FURTHER NOTICE** that LightSquared reserves the right to alter,

amend, modify, or supplement any of the documents contained in the Plan Supplement and may

file additional supplements.

     **PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan

Supplement are integral to, and part of, the Plan, and, if the Plan is confirmed, the Plan

Supplement shall be deemed approved in the order confirming the Plan.

     **PLEASE TAKE FURTHER NOTICE** that the Plan Supplement may be viewed for

free at the website of LightSquared's Claims and Solicitation Agent, Kurtzman Carson

Consultants LLC ("KCC"), at http://www.kccllc.net/lightsquared or for a fee on the Bankruptcy

Court's website at www.nysb.uscourt.gov.  To access documents on the Bankruptcy Court's

website, you will need a PACER password and login, which can be obtained at

http://www.pacer/psc/uscourt.gov.  To obtain hard copies of the Plan Supplement, please contact

KCC at (877) 499-4509 or by e-mail at LightSquaredInfo@kccllc.com.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Specific Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE that a hearing to consider the confirmation of the Plan (the "**<u>**Confirmation Hearing**</u>**") will commence before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in the Bankruptcy Court on March 17, 2014 at 10:00 a.m. (prevailing Eastern time), or such other date and time as determined by the Bankruptcy Court.**  Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Bankruptcy Court or otherwise.

Respectfully submitted,

New York, New York
Dated:  February 16, 2014

*/s/ Karen Gartenberg*
Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

## Exhibit C-2

**Second Lien Exit Credit Agreement**

**$[1,200,000,000]**

**JUNIOR LIEN LOAN AGREEMENT**

**dated as of [          ], 2014,**

**among**

**[NEWCO],**

**as the Borrower,**

**and**

**THE GUARANTORS PARTY HERETO,**

**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**[_____],**

**as Administrative Agent**

**and**

**J.P. MORGAN SECURITIES LLC,**

**as Sole Lead Arranger and Sole Bookrunner**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
## DEFINITIONS

Section 1.01.    Defined Terms ................................................................ 2
Section 1.02.    Terms Generally ............................................................. 36
Section 1.03.    Accounting Terms; GAAP ................................................ 36
Section 1.04.    Resolution of Drafting Ambiguities ............................... 36
Section 1.05.    Permitted Liens ............................................................. 36

## ARTICLE 2
## THE LOANS

Section 2.01.    Commitments ................................................................ 37
Section 2.02.    Loans ........................................................................... 37
Section 2.03.    [Reserved] ................................................................... 37
Section 2.04.    Evidence of Debt; Repayment of Loans ......................... 37
Section 2.05.    Fees ............................................................................ 38
Section 2.06.    Interest on Loans .......................................................... 38
Section 2.07.    Termination of Commitments ....................................... 41
Section 2.08.    [Reserved] ................................................................... 41
Section 2.09.    Repayment of Loans ..................................................... 41
Section 2.10.    Optional and Mandatory Prepayments of Loans ........... 41
Section 2.11.    [Reserved] ................................................................... 43
Section 2.12.    Yield Protection ........................................................... 43
Section 2.13.    [Reserved] ................................................................... 44
Section 2.14.    Payments Generally; Pro Rata Treatment; Sharing of Setoffs .... 44
Section 2.15.    Taxes .......................................................................... 46
Section 2.16.    Mitigation Obligations; Replacement of Lenders .......... 50
Section 2.17.    Currency Indemnity ...................................................... 51

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Section 3.01.    Organization; Powers .................................................... 52
Section 3.02.    Authorization; Enforceability ........................................ 52
Section 3.03.    No Conflicts ................................................................. 52
Section 3.04.    Financial Statements; Projections .................................. 53
Section 3.05.    Properties .................................................................... 53
Section 3.06.    Intellectual Property .................................................... 54
Section 3.07.    Equity Interests and Subsidiaries; Reorganized LightSquared Inc .... 55
Section 3.08.    Litigation; Compliance with Laws ................................. 56
Section 3.09.    Agreements .................................................................. 56
Section 3.10.    Federal Reserve Regulations ......................................... 57

Section 3.11.    Investment Company Act ................................................................ 57
Section 3.12.    Use of Proceeds ........................................................................... 57
Section 3.13.    Taxes ............................................................................................ 57
Section 3.14.    No Material Misstatements ............................................................ 57
Section 3.15.    Labor Matters ............................................................................... 58
Section 3.16.    Solvency ....................................................................................... 58
Section 3.17.    Employee Benefit Plans ................................................................ 58
Section 3.18.    Environmental Matters .................................................................. 60
Section 3.19.    Insurance ...................................................................................... 61
Section 3.20.    Security Documents ...................................................................... 62
Section 3.21.    Intercompany Indebtedness; Affiliate Indebtedness .................... 63
Section 3.22.    Anti-Terrorism Laws; Anti-Corruption Laws ............................... 64
Section 3.23.    Communications Licenses and Regulatory Matters ..................... 64
Section 3.24.    License Subsidiaries ..................................................................... 65

ARTICLE 4
CONDITIONS

Section 4.01.    Conditions ..................................................................................... 65

ARTICLE 5
AFFIRMATIVE COVENANTS

Section 5.01.    Financial Statements, Reports, etc. ............................................... 71
Section 5.02.    Litigation and Other Notices ........................................................ 73
Section 5.03.    Existence; Businesses and Properties ........................................... 74
Section 5.04.    Insurance ...................................................................................... 75
Section 5.05.    Obligations and Taxes .................................................................. 75
Section 5.06.    Employee Benefits ........................................................................ 76
Section 5.07.    Maintaining Records; Access to Properties and Inspections; Annual
                 Meetings ...................................................................................... 77
Section 5.08.    Use of Proceeds ........................................................................... 77
Section 5.09.    Compliance with Laws; Compliance with Environmental Laws;
                 Environmental Reports ................................................................. 77
Section 5.10.    Compliance with Communications Laws and ITU Rules and
                 Regulations .................................................................................. 78
Section 5.11.    Additional Collateral; Additional Guarantors .............................. 78
Section 5.12.    Security Interests; Further Assurances .......................................... 80
Section 5.13.    Information Regarding Collateral .................................................. 80
Section 5.14.    Post-Closing Collateral Matters ................................................... 81
Section 5.15.    License Subsidiaries ..................................................................... 81

ARTICLE 6
NEGATIVE COVENANTS

Section 6.01.    Indebtedness ................................................................................. 81
Section 6.02.    Liens ............................................................................................. 82

Section 6.03.    Sale and Leaseback Transactions ................................................................ 85
Section 6.04.    Investments, Loan, Advances and Acquisition .......................................... 85
Section 6.05.    Mergers and Consolidations ..................................................................... 87
Section 6.06.    Asset Sales ................................................................................................. 87
Section 6.07.    Dividends ................................................................................................... 89
Section 6.08.    Transactions with Affiliates ...................................................................... 89
Section 6.09.    [Reserved] .................................................................................................. 90
Section 6.10.    Prepayments of Other Indebtedness; Modifications of Organizational
                 Documents and Other Documents, etc ....................................................... 90
Section 6.11.    Limitation on Certain Restrictions on Subsidiaries ................................... 91
Section 6.12.    Limitation on Issuance of Capital Stock ................................................... 92
Section 6.13.    Limitation on Creation of Subsidiaries ...................................................... 92
Section 6.14.    Business ..................................................................................................... 92
Section 6.15.    Capital Expenditure ................................................................................... 92
Section 6.16.    Fiscal Year ................................................................................................. 92
Section 6.17.    No Further Negative Pledge ....................................................................... 93
Section 6.18.    Compliance with Anti-Terrorism Laws ..................................................... 93
Section 6.19.    Canadian Pension Plans ............................................................................ 94
Section 6.20.    Permitted Activities of License Subsidiaries ............................................. 94
Section 6.21.    Communications Licenses .......................................................................... 95
Section 6.22.    [Reserved] .................................................................................................. 95

ARTICLE 7
GUARANTEE

Section 7.01.    The Guarantee ........................................................................................... 95
Section 7.02.    Obligations Unconditional ......................................................................... 96
Section 7.03.    Reinstatement ............................................................................................ 97
Section 7.04.    Subrogation; Subordination ....................................................................... 97
Section 7.05.    Remedies ................................................................................................... 98
Section 7.06.    Instrument for the Payment of Money ........................................................ 98
Section 7.07.    Continuing Guarantee ................................................................................ 98
Section 7.08.    General Limitation on Guarantee Obligations ............................................ 98
Section 7.09.    Release of Guarantors ................................................................................ 98
Section 7.10.    Right of Contribution ................................................................................ 99

ARTICLE 8
EVENTS OF DEFAULT

Section 8.01.    Events of Default ....................................................................................... 99
Section 8.02.    Application of Proceeds ............................................................................ 103
Section 8.03.    Government Approval ............................................................................... 104

ARTICLE 9
THE ADMINISTRATIVE AGENT

ARTICLE 10
MISCELLANEOUS

Section 10.01.  Notices ......................................................................................... 107
Section 10.02.  Waivers; Amendment ................................................................... 109
Section 10.03.  Expenses; Indemnity; Damage Waiver ....................................... 112
Section 10.04.  Successors and Assigns ............................................................... 113
Section 10.05.  Survival of Agreement ................................................................ 121
Section 10.06.  Counterparts; Integration; Effectiveness .................................... 121
Section 10.07.  Severability .................................................................................. 122
Section 10.08.  Right of Setoff ............................................................................ 122
Section 10.09.  Governing Law; Jurisdiction; Consent to Service of Process ..... 122
Section 10.10.  Waiver of Jury Trial .................................................................... 123
Section 10.11.  Headings ...................................................................................... 123
Section 10.12.  Treatment of Certain Information; Confidentiality. .................... 123
Section 10.13.  Material Non-Public Information. ............................................... 124
Section 10.14.  Authorization to Distribute Certain Materials to Public-Siders ... 124
Section 10.15.  USA PATRIOT Act Notice and Customer Verification ............. 125
Section 10.16.  Interest Rate Limitation .............................................................. 125
Section 10.17.  Obligations Absolute ................................................................... 126
Section 10.18.  AML Legislation ......................................................................... 126

<u>SCHEDULES</u>

Schedule 1.01(a)      Disqualified Companies
Schedule 1.01(b)      Subsidiary Guarantors
Schedule 2.01         Commitments
Schedule 3.03         Governmental Approvals; Compliance with Laws
Schedule 3.06(c)      Violations or Proceedings
Schedule 3.07(c)      Organizational Chart
Schedule 3.08         Litigation and Government Proceedings
Schedule 3.09         Material Agreements
Schedule 3.18         Environmental Matters
Schedule 3.19         Insurance
Schedule 3.23(a)      Communications Licenses
Schedule 4.01(g)      Local Counsel
Schedule 5.14         Post-Closing Matters
Schedule 6.01(b)      Existing Indebtedness
Schedule 6.01(f)      Terms of Senior Lien Debt and Intercreditor Agreement
Schedule 6.02(c)      Existing Liens
Schedule 6.04(b)      Existing Investments
Schedule 6.06(g)      Asset Sales
Schedule 6.06(i)      Existing Agreements Pursuant to Which Assets May Be Sold

<u>EXHIBITS</u>

iv

Exhibit A      Form of Administrative Questionnaire
Exhibit B-1    Form of Assignment and Assumption
Exhibit B-2    Form of Assignment and Assumption for Affiliate Lenders
Exhibit C      [Reserved]
Exhibit D      Form of Compliance Certificate
Exhibit E      [Reserved]
Exhibit F      Form of Joinder Agreement
Exhibit G      Form of Landlord Access Agreement
Exhibit H      [Reserved]
Exhibit I      [Reserved]
Exhibit J      [Reserved]
Exhibit K      Form of Note
Exhibit L-1    Form of Perfection Certificate
Exhibit L-2    Form of Perfection Certificate Supplement
Exhibit M-1    Form of U.S. Security Agreement
Exhibit M-2    Form of Canadian Security Agreement
Exhibit M-3    Form of U.S. Pledge Agreement
Exhibit N      Form of Intercreditor Agreement
Exhibit O      Form of Solvency Certificate
Exhibit P      Form of Intercompany Note
Exhibit Q      Form of Tax Compliance Certificates

## JUNIOR LIEN LOAN AGREEMENT

This JUNIOR LIEN LOAN AGREEMENT (this "**Agreement**") dated as of [                    ], 2014, among [NewCo], a Delaware limited liability company (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), the Lenders and [___], as administrative agent and collateral agent for the Lenders (in such capacities, the "**Administrative Agent**").

### WITNESSETH:

WHEREAS, certain Subsidiaries (such term and each other capitalized term used but not otherwise defined in this introductory statement having the meaning specified in subsection 1.01) of the Borrower have been debtors in reorganization proceedings (the "**Bankruptcy Proceedings**") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, the Debtors filed on February 14, 2014 the Debtors' Third Amended Joint Plan pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 1308] (the "**Plan of Reorganization**") with the Bankruptcy Court pursuant to which the Borrower shall be formed and capitalized in accordance thereunder. The Plan of Reorganization is described in, and included as an exhibit to, the Debtors' Revised Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code (the "**Disclosure Statement**"), the final version of which was filed with and approved by the Bankruptcy Court on [          ], 2014.

WHEREAS, on [_____], 2014 the Bankruptcy Court entered the Plan Confirmation Order.

WHEREAS, certain of the Lenders are parties to the $1,650,000,000 Senior Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of [_____], 2014 (as amended, supplemented or otherwise modified from time to time, the "**New DIP Agreement**"), among LightSquared Inc., LightSquared LP and One Dot Six Corp., each as a debtor and debtor-in-possession in the Bankruptcy Proceedings, the guarantors party thereto, the lenders from time to time parties thereto and [_____], as administrative agent and collateral agent pursuant to which the lenders thereunder made term loans in the aggregate amount of $1,650,000,000, consisting of Tranche A Loans under, and as defined in, the New DIP Agreement (the "**Tranche A Loans**") in the aggregate amount of $1,350,000,000 and Tranche B Loans (as defined in the New DIP Agreement) in the aggregate amount of $300,000,000.

WHEREAS, pursuant the Plan of Reorganization, on the Plan Effective Date a portion of the Tranche A Loans shall be converted into Loans hereunder in the amounts set forth in the Plan of Reorganization.

WHEREAS, on the Closing Date, the Borrower will also obtain from the lenders under the Senior Lien Credit Agreement (as hereinafter defined) loans (the "**Senior Lien Loans**"), in aggregate principal amount of $[1,000,000,000], on the Closing Date.

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  *Defined Terms*.

As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

 "**Adjusted LIBO Rate**" shall mean, with respect to any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided* that the Adjusted LIBO Rate shall not be less than 1.00%.

"**Administrative Agent**" shall have the meaning assigned to such term in the recitals hereto and includes each other person appointed as the successor pursuant to Article 10.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of Exhibit A.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided*, *however*, that, for purposes of Section 6.08 and the proviso to the definition of "Affiliate Lender", the term "Affiliate" shall also include (x) any person that is an executive officer or director of the person specified and (y) the Equity Investors, except for any Equity Investor that ceases to own more than 5% of any class of Equity Interests in the Borrower and does not otherwise constitute an Affiliate pursuant to this definition.

"**Affiliate Lender**" shall mean each Lender that is an Affiliate of the Borrower; *provided* that no Equity Investor shall be an Affiliate Lender for any purpose under this Agreement.

"**Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**All-in Yield**" shall mean as to any Indebtedness, the effective interest rate  hereon as reasonably determined by the Administrative Agent (consistent with generally accepted financial practices), taking into account the interest rate, margin, original issue discount and upfront fees; *provided* that original issue discount and upfront fees shall be equated to interest rate assuming a four-year life to maturity of such Indebtedness; *provided further* that "All-in Yield" shall not include arrangement, underwriting, structuring or similar fees paid to arrangers or fees that are not paid ratably to the market with respect to such Indebtedness.

2

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, *provided* that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"**AML Legislation**" shall have the meaning assigned to such term in Section 10.18.

"**Anti-Terrorism Laws**" shall mean any Requirement of Law related to terrorism financing or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes the following Canadian requirements: Part II.1 of the Criminal Code, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act ("**PCTFA**"), the Special Economic Measures Act (Canada), the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" means, for any day, (i) with respect to any ABR Loan 10.0% and (ii) with respect to any Eurodollar Loan 11.0%

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage represented by the ratio of the amount of such Lender's Commitment to the aggregate Commitments at such time.  If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Assets**" means all rights, titles, and interests of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible including rights under the Inmarsat Agreement), but excluding leases (and subleases) of capacity on any satellite in the ordinary course of business and dispositions of cash and Cash Equivalents in the ordinary course

of business, by the Borrower or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of the Borrower, in each case, to any person other than (i) the Borrower, (ii) any Subsidiary Guarantor or (iii) other than for purposes of Section 6.06, any other Subsidiary.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B-1 (or in the case of an assignment to an Affiliate Lender, Exhibit B-2), or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligations".

"**Avoidance Action**s" shall have the meaning assigned to such term in the definition of Litigation Claims.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Proceedings**" shall have the meaning assigned to such term in the recitals hereto.

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such person, (iii) in the case of any partnership, the Board of Directors of the general partner of such person, (iv) in any other case, the functional equivalent of the foregoing and (vi) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" shall mean Boeing Satellite Systems, Inc.

"**Borrower**" shall have the meaning assigned to such term in the recitals hereto.

"**Borrowing**" shall mean Loans of the same Type, deemed made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the CCAA.

"**Canadian GAAP**" shall mean such generally accepted accounting principles in Canada as are used by the Canadian Loan Parties, applied on a consistent basis.

"**Canadian Income Tax Act**" means the *Income Tax Act* (Canada), and the regulations thereunder, as amended from time to time.

"**Canadian Loan Party**" means any Loan Party incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"**Canadian Pension Plan**" means a "**registered pension plan**", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Plan Even**t" means any event prohibited by Section 6.19 hereof which could reasonably be expected to result in liability for any Company.

"**Canadian Radiocommunication Act**" shall mean the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Security Agreement**" shall mean a Canadian Security Agreement substantially in the form of Exhibit M-2 among the Loan Parties party thereto and Administrative Agent for the benefit of the Secured Parties.

"**Canadian Security Agreement Collateral**" shall mean all present and after acquired property pledged or granted as collateral pursuant to the Canadian Security Agreement.

"**Canadian Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" shall mean the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capital Asset**s" shall mean, with respect to any person, any equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

5

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for Capital Assets (in each case, whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability); *provided* that payments to (x) Inmarsat under the Inmarsat Agreement, (y) under the One Dot Six Lease and (z) to NOAA, in each case in accordance with the business plan as described to the Lenders prior to the entry of the Plan Confirmation Order will not constitute "Capital Expenditures".

"**Capital Lease Obligation**s" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person and (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries, in each case other than any such loss, damage, destruction, condemnation or taking the Net Cash Proceeds of which are less than $[___]. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)     [reserved];

(b)     at any time a change of control occurs under any Material Indebtedness;

(c)     a plan relating to the liquidation or dissolution of the Borrower is adopted;

(d)     (i) any "person" or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) other than (x) any Permitted Holders or (y) group consisting of Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Voting Stock of the Borrower representing a majority of the voting power of the total outstanding Voting Stock of the Borrower, or (ii) at any time prior to an IPO, the Permitted Holders (other than any future Permitted Holders approved by the Administrative Agent or the Required Lenders as provided in the definition thereof) no longer has the right to designate at least three of the members of the Borrower's Board of Directors under the terms of the NewCo Interest Holders Agreement;

(e)     upon and following an IPO, during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Borrower (together with any new directors whose election to such Board of Directors or whose nomination for election was approved by a vote of a majority of the members of the Board of Directors of the Borrower, which members comprising such majority are then still in office and were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Borrower; or

(f)     a "change of control" or any comparable term under, and as defined in the Senior Lien Credit Agreement (or any documentation governing any Permitted Refinancing in respect thereof).

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by

7

any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in Section 10.16.

"**CIPO**" shall mean the Canadian Intellectual Property Office.

"**Closing Date**" shall have the meaning assigned to such term in Section 2.07.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, collectively, all of the U.S. Security Agreement Collateral, the Canadian Security Agreement Collateral, the U.S. Pledge Agreement Collateral, the Mortgaged Property and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document; *provided* that Collateral shall include Communications Licenses only to the maximum extent permitted by law but shall include the proceeds and right to receive proceeds from any Communications Licenses.

"**Commitment**" shall mean, with respect to each Lender, the commitment of such Lender hereunder to either (x) convert a portion of its Tranche A Loans into Loans hereunder or (y) exchange for other consideration provided to the Borrower pursuant to the Plan of Reorganization for Loans hereunder, in each case in the amount set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable.  The aggregate amount of the Commitments as of the Closing Date is $[1,200,000,000].

"**Commitment Letter**" shall mean that certain Commitment Letter, dated as of February 14, 2014, among J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation, Melody Business Finance, LLC, Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and Credit Distressed Blue Line Master Fund, Ltd., LightSquared Inc., One Dot Six Corp. and LightSquared LP.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Communications Act**" shall mean the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" shall mean the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications Licenses**" shall mean (i) the One Dot Six License and (ii) all other authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, Industry Canada and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" shall mean the Borrower and the Borrower's Subsidiaries; and "Company" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit D.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of

9

voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.  Without limiting the generality of the foregoing, for purposes of Section 6.08 and the definition of "Harbinger", a person shall be deemed to be Controlled by another person if such other person possesses, directly or indirectly, power to vote 10% or more of the Voting Stock.

"**Control Agreement**" shall have the meaning assigned to such term in the U.S. Security Agreement and the Canadian Security Agreement.

"**Controlled Investment Affiliate**" shall mean, as to any person, any other person which directly or indirectly is in Control of, is Controlled by, or is under common Control with, such person and is organized primarily for making equity or debt investments in other portfolio companies.

"**Cooperation Agreement Order**" shall mean the final order of the Bankruptcy Court dated [__], 2014 [Docket No. ___] authorizing the applicable Debtors' assumption and amendment of the Inmarsat Agreement on terms and conditions satisfactory to the Initial Lenders, as such order may be amended, supplemented or otherwise modified from time to time with the consent of the Initial Lenders.

"**CRTC**" shall mean the Canadian Radio-television and Telecommunications Commission, or any successor agency administering, among other things, the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Currency Due**" shall have the meaning assigned to such term in Section 2.17.

"**Debt Issuance**" shall mean the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtors**" shall mean, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, One Dot Six TVCC Corp, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc., each as a debtor and debtor-in-possession in the Bankruptcy Proceeding.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(b).

"**Disclosed Participants**" shall have the meaning assigned to such term in Section 10.04(c).

"**Disclosure Statement**" shall have the meaning assigned to such term in the recitals hereto.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Loan Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is 180 days after the Loan Maturity Date or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Loan Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Disqualified Company**" shall mean any company which is a competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), such additional companies which are competitors of the Borrower and the Affiliates of such companies, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided* that the addition of such persons shall not deem any Lender that is already a Lender, or any Participant that has previously acquired a participation interest in the Loans that was otherwise permitted hereunder as of the date of such designation to be a Disqualified Company, and such designation shall be effective two (2) Business Days after being notified to Lenders; *provided*, *further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption. A Disqualified Company will include any Affiliate thereof.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia.

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Affiliates or any other person, providing for access to data protected by passcodes or other security system.

"**Eligible Assignee**" shall mean any person to whom it is permitted to assign Loans and Commitments pursuant to Section 10.04(b); *provided* that "**Eligible Assignee**" shall not include (a) any natural person, (b) any Disqualified Company or (c) the Borrower or any of its Subsidiaries.

"**Embargoed Person**" shall mean any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (ii) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and in the case of each of (i) and (ii) shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of any Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the U.S. Security Agreement and the Canadian Security Agreement.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Investors**" shall mean each of (a) Fortress, (b) the Melody Investors, (c) Harbinger and (d) Reorganized LightSquared Inc., and in each case, their respective Controlled Investment Affiliates (other than the Borrower and its Subsidiaries).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code. For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any person who was, as to the time of such past event or period of time, an "ERISA Affiliate" within the meaning of the preceding sentence.

"**ERISA Event**" shall mean the occurrence of any one or more of the following: (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than any required contributions to any Plans and non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA; (e) the receipt by the Borrower, any Company or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by the Borrower, any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination

13

that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (k) the cessation of operations at a facility of the Companies or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; or (l) any other event or condition with respect to a Single Employer Plan or Multiemployer Plan that could result in liability of the Companies.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Swap Obligations**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes unlawful under the Commodity Exchange Act or any rule or regulation promulgated thereunder or order of the Commodity Futures Trading Commission (or the application or official interpretation of any provision thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest by such Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Subsidiary Guarantor hereunder, (a) Taxes imposed on or measured by its net income or profits (however denominated), franchise taxes imposed on it (in lieu of net income taxes), and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of the recipient being organized under the laws of or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on payments pursuant to any Requirements of Law that are in effect on the date on which (i) such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other

14

obligation that such Lender acquired pursuant to Section 2.16(b), or (ii) such Lender designates a new lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15 or (c) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.15(e), (d) any U.S. federal withholding Taxes imposed under FATCA, or (e) with respect to any payment to be made by any Canadian Loan Party hereunder, any taxes under the Canadian Income Tax Act payable by reason of the recipient being a person with whom the Canadian Loan Party does not deal at arm's length for purposes of the Canadian Income Tax Act at the time such payment was made.

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" shall mean the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**FCC Objectives**" shall mean (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding their possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financial Statements**" means the financial statements to be furnished pursuant to Section 5.01.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Satellite**" shall mean the Boeing GEM-F1 (Serial #7984010-103-001) satellite.

"**Flood Insurance Requirements**" shall mean, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) ("**Flood Laws**"), the following documents: (A) a completed standard "life of loan" flood hazard determination form (a "**Flood Determination Form**"), (B) if any improvements to the applicable real property are located in a special flood hazard area, a notification to the Borrower (the "**Borrower Notice**") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("**NFIP**") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice, and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following: the flood insurance policy, the borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Administrative Agent (any of the foregoing being "**Evidence of Flood Insurance**").

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust. In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes, a Foreign Lender shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof , but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof ) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding tax on payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) maintained or contributed to by any Company with respect to employees employed outside the United States (including for greater certainty

any employee benefit plan, program policy or arrangement maintained or contributed to by any Company with respect to employees employed in Canada, other than a Canadian Pension Plan).

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia or Canada or any province or territory thereof.

"**Fortress**" shall mean Fortress Investment Group and its affiliates' funds and/or managed accounts.

"**Fund**" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, Industry Canada and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, from, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article 7 by the Subsidiary Guarantors.

"**Guarantors**" shall mean the Subsidiary Guarantors.

"**Harbinger**" shall mean Harbinger Capital Partners, LLC.

"**Harbinger Entity**" shall mean Harbinger and any Affiliate thereof.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or hazardous or toxic chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" shall mean the orbital performance incentives and liquidated damages that may become due and payable under the Amendment, Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing, as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time so long as such amendment, supplement or other modification makes such contract more favorable to the Loan Parties compared to such contract as in effect on the date hereof.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (h) all Attributable Indebtedness of such person; (i) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (j) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor. For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03.

"**Independent Third Party**" means, with respect to any Lender, any person that is not an Affiliate of such Lender and is an Eligible Assignee.

"**Industry Canada**" shall mean the Canadian federal government Department of Industry or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Initial Lenders**" shall mean Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.

"**Inmarsat Agreement**" shall mean the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among Reorganized LightSquared LP, SkyTerra (Canada) Inc., Reorganized LightSquared Inc. and Inmarsat Global Limited, as in effect on the date hereof, as amended, supplemented or otherwise modified from time to time prior to the date hereof, and as further amended, supplemented or otherwise modified from time to time to the extent permitted herein.

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit P.

"**Intercreditor Agreement**" shall mean the Intercreditor Agreement in substantially the form of Exhibit N dated as of the Closing Date, among the Senior Lien Administrative Agent, as First Lien Representative for the First Lien Credit Agreement Secured Parties (each as defined therein) and the Administrative Agent, as Second Lien Representative for the Junior Lien Credit Agreement Secured Parties (each as defined therein), and each additional representative party

19

thereto from time to time, as amended, supplemented or otherwise modified from time to time as permitted thereunder.

"**Interest Election Request**" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.06.

"**Interest Payment Date**" shall mean (a) the last Business Day of each March, June, September and December to occur during any period in which such Loan is outstanding and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is three months thereafter.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**IPO**" shall mean the first underwritten public offering by the Equity Investors of their respective Equity Interests in the Borrower or any parent entity which owns a majority of the Equity Interests in the Borrower and Controls the Borrower and is formed to facilitate the underwritten public offering after the Closing Date pursuant to a registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act.

"**ITU**" shall mean the International Telecommunication Union, or any successor agency of the United Nations that develops standards and procedures concerning radiocommunication.

"**Joinder Agreement**" shall mean a joinder agreement substantially in the form of Exhibit F.

"**Judgment Currency**" shall have the meaning assigned to such term in Section 2.17.

"**Landlord Access Agreement**" shall mean a Landlord Access Agreement, substantially in the form of Exhibit G, or such other form as may reasonably be acceptable to the Administrative Agent.

"**Lead Arranger**" shall mean J.P. Morgan Securities LLC, in its capacity as sole lead arranger and sole bookrunner hereunder.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lenders**" shall mean (a) the financial institutions listed on Schedule 2.01 hereto and (b) any financial institution that has become a party hereto pursuant to an Assignment and

Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page) on such screen at approximately 11:00 a.m., London time, three Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits in the London interbank market with a maturity comparable to such Interest Period.  In the event that such rate does not appear on such page (or on any successor or substitute page on such screen or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying interest rates for dollar deposits in the London interbank market as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, three Business Days prior to the commencement of such Interest Period.

"**License Subsidiary**" shall mean each single purpose Subsidiary of the Borrower created solely to hold or lease Communications Licenses for one or more of its businesses.  As of the Closing Date, Reorganized LightSquared Subsidiary LLC is the only License Subsidiary (for the avoidance of doubt, License Subsidiary shall not include Reorganized One Dot Six).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or PPSA or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Linked Equity Interests**" shall mean the NewCo Series A-1 Preferred PIK Interests and NewCo Class A Common Interests, in each case issued pursuant to the Plan of Reorganization.

"**Litigation Claims**" shall mean (x) all of the Loan Parties' lawsuits or causes of action (including postpetition causes of action but excluding Avoidance Actions (as defined below)) and proceeds thereof and (y) all proceeds of any of the Loan Parties' avoidance actions or claims arising under chapter 5 of the Bankruptcy Code with respect to the Debtors (the "**Avoidance Actions**").

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Documents, the Intercreditor Agreement, the Commitment Letter and any other instrument or

agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"**Loan Maturity Date**" shall mean the date that is eight years after the Closing Date or, if such date is not a Business Day, the immediately preceding Business Day.

"**Loan Parties**" shall mean the Borrower and the Guarantors.

"**Loans**" shall mean the term loans deemed to be made by the Lenders to the Borrower pursuant to Section 2.01.

"**Make Whole Amount**" shall mean the present value, computed using a discount rate equal to the LIBO Rate for a three month Interest Period plus one-half of one percent (0.50%) as of the date of any payment or prepayment (whether mandatory, voluntary, as a result of an acceleration following an Event of Default or otherwise) of the Loans, of the sum of all required remaining scheduled interest payments due on the principal amount that would have accrued on the aggregate amount through and including the Loan Maturity Date.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on  the business, assets, property, operations or condition, financial or otherwise, or material agreements of the Borrower and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their material obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on a material portion of the Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans) or Hedging Obligations of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $[]. For purposes of determining Material Indebtedness, the "**principal amount**" in respect of any Hedging Obligations of the Borrower or any Subsidiary at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material License**" shall mean, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies.

"**Material Regulatory Request**" shall mean any or all of the following: (a) the License Modification Application (as defined in the General Disclosure Statement to the Plan); (b) the Spectrum Allocation Petition for Rulemaking (as defined in the General Disclosure Statement to the Plan); (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp's lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

"**Maturity Date**" shall mean the earlier of (a) the Loan Maturity Date or if such date is not a Business Day, the Business Day next preceding such date, and (b) the date upon which the Loans shall become due and payable pursuant to Article 8.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.16.

"**Melody Investors**" shall mean Melody Business Finance, LLC, Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC and Tennenbaum Senior Loan Fund IV-B, LP, any Controlled Affiliate of the foregoing and any person that is a participant in Melody Business Finance LLC's investment in the Borrower as of the date hereof that subsequently acquires, in accordance with the provisions hereof, direct ownership of the interest that was subject to the participation and, at the time such person acquires direct ownership of the interest, provides a representation that such persons is an "accredited investors" as defined in Rule 501 under the Securities Act and is not a Disqualified Company.

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean (a) each Real Property identified as a Mortgaged Property on Schedule 7(a) to the Perfection Certificate dated the Closing Date and (b) each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(c).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA to which any of the Companies or any of their respective ERISA Affiliates has, or at any time has ever had, an obligation to contribute.

"**Net Cash Proceeds**" shall mean:

(a)    with respect to any Asset Sale (including any issuance or sale of Equity Interests in subsidiaries of the Borrower), the cash proceeds received (including lease payments or license fees) by the Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by the Borrower or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash

23

Proceeds); (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties sold in such Asset Sale (including the Lien securing the Senior Lien Loans) or any remaining amounts payable to the manufacturer of the assets sold in such Asset Sale and, in each case, (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)    with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of (i) all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event and (ii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties (including the Lien securing the Senior Lien Loans) that are the subject of such Casualty Event (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such Casualty Event) or any remaining amounts payable to the manufacturer of the assets subject to such Casualty Event and, in each case, which is repaid with such proceeds.

(c)    with respect to any Debt Issuance by any Company, the aggregate cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(d)    with respect to any Litigation Claims, the aggregate cash proceeds thereof, net of customary fees, costs and other expenses incurred in connection therewith.

"**Network**" shall mean the Terrestrial wireless broadband network being developed by the Companies as of the Closing Date, which network is intended to provide 4G broadband services in the contiguous United States.

"**New DIP Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**New DIP Facility**" shall mean the loan facility under the New DIP Agreement.

"**NewCo Class A Common Interests**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**NewCo Interest Holders Agreement**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**NewCo Series A-1 Preferred PIK Interests**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**NOAA**" shall mean the National Oceanic and Atmospheric Administration, or any successor agency.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit K.

"**Obligations**" shall mean (a) obligations of the Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium (including any Make Whole Amount), if any, and interest (including PIK Interest, interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning assigned to such term in the definition of "**Embargoed Person**."

"**Offered Loans**" shall have the meaning assigned to such term in Section 10.04(g)(i).

"**Offering Lender**" shall have the meaning assigned to such term in Section 10.04(g)(i).

"**Offering Lender Notice**" shall have the meaning assigned to such term in Section 10.04(g)(ii).

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, one of the Financial Officers, or, in the case of a Canadian Subsidiary, the secretary, each in his or her official (and not individual) capacity.

"**One Dot Six Lease**" shall mean the Lease Purchase Agreement dated as of April 13, 2010, among One Dot Six, as purchaser, TVCC One Six Holdings LLC, as seller, and TVCC Holding Company, LLC (and all rights conveyed thereby to One Dot Six in that certain (a) Long-Term De Facto Transfer Lease Agreement dated as of July 23, 2007, between OP LLC, as lessor, and TVCC One Six Holdings, LLC, as lessee and (b) the Long-Term De Facto Transfer Sublease Agreement dated as of August 13, 2008, between OP LLC, as lessee, and TVCC One Six Holdings, LLC, as lessor), as renewed by One Dot Six on April 2, 2013 and as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time to the extent permitted hereunder.

25

"**One Dot Six Lease Authorization**" shall mean the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000007295, or another FCC consent substantially replicating that initial consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" shall mean the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**One Dot Six TVCC Corp.**" shall mean One Dot Six TVCC Corp., a Delaware corporation and wholly owned Subsidiary of One Dot Six.

"**Organizational Documents**" shall mean, with respect to any person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such person, (e) in the case of the Borrower, the NewCo Interest Holders Agreement and (f) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower or any Subsidiary Guarantor hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Lenders**" shall have the meaning assigned to such term in Section 10.04(g)(i).

"**Other Taxes**" shall mean all present or future stamp or documentary Taxes or any other excise, property, filing or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(b)).

"**Over-Allotment Notice**" shall have the meaning assigned to such term in Section 10.04.

"**Over-Allotment Period**" shall have the meaning assigned to such term in Section 10.04.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(c).

26

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**PCTFA**" shall have the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**."

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit L-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit L-2 or any other form approved by the Administrative Agent.

"**Permitted Collateral Liens**" shall mean (a) in the case of Collateral other than Mortgaged Property, Permitted Liens and (b) in the case of Mortgaged Property, "Permitted Collateral Liens" shall mean the Liens described in clauses (a), (b), (d), (e), (f), (g), (i), (k) and (s) of Section 6.02; *provided*, *however*, on the Closing Date or upon the date of delivery of each Mortgage under Section 5.11 or 5.12, Permitted Collateral Liens shall mean only those Liens set forth in Schedule B to the applicable Mortgage.

"**Permitted Holders**" shall mean Fortress, the Melody Investors, Reorganized LightSquared Inc. (so long as the owners of Reorganized LightSquared Inc. as of the date hereof continue to hold at least a majority of the voting equity of Reorganized LightSquared Inc.) and any person that is an equityholder of Reorganized LightSquared Inc. as of the date hereof any Controlled Investment Affiliates of the foregoing (other than the Borrower and its Subsidiaries) and any other institutional investors (other than Harbinger and its Affiliates) that are approved in advance to become "Permitted Holders" for purposes of this Agreement by the then existing Permitted Holders and, for the avoidance of doubt, no Disqualified Company shall be a Permitted Holder.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Refinancing**" shall mean, with respect to any Indebtedness any modification, refinancing, refunding, renewal or extension of such Indebtedness; *provided*, that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder; (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended (except by virtue of amortization of or prepayment of Indebtedness prior to such date of determination); (c) at the time thereof, no Default or Event of Default shall have occurred and be continuing; (d) the original obligors in respect of such Indebtedness being modified, refinanced, refunded,

27

renewed or extended remain the only obligors thereon; (e) the terms of such modification, refinancing, refunding, renewal or extension shall be, in the aggregate, no less favorable to the Borrower, taken as a whole, than those contained in the Indebtedness being renewed or refinanced or shall be consistent with terms available for similar debt then available; and (f) if such modification, refinancing, refunding, renewal or extension is secured then it may be secured only by liens on assets that secure such debt being refinanced.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.06(a).

"**Plan**" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any Company or with respect to which, the Borrower or any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Plan Confirmation Order**" shall mean the order of the Bankruptcy Court dated [__], 2014 [Docket No. ____] confirming the Plan of Reorganization, as such order may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Lenders.

"**Plan Effective Date**" shall mean the effective date of the Plan of Reorganization

"**Plan of Reorganization**" shall have the meaning assigned to such term in the recitals hereto.

"**PPSA**" shall mean the Personal Property Security Act (Ontario), as amended from time to time, together with all regulations made thereunder; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or (ii) the Civil Code of Quebec, "**PPSA**" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by [__] as its prime rate in effect at its office located at [__]; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Public-Sider**" means any representative of a Lender that does not want to receive material non-public information with the meaning of the federal and state securities laws.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Networks; *provided*, *however*, that (i) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Recognition Order**" shall mean the orders of the Canadian Court dated [__], 2014 recognizing, among other things, the entry of the Plan Confirmation Order and the Cooperation Agreement Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, claims, charges, interests, or other encumbrances other than Permitted Liens, in accordance with applicable law, as such orders may be amended, supplemented or otherwise modified from time to time with prior written consent of the Initial Lenders.

"**Register**" shall have the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganized Debtors**" shall mean the Debtors as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc.**" shall mean LightSquared Inc., as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc. Common Shares**" shall mean those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan of Reorganization, the Plan Confirmation Order, and the Reorganized LightSquared Inc. Shareholders Agreement.

"**Reorganized LightSquared Inc. Loan Agreement**" shall mean that certain $300 million senior secured term loan agreement dated as of [       ], 2014 among Reorganized LightSquared Inc., the lenders from time to time party thereto, and [_____] as administrative agent.

"**Reorganized LightSquared LP**" shall mean LightSquared LP, as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc. Shareholders Agreement**" shall mean that certain shareholders agreement or functionally equivalent document, as applicable, of Reorganized LightSquared Inc. with respect to the Reorganized LightSquared Inc. Common Shares, to be effective on the Plan Effective Date and binding on all holders of the Reorganized LightSquared Inc. Common Shares and holders of other capital stock of Reorganized LightSquared Inc.

"**Reorganized One Dot Six**" shall mean One Dot Six Corp. as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Repricing Transaction**" shall mean any repricing or refinancing through any waiver, consent, amendment or amendment and restatement, in each case, in connection with any waiver, consent, amendment or amendment and restatement to the Loans directed at, or the result of which would be, the lowering of the All-in Yield of the Loans or the incurrence of any Indebtedness having an All-in Yield that is less than the All-in Yield of the Loans (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced.

"**Required Lenders**" shall mean Lenders holding or having more than 50% of the outstanding principal amount of the Voting Interests; *provided* that any Affiliate Lender shall be excluded for the purposes of making a determination of Required Lenders.

"**Requirements of La**w" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law (including, for the avoidance of doubt, FATCA).

"**Respons**e" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**RLS Call Option**" shall have the meaning assigned to such term in the NewCo Interest Holders Agreement.

"**ROFO Acceptance Notice**" shall have the meaning assigned to such term in Section 10.04(g)(iii).

"**ROFO Notice Period**" shall mean the period commencing on the date the Offering Lender first transmits the Offering Lender Notice and ending on the 30th day following the transmission of the Offering Lender Notice.

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Second Satellite**" shall mean the Boeing-GEM-F2 (Serial #7984010-103-002) satellite, together with the related ground-based beam formers and related calibration equipment.

"**Secured Parties**" shall mean, collectively, the Administrative Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Securities Collateral**" shall have the meaning assigned to such term in the U.S. Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement.

"**Security Documents**" shall mean the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, the Mortgages and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as collateral for the Obligations, and all UCC, PPSA

31

or other financing statements or instruments of perfection required by this Agreement, the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, the Intercreditor Agreement, any Mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the U.S. Security Agreement, the Canadian Security Agreement, the U.S. Pledge Agreement, or any Mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Obligations.

"**Senior Lien Credit Agreement**" shall mean the Credit Agreement, dated as of the Closing Date among the Borrower, the Guarantors, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (as may be amended or modified to the extent permitted under Section 6.10).

"**Senior Lien Loan Documents**" shall mean the Loan Documents (as defined in the Senior Lien Credit Agreement).

"**Senior Lien Loans**" shall mean the Loans (as defined in the Senior Lien Credit Agreement).

"**Single Employer Plan**" shall mean any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is covered by Section 4021 of ERISA, and in respect of which the Borrower, any of the Borrower's Subsidiaries or any of their respective ERISA Affiliates is or, if such plan were terminated, would under Section 4069 of ERISA would be, deemed to be an "employer" as defined in Section 3(5) of ERISA.

"**Specified Lenders**" shall mean, collectively, Melody Business Finance, LLC, Fortress Credit Corp. and Reorganized LightSquared Inc.

"**SPSO Note**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Statutory Reserve Rate**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentage shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board

of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (ii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent, and (iii) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon) which is (i) prepared by a surveyor or engineer licensed to perform surveys in the jurisdiction where such Mortgaged Property is located, (ii) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property or any easement, right of way or other interest in the Mortgaged Property has been granted or become effective through operation of law or otherwise with respect to such Mortgaged Property which, in either case, can be depicted on a survey, in which events, as applicable, such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, or after the grant or effectiveness of any such easement, right of way or other interest in the Mortgaged Property, (iii) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent and the Title Company, (iv) complying in all respects with the minimum detail requirements of the American Land Title Association or local equivalent in respect of Real Property not located within the United States as such requirements are in effect on the date of preparation of such survey and (v) sufficient for the Title Company to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue endorsements acceptable to the Administrative Agent.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under or in respect of any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Syndication Agent**" shall have the meaning assigned to such term in the recitals hereto.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tag Along Lender**" shall have the meaning assigned to such term in Section 10.04(h)(i).

"**Tag Along Notice**" shall have the meaning assigned to such term in Section 10.04(h)(ii).

"**Tag Along Offer**" shall have the meaning assigned to such term in Section 10.04(h)(ii).

"**Tag Along Right**" shall have the meaning assigned to such term in Section 10.04(h)(i).

"**Tag Along Trigger Event**" shall mean [___].

"**Title Company**" shall mean any title insurance company as shall be retained by the Borrower and reasonably acceptable to the Administrative Agent.

"**Transaction Documents**" shall mean the Loan Documents, the Plan of Reorganization and any ancillary agreements governing the transactions contemplated by the Plan of Reorganization and the Plan Confirmation Order and the Recognition Order.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Transaction Documents, including (a) the execution, delivery and performance of the Loan Documents and the Borrowings hereunder, (b) the execution, delivery and performance of the Senior Lien Loan Documents and the borrowings thereunder; (c) the execution of the SPSO Note by LightSquared LP; and (d) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Transferring Lender**" shall have the meaning assigned to such term in Section 10.04(h)(i).

"**Treasury Rate**" shall mean a rate equal to the then current yield to maturity on the most actively traded U.S. Treasury security having a duration equal to (or the nearest available tenor) the period from the date that payment is received to the date that falls on the one year anniversary of the Closing Date.

"**Treasury Services Agreement**" shall mean any agreement relating to treasury, depositary and cash management services or automated clearinghouse transfer of funds.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**Unrestricted Cash and Cash Equivalents**" shall mean cash or Cash Equivalents of the Loan Parties that would not appear as "restricted" on a consolidated balance sheet of such Loan Party, which cash and Cash Equivalents are not subject to any Lien, claim or interest (other than Liens arising by operation of law or under the Loan Documents).

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Pledge Agreement**" shall mean the U.S. Pledge Agreement substantially in the form of Exhibit M-3 among the Borrower, Reorganized LightSquared Inc. and Administrative Agent for the benefit of the Secured Parties.

"**U.S. Pledge Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the U.S. Pledge Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**U.S. Security Agreement**" shall mean the U.S. Security Agreement substantially in the form of Exhibit M-1 among the Loan Parties party thereto and Administrative Agent for the benefit of the Secured Parties.

"**U.S. Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the U.S. Security Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**USA PATRIOT Act**" shall have the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**."

"**Voting Interests**" shall mean, at any time, all Commitments and/or Loans then outstanding that are not held by a Harbinger Entity; *provided*, *however*, that any Commitments and/or Loans that are not considered Voting Interests due to such Commitments and/or Loans being held by a Harbinger Entity shall become Voting Interests at the time that such Commitments and/or Loans are assigned by any Harbinger Entity to any person (other than another Harbinger Entity) in accordance with Section 10.04.

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.  Except for purposes of the definitions of "Affiliate Lender" and "Control", any Equity Interests held by Harbinger that cannot be voted for the election of the Board of Directors of the Borrower will not be considered Voting Stock for purposes of this definition so long as these Equity Interests are held by Harbinger.

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  *Terms Generally*.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights (and for the avoidance of doubt any reference solely to "real property" shall not include Communications Licenses) and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

Section 1.03.  *Accounting Terms; GAAP*.

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Required Lenders.

Section 1.04.  *Resolution of Drafting Ambiguities*.

Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.05.  *Permitted Liens*.

Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

ARTICLE 2
THE LOANS

Section 2.01.    *Commitments*.

Subject to the terms and conditions and relying upon the representations and warranties herein set forth, and subject to the terms and conditions in the Plan of Reorganization, (i) each Lender that was a lender immediately prior to the Closing Date under the New DIP Agreement agrees to convert a portion of its Tranche A Loans under the New DIP Agreement into a Loan to the Borrower on the Closing Date in the principal amount equal to its Commitment and (ii) each Lender that was not a lender immediately prior to the Closing Date under the New DIP Agreement agrees in partial exchange for consideration provided to the Borrower pursuant to the Plan of Reorganization to be deemed to have made a Loan to the Borrower on the Closing Date in the principal amount equal to its Commitment.  Amounts paid or prepaid in respect of Loans may not be reborrowed.

Section 2.02.    *Loans*.

(a)        Each Loan shall be deemed made by the Lenders ratably in accordance with their applicable Commitments.

(b)        (i) Each Lender that was a lender immediately prior to the Closing Date under the New DIP Agreement shall be deemed to have made a Loan on the Closing Date in partial exchange for the amount of such Lender's Tranche A Loans under the New DIP Agreement and (ii) each Lender that was not a lender immediately prior to the Closing Date under the New DIP Agreement shall be deemed to have made a Loan on the Closing Date in partial exchange for consideration provided to the Borrower pursuant to the Plan of Reorganization.

Section 2.03.    *[Reserved]*.

Section 2.04.    *Evidence of Debt; Repayment of Loans*.

(a)        *Promise to Repay*. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

(b)        *Lender and Administrative Agent Records*. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect

37

the obligations of the Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)     *Promissory Notes*. Any Lender by written notice to the Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit K. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to such payee and its registered assigns.

Section 2.05.   *Fees.*  The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

Section 2.06.   *Interest on Loans*.

(a)     *Interest*. Subject to the provisions of Section 2.06(b), the Loans shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect from time to time plus the Applicable Margin, payable in kind (the "**PIK Interest**") by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06). All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes.

(b)     *Default Rate*. Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to such Loan as provided in Section 2.06(a) (the "**Default Rate**").

(c)     *Interest Payment Dates*. Accrued interest on each Loan shall be payable in kind in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     *Interest Calculation*. All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)     *Interest Act (Canada)*. For the purposes of the Interest Act (Canada) and disclosure thereunder, in any case in which an interest or fee rate is stated in this Agreement to

be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate to which such interest or fee rate is equivalent is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation.

(f)    *No Criminal Rate of Interest*. If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)    first, by reducing the amount or rate of interest required to be paid to the affected Secured Party; and

(ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

(g)    Each Borrowing initially shall have an initial Interest Period commencing on the date of the initial Borrowing and ending on the numerically corresponding day in the calendar month that is three months thereafter.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.06; *provided* that except as otherwise provided herein, a Loan may be continued or converted only on the last day of an Interest Period for such Loan. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(h)    To make an election pursuant to this Section 2.06, the Borrower shall notify the Administrative Agent of such election by telephone no later than three Business Days prior to the last day of the then current Interest Period.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(i)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)      the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

(j)      If any such Interest Election Request is not timely delivered prior to the last day of the Interest Period applicable to such Borrowing or if any such Interest Election Request does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(k)      Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(l)      *Break Funding Payments*.  In the event of (a) the payment of any principal of any Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance therewith), or (c) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, then, in any such event, the Borrower shall compensate each Lender for the reasonable and documented loss, cost and expense attributable to such event. Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.06(l) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof, absent a good faith dispute.

(m)      *Alternate Interest Rate*.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing, the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period, then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any

40

Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, payable in kind by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06). All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes.  Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Section 2.07.   *Termination of Commitments*.

The Commitments shall automatically terminate on the date, subject to satisfaction of the conditions precedent set forth in Article IV, that the Loans are deemed made hereunder (such date, the "**Closing Date**").

Section 2.08.   *[Reserved]*.

Section 2.09.   *Repayment of Loans*.

The Borrower shall pay to the Administrative Agent, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans, together with accrued and unpaid interest thereon plus any Make Whole Amount.

Section 2.10.   *Optional and Mandatory Prepayments of Loans*.

(a)      *Optional Prepayments*. The Borrower shall have the right at any time (and from time to time) to prepay the Loans, in whole or in part, subject to the requirements of this Section 2.10, including but not limited to payment of the Make Whole Amount; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)      *Debt Issuance*. Immediately following any Debt Issuance by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(c)      *Asset Sales*. Not later than three (3) Business Days following the receipt of any Net Cash Proceeds in excess of $[__] of any Asset Sale by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that no such prepayment shall be required under this Section 2.10(c) with respect to any Asset Sale permitted by Section 6.06(a) and Section 6.06(c).

(d)      *Casualty Events*. Not later than three (3) Business Days following the receipt of any Net Cash Proceeds in excess of $[__] from a Casualty Event by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an

41

aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that so long as no Default shall then exist or arise therefrom, if such proceeds result from a Casualty Event involving (i) the First Satellite or (ii) assets that are being used or are contemplated to be used by the Borrower or any of its Subsidiaries in accordance with the business plan as described to the Lenders prior to the Closing Date, such proceeds shall not be required to be so applied on such date to the extent that the Borrower on or prior to such date requests such proceeds to be used to repair, replace or restore the First Satellite or the assets described in clause (ii) above and does apply such proceeds to such repair or replacement or restoration, as applicable, no later than 12 months following the date of receipt of such proceeds (or such longer period as the Required Lenders shall reasonably agree to).

(e)    *Litigation Claims*.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Litigation Claims contributed to the Borrower, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(f)    *Notice of Prepayment*. The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than (A) 30 days before the date of prepayment, if such prepayment is an optional prepayment pursuant to Section 2.10(a) and (B) 11:00 a.m., New York City time, three Business Days before the date of prepayment, if such prepayment is a mandatory prepayment pursuant to Section 2.10(b), (c), (d) or (e). Each such notice shall be irrevocable; *provided* that a notice of prepayment so delivered, if delivered with respect to the entire outstanding principal amount of the Obligations, may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified prepayment date) if such condition is not satisfied. Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

(g)    *Limitations under Senior Lien Credit Agreement.* Notwithstanding anything in this Section 2.10 to the contrary, the Borrower shall be required to actually make any mandatory prepayment required pursuant to Section 2.10(b), (c), (d) or (e) only to the extent the actual payment of such mandatory prepayment is not then prohibited by the terms of the Senior Lien Credit Agreement and the Intercreditor Agreement. To the extent the terms of the Senior Lien Credit Agreement or the Intercreditor Agreement prohibit the Borrower from actually making any portion of a mandatory prepayment required pursuant to Section 2.10(b), (c), (d) or (e), the Borrower's obligation to pay such portion of such mandatory prepayment shall accrue until such time as Senior Lien Credit Agreement and the Intercreditor Agreement no longer prohibit such payment, at which point the Borrower shall be required to make such payment pursuant to this Section 2.10.

(h)    *Application of Payments; Make Whole Amount*. If the Borrower prepays or repays, for any reason (including at maturity or any voluntary or mandatory prepayment pursuant to this Section 2.10, whether as a result of an acceleration following an Event of Default or otherwise), all or any part of the principal balance of any Loan prior to the Loan Maturity Date,

the Borrower shall pay in addition to such prepayment the Make Whole Amount to the Administrative Agent, for the benefit of all Lenders entitled to a portion of such prepayment or repayment; *provided* that until the third anniversary of the Closing Date the aggregate of the Make Whole Amount required to be paid plus the amount of the Loans prepaid shall not exceed 180% of the original principal amount of the Loans. Each Make Whole Amount payable hereunder shall be fully earned as a fee upon the effectiveness of the Closing Date. Each prepayment of Loans shall be applied ratably and otherwise in accordance with this Section 2.10. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

Section 2.11.   *[Reserved]*.

Section 2.12.   *Yield Protection*.

(a)     *Increased Costs Generally*. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender; or

(ii)     subject any Lender to any Taxes of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for (i) Indemnified Taxes indemnifiable under Section 2.15 and (ii) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes payable by such Lender);

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     *Capital Requirements*. If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)     *Certificates for Reimbursement*. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to the Borrower shall be

conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    *Delay in Requests*. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13.    *[Reserved]*.

Section 2.14.    *Payments Generally; Pro Rata Treatment; Sharing of Setoffs*.

(a)    *Payments Generally*. The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Sections 2.12, 2.15 or 10.03, or otherwise), including any Make Whole Amount, on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at New York City, except that payments pursuant to Sections 2.12, 2.15 or 10.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)    *Pro Rata Treatment*.

(i)    Except as provided in Section 2.10(b), each payment by the Borrower of interest in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.

(ii)    Except as provided in Section 2.10(b), each payment on account of principal of the Loans shall be allocated among the Lenders pro rata based on the principal amount of the Loans held by the Lenders.

44

(c)      *Insufficient Funds*. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(d)      *Sharing of Set-Off*. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans (including all PIK Interest that has been added to the principal amount) and accrued interest thereon or other Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal (including all PIK Interest that has been added to the principal amount) of and accrued interest on their respective Loans and other amounts owing them, *provided* that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e)      *The Borrower Default*. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in

accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.15.   *Taxes*.

(a)      *Payments Free of Taxes*. Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes; *provided* that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)      *Payment of Other Taxes by Loan Parties*. Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)      *Indemnification by Loan Parties*. The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable by, paid by, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis and computation of such payment or liability, shall be conclusive absent manifest error; *provided* that, upon the Borrower's timely written request, the Administrative Agent or Lender may, in its sole discretion, exercised in good faith, after consultation with the Borrower, and at the Borrower's expense, contest the validity, applicability or amount of such Taxes by (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, or (iii) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; *provided* that (y) the Administrative Agent or such Lender will not be required to take any action or continue to pursue an action (or inaction) hereunder which, in its sole discretion, could cause the Administrative Agent or such Lender to

46

suffer any disadvantage, and (z) on written demand from the Administrative Agent or the Lender, as the case may be, the Borrower agrees to pay, and shall timely pay, to the Administrative Agent or such Lender all reasonable costs and expenses that the Administrative Agent or such Lender actually incurs in connection with and reasonably allocable to contesting such claim (including reasonable legal and accounting fees, penalties, interest, and additions to Tax) and any Indemnified Taxes that are paid by the Administrative Agent or the Lender.

(d)    *Evidence of Payments*. As soon as practicable after any payment of Indemnified Taxes (or any Taxes otherwise withheld or deducted from any payments to the Administrative Agent, the Lenders, or any other recipient under the Loan Documents) by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    *Status of Lenders*.  (i)  Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding (including any withholding under FATCA). In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(ii)    Without limiting the generality of the foregoing,

(A)    any Foreign Lender shall, to the extent it may lawfully do so,  deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)    duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)    duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit Q-1, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(iv)    to the extent a Foreign Lender is not the beneficial owner executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W 8ECI, W-8BEN, a certificate in substantially the form of Exhibit Q-2 or Exhibit Q-3, Form W 9, and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit Q-4, on behalf of such direct and indirect partner or

(v)    any other form prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(B)    Each Foreign Lender shall, to the extent it is legally entitled to do so, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in withholding tax or (2) notify Administrative Agent and the Borrower of its legal inability to deliver any such forms, certificates or other evidence.

(C)    Any Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of the Borrower or the Administrative Agent), duly executed and

properly completed copies of Internal Revenue Service Form W-9 certifying that it is not subject to backup withholding.

(D)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    *Treatment of Certain Refunds*. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender or in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes giving rise to such refund had never been imposed in the first instance.

(g)    *Payments*. For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from the Borrower on behalf of such Lender shall be treated as a payment from the Borrower to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrower.

(h)      *Survival*. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

Section 2.16.    *Mitigation Obligations; Replacement of Lenders*.

(a)      *Designation of a Different Lending Office*. If any Lender requests compensation under Section 2.12, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to the Borrower shall be conclusive absent manifest error.

(b)      *Replacement of Lenders*. If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if the Borrower exercises its replacement rights under Section 10.02(d), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04 (including Section 10.04(g)), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)      the Borrower shall have paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans (including all PIK Interest that has been added to the principal amount), accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, assuming for this purpose (in the case of a Lender being replaced pursuant to Section 2.12, 2.15 or 10.02(d)) that the Loans of such Lender were being prepaid) from the assignee (to the extent of such outstanding principal (including all PIK Interest that has been added to the principal amount) and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)      in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Each Lender agrees that, if the Borrower elects to replace such Lender in accordance with this Section 2.16(b), it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

Section 2.17.    *Currency Indemnity*.

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given. For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office in New York, New York. In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency. This indemnity shall constitute a secured obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders (with references to the Companies being references thereto after giving effect to the Transactions unless otherwise expressly stated) that:

Section 3.01.  *Organization; Powers.*

Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

Section 3.02.  *Authorization; Enforceability.*

The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.  *No Conflicts.*

[Except as set forth on Schedule 3.03,][1] the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

---

[1]       Subject to review of Schedule 3.03.

Section 3.04.    *Financial Statements; Projections.*

(a)    *Historical Balance Sheets; Forecasted Cash Flows.* The Borrower has heretofore delivered to the Administrative Agent and the Lenders (i) an unaudited consolidated balance sheet for LightSquared Inc. as of and for the fiscal quarter ending immediately prior to the Closing Date, (ii) the unaudited consolidated monthly operating statements for the twelve fiscal months ending immediately prior to the Closing Date, (iii) the Borrower's most recent consolidated forecasted cash flows in form reasonably acceptable to the Lenders for the four-year period beginning on the Plan Effective Date (set forth on a monthly basis for the first year and on an annual basis thereafter), and (iv) a balance sheet of the Borrower on a consolidated basis after giving pro forma effect to the Transactions.  The balance sheets and information referred to in clauses (i) through (iv) of this Section 3.04(a) have not been prepared in accordance with GAAP.  The financial statements delivered pursuant to Sections 5.01(a) and (b) have been prepared in accordance with GAAP and present fairly and accurately the financial condition and , if applicable, the results of operations and cash flows, of LightSquared Inc. or the Borrower, as applicable, as of the dates and for the periods to which they relate.

(b)    *No Liabilities.* Except as set forth in the financial statements referred to in Section 3.04(a) (or, after the Closing Date, as set forth in the financial statements referred to in Section 5.01), there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents. Since December 31, 2013, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

(c)    *Forecasts.* The forecasts of financial performance of the Borrower and its subsidiaries furnished to the Lenders have been prepared in good faith by the Borrower and based on assumptions believed by the Borrower at the time such forecasts were prepared and delivered to be reasonable.

Section 3.05.    *Properties.*

(a)    *Generally.* Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Collateral Liens and, in the case of all other material property, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)    *Real Property.* Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of each interest in Real Property, other than Canadian Real Property, and each interest in material Canadian Real Property, in each case (i) owned by the Borrower or any of its Subsidiaries as of the date hereof and describes the type of

interest therein held and whether such owned Real Property is leased and if leased whether the underlying Lease contains any option to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by the Borrower or any of its Subsidiaries, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)    *No Casualty Event*. No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property. No Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04. No Mortgage encumbers improved Real Property that is located in an area that has been identified by an authority under the Conservation Authorities Act (Ontario) or similar legislation in any other Canadian jurisdiction as "hazardous lands" or as an area subject to regulation under Section 28 of that Act, unless approval from such authority has been obtained and the conditions of such approval, if any, have been complied with.

(d)    *Collateral*. Each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Loan Party's business as currently conducted. The use by each Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)    *One Dot Six Lease*. Each of the Loan Parties has complied in all material respects with all obligations under the One Dot Six Lease, which is in full force and effect. Reorganized One Dot Six enjoys peaceful and undisturbed possession under the One Dot Six Lease.

Section 3.06.    *Intellectual Property*.

(a)    *Ownership/No Claims*. Each Company owns, or is licensed to use, all patents, trademarks, trade names, service marks, copyrights (and all registrations and applications for registration of any of the foregoing), technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") material to the conduct of its business as currently conducted (as reflected in each Company's written public statements made prior to the date hereof). No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that any Company is infringing, misappropriating or otherwise violating the Intellectual Property rights of any person, nor does any Company know of any valid basis for any such claim that in each case could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. The conduct of

the business of each Company as currently conducted (as reflected in each Company's written public statements made prior to the date hereof) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

(b)     *Registrations*. Except pursuant to licenses and other user agreements entered into by the Borrower and its Subsidiaries in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate, on and as of the date hereof (i) the Borrower or its Subsidiaries, as indicated in Schedule 11(a) or 11(b) to the Perfection Certificate, owns and possesses the right to use, and has not licensed any other person to use, any copyright, patent, trademark or service mark (or any application for registration of any of the foregoing listed in Schedule 11(a) or 11(b) to the Perfection Certificate and (ii) to each Loan Party's knowledge, all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate are valid and in full force and effect.

(c)     *No Violations or Proceedings*. To each Loan Party's knowledge, on and as of the date hereof, there is no material violation by others of any right of the Borrower or its Subsidiaries with respect to any copyright, patent, trademark or service mark listed in Schedule 11(a) or 11(b) to the Perfection Certificate, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

Section 3.07.    *Equity Interests and Subsidiaries; Reorganized LightSquared Inc.*

(a)     *Equity Interests*. Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) all the Subsidiaries of the Borrower and their jurisdictions of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through Wholly Owned Subsidiaries. As of the Closing Date (and except as described in the Plan of Reorganization), all of the Equity Interests of the Borrower are owned directly or indirectly by the Equity Investors. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the U.S. Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created by the U.S. Security Agreement, the Canadian Security Agreement, and the U.S. Pledge Agreement. As of the Closing Date (and except as described in the Plan of Reorganization), there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     *No Consent of Third Parties Required*. No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or second priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the

55

Administrative Agent for the benefit of the Secured Parties under the U.S. Security Agreement, the Canadian Security Agreement, or the U.S. Pledge Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the U.S. Security Agreement, the Canadian Security Agreement, or the U.S. Pledge Agreement or the exercise of remedies in respect thereof, except for such FCC, Industry Canada or CRTC consents as may be required under the Communications Laws in connection with the exercise of such remedies.

(c)     *Organizational Chart*. An accurate organizational chart, showing the ownership structure of the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

(d)     *Inactive Subsidiaries*. Each of LightSquared Finance, Co., LightSquared (UK) Limited and SkyTerra Investors LLC has no assets and conducts no operations.

(e)     *Reorganized LightSquared Inc.* Reorganized LightSquared Inc. shall (i) other than its Equity Interest in the Borrower, have only de minimis assets ancillary to its existence and as contemplated by the Plan of Reorganization and its rights hereunder and under the Reorganized LightSquared Inc. Loan Agreement, and in any event shall have no leases, spectrum or tangible assets and (ii) have no operations, except those incidental to ownership of the assets described in clause (i).

Section 3.08.    *Litigation; Compliance with Laws*.

Except as set forth in Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. No Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

Section 3.09.    *Agreements*.

No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect. No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.09 accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 7(a) or 7(b) to the Perfection Certificate dated the

Closing Date) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

Section 3.10.   *Federal Reserve Regulations.*

No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the U.S. Security Agreement does not violate such regulations.

Section 3.11.   *Investment Company Act.*

No Company is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12.   *Use of Proceeds.*

The Borrower will use the proceeds of the Loans to refinance a portion of the indebtedness under the New DIP Agreement and in exchange for consideration provided to the Borrower by Reorganized LightSquared Inc.

Section 3.13.   *Taxes.*

Each Company has (a) timely filed or caused to be timely filed all material federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP) or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect and (c) satisfied all of its withholding tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Company has made adequate provision (after the Closing Date, in accordance with GAAP) for all material Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Except as could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "**participated**" in a "**listed transaction**" within the meaning of Treasury Regulation Section 1.6011-4.

Section 3.14.   *No Material Misstatements.*

No information, reports, financial statements, certificates, Borrowing Requests, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.15.    *Labor Matters*.

There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, the Canada Labour Code, as amended, or any other applicable Requirements of Law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.16.    *Solvency*.

Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of the Loans and after giving effect to the application of the proceeds of the Loans, (a) the fair value of the properties of the Borrower (on a consolidated basis with its Subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower (on a consolidated basis with its Subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

Section 3.17.    *Employee Benefit Plans*.

With respect to each Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of

ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance could not reasonably be expected to result in a Material Adverse Effect. Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Plan, Single Employer Plan or Multiemployer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by any Company or any of its ERISA Affiliates with respect to any Plan, Single Employer Plan or Multiemployer Plan, except where such liability could not reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates. The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on those assumptions used to fund such plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefit by a material amount. As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material. The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under a Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability could not reasonably be expected to result in a Material Adverse Effect.

To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. Except as could not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred which could reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so could not reasonably be expected to have a

Material Adverse Effect. The Canadian Pension Plans are in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Loan Parties (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect. All contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws, except to the extent that any failure to do so could not reasonably be expected to have a Material Adverse Effect. There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans. None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act.

Section 3.18.   *Environmental Matters*.

(a)   Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(i)   The Companies and their businesses, operations and Real Property have been and are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)   The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)   To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability of or by the Companies under any applicable Environmental Law;

(iv)   There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could reasonably form the basis of such an Environmental Claim; and

(v)    No person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)    Except as set forth in Schedule 3.18:

(i)    No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)    No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)    No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)    The Companies have made available to the Lenders all material records and files in the possession, custody or control of the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.19.    *Insurance*.

Schedule 3.19 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date. All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the Premises, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement. Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.20.  *Security Documents*.

(a)       *U.S. Security Agreement*. The U.S. Security Agreement is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the U.S. Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Administrative Agent of the U.S. Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by each Security Document), the Liens created by the U.S. Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the U.S. Security Agreement Collateral (other than such U.S. Security Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)       *Canadian Security Agreement*. The Canadian Security Agreement is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Canadian Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Administrative Agent of the Canadian Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by each Security Document), the Liens created by the Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Canadian Security Agreement Collateral (other than such Canadian Security Agreement Collateral in which a security interest cannot be perfected under the PPSA as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(c)       *U.S. Pledge Agreement*. The U.S. Pledge Agreement is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the U.S. Pledge Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Administrative Agent of the U.S. Pledge Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by each Security Document), the Liens created by the U.S. Pledge Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the U.S. Pledge Agreement Collateral (other than such U.S. Pledge Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(d)       [Reserved].

62

(e)    *PTO Filing*; Copyright Office Filing. When the U.S. Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Liens created by such U.S. Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in all Patents and Trademarks (each as defined in the U.S. Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the U.S. Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Permitted Collateral Liens.

(f)    *CIPO Filing*. When the Canadian Security Agreement or a short form thereof is filed with CIPO the Liens created by such Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents, Copyrights and Trademarks (as each such term is defined in the Canadian Security Agreement) registered or applied for with CIPO, in each case subject to no Liens other than Permitted Collateral Liens.

(g)    *Valid Liens*. Each Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than the applicable Permitted Collateral Liens.

Section 3.21.    *Intercompany Indebtedness; Affiliate Indebtedness*.

(a)    Except for Indebtedness owed by any Canadian Subsidiary to the Borrower the proceeds of which were used to fund operations, no Company has outstanding any Indebtedness owing to an Affiliate of such Loan Party (except Indebtedness that is permitted under Section 6.01).

(b)    Neither the Borrower nor any of its Subsidiaries is party to or otherwise bound by any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets (except for Indebtedness permitted under Section 6.01, so long as such Indebtedness does not prohibit Liens on the Collateral in favor of the Administrative Agent and the Lenders), or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary.

Section 3.22.   *Anti-Terrorism Laws; Anti-Corruption Laws.*

(a)      No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)      No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**").  No part of the proceeds of the loans will be used, directly or, to the Borrower's knowledge, indirectly for any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(c)      No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.23.   *Communications Licenses and Regulatory Matters.*

(a)      Schedule 3.23(a) accurately and completely lists all Communications Licenses, including a separate designation of Communications Licenses deemed to be Material Licenses as of the date hereof.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies as presently conducted.  All Material Licenses identified on Schedule 3.23(a) are in good standing and in full force and effect and, except for the One Dot Six License, are duly issued in the name of, or validly assigned to, the applicable Company.  One Dot Six has been validly granted the right to use the spectrum covered by the One Dot Six License pursuant to the One Dot Six Lease and the One Dot Six Lease Authorization.

64

(b)      The Companies are in compliance in all material respects with all Communications Laws.  No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.20(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect).  Except as described in Schedule 3.20(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as could not, individually or in the aggregate, have a Material Adverse Effect.

(c)      Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, and remain, true, correct and complete in all material respects.

(d)      Except for any FCC or Industry Canada consents that may be required in connection with any enforcement against any Collateral.  No consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)      Except as provided in Schedule 3.23(b), *provided* that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

Section 3.24.  *License Subsidiaries*.

No License Subsidiary holds any significant assets (other than the Communications Licenses held by it) or material liabilities (other than under the other Loan Documents to which it is a party and any documents related thereto to which it is a party) and other than the License Subsidiaries, Reorganized One Dot Six, and LightSquared Inc. of VA, none of the Companies holds any U.S. authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.

ARTICLE 4
CONDITIONS

Section 4.01.  *Conditions*.

The agreement of each Lender to make the Loans shall be subject to the satisfaction or waiver by each Lender of each of the conditions precedent set forth below.

(a)    *Loan Documents*. All legal matters incident to this Agreement and the other Loan Documents shall be satisfactory to the Lenders and to the Administrative Agent, there shall have been delivered to the Administrative Agent an executed counterpart of each of the Loan Documents and the Perfection Certificate and the Administrative Agent shall have received a complete and correct copy of the Senior Lien Loan Documents and the Loan Documents (as defined in the Reorganized LightSquared Inc. Loan Agreement).

(b)    *Corporate Documents*. The Administrative Agent shall have received:

(i)    a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party organized in the United States) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i));

(ii)    a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority); and

(iii)    such other documents as the Lenders or the Administrative Agent may reasonably request.

(c)    *Officers' Certificate*. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions precedent set forth in this Section 4.01.

(d)    *Financings and Other Transactions, etc.*

(i)    No event of default shall have occurred and be continuing under the New DIP Agreement nor shall the lenders thereunder (or any agent thereof) have commenced the exercise of rights and remedies under the documentation governing the New DIP Facility or Applicable Law.

(ii)    The Administrative Agent and the Lenders shall have received satisfactory evidence, including customary payoff letters, that all debt outstanding under the New DIP Facility has been (x) repaid in full in cash or (y) otherwise satisfied pursuant to the terms of the New DIP Agreement and the Plan of Reorganization.

(iii)    The pro forma capital and ownership structure of the Loan Parties shall be substantially as described in the Plan of Reorganization.

(e)    *Financial Statements; Pro Forma Balance Sheet; Projections*. The Lenders shall have received and shall be satisfied with the form of the information described in Section 3.04 and with the forecasts of the financial performance of the Borrower and its Subsidiaries.

(f)    *Indebtedness and Minority Interests*. After giving effect to the Transactions and the other transactions contemplated hereby and the consummation of the Plan of Reorganization, no Company shall have outstanding any Indebtedness or preferred stock, except as expressly contemplated by the Plan of Reorganization and expressly permitted under the Loan Documents.

(g)    *Opinions of Counsel*. The Administrative Agent shall have received, on behalf of itself, the Administrative Agent, and the Lenders, a favorable written opinion of (i) Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Loan Parties, (ii) Latham & Watkins LLP, FCC counsel for the Loan Parties and (iii) Dentons Canada LLP, Canadian counsel for SkyTerra (Canada) Inc., SkyTerra Holdings (Canada) Inc. and LightSquared Corp. and Canadian radiocommunication and telecommunications regulatory counsel for the Loan Parties and (iv) each local and foreign counsel listed on Schedule 4.01(g), in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent and the Lenders and (C) covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request.

(h)    *Solvency Certificate*. The Administrative Agent shall have received a solvency certificate in the form of Exhibit O, dated the Closing Date and signed by a Financial Officer of the Borrower.

(i)    *Requirements of Law*. The Lenders shall be satisfied that the Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board, and shall have received satisfactory evidence of such compliance reasonably requested by them.

(j)    *Minimum Unrestricted Cash and Cash Equivalents*.  The Loan Parties shall collectively have not less than $[__] in Unrestricted Cash and Cash Equivalents on a pro forma basis after giving effect to the Transactions.

(k)    *Consents*. The Lenders shall be satisfied that after giving effect to the Plan Confirmation Order and the Recognition Order, all requisite Governmental Authorities in all relevant jurisdictions, including, without limitation, the FCC, Industry Canada and any other relevant regulatory agency, and third parties shall have authorized, approved or consented to the Transactions, including as necessary in connection with the transfer, change of control, or assignment of FCC and Industry Canada licenses, (i) all relevant statutory waiting periods shall have expired, no appeals of any such approvals, authorizations or consents shall remain outstanding and (ii) except as set forth in Schedule 3.23(b), there shall be no governmental or judicial action, actual or threatened, in the case of each of (i) and (ii), (A) that has or would have, singly or in the aggregate, a reasonable likelihood of restraining, preventing or imposing burdensome conditions on the Transactions or the other transactions contemplated hereby, (B)

that directly affects the credit facility hereunder or the financial strength of the Loan Parties or (C) that could be reasonably expected to adversely affect the interests of the Administrative Agent or the Lenders, in each case as determined by the Required Lenders in their sole discretion.

(l)    *Senior Lien Financing*.  The Closing Date (as defined in the Senior Lien Credit Agreement) shall have occurred or shall occur substantially concurrently with the Closing Date, and the Borrower shall have received, or substantially simultaneously with the initial borrowing hereunder, shall receive $[1,000,000,000] in aggregate gross proceeds from the proceeds of the Senior Lien Loans, which shall be used (i) to make distributions to creditors of the Borrower and its Subsidiaries in accordance with the Plan of Reorganization, (ii) to pay related fees and expenses related to the Transactions and (iii) for general corporate purposes of the Borrower and its Subsidiaries.

(m)    *Fees*. The Administrative Agent and [__] shall have received all reasonable and documented invoiced fees and other amounts due and payable on or prior to the Closing Date hereunder and pursuant to the Commitment Letter, including, to the extent invoiced, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including the legal fees and expenses of [__]) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(n)    *Personal Property Requirements*. The Administrative Agent shall have received:

(i)    except as specified on Schedule 5.14, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)    [Reserved];

(iii)    except as specified on Schedule 5.14 and subject to Section 5.03(c), all other certificates, agreements, including Control Agreements, or instruments necessary to perfect the Administrative Agent's security interest in all Chattel Paper, all Instruments, all Deposit Accounts and all Investment Property of the Borrower and each Subsidiary Guarantor (as each such term is defined in the U.S. Security Agreement or Canadian Security Agreement, as applicable, and to the extent required by such agreement);

(iv)    UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable, filings with the United States Patent and Trademark Office, United States Copyright Office and CIPO and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Administrative Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents;

(v)    certified copies of UCC, PPSA, Bank Act (Canada), United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches, execution searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in

68

those federal, state, provincial and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Collateral Liens, Liens released on or prior to the Closing Date or any other Liens acceptable to the Administrative Agent); and

(vi)    evidence acceptable to the Administrative Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

(o)    *Insurance*. The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and, in the case of general liability policies, shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent.

(p)    *USA PATRIOT Act*. The Lenders and the Administrative Agent shall have received the information required under Section 10.15 not less than five (5) Business Days prior to the Closing Date provided and to the extent that such information is requested not less than ten (10) Business Days prior to the Closing Date.

(q)    *Plan Confirmation Order, Recognition Order and the Cooperation Agreement Order*. The Plan Confirmation Order and the Recognition Order shall (i) contain provisions approving this Agreement and the Transactions that are satisfactory to the Initial Lenders in their sole discretion, (ii) be consistent with the terms of this Agreement with respect to any terms therein reasonably related to this Agreement and the Transactions.  The Plan Confirmation Order, the Recognition Order and the Cooperation Agreement Order shall (A) be in form and substance satisfactory to the Lenders in their sole discretion, (B) have been entered by the Bankruptcy Court and the Canadian Court, as applicable, and shall be in full force and effect, unstayed, final and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived by the Initial Lenders in writing in their sole discretion; (C) not have been reversed, vacated or revoked; and (D) not have been amended, supplemented or otherwise modified in any manner without the prior written consent of the Initial Lenders.

(r)    *No Amendments to Plan of Reorganization*. The Plan of Reorganization as of [        ], 2014 and the Disclosure Statement as in effect on [        ], 2014 shall not have been amended, modified or supplemented in any manner without the prior written consent of the Initial Lenders.

(s)    *Satisfaction of Conditions Precedent*. (i) All conditions precedent to the effectiveness of the Plan of Reorganization shall have been (or shall be concurrently with the effectiveness of this Agreement) satisfied to the reasonable satisfaction of the Initial Lenders and shall not be waived or modified without the prior written consent of the Initial Lenders, (ii) the

Plan Effective Date shall have occurred on or before the Closing Date and (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan of Reorganization in accordance with its terms shall occur substantially concurrently with the Closing Date.

(t)      *FCC Matters*.  Except as otherwise agreed by the Initial Lenders, the FCC shall have not (i) denied any Material Regulatory Request in writing on material substantive grounds; (ii) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (iii) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

(u)      *License Subsidiaries*.  All licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries.

(v)      *Spectrum Leases*.  All material spectrum leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(w)      *Control Agreements*.  Any deposit or securities accounts maintained by the Borrower or any Subsidiary Guarantor shall be subject to account control agreements.

(x)      *No Material Adverse Effect*.  There shall not have occurred since [__], 2014 any change, circumstance, development or event (and the Initial Lenders shall not have discovered or otherwise become aware of facts or conditions not previously known to them), which the Initial Lenders shall determine has had or could be reasonably expected to have a Material Adverse Effect.

(y)      *No Default*. The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date.

(z)      *Representations and Warranties*. Each of the representations and warranties made by any Loan Party set forth in Article 3 hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(aa)      *No Legal Bar*. No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it. No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(bb)    *Other Agreements*.  Each of the One Dot Six Lease, the Material Licenses and the Inmarsat Agreement shall be in full force and effect and shall not have been terminated; *provided* that the Inmarsat Agreement shall have been amended in a manner acceptable to the Initial Lenders, which amendment shall include an extension of the period for election of spectrum and corresponding deferral of payments in respect thereof acceptable to the Initial Lenders.

Without limiting the generality of the provisions of Article 9, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed or becomes a party to this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

ARTICLE 5
AFFIRMATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of its Subsidiaries to:

Section 5.01.    *Financial Statements, Reports, etc*.

Furnish to the Administrative Agent and each Lender:

(a)    *Annual Reports*. As soon as available and in any event within 90 days after the end of each fiscal year, beginning with the fiscal year ending December 31, 2014 (in the case of the fiscal year ended December 31, 2014, within 120 days after the end of the fiscal year unless the Closing Date occurs after October 31, 2014, in which case within 180 days after the end of the fiscal year), financial statements and a "Management's Discussion and Analysis of Financial Condition and Results of Operations substantially equivalent to that which would be required to be included in an Annual Report on Form 10-K of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-K or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal year reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such year;

(b)    *Quarterly Reports*. As soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the first full fiscal quarter ending after the Closing Date (but not in any event required to be delivered sooner than 180 days after the Closing Date), financial statements and a "Management's Discussion and Analysis of Financial Condition and Results of Operations substantially equivalent to that which would be required to be included in a Quarterly Report on Form 10-Q of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-Q or any successor or comparable forms with the

Securities and Exchange Commission as at the end of and for any fiscal quarter reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such quarter;

(c)    *Financial Officer's Certificate*. (i) Concurrently with any delivery of financial statements under Section 5.01(a) or (b), a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; and (ii) concurrently with any delivery of financial statements under Section 5.01(a) above, beginning with the fiscal year ending December 31, 2014, a report of the accounting firm opining on or certifying such financial statements and, so long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, stating that in the course of its regular audit of the financial statements of the Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge that any Default insofar as it relates to financial or accounting matters has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof;

(d)    *Financial Officer's Certificate Regarding Collateral*. Concurrently with any delivery of financial statements under Section 5.01(a), (i) a certificate of a Financial Officer setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement and (ii) a certificate of a Financial Officer and the chief legal officer of the Borrower certifying that all UCC and PPSA financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(e)    *Organization*. Concurrently with any delivery of financial statements under Section 5.01(a), an accurate organizational chart as required by Section 3.07(c), or confirmation that there are no changes to Schedule 9(a) to the Perfection Certificate;

(f)    *Public Reports*. Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(g)    *Management Letters*. Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

72

(h)      *Budgets*. Within 60 days after the beginning of each fiscal year, a cash-based budget for the Borrower in reasonable detail for (i) each fiscal quarter of such fiscal year and (ii) each fiscal year thereafter, through and including the fiscal year in which the Loan Maturity Date occurs, prepared in summary form, in each case, with appropriate presentation and discussion of the principal assumptions upon which such budgets are based, accompanied by the statement of a Financial Officer of the Borrower to the effect that the budget of the Borrower is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such budget;

(i)      *Organizational Documents*. Promptly provide copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within 15 days after such Company gives or receives such notice; and

(j)      *Other Information*. Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Section 5.02.    *Litigation and Other Notices*.

Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five Business Days of the occurrence thereof):

(a)      any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to be materially adverse to such Company or Affiliate or (ii) with respect to any Loan Document;

(c)      any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)      the occurrence of a Casualty Event;

(e)      the occurrence of a Change in Control; and

(f)      the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease, the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with any Material License, the One Dot Six Lease, and/or the Inmarsat Agreement,

(iii) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, Industry Canada, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (iv) any material correspondence with the FCC or Industry Canada; *provided* that in relation to the notices required to be delivered under this Section 5.02(f), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.23(b) attached hereto.

Section 5.03.    *Existence; Businesses and Properties*.

(a)    Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Notwithstanding anything to the contrary contained in this Section 5.03, any of the Borrower and the Subsidiary Guarantors may change its partnership, corporate or other existence to another form of existence so long as the perfection and priority of the Liens of the Administrative Agent created by the Security Documents are not adversely affected.

(b)    Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, service marks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent (i) sales of property, consolidations, amalgamations or mergers by or involving any Company in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License) trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable, or (iv) the relinquishment of spectrum rights as contemplated by Schedule 6.06(g).

74

(c)      Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred upon the Companies thereunder), the One Dot Six Lease and the Inmarsat Agreement; *provided* that the Borrowers may take actions required in furtherance of the objective underlying any Material Regulatory Request.

(d)      From the Closing Date, the Borrower shall ensure that any deposit or securities accounts maintained by it or any Subsidiary Guarantors shall be subject to account control agreements.

Section 5.04.   *Insurance.*

(a)      *Generally.* Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to Mortgaged Properties and other properties material to the business of the Companies against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations.

(b)      *Requirements of Insurance.* All such insurance, except for insurance with respect to property subject to a Lien permitted under Section 6.02(i), shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days (or 15 days in the case of satellite insurance) after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as mortgagee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable and (iii) be reasonably satisfactory in all other respects to the Administrative Agent.

(c)      *Notice to Administrative Agent.* Notify the Administrative Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.04 is taken out by any Company; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies.

(d)      *Flood Insurance.* With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)      *Broker's Report.* Deliver to the Administrative Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent may from time to time reasonably request.

Section 5.05.   *Obligations and Taxes.*

(a)    *Payment of Obligations*. Pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and (i) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)    *Filing of Returns*. Timely and correctly file all material Tax Returns required to be filed by it. Withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

Section 5.06.    *Employee Benefits*.

Comply in all material respects with the applicable provisions of ERISA and the Code (and any Requirements of Law applicable to any Foreign Plan or Canadian Pension Plan) and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know that, (i) any ERISA Event or similar event with respect to a Foreign Plan or Canadian Pension Plan has occurred, (ii) the imposition of a Lien with respect to any Plan, a Single Employer Plan, Canadian Pension Plan or a Multiemployer Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan or Canadian Pension Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan or Canadian Pension Plan if such amendment results in a material increase in benefits or unfunded liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan,  Single Employer Plan or Canadian Pension Plan, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event or Canadian Plan Event and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as practicable following any request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Single Employer Plan or each annual information report for any Canadian Pension Plan; (ii) the most recent actuarial valuation report for each Plan, Canadian Pension Plan, Single Employer Plan and Multiemployer Plan; (iii) all notices received by any Company or any of its ERISA Affiliate from a Canadian Pension Plan or Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event or Canadian Pension Plan; (iv) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Plan or Canadian Pension Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent shall reasonably request and (z) as soon as practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any

76

Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; *provided* that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

Section 5.07.   *Maintaining Records; Access to Properties and Inspections; Annual Meetings.*

(a)     Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. The Borrower and each of its Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants).

(b)     Within 120 days after the end of each fiscal year of the Companies, at the request of the Administrative Agent or Required Lenders, hold a meeting (at a mutually agreeable time) by conference call (the costs of such call to be paid by the Borrower) with all Lenders who choose to attend such meeting, at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of the Companies and the budgets presented for the current fiscal year of the Companies.

Section 5.08.   *Use of Proceeds.*

Use the proceeds of the Loans only for the purposes set forth in Section 3.12.

Section 5.09.   *Compliance with Laws; Compliance with Environmental Laws; Environmental Reports.*

(a)     Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Comply, and undertake all commercially reasonable efforts to cause all of its employees occupying Real Property owned, operated or leased by the Borrower or any of its Subsidiaries to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, undertake, obtain, renew or conduct individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; *provided* that no Company shall

be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10.  *Compliance with Communications Laws and ITU Rules and Regulations.*

(a)      Comply with all applicable Communications Laws and the terms and conditions of any Communications Licenses and the One Dot Six Lease, including but not limited to requirements applicable to the Companies pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Diligently prosecute all of the Material Regulatory Requests.

(c)      Comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except for instances of non-compliance with applicable Requirements of Law which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.11.  *Additional Collateral; Additional Guarantors.*

(a)      Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Administrative Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent shall deem necessary or advisable to grant the Administrative Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Collateral Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. The Borrower shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall require to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties.

(b)      With respect to any person that is or becomes a Subsidiary after the Closing Date or if any applicable Subsidiary ceases to be an inactive Subsidiary as set forth in Section 3.07(d), promptly (and in any event within 30 days after such person becomes a Subsidiary or ceases to be an inactive Subsidiary) (i) deliver to the Administrative Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to the Borrower or any Subsidiary Guarantor together with instruments of transfer executed and delivered in blank by a duly authorized officer of the Borrower or such Subsidiary Guarantor and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the

U.S. Security Agreement or Canadian Security Agreement, as applicable, substantially in the form annexed thereto or, in the case of a Foreign Subsidiary, execute a security agreement compatible with the laws of such Foreign Subsidiary's jurisdiction in form and substance reasonably satisfactory to the Administrative Agent, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent to cause the Lien created by the U.S. Security Agreement or Canadian Security Agreement, as applicable, to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. Notwithstanding the foregoing, (1) the Equity Interests required to be delivered to the Administrative Agent pursuant to clause (i) of this Section 5.11(b) shall not include any Equity Interests of a Foreign Subsidiary created or acquired after the Closing Date and (2) no Foreign Subsidiary shall be required to take the actions specified in clause (ii) of this Section 5.11(b), if, in the case of either clause (1) or (2), doing so would constitute an investment of earnings in United States property under Section 956 (or a successor provision) of the Code, which investment would or could reasonably be expected to trigger a material increase in the net income of a United States shareholder of such Subsidiary pursuant to Section 951 (or a successor provision) of the Code, as reasonably determined by the Borrower; *provided* that this exception shall not apply to (A) Voting Stock of any Subsidiary which is a first-tier controlled foreign corporation (as defined in Section 957(a) of the Code) representing 66% of the total voting power of all outstanding Voting Stock of such Subsidiary and (B) 100% of the Equity Interests not constituting Voting Stock of any such Subsidiary, except that any such Equity Interests constituting "stock entitled to vote" within the meaning of Treasury Regulation Section 1.956-2(c)(2) shall be treated as Voting Stock for purposes of this Section 5.11(b).  For purposes of the preceding sentence, "Foreign Subsidiary" includes any subsidiary organized under the laws of Canada or any province or territory thereof.

(c)     Promptly grant to the Administrative Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on each Real Property owned in fee by the Borrower or any Subsidiary Guarantor as is acquired by the Borrower or such Subsidiary Guarantor after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $[___], as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 6.02). Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and shall constitute valid and enforceable perfected Liens subject only to Permitted Collateral Liens or other Liens acceptable to the Administrative Agent. The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. The Borrower or such Subsidiary Guarantor shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including a title policy, a Survey, where customary, a local counsel opinion (each in form and substance reasonably satisfactory to the Administrative Agent) and such documentation as is required by the Flood Insurance Requirements in respect of such Mortgage).

(d)    Upon the acquisition of any leased Real Property similar in size or type to the leased Real Property described in paragraph 1 of Schedule 5.14, use commercially reasonable efforts to provide to the Administrative Agent a Landlord Access Agreement in respect of such leased Real Property.

Section 5.12.    *Security Interests; Further Assurances.*

Promptly, upon the reasonable request of the Administrative Agent or any Lender, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Security Document, or obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent as the Administrative Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may reasonably require. If the Administrative Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of the Borrower or any Subsidiary Guarantor constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance satisfactory to the Administrative Agent.

Section 5.13.    *Information Regarding Collateral.*

Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

Section 5.14.   *Post-Closing Collateral Matters*.

Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule.

Section 5.15.   *License Subsidiaries*.

Hold and retain all Material Licenses issued by the FCC to any Company, and cause each Material License issued by the FCC and acquired by any Company after the date hereof to be held and retained, in one or more License Subsidiaries.

ARTICLE 6
NEGATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will not, nor will it cause or permit any Subsidiaries to:

Section 6.01.   *Indebtedness*.

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except

(a)      Indebtedness incurred under this Agreement and the other Loan Documents;

(b)      (i) Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b) and (ii) Permitted Refinancings thereof;

(c)      Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

(d)      [Indebtedness permitted by Section 6.04(d) and Section 6.04(e)];

(e)      Indebtedness of the Borrower in respect of Purchase Money Obligations, Capital Lease Obligations, and renewals and Permitted Refinancings thereof; *provided* that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(e) outstanding at any time shall not exceed $[__];

(f)      subject to the Intercreditor Agreement, Indebtedness in an aggregate original principal amount not to exceed $[500] million outstanding at any time; *provided* that (a) each Lender shall have the right (but not the obligation) to provide its pro rata share (based on such Lender's principal amount of Loans) of such Indebtedness; *provided*, *however*, that in the event that any Lender declines to provide its full pro rata share of such Indebtedness, the unfunded portion of such Lender's pro rata share (the "**Declined Amount**") shall be provided by the other Lenders on a pro rata basis; *provided*, *further* that in the event that any Lender has elected not to provide its pro rata share of the Declined Amount, such share of the Declined Amount may be

81

provided by any Independent Third Party reasonably acceptable to the Required Lenders; (b) the definitive documentation governing such Indebtedness shall contain terms no less favorable to the Companies than those of the Loan Documents; (c) no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(f); (d) the proceeds of which shall be used for the Companies' working capital purposes and/or capital expenditures; (e) such Indebtedness shall be secured by a Lien on the Collateral that is permitted by Section 6.02(h), which Lien shall not extend to any assets of the Borrower or any Subsidiary thereof that do not constitute Collateral; and (f) the definitive documentation governing such Indebtedness shall permit the incurrence and existence of the Obligations, including the accretion of PIK Interest.

(g)    Indebtedness and obligations of any Company in respect of letters of credit and bank guarantees, including without limitation, letters of credit in respect of bid, performance or surety bonds, workers' compensation claims, health, disability or other benefits to former employees or their families or property, casualty or liability or self-insurance obligations and completion guarantees and bankers acceptances issued for the account of any Company in the ordinary course of business, *provided* that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(g) outstanding at any time shall not exceed $[__];

(h)    Contingent Obligations of any Loan Party in respect of Indebtedness of any other Loan Party otherwise permitted under this Section 6.01;

(i)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(j)    Indebtedness representing the financing of installments of insurance premiums;

(k)    (i) Indebtedness arising under the Senior Lien Loan Documents (including any incremental loans thereunder) and Permitted Refinancings thereof in an aggregate original principal amount not to exceed $[1,500,000,000], less any principal prepayments thereof and (ii) Indebtedness arising under the SPSO Note in an aggregate principal amount not to exceed $[__] and Permitted Refinancings thereof that comply with Section 6.10(b); *provided* that (a) notwithstanding any other provision herein to the contrary, no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(k) and (b) the definitive documentation governing such Indebtedness shall permit the incurrence and existence of the Obligations, including the accretion of PIK Interest;

(l)    Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business; and

(m)    other unsecured Indebtedness in an aggregate principal amount outstanding at any time not to exceed $[__].

Section 6.02.  *Liens*.

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)    Liens in respect of property of the Borrower or any Subsidiary imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(c)    any Lien in existence on the Closing Date and set forth on Schedule 6.02(c) and any Lien granted as a replacement or substitute therefor; provided that any such replacement or substitute Lien (i) does not secure an aggregate amount of Indebtedness, if any, greater than that secured on the Closing Date except as permitted pursuant to a Permitted Refinancing and (ii) does not encumber any property other than the property subject thereto on the Closing Date (any such Lien, an "**Existing Lien**");

(d)    easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Borrower or its Subsidiaries at such Real Property;

(e)    Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)    Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeals bonds, letters of credit, statutory bonds, bids, leases, government contracts, trade contracts, deposits as security

83

for contested taxes or import duties or for the payment of rent, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x), (y) and (z) of this paragraph (f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(g)    Leases and subleases of Real Property if the Borrower or any Subsidiary granted by such Company to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(h)    Liens on Collateral securing Indebtedness permitted by Section 6.01(f); *provided* that the agent or representative under such Indebtedness has become a party to the Intercreditor Agreement and has agreed to subordinate such Liens on the Collateral securing the Senior Lien Loans (it being understood that such Liens may be senior to the Liens under the Loan Documents);

(i)    Liens securing Indebtedness incurred pursuant to Section 6.01(e);

(j)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)    Liens granted pursuant to the Security Documents to secure the Obligations;

(l)    non-exclusive licenses of Intellectual Property granted by the Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Borrower and its Subsidiaries;

(m)    the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(n)    Liens on the Second Satellite securing the Incentive Payments;

(o)    Liens securing Indebtedness incurred pursuant to Section 6.01(k)(i); *provided* that (x) such Liens do not extend to any assets that are not Collateral and (y) such Liens are subject to the terms of the Intercreditor Agreement;

(p)    [reserved];

(q)    [reserved];

(r)    Liens existing with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary securing cash management obligations not in excess of $[__] in the aggregate; and

(s)    Liens not otherwise permitted by this Section 6.02 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $[__] in the aggregate;

*provided*, *however*, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens permitted under Section 6.02(h), (k) and (o).

Section 6.03.    *Sale and Leaseback Transactions.*

Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

Section 6.04.    *Investments, Loan, Advances and Acquisition.*

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person (other than to customers in the ordinary course of business), or purchase or acquire any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)    the Borrower and its Subsidiaries may consummate the Transactions and the Plan of Reorganization in accordance with the provisions of the Transaction Documents;

(b)    Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(c)    the Borrower and its Subsidiaries may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(d)    Investments made by the Borrower in any Subsidiary Guarantor and by any Subsidiary Guarantor in the Borrower or any other Subsidiary Guarantor;

(e)    [Investments by the Borrower or any Canadian Subsidiary which is a Guarantor in any Canadian Subsidiary that is a Guarantor in the form of a loan or advance for purposes of funding their operations in the ordinary course provided that such loan or advance shall be evidenced by an Intercompany Note, in either case pledged by such party as Collateral pursuant to the Security Documents];

(f)    Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(g)    mergers, amalgamations and consolidations in compliance with Section 6.05 (other than Section 6.05(b));

(h)    Investments made by the Borrower or any Subsidiary received in connection with an Asset Sale made in compliance with Section 6.06;

(i)    Capital Expenditures made by the Borrower or any Subsidiary as would otherwise be permitted under Section 6.15;

(j)    purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business;

(k)    leases of real or personal property in the ordinary course of business and in accordance with the Security Documents;

(l)    [Investments necessary to satisfy any condition imposed by the FCC in connection with relief granted in response to a Material Regulatory Request or substantively similar request];

(m)    Investments in Subsidiaries that are not organized in the United States or any state thereof or the District of Columbia in an amount outstanding not to exceed $[__] in the aggregate since the Closing Date;

(n)    [reserved];

(o)    Investments consisting of nonexclusive licensing of intellectual property pursuant to joint marketing arrangements with other persons, for which license or contribution the Borrower and the Subsidiary Guarantors receives fair market value;

(p)    Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(q)    Investments in loans or advances to employees made in the ordinary course of business consistent with past practices of the Borrower or such Subsidiary Guarantor not to exceed $[__] at any time outstanding;

86

(r)       other Investments in an aggregate amount not to exceed $[__] since the Closing Date; and

(s)       Investments consistent with the Borrower's business plan as described to the Lenders prior to the Closing Date and made using proceeds of Indebtedness incurred pursuant to Section 6.01(f) or the issuance of Qualified Capital Stock by the Borrower.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment to the Borrower or any Subsidiary Guarantor.

Section 6.05.    *Mergers and Consolidations*.

Wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution) or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), except that the following shall be permitted:

(a)       Asset Sales in compliance with Section 6.06;

(b)       acquisitions in compliance with Section 6.04;

(c)       any Company may merge, amalgamate or consolidate with or into the Borrower or any Subsidiary Guarantor (as long as the Borrower is the surviving person in the case of any merger or consolidation involving the Borrower and a Subsidiary Guarantor is the surviving person and remains a Wholly Owned Subsidiary of the Borrower in any other case); *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Administrative Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable;

(d)       any Subsidiary may dissolve, liquidate or wind up its affairs at any time; provided that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect; and

(e)       any Subsidiary that is not a Guarantor may merge or consolidate with or into another Subsidiary that is not a Guarantor.

Section 6.06.    *Asset Sales*.

Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)       (i) disposition of used, worn out, obsolete or surplus property by the Borrower or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Borrower and its Subsidiaries taken as a whole and (ii) Asset Sales (or a series of Asset Sales) for fair market value, the Net Cash Proceeds of which are less than $[__];

(b)    Asset Sales at fair market value; *provided* that (i) at the time of such Asset Sale, no Default shall exist or would result from such Asset Sale, (ii) the aggregate fair market value of assets disposed in respect of all Asset Sales pursuant to this clause (b) shall not exceed $[__] in any four consecutive fiscal quarters of the Borrower and (iii) the purchase price for all property subject to such Asset Sale shall be paid to the Borrower or such Subsidiary solely in cash and Cash Equivalents;

(c)    Asset Sale of the Second Satellite at fair market value, which shall be paid for in cash; *provided* that such sale is in compliance with all Communications Laws; *provided*, *further* that the consideration paid to the Borrower with respect to the sale of the Second Satellite may be set off against the amount owing to Boeing by a Subsidiary of the Borrower;

(d)    [reserved];

(e)    the licensing or sublicensing of Intellectual Property; *provided*, *however*, that such licensing or sublicensing shall not interfere in any material respect with the Borrower's continued use of such Intellectual Property in its business;

(f)    to the extent constituting an Asset Sale, the creation of a Lien permitted by Section 6.02 (but not any Asset Sale of the property subject to such Lien);

(g)    Asset Sales described in Schedule 6.06(g)[2];

(h)    [reserved];

(i)    [reserved];

(j)    [Asset Sales pursuant to the agreements outstanding on the date hereof and set forth on Schedule 6.06(i)[3] attached hereto];

(k)    leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(l)    [reserved]; and

(m)    to the extent constituting Asset Sales, mergers, consolidations and amalgamations in compliance with Section 6.05 (other than Section 6.05(a)).

For the avoidance of doubt, nothing in this Section 6.06 (or any other provision of this Agreement) will permit directly or indirectly the Asset Sale of any spectrum associated with any Material License (including spectrum rights acquired pursuant to the Inmarsat Agreement) or the First Satellite. To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 6.06 with respect to the sale of any Collateral, or any Collateral is sold

---

[2]    NTD: Schedule to include Asset Sales required to satisfy conditions imposed in response to a Material Regulatory Request.

[3]    NTD:  Subject to review of Schedule 6.06(i).

as permitted by this Section 6.06, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the Security Documents, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Section 6.06, the Administrative Agent shall take all actions it deems appropriate in order to effect the foregoing.

Section 6.07.   *Dividends*.

Authorize, declare or pay, directly or indirectly, any Dividends with respect to the Borrower or any of its Subsidiaries, except that the following shall be permitted:

(a)    Dividends by any Company to the Borrower or any Guarantor that is a Wholly Owned Subsidiary of the Borrower; and

(b)    so long as no Default or Event of Default then exists (or would result therefrom), other Dividends, in an amount not to exceed $[__] in the aggregate from and after the Closing Date.

Section 6.08.   *Transactions with Affiliates*.

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Borrower and one or more Subsidiary Guarantors or among Subsidiary Guarantors), other than any transaction or series of related transactions on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)    Dividends permitted by Section 6.07;

(b)    [reserved];

(c)    Asset Sales at fair market value permitted by Section 6.06;

(d)    reasonable and customary director, officer and employee compensation (including bonuses) , retention arrangements, and other benefits (including retirement, health and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of the Borrower;

(e)    the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organizational Document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date, and which has been disclosed to the Lenders in writing as in effect on the Closing Date, and similar agreements that it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by any Loan Party of obligations under, any amendment to any such existing agreement or any such similar agreement entered into after the Closing Date shall only be permitted by this Section

6.08(e) to the extent not more adverse to the interest of the Lenders in any material respect, when taken as a whole, than any of such documents and agreements as in effect on the Closing Date;

(f)    [reserved];

(g)    [reserved];

(h)    (i) any issuance or sale of securities permitted under Section 6.12, and (ii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of the Borrower;

(i)    loans or advances to employees in the ordinary course of business in accordance with the past practices of the Borrower or the Subsidiary Guarantors, but in any event not to exceed $[__] in the aggregate outstanding at any one time;

(j)    the payment of reasonable and customary fees to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Borrower or the Subsidiary Guarantors;

(k)    the repayment on the Closing Date of amounts advanced to the Borrower by certain members of the Borrower prior to the Closing Date for purposes of paying certain fees and expenses relating to the formation of the Borrower, in an amount not to exceed $[     ]; and

(l)    the Transactions and Plan of Reorganization as contemplated by the Transaction Documents.

Section 6.09.   *[Reserved]*.

Section 6.10.   *Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc.*

Directly or indirectly:

(a)    make (or give any notice in respect thereof) any payment or prepayment of principal on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness incurred pursuant to Section 6.01(e), except (i) any payment of principal at scheduled maturity, (ii) any repayment of such Indebtedness with the proceeds of a Permitted Refinancing thereof, or (iii) with additional Indebtedness permitted under Section 6.01(e) with proceeds of an Asset Sale or Casualty Event with respect to property subject to a Lien securing such Indebtedness;

(b)    (i) amend or modify, or permit the amendment or modification of, any provision of any Senior Lien Loan Document or the definitive documentation governing the Indebtedness permitted to be incurred under Section 6.01(f), in each case in violation of the Intercreditor Agreement, (ii) amend or modify, or permit the amendment or modification of the One Dot Six Lease or the SPSO Note in any manner that is materially adverse to the interests of the Lenders or that would make such agreements more restrictive to any Loan Party in any respect, (iii)

90

amend or modify, or permit the amendment or modification of, any provision of any document governing any other Material Indebtedness in any manner that is materially adverse to the interests of the Lenders unless in the case of any Material Indebtedness, such Indebtedness, as amended or modified, would be permitted to be incurred as Indebtedness under Section 6.01 at the time of such amendment or modification or (iv) amend or modify, or permit the amendment or modification of, any provision of the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order in any manner without the prior written consent of the Initial Lenders; or

(c)      (i) terminate, amend or modify any of its Organizational Documents (including (x) by the filing or modification of any certificate of designation and (y) any election to treat any Pledged Securities (as defined in the U.S. Security Agreement or Canadian Security Agreement, as applicable) as a "security" under Section 8-103 of the UCC or under the Securities Transfer Act (Ontario), as applicable, other than concurrently with the delivery of certificates representing such Pledged Securities to the Administrative Agent) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such amendments or modifications or such new agreements which are (x) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.05 or (y) not adverse in any material respect to the interests of the Lenders or (ii) amend or modify, or permit any amendment or modification of, any of its Organizational Documents or any agreement to which it is a party with respect to its Equity Interests to permit Harbinger to vote for the Board of Directors of the Borrower.

Section 6.11.   *Limitation on Certain Restrictions on Subsidiaries.*

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or a Subsidiary, (b) make loans or advances to the Borrower or any Subsidiary or (c) transfer any of its properties to the Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale; (vii) any agreement in effect at the time such Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of the Borrower; (viii) without affecting the Loan Parties' obligations under Section 5.11, customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or

landlords under contracts entered into in the ordinary course of business; (x) in the case of any joint venture which is not a Loan Party in respect of any matters referred to in clauses (b) and (c) above, restrictions in such person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity; or (xi) any encumbrances or restrictions imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (vii) above; provided that such amendments or refinancings are no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

Section 6.12. *Limitation on Issuance of Capital Stock*.

Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) issuances by the Borrower of common stock or Qualified Capital Stock; *provided* such issuance does not constitute a Change in Control, (ii) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of the Borrower or any Subsidiaries in any class of the Equity Interest of such Subsidiary; (iii) Subsidiaries of the Borrower formed after the Closing Date in accordance with Section 6.13 may issue Equity Interests to the Borrower or the Subsidiary of the Borrower which is to own such Equity Interests; and (iv) issuances of Equity Interests pursuant to the Plan of Reorganization and the Plan Confirmation Order. All Equity Interests issued in accordance with this Section 6.12 shall, to the extent required by Sections 5.11 and 5.12 or any Security Document, be delivered to the Administrative Agent as Pledged Collateral.

Section 6.13. *Limitation on Creation of Subsidiaries*.

Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders; *provided* that, without such consent, the Borrower may (i) establish or create one or more Wholly Owned Subsidiaries of the Borrower or (ii) establish, create or acquire one or more Subsidiaries in connection with an Investment made pursuant to Section 6.04.

Section 6.14. *Business*.

(a)      [Reserved].

(b)      With respect to the Borrower and the Subsidiaries, engage (directly or indirectly) in any material respect in any business other than those businesses in which the Borrower and its Subsidiaries are engaged in or contemplated to be engaged in on the Closing Date.

Section 6.15. *Capital Expenditure*.

Make any Capital Expenditure in excess of $[_____] on or prior to the Loan Maturity Date.

Section 6.16. *Fiscal Year*.

Change its fiscal year-end to a date other than December 31.

Section 6.17.  *No Further Negative Pledge.*

Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of the Borrower or any Subsidiary Guarantor to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement and the other Transaction Documents, and indebtedness issued under Sections 6.01(k) and/or (f); (2) covenants in documents creating Liens permitted by Sections 6.02(c), (h), (i), (k), (n), (o) and (r) prohibiting further Liens on the properties encumbered thereby; (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; or (4) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale, (c) restricts subletting or assignment of leasehold interests contained in any Lease governing a leasehold interest of the Borrower or a Subsidiary, (d) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (3) or (5)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

Section 6.18.  *Compliance with Anti-Terrorism Laws.*

(a)    Directly or indirectly, in connection with the Loans, knowingly (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)    Directly or indirectly, in connection with the Loans, knowingly cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Anti-Terrorism Law.

(c)    Knowingly cause or permit (i) an Embargoed Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties in violation of any Anti-Terrorism Law or any other applicable law, (ii) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or

indirectly by, an Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law or (iii) any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(d)    The Borrower shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming its compliance with this Section 6.18.

Section 6.19.    *Canadian Pension Plans.*

(a)    Terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan which could reasonably be expected to result in any material liability of a Loan Party.

(b)    Fail to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any agreement relating thereto or applicable Requirements of Law, the Borrower or any other Loan Party is required to pay as contributions thereto, except where the failure to make such payments could not reasonably be expected to have a Material Adverse Effect.

(c)    Permit to exist any accumulated funding deficiency, whether or not waived, with respect to any Canadian Pension Plan in an amount which could reasonably be expected to have a Material Adverse Effect.

(d)    Contribute to or assume an obligation to contribute to, or permit any other Loan Party to contribute to or assume an obligation to contribute to, any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario).

(e)    Acquire, or permit any other Loan Party to acquire, an interest in any Person if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to any "multi-employer pension plan" as such term is defined in the Pension Benefits Act (Ontario); provided that, any Loan Party may acquire an interest in any such Person if such Person is acquired as a Permitted Acquisition and no Loan Party has any legal liability to perform such Person's obligations or assume such Person's liabilities.

(f)    Permit, or allow any other Loan Party to permit, the actuarial present value of the benefit liabilities (computed on an accumulated benefit obligation basis in accordance with GAAP and/or Canadian GAAP) under all Canadian Pension Plans in the aggregate to exceed the current value of the assets of all Canadian Pension Plans in the aggregate that are allocable to such benefit liabilities, in each case only to the extent such liabilities and assets relate to benefits to be paid to employees of the Loan Parties, by an amount that could reasonably be expected to cause a Material Adverse Effect.

Section 6.20.    *Permitted Activities of License Subsidiaries.*

With respect to any License Subsidiary, (a) incur, directly or indirectly, any Indebtedness other than the Indebtedness under this Agreement and the other Loan Documents; (b) create, or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Security Documents to which it is a party; (c) engage in any business or activity or own any assets other than (i) holding the Communications Licenses, (ii) performing its obligations and activities incidental thereto under the Loan Documents and (iii) in the case of One Dot Six, managing the One Dot Six Lease, the One Dot Six Lease Authorization, the One Dot Six License and the associated terrestrial network; (d) consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets to, any Person other than a License Subsidiary and in accordance the other provisions of this Agreement; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries other than to a License Subsidiary and in accordance with the other provisions of this Agreement; (f) create or acquire any Subsidiary or make or own any Investment in any Person; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

Section 6.21.  *Communications Licenses*.

(a)     Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease in all material respects.  No Company shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial.  No Company shall take any action that reasonably could be expected to cause a Governmental Authority to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of any Material License or the One Dot Six Lease, or take or permit to be taken any other action within its control that reasonably could be expected to result in non-compliance with the requirements of Communications Laws in any material respect.

(b)     Advocate for or consent to any modification, termination, or withdrawal of a Material Regulatory Request without the prior written consent of each of the Initial Lenders; *provided* that any Company may seek to modify or file any license modification, application, or petition for rulemaking that is either in furtherance of the satisfaction of the FCC Objectives or the purposes underlying the Material Regulatory Requests.

Section 6.22.  *[Reserved].*[4]

ARTICLE 7
GUARANTEE

Section 7.01.  *The Guarantee*.

The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by

---

[4]       Conform to Senior Lien Credit Agreement with appropriate cushion.

acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, that Excluded Swap Obligations in respect of any Guarantor shall at no time constitute Guaranteed Obligations of such Guarantor. The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02.   *Obligations Unconditional*.

The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)      at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)      any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)      the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

96

(iv)     any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)     the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto and each Guarantor hereby expressly renounces all benefit of division or discussion. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03.    *Reinstatement*.

The obligations of the Guarantors under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 7.04.    *Subrogation; Subordination*.

Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any

Indebtedness of any Loan Party permitted pursuant to Section 6.01(c) shall be subordinated to such Loan Party's Obligations pursuant to a subordination agreement in form and substance reasonably satisfactory to the Required Lenders.

Section 7.05.    *Remedies*.

The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06.    *Instrument for the Payment of Money*.

Each Guarantor hereby acknowledges that the guarantee in this Article 7 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07.    *Continuing Guarantee*.

The guarantee in this Article 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08.    *General Limitation on Guarantee Obligations*.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.09.    *Release of Guarantors*.

If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is the Borrower

or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and the pledge of such Equity Interests to the Administrative Agent pursuant to the U.S. Security Agreement or the Canadian Security Agreement shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Security Documents, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Agreement.

Section 7.10.  *Right of Contribution*.

Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

ARTICLE 8
EVENTS OF DEFAULT

Section 8.01.  *Events of Default*.

Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three (3) Business Days;

(c)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

99

(d)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.02, 5.03(a) or 5.08 or in Article 6;

(e)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 30 days after written notice thereof from the Administrative Agent or any Lender to the Borrower;

(f)    any Loan Party shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor; provided that it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds $[__] at any one time (provided that, in the case of Hedging Obligations, the amount counted for this purpose shall be the amount payable by all Loan Parties if such Hedging Obligations were terminated at such time);

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Loan Party, or of a substantial part of the property or assets of any Loan Party, under Title 11 of the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA); (ii) the appointment of a receiver, monitor, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Company; or (iii) the winding-up or liquidation of any Loan Party; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered or in respect of which such Loan Party files an answer admitting the material allegations of a petition filed against it in any such proceeding;

(h)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA or any plan of arrangement involving or affecting its creditors under corporate law in connection with a restructuring involving a compromise of the debts of a Loan Party); (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (g) above; (iii) apply for or consent to the appointment of a receiver, monitor, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Loan Party; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; (vi) become unable, admit in writing its inability or fail generally to pay its debts as

they become due; (vii) take any action for the purpose of effecting any of the foregoing; (viii) wind up or liquidate; or (ix) commit an act of bankruptcy under the BIA, or make an assignment of its property for the general benefit of its creditors under such Act, or make a proposal (or file a notice of its intention to do so) under such Act;

(i)      one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $[__] shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Loan Party to enforce any such judgment;

(j)      one or more ERISA Events, Canadian Plan Events or similar events with respect to Foreign Plans shall have occurred that, when taken together with all other such ERISA Events, Canadian Plan Events and similar events with respect to Foreign Plans that have occurred, could reasonably be expected to result in a Material Adverse Effect or in the imposition of a Lien on any properties of a Loan Party;

(k)      any security interest and Lien (other than a security interest or Lien on Collateral with a de minimis value) purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Administrative Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document (including a perfected second priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document and other than Liens permitted under Section 6.02(h))) in favor of the Administrative Agent, or shall be asserted by the Borrower or any other Loan Party not to be a valid, perfected, second priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby;

(l)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(m)      [there shall have occurred under any one or more material agreements of any Company (i) the termination of, or the receipt by any Loan Party of notice of the termination of, such agreement (other than scheduled termination in accordance with its terms in effect as of [            ], 2014 or, for material agreements entered into after [            ], 2014, other than the scheduled termination in the ordinary course in accordance with its terms) or (ii) the occurrence of any event or condition which would, with the passage of time or the giving of notice or both, constitute an event of default under, permit the termination of or permit the taking of any remediate action against the Collateral under (and in the case of this clause (ii), such occurrence,

event or condition either shall continue for the 30 days or the counterparty to such contract shall take any action with respect to such occurrence, event or condition) such agreement;][5]

(n)    the FCC shall have (i) denied any Material Regulatory Request in writing on material substantive grounds; (ii) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (iii) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective;

(o)    any Company shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(p)    [reserved];

(q)    (i) Reorganized One Dot Six shall be in material breach of or there shall be a material default under the One Dot Six Lease, (ii) the One Dot Six Lease shall be amended in any manner or (iii) the One Dot Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(r)    Reorganized LightSquared Inc. or any other Company party thereto shall be in material breach of or there shall be a material default under the Inmarsat Agreement, (ii) the Inmarsat Agreement shall be amended in any manner or (iii) the Inmarsat Agreement shall have been terminated or any Loan Party shall have received notice of termination thereof;

(s)    any of the Loan Parties shall be in material breach of or there shall be a material default under any material agreement of any Company or Material License, (ii) any material agreement of any Company or any Material License shall be amended in any manner or (v) any one or more material agreements of any Company or any Material Licenses shall be terminated, suspended, revoked or forfeited, or shall expire without the timely filing of an application for renewal thereof or the substantial replication of the rights thereunder without any materially adverse conditions;

(t)    [reserved];

(u)    Reorganized LightSquared Inc. shall (i) other than its Equity Interest in the Borrower, have more than de minimis assets ancillary to its existence and as contemplated by the Plan of Reorganization and its rights under the Reorganized LightSquared Inc. Loan Agreement, or shall have leases, spectrum or tangible assets or (ii) have operations, except those incidental to ownership of the assets described in clause (i);

(v)    [reserved]

---

[5]    To be discussed.

(w)    a Change in Control shall have occurred; or

(x)    (i) the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order shall have been revoked, rescinded or otherwise cease to be in full force and effect, (ii) any Loan Party shall have challenged the effectiveness or validity of the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order, (iii) any Loan Party shall have violated the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order  or (iv) the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order shall have been amended, supplemented or otherwise modified (A) in any manner adversely impacting the loan facility under this Agreement or the capitalization of the Loan Parties or (B) in any other manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans and other Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal amount of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees, any Make Whole Amount and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event, with respect to the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans (including all PIK Interest that has been added to the principal amount) then outstanding, together with accrued interest thereon, the Make Whole Amount and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.02.    *Application of Proceeds*.

The proceeds received by the Administrative Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent pursuant to this Agreement, promptly by the Administrative Agent as follows:

(a)    *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together

with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)    *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest, the Make Whole Amount and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)    *Fourth*, to the indefeasible payment in full in cash, pro rata, of principal amount of the Obligations and any premium thereon; and

(e)    *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

Section 8.03.    *Government Approval*.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses or the One Dot Six Lease or any company holding the Communications Licenses shall be pursuant to Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority. Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, Industry Canada, the CRTC or such other Governmental Authority.  Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of

such Loan Party's commercially reasonable efforts to assist in obtaining any approval of the FCC, Industry Canada, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, without limitation, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for Industry Canada's Spectrum Direct online system and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or the Communications Licenses.

ARTICLE 9
THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the

contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Notwithstanding anything to the contrary in this agreement, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower and such resignation shall become effective immediately upon delivery of such notice and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. Upon any such resignation, the retiring Administrative Agent may, on behalf of the Lenders and in consultation with the Borrower, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank, or the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges and agrees that the extensions of credit made hereunder are commercial loans and not investments in a business enterprise or securities. Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary

course of its business and has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.  Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

The Administrative Agent is hereby authorized to enter into the Intercreditor Agreement to the extent contemplated by the terms hereof, and the parties hereto acknowledge that they have reviewed the Intercreditor Agreement and that the Intercreditor Agreement is binding upon them.  Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (b) hereby authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  In addition, each Lender hereby authorizes the Administrative Agent to enter into (i) any amendments to the Intercreditor Agreement, and (ii) any other intercreditor arrangements, in the case of clauses (i), and (ii) to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by Section 6.02 of this Agreement.

ARTICLE 10
MISCELLANEOUS

Section 10.01. *Notices*.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)      if to the Borrower, to it at LightSquared Inc., [_____];

(ii)     if to the Administrative Agent, to [_____], [_____], Attention of [  ] (Telecopy No. (___) ___-____), with a copy to [_____], [_____] Attention of [  ] (Telecopy No. (___) ___-____ ];

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the

recipient).  Notices delivered through Electronic Systems, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)     Electronic Systems.

(i)     The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)     Any Electronic System used by the Administrative Agent is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Loan Parties, any Lender or any other person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the

Administrative Agent's transmission of communications through an Electronic System. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 10.02. *Waivers; Amendment*.

(a)      *Generally*. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      *Required Consents*. Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)      increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)      reduce the principal amount or premium, if any, of any Loan (except in connection with a payment contemplated by clause (viii) below) or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(b)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii)      (A) change the scheduled final maturity of any Loan, or any scheduled date of payment (or permitted prepayment) of or the installment otherwise due on the principal or accrual amount of any Loan under Section 2.09, (B) postpone the date for payment of any interest, premium or fees payable hereunder or (C) reduce the amount of,

waive or excuse any such payment or accrual (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby;

(iv)    permit the assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender;

(v)    release (x) all or any material Subsidiary Guarantors from their Guarantee (except as expressly provided in Article VII), or limit their liability in respect of such Guarantee, without the written consent of each Lender or (y) all or a material portion of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents, in each case without the written consent of each Lender;

(vi)    change Section 2.14(b), (c) or (d) in a manner that would alter the pro rata sharing of payments or setoffs required thereby or any other provision in a manner that would alter the pro rata allocation among the Lenders of Loan disbursements, including the requirements of Sections 2.02(a), without the written consent of each Lender; provided that this clause (vii) shall not apply to any change made to any of such Sections 2.14(b), (c) or (d) or any such other provision that allows the Borrower or any Subsidiary to make payments (as consideration for an assignment, sale or participation or otherwise) on Loans without any Loan Party, the payor or the recipient of such payments complying with the pro rata sharing of payments and setoffs required by such Sections or provisions, so long as such change requires that (x) the Borrower and its Subsidiaries offer to make such payments to all Lenders on a pro rata basis based on the aggregate principal amount of Loans then outstanding, (y) such payments are actually allocated to the Loans whose holders have elected to make them subject to such offer on a pro rata basis based on the aggregate principal amount of all Loans that have been made so subject to such offer and (z) all Loans that are paid in any such offer are deemed fully repaid and extinguished for all purposes and may not be reborrowed.

(vii)    change any provision of this Section 10.02(b) or Section 10.02(c) or (d), without the written consent of each Lender directly affected thereby;

(viii)    change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(ix)    subordinate the Obligations to any other obligation, without the written consent of each Lender;

(x)    change or waive any provision of Article 9 as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or

obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent; or

(xi)    change or waive (A) any provision of this Agreement requiring the consent or approval of the Specified Lenders or the definition of Specified Lenders, in each case, without the written consent of each Specified Lender, (B) any provision of this Agreement requiring the consent or approval of the Initial Lenders or the definition of Initial Lenders, in each case, without the written consent of each Initial Lender or (C) the definition of Permitted Holders, in each case, without the written consent of each Permitted Holder.

Neither the Borrower nor any of its Subsidiaries or Affiliates will, directly or indirectly, pay or cause to be paid any consideration, to or for the benefit of any Lender for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Agreement or any other Loan Document unless such consideration is offered to be paid to all Lenders and is paid to all Lenders that consent, waive or agree to amend in the time frame set forth in the documents relating to such consent, waiver or agreement.

Notwithstanding anything to the contrary herein:

(A)    no Affiliate Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder; and

(B)    any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent (without the consent of any Lender) solely to cure a defect or error, or to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property.

(c)    *Collateral*. Without the consent of any other person, the applicable Loan Party or Parties and the Administrative Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)    *Dissenting Lenders*. If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 10.02(b), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right (within five Business Days of obtaining such consent of the Required Lenders) to replace all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.16(b) so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination.

111

Section 10.03. *Expenses; Indemnity; Damage Waiver*.

(a)     The Borrower shall pay (i) all reasonable and documented out of pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of outside counsel for the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated thereby shall be consummated); (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such reasonable and documented out-of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, *provided* that the reimbursement of the charges of such counsel shall be limited to one counsel for the group (which shall be designated by the Administrative Agent) (and (i) appropriate local counsel in applicable local jurisdictions, but limited to one local counsel for the group in each such jurisdiction (which shall be designated by the Administrative Agent) and (ii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction for each group similarly situated); and (iii) all reasonable and documented out of pocket expenses payable under the Commitment Letter.

(b)     The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, in or from any property owned, leased, licensed or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, willful misconduct or a material breach of the obligations under Section 2.01 or Section 2.02 by such Indemnitee and (y) to the extent arising from any dispute solely among Indemnitees other than (i) any claims against the Administrative Agent or the Lead Arranger acting in such capacity or in fulfilling such role or any similar role under this Agreement and (ii) any claims arising out of any act or omission on the part of the Borrower or its Subsidiaries.  This Section 10.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that, nothing in this clause (d) shall relieve the Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)     All amounts due under this Section 10.03 shall be payable promptly after written demand therefor.

Section 10.04. *Successors and Assigns*.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in Section 10.04(b)(ii), Section 10.04(g) and Section 10.4(h) below, any Lender may assign to a Lender, an Affiliate of a Lender, an Approved Fund and a Participant and any other person that is an Eligible Assignee (and any attempted assignment or transfer to a person that is not an Eligible Assignee shall be null and void) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     each Specified Lender; *provided* that consent under this Section 10.04(b)(i)(A) shall only be required until the later of (x) the date that is 18 months from the date of entry of the Confirmation Order and (y) twelve months from the Closing Date; and *provided*, *further*, that such consent shall not be required with respect to assignments

113

to Lenders, Affiliates of Lenders, Approved Funds and Disclosed Participants so long as the assigned amount does not exceed the disclosed amount of such participation.

(B)    the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or a Participant.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender, an Approved Fund or a Participant or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent consents;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire in which the assignee designates one or more Credit Contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)    the Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company;

(F)    no Loan may be assigned to an Affiliate Lender pursuant to this Section 10.04 if, after giving effect to such assignment, Affiliate Lenders in the aggregate would own Loans with a principal amount in excess of 25% of the principal amount of all Loans then outstanding; and

(G)    prior to the earlier of the date that is six (6) months after the satisfaction of the FCC Objectives and the fifth anniversary of the Closing Date, no Lender shall assign any portion of its Loans (other than assignments in connection with the exercise of the RLS Call Option) unless such Lender and its affiliates simultaneously transfer to the same Assignee (or affiliate thereof) the same percentage of Linked Equity Interests as the Loans held by such Lender and its affiliates as Linked Equity Interests to be so assigned

(*i.e.*, if such Lender assigns 25% of the Loans it and its affiliates hold to an Assignee, such Lender and its affiliates must also transfer 25% of the Linked Equity Interests that it and its affiliates hold to such Assignee (or affiliate thereof));

For the purposes of this Section 10.04(b), the term "**Approved Fund**" has the following meanings:

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Eligible Assignee, the Administrative Agent shall have no liability with respect to any assignment made to a person that is not an Eligible Assignee and the Administrative Agent shall have no responsibility or obligation with respect to provisions concerning Affiliate Lenders, including without limitation Section 10.04(b)(ii)(F). Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.  The Administrative Agent and any Lender assigning all or a portion of its rights and obligations under this Agreement pursuant to this Section 10.04 may conclusively rely on the representation given by the assignee that it is not a Disqualified Company and that neither such Lender or Administrative Agent will have any liability for any breach by an assignee of such representation, and such Lender and Administrative Agent will be indemnified by the Borrower for any loss, cost or expense resulting thereof.

(iii)    Subject to acceptance and recording thereof pursuant to Section 10.04(b)(iv), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.15 and Section 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to, Section 2.02(b), Section 2.14(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    Any Lender may, with the consent of each Specified Lender (but without the consent of the Borrower or the Administrative Agent), sell participations to one or more banks or other entities (a "**Participant**") that are Eligible Assignees and not Affiliates of the Borrower in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (A) the consent of each Specified Lender under Section 10.04(c) shall only be required until the later of (x) the date that is 18 months from the date of entry of the Confirmation Order and (y) 12 months from the Closing; (B) such Lender's obligations under this Agreement shall remain unchanged; (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (D) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, (i) participations granted on or prior to February 14, 2014 (which participations (x) shall have no right of elevation and shall not be elevated to a direct holding or assignment, (y) shall have no direct or indirect voting or consent rights hereunder (other than as set below) and (z) but may, for the avoidance of doubt, be assigned (but not elevated) to Controlled Affiliates of the initial participant thereof) shall be permitted and (ii) participations granted on or prior to February 14, 2014 the name and participation amount of which was disclosed to each of the Initial Lenders on or prior to February 14, 2014 (the Participants referred to in this clause (ii), the "**Disclosed Participants**") shall be permitted.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement

and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver (1) described in clause (i), (ii), (iii) or (v) of the first proviso to Section 10.02(b) and (2) that directly affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12 and Section 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.16 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.12 or Section 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.14(d) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or that such Participant is not a Disqualified Company.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.  Notwithstanding the foregoing, prior to the earlier of the date that is six (6) months after the satisfaction of the FCC Objective and the fifth anniversary of the Closing Date, no Lender shall sell any participation in any portion of its Loans unless such Lender and its affiliates simultaneously transfer to the same assignee of such participation (or affiliate thereof) the same percentage of Linked Equity Interests as the Loans held by such Lender and its affiliates as Linked Equity Interests subject to such participation (i.e., if such Lender sells a participation in 25% of the Loans it and its affiliates, such Lender and its affiliates must also transfer 25% of the Linked Equity Interests that it and its affiliates hold to such assignee (or affiliate thereof)).

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to any person (other than a natural person or any Disqualified Company) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.04

shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     If any assignment or participation under this Section 10.04 is made to a Disqualified Company and the portion of the loan so assigned or participated is still held by a Disqualified Company, then the Borrower (i) shall have the right to repurchase such portion of the Loan at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrower at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.

(f)     Notwithstanding anything to the contrary in this Agreement, the Administrative Agent may exclude (by prior notice to) Affiliate Lenders from (a) attending (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Borrower are excluded or (b) receiving any information or material prepared by Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials are made available to the Borrower or their representatives; *provided*, that, in the case of clause (a) or (b), the Administrative Agent has been advised by counsel that a conflict of interest between the Affiliate Lenders and the other Lenders could exist.

(g)     Right of First Offer.

(i)     Subject to the terms and conditions specified in this Section 10.04(g), if any Lender (the "**Offering Lender**") proposes or is required to assign (other than assignments in connection with the exercise of the RLS Call Option) all or any portion of its Loans or any rights thereto or interests therein (including a participation) whether pursuant to this Section 10.04 or Section 2.16(b) (the "**Offered Loans**") owned by it, the Offering Lender shall first make an offering of the Offered Loans to each other Lender holding Loans (the "**Other Lenders**") on a pro rata basis in accordance with the following provisions of this 10.04(g); *provided*, *however*, that this Section 10.04(g) shall not apply to any assignments by a Lender (i) to one of its Affiliates, any Approved Fund of such Lender or any Disclosed Participant, or (ii) pursuant to an exercise of a Tag Along Right.

(ii)     The Offering Lender shall give written notice (the "**Offering Lender Notice**") to the Borrower and the Other Lenders stating its *bona fide* intention to assign the Offered Loans and specifying the aggregate principal amount of Offered Loans to the Other Lenders on a pro rata basis and the material terms and conditions, including the price and the date of the proposed sale (which date shall be at least thirty (30) days after the date of transmission of the Offering Lender Notice), pursuant to which the Offering Lender proposes to assign the Offered Loans. The Offering Lender Notice shall constitute the Offering Lender's offer to assign the Offered Loans to the Other Lenders, which offer shall be irrevocable for the duration of the ROFO Notice Period. By delivering the Offering Lender Notice, the Offering Lender represents and warrants to the

Borrower and the Other Lenders that: (x) the Offering Lender has full right, title and interest in and to the Offered Loans; (y) the Offering Lender has all the necessary power and authority and has taken all necessary action to sell such Offered Loans as contemplated by this Section 10.04(g); and (z) the Offered Loans are free and clear of any and all Liens other than those arising as a result of or under the terms of this Agreement.

(iii)     Upon receipt of the Offering Lender Notice, each Other Lender shall have twenty (20) days from the date of transmission of the Offering Lender Notice to agree to purchase up to such Other Lender's pro rata percentage (based on the aggregate principal amount of Loans held by such Other Lender as a percentage of the total number of Loans held by all Other Lenders) of the Offered Loans by delivering a written notice (a "**ROFO Acceptance Notice**") to the Offering Lender and the Borrower stating that it agrees to purchase a number of Offered Loans on the terms specified in the Offering Lender Notice, specifying the number of Offered Loans such Lender agrees to purchase. Any ROFO Acceptance Notice so delivered shall be binding upon delivery and irrevocable by the applicable Other Lender.

(iv)     Each Other Lender that has otherwise agreed to purchase any Offered Loans shall have a right of over-allotment such that if any Lender fails to exercise its rights hereunder to purchase its pro rata share of Offered Loans, such Other Lenders may agree to purchase the portion of Offered Loans that have not been subscribed for on a pro rata basis by delivering a notice to the Offering Lender within fifteen (15) days from the date the Offering Lender sends a notice (the "**Over-Allotment Period**") indicating that less than 100% of the Offered Loans have been subscribed for (the "**Over-Allotment Notice**").  If upon expiration of the Over-Allotment Period, the Other Lenders have collectively agreed to acquire less than 100% of the Offered Loans, the Offering Lender shall have the right, subject to the Tag Along Right, to terminate the sale of the Offered Loans pursuant hereto and assign all Offered Loans to an Independent Third Party on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Lender Notice.

(v)     Subject to Section 10.04(g)(iv), in the event one or more Other Lenders exercises its right to purchase any of the Offered Loans, then the Offering Lender shall sell such Offered Loans and each such Other Lender shall purchase the number of Offered Loans for which it subscribed, prior to the expiration of the ROFO Notice Period, at such date, time and place as the Offering Lender shall reasonably specify.  Each Lender shall take all actions as may be reasonably necessary to consummate such purchase and sale, including by entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this Section 10.04(g), the Offering Lender shall deliver to the purchasing Lenders certificates (if any) representing their respective Offered Loans, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefor from such Lender by certified or official bank check or by wire transfer of immediately available funds.

(vi)    Upon expiration of the ROFO Notice Period, the Offering Lender may, during the one hundred twenty days (120) day period following the expiration of the ROFO Notice Period, and subject to the Tag Along Right, assign any Offered Loans not acquired by any Other Lender to an Independent Third Party on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Lender Notice. If the Offering Lender does not enter into a binding agreement, on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Lender Notice, to assign the Offered Loans within such period the Offering Lender shall not thereafter sell any Offered Loans without reoffering such Offered Loans to the Other Lenders in the manner provided in this Section 10.04(g).

(vii)    The Borrower shall use its commercially reasonable efforts to facilitate the delivery by the Offering Lender of the Offering Lender Notice.  Each Other Lender electing to purchase any Offered Loans shall take all actions as may be reasonably necessary to consummate the assignment contemplated by this Section 10.04(g) including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(h)    Tag Along Rights.

(i)    If any assignment (other than assignments in connection with the exercise of the RLS Call Option), including any assignment subject to the right of first offer set forth in Section 10.04(g) above, would result in a Tag Along Trigger Event, each Lender shall have the right ("**Tag Along Right**") to require the proposed purchaser, which for the avoidance of doubt, shall be an Eligible Assignee (the "**Purchaser**") to purchase, the aggregate principal amount of Loans held by such Lender or the aggregate amount of Loans subject to such participation, as applicable, at the same price and on the same terms of payment as apply to the Lender or Lenders initiating such assignment (the "**Transferring Lender**") equal to its pro rata percentage of Loans subject to such assignment or participation (based on the aggregate principal amount of Loans held by such Lender as a percentage of the aggregate principal amounts of Loans outstanding at such time) (each Lender exercising the Tag Along Right, a "**Tag Along Lender**"); *provided*, *however*, that this Section 10.04(h) shall not apply to any assignment by a Lender to one of its Affiliates, any Approved Fund of such Lender or any Disclosed Participant that proposed to assign Loans or sell participations therein.

(ii)    The Transferring Lender shall promptly notify the other Lenders in writing in the event it proposes to make an assignment or sell a participation giving rise to Tag Along Rights, stating the Purchaser's name (and the name of any of its Affiliates and each of their respective officers, directors, managers and owners), the business(es) currently engaged in by the Purchaser and its Affiliates, the aggregate principal amount of Loans subject to the assignment or participation, the offered price applicable to the Loans subject to the assignment or participation, the other terms and conditions upon which the assignment is proposed to be made and that the Purchaser has been informed of the rights provided in this Section 10.04(h) and has agreed to purchase or participate in Loans in accordance with the terms hereof (the "**Tag Along Offer**").  The Tag Along Right may be exercised by each Tag Along Lender by delivery of a written notice (the

"**Tag Along Notice**") to the Transferring Lender and the Purchaser within fifteen (15) days following receipt of the Tag Along Offer.  If the Purchaser does not purchase each Tag Along Lender's Loans or participations therein as specified in the Tag Along Offer and pursuant to the Tag Along Notice, then the Transferring Lender shall not be permitted to sell any Loans or participations therein to the Purchaser in the proposed Tag Along Transfer.

Section 10.05. *Survival of Agreement*.

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments  delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of (including all PIK Interest that has been added to the principal amount) or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 2.12, Section 2.15 and Section 10.03 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06. *Counterparts; Integration; Effectiveness*.

(a)        This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)        Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any

applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07. *Severability.*

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08. *Right of Setoff.*

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09. *Governing Law; Jurisdiction; Consent to Service of Process.*

(a)      This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)      The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10. *Waiver of Jury Trial*.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11. *Headings*.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12. *Treatment of Certain Information; Confidentiality*.

Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its

123

advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "**Information**" means all information received from the Debtors, the Borrower or any of its Subsidiaries relating to the Debtors, the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Debtors, the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13. *Material Non-Public Information.*

(a)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14. *Authorization to Distribute Certain Materials to Public-Siders*.

(a)    None of the Parties currently has any publicly traded securities outstanding (including, but not limited to, 144A Securities, commercial paper notes or American Depositary Receipts); provided that the Borrower agrees that if any of the Parties issues any publicly traded securities at a future date, any of the information in the Loan Documents and the Financial Statements to be furnished pursuant to Section 5.01(a) and Section 5.01(b), to the extent then

material, will be publicly disclosed or set forth in the related prospectus or other offering document for such issuance.

(b)     The Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents and Financial Statements to all Lenders, including their Public-Siders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of the United States federal and state securities laws if the Companies had publicly-traded securities outstanding.

(c)     If the Borrower issues any 144A Securities during the term of this Agreement and its Financial Statements are not filed with the Securities and Exchange Commission, the Borrower (i) agrees to deliver to the Administrative Agent, and authorizes their posting by the Administrative Agent to the public-side view site of the Agency Site, the Financial Statements and (iii) represents, warrants and agrees that the Financial Statements will not constitute information that, upon disclosure to Public-Siders, would restrict them or their firms from purchasing or selling any of the 144A Securities under United States federal and state securities laws.  The Borrower further agrees to clearly label such Financial Statements with a notice stating: "Confidential Financial Statements provided to 144A Holders" before delivering them to the Administrative Agent.

(d)     The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the materials, documents and information distributed to them pursuant to the authorizations made herein.

Section 10.15. *USA PATRIOT Act Notice and Customer Verification.*

Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**") and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.16. *Interest Rate Limitation.*

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this

Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.17. *Obligations Absolute*.

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.18. *AML Legislation*.

(a)    The Borrower acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or else-where (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Secured Parties or any future assignee of a Secured Party may be required, now or hereafter, to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby. The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)    If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

126

(i)      shall be deemed to have done so as an agent for each Secured Party (or any future assignee of a Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Secured Party (or any future assignee of a Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

(ii)      shall provide to each Secured Party (or any future assignee of a Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Secured Party or any future assignee of a Secured Party, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.[6]

[NEWCO]


By:_____
　　　　Name:
　　　　Title:


LIGHTSQUARED LP
By:_____
　　　　Name:
　　　　Title:


[SUBSIDIARY GUARANTORS]


By:_____
　　　　Name:
　　　　Title:

---

[6]      NTD:  Guarantor entity names to be confirmed.

R-1

[_____], as
Administrative Agent


By: _____
       Name:
       Title:

## **Exhibit C-6**

**NewCo Interest Holders Agreement**

**OPERATING AGREEMENT**

**OF**

**[1][NEWCO], LLC**

**[ ], 2014**

---
[1] NTD: Name to be selected, subject to Major Investor Approval.

# TABLE OF CONTENTS

**Page**

ARTICLE I          CAPITAL CONTRIBUTIONS; DEFINITIONS ............................................ 2

    Section 1.1      Capital Contributions ......................................................... 2

    Section 1.2      Definitions ........................................................................ 4

ARTICLE II         GENERAL ................................................................................. 19

    Section 2.1      Name ................................................................................. 19

    Section 2.2      Principal Place of Business ............................................. 19

    Section 2.3      Names and Addresses of Members ................................... 19

    Section 2.4      Qualification in Other Jurisdictions ............................... 19

    Section 2.5      Registered Office and Registered Agent .......................... 19

    Section 2.6      Term of Existence ............................................................ 19

    Section 2.7      Taxation as Partnership ................................................... 19

    Section 2.8      Tax Matters Partner ........................................................ 20

    Section 2.9      [Reserved.] ....................................................................... 20

    Section 2.10     Representations and Warranties of the Company; Indemnity ................. 20

ARTICLE III        PURPOSE OF THE BUSINESS ................................................ 23

ARTICLE IV         MEMBERS; CERTAIN RIGHTS AND OBLIGATIONS .......................... 23

    Section 4.1      Members ........................................................................... 23

    Section 4.2      Representations and Warranties of the Members ................... 23

    Section 4.3      Place and Time of Meetings; Notice ................................. 24

    Section 4.4      Quorum ............................................................................ 25

    Section 4.5      Written Action .................................................................. 25

    Section 4.6      Number of Votes .............................................................. 25

    Section 4.7      Authority of the Members ................................................ 25

    Section 4.8      Liability of Members ....................................................... 25

    Section 4.9      No Right to Withdraw ...................................................... 25

    Section 4.10     Preparation of Financial Statements; Rights to Information ................... 26

    Section 4.11     Confidential Information .................................................. 28

    Section 4.12     No Grant of Dissenter's Rights or Appraisal Rights ............... 29

    Section 4.13     Delivery of Information .................................................... 29

    Section 4.14     Observation, Notice and Participation Rights ......................... 30

## TABLE OF CONTENTS

(continued)

**Page**

Section 4.15    Conduct of the Members with respect to the FCC and Industry Canada .................................................. 30

Section 4.16    [Reserved.] ................................................................................. 31

ARTICLE V    CAPITALIZATION; PREEMPTIVE RIGHTS; REDEMPTION; CALL OPTION ............................................................... 31

Section 5.1    Capitalization ............................................................................. 31

Section 5.2    Preemptive Rights ...................................................................... 32

Section 5.3    Mandatory Redemption; Optional Redemption ...................... 34

Section 5.4    Harbinger Call Option ............................................................... 36

Section 5.5    RLS Call Option ......................................................................... 37

ARTICLE VI    DISTRIBUTIONS; INITIAL PUBLIC OFFERING ..................... 37

Section 6.1    Distributions Generally, Operating Distributions ................... 37

Section 6.2    Liquidating Distributions .......................................................... 39

Section 6.3    Withholding and Other Tax Liabilities ..................................... 39

Section 6.4    In-Kind Distributions ................................................................. 39

Section 6.5    Initial Public Offering ............................................................... 39

ARTICLE VII    TRANSFERS; RIGHTS OF FIRST OFFER; DRAG ALONG RIGHT; TAG ALONG RIGHT ..................................................... 40

Section 7.1    Unit Register; Transfer Restrictions ......................................... 40

Section 7.2    Admission of New Members ...................................................... 43

Section 7.3    Right of First Offer ..................................................................... 43

Section 7.4    Tag Along Right ......................................................................... 46

Section 7.5    Drag Along Right ....................................................................... 46

ARTICLE VIII    MANAGEMENT AND OPERATION OF COMPANY BUSINESS ........... 48

Section 8.1    Board of Managers; Committees ............................................... 48

Section 8.2    Number, Qualification; Term of Office; Voting ....................... 49

Section 8.3    Powers and Duties of the Managers .......................................... 51

Section 8.4    Actions Requiring Member Consent ......................................... 52

Section 8.5    Reliance by Third Parties ........................................................... 56

Section 8.6    Meetings; Notice ........................................................................ 56

Section 8.7    Voting; Quorum .......................................................................... 57

# TABLE OF CONTENTS
(continued)

**Page**

Section 8.8      Written Action ....................................................................... 57

Section 8.9      Compensation to Managers.................................................... 57

Section 8.10    Transactions with Interested Persons; Business Opportunities .............. 57

Section 8.11    Waiver of Fiduciary Duties by Members................................. 58

Section 8.12    Managers' and Officers' Insurance......................................... 58

Section 8.13    Subsidiary Boards of Directors.............................................. 58

Section 8.14    Updates to Competitor Schedule ........................................... 59

ARTICLE IX      OFFICERS ............................................................................ 59

Section 9.1      Enumeration ........................................................................... 59

Section 9.2      Election .................................................................................. 59

Section 9.3      Qualification .......................................................................... 59

Section 9.4      Tenure .................................................................................... 59

Section 9.5      Removal ................................................................................. 59

Section 9.6      Vacancies .............................................................................. 59

Section 9.7      Powers and Duties.................................................................. 59

Section 9.8      Other Powers and Duties ....................................................... 60

Section 9.9      Confidentiality Agreement..................................................... 60

Section 9.10    Compensation of Officers ..................................................... 60

ARTICLE X       INDEMNIFICATION............................................................ 60

Section 10.1    Right to Indemnification ....................................................... 62

Section 10.3    Right of Indemnitee to Bring Action .................................... 62

Section 10.4    Funding and Insurance........................................................... 62

Section 10.5    Non-Exclusivity; Nature and Extent of Rights ..................... 63

Section 10.6    Partial Indemnity................................................................... 63

Section 10.7    Primacy of Indemnification and Advancement of Expenses................. 63

Section 10.8    Acknowledgement of Release and Exculpation ................... 63

ARTICLE XI      ACCOUNTING, TAX ELECTIONS AND RECORDS ............................ 64

Section 11.1    Accounting Period ................................................................ 64

Section 11.2    Records and Reports ............................................................. 64

Section 11.3    Annual Review; Compliance Report ..................................... 64

# TABLE OF CONTENTS
(continued)

**Page**

Section 11.4    Other Reports ........................................................................ 64

Section 11.5    Inspection ........................................................................... 64

Section 11.6    Tax Elections ......................................................................... 65

ARTICLE XII    CAPITAL ACCOUNTS ..................................................... 65

Section 12.1    Additional Capital Contributions .......................................... 65

Section 12.2    Capital Accounts ..................................................................... 65

ARTICLE XIII    ALLOCATIONS OF PROFITS, LOSSES, ETC. ....................... 66

Section 13.1    Allocations Generally ............................................................. 66

Section 13.2    Tax Allocations Under Section 704(c) of the Code ................... 66

Section 13.3    Qualified Income Offset .......................................................... 66

Section 13.4    Nonrecourse Deductions .......................................................... 67

Section 13.5    Company Minimum Gain Chargeback ...................................... 67

Section 13.6    Member Nonrecourse Debt ....................................................... 67

Section 13.7    Member Minimum Gain Chargeback ....................................... 67

Section 13.8    Allocation of Debt .................................................................. 68

Section 13.9    Compliance with Section 704(b) of the Code ........................... 68

Section 13.10    Safe Harbor Election ............................................................ 68

Section 13.11    Forfeiture Allocations ........................................................... 68

Section 13.12    Cancellation of Indebtedness Income ..................................... 68

Section 13.13    Built In Gain Allocation ........................................................ 68

Section 13.14    Refund Amount Payment ....................................................... 69

Section 13.15    Reserved ............................................................................. 69

ARTICLE XIV    DISSOLUTION AND LIQUIDATION ...................................... 70

Section 14.1    Dissolution ............................................................................ 70

Section 14.2    Liquidating Distributions ........................................................ 70

Section 14.3    Orderly Winding Up ............................................................... 70

ARTICLE XV    INTENTIONALLY OMITTED ................................................. 70

ARTICLE XVI    MISCELLANEOUS PROVISIONS .......................................... 70

Section 16.1    Additional Actions and Documents .......................................... 70

Section 16.2    Notices ................................................................................. 71

-iv-

# TABLE OF CONTENTS

(continued)

**Page**

Section 16.3    Entire Agreement ..................................................................................... 71

Section 16.4    Severability ............................................................................................. 71

Section 16.5    Survival ................................................................................................... 71

Section 16.6    Amendments; Waivers ............................................................................ 71

Section 16.7    Waiver of Certain Rights ........................................................................ 72

Section 16.8    Binding Effect ......................................................................................... 72

Section 16.9    Limitation on Benefits of this Agreement ............................................. 72

Section 16.10   Headings; Interpretation ......................................................................... 73

Section 16.11   Governing Law; Consent to Jurisdiction ............................................... 73

Section 16.12   Waiver of Jury Trial ............................................................................... 74

Section 16.13   Counterparts ............................................................................................ 74

**THIS OPERATING AGREEMENT OF [NEWCO], LLC** (as amended, supplemented or otherwise modified in accordance with the terms hereof, this "**Agreement**") is made and entered into as of [ ], 2014 by and among the Company and the Persons listed on Exhibit A hereto.

## WITNESSETH THAT:

**WHEREAS**, a company by the name of [NewCo], LLC, a Delaware limited liability company (the "**Company**"), was formed on [ ], 2014, through the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of the State of Delaware;

**WHEREAS**, LightSquared Inc., a Delaware corporation, and certain of its affiliates (collectively, the "**Debtors**"), filed on May 14, 2012 voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and each of the Debtors has continued to operate its business as a debtor and debtor in possession during its Chapter 11 case (the "**Bankruptcy Cases**");

**WHEREAS**, on February 14, 2014, the Debtors filed Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, as amended, supplemented or modified pursuant to the terms thereof (the "**Plan of Reorganization**"), pursuant to which, among other things, the Company will issue on the Effective Date (as defined in the Plan of Reorganization) membership interests in connection with and in exchange for (i) the LightSquared Transfer (as defined in the Plan of Reorganization) on the Effective Date (as defined in the Plan of Reorganization), (ii) the extinguishment of Allowed Existing LP Preferred Units Equity Interests (as defined in the Plan of Reorganization), (iii) the extinguishment of Allowed Existing Inc. Common Stock Equity Interests (as defined in the Plan of Reorganization), (iv) the extinguishment of the Allowed Prepetition Inc. Facility Subordinated Claims (as defined in the Plan of Reorganization), in each case on the terms and subject to the conditions set forth in the Plan of Reorganization, and (v) the extinguishment of the Allowed Specified Existing Inc. Preferred Stock Equity Interests (as defined in the Plan of Reorganization), in each case on the terms and for the consideration  and subject to the conditions set forth in the Plan of Reorganization;

**WHEREAS**, in connection with the Plan of Reorganization, the DIP Credit Agreement and the transactions contemplated thereby, certain of the Members became DIP Lenders under the DIP Credit Agreement and agreed to convert $115 million of the New DIP Tranche A Claims (as defined in the Plan of Reorganization) held by such Members plus 11% of any New DIP Tranche A Accrued Interest (as defined in the Plan of Reorganization) attributed to such Member's New DIP Tranche A Claims into equity interests of the Company and such Members agreed to be bound by the terms of certain documents, including this Agreement, in exchange for such equity interests in the Company as further described herein;

**WHEREAS**, the Plan of Reorganization was confirmed by the Bankruptcy Court on [_____ __, 2014] and the Confirmation Order (as defined in the Plan of Reorganization) was entered on the docket of the Bankruptcy Cases on such date;

**WHEREAS**, pursuant to and as more particularly described in the Plan of Reorganization and in Section 1.1(b) through (f) hereof, the Company will issue certain equity interests to certain Members on account, and in full satisfaction and discharge, of transfers made by and debt claims and equity interests held by such Members or their affiliates in one or more of the Debtors;

**WHEREAS**, pursuant to an initial operating agreement dated as of **[ ]**, 2014, relating to the Company (the "**Initial Operating Agreement**"), **[ ]** (the "**Initial Sole Member**") was admitted on **[ ]**, 2014, as the sole member of the Company without having made any contribution to the Company or being under any obligation to make any contribution to the Company and without having acquired any limited liability company interest in the Company, as is permitted by Section 18-301(d) of the Act, for the purpose of enabling the Company to take certain limited actions in furtherance of the consummation of the transactions contemplated by the Plan of Reorganization;

**WHEREAS**, the Company and the Initial Sole Member wish to amend and restate the Initial Operating Agreement by entering into this Agreement with the Members to provide for, among other things, the management of the business and affairs of the Company, the allocation of profits and losses among the Members, the respective rights and obligations of the Members to each other and to the Company, and certain other matters.

**NOW, THEREFORE**, in consideration of the premises, the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## CAPITAL CONTRIBUTIONS; DEFINITIONS

**Section 1.1    Capital Contributions**.  Subject to the receipt by the Members of a legal opinion from Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Company, dated as of the Effective Date, addressing the topics set forth on Exhibit B attached to this Agreement and in a form reasonably satisfactory to the Major Investors:

(a)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization and the DIP Credit Agreement, each Member designated on Exhibit A as a New DIP Tranche A Lender  (as defined on the Plan of Reorganization) shall convert the principal amount of and accrued interest with respect to the New DIP Tranche A Claim set forth next to such Person's name on Exhibit A under the caption "Claim/Interest Description Amount" into equity interests of the Company and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on Exhibit A under the caption "Capital Contribution Amount".  The parties hereto agree that the aggregate Capital Contribution Amount relating to the conversion of the New DIP Tranche A Claims into the equity interests described on Exhibit A is $[ ]**[2]**.

---

[2] NTD: To equal $115 million plus pro rata portion of 11% of the [Accrued Interest] on the New DIP Tranche A Claim through and including the Effective Date.

(b)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization, each Member designated on <u>Exhibit A</u> as a Holder of Allowed Prepetition Inc. Subordinated Facility Claims in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Claim/Interest Description and Amount" will receive equity interests in the Company in exchange for such Claims pursuant to the Plan of Reorganization and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Capital Contribution Amount".  The parties hereto agree that the aggregate Capital Contribution Amount relating to such Allowed Prepetition Inc. Subordinated Facility Claims is $[209,000,000].

(c)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization, each Member designated on <u>Exhibit A</u> as a Holder of Allowed Existing LP Preferred Units Equity Interests in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Claim/Interest Description and Amount" will receive, in addition to any other consideration that may be set forth in the Plan of Reorganization, equity interests in the Company in exchange for such Allowed Existing LP Preferred Units Equity Interests pursuant to the Plan of Reorganization and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Capital Contribution Amount".  The parties hereto agree that the aggregate Capital Contribution Amount relating to such Allowed Existing LP Preferred Units Equity Interests is $[75,000,000].

(d)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization, each Member designated on <u>Exhibit A</u> as a Holder of an Allowed Existing Inc. Common Stock Equity Interest in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Claim/Interest Description and Amount" will receive equity interests in the Company in exchange for such Allowed Existing Inc. Common Stock Equity Interest pursuant to the Plan of Reorganization and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Capital Contribution Amount".  The parties hereto agree that the aggregate Capital Contribution amount relating to such Allowed Existing Inc. Common Stock Equity Interest is $[ ].

(e)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization, each Member designated on <u>Exhibit A</u> as a Holder of Existing Inc. Series A Preferred Stock in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Claim/Interest Description and Amount" will receive equity interests in the Company in exchange for such Existing Inc. Series A Preferred Stock pursuant to the Plan of Reorganization and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Capital Contribution Amount".  The parties hereto agree that the aggregate Capital Contribution amount relating to such Allowed Existing Inc. Common Stock Equity Interest is $[17,540,000].

(f)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization, each Member designated on <u>Exhibit A</u> as a Holder of Other Existing Inc. Series B Preferred Stock in the amount set forth next to such Person's name on <u>Exhibit A</u> under the caption "Claim/Interest Description and Amount" will receive equity interests in the

Company in exchange for such Other Existing Inc. Series B Preferred Stock pursuant to the Plan of Reorganization and shall be deemed to have made an initial Capital Contribution in the amount set forth next to such Person's name on Exhibit A under the caption "Capital Contribution Amount".  The parties hereto agree that, for purposes of this Agreement, the aggregate Capital Contribution amount relating to such Other Existing Inc. Series B Preferred Stock is $[1,760,000].

(g)    On the Effective Date, and pursuant to the terms and conditions of the Plan of Reorganization and the RLS Asset Purchase Agreement, the Reorganized Debtors (as defined in the Plan of Reorganization), including Reorganized [LightSquared][3], will transfer certain assets in the LightSquared Transfer (as defined in the Plan of Reorganization) in exchange for the assumption of indebtedness and other consideration, including the Equity Interests described in Exhibit A.

**Section 1.2    Definitions**.  Unless the context otherwise specifies or requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.  All other capitalized terms used herein shall have the respective meanings ascribed to such terms in the Plan of Reorganization.

"**Act**" means the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.), as amended from time to time.

"**Action**" is defined in Section 10.1(a).

"**ADIC**" means [ ].

"**Advisory Committee**" is defined in Section 8.1(b).

"**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, where "**control**" (including the terms "controls", "controlled by" and "under common control with") means the possession, directly or indirectly through one or more intermediaries, of the ownership of more than fifty percent (50%) of the voting control of a Person, or the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise and shall also include investment funds under management of and/or advised by such first Person; provided, however, that no Member shall be deemed to be an Affiliate of the Company or any other Member solely by virtue of this Agreement.

"**Agreement**" is defined in the preamble to this Agreement.

"**Appointed Manager**" is defined in Section 8.2(a)(i).

---

[3] NTD: LightSquared mark to be transferred to [NewCo] pursuant to the RLS Asset Purchase Agreement. Agreement to be revised to reflect actual name Reorganized [LightSquared] once determined.

"**Approved Holder**" means each of the Melody Investors (other than any participant whose identity was not disclosed before February 14, 2014 to the other Major Investors), Fortress, Harbinger, Reorganized [LightSquared], and their respective Affiliates.

"**Asset Sale**" means the sale of all or substantially all of the Company's and its Subsidiaries' assets determined on a consolidated basis.

"**Assumed Tax Rate**" means the highest effective marginal combined U.S. federal, state and local income tax rate for a fiscal year prescribed for (i) an individual resident in New York, New York to the extent such Initial Member is an individual or an individual which is the direct (or indirect through a pass-through entity) beneficial owner of a pass-through entity, and (ii) a corporate resident in the State of residence of the Initial Member to the extent such Initial Member is not covered by clause (i), in each case taking into account (a) the deductibility of state and local income taxes for U.S. federal income tax purposes, assuming the limitation described in Section 68(a)(2) of the Code applies, and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income.

"**Available Cash**" is defined in Section 6.1(a).

"**Award Agreement**" is defined in Section 5.1(c).

"**Bankruptcy**" means, with respect to any Person, (a) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (b) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18 101(1) and 18 304 of the Act.

"**Bankruptcy Cases**" is defined in the recitals to this Agreement.

"**Bankruptcy Code**" is defined in the recitals to this Agreement.

"**Bankruptcy Court**" is defined in the recitals to this Agreement.

"**Bankruptcy Exception**" is defined in Section 2.10(a)(i).

"**Board**" means the board of managers of the Company for purposes of the Act. The Board shall be established and shall act pursuant to Article VIII.

"**Built In Gain**" means the excess of the book value (as such term is defined in Treas. Reg. section 1.704-3(a)(3)(i)) of the Built In Gain Assets contributed by Reorganized LightSquared in exchange for its equity Units (for U.S. federal income tax purposes) in the Company through the Plan of Reorganization (as described in Exhibit A and the Plan of Reorganization) over the adjusted tax basis of such Built In Gain Assets at the Effective Date; provided that such built-in gain will be thereafter reduced by decreases in such difference (as provided for in Treas. Reg. section 1.704-3(a)(3)(ii)).

"**Built In Gain Assets**" means the assets contributed by Reorganized LightSquared in connection with the LightSquared Transfer.

"**Built In Loss**" means the excess of such Member's tax basis in its Units in the Company over the amounts such Member would receive in accordance with Section 6., but only to the extent such excess is attributable to any Built In Gain for which a Member has received distributions or payments under Section 13.13.

"**Business**" means the business of (i) acquiring spectrum related assets and deploying or operating a terrestrial wireless broadband network, (ii) operating a digital video broadcasting network or (iii) operating a mobile-satellite service network.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law, regulation or order to close.

"**Capital Account**" is defined in Section 12.2(a).

"**Capital Contribution**" means, for any Member, all cash and the agreed Fair Market Value of the property deemed to have been contributed by the Member to the Company as of the Effective Date, and thereafter, as set forth on Exhibit A hereto, as such Exhibit A may be amended from time to time in accordance with this Agreement.

"**CEO**" is defined in Section 9.1.

"**Certificate**" is defined in the recitals to this Agreement.

"**Change of Control**" means (i) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act) becoming the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) after the Effective Date, directly or indirectly, of more than 50% of the Company's Voting Units, provided, however, that notwithstanding anything herein to the contrary, a Change of Control shall not be deemed to have occurred pursuant to this clause (i) if such "person" is an Approved Holder or is a "group" comprised of Approved Holders, (ii) any Asset Sale (other than a sale to a "person" or "group" controlled by each of the Approved Holders where such Approved Holders have equity interests substantially equivalent to any Equity Interests in the Company held by such Approved Holders immediately prior to such Asset Sale, unless otherwise be agreed by each of the Approved Holders), (iii) any acquisition, merger, recapitalization or restructuring of the Company if, as a result, holders of securities that

6

represented 100% of the Voting Units of the Company immediately prior to such transaction cease to own directly or indirectly at least a majority of the voting power of the voting securities of the surviving entity after such transaction (treating as non-voting any securities held by a Harbinger Entity for this purpose) and (iv) any other transaction or event which constitutes a "Change of Control" under the Debt Documents (other than the 1.5 Lien Loans).

"**Change of Control Redemption Event**" is defined in Section 5.3(a).

"**Chief Financial Officer**" is defined in Section 9.1.

"**Chief Operating Officer**" is defined in Section 9.1.

"**Code**" means the Internal Revenue Code of 1986, as amended, and, as may be applicable, the Treasury Regulations promulgated thereunder.  Any reference in this Agreement to a Section of the Code or the Treasury Regulations shall be considered also to include any subsequent amendment or replacement of that Section.

"**Common Member**" means any holder of Common Units and "Common Members" means, collectively, all of the holders of Common Units.

"**Common Percentage**" means, with respect to each Common Member as of any date of determination, the quotient, expressed as a percentage, obtained by dividing the number of Common Units owned by such Member on such date by the sum total of all Common Units outstanding on such date, including for purposes of both the numerator and denominator any unvested Common Units.

"**Common Units**" means, collectively, the Series A Common, the Series B Common,  the Series C Common and the Series D Common.

"**Communications Laws**" means the Communications Act of 1934, as amended, the Telecommunications Act of 1996, as amended, and/or any rule, regulation, decision of published policy of the FCC or its staff acting pursuant to delegated authority, and the Radiocommunication Act (Canada), as amended, and the Telecommunications Act (Canada), as amended and all rules, regulations, orders and published decisions promulgated thereunder by Industry Canada and the Canadian Radio-Television and Telecommunications Commission (or any successor agency thereto) and any applicable communications laws or regulations of any other Governmental Authority.

"**Company**" is defined in the recitals to this Agreement.

"**Company Minimum Gain**" is defined in Section 13.5.

"**Competitor**" means any Person that is listed on Schedule I of this Agreement, as such Schedule may be updated in accordance with Section 8.14 and any Person, that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common

control with any Person that is listed on <u>Schedule I (where control refers to the power to, directly or indirectly,</u> vote 10% or more of the voting stock or other equity interest of another Person).[4]

"**Confidential Information**" is defined in Section 4.11(b).

"**Contract**" means any agreement, contract, note, bond, pledge, mortgage, indenture, instrument, lease or license.

"**Covered Persons**" is defined in Section 8.10(b).

"**Debt Documents**" means the First Lien Facility, the 1.5 Lien Loans (as defined in the Plan of Reorganization) (if any), the Second Lien Facility and any agreements, instruments, certificates and other documents contemplated thereby or executed or delivered in connection therewith (whether delivered prior to, contemporaneous with or after the execution and delivery of this Agreement) and, in each case, as amended, supplemented or otherwise modified in accordance with the terms thereof.

"**Debtors**" is defined in the recitals to this Agreement.

"**Declining Member**" is defined in Section 5.2(b).

"**Dilutive Offering**" means, with respect to any series of Units, any issuance of Equity Interests that dilutes the percentage of that series held by any of the Melody Investors, Harbinger, LSQ or Reorganized [LightSquared]; <u>provided</u>, <u>however</u>, that issuances pursuant to any Incentive Plan that has received Major Investor Approval shall not be deemed to be issued in a Dilutive Offering.

"**DIP Credit Agreement**" means that certain $1,650,000,000 Senior Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of [_____], 2014, by and among LightSquared Inc., a Delaware corporation, LightSquared LP, a Delaware limited partnership and One Dot Six Corp., a Delaware corporation, as the Borrowers thereunder, the Guarantors named therein, the Lenders named therein, J.P. Morgan Securities LLC as Sole Lead Arranger and Bookrunner and [ ], as Administrative Agent and Collateral Agent for the Lenders.

"**Drag Units**" is defined in Section 7.5(a).

"**Economic Capital Account**" means, as of any date of determination, with respect to any Member, such Member's Capital Account balance as of such date after crediting to such Capital Account any amounts that such Member is deemed obligated to restore under Treasury Regulations Section 1.704-2.

"**Elected Manager**" is defined in Section 8.2(a)(ii).

"**Encumbrances**" means any lien, encumbrance, hypothecation, charge, mortgage, right of first refusal, preemptive right, imperfection of title, restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any

---

[4] NTD: Schedule I to tie to Schedule 1.01(a) of Disqualified Companies in the First Lien Facility.

income derived from any asset, and any restriction on the possession, exercise of transfer of any other attribute of ownership of any asset.

"**Environmental Laws**" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance, (b) pollution or protection of employee health or safety, public health or the environment, or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

"**Equity Interest**" means any membership or other equity interest in the Company or any Subsidiary, including all Units, any option, warrant or purchase right to acquire membership or other equity interests of the Company or any Subsidiary, any debt or other security convertible into any membership or equity interests of the Company or any Subsidiary, any equity appreciation rights, phantom equity rights and rights of first refusal, offer or other similar rights.

"**Exchange Act**" is defined in Section 4.10(d).

"**Exempted Securities**" means Units, or other equity securities convertible, exercisable or exchangeable for Units or other equity securities of the Company; (i) issued and outstanding on the Effective Date; (ii) issued pursuant to any Incentive Plan; (iii) issued as direct consideration for the acquisition by the Company or any Subsidiary of another business entity or all or substantially all of the assets of another business entity or the merger of any business entity with or into the Company or any Subsidiary, in each case approved by the Board and where required, the Major Investors; or (iv) issued in connection with any joint ventures or strategic partnerships entered into by the Company or any Subsidiary with the approval of the Board and where required, the Major Investors.

"**Exercise Notice**" is defined in Section 5.2(b).

"**Exercise Period**" is defined in Section 5.2(b).

"**Expenses**" is defined in Section 10.1(a).

"**Fair Market Value**" means, with respect to any asset, as of any date of determination, the cash price (as determined in good faith by a majority of the disinterested Managers) at which a willing seller would sell, and a willing buyer would buy, each being apprised of all relevant facts and neither acting under compulsion, such asset in an arm's length negotiated transaction with an unaffiliated third party without time constraints. If the fair market value is greater than $10,000,000, or if the Board cannot determine the value in accordance with this provision, then the Fair Market Value will be determined by an independent third-party appraisal conducted by a nationally-recognized valuation company.

"**FCC**" means the Federal Communications Commission or any successor agency thereto.

"**FCC Approvals**" means that (i) the Company or any of its Subsidiaries shall have FCC authority to (a) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (b) operate at transmit

power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (c) provide terrestrial signal coverage of 250 million total POPs; (ii) any build out conditions that may be imposed by the FCC on the Company or any of its Subsidiaries shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (iii) any specific restrictions that may be imposed by the FCC on the Company or any of its Subsidiaries regarding their possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

"**First Lien Facility**" means that certain First Lien Credit Agreement, dated as of [      ], 2014, for up to $[1,500,000,000], among the Company, as Borrower, Reorganized [LightSquared] LP, and the other Guarantors party thereto, as Guarantors, the Lenders party thereto, J.P. Morgan Securities LLC, as Joint Lead Arranger and Joint Bookrunner, Credit Suisse Securities (USA) LLC, as Joint Lead Arranger, Joint Bookrunner and Syndication Agent and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Fiscal Year**" means the twelve (12)-month accounting period of the Company ending on or about December 31 of each year, or such other date as is required pursuant to Section 706 of the Code.

"**Fortress**" means Fortress Investment Group.

"**GAAP**" means generally accepted accounting principles in effect from time to time in the United States.

"**Governmental Authority**" means the government of the United States of America or any other government and, in each case, any state, commonwealth, territory, county or municipality thereof, or the government of any political subdivision of any of the forgoing or any authority, agency, ministry, court or other similar body exercising executive, legislative, judicial, regulatory or administrative authority of such government (including any supra-national bodies such as the European Union, the European Central Bank or the Organization for Economic Co-operation and Development with jurisdiction over the Company or any of its Subsidiaries).

"**Harbinger**" means Harbinger Capital Partners, LLC.

"**Harbinger Call Option**" is defined in Section 5.4.

"**Harbinger Call Exercise Date**" is defined in Section 5.4.

"**Harbinger Entity**" means Harbinger and any Affiliate thereof.

"**Hazardous Substance**" means any pollutant, contaminant or toxic or hazardous material, substance or waste, or petroleum or any fraction thereof.

"**Incentive Plan**" means any Management Incentive Plan providing for the issuance of Common Units or other Equity Interests or the economic equivalent thereof that is adopted by

the Board and approved by each Major Investor on or after the date hereof, as the same may be amended from time to time as provided therein.

"**Incentive Unit**" means any Unit or other Equity Interest authorized for issuance pursuant to the Incentive Plan, if any.

"**Incentive Unit Return Threshold**" is defined in Section 5.1(c).

"**Indemnitee**" is defined in Section 10.1(a).

"**Indemnitee Action**" is defined in Section 10.1(a).

"**Independent Manager**" is defined in Section 8.2(a)(ii).

"**Independent Third Party**" means, with respect to any Member, any Person that is not an Affiliate of such Member.

"**Industry Canada**" means the Canadian Federal Department of Industry, or any successor thereto or department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

"**Initial Members**" means **[ ]**.

"**Initial Operating Agreement**" is defined in the Recitals.

"**Initial Sole Member**" is defined in the Recitals.

"**Insufficient Remedial Allocation**" means the excess of the amount of hypothetical deductions an Initial Member would have received if the "remedial method" of allocation under Treas. Reg. section 1.704-3(d) had been applied to the Built In Gain Assets over the amount of deductions such Initial Member actually received with respect to such Built In Gain Assets; provided that the Insufficient Remedial Allocation will deemed to be zero (i) unless and to the extent that the Company's accountants have determined, in accordance with Section 13.2, that the "remedial method" is not permissible with respect to some or all of the Built In Gain Assets or (ii) to the extent that the "remedial method" has been elected with respect to Built In Gain Assets, until such time (if any) that the Internal Revenue Service successfully challenges the use of the "remedial allocation" method by the Company with respect to such assets (in which case the obligations under Section 13.13(b) shall be calculated taking into account the date of disallowance of the use of the "remedial allocation" method).

"**Investor Business Opportunity**" is defined in Section 8.10(b).

"**IPO**" means the initial public offering of equity securities of the Company or a successor corporation pursuant to an effective registration statement under the Securities Act (other than any registration on Form S-8 or Form S-4, or any successor form thereto).

"**IRS**" means the United States Internal Revenue Service.

11

"**Laws**" means any law, statute, ordinance, code, rule, regulation, injunction, judgment, order, decree, ruling or binding directed promulgated by a Governmental Authority, or any similar provision having the force of law, including the Communications Laws and the Environmental Laws, as applicable.

"**Liability**" is defined in Section 10.1(a).

"**Liquidation Preference**" means, with respect to the Series A-1 Preferred, the Series A-1 Liquidation Preference and with respect to the Series A-2 Preferred, the Series A-2 Liquidation Preference.

"**LSQ**" means LSQ Acquisition Co LLC.

"**Major Investor Approval**" means the approval or written consent of each Person who constitutes a Major Investor on the date such consent or approval is sought.

"**Major Investors**" means each of Melody, Harbinger, LSQ and Reorganized [LightSquared]**,** so long as such Person or group of Persons, including their respective Affiliates (which in the case of Melody, includes the Melody Investors, in the case of LSQ, includes Fortress and its Affiliates and in the case of Harbinger includes any Harbinger Entity) holds at least 25% of the number of the Series A Common held by such Person on the Effective Date.

"**Majority Interest**" means the Members holding at least a majority of the outstanding Voting Units.

"**Make-Whole Payment**" means the total cash amount actually paid by the Company to satisfy the "make-whole" provisions of the Second Lien Facility as a result of any repayment or prepayment of the Second Lien Facility as provided in Sections 2.09 and 2.10 of the Second Lien Facility.

"**Manager**" means a member of the Board.  Each Manager shall also be a "**manager**" of the Company for purposes of the Act.

"**Management Report**" is defined in Section 4.10(a)(ii).

"**Mandatory Redemption Event**" means any Series A-1 Redemption Event or Change of Control Redemption Event.

"**Melody**" means Melody NewCo LLC.

"**Melody Investors**" means Melody, Centaurus Capital LP, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Special Value Opportunities Fund, LLC and any participant in Melody's investment as of February 14, 2014, that subsequently becomes a direct owner of the related Equity Interests in accordance with the terms of this Agreement.

"**Member**" means each Person listed on Exhibit A hereto, together with their respective permitted successors and assigns and any Person hereafter admitted as a Member of the

Company, in each case, in accordance with the Act and with this Agreement and who has not assigned all of its Units to another Person.

"**Member Indemnified Party**" is defined in Section 2.10(b).

"**Member Losses**" is defined in Section 2.10(b).

"**Member Nonrecourse Debt**" is defined in Section 13.6.

"**Member Nonrecourse Debt Minimum Gain**" is defined in Section 13.7.

"**Minimum Appointment Threshold**" is defined in 8.2(a)(iii).

"**New Issuance Closing Date**" is defined in Section 5.2(d).

"**New Issuance Notice**" is defined in Section 5.2(b).

"**New Units**" is defined in Section 5.2(b).

"**Nonrecourse Deductions**" is defined in Section 13.4.

"**Offered Membership Interest**" is defined in Section 7.3(a).

"**Offering Member**" is defined in Section 7.3(a).

"**Offering Member Notice**" is defined in Section 7.3(b).

"**Officer**" is defined in Section 9.1.

"**Opening Balance Sheet**" is defined in Section 4.10(a).

"**Optional Redemption Event**" is defined in Section 5.3(b).

"**Other Members**" is defined in Section 7.3(a).

"**Over-Allotment Notice**" is defined in Section 7.3(e).

"**Over-Allotment Period**" is defined in Section 7.3(e).

"**Percentage Interest**" means, with respect to any Member, as of any date of determination, the quotient, expressed as a percentage, obtained by dividing the number of Series A Common owned by such Member on such date by the number of Series A Common owned by such Member on the Effective Date.

"**Permitted Transferee**" means, (a) with respect to any Member (i) any Affiliate of such Member, (ii) any limited partner of such Member or Affiliate if such Member or Affiliate is a fund in connection with a Transfer resulting from the liquidation of such fund or a distribution by such fund to its limited partners on a pro rata basis, (iii) upon approval from each of the Specified Investors, any Person acquiring (A) an Equity Interest from such Member upon

13

exercise of a Permitted Warrant or (B) a participation interest from such Member and any subsequent transfer of the related Equity Interests to such participant; provided, however, that such approval of the Specified Investors shall not be required in either case of clauses (A) or (B), (1) with respect to any such Person whose identity and percentage of participation was disclosed in writing with reference to this definition via e-mail to each of the Major Investors on or prior to February 14, 2014 or, with respect to Melody, is included in the definition of Melody Investors other than any participant whose identity was not disclosed to the Major Investors, (2) after the date that is the later of (x) eighteen (18) months after the Confirmation Date (as defined in the Plan of Reorganization) and (y) twelve (12) months after the Effective Date; or (3) in connection with the exercise of a Permitted Warrant upon a Change of Control, Required Sale, IPO, Mandatory Redemption Event or Optional Redemption Event; (iv) any general partner or managing member of such Member or any Affiliate of such general partner or managing member; (v) any other Member; and (vi) any Person organized, formed or incorporated and managed or controlled by (x) such Member, its general partner, investment manager or managing member or (y) an Affiliate of its general partner, investment manager or managing member, (b) with respect to any holder of any Series C Common or Series D Common, Harbinger pursuant to the Harbinger Call Option; (c) with respect to the Series A-2 Callable Parties, Reorganized [LightSquared] pursuant to the RLS Call Option and (d) with respect to ADIC's Series C Common, Melody so long as ADIC retains the economic rights and Melody is granted sole discretion to vote such Series C Common without the requirement to obtain consent from ADIC with respect thereto on any matter which the Series C Common is entitled to vote upon.

"**Permitted Warrants**" means a written warrant agreement that provides the right to acquire a portion of a Member's Series A Common or Series A-1 Preferred, as applicable, upon exercise of the warrant issued by such Member and that it is not exercisable prior to six (6) months after the Effective Date or is only exercisable in connection with a Change of Control, Required Sale, IPO, Mandatory Redemption Event or Optional Redemption Event.[5].

"**Person**" means any natural person, corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, governmental agency, trust, estate, association, custodian, nominee or any other individual or entity, whether acting in an individual, fiduciary, representative or other capacity.

"**Plan of Reorganization**" is defined in the recitals to this Agreement.

"**Principal Office**" is defined in Section 2.2.

"**Public Accountants**" is defined in Section 4.10(a).

"**Purchaser**" is defined in Section 7.4(a).

"**Redemption Date**" means the date designated by the Company in the Company Redemption Notice upon which a redemption is to be effected.

---

[5] NTD: Permitted Warrants shall include options issued by Harbinger to Melody in those certain Option Agreements, dated as of October 7, 2013, by and among Melody, certain of its Affiliates party thereto and certain Harbinger entities party thereto, and the pledge agreements related thereto, if not exercised prior to the Effective Date for the purposes of the definition of Permitted Transferee.

"**Redemption Notice**" is defined in Section 5.3(d).

"**Refund Amount**" means the product of the Assumed Tax Rate and the amount of Built in Loss with respect to such Initial Member's Units.

"**Register of Members**" is defined in Section 7.1(a).

"**Remaining Members**" is defined in Section 7.3(d).

"**Reorganized [LightSquared]**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the transactions contemplated by the Plan of Reorganization.

"**Required Sale**" is defined in Section 7.5(a).

"**Required Sale Notice**" is defined in Section 7.5(a).

"**RLS Asset Purchase Agreement**" means that certain purchase agreement, dated as of [_____] 2014, by and among LightSquared Inc., a Delaware corporation, LightSquared Investors Holdings Inc., a [_____] corporation, TMI Communications Delaware, Limited Partnership and the Company.[6]

"**RLS Call Option**" is defined in Section 5.5.

"**ROFO Acceptance Notice**" is defined in Section 7.3(c).

"**ROFO Notice Period**" means the period commencing on the date the Offering Member first transmits the Offering Member Notice and ending on the 30th day following the transmission of the Offering Member Notice; provided, that such period shall be extended until the twentieth (20) day after the transmission of the Second Offering Member Notice, if one is sent and shall further be extended until the tenth (10th) day following the end of the Over-Allotment Period, to the extent applicable.

"**Sale Proposal**" is defined in Section 7.5(a).

"**Second Lien Facility**" means that certain $[1,200,000,000] Junior Lien Loan Agreement, dated as of [     ], 2014, among the Company, as Borrower, Reorganized [LightSquared] LP, and the other Guarantors party thereto, as Guarantors, the Lenders party thereto, J.P. Morgan Securities LLC, as Sole Lead Arranger and Sole Bookrunner and [   ], as Administrative Agent, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Second Offering Member Notice**" is defined in Section 7.3(d).

"**Secondary Indemnitors**" is defined in Section 10.7.

---

[6] NTD: This agreement to be satisfactory in form and substance to the Major Investors.

"**Secretary**" is defined in Section 9.1.

"**Section 754 Election**" is defined in Section 11.6.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Selling Member**" is defined in Section 7.5(a).

"**Series A Common**" is defined in Section 5.1(b).

"**Series A Preferred**" means, collectively, the Series A-1 Preferred and the Series A-2 Preferred.

"**Series A-1 Liquidation Preference**" means a dollar amount equal to the greater of (i) $[825][7] million reduced by $[144] million per annum after the Effective Date (or a pro rata portion thereof in the event of a payment within any year) and (ii) $[ ][8] million increased by $[126] million per annum after the Effective Date (or a pro rata portion thereof in the event of a payment within any year), in each case of clauses (i) and (ii) reduced (but not below zero) by any Make-Whole Payment incurred by the Company as a result of the prepayment of the Second Lien Facility <u>minus</u> any prior distributions paid with respect to the Series A-1 Preferred in accordance with Section 6.1(b)(i).[9]

"**Series A-1 Preferred**" is defined in Section 5.1(b).

"**Series A-1 Redemption Event**" is defined in Section 5.3(a).

"**Series A-2 Callable Party**" means holders of the Existing Inc. Series A Preferred Stock (as defined in the Plan of Reorganization) and Other Existing Inc. Series B Preferred Stock Holders (as defined in the Plan of Reorganization), in their respective capacities as holders of Series A-2 Preferred (and each of their respective successors and assigns).

"**Series A-2 Liquidation Preference**" means a dollar amount equal to the aggregate Stated Value for all Series A-2 Preferred, as set forth on <u>Exhibit A</u> (which amount is equal to $355 million as of the date hereof), plus dividends accruing at a rate of 9.75% per annum compounded annually to the date of payment minus any distributions paid with respect to dividends accruing on the Series A-2 Preferred pursuant to Section 6.1(b)(ii) prior to such date of payment.

"**Series A-2 Preferred**" is defined in Section 5.1(b).

"**Series B Common**" is defined in Section 5.1(b).

"**Series C Call Price**" means, as of any date of determination, an amount equal to $57,730,000 plus interest accruing at a rate of per annum compounded annually equal to 9.75%

---

[7] NTD: To be increased by an appropriate amount of accrued interest on the New DIP Tranche A Claim.
[8] NTD: To equal $150 million plus 11% interest accrued on the New DIP Tranche A Claim to the Effective Date.
[9] NTD: If the size of the Second Lien Facility is not equal to $1.2 billion, this amount will be adjusted to achieve the same economics.

calculated to the date of determination minus any distributions paid with respect to the Series C Common pursuant to Section 6.1(b)(iii) prior to the Harbinger Call Exercise Date.

"**Series C Common**" is defined in Section 5.1(b).

"**Series D Call Price**" means, as of any date of determination, an amount equal to $149,270,000 plus interest accruing at a rate of per annum compounded annually equal to 9.75% calculated to the date of determination minus any distributions paid with respect to the Series D Common pursuant to Section 6.1(b)(iii) prior to the Harbinger Call Exercise Date.

"**Series D Common**" is defined in Section 5.1(b).

"**Specified Investors**" means each of Melody, LSQ and Reorganized [LightSquared] so long as such Person is a Major Investor.

"**Stated Value**" means, with respect to each Unit, the amount paid for such Unit, as the same may be reduced from time to time pursuant to the provisions of Section 6.1(b) to account for distributions received with respect thereto that are in excess of any dividends accrued on such Unit, in each case, as set forth on Exhibit A.

"**Subsidiary**" means, with respect to any Person, any other Person of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.

"**Tag Along Member**" is defined in Section 7.4(a).

"**Tag Along Notice**" is defined in Section 7.4(b).

"**Tag Along Offer**" is defined in Section 7.4(b).

"**Tag Along Right**" is defined in Section 7.4(a).

"**Target Balance**" means, with respect to any Member as of the close of any period for which allocations are made under Section 13.1, the amount such Member would receive in a hypothetical liquidation of the Company as of the close of such period, assuming for purposes of any hypothetical liquidation (i) a sale of all of the assets of the Company at prices equal to their

then book values (as maintained by the Company for purposes of, and as maintained pursuant to, the capital account maintenance provisions of Treasury Regulations Sections 1.704-1(b)(2)(iv)), and (ii) the distribution of the net proceeds thereof to the Members pursuant to Section 6.2 (for this purpose, treating all outstanding Units as fully vested), after the payment of all actual Company indebtedness and any other liabilities related to the Company's assets (limited, with respect to each (x) "nonrecourse liability" as defined in Treasury Regulation 1.704-2(b)(3) and "partner nonrecourse liability" as defined in Treasury Regulation 1.704-2(b)(4) and (y) recourse liability under Section 1001 of the Code (i.e., a liability that can be satisfied from any of the assets of the Company) that does not constitute a "partner nonrecourse liability" as defined in Treasury Regulation 1.704-2(b)(4), to the collateral securing, or assets otherwise available to satisfy, such liabilities).

"**Tax Amount**" means the product of (i) the Assumed Tax Rate and the amount of Built In Gain inappropriately allocated to such Initial Member or (ii) the Assumed Tax Rate and the Insufficient Remedial Allocation, as applicable.

"**Tax Matters Partner**" is defined in Section 2.8.

"**Third Party Claim**" means, with respect to any Member, any claim brought by a Person other than such Member, any Debtor, the Company or any of their respective Affiliates.

"**Transfer**" means, with respect to any security, the direct or indirect sale, assignment, transfer, exchange, issuing of participation rights or other disposition of voting or economic rights in  such security, or any change in the direct beneficial ownership of such security, whether or not for value and whether voluntarily, involuntarily, by operation of law or otherwise.

"**Transfer Agent**" is defined in Section 7.1(a).

"**Transferring Member**" is defined in Section 7.4(a).

"**Treasurer**" is defined in Section 9.1.

"**Treasury Regulations**" refers to the regulations promulgated by the United States Treasury Department under the Code.

"**Unit**" is defined in Section 5.1(a).

"**Unreturned Capital Contribution**" means, with respect to any Member, the portion of such Member's Capital Contribution that has not, at any particular time, been returned to the Member through a distribution under Section 6.1(b) hereof.

"**Unvested Amount**" is defined in Section 6.1(c).

"**Voting Member**" means any Member who owns Voting Units.

"**Voting Units**" means the Series A Common, Series B Common and Series C Common, other than (i) any Common Units held by any Harbinger Entity; provided, however, that any Common Units that are not considered Voting Units due to such Units being held by a Harbinger

Entity shall become Voting Units at the time that such Units are Transferred by any Harbinger Entity to any Person (other than another Harbinger Entity) in accordance with this Agreement, (ii) any Series C Common held by ADIC; provided, however, that any Series C Common that are not considered Voting Units due to such Units being held by ADIC shall become Voting Units at the time that such Units are Transferred by ADIC to any Person (other than an Affiliate of ADIC) in accordance with this Agreement, (iii) any Series A Common held by Reorganized [LightSquared] and its successors or assigns that is in excess of [22.22]% of the outstanding Series A Common; provided, however, to the extent Reorganized [LightSquared]'s voting rights with respect to the Series A Common would exceed [22.22]% of the aggregate voting rights allocated to Series A Common but for the preceding clause, such excess percentage of voting rights shall be allocated ratably amongst the other Series A Common other than the Series A Common held by any Harbinger Entity (but only so long as such Series A Common is held by a Harbinger Entity) and (iv) any Series A Common issued pursuant to any Incentive Plan, which are issued without voting rights until fully vested, as provided in the Award Agreement under the applicable Incentive Plan, until such time as such Series A Common become fully vested.[10]

"**Withholding Payment**" is defined in Section 6.3(a).

## ARTICLE II
## GENERAL

**Section 2.1**    **Name**.  The name of the Company shall be, and the business of the Company shall be conducted under the name of, "**[NewCo], LLC**".

**Section 2.2**    **Principal Place of Business**.  The location of the principal place of business of the Company shall be [10802 Parkridge Boulevard, Reston, VA 20191] (the "**Principal Office**").  The Company may locate its place of business at any other place or places the Board may, from time to time, deem advisable.

**Section 2.3**    **Names and Addresses of Members**.  The names and addresses of the initial Members are as set forth in Exhibit A.

**Section 2.4**    **Qualification in Other Jurisdictions**.

The Board shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company owns property or engages in activities and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including the appointment of agents for service of process in such jurisdictions, if such qualification or registration is necessary or desirable to permit the Company to own property and engage in the Company's business in such jurisdictions.

**Section 2.5**    **Registered Office and Registered Agent**.

---

[10] NTD: Subject to satisfaction of applicable laws, rules and regulations, Reorganized [LightSquared]'s voting rights and rights to appoint Managers will revert to ratable treatment with other Major Investors.

The Company's registered office shall be at the office of its registered agent at c/o Corporation Service Company, 2711 Centerville Road, Wilmington, Delaware 19808 and the name of its registered agent shall be Corporation Service Company.

### Section 2.6    Term of Existence.

The Company's term of existence shall be perpetual unless earlier terminated, dissolved or liquidated in accordance with the Act or the provisions of this Agreement.

### Section 2.7    Taxation as Partnership.

Subject to Sections 2.9, 6.5 and 8.4(a)(i), to the extent permitted by applicable law, the Company intends to be treated as a partnership for United States federal, state and local tax purposes and the Members and the Company will make any necessary elections to achieve this result and refrain from making any elections that would have a contrary result. Subject to Sections 2.9, 6.5 and 8.4(a)(i), no Member shall knowingly take (or shall knowingly cause any of its Affiliates to take) any action that is inconsistent with the classification of the Company as a partnership for United States federal, state and local tax purposes. Each Member will be responsible for taxes imposed on its share of income of the Company (including withholding taxes).

### Section 2.8    Tax Matters Partner Subject to Section 8.4(a)(i), for so long as the Company is treated as a partnership for tax purposes, the Board shall designate a Member (or any other Person) to serve as a "**Tax Matters Partner**" of the Company as defined in Section 6231 of the Code. The Tax Matters Partner shall have all powers necessary and appropriate in connection therewith including: (a) to conduct all audits and other administrative proceedings with respect to Company tax items; (b) to extend the statute of limitations for all Members with respect to Company tax items; (c) to file a petition with an appropriate United States federal court for review of a final Company administrative adjustment; and (d) to enter into a settlement with the IRS on behalf of and binding upon, all of the Members unless a Member notifies the IRS (within the time prescribed by the Code and Regulations) that the Tax Matters Partner may not act on such Member's behalf. The Tax Matters Partner shall keep each Member informed of all administrative and judicial proceedings as is required by Section 6223(g) of the Code and the Treasury Regulations promulgated thereunder. Notwithstanding any provision in this Agreement to the contrary, the Person serving as the Tax Matters Partner of the Company shall have the sole authority to act on behalf of the Company in the Company's capacity as the tax matters partner of any other Person. The Tax Matters Partner shall have all the powers and duties assigned thereto under the Code and the Treasury Regulations thereunder, provided that, unless otherwise determined by the Board with Major Investor Approval at the time of designating the Tax Matters Partner, the Tax Matters Partner shall not take or initiate any action or proceeding in any court, extend any statute of limitations, or take any other action contemplated by Section 6222 through 6231 of the Code that would legally bind the Members or make any material election, report or filing without Major Investor Approval. Any action taken by the Tax Matters Partner pursuant to or in accordance its powers and duties as the "tax matters partner" of the Company under this Agreement shall be made as a fiduciary for the interest of all Members. If any Person designated as the Tax Matters Partner is no longer qualified to be the Tax Matters Partner pursuant to Section 6231(a)(7) of the Code and the Treasury Regulations promulgated

20

thereunder, the Board shall designate another eligible person as the Company's Tax Matters Partner.  Reorganized [LightSquared], LSQ and Melody will each be a "notice" partner as defined under Section 6231.

**Section 2.9**    **[Reserved.]**

**Section 2.10**    **Representations and Warranties of the Company; Indemnity**.

(a)    The Company hereby represents and warrants to each Member as of the date hereof:

(i)    All limited liability company action required to be taken by the Board of Managers and members in order to authorize the Company to enter into this Agreement and to issue the Units on the Effective Date has been taken.  Assuming the satisfaction of all conditions precedent to the effectiveness of the Plan of Reorganization, all action on the part of the authorized representatives of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement and the issuance and delivery of the Units has been taken.  Subject to satisfaction of conditions to consummation of the Plan of Reorganization, when this Agreement has been executed and delivered by the Company and assuming due and valid execution and delivery hereof by the Members, the Units shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally (the "**Bankruptcy Exception**"), or (ii) as limited by laws governing specific performance, injunctive relief, or other equitable remedies.

(ii)    The Units, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, the Plan of Reorganization and the DIP Credit Agreement, will be validly issued, fully paid and nonassessable, free of all Encumbrances other than any Encumbrance created by a Member with respect to its own Units.  Assuming the accuracy of the representations made by the Members in Section 4.2 and subject to the filings described in clause (iv) below, the Units will be issued in compliance with all applicable federal and state securities laws, including the registration requirements thereof, to the extent applicable.

(iii)    Neither the Company nor any Person acting on its behalf, has engaged or will engage in any form of general solicitation or general advertising (within the meaning of the Securities Act) in connection with the offer or sale of the Units.  Neither the Company nor any Person acting on its behalf has engaged or will engage in any directed selling efforts (as defined in the Securities Act) in respect of the Units.  Neither the Company nor any Person acting on its behalf has made or will make offers or sales of Units under circumstances that would require the registration of the Units under the Securities Act.

(iv)    Assuming the satisfaction of all conditions precedent to the effectiveness of the Plan of Reorganization and the accuracy of the representations made by the Members in Section 4.2 of this Agreement, no consent, approval, order or authorization of, or

21

registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement to occur on the date hereof, except for (A) filings pursuant to Regulation D of the Securities Act and applicable state securities laws, if applicable, which have been made or will be made in a timely manner and (B) notices of consummation and similar filings required under the Communications Laws.

(v)    The Company is not in violation or default (a) of any provisions of the Certificate of Formation or the Initial Operating Agreement or (b) of any material instrument, judgment, order, writ or decree, (c) under any material note, indenture, mortgage or other debt obligation, (d) under any material Contract or purchase order to which it is a party or by which it is bound, or (e) of any material Law applicable to the Company or any of its assets, except as limited by the Bankruptcy Exception.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, judgment, order, writ, decree, Contract or law, or (ii) an event which results in the creation of any Encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

(vi)    The Company has been formed solely for the purpose of engaging in the transactions contemplated hereby, the DIP Credit Agreement and the Plan of Reorganization and neither the Company nor the Initial Sole Member on behalf of the Company has issued any Equity Interests or conducted any activities other than in connection with the organization of the Company, the negotiation and execution of this Agreement, the First Lien Facility, the 1.5 Lien Loans (if any) and the Second Lien Facility, the application for approval from Governmental Authorities of the transactions contemplated by the Plan of Reorganization and other activities relating directly to the consummation of the transactions contemplated hereby and thereby.

(b)    The Company agrees that each Member, its Affiliates and its and their respective directors, officers, advisors, agents and employees (collectively, the "**Member Indemnified Parties**", and each a "**Member Indemnified Party**") will have no liability for, and will be indemnified and held harmless by the Company from and against, any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees, disbursements and other charges of counsel and costs of preparation and investigation (collectively, "**Member Losses**") that such Member Indemnified Party incurs resulting from, relating to or otherwise incurred in respect of the inaccuracy as of the date of this Agreement of any of the representations and warranties made by the Company in this Agreement; except, in each case for any losses, liabilities, obligations, claims, contingencies, damages, costs and expenses which, according to a final, nonappealable judgment of a court of competent jurisdiction, have arisen from the gross negligence or willful misconduct of the relevant Member Indemnified Party.  To the extent that the foregoing covenant by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Member Losses which is permissible in accordance with applicable Law.

(c)     Whenever any claim shall arise for indemnification hereunder, each Member Indemnified Party shall promptly notify the Company in writing in accordance with Section 16.2 hereof, of the claim and, when known, the facts constituting the basis for such claim, but failure to give prompt notice will not relieve the Company from its indemnification obligations, except to the extent the Company was materially prejudiced by the failure to give such notice.  In the event of any Third Party Claim, the notice to the Company shall specify, if known, a reasonable estimate of the amount of the Member Losses arising therefrom.  Any claim (other than any Third Party Claim) properly noticed shall, unless objected to in writing by the Company within ten (10) calendar days following such notice, be paid by the Company or otherwise settled to the satisfaction of the Member Indemnified Party within twenty (20) calendar days of such notice.  The Company shall have the right in its sole discretion to conduct the defense of any Third-Party Claim; provided, however, that the Company shall not settle any Third-Party Claim unless such settlement includes an unconditional release of each Member Indemnified Party from all liability arising out of such claim, action, suit or proceeding, without the prior written consent of the Member Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)     An indemnity under this Section 2.10 shall be paid solely out of and to the extent of the assets of the Company (including any assets held by any Subsidiary of the Company) and shall not be a personal obligation of any Member.

### ARTICLE III
### PURPOSE OF THE BUSINESS

The purpose of the business of the Company is to engage in the Business and any other lawful business, purpose or activity permitted under the terms of the Act which, in the judgment of the Board, shall be appropriate or desirable for the Company to pursue.  The Company may exercise all of the powers and privileges granted by the Act or that may be exercised by any other Person, together with any powers incidental thereto, so far as such powers or privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

### ARTICLE IV
### MEMBERS; CERTAIN RIGHTS AND OBLIGATIONS

Section 4.1     **Members**.  The Members of the Company shall be the Persons identified on Exhibit A hereto, as such Exhibit A may be amended from time to time in accordance with the terms of this Agreement.  The Members shall have only such rights with respect to the Company as specifically provided in this Agreement and as required by the Act.

Section 4.2     **Representations and Warranties of the Members**.

(a)     Each Member, severally and not jointly, hereby represents and warrants to the Company and acknowledges that (i) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (ii) it is able to bear

23

the economic and financial risk of an investment in the Company for an indefinite period of time and understands that (A) it has no right to withdraw from the Company or require the Company to repurchase its Units except as provided herein, or with respect to the Preferred Units, upon a Change of Control and (B) no public market now exists for the Units, and that the Company has made no assurances that a public market will ever exist for the Units, (iii) it is acquiring Units in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (iv) unless such Member only holds Units issued under the Incentive Plan, it is an "accredited investor" as defined in Rule 501 under the Securities Act, (v) it understands that the Units have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and the provisions of this Agreement with respect to the Transfer of the Units have been complied with, and (vi) the execution, delivery and performance of this Agreement do not require it to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any existing law or regulation applicable to it, any provision of its charter, by-laws or other governing documents (if applicable) or any agreement or instrument affecting the Units held by it and to which it is a party or by which it is bound.

(b)    Each Member, severally and not jointly, hereby represents and warrants to the Company and each other Member that, except as disclosed by the Member in a schedule delivered to the Company and each other Member on or before **[ ]**, 2014, this Agreement, together with the DIP Credit Agreement and the Plan of Reorganization and any other agreement to which all of the Major Investors are a party, constitutes the entire agreement by and between such Member and the Company and such Member and any other Member with respect to the matters set forth herein and such Member has not entered into any Contract, whether written or oral, which has the effect of establishing rights under, or altering or supplementing the terms of, or providing an interpretation with respect to, any provisions of this Agreement other than the rights established pursuant to any Permitted Warrant.

(c)    Each Major Investor, on behalf of itself and its Affiliates, hereby represents and warrants to the Company and each of the other Major Investors that it has not granted the right to exercise voting, approval or consent rights with respect to such Major Investor's Equity Interests to any participant in such Major Investor's investment in the Company.  Each Major Investor covenants that it shall not grant any such rights to any participant in its investment in the Company after the date hereof without Board approval and Major Investor Approval; provided, however, that nothing herein shall be construed as limiting such participant's rights if and to the extent such participant is admitted as a Member in accordance with this Agreement.

**Section 4.3    Place and Time of Meetings; Notice**.  Meetings of the Members may be held at such place and at such time as may be designated from time to time by the Board, and there shall be no requirement that the Company hold periodic or other meetings of the Members; provided, however, that, commencing on January 1, 2015, the Company shall hold an annual meeting of the Members each calendar year no later than the later of (a) April 30 of such calendar year and (b) the date that is thirty (30) days after the date the audited financial statements required pursuant to Section 4.10(a)(iii) are delivered to Members, to elect the Board for that year.  All Members shall be allowed to participate in or attend meetings of the Members;

24

provided, that only Voting Members shall be entitled to cast votes thereat unless any matter or matters to be voted on at such meeting requires the approval of any other Member or group of Members pursuant to the terms of this Agreement (in which case such other Member or group of Members shall be entitled to vote on such matters to the extent provided herein).  Any or all Members may participate in any meeting of Members by any means of conference communication through which all such Members may simultaneously hear each other during such meeting.  Notice of any meeting shall be given to each Member in person or by telephone, facsimile (with confirmation of receipt) or by electronic mail sent to such Member's email address at least five (5) Business Days in advance of such meeting.  Notice of any meeting may be waived by any Member upon either the signing of a written waiver thereof or presence at a meeting by such Member (unless such Member attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened).

   **Section 4.4 Quorum**.  At any meeting of the Members, the Members representing a Majority Interest shall constitute a quorum; provided, however, that if any matter to be acted upon at such meeting requires the separate vote of any series of Units, a majority of such series shall be required to constitute a quorum with respect to such matter.  If less than a quorum is present, the meeting may be adjourned and held without further notice upon reaching a quorum.

   **Section 4.5 Written Action**.  Any action that may be taken at a meeting of the Members may be taken without a meeting and without any notice to the Members if taken in writing and signed by Members representing the number and class of Units that would be required to take such action at a meeting of the Members, unless a larger number is required by the Act.  The Secretary of the Company shall provide reasonably prompt notice to the other Members of any action so taken.

   **Section 4.6 Number of Votes**.  Any action to be taken by the Members shall require the affirmative vote of Members representing a Majority Interest, unless a larger number is required by the Act or this Agreement or a separate vote of one or more series of Units is required to take such action by this Agreement.  Any action requiring consent or approval of the Major Investors shall require obtaining Major Investor Approval.

   **Section 4.7 Authority of the Members**.  Except as otherwise expressly provided herein or by the Board, no Member shall have any authority to act for, or to assume any obligations or responsibility on behalf of, or bind any other Member or the Company.

   **Section 4.8 Liability of Members**.  Except as otherwise provided in the Act, by law or expressly in this Agreement or by another written instrument signed by such Member, no Member shall be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company.  No Member shall have any obligation to contribute to, or in respect of, the liabilities or obligations of the Company or return distributions made by the Company except as required by the Act or other applicable law.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for making its Members (including the Tax Matters Partner) responsible for the liabilities of the Company.  The Company shall promptly

reimburse any Member (including, the Initial Sole Member, if applicable) for any reasonable and documented expenses incurred by such Member on behalf of the Company prior to the Effective Date in connection with the formation of the Company and obtaining any regulatory approvals for the Company required in connection with the Plan of Reorganization.

Section 4.9    **No Right to Withdraw**.  Except as otherwise provided herein, no Member shall have any right to resign or withdraw from the Company without the consent of the Board.  No Member shall have any right to receive any distribution or the repayment of its Capital Contribution, except as provided in Articles V, XIII and XIV.  No interest or other compensation shall be paid on or with respect to the Capital Contribution of any of the Members, except as expressly provided herein.

Section 4.10    **Preparation of Financial Statements; Rights to Information**.

(a)    The Company shall use its commercially reasonable efforts to:  promptly after the Effective Date, engage a firm of independent public accountants of recognized national standing selected by the Board (the "**Public Accountants**") and cause the Public Accountants promptly after their engagement to prepare an opening consolidated and consolidating balance sheet of the Company and its Subsidiaries as of the Effective Date (the "**Opening Balance Sheet**") in accordance with GAAP (and including, on a separate basis, a U.S. federal tax basis balance sheet) and to deliver it to each Member.  The Board shall have the discretion to require such Opening Balance Sheet to be audited by the Public Accountants. Thereafter, the Company shall use its commercially reasonable efforts to deliver to each Member:

(i)    as soon as practicable and in any event within fifteen (15) days after the end of each calendar month, or such later date as may be agreed to by the Board and the Major Investors (commencing with the first full calendar month occurring after the Effective Date (but not in any event required to be delivered sooner than 180 days after the Effective Date) and including the last calendar month of the Company's Fiscal Year), consolidated and consolidating balance sheets of the Company and its Subsidiaries, if any, and the related consolidated and consolidating statements of income, unaudited but prepared in accordance with GAAP, consistently applied from and after the Effective Date, and certified by the Treasurer or Chief Financial Officer of the Company as fairly presenting the financial condition, results of operations and cash flows of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, except that such financial statements will not contain financial statement notes and will be subject to normal year-end audit adjustments, such consolidated and consolidating balance sheets to be as of the end of such month and such consolidated and consolidating statements of income and cash flows to be for such month and for the period from the beginning of the Fiscal Year (except in the Company's first Fiscal Year, which shall be from the date of the Opening Balance Sheet) to the end of such month, in each case with comparative statements for the prior Fiscal Year (but only to the extent that there exists a comparable period in the prior Fiscal Year that commenced and was completed after the date of the Opening Balance Sheet); provided, however, that for the first full calendar month of the Company following the Effective Date the above described financial statements shall provide for the period from the date of the Opening Balance Sheet and all comparative financial statements during the Fiscal Year that includes the Effective Date shall be comparative to the Opening Balance Sheet and the date of the Opening Balance Sheet;

26

(ii)    as soon as practicable and in any event within forty-five (45) days after the end of each of the first three full fiscal quarters of the Company, beginning with the first full fiscal quarter ending after the Effective Date (but not in any event required to be delivered sooner than 180 days after the Effective Date) or, in each case, such later date as may be agreed to by the Board and the Major Investors, consolidated and consolidating balance sheets of the Company and its Subsidiaries, if any, and the related consolidated and consolidating statements of income and of cash flows, unaudited but prepared in accordance with GAAP, consistently applied from and after the Effective Date, and certified by the Treasurer or Chief Financial Officer of the Company as fairly presenting the financial condition, results of operations and cash flows of the Company and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, except that such financial statements will not contain financial statement notes and will be subject to normal year-end audit adjustments, such consolidated and consolidating balance sheets to be as of the end of such quarter and such consolidated and consolidating statements of income and cash flows to be for such quarter and for the period from the beginning of the Fiscal Year (except in the Company's first Fiscal Year, which shall be from the date of the Opening Balance Sheet) to the end of such quarter, in each case accompanied by a written report that contains information generally of the nature required by the substantive requirements of Item 303 of Regulation S-K (17 CFR Part 229.310) for such time period and the information required by Item 404(a) of Regulation S-K (17 CFR Part 229.404) (the "**Management Report**") and comparative statements for the prior Fiscal Year (but only to the extent that there exists a comparable period in the prior Fiscal Year that commenced and was completed after the date of the Opening Balance Sheet); provided, however, that for the first full fiscal quarter of the Company following the Effective Date the above described financial statements shall provide for the period from the date of the Opening Balance Sheet and all comparative financial statements during the Fiscal Year that includes the Effective Date shall be comparative to the Opening Balance Sheet and the date of the Opening Balance Sheet;

(iii)    as soon as practicable and in any event within ninety (90) days after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2015, and, in the case of the fiscal year ended December 31, 2014, within one hundred twenty (120) days after the end of such Fiscal Year or one hundred eighty (180) days after the end of such Fiscal Year, if the Effective Date occurs after October 31, 2014, or, in each case, such later date as may be agreed to by the Board and the Major Investors, consolidated and consolidating balance sheets of the Company and its Subsidiaries, if any, as of the end of such Fiscal Year and the related consolidated and consolidating statements of income and of cash flows for the Fiscal Year then ended, prepared in accordance with GAAP, consistently applied from and after the Effective Date, that shall be audited by the Public Accountants, in each case accompanied by a Management Report and comparative statements for the prior Fiscal Year (but only to the extent that there exists a comparable period in the prior Fiscal Year that commenced and was completed after the date of the Opening Balance Sheet); provided, however, that for the first partial Fiscal Year of the Company commencing with the Effective Date the above described financial statements shall provide for the period from the date of the Opening Balance Sheet and all comparative financial statements during the Fiscal Year that commenced with the Effective Date shall be comparative to the Opening Balance Sheet and the date of the Opening Balance Sheet; and

(iv)    any other information, whether financial or otherwise, provided to the respective Lenders (as respectively defined in the First Lien Facility, 1.5 Lien Loans (if any), and Second Lien Facility) pursuant to the terms of the Debt Documents, in each case, as soon as practicable, and in any event within one (1) Business Day of providing such information to the applicable lenders.

Notwithstanding anything herein to the contrary, so long as the Company is utilizing its commercially reasonable efforts to engage Public Accountants and assist such Public Accountants in preparing the Opening Balance Sheet, if the Board determines that a delay is required, the time periods set forth herein for the delivery of any financial statements and Management Report shall not begin to run until the date that the Opening Balance Sheet is prepared and audited by the Public Accountants.

(b)    The Company shall use its commercially reasonable efforts to provide to each Member and, to the extent necessary, to each former Member (or its legal representatives), within ninety (90) days following the end of each calendar year (or as promptly as reasonably practicable thereafter) a Schedule K-1 to IRS Form 1065 with respect to such Member's ownership of the Company.

(c)    Members shall have the right to receive from the Company, upon written request, a copy of the Certificate and this Agreement, as amended from time to time.  Except as provided in the immediately preceding sentence, a Member that holds only Units granted under the Incentive Plan shall not be entitled to any information from or about the Company, other than the information required to be reported on such Member's federal Schedule K-1 under the Code and any equivalent state income tax information forms.

(d)    At all times after the posting of the Opening Balance Sheet pursuant to Section 4.10(a), the Company covenants that (i) it will, upon the request of any Member, to the extent such Member is relying on Rule 144A under the Securities Act to sell any of its Units, prepare and provide to such Member, or any prospective transferee, the information required pursuant to Rule 144A(d)(4), for such time period as necessary to permit sales of such Units pursuant to Rule 144A, and (ii) it will use its commercially reasonable efforts to take such further action as any such Member may reasonably request from time to time to enable such Member to sell its Units without registration under the Securities Act within the limitations of the exemptions provided by (X) Rule 144A under the Securities Act, as such Rules may be amended from time to time, or (Y) any similar rule or regulation hereafter adopted by the SEC; provided that the Company shall not be required to take any action described in this paragraph (d) that would cause the Company to become subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act of 1934, as amended (the "**Exchange Act**"), if the Company was not subject to such requirements prior to taking such action. Upon the request of any Member, the Company will deliver to such Member a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

## Section 4.11    Confidential Information.

(a)    Each Member agrees that it shall not disclose to others any Confidential Information received from the Company or from any other Member for any purpose other than to

28

evaluate its investment in its Units or as consented to by the Board. The restrictions imposed by this Section 4.11 shall continue to apply to a former Member, notwithstanding such Member's withdrawal from the Company or Transfer of its Units.

(b)      "Confidential Information" means all confidential or proprietary documents and information, whether written or oral, including confidential or proprietary information with respect to customers, sales, marketing, production, costs, business operations, financials and assets, of the Company or any of its Subsidiaries, other than information that is: (i) in the public domain or otherwise generally available to the public other than as a result of a breach of the provisions of this Agreement; (ii) already in the possession of the receiving Person, without any restriction on disclosure, prior to any disclosure of such information to the receiving Person by or on behalf of the Company or any other Member pursuant to the terms of this Agreement or otherwise (for the avoidance of doubt, any information provided to any Member prior to the execution of the Agreement under an obligation of confidentiality, shall be included in the definition of Confidential Information and be subject to this Section 4.11); (iii) lawfully disclosed, without any restriction on additional disclosure, to the receiving Person by a third party who, to such Member's knowledge, is not prohibited from disclosing such information to such Member; or (iv) independently developed by the receiving Person without use of any Confidential Information.

(c)      Notwithstanding anything herein to the contrary, a Member may disclose Confidential Information:

(i)      as required to be disclosed by applicable law (including by compulsory legal process and any regulatory authority under which any Member is subject), provided that such disclosing Member notifies the Company, to the extent permitted by applicable law and to the extent commercially reasonable, of such required disclosure reasonably in advance so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Agreement, and provided further that, prior to disclosing such Confidential Information, the disclosing Member advises the recipient thereof of the confidential nature of such information and takes commercially reasonable steps to obtain reliable assurances that confidential treatment will be accorded to such information, provided that all legal fees, costs and expenses incurred in connection with such commercially reasonable efforts shall be paid by the Company; and

(ii)      to any advisor (including financial advisors and valuation or appraisal firms), employee, director, officer, current or prospective partner (limited or general), member, stockholder, Subsidiary, parent, agent or other representative of such Member, to any current or prospective financing sources, any person holding a participation interest in all or part of such Member's Equity Interests and to any transferee or potential transferee so long as such advisor, employee, director, officer, partner (limited or general), member, stockholder, Subsidiary, parent, agent, other representative, financing source, person holding a participation interest in all or part of such Member's Equity Interests, transferee or potential transferee (i) is not a Competitor and (ii) has been advised of and has agreed (which in the case of any financing source, any person holding a participation interest in all or part of such Member's Equity Interests and any transferee or potential transferee, shall be in writing) to be bound by the

29

confidentiality provisions of this Section 4.11 or is subject to comparable restrictions which are applicable to Confidential Information.

(d)    Notwithstanding anything herein to the contrary, no Member shall disclose any information regarding any other Member or any Confidential Information received by it in its capacity as a Manager or other employee or agent of the Company or any of its Subsidiaries, to any current or prospective financing sources and to any transferee or potential transferee.

**Section 4.12    No Grant of Dissenter's Rights or Appraisal Rights**.  The Members hereby expressly waive all rights under Section 18-210 of the Act (entitled "**Contractual Appraisal Rights**") in all circumstances.

**Section 4.13    Delivery of Information**.  Wherever this Agreement requires the Company to deliver or make available any information to one or more Members, such obligation shall be deemed to be satisfied if the Company provides access to such information under an appropriate heading on IntraLinks, Syndtrak or on any other similar electronic "data room" to which the Member entitled to such information has full access.

**Section 4.14    Observation, Notice and Participation Rights**.  At all times until the FCC Approvals are obtained, each of the  Major Investors shall have the right to receive:

(a)    commencing on the first Wednesday following the Effective Date (or at such other time as may be agreed to by the Major Investors in their reasonable discretion), updates by the Company or any of its Subsidiaries, via a weekly status call with the designated representatives of the Major Investors, relating to the FCC Approvals, which shall include (i) an update by the Company or any of its Subsidiaries on, and summary of, related meetings and discussions with the FCC or other Governmental Authority and/or FCC or other Governmental Authority actions since the prior briefing, (ii) an identification of FCC meetings and other contacts with the FCC or other Governmental Authority by the Company or any of its Subsidiaries,  representatives, or advisors, planned or anticipated to occur within the next two-week period and the topics to be covered at such meetings or contacts, (iii) notice of any hearing planned or anticipated to occur within the next two week period before the FCC or other Governmental Authority related to the efforts of the Company or any of its Subsidiaries  to secure the FCC Approvals, (iv) notice of and information regarding any written submissions expected to be made by the Company or any of its Subsidiaries to the FCC or other Governmental Authority within the next two week period and (v) an opportunity for the Major Investors to provide consultation and input to the Company or any of its Subsidiaries with respect to such efforts, submissions and meetings; and

(b)    with respect to the FCC Approvals (i) promptly, copies of all filings, notices, orders and any other correspondence between the FCC and the Company or any Subsidiary, including copies of all documentation received from, or submitted to, the FCC in respect thereof, and (ii) promptly after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company or any Subsidiary to the FCC or other Governmental Authority.

**Section 4.15    Conduct of the Members with respect to the FCC and Industry Canada**.  Each Member agrees that it shall not, whether on its own or in conjunction with the Company and its Subsidiaries, any other Member or any other Person, (i) engage in any communication (whether written, oral or otherwise) or (ii) permit any officer, employee, director or other representative of such Member to attend or otherwise participate in any hearing, meeting or other appearance, in each case, with the FCC or Industry Canada in any way relating to the Company or its Subsidiaries, including, without limitation, the Company's and its Subsidiaries' efforts to seek the FCC Approvals, unless (x) expressly so authorized in writing by the Board and each of the Major Investors or (y) requested by the FCC or Industry Canada, as the case may be; provided, however, that an officer, employee, director or other representative of any Member shall not be precluded from attending any hearing before the FCC or Industry Canada (A) that is open to the general public so long as such officer, employee, director or other representative does not participate in such hearing or (B) if such officer, employee, director or other representative of a Member is also an officer, employee, director or other representative of the Company or any of its Subsidiaries.

**Section 4.16**    [Reserved.][11]

**ARTICLE V**
**CAPITALIZATION; PREEMPTIVE RIGHTS; REDEMPTION; CALL OPTION**

**Section 5.1    Capitalization**.

(a)    All interests of Members in distributions and other amounts specified herein shall be represented by their units of membership interests in the Company (each a "**Unit**" and, collectively, the "**Units**").  The Company may issue fractional Units.  Except as otherwise provided herein, each Voting Unit shall carry the right to cast one vote per whole Unit on any matter to be approved by the Members and any fractional interests of a Member shall be rounded down to the nearest whole Unit for voting purposes with respect to such Member.  Each Member is entitled to and may apportion its aggregate votes cast in any manner which it may elect.  The Units shall be in book-entry form, unless otherwise determined by the Board.  In the event that certificates representing the Units are issued, unless otherwise determined by the Board, each such certificate shall be imprinted with a legend indicating that the Units have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered or qualified under applicable securities laws, or in accordance with an applicable exemption therefrom, and that the Transfer of Units is subject to conditions and restrictions set forth in this Agreement.

(b)    There are hereby established and authorized for issuance by the Company [ ] Units, of which [ ] are designated as Series A-1 Preferred Units (the "**Series A-1 Preferred**"),

---

[11] NTD: The Major Investors are discussing possible revisions to the NewCo Operating Agreement regarding the following provisions:  (i) requiring the "insulation" of certain Members under the Communications Laws, (ii) requiring each Member that is a limited partnership, limited liability partnership, limited liability company, or similar organization, to make reasonable efforts to "insulate" investors holding direct interests in such Member, (iii) conditioning or restricting transfers that materially complicate any regulatory approval process, and (iv) requiring Members to facilitate NewCo's compliance with regulatory restrictions and reporting obligations.

31

[ ] are designated as Series A-2 Preferred Units (the "**Series A-2 Preferred**", and together with the Series A-1 Preferred, the "**Series A Preferred**"), [ ] are designated as Series A Common Units (the "**Series A Common**"), [ ] are designated as Series B Common Units (the "**Series B Common**"), [ ] are designated as Series C Common Units (the "**Series C Common**") and [ ] are designated as Series D Common Units (the "**Series D Common**").[12]  Pursuant to and in accordance with the Plan of Reorganization, on and as of the Effective Date, the Company hereby issues to each Member the respective number and series of Units as is set forth opposite such Member's name on Exhibit A under the caption "Number and Series of Units".  Such Exhibit A may be amended from time to time in accordance with the terms of this Agreement.

(c)     Upon receipt of Major Investor Approval and adoption by the Board of an Incentive Plan, the Company shall be entitled to issue such additional number of Incentive Units as is set forth in such Incentive Plan, and this Agreement, including this Section 5.1, shall be amended to reflect the authorization, reservation for issuance and terms of such Incentive Units without further approval of the Members.  Each issuance of Incentive Units under the Incentive Plan shall be approved by the Board and issued in accordance with the Incentive Plan and this Agreement, for such consideration (or no consideration) as the Board may deem appropriate.  Unless otherwise determined by the Board, all Incentive Units shall be issued subject to vesting, forfeiture and repurchase restrictions pursuant to separate agreements (each, an "**Award Agreement**"), the provisions of which may be determined, altered or waived in the sole discretion of the Board.  In connection with the issuance of Incentive Units, if permitted by the Incentive Plan, the Board may set a minimum return threshold with respect to such Incentive Units (the "**Incentive Unit Return Threshold**") in accordance with the Incentive Plan.  In the event the Board issues additional Incentive Units with an Incentive Unit Return Threshold lower than the Incentive Unit Return Threshold associated with a prior issuance of Incentive Units, the Board may, in its sole discretion and if permitted by the Incentive Plan, reduce the Incentive Unit Return Threshold of the Incentive Units issued at the higher Incentive Unit Return Threshold.

(d)     Unless otherwise determined by the Board,  each Incentive Unit is intended to be a "profits interest" within the meaning of IRS Revenue Procedures 93-27 and 2001-43 and is issued with the intention, but without assurance or guarantee, that under current interpretations of the Code the recipient will not realize income upon the issuance of the Incentive Unit and that neither the Company nor any Member is entitled to any deduction either immediately or through depreciation or amortization as a result of the issuance of such Unit.  Any Person holding an Incentive Unit subject to a vesting arrangement shall make a timely election under Section 83(b) of the Code in accordance with Treasury Regulation 1.83-2 with respect to each such Incentive Unit (to the extent applicable).  Any Person making an election under Section 83(b) with respect to any Units, whether or not such Units are Incentive Units, shall promptly notify the Company of such election.

(e)     Subject to the other provisions of this Agreement (including in Sections 5.2, 7.2 and 8.4), the Company may (upon approval by the Board and receipt of Major Investor

---

[12] NTD: Number of Common Units to be weighted such that the Series A Common equals 60% of the total Common Units, the Series B Common equals 30.74% of the total Common Units, the Series C Common equals 2.58% of the total Common Units and the Series D Common equals 6.68% of the total Common Units.

Approval where required) from time to time issue additional Units of any class or series, and create new classes or series of Units, having such rights and preferences as the Board may determine and in exchange for such consideration as the Board may deem appropriate.  The Board may make such amendments to this Agreement as it deems appropriate to create and issue additional Units in accordance with this Section 5.1(e).

### Section 5.2    Preemptive Rights.

(a)    Subject to Section 8.4, the Board shall have the right at any time and from time to time to issue additional Units and to admit any Person as a new Member of the Company, all on such terms as the Board shall determine, subject to the provisions of this Section 5.2.  As a condition to the issuance of such Units in accordance with this Section 5.2, the Person who purchases such Units and who is not already a Member shall execute a counterpart to this Agreement, and upon such execution shall automatically be admitted as a Member subject to compliance with any requirements set forth by the Board and this Agreement.

(b)    If the Board desires to cause the Company to issue any new Units other than Exempted Securities ("**New Units**"), whether for cash or any other consideration, the Board shall give written notice thereof (each a "**New Issuance Notice**") to each Common Member (other than any holder that does not own any Common Units other than Incentive Units) at least twenty (20) days before the proposed date of issuance of such New Units.  The New Issuance Notice shall set forth the details of such New Units, including the Common Percentage represented by the New Units and the corresponding changes (if any) to the Common Percentage of the Common Members, all as of immediately following the issuance of the New Units, the Capital Contributions required from each purchaser of the New Units, any rights, preferences or privileges of the New Units that may differ from the rights, preferences or privileges of the outstanding Common Units, if any, and any amendments or modifications to this Agreement necessary to permit the issuance of such New Units.  Each Common Member shall have first right to acquire up to its pro rata portion of such New Units (based upon its Common Percentage) on the same terms and same price as the Board proposes to sell such New Units to any other Person by delivering written notice (the "**Exercise Notice**") thereof to the Board within ten (10) days following the receipt of the corresponding New Issuance Notice (the "**Exercise Period**"), with such Exercise Notice setting forth the amount of such New Units that the Common Member desires to purchase.   If one or more Common Members do not exercise their preemptive rights (the "**Declining Members**"), each other Common Member that has exercised its preemptive rights under this Section 5.2 shall be entitled, but not obligated, to purchase up to its pro rata portion (based upon its Common Percentage as compared to the Common Percentage of all exercising Common Members) of the New Units offered to the Declining Members; provided that a Common Member wishing to exercise its right to purchase New Units of any Declining Member shall specify its election to purchase any such New Units and any limits thereon in its Exercise Notice to the Board.  Any Member that does not provide written notice to the Board of its election to purchase the New Units within ten (10) days following its receipt of the New Issuance Notice, shall be deemed to have waived such right and to have elected not to purchase any such New Units; provided, however, that failure by any Common Member to exercise its preemptive rights pursuant to this Section 5.2 with respect to one offering, sale or issuance shall not affect its right to purchase New Units in any subsequent offering, sale or issuance.

33

(c)        If any Common Member does not timely exercise its right to purchase all of the New Units offered to such Common Member in accordance with Section 5.2(b), the Board shall be entitled to issue such New Units for which an election to purchase was not made on the same terms and conditions as contained in the New Issuance Notice relating to such New Units, but at a price, payable solely in cash, at least as great as the price offered to the Common Members, for a period of thirty (30) days following the expiration of the Exercise Period.  In the event the Company has not sold the New Units, or entered into a binding agreement to sell the New Units, within such 30-day period, the Company shall not thereafter issue or sell any New Units without reoffering such New Units to each Common Member in the manner provided in this Section 5.2.

(d)        The purchase and sale of the New Units to the Common Members exercising their preemptive rights pursuant to this Section 5.2 shall close on the date set forth in the New Issuance Notice (the "**New Issuance Closing Date**") at which time each purchaser thereof shall pay the purchase price therefor to the Company by wire transfer of immediately available funds.  The New Issuance Closing Date shall be at least thirty (30) days after the date of the New Issuance Notice and may be extended beyond the date specified in the New Issuance Notice to the extent necessary to (i) obtain required Government Approvals and other required third party approvals or consents (and the Company and the Common Members shall use their respective commercially reasonable efforts to obtain such approvals) and (ii) permit a Common Member to complete its internal capital call process following the Exercise Period; provided, that the extension pursuant to this clause (ii) shall not exceed sixty (60) days.

(e)        Upon the issuance of the New Units (either to the Members or to Persons not then Members) in accordance with the foregoing provisions: (i) the Board shall be entitled to amend this Agreement in the manner set forth in the New Issuance Notice to reflect such New Units, without the need for the consent of any other Member; and (ii) the Company shall deliver to each purchaser of New Units certificates (if any) evidencing the New Units, which New Units shall be issued free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof, along with any restrictions imposed by applicable securities laws), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Units shall be, upon issuance thereof to the purchaser and after payment therefor, duly authorized, validly issued, fully paid and non-assessable.  Each party to the purchase and sale of New Units shall take all such other actions as may be reasonably necessary to consummate such purchase and sale, including entering into such additional agreements as may be necessary or appropriate.

### Section 5.3        Mandatory Redemption; Optional Redemption.

(a)        Mandatory Redemption.  Subject to the provisions of paragraph (e) below, in the event of a Change of Control, the Company shall redeem all of the outstanding Preferred Units (a "**Change of Control Redemption Event**")  by paying in cash therefor, on or prior to the Redemption Date, a sum equal to the aggregate Series A-1 Liquidation Preference to each holder of Series A-1 Preferred in proportion to the number of Series A-1 Preferred held by each such Member and, after all the Series A-1 has been redeemed, a sum equal to the aggregate Series A-2 Liquidation Preference to each holder of Series A-2 Preferred in proportion to the number of Series A-2 Preferred held by each such Member.  Notwithstanding anything herein to

34

the contrary, if a Change of Control occurs at any such time when the Second Lien Facility has not been repaid in full, the Company shall not redeem the Series A-1 Preferred until immediately following such time that the Second Lien Facility has been repaid in full. In addition, in connection with a repayment in full of the Second Lien Facility, if the Company at any time incurs a Make-Whole Payment that together with any prior Make-Whole Payments is equal to or greater than the Series A-1 Liquidation Preference (determined prior to any reduction on account of Make-Whole Payments as provided in the definition thereof) the Company shall redeem all of the outstanding Series A-1 (a "**Series A-1 Redemption Event**") by notifying the holders of such redemption on or prior to the Redemption Date.

(b)    Optional Redemption.  The Company shall have the option (but not, except as required by Section 5.3(a) above, the obligation) at any time in its sole discretion, to (1) if the Second Lien Facility has been repaid in full redeem all (but not less than all) of the outstanding Series A-1 Preferred or (2) if the Series A-1 Preferred has been redeemed in full by the Company pursuant to this Section 5.3 or deemed to have been redeemed by virtue of having received their full Series A-1 Liquidation Preference pursuant to 6.1(b)(i), redeem all or any portion of the Series A-2 Preferred (an "**Optional Redemption Event**") by paying in cash therefor, on or prior to the Redemption Date, a sum equal to: (i) in the case of an Optional Redemption Event relating to the Series A-1 Preferred, the aggregate Series A-1 Liquidation Preference to each holder of Series A-1 Preferred in proportion to the number of Series A-1 Preferred held by each such Member or  (ii) in the case of an Optional Redemption Event relating to the Series A-2 Preferred, the aggregate Series A-2 Liquidation Preference to each holder of Series A-2 Preferred in proportion to the number of Series A-2 Preferred held by each such Member; provided, however, that if the Company elects to redeem less than all of the outstanding Series A-2 Preferred, the Company shall redeem the portion of the Series A-2 Preferred to be redeemed ratably among the holders of the Series A-2 Preferred based upon their holdings of Series A-2 Preferred.

(c)    If the Company is required or elects to redeem any Preferred Units in accordance with the provisions of Sections 5.3(a) or (b), the Company shall send a Redemption Notice to each applicable holder of Preferred Units at least ten (10) days prior to any Mandatory Redemption Event and at least fifteen (15) days prior to any Optional Redemption Event, as the case may be; provided, that, if the Company is not aware of the Mandatory Redemption Event ten days prior to the occurrence thereof, then the Redemption Notice will be given as soon as practicable, but in no event later than one (1) Business Day after the Company becomes aware of such Mandatory Redemption Event.  With respect to any Mandatory Redemption Event or Optional Redemption Event, the Redemption Date shall be no later than 30 days after the date of the Redemption Notice.

(d)    Redemption Notice.  The Company shall give written notice to each holder of record of each applicable series of Preferred Units (as of the close of business on the business day immediately preceding the day on which notice is given) (the "**Redemption Notice**"), at the address last shown on the records of the Company for such holder, notifying such holder of the redemption to be effected, the Redemption Date (which may be the date of the notice if the applicable payments are made on such date), the place at and manner in which payment may be obtained and notifying such holder that such Preferred Units shall be, without any affirmative act by the holder of such Preferred Units, surrendered to the Company, and each

35

surrendered Preferred Unit shall be cancelled upon payment therefor in accordance with the terms of this Section 5.3.

(e)      Insufficient Funds.  If the funds of the Company legally available under the Act or contractually available under the Company's Debt Documents, for redemption of Preferred Units on a Redemption Date are insufficient to redeem the total number of Preferred Units to be redeemed on such date, those funds which are legally and contractually available will be used to redeem the maximum possible number of such Units in accordance with the distribution provisions set forth in Section 6.1(b); provided, however, that in no event shall the Series A-1 Preferred be redeemable in part without Major Investor Approval as provided in Section 8.4(a).  The Preferred Units not redeemed shall remain outstanding and entitled to all the rights and preferences provided herein.  At any time thereafter when additional funds of the Company are available for the redemption of Preferred Units such funds will promptly (but in no event more than one (1) business day) be used to redeem the balance of the Preferred Units, in accordance with the distribution provisions set forth in Section 6.1(b), which the Company has become obliged to redeem on any such Redemption Date but which it has not redeemed.

(f)      On the Redemption Date, Exhibit A hereto shall be revised to reflect the redemption of any redeemed Preferred Units owned by each holder thereof following the redemption.  From and after payment of the amounts set forth herein in respect of any Preferred Unit, all rights of the holders of the Preferred Units so redeemed, as holders of such Preferred Units, shall cease with respect to such redeemed Preferred Units, and such Preferred Units shall not thereafter be transferred on the books of the Company or be deemed to be outstanding for any purpose whatsoever.

(g)      Except for any redemptions or repurchases required pursuant to an Incentive Plan and applicable Award Agreement thereunder, the Company shall not, and shall not permit any Subsidiary to, redeem or repurchase any Units or other Equity Interests of the Company (other than the Series A-1 Preferred, the Series A-2 Preferred, to the extent permitted hereunder,  or as may be required by the terms of any Incentive Plan) or any of its Subsidiaries or make any distributions (other than intercompany distributions) with respect thereto until such time as the Series A Preferred have been redeemed in full in accordance with the provisions hereof; provided, however, that nothing herein shall be construed as limiting the Company or any Subsidiary's ability to redeem or make distributions with respect to the Common Units thereafter.

(h)      Notwithstanding anything herein to the contrary, each series of Preferred Units will be deemed to have been redeemed in full at such time as the Liquidation Preference applicable to such series is equal to $0 (zero).

**Section 5.4      Harbinger Call Option**.  Each holder of (i) any Series C Common agrees that Harbinger has the option, but not the obligation, to purchase from such holder, on the terms and conditions set forth in this Agreement, all, but not less than all, of the Series C Common then outstanding, for an aggregate purchase price in cash equal to the Series C Call Price payable (directly by Harbinger or indirectly with proceeds from a Change of Control Redemption Event or other similar occurrence) to all holders of the Series C Common pro rata in proportion to the number of Series C Common held by each such holder and (ii) any Series D Common agrees that

Harbinger has the option, but not the obligation, to purchase from such holder, on the terms and conditions set forth in this Agreement, all, but not less than all, of the Series D Common then outstanding, for an aggregate purchase price in cash equal to the Series D Call Price payable (directly by Harbinger or indirectly with proceeds from a Change of Control Redemption Event or other similar occurrence) to all holders of the Series D Common pro rata in proportion to the number of Series D Common held by each such holder (such rights collectively referred to as the "**Harbinger Call Option**").  To exercise the Harbinger Call Option, Harbinger shall notify the Company in writing of its intent to exercise the Harbinger Call Option and the date on which such purchase is to be consummated, at least thirty (30) days prior to the date of such consummation (or as soon as practically permitted if consummation of such purchase shall occur in less than thirty (30) days as a result of the timing of a Change of Control Redemption Event) (the "**Harbinger Call Exercise Date**") and the Company shall promptly thereafter (and in any event within three (3) Business Days) deliver a written notice to each applicable Member setting forth the applicable purchase price to which such holder is entitled, thereof, and the date on which such purchase is to be consummated.  Upon receipt of evidence reasonably satisfactory to the Company that each holder of any Series C Common and Series D Common has been paid in accordance with the provisions hereof, the Company shall cause the Transfer to be recorded in the Register of Members and Exhibit A hereto shall be revised to reflect the Transfer of all Series C Common and Series D Common to Harbinger.  All Series C Common and Series D Common purchased by Harbinger pursuant to the exercise of the Harbinger Call Option shall (subject to the voting and approval rights granted to the Harbinger Entities in Section 8.4) be restricted from voting on matters on which such series would otherwise be entitled to vote; provided, however, such Units shall be entitled to vote on all such matters to which such series would otherwise be entitled to vote at the time such Units are transferred (and then, only to the extent so Transferred) by a Harbinger Entity to any Person (other than another Harbinger Entity) in accordance with Section 8.4(g).

**Section 5.5    RLS Call Option**.  Each Series A-2 Callable Party agrees that Reorganized [LightSquared] has the option, but not the obligation, to purchase from such holder, on the terms and conditions set forth in this Agreement, [all, but not less than all,] of the Series A-2 Preferred held by such Series A-2 Callable Party either, at the election of Reorganized [LightSquared] (i) in exchange, on a dollar-for-dollar basis, for an amount of the Second Lien Facility loans (based on principal and all accrued and unpaid interest thereon (including interest paid in kind)) that equals the par amount of the Series A-2 Preferred being acquired by Reorganized [LightSquared] *plus* the dividends accruing at a rate per annum compounded annually equal to 9.75% calculated to the date of acquisition *less* any distributions and dividends paid with respect to such Series A-2 Preferred or (ii) by paying an amount in cash equal to the par amount of the Series A-2 Preferred being acquired by Reorganized [LightSquared] *plus* the dividends accruing at a rate per annum compounded annually equal to 9.75% calculated to the date of acquisition *less* any distributions and dividends paid with respect to such Series A-2 Preferred (the "**RLS Call Option**").   To exercise the RLS Call Option, Reorganized [LightSquared] shall notify the Company in writing of its intent to exercise the RLS Call Option and the date on which such purchase is to be consummated, which date shall be no later than thirty (30) days after the date of such notice and the Company shall promptly thereafter (and in any event within three (3) Business Days) deliver a written notice to each applicable Series A-2 Callable Party setting forth the number of Series A-2 Preferred to be purchased and the date on which such purchase is to be consummated.  Upon receipt of evidence reasonably satisfactory to

37

the Company that each holder of any Series A-2 Preferred has received notes or other agreements evidencing an equal principal amount of the Second Lien Facility, in accordance with the provisions hereof, the Company shall cause the Transfer to be recorded in the Register of Members and Exhibit A hereto shall be revised to reflect the Transfer of such Series A-2 Preferred to Reorganized [LightSquared].

# ARTICLE VI
## DISTRIBUTIONS; INITIAL PUBLIC OFFERING

**Section 6.1**     **Distributions Generally, Operating Distributions**.

(a)     Distributions of property of the Company may be made in cash or in kind as determined by the Board in accordance with this Article VI.  Subject to the further provisions of this Article VI, the Board may, in its reasonable discretion, determine the amount of available cash (excluding proceeds from Capital Contributions) after good faith consideration of the Company's cash needs (including for payments of operating expenses, other cash expenditures, and any amounts set aside for the restoration, increase or creation of reasonable reserves) ("**Available Cash**") and the time when such amounts are to be distributed.  The Board may establish record dates for the purpose of determining the Members of the Company entitled to any distribution.

(b)     If the Board authorizes a distribution of Available Cash, distributions shall be made as follows:

(i)     First, and subject to Section 8.4(a)(ix), one hundred percent (100%) to all holders of outstanding Series A-1 Preferred until each holder of Series A-1 Preferred has received a proportional amount of the Series A-1 Liquidation Preference (pro rata in proportion to the Series A-1 Preferred held by such Member).

(ii)     Second, and only after the Series A-1 Preferred has been redeemed in full by the Company pursuant to Section 5.3 or deemed to have been redeemed by virtue of having received their full Liquidation Preference pursuant to clause (i) above, one hundred percent (100%) to all holders of outstanding Series A-2 Preferred until, after taking into account all prior distributions to such Members pursuant to this Section 6.1(b)(ii), each holder of Series A-2 Preferred has received a proportional amount of the Series A-2 Liquidation Preference (pro rata in proportion to the Series A-2 Preferred held by such Member), inclusive of dividends accumulating at an annual compounded rate of nine and three-quarters percent (9.75%) of the Stated Value per annum, calculated, with respect to any Member, on such Member's respective aggregate Stated Values from the date that such Units were issued to the dates that such Stated Values are returned pursuant to distributions made hereunder.  Distributions made pursuant hereto shall first be allocated towards the payment of the cumulative dividends owed with respect to the Series A-2 Preferred and then towards the reduction of the Stated Value of the Series A-2 Preferred.

(iii)     Third, and only after the Series A-1 Preferred has been redeemed in full by the Company pursuant to Section 5.3 or deemed to have been redeemed by virtue of

having received their full Liquidation Preference pursuant to clause (i) above and the Series A-2 Preferred has been redeemed in full by the Company pursuant to Section 5.3 or deemed to have been redeemed by virtue of having received their full Liquidation Preference pursuant to clause (ii) above, sixty percent (60%) to the holders of outstanding Series A Common; thirty and seventy-four hundredths of a percent (30.74%) to the holders of outstanding Series B Common; two and fifty-eight hundredths of a percent (2.58%) to the holders of outstanding Series C Common and six and sixty-eight hundredths of a percent (6.68%) to the holders of outstanding Series D Common.

(c)    To the extent provided in any Incentive Plan or applicable Award Agreement thereunder, the portion of any distribution to be made to a holder of unvested Units (the "**Unvested Amount**") shall be set aside and held by the Company until the earlier of the vesting, forfeiture or reacquisition of such unvested Units.  In the event such unvested Units become vested, the Unvested Amount shall be distributed to the owner of such Units upon (and to the extent of) such vesting.  Upon (and to the extent of) a forfeiture or reacquisition by the Company of such unvested Units, the Unvested Amount shall be considered Available Cash and shall be distributed to the remaining Members in accordance with Section 6.1(b) (not including for the purpose of such calculation such number of forfeited or reacquired Units) on the date determined by the Board.

**Section 6.2**    **Liquidating Distributions**.  Cash or property of the Company available for distribution upon the dissolution of the Company (including cash or property received upon the sale or other disposition of assets in anticipation of or in connection with such dissolution) shall be distributed in accordance with the provisions of Article XIV.

**Section 6.3**    **Withholding and Other Tax Liabilities**.

(a)    The Company shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from a distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Member arising as a result of such Member's interest in the Company (a "**Withholding Payment**").  Any Withholding Payment made from funds withheld upon a distribution will be treated as distributed to such Member for all purposes of this Agreement.  Any Withholding Payment in excess of distributions will be deemed to be a recourse loan by the Company to the relevant Member.  The amount of any Withholding Payment treated as a loan, plus interest thereon from the date of each such Withholding Payment until such amount is repaid to the Company at an interest rate of eight percent (8%) per annum, shall be repaid to the Company upon demand by the Company; provided, however, that in the Board's sole discretion, any such amount may be repaid by deduction from any distributions payable to such Member pursuant to this Agreement (with such deduction treated as an amount distributed to the Member) as determined by the Board in its sole discretion.

(b)    In the event that the distributions or proceeds to the Company from any Subsidiary are reduced on account of taxes withheld at the source or any taxes are otherwise required to be paid by the Company and such taxes are imposed on or with respect to one or more, but not all, of the Members, the amount of the reduction shall be borne by the relevant Members and treated as if it were paid by the Company as a Withholding Payment with respect

to such Members pursuant to Section 6.3(a).  Taxes imposed on the Company where the rate of tax varies depending on characteristics of the Members shall be treated as taxes imposed on or with respect to the Members for purposes of this Section 6.3(b).

**Section 6.4      In-Kind Distributions**.  The amount of any in-kind distribution shall be distributed on the basis of the property's then Fair Market Value and shall be otherwise distributed in accordance with, and subject to the same limitations as are set forth in, Section 6.1.

**Section 6.5      Initial Public Offering**.  Subject to receipt of approval under Section 8.4(e), if the Board of Directors determines to effect an IPO, the Board shall be entitled to convert (by the filing of a Certificate of Conversion as permitted by the Act, by merger or otherwise) the Company into a corporation or other successor entity and each Member shall and shall (to the extent it has the power to) cause its Affiliates to take all such action and execute and deliver such documents as the Board may reasonably request, and otherwise use its commercially reasonable efforts, all at the expense of the Company, to effect such IPO, including, without limitation, executing any documents or instruments to evidence any consent or approval of the Members or any customary "lock-up" agreement requested by the managing underwriter of an IPO Public Offering (provided the terms of such "lock-up" agreement are no more restrictive than the terms required of the officers and directors of the Company generally).  Notwithstanding any other provision of this Agreement, to the extent that any Member holding Units is treated as C corporation for federal income tax purposes then, in connection with the conversion of the Company to a corporation or other successor entity, the Company shall use its reasonable best efforts to enable the equity holders of such Member to transfer the equity interests of such Member to the converted corporation or other successor entity in exchange for equity interests in such converted corporation or other successor entity in a tax efficient manner.

## ARTICLE VII
## TRANSFERS; RIGHTS OF FIRST OFFER; DRAG ALONG RIGHT; TAG ALONG RIGHT

**Section 7.1      Unit Register; Transfer Restrictions**.

(a)      The Company shall keep at the Principal Office a register in which shall be entered the names and addresses of the Members and all Transfers of outstanding Units (the "**Register of Members**"); provided, however, that within a reasonable period of time after the Effective Date the Company shall apply for and obtain a corporate CUSIP number for each series of Preferred Units and Common Units from Standard & Poor's CUSIP Global Services, to the extent such CUSIP numbers are available therefor.  The Board shall have the discretion to select and appoint a transfer agent (the "**Transfer Agent**") to maintain the Register of Members.

(b)      Subject to this Article VII, each Unit, whether originally or in substitution for, or upon Transfer, exchange or other issuance of any Unit, shall be registered on the effective date of the Transfer, exchange or other issuance; provided, however, that no registration shall be effected with respect to any Units that are the subject of a purported Transfer not made in compliance with this Agreement or which have not obtained all applicable authorizations, consents, and regulatory approvals, including the expiration of any statutory waiting periods, required by applicable Law.

40

(c)     Prior to the date that is the later of (x) eighteen (18) months after the Confirmation Date and (y) twelve (12) months after the Effective Date, no Units may be Transferred, whether in whole or in part, by any Member without the consent of the Specified Investors; provided, however, that any Member may, during such period make a Transfer of Units, whether in whole or in part, to one of its Permitted Transferees (excluding for the purpose hereof, any Person that is included in the definition of Permitted Transferee solely pursuant to clause (v) of the definition thereof), so long as such Transfer complies with the remaining provisions of this Article VII.

(d)     Transfer of Units on the books of the Company may be authorized only by the holder of record of such Units, as shown on the Register of Members, such holder's legal representative or such holder's duly authorized attorney-in-fact.  The Company may treat as the absolute owner of Units of the Company the person or persons in whose name Units are registered on the Register of Members.  No Transfer shall be made on the books of the Company unless the initial Capital Contribution related to the Units to be Transferred is equal to or greater than $1,000,000, unless such Transfer constitutes a Transfer of all of the Units in a Series then held by the Member effectuating such Transfer or the Transfer is to a Permitted Transferee.  No Transfer or purported Transfer shall be effective until such Transfer is registered on the Register of Members.

(e)

(i)     Except for any Transfer to a Permitted Transferee or upon any redemption by the Company of the Series A-1 Preferred, no Member may, prior to the date that is the earlier of (x) six (6) months after the FCC Approval and (y) five (5) years after the Effective Date, Transfer (A) any Series A-1 Preferred unless such Member (or an Affiliate holding the Second Lien Facility) duly and concurrently Transfers a pro rata percentage (based on the number of Series A-1 Preferred proposed to be Transferred by such Member as a percentage of the total number of the Series A-1 Preferred held by such Member) of the Series A Common then held by such Member and its Affiliates and Second Lien Facility that is then held by such Member and its Affiliates, if any, in accordance with Section [__] of the Second Lien Facility  or (B) any Series A Common unless such Member (or an Affiliate holding the Second Lien Facility) duly and concurrently Transfers a pro rata percentage (based on the number of Series A Common proposed to be Transferred by such Member as a percentage of the total number of the Series A Common held by such Member) of the Series A-1 Preferred then held by such Member and its Affiliates and Second Lien Facility that is then held by such Member and its Affiliates, if any, in accordance with Section [__] of the Second Lien Facility.

(ii)     For the purposes of this Agreement, the Transfer of any Permitted Warrant shall be treated as a Transfer of the Units underlying such Permitted Warrant by the issuing Member.

(f)     Notwithstanding anything in this Agreement to the contrary, no Member may Transfer all or any portion of its Units (whether or not such purported Transfer is made to a Permitted Transferee) without the prior approval of the Board unless such Transfer will not (and, upon the request of the Board, the Member desiring to Transfer its Units provides an opinion of counsel in form and substance reasonably satisfactory to the Board that such Transfer will not):

41

(i)        violate any applicable federal or state securities laws or regulations;

(ii)        subject the Company (or any of its Subsidiaries) to registration as an investment company or election to be regulated as a "business development company" under the Investment Company Act of 1940;

(iii)        require any Member or any of their respective Affiliates to register as an investment advisor under the Investment Advisers Act of 1940;

(iv)        cause the Company or any Member to be treated as a fiduciary under ERISA;

(v)        cause the Company, in the judgment of the Board after consultation with counsel, to be deemed a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code;

(vi)        result in the Company being classified as an association taxable as a corporation for federal income tax purposes;

(vii)        with respect to each of Melody, LSQ and Reorganized [LightSquared], subject to clause (j) below, Transfer Units such that such Person and its Affiliates, which in the case of Melody includes the Melody Investors and in the case of LSQ, includes Fortress and its Affiliates, would no longer hold the Minimum Appointment Threshold;

(viii)        subject to clause (k) below, cause the Company to be in Default (as respectively defined in the First Lien Facility, 1.5 Lien Loans (if any) and Second Lien Facility) under any Debt Document as a result of a "Change in Control" (as respectively defined in the First Lien Facility, 1.5 Lien Loans (if any) and Second Lien Facility);

(ix)        violate any applicable FCC or Industry Canada ownership restrictions or other Communications Laws or cause the Company to lose any material rights or privileges as a result of such ownership restrictions or other Communications Laws or materially impair or delay the applications pending with the FCC with respect to the FCC Approval; or

(x)        result in a violation of this Agreement.

(g)        In the event that the Board requests an opinion of counsel pursuant to Section 7.1(f), the Company shall use its reasonable efforts to cooperate with such Member and its counsel, including with respect to providing information or certifications relating to the Company and its Affiliates.

(h)        The pledge or granting of a security interest, lien or other encumbrance in or against all or any portion of a Member's Units shall not be a Transfer subject to the restrictions of this Article VII; provided, that, the foreclosure of or exercise of other secured party remedies with respect to such pledge, security interest, lien or other encumbrance shall be a Transfer subject to this Article VII.

42

(i)    Notwithstanding the foregoing, no Member may at any time Transfer any Unit to any Competitor; provided, however, that a Member may Transfer Units to any Approved Holder, so long as such Approved Holder is not a Competitor other than by virtue of being an Affiliate of a Person listed on Schedule I (as such Schedule may be updated in accordance herewith).

(j)    Any Transfer that would be prohibited pursuant to clause (f)(vii) shall be permitted if (1) the Required Lenders (as respectively defined in the First Lien Facility and Second Lien Facility) have duly granted a permanent and irrevocable waiver to each of Melody, LSQ and Reorganized [LightSquared] and its Affiliates, which in the case of Melody includes the Melody Investors and in the case of LSQ, includes Fortress and its Affiliates, in form and substance reasonably satisfactory to the Board, that permits each such Person and its Affiliates to hold less than the Minimum Appointment Threshold without constituting a "Change in Control" under the Debt Documents or (2) the Debt Documents are amended or replaced and the amended Debt Documents or facilities replacing such Debt Documents, as applicable, do not contain a "Change in Control" or other default provisions relating to Transfers by Major Investors.

(k)    Subject to clause (i) above, any Transfer that would otherwise be prohibited pursuant to clause (f)(viii) shall be permitted if (1) the Required Lenders (as respectively defined in the First Lien Facility and Second Lien Facility) have duly granted a permanent and irrevocable waiver of such Default (as respectively defined in the First Lien Facility and Second Lien Facility) under the applicable Debt Document with respect to such Transfer and such waiver is otherwise in form and substance reasonably satisfactory to the Board or (2) the Debt Documents are amended or replaced and the amended Debt Documents or facilities replacing such Debt Documents, as applicable, do not contain a "Change in Control" or other default provisions relating to Transfers by Major Investors.

(l)    Any purported Transfer in violation of the terms of this Section 7.1 will be void *ab initio*.

**Section 7.2    Admission of New Members**.  No Transfer shall be registered and no transferee (including any Permitted Transferee) of any Units shall become a Member unless and until:  (a) the Board has approved such admittance in writing (which approval shall not be unreasonably withheld), provided that such Board approval requirement shall not apply to any transfer to a Permitted Transferee, (b) such transferee has executed an instrument in form and substance reasonably satisfactory to the Board accepting and adopting the terms and conditions of this Agreement, (c) such transferee has paid all reasonable expenses incurred by the Company in connection with such admission and (d) the conditions set forth in Section 7.1 are satisfied. Upon satisfaction of the conditions set forth in Sections 7.1 and 7.2, the Company shall cause its Officers or the Transfer Agent (as applicable) to register the Transfer in the Register of Members and amend Exhibit A attached hereto.

**Section 7.3    Right of First Offer**.

(a)    Subject to the terms and conditions specified in this Section 7.3, if any Member (the "**Offering Member**") proposes to Transfer all or any portion of its Units or any rights thereto or interests therein (the "**Offered Membership Interest**") owned by it, the

43

Offering Member shall first make an offering of the Offered Membership Interest to each Member holding Units of the same series as the Offered Membership Interest (the "**Other Members**") in accordance with the following provisions of this Section 7.3; provided, however, that this Section 7.3 shall not apply to any Transfers (i) to any Permitted Transferee (excluding for the purpose hereof, any Person that is included in the definition of Permitted Transferee solely pursuant to clause (v) of the definition thereof), (ii) pursuant to an exercise of a Tag Along Right or (iii) pursuant to the Harbinger Call Option or the RLS Call Option.

(b)      The Offering Member shall give written notice (the "**Offering Member Notice**") to the Company and the Other Members stating its bona fide intention to Transfer the Offered Membership Interest and specifying the number of Offered Membership Interest and the material terms and conditions, including the price and the date of the proposed sale (which date shall be at least thirty (30) days after the date of transmission of the Offering Member Notice), pursuant to which the Offering Member proposes to Transfer the Offered Membership Interest. The Offering Member Notice shall constitute the Offering Member's offer to Transfer the Offered Membership Interest to the Other Members, which offer shall be irrevocable for the duration of the ROFO Notice Period. By delivering the Offering Member Notice, the Offering Member represents and warrants to the Company and the Other Members that: (x) the Offering Member has full right, title and interest in and to the Offered Membership Interest; (y) the Offering Member has all the necessary power and authority and has taken all necessary action to sell such Offered Membership Interest as contemplated by this Section 7.3; and (z) the Offered Membership Interest are free and clear of any and all Liens other than those arising as a result of or under the terms of this Agreement.

(c)      Upon receipt of the Offering Member Notice, each Other Member shall have twenty (20) days from the date of transmission of the Offering Member Notice to agree to purchase up to such Other Member's pro rata percentage (based on the number of Units of the applicable series held by such Other Member as a percentage of the total number of Units of such series held by all Other Members) of the Offered Membership Interest by delivering a written notice (a "**ROFO Acceptance Notice**") to the Offering Member and the Company stating that it agrees to purchase a number of Offered Membership Interest on the terms specified in the Offering Member Notice, specifying the number of Offered Membership Interests such Member agrees to purchase. Any ROFO Acceptance Notice so delivered shall be binding upon delivery and irrevocable by the applicable Other Member.

(d)      If one or more Other Members fails to timely deliver a ROFO Acceptance Notice, or agrees to purchase less than all of the Offered Membership Interests which it was entitled to purchase based on its pro rata percentage, the Offering Member shall deliver a second notice (the "**Second Offering Member Notice**") to the Company and each Member that was not entitled to the Offering Member Notice as a result of not owning Units of the same series as the Offered Membership Interests (the "**Remaining Members**") specifying the number of Offered Membership Interest which are still available and the material terms and conditions, including the price and the date of the proposed sale, pursuant to which the Offering Member proposes to Transfer the Offered Membership Interest (which terms and conditions shall be the same as were set forth in the Offering Member Notice). Each Remaining Member shall be entitled to purchase up to such Remaining Member's pro rata percentage (based on the number of Units held by such Remaining Member as a percentage of the total number of Units held by all Remaining

Members) of the Offered Membership Interest not purchased by an Other Member by delivering a ROFO Acceptance Notice to the Offering Member and the Company within ten (10) days of the date of transmission of the Second Offering Member Notice stating that it agrees to purchase a number of Offered Membership Interest on the terms specified in the Second Offering Member Notice, specifying the number of Offered Membership Interests such Member agrees to purchase and representing that it will receive any required approvals or authorizations and be able to consummate the purchase by the date set forth in the Second Offering Member Notice.  Any ROFO Acceptance Notice so delivered shall be binding upon delivery and irrevocable by the applicable Remaining Member.

(e)      Each Other Member and Remaining Member that has otherwise agreed to purchase any Offered Membership Interests shall have a right of over-allotment such that if any Member fails to exercise its rights hereunder to purchase its pro rata share of Offered Membership Interests, such Other Members and Remaining Members may agree to purchase the portion of Offered Membership Interests that have not been subscribed for on a pro rata basis by delivering a notice to the Offering Member within fifteen (15) days from the date the Offering Member sends a notice (the "**Over-Allotment Period**") indicating that less than 100% of the Offered Membership Interests have been subscribed for (the "**Over-Allotment Notice**").  If upon expiration of the Over-Allotment Period, the Other Members and Remaining Members have collectively agreed to acquire less than 100% of the Offered Membership Interests, the Offering Member shall have the right, subject to the Tag Along Right, to terminate the sale of the Offered Membership Interests pursuant hereto and Transfer all Offered Membership Interests to an Independent Third Party on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Member Notice.

(f)      Subject to Section 7.3(e), in the event one or more Other Members or Remaining Members exercises its right to purchase any of the Offered Membership Interest, then the Offering Member shall sell such Offered Membership Interest and each such Other Member and Remaining Member shall purchase the number of Offered Membership Interests for which it subscribed, prior to the expiration of the ROFO Notice Period, at such date, time and place as the Offering Member shall reasonably specify.  Each Member shall take all actions as may be reasonably necessary to consummate such purchase and sale, including by entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this Section 7.3, the Offering Member shall deliver to the purchasing Members certificates (if any) representing their respective Offered Membership Interests, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefor from such Member by certified or official bank check or by wire transfer of immediately available funds.

(g)      Upon expiration of the ROFO Notice Period, the Offering Member may, during the one hundred twenty (120) day period following the expiration of the ROFO Notice Period, and subject to the Tag Along Right, Transfer any Offered Membership Interest not acquired by any Other Member or Remaining Member to an Independent Third Party on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Member Notice. If the Offering Member does not consummate such transfer or enter

45

into a binding agreement, on terms and conditions no more favorable to the Independent Third Party than those specified in the Offering Member Notice, to Transfer the Offered Membership Interest within such period the Offering Member shall not thereafter sell any Offered Membership Interest without reoffering such Offered Membership Units to the Other Members, and, if applicable, the Remaining Members, in the manner provided in this Section 7.3.

(h)    The Company shall use its commercially reasonable efforts to facilitate the delivery by the Offering Member of the Offering Member Notice and any Second Offering Member Notice.  Each Other Member and Remaining Member electing to purchase any Offered Membership Interest shall take all actions as may be reasonably necessary to consummate the Transfer contemplated by this Section 7.3 including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

**Section 7.4    Tag Along Right**.

(a)    If (i) any Transfer, including any Transfer subject to the right of first offer set forth in Section 7.3 above, would constitute a Change of Control and trigger a Mandatory Redemption Event, or (ii) Harbinger proposes to Transfer 20% of the Common Units that **[**it holds as of the Effective Date**]** in a transaction or series of transactions, including any series of transactions in which such number of Common Units are Transferred to the same Person or its Affiliates in any twenty-four (24) month period,  then, in each case, each Member shall have the right ("**Tag Along Right**") to require the proposed purchaser (the "**Purchaser**") to purchase, a number of Units held by such Member of the same series as are the subject of the applicable Transfer, at the same price and on the same terms of payment as apply to the Member or Members initiating such Transfer (the "**Transferring Member**") with respect to such series, equal to its pro rata percentage of such series of Units subject to such Transfer (based on the number of Units of the applicable series held by such Member as a percentage of the total number of Units of such series held by all Members) (each Member exercising the Tag Along Right, a "**Tag Along Member**"); provided, however, that this Section 7.4 shall not apply to any Transfer to a Permitted Transferee (excluding for the purpose hereof, any Person that is included in the definition of Permitted Transferee solely by reason of being an existing Member of the Company).  For the avoidance of doubt, the Tag Along Right shall only apply to those series of Units proposed to be Transferred by the Transferring Member to the Purchaser and only Members holding such series shall be entitled to rights hereunder but this limitation shall in no way release the Company from its obligation to redeem the Preferred Units pursuant to Section 5.3.

(b)    The Transferring Member shall promptly notify the Members in writing in the event it proposes to make a Transfer giving rise to Tag Along Rights, stating the Purchaser's name (and the name of any of its Affiliates and each of their respective officers, directors, managers and owners), the business(es) currently engaged in by the Purchaser and its Affiliates, the aggregate number of each series of Units subject to the Transfer, the offered price applicable to each series of Units subject to the Transfer, the other terms and conditions upon which the Transfer is proposed to be made and that the Purchaser has been informed of the rights provided in this Section 7.4 and has agreed to purchase Units of the series subject to the applicable Transfer in accordance with the terms hereof (the "**Tag Along Offer**").  The Tag Along Right

may be exercised by each Tag Along Member by delivery of a written notice (the "**Tag Along Notice**") to the Transferring Member and the Purchaser within fifteen (15) days following receipt of the Tag Along Offer.  If the Purchaser does not purchase each Tag Along Member's Units as specified in the Tag Along Offer and pursuant to the Tag Along Notice, then the Transferring Member shall not be permitted to sell any Units to the Purchaser in the proposed Tag Along Transfer.

### Section 7.5    <u>Drag Along Right</u>.

(a)    If any Member or group of Members desire to directly or indirectly transfer all, but not less than all, of such Member's or group of Member's Units which constitute, in the aggregate, more than fifty percent (50%) of the outstanding Voting Units (such Member or group of Members, the "**Selling Member**") together in a sale of all or substantially all of the Units owned by all of the other Members in a bona fide arm's length transaction to an unaffiliated third party (it being agreed that, for this purpose, a proposed transfer to a Member or a group that includes a Member shall be deemed to not be a transfer to an unaffiliated third party) or series of related transactions (including by way of a purchase agreement, merger, asset sale or other business combination transaction or otherwise) pursuant to a bona fide written offer (a "**Sale Proposal**") for cash consideration and such transfer is approved by a majority of the Board, specifying that this Section 7.5 shall apply to such Sale Proposal (subject to receipt of any approval required pursuant to Section 8.4(c)(ii)) and a majority of the Voting Units (such transfer, a "**Required Sale**"), then the Selling Member or the Company shall deliver a written notice (a "**Required Sale Notice**") with respect to such Sale Proposal at least ten (10) Business Days prior to the anticipated date of entering into, or the Company entering into, a binding agreement with respect to such Sale Proposal to all other Members requiring them to sell or otherwise transfer all of their Units (such Units, the "**Drag Units**") to the proposed transferee in accordance with the provisions of this Section 7.5.

(b)    The Required Sale Notice will include the material terms and conditions of the Required Sale, including (i) the name and address of the proposed transferee; (ii) the proposed amount of consideration; (iii) a description of any post-closing indemnification or liability of the Members; and (iv) the proposed transfer date, if known.  The Selling Member will deliver or cause to be delivered to each other Member copies of all transaction documents relating to the Required Sale promptly as the same become available.

(c)    Each Member, upon receipt of a Required Sale Notice, shall be obligated to sell or otherwise transfer all of its Drag Units and participate in the Required Sale contemplated by the Sale Proposal, to vote, if necessary under this Agreement or otherwise, its Drag Units in favor of the Required Sale at any meeting of the Members called to vote on or approve the Required Sale or to consent in writing to the Required Sale, to cause any Managers designated by such Member to vote in favor of the Required Sale or consent in writing to the Required Sale, to waive all dissenters' or appraisal rights, if any, in connection with the Required Sale, to enter into agreements relating to the Required Sale, to agree (as to itself) to make to the proposed purchaser the same representations, warranties, covenants (other than non-competition, non-solicitation and other similar restrictive covenants), indemnities and agreements as the Selling Member agrees to make in connection with the Required Sale, and to take or cause to be taken all other actions as may be reasonably necessary to consummate the Required Sale;

47

provided that, unless otherwise agreed by such Member, (i) a Member may not be required to make representations and warranties or provide indemnities as to any other Member and a Member shall not be required to make any representations and warranties about the business of the Company or of its Subsidiaries (but, subject to clause (iii) below, shall be required to provide several but not joint indemnities with respect to breaches of representations and warranties made by the Company or its Subsidiaries); (ii) no such Member shall be liable for the breach of any covenant by any other Member; and (iii) notwithstanding anything in this Section 7.5(c) to the contrary, any liability relating to representations or warranties and other indemnification obligations regarding the business of the Company or its Subsidiaries incurred in connection with the Required Sale (including any escrows, holdbacks or similar items relating to such indemnification obligations) shall be shared by all Members pro rata based on, and capped at, no more than their respective amount of consideration being received in respect of their Drag Units in the Required Sale (other than those that relate to representations or indemnities concerning a Member's valid ownership of its Drag Units free and clear of all liens, claims and encumbrances or a Member's authority, power and legal right to enter into and consummate a purchase or merger agreement or ancillary documentation, which shall be the responsibility of such Member and are not required to be so capped).

(d)    The obligations of the Members holding Drag Units pursuant to this Section 7.5 are subject to (i) each of the Members receiving (A) aggregate consideration from such Required Sale in proportion to the amounts that would be distributed upon a liquidation under Section 14.2, (B) the same form of consideration (including any payments made in connection with non-competition agreements) in respect of their Units as the Selling Member; (ii) the terms of the Required Sale not being more favorable in any non-*de minimis* manner to the Selling Member than to the other Members; and (iii) the consent of the holders of the Series A-1 Preferred to the extent required under Section 8.4(c)(ii).

(e)    The Selling Member shall, in its sole discretion, decide whether or not to pursue, consummate, postpone or abandon any Required Sale and the terms and conditions thereof.  Neither any Member nor any Affiliate of any such Member shall have any liability to any other Member or the Company arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any Required Sale except to the extent such Member shall have failed to comply with the provisions of this Section 7.5.

(f)    Each of the Members shall pay its own expenses in connection with the Required Sale (excluding, for the avoidance of doubt, any indemnities (including any holdbacks, escrows and similar items related to such indemnities) which shall be governed by Section 7.5(c)) and its pro rata share of any expenses incurred by the Company in connection with such Required Sale that are not borne by the purchaser in such Required Sale.

## ARTICLE VIII
## MANAGEMENT AND OPERATION OF COMPANY BUSINESS

**Section 8.1    <u>Board of Managers; Committees</u>**.

48

(a)      The business and affairs of the Company shall be managed by the Board. Subject to Section 8.4, the Board shall have full and complete authority, power and discretion to manage and control the affairs and properties of the Company as necessary or advisable to pursue the Business, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Business and affairs of the Company.  In the event of a vacancy on the Board, the remaining Managers, except as otherwise provided by law, may exercise the powers of the full Board until such vacancy is filled.  The Board may establish, from time to time, committees of the Board and may delegate thereto some or all of its powers, to the extent permitted by this Agreement and the Act.  The CEO shall not serve on any compensation committee (if a compensation committee is established).

(b)      The Board shall constitute an advisory committee consisting of five (5) Managers (the "**Advisory Committee**").  Reorganized [LightSquared] shall be entitled to appoint one (1) Person to serve on such Advisory Committee (or, if the size of such Advisory Committee is expanded to more than five (5), a number of appointees equal to 20% of the size of the Advisory Committee).  The remaining seats on the Advisory Committee shall be filled by a majority of the Board.  The Advisory Committee shall be tasked with making recommendations to the full Board regarding the operations of the Company and its Subsidiaries.  These recommendations will be subject to review and oversight by the Board and the Board shall, by simple majority, be entitled to adopt or reject any decision of the Advisory Committee;  provided, however, that if the Advisory Committee makes a recommendation with respect to any action which would otherwise require a supermajority or special vote of the Board under the terms of this Agreement, such action shall nonetheless require such supermajority or special vote notwithstanding the recommendation of the Advisory Committee.  For the avoidance of doubt, the Advisory Committee will not be able to direct the Board to take (or to omit from taking) any particular action (including with respect to adoption or rejection of any of the Advisory Committee's decisions), and will otherwise not have any governance rights or authority.

### Section 8.2      Number, Qualification; Term of Office; Voting.

(a)

(i)      The Board shall initially have six (6) Managers, consisting of (w) two (2) Managers appointed by Melody, (x) two (2) Managers appointed by LSQ, (y) one  (1) Manager appointed by Reorganized [LightSquared] (the Managers selected in accordance with the preceding clauses (w), (x) and (y) the "**Appointed Managers**") and (z) one (1) Manager nominated by the Appointed Managers, which seat shall, as of the Effective Date, be held by the CEO.

(ii)      Within thirty (30) days of the Effective Date (which date may be extended to the date that is ninety (90) days after the Effective Date if approved by a majority of the Board), the size of the Board shall be expanded from six (6) Managers to nine (9) Managers and, subject to clause (iii) below and Section 8.4(c), will thereafter consist of nine (9) Managers. Candidates to fill the three (3) vacancies created thereby shall be nominated by the unanimous decision of the Appointed Managers (unless another selection process is unanimously agreed to

by the Appointed Managers) for election to the Board by the Voting Members.  The four (4) Managers on the Board that are not the Appointed Managers, are collectively referred to as the "**Elected Managers**".  Except for the CEO, each of the Elected Managers shall be a natural person, other than any employee, officer, director, manager or consultant of any Major Investor who is also recognized as an industry or financial expert satisfying the New York Stock Exchange's director independence listing standards (an "**Independent Manager**").  Each Manager shall have one (1) vote in all matters to come before the Board.

(A)    Melody's and LSQ's right to appoint two (2) Appointed Managers pursuant to clause (i) above shall be reduced to a right to appoint one (1) Appointed Manager on the date, if ever, that the Percentage Interest held by the Melody Investors or LSQ, as applicable, and their respective Affiliates in the aggregate equals less than 50%.  In addition, each of Melody's, LSQ's and Reorganized [LightSquared]'s respective rights to appoint Appointed Managers pursuant to clause (i) above shall lapse and be of no further force and effect on the date, if ever, that the respective Percentage Interest held by such Person and its Affiliates, which in the case of Melody includes the Melody Investors and in the case of LSQ, includes Fortress and its Affiliates, equals less than 25% (the "**Minimum Appointment Threshold**").  Notwithstanding the foregoing, if any Person's right to appoint an Appointed Manager terminates prior to the end of an ongoing term, such Person's Appointed Manager shall be entitled to fulfill his or her term on the Board unless a majority of the remaining Managers vote to remove such Manager.  Thereafter, such former Appointed Manager may be nominated to serve as an Elected Manager, if such Person so qualifies, at the discretion of the Persons entitled at such time to make nominations.  In the event of any reduction in the right to appoint an Appointed Manager pursuant hereto, the size of the Board shall be correspondingly decreased.  If, at any time, only one (1) Member has the right to appoint an Appointed Manager, any Voting Member holding at least one percent (1%) of the Voting Units may nominate the CEO or Persons satisfying the criteria of an Independent Manager for election to the Board as Elected Managers.  If more Persons are so nominated than the number of vacancies on the Board, the Persons receiving the highest total of votes shall be elected to serve as the Elected Managers.

(b)    If required under the Act to effectuate the appointment of Managers in accordance with this Agreement, each Voting Member shall cause all Voting Units held by such Voting Member to be cast in favor of each Appointed Manager and each Person nominated by the Appointed Managers to serve as Elected Manager at any annual or special meeting held for the election of Managers or in any action of the Voting Members taken by written consent in lieu of such meeting.

(c)    Each of the Managers shall hold office until the next annual meeting for the election of Managers and until such Manager's successor shall have been elected and duly qualified, or until the earlier death, resignation, removal or disqualification of such Manager; provided, however, that if the CEO is serving as a Manager at any time, he or she shall immediately cease to be a Manager on the date that he or she no longer serves as the CEO.  From and after the Effective Date, any Appointed Manager may be removed at any time (with or

50

without cause) by the Member having the right to select and appoint such Manager pursuant to Section 8.2(a). Any vacancy on the Board resulting from such removal shall be filled only in accordance with the provisions of Section 8.2(a).

(d)    Each of Harbinger and Reorganized [LightSquared] shall have the right to designate one (1) person, and each of LSQ and Melody shall have the right to designate two (2) people, in each case, for so long as such Person holds any Common Units or Preferred Units, who shall be entitled to notice of, to attend and participate in as a nonvoting observer, and to receive any documentation distributed to Managers before, during and after, all meetings of the Board and all meetings of any committee thereof. Nonvoting observers may, subject to executing customary non-disclosure agreements which restrict the disclosure of information received by such observer, observe meetings of the Board by means of telephone conference or similar communications equipment which Managers are permitted to utilize to participate in such meeting. The Company reserves the right to exclude any observer from any portion of any meeting of the Board or any committee thereof, and to withhold access to any portion of the material provided to the Managers serving on the Board or such committee, if the Board determines in good faith (i) in reliance upon the advice of counsel that such exclusion is reasonably necessary to preserve the attorney-client privilege or (ii) in reliance upon the advice of counsel that inclusion of such observer is otherwise prohibited by applicable Law or that there exists a conflict of interest with respect to the Member designating such observer and a particular matter or transaction under consideration by the Board, which conflict of interest does not solely relate to or arise out of such Member's or its Affiliate's then ownership of a Unit or Units, such Member or any of its Affiliates being a party to this Agreement or such Member or any of its Affiliates being an existing lender to the Company or any of its Subsidiaries and that the exclusion of such observer is reasonably necessary in order to fulfill the Board's fiduciary duties to the Company or to avoid an actual or potential breach of such fiduciary duty; provided, however, that the designating Member will be notified of any intent to exclude an observer in reliance on clauses (ii) in advance of any meeting from which the observer is to be excluded and the designating Member shall be entitled to designate a replacement observer for the purpose of attending such meeting and receiving the applicable material; and provided, further, that, assuming no replacement observer has been designated or qualifies for designation, any observer which is excluded shall only be excluded for such portion of the meeting during which such matter or transaction is being discussed. Notwithstanding anything herein to the contrary, if an observer is as an employee, officer, director, manager or consultant of any Competitor (excluding any employee, officer, director, manager or consultant of the Member designating such observer) and the Company determines in good faith that the inclusion of such Person would result in the disclosure of highly confidential information, the disclosure of which to such Persons would materially and adversely affect the Company's competitive position or otherwise create a significant risk of materially adversely affecting the Company, at the Company's prior request, the Member designating such observer shall appoint a replacement observer that is not an employee, officer, director, manager or consultant of any Competitor. For the avoidance of doubt, the Company shall similarly be entitled to exclude any replacement observer pursuant to clauses (i) and (ii) of the preceding sentence to extent applicable.

(e)    Regulatory Approvals. Notwithstanding anything herein to the contrary, no Manager's appointment to the Board and no amendments or modifications to this Article VIII shall be effective until such time, if ever, as all authorizations, consents and regulatory approvals,

including the expiration of any applicable statutory waiting periods, required by applicable Law have been received by the Company.  Upon receipt by the Company of any nomination for Manager or notice of appointment from any Member with respect to an Appointed Manager, the Company shall use its commercially reasonable efforts to promptly obtain all such authorizations, consents and regulatory approvals as it determines, upon advice of counsel to be reasonably necessary or desirable.

Section 8.3    **Powers and Duties of the Managers**.  Subject to Section 8.4 and the other provisions of this Agreement, the Board shall have and may exercise on behalf of the Company all of its rights, powers, duties and responsibilities under Article III or as otherwise provided in the Act or this Agreement, including the right and authority:

(a)    to manage the business and affairs of the Company and its Subsidiaries and for this purpose to employ, retain or appoint any officers, employees, consultants, agents, brokers, professionals or other Persons in any capacity with the Company or its Subsidiaries for such compensation and on such terms as the Board deems necessary or desirable and to delegate to such Persons such of its duties and responsibilities as the Board shall determine, and to remove such Persons or revoke their delegated authority on such terms or under such conditions as the Board shall determine;

(b)    to form, manage and dissolve any Subsidiaries of the Company;

(c)    to enter into, execute, deliver, acknowledge, make, modify, supplement or amend any documents or instruments in the name of the Company;

(d)    to borrow money (including, subject to Section 8.10, from one or more Members) or otherwise obtain credit and other financial accommodations on behalf of the Company on a secured or unsecured basis and to perform or cause to be performed all of the Company's obligations in respect of its indebtedness or guarantees and any mortgage, lien or security interest securing such indebtedness;

(e)    to effectuate an IPO or otherwise issue additional Units or other rights or other interests in the Company, including to issue Series A Common if permitted under any Incentive Plan, and to designate additional classes of interests in the Company as provided in Section 5.1(e); and

(f)    to make elections and prepare and file returns regarding any federal, state or local tax obligations of the Company, and, subject to 8.4(a)(i) below, to designate one of the Members (or any other Person) to serve as the Tax Matters Partner (provided that such Person agrees to be the Tax Matters Partner).

Section 8.4    **Actions Requiring Member Consent**.  Notwithstanding the provisions of Section 8.3, the Company shall not, and shall not permit any Subsidiary to (whether by amendment, merger, consolidation or otherwise):

(a)    without having obtained Major Investor Approval:

(i)    subject to Section 6.5, so long as the Company has not converted into a corporation, amend Section 2.7 of the Agreement, designate a Member (or any other Person) to serve as the Tax Matters Partner, change the tax status of the Company from a partnership for federal income tax purposes to any other classification or make any other material change in any tax election or policy;

(ii)    adopt or materially amend, including by increasing the number of Incentive Units which may be issued thereunder, any Incentive Plan;

(iii)    issue any Units or other Equity Interests in a transaction or series of transactions which constitutes a Dilutive Offering with respect to any series of Units;

(iv)    except as provided in Section 8.2(a), increase or decrease the size of the Board;

(v)    enter into any voluntary liquidation, dissolution or filing or acquiescing in the filing of a petition in bankruptcy or any similar proceeding;

(vi)    subject to the Board's right to update Schedule I as provided in Section 8.14, amend the definition of "Competitor";

(vii)    except as required by applicable Law, exclude any Manager from the board of directors, board of managers or other governing body of any Subsidiary;

(viii)    amend or otherwise modify the definition of Change in Control in any Debt Document;

(ix)    redeem less than all of the Series A-1 Preferred outstanding at any time or make any distributions with respect to the Series A-1 Preferred other than in connection with a redemption of all outstanding Series A-1 Preferred;

(b)    without having obtained the affirmative vote or written consent of holders of Voting Units representing a Majority Interest:

(i)    consummate, be a party to, or agree to any binding agreement with respect to, any acquisition, merger, recapitalization or restructuring of the Company or any material Subsidiary of the Company (other than any internal reorganization, merger, consolidation or restructuring the consummation of which does not materially or adversely alter the rights and obligations of the Members hereunder);

(ii)    consummate, be a party to, or agree to any binding agreement with respect to, any Asset Sale;

(iii)    enter into any voluntary liquidation or dissolution following an Asset Sale if the Preferred Units are redeemed out of the proceeds of such Asset Sale;

(iv)    except as otherwise expressly provided herein, enter into any amendment, restatement or waiver of any provision of this Agreement;

(c)    without having obtained the affirmative vote or written consent of Members holding:

(i)    two-thirds of the outstanding Series A-1 Preferred (other than any Series A-1 Preferred held by any Harbinger Entity for approval of the matters set forth in clause (x)): (x) subject to the provisions of clause (ii) of this paragraph (c) below, amend, modify, terminate or waive any provision of this Agreement, or take any other action (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of the Series A-1 Preferred or (y) incur any indebtedness not permitted under the Debt Documents as in effect on the Effective Date;

(ii)    all outstanding Series A-1 Preferred (other than any Series A-1 Preferred held by any Harbinger Entity for approval of the matters set forth in clauses (w) and (x)): (w) issue any additional Series A-1 Preferred after the Effective Date or create or issue any other series of Equity Interests that rank either *pari passu* or senior as to distributions or upon liquidation with the Series A-1 Preferred, (x) create or issue any other series of Equity Interests that are junior to the Series A-1 Preferred, but that would constitute a Dilutive Offering with respect to the Series A-1 Preferred, (y) amend, modify, terminate or waive Section 6.1 of the Agreement or any other provision of this Agreement in a manner that modifies the Liquidation Preference or (z) approve any transaction which would constitute a Required Sale or other Change of Control if the aggregate amount of consideration to be received by the outstanding Series A-1 Preferred in cash in such transaction, when aggregated with all cash distributions previously received by the outstanding Series A-1 Preferred (if any), is or may reasonably be expected to be less than the Series A-1 Liquidation Preference;

(iii)    two-thirds of the outstanding Series A-2 Preferred (other than any Series A-2 Preferred held by any Harbinger Entity): subject to the provisions of clauses (iv) and (v) of this paragraph (c) below, amend, modify, terminate or waive any provision of this Agreement, or take any other action (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of the Series A-2 Preferred;

(iv)    all outstanding Series A-2 Preferred (other than any Series A-2 Preferred held by any Harbinger Entity for approval of the matters set forth in clauses (w) and (x)): (w) issue any additional Series A-2 Preferred after the Effective Date or create or issue any other series of Equity Interests that rank either *pari passu* or senior as to distributions or upon liquidation with the Series A-2 Preferred, (x) create or issue any other series of Equity Interests that are junior to the Series A-2 Preferred, but which would constitute a Dilutive Offering with respect to the Series A-2 Preferred, or (y) amend, modify, terminate or waive Section 6.1 of the Agreement or any other provision of this Agreement in a manner that modifies the Liquidation Preference or dividends to which the Series A-2 Preferred are entitled;

(v)    Notwithstanding anything in clauses (iii) or (iv)(w) and (iv)(x) to the contrary, the Series A-2 Preferred shall not be entitled to separately consent to any

54

amendment to which the Series A-1 Preferred has consented unless such amendment has a different or disproportionate impact on the Series A-2 Preferred as compared to the Series A-1 Preferred.

(d)    [Reserved.]

(e)    without having obtained the affirmative vote or written consent of Members:

(i)    holding a majority of the Voting Units: subject to the provisions of clauses (ii) and (iii) of this paragraph (e) below, (x) amend, modify, terminate or waive any provision of this Agreement, or take any other action (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of the holders of Common Units, including by creating or issuing any new series of Equity Interests or (y) effectuate an IPO;

(ii)    holding a majority of the applicable series of the Common Units: subject to the provisions of clause (iii) of this paragraph (f) below, amend, modify, terminate or waive any provision of this Agreement, or take any other action (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of such series of Common Units in a manner that is different or disproportionate from the manner in which such amendment, modification, termination, waiver or other action affects the rights or obligations of any other series of Common Units under this Agreement.

(iii)    Notwithstanding the provisions of clauses (i) and (ii), the holders of 100% of the Series A Common may authorize creating or issuing any series of Equity Interests or effectuating an IPO as an alternative to seeking or obtaining the approvals set forth in clauses (i) and (ii); provided, however, that the affirmative vote or written consent of Harbinger shall be required to approve any IPO in which each Major Investor is not entitled to register the same percentage of the Common Units held by such Major Investor immediately prior to such IPO.

(f)

(i)    without having obtained the affirmative vote or written consent of Harbinger: amend, modify, terminate or waive any provision of this Agreement, or take any other action  (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of any Units held by a Harbinger Entity in a manner that is different or disproportionate from the manner in which such amendment, modification, termination, waiver or other action affects the rights or obligations under this Agreement of other holders of the applicable series of Units so affected.  In addition, if any series of Units is held solely by the Harbinger Entities, any amendment, modification, termination or waiver of any provision of this Agreement, or the taking of any other action (through the Board or otherwise) that adversely changes the rights, preferences, privileges, restrictions or obligations relating to such series in a manner that is different or disproportionate from the manner in which such amendment, modification, termination, waiver or other action

55

affects the rights or obligations of any other series shall require the affirmative vote or written consent of Harbinger.

(ii)    without having obtained the affirmative vote or written consent of ADIC: amend, modify, terminate or waive any provision of this Agreement, or take any other action  (through the Board or otherwise), in either case in a manner that would adversely change the rights, preferences, privileges, restrictions or obligations of any Units held by ADIC in a manner that is different or disproportionate from the manner in which such amendment, modification, termination, waiver or other action affects the rights or obligations under this Agreement of other holders of the applicable series of Units so affected.  In addition,  if any series of Units is held solely by ADIC, any amendment, modification, termination or waiver of any provision of this Agreement, or the taking of any other action (through the Board or otherwise) that adversely changes the rights, preferences, privileges, restrictions or obligations relating to such series in a manner that is different or disproportionate from the manner in which such amendment, modification, termination, waiver or other action affects the rights or obligations of any other series shall require the affirmative vote or written consent of ADIC.

(g)    Notwithstanding any provision in this Agreement excluding any Units held by a Harbinger Entity or ADIC from voting, approving or consenting to any matter on which other Units of the same series have a voting, consent or approval right (including voting rights of Voting Units), such Units shall be entitled to vote on, consent to or approve all such matters to the extent that other Units of the same series have a voting, consent or approval right (including voting rights of Voting Units) at the time such Units are transferred (and then, only to the extent so Transferred) by a Harbinger Entity to any Person (other than another Harbinger Entity) or by ADIC to any Person (other than an Affiliate of ADIC), in each case, in compliance with the applicable provisions of Article VII.

(h)    For the avoidance of doubt, except as set forth in clauses (c)(v) and (e)(iii) above, the approval rights set forth herein shall be cumulative to the extent applicable and no such approval shall be deemed to be in lieu of any other approval that by the terms hereof is required.

**Section 8.5    Reliance by Third Parties**.  Any Person may rely upon a certificate signed by either (x) the CEO and a Secretary or Assistant Secretary or (y) by two (2) or more Managers, as to:  (i) the identity of any Managers or Members; (ii) any factual matters relevant to the affairs of the Company; (iii) the Persons who are authorized to execute and deliver any document on behalf of the Company; or (iv) any action taken or omitted by the Company, the Managers or any Member.

**Section 8.6    Meetings; Notice**.

(a)    Regularly scheduled meetings of the Board may be held at such time, date and place as a majority of the Managers then in office may from time to time determine by resolution and publicize by means of reasonable notice (at least five (5) Business Days) given to any Manager or Board observer who is not present at the meeting at which such resolution is adopted, but in no event shall the Board meet less than quarterly.  Special meetings of the Board may be called, orally, in writing or by means of electronic communication, by at least three (3) of

56

the Managers then in office or by the CEO, designating the time, date and place thereof. Managers may participate in meetings of the Board by means of telephone conference or similar communications equipment by means of which all Managers participating in the meeting can hear each other, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting.  No Manager may delegate its rights and obligations to participate in and vote at any meeting of the Board.

(b)    Notice of the time, date and place of all special meetings of the Board shall be given to each Manager and Board observer by the Secretary or Assistant Secretary, or in case of the death, absence, incapacity or refusal of such Persons, by the officer or one of the Managers calling the meeting.  Notice shall be given to each Manager and Board observer in person or by telephone, facsimile or electronic mail no later than the Business Day that is one (1) Business Day in advance of such special meeting and shall state the purpose of such special meeting.  Notice need not be given to any Manager if a written waiver of notice is executed by him before or after the meeting, if communication with such Manager is unlawful, or if such Manager is present at the meeting (unless such Manager attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened).

**Section 8.7**    <u>**Voting; Quorum**</u>.

At any meeting of the Board at which a quorum is present, a majority of the Managers present thereat may take any action on behalf of the Board, unless a larger number is required by the Act or by this Agreement.  Two-thirds of the members of the Board then in office shall constitute a quorum for the transaction of business at each meeting of the Board.

**Section 8.8**    <u>**Written Action**</u>.

Any action which might be taken at a meeting of the Board, or any duly constituted committee thereof, may be taken without a meeting by a unanimous written consent signed by all of the Managers then in office and filed with the records of meetings of the Board; <u>provided, however</u>, that within three (3) Business Days of such written consent of the Managers, the Board shall provide written notice to Harbinger of all actions taken by written consent, describing in reasonable detail such action taken or matter voted on.

**Section 8.9**    <u>**Compensation to Managers**</u>.

The Company shall promptly reimburse in full each Manager and Board observer for all such Manager's or Board observer's actual, reasonable and reasonably documented, out-of-pocket costs and expenses incurred in connection with attending any meeting of the Board or a committee thereof or any board of directors or committee thereof of a Subsidiary of the Company, subject to any travel and expense reimbursement policies adopted by the Board with respect to the Managers.  Only Managers who are Independent Managers may receive compensation for serving on the Board of and any committee thereof, and any board of directors or committee thereof of a Subsidiary of the Company, which compensation shall be determined by a majority of the Managers.

**Section 8.10    <u>Transactions with Interested Persons; Business Opportunities</u>**.

(a)    Unless entered into in bad faith, no contract or transaction between the Company and one of its Managers, Officers or Members, or between the Company and any other Person in which one or more of its Managers, Officers or Members have a material financial interest or are directors, officers, employees or own more than a five percent (5%) interest as partners, members or stockholders of such other Person, shall be voidable solely for this reason or solely because said Member, Manager or Officer was present or participated in the authorization of such contract or transaction if:  (i) the material facts as to the relationship or interest of said Person and as to the contract or transaction were disclosed or known to the Board and the contract or transaction was authorized by a majority of the disinterested Managers (if any); or (ii) the material facts as to the relationship or interest of said Person and as to the contract or transaction were disclosed or known to the Voting Members and the contract or transaction was authorized by holders of Voting Units representing a majority of the Voting Units held by disinterested Members.  Unless entered into in bad faith, no contract or transaction between the Company and any other Person in which one or more of its Managers, Officers or Members either have a financial interest that is not material in, or own an interest of than a five percent (5%) or less (whether as partners, members, stockholders or otherwise) of, such other Person, shall be voidable solely for this reason or solely because said Member, Manager or Officer was present or participated in the authorization of such contract or transaction.  Subject to compliance with the provisions of this Section 8.10, no Member, Manager or Officer interested in such contract or transaction, because of such interest, shall be considered to be in breach of this Agreement or liable to the Company, any other Member, Manager or other Person for any loss or expense incurred by reason of such contract or transaction or shall be accountable for any gain or profit realized from such contract or transaction.

(b)    The Company hereby renounces, on behalf of itself and its Subsidiaries, to the fullest extent permitted by the Act and applicable law, any interest or expectancy of the Company or its Subsidiaries in, or in being offered an opportunity to participate in, any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, (i) any Manager who is not an employee of the Company or any of its Subsidiaries, or (ii) any Member or any partner, member, director, stockholder, officer, employee or agent of any such Member, other than someone who is an employee of the Company or any of its Subsidiaries (collectively, "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a Manager or Member (an "**Investor Business Opportunity**").  To the fullest extent permitted by law, and solely in connection herewith, the Company hereby waives any claim against a Covered Person, and agrees to indemnify all Covered Persons against any claim that is based on fiduciary duties, the corporate opportunity doctrine or any other legal theory which could limit any Covered Person from pursuing or engaging in any such Investor Business Opportunity.

**Section 8.11    <u>Waiver of Fiduciary Duties by Members</u>**.  The Members' respective obligations to each other are limited to the express obligations described in this Agreement, which obligations the Members shall carry out with ordinary prudence and in a manner characteristic of businesspersons in similar circumstances.  No Member shall be a fiduciary of, or

have any fiduciary obligations to, the other Members in connection with the Company, this Agreement, or such Member's performance of its obligations under this Agreement; and each Member hereby waives to the fullest extent permitted by applicable law any rights it may have to claim any breach of fiduciary obligation under this Agreement or in connection with the Company.

        **Section 8.12    Managers' and Officers' Insurance**.  The Company shall maintain managers and officers' liability insurance coverage on terms satisfactory to a majority of the Managers.

        **Section 8.13    Subsidiary Boards of Directors**.  Subject to Section 8.4(a)(vii) and except as otherwise required by applicable Law, the Company shall ensure that the composition of the board of directors, board of managers or other governing body of each of its Subsidiaries shall be the same as, and shall be selected in the same manner as, the Board as set forth in Sections 8.1 and 8.2, unless otherwise approved by unanimous vote of the Board.

        **Section 8.14    Updates to Competitor Schedule**.  From time to time as determined by the Board (but no less than annually beginning in 2015),  the Board shall review the Persons listed as Competitors on Schedule I and shall make such revisions and additions to the list as it determines in good faith are appropriate based on the Board's good faith view of the Persons that are in competition with the Company; provided, however that no Approved Holder shall be included on Schedule I unless the addition of such Approved Holder is approved or consented to unanimously by all Managers other than any Manager appointed by such Approved Holder. Notwithstanding the foregoing, a Person that is deemed to be a Competitor prior to the date that such Person becomes an Affiliate of an Approved Holder shall not cease to be included in the definition of Competitor as a result of its affiliation with an Approved Holder.

## ARTICLE IX
## OFFICERS

        **Section 9.1    Enumeration**.  Except as otherwise provided herein, the Board may delegate its powers to act on behalf of the Company to officers (each, an "**Officer**" and, collectively, the "**Officers**"), which may consist of a Chief Executive Officer (the "**CEO**"), a Secretary (the "**Secretary**"), a Chief Financial Officer (the "**Chief Financial Officer**"), a Treasurer (the "**Treasurer**"), a Chief Operating Officer (the "**Chief Operating Officer**") and such other Officers, including one or more Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board may determine.

        **Section 9.2    Election**.  The CEO and Secretary shall be elected annually by the Board at its first meeting of each Fiscal Year.  Other Officers may be chosen by the Board at such meeting or at any other meeting.

        **Section 9.3    Qualification**.  No Officer need be a Member or Manager.  Any two (2) or more offices may be held by the same Person.  Any Officer may serve as a Manager or Member, subject to Section 8.2 hereof.

        **Section 9.4    Tenure**.  Except as otherwise provided by the Act or by this Agreement, each of the Officers shall hold office until his or her successor is elected or until his or her earlier

59

resignation or removal.  Any Officer may resign by delivering his or her written resignation to the Company, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

**Section 9.5**      **Removal**.  The Board may remove any Officer with or without cause at any time.

**Section 9.6**      **Vacancies**.  Any vacancy in any office may be filled for the unexpired portion of the term by the Board.

**Section 9.7**      **Powers and Duties**.

(a)      *CEO*.  The CEO shall, subject to the direction of the Board, have general supervision and control of the Company's business.  Unless otherwise provided by the Board, the CEO shall preside, when present, at all meetings of the Members.  The CEO shall initially be **[ ]**.  Any action taken by the CEO, and the signature of the CEO on any agreement, contract, instrument or other document on behalf of the Company shall, with respect to any third party, be sufficient to bind the Company and shall conclusively evidence the authority of the CEO and the Company with respect thereto.

(b)      *Chief Operating Officer*.  The Chief Operating Officer shall, subject to the direction of the Board and the Chief Executive Officer, have responsibility for various elements of the day-to-day operations, business, affairs and property of the Company.

(c)      *Treasurer and Chief Financial Officer*.  The Treasurer and Chief Financial Officer shall, subject to the direction of the Board, have general charge of the financial affairs of the Company and shall cause to be kept accurate books of account.  The Treasurer and Chief Financial Officer shall have custody of all funds, securities, and valuable documents of the Company, except as the Board may otherwise provide.

(d)      *Secretary and Assistant Secretaries*.  The Secretary shall record all the proceedings of the meetings of the Board (including committees thereof) in books kept for that purpose.  In the Secretary's absence from any such meeting an Assistant Secretary, or if there be none or the Assistant Secretary is absent, a temporary secretary chosen at the meeting, shall record the proceedings thereof.  The Secretary shall have such other duties and powers as may be designated from time to time by the Board or the CEO.

**Section 9.8**      **Other Powers and Duties**.  Subject to this Agreement, each Officer of the Company shall have, in addition to the duties and powers specifically set forth in this Agreement, such duties (including fiduciary duties) and powers as are customarily incident to his or her office, and such duties and powers as may be designated from time to time by the Board.

**Section 9.9**      **Confidentiality Agreement**.  Prior to taking office, each Officer of the Company shall sign a confidentiality and assignment of proprietary information agreement with the Company in a form approved by the Board.

**Section 9.10**      **Compensation of Officers**.  The Board shall approve the compensation, benefits and other remuneration of any Officer.

60

## ARTICLE X
## INDEMNIFICATION

### Section 10.1    Right to Indemnification

(a)    *Tax Matters Partner, Managers and Officers.*  To the maximum extent permitted by law if the Company were a corporation organized under the Delaware General Corporation Law, every Tax Matters Partner, Manager and Officer shall be entitled as of right to be indemnified by the Company against all Expenses and Liability incurred by such Person in connection with any actual or threatened claim, action, suit or proceeding, whether civil, criminal, administrative, investigative or other, or whether brought by or against such Person or by or in the right of the Company or otherwise, in which such Person may be involved, as a party or otherwise, by reason of such Person being or having been a Tax Matters Partner, Manager or Officer of the Company or a member of the board of directors or board of managers or comparable governing body or an officer of a Subsidiary of the Company or by reason of the fact that such Person is or was serving at the request of the Company as a manager, officer, employee, fiduciary or other representative of another corporation, partnership, joint venture, trust, employee benefit plan or other Person (such claim, action, suit or proceeding hereinafter being referred to as an "**Action**"); provided, however, that no such right to indemnification shall exist with respect to an Action brought by a Tax Matters Partner, Officer or Manager against the Company (an "**Indemnitee Action**") except as provided in Section 10.1(c); provided, further, that no such right to indemnification shall exist unless a majority of the disinterested members of the Board reasonably determine that such Indemnitee met the standard of conduct of (i) acting in good faith and in a manner such Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company and (ii) with respect to any criminal proceeding, having no reasonable cause to believe such Indemnitee's conduct was unlawful.  The termination of any Action by judgment, order, settlement or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that such Indemnitee acted in a manner contrary to the standards specified in clauses (i) or (ii) of the preceding sentence.  Persons who are not Tax Matters Partners, Managers or Officers of the Company may be similarly indemnified in respect of service to the Company or a Subsidiary of the Company or to another such Person at the request of the Company to the extent the Board at any time unanimously designates any of such Persons as entitled to the benefits of this Article.  As used in this Article, "**Indemnitee**" includes each Tax Matters Partner, Manager and Officer and each other Person unanimously designated by the Board as entitled to the benefits of this Article; "**Expenses**" means all expenses actually and reasonably incurred, including fees and expenses of counsel selected by an Indemnitee; and "**Liability**" means all liability incurred, including the amounts of any judgments, excise taxes, fines or penalties and any amounts paid in settlement.

(b)    *Current or Former New LightSquared Entities' Directors, Officers, Employees, or Agents.*  Notwithstanding anything herein to the contrary, the Company shall cause, and shall cause each New LightSquared Entity (as defined in the Plan of Reorganization) under its control to cause, the New LightSquared Entities Corporate Governance Document (as defined in the Plan of Reorganization) to provide that the New LightSquared Entities' current and former directors, officers, employees, and agents (including such current and former directors, officers, employees, and agents of the corresponding Inc. Debtors (as defined in the Plan of Reorganization) before reorganization in accordance with the Plan of Reorganization)

shall be entitled to indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses for any claims outstanding as of the Effective Date or relating to any acts or omissions occurring prior to the Effective Date, to the same extent as was available to such Person prior to the Effective Date or to such greater extent as is required by the Plan of Reorganization, as the same may be amended by the Confirmation Order (as defined in the Plan of Reorganization) or the Confirmation Recognition Order (as defined in the Plan of Reorganization).

(c)    An Indemnitee shall be entitled to be indemnified pursuant to this Article against Expenses incurred in connection with an Indemnitee Action if (i) the Indemnitee Action is instituted under Section 10.3 of this Article and the Indemnitee is successful in whole or in part in such Indemnitee Action, (ii) the Indemnitee is successful in whole or in part in an Indemnitee Action, other than an Indemnitee Action instituted under Section 10.3, for which Expenses are claimed or (iii) the indemnification for Expenses is included in a settlement of, or is awarded by a court in, such other Indemnitee Action.

(d)    Any indemnification under this Section 10.1 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the relevant standards of conduct set forth in Section 10.1(a) or Section 10.1(b), as applicable; provided, that an indemnity under this Article X shall be paid solely out of and to the extent of the assets of the Company (including any assets held by any Subsidiary of the Company) and shall not be a personal obligation of any Member.  Such determination shall be made (i) by the disinterested Managers, (ii) if the Managers so direct, by independent legal counsel in a written opinion, or (iii) by vote or consent of holders of Voting Units representing a Majority Interest. To the extent that an Indemnitee has been successful on the merits or otherwise in defense of any Action, or in defense of any claim, issue or matter therein, such Indemnitee shall be indemnified for any Expenses incurred without the necessity of authorization in the specific case.

Section 10.2    **Right to Advancement of Expenses**.  To the fullest extent permitted by law, every Indemnitee shall be entitled as of right to have the Expenses of the Indemnitee in defending any Action paid in advance by the Company prior to final disposition of the Action, provided that the Company receives a written undertaking by or on behalf of the Indemnitee to repay the amount advanced if it should ultimately be determined that the Indemnitee is not entitled to be indemnified for the Expenses.

Section 10.3    **Right of Indemnitee to Bring Action**.  If a written claim for indemnification under Section 10.1 or for advancement of Expenses under Section 10.2 is not paid in full by the Company within forty-five (45) days after the claim has been received by the Company, the Indemnitee may at any time thereafter bring an Indemnitee Action to recover the unpaid amount of the claim and, if successful in whole or in part, the Indemnitee shall also be entitled to be paid the expense of bringing and pursuing such Indemnitee Action.  The only defense to an Indemnitee Action to recover on a claim for indemnification under Section 10.1 shall be that the conduct of the Indemnitee did not meet the relevant standards of conduct set forth in Section 10.1(a) or Section 10.1(b), as applicable, but the burden of proving such defense shall be on the Company.  Neither the failure of the Company (including the Board, independent legal counsel and Members) to have made a determination prior to the commencement of such

Indemnitee Action that indemnification of the Indemnitee is proper in the circumstances, nor an actual determination by the Company (including the Board, independent legal counsel or the Members) that the conduct of the Indemnitee was such that indemnification is prohibited, shall be a defense to such Indemnitee Action or create a presumption that the conduct of the Indemnitee failed to meet such relevant standards of conduct. The only defense to an Indemnitee Action to recover on a claim for advancement of Expenses under Section 10.2 shall be failure by the Indemnitee to provide the undertaking required by Section 10.2. Notice of any Indemnitee Action shall be given to the Company promptly upon the filing of such Indemnitee Action.

Section 10.4    **Funding and Insurance**. The Company may create a trust fund, grant a security interest, cause a letter of credit to be issued or use other means (whether or not similar to the foregoing) to ensure the payment of all sums required to be paid by the Company to effect indemnification as provided in this Article X. The Company may purchase and maintain insurance to protect itself and any Indemnitee against any Expenses or Liability incurred by the Indemnitee in connection with any Action, whether or not the Company would have the power to indemnify the Indemnitee against the Expenses or Liability by law or under the provisions of this Article.

Section 10.5    **Non-Exclusivity; Nature and Extent of Rights**. The rights to indemnification and advancement of Expenses provided for in this Article X shall (a) not be deemed exclusive of any other rights, whether now existing or hereafter created, to which any Indemnitee may be entitled under any other agreement, provision in this Agreement, vote of the disinterested Managers or otherwise, (b) be deemed to create contractual rights in favor of each Indemnitee who serves at any time while this Article X is in effect (and each such Indemnitee shall be deemed to be serving in reliance on the provisions of this this Article X), (c) continue as to each Indemnitee who has ceased to have the status pursuant to which the Indemnitee was entitled or was designated as entitled to indemnification under this Article and inure to the benefit of the heirs and legal representatives of each Indemnitee and (d) be applicable to Actions commenced after this Article X becomes effective, whether arising from acts or omissions occurring before or after this Article becomes effective. Any amendment or repeal of this Article X or adoption of any other provision of this Agreement which has the effect of limiting in any way the rights to indemnification or advancement of Expenses provided for in this Article shall operate prospectively only and shall not affect any action taken, or any failure to act, by an Indemnitee prior to such amendment, repeal or other provision becoming effective.

Section 10.6    **Partial Indemnity**. If an Indemnitee is entitled under any provision of this Article X to indemnification by the Company for some or a portion of the Expenses or Liability incurred by the Indemnitee in the preparation, investigation, defense, appeal or settlement of any Action or Indemnitee Action but not, however, for the total amount thereof, the Company shall indemnify the Indemnitee for the portion of such Expenses or Liability to which the Indemnitee, is entitled.

Section 10.7    **Primacy of Indemnification and Advancement of Expenses**. The Company acknowledges that certain Indemnitees may have certain rights to indemnification and advancement of expenses from certain of their respective Affiliates or from certain other sources (whether currently in effect or established in the future, the "**Secondary Indemnitors**"). The Company agrees that, as between the Company and the Secondary Indemnitors, the Company is

63

primarily responsible for amounts required to be indemnified or advanced under this Agreement or the Act and any obligation of the Secondary Indemnitors to provide indemnification and advancement for the same amounts (whether currently in force or established in the future) is secondary to those Company obligations.  The Company waives any right of contribution or subrogation against the Secondary Indemnitors with respect to the indemnification and advancement obligations for which the Company is primarily responsible under this Article X. In the event of any payment by the Secondary Indemnitors of amounts otherwise required to be indemnified or advanced by the Company under this Agreement or the Act, the Secondary Indemnitors shall be subrogated to the extent of such payment to all of the rights of recovery of the applicable Indemnitee for indemnification or advancement of expenses under this Agreement and the Act.  It is the intention of the parties hereto that the Indemnitees and the Secondary Indemnitors be third party beneficiaries of this Article X.

Section 10.8   **Acknowledgement of Release and Exculpation**.  The Company and each Member hereto acknowledges that the Plan or Reorganization provides for the release and exculpation of the Released Parties (as defined in the Plan of Reorganization) and the Company hereby agrees to release and forever discharge such Released Party for such matters and to the fullest extent provided in the Plan of Reorganization.

## ARTICLE XI
## ACCOUNTING, TAX ELECTIONS AND RECORDS

Section 11.1   **Accounting Period**.  The Company's accounting period shall be the Fiscal Year.  The Company shall maintain complete books and records accurately reflecting the accounts, business, transactions and Members of the Company.  The books and accounts of the Company shall be maintained using the accrual method of accounting for tax purposes, unless the Board duly approves use of an alternate method.  Those documents relating to allocations of items of income, gain, loss, deduction or credit and Capital Accounts shall be kept under United States federal income tax accounting principles as provided herein.

Section 11.2   **Records and Reports**.  At the expense of the Company, the Board shall maintain records and accounts of all operations and expenditures of the Company.  Subject to Section 4.10, the Company shall keep, at a minimum, the following records: the full name and last known business residence, or mailing address, of each Member; copies of the Company's financial statements and income tax returns and reports, if any, for the three (3) most recent years; and copies of the Company's currently effective written operating agreement.

Section 11.3   **Annual Review; Compliance Report**.  At the time of delivery of each annual financial statement pursuant to Section 4.10(a)(iii), the Company shall deliver to each Member (i) a copy of the audit report from the Company's auditors and (ii) a certificate executed by the Chief Financial Officer of the Company stating that such Officer has caused this Agreement and the terms of the Units to be reviewed and has no knowledge of any default by the Company in the performance or observance of any of the provisions of this Agreement or the Units or, if such Officer has such knowledge, specifying such default and the nature thereof.

Section 11.4   **Other Reports**.  The Company shall furnish to each Manager, who shall be entitled to share it with the Member appointing such Manager, as applicable, promptly after

its receipt, its delivery or the issuance thereof (as applicable), (a) any communication with the Securities and Exchange Commission and (b) any reports prepared by the Company or any Subsidiary or their respective officers for governmental or other regulatory agencies, including the FCC and Industry Canada.  The Company shall provide each Manager with prompt written notice of any event that has had or could have a material effect on the Company or any of its Subsidiaries.

**Section 11.5    Inspection**.  The Company will permit each Member (and any requesting Manager), upon reasonable advance written notice and at the expense of such Member, no more than two (2) times each Fiscal Year, to visit and inspect any of the properties of the Company or its Subsidiaries, and to examine such information as they may be entitled to request under Section 18-305 of the Act, all during normal business hours.  Access to information about the Company may be made subject to any reasonable conditions and standards established by the Board, as permitted by the Act, which may include, but are not limited to, withholding of, or restrictions on, the use of Confidential Information.  In furtherance of the foregoing, the Company shall not be obligated to disclose any data or information pursuant to this Section 11.5 that is reasonably determined by the Board to be proprietary or competitively sensitive in nature and shall not be obligated to disclose any data or information pursuant to this Section 11.5 to any Person that is reasonably determined by the Board to be directly or indirectly engaged in the Business or an Affiliate of a Person engaged in the Business.

**Section 11.6    Tax Elections**.  The Company shall make the election provided for in Section 754 of the Code and the Regulations thereunder (the "**Section 754 Election**").  The Section 754 Election shall be filed by the Company with its U.S. federal income tax return, along with  any other forms necessary for the Section 754 Election to be effective, for the taxable year in which this Agreement is entered into.

# ARTICLE XII
# CAPITAL ACCOUNTS

**Section 12.1    Additional Capital Contributions**.

Except as may be required by any Award Agreement relating to an Incentive Unit or as expressly otherwise provided herein, no Member shall be required or obligated (a) to make any additional capital contribution to the Company, (b) to loan any money to the Company, or (c) to endorse or guaranty the payment or performance of any obligations of the Company.  Capital Contributions shall inure only to the benefit of the parties to this Agreement and their successors in interest and in no event shall any creditor, trustee in bankruptcy, or receiver of the Company or of any Manager, or other Person not a Member of the Company have any right to call for any Capital Contributions or to enforce payment thereof.

**Section 12.2    Capital Accounts**.

(a)    A separate capital account (each a "**Capital Account**") shall be established for each Member and shall be maintained in accordance with applicable regulations under Section 704 of the Code.  Each Member's Capital Account, as determined in accordance with Section 12.1, as of the Effective Date shall be as set forth opposite such Member's name

on Exhibit A under the caption "Capital Account".  No Member shall have any obligation to restore any portion of any deficit balance in such Member's Capital Account, whether upon liquidation of its interest in the Company, liquidation of the Company or otherwise.  In accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f), the Company may adjust (but shall adjust when Incentive Units are issued) the Capital Accounts of its Members to reflect revaluations (including any unrealized income, gain or loss) of the Company's property (including intangible assets such as goodwill), and in making such adjustment, employ the principles set forth in this Agreement, whenever it issues additional interests in the Company (including any interests with a zero initial Capital Account), or whenever the adjustments would otherwise be permitted under such Treasury Regulation.  In the event that the Capital Accounts of the Members are so adjusted, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property and (ii) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Section 704(c) of the Code.  In the event of the Transfer of any Units in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Units.  The Capital Accounts shall be maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members in liquidation or otherwise.

(b)    Except as otherwise expressly provided herein, no Member may withdraw, or shall be entitled to a return of, any portion of such Member's Capital Contribution.

## ARTICLE XIII
## ALLOCATIONS OF PROFITS, LOSSES, ETC.

**Section 13.1    Allocations Generally**.  Subject to Sections 13.3 through 13.7 and Section 13.11, income, gains, losses and deductions for any Fiscal Year or portion thereof as determined for book purposes shall be allocated among the Members in such ratio or ratios as may be required to cause the balances of the Members' Economic Capital Accounts to equal, as nearly as possible, their Target Balances, consistent with the provisions of Section 13.9.

**Section 13.2    Tax Allocations Under Section 704(c) of the Code**.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for income tax purposes and its book value for Capital Account purposes.  Unless the Company's accountants determine that there is no permissible reporting position, the Company shall use the "remedial allocation" method under Section 704(c) of the Code and Treasury Regulations Section 1.704-3(d).  Allocations pursuant to this Section 13.2 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of income, gain, loss or deduction pursuant to any provision of this Agreement.  In the event the book value of any of the assets of the Company is adjusted for Capital Account maintenance purposes as set forth in

Section 12.2, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its book value in the same manner as provided under Section 704(b) and (c) of the Code and the Regulations promulgated thereunder and in accordance with this Section 13.2.

Section 13.3    **Qualified Income Offset**.

Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases a deficit balance in such Member's Capital Account (increased by the amount of such Member's obligation to restore a deficit in such Member's Capital Account, including any deemed obligation pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5)) shall be allocated items of income and gain in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such deficit balance as quickly as possible.  This Section 13.3 is intended to comply with the alternate test for economic effect set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in a manner consistent therewith.

Section 13.4    **Nonrecourse Deductions**.  Nonrecourse Deductions shall be allocated to the Common Members in proportion to such Member's Common Percentage.  For purposes of this Section 13.4, the term "**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

Section 13.5    **Company Minimum Gain Chargeback**.  Notwithstanding any other provisions of this Article XIII, in the event there is a net decrease in Company Minimum Gain (as defined below) during any Company taxable year, the Members shall be allocated items of income and gain in accordance with Treasury Regulations Section 1.704-2(f).  For purposes of this Article XIII, the term "**Company Minimum Gain**" has the same meaning as "partnership minimum gain" as set forth in Treasury Regulations Section 1.704-2(b)(2), and any Member's share of Company Minimum Gain shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(1).  This Section 13.5 is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in a manner consistent therewith.

Section 13.6    **Member Nonrecourse Debt**.  Notwithstanding any other provisions of this Article XIII, to the extent required by Treasury Regulations Section 1.704-2(i), any items of income, gain, deduction and loss of the Company that are attributable to a nonrecourse debt of the Company that constitutes Member Nonrecourse Debt (as defined below) (including chargebacks of Member Nonrecourse Debt Minimum Gain, as defined below) shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2(i).  For purposes of this Article XIII, the term "**Member Nonrecourse Debt**" has the same meaning as "partner nonrecourse debt" as set forth in Treasury Regulations Section 1.704-2(i)(4).  This Section 13.6 is intended to satisfy the requirements of Treasury Regulations Section 1.704-2(i) (including the partner nonrecourse debt chargeback requirements) and shall be interpreted and applied in a manner consistent therewith.

**Section 13.7    Member Minimum Gain Chargeback**.  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article XIII, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's respective share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  For purposes of this Article XIII, the term "**Member Nonrecourse Debt Minimum Gain**" has the same meaning as "member nonrecourse debt minimum gain" as set forth in Treasury Regulations Section 1.704-2(i)(2).  This Section 13.7 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

**Section 13.8    Allocation of Debt.**  The indebtedness of the Company shall be allocated among the Members under Section 752 of the Code.  Excess nonrecourse liabilities shall be allocated among the Members in the same manner as Nonrecourse Deductions are allocated among the Members under Section 13.4 as permitted under Treasury Regulations Section 1.752 3(a)(3).

**Section 13.9    Compliance with Section 704(b) of the Code**.  The allocation provisions contained in this Article XIII are intended to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder and shall be interpreted and applied in a manner consistent therewith.

**Section 13.10  Safe Harbor Election**.  To the extent provided for in Treasury Regulations, revenue rulings, revenue procedures or other guidance issued by the IRS after the Effective Date, the Company is hereby authorized to, and at the direction of the Board shall (unless such election would materially adversely affect any Member), elect a safe harbor under which the Fair Market Value of any Units issued after the effective date of such Treasury Regulations (or other guidance) will be treated as equal to the liquidation value of such Units (i.e., a value equal to the total amount that would be distributed with respect to such Units if the Company sold all of its assets for their Fair Market Value immediately after the issuance of such Units, satisfied its liabilities (excluding any non-recourse liabilities to the extent the balance of such liabilities exceeds the Fair Market Value of the assets that secure them) and distributed the net proceeds to the Members under the terms of this Agreement).  In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to transfers of such Units while the safe harbor election remains effective.

**Section 13.11  Forfeiture Allocations**.  Notwithstanding the foregoing provisions of this Article XII, upon a forfeiture of any Incentive Units by any Member, gross items of income,

gain, loss or deduction shall be allocated to such Member if and to the extent required by final Treasury Regulations promulgated after the date hereof to ensure that allocations made with respect to all unvested Units are recognized under Section 704(b) of the Code.

**Section 13.12** **Cancellation of Indebtedness Income**.  Notwithstanding anything to the contrary contained in this Agreement, and for the avoidance of any doubt, any cancellation of indebtedness income realized by the Company as a result of the confirmation and effectiveness of the Plan of Reorganization shall be (i) treated as realized immediately before the effectiveness of this Agreement and (ii) allocated to the Common Limited Partners (as defined under the Second Amended and Restated Limited Partnership Agreement of LightSquared LP, dated October 18, 2012) of LightSquared LP immediately prior to the effectiveness of the Plan of Reorganization.

**Section 13.13** **Built In Gain Allocation**.

(a)    Notwithstanding anything to the contrary in this Agreement, and for the avoidance of doubt, any Built In Gain realized by the Company shall be allocated to Reorganized LightSquared under section 704(c) of the Code.  Pursuant to Section 13.2, it is assumed that the Company shall use the "remedial method" provided under Treas. Reg. section 1.704-3(d) to provide deductions to the Initial Members with respect to the Built In Gain Assets.

(b)    At such time and to the extent (i) any such Built In Gain is allocated to an Initial Member in a manner inconsistent with clause (a) or there is an Insufficient Remedial Allocation and (ii) the aggregate amount of income and gains allocated to such Initial Member since the Effective Date is in excess of the aggregate amount of losses and deductions allocated to such Initial Member, (x) future distributions under Article VI that are to be made to Reorganized LightSquared shall (as soon as available) instead be made to the Initial Members in an amount equal to the Tax Amount  and (y) if and to the extent such distributions made under clause (x) are less than the Tax Amount required to be paid under clause (x), interest and principal payments with respect to the Second Lien Facility required to be paid to Reorganized LightSquared or any of its Affiliates shall (as soon as available) instead be paid to such Initial Members to the extent of the Tax Amount has not been reimbursed pursuant to clause (x).

(c)    For purposes of determining the amount of Built In Loss and Refund Amount of an Initial Member, Built In Loss shall be deemed recognized and utilized to the extent that the Member receives an allocation of taxable gain on the Company's sale or exchange of all or substantially of its assets.  For purposes of calculating the Refund Amount with respect to an Initial Member (i) an Initial Member's Refund Amount may be reduced to the extent such Initial Member can clearly demonstrate its inability to utilize such Built In Loss after taking into account the assumption in the previous sentence, (ii) each Initial Member must certify that the Refund Amount is in compliance with the assumption set forth in the previous sentence and (iii) if the Built In Loss is subject to a carryforward, such Initial Member shall set aside the Refund Amount without reduction for clause (i) above in escrow until all carryforward periods have expired.

(d)    It is acknowledged and agreed that in preparing the income tax returns for the Company, its accountants shall prepare and send to each Member a schedule showing the

allocations of any Built In Gain for the relevant Fiscal Year and whether any payments are due under this section 13.13.   Subject to the limitations set forth in Section 13.13(b)(x) and Section 13.13(b)(y), any payments due under this section 13.13 shall be made no later than March 31 of the following Fiscal Year.

**Section 13.14  Refund Amount Payment**.  Upon a liquidation of the Company in accordance with Article XIV, each Initial Member, and its successors and assigns,that received distributions or payments pursuant to Section 13.13 shall be required to make a payment to Reorganized LightSquared in an amount equal to the Refund Amount.[13]

**Section 13.15  Reserved.**

## ARTICLE XIV
## DISSOLUTION AND LIQUIDATION

**Section 14.1    Dissolution**.  The Company shall be dissolved upon (i) the entry of a decree of judicial dissolution pursuant to Section 702 of the Act, (ii) the decision of the Board and Major Investor Approval (so long as there are any Major Investors), or (iii) as provided in Section 8.4.

**Section 14.2    Liquidating Distributions**.

In settling accounts upon winding up and liquidation of the Company, the assets of the Company shall be applied and distributed as expeditiously as possible in the following order:

(a)    to pay (or make reasonable provision for the payment of) all creditors of the Company, including, to the extent permitted by law, Members or other Affiliates that are creditors, in satisfaction of liabilities of the Company in the order of priority provided by law, including expenses relating to the dissolution and winding up of the Company, discharging liabilities of the Company, distributing the assets of the Company and terminating the Company as a limited liability company in accordance with this Agreement and the Act; and

(b)    to the Members in accordance with Section 6.1(b), subject to Sections 6.3 and 6.4.

**Section 14.3    Orderly Winding Up**.

Notwithstanding anything herein to the contrary, upon winding up and liquidation, if required to maximize the proceeds of liquidation, the Members may, upon approval of holders of Voting Units representing a Majority Interest, transfer the assets of the Company to a liquidating trust or trustees.

**Section 14.4   Bankruptcy of Members**

---

[13] NTD: Associated restrictions, if any, in transfers, and any related guarantee obligations, to be agreed upon by the parties.

Notwithstanding anything to the contrary in this Agreement, the Bankruptcy of any Member shall not cause (i) the Company to be dissolved or its affairs to be wound up, or (ii) the Member to cease to be a member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

## ARTICLE XV
## INTENTIONALLY OMITTED

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**Section 16.1    Additional Actions and Documents**.  Each Member, by acquiring its Units, hereby agrees to take or cause to be taken such further actions, to execute, acknowledge, deliver and file, or cause to be executed, acknowledged, delivered and filed such further documents and instruments, and to use all reasonable efforts to obtain such consents, as may be necessary or as may be reasonably requested in order to fully effectuate the purposes, terms and conditions of this Agreement.

**Section 16.2    Notices**.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents required or permitted to be given under this Agreement must be in writing and shall be deemed to have been given (a) upon delivery to the recipient in person or by courier, or (b) upon transmission (with confirmation retained) of a facsimile.  Such notices, requests and consents shall be given (x) to the Members at the addresses set forth under their respective names on Exhibit A, or such other address as may be specified by notice to the Board, and (y) to the Company or the Board at the address of the Principal Office of the Company.  Whenever any notice is required to be given by law or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 16.3    Entire Agreement**.  This Agreement constitute the entire agreement of the Members relating to equity interests of the Members in the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.[14]

**Section 16.4    Severability**.  The invalidity of any one or more provisions hereof or of any other agreement or instrument given pursuant to or in connection with this Agreement shall not affect the remaining portions of this Agreement or any such other agreement or instrument or any part thereof; and in the event that one or more of the provisions contained herein or therein should be invalid, or should operate to render this Agreement or any such other agreement or instrument invalid, this Agreement and such other agreements and instruments shall be construed as if such invalid provisions had not been inserted.

**Section 16.5    Survival**.  It is the express intention and agreement of the Members that all covenants, agreements, statements, representations, warranties and indemnities made in this Agreement shall survive the execution and delivery of this Agreement.  This Agreement shall

---

[14] NTD: To be updated for other agreements entered into by the Members.

terminate upon filing of a Certificate of Cancellation with the Secretary of State of the State of Delaware in accordance with the Act.  All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

       **Section 16.6   <u>Amendments; Waivers</u>**.  Except as otherwise set forth herein, this Agreement and the Certificate may be modified or amended, and any provision hereof may be waived, by an instrument in writing signed by the Board and holders of Units representing a Majority Interest; <u>provided, however</u>, that no amendment to this Agreement may, without the consent of each affected Member, (x) require any Member to make contributions to the Company, (y) make the Member liable for any debts or obligations of the Company or (z) impose any non-competition or non-solicitation or other similar obligations on such Member; <u>provided</u>, <u>further</u>, <u>however</u>, that (a) no amendment to this Agreement shall implement any greater restrictions on Transfer of Units or other equity interests of the Company by any Member other than those in effect on the date hereof without such Member's consent; (b) subject to Section 5.1(e), any amendment, modification or waiver of Section 8.4 shall require the same approval as would be required to take the applicable action that is the subject of the provision being so amended, modified or waived; (c) subject to Section 5.1(e), any amendment, modification or waiver of Section 4.6 or this Section 16.6 shall require the prior written consent of all Common Members; (d) any amendment, modification or waiver of Article X shall require the prior written consent of any Person adversely affected by such amendment, modification or waiver; (e) any party may waive, as to itself, any provision hereof intended for its benefit by written consent; (f) no amendment or modification of Section 4.11(a) or Section 4.11(b) that has the effect of further restricting the disclosure of Confidential Information by a Member or increasing such Member's obligation under Section 4.11(a) or Section 4.11(b) shall be binding upon or effective against such Member without such Member's consent and (g) any provision in this Agreement specifying or requiring the approval of Members representing greater than a Majority Interest (or the majority of any series entitled to vote) may only be modified or amended, or any such provision may only be waived, by an affirmative vote of such Members equal to or exceeding that same specified percentage level.  No failure or delay on the part of a Member or the Company in exercising any right, power or privilege hereunder and no course of dealing between the Members or between a Member and the Company shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.  The rights and remedies herein expressly provided are cumulative and not exclusive of any other rights or remedies which a Member or the Company would otherwise have at law or in equity or otherwise.  For the avoidance of doubt, Harbinger and ADIC shall each have the right to vote or consent to amend, modify or waive any provisions of this Agreement (including this Section 16.6) as set forth in this Section 16.6 and the vote or consent, as applicable, of Harbinger or ADIC, as the case may be shall be taken into consideration in determining whether the requisite approval is required or has been obtained.

Section 16.7   **Waiver of Certain Rights**.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

Section 16.8   **Binding Effect**.  Subject to any provisions hereof restricting assignment, this Agreement shall be binding upon and shall inure to the benefit of the Members and their respective successors and permitted assigns.  Subject to the provisions of this Agreement relating to transferability of Units, neither this Agreement nor any of the rights or obligations of any Member hereunder shall be assignable by any Member.

Section 16.9   **Limitation on Benefits of this Agreement**.  It is the explicit intention of the Members that no person or entity other than the Members and the Company is or shall be entitled to bring any action to enforce any provision of this Agreement against any Member or the Company, and that the covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Members (or their respective heirs, legal representatives, successors and assigns as permitted hereunder) and the Company; provided, however, that the Indemnitees and the Secondary Indemnitors shall, as intended third-party beneficiaries thereof, be entitled to the enforcement of Article X hereof, but only as insofar as the obligations sought to be enforced thereunder are those of the Company.

Section 16.10  **Headings; Interpretation**.  Article and Section headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The term "or" is not exclusive.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".

Section 16.11  **Governing Law; Consent to Jurisdiction**.

(a)   The provisions of this Agreement, all of the documents delivered pursuant hereto, their execution, performance or nonperformance, interpretation, construction and all matters based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement (whether in tort or contract) shall be governed by the Laws, both procedural and substantive, of the State of Delaware without regard to its conflict of Laws provisions that if applied might require the application of the Laws of another jurisdiction.

(b)   Each of the parties agrees that all actions, suits or proceedings arising out of or based upon this Agreement or the subject matter hereof shall be brought and maintained exclusively in the state and federal courts located in the State of Delaware.  Each of the parties by execution hereof (i) hereby irrevocably submits to the jurisdiction of the state and federal courts located in the State of Delaware for the purpose of any action, suit or proceeding arising out of or based upon this Agreement or the subject matter hereof and (ii) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that he or it is not subject personally to the jurisdiction of the above-named court, that he or it is immune from

73

extraterritorial injunctive relief or other injunctive relief, that his or its property is exempt or immune from attachment or execution, that any such action, suit or proceeding may not be brought or maintained in one of the above-named court should be dismissed on the grounds of *forum non conveniens*, should be transferred to any court other than one of the above-named court, should be stayed by virtue of the pendency of any other action, suit or proceeding in any court other than one of the above-named court, or that this Agreement or the subject matter hereof may not be enforced in or by any of the above-named court.  To the fullest extent permitted by law, each of the parties hereto hereby consents to service of process in any such suit, action or proceeding in any manner permitted by the laws of the State of Delaware, agrees that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to Section 16.2 hereof is reasonably calculated to give actual notice and waives and agrees not to assert by way of motion, as a defense or otherwise, in any such action, suit or proceeding any claim that service of process made in accordance with Section 16.2 hereof does not constitute good and sufficient service of process.  The provisions of this Section 16.11 shall not restrict the ability of any party to enforce in any court any judgment obtained in the state or federal courts located in the State of Delaware.

    **Section 16.12  <u>Waiver of Jury Trial</u>**.  TO THE EXTENT NOT PROHIBITED BY ANY APPLICABLE LAW THE APPLICATION OF WHICH CANNOT BE WAIVED, THE COMPANY AND EACH MEMBER HEREBY WAIVES, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.

    **Section 16.13  <u>Counterparts</u>**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  A facsimile or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes as of the date first written above.  At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile or other reproduction hereof.

*[Remainder of Page Left Intentionally Blank]*

74

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date.

Exhibit A

| Name and Address of Member | Claim/Interest Description and Amount | Capital Contribution Amount | Stated Value | Number and Series of Units | % of Voting Interests | Common Percentage |
|---|---|---|---|---|---|---|
| Tranche A Lenders: | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Holders of Allowed Prepetition Inc. Subordinated Facility Claims: | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Holders of Allowed Existing LP Preferred Units Equity Interests: | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Holders of Allowed Existing Inc. Common Stock Equity Interest: | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Name and Address of Member | Claim/Interest Description and Amount | Capital Contribution Amount | Stated Value | Number and Series of Units | % of Voting Interests | Common Percentage |
|---|---|---|---|---|---|---|
| Other Existing Inc. Series B Preferred Stock | | | | | | |
| | | | | | | |
| Existing Inc. Series A Preferred Stock | | | | | | |
| | | | | | | |
| Reorganized [LightSquared]: | | | | | | |
| | | | | | | |

## TOPICS TO BE COVERED BY OPINION OF SPECIAL COUNSEL
## SUBJECT TO MILBANK OPINION COMMITTEE REVIEW

- Based solely on our review of a "good standing" certificate issued by the Secretary of State of the State of Delaware, the Company is a Delaware limited liability company validly existing and in good standing under the laws of the State of Delaware.

- The Company has the limited liability company power to execute, deliver and perform its obligations under the Agreement and each of the agreements listed on Schedule I[15] (collectively, the "Opinion Documents").

- The Company has taken all necessary limited liability company action to authorize the execution, delivery and performance of each of the Opinion Documents.

- Each of the Opinion Documents has been duly executed and delivered by the Company.

- Each of the Opinion Documents constitutes a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or other similar laws relating to or affecting the rights of creditors generally,  and except as the enforceability of the Agreement is subject to the application of general principles of equity (regardless of whether considered in a proceeding in equity or at law), including without limitation (a) the possible unavailability of specific performance, injunctive relief or any other equitable remedy and (b) concepts of materiality, reasonableness, good faith and fair dealing.

- Assuming (a) the accuracy of the representations and warranties of the Company set forth in the Agreement, (b) the due performance by the Company of the covenants and agreements set forth in the Agreement, (c) the accuracy of the representations and warranties of the Members set forth in the Agreement and (d) the due performance by the Members of the covenants and agreements set forth in the Agreement, the offer, sale and delivery of the Units by the Company to the Members in the manner contemplated by the Agreement do not require registration under the Securities Act of 1933, as amended (it being understood that we express no opinion in this paragraph as to any subsequent resale of any Units).

- All of the Units have been duly authorized by the Company, and when issued by the Company on the Effective Date in accordance with the Agreement, will be validly issued.

- No Governmental Approvals (as defined below) under Applicable Law[16] (as defined below) are required for the Company to execute and deliver the Opinion Documents and for the issuance of the Units to the Members under the Agreement, except (a) such as have been made or obtained prior to the date hereof, (b) for the filing of a Form D Notice with the Securities and Exchange Commission or (c) as may be required under state securities or "blue sky" laws of any jurisdiction, in each case as to which we express no opinion.

---

[15] To include contracts executed by the Company and governed by New York law.
[16] Will expressly exclude matters relating to space or communications.

- None of the execution and delivery by the Company of the Opinion Documents, nor the issuance of the Units to the Members under the Agreement (a) results in a breach or violation of the certificate of formation or the Agreement, (b) constitutes a breach of, or a default under, or results in the imposition of any lien, charge or encumbrance upon any property or assets of the Company pursuant to the terms of any agreement listed on Schedule II[17] attached hereto or (c) results in a violation of Applicable Law.

- For the purposes of these opinions, (a) the term "Applicable Law" means the Delaware Limited Liability Company Act (the "DE LLC Act") (but not any legislative history or judicial decisions or any rules, regulations, guidelines, releases or interpretations concerning the DE LLC Act) and the laws, rules and regulations of the United States of America and the State of New York which, in our experience, are normally applicable to the type of transactions contemplated by the Agreement and (b) the term "Governmental Approval" means any consent, authorization, approval or order of, or registration, qualification or filing under Applicable Law.

---

[17] Schedule II to set forth those agreements governed by New York law.