Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**NOTICE OF FILING OF CLEAN AND BLACKLINE VERSIONS OF**
**(A) DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT**
**TO CHAPTER 11 OF BANKRUPTCY CODE, (B) DEBTORS'**
**THIRD AMENDED SPECIFIC DISCLOSURE**
**STATEMENT AND (C) REVISED FORM OF FINAL DIP ORDER**

    **PLEASE TAKE NOTICE** that, on February 14, 2014, LightSquared Inc. and certain of

its affiliates (collectively, "LightSquared"), as debtors and debtors in possession in the above-

captioned chapter 11 cases, filed the (a) *Debtors' Third Amended Joint Plan Pursuant to Chapter*

*11 of Bankruptcy Code* [Docket No. 1308] (as amended, modified, or supplemented, the

"Original Third Amended Plan") and (b) *Specific Disclosure Statement for Debtors' Third*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

*Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, modified, or supplemented, the "Original Third Amended Specific Disclosure Statement") [Docket No. 1308].

    **PLEASE TAKE FURTHER NOTICE** that LightSquared hereby files (a) a revised version of the Original Third Amended Plan (the "Revised Third Amended Plan"), attached hereto as Exhibit A-1, and (b) a blackline of the Revised Third Amended Plan, marked to show changes against the Original Third Amended Plan, attached hereto as Exhibit A-2.

    **PLEASE TAKE FURTHER NOTICE** that LightSquared hereby files (a) a revised version of the  Original Third Amended Specific Disclosure Statement (the "Revised Third Amended Specific Disclosure Statement"), attached hereto as Exhibit B-1, which incorporates certain additional disclosure requested by SPSO, and (b) a blackline of the Revised Third Amended Specific Disclosure Statement, marked to show changes against the Original Third Amended Specific Disclosure Statement, attached hereto as Exhibit B-2.

    **PLEASE TAKE FURTHER NOTICE** that, on February 14, 2014, LightSquared filed *LightSquared's Confirmation-Related Motion for Order (A) Approving Postpetition Financing, (B) Authorizing Use of Cash Collateral, If Any, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, and (E) Modifying Automatic Stay* [Docket No. 1311] (the "DIP Motion").  The DIP Motion includes as an exhibit thereto a proposed *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (A) Approving Postpetition Financing, (B) Authorizing Use of Cash Collateral, If Any, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, and (E) Modifying the Automatic Stay* (the "Original DIP Order").

**PLEASE TAKE FURTHER NOTICE** that LightSquared hereby files (a) a revised version of the Original DIP Order (the "Revised DIP Order"), attached hereto as Exhibit C-1, and (b) blackline of the Revised DIP Order, marked to show changes against the Original DIP Order, attached hereto as Exhibit C-2.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement may be viewed for free at the website of LightSquared's Claims and Solicitation Agent, Kurtzman Carson Consultants LLC ("KCC"), at http://www.kccllc.net/lightsquared or for a fee on the Bankruptcy Court's website at www.nysb.uscourt.gov. To access documents on the Bankruptcy Court's website, you will need a PACER password and login, which can be obtained at http://www.pacer/psc/uscourt.gov. To obtain hard copies of the Plan Supplement, please contact KCC at (877) 499-4509 or by e-mail at LightSquaredInfo@kccllc.com.

**PLEASE TAKE FURTHER NOTICE that a hearing to consider the confirmation of the Revised Third Amended Plan and approval of the DIP Motion (the "Confirmation Hearing") will commence before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in the Bankruptcy Court on March 17, 2014 at 10:00 a.m. (prevailing Eastern time), or such other date and time as determined by the Bankruptcy Court.** Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Bankruptcy Court or otherwise.

Respectfully submitted,

New York, New York                   /s/ Matthew S. Barr
Dated:  February 22, 2014            Matthew S. Barr
                                     Steven Z. Szanzer
                                     Karen Gartenberg
                                     MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
                                     1 Chase Manhattan Plaza
                                     New York, NY  10005-1413
                                     (212) 530-5000

                                     *Counsel to Debtors and Debtors in Possession*

## Exhibit A-1

**Revised Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

**DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO**
**CHAPTER 11 OF BANKRUPTCY CODE**

---

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M[C]CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated: New York, New York
        February 22, 2014

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
    OF TIME, AND GOVERNING LAW ...................................................................3

    A.    Defined Terms ........................................................................................3
    B.    Rules of Interpretation ........................................................................32
    C.    Computation of Time ..........................................................................33
    D.    Governing Law ....................................................................................33
    E.    Reference to Monetary Figures............................................................33

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
    COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
    AND U.S. TRUSTEE FEES ...............................................................................33

    A.    Administrative Claims .........................................................................33
    B.    Accrued Professional Compensation Claims.......................................35
    C.    DIP Inc. Claims...................................................................................36
    D.    DIP LP Claims ....................................................................................36
    E.    New DIP Claims .................................................................................37
    F.    Priority Tax Claims..............................................................................37
    G.    Payment of Statutory Fees ..................................................................38

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS ......................................................................................................38

    A.    Summary..............................................................................................38
    B.    Classification and Treatment of Claims and Equity Interests...............38
    C.    Special Provision Governing Unimpaired Claims and Equity Interests...............48
    D.    Acceptance or Rejection of Plan..........................................................48
    E.    Elimination of Vacant Classes ............................................................49
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code..........................49
    G.    Controversy Concerning Impairment ..................................................50

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ................................................50

    A.    Overview of Plan ................................................................................50
    B.    Plan Transactions ...............................................................................50
    C.    Sources of Consideration for Plan Distributions .................................50
    D.    Certain Pre-Confirmation Date, Confirmation Date, and Effective Date
    Plan Transactions ...............................................................................51
    E.    First Lien Exit Facility ........................................................................56
    F.    Second Lien Exit Facility.....................................................................57
    G.    Reorganized LightSquared Inc. Loan ..................................................57

i

H.      [RESERVED] ........................................................................................58
I.      Issuance of New LightSquared Entities Shares; Reinstatement of
        Reinstated Intercompany Interests .......................................................58
J.      Section 1145 and Other Exemptions......................................................59
K.      Listing of New LightSquared Entities Shares; Reporting Obligations .................59
L.      NewCo Interest Holders Agreement ......................................................59
M.      Indemnification Provisions in New LightSquared Entities Corporate
        Governance Documents .........................................................................60
N.      Management Incentive Plan ....................................................................60
O.      Corporate Governance ...........................................................................60
P.      Vesting of Assets in Reorganized Debtors .............................................60
Q.      Cancellation of Securities and Agreements ...........................................61
R.      Corporate Existence ...............................................................................62
S.      Corporate Action....................................................................................62
T.      Effectuating Documents; Further Transactions .....................................63
U.      Exemption from Certain Taxes and Fees................................................63
V.      Preservation, Transfer, and Waiver of Rights of Action .......................63
W.      Assumption of D&O Liability Insurance Policies .................................64
X.      Employee and Retiree Benefits ..............................................................65

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ...................................................................................66

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........66
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ............67
C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
        Pursuant to Plan ....................................................................................67
D.      Pre-existing Obligations to Debtors Under Executory Contracts and
        Unexpired Leases....................................................................................68
E.      Intercompany Contracts, Contracts, and Leases Entered into After Petition
        Date, Assumed Executory Contracts, and Unexpired Leases................68
F.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ............................................................................................69
G.      Postpetition Contracts and Leases .........................................................69
H.      Reservation of Rights..............................................................................69
I.      Nonoccurrence of Effective Date...........................................................70

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................70

A.      Distribution Record Date .......................................................................70
B.      Timing and Calculation of Amounts To Be Distributed........................70
C.      Disbursing Agent ...................................................................................71
D.      Rights and Powers of Disbursing Agent................................................71

E.   Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date ............................................................................72

F.   Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions ............................................................................72

G.   Compliance with Tax Requirements/Allocations .................................74

H.   Setoffs .................................................................................74

I.   Recoupment ..........................................................................75

J.   Claims Paid or Payable by Third Parties ...........................................75

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS .......................................................................76

A.   Allowance of Claims and Equity Interests...........................................76

B.   Claims and Equity Interests Administration Responsibilities ..................76

C.   Estimation of Claims or Equity Interests ...........................................77

D.   Expungement or Adjustment to Claims or Equity Interests Without Objection ..............................................................................78

E.   No Interest............................................................................78

F.   Deadline To File Objections to Claims or Equity Interests ....................78

G.   Disallowance of Claims or Equity Interests..........................................78

H.   Amendments to Claims...............................................................79

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .......................................................................79

A.   Discharge of Claims and Termination of Equity Interests......................79

B.   Subordinated Claims..................................................................80

C.   Compromise and Settlement of Claims and Controversies ...................80

D.   Releases by Debtors..................................................................80

E.   Exculpation ...........................................................................81

F.   Third-Party Releases by Holders of Claims or Equity Interests .............82

G.   Injunction .............................................................................83

H.   Release of Liens......................................................................83

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ......................................................84

A.   Conditions Precedent to Confirmation Date ......................................84

B.   Conditions Precedent to Effective Date ............................................84

C.   Waiver of Conditions.................................................................86

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ...............87

A.      Modification and Amendments..................................................................87
B.      Effect of Confirmation on Modifications ...............................................87
C.      Revocation or Withdrawal of Plan..........................................................87
D.      Validity of Certain Plan Transactions If Effective Date Does Not Occur.............88

ARTICLE XI. RETENTION OF JURISDICTION ......................................................88

ARTICLE XII. MISCELLANEOUS PROVISIONS .....................................................90

A.      Immediate Binding Effect.......................................................................90
B.      Additional Documents.............................................................................91
C.      Reservation of Rights..............................................................................91
D.      Successors and Assigns...........................................................................91
E.      Service of Documents .............................................................................91
F.      Term of Injunctions or Stays...................................................................93
G.      Plan Supplement .....................................................................................93
H.      Entire Agreement ....................................................................................93
I.      Non-severability of Plan Provisions .......................................................94
J.      Votes Solicited in Good Faith..................................................................94
K.      Waiver or Estoppel .................................................................................94
L.      Conflicts...................................................................................................94

## INTRODUCTION

LightSquared Inc. and the other Debtors in the above-captioned chapter 11 cases hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Reference is made to the Debtors' Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, with the consent of each Plan Support Party (and in accordance with the terms hereof, including, where applicable, with the consent of the Inc./LP Lender Parties), prior to its substantial consummation.

The Debtors have always believed, and continue to believe, that resolution of the pending FCC proceedings will maximize the value of their assets and, accordingly, will continue their efforts with the FCC and other federal agencies in seeking approval of their pending license modification applications and related proceedings before the FCC. Given the continuing nature of the FCC process and the facts and circumstances of these Chapter 11 Cases, the Debtors believed that it was necessary to take action to protect their Estates and the current value of their assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets. Accordingly, on August 30, 2013, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed, on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of the Debtors' assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, the Debtors, in consultation with, and at the direction of, the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee"), (i) were always receptive to any potential alternative transactions that would provide greater value for the Estates and all of the Debtors' stakeholders, and (ii) as such, fully preserved their rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As further explained in the Debtors' Disclosure Statement, upon consideration of the various proposals received to date, the Debtors, in consultation with, and at the direction of, the Special Committee, determined that a reorganization of the Debtors that satisfied all Claims in full and provided a return to Holders of Equity Interests – and not a sale – was in the best interests of these Estates. Accordingly, the Debtors initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of the Debtors through a series of restructuring transactions. Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, the Debtors, at the direction of the Special Committee, and the Plan Support Parties discussed modifications of that plan to garner as much support as possible for LightSquared's reorganization. These discussions led to the filing of this further amended Plan to enhance the transactions contemplated by the Second Amended Plan

and place the Debtors in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by the Debtors, substantially all of the key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders. Importantly, effectiveness of the Plan is not conditioned on the Debtors' receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of the Debtors' significant stakeholders. Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with the Debtors' emergence from chapter 11 pursuant to this Plan. To fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing the Debtors a $1.65 billion new debtor in possession credit facility. More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of the Debtors' litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. The Debtors, the Plan Support Parties, the Ad Hoc Secured Group, the Prepetition LP Agent, the DIP Inc. Agent, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of the Debtors' creditors and equityholders and is currently the highest and best restructuring offer available to the Debtors. Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Debtors to successfully exit the Chapter 11 Cases. Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from substantially all of the Debtors' significant stakeholders.

Moreover, in light of the broad support for the Plan, the Debtors are not pursuing at this time confirmation of the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of this Plan and April 15, 2014.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DEBTORS' DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**1.5 Lien Loans**" has the meaning set forth in Article IV.F hereof.

2.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

3.    "**Ad Hoc Secured Group**" means that certain Ad Hoc Group of LightSquared LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude the SPSO Parties and their affiliates.

4.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) any Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms of a Stalking Horse Agreement and the Bid Procedures Order; provided, however, that no SPSO Party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or

Expense Reimbursement; and (h) any fees and expenses that are earned and payable pursuant to the New DIP Facility, the First Lien Exit Facility, the Plan, and the other Plan Documents, including the Plan Support Party Break-Up Fee.

5.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

6.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the New LightSquared Entities and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or New LightSquared Entity, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

8.      "**Alternate Inc. Debtors Plan**" has the meaning set forth in the Second Amended Plan.

9.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

10.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

11.  "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

12.  "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

13.  "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

14.  "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.  "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

16.  "**Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

17.  "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.  "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

19.  "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

20.  "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

21.  "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause

of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

22.      "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

23.      "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.      "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

25.      "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

26.      "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

27.      "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

28.      "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

29.      "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

30.      "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.      "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

32.      "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33.      "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35. "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

36. "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to each Plan Support Party.

37. "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

38. "**Consummation**" means the occurrence of the Effective Date.

39. "**Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof); provided, that only Holders of Allowed Prepetition LP Facility Non-SPSO Claims that vote to accept the Plan may elect to exercise the foregoing right of conversion.

40. "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

41. "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

42. "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

43. "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

44. "**Debtors' Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. _____] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of each Plan Support Party).

45. "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agent.

46.    "**DIP Claim**" means a DIP Inc. Claim, a DIP LP Claim, or a New DIP Claim.

47.    "**DIP Facilities**" means the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facility.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

49.    "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

50.    "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all principal, interest, default interest, and exit fees provided for thereunder.

51.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

52.    "**DIP Inc. Facility**" means that certain $46.4 million debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

53.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

54.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

55.    "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

56.    "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

57.    "**DIP Lenders**" means the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders.

58.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

59.    "**DIP LP Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

60.    "**DIP LP Closing Date**" means February 5, 2014.

61.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents in the original aggregate principal amount of $33 million.

62.    "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

63.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

64.    "**DIP LP Obligors**" means the DIP LP Borrower and the DIP LP Guarantors.

65.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

66.    "**Disbursing Agent**" means, for Plan Distributions made prior to the Effective Date, the Debtors, the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition LP Agent to the extent they make or facilitate Plan Distributions, and, for Plan Distributions made on or after the Effective Date, the New LightSquared Entities, or the Entity or Entities designated by the New LightSquared Entities to make or facilitate Plan Distributions pursuant to the Plan on or after the Effective Date, including, without limitation, the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition LP Agent to the extent they make or facilitate Plan Distributions.

67.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.    "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the New LightSquared Entities for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

69.    "**Distribution Record Date**" means (a) for all Claims and Equity Interests (other than the DIP LP Claims and New DIP Claims), the Voting Record Date, (b) for the DIP LP Claims, the DIP LP Closing Date, and (c) for the New DIP Claims, the New DIP Closing Date.

70.    "**Effective Date**" means the date selected by the Debtors, with the consent of each Plan Support Party, that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.B hereof have been satisfied or waived (in accordance with Article IX.C hereof).

71.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger Capital Partners, LLC, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the

*Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

72.     "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

73.     "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

74.     "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

75.     "**Exculpated Party**" means a Released Party.

76.     "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

77.     "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

78.     "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

79.     "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

80.     "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

81.     "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

82.     "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

10

83.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

84.    "**Exit Agents**" means the First Lien Exit Agent and the Second Lien Exit Agent.

85.    "**Exit Credit Agreements**" means the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

86.    "**Exit Facilities**" means the First Lien Exit Facility and the Second Lien Exit Facility.

87.    "**Exit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated on or before the Effective Date, between the Exit Agents, the Exit Lenders, and the other relevant Entities governing, among other things, the respective rights, remedies, and priorities of claims and security interests held by the Exit Agents, the Exit Lenders, and the other relevant Entities under the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

88.    "**Exit Lenders**" means the First Lien Exit Lenders and the Second Lien Exit Lenders.

89.    "**Exit Obligors**" means the First Lien Exit Obligors and the Second Lien Exit Obligors.

90.    "**Expense Reimbursement**" has the meaning set forth in the Bid Procedures Order.

91.    "**FCC**" means the Federal Communications Commission.

92.    "**FCC Objectives**" means that (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding its possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

93.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

94.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors reserve the right to waive any appeal period, with the consent of each Plan Support Party.

96.    "**Financial Wherewithal Objection Deadline**" has the meaning set forth in Article V.C hereof.

97.    "**First Amended Plan**" has the meaning set forth in the Introduction hereof.

98.    "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

99.    "**First Lien Exit Agent**" means the administrative agent under the First Lien Exit Credit Agreement or any successor agent appointed in accordance with the First Lien Exit Credit Agreement.

100.    "**First Lien Exit Borrower**" means NewCo, as borrower under the First Lien Exit Credit Agreement.

101.    "**First Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the First Lien Exit Obligors, the First Lien Exit Agent, and the First Lien Exit Lenders.

102.    "**First Lien Exit Excess Amount**" means an amount equal to the aggregate principal amount that the First Lien Exit Facility exceeds $1 billion on the Effective Date.

103.    "**First Lien Exit Facility**" means that certain first lien credit facility in an original aggregate principal amount of not less than $1 billion provided in connection with the First Lien Exit Credit Agreement (which facility may be increased by an additional $500 million upon the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum as specified therein).

104.    "**First Lien Exit Guarantors**" means each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) required to be guarantors under the First Lien Exit Credit Agreement.

105.    "**First Lien Exit Lenders**" means the lenders party to the First Lien Exit Credit Agreement from time to time.

106.    "**First Lien Exit Obligors**" means the First Lien Exit Borrower and the First Lien Exit Guarantors.

107.    "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; or (i) Intercompany Claim.

108.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

109.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

110.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

111.    "**Inc./LP Lender Parties**" means the Ad Hoc Secured Group, the DIP Inc. Agent, and the Prepetition Inc. Non-Subordinated Parties.

112.    "**Inc. Administrative Claim**" means any Administrative Claim asserted against an Inc. Debtor.

113.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

114.    "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

115.    "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

116.    "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

117.    "**Inc. Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the Inc. Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the Inc. Debtors, *plus* (iii) the Inc. Debtors' Cash on hand on the Effective Date, *plus* (iv) without duplication of clause (i), Cash from the Reorganized LightSquared Inc. Loan, if any, and *less* (v) the Inc. Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, and (d) loans under the Reorganized LightSquared Inc. Loan.

118.    "**Inc. Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the Inc. Debtors and (b) together with the LP Plan Consideration

Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

119.    "**Inc. Priority Tax Claim**" means any Priority Tax Claim asserted against an Inc. Debtor.

120.    "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

121.    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

122.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

123.    "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

124.    "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

125.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

126.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

127.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

128.    "**LightSquared Transfer**" means the sale, assignment, and/or transfer by the Reorganized Debtors to NewCo of certain of the Reorganized Debtors' Assets and Equity Interests, and the assumption by NewCo of certain liabilities related thereto, in accordance with the Plan, including as set forth in Article IV.D.3(b) hereof, in exchange for the consideration provided to the Reorganized Debtors under the Plan, including as set forth in Article IV.D.3(a) hereof.

129.    "**License Modification Application**" has the meaning set forth in the Debtors' Disclosure Statement.

130.    "**LP Administrative Claim**" means any Administrative Claim asserted against an LP Debtor.

131.    "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

132.    "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

133.    "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

134.    "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

135.    "**LP Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the LP Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the LP Debtors, *plus* (iii) the LP Debtors' Cash on hand on the Effective Date, and *less* (iv) the LP Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, (d) loans under the New DIP Facility, and (e) the SPSO Note.

136.    "**LP Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the LP Debtors and (b) together with the Inc. Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

137.    "**LP Priority Tax Claim**" means any Priority Tax Claim asserted against an LP Debtor.

138.    "**Management Incentive Plan**" means that certain post-Effective Date management equity incentive plan, which provides that, among other things, up to 10% of NewCo Common Interests, on a fully diluted basis, shall be reserved for issuance by the NewCo Board after the Effective Date in accordance with the management equity incentive plan and the Plan; <u>provided</u>, that the foregoing shall be implemented in the discretion of the NewCo Board, subject to the terms of the NewCo Corporate Governance Documents, and shall remain subject to the agreement of each Plan Support Party.

139.    "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

140.    "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement or any successor agent appointed in accordance with the New DIP Credit Agreement.

141.    "**New DIP Borrowers**" means LightSquared Inc., LightSquared LP, and One Dot Six Corp., as borrowers under the New DIP Credit Agreement.

142.    "**New DIP Claim**" means a New DIP Tranche A Claim or a New DIP Tranche B Claim.

143.    "**New DIP Closing Date**" means the date upon which (a) the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, (b) all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and (c) the incurrence of obligations pursuant to the New DIP Facility shall have occurred, which shall be no later than the fifteenth (15th) day after the Confirmation Date, and (d) all (i) DIP Inc. Claims, (ii) DIP LP Claims, (iii) Prepetition Inc. Facility Non-Subordinated Claims, (iv) Non-Converted Prepetition LP Facility Non-SPSO Claims, and (v) reasonable and documented fees and expenses of the Inc./LP Lender Parties' legal and financial advisors incurred through and including such date, have been indefeasibly paid in full in Cash.

144.    "**New DIP Commitment Letter**" means that certain commitment letter by and among the New DIP Commitment Parties, LightSquared Inc., LightSquared LP, and One Dot Six Corp., dated February 14, 2014.

145.    "**New DIP Commitment Parties**" means J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee), Melody Business Finance, LLC (together with any affiliate thereof as its designee), Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., as the commitment parties under the New DIP Commitment Letter.

146.    "**New DIP Credit Agreement**" means that certain Debtor in Possession Credit Agreement, dated as of the New DIP Closing Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders, in form and substance satisfactory to each Plan Support Party.

147.    "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the original aggregate principal amount of $1.65 billion.

148.    "**New DIP Guarantors**" means each New DIP Borrower, as a guarantor to each other New DIP Borrower, and all other Debtors that are not New DIP Borrowers, as guarantors to the New DIP Borrowers, in each case, in accordance with the New DIP Credit Agreement.

149.    "**New DIP Initial Lenders**" means, collectively, Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.

150.    "**New DIP Lenders**" means the New DIP Tranche A Lenders and the New DIP Tranche B Lenders.

151.    "**New DIP Obligors**" means the New DIP Borrowers and the New DIP Guarantors.

152.    "**New DIP Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

153.    "**New DIP Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the New DIP Order.

154.    "**New DIP Tranche A Accrued Interest**" means accrued interest, including interest paid in kind, on the New DIP Tranche A Facility as of the Effective Date.

155.    "**New DIP Tranche A Claim**" means a Claim held by the New DIP Agent or New DIP Tranche A Lenders arising under, or related to, the New DIP Tranche A Facility.

156.    "**New DIP Tranche A Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche A Lenders through the provision of new financing in accordance with the New DIP Credit Agreement and New DIP Order, in an original aggregate principal amount of $1.35 billion.

157.    "**New DIP Tranche A Lenders**" means the Plan Support Parties and the other lenders under the New DIP Tranche A Facility, in each case, as lenders party to the New DIP Credit Agreement.

158.    "**New DIP Tranche B Cap**" means $300 million.

159.    "**New DIP Tranche B Claim**" means a Claim held by the New DIP Agent or New DIP Tranche B Lenders arising under, or related to, the New DIP Tranche B Facility.

160.    "**New DIP Tranche B Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche B Lenders in the original aggregate principal amount of $300 million through either (a) the conversion of Converted Prepetition LP Facility Non-SPSO Claims into Claims under the New DIP Facility (as set forth in Article IV.D hereof) and/or (b) new financing provided by the Plan Support Parties or other lenders, in each case, in accordance with the Plan, New DIP Credit Agreement, and New DIP Order.

161.    "**New DIP Tranche B Lenders**" means (a) certain Holders of Converted Prepetition LP Facility Non-SPSO Claims that elect to convert such Claims into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof) up to the New DIP Tranche B Cap and/or (b) the Plan Support Parties or other lenders to

the extent that they provide new financing under the New DIP Tranche B Facility, in each case, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

162.    "**New LightSquared Entities**" means, collectively, NewCo, Reorganized LightSquared Inc., and the Reorganized Subsidiaries.

163.    "**New LightSquared Entities Boards**" means, collectively, the NewCo Board, the Reorganized LightSquared Inc. Board, and each Reorganized Subsidiaries Board.

164.    "**New LightSquared Entities Bylaws**" means, collectively, the NewCo Bylaws, the Reorganized LightSquared Inc. Bylaws, and the Reorganized Subsidiaries Bylaws.

165.    "**New LightSquared Entities Charters**" means, collectively, the NewCo Charter, the Reorganized LightSquared Inc. Charter, and the Reorganized Subsidiaries Charters.

166.    "**New LightSquared Entities Corporate Governance Documents**" means, collectively, the NewCo Corporate Governance Documents, the Reorganized LightSquared Inc. Corporate Governance Documents, and the Reorganized Subsidiaries Corporate Governance Documents.

167.    "**New LightSquared Entities Shares**" means, collectively, the NewCo Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

168.    "**NewCo**" means a newly formed limited liability company in connection with the Plan Transactions contemplated by Article IV.D hereof.

169.    "**NewCo Board**" means the board of directors, board of managers, or equivalent governing body of NewCo, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable NewCo Corporate Governance Documents.

170.    "**NewCo Bylaws**" means the bylaws, partnership agreement, limited liability company membership agreement, or functionally equivalent document, as applicable, of NewCo.

171.    "**NewCo Charter**" means the charter, certificate of formation, certificate of partnership, or functionally equivalent document, as applicable, of NewCo.

172.    "**NewCo Class A Common Interests**" means those certain limited liability company class A common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

173.    "**NewCo Class B Common Interests**" means those certain limited liability company class B common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

174.    "**NewCo Class C Common Interests**" means those certain limited liability company class C common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

175. "**NewCo Class D Common Interests**" means those certain limited liability company class D common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

176. "**NewCo Common Interests**" means the NewCo Class A Common Interests, the NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests.

177. "**NewCo Corporate Governance Documents**" means, as applicable, (a) the NewCo Charter, (b) the NewCo Bylaws, (c) the NewCo Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to NewCo.

178. "**NewCo Interest Holders Agreement**" means that certain limited liability company operating agreement of NewCo with respect to the NewCo Interests, to be effective on the Effective Date and binding on all holders of the NewCo Interests.

179. "**NewCo Interests**" means, collectively, the NewCo Common Interests and the NewCo Preferred Interests.

180. "**NewCo Series A Preferred PIK Interests**" means the NewCo Series A-1 Preferred PIK Interests and the NewCo Series A-2 Preferred PIK Interests.

181. "**NewCo Series A-1 Preferred PIK Interests**" means those certain limited liability company series A-1 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

182. "**NewCo Series A-2 Preferred PIK Interests**" means those certain limited liability company series A-2 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

183. "**Non-Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof do not elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof).

184. "**Other Existing Inc. Series B Preferred Stock Holders**" means the Holders of the Existing Inc. Series B Preferred Stock Equity Interests other than SIG Holdings, Inc.

185. "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

186. "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

187. "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

188.    "**Petition Date**" means May 14, 2012.

189.    "**Plan**" means this *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of each Plan Support Party and in accordance with the terms hereof), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

190.    "**Plan Consideration**" means, collectively, the Inc. Plan Consideration and the LP Plan Consideration.

191.    "**Plan Consideration Carve-Out**" means, collectively, the Inc. Plan Consideration Carve-Out and the LP Plan Consideration Carve-Out.

192.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

193.    "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to each Plan Support Party.

194.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to each Plan Support Party) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including:  (a) executed commitment letters, form and/or definitive agreements, and related documents with respect to (i) the Exit Credit Agreements, (ii) the Reorganized LightSquared Inc. Loan Agreement, (iii) the SPSO Note Documents, and (iv) the Exit Intercreditor Agreement; (b) the New LightSquared Entities Corporate Governance Documents; (c) the Schedule of Assumed Agreements; and (d) the Schedule of Retained Causes of Action.

195.    "**Plan Supplement Date**" means February 14, 2014 or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Debtors reserve the right to File amended Plan Documents at any time prior to the Confirmation Hearing Date.

196.    "**Plan Support Parties**" means Plan Support Party A, Plan Support Party B, Plan Support Party C, and Plan Support Party D.

197.    "**Plan Support Party A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

198.    "**Plan Support Party ABC**" means Plan Support Party A, Plan Support Party B, and Plan Support Party C.

199.    "**Plan Support Party ABC Debt-Converted New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *less* (a) the Plan Support Party ABC Equity-Converted New DIP Claims and (b) Plan Support Party ABC's ratable share of the First Lien Exit Excess Amount.

200.    "**Plan Support Party ABC Equity-Converted New DIP Claims**" means $115 million of the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *plus* 11% of any New DIP Tranche A Accrued Interest attributed to Plan Support Party ABC's New DIP Tranche A Claims.

201.    "**Plan Support Party B**" means Melody Business Finance, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds.

202.    "**Plan Support Party Break-Up Fee**" means a break-up fee of $100 million for the ratable benefit of the New DIP Commitment Parties, irrevocably earned upon the New DIP Closing Date and payable in Cash on the earlier of the date (a) the Debtors propose or support any chapter 11 plan other than this Plan, (b) the Debtors withdraw this Plan or propose any modifications hereto pursuant to section 1127(b) of the Bankruptcy Code, in each case, without the prior written consent of each New DIP Initial Lender, or (c) the confirmation of any chapter 11 plan other than this Plan; <u>provided</u>, that the conditions to the effectiveness of the Plan set forth in Article IX.B hereof shall have been capable of being satisfied at the time of either clauses (a), (b), or (c) above, or such conditions shall have been capable of being satisfied but for the passage of time.

203.    "**Plan Support Party C**" means Harbinger Capital Partners, LLC or its designated affiliates.

204.    "**Plan Support Party C Call Option**" means a call option, exercisable by Plan Support Party C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests and NewCo Class D Common Interests in accordance with the NewCo Corporate Governance Documents.

205.    "**Plan Support Party Cashed-Out New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Parties that are not (a) Plan Support Party ABC Debt-Converted New DIP Claims, (b) Plan Support Party ABC Equity-Converted New DIP Claims, or (c) Plan Support Party D Debt-Converted New DIP Claims.

206.    "**Plan Support Party D**" means JPMorgan Chase & Co. or its designated affiliates.

207.    "**Plan Support Party D Debt-Converted New DIP Claims**" means $300 million of the Allowed New DIP Tranche A Claims held by Plan Support Party D, *plus* all New DIP Tranche A Accrued Interest thereon, *less* an amount equal to 22.22% of the First Lien Exit Excess Amount, which Claims shall be converted into loans under the Reorganized LightSquared Inc. Loan.

208.    "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to

effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the New LightSquared Entities determine are necessary or appropriate.

209.    "**Prepetition Agents**" means the Prepetition Inc. Agent and the Prepetition LP Agent.

210.    "**Prepetition Facilities**" means the Prepetition Inc. Facility and the Prepetition LP Facility.

211.    "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

212.    "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

213.    "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

214.    "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

215.    "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

216.    "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

217.    "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

218.    "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

219.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

220.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

221.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

222.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

223.    "**Prepetition Inc. Non-Subordinated Parties**" means the Prepetition Inc. Agent and the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims.

224.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

225.    "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

226.    "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

227.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

228.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

229.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

230.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

231.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

23

232.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO, its affiliates, or each of their successors or assigns.

233.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

234.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

235.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

236.    "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

237.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

238.    "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

239.    "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

240.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the New LightSquared Entities on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

241.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the New LightSquared Entities in the Professional Fee Escrow Account.

242.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

243.    "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

244.    "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

245.    "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

246.    "**Released Party**" means each of the following:  (a) the Debtors; (b) the New LightSquared Entities; (c) each Plan Support Party; (d) each DIP Agent,  each DIP Lender (other than any SPSO Party, subject to the proviso below), and each arranger and book runner of the DIP Facilities; (e) each Exit Agent, each Exit Lender, and each arranger and book runner of the Exit Facilities; (f) the Reorganized LightSquared Inc. Loan Holder and each agent, arranger, and book runner of the Reorganized LightSquared Inc. Loan; (g) each Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party, subject to the proviso below); (h) the Prepetition LP Agent; and (i) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such); provided, that each SPSO Party shall be deemed a Released Party if Class 7B votes to accept the

Plan and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility.

247.    "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

248.    "**Reorganized Debtors**" means, collectively, the Reorganized Inc. Debtors and the Reorganized LP Debtors.

249.    "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

250.    "**Reorganized LightSquared GP LLC**" means LightSquared GP Inc., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

251.    "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

252.    "**Reorganized LightSquared Inc. Board**" means the board of directors, board of managers, or equivalent governing body of Reorganized LightSquared Inc., as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized LightSquared Inc. Corporate Governance Documents.

253.    "**Reorganized LightSquared Inc. Bylaws**" means the bylaws or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

254.    "**Reorganized LightSquared Inc. Call Option**" means a call option, exercisable by Reorganized LightSquared Inc. in its sole discretion, to purchase (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests from the Holders of Existing Inc. Series A Preferred Stock Equity Interests (or their successor and assigns) and (b) $1.76 million of NewCo Series A-2 Preferred PIK Interests from the Other Existing Inc. Series B Preferred Stock Holders (or their successors and assigns), in each case in accordance with the NewCo Corporate Governance Documents.

255.    "**Reorganized LightSquared Inc. Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

256.    "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

257. "**Reorganized LightSquared Inc. Corporate Governance Documents**" means (a) the Reorganized LightSquared Inc. Charter, (b) the Reorganized LightSquared Inc. Bylaws, and (c) any other applicable organizational or operational documents with respect to Reorganized LightSquared Inc.

258. "**Reorganized LightSquared Inc. Loan**" means that certain secured credit facility in the original aggregate principal amount of $300 million provided in connection with the Reorganized LightSquared Inc. Loan Agreement, subject to adjustment in accordance with the Reorganized LightSquared Inc. Loan Adjustment.

259. "**Reorganized LightSquared Inc. Loan Adjustment**" means the amount, if any, the original aggregate principal amount of the Reorganized LightSquared Inc. Loan shall be (a) increased by the aggregate amount of New DIP Tranche A Accrued Interest attributed to Plan Support Party D's New DIP Tranche A Claims, and/or (b) decreased by an amount equal to the product of (i) the First Lien Exit Excess Amount and (ii) 22.22%, in each case, on a dollar-for-dollar basis.

260. "**Reorganized LightSquared Inc. Loan Agreement**" means that certain agreement entered into between the Reorganized LightSquared Inc. Loan Holder and Reorganized LightSquared Inc. documenting, among other things, the terms of the Reorganized LightSquared Inc. Loan and the obligations with respect thereto.

261. "**Reorganized LightSquared Inc. Loan Holder**" means Plan Support Party D.

262. "**Reorganized LightSquared Investors Holdings Inc.**" means LightSquared Investors Holdings Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

263. "**Reorganized LightSquared LP**" means Reorganized LightSquared LP, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

264. "**Reorganized LP Debtors**" means the LP Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

265. "**Reorganized One Dot Four Corp.**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

266. "**Reorganized One Dot Six LLC**" means One Dot Six Corp., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

267.    "**Reorganized SkyTerra Investors LLC**" means SkyTerra Investors LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

268.    "**Reorganized SkyTerra Rollup LLC**" means SkyTerra Rollup LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

269.    "**Reorganized SkyTerra Rollup Sub LLC**" means SkyTerra Rollup Sub LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

270.    "**Reorganized Subsidiaries**" means, collectively, the Reorganized Debtors, other than Reorganized LightSquared Inc.

271.    "**Reorganized Subsidiaries Board**" means the board of directors, board of managers, or equivalent governing body of each of the Reorganized Subsidiaries, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Subsidiaries Corporate Governance Documents.

272.    "**Reorganized Subsidiaries Bylaws**" means the bylaws or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

273.    "**Reorganized Subsidiaries Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

274.    "**Reorganized Subsidiaries Corporate Governance Documents**" means (a) the Reorganized Subsidiaries Charter, (b) the Reorganized Subsidiaries Bylaws, (c) the Reorganized Subsidiaries Shareholders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Subsidiaries.

275.    "**Reorganized Subsidiaries Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of the Reorganized Subsidiaries, to be effective on the Effective Date.

276.    "**Reorganized TMI Communications Delaware, Limited Partnership**" means Reorganized TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

277.    "**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

278.    "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

279.    "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

280.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

281.    "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

282.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

283.    "**Second Amended Plan**" has the meaning set forth in the Introduction hereof.

284.    "**Second Lien Exit Adjustment**" means (a) an increase to the original aggregate principal amount of the Second Lien Exit Facility equal to the product of (i) the aggregate amount of any New DIP Tranche A Accrued Interest and (ii) 89%, and/or (b) a decrease to the original aggregate principal amount of the Second Lien Exit Facility equal to the First Lien Exit Excess Amount, in each case, on a dollar-for-dollar basis.

285.    "**Second Lien Exit Agent**" means the arranger and administrative agent under the Second Lien Exit Credit Agreement or any successor agent appointed in accordance with the Second Lien Exit Credit Agreement.

286.    "**Second Lien Exit Borrower**" means NewCo, as borrower under the Second Lien Exit Credit Agreement.

287.    "**Second Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Second Lien Exit Obligors, the Second Lien Exit Agent, and the Second Lien Exit Lenders.

288.    "**Second Lien Exit Facility**" means that certain second lien credit facility in the original aggregate principal amount of $1.20 billion provided in connection with the Second Lien Exit Credit Agreement, subject to adjustment in accordance with the Second Lien Exit Adjustment.

289.    "**Second Lien Exit Guarantors**" means the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), as guarantors under the Second Lien Exit Credit Agreement.

290.    "**Second Lien Exit Lenders**" means the lenders party to the Second Lien Exit Credit Agreement from time to time.

291.    "**Second Lien Exit Obligors**" means the Second Lien Exit Borrower and the Second Lien Exit Guarantors.

292.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

293.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

294.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

295.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

296.    "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof), the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof), and any other relevant Prepetition Loan Documents.

297.    "**Special Committee**" has the meaning set forth in the Introduction hereof.

298.    "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Debtors' Disclosure Statement.

299.    "**SPSO**" means SP Special Opportunities, LLC.

300.    "**SPSO Note**" means a note issued by Reorganized LightSquared LP to the Holders of Allowed Prepetition LP Facility SPSO Claims, which note shall (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London Interbank Offered Rate floor of 1.00%), which interest shall be payable in kind, and (d) be secured or unsecured on the terms and conditions of, and subject to, the SPSO Option A Treatment or SPSO Option B Treatment, as applicable.

301.    "**SPSO Note Documents**" means the SPSO Note and any related indenture, agreements, or other documents, if any.

302. "**SPSO Option A Treatment**" means the following treatment:  (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $1.1069 billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; <u>provided</u>, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 hereof.

303. "**SPSO Option B Treatment**" means the following treatment:  (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; <u>provided</u>, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.

304. "**SPSO Parties**" means SPSO, L-Band Acquisition, LLC, Charles W. Ergen, DISH Network Corporation, and EchoStar Corporation.

305. "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

306. "**Stalking Horse Bidder**" has the meaning set forth in the Bid Procedures Order.

307. "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

308. "**Successor Cases**" has the meaning set forth in the New DIP Order.

309. "**Surviving DIP Inc. Indemnity**" has the meaning set forth in Article II.C hereof.

310. "**Surviving Inc. Indemnity**" has the meaning set forth in Article III.B.5(b) hereof.

311.    "**Surviving Indemnities**" means the Surviving DIP Inc. Indemnity, the Surviving Inc. Indemnity, and the Surviving LP Indemnity.

312.    "**Surviving LP Indemnity**" has the meaning set forth in Article III.B.7(b) hereof.

313.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

314.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

315.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

316.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

317.    "**Voting Deadline**" means March [3], 2014 at 4:00 p.m. (prevailing Pacific time), or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court, which is the date by which all completed Ballots must be received by the Claims and Solicitation Agent.

318.    "**Voting Record Date**" means October 9, 2013.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the New LightSquared Entities, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or New LightSquared Entity, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

# ARTICLE II.
# ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:   (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of

the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court. For the avoidance of doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the New LightSquared Entities no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date. Objections to such requests must be Filed and served on the New LightSquared Entities and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the New LightSquared Entities or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein (1) any claim by a New DIP Commitment Party for any Plan Support Party Break-Up Fee shall (a) be deemed an Allowed Administrative Claim, (b) be irrevocably earned by the New DIP Commitment Parties upon the New DIP Closing Date, (c) constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan, and (d) be payable in accordance with the terms of the New DIP Commitment Letter, (2) a Plan Support Party shall not be required to File any request for payment of such Administrative Claim, (3) any Plan Support Party Break-Up Fee shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (4) no SPSO Party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the New LightSquared Entities shall establish and fund the Professional Fee Escrow Account from the Plan Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors or New LightSquared Entities.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the New LightSquared Entities.  For the avoidance of doubt, the Inc. Debtors shall fund 15% of the Professional Fee Escrow Account from the Inc. Plan Consideration Carve-Out and the LP Debtors shall fund 85% of the Professional Fee Escrow Account from the LP Plan Consideration Carve-Out.

3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors and the Plan Support Parties no later than five (5) days prior to the anticipated Confirmation Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated and agreed to by the Debtors and the Plan Support Parties as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

4.    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or New LightSquared Entities, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or New LightSquared Entities, as applicable, on or after the Confirmation Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim

35

Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or New LightSquared Entities, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

## C.    DIP Inc. Claims

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $73,813,442.71 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, any amounts payable in accordance with Section 10.03 of the DIP Inc. Credit Agreement (the "Surviving DIP Inc. Indemnity"); provided, that (1) with respect to professional fees and expenses, the Surviving DIP Inc. Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm to represent the collective interests of the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders, (2) the Surviving DIP Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (3) the Surviving DIP Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the DIP Inc. Agent or any DIP Inc. Lender incurred for any period from and after the Effective Date.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims, except for the continuation of such Liens until the Effective Date to secure the Surviving DIP Inc. Indemnity, which Liens shall be junior only to the Liens securing the New DIP Facility), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

## D.    DIP LP Claims

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and

the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

E.    *New DIP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Claim agrees to a less favorable or other treatment, the Holders of New DIP Claims shall receive the following, as applicable:

1.    Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

2.    Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78% of the NewCo Series A-1 Preferred PIK Interests and (b) 77.78% of the NewCo Class A Common Interests;

3.    Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Reorganized LightSquared Inc. Loan in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

4.    Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and

5.    Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration in the form of Cash in an amount equal to such New DIP Tranche B Facility Claim.

F.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:   (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the

Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

G.      *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.      *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.      *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.      Class 1 – Inc. Other Priority Claims

(a)     *Classification*:  Class 1 consists of all Inc. Other Priority Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration

attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

(c)  *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    Class 2 – LP Other Priority Claims

(a)  *Classification*:  Class 2 consists of all LP Other Priority Claims.

(b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

(c)  *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Inc. Other Secured Claims

(a)  *Classification*:  Class 3 consists of all Inc. Other Secured Claims.

(b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*: Class 3 is Unimpaired by the Plan. Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.     Class 4 – LP Other Secured Claims

(a)     *Classification*: Class 4 consists of all LP Other Secured Claims.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*: Class 4 is Unimpaired by the Plan. Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.     Class 5 - Prepetition Inc. Facility Non-Subordinated Claims

(a)     *Classification*:  Class 5 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)     *Allowance*:  Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and

financial advisors incurred through and including the New DIP Closing Date, *plus* (iii) any amounts payable in accordance with Section 10.03 of the Prepetition Inc. Credit Agreement (the "Surviving Inc. Indemnity"); provided, that (A) with respect to professional fees and expenses, the Surviving Inc. Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm to represent the collective interests of the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders; provided, that the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders shall use the same United States and Canadian counsel, (B) the Surviving Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (C) the Surviving Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition Inc. Agent or any Prepetition Inc. Lender incurred for any period from and after the Effective Date.

(c)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, the Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim, shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class 5 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors.

(d)     *Voting:*  Class 5 is Unimpaired by the Plan.  Each Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

6.    Class 6 - Prepetition Inc. Facility Subordinated Claims

(a)    *Classification*:    Class 6 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.

(c)    *Voting:*    Class 6 is Impaired by the Plan.  Each Holder of a Class 6 Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.    Class 7A - Prepetition LP Facility Non-SPSO Claims

(a)    *Classification*:  Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)    *Allowance*:  Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in an amount equal to (i) all unpaid principal and accrued prepetition and postpetition interest at the contract rate (including, without limitation, default rate interest) held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents through and including the New DIP Closing Date, which amount is estimated to be $1.0903 billion in the aggregate, calculated based on the following assumptions:  (A) the face amount of debt held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents is $830.6 million; (B) adequate protection payments totaling $104.6 million have been made to the Prepetition LP Lenders between the Petition Date and February 2014 (net of professional fees); (C) an estimated $2.4 million of adequate protection payments will have been made to the Prepetition LP Lenders in March 2014 (net of professional fees); and (D) the Prepetition LP Facility Non-SPSO Claims will be paid on March 31, 2014; provided, that the estimated amount of unpaid principal and interest shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that

42

the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis, and otherwise adjusted to reflect any changes to the foregoing assumptions; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any repayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition LP Agent and the Ad Hoc Secured Group and each of their legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (iii) any amounts payable in accordance with Section 10.03 of the Prepetition LP Credit Agreement solely to the Prepetition LP Agent and Holders of Allowed Prepetition LP Facility Non-SPSO Claims (the "Surviving LP Indemnity"); provided, that (A) with respect to professional fees and expenses, the Surviving LP Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm for each of the Prepetition LP Agent and the Holders of Allowed Prepetition LP Facility Non-SPSO Claims (until the Effective Date), (B) the Surviving LP Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (C) the Surviving LP Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition LP Agent or any Prepetition LP Lender incurred for any period from and after the Effective Date.

(c)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, (i) the respective legal and financial advisors for each of the Ad Hoc Secured Group and the Prepetition LP Agent shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment:

(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim, shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or

(ii)    each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.

For the avoidance of doubt, the treatment provided to Class 7A herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.

(d)    *Voting*:  Class 7A is Impaired by the Plan.  Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.    Class 7B - Prepetition LP Facility SPSO Claims

(a)    *Classification*:   Class 7B consists of all Prepetition LP Facility SPSO Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)    in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or

(ii)    in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant

to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.

For the avoidance of doubt, the treatment provided to Class 7B herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors.

(c)    *Voting*:  Class 7B is Impaired by the Plan.  Each Holder of a Class 7B Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; <u>provided</u>, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court and treated in accordance with Article III.D.4 hereof.

9.    <u>Class 8 – Inc. General Unsecured Claims</u>

(a)    *Classification*:  Class 8 consists of all Inc. General Unsecured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

(c)    *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.    <u>Class 9 – LP General Unsecured Claims</u>

(a)    *Classification*:  Class 9 consists of all LP General Unsecured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)    *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Class 9 LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.    Class 10 – Existing LP Preferred Units Equity Interests

(a)    *Classification*:  Class 10 consists of all Existing LP Preferred Units Equity Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests.

(c)    *Voting*:  Class 10 is Impaired by the Plan.  Each Holder of a Class 10 Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.    Class 11A – Existing Inc. Series A Preferred Stock Equity Interests

(a)    *Classification*:  Class 11A consists of all Existing Inc. Series A Preferred Stock Equity Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series A Preferred Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.

(c)    *Voting*:  Class 11A is Impaired by the Plan.  Each Holder of a Class 11A Existing Inc. Series A Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.    Class 11B – Existing Inc. Series B Preferred Stock Equity Interests

(a)    *Classification*:  Class 11B consists of all Existing Inc. Series B Preferred Stock Equity Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series B Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series B Preferred Stock Equity Interest agrees to any other treatment (including as described in the immediately following proviso), each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

(c)    *Voting*:  Class 11B is Impaired by the Plan.  Each Holder of a Class 11B Existing Inc. Series B Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.    Class 12 – Existing Inc. Common Stock Equity Interests

(a)    *Classification*:   Class 12 consists of all Existing Inc. Common Stock Equity Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

(c)    *Voting*:  Class 12 is Impaired by the Plan.  Each Holder of a Class 12 Existing Inc. Common Stock Equity Interests as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    Class 13 – Intercompany Claims

(a)    *Classification*:  Class 13 consists of all Intercompany Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge,

any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

(c)    *Voting*: Class 13 is Unimpaired by the Plan. Each Holder of a Class 13 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 13 Intercompany Claim is entitled to vote to accept or reject the Plan.

16.    <u>Class 14 – Intercompany Interests</u>

(a)    *Classification*: Class 14 consists of all Intercompany Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

(c)    *Voting*: Class 14 is Unimpaired by the Plan. Each Holder of a Class 14 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 14 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.    *Acceptance or Rejection of Plan*

1.    <u>Voting Classes Under Plan</u>

Under the Plan, Classes 6, 7A, 7B, 8, 9, 10, 11A, 11B, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Debtors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as

conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.   Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 13, and 14 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.   Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.   Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.   *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.   *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Debtors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code. The Debtors reserve the right, with the consent of each Plan Support Party, to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary; provided, that the consent of (1) the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) the Holders of Allowed DIP Inc. Claim, or (3) the Holders of the majority in amount of Allowed Prepetition LP Facility Non-SPSO Claim that are members of the Ad Hoc Secured Group shall be required before the Debtors alter, amend, modify, or otherwise

49

affect any Plan terms (through the Plan, the Confirmation Order, or otherwise) concerning the (a) treatment and repayment of such Holders' Allowed Claims, (b) timing of such repayment, (c) consideration, releases, indemnifications, and other rights provided to such Holders, (d) Surviving Indemnities, or (e) reimbursement of the professional fees and expenses of the Inc./LP Lender Parties (in each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan).

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.
# MEANS FOR IMPLEMENTATION OF PLAN

A.      *Overview of Plan*

The Plan contemplates, among other things, (1) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (2) first lien exit financing, including a facility of not less than $1 billion, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (6) the preservation of the Debtors' litigation claims.

B.      *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On and after the Confirmation Date or the Effective Date, as applicable,  the Debtors or the New LightSquared Entities, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Debtors or the New LightSquared Entities, as applicable, determine are necessary or appropriate.

C.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Debtors, the New LightSquared Entities, or the Disbursing Agent, as applicable, to make Plan Distributions shall be obtained from the Plan Consideration and the Plan Consideration Carve-Out. After the satisfaction of all Allowed Claims and Allowed Equity Interests in accordance with the Plan, all remaining proceeds from the Exit Facilities shall be placed in a working capital reserve of NewCo.

D.    *Certain Pre-Confirmation Date, Confirmation Date, and Effective Date Plan Transactions*

1.    <u>Pre-Confirmation Date Plan Elections</u>.    Certain Plan Transactions require elections by certain Holders of Claims on their respective Ballots prior to the Confirmation Date, including the following:

(a)    Each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall be entitled to elect on its respective Ballot to convert on the New DIP Closing Date any portion of its Allowed Prepetition LP Facility Non-SPSO Claim into a New DIP Tranche B Claim in full satisfaction of such Converted Prepetition LP Facility Non-SPSO Claim as set forth in Article III.B.7(c)(ii) hereof; <u>provided</u>, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims:  (i) exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims; or (ii) is less than the New DIP Tranche B Cap, the Plan Support Parties shall provide new financing as part of the New DIP Tranche B Facility in an amount equal to the difference between the New DIP Tranche B Cap and the Converted Prepetition LP Facility Non-SPSO Claims.

2.    <u>Confirmation Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)    The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, the New DIP Lenders shall fund the New DIP Facility through the (i) conversion of Allowed Prepetition LP Facility Non-SPSO Claims into New DIP Tranche B Claims and/or (ii) provision of new financing by the Plan Support Parties as part of the New DIP Tranche A Facility and New DIP Tranche B Facility, as applicable, in each case, in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, and New DIP Order.

(b)    The Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims.

(c)    The Debtors, or a nominee thereof, shall have established NewCo.

3.    <u>Effective Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    NewCo

(i)    NewCo, the other First Lien Exit Obligors, and the other relevant Entities shall enter into the First Lien Exit Credit Agreement.  The First Lien Exit Lenders shall fund the First Lien Exit Facility through the provision of new financing, in accordance with the Plan, Confirmation Order, and First Lien Exit Credit Agreement. The proceeds of the First Lien Exit Facility shall be used to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repaying the New DIP Tranche B Facility, and provide post-Effective Date working capital.  The proceeds of First Lien Exit Excess Amount shall be used to repay a portion of the New DIP Tranche A Facility.

(ii)    NewCo, the other Second Lien Exit Obligors, and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement.  The Second Lien Exit Facility shall be funded through the (A) conversion of Plan Support Party ABC Debt-Converted New DIP Claims into loans under the Second Lien Exit Facility (which amount shall equal 77.78% of the original principal amount of the Second Lien Exit Facility) and (B) issuance of loans under the Second Lien Exit Facility (which amount shall equal 22.22% of the original principal amount of the Second Lien Exit Facility) to Reorganized LightSquared Inc. on account of the LightSquared Transfer, in each case, in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement.  The proceeds of the Second Lien Exit Facility shall be used to, among other things, satisfy certain obligations under the Plan.

(iii)    NewCo shall issue NewCo Series A-1 Preferred PIK Interests, which shall be issued and allocated as follows:  (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(iv)    NewCo shall issue NewCo Series A-2 Preferred PIK Interests, which shall be issued and allocated as follows:  (A) $75 million Pro Rata to Holders of Allowed Existing LP Preferred Units Equity

Interests on account of such Allowed Equity Interests; (B) $209 million Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims; (C) $17.54 million Pro Rata to Holders of Allowed Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); (D) $1.76 million Pro Rata to Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests  (subject to the Reorganized LightSquared Inc. Call Option); and (E) $51.7 million to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(v)      NewCo shall issue NewCo Class A Common Interests, which shall be issued and allocated as follows:  (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(vi)     NewCo shall issue NewCo Class B Common Interests, which shall be issued and allocated as follows:  (A) 70% Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims and (B) 30% Pro Rata to the Holders of Allowed Existing Inc. Common Stock Equity Interests on account of such Allowed Equity Interests.

(vii)    NewCo shall issue NewCo Class C Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated as follows:  (A) 90.9% Pro Rata to the Holders of Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests; and (B) 9.1% Pro Rata to the Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests.

(viii)   NewCo shall issue NewCo Class D Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

(ix)     NewCo shall reserve for issuance up to 10% of NewCo Common Interests in connection with the Management Incentive Plan (subject to the agreement of each Plan Support Party).

(x) Plan Support Party C shall be granted the Plan Support Party C Call Option.

(b) Reorganized Debtors

(i) One Dot Six Corp. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(ii) LightSquared Holdings GP Inc. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(iii) LightSquared Inc. shall be reorganized as Reorganized LightSquared Inc. and the other Debtors shall be reorganized as the Reorganized Subsidiaries.

(iv) Reorganized LightSquared Inc. shall sell, assign, and/or transfer to NewCo all of Reorganized LightSquared Inc.'s Assets and Equity Interests (other than Reorganized LightSquared Inc.'s tax attributes or its Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Inc.'s Equity Interests in Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(v) Reorganized LightSquared Investors Holdings Inc. shall sell, assign, and transfer to NewCo all of Reorganized LightSquared Investors Holdings Inc.'s Assets and Equity Interests (other than its tax attributes and its Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vi) Reorganized TMI Communications Delaware, Limited Partnership shall sell, assign, and transfer to NewCo all of Reorganized TMI Communications Delaware, Limited Partnership's Assets and

Equity Interests (other than its tax attributes), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vii)    Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. shall sell, assign, and transfer to NewCo all of such Entities' Assets (other than their tax attributes, Reorganized SkyTerra Rollup LLC's Equity Interests in Reorganized SkyTerra Rollup Sub LLC, and Reorganized SkyTerra Rollup Sub LLC's Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(viii)    All other Reorganized Subsidiaries shall sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

(ix)    As a result of the foregoing Plan Transactions, (A) NewCo shall be the limited partner, and Reorganized LightSquared GP LLC shall be the general partner, of Reorganized LightSquared LP, (B) NewCo shall wholly own Reorganized One Dot Six LLC, (C) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) shall have been sold, assigned, and transferred to NewCo and shall become subsidiaries of NewCo on the Effective Date, and (D) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., SkyTerra Rollup Sub LLC, and TMI Communications Delaware, Limited Partnership.

(x)    Reorganized LightSquared Inc. shall issue the Reorganized LightSquared Inc. Loan to Plan Support Party D in exchange for the Plan Support Party D Debt-Converted New DIP Claims in

accordance with the Plan, Confirmation Order, and Reorganized LightSquared Inc. Loan Agreement.

(xi)     Reorganized LightSquared Inc. shall issue to SIG Holdings, Inc. (or its designee) 100% of the Reorganized LightSquared Common Shares on account of, and in exchange for the cancellation of, the Allowed Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc.

(xii)    Plan Support Party C shall be granted the Plan Support Party C Call Option.

(xiii)   Reorganized LightSquared Inc. shall be granted the Reorganized LightSquared Inc. Call Option.

(xiv)    As a result of, and in exchange for, the Plan Transactions (including the LightSquared Transfer), Reorganized LightSquared Inc. shall hold (A) 22.22% of loans under the Second Lien Exit Facility, (B) 22.22% of NewCo Series A-1 Preferred PIK Interests, (C) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (D) 22.22% of NewCo Class A Common Interests, and (E) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

E.      *First Lien Exit Facility*

On the Effective Date, the First Lien Exit Obligors and the other relevant Entities shall enter into the First Lien Exit Credit Agreement, and the First Lien Exit Facility shall be funded with new financing in accordance therewith. The applicable New LightSquared Entities shall use the First Lien Exit Facility for the purposes specified in the Plan, the First Lien Exit Credit Agreement, and the other governing documents, including to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repayment of the New DIP Tranche B Facility, and provide post-Effective Date working capital.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) authorization for the Debtors to enter into the commitment letter and fee letter related to the First Lien Exit Facility Filed by the Debtors with the Plan Supplement and to incur obligations thereunder and to pay fees, indemnities, and expenses provided for therein, (2) approval of the First Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the First Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (3) authorization for the First Lien Exit Obligors to enter into and execute the First Lien Exit Credit Agreement and such other documents as may be required or appropriate. On the Effective Date, the First Lien Exit Facility, together with any new promissory notes evidencing the obligation of the First Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their

terms, and each party thereto shall be bound thereby. The obligations incurred by the First Lien Exit Obligors pursuant to the First Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the First Lien Exit Credit Agreement and related documents. The liens securing the First Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

F.    *Second Lien Exit Facility*

On the Effective Date, the Second Lien Exit Obligors and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement, and the Second Lien Exit Facility shall be funded as set forth in Article IV.D.3(a) hereof. The Second Lien Exit Facility shall permit NewCo to incur a new debt facility of up to $500 million, which shall be secured by liens senior to the liens under the Second Lien Exit Facility and junior to the liens under the First Lien Exit Facility (the "1.5 Lien Loans"). The Plan Support Parties shall have the right (but not the obligation) to purchase their *pro rata* share of any 1.5 Lien Loans based on their commitment percentages. In the event that any Plan Support Party fails to purchase its entire share of the 1.5 Lien Loans, the other Plan Support Parties shall have the right (but not the obligation) to purchase the remaining 1.5 Lien Loans on a *pro rata* basis. In the event that the Plan Support Parties do not exercise their right to purchase the entire principal amount of the 1.5 Lien Loans, NewCo may issue such remaining 1.5 Lien Loans to third parties. The applicable New LightSquared Entities shall use the Second Lien Exit Facility for the purposes specified in the Plan, the Second Lien Exit Credit Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Second Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for the Second Lien Exit Obligors to enter into and execute the Second Lien Exit Credit Agreement and such other documents as may be required or appropriate. On the Effective Date, the Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of the Second Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the Second Lien Exit Obligors pursuant to the Second Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Second Lien Exit Credit Agreement and related documents. The liens securing the Second Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

G.    *Reorganized LightSquared Inc. Loan*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the Reorganized LightSquared Inc. Loan Agreement. On the Effective Date, the Reorganized LightSquared Inc. Loan shall be funded by the Reorganized LightSquared Inc. Loan Holder converting its Plan Support Party D Debt-Converted New DIP Claims (inclusive of New DIP Tranche A Accrued Interest attributed thereto) into loans under the Reorganized LightSquared Inc. Loan, on a dollar-for-dollar basis, in full satisfaction of such Plan Support

Party D Debt-Converted New DIP Claims (as set forth in Articles II.E and IV.D hereof) in accordance with the Reorganized LightSquared Inc. Loan Agreement. Reorganized LightSquared Inc. shall use the Reorganized LightSquared Inc. Loan for the purposes specified in the Plan, the Reorganized LightSquared Inc. Loan Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Reorganized LightSquared Inc. Loan Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc. Loan Agreement and such other documents as may be required or appropriate. On the Effective Date, the Reorganized LightSquared Inc. Loan Agreement, together with the Reorganized LightSquared Inc. Loan evidencing the obligation of Reorganized LightSquared Inc., and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Loan Agreement and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Loan Agreement and related documents.

H.      [RESERVED]

I.      *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (b) reserve for issuance up to 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of each Plan Support Party), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof and treated in accordance with the Plan, as applicable. The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The applicable New Corporate Governance Documents shall contain provisions necessary to (1) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable New Corporate Governance Documents as permitted by applicable law, and (2) effectuate the

provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the New LightSquared Entities.

J.      *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares (other than the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer), shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code, and the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer shall be similarly exempted pursuant to the private placement exemption under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New LightSquared Entities Corporate Governance Documents, and (4) applicable regulatory approval, if any.

K.      *Listing of New LightSquared Entities Shares; Reporting Obligations*

The New LightSquared Entities shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.  In order to prevent the New LightSquared Entities from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New LightSquared Entities Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the New LightSquared Entities Corporate Governance Documents.

L.      *NewCo Interest Holders Agreement*

On the Effective Date, NewCo shall enter into and deliver the NewCo Interest Holders Agreement.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the NewCo Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by NewCo, and (2) authorization for NewCo to enter into and execute the NewCo

Interest Holders Agreement and such other documents as may be required or appropriate. On the Effective Date, the NewCo Interest Holders Agreement, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by NewCo pursuant to the NewCo Interest Holders Agreement and related documents shall be satisfied pursuant to, and as set forth in, the NewCo Interest Holders Agreement and related documents.

M.    *Indemnification Provisions in New LightSquared Entities Corporate Governance Documents*

As of the Effective Date, the New LightSquared Entities Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the New LightSquared Entities' current and former directors, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the New LightSquared Entities shall amend or restate the New LightSquared Entities Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the New LightSquared Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

N.    *Management Incentive Plan*

On or as soon as practicable following the Consummation of the Plan, the NewCo Board shall adopt the Management Incentive Plan.

O.    *Corporate Governance*

As shall be set forth in the New LightSquared Entities Charters and New LightSquared Entities Bylaws, the New LightSquared Entities Boards shall consist of a number of members, and appointed in a manner, to be agreed upon by each Plan Support Party or otherwise provided in the New LightSquared Entities Corporate Governance Documents. In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing: (1) the identities and affiliations of any Person proposed to serve as a member of the New LightSquared Entities Boards or officer of the New LightSquared Entities and (2) the nature of compensation for any officer employed or retained by the New LightSquared Entities who is an "insider" under section 101(31) of the Bankruptcy Code.

P.    *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized

Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Exit Facilities and any rights of any of the parties under the Exit Credit Agreements or any of the related documents, (2) any Liens granted to secure the Reorganized LightSquared Inc. Loan and any rights of any of the parties under the Reorganized LightSquared Inc. Loan Agreement or any of the related documents, (3) any Liens granted to secure the SPSO Note or any of the related documents if Class 7B elects to receive the SPSO Option A Treatment, and (4) any rights of any of the parties under any of the New LightSquared Entities Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each New LightSquared Entity may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Q.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility), except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the New LightSquared Entities shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, that (1) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the New LightSquared Entities and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

All Liens securing the Allowed Prepetition Facility Claims under the Prepetition Inc. Credit Agreement or the Allowed Prepetition LP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to the Effective Date of the Plan and

the payment in full of all Allowed Prepetition Facility Claims in accordance with the terms of the Plan, at which time such Liens shall be terminated; provided, that, for the avoidance of doubt, such Liens shall specifically remain in effect until (and not beyond) the Effective Date to secure the Surviving Indemnities.

R.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

S.    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the New LightSquared Entities, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the Exit Credit Agreements, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New LightSquared Entities Corporate Governance Documents, the Management Incentive Plan, and commitment letters and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the New LightSquared Entities; (5) the issuance and distribution of the New LightSquared Entities Shares and the SPSO Note; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments

contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate: (1) the Exit Credit Agreements; (2) the Reorganized LightSquared Inc. Loan Agreement; (3) the SPSO Note Documents; (4) the Exit Intercreditor Agreement; (5) the New LightSquared Entities Corporate Governance Documents; (6) the Management Incentive Plan; and (7) any and all other agreements, documents, securities, and instruments related to the foregoing. The authorizations and approvals contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the New LightSquared Entities and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the New LightSquared Entities, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

U.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a New LightSquared Entity or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the New LightSquared Entities, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

V.    *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be

preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary herein, on the Effective Date: (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action, and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses in exchange for the treatment of Claims and Equity Interests held by Plan Support Party C as set forth in this Plan; (3) NewCo, through its authorized agents or representatives, shall retain and may exclusively enforce and pursue any and all such Causes of Action; (4) NewCo shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; and (5) NewCo reserves and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

Plan Support Party C shall not assert any unasserted claim or Cause of Action arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses on and after the Effective Date unless and until NewCo asserts any such unasserted claim or Cause of Action; provided, however, that on and after the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum, Plan Support Party C shall be deemed to have irrevocably waived the right to assert any such unasserted claims or Causes of Action. Any proceeds of any rights of action contributed to NewCo from the Reorganized Debtors shall be payable to NewCo.

W.    *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be

deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the New LightSquared Entities shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. As of the Effective Date, the Debtors or New LightSquared Entities, as applicable, anticipate purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

X.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable New LightSquared Entities shall assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Debtors' Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or New LightSquared Entities' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Article III.B.14 hereof; provided, that the applicable New LightSquared Entities Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable New LightSquared Entities awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the New LightSquared Entities Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the New LightSquared Entities' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.    <u>Rejection of Executory Contracts and Unexpired Leases</u>

Except as otherwise provided herein (including Article IV.X hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

    2.    <u>Assumption of Executory Contracts and Unexpired Leases</u>

In connection with the Confirmation and Consummation of the Plan, the Debtors and the Plan Support Parties shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues

with respect to such Cure Costs. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.       *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the New LightSquared Entities no later than thirty (30) days after the Effective Date. All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.B.9 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 9 in Article III.B.10 hereof.

C.       *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Debtors or New LightSquared Entities, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the

notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the New LightSquared Entities' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline"). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the New LightSquared Entities to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Debtors or New LightSquared Entities, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors and the New LightSquared Entities reserve the right to reject any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.      *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and New LightSquared Entities expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the New LightSquared Entities, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable New LightSquared Entity in the ordinary course of business.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Postpetition Contracts and Leases*

Each New LightSquared Entity shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable New LightSquared Entity after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or New LightSquared Entity, in each case, in accordance with, and subject to, the then applicable terms. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and the New LightSquared Entities, with the consent of each Plan Support Party, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New LightSquared Entities shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend their decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Agents, the Prepetition Agents, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors and the New LightSquared Entities, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors and the New LightSquared Entities, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.      *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims on the New DIP Closing Date, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, New LightSquared Entity, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Plan Support Parties, the eligible Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder

entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The New LightSquared Entities are authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the New LightSquared Entities shall reserve any applicable Plan Consideration from Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.      Disbursing Agent

All Plan Distributions shall be made by the Debtors or the New LightSquared Entities as Disbursing Agent, or such other Entity designated by the Debtors or the New LightSquared Entities as Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Debtors or the New LightSquared Entities, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the New LightSquared Entities, as applicable, to the Disbursing Agent for the benefit of the Plan Support Parties, the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.      Rights and Powers of Disbursing Agent

        1.      Powers of Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

        2.      Expenses Incurred on or After Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by the New LightSquared Entities.

E.    *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

1.    Payments and Plan Distributions on Disputed Claims and Disputed Equity <u>Interests</u>

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

2.    Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed <u>Equity Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

1.    <u>Delivery of Plan Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' or the New LightSquared Entities' records as of the date of any such Plan Distribution; <u>provided</u>, <u>however</u>, that the manner of such Plan Distributions shall be determined at the discretion of the Debtors or the New LightSquared Entities; <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Articles VI.F.5 and VI.F.6 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    <u>Delivery of Plan Distributions to Holders of Allowed DIP Inc. Claims</u>

The Plan Distributions provided for Allowed DIP Inc. Claims pursuant to Article II.C hereof shall be made to the DIP Inc. Agent by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

72

3. <u>Delivery of Plan Distributions to Holders of Allowed DIP LP Claims</u>

The Plan Distributions provided for Allowed DIP LP Claims pursuant to Article II.D hereof shall be made to the DIP LP Lenders by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

4. <u>Delivery of Plan Distributions to Holders of Allowed New DIP Claims</u>

The Plan Distributions provided for Allowed New DIP Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

5. Delivery of Plan Distributions to Holders of Allowed Prepetition Inc. Facility <u>Claims</u>

The Plan Distributions provided for Allowed Prepetition Inc. Facility Non-Subordinated Claims by Article III.B.5 hereof shall be made to the Prepetition Inc. Agent by the Debtors, or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

The Plan Distribution provided by Article  III.B.6 hereof shall be made directly by the New LightSquared Entities or the Disbursing Agent to the Holders of Allowed Prepetition Inc. Subordinated Facility Claims.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Inc. Plan Consideration is eligible to be distributed to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims.

Notwithstanding anything to the contrary herein, no Holder of a Prepetition Inc. Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

6. Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility <u>Claims</u>

The Plan Distributions provided for Allowed Prepetition LP Facility Claims by Articles III.B.7 and III.B.8 hereof shall be made to the Prepetition LP Agent.  Plan Distributions to be made on account of Non-Converted Prepetition LP Facility Non-SPSO Claims shall be made by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.  To the extent possible, the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall provide that the applicable LP Plan Consideration is eligible to be distributed to Prepetition LP Lenders.

Notwithstanding anything to the contrary herein, no Holder of a Prepetition LP Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

7. <u>Minimum Plan Distributions</u>

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars.

Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down. The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

8.    Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the New LightSquared Entities (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the New LightSquared Entities shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the New LightSquared Entities and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The New LightSquared Entities reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *Setoffs*

Except with respect to any distributions on account of (1) DIP Inc. Claims, (2) DIP LP Claims, (3) Prepetition Inc. Facility Non-Subordinated Claims, or (4) Prepetition LP Facility Non-SPSO Claims, or as otherwise expressly provided for in the Plan, each Debtor or New LightSquared Entity, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Allowed Equity Interest and

the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Plan Distribution is made on account of such Allowed Claim or Equity Interest) any claims, rights, and Causes of Action of any nature that such Debtor or New LightSquared Entity, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or New LightSquared Entity, as applicable, of any such claims, rights, or Causes of Action that such New LightSquared Entity may possess against such Holder. In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtor or New LightSquared Entity, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

*I.*     *Recoupment*

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the New LightSquared Entities, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.*     *Claims Paid or Payable by Third Parties*

1.     Claims Paid by Third Parties

The Debtors or the New LightSquared Entities, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or New LightSquared Entity. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a New LightSquared Entity on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable New LightSquared Entity, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable New LightSquared Entity annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.       Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.       Applicability of Insurance Policies

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the New LightSquared Entities, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.       *Allowance of Claims and Equity Interests*

After the Effective Date, the New LightSquared Entities shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.V hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.7 hereof or the Bankruptcy Code.

B.       *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the New LightSquared Entities shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The New LightSquared Entities shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims.  The Inc. Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 15% of the Disputed Claims and Equity Interests Reserve from the Inc. Plan Consideration Carve-Out and the LP Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 85% of the Disputed Claims and Equity

Interests Reserve from the LP Plan Consideration Carve-Out.  The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become Disallowed Claims or Disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims or Equity Interests*

Before the Effective Date, the Debtors, and after the Effective Date, the New LightSquared Entities, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Debtors or New LightSquared Entities may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities, and any Claim or Equity Interest that has been amended may be adjusted thereon by the New LightSquared Entities, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Debtors or New LightSquared Entities, (3) provided for in a postpetition agreement in writing between the Debtors or New LightSquared Entities and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date.

G.      *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS

MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.      *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the New LightSquared Entities, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the New LightSquared Entities in accordance with Article III.B.16 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or New LightSquared Entities, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.      *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable.  Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the New LightSquared Entities may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities.   In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the New DIP Closing Date.

D.      *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether**

known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any

applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "**Releasing Party**") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; **provided**, **however**, that each present and former Holder of a Claim or Equity Interest abstaining from voting to accept or reject the Plan may reject the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release; **provided**, **further**, **however**, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.

Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents,

**Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.**

G.    *Injunction*

**Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the New LightSquared Entities and their successors and assigns.  The New LightSquared Entities shall be authorized to

file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

2.    The Confirmation Order shall be (a) in form and substance satisfactory to the Debtors and each Plan Support Party and (b) entered no later than March 31, 2014, or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan and the New DIP Facility and has taken such matters under advisement, April 15, 2014.

3.    The New DIP Order, in form and substance satisfactory to the Debtors and each other party to the New DIP Facility, shall have been entered contemporaneously with the Confirmation Order.

4.    The Debtors shall have received binding commitments with respect to the First Lien Exit Facility on terms and conditions satisfactory to the Debtors and each Plan Support Party.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, in form and in substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

2.    The New DIP Order, in form and substance satisfactory to the Debtors and each Plan Support Party, (a) shall have been entered and (b) shall each have become a Final Order.

3.    The New DIP Recognition Order, in form and substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

4.      The New DIP Facility shall have been funded, and there shall not be any default under the New DIP Credit Agreement or the New DIP Order that has not been waived in accordance with the terms of the New DIP Credit Agreement or the New DIP Order.

5.      The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)      the Exit Credit Agreements and any related documents, in forms and substance acceptable to the Debtors, each Plan Support Party, the Exit Agents, and the Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Exit Facilities shall have occurred;

(b)      the Reorganized LightSquared Inc. Loan Agreement and any related documents, in forms and substance acceptable to the Debtors and the Reorganized LightSquared Inc. Loan Holder, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Loan Agreement shall have occurred;

(c)      [Reserved];

(d)      the SPSO Note Documents and any related documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered (or be deemed executed and delivered) by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the SPSO Note Documents shall have occurred;

(e)      the Plan Documents relating to the LightSquared Transfer, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(f)      the New LightSquared Entities Corporate Governance Documents, in forms and substance acceptable to the Debtors and each Plan Support

Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(g)    the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.    The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

7.    The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Debtors and each Plan Support Party, without prejudice to the New LightSquared Entities' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, that each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the New LightSquared Entities and each Plan Support Party.

8.    All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

10.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

C.    *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by the Debtors, with the consent of each Plan Support Party (and in accordance with the terms hereof), without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of each Plan Support Party (and in accordance with the terms hereof), reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Debtors, with the consent of each Plan Support Party (and in accordance with the terms hereof), expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

In addition, the consent of (1) the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) the Holders of Allowed DIP Inc. Claim, or (3) the Holders of the majority in amount of Allowed Prepetition LP Facility Non-SPSO Claim that are members of the Ad Hoc Secured Group shall be required before the Debtors alter, amend, modify, or otherwise affect any Plan terms (through the Plan, the Confirmation Order, or otherwise) concerning the (a) treatment and repayment of such Holders' Allowed Claims, (b) timing of such repayment, (c) consideration, releases, indemnifications, and other rights provided to such Holders, (d) Surviving Indemnities, or (e) reimbursement of the professional fees and expenses of the Inc./LP Lender Parties (in each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan).

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors, with the consent of each Plan Support Party, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or

Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Debtors' Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, if the New DIP Facility Closing Date has not occurred within fifteen (15) days of the entry of the Confirmation Order, the Plan shall be deemed withdrawn and the Confirmation Order shall be deemed vacated unless (a) the Holders of Prepetition Inc. Facility Non-Subordinated Claims and (b) the Holders of the majority in amount of the Prepetition LP Facility Non-SPSO Claims that are members of the Ad Hoc Secured Group agree otherwise in writing.

D.     *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the Exit Facilities, the Plan, or otherwise, including the Plan Support Party Break-Up Fee and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.     Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear,

determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the New LightSquared Entities' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Debtors' Disclosure Statement;

9.      To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Exit Facilities, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New Corporate Governance Documents, or any ancillary or related agreements thereto;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of

the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

15.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    Determine any other matters that may arise in connection with or relate to the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Debtors' Disclosure Statement;

17.    Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.    Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    Enforce all orders previously entered by the Bankruptcy Court; and

22.    Hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the New LightSquared Entities, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or

compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the New LightSquared Entities, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

### C.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Debtors' Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

### D.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

### E.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the New LightSquared Entities, shall be served on:

| | |
|---|---|
| LightSquared Inc. | Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg

601 Lexington Avenue
New York, NY 10022

Plan Support Party D or Reorganized LightSquared Inc. Loan Holder, shall be served on:

JPMorgan Chase & Co.          Simpson Thacher & Bartlett LLP
Patrick Daniello              Sandeep Qusba
383 Madison Ave.             Elisha D. Graff
New York, NY 10179           425 Lexington Avenue
                             New York, NY 10017

Plan Support Party A, shall be served on:

Fortress Investment Group      Stroock & Stroock & Lavan LLP
1345 Avenue of the Americas    Kristopher M. Hansen
New York, NY 10105            Frank A. Merola
                             Jayme T. Goldstein
                             180 Maiden Lane
                             New York, NY 10038

the New DIP Agent or Plan Support Party B, shall be served on:

Melody Business Finance, LLC   Bingham McCutchen LLP
Andres Scaminaci             Jeffrey S. Sabin
717 Fifth Avenue, 12th Floor   Julia Frost-Davies
New York, NY 10022           399 Park Avenue
                             New York, NY 10022

the Ad Hoc Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

the Prepetition LP Agent, shall be served on:

Latham & Watkins LLP
Mark A. Broude
885 Third Avenue
New York, NY 10022

the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

Akin, Gump, Strauss, Hauer & Feld LLP

Philip C. Dublin
Meredith A. Lahaie
One Bryant Park
New York, NY 10036

Plan Support Party C, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

After the Effective Date, the New LightSquared Entities have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the New LightSquared Entities are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and

contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## I.    Non-severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or New LightSquared Entities', as applicable, consent, and (3) non-severable and mutually dependent.

## J.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

## K.    Waiver or Estoppel

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Debtors' Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

## L.    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Debtors' Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan,

unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:  February 22, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

**<u>Exhibit A-2</u>**

**Blackline of Revised Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO**
**CHAPTER 11 OF BANKRUPTCY CODE**

---

Matthew S. Barr
Steven Z. Szanzer
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<u>c</u>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Counsel to Debtors and Debtors in Possession

Dated:  New York, New York
February ~~14~~22, 2014

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
    OF TIME, AND GOVERNING LAW ......................................................................... 3

    A.    Defined Terms ............................................................................................. 3
    B.    Rules of Interpretation .............................................................................. 32
    C.    Computation of Time ............................................................................. ~~32~~**33**
    D.    Governing Law ...................................................................................... ~~32~~**33**
    E.    Reference to Monetary Figures .................................................................. 33

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
    COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
    AND U.S. TRUSTEE FEES ...................................................................................... 33

    A.    Administrative Claims ............................................................................... 33
    B.    Accrued Professional Compensation Claims .......................................... ~~34~~**35**
    C.    DIP Inc. Claims ..................................................................................... ~~35~~**36**
    D.    DIP LP Claims ........................................................................................... 36
    E.    New DIP Claims .................................................................................... ~~36~~**37**
    F.    Priority Tax Claims .................................................................................... 37
    G.    Payment of Statutory Fees ..................................................................... ~~37~~**38**

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS ............................................................................................................ ~~37~~**38**

    A.    Summary ................................................................................................ ~~37~~**38**
    B.    Classification and Treatment of Claims and Equity Interests ...................... 38
    C.    Special Provision Governing Unimpaired Claims and Equity Interests ... ~~47~~**48**
    D.    Acceptance or Rejection of Plan ............................................................ ~~47~~**48**
    E.    Elimination of Vacant Classes ............................................................... ~~48~~**49**
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code ............. ~~48~~**49**
    G.    Controversy Concerning Impairment ..................................................... ~~48~~**50**

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ............................................ ~~49~~**50**

    A.    Overview of Plan ................................................................................... ~~49~~**50**
    B.    Plan Transactions .................................................................................. ~~49~~**50**
    C.    Sources of Consideration for Plan Distributions .................................... ~~49~~**51**
    D.    Certain Pre-Confirmation Date, Confirmation Date, and Effective Date Plan
        Transactions ......................................................................................... ~~49~~**51**
    E.    First Lien Exit Facility ........................................................................... ~~55~~**56**
    F.    Second Lien Exit Facility ....................................................................... ~~55~~**57**
    G.    Reorganized LightSquared Inc. Loan ..................................................... ~~56~~**57**

H.    [RESERVED] ............................................................................... 57 58
I.    Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated
      Intercompany Interests .............................................................. 57 58
J.    Section 1145 and Other Exemptions ........................................ 57 59
K.    Listing of New LightSquared Entities Shares; Reporting Obligations ........ 58 59
L.    NewCo Interest Holders Agreement ......................................... 58 59
M.    Indemnification Provisions in New LightSquared Entities Corporate
      Governance Documents ............................................................. 58 60
N.    Management Incentive Plan ...................................................... 59 60
O.    Corporate Governance ............................................................... 59 60
P.    Vesting of Assets in Reorganized Debtors ............................... 59 60
Q.    Cancellation of Securities and Agreements ............................. 60 62
R.    Corporate Existence .................................................................. 60 62
S.    Corporate Action ....................................................................... 61 63
T.    Effectuating Documents; Further Transactions ...................... 61 63
U.    Exemption from Certain Taxes and Fees ................................ 62 64
V.    Preservation, Transfer, and Waiver of Rights of Action ........ 62 64
W.    Assumption of D&O Liability Insurance Policies .................. 63 65
X.    Employee and Retiree Benefits ............................................... 64 66

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ....................................................................................... 65 67

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .... 65 67
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases .... 66 68
C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
      Pursuant to Plan ......................................................................... 66 68
D.    Pre-existing Obligations to Debtors Under Executory Contracts and
      Unexpired Leases ....................................................................... 67 69
E.    Intercompany Contracts, Contracts, and Leases Entered into After Petition
      Date, Assumed Executory Contracts, and Unexpired Leases ... 67 69
F.    Modifications, Amendments, Supplements, Restatements, or Other
      Agreements ................................................................................. 68 70
G.    Postpetition Contracts and Leases ........................................... 68 70
H.    Reservation of Rights ................................................................ 68 70
I.    Nonoccurrence of Effective Date ............................................. 68 71

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............... 69 71

A.    Distribution Record Date .......................................................... 69 71
B.    Timing and Calculation of Amounts To Be Distributed ......... 69 71
C.    Disbursing Agent ....................................................................... 70 72
D.    Rights and Powers of Disbursing Agent ................................. 70 72

E.    Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date ........................................................................... 71 73

F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions ........................................................................... 71 73

G.    Compliance with Tax Requirements/Allocations ........................... 73 75

H.    Setoffs ........................................................................... 74 75

I.    Recoupment ........................................................................... 74 76

J.    Claims Paid or Payable by Third Parties ........................................ 74 76

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ........................................................................... 75 77

A.    Allowance of Claims and Equity Interests ..................................... 75 77

B.    Claims and Equity Interests Administration Responsibilities ............... 75 77

C.    Estimation of Claims or Equity Interests ........................................ 76 78

D.    Expungement or Adjustment to Claims or Equity Interests Without Objection 77 79

E.    No Interest ........................................................................... 77 79

F.    Deadline To File Objections to Claims or Equity Interests ................... 77 79

G.    Disallowance of Claims or Equity Interests ..................................... 77 79

H.    Amendments to Claims ........................................................... 78 80

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........................................................................... 78 80

A.    Discharge of Claims and Termination of Equity Interests ................... 78 80

B.    Subordinated Claims ........................................................... 79 81

C.    Compromise and Settlement of Claims and Controversies ................... 79 81

D.    Releases by Debtors ........................................................... 79 81

E.    Exculpation ........................................................................... 80 82

F.    Third-Party Releases by Holders of Claims or Equity Interests ............ 81 83

G.    Injunction ........................................................................... 82 84

H.    Release of Liens ........................................................................... 82 84

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ........................................................... 83 85

A.    Conditions Precedent to Confirmation Date ..................................... 83 85

B.    Conditions Precedent to Effective Date ........................................ 83 85

C.    Waiver of Conditions ........................................................... 86 87

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ........... 86 88

A.    Modification and Amendments ..................................................... 86 88

B.    Effect of Confirmation on Modifications ................................................ 86 88

C.    Revocation or Withdrawal of Plan ......................................................... 86 88

D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur ... 87 89

ARTICLE XI. RETENTION OF JURISDICTION .............................................. 87 89

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................ 89 91

A.    Immediate Binding Effect ...................................................................... 89 91

B.    Additional Documents ........................................................................... 90 92

C.    Reservation of Rights ............................................................................ 90 92

D.    Successors and Assigns ......................................................................... 90 92

E.    Service of Documents ............................................................................ 90 92

F.    Term of Injunctions or Stays ................................................................. 92 94

G.    Plan Supplement .................................................................................... 92 94

H.    Entire Agreement ................................................................................... 92 94

I.    Non-severability of Plan Provisions ....................................................... 93 95

J.    Votes Solicited in Good Faith ................................................................ 93 95

K.    Waiver or Estoppel ................................................................................ 93 95

L.    Conflicts ................................................................................................ 93 95

## INTRODUCTION

LightSquared Inc. and the other Debtors in the above-captioned chapter 11 cases hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Reference is made to the Debtors' Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, with the consent of each Plan Support Party **(and in accordance with the terms hereof, including, where applicable, with the consent of the Inc./LP Lender Parties)**, prior to its substantial consummation.

The Debtors have always believed, and continue to believe, that resolution of the pending FCC proceedings will maximize the value of their assets and, accordingly, will continue their efforts with the FCC and other federal agencies in seeking approval of their pending license modification applications and related proceedings before the FCC. Given the continuing nature of the FCC process and the facts and circumstances of these Chapter 11 Cases, the Debtors believed that it was necessary to take action to protect their Estates and the current value of their assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets. Accordingly, on August 30, 2013, the Debtors filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed, on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of the Debtors' assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, the Debtors, in consultation with, and at the direction of, the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee"), (i) were always receptive to any potential alternative transactions that would provide greater value for the Estates and all of the Debtors' stakeholders, and (ii) as such, fully preserved their rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As further explained in the Debtors' Disclosure Statement, upon consideration of the various proposals received to date, the Debtors, in consultation with, and at the direction of, the Special Committee, determined that a reorganization of the Debtors that satisfied all Claims in full and provided a return to Holders of Equity Interests – and not a sale – was in the best interests of these Estates. Accordingly, the Debtors initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of the Debtors through a series of restructuring transactions. Following certain developments in these Chapter 11 Cases after the filing of the Second Amended Plan, the Debtors, at the direction of the Special Committee, and the Plan Support Parties discussed modifications of that plan to garner as much support as possible for LightSquared's reorganization. These

discussions led to the filing of this further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place the Debtors in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by the Debtors, ~~certain~~**substantially all of the** key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders. Importantly, effectiveness of the Plan is not conditioned on the Debtors' receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of the Debtors' significant stakeholders. Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with the Debtors' emergence from chapter 11 pursuant to this Plan. To fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing the Debtors a $1.65 billion new debtor in possession credit facility. More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of the Debtors' litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. The Debtors ~~and~~**,** the Plan Support Parties, the Ad Hoc Secured Group**, the Prepetition LP Agent, the DIP Inc. Agent, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders** accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of the Debtors' creditors and equityholders and is currently the highest and best restructuring offer available to the Debtors. Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Debtors to successfully exit the Chapter 11 Cases. Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from ~~a substantial portion~~**substantially all** of the Debtors' significant stakeholders.

Moreover, in light of the broad support for the Plan, the Debtors are not pursuing at this time confirmation of the Alternate Inc. Debtors Plan. The Alternate Inc. Debtors Plan,

like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of this Plan and April 15, 2014.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DEBTORS' DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.     *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.     "**1.5 Lien Loans**" has the meaning set forth in Article IV.F hereof.

2.     "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

3.     "**Ad Hoc Secured Group**" means that certain Ad Hoc Group of LightSquared LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude the SPSO Parties and their affiliates.

4.     "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any

3

and all KEIP Payments; (g) any Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms of a Stalking Horse Agreement and the Bid Procedures Order; provided, however, that no SPSO Party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; and (h) any fees and expenses that are earned and payable pursuant to the New DIP Facility, the First Lien Exit Facility, the Plan, and the other Plan Documents, including the Plan Support Party Break-Up Fee.

5.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

6.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the New LightSquared Entities and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or New LightSquared Entity, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

8.      "**Alternate Inc. Debtors Plan**" has the meaning set forth in the Second Amended Plan.

9.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

10.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545,

547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

11.    "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

12.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

13.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

14.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

16.    "**Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

17.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

19.    "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

20.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

21.    "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.    Cause of Action also includes, without limitation, the following:   (a) any right of setoff, counterclaim,

or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Released Party or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

22.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

23.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.    "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

25.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

26.    "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

27.    "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

28.    "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

29.    "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

30.    "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.    "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

32.     "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33.     "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34.     "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

35.     "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

36.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to each Plan Support Party.

37.     "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

38.     "**Consummation**" means the occurrence of the Effective Date.

39.     "**Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof); provided, that only Holders of Allowed Prepetition LP Facility Non-SPSO Claims that vote to accept the Plan may elect to exercise the foregoing right of conversion.

40.     "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

41.     "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

42.     "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

43.     "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

44.    "**Debtors' Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. [_____]] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of each Plan Support Party).

45.    "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agent.

46.    "**DIP Claim**" means a DIP Inc. Claim, a DIP LP Claim, or a New DIP Claim.

47.    "**DIP Facilities**" means the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facility.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

49.    "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

50.    "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all principal, interest, default interest, and exit fees provided for thereunder.

51.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

52.    "**DIP Inc. Facility**" means that certain $46.4 million debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

53.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

54.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

55.    "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

56.    "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

57.    "**DIP Lenders**" means the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders.

58.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

59.    "**DIP LP Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

60.    "**DIP LP Closing Date**" means February 5, 2014.

61.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents in the original aggregate principal amount of $33 million.

62.    "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

63.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

64.    "**DIP LP Obligors**" means the DIP LP Borrower and the DIP LP Guarantors.

65.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

66.    "**Disbursing Agent**" means, for Plan Distributions made prior to the Effective Date, the Debtors, the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition LP Agent to the extent they make or facilitate Plan Distributions, and, for Plan Distributions made on or after the Effective Date, the New LightSquared Entities, or the Entity or Entities designated by the New LightSquared Entities to make or facilitate Plan Distributions pursuant to the Plan on or after the Effective Date, including, without limitation, the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition LP Agent to the extent they make or facilitate Plan Distributions.

67.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.    "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the New LightSquared Entities for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be

entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

69. "**Distribution Record Date**" means (a) for all Claims and Equity Interests (other than the DIP LP Claims and New DIP Claims), the Voting Record Date, (b) for the DIP LP Claims, the DIP LP Closing Date, and (c) for the New DIP Claims, the New DIP Closing Date.

70. "**Effective Date**" means the date selected by the Debtors, with the consent of each Plan Support Party, that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.B hereof have been satisfied or waived (in accordance with Article IX.C hereof).

71. "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger Capital Partners, LLC, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

72. "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

73. "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

74. "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

75. "**Exculpated Party**" means a Released Party.

76. "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

77. "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).  For the avoidance of doubt, Existing Inc.

Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

78.     "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

79.     "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

80.     "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

81.     "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

82.     "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

83.     "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

84.     "**Exit Agents**" means the First Lien Exit Agent and the Second Lien Exit Agent.

85.     "**Exit Credit Agreements**" means the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

86.     "**Exit Facilities**" means the First Lien Exit Facility and the Second Lien Exit Facility.

87.     "**Exit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated on or before the Effective Date, between the Exit Agents, the Exit Lenders, and the other relevant Entities governing, among other things, the respective rights, remedies, and priorities of claims and security interests held by the Exit Agents, the Exit Lenders, and the other relevant Entities under the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

88.     "**Exit Lenders**" means the First Lien Exit Lenders and the Second Lien Exit Lenders.

89.     "**Exit Obligors**" means the First Lien Exit Obligors and the Second Lien Exit Obligors.

90.     "**Expense Reimbursement**" has the meaning set forth in the Bid Procedures Order.

91.    "**FCC**" means the Federal Communications Commission.

92.    "**FCC Objectives**" means that (a) the Companies shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of 250 million total POPs; (b) any build out conditions that may be imposed by the FCC on the Companies shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Companies regarding its possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

93.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

94.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Debtors reserve the right to waive any appeal period, with the consent of each Plan Support Party.

96.    "**Financial Wherewithal Objection Deadline**" has the meaning set forth in Article V.C hereof.

97.    "**First Amended Plan**" has the meaning set forth in the Introduction hereof.

98.    "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

99.    "**First Lien Exit Agent**" means the administrative agent under the First Lien Exit Credit Agreement or any successor agent appointed in accordance with the First Lien Exit Credit Agreement.

100.    "**First Lien Exit Borrower**" means NewCo, as borrower under the First Lien Exit Credit Agreement.

101.    "**First Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the First Lien Exit Obligors, the First Lien Exit Agent, and the First Lien Exit Lenders.

102.    "**First Lien Exit Excess Amount**" means an amount equal to the aggregate principal amount that the First Lien Exit Facility exceeds $1 billion on the Effective Date.

103.    "**First Lien Exit Facility**" means that certain first lien credit facility in an original aggregate principal amount of not less than $1 billion provided in connection with the First Lien Exit Credit Agreement (which facility may be increased by an additional $500 million upon the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum as specified therein).

104.    "**First Lien Exit Guarantors**" means each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) required to be guarantors under the First Lien Exit Credit Agreement.

105.    "**First Lien Exit Lenders**" means the lenders party to the First Lien Exit Credit Agreement from time to time.

106.    "**First Lien Exit Obligors**" means the First Lien Exit Borrower and the First Lien Exit Guarantors.

107.    "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims: (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; or (i) Intercompany Claim.

108.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

109.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

110.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

111. "**Inc./LP Lender Parties**" means the Ad Hoc Secured Group, the DIP Inc. Agent, and the Prepetition Inc. Non-Subordinated Parties.

~~112. "**Inc./LP Lender Advisors Fee Cap**" means an aggregate amount equal to $500,000.~~

**112.** ~~113.~~ "**Inc. Administrative Claim**" means any Administrative Claim asserted against an Inc. Debtor.

**113.** ~~114.~~ "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

**114.** ~~115.~~ "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

**115.** ~~116.~~ "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

**116.** ~~117.~~ "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

**117.** ~~118.~~ "**Inc. Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the Inc. Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the Inc. Debtors, *plus* (iii) the Inc. Debtors' Cash on hand on the Effective Date, *plus* (iv) without duplication of clause (i), Cash from the Reorganized LightSquared Inc. Loan, if any, and *less* (v) the Inc. Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, and (d) loans under the Reorganized LightSquared Inc. Loan.

**118.** ~~119.~~ "**Inc. Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the Inc. Debtors and (b) together with the LP Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

**119.** ~~120.~~ "**Inc. Priority Tax Claim**" means any Priority Tax Claim asserted against an Inc. Debtor.

**120.** ~~121.~~ "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

**121.** ~~122.~~ "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

14

**122.** 123. "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

**123.** 124. "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

**124.** 125. "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

**125.** 126. "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

**126.** 127. "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

**127.** 128. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

**128.** 129. "**LightSquared Transfer**" means the sale, assignment, and/or transfer by the Reorganized Debtors to NewCo of certain of the Reorganized Debtors' Assets and Equity Interests, and the assumption by NewCo of certain liabilities related thereto, in accordance with the Plan, including as set forth in Article IV.D.3(b) hereof, in exchange for the consideration provided to the Reorganized Debtors under the Plan, including as set forth in Article IV.D.3(a) hereof.

**129.** 130. "**License Modification Application**" has the meaning set forth in the Debtors' Disclosure Statement.

**130.** 131. "**LP Administrative Claim**" means any Administrative Claim asserted against an LP Debtor.

**131.** 132. "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

**132.** 133. "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

**133.** ~~134.~~ "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

**134.** ~~135.~~ "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

**135.** ~~136.~~ "**LP Plan Consideration**" means, as applicable, (a) (i) Cash from the New DIP Facility allocated and attributed to the LP Debtors, *plus* (ii) without duplication of clause (i), Cash from the Exit Facilities allocated and attributed to the LP Debtors, *plus* (iii) the LP Debtors' Cash on hand on the Effective Date, and *less* (iv) the LP Plan Consideration Carve-Out, (b) the New LightSquared Entities Shares, (c) loans under the Second Lien Exit Facility, (d) loans under the New DIP Facility, and (e) the SPSO Note.

**136.** ~~137.~~ "**LP Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund (a) the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve solely with respect to the LP Debtors and (b) together with the Inc. Plan Consideration Carve-Out, the New LightSquared Entities' operations and liquidity requirements after the Effective Date, as determined by the New LightSquared Entities.

**137.** ~~138.~~ "**LP Priority Tax Claim**" means any Priority Tax Claim asserted against an LP Debtor.

**138.** ~~139.~~ "**Management Incentive Plan**" means that certain post-Effective Date management equity incentive plan, which provides that, among other things, up to 10% of NewCo Common Interests, on a fully diluted basis, shall be reserved for issuance by the NewCo Board after the Effective Date in accordance with the management equity incentive plan and the Plan; provided, that the foregoing shall be implemented in the discretion of the NewCo Board, subject to the terms of the NewCo Corporate Governance Documents, and shall remain subject to the agreement of each Plan Support Party.

**139.** ~~140.~~ "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; (d) the pending application filed by OP LLC to renew its license for Call Sign WPYQ831; and (e) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

**140.** ~~141.~~ "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement or any successor agent appointed in accordance with the New DIP Credit Agreement.

**141.** ~~142.~~ "**New DIP Borrowers**" means LightSquared Inc., LightSquared LP, and One Dot Six Corp., as borrowers under the New DIP Credit Agreement.

**142.** ~~143.~~ "**New DIP Claim**" means a New DIP Tranche A Claim or a New DIP Tranche B Claim.

**143.** ~~144.~~ "**New DIP Closing Date**" means the date upon which (a) the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, (b) all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and (c) the incurrence of obligations pursuant to the New DIP Facility shall have occurred, which shall be no later than the fifteenth (15th) day after the Confirmation Date, and (d) all (i) DIP Inc. Claims, (ii) DIP LP Claims, (iii) Prepetition Inc. Facility Non-Subordinated Claims, ~~and~~ (iv) Non-Converted Prepetition LP Facility Non-SPSO Claims**, and (v) reasonable and documented fees and expenses** of the Inc./LP Lender Parties' legal and financial advisors incurred through and including **such date,** have been indefeasibly paid in full in Cash.

**144.** ~~145.~~ "**New DIP Commitment Letter**" means that certain commitment letter by and among the New DIP Commitment Parties, LightSquared Inc., LightSquared LP, and One Dot Six Corp., dated February 14, 2014.

**145.** ~~146.~~ "**New DIP Commitment Parties**" means J.P. Morgan Securities LLC, Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee), Melody Business Finance, LLC (together with any affiliate thereof as its designee), Centaurus Capital LP, Special Value Opportunities Fund, LLC, Tennenbaum Opportunities Partners V, LP, Tennenbaum Opportunities Fund VI, LLC, Tennenbaum Senior Loan SPV IV-A, LLC, Tennenbaum Senior Loan Fund IV-B, LP, LSQ Acquisition Co LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., as the commitment parties under the New DIP Commitment Letter.

**146.** ~~147.~~ "**New DIP Credit Agreement**" means that certain Debtor in Possession Credit Agreement, dated as of the New DIP Closing Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders, in form and substance satisfactory to each Plan Support Party.

**147.** ~~148.~~ "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the original aggregate principal amount of $1.65 billion.

**148.** ~~149.~~ "**New DIP Guarantors**" means each New DIP Borrower, as a guarantor to each other New DIP Borrower, and all other Debtors that are not New DIP Borrowers, as guarantors to the New DIP Borrowers, in each case, in accordance with the New DIP Credit Agreement.

**149.** ~~150.~~ "**New DIP Initial Lenders**" means, collectively, Chase Lincoln First Commercial Corporation or its designated affiliates, Melody Business Finance, LLC, Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P., Credit Distressed Blue Line Master Fund, Ltd., and LSQ Acquisition Co LLC.

**150.** ~~151.~~ "**New DIP Lenders**" means the New DIP Tranche A Lenders and the New DIP Tranche B Lenders.

**151.** ~~152.~~ "**New DIP Obligors**" means the New DIP Borrowers and the New DIP Guarantors.

**152.** ~~153.~~ "**New DIP Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

**153.** ~~154.~~ "**New DIP Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Debtors and each Plan Support Party, recognizing the entry of the New DIP Order.

**154.** ~~155.~~ "**New DIP Tranche A Accrued Interest**" means accrued interest, including interest paid in kind, on the New DIP Tranche A Facility as of the Effective Date.

**155.** ~~156.~~ "**New DIP Tranche A Claim**" means a Claim held by the New DIP Agent or New DIP Tranche A Lenders arising under, or related to, the New DIP Tranche A Facility.

**156.** ~~157.~~ "**New DIP Tranche A Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche A Lenders through the provision of new financing in accordance with the New DIP Credit Agreement and New DIP Order, in an original aggregate principal amount of $1.35 billion.

**157.** ~~158.~~ "**New DIP Tranche A Lenders**" means the Plan Support Parties and the other lenders under the New DIP Tranche A Facility, in each case, as lenders party to the New DIP Credit Agreement.

**158.** ~~159.~~ "**New DIP Tranche B Cap**" means $300 million.

**159.** ~~160.~~ "**New DIP Tranche B Claim**" means a Claim held by the New DIP Agent or New DIP Tranche B Lenders arising under, or related to, the New DIP Tranche B Facility.

**160.** ~~161.~~ "**New DIP Tranche B Facility**" means that portion of the New DIP Facility funded by the New DIP Tranche B Lenders in the original aggregate principal amount of $300 million through either (a) the conversion of Converted Prepetition LP Facility Non-SPSO Claims into Claims under the New DIP Facility (as set forth in Article IV.D hereof) and/or (b) new financing provided by the Plan Support Parties or other lenders, in each case, in accordance with the Plan, New DIP Credit Agreement, and New DIP Order.

**161.** ~~162.~~ "**New DIP Tranche B Lenders**" means (a) certain Holders of Converted Prepetition LP Facility Non-SPSO Claims that elect to convert such Claims into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof) up to the New DIP Tranche B Cap and/or (b) the Plan Support Parties or other lenders to the extent that they provide new financing under the New DIP Tranche B Facility, in each case, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

**162.** 163. "**New LightSquared Entities**" means, collectively, NewCo, Reorganized LightSquared Inc., and the Reorganized Subsidiaries.

**163.** 164. "**New LightSquared Entities Boards**" means, collectively, the NewCo Board, the Reorganized LightSquared Inc. Board, and each Reorganized Subsidiaries Board.

**164.** 165. "**New LightSquared Entities Bylaws**" means, collectively, the NewCo Bylaws, the Reorganized LightSquared Inc. Bylaws, and the Reorganized Subsidiaries Bylaws.

**165.** 166. "**New LightSquared Entities Charters**" means, collectively, the NewCo Charter, the Reorganized LightSquared Inc. Charter, and the Reorganized Subsidiaries Charters.

**166.** 167. "**New LightSquared Entities Corporate Governance Documents**" means, collectively, the NewCo Corporate Governance Documents, the Reorganized LightSquared Inc. Corporate Governance Documents, and the Reorganized Subsidiaries Corporate Governance Documents.

**167.** 168. "**New LightSquared Entities Shares**" means, collectively, the NewCo Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

**168.** 169. "**NewCo**" means a newly formed limited liability company in connection with the Plan Transactions contemplated by Article IV.D hereof.

**169.** 170. "**NewCo Board**" means the board of directors, board of managers, or equivalent governing body of NewCo, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable NewCo Corporate Governance Documents.

**170.** 171. "**NewCo Bylaws**" means the bylaws, partnership agreement, limited liability company membership agreement, or functionally equivalent document, as applicable, of NewCo.

**171.** 172. "**NewCo Charter**" means the charter, certificate of formation, certificate of partnership, or functionally equivalent document, as applicable, of NewCo.

**172.** 173. "**NewCo Class A Common Interests**" means those certain limited liability company class A common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**173.** 174. "**NewCo Class B Common Interests**" means those certain limited liability company class B common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**174.** ~~175.~~ "**NewCo Class C Common Interests**" means those certain limited liability company class C common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**175.** ~~176.~~ "**NewCo Class D Common Interests**" means those certain limited liability company class D common interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**176.** ~~177.~~ "**NewCo Common Interests**" means the NewCo Class A Common Interests, the NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests.

**177.** ~~178.~~ "**NewCo Corporate Governance Documents**" means, as applicable, (a) the NewCo Charter, (b) the NewCo Bylaws, (c) the NewCo Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to NewCo.

**178.** ~~179.~~ "**NewCo Interest Holders Agreement**" means that certain limited liability company operating agreement of NewCo with respect to the NewCo Interests, to be effective on the Effective Date and binding on all holders of the NewCo Interests.

**179.** ~~180.~~ "**NewCo Interests**" means, collectively, the NewCo Common Interests and the NewCo Preferred Interests.

**180.** ~~181.~~ "**NewCo Series A Preferred PIK Interests**" means the NewCo Series A-1 Preferred PIK Interests and the NewCo Series A-2 Preferred PIK Interests.

**181.** ~~182.~~ "**NewCo Series A-1 Preferred PIK Interests**" means those certain limited liability company series A-1 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**182.** ~~183.~~ "**NewCo Series A-2 Preferred PIK Interests**" means those certain limited liability company series A-2 preferred payable-in-kind interests issued by NewCo in connection with, and subject to, the Plan, the Confirmation Order, and the NewCo Interest Holders Agreement.

**183.** ~~184.~~ "**Non-Converted Prepetition LP Facility Non-SPSO Claims**" means that portion of the Allowed Prepetition LP Facility Non-SPSO Claims that Holders thereof do not elect to convert into New DIP Tranche B Claims (in accordance with the conversion election contemplated by Article IV.D hereof).

**184.** ~~185.~~ "**Other Existing Inc. Series B Preferred Stock Holders**" means the Holders of the Existing Inc. Series B Preferred Stock Equity Interests other than SIG Holdings, Inc.

**185.** ~~186.~~ "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

**186.** ~~187.~~ "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

**187.** ~~188.~~ "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

**188.** ~~189.~~ "**Petition Date**" means May 14, 2012.

**189.** ~~190.~~ "**Plan**" means this *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of each Plan Support Party and in accordance with the terms hereof), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

**190.** ~~191.~~ "**Plan Consideration**" means, collectively, the Inc. Plan Consideration and the LP Plan Consideration.

**191.** ~~192.~~ "**Plan Consideration Carve-Out**" means, collectively, the Inc. Plan Consideration Carve-Out and the LP Plan Consideration Carve-Out.

**192.** ~~193.~~ "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

**193.** ~~194.~~ "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to each Plan Support Party.

**194.** ~~195.~~ "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to each Plan Support Party) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including:  (a) executed commitment letters, form and/or definitive agreements, and related documents with respect to (i) the Exit Credit Agreements, (ii) the Reorganized LightSquared Inc. Loan Agreement, (iii) the SPSO Note Documents, and (iv) the Exit Intercreditor Agreement; (b) the New LightSquared Entities Corporate Governance Documents; (c) the Schedule of Assumed Agreements; and (d) the Schedule of Retained Causes of Action.

**195.** ~~196.~~ "**Plan Supplement Date**" means February 14, 2014 or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Debtors reserve the right to File amended Plan Documents at any time prior to the Confirmation Hearing Date.

**196.** ~~197.~~ "**Plan Support Parties**" means Plan Support Party A, Plan Support Party B, Plan Support Party C, and Plan Support Party D.

**197.** ~~198.~~ "**Plan Support Party A**" means Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts.

**198.** ~~199.~~ "**Plan Support Party ABC**" means Plan Support Party A, Plan Support Party B, and Plan Support Party C.

**199.** ~~200.~~ "**Plan Support Party ABC Debt-Converted New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *less* (a) the Plan Support Party ABC Equity-Converted New DIP Claims and (b) Plan Support Party ABC's ratable share of the First Lien Exit Excess Amount.

**200.** ~~201.~~ "**Plan Support Party ABC Equity-Converted New DIP Claims**" means $115 million of the Allowed New DIP Tranche A Claims held by Plan Support Party ABC *plus* 11% of any New DIP Tranche A Accrued Interest attributed to Plan Support Party ABC's New DIP Tranche A Claims.

**201.** ~~202.~~ "**Plan Support Party B**" means Melody Business Finance, LLC and/or Melody NewCo, LLC, each on behalf of itself and its funds.

**202.** ~~203.~~ "**Plan Support Party Break-Up Fee**" means a break-up fee of $100 million for the ratable benefit of the New DIP Commitment Parties, irrevocably earned upon the New DIP Closing Date and payable in Cash on the earlier of the date (a) the Debtors propose or support any chapter 11 plan other than this Plan, (b) the Debtors withdraw this Plan or propose any modifications hereto pursuant to section 1127(b) of the Bankruptcy Code, in each case, without the prior written consent of each New DIP Initial Lender, or (c) the confirmation of any chapter 11 plan other than this Plan; provided, that the conditions to the effectiveness of the Plan set forth in Article IX.B hereof shall have been capable of being satisfied at the time of either clauses (a), (b), or (c) above, or such conditions shall have been capable of being satisfied but for the passage of time.

**203.** ~~204.~~ "**Plan Support Party C**" means Harbinger Capital Partners, LLC or its designated affiliates.

**204.** ~~205.~~ "**Plan Support Party C Call Option**" means a call option, exercisable by Plan Support Party C in its sole discretion, to purchase all (but not less than all) of the NewCo Class C Common Interests and NewCo Class D Common Interests in accordance with the NewCo Corporate Governance Documents.

**205.** 206. "**Plan Support Party Cashed-Out New DIP Claims**" means the Allowed New DIP Tranche A Claims held by Plan Support Parties that are not (a) Plan Support Party ABC Debt-Converted New DIP Claims, (b) Plan Support Party ABC Equity-Converted New DIP Claims, or (c) Plan Support Party D Debt-Converted New DIP Claims.

**206.** 207. "**Plan Support Party D**" means JPMorgan Chase & Co. or its designated affiliates.

**207.** 208. "**Plan Support Party D Debt-Converted New DIP Claims**" means $300 million of the Allowed New DIP Tranche A Claims held by Plan Support Party D, *plus* all New DIP Tranche A Accrued Interest thereon, *less* an amount equal to 22.22% of the First Lien Exit Excess Amount, which Claims shall be converted into loans under the Reorganized LightSquared Inc. Loan.

**208.** 209. "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the New LightSquared Entities determine are necessary or appropriate.

**209.** 210. "**Prepetition Agents**" means the Prepetition Inc. Agent and the Prepetition LP Agent.

**210.** 211. "**Prepetition Facilities**" means the Prepetition Inc. Facility and the Prepetition LP Facility.

**211.** 212. "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

**212.** 213. "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

**213.** 214. "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

**214.** 215. "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

**215.** ~~216.~~ "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

**216.** ~~217.~~ "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

**217.** ~~218.~~ "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

**218.** ~~219.~~ "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

**219.** ~~220.~~ "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

**220.** ~~221.~~ "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

**221.** ~~222.~~ "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

**222.** ~~223.~~ "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

**223.** ~~224.~~ "**Prepetition Inc. Non-Subordinated Parties**" means the Prepetition Inc. Agent and the Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims.

**224.** ~~225.~~ "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

**225.** ~~226.~~ "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

**226.** ~~227.~~ "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

**227.** ~~228.~~ "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

**228.** ~~229.~~ "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

**229.** ~~230.~~ "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

**230.** ~~231.~~ "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

**231.** ~~232.~~ "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

**232.** ~~233.~~ "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO, its affiliates, or each of their successors or assigns.

**233.** ~~234.~~ "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

**234.** ~~235.~~ "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

**235.** ~~236.~~ "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

**236.** ~~237.~~ "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

**237.** ~~238.~~ "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

238. 239. "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

239. 240. "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

240. 241. "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the New LightSquared Entities on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

241. 242. "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the New LightSquared Entities in the Professional Fee Escrow Account.

242. 243. "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

243. 244. "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

244. 245. "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for

any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

**245.** 246. "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

**246.** 247. "**Released Party**" means each of the following:  (a) the Debtors; (b) the New LightSquared Entities; (c) each Plan Support Party; (d) each DIP Agent,  each DIP Lender (other than any SPSO Party, subject to the proviso below), and each arranger and book runner of the DIP Facilities; (e) each Exit Agent, each Exit Lender, and each arranger and book runner of the Exit Facilities; (f) the Reorganized LightSquared Inc. Loan Holder and each agent, arranger, and book runner of the Reorganized LightSquared Inc. Loan; (g) each Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party, subject to the proviso below); ~~and~~ (h**) the Prepetition LP Agent; and (i**)each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such); <u>provided</u>, that each SPSO Party shall be deemed a Released Party if Class 7B votes to accept the Plan and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility.

**247.** 248. "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

**248.** 249. "**Reorganized Debtors**" means, collectively, the Reorganized Inc. Debtors and the Reorganized LP Debtors.

**249.** 250. "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**250.** 251. "**Reorganized LightSquared GP LLC**" means LightSquared GP Inc., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**251.** 252. "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger,

consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

252. 253. "**Reorganized LightSquared Inc. Board**" means the board of directors, board of managers, or equivalent governing body of Reorganized LightSquared Inc., as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized LightSquared Inc. Corporate Governance Documents.

253. 254. "**Reorganized LightSquared Inc. Bylaws**" means the bylaws or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

254. 255. "**Reorganized LightSquared Inc. Call Option**" means a call option, exercisable by Reorganized LightSquared Inc. in its sole discretion, to purchase (a) $17.54 million of NewCo Series A-2 Preferred PIK Interests from the Holders of Existing Inc. Series A Preferred Stock Equity Interests (or their successor and assigns) and (b) $1.76 million of NewCo Series A-2 Preferred PIK Interests from the Other Existing Inc. Series B Preferred Stock Holders (or their successors and assigns), in each case in accordance with the NewCo Corporate Governance Documents.

255. 256. "**Reorganized LightSquared Inc. Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of Reorganized LightSquared Inc.

256. 257. "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

257. 258. "**Reorganized LightSquared Inc. Corporate Governance Documents**" means (a) the Reorganized LightSquared Inc. Charter, (b) the Reorganized LightSquared Inc. Bylaws, and (c) any other applicable organizational or operational documents with respect to Reorganized LightSquared Inc.

258. 259. "**Reorganized LightSquared Inc. Loan**" means that certain secured credit facility in the original aggregate principal amount of $300 million provided in connection with the Reorganized LightSquared Inc. Loan Agreement, subject to adjustment in accordance with the Reorganized LightSquared Inc. Loan Adjustment.

259. 260. "**Reorganized LightSquared Inc. Loan Adjustment**" means the amount, if any, the original aggregate principal amount of the Reorganized LightSquared Inc. Loan shall be (a) increased by the aggregate amount of New DIP Tranche A Accrued Interest attributed to Plan Support Party D's New DIP Tranche A Claims, and/or (b) decreased by an amount equal to the product of (i) the First Lien Exit Excess Amount and (ii) 22.22%, in each case, on a dollar-for-dollar basis.

260. 261. "**Reorganized LightSquared Inc. Loan Agreement**" means that certain agreement entered into between the Reorganized LightSquared Inc. Loan Holder and

Reorganized LightSquared Inc. documenting, among other things, the terms of the Reorganized LightSquared Inc. Loan and the obligations with respect thereto.

**261.** 262. "**Reorganized LightSquared Inc. Loan Holder**" means Plan Support Party D.

**262.** 263. "**Reorganized LightSquared Investors Holdings Inc.**" means LightSquared Investors Holdings Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**263.** 264. "**Reorganized LightSquared LP**" means Reorganized LightSquared LP, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**264.** 265. "**Reorganized LP Debtors**" means the LP Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**265.** 266. "**Reorganized One Dot Four Corp.**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**266.** 267. "**Reorganized One Dot Six LLC**" means One Dot Six Corp., as reconstituted and reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**267.** 268. "**Reorganized SkyTerra Investors LLC**" means SkyTerra Investors LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**268.** 269. "**Reorganized SkyTerra Rollup LLC**" means SkyTerra Rollup LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**269.** 270. "**Reorganized SkyTerra Rollup Sub LLC**" means SkyTerra Rollup Sub LLC, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**270.** ~~271.~~ "**Reorganized Subsidiaries**" means, collectively, the Reorganized Debtors, other than Reorganized LightSquared Inc.

**271.** ~~272.~~ "**Reorganized Subsidiaries Board**" means the board of directors, board of managers, or equivalent governing body of each of the Reorganized Subsidiaries, as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Subsidiaries Corporate Governance Documents.

**272.** ~~273.~~ "**Reorganized Subsidiaries Bylaws**" means the bylaws or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

**273.** ~~274.~~ "**Reorganized Subsidiaries Charter**" means the charter, certificate of incorporation, certificate of formation, or functionally equivalent document, as applicable, of each of the Reorganized Subsidiaries.

**274.** ~~275.~~ "**Reorganized Subsidiaries Corporate Governance Documents**" means (a) the Reorganized Subsidiaries Charter, (b) the Reorganized Subsidiaries Bylaws, (c) the Reorganized Subsidiaries Shareholders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Subsidiaries.

**275.** ~~276.~~ "**Reorganized Subsidiaries Shareholders Agreement**" means that certain shareholders agreement or functionally equivalent document, as applicable, of the Reorganized Subsidiaries, to be effective on the Effective Date.

**276.** ~~277.~~ "**Reorganized TMI Communications Delaware, Limited Partnership**" means Reorganized TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

**277.** ~~278.~~ "**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

**278.** ~~279.~~ "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

**279.** ~~280.~~ "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

**280.** ~~281.~~ "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

**281.** ~~282.~~ "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the

Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Support Party).

**282.** 283. "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

**283.** 284. "**Second Amended Plan**" has the meaning set forth in the Introduction hereof.

**284.** 285. "**Second Lien Exit Adjustment**" means (a) an increase to the original aggregate principal amount of the Second Lien Exit Facility equal to the product of (i) the aggregate amount of any New DIP Tranche A Accrued Interest and (ii) 89%, and/or (b) a decrease to the original aggregate principal amount of the Second Lien Exit Facility equal to the First Lien Exit Excess Amount, in each case, on a dollar-for-dollar basis.

**285.** 286. "**Second Lien Exit Agent**" means the arranger and administrative agent under the Second Lien Exit Credit Agreement or any successor agent appointed in accordance with the Second Lien Exit Credit Agreement.

**286.** 287. "**Second Lien Exit Borrower**" means NewCo, as borrower under the Second Lien Exit Credit Agreement.

**287.** 288. "**Second Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Second Lien Exit Obligors, the Second Lien Exit Agent, and the Second Lien Exit Lenders.

**288.** 289. "**Second Lien Exit Facility**" means that certain second lien credit facility in the original aggregate principal amount of $1.20 billion provided in connection with the Second Lien Exit Credit Agreement, subject to adjustment in accordance with the Second Lien Exit Adjustment.

**289.** 290. "**Second Lien Exit Guarantors**" means the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), as guarantors under the Second Lien Exit Credit Agreement.

**290.** 291. "**Second Lien Exit Lenders**" means the lenders party to the Second Lien Exit Credit Agreement from time to time.

**291.** 292. "**Second Lien Exit Obligors**" means the Second Lien Exit Borrower and the Second Lien Exit Guarantors.

**292.** 293. "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable

pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

**293.** ~~294.~~ "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

**294.** ~~295.~~ "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

**295.** ~~296.~~ "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

**296.** ~~297.~~ "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof)~~ and~~**,** the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof)**, and any other relevant Prepetition Loan Documents**.

**297.** ~~298.~~ "**Special Committee**" has the meaning set forth in the Introduction hereof.

**298.** ~~299.~~ "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Debtors' Disclosure Statement.

**299.** ~~300.~~ "**SPSO**" means SP Special Opportunities, LLC.

**300.** ~~301.~~ "**SPSO Note**" means a note issued by Reorganized LightSquared LP to the Holders of Allowed Prepetition LP Facility SPSO Claims, which note shall (a) have a seven (7)-year bullet maturity, (b) be pre-payable at any time without penalty or premium, (c) bear interest at the London Interbank Offered Rate + 12.00% (with a London Interbank Offered Rate floor of 1.00%), which interest shall be payable in kind, and (d) be secured or unsecured on the terms and conditions of, and subject to, the SPSO Option A Treatment or SPSO Option B Treatment, as applicable.

**301.** ~~302.~~ "**SPSO Note Documents**" means the SPSO Note and any related indenture, agreements, or other documents, if any.

**302.** ~~303.~~ "**SPSO Option A Treatment**" means the following treatment: (a) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $~~1.1055~~**1.1069** billion; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c)(i) the SPSO Note shall be secured and (ii) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (d) each SPSO Party shall be deemed a Released Party; provided, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy

Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 hereof.

**303.** 304. "**SPSO Option B Treatment**" means the following treatment:  (a) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (b) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (c) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; provided, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (i) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (ii) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (d) no SPSO Party shall be deemed a Released Party.

**304.** 305. "**SPSO Parties**" means SPSO, L-Band Acquisition, LLC, Charles W. Ergen, DISH Network Corporation, and EchoStar Corporation.

**305.** 306. "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

**306.** 307. "**Stalking Horse Bidder**" has the meaning set forth in the Bid Procedures Order.

**307.** 308. "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

**308.** "**Successor Cases**" has the meaning set forth in the New DIP Order.

**309.** "**Surviving DIP Inc. Indemnity**" has the meaning set forth in Article II.C hereof.

**310.** "**Surviving Inc. Indemnity**" has the meaning set forth in Article III.B.5(b) hereof.

**311.** "**Surviving Indemnities**" means the Surviving DIP Inc. Indemnity, the Surviving Inc. Indemnity, and the Surviving LP Indemnity.

**312.** "**Surviving LP Indemnity**" has the meaning set forth in Article III.B.7(b) hereof.

**313.** ~~309.~~ "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

**314.** ~~310.~~ "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**315.** ~~311.~~ "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

**316.** ~~312.~~ "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**317.** ~~313.~~ "**Voting Deadline**" means March [3], 2014 at 4:00 p.m. (prevailing Pacific time), or such other date agreed to by the Debtors and each Plan Support Party or established by the Bankruptcy Court, which is the date by which all completed Ballots must be received by the Claims and Solicitation Agent.

**318.** ~~314.~~ "**Voting Record Date**" means October 9, 2013.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the New LightSquared Entities, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or New LightSquared Entity, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

# ARTICLE II.
# ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.   In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.   A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:   (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon

thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors or the New LightSquared Entities and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court.  For the avoidance of doubt, LP Allowed Administrative Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Allowed Administrative Claims shall be paid solely from Inc. Plan Consideration in the form of Cash.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the New LightSquared Entities no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.  Objections to such requests must be Filed and served on the New LightSquared Entities and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the New LightSquared Entities or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein (1) any claim by a New DIP Commitment Party for any Plan Support Party Break-Up Fee shall (a) be deemed an Allowed Administrative Claim, (b) be irrevocably earned by the New DIP Commitment Parties upon the New DIP Closing Date, (c) constitute an allowed super-priority administrative expense claim under sections 503(b) and 507(a)(1) of the Bankruptcy Code against the Debtors and their estates under the Plan, and (d) be payable in accordance with the terms of the New DIP Commitment Letter, (2) a Plan Support Party shall not be required to File any request for payment of such Administrative Claim, (3) any Plan Support Party Break-Up Fee shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (4) no SPSO Party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

In accordance with Article II.B.3 hereof, on the Effective Date, the New LightSquared Entities shall establish and fund the Professional Fee Escrow Account from the Plan Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors or New LightSquared Entities.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the New LightSquared Entities.  For the avoidance of doubt, the Inc. Debtors shall fund 15% of the Professional Fee Escrow Account from the Inc. Plan Consideration Carve-Out and the LP Debtors shall fund 85% of the Professional Fee Escrow Account from the LP Plan Consideration Carve-Out.

3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors and the Plan Support Parties no later than five (5) days prior to the anticipated Confirmation Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated and agreed to by the Debtors and the Plan Support Parties as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

4.    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or New LightSquared Entities, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or New LightSquared Entities, as applicable, on or after the Confirmation Date.  Upon the Confirmation Date, any

37

requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or New LightSquared Entities, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

C.    *DIP Inc. Claims*

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $~~72,366,120.36~~73,813,442.71 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, ~~all~~**any amounts payable in accordance with Section 10.03 of the DIP Inc. Credit Agreement (the "Surviving DIP Inc. Indemnity"); provided, that (1) with respect to professional fees and expenses, the Surviving DIP Inc. Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of ~~the~~ **one United States and one Canadian law firm to represent the collective interests** of the Prepetition Inc. Agent**, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims,** DIP Inc. Agent~~,~~ and **DIP Inc. Lenders, (2) the Surviving DIP Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (3) the Surviving DIP Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of** the DIP Inc. Agent~~'s legal and financial advisors~~ **or any DIP Inc. Lender** incurred ~~from the date after the New DIP Closing Date through and including~~**for any period from and after** the Effective Date ~~payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap~~. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims**, except for the continuation of such Liens until the Effective Date to secure the Surviving DIP Inc. Indemnity, which Liens shall be junior only to the Liens securing the New DIP Facility**), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

D.    *DIP LP Claims*

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date

occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

E.     *New DIP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Claim agrees to a less favorable or other treatment, the Holders of New DIP Claims shall receive the following, as applicable:

1.     Each Holder of a Plan Support Party ABC Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Second Lien Exit Facility in an amount equal to such Plan Support Party ABC Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

2.     Each Holder of a Plan Support Party ABC Equity-Converted New DIP Claim shall receive Plan Consideration in the form of its Pro Rata share of (a) 77.78% of the NewCo Series A-1 Preferred PIK Interests and (b) 77.78% of the NewCo Class A Common Interests;

3.     Each Holder of a Plan Support Party D Debt-Converted New DIP Claim shall receive Plan Consideration in the form of loans under the Reorganized LightSquared Inc. Loan in an amount equal to such Plan Support Party D Debt-Converted New DIP Claim (on a dollar-for-dollar basis);

4.     Each Holder of a Plan Support Party Cashed-Out New DIP Claim shall receive Plan Consideration in the form of Cash from the First Lien Exit Excess Amount in an amount equal to such Plan Support Party Cashed-Out New DIP Claim; and

5.     Each Holder of a New DIP Tranche B Facility Claim shall receive Plan Consideration in the form of Cash in an amount equal to such New DIP Tranche B Facility Claim.

F.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective

Date or as soon thereafter as reasonably practicable: (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the New LightSquared Entities; or (3) at the option of the New LightSquared Entities, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the New LightSquared Entities and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. For the avoidance of doubt, LP Priority Tax Claims shall be paid solely from LP Plan Consideration in the form of Cash and Inc. Priority Tax Claims shall be paid solely from Inc. Plan Consideration in the form of Cash in accordance with this paragraph.

G.    *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the New LightSquared Entities shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the New LightSquared Entities shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.  Class 1 – Inc. Other Priority Claims

    (a)  *Classification*:  Class 1 consists of all Inc. Other Priority Claims.

    (b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

    (c)  *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.  Class 2 – LP Other Priority Claims

    (a)  *Classification*:  Class 2 consists of all LP Other Priority Claims.

    (b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

    (c)  *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.  Class 3 – Inc. Other Secured Claims

    (a)  *Classification*:  Class 3 consists of all Inc. Other Secured Claims.

    (b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive

one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:   (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)   *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.   <u>Class 4 – LP Other Secured Claims</u>

(a)   *Classification*:  Class 4 consists of all LP Other Secured Claims.

(b)   *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)   *Voting*:  Class 4 is Unimpaired by the Plan.  Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.   <u>Class 5 - Prepetition Inc. Facility Non-Subordinated Claims</u>

(a)   *Classification*:   Class 5 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)   *Allowance*:  Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (i) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (ii) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (iii) ~~notwithstanding anything contained herein, in~~**any amounts payable in accordance with Section 10.03 of** the Prepetition Inc. Credit Agreement~~, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all~~ **(the "Surviving Inc. Indemnity"); provided, that (A) with respect to professional fees and expenses, the Surviving Inc. Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of **one United States and one Canadian law firm to represent the collective interests of** the Prepetition Inc. **Agent, Holders of Allowed** Prepetition Inc. Facility Non-Subordinated ~~Parties~~**Claims, DIP Inc. Agent,** and **DIP Inc. Lenders; provided, that** the Prepetition Inc. ~~Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the~~**Agent, Holders of Allowed** Prepetition Inc. **Facility** Non-Subordinated ~~Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.~~**Claims, DIP Inc. Agent, and DIP Inc. Lenders shall use the same United States and Canadian counsel, (B) the Surviving Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (C) the Surviving Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition Inc. Agent or any Prepetition Inc. Lender incurred for any period from and after the Effective Date.**

(c) *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the New DIP Closing Date, (i) the legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, the Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim, shall receive Inc. Plan Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class 5 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors.

(d) *Voting:*  Class 5 is Unimpaired by the Plan.  Each Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

6. Class 6 - Prepetition Inc. Facility Subordinated Claims

(a) *Classification*:    Class 6 consists of all Prepetition Inc. Facility Subordinated Claims.

(b) *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.

      (c)     *Voting:*  Class 6 is Impaired by the Plan.  Each Holder of a Class 6 Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.    <u>Class 7A - Prepetition LP Facility Non-SPSO Claims</u>

      (a)     *Classification*:   Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)     *Allowance*:  Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in ~~the aggregate amount of (i) $1.0883~~ **an amount equal to (i) all unpaid principal and accrued prepetition and postpetition interest at the contract rate (including, without limitation, default rate interest) held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents through and including** the New DIP Closing Date**, which amount is estimated to be $1.0903** billion **in the aggregate**, calculated ~~as follows~~**based on the following assumptions**:  (A) the face amount of debt **held by Prepetition LP Lenders (other than SPSO)** under the Prepetition LP Loan Documents ~~held by SPSO~~ is $~~844.3~~**830.6** million; (B) adequate protection payments totaling $~~95.7~~**104.6** million have been made to the Prepetition LP Lenders between the Petition Date and ~~December 31, 2013~~**February 2014 (net of professional fees)**; (C) an estimated $~~16.0~~**2.4** million of adequate protection payments ~~during January, February, and~~**will have been made to the Prepetition LP Lenders in** March 2014 **(net of professional fees)**; and (D) the ~~payment of the claims~~**Prepetition LP Facility Non-SPSO Claims will be paid** on March 31, 2014; ~~provided~~, that the ~~aggregate Allowed~~**estimated** amount **of unpaid principal and interest** shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis**, and otherwise adjusted to reflect any changes to the foregoing assumptions**; ~~provided~~, ~~further~~, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any ~~prepayment~~**repayment** premiums on such converted principal amount through and including the Confirmation Date, *plus* (ii) all reasonable and documented fees and expenses of the **Prepetition LP Agent and the** Ad Hoc Secured Group and ~~its~~**each of their** legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (iii) ~~notwithstanding anything contained herein, in~~**any amounts payable in accordance with Section 10.03 of** the Prepetition LP Credit Agreement~~, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all~~ **solely to the Prepetition LP Agent and Holders of Allowed Prepetition LP Facility Non-SPSO Claims (the "Surviving LP Indemnity"); provided, that (A) with respect to professional fees and expenses, the Surviving LP Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of ~~the Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the New DIP Closing Date through and including~~**one United States and one Canadian law firm for each of the Prepetition LP Agent and the Holders of Allowed Prepetition LP Facility Non-**

**SPSO Claims (until** the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap.**), (B) the Surviving LP Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (C) the Surviving LP Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition LP Agent or any Prepetition LP Lender incurred for any period from and after the Effective Date.**

(c)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, (i) the **respective** legal and financial advisors for **each of** the Ad Hoc Secured Group **and the Prepetition LP Agent** shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) hereof) and (ii) except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment:

(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim, shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or

(ii)    each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.

For the avoidance of doubt, the treatment provided to Class 7A herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors.

(d)    *Voting*:  Class 7A is Impaired by the Plan.  Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.    Class 7B - Prepetition LP Facility SPSO Claims

(a)    *Classification*:   Class 7B consists of all Prepetition LP Facility SPSO Claims.

(b)    *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)    in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or

(ii)    in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.

For the avoidance of doubt, the treatment provided to Class 7B herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors.

(c)    *Voting*:  Class 7B is Impaired by the Plan.  Each Holder of a Class 7B Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court and treated in accordance with Article III.D.4 hereof.

9.     <u>Class 8 – Inc. General Unsecured Claims</u>

    (a)     *Classification*:  Class 8 consists of all Inc. General Unsecured Claims.

    (b)     *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim.

    (c)     *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.     <u>Class 9 – LP General Unsecured Claims</u>

    (a)     *Classification*:  Class 9 consists of all LP General Unsecured Claims.

    (b)     *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

    (c)     *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Class 9 LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.     <u>Class 10 – Existing LP Preferred Units Equity Interests</u>

    (a)     *Classification*:   Class 10 consists of all Existing LP Preferred Units Equity Interests.

    (b)     *Treatment*:   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan Consideration in the form of its Pro

Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests.

(c)    *Voting*:  Class 10 is Impaired by the Plan.  Each Holder of a Class 10 Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.    Class 11A – Existing Inc. Series A Preferred Stock Equity Interests

(a)    *Classification*:    Class 11A consists of all Existing Inc. Series A Preferred Stock Equity Interests.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series A Preferred Stock Equity Interest agrees to any other treatment, each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests.

(c)    *Voting*:    Class 11A is Impaired by the Plan.   Each Holder of a Class 11A Existing Inc. Series A Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.    Class 11B – Existing Inc. Series B Preferred Stock Equity Interests

(a)    *Classification*:  Class 11B consists of all Existing Inc. Series B Preferred Stock Equity Interests.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series B Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Series B Preferred Stock Equity Interest agrees to any other treatment (including as described in the immediately following proviso), each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

50

(c) *Voting*:  Class 11B is Impaired by the Plan.  Each Holder of a Class 11B Existing Inc. Series B Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.   Class 12 – Existing Inc. Common Stock Equity Interests

(a) *Classification*:  Class 12 consists of all Existing Inc. Common Stock Equity Interests.

(b) *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests.

(c) *Voting*:  Class 12 is Impaired by the Plan.  Each Holder of a Class 12 Existing Inc. Common Stock Equity Interests as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.   Class 13 – Intercompany Claims

(a) *Classification*:  Class 13 consists of all Intercompany Claims.

(b) *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Claim agrees to any other treatment, each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc.  After the Effective Date, the New LightSquared Entities, in their sole discretion, shall have the right to resolve or compromise Allowed Intercompany Claims without further notice to or action, order, or approval of the Bankruptcy Court.

(c) *Voting*:  Class 13 is Unimpaired by the Plan.  Each Holder of a Class 13 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 13 Intercompany Claim is entitled to vote to accept or reject the Plan.

51

16.    Class 14 – Intercompany Interests

(a)    *Classification*:  Class 14 consists of all Intercompany Interests.

(b)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Intercompany Interest agrees to any other treatment, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

(c)    *Voting*:  Class 14 is Unimpaired by the Plan.  Each Holder of a Class 14 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 14 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.    *Acceptance or Rejection of Plan*

1.    Voting Classes Under Plan

Under the Plan, Classes 6, 7A, 7B, 8, 9, 10, 11A, 11B, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; provided, however, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Debtors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 13, and 14 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.    Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.    Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Debtors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Debtors shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code.  The Debtors reserve the right, with the consent of each Plan Support Party, to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary; provided, that the consent of ~~an (1)~~ **(1)** the Holders of ~~an (1)~~ Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) **the Holders of** Allowed DIP Inc. Claim, or (3) **the Holders of the majority in amount of** Allowed Prepetition LP Facility Non-SPSO Claim **that are members of the Ad Hoc Secured Group** shall be required ~~with respect to any amendment or modification to~~ **before the Debtors alter, amend, modify, or otherwise affect any Plan terms (through** the Plan ~~that affects~~**, the Confirmation Order, or otherwise) concerning** the (a) treatment and repayment of such Holders' Allowed Claims ~~or~~**,** (b) timing of such repayment**, (c) consideration, releases, indemnifications, and other rights provided to such Holders, (d) Surviving Indemnities, or (e) reimbursement of the professional fees and expenses** ~~of the Inc./LP Lender~~ **Parties** (in each case, solely to the extent such Holders **(i)** vote to accept the Plan **or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the**

**Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan**).

G.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.     *Overview of Plan*

The Plan contemplates, among other things, (1) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (2) first lien exit financing, including a facility of not less than $1 billion, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (6) the preservation of the Debtors' litigation claims.

B.     *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On and after the Confirmation Date or the Effective Date, as applicable,  the Debtors or the New LightSquared Entities, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:   (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Debtors or the New LightSquared Entities, as applicable, determine are necessary or appropriate.

C.     *Sources of Consideration for Plan Distributions*

All consideration necessary for the Debtors, the New LightSquared Entities, or the Disbursing Agent, as applicable, to make Plan Distributions shall be obtained from the Plan Consideration and the Plan Consideration Carve-Out.  After the satisfaction of all Allowed

Claims and Allowed Equity Interests in accordance with the Plan, all remaining proceeds from the Exit Facilities shall be placed in a working capital reserve of NewCo.

D.      *Certain Pre-Confirmation Date, Confirmation Date, and Effective Date Plan Transactions*

   1.   <u>Pre-Confirmation Date Plan Elections</u>.  Certain Plan Transactions require elections by certain Holders of Claims on their respective Ballots prior to the Confirmation Date, including the following:

      (a)   Each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall be entitled to elect on its respective Ballot to convert on the New DIP Closing Date any portion of its Allowed Prepetition LP Facility Non-SPSO Claim into a New DIP Tranche B Claim in full satisfaction of such Converted Prepetition LP Facility Non-SPSO Claim as set forth in Article III.B.7(c)(ii) hereof; <u>provided</u>, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims:  (i) exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) hereof) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims; or (ii) is less than the New DIP Tranche B Cap, the Plan Support Parties shall provide new financing as part of the New DIP Tranche B Facility in an amount equal to the difference between the New DIP Tranche B Cap and the Converted Prepetition LP Facility Non-SPSO Claims.

   2.   <u>Confirmation Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

      (a)   The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, the New DIP Lenders shall fund the New DIP Facility through the (i) conversion of Allowed Prepetition LP Facility Non-SPSO Claims into New DIP Tranche B Claims and/or (ii) provision of new financing by the Plan Support Parties as part of the New DIP Tranche A Facility and New DIP Tranche B Facility, as applicable, in each case, in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, and New DIP Order.

      (b)   The Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims.

      (c)    The Debtors, or a nominee thereof, shall have established NewCo.

3.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

    (a)    NewCo

        (i) The Debtors, or a nominee thereof, shall have established NewCo.

        (i)    (ii) NewCo, the other First Lien Exit Obligors, and the other relevant Entities shall enter into the First Lien Exit Credit Agreement.  The First Lien Exit Lenders shall fund the First Lien Exit Facility through the provision of new financing, in accordance with the Plan, Confirmation Order, and First Lien Exit Credit Agreement.  The proceeds of the First Lien Exit Facility shall be used to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repaying the New DIP Tranche B Facility, and provide post-Effective Date working capital.  The proceeds of First Lien Exit Excess Amount shall be used to repay a portion of the New DIP Tranche A Facility.

        (ii)    (iii) NewCo, the other Second Lien Exit Obligors, and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement.  The Second Lien Exit Facility shall be funded through the (A) conversion of Plan Support Party ABC Debt-Converted New DIP Claims into loans under the Second Lien Exit Facility (which amount shall equal 77.78% of the original principal amount of the Second Lien Exit Facility) and (B) issuance of loans under the Second Lien Exit Facility (which amount shall equal 22.22% of the original principal amount of the Second Lien Exit Facility) to Reorganized LightSquared Inc. on account of the LightSquared Transfer, in each case, in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement.  The proceeds of the Second Lien Exit Facility shall be used to, among other things, satisfy certain obligations under the Plan.

        (iii)    (iv) NewCo shall issue NewCo Series A-1 Preferred PIK Interests, which shall be issued and allocated as follows:  (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and

(B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

**(iv)** ~~(v)~~ NewCo shall issue NewCo Series A-2 Preferred PIK Interests, which shall be issued and allocated as follows: (A) $75 million Pro Rata to Holders of Allowed Existing LP Preferred Units Equity Interests on account of such Allowed Equity Interests; (B) $209 million Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims; (C) $17.54 million Pro Rata to Holders of Allowed Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); (D) $1.76 million Pro Rata to Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests (subject to the Reorganized LightSquared Inc. Call Option); and (E) $51.7 million to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

**(v)** ~~(vi)~~ NewCo shall issue NewCo Class A Common Interests, which shall be issued and allocated as follows: (A) 77.78% Pro Rata to Plan Support Party A, Plan Support Party B, and Plan Support Party C on account of, and in accordance with, the conversion of their Plan Support Party ABC Equity-Converted New DIP Claims as contemplated herein and (B) 22.22% to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

**(vi)** ~~(vii)~~ NewCo shall issue NewCo Class B Common Interests, which shall be issued and allocated as follows: (A) 70% Pro Rata to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims on account of such Allowed Claims and (B) 30% Pro Rata to the Holders of Allowed Existing Inc. Common Stock Equity Interests on account of such Allowed Equity Interests.

**(vii)** ~~(viii)~~ NewCo shall issue NewCo Class C Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated as follows: (A) 90.9% Pro Rata to the Holders of Existing Inc. Series A Preferred Stock Equity Interests on account of such Allowed Equity Interests; and (B) 9.1% Pro Rata to the Other Existing Inc. Series B Preferred Stock Holders on account of their Allowed Existing Inc. Series B Preferred Stock Equity Interests.

**(viii)** ~~(ix)~~ NewCo shall issue NewCo Class D Common Interests (subject to the Plan Support Party C Call Option), which shall be issued and allocated to Reorganized LightSquared Inc. on account of the LightSquared Transfer.

**(ix)** ~~(x)~~ NewCo shall reserve for issuance up to 10% of NewCo Common Interests in connection with the Management Incentive Plan (subject to the agreement of each Plan Support Party).

**(x)** ~~(xi)~~ Plan Support Party C shall be granted the Plan Support Party C Call Option.

(b) Reorganized Debtors

(i) One Dot Six Corp. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(ii) ~~Lightsquared~~**LightSquared** Holdings GP Inc. shall be reconstituted as a limited liability company and shall be treated as a disregarded entity for U.S. federal income tax purposes.

(iii) LightSquared Inc. shall be reorganized as Reorganized LightSquared Inc. and the other Debtors shall be reorganized as the Reorganized Subsidiaries.

(iv) Reorganized LightSquared Inc. shall sell, assign, and/or transfer to NewCo all of Reorganized LightSquared Inc.'s Assets and Equity Interests (other than Reorganized LightSquared Inc.'s tax attributes or its Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Inc.'s Equity Interests in Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(v) Reorganized LightSquared Investors Holdings Inc. shall sell, assign, and transfer to NewCo all of Reorganized LightSquared Investors Holdings Inc.'s Assets and Equity Interests (other than its tax attributes and its Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all Reorganized LightSquared Investors Holdings Inc.'s Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared

GP LLC, and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vi)    Reorganized TMI Communications Delaware, Limited Partnership shall sell, assign, and transfer to NewCo all of Reorganized TMI Communications Delaware, Limited Partnership's Assets and Equity Interests (other than its tax attributes), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of Reorganized TMI Communications Delaware, Limited Partnership's Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(vii)    Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. shall sell, assign, and transfer to NewCo all of such Entities' Assets (other than their tax attributes, Reorganized SkyTerra Rollup LLC's Equity Interests in Reorganized SkyTerra Rollup Sub LLC, and Reorganized SkyTerra Rollup Sub LLC's Equity Interests in Reorganized TMI Communications Delaware, Limited Partnership), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' intellectual property, contractual rights, and Retained Causes of Action, and NewCo shall assume all obligations related thereto (including the payments to equityholders).

(viii)    All other Reorganized Subsidiaries shall sell, assign, and transfer to NewCo all of such Reorganized Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

(ix)    As a result of the foregoing Plan Transactions, (A) NewCo shall be the limited partner, and Reorganized LightSquared GP LLC shall be the general partner, of Reorganized LightSquared LP, (B) NewCo shall wholly own Reorganized One Dot Six LLC, (C) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) shall have been sold, assigned, and transferred to NewCo and shall become subsidiaries of NewCo on the Effective Date, and (D) Reorganized LightSquared Inc. shall retain its 100% direct or

indirect ownership, as applicable, of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., SkyTerra Rollup Sub LLC, and TMI Communications Delaware, Limited Partnership.

(x)     Reorganized LightSquared Inc. shall issue the Reorganized LightSquared Inc. Loan to Plan Support Party D in exchange for the Plan Support Party D Debt-Converted New DIP Claims in accordance with the Plan, Confirmation Order, and Reorganized LightSquared Inc. Loan Agreement.

(xi)    Reorganized LightSquared Inc. shall issue to SIG Holdings, Inc. (or its designee) 100% of the Reorganized LightSquared Common Shares on account of, and in exchange for the cancellation of, the Allowed Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc.

(xii)   Plan Support Party C shall be granted the Plan Support Party C Call Option.

(xiii)  Reorganized LightSquared Inc. shall be granted the Reorganized LightSquared Inc. Call Option.

(xiv)   As a result of, and in exchange for, the Plan Transactions (including the LightSquared Transfer), Reorganized LightSquared Inc. shall hold (A) 22.22% of loans under the Second Lien Exit Facility, (B) 22.22% of NewCo Series A-1 Preferred PIK Interests, (C) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (D) 22.22% of NewCo Class A Common Interests, and (E) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

E.      *First Lien Exit Facility*

On the Effective Date, the First Lien Exit Obligors and the other relevant Entities shall enter into the First Lien Exit Credit Agreement, and the First Lien Exit Facility shall be funded with new financing in accordance therewith. The applicable New LightSquared Entities shall use the First Lien Exit Facility for the purposes specified in the Plan, the First Lien Exit Credit Agreement, and the other governing documents, including to, among other things, fund the Cash payments contemplated by the Plan to be made on the Effective Date, including repayment of the New DIP Tranche B Facility, and provide post-Effective Date working capital.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) authorization for the Debtors to enter into the commitment letter and fee letter related to the First Lien Exit Facility Filed by the Debtors with the Plan Supplement and to incur obligations thereunder and to pay fees, indemnities, and expenses provided for therein, (2) approval of the First Lien Exit Facility and all transactions contemplated thereby, including

any and all actions to be taken, undertakings to be made, and obligations to be incurred by the First Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (3) authorization for the First Lien Exit Obligors to enter into and execute the First Lien Exit Credit Agreement and such other documents as may be required or appropriate.   On the Effective Date, the First Lien Exit Facility, together with any new promissory notes evidencing the obligation of the First Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the First Lien Exit Obligors pursuant to the First Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the First Lien Exit Credit Agreement and related documents.   The liens securing the First Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

F.    *Second Lien Exit Facility*

On the Effective Date, the Second Lien Exit Obligors and the other relevant Entities shall enter into the Second Lien Exit Credit Agreement, and the Second Lien Exit Facility shall be funded as set forth in Article IV.D.3(a) hereof.   The Second Lien Exit Facility shall permit NewCo to incur a new debt facility of up to $500 million, which shall be secured by liens senior to the liens under the Second Lien Exit Facility and junior to the liens under the First Lien Exit Facility (the "1.5 Lien Loans").   The Plan Support Parties shall have the right (but not the obligation) to purchase their *pro rata* share of any 1.5 Lien Loans based on their commitment percentages.   In the event that any Plan Support Party fails to purchase its entire share of the 1.5 Lien Loans, the other Plan Support Parties shall have the right (but not the obligation) to purchase the remaining 1.5 Lien Loans on a *pro rata* basis.   In the event that the Plan Support Parties do not exercise their right to purchase the entire principal amount of the 1.5 Lien Loans, NewCo may issue such remaining 1.5 Lien Loans to third parties.   The applicable New LightSquared Entities shall use the Second Lien Exit Facility for the purposes specified in the Plan, the Second Lien Exit Credit Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Second Lien Exit Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for the Second Lien Exit Obligors to enter into and execute the Second Lien Exit Credit Agreement and such other documents as may be required or appropriate.   On the Effective Date, the Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of the Second Lien Exit Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the Second Lien Exit Obligors pursuant to the Second Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to,

and as set forth in, the Second Lien Exit Credit Agreement and related documents.  The liens securing the Second Lien Exit Facility shall be subject to the Exit Intercreditor Agreement.

G.    *Reorganized LightSquared Inc. Loan*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the Reorganized LightSquared Inc. Loan Agreement.  On the Effective Date, the Reorganized LightSquared Inc. Loan shall be funded by the Reorganized LightSquared Inc. Loan Holder converting its Plan Support Party D Debt-Converted New DIP Claims (inclusive of New DIP Tranche A Accrued Interest attributed thereto) into loans under the Reorganized LightSquared Inc. Loan, on a dollar-for-dollar basis, in full satisfaction of such Plan Support Party D Debt-Converted New DIP Claims (as set forth in Articles II.E and IV.D hereof) in accordance with the Reorganized LightSquared Inc. Loan Agreement.  Reorganized LightSquared Inc. shall use the Reorganized LightSquared Inc. Loan for the purposes specified in the Plan, the Reorganized LightSquared Inc. Loan Agreement, and the other governing documents.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the Reorganized LightSquared Inc. Loan Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc. Loan Agreement and such other documents as may be required or appropriate.  On the Effective Date, the Reorganized LightSquared Inc. Loan Agreement, together with the Reorganized LightSquared Inc. Loan evidencing the obligation of Reorganized LightSquared Inc., and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Loan Agreement and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Loan Agreement and related documents.

H.      [RESERVED]

I.      *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the New LightSquared Entities shall (a) issue the applicable New LightSquared Entities Shares for distribution to the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (b) reserve for issuance up to 10% of NewCo Common Interests in accordance with the Management Incentive Plan (subject to the agreement of each Plan Support Party), and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof and treated in accordance with the Plan, as applicable. The issuance of the New LightSquared Entities Shares by the New LightSquared Entities and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The applicable New Corporate Governance Documents shall contain provisions necessary to (1) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable New Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the New LightSquared Entities.

J.      *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares (other than the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer), shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code, and the NewCo Interests being issued to Reorganized LightSquared Inc. on account of the LightSquared Transfer shall be similarly exempted pursuant to the private placement exemption under section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and

instruments, including those set forth in the New LightSquared Entities Corporate Governance Documents, and (4) applicable regulatory approval, if any.

K.    *Listing of New LightSquared Entities Shares; Reporting Obligations*

The New LightSquared Entities shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.  In order to prevent the New LightSquared Entities from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New LightSquared Entities Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the New LightSquared Entities Corporate Governance Documents.

L.    *NewCo Interest Holders Agreement*

On the Effective Date, NewCo shall enter into and deliver the NewCo Interest Holders Agreement.

Confirmation of the Plan shall constitute, upon the occurrence of the New DIP Closing Date, (1) approval of the NewCo Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by NewCo, and (2) authorization for NewCo to enter into and execute the NewCo Interest Holders Agreement and such other documents as may be required or appropriate.  On the Effective Date, the NewCo Interest Holders Agreement, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by NewCo pursuant to the NewCo Interest Holders Agreement and related documents shall be satisfied pursuant to, and as set forth in, the NewCo Interest Holders Agreement and related documents.

M.    *Indemnification Provisions in New LightSquared Entities Corporate Governance Documents*

As of the Effective Date, the New LightSquared Entities Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the New LightSquared Entities' current and former directors, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the New LightSquared Entities shall amend or restate the New LightSquared Entities Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the New LightSquared

Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

### N.    Management Incentive Plan

On or as soon as practicable following the Consummation of the Plan, the NewCo Board shall adopt the Management Incentive Plan.

### O.    Corporate Governance

As shall be set forth in the New LightSquared Entities Charters and New LightSquared Entities Bylaws, the New LightSquared Entities Boards shall consist of a number of members, and appointed in a manner, to be agreed upon by each Plan Support Party or otherwise provided in the New LightSquared Entities Corporate Governance Documents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the New LightSquared Entities Boards or officer of the New LightSquared Entities and (2) the nature of compensation for any officer employed or retained by the New LightSquared Entities who is an "insider" under section 101(31) of the Bankruptcy Code.

### P.    Vesting of Assets in Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Exit Facilities and any rights of any of the parties under the Exit Credit Agreements or any of the related documents, (2) any Liens granted to secure the Reorganized LightSquared Inc. Loan and any rights of any of the parties under the Reorganized LightSquared Inc. Loan Agreement or any of the related documents, (3) any Liens granted to secure the SPSO Note or any of the related documents if Class 7B elects to receive the SPSO Option A Treatment, and (4) any rights of any of the parties under any of the New LightSquared Entities Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each New LightSquared Entity may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Q.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the New LightSquared Entities shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, that (1) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the New LightSquared Entities and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

All Liens securing the **Allowed** Prepetition Facility Claims under the Prepetition Inc. Credit Agreement or the **Allowed** Prepetition LP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to the Effective Date of the Plan **and the payment in full of all Allowed Prepetition Facility Claims in accordance with the terms of the Plan**, at which time such Liens shall be terminated**; provided, that, for the avoidance of doubt, such Liens shall specifically remain in effect until (and not beyond) the Effective Date to secure the Surviving Indemnities**.

R.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan

without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

S.    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the New LightSquared Entities, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the Exit Credit Agreements, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New LightSquared Entities Corporate Governance Documents, the Management Incentive Plan, and commitment letters and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the New LightSquared Entities; (5) the issuance and distribution of the New LightSquared Entities Shares and the SPSO Note; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate:  (1) the Exit Credit Agreements; (2) the Reorganized LightSquared Inc. Loan Agreement; (3) the SPSO Note Documents; (4) the Exit Intercreditor Agreement; (5) the New LightSquared Entities Corporate Governance Documents; (6) the Management Incentive Plan; and (7) any and all other agreements, documents, securities, and instruments related to the foregoing.  The authorizations and approvals contemplated by this Article IV.S shall be effective notwithstanding any requirements under non-bankruptcy law.

T.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the New LightSquared Entities and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement,

and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the New LightSquared Entities, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

## U.    Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a New LightSquared Entity or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the New LightSquared Entities, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## V.    Preservation, Transfer, and Waiver of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Debtors' Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them.   The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In accordance with section 1123(b)(3) of

the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary herein, on the Effective Date:    (1) the Reorganized Debtors shall sell, assign, and transfer to NewCo all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action, and NewCo shall thereafter maintain the right to commence, prosecute, or settle such Causes of Action; (2) Plan Support Party C shall sell, assign, and transfer to NewCo all Causes of Action asserted by Plan Support Party C as of the Effective Date arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses in exchange for the treatment of Claims and Equity Interests held by Plan Support Party C as set forth in this Plan; (3) NewCo, through its authorized agents or representatives, shall retain and may exclusively enforce and pursue any and all such Causes of Action; (4) NewCo shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; and (5) NewCo reserves and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.

Plan Support Party C shall not assert any unasserted claim or Cause of Action arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses on and after the Effective Date unless and until NewCo asserts any such unasserted claim or Cause of Action; provided, however, that on and after the receipt of certain FCC confirmations and/or approvals related to certain spectrum usage rights for terrestrial services in the United States in 30 MHz of spectrum, Plan Support Party C shall be deemed to have irrevocably waived the right to assert any such unasserted claims or Causes of Action.  Any proceeds of any rights of action contributed to NewCo from the Reorganized Debtors shall be payable to NewCo.

W.    *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the New LightSquared Entities shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring

69

prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.  As of the Effective Date, the Debtors or New LightSquared Entities, as applicable, anticipate purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

X.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable New LightSquared Entities shall assume and continue to perform the Debtors' obligations to:   (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Debtors' Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or New LightSquared Entities' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.   In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Article III.B.14 hereof; provided, that the applicable New LightSquared Entities Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable New LightSquared Entities awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the New LightSquared Entities Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the New LightSquared Entities' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein (including Article IV.X hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.    Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Debtors and the Plan Support Parties shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption,

or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the New LightSquared Entities no later than thirty (30) days after the Effective Date. All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.B.9 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 9 in Article III.B.10 hereof.

C.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Debtors or New LightSquared Entities, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the New LightSquared Entities' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline"). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or

Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the New LightSquared Entities to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Debtors or New LightSquared Entities, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors and the New LightSquared Entities reserve the right to reject any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and New LightSquared Entities expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the New LightSquared Entities, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor

and not rejected prior to the Effective Date, may be performed by the applicable New LightSquared Entity in the ordinary course of business.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Postpetition Contracts and Leases*

Each New LightSquared Entity shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable New LightSquared Entity after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or New LightSquared Entity, in each case, in accordance with, and subject to, the then applicable terms.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and the New LightSquared Entities, with the consent of each Plan Support Party, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New LightSquared Entities shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend their decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Agents, the Prepetition Agents, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors and the New LightSquared Entities, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors and the New LightSquared Entities, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.    *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims on the New DIP Closing Date, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the Plan Support Parties, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, New LightSquared Entity, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Plan Support Parties, the eligible Holders

of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The New LightSquared Entities are authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the New LightSquared Entities shall reserve any applicable Plan Consideration from Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.    *Disbursing Agent*

All Plan Distributions shall be made by the Debtors or the New LightSquared Entities as Disbursing Agent, or such other Entity designated by the Debtors or the New LightSquared Entities as Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Debtors or the New LightSquared Entities, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the New LightSquared Entities, as applicable, to the Disbursing Agent for the benefit of the Plan Support Parties, the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.    *Rights and Powers of Disbursing Agent*

1.    <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.    <u>Expenses Incurred on or After Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including

reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by the New LightSquared Entities.

E.    *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

    1.    Payments and Plan Distributions on Disputed Claims and Disputed Equity <u>Interests</u>

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

    2.    Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed <u>Equity Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

    1.    <u>Delivery of Plan Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' or the New LightSquared Entities' records as of the date of any such Plan Distribution; <u>provided</u>, <u>however</u>, that the manner of such Plan Distributions shall be determined at the discretion of the Debtors or the New LightSquared Entities; <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Articles VI.F.5 and VI.F.6 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    <u>Delivery of Plan Distributions to Holders of Allowed DIP Inc. Claims</u>

The Plan Distributions provided for Allowed DIP Inc. Claims pursuant to Article II.C hereof ~~and the New DIP Facility~~ shall be made to the DIP Inc. Agent by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

3.    <u>Delivery of Plan Distributions to Holders of Allowed DIP LP Claims</u>

The Plan Distributions provided for Allowed DIP LP Claims pursuant to Article II.D hereof ~~and the New DIP Facility~~ shall be made to the DIP LP Lenders by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

4.    <u>Delivery of Plan Distributions to Holders of Allowed New DIP Claims</u>

The Plan Distributions provided for Allowed New DIP Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

5.    <u>Delivery of Plan Distributions to Holders of Allowed Prepetition Inc. Facility Claims</u>

The Plan Distributions provided for Allowed Prepetition Inc. Facility Non-Subordinated Claims by Article III.B.5 hereof shall be made to the Prepetition Inc. Agent by the Debtors, or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.

The Plan Distribution provided by Article  III.B.6 hereof shall be made ~~to the Prepetition Inc. Agent~~ directly by the New LightSquared Entities or the Disbursing Agent to the Holders of Allowed Prepetition Inc. Subordinated Facility Claims.  To the extent possible, the New LightSquared Entities and the Disbursing Agent shall provide that the applicable Inc. Plan Consideration is eligible to be distributed to the Holders of Allowed Prepetition Inc. Facility Subordinated Claims ~~at the direction of the Prepetition Inc. Agent~~.

Notwithstanding anything to the contrary herein, ~~(a) any Holder of a Disputed Prepetition Inc. Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b)~~ no Holder of a Prepetition Inc. Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

6.      Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility
Claims

The Plan Distributions provided for Allowed Prepetition LP Facility Claims by Articles III.B.7 and III.B.8 hereof shall be made to the Prepetition LP Agent.  Plan Distributions to be made on account of Non-Converted Prepetition LP Facility Non-SPSO Claims shall be made by the Debtors or the New DIP Lenders, on behalf of the Debtors, on the New DIP Closing Date.  To the extent possible, the Debtors or the New LightSquared Entities, as applicable, and the Disbursing Agent shall provide that the applicable LP Plan Consideration is eligible to be distributed to Prepetition LP Lenders at the direction of the Prepetition LP Agent.

Notwithstanding anything to the contrary herein, (a) any Holder of a Disputed Prepetition LP Facility Claim shall not receive any Plan Distribution until any such Disputed Prepetition Inc. Facility Claim is Allowed in accordance with Article VII hereof, and (b) no Holder of a Prepetition LP Facility Claim shall be entitled to invoke any rights or remedies under the applicable Sharing Provision.

7.      Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.  The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

8.      Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the New LightSquared Entities (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the New LightSquared Entities shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such

withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the New LightSquared Entities and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The New LightSquared Entities reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

## H.    Setoffs

Except with respect to any distributions on account of (1) DIP Inc. Claims, (2) DIP LP Claims, (3) Prepetition Inc. Facility Non-Subordinated Claims, or (4) Prepetition LP Facility Non-SPSO Claims, or as otherwise expressly provided for in the Plan, each Debtor or New LightSquared Entity, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Equity Interest, may set off against any Allowed Claim or Allowed Equity Interest and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any Plan Distribution is made on account of such Allowed Claim or Equity Interest) any claims, rights, and Causes of Action of any nature that such Debtor or New LightSquared Entity, as applicable, may hold against the Holder of such Allowed Claim or Equity Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or New LightSquared Entity, as applicable, of any such claims, rights, or Causes of Action that such New LightSquared Entity may possess against such Holder. In no event shall any Holder of Claims or Equity Interests be entitled to set off any Claim or Equity Interest against any claim, right, or Cause of Action of the Debtor or New LightSquared Entity, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

## I.    Recoupment

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the New LightSquared Entities, as applicable, unless such Holder

actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.    Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the New LightSquared Entities, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or New LightSquared Entity.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a New LightSquared Entity on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable New LightSquared Entity, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable New LightSquared Entity annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the New LightSquared Entities, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
**AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS**

A.    *Allowance of Claims and Equity Interests*

After the Effective Date, the New LightSquared Entities shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.V hereof. Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.7 hereof or the Bankruptcy Code.

B.    *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the New LightSquared Entities shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The New LightSquared Entities shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims. The Inc. Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 15% of the Disputed Claims and Equity Interests Reserve from the Inc. Plan Consideration Carve-Out and the LP Debtors (or the corresponding New LightSquared Entities, as applicable) shall fund 85% of the Disputed Claims and Equity Interests Reserve from the LP Plan Consideration Carve-Out. The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become Disallowed Claims or Disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims or Equity Interests*

Before the Effective Date, the Debtors, and after the Effective Date, the New LightSquared Entities, may at any time request that the Bankruptcy Court estimate (1) any

Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Debtors or New LightSquared Entities may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities, and any Claim or Equity Interest that has been amended may be adjusted thereon by the New LightSquared Entities, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the New LightSquared Entities without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Debtors or New LightSquared Entities, (3) provided for in a postpetition agreement in writing between the Debtors or New LightSquared Entities and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date.

G.      *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT

ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.    *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the New LightSquared Entities, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the New LightSquared Entities in accordance with Article III.B.16 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or New LightSquared Entities, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.      *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the New LightSquared Entities may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities. In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the New DIP Closing Date.

D.      *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the New LightSquared Entities, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities**

whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the New LightSquared Entities, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.     *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Debtors' Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Debtors' Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to Final Order of the Bankruptcy Court, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the

distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.     *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "<u>Releasing Party</u>") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the DIP Facilities, the Exit Facilities, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the SPSO Note, or the Reorganized LightSquared Inc. Loan, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Debtors' Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; <u>provided</u>, <u>however</u>, that each present and former Holder of a Claim or Equity Interest abstaining from voting to accept or reject the Plan may reject the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release; <u>provided</u>, <u>further</u>, <u>however</u>, that the foregoing proviso shall not apply to Holders of Prepetition LP Facility SPSO Claims in the event that the votes of such Holders of Prepetition LP Facility SPSO Claims are designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code.

Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Credit Agreements, Reorganized LightSquared Inc. Loan Agreement, SPSO Note Documents, Exit Intercreditor Agreement, New LightSquared Entities Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

G.    *Injunction*

Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the New LightSquared Entities:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or New LightSquared Entities, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the New LightSquared Entities, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security

interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the New LightSquared Entities and their successors and assigns.  The New LightSquared Entities shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

2.    The Confirmation Order shall be (a) in form and substance satisfactory to the Debtors and each Plan Support Party and (b) entered no later than March 31, 2014, or, if as of March 31, 2014, the Bankruptcy Court has completed hearings on the Plan and the New DIP Facility and has taken such matters under advisement, April 15, 2014.

3.    The New DIP Order, in form and substance satisfactory to the Debtors and each other party to the New DIP Facility, shall have been entered contemporaneously with the Confirmation Order.

4.    The Debtors shall have received binding commitments with respect to the First Lien Exit Facility on terms and conditions satisfactory to the Debtors and each Plan Support Party.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, in form and in substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

2.      The New DIP Order, in form and substance satisfactory to the Debtors and each Plan Support Party, (a) shall have been entered and (b) shall each have become a Final Order.

3.      The New DIP Recognition Order, in form and substance satisfactory to the Debtors and each Plan Support Party, shall have become a Final Order.

4.      The New DIP Facility shall have been funded, and there shall not be any default under the New DIP Credit Agreement or the New DIP Order that has not been waived in accordance with the terms of the New DIP Credit Agreement or the New DIP Order.

5.      The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)      the Exit Credit Agreements and any related documents, in forms and substance acceptable to the Debtors, each Plan Support Party, the Exit Agents, and the Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Exit Facilities shall have occurred;

(b)      the Reorganized LightSquared Inc. Loan Agreement and any related documents, in forms and substance acceptable to the Debtors and the Reorganized LightSquared Inc. Loan Holder, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Loan Agreement shall have occurred;

(c)      [Reserved];

(d)      the SPSO Note Documents and any related documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered (or be deemed executed and delivered) by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the SPSO Note Documents shall have occurred;

(e)      the Plan Documents relating to the LightSquared Transfer, in forms and substance acceptable to the Debtors and each Plan Support Party, shall

have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(f)    the New LightSquared Entities Corporate Governance Documents, in forms and substance acceptable to the Debtors and each Plan Support Party, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(g)    the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.    The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

7.    The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Debtors and each Plan Support Party, without prejudice to the New LightSquared Entities' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, that each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the New LightSquared Entities and each Plan Support Party.

8.    All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.    Except as otherwise agreed by each of the New DIP Initial Lenders, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective.

10.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

C.    *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by the Debtors, with the consent of each Plan Support Party **(and in accordance with the terms hereof)**, without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of each Plan Support Party **(and in accordance with the terms hereof)**, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Debtors, with the consent of each Plan Support Party **(and in accordance with the terms hereof)**, expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

In addition, ~~that~~ the consent of **(1)** the Holders of ~~an (1)~~ Allowed Prepetition Inc. Facility Non-Subordinated Claim, (2) **the Holders of** Allowed DIP Inc. Claim, or (3) **the Holders of the majority in amount of** Allowed Prepetition LP Facility Non-SPSO Claim **that are members of the Ad Hoc Secured Group** shall be required ~~with respect to any amendment or modification to~~ **before the Debtors alter, amend, modify, or otherwise affect any Plan terms (through** the Plan ~~that affects~~**, the Confirmation Order, or otherwise) concerning** the (a) treatment and repayment of such Holders' Allowed Claims ~~or,~~ (b) timing of such repayment**, (c) consideration, releases, indemnifications, and other rights provided to such Holders, (d) Surviving Indemnities, or (e) reimbursement of the professional fees and expenses of the Inc./LP Lender Parties** (in each case, solely to the extent such Holders **(i)** vote to accept the Plan **or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan**).

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant

to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors, with the consent of each Plan Support Party, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:    (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Debtors' Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.   **Notwithstanding anything in the Plan or the Confirmation Order to the contrary, if** the New DIP Facility **Closing Date has not occurred within fifteen (15) days of the entry of the Confirmation Order, the Plan shall be deemed withdrawn and the Confirmation Order shall be deemed vacated unless (a) the Holders of Prepetition Inc. Facility Non-Subordinated Claims and (b) the Holders of the majority in amount of the Prepetition LP Facility Non-SPSO Claims that are members of the Ad Hoc Secured Group agree otherwise in writing.**

D.    *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the Exit Facilities, the Plan, or otherwise, including the Plan Support Party Break-Up Fee and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and

of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.      Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the New LightSquared Entities' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Debtors' Disclosure Statement;

9.      To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Exit Facilities, the Reorganized LightSquared Inc. Loan Agreement, the SPSO Note Documents, the Exit Intercreditor Agreement, the New Corporate Governance Documents, or any ancillary or related agreements thereto;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

95

11.  Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.  Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

15.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.  Determine any other matters that may arise in connection with or relate to the Plan, the Debtors' Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Debtors' Disclosure Statement;

17.  Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.  Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.  Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.  Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.  Enforce all orders previously entered by the Bankruptcy Court; and

22.  Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

## A.    Immediate Binding Effect

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the New LightSquared Entities, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

## B.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the New LightSquared Entities, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

## C.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Debtors' Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

## D.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

## E.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the New LightSquared Entities, shall be served on:

LightSquared Inc.                                    Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP

Attn: General Counsel                    Matthew S. Barr
10802 Parkridge Boulevard                Steven Z. Szanzer
Reston, VA 20191                         Karen Gartenberg
                                         One Chase Manhattan Plaza
                                         New York, NY 10005


the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Plan Support Party D or Reorganized LightSquared Inc. Loan Holder, shall be served

on:

JPMorgan Chase & Co.                     Simpson Thacher & Bartlett LLP
Patrick Daniello                         Sandeep Qusba
383 Madison Ave.                         Elisha D. Graff
New York, NY 10179                       425 Lexington Avenue
                                         New York, NY 10017


Plan Support Party A, shall be served on:

Fortress Investment Group                Stroock & Stroock & Lavan LLP
1345 Avenue of the Americas              Kristopher M. Hansen
New York, NY 10105                       Frank A. Merola
                                         Jayme T. Goldstein
                                         180 Maiden Lane
                                         New York, NY 10038


the New DIP Agent or Plan Support Party B, shall be served on:

Melody Business Finance, LLC             Bingham McCutchen LLP
Andres Scaminaci                         Jeffrey S. Sabin
717 Fifth Avenue, 12th Floor             Julia Frost-Davies
New York, NY 10022                       399 Park Avenue
                                         New York, NY 10022


the Ad Hoc Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

the Prepetition LP Agent, shall be served on:

Latham & Watkins LLP
Mark A. Broude
885 Third Avenue
New York, NY 10022

the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

Akin, Gump, Strauss, Hauer & Feld LLP
Philip C. Dublin
Meredith A. Lahaie
One Bryant Park
New York, NY 10036

Plan Support Party C, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

After the Effective Date, the New LightSquared Entities have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the New LightSquared Entities are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall

mean the Plan and the Plan Supplement.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

*H.*    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*I.*    *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or New LightSquared Entities', as applicable, consent, and (3) non-severable and mutually dependent.

*J.*    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

*K.*    *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity**

**Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Debtors' Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Debtors' Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:  February ~~14~~**22**, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## <u>Exhibit B-1</u>

**Revised Third Amended Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | |
| In re: ) | Chapter 11 |
| ) | |
| LIGHTSQUARED INC., *et al.*, ) | Case No. 12-12080 (SCC) |
| ) | |
| Debtors.[1] ) | Jointly Administered |
| _____ ) | |

---

### SPECIFIC DISCLOSURE STATEMENT FOR
### DEBTORS' THIRD AMENDED JOINT PLAN
### PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE
---

- Voting Record Date:  October 9, 2013
- Voting Deadline:  March [3], 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan Objection Deadline:  March [11], 2014 at 4:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  March [17], 2014 at 10:00 a.m. (prevailing Eastern time)

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]     The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT (THE "DEBTORS' SPECIFIC DISCLOSURE STATEMENT") FOR THE DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT"). THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. 1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN). IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS). ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN IN THEIR ENTIRETY. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. **SEE ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE

WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING TO THE PLAN, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THE DEBTORS' SPECIFIC

DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE. THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ............................................................................................ **1**

    **A.**    **Overview of Plan** .................................................................................... **1**

        1.    Path to Value-Maximizing Transaction ......................................... 1

        2.    Previously Filed Plans and Path to Plan ........................................ 2

        3.    General Structure of LightSquared and New LightSquared Entities ...... 5

        4.    Administrative and Priority Claims ................................................ 8

        5.    Classes and Treatment .................................................................... 9

    **B.**    **Chapter 11 Cases** ................................................................................ **15**

        1.    Ergen Adversary Proceeding ........................................................ 15

    **C.**    **Solicitation Process and Voting Procedures** .................................... **19**

    **D.**    **Plan Supplement** ................................................................................ **21**

    **E.**    **Confirmation Procedures** .................................................................. **21**

    **F.**    **Risk Factors** ........................................................................................ **22**

    **G.**    **Identity of Persons to Contact for More Information** .................... **22**

    **H.**    **Disclaimer** ............................................................................................ **22**

    **I.**    **Rules of Interpretation** ...................................................................... **23**

**ARTICLE II SUMMARY OF PLAN** .................................................................................. **23**

**ARTICLE III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ............ **24**

    **A.**    **Valuation of New LightSquared Entities' Assets** ............................ **24**

    **B.**    **Valuation Methodologies** ................................................................... **25**

    **C.**    **Valuation Considerations** ................................................................... **27**

    **D.**    **Financial Projections** ......................................................................... **27**

**ARTICLE IV CERTAIN PLAN MATTERS** ...................................................................... **29**

    **A.**    **Best Interests of Creditors Test** ........................................................ **29**

    **B.**    **Feasibility** ............................................................................................ **30**

    **C.**    **Confirmation-Related Claims and Remedies Against SPSO** .......... **31**

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN** .................................................................................. **31**

    **A.**    **Certain Bankruptcy Law Considerations** ........................................ **31**

        1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests ......................................................... 31

|   |   |   |   |
|---|---|---|---|
| | 2. | Plan May Not Receive Requisite Acceptances | 32 |
| | 3. | LightSquared May Not Be Able To Obtain Confirmation of Plan | 32 |
| | 4. | LightSquared May Not Obtain Recognition from Canadian Court | 32 |
| | 5. | LightSquared May Not Be Able To Consummate Plan | 33 |
| | 6. | LightSquared May Object to Amount or Classification of Claim | 33 |
| | 7. | Contingencies Not To Affect Votes of Impaired Classes To Accept Plan | 33 |
| **B.** | | **Factors Affecting LightSquared** | **33** |
| | 1. | Regulatory Risks | 33 |
| | 2. | Business-Related Risks | 35 |
| | 3. | Risks Related to New LightSquared Entities Shares | 39 |
| **C.** | | **Litigation Risks** | **40** |
| **D.** | | **Certain Tax Matters** | **40** |
| **ARTICLE VI CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** | | | **40** |
| **A.** | | **Certain United States Federal Income Tax Consequences of Plan to LightSquared** | **41** |
| | 1. | Treatment of Transfers to NewCo | 41 |
| | 2. | Cancellation of Debt and Reduction of Tax Attributes | 42 |
| | 3. | Potential Limitations on NOLs and Other Tax Attributes | 42 |
| | 4. | Alternative Minimum Tax | 44 |
| **B.** | | **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** | **44** |
| | 1. | Consequences to Holders of Claims | 45 |
| | 2. | Consequences to Holders of Equity Interests | 49 |
| | 3. | Consequences of Holding NewCo Interests and Debt Obligations | 50 |
| | 4. | Information Reporting and Backup Withholding | 52 |
| **ARTICLE VII CONCLUSION AND RECOMMENDATION** | | | **52** |

## EXHIBITS

**Exhibit A**    Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**Exhibit B**    Projections

**Exhibit C**    Plan Supplement for Plan

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (a) solicitation of votes to accept or reject their joint chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),[2] and (b) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (a) terms, provisions, and implications of the Plan and (b) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan. The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases. Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so. While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[3]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

## A.    Overview of Plan

### 1.    Path to Value-Maximizing Transaction

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue

---

[2]        Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[3]        If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC.  Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction.  A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**."  A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces.  Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below), certain of LightSquared's stakeholders agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on approval of LightSquared's pending license modification applications.

### 2.    Previously Filed Plans and Path to Plan

#### a.    Prior LightSquared Plans

Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to exercise properly its fiduciary duty to all of its stakeholders in light of the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, it would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets.  Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of LightSquared's assets.  Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring

plans or plans of reorganization filed by LightSquared or any other parties. In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets. In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders. After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates. Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO, multiple potential bidders were reluctant to participate in the Auction. Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases. No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize. LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal. LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders. Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108]. Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize the value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c)

provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan. LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through the Alternative Transaction.

### b.    Termination of LBAC Bid

Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid").  On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC.  The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.  In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement).  LightSquared reserves all of its rights with respect to such matters in all respects.

### c.    Amended Alternative Transaction

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by LightSquared, substantially all of the key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns for the

Estates and stakeholders.  Importantly, effectiveness of the Plan is not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (i.e., among other approvals, the license modification), thereby addressing a key concern of certain of LightSquared's significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan.  To fund LightSquared's operations through the Effective Date and to indefeasibly repay in full on the New DIP Closing Date the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new debtor in possession credit facility.  More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of LightSquared's litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications.  LightSquared, the Plan Support Parties, the Ad Hoc Secured Group, the Prepetition LP Agent, the DIP Inc. Agent, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer available to LightSquared.  Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases.  Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from substantially all of LightSquared's significant stakeholders.

Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of the Alternate Inc. Debtors Plan.  The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.

For more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

### 3. General Structure of LightSquared and New LightSquared Entities

As of the Petition Date, LightSquared maintained the following corporate organizational structure:



**PREPETITION DEBTOR ORGANIZATION CHART**

In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities. More specifically, Reorganized LightSquared Inc., Reorganized LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and Equity Interests (other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' Equity Interests in LightSquared LP, Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo will assume all obligations related thereto (including the payments to equityholders). All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized

Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

As a result of the foregoing Plan Transactions, (a) NewCo will be the limited partner, and Reorganized LightSquared GP LLC will be the general partner, of Reorganized LightSquared LP, (b) NewCo will wholly own Reorganized One Dot Six LLC, (c) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared Inc. will retain its 100% ownership of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.  In addition, NewCo will, among other things, issue several series of equity interests – including, the NewCo Series A-1 Preferred PIK Interests, NewCo Series A-2 Preferred PIK Interests, NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests – to Reorganized LightSquared Inc., certain Plan Support Parties, certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan. Reorganized LightSquared Inc. will hold (v) 22.22% of loans under the Second Lien Exit Facility, (w) 22.22% of NewCo Series A-1 Preferred PIK Interests, (x) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (y) 22.22% of NewCo Class A Common Interests, and (z) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:



### 4.    Administrative and Priority Claims

#### a.    Treatment of Administrative and Priority Claims Generally

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan.  Such Claims shall be satisfied in full in accordance with the Plan.  All other Claims and Equity Interests are classified under the Plan.

#### b.    Treatment of DIP Inc. Claims

All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $73,813,442.71 as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and

financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, any amounts payable in accordance with Section 10.03 of the DIP Inc. Credit Agreement (the "Surviving DIP Inc. Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving DIP Inc. Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm to represent the collective interests of the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders, (ii) the Surviving DIP Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving DIP Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the DIP Inc. Agent or any DIP Inc. Lender incurred for any period from and after the Effective Date.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims, except for the continuation of such Liens until the Effective Date to secure the Surviving DIP Inc. Indemnity, which Liens shall be junior only to the Liens securing the New DIP Facility), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

### c.    Treatment of DIP LP Claims

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

### 5.    Classes and Treatment

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan

under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote. This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution. Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | 100% |
| 4 | LP Other | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall | Unimpaired | No (Deemed | 100% |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | Secured Claims | receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | | To Accept) | |
| 5 | Prepetition Inc. Facility Non-Subordinated Claims | The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim,[4] shall receive Inc. Plan | Unimpaired | No (Deemed To Accept) | 100% |

---

4    Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (c) any amounts payable in accordance with Section 10.03 of the Prepetition Inc. Credit Agreement (the "Surviving Inc. Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving Inc. Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm to represent the collective interests of the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders; provided, that the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, DIP Inc. Agent, and DIP Inc. Lenders shall use the same United States and Canadian counsel, (ii) the Surviving Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition Inc. Agent or any Prepetition Inc. Lender incurred for any period from and after the Effective Date.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors. | | | |
| 6 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors. | Impaired | Yes | 100% |
| 7A | Prepetition LP Facility Non-SPSO Claims | The respective legal and financial advisors for each of the Ad Hoc Secured Group and the Prepetition LP Agent shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:<br><br>(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non- | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | SPSO Claim,[5] shall receive LP Plan Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; or | Impaired | Yes | 100% |
| | | (ii)    each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim | | | |

---

[5]    Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in an amount equal to (a) all unpaid principal and accrued prepetition and postpetition interest at the contract rate (including, without limitation, default rate interest) held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents through and including the New DIP Closing Date, which amount is estimated to be $1.0903 billion in the aggregate, calculated based on the following assumptions:  (i) the face amount of debt held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents is $830.6 million; (ii) adequate protection payments totaling $104.6 million have been made to the Prepetition LP Lenders between the Petition Date and February 2014 (net of professional fees); (iii) an estimated $2.4 million of adequate protection payments will have been made to the Prepetition LP Lenders in March 2014 (net of professional fees); and (iv) the Prepetition LP Facility Non-SPSO Claims will be paid on March 31, 2014; provided, that the estimated amount of unpaid principal and interest shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis, and otherwise adjusted to reflect any changes to the foregoing assumptions; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any repayment premiums on such converted principal amount through and including the Confirmation Date, *plus* (b) all reasonable and documented fees and expenses of the Prepetition LP Agent and the Ad Hoc Secured Group and each of their legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (c) any amounts payable in accordance with Section 10.03 of the Prepetition LP Credit Agreement solely to the Prepetition LP Agent and Holders of Allowed Prepetition LP Facility Non-SPSO Claims (the "Surviving LP Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving LP Indemnity obligations shall be limited to the reasonable and documented fees and expenses of one United States and one Canadian law firm for each of the Prepetition LP Agent and the Holders of Allowed Prepetition LP Facility Non-SPSO Claims (until the Effective Date), (ii) the Surviving LP Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving LP Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition LP Agent or any Prepetition LP Lender incurred for any period from and after the Effective Date.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.<br><br>For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors. | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive one of the following:<br><br>(i) in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or<br><br>(ii) in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.<br><br>For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors. | Impaired | Yes | 100% |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | Impaired | Yes | 100%[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | 100% |
| 10 | Existing LP Preferred Units | Each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan | Impaired | Yes | 100% |

---

[6]    LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | Equity Interests | Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests. | | | |
| 11A | Existing Inc. Series A Preferred Stock Equity Interests | Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests. | Impaired | Yes | 100% |
| 11B | Existing Inc. Series B Preferred Stock Equity Interests | Each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares. | Impaired | Yes | 100% |
| 12 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | TBD |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. | Unimpaired | No (Deemed To Accept) | 100% |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | 100% |

**B.      Chapter 11 Cases**

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

**1.      Ergen Adversary Proceeding**

Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts.  Since the filing of the General Disclosure Statement, the parties to the Ergen Adversary Proceeding have, among other things, engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable.  In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined.  The record in the Ergen Adversary Proceeding has closed.  The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.

Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims. This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.

The Ad Hoc Secured Group intends to proceed as outlined herein.  In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases.  LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated. The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen, and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases.  The parties further believe that the

evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment. Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH. Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment only on Hart-Scott-Rodino approval. The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized. This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction. In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest. To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013. In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced. The parties' agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.

- The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed. At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones. Despite this fact, the Ergen Entities refused at the time to amend the milestones, but

18

repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.

- With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million.  To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.

- Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids.  Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable.  Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court.  The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction.  The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction.  Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.

- Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted.  With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price.  With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal.  This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money."  Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million).  Thus, the Ergen Entities essentially converted the

largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

- After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further. Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement. When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered significant harm as a result of the Ergen Entities' continuing inequitable conduct. As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders. As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims. Among other relief, the Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.

SPSO and Mr. Charles Ergen believe the pending and threatened allegations in the Ergen Adversary Proceeding are without merit. SPSO also disputes the accuracy of many of the statements above, and believes such statements are contradicted by the record of the Ergen Adversary Proceeding.

20

**C.      Solicitation Process and Voting Procedures**

On February [__], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. _____] (the "Resolicitation Order"), which, among other things, approved the Debtors' Specific Disclosure Statement and the resolicitation of the Plan.

**1.      Solicitation Process**

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**."

**2.      Summary of Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON MARCH [3], 2014 (THE "VOTING DEADLINE").  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

### 3.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d): (a) from the Claims and Solicitation Agent (i) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

## D.    Plan Supplement

The Plan Supplement documents for the Plan (the "Plan Supplements") are attached hereto as exhibits and incorporated herein by reference.  The Plan Supplement consists of the following documents:[7]

- Exhibit C-1 - First Lien Exit Credit Agreement

- Exhibit C-2 - Second Lien Exit Credit Agreement

---

[7]    Exhibit C-1, Exhibit C-4, Exhibit C-5, and Exhibit C-6 (filed with the version of the Specific Disclosure Statement filed on February 14, 2014 [Docket No. 1308]) contain form agreements and/or related documents with respect to the First Lien Exit Credit Agreement, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  On February 17, 2014, LightSquared filed form documentation with respect to the Second Lien Exit Credit Agreement and the NewCo LLC Operating Agreement [Docket No. 1312].  The Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Exit Credit Agreement will be filed prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

- <u>Exhibit C-3</u> - Exit Intercreditor Agreement

- <u>Exhibit C-4</u> - Reorganized LightSquared Inc. Loan Agreement

- <u>Exhibit C-5</u> - SPSO Note Documents

- <u>Exhibit C-6</u> - New LightSquared Entities Corporate Governance Documents

- <u>Exhibit C-7</u> - Schedule of Assumed Agreements

- <u>Exhibit C-8</u> - Schedule of Retained Causes of Action

- <u>Exhibit C-9</u> - Liquidation Analysis

## E.    Confirmation Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Resolicitation Order, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation process:

- Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).

- Plan Objection Deadline: March [11], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: March [7], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit confirmation briefs in support of the Plan and in response to Plan Objections: March [13], 2014 at 4:00 p.m. (prevailing Eastern time).

- Confirmation Hearing: March [17], 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## F.    Risk Factors

Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement, including the risk factors described in Article V, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

G.    **Identity of Persons to Contact for More Information**

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

H.    **Disclaimer**

In formulating the Plan, LightSquared has relied on financial data derived from its books and records. LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge. LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests. However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a Claim and Interest is, or is not, identified in the Disclosure Statement.

I.    **Rules of Interpretation**

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a

24

particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein. The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A. The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the New LightSquared Entities, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

## ARTICLE III
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    Valuation of New LightSquared Entities' Assets

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets. Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications described herein, Moelis' view as of February 11, 2014, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of October 31,

2014, would be in a range between $6.2 billion and $9.1 billion with a midpoint of $7.7 billion. Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims. Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (i.e., February 11, 2014). It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States. Moelis' analysis is also based, at LightSquared's direction, on a number of other assumptions, including that (1) LightSquared will be reorganized in accordance with the Plan, which will be effective on or prior to October 31, 2014, (2) the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and the Disclosure Statement, and (3) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections (as defined below). In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below. The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein. The actual value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things: (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including its spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including alleged GPS interference issues and LightSquared's pending license modification application), and general prospects of the New LightSquared Entities, including the Projections, furnished to Moelis by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the

financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan as of February 11, 2014; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate.  In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects.  Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim as to how such person should vote or otherwise act with respect to the Plan.  Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future.  The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

## B.    Valuation Methodologies

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network.  Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions.  Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS.  THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND CIRCUMSTANCES, AND SUCH ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.**

### 1.    Spectrum

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015.  Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP").  The term MHzPOP is defined as the amount of spectrum bandwidth, or capacity, measured in MHz multiplied by the population of the area the spectrum covers.  Moelis' analysis is based on a United States population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion United States MHzPOPs (which takes into account potential coordination zones for certain of its spectrum where operations may be constrained) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation.  Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors including (1) channel size, (2) spectrum depth, (3) frequency range/propagation quality, (4) geographic coverage, (5) equipment ecosystem, and (6) regulatory characteristics.  In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for an additional 10 MHz of fully usable terrestrial spectrum in approximately seven years covering the United States.

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's United States or Canadian spectrum.  The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed.  Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's United States spectrum as of the assumed FCC approval effective dates and then discounted to present value as of the assumed Effective Date.  The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum was discounted back seven (7) years.  Moelis applied a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum.  Moelis' analysis resulted in a total gross United States spectrum valuation range of $5.6 - $8.4 billion and a total gross spectrum valuation range of $5.8 - $8.7 billion as of the assumed Effective Date.

### 2. Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network. LightSquared's satellite network comprises two (2) satellites: SkyTerra-1 is in orbit (accepted on February 11, 2011) and SkyTerra-2 is fully built and remains in storage. Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value. Moelis considered a number of factors in determining its range of discounts including: potential buyer universe, geographic patterning, cost to relocate, inability to offer services at other frequency bands, launch costs and associated risks, and remaining life span. Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation. Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $425 million for the satellite network.

## C. Valuation Considerations

Moelis relied upon spectrum transaction precedents, government auctions, and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively. Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies. Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis. Moelis did not view a DCF analysis as a relevant valuation methodology for LightSquared at this time because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation. Depending on the actual financial results of the Debtors, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of October 31, 2014. In addition, the market prices, to the extent there is a market, of New LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## D. Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan." 11 U.S.C. § 1129(a)(11). In connection with developing the Plan, and for the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections

attached hereto as Exhibit B (the "Projections"), analyzed the New LightSquared Entities' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan.

LightSquared believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities. In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities will be financially viable. Indeed, LightSquared believes that the New LightSquared Entities, will have sufficient liquidity, assuming the availability of the Exit Facilities and the Reorganized LightSquared Inc. Loan, to fund obligations as they arise, thereby maintaining value. Accordingly, LightSquared believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities. Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts. Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies. The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American**

Institute of Certified Public Accountants.  LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.

LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows.  Accordingly, neither LightSquared nor the New LightSquared Entities intend to, and each disclaims any obligation to:  (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) holders of claims under the Exit Facilities, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.  LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan.  In addition, the Projections have been presented in lieu of pro forma historical financial information.  Reference should be made to Article V hereof, entitled "**Plan-Related Risk Factors To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the New LightSquared Entities.

## ARTICLE IV
## CERTAIN PLAN MATTERS

As mentioned, a description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  LightSquared believes that:  (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.  This section discusses certain specific requirements for confirmation of the Plan, including that the Plan is (y) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (z) feasible.  In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.

**A.      Best Interests of Creditors Test**

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under the Plan is attached hereto as Exhibit C-10.

Under the Plan, Prepetition Inc. Facility Subordinated Claims, Prepetition LP Facility Non-SPSO Claims, Prepetition LP Facility SPSO Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.[8]  Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan. The Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared. A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the

---

[8]      Notwithstanding the foregoing, LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code. LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan." Under the Plan, all Holders of Claims or Equity Interests will be paid in full in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan. Moreover, LightSquared believes that the New LightSquared Entities, as applicable, will have sufficient liquidity to fund obligations as they arise. Accordingly, LightSquared believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## C.    Confirmation-Related Claims and Remedies Against SPSO

LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation. LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise. As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code. Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code. SPSO disagrees with the foregoing, however, and has asserted that the Plan is not confirmable because, among other reasons, (i) the Plan unfairly discriminates against, and is not fair and equitable with respect to, SPSO, (ii) the Plan is not feasible, and          (iii) the Plan's classification scheme is not permissible under applicable law.

## ARTICLE V
## PLAN-RELATED RISK FACTORS TO CONFIRMING AND
## CONSUMMATING PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. **Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure**

**Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (a) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (b) risks that information in the General Disclosure Statement may be inaccurate, and (c) risks related to liquidation under chapter 7 of the Bankruptcy Code.

## A.    Certain Bankruptcy Law Considerations

### 1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class.  LightSquared believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, because each Class created by LightSquared contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, LightSquared intends to seek Confirmation of the Plan.  If the Plan does not receive the required support from the Voting Classes, LightSquared may elect to amend the Plan.

### 3.    LightSquared May Not Be Able To Obtain Confirmation of Plan

LightSquared cannot ensure that it will receive the requisite acceptances to confirm the Plan.  Even if LightSquared receives the requisite acceptances, LightSquared cannot ensure that the Bankruptcy Court will confirm the Plan.  A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be

followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code. While LightSquared believes that the Plan complies with section 1129 of the Bankruptcy Code,[9] there can be no assurance that the Bankruptcy Court will reach the same conclusion.

LightSquared, subject to the terms and conditions of the Plan (including the consent rights provided to the relevant parties therein), reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

As conditions precedent to the Effective Date, the Plan requires that the Canadian Court shall have entered the Confirmation Recognition Order and New DIP Recognition Order, and such orders shall have become Final Orders. LightSquared believes that such orders will be approved and entered by the Canadian Court and become Final Orders for all purposes under the Plan; however, there can be no guarantee as to such outcome.

### 5.    LightSquared May Not Be Able To Consummate Plan

Although LightSquared believes that it will be able to consummate the Plan and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date. Consummation of the Plan is also subject to certain conditions set forth in the Plan itself. If the Plan is not consummated, it is unclear what distributions Holders of Allowed Claims or Equity Interests (other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date) ultimately would receive with respect to their Claims and Equity Interests.

In addition, the Effective Date may not occur, or may be delayed, to the extent one or more parties appeals the entry of the Confirmation Order and the appellate court stays such order.

---

[9]    SPSO asserts, however, that the Plan will not be capable of confirmation unless the Prepetition LP Facility SPSO Claims are equitably subordinated to all other claims and are disallowed in whole or in substantial part. LightSquared does not agree with this assertion.

### 6.    LightSquared May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan, including with respect to the DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the Plan, LightSquared reserves the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

### 7.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not require resolicitation of the Impaired Classes.

## B.    Factors Affecting LightSquared

LightSquared is exposed to various factors and risks that include, without limitation, the following.

### 1.    Regulatory Risks

#### a.    LightSquared May Not Receive FCC Consents To Emerge From Chapter 11 in Timely Fashion

The effectiveness of the Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with the Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings.

#### b.    LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access.  LightSquared believes that record evidence demonstrates that its proposed operations would serve the public interest.  Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

> **c.**    **FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service**

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users.  It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared.  These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality.  Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

> **d.**    **Transactions Contemplated by Plan May Require Various Other Regulatory Approvals**

Various other regulatory approvals, including the expiry of certain statutory waiting periods, may be required to give effect to the transactions contemplated in the Plan, including approvals and/or pre-merger filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada).  There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all.  In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

> **2.**    **Business-Related Risks**

> **a.**    **LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To**

**Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business**

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit Facilities, the Reorganized LightSquared Inc. Loan, and the SPSO Note. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although certain of the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged. If LightSquared incurs additional indebtedness, the related risks could intensify.

**b.      Exit Facilities and Reorganized LightSquared Inc. Loan Contemplated Under Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared May Incur Additional Future Debt**

The Exit Facilities and the Reorganized LightSquared Inc. Loan contemplated by the Plan may contain covenants that, among other things, restrict LightSquared's ability to take specific actions, including restrictions that may limit LightSquared's ability to engage in actions or transactions that may be in LightSquared's long-term interest. In addition, as described above, LightSquared may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit Facilities and the Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates. These operating restrictions may adversely affect LightSquared's ability to finance future operations or capital needs, engage in transactions with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities. LightSquared's ability to comply with any financial covenants may be affected by events beyond LightSquared's control, and there is no assurance that LightSquared will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's indebtedness could result in a default, which could allow LightSquared's lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared to

38

apply all available cash to repay these borrowings.  If LightSquared is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

### c. LightSquared May Not Be Able To Achieve Its Projected Financial Results

The Projections set forth on Exhibit B attached hereto represent LightSquared's management's best estimate of LightSquared's future financial performance based on currently known facts and assumptions about LightSquared's future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared operates in particular.  LightSquared's actual financial results may differ significantly from the Projections.  If LightSquared does not achieve its projected financial results, the value of the New LightSquared Entities Shares may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

### d. LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America. There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all.  If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

e.     **LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business. Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

f.     **LightSquared Faces Significant Competition from Companies that Are Larger or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed

competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.  Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared.  Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services.  In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

**g.    Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network**

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network.  Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets.  However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices.  If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

**h.    LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers**

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel.  The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

i.    **Adverse Conditions in U.S. and Global Economies Could Impact LightSquared's Results of Operations**

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services. In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies. Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic decisions, including the rollout of new retail service offerings. Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

3.    **Risks Related to New LightSquared Entities Shares**

a.    **There Is Currently No Trading Market for New LightSquared Entities Shares, Active Liquid Trading Market for New LightSquared Entities Shares May Not Develop, and New LightSquared Entities Shares Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements, as Applicable**

There is currently no existing trading market for the New LightSquared Entities Shares. LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the New LightSquared Entities Shares and, even if one develops, such public trading market may not be maintained. If an active public trading market for the New LightSquared Entities Shares does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all. If any New LightSquared Entities Shares are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the

New LightSquared Entities Shares, regardless of LightSquared's businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares. The New LightSquared Entities Shares may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements, as applicable. This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares.

## C.    Litigation Risks

To the extent that distributions available to Holders of Allowed Claims or Equity Interests under the Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the New LightSquared Entities, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the Plan. Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

## D.    Certain Tax Matters

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the New LightSquared Entities, see Article VI hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan. Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES**

**FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.   Certain United States Federal Income Tax Consequences of Plan to LightSquared

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return. Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013. Some small portion of these NOLs may be subject to existing limitations.

### 1.      Treatment of Transfers to NewCo

Pursuant to the Plan, (a) Reorganized LightSquared Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized One Dot Six LLC, (b) Reorganized LightSquared Investors Holdings Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, (c) Reorganized TMI Communications Delaware, Limited Partnership will sell, assign, and transfer to NewCo its Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action as contemplated by Article IV.V of the Plan.  In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain debt obligations from, and Equity Interests in, NewCo and Cash.  The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and other transactions contemplated by the Plan are not certain.  The transactions, taken together, may give rise to net taxable income or gain for LightSquared.  To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow in part or any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain.  Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

### 2.      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order:  (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and Equity Interests of NewCo.  Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date.  Based on the terms of the Plan, LightSquared does not anticipate that there will be a

significant amount of COD Income.  To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.56% for ownership changes occurring in February 2014).  As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.  Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss.  If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as

46

recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.    Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it. If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income. Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of the amount of any such gain.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.  Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

1.      **Consequences to Holders of Claims**

a.      **Holders of Prepetition Inc. Facility Subordinated Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim will receive NewCo Series A-2 Preferred PIK Interests and NewCo Class B Common Interests.  A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest, which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

b.      **Holders of Prepetition LP Facility Non-SPSO Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, except to the extent that a Holder agrees to any other treatment, each Holder will receive Cash for its Allowed Prepetition LP Facility Non-SPSO Claim unless the Holder elects to receive New DIP Tranche B Claims in exchange for all or a portion of its Allowed Prepetition LP Facility Non-SPSO Claim instead of Cash (subject to the New DIP Tranche B Cap).  A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received and, if relevant, the "issue price" (as defined below) of the New DIP Tranche B Claims received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash.  Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so.  U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding).  In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will

49

be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption.  In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

### c.    Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note.  A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d.    Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash.  A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e.    Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash.  A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f.      Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange.  If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.      Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.      Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain

51

recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

## 2.    Consequences to Holders of Equity Interests

### a.    Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive Cash and NewCo Series A-2 Preferred PIK Interests. Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash and the fair market value of NewCo Series A-2 Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests. A Holder's tax basis in any NewCo Series A-2 Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for Cash and interest in NewCo in a wholly taxable transaction, it may be possible that a Holder will be treated as, in part, contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series A-2 Preferred PIK Interests in a non-taxable transaction. In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for NewCo Series A-2 Preferred PIK Interests, its basis in the NewCo Series A-2 Preferred PIK Interests will equal its basis in

its Existing LP Preferred Units Equity Interests exchanged therefor, and its holding period for its NewCo Series A-2 Preferred PIK Interests would include its holding period in its interests exchanged therefor.

### b. Consequences to Holders of Existing Inc. Series A Preferred Stock Equity Interests and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the "Specified Existing Inc. Preferred Stock Equity Interests"), except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Specified Existing Inc. Preferred Stock Equity Interest will receive (i) NewCo Series A-2 Preferred PIK Interests and (ii) NewCo Class C Common Interests.

Subject to the discussion below regarding accrued yield, a U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received and (ii) the Holder's adjusted tax basis in its Specified Existing Inc. Preferred Stock Equity Interests. A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their fair market value as of the Effective Date, and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Specified Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the U.S. federal consequences of the Plan to it in lights of its particular circumstances.

### c.    Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests.  A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests.  A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

### 3.    Consequences of Holding NewCo Interests and Debt Obligations

### a.    NewCo Class B Common Interests and NewCo Class C Common Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation.  Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax.  Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules.  Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo.  In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### b.    NewCo Series A-2 Preferred PIK Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation.  Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax.  Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules.  Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo.  In that case, a Holder would be required to fund any such taxes from other sources.  In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving

guaranteed payments under section 707(c) of the Tax Code.  A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

A Holder of NewCo Series A-2 Preferred PIK Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### c.    SPSO Note

A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a *de minimis* amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest."  Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually.  Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually.  Accordingly, the SPSO Note will be treated as issued with OID.

A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting).  Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash.  Any OID that a U.S. Holder includes in income will increase the tax basis of the Holder in the SPSO Note.  A U.S. Holder of  the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that

may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on March [3], 2014.**

New York, New York
Dated:  February 22, 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

## **Exhibit A**

Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

## **Exhibit B**

Projections

**<u>Exhibit C</u>**

Plan Supplement

**Exhibit B-2**

**Blackline of Third Amended Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

**SPECIFIC DISCLOSURE STATEMENT FOR**
**DEBTORS' THIRD AMENDED JOINT PLAN**
**PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE**

---

- Voting Record Date:  October 9, 2013
- Voting Deadline:  March [3], 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan Objection Deadline:  March [10**11**], 2014 at 4:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  March [17], 2014 at 10:00 a.m. (prevailing Eastern time)

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

1    The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS MARCH [3], 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT (THE "DEBTORS' SPECIFIC DISCLOSURE STATEMENT") FOR THE DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. THE DELIVERY OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. LIGHTSQUARED HAS NO DUTY TO UPDATE THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT"). THIS DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY LIGHTSQUARED, INCLUDING THE REVISED SPECIFIC DISCLOSURE STATEMENT FOR DEBTORS' REVISED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE [DOCKET NO. 1166].

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(A).

THE PURPOSE OF THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "<u>BANKRUPTCY CODE</u>") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND DEBTORS' SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  **SEE ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE

iii

WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY
LAW.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING,
SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD
NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND
SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF
THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR
DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE
"SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY
OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE
CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF
VOTES TO ACCEPT OR REJECT THE PLAN NOR THE DISCLOSURE STATEMENT
CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY,
SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR
SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN
PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING
TO THE PLAN, AND FINANCIAL INFORMATION.  ALTHOUGH LIGHTSQUARED
BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR
AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT
THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR
STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE
DEBTORS' SPECIFIC DISCLOSURE STATEMENT HAS BEEN PROVIDED BY
LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY
NOTED.  LIGHTSQUARED IS UNABLE TO WARRANT OR REPRESENT THAT THE
INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION,
IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND
EXCULPATION PROVISIONS.  **SEE ARTICLE VIII OF THE PLAN, "SETTLEMENT,
RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

THE INFORMATION CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE
STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING
ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED
UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE
PLAN.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE MUST
RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN
ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION,
ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO
ACCEPT OR REJECT THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE
ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY
OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY,
SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING
SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THE DEBTORS' SPECIFIC

iv

DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DEBTORS' SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

LIGHTSQUARED PRESENTLY INTENDS TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN.

**LIGHTSQUARED URGES ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ............................................................................. **1**

    **A.**    **Overview of Plan** .................................................................... **1**

        1.    Path to Value-Maximizing Transaction ........................... 1
        2.    Previously Filed Plans and Path to Plan ......................... 2
        3.    General Structure of LightSquared and New LightSquared Entities ..... 5
        4.    Administrative and Priority Claims ................................. 8
        5.    Classes and Treatment ..................................................... 9

    **B.**    **Chapter 11 Cases** ................................................................. ~~14~~15

        1.    Ergen Adversary Proceeding ......................................... 15

    **C.**    **Solicitation Process and Voting Procedures** ................... ~~18~~19

    **D.**    **Plan Supplement** .................................................................. ~~20~~21

    **E.**    **Confirmation Procedures** .................................................... ~~20~~21

    **F.**    **Risk Factors** ......................................................................... ~~21~~22

    **G.**    **Identity of Persons to Contact for More Information** ..... ~~21~~22

    **H.**    **Disclaimer** ............................................................................. ~~21~~22

    **I.**    **Rules of Interpretation** ........................................................ ~~22~~23

**ARTICLE II SUMMARY OF PLAN** .................................................................... ~~22~~23

**ARTICLE III VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ..... ~~23~~24

    **A.**    **Valuation of New LightSquared Entities' Assets** ............ ~~23~~24

    **B.**    **Valuation Methodologies** .................................................... ~~24~~25

    **C.**    **Valuation Considerations** ................................................... ~~26~~27

    **D.**    **Financial Projections** ........................................................... ~~26~~27

**ARTICLE IV CERTAIN PLAN MATTERS** ........................................................ ~~28~~29

    **A.**    **Best Interests of Creditors Test** ........................................ **29**

    **B.**    **Feasibility** .............................................................................. **30**

    **C.**    **Confirmation-Related Claims and Remedies Against SPSO** ..... ~~30~~31

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND**
        **CONSUMMATING PLAN** ............................................................. ~~30~~31

    **A.**    **Certain Bankruptcy Law Considerations** ........................ **31**

        1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests ................................................. 31
        2.    Plan May Not Receive Requisite Acceptances ............. ~~31~~32

| | 3. | LightSquared May Not Be Able To Obtain Confirmation of Plan | ~~31~~32 |
|---|---|---|---|
| | 4. | LightSquared May Not Obtain Recognition from Canadian Court | 32 |
| | 5. | LightSquared May Not Be Able To Consummate Plan | ~~32~~33 |
| | 6. | LightSquared May Object to Amount or Classification of Claim | ~~32~~33 |
| | 7. | Contingencies Not To Affect Votes of Impaired Classes To Accept Plan | ~~32~~33 |
| **B.** | **Factors Affecting LightSquared** | | **33** |
| | 1. | Regulatory Risks | 33 |
| | 2. | Business-Related Risks | ~~34~~35 |
| | 3. | Risks Related to New LightSquared Entities Shares | ~~38~~39 |
| **C.** | **Litigation Risks** | | **~~39~~40** |
| **D.** | **Certain Tax Matters** | | **~~39~~40** |
| **ARTICLE VI CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** | | | **~~39~~40** |
| **A.** | **Certain United States Federal Income Tax Consequences of Plan to LightSquared** | | **~~40~~41** |
| | 1. | Treatment of Transfers to NewCo | ~~40~~41 |
| | 2. | Cancellation of Debt and Reduction of Tax Attributes | ~~41~~42 |
| | 3. | Potential Limitations on NOLs and Other Tax Attributes | 42 |
| | 4. | Alternative Minimum Tax | ~~43~~44 |
| **B.** | **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** | | **44** |
| | 1. | Consequences to Holders of Claims | ~~44~~45 |
| | 2. | Consequences to Holders of Equity Interests | ~~48~~49 |
| | 3. | Consequences of Holding NewCo Interests and Debt Obligations | ~~49~~50 |
| | 4. | Information Reporting and Backup Withholding | ~~51~~52 |
| **ARTICLE VII CONCLUSION AND RECOMMENDATION** | | | **~~51~~52** |

## EXHIBITS

**Exhibit A**   Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**Exhibit B**   Projections

**Exhibit C**   Plan Supplement for Plan

# ARTICLE I
# INTRODUCTION

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this Specific Disclosure Statement (the "Debtors' Specific Disclosure Statement") in connection with the (a) solicitation of votes to accept or reject their joint chapter 11 plan (attached hereto as Exhibit A, and as may be amended from time to time, the "Plan"),[2] and (b) hearing to consider confirmation of such Plan.

The purpose of the Debtors' Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (a) terms, provisions, and implications of the Plan and (b) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "Holders") and their rights under the Plan. The Debtors' Specific Disclosure Statement does not contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases. Such generally applicable disclosures are set forth in the First Amended General Disclosure Statement [Docket No. 918] (the "General Disclosure Statement" and, together with the Debtors' Specific Disclosure Statement, the "Disclosure Statement"), which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases.

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so. While the Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[3]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan, the Debtors' Specific Disclosure Statement, and the General Disclosure Statement.

## A.    Overview of Plan

### 1.    Path to Value-Maximizing Transaction

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, will continue

---

2    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

3    If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Debtors' Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.

its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC. Indeed, LightSquared has always operated on the premise that concluding discussions with the FCC and interested government agencies regarding the terrestrial deployment of its wireless spectrum significantly increases the value of its Estates and most likely leads to a value-maximizing solution, whether through a sale process or an alternative transaction. A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**." A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

In pursuing a resolution with the FCC regarding the terrestrial deployment of its 4G LTE wireless network, LightSquared has always been keenly aware that the regulatory path upon which it embarked (and continues to pursue), and the restructuring path to which it is subject in these Chapter 11 Cases, may progress at different paces. Although prior filed plans either contemplated a sale or emergence from chapter 11 after approval of pending license modification applications, following certain developments in these Chapter 11 Cases (as more fully described below), certain of LightSquared's stakeholders agreed to modify the previously filed Second Amended Plan (as defined below) to propose a transaction that continues to seek to maximize the value of LightSquared's assets, but does not condition emergence from chapter 11 on approval of LightSquared's pending license modification applications.

## 2. Previously Filed Plans and Path to Plan

### a. Prior LightSquared Plans

Given the potentially disparate timing between its bankruptcy and regulatory processes, LightSquared recognized that, to exercise properly its fiduciary duty to all of its stakeholders in light of the continuing nature of the FCC process and the facts and circumstances of the Chapter 11 Cases, it would need to take action to protect its Estates and the current value of its assets through the filing of a chapter 11 plan that contemplates a sale of the Estates' assets. Accordingly, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of LightSquared's assets. Notwithstanding the filing of, and commencement of the solicitation of votes for, the First Amended Plan, LightSquared was always receptive to any potential alternative transactions that would provide greater value for the Estates and all of LightSquared's stakeholders, and, indeed, fully preserved its rights to determine that it was in the best interests of these Estates to modify or supplement the First Amended Plan.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential Sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring

2

plans or plans of reorganization filed by LightSquared or any other parties.  In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets.  In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders.  After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates.  Indeed, LightSquared's advisors were informed that, in light of the current circumstances surrounding these Chapter 11 Cases and the nature of the $2.22 billion stalking horse bid submitted by L-Band Acquisition, LLC ("LBAC"), combined with the substantial holdings of debt issued under the Prepetition LP Facility held by its affiliate, SPSO, multiple potential bidders were reluctant to participate in the Auction.  Given this market feedback, LightSquared was not surprised that, although it had actively solicited participation in the Auction and the submission of bids for the purchase of its Assets, it ultimately only received bids from parties already highly involved in these Chapter 11 Cases.  No qualified bids were received from third parties outside of its capital structure.

While LightSquared was unable to obtain robust participation in the sale process and Auction, third parties expressed to LightSquared an interest in providing LightSquared with debt and equity to reorganize.  LightSquared and its advisors, at the direction of the Special Committee, thus worked diligently with such third parties over the course of two (2) months to solidify a new value reorganization proposal.  LightSquared's diligent efforts were rewarded with a proposal from the Plan Support Parties – nearly all existing stakeholders in LightSquared's capital structure and certain independent third parties that believe in the future viability and value of LightSquared – to support a plan of reorganization based on new financing and equity investments (the "Alternative Transaction"), subject to receipt of required approvals and execution and delivery of definitive documentation and related commitment letters in form and substance satisfactory to each of the parties and the satisfaction of the conditions set forth in the Plan and therein.

After expending considerable time and effort evaluating all bids received, including those submitted pursuant to the Bid Procedures Order and those submitted in the form of new value reorganization proposals, LightSquared, at the direction of the Special Committee, determined that the Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders.  Accordingly, at the direction of the Special Committee, LightSquared did not hold the Court-scheduled Auction for LightSquared's Assets, or any grouping or subset thereof, under the First Amended Plan, and did not deem any bid received for the Assets, or any grouping or subset thereof, the Successful Bid under its First Amended Plan [Docket Nos. 1086 and 1108].  Instead, in accordance with LightSquared's belief that the Alternative Transaction would (a) maximize the value of LightSquared's assets for all of its stakeholders, (b) allow such stakeholders to realize the true value of LightSquared's assets once LightSquared's license issues are resolved, (c)

provide greater recoveries to all stakeholders as compared to each of the sale plans that had been proposed, and (d) provide the best resolution to the Chapter 11 Cases, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan. LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated the reorganization of LightSquared through the Alternative Transaction.

**b.      Termination of LBAC Bid**

Following the filing of the Second Amended Plan, on January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement, dated as of July 23, 2013 (the "Plan Support Agreement"), between the Ad Hoc Secured Group and LBAC, based on the alleged failure to meet certain milestones set forth therein, and subsequently informed the Ad Hoc Secured Group of the termination of the LBAC Bid.  On January 13, 2014, the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220] (the "Ad Hoc Secured Group Statement"), in which the Ad Hoc Secured Group challenged LBAC's termination of its bid for the LP Debtors' assets (the "LBAC Bid").  On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the plan support agreement and the LBAC Bid were appropriately and lawfully terminated by LBAC.  The Ad Hoc Secured Group has reserved its rights regarding this matter in all respects.  In addition, LightSquared may also have claims against LBAC and DISH Network Corporation ("DISH"), including claims for damages, based on the same facts and circumstances set forth in the Ad Hoc Secured Group Statement (including breaches by LBAC and DISH of the Bid Procedures Order and Asset Purchase Agreement).  LightSquared reserves all of its rights with respect to such matters in all respects.

**c.      Amended Alternative Transaction**

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the Plan Support Parties discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization.  These discussions led to the filing of the further amended Plan to enhance the transactions contemplated by the Second Amended Plan and place LightSquared in an even better position to reorganize and maximize value for all of the Estates and stakeholders.

The Plan represents the culmination of significant negotiations and efforts by LightSquared, ~~certain~~**substantially all of the** key constituents in the Chapter 11 Cases, and certain third party investors to develop a restructuring plan that will achieve maximum returns

for the Estates and stakeholders.  Importantly, effectiveness of the Plan is not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (*i.e.*, among other approvals, the license modification), thereby addressing a key concern of certain of LightSquared's significant stakeholders.  Rather, the only regulatory approvals required for the Plan's effectiveness are customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of any statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that are necessary in connection with LightSquared's emergence from chapter 11 pursuant to the Plan.  To fund LightSquared's operations through the Effective Date and to indefeasibly repay in full on the New DIP Closing Date the Allowed DIP Inc. Claims, DIP LP Claims, Non-Converted Prepetition LP Facility Non-SPSO Claims, and Prepetition Inc. Facility Non-Subordinated Claims, the Plan Support Parties and certain other entities are providing LightSquared a $1.65 billion new debtor in possession credit facility.  More specifically, as set forth herein, the Plan contemplates, among other things, (i) $1.65 billion in new debtor in possession financing (approximately $930 million of which will be converted into second lien exit financing, $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and approximately $115 million of which will be converted into equity, in each case, subject to adjustments as set forth in the Plan), (ii) first lien exit financing, including a facility of not less than $1 billion, (iii) the issuance of new debt and equity instruments, (iv) the assumption of certain liabilities, (v) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (vi) the preservation of LightSquared's litigation claims.

Upon their emergence from bankruptcy, the New LightSquared Entities will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. LightSquared~~ and~~**, the Plan Support Parties, the Ad Hoc Secured Group, the Prepetition LP Agent,** the DIP Inc. Agent**, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders** accordingly believe that the Plan will maximize the value of the Estates for the benefit of all of LightSquared's creditors and equityholders and is currently the highest and best restructuring offer available to LightSquared.  Moreover, it is the only all-inclusive restructuring proposal that envisions value being obtained for, and provided to, all of the Estates and is thus – compared to a value-minimizing liquidation – the only path available for all of the Estates to successfully exit the Chapter 11 Cases.  Given the undeniable benefits of the contemplated restructuring, it is therefore not surprising that the Plan has received overwhelming consensus and support from ~~a substantial portion~~**substantially all** of LightSquared's significant stakeholders.

Moreover, in light of the broad support for the Plan, LightSquared is not pursuing at this time confirmation of the Alternate Inc. Debtors Plan.  The Alternate Inc. Debtors Plan, like the chapter 11 plans proposed by Harbinger, the Ad Hoc Secured Group, and the Prepetition Inc. Lenders (other than Harbinger), will be held in abeyance until the earlier of confirmation of the Plan and April 15, 2014.

For more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

5

### 3.    General Structure of LightSquared and New LightSquared Entities

As of the Petition Date, LightSquared maintained the following corporate organizational structure:

### PREPETITION DEBTOR ORGANIZATION CHART



In connection with the restructuring transactions contemplated by the Plan, the Debtors will be reorganized and a new limited liability company – NewCo – will be formed to, among other things, hold equity interests in certain of the Reorganized Debtors and issue equity interests to certain Entities.  More specifically, Reorganized LightSquared Inc., Reorganized LightSquared Investors Holdings Inc., Reorganized TMI Communications Delaware, Limited Partnership, Reorganized SkyTerra Rollup LLC, Reorganized SkyTerra Rollup Sub LLC, and Reorganized One Dot Four Corp. will sell, assign, and/or transfer to NewCo all of such Entities' Assets and Equity Interests (other than such Entities' tax attributes or Equity Interests in Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, Reorganized One Dot Four Corp., and Reorganized SkyTerra Rollup Sub LLC), including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Entities' Equity Interests in LightSquared LP, Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized One Dot Six LLC, intellectual property, contractual rights, and Retained Causes of Action, and NewCo will assume all obligations related thereto (including the payments to equityholders).  All other Reorganized Subsidiaries will sell, assign, and transfer to NewCo all of such Reorganized

6

Subsidiaries' legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action.

As a result of the foregoing Plan Transactions, (a) NewCo will be the limited partner, and Reorganized LightSquared GP LLC will be the general partner, of Reorganized LightSquared LP, (b) NewCo will wholly own Reorganized One Dot Six LLC, (c) each of the Reorganized Subsidiaries (other than Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.) will have been sold, assigned, and transferred to NewCo and will become subsidiaries of NewCo on the Effective Date, and (d) Reorganized LightSquared Inc. will retain its 100% ownership of Reorganized LightSquared Investors Holdings Inc., Reorganized SkyTerra Rollup LLC, and Reorganized One Dot Four Corp.  In addition, NewCo will, among other things, issue several series of equity interests – including, the NewCo Series A-1 Preferred PIK Interests, NewCo Series A-2 Preferred PIK Interests, NewCo Class A Common Interests, NewCo Class B Common Interests, NewCo Class C Common Interests, and NewCo Class D Common Interests – to Reorganized LightSquared Inc., certain Plan Support Parties, certain Holders of Allowed Claims or Allowed Equity Interests, and other eligible Entities, as applicable, under the Plan. Reorganized LightSquared Inc. will hold (v) 22.22% of loans under the Second Lien Exit Facility, (w) 22.22% of NewCo Series A-1 Preferred PIK Interests, (x) $51.7 million of the NewCo Series A-2 Preferred PIK Interests, (y) 22.22% of NewCo Class A Common Interests, and (z) 100% of NewCo Class D Common Interests (subject to the Plan Support Party C Call Option).

As a result of the Plan Transactions, the New LightSquared Entities will have the following general corporate organizational structure on the Effective Date:



**4.    Administrative and Priority Claims**

    **a.    Treatment of Administrative and Priority Claims Generally**

    In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan.  Such Claims shall be satisfied in full in accordance with the Plan.  All other Claims and Equity Interests are classified under the Plan.

    **b.    Treatment of DIP Inc. Claims**

    All DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $~~72,366,120.36~~**73,813,442.71** as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's

legal and financial advisors incurred through and including the New DIP Closing Date, *plus* notwithstanding anything contained herein, in the DIP Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, ~~all~~**any amounts payable in accordance with Section 10.03 of the DIP Inc. Credit Agreement (the "Surviving DIP Inc. Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving DIP Inc. Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of ~~the~~**one United States and one Canadian law firm to represent the collective interests of the Prepetition Inc. Agent, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims,** DIP Inc. Agent**,** and **DIP Inc. Lenders, (ii) the Surviving DIP Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving DIP Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of** the DIP Inc. Agent~~'s legal and financial advisors~~ **or any DIP Inc. Lender** incurred ~~from the date after the New DIP Closing Date through and including~~**for any period from and after** the Effective Date ~~payable by the Estates solely up to the DIP Inc. Agent's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap~~. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim and the termination of the Liens securing the same (which Liens, for the avoidance of doubt, shall be released upon the indefeasible payment in full in Cash of all DIP Inc. Claims**, except for the continuation of such Liens until the Effective Date to secure the Surviving DIP Inc. Indemnity, which Liens shall be junior only to the Liens securing the New DIP Facility**), on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Claim agrees to a less favorable or other treatment, the DIP Inc. Agent, for the benefit of each Holder of a DIP Inc. Claim, shall receive Inc. Plan Consideration allocated and attributed to the DIP Inc. Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP Inc. Claim.

c.   <b>Treatment of DIP LP Claims</b>

All DIP LP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $33.7 million as of March 31, 2014 (as increased to the extent the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), *plus* all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred through and including the New DIP Closing Date to the extent, and in accordance with, the DIP LP Order.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim and the termination of the Liens securing the same, on the New DIP Closing Date, except to the extent that a Holder of a DIP LP Claim agrees to a less favorable or other treatment, each Holder of a DIP LP Claim shall receive LP Plan Consideration allocated and attributed to the DIP LP Obligors in the form of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed DIP LP Claim.

5.    **Classes and Treatment**

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan. For example, Holders in Classes that are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote. This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution. Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Debtors' Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | Inc. Other Priority Claims | Each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 2 | LP Other Priority Claims | Each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 3 | Inc. Other Secured Claims | Each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable: (i) Inc. Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner | Unimpaired | No (Deemed To Accept) | 100% |

10

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired. | | | |
| 4 | LP Other Secured Claims | Each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the Debtors or the New LightSquared Entities, as applicable:  (i) LP Plan Consideration attributed to such LP Debtor in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | 100% |
| 5 | Prepetition Inc. Facility Non-Subordinated Claims | The (i) legal and financial advisors for the Prepetition Inc. Non-Subordinated Parties shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.5(b) of the Plan) and (ii) Prepetition Inc. Agent, for the benefit of each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim,[4] shall receive Inc. Plan | | | |

---

[4]    Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of (a) $295,091,178.04 as of March 31, 2014 (as increased to the extent **that** the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis), inclusive of principal, default interest payable thereon from the Petition Date through and including the New DIP Closing Date, and all premium payments allocable to the Prepetition Inc. Facility Non-Subordinated Claims, *plus* (b) all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the New DIP Closing Date, *plus* (c) notwithstanding anything contained herein, in**any amounts payable in accordance with Section 10.03 of** the Prepetition Inc. Credit Agreement, any other agreement, or in any order entered in these Chapter 11 Cases to the contrary, all**(the "Surviving Inc. Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving Inc. Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of **one United States and one Canadian law firm to represent the collective interests of** the Prepetition Inc. **Agent, Holders of Allowed Prepetition Inc. Facility** Non-Subordinated Parties**Claims, DIP Inc. Agent,** and **DIP Inc. Lenders; provided, that** the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred from the date after the New DIP Closing Date through and including the Effective Date payable by the Estates solely up to the**Agent, Holders of Allowed** Prepetition Inc. **Facility** Non-

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Consideration in the form of its Pro Rata share of Cash (from the proceeds of the New DIP Facility) in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claim.  For the avoidance of doubt, the treatment provided to Class 5 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Non-Subordinated Claims against any and all Debtors. | Unimpaired | No (Deemed To Accept) | 100% |
| 6 | Prepetition Inc. Facility Subordinated Claims | Each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $209 million of NewCo Series A-2 Preferred PIK Interests and (ii) 70% of the NewCo Class B Common Interests.  For the avoidance of doubt, the treatment provided to Class 6 in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors. | Impaired | Yes | 100% |
| 7A | Prepetition LP Facility Non-SPSO Claims | The respective legal and financial advisors for each of the Ad Hoc Secured Group and the Prepetition LP Agent shall receive payment in Cash of all due, payable, reasonable, and documented fees and expenses (as set forth in Article III.B.7(b) of the Plan) and:<br><br>(i)    the Prepetition LP Agent, for the benefit of each Holder of an Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim,[5] shall receive LP Plan | | | |

Subordinated ~~Parties' share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap~~ **Claims, DIP Inc. Agent, and DIP Inc. Lenders shall use the same United States and Canadian counsel, (ii) the Surviving Inc. Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring the** Chapter 11 Cases**, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving Inc. Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition Inc. Agent or any Prepetition Inc. Lender incurred for any period from and after the Effective Date.**

5    Prepetition LP Facility Non-SPSO Claims shall be Allowed and deemed to be Allowed Claims in ~~the aggregate amount of (a) $1.0883~~ **an amount equal to (a) all unpaid principal and accrued**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Consideration in the form of Cash in an amount equal to such Allowed Non-Converted Prepetition LP Facility Non-SPSO Claim; provided, that for the avoidance of doubt, any Holder of a Prepetition LP Facility Non-SPSO Claim that votes to reject the Plan shall have such Claim treated as a Non-Converted Prepetition LP Facility Non-SPSO Claim; | Impaired | Yes | 100% |

aggregate amount of (a) $1.0883 **an amount equal to (a) all unpaid principal and accrued prepetition and postpetition interest at the contract rate (including, without limitation, default rate interest) held by Prepetition LP Lenders (other than SPSO) under the Prepetition LP Loan Documents through and including** the New DIP Closing Date**, which amount is estimated to be $1.0903** billion **in the aggregate**, calculated as follows**based on the following assumptions**:  (i) the face amount of debt **held by Prepetition LP Lenders (other than SPSO)** under the Prepetition LP Loan Documents held by SPSO is $844.3**830.6** million; (ii) adequate protection payments totaling $95.7**104.6** million have been made to the Prepetition LP Lenders between the Petition Date and December 31, 2013**February 2014 (net of professional fees)**; (iiii**iii**) an estimated $16.02.**2.4** million of adequate protection payments during January, February, and**will have been made to the Prepetition LP Lenders in** March 2014 **(net of professional fees)**; and (iv) the payment of the claims**Prepetition LP Facility Non-SPSO Claims will be paid** on March 31, 2014; provided, that the aggregate Allowed**estimated** amount **of unpaid principal and interest** shall be increased to the extent that the New DIP Closing Date occurs after March 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before March 31, 2014, in each case, on a *per diem* basis**, and otherwise adjusted to reflect any changes to the foregoing assumptions**; provided, further, that solely with respect to the Converted Prepetition LP Facility Non-SPSO Claims, the Allowed amount thereof shall include any prepayment**repayment** premiums on such converted principal amount through and including the Confirmation Date, *plus* (b) all reasonable and documented fees and expenses of the **Prepetition LP Agent and the** Ad Hoc Secured Group and its**each of their** legal and financial advisors incurred through and including the New DIP Closing Date to the extent such fees and expenses remain unpaid as of such date (including after giving effect to the application of adequate protection payments in satisfaction of such fees), *plus* (c) notwithstanding anything contained herein, in**any amounts payable in accordance with Section 10.03 of** the Prepetition LP Credit Agreement, any other  agreement, or in any order entered in these Chapter 11 Cases to the contrary, all**solely to the Prepetition LP Agent and Holders of Allowed Prepetition LP Facility Non-SPSO Claims (the "Surviving LP Indemnity"); provided, that (i) with respect to professional fees and expenses, the Surviving LP Indemnity obligations shall be limited to the** reasonable and documented fees and expenses of the ~~Ad Hoc Secured Group and its legal and financial advisors incurred from the date after the~~ New DIP Closing Date ~~through and including~~**one United States and one Canadian law firm for each of the Prepetition LP Agent and the Holders of Allowed Prepetition LP Facility Non-SPSO Claims (until** the Effective Date payable by the Estates solely up to the Ad Hoc Secured Group's share (as determined by the Inc./LP Lender Parties) of the Inc./LP Lender Advisors Fee Cap)**, (ii) the Surviving LP Indemnity obligations will not extend to (and no fees or expenses will be paid in connection with) fees incurred solely in connection with monitoring** Chapter 11 Cases**, any Successor Cases, or any related Canadian proceedings, and (iii) the Surviving LP Indemnity obligations shall terminate upon the occurrence of the Effective Date and none of the Debtors, the Reorganized Debtors, and/or NewCo shall be obligated to indemnify or make any payments for any indemnification of the Prepetition LP Agent or any Prepetition LP Lender incurred for any period from and after the Effective Date.**

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | or<br><br>(ii)   each Holder of an Allowed Converted Prepetition LP Facility Non-SPSO Claim shall receive LP Plan Consideration in the form of a New DIP Tranche B Claim in an amount equal to such Holder's Converted Prepetition LP Facility Non-SPSO Claim; provided, that in the event that the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeds the New DIP Tranche B Cap, the amount of Converted Prepetition LP Facility Non-SPSO Claims exceeding such New DIP Tranche B Cap shall be converted on a Pro Rata basis (based on the aggregate amount of such Converted Prepetition LP Facility Non-SPSO Claims) back to, and treated in accordance with the Plan (including Article III.B.7(c)(i) of the Plan) for all purposes as, Non-Converted Prepetition LP Facility Non-SPSO Claims.<br><br>For the avoidance of doubt, the treatment provided to Class 7A in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility Non-SPSO Claims against any and all Debtors. | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 7B | Prepetition LP Facility SPSO Claims | Each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive one of the following:<br><br>(i)   in the event that (A) Class 7B votes to accept the Plan and (B) the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility, the SPSO Option A Treatment; or<br><br>(ii)   in the event that (A) Class 7B votes to reject the Plan, (B) the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or (C) any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the SPSO Option B Treatment.<br><br>For the avoidance of doubt, the treatment provided to Class 7B in the Plan shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition LP Facility SPSO Claims against any and all Debtors. | Impaired | Yes | 100% |
| 8 | Inc. General Unsecured Claims | Each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Inc. Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. General Unsecured Claim. | Impaired | Yes | 100%[6] |
| 9 | LP General Unsecured Claims | Each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive LP Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | 100% |
| 10 | Existing LP Preferred Units | Each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive LP Plan | Impaired | Yes | 100% |

---

6    LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | Equity Interests | Consideration in the form of its Pro Rata share of (i) Cash in an amount equal to $223 million and (ii) $75 million of NewCo Series A-2 Preferred PIK Interests. | | | |
| 11A | Existing Inc. Series A Preferred Stock Equity Interests | Each Allowed Existing Inc. Series A Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $17.54 million of NewCo Series A-2 Preferred PIK Interests and (ii) 90.9% of the NewCo Class C Common Interests. | Impaired | Yes | 100% |
| 11B | Existing Inc. Series B Preferred Stock Equity Interests | Each Allowed Existing Inc. Series B Preferred Stock Equity Interest shall receive Inc. Plan Consideration in the form of its Pro Rata share of (i) $1.76 million of NewCo Series A-2 Preferred PIK Interests and (ii) 9.1% of the NewCo Class C Common Interests; provided, that, in lieu of such treatment, SIG Holdings Inc., in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Existing Inc. Series B Preferred Stock Equity Interest, shall receive 100% of the Reorganized LightSquared Inc. Common Shares. | Impaired | Yes | 100% |
| 12 | Existing Inc. Common Stock Equity Interests | Each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive Plan Consideration in the form of its Pro Rata share of 30% of the NewCo Class B Common Interests. | Impaired | Yes | TBD |
| 13 | Intercompany Claims | Each Allowed Intercompany Claim shall be Reinstated for the benefit of the Holder thereof; provided, that LightSquared Inc. agrees that it shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that it can assert against each of the other Debtors, and all other Debtors agree that they each shall not receive any recovery on account of, and shall discharge, any and all of the Intercompany Claims that they each can assert against LightSquared Inc. | Unimpaired | No (Deemed To Accept) | 100% |
| 14 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof. | Unimpaired | No (Deemed To Accept) | 100% |

16

**B.      Chapter 11 Cases**

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

**1.      Ergen Adversary Proceeding**

Article III.D.3 of the General Disclosure Statement provides a discussion of the adversary proceeding brought against Ergen, EchoStar Corporation, DISH, and SPSO relating to, among other things, such defendants' conduct (a) with respect to acquiring Prepetition LP Facility Claims in violation of the Prepetition LP Credit Agreement, and (b) throughout the Chapter 11 Cases and LightSquared's restructuring efforts.  Since the filing of the General Disclosure Statement, the parties to the Ergen Adversary Proceeding have, among other things, engaged in discovery and submitted pre-trial briefs in support of their cases and defenses, as applicable.  In addition, hearings were conducted for the Ergen Adversary Proceeding throughout January 2014, during which various witnesses associated with LightSquared and the defendants testified and were cross-examined.  The record in the Ergen Adversary Proceeding has closed.  The plaintiffs must file their findings of fact and memorandum of law by February 24, 2014, the defendants must file their findings of fact and memorandum of law by March 10, 2014, and the Court will hear closing arguments on March 12, 2014.

Independent of the Ergen Adversary Proceeding, the Ad Hoc Secured Group and other parties in interest are entitled to pursue the equitable subordination of SPSO's Claims in conjunction with confirmation of a plan that contemplates subordination of the SPSO claims. This relief may be premised on theories of misconduct different from, or in addition to, those set forth in the Ergen Adversary Proceeding.

The Ad Hoc Secured Group intends to proceed as outlined herein.  In addition to the facts alleged and claims asserted in connection with the Ergen Adversary Proceeding, LightSquared and other parties aligned with LightSquared in the Ergen Adversary Proceeding (the "Supporting Parties") believe that the entities controlled by Ergen, including SPSO, LBAC, and DISH (collectively, the "Ergen Entities"), continued to engage in inequitable conduct throughout these Chapter 11 Cases.  LightSquared and the Supporting Parties believe that such conduct further supports a determination by the Bankruptcy Court that SPSO's Claims should be equitably subordinated and that its vote on the Plan should be designated. The parties further believe that each of the Ergen Entities has acted in concert in these Chapter 11 Cases at the direction of Ergen, and due to the lack of separation and disregard of corporate formalities by and between the Ergen Entities, their collective misconduct is attributable to SPSO and its Claims.

LightSquared and the Supporting Parties believe that Ergen Entities' inequitable scheme – which was outlined to the DISH board in a May 2, 2013 presentation – began when SPSO, which is controlled by Ergen, acquired LightSquared LP secured bank debt and preferred stock to influence these Chapter 11 Cases.  The parties further believe that the

evidence at trial contradicted the Ergen Entities' contention that SPSO purchased LightSquared LP's debt solely as an investment. Rather, the evidence demonstrated that SPSO's acquisition was a scheme to control LightSquared's bankruptcy process and to facilitate a spectrum acquisition option by DISH. Among other things, Ergen's and Stephen Ketchum's testimony demonstrated that (a) the Ergen Entities paid a third percent (30%) premium on what Ergen believed the debt was worth in order to obtain a blocking position, (b) obtaining a blocking position was an early objective, and (c) the Ergen Entities' equated the blocking position with facilitating the acquisition of LightSquared's spectrum assets.

LightSquared and the Supporting Parties further believe that, in the next phase of the Ergen Entities' concerted scheme, shortly after SPSO had acquired a blocking position, Ergen caused LBAC to make a bid for substantially all of LightSquared LP's assets, a bid that Ergen designed to be particularly attractive to LightSquared LP's other secured lenders by consisting of an amount sufficient to pay LightSquared LP's secured debt in full, and conditioning payment only on Hart-Scott-Rodino approval. The Ergen Entities, however, were already contemplating ways in which they could pay less than the agreed purchase price for the LightSquared LP assets if no other bids materialized. This tactic – reverting at a later date with an altogether different bid – was also outlined in the May 2, 2013 presentation.

The Ad Hoc Secured Group informed LightSquared of the following additional allegations raised by the Ad Hoc Secured Group regarding the Ergen Entities:

- In reliance on the LBAC Bid, the Ad Hoc Secured Group entered into the Plan Support Agreement, pursuant to which the Ad Hoc Secured Group agreed to file and prosecute a plan (the "Ad Hoc Secured Group Plan") that would be funded by the LBAC Bid or a higher and better offer obtained through an auction. In addition, to reduce execution risk and to ensure that junior stakeholders would receive value, the Ad Hoc Secured Group agreed that if the LBAC Bid was the only bid received, then the Claims of LightSquared LP's lenders under the Ad Hoc Secured Group Plan would be reduced by three (3) months of interest. To protect its economics under the Ad Hoc Secured Group Plan, the Ad Hoc Secured Group required that funding occur by year end, with confirmation occurring in early December 2013. In contrast to the Ad Hoc Secured Group's focus on the timing of payment, the Ergen Entities were focused on when bid protections would be provided and when an auction would be commenced. The parties' agreement regarding deadlines was reflected in milestones attached to the Plan Support Agreement.

- The day after the parties entered into the Plan Support Agreement, the Bankruptcy Court held a hearing regarding LightSquared's proposed timeline for the confirmation process, including with respect to the Ad Hoc Secured Group Plan and other competing plans that were expected to be filed. At the conclusion of the hearing, the Bankruptcy Court set a confirmation timeline that included dates beyond those set forth in the Plan Support Agreement milestones. Despite this fact, the Ergen Entities refused at the time to amend the milestones, but

repeatedly expressed their commitment to follow through with the deal so long as they could get bid protections in a timely manner.

- With the support of the Ad Hoc Secured Group, and after protracted negotiations with LightSquared, LBAC gained the competitive advantage of being a stalking horse and received material bid protections, including approval of a break-up fee over $50 million. To get the bid protections (and clearly showing the Ergen Entities' lack of concern with the December milestones for confirmation and funding), LBAC agreed to make its offer irrevocable.

- Late in the auction process, LightSquared obtained a short extension of the auction and confirmation schedule to accommodate the development of other bids. Again, however, the extended dates set by the Bankruptcy Court were outside the milestones for confirmation and funding in the Plan Support Agreement, making it terminable. Even though the confirmation and funding dates were put in the Plan Support Agreement to protect the Prepetition LP Lenders' economics, and extending such milestones would have no negative impact on LBAC, the Ergen Entities inexplicably refused to extend the milestones to accommodate the revised schedule set by the Bankruptcy Court. The Ergen Entities wanted to maintain the support of the Ad Hoc Secured Group pending completion of the auction. The Ergen Entities never disclosed their secret intent to not consummate their bid unless there was another qualified bid submitted at the auction. Instead, the Ergen Entities decided to keep the Ad Hoc Secured Group locked up to support the LBAC Bid and only offered to extend the confirmation hearing milestone on a piecemeal basis, up to January 6, 2014, but never agreed to make the confirmation and funding milestones realistic in view of the January 9, 2014 confirmation hearing date already established by the Bankruptcy Court.

- Meanwhile, the auction date was extended to December 11, 2013, but no other qualified bids were submitted. With no other bidders to compete with, and LightSquared running out of money, the Ergen Entities implemented their plan to leverage a lower purchase price. With its Plan Support Agreement termination right in hand, and seeking to capitalize on a strategy that had been developed as early as May 2013, LBAC then raised for the first time a purported technical issue that it claimed needed to be resolved before it would recommit to the deal. This about-face flatly contradicted counsel for LBAC's repeated representations to the Court that LBAC's bid was a firm, unconditional offer for "a big bag of green money." Indeed, on December 24, 2013 (two weeks before the confirmation hearing), having not terminated the Plan Support Agreement or indicated that it was unwilling or unable to enter into the asset purchase agreement, the Ergen Entities sent the Ad Hoc Secured Group a proposal to modify the $2.22 billion largely unconditional bid to a bid conditioned on FCC approvals that did not account for the Prepetition LP Lenders' expected accrual of interest during that extended period before the proposed effective date (approximately $360 million). Thus, the Ergen Entities essentially converted the

19

largely unconditional commitment to purchase the LP Debtors' assets into an option to purchase such assets for significantly less value.

- After obtaining a blocking position and stalking horse protections, the Ergen Entities continuously misrepresented that they were committed to the LBAC offer, while instead conceiving of ways to reduce the purchase price even further. Indeed, even after no other bids materialized, and LightSquared was almost out of money and other parties in interest were negotiating alternative transactions, the Ergen Entities kept the Ad Hoc Secured Group locked up to the LBAC Bid and seized on the technical right to terminate the Plan Support Agreement (pursuant to a milestone that was intended to protect only the Prepetition LP Lenders' economics) in an effort to compel the Ad Hoc Secured Group to agree to sale terms grossly inferior to those that had formed the basis of the parties' agreement. When the Ad Hoc Secured Group rejected such terms, LBAC terminated the Plan Support Agreement and withdrew its bid.

LightSquared and the Supporting Parties (including the Ad Hoc Secured Group) believe that the Estates and all stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP Lenders, and all other parties in interest in these Chapter 11 Cases have suffered significant harm as a result of the Ergen Entities' continuing inequitable conduct. As asserted by the Ad Hoc Secured Group, as a result of these concerted actions of the Ergen Entities, the Ad Hoc Secured Group was unable to pursue other restructuring alternatives prior to the termination of the Plan Support Agreement, including the negotiation of a plan with LightSquared and other stakeholders. As a consequence, the length of the Chapter 11 Cases has been extended, millions of dollars of unnecessary fees were incurred, the Estates' liquidity was drained, and the cost of an alternative restructuring transaction was materially increased by, among other things, the continued accrual of interest on the Prepetition Facility Claims.

The outcome of the Ergen Adversary Proceeding and other claims made against the Ergen Parties, in conjunction with the Confirmation Hearing, may result in various relief granted to LightSquared against SPSO and the other defendants that may impact the Plan and the treatment of SPSO's asserted Claims. Among other relief, the Bankruptcy Court may determine that (a) SPSO's asserted Claims against LightSquared should be disallowed in full or in part under section 502(b) of the Bankruptcy Code, reduced to their basis, and/or subordinated under section 510(c) of the Bankruptcy Code, (b) SPSO is liable for certain damages, and/or (c) SPSO's vote should be designated pursuant to section 1126(e) of the Bankruptcy Code.

**SPSO and Mr. Charles Ergen believe the pending and threatened allegations in the Ergen Adversary Proceeding are without merit. SPSO also disputes the accuracy of many of the statements above, and believes such statements are contradicted by the record of the Ergen Adversary Proceeding.**

**C.      Solicitation Process and Voting Procedures**

On February [__], 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. ____] (the "Resolicitation Order"), which, among other things, approved the Debtors' Specific Disclosure Statement and the resolicitation of the Plan.

**1.      Solicitation Process**

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**."

**2.      Summary of Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON MARCH [3], 2014 (THE "VOTING DEADLINE").  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), OR LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS.**

### 3.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Debtors' Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d): (a) from the Claims and Solicitation Agent (i) except Ballots) at its website at http://www.kccllc.net/lightsquared, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (iii) by calling (877) 499-4509, or (iv) by emailing LightSquaredInfo@kccllc.com; or (b) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

## D.    Plan Supplement

The Plan Supplement documents for the Plan (the "Plan Supplements") are attached hereto as exhibits and incorporated herein by reference.  The Plan Supplement consists of the following documents:[7]

- Exhibit C-1 - First Lien Exit Credit Agreement

---

[7]    Exhibit C-1, Exhibit C-4, Exhibit C-5, and Exhibit C-6 **(filed with the version of the** Specific Disclosure Statement **filed on February 14, 2014 [Docket No. 1308])** contain form agreements and/or related documents with respect to the First Lien Exit Credit Agreement, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents, respectively.  ~~To the extent not filed with this Specific Disclosure Statement (including~~ **On February 17, 2014, LightSquared filed form documentation with respect to** the Second Lien Exit Credit Agreement and the NewCo LLC Operating Agreement~~), form or definitive documentation with respect to such items will be submitted prior to the hearing to approve the Disclosure Statement, and the~~ **[Docket No. 1312].  The** Exit Intercreditor Agreement and commitment letter and fee letter with respect to the First Lien Exit Credit Agreement will be filed prior to the Confirmation Hearing.  In addition, note that certain documents listed herein, while not Plan Supplement documents, are being included herein for ease of reference and shall be deemed Plan Supplement documents.

- Exhibit C-2 - Second Lien Exit Credit Agreement

- Exhibit C-3 - Exit Intercreditor Agreement

- Exhibit C-4 - Reorganized LightSquared Inc. Loan Agreement

- Exhibit C-5 - SPSO Note Documents

- Exhibit C-6 - New LightSquared Entities Corporate Governance Documents

- Exhibit C-7 - Schedule of Assumed Agreements

- Exhibit C-8 - Schedule of Retained Causes of Action

- Exhibit C-9 - Liquidation Analysis

**E.    Confirmation Procedures**

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Resolicitation Order, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation process:

- Plan Voting Deadline:  March [3], 2014 2014 at 4:00 p.m. (prevailing Pacific time).

- Plan Objection Deadline: March [10**11**], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit Voting Report: March [7], 2014 at 4:00 p.m. (prevailing Eastern time).

- Deadline to submit confirmation briefs in support of the Plan and in response to Plan Objections: March [13], 2014 at 4:00 p.m. (prevailing Eastern time).

- Confirmation Hearing: March [17], 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or LightSquared (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

**F.    Risk Factors**

Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Debtors' Specific Disclosure Statement,

including the risk factors described in Article V, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

## G.    Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

## H.    Disclaimer

In formulating the Plan, LightSquared has relied on financial data derived from its books and records.  LightSquared, therefore, represents that everything stated in the Debtors' Specific Disclosure Statement is true to the best of its knowledge.  LightSquared nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Debtors' Specific Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan.

Although the attorneys, accountants, advisors, and other professionals employed by LightSquared have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other professionals employed by LightSquared shall have no liability for the information in the Disclosure Statement.

LightSquared and its professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests.  However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a Claim and Interest is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Debtors' Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to

Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Debtors' Specific Disclosure Statement in its entirety rather than to a particular portion of the Debtors' Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Debtors' Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Debtors' Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein. The statements contained in the Debtors' Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A. The statements contained in the Debtors' Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the New LightSquared Entities, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between the Debtors' Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

## ARTICLE III
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## A.    Valuation of New LightSquared Entities' Assets

At LightSquared's request, Moelis & Company ("Moelis") performed a valuation analysis of the Reorganized Debtors' assets. Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations, and qualifications

described herein, Moelis' view as of February 11, 2014, was that the estimated enterprise valuation of the Reorganized Debtors' assets, as of an assumed Effective Date of October 31, 2014, would be in a range between $6.2 billion and $9.1 billion with a midpoint of $7.7 billion. Moelis' estimated valuation of the Reorganized Debtors' assets as of the assumed Effective Date does not include any value associated with LightSquared's net operating loss carryforwards, proceeds from potential causes of action against the GPS community, or proceeds from other pending litigation claims. Moelis' views are necessarily based on economic, market, and other conditions as in effect on, and the information made available to Moelis as of, the date of its analysis (i.e., February 11, 2014). It should be understood that, although subsequent developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or reaffirm its estimate.

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States. Moelis' analysis is also based, at LightSquared's direction, on a number of other assumptions, including that (1) LightSquared will be reorganized in accordance with the Plan, which will be effective on or prior to October 31, 2014, (2) the New LightSquared Entities' capitalization and available cash will be as set forth in the Plan and the Disclosure Statement, and (3) the applicable New LightSquared Entities will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections (as defined below). In addition, Moelis assumed that there will be no material change in economic, market, financial, and other conditions as of the assumed Effective Date.

The estimated valuation in this section represents a hypothetical valuation of the assets of the New LightSquared Entities, after giving effect to the Plan, based on certain valuation methodologies as described below. The estimated valuation in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the New LightSquared Entities, their securities or their assets, which may be significantly higher or lower than the estimated valuation range herein. The actual value of the New LightSquared Entities' assets is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of the New LightSquared Entities.

In conducting its analysis, Moelis, among other things: (1) reviewed certain publicly available business and financial information relating to LightSquared that Moelis deemed relevant; (2) reviewed certain internal information relating to the business, earnings, cash flow, capital expenditures, assets (including its spectrum assets and satellite network assets), liabilities (including spectrum leases), regulatory issues (including alleged GPS interference issues and LightSquared's pending license modification application), and general prospects of the New LightSquared Entities, including the Projections, furnished to Moelis by LightSquared; (3) conducted discussions with members of senior management and representatives of LightSquared concerning the matters described in clauses (1) and (2) of this paragraph, as well as their views concerning LightSquared's business and prospects before and

after giving effect to the Plan; (4) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (5) reviewed the financial terms of certain asset sale transactions that Moelis deemed relevant; (6) reviewed a draft of the Plan as of February 11, 2014; and (7) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. Moelis also assumed, with LightSquared's consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated valuation in this section does not constitute a recommendation to any Holder of a Claim as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to, and does not, express any view as to what the trading value of the New LightSquared Entities' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated valuation set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

## B.    Valuation Methodologies

In performing its analysis, Moelis separately valued LightSquared's spectrum usable for terrestrial mobile broadband services and its satellite network. Moelis' valuation of LightSquared's terrestrial spectrum is based on Moelis' analysis of precedent spectrum transactions and government spectrum auctions. Moelis' valuation of the satellite network is based on Moelis' analysis of replacement value.

**THIS SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED AND FACTORS CONSIDERED BY MOELIS. THE PREPARATION OF A VALUATION ANALYSIS IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS JUDGMENTAL DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND CIRCUMSTANCES, AND SUCH ANALYSES AND JUDGMENTS ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.**

### 1.    Spectrum

LightSquared directed Moelis (based on opinions of LightSquared and its FCC experts) to conduct its analysis, and Moelis has conducted its analysis, assuming LightSquared receives FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015. Moelis' spectrum valuation analysis also assumes FCC approval of an additional 10 MHz of fully usable terrestrial spectrum in approximately seven (7) years covering the United States.

Valuation of wireless spectrum is generally expressed as a multiple of megahertz-population ("MHzPOP").  The term MHzPOP is defined as the amount of spectrum bandwidth, or capacity, measured in MHz multiplied by the population of the area the spectrum covers.  Moelis' analysis is based on a United States population of approximately 312 million and a Canadian population of approximately 34 million or a total of 12.3 billion United States MHzPOPs (which takes into account potential coordination zones for certain of its spectrum where operations may be constrained) and total Canadian MHzPOPs of 1.4 billion.

Moelis reviewed spectrum transactions and government spectrum auctions completed over the last several years to derive its valuation.  Moelis determined the most relevant spectrum transactions and government auctions based on a number of factors including (1) channel size, (2) spectrum depth, (3) frequency range/propagation quality, (4) geographic coverage, (5) equipment ecosystem, and (6) regulatory characteristics.  In conducting its analysis of selected precedent spectrum transactions and comparing the spectrum in such transactions to LightSquared's spectrum, at LightSquared's direction, Moelis did not apply any discount to reflect any risk or perceived risk that (1) LightSquared would not receive FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015, or (2) LightSquared would not receive FCC approval for an additional 10 MHz of fully usable terrestrial spectrum in approximately seven years covering the United States.

No spectrum transaction or government auction used in the analysis was identical or directly comparable to LightSquared's United States or Canadian spectrum.  The analysis involved complex considerations and judgments concerning differences between LightSquared's spectrum and the spectrum involved in the various transactions and government spectrum auctions analyzed.  Moelis applied a range of $0.60 - $0.90 / MHzPOP for LightSquared's United States spectrum as of the assumed FCC approval effective dates and then discounted to present value as of the assumed Effective Date.  The value applied to 30 MHz of the Debtor's spectrum was discounted from December 31, 2015, while the value applied to the remaining 10 MHz of spectrum was discounted back seven (7) years.  Moelis applied a range of $0.12 - $0.22 / MHzPOP for the Canadian spectrum.  Moelis' analysis resulted in a total gross United States spectrum valuation range of $5.6 - $8.4 billion and a total gross spectrum valuation range of $5.8 - $8.7 billion as of the assumed Effective Date.

### 2.    Satellite Network

Moelis utilized a replacement value analysis to apply a valuation range to LightSquared's satellite network.  LightSquared's satellite network comprises two (2) satellites:  SkyTerra-1 is in orbit (accepted on February 11, 2011) and SkyTerra-2 is fully built and remains in storage.  Moelis used management's estimated total replacement value of $750 million for both satellites and applied a range of discounts to replacement value.  Moelis considered a number of factors in determining its range of discounts including:  potential buyer universe, geographic patterning, cost to relocate, inability to offer services at other frequency bands, launch costs and associated risks, and remaining life span.  Moelis assumed LightSquared's 6 MHz of dedicated satellite spectrum is included in the valuation.  Based on the mid-point of the valuation range, Moelis concluded a gross valuation of approximately $425 million for the satellite network.

## C.    Valuation Considerations

Moelis relied upon spectrum transaction precedents, government auctions, and replacement value analysis to derive its valuation for LightSquared's spectrum and satellite network, respectively.  Moelis determined that selected company trading analysis was not relevant given the lack of relevant publicly traded comparable companies.  Moelis also considered but ultimately determined not to complete a discounted cash flow analysis ("DCF Analysis") as part of its valuation analysis.  Moelis did not view a DCF analysis as a relevant valuation methodology for LightSquared at this time because LightSquared has not yet developed a business plan or financial forecast related thereto.

As a result of the foregoing, the estimated valuation in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein.  Accordingly, none of LightSquared, Moelis, or any other person assumes responsibility for the accuracy of such estimated valuation.  Depending on the actual financial results of the Debtors, changes in the financial markets, or changes in the market for spectrum, the valuation of the New LightSquared Entities as of the Effective Date may differ from the estimated valuation set forth herein as of an assumed Effective Date of October 31, 2014.  In addition, the market prices, to the extent there is a market, of New LightSquared Entities' securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## D.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  In connection with developing the Plan, and for the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections

attached hereto as <u>Exhibit B</u> (the "<u>Projections</u>"), analyzed the New LightSquared Entities' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses. The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan.

LightSquared believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the New LightSquared Entities. In general, as illustrated by the Projections, LightSquared believes that the New LightSquared Entities will be financially viable. Indeed, LightSquared believes that the New LightSquared Entities, will have sufficient liquidity, assuming the availability of the Exit Facilities and the Reorganized LightSquared Inc. Loan, to fund obligations as they arise, thereby maintaining value. Accordingly, LightSquared believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the New LightSquared Entities. Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial position after giving effect to the reorganization contemplated under the Plan, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts. Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by LightSquared, its advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies. The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, LightSquared expects that the actual and projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the New LightSquared Entities' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that LightSquared considered or considers the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. LightSquared does not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American**

Institute of Certified Public Accountants.  LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.

LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows.  Accordingly, neither LightSquared nor the New LightSquared Entities intend to, and each disclaims any obligation to:  (1) furnish updated projections to (a) Holders of Claims and Equity Interests prior to the Effective Date, (b) holders of claims under the Exit Facilities, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Loan, or the SPSO Note, or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.  LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan.  In addition, the Projections have been presented in lieu of pro forma historical financial information.  Reference should be made to Article V hereof, entitled "**Plan-Related Risk Factors To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the New LightSquared Entities.

## ARTICLE IV
## CERTAIN PLAN MATTERS

As mentioned, a description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  LightSquared believes that:  (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.  This section discusses certain specific requirements for confirmation of the Plan, including that the Plan is (y) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (z) feasible.  In addition, this section describes certain potential claims and remedies against SPSO related to the Confirmation of the Plan.

## A.    Best Interests of Creditors Test

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared (the "Liquidation Analysis").  In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under the Plan is attached hereto as Exhibit C-10.

Under the Plan, Prepetition Inc. Facility Subordinated Claims, Prepetition LP Facility Non-SPSO Claims, Prepetition LP Facility SPSO Claims, Inc. General Unsecured Claims, LP General Unsecured Claims, Existing LP Preferred Units Equity Interests, Existing Inc. Preferred Stock Equity Interests, and Existing Inc. Common Stock Equity Interests are "Impaired" and are entitled to vote to accept or reject the Plan.[8]   Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity Interests either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan. The Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan.

LightSquared believes that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared. A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the

---

[8]     Notwithstanding the foregoing, LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, LightSquared believes that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  LightSquared believes that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  Under the Plan, all Holders of Claims or Equity Interests will be paid in full in Cash or otherwise satisfied in full on the New DIP Closing Date or the Effective Date, as applicable, in accordance with the Plan.  Moreover, LightSquared believes that the New LightSquared Entities, as applicable, will have sufficient liquidity to fund obligations as they arise. Accordingly, LightSquared believes that the Plan satisfies the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## C.    Confirmation-Related Claims and Remedies Against SPSO

LightSquared recognizes the possibility that SPSO may vote to reject the Plan and oppose its confirmation.  LightSquared believes, however, that the Plan is confirmable over any such objection by SPSO based on, among other things, the Plan's treatment of SPSO's Claims complying with the Bankruptcy Code's confirmation standards, SPSO's conduct throughout the Chapter 11 Cases, and certain remedies that may be sought in connection with the Ergen Adversary Proceeding or otherwise.  As previously discussed, LightSquared believes that one or more avenues of relief should be granted against SPSO under the facts and circumstances of these Chapter 11 Cases, including under sections 502(b), 510(c), and/or 1126(e) of the Bankruptcy Code.  Accordingly, LightSquared believes that the treatment provided to SPSO under the Plan satisfies all applicable confirmation requirements under section 1129(a) and/or (b) of the Bankruptcy Code.  **SPSO disagrees with the foregoing, however, and has asserted that the Plan is not confirmable because, among other reasons, (i) the Plan unfairly discriminates against, and is not fair and equitable with respect to, SPSO, (ii) the Plan is not feasible, and (iii) the Plan's classification scheme is not permissible under applicable law.**

## ARTICLE V
## PLAN-RELATED RISK FACTORS TO CONFIRMING AND
## CONSUMMATING PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  **Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure**

**Statement (including the risk factors set forth therein), and the Debtors' Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Debtors' Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (a) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (b) risks that information in the General Disclosure Statement may be inaccurate, and (c) risks related to liquidation under chapter 7 of the Bankruptcy Code.

## A.    Certain Bankruptcy Law Considerations

### 1.    Parties in Interest May Object To LightSquared's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class. LightSquared believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, because each Class created by LightSquared contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, LightSquared intends to seek Confirmation of the Plan. If the Plan does not receive the required support from the Voting Classes, LightSquared may elect to amend the Plan.

### 3.    LightSquared May Not Be Able To Obtain Confirmation of Plan

LightSquared cannot ensure that it will receive the requisite acceptances to confirm the Plan. Even if LightSquared receives the requisite acceptances, LightSquared cannot ensure that the Bankruptcy Court will confirm the Plan. A Holder of Claims or Equity Interests might challenge the adequacy of the Disclosure Statement, the procedures for solicitation, and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things: (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be

followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code.  While LightSquared believes that the Plan complies with section 1129 of the Bankruptcy Code,**[9]** there can be no assurance that the Bankruptcy Court will reach the same conclusion.

LightSquared, subject to the terms and conditions of the Plan **(including the consent rights provided to the relevant parties therein)**, reserves the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    LightSquared May Not Obtain Recognition from Canadian Court

As conditions precedent to the Effective Date, the Plan requires that the Canadian Court shall have entered the Confirmation Recognition Order and New DIP Recognition Order, and such orders shall have become Final Orders.  LightSquared believes that such orders will be approved and entered by the Canadian Court and become Final Orders for all purposes under the Plan; however, there can be no guarantee as to such outcome.

### 5.    LightSquared May Not Be Able To Consummate Plan

Although LightSquared believes that it will be able to consummate the Plan and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date.  Consummation of the Plan is also subject to certain conditions set forth in the Plan itself.  If the Plan is not consummated, it is unclear what distributions Holders of Allowed Claims or Equity Interests (other than distributions to Holders of DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Non-Converted Prepetition LP Facility Non-SPSO Claims, which Claims shall be indefeasibly paid in full, in Cash, on the New DIP Closing Date) ultimately would receive with respect to their Claims and Equity Interests.

**In addition, the Effective Date may not occur, or may be delayed, to the extent one or more parties appeals the entry of the Confirmation Order and the appellate court stays such order.**

---

**[9]**    **SPSO asserts, however, that the Plan will not be capable of confirmation unless the Prepetition LP Facility SPSO Claims are equitably subordinated to all other claims and are disallowed in whole or in substantial part.  LightSquared does not agree with this assertion.**

6.     **LightSquared May Object to Amount or Classification of Claim**

Except as otherwise provided in the Plan, including with respect to the DIP Inc. Claims, DIP LP Claims, Prepetition Inc. Facility Non-Subordinated Claims, and Prepetition LP Facility Non-SPSO Claims, which Claims are specifically Allowed pursuant to the terms of the Plan, LightSquared reserves the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Debtors' Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Debtors' Specific Disclosure Statement.

7.     **Contingencies Not To Affect Votes of Impaired Classes To Accept Plan**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not require resolicitation of the Impaired Classes.

**B.     Factors Affecting LightSquared**

LightSquared is exposed to various factors and risks that include, without limitation, the following.

1.     **Regulatory Risks**

a.     **LightSquared May Not Receive FCC Consents To Emerge From Chapter 11 in Timely Fashion**

The effectiveness of the Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with the Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings.

b.     **LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Business Plan**

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access. LightSquared believes that record evidence demonstrates that its proposed operations would serve the public interest.  Nevertheless, LightSquared can provide no assurance that the FCC will agree with LightSquared and grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

c.    **FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service**

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users.  It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services – regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared. These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality.  Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

d.    **Transactions Contemplated by Plan May Require Various Other Regulatory Approvals**

Various other regulatory approvals, including the expiry of certain statutory waiting periods, may be required to give effect to the transactions contemplated in the Plan, including approvals and/or pre-merger filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada). There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all.  In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

2.    **Business-Related Risks**

a.    **LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To**

**Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business**

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the Exit Facilities, the Reorganized LightSquared Inc. Loan, and the SPSO Note. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although certain of the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged. If LightSquared incurs additional indebtedness, the related risks could intensify.

**b.    Exit Facilities and Reorganized LightSquared Inc. Loan Contemplated Under Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared May Incur Additional Future Debt**

The Exit Facilities and the Reorganized LightSquared Inc. Loan contemplated by the Plan may contain covenants that, among other things, restrict LightSquared's ability to take specific actions, including restrictions that may limit LightSquared's ability to engage in actions or transactions that may be in LightSquared's long-term interest. In addition, as described above, LightSquared may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the Exit Facilities and the Reorganized LightSquared Inc. Loan. These covenants may limit LightSquared's ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates. These operating restrictions may adversely affect LightSquared's ability to finance future operations or capital needs, engage in transactions with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities. LightSquared's ability to comply with any financial covenants may be affected by events beyond LightSquared's control, and there is no assurance that LightSquared will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's indebtedness could result in a default, which could allow LightSquared's lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared to

apply all available cash to repay these borrowings.  If LightSquared is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

### c.    LightSquared May Not Be Able To Achieve Its Projected Financial Results

The Projections set forth on <u>Exhibit B</u> attached hereto represent LightSquared's management's best estimate of LightSquared's future financial performance based on currently known facts and assumptions about LightSquared's future operations as well as the economy, in general, and the current industry segments (or those planned industry segments) in which LightSquared operates in particular.  LightSquared's actual financial results may differ significantly from the Projections.  If LightSquared does not achieve its projected financial results, the value of the New LightSquared Entities Shares may be negatively affected, and LightSquared may lack sufficient liquidity to continue operating as planned after the Effective Date.

### d.    LightSquared May Not Be Successful in Implementing Its Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America. There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all.  If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

    e.      **LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all. If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses. Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service. While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators. Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services. Furthermore, devices connecting to LightSquared's satellites will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays. These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business. Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

    f.      **LightSquared Faces Significant Competition from Companies that Are Larger or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger or have greater resources and from companies that may introduce new technologies. While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to the delays in rolling out its business plan, it expects that parts of its business will face competition from many well-established and well-financed

competitors, including existing cellular and Personal Communications Service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.  Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared.  Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services.  In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on its business plan or future results of operations.

g.    **Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network**

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network.  Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets.  However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices.  If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

h.    **LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers**

LightSquared's future success depends upon the knowledge, ability, experience, and reputation of its personnel.  The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

i.    **Adverse Conditions in U.S. and Global Economies Could Impact LightSquared's Results of Operations**

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services.  In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies.  Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic decisions, including the rollout of new retail service offerings.  Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

3.    **Risks Related to New LightSquared Entities Shares**

a.    **There Is Currently No Trading Market for New LightSquared Entities Shares, Active Liquid Trading Market for New LightSquared Entities Shares May Not Develop, and New LightSquared Entities Shares Will Be Subject to Certain Transfer Restrictions in New LightSquared Entities Shareholders Agreements, as Applicable**

There is currently no existing trading market for the New LightSquared Entities Shares.  LightSquared does not currently intend to apply for listing of the New LightSquared Entities Shares on any securities exchange or for quotation of such securities on any automated dealer quotation system.  An active public trading market may not develop for the New LightSquared Entities Shares and, even if one develops, such public trading market may not be maintained.  If an active public trading market for the New LightSquared Entities Shares does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all.  If any New LightSquared Entities Shares are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Entities Shares will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's control.  Historically, the market for equity securities has been volatile.  Market volatility could materially and adversely affect the

42

New LightSquared Entities Shares, regardless of LightSquared's businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Entities Shares have not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Entities Shares. The New LightSquared Entities Shares may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the New LightSquared Entities Shareholders Agreements, as applicable. This could substantially adversely impact both the liquidity and the share price of the New LightSquared Entities Shares.

## C.    Litigation Risks

To the extent that distributions available to Holders of Allowed Claims or Equity Interests under the Plan may be derived, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the New LightSquared Entities, as applicable, there can be no assurance that any such Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Allowed Claims or Equity Interests under the Plan. Additionally, there may be significant delay before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

## D.    Certain Tax Matters

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the New LightSquared Entities, see Article VI hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests. This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan. Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests. Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES**

**FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan, including those items discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan. This discussion does not apply to Holders of Claims or Holders of Equity Interests that are not United States persons (as such term is defined in the Tax Code (except to the limited extent specifically noted herein)), or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Certain United States Federal Income Tax Consequences of Plan to LightSquared

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return. Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013. Some small portion of these NOLs may be subject to existing limitations.

1.      **Treatment of Transfers to NewCo**

Pursuant to the Plan, (a) Reorganized LightSquared Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized One Dot Six LLC, (b) Reorganized LightSquared Investors Holdings Inc. will sell, assign, and transfer to NewCo its Equity Interests in Reorganized SkyTerra Investors LLC, Reorganized LightSquared GP LLC, and Reorganized LightSquared LP, (c) Reorganized TMI Communications Delaware, Limited Partnership will sell, assign, and transfer to NewCo its Equity Interests in Reorganized LightSquared GP LLC and Reorganized LightSquared LP, and (d) the Reorganized Debtors will sell, assign, and transfer to NewCo, all of their legal, equitable, and beneficial right, title, and interest to all of the Retained Causes of Action as contemplated by Article IV.V of the Plan.  In exchange for these transfers, the transferors will receive, and Reorganized LightSquared Inc. will end up owning, certain debt obligations from, and Equity Interests in, NewCo and Cash.  The United States federal income tax consequences to LightSquared in connection with the transfers to NewCo and other transactions contemplated by the Plan are not certain.  The transactions, taken together, may give rise to net taxable income or gain for LightSquared.  To the extent that transferors are treated as related to NewCo for tax purposes, certain tax rules may disallow in part or any losses that may arise in connection with the transfer of individual Assets to NewCo, which could increase any overall net taxable income or gain.  Subject to the discussion of the alternative minimum tax, below, it is anticipated that existing NOLs should generally be available to offset net tax gains, if any, recognized as a result of the consummation of the Plan.

2.      **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid and (ii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order:  (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and Equity Interests of NewCo.  Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for federal income tax purposes and the value of the Equity Interests transferred in exchange for the Claims, in each case as of the Effective Date.  Based on the terms of the Plan, LightSquared does not anticipate that there will be a

significant amount of COD Income. To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing) COD Income, such income will reduce tax attributes, including NOLs, that may remain available to Reorganized LightSquared Inc. and its reorganized subsidiaries.

### 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to potential limitation under section 382 of the Tax Code. Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.

The transactions contemplated by the Plan are likely to constitute an "ownership change" of LightSquared Inc. and its corporate subsidiaries for these purposes.

### a.    General Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.56% for ownership changes occurring in February 2014). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an Internal Revenue Service notice, treated as

recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

If section 382(l)(5) of the Tax Code, described below, does not apply (either because Reorganized LightSquared Inc. does not qualify or elects not to apply it), and Reorganized LightSquared Inc. is treated as continuing its historic business or uses a significant portion of its historic assets in a new business for at least two (2) years after the ownership change of LightSquared Inc. (there is no dispositive guidance on the application of the continuing business requirement on these particular facts), Reorganized LightSquared Inc. would retain the use and benefit of LightSquared's NOLs subject to the limitations described above.

### b.    Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three (3) taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases. Moreover, if section 382(l)(5) applies and the debtor thereafter undergoes another ownership change within two (2) years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization, to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero (0), which may effectively render such pre-change losses unavailable.

It is uncertain whether section 385(l)(5) of the Tax Code will apply to the ownership change that occurs as a result of the consummation of the Plan or, if it does apply, whether Reorganized LightSquared Inc. will elect not to apply it. If section 382(l)(5) of the Tax Code does apply, Reorganized LightSquared Inc. would retain the full use and benefit of LightSquared's NOLs (excluding those NOLs of any corporate subsidiary transferred to NewCo) remaining after taking into account the use of NOLs to offset gain, if any, recognized in connection with the transfers to NewCo as well as any reduction of NOLs for any COD Income. Any such NOLs may be substantial and will be available to Reorganized LightSquared Inc., and not NewCo.

47

4.        **Alternative Minimum Tax**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared to be liable for federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if LightSquared has NOLs in excess of the amount of any such gain.

B.        **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan**

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.  Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the claim or equity interest has been held.

1.      **Consequences to Holders of Claims**

    a.      **Holders of Prepetition Inc. Facility Subordinated Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim will receive NewCo Series A-2 Preferred PIK Interests and NewCo Class B Common Interests. A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests received in the exchange (other than amounts allocable to accrued but unpaid interest, which will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should equal the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class B Common Interests should begin on the day following the Effective Date.

    b.      **Holders of Prepetition LP Facility Non-SPSO Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the New DIP Closing Date, except to the extent that a Holder agrees to any other treatment, each Holder will receive Cash for its Allowed Prepetition LP Facility Non-SPSO Claim unless the Holder elects to receive New DIP Tranche B Claims in exchange for all or a portion of its Allowed Prepetition LP Facility Non-SPSO Claim instead of Cash (subject to the New DIP Tranche B Cap). A U.S. Holder of an Allowed Prepetition LP Facility Non-SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received and, if relevant, the "issue price" (as defined below) of the New DIP Tranche B Claims received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

On the Effective Date of the Plan, any New DIP Tranche B Claims will be paid in Cash. Because the New DIP Tranche B Claims have a maturity that is less than one (1) year from their issue date, generally, a U.S. Holder who is a cash basis taxpayer will not be required to accrue original issue discount (as defined below) on its New DIP Tranche B Claims unless it elects to do so. U.S. Holders who make this election and U.S. Holders who report income for United States federal income tax purposes on the accrual method are required to include original issue discount (including stated interest, if any) in income on its New DIP Tranche B Claims as it accrues on a straight-line basis, unless an election is made to use the constant yield method (based on daily compounding). In the case of a U.S. Holder who is not required and does not elect to include original issue discount in income currently, any gain realized on the sale, exchange, or redemption of its New DIP Tranche B Claims will

be ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding), reduced by any interest received through the date of sale, exchange, or redemption. In addition, the U.S. Holder will be required to defer deductions for any interest paid on indebtedness incurred to purchase or carry New DIP Tranche B Claims in an amount not exceeding the deferred interest income, until such deferred interest income is recognized.

### c.      Holders of Prepetition LP Facility SPSO Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim will receive the SPSO Note. A U.S. Holder of an Allowed Prepetition LP Facility SPSO Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the SPSO Note received (other than to the extent amounts are allocable to accrued but unpaid interest, which amount will be treated as described below) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). A Holder's tax basis in the SPSO Note received should equal the issue price of the SPSO Note on the Effective Date and the Holder's holding period for such SPSO Note should begin on the day following the Effective Date.

### d.      Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor will receive Cash. A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### e.      Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor will receive Cash. A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received in the exchange (other than amounts allocable to accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).

### f.    Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange.  If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### g.    Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The Internal Revenue Service could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the Holder's holding period for such property should begin on the day following the Effective Date.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### h.    Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain

51

recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 2.      Consequences to Holders of Equity Interests

#### a.      Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, except to the extent that a Holder agrees to any other treatment, each Allowed Existing LP Preferred Units Equity Interest will receive Cash and NewCo Series A-2 Preferred PIK Interests. Subject to the discussion below addressing the treatment of the exchange as a non-taxable contribution, an exchanging Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash and the fair market value of NewCo Series A-2 Preferred PIK Interests received in exchange for its Existing LP Preferred Units Equity Interests and (ii) the Holder's adjusted tax basis in the Existing LP Preferred Units Equity Interests. A Holder's tax basis in any NewCo Series A-2 Preferred PIK Interests received should equal the fair market value of such interests on the Effective Date and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests should begin on the day following the Effective Date.

Rather than a Holder of Existing LP Preferred Units Equity Interests being treated as exchanging its interests for Cash and interest in NewCo in a wholly taxable transaction, it may be possible that a Holder will be treated as, in part, contributing its Existing LP Preferred Units Equity Interests to NewCo and taking back NewCo Series A-2 Preferred PIK Interests in a non-taxable transaction. In that case, a Holder may not recognize gain or loss on the exchange of its Existing LP Preferred Units Equity Interests for NewCo Series A-2 Preferred PIK Interests, its basis in the NewCo Series A-2 Preferred PIK Interests will equal its basis in

its Existing LP Preferred Units Equity Interests exchanged therefor, and its holding period for its NewCo Series A-2 Preferred PIK Interests would include its holding period in its interests exchanged therefor.

**b.** **Consequences to Holders of Existing Inc. Series A Preferred Stock Equity Interests and Existing Inc. Series B Preferred Stock Equity Interests (other than SIG Holdings, Inc.)**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Series A Preferred Stock Equity Interest and Allowed Existing Inc. Series B Preferred Stock Equity Interest (together, but excluding Existing Inc. Series B Preferred Stock Equity Interests held by SIG Holdings, Inc., the "Specified Existing Inc. Preferred Stock Equity Interests"), except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Specified Existing Inc. Preferred Stock Equity Interest will receive (i) NewCo Series A-2 Preferred PIK Interests and (ii) NewCo Class C Common Interests.

Subject to the discussion below regarding accrued yield, a U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received and (ii) the Holder's adjusted tax basis in its Specified Existing Inc. Preferred Stock Equity Interests. A Holder's tax basis in the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should equal their fair market value as of the Effective Date, and the Holder's holding period for the NewCo Series A-2 Preferred PIK Interests and the NewCo Class C Common Interests received should begin on the day following the Effective Date.

Notwithstanding the foregoing, if (i) there is accrued but unpaid yield on the Specified Existing Inc. Preferred Stock Equity Interests and (ii) LightSquared Inc. has current or accumulated earnings and profits (as determined for United States federal income tax purposes) at the end of that taxable year, the portion of the consideration received in exchange for the unpaid yield will be treated as dividend income to the extent of LightSquared Inc.'s earnings and profits. In that case, a Holder's basis in the consideration received in respect of accrued yield paid out of LightSquared Inc.'s earnings and profits would be the fair market value of such consideration on the Effective Date, and the Holder's holding period for the consideration should begin on the day following the Effective Date.

SIG Holdings, Inc., in its capacity as a Holder of the Existing Inc. Series B Preferred Stock Interests, should contact its advisor regarding the U.S. federal consequences of the Plan to it in lights of its particular circumstances.

### c.    Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, except to the extent that a Holder agrees to any other treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest will receive NewCo Class B Common Interests. A U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the NewCo Class B Common Interests received and (ii) the Holder's adjusted tax basis in its Existing Inc. Common Stock Equity Interests. A Holder's tax basis in the NewCo Class B Common Interests received should equal their fair market value as of the Effective Date and the Holder's holding period for the NewCo Class B Common Interests should begin on the day following the Effective Date.

### 3.    Consequences of Holding NewCo Interests and Debt Obligations

### a.    NewCo Class B Common Interests and NewCo Class C Common Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Class B Common Interests or NewCo Class C Common Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources.

A Holder of NewCo Class B Common Interests or NewCo Class C Common Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### b.    NewCo Series A-2 Preferred PIK Interests

NewCo is expected to be taxed as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. Assuming NewCo is taxed as a partnership, it will generally not be subject to income tax. Instead, its taxable income or loss will be allocated to Holders of equity interests in NewCo based on United States federal income tax rules. Allocation of taxable income to a holder of NewCo Series A-2 Preferred PIK Interests may result in such Holder being required to pay tax on such income in advance of its receipt of cash distributions from NewCo. In that case, a Holder would be required to fund any such taxes from other sources. In addition, to the extent a U.S. Holder of NewCo Series A-2 Preferred PIK Interests is or will be entitled to a payment that is determined without regard to NewCo's income, such Holder may be treated as receiving

54

guaranteed payments under section 707(c) of the Tax Code. A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to a NewCo Series A-2 Preferred PIK Interest.

A Holder of NewCo Series A-2 Preferred PIK Interests that is not a U.S. Holder (a "Non-U.S. Holder") may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business, and be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder.

### c.    SPSO Note

A debt instrument, such as the SPSO Note, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash or property (other than the issuer's debt instruments) at least annually. Interest on the SPSO Note will not be unconditionally payable in cash or property at least annually. Accordingly, the SPSO Note will be treated as issued with OID.

A U.S. Holder receiving the SPSO Note will generally be required to include any OID in income over the term of such note in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its note (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the Holder in the SPSO Note. A U.S. Holder of the SPSO Note will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such note by the amount of such payments.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that

may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

LightSquared believes that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities.  **Accordingly, LightSquared urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on March [3], 2014.**

New York, New YorkDated:
February 14[22], ⸺ 2014

LightSquared Inc. (for itself and all other Debtors)

/s/ Douglas Smith
Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

**Exhibit A**

Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code

**<u>Exhibit B</u>**

Projections

## **Exhibit C**

Plan Supplement

**Exhibit C-1**

**Revised DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.,* | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**FINAL ORDER, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507,**
**(A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF**
**CASH COLLATERAL, IF ANY, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION,**
**AND (E) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion") of LightSquared Inc. and certain of its affiliates, as debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter

11 Cases"), seeking entry of a final order (this "Final Order") under sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United

States Bankruptcy Court for the Southern District of New York (the "Local Rules"), *inter alia*:

(i)        authorizing LightSquared Inc., LightSquared LP, and One Dot Six Corp.

("One Dot Six" and, collectively with LightSquared Inc. and LightSquared LP, the "DIP Borrowers") to

obtain secured, superpriority postpetition financing in the aggregate amount of $1,650,000,000 (the "DIP

Facility") on a joint and several basis, pursuant to the terms and conditions of that certain Senior Secured

Super-Priority Debtor-in-Possession Loan Agreement, substantially in the form attached as Exhibit B to

---

[1]        The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

the Motion (as may be further amended, supplemented, restated, or otherwise modified from time to time,

the "DIP Agreement"), by and among the DIP Borrowers and the other DIP Obligors (as defined herein),

[_____] (or such other institution reasonably acceptable to the parties to the DIP Agreement as

may have agreed to serve in such capacity), as Administrative Agent and Collateral Agent (in such

capacity, together with its successors in such capacity, the "DIP Agent"), for and on behalf of itself and

the other lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the

"DIP Secured Parties"), which DIP Facility shall be made up of (a) $1,350,000,000 original aggregate

principal amount of new money loans (the "Tranche A DIP Loans") and (b) $300,000,000 original

aggregate principal amount (the "Tranche B DIP Loans"), which may consist of new money loans and/or

of loans deemed made to the DIP Borrowers in exchange for a like amount of obligations outstanding

under the Prepetition LP Credit Facility (as defined below);

(ii)     authorizing (a) LightSquared Corp., SkyTerra Holdings (Canada) Inc.,

and SkyTerra (Canada) Inc. (together, the "Canadian Guarantors") and each of the direct and indirect

domestic subsidiaries of LightSquared Inc. (other than a DIP Borrower) that are debtors and debtors in

possession in the Chapter 11 Cases (together with the Canadian Guarantors, the "DIP Guarantors") to

unconditionally guarantee, jointly and severally, all obligations of the DIP Borrowers under the DIP

Facility pursuant to the terms and conditions of the DIP Agreement and (b) each of the DIP Borrowers to

unconditionally guarantee, jointly and severally, all obligations of the other DIP Borrowers under the DIP

Facility pursuant to the terms and conditions of the DIP Agreement;

(iii)    authorizing the DIP Borrowers and DIP Guarantors (collectively, the

"DIP Obligors") to execute and deliver, and perform under, the DIP Agreement and other related loan

documents (collectively with all documents comprising the DIP Facility, the DIP Budget (as defined

herein), and all other related loan and security documents, the "DIP Documents") and to perform such

other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)    granting to the DIP Secured Parties allowed superpriority administrative

expense claims in each of the DIP Obligors' Chapter 11 Cases and any of the DIP Obligors' Successor

Cases (as defined herein) for the DIP Facility and all obligations owing thereunder and under the DIP

Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP

Obligations"), subject to the limitations and priorities set forth herein;

(v)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders,

automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein),

including, without limitation, all property constituting "cash collateral" (as defined in Bankruptcy Code

section 363(a), "Cash Collateral"), if any, which liens shall be subject to the priorities set forth herein;

(vi)    authorizing and directing the DIP Obligors to pay the principal, interest,

fees, expenses, and other amounts and compensation payable under each of the DIP Documents as they

become due, including, without limitation, administrative agent's fees, and such professional fees as may

be agreed among the DIP Lenders, all to the extent provided by, and in accordance with, the terms of this

Final Order and the DIP Documents;

(vii)    providing adequate protection to (a) SP Special Opportunities, LLC

("SPSO") for any diminution in value of its interests in the Prepetition LP Collateral (as defined herein)[2],

and (b) the affiliates of Harbinger Capital Partners, LLC (collectively, "Harbinger")[3] for any diminution

in value of its interests in the Prepetition Inc. Collateral (as defined herein); and

(viii)    vacating and modifying the automatic stay imposed by Bankruptcy Code

section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP

Documents and this Final Order.

The Court having considered the Motion, the exhibits and schedules attached thereto, and the

evidence submitted or proffered and the arguments of counsel made at the hearing on the Motion held in

connection with the confirmation hearing commencing on March [___], 2014 (the "Hearing"); and

---

[2]    The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien. Should an order be entered finding that SPSO does not have a valid lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

[3]    [This draft will be revised in all applicable places to reflect that the adequate protection liens are granted to the Prepetition Agents on behalf of Harbinger and SPSO.]

adequate notice of the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014; and the Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Final Order approving the Motion and the DIP Documents having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, and their stakeholders, and is essential for the continued operation of the Debtors' businesses; and adequate protection being provided on account of the interests in and liens on property of the estates on which liens are granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date.* On May 14, 2012 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Court").

B.    *Debtors in Possession.* The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in these Chapter 11 Cases.

C.    *Jurisdiction and Venue.* This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the Chapter 11 Cases and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Committee Formation.* As of the date hereof, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed a statutory committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

-4-

E.       _Existing Cash Collateral Order._   By the *Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 544] (as amended by the *Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 1118] and the *Second Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Docket No. 1292], the "Existing Cash Collateral Order"), the Court authorized the use of cash and other collateral subject to the liens and claims of certain Prepetition Secured Parties (as defined herein) and provided adequate protection to those parties.

F.       _Inc. DIP Facility_.   By the *Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 224] (as amended by the *Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 579] ("First Order Amending Inc. DIP Order"), *Second Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 1126], and *Third Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay* [Docket No. 1286], the "Inc. DIP Order"), the Court authorized the parties thereto to enter into that certain Senior Secured Super-Priority Debtor in Possession Credit Agreement, dated as of July 19, 2012, (the "Inc. DIP Credit Agreement" and, together with all

related documents, the "Inc. DIP Facility") as amended and in effect on the date hereof, among One Dot Six, the guarantors party thereto, the lenders party thereto (the "Inc. DIP Lenders"), and U.S. Bank National Association, as administrative and collateral agent (the "Inc. DIP Agent").

G.    *LP DIP Facility.*    By the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (the "LP DIP Order"), the Court authorized the parties thereto to perform under the terms of the LP DIP Facility (as defined in the LP DIP Order) (together with the Inc. DIP Facility, the "Existing DIP Facilities").

H.    *Debtors' Stipulations*. The Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge, and agree that (collectively, paragraphs H(i) through H(viii) below are referred to herein as the "Debtors' Stipulations"):

(i)    *Prepetition Inc. Credit Facility*.    Pursuant to that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, and restated, or otherwise modified from time to time, the "Prepetition Inc. Credit Agreement" and, together with all related credit and security documents, the "Prepetition Inc. Credit Documents"), between LightSquared Inc., as borrower, the subsidiary guarantors party thereto, namely One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. (collectively, the "Prepetition Inc. Subsidiary Guarantors" and, with LightSquared Inc., the "Inc. Obligors"), the lenders party thereto (collectively, the "Prepetition Inc. Lenders"), and U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch (in such capacity, the "Prepetition Inc. Agent" and, together with the Prepetition Inc. Lenders, the "Prepetition Inc. Secured Parties"), the Prepetition Inc. Lenders provided term loans to or for the benefit of LightSquared Inc. (the "Prepetition Inc. Credit Facility").

(ii)    *Prepetition Inc. Obligations*.    The Prepetition Inc. Credit Facility provided LightSquared Inc. with term loans in the aggregate principal amount of $263,750,000. As of the

Petition Date, an aggregate principal amount of approximately $322,203,486.02 was outstanding under the Prepetition Inc. Credit Documents (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition Inc. Credit Documents (including unpaid principal, accrued and unpaid interest, including default interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Inc. Obligors' obligations pursuant to the Prepetition Inc. Credit Documents, including all "Obligations" as described in the Prepetition Inc. Credit Agreement, the "Prepetition Inc. Obligations").  Interest on the Prepetition Inc. Obligations shall be deemed to have accrued from the Petition Date to July 12, 2012 at the default rate of 17% and, from and after July 13, 2012, at the default rate of 20%.  On or about March 13, 2013, approximately $8,429,469.57 of interest owing only to each Prepetition Inc. Lender that is also an Inc. DIP Lender and accruing on the Prepetition Inc. Obligations at the default rate set forth in paragraph 16(b) of the Inc. DIP Order, from and after the Petition Date and entry of the First Order Amending Inc. DIP Order, was added and became DIP Obligations under the Inc. DIP Facility, subject to the Ad Hoc Secured Group's Challenge (as defined in the Inc. DIP Order) to the Prepetition Inc. Obligations in accordance with the Inc. DIP Order.

(iii)    *Prepetition Inc. Collateral*.  To secure the Prepetition Inc. Obligations, the Inc. Obligors granted to the Prepetition Inc. Agent, for the benefit of itself and the Prepetition Inc. Lenders, first priority security interests in and liens (the "Prepetition Inc. Liens") on (a) the One Dot Six Lease (as defined in the Prepetition Inc. Credit Documents), (b) the One Dot Four Lease (as defined in the Prepetition Inc. Credit Documents),[4] (c) the capital stock of each Prepetition Inc. Subsidiary Guarantor, and (d) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any Debtor with respect to any of the foregoing,

---

[4]      Although the One Dot Four Lease was terminated, the Prepetition Inc. Agent retained a first priority security interest in any rights and benefits that may have accrued thereunder.

whether obtained prepetition or postpetition (collectively, the "Prepetition Inc. Collateral"). The Prepetition Inc. Collateral does not include cash other than proceeds of the Prepetition Inc. Collateral.

(iv)    *Validity, Perfection, and Priority of Prepetition Inc. Liens and Prepetition Inc. Obligations.* (a) As of the Petition Date, the Prepetition Inc. Liens on the Prepetition Inc. Collateral were valid, binding, enforceable, non-avoidable, and properly perfected, subject only to certain liens otherwise permitted by the Prepetition Inc. Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Inc. Liens as of the Petition Date, the "Permitted Prior Liens"),[5] (b) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Inc. Liens or the Prepetition Inc. Obligations exist, and no portion of the Prepetition Inc. Liens or Prepetition Inc. Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (except as provided in the subordination agreement among the Prepetition Inc. Lenders) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Inc. Agent, the Prepetition Inc. Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees in respect of the Prepetition Inc. Obligations or Prepetition Inc. Liens, (d) as of the Petition Date, the value of the Prepetition Inc. Collateral securing the Prepetition Inc. Obligations exceeded the amount of those obligations, and accordingly the Prepetition Inc. Obligations are allowed secured claims within the meaning of Bankruptcy Code section 506, in a principal amount of not less than $322,203,486.02, together with accrued and unpaid interest, fees (including, without limitation, attorneys' fees and related expenses), and any and all

---

[5]    The Permitted Prior Liens are liens otherwise permitted by the Prepetition Credit Documents (as defined herein), to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date. Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected, and non-avoidable. Moreover, nothing shall prejudice the rights of any party in interest to challenge the validity, priority, perfection, or extent of any such Permitted Prior Liens and/or security interest.

other charges of whatever nature owing in respect of such Prepetition Inc. Obligations, and (e) any payments made on account of the Prepetition Inc. Obligations to or for the benefit of the Prepetition Inc. Agent or the Prepetition Inc. Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Inc. Agent and the Prepetition Inc. Lenders were oversecured, were payments out of the Prepetition Inc. Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(v)    *Challenge by Certain Prepetition LP Lenders to Prepetition Inc. Liens.* On September 15, 2012, the Ad Hoc Secured Group of Prepetition LP Lenders (the "<u>Ad Hoc Secured Group</u>") filed the *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323] (the "<u>STN Motion</u>").  The STN Motion sought derivative standing for the Ad Hoc Secured Group to bring an adversary proceeding on behalf of LightSquared Inc., One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. against certain Prepetition Inc. Lenders, Harbinger Capital Partners SP Inc., Blue Line DZM Corp., Mast AK Fund LP, Mast Credit Opportunities I Master Fund Limited, Mast OC I Master Fund, Mast PC Fund LP, Mast Select Opportunities Master Fund, Seawall Credit Value Master Fund, Ltd., Seawall OC Fund, Ltd., and the Prepetition Inc. Agent. No party other than the Ad Hoc Secured Group commenced a challenge to the Prepetition Inc. Liens or Prepetition Inc. Obligations within the Challenge Period (as defined in the Inc. DIP Order).  Pursuant to Article VIII.C of the Plan, entry of the Confirmation Order (as defined herein) shall operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the STN Motion, and the STN Motion shall be deemed withdrawn upon the occurrence of the Closing Date (as defined in the DIP Agreement).  As a result, the Inc. DIP Order's findings and stipulations as to the priority, extent, and validity of the Prepetition Inc. Liens and Prepetition Inc. Obligations shall be deemed to be of full force and effect and forever binding upon the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interests in the Debtors' Chapter 11 Cases and any Successor Cases.

(vi)    *Prepetition LP Credit Facility*.    Pursuant to that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Prepetition LP Credit Agreement" and, together with all related credit and security documents, the "Prepetition LP Credit Documents" and, together with the Prepetition Inc. Credit Documents, the "Prepetition Credit Documents"), between LightSquared LP, as borrower, LightSquared Inc. and the other parent guarantors party thereto, namely LightSquared Investors Holdings Inc., LightSquared GP Inc., and TMI Communications Delaware, Limited Partnership (collectively, the "Prepetition LP Parent Guarantors"), the subsidiary guarantors party thereto, namely ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (collectively, the "Prepetition LP Subsidiary Guarantors" and, collectively with the Prepetition LP Parent Guarantors and LightSquared LP, the "LP Obligors"), the lenders party thereto (the "Prepetition LP Lenders" and, together with the Prepetition Inc. Lenders, the "Prepetition Lenders"), UBS AG, Stamford Branch, as administrative agent (in such capacity, and, together with Wilmington Trust FSB,[6] the "Prepetition LP Agent" and, together with the Prepetition LP Lenders, the "Prepetition LP Secured Parties")[7], and other parties thereto, the Prepetition LP Lenders provided term loans to or for the benefit of LightSquared LP (the "Prepetition LP Credit Facility" and, together with the Prepetition Inc. Facility, the "Prepetition Facilities").

(vii)    *Prepetition LP Obligations*.    The Prepetition LP Credit Facility provided LightSquared LP with term loans in the aggregate principal amount of $1,500,000,000.  As of the Petition Date, an aggregate principal amount of approximately $1,700,571,106 was outstanding under the Prepetition LP Credit Agreement (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition LP Credit Documents (including unpaid principal,

---

[6]    Wilmington Trust FSB serves as collateral trustee pursuant to that certain Collateral Trust Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time), between LightSquared LP, UBS AG, Stamford Branch, and Wilmington Trust FSB.

[7]    The Prepetition LP Agent, together with the Prepetition Inc. Agent, are the "Prepetition Agents" and, together with the Prepetition Lenders, the "Prepetition Secured Parties."

accrued and unpaid interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the LP Obligors' obligations pursuant to the Prepetition LP Credit Documents, including all "Obligations" as described in the Prepetition LP Credit Agreement, the "Prepetition LP Obligations" and, together with the Prepetition Inc. Obligations, the "Prepetition Obligations").

(viii)    *Prepetition LP Collateral*.  To secure the Prepetition LP Obligations, the LP Obligors granted to the Prepetition LP Agent, for the benefit of the Prepetition LP Lenders, first priority security interests in and liens (the "Prepetition LP Liens" and, together with the Prepetition Inc. Liens, the "Prepetition Liens") on (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP and the Prepetition LP Parent Guarantors (except LightSquared Inc.), (c) certain equity interests owned by the Pledgors (as defined in the Prepetition LP Credit Documents), (d) the Intercompany Notes (as defined in the Prepetition LP Credit Documents), and (e) the rights of LightSquared Inc. under and arising out of that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Inmarsat Cooperation Agreement"), by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited (collectively, the "Prepetition LP Collateral" and, together with the Prepetition Inc. Collateral, the "Prepetition Collateral").  As of the Petition Date, the Prepetition LP Liens were subject only to the Permitted Prior Liens.  For the avoidance of doubt, the Prepetition LP Collateral includes any proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).[8]  No

---

[8]    The Prepetition LP Collateral does not include the following: (a) any permit or license issued by a Governmental Authority (as defined in the Prepetition LP Credit Agreement) or other agreement to the extent and for so long as the terms thereof validly prohibit the creation by the pledgor thereof of a security interest in such permit, license, or other agreement; (b) property subject to any Purchase Money Obligation, Vendor Financing Indebtedness, or Capital Lease Obligations (in each case, as such term is defined in the Prepetition LP Credit Agreement) if the contract or other agreement in which such lien is granted validly

party commenced a challenge to the Prepetition LP Liens or Prepetition LP Obligations by the

Investigation Termination Date (as defined in the Existing Cash Collateral Order). As a result, the

Debtors' stipulations set forth in the Existing Cash Collateral Order regarding the Prepetition LP Liens

and Prepetition LP Obligations are binding on all parties in interest.[9]

      I.     *Plan of Reorganization*.

          On March [__], 2014, the Court entered an order (the "Confirmation Order") [Docket No.

_____] confirming the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*

(the "Plan") [Docket No. _____].

      J.     *Findings Regarding the Postpetition Financing*.

          (i)     *Postpetition Sources of Funding*. Since the Petition Date, the DIP

Obligors have been funding their businesses, administering their Chapter 11 Cases, and pursuing a

reorganization through a combination of unencumbered cash, advances under the Existing DIP Facilities,

and cash (the "LP Cash Collateral") that is subject to liens and claims of the Prepetition LP Agent and

Prepetition LP Lenders. The Debtors require additional postpetition financing to (a) indefeasibly repay in

full in cash the Existing DIP Facilities, (b) indefeasibly repay in full in cash all outstanding Prepetition

Inc. Obligations other than the Harbinger Prepetition Inc. Claims (as defined below) (such outstanding

obligations, the "Specified Prepetition Inc. Claims"), (c) indefeasibly repay in full in cash specified

Prepetition LP Obligations (the "Specified Prepetition LP Claims" and, together with the Specified

---

prohibits the creation of any other lien on such property; (c) the SkyTerra-2 satellite, while title remains with Boeing Satellite Systems, Inc. ("BSSI"), and those ground segment assets related to the SkyTerra-2 satellite, while title remains with BSSI; (d) any intent-to-use trademark application to the extent and for so long as a security interest therein would result in the loss by the pledgor thereof of any material rights therein; (e) certain deposit and securities accounts securing currency hedging or credit card vendor programs or letters of credit provided to vendors in the ordinary course of business; (f) equity interests in (i) excess of 66% in non-U.S. subsidiaries (other than the Canadian Subsidiaries (as defined in the Prepetition LP Credit Agreement)) held by a U.S. subsidiary, (ii) LightSquared Network LLC, and (iii) any joint venture or similar entity to the extent and for so long as the terms of such investment restrict such security interest; and (g) any consumer goods subject to the Canadian Security Agreement (as defined in the Prepetition LP Credit Agreement). For the avoidance of doubt, the Prepetition LP Collateral includes any proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).

[9]     For the avoidance of doubt, this finding does not apply to any claims, rights, or interests held or asserted by SPSO as a result of its acquisition of interests in the Prepetition LP Facility.

Prepetition Inc. Claims, the "Specified Prepetition Claims") to the extent that such Prepetition LP

Obligations are not (i) converted into Tranche B DIP Loans or (ii) obligations held by, or for the benefit

of, SPSO, (d) pay expenses in connection with the DIP Facility, and (e) maintain operations, make certain

capital expenditures, continue the regulatory approval process, and administer and preserve the value of

their estates post-confirmation pending the effective date (the "Effective Date") of the Plan.  The ability

of the Debtors to maintain their businesses pending occurrence of the Effective Date and complete a

successful reorganization that will maximize value for all stakeholders requires the availability of

working capital from the DIP Facility, the absence of which would immediately and irreparably harm the

Debtors, their estates, their creditors, and equity holders.

> (ii)    *No Credit Available on More Favorable Terms*.  The Debtors have

engaged in a lengthy process of evaluating various competing plans of reorganization and sale proposals

in their Chapter 11 Cases and, after significant negotiations and efforts by the Debtors and certain key

constituents and investors to develop a restructuring plan, have successfully obtained confirmation of the

Plan.  As part of these efforts, the Debtors diligently sought debtor in possession financing and equity

sponsors in connection with formulation of the Plan.  Given their current financial condition, financing

arrangements, and capital structure, the DIP Obligors have been unable to obtain financing from sources

other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors have been unable

to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense.   The Debtors have also been unable to obtain credit (a) having priority over that of

administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy

Code; (b) secured by a lien on property of the DIP Obligors and their estates that is not otherwise subject

to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to

a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for

the benefit of itself and the DIP Lenders, (1) perfected security interests in and senior, first priority

priming liens on (each as provided herein) all of the DIP Obligors' existing and after-acquired assets with

the priorities set forth in paragraph 8 below, (2) superpriority administrative expense claims and liens

with the priorities set forth in paragraph 9 below, and (3) the other protections set forth in this Final Order.

(iii)    *Continued Use of Prepetition Collateral.*    The continued use of the Prepetition Collateral will enable the DIP Obligors to continue to operate their businesses for the benefit of their estates and creditors and to obtain the DIP Facility.  Harbinger, in its capacity as a Prepetition Inc. Lender, has agreed to subordinate its rights in connection with the Prepetition Inc. Liens and all other rights and benefits (including, without limitation, the right of payment) in connection with the Prepetition Inc. Facility (collectively, the "Harbinger Prepetition Inc. Claims") to the rights of the DIP Agent and DIP Lenders under the DIP Facility.  In exchange, Harbinger will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any diminution in the value (the "Diminution in Value") of its interests in the Prepetition Inc. Collateral resulting from, among other things, the subordination to the Carve-Out (as defined herein) and the DIP Facility, the use, sale, or lease of the Prepetition Inc. Collateral, and the imposition of the automatic stay.  In addition, SPSO will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any Diminution in Value of its interests in the Prepetition LP Collateral resulting from, among other things, the subordination to the Carve-Out and the DIP Facility, the use, sale, or lease of the Prepetition LP Collateral, and the imposition of the automatic stay.

(iv)    *Use of Proceeds of the DIP Facility.*  As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facility, the DIP Agent and DIP Lenders required, and the DIP Obligors agreed, that the proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Documents, including the covenant (the "DIP Budget Covenant") contained therein pertaining to compliance (subject to the Permitted Variance (as defined herein)) with the budget attached hereto as Schedule 1 (the "DIP Budget"), the covenant (the "Capital Expenditure Covenant") contained therein pertaining to compliance with the agreed maximum amount of capital expenditures, and the covenant (the "Restructuring Costs Covenant") contained therein pertaining to compliance with the agreed maximum amount of restructuring costs.

K.     _Application of Proceeds of Collateral_.    As a condition to the entry into the DIP

Documents, the extension of credit under the DIP Facility, and the authorization to use the Prepetition

Collateral, the DIP Obligors agreed to apply the proceeds of DIP Collateral as set forth in the DIP

Documents.

L.     _Adequate Protection_.

(i)     _Harbinger Adequate Protection Liens and Claims_.    Harbinger will

receive adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for

any Diminution in Value of its interests in the Prepetition Inc. Collateral.    As adequate protection,

Harbinger will receive (a) the Harbinger Adequate Protection Liens (as defined herein) and (b) the

Harbinger Adequate Protection Superpriority Claims (as defined herein), each against the Prepetition Inc.

Collateral and the Inc. Obligors only.

(ii)     _SPSO Adequate Protection Liens and Claims_.    SPSO will receive

adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for any

Diminution in Value of its interests in the Prepetition LP Collateral.    As adequate protection, SPSO will

receive (a) the SPSO Adequate Protection Liens (as defined herein) and (b) the SPSO Adequate

Protection Superpriority Claims (as defined herein), each against the Prepetition LP Collateral and the LP

Obligors only.

M.     _Sections 506(c) and 552(b)_.    In light of (a) the DIP Agent's and DIP Lenders' agreement

to subordinate their liens and superpriority claims to the Carve-Out and the current payment of

administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the

Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Prepetition

Inc. Liens, Harbinger Adequate Protection Liens, and Harbinger Adequate Protection Superpriority

Claims to the Carve-Out and DIP Facility, and (c) the subordination of the Prepetition LP Liens, SPSO

Adequate Protection Liens, and SPSO Adequate Protection Superpriority Claims to the Carve-Out and

DIP Facility, each of the DIP Agent, the DIP Lenders, SPSO, and Harbinger are entitled to a waiver of

(i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (ii) the provisions of section 506(c) of the Bankruptcy Code.

    N.    *Good Faith of DIP Agent and DIP Lenders.*

    (i)    *Willingness To Provide Financing.* The DIP Lenders each have indicated a willingness to provide financing to the DIP Obligors subject to (a) the Confirmation Order having been entered by this Court and the time for seeking a stay thereof has expired, (b) the entry of this Final Order, (c) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (d) entry of findings by this Court that such financing is essential to the DIP Obligors' estates, that the DIP Agent and DIP Lenders are extending credit to the DIP Obligors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

    (ii)    *Business Judgment and Good Faith Pursuant to Bankruptcy Code Section 364(e).* The terms and conditions of the DIP Facility and the DIP Documents, and the fees and other compensation paid and to be paid thereunder, are fair, reasonable, and the best available to the DIP Obligors under the circumstances, reflect the DIP Obligors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the use of the Prepetition Collateral were negotiated in good faith and at arms' length among the DIP Agent, the DIP Lenders, and the DIP Obligors. All extensions of credit under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Secured Parties are entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order, and the DIP Secured Parties' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP

Documents will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order, the Confirmation Order, or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

O.    *Good Cause; Immediate Entry*.  The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the DIP Obligors, their estates, and their creditors and equity holders, as its implementation will, *inter alia*, provide the DIP Obligors with the necessary liquidity to (a) move forward with consummation of the confirmed Plan, (b) minimize the disruption to the DIP Obligors' businesses and ongoing operations, (c) preserve and maximize the value of the DIP Obligors' estates for the benefit of all the DIP Obligors' creditors and equity holders, and (d) avoid irreparable harm to the DIP Obligors, their estates, their creditors, equity holders, their businesses, their employees, and their assets pending occurrence of the Effective Date.

P.    *Notice*.  Notice of the Hearing and the relief requested in the Motion has been provided by the Debtors by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to (a) the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (c) counsel to the special committee for the board of directors for LightSquared Inc. and LightSquared GP Inc., (d) counsel to the Prepetition Inc. Agent and Prepetition LP Agent, (e) counsel to the agent under the Inc. DIP Facility, (f) counsel to the LP DIP Lenders (as defined in the LP DIP Order); (g) counsel to the Ad Hoc Secured Group, (h) counsel to Harbinger, (i) counsel to SPSO, (j) the Internal Revenue Service, (k) the United States Attorney for the Southern District of New York, (l) the Federal Communications Commission (the "FCC"), (m) Industry Canada, and (n) all parties having filed a request for notice under Bankruptcy Rule 2002.  Under the circumstances, such notice of the Motion, the relief requested therein, and the Hearing complies with Bankruptcy Rule 4001(c) and (d) and the Local Rules, and no other notice need be provided for entry of this Final Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.  <u>Motion Approved</u>.  The Motion is granted on a final basis as set forth herein, the DIP Facility is authorized and approved, and the grant of adequate protection to SPSO and Harbinger for the use of the Prepetition Collateral is authorized, subject to the terms and conditions set forth in this Final Order.

2.  <u>Objections Overruled</u>.  All objections to the Motion and entry of this Final Order, to the extent not withdrawn or resolved, are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.  <u>Authorization of DIP Financing and DIP Documents</u>.  The DIP Documents are hereby approved on a final basis.  The DIP Obligors are expressly and immediately authorized and empowered on a final basis to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and, to the extent applicable, execute and deliver any and all instruments and documents which may be necessary or appropriate for the performance by the DIP Obligors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in, and provided for by, this Final Order and the DIP Documents.  Contemporaneously with the indefeasible repayment in full in cash of all Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors are authorized and directed on a final basis to indefeasibly pay, in accordance with this Final Order, the principal, interest, fees, out-of-pocket expenses, and other amounts and compensation described in the DIP Documents as such become due and payable without need to obtain further Court approval, all to the extent provided in the DIP Documents, including, without limitation, administrative agent's fees and such professional fees as may be agreed among the DIP Lenders.  None of the fees and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Subject to any *bona fide* dispute as to the reasonableness of such fees and expenses, the DIP Obligors shall pay the reasonable, actual, and documented fees and expenses provided for in this section promptly

-18-

(but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors and the U.S. Trustee.  Any and all payments or proceeds remitted to the DIP Agent or DIP Lenders pursuant to the provisions of this Final Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability.  All collections and proceeds of the DIP Collateral or Prepetition Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Final Order and the DIP Documents.  The DIP Documents evidence the valid and binding obligations of the DIP Obligors, which obligations shall be enforceable against each of the DIP Obligors and their estates in accordance with the terms of the DIP Documents.  The failure specifically to include any particular provisions of the DIP Documents in this Final Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the DIP Documents be authorized and approved in their entirety.

4.      <u>Indefeasible Repayment of Existing DIP Facilities and Specified Prepetition Claims</u>. Proceeds of the DIP Loan shall be used to, among other things, indefeasibly repay in full in cash all Existing DIP Facilities and the Specified Prepetition Claims.  For the avoidance of doubt, the amount of obligations outstanding as of March 31, 2014, which amount shall be increased to the extent the DIP Loans are funded after March 31, 2014 and decreased to the extent that the DIP Loans are funded before March 31, 2014 is (i) $73,813,442.71 under the DIP Inc. Facility, plus all reasonable and documented fees and expenses of the DIP Inc. Agent and the DIP Inc. Agent's legal and financial advisors incurred through and including the Closing Date, (ii) $[33,746,585.00] under the DIP LP Facility, plus all reasonable and documented fees and expenses of the DIP LP Lenders' legal and financial advisors incurred from and after closing of the DIP LP Facility through and including the Closing Date solely as provided in, and in accordance with, the DIP LP Order, (iii) $295,091,178.04 with respect to the Specified Prepetition Inc. Claims, plus all reasonable and documented fees and expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties' legal and financial advisors incurred through and including the Closing Date, and (iv) $1,090,300,000.00 with respect to the Specified

Prepetition LP Claims (as such amount may be adjusted to reflect any changes to the assumed amounts set forth in Article III.7.b of the Plan), plus all reasonable and documented fees and expenses of the Prepetition LP Agent, the Ad Hoc Secured Group and their respective legal and financial advisors incurred through and including the Closing Date.

5.      Authorization To Borrow.  Until the earlier of the (a) Effective Date, (b) Maturity Date (as defined in the DIP Agreement), and (c) termination of obligations under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default (as defined herein) (such earlier date, the "Termination Date"), and subject to the terms, conditions, and limitations on availability, set forth in the DIP Documents, DIP Facility, and this Final Order, the DIP Borrowers are authorized and directed to request extensions of credit under the DIP Facility of up to the principal amount of $1,650,000,000 (the "Loans").  The Loans shall be funded in a single draw (by advance and, if applicable, conversion) on the Closing Date, and all proceeds thereof not used on the Closing Date to indefeasibly repay in full in cash the Existing DIP Facilities, and the Specified Prepetition Claims, or, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, to pay fees and expenses in connection with the DIP Facility, shall be deposited into a collateral account under the control of the DIP Agent (the "Collateral Account"), from which, subject to satisfaction of the conditions set forth in the DIP Agreement, the DIP Borrowers may withdraw funds in accordance with the DIP Budget, the DIP Budget Covenant, the Restructuring Costs Covenant, or the Capital Expenditure Covenant, as applicable, and in each case subject to the DIP Agreement.  The Collateral Account shall be subject to a first priority security interest and lien in favor of the DIP Agent for the benefit of the DIP Secured Parties, subject to the terms of the DIP Documents and this Final Order.

6.      DIP Obligations.  The DIP Documents and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligors' DIP Obligations, which DIP Obligations shall be enforceable against the DIP Obligors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under

-20-

chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). The DIP Obligations will include all loans, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Obligors to the DIP Agent or any of the DIP Lenders under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Documents. The DIP Obligations shall be due and payable without notice or demand on the Termination Date, subject to the Exit Conversion (as defined herein).

7.    DIP Liens and DIP Collateral.  Pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and the DIP Lenders, on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (the "DIP Liens") any and all presently owned and hereafter acquired personal property, real property, and other assets of the DIP Obligors, whether owned, consigned by or to, or leased from or to the DIP Obligors (collectively, the "DIP Collateral")[10], including, without limitation, all (a) Prepetition Collateral, (b) accounts, (c) books, (d) chattel paper, (e) deposit accounts, (f) equipment and fixtures, (g) general intangibles, (h) inventory, (i) investment related property, (j) negotiable collateral, (k) supporting obligations, (l) commercial tort claims, (m) money, cash, and cash equivalents, (n) all leases and leasehold interests, (o) owned real property, (p) all unencumbered assets, including postpetition lawsuits or causes of action and proceeds thereof, (q) all proceeds of any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code with respect to the DIP Obligors (the "Avoidance Actions"), (r) patents, (s) trademarks, (t) copyrights, (u) equity interests, (v) contract rights, (w) network and other equipment, (x) proceeds, and (y) all rights and interests of the Debtors in NOAA spectrum, if, when and to the extent obtained.

---

[10]    All terms not specifically defined in the description of DIP Collateral shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

8.    <u>DIP Lien Priority</u>.  The DIP Liens securing the DIP Obligations shall be junior only to the Carve-Out and Permitted Prior Liens and shall otherwise be (a) valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired unencumbered assets (whether currently or hereafter unencumbered) of all DIP Obligors, and (b) valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired encumbered assets of the DIP Obligors.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior at all times to (a) the Prepetition Inc. Liens, (b) the Prepetition LP Liens, (c) the Harbinger Adequate Protection Liens, and (d) the SPSO Adequate Protection Liens.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the DIP Obligors' Chapter 11 Cases or any Successor Cases.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the DIP Obligors' Chapter 11 Cases or any Successor Cases, upon the conversion of any of the DIP Obligors' Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the DIP Obligors' Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any DIP Obligor's estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

9.    <u>DIP Superpriority Claims</u>.  Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and the DIP Lenders, an allowed superpriority administrative expense claim in each of the DIP Obligors' Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations.  For the avoidance of doubt, the DIP Superpriority Claims shall extend to proceeds of any Avoidance Actions. The DIP Superpriority Claims shall be subordinate only to the Carve-Out and shall (a) otherwise have priority over any and all administrative expenses and claims against the DIP Obligors or their estates in

-22-

any of their Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the DIP Obligors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

10.     No Obligation To Extend Credit.  None of the DIP Agent or DIP Lenders shall have any obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Documents and this Final Order have been satisfied in full or waived by the DIP Agent and the DIP Lenders, each in its sole discretion.

11.     Use of DIP Facility Proceeds.  The Loans shall be used, and the Debtors are hereby authorized, to indefeasibly repay in full in cash the Existing DIP Facilities and the Specified Prepetition Claims, to, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, pay expenses in connection with the DIP Facility, to finance capital expenditures in accordance with the Capital Expenditure Covenant, to finance restructuring costs in accordance with the Restructuring Costs Covenant, and to finance operating expenses in accordance with the DIP Budget, which DIP Budget shall (a) be tested on a monthly basis for a trailing two (2)-month period and (b) provide for withdrawals from the Collateral Account to finance operating expenses for the purposes and in the amounts described therein, subject to a variance cushion of 15% in the aggregate for all such operating expenses, in each case as set forth in the DIP Agreement or the DIP Budget, as applicable (the "Permitted Variance").  The DIP Budget shall not be amended, supplemented, or otherwise modified in a manner adverse to the DIP Lenders without the approval of the Required DIP Lenders.

12.     Weekly Status Calls.  Commencing on the first Wednesday following issuance of the Confirmation Order, and continuing on each Wednesday (or at such other time as may be agreed to by the

Required DIP Lenders in their reasonable discretion) thereafter until the Maturity Date, the DIP Borrowers will hold a status call with the DIP Agent and the DIP Lenders, relating to (a) the Plan process, regulatory updates, contemplated asset sales, assignments, allocations, and other dispositions and the Chapter 11 Cases generally, (b) the Transfer Proceedings (as defined in the DIP Agreement), (c) the Material Regulatory Requests (as defined in the DIP Agreement), and (d) the FCC Objectives (as defined in the DIP Agreement), which shall include (i) an update on, and summary of, related meetings and discussions with the FCC and other Governmental Authorities and/or FCC or other Governmental Authority (as defined in the DIP Agreement) actions since the prior briefing, (ii) an identification of FCC or other Governmental Authority meetings and other contacts with the FCC or other Governmental Authorities by the Debtors or their representatives or advisors planned or anticipated to occur within the next two-week period and the topics to be covered at such meetings or contacts, (iii) notice of any hearing planned or anticipated to occur within the next two week period before the FCC or other Governmental Authorities related to the efforts of the Companies, (iv) notice of and information regarding any written submissions expected to be made by the Debtors to the FCC or other Governmental Authorities within the next two week period, and (v) an opportunity for the Initial Lenders (as defined in the DIP Agreement) to provide consultation and input to the Debtors with respect to such efforts, submissions, and meetings.

13. <u>FCC Submissions</u>. With respect to the Material Regulatory Requests, the Transfer Proceedings, and/or the FCC Objectives, the DIP Borrowers shall provide promptly to the Specified Lenders (as defined in the DIP Agreement) (i) copies of all filings, notices, orders, and any other correspondence between the FCC and the Debtors, including copies of all documentation received from, or submitted to, the FCC in respect thereof, and (ii) after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company to the FCC.

14. <u>Amendment of the DIP Documents</u>. The DIP Obligors and DIP Secured Parties are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents if (a) the amendment, modification, supplement, or waiver is (i) in accordance with the DIP Documents, (ii) beneficial to the DIP Obligors,

and (iii) not prejudicial in any material respect to the rights of third parties, (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, supplement, or waiver is provided to counsel for the Debtors, counsel for SPSO, counsel for Harbinger, and the U.S. Trustee (collectively, the "Notice Parties") upon five (5) business days' notice and an opportunity to object, and (c) the amendment, modification, supplement, or waiver is filed with the Court; provided, however, that consent of the Notice Parties, and approval of the Court is not necessary to effectuate any such amendment, modification, or supplement.  Except as otherwise provided in this paragraph 14, no waiver, amendment, modification, supplement, or waiver of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the DIP Obligors, and with the necessary consents required under, and executed in accordance with, the DIP Documents, and approved by the Court on notice.

15.  Use of Prepetition Collateral.  Subject to the terms and conditions of this Final Order and the DIP Documents, the DIP Obligors' use of Prepetition Collateral is approved until the Termination Date or as otherwise ordered by the Court.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any DIP Obligor's use of any Prepetition Collateral or other proceeds resulting therefrom, except as permitted in this Final Order and the DIP Documents.

16.  Adequate Protection Liens.

(a)  *Harbinger Adequate Protection Liens.*  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of Harbinger's interests in the Prepetition Inc. Collateral, the Inc. Obligors hereby grant to Harbinger, effective and perfected as of the Petition Date and without the necessity of the execution by the Inc. Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition Inc. Collateral (the "Harbinger Adequate Protection Liens").  For avoidance of doubt, the Harbinger Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition LP Guarantors to the

-25-

extent not Prepetition Inc. Collateral, or (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action.  The Harbinger Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)    *SPSO Adequate Protection Liens.*[11]  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of SPSO's interests in the Prepetition LP Collateral, the LP Obligors hereby grant to SPSO, effective and perfected as of the Petition Date and without the necessity of the execution by the LP Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition LP Collateral (the "SPSO Adequate Protection Liens").  For avoidance of doubt, the SPSO Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition Inc. Subsidiary Guarantors, (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action, or (iv) the SkyTerra-2 satellite while title remains with BSSI or those ground segment assets related to the SkyTerra-2 satellite while title remains with BSSI.[12]  The SPSO Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

(c)    *Priority of Adequate Protection Liens.*

(i)    The Harbinger Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The Harbinger Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Inc. Collateral.

---

[11]    The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien.  Should an order be entered finding that SPSO does not have a valid prepetition lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

[12]    For the avoidance of doubt, the Prepetition LP Collateral includes all General Intangibles (as defined in the Prepetition LP Credit Documents) to include, among other things, contract rights relating to that certain Amendment 4 Amended and Restated Contract between LightSquared and BSSI, dated November 10, 2010 (as amended, modified, supplemented, or amended and restated through the date hereof).

(ii)     The SPSO Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The SPSO Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition LP Collateral.

17.     Adequate Protection Superpriority Claims.

(a)     *Harbinger Adequate Protection Superpriority Claim.*  As further adequate protection of the interests of Harbinger in the Prepetition Inc. Collateral against any Diminution in Value of such interests in the Prepetition Inc. Collateral, Harbinger is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Harbinger Adequate Protection Superpriority Claim") in each of the Inc. Obligors' Chapter 11 Cases and Successor Cases.  The Harbinger Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)     *SPSO Adequate Protection Superpriority Claim.* As further adequate protection of the interests of SPSO in the Prepetition LP Collateral against any Diminution in Value of such interests in the Prepetition LP Collateral, SPSO is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "SPSO Adequate Protection Superpriority Claim") in each of the LP Obligors' Chapter 11 Cases and Successor Cases.  The SPSO Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

(c)     *Priority of Adequate Protection Superpriority Claims.*

(i)     The Harbinger Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the Harbinger Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Inc. Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation,

-27-

administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the Harbinger Adequate Protection Superpriority Claim shall be *pari passu* with the SPSO Adequate Protection Superpriority Claim against LightSquared Inc.

(ii)    The SPSO Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the SPSO Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the LP Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the SPSO Adequate Protection Superpriority Claim against LightSquared Inc. shall be *pari passu* with the Harbinger Adequate Protection Superpriority Claim against LightSquared Inc.

**Provisions Common to DIP Financing and Use of Prepetition Collateral**

18.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to (a) permit the DIP Obligors to grant the DIP Liens, Harbinger Adequate Protection Liens, SPSO Adequate Protection Liens, DIP Superpriority Claims, Harbinger Adequate Protection Superpriority Claim, and SPSO Adequate Protection Superpriority Claim; (b) permit the DIP Obligors to perform such acts as the DIP Agent in is sole discretion, and the Required DIP Lenders in their sole discretion, may request to assure the perfection and priority of the liens granted herein; (c) permit the DIP Obligors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, Harbinger, and SPSO under the DIP Documents, the DIP Facility, and this Final Order; and (d) contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the

Specified Prepetition Claims, authorize the DIP Obligors to pay the DIP Agent and the DIP Lenders in accordance with the terms of this Final Order.

19.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, the Harbinger Adequate Protection Liens, and the SPSO Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law), the DIP Liens, the Harbinger Adequate Protection Liens, and the SPSO Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, Harbinger, and SPSO the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, Harbinger, and SPSO are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction (and the DIP Agent is hereby authorized, but not required, to take possession of or control over, or take any other action with respect to the DIP Collateral) in order to validate and perfect the liens and security interests granted to them hereunder, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date.  Whether or not the DIP Agent on behalf of the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, as applicable, shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments (or, in the case of the DIP Agent, to take possession of or control over any DIP Collateral), or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of this Final Order.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agent, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, respectively, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)    The DIP Obligors are authorized and directed to execute and deliver promptly to the DIP Agent and the Prepetition Agents all such agreements, financing statements, instruments, and other documents as the DIP Agent or the Prepetition Agents may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and Adequate Protection Liens, respectively.

(d)    In furtherance of the foregoing and without further approval of this Court, each DIP Obligor is authorized to do and perform all acts to make, execute, and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for such DIP Obligor's performance hereunder.

20.    _Maintenance of DIP Collateral_.  Until the (a) Effective Date and satisfaction of all DIP Obligations pursuant to the terms of the Plan or (b) indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the DIP Obligors shall (a) insure the DIP Collateral as required under the DIP Documents and (b) maintain the cash management system as set forth in the _Final Order (A) Authorizing Debtors To (I) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms and (II) Continue Intercompany Transactions, (B) Providing Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Debtors' Banks to Honor All Related Payment Requests, and (D) Waiving Investment Guidelines of Section 345(b) of Bankruptcy Code_ [Docket No. 115] (the "Cash Management Order") or as otherwise required by the DIP Documents.  This Final Order shall be deemed to modify the Cash Management Order as necessary to permit the DIP Obligors to comply with the provisions of this Final Order and the DIP Documents.

-30-

21.     <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  The DIP Obligors

shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other

than as permitted in the DIP Documents without the prior written consents as required under the DIP

Documents (and, no such consent shall be implied, from any other action, inaction, or acquiescence by the

DIP Agent, the DIP Lenders, or from any order of this Court).

22.     <u>Exit Conversion; Payment of Tranche B DIP Obligations</u>.  Upon the occurrence of the

Effective Date, (a) the Tranche A DIP Obligations shall be treated in accordance with the terms of the

Plan (the "<u>Exit Conversion</u>"), and (b) the Tranche B DIP Obligations shall be indefeasibly paid in full in

cash in accordance with the terms of the Plan.

23.     <u>Events of Default</u>.  Unless expressly waived in writing in accordance with the consents

required in the DIP Documents, each of the following shall constitute an event of default (each, an "<u>Event</u>

<u>of Default</u>" and, collectively, the "<u>Events of Default</u>"):

(a)     This Court enters an order dismissing any of the Chapter 11 Cases of the DIP

Obligors with material assets or converting any such Chapter 11 Cases to cases under chapter 7;

(b)     This Court enters an order appointing a chapter 11 trustee in any of the Chapter

11 Cases of the DIP Obligors with material assets that is not stayed following entry;

(c)     This Court enters an order (i) staying, reversing, modifying, or vacating this Final

Order or (ii) amending this Final Order, including, without limitation, any modification on the ability of

the DIP Obligors to use Prepetition Collateral and/or the provision of additional or different adequate

protection to Harbinger or SPSO;

(d)     This Court enters an order appointing an examiner with enlarged powers in any

of the Chapter 11 Cases of the DIP Obligors, or any DIP Obligor shall file a motion or other pleading

seeking the dismissal of its Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(e)     Except as expressly allowed in this Final Order, this Court enters an order

granting any lien on, or security interest in, any DIP Collateral in favor of any party other than the DIP

-31-

Agent on behalf of the DIP Lenders, or granting an administrative claim payable by a DIP Obligor to any party other than the DIP Agent on behalf of the DIP Lenders (other than administrative claims incurred in the ordinary course of business that are not senior to or *pari passu* with the superpriority administrative claim granted to the DIP Agent and the DIP Lenders pursuant to this Final Order);

(f)  This Court enters an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any DIP Collateral;

(g)  This Court enters an order granting relief from the automatic stay under section 362 of the Bankruptcy Code with respect to all or any material portion of the property of the DIP Obligors' estates;

(h)  Any DIP Obligor shall make any payment on or in respect of any prepetition indebtedness or prepetition obligations of a DIP Obligor other than (i) as permitted by an order of this Court (A) entered prior to the date of the filing of the Motion or (B) upon effectiveness of the Plan or otherwise in connection with the DIP Obligors' assumption or assumption and assignment of any executory contract, (ii) payment in accordance with the Restructuring Costs Covenant, or (iii) to the extent expressly permitted by the DIP Agreement and approved by an order of this Court (including, for the avoidance of doubt, the indefeasible repayment in full in cash of all Existing DIP Facility and Specified Prepetition Claims);

(i)  Any DIP Obligor shall fail to comply with the terms of this Final Order in any material respect, it being understood that non-compliance with the DIP Budget Covenant, or any violation of the Restructuring Costs Covenant or the Capital Expenditure Covenant, shall constitute material non-compliance with this Final Order;

(j)  (i) One Dot Six shall be in material breach of, or there shall be a material default under, the One Dot Six Lease, (ii) the One Dot Six Lease shall be rejected (within the meaning of the Bankruptcy Code) by One Dot Six or the One Dot Six Lease shall be removed from the schedule of

-32-

assumed agreements filed in connection with the Plan of Reorganization, (iii) there shall have occurred any event or condition which results in One Dot Six no longer having the right to assume (within the meaning of the Bankruptcy Code) the One Dot Six Lease, (iv) the One Dot Six Lease shall be amended in any manner without the prior written consent of the Required DIP Lenders, or (v) the One Dot Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(k)     This Court enters an order approving the sale of any substantial DIP Collateral that does not provide for the payment in respect thereof to be remitted to the DIP Agent consistent with the priorities set forth in this Final Order;

(l)     Any DIP Obligor files any pleading seeking, or otherwise consenting to, or supporting or acquiescing in any other person's motion as to, any of the matters set forth in paragraph 29; and

(m)     An Event of Default as defined in the DIP Agreement occurs.

24.     <u>Rights and Remedies Upon Event of Default; Specific Performance</u>.  Immediately upon the occurrence of and during the continuation of an Event of Default, the DIP Agent may, and as directed by the Required DIP Lenders, shall, as provided in the DIP Documents, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the DIP Obligors to the extent any such commitment remains, and/or (c) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Agent shall be referred to herein as a "<u>Termination Declaration</u>").   The Termination Declaration shall be given by email (or other electronic means) to counsel to the DIP Obligors, counsel to SPSO, counsel to Harbinger, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "<u>Termination Declaration Date</u>").  Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that seven (7) business days after the Termination Declaration Date (the

"Remedies Notice Period"), the DIP Agent and DIP Lenders shall be entitled to exercise all rights and

remedies against the DIP Collateral permitted by, and in accordance with, the DIP Documents, this Final

Order, and applicable nonbankruptcy law, and shall be permitted to satisfy the DIP Obligations and DIP

Superpriority Claims, subject to prior satisfaction of the Carve-Out.  Notwithstanding anything to the

contrary, during the Remedies Notice Period, the DIP Obligors shall be entitled to use proceeds of the

DIP Facility and Cash Collateral, if any, solely as permitted in the DIP Documents and to seek an

emergency hearing with the Court solely for the purposes of contesting whether an Event of Default has

occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an

Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be

terminated at the end of the Remedies Notice Period without further notice or order, and the DIP Obligors

shall no longer have the right to use or seek to use DIP Collateral.  The DIP Agent and DIP Lenders shall

be permitted to exercise all remedies set forth herein and in the DIP Documents and as otherwise

available at law against the DIP Collateral, without any further order of or application or motion to the

Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code,

or otherwise, against the enforcement of the liens and security interest in the DIP Collateral, or any other

rights and remedies granted to the DIP Agent and DIP Lenders with respect thereto pursuant to the DIP

Documents or this Final Order.  The DIP Secured Parties shall have the right to specific performance of

all obligations of the DIP Obligors under the DIP Agreement, the DIP Documents, and this Final Order.

The DIP Secured Parties shall have the right to submit a credit bid for up to the full face amount of the

DIP Obligations in respect of any sale of DIP Collateral, whether pursuant to a plan or otherwise, which

amount shall not be limited, capped, or reduced pursuant to section 363(k) of the Bankruptcy Code for

cause or otherwise.

25.    Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this

Final Order.  The DIP Secured Parties each have acted in good faith in connection with negotiating the

DIP Documents and extending credit under the DIP Facility, and their reliance on this Final Order is in

good faith.  Based on the findings set forth in this Final Order and the record made during the Hearing,

and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Final Order are hereafter appealed, reargued, reconsidered, reversed, modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are each entitled to the full protections provided in section 364(e) of the Bankruptcy Code and this Final Order.  Any such appeal, reconsideration, reargument, reversal, modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances previously made or made hereunder, or lien, claim, priority, or protection authorized or created previously or hereby.  Any liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of any such appeal, reconsideration, reargument, reversal, modification, amendment, or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, benefits, and protections granted herein.

26.    _Indemnification of DIP Secured Parties_.  The indemnification provisions set forth in the DIP Agreement, as modified by this Final Order, are hereby approved in their entirety.  Without limiting the generality of the foregoing, subject to the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors shall indemnify and hold harmless the DIP Secured Parties and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of, or related to, the DIP Documents, the DIP Facility, or the transactions contemplated thereby and by this Final Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agent's and each other DIP Lender's exercise of discretionary rights granted under the DIP Facility.  In

-35-

all such litigation, or the preparation therefor, the DIP Agent and each other DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the DIP Obligors agree to promptly pay the reasonable fees and expenses of such counsel.

27.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent and DIP Lenders under the DIP Documents, the DIP Obligors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent and DIP Lenders reasonable access to the DIP Obligors' premises and their books and records in accordance with the DIP Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the DIP Obligors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and DIP Lenders all such information as may be reasonably requested with respect to the business, results of operations, and financial condition of any DIP Obligor. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent or the DIP Lenders, or their respective independent certified public accountants, financial advisors, investment bankers, and consultants, with any information subject to attorney-client privilege or consisting of attorney work product.

28.    <u>Carve-Out</u>.  As used in this Final Order, "<u>Carve-Out</u>" shall mean the Inc. Carve-Out and the LP Carve-Out.

(a)    *Inc. Carve-Out*. As used in this Final Order, the "<u>Inc. Carve-Out</u>" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the Inc. Obligors; (ii) all reasonable fees and expenses incurred by a trustee for the Inc. Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; (iii) the allowed and unpaid professional fees, expenses, and disbursements allocable to the Inc. Obligors incurred on or after the Termination Date by the Debtors for any professionals retained by final order of the Court (which order has not been vacated or stayed, unless

the stay has been vacated) by the Debtors under sections 327, 328, or 1103(a) of the Bankruptcy Code (the "Chapter 11 Case Professionals") in an aggregate amount not to exceed $1.5 million plus such allowed fees, expenses, and disbursements allocable to the Inc. Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (collectively, the "Allowed Inc. Professional Fees"); and (iv) reasonable and documented professional fees incurred in connection with the Surviving Inc. Indemnity Obligations (as defined herein) to the extent permitted by paragraph 41 hereof.

(b)    *LP Carve-Out*.  As used in this Final Order, the "LP Carve-Out" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the LP Obligors; (ii) with respect to the information officer (the "Information Officer") appointed by the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court") in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended, in the Canadian Court (the "Canadian Proceedings"), all fees and expenses required to be paid to the Information Officer and its counsel in connection with the Canadian Proceedings, which fees and expenses may be secured by a charging lien granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $200,000; (iii) all reasonable fees and expenses incurred by a trustee for the LP Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; (iv) the allowed and unpaid professional fees, expenses, and disbursements allocable to the LP Obligors incurred on or after the Termination Date by the Debtors for any Chapter 11 Case Professionals (which are restructuring professionals) in an aggregate amount not to exceed $4 million, plus such allowed fees, expenses, and disbursements allocable to the LP Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (the "Allowed LP Professional Fees" and, together with the Allowed Inc. Professional Fees, the "Allowed Professional

-37-

Fees"); and (v) reasonable and documented professional fees incurred in connection with the Surviving

LP Indemnity Obligations (as defined herein) to the extent permitted by paragraph 41 hereof.

(c)       *Payment of Allowed Professional Fees Prior to Termination Date.*  Prior to the

occurrence of the Termination Date, the DIP Obligors shall be permitted to pay Allowed Professional

Fees in accordance with the Restructuring Costs Covenant.  The amounts paid shall not reduce the Carve-

Out.

(d)       *No Direct Obligation To Pay Professional Fees; No Waiver of Right To Object to

Fees.*  Neither the DIP Agent nor the DIP Lenders shall be responsible for the direct payment or

reimbursement of any fees or disbursements of any professionals incurred in connection with the DIP

Obligors' Chapter 11 Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be

construed (i) to obligate the DIP Agent or DIP Lenders in any way to pay compensation to, or to

reimburse expenses of, any professionals retained by the DIP Obligors, or to guarantee that the DIP

Obligors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out

if actual Allowed Professional Fees incurred after the Termination Date exceed the Carve-Out; (iii) as

consent to the allowance of any professional fees or expenses of any professionals retained by the DIP

Obligors; or (iv) to affect the right of the DIP Agent or DIP Lenders to object to the allowance and

payment of such fees and expenses.

29.       <u>Limitations on DIP Facility, DIP Collateral, and Carve-Out.</u>  The DIP Facility, DIP

Collateral, and Carve-Out may not be used: (a) in connection with, or to finance in any way, any action,

suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to the interests

of the DIP Agent or DIP Lenders with respect to their respective collateral or their rights and remedies

under the DIP Documents or this Final Order, as applicable, including, without limitation, for the

payment of any services rendered by the professionals retained by the Debtors in connection with the

assertion of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection,

defense, or other contested matter, the purpose of which is to seek, or the result of which would be to

obtain, any order, judgment, determination, declaration, or similar relief; (ii) invalidating, setting aside,

avoiding, or subordinating, in whole or in part, the DIP Obligations; (iii) for monetary, injunctive, or other affirmative relief against any DIP Agent or DIP Lender or DIP Collateral; or (iv) except to contest the occurrence or continuation of any Event of Default as permitted in paragraph 24, preventing, hindering, or otherwise delaying the exercise by the DIP Agent or any DIP Lender of any rights and/or remedies under this Final Order, the DIP Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court, or otherwise) by the DIP Agent or DIP Lenders upon any of the DIP Collateral, provided, that any fees, costs, and expenses incurred pursuant to this provision shall be payable solely from the Carve-Out; (b) to make any payment in settlement of any claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior written consents required under the DIP Documents; (c) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the DIP Obligors without the prior written consents required under the DIP Documents; (d) except to contest the occurrence or continuation of any Event of Default as permitted in paragraph 24, object to, contest, or interfere with in any way the DIP Agent's or DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, provided, that any fees, costs, and expenses incurred pursuant to this provision shall be payable solely from the Carve-Out; (e) to sell or otherwise dispose of DIP Collateral without the consents required under the DIP Documents; (f) with respect to any insurance proceeds constituting DIP Collateral, without the consents required under the DIP Documents; (g) to incur Indebtedness (as defined in the DIP Agreement) outside the ordinary course of business without the prior consents required under the DIP Documents; (h) to object to or challenge in any way the claims, liens, or interests (including interests in the DIP Collateral) held by or on behalf of any DIP Agent or DIP Lender; (i) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent or DIP Lender; (j) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, or DIP Liens, or any other rights or interests of

any of the DIP Agent or DIP Lenders; or (k) to prevent, hinder, or otherwise delay the exercise by any DIP Agent or DIP Lender of any rights and remedies granted under this Final Order.

30.    <u>Release</u>.  Subject to the limitations contained herein and the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the DIP Obligors' Chapter 11 Cases or Successor Cases) and any party acting by, through, or under the Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the DIP Secured Parties, and each of their respective participants and each of their respective affiliates, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations existing as of the date of this Final Order, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, and DIP Facility, as applicable, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent or DIP Lenders and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Obligations, DIP Liens, Prepetition Inc. Obligations, Prepetition LP Obligations (other than Obligations held by, or for the benefit of, SPSO) and the Prepetition Liens (other than Prepetition Liens held for the benefit of SPSO).  For the avoidance of doubt, nothing contained in this paragraph 30 or any other provision of this Final Order shall constitute a release of SPSO or any related person or entity (including, without limitation, EchoStar Corporation ("<u>EchoStar</u>"), Charles Ergen, or DISH Network Corporation ("<u>DISH</u>")), and all claims, rights, and defenses of the Debtors and their estates against SPSO, EchoStar, Mr. Ergen, and DISH are expressly retained.

31.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

32.    <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of the Carve-Out, no costs or expenses of administration of the DIP Obligors' Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Secured Parties or any of their respective claims, (b) the DIP Collateral, (c) Harbinger or the Harbinger Adequate Protection Superpriority Claims, or (d) SPSO or the SPSO Adequate Protection Superpriority Claims pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law or in equity, without the prior written consent of the Initial Lenders, and no such consent shall be implied from any other action or inaction by the Initial Lenders.

33.    <u>Equities of the Case</u>.  Effective upon entry of this Final Order and in light of (a) the DIP Agent's and DIP Lenders' agreement to subordinate their liens to the Carve-Out and the Permitted Prior Liens and superpriority claims to the Carve-Out, and the current payment of administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Harbinger Adequate Protection Liens and Harbinger Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, and (c) the subordination of the SPSO Adequate Protection Liens and SPSO Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, each of the DIP Agent, the DIP Lenders, Harbinger, and SPSO shall be entitled to all benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, product, offspring, or profits of any of their collateral and proceeds shall be received and applied pursuant to the DIP Documents.  The DIP Agent, the DIP Lenders, Harbinger, and SPSO shall not be subject to the equitable doctrine of "marshaling" or any other similar

-41-

doctrine with respect to any of the DIP Collateral, Prepetition Inc. Collateral, or Prepetition LP Collateral, and proceeds shall be received and applied pursuant to the DIP Documents.

34.    <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

35.    <u>Discharge Waiver</u>.  The Debtors expressly stipulate, and the Court finds and adjudicates, that the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations.

36.    <u>Rights Preserved</u>.  Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Agent and DIP Lenders are preserved.

37.    <u>No Waiver by Failure To Seek Relief</u>.  The failure of any DIP Agent or DIP Lender, to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable DIP Agent or DIP Lender.

38.    <u>Binding Effect of Final Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, all other creditors of any of the Debtors, and all other parties in interest and their respective successors and assigns, including

any trustee or other fiduciary hereafter appointed in any of the DIP Obligors' Chapter 11 Cases, any

Successor Cases, or upon dismissal or conversion of any Chapter 11 Case or Successor Case.

39.    <u>No Modification of Final Order</u>.    Until and unless the DIP Obligations and DIP

Superpriority Claims have been indefeasibly paid in full in cash (such payment or conversion being

without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge

by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the DIP

Obligors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a)

except as permitted under the DIP Documents and with the prior written consent of each of the Initial

Lenders (i) any appeal, reconsideration, reargument, reversal, modification, stay, vacatur, or amendment

to this Final Order; (ii) a priority claim for any administrative expense or unsecured claim against the DIP

Obligors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation

any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b)) of the

Bankruptcy Code in any of the DIP Obligors' Chapter 11 Cases or Successor Cases, equal or superior to

the DIP Superpriority Claims, other than the Carve-Out, or (iii) any other order allowing use of the DIP

Collateral, and (b) except as permitted under the DIP Documents, any lien on any of the DIP Collateral

with priority equal or superior to the DIP Liens.  The DIP Obligors irrevocably waive any right to seek

any amendment, modification, or extension of this Final Order without the prior written consent, as

provided in the foregoing, of each of the Initial Lenders, and no such consent shall be implied by any

other action, inaction, or acquiescence of any of the Initial Lenders.  The DIP Obligors irrevocably waive

the right to seek any amendment or modification of this Final Order that will change, alter, amend, delay,

or impair in any way (w) the treatment provided to the Allowed DIP Inc. Claims (as defined, and set

forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing

thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed

DIP Inc. Claims without the prior written consent of the Holders of such Allowed DIP Inc. Claims (in

each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to

vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New

-43-

DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan), and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Inc. Agent or the Holder of any Allowed DIP Inc. Claims, (x) the treatment provided to the Allowed Prepetition Inc. Facility Non-Subordinated Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims without the prior written consent of the Holders of such Allowed Prepetition Inc. Facility Non-Subordinated Claims (in each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan), and no such consent shall be implied by any other action, inaction, or acquiescence of the Prepetition Inc. Agent or the Holder of any Allowed Prepetition Inc. Facility Non-Subordinated Claim, (y) the treatment provided to the Allowed DIP LP Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed DIP LP Claims without the prior written consent of the Holders of such Allowed DIP LP Claims (in each case, solely to the extent such Holders voted to accept the Plan), and no such consent shall be implied by any other action, inaction, or acquiescence of the Holder of any Allowed DIP LP Claim; and (z) the treatment provided to the Allowed Prepetition LP Facility Non-SPSO Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan and this Final Order, or consideration, releases, or indemnities provided to the Holders of Allowed Prepetition LP Facility Non-SPSO Claims,  without the prior written consent of the Holders of a majority in amount of such Allowed Prepetition LP Facility Non-SPSO Claims (in each case, solely to the extent such Holders voted to accept the Plan) who are members of the Ad Hoc Secured Group, and no such consent shall be implied by any other action, inaction, or acquiescence of the Prepetition LP Agent or any Holder of an Allowed Prepetition LP Facility Non-SPSO Claim.

-44-

40.    <u>Final Order Controls</u>.  This Final Order supersedes the Inc. DIP Order, the LP DIP Order, and the Existing Cash Collateral Order in all respects.  In the event of any inconsistency between the terms and conditions of the DIP Documents or this Final Order, the provisions of this Final Order shall govern and control.

41.    <u>Repayment of Fees and Expenses; Survival of Certain Indemnification Obligations</u>. Notwithstanding anything contained herein, in the Prepetition Credit Documents or any other agreement, or in any order entered in these Chapter 11 Cases to the contrary (including, without limitation, this Final Order or the Confirmation Order), until the occurrence of the Effective Date of the Plan (a) the indemnification provisions contained in Section 10.03 of the Prepetition LP Credit Agreement shall survive in full force and effect solely with respect to the Prepetition LP Agent and each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim, and (b) the indemnification provisions contained in Section 10.03 of the Prepetition Inc. Credit Agreement and Section 10.03 of the Inc. DIP Credit Agreement shall survive in full force and effect with respect to the Prepetition Inc. Agent, each Holder of a Prepetition Inc. Facility Non-Subordinated Claim, the DIP Inc. Agent and each Holder of a DIP Inc. Claim, as applicable; <u>provided</u>, that (w) with respect to professional fees and expenses of the holders of Allowed Prepetition LP Facility Non-SPSO Claims and Prepetition Inc. Facility Non-Subordinated Claims (respectively, the "<u>Surviving LP Indemnity Obligations</u>" and the "<u>Surviving Inc. Indemnity Obligations</u>"; collectively, the "<u>Surviving Indemnity Obligations</u>"), the Surviving Indemnity Obligations shall be limited to the reasonable and documented fees and expenses of (i) one United States and one Canadian counsel to represent the collective interests of the Prepetition Inc. Agent, Prepetition Inc. Lenders, Inc. DIP Agent and Inc. DIP Lenders and (ii) one United States and one Canadian counsel for each of the Prepetition LP Agent and the Holders of Allowed Prepetition LP Facility Non-SPSO Claims (until the Effective Date); (x) the Surviving Indemnity Obligations will not extend to (and no fees or expenses will be paid in connection with) fees and expenses incurred solely in connection with monitoring the DIP Obligors' Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, (y) the Surviving Indemnity Obligations shall terminate upon the occurrence of the Effective

-45-

Date of the Plan and none of the Debtors, the Reorganized Debtors, and/or NewCo (each as defined in the Plan) shall be obligated to indemnify or make any payments for any indemnification of any Prepetition Agent, Prepetition Lender, Inc. DIP Agent, or Inc. DIP Lender incurred for any period from and after the Effective Date of the Plan; and (z) for the avoidance of doubt, Surviving Indemnity Obligations payable pursuant to this paragraph 41 shall, until paid in full in cash, constitute superpriority administrative expense claims under Bankruptcy Code section 507(b), and shall be included in the Carve-Out as and to the extent set forth in paragraph 28 above.

42.    No Control.  Neither the DIP Agent nor any of the DIP Lenders shall be deemed control persons or insiders of the Debtors or any of their affiliates solely by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Agreement, DIP Documents, or this Final Order.

43.    Survival.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the DIP Obligors' Chapter 11 Cases other than the Plan; (b) converting any of the DIP Obligors' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the DIP Obligors' Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the DIP Obligors' Chapter 11 Cases or Successor Cases.  The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, and the Prepetition LP Agent on behalf of SPSO pursuant to this Final Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, or following dismissal of the DIP Obligors' Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until all DIP Obligations have been indefeasibly paid in full in accordance with the terms thereof and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Agent and/or DIP Lenders shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, following dismissal of the DIP Obligors'

-46-

Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

44.     <u>Effect of this Final Order</u>. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  The fourteen (14)-day stay otherwise imposed pursuant to Bankruptcy Rule 6004(h) is hereby expressly waived, and the terms of this Final Order and shall take effect immediately upon execution thereof.

45.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Court this ____ day of _____, 2014.

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit C-2</u>**

**Blackline of Revised DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**FINAL ORDER, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507,**
**(A) APPROVING POSTPETITION FINANCING, (B) AUTHORIZING USE OF**
**CASH COLLATERAL, IF ANY, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION,**
**AND (E) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "Motion") of LightSquared Inc. and certain of its affiliates, as debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter

11 Cases"), seeking entry of a final order (this "Final Order") under sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United

States Bankruptcy Court for the Southern District of New York (the "Local Rules"), *inter alia*:

(i)        authorizing LightSquared Inc., LightSquared LP, and One Dot Six Corp.

("One Dot Six" and, collectively with LightSquared Inc. and LightSquared LP, the "DIP Borrowers") to

obtain secured, superpriority postpetition financing in the aggregate amount of $1,650,000,000 (the "DIP

Facility") on a joint and several basis, pursuant to the terms and conditions of that certain Senior Secured

Super-Priority Debtor-in-Possession Loan Agreement, substantially in the form attached as Exhibit B to

---

[1]        The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax
or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc.
(0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra
Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited
Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC
(3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750),
LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd.
(7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC
Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston,
VA 20191.

the Motion (as may be further amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement"), by and among the DIP Borrowers and the other DIP Obligors (as defined herein), [_____] (or such other institution reasonably acceptable to the parties to the DIP Agreement as may have agreed to serve in such capacity), as Administrative Agent and Collateral Agent (in such capacity, together with its successors in such capacity, the "DIP Agent"), for and on behalf of itself and the other lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), which DIP Facility shall be made up of (a) $1,350,000,000 original aggregate principal amount of new money loans (the "Tranche A DIP Loans") and (b) $300,000,000 original aggregate principal amount (the "Tranche B DIP Loans"), which may consist of new money loans and/or of loans deemed made to the DIP Borrowers in exchange for a like amount of obligations outstanding under the Prepetition LP Credit Facility (as defined below);

(ii)    authorizing (a) LightSquared Corp., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (together, the "Canadian Guarantors") and each of the direct and indirect domestic subsidiaries of LightSquared Inc. (other than a DIP Borrower) that are debtors and debtors in possession in the Chapter 11 Cases (together with the Canadian Guarantors, the "DIP Guarantors") to unconditionally guarantee, jointly and severally, all obligations of the DIP Borrowers under the DIP Facility pursuant to the terms and conditions of the DIP Agreement and (b) each of the DIP Borrowers to unconditionally guarantee, jointly and severally, all obligations of the other DIP Borrowers under the DIP Facility pursuant to the terms and conditions of the DIP Agreement;

(iii)    authorizing the DIP Borrowers and DIP Guarantors (collectively, the "DIP Obligors") to execute and deliver, and perform under, the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the DIP Budget (as defined herein), and all other related loan and security documents, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)    granting to the DIP Secured Parties allowed superpriority administrative expense claims in each of the DIP Obligors' Chapter 11 Cases and any of the DIP Obligors' Successor

Cases (as defined herein) for the DIP Facility and all obligations owing thereunder and under the DIP

Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP

Obligations"), subject to the limitations and priorities set forth herein;

        (v)      granting to the DIP Agent, for the benefit of itself and the DIP Lenders,

automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein),

including, without limitation, all property constituting "cash collateral" (as defined in Bankruptcy Code

section 363(a), "Cash Collateral"), if any, which liens shall be subject to the priorities set forth herein;

        (vi)      authorizing and directing the DIP Obligors to pay the principal, interest,

fees, expenses, and other amounts and compensation payable under each of the DIP Documents as they

become due, including, without limitation, administrative agent's fees, and such professional fees as may

be agreed among the DIP Lenders, all to the extent provided by, and in accordance with, the terms of this

Final Order and the DIP Documents;

        (vii)     providing adequate protection to (a) SP Special Opportunities, LLC

("SPSO") for any diminution in value of its interests in the Prepetition LP Collateral (as defined herein)[2],

and (b) the affiliates of Harbinger Capital Partners, LLC (collectively, "Harbinger")[3] for any diminution

in value of its interests in the Prepetition Inc. Collateral (as defined herein); and

        (viii)    vacating and modifying the automatic stay imposed by Bankruptcy Code

section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP

Documents and this Final Order.

        The Court having considered the Motion, the exhibits and schedules attached thereto, and the

evidence submitted or proffered and the arguments of counsel made at the hearing on the Motion held in

connection with the confirmation hearing commencing on March [___], 2014 (the "Hearing"); and

---

[2]      The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien. Should an order be entered finding that SPSO does not have a valid lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

[3]      [This draft will be revised in all applicable places to reflect that the adequate protection liens are granted to the Prepetition Agents on behalf of Harbinger and SPSO.]

adequate notice of the Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b),

(c), and (d), and 9014; and the Hearing to consider the relief requested in the Motion having been held

and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this

Final Order approving the Motion and the DIP Documents having been withdrawn, resolved, or overruled

by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in

the best interests of the Debtors, their estates, and their stakeholders, and is essential for the continued

operation of the Debtors' businesses; and adequate protection being provided on account of the interests

in and liens on property of the estates on which liens are granted; and after due deliberation and

consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE DEBTORS, THE

COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF

LAW:

A.     _Petition Date._ On May 14, 2012 (the "Petition Date"), each of the Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the Southern District of New York (the "Court").

B.     _Debtors in Possession._  The Debtors continue to operate their businesses and manage

their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No

trustee or examiner has been appointed in these Chapter 11 Cases.

C.     _Jurisdiction and Venue._  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and

1334, over the Chapter 11 Cases and property affected hereby.  Consideration of the Motion constitutes a

core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§

1408 and 1409.

D.     _Committee Formation_.  As of the date hereof, the Office of the United States Trustee for

the Southern District of New York (the "U.S. Trustee") has not appointed a statutory committee of

unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.        _Existing Cash Collateral Order._    By the _Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay_ [Docket No. 544] (as amended by the _Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay_ [Docket No. 1118] and the _Second Order Amending Amended Agreed Final Order (A) Authorizing Debtors To Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay_ [Docket No. 1292], the "Existing Cash Collateral Order"), the Court authorized the use of cash and other collateral subject to the liens and claims of certain Prepetition Secured Parties (as defined herein) and provided adequate protection to those parties.

F.        _Inc. DIP Facility._    By the _Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay_ [Docket No. 224] (as amended by the _Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay_ [Docket No. 579] ("First Order Amending Inc. DIP Order"), _Second Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay_ [Docket No. 1126], and _Third Order Amending Final Order, Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection and (D) Modifying Automatic Stay_ [Docket No. 1286], the "Inc. DIP Order"), the Court authorized the parties thereto to enter into that certain Senior Secured Super-Priority Debtor in Possession Credit Agreement, dated as of July 19, 2012, **(the "Inc. DIP Credit Agreement" and,** together with all

related documents, **the "Inc. DIP Facility")** as amended and in effect on the date hereof, among One Dot Six, the guarantors party thereto, the lenders party thereto (the "Inc. DIP Lenders"), and U.S. Bank National Association, as administrative and collateral agent (together with all related documents, the "Inc. DIP Facility**Agent**").

G.    *LP DIP Facility*.    By the *Final Order (A) Authorizing LP DIP Obligors To Obtain Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1291] (the "LP DIP Order"), the Court authorized the parties thereto to perform under the terms of the LP DIP Facility (as defined in the LP DIP Order) (together with the Inc. DIP Facility, the "Existing DIP Facilities").

H.    *Debtors' Stipulations*. The Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge, and agree that (collectively, paragraphs H(i) through H(viii) below are referred to herein as the "Debtors' Stipulations"):

(i)    *Prepetition Inc. Credit Facility*.    Pursuant to that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, and restated, or otherwise modified from time to time, the "Prepetition Inc. Credit Agreement" and, together with all related credit and security documents, the "Prepetition Inc. Credit Documents"), between LightSquared Inc., as borrower, the subsidiary guarantors party thereto, namely One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. (collectively, the "Prepetition Inc. Subsidiary Guarantors" and, with LightSquared Inc., the "Inc. Obligors"), the lenders party thereto (collectively, the "Prepetition Inc. Lenders"), and U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch (in such capacity, the "Prepetition Inc. Agent" and, together with the Prepetition Inc. Lenders, the "Prepetition Inc. Secured Parties"), the Prepetition Inc. Lenders provided term loans to or for the benefit of LightSquared Inc. (the "Prepetition Inc. Credit Facility").

(ii)    *Prepetition Inc. Obligations.*    The Prepetition Inc. Credit Facility provided LightSquared Inc. with term loans in the aggregate principal amount of $263,750,000.  As of the Petition Date, an aggregate principal amount of approximately $322,203,486.02 was outstanding under the Prepetition Inc. Credit Documents (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition Inc. Credit Documents (including unpaid principal, accrued and unpaid interest, including default interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Inc. Obligors' obligations pursuant to the Prepetition Inc. Credit Documents, including all "Obligations" as described in the Prepetition Inc. Credit Agreement, the "Prepetition Inc. Obligations").  Interest on the Prepetition Inc. Obligations shall be deemed to have accrued from the Petition Date to July 12, 2012 at the default rate of 17% and, from and after July 13, 2012, at the default rate of 20%.  On or about March 13, 2013, approximately $8,429,469.57 of interest owing only to each Prepetition Inc. Lender that is also an Inc. DIP Lender and accruing on the Prepetition Inc. Obligations at the default rate set forth in paragraph 16(b) of the Inc. DIP Order, from and after the Petition Date and entry of the First Order Amending Inc. DIP Order, was added and became DIP Obligations under the Inc. DIP Facility, subject to the Ad Hoc Secured Group's Challenge (as defined in the Inc. DIP Order) to the Prepetition Inc. Obligations in accordance with the Inc. DIP Order.

(iii)    *Prepetition Inc. Collateral.*    To secure the Prepetition Inc. Obligations, the Inc. Obligors granted to the Prepetition Inc. Agent, for the benefit of itself and the Prepetition Inc. Lenders, first priority security interests in and liens (the "Prepetition Inc. Liens") on (a) the One Dot Six Lease (as defined in the Prepetition Inc. Credit Documents), (b) the One Dot Four Lease (as defined in the Prepetition Inc. Credit Documents),[4] (c) the capital stock of each Prepetition Inc. Subsidiary Guarantor, and (d) all proceeds and products of each of the foregoing and all accessions to, substitutions and

---

[4]    Although the One Dot Four Lease was terminated, the Prepetition Inc. Agent retained a first priority security interest in any rights and benefits that may have accrued thereunder.

replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any Debtor with respect to any of the foregoing, whether obtained prepetition or postpetition (collectively, the "Prepetition Inc. Collateral"). The Prepetition Inc. Collateral does not include cash other than proceeds of the Prepetition Inc. Collateral.

(iv)    *Validity, Perfection, and Priority of Prepetition Inc. Liens and Prepetition Inc. Obligations.*  (a) As of the Petition Date, the Prepetition Inc. Liens on the Prepetition Inc. Collateral were valid, binding, enforceable, non-avoidable, and properly perfected, subject only to certain liens otherwise permitted by the Prepetition Inc. Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Inc. Liens as of the Petition Date, the "Permitted Prior Liens"),[5] (b) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Inc. Liens or the Prepetition Inc. Obligations exist, and no portion of the Prepetition Inc. Liens or Prepetition Inc. Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (except as provided in the subordination agreement among the Prepetition Inc. Lenders) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Inc. Agent, the Prepetition Inc. Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees in respect of the Prepetition Inc. Obligations or Prepetition Inc. Liens, (d) as of the Petition Date, the value of the Prepetition Inc. Collateral securing the Prepetition Inc. Obligations exceeded the amount of those obligations, and accordingly the Prepetition Inc. Obligations are allowed secured claims within the meaning of Bankruptcy

---

[5]    The Permitted Prior Liens are liens otherwise permitted by the Prepetition Credit Documents (as defined herein), to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date.  Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected, and non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest to challenge the validity, priority, perfection, or extent of any such Permitted Prior Liens and/or security interest.

Code section 506, in a principal amount of not less than $322,203,486.02, together with accrued and unpaid interest, fees (including, without limitation, attorneys' fees and related expenses), and any and all other charges of whatever nature owing in respect of such Prepetition Inc. Obligations, and (e) any payments made on account of the Prepetition Inc. Obligations to or for the benefit of the Prepetition Inc. Agent or the Prepetition Inc. Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Inc. Agent and the Prepetition Inc. Lenders were oversecured, were payments out of the Prepetition Inc. Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(v)       *Challenge by Certain Prepetition LP Lenders to Prepetition Inc. Liens.* On September 15, 2012, the Ad Hoc Secured Group of Prepetition LP Lenders (the "Ad Hoc Secured Group") filed the *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323] (the "STN Motion"). The STN Motion sought derivative standing for the Ad Hoc Secured Group to bring an adversary proceeding on behalf of LightSquared Inc., One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp. against certain Prepetition Inc. Lenders, Harbinger Capital Partners SP Inc., Blue Line DZM Corp., Mast AK Fund LP, Mast Credit Opportunities I Master Fund Limited, Mast OC I Master Fund, Mast PC Fund LP, Mast Select Opportunities Master Fund, Seawall Credit Value Master Fund, Ltd., Seawall OC Fund, Ltd., and the Prepetition Inc. Agent. No party other than the Ad Hoc Secured Group commenced a challenge to the Prepetition Inc. Liens or Prepetition Inc. Obligations within the Challenge Period (as defined in the Inc. DIP Order). Pursuant to Article VIII.C of the Plan, entry of the Confirmation Order (as defined herein) shall operate to settle all claims and causes of action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the STN Motion, and the STN Motion shall be deemed withdrawn upon the occurrence of the Closing Date (as defined in the DIP Agreement). As a result, the Inc. DIP Order's findings and stipulations as to the priority, extent, and validity of the Prepetition Inc. Liens and Prepetition Inc. Obligations shall be deemed to be of full force and effect and forever binding upon the Debtors' bankruptcy estates and all

creditors, interest holders, and other parties in interests in the Debtors' Chapter 11 Cases and any

Successor Cases.

(vi)    *Prepetition LP Credit Facility*.    Pursuant to that certain Credit

Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise

modified from time to time, the "Prepetition LP Credit Agreement" and, together with all related credit

and security documents, the "Prepetition LP Credit Documents" and, together with the Prepetition Inc.

Credit Documents, the "Prepetition Credit Documents"), between LightSquared LP, as borrower,

LightSquared Inc. and the other parent guarantors party thereto, namely LightSquared Investors Holdings

Inc., LightSquared GP Inc., and TMI Communications Delaware, Limited Partnership (collectively, the

"Prepetition LP Parent Guarantors"), the subsidiary guarantors party thereto, namely ATC Technologies,

LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra

Holdings (Canada) Inc., and SkyTerra (Canada) Inc. (collectively, the "Prepetition LP Subsidiary

Guarantors" and, collectively with the Prepetition LP Parent Guarantors and LightSquared LP, the "LP

Obligors"), the lenders party thereto (the "Prepetition LP Lenders" and, together with the Prepetition Inc.

Lenders, the "Prepetition Lenders"), UBS AG, Stamford Branch, as administrative agent (in such

capacity, and, together with Wilmington Trust FSB,[6] the "Prepetition LP Agent" and, together with the

Prepetition LP Lenders, the "Prepetition LP Secured Parties")[7], and other parties thereto, the Prepetition

LP Lenders provided term loans to or for the benefit of LightSquared LP (the "Prepetition LP Credit

Facility" and, together with the Prepetition Inc. Facility, the "Prepetition Facilities").

(vii)    *Prepetition LP Obligations*.    The Prepetition LP Credit Facility provided

LightSquared LP with term loans in the aggregate principal amount of $1,500,000,000.  As of the Petition

Date, an aggregate principal amount of approximately $1,700,571,106 was outstanding under the

---

[6]    Wilmington Trust FSB serves as collateral trustee pursuant to that certain Collateral Trust Agreement, dated as of October 1, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time), between LightSquared LP, UBS AG, Stamford Branch, and Wilmington Trust FSB.

[7]    The Prepetition LP Agent, together with the Prepetition Inc. Agent, are the "Prepetition Agents" and, together with the Prepetition Lenders, the "Prepetition Secured Parties."

Prepetition LP Credit Agreement (collectively, with any amounts unpaid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition LP Credit Documents (including unpaid principal, accrued and unpaid interest, any fees, expenses, and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the LP Obligors' obligations pursuant to the Prepetition LP Credit Documents, including all "Obligations" as described in the Prepetition LP Credit Agreement, the "Prepetition LP Obligations" and, together with the Prepetition Inc. Obligations, the "Prepetition Obligations").

(viii)    *Prepetition LP Collateral.*  To secure the Prepetition LP Obligations, the LP Obligors granted to the Prepetition LP Agent, for the benefit of the Prepetition LP Lenders, first priority security interests in and liens (the "Prepetition LP Liens" and, together with the Prepetition Inc. Liens, the "Prepetition Liens") on (a) substantially all of the assets of LightSquared LP and the Prepetition LP Subsidiary Guarantors, (b) the equity interests of LightSquared LP and the Prepetition LP Parent Guarantors (except LightSquared Inc.), (c) certain equity interests owned by the Pledgors (as defined in the Prepetition LP Credit Documents), (d) the Intercompany Notes (as defined in the Prepetition LP Credit Documents), and (e) the rights of LightSquared Inc. under and arising out of that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Inmarsat Cooperation Agreement"), by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited (collectively, the "Prepetition LP Collateral" and, together with the Prepetition Inc. Collateral, the "Prepetition Collateral").  As of the Petition Date, the Prepetition LP Liens were subject only to the Permitted Prior Liens.  For the avoidance of doubt, the Prepetition LP Collateral includes any proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).[8]  No

---

[8]    The Prepetition LP Collateral does not include the following: (a) any permit or license issued by a Governmental Authority (as defined in the Prepetition LP Credit Agreement) or other agreement to the

party commenced a challenge to the Prepetition LP Liens or Prepetition LP Obligations by the

Investigation Termination Date (as defined in the Existing Cash Collateral Order). As a result, the

Debtors' stipulations set forth in the Existing Cash Collateral Order regarding the Prepetition LP Liens

and Prepetition LP Obligations are binding on all parties in interest.[9]

I.  _Plan of Reorganization_.

On March [__], 2014, the Court entered an order (the "Confirmation Order") [Docket No.

_____] confirming the _Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code_

(the "Plan") [Docket No. _____].

J.  _Findings Regarding the Postpetition Financing_.

(i)  _Postpetition Sources of Funding._  Since the Petition Date, the DIP

Obligors have been funding their businesses, administering their Chapter 11 Cases, and pursuing a

reorganization through a combination of unencumbered cash, advances under the Existing DIP Facilities,

and cash (the "LP Cash Collateral") that is subject to liens and claims of the Prepetition LP Agent and

Prepetition LP Lenders. The Debtors require additional postpetition financing to (a) indefeasibly repay in

full in cash the Existing DIP Facilities, (b) indefeasibly repay in full in cash all outstanding Prepetition

Inc. Obligations other than the Harbinger Prepetition Inc. Claims (as defined below) (such outstanding

---

extent and for so long as the terms thereof validly prohibit the creation by the pledgor thereof of a security
interest in such permit, license, or other agreement; (b) property subject to any Purchase Money Obligation,
Vendor Financing Indebtedness, or Capital Lease Obligations (in each case, as such term is defined in the
Prepetition LP Credit Agreement) if the contract or other agreement in which such lien is granted validly
prohibits the creation of any other lien on such property; (c) the SkyTerra-2 satellite, while title remains
with Boeing Satellite Systems, Inc. ("BSSI"), and those ground segment assets related to the SkyTerra-2
satellite, while title remains with BSSI; (d) any intent-to-use trademark application to the extent and for so
long as a security interest therein would result in the loss by the pledgor thereof of any material rights
therein; (e) certain deposit and securities accounts securing currency hedging or credit card vendor
programs or letters of credit provided to vendors in the ordinary course of business; (f) equity interests in (i)
excess of 66% in non-U.S. subsidiaries (other than the Canadian Subsidiaries (as defined in the Prepetition
LP Credit Agreement)) held by a U.S. subsidiary, (ii) LightSquared Network LLC, and (iii) any joint
venture or similar entity to the extent and for so long as the terms of such investment restrict such security
interest; and (g) any consumer goods subject to the Canadian Security Agreement (as defined in the
Prepetition LP Credit Agreement). For the avoidance of doubt, the Prepetition LP Collateral includes any
proceeds, substitutions, or replacements of any of the foregoing (unless such proceeds, substitutions, or
replacements would constitute Excluded Property (as defined in Prepetition LP Credit Documents)).

[9]   For the avoidance of doubt, this finding does not apply to any claims, rights, or interests held or asserted by
SPSO as a result of its acquisition of interests in the Prepetition LP Facility.

obligations, the "Specified Prepetition Inc. Claims"), (c) indefeasibly repay in full in cash specified

Prepetition LP Obligations (the "Specified Prepetition LP Claims" and, together with the Specified

Prepetition Inc. Claims, the "Specified Prepetition Claims") to the extent that such Prepetition LP

Obligations are not (i) converted into Tranche B DIP Loans or (ii) obligations held by, or for the benefit

of, SPSO, (d) pay expenses in connection with the DIP Facility, and (e) maintain operations, make certain

capital expenditures, continue the regulatory approval process, and administer and preserve the value of

their estates post-confirmation pending the effective date (the "Effective Date") of the Plan. The ability

of the Debtors to maintain their businesses pending occurrence of the Effective Date and complete a

successful reorganization that will maximize value for all stakeholders requires the availability of

working capital from the DIP Facility, the absence of which would immediately and irreparably harm the

Debtors, their estates, their creditors, and equity holders.

(ii)    *No Credit Available on More Favorable Terms.* The Debtors have

engaged in a lengthy process of evaluating various competing plans of reorganization and sale proposals

in their Chapter 11 Cases and, after significant negotiations and efforts by the Debtors and certain key

constituents and investors to develop a restructuring plan, have successfully obtained confirmation of the

Plan. As part of these efforts, the Debtors diligently sought debtor in possession financing and equity

sponsors in connection with formulation of the Plan. Given their current financial condition, financing

arrangements, and capital structure, the DIP Obligors have been unable to obtain financing from sources

other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors have been unable

to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense. The Debtors have also been unable to obtain credit (a) having priority over that of

administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy

Code; (b) secured by a lien on property of the DIP Obligors and their estates that is not otherwise subject

to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to

a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for

the benefit of itself and the DIP Lenders, (1) perfected security interests in and senior, first priority

priming liens on (each as provided herein) all of the DIP Obligors' existing and after-acquired assets with the priorities set forth in paragraph 8 below, (2) superpriority administrative expense claims and liens with the priorities set forth in paragraph 9 below, and (3) the other protections set forth in this Final Order.

(iii)    *Continued Use of Prepetition Collateral.*    The continued use of the Prepetition Collateral will enable the DIP Obligors to continue to operate their businesses for the benefit of their estates and creditors and to obtain the DIP Facility.  Harbinger, in its capacity as a Prepetition Inc. Lender, has agreed to subordinate its rights in connection with the Prepetition Inc. Liens and all other rights and benefits (including, without limitation, the right of payment) in connection with the Prepetition Inc. Facility (collectively, the "Harbinger Prepetition Inc. Claims") to the rights of the DIP Agent and DIP Lenders under the DIP Facility.  In exchange, Harbinger will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any diminution in the value (the "Diminution in Value") of its interests in the Prepetition Inc. Collateral resulting from, among other things, the subordination to the Carve-Out (as defined herein) and the DIP Facility, the use, sale, or lease of the Prepetition Inc. Collateral, and the imposition of the automatic stay.  In addition, SPSO will receive adequate protection as set forth in this Final Order, pursuant to Bankruptcy Code sections 361, 362, 363, and 507(b) for any Diminution in Value of its interests in the Prepetition LP Collateral resulting from, among other things, the subordination to the Carve-Out and the DIP Facility, the use, sale, or lease of the Prepetition LP Collateral, and the imposition of the automatic stay.

(iv)    *Use of Proceeds of the DIP Facility.*    As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facility, the DIP Agent and DIP Lenders required, and the DIP Obligors agreed, that the proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Documents, including the covenant (the "DIP Budget Covenant") contained therein pertaining to compliance (subject to the Permitted Variance (as defined herein)) with the budget attached hereto as Schedule 1 (the "DIP Budget"), the covenant (the "Capital Expenditure Covenant") contained therein pertaining to compliance with the agreed maximum amount of

capital expenditures, and the covenant (the "Restructuring Costs Covenant") contained therein pertaining to compliance with the agreed maximum amount of restructuring costs.

K.    _Application of Proceeds of Collateral_.    As a condition to the entry into the DIP Documents, the extension of credit under the DIP Facility, and the authorization to use the Prepetition Collateral, the DIP Obligors agreed to apply the proceeds of DIP Collateral as set forth in the DIP Documents.

L.    _Adequate Protection_.

(i)    _Harbinger Adequate Protection Liens and Claims._    Harbinger will receive adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for any Diminution in Value of its interests in the Prepetition Inc. Collateral.   As adequate protection, Harbinger will receive (a) the Harbinger Adequate Protection Liens (as defined herein) and (b) the Harbinger Adequate Protection Superpriority Claims (as defined herein), each against the Prepetition Inc. Collateral and the Inc. Obligors only.

(ii)    _SPSO Adequate Protection Liens and Claims._    SPSO will receive adequate protection pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code for any Diminution in Value of its interests in the Prepetition LP Collateral.   As adequate protection, SPSO will receive (a) the SPSO Adequate Protection Liens (as defined herein) and (b) the SPSO Adequate Protection Superpriority Claims (as defined herein), each against the Prepetition LP Collateral and the LP Obligors only.

M.    _Sections 506(c) and 552(b)_.    In light of (a) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and the current payment of administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Prepetition Inc. Liens, Harbinger Adequate Protection Liens, and Harbinger Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, and (c) the subordination of the Prepetition LP Liens, SPSO

Adequate Protection Liens, and SPSO Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, each of the DIP Agent, the DIP Lenders, SPSO, and Harbinger are entitled to a waiver of (i) any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (ii) the provisions of section 506(c) of the Bankruptcy Code.

N.    *Good Faith of DIP Agent and DIP Lenders.*

(i)    *Willingness To Provide Financing.*    The DIP Lenders each have indicated a willingness to provide financing to the DIP Obligors subject to (a) the Confirmation Order having been entered by this Court and the time for seeking a stay thereof has expired, (b) the entry of this Final Order, (c) approval of the terms and conditions of the DIP Facility and the DIP Documents, and (d) entry of findings by this Court that such financing is essential to the DIP Obligors' estates, that the DIP Agent and DIP Lenders are extending credit to the DIP Obligors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

(ii)    *Business Judgment and Good Faith Pursuant to Bankruptcy Code Section 364(e).*    The terms and conditions of the DIP Facility and the DIP Documents, and the fees and other compensation paid and to be paid thereunder, are fair, reasonable, and the best available to the DIP Obligors under the circumstances, reflect the DIP Obligors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the use of the Prepetition Collateral were negotiated in good faith and at arms' length among the DIP Agent, the DIP Lenders, and the DIP Obligors.  All extensions of credit under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Secured Parties are entitled to the full protection and benefits of section 364(e) of

-16-

the Bankruptcy Code and this Final Order, and the DIP Secured Parties' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP Documents will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, reconsideration, or appeal of this Final Order, the Confirmation Order, or any other order of a court having jurisdiction over these Chapter 11 Cases or any Successor Cases.

O.        *Good Cause; Immediate Entry*.  The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the DIP Obligors, their estates, and their creditors and equity holders, as its implementation will, *inter alia*, provide the DIP Obligors with the necessary liquidity to (a) move forward with consummation of the confirmed Plan, (b) minimize the disruption to the DIP Obligors' businesses and ongoing operations, (c) preserve and maximize the value of the DIP Obligors' estates for the benefit of all the DIP Obligors' creditors and equity holders, and (d) avoid irreparable harm to the DIP Obligors, their estates, their creditors, equity holders, their businesses, their employees, and their assets pending occurrence of the Effective Date.

P.        *Notice*.  Notice of the Hearing and the relief requested in the Motion has been provided by the Debtors by electronic mail, facsimile, regular or overnight mail, and/or hand delivery to (a) the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (c) counsel to the special committee for the board of directors for LightSquared Inc. and LightSquared GP Inc., (d) counsel to the Prepetition Inc. Agent and Prepetition LP Agent, (e) counsel to the agent under the Inc. DIP Facility, (f) counsel to the LP DIP Lenders (as defined in the LP DIP Order); (g) counsel to the Ad Hoc Secured Group, (h) counsel to Harbinger, (i) counsel to SPSO, (j) the Internal Revenue Service, (k) the United States Attorney for the Southern District of New York, (l) the Federal Communications Commission (the "FCC"), (m) Industry Canada, and (n) all parties having filed a request for notice under Bankruptcy Rule 2002.  Under the circumstances, such notice of the Motion, the relief requested therein, and the Hearing complies with Bankruptcy Rule 4001(c) and (d) and the Local Rules, and no other notice need be provided for entry of this Final Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.        <u>Motion Approved</u>.  The Motion is granted on a final basis as set forth herein, the DIP Facility is authorized and approved, and the grant of adequate protection to SPSO and Harbinger for the use of the Prepetition Collateral is authorized, subject to the terms and conditions set forth in this Final Order.

2.        <u>Objections Overruled</u>.  All objections to the Motion and entry of this Final Order, to the extent not withdrawn or resolved, are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.        <u>Authorization of DIP Financing and DIP Documents</u>.  The DIP Documents are hereby approved on a final basis.  The DIP Obligors are expressly and immediately authorized and empowered on a final basis to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents and, to the extent applicable, execute and deliver any and all instruments and documents which may be necessary or appropriate for the performance by the DIP Obligors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in, and provided for by, this Final Order and the DIP Documents.  Contemporaneously with the indefeasible repayment in full in cash of all Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors are authorized and directed on a final basis to indefeasibly pay, in accordance with this Final Order, the principal, interest, fees, out-of-pocket expenses, and other amounts and compensation described in the DIP Documents as such become due and payable without need to obtain further Court approval, all to the extent provided in the DIP Documents, including, without limitation, administrative agent's fees and such professional fees as may be agreed among the DIP Lenders.  None of the fees and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

Subject to any *bona fide* dispute as to the reasonableness of such fees and expenses, the DIP Obligors shall pay the reasonable, actual, and documented fees and expenses provided for in this section promptly (but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors and the U.S. Trustee.  Any and all payments or proceeds remitted to the DIP Agent or DIP Lenders pursuant to the provisions of this Final Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability.  All collections and proceeds of the DIP Collateral or Prepetition Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Final Order and the DIP Documents.  The DIP Documents evidence the valid and binding obligations of the DIP Obligors, which obligations shall be enforceable against each of the DIP Obligors and their estates in accordance with the terms of the DIP Documents.  The failure specifically to include any particular provisions of the DIP Documents in this Final Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the DIP Documents be authorized and approved in their entirety.

4.     Indefeasible Repayment of Existing DIP Facilities and Specified Prepetition Claims. Proceeds of the DIP Loan shall be used to, among other things, indefeasibly repay in full in cash all Existing DIP Facilities and the Specified Prepetition Claims.  For the avoidance of doubt, the amount of obligations outstanding as of March 31, 2014, which amount shall be increased to the extent the DIP Loans are funded after March 31, 2014 and decreased to the extent that the DIP Loans are funded before March 31, 2014, is (i) $~~72,366,120.36~~**73,813,442.71** under the DIP Inc. Facility, **plus** **all reasonable and documented fees and expenses of the DIP Inc. Agent and the** **DIP Inc. Agent's** legal and financial advisors **incurred through and including the Closing Date,** (ii) **$**[~~————~~**33,746,585.00**] under the DIP LP Facility**, plus all reasonable and documented fees and expenses of the DIP LP Lenders'** legal and financial advisors **incurred from and after closing of the DIP LP Facility through and including the Closing Date solely as provided in, and in accordance with, the DIP LP Order**, (iii) $295,091,178.04 with respect to the Specified Prepetition Inc. Claims**, plus all reasonable and documented fees and**

-19-

**expenses of the Prepetition Inc. Non-Subordinated Parties and the Prepetition Inc. Non-Subordinated Parties'** legal and financial advisors **incurred** through and including the **Closing Date,** and (iv) [_____]$1,090,300,000.00 with respect to the Specified Prepetition LP Claims. **(as such amount may be adjusted to reflect any changes to the assumed amounts set forth in Article III.7.b of the Plan), plus all reasonable and documented fees and expenses of the Prepetition LP Agent,** the Ad Hoc Secured Group and **their respective legal and financial advisors incurred through and including the Closing Date.**

5.    <u>Authorization To Borrow</u>.  Until the earlier of the (a) Effective Date, (b) Maturity Date (as defined in the DIP Agreement), and (c) termination of obligations under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default (as defined herein) (such earlier date, the "<u>Termination Date</u>"), and subject to the terms, conditions, and limitations on availability, set forth in the DIP Documents, DIP Facility, and this Final Order, the DIP Borrowers are authorized and directed to request extensions of credit under the DIP Facility of up to the principal amount of $1,650,000,000 (the "<u>Loans</u>").  The Loans shall be funded in a single draw (by advance and, if applicable, conversion) on the Closing Date, and all proceeds thereof not used on the Closing Date to indefeasibly repay in full in cash the Existing DIP Facilities, and the Specified Prepetition Claims, or, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, to pay fees and expenses in connection with the DIP Facility, shall be deposited into a collateral account under the control of the DIP Agent (the "<u>Collateral Account</u>"), from which, subject to satisfaction of the conditions set forth in the DIP Agreement, the DIP Borrowers may withdraw funds in accordance with the DIP Budget, the DIP Budget Covenant, the Restructuring Costs Covenant, or the Capital Expenditure Covenant, as applicable, and in each case subject to the DIP Agreement.  The Collateral Account shall be subject to a first priority security interest and lien in favor of the DIP Agent for the benefit of the DIP Secured Parties, subject to the terms of the DIP Documents and this Final Order.

6.    <u>DIP Obligations</u>.  The DIP Documents and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligors' DIP Obligations, which DIP Obligations shall be enforceable against the DIP Obligors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  The DIP Obligations will include all loans, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Obligors to the DIP Agent or any of the DIP Lenders under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees, expenses, and other amounts owed pursuant to the DIP Documents.  The DIP Obligations shall be due and payable without notice or demand on the Termination Date, subject to the Exit Conversion (as defined herein).

7.    <u>DIP Liens and DIP Collateral</u>.  Pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and the DIP Lenders, on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (the "<u>DIP Liens</u>") any and all presently owned and hereafter acquired personal property, real property, and other assets of the DIP Obligors, whether owned, consigned by or to, or leased from or to the DIP Obligors (collectively, the "<u>DIP Collateral</u>")[10], including, without limitation, all (a) Prepetition Collateral, (b) accounts, (c) books, (d) chattel paper, (e) deposit accounts, (f) equipment and fixtures, (g) general intangibles, (h) inventory, (i) investment related property, (j) negotiable collateral, (k) supporting obligations, (l) commercial tort claims, (m) money, cash, and cash equivalents, (n) all leases and leasehold interests, (o) owned real property, (p) all unencumbered assets, including postpetition lawsuits or causes of action and proceeds thereof, (q) all proceeds of any avoidance actions or claims arising under chapter 5 of the Bankruptcy

---

[10]    All terms not specifically defined in the description of DIP Collateral shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

Code with respect to the DIP Obligors (the "Avoidance Actions"), (r) patents, (s) trademarks, (t) copyrights, (u) equity interests, (v) contract rights, (w) network and other equipment, (x) proceeds, and (y) all rights and interests of the Debtors in NOAA spectrum, if, when and to the extent obtained.

8.    DIP Lien Priority.   The DIP Liens securing the DIP Obligations shall be junior only to the Carve-Out and Permitted Prior Liens and shall otherwise be (a) valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired unencumbered assets (whether currently or hereafter unencumbered) of all DIP Obligors, and (b) valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien on, or claim to all presently owned or hereafter acquired encumbered assets of the DIP Obligors.   Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior at all times to (a) the Prepetition Inc. Liens, (b) the Prepetition LP Liens, (c) the Harbinger Adequate Protection Liens, and (d) the SPSO Adequate Protection Liens.   Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the DIP Obligors' Chapter 11 Cases or any Successor Cases.   The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the DIP Obligors' Chapter 11 Cases or any Successor Cases, upon the conversion of any of the DIP Obligors' Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the DIP Obligors' Chapter 11 Cases or Successor Cases.   The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.   No lien or interest avoided and preserved for the benefit of any DIP Obligor's estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

9.    DIP Superpriority Claims.   Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligors hereby grant the DIP Agent, for the benefit of itself and the DIP Lenders, an allowed superpriority administrative expense claim in each of the DIP Obligors' Chapter 11 Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations.   For the

-22-

avoidance of doubt, the DIP Superpriority Claims shall extend to proceeds of any Avoidance Actions. The DIP Superpriority Claims shall be subordinate only to the Carve-Out and shall (a) otherwise have priority over any and all administrative expenses and claims against the DIP Obligors or their estates in any of their Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the DIP Obligors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

10.    No Obligation To Extend Credit.  None of the DIP Agent or DIP Lenders shall have any obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Documents and this Final Order have been satisfied in full or waived by the DIP Agent and the DIP Lenders, each in its sole discretion.

11.    Use of DIP Facility Proceeds.  The Loans shall be used, and the Debtors are hereby authorized, to indefeasibly repay in full in cash the Existing DIP Facilities and the Specified Prepetition Claims, to, contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, pay expenses in connection with the DIP Facility, to finance capital expenditures in accordance with the Capital Expenditure Covenant, to finance restructuring costs in accordance with the Restructuring Costs Covenant, and to finance operating expenses in accordance with the DIP Budget, which DIP Budget shall (a) be tested on a monthly basis for a trailing two (2)-month period and (b) provide for withdrawals from the Collateral Account to finance operating expenses for the purposes and in the amounts described therein, subject to a variance cushion of 15% in the aggregate for all such operating expenses, in each case as set forth in the DIP Agreement or the DIP Budget, as applicable (the "Permitted Variance").  The DIP Budget shall not be amended, supplemented,

-23-

or otherwise modified in a manner adverse to the DIP Lenders without the approval of the Required DIP Lenders.

12. <u>Weekly Status Calls</u>.  Commencing on the first Wednesday following issuance of the Confirmation Order, and continuing on each Wednesday (or at such other time as may be agreed to by the Required DIP Lenders in their reasonable discretion) thereafter until the Maturity Date, the DIP Borrowers will hold a status call with the DIP Agent and the DIP Lenders, relating to (a) the Plan process, regulatory updates, contemplated asset sales, assignments, allocations, and other dispositions and the Chapter 11 Cases generally, (b) the Transfer Proceedings (as defined in the DIP Agreement), (c) the Material Regulatory Requests (as defined in the DIP Agreement), and (d) the FCC Objectives (as defined in the DIP Agreement), which shall include (i) an update on, and summary of, related meetings and discussions with the FCC and other Governmental Authorities and/or FCC or other Governmental Authority (as defined in the DIP Agreement) actions since the prior briefing, (ii) an identification of FCC or other Governmental Authority meetings and other contacts with the FCC or other Governmental Authorities by the Debtors or their representatives or advisors planned or anticipated to occur within the next two-week period and the topics to be covered at such meetings or contacts, (iii) notice of any hearing planned or anticipated to occur within the next two week period before the FCC or other Governmental Authorities related to the efforts of the Companies, (iv) notice of and information regarding any written submissions expected to be made by the Debtors to the FCC or other Governmental Authorities within the next two week period, and (v) an opportunity for the Initial Lenders (as defined in the DIP Agreement) to provide consultation and input to the Debtors with respect to such efforts, submissions, and meetings.

13. <u>FCC Submissions</u>.  With respect to the Material Regulatory Requests, the Transfer Proceedings, and/or the FCC Objectives, the DIP Borrowers shall provide promptly to the Specified Lenders (as defined in the DIP Agreement) (i) copies of all filings, notices, orders, and any other correspondence between the FCC and the Debtors, including copies of all documentation received from, or submitted to, the FCC in respect thereof, and (ii) after a draft has been prepared, copies of drafts of any written materials proposed to be submitted by any Company to the FCC.

-24-

14.    <u>Amendment of the DIP Documents</u>.  The DIP Obligors and DIP Secured Parties are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents if (a) the amendment, modification, supplement, or waiver is (i) in accordance with the DIP Documents, (ii) beneficial to the DIP Obligors, and (iii) not prejudicial in any material respect to the rights of third parties, (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, supplement, or waiver is provided to counsel for the Debtors, counsel for SPSO, counsel for Harbinger, and the U.S. Trustee (collectively, the "<u>Notice Parties</u>") upon five (5) business days' notice and an opportunity to object, and (c) the amendment, modification, supplement, or waiver is filed with the Court; <u>provided</u>, <u>however</u>, that consent of the Notice Parties, and approval of the Court is not necessary to effectuate any such amendment, modification, or supplement.  Except as otherwise provided in this paragraph 14, no waiver, amendment, modification, supplement, or waiver of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the DIP Obligors, and with the necessary consents required under, and executed in accordance with, the DIP Documents, and approved by the Court on notice.

15.    <u>Use of Prepetition Collateral</u>.  Subject to the terms and conditions of this Final Order and the DIP Documents, the DIP Obligors' use of Prepetition Collateral is approved until the Termination Date or as otherwise ordered by the Court.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any DIP Obligor's use of any Prepetition Collateral or other proceeds resulting therefrom, except as permitted in this Final Order and the DIP Documents.

16.    <u>Adequate Protection Liens</u>.

(a)    *Harbinger Adequate Protection Liens.*  Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of Harbinger's interests in the Prepetition Inc. Collateral, the Inc. Obligors hereby grant to Harbinger, effective and perfected as of

-25-

the Petition Date and without the necessity of the execution by the Inc. Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition Inc. Collateral (the "Harbinger Adequate Protection Liens"). For avoidance of doubt, the Harbinger Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition LP Guarantors to the extent not Prepetition Inc. Collateral, or (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action. The Harbinger Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)    *SPSO Adequate Protection Liens*.[11]    Pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, as adequate protection against any Diminution in Value of SPSO's interests in the Prepetition LP Collateral, the LP Obligors hereby grant to SPSO, effective and perfected as of the Petition Date and without the necessity of the execution by the LP Obligors of security agreements, pledge agreements, mortgages, financing statements, or other agreements, valid, binding, enforceable, and perfected postpetition security interest in and liens on the Prepetition LP Collateral (the "SPSO Adequate Protection Liens"). For avoidance of doubt, the SPSO Adequate Protection Liens will not extend to (i) Avoidance Actions or proceeds thereof, (ii) the assets of the Prepetition Inc. Subsidiary Guarantors, (iii) the unencumbered assets of LightSquared Inc., including lawsuits or causes of action, or (iv) the SkyTerra-2 satellite while title remains with BSSI or those ground segment assets related to the SkyTerra-2 satellite while title remains with BSSI.[12]    The SPSO Adequate Protection Liens shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

---

[11]    The adequate protection provided to SPSO in this Final Order is conditioned upon plan treatment in which SPSO has a valid prepetition lien. Should an order be entered finding that SPSO does not have a valid prepetition lien, this Final Order shall be modified to remove the grant of adequate protection to SPSO.

[12]    For the avoidance of doubt, the Prepetition LP Collateral includes all General Intangibles (as defined in the Prepetition LP Credit Documents) to include, among other things, contract rights relating to that certain Amendment 4 Amended and Restated Contract between LightSquared and BSSI, dated November 10, 2010 (as amended, modified, supplemented, or amended and restated through the date hereof).

(c)     *Priority of Adequate Protection Liens.*

(i)     The Harbinger Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The Harbinger Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Inc. Collateral.

(ii)     The SPSO Adequate Protection Liens shall be junior only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Prior Liens.  The SPSO Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition LP Collateral.

17.     Adequate Protection Superpriority Claims.

(a)     *Harbinger Adequate Protection Superpriority Claim.*  As further adequate protection of the interests of Harbinger in the Prepetition Inc. Collateral against any Diminution in Value of such interests in the Prepetition Inc. Collateral, Harbinger is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Harbinger Adequate Protection Superpriority Claim") in each of the Inc. Obligors' Chapter 11 Cases and Successor Cases.  The Harbinger Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of Harbinger's claims as set forth in the Plan and Confirmation Order.

(b)     *SPSO Adequate Protection Superpriority Claim.* As further adequate protection of the interests of SPSO in the Prepetition LP Collateral against any Diminution in Value of such interests in the Prepetition LP Collateral, SPSO is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "SPSO Adequate Protection Superpriority Claim") in each of the LP Obligors' Chapter 11 Cases and Successor Cases.  The SPSO Adequate Protection Superpriority Claim shall be deemed satisfied and discharged in full upon the Effective Date by the treatment of SPSO's claims as set forth in the Plan and Confirmation Order.

(c)     *Priority of Adequate Protection Superpriority Claims.*

-27-

(i)  The Harbinger Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the Harbinger Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Inc. Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the Harbinger Adequate Protection Superpriority Claim shall be *pari passu* with the SPSO Adequate Protection Superpriority Claim against LightSquared Inc.

(ii)  The SPSO Adequate Protection Superpriority Claim shall be junior only to (A) the DIP Superpriority Claims and (B) the Carve-Out.  For the avoidance of doubt, except as set forth herein, the SPSO Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the LP Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as provided herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code and any other provision of the Bankruptcy Code; provided, however, that the SPSO Adequate Protection Superpriority Claim against LightSquared Inc. shall be *pari passu* with the Harbinger Adequate Protection Superpriority Claim against LightSquared Inc.

**Provisions Common to DIP Financing and Use of Prepetition Collateral**

18.  Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to (a) permit the DIP Obligors to grant the DIP Liens, Harbinger Adequate Protection Liens, SPSO Adequate Protection Liens, DIP Superpriority Claims, Harbinger Adequate Protection Superpriority Claim, and SPSO Adequate Protection Superpriority Claim;

-28-

(b) permit the DIP Obligors to perform such acts as the DIP Agent in is sole discretion, and the Required DIP Lenders in their sole discretion, may request to assure the perfection and priority of the liens granted herein; (c) permit the DIP Obligors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, Harbinger, and SPSO under the DIP Documents, the DIP Facility, and this Final Order; and (d) contemporaneously with the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, authorize the DIP Obligors to pay the DIP Agent and the DIP Lenders in accordance with the terms of this Final Order.

19.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, the Harbinger Adequate Protection Liens, and the SPSO Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law), the DIP Liens, the Harbinger Adequate Protection Liens, and the SPSO Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, Harbinger, and SPSO the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, Harbinger, and SPSO are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction (and the DIP Agent is hereby authorized, but not required, to take possession of or control over, or take any other action with respect to the DIP Collateral) in order to validate and perfect the liens and security interests granted to them hereunder, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date.  Whether or not the DIP Agent on behalf of the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, as applicable, shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments (or, in the case of the DIP

Agent, to take possession of or control over any DIP Collateral), or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of this Final Order.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agent, the Prepetition Inc. Agent on behalf of Harbinger, or the Prepetition LP Agent on behalf of SPSO, respectively, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)    The DIP Obligors are authorized and directed to execute and deliver promptly to the DIP Agent and the Prepetition Agents all such agreements, financing statements, instruments, and other documents as the DIP Agent or the Prepetition Agents may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and Adequate Protection Liens, respectively.

(d)    In furtherance of the foregoing and without further approval of this Court, each DIP Obligor is authorized to do and perform all acts to make, execute, and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for such DIP Obligor's performance hereunder.

20.    <u>Maintenance of DIP Collateral</u>.  Until the (a) Effective Date and satisfaction of all DIP Obligations pursuant to the terms of the Plan or (b) indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the DIP Obligors shall (a) insure the DIP Collateral as required under the DIP Documents and (b) maintain the cash management system as set forth in the *Final Order (A) Authorizing Debtors To (I) Continue Using Existing Cash Management Systems, Bank Accounts and Business Forms and (II) Continue Intercompany Transactions, (B) Providing Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Debtors' Banks to Honor All Related Payment Requests, and (D)*

*Waiving Investment Guidelines of Section 345(b) of Bankruptcy Code* [Docket No. 115] (the "Cash Management Order") or as otherwise required by the DIP Documents.  This Final Order shall be deemed to modify the Cash Management Order as necessary to permit the DIP Obligors to comply with the provisions of this Final Order and the DIP Documents.

21.    Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders.  The DIP Obligors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents without the prior written consents as required under the DIP Documents (and, no such consent shall be implied, from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or from any order of this Court).

22.    Exit Conversion; Payment of Tranche B DIP Obligations.   Upon the occurrence of the Effective Date, (a) the Tranche A DIP Obligations shall be treated in accordance with the terms of the Plan (the "Exit Conversion"), and (b) the Tranche B DIP Obligations shall be indefeasibly paid in full in cash in accordance with the terms of the Plan.

23.    Events of Default.  Unless expressly waived in writing in accordance with the consents required in the DIP Documents, each of the following shall constitute an event of default (each, an "Event of Default" and, collectively, the "Events of Default"):

(a)    This Court enters an order dismissing any of the Chapter 11 Cases of the DIP Obligors with material assets or converting any such Chapter 11 Cases to cases under chapter 7;

(b)    This Court enters an order appointing a chapter 11 trustee in any of the Chapter 11 Cases of the DIP Obligors with material assets that is not stayed following entry;

(c)    This Court enters an order (i) staying, reversing, modifying, or vacating this Final Order or (ii) amending this Final Order, including, without limitation, any modification on the ability of the DIP Obligors to use Prepetition Collateral and/or the provision of additional or different adequate protection to Harbinger or SPSO;

(d)     This Court enters an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases of the DIP Obligors, or any DIP Obligor shall file a motion or other pleading seeking the dismissal of its Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(e)     Except as expressly allowed in this Final Order, this Court enters an order granting any lien on, or security interest in, any DIP Collateral in favor of any party other than the DIP Agent on behalf of the DIP Lenders, or granting an administrative claim payable by a DIP Obligor to any party other than the DIP Agent on behalf of the DIP Lenders (other than administrative claims incurred in the ordinary course of business that are not senior to or *pari passu* with the superpriority administrative claim granted to the DIP Agent and the DIP Lenders pursuant to this Final Order);

(f)     This Court enters an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any DIP Collateral;

(g)     This Court enters an order granting relief from the automatic stay under section 362 of the Bankruptcy Code with respect to all or any material portion of the property of the DIP Obligors' estates;

(h)     Any DIP Obligor shall make any payment on or in respect of any prepetition indebtedness or prepetition obligations of a DIP Obligor other than (i) as permitted by an order of this Court (A) entered prior to the date of the filing of the Motion or (B) upon effectiveness of the Plan or otherwise in connection with the DIP Obligors' assumption or assumption and assignment of any executory contract, (ii) payment in accordance with the Restructuring Costs Covenant, or (iii) to the extent expressly permitted by the DIP Agreement and approved by an order of this Court **(including, for the avoidance of doubt, the indefeasible repayment in full in cash of all Existing DIP Facility and Specified Prepetition Claims)**;

(i)     Any DIP Obligor shall fail to comply with the terms of this Final Order in any material respect, it being understood that non-compliance with the DIP Budget Covenant, or any violation

-32-

of the Restructuring Costs Covenant or the Capital Expenditure Covenant, shall constitute material non-compliance with this Final Order;

(j)    (i) One Dot Six shall be in material breach of, or there shall be a material default under, the One Dot Six Lease, (ii) the One Dot Six Lease shall be rejected (within the meaning of the Bankruptcy Code) by One Dot Six or the One Dot Six Lease shall be removed from the schedule of assumed agreements filed in connection with the Plan of Reorganization, (iii) there shall have occurred any event or condition which results in One Dot Six no longer having the right to assume (within the meaning of the Bankruptcy Code) the One Dot Six Lease, (iv) the One Dot Six Lease shall be amended in any manner without the prior written consent of the Required DIP Lenders, or (v) the One Dot Six Lease shall have been terminated or any Loan Party shall have received notice of termination thereof;

(k)    This Court enters an order approving the sale of any substantial DIP Collateral that does not provide for the payment in respect thereof to be remitted to the DIP Agent consistent with the priorities set forth in this Final Order;

(l)    Any DIP Obligor files any pleading seeking, or otherwise consenting to, or supporting or acquiescing in any other person's motion as to, any of the matters set forth in paragraph 29; and

(m)    An Event of Default as defined in the DIP Agreement occurs.

24.    <u>Rights and Remedies Upon Event of Default; Specific Performance</u>.  Immediately upon the occurrence of and during the continuation of an Event of Default, the DIP Agent may, and as directed by the Required DIP Lenders, shall, as provided in the DIP Documents, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the DIP Obligors to the extent any such commitment remains, and/or (c) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Agent shall be referred to herein

as a "Termination Declaration").    The Termination Declaration shall be given by email (or other electronic means) to counsel to the DIP Obligors, counsel to SPSO, counsel to Harbinger, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date").    Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that seven (7) business days after the Termination Declaration Date (the "Remedies Notice Period"), the DIP Agent and DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral permitted by, and in accordance with, the DIP Documents, this Final Order, and applicable nonbankruptcy law, and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to prior satisfaction of the Carve-Out.    Notwithstanding anything to the contrary, during the Remedies Notice Period, the DIP Obligors shall be entitled to use proceeds of the DIP Facility and Cash Collateral, if any, solely as permitted in the DIP Documents and to seek an emergency hearing with the Court solely for the purposes of contesting whether an Event of Default has occurred and/or is continuing.    Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the DIP Obligors shall no longer have the right to use or seek to use DIP Collateral.    The DIP Agent and DIP Lenders shall be permitted to exercise all remedies set forth herein and in the DIP Documents and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral, or any other rights and remedies granted to the DIP Agent and DIP Lenders with respect thereto pursuant to the DIP Documents or this Final Order.    The DIP Secured Parties shall have the right to specific performance of all obligations of the DIP Obligors under the DIP Agreement, the DIP Documents, and this Final Order. The DIP Secured Parties shall have the right to submit a credit bid for up to the full face amount of the DIP Obligations in respect of any sale of DIP Collateral, whether pursuant to a plan or otherwise, which

-34-

amount shall not be limited, capped, or reduced pursuant to section 363(k) of the Bankruptcy Code for cause or otherwise.

25.     <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Final Order</u>.  The DIP Secured Parties each have acted in good faith in connection with negotiating the DIP Documents and extending credit under the DIP Facility, and their reliance on this Final Order is in good faith.  Based on the findings set forth in this Final Order and the record made during the Hearing, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Final Order are hereafter appealed, reargued, reconsidered, reversed, modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are each entitled to the full protections provided in section 364(e) of the Bankruptcy Code and this Final Order.  Any such appeal, reconsideration, reargument, reversal, modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances previously made or made hereunder, or lien, claim, priority, or protection authorized or created previously or hereby.  Any liens or claims granted to the DIP Agent or DIP Lenders hereunder arising prior to the effective date of any such appeal, reconsideration, reargument, reversal, modification, amendment, or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, benefits, and protections granted herein.

26.     <u>Indemnification of DIP Secured Parties</u>.  The indemnification provisions set forth in the DIP Agreement, as modified by this Final Order, are hereby approved in their entirety.  Without limiting the generality of the foregoing, subject to the indefeasible repayment in full in cash of the Existing DIP Facilities and the Specified Prepetition Claims, the DIP Obligors shall indemnify and hold harmless the DIP Secured Parties and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising

-35-

out of, or related to, the DIP Documents, the DIP Facility, or the transactions contemplated thereby and by this Final Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agent's and each other DIP Lender's exercise of discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation therefor, the DIP Agent and each other DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the DIP Obligors agree to promptly pay the reasonable fees and expenses of such counsel.

27.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent and DIP Lenders under the DIP Documents, the DIP Obligors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent and DIP Lenders reasonable access to the DIP Obligors' premises and their books and records in accordance with the DIP Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the DIP Obligors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and DIP Lenders all such information as may be reasonably requested with respect to the business, results of operations, and financial condition of any DIP Obligor. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent or the DIP Lenders, or their respective independent certified public accountants, financial advisors, investment bankers, and consultants, with any information subject to attorney-client privilege or consisting of attorney work product.

28.    <u>Carve-Out</u>.  As used in this Final Order, "<u>Carve-Out</u>" shall mean the Inc. Carve-Out and the LP Carve-Out.

(a)    *Inc. Carve-Out*. As used in this Final Order, the "Inc. Carve-Out" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the Inc. Obligors; (ii) all reasonable fees and expenses incurred by a trustee for the Inc. Obligors under section 726(b) of the Bankruptcy Code not to exceed $50,000; ~~and~~ (iii) the allowed and unpaid professional fees, expenses, and disbursements allocable to the Inc. Obligors incurred on or after the Termination Date by the Debtors for any professionals retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) by the Debtors under sections 327, 328, or 1103(a) of the Bankruptcy Code (the "Chapter 11 Case Professionals") in an aggregate amount not to exceed $1.5 million plus such allowed fees, expenses, and disbursements allocable to the Inc. Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (collectively, the "Allowed Inc. Professional Fees")**; and (iv) reasonable and documented professional fees incurred in connection with the Surviving Inc. Indemnity Obligations (as defined herein) to the extent permitted by paragraph 41 hereof**.

(b)    *LP Carve-Out*.  As used in this Final Order, the "LP Carve-Out" shall mean, upon the occurrence of the Termination Date, the following expenses: (i) all statutory fees payable to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) for the LP Obligors; (ii) with respect to the information officer (the "Information Officer") appointed by the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court") in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended, in the Canadian Court (the "Canadian Proceedings"), all fees and expenses required to be paid to the Information Officer and its counsel in connection with the Canadian Proceedings, which fees and expenses may be secured by a charging lien granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $200,000~~.~~**;** (iii) all reasonable fees and expenses incurred by a trustee for the LP Obligors under section 726(b) of the Bankruptcy Code not to exceed

-37-

$50,000; ~~and~~ (iv) the allowed and unpaid professional fees, expenses, and disbursements allocable to the LP Obligors incurred on or after the Termination Date by the Debtors for any Chapter 11 Case Professionals (which are restructuring professionals) in an aggregate amount not to exceed $4 million, plus such allowed fees, expenses, and disbursements allocable to the LP Obligors incurred in accordance with the Restructuring Costs Covenant prior to the Termination Date, but which remain unpaid as of the Termination Date, whether approved by the Court before or after the Termination Date (the "Allowed LP Professional Fees" and, together with the Allowed Inc. Professional Fees, the "Allowed Professional Fees")**; and (v) reasonable and documented professional fees incurred in connection with the Surviving LP Indemnity Obligations (as defined herein) to the extent permitted by paragraph 41 hereof**.

(c)    *Payment of Allowed Professional Fees Prior to Termination Date*.  Prior to the occurrence of the Termination Date, the DIP Obligors shall be permitted to pay Allowed Professional Fees in accordance with the Restructuring Costs Covenant.  The amounts paid shall not reduce the Carve-Out.

(d)    *No Direct Obligation To Pay Professional Fees; No Waiver of Right To Object to Fees*.  Neither the DIP Agent nor the DIP Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the DIP Obligors' Chapter 11 Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be construed (i) to obligate the DIP Agent or DIP Lenders in any way to pay compensation to, or to reimburse expenses of, any professionals retained by the DIP Obligors, or to guarantee that the DIP Obligors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out if actual Allowed Professional Fees incurred after the Termination Date exceed the Carve-Out; (iii) as consent to the allowance of any professional fees or expenses of any professionals retained by the DIP Obligors; or (iv) to affect the right of the DIP Agent or DIP Lenders to object to the allowance and payment of such fees and expenses.

-38-

29.    <u>Limitations on DIP Facility, DIP Collateral, and Carve-Out</u>.    The DIP Facility, DIP

Collateral, and Carve-Out may not be used: (a) in connection with, or to finance in any way, any action,

suit, arbitration, proceeding, application, motion, or other litigation of any type (i) adverse to the interests

of the DIP Agent or DIP Lenders with respect to their respective collateral or their rights and remedies

under the DIP Documents or this Final Order, as applicable, including, without limitation, for the

payment of any services rendered by the professionals retained by the Debtors in connection with the

assertion of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection,

defense, or other contested matter, the purpose of which is to seek, or the result of which would be to

obtain, any order, judgment, determination, declaration, or similar relief; (ii) invalidating, setting aside,

avoiding, or subordinating, in whole or in part, the DIP Obligations; (iii) for monetary, injunctive, or

other affirmative relief against any DIP Agent or DIP Lender or DIP Collateral; or (iv) except to contest

the occurrence or continuation of any Event of Default as permitted in paragraph 24, preventing,

hindering, or otherwise delaying the exercise by the DIP Agent or any DIP Lender of any rights and/or

remedies under this Final Order, the DIP Documents, or applicable law, or the enforcement or realization

(whether by foreclosure, credit bid, further order of the Court, or otherwise) by the DIP Agent or DIP

Lenders upon any of the DIP Collateral, <u>provided</u>, that any fees, costs, and expenses incurred pursuant to

this provision shall be payable solely from the Carve-Out; (b) to make any payment in settlement of any

claim, action, or proceeding, before any court, arbitrator, or other governmental body without the prior

written consents required under the DIP Documents; (c) to pay any fees or similar amounts to any person

who has proposed or may propose to purchase interests in any of the DIP Obligors without the prior

written consents required under the DIP Documents; (d) except to contest the occurrence or continuation

of any Event of Default as permitted in paragraph 24, object to, contest, or interfere with in any way the

DIP Agent's or DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of

Default has occurred, <u>provided</u>, that any fees, costs, and expenses incurred pursuant to this provision shall

be payable solely from the Carve-Out; (e) to sell or otherwise dispose of DIP Collateral without the

consents required under the DIP Documents; (f) with respect to any insurance proceeds constituting DIP

Collateral, without the consents required under the DIP Documents; (g) to incur Indebtedness (as defined in the DIP Agreement) outside the ordinary course of business without the prior consents required under the DIP Documents; (h) to object to or challenge in any way the claims, liens, or interests (including interests in the DIP Collateral) held by or on behalf of any DIP Agent or DIP Lender; (i) to assert, commence, or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent or DIP Lender; (j) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, or DIP Liens, or any other rights or interests of any of the DIP Agent or DIP Lenders; or (k) to prevent, hinder, or otherwise delay the exercise by any DIP Agent or DIP Lender of any rights and remedies granted under this Final Order.

30.    <u>Release</u>.  Subject to the limitations contained herein and the indefeasible repayment in full in cash of the Existing DIP Facilities and Specified Prepetition Claims, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the DIP Obligors' Chapter 11 Cases or Successor Cases) and any party acting by, through, or under the Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the DIP Secured Parties, and each of their respective participants and each of their respective affiliates, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations existing as of the date of this Final Order, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, DIP Liens, and DIP Facility, as applicable, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Agent or DIP Lenders and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority,

enforceability, and nonavoidability of the DIP Obligations, DIP Liens, Prepetition Inc. Obligations, Prepetition LP Obligations (other than Obligations held by, or for the benefit of, SPSO) and the Prepetition Liens (other than Prepetition Liens held for the benefit of SPSO). For the avoidance of doubt, nothing contained in this paragraph 30 or any other provision of this Final Order shall constitute a release of SPSO or any related person or entity (including, without limitation, EchoStar Corporation ("EchoStar"), Charles Ergen, or DISH Network Corporation ("DISH")), and all claims, rights, and defenses of the Debtors and their estates against SPSO, EchoStar, Mr. Ergen, and DISH are expressly retained.

31.    <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

32.    <u>Limitation on Charging Expenses Against Collateral</u>. Except to the extent of the Carve-Out, no costs or expenses of administration of the DIP Obligors' Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Secured Parties or any of their respective claims, (b) the DIP Collateral, (c) Harbinger or the Harbinger Adequate Protection Superpriority Claims, or (d) SPSO or the SPSO Adequate Protection Superpriority Claims pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law or in equity, without the prior written consent of the Initial Lenders, and no such consent shall be implied from any other action or inaction by the Initial Lenders.

33.    <u>Equities of the Case</u>. Effective upon entry of this Final Order and in light of (a) the DIP Agent's and DIP Lenders' agreement to subordinate their liens to the Carve-Out and the Permitted Prior Liens and superpriority claims to the Carve-Out, and the current payment of administrative expenses of the DIP Obligors' estates in accordance with the DIP Budget and subject to the Restructuring Costs Covenant and Capital Expenditure Covenant, (b) the subordination of the Harbinger Adequate Protection Liens and Harbinger Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, and

-41-

(c) the subordination of the SPSO Adequate Protection Liens and SPSO Adequate Protection Superpriority Claims to the Carve-Out and DIP Facility, each of the DIP Agent, the DIP Lenders, Harbinger, and SPSO shall be entitled to all benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, product, offspring, or profits of any of their collateral and proceeds shall be received and applied pursuant to the DIP Documents.  The DIP Agent, the DIP Lenders, Harbinger, and SPSO shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, Prepetition Inc. Collateral, or Prepetition LP Collateral, and proceeds shall be received and applied pursuant to the DIP Documents.

34.    <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

35.    <u>Discharge Waiver</u>.  The Debtors expressly stipulate, and the Court finds and adjudicates, that the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations.

36.    <u>Rights Preserved</u>.  Other than as expressly set forth in this Final Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Agent and DIP Lenders are preserved.

-42-

37.    <u>No Waiver by Failure To Seek Relief</u>.  The failure of any DIP Agent or DIP Lender, to

seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Documents, or

applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder,

thereunder, or otherwise of the applicable DIP Agent or DIP Lender.

38.    <u>Binding Effect of Final Order</u>.  Immediately upon entry by this Court (notwithstanding

any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid

and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, all other creditors of

any of the Debtors, and all other parties in interest and their respective successors and assigns, including

any trustee or other fiduciary hereafter appointed in any of the DIP Obligors' Chapter 11 Cases, any

Successor Cases, or upon dismissal or conversion of any Chapter 11 Case or Successor Case.

39.    <u>No Modification of Final Order</u>.  Until and unless the DIP Obligations and DIP

Superpriority Claims have been indefeasibly paid in full in cash (such payment or conversion being

without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge

by their terms) and all commitments to extend credit under the DIP Facility have been terminated, the DIP

Obligors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a)

except as permitted under the DIP Documents and with the prior written consent of each of the Initial

Lenders (i) any appeal, reconsideration, reargument, reversal, modification, stay, vacatur, or amendment

to this Final Order; (ii) a priority claim for any administrative expense or unsecured claim against the DIP

Obligors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation

any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b)) of the

Bankruptcy Code in any of the DIP Obligors' Chapter 11 Cases or Successor Cases, equal or superior to

the DIP Superpriority Claims, other than the Carve-Out, or (iii) any other order allowing use of the DIP

Collateral, and (b) except as permitted under the DIP Documents, any lien on any of the DIP Collateral

with priority equal or superior to the DIP Liens.  The DIP Obligors irrevocably waive any right to seek

any amendment, modification, or extension of this Final Order without the prior written consent, as

provided in the foregoing, of each of the Initial Lenders, and no such consent shall be implied by any

other action, inaction, or acquiescence of any of the Initial Lenders.  **The DIP Obligors irrevocably waive the right to seek any amendment or modification of this Final Order that will change, alter, amend, delay, or impair in any way (w) the treatment provided to the Allowed DIP Inc. Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed DIP Inc. Claims without the prior written consent of the Holders of such Allowed DIP Inc. Claims (in each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan), and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Inc. Agent or the Holder of any Allowed DIP Inc. Claims, (x) the treatment provided to the Allowed Prepetition Inc. Facility Non-Subordinated Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims without the prior written consent of the Holders of such Allowed Prepetition Inc. Facility Non-Subordinated Claims (in each case, solely to the extent such Holders (i) vote to accept the Plan or, if such Holders are ineligible to vote under the Plan, to the extent such Holders do not object to, or otherwise contest, the Plan or the New DIP Order and (ii) do not withdraw any of their statements filed in support of the Plan), and no such consent shall be implied by any other action, inaction, or acquiescence of the Prepetition Inc. Agent or the Holder of any Allowed Prepetition Inc. Facility Non-Subordinated Claim, (y) the treatment provided to the Allowed DIP LP Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan (including the timing thereof) and this Final Order, or consideration, releases, or indemnities provided to Holders of Allowed DIP LP Claims without the prior written consent of the Holders of such Allowed DIP LP Claims (in each case, solely to the extent such Holders voted to accept the Plan), and no such**

**consent shall be implied by any other action, inaction, or acquiescence of the Holder of any Allowed DIP LP Claim; and (z) the treatment provided to the Allowed Prepetition LP Facility Non-SPSO Claims (as defined, and set forth, in the Plan), the repayment of such claims in accordance with the Plan and this Final Order, or consideration, releases, or indemnities provided to the Holders of Allowed Prepetition LP Facility Non-SPSO Claims,  without the prior written consent of the Holders of a majority in amount of such Allowed Prepetition LP Facility Non-SPSO Claims (in each case, solely to the extent such Holders voted to accept the Plan) who are members** of the Ad Hoc Secured Group**, and no such consent shall be implied by any other action, inaction, or acquiescence of the Prepetition LP Agent or any Holder of an Allowed Prepetition LP Facility Non-SPSO Claim.**

40.    <u>Final Order Controls</u>.  This Final Order supersedes the Inc. DIP Order, the LP DIP Order, and the Existing Cash Collateral Order in all respects.  In the event of any inconsistency between the terms and conditions of the DIP Documents or this Final Order, the provisions of this Final Order shall govern and control.

41.    <u>Repayment of Fees and Expenses</u>**; Survival of Certain Indemnification Obligations**.  Notwithstanding anything contained herein, in the Prepetition Credit Documents or any other agreement, or in any order entered in these Chapter 11 Cases to the contrary (including, without limitation, this Final Order or the Confirmation Order), ~~the Debtors shall remain obligated to pay all reasonable fees and expenses, subject to a cap of $500,000 in the aggregate, incurred by (a) the DIP Inc. Agent and each DIP Inc. Lender, including all reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (b)~~**until the occurrence of the Effective Date of the Plan (a) the indemnification provisions contained in Section 10.03 of the Prepetition LP Credit Agreement shall survive in full force and effect solely with respect to the Prepetition LP Agent and each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim, and (b) the indemnification provisions contained in Section 10.03 of the Prepetition Inc. Credit Agreement and Section 10.03 of the Inc. DIP Credit Agreement shall survive in full force and effect with respect to** the Prepetition Inc. Agent

and, each holderHolder of a Prepetition Inc. Facility Non-Subordinated Claim (as defined in the Plan), including all, the DIP Inc. Agent and each Holder of a DIP Inc. Claim, as applicable; provided, that (w) with respect to professional fees and expenses of the holders of Allowed Prepetition LP Facility Non-SPSO Claims and Prepetition Inc. Facility Non-Subordinated Claims (respectively, the "Surviving LP Indemnity Obligations" and the "Surviving Inc. Indemnity Obligations"; collectively, the "Surviving Indemnity Obligations"), the Surviving Indemnity Obligations shall be limited to the reasonable and documented fees and expenses of legal and financial advisors retained by either of the foregoing, (c)(i) one United States and one Canadian counsel to represent the collective interests of the Prepetition Inc. Agent, Prepetition Inc. Lenders, Inc. DIP Agent and Inc. DIP Lenders and (ii) one United States and one Canadian counsel for each of the Prepetition LP Agent, and (d) the Ad Hoc Secured Group and all reasonable and documentedthe Holders of Allowed Prepetition LP Facility Non-SPSO Claims (until the Effective Date); (x) the Surviving Indemnity Obligations will not extend to (and no fees or expenses will be paid in connection with) fees and expenses of the Ad Hoc Secured Group's legal and financial advisors, in each case through and including the effective dateincurred solely in connection with monitoring the DIP Obligors' Chapter 11 Cases, any Successor Cases, or any related Canadian proceedings, (y) the Surviving Indemnity Obligations shall terminate upon the occurrence of the Effective Date of the Plan. Forand none of the Debtors, the Reorganized Debtors, and/or NewCo (each as defined in the Plan) shall be obligated to indemnify or make any payments for any indemnification of any Prepetition Agent, Prepetition Lender, Inc. DIP Agent, or Inc. DIP Lender incurred for any period from and after the Effective Date of the Plan; and (z) for the avoidance of doubt, the financial and legal advisors covered bySurviving Indemnity Obligations payable pursuant to this paragraph 41 and subject to the aggregate cap of $500,000 include (t) Akin Gump Strauss Hauer & Feld LLP, (u) Houlihan Lokey, (v) Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, (w) White & Case LLP, (x) The Blackstone Group, (y) Latham & Watkins LLP, and (z) Bennett Jones LLP.shall, until paid in full in cash, constitute

**superpriority administrative expense claims under Bankruptcy Code section 507(b), and shall be included in the Carve-Out as and to the extent set forth in paragraph 28 above.**

42.    No Control.  Neither the DIP Agent nor any of the DIP Lenders shall be deemed control persons or insiders of the Debtors or any of their affiliates solely by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Agreement, DIP Documents, or this Final Order.

43.    Survival.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the DIP Obligors' Chapter 11 Cases other than the Plan; (b) converting any of the DIP Obligors' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the DIP Obligors' Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the DIP Obligors' Chapter 11 Cases or Successor Cases.  The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the Prepetition Inc. Agent on behalf of Harbinger, and the Prepetition LP Agent on behalf of SPSO pursuant to this Final Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, or following dismissal of the DIP Obligors' Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until all DIP Obligations have been indefeasibly paid in full in accordance with the terms thereof and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Agent and/or DIP Lenders shall continue in the DIP Obligors' Chapter 11 Cases, in any Successor Cases, following dismissal of the DIP Obligors' Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

44.    Effect of this Final Order. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.  The fourteen (14)-day stay otherwise imposed

pursuant to Bankruptcy Rule 6004(h) is hereby expressly waived, and the terms of this Final Order and

shall take effect immediately upon execution thereof.

45.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final

Order according to its terms.

SO ORDERED by the Court this _____ day of _____, 2014.


_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

-48-