Hearing Date:  March 17, 2014 at 10:00 a.m. (prevailing Eastern time)
Objection Deadline:  March 11, 2014 at 12:00 p.m. (prevailing Eastern time)

Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**NOTICE OF LIGHTSQUARED'S MOTION FOR ENTRY OF ORDER**
**DESIGNATING VOTE OF SP SPECIAL OPPORTUNITIES, LLC**

      **PLEASE TAKE NOTICE** that LightSquared Inc. and certain of its affiliates, as

debtors and debtors in possession (collectively, "LightSquared" or the "Debtors") in the above-

captioned chapter 11 cases (the "Chapter 11 Cases"), at the direction, and with the support, of the

special committee of the boards of directors (the "Special Committee") for LightSquared Inc.

and LightSquared GP Inc., file the motion (the "Motion"), pursuant to section 1126(e) of title 11

of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), for

---

[1]      The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's
federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared
Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup
LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications
Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC
Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared
Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821),
Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc.
(0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802
Parkridge Boulevard, Reston, VA 20191.

entry of an order substantially in the form attached thereto as <u>Exhibit A</u> (the "<u>Order</u>")

designating the vote of SP Special Opportunities, LLC ("<u>SPSO</u>") to reject the *Debtors' Third*

*Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1336] (as

amended, supplemented, or modified, the "<u>Plan</u>").[2]

      **PLEASE TAKE FURTHER NOTICE** that a hearing (the "<u>Hearing</u>") on the

Motion will be held before the Honorable Shelley C. Chapman, Judge of the United States

Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), in

connection with the Confirmation Hearing scheduled to commence on **March 17, 2014 at 10:00**

**a.m. (prevailing Eastern time), or such other date and time as ordered by the Bankruptcy**

**Court**.

      **PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to

the Motion and the relief requested therein must be made in writing, conform to the Federal

Rules of Bankruptcy Procedure and the Local Rules for the Bankruptcy Court for the Southern

District of New York, set forth the basis for the objection and the specific grounds therefor, and

be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing

system, electronically in accordance with General Order M-399 (which can be found at

http://nysb.uscourts.gov) and (b) by all other parties in interest, in text-searchable portable

document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with

the customary practices of the Bankruptcy Court and General Order M-399 and shall be served

in accordance with General Order M-399 upon each of the following:  (i) LightSquared Inc.,

10802 Parkridge Boulevard, Reston, VA 20191, Attn:  Marc R. Montagner and Curtis Lu, Esq.;

(ii) counsel to LightSquared, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

Plaza, New York, NY 10005, Attn: Matthew S. Barr, Esq., Alan J. Stone, Esq., Michael L.

Hirschfeld, Esq., and Andrew M. Leblanc, Esq.; (iii) counsel to the Special Committee, Kirkland

& Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: James H.M. Sprayregen,

Esq., Paul M. Basta, Esq., and Joshua A. Sussberg, Esq.; (iv) the Office of the United States

Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street,

Suite 1006, New York, NY 10014, Attn: Susan D. Golden, Esq.; (v) counsel to U.S. Bank

National Association, as administrative agent under the Prepetition Inc. Credit Agreement and

administrative agent under the Inc. DIP Credit Agreement, Akin Gump Strauss Hauer & Feld

LLP, One Bryant Park, New York, NY 10036, Attn: Philip C. Dublin, Esq. and Kenneth A.

Davis, Esq.; (vi) counsel to UBS AG, Stamford Branch, as administrative agent under the

Prepetition LP Credit Agreement, Latham & Watkins LLP, 885 Third Avenue, New York, NY

10022, Attn: Mark A. Broude, Esq.; (vii) counsel to the ad hoc secured group of Prepetition LP

Lenders, White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036, Attn:

Thomas E Lauria, Esq. and Andrew C. Ambruoso, Esq.; (viii) counsel to Harbinger Capital

Partners, LLC, Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY

10019, Attn: David M. Friedman, Esq. and Adam L. Shiff, Esq.; (ix) counsel to Melody Business

Finance, LLC, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022, Attn:

Jeffrey Sabin, Esq. and Julia Frost-Davies, Esq.; (x) counsel to JPMorgan Chase Bank, N.A.,

Simpson Thacher & Bartlett LLP, 425 Lexington Avenue New York, NY 10017, Attn: Sandeep

Qusba, Esq. and Terry Sanders, Esq.' and (xi) counsel to Fortress Credit Corp., Stroock &

Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen

Esq., Frank A. Merola Esq., and Jayme T. Goldstein, Esq., so as to be actually received **no later**

**than March 11, 2014 at 12:00 p.m. (prevailing Eastern time), or such other date and time as**

**ordered by the Bankruptcy Court**.  Only those responses or objections that are timely filed,

served, and received will be considered at the Hearing.

PLEASE TAKE FURTHER NOTICE that if you do not timely file and serve a

written objection to the relief requested in the Motion, the Bankruptcy Court may deem any

opposition waived, treat the Motion as conceded, and enter an order granting the relief requested

in the Motion without further notice or hearing.

PLEASE TAKE FURTHER NOTICE that a copy of the Motion may be

obtained at no charge at http://www.kccllc.net/LightSquared or for a fee via PACER at

http://www.nysb.uscourts.gov.


New York, New York                          Respectfully submitted,
Dated:  March 3, 2014


                                            /s/ Matthew S. Barr
                                            Matthew S. Barr
                                            Alan J. Stone
                                            Andrew M. Leblanc
                                            Michael L. Hirschfeld
                                            MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
                                            One Chase Manhattan Plaza
                                            New York, NY 10005-1413
                                            (212) 530-5000

                                            *Counsel to Debtors and Debtors in Possession*


4

Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**LIGHTSQUARED'S MOTION FOR ENTRY OF ORDER**
**DESIGNATING VOTE OF SP SPECIAL OPPORTUNITIES, LLC**

---

[1]    The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ...................................................................................................1

Jurisdiction .....................................................................................................................8

Background .....................................................................................................................8

Background to Motion ....................................................................................................9

    A.    Ergen Parties Are LightSquared Competitors That Have Sought To
Further Their Strategic Interest in LightSquared's Spectrum Assets ..............9

        i.    Ergen Parties and SPSO Are Direct and Indirect Competitors of
LightSquared....................................................................................9

        ii.    Ergen Parties' Strategic, Long-Term Interest in Spectrum Assets ........10

        iii.    Ergen Parties' Focus on LightSquared ...............................................11

        iv.    Ergen Parties Begin To Act on Strategic Interest in LightSquared .......13

        v.    Ergen Parties Sharpen Focus and Coordinate Investment ....................14

        vi.    Ergen Parties Execute Prepetition LP Facility Claims Purchases and
Bolster Blocking Position ................................................................15

        vii.    Ergen Parties Further Act on Interest Through LBAC Bid ..................19

        viii.    LightSquared's Negotiations with Creditors Ended Following SPSO's
Elevated Participation in Cases........................................................21

    B.    Plan, SPSO's Treatment, and SPSO's Rejection Vote..............................24

        i.    Plan and Solicitation ........................................................................24

        ii.    SPSO's Treatment and Rejection Vote................................................25

Relief Requested ..........................................................................................................28

    A.    Standard for Vote Designation ...............................................................28

    B.    Vote Designation Precedent Cases on All Fours With These Cases............30

    C.    Ergen Parties' and SPSO's Conduct Sets a New High-Water Mark in
Vote Designation Jurisprudence.............................................................32

Motion Practice ............................................................................................................40

No Previous Request .....................................................................................................41

Notice ...........................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)..................................................................................29

Dish Network Corp. v. DBSD N. Am, Inc. (In re DBSD N. Am., Inc.),
    634 F.3d 79 (2d Cir. 2010)....................................................................... passim

In re Allegheny Int'l, Inc.,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ...............................................32, 36, 38, 40

In re Applegate Prop., Ltd.,
    133 B.R. 827 (Bankr. W.D. Tex. 1991) ...............................................................40

In re DBSD N. Am., Inc.,
    421 B.R. 179 (Bankr. S.D.N.Y. 2009), aff'd, 2010 WL 1223109 (S.D.N.Y. 2010) ....... passim

In re Dune Deck Owners Corp.,
    175 B.R. 839 (Bankr. S.D.N.Y. 1995) ...........................................................29, 37

In re Indianapolis Downs, LLC,
    486 B.R. 286 (Bankr. D. Del. 2013) ...................................................................28

In re MacLeod Co.,
    63 B.R. 654 (Bankr. S.D. Ohio 1986)...........................................................30, 40

In re Quigley Co.,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010)..........................................................28, 29

LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.),
    Case No. 12-12080 (SCC) ...................................................................................1

Siewe v. Gonzales,
    480 F.3d 160 (2d Cir. 2007).................................................................................29

Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc.,
    152 F. Supp. 903 (S.D.N.Y. 1957).......................................................................29

**STATUTES**

11. U.S.C § 107.......................................................................................................37

11 U.S.C § 1107(a) ..................................................................................................8

11 U.S.C § 1108.......................................................................................................8

11 U.S.C § 1126(e) ............................................................................................ passim

28 U.S.C. § 157(b)(2) ................................................................................................8

28 U.S.C. § 1334 .......................................................................................................8

28 U.S.C. § 1408 .......................................................................................................8

28 U.S.C. § 1409 .......................................................................................................8

FED. R. BANKR. P. 1007(d).......................................................................................41

FED. R. BANKR. P. 2002 ...........................................................................................41

S.D.N.Y Local Rule 9013-1(a) .................................................................................41

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), at the direction, and with the support, of the special committee of the boards of directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., file this motion (the "Motion"), pursuant to section 1126(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") designating the vote of SP Special Opportunities, LLC ("SPSO") to reject the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1336] (as amended, supplemented, or modified, the "Plan").  In support of this Motion, LightSquared relies on (a) evidence presented in the adversary proceeding, LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.), Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013) (the "Ergen Adversary Proceeding"), as referenced in *Plaintiffs' Proposed Findings of Fact* [Adv. Docket No. 132] (the "FOF") and *Plaintiffs' Post-Trial Brief* [Adv. Docket No. 133] (the "Post-Trial Brief" and, together with the FOF, the "Post-Trial Submissions"), and (b) any further evidence that may be adduced at the Confirmation Hearing and/or hearing on this Motion,[2] and further respectfully states as follows:[3]

## Preliminary Statement

1.      By this Motion, LightSquared asks the Court to designate SPSO's vote to reject the Plan pursuant to section 1126(e) of the Bankruptcy Code.  The grounds for the Motion

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the FOF, as applicable.

[3]    LightSquared intends to prosecute this Motion in connection with confirmation of the Plan subject to the Court's view otherwise.

are straightforward:  SPSO's rejection of the Plan "was not in good faith," as required by section 1126(e).  Indeed, SPSO's rejection of the Plan is in furtherance of its strategy – executed in concert with Ergen and his other controlled companies – to acquire LightSquared at a steep discount to its fair value by preventing LightSquared from reorganizing on a standalone basis.[4]

2.      As already developed in the rich record of the Ergen Adversary Proceeding, DISH Network Corporation ("DISH") and EchoStar Corporation ("EchoStar") are competitors of LightSquared and, as such, are barred by the terms of the Prepetition LP Credit Agreement from purchasing LP Debt.  SPSO is a "special purpose vehicle" formed by Charles W. Ergen, the Executive Chairman and controlling stockholder of DISH and EchoStar ("Ergen" and, collectively with DISH and EchoStar, the "Ergen Parties"), to circumvent and evade the transfer restrictions in the Prepetition LP Credit Agreement.[5]  SPSO's sole purpose was deception:  to allow the Ergen Parties to acquire Prepetition LP Facility Claims indirectly as the initial step in a comprehensive and premeditated plan to acquire LightSquared's spectrum.  By voting to reject the Plan, SPSO seeks to further the interests of the Ergen Parties and to facilitate their business strategy of acquiring spectrum assets.

