Rachel C. Strickland
Tariq Mundiya
James C. Dugan
Matthew Freimuth
Daniel I. Forman
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel to SP Special Opportunities, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.* | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**POST CONFIRMATION TRIAL BRIEF OF SP SPECIAL OPPORTUNITIES, LLC AND OBJECTION TO CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629) and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1
    A.    Confirmation Decision Tree ...............................................................4
    B.    Debtors' Scenario A: Vote Designation ............................................5
    C.    Debtors' Scenario B: Equitable Subordination..................................6
    D.    Debtors' Scenario C: Claim Disallowance ........................................6
    E.    Debtors' Scenario D: Standalone Cramdown .....................................7

ARGUMENT ....................................................................................................7
    I.    Economic Analyses of the Plan Reveal its True Purpose. ............................7
        A.    Plan Support Parties' Investments and Recoveries. ...........................7
        B.    Plan's Implied Value of Equity .....................................................18
    II.    The Plan Was Not Proposed in Good Faith  And Does Not Meet the Requirements
        of Section 1129(a)(3). .................................................................20
        A.    Harbinger, Melody, and Fortress Controlled Plan Negotiations and Designed a
            Plan Premised on Discriminating Against SPSO. .............................20
        B.    The Structure of the Plan and Undisclosed Side Deals Indicate a Lack of Good
            Faith ......................................................................................28
    III.    SPSO's Claims Should Not Be Equitably Subordinated. ...........................31
        A.    Equitable Subordination Arguments Should be Restricted to the Equitable
            Subordination Remedy. ...............................................................31
        B.    SPSO's Claims Should Not be Subordinated Because the Debtors Have Been
            Unable to Prove Any Harm. ..........................................................31
        C.    The Debtors' New "Evidence" of Misconduct Is Not Persuasive ...................33
    IV.    Separate Classification of SPSO's and other LP Lenders' Claims Violates Section
        1122 of the Bankruptcy Code Whether or Not SPSO's Claims are Subordinated...35
        A.    The Plan's Separate Classification Constitutes de facto Subordination .........35
        B.    Separate Classification of Identical  Claims is not Supported by the Facts of
            this Case. .................................................................................36
        C.    Separate Classification May Not be Utilized to Mistreat a Creditor. .............42
        D.    Even if Fully Subordinated, the  Plan's Classification Violates the Bankruptcy
            Code ......................................................................................44
    V.    The Court Lacks Jurisdiction to Confirm a Plan that Rewrites the  Prepetition LP
        Credit Agreement by Circumventing the Sharing Provision ...........................44
    VI.    The Payments to be Made Under the Plan are Unreasonable. ..................47
    VII.    The Plan Violates Section 1129(a)(7)..................................................50
    VIII.    The Plan does not Pay All Administrative Claims in Full, Violating Section
        1129(a)(9) of the Bankruptcy Code. ....................................................53
    IX.    No Impaired Class has Voted to Accept the Plan. .................................54
    X.    The Plan Is Not Feasible. .................................................................55
        A.    LightSquared's Proposed Capital Structure Is Based On A Flawed and Highly
            Speculative Valuation. ................................................................56
        B.    GLC's Valuation Is A More Realistic Assessment of the Value of
            LightSquared's Assets. ...............................................................63
        C.    The GLC Valuation is Consistent with Melody's Valuation ...........................75

D.      The Ergen and PWP Valuations Are Not Indicative of Current Value. .........76
E.      The Debtors Have No Business Plan. ...............................................................78
F.      The Projections Foretell a Near-Term Liquidity Crisis. ...................................80
G.      The Conditions to Effective Date Contain Unacceptable Execution Risk. .....84
XI.    The Debtors Failed to Demonstrate that the Plan Satisfies the  Cram Down
        Requirements of Section 1129(b) of the Bankruptcy Code. ...................................85
A.      The Plan Unfairly Discriminates Against SPSO. .............................................86
B.      The Plan is not Fair and Equitable with Respect to SPSO in any Scenario. ...88
XII.   SPSO's Vote Should Not be Designated. .................................................................96
A.      There is No Disagreement on the Showing the  Debtors Must Make in Order
        for the Court to Designate SPSO's Vote. .........................................................96
B.      By Voting Against the Plan SPSO did not try to  Extract an Advantage Over
        Similarly Situated Creditors ............................................................................97
C.      SPSO's Vote to Reject is Consistent with its  Interests as a Creditor and was
        not Cast with any Ulterior Motive. ...................................................................98
D.      Why Did LightSquared Permit (and Encourage) SPSO's Debt Purchases?..111
E.      DBSD and Allegheny are Distinguishable ....................................................113
F.      Designation of SPSO's Vote Does Not Allow the  Debtors to Ignore the
        Remainder of the Bankruptcy Code. ..............................................................115
XIII.  The Third Party Releases Should be Stripped from the Plan. ................................118
A.      The Breadth of the Third Party Releases Exceed the Court's Jurisdiction....118
B.      The Third Party Releases are not Consensual and The Debtors Have Failed to
        Show that Extraordinary Circumstances Justify their Approval. ...................120
XIV.   SPSO Is Entitled to Default Rate Postpetition Interest...........................................123
XV.    SPSO's Claim Should Not Be Disallowed ............................................................126
A.      Disallowance under Section 502(b) is not Appropriate...................................127
B.      The Debtors Cannot Point to Any Actual Harm Caused by SPSO. ..............129
XVI.   The New DIP Facility Does Not  Comply with Section 364 of the Bankruptcy
        Code .......................................................................................................................135
A.      The Debtors Made No Attempt to Secure Financing on More Favorable
        Terms. ..............................................................................................................136
B.      SPSO's Interests in Collateral Will Not Be Adequately Protected. ..............138
C.      The New DIP Facility is a Sub Rosa Plan. .....................................................140
D.      The New DIP Lenders are not Entitled to Good Faith Protections. ..............142

RESERVATION OF RIGHTS...............................................................................................143

CONCLUSION .......................................................................................................................144

## TABLE OF AUTHORITIES

### Cases

In re 495 Cent. Park Ave. Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992)...............................................................136

In re Adelphia Commc'ns Corp.,
    359 B.R. 54 (Bankr. S.D.N.Y. 2006).................................................................97

In re Adelphia Commc'ns Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007).......................................................36, 125

In re Allegheny Int'l, Inc.,
    118 B.R. 282 (Bankr. W.D. Pa. 1990)......................................................113, 114

In re Ames Dep't Stores, Inc.,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)........................................................137, 138

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006)..............................................................................86

Bank of Am., N.A. v. Lightstone Holdings, LLC (In re Extended Stay Inc.),
    418 B.R. 49 (Bankr. S.D.N.Y. 2009)......................................................44, 45

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
    526 U.S. 434 (1999).........................................................................................50

In re BearingPoint, Inc.,
    453 B.R. 486 (Bankr. S.D.N.Y. 2011).............................................................123

In re BearingPoint, Inc.,
    Case No. 09-10691 (Bankr. S.D.N.Y.) ...........................................................123

Benjamin v. Diamond (In re Mobile Steel Co.),
    563 F.2d 692 (5th Cir. 1977) .............................................................................32

In re Bergman,
    585 F.2d 1171 (2d Cir. 1978) ...........................................................................82

Big Shanty Land Corp. v. Comer Props., Inc.,
    61 B.R. 272 (N.D. Ga. 1985)............................................................................29

In re Boston Generating, LLC,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010)...............................................................63

Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),
    764 F.2d 406 (5th Cir. 1985) .............................................................................92

In re Bush Indus., Inc.,
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ...........................................................20

In re Chemtura Corp.,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...........................................................20

In re City of Colorado Springs Creek Gen. Imp. Dist.,
    187 B.R. 683 (Bankr. D. Col. 1995) ..............................................................46

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
    280 F.3d 648 (6th Cir. 2002) ......................................................................120

Corestates Bank, N.A. v. United Chem. Techs., Inc.,
    202 B.R. 33 (E.D. Pa. 1996) ........................................................................90

In re Cottonwood Corners Phase V, LLC,
    No. 11-11-12663, 2012 WL 566426 (Bankr. D.N.M. Feb. 17, 2012) ...............90

In re DBSD N. Am., Inc.,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) .................................................... 91, 115

In re DBSD N. Am., Inc.,
    421 B.R. 133 (Bankr. S.D.N.Y. 2009) .................................... 97, 113, 114, 138

In re DeLuca,
    194 B.R. 797 (Bankr. E.D. Va. 1996) ...........................................................110

DISH Networks Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.),
    634 F.3d 79 (2d Cir. 2011) ................................................................... 97, 110

In re Dow Corning Corp.,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) .........................................................86

In re Dune Deck Owners Corp.,
    175 B.R. 839 (Bankr. S.D.N.Y. 1995) ...........................................................97

In re EDC Holding Co.,
    676 F.2d 945 (7th Cir. 1982) ......................................................................142

In re Edgewater Motel, Inc.,
    85 B.R. 989 (Bankr. E.D. Tenn. 1988) ..........................................................82

FCC v. NextWave Personal Commc'ns, Inc.,
    537 U.S. 293 (2003) ...................................................................................83

In re Federal-Mogul Global, Inc.,
    684 F.3d 355 (3d Cir. 2012) ........................................................................46

iv

Figter Ltd. v. Teachers Ins. and Annuity Ass'n of Am. (in re Figter Ltd.),
    118 F.3d 635 (9th Cir. 1997) ...........................................................97, 111

Ford Prods. Corp. v. Bank of New York (In re Ford Prods. Corp.),
    159 B.R. 693 (Bankr. S.D.N.Y. 1993) ...............................................90

In re Foxridge Ltd. P'ship,
    238 B.R. 810 (Bankr. W.D. Mo. 1999) ...............................................37

In re Fur Creations by Varriale, Ltd.,
    188 B.R. 754 (Bankr. S.D.N.Y. 1995) ...............................................55

In re General Growth Props.,
    451 B.R. 323 (Bankr. S.D.N.Y. 2011)...................................124, 125, 126

In re Gilbert,
    104 B.R. 206 (Bankr. W.D. Mo. 1989) ...............................................111

In re Good,
    428 B.R. 235 (Bankr. E.D. Tex. 2010) ...............................................139

In re Graphics Commc'ns, Inc.,
    200 B.R. 143 (Bankr. E.D. Mich. 1996)...................................36, 37, 43

Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.),
    504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ......................................127

In re Iridium Operating LLC,
    No. 99-45005 (Bankr. S.D.N.Y. Nov. 20, 200) ..................................84

In re James Wilson Assocs.,
    965 F.2d 160 (7th Cir. 1992) ...........................................................92

In re Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1987)...............................................86

In re Johns-Manville Corp.,
    517 F.2d 52 (2d Cir. 2008)
    rev'd on others grounds, 557 U.S. 137 (2009) ..................................118

JPMorgan Chase Bank, N.A. v. Chart Commc'ns Operating, LLC (In re Charter Commc'ns),
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)...............................................41

Kane v. Johns-Manville,
    843 F.2d 636 (2d Cir. 1988) ...........................................................20

Key Bank, N.A. v. Milham (In re Milham),
    141 F.3d 420 (2d Cir. 1998) ...........................................................125

Kitrosser v. CIT Group/Factoring, Inc.,
   177 B.R. 458 (S.D.N.Y. 1995) ............................................................................54

Koelbl v. Glessing (In re Koelbl),
   751 F.2d 137 (2d Cir. 1984) ..............................................................................20

Kuehner v. Irving Trust Co.,
   299 U.S. 445 (1937) ...........................................................................................98

In re L.B.G. Properties, Inc.,
   72 B.R. 65 (Bankr. S.D. Fla. 1987) ...................................................................90

In re Lakeside Global II, Ltd.,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) .............................................................82

Law v. Siegel,
   134 S. Ct. 1188 (2014) .....................................................................................127

In re Leslie Fay Cos.,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..............................................................86

Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.),
   Adv. No. 10-05524 (BRL), 2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011)...........32

In re M&S Assocs., Ltd.,
   138 B.R. 845 (Bankr. W.D. Tex. 1992)..............................................................82

Metro. Life Ins. Co. v. San Felipe @ Voss, Ltd. (In re San Felipe @ Voss, Ltd.),
   115 B.R. 526 (S.D. Tex. 1990) ..........................................................................92

In re Metromedia Fiber Network, Inc.,
   416 F.3d 136 (2d Cir. 2005) ....................................................................120, 122

Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)
   470 B.R. 289 (Bankr. D. Del. 2012) ..................................................................82

Mokava Corp. v. Dolan, 147 F.2d 340 (2d Cir. 1945) .............................................110

In re N & D Props., Inc.,
   799 F.2d 726 (11th Cir. 1986) ......................................................................32, 33

N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,
   930 A.2d 92 (Del. 2007) .....................................................................................83

NextWave Personal Commc'ns, Inc. v. FCC,
   254 F.3d 130 (2003) ...........................................................................................83

Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.
      (In re BH S & B Holdings LLC), 420 B.R. 112 (Bankr. S.D.N.Y. 2009)
      aff'd as modified 807 F. Supp. 2d 199 (S.D.N.Y. 2011).................................32

Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.
      (In re Sunbeam Corp.), 284 B.R. 355 (Bankr. S.D.N.Y. 2002)........................32

In re One Times Square Assocs. Ltd. P'ship,
      159 B.R. 695 (Bankr. S.D.N.Y. 1993)..............................................................36

In re Papercraft,
      No. 00-2181, 2002 WL 34702177 (W.D. Pa. Feb. 20, 2002), aff'd sub nom.
      Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
      323 F.3d 228 (3d Cir. 2003) ...........................................................32, 132, 133

In re Philadelphia Newspapers, LLC,
      599 F.3d 298(3d Cir. 2010) .............................................................................92

In re Pine Mountain, Ltd.,
      80 B.R. 171 (B.A.P. 9th Cir. 1987) ..................................................................92

In re Premiere Networks Services, Inc.,
      333 B.R. 130 (Bankr. N.D. Tex. 2005)................................................37, 38, 39

In re Quigley Co.,
      676 F.3d 45 (2d Cir. 2012) .......................................................................26, 119

RadLAX Gateway Hotel, LLC v. Amalgamated Bank,
      132 S. Ct. 2065 (2012)...........................................................................89, 91, 92

Rusking v. Griffiths,
      269 F.2d 827 (2d Cir. 1959) ...........................................................................126

S&P, Inc. v. Pfeifer,
      189 B.R. 173 (N.D. Ind. 1995) .........................................................................80

In re Salem Suede, Inc.,
      219 B.R. 922 (Bankr. D. Mass. 1998) ..............................................................92

In re SM 104 Ltd.,
      160 B.R. 202 (Bankr. S.D. Fla. 1993) ..............................................................80

Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),
      324 F.3d 197 (3d Cir. 2003) .............................................................................54

Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),
      378 B.R. 283 (S.D.N.Y. 2007) .........................................................................83

Stern v. Marshall,
    131 S. Ct. 2594 (2011)..........................................................................44, 45

Texas Hotel Sec. Corp. v. Waco Dev. Co.,
    87 F.2d 395 (5th Cir. 1936) .............................................................117, 118

In re Texas Star Refreshments, LLC,
    494 B.R. 684 (Bankr. N.D. Tex. 2013)........................................36, 39, 42, 43

Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.,
    549 U.S. 443 (2007)...............................................................................55

In re Walat Farms, Inc.,
    70 B.R. 330 (Bankr. E.D. Mich. 1987).......................................................92

Young v. Higbee Co.,
    65 S. Ct. 594 (1945)............................................................................117

In re Young Broad. Inc.,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010).........................................................86

## Statutes

11 U.S.C. § 103(b)...............................................................................54

11 U.S.C. § 502(b)(2)...........................................................................54

11 U.S.C. § 1123(a)(5)(F).......................................................................46

11 U.S.C. § 1126(e)..............................................................................81

11 U.S.C. § 1129(a)(4)..........................................................................47

11 U.S.C. § 1129(a)(7)..........................................................................50

11 U.S.C. § 1129(a)(10).........................................................................54

11 U.S.C. § 1129(a)(11).........................................................................55

11 U.S.C. § 1129(b)(1)..........................................................................86

11 U.S.C. § 1129(b)(2)(A)(i)...................................................................89

11 U.S.C. § 1129(b)(2)(B)(i)...................................................................96

**Other Sources**

FCC Announces NextWave Settlement Agreement,
    (April 20, 2004), available at:
    http://www.justice.gov/usao/nys/pressreleases/April04/nextwavepr.pdf ......................... 83

Jacob Scott, Codified Canons and the Common Law of Interpretation,
    98 Geo. L.J. 341 (2010) ............................................................................................... 35

Revision of the Bankruptcy Act: Hearing before the H. Comm. on the Judiciary,
    75th Cong., 1st Sess. (1937) ...................................................................................... 118

Russia Plan Four GLONASS-M Launches in November, System Nears FOC (Oct. 31, 2011),
    available at http://www.insidegnss.com/node/2803 ....................................................... 71

Russian Proton-M launches three Glonass-M GPS satellites (Nov. 4, 2011)
    available at http://www.nasaspaceflight.com/2011/11/russian-proton-m-launches-
    three-glonass-m-gps-satellites/ ...................................................................................... 71

TO:    **THE HONORABLE SHELLEY C. CHAPMAN**
       **UNITED STATES BANKRUPTCY JUDGE**

An eight-day contested confirmation hearing was held in the above-captioned chapter 11 cases of the debtors and debtors in possession (collectively, "**LightSquared**" or the "**Debtors**") between March 19, 2014 and March 31, 2014. SP Special Opportunities, LLC ("**SPSO**") respectfully submits this post-trial brief opposing confirmation of the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1336] (the "**Plan**")[1] for failure to comply with the applicable provisions of title 11 of the United States Code (the "**Bankruptcy Code**").

## PRELIMINARY STATEMENT

1.      A confirmation hearing was held to give the Debtors an opportunity to show that the proposed Plan meets the requirements of the Bankruptcy Code, so the Court can decide whether estate assets will be distributed to creditors in accordance with their relative priorities. The Debtors' Plan makes that task impossible. Confirmation has a lot of non-negotiable requirements. Although the Debtors want the Court to approve a plan based on their version of equity or rough justice, sections 1122, 1123, 1126 and 1129 of the Bankruptcy Code don't permit that. The burden is on the Debtors to confirm their plan — and neither their accusations nor "consensus" is enough to satisfy the code. For the Court to confirm this Plan, the Court must find, among other things, that:

- The Debtors proposed the Plan in good faith, notwithstanding the fact that the Plan was devised by the Debtors' controlling shareholder to promote equity over a senior secured lender;

---

[1]    Capitalized terms used but not defined herein have the meanings assigned in the Plan, in the *Specific Disclosure Statement Relating to Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1336] (the "**Disclosure Statement**"), or the Debtors' post-trial memorandum of law in support of confirmation [Docket No. 1486], as applicable.

- The Plan is feasible in the face of projections that predict a liquidity crisis within 18 months;

- It is permissible to pay cash to equity and convert a senior secured claimant into an involuntary postpetition deeply subordinated lender;

- Separately classifying identical claims based solely on their holders is permissible, without any guiding precedent;

- An impaired class has voted to accept the Plan, when the Debtors argue that all stakeholders are made whole;

- Subordinating reinstated senior secured debt behind at least $2.2 billion dollars with a silent, seven-year instrument vs. payment in full within fifteen days is fair discrimination;

- The senior secured lender that receives subordinated paper retains its liens on prepetition collateral;

- A silent, seven-year, third-lien, non-market note that pays interest in kind is the indubitable equivalent of senior, secured, first priority debt with cash pay interest at a higher interest rate;

- Creditors will receive more under the Plan than in a liquidation, even though the Debtors have virtually no ongoing business, hold the same assets they did prepetition, and will exit chapter 11 more leveraged than they entered it;

- It has jurisdiction to delete a provision of a prepetition credit agreement, even though that would pre-judge the outcome of a purely inter-creditor, non-debtor dispute;

- A $100 million break up fee, that was never negotiated, and is unnecessary to secure any commitment is reasonable; and that

- Broad third party releases for fiduciaries that ignored their legal obligations and creditors that are providing no consideration to the estates are integral to the Plan and should be forced on stakeholders that affirmatively opted out.

2.    To believe the Debtors' valuation — the evidence the Debtors put forth to show that the Plan complies with sections 1129(a)(7), 1129(a)(11) and 1129(b) of the Bankruptcy Code, the Court must be persuaded (with 100% certainty) of the following

2

assumptions and more, which are all independent, *necessary* conditions precedent to the Plan's

total enterprise value:



- The FCC will grant approval of LightSquared's pending license modification applications for 30 MHz by 12/31/15 even though LightSquared's applications have already been pending for over two years

- The FCC will approve terrestrial use of the Lower 10 MHz Downlink within seven years even though                    LightSquared has not even renewed its request to the FCC to use this spectrum for terrestrial purposes;

- NOAA will not be auctioned, or, if it is, LightSquared will win the auction; and

3.    If the Court ascribes even a 90% likelihood to each of just these eleven,

independent, but individually necessary, assumptions (and the Debtors make even more than

3

these), the likelihood of *all* eleven being true together is less than one in three.[2]  There can be no

justifying the Debtors' decision to ascribe a 100% certainty to the many contingent aspects of

LightSquared's future prospects.

        4.      If the confirmation hearing proved anything, it showed that the Debtors

pitch conjecture and wishful thinking to convince the Court to take a leap of faith.  As long as

everything works out magnificently over the next two to seven years, without even one small

hiccup, LightSquared will realize the full potential of its assets (a feat it has thus far failed at

miserably) and all stakeholders will be paid in full.  Bankruptcy was not designed to allow broke

companies to gamble its senior creditors' entitlements.  Instead, bankruptcy was designed to

ensure senior creditors are first in line when things have gone wrong.  The Debtors' Plan perverts

that purpose.

      A.    ***Confirmation Decision Tree***

        5.      The many obstacles that must (and cannot) be overcome in order for the

Plan to be confirmed are depicted in the confirmation decision tree annexed hereto as

Attachment A.  In light of the choices the Debtors have made, confirmation of the Plan is far

more complex than what is implied in the Debtors' pleadings (and also more complex than what

is attached hereto).  On the other hand, denying confirmation *is* straightforward.  If the Court

finds that the Plan fails *one* of the Bankruptcy Code's confirmation requirements, and SPSO

argues herein that it fails many, then the Court must deny confirmation.  Denial of confirmation

will not result in certain liquidation — nor is that SPSO's goal in objecting to confirmation.

Instead, a denial will require the Debtors and other stakeholders to formulate a plan that is

---

[2]     $0.9^{11} \approx 0.314$

4

permitted by the Bankruptcy Code — an undertaking no party is motivated to do while the Plan is a possibility.

6.        Notwithstanding the complexity inherent in a Plan that is founded on separate classification of identical claims and discriminatory treatment, the Debtors urge the Court to decide confirmation based on a decision tree that grossly over-simplifies the paths to confirmation.    The Debtors' continued emphasis on the "several, independent paths to confirmation" available to the Court is a thinly veiled mischaracterization of the obstacles standing between them and a confirmation order.[3]   The Court should reject the Debtors' over-simplified decision tree.   In reality, each path to confirmation requires the Court to make multiple, independent findings, the failure of any one of which would preclude confirmation:

B.    ***Debtors' Scenario A: Vote Designation***

❖ Debtors' Formulation:  If SPSO's vote is designated, cramdown is not required because SPSO's class would be deemed to accept.

➢ Flaw:  Even if SPSO's vote is designated, before the Court can confirm the Plan, the Debtors must carry their burden of showing and/or justifying, among other things:

| | |
|---|---|
| (i) | The Plan was proposed in good faith (See Section II) |
| (ii) | Classification satisfies section 1122 of the Bankruptcy Code (See Section IV) |
| (iii) | Court has jurisdiction to modify and delete the Prepetition LP Credit Agreement's Sharing Provision (See Section V) |
| (iv) | Payments to be made under the Plan are reasonable (See Section VI) |
| (v) | The Plan pays all administrative claims in full (See Section VIII) |
| (vi) | An impaired class voted to accept the Plan (See Section IX) |
| (vii) | The Plan is feasible (See Section X) |

---

[3]    Debtors' pre-trial memorandum of law in support of confirmation [Docket No. 1413] (the "**Debtors' Pre-Trial Brief**") ¶ 6; Debtors' post-trial memorandum of law in support of confirmation [Docket No. 1486] (the "**Debtors' Post-Trial Brief**"), Exhibit A.

(viii)    The Plan satisfies the best interests test and the cramdown standards of section 1129(b) of the Bankruptcy Code.[4] (See Sections VII and XI).

C.    ***Debtors' Scenario B: Equitable Subordination***

❖    Debtors' Formulation:  If SPSO's claims are equitably subordinated *in full,*[5] any issues with respect to classification would be rendered moot, SPSO's claims would be unsecured, and the SPSO Note represents value equal to the allowed amount of SPSO's claims.

➢    Flaw:  Even if SPSO's claims are subordinated *in full*, the Debtors *still* have the burden of showing and/or justifying, among other things:

(i)    Good Faith (See Section II)
(ii)    Classification (See Section IV)[6]
(iii)    Jurisdiction (See Section V)
(iv)    Reasonableness of Plan Payments (See Section VI)
(v)    Best Interests (See Section VII)
(vi)    Payment of Admin Claims (See Section VIII)
(vii)    Impaired Accepting Class (See Section IX)
(viii)    Feasibility (See Section X)
(ix)    Cramdown (See Section XI)

D.    ***Debtors' Scenario C: Claim Disallowance***

❖    Debtors' Formulation:  If SPSO's claims are disallowed *in full,*[7] then the Plan is confirmable without satisfying SPSO's claims.

➢    Flaw:  The Court has previously discarded this argument.  LightSquared owed money to the lenders that sold SPSO their claims, and enjoyed the benefit of the Prepetition LP Facility.  Disallowing SPSO's Claims has no Basis under the Bankruptcy Code and would hand LightSquared a "free house." (See 10/29/13 Hr'g Tr. 115:10-116:17; See Section XV)

---

[4]    The Debtors dispute whether best interests and cramdown should be considered in the event SPSO's vote is designated.  However, as set forth in Section XI.F below, the Court should require those fundamental protections to be met, whether or not the Court decides to designate SPSO's vote.  The Debtors' suggestion would render moot one of the central purposes of the Bankruptcy Code — the equitable distribution of estate assets to stakeholders in the order of the priority of their claims.

[5]    The Debtors concede that partial subordination would kick the decision tree to another of their four scenarios.

[6]    Even if *fully* equitably subordinated, the Debtors still would have to justify separately classifying SPSO's subordinated claims apart from other general unsecured claims.  A showing the Debtors have not made.

[7]    The Debtors concede that partial disallowance would kick the decision tree to another of their four scenarios at the reduced claim amount.

6

E.    ***Debtors' Scenario D: Standalone Cramdown***

❖ <u>Debtors' Formulation:</u>  The Plan is confirmable on a standalone basis — the SPSO Note represents the indubitable equivalent of SPSO's claims.

➤ <u>Flaw:</u>  Under this path, the Debtors admit that they must satisfy every relevant confirmation requirement, but they mislead the Court by implying that the only requirement worthy of consideration is whether the SPSO Note represents the indubitable equivalent of SPSO's claims.  To the contrary, in order for the Court to confirm the Plan, the Debtors have the burden of showing and/or justifying, among other things:

(i)    Good Faith (<u>See</u> Section II)
(ii)    Classification (<u>See</u> Section IV)
(iii)   Jurisdiction (<u>See</u> Section V)
(iv)   Reasonableness of Plan Payments (<u>See</u> Section VI)
(v)    Best Interests (<u>See</u> Section VII)
(vi)   Payment of Admin Claims (<u>See</u> Section VIII)
(vii)  Impaired Accepting Class (<u>See</u> Section IX)
(viii) Feasibility (<u>See</u> Section X)
(ix)   Cramdown (<u>See</u> Section XI)

## ARGUMENT

I.    <u>Economic Analyses of the Plan Reveal its True Purpose.</u>

A.    ***Plan Support Parties' Investments and Recoveries.***

7.    The Debtors argue, again and again, that the "Plan Support Parties' new value investments provide compelling evidence of LightSquared's value . . . the fact that the Plan Support Parties would invest hundreds of millions of dollars ranked junior to the SPSO Note speaks volumes as to the true value of LightSquared's assets (and the value of the SPSO Note)."[8] (Debtors' Post-Trial Br. ¶ 95; <u>see also</u>, <u>id.</u> at ¶ 202 ("that Reynertson would then ask the Court to

---

[8] This is not evidence of value.  Investors have a variety of motivations and every investor sometimes makes a bad decision and loses money.  Without disclosure and analysis of each fund's proprietary trading strategies, the Debtors cannot point to anything concrete that supports their valuation argument.  In fact, the Plan Support Parties and the Debtors were very careful not to divulge any evidence that would expose the Plan Support Parties' investment strategies.  At trial, when asked to discuss alternative plan proposals discussed between Melody and Harbinger, Mr. Jaffrey of Melody became very concerned that questioning would stray into his company's proprietary trading strategies, and counsel to the Debtors, Mr. Hirshfeld, likewise expressed concerns that communications between Plan Support Parties and their investors not be shared.  (Jaffrey, Hr'g Tr. 3/28/14 Hr'g Tr. 45:18-48:6.)

believe that what some would call 'economic animals' would simply 'gamble' and shrug off, for the sake of argument, a $115 million equity investment (or 9% of their aggregate investment) in LightSquared defies common sense and logic.")  However, the Plan Support Parties' do not believe Moelis' valuation, (or if they do, they have extracted a bonanza from these estates).  By examining the net position that the plan sponsors will be in as of the assumed Effective Date of the Plan, the Plan Support Parties' true investment thesis is revealed.

8.    Today Fortress owns  Fortress will walk away from these cases holding approximately $311 million of debt senior to the SPSO Note.  Melody[9] will invest $550 million in LightSquared and receive approximately $489 million of debt senior to the SPSO Note.  JPMorgan, a holding company of an equity holder today, will invest $300 million and receive 100% ownership of Reorganized LightSquared Inc., which will be indebted to JPMorgan on day one for the amount of JPMorgan's investment, and which will own approximately $267 million of NewCo debt senior to the SPSO Note.  Harbinger will invest $150 million and surrender its subordinated Inc. debt holdings and receive approximately $133 million of debt senior to the SPSO Note.  Notably, even under a conservative valuation of LightSquared's assets, (which assumes that the Second Lien Exit Facility is capable of being repaid, but ascribes zero value to any distributions junior to SPSO), the risks assumed by the Plan Support Parties on their new money investments are miniscule given the interest that will accrue post Effective Date on their Second Lien Exit Facility loans (at L+11%).  After only

---

[9]    For purposes of this section only, unless indicated otherwise, references to "Melody" are intended to include Melody and its co-investors.

approximately one year, any gap between the Plan Support Parties' new money investments and their second lien loans will be completely filled.  Of course, under any valuation scenario, the Plan Support Parties will own *all of the upside* if LightSquared eventually does receive the FCC approvals it seeks, and the value of its assets exceed the amount of its debt.[10]

9.    *Fortress:*

| *Step One:* Fortress' Prepetition Holdings[11] |
| --- |
| Prepetition LP Facility Claim: ███████████████ |
| Existing LP Preferred Units: ██████████████████████████ ████████ |

| *Step Two:* Fortress' Total Commitments[14] |
| --- |
| DIP Tranche A: $350 million |
| DIP Tranche B: Approximately $70 million |

---

[10]    As neither the Plan nor the Disclosure Statement is a model of clarity on the transformation of LightSquared's capital structure, the information below in this section is based on the best available information.  SPSO's internal efforts to recreate the morass the Debtors propose is attached as <u>Attachment B</u>.  The illustrative calculations contained in this section do not account for the time value of money.

[11]    (PX0543; D136.)

[12]    Fortress' holdings of Existing LP Preferred Units is estimated at 115,000 units.  LightSquared had 164,646.47 outstanding LP prefs as of the Petition Date.  See *Declaration of Marc R. Montagner, Chief Financial Officer and Interim Co-Chief Operating Officer of LightSquared Inc., (A) In Support of First Day Pleadings and (B) Pursuant to Rule 1007-2 of Local Bankruptcy Rules for United States Bankruptcy Court For Southern District of New York* ¶ 43 (May 14, 2012) [Docket No. 3].  115,000/164,646.47 = 69.8%.

[13]    Holders of Existing LP Preferred Units Equity Interests will receive $223 million cash and $75 million of New Co Series A-2 Preferred PIK interests on the effective date.  (See Plan, Article IIIB.11.)
███████████████████████████████████████

[14]    See *Notice of Filing Relating to Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, pp. 400-401 (April 11, 2014) [Docket No. 1482], ("<u>DIP Commitments</u>").  JPMorgan's, Melody's and Harbinger's commitments are evident from the names of the funds on Schedule 2.01 to the New DIP Credit Agreement.  The last large commitment is from LSQ Acquisition Co LLC, which is assumed to be a Fortress fund.



| ***Step Three:*** Adequate Protection Payments |
| --- |
| ████████████████████████████████████ |

| ***Step Four:*** DIP Closing |
| --- |
| All Prepetition LP Facility Claims other than SPSO's paid in full.[16] |
| ████████████████████████████████ |

| ***Step Five:*** Effective Date |
| --- |
| New DIP Facility Tranche B commitment paid in full.[18] <br> -and- <br> $223 million distributed to holders of Existing LP Preferred Units[19] |
| Fortress to receive: Approximately $70 million + approximately $3 million in accrued interest[20] <br> -and- <br> ████████████████████████████████ |

---

[15]   This estimate of adequate protection payments made to Fortress is based upon the Debtors' disclosure in the Plan that $104.6 million of adequate protection payments were made to Prepetition LP Lenders between the Petition Date and February, 2014 (net of professional fees), and assumes a confirmation date of 6/1/2014 and a New DIP closing date of 6/15/2014.

[16]   Only approximately $30.5 million of Prepetition LP Facility Non-SPSO Claims will be rolled into Tranche B of the New DIP Facility.  See DIP Commitments.  Even if the $30 million are all Fortress claims, Fortress (at most) committed to roll *less than* 20% of its prepetition secured claims into the New DIP Facility.  In any event, Tranche B of the New DIP Facility will earn interest until the Effective Date and be paid in full in cash on the Effective Date from the proceeds of the First Lien Exit Facility.  See Plan, at Article IV.D.3.(a)(i).

[17]   Assuming a New DIP closing date of 6/15/14.

[18]   See Plan, at Article IV.D.3.(a)(i).

[19]   See Plan, at Article III.B.11.

[20]   Assuming a 6/15/2014 closing of the New DIP Facility, and a 10/31/14 Effective Date of the Plan.

