**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

**DECISION DENYING CONFIRMATION OF DEBTORS' THIRD AMENDED**
**JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE**

A P P E A R A N C E S:

MILBANK, TWEED, HADLEY & M^CCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
By:    Matthew S. Barr, Esq.
        Alan J. Stone, Esq.
        Michael L. Hirschfeld, Esq.
        Karen Gartenberg., Esq.


International Square Building
1850 K Street, NW
Washington, DC 20006
By:    Andrew M. Leblanc, Esq.


*Attorneys for Debtors and Debtors in Possession*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:    Rachel C. Strickland, Esq.
        James C. Dugan, Esq.
        Tariq Mundiya, Esq.
        Matthew Freimuth, Esq.


*Attorneys for SP Special Opportunities, LLC*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:    Paul M. Basta, Esq.
        Joshua A. Sussberg, Esq.


*Attorneys for Special Committee of Boards of Directors of LightSquared Inc. and LightSquared
GP Inc.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    David M. Friedman, Esq.
        Adam Shiff, Esq.


*Attorneys for Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM
Corp., and Harbinger Capital Partners SP, Inc.*

1

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By:    Thomas E Lauria, Esq.
        Glenn M. Kurtz, Esq.
        Andrew C. Ambruoso, Esq.
        Julia M. Winters, Esq.

*Attorneys for Ad Hoc Secured Group of LightSquared LP Lenders*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, NY 10036
By:    Philip C. Dublin, Esq.

*Attorneys for U.S. Bank National Association and MAST Capital Management, LLC*

BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
By:    Jeffrey S. Sabin, Esq.

*Attorneys for Centaurus Capital and Melody Business Finance*

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
By:    Sandeep Qusba, Esq.

*Attorneys for JPMorgan*

## TABLE OF CONTENTS

I.      BACKGROUND ............................................................................................2

        A.   The Third Amended Plan.........................................................5

        B.   Motions Filed in Connection with Confirmation......................................8

        C.   Pleadings Filed in Connection with the Plan
             and Confirmation-Related Motions .......................................9

        D.   The Confirmation Hearing .......................................................9

        E.   LightSquared's Pending License Modification ....................................11

II.     CONFIRMATION TESTIMONY ...................................................................13

        A.   Mr. Robert McDowell................................................................13

        B.   Mr. Christopher Rogers ...........................................................16

        C.   Mr. Douglas Smith..................................................................17

        D.   Mr. Marc Montagner...............................................................18

        E.   Mr. Steven Zelin ....................................................................18

        F.   Mr. Charles Ergen...................................................................19

        G.   Mr. Omar Jaffrey ...................................................................21

        H.   Mr. Philip Falcone ..................................................................23

III.    THE MOELIS VALUATION ANALYSIS.......................................................24

IV.     THE GLC VALUATION ANALYSIS ............................................................29

V.      CONFIRMATION TESTIMONY REGARDING THE "TECHNICAL ISSUE" ...........32

        A.   Mr. Douglas Hyslop..............................................................32

        B.   Mr. John Jacob Rasweiler V ....................................................33

DISCUSSION ................................................................................................................33

I.   THE PLAN CANNOT BE CONFIRMED ........................................................33

   A.  Separate Classification of Prepetition LP Facility SPSO Claim
       Complies With Section 1122 ................................................................33

   B.  SPSO's Vote to Reject the Plan Shall Not Be Designated ...................43

   C.  Because SPSO's Vote Cannot Be Designated, the Cramdown Requirements
       of Section 1129(b) Are Applicable to Class 7B....................................48

      1.  The Plan Is Not Fair and Equitable With Respect to Class 7B.......................49

         a.  The Moelis Valuation ................................................................54

         b.  The GLC Valuation....................................................................55

         c.  The Ergen Valuation ................................................................56

         d.  The PWP Valuation ................................................................56

         e.  Additional Valuation Issues......................................................57

      2.  The Plan Unfairly Discriminates Against Class 7B........................................59

   D.  The Claim of SPSO Shall be Subordinated to the Extent of Harm
       Caused to Innocent Creditors................................................................62

II.  ADDITIONAL OBJECTIONS TO THE PLAN .................................................65

CONCLUSION.............................................................................................................67

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of*

*Bankruptcy Code* [Docket No. 1308] (as amended, supplemented, or modified in accordance

with the terms thereof, the "Third Amended Plan" or the "Plan").  The Plan enjoys the support of

every significant party in interest in these cases, save one: SPSO, a special purpose entity owned

and controlled by Mr. Charles Ergen.  SPSO opposes confirmation of the Plan.  SPSO holds

approximately $844 million face amount of the outstanding LightSquared LP prepetition secured

debt.  The facts and circumstances surrounding SPSO's acquisition of its claim (the "SPSO

Claim"), and the conduct of Mr. Ergen and certain of his affiliated entities in these cases, are the

subject of a separate adversary proceeding pending in this Court and are also at issue in

connection with consideration of confirmation of the Plan.  Among other things, the Debtors

seek to disallow or subordinate the SPSO Claim in its entirety, and have also moved, pursuant to

section 1126(e) of the Bankruptcy Code, to designate SPSO's vote.  Pointing to SPSO's

connection to Mr. Ergen and DISH, the Debtors, Harbinger, and the Ad Hoc Group of

LightSquared LP Lenders have constructed a Plan that purports to follow the blueprint laid out

by the decisions in DBSD,[1] to address conduct by Mr. Ergen that they maintain is even more

egregious than the conduct at issue in DBSD.  The Plan Proponents separately classify the SPSO

Claim; seek to designate SPSO's vote and disregard the class (7B) in which the SPSO Claim is

the sole classified claim; and seek to confirm the Plan without satisfying the requirements of

section 1129(b) of the Code, among others.  In the alternative, the Plan Proponents assert that the

treatment of the SPSO Claim, which is markedly different from the treatment the Plan affords to

---

[1]      In re DBSD North America, Inc., 421 B.R. 133 (Bankr. S.D.N.Y. 2009); In re DBSD North America, Inc.,
634 F.3d 79 (2d Cir. 2011) (together, "DBSD").

1

the other holders of LightSquared LP prepetition secured debt, provides SPSO with the

indubitable equivalent of its claim and satisfies all requirements for confirmation, including

those embodied in section 1129(b).  It is no understatement to say that the parties have waged a

lengthy and increasingly nasty litigation war against each other over the past year and the

confirmation hearing was a particularly vivid display of the parties' animosity towards each

other.  The parties continued to file motions and cross-motions for weeks after the evidentiary

record on confirmation was to be closed and for weeks after the evidentiary record in the

Adversary Proceeding[2] was to be closed.  This Decision[3] will address confirmation of the Plan

and all pending motions related to the confirmation hearing.

## I.    BACKGROUND[4]

LightSquared LP, LightSquared Inc., LightSquared Investors Holdings Inc., TMI

Communications Delaware Limited Partnership, LightSquared GP Inc., ATC Technologies,

LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC,

SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as debtors and debtors in

possession (collectively, with certain of their affiliated debtors and debtors in possession,

"LightSquared" or the "Debtors") provide wholesale mobile satellite communications and

broadband services throughout North America.  Through its ownership of several satellites and

licenses to use mobile satellite service spectrum issued by the Federal Communications

Commission (the "FCC"), LightSquared delivers voice and data services to mobile devices used

---

[2]    Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.), Adv. Pro. 13-1390-scc (Bankr.
S.D.N.Y.) (the "Adversary Proceeding").
[3]    This Decision supersedes this Court's Bench Decision read into the record on May 8, 2014.
[4]    The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy
Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so
deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so
deemed.

by the military, first responders and other safety professionals, and individuals throughout North

America.  (See Declaration of Marc R. Montagner [Docket No. 3] ¶¶ 18-31.)

On May 14, 2012 (the "Petition Date"), LightSquared filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  Pursuant to Bankruptcy

Rule 1015 and the *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket

No. 33], the Court directed the joint administration of the Chapter 11 Cases for procedural

purposes only.  LightSquared continues to operate its businesses and manage its properties as

debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official

committee has been appointed in the Chapter 11 Cases.  No trustee or examiner has been

appointed in the Chapter 11 Cases.

On August 6, 2013, Harbinger Capital Partners LLC, HGW US Holding Company LP,

Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger")

commenced the Adversary Proceeding against Charles Ergen, DISH Network Corporation

("DISH"), EchoStar Corporation ("EchoStar"), L-Band Acquisition, LLC ("LBAC"), SP Special

Opportunities LLC ("SPSO"), Special Opportunities Holdings LLC, Sound Point Capital

Management LP, and Stephen Ketchum, alleging inequitable conduct, fraud, aiding and abetting

fraud, tortious interference with prospective economic advantage, tortious interference with

contractual relationship, unfair competition, and civil conspiracy; and seeking equitable

disallowance of claims, compensatory and punitive damages, costs and fees, interest, and other

appropriate relief.  After the Court granted motions to dismiss Harbinger's complaint,[5]

LightSquared filed a Complaint-in-Intervention against SPSO, DISH, EchoStar, and Mr. Ergen,[6]

---

[5]    See Memorandum Decision Granting Motions to Dismiss Complaint [Adv. Docket No. 68], 504 B.R. 321
(Bankr. S.D.N.Y. 2013).
[6]    SPSO, DISH, EchoStar, Mr. Ergen, and LBAC will be referred to collectively herein as the "Ergen
Parties."

and Harbinger filed a second amended complaint.  A trial in the Adversary Proceeding was held between January 9 and 17, 2014, with closing arguments held on March 17, 2014.  This Court issued a bench decision on May 8, 2014, which was superseded by its Post-Trial Findings of Fact and Conclusions of Law, dated June 10, 2014 (the "Adversary Proceeding Decision").[7]

On August 29, 2013, LightSquared filed the *General Disclosure Statement* [Docket No. 815] and, on October 7, 2013, filed the *First Amended General Disclosure Statement* [Docket No. 918] (the "General Disclosure Statement").  On October 10, 2013, the Court entered an order approving, among other things, the General Disclosure Statement and certain solicitation, notice, balloting, and confirmation procedures in the Chapter 11 Cases.[8]  On December 31, 2013, LightSquared filed the *Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan").

On February 14, 2014, LightSquared filed the Plan[9] and the corresponding *Specific Disclosure Statement for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1308] (as amended, supplemented, or modified, the "Specific Disclosure Statement").  On February 24, 2014, the Court entered the *Order Approving (A) LightSquared's Third Amended Specific Disclosure Statement and (B) Shortened Time To Object to Confirmation of LightSquared's Third Amended Plan and Streamlined Resolicitation Thereof* [Docket No. 1343] (the "Revised Disclosure Statement Order"), approving, among other things, (a) the Specific Disclosure Statement, (b) the streamlined solicitation of votes on the Plan, and (c) certain amended dates and deadlines with respect thereto.  The Revised Disclosure Statement Order established, among other things, (i) March 3, 2014 at 4:00 p.m. (prevailing

---

[7]    Post-Trial Findings of Fact and Conclusions of Law, [Adv. Docket No. 165], 2014 Bankr. LEXIS 2528 (Bankr. S.D.N.Y. June 10, 2014).  Additional background on the Chapter 11 Cases and Adversary Proceeding can be found in the Adversary Proceeding Decision.

[8]    Docket No. 936.

[9]    The Plan was subsequently modified several times.  See Docket Nos. 1336, 1422, and 1482.

4

Pacific time) as the Plan voting deadline and (ii) March 11, 2014 at 12:00 p.m. (prevailing Eastern time) as the Plan objection deadline, which was subsequently extended for SPSO until March 15, 2014 at 12:00 p.m. (prevailing Eastern Time).   SPSO's Objection to Approval of the Specific Disclosure Statement [Docket No. 1325] was overruled.

### A.    The Third Amended Plan

Article III of the Third Amended Plan provides for separate classification of claims and equity interests into the following sixteen distinct classes:[10]

| | |
|---|---|
| Class 1: | Inc. Other Priority Claims |
| Class 2: | LP Other Priority Claims |
| Class 3: | Inc. Other Secured Claims |
| Class 4: | LP Other Secured Claims |
| Class 5: | Prepetition Inc. Facility Non-Subordinated Claims |
| Class 6: | Prepetition Inc. Facility Subordinated Claims |
| Class 7A: | Prepetition LP Facility Non-SPSO Claims |
| Class 7B: | Prepetition LP Facility SPSO Claims |
| Class 8: | Inc. General Unsecured Claims |
| Class 9: | LP General Unsecured Claims |
| Class 10: | Existing LP Preferred Units Equity Interests |
| Class 11A: | Existing Inc. Series A Preferred Stock Equity Interests |
| Class 11B: | Existing Inc. Series B Preferred Stock Equity Interests |
| Class 12: | Existing Inc. Common Stock Equity Interests |
| Class 13: | Intercompany Claims |
| Class 14: | Intercompany Interests |

(See Plan, Art. III.)

Each class of Claims and Equity Interests under the Plan contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that class. Pursuant to the Plan, holders of Prepetition LP Facility Claims[11] are divided into two classes, Class 7A and Class 7B.  While holders of Prepetition LP Facility Non-SPSO Claims in Class 7A

---

[10]    In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Inc. Facility Claims, DIP LP Claims, New DIP Claims, U.S. Trustee Fees, and Priority Tax Claims are not classified in the Plan.

[11]    "Prepetition LP Facility Claims" refers to claims held by the Prepetition LP Agent or the Prepetition LP Lenders arising under, or related to, the $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement, dated as of October 1, 2010, by and among LightSquared LP and certain of its affiliates and the Prepetition LP Lenders thereunder.  "LP Debt" refers to the secured debt of LightSquared LP issued pursuant to the Prepetition LP Credit Agreement.

will receive Plan consideration in the form of cash payment equal to the amount of their allowed claims,[12] SPSO, the sole claimant in Class 7B (Prepetition LP Facility SPSO Claims) will receive Plan consideration in the form of the SPSO Note.[13]  Pursuant to the Plan, the SPSO Note, which shall have a seven-year maturity and bear interest at LIBOR plus twelve percent, payable in kind, will be secured or unsecured as determined by this Court, provided, however, that if this Court determines that the SPSO Note shall be secured, the liens securing such note will be silent, third priority liens junior to the liens securing the two exit facilities created in connection with the Plan.  Because SPSO is not being paid in cash, the Plan requires almost $1 billion less in financing than the Second Amended Plan.  (Plan § IV.A.; Mar. 6, 2014 Dep. Tr. (Montagner) 197:9-21.)

The Plan contemplates, among other things:  (a) first lien exit financing, including a facility of not less than $1.0 billion; (b) the issuance of new debt and equity instruments; (c) the payment of all allowed claims and equity interests with cash and other consideration, as applicable; (d) the assumption of certain liabilities; (e) the provision of a $1.65 billion new debtor in possession facility by the Plan Support Parties (as defined below) shortly following confirmation of the Plan but prior to the Effective Date (the "New DIP Facility") (approximately (i) $930 million of which will be converted into second lien exit financing, (ii) $300 million of which will be converted into the Reorganized LightSquared Inc. Loan, and (iii) approximately $115 million of which will be converted into new equity,[14] in each case, subject to adjustments as set forth in the Plan), which New DIP Facility will be used to fund operations pending

---

[12]     Pursuant to the Plan, such claimants may also elect to receive Plan consideration in the form of New DIP Tranche B Claims (for Converted Prepetition LP Facility Non-SPSO Claims).

[13]     The Plan provides that Class 7B will receive the "SPSO Option A Treatment" or the "SPSO Option B Treatment," depending on whether SPSO votes to accept the Plan.  Given that SPSO has voted to reject the Plan, it would receive the SPSO Option B Treatment, discussed herein.

[14]     Pursuant to the Plan, this $115 million will be converted into equity junior to the proposed SPSO Note. (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 55:1-12.)

consummation of the Plan and to make distributions to certain creditors; and (f) the preservation of LightSquared's litigation claims.[15]

The Plan has the affirmative support of (a) Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts ("Fortress"), (b) Melody Capital Advisors, LLC and/or Melody NewCo, LLC, each of behalf of itself and its funds ("Melody"), (c) Harbinger, (d) JP Morgan Chase & Co. or its designated affiliates ("JPMorgan," and, collectively with Fortress, Melody, and Harbinger, the "Plan Support Parties"), (e) U.S. Bank National Association ("U.S. Bank") and MAST Capital Management, LLC ("MAST"), and (f) the Ad Hoc Secured Group of Prepetition LightSquared LP Lenders (the "Ad Hoc Secured Group").

The tabulation reports filed in connection with the Plan reflect the following voting results:

| Class | Amount Accepted | Number Accepted |
|---|---|---|
| 6 (Prepetition Inc. Facility Subordinated Claims) | 100% | 100% |
| 7A (Prepetition LP Facility Non-SPSO Claims) | 100% | 100% |
| 7B (Prepetition LP Facility SPSO Claims) | 0% | 0% |
| 8 (Inc. General Unsecured Claims) | 100% | 100% |
| 9 (LP General Unsecured Claims) | 100% | 100% |
| 10 (Existing LP Preferred Units Equity Interests) | 100% | 100% |

---

[15]      The Specific Disclosure Statement contained form agreements and/or related documents with respect to various Plan Supplement documents, including the First Lien Exit Credit Agreement, Reorganized LightSquared Inc. Loan, and New LightSquared Entities Corporate Governance Documents [Docket No. 1308].  This filing also contained copies of the SPSO Note Documents, the Schedule of Assumed Agreements, and the Schedule of Retained Causes of Action.  On February 17, 2014, LightSquared filed a *Notice of Filing of Plan Supplement Documents for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1312], attaching copies of the Second Lien Exit Credit Agreement and NewCo Interest Holders Agreement.