3.      From April 2012 through May 2013, SPSO and the Ergen Parties successfully deployed this scheme when SPSO contracted to buy more than $1 billion in face amount of Prepetition LP Facility Claims (and attempting to purchase other LightSquared

---

[4]      Although SPSO is the party that purchased the Prepetition LP Facility Claims and voted them to reject the Plan, the acts of SPSO and the Ergen Parties (as defined herein) are so closely tied that they are referenced together where appropriate in this Motion with respect to the bad faith conduct that culminated with SPSO's vote to reject the Plan.  Thus, the actions and conduct of each of SPSO and the Ergen Parties in these Chapter 11 Cases should be taken into account in considering whether SPSO's vote to reject the Plan should be designated.

[5]      LightSquared respectfully refers the Court to Point I of the Post-Trial Brief, incorporated herein by reference, for a full discussion of the terms of Prepetition LP Credit Agreement that bar purchase of LP Debt by the Ergen Parties, and for a recitation of the facts and law giving rise to the conclusion that the contractual bar against purchase of LP Debt applies as well to SPSO.

securities) and eventually built a "blocking position" in the Plan class for such claims – all while

going to great lengths to conceal the involvement of the Ergen Parties.  Throughout that period,

and continuously to date, SPSO and the Ergen Parties did not act in good faith.  Rather, SPSO

and the Ergen Parties did everything in their power to (a) derail LightSquared's efforts to achieve

and implement a successful reorganization and (b) allow the Ergen Parties to acquire

LightSquared's spectrum assets at fire-sale prices.  Thus,

> On May 4, 2012, SPSO directed a prior holder from whom it had just agreed to buy $247 million of LP Debt to vote against a one-week forbearance intended to allow LightSquared to continue ongoing prepetition negotiations with its lenders. (FOF ¶¶ 97-100.)

> From October 2012 through June 2013, SPSO left hundreds of millions of dollars of trades in limbo for three to four months or longer by purposely failing to release funds necessary to settle the trades.  By so doing, SPSO deliberately rendered the composition of the Ad Hoc Secured Group uncertain at best and effectively paralyzed LightSquared's ability to negotiate a consensual reorganization plan.  (FOF ¶¶ 221-22.)

> In May 2013, as LightSquared and Jefferies kicked off the long-planned roadshow to support its effort to raise new capital, Ergen made an unsolicited bid for LightSquared's spectrum through LBAC (eventually acquired by DISH for merely $1.00), and then disclosed that he controlled SPSO.  (FOF ¶¶ 160-63, 223.)  The LBAC bid was expressly conceived by Ergen to thwart development of other restructuring options, and was hurriedly made before LBAC was even formed.  As SPSO and the Ergen Parties intended, potential new lenders walked away, convinced that the Ergen Parties already had control of LightSquared's spectrum.  (FOF ¶¶ 209-33.)  Ergen had specifically previewed such a strategy in presentations to the DISH and EchoStar boards on May 1 and 2, 2013, when he noted how SPSO's blocking position could be used to control the bankruptcy process to ensure that DISH or EchoStar could acquire the LightSquared spectrum.  (FOF ¶¶ 142, 161.)

> On June 13, 2013, when the size of its LP Debt holdings imperiled the continued effectiveness of the Exclusivity Stipulation – because the Ad Hoc Secured Group's LP Debt holdings had fallen below the required threshold – SPSO strategically "joined" the Ad Hoc Secured Group to force LightSquared's continued adherence to the Exclusivity Stipulation's terms, which (1) required that LightSquared negotiate only with the Ad Hoc Secured Group, and (2) if those negotiations did not yield an agreement on a plan by July 15, 2013, terminated exclusivity and required LightSquared to conduct a sales process.  (FOF ¶¶ 221-33.)

> ➢ But rather than work to advance the Court-approved process embodied in the Exclusivity Stipulation, SPSO worked to defeat it:

- • SPSO refused to consider any chapter 11 plan that did not include a sale of the LightSquared spectrum to LBAC, killing a term sheet that had been exchanged on May 24, 2013 – just prior to SPSO's joining the Ad Hoc Secured Group on June 13, 2013 – under which SPSO would receive a full cash recovery while non-SPSO Prepetition LP Lenders would receive cash recovery and warrants.  (FOF ¶¶ 223-228.)

- • After preventing the Ad Hoc Secured Group from reaching any agreement with LightSquared, SPSO used its dominant LP Debt holdings to cause the Ad Hoc Secured Group to announce its own plan and sign the PSA, one week after the expiration of exclusivity, with LBAC's unsolicited bid as the centerpiece.  (FOF ¶¶ 168-69, 228.)  The PSA bound members of the Ad Hoc Secured Group to support the LBAC Bid and prohibited them from negotiating with LightSquared.  (FOF ¶¶ 228-30.)

- • When agreement was not reached on a consensual plan, the combination of the LBAC stalking horse bid and SPSO's blocking position chilled bidding at the auction, resulting in a process that would not maximize value for LightSquared's estates.  (FOF ¶¶ 227-32.)

> ➢ Then in January 2014, after SPSO and the Ergen Parties caused the auction to fail, DISH withdrew its bid, untethering the Ad Hoc Secured Group Plan and positioning the Ergen Parties to return in the future with a lower bid for LightSquared's spectrum, or to take control through SPSO's debt holdings.  (FOF ¶¶ 209-20, 233.)

4.      Now, just as LightSquared is on the cusp of confirming the Plan – a global chapter 11 plan that has widespread stakeholder support, will maximize recoveries for all estates and stakeholders, and bring finality to these Chapter 11 Cases – SPSO has voted its Prepetition LP Facility Claims, not as a creditor concerned with its Plan recovery, but as a competitor (one with a clear conflict of interest as compared to the rest of the holders of the Prepetition LP Facility Claims) seeking to advance SPSO's and the Ergen Parties' agenda to obtain LightSquared's spectrum assets at a bargain price.  SPSO will vote down any Plan that does not provide the Ergen Parties and/or SPSO with a strategic interest in LightSquared's spectrum, and any assertion by the Ergen Parties or SPSO to the contrary is just plain fiction.

5.      If there was any doubt as to the Ergen Parties' and SPSO's ulterior

motives, culminating with SPSO's vote to reject the Plan, LightSquared directs the Court's

attention to the following four documents obtained through discovery.  (Notably, two of these

documents, both dated in July 2013, were produced literally the day before this Motion was filed,

although they plainly relate to the issues that were crucial to the Ergen Adversary Proceeding

and were plainly available for production in connection therewith.):[6]

> Ergen's May 2013 presentation to the DISH and EchoStar board of directors
(FOF ¶ 142), which provided a step-by-step guide to taking over LightSquared
through a bid and SPSO's blocking position, and explained that "Ergen's
substantial interests in [LightSquared] debt and preferred stock compliment any
acquisition strategy and could have significant influence in [LightSquared]'s
chapter 11 cases."  (Attached hereto as <u>Exhibit B</u>.)



(Attached hereto as <u>Exhibit C</u>.)

---

[6]        The content in <u>Exhibit C</u> and <u>Exhibit D</u> is of such significance not only in terms of bad faith supporting
vote designation, but also in terms of the Ergen Adversary Proceeding, where it squarely contradicts the
Defendants' testimony, and confirmation, where it underscores feasibility, that the Plaintiffs in the Ergen
Adversary Proceeding intend to request permission for a supplemental briefing and other appropriate relief.
Inexplicably, and indefensibly, this is the first time LightSquared has seen these documents and it is likely
the first time the Court will have seen them as well.

[7]        <u>Exhibit C</u>, and the references to its content in this Motion, are filed under seal and redacted.  Unredacted
copies will be provided to the Court and parties in interest.



(Attached hereto as <u>Exhibit D</u>.)

(Attached hereto as <u>Exhibit E</u>.)

The foregoing newly-produced documents show that SPSO and the Ergen Parties acted with the

ulterior motive to acquire the assets as a competitor to LightSquared.  SPSO's manipulative

---

[8]    <u>Exhibit D</u>, and the references to its content in this Motion, are filed under seal and redacted.  Unredacted copies will be provided to the Court and parties in interest.

[9]    <u>Exhibit E</u>, and the references to its content in this Motion, are filed under seal and redacted.  Unredacted copies will be provided to the Court and parties in interest.

behavior throughout these Chapter 11 Cases and impermissible use of its purported secured position in the capital structure should no longer be tolerated.  SPSO should not be permitted to destroy LightSquared's best opportunity to reorganize and emerge from bankruptcy.

6.    The authority for the relief sought is clear – tellingly, established by Ergen and DISH in their similar attempt to gain control of another satellite company, DBSD North America, Inc. (together with its affiliates, the "DBSD Entities").  The Second Circuit's recent decision affirming Judge Gerber's designation of DISH's votes cast against the DBSD Entities' plan of reorganization, DBSD II,[10] is controlling authority for the imposition of the designation remedy here.  Indeed, as demonstrated below, while SPSO and the Ergen Parties have exhibited the same intent that Judge Gerber found sufficiently indicative of bad faith to disqualify the votes in DBSD, they have implemented that intent through a level of misconduct that far exceeds the misconduct in DBSD – the Ergen Parties, through SPSO, acquired their Prepetition LP Facility Claims through breach of contract, breach of the implied covenant of good faith and fair dealing, and purposeful misrepresentation, and then did everything in their power over a span of nearly two years to disrupt the ordinary processes of these Chapter 11 Cases.

7.    SPSO undoubtedly will argue, as it has alluded to in open court, that its rejection of the Plan is born simply of its distaste for its particular Plan treatment – its desire not to be "[bound] . . . in duct tape, throw[n] . . . in the trunk of [a] car, and we ride along for [a] seven-year ride."  (Feb. 24 Tr. (Strickland): 68:22-24.)  The Court should not be misled, once again, by SPSO's colorful-yet-empty protestations, and should be mindful of the following:

---

[10]    "DBSD I" refers to In re DBSD N. Am., Inc., 421 B.R. 179 (Bankr. S.D.N.Y. 2009), aff'd, 2010 WL 1223109 (S.D.N.Y. 2010), judgment aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010), opinion issued, 634 F.3d 79 (2d Cir. 2011).  "DBSD II" refers to Dish Network Corp. v. DBSD N. Am, Inc. (In re DBSD N. Am., Inc.), 634 F.3d 79, 104 (2d Cir. 2010).  "DBSD" refers to DBSD I and DBSD II, collectively.

➢ Every creditor subject to a vote designation challenge makes the identical argument.

➢ The Plan treatment for SPSO – just as it was in the case of DISH's plan treatment in <u>DBSD</u> – is *full payment*, pursuant to a note with a shorter maturity than the new money second lien debt and which is senior to a new equity investment to be contributed by certain existing stakeholders and outside investors.

➢ SPSO's purported interest in negotiating a chapter 11 plan for LightSquared is unclear at best and untruthful at worst as SPSO's *modus operandi* has consistently been a series of actions designed to force a sale of LightSquared's spectrum for the cheapest price possible.

8.    Simply put, SPSO's rejection of the Plan has nothing to do with the terms of the Plan itself.  SPSO's commercial interests as a lender are entirely subordinate to, and dominated by, its interests as a formidable competitor.  Its rejection of the Plan is quintessentially bad faith.  Accordingly, vote designation is both justified and appropriate.

## **Jurisdiction**

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The statutory basis for the relief requested herein is section 1126(e) of the Bankruptcy Code.

## **Background**

12.    On May 14, 2012 (the "<u>Petition Date</u>"), LightSquared filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

13.    LightSquared continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in the Chapter 11 Cases.  No trustee or examiner has been appointed in the Chapter 11 Cases.