[21]   ████████████████████████

10.    To determine Fortress' total net "new" money investment we consider its total DIP commitments (step 2) and subtract all of the cash Fortress will have received by the time the Plan goes effective (steps 3 through 5):

| Fortress Net New Money ($ in millions) | |
| --- | --- |
| DIP Tranche A Commitment | $350 |
| DIP Tranche B Commitment | 70 |
| Total New Investment | $420 |
| Less: | |
| Adequate Protection Payments | ($13) |
| Prepetition LP Facility Claim | (170) |
| Accrued Interest | (56) |
| DIP Tranche B Principal | (70) |
| DIP Tranche B Interest | (3) |
| Existing LP Preferred Units | (156) |
| Net New Investment | ($48) |

| Fortress' Post-Effective Date Holdings Senior to SPSO |
| --- |
| Second Lien Exit Facility loans: Approximately $311 million[22] |

11.    In addition, Fortress will receive various tranches of preferred and common equity,[23] worth hundreds of millions of dollars if Moelis' valuation is to be believed.[24]

---

[22]    This represents what Fortress will receive on account of its New DIP FacilityTranche A Claims. Fortress' *pro rata* share of the $1.2 billion Second Lien Exit Facility can be determined by reference to the Pro Forma Summary (defined below), which sets forth each Plan Support Parties' recovery of NewCo Class A Common Interests, which are split in the same proportion as the Second Lien Exit Facility.

[23]    Fortress will receive (in addition to its portion of the Second Lien Exit Facility): (a) New Co Series A-1 Preferred Interests (on account the Plan Support Party ABC Equity-Converted New DIP Claims), (b) approximately $40 million of NewCo Series A-2 Preferred (on account of its *pro rata* share of $75 million of A-2 prefs distributed to prepetition LP pref holders on the Effective Date); and (c) approximately 15.56% of NewCo common equity. (See Plan, Article IV; *Notice of Filing Relating to Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code,* p. 12 (March 21, 2014) [Docket No. 1433] (the "**Pro Forma Summary**").)

Moreover, less than 11%[25] of Fortress' New DIP Facility Tranche A Claims (less than $38.5 million) are being converted into equity junior to the approximately $1 billion SPSO Note. It is clear that the equity component of Fortress' investment is part of a carefully calculated investment allocation under which Fortress stands to potentially realize tremendous upside while the vast majority of its investment is actually in a secured debt tranche senior to the SPSO Note. The other three Plan Support Parties, junior equity holders today, have signed up to support a Plan that ensures the repayment of their commitments by subordinating SPSO's senior debt, and elevates their out-of-the money equity positions.

### 12. *JPMorgan:*

| JPMorgan's Prepetition Holdings |
| --- |
| An affiliate of JPMorgan, SIG Holdings, Inc.,[26] currently holds Existing Inc. Series B Preferred Stock Equity Interests. |
| With respect to Inc. assets, those interests are currently subordinated to Inc. series A prefs, Inc. subordinated debt held by Harbinger, and approximately $300 million of Inc. non-subordinated debt.[27] |
| The Inc. series B prefs are also structurally subordinated with respect to all LP assets, upon which SPSO (as a holder of Prepetition LP Facility Claims) currently holds a senior, secured, first priority lien. |

---

[24]    See infra Section I.B..

[25]    11% was calculated by dividing the $115 million equity converted New DIP Claims by the total $1050 million New DIP Tranche A Facility Claims committed by Plan Support Parties other than JPMorgan. See DIP Commitments; Plan at Article I.A.200 (definition of Plan Support Party ABC Equity-Converted New DIP Claims). The actual percentage is *lower* because only 11% of the interest accrued on such Plan Support Parties' DIP Claims is added to the equity-converted piece, while the remainder of the interest accrued (89%) is added to the portion of the New DIP Facility Claims that are converted into a majority of the Second Lien Exit Facility. (See Plan, at Article I.A.199 (definition of Plan Support Party ABC Debt-Converted New DIP Claims), and Article IV.D.3.(a)(ii).) For convenience, an approximate 90-10 split between debt-converted New DIP Facility Claims and equity converted New DIP Facility Claims is referred to throughout this pleading. The Debtors do not dispute this approximation, and have noted that the Plan Support Parties are converting "approximately 9% of their aggregate investment" into equity. (See Debtors' Post-Trial Br. ¶ 202.)

[26]    See Pro Forma Summary n.4.

[27]    See Plan, Article III.B.5.

| JPMorgan's Total Commitments[28] |
|---|
| DIP Tranche A: $300 million |
| DIP Tranche B: Approximately $60 million |

13.    JPMorgan's entire New DIP Facility Tranche B commitment (approximately $60 million) will be paid in full on the Effective Date (after accruing interest from closing through the Effective Date).[29]  Therefore, JPMorgan's total long-term investment is approximately $300 million in principal amount.

| JPMorgan's Post-Effective Date Holdings Senior to SPSO |
|---|
| Second Lien Exit Facility loans: Approximately $267 million[30] |

14.    JPMorgan's Tranche A commitment ($300 million) will roll into the Reorganized LightSquared Inc. Loan (also $300 million).[31]  The Plan converts all of SIG Holdings, Inc.'s deeply subordinated interests into 100% of Reorganized LightSquared Inc. Common Shares.[32]  Therefore, upon the Effective Date, JPMorgan will be the sole owner of Reorganized LightSquared Inc. and its sole lender, and will therefore own all of Reorganized LightSquared Inc.'s assets, which will include:  (a) 22.22% of the loans under the Second Lien

---

[28]    See DIP Commitments.

[29]    See Plan, Article IV.D.3.(a)(i).

[30]    Reorganized LightSquared Inc. (wholly owned by JPMorgan) will own 22.22% of the loans under the $1.2 billion Second Lien Exit Facility as of the Effective Date.  (See Plan, Article IV.D.3.(b)(xii).)

[31]    See Plan, Article IV.D.3.(b)(x).  The Plan contains complicated adjustments to the amount of the Reorganized LightSquared Inc. Loan to account for interest that accrues on JPMorgan's New DIP Facility Tranche A Claims prior to the effective date and any First Lien Exit Excess Amount.  The net effect of all of these adjustments is that the total amount of JPMorgan's New DIP Facility Claims (principal plus accrued interest) will roll over into a senior secured lien on all of Reorganized LightSquared Inc.'s assets.

[32]    See Plan, Article IV.D.3.(b)(xi).

Exit Facility, or approximately $267 million dollars of debt senior to the SPSO Note, and (b) various tranches of preferred and common equity,[33] worth hundreds of millions of dollars if Moelis' valuation is to be believed. In addition, the Reorganized Debtors' corporate structure was devised so that JPMorgan could benefit from LightSquared's net operating tax loss carryforwards ("**NOLs**"), which the Debtors have estimated to be over $2 billion.[34] This valuable additional consideration is not found in the treatment section of the Plan, the Disclosure Statement or the Liquidation Analysis.

15.   *Harbinger:*

| Harbinger's Prepetition Holdings |
| --- |
| Inc. subordinated debt and approximately 96% of LightSquared Inc.'s common stock.[35] |
| With respect to Inc. assets, Inc. common stock is subordinated to two tranches of Inc. prefs, subordinated Inc. debt (also held by Harbinger), and nearly $300 million of Inc. non-subordinated debt.[36] |
| All known Harbinger holdings are also structurally subordinated with respect to all LP assets, upon which SPSO (as a holder of Prepetition LP Facility Claims) currently holds a senior, secured, first priority lien. |

---

[33]   Through its ownership of reorganized Inc., JPMorgan will receive (in addition to its portion of the Second Lien Exit Facility): (a) 22.22% of NewCo Series A-1 Preferred PIK Interests, (b) $51.7 million of NewCo Series A-2 Preferred PIK interests, and (c) 20.01% of NewCo's common stock. (See Plan, Article IV.D.3.(b)(xii); Pro Forma Summary.)

[34]   See Specific Disclosure Statement, Article VI.A.

[35]   See *First Amended Disclosure Statement*, p. 10 (October 7, 2013) [Docket No. 918].

[36]   See Plan, Article III.B.5.

| Harbinger's Total Commitments[37] |
| --- |
| DIP Tranche A: $150 million |
| DIP Tranche B: Approximately $30 million |

16.   Harbinger's entire New DIP Facility Tranche B commitment (approximately $30 million) will be paid in full on the Effective Date (after accruing interest from closing through the Effective Date).[38]  Therefore, Harbinger's total long-term investment is approximately $150 million in principal amount.

| Harbinger's Post-Effective Date Holdings Senior to SPSO |
| --- |
| Second Lien Exit Facility loans: Approximately $133 million[39] |

17.   In addition, Harbinger will receive various tranches of preferred and common equity,[40] worth hundreds of millions of dollars if Moelis' valuation is to be believed.

---

[37]   See DIP Commitments.  For purposes of this analysis we have assumed that Credit Distressed Blue Line Master Fund, Ltd. is affiliated with Harbinger, and that Melody is investing with Centaurus Capital LP, the Tennenbaum entities listed on the Pro Forma Summary, and Special Value Opportunities Fund.  (See DIP Commitments.)  While the Debtors were less than forthcoming, these assumptions regarding the percentage commitments for the Tranche A New DIP Facility loans match the percentage breakdown of the class A common distribution set forth in the Pro Forma Summary.  (See Pro Forma Summary.)

[38]   See Plan, Article IV.D.3.(a)(i).

[39]   This represents what Harbinger will receive on account of its New DIP Facility Tranche A Claims. Harbinger's pro rata share of the $1.2 billion Second Lien Exit Facility can be determined by reference to the Pro Forma Summary, which sets forth each Plan Support Parties' recovery of NewCo Class A Common Interests, which are split in the same proportion as the Second Lien Exit Facility.

[40]   Harbinger will receive (in addition to its portion of the Second Lien Exit Facility):  (a) New Co Series A-1 Preferred Interests (on account the Plan Support Party ABC Equity-Converted New DIP Claims), (b) $209 million of NewCo Series A-2 Preferred PIK Interests (on account of its subordinated Inc. debt); (c) 11.11% of NewCo Class A Common Interests (on account of the Plan Support Party ABC Equity-Converted New DIP Claims); and (d) approximately 78% of NewCo Class B Common Interests (on account of its subordinated Inc. debt and Inc. common interests).  Harbinger will own 36.02% of NewCo's equity on the Effective Date.  (See Plan, Articles III and IV; Pro Forma Summary.)

Importantly, less than 11% of Harbinger's New DIP Facility Tranche A Claims (less than $16.5

million) are being converted into equity junior to the approximately $1 billion SPSO Note.

18.    *Melody:*

| Melody's Prepetition Holdings |
| --- |
| Melody owns penny warrants to purchase 6.5% of Harbinger's LightSquared Inc. common stock, so Harbinger's recoveries directly benefit Melody.[41] |
| (Jaffrey, 3/28/14 Hr'g Tr. 91:24-92:13, 95:19-99:19 Melody received penny warrants for Inc. common stock as part of its commitment to support Harbinger's plan, which commitment expired on March 31, 2014) |

| Melody's Total Commitments[42] |
| --- |
| DIP Tranche A: $550,000,000.00 |
| DIP Tranche B: Approximately $110 million. |

19.    Melody's entire New DIP Facility Tranche B commitment (approximately

$110 million) will be paid in full on the Effective Date (after accruing interest from closing

---

[41]    See infra Section II.B.  The record suggests that Melody's co-investors are also invested in Harbinger's equity, but the record is not perfectly clear.  (Jaffrey, 3/28/14 Hr'g Tr. 95:19-99:18 (Q. Okay.  So at that point, you will have fully earned certain fees in connection with that commitment [to the Harbinger plan]? By "you" I mean Melody?  A. By Melody and the group of investors that committed to the plan."))

[42]    See DIP Commitments.  For purposes of this analysis we have assumed that Melody is investing with Centaurus Capital LP, the Tennenbaum entities listed on the Pro Forma Summary, and Special Value Opportunities Fund, and that Credit Distressed Blue Line Master Fund, Ltd. is affiliated with Harbinger. (See DIP Commitments.)  While the Debtors were less than forthcoming, these assumptions regarding the percentage commitments for the Tranche A New DIP Facility loans match the percentage breakdown of the class A common distribution set forth in the Pro Forma Summary.  (See Pro Forma Summary.)

through the Effective Date).[43]  Therefore, Melody's total long-term investment is approximately

$550 million in principal amount.[44]

| Melody's Post-Effective Date Holdings Senior to SPSO |
| --- |
| Second Lien Exit Facility loans: Approximately $489 million[45] |

20.    Melody will also receive various tranches of preferred and common

equity,[46] worth hundreds of millions of dollars if Moelis' valuation is to be believed.  Moreover,

less than 11% of Melody's New DIP Facility Tranche A Claims (less than $60.5 million) are

being converted into equity junior to the approximately $1 billion SPSO Note.

21.    If these recoveries seem too good to be true, it is because they are.  These

recoveries are only made possible by the Plan's discrimination against SPSO.  If the Plan is

confirmed and goes effective, SPSO will receive a silent, third lien, seven-year note, with PIK

interest, in the "aggregate principal amount"[47] of SPSO's allowed claims in lieu of more than $1

billion of prepetition senior, secured debt.  The Plan Support Parties have devised a Plan that

provides a windfall to junior stakeholders by subordinating, disallowing, and largely ignoring the

---

[43]      See Plan, Article IV.D.3.(a)(i).

[44]      Melody has also earned an 8% fee on its $550 million commitment to the Harbinger Plan for the seven
          month period between September, 2013 and March 31, 2014.  Although another offset in Melody's favor,
          this fee is not reflected here. (Jaffrey, 3/28/14 Hr'g Tr. 95:19-99:19)

[45]      This represents what Melody will receive on account of its New DIP Facility Tranche A Claims.  Melody's
          *pro rata* share of the $1.2 billion Second Lien Exit Facility can be determined by reference to the Pro
          Forma Summary, which sets forth each Plan Support Parties' recovery of NewCo Class A Common
          Interests, which are split in the same proportion as the Second Lien Exit Facility.

[46]      Melody will receive (in addition to its portion of the Second Lien Exit Facility): (a) New Co Series A-1
          Preferred Interests (on account the Plan Support Party ABC Equity-Converted New DIP Claims), and (b)
          approximately 24.44% of NewCo's common equity on the Effective Date. (See Plan, Articles III and IV;
          Pro Forma Summary.)

[47]      See Plan, at Article I.A.303. (definition of SPSO Option B Treatment).

Debtors' single largest, senior secured stakeholder. The Bankruptcy Code prohibits the confirmation of such a Plan.

B.    *Plan's Implied Value of Equity*

22.    The Plan and the Moelis Valuation provide most of the necessary inputs to determine the value of NewCo equity implied by the Plan. To determine the value of equity we take total enterprise value ("**TEV**") and subtract liabilities including debt. Moelis' midpoint valuation ascribes a TEV of approximately $7.665 billion and identifies certain Obligations totaling approximately $1.712 billion.[48] From there we have to subtract the debt, including the First Lien Exit Facility ($1 billion), the Second Lien Exit Facility ($1.2 billion) and the SPSO Note (approximately $1 billion).

| Moelis Valuation Implied Equity Value ($ in millions) | |
|---|---|
| Gross TEV | $7,665 |
| Less: | |
| Operating Liabilities | (1,712) |
| First Lien Exit Facility | (1,000) |
| Second Lien Exit Facility | (1,200) |
| SPSO Note | (1,000) |
| Implied Equity Value | $2,753 |

23.    Therefore, the Plan implies a value of $2.753 billion for the two tranches of preferred and for common equity holders. The Plan Support Parties will receive 100% of NewCo Series A-1 Preferred PIK Interests,[49] and 96% of NewCo Common Interests[50] — *i.e.* the bulk of any equity upside.[51]

---

[48]    In computing Obligations as of the Effective Date, Moelis considered the present value of future Inmarsat lease payments ($1.261 billion), the 1.6 GHz purchase option ($150 million); NOAA clearing payment ($70 million); present value of future NOAA payments ($147 million) and present value of assumed satellite liabilities ($84 million). (See SP098 at MOEPLAN0003112).

[49]    77.78% of these interests are distributed to Fortress, Harbinger and Melody directly in exchange for the Plan Support Party ABC Equity-Converted New DIP Claims, and 22.22% are distributed to Reorganized LightSquared Inc., which will be wholly owned by JPMorgan.

18

24.     The Plan Support Parties are allocating themselves this upside for a very small portion of their commitments. On the Effective Date, $115 million of Harbinger's, Fortress' and Melody's New DIP Tranche A Claims are converted to 77.78% of NewCo Series A-1 Preferred PIK Interests and 77.78% of NewCo Class A Common Interests.[52] JPM will receive its share of the post Effective Date equity by rolling the full face value of its New DIP Facility Claims into the senior secured Reorganized LightSquared Inc. Loan and agreeing to convert its deeply subordinated prepetition Inc. preferred holdings into 100% of Reorganized LightSquared Inc. Common Shares. In exchange for these relatively small contributions and the surrender of various subordinated prepetition interests, the Plan Support Parties will receive the majority of NewCo's equity, which, according to Moelis, is worth approximately $2.753 billion on the Effective Date.

25.     There are two ways to interpret this disparity, neither of which is good for the Plan. Either the Plan Support Parties emphatically disagree with Moelis' inflated valuation, or the Plan inequitably allocates value to junior interest holders at SPSO's expense. This also reveals the Plan Support Parties' investment thesis. As long as LightSquared is worth at least *$2.2 billion*, i.e., as long as the Second Lien Exit Facility is in the money as of the Effective Date, then each of the Plan Support Parties will make a positive return. The Plan shifts the rest of LightSquared's risk onto SPSO's back by subordinating the SPSO Note behind at least $2.2

---

[50]     See Pro Forma Summary (JPMorgan is the sole owner of, and lender to, Reorganized LightSquared, Inc.).

[51]     Moreover, as set forth above, the Plan Support Parties (except Melody) are *also* receiving the majority of the NewCo Series A-2 Preferred PIK Interests on account of subordinated prepetition interests.

[52]     See Plan, Article IV.D.3.(iii), (v). For ease of reference, this analysis does not consider the incremental amounts above $115 million that will be converted into equity on account of 11% of the interest that accrues on the Plan Support Parties' DIP Tranche A loans. Assuming a 6/15/14 DIP closing date and 10/31/14 Effective Date, this amounts to an additional $5.3 million.

billion of debt. If that wasn't enough, the Plan Support Parties have made sure to allocate the vast majority of potential upside (worth $2.7+ billion, if Moelis is to be believed) to themselves.

II.    **The Plan Was Not Proposed in Good Faith**
       **And Does Not Meet the Requirements of Section 1129(a)(3).**

26.    The first hurdle the Debtors must clear for the Plan to be confirmed is to establish, as required by section 1129(a)(3), that the Plan was proposed in good faith. <u>See</u> 11 U.S.C. § 1129(a)(3) (plan must be "proposed in good faith and not by any means forbidden by law"). In determining whether a chapter 11 plan has been proposed in good faith, courts look to whether a plan is proposed "with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" <u>Kane v. Johns-Manville</u>, 843 F.2d 636, 649 (2d Cir. 1988), <u>quoting</u> <u>Koelbl v. Glessing (In re Koelbl)</u>, 751 F.2d 137, 139 (2d Cir. 1984). The good faith requirement looks closely at the plan development process and the plan proponent's efforts to negotiate a confirmable plan acceptable to all parties. <u>See</u> <u>In re Chemtura Corp.</u>, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) ("[T]he requirement of Section 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'") (quoting <u>In re Bush Indus., Inc.</u>, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). The Debtors have not established the prerequisites of section 1129(a)(3) because that the Plan was not proposed in good faith — it is nothing more than an attempt to reallocate to other stakeholders value that belongs to the Debtors' largest, secured creditor, SPSO.

A.    *Harbinger, Melody, and Fortress Controlled Plan Negotiations and Designed a*
      *Plan Premised on Discriminating Against SPSO.*

27.    The formulation of the Plan by Harbinger, Fortress, and Melody is a model for the abdication of fiduciary duties by a debtor and its supposedly independent board members. The record establishes that (a) the Debtors and the Special Committee had no real role in the negotiation of the Plan, and (b) that the Plan was formulated for the express purpose of

20

increasing the return to equity holders and using SPSO to decrease the cost of financing an exit

from bankruptcy. (SPSO FOF ¶¶ 19-32.)

        28.    In mid-January 2014, sponsors of the Debtors' Second Amended Plan

became concerned that (a) JP Morgan would not be able to raise sufficient financing to pay off

the first lien debtholders and (b) there could be significant delay in LightSquared obtaining the

FCC approvals on which the reorganization contemplated by the Second Amended Plan was

conditioned. (SPSO FOF ¶¶ 3-4.) The Plan here started as a proposal that Melody's Omar

Jaffrey sent to Jerry Abbruzzese, an outside consultant to Harbinger, that did not condition

emergence on FCC approval, but that did include an express condition precedent that SPSO's

debt claims be subordinated or disallowed. (SPSO FOF ¶ 4.) Mr. Falcone told Mr. McKnight of

Fortress that he "like[d] [O]mar's non contingent deal with the subordination. It's a better deal

and more likely to get approved." (SP072) Thereafter, Harbinger, Melody, and Fortress

engaged in negotiations over how to structure the Plan. (SPSO FOF ¶¶ 5-18.) Fortress was

determined not to have SPSO's claims ahead of Fortress in priority: "putting our 3rd liens back

there is a non starter." (SP069) According to Mr. Falcone, the solution was easy: "Then move

it ahead of [C]harlie." (SP069)

        29.    During the negotiations, Mr. Falcone made clear that he was interested in

using the Plan to enrich himself and equity holders at the expense all other stakeholders. (SPSO

FOF ¶ 14 ("There are three groups that I'm interested in protecting, fortress harbinger and jpm.

All else is up for grabs.").) Moreover, Mr. Falcone made it clear in numerous emails that the

primary purpose of the Plan and its subordination or disallowance of SPSO's claims was to

enrich Mr. Falcone and Harbinger:

- **Falcone:** "But subordination doesn't improve my position and we were the ones pushing this and fighting this to get him subordinated." (SPSO FOF ¶ 13; SP074.)

- **Falcone:** "The point is to utilize the subordination and maybe the disallowance to improve everyone's position. Why do we need so much money on a contingent deal if Charlie gets reinstated and subordinated?" (SPSO FOF ¶ 14; SP071.)

- **Falcone:** "Harbinger and its efforts have been the key to getting the ergen debt subordinated. Any deal that is done should be better for everyone in the cap structure, including the equity." (SPSO FOF ¶ 13; SP157.)

- **Falcone:** "If it doesn't improve the equity return, what was the purpose of going to court and jamming Charlie? We did it to lower the amount of equity and debt needed so we could subordinate him and reinstate him yet my position seems to be getting worse. By my calculation, we should need $1.1b less." (SPSO FOF ¶ 13; SP073.)

- **McKnight:** Let's get on [the] phone tomorrow. With subordination I agree this deal should be getting better for everyone, and we don't need the jr DIP. Game changer so all the existing stakeholders should have better deal. **Falcone:** Totally agree. We are on the same page. (SPSO FOF ¶ 15; SP077.)

30.    Mr. Falcone testified that he advocated subordinating and disallowing SPSO's position in order to improve Harbinger's equity position because, as a fiduciary *to Harbinger*, it was his duty to do so. (SPSO FOF ¶ 14.) It was Mr. Falcone's idea to pay off Fortress' Preferred equity and have them reinvest as second lien DIP ahead of SPSO's third lien note. (Falcone, 3/31/14 Hr'g. Tr. 62:4-63:1.) In his testimony, Mr. Falcone was recalcitrant in attempting to justify this shockingly self-interested negotiating position by declaring that he was "fighting for value." (Falcone, 3/31/14 Hr'g. Tr. 54:22-25, 55:16-19.) That he believes this justifies discrimination against LightSquared's largest secured debtholder is telling.

31.    Mr. Falcone also used the threat of suing the FCC and tying LightSquared up in litigation for ten years as leverage in his negotiations with other plan sponsors. (Falcone, 3/31/14 Hr'g. Tr. 78:1-25.)

22

32.    By January 22, 2014, Harbinger, Fortress, and Melody had agreed on a structure for the Plan and were working on a term sheet. (SPSO FOF ¶ 18.)  As Mr. Jaffrey put it, at that point their "goal [was] to circulate the revised plan term sheets tomorrow[,] [f]or all of us (H, fortress, Melody Group) to lock-down on it together – make sure its a win-win..and then get in front of Chapman ASAP." (SP341)  Only at that point — when it was already "locked-down" — was the "plan" brought to the Debtors' Special Committee.

33.    The next day, on January 23, 2014, representatives of Harbinger, Fortress, and Melody met with the Special Committee to present their plan. (SPSO FOF ¶ 19.)  That same day, the Special Committee agreed to support the plan. (SPSO FOF ¶ 19.)

34.    The Debtors expend several pages in their Post-Trial Memorandum attempting to establish that the Plan was the product of arms'-length negotiation between the Debtors, the Special Committee, and the Plan Support Parties. (Debtors' Post-Trial Br. ¶¶ 6-17.)  Tellingly, the Debtors provide no dates for when any of these efforts took place, indicating that all of these supposed "negotiations" occurred *after* January 23, 2014, when the Special Committee signed on to the Harbinger/Fortress/Melody plan.  And significantly, the Debtors and the Special Committee have produced no documentary evidence of any negotiations, whether over the terms of the Plan, New DIP Facility, break-up fee or otherwise.  To be clear, not a single document indicates that any negotiation took place.  Based on this material omission, the Court can only infer that *no negotiations occurred* and the Debtors and the Special Committee adopted wholesale the Harbinger/Fortress/Melody plan. (SPSO FOF ¶ 24.)

35.    The "negotiations" supposedly engaged in by the Debtors as set forth in the briefing amounted little more than helping pick directors (subject, of course, to Harbinger's informal but effective veto), adding information to the Plan documentation regarding Inmarsat,

and providing financial projections. (Debtors' Post-Trial Br. ¶¶ 7, 9.) Putting aside that picking

directors and providing information is not the same as actually negotiating on behalf of all

stakeholders, testimony from the Debtors' CFO, Mr. Montagner, confirms that management was

completely sidelined while the Plan Sponsors formulated the Plan for their own benefit:

> Q: Were you involved, Mr. Montagner, in any discussions with the
> plan sponsors in connection with formulating the aspect of the plan
> where SPSO's senior secured debt would be rolled into third tier or
> unsecured debt? . . .
> A: I don't think "involved" is the word. I was on the receiving
> end of whatever they negotiated.
> Q: So you were told that that was an aspect of the plan?
> A: That's right.
> Q: And who was involved in negotiating the plan, to your
> understanding?
> A: I was not involved in the negotiation.
> Q: Do you know who was?
> A: I would have to speculate.
> Q: Were you asked to comment on that aspect of the plan?
> A: No.
> Q: Was *anyone at LightSquared* asked to comment on that aspect
> of the plan, to your knowledge?
> A: Not to my knowledge.

See 3/6/14 Deposition of Marc Montagner ("**Montagner Tr.**") 86:16-20, 87:3-87:21 (emphasis

added); SPSO FOF ¶ 28.)    The Debtors' counsel's role was limited to drafting Plan

documentation. (SPSO FOF ¶ 28.) The Debtors have defended against these facts by apparently

arguing that only the CFO wasn't involved, implying that others were. However, if the CFO

isn't involved in negotiating the interest rates, maturity, or dollar amounts of the company's

postpetition capital structure, that is quite telling. Montagner was further instructed to cut off the

Debtors' cash projections after two years, but couldn't explain why. (Montagner Tr. 43:17-22.)

    36.    Time and again, the Debtors' witnesses testified that plan negotiations

were conducted "through counsel." (Montagner Tr. 34:3-4, 34:17-20, 36:21-24, 39:10-21, 39:25,

43:17–18, 43:19-22, 81:13-82:6, 89:16-19, 89:23-90:2, 91:15-17, 91:23-24; Rogers, 3/19/14

Hr'g Tr. 24:5-17, 61:19-23.)  In this way, the Debtors use the assertion of privilege as a shield

and sword — the Debtors promise that substantial negotiations took place between the company

and the Plan Support Parties, and that the Debtors' management and special committee were

heavily involved, but simultaneously, they assert a privilege over any evidence that might be

probative of those assertions.  Given this, the Court has nothing in the record supporting the

Debtors' claims or establishing an informed basis to defer to the Debtors' business judgment.

37.    The Special Committee supposedly had a "pivotal role" in the formulation

of the Plan (Debtors' Post-Trial Br. ¶¶ 10-11), but all of the "evidence" cited in support relates to

the Special Committee's role with respect to the Second Amended Plan.  (Debtors' Post-Trial Br.

¶¶ 12-14.)    The evidence actually establishes that the Special Committee had no role in

formulating the Plan until the Plan Support Parties brought their fully-baked proposal to the

Special Committee on January 23, 2014, which the Special Committee effectively rubber

stamped.  (SPSO FOF ¶¶ 2-32.)  Indeed, Mr. Rogers of the Special Committee admitted that he

first learned of the Plan after his counsel brought him the details.  (SPSO FOF ¶ 26.)  Nor was he

aware that the Plan had been modified to increase the number of "pops" that LightSquared would

need to cover to 290 million — a significant change that he described as being on the "high side"

compared to other 4G LTE carriers.  (SPSO FOF ¶ 26.)  The Debtors' Pre-Trial Brief even

admits that the Plan Support Parties dictated the terms of the Plan:  "the Plan Support Parties

have indicated to LightSquared that they have no ability to support, or provide capital for, a plan

of reorganization that does not reflect the capital structure set forth in the Plan."  (Debtors' Pre-

Trial Br. ¶ 37.)  The Special Committee, the fiduciaries anointed to protect all stakeholders'

interests, didn't even consider it their responsibility to negotiate on behalf of all creditors.  When

Mr. Rogers was asked "whether there was ever a structure considered [by the Special

25

Committee] that treated SPSO and other creditors in the same way?" Mr. Rogers responded: "So did we have a plan that treated — the way you just said, that we could evaluate – no." (Rogers, 3/19/14 Hr'g Tr. 61:5-13.) Mr. Rogers considered it his job to sit back and wait for proposals to come to him, and when a discriminatory plan appeared on the Special Committee's desk, they approved it without considering any alternatives.

38.     The Debtors are the proponents of the Plan in name only. (SPSO FOF ¶¶ 19-28.) The party that physically typed the long form plan documents into a computer is irrelevant. Harbinger and the other Plan Support Parties conceived and executed the Plan and are the real proponents of the Plan. (see SPSO FOF ¶¶ 2-28.) The Plan, as were the others before it, is designed to protect Harbinger's equity position. (SPSO FOF ¶¶ 2-28.) The Debtors and Special Committee are little more than bystanders — as they have been throughout this bankruptcy — tasked with executing the reckless strategies of Harbinger and Mr. Falcone. (SPSO FOF ¶¶ 19-28.) The Plan is not the product of an arms'-length process and has not been proposed in good faith. See In re Quigley Co., Inc., 437 B.R. 102 (Bankr. S.D.N.Y. 2010). It is especially troubling that Mr. Falcone, a director of LightSquared with fiduciary duties to all stakeholders (including SPSO), was among the masterminds behind the Plan. (SPSO FOF ¶¶ 4-28.) By his own admission, Falcone was solely focused on protecting "fortress, harbinger and jpm. All else is up for grabs." (SP078).

39.     Further, this protectionist conduct on the part of Harbinger and Mr. Falcone should be all the more troubling to the Court because of the effect it will have on the company post-emergence. Mr. Falcone has already started to lay the groundwork for the exercise of at least negative governance control upon Debtors' emergence from bankruptcy, objecting to an investment by Cerberus and the naming of Tim Donahue to the board of the new reorganized

LightSquared entity because *Mr. Falcone* did not like or trust them (Falcone, 3/31/14 Hr'g. Tr. 82:20-84:10; SP086 ("Don't trust them and don't like them, especially their advisor Tim Donahue. Unless it gets better for me. I don't want them [making an investment in the Plan].").); SPSO FOF ¶ 32).) That Mr. Falcone objected without even knowing the extent of his veto rights is even more disturbing as it evidences his disregard for any potential limits on his influence. (Falcone, 3/31/14 Hr'g. Tr. 109:16-111:1)

40.    Neither the Debtors nor the Special Committee — entrusted with exercising fiduciary duties to the company's creditors — made any attempt to treat SPSO in an equitable manner. None of the parties included SPSO in any discussions until February 12, two days before the Plan was filed. (SPSO FOF ¶ 29.) At that point, SPSO was shown a term sheet dated February 5, 2014, indicating that the parties had been in agreement for quite some time, yet still did not see fit to include SPSO in the discussion. (SPSO FOF ¶ 12.)

41.    According to the Debtors, SPSO was not included in any of the discussions until February 12 because the parties were still negotiating material terms. (Debtors' Pre-Trial Br. ¶ 59.) But the Debtors, the Special Committee, the Plan Support Parties, and the Ad Hoc Secured Group have asserted common interest privilege going back as far as January 28, 2014. (SPSO FOF ¶ 24.) To make matters worse, the Debtors, Special Committee, and Plan Support Parties have asserted a common interest privilege starting in December. (See Ex. B, 4/2/14 Letter from A. Stone to Judge Chapman regarding Common Interest Privilege.)[53] Either the parties were negotiating material terms and therefore did not have a common interest as of

---

[53] Citations to "Ex. __" refer to exhibits attached to the Declaration of Rachel C. Strickland in Support of Post Confirmation Trial Brief of SP Special Opportunities, LLC and Objection to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and Post Confirmation Proposed Findings of Fact of SP Special Opportunities, LLC.

27

those dates, or they had already agreed to terms and did not care to inform SPSO of the details.

Neither shows good faith.

      B.     ***The Structure of the Plan and Undisclosed Side Deals Indicate a Lack of Good Faith***

      42.     Even putting aside that neither the Debtors nor the Special Committee had

any real role in negotiating the Plan, the Plan structure itself indicates that it was not proposed in

good faith. The Plan shifts virtually the entire risk of the Debtors' reorganization on SPSO by

putting SPSO in the junior-most debt position in reorganized LightSquared's highly leveraged

capital structure. (SPSO FOF ¶ 30.) That capital structure features multiple tranches of debt that

will grow to at least $7.3 billion before any payment is due under the SPSO Note. (SPSO FOF ¶

260.) Meanwhile, the Plan Support Parties that are contributing "new money"[54] have protected

their investment by having the vast majority of the New DIP Facility — the primary vehicle

through which new money is being invested — be repaid in cash on the Effective Date or rolled

into the Second Lien Exit Facility. (<u>See</u> Plan, § II.E.; <u>see</u> <u>supra</u> Section I.) The truth is that the

Plan Support Parties are only willing to bank on investments that fall within the first $2.2 billion

of the post Effective Date capital structure and have placed only a token of their investment

below SPSO's supposedly fully collateralized note. (SPSO FOF ¶¶ 259, 273.) This structure

speaks volumes about their confidence in the SPSO Note being repaid in full.

      43.     Even the Plan Support Parties' 10% junior investment should be placed in

its proper context. (<u>See</u> <u>supra</u> Section I.) Each of the Plan Support Parties holds large positions

junior to SPSO today. Even Melody, the Plan Support Party the Debtors point to as an outsider,

owns penny warrants — making it the true economic beneficiary behind certain of Harbinger's

---

[54]    None of which is making a contribution of a value that even comes close to approaching the over $1 billion
of claims that the Plan requires SPSO to "roll over."