On March 18, 2014, LightSquared filed a *Notice of Filing of (A) Modified Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code and (B) Accompanying Confirmation Order* [Docket No. 1422]. On March 21, 2014, LightSquared filed a *Notice of Filing Relating to Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1433], attaching (a) Highly Confident Letters from J.P. Morgan Securities LLC and Credit Suisse Securities (USA), LLC Relating to First Lien Exit Credit Agreement, (b) the Pro Forma Ownership Summary for NewCo, and (c) a list of officers for the New LightSquared Entities (indicating that the identities of the directors of the New LightSquared Entities would be disclosed in a further supplement to the Plan).  On March 31, 2014, LightSquared filed a *Notice of Filing Relating to Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1456], attaching the Initial List of Directors for the New LightSquared Entities, subject to further supplement prior to the close of the Confirmation Hearing.

| 11A (Existing Inc. Series A Preferred Stock Equity Interests) | 100% | 100% |
| 11B (Existing Inc. Series B Preferred Stock Equity Interests) | 100% | 100% |
| 12 (Existing Inc. Common Stock Equity Interests) | 100% | 100% |

(See *Certification of Gil Hopenstand with Respect to Tabulation of Votes on Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, sworn to March 7, 2014 [Docket No. 1380], Exs. A-B.)  SPSO, the sole member of Class 7B (Prepetition LP Facility SPSO Claims), voted to reject the Plan.  (See id.)

Under the Plan, Holders of Claims or Equity Interests in Classes 1 (Inc. Other Priority Claims), 2 (LP Other Priority Claims), 3 (Inc. Other Secured Claims), 4 (LP Other Secured Claims), 5 (Prepetition Inc. Non-Subordinated Facility Claims), 13 (Intercompany Claims), and 14 (Intercompany Interests) are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are deemed to have voted to accept the Plan.  (See Plan, Art. III.)

## B.    Motions Filed in Connection with Confirmation

In addition to confirmation of the Plan, there are numerous confirmation-related motions pending before the Court, and the various objections and responses thereto.  They are:

- LightSquared's *Motion for Entry of Order Designating Vote of SP Special Opportunities, LLC* [Docket No. 1371] (the "Vote Designation Motion").  The Vote Designation Motion seeks to designate the vote of SPSO pursuant to section 1126(e) of the Bankruptcy Code.

- LightSquared's *Confirmation-Related Motion for Order (A) Approving Postpetition Financing, (B) Authorizing Use of Cash Collateral, If Any, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection, and (E) Modifying Automatic Stay* [Docket No. 1311] (the "New DIP Motion"), seeking an order (a) approving postpetition financing for the period between post-confirmation and the Effective Date, (b) authorizing the use of cash collateral, if any, (c) granting liens and providing superpriority administrative expense status, (d) granting adequate protection, and (e) modifying the automatic stay.

- LightSquared's *Supplement to Motion for Entry of Order Authorizing LightSquared To Modify and Extend Existing Key Employee Incentive Plan* [Docket No. 1390] ("the KEIP Supplement").  The KEIP Supplement seeks an

8

order authorizing LightSquared to modify its existing Key Employee Incentive Plan.[16]

- LightSquared's *Motion to Strike Certain Portions of Expert Testimony of Douglas Hyslop and J. Soren Reynerston* [Docket No. 1458] (the "Motion to Strike Hyslop and Reynertson")

- SPSO's *Motion to Strike Certain of the Testimony of Robert McDowell and Mark Hootnick* [Docket No. 1460] (the "Motion to Strike McDowell and Hootnick")

- SPSO's *Motion to Admit SPSO Confirmation Exhibit 2* [Docket No. 1505] (the "Exhibit 2 Motion")[17]

**C.    Pleadings Filed in Connection with the Plan and Confirmation-Related Motions**

SPSO filed objections to the Plan, the Vote Designation Motion, the New DIP Motion, the KEIP Supplement, and the Motion to Strike Hyslop and Reynertson.

On March 18, 2014, LightSquared filed its *(A) Memorandum of Law in Support of Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code and (B) Omnibus Response to Objections to (i) Confirmation of Plan, (ii) Motion to Designate Vote of SP Special Opportunities, LLC, and (iii) Motion Seeking Approval of New DIP Facility* [Docket No. 1413], accompanied by the Declaration of Matthew S. Barr and the Declaration of Douglas Smith.  Statements and/or pleadings in support of the Plan were filed by (a) Fortress, (b) Melody, (c)  Harbinger, (d) JPMorgan, (e) U.S. Bank and MAST, (f) the Ad Hoc Secured Group, and (g) the Special Committee.[18]

**D.    The Confirmation Hearing**

---

[16]    This Decision does not address the KEIP Supplement, which remains *sub judice*.

[17]    Exhibit 2 (SPX002), produced by a non-party, has not been properly authenticated, contains multiple layers of hearsay, and does not fall under any exception to the prohibition on hearsay.  Morever, the Exhibit 2 Motion, dated April 30, 2014, was filed well after the close of the evidentiary record on confirmation, rendering it procedurally improper.  For these reasons, the Exhibit 2 Motion is denied and Exhibit 2 is excluded from the record.

[18]    In September 2013, the Court ordered the appointment of the Special Committee of the Boards of Directors of LightSquared Inc. and LightSquared GP Inc. (the "Special Committee") to direct many of LightSquared's significant actions with respect to these Chapter 11 Cases.  (See Docket No. 866; PX0755; PX0789.)

On March 19, 2014, the Court commenced a hearing on the Plan, the Vote Designation

Motion, and the New DIP Motion; the evidentiary hearing was conducted over the course of

eight days (the "Confirmation Hearing").  The Court heard live testimony from the following

witnesses and rebuttal witnesses called by the Debtors, the Ad Hoc Secured Group, and SPSO:

(i) Mr. Christopher  Rogers, a member of the Special Committee; (ii) Mr. Robert McDowell,

offered by the Debtors as an expert on FCC-related matters; (iii) Mr. Douglas Smith, the

Debtors' Chief Executive Officer; (iv) Mr. Mark Hootnick, a Managing Director of Moelis &

Company ("Moelis"), the Debtors' financial advisor; (v) Mr. John Jacob Rasweiler V, a principal

of Sublime Wireless, offered by the Debtors as an expert with respect to the "technical issue;"[19]

(vi) Mr. Charles Ergen, who is, among other things, the ultimate owner of SPSO, the controlling

shareholder of DISH, and the Chairman of DISH's Board of Directors; (vii) Mr. Philip Falcone,

the controlling member of Harbinger Capital Partners, one of the Plan Support Parties and the

principal shareholder of LightSquared; (viii) Mr. Douglas Hyslop of Wireless Strategy LLC and

SmartSky Networks LLC, offered by SPSO as an expert with respect to the "technical issue;"

(ix) Mr. Omar Jaffrey, a principal of Melody, a private investment firm which is one of the Plan

Support Parties; (x) Mr. J. Soren Reynertson, a Managing Director of GLC Advisors & Co.

("GLC"), offered by SPSO as an expert on valuation issues; and (xi) Mr. Steven Zelin, a

Managing Director of The Blackstone Group ("Blackstone"), the financial advisor to the Ad Hoc

Secured Group.  The testimony of Mr. Marc Montagner, the Debtors' Chief Financial Officer,

---

[19]        In late 2013, SPSO, DISH, and LBAC raised what has been referred to as a "technical issue" with
LightSquared's spectrum which would allegedly be an impediment to the use of certain LightSquared uplink
spectrum.  The Debtors submitted both documentary evidence and the live testimony of Mr. Rasweiler at trial in
support of their position that that the "technical issue" poses no impediment to the use of LightSquared's spectrum
and does not impact the value of LightSquared's assets.  All pleadings and proceedings relating to the "technical
issue" are confidential and have been filed under seal.  Accordingly, the Court's findings with respect to the
"technical issue" are reflected in Appendix A, which has been separately filed under seal and which is attached
hereto in redacted form.

was presented via videotape and deposition transcript designations.  Several volumes of

documentary exhibits have also been admitted into evidence.

Detailed proposed findings of fact and lengthy post-trial memoranda were also submitted

by the parties, which submissions were in addition to the pre-trial memoranda filed by the parties

prior to the commencement of the Confirmation Hearing.  The Court heard closing arguments

concerning the Plan, the Vote Designation Motion, and the New DIP Motion on May 5 and 6,

2014.

### E.    LightSquared's Pending License Modification Application

The Plan valuation is premised on LightSquared's ownership and/or use of four spectrum

blocks within the L-Band:  (a) a 10 MHz downlink at 1526 to 1536 MHz ("Lower Downlink");

(b) a 10 MHz uplink at 1627.5 to 1637.5 MHz ("Uplink 1" or "Lower Uplink"); (c) a 10 MHz

uplink at 1646.7 to 1656.7 MHz ("Uplink 2" or "Upper Uplink"); and (d) a spectrum block

located at 1670 to 1680 MHz (the "New Downlink"), which is comprised of 5 MHz currently

used by the National Oceanic and Atmospheric Administration ("NOAA") and 5 MHz currently

leased by LightSquared.

On September 28, 2012, LightSquared filed with the FCC a series of applications seeking

to modify various of its licenses (collectively, the "License Modification Application") to,

among other things:

- authorize LightSquared to use the 1675-1680 MHz spectrum band (the "NOAA
  Spectrum") on a shared basis with certain government users, including NOAA;

- permit LightSquared to conduct terrestrial operations "pairing" the 1670-1680 MHz New
  Downlink with two 10 MHz L-Band uplink channels in which LightSquared currently is
  authorized to operate (Uplink 1 and Uplink 2); and

- permanently relinquish LightSquared's right to use its upper 10 MHz of L-Band
  downlink spectrum (a 10 MHz band at 1545.2 to 1555.2 MHz) for terrestrial purposes
  (that portion of the spectrum closest to the band designated for GPS devices).

In conjunction with submitting the License Modification Application, LightSquared also asked that the FCC open a proceeding via a petition for rulemaking, filed on November 2, 2012, to make an administrative change amending the U.S. Table of Frequency Allocations to add a primary allocation permitting non-federal terrestrial mobile use of the NOAA Spectrum.  Thus, LightSquared has been pursuing a solution through the License Modification Application that would provide it with 30 MHz of spectrum – an amount, LightSquared states, that is sufficient to implement its business plan.[20]  SPSO argues that one of the many reasons that the Plan is not feasible is that the NOAA Spectrum, which is needed for LightSquared to have a full 10 MHz of New Downlink, may be auctioned off by the FCC rather than assigned to LightSquared. LightSquared has conceded that it cannot predict with certainty whether the NOAA Spectrum will be assigned to LightSquared or put up for auction but maintains that this uncertainty does not preclude a finding of feasibility.

LightSquared has also requested that the FCC open an additional proceeding via a petition for rulemaking to examine the conditions and operational parameters under which its Lower Downlink could be used sometime in the future for terrestrial service.  LightSquared asserts that it will have authorization to use the Lower Downlink within the next three to seven years.  (See Conf. Hr'g Tr. Mar. 20, 2014 (Smith) 131:22-25 (three to five years); Mr. McDowell testified that "the lower 10 will be granted within approximately seven years."  (See Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) 73:17-19.)  None of SPSO's witnesses testified regarding the timing or likelihood of FCC approval for the Lower Downlink.[21]

---

[20]    See General Disclosure Statement [Docket No. 918] at 39-40.
[21]    SPSO's valuation expert, Mr. Reynertson, testified that "[t]he lower downlink block is still subject to controversy, and as highlighted by Mr. Smith's presentation, and so ultimately, we felt that there was a range of outcomes here."  (Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 158:1-3.)

While effectiveness of the Plan is not conditioned on FCC approval of LightSquared's pending License Modification Application, LightSquared's Plan valuation relies on opinions offered at the Confirmation Hearing that the FCC will approve the pending License Modification Application and the later use of its Lower Downlink within the timeframes upon which the valuation is based.

## II.    CONFIRMATION TESTIMONY

### A.    Mr. Robert McDowell

Mr. Robert McDowell, a former FCC Commissioner, was retained by the Special Committee in November 2013 to advise it with respect to FCC issues and was presented as an expert witness at the Confirmation Hearing.  (See Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) at 73:22-24.)  Mr. McDowell left the FCC in May 2013, having served as one of five FCC Commissioners for a period of almost seven years.  (See Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) at 70:22-25; PX1078.)[22]

During the Confirmation Hearing, Mr. McDowell offered his opinion that he agreed with LightSquared's forecast that it would receive FCC approval of the License Modification Application by December 31, 2015, including the premise that a portion of the New Downlink spectrum would be made available from the NOAA Spectrum.   (See Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) at Tr.75:1-7, 15-25.)  In addition, Mr. McDowell testified that he believed it was very likely that the FCC would approve LightSquared's use of its 10 MHz of Lower Downlink (1526MHz to 1536MHz) for terrestrial use within the seven years contemplated by the Plan.  (Id. at 75:8-9.)

---

[22]    As an FCC Commissioner, Mr. McDowell's duties included consideration of, and decisions regarding, spectrum issues involving satellite, media, and wireless companies.  (See PX1078 at 2.)

Mr. McDowell did not pick these dates; rather, he was simply given the dates reflected in the Plan. Although he testified that he had participated in and had knowledge of matters relating to LightSquared during his tenure at the FCC, he acknowledged that he is precluded by government rules and regulations from having any contact with the FCC during the two years subsequent to his departure from the agency. Accordingly, since that two year period has yet to expire, Mr. McDowell has had no contact whatsoever with FCC personnel regarding matters pending before it relating to LightSquared. (Id. at 87:1-2.) Nonetheless, he offered his opinions "based on his thirty years of experience" that the FCC will grant the License Modification Application before the end of 2015; will not require an auction of the NOAA Spectrum; and will approve use of the Lower Downlink spectrum by the end of seven years.

Although Mr. McDowell admitted that the FCC could commence a rule-making proceeding with respect to the NOAA Spectrum which could take years and acknowledged that the FCC had filed a statement in these cases indicating that it could give no "assurances about what its decision would be or the timing of the decision,"[23] he nonetheless offered his opinions on the critical timing issues on which the Plan is premised. He testified that he examined, and ultimately discounted, a number of factors that could theoretically present issues for LightSquared's regulatory approval process, including (i) potential GPS interference issues raised by members of the GPS community during a meeting with the FCC in December 2013 (see id. at 80:10-81:2); (ii) potential handset interference issues raised by SPSO with respect to the use of LightSquared's uplink spectrum, which have not been raised by any party in a formal

---

[23]    See Statement Regarding the FCC Exit Condition in Debtors' Revised Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code, dated January 17, 2014 [Docket No. 1235] (the "FCC Statement"). Mr. McDowell concluded that the FCC Statement did not change his opinion for two key reasons. First, he opined that the FCC Statement in this case is a "fairly routine filing for the Commission to preserve all of its legal options and [the statement] doesn't reach any conclusions." (Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) at 81:22-82:4.) Second, Mr. McDowell noted that the FCC Statement "speaks to the second amended plan . . . which had a contingency of resolution at the FCC or grants by the end of this calendar year, 2014. And the third amended plan does not have such a contingency." (Id. at 82:5-10.)

objection (see id. at 82:11-83:4); and (iii) the possibility that the FCC could auction the NOAA

Spectrum instead of agreeing to swap it for LightSquared's 10 MHz of downlink spectrum

closest to the GPS band.  With respect to NOAA, he pointed out that the FCC has granted license

modification applications in the past that involved spectrum swaps without holding an auction.

(See id. at 83:5-84:7.)

        Mr. McDowell concluded that, whether or not the FCC decides to hold an auction for the

NOAA Spectrum, LightSquared's "license modification will be granted by the end of calendar

year 2015."  (Id. at 84:8-14.)  Important to his conclusion in this regard were the following facts:

(a) there is "more than ample time to resolve these issues" given that LightSquared's License

Modification Application has already been pending for a year and a half and there are almost two

years until the end of 2015; (b) precedent transactions, including the Sprint 800 MHz rebanding

and the H-block auction that resulted in DISH as the winning bidder, illustrate that the FCC can

issue orders resolving very complex issues within a relatively short timeframe; and (c) resolution

of the bankruptcy is imminent, which will cause the FCC to "act with alacrity."  (Id. at 84:15-

85:25.)  The only other support that Mr. McDowell offered for his opinions was the fact that no

so-called "petitions to deny" or formal objections had been filed with respect to the License

Modification Application.[24]  Mr. McDowell pointed to no evidence indicating that the FCC will

proceed along the timeline suggested, offered no evidence that he had any knowledge of how or

when the National Telecommunications and Information Administration or any coordinate

agency intends to act with respect to LightSquared's application, and could not credibly estimate

---

[24]        At the Confirmation Hearing, Mr. McDowell noted that the window for lodging such formal objections to
the License Modification Application had closed over a year ago.  (Conf. Hr'g Tr. Mar. 19, 2014 (McDowell) at
78:1-11; 78:25-80:9.)

or state when any required rulemaking proceeding may be commenced or how long it would take. His opinion is simply an educated guess and cannot be afforded significant weight.

### B.    Mr. Christopher Rogers

Mr. Christopher Rogers serves as a member of the three-member Special Committee of the boards of directors of LightSquared Inc. and LightSquared GP Inc., which was constituted in the fall of 2013. Against the backdrop of allegations by SPSO that the plan process was driven not by the Special Committee but by Harbinger and those parties that Mr. Falcone wished to "protect," including Harbinger, Fortress, and JPMorgan (see SPX78), Mr. Rogers testified to his personal involvement in the plan formulation and negotiation process and that of the Special Committee. (Conf. Hr'g Tr. Mar. 19, 2014 (Rogers) 12:10-67:2.) He estimated that he had spent around 500 hours working on the Plan and related issues,[25] although he did not provide much, if any, detail into how he or other members of the Special Committee had been involved in negotiating the economics of the Plan. For the most part, his testimony was credible but superficial, and consistent with the proposition that he and the other members of the Special Committee were involved in some discussions regarding the plan process from the time of their appointment through the present. However, in the face of a great deal of evidence that the economic terms of the Plan have been largely dictated by Harbinger, and in particular by Mr. Falcone, Mr. Rogers shed little light on how the economic terms of the Plan emerged and evolved, or on the involvement of the Special Committee in those negotiations. Because the Special Committee has asserted a broad common interest privilege with respect to communications among it, the Plan Support Parties, and the Ad Hoc Secured Group, there are no documents that were produced in discovery or are in evidence that reflect any communications

---

[25]     Mr. Rogers testified that he personally spent more than five hundred hours on the work of the Special Committee, including meetings with stakeholders, regulators, and prospective purchasers. (See Conf. Hr'g Tr. Mar. 19, 2014 (Rogers) at 19:18-20:20.)

on this point during the relevant timeframe.