8

<u>Background to Motion</u>[11]

**A.    Ergen Parties Are LightSquared Competitors That Have Sought To Further Their Strategic Interest in LightSquared's Spectrum Assets**

> ### i.    *Ergen Parties and SPSO Are Direct and Indirect Competitors of LightSquared*

14.    DISH is a provider of broadband and satellite television services that aims to expand its broadband offerings, including by building a terrestrial broadband network.  In addition to its satellite broadcast business, DISH owns significant spectrum assets, including mobile satellite spectrum ("<u>MSS</u>").  EchoStar is a satellite communications company that currently operates, leases, or manages a number of satellites, including the satellites that provide services to DISH.  DISH and EchoStar are direct competitors of LightSquared.  (FOF ¶¶ 3-4.)

15.    Ergen is the founder, Chairman of the board of directors, the Executive Chairman, and majority owner of both DISH and EchoStar.  Ergen – personally and through his family trusts – beneficially owns and controls over 88% of DISH's voting shares and over 80% of EchoStar's voting shares.  (FOF ¶ 6.)  Ergen also wholly owns and controls SPSO and Special Opportunities Holdings LLC ("<u>SO Holdings</u>"), which is SPSO's sole and managing member. SPSO was formed by Sound Point Capital Management LP ("<u>Sound Point</u>") for the exclusive purpose to serve as the investment vehicle through which Ergen made trades for Prepetition LP Facility Claims, without those trades being traceable to the Ergen Parties.  (FOF ¶¶ 5-6.)

16.    Other relevant parties involved in the trades include:  (a) Jason Kiser ("<u>Kiser</u>"), the Treasurer of DISH and Vice President of Corporate Development at DISH and EchoStar, and part of the corporate development team at DISH and EchoStar, who facilitated and managed Ergen's trades through SPSO; and (b) Stephen Ketchum ("<u>Ketchum</u>"), the founder and

---

[11]    Additional background and factual and evidentiary support for the Motion can be found in the Post-Trial Submissions.

sole managing partner of Sound Point, who served as the point of contact between Sound Point and Kiser and Ergen. (FOF ¶¶ 10-11.)

### ii. Ergen Parties' Strategic, Long-Term Interest in Spectrum Assets

17.    DISH is diversifying away from its core Pay-TV business and expanding into the terrestrial wireless business. Led by Ergen, DISH's strategic goal is to compete in the wireless space with telecommunications giants like AT&T and Verizon, which requires a great deal of spectrum. As Ergen acknowledged, spectrum is a limited resource that currently suffers from a shortage, with the amount of data flowing over available spectrum doubling every year. (FOF ¶ 53.) Accordingly, Ergen and DISH regularly monitored MSS companies that hold spectrum, and in particular, the DBSD Entities, TerreStar Corp. (together with its affiliates, "TerreStar"), and LightSquared. (Id.)

18.    DISH and EchoStar, with Ergen at the helm, for years have been attempting to acquire, or merge with, numerous spectrum-owning companies, including actual and potential transactions involving the DBSD Entities, TerreStar, Sirius XM Holdings, Inc., Clearwire Corp., Sprint Corp., and Inmarsat plc. (FOF ¶ 54.) To this end, DISH and EchoStar, at Ergen's direction, have a history of purchasing distressed or discounted debt of their targets as a step toward an eventual acquisition, including acquiring a blocking voting position in distressed satellite companies in bankruptcy, such as the DBSD Entities and TerreStar, to facilitate the acquisition of the companies' spectrum assets at a discount. (FOF ¶ 55.)

19.    In DISH's acquisition of TerreStar through bankruptcy, the Ergen Parties employed a three-step strategy similar to the strategy employed here for LightSquared. *First*, EchoStar became the largest secured creditor of TerreStar Networks and the second-biggest shareholder in the parent, TerreStar Corp., to gain influence over the restructuring process. *Second*, DISH became stalking horse bidder on terms that repaid EchoStar in full. *Third*, DISH

10

entered into a purchase agreement with TerreStar whereby both the debt-buyer (EchoStar) **and**

the acquirer (DISH) – both represented by SPSO's counsel, Willkie Farr & Gallagher LLP

("Willkie") – obtained broad releases that ensured EchoStar's claims would be paid in full.

(FOF ¶ 56.)

20.     DISH's acquisition of the DBSD Entities' assets through the bankruptcy

process, in which Ergen was also intimately involved, employed a similar strategy.  DISH

acquired a blocking position in the DBSD Entities' first lien debt and attempted to acquire a

blocking position in their second lien debt to facilitate its acquisition.  See DBSD II, 634 F.3d at

104 ("DISH purchased the claims as votes it could use as levers to bend the bankruptcy process

toward its own strategic objective of acquiring [the DBSD Entities'] spectrum rights, not toward

protecting its claim."); DBSD I, 421 B.R. at 136 (quoting DISH document stating that DISH

"believe[d] there is a strategic opportunity to obtain a blocking position in the 2nd Priority

Convertible Notes and control the bankruptcy process for this potentially strategic asset.").

Despite the DBSD court's designating DISH's votes, as discussed in greater detail below, DISH

ultimately acquired the DBSD Entities' spectrum assets and was repaid in full on its debt

holdings.  (FOF ¶ 57.)

21.     In March 2012, DISH gained control of the DBSD Entities' and

TerreStar's spectrum, now known as AWS-4 spectrum, which, as of at least January 17, 2014,

DISH has still not deployed – for reasons, as explained below, that underscore DISH's interest in

LightSquared's spectrum.  (FOF ¶ 58.)

### iii.     *Ergen Parties' Focus on LightSquared*

22.     There is little doubt that Ergen has long desired to acquire LightSquared's

spectrum for DISH and EchoStar.  (FOF ¶ 59.)  DISH and Ergen were aware at all times of the

inherent value in LightSquared's spectrum and its actual and potential synergies with DISH's

11

spectrum. (FOF ¶ 62.) The Ergen Parties' interest in LightSquared began prior to 2011, when

EchoStar expressed interest in LightSquared's predecessor company, SkyTerra (prior to

Harbinger's own investment). (FOF n.2.)

23.     In 2011, Ergen again considered a DISH investment in LightSquared.

(FOF ¶ 59.) Underlying the focus on LightSquared, Ergen believed that LightSquared was "very

similar" to the DBSD Entities and TerreStar and that its spectrum "could fit with the existing

spectrum [that DISH owns] in the long-term."[12] (FOF ¶ 60.) Ergen further believed that he

could "clean up" LightSquared's spectrum, i.e., obtain the necessary FCC approvals to

streamline its deployment. (FOF ¶ 61.) The effects of this approval, in which Ergen expressed

such confidence, are indicated by the similar approvals relating to the AWS-4 spectrum DISH

obtained from the FCC in early 2013, which Ergen described as a "great favor" that caused the

former DBSD Entities and TerreStar assets to increase in value by "billions of dollars." (FOF ¶¶

60, 62.)

24.     Importantly, LightSquared's spectrum provides a natural fit with DISH's

existing spectrum because it offers use of clean uplink spectrum to pair with DISH's downlink

spectrum. (FOF ¶ 61.) After DISH acquired the AWS-4 spectrum held by the DBSD Entities

and TerreStar, it applied for and received permission to use that spectrum to build out a

terrestrial-only wireless network. (Id.) But the FCC's authorization came with a restriction:

DISH would have to devote a portion of the AWS-4 uplink to serve as a "guard band" for the

adjoining H-Band spectrum, meaning that portion of the uplink spectrum was largely unusable,

and DISH had only 35 MHz usable spectrum of the 40 MHz that it acquired from the DBSD

Entities and TerreStar. (Id.) To enable full use of the newly acquired AWS-4 spectrum, DISH

---

[12]     Ergen recognized the value in LightSquared's spectrum, testifying that it is "great collateral." (FOF ¶ n.3.)

sought, and received, approval to convert all of it to downlink spectrum. (Id.) Which meant that DISH would have to find uplink spectrum elsewhere.

25. LightSquared has significant blocks of useable uplink spectrum that is a natural pairing for the DISH downlink AWS-4 spectrum. (Id.) Indeed, LightSquared is presently, and has been for some time, the ***only*** significant source of available uplink spectrum to acquire. (Id.) It was thus of no surprise, and with reasonable confidence, that Ergen testified that had he acquired LightSquared, his plan would entail "two or three years to clean up LightSquared['s spectrum]" and that he believed "at the end of the process, there would be . . . twenty megahertz of uplink spectrum." (FOF ¶ 63.)

### iv. Ergen Parties Begin To Act on Strategic Interest in LightSquared

26. With motive in hand, in the Fall of 2011, Ergen began investigating the acquisition of Prepetition LP Facility Claims as an opportunity for DISH. Upon request by Ergen, Kiser compiled and discussed with Ergen information on LightSquared's spectrum and capital structure. (FOF ¶¶ 66-69.)

27. Thereafter, Kiser sought and obtained Ergen's permission to retain Sound Point to facilitate purchases of Prepetition LP Facility Claims and asked Sound Point's founder, Ketchum – a long-standing investment banker for EchoStar, who had worked with Kiser over twenty years on EchoStar and DISH-related transactions – if DISH was permitted to purchase the Claims. (FOF ¶ 70.) Kiser also consulted with Sullivan and Cromwell LLP ("S&C"), DISH's and EchoStar's outside counsel that handles their securities work, to determine whether DISH could purchase Prepetition LP Facility Claims. (FOF ¶ 75.) As a result of the investigation and discussions with S&C and Sound Point, Kiser determined that neither DISH nor EchoStar was a permitted buyer of Prepetition LP Facility Claims and communicated this information to Ergen. (FOF ¶¶ 74, 76.)

13

### v.    *Ergen Parties Sharpen Focus and Coordinate Investment*

28.    After learning DISH was restricted under the Prepetition LP Credit Agreement from purchasing Prepetition LP Facility Claims, Ergen and Kiser investigated alternative means to purchase the debt. During this exercise, Kiser still asked Sound Point to monitor the prices and volume of the Prepetition LP Facility Claims. (FOF ¶ 80.)

29.    One alternative that was considered was for Ergen to "personally" make the trades. Accordingly, Kiser consulted with S&C to determine whether Ergen could buy the debt and communicated to Ergen that this, too, would not work, because the Prepetition LP Credit Agreement barred Ergen and all other "natural persons" from buying the debt. (FOF ¶ 82.)

30.    Kiser further inquired of S&C in 2011 whether there were other ways for DISH or EchoStar to take advantage of "the LightSquared opportunity," including whether an investment vehicle could buy the Prepetition LP Facility Claims. This would accomplish indirectly – and secretly – what Ergen, Kiser, and Ketchum knew they were prohibited from doing directly. (FOF ¶ 83.)

31.    Kiser structured the purchases through an SPV, initially directing the creation of two companies, Bal Harbour Capital Management LLC ("Bal Harbour Capital") and Bal Harbour Holdings, LLC ("Bal Harbour Holdings" and, together with Bal Harbour Capital, "Bal Harbour"). (FOF ¶ 84.) On December 21, 2011, Sound Point set up Bal Harbour Capital and its sole managing member and holding company, Bal Harbour Holdings, so that Ergen could begin to purchase the Prepetition LP Facility Claims without alerting UBS and LightSquared to the Ergen Parties' roles in the purchases. This subterfuge was necessary because none of the Ergen Parties was an "Eligible Assignee" under the Prepetition LP Credit Agreement. (FOF ¶ 85.)

14

32.     After Bal Harbour had been formed, Kiser realized that a Littleton,
Colorado address – where Ergen resides, and next door to Englewood, where DISH and
EchoStar are headquartered – appeared in its formation documents.  Concerned that the Colorado
address would permit the public to track the purchaser of LightSquared debt back to the source,
Kiser directed Sound Point to create new SPVs to replace Bal Harbour.  (FOF ¶ 86.)