Existing Inc. Common Stock today.  (Jaffrey, 3/28/14 Hr'g Tr. 91:24-92:13, 95:19-99:19.)[55]

Two aspects of the Plan are designed specifically to reduce the size and extent of such parties'

junior interests in these Debtors.  First, on the Effective Date, junior equity interests will be paid

$223 million in cash.  (See Plan, Section III.B.11.)  Second, certain of the parties' junior interests

will be exchange for more senior currency.  Put simply, the Plan Support Parties are moving cash

from one pocket to another, reducing their current risk profile and retaining upside in the event

things ever pan out for the Debtors.

        44.    Further underscoring the bad faith of this plan is the fact that Melody is

being paid by Harbinger to provide financing for the Plan, a fact that was not disclosed in

LightSquared's disclosure statement.   In connection with Harbinger's abandoned plan of

reorganization (the "**Harbinger Plan**"), Melody committed to providing $550 million of

financing, in exchange for 75 basis points and a commitment fee of 8% per annum.  (SPSO FOF

¶ 35.)  Harbinger also agreed to pay Melody a break-up fee in the event that LightSquared is sold

out of bankruptcy equal to approximately 11.5% of Harbinger's economic stake in LightSquared.

(SPSO FOF ¶ 35.)  Although the parties have known that conditions of the deal could not be met,

for months, the Harbinger Plan has never been withdrawn, meaning Melody continued to accrue

the 8% per annum fee on its $550 million commitment until three weeks ago.  The lack of

disclosure surrounding this side agreement indicates a lack of good faith.  See Big Shanty Land

Corp. v. Comer Props., Inc., 61 B.R. 272 (N.D. Ga. 1985) (affirming denial of confirmation of

plan because the debtor did not disclose side agreements it entered into with purchaser under the

plan).

---

[55]    Melody received penny warrants for Inc. common stock as part of its commitment to support Harbinger's
plan, which commitment expired on March 31, 2014.

45.    Equity holders conceived the plan to benefit themselves at the expense of the Debtors' largest secured creditor, which alone proves that the Plan was proposed in bad faith. Fortress is similarly beholden to Mr. Falcone and Harbinger — it already has a substantial investment in LightSquared and its claims were moved ahead of SPSO's claims in exchange for its support of the Plan. (SPSO FOF ¶¶ 15, 33-34.) A Harbinger/Melody/Fortress deal, then, is one that primarily seeks to benefit and enrich Harbinger and its close associates. But the Plan also serves another improper purpose: to put pressure on the Court to impose remedies against SPSO in the Ergen Adversary Proceeding that could make the Plan's discriminatory treatment of SPSO workable. In fact, counsel to the Debtors' Special Committee previewed this ultimatum prior to opening statements in the Ergen Adversary Proceeding, noting that "a remedy that's fashioned as part of this adversary proceeding can make that standalone plan much more attractive, especially to currently non-constituents that are not supporting the plan, or constituents that aren't supporting the plan." (See 1/9/14 Hr'g Tr. 12:9-13.) The Debtors' use of the Plan as a point of leverage in the Ergen Adversary Proceeding and the overall reorganization is not consistent with good faith.

46.    These facts betray a process whereby LightSquared's equity holders formulated a discriminatory plan intended to shift a majority of the economic risk onto SPSO, and presented the plan to the Special Committee to get rubber stamped. (SPSO FOF ¶¶ 2-32.) Of course, as it has repeatedly done in these cases, the Special Committee obliged. (SPSO FOF ¶¶ 19.) The Plan represents the culmination of a plan formulation process in which SPSO was deprived of a voice, and that was designed to single out the Debtors' largest creditor for inferior treatment and put pressure on the Court to rule in the Debtors' favor in pending litigation. While the Debtors claim that the Plan is not contingent upon the Court imposing drastic remedies on

SPSO, the communications between Plan sponsors cited above indicate otherwise. Under these circumstances, the Plan cannot be found to have been proposed in good faith.

**III.    SPSO's Claims Should Not Be Equitably Subordinated.**

    A.    *Equitable Subordination Arguments Should be Restricted to the Equitable Subordination Remedy.*

        47.    Though the record for the Adversary Proceeding has closed, the Debtors continue to re-argue their equitable subordination claims throughout the confirmation process. The Debtors have polluted their confirmation arguments with reanimated subordination arguments and ask the Court to designate SPSO's votes, approve a gerrymandered classification scheme, and ignore the cramdown safeguards all based the same allegations that the Court will consider when deciding whether to subordinate any of SPSO's claims. However, each section of the Bankruptcy Code, and each relevant confirmation standard, serves its own purpose. The Debtors should not be given multiple bites at the apple to request any number of alternative punishments for identical (alleged) misbehavior. Throughout this brief, SPSO has endeavored to respond to the variety of unfounded accusations the Debtors and the Ad Hoc Secured Group bring regarding SPSO's alleged bad faith in these cases. However, in each instance, SPSO submits that all of these arguments are best considered in connection with subordination. The Court will decide if, and to what extent, it will subordinate SPSO's claims. If it does, after that punishment remedies any harm supposedly caused by SPSO's behavior, SPSO should not be subjected to further, diverse punishments based on code sections that were enacted to define a debtor's burdens to confirm a plan and that have nothing to do with creditor conduct.

    B.    *SPSO's Claims Should Not be Subordinated Because the Debtors Have Been Unable to Prove Any Harm.*

        48.    For the reasons set forth in SPSO's and Charles W. Ergen's post-trial memorandum in the Adversary Proceeding ("**SPSO/Ergen Adv. Pro. Post-Trial Brief**"),

SPSO's claims should not be subordinated.  (See SPSO/Ergen Adv. Pro. Post-Trial Br. 68-80.) The overwhelming majority of equitable subordination case law pertains to insiders and cases that have equitably subordinated claims of non-insiders are exceedingly rare.  The case the Debtors mainly rely on is In re Papercraft Corp., No. 00-2181, 2002 WL 34702177 (W.D. Pa. Feb. 20, 2002), aff'd sub nom., Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228 (3d Cir. 2003),[56] but that case involved the equitable subordination of an insider based on conduct far more egregious and damaging to the estate and other creditors than is alleged here.[57]

49.    At closing arguments for the Adversary Proceeding, the Court inquired whether the second prong of the In re Mobile Steel test was disjunctive or conjunctive.  (See 3/17/14 Hr'g Tr. 106:8-22.)  Although there is competing case law on the issue, it does not matter if the test itself is disjunctive.  Either way, a claim can only be subordinated "to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."  Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 701 (5th Cir. 1977); Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002); Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) aff'd as modified, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); In re N & D Props., Inc., 799 F.2d 726, 733 (11th Cir. 1986) ("Since equitable subordination operates only to redress the amount of actual harm done."); see also Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.), Adv. No. 10-05524 (BRL), 2011 WL 1042767, at *3 (Bankr. S.D.N.Y. Mar.

---

[56]    See 3/17/14 Hr'g Tr. 75-76, 108-111, 169-172.

[57]    See SPSO/Ergen Adv. Pro. Post-Trial Br. 73 n.75.

17, 2011) ("to plead equitable subordination adequately, Lyme Regis must allege two critical elements: the defendant must have done something wrong and second, the creditor has to have been harmed by the defendant's conduct"). Thus, while the test itself may envision a finding of either harm or unfair advantage, some harm must be established in order to warrant remediation. "The injury suffered sets the limits of the remedy regardless of the nature of the claimant's conduct." Sunbeam, 284 B.R. at 364.

50.    The Debtors have been unable to show any harm to the Debtors or stakeholders. In fact, almost every word of the Debtors' brief that is not about SPSO touts LightSquared's inherent value, such that there is sufficient value to pay all creditors *in full*. Furthermore, the broad strokes with which the Debtors attempt to paint the supposed harm here is contrary to how Courts examine these issues. For example, in In re N & D Properties, Inc., 799 F.2d 726 (11th Cir. 1986), the court examined which specific stakeholders were harmed and determined "only a portion of the creditors, specifically the consumer creditors" were harmed while trade creditors were not. Id. at 732. For SPSO's claims to be subordinated, the Debtors must be able to establish which specific stakeholder was harmed and the extent of that harm. They have not done this.

C.    *The Debtors' New "Evidence" of Misconduct Is Not Persuasive*

51.    The supposed "evidence" of SPSO's pattern of bad faith conduct does not withstand scrutiny. ███████████████████████████████████████████████
██████████████████ (Debtors' Post-Trial Br. ¶ 23.) ████████████████████████
███████████████████████████████████████████████████████ (SPSO FOF ¶¶
67.) ████████████████████████████████████████████████. (SPSO
FOF ¶¶ 63-66, 167-234; see also infra SPSO Post-Trial Br. ¶¶ 111-116). ████████████
██████████████████████████ (Smith, 3/20/14 Hr'g Tr. 167:13-15).

33

52. 

(Debtors' Post-Trial Br. ¶ 23.)

(Smith, 3/20/14 Hr'g

Tr. 99:3-100:17, 167:13-15; SPSO FOF ¶ 69.)

53.    Third, the Debtors claim that DISH discussed its plans for the

LightSquared spectrum with the FCC.  This indicates only that when DISH/LBAC had an open

bid for LightSquared's spectrum, it was interested in using LightSquared's spectrum.

(SPSO

FOF ¶ 103; Ergen, 3/26/14 Hr'g Tr. 338:24-339:4 (

.

54.    Fourth, the Debtors argue that SPSO's abstention from the Ad Hoc

Secured Group's effort to compel specific performance is evidence that SPSO is not acting in

accordance with its creditor interests.  (Debtors' Post-Trial Br. ¶ 23.)  This makes no sense.  By

not arguing for specific performance, SPSO cleared the way for Harbinger and the other equity

holders to propose the Plan, which may allow them to maintain their equity position.  Why

would a competitor do that?  Neither the Debtors nor the Ad Hoc Secured Group explain this

contradiction.  Furthermore, this Court ruled that such lawsuit was meritless, which confirmed

Mr. Ergen's lay person's assessment.  (1/22/14 Hr'g Tr. 109:12-22 ("the PSA was appropriately

and lawfully terminated as a result of the failure to achieve the milestones that were set forth in

34

the plan and that was continued from time to time after that, as a result of that, because the plan

support agreement was terminated by LBAC, it was permissible for LBAC to withdraw its

bid").) SPSO did not have an affirmative obligation to pursue any litigation, let alone meritless

litigation.

55.    Throughout their pleadings both the Ad Hoc Secured Group and the

Debtors continuously repackage the claims set forth above and others to fit whichever remedy

they seek at the time.  As such, throughout this responsive pleading, SPSO responds to such

allegations in their recycled forms as they arise.  Nevertheless, statutes should be interpreted so

as to avoid rendering any provision superfluous or unnecessary.[58]  The Debtors and the Ad Hoc

Secured Group put forth endless attempts to find alternative means to punish SPSO, whether by

classification, designation, disallowance, or otherwise asking this Court to deny SPSO the

protections afforded creditors under section 1129(b) of the Bankruptcy Code.  Section 510(c) of

the Bankruptcy Code would be rendered superfluous if the Plan were permitted to equitably

subordinate SPSO's Claims through (for instance) a discriminatory classification scheme.

**IV.    Separate Classification of SPSO's and other LP Lenders' Claims Violates Section
1122 of the Bankruptcy Code Whether or Not SPSO's Claims are Subordinated.**

A.    *The Plan's Separate Classification Constitutes de facto Subordination*

56.    The Debtors recognize that the Plan's suspect classification scheme is

problematic, and they hope to avoid the issue entirely by pushing the Court to enforce a drastic

equitable remedy.  They argue that "upon subordination of SPSO's claims, any issues raised by

SPSO with respect to separate classification would be rendered moot."  (See Debtors' Pre-Trial

Br., p. 6.)  In addition, although the Debtors were permitted to continue to develop the equitable

---

[58]    Jacob Scott, Codified Canons and the Common Law of Interpretation, 98 Geo. L.J. 341, 363 (2010) ("The
rule to avoid surplusage is another broad coherence-based common law canon and a close relative of the
whole act rule: interpreters should avoid interpretations of statutes that would render provisions of an act
superfluous or unnecessary.")

35

subordination record at the confirmation hearing, even with the benefit of a second chance to

prove their case, the Debtors failed to establish that SPSO's claims should be subordinated.

B.     **Separate Classification of Identical**
**Claims is not Supported by the Facts of this Case.**

57.   · If *any amount* of SPSO's claims are not equitably subordinated, the Plan's

separate classification of identical claims arising under the Prepetition LP Credit Agreement

violates section 1122 of the Bankruptcy Code.   Separate classification of similar claims is

"permissible only when there is a reasonable basis for doing so or when the decision to

separately classify 'does not offend one's sensibility of due process and fair play.'"   In re

Adelphia Commc'ns Corp., 368 B.R. 140, 246-47 (Bankr. S.D.N.Y. 2007) (citing In re One

Times Square Assocs. Ltd. P'Ship, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993)).

(i)     *SPSO's Affiliation with DISH is*
*Insufficient to Warrant Separate Classification.*

58.     The Debtors arguments in favor of separate classification of SPSO's

identical claims all fail to stand up under scrutiny.  First, citing In re Texas Star Refreshments,

LLC and In re Graphic Commc'ns, Inc., the Debtors' argue that "[c]ourts routinely permit

debtors to separately classify competitors . . . with no attributions to, or focus on, such

competitors' motivations."  (See Debtors' Pre-Trial Br. ¶ 31; Debtors' Post-Trial Br. ¶¶ 153-

157.)  In Texas Star, the court permitted the separate classification of a judgment creditor from

trade creditors because the judgment creditor "reveal[ed] that its real desire and indeed the way

in which it benefits the most is by [the debtor's] liquidation."  Texas Star, 494 B.R. 684, 696

(Bankr. N.D. Tex. 2013).   In Graphics Commc'ns, in the midst of an opinion that *denied*

*confirmation* because the separately classified creditor was treated inequitably, the court did find

that the separate classification of a competitor from unsecured trade creditors was permissible.

However, the *reason* court allowed the separate classification was because the separately

classified creditor was a *lender*, a relationship that is easily distinguishable from that of a *trade creditor*: "[Subject creditor] made the loans to the debtor because of their close business relationship at the time. The debtor needed money to pay operating expenses. *This is somewhat different from the usual situation with trade creditors* who advance goods and services that the debtor needs to operate." Graphics Commc'ns, 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996) (emphasis added). The Debtors' bold assertion that precedent exists to separately classify competitors *holding identical claims* is flat wrong.

<div align="center">

(ii)  *SPSO is not a Strategic Competitor and Cannot be Separately Classified on that Basis Alone.*

</div>

59. Next, the Debtors argue, relying on one case from the Northern District of Texas, that "strategic competitors" may be separately classified.[59] (See Debtors' Post-Trial Br. ¶¶ 158-160; Debtors' Pre-Trial Br. ¶ 33.) In In re Premiere Network Services, Inc., a bankruptcy court permitted the separate classification of one trade creditor from the rest, because "evidence presented to the [c]ourt show[ed] that [subject creditor] directly competes with the Debtor and will likely continue to compete with the successor to the Debtor under the Plan. Thus . . . [subject creditor] will benefit from the rejection of the plan and failure of the Debtor's reorganization." In re Premiere Network Srvs., Inc., 333 B.R. 130, 135 (Bankr. N. D. Tex.

---

[59] The other "strategic competitor" case relied upon the Debtors, In re Foxridge Ltd. P'ship., concerned the separate classification of two limited partners who were competing over the control of the debtor. The court first denied plan proposals that left open the possibility that both limited partners would retain their partnership interests post-bankruptcy, because the court found that such plans were "not feasible" by not offering a reasonable prospect of success due to the litigious history of the limited partners. Instead, the court confirmed a plan that separately classified the two competing limited partners from the other partners, and mandated that the competing partner that did not prevail at a planned auction would be forced to sell his interests to the other (the other limited partners could choose between selling or retaining their interests). See In re Foxridge P'Ship, 238 B.R. 810, 813-14, 817-18 (Bankr. W.D. Mo. 1999). The separate classification of partnership interests held by individuals preparing to participate in an auction for the another partner's interests has no bearing on whether it is appropriate to separately classify SPSO's secured claims from identical claims held by other lenders.

2005).  Among other evidence, the <u>Premiere</u> court noted that the debtor and the separately classified trade creditor "directly compete[d] for customers." <u>Id.</u> at 132.

60.    The rationale of <u>Premiere</u> is inapplicable to the facts of this case.  SPSO — a special purpose vehicle which the Debtors argue is a mere "shell" entity — has no ability to compete with LightSquared.  (SPSO FOF ¶¶ 97-98.)  SPSO has no customers, it has no operations.  It is not a business, it is a special purpose vehicle formed to make debt investments. (SPSO FOF ¶¶ 97-98.)  There is no evidence that SPSO ever interfered with LightSquared's (minimal) operations from the time it started purchasing LightSquared debt to the present day. SPSO never made a request of the Prepetition LP Agent or the Debtors for confidential information.  As a result, LightSquared has not even alleged that SPSO ever leveraged its position as lender to extract confidential information pertaining to LightSquared on behalf of DISH. SPSO simply cannot compete with LightSquared.  (SPSO FOF ¶¶ 97-98.)

61.    The Debtors contend that the fact that SPSO has pointed out the various problems with LightSquared's spectrum and valuation — numerous interference issues and reliance on the use of the NOAA block that is anything but certain — shows that SPSO has "ulterior motives."  (Debtors' Post-Trial Br. ¶ 25.)  SPSO raises these points merely to establish that it will not receive value as the holder of a silent third lien in a company that is destined to fail.  (SPSO FOF ¶ 101.)  There is no motive here other than obtaining fair and equitable treatment.  (SPSO FOF ¶¶ 277, 287.)  Any creditor forced to accept a third lien backed by encumbered and impaired assets would justifiably make the same arguments.

62.    The Debtors' CEO's self serving testimony with respect to Carlos Slim's potential presence in LightSquared's capital structure, uttered for the first time at the confirmation hearing, is revealing. (Smith, 3/20/14 Hr'g Tr. 25:2-26:4.) The Debtors and the

38

Plan Support Parties are not separately classifying SPSO to keep Mr. Ergen out of the capital structure — apparently they aren't bothered if a notorious corporate raider that owns telecommunications assets buys their debt. Instead, the Plan separately classifies SPSO solely to impose discriminatory treatment.

63.    None of the cases cited by the Debtors indicate that a court should separately classify a creditor because it is an affiliate of an entity that may, at some point in time, compete in some unspecified manner with the debtor. In sum, the Debtors' argument that SPSO should be separately classified as a competitor of LightSquared rests on two cases from the Northern District of Texas (Texas Star and Premiere) that permitted the separate classification of a judgment creditor from trade, and the separate classification of a direct competitor holding trade claims from the remainder of the trade creditor body. Both cases relied on specific evidence that the separately classified creditor desired to force a liquidation. Unsurprisingly, the Debtors were unable to cite to one case where lenders holding identical secured claims were successfully separately classified.

64.    Moreover, when the Debtors' explain the rationale behind the "strategic competitor" justification for separate classification, their self-serving testimony exposes the fact that the remedy (to the extent it is viable at all) doesn't fit the facts of this Plan. When asked to explain SPSO's separate classification, Mr. Smith replied that: "it's important to us as a business, as an ongoing concern, that we be able to compete freely in the marketplace and that we are not obligated to share certain information to one of our competitors." (Smith, 3/20/14 Hr'g Tr. 21:21-25.) Mr. Smith elaborated by analogy to a proposed Sprint deal from 2011, where he had to share information with his lenders: "We had to seek [the lenders'] approval . . . so that we could actually enter into that agreement. That's a situation and an example that I would not want

39

a competitor to know what we were doing before we did it." (Id. at 28:19-22.) The Debtors'
Pre-Trial Brief similarly argues that separately classifying SPSO "is the only way to protect
LightSquared's stakeholders from the aggressive tactics employed by competitors such as SPSO
and the other Ergen Parties." (Debtors' Pre-Trial Br. ¶ 32.)[60] But the Plan separately classifies
SPSO *to keep them in the capital structure*, while the lenders holding identical claims are paid in
full and exit the capital structure *immediately*.[61] The Debtors are not forthright when they argue
that SPSO is separately classified in the Plan because its affiliate may be a "strategic
competitor." If that were truly the motivation for separately classifying SPSO's claims, SPSO's
treatment would be very different, and certainly would not include any piece of the reorganized
company's capital structure. But the Plan accomplishes the exact opposite of what the Debtors
claim they are trying to do — it keeps SPSO in the capital structure for seven more years.

65.    Even if the competitor justification did justify separately classifying
SPSO's claims, section 1122 certainly does not justify subordinating SPSO's resulting recovery.
Though SPSO's stated preference is ratable treatment, SPSO would entertain an offer that
exchanges its senior secured claims for first priority NewCo debt, with a market first lien debt
instrument that is narrowly drafted to address the Debtors' concerns (i.e., limited information
rights, and no board or operating controls) but otherwise contains appropriate non-operational
covenants and defaults (e.g., limitations on senior indebtedness). Were the Debtors willing to
negotiate on that basis, it would solve several of the Debtors' problems. SPSO could consent to
disparate treatment under section 1123(a)(4) of the Bankruptcy Code and obviate the need to

---

[60]

[61]    SPSO would gladly accept payment in full, and walk away from these cases today.

wage a cram down fight that can't be won.  The debtors could satisfy their claims despite being

unable to raise any more cash in the market, and finally, and most importantly, such a construct

would effectively give the Debtors $1 billion of postpetition financing *without onerous break up*

*or commitment fees*.  If such a proposal cannot gain any traction, it's because the Debtors'

investors must agree that there is a significant risk for any holder of debt beyond the first $2.2

billion.

<div align="center">

(iii)    *"Necessity" Is Not a Legitimate*
*Reason to Separately Classify Creditors.*

</div>

66.    Last, the Debtors argue based on dicta alone that creditors may be

separately classified based on "necessity."  (See Debtors' Post-Trial Br. ¶¶ 161-162.)  For this

argument the Debtors cite to a Charter Communications opinion that approved the separate

classification of noteholders' claims (32.7% recovery) from general unsecured claims (100%).

In Charter the court found the noteholders' argument "regarding unfair discrimination . . . weak

to the point of being meritless" because (among other factors distinguishing the notes from

general unsecured claims) the notes were convertible to equity and structurally subordinated to

debt of other subsidiaries and the noteholders enjoyed an alternate source of recovery from the

debtors' parent.  JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re

Charter Commc'ns), 419 B.R. 221, 267 (Bankr. S.D.N.Y. 2009).  In Charter the court recognized

that *even if* the claimants were similarly situated, the "disparate legal rights of each class"

(including the debtors' obligation to indemnify certain general unsecured creditors) would have

justified the discriminatory treatment.  To contrast, here, the Debtors attempt to separately

classify (and discriminate against) SPSO's claims, which are *identical* to those of the other LP

lenders.  The Debtors also cite to dicta in the Texas Star case where, as noted above, the court

approved separate classification of a judgment creditor from trade creditors because the

<div align="center">41</div>

judgment creditor was trying to force a liquidation. Texas Star, 494 B.R. at 696. Contrary to the

Debtors' mischaracterization of the case, the Texas Star court considered the fact that the debtor

could not raise capital sufficient to pay off the judgment creditor as evidence of the judgment

creditor's preference for liquidation — *not* as a legitimate justification for discriminatory

treatment of the judgment creditor's claims. See id. Of course the Debtors could not cite any

case law that permits discriminatory treatment of *identical claims* out of "necessity." Taken to

its logical conclusion, that argument would allow plan proponents to pay whatever they felt like

to whomever they deemed worthy, and would render the entire priority scheme of the

Bankruptcy Code meaningless.

C.    *Separate Classification May Not be Utilized to Mistreat a Creditor.*

67.    Testimony confirms that the Plan Support Parties conceived a plan that

separately classifies SPSO's Claims in order to discriminate against SPSO and Charlie Ergen,

and the company was happy to go along for the ride.  (See Hootnick, 3/24/14 Hr'g Tr. 111:25-

112:3 ("Q. And you agree that the third plan reflects an assumption that SPSO should be treated

differently because it's a bad actor, in part? A. Yes, and because they're a competitor.");

Falcone, 3/31/14 Hr'g Tr. 45:6-10 ("Q. Right. And what you're suggesting is, if he doesn't like

that term of the plan, he should negotiate a term which puts the LP preferred ahead of SPSO in

the capital structure? A. Well, I didn't think Charlie should be there to begin with, so it was

irrelevant to me."); SP337 (distinguishing the "GOOD GUYS LPS" from Mr. Ergen and SPSO).

However, the case law is clear that separate classification may not be used to discriminate.[62]

---

[62]    That the Debtors are motivated purely by animus in these cases was once again demonstrated when SPSO's
counsel had to request multiple times over the course of several weeks for information regarding a
customer contract that was recently re-negotiated.  Rather than answer SPSO's simple questions as to the
net effect of the renegotiated contract on the Debtors' business, the Debtors decided to hand over a copy of
the contract that redacted all material business terms.  Then, in open Court, Debtor's counsel announced he
wouldn't divulge any more information unless SPSO filed a motion.  After SPSO took him up on his offer,
a phone call was arranged with LightSquared operations representatives and the issue was resolved in a

68.    The Debtors once again cite to <u>Texas Star</u> and <u>Graphics Commc'ns</u> to support the following proposition: "a survey of the plan treatment provided to separately classified competitors reveals that . . . separately classified competitors typically receive *less* favorable treatment." (Debtors' Pre-Trial Br. p. 21 n. 27 (emphasis in original).) That is incorrect. In <u>Texas Star</u>, the court noted that "separate classification has clearly not been used a means to mistreat." 494 B.R. at 696. Moreover, in <u>Texas Star</u>, the separately classified creditor would be paid in full following receipt of a balloon payment in the 84th month, while the unsecured creditors with whom the subject creditor argued it should have been classified received payment over a much longer 120-month term. See <u>id.</u> at 688, 696.

69.    The Debtors' reliance on <u>Graphics Commc'ns</u> cannot be explained, and, unfortunately for the Debtors, is directly applicable here. The <u>Graphics</u> court *denied confirmation* because the plan *unfairly discriminated* against the separately classified creditor by providing it with a 10% recovery, while general unsecured creditors were paid 100% on their claims. 200 B.R. at 148-49 (emphasis added). In a portion of the opinion remarkably on point, the court noted that the "circumstances of [the] case suggest the discriminatory treatment of [the separately classified creditor] furthers [the plan proponent's] personal animosity against the [separately classified creditor]." <u>Id.</u> at 149. Just as the <u>Graphics</u> court denied confirmation, this Court must do the same.

---

fifteen minute phone conversation. That the Debtors opted to be adversarial for no reason, and cause SPSO to incur additional expenses and burden this Court with an unnecessary pleading is telling. The Debtors' true motivations were revealed when they then turned around and tried to use SPSO's motion (which Debtors' counsel instructed SPSO to file) as evidence of SPSO's bad faith. (<u>See</u> Debtors' Post-Trial Br.¶ 26).

D.  *Even if Fully Subordinated, the*
*Plan's Classification Violates the Bankruptcy Code*

70.    Even if SPSO's claims are fully subordinated, and its liens are stripped, the Debtors have the burden of showing a reasonable basis to separately classify SPSO's subordinated claims from then-similarly situated general unsecured creditors (who are being paid in cash, in full, on the Effective Date). The Debtors have offered nothing in this regard except for the conclusory footnote on page 6 of the Debtors' Pre-Trial Brief cited above. (See supra Section IV.A)

V.    **The Court Lacks Jurisdiction to Confirm a Plan that Rewrites the Prepetition LP Credit Agreement by Circumventing the Sharing Provision**

71.    Confirming the Plan requires the Court to step outside its jurisdiction and re-write, or more specifically delete, the Sharing Provision of the Prepetition LP Credit Agreement in order to facilitate the unequal distributions to Prepetition LP Lenders. The Prepetition LP Agent apparently refused to do what the Debtors now ask of the Court. (See Docket No. 1336, Ex. A-2 (Plan Blackline) at § VI.F.6 (language providing that distributions on account of Prepetition LP Facility Claims would be made "at the direction of the LP Agent" deleted).) In Stern v. Marshall the Supreme Court held that bankruptcy courts lack jurisdiction to adjudicate inter-creditor disputes that cannot be resolved in the context of ruling on a creditor's proof of claim. See Stern v. Marshall, 131 S. Ct. 2594, 2611 (2011). Here, the proposed Plan mandates that funds be distributed in violation of an agreement between non-debtor parties. Were the Court to enter the confirmation order, the Court would be dictating the outcome of a dispute that is purely between non-debtors.

72.    The Debtors' attack on SPSO's citation to Bank of Am., N.A. v. Lightstone Holdings, LLC (In re Extended Stay Inc.), 418 B.R. 49 (Bankr. S.D.N.Y. 2009) is not

warranted.[63]   In that case, Judge Peck ruled that certain disputes between non-debtors, including

contractual disputes relating to prepetition guarantees and tortuous interference claims (among

others) were not core proceedings.  Id. at 57, 60.  That is the proposition for which SPSO cited

the case.  The Debtors, however, focus on a separate holding in the same case where the Court

determined it had jurisdiction to resolve a lawsuit brought by a certificateholder alleging that

certain other holders breached the trust agreement when they negotiated directly with the debtor

rather than operating through the servicer and/or special servicer.  Id. at 56-57.  Judge Peck

remarked that the plaintiffs' admission that it was suing in order to enjoin negotiations with the

debtors was sufficient to find that the dispute was core because it directly impacted the debtor's

plan process.  Id. at 57.  By citing this language from Extended Stay, the Debtors show that they

misunderstand SPSO's jurisdictional argument.  SPSO argues that the Court lacks jurisdiction to

preempt any cause of action that SPSO might assert against ***non-Debtor parties*** under the

Sharing Provision.  Not one of Extended Stay's holdings stand for the proposition that the

bankruptcy court has the jurisdiction to foreclose creditors' state law causes of action against

non-debtors by re-writing prepetition agreements.[64]   Accordingly, the Debtors reliance on

Extended Stay is misplaced.

       73.    Contrary to the Debtors' assertion, section 1123(a)(5)(F) of the

Bankruptcy Code does not permit the modification of the Sharing Provision.  The Debtors cite to

one case to support its novel reading of the Bankruptcy Code's language permitting the

"cancellation or modification of any indenture or similar instrument."  11 U.SC. § 1123(a)(5)(F).

---

[63]   The Debtors inexplicably state that SPSO relies on Extended Stay as "its shining example."  (See Debtors' Pre-Trial Br. ¶ 45.)  Extended Stay is cited in [SPSO's Objection] *once* in a string cite preceded by the signal "see, e.g."

[64]   In any event, Extended Stay was decided prior to Stern v. Marshall, which necessary overruled Extended Stay insofar as its holdings were inconsistent with those of the Supreme Court's later decision.

12-12080-scc    Doc 1517    Filed 04/27/14    Entered 04/27/14 01:48:26    Main Document
Pg 56 of 158

In <u>In re City of Colorado Springs Creek Gen. Imp. Dist.</u> the court confirmed a plan that restructured a municipality's bond indebtedness by paying cash proceeds of a letter of credit to holders of bonds with near term maturity, and issuing replacement bonds to holders of longer maturity bonds. The case is easily distinguished by noting that under the indenture the holders of long term bonds had no basis to object to such treatment if agreed between the municipality and the trustee. See <u>In re City of Colorado Springs Creek Gen. Imp. Dist.</u>, 187 B.R. 683, 692 (Bankr. D. Col. 1995). By contrast, here, the Sharing Provision requires ratable distributions to protect individual lenders, and any violation could give rise to a breach of contract claim for an aggrieved lender.[65]

74.    Finally, the Debtors try to dismiss SPSO's due process concerns regarding the Plan's modification of the Sharing Provision by arguing that SPSO is clearly aware of the Plan's intended effect, and by participating in the confirmation hearing, SPSO has "ample time to air its concerns." (Debtors' Pre-Trial Br., p. 29 n.36.) The Debtors confuse an opportunity to be heard with respect to confirmation on the one hand, with the Plan's automatic deprivation of SPSO's property on the other. The confirmation hearing is not a trial on the merits of SPSO's claims against non-debtor third parties (nor could it be). Moreover, there is no remedy available (short of denying confirmation) that will preserve SPSO's right to its property. For instance, it will not suffice if the Court modifies the Plan releases so that rejecting parties are not compelled to grant them (as SPSO argues the Court should in Section XIII below). If the Plan is confirmed,

---

[65]    The Debtors also cite to <u>In re Federal-Mogul Global, Inc.</u>, which involves section 1123(a)(5)(B), not 1123(a)(5)(F). See <u>In re Federal-Mogul Global, Inc.</u>, 684 F.3d 355, 370 (3d Cir. 2012). In that case, the Third Circuit determined section 1123(a)(5) permitted the Court to confirm a plan that created a channeling injunction and assigned proceeds of the debtors' asbestos insurance policies to a § 524(g) trust. <u>Federal-Mogul</u>, which stands for the proposition that claims against the debtor can be channeled to a trust funded by the debtor's insurance policies (notwithstanding the policies' anti-assignment provisions), **does not** support a reading of section 1123(a)(5)(F) of the bankruptcy code that would permit the Court to re-write the Prepetition LP Credit Agreement to foreclose valid causes of action SPSO may hold against non-debtor parties.

the damage will be done without SPSO receiving due process of law prior to the deprivation of claims SPSO may hold against other prepetition LP lenders. Importantly the Debtors ask the Court to make the modification of the Sharing Provision binding before the Plan goes effective to facilitate distributions within fifteen days of confirmation to the non-SPSO LP lenders. Thus, even if the Plan is never consummated, the damage will have been done.

## VI.    The Payments to be Made Under the Plan are Unreasonable.

75.    The Plan fails to satisfy the mandate of section 1129(a)(4) of the Bankruptcy Code that "[a]ny payment made or to be made . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan . . . [must be] approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). The Court should not approve the Plan Support Break-Up Fee, because it is not reasonable, and the Plan should not provide for the payment of pre-Effective Date fees and expenses of estate professionals without Court review.

76.    The Debtors attempt to justify the $100 million break-up fee by arguing that it is only earned upon an actual outlay of funds from the DIP Lenders for immediate use pursuant to the Plan. (See Debtors' Post-Trial Br. ¶ 224.) The Debtors go so far to argue that "LightSquared should only be so lucky to find itself in the highly unlikely position of having to pay the Plan Support Party Break-Up Fee because that necessarily means that an outcome even more beneficial to all stakeholders was realized." (Debtors' Pre-Trial Br. ¶ 63; Debtors' Post-Trial Br. ¶ 225 (same).) Again, this is not true. After the $100 million break-up fee is "earned," the New DIP Lenders will have the right to walk away from their commitments and exercise remedies upon the occurrence of one of the more than 25 Events of Default in the New DIP Credit Agreement. Melody and Centaurus argued that SPSO misreads the Plan, because the break-up fee is only payable if the Debtors: (a) propose or support a plan other than the current

47

Plan, (b) withdraw the Plan or propose a modification without the prior written consent of the each New DIP Initial Lender, or (c) a chapter 11 Plan other than the Plan is confirmed. (See Joinder of Centaurus Capital LP and Melody Business Finance, LLC to the Debtors' Pre-Trial Brief [Docket No. 1414]; Plan, Article I.A.202 (definition of "Plan Support Party Break-Up Fee").) This does not solve the problem. If the New DIP Facility is terminated by the New DIP Lenders upon a technical Event of Default, that will force the Debtors to seek confirmation of a different plan. As the testimony of Mr. Hootnick (cited by the Debtors in their post-trial brief) ably demonstrates: "[Payment of the Plan Support Party Break Up Fee] also requires that the debtors' board of directors determine not to move forward with the existing plan. In order for that to happen, something game-changing must occur, and the board will consider the payment of the break-up fee in making its decision at that point in time." (Hootnick, 3/24/14 Hr'g Tr. 47:7-12.) The DIP lenders' decision to terminate the New DIP Facility would certainly be a "game-changing" event that forces the board to move in another direction *and* pay the break-up fee. The Debtors should explicitly clarify that no break-up fee shall be payable if the New DIP Facility is terminated by the Plan Support Parties.