### C.    Mr. Douglas Smith

Mr. Douglas Smith, the Debtors' Chief Executive Officer, testified at length about a variety of topics relating to the conduct of these cases, including the plan process and the involvement of LightSquared's management in plan negotiations.  (Conf. Hr'g Tr. Mar. 20, 2014 (Smith).)  He also testified about a host of issues relating to the FCC process and certain technical issues relating to LightSquared's spectrum assets.  Mr. Smith has been involved in the implementation of LightSquared's strategy for the long-term deployment of its spectrum assets since LightSquared filed such a plan with the FCC in September 2012.  (See Conf. Hr'g Tr. Mar. 20, 2014 (Smith) at 32:19-35:7.)

During his testimony, Mr. Smith explained the basis of his belief that approval of the License Modification Application by December 31, 2015 and the seven-year Lower Downlink approval process timeline were achievable.  (Conf. Hr'g Tr. Mar. 20, 2014 (Smith) at 32:15-18; 131:22-25.)  In support of his opinion, Mr. Smith highlighted four specific points:  (i) the completion of two comment cycles with respect to use of the two upper 10MHz of uplink spectrum (id. at 33:10-12); (ii) the fact that "great progress" has been made with NOAA (id. at 40:5-7); (iii) the observation that the latest U.S. budget reflects NOAA-related costs that are not inconsistent with LightSquared's projections and objectives (id. at 46:6-25); and (iv) the fact that a petition for rulemaking with respect to the lower 10MHz of downlink has already been filed with the FCC and could be complete in three to five years (id. at 129:13-18; 131:22-25).  In addition to testifying about the FCC approval process, Mr. Smith gave substantial testimony regarding the "technical issue" raised by LBAC with respect to LightSquared's spectrum and the basis of LightSquared's belief that the issue does not exist or can easily be managed at minimal cost.  Mr. Smith, though soft-spoken, is powerfully earnest and credible as a witness, and it is

17

clear that he has been working tirelessly in pursuit of LightSquared's business and strategic goals.

### D.    Mr. Marc Montagner

Mr. Marc Montagner, the Debtors' Chief Financial Officer, gave deposition testimony regarding numerous issues, and certain portions of his videotaped deposition were designated by the parties, placed into the record, and viewed by the Court on videotape.  (Mar. 6, 2014 Dep Tr. (Montagner).)  Mr. Montagner testified, among other things, about (i) his participation in the plan process – which he described as "mostly being on the receiving end" (id. at 8:16-18); (ii) his preparation of financial forecasts for use in connection with the Plan (id. at 9:5-10:2); (iii) his views with respect to FCC matters; and (iv) his knowledge of the "technical issue."  Mr. Montagner was forthright in his testimony, as he has been in the past in connection with other contested hearings in these cases.

### E.    Mr. Steven Zelin

The Ad Hoc Secured Group called its financial advisor, Mr. Steven Zelin, of Blackstone, to testify.  (Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) 6:13-118:13.)  Mr. Zelin detailed the various plan alternatives he had explored with the Ad Hoc Secured Group in 2013 and earlier, and he described his participation in the negotiations leading to the execution of the Plan Support Agreement in connection with the DISH/LBAC Bid.[26]  He described in some detail his reaction to what he viewed as "strange" conduct and comments by DISH, SPSO, and their counsel in

---

[26]    As described more fully in the Adversary Proceeding Decision, on May 15, 2013, Mr. Ergen, through his wholly-owned entity LBAC, submitted an unsolicited bid for LightSquared LP's spectrum assets for $2 billion.  On July 22, 2013, DISH purchased LBAC for a dollar, and, the next day, DISH announced its intention to bid through LBAC for LightSquared LP's spectrum assets for $2.22 billion (the "DISH/LBAC Bid").  On that date, DISH also executed a Plan Support Agreement with the Ad Hoc Secured Group, pursuant to which LBAC would act as the stalking horse bidder for the Ad Hoc Secured Group's plan.  A joint chapter 11 plan of reorganization proposed by the Ad Hoc Secured Group (of which SPSO was a member at that time) was filed on July 23, 2013.  See *First Amended Joint Chapter 11 Plan for LightSquared LP, et al., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 970].

connection with the "technical issue" and in connection with the pursuit of the DISH/LBAC Bid

in the time period leading up to and subsequent to the scheduled December 11, 2013

LightSquared auction.[27]  He also shared his theories about why LBAC terminated its bid.  Mr.

Zelin's testimony was credible, but it added little of substance to the issues at the heart of this

proceeding.

### F.    Mr. Charles Ergen

Mr. Charles Ergen was called as a witness by the Ad Hoc Secured Group and testified for

a full day, taking the witness stand at ten in the morning, and stepping down at approximately

7:45 in the evening.  (Conf. Hr'g Tr. Mar. 26, 2014 (Ergen).)  He was questioned extensively on

a number of topics, having already given substantial testimony during the trial in the Adversary

Proceeding relating to SPSO's acquisition of its holdings in the LP Debt.[28]  His testimony

focused on, among other things: (i) the valuation analysis he prepared and presented to the DISH

---

[27]        Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 21:13-23:1 ("My reaction was that a bidder in a process demanding
that information that they uncover that they think are issues that other bidders should know is quite strange.  I've
never experienced that before.")  The Debtors and the Special Committee canceled the December 11, 2013 Court-
scheduled auction for LightSquared's assets (or any grouping or subset thereof), and they did not deem any bid the
"Successful Bid."  See Specific Disclosure Statement at 3.  On January 7, 2014, LBAC, through its counsel, sent the
Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement and subsequently
informed the Ad Hoc Secured Group of the termination of the DISH/LBAC Bid.  See id. at 4.  On January 13, 2014,
the Ad Hoc Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and
Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP,
ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC,
LightSquared Finance Co., LightSquared Network LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada)
Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No.
1220], in which the Ad Hoc Secured Group challenged LBAC's termination of the DISH/LBAC Bid (the "Ad Hoc
Secured Group Motion to Enforce").  LBAC then sought a declaratory judgment "declaring that both the PSA and
LBAC Bid were terminated in their entirety on or before January 10, 2014."  See *Objection of L-Band Acquisition,
LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of
Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory
Relief*, dated January 16, 2014 [Docket No. 1232] at 18; *Reply in Further Support of Objection of L-Band
Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and
Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for
Declaratory Relief*, dated January 21, 2014 [Docket No. 1246].  On January 22, 2014, this Court issued a ruling that
the Plan Support Agreement and the DISH/LBAC Bid were lawfully terminated by LBAC.  See Jan. 22, 2014 Hr'g
Tr. [Docket No. 1278].

[28]        See fn 11, *supra*.  Between April 13, 2012 and April 26, 2013, SPSO contracted to purchase over $1 billion
in face amount of LP Debt, of which it actually closed trades for $844,323,097.83, which is the current face amount
of the SPSO Claim, excluding interest.

Board in July 2013 with respect to the LightSquared spectrum assets, which estimated that, in

DISH's hands, the total value of LightSquared's assets would be between $5.17 billion and $8.99

billion (including value that would be realized by DISH based on enhanced ability to utilize its

existing spectrum);[29] (ii) his knowledge of the fairness opinion and valuation of LightSquared

prepared by Perella Weinberg Partners ("PWP")[30] for the DISH Board (the "PWP Valuation");

(iii) his knowledge of the so-called "technical issue" and how he believes it affects the value of

the LightSquared spectrum; (iv) his participation, on behalf of DISH, in the LightSquared

auction process in December 2013, including the readiness of DISH to increase its bid and

DISH's ultimate decision to terminate the DISH/LBAC Bid; and (v) whether or not he views

SPSO and/or DISH as competitors of LightSquared.  Mr. Ergen's testimony leaves little doubt

that he has a tremendous amount of knowledge and expertise with respect to the wireless

telecommunications industry, displaying great command of detail with respect to spectrum issues

and spectrum deployment strategy.  And yet his testimony became remarkably less precise and

straightforward when queried about his involvement in the events leading to the termination of

the DISH/LBAC Bid, and his answers with respect to potential competition between DISH and

---

[29]      Mr. Ergen's presentation (the "Ergen Valuation"), was entitled "Strategic Investment Opportunity – L-Band Acquisition, LLC."  (PX1047.)  It was delivered to the DISH Board of Directors by Mr. Ergen at a special meeting on July 8, 2013.  Under a line item entitled "Implied Net Primary Asset Value," the Ergen Valuation listed a range of values of between $3.341 billion and $5.213 billion, with a mid-point of $4.277 billion, referring to Mr. Ergen's estimate of the value of 20 MHz of LightSquared's spectrum assets and its satellites, excluding its 10MHz of Lower Downlink.  Under the heading "Implied Supplemental Asset Value," the Ergen Valuation listed a range of values of between $1.833 billion and $3.783 billion, with a mid-point of $2.308 billion, for what it identifies as the total of (i) 5.0 MHz of "Reclaimed Unuseable [sic] AWS-4," (ii) 5.0 MHz of "Reclaimed Impaired AWS-4," and (iii) "L-Band Downlink Spectrum."  The Implied Supplemental Asset Value was Mr. Ergen's estimate of (a) the increase in value of DISH's existing spectrum that would flow from DISH's acquisition of LightSquared's spectrum, which would permit unusable and impaired uplink AWS-4 spectrum owned by DISH to be converted to downlink and (b) his range of values for 20 MHz of LightSquared's downlink spectrum.  In other words, the supplemental value of LightSquared's assets to DISH was estimated by Mr. Ergen to be between $1.833 billion and $3.783 billion.  Combined with the Implied Net Primary Asset Value of $3.341 billion to $5.213 billion, the total value of LightSquared's assets in DISH's hands was estimated by Mr. Ergen to be between $5.174 billion and $8.996 billion, with a midpoint of $7.085 billion.
[30]      PWP served as financial advisor to the Special Committee of the DISH Board of Directors that was created on May 8, 2013 to evaluate and make recommendations to the DISH Board regarding a possible bid by DISH for LightSquared's assets and to review any potential conflicts of interest arising from Mr. Ergen's purchases of LightSquared debt.

LightSquared were facile and disingenuous.  Moreover, his testimony with respect to actions taken by DISH with respect to the "technical issue" supports the conclusion that once it was allegedly "identified" by DISH, there was no meaningful effort made to identify a solution that would preserve the billions of dollars in value that DISH would realize via consummation of the DISH/LBAC Bid.  This defies common sense.  Mr. Ergen's testimony on this point was not credible.  His testimony with respect to his dealings with Inmarsat was also not credible.

### G.    Mr. Omar Jaffrey

SPSO next called Mr. Omar Jaffrey, a principal of Melody, to testify.  (Conf. Hr'g Tr. Mar. 28, 2014 (Jaffrey) 27:8-99:25.)  Mr. Jaffrey testified that he contacted Mr. Falcone in the summer of 2013 to find a way for his firm to invest in LightSquared.  (Id. at 28:20-25.)  Melody was first retained by Harbinger to provide a $550 million commitment for a debtor-in-possession financing for a plan of reorganization proposed by Harbinger.  (Id. at 29:4-15.)  Pursuant to that commitment, Melody was entitled to the payment of an eight percent per annum commitment fee for as long as the commitment remained outstanding, as well as a $4 million upfront fee and a double-digit break-up fee in the event that LightSquared was sold – all payable by Harbinger. (Id. at 52:18-25; 55:17-56:24.)  It was Mr. Jaffrey's belief that Melody's commitment to Harbinger was still outstanding as of the date of his testimony on March 28, 2014.  (Id. at 91:25-92:6.)

In December 2013, Melody took on a second commitment – a $550 million commitment to the Debtors' Second Amended Plan that included debtor-in-possession financing of $285 million.  (Id. at 30:21-31:4.)  Correspondence between Mr. Jaffrey and others was introduced into evidence reflecting Melody's view that, as of the time Melody entered into this commitment, "there was a ninety percent chance" that Mr. Ergen would purchase LightSquared out of the

bankruptcy such that the Melody financing would never be needed.  (Id. at 40:10-41:16; SPX365 (December 22, 2013 Melody investment memo).)

In January 2014, the Second Amended Plan was abandoned[31] and discussions began surrounding what would become the Third Amended Plan which would, in Mr. Jaffrey's words, "allow the company to exit quicker from bankruptcy and drop an FCC conditionality."  (Conf. Hr'g Tr. Mar. 28, 2014 (Jaffrey) at 49:8-11.)  Extensive testimony was elicited from Mr. Jaffrey regarding the evolution of the economic terms of what eventually became the Plan; email correspondence from the January 2014 timeframe indicates that, even as the trial in the Adversary Proceeding was unfolding, there was close coordination among Mr. Jaffrey, Mr. Falcone, and Drew McKnight of Fortress regarding the economics of the Plan, how to structure it to satisfy the concerns of Fortress, how to include JPMorgan, and how to deal with the SPSO Claim.  (Id. at 48:12-52:6: 57:6-69:13.)  The entire premise of the Melody proposal was the subordination of the SPSO Claim, a notion that was obviously consistent with Mr. Falcone's mindset.  (Id. at 49:22-50:18; SPX072; SPX337.)  As Mr. Jaffrey put it in an email, the goal was a "win-win" – for everyone but SPSO.  (SPX341; Conf. Hr'g Tr. Mar. 28, 2014 (Jaffrey) at 65:21-69:22; 71:4-72:4.)  While Mr. Jaffrey, not surprisingly, declined to share the details of his so-called LightSquared investment thesis, it is clear that he and Melody have opportunistically entered the picture not to "help" but to earn a sizable return through fees, interest on Melody's highly secure proposed second lien exit investment, and equity upside tied to LightSquared's success.

---

[31]    Because the Second Amended Plan was conditioned on FCC approval of the License Modification Application, and there was uncertainty about the timing of such approval, the parties determined to develop a different plan that was not conditioned on FCC approval.  (See Conf. Hr'g Tr. Mar. 20, 2014 (Smith) at 17:16-18:15; Conf. Hr'g Tr. Mar. 28, 2014 (Jaffrey) at 41:17-42:7.)

### H.    Mr. Philip Falcone

Mr. Philip Falcone was the final witness called to testify at the Confirmation Hearing. (Conf. Hr'g Tr. Mar. 31, 2014 (Falcone).)  The scope of Mr. Falcone's testimony did not include matters as to which he had previously testified during the Adversary Proceeding.   Called by SPSO, Mr. Falcone testified about his intimate involvement in the formulation of the Plan, detailing his discussions with Mr. Jaffrey of Melody, Mr. McKnight of Fortress, and others. Email correspondence was introduced reflecting Mr. Falcone's desire to subordinate Mr. Ergen's claim and to protect the interests of Harbinger, Fortress, and JPMorgan.  He detailed his views about the FCC approval process and his continuing belief that approval is forthcoming.  He indicated his view that the "technical issue" was fabricated by DISH and is merely "fluff" that the FCC will see "for what it is and will ultimately grant LightSquared the license."  (Id. at 130:18; 143:19; 127:21-23.)  Mr. Falcone also answered a number of questions about what consideration Harbinger would receive under the Plan and what Harbinger's options were to increase its proposed stake in the reorganized company.  Mr. Falcone confirmed that Harbinger could put in an additional $150 million dollars to increase its post-confirmation stake in the reorganized company to thirty-six percent, and that at least part of that sum would be "part of the second lien" and therefore would be ahead of the SPSO Note.  (Id. at 102:18-103:25.)[32]  Mr. Falcone stated that he believed he did not get everything he had asked for and that Harbinger is entitled to in connection with the Plan, citing the fact that neither he nor anyone from Harbinger has a seat on the board of directors of the reorganized company and that he is giving up his

---

[32]    Mr. Falcone also added that, under the Plan, Harbinger could pay "a couple of hundred" million for a call option which would enable Harbinger to increase its stake in the reorganized company from thirty-six percent to forty-five percent.  (Conf. Hr'g Tr. Mar. 31, 2014 (Falcone) 103:4-13.)  He testified that the preferred and common stock that Harbinger would receive under the Plan would rank junior to the SPSO Note.  (Id. at 102:8-12.)

causes of action against the GPS industry.  (Id. at 105:13-107:5.)[33]  It is fair to say that there was

much correspondence introduced into evidence that, at best, reflects mean-spirited banter by Mr.

Falcone about various aspects of these cases and, at worst, reflects genuinely malevolent views

towards various individuals.  His many attempts to spin his words otherwise were unconvincing.

It is clear that Mr. Falcone more or less dictated the principal economic terms and structure of

the Plan.

## III.    THE MOELIS VALUATION ANALYSIS

The Debtors called Mr. Mark Hootnick of Moelis to testify in support of the valuation

that undergirds the Plan and that provides the basis and support for SPSO's treatment under the

Plan.  (Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick).)

In preparing Moelis' valuation, Mr. Hootnick conducted extensive research and analysis

over the almost two years in which he has been involved as LightSquared's financial advisor and

also relied on his experience with other valuation exercises of similar assets.  (Id. at 129:13-18

(attesting that Moelis has "experience valuing spectrum other than in the LightSquared matter. . .

We have a telecom practice that is run by my partner Stan Holtz who's been very involved in the

entire LightSquared engagement.  I've worked on a number of spectrum deals myself").)  He

also had "[e]xtensive discussions" with management on a "wide variety of topics," throughout

these Chapter 11 Cases, including "regulatory issues" and LightSquared's "business plan" and

"liquidity forecast."  (Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 7:7-14.)  Moelis' research,

discussions with management, and discussions with Mr. McDowell concerning various

assumptions on the likelihood of approval and timing of such approval of LightSquared's FCC

---

[33]    The Special Committee asserts that it adopted terms that were not beneficial to the Plan Support Parties,
and actually contrary to "conditions precedent" initially proposed by the Plan Support Parties.  For instance, the
Special Committee rejected Harbinger's request for board representation in the New LightSquared Entities (see
Conf. Hr'g Tr. Mar. 19, 2014 (Rogers) at 107:1-5), and Harbinger contributed to the estate its litigation claims
against Mr. Ergen, the GPS industry, and the FCC.  (Id. at 105:2-106:7.)

regulatory applications culminated with Moelis' valuation report submitted to the Court (PX1001) (the "Moelis Valuation Report"), which report contains a thorough analysis of the value of LightSquared's assets.  (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 10:4-11.)