33.     On May 11, 2012, Ketchum suggested to Kiser that the new entity's name
be SP Special Opportunities, LLC – a name suggesting Sound Point ownership.  Following
Ketchum's suggestion, Ergen formed two entities on May 16, 2012:  SO Holdings and SPSO.[13]
(FOF ¶ 88.)  Rather than list a Colorado address, the SO Holdings and SPSO formation
documents listed a Delaware address.  As Kiser testified, SPSO's address was specifically
chosen to deflect any possible connection between Ergen and SPSO's purchases of the
Prepetition LP Facility Claims.  (FOF ¶ 89.)

> ### vi.     *Ergen Parties Execute Prepetition LP Facility Claims Purchases and Bolster Blocking Position*

34.     Between April 13, 2012 and April 26, 2013, SPSO contracted to purchase
over $1 billion of Prepetition LP Facility Claims, of which it actually closed trades for
$844,323,097.83.  When the Ergen Parties intended to close a trade, Kiser would contact Ergen's
asset manager, Bear Creek Asset Management LLC ("Bear Creek"), and tell them how much
money was needed to close the trade.  Ergen would then authorize the wire transfer and Bear
Creek would liquidate investments to fund the transfer.  (FOF ¶ 94.)

---

[13]     The capital structure of SPSO and SO Holdings was set up to mirror that of the Bal Harbour entities.  (FOF ¶ n.7.)

35.    The following chart sets forth SPSO's trades for Prepetition LP Facility

Claims, including the trade and closing dates, par amount, purchase price, cost,

broker/counterparty, and settlement status.

| Trade Date | Closing Date | Par | Price | Cost | Counterparty | Status |
|---|---|---|---|---|---|---|
| 04/13/12 | 09/06/12 | 5,000,000.00 | 48.750 | 2,437,500 | UBS | Settled |
| 05/03/12 | 07/23/12 | 4,545,500.00 | 59.00 | 2,681,845 | Jefferies | Settled |
| 05/03/12 | 07/26/12 | 20,000,000.00 | 59.250 | 11,850,000 | Seaport | Settled |
| 05/03/12 | 09/06/12 | 3,000,000.00 | 58.750 | 1,762,500 | UBS | Settled |
| 05/03/12 | 09/06/12 | 2,000,000.00 | 58.500 | 1,170,000 | UBS | Settled |
| 05/03/12 | 07/23/12 | 5,000,000.00 | 59.000 | 2,950,000 | Jefferies | Settled |
| 05/04/12 | 05/31/12 | 247,259,046.62 | 60.250 | 148,973,576 | Jefferies | Settled |
| 10/04/12 | 11/30/12 | 19,417,287.99 | 78.500 | 15,242,571 | Jefferies | Settled |
| 10/23/12 | 02/06/13 | 3,000,000.00 | 83.750 | 2,512,500 | UBS | Settled |
| 11/15/12 | 01/08/13 | 7,997,057.00 | 81.750 | 6,537,594 | Jefferies | Settled |
| 12/12/12 | 6/11/13 | 2,000,000.00 | 84.000 | 1,680,000 | Goldman Sachs | Settled |
| 12/13/12 | 03/12/13 | 7,000,000.00 | 86.000 | 6,020,000 | Jefferies | Settled |
| 12/20/12 | 04/09/13 | 14,782,302.32 | 85.500 | 12,934,515 | UBS | Settled |
| 12/28/12 | 03/13/13 | 15,000,000.00 | 88,500 | 13,275,000 | Jefferies | Settled |
| 01/02/13 | 03/07/13 | 20,000,000.00 | 89.125 | 17,825,000 | Jefferies | Settled |
| 01/02/13 | 04/05/13 | 6,000,000.00 | 89.125 | 5,347,500 | Jefferies | Settled |
| 01/03/13 | 03/07/13 | 17,999,999.97 | 89.250 | 16,065,000 | Jefferies | Settled |
| 01/07/13 | 05/24/13 | 7,000,000.00 | 89.500 | 6,265,000 | Jefferies | Settled |
| 01/14/13 | 05/24/13 | 9,410,420.00 | 91.500 | 8,610,534 | Jefferies | Settled |
| 02/01/13 | 07/23/13 | 20,000,000.00 | 91.875 | 18,375,000 | JPM | Settled |
| 03/25/13 | 05/24/13 | 88,262,536.00 | 93.375 | 84,180,394 | Jefferies | Settled |
| 03/28/13 | - | 168,759,227.85 | 96.000 | 162,008,859 | Jefferies | Unsettled |
| 04/01/13 | 6/25/13 | 5,500,000.00 | 96.000 | 5,280,000 | Seaport | Settled |
| 04/19/13 | 6/14/13 | 122,250,172.79 | 96.000 | 117,360,166 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 145,712,408.57 | 96.000 | 139,883,912 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 46,186,366.57 | 96.000 | 44,338,912 | Jefferies | Settled |
| | | | | | | |
| Total Purchased | | 1,013,082,325.68 | 84.450 | 855,567,878 | | |
| Total Settled | | 844,323,097.83 | 82.140 | 693,559,019 | | |
| Total Unsettled | | 168,759,227.85 | | | | |

(FOF ¶ 95.)

36.    As detailed above, although the earlier trades were below par, the later

ones were almost at par, and the average contracted purchase price was 84.45 cents on the dollar.

Although SPSO initiated a few claim purchases prepetition, those purchases occurred during a

period when there was already significant public speculation that LightSquared was approaching

bankruptcy.  At any rate, all trades closed postpetition.  As further discussed below, these close-

to-par purchases are consistent with DISH's claim purchases in DBSD.  Further evidencing their

intent to be post-bankruptcy claim holders, the Ergen Parties (a) directed a vote against a

proposed amendment to the Prepetition LP Credit Agreement that would have forestalled

LightSquared's bankruptcy filing[14] and (b) made the overwhelming majority of their claims

purchases postpetition.  (FOF ¶¶ 97-100.)

37.    In fact, Ergen was so intent on obtaining a blocking position and control of

the bankruptcy process, he sought to purchase preferred units of LightSquared LP (the "Preferred

LP Units") that were bundled with the 96-cents-on-the-dollar Prepetition LP Facility Claims

trades, and offered to pay for such Preferred LP Units between 92 and 95 cents on the dollar, or

approximately $122 million, just so, as Kiser testified, Ergen could have the privilege of

obtaining the Prepetition LP Facility Claims.  (FOF ¶ 154.)

---

[14]    More specifically, on May 4, 2012, SPSO was notified that, in connection with LP Debt that SPSO had agreed to purchase but not yet closed on, it had the right to direct the seller how to vote on a proposed amendment to the Prepetition LP Credit Agreement that would give LightSquared an additional week to continue negotiations to reach an agreement with the Prepetition LP Lenders.  In a May 4, 2012 email, Kiser wrote to Ergen, in part, that "[t]he seller is inclined to vote to approve this one week extension of time to continue negotiations, and so if the buyer does not direct the seller to the contrary, that is how the seller will vote."  (FOF ¶ 97.)  Ergen replied to Kiser's email, "I would have them vote no."  (Id.)  Following Ergen's direction, Kiser directed Sound Point to vote no on the amendment.  A Sound Point employee relayed these instructions to Ketchum, commenting "[n]o extension, so they want it to file bankruptcy," Ketchum replied, "[n]o surprise there."  (Id.)  Although Ergen testified that he made that decision because he did not have necessary documentation, the facts and evidence show otherwise.  In fact, Kiser conceded that he made no effort to discuss the amendment with any of the Prepetition LP Lenders. (FOF ¶ 98.)  Ketchum professed not to recall the details surrounding the decision to vote "no" and whether the amendment was actually available, but at his deposition weeks earlier, Ketchum explained that he "would not have granted an extension," explaining that in his opinion "the sooner that [LightSquared] entered the Chapter 11 process the better." (FOF ¶ 99.)

38.     From the outset, Ergen's strategy in acquiring Prepetition LP Facility
Claims was to acquire the LightSquared assets.  Ketchum and others at Sound Point understood
Ergen's and Kiser's strategy was to purchase the Prepetition LP Facility Claims and use those
claims as leverage in the bankruptcy case to acquire LightSquared for DISH.  (FOF ¶ 100.)
LightSquared was a "loan to own" investment, Ketchum testified, in that "most investors
believed that given the capital structure of the company, that the term loan B . . . was likely to be
exchanged for equity securities."  (Id.)

39.     Consistent with Ergen's strategy, after reconfirming that DISH and
EchoStar still could not purchase LP Debt, on October 4, 2012, a few months after
LightSquared's bankruptcy filing, Ergen instructed Kiser that "I am interested to increase my
position at the 75 level at least up to a 33% ownership level of the class" – i.e., up to a level that
would establish a blocking position, which he understood to be valuable in a bankruptcy from his
experience in TerreStar and the DBSD Entities.  (FOF ¶ 101.)  Both Kiser and Ergen testified
that 33% would provide SPSO, and therefore the Ergen Parties, with a "blocking" position such
that SPSO could enforce "certain rights" during the bankruptcy proceeding.[15]  (FOF ¶ 96.)  At
Ergen's direction, Kiser had Sound Point regularly monitor and advise him how close SPSO was
to reaching a blocking position and kept a close eye on developments in the bankruptcy itself.
(FOF ¶ 101.)[16]

40.     On March 28, 2013, SPSO agreed to a trade that, had it closed, would
have achieved its desired blocking position.  As that trade happened, Ketchum sent an email to

---

[15]     In fact, Ergen was so intent on acquiring a large position in the class of Prepetition LP Facility Claims that
he was not even willing to share a small position with Sound Point.  (FOF n.9.)

[16]     Although Ketchum initially testified that he did not recall discussing acquiring a blocking position with
Kiser, he later admitted that Kiser told him "he was very interested in tracking whether or not SPSO had a
blocking position with respect to LightSquared."  (FOF n.10.)

Kiser, stating that "[y]ou just bought a spectrum company." (FOF ¶ 102.) Ketchum thereafter

concluded "we now control the company." (Id.)

### vii. *Ergen Parties Further Act on Interest Through LBAC Bid*

41.    Having acquired the blocking position on March 28, 2013, Ergen

immediately went to work on putting it to use to get LightSquared's spectrum for DISH and

EchoStar. On April 3, 2013, Ergen caused DISH to raise $2.3 billion in funding for "[potential

spectrum acquisitions]," without ever informing the DISH board. (FOF ¶ 138.) That same

month, Ergen (a) hired Willkie – the same counsel who had advised DISH in the TerreStar

acquisition – as bankruptcy counsel in connection with the Chapter 11 Cases, (b) began to put

together a bid for LightSquared, and (c) devised a plan to make public his clandestine buying of

LP Debt. (FOF ¶¶ 56, 140-41.)

42.    On May 1 and 2, 2013, Ergen presented to the boards of DISH and

EchoStar his holdings in LP Debt and his plan to pursue a transaction for LightSquared's assets,

which DISH and EchoStar were invited to take over. (FOF ¶ 141.) In that presentation, Ergen

outlined the leverage that SPSO had already created: "Ergen's substantial interests in

[LightSquared] debt and preferred stock compliment any acquisition strategy and could have

significant influence in [LightSquared]'s chapter 11 cases." (FOF ¶ 142.) As Ergen testified, the

timing was critical because LightSquared's exclusivity was terminating on July 15, 2013, and he

feared that, unless the Ergen Parties were able to interfere, LightSquared might successfully

reorganize. (FOF ¶ 144.)

43.    Acting on the importance of moving prior to the termination of

exclusivity, on May 15, 2013, Ergen executed on his plan and submitted an "offer" (the "LBAC

Bid") to purchase certain of LightSquared's assets by L-Band Acquisition, LLC ("LBAC").

LBAC did not exist at the time the offer was made and was not formed until two weeks later, on

May 28, 2013.  (FOF ¶ 160.)  The Ergen Parties' unsolicited proposal was only for $2 billion –

an amount that would merely satisfy the outstanding Prepetition LP Facility Claims.  (FOF ¶

162).  In other words, the proposal ensured that Ergen would be repaid in full on his initial

investment and also receive $140 million in profits as well as "significant" interest.  (FOF ¶

162.)