77.    It is also fair to question the purpose of the Plan Support Party Break Up Fee. As the Debtors and the DIP lenders have both argued, the fee is only earned following funding. The New DIP Lenders, therefore, are willing to *commit* to fund the New DIP Facility (and indeed already have), without the payment of any fee. Instead, the fee is intended (in the words of the Debtors) to compensate the lenders for "substantial contributions being made, and significant risks being assumed." (Debtors' Pre-Trial Br. ¶ 63.) The Debtors likewise argue that the fee is reasonable "given the significant consideration . . . being provided (and the attendant risks being assumed)." (Debtors' Post-Trial Br. ¶ 224.) First, the New DIP Facility bears

interest. Is it not the fundamental nature of a credit agreement that accruing interest compensates the lender for the risk undertaken in extending the loan? In addition, what is so risky about the New DIP Facility? If the Plan is not consummated, the DIP Lenders can terminate their commitments, and they will hold senior super-priority liens and claims. If the Plan is consummated, approximately 90% of the Plan Support Parties' investment will be converted to secured debt with payment priority over the SPSO Note on the Effective Date. It is noteworthy that the Debtors consider a $1.65 billion loan, with super-priority liens and claims and short-term maturity, *significantly risky*, but argue that the *silent* SPSO Note, behind *at least* $2.2 billion of senior debt, and payable over the course of *seven years*, is "payment in full," *and* that such treatment is not discriminatory in comparison to payment, in full, in cash, *prior to the Effective Date*. If the SPSO Note bears the same risk profile as payment in cash fifteen days after confirmation, then the New DIP Facility, which will be converted to debt *senior* to the SPSO Note, surely bears no risk at all. To compensate that "risk" the Plan promises an unconscionable $100 million fee.

78.    The Plan's proposed Break Up Fee is over *6%* of the Plan Support Parties' New DIP Facility commitments. Yet, just a few months ago, the Debtors filed an objection to bid protections because a *3%* break up fee would "chill bidding," was not "actually necessary to preserve the value of LightSquared's estates," and "would only serve to provide a windfall to [the stalking horse purchasers]."[66] The Plan Support Parties' break-up fee supports a smaller commitment and is double the proposed break up fee the Debtors previously found

---

[66] See *LightSquared's Omnibus Objection to (I) Bid Procedures Motion of Ad Hoc Secured Group of LightSquared LP Lenders and (II) Bid Procedures Motion of U.S. Bank National Association and Mast Capital Management, LLC*, Sept. 17, 2013 [Docket No. 847] ¶¶ 61 – 65. After the Debtors objected, the 3% break-up fee was subsequently re-negotiated and *reduced*.

objectionable. By the Debtors' own reasoning, the request for a $100 million break-up fee

should be denied.[67]

## VII.    The Plan Violates Section 1129(a)(7).

79.    The Plan should not be confirmed because it fails to satisfy the "best

interests of creditors" test under section 1129(a)(7). See 11 U.S.C. § 1129(a)(7). SPSO, which

has not accepted the Plan, will not "receive or retain under the [P]lan on account of [SPSO's]

claim . . . property of a value, as of the effective date of the [P]lan, that is not less than the

amount that such holder would so receive or retain if the debtor were liquidated under chapter 7"

of the Bankruptcy Code on the [Effective Date]. 11 U.S.C. § 1129(a)(7); see also Bank of Am.

Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434, 440 (1999). The Plan fails

to satisfy the "best interest" test because the SPSO Note is out of the money and potentially

worthless.

80.    The Debtors' Liquidation Analysis purports to show that the SPSO Note

gives SPSO a 100% recovery on its claims, and projects that SPSO would receive a 42%

recovery in a chapter 7 liquidation. (See PX1097 at 3; Hootnick, 3/24/14 Hr'g Tr. 62:21-

63:16.)[68] The Debtors' assumption that the SPSO Note will provide SPSO with a full recovery is

premised on the Debtors' deeply flawed valuation, which values the Debtors' enterprise at a

range between $6.2 billion and $9.1 billion, with a $7.7 billion midpoint. (See PX1001 at

---

[67]    In addition, SPSO renews its objection that payment of professional fees post-confirmation but pre-
Effective Date should be subject to Court approval. (See Objection of SP Special Opportunities, LLC to
Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code
[Docket No. 1408] ("SPSO Plan Objection") ¶ 39). Notwithstanding the confirmation orders cited by the
Debtors, such a mechanic is inappropriate in this highly contentious case, where there is likely to be
significant professionals' involvement following confirmation.

[68]    Although SPSO is not seeking to convert these cases to a liquidation under chapter 7 of the Bankruptcy
Code, it is not clear why the valuation of LightSquared's assets should be dramatically different as a going
concern versus in a liquidation. The Debtors have no business plan, own raw, unapproved spectrum, and
they have virtually no operations. The Debtors admit that nothing is likely to change prior to the Effective
Date.

GLCAL200006391.)  As discussed below, this valuation is based on unrealistic assumptions about spectrum availability and value.  (See infra Section X.A.)  In reality, the Debtors' actual total enterprise value is no more than $4.6 billion, even when adopting certain conservative, Debtor-favorable assumptions.  (See SPSO FOF ¶ 256; Reynertson, 3/27/14 Hr'g Tr. 169:10-170:2; 161:11-162:6; 172:2-9; 225:18-22.)  Moreover, this $4.6 billion upper limit does not account for liabilities necessary to (a) acquire spectrum LightSquared does not own and (b) utilize the spectrum it does own (the "**Spectrum Liabilities**").  As Mr. Reynertson testified at trial, these Spectrum Liabilities include amounts owed under the Inmarsat lease, amounts necessary to purchase the Crown Castle spectrum, payments to NOAA, and satellite liabilities. (Reynertson, 3/27/14 Hr'g Tr. 172:13-173:6).  After taking into account the Spectrum Liabilities, the Debtors' total enterprise value as of the Effective Date will only be approximately $2.1 billion to $3 billion.  (Reynertson, Hr'g Tr. 172:10-173:9; SP158 ("**GLC Report**") at 16.)

81.    The Debtors' Liquidation Analysis assumes that the amount of the Prepetition LP Facility SPSO Claims will be determined as of March 31, 2014, with default interest accrued through the pendency of the Debtors' cases.  (See PX1097 at 3, n.6.)  The value of SPSO's claims at the Effective Date, calculated in accordance with the assumptions in the Liquidation Analysis, are approximately $1.1055 billion.  According to the Plan, the Debtors propose to put, at a minimum, $2.2 billion of debt ahead of the SPSO Note in the capital structure.  Based on a likely range of $2.1 to $3 billion total enterprise value for the Debtors, net of the Spectrum Liabilities, the SPSO Note is entirely out of the money—i.e., worthless—at the low end, conservative valuation.  Thus, the SPSO Note will provide SPSO with a recovery that is far less than the 42% recovery the Debtors project in the Liquidation Analysis.

82.    The 42% liquidation recovery projected in the Debtors' Liquidation Analysis further assumes that SPSO's claims will be subordinated in full to the other Prepetition LP Facility Claims in a chapter 7 liquidation. (See PX1097 at 3-4 n.6.)  As the Court is aware, no subordination of SPSO's claims has been ordered by the Court (and SPSO submits that there is no basis for any such relief).  To the extent that SPSO's claims are not subordinated, as the Debtors note, "the Prepetition LP Facility SPSO Claims will receive a higher cash return by virtue of the treatment of their claims on a *pari passu* basis with the Prepetition LP Facility Non-SPSO Claims."  (Id.)  The Liquidation Analysis reflects that the Prepetition LP Facility Claims are the "fulcrum" class in a liquidation and would receive all residual value in the LP Assets, with no value remaining for junior stakeholders.  Because such claims are owned approximately 50% by SPSO and 50% by non-SPSO lenders, the blended recovery to holders of Prepetition LP Facility Claims would be approximately 71%.[69]  (See Debtors' Post-Trial Br. ¶ 114 n.47; See also Hootnick, 3/24/14 Hr'g Tr. 63:17-64:3 ("I think the recovery to the LP credit facility would be seventy-one percent").)  Even with the upside-case valuation scenario—a $3 billion enterprise valuation, net of the Spectrum Liabilities—assuming the minimum amount of senior debt ($2.2 billion), there would be approximately $810 million of residual value in the Debtors' assets after taking into consideration the senior debt.  That residual value would result in the SPSO Note having an implied value of 73% as of the Effective Date.  But, because the postpetition debt PIKs, it grows rapidly, and absent a commensurate drastic increase in the value of the collateral, the Plan fails to provide better value to SPSO than does a liquidation.

83.    No matter how flawed, the Liquidation Analysis confirms that SPSO would not only recover something in the event of a liquidation but something far more certain.

---

[69]    The approximate blended recovery is calculated as follows:  (.50)(100% projected recovery to non-SPSO lenders) + (.50)(42% projected recovery to SPSO) = 50% + 21% = 71%.

In a Chapter 7 liquidation scenario, SPSO would not have to worry about any artificial classification scheme that found a way to pay junior equity cash while reinstating senior secured debt. In every liquidation, cash must flow to secured creditors before it flows to junior equity. In a liquidation, SPSO would not have receive a speculative instrument, contingent on uncertain FCC prospects, while junior stakeholders exit with cash. Indeed, Mr. Hootnick testified that the Debtors' Liquidation Analysis assumes no FCC approval, which results in a lower return for the assets: "a true distressed sale being administered by a Chapter 7 trustee, without any real clarity on the FCC and regulatory issues facing the company, would result in a significantly diminished return on the assets." (Debtors' Post-Trial Br. ¶ 114; Hootnick, 3/27/14 Hr'g Tr. 63:13-16.) If a distressed sale today cannot cover the current *lighter* debt burden, a distressed sale following confirmation (when the Debtors will be carrying *more* debt than they are today) will bring even worse results. The situation is even bleaker following the Effective Date, when LightSquared's outstanding debt balloons to its highest levels since prior to the bankruptcy cases (and then *continues* to grow even higher as interest is paid-in-kind thereafter). But the Debtors have not proven that they will receive the license modifications necessary to increase the value of the assets, they just assume that they will. (See infra Section X.A.) Thus, even if the Plan is confirmed, there is no guarantee that the assets will be worth what the Debtors contend. The Plan fails to satisfy the "best interests" test under Section 1129(a)(7) with respect to SPSO and cannot be confirmed.

## VIII.  The Plan does not Pay All Administrative Claims in Full, Violating Section 1129(a)(9) of the Bankruptcy Code.

84.    SPSO renews its objection that the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code for failure to pay certain administrative claims in cash on the Effective

Date.[70] The Debtors should not be permitted to justify the non-payment of administrative claims by asking the Court to rubber stamp the Debtors' *a priori* assessment of the merits of a hypothetical litigation over whether certain administrative claims are payable.

## IX.    No Impaired Class has Voted to Accept the Plan.

85.    The Plan does not impair general unsecured creditors, and separately classifies SPSO's claims from those of the other Prepetition LP Lenders in order to gerrymander an impaired accepting class. Therefore, the Plan fails the Bankruptcy Code's requirement of at least one impaired accepting class. See 11 U.S.C. § 1129(a)(10).

86.    The Inc. General Unsecured Claims and the LP General Unsecured Claims are not impaired. Both will receive the full principal amounts of their claims on the Effective Date of the Plan. Section 502(b)(2) of the Bankruptcy Code explicitly prohibits the allowance of "unmatured" (i.e. postpetition) interest. 11 U.S.C. § 502(b)(2).[71] Therefore, general unsecured creditors are being paid the full allowed amount of their allowable claims on the Effective Date, and are not impaired. See, e.g., Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 205 (3d Cir. 2003) (rejecting argument that landlord was impaired because of imposition of section 502(b)(6) cap on lease rejection damages because "the Bankruptcy Code, not the Plan, [was] the only source of limitation" on the landlord's rights).

---

[70]    See SPSO Plan Obj. ¶ 46.

[71]    While section 502(b)(2) provides that the *allowed amount* of a claim cannot include postpetition interest, postpetition interest is required to be paid *on* such an allowed claim before distributions can be made to equityholders under section 726(a)(5) of the Bankruptcy Code, made applicable in chapter 11 cases by the "best interests" test of section 1129(a)(7). See Kitrosser v. CIT Group/Factoring, Inc., 177 B.R. 458, 469 (S.D.N.Y. 1995) ("Section 726(a)(5) provides that in a Chapter 7 liquidation proceeding, prior to funds being returned to the debtor, unsecured creditors are afforded the right to 'payment of interest at the legal rate from the date of the filing of the petition.' Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings, see 11 U.S.C. § 103(b), Section 726 does apply through the requirements of Section 1129.") (citations omitted).

87.    The Debtors countered this argument by citing one sentence of a Supreme Court decision out of context. (See Debtors' Pre-Trial Br. 53, n. 51 (citing Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co., 549 U.S. 443, 450 (2007)).)  The Court's Travelers opinion does not discuss impairment (the word "impair" does not appear in the text); nor is the opinion otherwise applicable by analogy.  In Travelers, the Supreme Court held that section 502(b) did not preclude an unsecured creditor's claim for attorneys' fees, and the lower court erred when it disallowed that claim based on a common law rule that lacked textual, Bankruptcy Code support. Travelers, 549 U.S. at 449-54. The case is inapplicable to whether or not general unsecured creditors are impaired by the Plan.  Section 502(b)(2) *does* explicitly prohibit the allowance of claims for unmatured interest.  Therefore, payment to general unsecured claimants of the full principal amount of their claims *is* payment of the full allowed amount of such claims, and renders general unsecured claims unimpaired.

88.    The Court should find that the Debtors cannot rely on either the "acceptance" of a gerrymandered class,[72] or the acceptance of unimpaired general unsecured creditors in order to demonstrate compliance with section 1129(a)(10) of the Bankruptcy Code.

## X.    The Plan Is Not Feasible.

89.    The Debtors have not demonstrated that confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11).  Indeed, the Plan proposes to

---

[72] Even if the Court determines that the separate classification of SPSO's LP debt claims is appropriate, the class consisting of non-SPSO LP debt claims would still fail to be a valid impaired accepting class. The Debtors have failed to meet their burden of establishing that the "impairment" of the Prepetition LP Facility Non-SPSO Claims is "necessary for economical or other justifiable reasons and not just to achieve a 'cram down'" as is required by the case law. See In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995). The Debtors', Ad Hoc Secured Group's and the Plan Support Parties' invocations of the common interest privilege undermines the Debtors' unsupported statements that: "the Plan Support Parties and the Prepetition LP Lenders (other than SPSO) agreed [on the terms of the Plan] (after highly contentious negotiations.)" (See Debtors' Pre-Trial Br. ¶ 93.)

55

have the Debtors emerge from chapter 11 with even more leverage than they had when they entered, despite the fact that there has been no demonstrable positive change in the Debtors' regulatory process or business prospects suggesting that the Debtors' debt capacity has increased.

90.    The evidence adduced at the confirmation hearing demonstrated that the Plan is not feasible for three primary reasons:  (a) the Debtors' own valuation, on which the viability of their proposed capital structure depends, is deeply flawed, and a realistic valuation makes clear that the Debtors will not be able to service or repay the billions of dollars of new debt contemplated by the Plan; (b) the Debtors' own financial projections demonstrate that the company will run out of cash within two years; and (c) though the occurrence of the Effective Date is no longer dependent on a full regulatory victory prior to emergence, it is still subject to a number of contingencies that leave serious doubt as to whether the Effective Date will ever occur. Because the Plan is not feasible, it cannot be confirmed.

A.    *LightSquared's Proposed Capital Structure Is Based On A Flawed and Highly Speculative Valuation.*

91.    Under any realistic valuation of the Debtors' assets, the capital structure proposed by the Plan is unsustainable.  Specifically, the Plan contemplates that LightSquared will emerge from bankruptcy with $3.3 billion of debt, which will grow to at least $7.3 billion in principal amount at maturity of the SPSO Note in seven years. (SPSO FOF ¶ 260; GLC Report, p. 21.)  The Debtors claim that this capital structure is viable based on Moelis' $6.2 to $9.1 billion enterprise valuation.   That valuation, however, is based on numerous unfounded assumptions, the most notable of which is that "the Debtors receive FCC approval of its pending license modification application resulting in 30 MHz of spectrum fully usable for terrestrial mobile broadband services effective as of December 31, 2015" as well as "FCC approval of an

56

additional 10 MHz of fully usable terrestrial spectrum in approximately seven years covering the

U.S." (PX1001 at GLCAL200006383.)

92.    Mr. Hootnick relied on Mr. McDowell's opinions regarding the timing and

outcome of the license modification. (Hootnick, 3/24/14 Hr'g Tr. 79:10-22, 80:3-12, 89:2-5.)

Mr. McDowell had no legitimate basis for his opinion regarding if or when the modifications

would be granted. (SPSO FOF ¶¶ 155-159.) Mr. McDowell claimed that his opinion was based

on (a) conversations with LightSquared executives, (b) a review public documents, and (c) his

own experience. (McDowell, 3/19/14 Hr'g Tr. 75:10-18.) However, LightSquared's executives

and Special Committee were specifically told by the FCC in December 2013 that the FCC could

not state whether or when the modification would be granted and further indicated that the FCC

would likely auction the NOAA spectrum, rather than engage in LightSquared's preferred swap

transaction. (SPSO FOF ¶¶ 161-62; Smith, 3/20/14 Hr'g Tr. 222:4-223:9; Rogers, 3/19/14 Hr'g

Tr. 40:9-41:1, 51:5-17, 52:8-23.)[73] Mr. McDowell could hardly have a full understanding of the

issues plaguing LightSquared's spectrum from his review of public documents, since he did not

even consider ████████████████████████ in jumping to his conclusion that the

modification will be granted. (McDowell, 3/19/14 Hr'g Tr. 105:13-106:10)[74] And with respect

---

[73]    When it comes to their own compensation, LightSquared's executives are considerably less bullish on FCC
prospects. On March 11, 2014, the Debtors filed a motion to "amend and extend" their key employee
incentive plan, by *removing* the plan's FCC regulatory objectives from the enumerated incentives. If
regulatory approval was 100% guaranteed, there would be no reason to remove regulatory objectives from
an incentive plan. See *LightSquared's Supplement to Motion for Entry of Order Authorizing LightSquared
to Modify and Extend Existing Key Employee Incentive Plan*, Mar. 11, 2014 [Docket No. 1390] ("**KEIP
Motion**"); see also SPSO's objection to the KEIP Motion, dated March 25, 2014 [Docket No. 1445].

[74]    Mr. McDowell's credibility was severely undermined by his claim that he considered ████████████,
but that it did not change his opinion (McDowell, 3/19/14 Hr'g Tr. 82-83), because he was crystal clear at
his deposition—and admitted on cross examination at trial—that he did not consider ████████████ in
reaching his conclusions. (McDowell, 3/19/14 Hr'g Tr. 106:4-10.) The Debtors now claim that Mr.
McDowell "considered the issues SPSO raised concerning handset interference." (Debtors' Post-Trial Br. ¶
46.) In light of both Mr. McDowell's contradictory sworn statements, this claim should be given little if
any weight.

to his "experience," Mr. McDowell did not offer any testimony as to why his experience leads

him to believe that the modification will be granted. Mr. McDowell is barred from

communicating with anyone at the FCC and thus did not discuss LightSquared with the FCC.

(McDowell, 3/19/14 Hr'g Tr. 87:1–12.) His *ipse dixit* opinion that the modification will be

granted by December 31, 2015 and the lower downlink cleared for use within seven years of

October 2014 should be given little weight.

93.     In fact, there are numerous reasons why Mr. McDowell's ultimate

conclusion is likely incorrect. First, he testified that the FCC would conduct a public notice and

comment rule-making process in connection with the 5 MHz of NOAA spectrum that

LightSquared proposes to use as part of the 10 MHz of new downlink and confirmed that such a

rulemaking process "can extend for years" especially in "complex circumstances," like the

circumstances in which LightSquared finds itself here. (McDowell, 3/19/14 Hr'g Tr. 94:4-7,

95:8-19.) Mr. McDowell also confirmed that once the FCC starts the notice and comment

process, there would be a public comment period, an opportunity for objections to be filed, an

opportunity to reply to the objections, and then the FCC would consider all of the evidence

before making a determination, all of which "can take years" to complete. (McDowell, 3/19/14

Hr'g Tr. 95:24-96:8, 96:12-14.) Significantly, and despite his certainty that the Debtors would

be approved for 30 MHz of spectrum for terrestrial use by December 31, 2015, Mr. McDowell

testified that "*[y]ou can't know for sure*" how long the FCC's rulemaking process would take.

(McDowell, 3/19/14 Hr'g Tr. 96:20-22 (emphasis added).)

94.     Mr. McDowell also admitted that the FCC may not permit the Debtors to

"swap" the NOAA spectrum and instead submit the spectrum to an auction process, in which

case it would be sold to the highest qualified bidder, which may not necessarily be LightSquared.

(McDowell, 3/19/14 Hr'g Tr. 96:23-97:2, 97:3-8.) If LightSquared was not the winner of the

NOAA auction, it would leave LightSquared with only 5 MHz of downlink, significantly

diminishing the commercial viability of LightSquared's assets. (Hootnick, 3/24/14 Hr'g Tr.

104:5-11 ("Q. And you testified earlier today that in order to have a commercially viable block,

you need at least 10 megahertz in either direction, uplink or downlink? A. No, it's in both

directions. Q. Both directions. And in this analysis [absent NOAA block], you would only have

five of downlink? A. That's correct.").) Moreover, Mr. McDowell testified that the FCC could

"choose to do nothing at all" with respect to the Debtors modification application. (McDowell,

3/19/14 Hr'g Tr. 98:4-6.)[75]

          95.    The FCC's own statements regarding the Application do not provide any

comfort that it will be granted by the end of 2015. Mr. McDowell understood that the FCC had

given LightSquared "no assurances about what its decision would be or the timing of that

decision." (McDowell, 3/19/14 Hr'g Tr. 90:24-91:4.) Indeed, on January 17, 2014, the FCC

filed a statement in this proceeding concerning the FCC Exit Conditions in the Second Amended

Plan, which closely track the elements of the license modification application. (See SP141.) In

that filing, the FCC made clear that it is *"impossible to predict* what decisions the Commission

may reach on these matters." (Id. at 3 (emphasis added).)[76] In other words, the FCC itself

cannot predict whether the Application will be granted. LightSquared's executives and its

Special Committee were told by the FCC in December 2013 that the FCC could make no

commitments regarding the outcome of LightSquared's Application or when such a decision

---

[75]    Mr. McDowell also testified that he believes that "doing nothing is what the government does best."
(McDowell, 3/19/14 Hr'g Tr. at 97:14-23.) He attempted to dismiss his remarks as "flippancy under oath"
(id. at 97:23), but they speak volumes about Mr. McDowell's lack of conviction regarding his own opinion.

[76]    The FCC does not typically file statements such as this one in bankruptcy cases involving companies that
own spectrum assets. See infra ¶ 143.

would be made. (Rogers, 3/19/14 Hr'g Tr. 31:22-32:3; Smith, 3/20/14 Hr'g Tr. 222:12-25.)

Christopher Rogers of LightSquared's Special Committee testified that he came away from the

meeting thinking it was likely that the FCC would auction the NOAA spectrum, rather than

authorize a swap transaction. (Rogers, 3/19/14 Hr'g Tr. 50:2-13.) Mr. Rogers also confirmed

that the FCC never gave an answer as to when they would make a decision regarding

LightSquared's Application or tell LightSquared how much time it would take to complete all of

the regulatory steps that would be required for them to finish their evaluation of the Application.

(Rogers, 3/19/14 Hr'g Tr. 51:5-17.) As Mr. Rogers testified, the FCC is "not in the business of

making promises to people like [LightSquared] about timing." (Rogers, 3/19/14 Hr'g Tr. 31:22-
32:11.)

96.    With respect to interference with GPS devices, Mr. McDowell admitted

that GPS devices serve important national security and defense purposes and, because of that, the

FCC "listens to the GPS industry." (McDowell, 3/19/14 Hr'g Tr. 99:2-24.) He further admitted

that the GPS Innovation Alliance met with the FCC as recently as December 23, 2013 and

informed the FCC that interference issues relating to LightSquared's uplink spectrum have not

been resolved.[77]    (McDowell, 3/19/14 Hr'g Tr. 100:13-23.) Mr. McDowell maintained his

opinion that the license modification was a certainty by the end of 2015 despite acknowledging

that "the core of all spectrum policy at the FCC" is to "prevent harmful interference."

(McDowell, 3/19/14 Hr'g Tr. 98:7-11.)

97.    Though the Debtors would have the Court believe that Mr. McDowell's

opinions regarding FCC approvals is sufficient to support Moelis' assumption that FCC approval

---

[77]    Mr. McDowell testified on direct examination that no petitions to deny LightSquared's modification
application have been filed. (McDowell, 3/19/14 Hr'g Tr. 82:15-21; 86:4-8.) That no petitions to deny
LightSquared's application have been filed is not probative of whether the application will be granted,
because, as Mr. McDowell testified, important stakeholders, including the GPS industry, have continued to
raise issues concerning the terrestrial use of the L-Band spectrum. (Id. at 99:2-24.)

is *a 100% certainty* by December 31, 2015 — the foundation of Moelis' valuation analysis —
the Debtors do not attempt to confront the significant issues with Mr. McDowell's testimony.
(See Debtors' Post-Trial Br. 42-46.) Mr. McDowell himself testified that FCC approval cannot
be guaranteed 100%. (SPSO FOF ¶¶ 155-58, 165; McDowell, 3/19/14 Hr'g Tr. 97:9-13; 102:1-
17)

98.    Mr. Hootnick blindly relied on Mr. McDowell's baseless opinion that the
modification would be granted by the end of 2015. (SPSO FOF ¶¶ 153-54, 165.) Mr. McDowell
and Mr. Hootnick have had exactly one conversation. (Hootnick, 3/24/14 Hr'g Tr. 81:12-14;
McDowell, 3/19/14 Hr'g Tr. 101:5-7.) During that conversation, Mr. Hootnick did not ask Mr.
McDowell if there were any comparable transactions that Mr. McDowell considered in reaching
his view that the license modification application would be granted by the end of 2015.
(Hootnick, 3/24/14 Hr'g Tr. 81:7-11.) Nor did they discuss whether there was any possibility
that the FCC would not grant the license modification. (McDowell, 3/19/14 Hr'g Tr. 102:6-12.)

99.    Mr. Hootnick's testimony underscores that his valuation does not
appropriately account for regulatory uncertainty. Mr. Hootnick testified that his valuation of
LightSquared's assets was "subject to uncertainties and contingencies that are difficult to
predict." (Hootnick, 3/24/14 Hr'g Tr. 93:13-16.) Indeed, he testified that those "uncertaint[ies]
and contingenc[ies]" include whether the FCC will grant the license modification application (id.
at 94:1-5), whether the FCC will grant LightSquared permission to use the NOAA spectrum (id.
at 94:10-12), and whether the 10 MHz of lower downlink will be available within seven years
(id. at 94:6-9). And instead of taking into account the various "interference issues raised by the
GPS industry and the Department of Transportation," Mr. Hootnick's valuation merely assumed
that all such issues would be resolved in the Debtors' favor. (Id. at 94:18-22.) Mr. Hootnick

testified that he "didn't attempt to factor in any of these uncertainties or contingencies" in his valuation of LightSquared's assets. (Id. at 94:23-25.)

100.    The assumptions regarding regulatory approval resulted in Mr. Hootnick and Moelis using a midpoint of $0.75 per MHz POP for 30 MHz (the uplink and New Downlink) based on a comparison to spectrum that is already approved for terrestrial only use.  In contrast, the comparables relied upon by the Debtors in connection with the hearing on the DIP LP Facility in late January, which involved transactions in spectrum, like LightSquared's spectrum, that was *not* licensed for terrestrial-only deployment, imply that the Debtors' U.S. spectrum currently has a value of $0.33 per MHz POP.    (GLC Report, p. 14; SP314 at MOEPLAN0002786.)   At the time, Mr. Hootnick testified that the DIP comparables were appropriate because "plug and play" spectrum was more valuable as compared to spectrum assets that needed work prior to being deployed. (Hootnick, 3/24/14 Hr'g Tr. 95:8-96:7.)  The Debtors have pointed to nothing that has changed in the last two months that would justify such a drastic shift in assumptions, nor is any such change realistically anticipated to occur prior to the Effective Date.  (Hootnick, 3/24/14 Hr'g Tr. 98:6-8 (LightSquared spectrum is still not plug and play.))

101.    Furthermore, the Debtors include value for the NOAA spectrum, which they do not own and may not ever obtain permission to use.  The value to the Debtors of the NOAA spectrum—effectively the key to Debtors' business plans—is underscored by an assessment of a "20x5" network prepared by Moelis, which reflects the uncertainty regarding whether LightSquared will be granted use of the NOAA spectrum.  (SP104; Hootnick, 3/24/14 Hr'g Tr. 103-04.)  Moelis' 20x5 valuation was put together "at the company's request," which indicates that if they were interested in understanding the value of a 20x5 network, not everyone

at the company was so certain that they would be granted the NOAA spectrum. (Hootnick, 3/24/14 Hr'g Tr. 103:18-23.) The 20x5 valuation uses a $.50/MHz POP midpoint valuation and indicates a total enterprise valuation at the high end of $4.4 billion, with a midpoint of $3.6 billion. (SP104.) Mr. Hootnick agreed that "[i]t's a possibility" that LightSquared would not be the high bidder for the NOAA spectrum, yet did not take that into account in his valuation here. (Hootnick, 3/24/14 Hr'g Tr. 104:15-18.)

102.    The Debtors' prior sale process further undermines the credibility of Moelis' valuation. The Debtors' lowest valuation is *higher than* the highest indication of interest the Debtors received when they tried to sell their spectrum assets, and that offer was contingent on obtaining 30 MHz of usable spectrum (and never fully documented). (Reynertson, 3/27/14 Hr'g Tr. 175:22-176:9 (The value attributed to the Centerbridge bid was $5 billion); SP158 at 17)  The Debtors also failed to raise sufficient capital to treat all creditors ratably, as was proposed in the Debtors' prior plan, also indicating that the valuation is not based on reality. (GLC Report, pp. 17, 18.)  If value is really as high as the Debtors say it is, then all 90 potential investors missed out on a fantastic bargain.  Of course, the more realistic inference is that the Debtors' assets are not worth as much as indicated by Moelis' inflated valuation, and are worth closer to the $2.2 billion threshold pegged by the Plan Support Parties' investment thesis. See In re Boston Generating, LLC, 440 B.R. 302, 325 (Bankr. S.D.N.Y. 2010) ("[A]bsent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."). (SP 158 at 17-18; Reynertson, 3/27/14 Hr'g Tr. 178:21-179:17.)

B.    *GLC's Valuation Is A More Realistic Assessment of the Value of LightSquared's Assets.*

103.    Soren Reynertson is an investment banker with over twenty years of experience in asset valuation. (SPSO FOF ¶¶ 249-50.)  Prior to co-founding GLC Advisors five

63

years ago, Mr. Reynertson was a managing director at UBS and Morgan Stanley working on restructuring and investment banking matters. (Reynertson, 3/27/14 Hr'g Tr. 121:16, 122:17-21.) He has been called to value assets of telecommunications companies on numerous occasions and his team has extensive experience in valuing spectrum assets. (SPSO FOF ¶ 250.)

104.    To prepare his valuation report, Mr. Reynertson consulted information in the public domain, documents obtained in the discovery process, his own independent research, Doug Hyslop for technical matters, and members of his own team with extensive experience in valuing spectrum assets. (Reynertson, 3/27/14 Hr'g Tr. 132:2-6, 146:8-14, 128:4-7, 124:11-125:7.) In this regard, Reynertson's process was, for the most part, no different than Mark Hootnick's.[78]    In evaluating LightSquared's assets, Hootnick consulted with various LightSquared employees — Doug Smith and Jeffrey Carlisle, for example — and despite not being an expert on FCC matters, technical matters relating to spectrum, or on spectrum interference issues, or even the Moelis banker most knowledgeable about such matters, Hootnick testified that his lack of expertise in those matters did not disqualify him from opining on the assets' value. (Hootnick, 3/24/14 Hr'g Tr. 77:12-79:2; Debtors' Post-Trial Br. 94.)[79]

105.    Mr. Reynertson's valuation used reasonable and appropriate adjustments to reflect a realistic range of available spectrum and appropriate valuation comparables. Using comparable transactions involving spectrum that, like LightSquared's, required work before being deployed for terrestrial use, Reynertson applied an average MHz/pop value of $0.33.

---

[78]    Notably, one difference between Mr. Reynertson's and Mr. Hootnick's analyses is that Mr. Reynertson applied judgment and common sense rather than blindly accepting inputs even if they were questionable. One need not be an FCC expert to know that regulatory approval, let alone by a date certain, isn't an event that can be guaranteed with 100% certainty. Where it made sense to do so, Mr. Reynertson discounted the likelihood of certain outcomes. Even where it defies common sense, Mr. Hootnick did not.

[79]    Valuation experts often have to rely on other experts for the inputs necessary to perform a valuation so it was of no consequence that this was the first time that Reynertson specifically has valued spectrum.

(SPSO FOF ¶ 255)  This is the same value Moelis used in its January 29 Valuation. (SPSO FOF

¶ 255.)  Considering the 15 MHz to 30 MHz range of spectrum GLC assumed would ultimately

be available to LightSquared, LightSquared LP's spectrum assets were estimated to be worth

between $500 million and $2.1 billion. (SPSO FOF ¶ 256.)  Adding the value of LightSquared's

Canadian spectrum and its satellites, and the value of LightSquared Inc.'s One Dot Spectrum,

GLC arrived at a gross enterprise value of between $3.1 billion and $4.6 billion. (SPSO FOF ¶

256.)  With the deduction of certain costs included in the Moelis valuation and the modified

present value of the Inmarsat lease, the net enterprise value of LightSquared's assets was

calculated to be between $2.1 billion and $3 billion. (SPSO FOF ¶ 258.)

106.    LightSquared's Current Spectrum Access.



.  (SPSO FOF ¶ 150.)

(Smith, 3/20/14 Hr'g Tr. 138:11-139:3; GLC Report, p. 5.)

(See FOF ¶ 159;   Ex. D, 12/2/13 Email from P. Falcone to A. Durmer

(HARBPLAN00001846).)