Mr. Hootnick relied on Mr. McDowell's opinions regarding the timing and outcome of the license modification process; he also relied on the opinions of Mr. Smith with respect to certain regulatory matters.  For the purposes of preparing the Moelis Valuation Report, Mr. Hootnick assumed that the FCC would grant LightSquared a license for 30MHz of spectrum, including the 5 MHz of NOAA Spectrum, for terrestrial use, on or before the end of 2015; he further assumed that the Lower Downlink would be approved for terrestrial use within seven years.[34]  He did not take into account the alleged "technical issue" that has been raised by SPSO. He acknowledged that the FCC Statement means that the FCC is "making no promises" on timing, and he has had no personal contact with any FCC personnel on any issues related to LightSquared.[35]  Mr. Hootnick's valuation rises or falls with Mr. McDowell's opinions on the timing of FCC approvals.

In preparing the Moelis Valuation Report, Moelis adopted an industry-accepted valuation method in its valuation of LightSquared, specifically the use of a market multiple comparable based on the price per MHz/POP, which reflects the market price as a function of the size of the spectrum and the number of people it covers.  (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at

---

[34]    Mr. Hootnick testified that both assumptions as to FCC approval are "outside dates," explaining that LightSquared, Mr. McDowell, and Moelis have utilized the "conservative view," while some expect the License Modification Application to be granted sooner.  (Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 12:14-22; 22:14-23:13.)

[35]    To perform its valuation of LightSquared's Lower Uplink and Upper Uplink (together, the "Uplinks") and the New Downlink, Moelis relied on discussions with Mr. Smith and Jeffrey Carlisle, LightSquared's Executive Vice President for Regulatory Affairs and Public Policy, and the opinion of Mr. McDowell, that, by the end of 2015, the FCC would have granted the License Modification Application, which includes the use of the Uplinks and the swap with the NOAA Spectrum to make a ten-by-twenty block of spectrum.  (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 10:15-13:6, 24:21-25:3.)  Messrs. Smith and Carlisle were the "two main parties interacting with the FCC."  (Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 11:23-12:7.)

16:13-17:6 (describing the MHz/POP terminology and usage); Moelis Valuation Report at 10

(detailing, based on spectrum characteristics, LightSquared's attractive, low-frequency spectrum

with strong propagation and in-building penetration).)  Moelis reviewed "comparable spectrum"

transactions and, by taking into account the unique considerations relevant to each spectrum

block, derived the appropriate $/MHz/POP range multiples to apply to LightSquared's spectrum

assets.[36]  The processes, conclusions, and comparables reflected in the Moelis Valuation Report

are similar to those reflected in the Ergen Valuation and PWP Valuation, each described herein.[37]

Based on the assumption that the License Modification Application would be granted by

the forecasted dates, Moelis derived a "market comp range of sixty to ninety cents" per

MHz/POP.  (Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 22:14-24:3.)  Using that determined

range, Moelis derived a value for LightSquared's spectrum assets.  To account for the fact that

the License Modification Application may not be achieved until the end of 2015, Moelis

discounted the derived value back to October of 2014 (the estimated date of LightSquared's

emergence from chapter 11) to determine its present value.  (See id. at 22:14-24:3.)  Using this

generally accepted method, Moelis concluded a value of LightSquared's Uplinks, together with

the New Downlink, of approximately $4.8 billion to $7.2 billion, with a midpoint of $6 billion.

(See id. at 22:14-23:13; Moelis Valuation Report at 11.)

With respect to the Lower Downlink spectrum, Moelis adopted a similar approach using

the information from Mr. Smith and the expert opinion of Mr. McDowell that the Lower

Downlink (located at 1526 to 1536 MHz) would be available within seven years of

LightSquared's emergence from bankruptcy.  (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at

---

[36]    Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 22:19-22 ("We came up with a market comp range of sixty
cents to ninety cents a megahertz POP for use in our valuation.  We then made some additional -- or adjustments
based on the assumptions we talked about earlier."); see also id. at 29:2-14; Moelis Valuation Report at 12 (setting
forth selected broadband wireless spectrum precedents).
[37]    See PX1047, PX1048; Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 32:5-37:16.

10:15-13:6.)   Mr. Hootnick discounted that value back to present value from the outside date of

October 2021, resulting in a multiple of $.26-$.39/MHz/POP, or a value of $811 million to

approximately $1.22 billion, with a midpoint of $1.03 billion.  (See id. at 24:4-12; Moelis

Valuation Report at 11.)

Upon measuring the value of each component of LightSquared's spectrum and satellite

portfolio, Moelis provided a conclusion regarding the total enterprise value of such assets.  (See

Moelis Valuation Report at 11.)  Mr. Hootnick opined that LightSquared's total enterprise value

is approximately $6.2 billion to $9.1 billion, with a midpoint of $7.7 billion.  (See Conf. Hr'g Tr.

Mar. 24, 2014 (Hootnick) at 25:4-27:7 (explaining sum of valuations of LightSquared's "U.S.

spectrum value, the Canadian L-band spectrum, and the value of the satellite system"); Moelis

Valuation Report at 11 (same).)  After netting out certain payment obligations, LightSquared's

total value approximated $4.47 billion to $7.4 billion, with a midpoint of $5.96 billion.  (See

Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 27:8-29:1.)

The Moelis Valuation Report is consistent with aspects of the valuations performed by

the Ergen Parties.  In July 2013, both Mr. Ergen and PWP performed valuations of

LightSquared's spectrum to aid the DISH Board in its consideration of whether to pursue an

acquisition of LightSquared's spectrum.  (PX1047; PX1048.)  Both Mr. Ergen and PWP valued

LightSquared spectrum on an "as is" basis, without assuming favorable FCC modifications.  (See

id.)

Moelis, Mr. Ergen, and PWP incorporated the same basic spectrum valuation

methodologies, assumptions, and views in their respective valuations of LightSquared.  (See

Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 32:13-34:1 (agreeing with Mr. Ergen's observations

in the Ergen Valuation that L-Band is low band spectrum and is uniquely positioned due to its

excellent propagation characteristics); 34:2-16 (noting that Ergen Valuation contains "a similar

valuation exercise to what we've just walked through that Moelis did. . . . [They are] . . . very

consistent as far as the market valuation of the L-band spectrum"); 36:22-37:4 (noting that PWP

Valuation is "very similar").)  Mr. Ergen's valuation applies a higher range of $/MHz/POP than

that used by Moelis in its valuation (see id. at 34:2-16 ("[T]heir valuation range is actually a little

bit higher than the Moelis range.  We were sixty to ninety cents a megahertz POP.  They're

sixty-five to ninety-five cents[.]")), and includes only a portion of LightSquared's assets (see id.

at 34:2-16 ("The other big differential, they only include 20 megahertz of our spectrum in their

primary asset value."), 34:21-24.)  As for the PWP Valuation, the $/MHz/POP range applied to

LightSquared's Uplinks – "fifty to nine[t]y cents" –  is similar to Moelis's $.60-$.90 range.  (See

id. at 36:22-37:4.)  The Ergen Valuation and the PWP Valuation reflect a similar, but ultimately

higher, value of LightSquared's satellite system.  (See id. at 35:19-36:2 (as to Ergen Valuation:

"They did a similar valuation and exercise but notably came up with a higher estimate of the

satellite system than the Moelis valuation"); 37:5-16 (as to PWP Valuation:  "they conclude to a

range that's almost identical to the Moelis valuation or the higher end of their range of the

satellites and the satellite spectrum").)

 The Ergen Valuation reflects that LightSquared LP's spectrum assets carried an implied

net primary value of up to $5.213 billion, with a midpoint of $4.277 billion.  (See Ergen

Valuation at 5.)  The PWP Valuation reflects a $2.3 to $5.4 billion standalone valuation of

LightSquared LP.  (See PWP Valuation at 6.)

 LightSquared, its FCC expert, and Moelis all assume that LightSquared's Upper

Downlink will be relinquished in a future spectrum swap arrangement and, accordingly, the

Moelis Valuation Report does not attribute any value to the Upper Downlink.  (See Conf. Hr'g

Tr. Mar. 24, 2014 (Hootnick) at 16:2-6; 35:12-18.)  Mr. Ergen valued the Upper and Lower

Downlinks together, at between $312 million to $1.56 billion, with a midpoint of $936 million.

(See Ergen Valuation at 5.)

## IV.    THE GLC VALUATION ANALYSIS

SPSO offered the expert valuation testimony of Mr. J. Soren Reynertson of GLC.  (Conf.

Hr'g Tr. Mar. 27, 2014 (Reynertson) 121:4-250:11.)  Mr. Reynertson was paid $1.25 million

dollars by SPSO for his work[38] and was given three weeks to form his opinions.[39]  The Debtors

raised a Daubert challenge to Mr. Reynertson's qualifications under Federal Rule of Evidence

702,[40] which was overruled by the Court, in part because there had been no notice of such

challenge prior to the witness taking the stand, and in part based on the Court's conclusion that a

Daubert exclusion was inappropriate on the merits.  (Id. at 140:11-143:13.)  The Debtors have

renewed their objection to a portion of Mr. Reynertson's testimony in their Motion to Strike

Hyslop and Reynertson.

Mr. Reynertson testified that he relied "100 percent" on the opinions of Mr. Hyslop with

respect to the amount of spectrum that will be available to and usable by LightSquared, including

with respect to Uplink 1 and Uplink 2.  (See Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 208:8-

11; 246:15-247:7.)  Despite this admission, Mr. Reynertson purported to value LightSquared's

assets based on GLC's assessment of the risk associated with obtaining FCC approval for use of

the spectrum, notwithstanding the fact that Mr. Reynertson was not offered as an FCC expert.

---

[38]    See Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) 73:3-15.

[39]    On March 4, 2014, when Mr. Reynertson submitted GLC's valuation report (PX1002 and SPX158, the "GLC Valuation Report"), he had had only three weeks of experience with spectrum and satellite valuation generally – those being the three weeks beginning with his retention by SPSO and concluding with delivery of the GLC Valuation Report.  (See Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 199:20-200:6.)

[40]    Conf. Hr'g Tr. Mar. 27, 2014 at 135:10-15 (Mr. Cohen: "They would like this witness to offer valuation testimony when he just told you he didn't do a valuation on the assets of the company, which are the spectrum and the satellites.  We don't think . . . it meets the standards under [Federal Rule of Evidence] 702."); 137:1-140:21 (Mr. Cohen: "And with respect to those issues, I think he . . . acquired them for purposes of this case in the last five weeks.  I don't think that makes him an expert.").

(See id. at 152:9-19 (explaining, for GLC Valuation Report, "[w]hat we did was evaluate each of

the individual blocks of spectrum that LightSquared either owns, leases or has an option to

auction on, and evaluated the risk associated with the interference issues, which are widely

known, and determined with conversations with Hyslop and the research what the ultimate

available footprint might look like"); 164:19-24 (purporting to identify range of risks in spectrum

blocks); 235:2-10.)[41]

Mr. Reynertson's analysis utilized Mr. Hootnick's valuation methodology but changed

many of the inputs, including (a) reducing the amount of available spectrum by 10 MHz by

applying two 5 MHz guard bands as a result of purported interference concerns and

(b) discounting the price per MHz/POP from the price used by Mr. Hootnick by assuming that

LightSquared's License Modification Application would not be approved.  (GLC Valuation

Report at 12.)

With respect to the reduction by 10 MHz of LightSquared's spectrum for a guard band,

the GLC Valuation Report concludes that "[a]fter resolution of the technical issues facing

LightSquared spectrum, the Company will have 15-30 MHz of useable spectrum."  (GLC

Valuation Report at 12; Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 159:21-160:6.)  This

reduction of LightSquared's spectrum footprint was based, in part, on the alleged need to

designate 50 percent of LightSquared's Uplinks as unusable guard bands due to certain alleged

---

[41]    Mr. Reynertson, using his own judgment, made reductions to the value of LightSquared's spectrum based
on the "risk" associated with achieving regulatory approval.  (See Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at
164:19-24 (noting that page 12 of GLC Valuation Report reflects "the sum of the proposed 2021 numbers the
debtors hope to achieve, and then a reduction for the risks that we saw, the range of risks that we saw in each of the
blocks").)  Mr. Reynertson, however, could not assess those risks himself and did not have anyone upon whom he
could rely to do so.  He also drew his own conclusions as to which interference issues are insurmountable or,
alternatively, would cause reductions in the value of the spectrum.  (See id. at 164:19-24.)  For example, he
deducted from the value of LightSquared's spectrum the costs of relocating NOAA from its current spectrum block
as a result of the granting of the License Modification Application.  (See Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick)
38:2-42:14 (discussing inaccuracies in the GLC Valuation Report).)  In addition, Mr. Reynertson improperly
discounted twice for the same purported "defect" in the uplink spectrum:  the "guard bands" he created in the
Uplinks are intended to "cure" the purported interference issues, yet he valued the remaining 5 MHz of spectrum in
each uplink band as if the interference "problem" had not been resolved, and FCC approval had not been obtained.

interference issues.

Mr. Reynertson testified that he based his conclusions on the opinions of Mr. Hyslop. (See Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 246:15-247:7.)  However, with respect to the use of guard bands, Mr. Reynertson could not have relied on Mr. Hyslop's opinion when he wrote the GLC Valuation Report (which was completed on March 4, 2014) or when he testified at his deposition (on March 5, 2014) because Mr. Hyslop did not think about a guard band as a potential solution until some days or weeks after his own deposition on March 8, 2014.  (See Motion to Strike Hyslop and Reynerston ¶¶ 14-19, 32-34.)  In addition, Mr. Reynertson conceded that if the "guard band" assumption that underlies his report is mistaken or unsupported, that will moot the portion of the GLC Valuation Report based thereon.  (See Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 221:9-14 (conceding reliance on Hyslop to subtract 5 MHz for guard band, and, if that number is wrong, it would affect opinion).)

Many aspects of Mr. Reynertson's testimony are noteworthy: (i) he had never previously valued satellites or spectrum (see Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 126:14-23); (ii) he applied certain faulty and arbitrary assumptions in his valuation methodology (see fn 41, supra); and (iii) he was not provided with the valuation analyses that had been prepared by Mr. Ergen and by PWP during the summer of 2013, and, when presented with such analyses at the Confirmation Hearing, he admitted that seeing these would have helped him and may have changed what he did in connection with forming his opinions.[42]

The GLC Valuation Report was rife with inconsistencies and flaws; it was on the whole an unimpressive piece of work and will not be afforded significant weight.  In addition, a portion

---

[42]    The first time Mr. Reynertson saw the PWP Valuation and the Ergen Valuation was at his deposition on March 5, 2014, the day after he completed the GLC Valuation Report.  (Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) 144:24-146:1.)  Mr. Reynertson acknowledged that reviewing these reports would have been "informative" and would "have helped [him] understand how other sophisticated investors have looked at this spectrum."  (Id. at 249:24-250:5.)

of Mr. Reynertson's testimony relied on the expert opinion of Mr. Hyslop.  As the Court finds

that portions of Mr. Hyslop's expert opinion shall be stricken from the record, as discussed *infra*,

the portion of the GLC Valuation Report that relies on the stricken Hyslop testimony shall be

afforded little weight.

## V.    CONFIRMATION TESTIMONY REGARDING THE "TECHNICAL ISSUE"[43]

### A.    Mr. Douglas Hyslop

SPSO called Mr. Douglas Hyslop of Wireless Strategy LLC and SmartSky Networks

LLC, engineering consulting firms which provide engineering services for wireless operators.

(Conf. Hr'g Tr. Mar. 25, 2014 (Hyslop) [under seal].)  SPSO retained Mr. Hyslop to provide

expert testimony on the "technical issue."  Mr. Hyslop was retained on February 28, 2014 and

formed his opinions by March 3, 2014; his deposition was conducted on March 8, 2014.  The

Debtors have moved to strike a portion of Mr. Hyslop's testimony on the basis that it reflects, in

his own words, a new opinion regarding "guard bands" that first occurred to him after he gave

his deposition testimony and thus was first revealed to the Debtors at the Confirmation Hearing.

(See Motion to Strike Hyslop and Reynertson at ¶¶ 2-3, 20-31.)  The parties dispute whether or

not this opinion should be considered "new" and whether or not gamesmanship is implicated in

the Debtors' approach to eliciting the opinion.  For the reasons set forth in the Debtors' Motion

to Strike Hyslop and Reynertson, the motion shall be granted as to Mr. Hyslop, and the requested

portions of Mr. Hyslop's testimony shall be stricken from the record.  The remainder of Mr.

Hyslop's testimony, as to which the Court makes detailed findings under seal, does not lend

credible support to SPSO's position with respect to the existence and magnitude of the "technical

issue."  (See Appendix A (filed under seal).)

---

[43]        See fn 19, *supra*; Appendix A (filed under seal).

B.    **Mr. John Jacob Rasweiler V**

Mr. John Jacob Rasweiler V testified as the Debtors' rebuttal expert with respect to the

"technical issue."  (Conf. Hr'g Tr. Mar. 28, 2014 (Rasweiler) [under seal].)  Mr. Rasweiler is

employed by Sublime Wireless, a professional engineering and services firm that provides

communications services for operators and equipment providers such as Sprint, Samsung, and

AT&T.  He has substantial experience in radio frequency engineering and network design.  In

response to SPSO's contentions with respect to the "technical issue," Mr. Rasweiler provided

credible and compelling testimony that the "technical issue" is unlikely to exist at all and that,

even if it did exist, technology is available today that can eliminate the problem, rendering it a

non-issue.  In addition, Mr. Rasweiler identified new technology which, while not currently in

commercial production, reflects further advances in certain devices that could be deployed to

address the "technical issue."  Mr. Rasweiler's testimony substantially undercut the credibility of

Mr. Hyslop's conclusions with respect to many critical aspects of the "technical issue" alleged

by SPSO.  (See Appendix A (filed under seal).)