      44.     Although Ergen testified that he was prepared to proceed with the LBAC

Bid as a "personal investment," the evidence does not support this claim.  First, Ergen did not

have financing agreements lined up with investors.  (FOF ¶ 163.)  Second, Ergen ended up

investing nearly all of his non-DISH/EchoStar assets – which, until then had been invested

conservatively in T-Bills – to acquire the Prepetition LP Facility Claims.  (FOF ¶ 148.)  Both

Ergen personally, and DISH as a corporate entity, understood that DISH was the real party in

interest on the LBAC Bid.  (FOF ¶ 163.)

      45.     It was therefore no surprise when, on July 23, 2013, DISH announced its

intention to bid through LBAC (which it acquired from SPSO for only $1.00) for LightSquared's

spectrum.  At the same time, DISH announced that it had signed a Plan Support Agreement

("PSA") with the Ad Hoc Secured Group in which LBAC would act as the stalking horse bidder

in the *Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp.,*

*LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co.,*

*LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and*

*SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders*

[Docket No. 764] (as amended, the "Ad Hoc Secured Group Plan").  (FOF ¶¶ 168-169, 228.)

      46.     The Ad Hoc Secured Group Plan, incorporated by reference into the PSA,

contained a broad release for all claims against Ergen, DISH, EchoStar, SPSO, and their related

parties. (FOF ¶¶ 170, 234; Ad Hoc Secured Group Plan.) On July 23, 2013, the Ad Hoc

Secured Group filed the PSA and other plan-related documents to start the process of obtaining

approval of the Ergen-turned-DISH LBAC Bid. (FOF ¶ 228.)

### viii.   *LightSquared's Negotiations with Creditors Ended Following SPSO's Elevated Participation in Chapter 11 Cases*

47.    The Ergen Parties' and SPSO's undue influence over LightSquared and its

stakeholders was felt throughout the Chapter 11 Cases. As reflected in his May 2013

presentation to the boards of directors for DISH and EchoStar, Ergen knew that SPSO's

"substantial interests in [LightSquared] debt and preferred stock compliment any acquisition

strategy and could have significant influence in L2's chapter 11 cases." (FOF ¶ 142.) For

example, after SPSO purchased LP Debt owned by two investors, both entities immediately

withdrew from plan negotiations. (FOF ¶ 210.) In addition, although LightSquared had met with

several large holders of the LP Debt to explore ideas for a consensual plan of reorganization,

"further discussions were halted after Sound Point agreed to purchase the LightSquared LP

preferred stock from these investors." (Id.)

48.    Restructuring discussions with certain holders of Preferred LP Units were

also impacted by SPSO's attempt, albeit unsuccessful, to purchase Preferred LP Units from other

stakeholders because they became wary that an "activist lender" would harm their interests.

(FOF ¶ 211.) For instance, on April 11, 2013, a holder of Preferred LP Units expressed concerns

to Marc Montagner, LightSquared's Chief Financial Officer, stating: "[w]e've been lenders and

pref holders since original issue and are inclined to see this through to the end, but are cautious

of potential adverse actions by this alleged activist lender." (Id.)

49.    SPSO's impact solidified on June 13, 2013, when it joined the Ad Hoc

Secured Group. SPSO strategically "joined" the Ad Hoc Secured Group to ensure that the

21

*Stipulation Between Parties in Interest Regarding Entry of Order Pursuant to 11 U.S.C. §*

*1121(d) Further Extending LightSquared's Exclusive Periods To File a Plan of Reorganization*

*and Solicit Acceptances Thereof* [Docket No. 522] (the "Exclusivity Stipulation") remained in

effect and that exclusivity terminated on the previously negotiated schedule.  (FOF ¶ 221.)  The

consequence of that, of course, was to force a sale of the company pursuant to paragraphs 7 and

8 of the Exclusivity Stipulation.  (FOF ¶ 221-22.)  Within days of joining the Ad Hoc Secured

Group, several hundreds of millions of dollars in "hung" Prepetition LP Facility trades

miraculously closed, definitively giving SPSO a blocking position and making SPSO the largest

member of the Ad Hoc Secured Group.  (Id.)

50.     The belated settlement of the hung trades destabilized LightSquared's

negotiation posture.  SPSO's known presence in LightSquared's capital structure and

membership in the Ad Hoc Secured Group stymied LightSquared's ability to negotiate with its

largest consortium of creditors and put SPSO in a position to "run out the clock" on the

exclusivity period.  (FOF ¶ 222-27.)  For example, on May 24, 2013 – just prior to SPSO's

joining the Ad Hoc Secured Group – the parties exchanged a term sheet that envisioned that

SPSO would receive a full cash recovery, while non-SPSO lenders would receive a recovery of

cash and warrants. (FOF ¶ 224.)  However, once SPSO joined the group, the Ad Hoc Secured

Group increasingly pushed for a sale of LightSquared's assets to LBAC, frustrating the

negotiation efforts.  (FOF ¶¶ 224-26.)  Negotiations with the Ad Hoc Secured Group or SPSO

towards a plan in which LightSquared would continue as a going concern came to an end.  (FOF

¶ 228.)

51.     The PSA bound the Ad Hoc Secured Group to support LBAC Bid, stating

that parties "[s]hall not directly or indirectly seek, solicit, support, or vote in favor of any other

plan, sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Debtors other than the Plan[.]"  (FOF ¶ 229.)  In essence, negotiations with the Prepetition LP Lenders were rendered a "moot point" once the Ad Hoc Secured Group signed the PSA.  Specifically citing negotiations with a large lender, Mark Hootnick, a managing director at Moelis, testified that outstanding terms for a consensual deal "became irrelevant . . . [because the lender] was no longer permitted to talk to us" after signing the PSA.  (FOF ¶ 230.)

52.    Furthermore, strategic investors did not believe there was a level playing field for an auction process because they perceived Ergen's blocking position gave DISH an advantage over the other bidders.  As LightSquared's expert, William Derrough, testified, a bidder holding a blocking position is a "true party in interest" and has the power to drive the plan and auction processes.  Further, other bidders would have to pay *a higher* price than a party within the capital structure who established a significant position in the underlying debt at a discount, and, thus, it would be more expensive for an outside bidder to compete.  (FOF ¶ 231.)[17]

53.    Moreover, win or lose, participation in an auction process can be very expensive, and bidders often have to hire law firms, accountants, bankers, and other professionals.  Potential bidders will undertake the reputational and financial risk of participating in the auction process only if there is a "level-playing field" and a "legitimate opportunity or chance of winning."  (FOF ¶ 232.)  However, where a competitor holds the strategic advantage of a blocking position, the playing field will appear skewed towards the competitor and potential bidders will perceive little chance of winning.  (Id.)

54.    Thus, Ergen's involvement and influence over the bankruptcy process impeded LightSquared's ability to file a consensual plan that maximized the value for the estates

---

[17]    In addition, LBAC had the benefit of a $50 million break-up fee.  *See Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

23

or conduct a fair auction for LightSquared's assets and delayed the time in which the creditors

would receive distributions from LightSquared's estates.

55.    After LBAC withdrew its stalking horse bid, there was great uncertainty

about the creditors' prospects of receiving a full recovery, rather than the reduced recovery that

would result from LightSquared being forced into liquidation.  (FOF ¶ 233.)  The estates and all

stakeholders (other than SPSO), including the Ad Hoc Secured Group, the Prepetition LP

Lenders, and all other parties in interest in these Chapter 11 Cases have suffered significant harm

as a result of the Ergen Parties' continuing inequitable conduct.  As a result of these concerted

actions of SPSO and the Ergen Parties, the Ad Hoc Secured Group was unable to pursue other

restructuring alternatives prior to the termination of the PSA, including the negotiation of a plan

with LightSquared and other stakeholders.  As a consequence, the length of the Chapter 11 Cases

has been extended, millions of dollars of unnecessary fees were incurred, the estates' liquidity

was drained, and the cost of an alternative restructuring transaction was materially increased by,

among other things, the continued accrual of interest on the Prepetition Facility Claims.

**B.    Plan, SPSO's Treatment, and SPSO's Rejection Vote**

###    *i.    Plan and Solicitation*

56.    On February 14, 2014, LightSquared filed the (a) Plan and

(b) corresponding *Specific Disclosure Statement for Debtors' Third Amended Joint Plan*

*Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1308] (as amended, supplemented, or

modified, the "Specific Disclosure Statement").  On February 22, 2014, LightSquared filed

amended versions of the Plan and Specific Disclosure Statement [Docket No. 1336].

57.    The Plan is a plan of reorganization supported by all key constituents in

the Chapter 11 Cases (other than SPSO) as well as certain independent, third party investors who

are providing substantial new capital – including equity capital junior to the new SPSO Note – to

24

fund the plan distributions.  The Plan provides a means for LightSquared to reorganize

successfully and emerge from chapter 11 bankruptcy by, among other things, receiving new

financing, shedding various obligations, and providing time and ability to prosecute the pending

spectrum license modification applications.  Notably, under the Plan, LightSquared's emergence

from chapter 11 is no longer contingent on LightSquared obtaining approval of its pending

license modification applications.

        58.    Most significantly, the Plan forgoes a sale structure that would generate

"fire sale" prices for assets that are worth significantly more to the stakeholders and, thus,

prevent the severe injustice of liquidating a valuable business enterprise that has spent almost

two years in chapter 11 restructuring its liabilities, preserving value, and attracting investors.  It

cannot be overstated that, through the Plan, all Allowed Claims and Equity Interests – even those

of SPSO – will be paid or otherwise satisfied in full.

### ii.    *SPSO's Treatment and Rejection Vote*

        59.    LightSquared has taken particular care to classify and treat appropriately

the various Claims against, and Equity Interests in, its estates under the Plan.  The Prepetition LP

Facility Claims have been separated into two Classes:  the Prepetition LP Facility Claims not

held by SPSO are in Class 7A (i.e., the "Prepetition LP Facility Non-SPSO Claims") and the

Prepetition LP Facility Claims held by SPSO are in Class 7B (i.e., the "Prepetition LP Facility

SPSO Claims").  The separate classification of SPSO's claims is a result of, among other

reasons, LightSquared's proper business decision to place the conflicted SPSO, as a competitor

of LightSquared with an adverse, non-creditor interest in acquiring LightSquared's assets, in a

class apart from the other traditional lenders that hold Prepetition LP Facility Claims as financial,

and not strategic investments.  Importantly, the resolution of this Motion does not require the

Court to approve the classification. Classification and other issues with respect to confirmation of the Plan will be addressed in LightSquared's memorandum in support of confirmation.