(Falcone, 3/31/14

Hr'g Tr. 125:11-126:14.)  The FCC itself confirmed in a pleading with the Court that it "is

impossible to predict what decisions the Commission may reach on these matters [approval of

LightSquared's license modification application]."[80] ████████████████████

████████████    (SP280 at L2PLAN0001990 (███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████).)

     107.   <u>Lower 10 MHz Downlink Problems</u>.  LightSquared assumes that it will receive approval to use its lower 10MHz downlink within seven (7) years.  (Reynertson, 3/27/14 Hr'g Tr. 155:15-19.)  ████████████████████████████████████████

████████████████████████████████████████████████████████

(Smith, 3/20/14 Hr'g Tr. 52:12-53:6.)  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████  (SPSO FOF ¶ 171.)  ████████████████████████████████████████

████████████████████████████████████████████████████████

████  (SPSO FOF ¶ 176.)

     108.   Additionally, approval of the lower 10 MHz band for terrestrial use faces the additional hurdles of reversing the NTIA's prior determination, obtaining FCC approval, and gaining industry support from GPS device manufacturers and commercial wireless carriers; steps that have not yet been initiated.  (SPSO FOF ¶¶ 159, 170; GLC Report, p. 7.)  LightSquared recognizes that it may be a decade before its network will be able to operate at more robust power levels, if ever.  (<u>See</u> Ex. C, 10/22/13 Email from J. Abbruzzese to R. Cates.)

---

[80]   <u>See</u> *Federal Communications Commissions' Statement Regarding the FCC Exit Condition in Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* (Jan. 17, 2014) [Docket No. 1235] ¶ 4.

109.    In consideration of these issues with the lower 10 MHz downlink, Mr. Reynertson's report appropriately considers the possibility that none of the lower downlink will be available for terrestrial use within seven years.  To reflect this uncertainty, Mr. Reynertson assumed that between 0 and 10 MHz of the lower downlink would ultimately become fully available for terrestrial only use rather than all of it. (GLC Report, p. 7; Reynertson, 3/27/14 Hr'g Tr.157:17-158:8.)

110.    It is unreasonable to base an entire business plan on not operating at full power.  (Debtor's Post-Trial Br. ¶ 68.)  Even worse, Moelis' valuation should not have equated LightSquared's spectrum to fully operational comparables, if the Debtors plan does in fact contemplate operating at reduced levels.  Spectrum that has to operate at a lower power is impaired. (SPSO FOF ¶ 176.)  The most valuable spectrum is that which is fully licensed to support high power operation through a broad area—low power deployment is inherently less valuable. (SPSO FOF ¶ 176.)  Recent revisions to the Plan indicate a new target of terrestrial signal coverage of 290 million total POPs, revised up from 250.  See Redline of Plan filed Mar. 18, 2014 (definition of FCC Objectives) pg. 195 [Docket No. 1422].[81]  Mr. Rogers testified that it is hard to cover such a large population.  (Rogers, 3/19/14 Hr'g Tr. 64:13-65:3 (Based on the coverage of other 4G LTE carriers, coverage of 290 million pops is on the "high side.").)  Moreover, given the entire population of the United States (slightly more than 300 million) it is not clear that a low powered network could ever reach 290 million total POPs.

111.    ████████████████████████████████████████████████████████████████

████████████████████████████  (SPSO FOF ¶¶ 177-226.)  ██████████████████████

---

[81]    The definition of FCC Objective is critical, because the New DIP Initial Lenders can prevent the consummation of the Plan if the FCC "otherwise take[s] action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective." (Plan, Article IX.B.9.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ (SPSO FOF ¶¶ 187-212.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████. (SPSO FOF ¶ 189.)

112.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (SPSO FOF ¶¶
182, 189.)    ████████████████████████████████████

████████████████████████████ (SPSO FOF ¶ 183.) ██████████

████████████████████████████████████████████████████

████████████████████████████████████ (SPSO FOF ¶ 181;

Smith, 3/20/14 Hr'g Tr. 79:17-21.)

113.    ██████████████████████████████████

████████████████████████████████████████████████████

██████ (SPSO FOF ¶ 189.) ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (SPSO FOF ¶ 207.) ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



(SPSO FOF ¶ 208; Hyslop, 3/25/14 Hr'g Tr. 47:11-23.)[82]

114.

(SPSO FOF ¶ 209.)

(SPSO FOF ¶ 184.)

(SPSO FOF ¶¶ 199-200, 208.)

[82]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

116.    ███████████████████████

████████████████████████████████████████

█████████████████████████████████    (See Debtors'

Post-Trial Br. ¶ 71.)  ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████    (See Ergen 3/26/14 Hr'g Tr. 290:8-301:12  ███████████

████████████████████████████████████████

███████████████████████.  ███████████████

---

83  ████████████      █████████████████████



. (SP374 (

).)

117.

(SPSO FOF ¶¶ 168, 218)

(SPSO FOF ¶ 186.)

[84]

[84]  See Ex. J, *Russia Plan Four GLONASS-M Launches in November, System Nears FOC*, Oct. 31, 2011, available at http://www.insidegnss.com/node/2803 (last visited Apr. 26, 2014); *Russian Proton-M launches three Glonass-M GPS satellites*, Nov. 4, 2011, available at http://www.nasaspaceflight.com/2011/11/russian-proton-m-launches-three-glonass-m-gps-satellites/ (last visited Apr. 26, 2014).



118. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (SPSO FOF ¶¶ 219-226.) ▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (SPSO FOF ¶ 219.) ▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (SPSO FOF ¶ 210.)

119. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄[85] (SPSO
FOF ¶ 219.)

120. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (SPSO FOF ¶ 221.) ▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄ (SPSO FOF ¶ 224; GLC Report, p. 11.)

121. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄ (SPSO FOF ¶ 221.) ▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄ (SPSO FOF ¶ 222.) ▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

---

[85] ▄▄▄▄▄▄▄▄▄▄▄▄ (Hyslop, 3/25/14 Hr'g Tr. 176:14-15.)



(SPSO FOF ¶ 223.)

(Hyslop, 3/25/14 Hr'g Tr. 51:2-15.)

[86] (SPSO FOF ¶ 225.)

---

[86]    See Ex. G, email exchange between Masoud Olfat and Michael Tseytlin of LightSquared, dated October 10, 2013.

(SP061 ████████████████████████████████████████

████████████ (emphasis added).)[87]

123.    <u>NOAA Spectrum Likely to Be Subject to Auction</u>.  LightSquared claims

that the FCC will grant it use of the NOAA spectrum, but there is substantial testimony and

evidence suggesting that the FCC will, instead, auction the band to the highest qualified bidder.

(SPSO FOF ¶ 156.)  Given this uncertainty, the court cannot plausibly take LightSquared's claim

at face value — let alone accept its 100% guarantee.

124.    LightSquared does not presently own the NOAA spectrum, nor can it

make any guarantees that it will own the NOAA spectrum in the future.  (Smith, 3/20/14 Hr'g Tr.

223:1-9; Hootnick, 3/24/14 Hr'g Tr. 94:10-12; Rogers, 3/19/14 Hr'g Tr. 50:14-17.)  The Plan,

however, assumes that there will be no auction and LightSquared will be granted a license to use

5MHz of NOAA spectrum.  As a preliminary matter, it is highly unusual for a debtor to seek

confirmation with a valuation analysis that includes and relies upon the value of assets it does not

own.  What's more, in this case, ownership of these assets cannot be assured.  For the FCC to

grant the NOAA spectrum without an auction would be unusual, and contrary to the expectations

expressed by the Debtors' financial advisor just 3 months ago.[88]  Rogers testified that an auction

was "more likely than not."  (Rogers, 3/19/14 Hr'g Tr. 40:23-41:1.)  Assuming an auction is

held, it could attract other bidders, and LightSquared could incur significant costs not reflected in

their valuation in order to prevail in an auction of the NOAA Spectrum.  (GLC Report, p. 10.)

---

[87]    LightSquared declined to call any of their engineers to the stand to support confirmation.  Instead they
chose to rely on a newly hired expert that could not or elected not to opine on several technical matters
raised by SPSO.

[88]    Mr. Hootnick emailed Stanley Holtz of Moelis on December 19, 2013, the day after a meeting with the
FCC: "After yesterday, it sounded like the fcc was going to force an auction of the noaa spectrum which
means the deal is basically doa." (<u>see</u> SP108)  More recently, Mr. Rogers testified that he thinks "it more
likely than not" that the FCC will hold an auction for the NOAA spectrum.  (<u>Rogers, 3/19/14 Hr'g Tr.
40:23-41:1</u>.)

125.    <u>Other Unique Problems with LightSquared's Spectrum.</u>   Other problems unique to LightSquared's spectrum further undercut its value.  First, the Debtors are severely lacking in downlink—its lower 10 MHz downlink has not been cleared for use and it does not yet own or have access to the 5 MHz NOAA band that it proposes to use as part of its 10 MHz New Downlink.  This leaves LightSquared with only the 5 MHz of spectrum is has access to under the Crown Castle lease.  (Hootnick, 3/24/14 Hr'g Tr. 104:5-8.) ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████   Finally, there is the ongoing regulatory uncertainty with regards to its license modification applications which have been before the FCC for over two years and with which the Debtors have made minimal progress.  Further aggravating this factor was the company's decision to sue the GPS industry (SPSO FOF ¶¶ 46-47) and threats to sue the FCC (SP085), which could not possibly be expected to help alleviate the logjam.

C.    ***The GLC Valuation is Consistent with Melody's Valuation.***

126.    ████████████████████████████████████████

███████████████████████████   (Jaffrey, 3/28/14 Tr. 78:15-19.)  ██████████

███████████████████████████████████████████   (Jaffrey, 3/28/14 Hr'g Tr. 78:5-11.)  ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████   (PX1126.)  ██████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ (PX1126 at

GLCAL200005621.) █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(PX1126 at GLCAL200005631.)

     127.   █████████████████████████████████

████████████████████████████████████████████████████

(Jaffrey, 3/28/14 Hr'g Tr. 79:11-23.) ████████████████████

█████████████████████████████████ (Jaffrey, 3/28/14 Hr'g Tr. 80:10-

81:8.)

     128.   █████████████████████████████████

████████████████████████████████████████████████████

████████████████.

    D.    ***The Ergen and PWP Valuations Are Not Indicative of Current Value.***

     129.   Rather than consider the valuation of a leading expert in the satellite, media and telecom sectors, the Debtors point to the valuations prepared by Ergen and the DISH Special Committee's financial advisor from July 2013 and argue that these are more accurate valuations of the company's assets than the GLC valuation (and by extension the consistent Musey valuation). This argument is without merit.

     130.   Mr. Ergen, on his own, prepared a valuation of LightSquared's spectrum assets in early July upon request by members of the DISH special committee while it was considering whether to make a bid for the LP assets. (Ergen, 3/26/14 Hr'g Tr. 62:17-22, 72:24-73:3, 233:13-22.) The valuation reflects only what Mr. Ergen believed to have been the potential value of the assets to DISH, at the time it was created, based on what he knew at the time without

76

the benefit of any diligence other than what was publicly available. (Ergen, 3/26/14 Hr'g Tr. 66:13-19.) Mr. Ergen's valuation is dated July 8, 2013. LBAC's Confidentiality Agreement with LightSquared is dated July 26, 2013.

131. The valuation makes a number of inappropriate assumptions that belie LightSquared's reliance on it. First, it assumes 20 MHz of clean, fully-powered, and usable uplink spectrum clear of any interference issues. (Ergen, 3/26/14 Hr'g Tr. 234:7-18; PX1052 at DISH_PLAN000003217.) Second, it expresses the value of the spectrum for use *by DISH* (Ergen, 3/26/14 Hr'g Tr. 66:17-19, 205:2-6), which has its own assets that, paired with LightSquared spectrum, could attain synergies that would supplement the spectrum's value (Ergen, 3/26/14 Hr'g Tr. 238:19-239:14). For instance, though Mr. Ergen's valuation identified LightSquared's use of its 20 MHz of downlink as "speculative due to interference issues" (PX1052 at DISH_PLAN000003217), he believed that DISH could use it in conjunction with its own pre-existing infrastructure spectrum holdings (Ergen, 3/26/14 Hr'g Tr. 234:19-235:9, 239:8-10, 243:14-244:19). Third, the valuation was made before DISH became aware of (i) ███, (ii) ████████████████ and (iii) the FCC's January 17, 2014 filing in these bankruptcy cases. (See SPSO FOF ¶ 240; Ergen, 3/26/14 Hr'g Tr. 67:8-15.) Fourth, the valuation did not account for nationwide build-out costs, estimated at about $15 billion. (Ergen, 3/26/14 Hr'g Tr. 237:1-10.) Finally, the valuation of the satellites in particular was based on their replacement costs, an overestimation of their value because satellites depreciate in value each year and are not typically replaced. (Ergen, 3/26/14 Hr'g Tr. 237:18-238:18.)

132.    In addition to asking Mr. Ergen for a valuation, DISH's special committee hired Perella Weinberg Partners ("**PWP**") as an independent expert to value LightSquared's spectrum assets in connection with its consideration of whether DISH would pursue a bid for them. (Ergen, 3/26/14 Hr'g Tr. 58:20-23.) PWP's valuation estimated between $2.3 billion and $5.4 billion standalone valuation of LightSquared LP. (PX1053 at DISHSC_PLAN000000102.)

133.    This valuation also makes assumptions which have now been disproven. Like Mr. Ergen's valuation, PWP's valuation, created in July 2013 (a) pre-dates (i) █████ ████████████████████████████████████████████████████████████████, (ii) ██████████████████████████████████████████████████████████████ ████████████████████████████████████████, and (iii) the FCC's January 17, 2014 filing in these bankruptcy cases; (b) supposes the combining of LightSquared's spectrum with DISH's existing spectrum holdings (PX1053 at DISHSC_PLAN000000102); and (c) assumes that the 20 MHz of uplink is unimpaired and ready for immediate use (PX1053 at DISHSC_PLAN000000112).    Additionally, PWP assumed, incorrectly, that no significant FCC approvals were required. (PX1053 at DISHSC_PLAN000000102.)

E.    *The Debtors Have No Business Plan.*

134.    Even if the Debtors overcome the technical and regulatory hurdles to utilizing the entire spectrum upon which their valuation is based, the Debtors have no business plan to deploy a communications network over that spectrum. (Hootnick, 3/24/14 Hr'g Tr. 93:2-12 ("Q. Am I correct that you haven't seen a business plan for LightSquared in connection with deploying a nationwide wireless network? A. Not for over a year.").)  The CFO confirmed the same:

> Q: Does LightSquared have any plan which [it] is intending to use in order to have a business going forward into the future?

78

...

A: That has not been finalized yet."

Q: Okay. Who is in charge of finalizing that?

...

A: My understanding is that the new board with a new management team will make that decision.

Q: And when is the new management team going to be in place?

A: I don't know.

Q: Are you going to be part of the new management team?

A: I don't know.

Q: Until there's a new management team, there isn't any business plan for LightSquared. Is that what you're telling me?

A: We have an operating plan. You can see the forecast associated with this operating plan in front of you.

...

Q: Can you tell me what the operating plan is?

A: The operating plan is to conserve cash and to basically perfect our spectrum position with the FCC.

...

Q: And does LightSquared have any plan with respect to what it intends to do if it obtains the approvals it's asked for?

A: That has not been finalized yet.

See Montagner Tr. 56:15-17; 56:19-21; 56:24-57:14; 57:21-58:13.

135.   The Debtors dismiss SPSO's concerns regarding the lack of a business plan as "not relevant in this context." (Debtors' Pre-Trial Br. ¶ 102.) Instead, the Debtors assert: "LightSquared's business plan involves resolving open regulatory issues with the FCC and other governmental agencies." Id. The Debtors misunderstand SPSO's concern. The SPSO Note has a seven year maturity; it will remain unpaid for more than *five years* after December 31, 2015 — the date by when (at least according to the Debtors) LightSquared is 100% guaranteed to have cleared the bulk of their regulatory hurdles. At that point SPSO will own a silent note, secured by subordinated liens, and will not enjoy the benefit of any covenants or information rights. How can the Court be comforted that the Debtors Plan is feasible, *i.e.* that the debt incurred under the Plan (including the SPSO Note) will be repaid if the reorganized company has no plan to run a profitable business after it resolves its FCC issues?

79

F.    *The Projections Foretell a Near-Term Liquidity Crisis.*

136.    Section 1129(a)(11) "requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." S&P, Inc. v. Pfeifer, 189 B.R. 173, 183 (N.D. Ind. 1995) (citing In re SM 104 Ltd., 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993)).    Here, the Debtors' financial projections (the "**Projections**") anticipate a near-term liquidity crisis, and indicate that confirmation of the Plan is likely to be followed by the need for further reorganization.  (SPSO FOF ¶ 245.)

137.    The Projections indicate that LightSquared will be burning cash at approximately $50 million per quarter from the first quarter of 2014 through the first quarter of 2016, and a cash balance of approximately $50.5 million at the end of the first quarter of 2016. See Projections.  Therefore, the Debtors will effectively be out of cash one quarter after the period covered by the Projections ends.  (SPSO FOF ¶ 245.)  The fact is not lost on the Special Committee; when asked to evaluate the Debtors projected financial position as of the second quarter of 2016, Mr. Rogers responded that it looked "dire."  (Rogers, 3/19/14 Hr'g Tr. 63:9-24) Mr. Reynertson confirmed that the company will run out of cash in 2016.  (Reynertson, 3/27/14 Hr'g Tr. 179:18-180:2 ("[I]f there was a Q2 2016 here, the ending cash balance would probably be at or about zero.").)    The Debtors acknowledge the same in their Pre-Trial Brief: "exit financing . . . will ensure that LightSquared has sufficient liquidity through at least the first quarter of 2016." (Debtors' Pre-Trial Br. ¶ 98.)

138.    The SPSO Note is a seven year instrument.  So the Debtors' defense of feasibility on the grounds that cost savings should extend the runway by "many months" or "six months" is not meaningful.  (See Debtors' Post-Trial Br. ¶¶ 31, 37.)

139.    Having conceded that they will run out of money in 2016, and that cost savings can only buy "months," the Debtors resort to arguing that they will be able to re-access

the capital markets "upon the occurrence of certain regulatory milestones." (See Debtors' Post-Trial Br. ¶ 38-39; see also Debtors' Pre-Trial Br. ¶ 101.)  However, even if the reorganized company were able to obtain additional financing on top of its already over-leveraged capital structure, it is unclear how the negative cash flows set forth in the Projections could service additional interest expense.

140.    The Projections themselves may not be reliable.  Though the Debtors have characterized the Projections as "highly conservative" (see Debtors' Post-Trial Br. ¶ 36), they do not appear to account for the necessary capital investment required to build a network if all of the Debtors' assumptions regarding spectrum availability, and FCC approvals, came to fruition prior to 2016. (SPSO FOF ¶¶ 244-45.)  When the Debtors want to value their spectrum, FCC approval is 100% guaranteed by December 31, 2015.  (SPSO FOF ¶¶ 153-54.)  But when the Debtors want to project their available cash as of the beginning of 2016, they (apparently) do not consider the massive capital investment required to build out a network.  (SPSO FOF ¶¶ 244-45.)  In a press release announcing a prior $9 billion network sharing deal with Sprint (excluding the value of credits), the Debtors touted the value of the deal by implying the incremental cost of a stand-alone network build would have been an additional *$13 billion* over eight years.[89]

141.    The Debtors also put forth the argument that their assets are appreciating, and therefore, as time goes on, the company can support an ever growing debt capacity.  (See Debtors' Post Trial Br. ¶ 34 ("the asset will appreciate quicker than the debt will accrue"), ¶ 199 ("LightSquared's spectrum represents an appreciating asset, [which] will be worth far more than currently proposed, and is more than sufficient to cover all of the Reorganized LightSquared Entities' debt obligations.") (internal citations omitted).)  However, courts have found that a plan

---

[89]    See SP334.

may not be feasible under section 1129(a)(11) of the Bankruptcy Code if the reorganized

company's ability to repay debt incurred is based on an assumption that the underlying assets

will appreciate following confirmation. See In re Lakeside Global II, Ltd., 116 B.R. 499, 510

(Bankr. S.D. Tex. 1989) (finding that a plan was not feasible because the value of the assets did

not support the plan's capital structure, notwithstanding the debtor's argument that the assets

would appreciate in the future); In re Edgewater Motel, Inc., 85 B.R. 989, 996-97 (Bankr. E.D.

Tenn. 1988) (denying confirmation where plan deferred payments to a secured creditor for many

years, highlighting that "ability of the debtor to retire the claim of its major secured creditor

[was] at best speculative").[90]

142.    Though the Debtors passionately argue that as soon as they have FCC

approval, capital market participants will be lined up around the block to pour money into the

company, that is not enough for the Court to find feasibility.    FCC approval is anything but

guaranteed.    (See supra Section X.A.)    Moreover, the Debtors have produced no concrete

evidence that even with FCC approval the capital markets will be interested.    "Sincerity, honesty,

and willingness are not sufficient to make the plan feasible, and neither are any visionary

promises. The test is whether the things which are to be done after confirmation can be done as a

practical matter under the facts." In re Bergman, 585 F.2d 1171, 1179 (2d Cir. 1978) (citation

omitted); see also, In re M&S Assocs., Ltd., 138 B.R. 845, 852 (Bankr. W.D. Tex. 1992)

(concluding that plan providing for negative amortization of secured claims was not feasible

---

[90]    Moreover, the SPSO Note will bear PIK interest after the Effective Date — a sure sign that the Debtors
themselves question their ability to repay the indebtedness. See Michaelson v. Farmer (In re Appleseed's
Intermediate Holdings, LLC), 470 B.R. 289, 295 (Bankr. D. Del. 2012) (describing that debtors' use of PIK
option in loan agreements allowed debtors who could not pay their debts as they came due to delay filing
for bankruptcy).

where "confirmation of the plan would merely allow the Debtor to postpone the inevitable, and to gamble . . . on the long shot possibility of a drastic improvement in the [debtor's] market").

143.    A review of large bankruptcy cases of spectrum companies reiterates that spectrum is a volatile commodity, and despite the Debtors' assurances here, there can be no guarantee that reorganized LightSquared will be in position to repay the debt incurred under the Plan when it matures. See, e.g., NextWave Personal Commc'ns, Inc. v. FCC, 254 F.3d 130, 133-35 (2003) (detailing precipitous drop in value of spectrum licenses following FCC auction); N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 95 (Del. 2007) (describing the collapse of the market for wireless spectrum following WorldCom's announcement of accounting problems).    In Nextwave it took nearly 6 years from the filing of the bankruptcy case for the debtors to achieve final approval from the FCC to use their spectrum licenses, and the debtors ultimately were forced to return or sell over 90% of their original spectrum. See FCC v. NextWave Personal Commc'ns, Inc., 537 U.S. 293, 297 (2003).[91] Similarly, Iridium launched a new satellite communications service with much fanfare and market projections of great success, but the service failed dramatically and Iridium found itself in Chapter 11 just nine months after launching its service. See Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 291 (S.D.N.Y. 2007) (explaining the events leading up to the bankruptcy filing). Iridium sold nearly all of its operating assets which had originally cost billions of dollars, including their satellite system and the FCC licenses to operate the system, for *just $25 million*.  See id. (detailing how Motorola received approximately $3.7 billion from the debtors pre-petition for building out the Iridium network); In

---

[91]    See also Ex. H, FCC Announces NextWave Settlement Agreement, News Release (Apr. 20, 2004), available at http://www.justice.gov/usao/nys/pressreleases/April04/nextwavepr.pdf (announcing that as part of a settlement agreement, the debtors would return or sell over 90% of their original spectrum and the FCC would approve the debtors' use of their remaining spectrum) (last visited April 19, 2014).

re Iridium Operating LLC, No, 99-45005, Order Pursuant to Sections 105(a), 363(b), (f), (m), 365(a), (b), (f) and (k) and 1146(c) of the Bankruptcy Code (I) Approving the Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Assets of the Debtors Outside the Ordinary Course Business, (II), Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (III) Determining that Such Sale is Exempt from Any Stamp, Transfer, Recording or Similar Tax, (IV) Authorizing the Assumption of Certain Executory Contracts and Unexpired Leases and the Rejection of Certain Other Executory Contracts and (V) Granting Related Relief [Docket No. 770] (Bankr. S.D.N.Y. Nov. 20, 2000) (ordering the sale of substantially all of the debtors' assets for $25 million). Furthermore, in *none* of these cases did the FCC file *any* pleadings similar to the January 17th filing in this case, where the FCC cautioned that it would not rush to a decision. (See Federal Communications Commission's Statement Regarding the FCC Exit Condition in Debtors' Revised Second Amended Joint Plan, [Docket No. 1235] (Jan. 17, 2014).)[92] In this case, the FCC has stepped outside its normal practice specifically to alert the Court to the uncertainty of the Debtors' regulatory prospects.

G.    *The Conditions to Effective Date Contain Unacceptable Execution Risk.*

144.    SPSO renews its objection that the deletion of the "FCC Exit Condition" from the proposed Plan does not eliminate execution risk. It is still a condition to effectiveness that "the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds

---

[92]    Nor did the FCC file any similar pleading in: Adelphia Communications Corp., No. 02-41729 (Bank. S.D.N.Y.); DBSD North America, Inc., No. 09-13061 (Bank. S.D.N.Y.); Verestar, Inc., No. 03-18077 (Bank. S.D.N.Y.); WorldCom, Inc., No. 02-13533 (Bank. S.D.N.Y.); Charter Communications, Inc., Case No. 09-11435 (Bank. S.D.N.Y.); and Tribune Company, Case No. 08-13141 (Bank. D. Del.).

without affording the applicant or petitioner an opportunity to submit a similar request without prejudice, or (c) otherwise taken action with respect to any Material Regulatory Request so as to preclude a reasonable prospect of satisfying any FCC Objective" unless otherwise agreed by each of the New DIP Initial Lenders. (See Plan, §§ IX.A.1. and IX.B.9. (the "**FCC Condition**").) "FCC Objective" is defined to be to the procurement of every regulatory goal that the Debtors' Plan assumes to be a *fait accompli* for valuation purposes. This conditionality confirms that the Plan is not feasible without assuming away all FCC risk. The condition also allows the New DIP Initial Lenders tremendous leeway to prevent the occurrence of the Effective Date if the FCC "otherwise take[s] action [that] precludes a reasonable prospect of [FCC approval]," and thereby trigger the unreasonable Plan Support Party Break-Up Fee. The Ad Hoc Secured Group does not object to such conditionality because all lenders other than SPSO will be paid, in full, in cash fifteen days after confirmation. SPSO is the only senior lender asked to bear the risk that the Debtors are unable to consummate the Plan.[93] If it is unclear whether or not the Plan will even be consummated, it cannot be feasible.

## XI.    The Debtors Failed to Demonstrate that the Plan Satisfies the Cram Down Requirements of Section 1129(b) of the Bankruptcy Code.

145.    Whether or not SPSO's Claims are subordinated, and whether or not SPSO's vote against the Plan is designated,[94] the Debtors must show that the Plan complies with section 1129(b) of the Bankruptcy Code, because SPSO's class has voted to reject the Plan. The

---

[93]    In addition, SPSO renews its objection to the remaining conditions to the Effective Date that increase the risk that the Plan will not be consummated set forth in SPSO's Plan Objection ¶ 66.

[94]    See infra Section XI.B. for a discussion as to why cramdown protections should be considered even if SPSO's vote is designated. In short, a holding that designation of an entire class allows a plan proponent to circumvent central bankruptcy code creditor protections (such as the best interests test and cramdown), would imbue section 1126(e) with the power to eviscerate the central purpose of the Bankruptcy Code — to ensure the equitable treatment of all stakeholders.

Debtors have failed to show that the Plan does not discriminate unfairly against, and is fair and equitable to, SPSO. 11 U.S.C. § 1129(b)(1).

A.    *The Plan Unfairly Discriminates Against SPSO.*

146.    The Bankruptcy Code's requirement that a plan not discriminate unfairly against a class of creditors "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes," and prohibits a plan proponent from separating "two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987); see also In re Young Broad. Inc., 430 B.R. 99, 139-40 (Bankr. S.D.N.Y. 2010) ("[A] plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment.").

147.    The Debtors do not contest that SPSO's treatment is discriminatory and instead rely on the following: "Section 1129(b)(1)'s 'unfair discrimination' standard does not prohibit all types of discrimination among holders of impaired, dissenting classes; instead, it prohibits only *unfair* discrimination." (Debtors Pre-Trial Br. ¶ 167 (citing In re Leslie Fay Cos., 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y. 1997)).) Tellingly, the Debtors also do not contest the fact that the Plan shifts the risk of realizing the full value of the Claims arising under the Prepetition LP Credit Facility squarely on SPSO's back by treating SPSO's Claims with a *seven-year* note, and paying the other Prepetition LP lenders in full, in cash, within *fifteen days* of confirmation (on account of *identical* claims). However, the Debtors have not overcome the presumption of unfair discrimination that arises when bankruptcy plans allocate "materially greater risk" to the dissenting class relative to a class of the same priority. See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006); In re Dow Corning Corp., 244 B.R. 696, 703 (Bankr. E.D. Mich. 1999).

86

148.    To support the Plan's discriminatory treatment the Debtors offer three arguments: (a) SPSO deserves discriminatory treatment as punishment for alleged misbehavior in these cases; (b) the discriminatory treatment is necessary, because the Plan is the Debtors' only option, and *"embodies the precise terms of the restructuring offer that LightSquared received from the Plan Support Parties;"*[95] and (c) the Plan satisfies SPSO's Claims in full. (See Debtors' Pre-Trial Br. ¶¶ 168-170 (emphasis added).)[96]

149.    The first two arguments hardly require rebuttal.    The argument that discriminatory treatment is warranted due to SPSO's behavior in these cases is simply the Debtors' repeating their equitable subordination case.    It does nothing to further the Debtors' position that SPSO's treatment is "fair" discrimination in the event the Court determines not to *fully* subordinate SPSO's Claims.

150.    Other than revealing how the Debtors' "negotiated" the terms of the Plan, the second argument similarly is unavailing.    As argued supra, if "necessity" was a legitimate reason to specifically target and mistreat one creditor, why should the Court consider the Bankruptcy Code at all?    By this argument, the Debtors are asking the Court to hold that plan proponents need only demonstrate that their plan sponsors harbor animosity against one particular creditor in order to confirm a plan that discriminates against the outsider.    The Court

---

[95]    This troubling quote is copied from the Debtors Pre-Trial Brief. (See ¶ 169.)  The Debtors argued elsewhere that the Plan was the result of "extensive, arm's length negotiations between LightSquared and its Special Committee, the Plan Support Parties, the Ad Hoc Secured Group . . ." (Debtors' Pre-Trial Br. ¶ 55.)  However, the truth is elusive.  Whether or not the Debtors actually adopted the terms of the Plan presented by the Plan Support Parties wholesale (as the Debtors themselves conveniently argue when they want to show that SPSO's treatment is "necessary"), is difficult to determine from the record, because the Debtors have asserted a common interest privilege over all communications between the Special Committee and the Plan Support Parties that contain any discussion of the Plan.  As discussed supra, SPSO asks the Court to make the only inference possible from the record — no one negotiated the Plan on behalf of LightSquared's stakeholders.

[96]    The Debtors' Post-Trial Brief does not address whether SPSO's treatment constitutes "fair" discrimination, and instead relies on the Debtors' Pre-Trial Brief by reference. (See Debtors' Post-Trial Br. ¶ 187 n.61.)

87

could not so hold without seriously damaging legitimate creditor expectations of being treated

fairly in bankruptcy. Accordingly, this second rationale should be read as nothing more than yet

another repackaging of the Debtors' equitable subordination case.

151.    Finally, the Debtors argue that SPSO's discriminatory treatment is "fair"

because it constitutes payment in full. As more fully set forth elsewhere herein, SPSO contests

that assertion. The SPSO Note is a highly speculative instrument, likely under-secured as of the

Effective Date, and its value is entirely contingent on whether or not LightSquared procures FCC

approvals before the end of 2015. Such treatment cannot be considered satisfaction in full. Even

if the Court is persuaded that the Debtors' flawed valuation supports the argument that the SPSO

Note constitutes payment in full, such a finding is not the same as holding that SPSO's

discriminatory treatment is fair vis-à-vis other similarly situated creditors. The other Prepetition

LP Lenders are being paid in full, in cash, fifteen days after confirmation and months before the

Effective Date of the Plan.[97] Even if the Court believes the Debtors' valuation, SPSO will not be

paid for seven years. If that discriminatory treatment was indeed "fair," rational actors should be

indifferent as to which treatment they receive. However, the basic economic premise that cash

today trumps cash tomorrow undermines any argument that the Plan's treatment constitutes

"fair" discrimination.

B.    *The Plan is not Fair and Equitable with Respect to SPSO in any Scenario.*

(i)    The Plan is not Fair and Equitable with Respect to SPSO's Secured
Claims.

152.    If the Court does not *fully* subordinate SPSO's Claims, the Debtors must

satisfy the fair and equitable requirement mandated for secured creditors by section

---

[97]    Even if SPSO's Claims are fully subordinated, general unsecured creditors are being paid in full, in cash on
the Effective Date, and the same rationale holds. Payment in seven years vs. payment today is not "fair"
discrimination, whether the seven year note is highly speculative (as it is here) or 100% guaranteed.

1129(b)(2)(A) of the Bankruptcy Code.  SPSO renews its argument that the Supreme Court's

holding in RadLAX requires that the Plan comply with section 1129(b)(2)(A)(i).  The Supreme

Court held that the "indubitable equivalent" standard of subsection (iii) of section 1129(b)(2)(A)

cannot be used to impose treatment that would not be permitted under the other the more specific

subsections of section 1129(b)(2)(A).  RadLAX Gateway Hotel, LLC v. Amalgamated Bank,

132 S.Ct. 2065, 2072 (2012) ("The structure [of section 1129(b)(2)(A)] suggests, to the contrary,

that [subsection] (i) is the rule for plans under which the creditor's lien remains on the property,

[subsection] (ii) is the rule for plans under which the property is sold free and clear of the

creditor's lien, and [subsection] (iii) is a residual provision covering dispositions under all other

plans . . . .").  The Debtors try to remove this Plan from the holding of RadLAX by incrementally

expanding the property to which SPSO's liens will attach if the Plan is confirmed.  (See Debtors'

Post-Trial Brief ¶ 191 n. 63.)  This does not work.  Notwithstanding the amendments to the Plan,

SPSO has a first priority lien on LP assets today, and will have a silent, third lien on LP assets

following confirmation.  It is irrelevant that in an effort to avoid compliance the Debtors

amended the Plan to incrementally alter the collateral package — the plain meaning of section

1129(b)(2)(A)(i) still applies.