## DISCUSSION

I.    **THE PLAN CANNOT BE CONFIRMED**

A.    **Separate Classification of Prepetition LP Facility SPSO Claim Complies
        With Section 1122**

Under the Plan, the Prepetition LP Facility SPSO Claim is placed in a separate class

(Class 7B) from the Prepetition LP Facility Non-SPSO Claims (Class 7A).  The proffered

justification for such separate classification of claims which, on their face, are identical is not

equitable subordination but rather that the holder of the SPSO Claim is a competitor of the

Debtors that has various non-creditor interests and that there is thus a valid business reason for

33

separately classifying the SPSO Claim.  SPSO vehemently opposes separate classification of its

claim.  For the reasons set forth herein, the Court finds that such separate classification is

permitted by the Bankruptcy Code and applicable case law.

Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."  See 11 U.S.C. § 1122(a).  Although section 1122(a) specifies

that a claim or an interest may only be included in a particular class if it is "substantially similar"

to the other claims or interests in such class, it does not *require* that all similar claims be placed

in a single class, nor does it address when similar claims may be placed in different

classes.  Stated differently, the Bankruptcy Code does not prohibit placing similar claims in

separate classes.

Courts that have considered the issue, including the Court of Appeals for the Second

Circuit as well as numerous courts in this District, have concluded that the separate classification

of otherwise substantially similar claims and interests is appropriate so long as the plan

proponent can articulate a "reasonable" (or "rational") justification for separate

classification.  See, e.g., Aetna Cas. and Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In

re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); In re Lafayette Hotel Partnership, 227

B.R. 445, aff'd, 198 F. 3d 942, 950 (2d Cir. 1999); In re Adelphia Commc'ns Corp., 368 B.R.

140, 246-247 (Bankr. S.D.N.Y. 2007).  Whether there is any "good business reason" to support a

plan proponent's separate classification is a question of fact.  Phoenix Mut. Life Ins. Co. v.

Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 n. 7 (5th

Cir. 1991), cert. denied, 506 U.S. 821 (1992).  However, the "separate classification of

substantially similar . . . claims . . . [must not] offend one's sensibility of due process and fair

play." In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993).

One such reasonable justification for separate classification is where a claimant is a

competitor of the debtor.  See, e.g. In re Premiere Networks Servs., Inc., 333 B.R. 130, 133-34

(Bankr. N.D. Tex. 2005) ("a non-creditor interest in the reorganized debtor meets the 'good

business reason' standard and justifies separate classification of the creditor's claim"); In re

Graphic Commc'ns, Inc., 200 B.R. 143 (Bankr. E.D. Mich. 1996) (holding that a rational

business reason existed for classifying competitor separately from general trade creditors); In re

Texas Star Refreshments, LLC, 494 B.R. 684, 696 (Bankr. N.D. Tex. 2013) (separately

classifying trade creditors from competitor creditor).  Importantly, it is not merely the creditor's

status as a competitor that is dispositive so much as the "non-creditor" interests that the creditor-

competitor may pursue.  In Premiere Networks, for example, the separately classified creditor's

"non-creditor interest" was "a different stake in the future viability of the reorganized company."

333 B.R. at 134.[44]

The parties also cite to In re 500 Fifth Ave. Assocs., 148 B.R. 1010 (Bankr. S.D.N.Y.

1993), but disagree on its applicability here.  In 500 Fifth Ave. Assocs., the debtor isolated the

unsecured deficiency claim of a secured creditor in a separate plan class from other recourse

unsecured claims, arguing that such treatment was justified due to the legal distinction between

non-recourse deficiency claims and other unsecured claims.  Id. at 1019.  The court found that

separate classification was not justified because the deficiency claim of the secured lender was

an allowed, unsecured claim that was no different in a bankruptcy case from the obligation owed

---

[44]       In addition to a creditor being a competitor, other justifications for separate classification cited to the Court
by the Debtors include (i) ulterior motives demonstrated by the creditor's conduct during a debtor's case and (ii)
necessity.  *LightSquared's Post-Trial Memorandum of Law in Further Support of (I) Confirmation of Debtors'
Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, (II) Motion To Designate Vote of SP Special
Opportunities, LLC, and (III) Motion Seeking Approval of New DIP Facility* [Docket No. 1486] at 78, 82-86.

to a recourse creditor, and it also found that the separate classification of the deficiency claim was based on the debtor's clear desire to gerrymander an impaired accepting class to ensure confirmation of its plan.  Id.  The court, perhaps presaging Judge Gerber's views in Adelphia, 368 B.R. 140, observed that the fact that a creditor's secured claim may drive the manner in which it votes its unsecured deficiency claim (which may be contrary to its best interests as an unsecured creditor) is not a valid reason for separately classifying a secured creditor's deficiency claim.  Id.

SPSO, relying on 500 Fifth Ave. Assocs., argues that a secured creditor's "motives and agenda" cannot justify separate classification of a creditor's claims and that the Court should focus, instead, on the legal nature of the underlying claim.  The Debtors and the Ad Hoc Secured Group argue that 500 Fifth Ave. Assocs. merely addresses the separate classification of a secured creditor's garden variety unsecured deficiency claim, and it does not address the propriety of separately classifying the claim of a competitor creditor "whose sole interest was to acquire the company by one means or another."[45]  The Court agrees.

While SPSO urges that the Court should decline to delve into an analysis of ulterior motives, and poses myriad hypotheticals to demonstrate instances in which evaluation of a classification scheme based on claim holder considerations would be a "complicated and arbitrary line-drawing exercise,"[46] there is no need to go down that path here.   SPSO's different stake in the future of LightSquared is manifest and does not require a searching inquiry into ulterior motives.  Although, as a general matter, 500 Fifth Ave. Assocs. does indeed hold that,

---

[45]     *LightSquared's (A) Memorandum of Law in Support of Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code and (B) Omnibus Response to Objections to (i) Confirmation of Plan, (ii) Motion To Designate Vote of SP Special Opportunities, LLC, and (iii) Motion Seeking Approval of New DIP Facility* [Docket No. 1413] at 19 n.24.

[46]     *Objection of SPSO to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1408] at 7 n.5.

when considering classification issues, the focus should be on the legal nature of the underlying

claim rather than on the motives and agenda of the claim holder,[47] here it is necessary to

recognize that a claim reflects more than a dollar amount on a proof of claim; it reflects a bundle

of rights and remedies that are wielded by the holder of the claim.  Accordingly, both the nature

of the claim and the identity of the claimant may be relevant in the context of separate

classification.

While SPSO (as opposed to DISH or Mr. Ergen) is the holder of the SPSO Claim, the

Court finds that, under the circumstances here, SPSO, which is wholly-owned by Mr. Ergen, the

Chairman of the Board of Directors and controlling shareholder of DISH, must be considered to

have interests which are aligned with those of DISH, which is a competitor of the Debtors.[48]

Notwithstanding Mr. Ergen's reluctance to admit as much, the record makes it clear that (a) both

DISH and the Debtors own spectrum assets; (b) DISH has been and remains active in the market

to acquire more spectrum assets and/or to engage in transactions with third parties that own

spectrum assets;[49] (c) Mr. Ergen himself purports to having an interest in owning spectrum

"personally" (if his testimony in the Adversary Proceeding is to be credited); and (d) both DISH

---

[47]    See 500 Fifth Ave. Assocs., 148 B.R. at 1019-20 (citing 5 L. King, COLLIER ON BANKRUPTCY pp.
1122.03[1]-[b](15th ed.1992)).

[48]    This Court has previously found that "one could reasonably expect a competitor to vote differently than a
non-competitor lender on material matters concerning LightSquared, and, more significantly, a competitor given
access to material non-public information about LightSquared may use it to LightSquared's detriment, given that a
competitor may possess a desire to see LightSquared fail."  Adversary Proceeding Decision at 128.

[49]    Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 17:13-18:7 (explaining how DISH and LightSquared were
competitors prior to the commencement of the Chapter 11 Cases:  "It's clear what DISH's business plan was having
experienced it and read about it in other matters where [Ergen] was looking to build a network, LightSquared was
looking to get its spectrum issues behind it and build a network, or had been building a network until the spectrum
issues popped up.  They'd be competing for handset designs, customer designs.  In fact, LightSquared had a deal
with Sprint to be the backbone of their infrastructure before the filing. In the months before, DISH was making –
Ergen was making a competing hostile offer to buy Sprint.  So they might have been competing for kind of parties
that could support the infrastructure as well"); Conf. Hr'g Tr. Mar. 27, 2014 (Reynertson) at 209:10-13)
(acknowledging that DISH will be a direct competitor of LightSquared following LightSquared's emergence from
bankruptcy, "I think DISH intends to – presumably intends to become a competitor.  Certainly the marketplace
thinks that they intend to become a competitor"); Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 328:15-329:15 (admitting
that (a) both DISH and LightSquared had previously sought (in LightSquared's case) to partner with or (in DISH's
case) acquire Sprint as part of their respective spectrum-deployment strategies, and (b) DISH and LightSquared,
each owners of valuable spectrum assets, will compete in the marketplace for lucrative partnership arrangements).

and the Debtors have announced their intention to develop and operate telephonic networks that would utilize spectrum assets and that would compete with each other for customers and business.[50]  The Debtors and the Ergen Parties (one of which is SPSO) are competitors for spectrum assets under any reasonable meaning of the word.[51]

Given Mr. Ergen's interests as the sole beneficial owner of SPSO and as the Chairman of the Board of Directors and controlling shareholder of DISH, it is not hard to conjure a set of facts and circumstances in which he personally would benefit more from LightSquared's failure than its success; stated differently, his fiduciary duties as the Chairman of the DISH Board may at some point require him to take action that is contrary to the best interests of LightSquared and contrary to his interests as a creditor (through SPSO) of LightSquared LP.  As Mr. Ergen himself made clear in pursuing his so-called personal bid for LightSquared's spectrum through LBAC, preserving optionality for DISH is a hallmark of his ongoing strategy for DISH in these cases, and more generally.  See Adversary Proceeding Decision at FOF ¶ 178.  Optionality for DISH should not come at the expense of the interests of LightSquared's creditors who do not share Mr. Ergen's economic interest in and lifelong commitment to DISH.

Since becoming a holder of LP Debt, SPSO and Mr. Ergen have acted to further the interests of DISH and EchoStar with respect to LightSquared and its spectrum assets, which interests are different from the interests of LightSquared's other creditors.  At all relevant times,

---

[50]    DISH was seeking, among other things, to acquire spectrum in competition with LightSquared, to develop handsets in competition with LightSquared, and to take control of Sprint, with which LightSquared had hoped to join in building its network.  (See Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 15:18-18:7; Conf. Hr'g Tr. Mar. 20, 2014 (Smith) at 26:21-29:10 (explaining circumstances of LightSquared's relationship with Sprint and the difficulties that SPSO could have caused if it had been a lender at the time LightSquared first negotiated and entered into its agreement with Sprint and could cause in the future for negotiation of similar contractual arrangements).

[51]    In fact, as early as the spring of 2013, Mr. Zelin suggested placing SPSO in a separate plan class because, despite not knowing with certainty the identity of SPSO, the parties suspected it was a competitor.  (Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) 17:13-18:7 (explaining basis for Ad Hoc Secured Group separately classifying SPSO's claims in restructuring proposal in May 2013 to LightSquared:  "I think in our judgment and the judgment of our clients, Ergen, whether he was SPSO, whether he was LBAC, the initials didn't make a difference to me, Ergen was Ergen.  He was a competitor, somebody who would have competing interests").)

SPSO has acted in a manner which is consistent with DISH's strategic motivations, instead of as

an ordinary creditor, and also has taken steps that had the potential to destroy LightSquared's

value and interrupt its business plans and operations, including the following:

- SPSO deliberately delayed the closing of trades of LP Debt, which created uncertainty as to ownership and impeded LightSquared's negotiation of a consensual plan of reorganization. (Adversary Proceeding Decision at 155, 166-67.)

- Mr. Ergen told the DISH Board that SPSO's blocking position was available to facilitate an acquisition of LightSquared's spectrum by DISH. (Adversary Proceeding Decision FOF ¶¶ 131-32.)

- When DISH did not act quickly enough, Mr. Ergen himself undertook to do so, by submitting a "personal" bid for LightSquared's most significant assets. Mr. Ergen later sold LBAC (and thus the option to purchase LightSquared's assets through such bid) to DISH for $1. (Adversary Proceeding Decision FOF ¶¶ 136-37, 161-62.)

- SPSO and the Ergen Parties negotiated and bound the Ad Hoc Secured Group to a plan that would effectuate the DISH/LBAC Bid and prevent the Ad Hoc Secured Group from negotiating any other plan with LightSquared and its other stakeholders. (Adversary Proceeding Decision FOF ¶¶ 273-74.) In January 2014, they withdrew the DISH/LBAC Bid. (See fns 26-27, supra.)[52]

- Although the Ad Hoc Secured Group filed its Motion to Enforce, seeking to compel specific performance of the DISH/LBAC Bid and advance its creditor interests (which would have paid SPSO almost in full), SPSO declined to support that effort and, instead, allowed its lawyers to act for DISH and LBAC in opposing and defeating such motion. (See *Objection of L-Band Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief*, dated January 16, 2014 [Docket No. 1232]; *Reply in Further Support of Objection of L-Band Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for*

---

[52]    During the day of the auction scheduled for December 11, 2013, LBAC's and SPSO's counsel told Mr. Zelin that she hoped that someone else showed up or it would be bad for his clients. (Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 37:25-39:3.) Later that same day, after the auction was cancelled by the Special Committee, counsel told the Ad Hoc Secured Group that LBAC was not prepared to close on the terms that they had negotiated. (Id. at 39:4-21.)

*Declaratory Relief*, dated January 21, 2014 [Docket No. 1246]; Conf. Hr'g
Tr. Mar. 26, 2014 (Ergen) at 131:12-138:4.)[53]

- ▪ SPSO and the Ergen Parties spoke to FCC personnel about DISH's plans
  for LightSquared's spectrum should DISH ultimately acquire it. (Conf.
  Hr'g Tr. Mar. 20, 2014 (Smith) at 22:5-12.)

- ▪ In the first quarter of 2014, Mr. Ergen met with executives of Inmarsat on
  two separate occasions. At these meetings, Mr. Ergen discussed
  LightSquared even though LightSquared is currently negotiating a
  modification of its cooperation agreement with Inmarsat and such
  modification is a condition of the Plan. (Conf. Hr'g Tr. Mar. 26, 2014
  (Ergen) at 188:4-190:19; 207:24-209:5.)

- ▪ SPSO and the Ergen Parties raised a "technical issue" with respect to
  LightSquared and insisted that notification of the purported "technical
  issue" be given to all parties evaluating a potential bid in the auction for
  LightSquared's spectrum scheduled to occur in December 2013. (See
  Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 37:25-39:21; 40:1-43:20; 57:6-
  18.) DISH's engineers have been told by different vendors, including
  Huawei and Avago, that the "technical issue" was not an impediment to
  use of LightSquared's Uplinks. One email from Huawei acknowledged
  Mr. Ergen's intent to use the "technical issue" as a device to "lower" the
  acquisition price for LightSquared's spectrum. (PX1026.)

- ▪ SPSO has argued that the NOAA Spectrum should and would be
  auctioned, an argument which is not consistent with the interests of an
  ordinary, non-competitor creditor. (See *Objection of SPSO to
  Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter
  11 of the Bankruptcy Code* [Docket No. 1408] at 37-38; Conf. Hr'g Tr.
  Mar. 20, 2014 (Smith) at 23:8-17.)

While SPSO maintains that is not a competitor of the Debtors because, although it is

affiliated with DISH and EchoStar, those companies are in the pay television business while the

Debtors own spectrum "but have no ability or authority to use it for commercial purposes,"[54] this

position is demonstrably unsupportable and is contrary to Mr. Ergen's sworn testimony.[55]  Mr.

---

[53]     Mr. Ergen testified that he did not even talk to SPSO's counsel about the specific performance on behalf of
SPSO because he alone viewed the claim as frivolous.  (See Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 133:24-142:3.)
[54]     See *Objection of SPSO to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of
the Bankruptcy Code* [Docket No. 1408] ¶ 13, n.4.
[55]     Mr. Ergen attempted to disclaim that DISH and LightSquared were competitors.  Mr. Ergen testified that
(a) LightSquared did not have a network today that could compete with a DISH network of the future and (b)
LightSquared did not have the financial wherewithal to bid on other available spectrum and thus did not compete

Ergen clearly has big ambitions for DISH – indeed, DISH is expanding, or at least has the desire

to expand, into the terrestrial wireless business.  Mr. Ergen has specifically testified that DISH

would like to compete with telecommunication companies such as AT&T and Verizon.  (Jan. 13,

2014 Hr'g Tr. (Ergen) at 26:18-20; 96:18-98:22; 100:25-101:4.)[56]  Doing so requires obtaining

spectrum, which Mr. Ergen describes as a limited commodity.  (Id. at 47:3-48:10; 96:5-14.)

DISH's takeover of DBSD and TerreStar and its failed attempts at transactions with, among

others, Clearwire Corp., Sprint Corp., and Inmarsat plc.[57] demonstrate that DISH is an active

market participant in the race for spectrum and a player on the every-changing chessboard of

spectrum usage.  Indeed, DISH's participation in the recently concluded H-block auction has

been raised many times in these cases in a variety of contexts.

The fact that the Ergen Parties are competitors of LightSquared is bolstered by the fact

that DISH was listed as a "Disqualified Company" under the Prepetition LP Credit Agreement

and, as a result, was prohibited from purchasing LP Debt.  (Adversary Proceeding Decision FOF

¶¶ 22, 25, 26.)  Mr. Ergen's testimony, as well as the testimony of SPSO's valuation expert, Mr.