60.    In full satisfaction of the Class 7B Prepetition LP Facility SPSO Claims, SPSO will receive one of the following treatments:

a.    SPSO Option A Treatment. If Class 7B votes to accept the Plan and the SPSO Parties and their affiliates withdraw all of their objections (if any) to the Plan and the New DIP Facility: (i) the aggregate Allowed amount of the Prepetition LP Facility SPSO Claims shall equal $1.1083 billion; (ii) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (iii)(a) the SPSO Note shall be secured and (b) the liens securing the SPSO Note shall be limited to the assets of Reorganized LightSquared LP and its subsidiaries and junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility; and (iv) each SPSO Party shall be deemed a Released Party; provided, that for the avoidance of doubt, if any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code, the Holders of Allowed Prepetition LP Facility SPSO Claims shall receive the SPSO Option B Treatment and the votes of such Holders shall be treated in accordance with Article III.D.4 of the Plan.[18]

b.    SPSO Option B Treatment. If Class 7B votes to reject the Plan, the SPSO Parties or any of their affiliates do not withdraw all of their objections to the Plan or the New DIP Facility, or any vote to reject by Class 7B is designated by the Bankruptcy Court pursuant to section 1126(e) of the Bankruptcy Code: (i) the aggregate Allowed amount, if any, of the Prepetition LP Facility SPSO Claims shall equal the original aggregate principal amount of such Allowed Prepetition LP Facility SPSO Claims or as determined by the Court; (ii) each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive an SPSO Note in an amount equal to its Pro Rata share of the foregoing aggregate Allowed amount; (iii) the SPSO Note shall be unsecured or secured, as determined by the Bankruptcy Court; provided, that if the Bankruptcy Court determines that the SPSO Note shall be secured, (a) the liens securing the SPSO Note shall be silent, third priority liens limited to the assets of Reorganized LightSquared LP and its subsidiaries, junior to the liens securing the First Lien Exit Facility and the Second Lien Exit Facility, and (b) the SPSO Note shall have no rights or remedies until all of the obligations under the First Lien Exit

---

[18]    Article III.D.4 of the Plan provides that "If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class." As noted above, if the SPSO vote is designated, SPSO will receive SPSO Option B Treatment under the Plan.

26

Facility and the Second Lien Exit Facility are indefeasibly repaid in full in Cash; and (iv) no SPSO Party shall be deemed a Released Party.

(See Plan, Articles I.A.302-304 and III.B.8.)

61.    On February 24, 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. 1343] (the "Solicitation Order"), approving, among other things, (a) the Specific Disclosure Statement, (b) the streamlined solicitation of the Plan, and (c) certain amended dates and deadlines with respect thereto.  Promptly after entry of the Solicitation Order, the Claims and Solicitation Agent commenced distribution of the Specific Disclosure Statement, the Plan, Ballots, and related solicitation materials to the Holders of Claims and Equity Interests eligible to vote on the Plan.

62.    The deadline for Holders of Claims or Equity Interests to submit Ballots to accept or reject the Plan is March 3, 2014 at 4:00 p.m. (prevailing Pacific time).  SPSO voted its Class 7B Prepetition LP Facility SPSO Claims to reject the Plan.  As described herein, SPSO purchased the Prepetition LP Facility SPSO Claims with the intent of voting such Claims to reject any plan (such as the Plan) that did not provide the Ergen Parties with a strategic interest in LightSquared's assets.  All other impaired Classes of Claims and Equity Interests in which votes were cast overwhelmingly voted to accept the Plan.[19]

---

[19]    In accordance with the Solicitation Order, LightSquared is not resoliciting votes from the Holders of Inc. General Unsecured Claims or LP General Unsecured Claims given that the treatment of, and recovery for, such Classes of Claims has not changed from the Second Amended Plan, which such Holders overwhelmingly voted to accept.

27

## Relief Requested

63.     By this Motion, LightSquared respectfully requests entry of an Order,

pursuant to section 1126(e) of the Bankruptcy Code, designating the vote of SPSO to reject the

Plan.[20]

## Basis for Relief

**A.     Standard for Vote Designation**

64.     Section 1126(e) of the Bankruptcy Code provides a bankruptcy court with

broad discretion to designate the votes of "any entity whose acceptance or rejection of [a] plan

was not in good faith."  11 U.S.C. § 1126(e); see In re Quigley Co., 437 B.R. 102, 130 (Bankr.

S.D.N.Y. 2010) ("The provision grants the bankruptcy court discretion to sanction any conduct

that taints the voting process, whether it violates a specific provision or is in 'bad faith.'")

(citation and quotations omitted).

65.     An analysis of a motion for vote designation involves a fact-intensive

inquiry that considers the totality of the circumstances.  See DBSD II, 634 F.3d at 102, 105 ("[A]

decision that someone did or did not act in good faith hinges on an essentially factual inquiry and

is driven by the data of practical human experience[.] . . .  Whether a vote has been properly

designated is a fact-intensive question that must be based on the totality of the circumstances,

according considerable deference to the expertise of bankruptcy judges.") (internal citation and

quotations omitted); In re Indianapolis Downs, LLC, 486 B.R. 286, 296 (Bankr. D. Del. 2013)

("The decision whether to designate a creditor's ballot is within the sound discretion of the

---

[20]     LightSquared submits that SPSO's vote, to the extent designated, should be disregarded in respect of
various confirmation requirements under the Bankruptcy Code – and LightSquared will be seeking such
relief in furtherance of confirmation of the Plan.

Court, and requires a factual inquiry on a case-by-case basis.").[21]

66.    A creditor's vote should be designated when the creditor votes its claim in any manner that is (a) aimed to extract a personal advantage or (b) inconsistent with its interest as a creditor.  See DBSD II, 634 F.3d at 102 ("A bankruptcy court may . . . designate the vote of a party who . . . votes with an 'ulterior motive,' that is, with an interest other than an interest as a creditor.") (citations and quotations omitted); In re Quigley Co., 437 B.R. at 130-31; In re Dune Deck Owners Corp., 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995) ("Section 1126(e) . . . recognizes two types of bad faith:  (1) the claim holder attempts to extract or extort a personal advantage not available to other creditors in its class, and (2) the creditor has an 'ulterior motive', such as to procure some collateral or competitive advantage that does not relate to its claim.") (citation omitted).

67.    Moreover, courts have enumerated certain "badges" of bad faith, including when votes are designed to (a) assume control of the debtor, (b) put the debtor out of business or otherwise gain a competitive advantage, (c) destroy the debtor's business out of malice, or (d) obtain benefits available under a private agreement with a third party that depends on the debtor's failure to reorganize.  See In re Dune Deck Owners Corp., 175 B.R. at 844-45 (citations omitted).

---

[21]    The case law emphasizes the need for judges to apply their experience and common sense when evaluating the motivations of parties whose conduct is at issue, as is the case here when assessing the good faith/bad faith with which SPSO and the Ergen Parties have conducted themselves in connection with these bankruptcy cases.  See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (when evaluating plausibility of claim, "court [must] draw on its judicial experience and common sense"); Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc., 152 F. Supp. 903, 920 (S.D.N.Y. 1957) ("As fact-finder, the Court is . . . required to select from the entire record those logical inferences which accord with common sense and experience  . . . ."). Rational inferences drawn from circumstantial evidence are neither "speculative [n]or conjectural," and the Second Circuit has long "rejected the view that circumstantial evidence is probatively inferior to direct evidence."  Universe Tankships, Inc., 152 F. Supp. at 920 (citations omitted); see also Siewe v. Gonzales, 480 F.3d 160, 168-69 (2d Cir. 2007) ("The speculation that inheres in inference is not 'bald' if the inference is made . . . by record facts, or even a single fact, viewed in the light of common sense and ordinary experience.").

68.    Notably, courts have reviewed the conduct and motives of competitors of debtors, who purchase and vote claims, with a high degree of skepticism.  See DBSD II, 634 F.3d at 105, n.12 ("Courts have been especially wary of the good faith of parties who purchase claims against their competitors."); In re MacLeod Co., 63 B.R. 654, 655-56 (Bankr. S.D. Ohio 1986) (designating vote of creditors with "ulterior purpose of destroying or injuring debtor in its business so that the interests of the competing business with which the named individuals were associated, could be furthered").

**B.    Vote Designation Precedent Cases on All Fours With These Chapter 11 Cases**

69.    SPSO's vote to reject the Plan here contains all the hallmarks of bad faith that should result in its vote being designated.  In fact, SPSO's role in these Chapter 11 Cases adds to an unfortunate – but consistent – pattern of misconduct by the Ergen Parties, which on a prior occasion led to the leading decision on vote designation – the Second Circuit's opinion in the DBSD case.  Remarkably, the Ergen Parties' and SPSO's misconduct in the Chapter 11 Cases now at issue goes well beyond the conduct that Judge Gerber and the Second Circuit found to be sufficient to warrant designation in DBSD.

70.    In DBSD I, this Court granted a motion to designate the vote of DISH based upon its bad faith conduct and subsequent vote in furtherance of that bad faith.  DBSD began as a pre-packaged bankruptcy, with a two-thirds majority of the fulcrum second lien noteholders signing a plan support agreement prior to the petition filing.  See DBSD I, 421 B.R. at 135.  Following the bankruptcy petition and the submission of the DBSD Entities' plan, DISH – a competitor of the debtors – purchased all of the debtors' small first lien debt and a portion of the second lien debt "with an eye toward [the DBSD Entities'] spectrum rights."  DBSD II, 634 F.3d at 87.  DISH, who paid par for the first lien debt, admittedly made the claims acquisition "not just to acquire a 'market piece of paper' but also to 'be in a position to take advantage of [its

30

claim] if things didn't go well in a restructuring.'" Id.

71.    DISH voted its first lien debt to reject the DBSD Entities' plan and challenged its confirmability.  See DBSD I, 421 B.R. at 136-37.  Further, just days before the hearing to consider both the motion to designate its vote and confirmation of the DBSD Entities' plan, DISH sent to Judge Gerber an unsolicited proposal to acquire the DBSD Entities' assets for a fraction of their value and sought to terminate exclusivity so DISH could pursue its alternative transaction.  See id. at 137.  In DBSD, unlike here, there were no arguments made that DISH improperly or secretly infiltrated the capital structure and no allegations of breach of contract, tortious interference, or violations of the covenant of good faith and fair dealing.  Nonetheless, based on DISH's conduct, Judge Gerber found that DISH's vote was cast in bad faith and designated it.

72.    The Second Circuit affirmed this Court's finding that "DISH, a competitor to [the DBSD Entities], was voting against the plan 'not as a traditional creditor seeking to maximize its return on the debt it holds, but . . . "to establish control over this strategic asset."'" DBSD II, 634 F.3d at 87-88 (quoting DBSD I, 421 B.R. at 137).  The Second Circuit held that a creditor's vote – such as DISH's vote in DBSD and SPSO's vote in these Chapter 11 Cases – should be designated where "a competitor bought claims with the intent of voting against any plan that did not give it a strategic interest in the reorganized company." Id. at 104.  Designation was appropriate because DISH was "less interested in maximizing the return on its claim than in diverting the progress of the proceedings to achieve an outside benefit." Id.  The Second Circuit concluded that its ruling "should deter . . . attempts to 'obtain a blocking position' and thereby 'control the bankruptcy process for [a] potentially strategic asset.'" Id. at 105 (emphasis in original).

31

73.    Judge Gerber was guided in his decision-making by the then-leading case

on vote designation – In re Allegheny Int'l, Inc., 118 B.R. 282 (Bankr. W.D. Pa. 1990).  In

Allegheny, the court designated the vote of Japonica Partners, L.P. ("Japonica"), who had a long-

standing interest in acquiring the debtor.  Shortly after the Allegheny debtor proposed a chapter

11 plan, Japonica (a) filed an alternate plan, under which it would take control of the debtor, and

(b) purchased significant, carefully targeted claims to obtain a blocking position.  See id. at 289-

90.  In granting the debtor's motion to designate Japonica's vote, the court observed, among

other factors, that Japonica:  (i) did not purchase claims against the debtor until after its plan was

filed; (ii) purchased claims in the highest priority class and at the exact minimum amount

necessary to reject the plan; (iii) paid between 80% and 95% for the claims it purchased;

(iv) purchased a blocking position in the second-highest priority class; and (v) filed the

competing plan.  See id.  As a result, the court found that Japonica's "purpose was control and

was in bad faith" and, therefore, warranted designation of Japonica's vote.  Id. at 290.  As

explained below, the Ergen Parties' and SPSO's controlling and bad faith conduct was worse

than that in both Allegheny and DBSD.