<div align="center">(ii)        The SPSO Note Does Not Satisfy Section 1129(b)(2)(A)(i)</div>

153.    Section 1129(b)(2)(A)(i) requires that a dissenting class of secured

creditors whose claims are treated through the issuance of a new debt instrument, like SPSO's

Claims here, must both:  (a) retain their liens on the same collateral, to the extent of the allowed

amount of such claims; and (b) receive deferred cash payments of a value equal, as of the

effective date of the plan, to the value of the secured creditors' interests in the estates' interests in

such collateral.  11 U.S.C. § 1129(b)(2)(A)(i).  The Debtors do not bother to argue that the Plan

treatment satisfies this prong of the cram down requirements, because the Plan is deficient on its

<div align="center">89</div>

face. The subordination of SPSO's senior liens on LP property to at least $2.2 billion of new senior debt violates the first requirement of section 1129(b)(2)(A)(i). See In re Cottonwood Corners Phase V, LLC, No. 11-11-12663, 2012 WL 566426, at *23 (Bankr. D.N.M. Feb. 17, 2012) ("By including subordination and non-disturbance provisions applicable to the leases to Baillios and Panera in its Plan, *Cottonwood is altering JPI's lien by modifying its lien rights as to new tenants, thereby not retaining JPI's existing lien. . . .* This modifies JPI's lien, and therefore does not satisfy the requirement of Section 1129(b)(2)(A)(i) 'that the holders of such claims retain the liens securing such claims.'") (emphasis added); Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 49-50 (E.D. Pa. 1996) ("Courts have refrained from confirming plans that substantially modify the rights of the creditor through either an open and notorious removal of the liens or the execution of subordination agreements. In such cases, the courts suggest a *literal interpretation of the statute requiring lien retention is appropriate*.") (emphasis added); Ford Prods. Corp. v. Bank of New York (In re Ford Prods. Corp.), 159 B.R. 693 (Bankr. S.D.N.Y. 1993) (characterizing the requirement that a mortgagor subordinate its claims to future tenant's interests as a plan's "fatal flaw," because it violated the lien retention requirement).[98]

154.    SPSO will also not receive deferred cash payments of a value equal, as of the effective date of the plan, to the value of SPSO's interests in LightSquared's interest in the LP collateral. First, the SPSO Note will not be in the money as of the Effective Date, and thus cannot provide SPSO with the present value of its claims as of such date. (SPSO FOF ¶ 272.)

---

[98]    The Debtors argue that their valuation of the applicable collateral is sufficient to fully collateralize SPSO's subordinated claim. This argument is irrelevant to the lien retention analysis. In In re L.B.G. Properties, Inc., 72 B.R. 65 (Bankr. S.D. Fla. 1987), the debtor proposed to subordinate a lender's prepetition senior mortgage to a new $4.8 million first lien and argued that the value of the collateral would "increase immediately at a rate sufficient to provide full collateralization of [the subordinated mortgage]." Id. at 67 But, the Bankruptcy Court could not "justify the replacement of existing collateral with a projected property valuation" and found that the subordinated mortgage did not satisfy the requirements of section 1129(b)(2)(A)(i). Id.

Second, courts look to the prepetition contract rate to determine whether the deferred cash payments prong is satisfied. See In re DBSD N. Am., Inc., 419 B.R. 179, 209 (Bankr. S.D.N.Y. 2009) (finding that deferred cash payments at the same interest rate as the prepetition loans coupled with a new first lien instrument that was "oversecured several times over" satisfied section 1129(b)(2)(A)(i) of the Bankruptcy Code). Here, the interest rate payable on the SPSO Note (13%, based on current LIBOR and the 1% LIBOR floor under the SPSO Note) is lower than the interest rate applicable to the SPSO's Claims today (17%) and the SPSO Note is paid-in-kind, rather than paid-in-cash. Therefore, the SPSO Note also violates the deferred cash payments prong of the cram down standard applicable to SPSO's class. In sum, if any portion of SPSO's Claims are not subordinated, and the Court follows the Supreme Court's holding in RadLAX, the Plan cannot be confirmed.

(iii)    The Debtors Fail to Show that the
Indubitable Equivalent Standard has been Satisfied

155.    Even if the Court does not follow the holding in RadLAX, and instead applies the indubitable equivalent standard to the treatment of SPSO's secured Claims, the Debtors have failed to show that standard is met. The Debtors short-circuit the inquiry by asserting that the SPSO Note provides SPSO with the present value of its claim and that the full value of SPSO's claims are protected by an equity cushion. (See Debtors' Post-Trial Br. ¶¶ 192-200; Debtors' Pre-Trial Br. ¶ 176 ("at bottom, the sufficiency of an equity cushion is the core of the indubitable equivalent test, its existence here . . . is all that is necessary to satisfy the fair and equitable standard.").) However, as described above and as shown by GLC's realistic valuation, the SPSO Note is out of the money on the Effective Date, and does not represent the equivalent of SPSO's $1 billion of senior secured claims. Second, an equity cushion (which does not exist here) is insufficient. Instead, the "indubitable equivalent" standard requires that there be *no*

91

*doubt* that replacement recoveries are equal to existing security interests.  See In re Philadelphia Newspapers, LLC, 599 F.3d 298, 310 (3d Cir. 2010) ("Thus the 'indubitable equivalent' under subsection (iii) is the *unquestionable value* of a lender's secured interest in the collateral.") (emphasis added); see also, In re Salem Suede, Inc., 219 B.R. 922, 935 (Bankr. D. Mass. 1998) (requiring "there [be] *no reasonable doubt* that [the subject creditor] will receive the full value of what it bargained for") (emphasis added) (internal citation omitted); In re Walat Farms, Inc., 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) ("'Indubitable' means '*too evident to be doubted*.'") (emphasis added) (internal citation omitted).

156.    To argue that SPSO's subordinated debt and supplemental collateral represent the indubitable equivalent of SPSO's prepetition first-priority secured lien, the Debtors (by necessity) cite to four cases that predate RadLAX (each by more than twenty years) where courts approved treating senior creditors with subordinated debt or replacement collateral.  SPSO submits that these cases are no longer persuasive authority given the RadLAX holding, but nevertheless points out that in each case the court made a specific finding the new collateral package fully compensated the subject creditor.  See In re James Wilson Assocs., 965 F.2d 160, 172 (7th Cir. 1992); In re Pine Mountain, Ltd., 80 B.R. 171, 175 (B.A.P. 9th Cir. 1987); Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.), 764 F.2d 406, 409 (5th Cir. 1985); Metro. Life Ins. Co. v. San Felipe @ Voss, Ltd. (In re San Felipe @ Voss, Ltd.), 115 B.R. 526, 531 (S.D. Tex. 1990).  The Debtors can not make the same showing here, where the SPSO Note is of entirely speculative value as of the Effective Date.  It is evident that FCC approval cannot be 100% guaranteed.  (See McDowell, 3/19/14 Hr'g Tr. 97:9-13 ("Q. Now, am I also correct, Mr. McDowell, based on your experience, with respect to the license modification application, it is possible the FCC will choose to do nothing at all? A. That is possible.").)  Moreover, the outside

92

dates set forth in the Plan, and specifically in Moelis' valuation, were not based on the opinions of Mr. McDowell, but were already set forth in the Plan and Mr. McDowell was simply asked to bless them after-the-fact. (SPSO FOF ¶ 155.) Moreover, McDowell based his opinions on (a) conversations with biased LightSquared executives (that were just told in December, 2013, *by the FCC* that the FCC could not state whether or when the license modifications would be granted); (b) a review of public documents (█████████████████████████████████████████

██████); and (c) his own experience (but Mr. McDowell offered no testimony as to precisely how that experience led to his opinions here and he is ethically barred from communicating with the FCC). (See supra Section X.A.) And, even apart from regulatory uncertainty, there are multiple technical issues with the Debtors' spectrum, the solution to which may involve expensive filters (which haven't been invented yet) and/or reduced power and impaired spectrum. (See supra Section X.A.) Therefore it is impossible for the Debtors to show that there is *no doubt* that the SPSO Note will be paid, as is required by the indubitable equivalent standard.

157.    The Debtors also try to argue that the fact that the Plan Support Parties are investing "hundreds of millions" of dollars behind the SPSO Note "speaks volumes as to the market's belief that the New LightSquared Entities' assets are more than capable of supporting the SPSO Note." (Debtors' Post-Trial Br. ¶ 201.) This misleading argument appears throughout the Debtors' pleadings but is unconvincing. First, the Plan Support Parties are investing $115 million behind SPSO *not* "hundreds of millions." Second, that $115 million investment is approximately *10%* of the Plan Support Parties' blended investment strategy that is heavily weighted in favor of putting in cash *ahead* of SPSO. Finally, the greatest indictment of this argument is the fact that in exchange for *$115 million*, and JPMorgan's agreement to take Reorganized LightSquared Inc. Common Shares in exchange for its deeply subordinated

93

interests, the Plan Support Parties stand to receive the vast majority of the supposed *$2.753 billion* of equity upside — at least if Moelis' valuation is to be believed. (See Section I.B. *supra*.)  What is more likely, is that the Plan Support Parties themselves don't believe Moelis' valuation.  Instead they have guaranteed themselves a positive return if the company is worth $2.2 billion, and have preserved all potential upside for themselves, in the unlikely event Moelis' valuation proves accurate.  Even Harbinger doesn't believe Moelis.  If it did, and NewCo's equity was worth $2.753 billion on the Effective Date, why would Harbinger share that recovery with the other Plan Support Parties?  Rather than buttress Moelis' inflated valuation, the Plan Support Parties' investment strategy demonstrates a much lower total enterprise value.

158.    Aside from the fact that the value of the SPSO Note will be highly speculative as of the Effective Date, other terms of the SPSO Note distinguish it from the indubitable equivalent of SPSO's Claims.  If the Plan is confirmed and consummated, the SPSO Note will (a) be issued in the "original principal amount" of SPSO's Prepetition LP Facility Claims (i.e., SPSO will not receive credit for postpetition interest accrued through the Effective Date, earned pursuant to section 506(b) of the Bankruptcy Code), (b) provide for the payment of interest in kind, rather than in cash (as under the Prepetition LP Facility), (c) have a longer maturity (seven years) than the Prepetition LP Facility (four years), (d) be subject to more rigorous transfer restrictions and be less liquid than SPSO's Prepetition LP Facility Claims, (e) not give SPSO any intercreditor rights and (f) be "silent" and not contain customary affirmative or negative debt covenants or defaults to protect SPSO's position.

159.    Finally, the Debtors accuse SPSO of being "disingenuous at best" when SPSO argues that repayment of the SPSO Note (a silent, third lien instrument, subordinated behind at least $2.2 billion of senior debt) is far riskier than SPSO's positions in prepetition LP

senior secured debt. (See Debtors' Pre-Trial Br., ¶ 176 n.93.) The Debtors continue: "SPSO chose to lend to a company subject to the rules and regulations promulgated by the FCC. Its entitlement to repayment at any given time, whether in a first lien or third lien position, was always dependent upon LightSquared's success in its regulatory endeavors. Thus, from a regulatory perspective, [SPSO] bears equal risk today as it did when it chose to enter into LightSquared's capital structure." Id. By this footnote, the Debtors argue that a third lien note subordinated behind at least $2.2 billion of senior loans bears "equal risk" to first priority secured debt given the fact that LightSquared's business is subject to regulatory oversight. By the Debtors' reasoning, then, the SPSO Note should be considered the indubitable equivalent of prepetition senior debt because both could turn out to be worthless if the FCC does not grant the license modification. That the Debtors would make this argument in the context of the proposed Plan, which contemplates paying the bulk of its creditors other than SPSO cash in full (senior lenders fifteen days after confirmation and general unsecured creditors on the Effective Date), and $223 million to holders of equity interests on the Effective Date, while it reinstates SPSO's Claims with deeply subordinated paper, is stunning.

> (iv)    The Plan is not Fair and Equitable with Respect to SPSO Claims the Court may Deem Unsecured (if any).

160.    Even if SPSO's Claims are partially (or fully) subordinated, the Debtors still must satisfy the cramdown requirements for unsecured creditors found in section 1129(b)(2)(B) with respect to any claims deemed unsecured by the Court. To satisfy this burden, the Debtors posit (with no support), that SPSO will retain, on account of its claims "property . . . that is of value equal to the full amount of SPSO's allowed claims" because "the SPSO Note will be issued in an amount equal to the allowed amount of SPSO's claims." (Debtors' Post-Trial Br. ¶ 190; Debtors' Pre-Trial Br. ¶¶ 171-172 (same)); 11 U.S.C. § 1129(b)(2)(B)(i). That argument

fails because the SPSO Note is a speculative instrument, that is out of the money on the Effective

Date, and accrues interest at a lower rate than SPSO's prepetition Claims. The face amount of

the SPSO Note is only one input that determines its value.

       161.    As argued throughout herein, it is not clear what the SPSO Note is worth

on the Effective Date, because the reorganized company's prospects are entirely contingent on

FCC approvals about which there is no certainty. (See supra ¶ 95.) The Debtors' own valuation

analysis is based on the assumption that FCC approvals are a foregone conclusion. The Debtors'

cannot simultaneously put forth a valuation that is contingent on FCC approval and argue that

the SPSO Note enjoys a substantial equity cushion based upon that valuation *as of the Effective*

*Date*, when everyone acknowledges that the correctness of the central assumption underlying

Moelis' analysis will likely be unknown as of that date.[99]

## XII.   SPSO's Vote Should Not be Designated.

    A.    *There is No Disagreement on the Showing the*
           *Debtors Must Make in Order for the Court to Designate SPSO's Vote.*

       162.    SPSO and the Debtors agree that to designate SPSO's vote, the Court must

be persuaded that SPSO voted its claim (a) to extract an advantage not available to other

creditors, or (b) in furtherance of an ulterior motive unrelated to its claim or its interests as a

creditor. (See Debtors' Post-Trial Br. ¶ 172; Debtors' Pre-Trial Br. ¶ 128); See In re DBSD N.

Am., Inc., 421 B.R. 133, 138 (Bankr. S.D.N.Y. 2009) ("**DBSD I**") (citing In re Dune Deck

---

[99] In addition to the specific statutory requirements enumerated above, as of the filing of this Post-Trial Brief (SPSO's last opportunity to object to confirmation of the Plan in writing) the Plan still fails to satisfy section 1129(a)(5) of the Bankruptcy Code, because the plan proponent has not "disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," and has failed to show that such appointment is "consistent with the interests of creditors." See 11 U.S.C. 1129(a)(5). On March 31, 2014 the Debtors filed an "Initial List of Directors for New LightSquared Entities" [Docket No. 1456], which discloses the identity of just 3 individual proposed board members, one of whom is the current CEO. If the Debtors intend on appointing representatives of the other Plan Support Parties to the Reorganized Debtors' boards, that information was required to have been disclosed by now. Because the Debtors have failed to do so, SPSO has been deprived of the opportunity to evaluate whether the proposed board members are "consistent with the interests of creditors."

Owners Corp., 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995); In re Adelphia Commc'ns Corp., 359

B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).    Importantly, "Section 1126(e) comes into play when

voters venture beyond mere self-interested promotion of their claims, [and applies to those]

attempting to obtain some benefit to which they were not entitled." DISH Network Corp. v.

DBSD N. Am., Inc. (In re DBSD N. Am., Inc.), 634 F.3d 79, 101-02 (2d. Cir. 2011) ("**DBSD**

**II**") (citing Figter Ltd. v. Teachers Ins. and Annuity Ass'n of Am., (In re Figter Ltd.), 118 F.3d

635, 638 (9th Cir. 1997)).

  B.    *By Voting Against the Plan SPSO did not try to*
       *Extract an Advantage Over Similarly Situated Creditors*

       163.    The first prong of the designation analysis is important; it reveals the

purpose of section 1126(e) of the Bankruptcy Code — to shield the Debtors from a singular

creditor's attempt to exploit a collective action problem.    Here, the Debtors try to use designation

as a sword.    The Debtors separately classified SPSO and sought designation as a coordinated

strategy in an attempt to avoid the application of *nearly every* confirmation requirement designed

to protect creditors' expectations, including the cram down requirements and the best interests

test.    This strategy is an abuse of the intended purposes of section 1126(e).    (See infra Section

XII.F.)    In fact, as the Court is aware, Harbinger's counsel first raised the threat of designation of

SPSO's vote before *any* plan was on file in these cases.

       164.    It is not surprising that the Debtors devote just one paragraph in their Pre-

Trial Brief to the first prong of the designation analysis.    Given the Plan's treatment of similar

claims, SPSO's vote to reject cannot be shown to be an attempt to gain an advantage unavailable

to other creditors.    The Plan discriminates against SPSO by (a) paying similarly situated senior

secured lenders cash *prior to* the Effective Date in full satisfaction of their claims, (b) treating

equity with cash payments upon consummation, and (c) rolling SPSO's senior secured claims

into a silent, third-lien note, subordinated to at least $2.2 billion of new senior debt, that pays

interest at a lower rate than SPSO's prepetition holdings. Against that backdrop, SPSO's vote to

reject protests against *unequal treatment*, and should not be misconstrued as an attempt to extract

an advantage unavailable to other creditors. SPSO has stated time and again that it only desires

ratable, equitable treatment.[100]   The Debtors' baseless accusations that SPSO is lying is

insufficient to support such a finding. To understand SPSO's vote to reject, one need only

consider the Plan's discriminatory treatment of SPSO's claims which speaks for itself.

   C.    ***SPSO's Vote to Reject is Consistent with its
         Interests as a Creditor and was not Cast with any Ulterior Motive.***

         165.    The Plan's treatment is also the best available evidence showing that

SPSO's vote to reject was ***entirely*** consistent with its interest as a creditor and not in furtherance

of an ulterior motive. This would be a different case if SPSO was being treated ratably with the

other LP lenders. In that scenario SPSO could be forced to argue why its interests (legitimately)

diverge from the remainder of its class to avoid designation. As the Plan stands, however,

SPSO's argument is easy. No senior secured creditor in SPSO's position would ever vote in

favor of the Plan, because there is no plausible argument that a seven year, silent note (with PIK

---

[100]    Indeed, many (if not *most*) of SPSO's objections to the Plan would be rendered moot if the Debtors simply took the total consideration being paid to Prepetition LP Lenders under the Plan (i.e. just over $1 billion cash plus post Effective Date debt) and distributed such recoveries ratably among all Prepetition LP Lenders, as is *required* under the Prepetition LP Credit Agreement. SPSO is willing to accept any debt instrument that is acceptable to the other Prepetition LP lenders as long as distributions are ratable and equitable. The Debtors argue that because SPSO's affiliate set the other LP lenders' expectations of full cash payment (via LBAC's bid), SPSO must suffer the consequences now that financing sufficient to pay off all lenders is not forthcoming. At best, this argument is borderline frivolous. The Debtors are represented by experienced counsel who understand that circumstances change as time passes in every single bankruptcy case. But this argument is also a direct attack on the power of this Court to enforce the provisions of the Bankruptcy Code, and the fundamental object of bankruptcy laws: "the equitable distribution of the debtor's assets amongst his creditors." Kuehner v. Irving Trust Co., 299 U.S. 445, 451 (1937). Sometimes, stakeholders have to accept less than full payment in cash in bankruptcy proceedings, and the Prepetition LP Lenders may have to in this case, but the reason insolvency laws exist in the first instance is to ensure that all stakeholders will be fairly treated. The Debtors' Plan is a perversion of that fundamental principle.

98

interest) devoid of any covenants is commensurate with payment in full, in cash, prior to the effective date.

166.    To overcome this reality, the Debtors resort to urging the Court to find that SPSO would vote against *any* Plan based on the "the totality of the circumstances" (including events occurring before these cases were even filed).  (See Debtors' Post-Trial Br. ¶¶ 171, 178, 183; Debtors' Pre-Trial Br. ¶ 143.)  In their Post-Trial Brief, the Debtors argue that "SPSO and the Ergen Parties have demonstrated by their conduct that they would vote against, and indeed have voted against, any chapter 11 plan that does not provide the Ergen Parties with substantial control over reorganized LightSquared." (Debtors' Post-Trial Br. ¶ 184.)  In the Pre-Trial Brief, the Debtors' disingenuously refer to a term sheet that SPSO provided to LightSquared as "evidence" that SPSO is lying when it reiterates that it only wants ratable treatment. Specifically, the Debtors assert: "[o]ne only has to review the SPSO Plan Term Sheet sent by SPSO to LightSquared to recognize that SPSO and the Ergen Parties remain very interested in entering into a transaction to acquire LightSquared and will vote (and, in fact have voted) down any chapter 11 plan that does not effect such an outcome." (Debtors' Pre-Trial Br. ¶ 143.)[101] What the Debtors do not disclose in connection with this inappropriate use of settlement discussions, is that out of a six page term sheet, which relates to a proposed exchange for *debt and cash*, a single, one sentence footnote provided that if the requisite majority of Prepetition LP Lenders agreed, SPSO would be amenable to accepting other non-cash consideration including equity in Reorganized LP. In other words, the Debtors have nothing to support this accusation

---

[101]    The Debtors cajoled SPSO into sending a term sheet, arguing in front of the Court in an off-the-record conference that the absence of a term sheet should be viewed as "evidence" of SPSO's bad faith.  Upon receipt of a term sheet, however, the Debtors turned around and argued that the fact that SPSO would accept non-cash consideration on account of its claims is also evidence of wrong doing. While SPSO does not agree that settlement discussions should be admissible in any event, surely they can't be evidence both of crimes of commission and of omission.

either. Yet again, the Debtors have re-packaged their equitable subordination arguments into yet

another code section.

<div align="center">

(i)    *There is No Evidence of a Pre-Meditated Scheme*
*That Indicates SPSO Voted to Reject with an Ulterior Motive*

</div>

167.    The Debtors' argument that SPSO voted to reject as part of a broader pre-

conceived acquisition strategy rests on the conspiracy theory spun by the Debtors, the Ad Hoc

Secured Group, and Harbinger that Mr. Ergen seeks to drive the price of LightSquared's

spectrum down as far as he can, and as soon as it hits bottom, he'll buy it. The record of these

cases (including the fact that LBAC's bid has been withdrawn), the sworn testimony of Mr.

Ergen, and SPSO's continued assertion that it is only seeking ratable treatment, should convince

the Court to reject the Debtors' wild, unsupportable allegations. The latest egregious fantasies

are debunked below:[102]

---

[102]    Objection of SP Special Opportunities, LLC to (A) LightSquared's Motion for Entry of an Order
Designating Vote of SP Special Opportunities, LLC and (B) Joinder of Ad Hoc Group of LightSquared LP
Lenders in Support of Same ("**SPSO Designation Objection**") [Docket No. 1405] contains SPSO's
responses to the myriad allegations contained in the Debtors' Designation Motion [Docket No. 1371] and
repeated in the Debtors' Post Trial Brief, and are incorporated herein by reference.

<div align="center">

100

</div>

| Fantasy | Reality |
|---|---|
| In June of 2013, SPSO joined the Ad Hoc Secured Group in name only and solely as a pretext to ensure that LightSquared did not get the benefit of its bargain in the Exclusivity Stipulation. (Debtors' Post-Trial Br. ¶ 176) | Prior to joining the Ad Hoc Secured Group, SPSO appeared in Court and advised the Debtors, the Court and other parties in interest that it wanted to keep the creditor protection provisions without joining the group and would only join the group if that was the only means of keeping the Debtors bound to the Exclusivity Stipulation. SPSO eventually joined the Ad Hoc Secured Group to make sure the creditor protection provisions of the Exclusivity Stipulation survived, because that was the only way SPSO could be assured that the Debtors would comply with their fiduciary duties to all stakeholders and pursue a value maximizing sale, even if such approach was opposed by the Debtors' controlling equity holder. (See infra Section XII.D.) |
| In July of 2013, LBAC and SPSO entered into the Plan Support Agreement to tie up the Ad Hoc Secured Group, who were at that time negotiating with LightSquared and other parties to try to reach to a consensual resolution of these Chapter 11 Cases. (Debtors' Post-Trial Br. ¶ 176) Although LightSquared and the Ad Hoc Secured Group tried to continue negotiations (after SPSO disclosed its holdings), they were derailed in short order by Ergen's presence. (Id. at ¶ 122). | The Debtors and the Ad Hoc Secured Group's "negotiations" were not leading to any viable end to these chapter 11 cases. In January 2013, before SPSO was involved in these cases, this Court presided over a trial whereby the Ad Hoc Secured Group argued that exclusivity should be terminated so the lenders could propose their own plan or propose a sale of the company. Therefore, in an effort to push these cases forward, the Ad Hoc Secured Group engaged in arm's length, rigorous negotiations before entering into the Plan Support Agreement of their own free will and upon the advise of counsel and financial advisors.[103] The Ad Hoc Secured Group insisted on a myriad of provisions, including an increase in the purchase price and other terms. LBAC negotiated for a number of key terms as well, |

---

[103]    The Ad Hoc Secured Group argues that LBAC "aggressively pursued an arrangement that would prevent the Ad Hoc Secured Group members from taking on any other plan alternatives." (AHG Post-Trial Br., p. 34.) The innuendo that SPSO overwhelmed the Ad Hoc Secured Group's better judgment and forced the lenders to sign the Plan Support Agreement is ridiculous. Even the Ad Hoc Secured Group admits that "the **Ad Hoc Secured Group** then broke off negotiations with other parties in interest." (Id.). Every active party in these cases is ably represented by experienced counsel, and any suggestion that SPSO somehow controlled negotiations it was not a party to is without basis.

| *Fantasy* | *Reality* |
|---|---|
| | including milestones, which were negotiated, memorialized in writing, and agreed to. |
| | LBAC did negotiate in good faith with the Debtors in the Summer and early Fall of 2013, and relayed an interest in getting the company on board. (SPSO FOF ¶ 44.) LBAC's counsel did say that she believed that having a willing seller would be worth something in the context of trying to negotiate a consensual deal. (See, Zelin, 3/27/14 32:8-16.) While its bid was open, LBAC worked in good faith to get a deal done and sought to have a consensual arrangement with the company as opposed to a litigated forced sale. The Debtors rebuffed every attempt. So much so that the financial advisor to the Ad Hoc Secured Group complained to the Special Committee that the management and board were acting solely for equity and ignoring LBAC's bid to the company's detriment. |
| The next step in Ergen's May 2 plan was to await the outcome of the marketing process in the hope that no other parties would participate, allowing Ergen to negotiate a lower price. (Debtors' Post-Trial Br.¶ 129).<br><br>The May 2 Presentation evidences an 8-step "Strategy Plan" for "DISH to acquire the LightSquared spectrum, including a bait and switch scheme" that was supposedly hidden from LightSquared and its lenders. (AHG Post-Trial Br., pp. 32-37)[104] | The Debtors and the Ad Hoc Secured Group disregard the context in which the May 2 Presentation was made in order to distort its import. The record makes clear that there is absolutely nothing nefarious about the May 2 Presentation. The Ad Hoc Group clings to the following statement in the May 2 Presentation to argue that LBAC was pursuing a "bait and switch scheme" where LBAC would consummate its bid only if there were other competing bids: "If proposal not accepted, NewCo will have the ability to see results of marketing process and, if process is unsuccessful, revert with a different bid later." (PX0867 at SPSO-00011828.) However, the context and content of the May 2 Presentation clearly indicate otherwise. The May 2 Presentation was written more than two |

---

[104]    The Ad Hoc Secured Group's counsel similarly misconstrued the May 2 Presentation during the Plan Confirmation hearing, calling it a "play book." (Ergen, 3/26/14 Hr'g Tr. 18:16-23 ("[T]his was not a play book. . . . This was a presentation to the board . . . ."), 22:8-9 (Judge Chapman: "Mr. Kurtz, we're not going to call it a play book, all right?").)

| Fantasy | Reality |
|---|---|
| | months before LBAC and the Ad Hoc Group entered into the PSA calling for an auction and has nothing to do with whether LBAC would follow through with its bid at the December 11 auction. Instead, it discusses DISH's strategy to propose an acquisition to the Debtors before the Debtors' exclusivity periods expired, and what would happen if the Debtors declined the offer. (See, infra ¶¶ 168-170.) |
| In November and December of 2013, the Ergen Parties fabricated an alleged technical issue to discourage other bidders and justify their subsequent disavowal of their obligations under, or in connection with, the LBAC Bid. (Debtors' Post-Trial Br. ¶¶ 130, 176) | The technical issue was raised by ▮▮▮▮▮ during a conference call with LBAC in November. (See infra Section XV.B., ¶¶ 210-11). After the call, LBAC openly communicated its concerns with its plan support partners. That LBAC sought to find a way to stay in the deal and alleviate its concerns regarding technical issues is an indication of *good faith*, not bad. |
| DISH insisted that LightSquared publicize the technical issue to all prospective bidders by requiring LightSquared to disclose the issue in its data room. (Debtors' Post-Trial Br. ¶¶ 23, 132) The only plausible explanation to be drawn from this conduct is that the Ergen Parties wanted to drive away other bidders by scaring them in the days before the auction. By doing this, they could prevent other bidders from participating in the auction, ensuring they could win. (Id. at ¶ 133). | None of DISH, LBAC or SPSO ever demanded anything in this regard. The topic was raised by counsel to LBAC solely with an advisor to the lenders (which was permitted by the confidentiality agreement). No request, let alone demand was ever made to the company by a representative of LBAC and no information was ever shared with a third party investor or bidder. LightSquared independently decided that it was important to share information with everyone having nothing to do with LBAC. (See Debtors' Post Trial Br. ¶ 132, n.50).[105] Once it did, Centerbridge walked away within days. Had the Debtors kept that information to itself, more time and expense would have been wasted as the Debtors ignored more viable options. |

---

[105]    The Debtors' Post-Trial Brief both accuses SPSO of "fabricating" the technical issue (¶ 176) and cites LightSquared's CEO's testimony where he admitted that "LightSquared itself intended to provide information about the alleged technical issue to prospective bidders by posting such information in its data room." (Debtors' Post-Trial Br. ¶ 132, n.50) The trial testimony of the Debtors' own CEO fatally undermines the Debtors' claim that SPSO "fabricated" the technical issue.

| *Fantasy* | *Reality* |
|---|---|
|  | LBAC expressed concern that the Debtors were hiding a technical problem from other potential bidders, which does not constitute bad faith, nor is it unusual. LBAC wanted to participate in a process that was level and transparent. LBAC was concerned that the Debtors risked the integrity of the process by negotiating and trying to sign up third parties that were bidding with incomplete information. Among other problems, this could divert the Debtors' attentions and resources to deals that ultimately would not close and waste precious time. LBAC had a legitimate interest in making sure that parity of information existed. |
| DISH indicated "through counsel, [that] when other bidders failed to materialize during the auction process, that it might reevaluate and lower [its] stalking horse bid." (Debtors' Post-Trial Br. ¶ 23.) | This testimony appears nowhere in the record.[106] At no point did Mr. Zelin testify that LBAC threatened to "lower" its bid if no other bidders materialized. In fact, all Mr. Zelin recounted was that he was told by LBAC's counsel that when other bidders failed to materialize, it should force the Debtors to cooperate with LBAC. (See Zelin, 3/27/14 Hr'g Tr. 38:10-12). Mr. Zelin even proposed that he thought LBAC's counsel was merely trying "to get [the Debtors] to the table and to get them to focus on negotiating a contract and finishing diligence." (See Zelin, 3/27/14 Hr'g Tr. 38:14-15). LBAC's counsel's (alleged) statements are entirely consistent with a stalking horse purchaser that wants to firm up its deal. |
| On December 11, 2013, notwithstanding the alleged technical issue and their purported diminished interest in the assets, multiple representatives of the Ergen Parties came to New York ready to participate fully in the auction. (Debtors' Post-Trial Br. ¶ 176) | *Precisely*. How the Debtors can possibly interpret the fact that LBAC intended to honor its commitment at the auction notwithstanding the technical issue as indicative of bad faith or a pre-meditated strategy to torpedo value is not explained in their brief. The Ad Hoc Secured Group argues that the fact that LBAC was |

---

[106] Although not clear, the argument appears to be based on either (a) hearsay testimony about what Mr. Zelin was told by counsel for LBAC or (b) testimony about what Mr. Zelin thought counsel for LBAC was trying to tell him. Either way, it is inadmissible.

| *Fantasy* | *Reality* |
|---|---|
| | prepared to participate in the auction proves that the "technical issue" (discovered pre-auction) was merely a pretext for later withdrawing the bid. However, SPSO did not withdraw its bid until it was permitted to do so under the Plan Support Agreement, and the Court has found that LBAC could have withdrawn its bid at that time for no reason at all. That LBAC still tried to get a deal done and didn't withdraw its bid until it had a right to do so under the Plan Support Agreement, emphasizes LBAC's good faith. |
| On December 11, 2013, after the LightSquared auction was cancelled, LBAC's counsel told the Ad Hoc Secured Group that they wanted to renegotiate the LBAC Bid. (Debtors' Post-Trial Br. ¶¶ 136, 176) | *LightSquared* cancelled the auction to pursue the Centerbridge "deal." (SPSO FOF ¶ 50.) |
| On December 31, 2013, the Ergen Parties proposed a significantly devalued bid for LightSquared's assets. (Debtors' Post-Trial Br. ¶¶ 138, 176). Instead of an unconditional commitment to buy, LBAC offered to purchase the assets subject to a host of conditions, including, among others, FCC approval of the uplinks for standalone mobile terrestrial broadband service and confirmation that such use would not interfere with GNSS receivers. Yet, in what Ergen testified was a good faith offer, the revised LBAC proposal called for FCC approval to be granted and the other conditions to be met by December 31, 2014, the newly proposed outside date. (Id. at ¶ 139; see also Id. at 52. | Again, SPSO objects to the admissibility of settlement discussions. However, this is evidence of LBAC's desire to pursue a deal by finding a consensual work-around to address the newly discovered technical issue. It is not evidence of any broader scheme. In fact, the plan proponents seek to have this both ways. In its offer, LBAC offered to pay the same consideration as soon as it could be determined that 20 MHz of clean uplink spectrum was available. It communicated in writing that the means of testing was open for discussion and that it wasn't wedded to a particular test or construct as to how the "technical issue" could be ruled out. Despite arguing that the technical issue is made up and not an issue, the Debtors and the Ad Hoc Secured Group were not prepared to assume that risk. As offered, the bid is only devalued if the technical issue is real or if it takes a long time to demonstrate that the spectrum can be cleaned up. The settlement offer did not assume FCC approval within a year, it merely recognized that the Ad Hoc Secured Group would want an outside date by which they could terminate if a closing did not appear to be promising. That proposed |

| Fantasy | Reality |
|---|---|
| | "walk date" — not approval date — was capable of being extended by the parties. |
| On January 9, 2014, LBAC terminated the LBAC Bid, citing the failure of certain milestones as the basis, despite the fact that they had known since November 25, 2013 of the changes in the dates for the Confirmation Hearing. | It is not bad faith for LBAC to exercise walk rights it negotiated for under the terms of the Plan Support Agreement.   The Court has already ruled that LBAC was entitled to terminate for any reason or no reason. |

168.    The Debtors' and the Ad Hoc Secured Group's "evidence" that SPSO's conduct throughout these cases (up to and including its vote against the Plan) is all a part of a pre-conceived "playbook" is entirely predicated on a mangled reading of Mr. Ergen's May 2, 2013 presentation to the DISH board.  In particular, the notion that the document proposes a plan to revert with a lower bid if there is no competing bidder at auction has no support.  The "key to the scheme" according to the Ad Hoc Secured Group is the following sentence: "If proposal not accepted, NewCo will have the ability to see results of marketing process and, if process is unsuccessful, revert with a different bid later."  (PX0867 at SPSO-00011828).  However, in context, the presentations' innocent meaning is clear.  The May 2 Presentation contemplated that in early June 2013, LightSquared and Mr. Falcone would be working to prepare a plan of reorganization to propose before LightSquared's exclusivity period expired on July 15.  (Ergen, 3/26/14 Hr'g Tr. 229:25-231:13.)  The May 2 Presentation contemplated LBAC making a bid for LightSquared's assets by May 15, before LightSquared began marketing efforts in connection with such a plan.  (Ergen, 1/13/14 Hr'g Tr. 203:11-25; Ergen, 3/26/14 Hr'g Tr. 229:15-19.)  Mr. Ergen understood that if LightSquared rejected the bid, then it likely would engage in a marketing effort in connection with its plan *before exclusivity expired*.  (Ergen, 3/26/14 Hr'g Tr. 229:20-24.)  *If LBAC's bid was rejected by the company*, LBAC could see the results of

106

LightSquared's June marketing efforts and have the benefit of knowing what plan of

reorganization or transaction LightSquared filed by July 15. With that new information, LBAC

could then consider returning to LightSquared with another offer to buy the assets. (Ergen,

3/26/14 Hr'g Tr. 29:17-30:7; 229:15-24.) The May 2 Presentation says nothing about LBAC not

following through with a bid if its bid was accepted. A full reading of the relevant page from the

May 2 Presentation makes this clear:

### Timing Considerations

- L2 has the exclusive right to file a chapter 11 plan until July 15

- L2 likely to begin exploring strategic alternatives in early June if no restructuring or sale strategy emerges

- Submit offer now, subject to minimal conditions, and require prompt acceptance (e.g., by May 15) before marketing process gets underway

  - If proposal accepted, L2 would be subject to "no shop" until NewCo's stalking horse bid protections are approved

  - If proposal not accepted, NewCo will have the ability to see results of marketing process and, if process is unsuccessful, revert with different bid later

169.    LBAC did, in fact, follow this strategy. It made a $2 billion bid on May

15 and asked for LightSquared to respond by the end of May. (SPSO FOF ¶ 72.) LightSquared

did not respond to the bid and showed no signs of engaging with LBAC. Once it was legally

able to do so, LBAC reverted with a different bid, this time to LightSquared's lenders and,

ultimately, entered into the PSA with the Ad Hoc Group pursuant to which LBAC would bid

$2.22 billion for LightSquared's assets in an auction. (SPSO FOF ¶ 83.)