Reynertson, supports the conclusion that DISH and LightSquared are currently competitors, and

would continue to be competitors upon LightSquared's emergence from chapter 11.  (See, e.g.,

Mar. 26, 2014 Conf. Hr'g Tr. (Ergen) at 279:18-282:2; 328:15-330:2; Mar. 27, 2014 Conf. Hr'g

Tr. (Reynertson) at 209:11-13.)  Even if the status of DISH and EchoStar as competitors of

LightSquared were not imputable to Mr. Ergen and SPSO (which it is), SPSO is clearly an

affiliate of such entities and, by virtue of such affiliation and the common control exercised by

---

with DISH.  (See Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 279:2-282:12.)  Mr. Ergen later admitted that both DISH
and LightSquared today would compete in the marketplace as sellers of spectrum or as potential partners for other
network owners.  (See id. at 328:15-330:2.)

[56]      Mr. Ergen's January 13, 2014 testimony was given in the Adversary Proceeding trial.

[57]      DISH Form 10-K at F-18 (Feb. 21, 2014); Jan. 13, 2014 Hr'g Tr. (Ergen) 95:6-96:4; 101:5-103:5; 105:11-
108:10; Mar. 26, 2014 Conf. Hr'g Tr. (Ergen) 328:15-329:15.

Mr. Ergen with respect to these entities, SPSO is properly viewed as a competitor of the

Debtors.[58]  SPSO's attempts to distance itself from the overwhelming evidence of its competitor

status and interests must be rejected.  That being said, SPSO is quite correct in its argument that

separate classification cannot be used to mistreat a creditor, out of personal animosity or

otherwise.[59]  The unfair discrimination against SPSO reflected in the Plan will be dealt with

separately herein.

For all of these reasons, the separate classification of the Prepetition LP Facility SPSO

Claim is thus necessary and appropriate.  SPSO must be viewed as a competitor of the Debtors

with significant "non-creditor" interests, or, in the alternative, SPSO is an affiliate of a

competitor controlled by SPSO's ultimate owner, Mr. Ergen.  Under the facts and circumstances

of this case, the separate classification of SPSO's claim comports with section 1122 of the Code.

It is worth noting that, while the separate classification of the SPSO Claim and the Prepetition

LP Facility Non-SPSO Claims is permissible under section 1122, that does not mean that it is

required; indeed, it is possible to envision a plan of reorganization which classifies *all*

Prepetition LP Facility Claims in the same class, subject to being able to navigate successfully

---

[58]     See Conf. Hr'g Tr. Mar. 20, 2014 (Smith) at 21:13-25 ("The primary reason [for separately classifying SPSO's claims] is that SPSO is a competitor of LightSquared. . . . [A]s a competitor, and we absolutely view them as a competitor here in that their interests are not those typically of a financial investor, meaning that their actions and behaviors are driven by different motivations."); 28:7-29:10 ("Part of the classification certainly has to do with the competitor status, as I said.  And I'd like to illustrate a point.  So there are certain rights that our first and second lien holders have.  It's [sic] right to information, it's [sic] approval rights.  So, for example, under the current LP debt documents, back when we were building our network in 2011, we signed an agreement with Sprint.  That was an agreement that needed lender approval.  So we had to make them aware of exactly what we were doing before we had signed a document.  We had to seek their approval so we got certain waivers so that we could actually enter into that agreement.  That's a situation and an example that I would not want a competitor to know what we were doing before we did it.  In that case specifically, I understand through press reports and other statements that DISH was also trying to seek a similar agreement with Sprint in and around the same time for a network sharing agreement.  And that's something where we can't be effective as a company if that type of information is given to a competitor and they can see the terms of the agreement, they can see exactly what we're doing, and they still have time to go in and try and take it from us.  So part of this is governance as well, which is we need to control the information, and part of the position and the treatment that SPSO receives does limit what we have to share with them and it's really focused on the competitive nature of what we're doing.").

[59]     *Post Confirmation Trial Brief of SP Special Opportunities, LLC and Objection to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1517] at 42-43.

the requirements of section 1123(a)(4).  Of course, that portion of the SPSO Claim which is

equitably subordinated could not be included in such a class absent the consent of all affected

parties.

### B.    SPSO's Vote to Reject the Plan Shall Not Be Designated

Section 1126(e) of the Bankruptcy Code provides that a bankruptcy court may designate

the vote of "any entity whose acceptance or rejection of [a] plan was not in good faith." 11

U.S.C. § 1126(e).  The seminal decision in this Circuit addressing vote designation is the Second

Circuit's 2011 decision in In re DBSD N. Am., Inc., 634 F.3d 79 (2d Cir. 2011), in which the

court made the following observations:

> The Code provides no guidance about what constitutes a bad faith vote to accept
> or reject a plan.  Rather, § 1126(e)'s "good faith" test effectively delegates to the
> courts the task of deciding when a party steps over the boundary. . . .  Bankruptcy
> courts should employ § 1126(e) designation sparingly, as "the exception, not the
> rule. . . .  Merely purchasing claims in bankruptcy "for the purpose of securing the
> approval or rejection of a plan does not of itself amount to 'bad faith.'"  Nor will
> selfishness alone defeat a creditor's good faith; the Code assumes that parties will
> act in their own self interest and allows them to do so. . . .  Section 1126(e) comes
> into play when voters venture beyond mere self-interested promotion of their
> claims. "[T]he section was intended to apply to those who were not attempting to
> protect their own proper interests, but who were, instead, attempting to obtain
> some benefit to which they were not entitled."  A bankruptcy court may,
> therefore, designate the vote of a party who votes "in the hope that someone
> would pay them more than the ratable equivalent of their proportionate part of the
> bankrupt assets," or one who votes with an "ulterior motive," that is, with "an
> interest other than an interest as a creditor."

Id. at 101-102 (all citations omitted).  Moreover, votes cast by parties who purchase claims in a

competitor's bankruptcy case are viewed by courts as being particularly worthy of scrutiny.  Id.

at 105, n. 12 (citations omitted); see also In re Allegheny Int'l, Inc., 118 B.R. 282, 296 (Bankr.

W.D. Pa. 1990).

As described in greater detail in the Vote Designation Motion and the Ad Hoc Secured

Group's joinder to that motion [Docket No. 1384] (the "Vote Designation Joinder"), the Debtors

maintain that (i) Mr. Ergen's attempt to secure control of the LP Debtors' assets by purchasing a

blocking position in the LP Debt is precisely the behavior the Second Circuit attempted to deter

and punish in <u>DBSD</u> and (ii) the behavior of SPSO in these cases is even worse than the behavior

of DISH in <u>DBSD</u>.  (<u>See</u> Vote Designation Motion at ¶¶ 69-85; Vote Designation Joinder at ¶¶

10, 14, 16-17.)  They allege the following in support of their conclusion:

- SPSO and the Ergen Parties have followed the <u>DBSD</u> and <u>TerreStar</u> "playbooks" to gain control of a company in distress by buying claims and manipulating the chapter 11 process for their non-creditor interests, but, in this case, they did so with stealth.

- SPSO's purchase of the LP Debt at close to par to acquire a blocking position was part of Mr. Ergen's scheme and not simply, as he testified, to obtain higher returns or to ensure he had "bankruptcy protections" against cramdown.

- Mr. Ergen's overall interest in these cases (as an owner of LP Debt through SPSO and as the majority equity owner of DISH) gives him incentives to help DISH achieve as low a purchase price for the Debtors' assets as possible, in direct contravention of his interests as a creditor.

- Rather than acting in its interests as a creditor, SPSO opposed a near full recovery in cash under the Ad Hoc Secured Group's plan by authorizing its counsel to object to the Ad Hoc Secured Group Motion to Enforce and to seek a declaratory judgment that the DISH/LBAC Bid was terminated.[60]

And, once again, the Debtors and the Ad Hoc Secured Group urge that the bad acts of all

Ergen Parties other than SPSO should be imputed to SPSO for purposes of vote designation.

(<u>See</u> *Corrected Post-Trial Confirmation Brief of the Ad Hoc Secured Group of LightSquared LP*

*Lenders* [Docket No. 1494] at 70 (pointing out that "[i]f this were not the case, it would be easy

to eviscerate the protections intended by section 1126(e) by simply forming multiple entities and

having one buy claims while the others engaged in disruptive inequitable conduct—exactly as

the Ergen Parties did here").)  While there is certainly truth to such an observation, those are not

---

[60]    <u>See</u> Vote Designation Motion at ¶¶ 69-85; Vote Designation Joinder at ¶¶ 10, 14, 16-17; *Corrected Post-Trial Confirmation Brief of the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1494] at 70.

the facts before the Court with respect to vote designation.  Moreover, whether or not the alleged

bad acts of all the Ergen Parties (including LBAC) can be imputed or attributed to SPSO, the

Court finds that SPSO's vote to reject the Plan cannot be designated.

What the Debtors and the Ad Hoc Secured Group ignore is the fact that, as will be

discussed in detail below, the Third Amended Plan is unconfirmable for a variety of reasons, not

the least of which is the unpalatable treatment it affords the SPSO Claim.  Where a creditor votes

to reject a plan for an admixture of reasons, some of which can be characterized as being

consistent with the interests of a creditor acting to protect its legitimate creditor interests, its vote

cannot be designated.  SPSO has voted against a plan that not only deprives it of its first lien

security interest but provides it with plan consideration that is virtually indistinguishable from

equity interests.  It is not at all surprising that SPSO declined to accept such treatment; the other

members of the Ad Hoc Secured Group would most certainly have done likewise.  Indeed, Mr.

Falcone could not even interest Mr. McKnight in taking that treatment on account of the LP

Preferred Equity Interests held by Fortress.[61]

While the Debtors urge that <u>DBSD</u> compels designation of SPSO's vote to reject the

Plan, to do so would materially extend the reach of <u>DBSD</u> in ways that section 1126(e) does not

contemplate.  The centerpiece of the Second Circuit's decision in <u>DBSD</u> was its observation that

a competitor of DBSD (DISH) "bought claims with the intent of voting against any plan that did

not give it a strategic interest in the reorganized company," and it bought those claims above par

and after a plan had been proposed by DBSD.  <u>DBSD</u>, 634 F.3d at 104.  So too in <u>Allegheny</u>, in

which creditor Japonica purchased its claims after balloting on a plan had already begun.  <u>In re</u>

<u>Allegheny Int'l, Inc.</u>, 118 B.R. at 286.  As Judge Gerber noted in <u>DBSD</u>, DISH intended "to use

---

[61]        Mr. Falcone offered to move Fortress' and the other LP preferred holders' claims ahead of the SPSO
Claim.  (SPX069 ("Then move it ahead of charlie."); SPX071 ("What if we move the LP pref ahead of Charlie?");
SPX070 ("We are working on elevating the pref ahead of Charlie.  Will that help?").)

[its] status as a creditor to provide advantages over proposing a plan as an outsider or making a traditional bid for the company or its assets." DBSD, 421 B.R. at 139-40.  However, both Judge Gerber and the Second Circuit were particularly focused on the timing of DISH's debt purchases which were made after the plan in DBSD had been filed.  Here, SPSO made no purchases of debt above par and acquired a significant portion (approximately $287 million) of its claim before the Chapter 11 Cases were commenced, when the LP Debt was trading at or below approximately 60 cents on the dollar; moreover, SPSO acquired all of its LP Debt below par and prior to the filing of any plan.[62]  SPSO is thus arguably, at least in part, a "pre-existing creditor,"[63] albeit one who has allegedly voted with strategic intentions – the type of creditor that the Second Circuit did not expressly include in the ambit of its prohibition on voting in connection with strategic claims acquisitions.  DBSD, 634 F.3d at 106.  The Court declines to extend the holding of DBSD to cover votes cast with respect to claims which were acquired before a plan had been proposed by any party and where, as discussed below, there are valid, economically self-interested creditor reasons for the holder of such claims to reject a proposed plan.

While courts in this District and elsewhere have held that casting a vote on a plan to gain more than one deserves is evidence of bad faith, it takes more than evidence of simply a selfish or aggressive attempt to maximize recovery to demonstrate bad faith.  See, e.g., Adelphia, 359 B.R. 54, 63-64 (Bankr. S.D.N.Y. 2006) (declining to designate votes of creditor who held claims against two different Adelphia debtors and who cast votes with respect to one set of claims with ulterior purpose of increasing its recovery on the claims it held against another debtor).  Judge Gonzalez had occasion to analyze the issue of alleged "mixed-motive" voting post-DBSD in the case of In re GSC, Inc., 453 B.R. 132 (S.D.N.Y. 2011).  In GSC, there were allegations that a

---

[62]      See Adversary Proceeding Decision FOF ¶¶ 63, 89.
[63]      It is unclear exactly what the Second Circuit intended by the words "pre-existing" – i.e., pre-petition or pre-plan proposal.

creditor, Black Diamond, had voted against a plan in order to pursue a sale transaction that

would have given it more than its ratable share of the debtors' assets.  In analyzing whether there

was evidence to this effect, Judge Gonzalez observed that, even if there were such evidence, the

objectors would have needed to establish Black Diamond's intent to pursue this alternative at the

time of voting and that, even if the objectors could have succeeded in making such a showing,

the objectors would "have had to further prove that Black Diamond's *sole* or *primary* goal in

rejecting the [p]lan was to benefit at the expense of other creditors."  Id. at 161 (emphasis in

original).  Stated differently, vote designation should not be ordered where a creditor can

articulate a valid business reason for rejecting a plan even if such rejection may also be

consistent with such creditor's non-creditor interests.  See also In re Figter Ltd., 118 F.3d 635

(9th Cir. 1997) (denying vote designation where creditor acted to preserve what he reasonably

perceived as his fair share of the debtor's estate); In re Landing Assocs., Ltd., 157 B.R. 791, 807-

08 (Bankr. W.D.Tex. 1993) (noting that creditors act with a variety of motives and evaluating an

admixture of creditor-related and non-creditor-related motives); In re Dune Deck Owners Corp.,

175 B.R. 839, 845 (S.D.N.Y. 1995) (stating that court must decide whether the creditor opposes

the plan because of how it affects his claim, or instead, because the creditor really seeks to obtain

some collateral advantage in another capacity and has voted without regard to the treatment of its

claim).  Here, there is an ample basis to find that, notwithstanding SPSO's alleged ulterior

motives, its non-creditor/competitor interests, and its demonstrably inequitable conduct in

acquiring at least a substantial portion of its claim, it cast its vote to block a plan that provided it

with abysmal treatment that no similarly-situated creditor would have accepted.

The Debtors would have the Court conflate the provisions of section 1126(e) and section

510(c) and hold that a finding of inequitable conduct sufficient to support equitable

subordination of a creditor's claim necessarily translates into the basis for designating the bad

actor's vote.  Moreover, the Debtors would seek to transform vote designation into a substantive

treatment provision.  The Court declines to read section 1126(e) so broadly; in the plain words of

the statute, designation may be ordered with respect to "any entity whose acceptance or rejection

of such plan was not in good faith."  It is vote-specific and plan-specific.  It focuses on the voting

conduct of the creditor holding the claim.  Simply put, had SPSO voted to reject a plan that

proposed to pay it in full in cash or a plan proposing that SPSO receive some other treatment that

was accepted by the non-SPSO holders of LP Debt, SPSO's good faith in rejecting such a plan

would be open to serious question.  Indeed, as SPSO itself ironically points out in drawing a

distinction between this case and DBSD, "[i]t is one thing to designate a creditor that votes

against a [p]lan that manifestly compensates the designated stakeholder's economic expectations

*in full*" but quite another thing to designate SPSO's vote on this Plan.[64]  Here, while it is not

subject to credible dispute that SPSO has non-creditor interests, its vote to reject this

demonstrably unconfirmable plan cannot be designated, especially when to do so would arguably

render the protections of section 1129(b) inapplicable.

### C.   Because SPSO's Vote Cannot be Designated, the Cramdown Requirements of Section 1129(b) Are Applicable to Class 7B

Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Court may confirm a plan

over a dissenting impaired class of claims so long as the plan is "fair and equitable" and does not

"discriminate unfairly" with respect to the dissenting class.  11 U.S.C. § 1129(b)(1).  See, e.g.,

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 650 (2d Cir. 1988); In

re Chemtura Corp., 439 B.R. 561, 592, n. 131 (Bankr. S.D.N.Y. 2010).   The Plan satisfies

neither requirement with respect to Class 7B.

---

[64]   *Post Confirmation Trial Brief of SP Special Opportunities, LLC and Objection to Confirmation of Debtors'
Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1517] at ¶ 185.

1.    **The Plan Is Not Fair and Equitable With Respect to Class 7B**

A plan is fair and equitable with respect to a class of secured claims if it satisfies one of

the three alternatives set forth in section 1129(b)(2)(A).  The plan must provide (i) that the

holders of such claims (a) retain their liens on the same collateral, to the extent of the allowed

amount of such claims and (b) receive deferred cash payments of a value equal, as of the

effective date of the plan, to the value of the secured creditors' interests in the estates' interests in

such collateral; (ii) for the sale of any property that is subject to the liens securing such claims,

free and clear of such liens, with such liens to attach to the proceeds of such sale, and the

treatment of such liens to comply with clause (i) or (iii) of section 1129(b)(2)(A) (a provision

which the parties agree is not applicable here); or (iii) for the realization by such holders of the

indubitable equivalent of such claims.  11 U.S.C. § 1129(b)(2)(A).

The Plan is not fair and equitable with respect to Class 7B.  Although the parties here

disagree as to whether the Plan must comply with section 1129(b)(2)(A)(i) or section

1129(b)(2)(A)(iii) with respect to SPSO, see RadLAX Gateway Hotel, LLC v. Amalgamated

Bank, __ U.S. __, 132 S. Ct. 2065, 2072 (2012), the Plan fails to satisfy either subsection.  On its

face, the Plan does not comply with subsection (A)(i) inasmuch as it replaces SPSO's first lien

with a third lien.  Since the SPSO Claim will not be subordinated in its entirety, the analysis of

this species of "fair and equitable" treatment ends there.