C.    **Ergen Parties' and SPSO's Conduct Sets a New High-Water Mark in Vote
      Designation Jurisprudence**

74.    When the conduct of SPSO and the Ergen Parties is compared to the

conduct that was found to support designation in Allegheny and DBSD, there can be no question

of the outcome.  The Court should designate SPSO's vote.  Here, while the Ergen Parties have

exhibited the same intent that caused the courts to disqualify the votes in DBSD and Allegheny,

they have implemented that intent through a level of misconduct that far exceeds the conduct in

those cases.  Unlike the wrongdoers in DBSD and Allegheny, the Ergen Parties and SPSO

acquired their Prepetition LP Facility Claims through acts that constitute breach of contract,

32

breach of the implied covenant of good faith and fair dealing, and purposeful misrepresentation, and then did everything in their power over a span of nearly two years (and counting) to disrupt the ordinary processes of these Chapter 11 Cases.

75. The following chart, comparing the conduct found to be in bad faith in DBSD with the conduct of the Ergen Parties and SPSO here, vividly underscores that their conduct here has been more brazen and cavalier than the conduct that was sanctioned in DBSD:

| Conduct | DISH in DBSD Cases | SPSO in LightSquared Cases | More Suggestive of Bad Faith |
|---|---|---|---|
| **Ownership in Debtors' Capital Structure** | Bought 100% of an approximately $30 million tranche of first lien debt.<br><br>Bought approximately $100 million of second lien debt, or 14% of class. | Bought over $844 million, or 50.45%, of the first lien LP Debt, and tried to buy more, all in violation of a contractual prohibition.<br><br>Agreed to buy controlling block of Preferred LP Units. | SPSO in LightSquared cases, because in DBSD, DISH bought 100% of a small class that would potentially never be the fulcrum security. |
| **Public Disclosure of Acquisitions** | DISH appeared openly in the bankruptcy case shortly after buying first lien debt and acknowledged its ownership of minority position in second lien debt. | SPSO hid its involvement until it acquired a blocking position, and Ergen Parties made an "unsolicited" bid for LP Assets, after which SPSO went public, with an announcement timed to disrupt LightSquared's capital raise. | SPSO in LightSquared cases, because its actions deceived Lightsquared, the Prepetition LP Lenders, and the Prepetition LP Agent, UBS, and caused significant uncertainty and concern in the marketplace. |
| **Efforts to Avoid Detection** | None. DISH purchased first lien debt in its own name. Used a wholly owned subsidiary with | SPSO was created to avoid detection. Ketchum and others actively sought to mislead parties in | SPSO in LightSquared cases. |

| Conduct | DISH in **DBSD** Cases | SPSO in LightSquared Cases | More Suggestive of Bad Faith |
|---|---|---|---|
| | address in Colorado to buy second lien debt. | interest as to who was buying debt. | |
| **Delays in Closing Trades** | None – trades closed within days of agreement. | Months of delay without any credible explanation, disrupting negotiations among stakeholders and terms of Exclusivity Stipulation, followed by the immediate closing of such trades after SPSO joined forces with the Ad Hoc Secured Group. | SPSO in LightSquared cases. |
| **Control of Debt Before Closing Trades** | DISH conditioned its purchase of first lien debt on lenders making objection to disclosure statement, to which DISH succeeded after sale closed. | SPSO hastened the filing of these Chapter 11 Cases when it directed a selling lender on the date of sale to vote against one week forbearance to permit negotiations to avoid bankruptcy. | SPSO in LightSquared cases. |
| **Efforts to Frustrate Exclusivity** | Shortly before confirmation hearing and after voting concluded, DISH sent competing plan to Court and proposed terminating exclusivity. | Ergen sent an unsolicited, purportedly "unconditional offer" to purchase certain of LightSquared's assets on behalf of LBAC (which did not yet exist), which precluded other Ad Hoc Secured Group members from proposing a plan.  To ensure exclusivity was terminated, SPSO strategically "joined" the Ad Hoc Secured. | SPSO in LightSquared cases. |

34

| Conduct | DISH in **DBSD** Cases | SPSO in LightSquared Cases | More Suggestive of Bad Faith |
|---|---|---|---|
| **Purchase Prices Suggesting Acquisition Strategy** | DISH bought first lien debt at 100% of face value. | SPSO paid prices as high as 96% for many of its purchases. | Tie. |
| **Evidence of Intent to Purchase Assets** | Board minutes suggesting plan to buy a blocking position as part of a strategy to buy assets. | Emails from Ketchum reflecting "loan to own" strategy.<br><br>Near constant tracking of "blocking position" in Prepetition LP Facility Claims.<br><br>E-mail from Ketchum congratulating Ergen on acquiring a spectrum company.<br><br>Board presentation noting that SPSO's holdings would complement acquisition strategy. | SPSO in LightSquared cases, because of persistent, premeditated behavior indicating an intent to acquire assets for competitive reasons. |
| **Strategic Nature of Assets** | At the time of the purchase, DISH owned no spectrum in S-Band and did not have a broad portfolio of spectrum assets. | At time of offer, DISH owned 40 MHz of S-Band spectrum, with known interference issues, which could be overcome by using LightSquared's spectrum as uplink. | SPSO in LightSquared cases, because LightSquared's spectrum would clearly complement assets that DISH owns. |
| **Restrictions in Credit Agreement Limiting Ability to Purchase Debt** | None. | Restrictions that prevent competitors or natural persons from purchasing debt. | SPSO in LightSquared cases. |
| **Effect of Competitor's Role on Case** | None – other creditors had already signed a plan support agreement and continued through confirmation of the proposed plan. | Significant – Hootnick, Falcone, and Smith all testified to negative impact of DISH's role on ability to attract other bidders and on discussions | SPSO in LightSquared cases. |

35

| Conduct | DISH in <u>DBSD</u> Cases | SPSO in LightSquared Cases | More Suggestive of Bad Faith |
|---|---|---|---|
| | | with other stakeholders. | |
| **Non-Credible Testimony Presented to Court** | None. | Ergen, Kiser, and Ketchum each offered testimony that was simply not credible.[22] | SPSO in LightSquared cases. |
| **Allegations in Adversary Proceedings Relating to Role in Case** | None – no allegations were ever made that DISH breached a contract or committed a tort, merely that it acted in bad faith in connection with its vote. | Breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, claim disallowance. | SPSO in LightSquared cases. |

76.    In addition, the Ergen Parties' and SPSO's misconduct was more suggestive of bad faith than that of Japonica in <u>Allegheny</u> because the Ergen Parties and SPSO achieved their blocking position secretly and in clear violation of the Prepetition LP Credit Agreement provisions barring competitors' from owning LP Debt.  It is for good reason that "[c]ourts have been especially wary of the good faith of parties who purchase claims against their competitors."  <u>DBSD II</u>, 634 F.3d at 105, n.12.  The effect of the subject conduct was to (a) expose a valuable business enterprise to a dominating industry competitor, (b) contribute to LightSquared's path into, and then inhibit LightSquared's ability to exit, chapter 11, and (c) threaten LightSquared's survival.

77.    The fact that, unlike in <u>DBSD</u> and <u>Allegheny</u>, SPSO purchased its claims before LightSquared proposed the current Plan is of no moment.  Although DISH made its purchases of the DBSD Entities' debt after the debtors there had filed their plan of

---

[22]    <u>See</u> FOF ¶¶ 98-100; 149-52; Post-Trial Brief Section I.B.1.b n.5, Section I.B.1.g.

reorganization, Judge Gerber did not place particular reliance on this fact.  See DBSD I, 421 B.R. at 140-43.  The timing of the purchases by DISH, standing alone, was not, according to Judge Gerber, a factor that *by itself* would indicate bad faith.  Id.  Rather, Judge Gerber noted that this timing was significant because it allowed DISH to purchase the DBSD Entities' debt with knowledge of a plan, and therefore to make targeted purchases specifically designed to serve DISH's purpose of defeating that plan and acquiring control of the DBSD Entities' spectrum assets for itself.  See id. at 140.

78.    In the "Findings of Fact" portion of his designation opinion in DBSD I, after noting the timing of DISH's purchases, Judge Gerber did not remark upon it further, but rather moved directly to a discussion of the admissions of improper motive contained in DISH's own documents, including that (a) the plan's treatment of the debt made the debt purchases themselves, in isolation, not economically attractive, and (b) the purpose of the investment was to gain control of a strategic asset – i.e., the DBSD Entities' spectrum.  See id. at 136.[23]  Judge Gerber then analyzed the meaning of the phrase "not in good faith" appearing in section 1126(e).  Judge Gerber noted that, under Dune Deck and Adelphia, "bad faith" occurs when "a creditor acts in furtherance of an ulterior motive, unrelated to its claim or its interest as a creditor," and that the first of the "badges of bad faith" is an intent "to assume control of the debtor."  Id. at 138.  Significantly, Judge Gerber did not invoke the "post-plan" timing of DISH's purchases as indicative of either an ulterior motive or an intent to gain control of the debtors.

---

[23]    Indeed, Judge Gerber was so incensed by the content of the DISH documents that he included that content in his published opinion, "in the public interest," notwithstanding the designation of those documents as "Highly Confidential.  For Attorneys' Eyes Only," and specifically rejected the claim of confidentiality as inconsistent with section 107 of the Bankruptcy Code.  421 B.R. at 136 n.9.  This further underscores that it was the intent disclosed in DISH's documents, much more than the post-plan timing of the purchases, that moved Judge Gerber to designate DISH's vote.

79.     The significance of timing, rather, appears in Judge Gerber's discussion of
Allegheny.  In that discussion, Judge Gerber noted that "Japonica did not acquire most of its
claims until a plan had been proposed (and, indeed, a disclosure statement with respect to that
plan had been approved); [and therefore] 'knew what it was getting into when it purchased its
claims.'"  Id. at 139.  Because of this, as Judge Gerber observed (quoting the Allegheny court),
"'[t]he particular claims that Japonica purchased, and the manner in which they were purchased,
can be used to determine their intent.'"  Id.  And then Judge Gerber noted the targeted nature of
the purchases in Allegheny, and compared them to the similarly targeted nature of the purchases
by DISH in DBSD:  "Like Japonica, DISH acquired claims after the Debtors proposed a plan of
reorganization.  Also like Japonica, DISH acquired claims that would give it voting power to
resist the Debtors' reorganization efforts. . . . Unlike Japonica, however, DISH did not stop when
it acquired the minimum claims necessary for a blocking position; DISH acquired all of the First
Lien Debt."  Id. at 140 (emphasis in original).

80.     Thus, the significance of the "post-plan" timing of the purchases was that
it created an inference that the subject party was acting in bad faith to target the purchases so as
to defeat the plan and seize control of the bankruptcy process to pursue its improper agenda.

81.     Here, by contrast, SPSO and the Ergen Parties did not need the benefit of
an announced plan of reorganization to know exactly what purchases they needed to make in
order to take control of these Chapter 11 Cases.  LightSquared's debt and equity structures were
well known and completely straightforward.  Substantial control of the reorganization process
lay, unambiguously, with the holders of LP Debt, and, even before forming SPSO, the Ergen
Parties knew, unambiguously, how much LP Debt they had to buy in order to further their
objective to acquire the LightSquared spectrum assets.  And, once they started buying the debt,

38

SPSO and the Ergen Parties knew that the ownership threshold they needed to have, at a minimum, was a blocking position in the Prepetition LP Facility Claims. Simply stated, SPSO and the Ergen Parties did not need to await the filing of a plan to know what Claims to buy, nor did they need to wait until a plan was proposed to control these Chapter 11 Cases.

82.     Moreover, regardless of the timing of SPSO's purchases, there is substantial evidence from which the Court can infer the true motivation of the Ergen Parties in purchasing the Prepetition LP Facility Claims. The record demonstrates that SPSO purchased the Prepetition LP Facility Claims, and voted those Claims against the Plan, with the motive of seeking to acquire LightSquared's assets at the lowest possible price. This goal has no nexus to the motivations of a typical holder seeking to maximize creditor recoveries. In other words, consistent with DISH's intentions in DBSD, SPSO purchased the Prepetition LP Facility Claims "with the intent of voting against *any* plan that did not give it a strategic interest in the reorganized company." DBSD II, 634 F.3d at 104 (emphasis added). Further, any notion that the Ergen Parties are no longer interested in acquiring the LightSquared assets is simply a fallacy.