170.    The May 2 Presentation, written more than two months before LBAC and the Ad Hoc Group entered into the PSA calling for an auction, has nothing to do with whether LBAC would follow through with its bid at the December 11 auction. It also has nothing to do with the facts that: (1) in November 2013, ████████████████████████; (2) after LightSquared cancelled the auction, the milestones in the PSA were not met; and (3) LBAC made a good faith effort to negotiate a new deal with the Ad Hoc Group that included an FCC condition. The only plausible reading of the presentation should foreclose the Debtors' and the Ad Hoc Secured Group's desperate attempts to find "evidence" of a scheme that doesn't exist.

171.    Trading, trying to settle disputes, negotiating, extending deadlines to work in good faith, seeking a level playing field without communicating with or seeking to influence other bidders, these things have all been turned on their head. What if LBAC had done the opposite of what it is accused of? For instance, how would the Debtors' brief read if LBAC *didn't* send its principles to participate in an auction the *Debtors* ultimately cancelled. Would it have made a difference at all? What if SPSO had merely traded and not joined the Ad Hoc Secured Group? How would the Ad Hoc Secured Group's brief read in that case? Would it have made a difference? The Debtors and the Ad Hoc Secured Group have turned a series of legal activities into a nefarious scheme. Purchasing claims from willing sellers — evidence of SPSO's desire to halt negotiations. Objecting to confirmation of a plan that subordinates, disallows and discriminates against its position — evidence of a desire to liquidate the company. Trying to settle — evidence of bad faith. Trying to engage a company to be a willing seller — more bad faith. Not prosecuting a specific performance action that the court ruled was meritless — bad faith and evidence of improper motive. It's all a catch 22.

108

172.    Notwithstanding the Debtors' attempts to twist the facts, at no point did SPSO act in any way that "proves" the existence of a pre-conceived plot to infiltrate LightSquared and "kill the company." If the Court is to believe the Ad Hoc Secured Group and the Debtors, a senior secured lender can never argue that there is insufficient value to pay equity. Because if the lender disparages the Debtors' valuation, that is "evidence" that the lender is acting with impure motivations, and is trying to force a liquidation. SPSO vigorously disputes Moelis' valuation to demonstrate that its silent, third lien (or unsecured paper) is not valuable — a position in the capital structure no outside or inside participant would take. Not even LP preferred holders are comfortable staying where they are, and instead have committed protective investments designed to roll up their current equity investments into a higher priority. If pointing out flaws is evidence of bad faith, no valuation fight in chapter 11 would be immune.

(ii)    *Purchasing Claims to Acquire a Blocking Position (even if true) Is Not Sufficient Evidence to Designate a Creditors Vote*

173.    After sifting through those allegations born of the Debtors' and the Ad Hoc Secured Group's overactive imaginations, the primary allegation in support of designation is that SPSO purchased a blocking position to further an acquisition strategy. They argue that Mr. Ergen created SPSO to acquire a blocking position in LightSquared's senior secured debt in order to control the bankruptcy and facilitate an acquisition of LightSquared's spectrum by DISH. As has been extensively argued and briefed, SPSO does not concede this point, and maintains that a legitimate investment purpose motivated SPSO's debt purchases, including SPSO's purposeful acquisition of a blocking position.[107] (See 1/13/14 Hr'g Tr. 66:16-25 ("Q. So you saw the industry changes, you saw the things happening at the FCC. What did you do in

---

[107]    This case is the poster child for why a creditor would want to secure the protections afforded by section 1129(b) of the Bankruptcy Code.

response to those changes? A. Well, I believed the collateral was even better, right. So I was very
confident in the collateral. So I continued to invest. I didn't take every trade that was offered to
me. But when I got to a price – I think I raised my limit up to ultimately to about ninety-six cents
on the dollar. And when I got to th[at] limit, I bought whatever people would sell at that limit,
because I felt that it was a great investment.").) Even if the Court considers the motives and
conduct of DISH, LBAC or other affiliates of Mr. Ergen, the Debtors' allegations are
unsupported by the record.  (SPSO FOF ¶¶ 276-87.)  LBAC has withdrawn its bid, and Mr.
Ergen confirmed in sworn testimony that neither he nor DISH is interested in purchasing
LightSquared's spectrum. (SPSO FOF ¶ 81; Ergen, 3/26/14 Hr'g Tr. 339:16-18)

174.    However, even if the Court wants to believe that SPSO purchased
LightSquared debt with an eye towards acquiring its spectrum, that fact alone would not be
enough to designate SPSO's vote.  The Debtors accuse DISH of employing a "loan-to-own"
strategy, but do not cite to one case or statute outlawing such behavior.  In fact, the Second
Circuit's decision in DBSD, the foundation of the Debtors' designation strategy, stated the exact
opposite of what the Debtors try to argue: "We emphasize, moreover, that our opinion imposes
no categorical prohibition on purchasing claims or other strategic intentions.  On other facts,
such purchases may be appropriate." See DBSD II, 634 F.3d at 105.[108]

175.    Moreover, the Debtors try, but fail to distinguish the cases cited by SPSO
that have held acquiring a blocking position for the purposes of securing acceptance or rejection
of a plan does not constitute bad faith.  (See Debtors' Pre-Trial Br. ¶ 135.) See also Mokava
Corp. v. Dolan 147 F.2d 340 (2d Cir. 1945); In re DeLuca, 194 B.R. 797 (Bankr. E.D. Va. 1996);

---

[108]    The Second Circuit's pronouncement in DBSD is not surprising considering that, in a case decided before
the enactment of the Bankruptcy Code, the Second Circuit previously held that purchasing claims to secure
control of a Debtor was not a valid reason to disregard a creditor's vote. Mokava Corp. v. Dolan, 147 F.2d
340 (2d Cir. 1945).

110

In re Figter Ltd., 118 F.3d 635; In re Gilbert, 104 B.R. 206 (Bankr. W.D. Mo. 1989) (each

holding, under various factual circumstances, that obtaining a blocking position to defeat

confirmation of a plan is permissible). The Debtors' attempts to distinguish these cases by citing

excerpts from the opinions finding that the relevant claim purchases did not harm other creditors.

In sum, the Debtors try to argue away the relevance of these decisions by assuming the truth of

their unsupported allegation — that SPSO has caused identifiable harm. If the Debtors truly

believe they are proposing a Plan that pays all creditors in full, where are the damages? The

Debtors argue whatever is convenient when it suits them; the Plan cannot make everyone whole

if SPSO has caused irreparable harm to creditors.

D.    *Why Did LightSquared Permit (and Encourage) SPSO's Debt Purchases?*

176.    The Debtors argue that SPSO's purchases of LightSquared debt was in

bad faith, damaged the company and its stakeholders, and warrant the designation of SPSO's

vote. However, the Debtors have not always taken this position. SPSO's first trade was entered

into on April 13, 2012, more than one month before the Debtors filed for bankruptcy, and SPSO

initiated six more trades prior to the commencement of these cases on May 14, 2012. (See Ex. E,

SPSO Trading Detail.) Evidence from the Ergen Adversary Proceeding and the record of the

confirmation hearing shows that Mr. Falcone, and by extension, LightSquared, were well aware

that Mr. Ergen was behind SPSO's purchases. (See Defendants SP Special Opportunities, LLC

and Charles W. Ergen's Proposed Findings of Fact, Adv. Proc. 13-01390 [Docket No. 144] (filed

Mar. 14, 2014) ("**SPSO/Ergen Adv. Pro. FOF**") ¶ 38.

177.    If the Debtors wanted to keep Mr. Ergen out of their capital structure, the

beginning of these cases was the time to do something about it. The Court may have fashioned

appropriate relief at that time (if it was warranted), and we wouldn't be here today. However, at

the time, LightSquared *wanted* Mr. Ergen in the capital structure because the Debtors were

111

engaged in an exclusivity battle with the Ad Hoc Secured Group from the first day of these cases. Mr. Ergen was seen as a potential ally in that fight who was positioned (and possessed the financial wherewithal) to rearrange the balance of power.

178.    In February, 2013, The Debtors and Harbinger entered into an Exclusivity Stipulation with the Ad Hoc Secured Group. The key terms of that agreement obligated the Debtors to prepare for and conduct a sale of LightSquared's spectrum if the Debtors and Ad Hoc Secured Group were unable to reach agreement on a consensual plan by June 3, 2013. The Exclusivity Stipulation provided that those terms would evaporate if the Ad Hoc Secured Group's debt holdings fell below 50%.

179.    SPSO was seen as the Debtors' ticket to nullifying lender protections that would make it difficult for equity to continue to stall. In May 2013, counsel for the Debtors cited SPSO's holdings in a letter to the Ad Hoc Secured Group as a basis to terminate the provisions of the Exclusivity Stipulation requiring a sale. Even after SPSO's counsel confirmed to the Debtors that Mr. Ergen was the owner of SPSO, ███████████████████████████ ████████████████████████. (See Ex. F, 6/13/13 Email from M. Barr of Milbank Tweed to R. Strickland of Willkie Farr (SPSO-00009064) ( "████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████"). Ultimately, SPSO nominally joined the Ad Hoc Secured Group to preserve the requirement that the Debtors initiate a sale process.

180.    Now that the presence of SPSO in LightSquared's capital structure no longer advances the Debtors' (improper) desire to preserve equity to the detriment of senior stakeholders, the Debtors' position has taken a one hundred and eighty degree turn.  Ironically, now, instead of encouraging SPSO to close their trades, the Debtors accuse SPSO of intentionally "hanging" trades, and cite SPSO's debt trading as the primary reason to designate SPSO's vote (and the source of any and all evils to befall the Debtors' cases).  The Debtors' flexible, self-serving attitude towards SPSO's ownership of LightSquared debt undermines the Debtors' allegations regarding the damage SPSO's presence has inflicted on the estates.  If the Debtors had stepped in and sought an injunction, SPSO would not now be asked to suffer a loss of hundreds of millions of dollars.  The fact that the Debtors sat around and watched — when they first suspected and thereafter knew the identity of SPSO — is a critical fact that cannot be overlooked.  That is not equitable.

E.    ***DBSD and Allegheny are Distinguishable***

181.    SPSO has previously demonstrated that <u>DBSD</u> and <u>Allegheny</u>[109] are distinguishable from this case on at least five bases:

- SPSO purchased claims *before* the Debtors' proposed the Plan.  The creditors in <u>DBSD</u> and <u>Allegheny</u> purchased after an objectionable plan was proposed.  As the Court will recall, the Debtors in this case threatened designation before *any* Plan was on file.

- Each of SPSO's purchases made good economic sense at the price paid.[110]  DISH paid par in <u>DBSD</u>, and Japonica paid a premium for a blocking position in <u>Allegheny</u>, then immediately stopped purchasing claims.

- SPSO has repeatedly indicated to the Debtors in pleadings and direct communications between professionals that it is interested in only ratable

---

[109]    <u>In re Allegheny Int'l, Inc.</u>, 118 B.R. 282 (Bankr. W.D. Pa 1990).

[110]    Even the trades at 96 cents on the dollar were economically rational.  At the time, the debt was worth more than par.  The record shows that SPSO passed on numerous trades, including a trade that would have yielded a blocking position much earlier.

treatment, and its vote is not contingent on acquiring the Debtors assets. The DBSD court was able to rely on direct evidence of DISH's willingness to overpay for claims in order to control the bankruptcy process.

- There is no pending acquisition proposal from SPSO (and never was), and LBAC has withdrawn its bid. The designated creditors in both DBSD and Allegheny had an open acquisition proposal when it voted against the debtor's plan.

- The SPSO Note will be undersecured or unsecured as of the Effective Date, and Judge Gerber found in DBSD that the first lien lenders were "dramatically oversecured," and there was no "material risk" that the first lien lenders would not be paid on account of their claims.

    See SPSO Designation Objection ¶¶ 31 – 45.

    182.    The Debtors, of course, disagree and argue that the cases are directly on point. (See Debtors' Pre-Trial Br. ¶¶ 137-142.)  Whether the Court is ultimately persuaded by SPSO or the Debtors, one fact cannot be disputed:  In neither DBSD nor Allegheny, did the debtors separately classify and designate one creditor apart from creditors holding identical claims in a pre-meditated, strategic effort to discriminate against one disfavored party due to the animus of a controlling shareholder.  That would have been impossible in those cases because the designated creditors purchased claims *after* plans were proposed.  In DBSD, the designated party bought up all of the claims of an entire class.  DBSD, 421 B.R. at 135.  In Allegheny, Japonica's purchased claims represented 27% of the claims in their class.  See Allegheny, 118 B.R. at 286.  Therefore, in neither DBSD nor Allegheny was designation used as a tool to impose discriminatory treatment. This distinction is critical, because the Debtors are trying to use DBSD to excuse the Plan from complying with the Bankruptcy Code's cram down requirements and the best interests test.

114

F.    *Designation of SPSO's Vote Does Not Allow the
Debtors to Ignore the Remainder of the Bankruptcy Code.*

183.    If the debtors have their way, and SPSO's vote is designated, SPSO will

not have the protection of cram down, best interests and will be deemed to accept the releases

and other plan treatment.  This isn't what 1126(e) says or means.  If it did, the debtors could

offer SPSO $100 and pay all junior stakeholders in full.  While certain sentences in the DBSD

opinion suggest that may be possible if read in isolation, the context, actions and findings of the

court in DBSD are very different.  It was important to Judge Gerber that the creditor whose vote

was designated was receiving non-discriminatory treatment that left its claims protected by an

enterprise value 6 to 10 times greater than the treatment received pursuant to the plan.

184.    In DBSD, Judge Gerber concluded that DISH's treatment would have

satisfied the indubitable equivalent standard.  In re DBSD N. Am., Inc., 419 B.R. 179, 207

(Bankr. S.D.N.Y. 2009) ("**DBSD III**").  As set forth above, the Debtors cannot make the same

showing here.  SPSO's treatment under the Plan does not resemble DISH's treatment in DBSD

III:

| LightSquared | DBSD<br>See DBSD III, 419 B.R. 207-09 |
|---|---|
| The SPSO Note will be secured by a silent, non-market, *third lien* | The new debt issued to DISH (the "Amended Facility") was to be secured by a first lien on substantially all of the reorganized Debtors' assets, excluding auction rate securities. |
| The Debtors' total enterprise value on the Effective Date, net of Spectrum Liabilities, is $2.058 billion to $3.010 billion — *less than* the aggregate outstanding principal amount of the First Lien Exit Facility ($1 billion minimum), Second Lien Exit Facility ($1.2 billion minimum), and SPSO Note (over $1 billion, | The reorganized Debtors' total enterprise value was between $492 million and $692 million, *at least 9.6 times the value of the first lien debt to be satisfied through the issuance of the Amended Facility, and 6 times the outstanding amount of the Amended Facility at its four-year maturity ($80 million).*  As |

| | |
|---|---|
| including postpetition interest on its oversecured claim)[111] on the Effective Date, such that the SPSO Note would be dramatically *undersecured* on the Effective Date.<br><br>The reorganized Debtors' debt under the Exit Facilities and SPSO Note will increase to at least $7.3 billion at the 7-year maturity of the SPSO Note, resulting in the SPSO Note becoming even more *undersecured* over time. | such, Judge Gerber found that the first lien lenders were "dramatically oversecured," and there was no "material risk" that the first lien lenders would not be paid on account of their claims under the Amended Facility. |
| The SPSO Note will bear interest at a rate that is *lower* than the interest rate applicable to the Prepetition LP Facility Claims, and pay interest in kind rather than in cash, despite the fact that the Debtors will emerge from chapter 11 with a more leveraged capital structure and more regulatory uncertainty than when they entered. | The 12.5% interest rate payable under the Amended Facility was the same rate payable under the prepetition first lien facility, which was entered into at a time when the Debtors were substantially more leveraged than they would be at emergence. |

185.    Unlike DISH's treatment in <u>DBSD</u>, the Plan fails to protect the value of SPSO's Claims, and the Court cannot be satisfied, as Judge Gerber clearly was, that designation would not lead to any economic harm — something that is not contemplated by section 1126 of the Bankruptcy Code.   It is one thing to designate a creditor that votes against a Plan that manifestly compensates the designated stakeholder's economic expectations *in full*.   Without such fair treatment in this case, designation of SPSO's vote would have far greater consequences.   SPSO has voted to reject the Plan, consistent with its interests as a creditor, to protect its economic stake.   Designation would deprive SPSO of that right in a way that designation did not deprive DISH in <u>DBSD</u>.

186.    By its express terms, section 1126(e) is targeted at individual stakeholders, and is intended to cure the situation where a class of creditors would vote to accept a plan but for

---

[111]    Presumably, the Debtors believe that Prepetition LP Facility Claims are oversecured, as the Plan allocates value from the LP Debtors' assets (i.e., the collateral securing the Prepetition LP Facility Claims) to classes that are junior to the Prepetition LP Facility Claims.

116

an individual creditor holding out for superior treatment. It is the classic prisoner's dilemma. Why should I vote for the plan in the first instance, if I can wait until my vote is necessary to create an accepting class, and I can leverage that position for better treatment? Other provisions of the Bankruptcy Code (*i.e.* section 1129(b) cram down) are designed to solve the distinct problem of an entire class that rejects a plan. Legislative history confirms that the purpose of section 1126(e) is to overcome a *minority* claim holder acting in bad faith to extract favorable treatment. As the Supreme Court has stated (when discussing section 203 of the Bankruptcy Act, the precursor of 1126(e)): "The history of this provision makes clear that it was intended to apply to those stockholders whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them *more than the ratable equivalent of their proportionate part of the bankrupt assets*." Young v. Higbee Co., 65 S. Ct. 594, 598 (1945) (emphasis added). Here, the sole reason SPSO has voted to reject the Plan is because *the Plan denies SPSO its ratable share*. The Supreme Court further explained the origin of the provision as follows:

> A year before the House Committee on the Judiciary held its extensive hearings on the Chandler Act, a Circuit Court of Appeals held that a creditor could not be denied the privilege of voting on a reorganization plan under § 77B, although he bought the votes for the purpose of preventing confirmation unless certain demands of his should be met. Texas Hotel Sec. Corp. v. Waco Dev. Co., 87 F.2d 395 (5th Cir. 1936). The hearings make clear the purpose of the Committee to pass legislation which would bar creditors from a vote who were prompted by such a purpose. To this end they adopted the "good faith" provisions of § 203. Its purpose was to prevent creditors from participating who "by the use of obstructive tactics and hold-up techniques exact for themselves undue advantages from the other stockholders who are cooperating." Bad faith was to be attributed to claimants who opposed a plan for a time until they were "bought off"; those who "refused to vote in favor of a plan unless . . . given some particular preferential advantage."

117

Higbee, 65 S. Ct. at 599, n.10 (citing Revision of the Bankruptcy
Act: Hearing before the H. Comm. on the Judiciary, 75th Cong.,
1st Sess. 180-182 (1937).)

187.    Beyond the portion cited by the Supreme Court, the legislative history

further demonstrates the Debtors' misapplication of section 1126(e). "We envisage that "good

faith" clause to enable the courts to affirm a plan over the opposition of a minority attempting to

block the adoption of a plan merely for selfish purposes. The Waco case . . . . was such a

situation. If my memory does not serve me wrong it was a case where a minority group of

security holders refused to vote in favor of the plan unless that group were given some particular

preferential treatment, such as the management of the company." Revision of the Bankruptcy

Act: Hearing before the H. Comm. on the Judiciary, 75th Cong. 181 (1937) (statement of Jacob

Weinstein).

188.    By separately classifying SPSO *and* seeking designation to create an

empty (and therefore accepting) class, the Debtors ask the Court to turn the Bankruptcy Code on

its head, and find that a designated *class* of creditors is not entitled to the fundamental

protections of the Bankruptcy Code.

## XIII.    The Third Party Releases Should be Stripped from the Plan.

### A.    *The Breadth of the Third Party Releases Exceed the Court's Jurisdiction.*

189.    The non-Debtor releases and related injunction in the Plan (found in

Sections VIII.F and VIII.G of the Plan, respectively (collectively, the "Third-Party Releases"))

are overly broad and cannot be approved, because the Court does not have jurisdiction to

approve those aspects of the Third Party Releases that seek to enjoin the prosecution of claims

that are unrelated to the bankruptcy cases and the *res* of the Debtors' estates. See In re Johns-

Manville Corp. 517 F.3d 52, 66 (2d Cir. 2008), rev'd on other grounds, 557 U.S. 137 (2009)

(holding that a bankruptcy court "only has jurisdiction to enjoin third-party, non-debtor claims

118

that directly affect the *res* of the bankruptcy estate.").[112]    The Third-Party Releases attempt to enjoin claims "relating to, or in any manner arising from, in whole or in part" transactions in the Debtors' securities, and claims which "the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan" or based "upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date." Plan at § VIII.F.  The Debtors have not made the necessary showing that the vast universe of claims covered by these provisions all have a "conceivable effect" on the bankruptcy estates.  See In re Quigley Co., 676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any 'conceivable effect' on the bankruptcy estate.'").

190.    In a vain attempt to meet this burden, the Debtors make the bare assertion that all of the claims subject to the Third-Party Releases "would impact both the property and administration of LightSquared's Estates, would distract management from running the business, and could implicate indemnity requirements LightSquared may be required to exercise with respect to its directors and officers." (Debtors' Pre-Trial Br. ¶ 188.)  It is unclear how claims against Released Parties who are not directors, officers or other employees of the Debtors would impact the property or administration of LightSquared's Estates or distract management from running the business such as it is.  Furthermore, since the Debtors failed to present any evidence to the contrary, the Court can only conclude that the Third-Party Releases are in no way designed to mirror any of the Debtors' indemnity obligations.[113]

---

[112]    The Debtors do not dispute this jurisdictional threshold; they cited to the same formulation.  (See Debtors' Pre-Trial Br. ¶ 188.)

[113]    ██████████████████████████████████████  See *Motion of Special Opportunities, LLC for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute, and/or Settle Certain Claims of the Debtors' Estates Against Philip Falcone*, dated April 4, 2014 [Docket No. 1473], at ¶ 50 n.25.

B.    *The Third Party Releases are not Consensual and The Debtors Have Failed to Show that Extraordinary Circumstances Justify their Approval.*

191.    Even if the Court determines that it has jurisdiction to approve the Third-Party Releases as written, the facts of this case do not warrant their approval.  Non-debtor releases are a "dramatic measure to be used cautiously" which should only be approved "in extraordinary cases." In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir. 2005) ("Metromedia") (citing Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 657–58 (6th Cir. 2002).  Here, contrary to the Debtors' assertions, the releases are not (a) "essential to achieving consensus," (b) "largely consensual," or (c) justified by the alleged contributions of the released parties.  (See Debtors Post-Trial Br. ¶ 219-21; Debtors Pre-Trial Br. ¶ 189-98.)

192.    The Second Circuit has explained that a non-debtor release should be approved only upon a finding that "truly unusual circumstances render the release terms important to the success of the plan." Metromedia, 416 F.3d at 142-43.  However, the evidence adduced at trial clearly contradicts the Debtors' unsupported argument that the "intimate involvement of the Plan Support Parties in the development of the Plan, . . . would have been rendered extremely difficult, if not impossible, without the Third Party Releases." (See Debtors' Post-Trial Br. ¶ 219.)  In fact, the evidence proves exactly the opposite: the Third Party Releases were not a part of the plan negotiations.  Mr. Falcone, the architect of the Plan, and the point person for negotiations with the other plan support parties, specifically testified that he never thought about releases during the negotiations, nor did he even know that Harbinger was getting a release under the Plan.

> Q:  Mr. Falcone, with respect to the third amended plan, did you insist that you and Harbinger get releases under that plan? [...]
> A:  I don't recall negotiating that or discussing it.
> Q:  Do you know that Harbinger is getting a release under that plan?

A: Not that I knew. You just informed me. So I haven't read it in detail.
Q: Do you know if Harbinger would go forward with a third amended plan if the releases were not included?
A: I haven't thought about it.

Falcone, 3/31/14 Hr'g Tr. 99:2-14

193.    The releases also cannot be justified as consensual.  Courts have allowed non-debtor releases where the affected creditors consent by affirmatively voting in favor of the plan, as long as the release is appropriately disclosed in the ballots for soliciting votes for a plan. See Adelphia 368 B.R. at 267.  Here, SPSO was not given the opportunity to opt-out of the Third-Party Releases.  The Plan provides that *abstaining* voters can opt-out of the Third-Party Releases, but curiously provides that creditors who vote to *reject* the Plan are bound by the releases. (See Plan, Section VIII.F.)

194.    The Debtors attempt to explain this novel construction by twisting the Court's advice regarding the release provisions at the hearing on the disclosure statement for the Debtors' First Amended Plan.  The Debtors claim the "First Amended Plan originally permitted rejecting creditors to reject the third party release [...] however, the Court advised LightSquared to change its release provisions to its current construct."  (Debtors' Pre-Trial Br. ¶ 191.)  The Court did no such thing.  The Court merely explained that the Debtors ought to provide an opportunity to opt out for creditors who did not abstain.  (10/9/13 Hr'g Tr. 29:23-30:10, 31:17-22.)  At the same hearing, Debtors' counsel acknowledged that if a creditor votes against the plan (as it existed at that time), the creditor does not consent to the plan.  Id. at 31:4-10 ("MR. BARR: If you vote for [the plan] you [...] consent; if you vote [...] against [...] you don't consent.") The Court did not instruct the Debtors to amend the existing plan to provide that creditors who vote to *reject* the Plan consent to the release; the Court's only advice was regarding an opportunity for *abstaining* creditors to opt out of the release.  Id. at 34:23-24 ("THE COURT:

121

"I'm just giving somebody who doesn't vote, specifically the right to opt out.")[114]  Recognizing

the Plan's failure to allow rejecting creditors to opt out of the releases, SPSO specifically wrote

on its ballot that "SPSO does not consent to, and does not grant, any releases under the Plan."[115]

The Court never authorized or suggested that rejecting creditors could be bound to the Third-

Party Releases, and the Debtors' attempts to impute their overreaching to the Court should not be

tolerated.

       195.    Because the Third Party Releases were neither essential to negotiating the

Plan nor consensual, the Debtors resort to arguing that the "substantial contributions" of the

released parties make these cases the "extraordinary case" with the requisite "unusual

circumstances" required to approve non-debtor releases in this Circuit under <u>Metromedia</u> and its

progeny.    However, this argument ignores the law, because independent of any argument that

one or more of the Released Parties provided a material contribution to the Plan, <u>Metromedia</u>

makes clear that the release *itself* must be important to the plan in order to be enforceable, and a

material contribution alone is not enough to justify a release.  <u>See Metromedia</u>, 416 F.3d at 143

("Here, the sole finding made to justify the Kluge Comprehensive Release is that the Kluge Trust

made a 'material contribution' to the estate.  But there is no finding (or evidence presented) that

the Kluge Comprehensive Release was itself important to the Plan — which is what <u>Drexel</u>

<u>Burnham</u> at minimum requires.").  The Debtors have not made any such showing that the Third-

Party Releases were an integral aspect of the Plan, and in fact the record establishes the opposite.

---

[114]    Debtors' counsel even acknowledged that the suggested change was with respect to the opt out for
abstaining creditors.  <u>Id.</u> at 36:17:20 ("MR. BARR: So to be clear, we will add to the ballot as well that if
you abstain from voting on LightSquared's plan, you can opt out of the release. THE COURT: Yes.")

[115]    <u>See</u> Ex. I, SPSO Ballot.

196.    Finally, even if a contribution alone could justify releases, the Debtors' evidence falls short of proving what must be a high burden. Many of the Released Parties have contributed little or nothing to the Plan. For instance, the other Prepetition LP Lenders will get paid in full, in cash *before* the Effective Date, and the record is devoid of any concessions worthy of their broad Third Party Releases. Claims against another Released Party (Mr. Falcone) represent a potential source of value for the estates, which the Plan flippantly discards (even though Mr. Falcone testified that he didn't negotiate for or know about his or Harbinger's release).[116]  In short, because the Debtors have failed to prove that the Third Party Releases are necessary, consensual or justified they should be struck from the Plan.

## XIV.    SPSO Is Entitled to Default Rate Postpetition Interest

197.    The Plan assumes that SPSO's claims are oversecured by providing substantial recoveries to junior stakeholders — payment in full, in cash to general unsecured creditors, and cash to holders of equity interests. The Debtors admit as much by maintaining throughout that (a) the Plan "is not intended to punish SPSO, [because] SPSO's clam is being satisfied in full"; (b) the "SPSO note is equivalent to SPSO's claim"; and (c) there is "no question that SPSO's interest in the collateral is more than sufficiently preserved in all scenarios" (Debtors' Post-Trial Br. ¶¶ 18, 193, 239.) Therefore, section 506(b) of the Bankruptcy Code mandates that the Plan pay SPSO postpetition interest. However, the Plan provides that SPSO's claims will be allowed only in the "original aggregate principal amount of the Allowed

---

[116]    This defect in the Plan can be remedied, as the Court can strike or modify the releases to make sure valuable claims are not lost forever. In In re BearingPoint, Inc., the court refused to grant current and former officers and directors full releases, excepting from the release provision "claims for fraud, negligence, corporate waste, abuse, mismanagement, or breach of fiduciary or other duties." In re BearingPoint, Inc., 453 B.R. 486, 488 (Bankr. S.D.N.Y. 2011); see also In re BearingPoint, Inc., No. 09-10691, Plan Confirmation Order [Docket No. 1550] at Exhibit A, pg. 57 (providing for a limited release for current and former officers and directors). The BearingPoint court specifically allowed claims to be brought against the debtor's former CEO and former directors which were expressly excepted from those releases. BearingPoint, 453 B.R. at 498.

Prepetition LP Facility SPSO Claims." (See Plan, §§ I.A. (definition of "SPSO Option B Treatment") and III.B.8.)

198.    In the Debtors' Pre-Trial Brief, the Debtors "clarified" SPSO's treatment under the plan, indicating that SPSO would receive either the "original aggregate principal amount of the Allowed Prepetition LP Facility SPSO Claims" or an amount "as otherwise determined by the court." (Debtors' Pre-Trial Br., p. 24 n. 31.) The Debtors claim that "such amount includes postpetition interest" and that the Plan therefore does not violate section 506(b). Id. Clearly then, unless the Court orders otherwise, the Plan violates section 506(b). SPSO respectfully requests that, if the Plan is confirmed, the confirmation order provide that the face amount of the SPSO's treatment include all postpetition interest earned on SPSO's Prepetition LP Facility Claims through and including the Effective Date.

199.    In the Debtors' Post-Trial Brief, *for the first time*, the Debtors argue that SPSO's postpetition interest should be limited to the federal judgment rate, rather than the Prepetition LP Credit Agreement's contract rate. However, the Debtors fail to acknowledge that there is a "presumption in favor of granting an oversecured creditor interest at the rate specified in the contract." In re General Growth Props., 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011). To combat this presumption the Debtors recycle their equitable subordination argument and simultaneously reserve their rights to argue that SPSO is not entitled to postpetition interest if its claims are subordinated pursuant to section 510(c) of the Bankruptcy Code. (See Debtors' Post-Trial Br. ¶¶ 216-17.)[117] But by doing so, the Debtors ask the Court to double-count the alleged misconduct. If the Court determines not to subordinate all (or a portion) of SPSO's claims based on identical equitable arguments, the Court should not give the Debtors' the opportunity to argue

---

[117]    SPSO reserves all rights on whether SPSO is entitled to postpetition interest if its claims are subordinated pursuant to section 510(c) of the Bankruptcy Code.

that the same allegations (previously addressed and remedied by the Court) warrant a separate, additional punishment.

200.    Aside from recycling equitable subordination arguments, the Debtors selectively quote the cases they do cite. In one, the Second Circuit confirmed that "[m]ost courts have awarded pendency [*i.e.* post-petition] interest at the contractual rate." Key Bank, N.A. v. Milham (In re Milham), 141 F.3d 420, 423 (2d Cir. 1998). In Key Bank the Second Circuit approved a Plan that reduced the contractual interest rate from 9.5% to 8.5%. Here, the Debtors request a reduction from 17% to 0.18%. Another case cited by the Debtors (that awarded default rate postpetition interest) provided *exceptions to the general rule* that postpetition interest should be calculated at the contractual default rate: "[t]he payment of default interest in this matter is also consistent with the increasing reluctance of courts in this and other circuits, in construing the requirement of § 506(b) . . . to modify private contractual arrangements imposing default interest rates except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to the unsecured creditors; (iii) the contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's fresh start." General Growth Props., 323 B.R. at 328. The Debtors only address one of the foregoing exceptions (by re-hashing equitable subordination issues), because none of the remainder apply here. Paying SPSO its lawful entitlement would not harm any other creditors, the default rate is not a penalty, and its application would not impair the Debtors' fresh start. Of course, the Plan proposes to pay other LP lenders their default postpetition interest; so the Debtors are precluded from making these arguments.