Nor does the Plan fare better under section 1129(b)(2)(A)(iii), which requires the

realization by the creditor of the "indubitable equivalent" of its claims.  11 U.S.C.

§ 1129(b)(2)(A)(iii).  In DBSD, the bankruptcy court held that, although "indubitable

equivalent" is not defined in the Bankruptcy Code, "courts generally will find the requirement

satisfied where a plan both protects the creditor's principal and provides for the present value of

the creditor's claim." <u>DBSD</u>, 419 B.R. at 207 (citing <u>In re Sparks</u>, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994)).  The court continued, stating that "courts focus on the value of the collateral relative to the secured claim, and the proposed interest rate of the facility providing the indubitable equivalent."  <u>Id.</u>  Courts have held that the "indubitable equivalent" standard requires that there be no doubt that replacement recoveries are equal to existing security interests.  <u>See In re Philadelphia Newspapers, LLC</u>, 599 F.3d 298, 310 (3d Cir. 2010) ("Thus the 'indubitable equivalent' under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral."); <u>see also</u> <u>In re Salem Suede, Inc.</u>, 219 B.R. 922, 935 (Bankr. D. Mass. 1998) (requiring that "there [be] no reasonable doubt that [the subject creditor] will receive the full value of what it bargained for") (internal citation omitted).

Here, the Plan proposes to give SPSO the SPSO Note, which (i) accrues PIK interest at the rate of LIBOR plus twelve percent, (ii) has a seven year maturity, and (iii) is secured by a third-priority lien on all of the assets of the New LightSquared Entities.  SPSO argues that the SPSO Note does not represent the indubitable equivalent of its claim because, among other things, (a) the value of such note will be highly speculative as of the Effective Date of the Plan; (b) such note does not provide for postpetition interest accrued through the Effective Date; (c) such note contains economic terms that are inferior to those SPSO enjoys pursuant to the Prepetition LP Facility, as the SPSO Note provides for the payment of interest in kind, rather than in cash, and its seven-year maturity is longer than the four-year maturity under the Prepetition LP Facility; and (d) such note will be subject to more rigorous transfer restrictions and be less liquid than SPSO's Prepetition LP Facility Claim, while at the same time containing reduced covenant protections for SPSO.[65]

---

[65]    *Post Confirmation Trial Brief of SP Special Opportunities, LLC and Objection to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1517] at ¶ 158.

The Debtors submit that the SPSO Note will provide SPSO with the indubitable equivalent of its claim by providing SPSO with payment in full.  To determine whether the SPSO Note provides for the indubitable equivalent of the SPSO Claim, the Debtors suggest that the Court must (i) compare the value of the collateral securing the SPSO Note to the value of the SPSO Claim to ensure SPSO's principal is protected and (ii) analyze the interest rate and maturity of the SPSO Note to ensure SPSO is receiving the present value of its claim; if an equity cushion can be shown, the Debtors argue, indubitable equivalence is established.  (See Conf. Hr'g Tr. May 6, 2014 at 70:1-81:4.)  Pointing to the Moelis Valuation Report, a collateral valuation with a midpoint of $7.7 billion, the Debtors argue that the full principal value of the SPSO Claim would be more than sufficiently protected by a third-lien note on the existing collateral securing the Prepetition LP Facility.  (See id.)

Nevertheless, to "erase any shadow of doubt (to the extent any such doubt existed), that SPSO was not receiving fair and equitable treatment,"[66] the Debtors emphasize that the Plan enhances SPSO's collateral package by providing SPSO with a third lien on existing collateral as well as a lien on certain *new* collateral,[67] including substantially all of the assets of NewCo and its direct and indirect subsidiaries.[68]  The SPSO Note, according to the Debtors, is thus secured by a new collateral package that is more "expansive" than that provided under the Prepetition LP

---

[66]    *LightSquared's (A) Memorandum of Law in Support of Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code and (B) Omnibus Response to Objections to (i) Confirmation of Plan, (ii) Motion To Designate Vote of SP Special Opportunities, LLC, and (iii) Motion Seeking Approval of New DIP Facility* [Docket No. 1413] at ¶ 175.

[67]    Because the SPSO Claim will not be subordinated in its entirety, it must be considered a secured claim for purposes of the cramdown analysis.

[68]    See *Notice of Filing of Clean and Blackline Versions of (A) Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, (B) Debtors' Third Amended Specific Disclosure Statement and (C) Revised Form of Final DIP Order* [Docket No. 1336] at Exhibit B (Projections); Mar. 24, 2014 Conf. Hr'g Tr. (Hootnick) 25:4-27:7; 52:19-24; 54:12-20; 62:2-6; 66:7-11; 112:11-113:2; see also Mar. 20, 2014 Conf. Hr'g Tr. (Smith) 45:10-47:6; 48:4-50:23; Mar. 6, 2014 Dep. Tr. (Montagner) 10:17-14:5; 38:4-39:18; 67:25-68:5.

Facility;[69] and the Ad Hoc Secured Group argues that this so-called "additional collateral,"

which includes the assets of LightSquared Inc., increases SPSO's collateral package by at least

hundreds of millions of dollars, given the value of the Inc. Debtors.  (See *Corrected Post-Trial*

*Confirmation Brief of the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No.

1494] at 75-76; see also Mar. 26, 2014 Conf. Hr'g Tr. (Ergen) 43:2-13 (testifying that, in the new

proposal sent by SPSO on December 31, 2013, SPSO was willing to pay $348 million dollars for

the Inc. Debtors' assets); Mar. 24, 2014 Conf. Hr'g Tr. (Hootnick) 60:9-16 ("Moelis has never

been asked nor have we done a separate valuation for the Inc. assets.  We . . . believe it to be

worth at least a few hundred million dollars.  I know that other parties in this room believe they

could be worth as much as a billion dollars.  We don't have a full presentation nor have we gone

to an internal committee to give you a decided-on view, but I think it's safe to say that it's worth

a few hundred million dollars.")).[70]

        SPSO disagrees entirely.  In addition to disputing the Debtors' valuation and projections,

SPSO argues that the third lien it will receive under the SPSO Note cannot satisfy indubitable

equivalence where SPSO currently purports to enjoy a first lien.  (*Objection of SPSO to*

*Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy*

*Code* [Docket No. 1408] at ¶¶ 82-87).

        While some courts have held that a subordinated lien can constitute the indubitable

equivalent of a secured creditor's claim under section 1129(b)(2)(A)(iii), such cases are few and

far between.  See, e.g., Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.), 80 B.R. 171,

---

[69]        See Plan at I.A.303 ("the liens securing the SPSO Note shall be silent, third priority liens limited to the
assets of NewCo and each of its subsidiaries . . .").
[70]        At closing argument, counsel for the Special Committee also highlighted for the Court the increased value
of the Debtors' assets under the Plan due to the fact that the Plan integrates the estates of LightSquared LP and
LightSquared Inc. and thus creates increased value through (i) synergies between the two estates and (ii) the
preservation of a valuable net operating loss.  (May 5, 2014 Conf. Hr'g Tr. at 28:24-30:7.)

174-75 (9th Cir. B.A.P. 1987) (finding indubitable equivalent where secured creditor received

new promissory notes junior only to a construction loan); <u>Affiliated Nat'l Bank-Englewood v.

TMA Assocs., Ltd.</u>, 160 B.R. 172, 176 (D. Col. 1993) (holding that secured creditor received

indubitable equivalent despite payment in full to partially junior and partially senior creditor).

No cases from courts in this District have been cited to the Court in support of this

contention.  Moreover, in each case cited by the Ad Hoc Secured Group in support of its

indubitable equivalence argument, the court found that the secured creditor in question was

demonstrably oversecured and that the creditor's equity cushion protected it from any diminution

of its security interest.  In <u>In re Pine Mountain</u>, for example, the 9th Circuit B.A.P. based its

determination that the secured creditor received the indubitable equivalent of its claim on the fact

that the creditor's claim "would still be fully secured" even after obtaining a senior construction

loan.  80 B.R. at 174-75.  Similarly, in <u>Affiliated Nat'l Bank-Englewood</u>, the court based its

holding on the bankruptcy court's determination that property securing the creditor's $1 million

claim was worth between $1.8 million and $2.0 million.  160 B.R. at 174-75.

The Debtors readily concede that, although the Plan is not conditioned on FCC approval,

the Debtors' valuation of the SPSO Note and SPSO's proposed recovery thereunder indeed rely

on opinions offered at the Confirmation Hearing that the FCC will approve LightSquared's

pending License Modification Application and the later use of its lower downlink spectrum.[71]

Thus, the value of the collateral securing the SPSO Note depends – almost entirely – on whether

or not such approvals occur.  Accordingly, it appears that the parties are in agreement that the

valuation of LightSquared and its assets, including its spectrum assets, is ultimately dispositive

of the question of indubitable equivalence.

---

[71]    *LightSquared's Post-Trial Memorandum of Law in Further Support of (I) Confirmation of Debtors' Third
Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, (II) Motion To Designate Vote of SP Special
Opportunities, LLC, and (III) Motion Seeking Approval of New DIP Facility* [Docket No. 1486] at 23.

There is enormous disagreement on valuation, however.  Not surprisingly, the Debtors

and the Plan Support Parties, on the one hand (with the vocal support of the Ad Hoc Secured

Group), and SPSO, on the other hand, have drastically different views on valuation.  Mr. Ergen

himself prepared a valuation of the Debtors' spectrum assets, as did PWP when it issued a

fairness opinion for the DISH Special Committee in connection with the now-terminated

DISH/LBAC Bid.  Of course, the assumptions underlying each of these valuations are radically

different from one another, with respect to variables such as the appropriate price per MHz/POP

metric, the impact of FCC approval on the License Modification Application, the proposed use

of each block of spectrum, and the question of whether or not there is a "technical issue" with

respect to portions of the spectrum.

The Court makes the following findings with respect to valuation.

### a.       The Moelis Valuation

As the Debtors readily concede, the value of LightSquared's assets is central to the

determination of the feasibility of the Plan and the appropriateness of the treatment of the SPSO

Claim.  Under the direction of Mr. Hootnick, Moelis prepared a valuation analysis of

LightSquared's assets that reflects a range of value from $6.2 billion at the low end to $9.1

billion at the high end.  The methodology employed by Moelis is industry-accepted and indeed

does not differ in any material respect from the methodology used by SPSO's valuation expert,

or from the methodology used in the valuations performed by PWP for the DISH Special

Committee or by Mr. Ergen himself.  The methodology employs market comparables based on

the price per MHz/POP, which reflects, among other things, the market price as a function of the

size of the band of spectrum and the number of people it covers.  Spectrum characteristics are

also taken into account, including, for example, the propagation characteristics of the spectrum.

(See Moelis Valuation Report at 10; Mar. 24, 2014 Conf. Tr. (Hootnick) at 16:13-20:5.)  Moelis relied on the opinions of Mr. Smith, Mr. McDowell, and Mr. Jeffrey Carlisle, LightSquared's EVP for Regulatory Affairs, that the FCC will grant LightSquared's License Modification Application by the end of 2015 and will approve the use of the Lower Downlink in seven years. Mr. Hootnick's qualifications as an expert are stellar; Moelis' experience in valuing complex assets in the telecommunications space is broad and deep; and the methodology employed in the Moelis Valuation Report is clearly consistent with industry standards.  But because the Moelis Valuation rests almost entirely on unsupportable assumptions about the timing of FCC approvals, the Court is unable to afford it weight sufficient to support the valuation premise of the Plan.[72]

### b.    The GLC Valuation

The GLC Valuation Report offered by SPSO suffered from many infirmities and inconsistencies.  On the one hand, Mr. Reynertson purported to have relied on the opinions of Mr. Hyslop for his determination of how much of LightSquared's spectrum should be included in his valuation analysis and how much might be sidelined due to the "technical issue."  He appears to have relied in part on a Hyslop opinion that was first revealed at the Confirmation Hearing; this undermines the integrity of Mr. Reynertson's opinion and, more generally, raises questions about his credibility.  Moreover, notwithstanding his reliance on others for regulatory and technical assumptions, he appears to have used his own judgment to risk-adjust his valuation analysis.  Simply put, his methodology is all over the place.  Paid $1.25 million dollars for his work, Mr. Reynertson delivered a superficial analysis that was not even informed by a review of the valuations prepared by Mr. Ergen and PWP.   The Court affords it little weight.

---

[72]    The Moelis Valuation Report was not the first valuation performed by Moelis with respect to LightSquared. Moelis has performed valuations of the Debtors' assets on several previous occasions, including in connection with proposed DIP financing; none of these reflects a valuation as high as that reflected in the Moelis Valuation Report.

### c.    The Ergen Valuation

In connection with the consideration of Mr. Ergen's LBAC bid by the DISH Board and

the DISH Special Committee, Mr. Ergen prepared the Ergen Valuation, a six-page presentation,

dated July 3, 2013, entitled "*Strategic Investment Opportunity – L-Band Acquisition, LLC.*"

(PX1047.)  The Ergen Valuation reflects Mr. Ergen's analysis of the aggregate value of

LightSquared's assets to DISH, comprised of (a) the value of 20 MHz of the LightSquared

spectrum and satellites themselves and (b) the incremental value that would be realized by DISH

due to the substantial additional value that LightSquared's spectrum would bring to DISH's

existing AWS-4 spectrum.  The range of value for the former, per Mr. Ergen, is $3.3 billion to

$5.2 billion; the range of value for the latter (i.e., inclusive of DISH supplemental asset value) is

$5.1 billion to $8.9 billion.  The Ergen Valuation includes a higher range of $/MHz /POP than

the Moelis Valuation ($0.65 to $0.95 versus $0.60 to $0.90).  SPSO has attempted to retreat from

the numbers reflected in the Ergen Valuation on the grounds that it does not reflect the negative

effect of the "technical issue."  As the Court repeatedly observed during the Confirmation

Hearing, however, no attempt was ever made by DISH to solve (let alone quantify) the

"technical issue" which allegedly stood in the way of the realization by DISH of billions of

dollars of supplemental asset value.  It is indeed a curious thing.  The Ergen Valuation, while

offering strong support for the proposition that LightSquared's assets have tremendous value in

the hands of DISH, does not provide sufficient support for the valuation on which the Plan and

the treatment of the SPSO Claim are premised.

### d.    The PWP Valuation

In addition to the Ergen Valuation, a valuation prepared by PWP was considered by the

DISH Special Committee.  (PX1048.)  PWP was retained by the DISH Special Committee to

issue a fairness opinion with respect to the potential $2.2 billion DISH/LBAC Bid in July 2013.
In connection with its assignment, PWP performed an extensive valuation analysis of
LightSquared's assets and concluded that "the cumulative value . . . is estimated to be $4.4
billion to $13.3 billion."  (PWP Valuation at 39.)  This valuation range includes the stand-alone
value of LightSquared's spectrum and an estimate of the magnitude of the ways in which the
LightSquared spectrum would enhance the value of DISH's existing and planned businesses.

### e.    Additional Valuation Issues

In order to demonstrate the existence of an equity cushion, the Debtors point not only to
the Moelis Valuation Report but also to (i) the Ergen Valuation, which yields an approximately
23 percent "equity cushion" (not including value attributable to the Lower Downlink) and (ii) the
PWP Valuation, which yields an approximately 15 percent equity cushion, both of which are
higher than the 10 percent equity cushion which has been found to be sufficient by courts in this
District.  (See Conf. Hr'g Tr. May 6, 2014 at 76:13-80:3.)  SPSO, not surprisingly, argues that
these various equity cushion calculations should be given little credence because of the
"technical issue" that was allegedly discovered after preparation of the Ergen and PWP
Valuations and, as such, these valuations are no longer indicative of current value.  The Debtors
contend that the Ergen and PWP Valuations, which are consistent with the Moelis Valuation, are
illustrative and persuasive evidence of the value of LightSquared's assets and that the purported
"technical issue" is a red herring manufactured by SPSO that likely does not materially alter such
valuations.  The Court is inclined to agree, but, other than as reflected in Appendix A hereto
(filed under seal), this issue was not explored or fully developed during the evidentiary hearing.[73]

---

[73]    As a consequence of the Court's overall ruling on valuation, there is no need to quantify the effect, if any,
on the value of LightSquared's spectrum assets due to the "technical issue."

Based on all of the valuation evidence in the record, it is clear that LightSquared is indeed the owner of valuable spectrum assets – unbuilt "beachfront property"[74] that has yet to be put to its highest and best use. But as long as the regulatory hurdles that exist remain unresolved, it is impossible to conclude, by a preponderance of the evidence, that the Debtors' valuation and projections are sufficiently reliable to support – indubitably – the valuation on which SPSO's treatment under the Plan is premised. As the Court has found, the Moelis Valuation Report is premised on unsupportable assumptions about the timing of FCC approvals, and no party has the ability to predict when and if such approvals will be obtained. Moreover, the fact that certain of the Plan Support Parties appear to be investing what the Debtors characterize as "hundreds of millions" of dollars junior to the SPSO Note does not persuade the Court otherwise. As graphically demonstrated in SPSO's Post-Confirmation Trial Brief, the Plan is in large part a sophisticated shell game that moves debt and cash up and down the capital structure in ways that are less than obvious but nonetheless real.[75] A substantial amount of the purportedly junior investment by Melody is being offset by substantial fees paid to Melody by Harbinger in connection with the defunct Harbinger Plan. Moreover, certain of the Plan Support Parties who are holders of Existing LP Preferred Equity Interests, including Fortress, would receive some $223 million in cash and additional Preferred PIK Interests under the Plan. As the January 2014 correspondence among the Plan Support Parties makes very clear, the Plan was constructed to bootstrap these preferred interests into the second lien position ahead of Mr. Ergen. When Mr. McKnight balked at being third to Mr. Ergen's second, Mr. Falcone simply moved him up "ahead of Charlie." (See SPX069.) Breathtakingly simple – but entirely unsupportable.

---

[74]    Jan. 16, 2014 Hr'g Tr. (Falcone) 15:17-16:1. Mr. Falcone's January 16, 2014 testimony was given in the Adversary Proceeding trial.

[75]    *Post Confirmation Trial Brief of SP Special Opportunities, LLC and Objection to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1517], Attachment B.