83.     Indeed, notwithstanding the undeniable benefits to the estates and stakeholders provided by the Plan, SPSO remains determined to defeat the Plan and further its efforts to extract a personal advantage over other creditors and to create conditions that will allow DISH to acquire ownership over, or SPSO (Ergen) to gain control of, LightSquared's valuable assets. SPSO used its votes, which it obtained in breach of the Prepetition LP Credit Agreement, "as levers to bend the bankruptcy process toward its own strategic objective of acquiring [LightSquared's] spectrum rights, not toward protecting its claim." DBSD II. 634 F.3d at 104. These actions are inconsistent with the reorganization process, reveal that the Ergen

Parties and SPSO were motivated and dominated by more than creditor self-interest, and reflect

the sort of conduct the Second Circuit sought to deter in DBSD II.

84.     Undeniably, while the Ergen Parties and SPSO have advanced their

conflicted, non-creditor/competitor interests and voted against the Plan, they have effectively

endeavored to destroy LightSquared's enterprise along the way, including, prior to the petition

date, directing a holder of Prepetition LP Facility Claims to vote against a forbearance, and

postpetition, by stymieing restructuring negotiations during the Chapter 11 Cases and creating

unnecessary fees and expenses.  Such destructive conduct alone has caused courts to disqualify

votes.  See, e.g., In re Allegheny Int'l, Inc., 118 B.R. at 290; In re MacLeod Co., 63 B.R. at 655-

56; see also In re Applegate Prop., Ltd., 133 B.R. 827, 833-35 (Bankr. W.D. Tex. 1991) (finding

bad faith where affiliate of debtor purchased claims not for purpose of collecting on claims but to

prevent confirmation of competing plan).  SPSO and the Ergen Parties have engaged in such

destructive conduct to advance their agenda at LightSquared's expense, and they will have the

ability to add to their pattern of bad faith conduct and harm to the estates if the Plan is not

confirmed in the near term.

85.     In summary, the Ergen Parties and SPSO had ample, legitimate ways to

acquire LightSquared's spectrum assets, including by participating in an auction.  Instead, they

chose to try use their DBSD playbook one more time.  The consequences of their action should

be no different here:  SPSO's bad faith conduct merits an order by this Court designating SPSO's

votes pursuant to section 1126(e) of the Bankruptcy Code.

**Motion Practice**

86.     This Motion includes citations to the applicable rules and statutory

authorities upon which the relief requested herein is predicated and a discussion of their

application to this Motion.  Accordingly, LightSquared submits that this Motion satisfies
Rule 9013-1(a) of the Local Rules for the Bankruptcy Court for the Southern District of New
York.

**No Previous Request**

87.    Other than as sought in the Ergen Adversary Proceeding, no prior motion
for the relief requested herein has been made by LightSquared to this or any other court.

**Notice**

88.    LightSquared has provided notice of this motion to:  (a) the Office of the
United States Trustee for the Southern District of New York, (b) the entities listed on the
Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to
Bankruptcy Rule 1007(d), (c) counsel to the Special Committee, (d) counsel to the Prepetition
Inc. Agent and DIP Agent, (e) counsel to the Prepetition LP Agent, (f) counsel to the ad hoc
secured group of Prepetition LP Lenders, (g) counsel to the DIP LP Lenders, (h) counsel to
Harbinger Capital Partners, LLC, (i) counsel to each other Plan Support Party, (j) the Internal
Revenue Service, (k) the United States Attorney for the Southern District of New York, (l) the
Federal Communications Commission, (m) Industry Canada, (n) counsel to SPSO, and
(o) parties in interest who have filed a notice of appearance in these Chapter 11 Cases pursuant
to Bankruptcy Rule 2002.  LightSquared respectfully submits that no other or further notice is
required or necessary.

WHEREFORE, for the reasons set forth above, LightSquared respectfully requests that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A, designating the vote of SPSO under the Plan and (b) grant such other and further relief as the Court may deem just and proper.

New York, New York
Dated:  March 3, 2014

/s/ Matthew S. Barr
Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & M^CCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

42

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
|  | ) |
| Debtors.[1] | ) Jointly Administered |
|  | ) |

### ORDER DESIGNATING VOTE OF
### SP SPECIAL OPPORTUNITIES, LLC

Upon the motion (the "Motion")[2] of LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), at the direction, and with the support, of the special committee of the boards of directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., for entry of an order (the "Order"), pursuant to section 1126(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), designating the vote of SP Special Opportunities, LLC ("SPSO") to reject the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1308] (as amended, supplemented, or modified, the "Plan"); and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this

---

[1]    The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

proceeding and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

notice of the Motion appearing adequate and appropriate under the circumstances; and the Court

having found that no other or further notice is needed or necessary; and the Court having

reviewed the Motion, the Post-Trial Submissions, and having heard statements in support of the

Motion at the hearings for the Ergen Adversary Proceeding, the Confirmation Hearing, and a

hearing held before the Court on this Motion (collectively, the "Hearings"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearings establish

just cause for the relief granted herein; and it appearing, and the Court having found, that the

relief requested in the Motion is in the best interests of LightSquared's estates, its creditors, and

other parties in interest; and any objections to the relief requested in the Motion having been

withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing

therefor, it is hereby **ORDERED** that:

1.      The Motion is granted.

2.      The vote cast by SPSO to reject the Plan is hereby designated pursuant to

section 1126(e) of the Bankruptcy Code.

3.      LightSquared is authorized and empowered to take all other actions

necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      The requirements set forth in Local Rule 9013-1(a) are satisfied.

5.      The Court retains jurisdiction with respect to all matters arising from or

related to the implementation and interpretation of this Order.


Dated: _____, 2014
       New York, New York

                                        _____
                                        HONORABLE SHELLEY C. CHAPMAN
                                        UNITED STATES BANKRUPTCY JUDGE

2

**<u>Exhibit B</u>**

**Ergen May 2013 Board Presentation**

# *Proposal to Acquire LightSquared LP L-Band Spectrum*

**Privileged and Highly Confidential**
**Attorney Work Product**

WILLKIE FARR & GALLAGHER LLP

**PX0867**

HIGHLY CONFIDENTIAL

SPSO-00011823

# *Overview and Background*

- **Proposal**:  Acquisition vehicle ("NewCo") formed to acquire assets of LightSquared LP ("L2"), including 46 MHz of L-Band MSS spectrum "free and clear" of liabilities through bankruptcy sale process

- **Background**:  Mr. Ergen has recently acquired significant amounts of L2 bank debt and L2 preferred stock
  - Mr. Ergen's substantial interests in L2 debt and preferred stock compliment any acquisition strategy and could have significant influence in L2's chapter 11 cases
  - DISH Network Corporation and EchoStar Corporation are prohibited from acquiring L2 bank debt by express terms of credit agreement governing such debt

WILLKIE FARR & GALLAGHER LLP

**HIGHLY CONFIDENTIAL**

# *Proposed Acquisition – Key Terms*

- *Acquisition Vehicle.* NewCo to be formed by any combination of Mr. Ergen, EchoStar and/or DISH based on Company interest.
  - Initial offer need not specify ownership structure of NewCo
- *Consideration.* Proposed bid of $2 to 2.1 billion in cash consideration.
  - Certain of L2's bank lenders have been active and litigious in L2's bankruptcy. Debt is currently trading near par.
  - To warrant serious consideration at this time, first by L2's board and ultimately by L2's creditors and the Court, NewCo's bid must offer consideration sufficient to (a) pay L2's bank debt and unsecured debt in full (~$1.9 - $2.0 billion) and (b) provide a significant (or full) recovery to holders of preferred ($185 million face value as of bankruptcy filing)
  - Consideration would ultimately be paid to holders of L2 bank debt and other L2 stakeholders in accordance with bankruptcy priority waterfall (through plan of reorganization or otherwise)

WILLKIE FARR & GALLAGHER LLP

**HIGHLY CONFIDENTIAL**

# *Proposed Acquisition – Key Terms (cont.)*

- *Early Funding.*  FCC approval would <u>not</u> be a condition to funding purchase price.
  - ➤ Absent an acquisition, amount and timing of L2's creditors' recoveries is highly speculative and dependent on L2's pending FCC applications
  - ➤ Offer that assumes FCC risk will be highly attractive to stakeholders and put pressure on L2 fiduciaries to consider proposal
  - ➤ Early funding enables prompt payoff of bank debt, cuts off further interest accrual and preserves value for junior stakeholders
  - ➤ Bid to include mechanism for NewCo to designate sale of assets for NewCo's benefit if FCC approval not received

WILLKIE FARR & GALLAGHER LLP

**HIGHLY CONFIDENTIAL**

# *Competitive Advantage to Stalking Horse*

- NewCo will seek to act as "stalking horse" bidder in LightSquared's bankruptcy asset sale process.
  - ➤ If L2's board accepts NewCo's offer:
    - – Bid would be subject to L2's solicitation of higher and better offers and Bankruptcy Court approval; <u>no</u> creditor vote
    - – L2 to provide NewCo bid protections, including break-up fee, expense reimbursement and consent rights on bidding and auction procedures
    - – Bid will include "no shop" provision prohibiting L2 from seeking other offers before NewCo bid protections approved

WILLKIE FARR & GALLAGHER LLP

HIGHLY CONFIDENTIAL

SPSO-00011827

# *Timing Considerations*

- L2 has the exclusive right to file a chapter 11 plan until July 15.

- L2 likely to begin exploring strategic alternatives in early June if no restructuring or sale strategy emerges

- Submit offer now, subject to minimal conditions, and require prompt acceptance (e.g., by May 15) before marketing process gets underway

  - ➤ If proposal accepted, L2 would be subject to "no shop" until NewCo's stalking horse bid protections are approved

  - ➤ If proposal not accepted, NewCo will have the ability to see results of marketing process and, if process is unsuccessful, revert with different bid later

WILLKIE FARR & GALLAGHER LLP

HIGHLY CONFIDENTIAL

# *Illustrative Transaction Timeline*

| Event | Approximate Timing |
|---|---|
| Term sheet acceptance | May 15 |
| Purchase agreement executed | May 31 |
| Motion to approve bid procedures and stalking horse bid protections filed | June 1 – June 8 |
| Bid procedures/stalking horse bid protections approved | June 28 |
| Auction held (if topping bids received) | July 19 |
| Sale to NewCo approved (if winning bidder) | July 22 |
| Early funding date | August 15 |
| FCC approval/closing | December 2013/January 2014 |

WILLKIE FARR & GALLAGHER LLP

HIGHLY CONFIDENTIAL

SPSO-00011829

# *Annex – LightSquared LP Capital Structure and Ergen Holdings*

| Security/Class of Claims[1] | Aggregate Face Amount/Par Value | Face Amount/Par Value Held By Ergen | Percentage Held by Ergen |
|---|---|---|---|
| Senior Secured Term Loan | $1,674,890,000 | $1,013,080,000 | 60.5% |
| General Unsecured Claims | Approximately $10,000,000 | $0 | 0.0% |
| Series A Preferred Units | $189,420,000 | $130,740,000 | 69.0% |
| Common Units | n/a | $0 | 0% |

1 – Securities/Claims listed in order of seniority

WILLKIE FARR & GALLAGHER LLP

HIGHLY CONFIDENTIAL

SPSO-00011830

**Exhibit C**

███████████ ███████████[1]

---

[1]    Filed under seal.

**<u>Exhibit D</u>**

██████████████████████████████████ ████████████ [1]

---

[1]        Filed under seal.

**<u>Exhibit E</u>**

███████████████ █████████[1]

---
[1]    Filed under seal.