201.    Section 506(b) of the Bankruptcy Code is not the only source of authority that provides SPSO's entitlement to postpetition interest. In asking the Court to nearly wipe-out

SPSO's lawful entitlement, the Debtors fail to address the well-known principles that "before there is a return to equity in a reorganization case, creditors should receive interest as compensation for the delay of the bankruptcy process," and the long-standing case law that "calls for the payment of default interest by a solvent debtor to effect the cure and reinstatement of a debt, absent factors that would make such payment inequitable." General Growth Props., 451 B.R. at 326-28 (citing Ruskin v. Griffiths, 269 F.2d 827 (2d Cir. 1959)). Here, the Plan provides a substantial return to equity and the Debtors unequivocally believe they are solvent. The Plan should fully compensate SPSO its bargained-for entitlement to default interest.

202.    Finally, the Debtors argue throughout their pleadings that the Plan does not discriminate *unfairly* against SPSO because, just like the other LP lenders, "the treatment proposed by the Plan satisfies SPSO's allowed Claims in full." (See, e.g., Debtors' Pre-Trial Br. ¶ 170; see also Debtors' Post-Trial Br. ¶ 61, n. 61.) By asking the Court to differentiate between SPSO's entitlement to postpetition interest and the entitlements of the other LP lenders — which stem from the same agreement — the Debtors add more "red-penciling" and yet another discriminatory aspect to the Plan's treatment.

## XV.    SPSO's Claim Should Not Be Disallowed

203.    Furthering their effort to finance their reorganization on the back of SPSO's first-lien claims, the Debtors contend that SPSO's claims relating to almost one billion dollars worth of first-lien debt should be disallowed in full (Debtors' Post-Trial Br. ¶¶ 206-07), or that SPSO's recovery should be limit based on the supposed harm caused by SPSO (Debtors' Post-Trial Br. ¶¶ 208-217).  The Debtors' legal and factual arguments in this regard do not withstand scrutiny.

126

A.    *Disallowance under Section 502(b) is not Appropriate.*

204.    The Debtors contend that SPSO's claims should be disallowed in full because "SPSO is not an Eligible Assignee of the LP Debt under the Prepetition LP Credit Agreement and is therefore entitled to no rights thereunder." [118]    (Debtors' Post-Trial Br. ¶ 206.) The Debtors have no factual or legal basis for this position.    As set forth more fully in SPSO's Post-Trial Brief in the Adversary Proceeding, SPSO was an Eligible Purchaser because it was not and is not a "known subsidiary" of either DISH Network or EchoStar Corporation.    (See Post-Trial Br. ¶¶ 13-46.)    Moreover, even if SPSO was not an Eligible Assignee (it was), SPSO's claims still would be enforceable.    Nothing in the Credit Agreement treats transfers in violation of the transfer restrictions as void or voidable, let alone renders the transferred debt claims unenforceable against LightSquared.    To the contrary, the Credit Agreement expressly provides that improper assignment shall be treated as a participation and that "any breach by any Lender or participant or sub-participant of the restrictions on assignment hereunder (including, without limitation, to Disqualified Companies) shall not excuse, in any respect, performance by the Borrower under the Loan Documents."    (SPSO/Ergen Adv. Proc. FOF ¶¶ 173-74.)    And section 10.16 of the Credit Agreement states that "all obligations of the Loan Parties [the Borrower and Guarantors] hereunder shall be absolute and unconditional irrespective of . . . any lack of validity or enforceability of any Loan Document or any other . . . circumstance which might otherwise

---

[118]    The Debtors' contention that SPSO's claims should be disallowed in full are little more than a thinly disguised claim for equitable disallowance, which the Court has correctly held is not an available claim under the Bankruptcy Code.    Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.), 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013).    A recent Supreme Court case regarding section 105(a) of the code supports this Court's ruling regarding the unavailability of equitable disallowance because it contravenes the language of section 502(b).    See Law v. Siegel, 134 S. Ct. 1188, 1194 (2014) (holding that "in exercising those statutory and inherent powers [under section 105(a) of the Bankruptcy Code], a bankruptcy court may not contravene specific statutory provisions").

127

constitute a defense available to, or a discharge of, the Loan Parties." (SPSO/Ergen Adv. Proc.
FOF ¶ 175; See generally SPSO/Ergen Adv. Proc. Post-Trial Br. 52-55.)

205.    The Debtors further contend that "there can be no doubt that, at a
minimum, SPSO's purchases of the LP Debt that closed after DISH's name was added to the list
of Disqualified Companies . . . were improper and that those portions of SPSO's claims relating
to such trades should be disallowed." (Debtors' Post-Trial Br. ¶ 206.) This argument is not
supported by any reasoning and makes no sense. Adding DISH to the list of Disqualified
Companies does not make SPSO a "known subsidiary" of DISH or EchoStar. In fact, adding
DISH establishes that SPSO's purchases were appropriate—if the Debtors truly understood the
Credit Agreement to bar assignment to entities with common controlling shareholders as a
Disqualified Company, then there would have been no reason to add DISH to the disqualified
list, as it shares a common controlling shareholder with EchoStar, which was already listed. That
LightSquared (or, more accurately, Mr. Falcone as part of a "nice surprise")[119] felt the need to
add DISH establishes that affiliates (as SPSO is) were not covered by the transfer restrictions in
the Credit Agreement. (See SPSO/Ergen Adv. Proc. Post-Trial Br. 18-19.)

206.    In short, SPSO's claim is enforceable in this bankruptcy proceeding even
if Plaintiffs establish that SPSO was not an Eligible Assignee. As the Court put it in a prior
hearing, "the contract also specifically says that if [the lenders] mess up on the eligible assignee
part, it doesn't affect the obligation of the borrower. . . . They borrowed the money, they owe the
money." (10/29/13 Hr'g Tr. 115:10-116:18.)[120]

---

[119]    (D038.)

[120]    A longer citation to the Court's statement from the same hearing is instructive: "this is the big Chapter 11
corporate analogy to what we see in the consumer context of the free house. . . . [T]he mortgage gets
transferred sixteen ways, and not surprisingly the chain of title gets messed up . . . . And consumer debtors
occasionally come in and say ah-ha, they messed up, I get a free house, right? And what you're telling me
is it wasn't an eligible assignee, I get that billion dollars, right? But the company borrowed the money,

128

B.    *The Debtors Cannot Point to Any Actual Harm Caused by SPSO.*

207.    The Debtors next contend that "SPSO's claims must be reduced to offset against the tangible harm caused to LightSquared and its stakeholders." (Debtors' Post-Trial Br. at ¶ 208.)  While the Debtors continue to contend that "tangible harm" was caused, they can point to no actual harm befalling the Estate that was not caused by LightSquared itself or its controlling shareholder, Harbinger.

208.    The Debtors contend that SPSO "plainly interfered with LightSquared's negotiations with constituents regarding a plan of reorganization," but the evidence indicates otherwise.  As set forth more fully in SPSO's Post-Trial brief in the Adversary Proceeding, SPSO and Mr. Ergen did not cause, and are not responsible for, the harm that has befallen LightSquared and the predicament in which it finds itself.  (See Adv. Proc. Post-Trial Br. at 58-67.)  Indeed, during the Confirmation Hearing, Steven Zelin of Blackstone confirmed that he "testified under oath that the trading by SPSO had *zero impact* on [the Ad Hoc Secured Group's] negotiations with Harbinger and LightSquared."  (See Zelin, 3/27/14 Hr'g Tr. 63:16-19.)  Any claim that SPSO joined the Ad Hoc Secured Group in order to "limit LightSquared to negotiations with a body now dominated by SPSO and force LightSquared down a sale path," is belied by the fact that LightSquared and Harbinger continued to negotiate with the Ad Hoc Secured Group in June and July 2013, after SPSO had joined.  The Debtors also presented no evidence in the Adversary Proceeding (or the confirmation hearing) that LightSquared and the Ad Hoc Secured Group were ever close to agreeing on a plan of reorganization; at best the parties were in discussions, though they remained far apart on key terms through 2013.

---

right? . . . They actually owed it to people, those people that SPSO bought the debt from, right?  So it's kind of hard to understand the circumstances under which I would, in essence, you know, give Harbinger the free house. . . . They borrowed the money, they owe the money."  See 10/29/13 Hr'g Tr. 115:10-116:18.

129

(SPSO/Ergen Adv. Proc. Post-Trial Br. 59, 61-62.)  Nor were they able to demonstrate that

SPSO was aware of, or had access to information about the status of the negotiations such that

SPSO could deliberately interfere with them. (Adv. Proc. Post-Trial Br. ¶ 59.)  In fact the record

shows the exact opposite.  In an email chain with counsel to the Debtors and Harbinger, dated

July 10-14, 2013 counsel to the Ad Hoc Secured Group complained that the Debtors appeared to

be purposefully stalling the scheduling of a meeting with LBAC to discuss an acquisition

proposal.  (D277 at MOEAP0002649 (███████████████████████████████████

████████████████████████████████████████████").)

209.    Instead, LightSquared stood in its own way and prevented the agreement

on a plan. As explained by Blackstone, in its presentation to LightSquared's Special Committee

on September 25, 2013, among other things, LightSquared spent nearly 15 months in bankruptcy

solely pursuing regulatory approval at the expense of more viable alternatives; the absence of

these approvals stymied its ability to raise much needed financing; and its largest equity holder,

Harbinger, took actions inconsistent with maximizing LightSquared's value and bringing a

successful resolution to the bankruptcy cases. (SPSO/Ergen Adv. Proc. Post-Trial Br. 60-61.)

These ills cannot be attributed to SPSO.

210.    The Debtors' contention that withdrawal of the LBAC bid was "obviously

pre-planned" (Debtors' Post-Trial Br. ¶ 211) is also unsupported by the evidence.  DISH

withdrew the bid after milestones lapsed, a step the Court has held it was entitled to take for any

reason at all.  Although, the evidence demonstrated that the ██████████████████████

██████████ in a November conference call were serious and real, (SPSO FOF ¶¶ 63-75; 213-18)

LBAC was not required to rely on such issues in order to withdraw its bid. The evidence showed

that the DISH Board's decision to withdraw its bid was not made hastily—the board reached no

conclusions regarding the technical issues in the first board meeting at which the issues were discussed, and even authorized an additional bid for LightSquared Inc.'s assets at that time. (SPSO FOF ¶ 72.) Nor was withdrawing the bid a foregone conclusion—representatives of DISH were in New York and prepared to participate on December 11, the day of the auction, when LightSquared cancelled it (SPSO FOF ¶ 73); DISH considered adding conditions to its bid in an effort to deal with the technical issues in lieu of withdrawing (SPSO FOF ¶ 73); and DISH caused LBAC to extend the December 16 milestone by seven days so that it could continue its research of the issue (SPSO FOF ¶ 75). ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

211.    LightSquared's own actions in response to the conference call and a subsequent conversation with ████████, this one without DISH, undermine the Debtors' current characterization of the technical issue as "false" and their suggestion that SPSO disseminated the issue to discourage bidders at the auction. (Debtors' Post-Trial Br. ¶211.)

████████████████████████████████████████████████████

████████████████████████████████████ (SPSO FOF ¶ 307.)

A few weeks after the first call, LightSquared put a document in the diligence data room, used by LBAC, DISH and others to do diligence on LightSquared's assets, that specifically addressed the two issues raised by ████████. (SPSO FOF ¶ 65.) ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (SP094.)

212.    Mr. Falcone has already revealed that he is not above accusing his adversaries of malicious, and potentially illegal, conduct based on nothing but speculation. For instance, Mr. Falcone admitted at trial that it was only his *personal opinion* that AT&T and Verizon lobbied the FCC to suspend LightSquared's license and conceded that he "[did]n't have any facts supporting it and . . . could be dead wrong." (Falcone, 3/31/14 Hr'g. Tr. 137:2-13.) LightSquared's allegations of improper conduct by SPSO in this case, including but not limited to the allegation that SPSO was responsible for disseminating the allegedly false technical issues, are likewise unsubstantiated and baseless.   LightSquared's use of those arguments without evidence only proves how wed the estates are to whatever equity wants.

213.    The facts on the record in this case are too clearly distinguishable from those in Papercraft for the Debtors' attempts at drawing parallels to be successful. In Papercraft, the debtor had an agreement on a structuring plan that was to be filed in conjunction with its voluntary chapter 11 petition, which the wrongdoer-insider creditor approved. Papercraft 2002 WL 34702177, at *1. It was only after the filing of the petition *and the plan*—but before the filing of the disclosure statement—that the creditor purchased its claims, objected to the confirmation of the plan it had previously approved, and offered a competing plan of its own. Id. The bankruptcy court's finding that the Papercraft creditor had caused unnecessary delay and created significant unnecessary expense to the estate was, in no small part, based on the creditor's use of his inside position and requests for debtor's information to help draft his competing plan. This had the effect of delaying the filing of debtor's disclosure  statement by diverting the debtor's attention. Also, the Papercraft Court considered the insider's use of his new position (as creditor) to assert objections to the plan when the confirmation process *was already underway*, which had the effect of causing delay between the filing of the disclosure

statement and the plan's confirmation. Id. at *7-8 (the court noted that it was not the assertion of

objections that necessarily caused the delay, but the creditor's "conduct" that led to "plan

language [having to be] changed to reflect a compromise reached by the parties."). As explained

above, SPSO's conduct did not attempt to nor have the effect of diverting the attentions of the

estate or disrupting any specific plan of reorganization (it didn't even file an appearance or talk

to any stakeholder for the first year of these cases). The Debtors had not proposed any plan at

the time SPSO purchased its claims; they had not even made substantial progress towards an

agreement; and because there was no plan on file, SPSO could not have caused any delay with

respect to one.

214.    Even if Papercraft were instructive in determining whether SPSO's

conduct caused damage to the Debtors in this case, naming the start date for the accrual of those

damages as the date SPSO entered into the later-failed Fortress trade (March 28, 2013) is both

inaccurate and self-serving. First, LightSquared and Mr. Falcone viewed the trade as a beneficial

one because it potentially meant that SPSO had a larger position than the Ad Hoc Secured Group

and that LightSquared would no longer have to honor certain provisions under the Exclusivity

Stipulation. (SPSO/Ergen Adv. Proc. FOF ¶¶ 34, 63-68.)  Second, because the trade was a

bundle of both bank debt and LP Preferred Units, which SPSO was not permitted to purchase

pursuant the Stockholders' Agreement (a fact that SPSO did not know at the time), the trade

could only close upon LightSquared's consent. (SPSO/Ergen Adv. Proc. FOF ¶¶ 231-233, 235-

239.) However, it was LightSquared that first delayed, then ultimately refused, to consent to the

trade. LightSquared discussed the transfer at its April 18, 2013 board meeting (SPSO/Ergen

Adv. Proc. FOF ¶ 234)—though Mr. Falcone knew of Fortress' intent to sell its preferred units to

SPSO the day the transfer was entered into (SPSO/Ergen Adv. Proc. FOF ¶¶ 34, 63)—but,

nevertheless, waited until October 2013 to respond and refuse their consent (SPSO/Ergen Adv. Proc. FOF ¶ 239). LightSquared again refused after the trade restriction set forth in the Stockholders' Agreement expired citing a generic provision of the agreement. (SPSO/Ergen Adv. Proc. FOF ¶ 240.) LightSquared's numerous attempts to manipulate this single transaction as it best serves LightSquared's own purposes at the time is staggering. That they now attempt to use it as a marker of SPSO's attempts to delay and evidence of alleged harm is highly suspect.

215.   Moreover, the Debtors are not entitled to lock any stakeholder into their prepetition positions, if that stakeholder wants to sell. That Fortress, upon entering a trade, may have left the negotiating table (and the Debtors have submitted no evidence and certainly not proved that negotiation was likely to lead to a confirmed plan of reorganization) is not evidence of any undisclosed maneuvering on SPSO's part — to the contrary, it is evidence that the entire matter was transparent and aboveboard. There is no evidence that SPSO ever thought, discussed, tried, or did anything nefarious with respect to the timing of its trades to interfere with negotiations it was not privy to, or capital raise efforts that were discussed solely in the LightSquared board room and wouldn't be publicly unveiled for months. (SPSO FOF ¶¶ 281-83.) The claim that SPSO purposefully torpedoed negotiations between parties, by attempting to purchase claims from a *willing seller*, is baseless.

216.   The Debtor's alternative suggestion of naming the start date as December 31, 2013 is also unjustified. The suggestion that "the parties would have reached an agreement on a consensual plan of reorganization by the late summer of 2013 and obtained confirmation by December 31, 2013" (Debtors' Post-Trial Br. ¶ 214) is based on nothing more than conjecture and wishful thinking and is unfounded speculation.

134

217.    The Debtors also try to attribute legal fees of $46 million as "a consequence of SPSO's actions" in these cases "from a sampling of invoices presented for reimbursement." (Debtors Post-Trial Br., at ¶ 212).  However, among other things, SPSO is a defendant in these cases, not a plaintiff, and did not cause the Ergen Adversary Proceeding to be filed.  The litigations were the brain child of Mr. Falcone and were driven directly by his desire to "attack" Ergen in order to enhance his position in the bankruptcy.  The litigations are also the byproduct of LightSquared sitting on its hands while SPSO acquired debt, then deciding, after the fact, to sue SPSO, Ergen, DISH and EchoStar in order to derail efforts to sell the company.  Finally, there is absolutely no support offered for the total $546 million in damages but the Debtors' own say-so.  (See Debtors' Post-Trial Br., at ¶¶ 212-213).  Perhaps this tally reflects the amount the Debtors have spent litigating with every party in the case.  After all, the Debtors litigated almost non-stop with the Ad Hoc Group (without SPSO's involvement) for well over eighteen months.

## XVI.    The New DIP Facility Does Not Comply with Section 364 of the Bankruptcy Code.

218.    SPSO objects to the New DIP Facility on three primary bases:  (a) the Debtors failed to seek postpetition financing on more favorable terms; (b) SPSO's secured interests in prepetition collateral will not be adequately protected; and (c) the New DIP Facility is an impermissible *sub rosa* plan.[121]   In addition, the record of the confirmation hearing precludes a finding that the New DIP Lenders are extending credit in good faith, and the lenders should not be granted the protections of section 364(e) of the Bankruptcy Code.

---

[121]    SPSO renews its objection the New DIP Facility on the separate grounds set forth in Section V of SPSO's objection to the New DIP Facility [Docket No. 1393]:  (a) the New DIP Lenders' commitments are highly conditional; (b) the DIP order purports to elevate the Prepetition LP Lenders' indemnification claims above SPSO's identical claims arising under the Prepetition LP Credit Agreement; (c) the Carve-Out is excessive; (d) the limitation on use of DIP Proceeds is overbroad; (e) the DIP order purports to compromise SPSO's rights for no consideration; and (f) Harbinger's adequate protection claims should be junior to SPSO's.

A.    ***The Debtors Made No Attempt to Secure Financing on More Favorable Terms.***

219.    The Debtors do not dispute that section 364(d) of the Bankruptcy Code requires an evidentiary showing that financing on less onerous terms is unavailable. See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) ("Because super priority financing displaces liens on which creditors have relied in extending credit, the debtor must demonstrate to the court that it cannot obtain financing by other means.").

220.    To meet this burden the Debtors offer a singular section of testimony from Mr. Hootnick that is either deficient or wholly irrelevant.  Mr. Hootnick testified that from the beginning of these cases (when the Debtors obtained DIP financing at the Inc. level) to "this past January" (when a DIP was procured for the LP Debtors) "we've conducted market tests in each of those instances."  (See Hootnick, 3/24/14 Hr'g Tr. 51:18-22.)  First, this testimony reveals no details of any "market tests," and the Court is asked to rule on nothing more than the Debtors' professionals' word that they contacted a sufficient number of potential lenders and considered a wide variety of available alternatives in each prior instance.[122]  Second, the New DIP Facility is a different credit facility from the incremental DIP facilities the Debtors have obtained periodically in these cases.  Even if the Debtors did appropriately market a $33 million DIP in January, that process is not probative of the market's interest in a $1.65 billion loan.  The Debtors also conveniently cite to the prior DIP shopping efforts to try to meet their burden with respect to section 364 of the Bankruptcy Code, but ignore Moelis' lower January DIP valuation when it comes to arguing feasibility and plan value. (See supra Section X.A.)

---

[122]    For instance, when the Debtors sought DIP financing for the LP Debtors, the Debtors did not even reach out to their largest senior secured lender to negotiate financing.  Instead, SPSO was forced to contact the Debtors themselves.  ***SPSO's*** efforts to be involved in the DIP financing effort, is not a substitution for the ***Debtors'*** legal obligation to affirmatively seek financing on less onerous terms.

136

221.    Next, Mr. Hootnick conclusively asserted that he was also "looking for financing more broadly for exit financing purposes." (See Hootnick, 3/24/14 Hr'g Tr. 51:23-24.) This testimony falls short of the Debtors' evidentiary burden and does not bode well for their valuation arguments.  Without any details regarding who Mr. Hootnick contacted, what those discussions looked like, or the details of any other offers he was able to solicit, the Court has insufficient evidentiary support to find that the Debtors "reasonably attempted, but failed" to obtain financing on superior terms.  See e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("A court, however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b).").  In fact, Mr. Hootnick even concedes that "we did not shop the $1.65 billion DIP." (Hootnick, 3/24/14 Hr'g Tr. 113:6-16.)

222.    The Debtors also assert that "at no point in the two years that LightSquared has been in chapter 11, has any party . . . stepped up to provide $1.65 billion in financing on any terms (let alone better terms) while LightSquared remains in bankruptcy." (See Debtors' Post-Trial Br. ¶ 232.)  Unfortunately for the Debtors, the Bankruptcy Code does not permit them to obtain financing on the first set of terms offered to them by a third party. Instead, section 364 of the Bankruptcy Code imposes an affirmatively obligation on the Debtors to seek better terms.  The Court should be essentially sensitive to this requirement when the proposed financing is sourced from insiders, and is being used to elevate prepetition equity interests over senior secured claims.

223.    Finally, the Debtors have asserted a common interest privilege covering *any and all* communications between the Special Committee and the Plan Support Parties regarding the Plan.  Given the lack of evidence of any negotiation, the Court should make the

137

only inference possible based on the available evidence and determine that the terms of the Plan
and the related New DIP Facility were dictated by the Plan Support Parties and the New DIP
Lenders. Under these circumstances, the Court cannot find that the Debtors' "decision" to enter
into the New DIP Facility is a sound exercise of reasonable business judgment, because
according to the non-existent record, the Debtors exercised *zero* judgment in this case. See
Ames Dep't Stores, 115 B.R. at 38.

   B.    ***SPSO's Interests in Collateral Will Not Be Adequately Protected.***

      224.    The Debtors assert that SPSO is not entitled to adequate protection
because, if the Plan is confirmed (a prerequisite to entry of the proposed DIP Order), either
SPSO will be deemed to accept the Plan, or the Court will determine that the SPSO Note is the
"indubitable equivalent" of SPSO's allowed secured claims. (See Debtors' Post-Trial Br. ¶ 237.)
The Debtors' gloss on these points de-emphasizes the extraordinary relief the Debtors seek.
First, for the Court to find that SPSO is deemed to accept the Plan, the Court must also
necessarily find (in addition to every other confirmation requirement) that: (a) the Plan
appropriately classifies SPSO's claims separately from those of the other LP lenders, (but it does
not, see supra Section III); (b) SPSO's vote should be designated (but it should not, see supra
Section XI.); and (c) the "empty class" ruling of DBSD should be extended and applied to the
specific facts of this case (the DBSD ruling should not be extended, see supra Section XII.E. and
XII.F.). Alternatively, the Court similarly should not find that the SPSO Note represents the
indubitable equivalent of SPSO's secured claims. (See supra Section XI.B.)

      225.    Even if the Court rules in favor of the Debtors on every one of the
foregoing points, SPSO maintains that under the specific facts of this case, where the Debtors
anticipate a gap of several months between confirmation and the Effective Date, SPSO should
continue to be protected by the requirements of section 364(d)(1)(B) while the Debtors remain in

bankruptcy. See In re Good, 428 B.R. 235 (Bankr. E.D. Tex. 2010) (finding that the failure of

adequate protection during the gap period between confirmation and effective date exposes the

estate to priority administrative expense claims and threatens consummation of the plan).

226.    The Debtors argue that SPSO is adequately protected by an equity

cushion, adequate protection liens and a superpriority claim.  As set forth herein, the valuation

evidence presented at trial undermines the Debtors' equity cushion argument — the SPSO Note

is out of the money as of the Effective Date (i.e. before LightSquared receives FCC approvals —

an outcome no one can guarantee, yet Moelis assumes to be a 100% likelihood to arrive at their

enterprise valuation).  Second, a comparison of the adequate protection proposed in connection

with the New DIP Facility against the adequate protection SPSO currently enjoys as an LP DIP

lender[123] demonstrates the inadequacy of the Debtors' proposal.  SPSO's existing adequate

protection includes (in addition to adequate protection liens and superpriority claims) periodic

cash payments, certain reporting requirements and the payment of professionals' fees.  Now the

Debtors propose to subordinate SPSO to $1.65 billion dollars and offer far less adequate

protection.    This is a plain vanilla priming fight that must be decided based on what

LightSquared is worth today, not what it may be worth in the future.  The Debtors have not met

their burden.  Perhaps one reason the Debtors steadfastly refuse to provide customary and

appropriate adequate protection is because doing so would further erode their projections, which

already show that LightSquared will run out of cash within two years.

227.    Even worse, the proposed DIP order would permit the New DIP lenders to

further impair SPSO's post-confirmation position without Court approval.  The New DIP Credit

Agreement allows the Debtors to propose "Permitted Amendments" to the New DIP Lenders.

---

[123]    Such a comparison is set forth in detail in SPSO's objection to the New DIP Facility [Docket No. 1393] ¶¶
16-17.

(See New DIP Credit Agreement at § 2.19.)  "Permitted Amendments" include modifying material economic provisions, including, among others, amending the maturity date, changing the Applicable Margin, or changing fees payable to, "or the inclusion of *new fees* to be payable to" the DIP Lenders.  (See DIP Agreement (definition of "Permitted Amendment") (emphasis added).)  The DIP Order, meanwhile, permits the Debtors to enter into such amendments *without any Court approval*, upon just five business days' notice. (See proposed DIP Order ¶ 14.)

228.    Further undermining SPSO's "adequate protection," the New DIP Lenders alone have the ability to waive Events of Default under the DIP Facility, and SPSO must remain silent.  For example, the FCC could deny a "Material Regulatory Request" — an event that would injure all of the Debtors' creditors (including SPSO, the largest) — and SPSO would have no ability to exercise remedies, or any other protection, in such event.  Similarly, the proposed DIP Order prohibits the Debtors from charging costs or expenses of administration to the DIP Collateral or to SPSO or to the SPSO Adequate Protection Superpriority Claims pursuant to section 506(c) of the Bankruptcy Code, but the New DIP Lenders alone are free to consent to such a surcharge, even if it would materially and adversely affect SPSO, without SPSO's consent.  (See DIP Order ¶ 32.)  Thus, the proposed DIP Order makes SPSO subject to the whims of the New DIP Lenders, who have already demonstrated open hostility toward SPSO. The Court should find that SPSO's interests in the prepetition collateral are not adequately protected by the proposed DIP Order between confirmation and the Effective Date.

C.    *The New DIP Facility is a Sub Rosa Plan.*

229.    The Debtors try to dismiss SPSO's *sub rosa* argument by re-iterating that because "the New DIP Facility [is] a critical component of the Plan, the New Dip Facility will be considered in the context of the Court's consideration of the Plan under section1 1129 of the Bankruptcy Code — the very opposite of a *sub rosa* plan." (See Debtors' Pre-Trial Br. ¶ 210.)

140

But this argument does not address SPSO's concerns. If the New DIP Facility is approved and the Plan never goes effective, LightSquared's capital structure will nonetheless look completely different. Entry of the proposed DIP Order will permit *irrevocable and indefeasible* payment to the other LP lenders, and will subordinate SPSO's *identical* claims to $1.65 billion of new indebtedness. This occurs whether or not the Plan is subsequently revoked, withdrawn, or otherwise unable to be consummated. Such an outcome is easy to imagine, if, for instance, LightSquared receives a negative indication from the FCC and the New DIP Lenders call an Event of Default. In that case, LightSquared's assets will have been substantially devalued, repayment of SPSO's prepetition claims will be in serious jeopardy (subordinated behind $1.65 billion), and the other LP lenders will be long gone having been paid in full, in cash, upon the closing of the New DIP Facility. SPSO maintains that it is nearly impossible to imagine *any* "fair and equitable" treatment of SPSO's claims given that the other LP lenders will be paid in cash, in full within fifteen days of confirmation (and certainly the SPSO Note does not satisfy section 1129(b) of the Bankruptcy Code). However, even if the Court were persuaded that such discriminatory treatment could be fair, it is undeniable that if the Plan is revoked following the full satisfaction (in cash) of the other LP Lenders' claims,[124] the Debtors will find themselves in the *impossible* position of having to provide SPSO's claims with treatment that is "fair and equitable" when compared against full payment, in cash *already received* by the other LP lenders. And that obligation will be *in addition* to the Debtors' *new* obligation to repay $1.65 billion of senior debt. In sum, the New DIP Facility is a *sub rosa* plan, because it alters the priorities of stakeholders on a standalone basis.

---

[124]    Perhaps due to the DIP Lenders calling a default because they believe the Debtors' assets no longer could support the Plan's anticipated debt-load.

D.    *The New DIP Lenders are not Entitled to Good Faith Protections.*

230.    The record of the confirmation hearing has proven that the New DIP Facility and the Plan it facilitates were dictated by the Plan Support Parties, exclusively for their own benefit, and reflect the animus of the Debtors' largest equity holder towards LightSquared's largest secured lender.  (See supra Section II.)  Moreover, given the lack of any documents reflecting good faith negotiations between the New DIP Lenders and the Special Committee, the Court must conclude that no one negotiated the terms of the New DIP Facility on behalf of the estate's other stakeholders.  Under these circumstances, the Court should not find that the New DIP Lenders (the Plan architects) are extending credit in good faith.

231.    One of the improper purposes of the New DIP Facility is to elevate certain prepetition equity interests above SPSO's senior secured claims.  The Debtors ignore the substance of this argument and label it a "red herring."  (Debtors' Post-Trial Br. ¶ 235.)  The Debtors also falsely assert that "the only Claims that will prime SPSO's existing Claims are new Claims resulting from the issuance of $1.65 billion in new money."  Id.  The Debtors are hiding the ball.  Holders of Existing LP Preferred Units Equity Interests (at least one of whom is a New DIP Lender) will be paid, *in cash* on the Effective Date.  (See Plan at §§ III.B.11 (treatment of Existing LP Preferred Units Equity Interests).)[125]

232.    The terms of the New DIP Facility and the proposed DIP Order also violate applicable law, by engineering a violation of the Prepetition LP Credit Agreement's Sharing Provision, providing an independent basis for the Court to deny a finding of good faith. See In re EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982) (finding lenders did not act in

---

[125]    Notably, Fortress, a large holder of Existing LP Preferred Units Equity Interests, will also receive payment in full in cash of its Prepetition LP Facility Claims (unless it elects to convert such claims to New DIP Tranche B Claims secured by a priming lien).

142

good faith because they knew their loan would be used for an improper purpose). The New DIP

Lenders know that more than half of their loan will be used to immediately pay all of the LP

lenders except SPSO. This willing violation of applicable law precludes a finding of good faith.

233. The New DIP Facility cannot be approved because the Plan fails to satisfy

the confirmation requirements of section 1129 of the Bankruptcy Code. However, the New DIP

Facility standing alone is comparably defective, and the Debtors have failed to meet their burden

set forth in section 364 of the Bankruptcy Code: (a) they have not shown financing on better

terms to be unavailable; (b) SPSO's interests will not be adequately protected; (c) the New DIP

Facility is a *sub rosa* plan, and (d) the New DIP Lenders are not entitled to a good faith finding.

## RESERVATION OF RIGHTS

234. SPSO reserves its rights to raise such other or further objections to the

Plan as may be necessary or appropriate at or prior to the close of the confirmation hearing.

143

## CONCLUSION

For the reasons set forth herein, SPSO respectfully requests that the Court deny (a) confirmation of the Plan (b) designation of SPSO's vote, and (c) approval of the New DIP Facility and grant such other relief as may be just or proper.

Dated: April 26, 2014
     New York, New York

WILLKIE FARR & GALLAGHER LLP

By:  /s/ Rachel C. Strickland
     Rachel C. Strickland
     Tariq Mundiya
     James C. Dugan
     Matthew Freimuth
     Daniel I. Forman

787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

*Counsel to SP Special Opportunities, LLC*

144

**Attachment A**

**Confirmation Decision Tree**



Deny Confirmation
Plan not proposed in good faith
The SPSO Note does not equal payment in full
Plan does not satisfy 1122
Plan does not provide SPSO with the indubitable equivalent of its claims
No jurisdiction
SPSO does not retain its liens
Plan unfairly discriminates
If 'no'
Plan is not feasible
Plan fails best interests test
If 'no'
If 'no'
START HERE
Good Faith 1129(a)(3)
Are Fees Associated with the Plan Reasonable? 1129(a)(4)
Feasibility 1129(a)(11)
Cramdown 1129(b)
Unfair Discrimination?
Follow RadLAX?
If 'no'
If 'yes'
If 'yes'
If 'no'
If 'no'
If 'yes'
If no/partial subordination
Does the Plan Pay all Admin Claims in Full 1129(a)(9)
If 'yes'
Jurisdiction to Amend Sharing Provision?
If 'yes'
Designation 1126(e)
If 'no'
Does SPSO retain its liens? 1129(b)(2)(A)(i)
Fair and Equitable?
Is there an Impaired Accepting Class? 1129(a)(10)
If 'yes'
If 'yes'
If 'yes'
Classification 1122
Expand DBSD Holding?
Best Interests 1129(a)(7)
Indubitable Equivalent? 1129(b)(2)(A)(iii)
If 'partial' or 'no'
If 'ok'
If claims were fully subordinated and liens stripped
If fully subordinated AND separate classification from GUCs is 'ok'
Equitable Subordination 510(c)
SPSO Note = payment in full? 1129(b)(2)(B)(i)
If 'partial' or 'no'
Claim Disallowance 502(b)
Confirm Plan
Confirmation Scenario 2
If Plan was proposed in good faith
AND classification is okay
AND the Court finds that it has jurisdiction
AND the fees paid under the Plan are reasonable
AND Plan satisfies the best interests test
AND the Plan pays all admin claims in full
AND there Is an impaired accepting class
AND the Plan is feasible
AND SPSO's vote is designated
AND the Court expands DBSD's "empty class" holding
Confirmation Scenario 1
If Plan was proposed in good faith
AND SPSO's claim is fully disallowed
Confirmation Scenario 3
If everything is true from Scenario 2, but cramdown applies,
AND the Plan does not discriminate unfairly
AND the Plan is fair and equitable,
because either: (a) SPSO retains its liens, or
(b) (if RadLAX is not followed) SPSO Note is indubitable equivalent, or
(c) (if full subordination) the SPSO Note = payment full

**Attachment B**

**LightSquared Plan Transactions**



# LightSquared Plan Transactions