Because the Debtors' asset valuation does not support the valuation on which the Plan

and the treatment of the SPSO Claim are premised, the Court cannot conclude that, under the

Plan, SPSO will realize the indubitable equivalent of its existing Prepetition LP Facility Claim

such that the Plan is fair and equitable with respect to Class 7B.[76]  Even if the Court were to find

that the valuation that undergirds the Plan is sufficient to protect SPSO's principal, however, the

Court determines that the SPSO Note would still not constitute the indubitable equivalent of the

SPSO Claim because of other features of the SPSO Note, including the alteration of the type of

interest received under the SPSO Note as compared to the Prepetition LP Facility (PIK versus

cash), the longer maturity of the SPSO Note as compared to the Prepetition LP Facility (seven

years versus four years), and the fact that the note, instead of providing SPSO with a first lien,

provides for far riskier third lien treatment subordinated behind at least $2.2 billion of senior

debt.

## 2.    The Plan Unfairly Discriminates Against Class 7B

Contrary to the requirement of section 1129(b)(1) of the Code, the Plan discriminates

unfairly against Class 7B.  While the "currency" with which the Prepetition LP Facility SPSO

Claim is paid (i.e., the SPSO Note) does not have to be exactly the same as that provided to the

Prepetition LP Facility Non-SPSO Claims, there must nonetheless be a determination that the

treatment afforded SPSO does not discriminate unfairly against SPSO.  The purpose of the

requirement is to ensure that a dissenting class will receive relative value equal to the value given

to all other similarly situated classes.  In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr.

S.D.N.Y. 1987); see also In re Sea Trail Corp., No. 11-07370-8, 2012 WL 5247175, at *9

---

[76]    The Court does not reach the second prong of the indubitable equivalent analysis – appropriateness of the interest rate of the note – and makes no findings with respect to the appropriateness of the proposed rate of interest of the SPSO Note, which is LIBOR (with a floor of 1.00%) plus 12.00%.  (Plan at § I.A.300).

(Bankr. E.D.N.C. Oct. 23, 2012) (holding that a chapter 11 plan providing one class of unsecured creditors with proceeds of asset sales and avoidance actions and another class of unsecured creditors with title to a sewer facility and assignment of a sewer service agreement was not unfairly discriminatory); In re Hawaiian Telcom Commc'ns, Inc., 430 B.R. 564, 605 (Bankr. D. Haw. 2009) (plan that awards cash to general unsecured creditors and warrants to unsecured senior noteholders does not unfairly discriminate; section 1129(b) of the Bankruptcy Code does not preclude a plan's disparate treatment of classes of same-priority claims, it prohibits only unfair discrimination); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 222-23, 231-32 (Bankr. D. N.J. 2000) (chapter 11 plan providing undersecured noteholders with new notes and new common stock on account of their deficiency claims but other unsecured creditors with cash was not unfairly discriminatory because the debtors' value was determined to be sufficient to ensure payment).

To determine whether a plan discriminates unfairly, courts consider whether (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without the discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale.  In re WorldCom, Inc., 2003 Bankr. LEXIS 1401, *174-175 (Bankr. S.D.N.Y. Oct. 31, 2003) (citations omitted).  The Debtors argue that each of these elements has been satisfied, because (a) SPSO impermissibly acquired LP Debt intending to facilitate the acquisition of LightSquared's assets by DISH, a competitor, thus providing a rational basis for the treatment, (b) the treatment of the SPSO Claim is necessary because the Plan represents the "best and only path for LightSquared to emerge," (c) the Plan has been proposed in good faith, and (d) there is nothing "unfair" about the fact that the Plan satisfies

60

the SPSO Claim in full.[77]  SPSO vehemently disputes such assertions, arguing that the disparate

treatment of SPSO is not supported by any reasonable basis, and, far from providing payment in

full, the SPSO Note "is at best, a highly distressed debt instrument and, at worst, is entirely

worthless."[78]

At a minimum, the treatment proposed in the Plan clearly does not pass muster under

prongs (i) and (iv) of the <u>WorldCom</u> test, and likely falls short on the "good faith" prong as well.

Simply put, it is difficult to imagine discrimination that could be much more unfair than that

contemplated by the Plan: close to full cash payment on confirmation (not the Effective Date) for

Class 7A versus an equity-like deeply subordinated seven year third-lien PIK interest note for

Class 7B – treatment that, even if possibly yielding payment of the value of the SPSO Claim

seven years down the road, for all intents and purposes puts SPSO at the mercy of the rest of the

proposed post-confirmation capital structure, including the equityholders below it.  (<u>See</u>, <u>e.g.</u>,

Conf. Hr'g Tr. Mar. 31, 2014 (Falcone) at 103:9-25 (testifying regarding $150 million call option

of Harbinger that would be part of the second lien and above SPSO); Conf. Hr'g Tr. Mar. 24,

2014 (Hootnick) at 68:7-25 (describing LightSquared's future ability pursuant to the Plan to raise

another $500 million which would come in ahead of the second lien debt and the SPSO Note).)

While some discrimination in this case may be necessary to address the non-

creditor/competitor interests of SPSO, <u>see</u> Section I.A., *supra*, the Plan's treatment of Class 7B is

not designed to achieve that goal.  The legitimate business reasons for separately classifying the

SPSO Claim hardly entitle the Debtors to discriminate against SPSO in ways that far exceed

---

[77]     *LightSquared's Reply in Support of Its Post-Trial Memorandum of Law in Further Support of (I)
Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, (II) Motion To
Designate Vote of SP Special Opportunities, LLC, and (III) Motion Seeking Approval of New DIP Facility* [Docket
No. 1525] at Ex. A, p. 21.
[78]     *Objection of SPSO to Confirmation of Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of the
Bankruptcy Code* [Docket No. 1408] at ¶ 72.

those necessary to address the legitimate concerns attendant to SPSO's competitor status and

connections to DISH, e.g., through appropriate covenants and other non-economic protective

measures.  Moreover, the fact that, as Mr. Smith testified, SPSO is getting a "promissory note"

because "there's not enough cash for everybody to receive cash" does not provide a legitimate

basis for the Plan's discriminatory treatment of Class 7B. (Conf. Hr'g Tr., Mar 20, 2014 (Smith)

at 26:18 -27:14.)  Nor is it a justification for such discrimination to point to the fact that, as some

have observed, the Ad Hoc Secured Group "requires" early payment in full in cash.  (See, e.g.,

Conf. Hr'g Tr. Mar. 24, 2014 (Hootnick) at 45:4-7 ("And [the plan] satisfies the requirement of

certain constituents, particularly the non-SPSO lenders who have been promised an early pay-out

by the LBAC approach [and] who have required throughout that they be paid off quickly");

Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 69:15 ("I think our clients want to be paid in full in

cash").)  There are many creative ways to attempt to address the limited availability of cash,[79]

but unfair discrimination is not one of them. Thus, separate and apart from its failure to satisfy

the fair and equitable requirement of section 1129(b)(2)(b), the Plan fails to pass muster on

unfair discrimination grounds as well and, thus, cannot be confirmed.

### D.    The Claim of SPSO Shall Be Subordinated to the Extent of Harm Caused to Innocent Creditors

As set forth in detail in the Adversary Proceeding Decision, the Court has concluded that

SPSO has engaged in inequitable conduct in connection with its acquisition of its now nearly $1

billion LP Debt claim.  Although the Confirmation Hearing did not encompass a re-trial of those

issues that were presented and have now been adjudicated in connection with Adversary

---

[79]    See, e.g., In re Central European Distribution Corporation, et al., Case No. 13-10738 (CSS) (Bankr. D. Del. March 13, 2013), Findings of Fact and Conclusions of Law (I) Approving (A) The Disclosure Statement, (B) The Prepetition Solicitation Procedures, and (C) Forms of Ballots, and (II) Confirming the Second Amended and Restated Joint Prepackaged Chapter 11 Pan of Reorganization of Central European Distribution Corporation, et al., dated March 13, 2013 [Docket No. 166] (confirming plan employing a reverse Dutch auction procedure in which noteholders could elect to bid for cash treatment).

Proceeding, there are additional allegations of inequitable conduct that were raised in connection

with confirmation.  In essence, the Ad Hoc Secured Group maintains that they were the victims

of an elaborate "bait and switch" strategy perpetrated by Mr. Ergen through SPSO, LBAC, and

DISH.  The strategy was allegedly hatched in a presentation prepared by Mr. Ergen's counsel in

late April 2013 and presented by Mr. Ergen to the DISH Board in May 2013, which stated,

among other things, that Mr. Ergen wanted to "see [the] results of [the] marketing process and, if

[the] process is unsuccessful, revert with [a] different bid later."  (See Adv. Pro. Ex. PX0867;

Adversary Proceeding Decision FOF ¶¶ 131-32.)  There, says the Ad Hoc Secured Group, it is

made crystal clear that the Ergen-led strategy was to make a bid, wait and see if anyone else is

interested in the LightSquared assets at that price, and if not, pull the bid and come back later

with a lower bid.  "Had they only known," say the members of the Ad Hoc Secured Group, they

would never have gone down that path.  But now, pointing again and again to the DBSD and

Terrestar "playbooks" as evidence of Mr. Ergen's *modus operandi* for acquiring distressed

assets, the Ad Hoc Secured Group complains that it was deceived into signing up for a deal that

Mr. Ergen never intended to close.[80]  The fly now regrets having accepted the invitation of the

spider to enter its parlour.

Not surprisingly, there is no documentary evidence reflecting the alleged "bait and

switch" strategy.  Mr. Ergen's May 2, 2013 DISH Board presentation,[81] on which the Ad Hoc

Secured Group principally relies, cannot be fairly read as the Ad Hoc Secured Group suggests it

should be read.  The DISH Board minutes in the December 2013 timeframe contain carefully

constructed high level summaries of the status of the DISH/LBAC Bid and, not surprisingly,

contain no hint of any such strategy.  Consistent with the allegations of the Ad Hoc Secured

---

[80]    See *Corrected Post-Trial Confirmation Brief of the Ad Hoc Secured Group of LightSquared LP Lenders*
[Docket No. 1494] at 2-3, 32-33, 36-38.
[81]    Adv. Pro. Ex. PX0867.

Group that the so-called "technical issue" was fabricated as a pretext for LBAC's termination of
its bid, there are, however, DISH internal documents that suggest that the so-called "technical
issue" was not being approached as something to be resolved in order to keep the proposed
transaction on track, but rather was being viewed as something DISH was hoping would turn out
to be real.[82]  In addition to the unsettling content and tenor of some of the documents, Mr.
Ergen's testimony on this issue was quite evasive.

Moreover, the words and behavior of Mr. Ergen in connection with the December 11
auction are not exactly what one would expect to hear and see from a stalking horse bidder who
had snagged assets that were worth, in DISH's hands, billions of dollars of net incremental value.
Why would Mr. Ergen fly to New York to attend the auction with a sizeable team of DISH
personnel and the DISH Board on standby[83] but on that very day have his counsel tell Mr. Zelin
that she hoped another bidder would appear or it would be bad for the Ad Hoc Secured Group?[84]
Why in December did the DISH Board waive its 48-hour meeting notice requirement[85] until
January 9, 2014 – the very day on which the DISH/LBAC Bid termination became effective?
There are no good answers to these and many other questions about the conduct of LBAC and
SPSO.

---

[82]      Evidence was presented at the Confirmation Hearing that DISH's engineers have been told by different
vendors, including Huawei and Avago, that the "technical issue" is not an impediment to use of LightSquared's
Uplinks.  One email from Huawei acknowledged Mr. Ergen's intent to use the "technical issue" as a device to
"lower" the acquisition price for LightSquared's spectrum. (PX1026) (Huawei employee stating that "technically,
we are optimistic to make L-band . . . work for DISH but understand it might involve more than technical for
Charlie to make decision now, and wise to leave the door open and drive the price down in the future.").

[83]      Mr. Ergen flew to New York to attend the auction with a team of DISH personnel, including Stanton
Dodge (DISH General Counsel), Tom Cullen (DISH Executive Vice President, Corporate Development), George
Brokaw (DISH Independent Director), Carl Vogel (DISH Director), and at least two members of DISH's technical
team.  (See Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 81:16-83:7; 230:18-231:13.)  Mr. Ergen also had a quorum of
DISH's Board ready to be on standby during the auction.  ((Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 82:18-83:7.)

[84]      See fn 52, supra.

[85]      Before the auction, Mr. Ergen consulted with the DISH Board with respect to the auction and put the DISH
board on notice to act immediately.  The Board granted a waiver of the typical forty-eight hour requirement for
board meetings until January 9, 2014, which was the day that the trial in the Adversary Proceeding was scheduled to
begin.  (Conf. Hr'g Tr. Mar. 26, 2014 (Ergen) at 256:25-257:6; 286:7-287:5; SPX028.)

Nonetheless, the fact remains that the LBAC transaction was tied to the achievement of

certain milestones set forth in the PSA.[86]  And LBAC, as this Court has ruled, was free to

terminate the PSA and then terminate its bid – for any reason – once any of those milestones was

missed.[87]  The milestones were aggressive from the outset, and were soon missed.  Moreover, the

Bid Procedures Order only required LBAC to remain in place as a back-up bidder until mid-

February 2014 only if another party had outbid it at the auction.[88]  That did not occur.

Whether LBAC terminated its bid because it "believed" there was a technical issue (even

though the record does not support a finding that there was or is such an issue), or because it

wanted to make a lower conditional bid, or because Mr. Ergen decided to direct DISH and its

capital elsewhere, or because of negative implications for DISH in connection with the Nevada

shareholder litigation, remains unclear.  What is in undisputable, however, is that the actions of

Mr. Ergen in this regard defy logical explanation.  Mr. Ergen was particularly evasive when

asked at the Confirmation Hearing about his reasons for coming to the December 11 auction

fully prepared to proceed, and then terminating his bid shortly thereafter.[89]  Notwithstanding, the

record of the Confirmation Hearing does not provide compelling additional support for the

equitable subordination of the SPSO Claim, even assuming that the conduct of LBAC and DISH

in terminating the DISH/LBAC Bid were attributable to SPSO.

## II.    ADDITIONAL OBJECTIONS TO THE PLAN

SPSO has raised numerous additional objections to confirmation of the Plan including:

the failure to satisfy the "best interests of creditors" test under section 1129(a)(7) of the Code;

---

[86]     Section 6.1(f)(1) of the Plan Support Agreement permitted LBAC to terminate on three business days'
written notice in the event that one or more of the milestones set forth on Exhibit C to the Plan Support Agreement
were not satisfied.  See Plan Support Agreement [Docket No. 765] at Ex. A, §6.1(f)(1).
[87]     See Jan. 22, 2014 Hr'g Tr. [Docket No. 1278].
[88]     Id. at 109:23-110:9; *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction,
(C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice and (E) Granting Related
Relief*, dated October 1, 2013 [Docket No. 892].
[89]     Mar. 26, 2014 Conf. Hr'g Tr. (Ergen) at 93:25-102:6.

the failure of the Plan to contain projections that extend beyond the first quarter of 2016; the impermissibility of the Plan's proposed Non-Debtor Releases; the effect of the Plan on SPSO's inter-creditor rights under the Prepetition LP Credit Agreement; certain infirmities with the proposed New DIP Facility, including its alleged lack of adequate protection; the alleged artificial impairment of certain accepting classes; the Debtors' failure to demonstrate that the Plan is feasible; and the Debtors' alleged lack of good faith in soliciting acceptances of the Plan under section 1125(e). While there may be merit to several of these additional objections, the Court need not address them now in light of the other bases on which the Court has denied confirmation of the Plan.

One final observation is in order. This Court has previously ruled, in this case, that the Bankruptcy Code does not contemplate or permit equitable disallowance of a creditor's claim.[90] Against the backdrop of allegations – and findings – that SPSO and Mr. Ergen indeed orchestrated an end-run around the restrictions on the Prepetition LP Credit Agreement, it is remarkable that the Debtors and those parties who support the Plan have constructed a plan of reorganization that is a gerrymandered end-run around their inability to disallow the SPSO Claim. The latest such attempt is the invocation of "unjust enrichment" by the Ad Hoc Secured Group. (See *Corrected Post-Trial Confirmation Brief of the Ad Hoc Group of Secured Lenders* [Docket 1494] at 23.) And the trial record leaves no doubt that subordinating the SPSO Claim – with or without a finding of equitable subordination – was the *sine qua non* of the Harbinger-driven plan process. This was a plan that was orchestrated by Mr. Falcone and those he sought to "protect;" it provides the Ad Hoc Secured Group with the quick cash payout it had hoped to obtain from LBAC's purchase of the LP assets; and it assumes a result in the Adversary

---

[90]    See Memorandum Decision Granting Motions to Dismiss Complaint [Adv. Docket No. 68], 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013).

Proceeding that is not to be.  As these cases approach their two-year anniversary in this Court, the time is long overdue for the parties to adjust their expectations, tone down their animosity, and work constructively to maximize the value of LightSquared's valuable spectrum assets.

## CONCLUSION

For all of the foregoing reasons, (i) confirmation of the Third Amended Joint Plan is denied; (ii) SPSO's Motion to Strike McDowell and Hootnick is denied; (iii) the Debtors' Motion to Strike Hyslop and Reynertson is granted as to Mr. Hyslop and denied as to Mr. Reynertson; (iv) the Vote Designation Motion is denied; (v) the New DIP Motion and its request for related relief, including the request to approve the Plan Support Party Break-up Fee, is denied, as moot; (vi) the Exhibit 2 Motion is denied; and (vii) the request for equitable subordination of the SPSO Claim is granted for the reasons set forth in the Adversary Proceeding Decision, with the extent of such subordination to be determined in further proceedings to be held in this Court.  Counsel to the Debtors shall be provided with an unredacted copy of Appendix A and shall distribute it to those parties entitled to receive it pursuant to applicable confidentiality agreements and sealing orders.

IT IS SO ORDERED.

Dated: July 11, 2014
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE

**APPENDIX A**

**FILED UNDER SEAL**