| | |
|---|---|
| Matthew S. Barr | Thomas E Lauria (*admitted pro hac vice*) |
| Alan J. Stone | Glenn M. Kurtz |
| Steven Z. Szanzer | Andrew C. Ambruoso |
| Karen Gartenberg | Matthew C. Brown (*admitted pro hac vice*) |
| MILBANK, TWEED, HADLEY & | WHITE & CASE LLP |
| M$^C$CLOY LLP | 1155 Avenue of the Americas |
| One Chase Manhattan Plaza | New York, NY 10036 |
| New York, NY 10005-1413 | (212) 819-8200 |
| (212) 530-5000 | |

*Counsel to Debtors and Debtors in Possession*

*Counsel for Ad Hoc Secured Group of LightSquared LP Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**NOTICE OF FILING OF FIRST AMENDED JOINT PLAN AND**
**RELATED SPECIFIC DISCLOSURE STATEMENT**

**PLEASE TAKE NOTICE** that, on August 7, 2014, (i) LightSquared Inc., LightSquared

LP, and certain of their affiliates, as debtors and debtors in possession (collectively,

"LightSquared" or the "Debtors") in the above-captioned chapter 11 cases, at the direction of the

special committee of the boards of directors for LightSquared Inc. and LightSquared GP Inc. (the

"Special Committee"), and (ii) the Ad Hoc Secured Group of LightSquared LP Lenders

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

(the "Ad Hoc LP Secured Group" and, together with LightSquared, the "Plan Proponents"), filed

the *Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc*

*Secured Group of LightSquared LP Lenders* [Docket No. 1686] (the "Joint Plan") and the

*Specific Disclosure Statement for Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*

*Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (the "Specific

Disclosure Statement") [Docket No. 1689].[2]

PLEASE TAKE FURTHER NOTICE that, on August 15, 2014, at the direction of the

Court, the Plan Proponents filed the *Notice of Filing of Exhibit to Joint Plan Pursuant to Chapter*

*11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP*

*Lenders* [Docket No. 1710], which attached thereto a version of the Joint Plan reflecting the

implementation of Article IV.U of the Joint Plan, and was titled *Joint Plan of LP Debtors Only*

*Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured*

*Group of LightSquared LP Lenders* (the "LP Debtors-Only Plan").

PLEASE TAKE FURTHER NOTICE that the Plan Proponents hereby file the *First*

*Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad*

*Hoc Secured Group of LightSquared LP Lenders* (as may be amended, modified, or

supplemented from time to time, the "First Amended Joint Plan") and the *First Amended Joint*

*Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors*

*and Ad Hoc Secured Group of LightSquared LP Lenders* (as may be amended, modified, or

supplemented from time to time, the "First Amended LP Debtors-Only Plan").[3]  The First

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Amended Joint Plan.

[3]    The First Amended LP Debtors-Only Plan will be attached as Exhibit A to the solicitation version of the First Amended Joint Plan.  The First Amended Joint Plan (and First Amended LP Debtors-Only Plan) will be attached as Exhibit A to the solicitation version of the First Amended Specific Disclosure Statement.  As set forth therein, the First Amended Joint Plan contemplates a restructuring of all of LightSquared's estates;

Amended Joint Plan is attached hereto as <u>Exhibit A-1</u> and a blackline comparison (changed pages only) of the First Amended Joint Plan marked against the Joint Plan, filed with the Court on August 7, 2014, is attached hereto as <u>Exhibit A-2</u>.  The First Amended LP Debtors-Only Plan is attached hereto as <u>Exhibit A-3</u> and a blackline comparison (changed pages only) of the First Amended LP Debtors-Only Plan marked against the LP Debtors-Only Plan, filed with the Court on August 15, 2014, is attached hereto as <u>Exhibit A-4</u>.

**PLEASE TAKE FURTHER NOTICE** that the Plan Proponents hereby file the *Specific Disclosure Statement for First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as may be amended, modified, or supplemented from time to time, the "<u>First Amended Specific Disclosure Statement</u>").  The First Amended Specific Disclosure Statement is attached hereto as <u>Exhibit B-1</u> and a blackline comparison (changed pages only) of the First Amended Specific Disclosure Statement marked against the Specific Disclosure Statement, filed with the Court on August 7, 2014, is attached hereto as <u>Exhibit B-2</u>.

**PLEASE TAKE FURTHER NOTICE** that the First Amended Joint Plan (which includes as an exhibit the First Amended LP Debtors-Only Plan), the First Amended Specific Disclosure Statement, and all exhibits thereto may be viewed for free at the website of LightSquared's Claims and Solicitation Agent, Kurtzman Carson Consultants LLC ("<u>KCC</u>"), at http://www.kccllc.net/lightsquared or for a fee on the Bankruptcy Court's website at www.nysb.uscourt.gov.  To access documents on the Bankruptcy Court's website, you will need a PACER password and login, which can be obtained at http://www.pacer/psc/uscourt.gov.  To

---

<u>provided</u>, that if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the First Amended Joint Plan, the First Amended Joint Plan shall be withdrawn with respect to the Inc. Debtors, and the Plan Proponents shall pursue confirmation of the First Amended Joint Plan solely with respect to the LP Debtors (through the First Amended LP Debtors-Only Plan).

obtain hard copies of the Plan, please contact KCC at (877) 499-4509 or by email at

LightSquaredInfo@kccllc.com.

Respectfully submitted,

New York, New York                          /s/  Matthew S. Barr
Dated:  August 26, 2014                      Matthew S. Barr
                                             Alan J. Stone
                                             Steven Z. Szanzer
                                             Karen Gartenberg
                                             MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
                                             1 Chase Manhattan Plaza
                                             New York, NY  10005-1413
                                             (212) 530-5000

                                             *Counsel to Debtors and Debtors in Possession*

                                             -and-

                                             /s/  Matthew C. Brown
                                             Thomas E Lauria (*admitted pro hac vice*)
                                             Matthew C. Brown (*admitted pro hac vice*)
                                             WHITE & CASE LLP
                                             Southeast Financial Center, Suite 4900
                                             200 South Biscayne Blvd.
                                             Miami, FL  33131
                                             (305) 371-2700

                                             -and-

                                             Glenn M. Kurtz
                                             Andrew C. Ambruoso
                                             WHITE & CASE LLP
                                             1155 Avenue of the Americas
                                             New York, NY  10036
                                             (212) 819-8200

                                             *Counsel for Ad Hoc Secured Group of*
                                             *LightSquared LP Lenders*

**<u>Exhibit A-1</u>**

**First Amended Joint Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF**
**BANKRUPTCY CODE PROPOSED BY DEBTORS AND**
**AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS**

---

Dated:  New York, New York
　　　　August 26, 2014

**MILBANK, TWEED, HADLEY & M^C^CLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group of LightSquared LP Lenders*

---

[1]　　The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
      OF TIME, AND GOVERNING LAW ................................................................1

    A.     Defined Terms ..........................................................................................1
    B.     Rules of Interpretation ...........................................................................28
    C.     Partially Consolidated Plan....................................................................29
    D.     Computation of Time .............................................................................29
    E.     Governing Law ......................................................................................29
    F.     Reference to Monetary Figures...............................................................30

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
      COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
      AND U.S. TRUSTEE FEES .......................................................................30

    A.     Administrative Claims ...........................................................................30
    B.     Accrued Professional Compensation Claims..........................................31
    C.     DIP Inc. Facility Claims ........................................................................32
    D.     DIP LP Facility Claims ..........................................................................33
    E.     New DIP Facility Claims .......................................................................33
    F.     Priority Tax Claims ...............................................................................33
    G.     Payment of Statutory Fees .....................................................................34

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
      INTERESTS ...............................................................................................34

    A.     Summary................................................................................................34
    B.     Classification and Treatment of Claims and Equity Interests................34
    C.     Special Provision Governing Unimpaired Claims and Equity Interests...............45
    D.     Acceptance or Rejection of Plan............................................................45
    E.     Elimination of Vacant Classes ...............................................................46
    F.     Confirmation Pursuant to Section 1129(b) of Bankruptcy Code...........46
    G.     Controversy Concerning Impairment .....................................................47

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ................................................47

    A.     Sources of Consideration for Plan Distributions ...................................47
    B.     Plan Transactions ..................................................................................47
    C.     Allocation of Auction Proceeds .............................................................55
    D.     Section 1145 and Other Exemptions......................................................56
    E.     Listing of New LightSquared Common Equity; Reporting Obligations ..............56
    F.     Initial Boards of Directors and Managers...............................................57

i

G.      Reorganized Debtors Corporate Governance Documents and
        Indemnification Provisions Therein..........................................................57
H.      Management Incentive Plan....................................................................58
I.      Management and Officers of Reorganized Debtors...............................58
J.      Corporate Governance ...........................................................................58
K.      Vesting of Assets in Reorganized Debtors ............................................58
L.      Cancellation of Securities and Agreements ..........................................59
M.      Corporate Existence ..............................................................................60
N.      Corporate Action....................................................................................60
O.      Effectuating Documents; Further Transactions ....................................61
P.      Exemption from Certain Taxes and Fees...............................................61
Q.      Preservation, Transfer, and Waiver of Rights of Action ......................61
R.      Assumption of D&O Liability Insurance Policies ................................62
S.      Employee and Retiree Benefits..............................................................62
T.      Prepetition Inc. Facility Actions ...........................................................63
U.      Withdrawal of Plan With Respect To Inc. Debtors ..............................63

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ...................................................................................................64

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........64
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases............65
C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
        Pursuant to Plan ....................................................................................65
D.      Pre-existing Obligations to Debtors Under Executory Contracts and
        Unexpired Leases....................................................................................66
E.      Intercompany Contracts, Contracts, and Leases Entered into After Petition
        Date, Assumed Executory Contracts, and Unexpired Leases...............67
F.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements .............................................................................................67
G.      Postpetition Contracts and Leases ........................................................67
H.      Reservation of Rights..............................................................................67
I.      Nonoccurrence of Effective Date...........................................................68

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................68

A.      Distribution Record Date .......................................................................68
B.      Timing and Calculation of Amounts To Be Distributed........................68
C.      Disbursing Agent ...................................................................................69
D.      Rights and Powers of Disbursing Agent................................................69
E.      Plan Distributions on Account of Claims and Equity Interests Allowed
        After Effective Date................................................................................70

F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
      Distributions.................................................................................................70

G.    Compliance with Tax Requirements/Allocations ...................................................71

H.    Setoffs .................................................................................................................72

I.    Recoupment ..........................................................................................................72

J.    Claims Paid or Payable by Third Parties ...............................................................72

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
              UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED
              EQUITY INTERESTS............................................................................73

A.    Allowance of Claims and Equity Interests.............................................................73

B.    Claims and Equity Interests Administration Responsibilities .................................73

C.    Estimation of Claims or Equity Interests ...............................................................74

D.    Expungement or Adjustment to Claims or Equity Interests Without
      Objection..............................................................................................................75

E.    No Interest ............................................................................................................75

F.    Deadline To File Objections to Claims or Equity Interests ....................................75

G.    Disallowance of Claims or Equity Interests...........................................................75

H.    Amendments to Claims .........................................................................................76

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
               PROVISIONS .......................................................................................76

A.    Discharge of Claims and Termination of Equity Interests......................................76

B.    Subordinated Claims..............................................................................................76

C.    Compromise and Settlement of Claims and Controversies .....................................77

D.    Releases by Debtors ..............................................................................................78

E.    Exculpation ...........................................................................................................78

F.    Third-Party Releases by Holders of Claims or Equity Interests .............................79

G.    Injunction .............................................................................................................80

H.    Release of Liens ....................................................................................................81

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
             EFFECTIVE DATE OF PLAN ...............................................................81

A.    Conditions Precedent to Confirmation Date ..........................................................81

B.    Conditions Precedent to Effective Date .................................................................82

C.    Waiver of Conditions ............................................................................................83

D.    Harbinger Litigation Action...................................................................................83

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ................83

A.    Modification and Amendments...............................................................................83

B.    Effect of Confirmation on Modifications ............................................................84
C.    Revocation or Withdrawal of Plan.....................................................................84
D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur............84

ARTICLE XI. RETENTION OF JURISDICTION .....................................................................84

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................87

A.    Immediate Binding Effect..................................................................................87
B.    Additional Documents ......................................................................................87
C.    Reservation of Rights.......................................................................................87
D.    Successors and Assigns...................................................................................88
E.    Service of Documents ......................................................................................88
F.    Term of Injunctions or Stays.............................................................................89
G.    Plan Supplement .............................................................................................89
H.    Entire Agreement .............................................................................................89
I.    Non-severability of Plan Provisions ..................................................................89
J.    Votes Solicited in Good Faith...........................................................................90
K.    Waiver or Estoppel ..........................................................................................90
L.    Conflicts...........................................................................................................90

**INTRODUCTION**

LightSquared Inc., LightSquared LP, and the other Debtors in the Chapter 11 Cases, with the authority, and at the direction, of the Special Committee, together with the Ad Hoc LP Secured Group, collectively as the Plan Proponents, hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding Claims against, and Equity Interests in, the Debtors.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan (in accordance with the terms hereof), prior to its substantial consummation, including withdrawal of the Plan as to the Inc. Debtors and pursuit of the Plan solely with respect to the LP Debtors, pursuant to Article IV.U hereof.

Among other things, the Plan provides for the potential satisfaction in full of senior secured claims against the Debtors and offers a compromised treatment for Prepetition LP Facility SPSO Claims that would avoid costly litigation with respect to subordination of such Claims.  The Plan also provides for potential recoveries to junior stakeholders through an Auction of the New LightSquared Common Equity that is otherwise distributable to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable), if such Claims (and Allowed DIP Facility Claims) are first satisfied in full, in Cash, from the proceeds of the Auction.

The Plan Proponents believe that the Plan is currently the highest and best restructuring offer available to the Debtors that will maximize the value of the Estates for the benefit of the Debtors' creditors and equityholders.  Moreover, it is the only restructuring proposal that avoids a value-minimizing liquidation, and is the only path currently available for the Debtors to successfully exit the Chapter 11 Cases.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.      Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.     "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.     "**Ad Hoc LP Secured Group**" means that certain ad hoc group of Prepetition LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude SPSO.

3.     "**Ad Hoc LP Secured Group Advisors**" means White & Case LLP, as counsel to the Ad Hoc LP Secured Group, and Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc LP Secured Group.

4.     "**Ad Hoc LP Secured Group Fee Claims**" means all Claims for the reasonable documented fees and expenses of the Ad Hoc LP Secured Group Advisors.

5.     "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) Claims for the Break-Up Fee or Expense Reimbursement; provided, however, that no party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; (h) the Ad Hoc LP Secured Group Fee Claims; and (i) any fees and expenses that are earned and payable pursuant to the New DIP Facilities, the New LightSquared Working Capital Facility, the Plan, and the other Plan Documents.

6.     "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

7.     "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge (including the commencement of an adversary proceeding against a Holder of a Claim) has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors or Reorganized Debtors, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

9.      "**Alternative Successful Purchaser**" has the meaning set forth in the Auction Procedures.

10.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

11.      "**Auction**" means the auction of New LightSquared Common Equity to be conducted in accordance with the Plan and the Auction Procedures.

12.      "**Auction Procedures**" means the process and procedures for conducting the Auction, which procedures shall be filed with the Plan Supplement, and shall be approved by the Bankruptcy Court in connection with Confirmation of the Plan.

13.      "**Auction Proceeds**" means all net Cash proceeds and other consideration deliverable to the Debtors upon consummation of the Auction in accordance with the Plan, the Auction Procedures, and the Confirmation Order.

14.      "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

15.     "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

16.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

17.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

18.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

19.     "**Board**" means the initial board of directors or managers of New LightSquared.

20.     "**Break-Up Fee**" has the meaning set forth in the Prior Bid Procedures Order.

21.     "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

22.     "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by LightSquared LP, in its capacity as foreign representative of the Debtors, pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

23.     "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

24.     "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; and (f) any cause of action listed on the Schedule of Retained Causes of Action.

25.     "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

26.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor or group of Debtors, the chapter 11 case pending for that Debtor or group of Debtors in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.    "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

28.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

29.    "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

30.    "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

31.    "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

32.    "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

33.    "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

34.    "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

35.    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

38.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

39.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and granting other related relief, in form and substance satisfactory to the Plan Proponents.

40.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

41.    "**Consummation**" means the occurrence of the Effective Date.

42.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

44.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

45.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

46.    "**DIP Claim**" means a DIP Inc. Facility Claim, a DIP LP Facility Claim, or a New DIP Facility Claim.

47.    "**DIP Facilities**" means, collectively, the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facilities.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

49.    "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

50.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

51.    "**DIP Inc. Facility**" means that certain debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

52.    "**DIP Inc. Facility Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all

principal, interest, and default interest, but excluding fees and expenses provided for thereunder, which shall be paid by the Debtors in accordance with the DIP Inc. Order.

53.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

54.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

55.    "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

56.    "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

57.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

58.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents.

59.    "**DIP LP Facility Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

60.    "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

61.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

62.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Fifth Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1681] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

63.    "**Disbursing Agent**" means, for purposes of making distributions under the Plan, New LightSquared or such other Entity designated by the Plan Proponents or New LightSquared, as applicable.

64.    "**Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. __] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and

references therein that relate to the Plan, in each case, subject to the prior consent of the Ad Hoc LP Secured Group, which consent shall not be unreasonably withheld).

65.    "**Disclosure Statement Order**" means the order or orders entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably acceptable to the Plan Proponents, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

66.    "**Disclosure Statement Recognition Order**" means the order or orders of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Disclosure Statement Order.

67.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.    "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the Reorganized Debtors for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.  Plan Consideration to be reserved on account of any Disputed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14, and payable on account of any such Claims or Equity Interests that are later Allowed, shall be derived solely from Excess Auction Proceeds.

69.    "**Distribution Record Date**" means (a) the New DIP Facilities Closing Date for all New DIP Facility Claims and (b) the Voting Record Date for all other Claims and Equity Interests.

70.    "**Effective Date**" means a date selected by the Plan Proponents that shall be a Business Day that is no later than five (5) days after all of the conditions precedent set forth in Article IX.B hereof have been satisfied or waived (to the extent such conditions can be waived).

71.    "**Eligible Transferee**" means any Person that is not a Prohibited Transferee.

72.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

73.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not

transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

75.    "**Ergen Action**" means the Ergen Adversary Proceeding, the case captioned *Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, LLC v. Charles W. Ergen, Dish Network Corporation, L-Band Acquisition LLC, SP Special Opportunities LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, and Stephen Ketchum*, No. 14-01907 (D. Co. filed July 8, 2014), and, as to each of the foregoing, any claims or actions pertaining or related to the allegations set forth therein as they may relate to Charles W. Ergen, SPSO, DISH Network Corporation, EchoStar Corporation, L-Band Acquisition LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, Stephen Ketchum, and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members, or representatives.

76.    "**Ergen Adversary Proceeding**" means the adversary proceeding under the caption *LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013).

77.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

78.    "**Excess Auction Proceeds**" means all Auction Proceeds remaining, if any, after payment in full, in Cash, of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP Facility Claims, pursuant to and in accordance with Articles III.B and IV.C hereof.

79.    "**Excess Inc. Auction Proceeds**" means Excess Auction Proceeds allocated to the Inc. Debtors by Final Order of the Bankruptcy Court, plus any Excess LP Auction Proceeds remaining, if any, after payment in full of all Allowed Prepetition LP Facility SPSO Subordinated Claims (if any) and Allowed Existing LP Preferred Units Equity Interests.

80.    "**Excess LP Auction Proceeds**" means Excess Auction Proceeds allocated to the LP Debtors by Final Order of the Bankruptcy Court.

81.    "**Exculpated Party**" means a Released Party.

82.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

9

83.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

84.    "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

85.    "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

86.    "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

87.    "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP, and the outstanding Equity Interests in LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

88.    "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

89.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

90.    "**Expense Reimbursement**" has the meaning set forth in the Prior Bid Procedures Order.

91.    "**FCC**" means the Federal Communications Commission.

92.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

93.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

94.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, including the Canadian Court, with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or under the Ontario Rules of Civil Procedure, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Plan Proponents reserve the right to waive any appeal period.

10

95.    "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; (i) Prepetition LP Facility SPSO Subordinated Claim (if any); (j) Inc. Convenience Claim; or (k) Intercompany Claim.

96.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

97.    "**GPS Industry**" means Deere & Company, Garmin International, Inc., Trimble Navigation Limited, the U.S. GPS Industry Council, the Coalition to Save Our GPS, and any of their related entities or affiliates or any of their successors and assigns.

98.    "**Group**" has the meaning set forth under Regulation 13D under the Securities Exchange Act.

99.    "**Harbinger**" means Harbinger Capital Partners, LLC, its affiliated and managed funds, and any affiliated Persons thereof.

100.    "**Harbinger Litigation Action**" shall mean an action (including, without limitation, by motion or adversary proceeding before the Bankruptcy Court) brought by any of the Plan Proponents to stay, bar, enjoin, preclude, or otherwise limit Harbinger and/or any of its affiliates from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is, or directly affects, any property of one or more of the Debtors' Estates or the Reorganized Debtors.

101.    "**Harbinger Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court or other court of competent jurisdiction, that stays, bars, enjoins, precludes, or otherwise limits Harbinger and/or any of its affiliates from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is or directly affects any property of one or more of the Debtors' Estates or the Reorganized Debtors.

102.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

103.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

104.    "**Inc. Convenience Claim**" means any General Unsecured Claim asserted against an Inc. Debtor that is in an amount equal to or less than $65,000.

105.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

106.    "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

107.    "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

108.    "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

109.    "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

110.    "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time), by and between LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited.

111.    "**Inmarsat Cooperation Agreement Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, that, as between the Debtors and their Affiliates, LightSquared LP and SkyTerra (Canada) Inc. are the sole beneficiaries of the Inmarsat Cooperation Agreement, and the Inc. Debtors do not hold any beneficial interest in the Inmarsat Cooperation Agreement.

112.    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

113.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

114.    "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

115.    "**Interim Compensation Order**" means the Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

116.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

117.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

118.   "**License Modification Application**" has the meaning set forth in the Disclosure Statement.

119.   "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

120.   "**Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors, (a) addressing whether (i) any of the claims and Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Company*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC, et al. v. United States of America*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014), and (ii) any other identified claims and Causes of Action that may be asserted against the GPS Industry and/or the United States of America relating in any way to the Debtors' FCC licenses and authorizations or the use of the spectrum rights conferred thereby, are property of one or more of the LP Debtors' Estates and (b) providing that all other Persons (including, without limitation, Harbinger and its non-Debtor affiliates) shall be stayed, barred, enjoined, precluded, or otherwise limited from pursuing, asserting, interfering with, or exercising any dominion or control over any such claims or Causes of Action that are determined by the Bankruptcy Court to be, or to directly affect any, property of one or more of the LP Debtors' Estates.

121.   "**LP Cash Collateral Order**" means the *Amended Agreed Final Order (a) Authorizing Debtors To Use Cash Collateral, (b) Granting Adequate Protection to Prepetition LP Facility Secured Parties, and (c) Modifying Automatic Stay* [Docket No. 544] (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

122.   "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

123.   "**LP Debtors-Only Plan**" means the Plan after implementation of Article IV.U hereof following a Vote To Reject, which implementation is reflected in the *Joint Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as amended, supplemented, or modified from time to time) attached hereto as Exhibit A.

124.   "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

125.   "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

126.   "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

127.    "**Management Incentive Plan**" means a post-Effective Date management equity incentive plan approved by the Board, which may provide for the issuance of New LightSquared Common Equity to officers and employees of the Reorganized Debtors.

128.    "**MAST Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses incurred by MAST Capital Management, LLC in connection with the Chapter 11 Cases.

129.    "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; and (d) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

130.    "**Minimum Bid**" has the meaning set forth in Article IV.B.1(b)(ii) hereof.

131.    "**New DIP Facilities**" means the New DIP LP Facility and the New DIP Inc. Facility.

132.    "**New DIP Facilities Closing Date**" means the Confirmation Date or as soon as practicable thereafter.

133.    "**New DIP Facility Agents**" means the administrative agents under the New DIP Facility Credit Agreements or any successor agent appointed in accordance with the New DIP Facility Credit Agreements.

134.    "**New DIP Facility Claim**" means a Claim held by the New DIP Facility Agents or New DIP Facility Lenders arising under, or related to, the New DIP Facilities, including, without limitation, all outstanding principal, interest, default interest, and fees provided for thereunder.

135.    "**New DIP Facility Credit Agreements**" means the New DIP LP Facility Credit Agreement and the New DIP Inc. Facility Credit Agreement.

136.    "**New DIP Facility Lenders**" means the New DIP LP Facility Lenders and the New DIP Inc. Facility Lenders.

137.    "**New DIP Facility Loans**" means the New DIP LP Facility Loans and the New DIP Inc. Facility Loans.

138.    "**New DIP Facility Orders**" means Final Orders of the Bankruptcy Court, in form and substance reasonably acceptable to the Plan Proponents, approving the New DIP Facilities (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof).

139.    "**New DIP Inc. Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $20.6 million, <u>plus</u> the aggregate amount of Allowed DIP Inc. Claims, which shall have market terms and conditions and which

shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp, in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the Debtors.

140.    "**New DIP Inc. Facility Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement to be entered into among LightSquared Inc., as borrower, certain of the other Inc. Debtors, as guarantors, and the New DIP Inc. Facility Lenders.

141.    "**New DIP Inc. Facility Lenders**" means the lenders party to the New DIP Inc. Facility Credit Agreement from time to time.

142.    "**New DIP Inc. Facility Loans**" means the loans to be made under the New DIP Inc. Facility.

143.    "**New DIP Inc. Facility Obligors**" means certain of the Inc. Debtors.

144.    "**New DIP LP Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $120.6 million, <u>plus</u> the aggregate amount of Allowed DIP LP Claims, which shall have market terms and conditions and which shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of the Debtors, in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the Debtors.

145.    "**New DIP LP Facility Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement to be entered into among LightSquared LP, as borrower, the other LP Debtors, as guarantors, and the New DIP LP Facility Lenders.

146.    "**New DIP LP Facility Lenders**" means the lenders party to the New DIP LP Facility Credit Agreement from time to time.

147.    "**New DIP LP Facility Loans**" means the New DIP LP Facility Tranche A Loans and the New DIP LP Facility Tranche B Loans.

148.    "**New DIP LP Facility Obligors**" means the LP Debtors.

149.    "**New DIP LP Facility Tranche A Loans**" means the tranche "A" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP Facility Tranche B Loans, except as specified below in the definition of "New DIP LP Facility Tranche B Loans."

150.    "**New DIP LP Facility Tranche B Loans**" means the tranche "B" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP Facility Tranche A Loans, except that the Holders of the New DIP LP Facility Tranche B Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New DIP LP Facility, other than with respect to changes to the principal

amount of, or the interest rate or payment date or maturity date applicable to, New DIP LP Facility Tranche B Loans, the release of all or substantially all of the applicable Collateral, the release of any New DIP LP Facility Obligor from its obligations under the New DIP LP Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New DIP LP Facility Tranche B Loans compared with the New DIP LP Facility Tranche A Loans.

151.   "**New LightSquared**" means LightSquared LP as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

152.   "**New LightSquared Class A Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class B Common Equity, but each share or unit of New LightSquared Class A Common Equity shall have five (5) times the voting power of a share or unit of New LightSquared Class B Common Equity.

153.   "**New LightSquared Class B Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class A Common Equity, but each share or unit of New LightSquared Class B Common Equity shall have one-fifth (1/5th) the voting power of a share or unit of New LightSquared Class A Common Equity.

154.   "**New LightSquared Common Equity**" means New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.

155.   "**New LightSquared Loan Facility**" means the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.

156.   "**New LightSquared Loan Facility Agreement**" means that certain credit agreement to be entered into among New LightSquared and its subsidiaries and the Holders of Prepetition LP Facility Non-SPSO Claims, the Holders of Prepetition LP Facility SPSO Claims, the Holders of Prepetition Inc. Facility Non-Subordinated Claims, and the New LightSquared Working Capital Facility Lenders.

157.   "**New LightSquared Obligors**" means New LightSquared and its subsidiaries.

158.   "**New LightSquared Stapled A Units**" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term Loans held by such holder) of New LightSquared

Tranche A Working Capital Loans (to the extent applicable) and New LightSquared Class A Common Equity.

159. "**New LightSquared Stapled B Units**" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement, which shall be the same amount set with respect to the New LightSquared Stapled A Units) of principal amount of New LightSquared Tranche B Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche B Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche B Term Loans bears to the aggregate principal amount of New LightSquared Tranche B Term Loans held by such holder) of New LightSquared Tranche B Working Capital Loans (to the extent applicable) and New LightSquared Class B Common Equity.

160. "**New LightSquared Term Loan Facility**" means a term loan facility which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Working Capital Facility, but subject to the "super-priority" status of the New LightSquared Working Capital Facility as described in the second succeeding sentence. The New LightSquared Term Loan Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors, and which shall be in the aggregate principal amount of: (a) $1.0 billion if Class 5B (Prepetition LP Facility SPSO Claims) votes to accept, or is deemed to accept, the Plan; or (b) $1.2 billion plus the Allowed amount of Prepetition LP Facility SPSO Claims, if Class 5B (Prepetition LP Facility SPSO Claims) votes to reject the Plan. If (y) a default or an event of default has occurred and is continuing under the New LightSquared Loan Facilities or (z) an enforcement action against the Collateral has commenced, all voluntary prepayments and mandatory prepayments, and the proceeds realized in any enforcement action, shall first be applied to prepay or repay in full all then outstanding New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans (on a pro rata basis) before any portion of such prepayment or repayment is applied to the New LightSquared Tranche A Term Loans or New LightSquared Tranche B Term Loans.

161. "**New LightSquared Term Loans**" means the New LightSquared Tranche A Term Loans and the New LightSquared Tranche B Term Loans.

162. "**New LightSquared Tranche A Term Loans**" means the tranche "A" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Term Loans, and which shall have the same rights as the New LightSquared Tranche B Term Loans, except as specified below in the definition of "New LightSquared Tranche B Term Loans."

163. "**New LightSquared Tranche A Working Capital Loans**" means the tranche "A" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Working Capital Loans, and which shall have the same rights

17

as the New LightSquared Tranche B Working Capital Loans, except as specified below in the definition of "New LightSquared Tranche B Working Capital Loans."

164.    "**New LightSquared Tranche B Term Loans**" means the tranche "B" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Term Loans, and which shall have the same rights as the New LightSquared Tranche A Term Loans, except that the Holders of the New LightSquared Tranche B Term Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans.

165.    "**New LightSquared Tranche B Working Capital Loans**" means the tranche "B" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche A Working Capital Loans, except that the Holders of the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans.

166.    "**New LightSquared Working Capital Facility**" means a "super-priority" working capital term loan facility in an aggregate principal amount of $500 million, plus the aggregate amount of Allowed New DIP Facility Claims to be satisfied thereby, which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Term Loan Facility; provided that the New LightSquared Working Capital Facility shall have "super-priority" status with respect to certain prepayments, repayments, and the application of proceeds in connection with an enforcement action as described above in the definition of "New LightSquared Term Loan Facility."  The New LightSquared Working Capital Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors.

167.    "**New LightSquared Working Capital Facility Lenders**" means the lenders under the New LightSquared Working Capital Facility that are party to the New LightSquared Loan Facility Agreement from time to time.

168.    "**New LightSquared Working Capital Facility Loans**" means the New LightSquared Tranche A Working Capital Loans and the New LightSquared Tranche B Working Capital Loans.

169.    "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

170.    "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

171.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

172.    "**Petition Date**" means May 14, 2012.

173.    "**Plan**" means this chapter 11 plan, including all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time (but solely in accordance with the terms hereof), in form and substance reasonably acceptable to the Plan Proponents, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

174.    "**Plan Consideration**" means a payment or distribution of Cash, assets, securities, or instruments evidencing an obligation to Holders of Allowed Claims or Equity Interests under the Plan.  Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14 shall consist solely of Excess Auction Proceeds.

175.    "**Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve.

176.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

177.    "**Plan Documents**" means the documents other than this Plan to be executed, delivered, assumed, or performed in conjunction with the Plan as necessary to consummate the Plan Transactions, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to the Plan Proponents.

178.    "**Plan Proponents**" means the Debtors and the Ad Hoc LP Secured Group.

179.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to the Plan Proponents) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including the Plan Documents.

180.    "**Plan Supplement Date**" means (a) September 16, 2014 or (b) such other date agreed to by the Plan Proponents and approved by the Bankruptcy Court; provided that the Plan Proponents reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

181.    "**Plan Transactions**" means one or more transactions to occur on or before the Effective Date, or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Plan Proponents or Reorganized Debtors, as applicable, determine are necessary or appropriate.

182.    "**Potential Harbinger Claims**" means any claim or Cause of Action that has been or may be asserted by Harbinger arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses, including against any Entities in the GPS Industry or the United States government, including, without limitation, the Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Co. (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Co.*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), *Harbinger Capital Partners LLC v. Deere & Co.*, Case No. 13-cv-5543 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC v. United States*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014).

183.    "**Prepetition Facilities**" means the Prepetition LP Facility and the Prepetition Inc. Facility.

184.    "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

185.    "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

186.    "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

187.    "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

188.    "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

20

189.    "**Prepetition Inc. Facility Action**" means an action brought by the Ad Hoc LP Secured Group prior to the Effective Date, in accordance with the terms and conditions of this Plan, pursuant to which it brings Claims or Causes of Action identified or alleged against the Prepetition Inc. Agent and/or the Prepetition Inc. Lenders, as the case may be, in the Standing Motion.

190.    "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

191.    "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders, which shall remain in effect until the Effective Date.

192.    "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

193.    "**Prepetition Inc. Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition Inc. Loan Documents from and after the Petition Date.

194.    "**Prepetition Inc. Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition Inc. Loan Documents prior to the Petition Date.

195.    "**Prepetition Inc. Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(g) of the Prepetition Inc. Credit Agreement.

196.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

197.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

198.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

199.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

21

200.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

201.    "**Prepetition Loan Documents**" means, collectively, the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

202.    "**Prepetition LP Agent**" means, collectively, Wilmington Savings Fund Society, FSB, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

203.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

204.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

205.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

206.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

207.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim or a Prepetition LP Facility SPSO Subordinated Claim.

208.    "**Prepetition LP Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition LP Credit Agreement from and after the Petition Date <u>less</u> the amount of adequate protection payments made by LightSquared LP during the Chapter 11 Cases pursuant to the LP Cash Collateral Order (exclusive of Professional Fees (as defined in the LP Cash Collateral Order) paid in accordance with the LP Cash Collateral Order).

209.    "**Prepetition LP Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition LP Loan Documents prior to the Petition Date.

210.    "**Prepetition LP Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(f) of the Prepetition LP Credit Agreement.

211.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its affiliates, other than a Prepetition LP Facility SPSO Subordinated Claim.

212.    "**Prepetition LP Facility SPSO Subordinated Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its affiliates that has been equitably subordinated pursuant to an order of the Bankruptcy Court following the Confirmation Date.

213. "**Prepetition LP Facility SPSO Subordinated Guarantee Claim**" means a Prepetition LP Facility SPSO Subordinated Claim against any of the Inc. Debtors.

214. "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

215. "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

216. "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

217. "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

218. "**Prior Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

219. "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

220. "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

221. "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

222.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

223.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the Reorganized Debtors in the Professional Fee Escrow Account.

224.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

225.    "**Prohibited Transferee**" means SPSO, any SPSO Affiliate, and any other Entity that may be identified by the Plan Proponents in the Plan Supplement as a Prohibited Transferee and such Entity's successors or any member of any Group of which any such Entity or its successors is a member or any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, any such Entity or its successors or any member of any Group of which any such Entity or its successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (a) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (b) in the case of a corporation, any officer or director of such corporation, (c) in the case of a partnership, any general partner of such partnership, (d) in the case of a trust, any trustee or beneficiary of such trust, (e) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (a) through (d) above, and (f) any trust for the benefit of any individual described in clauses (a) through (e) above.

226.    "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

227.    "**Qualified Bid**" has the meaning set forth in the Auction Procedures.

228.    "**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or

Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

229.    "**Reinstated Intercompany Interests**" means, except as otherwise provided in the Plan, the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

230.    "**Released Party**" means each of the following:  (a) the Debtors; (b) the Ad Hoc LP Secured Group and each member thereof; (c) each Prepetition LP Lender; (d) each Prepetition Inc. Lender; (e) the Prepetition LP Agent; (f) the Prepetition Inc. Agent; (g) each DIP LP Lender; (h) each DIP Inc. Lender; (i) the DIP Inc. Agent; (j) each New DIP Facility Lender; (k) the New DIP Facility Agents; (l) the present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors of the parties listed in (a) through (k), in each case in their capacity as such; (m) each of the respective affiliates of the parties listed in (a) through (l), in their capacity as such; and (n) any Person claimed to be liable derivatively through any of the foregoing; provided, however, that (i) to the extent Holders of Allowed Prepetition LP Facility SPSO Claims in Class 5B vote to reject the Plan, such Holders of Allowed Prepetition LP Facility SPSO Claims, along with each of their present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors shall not be Released Parties, and (ii) to the extent Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7 vote to reject the Plan and/or do not agree to waive any purported Potential Harbinger Claims and, in the event Class 5B votes to accept the Plan, the Ergen Actions, Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7 (including, for the avoidance of doubt, Harbinger) along with each of their present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors shall not be Released Parties.

231.    "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

232.    "**Reorganized Debtors**" means, collectively, New LightSquared and each of the Debtors other than LightSquared Inc. and LightSquared LP, as reorganized under, and pursuant to, the Plan, on or after the Effective Date.

233.    "**Reorganized Debtors Boards**" means, collectively, the boards of each of the Reorganized Debtors.

234.    "**Reorganized Debtors Bylaws**" means, collectively, the bylaws of each of the Reorganized Debtors.

235.    "**Reorganized Debtors Charters**" means, collectively, the charters of each of the Reorganized Debtors.

236.    "**Reorganized Debtors Corporate Governance Documents**" means, as applicable, (a) the Reorganized Debtors Bylaws, (b) the Reorganized Debtors Charters, and (c) any other applicable organizational or operational documents with respect to the Reorganized Debtors.

237.    "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

238.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

239.    "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

240.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

241.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

242.    "**Secured Claim**" means a Claim, either as set forth in this Plan, as agreed to by the Holder of such Claim and the Plan Proponents, or as determined by a Final Order in accordance with sections 506(a) and 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

243.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

244.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

245.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

246.    "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof), the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof), and any other relevant Prepetition Loan Documents.

247.    "**Special Committee**" means the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc.

248.    "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Disclosure Statement.

249.    "**SPSO**" means SP Special Opportunities, LLC.

250.    "**SPSO Affiliate**" means (a) Charles W. Ergen and L-Band Acquisition, LLC and their successors and any member of a Group of which SPSO, Charles W. Ergen and L-Band Acquisition, LLC or their successors are a member, and (b) any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors or any member of any Group of which SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (u) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above. For the avoidance of doubt, it is understood that DISH Network Corporation, EchoStar Corporation, and any other Entity directly or indirectly controlling, controlled by, or under common control with, DISH Network Corporation or EchoStar Corporation are currently SPSO Affiliates.

251.    "**SPSO Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses (including professionals' fees and expenses) incurred by SPSO in connection with the Chapter 11 Cases or the Prepetition LP Loan Documents.

252.    "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

253.    "**Successful Purchaser**" has the meaning set forth in the Auction Procedures.

254.    "**Transfer**" or "**Transferred**" means, whether voluntarily or involuntarily or by operation of law, directly or indirectly, the sale, assignment, donation, gift, pledging,

hypothecation, disposal of, encumbering or granting a security interest in, or in any other manner, transferring any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, New LightSquared Tranche B Working Capital Loans, or New DIP LP Facility Tranche B Loans, in whole or in part, with or without consideration, or any other right or interest therein, or entering into any transaction which results in the economic equivalent of a transfer to any Person, including any derivative transaction that has the effect of changing materially the economic benefits and risks of ownership.

255.   "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

256.   "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

257.   "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

258.   "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

259.   "**Vote To Reject**" has the meaning set forth in Article IV.U hereof.

260.   "**Voting Record Date**" means the first day of the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement filed with respect to the Plan.

B.   *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the

Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.      *Partially Consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and consolidates classes of Claims against, and Equity Interests in, the Debtors, the Plan only provides for the substantive consolidation of the Inc. Debtors and does not provide for the substantive consolidation of any of the LP Debtors.

The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, of the consolidation of the Inc. Debtors for voting, confirmation, and distribution purposes under the Plan.  Pursuant to such consolidation, (1) all assets and all liabilities of the Inc. Debtors shall be treated as though they were merged, (2) all joint obligations of two or more Inc. Debtors and all multiple Claims against such Inc. Debtors on account of such joint obligations shall be treated and Allowed as a single Claim against the consolidated Inc. Debtors, (3) each Claim filed in the Chapter 11 Case of any Inc. Debtor shall be deemed filed against the consolidated Inc. Debtors and deemed a single obligation of the consolidated Inc. Debtors, and (4) all transfers, disbursements, and distributions made by any Inc. Debtor hereunder shall be deemed to be made by the substantively consolidated Inc. Debtors and their Estates.  The substantive consolidation effected pursuant to this Article I.C. shall not otherwise affect the legal and organizational structure of the Inc. Debtors.

For the avoidance of doubt, the Plan must comply with section 1129 of the Bankruptcy Code for the Inc. Debtors as consolidated and for each LP Debtor, and votes with respect to the Plan shall be tabulated on a consolidated basis by class with respect to the Inc. Debtors and on a non-consolidated basis by class and by Debtor with respect to the LP Debtors for the purpose of determining whether the Plan satisfies section 1129 of the Bankruptcy Code.

D.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

E.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in

New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

F.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof. In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Plan Proponents and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Facility Orders) of the Bankruptcy Court.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date pursuant to

the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein, (1) a Plan Proponent shall not be required to File any request for payment of such Administrative Claim, (2) any Plan Proponent shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (3) no party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

Notwithstanding anything to the contrary herein, (1) in the case of the Ad Hoc LP Secured Group Fee Claims incurred through and including the New DIP Facilities Closing Date, such Ad Hoc LP Secured Group Fee Claims shall be paid in full in Plan Consideration in the form of Cash on the New DIP Facilities Closing Date, and (2) all Ad Hoc LP Secured Group Fee Claims incurred after the New DIP Facilities Closing Date through and including the Effective Date (to the extent not previously paid by the Debtors), shall be paid monthly subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to File a fee application with the Bankruptcy Court. In the event that the Debtors dispute all or a portion of the Ad Hoc LP Secured Group Fee Claims, the Debtors shall pay the undisputed amount of such Ad Hoc LP Secured Group Fee Claims and segregate the remaining portion of such Ad Hoc LP Secured Group Fee Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

*B.   Accrued Professional Compensation Claims*

1.   <u>Final Fee Applications</u>

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.   <u>Professional Fee Escrow Account</u>

In accordance with Article II.B.3 hereof, on the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account from the Plan Consideration

Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors or Reorganized Debtors.  The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

> 3.     Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Plan Proponents as soon as practicable after the Confirmation Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated and agreed to by the Plan Proponents shall comprise the Professional Fee Reserve Amount.

> 4.     Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, and subject to the terms of the New DIP Facilities, on and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or Reorganized Debtors, as applicable, on or after the Confirmation Date through the Effective Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered from the Confirmation Date through the Effective Date shall terminate, and the Debtors or Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court, subject to the terms of the New DIP Facilities.

C.     *DIP Inc. Facility Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive on the Confirmation Date, New DIP Inc. Facility Loans to be issued under the New DIP Inc. Facility in an amount equal to the Allowed DIP Inc. Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP Inc. Facility Claim objects to such treatment, such Holder of an Allowed DIP Inc. Facility Claim shall receive Cash from the proceeds of the New DIP Inc.

Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP Inc. Facility Claim.

### D.    DIP LP Facility Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Facility Claim, except to the extent that a Holder of a DIP LP Facility Claim agrees to less favorable or other treatment, each Holder of a DIP LP Facility Claim shall receive on the Confirmation Date, New DIP LP Facility Loans to be issued under the New DIP LP Facility in an amount equal to the Allowed DIP LP Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP LP Facility Claim objects to such treatment, such Holder of an Allowed DIP LP Facility Claim shall receive Cash from the proceeds of the New DIP LP Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP LP Facility Claim.  Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans, and shall be subject to the restrictions set forth in Article IV.B.1(a) hereof.

### E.    New DIP Facility Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Facility Claim, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, each Holder of a New DIP Facility Claim shall receive, on the Effective Date, New LightSquared Working Capital Facility Loans to be issued under the New LightSquared Working Capital Facility in an amount equal to the Allowed New DIP Facility Claims; provided, however, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed New DIP Facility Claims shall receive Auction Proceeds in lieu of New LightSquared Working Capital Facility Loans as provided in Article IV.C hereof; provided, further, however, that to the extent a Holder of an Allowed New DIP Facility Claim objects to the treatment set forth above in this Article II.E, such Holder of an Allowed New DIP Facility Claim shall receive Plan Consideration in the form of Cash on the Effective Date in an amount equal to its Allowed New DIP Facility Claim.  Any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans, and shall be subject to the restrictions set forth in Article IV.B.2(c) and (d) hereof.

### F.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized Debtors; or (3) at the option of the Reorganized Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than

five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

G.    *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the Reorganized Debtors shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    Class 1 – LP Other Priority Claims

(a)    *Classification*: Class 1 consists of all LP Other Priority Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

(c)     *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 – LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 – LP Other Priority Claim is entitled to vote to accept or reject the Plan.

2.     <u>Class 2 – Inc. Other Priority Claims</u>

(a)     *Classification*:  Class 2 consists of all Inc. Other Priority Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

(c)     *Voting*:   Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 – Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 – Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

3.     <u>Class 3 – LP Other Secured Claims</u>

(a)     *Classification*:  Class 3 consists of all LP Other Secured Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents:  (i) Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 – LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 – LP Other Secured Claim is entitled to vote to accept or reject the Plan.

(d)    *Deficiency Claims*: To the extent that the value of the Collateral securing each Allowed LP Other Secured Claim is less than the amount of such Allowed LP Other Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under this Plan as an LP General Unsecured Claim and shall be classified as a Class 8 – LP General Unsecured Claim.

4.    <u>Class 4 – Inc. Other Secured Claims</u>

(a)    *Classification*:  Class 4 consists of all Inc. Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents:  (i) Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 4 is Unimpaired by the Plan.  Each Holder of a Class 4 – Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 – Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

(d)    *Deficiency Claims*: To the extent that the value of the Collateral securing each Allowed Inc. Other Secured Claim is less than the amount of such Allowed Inc. Other Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under this Plan as an Inc. General Unsecured Claim and shall be classified as a Class 10 – Inc. General Unsecured Claim.

5.    <u>Class 5A – Prepetition LP Facility Non-SPSO Claims</u>

(a)    *Classification*: Class 5A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)    *Allowance*: The Prepetition LP Facility Non-SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, and for the avoidance of doubt shall include all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, and the Prepetition LP Facility Repayment Premium.

(c)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall receive its Pro Rata share of (i) $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (ii) 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to this Article III.B.5(c) shall be increased to $1.2 billion.  A Holder's Pro Rata share in this Article III.B.5(c) shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (i) Allowed Prepetition LP Facility Non-SPSO Claims, plus (ii) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan, plus (iii) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.5(c), as provided in Article IV.C hereof.

For the avoidance of doubt, except as set forth in Article IV.U hereof, the treatment specified in this Article III.B.5(c) shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility Non-SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility Non-SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

(d)     *Voting*: Class 5A is Impaired by the Plan.  Each Holder of a Class 5A – Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

6.     Class 5B – Prepetition LP Facility SPSO Claims

(a)     *Classification*: Class 5B consists of all Prepetition LP Facility SPSO Claims.

(b)     *Allowance*: Prepetition LP Facility SPSO Claims shall be Allowed as follows:

(i)     in the event that Class 5B votes to accept the Plan, the

37

Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts otherwise accrued under the Prepetition LP Loan Documents with respect to such Prepetition LP Facility SPSO Claims through and including the Confirmation Date), plus (B) all Prepetition LP Facility Postpetition Interest that accrues on such Prepetition LP Facility SPSO Claims between the Confirmation Date and the Effective Date, plus (C) all SPSO Fee Claims incurred between the Confirmation Date and the Effective Date; or

(ii)    in the event that Class 5B votes to reject the Plan, (A) the Allowed amount of the Prepetition LP Facility SPSO Claims, including the amount of the Prepetition LP Facility SPSO Subordinated Claims, shall be determined by the Bankruptcy Court after the Confirmation Date, (B) the Class 5B – Prepetition LP Facility SPSO Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition LP Facility SPSO Claim shall not be treated as a Released Party, and (D) all claims against SPSO shall be preserved.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)    in the event that Class 5B votes to accept the Plan, (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity. A Holder's Pro Rata share in this Article III.B.6(c)(i) shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (X) Allowed Prepetition LP Facility SPSO Claims, plus (Y) Allowed Prepetition LP Facility Non-SPSO Claims, plus (Z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan; or

(ii)     in the event that Class 5B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.6(c), as provided in Article IV.C hereof.

For the avoidance of doubt, except as set forth in Article IV.U hereof, the treatment specified in this Article III.B.6(c) shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

(d)     *Voting*:  Class 5B is Impaired by the Plan.  Each Holder of a Class 5B – Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; <u>provided</u>, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.

7.     <u>Class 5C – Prepetition LP Facility SPSO Subordinated Claims</u>

(a)     *Classification*: Class 5C consists of all Prepetition LP Facility SPSO Subordinated Claims, if any.

(b)     *Allowance*: In the event that Class 5B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after the Confirmation Date, (ii) the Class 5C – Prepetition LP Facility SPSO Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim shall not be treated as a Released Party, and (iv) all claims against SPSO shall be preserved.

(c)     *Treatment*: In the event that Class 5B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO

39

Subordinated Claim shall receive its Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C hereof; provided, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims).

(d)      *Voting*: Class 5C is Impaired by the Plan. Each Holder of a Class 5C – Prepetition LP Facility SPSO Subordinated Claim, if any, as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court. For the avoidance of doubt, in the event that Class 5B votes to accept the Plan, Class 5C shall not exist and any vote cast with respect to Class 5C shall not be counted.

8.      Class 6 – Prepetition Inc. Facility Non-Subordinated Claims

(a)      *Classification*: Class 6 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)      *Allowance*: Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes and, for the avoidance of doubt, shall include all Prepetition Inc. Facility Postpetition Interest, all Prepetition Inc. Facility Prepetition Interest, the Prepetition Inc. Facility Repayment Premium, and the MAST Fee Claims.

(c)      *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim shall receive (i) Cash in the amount of the MAST Fee Claims, (ii) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (iii) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to this Article III.B.8(c) shall be increased to $1.2 billion. A Holder's Pro Rata share in this Article III.B.8(c) shall be the proportion that a Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim bears to the aggregate amount of all (A) Allowed Prepetition Inc. Facility Non-

Subordinated Claims, plus (B) Allowed Prepetition LP Facility Non-SPSO Claims, plus (C) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.8(c), as provided in Article IV.C hereof.

(d)    *Voting:* Class 6 is Impaired by the Plan. Each Holder of a Class 6 – Prepetition Inc. Facility Non-Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

9.    Class 7 – Prepetition Inc. Facility Subordinated Claims

(a)    *Classification*: Class 7 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)    *Allowance*: Prepetition Inc. Facility Subordinated Claims shall be Allowed as follow:

(i)    in the event that Class 7 votes to accept the Plan, the Prepetition Inc. Facility Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes; or

(ii)    in the event that Class 7 votes to reject the Plan, (A) the Allowed amount of the Prepetition Inc. Facility Subordinated Claims shall be determined by the Bankruptcy Court following and after giving effect to the outcome of the Prepetition Inc. Facility Actions, (B) the Class 7 – Prepetition Inc. Facility Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition Inc. Facility Subordinated Claim shall not be treated as a Released Party, and (D) all claims against Holders of Prepetition Inc. Facility Subordinated Claims shall be preserved.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C hereof; provided, in no event shall any distribution to a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim pursuant to the Plan be in excess of 100% of the

41

amount of such Holder's Allowed Prepetition Inc. Facility Subordinated Claim.

(d)     *Voting:* Class 7 is Impaired by the Plan.  Each Holder of a Class 7 – Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.     <u>Class 8 – LP General Unsecured Claims</u>

(a)     *Classification*: Class 8 consists of all LP General Unsecured Claims.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)     *Voting*: Class 8 is Impaired by the Plan.  Each Holder of a Class 8 – LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.     <u>Class 9 – Inc. Convenience Claims</u>

(a)     *Classification*: Class 9 consists of all Inc. Convenience Claims, which are classified together pursuant to section 1122(b) of the Bankruptcy Code.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Convenience Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Convenience Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. Convenience Claim.

(c)     *Voting*: Class 9 is Impaired by the Plan.  Each Holder of a Class 9 – Inc. Convenience Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.     <u>Class 10 – Inc. General Unsecured Claims</u>

(a)     *Classification*: Class 10 consists of all Inc. General Unsecured Claims.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except

to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. General Unsecured Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C hereof; provided, in no event shall any distribution to a Holder of an Allowed Inc. General Unsecured Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Inc. General Unsecured Claim.

(c)    *Voting*: Class 10 is Impaired by the Plan.  Each Holder of a Class 10 – Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.    <u>Class 11 – Existing LP Preferred Units Equity Interests</u>

(a)    *Classification*: Class 11 consists of all Existing LP Preferred Units Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C hereof; provided, in no event shall any distribution to a Holder of an Allowed Existing LP Preferred Units Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing LP Preferred Units Equity Interest.

(c)    *Voting*: Class 11 is Impaired by the Plan.  Each Holder of a Class 11 – Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.    <u>Class 12 – Existing Inc. Preferred Stock Equity Interests</u>

(a)    *Classification*: Class 12 consists of all Existing Inc. Preferred Stock Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, each Existing Inc. Preferred Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C hereof; provided, in no event shall any

distribution to a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing Inc. Preferred Stock Equity Interest.

(c)    *Voting*: Class 12 is Impaired by the Plan.  Each Holder of a Class 12 – Existing Inc. Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    Class 13 – Existing LP Common Units Equity Interests

(a)    *Classification*: Class 13 consists of all Existing LP Common Units Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Common Units Equity Interest, each Existing LP Common Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Existing LP Common Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C hereof.

(c)    *Voting*: Class 13 is Impaired by the Plan.  Each Holder of a Class 13 – Existing LP Common Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

16.    Class 14 – Existing Inc. Common Stock Equity Interests

(a)    *Classification*: Class 14 consists of all Existing Inc. Common Stock Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C hereof.

(c)    *Voting*: Class 14 is Impaired by the Plan.  Each Holder of a Class 14 – Existing Inc. Common Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

17.    Class 15 – Intercompany Claims

(a)    *Classification*: Class 15 consists of all Intercompany Claims.

    (b)    *Treatment*: All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof.

    (c)    *Voting*: Class 15 is Impaired by the Plan.  Each Holder of a Class 15 – Intercompany Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 15 – Intercompany Claim is entitled to vote to accept or reject the Plan.

18.    <u>Class 16 – Intercompany Interests</u>

    (a)    *Classification*: Class 16 consists of all Intercompany Interests other than Existing LP Common Units Equity Interests.

    (b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest other than Allowed Existing LP Common Units Equity Interests, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest other than an Existing LP Common Units Equity Interests shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

    (c)    *Voting*: Class 16 is Unimpaired by the Plan.  Each Holder of a Class 16 – Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 16 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims and Equity Interests*

    Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.    *Acceptance or Rejection of Plan*

1.    <u>Voting Classes Under Plan</u>

    Under the Plan, Classes 5A, 5B, 5C, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; provided, however, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Plan Proponents reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in

such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

> ## 2.    Presumed Acceptance Under Plan

Under the Plan, Classes 1, 2, 3, 4, and 16 are Unimpaired, and the Holders of Claims or Equity Interests in such Classes are (a) conclusively presumed to have accepted the Plan, and (b) not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

> ## 3.    Deemed Rejection of the Plan

Under the Plan, Class 15 is Impaired, and the Holders of Claims in such Class (a) shall receive no distributions under the Plan on account of their Claims, (b) are deemed to have rejected the Plan, and (c) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

> ## 4.    Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

> ## 5.    Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

## E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## F.    *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to reject the Plan, the Plan Proponents may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Plan Proponents shall not be required to satisfy section 1129(b) of the Bankruptcy Code

with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the Bankruptcy Code. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *Sources of Consideration for Plan Distributions*

All consideration necessary for the Disbursing Agent to make Plan Distributions shall be obtained from the Plan Consideration. Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14 shall consist solely of Excess Auction Proceeds.

B.    *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions. On and after the Confirmation Date or the Effective Date, as applicable, the Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine are necessary or appropriate.

1.    <u>Confirmation Date Plan Transactions</u>. Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)    <u>New DIP Facilities</u>. On or as soon as practicable after the Confirmation Date, the New DIP LP Facility Obligors, New DIP Inc. Facility Obligors, and the other relevant entities shall enter into the applicable New DIP Facility Credit Agreement. On the New DIP Facilities Closing Date, subject to the terms of the New DIP Facility Credit Agreements, the New DIP Facility Lenders shall fund the New DIP Facilities and the proceeds

shall be used to (i) if and to the extent necessary, indefeasibly repay in full in Cash the Allowed DIP LP Facility Claims and Allowed DIP Inc. Facility Claims, as applicable, (ii) pay (out of proceeds of the New DIP LP Facility) certain Ad Hoc LP Secured Group Fee Claims as set forth in Article II.A hereof, and (iii) fund the working capital requirements of the Debtors through the Effective Date.

Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans. If SPSO or any SPSO Affiliate acquires any right, title, or interest to or in respect of New DIP LP Facility Tranche A Loans, such New DIP LP Facility Tranche A Loans shall automatically convert to New DIP LP Facility Tranche B Loans.

If New DIP LP Facility Tranche B Loans are Transferred to an Eligible Transferee, then such New DIP LP Facility Tranche B Loans shall convert to New DIP LP Facility Tranche A Loans. All Transfers of New DIP LP Facility Tranche B Loans shall be subject to the prior approval of the Debtors' board of directors or managers, as applicable.

(b)   Auction for New LightSquared Common Equity.

(i)   The Confirmation Order shall approve the Auction Procedures, and, to the extent a Qualified Bid with respect to the New LightSquared Common Equity is received, the sale of the New LightSquared Common Equity to the Successful Purchaser pursuant to sections 105(a), 1123(a)(5), 1123(b)(4), 1141, 1142(b), 1145, and 1146(a) of the Bankruptcy Code free and clear of any Claims, Liens, interests, or encumbrances.

(ii)   Pursuant to the Auction Procedures, a Qualified Bid for the New LightSquared Common Equity shall, at a minimum (a "Minimum Bid"), be for Cash and (A) in the event that Class 5B and Class 6 vote to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims, (2) all Allowed Prepetition Inc. Facility Non-Subordinated Claims, and (3) all Allowed Prepetition LP Facility SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims, (B) in the event that Class 5B votes to reject the Plan and Class 6 votes to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims and (2) all Allowed Prepetition Inc. Facility Non-Subordinated Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims,

(C) in the event that Class 5B votes to accept the Plan and Class 6 votes to reject the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims and (2) all Allowed Prepetition LP Facility SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims, or (D) in the event that Class 5B and Class 6 vote to reject the Plan, shall be in a minimum amount sufficient to pay all Allowed Prepetition LP Facility Non-SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims.  Auction Proceeds shall be applied as set forth in Article IV.C hereof.  Any Holder of a Claim or Equity Interest under the Plan, on its own, together with any number of additional Holders of Claims and/or Equity Interests and/or in partnership with a third party, shall be permitted to submit a Qualified Bid in accordance with the Auction Procedures.

(iii)    Subject to the approval of a Successful Purchaser by the Ad Hoc LP Secured Group in consultation with the Debtors, on the Effective Date, New LightSquared shall be authorized to, among other things, issue, sell, assign, and/or transfer the New LightSquared Common Equity, subject to applicable law and the terms and conditions of the Auction Procedures and the Confirmation Order, and take any and all actions necessary to consummate such transaction.  Nothing in the Plan or Confirmation Order shall authorize the transfer or assignment of the New LightSquared Common Equity to the Successful Purchaser (or, if applicable, the Alternative Successful Purchaser) without such Successful Purchaser's (or, if applicable, the Alternative Successful Purchaser's) compliance with applicable non-bankruptcy laws regarding the transfer, assignment, or ownership of the New LightSquared Common Equity.

2.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    Combination of Inc. Debtors' Assets with and into LightSquared LP. Except as may be otherwise set forth in the Plan Supplement, and in consideration of the treatment provided under the Plan with respect to Allowed Claims in Classes 2, 4, 6, 7, and 10, all of the Assets of, or Equity Interests in, each Inc. Debtor and each of LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc. shall be sold, assigned, and/or transferred to LightSquared LP, including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Debtor's equity interests, if any, in any Reorganized Debtor, intellectual

property, contractual rights, Retained Causes of Action, and the right to prosecute such Retained Causes of Action and receive the benefits therefrom.

(b)     New LightSquared.  Except as may be otherwise set forth in the Plan Supplement, LightSquared LP shall be converted to a Delaware limited liability company or corporation with the appropriate governmental authorities pursuant to applicable law.

(c)     New LightSquared Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Loan Facility, comprised of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.  Confirmation of the Plan shall constitute (i) approval of the New LightSquared Loan Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the New LightSquared Loan Facility Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization for the New LightSquared Loan Facility Obligors to enter into and execute the New LightSquared Loan Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the New LightSquared Loan Facility, together with any new promissory notes evidencing the obligation of the New LightSquared Loan Facility Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the New LightSquared Loan Facility Obligors pursuant to the New LightSquared Loan Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New LightSquared Loan Facility Agreement and related documents.

(i)      New LightSquared Term Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Term Loan Facility, which shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Working Capital Facility, but which shall be subject to the "super-priority" status of the New LightSquared Working Capital Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors.  The New LightSquared Term Loans made pursuant to the New LightSquared Term Loan Facility shall be made by the Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed Prepetition Inc. Facility Non-Subordinated Claims pursuant to, and in accordance

50

with, Article III.B hereof.  If there is a Successful Purchaser pursuant to the Auction described in Article IV.B.1(b) hereof, and such Successful Purchaser closes, the Auction Proceeds shall be applied in accordance with Article IV.C hereof.  Pursuant to Article IV.C hereof, the aggregate amount of New LightSquared Term Loans to be made under the New LightSquared Term Loan Facility shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds paid to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims in lieu of making New LightSquared Term Loans.

In the event Class 5B votes to accept the Plan, the New LightSquared Tranche B Term Loans shall be stapled to the New LightSquared Class B Common Equity, and, if applicable, the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units).

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.  In the event Class 5B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Term Loans are Transferred to an Eligible Transferee (as determined by the Board), such New LightSquared Tranche B Term Loans shall convert into New LightSquared Tranche A Term Loans.  If any New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Term Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable.

The New LightSquared Tranche A Term Loans shall be stapled to the New LightSquared Class A Common Equity and, if applicable, the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units).  If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Tranche A Term Loans, such New

LightSquared Tranche A Term Loans shall automatically convert into New LightSquared Tranche B Term Loans.

(ii)    New LightSquared Working Capital Facility.   On the Effective Date, New LightSquared and the other relevant entities shall enter into the New LightSquared Working Capital Facility, which shall provide for new money loans in the aggregate principal amount of $500 million, plus additional loans in an aggregate principal amount equal to the New DIP Facility Claims to be satisfied thereby, which loans shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility, but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors.   The members of the Ad Hoc LP Secured Group shall backstop, arrange or fund the New LightSquared Working Capital Facility pursuant to arrangements satisfactory to them. In the event Class 5B votes to accept the Plan, SPSO shall have the right to fund its pro rata share of the New LightSquared Working Capital Facility; provided that any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans.

In the event Class 5B votes to accept the Plan, the New LightSquared Tranche B Working Capital Loans shall be stapled to the New LightSquared Class B Common Equity and the New LightSquared Tranche B Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units).

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.   In the event Class 5B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Working Capital Loans are Transferred to an Eligible Transferee (as determined by the Board), such New LightSquared Tranche B Working Capital Loans shall convert into New LightSquared Tranche A Working Capital Loans. If any New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared

Stapled A Units or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, as applicable.

The New LightSquared Tranche A Working Capital Loans shall be stapled to the New LightSquared Class A Common Equity and the New LightSquared Tranche A Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Tranche A Working Capital Loans, such New LightSquared Tranche A Working Capital Loans shall automatically convert into New LightSquared Tranche B Working Capital Loans.

New LightSquared shall use the proceeds from the New LightSquared Working Capital Facility for the purposes specified in the Plan, including to repay the New DIP Facilities (to the extent Holders of Allowed New DIP Facility Claims object to receiving New LightSquared Working Capital Facility Loans in satisfaction of such claims, as provided in Article II.E hereof), for general corporate purposes and working capital needs, and to make Plan Distributions (other than Plan Distributions with respect to any Allowed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14, which shall be made solely from Excess Auction Proceeds).

(d)    New LightSquared Common Equity.  New LightSquared shall issue the New LightSquared Common Equity, comprised of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity, required to be issued in accordance with the Plan and all related instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order, or rule, or order of the Bankruptcy Court, but subject to the receipt of all regulatory approvals required in connection with such issuance.

(i)    Economic Rights.  Each share or unit of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity shall rank *pari passu* with respect to any dividends, distributions upon liquidation, dissolution or winding up of the company, which terms may not be altered without the consent of each of the holders of such shares or units.

(ii)    Voting.  Each share or unit of New LightSquared Class A Common Equity shall entitle the holder thereof to five (5) votes on

any matter requiring the affirmative vote of the equityholders and each share or unit of New LightSquared Class B Common Equity shall entitle the holder thereof to one (1) vote on any matter requiring the affirmative vote of the equityholders.

(iii)    <u>Restrictions on Transfer</u>.

The New LightSquared Class A Common Equity shall be stapled to the New LightSquared Tranche A Term Loans, and, if applicable, to the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

The New LightSquared Class B Common Equity shall be stapled to the New LightSquared Tranche B Term Loans, and, if applicable, to the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). If any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable.  If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Stapled A Units or New LightSquared Class A Common Equity, such New LightSquared Stapled A Units or New LightSquared Class A Common Equity, as applicable, shall automatically convert into New LightSquared Stapled B Units or New LightSquared Class B Common Equity, as applicable.

Any Transfer of New LightSquared Common Equity, other than a sale of the business, shall be prohibited and *void ab initio* to the extent that, upon completion of such Transfer, any Entity or Group (together with all Entities and Groups directly or indirectly controlling, controlled by or under the direct or indirect common control of such Entity or Group) beneficially owns or controls New LightSquared Common Equity representing at least 30% of the votes represented by all New LightSquared Common Equity issued and outstanding at the time of determination.

(iv)    <u>Reorganized Debtors Corporate Governance Documents</u>.    The foregoing terms regarding the rights and obligations of the New LightSquared Common Equity shall be implemented through appropriate terms contained in the Reorganized Debtors Corporate Governance Documents.

C.    *Allocation of Auction Proceeds*

Auction Proceeds shall be applied (1) first, in an aggregate amount equal to the Minimum Bid to pay Pro Rata Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims, as applicable, in lieu of the New LightSquared Common Equity to be otherwise provided with respect to such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (2) second, with respect to any amount over and above the Minimum Bid, to pay Pro Rata such Allowed Claims in lieu of New LightSquared Term Loans to be issued to Holders of such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (3) third, to pay Allowed New DIP Facility Claims, and (4) fourth, to pay Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, Allowed Existing LP Common Units Equity Interests, Allowed Prepetition Inc. Facility Subordinated Claims, Allowed Inc. General Unsecured Claims, Allowed Existing Inc. Preferred Stock Equity Interests, and Allowed Existing Inc. Common Stock Equity Interests in accordance with the immediately succeeding paragraph (which payments under this clause (4), for the avoidance of doubt, shall be made solely from Excess Auction Proceeds as described below). The amount of New LightSquared Term Loans to be issued to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders with respect to such New LightSquared Term Loans. The amount of New LightSquared Working Capital Facility Loans to be issued to Holders of Allowed New DIP Facility Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders in lieu of such New LightSquared Working Capital Facility Loans.

Excess Auction Proceeds, that is, Auction Proceeds remaining, if any, after payment in full in Cash of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, Allowed Prepetition LP Facility SPSO Claims and Allowed New DIP Facility Claims, shall be held in trust by the Debtors or Reorganized Debtors, as the case may be, for the benefit of the Holders of Allowed Prepetition LP Facility SPSO

Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, Allowed Existing LP Common Units Equity Interests, Allowed Prepetition Inc. Facility Subordinated Claims, Allowed Inc. General Unsecured Claims, Allowed Existing Inc. Preferred Stock Equity Interests, and Allowed Existing Inc. Common Stock Equity Interests.  The Excess Auction Proceeds shall then be allocated by the Bankruptcy Court as between the LP Debtors, on the one hand (Excess LP Auction Proceeds), and the Inc. Debtors, on the other (Excess Inc. Auction Proceeds), and then paid to the Holders of Allowed Claims and Equity Interests against such Debtors in order of priority as follows: (1) with respect to Excess LP Auction Proceeds, (a) first, Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, (b) second, Allowed Existing LP Preferred Units Equity Interests, and (c) third, Allowed Existing LP Common Units Equity Interests; and (2) with respect to Excess Inc. Proceeds (which includes Excess LP Auction Proceeds remaining, if any, after payment in full of Allowed Existing LP Preferred Units Equity Interests), (a) first, Allowed Prepetition Inc. Facility Subordinated Claims, (b) second, Allowed Inc. General Unsecured Claims, (c) third, Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, if any, (d) fourth, Allowed Existing Inc. Preferred Stock Equity Interests, and (e) fifth, Allowed Existing Inc. Common Stock Equity Interests; provided, however, that the priority of distribution set forth herein with respect to Excess Inc. Auction Proceeds is subject to the outcome of the Prepetition Inc. Facility Actions, as applicable.

D.    *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including New LightSquared Common Equity, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code.  In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Common Equity, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized Debtors Corporate Governance Documents, and (4) applicable regulatory approval, if any.

E.    *Listing of New LightSquared Common Equity; Reporting Obligations*

Except as the Board may otherwise direct, the Reorganized Debtors shall not be (1) obligated to list the New LightSquared Common Equity on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Reorganized Debtors Corporate Governance Documents may impose certain trading restrictions,

and the New LightSquared Common Equity may be subject to certain transfer and other restrictions pursuant to the Reorganized Debtors Corporate Governance Documents.

F.    Initial Boards of Directors and Managers

The Board shall be comprised of seven (7) members, which shall initially include an independent chairperson, the chief executive officer of New LightSquared, two (2) independent directors with relevant industry experience, and three (3) directors selected in a manner to be determined by the Plan Proponents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Plan Proponents shall disclose in the Plan Supplement or otherwise prior to the Confirmation Hearing the identity and affiliations of any person proposed to serve on the initial Board and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person.  Each director or manager appointed to the Board and to the boards of the other Reorganized Debtors, as applicable, shall serve from and after the Effective Date pursuant to the terms of the applicable Reorganized Debtors Corporate Governance Documents and applicable law.

The term of any current members of the boards of directors or managers of any of the Debtors shall expire upon the Effective Date.  From and after the Effective Date, the members of the Board and the boards of any of the other Reorganized Debtors shall be selected and determined in accordance with the Reorganized Debtors Corporate Governance Documents of the applicable Reorganized Debtor and applicable law, including sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

G.    Reorganized Debtors Corporate Governance Documents and Indemnification Provisions Therein

On the Effective Date, the applicable Reorganized Debtors shall enter into and deliver the relevant Reorganized Debtors Corporate Governance Documents.

Confirmation of the Plan shall constitute authorization and approval:  (1) of the Reorganized Debtors Corporate Governance Documents and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors; and (2) for the Reorganized Debtors to enter into and execute, on or after the Effective Date, the Reorganized Debtors Corporate Governance Documents and such other documents as may be required or appropriate, including, without limitation, (a) taking steps, in the discretion of the Plan Proponents and Reorganized Debtors, as applicable, to insulate certain equityholders of New LightSquared in accordance with Section 1.993 of the rules of the FCC and (b) taking such other measures as deemed necessary and appropriate by the Plan Proponents to institute the measures set forth therein to have New LightSquared deemed, on the Effective Date, to be less than 25% foreign owned for purposes of compliance with Section 310(b) of the Communications Act of 1934, as amended, and the rules of the FCC.  On the Effective Date, the Reorganized Debtors Corporate Governance Documents, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the Reorganized Debtors pursuant to the Reorganized Debtors Corporate Governance Documents

and related documents shall be satisfied pursuant to, and as set forth in, the Reorganized Debtors Corporate Governance Documents and related documents.

As of the Effective Date, the Reorganized Debtors Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Debtors' then current directors, officers, employees, or agents (and such directors, officers, employees, or agents that held such positions as of the Confirmation Date) at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the Reorganized Debtors shall amend or restate the Reorganized Debtors Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

## H.    Management Incentive Plan

On or as soon as practicable following the Effective Date, the Board may adopt a Management Incentive Plan.  **All New LightSquared Common Equity to be issued pursuant to the Plan to Holders of Allowed Claims shall be subject to dilution by any New LightSquared Common Equity issued pursuant to a Management Incentive Plan.**

## I.    Management and Officers of Reorganized Debtors

Subject to any applicable employment contracts and applicable law, from and after the Effective Date, the officers of the Reorganized Debtors shall be selected and appointed by the board of directors of New LightSquared in accordance with, and pursuant to, the provisions of the Reorganized Debtors Corporate Governance Documents of New LightSquared, and applicable law.

## J.    Corporate Governance

As shall be set forth in the Reorganized Debtors Charters and Reorganized Debtors Bylaws, the Reorganized Debtors Boards shall consist of a number of members, and be appointed in a manner, to be agreed upon by each Plan Proponent or otherwise provided in the Reorganized Debtors Corporate Governance Documents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent not already disclosed, the Plan Proponents shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized Debtors Boards or officer of the Reorganized Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

## K.    Vesting of Assets in Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the

Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for any Liens granted to secure the New LightSquared Working Capital Facility and New LightSquared Term Loans) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, AFTER THE EFFECTIVE DATE, NO REORGANIZED DEBTOR AND NO AFFILIATE OF ANY SUCH REORGANIZED DEBTOR SHALL HAVE, OR BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM, OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO LIGHTSQUARED INC., LIGHTSQUARED LP, OR ANY OTHER DEBTOR) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO ANY OF THE REORGANIZED DEBTORS OR ANY OF THEIR AFFILIATES. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SHALL NOT AND SHALL NOT BE DEEMED TO PROVIDE A RELEASE OR WAIVER IN FAVOR OF HARBINGER.**

L.      *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Facilities Closing Date with respect to the DIP LP Facility and DIP Inc. Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity

Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the Reorganized Debtors.

*M.    Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, including Article IV.B.2(a) hereof, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court to the extent permitted by Canadian law, or any other Entity.

*N.    Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity or Person, including, without limitation, the following:  (1) all transfers of assets (including Equity Interests) that are to occur pursuant to the transactions contemplated under the Plan; (2) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions; (3) the execution and delivery of all applicable Plan Documents; (4) the implementation of all settlements and compromises as set forth in, incorporated by reference, or otherwise contemplated by the Plan; (5) the execution and delivery or consummation of any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation; (6) the adoption of by-laws and certificates of incorporation; and (7) the selection of the Board.  All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, enter, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate:  (1) all transfers of assets (including Equity Interests) that are to occur pursuant to the transactions contemplated under the Plan; (2) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions; (3) the execution and delivery of all applicable Plan Documents; (4) the

implementation of all settlements and compromises as set forth in, incorporated by reference, or otherwise contemplated by the Plan; (5) the execution and delivery or consummation of any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation; (6) the adoption of the Reorganized Debtors Corporate Governance Documents; and (7) the selection of the Board.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors or managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

P.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.      *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to

any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as applicable.

R.       *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and (except as otherwise set forth herein) all directors and officers of the Debtors who served in such capacity at any time on and after the Confirmation Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

S.       *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable Reorganized Debtors intend to assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Disclosure Statement or other pleadings, for, among other things, compensation and wages (including bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the

Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such expired or terminated policy, program, or plan. In addition, as of the Effective Date, Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors shall be treated in accordance with Class 14 in Article III.B.16 hereof and any such Equity Interest and equity plan shall be cancelled as of the Effective Date; provided, that the applicable Reorganized Debtors boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable Reorganized Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the Reorganized Debtors boards deem appropriate. Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing herein shall be, or shall be construed as, and implementation of the Plan shall not constitute, or be deemed to constitute, a change of control (or similar event) under any of the Debtors' or their Affiliates' contracts, agreements, policies, programs, or plans addressed by this Article IV.S.

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

T.      *Prepetition Inc. Facility Actions*

With respect to any Holders of a Prepetition Inc. Facility Non-Subordinated Claim in Class 6 who vote to reject the Plan or Prepetition Inc. Facility Subordinated Claim in Class 7 who vote to reject the Plan and do not waive the Potential Harbinger Claims, the Plan serves as a request by the Ad Hoc LP Secured Group for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order. For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to the Ad Hoc LP Secured Group for purposes of pursuing any Prepetition Inc. Facility Action, and the filing of the Plan shall not be deemed as the Debtors' consent to, or support of, the grant of such standing.

U.      *Withdrawal of Plan With Respect To Inc. Debtors*

**The Plan is a joint chapter 11 plan for the resolution of outstanding Claims against, and Equity Interests in, the consolidated Inc. Debtors and the LP Debtors; provided, that if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan (the "Vote To Reject"), the Plan shall be withdrawn with respect to the Inc. Debtors, and the Plan Proponents shall pursue confirmation of the Plan solely with respect to the LP Debtors. A version of the Plan that reflects implementation of the LP Debtors-only**

reorganization (as contemplated by the Plan following the Vote To Reject) is attached as Exhibit A hereto.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein or in the LP Debtors-Only Plan, if the Plan is withdrawn with respect to the Inc. Debtors because of the Vote To Reject, then (1) all Articles, provisions, and terms of the LP Debtors-Only Plan shall apply and control with respect to the Plan and (2) all claims and Causes of Action held by any LP Debtor or any Holder of a Claim against or Equity Interest in an LP Debtor against any Inc. Debtor or any Holder of a Claim against or Equity Interest in an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.     Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.     Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Plan Proponents shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan. On the Effective Date, the Debtors shall

assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement, which shall include the Inmarsat Cooperation Agreement (unless otherwise agreed in writing by the Ad Hoc LP Secured Group).

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Plan Proponents shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the Reorganized Debtors no later than thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 10 in Article III.B.12 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 8 in Article III.B.10 hereof.

C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Plan Proponents or Reorganized Debtors, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Prior Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in

connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the Reorganized Debtors' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the Reorganized Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Plan Proponents or Reorganized Debtors, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors reserve the right to reject, subject to the consent of the Ad Hoc LP Secured Group, any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary,

the Plan Proponents and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Postpetition Contracts and Leases*

Each Reorganized Debtor shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable Reorganized Debtor after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or Reorganized Debtor, in each case, in accordance with, and subject to, the then applicable terms. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Plan Proponents on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Plan Proponents that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Plan Proponents reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise

provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the Plan Proponents or the Reorganized Debtors, as applicable, shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend the decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP LP Lenders, the DIP Inc. Lenders, the Prepetition Lenders, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.      *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors on or prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Common Equity shall be deemed to be issued to (and the Reinstated Intercompany Interests shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, Reorganized Debtor, or any other

68

Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The Disbursing Agent is authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the Disbursing Agent shall reserve any applicable Plan Consideration from Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.    *Disbursing Agent*

All Plan Distributions shall be made by New LightSquared as Disbursing Agent, or such other Entity designated by the Plan Proponents or New LightSquared, as applicable, as Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Plan Proponents or the Reorganized Debtors, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable, to the Disbursing Agent for the benefit of the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable. All Plan Distributions by the Disbursing Agent shall be at the discretion of the Plan Proponents or the Reorganized Debtors, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.    *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to: (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (2) make all Plan Distributions contemplated hereby; (3) employ professionals to represent it with respect to its responsibilities; and (4) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.    *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

    1.    Payments and Plan Distributions on Disputed Claims and Disputed Equity Interests

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

    2.    Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed Equity Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

    1.    Delivery of Plan Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' or the Reorganized Debtors' records as of the date of any such Plan Distribution; provided, however, that the manner of such Plan Distributions shall be determined at the discretion of the Plan Proponents or the Reorganized Debtors, as applicable; provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, if any, which terms and conditions shall bind each Entity receiving such Plan Distribution.

    2.    Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility Claims or Allowed Prepetition Inc. Facility Claims

The Plan Distributions provided for Allowed Prepetition LP Facility Claims or Allowed Prepetition Inc. Facility Claims in Articles III.B.5, III.B.6, III.B.7, and III.B.8 hereof shall be made to applicable Holders of Allowed Prepetition LP Facility Claims or Allowed Prepetition Inc. Facility Claims by the Disbursing Agent.

Notwithstanding anything to the contrary herein, no Holder of an Allowed Prepetition LP Facility Claim or an Allowed Prepetition Inc. Facility Claim shall be entitled to invoke any rights or remedies under any applicable Sharing Provision. Holders of Prepetition LP Facility Claims and Prepetition Inc. Facility Claims are entitled only to the treatment specified with respect to such Claims in the Plan.

3.    Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down. The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Common Equity and such fractions shall be deemed to be zero.

4.    Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent

that the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

H.    *Setoffs*

Each Debtor, or such entity's designee as instructed by such Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Non-Subordinated Claim, Allowed DIP Facility Claim or, in the event Class 5B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) or any Allowed Equity Interest, and the Plan Distributions on account of such Allowed Claim or Allowed Equity Interest, any and all claims, rights, and Causes of Action that a Debtor or its successors may hold against the Holder of such Allowed Claim or Allowed Equity Interest after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim or Equity Interest (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Non-Subordinated Claim, Allowed DIP Facility Claim or, in the event Class 5B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that a Debtor or its successor may possess against such Holder.

I.    *Recoupment*

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, or the Disbursing Agent. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a Reorganized Debtor, or the Disbursing Agent, on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Debtor or the Disbursing Agent, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan. The failure of such Holder to timely repay or return

such Plan Distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties</u>

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.    <u>Preservation of Insurance Rights</u>

Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which any of the Debtors is an insured or a beneficiary, nor shall anything contained herein constitute or be deemed a waiver by any of the Debtors' insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.    *Allowance of Claims and Equity Interests*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.Q hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.8 hereof or the Bankruptcy Code.

B.    *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The Reorganized Debtors shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims and Disputed Equity Interests.  The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in

such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become disallowed Claims or disallowed Equity Interests shall be released from such reserve and may be used to fund the other reserves and Plan Distributions.

C.      *Estimation of Claims or Equity Interests*

Before the Effective Date, the Plan Proponents, and after the Effective Date, the Reorganized Debtors, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Plan Proponents or the Reorganized Debtors, as applicable, may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest.  Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.     *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the Reorganized Debtors, and any Claim or Equity Interest that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the Reorganized Debtors without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.     *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Plan Proponents or the Reorganized Debtors, as applicable, (3) provided for in a postpetition agreement in writing between the Plan Proponents or the Reorganized Debtors, as applicable, and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.     *Deadline To File Objections to Claims or Equity Interests*

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date, as may be extended from time to time.

G.     *Disallowance of Claims or Equity Interests*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS

MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.      *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection

with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, (1) the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code and (2) in the event that Class 5B votes to reject the Plan, the Prepetition LP Facility SPSO Subordinated Claims shall be (a) Disputed Claims and shall be treated in accordance with Articles VI and VII hereof, (b) subordinated to all other Claims against each of the LP Debtors and Inc. Debtors, as applicable, and (b) treated under the Plan as an unsecured Claim.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable.  Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities.  In addition, to the extent that Class 6 and Class 7 vote to accept, or are deemed to accept, the Plan (and with respect to Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7, agree to waive any purported Potential Harbinger Claims), entry of the Confirmation Order shall also operate to settle all Claims and Causes of Action alleged against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in the Standing Motion, and the Standing Motion shall be deemed withdrawn with prejudice upon the occurrence of the Effective Date; provided, however, (1) if Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims in Class 6 vote to reject the Plan, then all Prepetition Inc. Facility Actions against such Holders shall not be settled, waived, or withdrawn and the Ad Hoc LP Secured Group shall be authorized and permitted to pursue all such Prepetition Inc. Facility Actions against such Holders, and (2) if Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7 vote to reject the Plan and/or do not agree to waive any purported Potential Harbinger Claims, then all Prepetition Inc. Facility Actions against such Holders shall not be settled, waived, or withdrawn and the Ad Hoc LP Secured Group shall be authorized and permitted to pursue all such Prepetition Inc. Facility Actions against such Holders.

D.    *Releases by Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including, but not limited to, the Ergen Actions in the event that Class 5B votes to accept the Plan), and any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors, the New LightSquared Term Loan Facility, the New DIP Facilities, the New LightSquared Working Capital Facility, or the New LightSquared Common Equity, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New LightSquared Loan Facility Agreement, and Reorganized Debtors Corporate Governance Documents) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the    Disclosure Statement, or

Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.    The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever (including, but not limited to, the Ergen Actions in the event that Class 5B votes to accept the Plan), and any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors, the New LightSquared Term Loan Facility, the New DIP Facilities, the New LightSquared Working Capital Facility, or the New LightSquared Common Equity, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; **provided**, **however**, that the third-party release in this Article VIII.F shall

not apply to each present and former Holder of a Claim or Equity Interest that (a) votes to reject the Plan or has abstained from voting to accept or reject the Plan and (b) rejects the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release.

Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New LightSquared Loan Facility Agreement, and Reorganized Debtors Corporate Governance Documents) executed to implement the Plan.

G.    *Injunction*

Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof, are permanently enjoined to the fullest extent permissible under applicable law, from and after the Effective Date, from (1) pursuing any claims or actions released pursuant to Article VIII.F hereof (including, but not limited to, the Ergen Actions in the event that Class 5B votes to accept the Plan), and (2) taking any of the following actions against the Debtors or the Reorganized Debtors:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity shall (i) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

# ARTICLE IX.
# CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Except as otherwise agreed by the Ad Hoc LP Secured Group, in consultation with the Debtors, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of obtaining an approval of any Material Regulatory Request.

2.    The Bankruptcy Court shall have entered the Disclosure Statement Order and the Canadian Court shall have entered the Disclosure Statement Recognition Order.

3.    The Debtors shall have received binding commitments with respect to the New DIP Facilities and New LightSquared Working Capital Facility.

4.    The Debtors shall have listed on the Schedule of Assumed Agreements in the Plan Supplement the Inmarsat Cooperation Agreement (unless otherwise agreed in writing by the Ad Hoc LP Secured Group).

5.    The Bankruptcy Court shall have entered the Confirmation Order, which shall (a) be in form and substance satisfactory to the Plan Proponents, (b) entered no later than October 31, 2014, and (c) approve the New LightSquared Loan Facility.

6.    The Bankruptcy Court shall have entered the New DIP Facility Orders, which shall have become Final Orders.

B.      *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      Each of the Confirmation Order and the Confirmation Recognition Order, in form and substance satisfactory to the Plan Proponents, shall have become a Final Order.

2.      All conditions precedent to the closing of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility shall have been satisfied or waived in accordance therewith.

3.      The Bankruptcy Court shall have made a Litigation Determination.

4.      The Bankruptcy Court shall have made an Inmarsat Cooperation Agreement Determination.

5.      The Plan Documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith:

   (a)      the New LightSquared Loan Facility Agreement and any related documents, in forms and substance acceptable to the Plan Proponents, shall have been executed and delivered by all of the Entities that are parties thereto, and the incurrence of obligations pursuant to the New LightSquared Loan Facility shall have occurred;

   (b)      the Reorganized Debtors Corporate Governance Documents, in forms and substance acceptable to the Ad Hoc LP Secured Group, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

   (c)      the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.      The Debtors shall have paid in full in Cash all Ad Hoc LP Secured Group Fee Claims.

7.      All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

8.      The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to

emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses, the transfer of control of the Debtors and/or the issuance of New LightSquared Common Equity, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including, if applicable, under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

9.    Except as otherwise agreed by the Ad Hoc LP Secured Group, in consultation with the Debtors, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of obtaining an approval of any Material Regulatory Request.

C.    *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by each Plan Proponent (in accordance with the terms hereof), without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  For the avoidance of doubt, the Ad Hoc LP Secured Group's consent to waive such conditions shall be determined by the vote of a majority in principal amount of outstanding loans held by the members of the Ad Hoc LP Secured Group.  For the avoidance of doubt, the conditions set forth in Article IX.A.1 and IX.B.9 hereof, to the extent applicable, may only be waived by the Ad Hoc LP Secured Group.

D.    *Harbinger Litigation Action*

To the extent that they have not already done so, the Plan Proponents shall promptly commence and prosecute a Harbinger Litigation Action and shall use their best efforts to obtain a Harbinger Litigation Determination prior to the occurrence of the Effective Date.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Plan Proponents (in accordance with the terms hereof), reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Plan Proponents (in accordance with the terms hereof), expressly reserves its respective right to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the

Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Plan Proponents revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.  Further, the Debtors reserve their right to withdraw support for the Plan at any time if it is determined that pursuing the Plan would be inconsistent with the exercise of their fiduciary duties; provided that such withdrawal is without prejudice to the right of the Ad Hoc LP Secured Group to continue to seek confirmation and consummation of the Plan.  Moreover, to the extent Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan or otherwise pursues confirmation of a chapter 11 plan as it relates to the collateral securing the Prepetition Inc. Facility Non-Subordinated Claims, the Debtors shall be permitted to support such plan (or any other Inc. Debtor-related plan) notwithstanding the filing of this Plan.

D.      *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facilities, the Plan, or otherwise, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all

matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.  Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.  Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  Adjudicate, decide, or resolve any and all matters related to Causes of Action or Potential Harbinger Claims;

7.  Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the   Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Enforce all orders previously entered by the Bankruptcy Court;

21.     Enforce the Litigation Determination, including by issuing injunctions, entering and implementing other orders, and taking such other actions as may be necessary to stay, bar, preclude, or otherwise limit Persons (other than the Debtors) to assert any claims or causes of action against the GPS Industry and/or the FCC;

22.     Hear and determine any Harbinger Litigation Action;

23.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Plan Proponents or the Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

### C.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.      *Successors and Assigns*

Except as otherwise provided in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the Reorganized Debtors, shall be served on:

LightSquared Inc.                      Milbank, Tweed, Hadley & McCloy LLP
Attn: General Counsel                  Matthew S. Barr
10802 Parkridge Boulevard              Steven Z. Szanzer
Reston, VA 20191                       Karen Gartenberg
                                       One Chase Manhattan Plaza
                                       New York, NY 10005

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

the Ad Hoc LP Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

Wilmington Savings Fund Society, FSB, as administrative agent under the Prepetition LP Credit Agreement, shall be served on:

McDermott Will & Emery LLP
Leonard Klingbaum
Darren Azman
340 Madison Avenue
New York, NY 10173

the DIP Inc. Agent, the Prepetition Inc. Agent, or the Prepetition Inc. Lenders, shall be served on:

> Akin Gump Strauss Hauer & Feld LLP
> Philip C. Dublin
> Meredith A. Lahaie
> One Bryant Park
> New York, NY 10036

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent

practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors', as applicable, consent, and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Plan Proponents shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.      *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated:  August 26, 2014

**LIGHTSQUARED INC. ( FOR ITSELF AND ALL OTHER DEBTORS)**

By:          */s/ Douglas Smith*
Name:       Douglas Smith
Title:       Chief Executive Officer, President, and Chairman of the Board of LightSquared Inc.

**CAPITAL RESEARCH AND MANAGEMENT COMPANY, IN ITS CAPACITY AS INVESTMENT MANAGER TO CERTAIN FUNDS THAT ARE HOLDERS OF PREPETITION  LP FACILITY CLAIMS**

By:          */s/ Mark E. Brubaker*
Name:       Mark E. Brubaker
Title:       Authorized Signatory

**CYRUS CAPITAL PARTNERS, L.P., IN ITS CAPACITY AS INVESTMENT MANAGER TO CERTAIN FUNDS THAT ARE HOLDERS OF PREPETITION LP FACILITY CLAIMS**

By:          */s/ Jennifer M. Pulick*
Name:       Jennifer M. Pulick
Title:       Authorized Signatory

[First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders]

## **Exhibit A**

**LP Debtors-Only Plan**

[Attached as <u>Exhibit A-3</u> to the *Notice of Filing of First Amended Joint Plan and Related Specific Disclosure Statement*]

## **Exhibit A-2**

**Blackline Comparison of First Amended Joint Plan (Changed Pages Only)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

**FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF**
**BANKRUPTCY CODE PROPOSED BY DEBTORS AND**
**AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS**

---

Dated: New York, New York
   August 726, 2014

**MILBANK, TWEED, HADLEY & M^CCLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group*
   *of LightSquared LP Lenders*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW ........................................................ 2~~1~~

    A.    Defined Terms ........................................................................... 2~~1~~
    B.    Rules of Interpretation ............................................................. 28
    C.    Partially Consolidated Plan ...................................................... ~~28~~**29**
    D.    Computation of Time ................................................................ 29
    E.    Governing Law .......................................................................... 29
    F.    Reference to Monetary Figures ................................................ ~~29~~**30**

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
AND U.S. TRUSTEE FEES .................................................................... 30

    A.    Administrative Claims .............................................................. 30
    B.    Accrued Professional Compensation Claims ........................... 31
    C.    DIP Inc. Facility Claims ........................................................... 32
    D.    DIP LP Facility Claims ............................................................ ~~32~~**33**
    E.    New DIP Facility Claims .......................................................... 33
    F.    Priority Tax Claims .................................................................. 33
    G.    Payment of Statutory Fees ....................................................... 34

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS .......................................................................................... 34

    A.    Summary ................................................................................... 34
    B.    Classification and Treatment of Claims and Equity Interests ... 34
    C.    Special Provision Governing Unimpaired Claims and Equity Interests ... 45
    D.    Acceptance or Rejection of Plan .............................................. 45
    E.    Elimination of Vacant Classes ................................................. 46
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code ... 46
    G.    Controversy Concerning Impairment ....................................... 47

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ............................... 47

    A.    Sources of Consideration for Plan Distributions ...................... 47
    B.    Plan Transactions ..................................................................... 47
    C.    Allocation of Auction Proceeds ............................................... 55
    D.    Section 1145 and Other Exemptions ........................................ 56
    E.    Listing of New LightSquared Common Equity; Reporting Obligations ... 56
    F.    Initial Boards of Directors and Managers ................................ 57

G.    Reorganized Debtors Corporate Governance Documents and Indemnification
      Provisions Therein ............................................................................................. 57
H.    Management Incentive Plan ................................................................................ 58
I.     Management and Officers of Reorganized Debtors ............................................ 58
J.     Corporate Governance ....................................................................................... 58
K.    Vesting of Assets in Reorganized Debtors ........................................................ 58
L.     Cancellation of Securities and Agreements ....................................................... 59
M.    Corporate Existence ........................................................................................... 60
N.    Corporate Action ............................................................................................... 60
O.    Effectuating Documents; Further Transactions ................................................. 61
P.     Exemption from Certain Taxes and Fees .......................................................... 61
Q.    Preservation, Transfer, and Waiver of Rights of Action ................................... 61
R.    Assumption of D&O Liability Insurance Policies ............................................. 62
S.     Employee and Retiree Benefits ......................................................................... 62
T.     Prepetition Inc. Facility Actions ....................................................................... 63
U.    Withdrawal of Plan With Respect To Inc. Debtors ........................................... 63

ARTICLE V.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ......................................................................................................... 64

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....... 64
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 65
C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
      Pursuant to Plan ................................................................................................ 65
D.    Pre-existing Obligations to Debtors Under Executory Contracts and
      Unexpired Leases ............................................................................................... 66
E.    Intercompany Contracts, Contracts, and Leases Entered into After Petition
      Date, Assumed Executory Contracts, and Unexpired Leases ............................ 67
F.     Modifications, Amendments, Supplements, Restatements, or Other
      Agreements ........................................................................................................ 67
G.    Postpetition Contracts and Leases ..................................................................... 67
H.    Reservation of Rights ........................................................................................ 67
I.     Nonoccurrence of Effective Date ...................................................................... 68

ARTICLE VI.  PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 68

A.    Distribution Record Date ................................................................................... 68
B.    Timing and Calculation of Amounts To Be Distributed .................................... 68
C.    Disbursing Agent ............................................................................................... 69
D.    Rights and Powers of Disbursing Agent ............................................................ 69
E.    Plan Distributions on Account of Claims and Equity Interests Allowed After
      Effective Date .................................................................................................... 69 70

F.     Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
        Distributions ................................................................................................... 70
G.     Compliance with Tax Requirements/Allocations ........................................... 71
H.     Setoffs ....................................................................................................... 71 72
I.     Recoupment .................................................................................................... 72
J.     Claims Paid or Payable by Third Parties ....................................................... 72

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED
        EQUITY INTERESTS ..................................................................................... 73

A.     Allowance of Claims and Equity Interests ..................................................... 73
B.     Claims and Equity Interests Administration Responsibilities ........................ 73
C.     Estimation of Claims or Equity Interests ....................................................... 74
D.     Expungement or Adjustment to Claims or Equity Interests Without Objection 74 75
E.     No Interest ....................................................................................................... 75
F.     Deadline To File Objections to Claims or Equity Interests ............................ 75
G.     Disallowance of Claims or Equity Interests ................................................... 75
H.     Amendments to Claims ................................................................................... 76

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
        PROVISIONS ................................................................................................... 76

A.     Discharge of Claims and Termination of Equity Interests ............................. 76
B.     Subordinated Claims ....................................................................................... 76
C.     Compromise and Settlement of Claims and Controversies ............................ 77
D.     Releases by Debtors .................................................................................... 77 78
E.     Exculpation ..................................................................................................... 78
F.     Third-Party Releases by Holders of Claims or Equity Interests .................... 79
G.     Injunction ........................................................................................................ 80
H.     Release of Liens .......................................................................................... 80 81

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
        EFFECTIVE DATE OF PLAN ........................................................................ 81

A.     Conditions Precedent to Confirmation Date ................................................... 81
B.     Conditions Precedent to Effective Date ......................................................... 82
C.     Waiver of Conditions ...................................................................................... 83
D.     Harbinger Litigation Action ........................................................................... 83

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ............ 83

A.     Modification and Amendments ....................................................................... 83
B.     Effect of Confirmation on Modifications ....................................................... 84

## INTRODUCTION

LightSquared Inc., LightSquared LP, and the other Debtors in the Chapter 11 Cases, with the authority, and at the direction, of the Special Committee, together with the Ad Hoc LP Secured Group, collectively as the Plan Proponents, hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding Claims against, and Equity Interests in, the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan (in accordance with the terms hereof), prior to its substantial consummation, including withdrawal of the Plan as to the Inc. Debtors **and pursuit of the Plan solely** with respect to the LP Debtors, pursuant to Article IV.U hereof.

Among other things, the Plan provides for the potential satisfaction in full of senior secured claims against the Debtors and offers a compromised treatment for Prepetition LP Facility SPSO Claims that would avoid costly litigation with respect to subordination of such Claims. The Plan also provides for potential recoveries to junior stakeholders through an Auction of the New LightSquared Common Equity that is otherwise distributable to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable), if such Claims (and Allowed DIP Facility Claims) are first satisfied in full, in Cash, from the proceeds of the Auction.

The Plan Proponents believe that the Plan is currently the highest and best restructuring offer available to the Debtors that will maximize the value of the Estates for the benefit of the Debtors' creditors and equityholders. Moreover, it is the only restructuring proposal that avoids a value-minimizing liquidation, and is the only path currently available for the Debtors to successfully exit the Chapter 11 Cases.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.    "**Ad Hoc LP Secured Group**" means that certain ad hoc group of Prepetition LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude SPSO.

3.    "**Ad Hoc LP Secured Group Advisors**" means White & Case LLP, as counsel to the Ad Hoc LP Secured Group, and Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc LP Secured Group.

4.    "**Ad Hoc LP Secured Group Fee Claims**" means all Claims for: (a) the reasonable documented fees and expenses of the Ad Hoc LP Secured Group Advisors and [(b) reasonable out-of-pocket expenses incurred by each member of the Ad Hoc LP Secured Group in their capacities as such, including the reasonable documented fees and expenses of LightSquared LP Lender Advisors.].

5.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) **Claims for** the Break-Up Fee or Expense Reimbursement; provided, however, that no party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; (h) the Ad Hoc LP Secured Group Fee Claims; and (i) any fees and expenses that are earned and payable pursuant to the New DIP Facilities, the New LightSquared Working Capital Facility, the Plan, and the other Plan Documents.

6.    "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

7.    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.    "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge (including the commencement of an adversary proceeding against a Holder of a Claim) has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors or Reorganized Debtors, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

9.    "**Alternative Successful Purchaser**" has the meaning set forth in the Auction Procedures.

10.    "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

11.    "**Auction**" means the auction of New LightSquared Common Equity to be conducted in accordance with the Plan and the Auction Procedures.

12.    "**Auction Procedures**" means the process and procedures for conducting the Auction, which procedures ~~will~~**shall** be filed with the Plan Supplement, and shall be approved by the Bankruptcy Court in connection with Confirmation of the Plan.

13.    "**Auction Proceeds**" means all net Cash proceeds and other consideration deliverable to the Debtors upon consummation of the Auction in accordance with the Plan, the Auction Procedures, and the Confirmation Order.

and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; and (f) any cause of action listed on the Schedule of Retained Causes of Action.

25.     "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

26.     "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor **or group of Debtors**, the chapter 11 case pending for that Debtor **or group of Debtors** in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

28.     "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

29.     "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

30.     "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

31.     "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

32.     "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

33.     "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

34.     "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

35.     "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

38.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

39.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, **and granting other related relief,** in form and substance satisfactory to the Plan Proponents.

40.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

41.    "**Consummation**" means the occurrence of the Effective Date.

42.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

44.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

45.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

46.    "**DIP Claim**" means a DIP Inc. Facility Claim, a DIP LP Facility Claim, or a New DIP Facility Claim.

47.    "**DIP Facilities**" means, collectively, the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facilities.

48.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

62.     "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Fifth Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1681] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

63.     "**Disbursing Agent**" means, for purposes of making distributions under the Plan, New LightSquared or such other Entity designated by the Plan Proponents or New LightSquared, as applicable.

64.     "**Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for **First Amended** Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. ~__] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of the Ad Hoc LP Secured Group, which consent shall not be unreasonably withheld).

65.     "**Disclosure Statement Order**" means the order **or orders** entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably acceptable to the Plan Proponents, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

66.     "**Disclosure Statement Recognition Order**" means the order **or orders** of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Disclosure Statement Order.

67.     "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

68.     "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the Reorganized Debtors for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.  Plan Consideration to be reserved on account of any Disputed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14, and payable on account of any such Claims or Equity Interests that are later Allowed, shall be derived solely from Excess Auction Proceeds.

69.     "**Distribution Record Date**" means (a) the New DIP Facilities Closing Date for all New DIP Facility Claims and (b) the Voting Record Date for all other Claims and Equity Interests.

70.     "**Effective Date**" means a date selected by the Plan Proponents that shall be a Business Day that is no later than five (5) days after all of the conditions precedent set forth

in Article IX.B ~~of the Plan~~**hereof** have been satisfied or waived (to the extent such conditions can be waived).

71.    "**Eligible Transferee**" means any Person that is not a Prohibited Transferee.

72.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

73.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

75.    "**Ergen Action**" means the Ergen Adversary Proceeding, the case captioned *Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, LLC v. Charles W. Ergen, Dish Network Corporation, L-Band Acquisition LLC, SP Special Opportunities LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, and Stephen Ketchum*, No. 14-01907 (D. Co. filed July 8, 2014), and, as to each of the foregoing, any claims or actions pertaining or related to the allegations set forth therein as they may relate to Charles W. Ergen, SPSO, DISH Network Corporation, EchoStar Corporation, L-Band Acquisition LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, Stephen Ketchum, and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members, or representatives.

76.    "**Ergen Adversary Proceeding**" means the adversary proceeding under the caption *LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013).

77.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

78.    "**Excess Auction Proceeds**" means all Auction Proceeds remaining, if any, after payment in full, in Cash, of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP Facility Claims, pursuant to and in accordance with Articles III.B and IV.C hereof.

79.    "**Excess Inc. Auction Proceeds**" means Excess Auction Proceeds allocated to the Inc. Debtors by Final Order of the Bankruptcy Court, <u>plus</u> any Excess LP Auction Proceeds remaining, if any, after payment in full of all Allowed Prepetition LP Facility SPSO Subordinated Claims (if any) and Allowed Existing LP Preferred Units Equity Interests.

80.    "**Excess LP Auction Proceeds**" means Excess Auction Proceeds allocated to the LP Debtors by Final Order of the Bankruptcy Court.

81.    "**Exculpated Party**" means a Released Party.

82.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

83.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

84.    "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

85.    "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

86.    "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

87.    "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP**, and the outstanding Equity Interests in LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc**.

88.    "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

89.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

90. "**Expense Reimbursement**" has the meaning set forth in the Prior Bid Procedures Order.

91. "**FCC**" means the Federal Communications Commission.

92. "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

93. "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

94. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, including the Canadian Court, with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or under the Ontario Rules of Civil Procedure, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Plan Proponents reserve the right to waive any appeal period.

95. "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims: (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; (i) Prepetition LP Facility SPSO Subordinated Claim (if any); (j) Inc. Convenience Claim; or (k) Intercompany Claim.

96. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

97. "**GPS Industry**" means Deere & Company, Garmin International, Inc., Trimble Navigation Limited, the U.S. GPS Industry Council, the Coalition to Save Our GPS, and any of their related entities or ~~Affiliates~~**affiliates** or any of their successors and assigns.

**98.    "Group" has the meaning set forth under Regulation 13D under the Securities Exchange Act.**

**99.** ~~98.~~ "**Harbinger**" means Harbinger Capital Partners, LLC, its affiliated and managed funds, and any affiliated Persons thereof.

**100.** ~~99.~~ "**Harbinger Litigation Action**" shall mean an action (including, without limitation, by motion or adversary proceeding before the Bankruptcy Court) brought by any of the Plan Proponents to stay, bar, enjoin, preclude, or otherwise limit Harbinger and/or any of its ~~Affiliates~~**affiliates** from asserting against the GPS Industry and/or the United States of

America any claim or Cause of Action that is, or directly affects, any property of one or more of the Debtors' Estates or the Reorganized Debtors.

**101.** ~~100.~~ "**Harbinger Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court or other court of competent jurisdiction, that stays, bars, enjoins, precludes, or otherwise limits Harbinger and/or any of its ~~Affiliates~~**affiliates** from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is or directly affects any property of one or more of the Debtors' Estates or the Reorganized Debtors.

**102.** ~~101.~~ "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

**103.** ~~102.~~ "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

**104.** ~~103.~~ "**Inc. Convenience Claim**" means any General Unsecured Claim asserted against an Inc. Debtor that is in an amount equal to or less than $65,000.

**105.** ~~104.~~ "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

**106.** ~~105.~~ "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

**107.** ~~106.~~ "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

**108.** ~~107.~~ "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

**109.** ~~108.~~ "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

**110.** ~~109.~~ "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time), by and between LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited.

**111.** ~~110.~~ "**Inmarsat Cooperation Agreement Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, that, as between the Debtors and their Affiliates, LightSquared LP and SkyTerra (Canada) Inc. are the

12

sole beneficiaries of the Inmarsat Cooperation Agreement, and the Inc. Debtors do not hold any beneficial interest in the Inmarsat Cooperation Agreement.

**112.** ~~111.~~ "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

**113.** ~~112.~~ "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

**114.** ~~113.~~ "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

**115.** ~~114.~~ "**Interim Compensation Order**" means the Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

**116.** ~~115.~~ "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

**117.** ~~116.~~ "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

**118.** ~~117.~~ "**License Modification Application**" has the meaning set forth in the Disclosure Statement.

**119.** ~~118.~~ "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

~~119. ["**LightSquared LP Lender Advisors**" means counsel to a LightSquared LP lender that is a member of the Ad Hoc LP Secured Group (but does not include the Ad Hoc LP Secured Group Advisors).]~~

120. "**Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors, (a) addressing whether (i) any of the claims and Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Company*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC, et al. v. United States of America*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014), and (ii) any other identified claims and Causes of Action that may be asserted against the GPS Industry and/or the United States of America relating in any way to the Debtors' FCC licenses and authorizations or the use of the spectrum rights conferred thereby, are property of one or more of the LP Debtors' Estates and (b) providing that all other Persons (including, without limitation, Harbinger and its non-

Debtor affiliates) shall be stayed, barred, enjoined, precluded, or otherwise limited from pursuing, asserting, interfering with, or exercising any dominion or control over any such claims or Causes of Action that are determined by the Bankruptcy Court to be, or to directly affect any, property of one or more of the LP Debtors' Estates.

121.    "**LP Cash Collateral Order**" means the *Amended Agreed Final Order (a) Authorizing Debtors To Use Cash Collateral, (b) Granting Adequate Protection to Prepetition LP Facility Secured Parties, and (c) Modifying Automatic Stay* [Docket No. 544] (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

122.    "**LP Debtors**" means, collectively, LightSquared Inc., LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

**123.    "LP Debtors-Only Plan" means the Plan after implementation of Article IV.U hereof following a Vote To Reject, which implementation is reflected in the *Joint Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as amended, supplemented, or modified from time to time) attached hereto as Exhibit A.**

**124.**    123.    "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

**125.**    124.    "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

**126.**    125.    "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

**127.**    126.    "**Management Incentive Plan**" means a post-Effective Date management equity incentive plan approved by the Board, which may provide for the issuance of New LightSquared Common Equity to officers and employees of the Reorganized Debtors.

**128.**    127.    "**MAST Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses incurred by MAST Capital Management, LLC in connection with the Chapter 11 Cases.

**129.**    128.    "**Material Regulatory Request**" means any of the following:  (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; (c) the pending petition for rulemaking in RM-11683; and (d) the pending application filed by OP LLC and One Dot Six Corp. to renew the FCC's authorization of One Dot Six Corp.'s lease of spectrum rights in the 1670-1675 MHz band from OP LLC.

**130.**    129.    "**Minimum Bid**" has the meaning set forth in Article IV.B.1(b)(ii) hereof.

**131.** ~~130.~~ "**New DIP Facilities**" means the New DIP LP Facility and the New DIP Inc. Facility.

**132.** ~~131.~~ "**New DIP Facilities Closing Date**" means the Confirmation Date or as soon as practicable thereafter.

**133.** ~~132.~~ "**New DIP Facility Agents**" means the administrative agents under the New DIP Facility Credit Agreements or any successor agent appointed in accordance with the New DIP Facility Credit Agreements.

**134.** ~~133.~~ "**New DIP Facility Claim**" means a Claim held by the New DIP Facility Agents or New DIP Facility Lenders arising under, or related to, the New DIP Facilities, including, without limitation, all outstanding principal, interest, default interest, and fees provided for thereunder.

**135.** ~~134.~~ "**New DIP Facility Credit Agreements**" means the New DIP LP Facility Credit Agreement and the New DIP Inc. Facility Credit Agreement.

**136.** ~~135.~~ "**New DIP Facility Lenders**" means the New DIP LP Facility Lenders and the New DIP Inc. Facility Lenders.

**137.** ~~136.~~ "**New DIP Facility Loans**" means the New DIP LP Facility Loans and the New DIP Inc. Facility Loans.

**138.** ~~137.~~ "**New DIP Facility Orders**" means Final Orders of the Bankruptcy Court, in form and substance reasonably acceptable to the Plan Proponents, approving the New DIP Facilities (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof).

**139.** ~~138.~~ "**New DIP Inc. Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $~~[23.5]~~20.6 million, plus the aggregate amount of Allowed DIP Inc. Claims, which shall have market terms and conditions and which shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the Debtors.

**140.** ~~139.~~ "**New DIP Inc. Facility Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement to be entered into among LightSquared Inc., as borrower, certain of the other Inc. Debtors, as guarantors, and the New DIP Inc. Facility Lenders.

**141.** ~~140.~~ "**New DIP Inc. Facility Lenders**" means the lenders party to the New DIP Inc. Facility Credit Agreement from time to time.

**142.** ~~141.~~ "**New DIP Inc. Facility Loans**" means the loans to be made under the New DIP Inc. Facility.

**143.** 142. "**New DIP Inc. Facility Obligors**" means certain of the Inc. Debtors.

**144.** 143. "**New DIP LP Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $[119.3]**120.6** million, plus the aggregate amount of Allowed DIP LP Claims, which shall have market terms and conditions and which shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of the Debtors, in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the Debtors.

**145.** 144. "**New DIP LP Facility Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement to be entered into among LightSquared LP, as borrower, the other LP Debtors, as guarantors, and the New DIP LP Facility Lenders.

**146.** 145. "**New DIP LP Facility Lenders**" means the lenders party to the New DIP LP Facility Credit Agreement from time to time.

**147.** 146. "**New DIP LP Facility Loans**" means the New DIP LP Facility Tranche A Loans and the New DIP LP Facility Tranche B Loans.

**148.** 147. "**New DIP LP Facility Obligors**" means the LP Debtors.

**149.** 148. "**New DIP LP Facility Tranche A Loans**" means the tranche "A" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP Facility Tranche B Loans, except as specified below in the definition of "New DIP LP Facility Tranche B Loans."

**150.** 149. "**New DIP LP Facility Tranche B Loans**" means the tranche "B" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP Facility Tranche A Loans, except that the Holders of the New DIP LP Facility Tranche B Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New DIP LP Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New DIP LP Facility Tranche B Loans, the release of all or substantially all of the applicable Collateral, the release of any New DIP LP Facility Obligor from its obligations under the New DIP LP Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New DIP LP Facility Tranche B Loans compared with the New DIP LP Facility Tranche A Loans.

**151.** 150. "**New LightSquared**" means LightSquared LP as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

152. ~~151.~~ "**New LightSquared Class A Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class B Common Equity, but each share or unit of New LightSquared Class A Common Equity ~~will~~**shall** have five (5) times the voting power of a share or unit of New LightSquared Class B Common Equity.

153. ~~152.~~ "**New LightSquared Class B Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class A Common Equity, but each share or unit of New LightSquared Class B Common Equity ~~will~~**shall** have one-fifth (1/5th) the voting power of a share or unit of New LightSquared Class A Common Equity.

154. ~~153.~~ "**New LightSquared Common Equity**" means New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.

155. ~~154.~~ "**New LightSquared Loan Facility**" means the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.

156. ~~155.~~ "**New LightSquared Loan Facility Agreement**" means that certain credit agreement to be entered into among New LightSquared and its subsidiaries and the Holders of Prepetition LP Facility Non-SPSO Claims, the Holders of Prepetition LP Facility SPSO Claims, the Holders of Prepetition Inc. Facility Non-Subordinated Claims, and the New LightSquared Working Capital Facility Lenders.

157. ~~156.~~ "**New LightSquared Obligors**" means New LightSquared and its subsidiaries.

~~157. "**New LightSquared Shareholder Agreement**" means a shareholder agreement, to be filed with the Plan Supplement.~~

**158.** "**New LightSquared Stapled A Units**" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term Loans held by such holder) of New LightSquared Tranche A Working Capital Loans (to the extent applicable) and New LightSquared Class A Common Equity.

**159.** ~~158.~~ "**New LightSquared Stapled B Units**" means a single unit comprised of $1 million **(or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement, which shall be the same amount set with respect to the New LightSquared Stapled A Units)** of principal amount of New LightSquared Tranche B Term Loans (or, if less **than such amount**, the entire aggregate principal amount of the New LightSquared Tranche B Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche B Term Loans bears to the aggregate principal amount of New LightSquared Tranche B Term Loans held by such holder) of New LightSquared Tranche B Working Capital Loans (to the extent applicable) and New LightSquared Class B Common Equity.

**160.** ~~159.~~ "**New LightSquared Term Loan Facility**" means a term loan facility which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Working Capital Facility, but subject to the "super-priority" status of the New LightSquared Working Capital Facility as described in the second succeeding sentence. The New LightSquared Term Loan Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors, and which shall be in the aggregate principal amount of: (a) $1.0 billion if Class 5B (Prepetition LP Facility SPSO Claims) votes to accept, or is deemed to accept, the Plan; or (b) $1.2 billion <u>plus</u> the Allowed amount of Prepetition LP Facility SPSO Claims, if Class 5B (Prepetition LP Facility SPSO Claims) votes to reject the Plan. If (y) a default or an event of default has occurred and is continuing under the New LightSquared Loan Facilities or (z) an enforcement action against the Collateral has commenced, all voluntary prepayments and mandatory prepayments, and the proceeds realized in any enforcement action, shall first be applied to prepay or repay in full all then outstanding New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans (on a pro rata basis) before any portion of such prepayment or repayment is applied to the New LightSquared Tranche A Term Loans or New LightSquared Tranche B Term Loans.

**161.** ~~160.~~ "**New LightSquared Term Loans**" means the New LightSquared Tranche A Term Loans and the New LightSquared Tranche B Term Loans.

**162.** ~~161.~~ "**New LightSquared Tranche A Term Loans**" means the tranche "A" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Term Loans, and which shall have the same rights as the New LightSquared Tranche B Term Loans, except as specified below in the definition of "New LightSquared Tranche B Term Loans."

**163.** ~~162.~~ "**New LightSquared Tranche A Working Capital Loans**" means the tranche "A" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche B Working Capital Loans, except as specified below in the definition of "New LightSquared Tranche B Working Capital Loans."

**164.** ~~163.~~ "**New LightSquared Tranche B Term Loans**" means the tranche "B" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Term Loans, and which shall have the same rights as the New LightSquared Tranche A Term Loans, except that the Holders of the New LightSquared Tranche B Term Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans.

**165.** ~~164.~~ "**New LightSquared Tranche B Working Capital Loans**" means the tranche "B" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche A Working Capital Loans, except that the Holders of the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans.

**166.** ~~165.~~ "**New LightSquared Working Capital Facility**" means a "super-priority" working capital term loan facility in an aggregate principal amount of $500 million, plus the aggregate amount of Allowed New DIP Facility Claims to be satisfied thereby, which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Term Loan Facility; provided that the New LightSquared Working Capital Facility shall have "super-priority" status with respect to certain prepayments, repayments, and the application of proceeds in connection with an enforcement action as described above in the definition of "New LightSquared Term Loan Facility." The New LightSquared Working Capital Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors.

**167.** ~~166.~~ "**New LightSquared Working Capital Facility Lenders**" means the lenders under the New LightSquared Working Capital Facility that are party to the New LightSquared Loan Facility Agreement from time to time.

**168.** ~~167.~~ "**New LightSquared Working Capital Facility Loans**" means the New LightSquared Tranche A Working Capital Loans and the New LightSquared Tranche B Working Capital Loans.

**169.** ~~168.~~ "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

**170.** ~~169.~~ "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

**171.** ~~170.~~ "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

**172.** ~~171.~~ "**Petition Date**" means May 14, 2012.

**173.** ~~172.~~ "**Plan**" means this chapter 11 plan, including all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time (but solely in accordance with the terms hereof), in form and substance reasonably acceptable to the Plan Proponents, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

**174.** ~~173.~~ "**Plan Consideration**" means a payment or distribution of Cash, assets, securities, or instruments evidencing an obligation to Holders of Allowed Claims or Equity Interests under the Plan.  Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14 shall consist solely of Excess Auction Proceeds.

**175.** ~~174.~~ "**Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve.

**176.** ~~175.~~ "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

**177.** ~~176.~~ "**Plan Documents**" means the documents other than this Plan to be executed, delivered, assumed, or performed in conjunction with the Plan as necessary to consummate the Plan Transactions, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to the Plan Proponents.

**178.** ~~177.~~ "**Plan Proponents**" means the Debtors and the Ad Hoc LP Secured Group.

**179.** ~~178.~~ "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance

satisfactory to the Plan Proponents) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including the Plan Documents.

**180.** 179. "**Plan Supplement Date**" means (a) [_____]**September 16**, 2014 or (b) such other date agreed to by the Plan Proponents and approved by the Bankruptcy Court; provided that the Plan Proponents reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

**181.** 180. "**Plan Transactions**" means one or more transactions to occur on or before the Effective Date, or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Plan Proponents or Reorganized Debtors, as applicable, determine are necessary or appropriate.

**182.** 181. "**Potential Harbinger Claims**" means any claim or Cause of Action that has been or may be asserted by Harbinger arising out of, relating to, or in connection with the Chapter 11 Cases, the Debtors, or the Debtors' businesses, including against any Entities in the GPS Industry or the United States government, including, without limitation, the Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Co. (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Co.*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), *Harbinger Capital Partners LLC v. Deere & Co.*, Case No. 13-cv-5543 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC v. United States*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014).

**183.** 182. "**Prepetition Facilities**" means the Prepetition LP Facility and the Prepetition Inc. Facility.

**184.** 183. "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

**185.** 184. "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

**186.** 185. "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

**187.** 186. "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise

modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

188. 187. "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

189. 188. "**Prepetition Inc. Facility Action**" means an action brought by the Ad Hoc LP Secured Group prior to the Effective Date, in accordance with the terms and conditions of this Plan, pursuant to which it brings Claims or Causes of Action identified or alleged against the Prepetition Inc. Agent and/or the Prepetition Inc. Lenders, as the case may be, in the Standing Motion.

190. 189. "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

191. 190. "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders, which shall remain in effect until the Effective Date.

192. 191. "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

193. 192. "**Prepetition Inc. Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition Inc. Loan Documents from and after the Petition Date.

194. 193. "**Prepetition Inc. Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition Inc. Loan Documents prior to the Petition Date.

195. 194. "**Prepetition Inc. Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(g) of the Prepetition Inc. Credit Agreement.

196. 195. "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

197. 196. "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

198. 197. "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

199. 198. "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

200. 199. "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

201. 200. "**Prepetition Loan Documents**" means, collectively, the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

202. 201. "**Prepetition LP Agent**" means, collectively, Wilmington Savings Fund Society, FSB, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

203. 202. "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

204. 203. "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

205. 204. "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

206. 205. "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

207. 206. "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim or a Prepetition LP Facility SPSO Subordinated Claim.

208. 207. "**Prepetition LP Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition LP Credit Agreement from and after the Petition Date <u>less</u> the amount of adequate protection payments made by LightSquared LP during the Chapter 11 Cases pursuant to the LP Cash Collateral Order (exclusive of Professional Fees (as defined in the LP Cash Collateral Order) paid in accordance with the LP Cash Collateral Order).

209. 208. "**Prepetition LP Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition LP Loan Documents prior to the Petition Date.

210. 209. "**Prepetition LP Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(f) of the Prepetition LP Credit Agreement.

**211.** ~~210.~~ "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its ~~Affiliates~~**affiliates**, other than a Prepetition LP Facility SPSO Subordinated Claim.

~~211.   "**Prepetition LP Facility SPSO Subordinated Guarantee Claim**" means a Prepetition LP Facility SPSO Subordinated Claim against any of the Inc. Debtors.~~

212.   "**Prepetition LP Facility SPSO Subordinated Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its ~~Affiliates~~**affiliates** that has been equitably subordinated pursuant to an order of the Bankruptcy Court following the Confirmation Date.

**213.**   "**Prepetition LP Facility SPSO Subordinated Guarantee Claim**" means a Prepetition LP Facility SPSO Subordinated Claim against any of the Inc. Debtors.

**214.** ~~213.~~ "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

**215.** ~~214.~~ "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

**216.** ~~215.~~ "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

**217.** ~~216.~~ "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

**218.** ~~217.~~ "**Prior Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

**219.** ~~218.~~ "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

**220.** ~~219.~~ "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to

the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

**221.** ~~220.~~ "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

**222.** ~~221.~~ "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

**223.** ~~222.~~ "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the Reorganized Debtors in the Professional Fee Escrow Account.

**224.** ~~223.~~ "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

**225.** ~~224.~~ "**Prohibited Transferee**" means SPSO, any SPSO Affiliate, and any other ~~Person~~**Entity** that may be identified by the Plan Proponents in ~~a~~**the** Plan Supplement as a Prohibited Transferee~~.~~ **and such Entity's successors or any member of any Group of which any such Entity or its successors is a member or any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, any such Entity or its successors or any member of any Group of which any such Entity or its successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (a) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (b) in the case of a corporation, any officer or director of such corporation, (c) in the case of a partnership, any general partner of such partnership, (d) in the case of a trust, any trustee or beneficiary of such trust, (e) any spouse, parent, sibling, or child or lineal descendant of any individual described in**

**clauses (a) through (d) above, and (f) any trust for the benefit of any individual described in clauses (a) through (e) above.**

**226.** ~~225.~~ "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

**227.** ~~226.~~ "**Qualified Bid**" has the meaning set forth in the Auction Procedures.

**228.** ~~227.~~ "**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

**229.** ~~228.~~ "**Reinstated Intercompany Interests**" means, except as otherwise provided in the Plan, the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

**230.** ~~229.~~ "**Released Party**" means each of the following:  (a) the Debtors; (b) the Ad Hoc LP Secured Group and each member thereof; (c) each Prepetition LP Lender; (d) each Prepetition Inc. Lender; (e) the Prepetition LP Agent; (f) the Prepetition Inc. Agent; (g) each DIP LP Lender; (h) each DIP Inc. Lender; (i) the DIP Inc. Agent; (j) each New DIP Facility Lender; (k) the New DIP Facility Agents; (l) the present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors of the parties listed in (a) through (k), in each case in their capacity as such; (m) each of the respective affiliates of the parties listed in (a) through (l), in their capacity as such; and (n) any Person claimed to be liable derivatively through any of the foregoing; provided, however, that (i) to the extent Holders of Allowed Prepetition LP Facility SPSO Claims in Class 5B vote to reject the Plan, such Holders of Allowed Prepetition LP Facility SPSO Claims, along with each of their present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors shall not be Released Parties, and

26

(ii) to the extent Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7 vote to reject the Plan and/or do not agree to waive any purported Potential Harbinger Claims and, in the event Class 5B votes to accept the Plan, the Ergen Actions, Holders of Allowed Prepetition Inc. Facility Subordinated Claims in Class 7 (including, for the avoidance of doubt, Harbinger) along with each of their present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors shall not be Released Parties.

**231.** 230. "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

**232.** 231. "**Reorganized Debtors**" means, collectively, New LightSquared and each of the Debtors other than LightSquared Inc. and LightSquared LP, as reorganized under, and pursuant to, the Plan, on or after the Effective Date.

**233.** 232. "**Reorganized Debtors Boards**" means, collectively, the boards of each of the Reorganized Debtors.

**234.** 233. "**Reorganized Debtors Bylaws**" means, collectively, the bylaws of each of the Reorganized Debtors.

**235.** 234. "**Reorganized Debtors Charters**" means, collectively, the charters of each of the Reorganized Debtors.

**236.** 235. "**Reorganized Debtors Corporate Governance Documents**" means, as applicable, (a) the Reorganized Debtors Bylaws, (b) the Reorganized Debtors Charters, and (c) any other applicable organizational or operational documents with respect to the Reorganized Debtors.

**237.** 236. "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

**238.** 237. "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

**239.** 238. "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

**240.** 239. "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and

the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

**241.** ~~240.~~ "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

**242.** ~~241.~~ "**Secured Claim**" means a Claim, either as set forth in this Plan, as agreed to by the Holder of such Claim and the Plan Proponents, or as determined by a Final Order in accordance with sections 506(a) and 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**243.** ~~242.~~ "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

**244.** ~~243.~~ "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

**245.** ~~244.~~ "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

**246.** ~~245.~~ "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition Inc. Credit Agreement (including, without limitation, Sections 2.12 and 8.02 thereof), the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof), and any other relevant Prepetition Loan Documents.

**247.** ~~246.~~ "**Special Committee**" means the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc.

**248.** ~~247.~~ "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Disclosure Statement.

**249.** ~~248.~~ "**SPSO**" means SP Special Opportunities, LLC.

~~249. "**SPSO Affiliate**" means any Affiliate of SPSO, including, but not limited to, (a) Charles W. Ergen and any Affiliate of Charles W. Ergen, (b) any Entity owned or controlled by Charles W. Ergen, (c) DISH Network Corporation and EchoStar Corporation, (d) any Affiliate of DISH Network Corporation or EchoStar Corporation, and (e) any Affiliates of the foregoing.~~

**250.** "**SPSO Affiliate**" **means (a) Charles W. Ergen and L-Band Acquisition, LLC and their successors and any member of a Group of which SPSO, Charles W. Ergen and L-Band Acquisition, LLC or their successors are a member, and (b) any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors or any member of any Group of which SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (u) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above. For the avoidance of doubt, it is understood that DISH Network Corporation, EchoStar Corporation, and any other Entity directly or indirectly controlling, controlled by, or under common control with, DISH Network Corporation or EchoStar Corporation are currently SPSO Affiliates.**

**251.** 250. "**SPSO Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses (including professionals' fees and expenses) incurred by SPSO in connection with the Chapter 11 Cases or the Prepetition LP Loan Documents.

**252.** 251. "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

**253.** 252. "**Successful Purchaser**" has the meaning set forth in the Auction Procedures.

**254.** 253. "**Transfer**" or "**Transferred**" means, whether voluntarily or involuntarily or by operation of law, directly or indirectly, the sale, assignment, donation, gift, pledging, hypothecation, disposal of, encumbering or granting a security interest in, or in any other manner, transferring any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, New LightSquared Tranche B Working Capital Loans, or New DIP LP Facility Tranche B Loans, in whole or in part, with or without consideration, or any other right or interest therein, or entering into any transaction which results in the economic equivalent of a

transfer to any Person, including any derivative transaction that has the effect of changing materially the economic benefits and risks of ownership.

**255.** 254. "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

**256.** 255. "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**257.** 256. "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

**258.** 257. "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**259.** **"Vote To Reject" has the meaning set forth** in Article IV.U **hereof.**

**260.** 258. "**Voting Record Date**" means the first day of the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement filed with respect to the Plan.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Partially Consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and consolidates classes of Claims against, and Equity Interests in, the Debtors, the Plan only provides for the substantive consolidation of the Inc. Debtors and does not provide for the substantive consolidation of any of the LP Debtors.

The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, of the consolidation of the Inc. Debtors for voting, confirmation, and distribution purposes under the Plan.  Pursuant to such consolidation, (1) all assets and all liabilities of the Inc. Debtors shall be treated as though they were merged, (2) all joint obligations of two or more Inc. Debtors and all multiple Claims against such Inc. Debtors on account of such joint obligations shall be treated and Allowed as a single Claim against the consolidated Inc. Debtors, (3) each Claim filed in the Chapter 11 Case of any Inc. Debtor shall be deemed filed against the consolidated Inc. Debtors and deemed a single obligation of the consolidated Inc. Debtors, and (4) all transfers, disbursements, and distributions made by any Inc. Debtor hereunder ~~will~~**shall** be deemed to be made by the substantively consolidated Inc. Debtors and their Estates.  The substantive consolidation effected pursuant to this Article I.C. shall not otherwise affect the legal and organizational structure of the Inc. Debtors.

For the avoidance of doubt, the Plan must comply with section 1129 of the Bankruptcy Code for the Inc. Debtors as consolidated and for each LP Debtor, and votes with respect to

the Plan ~~will~~**shall** be tabulated on a consolidated basis by class with respect to the Inc. Debtors and on a non-consolidated basis by class and by Debtor with respect to the LP Debtors for the purpose of determining whether the Plan satisfies section 1129 of the Bankruptcy Code.

D.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

E.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

F.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES**

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and

final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:   (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Plan Proponents and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Facility Orders) of the Bankruptcy Court.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.  Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein, (1) a Plan Proponent shall not be required to File any request for payment of such Administrative Claim, (2) any Plan Proponent shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (3) no party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

Notwithstanding anything to the contrary herein, (1) in the case of the Ad Hoc LP Secured Group Fee Claims incurred through and including the New DIP Facilities Closing Date, such Ad Hoc LP Secured Group Fee Claims ~~will~~**shall** be paid in full in Plan Consideration in the form of Cash on the New DIP Facilities Closing Date, and (2) all Ad Hoc LP Secured Group Fee Claims incurred after the New DIP Facilities Closing Date

as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors or Reorganized Debtors, as applicable, on or after the Confirmation Date through the Effective Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered from the Confirmation Date through the Effective Date shall terminate, and the Debtors or Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court, subject to the terms of the New DIP Facilities.

C.      *DIP Inc. Facility Claims*

        In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive  on the Confirmation Date, New DIP Inc. Facility Loans to be issued under the New DIP Inc. Facility in an amount equal to the Allowed DIP Inc. Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP Inc. Facility Claim objects to such treatment, such Holder of an Allowed DIP Inc. Facility Claim shall receive Cash from the proceeds of the New DIP Inc. Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP Inc. Facility Claim.

D.      *DIP LP Facility Claims*

        In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Facility Claim, except to the extent that a Holder of a DIP LP Facility Claim agrees to less favorable or other treatment, each Holder of a DIP LP Facility Claim shall receive on the Confirmation Date, New DIP LP Facility Loans to be issued under the New DIP LP Facility in an amount equal to the Allowed DIP LP Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP LP Facility Claim objects to such treatment, such Holder of an Allowed DIP LP Facility Claim shall receive Cash from the proceeds of the New DIP LP Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP LP Facility Claim.  Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans, and shall be subject to the restrictions set forth in Article IV.B.1(a) **hereof**.

E.      *New DIP Facility Claims*

        In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Facility Claim, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, each Holder of a New DIP Facility Claim shall receive, on the Effective Date, New LightSquared Working Capital Facility Loans to be issued under the New LightSquared Working Capital Facility in an amount equal to the Allowed New DIP Facility Claims; provided, however, if there is a Successful Purchaser pursuant to

the Auction and such Successful Purchaser closes, Holders of Allowed New DIP Facility Claims shall receive Auction Proceeds in lieu of New LightSquared Working Capital Facility Loans as provided in Article IV.C hereof; provided, further, however, that to the extent a Holder of an Allowed New DIP Facility Claim objects to the treatment set forth above in this Article II.E, such Holder of an Allowed New DIP Facility Claim shall receive Plan Consideration in the form of Cash on the Effective Date in an amount equal to its Allowed New DIP Facility Claim.  Any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans, and shall be subject to the restrictions set forth in Article IV.B.2(c) and (d) hereof.

F.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized Debtors; or (3) at the option of the Reorganized Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

G.    *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the Reorganized Debtors shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or

SPSO Claims if Class 5B votes to accept the Plan, plus (iii) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.5(c), as provided in Article IV.C **hereof**.

For the avoidance of doubt, except as set forth in Article IV.U hereof, the treatment specified in this Article III.B.5(c) shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility Non-SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility Non-SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

(d)    *Voting*: Class 5A is Impaired by the Plan. Each Holder of a Class 5A – Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

6.    Class 5B – Prepetition LP Facility SPSO Claims

(a)    *Classification*: Class 5B consists of all Prepetition LP Facility SPSO Claims.

(b)    *Allowance*: Prepetition LP Facility SPSO Claims shall be Allowed as follows:

(i)    in the event that Class 5B votes to accept the Plan, the Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts otherwise accrued under the Prepetition LP Loan Documents with respect to such Prepetition LP Facility SPSO Claims through and including the Confirmation Date), plus (B) all Prepetition LP Facility Postpetition Interest that accrues on such Prepetition LP Facility SPSO Claims between the Confirmation Date and the Effective Date, plus (C) all SPSO Fee Claims incurred between the Confirmation Date and the Effective Date; or

(ii)    in the event that Class 5B votes to reject the Plan, (A) the Allowed amount of the Prepetition LP Facility SPSO Claims, including the amount of the Prepetition LP Facility SPSO Subordinated Claims,

shall be determined by the Bankruptcy Court after the Confirmation Date, (B) the Class 5B – Prepetition LP Facility SPSO Claims ~~will~~**shall** be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition LP Facility SPSO Claim ~~will~~**shall** not be treated as a Released Party, and (D) all claims against SPSO ~~will~~**shall** be preserved.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)    in the event that Class 5B votes to accept the Plan, (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in this Article III.B.6(c)(i) shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (X) Allowed Prepetition LP Facility SPSO Claims, <u>plus</u> (Y) Allowed Prepetition LP Facility Non-SPSO Claims, <u>plus</u> (Z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan; or

(ii)    in the event that Class 5B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.6(c), as provided in Article IV.C **hereof**.

For the avoidance of doubt, except as set forth in Article IV.U hereof, the treatment specified in this Article III.B.6(c) shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP

41

Facility SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

(d) *Voting*:  Class 5B is Impaired by the Plan.  Each Holder of a Class 5B – Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; <u>provided</u>, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.

7.   <u>Class 5C – Prepetition LP Facility SPSO Subordinated Claims</u>

(a) *Classification*: Class 5C consists of all Prepetition LP Facility SPSO Subordinated Claims, if any.

(b) *Allowance*: In the event that Class 5B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after the Confirmation Date, (ii) the Class 5C – Prepetition LP Facility SPSO Subordinated Claims ~~will~~**shall** be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim ~~will~~**shall** not be treated as a Released Party, and (iv) all claims against SPSO ~~will~~**shall** be preserved.

(c) *Treatment*: In the event that Class 5B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive its Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C <u>hereof</u>; <u>provided</u>, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims).

(d) *Voting*: Class 5C is Impaired by the Plan.  Each Holder of a Class 5C – Prepetition LP Facility SPSO Subordinated Claim, if any, as of the Voting Record Date is entitled to vote to accept or reject the Plan; <u>provided</u>, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.  For the

avoidance of doubt, in the event that Class 5B votes to accept the Plan, Class 5C ~~will~~**shall** not exist and any vote cast with respect to Class 5C ~~will~~**shall** not be counted.

8.    <u>Class 6 – Prepetition Inc. Facility Non-Subordinated Claims</u>

(a)    *Classification*: Class 6 consists of all Prepetition Inc. Facility Non-Subordinated Claims.

(b)    *Allowance*: Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes and, for the avoidance of doubt, shall include all Prepetition Inc. Facility Postpetition Interest, all Prepetition Inc. Facility Prepetition Interest, the Prepetition Inc. Facility Repayment Premium, and the MAST Fee Claims.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim shall receive (i) Cash in the amount of the MAST Fee Claims, (ii) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (iii) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; <u>provided</u>, <u>however</u>, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to this Article III.B.8(c) shall be increased to $1.2 billion.   A Holder's Pro Rata share in this Article III.B.8(c) shall be the proportion that a Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim bears to the aggregate amount of all (A) Allowed Prepetition Inc. Facility Non-Subordinated Claims, <u>plus</u> (B) Allowed Prepetition LP Facility Non-SPSO Claims, <u>plus</u> (C) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.8(c), as provided in Article IV.C **hereof**.

(d)    *Voting:* Class 6 is Impaired by the Plan.  Each Holder of a Class 6 – Prepetition Inc. Facility Non-Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

9.    Class 7 – Prepetition Inc. Facility Subordinated Claims

(a)    *Classification*: Class 7 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)    *Allowance*: Prepetition Inc. Facility Subordinated Claims shall be Allowed as follow:

(i)    in the event that Class 7 votes to accept the Plan, the Prepetition Inc. Facility Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes; or

(ii)    in the event that Class 7 votes to reject the Plan, (A) the Allowed amount of the Prepetition Inc. Facility Subordinated Claims shall be determined by the Bankruptcy Court following and after giving effect to the outcome of the Prepetition Inc. Facility Actions, (B) the Class 7 – Prepetition Inc. Facility Subordinated Claims ~~will~~**shall** be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition Inc. Facility Subordinated Claim ~~will~~**shall** not be treated as a Released Party, and (D) all claims against Holders of Prepetition Inc. Facility Subordinated Claims ~~will~~**shall** be preserved.

(c)    *Treatment*:    In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C **hereof**; provided, in no event shall any distribution to a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition Inc. Facility Subordinated Claim.

(d)    *Voting:* Class 7 is Impaired by the Plan.  Each Holder of a Class 7 – Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

10.    Class 8 – LP General Unsecured Claims

(a)    *Classification*: Class 8 consists of all LP General Unsecured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably

44

practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)    *Voting*: Class 8 is Impaired by the Plan.  Each Holder of a Class 8 – LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

11.    Class 9 – Inc. Convenience Claims

(a)    *Classification*: Class 9 consists of all Inc. Convenience Claims, which are classified together pursuant to section 1122(b) of the Bankruptcy Code.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Convenience Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Convenience Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. Convenience Claim.

(c)    *Voting*: Class 9 is Impaired by the Plan.  Each Holder of a Class 9 – Inc. Convenience Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

12.    Class 10 – Inc. General Unsecured Claims

(a)    *Classification*: Class 10 consists of all Inc. General Unsecured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. General Unsecured Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C **hereof**; provided, in no event shall any distribution to a Holder of an Allowed Inc. General Unsecured Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Inc. General Unsecured Claim.

(c)     *Voting*: Class 10 is Impaired by the Plan.  Each Holder of a Class 10 – Inc. General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

13.     Class 11 – Existing LP Preferred Units Equity Interests

(a)     *Classification*: Class 11 consists of all Existing LP Preferred Units Equity Interests.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C **hereof**; *provided*, in no event shall any distribution to a Holder of an Allowed Existing LP Preferred Units Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing LP Preferred Units Equity Interest.

(c)     *Voting*: Class 11 is Impaired by the Plan.  Each Holder of a Class 11 – Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.     Class 12 – Existing Inc. Preferred Stock Equity Interests

(a)     *Classification*: Class 12 consists of all Existing Inc. Preferred Stock Equity Interests.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, each Existing Inc. Preferred Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C **hereof**; *provided*, in no event shall any distribution to a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing Inc. Preferred Stock Equity Interest.

46

(c)    *Voting*: Class 12 is Impaired by the Plan.  Each Holder of a Class 12 – Existing Inc. Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    Class 13 – Existing LP Common Units Equity Interests

(a)    *Classification*: Class 13 consists of all Existing LP Common Units Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Common Units Equity Interest, each Existing LP Common Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Existing LP Common Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C **hereof**.

(c)    *Voting*: Class 13 is Impaired by the Plan.  Each Holder of a Class 13 –Existing LP Common Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

16.    Class 14 – Existing Inc. Common Stock Equity Interests

(a)    *Classification*: Class 14 consists of all Existing Inc. Common Stock Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C **hereof**.

(c)    *Voting*: Class 14 is Impaired by the Plan.  Each Holder of a Class 14 –Existing Inc. Common Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

17.    Class 15 – Intercompany Claims

(a)    *Classification*: Class 15 consists of all Intercompany Claims.

(b)    *Treatment*: All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; provided,

47

however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof.]

(c)     *Voting*: Class 15 is Impaired by the Plan.  Each Holder of a Class 15 – Intercompany Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 15 – Intercompany Claim is entitled to vote to accept or reject the Plan.

18.     Class 16 – Intercompany Interests

(a)     *Classification*: Class 16 consists of all Intercompany Interests other than Existing LP Common Units Equity Interests.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest other than Allowed Existing LP Common Units Equity Interests, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest other than an Existing LP Common Units Equity Interests shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

(c)     *Voting*: Class 16 is Unimpaired by the Plan.  Each Holder of a Class 16 –Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 16 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.     *Acceptance or Rejection of Plan*

1.     Voting Classes Under Plan

Under the Plan, Classes 5A, 5B, 5C, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; provided, however, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Plan Proponents reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

repay in full in Cash the Allowed DIP LP Facility Claims and Allowed DIP Inc. Facility Claims, as applicable, (ii) pay (out of proceeds of the New DIP LP Facility) certain Ad Hoc LP Secured Group Fee Claims as set forth in Article II.A hereof, and (iii) fund the working capital requirements of the Debtors through the Effective Date.

Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans. If SPSO or any SPSO Affiliate acquires any right, title, or interest to or in respect of New DIP LP Facility Tranche A Loans, such New DIP LP Facility Tranche A Loans shall automatically convert to New DIP LP Facility Tranche B Loans.

If New DIP LP Facility Tranche B Loans are Transferred to an Eligible Transferee, then such New DIP LP Facility Tranche B Loans shall convert to New DIP LP Facility Tranche A Loans. All Transfers of New DIP LP Facility Tranche B Loans shall be subject to the prior approval of the Debtors' board of directors or managers, as applicable. ~~Any Transfer or purported Transfer of New DIP LP Facility Tranche B Loans without the prior approval of the Debtors' board of directors or managers, as applicable, shall be void ab initio (for the avoidance of doubt, if, following a Transfer of New DIP LP Facility Tranche B Loans, it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be void ab initio).~~

(b)    Auction for New LightSquared Common Equity.

(i)    The Confirmation Order shall approve the Auction Procedures, and, to the extent a Qualified Bid with respect to the New LightSquared Common Equity is received, the sale of the New LightSquared Common Equity to the Successful Purchaser pursuant to sections 105(a), 1123(a)(5), 1123(b)(4), 1141, 1142(b), 1145, and 1146(a) of the Bankruptcy Code free and clear of any Claims, Liens, interests, or encumbrances.

(ii)   Pursuant to the Auction Procedures, a Qualified Bid for the New LightSquared Common Equity shall, at a minimum (a "Minimum Bid"), be for Cash and (A) in the event that Class 5B and Class 6 vote to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims, (2) all Allowed Prepetition Inc. Facility Non-Subordinated Claims, and (3) all Allowed Prepetition LP Facility SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims, (B)

51

in the event that Class 5B votes to reject the Plan and Class 6 votes to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims and (2) all Allowed Prepetition Inc. Facility Non-Subordinated Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims, (C) in the event that Class 5B votes to accept the Plan and Class 6 votes to reject the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims and (2) all Allowed Prepetition LP Facility SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims, or (D) in the event that Class 5B and Class 6 vote to reject the Plan, shall be in a minimum amount sufficient to pay all Allowed Prepetition LP Facility Non-SPSO Claims, minus the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims. Auction Proceeds shall be applied as set forth in Article IV.C **hereof**. Any Holder of a Claim or Equity Interest under the Plan, on its own, together with any number of additional Holders of Claims and/or Equity Interests and/or in partnership with a third party, shall be permitted to submit a Qualified Bid in accordance with the Auction Procedures.

(iii)    Subject to the approval of a Successful Purchaser by the Ad Hoc LP Secured Group in consultation with the Debtors, on the Effective Date, New LightSquared shall be authorized to, among other things, issue, sell, assign, and/or transfer the New LightSquared Common Equity, subject to applicable law and the terms and conditions of the Auction Procedures and the Confirmation Order, and take any and all actions necessary to consummate such transaction.    Nothing in the Plan or Confirmation Order shall authorize the transfer or assignment of the New LightSquared Common Equity to the Successful Purchaser (or, if applicable, the Alternative Successful Purchaser) without such Successful Purchaser's (or, if applicable, the Alternative Successful Purchaser's) compliance with applicable non-bankruptcy laws regarding the transfer, assignment, or ownership of the New LightSquared Common Equity.

2.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    Combination of Inc. Debtors' Assets with and into LightSquared LP. Except as may be otherwise set forth in ~~a~~ **the** Plan Supplement, and in

52

consideration of the treatment provided under the Plan with respect to Allowed Claims in Classes 2, 4, 6, 7, and 10, **all of the Assets of, or Equity Interests in,** each Inc. Debtor ~~shall sell, assign, and/or transfer~~**and each of LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc. shall be sold, assigned, and/or transferred** to LightSquared LP ~~all of such Inc. Debtor's assets and equity interests~~, including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such ~~Inc.~~ Debtor's equity interests, if any, in any Reorganized Debtor, intellectual property, contractual rights, Retained Causes of Action, and the right to prosecute such Retained Causes of Action and receive the benefits therefrom.

(b)    New LightSquared.  Except as may be otherwise set forth in ~~a~~**the** Plan Supplement, LightSquared LP shall be converted to a Delaware limited liability company or corporation with the appropriate governmental authorities pursuant to applicable law.

(c)    New LightSquared Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Loan Facility, comprised of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.  Confirmation of the Plan shall constitute (i) approval of the New LightSquared Loan Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the New LightSquared Loan Facility Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization for the New LightSquared Loan Facility Obligors to enter into and execute the New LightSquared Loan Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the New LightSquared Loan Facility, together with any new promissory notes evidencing the obligation of the New LightSquared Loan Facility Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the New LightSquared Loan Facility Obligors pursuant to the New LightSquared Loan Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New LightSquared Loan Facility Agreement and related documents.

(i)    New LightSquared Term Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Term Loan Facility, which shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared

Working Capital Facility, but which shall be subject to the "super-priority" status of the New LightSquared Working Capital Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors. The New LightSquared Term Loans made pursuant to the New LightSquared Term Loan Facility shall be made by the Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed Prepetition Inc. Facility Non-Subordinated Claims pursuant to, and in accordance with, Article III.B **hereof**. If there is a Successful Purchaser pursuant to the Auction described in Article IV.B.1(b) **hereof**, and such Successful Purchaser closes, the Auction Proceeds shall be applied in accordance with Article IV.C **hereof**. Pursuant to Article IV.C **hereof**, the aggregate amount of New LightSquared Term Loans to be made under the New LightSquared Term Loan Facility shall be reduced on a ~~dollar for dollar~~**dollar-for-dollar** basis by the amount of Auction Proceeds paid to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims in lieu of making New LightSquared Term Loans.

In the event Class 5B votes to accept the Plan, the New LightSquared Tranche B Term Loans shall be stapled to the New LightSquared Class B Common Equity, and, if applicable, the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). ~~Restrictions on the Transfer of New LightSquared Stapled B Units are discussed below in Article IV.B.2(c) and (d).~~

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee **(as determined by the Board)**, then such New LightSquared ~~Class~~**Stapled** B ~~Stapled~~ Units shall convert into New LightSquared ~~Class~~**Stapled** A ~~Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, and, if applicable, New LightSquared Tranche B Working Capital Loans~~**Units**. In the event Class 5B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Term Loans are Transferred to an Eligible Transferee **(as determined by the Board)**, such New LightSquared Tranche B Term Loans shall convert into New LightSquared Tranche A Term Loans~~, and shall no longer be subject to the voting restrictions applicable to New LightSquared Tranche B Term Loans. All Transfers of~~ **If any** New

LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable, shall be subject to the prior approval of the Board. Any Transfer or purported Transfer of New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans without the prior approval of the Board shall be void ab initio (for the avoidance of doubt, if, following a Transfer of **are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be void ab initio)**as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Term Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable.**

**The** New LightSquared Tranche A Term Loans **shall be stapled to the New LightSquared Class A Common Equity and, if applicable, the** New LightSquared Tranche A Working Capital Loans, and **may only be Transferred together as a single strip (with such strips to be divided into** New LightSquared **Stapled A Units). If any** New LightSquared **Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared **Stapled A Units shall convert into New LightSquared Stapled B Units.**

On and after the Effective Date, SPSO and all SPSO Affiliates shall be prohibited from acquiring any additional debt or securities of the Reorganized Debtors, except with the prior approval of the Board. If SPSO or any SPSO Affiliate**If any Prohibited Transferee** acquires any right, title, or interest to**,** or in respect of any**,** New LightSquared Tranche A Term Loan**Loans**, such New LightSquared Tranche A Term Loan**Loans** shall automatically convert into a **New** LightSquared Tranche B Term Loan**Loans**.

(ii)    New LightSquared Working Capital Facility. On the Effective Date, New LightSquared and the other relevant entities shall enter into the New LightSquared Working Capital Facility, which shall provide for new money loans in the aggregate principal amount of $500 million, plus additional loans in an aggregate principal amount equal to the New DIP Facility Claims to be satisfied thereby, which loans shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility, but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall

have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the Debtors. The members of the Ad Hoc LP Secured Group shall backstop, arrange or fund the New LightSquared Working Capital Facility pursuant to arrangements satisfactory to them. In the event Class 5B votes to accept the Plan, SPSO shall have the right to fund its pro rata share of the New LightSquared Working Capital Facility; provided that any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans.

In the event Class 5B votes to accept the Plan, the New LightSquared Tranche B Working Capital Loans shall be stapled to the New LightSquared Class B Common Equity and the New LightSquared Tranche B Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). Restrictions on the Transfer of New LightSquared Stapled B Units are discussed below in Article IV.B.2(d).

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared ~~Class~~ **Stapled** A ~~Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, and, if applicable, New LightSquared Tranche B Working Capital Loans~~ **Units**.  In the event Class 5B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Working Capital Loans are Transferred to an Eligible Transferee **(as determined by the Board)**, such New LightSquared Tranche B Working Capital Loans shall convert into New LightSquared Tranche A Working Capital Loans~~, and shall no longer be subject to the voting restrictions applicable to New LightSquared Tranche B Working Capital Loans.  All Transfers of~~**. If any** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans~~, as applicable, shall be subject to the prior approval of the Board.  Any Transfer or purported Transfer of~~ New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans ~~without the prior approval of the Board shall be void ab initio (for the avoidance of doubt, if, following a Transfer of~~**are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, ~~it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be void ab initio).~~**as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Working Capital Loans and shall remain** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans**, as applicable.**

**The New LightSquared Tranche A Working Capital Loans shall be stapled to the New LightSquared Class A Common Equity and the New LightSquared Tranche A Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units).  If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.**

~~On and after the Effective Date, SPSO and all SPSO Affiliates shall be prohibited from acquiring any additional debt or securities of the Reorganized Debtors, except with the prior approval of the Board.  If~~

~~SPSO or any SPSO Affiliate~~**If any Prohibited Transferee** acquires any right, title, or interest to**,** or in respect of ~~any~~**,** New LightSquared Tranche A Working Capital ~~Loan~~**Loans**, such New LightSquared Tranche A Working Capital ~~Loan~~**Loans** shall automatically convert into ~~a~~ New LightSquared Tranche B Working Capital ~~Loan~~**Loans**.

New LightSquared shall use the proceeds from the New LightSquared Working Capital Facility for the purposes specified in the Plan, including to repay the New DIP Facilities (to the extent Holders of Allowed New DIP Facility Claims object to receiving New LightSquared Working Capital Facility Loans in satisfaction of such claims, as provided in Article II.E **hereof**), for general corporate purposes and working capital needs, and to make Plan Distributions (other than Plan Distributions with respect to any Allowed Claims or Equity Interests in Classes 5C, 7, 10, 11, 12, 13, and 14, which shall be made solely from Excess Auction Proceeds).

(d)   New LightSquared Common Equity.  New LightSquared shall issue the New LightSquared Common Equity, comprised of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity, required to be issued in accordance with the Plan and all related instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order, or rule, or order of the Bankruptcy Court, but subject to the receipt of all regulatory approvals required in connection with such issuance.

(i)   Economic Rights.  Each share or unit of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity ~~will provide for the same rights as to~~**shall rank *pari passu* with respect to any** dividends ~~and~~**,** distributions upon liquidation**, dissolution or winding up of the company**, which terms may not be altered without the consent of each of the holders of such shares or units.

(ii)   Voting.  ~~Other than with respect to the economic rights discussed above, each~~**Each** share or unit of New LightSquared Class A Common Equity shall entitle the holder thereof to five (5) votes on any matter requiring the affirmative vote of the equityholders and each share or unit of New LightSquared Class B Common Equity shall entitle the holder thereof to one (1) vote on any matter requiring the affirmative vote of the equityholders.

(iii)    Restrictions on Transfer.

The New LightSquared Class A Common Equity shall be stapled to the New LightSquared Tranche A Term Loans, and, if applicable, to the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

The New LightSquared Class B Common Equity shall be stapled to the New LightSquared Tranche B Term Loans, and, if applicable, to the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). If any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable. If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee, then such New LightSquared Class B Stapled Units shall convert into New LightSquared Class A Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, and, if applicable, New LightSquared Tranche B Working Capital Loans.  All Transfers of New LightSquared Stapled B Units shall be subject to the prior approval of the Board.  Any Transfer or purported Transfer

of New LightSquared Stapled B Units without the prior approval of the Board shall be void ab initio (for the avoidance of doubt, if, following a Transfer of New LightSquared Stapled B Units, it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be void ab initio).

On and after the Effective Date, all**If any** Prohibited Transferees shall be prohibited from acquiring any additional debt or securities of the Reorganized Debtors, except with the prior approval of the Board and then, only upon such terms and conditions as may be approved by the Board in its sole and absolute discretion.  If SPSO or any SPSO Affiliate**Transferee** acquires any right, title, or interest to, or in respect of, New LightSquared Class**Stapled** A Common Equity, such**Units or** New LightSquared Class A Common Equity**, such New LightSquared Stapled A Units or New LightSquared Class A Common Equity, as applicable,** shall automatically convert into **New LightSquared Stapled B Units or** New LightSquared Class B Common Equity**, as applicable**.

**Any Transfer of New LightSquared Common Equity, other than a sale of the business, shall be prohibited and** *void ab initio* **to the extent that, upon completion of such Transfer, any Entity or Group (together with all Entities and Groups directly or indirectly controlling, controlled by or under the direct or indirect common control of such Entity or Group) beneficially owns or controls New LightSquared Common Equity representing at least 30% of the votes represented by all New LightSquared Common Equity issued and outstanding at the time of determination.**

(iv)    New LightSquared Shareholder Agreement.  Except to the extent there is a Successful Purchaser pursuant to the Auction, the**Reorganized Debtors Corporate Governance Documents. The** foregoing terms regarding the rights and obligations of the New LightSquared Common Equity shall be implemented through an appropriate New LightSquared Shareholder Agreement or other appropriate terms contained in the Reorganized Debtors Corporate Governance Documents.

## C.    *Allocation of Auction Proceeds*

Auction Proceeds shall be applied (1) first, in an aggregate amount equal to the Minimum Bid to pay Pro Rata Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims, as applicable, in lieu of the New LightSquared Common Equity to be otherwise

provided with respect to such Allowed Claims pursuant to, and in accordance with, Article III.B **hereof**, (2) second, with respect to any amount over and above the Minimum Bid, to pay Pro Rata such Allowed Claims in lieu of New LightSquared Term Loans to be issued to Holders of such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (3) third, to pay Allowed New DIP Facility Claims, and (4) fourth, to pay Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, Allowed Existing LP Common Units Equity Interests, Allowed Prepetition Inc. Facility Subordinated Claims, Allowed Inc. General Unsecured Claims, Allowed Existing Inc. Preferred Stock Equity Interests, and Allowed Existing Inc. Common Stock Equity Interests in accordance with the immediately succeeding paragraph (which payments under this clause (4), for the avoidance of doubt, shall be made solely from Excess Auction Proceeds as described below). The amount of New LightSquared Term Loans to be issued to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed Prepetition LP Facility SPSO Claims shall be reduced on a ~~dollar for dollar~~**dollar-for-dollar** basis by the amount of Auction Proceeds received by such Holders with respect to such New LightSquared Term Loans. The amount of New LightSquared Working Capital Facility Loans to be issued to Holders of Allowed New DIP Facility Claims shall be reduced on a ~~dollar for dollar~~**dollar-for-dollar** basis by the amount of Auction Proceeds received by such Holders in lieu of such New LightSquared Working Capital Facility Loans.

Excess Auction Proceeds, that is, Auction Proceeds remaining, if any, after payment in full in Cash of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition Inc. Facility Non-Subordinated Claims, Allowed Prepetition LP Facility SPSO Claims and Allowed New DIP Facility Claims, shall be held in trust by the Debtors or Reorganized Debtors, as the case may be, for the benefit of the Holders of Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, Allowed Existing LP Common Units Equity Interests, Allowed Prepetition Inc. Facility Subordinated Claims, Allowed Inc. General Unsecured Claims, Allowed Existing Inc. Preferred Stock Equity Interests, and Allowed Existing Inc. Common Stock Equity Interests. The Excess Auction Proceeds shall then be allocated by the Bankruptcy Court as between the LP Debtors, on the one hand (Excess LP Auction Proceeds), and the Inc. Debtors, on the other (Excess Inc. Auction Proceeds), and then paid to the Holders of Allowed Claims and Equity Interests against such Debtors in order of priority as follows: (1) with respect to Excess LP Auction Proceeds, (a) first, Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, (b) second, Allowed Existing LP Preferred Units Equity Interests, and (c) third, Allowed Existing LP Common Units Equity Interests; and (2) with respect to Excess Inc. Proceeds (which includes Excess LP Auction Proceeds remaining, if any, after payment in full of Allowed Existing LP Preferred Units Equity Interests), (a) first, Allowed Prepetition Inc. Facility Subordinated Claims, (b) second, Allowed Inc. General Unsecured Claims, (c) third, Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, if any, (d) fourth, Allowed Existing Inc. Preferred Stock Equity Interests, and (e) fifth, Allowed Existing Inc. Common Stock Equity Interests; provided, however, that the priority of distribution set forth herein with respect to Excess Inc. Auction Proceeds is subject to the outcome of the Prepetition Inc. Facility Actions, as applicable.

F.    *Initial Boards of Directors and Managers*

The Board shall be comprised of ~~the persons identified in the Plan Supplement. The Board shall be~~**seven (7) members, which shall initially include an independent chairperson, the chief executive officer of New LightSquared, two (2) independent directors with relevant industry experience, and three (3) directors** selected in a manner to be determined by the Plan Proponents.    In accordance with section 1129(a)(5) of the Bankruptcy Code, the Plan Proponents ~~will~~**shall** disclose in the Plan Supplement **or otherwise prior to the Confirmation Hearing** the identity and affiliations of any person proposed to serve on the **initial** Board and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person.  Each director or manager appointed to the Board and to the boards of the other Reorganized Debtors, as applicable, shall serve from and after the Effective Date pursuant to the terms of the applicable Reorganized Debtors Corporate Governance Documents and applicable law.

The term of any current members of the boards of directors or managers of any of the Debtors shall expire upon the Effective Date.  From and after the Effective Date, the members of the Board and the boards of any of the other Reorganized Debtors shall be selected and determined in accordance with the Reorganized Debtors Corporate Governance Documents of the applicable Reorganized Debtor and applicable law, including sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

G.    *Reorganized Debtors Corporate Governance Documents and Indemnification Provisions Therein*

On the Effective Date, the applicable Reorganized Debtors shall enter into and deliver the relevant Reorganized Debtors Corporate Governance Documents.

Confirmation of the Plan shall constitute authorization and approval:  (1) of the Reorganized Debtors Corporate Governance Documents and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors; and (2) for the Reorganized Debtors to enter into and execute, on or after the Effective Date, the Reorganized Debtors Corporate Governance Documents and such other documents as may be required or appropriate, including, without limitation, (a) taking steps, in the discretion of the Plan Proponents and Reorganized Debtors, as applicable, to insulate certain equityholders of New LightSquared in accordance with Section 1.993 of the rules of the FCC and (b) taking such other measures as deemed necessary and appropriate by the Plan Proponents to institute the measures set forth therein to have New LightSquared deemed, on the Effective Date, to be less than 25% foreign owned for purposes of compliance with Section 310(b) of the Communications Act of 1934, as amended, and the rules of the FCC.  On the Effective Date, the Reorganized Debtors Corporate Governance Documents, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the Reorganized Debtors pursuant to the Reorganized Debtors Corporate

Governance Documents and related documents shall be satisfied pursuant to, and as set forth in, the Reorganized Debtors Corporate Governance Documents and related documents.

As of the Effective Date, the Reorganized Debtors Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Debtors' then current directors, officers, employees, or agents (and such directors, officers, employees, or agents that held such positions as of the Confirmation Date) at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the Reorganized Debtors shall amend or restate the Reorganized Debtors Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

H.    *Management Incentive Plan*

On or as soon as practicable following the Effective Date, the Board may adopt a Management Incentive Plan. **All New LightSquared Common Equity to be issued pursuant to the Plan to Holders of Allowed Claims shall be subject to dilution by any New LightSquared Common Equity issued pursuant to a Management Incentive Plan.**

I.    *Management and Officers of Reorganized Debtors*

Subject to any applicable employment contracts and applicable law, from and after the Effective Date, the officers of the Reorganized Debtors ~~will~~**shall** be selected and appointed by the board of directors of New LightSquared in accordance with, and pursuant to, the provisions of the Reorganized Debtors Corporate Governance Documents of New LightSquared, and applicable law.

J.    *Corporate Governance*

As shall be set forth in the Reorganized Debtors Charters and Reorganized Debtors Bylaws, the Reorganized Debtors Boards shall consist of a number of members, and be appointed in a manner, to be agreed upon by each Plan Proponent or otherwise provided in the Reorganized Debtors Corporate Governance Documents. In accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent not already disclosed, the Plan Proponents shall disclose the following at, or prior to, the Confirmation Hearing: (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized Debtors Boards or officer of the Reorganized Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

K.    *Vesting of Assets in Reorganized Debtors*

L.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Facilities Closing Date with respect to the DIP LP Facility and DIP Inc. Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the Reorganized Debtors.

M.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, including Article IV.B.2(a) **hereof**, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court to the extent permitted by Canadian law, or any other Entity.

N.    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity or Person, including, without limitation, the following:  (1) all transfers of assets (including Equity Interests) that are to occur pursuant to the transactions contemplated under the Plan; (2) the incurrence of all

each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and (except as otherwise set forth herein) all directors and officers of the Debtors who served in such capacity at any time on and after the Confirmation Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

S.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable Reorganized Debtors intend to assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Disclosure Statement or other pleadings, for, among other things, compensation and wages (including ~~equity based and~~ bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such **expired or terminated** policy, program, or plan. In addition, as of the Effective Date, ~~(1)~~ Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors~~, and any such applicable equity plan, shall be cancelled and terminated and (2) Holders of such Equity Interests~~ shall be treated in accordance with Class 14 in Article III.B.16 hereof **and any such Equity Interest and equity plan shall be cancelled as of the Effective Date**; provided, that the applicable Reorganized Debtors boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable Reorganized Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the Reorganized Debtors boards deem appropriate. **Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing herein shall be, or shall be construed as, and implementation of the Plan shall not constitute, or be deemed to constitute, a change of control (or similar event) under any of the Debtors' or their Affiliates' contracts, agreements, policies, programs, or plans addressed by this Article IV.S.**

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts,

T.     *Prepetition Inc. Facility Actions*

With respect to any Holders of a Prepetition Inc. Facility Non-Subordinated Claim in Class 6 **who vote to reject the Plan** or Prepetition Inc. Facility Subordinated Claim in Class 7 who vote to reject the Plan and do not waive the Potential Harbinger Claims, ~~as applicable, the Confirmation Order shall be deemed to be an order granting~~**the Plan serves as a request by** the Ad Hoc LP Secured Group ~~standing to bring, on or before the Effective Date,~~ **for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order. For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to** the Ad Hoc LP Secured Group **for purposes of pursuing any** Prepetition Inc. Facility ~~Actions against such Holders~~**Action, and the filing of the Plan shall not be deemed as the Debtors' consent to, or support of, the grant of such standing**.

U.     *Withdrawal of Plan With Respect To Inc. Debtors*

**The Plan is a joint chapter 11 plan for the resolution of outstanding Claims against, and Equity Interests in, the consolidated Inc. Debtors and the LP Debtors**~~. If, however,~~**; provided, that if** Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) **votes to reject the Plan**~~, then~~ **(the "Vote To Reject"),** the Plan shall be ~~withdrawn with respect to all of the Inc. Debtors, shall be a plan only for the LP Debtors and may be confirmed with respect to the LP Debtors. If the Plan is~~ **withdrawn with respect to the Inc. Debtors,** ~~then without any further notice or action, order, or approval of the Bankruptcy Court, and notwithstanding anything to the contrary contained in~~**and** the Plan**, Proponents shall pursue confirmation of** the Plan ~~shall be deemed amended and modified to, among other things, eliminate (1) the Inc. Debtors from the Plan, (2) treatment of all Claims against and Equity Interests in any of the Inc. Debtors, (3) the combination of Inc. Debtors' Assets with and into LightSquared LP pursuant to Article IV.B.2, (4) the substantive consolidation of the Inc. Debtors pursuant to Article I.C, (5) the inclusion of any Claims against or Equity Interests in the Inc. Debtors in the calculation of the Pro Rata share of treatment provided to a Holder of an Allowed Claim against the LP Debtors, (6) any New DIP Inc. Facility Loans to be issued on account of Allowed DIP Inc. Facility Claims, (7) any~~ **New LightSquared Working Capital Facility** ~~Loans related to repayment of New DIP Inc. Facility Loans, and the amount of the New LightSquared Working Capital~~ **Facility will be adjusted accordingly, (8) any Inc. Debtor and any Holder of a Claim against or Equity Interest in any Inc. Debtor, in their capacity as such a Holder, from the definition of "Released Party," and (9) any settlement or compromise for the benefit of any Inc. Debtor or any Holder of a Claim against or Equity Interest in any Inc. Debtor, in their capacity as such a Holder.**solely **with respect to the LP Debtors. A version of the Plan that reflects implementation of the LP Debtors-only reorganization (as contemplated by the Plan following the Vote To Reject) is attached as Exhibit A hereto.**

**For the avoidance of doubt, notwithstanding anything to the contrary contained herein or in the LP Debtors-Only Plan, if the Plan is withdrawn with respect to the Inc. Debtors**~~, then~~ **because of the Vote To Reject, then (1) all Articles, provisions, and terms**

**of the LP Debtors-Only Plan shall apply and control with respect to the Plan and (2) all claims and Causes of Action held by any LP Debtor or any Holder of a Claim against or Equity Interest in an LP Debtor against any Inc. Debtor or any Holder of a Claim against or Equity Interest in an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents.**

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

      1.    Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

      2.    Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Plan Proponents shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement, which shall include the Inmarsat Cooperation Agreement (unless otherwise agreed in writing by the Ad Hoc LP Secured Group).

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Plan Proponents shall have

assumption and assignment, or with respect to asserted Cure Costs, then the Plan Proponents or the Reorganized Debtors, as applicable, shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend the decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the ~~applicable agent under the DIP Facilities, the applicable agent under~~ **DIP LP Lenders, the DIP Inc. Lenders,** the Prepetition ~~Facilities~~**Lenders**, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests.  Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date.  Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.    *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors on or prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Common Equity shall be deemed to be issued to (and the Reinstated Intercompany Interests shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, Reorganized Debtor, or any other

applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

## H.    Setoffs

Each Debtor, or such entity's designee as instructed by such Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Non-Subordinated Claim, Allowed DIP Facility Claim or, in the event Class 5B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) or any Allowed Equity Interest, and the Plan Distributions on account of such Allowed Claim or Allowed Equity Interest, any and all claims, rights, and Causes of Action that a Debtor or its successors may hold against the Holder of such Allowed Claim or Allowed Equity Interest after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim or Equity Interest (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Non-Subordinated Claim, Allowed DIP Facility Claim or, in the event Class 5B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) hereunder ~~will~~**shall** constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that a Debtor or its successor may possess against such Holder.

## I.    Recoupment

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## J.    Claims Paid or Payable by Third Parties

### 1.    Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, or the Disbursing Agent. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a Reorganized Debtor, or the Disbursing Agent, on account of such Claim, such

**or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity shall (i) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Except as otherwise agreed by the Ad Hoc LP Secured Group, in consultation with the Debtors, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of obtaining an approval of any Material Regulatory Request~~; provided, that this condition to the Confirmation Date shall not apply in the event that Class 6 (Prepetition Inc. Facility Non Subordinated Claims) votes to reject the Plan and the Plan is withdrawn with respect to the Inc. Debtors as provided in Article IV.U.~~.

2.    The Bankruptcy Court shall have entered the Disclosure Statement Order and the Canadian Court shall have entered the Disclosure Statement Recognition Order.

thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(c)    the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.    The Debtors shall have paid in full in Cash all Ad Hoc LP Secured Group Fee Claims.

7.    All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

8.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses, the transfer of control of the Debtors and/or the issuance of New LightSquared Common Equity, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including, if applicable, under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

9.    Except as otherwise agreed by the Ad Hoc LP Secured Group, in consultation with the Debtors, the FCC shall not have:  (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of obtaining an approval of any Material Regulatory Request~~; provided, that this condition to the Effective Date shall not apply in the event that Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan and the Plan is withdrawn with respect to the Inc. Debtors as provided in Article IV.U.~~.

*C.*    *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by each Plan Proponent (in accordance with the terms hereof), without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  For the avoidance of doubt, the Ad Hoc LP Secured Group's consent to waive such conditions shall be determined by the vote of a majority in principal amount of outstanding loans held by the members of the Ad Hoc LP Secured Group.  For the avoidance of doubt, the conditions set forth in Article IX.A.1 and IX.B.9 **hereof**, to the extent applicable, may only be waived by the Ad Hoc LP Secured Group.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Plan Proponents or the Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.    *Successors and Assigns*

~~The~~**Except as otherwise provided in the Plan, the** rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

New York, New York
Dated:  August ~7~26, 2014

**LIGHTSQUARED INC. ( FOR ITSELF AND ALL OTHER DEBTORS)**

By:        */s/ Douglas Smith*
Name:    Douglas Smith
Title:     Chief Executive Officer, President, and Chairman of the Board of LightSquared Inc.

**CAPITAL RESEARCH AND MANAGEMENT COMPANY, IN ITS CAPACITY AS INVESTMENT MANAGER TO FUNDS THAT ARE HOLDERS PREPETITION  LP**

**CERTAIN OF FACILITY CLAIMS**

By:        */s/ ~Kristine M. Nishiyama~Mark E. Brubaker*
Name:    ~Kristine M. Nishiyama~Mark E. Brubaker
Title:     Authorized Signatory

**CYRUS CAPITAL PARTNERS, L.P., IN ITS CAPACITY AS INVESTMENT MANAGER TO CERTAIN FUNDS THAT ARE HOLDERS OF PREPETITION LP FACILITY CLAIMS**

By:        */s/ Jennifer M. Pulick*
Name:    Jennifer M. Pulick
Title:     Authorized Signatory

[First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders]

**Exhibit A-3**

**First Amended LP Debtors-Only Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**FIRST AMENDED JOINT PLAN OF LP DEBTORS ONLY PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY LP DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS**

---

Dated:  New York, New York
        August 26, 2014

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group*
*of LightSquared LP Lenders*

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW ....................................................................1

    A.     Defined Terms ......................................................................................1
    B.     Rules of Interpretation .......................................................................24
    C.     Non-Consolidated Plan ......................................................................25
    D.     Computation of Time .........................................................................25
    E.     Governing Law ..................................................................................25
    F.     Reference to Monetary Figures..........................................................25

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
AND U.S. TRUSTEE FEES ..............................................................................25

    A.     Administrative Claims .......................................................................26
    B.     Accrued Professional Compensation Claims......................................27
    C.     DIP LP Facility Claims ......................................................................28
    D.     New DIP LP Facility Claims ..............................................................28
    E.     Priority Tax Claims............................................................................29
    F.     Payment of Statutory Fees .................................................................29

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ...................................................................................................29

    A.     Summary............................................................................................29
    B.     Classification and Treatment of Claims and Equity Interests...............30
    C.     Special Provision Governing Unimpaired Claims and Equity Interests...............36
    D.     Acceptance or Rejection of Plan.........................................................36
    E.     Elimination of Vacant Classes ...........................................................37
    F.     Confirmation Pursuant to Section 1129(b) of Bankruptcy Code...........37
    G.     Controversy Concerning Impairment ..................................................38

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN .................................................38

    A.     Sources of Consideration for Plan Distributions .................................38
    B.     Plan Transactions...............................................................................38
    C.     Allocation of Auction Proceeds ..........................................................45
    D.     Section 1145 and Other Exemptions...................................................46
    E.     Listing of New LightSquared Common Equity; Reporting Obligations ..............46
    F.     Initial Boards of Directors and Managers............................................47
    G.     Reorganized LP Debtors Corporate Governance Documents and
Indemnification Provisions Therein....................................................47

H.  Management Incentive Plan ...........................................................................48
I.  Management and Officers of Reorganized LP Debtors .........................48
J.  Corporate Governance .................................................................................48
K.  Vesting of Assets in Reorganized LP Debtors .....................................48
L.  Cancellation of Securities and Agreements .........................................49
M.  Corporate Existence .....................................................................................50
N.  Corporate Action ............................................................................................50
O.  Effectuating Documents; Further Transactions ...................................51
P.  Exemption from Certain Taxes and Fees ................................................51
Q.  Preservation, Transfer, and Waiver of Rights of Action ...................52
R.  Assumption of D&O Liability Insurance Policies ................................52
S.  Employee and Retiree Benefits ..................................................................53
T.  Prepetition Inc. Facility Actions ...............................................................53

ARTICLE V.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ................................................................................................54

A.  Assumption and Rejection of Executory Contracts and Unexpired Leases ..........54
B.  Claims Based on Rejection of Executory Contracts or Unexpired Leases ............55
C.  Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
    Pursuant to Plan ..............................................................................................55
D.  Pre-existing Obligations to LP Debtors Under Executory Contracts and
    Unexpired Leases .............................................................................................56
E.  Intercompany Contracts, Contracts, and Leases Entered into After Petition
    Date, Assumed Executory Contracts, and Unexpired Leases ................................56
F.  Modifications, Amendments, Supplements, Restatements, or Other
    Agreements ......................................................................................................57
G.  Postpetition Contracts and Leases ...........................................................57
H.  Reservation of Rights ....................................................................................57
I.  Nonoccurrence of Effective Date ...............................................................57

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................58

A.  Distribution Record Date .............................................................................58
B.  Timing and Calculation of Amounts To Be Distributed ......................58
C.  Disbursing Agent ...........................................................................................59
D.  Rights and Powers of Disbursing Agent .................................................59
E.  Plan Distributions on Account of Claims and Equity Interests Allowed
    After Effective Date .........................................................................................59
F.  Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
    Distributions ....................................................................................................60
G.  Compliance with Tax Requirements/Allocations .................................61
H.  Setoffs ...............................................................................................................61

I.      Recoupment ..................................................................................................62
J.      Claims Paid or Payable by Third Parties ...................................................62

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED
          EQUITY INTERESTS......................................................................63

A.      Allowance of Claims and Equity Interests.................................................63
B.      Claims and Equity Interests Administration Responsibilities ..............63
C.      Estimation of Claims or Equity Interests ...............................................63
D.      Expungement or Adjustment to Claims or Equity Interests Without
          Objection.............................................................................................64
E.      No Interest ..............................................................................................65
F.      Deadline To File Objections to Claims or Equity Interests ...................65
G.      Disallowance of Claims or Equity Interests...........................................65
H.      Amendments to Claims...........................................................................65

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
          PROVISIONS .................................................................................66

A.      Discharge of Claims and Termination of Equity Interests....................66
B.      Subordinated Claims ..............................................................................66
C.      Compromise and Settlement of Claims and Controversies ..................67
D.      Releases by LP Debtors ..........................................................................67
E.      Exculpation ............................................................................................68
F.      Third-Party Releases by Holders of Claims or Equity Interests ..........68
G.      Injunction ...............................................................................................69
H.      Release of Liens......................................................................................70

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
          EFFECTIVE DATE OF PLAN ......................................................70

A.      Conditions Precedent to Confirmation Date ..........................................70
B.      Conditions Precedent to Effective Date .................................................71
C.      Waiver of Conditions..............................................................................72
D.      Harbinger Litigation Action....................................................................72

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ...............72

A.      Modification and Amendments................................................................72
B.      Effect of Confirmation on Modifications ...............................................73
C.      Revocation or Withdrawal of Plan..........................................................73
D.      Validity of Certain Plan Transactions If Effective Date Does Not Occur ............73

ARTICLE XI. RETENTION OF JURISDICTION........................................................73

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................................76

    A.     Immediate Binding Effect...................................................................76
    B.     Additional Documents ........................................................................76
    C.     Reservation of Rights.........................................................................76
    D.     Successors and Assigns.......................................................................76
    E.     Service of Documents .........................................................................77
    F.     Term of Injunctions or Stays..............................................................78
    G.     Plan Supplement .................................................................................78
    H.     Entire Agreement ................................................................................78
    I.     Non-severability of Plan Provisions ...................................................78
    J.     Votes Solicited in Good Faith.............................................................78
    K.     Waiver or Estoppel .............................................................................79
    L.     Conflicts..............................................................................................79

## INTRODUCTION

The LP Debtors, with the authority, and at the direction, of the Special Committee, together with the Ad Hoc LP Secured Group, collectively as the Plan Proponents, hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding Claims against, and Equity Interests in, the LP Debtors.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan (in accordance with the terms hereof), prior to its substantial consummation.

Among other things, the Plan provides for the potential satisfaction in full of senior secured claims against the LP Debtors and offers a compromised treatment for Prepetition LP Facility SPSO Claims that would avoid costly litigation with respect to subordination of such Claims.  The Plan also provides for potential recoveries to junior stakeholders through an Auction of the New LightSquared Common Equity that is otherwise distributable to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims (if applicable) if such Claims (and Allowed DIP LP Facility Claims) are first satisfied in full, in Cash, from the proceeds of the Auction.

The Plan Proponents believe that the Plan is currently the highest and best restructuring offer available to the LP Debtors that will maximize the value of their Estates for the benefit of the LP Debtors' creditors and equityholders.  Moreover, it is the only restructuring proposal that avoids a value-minimizing liquidation, and is the only path currently available for the LP Debtors to successfully exit the Chapter 11 Cases.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date that are properly allocable to the LP Debtors and their Estates, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "**Ad Hoc LP Secured Group**" means that certain ad hoc group of Prepetition LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude SPSO.

3.      "**Ad Hoc LP Secured Group Advisors**" means White & Case LLP, as counsel to the Ad Hoc LP Secured Group, and Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc LP Secured Group.

4.      "**Ad Hoc LP Secured Group Fee Claims**" means all Claims for the reasonable documented fees and expenses of the Ad Hoc LP Secured Group Advisors.

5.      "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the LP Debtors' Estates and operating the businesses of the LP Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise that are properly allocable to the LP Debtors and their Estates for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the LP Debtors and their Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases of the LP Debtors pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments that are properly allocable to the LP Debtors and their Estates; (g) Claims for the Break-Up Fee or Expense Reimbursement; provided, however, that no party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; (h) the Ad Hoc LP Secured Group Fee Claims; and (i) any fees and expenses that are earned and payable pursuant to the New DIP LP Facility, the New LightSquared Working Capital Facility, the Plan, and the other Plan Documents.

6.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

7.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the LP Debtors by a Final Order, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that,

2

with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge (including the commencement of an adversary proceeding against a Holder of a Claim) has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the LP Debtors or the Reorganized LP Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the LP Debtors or Reorganized LP Debtors, as applicable.  In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any LP Debtor or any subsidiary of an LP Debtor) in the stock transfer ledger or similar register of the applicable LP Debtor on the Distribution Record Date and is not subject to any objection or challenge.

9.      "**Alternative Successful Purchaser**" has the meaning set forth in the Auction Procedures.

10.      "**Assets**" means all rights, titles, and interest of the LP Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

11.      "**Auction**" means the auction of New LightSquared Common Equity to be conducted in accordance with the Plan and the Auction Procedures.

12.      "**Auction Procedures**" means the process and procedures for conducting the Auction, which procedures shall be filed with the Plan Supplement, and shall be approved by the Bankruptcy Court in connection with Confirmation of the Plan.

13.      "**Auction Proceeds**" means all net Cash proceeds and other consideration deliverable to the LP Debtors upon consummation of the Auction in accordance with the Plan, the Auction Procedures, and the Confirmation Order.

14.      "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the LP Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

15.      "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

16.      "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

17.      "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the

withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

18.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

19.     "**Board**" means the initial board of directors or managers of New LightSquared.

20.     "**Break-Up Fee**" has the meaning set forth in the Prior Bid Procedures Order.

21.     "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

22.     "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by LightSquared LP, in its capacity as foreign representative of the Debtors, pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

23.     "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

24.     "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; and (f) any cause of action listed on the Schedule of Retained Causes of Action.

25.     "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

26.     "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor or group of Debtors, the chapter 11 case pending for that Debtor or group of Debtors in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "**Claim**" means any claim against an LP Debtor as defined in section 101(5) of the Bankruptcy Code.

28.     "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

29.     "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

30.     "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

31.     "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

32.     "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

33.     "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

34.     "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

35.     "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36.     "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37.     "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

38.     "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

39.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and granting other related relief, in form and substance satisfactory to the Plan Proponents.

40.     "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Confirmation Order and vesting in the Reorganized LP Debtors all of the LP Debtors' rights,

titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

41.     "**Consummation**" means the occurrence of the Effective Date.

42.     "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the LP Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.     "**D&O Liability Insurance Policies**" means all insurance policies of any of the LP Debtors for directors', managers', and officers' liability.

44.     "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

45.     "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

46.     "**DIP Claim**" means a DIP LP Facility Claim or a New DIP LP Facility Claim.

47.     "**DIP Facilities**" means, collectively, the DIP LP Facility and the New DIP LP Facility.

48.     "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

49.     "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents.

50.     "**DIP LP Facility Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

51.     "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

52.     "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

53.     "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Fifth Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1681] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

6

54.     "**Disbursing Agent**" means, for purposes of making distributions under the Plan, New LightSquared or such other Entity designated by the Plan Proponents or New LightSquared, as applicable.

55.     "**Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. __] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of the Ad Hoc LP Secured Group, which consent shall not be unreasonably withheld).

56.     "**Disclosure Statement Order**" means the order or orders entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably acceptable to the Plan Proponents, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

57.     "**Disclosure Statement Recognition Order**" means the order or orders of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Disclosure Statement Order.

58.     "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

59.     "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the Reorganized LP Debtors for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.  Plan Consideration to be reserved on account of any Disputed Claims or Equity Interests in Classes 3C, 4, 5, and 6, and payable on account of any such Claims or Equity Interests that are later Allowed, shall be derived solely from Excess Auction Proceeds.

60.     "**Distribution Record Date**" means (a) the New DIP LP Facility Closing Date for all New DIP LP Facility Claims and (b) the Voting Record Date for all other Claims and Equity Interests.

61.     "**Effective Date**" means a date selected by the Plan Proponents that shall be a Business Day that is no later than five (5) days after all of the conditions precedent set forth in Article IX.B hereof have been satisfied or waived (to the extent such conditions can be waived).

62.     "**Eligible Transferee**" means any Person that is not a Prohibited Transferee.

63.     "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

64.     "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in an LP Debtor, including any issued or unissued share of common stock,

preferred stock, or other instrument evidencing an ownership interest in an LP Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in an LP Debtor that existed immediately prior to the Effective Date, any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the LP Debtors pursuant to any equity plan maintained by the LP Debtors or under any existing employment agreement of the LP Debtors' existing employees, any Existing Shares, and any Claim against the LP Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

65.      "**Ergen Action**" means the Ergen Adversary Proceeding, the case captioned *Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, LLC v. Charles W. Ergen, Dish Network Corporation, L-Band Acquisition LLC, SP Special Opportunities LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, and Stephen Ketchum*, No. 14-01907 (D. Co. filed July 8, 2014), and, as to each of the foregoing, any claims or actions pertaining or related to the allegations set forth therein as they may relate to Charles W. Ergen, SPSO, DISH Network Corporation, EchoStar Corporation, L-Band Acquisition LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, Stephen Ketchum, and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members, or representatives.

66.      "**Ergen Adversary Proceeding**" means the adversary proceeding under the caption *LightSquared Inc. v. SP Special Opportunities LLC (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01390 (SCC) (Bankr. S.D.N.Y. 2013).

67.      "**Estate**" means the bankruptcy estate of any LP Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

68.      "**Excess Auction Proceeds**" means all Auction Proceeds remaining, if any, after payment in full, in Cash, of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP LP Facility Claims, pursuant to and in accordance with Articles III.B and IV.C hereof.

69.      "**Exculpated Party**" means a Released Party.

70.      "**Executory Contract**" means a contract to which one or more of the LP Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

71.      "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP, and the outstanding Equity Interests in LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

72.      "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

73.    "**Existing Shares**" means all Equity Interests related to Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

74.    "**Expense Reimbursement**" has the meaning set forth in the Prior Bid Procedures Order.

75.    "**FCC**" means the Federal Communications Commission.

76.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

77.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

78.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, including the Canadian Court, with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or under the Ontario Rules of Civil Procedure, may be Filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Plan Proponents reserve the right to waive any appeal period.

79.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

80.    "**GPS Industry**" means Deere & Company, Garmin International, Inc., Trimble Navigation Limited, the U.S. GPS Industry Council, the Coalition to Save Our GPS, and any of their related entities or affiliates or any of their successors and assigns.

81.    "**Group**" has the meaning set forth under Regulation 13D under the Securities Exchange Act.

82.    "**Harbinger**" means Harbinger Capital Partners, LLC, its affiliated and managed funds, and any affiliated Persons thereof.

83.    "**Harbinger Litigation Action**" shall mean an action (including, without limitation, by motion or adversary proceeding before the Bankruptcy Court) brought by any of the Plan Proponents to stay, bar, enjoin, preclude, or otherwise limit Harbinger and/or any of its affiliates from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is, or directly affects, any property of one or more of the LP Debtors' Estates or the Reorganized LP Debtors.

84.    "**Harbinger Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court or other court of competent jurisdiction, that stays, bars,

9

enjoins, precludes, or otherwise limits Harbinger and/or any of its affiliates from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is or directly affects any property of one or more of the LP Debtors' Estates or the Reorganized LP Debtors.

85.     "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

86.     "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

87.     "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

88.     "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

89.     "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time), by and between LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited.

90.     "**Inmarsat Cooperation Agreement Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, that, as between the Debtors and their Affiliates, LightSquared LP and SkyTerra (Canada) Inc. are the sole beneficiaries of the Inmarsat Cooperation Agreement, and the Inc. Debtors do not hold any beneficial interest in the Inmarsat Cooperation Agreement.

91.     "**Intercompany Claim**" means any Claim against an LP Debtor held by another LP Debtor.

92.     "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are LP Debtors.

93.     "**Intercompany Interest**" means any Equity Interest in an LP Debtor held by another LP Debtor.

94.     "**Interim Compensation Order**" means the Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

95.     "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

96.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the LP Debtors approved pursuant to an order of the Bankruptcy Court.

97.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

98.    "**Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, (a) addressing whether (i) any of the claims and Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Company*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC, et al. v. United States of America*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014), and (ii) any other identified claims and Causes of Action that may be asserted against the GPS Industry and/or the United States of America relating in any way to the LP Debtors' FCC licenses and authorizations or the use of the spectrum rights conferred thereby, are property of one or more of the LP Debtors' Estates and (b) providing that all other Persons (including, without limitation, Harbinger and its non-Debtor affiliates) shall be stayed, barred, enjoined, precluded, or otherwise limited from pursuing, asserting, interfering with, or exercising any dominion or control over any such claims or Causes of Action that are determined by the Bankruptcy Court to be, or to directly affect any, property of one or more of the LP Debtors' Estates.

99.    "**LP Cash Collateral Order**" means the *Amended Agreed Final Order (a) Authorizing Debtors To Use Cash Collateral, (b) Granting Adequate Protection to Prepetition LP Facility Secured Parties, and (c) Modifying Automatic Stay* [Docket No. 544] (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

100.    "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings, Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

101.    "**LP General Unsecured Claim**" means any Claim that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition LP Facility Non-SPSO Claim; (g) Prepetition LP Facility SPSO Claim; (e) Prepetition LP Facility SPSO Subordinated Claim (if any); or (f) Intercompany Claim.

102.    "**LP Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

103.    "**LP Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition LP Facility Claim.

104.    "**Management Incentive Plan**" means a post-Effective Date management equity incentive plan approved by the Board, which may provide for the issuance of New LightSquared Common Equity to officers and employees of the Reorganized LP Debtors.

105.    "**Minimum Bid**" has the meaning set forth in Article IV.B.1(b)(ii) hereof.

106.    "**New DIP LP Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $120.6 million, plus the aggregate amount of Allowed DIP LP Claims, which shall have market terms and conditions and which shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of the LP Debtors, in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the LP Debtors.

107.    "**New DIP LP Facility Agent**" means the administrative agent under the New DIP LP Facility Credit Agreement or any successor agent appointed in accordance with the New DIP LP Facility Credit Agreement.

108.    "**New DIP LP Facility Claim**" means a Claim held by the New DIP LP Facility Agent or New DIP LP Facility Lenders arising under, or related to, the New DIP LP Facility, including, without limitation, all outstanding principal, interest, default interest, and fees provided for thereunder.

109.    "**New DIP LP Facility Closing Date**" means the Confirmation Date or as soon as practicable thereafter.

110.    "**New DIP LP Facility Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement to be entered into among LightSquared LP, as borrower, the other LP Debtors, as guarantors, and the New DIP LP Facility Lenders.

111.    "**New DIP LP Facility Lenders**" means the lenders party to the New DIP LP Facility Credit Agreement from time to time.

112.    "**New DIP LP Facility Loans**" means the New DIP LP Facility Tranche A Loans and the New DIP LP Facility Tranche B Loans.

113.    "**New DIP LP Facility Obligors**" means the LP Debtors.

114.    "**New DIP LP Facility Order**" means the Final Order of the Bankruptcy Court, in form and substance reasonably acceptable to the Plan Proponents, approving the New DIP LP Facility (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof).

115.    "**New DIP LP Facility Tranche A Loans**" means the tranche "A" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP

Facility Tranche B Loans, except as specified below in the definition of "New DIP LP Facility Tranche B Loans."

116.    "**New DIP LP Facility Tranche B Loans**" means the tranche "B" loans to be made under the New DIP LP Facility, which shall have the same rights as the New DIP LP Facility Tranche A Loans, except that the Holders of the New DIP LP Facility Tranche B Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New DIP LP Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New DIP LP Facility Tranche B Loans, the release of all or substantially all of the applicable Collateral, the release of any New DIP LP Facility Obligor from its obligations under the New DIP LP Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New DIP LP Facility Tranche B Loans compared with the New DIP LP Facility Tranche A Loans.

117.    "**New LightSquared**" means LightSquared LP as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

118.    "**New LightSquared Class A Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class B Common Equity, but each share or unit of New LightSquared Class A Common Equity shall have five (5) times the voting power of a share or unit of New LightSquared Class B Common Equity.

119.    "**New LightSquared Class B Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class A Common Equity, but each share or unit of New LightSquared Class B Common Equity shall have one-fifth (1/5th) the voting power of a share or unit of New LightSquared Class A Common Equity.

120.    "**New LightSquared Common Equity**" means New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.

121.    "**New LightSquared Loan Facility**" means the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.

122.    "**New LightSquared Loan Facility Agreement**" means that certain credit agreement to be entered into among New LightSquared and its subsidiaries and the Holders of Prepetition LP Facility Non-SPSO Claims, the Holders of Prepetition LP Facility SPSO Claims, and the New LightSquared Working Capital Facility Lenders.

123.    "**New LightSquared Obligors**" means New LightSquared and its subsidiaries.

124.    "**New LightSquared Stapled A Units**" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan

Supplement) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term Loans held by such holder) of New LightSquared Tranche A Working Capital Loans (to the extent applicable) and New LightSquared Class A Common Equity.

125.    "**New LightSquared Stapled B Units**" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement, which shall be the same amount set with respect to the New LightSquared Stapled A Units) of principal amount of New LightSquared Tranche B Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche B Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche B Term Loans bears to the aggregate principal amount of New LightSquared Tranche B Term Loans held by such holder) of New LightSquared Tranche B Working Capital Loans (to the extent applicable) and New LightSquared Class B Common Equity.

126.    "**New LightSquared Term Loan Facility**" means a term loan facility which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Working Capital Facility, but subject to the "super-priority" status of the New LightSquared Working Capital Facility as described in the second succeeding sentence.    The New LightSquared Term Loan Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, and which shall be in the aggregate principal amount of:  (a) $1.0 billion if Class 3B (Prepetition LP Facility SPSO Claims) votes to accept, or is deemed to accept, the Plan; or (b) $1.2 billion plus the Allowed amount of Prepetition LP Facility SPSO Claims, if Class 3B (Prepetition LP Facility SPSO Claims) votes to reject the Plan.   If (y) a default or an event of default has occurred and is continuing under the New LightSquared Loan Facilities or (z) an enforcement action against the Collateral has commenced, all voluntary prepayments and mandatory prepayments, and the proceeds realized in any enforcement action, shall first be applied to prepay or repay in full all then outstanding New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans (on a pro rata basis) before any portion of such prepayment or repayment is applied to the New LightSquared Tranche A Term Loans or New LightSquared Tranche B Term Loans.

127.    "**New LightSquared Term Loans**" means the New LightSquared Tranche A Term Loans and the New LightSquared Tranche B Term Loans.

128.    "**New LightSquared Tranche A Term Loans**" means the tranche "A" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Term Loans, and which

shall have the same rights as the New LightSquared Tranche B Term Loans, except as specified below in the definition of "New LightSquared Tranche B Term Loans."

129.    "**New LightSquared Tranche A Working Capital Loans**" means the tranche "A" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche B Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche B Working Capital Loans, except as specified below in the definition of "New LightSquared Tranche B Working Capital Loans."

130.    "**New LightSquared Tranche B Term Loans**" means the tranche "B" term loans to be made under the New LightSquared Term Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Term Loans, and which shall have the same rights as the New LightSquared Tranche A Term Loans, except that the Holders of the New LightSquared Tranche B Term Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans.

131.    "**New LightSquared Tranche B Working Capital Loans**" means the tranche "B" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche A Working Capital Loans, except that the Holders of the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans.

132.    "**New LightSquared Working Capital Facility**" means a "super-priority" working capital term loan facility in an aggregate principal amount of $500 million, plus the aggregate amount of Allowed New DIP LP Facility Claims to be satisfied thereby, which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Term Loan Facility; <u>provided</u> that the New LightSquared Working Capital Facility shall have "super-priority" status with respect to certain prepayments, repayments, and the application of proceeds in connection with an enforcement action as described above in the definition of "New LightSquared Term Loan Facility." The New LightSquared Working Capital Facility shall have

15

market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors.

133.    "**New LightSquared Working Capital Facility Lenders**" means the lenders under the New LightSquared Working Capital Facility that are party to the New LightSquared Loan Facility Agreement from time to time.

134.    "**New LightSquared Working Capital Facility Loans**" means the New LightSquared Tranche A Working Capital Loans and the New LightSquared Tranche B Working Capital Loans.

135.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

136.    "**Petition Date**" means May 14, 2012.

137.    "**Plan**" means this chapter 11 plan, including all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time (but solely in accordance with the terms hereof), in form and substance reasonably acceptable to the Plan Proponents, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

138.    "**Plan Consideration**" means a payment or distribution of Cash, assets, securities, or instruments evidencing an obligation to Holders of Allowed Claims or Equity Interests under the Plan.  Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 3C, 4, 5, and 6 shall consist solely of Excess Auction Proceeds.

139.    "**Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve.

140.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

141.    "**Plan Documents**" means the documents other than this Plan to be executed, delivered, assumed, or performed in conjunction with the Plan as necessary to consummate the Plan Transactions, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to the Plan Proponents.

142.    "**Plan Proponents**" means the LP Debtors and the Ad Hoc LP Secured Group.

143.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to the Plan Proponents) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including the Plan Documents.

144.    "**Plan Supplement Date**" means (a) September 16, 2014 or (b) such other date agreed to by the Plan Proponents and approved by the Bankruptcy Court; <u>provided</u> that the Plan Proponents reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

145.    "**Plan Transactions**" means one or more transactions to occur on or before the Effective Date, or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Plan Proponents or Reorganized LP Debtors, as applicable, determine are necessary or appropriate.

146.    "**Potential Harbinger Claims**" means any claim or Cause of Action that has been or may be asserted by Harbinger arising out of, relating to, or in connection with the Chapter 11 Cases of the LP Debtors, the LP Debtors, or the LP Debtors' businesses, including against any Entities in the GPS Industry or the United States government, including, without limitation, the Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Co. (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Co.*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), *Harbinger Capital Partners LLC v. Deere & Co.*, Case No. 13-cv-5543 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC v. United States*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014).

147.    "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

148.    "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

149.    "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

150.    "**Prepetition Inc. Facility Action**" means an action brought by the Ad Hoc LP Secured Group prior to the Effective Date, in accordance with the terms and conditions of this Plan, pursuant to which it brings Claims or Causes of Action identified or alleged against the Prepetition Inc. Agent and/or the Prepetition Inc. Lenders, as the case may be, in the Standing Motion.

151.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

152.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

153.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

154.    "**Prepetition LP Agent**" means, collectively, Wilmington Savings Fund Society, FSB, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

155.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

156.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

157.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

158.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

159.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim or a Prepetition LP Facility SPSO Subordinated Claim.

160.    "**Prepetition LP Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition LP Credit Agreement from and after the Petition Date <u>less</u> the amount of adequate protection payments made by LightSquared LP during the Chapter 11 Cases pursuant to the LP Cash Collateral Order (exclusive of Professional Fees (as defined in the LP Cash Collateral Order) paid in accordance with the LP Cash Collateral Order).

161.    "**Prepetition LP Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition LP Loan Documents prior to the Petition Date.

162.    "**Prepetition LP Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(f) of the Prepetition LP Credit Agreement.

163.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its affiliates, other than a Prepetition LP Facility SPSO Subordinated Claim.

164.    "**Prepetition LP Facility SPSO Subordinated Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its affiliates that has been equitably subordinated pursuant to an order of the Bankruptcy Court following the Confirmation Date.

165.    "**Prepetition LP Facility SPSO Subordinated Guarantee Claim**" means a Prepetition LP Facility SPSO Subordinated Claim against any of the Inc. Debtors.

166.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

167.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

168.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

169.    "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

170.    "**Prior Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

171.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

172.    "**Pro Rata**" means (a) with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims, and (b) with respect to Equity Interests, the proportion that an Allowed Equity Interest in a particular Class bears to the aggregate amount of the Allowed Equity Interests in that Class or the proportion that an Allowed Equity Interest in a particular Class and other Classes entitled to share in the same recovery as such Allowed Equity Interest under the Plan bears to the aggregate amount of such Allowed Equity Interests.

173.    "**Professional**" means an Entity employed by the LP Debtors and their Estates pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective

Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

174.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized LP Debtors on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

175.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the Reorganized LP Debtors in the Professional Fee Escrow Account.

176.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

177.    "**Prohibited Transferee**" means SPSO, any SPSO Affiliate, and any other Entity that may be identified by the Plan Proponents in the Plan Supplement as a Prohibited Transferee and such Entity's successors or any member of any Group of which any such Entity or its successors is a member or any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, any such Entity or its successors or any member of any Group of which any such Entity or its successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (a) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (b) in the case of a corporation, any officer or director of such corporation, (c) in the case of a partnership, any general partner of such partnership, (d) in the case of a trust, any trustee or beneficiary of such trust, (e) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (a) through (d) above, and (f) any trust for the benefit of any individual described in clauses (a) through (e) above.

178.    "**Proof of Claim**" means a proof of Claim Filed against any of the LP Debtors in the Chapter 11 Cases.

179.    "**Qualified Bid**" has the meaning set forth in the Auction Procedures.

180.    "**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual

provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

181.    "**Reinstated Intercompany Interests**" means, except as otherwise provided in the Plan, the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

182.    "**Released Party**" means each of the following:  (a) the LP Debtors; (b) the Ad Hoc LP Secured Group and each member thereof; (c) each Prepetition LP Lender; (d) the Prepetition LP Agent; (e) each DIP LP Lender; (f) each New DIP LP Facility Lender; (g) the New DIP LP Facility Agent; (h) the present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors of the parties listed in (a) through (g), in each case in their capacity as such; (i) each of the respective affiliates of the parties listed in (a) through (h), in their capacity as such; and (j) any Person claimed to be liable derivatively through any of the foregoing; provided, however, that to the extent Holders of Allowed Prepetition LP Facility SPSO Claims in Class 3B vote to reject the Plan, such Holders of Allowed Prepetition LP Facility SPSO Claims, along with each of their present and former directors, officers, managers, equity holders, agents, successors, assigns, attorneys, accountants, consultants, investment bankers, brokers, bankruptcy and restructuring advisors, and financial advisors shall not be Released Parties; provided, further, that notwithstanding the foregoing, none of the Inc. Debtors shall be a Released Party.

183.    "**Releasing Party**" has the meaning set forth in Article VIII.F hereof.

184.    "**Reorganized LP Debtors**" means, collectively, New LightSquared and each of the LP Debtors other than LightSquared LP as reorganized under, and pursuant to, the Plan, on or after the Effective Date.

185.    "**Reorganized LP Debtors Boards**" means, collectively, the boards of each of the Reorganized LP Debtors.

186.    "**Reorganized LP Debtors Bylaws**" means, collectively, the bylaws of each of the Reorganized LP Debtors.

187.    "**Reorganized LP Debtors Charters**" means, collectively, the charters of each of the Reorganized LP Debtors.

188.    "**Reorganized LP Debtors Corporate Governance Documents**" means, as applicable, (a) the Reorganized LP Debtors Bylaws, (b) the Reorganized LP Debtors Charters, and (c) any other applicable organizational or operational documents with respect to the Reorganized LP Debtors.

189.    "**Retained Causes of Action**" means the Causes of Action of the LP Debtors listed on the Schedule of Retained Causes of Action.

190.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the LP Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

191.    "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the LP Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each Plan Proponent).

192.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the LP Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

193.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

194.    "**Secured Claim**" means a Claim, either as set forth in this Plan, as agreed to by the Holder of such Claim and the Plan Proponents, or as determined by a Final Order in accordance with sections 506(a) and 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim Holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

195.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

196.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

197.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

198.    "**Sharing Provision**" means the equitable and ratable distribution and sharing provisions of the Prepetition LP Credit Agreement (including, without limitation, Sections 2.14 and 8.02 thereof), and any other relevant Prepetition LP Loan Documents.

199.    "**Special Committee**" means the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc.

200.    "**SPSO**" means SP Special Opportunities, LLC.

201.    "**SPSO Affiliate**" means (a) Charles W. Ergen and L-Band Acquisition, LLC and their successors and any member of a Group of which SPSO, Charles W. Ergen and L-Band Acquisition, LLC or their successors are a member, and (b) any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors or any member of any Group of which SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (u) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above.  For the avoidance of doubt, it is understood that DISH Network Corporation, EchoStar Corporation, and any other Entity directly or indirectly controlling, controlled by, or under common control with, DISH Network Corporation or EchoStar Corporation are currently SPSO Affiliates.

202.    "**SPSO Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses (including professionals' fees and expenses) incurred by SPSO in connection with the Chapter 11 Cases or the Prepetition LP Loan Documents.

203.    "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

204.    "**Successful Purchaser**" has the meaning set forth in the Auction Procedures.

205.    "**Transfer**" or "**Transferred**" means, whether voluntarily or involuntarily or by operation of law, directly or indirectly, the sale, assignment, donation, gift, pledging, hypothecation, disposal of, encumbering or granting a security interest in, or in any other manner, transferring any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, New LightSquared Tranche B Working Capital Loans, or New DIP LP Facility

Tranche B Loans, in whole or in part, with or without consideration, or any other right or interest therein, or entering into any transaction which results in the economic equivalent of a transfer to any Person, including any derivative transaction that has the effect of changing materially the economic benefits and risks of ownership .

206.    "**Unexpired Lease**" means a lease to which one or more of the LP Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

207.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

208.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

209.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717, in each case payable by the LP Debtors and their Estates.

210.    "**Voting Record Date**" means the first day of the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement filed with respect to the Plan.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.      *Non-Consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the LP Debtors and consolidates classes of Claims against, and Equity Interests in, the LP Debtors, the Plan does not provide for the substantive consolidation of any of the LP Debtors.

For the avoidance of doubt, the Plan must comply with section 1129 of the Bankruptcy Code for each LP Debtor, and votes with respect to the Plan shall be tabulated on a non-consolidated basis by class and by Debtor with respect to the LP Debtors for the purpose of determining whether the Plan satisfies section 1129 of the Bankruptcy Code.

D.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

E.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the LP Debtors or the Reorganized LP Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable LP Debtor or Reorganized LP Debtor, as applicable.

F.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified

in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the LP Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:    (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the LP Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Plan Proponents and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP LP Facility Order) of the Bankruptcy Court.

Except for Claims of Professionals, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized LP Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.    Objections to such requests must be Filed and served on the Reorganized LP Debtors and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.    After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the LP Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized LP Debtors or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein, (1) a Plan Proponent shall not be required to File any request for payment of such Administrative Claim, (2) any Plan Proponent

shall be paid in accordance with the terms of the Plan or other applicable governing documents, and (3) no party shall be entitled to, or receive, any Break-Up Fee or Expense Reimbursement.

Notwithstanding anything to the contrary herein, (1) in the case of the Ad Hoc LP Secured Group Fee Claims incurred through and including the New DIP LP Facility Closing Date, such Ad Hoc LP Secured Group Fee Claims shall be paid in full in Plan Consideration in the form of Cash on the New DIP LP Facility Closing Date, and (2) all Ad Hoc LP Secured Group Fee Claims incurred after the New DIP LP Facility Closing Date through and including the Effective Date (to the extent not previously paid by the Debtors), shall be paid monthly subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to File a fee application with the Bankruptcy Court. In the event that the Debtors dispute all or a portion of the Ad Hoc LP Secured Group Fee Claims, the Debtors shall pay the undisputed amount of such Ad Hoc LP Secured Group Fee Claims and segregate the remaining portion of such Ad Hoc LP Secured Group Fee Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

B.    *Accrued Professional Compensation Claims*

1.    <u>Final Fee Applications</u>

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

In accordance with Article II.B.3 hereof, on the Effective Date, the Reorganized LP Debtors shall establish and fund the Professional Fee Escrow Account from the Plan Consideration Carve-Out in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors or Reorganized LP Debtors. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized LP Debtors.

3.    <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Plan Proponents as soon as practicable after the Confirmation Date; <u>provided</u>, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The

total amount so estimated and agreed to by the Plan Proponents shall comprise the Professional Fee Reserve Amount.

        4.      <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, and subject to the terms of the New DIP LP Facility, on and after the Confirmation Date, the LP Debtors or Reorganized LP Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the LP Debtors or Reorganized LP Debtors, as applicable, on or after the Confirmation Date through the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered from the Confirmation Date through the Effective Date shall terminate, and the LP Debtors or Reorganized LP Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court, subject to the terms of the New DIP LP Facility.

*C.*      *DIP LP Facility Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Facility Claim, except to the extent that a Holder of a DIP LP Facility Claim agrees to less favorable or other treatment, each Holder of a DIP LP Facility Claim shall receive on the Confirmation Date, New DIP LP Facility Loans to be issued under the New DIP LP Facility in an amount equal to the Allowed DIP LP Facility Claims; <u>provided</u>, <u>however</u>, that to the extent a Holder of an Allowed DIP LP Facility Claim objects to such treatment, such Holder of an Allowed DIP LP Facility Claim shall receive Cash from the proceeds of the New DIP LP Facility on the New DIP LP Facility Closing Date in an amount equal to its Allowed DIP LP Facility Claim. Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans, and shall be subject to the restrictions set forth in Article IV.B.1(a) hereof.

*D.*      *New DIP LP Facility Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP LP Facility Claim, except to the extent that a Holder of a New DIP LP Facility Claim agrees to a less favorable or other treatment, each Holder of a New DIP LP Facility Claim shall receive, on the Effective Date, New LightSquared Working Capital Facility Loans to be issued under the New LightSquared Working Capital Facility in an amount equal to the Allowed New DIP LP Facility Claims; <u>provided</u>, <u>however</u>, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed New DIP LP Facility Claims shall receive Auction Proceeds in lieu of New LightSquared Working Capital Facility Loans as provided in Article IV.C hereof; <u>provided</u>, <u>further</u>, <u>however</u>, that to the extent a Holder of an Allowed New DIP LP Facility Claim objects to the treatment set forth above in this Article II.D, such Holder of an Allowed New DIP LP Facility Claim shall receive Plan Consideration in the form of Cash on the Effective Date in an amount equal to its Allowed New DIP LP Facility

Claim.    Any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP LP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans, and shall be subject to the restrictions set forth in Article IV.B.2(c) and (d) hereof.

E.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:   (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized LP Debtors; or (3) at the option of the Reorganized LP Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized LP Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

F.    *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized LP Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the Reorganized LP Debtors shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases of the LP Debtors being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the LP Debtors for all purposes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.      *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular LP Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.      Class 1 – LP Other Priority Claims

   (a)     *Classification*:  Class 1 consists of all LP Other Priority Claims.

   (b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

   (c)     *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 – LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 – LP Other Priority Claim is entitled to vote to accept or reject the Plan.

2.      Class 2 – LP Other Secured Claims

   (a)     *Classification*:  Class 2 consists of all LP Other Secured Claims.

   (b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents:  (i) Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

   (c)     *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 – LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 – LP Other Secured Claim is entitled to vote to accept or reject the Plan.

(d)     *Deficiency Claims*: To the extent that the value of the Collateral securing each Allowed LP Other Secured Claim is less than the amount of such Allowed LP Other Secured Claim, the undersecured portion of such Claim shall be treated for all purposes under this Plan as an LP General Unsecured Claim and shall be classified as a Class 4 – LP General Unsecured Claim.

3.     Class 3A – Prepetition LP Facility Non-SPSO Claims

(a)     *Classification*: Class 3A consists of all Prepetition LP Facility Non-SPSO Claims.

(b)     *Allowance*: The Prepetition LP Facility Non-SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, and for the avoidance of doubt shall include all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, and the Prepetition LP Facility Repayment Premium.

(c)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall receive its Pro Rata share of (i) $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (ii) 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 3B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to this Article III.B.3(c) shall be increased to $1.2 billion. A Holder's Pro Rata share in this Article III.B.3(c) shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (i) Allowed Prepetition LP Facility Non-SPSO Claims, plus (ii) Allowed Prepetition LP Facility SPSO Claims if Class 3B votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.3(c), as provided in Article IV.C hereof.

For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, held by any Holder of a Prepetition LP Facility Non-

31

SPSO Claim against any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article III.B.3(c).

(d)    *Voting*: Class 3A is Impaired by the Plan.  Each Holder of a Class 3A – Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

4.    Class 3B – Prepetition LP Facility SPSO Claims

(a)    *Classification*: Class 3B consists of all Prepetition LP Facility SPSO Claims.

(b)    *Allowance*: Prepetition LP Facility SPSO Claims shall be Allowed as follows:

(i)    in the event that Class 3B votes to accept the Plan, the Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts otherwise accrued under the Prepetition LP Loan Documents with respect to such Prepetition LP Facility SPSO Claims through and including the Confirmation Date), plus (B) all Prepetition LP Facility Postpetition Interest that accrues on such Prepetition LP Facility SPSO Claims between the Confirmation Date and the Effective Date, plus (C) all SPSO Fee Claims incurred between the Confirmation Date and the Effective Date; or

(ii)    in the event that Class 3B votes to reject the Plan, (A) the Allowed amount of the Prepetition LP Facility SPSO Claims, including the amount of the Prepetition LP Facility SPSO Subordinated Claims, shall be determined by the Bankruptcy Court after the Confirmation Date, (B) the Class 3B – Prepetition LP Facility SPSO Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition LP Facility SPSO Claim shall not be treated as a Released Party, and (D) all claims against SPSO shall be preserved.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed

Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

(i)    in the event that Class 3B votes to accept the Plan, (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in this Article III.B.4(c)(i) shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (Y) Allowed Prepetition LP Facility SPSO Claims, plus (Z) Allowed Prepetition LP Facility Non-SPSO Claims; or

(ii)    in the event that Class 3B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.4(c), as provided in Article IV.C hereof.

For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, held by any Holder of a Prepetition LP Facility SPSO Claim against any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article III.B.4(c).

(d)    *Voting*:  Class 3B is Impaired by the Plan.  Each Holder of a Class 3B – Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.

5.    Class 3C – Prepetition LP Facility SPSO Subordinated Claims

(a)    *Classification*: Class 3C consists of all Prepetition LP Facility SPSO Subordinated Claims, if any.

(b)    *Allowance*: In the event that Class 3B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after the Confirmation Date, (ii) the Class 3C – Prepetition LP Facility SPSO Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim shall not be treated as a Released Party, and (iv) all claims against SPSO shall be preserved.

(c)    *Treatment*: In the event that Class 3B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive its Pro Rata share of Excess Auction Proceeds, if any; provided, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims).

(d)    *Voting*: Class 3C is Impaired by the Plan.  Each Holder of a Class 3C – Prepetition LP Facility SPSO Subordinated Claim, if any, as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.  For the avoidance of doubt, in the event that Class 3B votes to accept the Plan, Class 3C shall not exist and any vote cast with respect to Class 3C shall not be counted.

6.    Class 4 – LP General Unsecured Claims

(a)    *Classification*: Class 4 consists of all LP General Unsecured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in

34

an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

(c)    *Voting*: Class 4 is Impaired by the Plan.  Each Holder of a Class 4 – LP General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.    <u>Class 5 – Existing LP Preferred Units Equity Interests</u>

(a)    *Classification*: Class 5 consists of all Existing LP Preferred Units Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess Auction Proceeds, if any, as provided in Article IV.C hereof; <u>provided</u>, in no event shall any distribution to a Holder of an Allowed Existing LP Preferred Units Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing LP Preferred Units Equity Interest.

(c)    *Voting*: Class 5 is Impaired by the Plan.  Each Holder of a Class 5 – Existing LP Preferred Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.    <u>Class 6 – Existing LP Common Units Equity Interests</u>

(a)    *Classification*: Class 6 consists of all Existing LP Common Units Equity Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Common Units Equity Interest, each Existing LP Common Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Existing LP Common Units Equity Interest shall receive its Pro Rata share of Excess Auction Proceeds, if any, as provided in Article IV.C hereof.

(c)    *Voting*: Class 6 is Impaired by the Plan.  Each Holder of a Class 6 – Existing LP Common Units Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

9.      Class 7 – Intercompany Claims

    (a)      *Classification*: Class 7 consists of all Intercompany Claims.

    (b)      *Treatment*: All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof.

    (c)      *Voting*: Class 7 is Impaired by the Plan.  Each Holder of a Class 7 – Intercompany Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 7 – Intercompany Claim is entitled to vote to accept or reject the Plan.

10.     Class 8 – Intercompany Interests

    (a)      *Classification*: Class 8 consists of all Intercompany Interests.

    (b)      *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

    (c)      *Voting*: Class 8 is Unimpaired by the Plan.  Each Holder of a Class 8 – Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 8 Intercompany Interest is entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the LP Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.      *Acceptance or Rejection of Plan*

1.      Voting Classes Under Plan

Under the Plan, Classes 3A, 3B, 3C, 4, 5, and 6 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan; provided, however, that to the extent that any Class of Claims or Equity Interests is satisfied in full, in Cash, from Plan Consideration, the Plan Proponents reserve the right to

(a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 2. Presumed Acceptance Under Plan

Under the Plan, Classes 1, 2, and 8 are Unimpaired, and the Holders of Claims or Equity Interests in such Classes are (a) conclusively presumed to have accepted the Plan, and (b) not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

### 3. Deemed Rejection of the Plan

Under the Plan, Class 7 is Impaired, and the Holders of Claims in such Class (a) shall receive no distributions under the Plan on account of their Claims, (b) are deemed to have rejected the Plan, and (c) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

### 4. Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

### 5. Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

### E. Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### F. Confirmation Pursuant to Section 1129(b) of Bankruptcy Code

To the extent that any Impaired Class votes to reject the Plan, the Plan Proponents may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code; provided, that the Plan Proponents shall not be required to satisfy section 1129(b) of the Bankruptcy Code with respect to any Class whose vote(s) are designated pursuant to section 1126(e) of the

Bankruptcy Code.  The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Disbursing Agent to make Plan Distributions shall be obtained from the Plan Consideration.  Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 3C, 4, 5, and 6 shall consist solely of Excess Auction Proceeds.

B.      *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On and after the Confirmation Date or the Effective Date, as applicable,  the LP Debtors or the Reorganized LP Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:   (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the LP Debtors or the Reorganized LP Debtors, as applicable, determine are necessary or appropriate.

1.      Confirmation Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)      New DIP LP Facility.  On or as soon as practicable after the Confirmation Date, the New DIP LP Facility Obligors and the other relevant entities shall enter into the New DIP LP Facility Credit Agreement.  On the New DIP LP Facility Closing Date, subject to the terms of the New DIP LP Facility Credit Agreement, the New DIP LP Facility Lenders shall fund the New DIP LP Facility and the proceeds shall be used to (i) if and to the extent necessary, indefeasibly repay in full in Cash the Allowed DIP LP

Facility Claims, (ii) pay certain Ad Hoc LP Secured Group Fee Claims as set forth in Article II.A hereof, and (iii) fund the working capital requirements of the LP Debtors through the Effective Date.

Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans. If SPSO or any SPSO Affiliate acquires any right, title, or interest to or in respect of New DIP LP Facility Tranche A Loans, such New DIP LP Facility Tranche A Loans shall automatically convert to New DIP LP Facility Tranche B Loans.

If New DIP LP Facility Tranche B Loans are Transferred to an Eligible Transferee, then such New DIP LP Facility Tranche B Loans shall convert to New DIP LP Facility Tranche A Loans. All Transfers of New DIP LP Facility Tranche B Loans shall be subject to the prior approval of the LP Debtors' board of directors or managers (including the board of an LP Debtors' general partner), as applicable.

(b) <u>Auction for New LightSquared Common Equity</u>.

(i) The Confirmation Order shall approve the Auction Procedures, and, to the extent a Qualified Bid with respect to the New LightSquared Common Equity is received, the sale of the New LightSquared Common Equity to the Successful Purchaser pursuant to sections 105(a), 1123(a)(5), 1123(b)(4), 1141, 1142(b), 1145, and 1146(a) of the Bankruptcy Code free and clear of any Claims, Liens, interests, or encumbrances.

(ii) Pursuant to the Auction Procedures, a Qualified Bid for the New LightSquared Common Equity shall, at a minimum (a "<u>Minimum Bid</u>"), be for Cash and (A) in the event that Class 3B votes to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims, and (2) all Allowed Prepetition LP Facility SPSO Claims, <u>minus</u> the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims or (B) in the event that Class 3B votes to reject the Plan, shall be in a minimum amount sufficient to pay all Allowed Prepetition LP Facility Non-SPSO Claims, <u>minus</u> the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims. Auction Proceeds shall be applied as set forth in Article IV.C hereof. Any Holder of a Claim or Equity Interest under the Plan, on its own, together with any number of additional Holders of Claims and/or Equity Interests and/or in

partnership with a third party, shall be permitted to submit a Qualified Bid in accordance with the Auction Procedures.

(iii)    Subject to the approval of a Successful Purchaser by the Ad Hoc LP Secured Group in consultation with the LP Debtors, on the Effective Date, New LightSquared shall be authorized to, among other things, issue, sell, assign, and/or transfer the New LightSquared Common Equity, subject to applicable law and the terms and conditions of the Auction Procedures and the Confirmation Order, and take any and all actions necessary to consummate such transaction. Nothing in the Plan or Confirmation Order shall authorize the transfer or assignment of the New LightSquared Common Equity to the Successful Purchaser (or, if applicable, the Alternative Successful Purchaser) without such Successful Purchaser's (or, if applicable, the Alternative Successful Purchaser's) compliance with applicable non-bankruptcy laws regarding the transfer, assignment, or ownership of the New LightSquared Common Equity.

2.    <u>Effective Date Plan Transactions</u>.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    <u>New LightSquared</u>.  Except as may be otherwise set forth in the Plan Supplement, LightSquared LP shall be converted to a Delaware limited liability company or corporation with the appropriate governmental authorities pursuant to applicable law.

(b)    <u>New LightSquared Loan Facility</u>.  New LightSquared and the other relevant entities shall enter into the New LightSquared Loan Facility, comprised of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.  Confirmation of the Plan shall constitute (i) approval of the New LightSquared Loan Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the New LightSquared Loan Facility Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization for the New LightSquared Loan Facility Obligors to enter into and execute the New LightSquared Loan Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the New LightSquared Loan Facility, together with any new promissory notes evidencing the obligation of the New LightSquared Loan Facility Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the New LightSquared Loan Facility Obligors pursuant to the New LightSquared Loan Facility and related documents shall be secured

and paid or otherwise satisfied pursuant to, and as set forth in, the New LightSquared Loan Facility Agreement and related documents.

(i)      New LightSquared Term Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Term Loan Facility, which shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Working Capital Facility, but which shall be subject to the "super-priority" status of the New LightSquared Working Capital Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors.  The New LightSquared Term Loans made pursuant to the New LightSquared Term Loan Facility shall be made by the Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims pursuant to, and in accordance with, Article III.B hereof.  If there is a Successful Purchaser pursuant to the Auction described in Article IV.B.1(b) hereof, and such Successful Purchaser closes, the Auction Proceeds shall be applied in accordance with Article IV.C hereof.  Pursuant to Article IV.C hereof, the aggregate amount of New LightSquared Term Loans to be made under the New LightSquared Term Loan Facility shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds paid to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims in lieu of making New LightSquared Term Loans.

In the event Class 3B votes to accept the Plan, the New LightSquared Tranche B Term Loans shall be stapled to the New LightSquared Class B Common Equity, and, if applicable, the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units).

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.  In the event Class 3B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Term Loans are Transferred to an Eligible Transferee (as determined by the Board), such New LightSquared Tranche B Term Loans shall convert into New LightSquared Tranche A Term Loans.  If any New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units or New

41

LightSquared Tranche B Term Loans, as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Term Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable.

The New LightSquared Tranche A Term Loans shall be stapled to the New LightSquared Class A Common Equity and, if applicable, the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units).  If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Tranche A Term Loans, such New LightSquared Tranche A Term Loans shall automatically convert into New LightSquared Tranche B Term Loans.

(ii)    New LightSquared Working Capital Facility.  On the Effective Date, New LightSquared and the other relevant entities shall enter into the New LightSquared Working Capital Facility, which shall provide for new money loans in the aggregate principal amount of $500 million, plus additional loans in an aggregate principal amount equal to the New DIP LP Facility Claims to be satisfied thereby, which loans shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility, but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors.  The members of the Ad Hoc LP Secured Group shall backstop, arrange or fund the New LightSquared Working Capital Facility pursuant to arrangements satisfactory to them.  In the event Class 3B votes to accept the Plan, SPSO shall have the right to fund its pro rata share of the New LightSquared Working Capital Facility; provided that any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP LP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans.

In the event Class 3B votes to accept the Plan, the New LightSquared Tranche B Working Capital Loans shall be stapled to the New LightSquared Class B Common Equity and the New LightSquared Tranche B Term Loans, and may only be Transferred together as a single

strip (with such strips to be divided into New LightSquared Stapled B Units).

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.  In the event Class 3B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Working Capital Loans are Transferred to an Eligible Transferee (as determined by the Board), such New LightSquared Tranche B Working Capital Loans shall convert into New LightSquared Tranche A Working Capital Loans. If any New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, as applicable.

The New LightSquared Tranche A Working Capital Loans shall be stapled to the New LightSquared Class A Common Equity and the New LightSquared Tranche A Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units).  If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Tranche A Working Capital Loans, such New LightSquared Tranche A Working Capital Loans shall automatically convert into New LightSquared Tranche B Working Capital Loans.

New LightSquared shall use the proceeds from the New LightSquared Working Capital Facility for the purposes specified in the Plan, including to repay the New DIP LP Facility (to the extent Holders of Allowed New DIP LP Facility Claims object to receiving New LightSquared Working Capital Facility Loans in satisfaction of such claims, as provided in Article II.D hereof), for general corporate purposes and working capital needs, and to make Plan Distributions (other than Plan Distributions with respect to any Allowed Claims or Equity Interests in Classes 3C, 4, 5, and 6, which shall be made solely from Excess Auction Proceeds).

(c)    <u>New LightSquared Common Equity</u>.  New LightSquared shall issue the New LightSquared Common Equity, comprised of New LightSquared

Class A Common Equity and New LightSquared Class B Common Equity, required to be issued in accordance with the Plan and all related instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order, or rule, or order of the Bankruptcy Court, but subject to the receipt of all regulatory approvals required in connection with such issuance.

(i)     <u>Economic Rights</u>.  Each share or unit of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity shall rank *pari passu* with respect to any dividends, distributions upon liquidation, dissolution or winding up of the company, which terms may not be altered without the consent of each of the holders of such shares or units.

(ii)    <u>Voting</u>.  Each share or unit of New LightSquared Class A Common Equity shall entitle the holder thereof to five (5) votes on any matter requiring the affirmative vote of the equityholders and each share or unit of New LightSquared Class B Common Equity shall entitle the holder thereof to one (1) vote on any matter requiring the affirmative vote of the equityholders.

(iii)   <u>Restrictions on Transfer</u>.

The New LightSquared Class A Common Equity shall be stapled to the New LightSquared Tranche A Term Loans, and, if applicable, to the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

The New LightSquared Class B Common Equity shall be stapled to the New LightSquared Tranche B Term Loans, and, if applicable, to the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). If any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units, New LightSquared Tranche A Term Loans, or

44

New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable.  If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Stapled A Units or New LightSquared Class A Common Equity, such New LightSquared Stapled A Units or New LightSquared Class A Common Equity, as applicable, shall automatically convert into New LightSquared Stapled B Units or New LightSquared Class B Common Equity, as applicable.

Any Transfer of New LightSquared Common Equity, other than a sale of the business, shall be prohibited and *void ab initio* to the extent that, upon completion of such Transfer, any Entity or Group (together with all Entities and Groups directly or indirectly controlling, controlled by or under the direct or indirect common control of such Entity or Group) beneficially owns or controls New LightSquared Common Equity representing at least 30% of the votes represented by all New LightSquared Common Equity issued and outstanding at the time of determination.

(iv)   <u>Reorganized LP Debtors Corporate Governance Documents</u>.  The foregoing terms regarding the rights and obligations of the New LightSquared Common Equity shall be implemented through appropriate terms contained in the Reorganized LP Debtors Corporate Governance Documents.

*C.     Allocation of Auction Proceeds*

Auction Proceeds shall be applied (1) first, in an aggregate amount equal to the Minimum Bid to pay Pro Rata Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims, as applicable, in lieu of the New LightSquared Common Equity to be otherwise provided with respect to such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (2) second, with respect to any amount over and above the Minimum Bid, to pay Pro Rata such Allowed Claims in lieu of New LightSquared Term Loans to be issued to Holders of such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (3) third, to pay Allowed New DIP LP Facility Claims, and (4) fourth, to pay Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, and Allowed Existing LP Common Units Equity Interests, in accordance with the immediately succeeding paragraph (which payments under this clause (4), for the avoidance of doubt, shall be made solely from Excess Auction Proceeds as described below). The amount of New LightSquared Term Loans to be issued to Holders of Allowed Prepetition LP Facility

Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders with respect to such New LightSquared Term Loans.  The amount of New LightSquared Working Capital Facility Loans to be issued to Holders of Allowed New DIP LP Facility Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders in lieu of such New LightSquared Working Capital Facility Loans.

Excess Auction Proceeds, that is, Auction Proceeds remaining, if any, after payment in full in Cash of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP LP Facility Claims, shall be paid to the Holders of Allowed Claims and Equity Interests against the LP Debtors in order of priority as follows: (1) first, Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, (2) second, Allowed Existing LP Preferred Units Equity Interests, and (3) third, Allowed Existing LP Common Units Equity Interests.

D.      *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including New LightSquared Common Equity, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code.   In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Common Equity, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized LP Debtors Corporate Governance Documents, and (4) applicable regulatory approval, if any.

E.      *Listing of New LightSquared Common Equity; Reporting Obligations*

Except as the Board may otherwise direct, the Reorganized LP Debtors shall not be (1) obligated to list the New LightSquared Common Equity on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized LP Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Reorganized LP Debtors Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Common Equity may be subject to certain transfer and other restrictions pursuant to the Reorganized LP Debtors Corporate Governance Documents.

46

F.    *Initial Boards of Directors and Managers*

The Board shall be comprised of seven (7) members, which shall initially include an independent chairperson, the chief executive officer of New LightSquared, two (2) independent directors with relevant industry experience, and three (3) directors selected in a manner to be determined by the Plan Proponents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Plan Proponents shall disclose in the Plan Supplement or otherwise prior to the Confirmation Hearing the identity and affiliations of any person proposed to serve on the initial Board and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person.  Each director or manager appointed to the Board and to the boards of the other Reorganized LP Debtors, as applicable, shall serve from and after the Effective Date pursuant to the terms of the applicable Reorganized LP Debtors Corporate Governance Documents and applicable law.

The term of any current members of the boards of directors or managers of any of the LP Debtors shall expire upon the Effective Date.  From and after the Effective Date, the members of the Board and the boards of any of the other Reorganized LP Debtors shall be selected and determined in accordance with the Reorganized LP Debtors Corporate Governance Documents of the applicable Reorganized LP Debtor and applicable law, including sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

G.    *Reorganized LP Debtors Corporate Governance Documents and Indemnification Provisions Therein*

On the Effective Date, the applicable Reorganized LP Debtors shall enter into and deliver the relevant Reorganized LP Debtors Corporate Governance Documents.

Confirmation of the Plan shall constitute authorization and approval:  (1) of the Reorganized LP Debtors Corporate Governance Documents and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized LP Debtors; and (2) for the Reorganized LP Debtors to enter into and execute, on or after the Effective Date, the Reorganized LP Debtors Corporate Governance Documents and such other documents as may be required or appropriate, including, without limitation, (a) taking steps, in the discretion of the Plan Proponents and Reorganized LP Debtors, as applicable, to insulate certain equityholders of New LightSquared in accordance with Section 1.993 of the rules of the FCC and (b) taking such other measures as deemed necessary and appropriate by the Plan Proponents to institute the measures set forth therein to have New LightSquared deemed, on the Effective Date, to be less than 25% foreign owned for purposes of compliance with Section 310(b) of the Communications Act of 1934, as amended, and the rules of the FCC.   On the Effective Date, the Reorganized LP Debtors Corporate Governance Documents, together with all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by the Reorganized LP Debtors pursuant to the Reorganized LP Debtors Corporate Governance Documents and related documents shall be satisfied pursuant to, and as set forth in, the Reorganized LP Debtors Corporate Governance Documents and related documents.

As of the Effective Date, the Reorganized LP Debtors Corporate Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized LP Debtors' then current directors, officers, employees, or agents (and such directors, officers, employees, or agents that held such positions as of the Confirmation Date) at least to the same extent as the organizational documents of each of the respective LP Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the Reorganized LP Debtors shall amend or restate the Reorganized LP Debtors Corporate Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the Reorganized LP Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

H.    Management Incentive Plan

On or as soon as practicable following the Effective Date, the Board may adopt a Management Incentive Plan.  **All New LightSquared Common Equity to be issued pursuant to the Plan to Holders of Allowed Claims shall be subject to dilution by any New LightSquared Common Equity issued pursuant to a Management Incentive Plan.**

I.    Management and Officers of Reorganized LP Debtors

Subject to any applicable employment contracts and applicable law, from and after the Effective Date, the officers of the Reorganized LP Debtors shall be selected and appointed by the board of directors of New LightSquared in accordance with, and pursuant to, the provisions of the Reorganized LP Debtors Corporate Governance Documents of New LightSquared, and applicable law.

J.    Corporate Governance

As shall be set forth in the Reorganized LP Debtors Charters and Reorganized LP Debtors Bylaws, the Reorganized LP Debtors Boards shall consist of a number of members, and be appointed in a manner, to be agreed upon by each Plan Proponent or otherwise provided in the Reorganized LP Debtors Corporate Governance Documents.    In accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent not already disclosed, the Plan Proponents shall disclose the following at, or prior to, the Confirmation Hearing:    (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized LP Debtors Boards or officer of the Reorganized LP Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized LP Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

K.    Vesting of Assets in Reorganized LP Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the

48

Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the LP Debtors pursuant to the Plan shall vest in each respective Reorganized LP Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for any Liens granted to secure the New LightSquared Working Capital Facility and New LightSquared Term Loans) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized LP Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, AFTER THE EFFECTIVE DATE, NO REORGANIZED LP DEBTOR AND NO AFFILIATE OF ANY SUCH REORGANIZED LP DEBTOR SHALL HAVE, OR BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM, OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO LIGHTSQUARED LP OR ANY OTHER LP DEBTOR) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO ANY OF THE REORGANIZED LP DEBTORS OR ANY OF THEIR AFFILIATES. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SHALL NOT AND SHALL NOT BE DEEMED TO PROVIDE A RELEASE OR WAIVER IN FAVOR OF HARBINGER OR ANY INC. DEBTOR.**

L.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP LP Facility Closing Date with respect to the DIP LP Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the LP Debtors under the DIP Facilities, the Prepetition LP Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the LP Debtors giving rise to any Claim or Equity Interest (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan), shall be cancelled solely as to the LP Debtors, and the Reorganized LP Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the LP Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the LP Debtors (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions

under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the Reorganized LP Debtors. For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, against any Inc. Debtor or any Holder of a Claim against, or equity interest in, an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article IV.L.

M.      Corporate Existence

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, including Article IV.B.2(a) hereof, each LP Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable LP Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court to the extent permitted by Canadian law, or any other Entity.

N.      Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the LP Debtors, the Reorganized LP Debtors, or any other Entity or Person, including, without limitation, the following: (1) all transfers of assets (including Equity Interests) that are to occur pursuant to the transactions contemplated under the Plan; (2) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions; (3) the execution and delivery of all applicable Plan Documents; (4) the implementation of all settlements and compromises as set forth in, incorporated by reference, or otherwise contemplated by the Plan; (5) the execution and delivery or consummation of any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation; (6) the adoption of by-laws and certificates of incorporation; and (7) the selection of the Board. All matters provided for in the Plan involving the company structure of the LP Debtors, and any company action required by the LP Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the LP Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the LP Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and

directed to issue, enter, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the LP Debtors, including, as appropriate:  (1) all transfers of assets (including Equity Interests) that are to occur pursuant to the transactions contemplated under the Plan; (2) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions; (3) the execution and delivery of all applicable Plan Documents; (4) the implementation of all settlements and compromises as set forth in, incorporated by reference, or otherwise contemplated by the Plan; (5) the execution and delivery or consummation of any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation; (6) the adoption of the Reorganized LP Debtors Corporate Governance Documents; and (7) the selection of the Board.  The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized LP Debtors and the officers and members of the boards of directors or managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized LP Debtors, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

P.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from an LP Debtor to a Reorganized LP Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the LP Debtors or the Reorganized LP Debtors, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.        *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized LP Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized LP Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the LP Debtors or the Reorganized LP Debtors, as applicable, shall not pursue any and all available Causes of Action against them.  The LP Debtors or the Reorganized LP Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized LP Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that an LP Debtor may hold against any Entity shall vest in the Reorganized LP Debtors, as applicable.

R.        *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the LP Debtors shall be deemed to have assumed all of the LP Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the LP Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies, and the LP Debtors shall be responsible only for premiums for the D&O Liability Insurance Policies properly allocable to the LP Debtors and their Estates.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the LP Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized LP Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and (except as otherwise set forth herein) all directors and officers of the LP Debtors who served in such capacity at any time on and after the Confirmation Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

S.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable Reorganized LP Debtors intend to assume and continue to perform the LP Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Disclosure Statement or other pleadings, for, among other things, compensation and wages (including bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the LP Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the LP Debtors' or Reorganized LP Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such expired or terminated policy, program, or plan. In addition, as of the Effective Date, Equity Interests granted to an existing employee of the LP Debtors pursuant to any equity plan maintained by the LP Debtors or under any existing employment agreement of the LP Debtors shall be treated in accordance with Class 4 in Article III.B.6 hereof and any such Equity Interest and equity plan shall be cancelled as of the Effective Date; provided, that the applicable Reorganized LP Debtors boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable Reorganized LP Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the Reorganized LP Debtors boards deem appropriate. Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing herein shall be, or shall be construed as, and implementation of the Plan shall not constitute, or be deemed to constitute, a change of control (or similar event) under any of the Debtors' or their Affiliates' contracts, agreements, policies, programs, or plans addressed by this Article IV.S.

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized LP Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

T.      *Prepetition Inc. Facility Actions*

The Plan serves as a request by the Ad Hoc LP Secured Group for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order. For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to the Ad Hoc LP Secured Group for purposes of pursuing any Prepetition Inc. Facility Action, and the filing of the Plan shall not be deemed as the Debtors' consent to, or support of, the grant of such standing.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the LP Debtors by Final Order or has been assumed, assumed and assigned, or rejected by the LP Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-LP Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-LP Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.      Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the Plan Proponents shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the LP Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement, which shall include the Inmarsat Cooperation Agreement (unless otherwise agreed in writing by the Ad Hoc LP Secured Group).

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Plan Proponents shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the LP Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the Reorganized LP Debtors no later than thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 6 in Article III.B.8 hereof.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Plan Proponents or Reorganized LP Debtors, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

In accordance with the Prior Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; <u>provided</u>, <u>however</u>, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the Reorganized LP Debtors' financial wherewithal must have been Filed, served, and actually received by the appropriate notice parties no later than December 30, 2013, at 4:00 p.m. (prevailing Eastern time).  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or

Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the Reorganized LP Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the Plan Proponents or Reorganized LP Debtors, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the LP Debtors reserve the right to reject, subject to the consent of the Ad Hoc LP Secured Group, any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to LP Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the LP Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Plan Proponents and the Reorganized LP Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting LP Debtors, from non-LP Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any LP Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any LP

Debtor and not rejected prior to the Effective Date, may be performed by the applicable Reorganized LP Debtor in the ordinary course of business.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the LP Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Postpetition Contracts and Leases*

Each Reorganized LP Debtor shall perform its obligations under each contract and lease entered into by the respective LP Debtor or applicable Reorganized LP Debtor after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such LP Debtor or Reorganized LP Debtor, in each case, in accordance with, and subject to, the then applicable terms. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Plan Proponents on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Plan Proponents that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the LP Debtors, or their respective Affiliates, have any liability thereunder.

The Plan Proponents reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the Plan Proponents or the Reorganized LP Debtors, as applicable, shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend the decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming

and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the LP Debtors, the DIP LP Lenders, the Prepetition LP Agent, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Except as otherwise provided in the Plan, the LP Debtors and the Reorganized LP Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. Except as otherwise provided in the Plan, the LP Debtors and the Reorganized LP Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.    *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the LP Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the LP Debtors on or prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Common Equity shall be deemed to be issued to (and the Reinstated Intercompany Interests shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any LP Debtor, Disbursing Agent, Reorganized LP Debtor, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The Disbursing Agent is authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the Disbursing Agent shall reserve any applicable Plan Consideration from Plan Distributions to

applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.      *Disbursing Agent*

All Plan Distributions shall be made by New LightSquared as Disbursing Agent, or such other Entity designated by the Plan Proponents or New LightSquared, as applicable, as Disbursing Agent. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Plan Proponents or the Reorganized LP Debtors, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the LP Debtors or the Reorganized LP Debtors, as applicable, to the Disbursing Agent for the benefit of the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable. All Plan Distributions by the Disbursing Agent shall be at the discretion of the Plan Proponents or the Reorganized LP Debtors, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.      *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to:  (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (2) make all Plan Distributions contemplated hereby; (3) employ professionals to represent it with respect to its responsibilities; and (4) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

        1.      Payments and Plan Distributions on Disputed Claims and Disputed Equity Interests

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

        2.      Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed Equity Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection

with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order and the Disputed Claims or Disputed Equity Interests have been Allowed.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

1.    Delivery of Plan Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the LP Debtors' or the Reorganized LP Debtors' records as of the date of any such Plan Distribution; provided, however, that the manner of such Plan Distributions shall be determined at the discretion of the Plan Proponents or the Reorganized LP Debtors, as applicable; provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, if any, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility Claims

The Plan Distributions provided for Allowed Prepetition LP Facility Claims in Articles III.B.3, III.B.4, 5 and III.B.5 hereof shall be made to applicable Holders of Allowed Prepetition LP Facility Claims by the Disbursing Agent.

Notwithstanding anything to the contrary herein, no Holder of an Allowed Prepetition LP Facility Claim shall be entitled to invoke any rights or remedies under any applicable Sharing Provision.  Holders of Prepetition LP Facility Claims are entitled only to the treatment specified with respect to such Claims in the Plan.

3.    Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.   The

Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Common Equity and such fractions shall be deemed to be zero.

4.    Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized LP Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized LP Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized LP Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized LP Debtors reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

H.    Setoffs

Each LP Debtor, or such entity's designee as instructed by such LP Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim (other than an Allowed Prepetition LP Facility Non-SPSO Claim, Allowed DIP Claim, or, in the event Class 3B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) or any Allowed Equity Interest, and the Plan Distributions on account of such Allowed Claim or Allowed Equity Interest, any and all claims, rights, and Causes of Action that an LP Debtor or its successors may hold against the Holder of such Allowed Claim or Allowed Equity Interest after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim or Equity Interest (other than an Allowed Prepetition LP Facility Non-SPSO Claim, Allowed DIP Claim,

or, in the event Class 3B votes to accept the Plan, Allowed Prepetition LP Facility SPSO Claim) hereunder shall constitute a waiver or release by an LP Debtor or its successor of any and all claims, rights, and Causes of Action that an LP Debtor or its successor may possess against such Holder.

*I.    Recoupment*

In no event shall any Holder of Claims against, or Equity Interests in, the LP Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the LP Debtors or the Reorganized LP Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the LP Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*J.    Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The LP Debtors or the Reorganized LP Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not an LP Debtor or Reorganized LP Debtor, or the Disbursing Agent. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not an LP Debtor or a Reorganized LP Debtor, or the Disbursing Agent, on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized LP Debtor or the Disbursing Agent, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized LP Debtor annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the LP Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the LP Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3. <u>Preservation of Insurance Rights</u>

Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which any of the LP Debtors is an insured or a beneficiary, nor shall anything contained herein constitute or be deemed a waiver by any of the LP Debtors' insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.    *Allowance of Claims and Equity Interests*

After the Effective Date, the Reorganized LP Debtors shall have and retain any and all rights and defenses that the LP Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Article IV.Q hereof.  Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Article I.A.8 hereof or the Bankruptcy Code.

B.    *Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized LP Debtors shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The Reorganized LP Debtors shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims and Disputed Equity Interests.  The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become disallowed Claims or disallowed Equity Interests shall be released from such reserve and may be used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims or Equity Interests*

Before the Effective Date, the Plan Proponents, and after the Effective Date, the Reorganized LP Debtors, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Plan Proponents or the Reorganized LP Debtors, as applicable, may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims or Equity Interests Without Objection*

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable LP Debtor, as applicable, by the Reorganized LP Debtors, and any Claim or Equity Interest that has been amended may be adjusted thereon by the Reorganized LP Debtors, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same LP Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable LP Debtor, as applicable, by the Reorganized LP Debtors without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

### E.        No Interest

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Plan Proponents or the Reorganized LP Debtors, as applicable, (3) provided for in a postpetition agreement in writing between the Plan Proponents or the Reorganized LP Debtors, as applicable, and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### F.        Deadline To File Objections to Claims or Equity Interests

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date, as may be extended from time to time.

### G.        Disallowance of Claims or Equity Interests

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the LP Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

### H.        Amendments to Claims

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized LP Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the LP Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the LP Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the LP Debtors or their Affiliates (other than the Inc. Debtors) with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, in the event that Class 3B votes to reject the Plan, the Prepetition LP Facility SPSO Subordinated Claims shall be (a) Disputed Claims and shall be treated in accordance with Articles VI and VII hereof, (b) subordinated to all other Claims against each of the LP Debtors, and (c) treated under the Plan as an unsecured Claim.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the LP Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable.  Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the Reorganized LP Debtors may compromise and settle Claims against, or Equity Interests in, the LP Debtors, and Causes of Action against other Entities.

D.    *Releases by LP Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the LP Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, the Released Parties are deemed released and discharged by the LP Debtors, the Reorganized LP Debtors, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including, but not limited to, the Ergen Actions in the event that Class 3B votes to accept the Plan), and any derivative claims asserted on behalf of the LP Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the LP Debtors, the Reorganized LP Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the LP Debtors, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the LP Debtors, the New LightSquared Term Loan Facility, the New DIP LP Facility, the New LightSquared Working Capital Facility, or the New LightSquared Common Equity, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission,**

transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New LightSquared Loan Facility Agreement, and Reorganized LP Debtors Corporate Governance Documents) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages,

68

Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever (including, but not limited to, the Ergen Actions in the event that Class 3B votes to accept the Plan), and any derivative claims asserted on behalf of an LP Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the LP Debtors, the LP Debtors' restructuring, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors, the New LightSquared Term Loan Facility, the New DIP LP Facility, the New LightSquared Working Capital Facility, or the New LightSquared Common Equity, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any LP Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; provided, however, that the third-party release in this Article VIII.F shall not apply to each present and former Holder of a Claim or Equity Interest that (a) votes to reject the Plan or has abstained from voting to accept or reject the Plan and (b) rejects the third-party release provided in this Article VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release.

Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New LightSquared Loan Facility Agreement, and Reorganized LP Debtors Corporate Governance Documents) executed to implement the Plan.

G.     *Injunction*

Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article VIII.D hereof or Article VIII.F hereof, discharged pursuant to Article VIII.A hereof, or are subject to exculpation pursuant to Article VIII.E hereof, are permanently enjoined to the fullest extent permissible under applicable law, from and after the Effective Date, from (1) pursuing any claims or actions released pursuant to Article VIII.F hereof (including, but not limited to, the Ergen Actions in the event that Class 3B votes to accept the Plan), and (2) taking any of the following actions against the LP Debtors or the Reorganized LP Debtors: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with

69

respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the LP Debtors in a nominal capacity to recover insurance proceeds so long as the LP Debtors or Reorganized LP Debtors, as applicable, and any such Entity agree in writing that such Entity shall (i) waive all Claims against the LP Debtors, the Reorganized LP Debtors, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

H.    *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the Reorganized LP Debtors and their successors and assigns.  The Reorganized LP Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order and the Canadian Court shall have entered the Disclosure Statement Recognition Order.

2.    The LP Debtors shall have received binding commitments with respect to the New DIP LP Facility and New LightSquared Working Capital Facility.

3.    The LP Debtors shall have listed on the Schedule of Assumed Agreements in the Plan Supplement the Inmarsat Cooperation Agreement (unless otherwise agreed in writing by the Ad Hoc LP Secured Group).

4.    The Bankruptcy Court shall have entered the Confirmation Order, which shall (a) be in form and substance satisfactory to the Plan Proponents, (b) be entered no later than October 31, 2014, and (c) approve the New LightSquared Loan Facility.

5.    The Bankruptcy Court shall have entered the New DIP LP Facility Order, which shall have become a Final Order.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    Each of the Confirmation Order and the Confirmation Recognition Order, in form and substance satisfactory to the Plan Proponents, shall have become a Final Order.

2.    All conditions precedent to the closing of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility shall have been satisfied or waived in accordance therewith.

3.    The Bankruptcy Court shall have made a Litigation Determination.

4.    The Bankruptcy Court shall have made an Inmarsat Cooperation Agreement Determination.

5.    The Plan Documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith:

(a)    the New LightSquared Loan Facility Agreement and any related documents, in forms and substance acceptable to the Plan Proponents, shall have been executed and delivered by all of the Entities that are parties thereto, and the incurrence of obligations pursuant to the New LightSquared Loan Facility shall have occurred;

(b)    the Reorganized LP Debtors Corporate Governance Documents, in forms and substance acceptable to the Ad Hoc LP Secured Group, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(c)    the LP Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

6.    The LP Debtors shall have paid in full in Cash all Ad Hoc LP Secured Group Fee Claims.

7.    All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

8.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the LP Debtors to emerge from chapter 11 pursuant to this Plan (including, without limitation and to the extent applicable, consents to the assignment of the LP Debtors' licenses, the transfer of control of the LP Debtors and/or the issuance of New LightSquared Common Equity, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including, if applicable, under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)).

C.    *Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by each Plan Proponent (in accordance with the terms hereof), without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  For the avoidance of doubt, the Ad Hoc LP Secured Group's consent to waive such conditions shall be determined by the vote of a majority in principal amount of outstanding loans held by the members of the Ad Hoc LP Secured Group.

D.    *Harbinger Litigation Action*

To the extent that they have not already done so, the Plan Proponents shall promptly commence and prosecute a Harbinger Litigation Action and shall use their best efforts to obtain a Harbinger Litigation Determination prior to the occurrence of the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Plan Proponents (in accordance with the terms hereof), reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code.    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, each of the Plan Proponents (in accordance with the terms hereof), expressly reserves its respective right to revoke or withdraw, or, to alter, amend, or modify materially the Plan with respect to any LP Debtor, one or more

times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect. Further, the Debtors reserve their right to withdraw support for the Plan at any time if it is determined that pursuing the Plan would be inconsistent with the exercise of their fiduciary duties; <u>provided</u> that such withdrawal is without prejudice to the right of the Ad Hoc LP Secured Group to continue to seek confirmation and consummation of the Plan.

D.      *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP LP Facility, the Plan, or otherwise, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.     Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which an LP Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized LP Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.     Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving an LP Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action or Potential Harbinger Claims;

7.     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

11. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. Hear and determine all disputes involving the existence, nature, or scope of the LP Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

13. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Article VI.J hereof;

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Determine any other matters that may arise in connection with or relate to the Plan, the  Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. Enter an order or final decree concluding or closing the Chapter 11 Cases;

17. Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

18. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20. Enforce all orders previously entered by the Bankruptcy Court;

21. Enforce the Litigation Determination, including by issuing injunctions, entering and implementing other orders, and taking such other actions as may be necessary to stay, bar, preclude, or otherwise limit Persons (other than the Debtors) to assert any claims or causes of action against the GPS Industry and/or the FCC;

22.    Hear and determine any Harbinger Litigation Action;

23.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan; and

24.    Hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the LP Debtors, the Reorganized LP Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-LP Debtor parties to Executory Contracts or Unexpired Leases with the LP Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Plan Proponents or the Reorganized LP Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.    *Successors and Assigns*

Except as otherwise provided in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any

heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the LP Debtors or the Reorganized LP Debtors, shall be served on:

| | |
|---|---|
| LightSquared LP | Milbank, Tweed, Hadley & McCloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

the Ad Hoc LP Secured Group or any members thereof, shall be served on:

White & Case LLP
Thomas E Lauria
Glenn M. Kurtz
1155 Avenue of the Americas
New York, NY 10036

Wilmington Savings Fund Society, FSB, as administrative agent under the Prepetition LP Credit Agreement, shall be served on:

McDermott Will & Emery LLP
Leonard Klingbaum
Darren Azman
340 Madison Avenue
New York, NY 10173

After the Effective Date, the Reorganized LP Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized LP Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.     *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.     *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the LP Debtors' or Reorganized LP Debtors', as applicable, consent, and (3) non-severable and mutually dependent.

J.     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Plan Proponents shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and

pursuant to section 1125(e) of the Bankruptcy Code, the LP Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.    *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the LP Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

New York, New York
Dated: August 26, 2014

**LIGHTSQUARED LP (FOR ITSELF AND
ALL OTHER LP DEBTORS)**

By:          */s/ Douglas Smith*
Name:      Douglas Smith
Title:       Chief Executive Officer, President,
             and Chairman of the Board of
             LightSquared LP


**CAPITAL RESEARCH AND MANAGEMENT
COMPANY, IN ITS CAPACITY AS
INVESTMENT MANAGER TO CERTAIN
FUNDS THAT ARE HOLDERS OF
PREPETITION LP FACILITY CLAIMS**

By:          */s/ Mark E. Brubaker*
Name:      Mark E. Brubaker
Title:       Authorized Signatory


**CYRUS CAPITAL PARTNERS, L.P., IN ITS
CAPACITY AS INVESTMENT MANAGER TO
CERTAIN FUNDS THAT ARE HOLDERS OF
PREPETITION LP FACILITY CLAIMS**

By:          */s/ Jennifer M. Pulick*
Name:      Jennifer M. Pulick
Title:       Authorized Signatory

**Exhibit A-4**

**Blackline Comparison of First Amended LP Debtors-Only Plan (Changed Pages Only)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**FIRST AMENDED JOINT PLAN OF LP DEBTORS ONLY PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY LP DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS**

---

Dated:  New York, New York
         August ~~15~~26, 2014

**MILBANK, TWEED, HADLEY & M$^{\underline{C}}$CLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group*
       *of LightSquared LP Lenders*

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
    OF TIME, AND GOVERNING LAW .................................................................. 1

    A.    Defined Terms ......................................................................................... 1
    B.    Rules of Interpretation ....................................................................... ~~23~~24
    C.    Non-Consolidated Plan ...................................................................... ~~24~~25
    D.    Computation of Time ......................................................................... ~~24~~25
    E.    Governing Law ................................................................................... ~~24~~25
    F.    Reference to Monetary Figures ......................................................... ~~24~~25

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
    COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS,
    AND U.S. TRUSTEE FEES ................................................................................ ~~24~~25

    A.    Administrative Claims ........................................................................ ~~25~~26
    B.    Accrued Professional Compensation Claims ..................................... ~~26~~27
    C.    DIP LP Facility Claims ..................................................................... ~~27~~28
    D.    New DIP LP Facility Claims ............................................................. ~~27~~28
    E.    Priority Tax Claims ........................................................................... ~~28~~29
    F.    Payment of Statutory Fees ................................................................. ~~28~~29

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS ......................................................................................................... ~~28~~29

    A.    Summary ............................................................................................ ~~28~~29
    B.    Classification and Treatment of Claims and Equity Interests ........... ~~29~~30
    C.    Special Provision Governing Unimpaired Claims and Equity Interests ... ~~35~~36
    D.    Acceptance or Rejection of Plan ....................................................... ~~35~~36
    E.    Elimination of Vacant Classes .......................................................... ~~36~~37
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code ....... ~~36~~37
    G.    Controversy Concerning Impairment ................................................ ~~37~~38

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ...................................... ~~37~~38

    A.    Sources of Consideration for Plan Distributions ............................... ~~37~~38
    B.    Plan Transactions .............................................................................. ~~37~~38
    C.    Allocation of Auction Proceeds ........................................................ ~~44~~45
    D.    Section 1145 and Other Exemptions ................................................. ~~45~~46
    E.    Listing of New LightSquared Common Equity; Reporting Obligations ... ~~45~~46
    F.    Initial Boards of Directors and Managers ......................................... ~~46~~47

G.    Reorganized LP Debtors Corporate Governance Documents and
        Indemnification Provisions Therein ................................................... 4647

H.    Management Incentive Plan ............................................................... 4748

I.    Management and Officers of Reorganized LP Debtors ........................ 4748

J.    Corporate Governance ...................................................................... 4748

K.    Vesting of Assets in Reorganized LP Debtors ................................... 4748

L.    Cancellation of Securities and Agreements ........................................ 4849

M.    Corporate Existence ......................................................................... 4950

N.    Corporate Action .............................................................................. 4950

O.    Effectuating Documents; Further Transactions .................................. 5051

P.    Exemption from Certain Taxes and Fees .......................................... 5051

Q.    Preservation, Transfer, and Waiver of Rights of Action ..................... 5152

R.    Assumption of D&O Liability Insurance Policies ............................... 5152

S.    Employee and Retiree Benefits ......................................................... 5253

T.    Prepetition Inc. Facility Actions ....................................................... 5253

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ........................................................................................... 5354

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ... 5354

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases .... 5455

C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed
        Pursuant to Plan ............................................................................... 5455

D.    Pre-existing Obligations to LP Debtors Under Executory Contracts and
        Unexpired Leases ............................................................................. 5556

E.    Intercompany Contracts, Contracts, and Leases Entered into After Petition
        Date, Assumed Executory Contracts, and Unexpired Leases .............. 5556

F.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ...................................................................................... 5657

G.    Postpetition Contracts and Leases .................................................... 5657

H.    Reservation of Rights ....................................................................... 5657

I.    Nonoccurrence of Effective Date ....................................................... 5657

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ......................... 5758

A.    Distribution Record Date .................................................................. 5758

B.    Timing and Calculation of Amounts To Be Distributed ...................... 5758

C.    Disbursing Agent .............................................................................. 5859

D.    Rights and Powers of Disbursing Agent ............................................ 5859

E.    Plan Distributions on Account of Claims and Equity Interests Allowed After
        Effective Date .................................................................................. 5859

F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan
        Distributions .................................................................................... 5960

G.    Compliance with Tax Requirements/Allocations ............................................. 6061
H.    Setoffs ........................................................................................................... 6061
I.    Recoupment ................................................................................................... 6162
J.    Claims Paid or Payable by Third Parties ...................................................... 6162

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED,  AND DISPUTED CLAIMS AND DISPUTED
        EQUITY INTERESTS ...................................................................... 6263

A.    Allowance of Claims and Equity Interests .................................................... 6263
B.    Claims and Equity Interests Administration Responsibilities ........................ 6263
C.    Estimation of Claims or Equity Interests ...................................................... 6263
D.    Expungement or Adjustment to Claims or Equity Interests Without Objection 6364
E.    No Interest ..................................................................................................... 6465
F.    Deadline To File Objections to Claims or Equity Interests ........................... 6465
G.    Disallowance of Claims or Equity Interests .................................................. 6465
H.    Amendments to Claims .................................................................................. 6465

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
        PROVISIONS ................................................................................... 6566

A.    Discharge of Claims and Termination of Equity Interests ............................ 6566
B.    Subordinated Claims ...................................................................................... 6566
C.    Compromise and Settlement of Claims and Controversies ........................... 6667
D.    Releases by LP Debtors ................................................................................. 6667
E.    Exculpation .................................................................................................... 6768
F.    Third-Party Releases by Holders of Claims or Equity Interests ................... 6768
G.    Injunction ...................................................................................................... 6869
H.    Release of Liens ............................................................................................ 6970

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND
        EFFECTIVE DATE OF PLAN .......................................................... 6970

A.    Conditions Precedent to Confirmation Date .................................................. 6970
B.    Conditions Precedent to Effective Date ........................................................ 7071
C.    Waiver of Conditions ..................................................................................... 7172
D.    Harbinger Litigation Action .......................................................................... 7172

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ...... 7172

A.    Modification and Amendments ...................................................................... 7172
B.    Effect of Confirmation on Modifications ...................................................... 7273
C.    Revocation or Withdrawal of Plan ................................................................ 7273
D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur ..... 7273

iv

ARTICLE XI. RETENTION OF JURISDICTION ........................................ ~~72~~73

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................... ~~75~~76

    A.     Immediate Binding Effect ................................................... ~~75~~76

    B.     Additional Documents ........................................................ ~~75~~76

    C.     Reservation of Rights ......................................................... ~~75~~76

    D.     Successors and Assigns ...................................................... ~~75~~76

    E.     Service of Documents ........................................................ ~~76~~77

    F.     Term of Injunctions or Stays ............................................. ~~77~~78

    G.     Plan Supplement .............................................................. ~~77~~78

    H.     Entire Agreement .............................................................. ~~77~~78

    I.     Non-severability of Plan Provisions .................................. ~~77~~78

    J.     Votes Solicited in Good Faith ........................................... ~~77~~78

    K.     Waiver or Estoppel ........................................................... ~~78~~79

    L.     Conflicts ........................................................................... ~~78~~79

expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "**Ad Hoc LP Secured Group**" means that certain ad hoc group of Prepetition LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude SPSO.

3.      "**Ad Hoc LP Secured Group Advisors**" means White & Case LLP, as counsel to the Ad Hoc LP Secured Group, and Blackstone Advisory Partners L.P., as financial advisor to the Ad Hoc LP Secured Group.

4.      "**Ad Hoc LP Secured Group Fee Claims**" means all Claims for: (a) the reasonable documented fees and expenses of the Ad Hoc LP Secured Group Advisors and [(b) reasonable out-of-pocket expenses incurred by each member of the Ad Hoc LP Secured Group in their capacities as such, including the reasonable documented fees and expenses of LightSquared LP Lender Advisors.].

5.      "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the LP Debtors' Estates and operating the businesses of the LP Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise that are properly allocable to the LP Debtors and their Estates for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the LP Debtors and their Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases of the LP Debtors pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments that are properly allocable to the LP Debtors and their Estates; (g) Claims for the Break-Up Fee or Expense Reimbursement; provided, however, that no party shall be entitled to, or receive (nor shall any reserve be required on account of), any Break-Up Fee or Expense Reimbursement; (h) the Ad Hoc LP Secured Group Fee Claims; and (i) any fees and expenses that are earned and payable pursuant to the New DIP LP Facility, the New LightSquared Working Capital Facility, the Plan, and the other Plan Documents.

6.      "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

7.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

36.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

38.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

39.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, **and granting other related relief,** in form and substance satisfactory to the Plan Proponents.

40.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Confirmation Order and vesting in the Reorganized LP Debtors all of the LP Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

41.    "**Consummation**" means the occurrence of the Effective Date.

42.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the LP Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the LP Debtors for directors', managers', and officers' liability.

44.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

45.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

46.    "**DIP Claim**" means a DIP LP Facility Claim or a New DIP LP Facility Claim.

47.    "**DIP Facilities**" means, collectively, the DIP LP Facility and the New DIP LP Facility.

48.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

49.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents.

6

50.    "**DIP LP Facility Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

51.    "**DIP LP Guarantors**" means each existing and future, direct or indirect, subsidiary of LightSquared LP, as guarantors under the DIP LP Facility.

52.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

53.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Fifth Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1681] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

54.    "**Disbursing Agent**" means, for purposes of making distributions under the Plan, New LightSquared or such other Entity designated by the Plan Proponents or New LightSquared, as applicable.

55.    "**Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918] and (b) the *Specific Disclosure Statement for First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. ~~1689~~__] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, subject to the prior consent of the Ad Hoc LP Secured Group, which consent shall not be unreasonably withheld).

56.    "**Disclosure Statement Order**" means the order or orders entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably acceptable to the Plan Proponents, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

57.    "**Disclosure Statement Recognition Order**" means the order or orders of the Canadian Court, which shall be in form and substance acceptable to the Plan Proponents, recognizing the entry of the Disclosure Statement Order.

58.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

59.    "**Disputed Claims and Equity Interests Reserve**" means applicable Plan Consideration from the Plan Consideration Carve-Out to be held in reserve by the Reorganized LP Debtors for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.  Plan Consideration to be reserved on account of any Disputed Claims or Equity Interests in Classes 3C, 4, 5, and 6, and payable on account of any

7

68. "**Excess Auction Proceeds**" means all Auction Proceeds remaining, if any, after payment in full, in Cash, of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP LP Facility Claims, pursuant to and in accordance with Articles III.B and IV.C hereof.

69. "**Exculpated Party**" means a Released Party.

70. "**Executory Contract**" means a contract to which one or more of the LP Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

71. "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP**, and the outstanding Equity Interests in LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc**.

72. "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

73. "**Existing Shares**" means all Equity Interests related to Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

74. "**Expense Reimbursement**" has the meaning set forth in the Prior Bid Procedures Order.

75. "**FCC**" means the Federal Communications Commission.

76. "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

77. "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

78. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, including the Canadian Court, with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or under the Ontario Rules of Civil Procedure, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, that the Plan Proponents reserve the right to waive any appeal period.

79. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

80.    "**GPS Industry**" means Deere & Company, Garmin International, Inc., Trimble Navigation Limited, the U.S. GPS Industry Council, the Coalition to Save Our GPS, and any of their related entities or ~~Affiliates~~**affiliates** or any of their successors and assigns.

**81.    "Group" has the meaning set forth under Regulation 13D under the Securities Exchange Act.**

**82.**    ~~81.~~ "**Harbinger**" means Harbinger Capital Partners, LLC, its affiliated and managed funds, and any affiliated Persons thereof.

**83.**    ~~82.~~ "**Harbinger Litigation Action**" shall mean an action (including, without limitation, by motion or adversary proceeding before the Bankruptcy Court) brought by any of the Plan Proponents to stay, bar, enjoin, preclude, or otherwise limit Harbinger and/or any of its ~~Affiliates~~**affiliates** from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is, or directly affects, any property of one or more of the LP Debtors' Estates or the Reorganized LP Debtors.

**84.**    ~~83.~~ "**Harbinger Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court or other court of competent jurisdiction, that stays, bars, enjoins, precludes, or otherwise limits Harbinger and/or any of its ~~Affiliates~~**affiliates** from asserting against the GPS Industry and/or the United States of America any claim or Cause of Action that is or directly affects any property of one or more of the LP Debtors' Estates or the Reorganized LP Debtors.

**85.**    ~~84.~~ "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

**86.**    ~~85.~~ "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

**87.**    ~~86.~~ "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, and One Dot Six TVCC Corp.

**88.**    ~~87.~~ "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act (Canada), among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

**89.**    ~~88.~~ "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time), by and between LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc., and Inmarsat Global Limited.

**90.**    ~~89.~~ "**Inmarsat Cooperation Agreement Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, that, as between the Debtors and their Affiliates, LightSquared LP and SkyTerra (Canada) Inc. are the

sole beneficiaries of the Inmarsat Cooperation Agreement, and the Inc. Debtors do not hold any beneficial interest in the Inmarsat Cooperation Agreement.

**91.** 90. "**Intercompany Claim**" means any Claim against an LP Debtor held by another LP Debtor.

**92.** 91. "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are LP Debtors.

**93.** 92. "**Intercompany Interest**" means any Equity Interest in an LP Debtor held by another LP Debtor.

**94.** 93. "**Interim Compensation Order**" means the Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

**95.** 94. "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

**96.** 95. "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the LP Debtors approved pursuant to an order of the Bankruptcy Court.

**97.** 96. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

97. ["**LightSquared LP Lender Advisors**" means counsel to a LightSquared LP lender that is a member of the Ad Hoc LP Secured Group (but does not include the Ad Hoc LP Secured Group Advisors).]

98. "**Litigation Determination**" means a determination, by order or other judgment of the Bankruptcy Court, which shall be acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors, (a) addressing whether (i) any of the claims and Causes of Action asserted in the proceedings captioned *LightSquared Inc. v. Deere & Company (In re LightSquared Inc.)*, Case No. 12-12080 (SCC), Adv. Proc. No. 13-01670 (SCC) (Bankr. S.D.N.Y. 2013), *LightSquared Inc. v. Deere & Company*, Case No. 13-cv-08157 (RMB) (S.D.N.Y. 2013), and *Harbinger Capital Partners, LLC, et al. v. United States of America*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014), and (ii) any other identified claims and Causes of Action that may be asserted against the GPS Industry and/or the United States of America relating in any way to the LP Debtors' FCC licenses and authorizations or the use of the spectrum rights conferred thereby, are property of one or more of the LP Debtors' Estates and (b) providing that all other Persons (including, without limitation, Harbinger and its non-Debtor affiliates) shall be stayed, barred, enjoined, precluded, or otherwise limited from pursuing, asserting, interfering with, or exercising any dominion or control over any such

claims or Causes of Action that are determined by the Bankruptcy Court to be, or to directly affect any, property of one or more of the LP Debtors' Estates.

99.    "**LP Cash Collateral Order**" means the *Amended Agreed Final Order (a) Authorizing Debtors To Use Cash Collateral, (b) Granting Adequate Protection to Prepetition LP Facility Secured Parties, and (c) Modifying Automatic Stay* [Docket No. 544] (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

100.    "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., LightSquared Investors Holdings, Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.

101.    "**LP General Unsecured Claim**" means any Claim that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition LP Facility Non-SPSO Claim; (g) Prepetition LP Facility SPSO Claim; (e) Prepetition LP Facility SPSO Subordinated Claim (if any); or (f) Intercompany Claim.

102.    "**LP Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

103.    "**LP Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition LP Facility Claim.

104.    "**Management Incentive Plan**" means a post-Effective Date management equity incentive plan approved by the Board, which may provide for the issuance of New LightSquared Common Equity to officers and employees of the Reorganized LP Debtors.

105.    "**Minimum Bid**" has the meaning set forth in Article IV.B.1(b)(ii) hereof.

106.    "**New DIP LP Facility**" means a senior secured, priming, superpriority debtor-in-possession facility in the aggregate principal amount of $[119.3]120.6 million, plus the aggregate amount of Allowed DIP LP Claims, which shall have market terms and conditions and which shall be secured by senior priming liens and allowed superpriority administrative expense claims on all the assets of the LP Debtors, in form and substance satisfactory to the Ad Hoc LP Secured Group and reasonably satisfactory to the LP Debtors.

107.    "**New DIP LP Facility Agent**" means the administrative agent under the New DIP LP Facility Credit Agreement or any successor agent appointed in accordance with the New DIP LP Facility Credit Agreement.

108.    "**New DIP LP Facility Claim**" means a Claim held by the New DIP LP Facility Agent or New DIP LP Facility Lenders arising under, or related to, the New DIP LP

118.    "**New LightSquared Class A Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class B Common Equity, but each share or unit of New LightSquared Class A Common Equity shall have five (5) times the voting power of a share or unit of New LightSquared Class B Common Equity.

119.    "**New LightSquared Class B Common Equity**" means those certain equity interests issued by New LightSquared in connection with, and subject to, the Plan and the Confirmation Order, each share or unit of which shall provide for the same rights as to dividends and distributions upon liquidation as each share or unit of New LightSquared Class A Common Equity, but each share or unit of New LightSquared Class B Common Equity shall have one-fifth (1/5ᵗʰ) the voting power of a share or unit of New LightSquared Class A Common Equity.

120.    "**New LightSquared Common Equity**" means New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.

121.    "**New LightSquared Loan Facility**" means the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.

122.    "**New LightSquared Loan Facility Agreement**" means that certain credit agreement to be entered into among New LightSquared and its subsidiaries and the Holders of Prepetition LP Facility Non-SPSO Claims, the Holders of Prepetition LP Facility SPSO Claims, and the New LightSquared Working Capital Facility Lenders.

123.    "**New LightSquared Obligors**" means New LightSquared and its subsidiaries.

124. "**New LightSquared Shareholder Agreement**" means a shareholder agreement, to be filed with the Plan Supplement.

**124.    "New LightSquared Stapled A Units" means a single unit comprised of $1 million (or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans held by the applicable holder), together with a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term Loans held by such holder) of New LightSquared Tranche A Working Capital Loans (to the extent applicable) and New LightSquared Class A Common Equity.**

125.    "**New LightSquared Stapled B Units**" means a single unit comprised of $1 million **(or such lesser amount to be determined by the Plan Proponents and disclosed in the Plan Supplement, which shall be the same amount set with respect to the New LightSquared Stapled A Units)** of principal amount of New LightSquared Tranche B Term Loans (or, if less **than such amount**, the entire aggregate principal amount of the New

approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans.

131.    "**New LightSquared Tranche B Working Capital Loans**" means the tranche "B" "super-priority" working capital term loans to be made under the New LightSquared Working Capital Loan Facility, which shall rank *pari passu* in right of payment and security with the New LightSquared Tranche A Working Capital Loans, and which shall have the same rights as the New LightSquared Tranche A Working Capital Loans, except that the Holders of the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans.

132.    "**New LightSquared Working Capital Facility**" means a "super-priority" working capital term loan facility in an aggregate principal amount of $[—]**500** million, plus the aggregate amount of Allowed New DIP LP Facility Claims to be satisfied thereby, which shall be secured by liens on substantially all of the assets of New LightSquared and its subsidiaries and rank *pari passu* in right of payment and security with the New LightSquared Term Loan Facility; provided that the New LightSquared Working Capital Facility shall have "super-priority" status with respect to certain prepayments, repayments, and the application of proceeds in connection with an enforcement action as described above in the definition of "New LightSquared Term Loan Facility."   The New LightSquared Working Capital Facility shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors.

133.    "**New LightSquared Working Capital Facility Lenders**" means the lenders under the New LightSquared Working Capital Facility that are party to the New LightSquared Loan Facility Agreement from time to time.

134.    "**New LightSquared Working Capital Facility Loans**" means the New LightSquared Tranche A Working Capital Loans and the New LightSquared Tranche B Working Capital Loans.

135.     "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

136.    "**Petition Date**" means May 14, 2012.

16

137.    "**Plan**" means this chapter 11 plan, including all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time (but solely in accordance with the terms hereof), in form and substance reasonably acceptable to the Plan Proponents, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

138.    "**Plan Consideration**" means a payment or distribution of Cash, assets, securities, or instruments evidencing an obligation to Holders of Allowed Claims or Equity Interests under the Plan.  Plan Consideration to be paid or distributed with respect to any Allowed Claims or Equity Interests in Classes 3C, 4, 5, and 6 shall consist solely of Excess Auction Proceeds.

139.    "**Plan Consideration Carve-Out**" means the amount of Plan Consideration necessary to fund the Professional Fee Reserve and Disputed Claims and Equity Interests Reserve.

140.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

141.    "**Plan Documents**" means the documents other than this Plan to be executed, delivered, assumed, or performed in conjunction with the Plan as necessary to consummate the Plan Transactions, including, without limitation, any documents included in the Plan Supplement, in each case, in form and substance satisfactory to the Plan Proponents.

142.    "**Plan Proponents**" means the LP Debtors and the Ad Hoc LP Secured Group.

143.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, in form and substance satisfactory to the Plan Proponents) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including the Plan Documents.

144.    "**Plan Supplement Date**" means (a) [~~_____~~]**September 16**, 2014 or (b) such other date agreed to by the Plan Proponents and approved by the Bankruptcy Court; provided that the Plan Proponents reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

145.    "**Plan Transactions**" means one or more transactions to occur on or before the Effective Date, or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or

155.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

156.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

157.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

158.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

159.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim or a Prepetition LP Facility SPSO Subordinated Claim.

160.    "**Prepetition LP Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition LP Credit Agreement from and after the Petition Date less the amount of adequate protection payments made by LightSquared LP during the Chapter 11 Cases pursuant to the LP Cash Collateral Order (exclusive of Professional Fees (as defined in the LP Cash Collateral Order) paid in accordance with the LP Cash Collateral Order).

161.    "**Prepetition LP Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition LP Loan Documents prior to the Petition Date.

162.    "**Prepetition LP Facility Repayment Premium**" means the repayment premium due and owing pursuant to § 2.10(f) of the Prepetition LP Credit Agreement.

163.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its ~~Affiliates~~**affiliates**, other than a Prepetition LP Facility SPSO Subordinated Claim.

164.    "**Prepetition LP Facility SPSO Subordinated Claim**" means a Prepetition LP Facility Claim held by SPSO or any of its affiliates that has been equitably subordinated pursuant to an order of the Bankruptcy Court following the Confirmation Date.

165.    [**"Prepetition LP Facility SPSO Subordinated Guarantee Claim**" means a Prepetition LP Facility SPSO Subordinated Claim against any of the Inc. Debtors.]

166.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

19

175.    "**Professional Fee Reserve**" means the Cash from the Plan Consideration Carve-Out in an amount equal to the Professional Fee Reserve Amount to be held in reserve by the Reorganized LP Debtors in the Professional Fee Escrow Account.

176.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

177.    "**Prohibited Transferee**" means SPSO, any SPSO Affiliate, and any other ~~Person~~**Entity** that may be identified by the Plan Proponents in ~~a~~**the** Plan Supplement as a Prohibited Transferee~~.~~ **and such Entity's successors or any member of any Group of which any such Entity or its successors is a member or any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, any such Entity or its successors or any member of any Group of which any such Entity or its successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (a) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (b) in the case of a corporation, any officer or director of such corporation, (c) in the case of a partnership, any general partner of such partnership, (d) in the case of a trust, any trustee or beneficiary of such trust, (e) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (a) through (d) above, and (f) any trust for the benefit of any individual described in clauses (a) through (e) above.**

178.    "**Proof of Claim**" means a proof of Claim Filed against any of the LP Debtors in the Chapter 11 Cases.

179.    "**Qualified Bid**" has the meaning set forth in the Auction Procedures.

180.    "**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such

199.    "**Special Committee**" means the special committee of the board of directors of LightSquared Inc. and LightSquared GP Inc.

200.    "**SPSO**" means SP Special Opportunities, LLC.

201.    "**SPSO Affiliate**" means ~~any Affiliate of SPSO, including, but not limited to,~~ (a) Charles W. Ergen and ~~any Affiliate of~~**L-Band Acquisition, LLC and their successors and any member of a Group of which SPSO,** Charles W. Ergen~~,~~ **and L-Band Acquisition, LLC or their successors are a member, and** (b) any **other** Entity ~~owned or~~**or Group directly or indirectly controlling,** controlled by**, or under common control with, SPSO,** Charles W. Ergen~~, (c)~~ **and/or L-Band Acquisition, LLC or their successors or any member of any Group of which SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (u) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above. For the avoidance of doubt, it is understood that** DISH Network Corporation~~and~~**,** EchoStar Corporation, ~~(d) any Affiliate of~~**and any other Entity directly or indirectly controlling, controlled by, or under common control with,** DISH Network Corporation or EchoStar Corporation~~, and (e) any~~ **are currently SPSO** Affiliates~~of the foregoing~~.

202.    "**SPSO Fee Claims**" means all Claims for the reasonable and documented out-of-pocket expenses (including professionals' fees and expenses) incurred by SPSO in connection with the Chapter 11 Cases or the Prepetition LP Loan Documents.

203.    "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

204.    "**Successful Purchaser**" has the meaning set forth in the Auction Procedures.

205.    "**Transfer**" or "**Transferred**" means, whether voluntarily or involuntarily or by operation of law, directly or indirectly, the sale, assignment, donation, gift, pledging, hypothecation, disposal of, encumbering or granting a security interest in, or in any other manner, transferring any New LightSquared Stapled B Units, New LightSquared Tranche B

Loans issued pursuant to this Article III.B.3(c) shall be increased to $1.2 billion.  A Holder's Pro Rata share in this Article III.B.3(c) shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (i) Allowed Prepetition LP Facility Non-SPSO Claims, plus (ii) Allowed Prepetition LP Facility SPSO Claims if Class 3B votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.3(c), as provided in Article IV.C hereof.

For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, held by any Holder of a Prepetition LP Facility Non-SPSO Claim against any Inc. Debtor or any ~~holder~~**Holder** of a ~~claim~~**Claim** against**,** or ~~equity interest~~**Equity Interest** in**,** an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article III.B.3(c).

(d)  *Voting*: Class 3A is Impaired by the Plan.  Each Holder of a Class 3A – Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

4.  Class 3B – Prepetition LP Facility SPSO Claims

(a)  *Classification*: Class 3B consists of all Prepetition LP Facility SPSO Claims.

(b)  *Allowance*: Prepetition LP Facility SPSO Claims shall be Allowed as follows:

(i)  in the event that Class 3B votes to accept the Plan, the Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts otherwise accrued under the Prepetition LP Loan Documents with respect to such Prepetition LP Facility SPSO Claims through and including the Confirmation Date), plus (B) all Prepetition LP Facility Postpetition Interest that accrues on such Prepetition LP Facility SPSO Claims between the Confirmation Date and the Effective Date, plus (C) all

33

SPSO Fee Claims incurred between the Confirmation Date and the Effective Date; or

(ii)    in the event that Class 3B votes to reject the Plan, (A) the Allowed amount of the Prepetition LP Facility SPSO Claims, including the amount of the Prepetition LP Facility SPSO Subordinated Claims, shall be determined by the Bankruptcy Court after the Confirmation Date, (B) the Class 3B – Prepetition LP Facility SPSO Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (C) each Holder of a Prepetition LP Facility SPSO Claim shall not be treated as a Released Party, and (D) all claims against SPSO shall be preserved.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

**(i)**    (iii) in the event that Class 3B votes to accept the Plan, (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $[1.0 billion] of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in this Article III.B.4(c)(i) shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (Y) Allowed Prepetition LP Facility SPSO Claims, plus (Z) Allowed Prepetition LP Facility Non-SPSO Claims; or

**(ii)**    (iv) in the event that Class 3B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in this Article III.B.4(c), as provided in Article IV.C hereof.

For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, held by any Holder of a Prepetition LP Facility SPSO Claim against any Inc. Debtor or any ~~holder~~**Holder** of a ~~claim~~**Claim** against**,** or ~~equity interest~~**Equity Interest** in**,** an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article III.B.4(c).

(d)      *Voting*: Class 3B is Impaired by the Plan. Each Holder of a Class 3B – Prepetition LP Facility SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, that such vote may be designated under section 1126(e) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court.

5.    Class 3C – Prepetition LP Facility SPSO Subordinated Claims

(a)      *Classification*: Class 3C consists of all Prepetition LP Facility SPSO Subordinated Claims, if any.

(b)      *Allowance*: In the event that Class 3B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after the Confirmation Date, (ii) the Class 3C – Prepetition LP Facility SPSO Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII hereof, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim shall not be treated as a Released Party, and (iv) all claims against SPSO shall be preserved.

(c)      *Treatment*: In the event that Class 3B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive its Pro Rata share of Excess Auction Proceeds, if any; provided, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim ~~[~~(including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims)~~]~~.

(c)    *Voting*: Class 5 is Impaired by the Plan.  Each Holder of a Class 5 –
Existing LP Preferred Units Equity Interest as of the Voting Record
Date is entitled to vote to accept or reject the Plan.

8.    <u>Class 6 – Existing LP Common Units Equity Interests</u>

(a)    *Classification*: Class 6 consists of all Existing LP Common Units Equity
Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and
discharge of, and in exchange for, each Allowed Existing LP Common
Units Equity Interest, each Existing LP Common Units Equity Interest
shall be cancelled and, on the Effective Date or as soon thereafter as
reasonably practicable, each Holder of an Allowed Existing LP Common
Units Equity Interest shall receive its Pro Rata share of Excess Auction
Proceeds, if any, as provided in Article IV.C hereof.

(c)    *Voting*: Class 6 is Impaired by the Plan.  Each Holder of a Class 6
–Existing LP Common Units Equity Interest as of the Voting Record
Date is entitled to vote to accept or reject the Plan.

9.    <u>Class 7 – Intercompany Claims</u>

(a)    *Classification*: Class 7 consists of all Intercompany Claims.

(b)    *Treatment*: All Allowed Intercompany Claims shall be cancelled as of
the Effective Date, and Holders of Allowed Intercompany Claims shall
not receive any distribution from Plan Consideration, or retain any
Claims, on account of such Allowed Intercompany Claims; <u>provided,
however</u>, that any Allowed Intercompany Claim of SkyTerra (Canada)
Inc. against LightSquared Corp. shall not be cancelled and shall be
Reinstated for the benefit of the Holder thereof.

(c)    *Voting*: Class 7 is Impaired by the Plan.  Each Holder of a Class 7 –
Intercompany Claim is deemed to have rejected the Plan pursuant to
section 1126(g) of the Bankruptcy Code.  No Holder of a Class 7 –
Intercompany Claim is entitled to vote to accept or reject the Plan.

10.    <u>Class 8 – Intercompany Interests</u>

(a)    *Classification*: Class 8 consists of all Intercompany Interests.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and
discharge of, and in exchange for, each Allowed Intercompany Interest,
on the Effective Date or as soon thereafter as reasonably practicable,
each Allowed Intercompany Interest shall be Reinstated for the benefit

New DIP LP Facility Tranche B Loans shall be subject to the prior approval of the LP Debtors' board of directors or managers (including the board of an LP Debtors' general partner), as applicable. ~~Any Transfer or purported Transfer of New DIP LP Facility Tranche B Loans without the prior approval of the LP Debtors' board of directors or managers (including the board of an LP Debtors' general partner), as applicable, shall be *void ab initio* (for the avoidance of doubt, if, following a Transfer of New DIP LP Facility Tranche B Loans, it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be *void ab initio*).~~

(b)     <u>Auction for New LightSquared Common Equity</u>.

(i)     The Confirmation Order shall approve the Auction Procedures, and, to the extent a Qualified Bid with respect to the New LightSquared Common Equity is received, the sale of the New LightSquared Common Equity to the Successful Purchaser pursuant to sections 105(a), 1123(a)(5), 1123(b)(4), 1141, 1142(b), 1145, and 1146(a) of the Bankruptcy Code free and clear of any Claims, Liens, interests, or encumbrances.

(ii)    Pursuant to the Auction Procedures, a Qualified Bid for the New LightSquared Common Equity shall, at a minimum (a "<u>Minimum Bid</u>"), be for Cash and (A) in the event that Class 3B votes to accept the Plan, shall be in a minimum amount sufficient to pay (1) all Allowed Prepetition LP Facility Non-SPSO Claims, and (2) all Allowed Prepetition LP Facility SPSO Claims, <u>minus</u> the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims or (B) in the event that Class 3B votes to reject the Plan, shall be in a minimum amount sufficient to pay all Allowed Prepetition LP Facility Non-SPSO Claims, <u>minus</u> the maximum aggregate amount of New LightSquared Term Loans to be issued under the New LightSquared Term Loan Facility on account of such Claims.  Auction Proceeds shall be applied as set forth in Article IV.C hereof.  Any Holder of a Claim or Equity Interest under the Plan, on its own, together with any number of additional Holders of Claims and/or Equity Interests and/or in partnership with a third party, shall be permitted to submit a Qualified Bid in accordance with the Auction Procedures.

(iii)   Subject to the approval of a Successful Purchaser by the Ad Hoc LP Secured Group in consultation with the LP Debtors, on the Effective Date, New LightSquared shall be authorized to, among other things, issue, sell, assign, and/or transfer the New

41

LightSquared Common Equity, subject to applicable law and the terms and conditions of the Auction Procedures and the Confirmation Order, and take any and all actions necessary to consummate such transaction. Nothing in the Plan or Confirmation Order shall authorize the transfer or assignment of the New LightSquared Common Equity to the Successful Purchaser (or, if applicable, the Alternative Successful Purchaser) without such Successful Purchaser's (or, if applicable, the Alternative Successful Purchaser's) compliance with applicable non-bankruptcy laws regarding the transfer, assignment, or ownership of the New LightSquared Common Equity.

2.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    New LightSquared.  Except as may be otherwise set forth in a**the** Plan Supplement, LightSquared LP shall be converted to a Delaware limited liability company or corporation with the appropriate governmental authorities pursuant to applicable law.

(b)    New LightSquared Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Loan Facility, comprised of the New LightSquared Term Loan Facility and the New LightSquared Working Capital Facility.  Confirmation of the Plan shall constitute (i) approval of the New LightSquared Loan Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the New LightSquared Loan Facility Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization for the New LightSquared Loan Facility Obligors to enter into and execute the New LightSquared Loan Facility Agreement and such other documents as may be required or appropriate.   On the Effective Date, the New LightSquared Loan Facility, together with any new promissory notes evidencing the obligation of the New LightSquared Loan Facility Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the New LightSquared Loan Facility Obligors pursuant to the New LightSquared Loan Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the New LightSquared Loan Facility Agreement and related documents.

(i)    New LightSquared Term Loan Facility.  New LightSquared and the other relevant entities shall enter into the New LightSquared Term Loan Facility, which shall be secured by senior liens on all assets of

New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Working Capital Facility, but which shall be subject to the "super-priority" status of the New LightSquared Working Capital Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors.  The New LightSquared Term Loans made pursuant to the New LightSquared Term Loan Facility shall be made by the Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims pursuant to, and in accordance with, Article III.B hereof.  If there is a Successful Purchaser pursuant to the Auction described in Article IV.B.1(b) hereof, and such Successful Purchaser closes, the Auction Proceeds shall be applied in accordance with Article IV.C hereof.  Pursuant to Article IV.C hereof, the aggregate amount of New LightSquared Term Loans to be made under the New LightSquared Term Loan Facility shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds paid to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims in lieu of making New LightSquared Term Loans.

In the event Class 3B votes to accept the Plan, the New LightSquared Tranche B Term Loans shall be stapled to the New LightSquared Class B Common Equity, and, if applicable, the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). ~~Restrictions on the Transfer of New LightSquared Stapled B Units are discussed below in Article IV.B.2(c) and (d) hereof.~~

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee **(as determined by the Board)**, then such New LightSquared ~~Class~~**Stapled** B ~~Stapled~~ Units shall convert into New LightSquared ~~Class~~**Stapled** A ~~Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, and, if applicable, New LightSquared Tranche B Working Capital Loans~~**Units**.  In the event Class 3B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Term Loans are Transferred to an Eligible Transferee **(as determined by the Board)**, such New LightSquared Tranche B Term Loans shall convert into New LightSquared Tranche A Term Loans~~, and shall no longer be subject to the voting restrictions applicable to New LightSquared Tranche B Term Loans.  All Transfers of~~**.  If any** New

LightSquared Stapled B Units or New LightSquared Tranche B Term Loans~~, as applicable, shall be subject to the prior approval of the Board. Any Transfer or purported Transfer of New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans without the prior approval of the Board shall be *void ab initio*~~ (for the avoidance of doubt, if, ~~following a Transfer of~~ **are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, ~~it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be *void ab initio*).~~**as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Term Loans and shall remain New LightSquared Stapled B Units or New LightSquared Tranche B Term Loans, as applicable.**

**The** New LightSquared Tranche A Term Loans **shall be stapled to the New LightSquared Class A Common Equity and, if applicable, the** New LightSquared Tranche A Working Capital Loans, and **may only be Transferred together as a single strip (with such strips to be divided into** New LightSquared **Stapled A Units).  If any** New LightSquared **Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared **Stapled A Units shall convert into New LightSquared Stapled B Units.**

~~On and after the Effective Date, SPSO and all SPSO Affiliates shall be prohibited from acquiring any additional debt or securities of the Reorganized LP Debtors, except with the prior approval of the Board.  If SPSO or any SPSO Affiliate~~**If any Prohibited Transferee** acquires any right, title, or interest to~~,~~ or in respect of ~~any,~~ New LightSquared Tranche A Term ~~Loan~~**Loans**, such New LightSquared Tranche A Term ~~Loan~~**Loans** shall automatically convert into ~~a~~ New LightSquared Tranche B Term ~~Loan~~**Loans**.

(ii)     New LightSquared Working Capital Facility.  On the Effective Date, New LightSquared and the other relevant entities shall enter into the New LightSquared Working Capital Facility, which shall provide for new money loans in the aggregate principal amount of $~~[    500~~ million~~]~~, plus additional loans in an aggregate principal amount equal to the New DIP LP Facility Claims to be satisfied thereby, which loans shall be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility, but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments, and which

shall have market terms and conditions acceptable to the Ad Hoc LP Secured Group and reasonably acceptable to the LP Debtors. The members of the Ad Hoc LP Secured Group shall backstop, arrange or fund the New LightSquared Working Capital Facility pursuant to arrangements satisfactory to them. In the event Class 3B votes to accept the Plan, SPSO shall have the right to fund its pro rata share of the New LightSquared Working Capital Facility; provided that any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP LP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans.

In the event Class 3B votes to accept the Plan, the New LightSquared Tranche B Working Capital Loans shall be stapled to the New LightSquared Class B Common Equity and the New LightSquared Tranche B Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). ~~Restrictions on the Transfer of New LightSquared Stapled B Units are discussed below in Article IV.B.2(d) hereof.~~

If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee **(as determined by the Board)**, then such New LightSquared Stapled B Units shall convert into New LightSquared ~~Class~~**Stapled** A ~~Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, and, if applicable, New LightSquared Tranche B Working Capital Loans~~**Units**. In the event Class 3B votes to reject the Plan and Holders of Allowed Prepetition LP Facility SPSO Claims do not receive New LightSquared Common Equity, then if any New LightSquared Tranche B Working Capital Loans are Transferred to an Eligible Transferee **(as determined by the Board)**, such New LightSquared Tranche B Working Capital Loans shall convert into New LightSquared Tranche A Working Capital Loans~~, and shall no longer be subject to the voting restrictions applicable to New LightSquared Tranche B Working Capital Loans. All Transfers of~~**. If any** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans~~, as applicable, shall be subject to the prior approval of the Board. Any Transfer or purported Transfer of~~ New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans ~~without the prior approval of the Board shall be~~ *void ab initio* ~~(for the avoidance of doubt, if, following a Transfer of~~**are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans, ~~it is determined by the Board that the~~

transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be *void ab initio*)**.as applicable, shall not convert into New LightSquared Stapled A Units or New LightSquared Tranche A Working Capital Loans and shall remain** New LightSquared Stapled B Units or New LightSquared Tranche B Working Capital Loans**, as applicable.**

**The New LightSquared Tranche A Working Capital Loans shall be stapled to the New LightSquared Class A Common Equity and the New LightSquared Tranche A Term Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into** New LightSquared Stapled B Units**.**

On and after the Effective Date, SPSO and all SPSO Affiliates shall be prohibited from acquiring any additional debt or securities of the Reorganized LP Debtors, except with the prior approval of the Board. If SPSO or any SPSO Affiliate**If any Prohibited Transferee** acquires any right, title, or interest to**,** or in respect of any**,** New LightSquared Tranche A Working Capital Loan**Loans**, such New LightSquared Tranche A Working Capital Loan**Loans** shall automatically convert into a New LightSquared Tranche B Working Capital Loan**Loans**.

New LightSquared shall use the proceeds from the New LightSquared Working Capital Facility for the purposes specified in the Plan, including to repay the New DIP LP Facility (to the extent Holders of Allowed New DIP LP Facility Claims object to receiving New LightSquared Working Capital Facility Loans in satisfaction of such claims, as provided in Article II.D hereof), for general corporate purposes and working capital needs, and to make Plan Distributions (other than Plan Distributions with respect to any Allowed Claims or Equity Interests in Classes 3C, 4, 5, and 6, which shall be made solely from Excess Auction Proceeds).

(c)     <u>New LightSquared Common Equity</u>.  New LightSquared shall issue the New LightSquared Common Equity, comprised of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity, required to be issued in accordance with the Plan and all related instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order, or rule, or order of the Bankruptcy Court, but subject to the receipt of all regulatory approvals required in connection with such issuance.

46

(i)   Economic Rights.  Each share or unit of New LightSquared Class A Common Equity and New LightSquared Class B Common Equity shall ~~provide for the same rights as to~~**rank *pari passu* with respect to any** dividends ~~and~~**,** distributions upon liquidation**, dissolution or winding up of the company**, which terms may not be altered without the consent of each of the holders of such shares or units.

(ii)   Voting.  ~~Other than with respect to the economic rights discussed above, each~~**Each** share or unit of New LightSquared Class A Common Equity shall entitle the holder thereof to five (5) votes on any matter requiring the affirmative vote of the equityholders and each share or unit of New LightSquared Class B Common Equity shall entitle the holder thereof to one (1) vote on any matter requiring the affirmative vote of the equityholders.

(iii)   Restrictions on Transfer.

The New LightSquared Class ~~B~~**A** Common Equity shall be stapled to the New LightSquared Tranche ~~B~~**A** Term Loans, and, if applicable, to the New LightSquared Tranche ~~B~~**A** Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled ~~B~~**A** Units). If any New LightSquared Stapled ~~B~~**A** Units are Transferred to **an Entity that has not been determined by the Board to be** an Eligible Transferee, then such New LightSquared ~~Class B~~ Stapled **A** Units shall convert into New LightSquared **Stapled B Units.**

~~Class A Common Equity, New LightSquared Tranche A Term Loans, and, if applicable, New LightSquared Tranche A Working Capital Loans, and shall no longer be stapled or subject to the voting restrictions (or diluted voting requirements, as applicable) applicable to~~**The** New LightSquared Class B Common Equity~~,~~ **shall be stapled to the** New LightSquared Tranche B Term Loans, and, if applicable, **to the** New LightSquared Tranche B Working Capital Loans~~. All Transfers of~~ **, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). If any** New LightSquared Stapled B Units, **New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been** determined by the Board **to be** an Eligible Transferee, **then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units**, New LightSquared

47

Tranche A Term Loans, **or** New LightSquared Tranche A Working Capital Loans **and shall remain** New LightSquared **Stapled B Units**, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans**, as applicable. If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such** New LightSquared Stapled B Units shall ~~be subject to the prior approval of the Board. Any Transfer or purported Transfer of~~**convert into** New LightSquared Stapled ~~B~~**A** Units ~~without the prior approval of the Board shall be *void ab initio* (for the avoidance of doubt, if, following a Transfer of New LightSquared Stapled B Units, it is determined by the Board that the transferee thereof is not, or was not at the time of such Transfer, an Eligible Transferee, the Transfer shall be *void ab initio*)~~**.**

~~On and after the Effective Date, all~~**If any** Prohibited ~~Transferees shall be prohibited from acquiring any additional debt or securities of the Reorganized LP Debtors, except with the prior approval of the Board and then, only upon such terms and conditions as may be approved by the Board in its sole and absolute discretion. If SPSO or any SPSO Affiliate~~**Transferee** acquires any right, title, or interest to, or in respect of, New LightSquared ~~Class~~**Stapled** A ~~Common Equity, such~~**Units or** New LightSquared Class A Common Equity**, such New LightSquared Stapled A Units or New LightSquared Class A Common Equity, as applicable,** shall automatically convert into **New LightSquared Stapled B Units or** New LightSquared Class B Common Equity**, as applicable**.

**Any Transfer of New LightSquared Common Equity, other than a sale of the business, shall be prohibited and *void ab initio* to the extent that, upon completion of such Transfer, any Entity or Group (together with all Entities and Groups directly or indirectly controlling, controlled by or under the direct or indirect common control of such Entity or Group) beneficially owns or controls New LightSquared Common Equity representing at least 30% of the votes represented by all New LightSquared Common Equity issued and outstanding at the time of determination.**

(iv) ~~New LightSquared Shareholder Agreement. Except to the extent there is a Successful Purchaser pursuant to the Auction, the~~**Reorganized LP Debtors Corporate Governance Documents. The** foregoing terms regarding the rights and obligations of the New LightSquared Common Equity shall be

implemented through ~~an appropriate New LightSquared Shareholder Agreement or other~~ appropriate terms contained in the Reorganized LP Debtors Corporate Governance Documents.

C.     *Allocation of Auction Proceeds*

Auction Proceeds shall be applied (1) first, in an aggregate amount equal to the Minimum Bid to pay Pro Rata Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims, as applicable, in lieu of the New LightSquared Common Equity to be otherwise provided with respect to such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (2) second, with respect to any amount over and above the Minimum Bid, to pay Pro Rata such Allowed Claims in lieu of New LightSquared Term Loans to be issued to Holders of such Allowed Claims pursuant to, and in accordance with, Article III.B hereof, (3) third, to pay Allowed New DIP LP Facility Claims, and (4) fourth, to pay Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, Allowed Existing LP Preferred Units Equity Interests, and Allowed Existing LP Common Units Equity Interests, in accordance with the immediately succeeding paragraph (which payments under this clause (4), for the avoidance of doubt, shall be made solely from Excess Auction Proceeds as described below). The amount of New LightSquared Term Loans to be issued to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP Facility SPSO Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders with respect to such New LightSquared Term Loans. The amount of New LightSquared Working Capital Facility Loans to be issued to Holders of Allowed New DIP LP Facility Claims shall be reduced on a dollar-for-dollar basis by the amount of Auction Proceeds received by such Holders in lieu of such New LightSquared Working Capital Facility Loans.

Excess Auction Proceeds, that is, Auction Proceeds remaining, if any, after payment in full in Cash of all Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed New DIP LP Facility Claims, shall be paid to the Holders of Allowed Claims and Equity Interests against the LP Debtors in order of priority as follows: (1) first, Allowed Prepetition LP Facility SPSO Subordinated Claims, if any, (2) second, Allowed Existing LP Preferred Units Equity Interests, and (3) third, Allowed Existing LP Common Units Equity Interests.

D.     *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated therein, including New LightSquared Common Equity, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code. In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Common Equity, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any

rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized LP Debtors Corporate Governance Documents, and (4) applicable regulatory approval, if any.

E.    *Listing of New LightSquared Common Equity; Reporting Obligations*

Except as the Board may otherwise direct, the Reorganized LP Debtors shall not be (1) obligated to list the New LightSquared Common Equity on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.  In order to prevent the Reorganized LP Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Reorganized LP Debtors Corporate Governance Documents may impose certain trading restrictions, and the New LightSquared Common Equity may be subject to certain transfer and other restrictions pursuant to the Reorganized LP Debtors Corporate Governance Documents.

F.    *Initial Boards of Directors and Managers*

The Board shall be comprised of ~~the persons identified in the Plan Supplement.  The Board shall be~~**seven (7) members, which shall initially include an independent chairperson, the chief executive officer of New LightSquared, two (2) independent directors with relevant industry experience, and three (3) directors** selected in a manner to be determined by the Plan Proponents.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the Plan Proponents shall disclose in the Plan Supplement **or otherwise prior to the Confirmation Hearing** the identity and affiliations of any person proposed to serve on the **initial** Board and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person.  Each director or manager appointed to the Board and to the boards of the other Reorganized LP Debtors, as applicable, shall serve from and after the Effective Date pursuant to the terms of the applicable Reorganized LP Debtors Corporate Governance Documents and applicable law.

The term of any current members of the boards of directors or managers of any of the LP Debtors shall expire upon the Effective Date.  From and after the Effective Date, the members of the Board and the boards of any of the other Reorganized LP Debtors shall be selected and determined in accordance with the Reorganized LP Debtors Corporate Governance Documents of the applicable Reorganized LP Debtor and applicable law, including sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code.

**EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM, OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO LIGHTSQUARED LP OR ANY OTHER LP DEBTOR) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO ANY OF THE REORGANIZED LP DEBTORS OR ANY OF THEIR AFFILIATES. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SHALL NOT AND SHALL NOT BE DEEMED TO PROVIDE A RELEASE OR WAIVER IN FAVOR OF HARBINGER OR ANY INC. DEBTOR.**

L.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP LP Facility Closing Date with respect to the DIP LP Facility), except as otherwise specifically provided for in the Plan: (1) the obligations of the LP Debtors under the DIP Facilities, the Prepetition LP Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the LP Debtors giving rise to any Claim or Equity Interest (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan), shall be cancelled solely as to the LP Debtors, and the Reorganized LP Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the LP Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the LP Debtors (except certain Intercompany Interests that are to be Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the Reorganized LP Debtors. For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, all claims and Causes of Action, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents, against any Inc. Debtor or any ~~holder~~**Holder** of a ~~claim~~**Claim** against**,** or equity interest in**,** an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including pursuant to the treatment specified in this Article IV.L.

M.    *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, including Article IV.B.2(a) hereof, each LP Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to

settled in the Plan or a Bankruptcy Court order, the Reorganized LP Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.    In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that an LP Debtor may hold against any Entity shall vest in the Reorganized LP Debtors, as applicable.

R.    *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the LP Debtors shall be deemed to have assumed all of the LP Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the LP Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies, and the LP Debtors shall be responsible only for premiums for the D&O Liability Insurance Policies properly allocable to the LP Debtors and their Estates.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the LP Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized LP Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and (except as otherwise set forth herein) all directors and officers of the LP Debtors who served in such capacity at any time on and after the Confirmation Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

S.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, the applicable Reorganized LP Debtors intend to assume and continue to perform the LP Debtors' obligations to:  (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Disclosure Statement or other pleadings, for, among other things, compensation and wages (including ~~equity based and~~ bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the LP Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the LP Debtors' or Reorganized LP Debtors' performance of any employment agreement shall not entitle any Person or Entity to

56

any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such **expired or terminated** policy, program, or plan.  In addition, as of the Effective Date, ~~(1)~~ Equity Interests granted to an existing employee of the LP Debtors pursuant to any equity plan maintained by the LP Debtors or under any existing employment agreement of the LP Debtors, ~~and any such applicable equity plan, shall be cancelled and terminated and (2) Holders of such Equity Interests~~ shall be treated in accordance with Class 4 in Article III.B.6 hereof **and any such Equity Interest and equity plan shall be cancelled as of the Effective Date**; provided, that the applicable Reorganized LP Debtors boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable Reorganized LP Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the Reorganized LP Debtors boards deem appropriate.  **Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing herein shall be, or shall be construed as, and implementation of the Plan shall not constitute, or be deemed to constitute, a change of control (or similar event) under any of the Debtors' or their Affiliates' contracts, agreements, policies, programs, or plans addressed by this Article IV.S.**

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized LP Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

T.    *Prepetition Inc. Facility Actions*

**[**The ~~Confirmation Order shall be deemed to be an order granting~~**Plan serves as a request by** the Ad Hoc LP Secured Group ~~standing to bring, on or before the Effective Date, the Prepetition Inc. Facility Actions.]~~**for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order.**  For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to the Ad Hoc LP Secured Group for purposes of pursuing any Prepetition Inc. Facility Action, and the filing of the Plan shall not be deemed as the Debtors' consent **to,** or support ~~to~~**of,** the grant of such standing.

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.    Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless

## J.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Plan Proponents shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the LP Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

## K.    *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the LP Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

## L.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion                of the Plan shall govern and control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

New York, New York
Dated:  August ~~15~~26, 2014

**LIGHTSQUARED LP (FOR ITSELF AND
ALL OTHER LP DEBTORS)**

By: _____ */s/ Douglas Smith* _____
Name:      Douglas Smith
Title:     Chief Executive Officer, President,
           and Chairman of the Board of
           LightSquared LP

**CERTAIN
OF
FACILITY CLAIMS**

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY, IN ITS CAPACITY AS
INVESTMENT MANAGER TO
FUNDS THAT ARE HOLDERS
PREPETITION  LP**

By: _____ */s/ ~~Kristine M. Nishiyama~~Mark E.
Brubaker* _____
Name:      ~~Kristine   M.   Nishiyama~~**Mark   E.
Brubaker**
Title:     Authorized Signatory

**CYRUS CAPITAL PARTNERS, L.P., IN ITS
CAPACITY AS INVESTMENT MANAGER
TO CERTAIN FUNDS THAT ARE HOLDERS
OF PREPETITION LP FACILITY CLAIMS**

By: _____ */s/ Jennifer M. Pulick* _____
Name:      Jennifer M. Pulick
Title:     Authorized Signatory

**<u>Exhibit B-1</u>**

**First Amended Specific Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

### SPECIFIC DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS

- Voting Record Date:  August 25, 2014
- Voting Deadline:  September 23, 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan/Disclosure Statement Objection Deadline:  October 3, 2014 at 12:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  October 20, 2014 at 10:00 a.m. (prevailing Eastern time)

**MILBANK, TWEED, HADLEY & M^C^CLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group of LightSquared LP Lenders*

Dated:  New York, New York
        August 26, 2014

---

[1]     The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

**THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS SEPTEMBER 23, 2014 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION, AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION AGENT"), NO LATER THAN THE VOTING DEADLINE.**

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT (THE "SPECIFIC DISCLOSURE STATEMENT") FOR THE FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THE SPECIFIC DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. LIGHTSQUARED AND THE AD HOC LP SECURED GROUP (THE "PLAN PROPONENTS") HAVE NO DUTY TO UPDATE THE SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY COURT").  THIS SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR SPECIFIC DISCLOSURE STATEMENTS FILED BY EITHER OF THE PLAN PROPONENTS.

THE PLAN IS A JOINT PLAN FOR ALL OF THE DEBTORS PREMISED ON THE MERGER OR OTHER COMBINATION OF EACH INC. DEBTOR AND EACH OF LIGHTSQUARED INVESTORS HOLDINGS INC., TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP, AND LIGHTSQUARED GP INC. WITH AND INTO LIGHTSQUARED LP, IN CONSIDERATION FOR THE TREATMENT PROVIDED UNDER THE PLAN TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, AS APPLICABLE, THE INC. DEBTORS AND LIGHTSQUARED INVESTORS HOLDINGS INC., TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP, AND LIGHTSQUARED GP INC.  **NOTWITHSTANDING THE FOREGOING, IF CLASS 6 (PREPETITION INC. FACILITY NON-SUBORDINATED CLAIMS) VOTES TO REJECT THE PLAN, THEN (A) THE PLAN SHALL BE WITHDRAWN WITH**

ii

**RESPECT TO ALL OF THE INC. DEBTORS, AND (B) THE PLAN PROPONENTS SHALL PURSUE CONFIRMATION OF THE PLAN WITH RESPECT TO THE LP DEBTORS.  A VERSION OF THE PLAN THAT REFLECTS IMPLEMENTATION OF THE LP DEBTORS-ONLY REORGANIZATION (AS CONTEMPLATED BY THE PLAN FOLLOWING THE VOTE TO REJECT) IS ATTACHED AS <u>EXHIBIT A</u> TO THE PLAN.**

THE SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (AS MAY BE AMENDED OR SUPPLEMENTED, THE "<u>GENERAL DISCLOSURE STATEMENT</u>" AND, TOGETHER WITH THE SPECIFIC DISCLOSURE STATEMENT, THE "<u>DISCLOSURE STATEMENT</u>"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. <u>SEE</u> 11 U.S.C. § 1125(a).

THE PURPOSE OF THE SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "<u>BANKRUPTCY CODE</u>") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THE SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

EXCEPT AS OTHERWISE STATED IN THIS SPECIFIC DISCLOSURE STATEMENT, HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO THE GENERAL DISCLOSURE STATEMENT FOR RELEVANT INFORMATION REGARDING THE HISTORY OF LIGHTSQUARED, ITS BUSINESSES, EVENTS IN THE RESTRUCTURING OF LIGHTSQUARED, PROCEDURES REGARDING THE SOLICITATION AND CONFIRMATION OF THE PLAN, AND THE CHAPTER 11 CASES.

NO REPRESENTATIONS CONCERNING LIGHTSQUARED'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY LIGHTSQUARED OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS).  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE GENERAL AND SPECIFIC DISCLOSURE STATEMENTS (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) AND THE PLAN IN THEIR ENTIRETY.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  **SEE ARTICLE V HEREOF, "PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN."**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF LIGHTSQUARED, IF ANY, SHOULD NOT RELY UPON THE DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED, APPROVED, OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.  NEITHER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN NOR THE DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING TO THE PLAN, AND FINANCIAL INFORMATION.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THE SPECIFIC

DISCLOSURE STATEMENT HAS BEEN PROVIDED BY LIGHTSQUARED'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PLAN CONTAINS CERTAIN RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS.  **<u>SEE</u> ARTICLE VIII OF THE PLAN, "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

THE INFORMATION CONTAINED IN THE SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN MUST RELY ON THEIR OWN EVALUATIONS OF LIGHTSQUARED AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF LIGHTSQUARED OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO, OR APPROVED BY, SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.  NOTHING CONTAINED IN THE SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR RULE OR STATUTE.  THE SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING LIGHTSQUARED OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, LIGHTSQUARED.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT ITS OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

TAX DISCUSSIONS CONTAINED IN THE SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING DOCUMENTS) IS NOT INTENDED OR WRITTEN TO BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX DISCUSSIONS CONTAINED IN THE SPECIFIC DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS, ATTACHMENTS, AND OTHER ACCOMPANYING

DOCUMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE PLAN PROPONENTS PRESENTLY INTEND TO CONSUMMATE THE PLAN AS PROMPTLY AS POSSIBLE.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS OR EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN THE PLAN.

**THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ....................................................................................1

    **A.**       **Overview of Plan** .....................................................................................1

          1.      Path to Value-Maximizing Transaction ...................................1

          2.      Path to Plan .............................................................................2

          3.      General Structure of LightSquared and Reorganized Debtors Under Plan ...............................................................................13

          4.      Administrative and Priority Claims ........................................14

          5.      Classes and Treatment ...........................................................15

    **B.**       **Chapter 11 Cases** ..................................................................................25

          1.      Debtor-in-Possession Financing ............................................25

          2.      Ergen Adversary Proceeding ..................................................26

          3.      Postpetition FCC Developments .............................................26

    **C.**       **Solicitation Process and Voting Procedures** .....................................26

          1.      Solicitation Process ................................................................26

          2.      Confirmation Hearing .............................................................29

    **D.**       **Plan Supplement** ..................................................................................29

    **E.**       **Confirmation and Related Procedures** ..............................................30

    **F.**       **Risk Factors** .........................................................................................30

    **G.**       **Identity of Persons to Contact for More Information** ......................30

    **H.**       **Disclaimer** ............................................................................................31

    **I.**       **Rules of Interpretation** .......................................................................31

**ARTICLE II SUMMARY OF PLAN** ........................................................................32

**ARTICLE III VALUATION CONSIDERATIONS AND FINANCIAL PROJECTIONS** ................................................................................................32

    **A.**       **Valuation Considerations** ....................................................................32

    **B.**       **Financial Projections** ..........................................................................33

**ARTICLE IV CERTAIN PLAN MATTERS** ...........................................................35

    **A.**       **Best Interests of Creditors Test** .........................................................35

    **B.**       **Feasibility** .............................................................................................36

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND CONSUMMATING PLAN** ...............................................................................36

    **A.**       **Certain Bankruptcy Law Considerations** .........................................37

|   |   | 1. | Parties in Interest May Object To Plan's Classification of Claims and Equity Interests | 37 |
|   |   | 2. | Plan May Not Receive Requisite Acceptances | 37 |
|   |   | 3. | Plan Proponents May Not Be Able To Obtain Confirmation of Plan | 37 |
|   |   | 4. | Plan Proponents May Not Obtain Recognition from Canadian Court | 38 |
|   |   | 5. | Plan Proponents May Not Be Able To Consummate Plan | 38 |
|   |   | 6. | Plan Proponents May Object to Amount or Classification of Claim | 39 |
|   |   | 7. | Contingencies Not To Affect Votes of Impaired Classes To Accept Plan | 39 |
|   |   | 8. | Plan Proponents May Not Obtain Harbinger Litigation Determination | 39 |
|   |   | 9. | Withdrawal of Plan for Inc. Debtors May Result in Litigation Among Debtor Estates | 39 |
|   | **B.** | | **Factors Affecting LightSquared** | **40** |
|   |   | 1. | Regulatory Risks | 40 |
|   |   | 2. | Business-Related Risks | 41 |
|   |   | 3. | Risks Related to New LightSquared Common Equity and the Auction | 45 |
|   | **C.** | | **Litigation Risks** | **46** |
|   | **D.** | | **Certain Tax Matters** | **46** |
| **ARTICLE VI** | | | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** | **46** |
|   | **A.** | | **Certain United States Federal Income Tax Consequences of Plan to LightSquared** | **48** |
|   |   | 1. | U.S. Federal Income Tax Consequences of Plan to LightSquared Inc. | 48 |
|   |   | 2. | Cancellation of Debt and Reduction of Tax Attributes to LightSquared | 49 |
|   |   | 3. | Potential Limitations on NOLs and Other Tax Attributes | 49 |
|   | **B.** | | **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** | **51** |
|   |   | 1. | Consequences to Holders of Claims | 51 |
|   |   | 2. | Consequences to Holders of Equity Interests | 59 |
|   |   | 3. | Consequences of Holding New LightSquared Common Equity and Debt Obligations | 61 |
|   |   | 4. | Information Reporting and Backup Withholding | 63 |
| **ARTICLE VII** | | | **CONCLUSION AND RECOMMENDATION** | **64** |

**EXHIBITS**

**Exhibit A**        First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code
                    Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders

**Exhibit B**        Projections

**Exhibit C**        Liquidation Analysis/Comparison

# ARTICLE I
# INTRODUCTION

The Debtors and the Ad Hoc LP Secured Group submit this Specific Disclosure Statement in connection with the (a) solicitation of votes to accept or reject the Plan (attached hereto as <u>Exhibit A</u>),[2] and (b) hearing to consider confirmation of the Plan.

The purpose of the Specific Disclosure Statement is to set forth certain information specific to the Plan concerning, among other things, the (a) terms, provisions, and implications of the Plan and (b) holders of Claims against, and Equity Interests in, LightSquared (collectively, the "<u>Holders</u>") and their rights under the Plan.  The Specific Disclosure Statement does **not** contain disclosures that are by their nature generally applicable to any chapter 11 plan that may be proposed in the Chapter 11 Cases.  Such generally applicable disclosures are set forth in the General Disclosure Statement, which provides, among other things, information concerning the history of LightSquared, a description of its businesses, operations, and capital structure, events leading up to the Chapter 11 Cases and the Canadian Proceedings, and significant events occurring in the Chapter 11 Cases (as supplemented hereby).

Altogether, the Disclosure Statement provides certain information, as required under section 1125 of the Bankruptcy Code, to the Holders who will have the right to vote on the Plan, so that such Holders can make informed decisions in doing so.  While the Specific Disclosure Statement includes a summary of the terms of the Plan for the convenience of the Holders, such summary is qualified in its entirety by reference to the Plan.[3]

Accordingly, for a complete understanding of the Plan, the Holders who have the right to vote on the Plan are advised and encouraged to read, **in their entirety**, the Plan, the Specific Disclosure Statement, and the General Disclosure Statement.

## A.    Overview of Plan

### 1.    Path to Value-Maximizing Transaction

LightSquared has always believed, and continues to believe, that resolution of the pending FCC proceedings will maximize the value of its assets and, accordingly, is continuing its efforts with the FCC and other federal agencies in seeking approval of its pending license modification applications and related proceedings before the FCC.  A detailed description of LightSquared's restructuring efforts, including its attempts to resolve the pending FCC proceedings, is provided in Article III.F of the General Disclosure Statement, entitled "**Restructuring Efforts**."  A detailed description of the current status of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**."

---

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[3]    If any inconsistency exists between (a) the Plan, on the one hand, and (b) the Specific Disclosure Statement or the General Disclosure Statement (or both), on the other hand, the terms of the Plan control.  If any inconsistency exists between the Specific Disclosure Statement and the General Disclosure Statement, the Specific Disclosure Statement shall control.

With the goal of maximizing the value of its Estates for the benefit of all parties in interest, LightSquared has worked diligently with all of its stakeholders to formulate a consensual means by which it could exit chapter 11 expeditiously.  The Second Amended Plan and the Third Amended Plan (each, as defined below) represent LightSquared's good faith efforts at pursuing such a value-generating transaction.  Unfortunately, as described below, numerous economic and legal obstacles, coupled with significant intercreditor disputes, have created an environment where such a transaction is unlikely to succeed.  It is with these realities in mind that LightSquared joins the Ad Hoc LP Secured Group and files the Plan.

### 2.      Path to Plan

#### a.      Sale Process Efforts

The Plan Proponents recognized during the earlier stages of the Chapter 11 Cases that, to maximize value for all stakeholders and given the continuing uncertainty of the FCC process, it would need to take action to protect the current value of the assets through the filing of a chapter 11 plan that contemplated a sale of the Estates' assets.  Accordingly, on July 23, 2013, after the termination of the Debtors' exclusive periods to file and solicit a plan, the Ad Hoc LP Secured Group filed a sale plan (the "Sale Plan") and related disclosure statement.  The Sale Plan was a plan for the LP Debtors premised on the sale (the "LP Sale") of substantially all of the LP Debtors' assets through a Bankruptcy Court-approved sale process, which was to test the market for such assets and maximize the value of the LP Debtors' Estates.  L-Band Acquisition, LLC ("LBAC") agreed to enter into an asset purchase agreement and plan support agreement (the "Plan Support Agreement"), pursuant to which it served as the stalking horse bidder for the LP Sale subject to the terms and conditions therein.  Pursuant to such stalking horse agreement, LBAC submitted a bid (the "LBAC Bid") of $2.22 billion in cash plus the assumption of certain material liabilities.  Notably, the funding of the $2.22 billion cash portion of the purchase price was not conditioned on approval by the FCC or Industry Canada.  The LBAC Bid was subject to the submission of higher or otherwise better bids at an auction (the "Sale Plan Auction") pursuant to bid procedures which had been approved by the Bankruptcy Court.

Thereafter, on August 30, 2013, LightSquared filed the *Debtors' Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 817] and subsequently filed on October 7, 2013, and commenced the solicitation of votes for, the *Debtors' First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 919] (the "First Amended Plan") that, among other things, contemplated the sale of substantially all of the Debtors' assets.  The First Amended Plan was similar to the Sale Plan, but it provided for a sale with respect to all of the Debtors (i.e., the LP Debtors and the Inc. Debtors) and was not backed by a stalking horse bid.

Also on August 30, 2013, MAST Capital Management, LLC filed the *Chapter 11 Plan for One Dot Six Corp. Proposed by U.S. Bank National Association and MAST Capital Management, LLC* [Docket No. 823] (as amended, modified, or supplemented, the "One Dot Six Plan") that, among other things, contemplated the sale of One Dot Six Corp.'s assets to a purchaser through a court-supervised auction process.  MAST Spectrum Acquisition Company LLC ("MSAC"), an entity formed by MAST Capital Management, LLC, was to serve as the stalking horse bidder for certain of One Dot Six Corp.'s assets with a bid consisting of (i) a credit bid of all of its claims under the DIP Inc. Facility and $1 of its claims under the Prepetition Inc.

2

Facility and (ii) cash sufficient to pay in full all classes of claims receiving such treatment under the One Dot Six Plan.  The proceeds of the sale were to be distributed to Holders of Claims against that Debtor.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties.  In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets.  In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders.  After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates.  Indeed, in light of the then-existing circumstances surrounding the Chapter 11 Cases, there was limited interest in the auction and LightSquared ultimately only received bids from parties already highly involved in the Chapter 11 Cases.  Since no qualified bids were received from third parties outside of LightSquared's capital structure, LightSquared, at the direction of the Special Committee, determined not to hold the Bankruptcy Court-scheduled Sale Plan Auction.

### b.    Second Amended Plan

Although LightSquared did not receive any other qualified bids for its Assets, third parties expressed to LightSquared an interest in providing LightSquared with new debt financing and equity investments to support a reorganization.  LightSquared and its advisors, at the direction of the Special Committee, worked with such third parties over the course of two (2) months to develop an alternative plan of reorganization based on new financing and equity investments, subject to receipt of regulatory approvals, execution and delivery of commitment letters and definitive documentation, and the satisfaction of various conditions

LightSquared, at the direction of the Special Committee, determined that the Sale Plan Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders.  Accordingly, at the direction of the Special Committee, LightSquared did not hold the Bankruptcy Court-scheduled Sale Plan Auction for LightSquared's Assets, or any grouping or subset thereof, under the Sale Plan, the First Amended Plan, or the One Dot Six Plan and did not deem any bid received for the Debtors' assets, or any grouping or subset thereof, a successful bid under any plan [Docket Nos. 1086 and 1108].  Instead, LightSquared, at the direction of the Special Committee, modified and supplemented the First Amended Plan.  LightSquared initially filed, on December 24, 2013, the *Debtors' Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1133] and subsequently filed, on December 31, 2013, the *Debtors' Revised Second Amended*

*Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1166] (the "Second Amended Plan") that, among other things, contemplated a reorganization of LightSquared.

Following the cancellation of the auction by the Special Committee, on January 7, 2014, counsel for DISH and LBAC sent counsel for the Ad Hoc LP Secured Group a letter purporting to terminate the Plan Support Agreement effective January 10, 2014, pursuant to Section 6.1(f)(1) of the Plan Support Agreement – i.e., for failure to achieve the Milestones (as defined therein). LBAC also subsequently purported to terminate the LBAC Bid.

On January 13, 2014, the Ad Hoc LP Secured Group filed the *Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, Lightsquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 1220], in which the Ad Hoc LP Secured Group challenged LBAC's termination of its bid for the LP Debtors' Assets. On January 22, 2014, the Bankruptcy Court issued a preliminary ruling finding that the Plan Support Agreement and the LBAC Bid were lawfully terminated by LBAC. The Ad Hoc LP Secured Group has reserved its rights regarding this matter in all respects.

### c.    Third Amended Plan, Ergen Adversary Proceeding, and Related Bankruptcy Court Rulings

#### (i)    Third Amended Plan

After the filing of the Second Amended Plan and the termination of the LBAC Bid, LightSquared, at the direction of the Special Committee, and the parties sponsoring such plan discussed modifications to the Second Amended Plan to garner as much support as possible for LightSquared's reorganization. These discussions led to the filing of the *Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1482] (the "Third Amended Plan").

The Third Amended Plan contemplated, among other things, (A) $1.65 billion in new debtor in possession financing (approximately $930 million of which would be converted into second lien exit financing, $300 million of which would be converted into a separate loan for RLI, and approximately $115 million of which would be converted into equity, in each case, subject to adjustments as set forth in the Third Amended Plan), (B) first lien exit financing, including a facility of not less than $1 billion, (C) the issuance of new debt and equity instruments, (D) the assumption of certain liabilities, (E) the satisfaction in full of all Allowed Claims and Allowed Equity Interests with Cash and other consideration, as applicable, and (F) the preservation of LightSquared's litigation claims. Additionally, the Third Amended Plan, in contrast to previous proposals by the Debtors, was not conditioned on LightSquared's receipt of a series of regulatory approvals from the FCC related to terrestrial spectrum rights (e.g., the grant of the License Modification Application). Rather, the only regulatory conditions precedent to the effectiveness of the Third Amended Plan were customary filings with, and approvals by, the FCC, Industry Canada, and other applicable governmental authorities and the expiry of

4

statutory waiting periods (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976* and the *Competition Act* (Canada)) that would be necessary for LightSquared to emerge from chapter 11.

> *(ii)    Confirmation and Related Hearings, Ergen Adversary Proceeding, and Bankruptcy Court Rulings*

The Bankruptcy Court considered confirmation of the Third Amended Plan in tandem with the Ergen Adversary Proceeding and related litigation.  As discussed in Article III.D.3 of the General Disclosure Statement, in the Ergen Adversary Proceeding, Harbinger and LightSquared (with the support of the Ad Hoc LP Secured Group) sought certain relief against Ergen, EchoStar Corporation ("EchoStar"), DISH Network Corporation ("DISH"), and SPSO (collectively, the "Ergen Defendants") relating to such defendants' conduct (A) with respect to acquiring Prepetition LP Facility Claims, (B) throughout the Chapter 11 Cases, and (C) in connection with LightSquared's restructuring efforts, including (1) damages for SPSO's breach of the Prepetition LP Credit Agreement and tortious interference with contractual relations against Ergen, EchoStar, and DISH, (2) disallowance of SPSO's Claims, and (3) equitable subordination of such Claims.  LightSquared and various parties submitted extensive filings in support of the relief sought by LightSquared in the Third Amended Plan, the Ergen Adversary Proceeding, and related pleadings, including *LightSquared's Motion for Entry of Order Designating Vote of SP Special Opportunities, LLC* [Docket No. 1371] (the "Designation Motion"), which sought entry of an order, pursuant to section 1126(e) of the Bankruptcy Code, designating the vote of SPSO to reject the Third Amended Plan.  SPSO submitted filings in opposition to such relief.

Beginning on January 9, 2014, the Bankruptcy Court held a trial on the Ergen Adversary Proceeding.  The evidentiary portion of such trial took place over a five (5)-day period and, following post-trial briefing, concluded with closing arguments on March 17, 2014.  On May 8, 2014, the Bankruptcy Court issued a bench ruling with respect to the Ergen Adversary Proceeding, finding, among other things, that SPSO engaged in misconduct warranting equitable subordination of SPSO's Claim under section 510(c) of the Bankruptcy Code.  The bench ruling was subsequently issued in publication form on June 10, 2014 [Adv. Proc. Docket No. 165] (the "Ergen Adversary Decision").  In the Ergen Adversary Decision, the Bankruptcy Court did not rule on the amount of SPSO's Claim that was subject to equitable subordination under section 510(c) of the Bankruptcy Code, which was to be set for hearing at a later time.  Between June 19, 2014 and June 24, 2014, Harbinger, the Ergen Parties, LightSquared, and the Ad Hoc LP Secured Group each filed notices of appeal with respect to the Ergen Adversary Decision [Adv. Proc. Docket Nos. 166, 170, 171 and 172], but subsequently agreed to stay the briefing on such appeals pending further developments in the Chapter 11 Cases.  Such appeals are currently pending before the United States District Court for the Southern District of New York.

On March 19, 2014, the Bankruptcy Court commenced the confirmation hearing for the Third Amended Plan.  The evidentiary portion of such confirmation hearing concluded on March 31, 2014, and closing arguments took place on May 5 and May 6, 2014.  On May 8, 2014, the Bankruptcy Court (A) issued a bench decision denying confirmation of the Third Amended Plan and the Designation Motion, (B) directed that the parties work to reach a consensual resolution

on a reorganization path, taking into account the Bankruptcy Court's findings with respect to both plan confirmation and the Ergen Adversary Proceeding, and (C) imposed a deadline of May 27, 2014 to reach any such resolution, absent which the Bankruptcy Court would appoint a mediator. The bench ruling was subsequently issued in publication form on July 11, 2014 [Docket No. 1631] (the "Confirmation Decision").

The Bankruptcy Court held a status conference on May 27, 2014, at which time the parties informed the Bankruptcy Court that no resolution had been reached. Accordingly, on May 28, 2014, the Bankruptcy Court entered an order appointing the Honorable Robert D. Drain, United States Bankruptcy Judge for the Southern District of New York, as the mediator [Docket No. 1557] (the "Mediation Order").

### d.    Mediation

Pursuant to the Mediation Order, Judge Drain conducted mediation sessions on June 9, June 17, and June 23, 2014. LightSquared and the key stakeholders all participated in the mediation sessions, along with their advisors. Over the course of the mediation, LightSquared, existing stakeholders, and third parties continued discussions regarding key issues for a chapter 11 plan. In addition, Judge Drain and LightSquared engaged the parties in numerous other discussions during this period.

On June 27, 2014, Judge Drain filed the *Mediator's Memorandum Under ¶¶ 14 and 15 of Mediation Order* [Docket No. 1612] (the "Mediator's Memorandum"), reporting, among other things, that, with the exception of SPSO, all parties to the mediation had reached agreement on key business terms that would form the basis of a new plan of reorganization. In the days following the Mediator's Memorandum, the parties continued to negotiate and refine the terms of their agreement with the goal of developing a chapter 11 plan that could be confirmed without the need for a lengthy confirmation hearing.

On July 14, 2014, Judge Drain filed the M*ediator's Supplemental Memorandum Under ¶¶ 14 and 15 of Mediation Order* [Docket No. 1640] (the "Mediator's Supplemental Memorandum"), stating that an agreement had been reached on the "key terms of SPSO/Ergen's treatment under a chapter 11 plan as well as new funding that is fundamentally consistent with the consensual plan terms previously negotiated by the other parties." (Mediator's Supplemental Memorandum at 2.) At a status conference held on July 14, 2014, LightSquared detailed the terms of such agreement and agreed to file a plan and disclosure statement by July 21, 2014.

Notwithstanding LightSquared's good faith efforts to negotiate and file a consensual plan, such plan did not materialize by July 21, 2014, and it does not appear that the agreement-in-principle reached during the Mediation will materialize into a chapter 11 plan to be filed with the Bankruptcy Court. Meanwhile, secured Claims against the Debtors continue to accrue interest, and the Debtors continue to incur administrative expenses that will need to be satisfied pursuant to a plan. With each passing day, the Debtors' ability to successfully reorganize becomes more difficult. Recognizing this fact, the Plan Proponents propose the Plan, as described herein.

e.      **Summary of Plan Terms**

The following is an overview of the Plan.  This overview is qualified in its entirety by reference to the full text of the Plan, which is attached to this Specific Disclosure Statement as Exhibit A.

(i)      *General Structure*

The Plan is a joint plan for all of the Debtors premised on the merger or other combination of each Inc. Debtor and each of LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc. with and into LightSquared LP, in consideration for the treatment provided under the Plan to Holders of Claims against, and Equity Interests in, as applicable, the Inc. Debtors and LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc.  LightSquared LP, prior to or following the merger or other combination with LightSquared Inc., will be converted into a Delaware corporation or limited liability company ("New LightSquared").  The Plan also provides for the consolidation of the Inc. Debtors for voting, confirmation, and distribution purposes under the Plan.  Pursuant to such consolidation, (A) all assets and all liabilities of the Inc. Debtors shall be treated as though they were merged, (B) all joint obligations of two or more Inc. Debtors and all multiple Claims against such Inc. Debtors on account of such joint obligations shall be treated and Allowed as a single Claim against the consolidated Inc. Debtors, (C) each Claim filed in the Chapter 11 Case of any Inc. Debtor shall be deemed filed against the consolidated Inc. Debtors and a single obligation of the consolidated Inc. Debtors, and (D) all transfers, disbursements, and distributions made by any Inc. Debtor hereunder will be deemed to be made by the substantively consolidated Inc. Debtors and their Estates.

(ii)      *Financing Transactions*

On the Confirmation Date, the Debtors will enter into the New DIP LP Facility and the New DIP Inc. Facility, which together are expected to be in the aggregate principal amount of $141.2 million, plus the aggregate amount of Allowed DIP LP Facility Claims and Allowed DIP Inc. Facility Claims.  The New DIP Facilities will provide working capital for the Debtors between the New DIP Facilities Closing Date and the Effective Date, and Holders of Allowed DIP Inc. Facility Claims and Allowed DIP LP Facility Claims will receive New DIP Facility Loans to be issued under the New DIP Facilities in an amount equal to such Claims, respectively. To the extent a Holder of Allowed DIP LP Facility Claims or Allowed DIP Inc. Facility Claims objects to this treatment, such Holder, as applicable, will receive Cash from the proceeds of the applicable New DIP Facility on the New DIP Facilities Closing Date.

On the Effective Date, the Reorganized Debtors will enter into the New LightSquared Working Capital Facility in the aggregate principal amount of $500 million, plus the aggregate amount of Allowed New DIP Facility Claims to be satisfied thereby.  The New LightSquared Working Capital Facility will provide working capital for the Reorganized Debtors from and after the Effective Date and will be used to satisfy New DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims.  The New LightSquared Working Capital Facility will be

7

divided into New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans, which will have identical economic terms, but the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Working Capital Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans. The New LightSquared Working Capital Loans will be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility (discussed below), but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments.

On the Effective Date, the Reorganized Debtors will also enter into the New LightSquared Term Loan Facility in an aggregate principal amount of either (A) $1.0 billion if Holders of Prepetition LP Facility SPSO Claims vote to accept the Plan or (B) if Holders of Prepetition LP Facility SPSO Claims vote to reject the Plan, $1.2 billion plus the Allowed amount of Prepetition LP Facility SPSO Claims (as discussed below). The New LightSquared Term Loans issued under the New LightSquared Term Loan Facility shall be used to satisfy (in full or in part, depending on certain conditions in the Plan) Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed Prepetition Inc. Facility Non-Subordinated Claims. The New LightSquared Term Loans will be divided into New LightSquared Tranche A Term Loans and New LightSquared Tranche B Term Loans, which will have identical economic terms, but the New LightSquared Tranche B Term Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans. If (A) a default or an event of default has occurred and is continuing under the New LightSquared Loan Facilities or (B) an enforcement action against the Collateral has commenced, all voluntary prepayments and mandatory prepayments, and the proceeds realized in any enforcement action, shall first be applied to prepay or repay in full all then outstanding New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans (on a *pro rata* basis) before any portion of such prepayment or repayment is applied to the New LightSquared Term Loans.

(iii)    *New Equity Issuances, Claims and Equity Interests*
*Treatment, and Auction Process*

On the Effective Date, New LightSquared will issue New LightSquared Common Equity, which may be divided into two classes:  New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.  The New LightSquared Class A Common Equity and New LightSquared Class B Common Equity will provide for identical rights as to dividends and distributions upon liquidation, but each share or unit of New LightSquared Class B Common Equity will have one-fifth (1/5th) the voting power of a share or unit of New LightSquared Class A Common Equity.  The New LightSquared Common Equity will be issued, subject to the Auction described below, to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims and may be issued to Allowed Prepetition LP Facility SPSO Claims if they accept the Plan, subject to the Auction described below.

Allowed Prepetition LP Facility Non-SPSO Claims generally will be satisfied through the receipt of New LightSquared Tranche A Term Loans made under the New LightSquared Term Loan Facility and New LightSquared Class A Common Equity, subject to the Auction described below.

The allowance and treatment of Prepetition LP Facility SPSO Claims will be determined by whether the Holders of Prepetition LP Facility SPSO Claims vote to accept or reject the Plan. If Holders of Prepetition LP Facility SPSO Claims vote to accept the Plan, such Claims will be Allowed in the reduced amount of $900 million (plus interest accrued from the Confirmation Date through the Effective Date), and Holders of such Allowed Claims will receive their Pro Rata share (along with Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable)) of (A) New LightSquared Term Loans under the New LightSquared Term Loan Facility and (B) New LightSquared Common Equity.  If, however, Holders of Prepetition LP Facility SPSO Claims vote to reject the Plan, the Prepetition LP Facility SPSO Claims will be subject to equitable subordination (the "Subordinated SPSO Claims"), and the remaining secured portion of the Prepetition LP Facility SPSO Claims will receive New LightSquared Term Loans in the Allowed amount of such secured Claims.  The Subordinated SPSO Claims will be treated along with other junior claims, as described below.  The New LightSquared Term Loans and New LightSquared Common Equity to be issued to Holders of Allowed Prepetition LP Facility SPSO Claims, as applicable, will be New LightSquared Tranche B Term Loans and New LightSquared Class B Common Equity, respectively.

The treatment of Prepetition Inc. Facility Non-Subordinated Claims will be determined by whether the Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to accept or reject the Plan.  If Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to accept the Plan, such Holders will receive their Pro Rata share (along with Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP SPSO Claims (if applicable)) of (A) New LightSquared Term Loans under the New LightSquared Term Loan Facility and (B) New LightSquared Common Equity.  The New LightSquared Term Loans and New LightSquared Common Equity to be issued to Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, as applicable, will be New LightSquared Tranche A Term Loans and

9

New LightSquared Class A Common Equity, respectively. If, however, Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to reject the Plan, then, as discussed below, the Plan shall be withdrawn with respect to all of the Inc. Debtors, shall be a plan only for the LP Debtors (as set forth in the LP Debtors-Only Plan), and may be confirmed with respect to the LP Debtors.

Except as may be set forth by the Plan Proponents in the Plan Supplement, the New LightSquared Class A Common Equity shall be stapled to the New LightSquared Tranche A Term Loans, and, if applicable, to the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units). If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.

Except as may be set forth by the Plan Proponents in the Plan Supplement, the New LightSquared Class B Common Equity shall be stapled to the New LightSquared Tranche B Term Loans, and, if applicable, to the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units). If any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable. If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.

Each New LightSquared Stapled A Unit shall be comprised of (A) $1 million (or such lesser amount to be determined by the Plan Proponents) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans beneficially owned by the applicable holder and its affiliates), together with (B) a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term Loans beneficially owned by the applicable holder and its affiliates) of (1) New LightSquared Tranche A Working Capital Loans (to the extent applicable) and (2) New LightSquared Class A Equity Interests. For illustrative purposes only, if a holder of 200 shares of New LightSquared Class A Equity Interests and $100 million of New LightSquared Tranche A Term Loans wished to transfer twenty (20) shares of New LightSquared Class A Equity Interests, each New LightSquared Stapled A Unit would consist of $1 million of principal amount of New LightSquared Tranche A Term Loans and two (2) shares of New LightSquared Class A Equity Interests. In order to transfer twenty (20) shares of New LightSquared Class A Equity Interests, such holder would be required to transfer ten (10) New LightSquared Stapled A Units, representing in the aggregate, $10 million of principal amount of

New LightSquared Tranche A Term Loans and twenty (20) shares of New LightSquared Class A Equity Interests.

Similarly, each New LightSquared Stapled B Unit shall be comprised of (A) $1 million (or such lesser amount to be determined by the Plan Proponents, which shall be the same as the amount set with respect to the New LightSquared Stapled A Units) of principal amount of New LightSquared Tranche B Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche B Term Loans beneficially owned by the applicable holder and its affiliates), together with (B) a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche B Term Loans bears to the aggregate principal amount of New LightSquared Tranche B Term Loans beneficially owned by the applicable holder and its affiliates) of (1) New LightSquared Tranche B Working Capital Loans (to the extent applicable) and (2) New LightSquared Class B Equity Interests.

If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Stapled A Units, New LightSquared Class A Common Equity, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans, then such New LightSquared Stapled A Units, New LightSquared Class A Common Equity, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans, as applicable, shall automatically convert into New LightSquared Stapled B Units, New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable.

The New LightSquared Common Equity to be distributed on account of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable) may be sold pursuant to an Auction that will occur following confirmation of the Plan.  The Auction Proceeds shall be applied first *in lieu* of the New LightSquared Common Equity to be otherwise distributed to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable), then to reduce on a dollar-for-dollar basis the amount of New LightSquared Term Loans to be issued to satisfy such Claims, and then to pay Allowed New DIP Facility Claims (and thereby reduce the amount of the New LightSquared Working Capital Facility).  If the Allowed Prepetition LP Facility Non-SPSO Claims, Allowed LP Facility SPSO Claims (excluding any Subordinated SPSO Claims), Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed New DIP Facility Claims are satisfied in full in Cash from the Auction Proceeds, then the remaining Auction Proceeds, if any, will be held in trust subject to a determination by the Bankruptcy Court regarding the allocation of such remaining Auction Proceeds as between the Estates of the Inc. Debtors, on the one hand, and the LP Debtors, on the other hand.  Following such allocation, the remaining Auction Proceeds will be distributed in order of priority to the other Holders of Claims against, and Equity Interests in, the Inc. Debtors and LP Debtors, respectively (including the Subordinated SPSO Claims).

Holders of Allowed LP General Unsecured Claims or Allowed Inc. Convenience Claims (which are General Unsecured Claims asserted against an Inc. Debtor that are Allowed in an amount equal to or less than $65,000), shall receive Plan Consideration in the form of Cash in an

11

amount equal to the principal amount of such Allowed LP General Unsecured Claims or Allowed Inc. Convenience Claims.

*(iv)     LP Debtors-Only Plan*

**Pursuant to Article IV.U of the Plan, if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan (the "Vote To Reject"), then the Plan shall be withdrawn with respect to all of the Inc. Debtors, and the Plan Proponents shall pursue confirmation of the Plan with respect to the LP Debtors.  The Plan implements this concept through the *Joint Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as amended, supplemented, or modified from time to time, the "LP Debtors-Only Plan"), which is attached as Exhibit A to the Plan.**

As set forth therein, the LP Debtors-Only Plan, among other things, eliminates (A) the Inc. Debtors from the Plan, (B) treatment of all Claims against, and Equity Interests in, any of the Inc. Debtors, (C) the combination of Inc. Debtors' Assets with and into LightSquared LP pursuant to Article IV.B.2 of the Plan, (D) the substantive consolidation of the Inc. Debtors pursuant to Article I.C of the Plan, (E) the inclusion of any Claims against, or Equity Interests in, the Inc. Debtors in the calculation of the Pro Rata share of treatment provided to a Holder of an Allowed Claim against the LP Debtors, (F) any New LightSquared Working Capital Facility Loans related to repayment of New DIP Inc. Facility Loans, and the amount of the New LightSquared Working Capital Facility will be adjusted accordingly, (G) any Inc. Debtor and any Holder of a Claim against, or Equity Interest in, any Inc. Debtor, in their capacity as such a Holder, from the definition of "Released Party," (H) any settlement or compromise for the benefit of any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, any Inc. Debtor, in their capacity as such a Holder, and (I) the allocation of Excess Auction Proceeds as between the Inc. Debtors and LP Debtors.

**For the avoidance of doubt, notwithstanding anything to the contrary contained herein, in the Plan, or in the LP Debtors-Only Plan, if the Plan is withdrawn because of the Vote To Reject, then:  (A) all Articles, provisions, and terms of the LP Debtors-Only Plan shall apply and control; (B) as set forth in the LP Debtors-Only Plan, all claims and Causes of Action held by any LP Debtor or any Holder of a Claim against, or Equity Interest in, an LP Debtor against any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents; and (C) all parties (1) reserve their respective rights and defenses with respect to the foregoing (including with respect to the value of consideration provided to Holders of Allowed Claims under the Plan and in connection with the Prepetition LP Loan Documents) and (2) reserve their rights with respect to any Claims or Causes of Action challenging the liens securing the Prepetition Inc. Facility Claims or otherwise seeking to recharacterize any Claims held by the Prepetition Inc. Lenders (any such action, a "Prepetition Inc. Facility Action").**

With respect to any Holders of a Prepetition Inc. Facility Non-Subordinated Claim in Class 6 who vote to reject the Plan or Prepetition Inc. Facility Subordinated Claim in Class 7

who vote to reject the Plan and do not waive the Potential Harbinger Claims, the Plan serves as a request by the Ad Hoc LP Secured Group for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order.  For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to the Ad Hoc LP Secured Group for purposes of pursuing any Prepetition Inc. Facility Action, and the filing of the Plan shall not be deemed as the Debtors' consent to, or support of, the grant of such standing.

For more details, refer to the Plan, attached hereto as <u>Exhibit A</u>.

### 3.    General Structure of LightSquared and Reorganized Debtors Under Plan

As of the Petition Date, LightSquared maintained the following corporate organizational structure:



PREPETITION DEBTOR ORGANIZATION CHART

Article IV.B of the Plan sets forth the key restructuring transactions contemplated by LightSquared's reorganization.  In connection with the Plan, the Debtors will be reorganized, and all of the Assets of, or Equity Interests in, each Inc. Debtor and each of LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc. shall be sold, assigned, and/or transferred to LightSquared LP, including through a merger or other combination, including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such Debtor's equity interests, if any, in any Reorganized Debtor, intellectual property, contractual rights, Retained Causes of Action, and the right to prosecute such Retained Causes of Action and receive the benefits therefrom. LightSquared LP shall then be converted into a Delaware corporation or limited liability company with the appropriate governmental authorities pursuant to applicable law.

13

4.        **Administrative and Priority Claims**

a.        **Treatment of Administrative and Priority Claims Generally**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Accrued Professional Compensation Claims, DIP Claims, KEIP Payments, and U.S. Trustee Fees) and Priority Tax Claims have not been classified, and the Holders thereof are not entitled to vote on the Plan.  Such Claims shall be satisfied in full in accordance with the Plan. All other Claims and Equity Interests are classified under the Plan.

b.        **Treatment of DIP Inc. Claims**

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive on the Confirmation Date, New DIP Inc. Facility Loans to be issued under the New DIP Inc. Facility in an amount equal to the Allowed DIP Inc. Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP Inc. Facility Claim objects to such treatment, such Holder of an Allowed DIP Inc. Facility Claim shall receive Cash from the proceeds of the New DIP Inc. Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP Inc. Facility Claim.

c.        **Treatment of DIP LP Claims**

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Facility Claim, except to the extent that a Holder of a DIP LP Facility Claim agrees to less favorable or other treatment, each Holder of a DIP LP Facility Claim shall receive on the Confirmation Date, New DIP LP Facility Loans to be issued under the New DIP LP Facility in an amount equal to the Allowed DIP LP Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP LP Facility Claim objects to such treatment, such Holder of an Allowed DIP LP Facility Claim shall receive Cash from the proceeds of the New DIP LP Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP LP Facility Claim.   Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans, subject to the restrictions set forth in Article IV.B.1(a) of the Plan.

d.        **Treatment of New DIP Claims**

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Facility Claim, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, each Holder of a New DIP Facility Claim shall receive, on the Effective Date, New LightSquared Working Capital Facility Loans to be issued under the New LightSquared Working Capital Facility in an amount equal to the Allowed New DIP Facility Claims; provided, however, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed New DIP Facility Claims shall receive Auction Proceeds in lieu of New LightSquared Working Capital Facility Loans as

provided in Article IV.C of the Plan; <u>provided further</u>, <u>however</u>, that to the extent a Holder of an Allowed New DIP Facility Claim objects to the treatment set forth above, such Holder of an Allowed New DIP Facility Claim shall receive Plan Consideration in the form of Cash on the Effective Date in an amount equal to its Allowed New DIP Facility Claim.  Any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans, and shall be subject to the restrictions set forth in Article IV.B.2(c) and (d) of the Plan.

**5.      Classes and Treatment**

Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  Under the Plan, (a) Classes 1, 2, 3, 4, and 16 are Unimpaired, and the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and (b) Class 15 is Impaired and shall receive no distributions under the Plan on account of its Claims, and the Holders of Claims in such Class are deemed to have rejected the Plan.  As a result, the Holders of Claims or Equity Interests in the foregoing Classes are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

The chart below summarizes the Classes of Claims and Equity Interests, the treatment of such Classes (except to the extent a Holder agrees to other treatment), whether they are Impaired or Unimpaired, and the entitlement of such Classes to vote.  This chart and its content are subject to change based upon changes in the amount of Allowed Claims and Allowed Equity Interests and the amounts available for distribution.  Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim or Equity Interest.

Reference should be made to the entirety of the Specific Disclosure Statement and the Plan for a complete understanding of the classification and treatment of Allowed Claims and Allowed Equity Interests.

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 1 | LP Other Priority Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |

15

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 2 | Inc. Other Priority Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim. | Unimpaired | No (Deemed To Accept) | 100% |
| 3 | LP Other Secured Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Secured Claim each Holder of an Allowed LP Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents: (i) Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired. | Unimpaired | No (Deemed To Accept) | 100% |
| 4 | Inc. Other Secured Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents:  (i) Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. | Unimpaired | No (Deemed To Accept) | 100% |

16

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired. | | | |
| 5A | Prepetition LP Facility Non-SPSO Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall receive its Pro Rata share of (i) $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (ii) 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.5(c) of the Plan shall be increased to $1.2 billion.  A Holder's Pro Rata share in Article III.B.5(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (A) Allowed Prepetition LP Facility Non-SPSO Claims, plus (B) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan, plus (C) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan. <br><br> Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.5(c) of the Plan, as provided in Article IV.C of the Plan. <br><br> For the avoidance of doubt, except as set forth in Article IV.U of the Plan, the treatment specified in Article III.B.5(c) of the Plan shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility Non-SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility Non-SPSO Claims | Impaired | Yes | Undetermined |

17

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates. | | | |
| 5B | Prepetition LP Facility SPSO Claims | *Allowance:* Prepetition LP Facility SPSO Claims shall be Allowed as follows:<br><br>(i)      in the event that Class 5B votes to accept the Plan, the Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts otherwise accrued under the Prepetition LP Loan Documents with respect to such Prepetition LP Facility SPSO Claims through and including the Confirmation Date), plus (B) all Prepetition LP Facility Postpetition Interest that accrues on such Prepetition LP Facility SPSO Claims between the Confirmation Date and the Effective Date, plus (C) all SPSO Fee Claims incurred between the Confirmation Date and the Effective Date; or<br><br>(ii)      in the event that Class 5B votes to reject the Plan, (A) the Allowed amount of the Prepetition LP Facility SPSO Claims, including the amount of the Prepetition LP Facility SPSO Subordinated Claims, shall be determined by the Bankruptcy Court after the Confirmation Date, (B) the Class 5B – Prepetition LP Facility SPSO Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII of the Plan, (C) each Holder of a Prepetition LP Facility SPSO Claim shall not be treated as a Released Party, and (D) all claims against SPSO shall be preserved.<br><br>*Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of a Prepetition LP Facility SPSO Claim shall receive: | Impaired | Yes | In the event that Class 5B votes to accept the Plan: Undetermined<br><br>In the event that Class 5B votes to reject the Plan: 100% of secured Claim remaining after subordination |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | (i)      in the event that Class 5B votes to accept the Plan, (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in Article III.B.6(c)(i) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (x) Allowed Prepetition LP Facility SPSO Claims, plus (y) Allowed Prepetition LP Facility Non-SPSO Claims, plus (z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan; or

(ii)      in the event that Class 5B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.6(c) of the Plan, as provided in Article IV.C of the Plan.

For the avoidance of doubt, except as set forth in Article IV.U of the Plan, the treatment specified in Article III.B.6(c) of the Plan shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates. | | | |
| 5C | Prepetition LP Facility SPSO Subordinated Claims | *Allowance*: In the event that Class 5B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after | Impaired | Yes | 0% |

19

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 6 | | the Confirmation Date, (ii) the Class 5C – Prepetition LP Facility SPSO Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII of the Plan, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim shall not be treated as a Released Party, and (iv) all claims against SPSO shall be preserved.<br><br>*Treatment*: In the event that Class 5B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive its Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; <u>provided</u>, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims). | | | |
| 6 | Prepetition Inc. Facility Non-Subordinated Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of a Prepetition Inc. Facility Non-Subordinated Claim shall receive (i) Cash in the amount of the MAST Fee Claims, (ii) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (iii) its Pro Rata share 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; <u>provided</u>, | Impaired | Yes | Undetermined |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.8(c) of the Plan shall be increased to $1.2 billion.  A Holder's Pro Rata share in Article III.B.8(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim bears to the aggregate amount of all (A) Allowed Prepetition Inc. Facility Non-Subordinated Claims, plus (B) Allowed Prepetition LP Facility Non-SPSO Claims, plus (C) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.<br><br>Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims may receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.8(c) of the Plan, as provided in Article IV.C of the Plan. | | | |
| 7 | Prepetition Inc. Facility Subordinated Claims | Allowance: Prepetition Inc. Facility Subordinated Claims shall be Allowed as follows:<br><br>(i)        in the event that Class 7 votes to accept the Plan, the Prepetition Inc. Facility Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes; or<br><br>(ii)       in the event that Class 7 votes to reject the Plan, (A) the Allowed amount of the Prepetition Inc. Facility Subordinated Claims shall be determined by the Bankruptcy Court following and after giving effect to the outcome of the Prepetition Inc. Facility Actions, (B) the Class 7 – Prepetition Inc. Facility Subordinated Claims shall be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII of the Plan, (C) each Holder of a Prepetition Inc. Facility Subordinated Claim shall not be treated as a Released Party, and (D) all claims against Holders of Prepetition Inc. Facility Subordinated Claims shall be preserved.<br><br>Treatment: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that | Impaired | Yes | 0% |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition Inc. Facility Subordinated Claim. | | | |
| 8 | LP General Unsecured Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim. | Impaired | Yes | 100% |
| 9 | Inc. Convenience Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Convenience Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Convenience Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. Convenience Claim. | Impaired | Yes | 100% |
| 10 | Inc. General Unsecured Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. General Unsecured Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan; provided, in no event shall any | Impaired | Yes | 0% |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | distribution to a Holder of an Allowed Inc. General Unsecured Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Inc. General Unsecured Claim. | | | |
| 11 | Existing LP Preferred Units Equity Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Existing LP Preferred Units Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing LP Preferred Units Equity Interest. | Impaired | Yes | 0% |
| 12 | Existing Inc. Preferred Stock Equity Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, each Existing Inc. Preferred Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing Inc. Preferred Stock Equity Interest. | Impaired | Yes | 0% |
| 13 | Existing LP Common Units Equity Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Common Units Equity Interest, each Existing LP Common Units Equity Interest shall be cancelled and, on the Effective | Impaired | Yes | 0% |

23

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Existing LP Common Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C of the Plan. | | | |
| 14 | Existing Inc. Common Stock Equity Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan. | Impaired | Yes | 0% |
| 15 | Intercompany Claims | All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof. | Impaired | No (Deemed to Reject) | 0% |
| 16 | Intercompany Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest other than Allowed Existing LP Common Units Equity Interests, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest other than an Existing LP Common Units Equity Interests shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable. | Unimpaired | No (Deemed To Accept) | 100% |

24

**B.**    **Chapter 11 Cases**

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

**1.**    **Debtor-in-Possession Financing**

A description of the DIP Inc. Facility is provided in Article III.B.3 of the General Disclosure Statement, entitled "**DIP Inc. Facility**." Notwithstanding the foregoing, the following information is intended to supplement Article III.B.3 of the General Disclosure Statement and additionally provide a description of the DIP LP Facility:

**a.**    **DIP Inc. Facility**

As described in Article III.B.3 of the General Disclosure Statement, on July 17, 2012, the Bankruptcy Court entered an order (the "DIP Inc. Order"), which provided the DIP Borrower access to $41.4 million of secured, priming postpetition borrowings [Docket No. 224] (the "DIP Inc. Facility"). The DIP Inc. Order was subsequently amended pursuant to those certain orders dated as of March 13, 2013 [Docket No. 579], December 23, 2013 [Docket No. 1126], January 31, 2014 [Docket No. 1286], March 25, 2014 [Docket No. 1444], April 15, 2014 [Docket No. 1492], June 13, 2014 [Docket No. 1581], June 30, 2014 [Docket No. 1613], July 15, 2014 [Docket No. 1645], July 22, 2014 [Docket No. 1657], and August 1, 2014 [Docket No. 1683]. The DIP Inc. Facility is scheduled to mature on August 31, 2014.

**b.**    **DIP LP Facility**

On January 18, 2014, the Debtors filed a motion (the "DIP LP Motion") seeking authority to allow LightSquared LP (the "DIP LP Borrower") to obtain, and each LightSquared LP subsidiary (collectively, the "DIP LP Guarantors" and, together with the DIP LP Borrower, the "LP Obligors") to unconditionally guaranty jointly and severally the DIP LP Borrower's obligations in respect of, secured, priming superpriority postpetition financing (the "DIP LP Facility") in the amount of $33 million [Docket No. 1237]. On February 4, 2014, the Bankruptcy Court entered the order approving the DIP LP Motion (the "DIP LP Order") [Docket No. 1291].

On April 10, 2014, the Bankruptcy Court entered the *Final Order (A) Authorizing LP DIP Obligors To Obtain Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1476] and thereby approved, among other things, the provision of certain superpriority senior secured priming postpetition financing by the DIP LP Lenders to the DIP LP Obligors through June 15, 2014. On June 9, 2014, the Debtors filed the *Notice of Extension of Final Maturity Date Under Replacement LP DIP Facility* [Docket No. 1574], providing that the DIP LP Lenders had agreed to extend the maturity of the replacement DIP LP Facility to June 30, 2014. The existing DIP LP Facility was subsequently supplanted with a "replacement" DIP LP

25

Facility with an extended maturity date pursuant to those certain orders dated as of June 30, 2014 [Docket No. 1614], July 14, 2014 [Docket No. 1639], July 24, 2014 [Docket No. 1668], and August 1, 2014 [Docket No. 1681]. Such DIP LP Facility is scheduled to mature on August 31, 2014.

### 2. Ergen Adversary Proceeding

Article III.D.3 of the General Disclosure Statement and the Introduction hereof provides a discussion of the adversary proceeding brought against the Ergen Defendants. Following the issuance of the Ergen Adversary Decision, parties in interest in the Ergen Adversary Proceeding filed notices of appeal regarding certain issues and pleadings related thereto. The appeal process is ongoing.

### 3. Postpetition FCC Developments

A detailed description of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**." Notwithstanding the foregoing, the following information is intended to supplement Article III.F.1 of the General Disclosure Statement:

On July 1, 2014, Karl B. Nebbia, the Associate Administrator of the Office of Spectrum Management of the National Telecommunications and Information Administration (the "NTIA") sent a letter to Julius Knapp, Chief, Office of Engineering and Technology of the FCC. The letter forwarded, for inclusion in the record of the License Modification Application and related FCC proceedings and for consideration by the FCC, a letter to the NTIA from the Department of Transportation ("DOT"). That DOT letter raises certain issues about the compatibility of GPS receivers with terrestrial "uplink" operations (i.e., terrestrial handset operations) over LightSquared's network. To the extent that the FCC is inclined to authorize terrestrial-only handsets in the 1626.5-1660.5 MHz band, NTIA urges the FCC to carefully consider the issues raised by DOT along with the rest of the record and to ensure that LightSquared's proposal is adequately supported.

## C.    Solicitation Process and Voting Procedures

### 1.    Solicitation Process

#### a.    General

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**." Notwithstanding the foregoing, the following process and procedures apply with respect to the Plan:

On August 15, 2014, the Bankruptcy Court entered the *Order Scheduling Certain Hearing Dates and Establishing Deadlines in Connection with Chapter 11 Process* [Docket No. 1708] (the "Scheduling Order") and, on August 20, 2014, the Bankruptcy Court entered the *(i) Order (A) Conditionally Approving Specific Disclosure Statements, (B) Approving Solicitation and Notice Procedures in Connection with Voting on Certain Chapter 11 Plans, (C) Approving Form of Ballot and Notices in Connections Therewith, (D)  Scheduling Certain*

26

*Dates and Deadlines in Connection with Confirmation of All Competing Chapter 11 Plans, and (E) Granting Related Relief* [Docket No. 1715] (the "Solicitation Order").  The Solicitation Order, together with the Scheduling Order, among other things, (i) conditionally approved the disclosure statements for, and solicitation of, the new chapter 11 plans proposed by (A) the Plan Proponents and (B) Harbinger[4] and (ii) as detailed below, scheduled certain dates in connection with the approval process of such new plans and a third competing plan (i.e., the One Dot Six Plan).[5]

This Specific Disclosure Statement and other documents described herein are being furnished by the Plan Proponents to Holders of Claims against, and Equity Interests in, the Debtors pursuant to the Disclosure Statement Order, as recognized in the Canadian Proceedings (the "Disclosure Statement Recognition Order"), for the purpose of soliciting votes on the Plan. There will be no separate voting process for Canadian Holders of Claims or Equity Interests, and Canadian Holders of Claims or Equity Interests will be subject to the voting process set out in the Disclosure Statement Order, as recognized by the Disclosure Statement Recognition Order.

Copies of the Disclosure Statement Order entered by the Bankruptcy Court and a notice (the "Confirmation Hearing Notice") of, among other things, voting procedures and the dates set for objections to, and the hearing on, confirmation (the "Confirmation Hearing") of the Plan (and approval of the Disclosure Statement) are also being transmitted with this Specific Disclosure Statement.  The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan (and approval of the Disclosure Statement), the treatment for balloting purposes of certain types of Claims and Equity Interests, and the assumptions for tabulating ballots.  In addition, detailed voting instructions will accompany each ballot.  Each Holder of a Claim or Equity Interest within a Class entitled to vote should read, as applicable, the General Disclosure Statement, the Specific Disclosure Statement (including all exhibits, attachments, and other accompanying documents), the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the ballots in their entirety before voting on the Plan.  These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

### b.    Who Is Entitled To Vote

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established August 25, 2014 (the "Voting Record Date") as the record date for determining the Holders of Claims or Equity Interests entitled to vote to accept or reject the Plan.  Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest Holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote. Creditors or equity interest Holders whose claims or interests are impaired by a plan, but who

---

[4]        See *Harbinger Capital Partners LLC's Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1696].

[5]        See *Second Amended Chapter 11 Plan for One Dot Six Corp. Proposed by U.S. Bank National Association and MAST Capital Management, LLC* [Docket No. 1714].

will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.

Under the Plan, Classes 5A, 5B, 5C, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are "Impaired," and the Holders in such Classes are entitled to vote to accept or reject the Plan.

### c.      Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON SEPTEMBER 23, 2014.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY, (D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE BANKRUPTCY COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), LIGHTSQUARED'S**

28

**FINANCIAL OR LEGAL ADVISORS, THE AD HOC LP SECURED GROUP, OR THE AD HOC LP SECURED GROUP'S FINANCIAL OR LEGAL ADVISORS.**

### d.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing at 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d):  (i) from the Claims and Solicitation Agent (A) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (B) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (C) by calling (877) 499-4509, or (D) by emailing LightSquaredInfo@kccllc.com; or (ii) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

### 2.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on October 20, 2014 at 10:00 a.m. (prevailing Eastern time), before the Honorable Shelley C. Chapman, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan (and approval of the Disclosure Statement) be filed and served so that they are received on or before October 3, 2014 at 12:00 p.m. (prevailing Eastern time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Plan Proponents (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a Confirmation Order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## D.    Plan Supplement

The Plan Supplement documents for the Plan (the "Plan Supplement") will be filed with the Bankruptcy Court by September 16, 2014.  The Plan Supplement will include executed commitment letters, engagement letters, highly confident letters, related term sheets, or form and/or definitive agreements, and documents with respect to:

- New LightSquared Loan Facility Agreement

- New DIP Facility Credit Agreements

- Reorganized Debtors Corporate Governance Documents

- Schedule of Assumed Agreements

- ▪ Schedule of Retained Causes of Action

- ▪ Auction Procedures

## E.    Confirmation and Related Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Solicitation Order and Scheduling Order, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation and related processes for each of the proposed chapter 11 plans:

- ▪ Plan Voting Deadline:  September 23, 2014 at 4:00 p.m. (prevailing Pacific time)

- ▪ Plan/Disclosure Statement Objection Deadline:  October 3, 2014 at 12:00 p.m. (prevailing Eastern time)

- ▪ Deadline to submit Voting Report:  October 2, 2014 at 4:00 p.m. (prevailing Eastern time)

- ▪ Deadline to submit confirmation briefs in support of the Plans and in response to objections thereto:  October 10, 2014 at 5:00 p.m. (prevailing Eastern time)

- ▪ Commencement of Confirmation Hearing:  October 20, 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or Plan Proponents (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

## F.    Risk Factors

Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement, including the risk factors described in Article V thereof, entitled "**General Risk Factors**," and the Specific Disclosure Statement, including the risk factors described in Article V, entitled "**Plan-Related Risk Factors to Confirming and Consummating Plan**."

## G.    Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, via electronic mail at LightSquaredInfo@kccllc.com, or by phone at (877) 499-4509.

## H.    Disclaimer

In formulating the Plan, the Plan Proponents have relied on financial data derived from the books and records of LightSquared.  The Plan Proponents, therefore, represent that everything stated in the Specific Disclosure Statement is true to the best of their knowledge.  The Plan Proponents nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Specific Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable, and the Bankruptcy Court does not recommend whether you should vote to accept or reject the Plan.

Although the attorneys, accountants advisors, and other professionals employed by the Plan Proponents have assisted in preparing the Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of LightSquared, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other professionals employed by the Plan Proponents shall have no liability for the information in the Disclosure Statement.

The Plan Proponents and their professionals also have made a diligent effort to identify the pending litigation claims and projected objections to Claims and Equity Interests.  However, no reliance should be placed on the fact that a particular litigation claim or projected objection to a Claim and Interest is, or is not, identified in the Disclosure Statement.

## I.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Specific Disclosure Statement:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Specific Disclosure Statement in its entirety rather than to a particular portion of the Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy

Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein.  The statements contained in the Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as <u>Exhibit A</u>.  The statements contained in the Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between the Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

**Pursuant to Article IV.U of the Plan, in the event of the Vote To Reject, the Plan shall be withdrawn with respect to all of the Inc. Debtors, and the Plan Proponents shall pursue confirmation of the Plan solely with respect to the LP Debtors.  A version of the Plan that reflects implementation of the LP Debtors-only reorganization (as contemplated by the Plan following the Vote To Reject) is attached as <u>Exhibit A</u> to the Plan.  Upon its confirmation, the LP Debtors-Only Plan shall be binding upon all Holders of Claims against, and Equity Interests in, the LP Debtors, the LP Debtors' Estates, the Reorganized Debtors (excluding the Inc. Debtors), all parties receiving property under the Plan, and other parties in interest.**

## ARTICLE III
## VALUATION CONSIDERATIONS AND FINANCIAL PROJECTIONS

### A.    Valuation Considerations

As previously stated, the purpose of the Disclosure Statement is to provide "adequate information" of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Holders of Claims or Equity Interests of the relevant Class to make an informed judgment concerning the Plan.  <u>See</u> 11 U.S.C. § 1125(a).

The Bankruptcy Court may approve the Disclosure Statement without a valuation of the Debtors or an appraisal of the Debtors' Assets.  See 11 U.S.C. § 1125(b).

As discussed in Article I.A.1.a of this Specific Disclosure Statement, the Debtors' Assets have been extensively marketed over at least the past year, including at the direction of the Special Committee following its appointment in September 2013.  While the marketing process produced some indications of interest, given the highly contentious and litigious nature of these Chapter 11 Cases, it did not produce adequate bids for the Debtors' Assets that were capable of execution.  In denying confirmation of the Third Amended Plan, the Bankruptcy Court also recognized the uncertainty of the value of the Debtors' Assets under certain circumstances when it did not accept the valuations submitted in support of, and opposition to, the Third Amended Plan, finding that such plan was based "entirely on unsupportable assumptions about the timing of FCC approvals."  See, e.g., In re LightSquared Inc., et al., Case No. 12-12080 (SCC) [Docket No. 1631] (Bankr. S.D.N.Y. July 11, 2014) at 55.

Given these considerations, the Plan Proponents have designed the Plan to test the value of the Debtors' Assets through the Auction of the New LightSquared Common Equity following confirmation of the Plan.  (See Article I.A.1.e of this Specific Disclosure Statement and Article IV.B.1.b of the Plan.)  As such, the Specific Disclosure Statement does not include a valuation or appraisal of the Debtors' Assets.

## B.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan." 11 U.S.C. § 1129(a)(11).  For the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the development of certain financial projections attached hereto as Exhibit B (the "Projections"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.  The Projections will also assist each Holder of a Claim or Equity Interest in the Voting Classes in determining whether to vote to accept or reject the Plan.

The Plan Proponents believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.  In general, as illustrated by the Projections, the Plan Proponents believe that the Reorganized Debtors will be financially viable.  Indeed, the Plan Proponents believe that the Reorganized Debtors will have sufficient liquidity, assuming the availability of the New LightSquared Working Capital Facility, to fund obligations as they arise, thereby maintaining value.  Accordingly, the Plan Proponents believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  LightSquared prepared the Projections in good faith based upon, among other things, the estimates and assumptions as to the future financial condition and results of operations of the Reorganized Debtors.  Although the Projections represent LightSquared's best estimates of the results of LightSquared's operations and financial

position after giving effect to the reorganization contemplated under the Plan, and although LightSquared believes it has a reasonable basis for the Projections as of the date hereof, the Projections are only estimates, and actual results may vary considerably from forecasts. Consequently, the inclusion of the information regarding the Projections herein should not be regarded as a representation by the Plan Proponents, their advisors, or any other Entity that the forecast results will be achieved.

The estimates and assumptions in the Projections, while considered reasonable by LightSquared's management, may not be realized and are inherently subject to a number of uncertainties and contingencies. The Projections also are based on factors such as industry performance and general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond LightSquared's control. Because future events and circumstances may well differ from those assumed, and unanticipated events or circumstances may occur, the Plan Proponents expect that the actual and projected results will differ, and the actual results may differ materially from those contained in the Projections. No representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Plan Proponents considered or consider the Projections to reliably predict future performance. The Projections are subjective in many respects and, thus, are susceptible to interpretations and periodic revisions based on actual experience and developments. The Plan Proponents do not intend to update or otherwise revise the Projections to reflect the occurrence of future events, even if assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**LightSquared did not prepare the Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. LightSquared's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**LightSquared does not, as a matter of course, publish projections of its anticipated financial position, results of operations, or cash flows. Accordingly, neither LightSquared, the Ad Hoc LP Secured Group, nor the Reorganized Debtors intend to, and each disclaims any obligation to: (1) furnish updated projections to (a) Holders of Claims or Equity Interests prior to the Effective Date, (b) holders of claims under the New LightSquared Working Capital Facility, or the New LightSquared Common Equity (unless otherwise required to do so), or (c) any other Entity after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available. LightSquared periodically issues press releases reporting financial results, and Holders of Claims or Equity Interests are urged to review any such press releases when, and as, issued.**

34

The Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. In addition, the Projections have been presented in lieu of pro forma historical financial information. Reference should be made to Article V hereof, entitled "**Plan-Related Risk Factors To Confirming And Consummating Plan**" for a discussion of the risks related to the Plan.

The Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Reorganized Debtors.

## ARTICLE IV
## CERTAIN PLAN MATTERS

As mentioned, a description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**." The Plan Proponents believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith. This section discusses certain specific requirements for confirmation of the Plan, including that the Plan is (y) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan and (z) feasible.

### A.    Best Interests of Creditors Test

Please refer to (1) Article IV.C.2 of the General Disclosure Statement, entitled "**Best Interests of Creditors Test and Liquidation Analysis**" for a description of the confirmation requirement for a chapter 11 plan to be in the "best interests" of holders of claims and equity interests and (2) Exhibit C attached to the General Disclosure Statement setting forth an analysis of the estimated aggregate amount of liquidation proceeds available to Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared. In addition, a comparison of the estimated recoveries of Holders of Claims or Equity Interests in a hypothetical chapter 7 liquidation of LightSquared and the estimated recoveries of Holders of Claims or Equity Interests under the Plan is attached hereto as Exhibit C (the "Liquidation Analysis/Comparison").

Under the Plan, Classes 5A, 5B, 5C, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are "Impaired," and the Holders in such Classes are entitled to vote to accept or reject the Plan. Because the Bankruptcy Code requires that Holders of Impaired Claims or Equity Interests either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation (after accounting for recoveries by Holders of Unimpaired or unclassified Claims), the Holders of Impaired Claims or Equity Interests will receive more than under the Plan. The Plan is not in the best interests of Impaired Claims or Equity Interest Holders if the probable distribution to the Impaired Claims or Equity Interest Holders under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan.

The Plan Proponents believe that the value of any distributions in a chapter 7 case would be the same or less than the value of distributions under the Plan.  In particular, proceeds generated in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale.  Holders of Impaired Claims or Equity Interests will likely receive at least as much or more of a recovery under the Plan because, among other things, the continued operation of LightSquared as a going concern, rather than a chapter 7 liquidation, will allow the realization of more value on account of the assets of LightSquared, including through the Auction.  A chapter 7 liquidation also would give rise to additional costs, expenses, and Administrative Claims, including the fees and expenses of a chapter 7 trustee, further reducing Cash available for distribution.  In the event of a chapter 7 liquidation, the aggregate amount of General Unsecured Claims no doubt will increase as a result of rejection of a greater number of LightSquared's Executory Contracts and Unexpired Leases.  All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation.

Accordingly, the Ad Plan Proponents believe that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  The Plan Proponents believe that the members of each Class that is Impaired will receive at least as much as they would if LightSquared were liquidated under chapter 7 of the Bankruptcy Code.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  Under the Plan, Holders of Allowed Claims will receive cash, new debt, and/or equity, or may receive a share of the Auction Proceeds, to the extent applicable, in accordance with the Plan.  Moreover, the Plan Proponents believe that the Reorganized Debtors, as applicable, will have sufficient liquidity to fund obligations as they arise.  Specifically, the New LightSquared Working Capital Facility will provide sufficient liquidity to keep the business of the Reorganized Debtors running.  Additionally, set forth on Exhibit B are the Projections for the Reorganized Debtors, which analyze the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.  Based upon the Projections (but subject to assumptions made in connection therewith), the Plan Proponents submit that further reorganization or liquidation of the Reorganized Debtors is not likely to be required.  Accordingly, the Plan Proponents believe that the Plan satisfies the financial feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE V
## PLAN-RELATED RISK FACTORS TO CONFIRMING AND
## CONSUMMATING PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  **Prior to deciding whether and how to vote on the Plan, Holders of Claims or Equity Interests in a Voting Class should read and consider carefully all of the information in the Plan, the General Disclosure Statement**

**(including the risk factors set forth therein), and the Specific Disclosure Statement (including the risk factors set forth herein), as well as all other information referenced or incorporated by reference into the General Disclosure Statement or the Specific Disclosure Statement.**

Please refer to Article V of the General Disclosure Statement, entitled "**General Risk Factors**" for a description of (a) risk factors affecting LightSquared, including business-related risks, regulatory risks, and legal proceedings, (b) risks that information in the General Disclosure Statement may be inaccurate, and (c) risks related to liquidation under chapter 7 of the Bankruptcy Code.

## A.    Certain Bankruptcy Law Considerations

### 1.    Parties in Interest May Object To Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class of claims or equity interests in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class.  The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, because each Class created by the Plan Proponents contains Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class.  Furthermore, the Bankruptcy Court has previously ruled in these Chapter 11 Cases that similar classifications were acceptable and complied with section 1122 of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion with respect to the Plan.

### 2.    Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan.  If the Plan does not receive the required support from the Voting Classes, the Plan Proponents may elect to amend the Plan.

### 3.    Plan Proponents May Not Be Able To Obtain Confirmation of Plan

The Plan Proponents cannot ensure that it will receive the requisite acceptances to confirm the Plan.  Even if the Plan Proponents receive the requisite acceptances, the Plan Proponents cannot ensure that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting Holders of Claims or Equity Interests within an impaired class will

37

not be "less than the amount that such Holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code. While the Plan Proponents believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan Proponents, subject to the terms and conditions of the Plan (including the consent rights provided to the relevant parties therein), reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

In addition, the Plan provides that if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan, then the Plan shall be withdrawn with respect to all of the Inc. Debtors and shall be a plan only for the LP Debtors. If that occurs, the Plan will not be confirmed with respect to the Inc. Debtors and may only be confirmed with respect to the LP Debtors (as contemplated by the LP Debtors-Only Plan).

### 4.    Plan Proponents May Not Obtain Recognition from Canadian Court

As a condition precedent to the Effective Date, the Plan requires that the Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order. The Plan Proponents believe that such order will be approved and entered by the Canadian Court and become a Final Order for all purposes under the Plan; however, there can be no guarantee as to such outcome.

### 5.    Plan Proponents May Not Be Able To Consummate Plan

Although the Plan Proponents believe that they will be able to consummate the Plan and the Effective Date will occur, there can be no assurance as to timing or the likelihood of the occurrence of the Effective Date. Consummation of the Plan is also subject to certain conditions set forth in the Plan itself. If the Plan is not consummated, it is unclear what distributions to Holders of Allowed Claims or Equity Interests (other than distributions to Holders of Allowed DIP LP Claims and Allowed DIP Inc. Claims, which Allowed Claims shall receive New DIP LP Facility Loans to be issued under the New DIP LP Facility on the Confirmation Date and New DIP Inc. Facility Loans to be issued under the New DIP Inc. Facility on the Confirmation Date, respectively, or, to the extent such Holders object, paid in full, in Cash, on the New DIP Facilities Closing Date) ultimately would receive with respect to their Claims and Equity Interests.

In addition, the Effective Date may not occur, or may be delayed, to the extent one or more parties appeals the entry of the Confirmation Order and an appellate court stays such order.

### 6.    Plan Proponents May Object to Amount or Classification of Claim

Except as otherwise provided in the Plan, each of the Plan Proponents reserves the right to object to the amount or classification of any Claim or Equity Interest.  The estimates set forth in the Specific Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in the Specific Disclosure Statement.

### 7.    Contingencies Not To Affect Votes of Impaired Classes To Accept Plan

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims and the amount of Auction Proceeds available for distribution to Holders of Allowed Claims and Equity Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not require re-solicitation of the Impaired Classes.

### 8.    Plan Proponents May Not Obtain Harbinger Litigation Determination

The Plan contemplates the Plan Proponents commencing an action (the "Harbinger Litigation Action") seeking a determination by the Bankruptcy Court or other court of competent jurisdiction  to stay or otherwise enjoin certain claims and Causes of Action commenced by Harbinger against the GPS Industry and the United States of America (the "Harbinger Litigation Determination").  If the Harbinger Litigation Determination is not obtained, however, the continued prosecution of such claims and Causes of Action by Harbinger may interfere with, or otherwise negatively impact, the License Modification Application or other solution with respect to the Debtors' spectrum rights.

### 9.    Withdrawal of Plan for Inc. Debtors May Result in Litigation Among Debtor Estates

As discussed above, the Plan provides that if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan, then the Plan shall be withdrawn with respect to all of the Inc. Debtors.  In the event the Plan is not confirmed with respect to the Inc. Debtors, there is a risk that litigation will arise between the Inc. Debtors' Estates and the LP Debtors' Estates and/or their respective stakeholders, including litigation with respect to the allocation of the costs and benefits associated with the Inmarsat Cooperation Agreement between LightSquared LP, SkyTerra (Canada) Inc., on the one hand, and the LightSquared Inc., on the other hand.

**B.      Factors Affecting LightSquared**

LightSquared is exposed to various factors and risks that include, without limitation, the following.

**1.      Regulatory Risks**

**a.      LightSquared May Not Receive FCC Consents To Emerge From Chapter 11 in Timely Fashion**

The effectiveness of the Plan would result in an assignment and/or transfer of control requiring prior FCC consent(s) under the Communications Act and the FCC's implementing rules.  Under those rules, any proposed buyer or buyer group must be "qualified" and capable of satisfying requirements established under FCC policies with respect to foreign ownership, character, spectrum aggregation, competition, etc.  In connection with any assignment or transfer of control, other FCC consents also could be required.  For example, under the Communications Act and the FCC's implementing rules, a common carrier licensee must petition the FCC for approval of specific foreign ownership in excess of a twenty-five percent (25%) threshold (or twenty percent (20%) in some cases).  The filing and grant of such a petition could be required in connection with the Plan to the extent it results in any material change in the indirect foreign ownership of the holder on an FCC authorization.  There is no set timetable for the processing of such applications and related filings.

**b.      LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Current Business Plan**

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's current business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access.  Nevertheless, LightSquared can provide no assurance that the FCC will grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

Furthermore, the Plan provides that, if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan, then the Plan shall be withdrawn with respect to all of the Inc. Debtors and shall be a plan only for the LP Debtors (as set forth in the LP Debtors-Only Plan).  LightSquared's License Modification Application contemplates the use of spectrum rights held by the Inc. Debtors in conjunction with spectrum rights held by the LP Debtors.  If the Inc. Debtors are severed from the Plan, there can be no assurances that LightSquared's current business plan will remain viable.

**c.      FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service**

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required

40

to accept interference into that terrestrial wireless service from certain other spectrum users. It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services—regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared. These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality. Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

> ### d. Transactions Contemplated by Plan May Require Various Other Regulatory Approvals

Various other regulatory approvals, including the expiry of certain statutory waiting periods, may be required to give effect to the transactions contemplated in the Plan, including approvals and/or pre-merger filings under the *Investment Canada Act*, the *Competition Act* (Canada), the *Radiocommunication Act* (Canada), and the *Defence Production Act* (Canada). There is no guarantee that such approvals would be obtained in a timely manner or, possibly, at all. In addition, obtaining these approvals could result in one or more delays in completing the transactions or the imposition of onerous and/or materially disadvantageous terms and conditions.

> ## 2. Business-Related Risks

> ### a. LightSquared Will Emerge with Substantial Indebtedness, Which May Adversely Affect Cash Flow, Reduce LightSquared's Ability To Obtain Additional Financing, and Limit LightSquared's Ability To Operate Its Business

LightSquared will emerge from bankruptcy a highly leveraged company as a result of entering into the New LightSquared Loan Facility. LightSquared may incur significant additional indebtedness to finance the deployment of its 4G LTE terrestrial wireless network, fund its operations, and service its outstanding indebtedness. LightSquared's substantial indebtedness could limit its ability to incur additional indebtedness or issue equity, which it would need to fund its 4G LTE terrestrial wireless network deployment and operating expenses until it can launch commercial services and begin generating cash flow from operations. LightSquared's substantial indebtedness also reduces the amount of cash available for capital expenditures, operating expenses, or other corporate purposes by requiring it to dedicate a substantial portion of its available cash to pay interest on its indebtedness.

Although certain of the agreements governing LightSquared's indebtedness place limitations on the amount of indebtedness it may incur, LightSquared may be able to incur substantial amounts of additional indebtedness in the future and, as a result, it may become even more highly leveraged. If LightSquared incurs additional indebtedness, the related risks could intensify.

        **b.**      **The New LightSquared Loan Facility Contemplated Under Plan May Contain Covenants that May Limit Operating Flexibility, and LightSquared May Incur Additional Future Debt**

The New LightSquared Loan Facility contemplated by the Plan may contain covenants that, among other things, restrict LightSquared's ability to take specific actions, including restrictions that may limit LightSquared's ability to engage in actions or transactions that may be in LightSquared's long-term interest.  In addition, as described above, LightSquared may incur other indebtedness in the future that may contain financial or other covenants more restrictive than those of the New LightSquared Loan Facility.  These covenants may limit LightSquared's ability to, among other things, incur additional indebtedness, create or incur liens, pay dividends, redeem or prepay indebtedness, make certain investments, engage in mergers or other strategic transactions, sell assets, and engage in transactions with affiliates.  These operating restrictions may adversely affect LightSquared's ability to finance future operations or capital needs, engage in transactions with potential strategic partners, respond to changes in its business or the wireless industry by acquiring or disposing of certain assets, or engage in other business activities.  LightSquared's ability to comply with any financial covenants may be affected by events beyond LightSquared's control, and there is no assurance that LightSquared will satisfy those requirements.

A breach of any of the restrictive covenants in the agreements governing LightSquared's indebtedness could result in a default, which could allow LightSquared's lenders to declare all outstanding borrowings, together with accrued interest and other fees, to be immediately due and payable, enforce their security interest, or require LightSquared to apply all available cash to repay these borrowings.  If LightSquared is unable to repay outstanding borrowings when due, its lenders may have the right to proceed against the collateral granted to them to secure the debt owed to them.

        **c.**      **LightSquared May Not Be Successful in Implementing Its Current Business Plan, and Such Failure Would Have a Material Effect on LightSquared's Financial Condition and Ability To Generate Revenues From Operations and Realize Earnings**

LightSquared's current business plan contemplates building a nationwide 4G LTE terrestrial wireless network that incorporates satellite coverage throughout North America.  There are significant risks and uncertainties associated with the deployment of LightSquared's 4G LTE terrestrial wireless network and the execution of LightSquared's business plan, and, as a result, LightSquared is unable to predict the extent of its future losses or when it will become profitable, if at all.  If LightSquared proceeds with its current business plan but is unable to deploy its network on a timely basis, or if it fails to successfully sell wholesale capacity on its network, its business, prospects, financial condition, and results of operations could be materially adversely affected, and LightSquared could be unable to continue operations.

> **d.    LightSquared May Be Unable To Deploy Its Terrestrial Wireless Network in Appropriate Timeframe and at Appropriate Cost, Which Would Have Material Effect on Its Financial Condition and Ability To Generate Revenues from Operations and To Realize Earnings**

LightSquared is at an early stage of deploying its 4G LTE terrestrial wireless network and might not be able to execute its deployment plan in accordance with its currently contemplated timing, budget, or nationwide coverage, if at all.  If LightSquared elects to pursue its current business plan, deployment delays could cause LightSquared to delay the launch of its commercial service in certain markets, which will negatively impact LightSquared's ability to generate revenues and could jeopardize its ability to maintain certain of its licenses.  Failure to complete the nationwide 4G LTE terrestrial wireless network on a timely basis could also discourage potential wholesale customers from using LightSquared's wireless services or negatively impact such customers' ability to provide retail service offerings that are competitive with wireless operators, such as Verizon Communications Inc., AT&T Inc., or Clearwire Corporation, which could have more fully deployed nationwide 4G networks.

Service limitations during the network deployment phase could impact the marketability of LightSquared's service.  While LightSquared expects to be able to provide coverage during its network deployment pursuant to 3G roaming arrangements with wireless carriers, as well as via its integrated next generation satellite network, the quality of the wireless services that it will be able to provide may not meet consumer expectations and may not compare favorably with the 4G services provided by other operators.  Wireless services provided by LightSquared's roaming partners' 3G networks and its next generation satellite network will likely offer lower speeds and performance relative to other 4G terrestrial services.  Furthermore, when services are provided via LightSquared's satellite network, availability of such services will be limited to outdoor use in areas with line of sight to a satellite and will experience latency delays.  These service limitations could negatively impact the experience of consumers using LightSquared's network and damage the reputation of its network quality and reliability.

If commercial service is not launched during LightSquared's network deployment, LightSquared may fail to generate sufficient revenue to continue operating its business.  Deployment delays, budget overruns, or failure to fully deploy LightSquared's network nationwide could materially impair LightSquared's ability to generate cash flow from operations and could materially adversely affect its business, prospects, financial condition, and results of operations.

> **e.    LightSquared Faces Significant Competition from Companies that Are Larger and/or Have Greater Resources**

LightSquared faces significant competition both from companies that are larger and/or have greater resources and from companies that may introduce new technologies.  While LightSquared had planned to be one of the first companies to offer integrated satellite and ATC-based terrestrial services, due to delays, the Plan Proponents expect that parts of LightSquared's business will face competition from many well-established and well-financed competitors, including existing cellular and personal communications service operators who have large established customer bases and may be able to roll out their businesses ahead of LightSquared.

Many of these competitors have substantially greater access to capital and have significantly more operating experience than LightSquared.  Further, due to their larger size, many of these competitors enjoy economies of scale benefits that are not available to LightSquared.

LightSquared may also face competition from other MSS operators planning to offer MSS/ATC services.  In addition, the FCC or Industry Canada could make additional wireless spectrum available to new or existing competitors.

LightSquared may also face competition from the entry of new competitors or from companies with new technologies, and LightSquared cannot predict the impact that this would have on any business plan it employs or the future results of operations.

**f.      Device Manufacturers May Not Make Their Products Compatible with LightSquared's 4G LTE Terrestrial Wireless Network**

Devices operating on LightSquared's 4G LTE terrestrial wireless network would be required to incorporate chipsets that are compatible with LightSquared's 4G LTE terrestrial wireless network.  Qualcomm's standard LTE chipset platforms are capable of the L-band spectrum support required to operate on LightSquared's terrestrial wireless network, and LightSquared may promote additional chipset development in order to develop additional sources of compatible chipsets.  However, there can be no assurance that device manufacturers will select compatible chipsets in a sufficient number of popular wireless devices.  If manufacturers of commercially popular devices, such as smartphones or tablet computers, do not incorporate compatible chipsets in their products, LightSquared will not be able to offer retail wireless services using capacity on its 4G LTE terrestrial wireless network to connect such devices, which could render LightSquared's service offering less attractive or require LightSquared to deploy alternative technologies.

**g.      LightSquared's Success Depends Upon Key Management Personnel, and LightSquared's Limited Liquidity and Related Business Risks May Make It Difficult To Retain Key Managers and, If Necessary, Attract New Managers**

LightSquared's future success may depend upon the knowledge, ability, experience, and reputation of its personnel.  The loss of key personnel and the inability to recruit and retain qualified individuals could adversely affect LightSquared's ability to implement its business strategy and to operate its businesses.

**h.      Adverse Conditions in U.S. and Global Economies Could Impact LightSquared's Results of Operations**

Unfavorable general economic conditions, such as a recession or economic slowdown in the United States, could negatively affect the affordability of, and demand for, 4G LTE terrestrial wireless products and services.  In difficult economic conditions, consumers may seek to reduce discretionary spending by electing to use fewer higher margin services or obtaining products and services under lower-cost programs offered by other companies.  Similarly, under these conditions, the wholesale customers that LightSquared intends to serve may delay strategic

decisions, including the rollout of new retail service offerings. Should these current economic conditions worsen, LightSquared likely would experience a decrease in revenues, which could have a material adverse effect on its results of operations.

### 3.    Risks Related to New LightSquared Common Equity and the Auction

There is currently no existing trading market for the New LightSquared Common Equity. The Auction contemplated by the Plan, therefore, may not produce a Successful Purchaser. Accordingly, Holders of Allowed Claims and Equity Interest entitled only to receive Excess Auction Proceeds under the Plan may not receive any recovery, and Holders of Allowed Claims who receive New LightSquared Common Equity pursuant to the Plan may not be able to sell such securities at desired times and prices or at all.

Furthermore, the Plan does not currently contemplate applying for listing of the New LightSquared Common Equity on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the New LightSquared Common Equity and, even if one develops, such public trading market may not be maintained. If an active public trading market for the New LightSquared Common Equity does not develop or is not maintained, the market price and liquidity of such securities are likely to be adversely affected, and holders may not be able to sell such securities at desired times and prices or at all.

The liquidity of the trading market, if any, and future trading prices of the New LightSquared Common Equity will depend on, and may be adversely affected by, unfavorable changes in many factors, including, without limitation:

- Prevailing interest rates;

- LightSquared's businesses, financial condition, results of operations, prospects, and credit quality;

- The market for similar securities and the overall securities market; and

- General economic and financial market conditions.

Many of these factors are beyond LightSquared's and the Ad Hoc LP Secured Group's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the New LightSquared Common Equity, regardless of LightSquared's businesses, financial condition, results of operations, prospects, or credit quality.

The New LightSquared Common Equity has not been registered under the Securities Act, which could affect the liquidity and price of the New LightSquared Common Equity. The New LightSquared Common Equity may be transferred by holders of such interests to the extent that there is an available exemption from the registration requirements of the Securities Act. This could substantially adversely impact both the liquidity and the share price of the New LightSquared Common Equity.

C.       **Litigation Risks**

To the extent that distributions available to Holders of Allowed Claims or Equity Interests under the Plan may be affected, in whole or in part, from recoveries from Causes of Action asserted by LightSquared or the Reorganized Debtors, including, without limitation, the Prepetition Inc. Facility Actions, there can be no assurance as to the outcome of such Causes of Action and the effect on distributions to be made to Holders of Allowed Claims or Equity Interests under the Plan.  Additionally, there may be significant delays before any resolution of such Causes of Action and, therefore, any distributions made on account of such Causes of Action may not occur until much later in time.

D.       **Certain Tax Matters**

For a discussion of certain United States federal income tax consequences of the Plan to certain Holders of Claims or Equity Interests and to the Reorganized Debtors, see Article VII hereof, entitled "**Certain United States Federal Income Tax Consequences**."

This statement does not address the Canadian federal income tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests.  Holders to whom the Canadian federal income tax rules may be relevant should consult their own tax advisors.

## ARTICLE VI
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of certain United States federal income tax consequences of the Plan to LightSquared and certain Holders of Claims and Holders of Equity Interests that receive consideration from the Debtors pursuant to the Plan.  This discussion does not address the United States federal income tax consequences to Holders of Claims or Holders of Equity Interests who are Unimpaired or Holders who are not entitled to vote because they are deemed to reject the Plan, and, except as specifically provided below, does not apply with respect to DIP Claims.  Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the Holders of Claims and Equity Interests.  Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Specific Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan, including those items discussed below.  The

46

characterization of the Plan set forth in this discussion will not be binding on the IRS or the U.S. courts. Therefore, there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan or that such characterization will be sustained by a U.S. court if so challenged.  Except as otherwise specifically provided, this discussion applies solely to Holders that are U.S. Holders (defined below), and does not apply to Holders of Claims or Holders of Equity Interests that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)).  The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code.  Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances.  Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

For purposes of the following discussion, while not free from doubt, for United States federal income tax purposes, there is a strong likelihood that if one class of the New LightSquared Term Loans is stapled to one class of the New LightSquared Common Equity, the stapled instruments would be treated together as an equity interest in New LightSquared (i.e., a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit) and the following discussions assume such treatment.  Thus, for example, the Reorganized Debtors generally would not receive a deduction for any payments on a New LightSquared Stapled A Unit or New LightSquared Stapled B Unit, and Holders thereof would receive distributions with respect to their stock – not interest payments with respect to debt – with respect to payments on a New LightSquared Stapled A Unit or New LightSquared Stapled B Unit.

Additionally, for purposes of this discussion, Auction Proceeds are assumed to be exclusively Cash (as contemplated by the Plan and Auction Procedures), and there is no discussion regarding the consequences of receiving Auction Proceeds other than Cash.  Finally, other than as specifically provided, this discussion assumes that Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to accept the Plan and, therefore, the Plan is not withdrawn with respect to the Inc. Debtors.  If the Plan were withdrawn with respect to the Inc. Debtors as described in Article IV.U of the Plan, the United States federal income tax consequences of the Plan may be materially different for the Inc. Debtors and Holders of Claims against the Inc. Debtors, or Holders of Equity Interests in LightSquared Inc.  For example, if the Plan is withdrawn with respect to the Inc. Debtors, New LightSquared would not succeed to the Group NOLs.  Instead, those NOLs may remain with the Inc. Debtors or, in some cases, may be lost.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST.  ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY

INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE
FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER
THE PLAN.

## A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF PLAN TO LIGHTSQUARED

For United States federal income tax purposes, LightSquared Inc. is the parent of an
affiliated group of corporations that files a consolidated federal income tax return.  Through
December 31, 2012, this group has reported that it incurred United States federal tax net
operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that
additional NOLs were generated in 2013 (such NOLs of the consolidated group of which
LightSquared Inc. is the parent, the "Group NOLs").  Some small portion of these Group NOLs
may be subject to existing limitations.

### 1.    U.S. Federal Income Tax Consequences of Plan to LightSquared Inc.

It is anticipated that New LightSquared will be treated as a corporation for U.S. federal
income tax purposes and the remainder of this discussion assumes that is the case.  If New
LightSquared is not treated as a corporation for U.S. federal income tax purposes, the tax
consequences of the Plan to the Debtors and Holders of Claims may be materially different than
described herein.  Depending on the amount and type of consideration received by Holders
pursuant to the Plan, the contribution of the assets of LightSquared Inc. to New LightSquared
(the "LightSquared Inc. Reorganization") may qualify as a reorganization within the meaning of
Section 368(a) of the Tax Code (a "Reorganization").  If such transaction qualifies as a
Reorganization, all or a portion of the Group NOLs generally would carry over to New
LightSquared, subject to reductions with respect to cancellation of indebtedness, as discussed
below.  The usage of such NOLs also could be limited by the change in ownership limitation
discussed below.  If, however, such transaction does not qualify as a Reorganization within the
meaning of Section 368(a) of the Tax Code, the Group NOLs would not carry over to New
LightSquared and would likely be lost when LightSquared Inc. liquidates.

Implementation of the Plan through a Reorganization may, and receipt of Auction
Proceeds following a successful sale will likely, give rise to currently taxable income or gain for
LightSquared Inc. and other entities in the group.  As noted above, the LightSquared Inc.
consolidated U.S. federal income tax group has significant NOLs, all or a portion of which may
be used to offset all or a portion of any gain recognized in connection with the implementation of
the Plan.  Depending on the amount of taxable income or gain, NOLs may not be sufficient to
offset U.S. federal taxable income, and  even if there are sufficient NOLs to offset all income or
gain recognized as a result of the consummation of the Plan, alternative minimum tax may be
payable as described below.  In addition, state and local taxes may arise as a result of
implementation of the Plan.

In general, an alternative minimum tax ("AMT") is imposed on a corporation's
alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the
corporation's regular U.S. federal income tax for the year.  AMTI is generally equal to regular
taxable income with certain adjustments.  For purposes of computing AMTI, certain tax

deductions and other beneficial allowances are modified or eliminated.  For example, only 90% of a corporation's AMTI generally may be offset by available NOLs.  The effect of this rule could cause LightSquared Inc. and the other corporate members of the LightSquared Inc. consolidated U.S. federal income tax group to be liable for U.S. federal income taxes in connection with gain, if any, arising in connection with the transactions contemplated by the Plan, even if there are Group NOLs in excess of the amount of any such gain.

**2.      Cancellation of Debt and Reduction of Tax Attributes to LightSquared**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued in satisfaction of such existing indebtedness, and (iii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A corporate debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  In the case of a debtor that is a partnership, partners of such partnership will not be required to include any amount of COD Income of the partnership in gross income if such partner is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor (or its partners) must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order: (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits.  A debtor (or partner) with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and equity interests of New LightSquared (including New LightSquared Stapled A Units and New LightSquared Stapled B Units).  Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for U.S. federal income tax purposes and the amount of Cash, the value of the equity interests and the issue price of the debt obligations, if any, transferred in exchange for the Claims, in each case as of the New DIP Closing Date or the Effective Date, as relevant.  To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing through LightSquared LP) COD Income, such income will reduce tax attributes, including NOLs (if any), that may remain available to New LightSquared and its reorganized subsidiaries.

**3.      Potential Limitations on NOLs and Other Tax Attributes**

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code.  Any section 382

limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

In general under section 382, if a corporation undergoes an "ownership change" the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. The transactions contemplated by the Plan are likely to constitute an "ownership change" with respect to the Group NOLs and other tax attributes.

For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the amount of the annual limitation on the usage of pre-change losses is equal to the product of (i) the fair market value of the stock of the corporation immediately after the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments, multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 3.14% for ownership changes occurring in August, 2014). For purposes of this calculation, in no event, can the corporation's stock value exceed the pre-change gross value of the corporation's assets. As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in gain" in its assets at the time of the ownership change.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero (0), thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOLs expire twenty (20) years after the year in which they arose.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss. If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Corresponding rules may reduce the corporation's ability to use losses if it has a built-in loss in its assets. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the amount is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors expect that they have a substantial net unrealized built-in gain in their assets.

50

**B.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS UNDER PLAN**

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor. Where gain or loss is recognized by a Holder of a Claim or a Holder of an Equity Interest, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder and how long the Claim or Equity Interest has been held.

**1.    Consequences to Holders of Claims**

**a.    Holders of Prepetition LP Facility Non-SPSO Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall receive its Pro Rata share of (i) $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (ii) 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.5(c) of the Plan shall be increased to $1.2 billion. A Holder's Pro Rata share in Article III.B.5(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (A) Allowed Prepetition LP Facility Non-SPSO Claims, plus (B) Allowed Prepetition LP Facility

SPSO Claims if Class 5B votes to accept the Plan, <u>plus</u> (C) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

The U.S. federal income tax consequences of the Plan for the U.S. Holders of Prepetition LP Facility Non-SPSO Claims are not certain.

The Plan may be a taxable transaction for the U.S. Holders of Prepetition LP Facility Non-SPSO Claims, in which case a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim is likely to have gain or loss equal to the difference between such Holder's basis in its Allowed Prepetition LP Facility Non-SPSO Claim and the sum of the amount of any Cash and the fair market value of the New LightSquared Stapled A Units it receives pursuant to the Plan. A U.S. Holder's tax basis in the New LightSquared Stapled A Units, if applicable, should equal the fair market value of the New LightSquared Stapled A Units on the Effective Date, and the U.S. Holder's holding period for the New LightSquared Stapled A Units should begin on the day following the Effective Date.

U.S. Holders of Prepetition LP Facility Non-SPSO Claims should discuss with their tax advisors potential alternative U.S. federal income tax treatment of the Plan, including the possibility that the Plan is partially tax-free to them and the U.S. federal income tax consequences of such treatment.

Where gain or loss is recognized by such U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition LP Facility Non-SPSO Claims held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### b.   Holders of Prepetition LP Facility SPSO Claims and Prepetition LP Facility SPSO Subordinated Claims

#### (i)   *Class 5B Votes to Accept the Plan*

In the event that Class 5B votes to accept the Plan, then pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive: (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity. A Holder's Pro Rata share in Article III.B.6(c)(i) of the Plan shall be

the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (x) Allowed Prepetition LP Facility SPSO Claims, plus (y) Allowed Prepetition LP Facility Non-SPSO Claims, plus (z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

In the event that Class 5B votes to accept the Plan, the U.S. federal income tax consequences of the Plan for the U.S. Holders of Prepetition LP Facility SPSO Claims are not certain.

The Plan may be a taxable transaction for the U.S. Holders of Prepetition LP Facility SPSO Claims, in which case a Holder of an Allowed Prepetition LP Facility SPSO Claim is likely to have gain or loss equal to the difference between such Holder's combined basis in their Allowed Prepetition LP Facility SPSO Claim and Prepetition LP Facility SPSO Subordinated Claim and the sum of the amount of any Cash and the fair market value of the New LightSquared Stapled B Units they receive pursuant to the Plan.  A U.S. Holder's tax basis in the New LightSquared Stapled B Units, if applicable, should equal the fair market value of the New LightSquared Stapled B Units on the Effective Date, and the U.S. Holder's holding period for the New LightSquared Stapled B Units should begin on the day following the Effective Date.

U.S. Holders of Prepetition LP Facility SPSO Claims should discuss with their tax advisors potential alternative U.S. federal income tax treatment of the Plan, including the possibility that the Plan is partially tax-free to them and the U.S. federal income tax consequences of such treatment.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition LP Facility SPSO Claims held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

(ii)      *Class 5B Votes to Reject the Plan*

In the event that Class 5B votes to reject the Plan, then pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Prepetition LP Facility SPSO Claim treated as an Allowed Prepetition LP Facility SPSO Claim and an Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of a Prepetition LP Facility SPSO Claim treated as, in part, an Allowed Prepetition LP Facility SPSO Claim and an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive (A) in respect of the portion of the Claim treated as an Allowed Prepetition LP Facility SPSO Claim, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim, and (B) in respect of the portion of the

Claim treated as an Allowed Prepetition LP Facility SPSO Subordinated Claim, its Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan.

A U.S. Holder of a Prepetition LP Facility SPSO Claim treated as an Allowed Prepetition LP Facility SPSO Claim and an Allowed Prepetition LP Facility SPSO Subordinated Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (A) the sum of (i) the issue price of the New LightSquared Term Loans received pursuant to the Plan (or the amount of Cash from Auction Proceeds received in lieu thereof) and (ii) the amount of Cash received by such Holder with respect to its share of Excess LP Auction Proceeds and Excess Inc. Auction Proceeds, if any, and (B) the sum of such Holder's adjusted tax basis in its Claim.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of a Prepetition LP Facility SPSO Claim treated as an Allowed Prepetition LP Facility SPSO Claim and an Allowed Prepetition LP Facility SPSO Subordinated Claim held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### c.    Holders of Prepetition Inc. Facility Non-Subordinated Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim shall receive (i) Cash in the amount of the MAST Fee Claims, (ii) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (iii) its Pro Rata share 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.8(c) of the Plan shall be increased to $1.2 billion. A Holder's Pro Rata share in Article III.B.8(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim bears to the aggregate amount of all (A) Allowed Prepetition Inc. Facility Non-Subordinated Claims, plus (B) Allowed Prepetition LP Facility Non-SPSO Claims, plus (C) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.

The tax consequences to the U.S. Holders will depend on whether the Plan is treated as a Reorganization for U.S. federal income tax purposes, which determination will be based, in part,

on whether a Prepetition Inc. Facility Non-Subordinated Claim is a "Security." There is no precise definition of what constitutes a Security, and all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether or not it is a Security. Courts have held that a corporate debt instrument with an original maturity of ten years or more generally will be considered a Security, while an instrument with an original maturity of less than five years generally will not be considered a Security. Additional relevant factors for purposes of making this determination may include:  (i) whether the instrument is secured; (ii) the degree of subordination of the instrument; (iii) the ratio of debt to equity of the issuer; (iv) the negotiability of the instruments; (v) the creditworthiness of the obligor; (vi) the right to vote or otherwise participate in the management of the obligor; (vii) the convertibility of the instrument into an equity interest of the obligor; (viii) whether payments of interest are fixed, variable, or contingent; and (ix) whether such payments are made on a current basis or are accrued.

If a U.S. Holder's Allowed Prepetition LP Facility Non-SPSO Claim qualifies as a Security for U.S. federal income tax purposes and the LightSquared Inc. Reorganization qualifies as a Reorganization for U.S. federal income tax purposes, then the LightSquared Inc. Reorganization generally would result in the following U.S. federal income tax consequences to U.S. Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims:  (i) no gain or loss would be recognized by such a U.S. Holder with respect to the U.S. Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim surrendered pursuant to the Plan, except that such a U.S. Holder would recognize gain, if any, up to the amount of  the sum of any Cash received pursuant to the Plan; (ii) the aggregate tax basis of the New LightSquared Stapled A Units received in the LightSquared Inc. Reorganization would be the same as the aggregate tax basis of the U.S. Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claims surrendered in exchange for the New LightSquared Stapled A Units, decreased by the amount of Cash received pursuant to the Plan and increased by any gain recognized in connection with the LightSquared Inc. Reorganization; and (iii) the U.S. Holder's holding period of the New LightSquared Stapled A Units received generally would include the holding period of the Allowed Prepetition Inc. Facility Non-Subordinated Claims surrendered in exchange therefor.

If the LightSquared Inc. Reorganization does not qualify as a Reorganization for U.S. federal income tax purposes or if the Allowed Prepetition Inc. Facility Non-Subordinated Claims do not qualify as Securities for U.S. federal income tax purposes, a U.S. Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim generally should recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash and the fair market value of any New LightSquared Stapled A Units received by such Holder and such Holder's adjusted tax basis in its Allowed Prepetition Inc. Facility Non-Subordinated Claim.  The U.S. Holder will have an initial tax basis with respect to its New LightSquared Stapled A Units equal to the fair market value of such interests at the Effective Date, and the U.S. Holder's holding period for the New LightSquared Stapled A Units should begin on the day following the Effective Date.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the

55

claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition Inc. Facility Non-Subordinated Claim held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

### d.    Holders of Prepetition Inc. Facility Subordinated Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan.

A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally should recognize gain or loss in an amount equal to the difference, if any, between the amount of Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Prepetition Inc. Facility Subordinated Claim. If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Prepetition Inc. Facility Subordinated Claim, such Holder generally will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Prepetition Inc. Facility Subordinated Claim.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition Inc. Facility Subordinated Claims held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

### e.    Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

A U.S. Holder of an Allowed LP General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between the amount of Cash received by such Holder in connection with the Plan and such Holder's adjusted tax basis in its Allowed LP General Unsecured Claim.  Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction or worthless securities deduction.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection

with the Plan of an Allowed LP General Unsecured Claim held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### f.      Holders of Inc. Convenience Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Convenience Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Convenience Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. Convenience Claim.

A U.S. Holder of an Allowed Inc. Convenience Claim generally will recognize gain or loss in an amount equal to the difference, if any, between the amount of Cash received by such Holder in connection with the Plan and such Holder's adjusted tax basis in its Allowed Inc. Convenience Claim. Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction or worthless securities deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Inc. Convenience Claim held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### g.      Holders of Inc. General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. General Unsecured Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan.

A U.S. Holder of an Allowed Inc. General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between the amount of Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Inc. General Unsecured Claim. If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Inc. General Unsecured Claim, such Holder generally will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Inc. General Unsecured Claim. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Inc. General Unsecured Claims held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### h.    Issue Price

The issue price of a debt instrument will depend on whether it or property for which it is exchanged is considered to be "traded on an established market."  In general, a debt instrument will be treated as traded on an established market if, at any time during the thirty-one (31)-day period ending fifteen (15) days after the issue date, (i) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (ii) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (iii) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  If a debt instrument (or property for which it is exchanged) is traded on an established market, the issue price of the debt instrument is generally its fair market value (or the fair market value of the property for which it was issued) as of the date of the exchange. If a debt instrument (and property for which it is exchanged) is not traded on an established market, its issue price is generally its stated principal amount.

### i.    Accrued but Untaxed Interest

A portion of the consideration received by a Holder of Claims may be attributable to accrued but unpaid interest on such Claims.  Any amounts treated as received for accrued interest should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. If the fair value of the consideration received by a Holder of Claims is not sufficient to fully satisfy all principal and interest on such Claims, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a Holder of Claims will be allocated first to the principal amount of the Holder's Claims, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  A Holder of an Allowed Claim should generally recognize a deductible loss to the extent the Holder previously included accrued interest in its gross income and such interest is not paid in full.  A Holder of Claims that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the New DIP Closing Date or Effective Date, as relevant, and the Holder's holding period for such property should begin on the day following the New DIP Closing Date or Effective Date, as relevant.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### j.    Market Discount

Holders of Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code.  Under these provisions, some or all of the gain recognized by a

58

Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one (1) year that is acquired by a Holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that Holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the Holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity, or revised issue price in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

> ### 2.    Consequences to Holders of Equity Interests

> #### a.    Consequences to Holders of Existing LP Preferred Units Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C of the Plan.

Regardless of whether a Holder of Allowed Existing LP Preferred Units Equity Interests receives any Auction Proceeds, such a Holder may be allocated COD income in connection with the implementation of the Plan. After taking into account any COD income allocated to a Holder of Allowed Existing LP Preferred Units Equity Interests, a U.S. Holder of any such interests will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (A) the amount of Cash received by such Holder with respect to its share of Excess LP Auction Proceeds, if any, and (B) any amount deemed distributed to the U.S. Holder in connection with the Plan as a result of the relief of a liability under Section 752 of the Tax Code; and (ii) such Holder's adjusted tax basis in its Allowed Existing LP Preferred Equity Interest (adjusted to take into account any COD income allocable to such Holder).

Where gain or loss is recognized by such U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a

capital asset in the hands of the Holder and how long it has been held, and the mix of assets held by LightSquared LP.

A U.S. Holder of Existing LP Preferred Units Equity Interests may be allocated gain in connection with an Auction sale and COD Income arising with respect to the repayment of certain LightSquared LP Claims for less than the full amount of such Claims in excess of any Excess Auction Proceeds received by the Holder.

### b.      Consequences to Holders of Existing Inc. Preferred Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, each Existing Inc. Preferred Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan.

A Holder generally will recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Existing Inc. Preferred Stock Equity Interest. If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Existing Inc. Preferred Equity Interest, such Holder will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Existing Inc. Preferred Equity Interest.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held and whether and to what extent the Holder previously had claimed a worthless securities deduction.

### c.      Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan.

A Holder generally will recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash received by such Holder with respect to its share of Excess

Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Existing Inc. Common Stock Equity Interest.  If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Existing Inc. Common Stock Equity Interest, such Holder will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Existing Inc. Common Stock Equity Interest.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held and whether and to what extent the Holder previously had claimed a worthless securities deduction.

### 3. Consequences of Holding New LightSquared Stapled A Units, New LightSquared Stapled B Units, and Debt Obligations

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of New LightSquared Stapled A Units, New LightSquared Stapled B Units, and New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit.  This discussion addresses only the U.S. federal income tax considerations of U.S. Holders that will receive an interest in the New LightSquared Stapled A Units, New LightSquared Stapled B Units, or New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit under the Plan and that will hold such an interest in the New LightSquared Stapled A Units, New LightSquared Stapled B Units, or New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit as capital assets.

### a. Consequences of Ownership of New LightSquared Stapled A Units or New LightSquared Stapled B Units Issued Pursuant to the Plan

#### (i) Distributions

The gross amount of any distribution of Cash and the fair market value of any property distributed to a U.S. Holder with respect to the New LightSquared Stapled A Units or New LightSquared Stapled B Units generally will be includible in gross income by such Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of New LightSquared as determined under U.S. federal income tax principles.  Dividends received by non-corporate Holders may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of New LightSquared's current and accumulated earnings and profits will first be treated as a return of capital to the extent of the Holder's adjusted tax basis in the New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable, and will be applied against and reduce such basis.  To the extent that such distribution exceeds the Holder's adjusted tax basis in its New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such Holder's holding period in its New LightSquared Stapled

A Units or New LightSquared Stapled B Units, as applicable, exceeds one (1) year as of the date of the distribution.  Long term capital gains may be eligible for reduced rates of taxation.

> (ii)    *Sale and Exchange of New LightSquared Stapled A Units or New LightSquared Stapled B Units*

For U.S. federal income tax purposes, a Holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable, in an amount equal to the difference, if any, between the amount realized for the New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable, and the Holder's adjusted tax basis in the New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition of New LightSquared Stapled A Units or New LightSquared Stapled B Units, as applicable, held for more than one (1) year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

### b.    Consequences of Holding New LightSquared Term Loans that Are Not Component of New LightSquared Stapled A Unit or New LightSquared Stapled B Unit Issued Pursuant to Plan

The New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit will be treated as being issued with OID in an amount equal to the difference between (i) the sum of all payments of principal and stated interest due under such New LightSquared Term Loans and (ii) the issue price of such New LightSquared Term Loans.  The issue price of such New LightSquared Term Loans will depend on whether it or the property for which it was exchanged is considered to be "traded on an established market."  It is not clear whether such New LightSquared Term Loans will be considered traded on an established market.  If such New LightSquared Term Loans (or the property for which they are exchanged) are traded on an established market, the issue price of such New LightSquared Term Loans will be the fair market value of such New LightSquared Term Loans (or the fair market value of the property for which they are exchanged) as of the date they are received pursuant to the Plan.  If such New LightSquared Term Loans (and the property for which they are exchanged) are not traded on an established market, the issue price of such New LightSquared Term Loans generally will be their stated principal amount.

U.S. Holders of the New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit must include OID in their gross income as ordinary income calculated on a constant-yield method before the receipt of cash attributable to the income.  The amount of OID includible in income by a U.S. Holder is the sum of the daily portions of OID with respect to such New LightSquared Term Loan for each day during the taxable year or portion of the taxable year on which the U.S. Holder holds such New LightSquared Term Loan ("accrued OID").  The daily portion is determined by allocating to each day in any "accrual period" a *pro rata* portion of the OID allocable to that accrual period.  Accrual periods with respect to such New LightSquared Term Loan may be of any length selected by the U.S. Holder and may vary in length over the term of such New LightSquared Term Loan as long as (i) no accrual period is longer than one (1) year and (ii) each scheduled

payment of interest or principal on such New LightSquared Term Loan occurs on either the final or first day of an accrual period. The amount of OID allocable to an accrual period equals the product of such New LightSquared Term Loan's adjusted issue price at the beginning of the accrual period and such New LightSquared Term Loan's yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted to reflect the length of the accrual period). The adjusted issue price of such New LightSquared Term Loan at the beginning of any accrual period will generally be the issue price of such New LightSquared Term Loan increased by (i) the amount of accrued OID for each prior accrual period and decreased by (ii) the amount of any payments previously made on such New LightSquared Term Loan.

A U.S. Holder will generally recognize gain or loss on the sale, exchange or other disposition of a New LightSquared Term Loan that is not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit equal to the difference between (i) the amount realized upon the sale, exchange, retirement or other taxable disposition and (ii) the U.S. Holder's adjusted tax basis in such New LightSquared Term Loan. Long term capital gain recognized in respect of such a New LightSquared Term Loan by certain non-corporate U.S. Holders generally will be subject to tax at a reduced rate. The ability of U.S. Holders to offset capital losses against ordinary income is limited.

The New LightSquared Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit may be treated as contingent payment debt instruments ("CPDIs") for U.S. federal income tax purposes. The CPDI rules could affect the timing of accruals and the character of gain on the sale or other disposition of such New LightSquared Term Loans.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE

TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities. **Accordingly, the Plan Proponents urge all Holders of Claims or Equity Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on September 23, 2014.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

New York, New York
Dated:  August 26, 2014

**LIGHTSQUARED INC. ( FOR ITSELF AND
ALL OTHER DEBTORS)**

By:          */s/ Douglas Smith*

Name:      Douglas Smith

Title:       Chief Executive Officer, President,
and Chairman of the Board of
LightSquared Inc.

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY, IN ITS CAPACITY AS
INVESTMENT MANAGER TO CERTAIN
FUNDS THAT ARE HOLDERS OF
PREPETITION  LP  FACILITY CLAIMS**

By:          */s/ Mark E. Brubaker*

Name:      Mark E. Brubaker

Title:       Authorized Signatory

**CYRUS CAPITAL PARTNERS, L.P., IN ITS
CAPACITY AS INVESTMENT MANAGER TO
CERTAIN FUNDS THAT ARE HOLDERS OF
PREPETITION LP FACILITY CLAIMS**

By:          */s/ Jennifer M. Pulick*

Name:      Jennifer M. Pulick

Title:       Authorized Signatory

**Exhibit A**

First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and
Ad Hoc Secured Group of LightSquared LP Lenders

[Attached as Exhibit A-1 to the *Notice of Filing of First Amended Joint Plan and Related
Specific Disclosure Statement*]

## **Exhibit B**

Projections

**CONSOLIDATED**

| ($ in 000s) | 2014 | | 2015 | | | | 2016 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| **Beginning Cash** | $22,748 | $34,839 | $95,497 | $30,034 | $257,211 | $221,026 | $175,954 | $132,457 | $71,973 |
| Satellite Revenue | $4,268 | $4,288 | $3,682 | $3,780 | $4,103 | $3,815 | $3,680 | $3,895 | $4,283 |
| Interest Income | $2 | $14 | $38 | $142 | $158 | $140 | $114 | $87 | $46 |
| New Financing | $51,998 | $132,000 | $0 | $388,100 | $0 | $0 | $0 | $0 | $0 |
| **Total Sources** | $56,268 | $136,302 | $3,719 | $392,022 | $4,262 | $3,955 | $3,794 | $3,982 | $4,329 |
| Operating Expenses | $25,279 | $45,872 | $44,516 | $132,781 | $37,294 | $45,826 | $44,042 | $61,169 | $53,209 |
| Capital Expenditures | $1,650 | $750 | $3,060 | $15,236 | $3,153 | $3,200 | $3,249 | $3,298 | $3,348 |
| Restructuring Related Expenses | $17,249 | $29,022 | $21,605 | $16,829 | $0 | $0 | $0 | $0 | $0 |
| **Total Uses** | $44,178 | $75,644 | $69,182 | $164,846 | $40,447 | $49,027 | $47,290 | $64,466 | $56,557 |
| **Ending Cash Balance** | $34,839 | $95,497 | $30,034 | $257,211 | $221,026 | $175,954 | $132,457 | $71,973 | $19,745 |

**LP ONLY**

| ($ in 000s) | 2014 | | 2015 | | | | 2016 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| **Beginning Cash (incl TMI cash)** | $17,154 | $23,877 | $80,416 | $20,995 | $268,913 | $233,791 | $196,936 | $154,748 | $102,571 |
| Satellite Revenue | $4,268 | $4,288 | $3,682 | $3,780 | $4,103 | $3,815 | $3,680 | $3,895 | $4,283 |
| Interest Income | $1 | $10 | $30 | $147 | $169 | $154 | $132 | $109 | $71 |
| New Financing | $41,998 | $113,500 | $0 | $396,400 | $0 | $0 | $0 | $0 | $0 |
| **Total Sources** | $46,267 | $117,798 | $3,712 | $400,327 | $4,272 | $3,969 | $3,812 | $4,004 | $4,355 |
| Operating Expenses | $24,163 | $37,133 | $42,607 | $123,971 | $36,242 | $37,623 | $42,751 | $52,884 | $52,148 |
| Capital Expenditures | $1,650 | $750 | $3,060 | $15,236 | $3,153 | $3,200 | $3,249 | $3,298 | $3,348 |
| Restructuring Related Expenses | $13,731 | $23,377 | $17,465 | $13,202 | $0 | $0 | $0 | $0 | $0 |
| **Total Uses** | $39,544 | $61,259 | $63,132 | $152,409 | $39,394 | $40,823 | $46,000 | $56,181 | $55,496 |
| **Ending Cash Balance (incl TMI cash)** | $23,877 | $80,416 | $20,995 | $268,913 | $233,791 | $196,936 | $154,748 | $102,571 | $51,430 |

## **Exhibit C**

Liquidation Analysis/Comparison

Below is a summary of the proposed recoveries by Holders of Allowed Claims against, and Allowed Equity Interests in, the Debtors pursuant to the *First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as may be amended in accordance with the terms thereof, the "Plan")[1] as compared to potential recoveries in a hypothetical chapter 7 liquidation:

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|----------------------|
| - | Administrative Claims | A | Cash payment | 100% recovery; unimpaired | 0% |
| - | TIP Facility Claims[3] | N/A | N/A | N/A | 100% |
| - | DIP Inc. Facility Claims | B | New DIP Inc. Facility Loans <br> *or* <br> Cash payment[4] | 100% recovery; unimpaired | 100% |
| - | DIP LP Facility Claims | C | New LP DIP Facility Loans <br> *or* <br> Cash payment[5] | 100% recovery; unimpaired | 100% |

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]    The estimates of recoveries in the hypothetical chapter 7 liquidation set forth herein assume that the Debtors do not receive approval of the License Modification Application.

[3]    The hypothetical chapter 7 liquidation set forth herein assumes that the chapter 7 trustee will be required to secure a $86 million trustee in possession ("TIP") loan to provide adequate liquidity to enable the existing satellite operating business to continue to operate, make payments pursuant to the Inmarsat Cooperation Agreement, and provide additional liquidity to cover some of his professional fees to be incurred during the pendency of the hypothetical chapter 7 case.

[4]    The DIP Inc. Facility Claims shall receive Plan Consideration on the New DIP Facility Closing Date.

[5]    The DIP LP Facility Claims shall receive Plan Consideration on the New DIP Facility Closing Date.

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|------------------------|
| - | New DIP Facility Claims[6] | D | New LightSquared Working Capital Facility Loans<br><br>or<br><br>Cash Payment[7] | 100% recovery; unimpaired | N/A |
| - | Priority Tax Claims | E | Cash payment | 100% recovery; unimpaired | 0% |
| - | Statutory Fees | F | Cash payment | 100% recovery; unimpaired | 100% |
| Class 1 | LP Other Priority Claims | G | Cash payment | 100% recovery; unimpaired | 0% |
| Class 2 | Inc. Other Priority Claims | H | Cash payment | 100% recovery; unimpaired | 0% |
| Class 3 | LP Other Secured Claims | I | Cash payment; collateral return plus allowed interest under section 506(b) of the Bankruptcy Code; or other unimpaired treatment | 100% recovery; unimpaired | 0% |
| Class 4 | Inc. Other Secured | J | Cash payment; collateral return plus | 100% recovery; | 0% |

---

[6]    The New DIP Facility Claims (a) arise in connection with the New DIP Facility Closing Date, and (b) are unimpaired because the Holders of such Claims are receiving everything to which they are entitled under the New DIP Credit Agreement consistent with section 1124 of the Bankruptcy Code.

[7]    The New DIP Facility Claims shall receive Plan Consideration on the Effective Date.

2

## COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|------------------------|
| | Claims | | allowed interest under section 506(b) of the Bankruptcy Code; or other unimpaired treatment | unimpaired | |
| Class 5A | Prepetition LP Facility Non-SPSO Claims[8] | K | If Class 5B votes to accept the Plan, Pro Rata share of (i) $1.0 billion of New LightSquared Tranche A Term Loans and (ii) 100% of the LightSquared Class A Common Equity;<br><br>or<br><br>If Class 5B votes to reject the Plan, Pro Rata share of (i) $1.2 billion of New LightSquared Tranche A Term Loans and (ii) 100% of the LightSquared Class A Common Equity;<br><br>and<br><br>If there is a Successful Bidder pursuant to Auction, Pro Rata share of Auction Proceeds in lieu of certain consideration set forth above | Undetermined recovery; impaired | 85.2% |
| Class 5B | Prepetition LP Facility SPSO Claims[9] | L | If Class 5B votes to accept the Plan, (i)Cash in the amount of the SPSO Fee | In the event that Class 5B votes | 85.2% |

---

[8]    The Prepetition LP Facility Non-SPSO Claims shall receive Plan Consideration on the Effective Date.

3

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|----------------------|
| | | | Claims incurred between the Confirmation Date and the Effective Date, (ii) Pro Rata share of $1.0 billion of New LightSquared Tranche B Term Loans, and (iii) Pro Rata share of 100% of the New LightSquared Class B Common Equity;<br><br>*or*<br><br>If Class 5B votes to reject the Plan, New LightSquared Tranche B Term Loans in an amount equal to its Allowed Prepetition LP Facility SPSO Claim;<br><br>*and*<br><br>If there is a Successful Bidder pursuant to Auction, Pro Rata share of Auction Proceeds in lieu of certain consideration set forth above | to accept the Plan: Undetermined recovery<br><br>In the event that Class 5B votes to reject the Plan: 100% recovery; impaired | |
| Class 5C | Prepetition LP Facility SPSO Subordinated Claims | M | Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any | Undetermined recovery; impaired | 0.0% |

[9]    In the event of the Chapter 7 hypothetical liquidation, (a) the proportion of the Prepetition LP Facility SPSO Claims that will be subordinated is assumed to be $500 million, leaving approximately $716 million of a non-subordinated Allowed Claim that participates on a *pari passu* basis with the Prepetition LP Facility Non-SPSO Claims, and (b) the recovery on the $500 million subordinated claim is set forth in Class 5C.

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|-----------------------|
| Class 6 | Prepetition Inc. Facility Non-Subordinated Claims | N | If Class 5B votes to accept the Plan, (i) Cash in the amount of the MAST Fee Claims, (ii) Pro Rata share of $1.0 billion of New LightSquared Tranche A Term Loans, and (iii) Pro Rata share of 100% of the New LightSquared Class A Common Equity; <br><br> or <br><br> If Class 5B votes to reject the Plan, (i) Cash in the amount of the MAST Fee Claims, (ii) Pro Rata share of $1.2 billion of New LightSquared Tranche A Term Loans, and Pro Rata share of 100% of the New LightSquared Class A Common Equity; <br><br> and <br><br> If there is a Successful Bidder pursuant to Auction, Pro Rata share of Auction Proceeds in lieu of certain consideration set forth above | Undetermined recovery; impaired | 37.0% |
| Class 7 | Prepetition Inc. Facility Subordinated Claims | O | Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, based on the Allowed amount of the Prepetition Inc. Facility Subordinated Claims | Undetermined recovery; impaired | 0% |
| Class 8 | LP General Unsecured Claims | P | Cash payment of principal amount | 100% recovery; impaired | 0% |

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|---|---|---|---|---|---|
| Class 9 | Inc. Convenience Claims | Q | Cash payment of principal amount | 100% recovery; impaired | 0% |
| Class 10 | Inc. General Unsecured Claims | R | Pro Rata share of Excess Inc. Auction Proceeds remaining, if any | Undetermined recovery; impaired | 0% |
| Class 11 | Existing LP Preferred Units Equity Interests | S | Pro Rata share of Excess LP Auction Proceeds remaining, if any | Undetermined recovery; impaired | 0% |
| Class 12 | Existing Inc. Preferred Stock Equity Interests | T | Pro Rata share of Excess Inc. Auction Proceeds remaining, if any | Undetermined recovery; impaired | 0% |
| Class 13 | Existing LP Common Units Equity Interests | U | Pro Rata share of Excess LP Auction Proceeds remaining, if any | Undetermined recovery; impaired | 0% |
| Class 14 | Existing Inc. Common Stock Equity Interests | V | Pro Rata share of Excess Inc. Auction Proceeds remaining, if any | Undetermined recovery; impaired | 0% |
| Class 15 | Intercompany Claims | W | Claims shall be cancelled as of the Effective Day, and Holders shall not receive any distribution from Plan Consideration or retain any Equity Interests; provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder | 0% recovery (except for any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared | 0% |

6

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

| Class | Claim | Note | Plan Consideration | % Plan Recovery | Chapter 7 Recovery[2] |
|-------|-------|------|--------------------|-----------------|---------------------|
| | | | thereof | Corp., which would receive 100% recovery); impaired | |
| Class 15 | Intercompany Interests | X | Reinstated | 100% recovery; unimpaired | 0% |

A.  Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Plan Proponents and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Facility Orders) of the Bankruptcy Court.

B.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive  on the Confirmation Date, New DIP Inc. Facility Loans to be issued under the New DIP Inc. Facility in an amount equal to the Allowed DIP Inc. Facility Claims; provided, however, that to the extent a Holder of an

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

Allowed DIP Inc. Facility Claim objects to such treatment, such Holder of an Allowed DIP Inc. Facility Claim shall receive Cash from the proceeds of the New DIP Inc. Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP Inc. Facility Claim.

C.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Facility Claim, except to the extent that a Holder of a DIP LP Facility Claim agrees to less favorable or other treatment, each Holder of a DIP LP Facility Claim shall receive on the Confirmation Date, New DIP LP Facility Loans to be issued under the New DIP LP Facility in an amount equal to the Allowed DIP LP Facility Claims; provided, however, that to the extent a Holder of an Allowed DIP LP Facility Claim objects to such treatment, such Holder of an Allowed DIP LP Facility Claim shall receive Cash from the proceeds of the New DIP LP Facility on the New DIP Facilities Closing Date in an amount equal to its Allowed DIP LP Facility Claim.  Any New DIP LP Facility Loans to be made by SPSO, either in satisfaction of Allowed DIP LP Facility Claims held by SPSO or otherwise, shall be New DIP LP Facility Tranche B Loans and shall be subject to the restrictions set forth in Article IV.B.1(a) of the Plan.

D.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each New DIP Facility Claim, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, each Holder of a New DIP Facility Claim shall receive, on the Effective Date, New LightSquared Working Capital Facility Loans to be issued under the New LightSquared Working Capital Facility in an amount equal to the Allowed New DIP Facility Claims; provided, however, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed New DIP Facility Claims shall receive Auction Proceeds in lieu of New LightSquared Working Capital Facility Loans as provided in Article IV.C of the Plan; provided further, however, that to the extent a Holder of an Allowed New DIP Facility Claim objects to the treatment set forth above in Article II.E of the Plan, such Holder of an Allowed New DIP Facility Claim shall receive Plan Consideration in the form of Cash on the Effective Date in an amount equal to its Allowed New DIP Facility Claim.  Any New LightSquared Working Capital Loans to be made by SPSO, either in satisfaction of Allowed New DIP Facility Claims held by SPSO, if any, or otherwise, shall be New LightSquared Tranche B Working Capital Loans and shall be subject to the restrictions set forth in Articles IV.B.2(c) and (d) of the Plan.

E.   Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized Debtors; or (3) at the option of the Reorganized Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

F.   On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the Reorganized Debtors shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

G.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

H.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Priority Claim shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

I.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed LP Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents: (1) Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (2) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (3) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

J.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Proponents:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (2) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (3) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

K.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility Non-SPSO Claim shall receive its Pro Rata share of (1) $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (2) 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.5(c) of the Plan shall be increased to $1.2 billion.  A Holder's Pro Rata share in Article III.B.5(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility Non-SPSO Claim bears to the aggregate amount of all (1) Allowed Prepetition LP Facility Non-SPSO Claims, plus (2) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan, plus (3) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.5(c) of the Plan, as provided in Article IV.C of the Plan.

For the avoidance of doubt, except as set forth in Article IV.U of the Plan, the treatment specified in Article III.B.5(c) of the Plan shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility Non-SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility Non-SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

10

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

L.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:

> 1)  in the event that Class 5B votes to accept the Plan, (a) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (b) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (c) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in Article III.B.6(c)(i) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (x) Allowed Prepetition LP Facility SPSO Claims, plus (y) Allowed Prepetition LP Facility Non-SPSO Claims, plus (z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan; or

> 2)  in the event that Class 5B votes to reject the Plan, New LightSquared Tranche B Term Loans issued under the New LightSquared Term Loan Facility in an amount equal to its Allowed Prepetition LP Facility SPSO Claim.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility SPSO Claims may receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.6(c) of the Plan, as provided in Article IV.C of the Plan.

For the avoidance of doubt, except as set forth in Article IV.U of the Plan, the treatment specified in Article III.B.6(c) of the Plan shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates.

M.  In the event that Class 5B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

receive its Pro Rata share of (1) Excess LP Auction Proceeds, if any, and (2) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims).

N.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim shall receive (1) Cash in the amount of the MAST Fee Claims, (2) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche A Term Loans, and (3) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class A Common Equity; provided, however, that if Class 5B votes to reject the Plan, the amount of the New LightSquared Term Loans issued pursuant to Article III.B.8(c) of the Plan shall be increased to $1.2 billion.  A Holder's Pro Rata share in Article III.B.8(c) of the Plan shall be the proportion that a Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim bears to the aggregate amount of all (1) Allowed Prepetition Inc. Facility Non-Subordinated Claims, plus (2) Allowed Prepetition LP Facility Non-SPSO Claims, plus (3) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.

Notwithstanding the foregoing, if there is a Successful Purchaser pursuant to the Auction and such Successful Purchaser closes, Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims shall receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.8(c) of the Plan, as provided in Article IV.C of the Plan.

O.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition Inc. Facility Subordinated Claim.

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS TO RECOVERIES IN A LIQUIDATION**

P.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP General Unsecured Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claim.

Q.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Convenience Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Convenience Claim agrees to less favorable treatment, each Holder of an Allowed Inc. Convenience Claim shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed Inc. Convenience Claim.

R.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed Inc. General Unsecured Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Inc. General Unsecured Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Inc. General Unsecured Claim.

S.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units Equity Interest, each Existing LP Preferred Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing LP Preferred Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Existing LP Preferred Units Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing LP Preferred Units Equity Interest.

T.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, each Existing Inc. Preferred Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Preferred Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan; provided,

13

**COMPARISON OF PROPOSED TREATMENT UNDER FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP LENDERS  TO RECOVERIES IN A LIQUIDATION**

in no event shall any distribution to a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Existing Inc. Preferred Stock Equity Interest.

U.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Common Units Equity Interest, each Existing LP Common Units Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Existing LP Common Units Equity Interest shall receive its Pro Rata share of Excess LP Auction Proceeds, if any, as provided in Article IV.C of the Plan.

V.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan.

W.  All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof.

X.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest other than Allowed Existing LP Common Units Equity Interests, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest other than an Existing LP Common Units Equity Interests shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

14

## **Exhibit B-2**

**Blackline Comparison of First Amended Specific Disclosure Statement
(Changed Pages Only)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

## SPECIFIC DISCLOSURE STATEMENT FOR
## FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY
## CODE PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF
## LIGHTSQUARED LP LENDERS

---

- Voting Record Date:  [ ]**August 25, 2014**
- Voting Deadline:  [ ]**September 23**, 2014 at 4:00 p.m. (prevailing Pacific time)
- Plan/**Disclosure Statement** Objection Deadline:  [ ]**October 3**, 2014 at 12:00 p.m. (prevailing Eastern time)
- Confirmation Hearing:  [ ]**October 20**, 2014 at 10:00 a.m. (prevailing Eastern time)

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
*Counsel for Debtors and Debtors in Possession*

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200
*Counsel for Ad Hoc Secured Group
of LightSquared LP Lenders*

Dated:  New York, New York
        August 726, 2014

---

[1]    The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of LightSquared's corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR REJECTION OF THE
PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL TO THE BANKRUPTCY COURT AND HAS NOT BEEN APPROVED
BY THE BANKRUPTCY COURT AT THIS TIME.

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS [ ]SEPTEMBER 23, 2014
AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE").  TO BE
COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON
CONSULTANTS LLC, LIGHTSQUARED'S NOTICE, CLAIMS, SOLICITATION,
AND BALLOTING AGENT ("KCC" OR THE "CLAIMS AND SOLICITATION
AGENT"), NO LATER THAN THE VOTING DEADLINE.

THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE
STATEMENT (THE "SPECIFIC DISCLOSURE STATEMENT") FOR THE FIRST
AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE
PROPOSED BY DEBTORS AND AD HOC SECURED GROUP OF LIGHTSQUARED LP
LENDERS (ATTACHED HERETO AS EXHIBIT A, AND AS THE SAME MAY BE
AMENDED FROM TIME TO TIME, THE "PLAN") OF LIGHTSQUARED INC. AND
CERTAIN OF ITS AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION
(COLLECTIVELY, "LIGHTSQUARED" OR THE "DEBTORS") IN THE ABOVE-
CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"), ARE MADE ONLY
AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE
STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER
SUCH DATE.  THE DELIVERY OF THE SPECIFIC DISCLOSURE STATEMENT AFTER
THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN
INFORMATION SET FORTH HEREIN.  LIGHTSQUARED AND THE AD HOC LP
SECURED GROUP (THE "PLAN PROPONENTS") HAVE NO DUTY TO UPDATE THE
SPECIFIC DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY
THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
HAVING JURISDICTION OVER THE CHAPTER 11 CASES (THE "BANKRUPTCY
COURT").  THIS SPECIFIC DISCLOSURE STATEMENT SUPERSEDES ALL PRIOR
SPECIFIC DISCLOSURE STATEMENTS FILED BY EITHER OF THE PLAN
PROPONENTS.

THE PLAN IS A JOINT PLAN FOR ALL OF THE DEBTORS PREMISED ON THE
MERGER OR OTHER COMBINATION OF LIGHTSQUARED INCEACH INC. DEBTOR
AND EACH OF LIGHTSQUARED INVESTORS HOLDINGS INC., TMI
COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP, AND
LIGHTSQUARED GP INC. WITH AND INTO LIGHTSQUARED LP, IN
CONSIDERATION FOR THE TREATMENT PROVIDED UNDER THE PLAN TO
HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, AS APPLICABLE,

ii

THE INC. DEBTORS AND LIGHTSQUARED INVESTORS HOLDINGS INC., TMI COMMUNICATIONS DELAWARE, LIMITED PARTNERSHIP, AND LIGHTSQUARED GP INC.  NOTWITHSTANDING THE FOREGOING, IF CLASS 6 (PREPETITION INC. FACILITY NON-SUBORDINATED CLAIMS) VOTES TO REJECT THE PLAN, THEN ~~THE PLAN~~ (A) THE PLAN SHALL BE WITHDRAWN WITH RESPECT TO ALL OF THE INC. DEBTORS, AND (B) ~~SHALL BE A~~THE PLAN ~~ONLY FOR THE LP DEBTORS, AND (C) MAY BE CONFIRMED~~PROPONENTS SHALL PURSUE CONFIRMATION OF THE PLAN WITH RESPECT TO THE LP DEBTORS.  A VERSION OF THE PLAN THAT REFLECTS IMPLEMENTATION OF THE LP DEBTORS-ONLY REORGANIZATION (AS CONTEMPLATED BY THE PLAN FOLLOWING THE VOTE TO REJECT) IS ATTACHED AS EXHIBIT A TO THE PLAN.

THE SPECIFIC DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE SPECIFIC DISCLOSURE STATEMENT, TAKEN TOGETHER WITH THE FIRST AMENDED GENERAL DISCLOSURE STATEMENT [DOCKET NO. 918] (AS MAY BE AMENDED OR SUPPLEMENTED, THE "GENERAL DISCLOSURE STATEMENT" AND, TOGETHER WITH THE SPECIFIC DISCLOSURE STATEMENT, THE "DISCLOSURE STATEMENT"), IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF LIGHTSQUARED AND THE CONDITION OF LIGHTSQUARED'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

THE PURPOSE OF THE SPECIFIC DISCLOSURE STATEMENT IS TO PROVIDE (A) INFORMATION CONCERNING THE PLAN, (B) INFORMATION FOR HOLDERS OF CLAIMS OR EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PLAN, AND (C) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (AS AMENDED, THE "BANKRUPTCY CODE") AND SHOULD BE CONFIRMED.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS, THE SPECIFIC DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THE SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED TO THE PLAN, AND THE PLAN SUPPLEMENT (AS DEFINED IN THE PLAN).  IF ANY INCONSISTENCY EXISTS AMONG THE PLAN, THE GENERAL DISCLOSURE STATEMENT, AND THE SPECIFIC DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

EXCEPT AS OTHERWISE STATED IN THIS SPECIFIC DISCLOSURE STATEMENT, HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD REFER TO

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ........................................................................... **1**

    **A.**    **Overview of Plan** ....................................................................... **1**

        1.    Path to Value-Maximizing Transaction ........................ 1
        2.    Path to Plan ................................................................. 2
        3.    General Structure of LightSquared and Reorganized Debtors Under
            Plan ........................................................................ ~~11~~**13**
        4.    Administrative and Priority Claims ............................ ~~12~~**14**
        5.    Classes and Treatment ............................................... ~~13~~**15**

    **B.**    **Chapter 11 Cases** ...................................................................... ~~23~~**25**

        1.    Debtor-in-Possession Financing .................................. ~~23~~**25**
        2.    Ergen Adversary Proceeding ...................................... ~~24~~**26**
        3.    Postpetition FCC Developments ................................. ~~24~~**26**

    **C.**    **Solicitation Process and Voting Procedures** ............................ ~~24~~**26**

        1.    Solicitation Process .................................................... ~~24~~**26**
        2.    Confirmation Hearing ................................................. ~~27~~**29**

    **D.**    **Plan Supplement** ...................................................................... ~~27~~**29**

    **E.**    **Confirmation and Related Procedures** ..................................... ~~27~~**30**

    **F.**    **Risk Factors** ............................................................................. ~~28~~**30**

    **G.**    **Identity of Persons to Contact for More Information** ............. ~~28~~**30**

    **H.**    **Disclaimer** ................................................................................ ~~28~~**31**

    **I.**    **Rules of Interpretation** ............................................................ ~~29~~**31**

**ARTICLE II SUMMARY OF PLAN** ................................................................... ~~29~~**32**

**ARTICLE III VALUATION CONSIDERATIONS AND FINANCIAL
            PROJECTIONS** .................................................................... ~~30~~**32**

    **A.**    **Valuation Considerations** ......................................................... ~~30~~**32**

    **B.**    **Financial Projections** ............................................................... ~~31~~**33**

**ARTICLE IV CERTAIN PLAN MATTERS** ...................................................... ~~33~~**35**

    **A.**    **Best Interests of Creditors Test** ............................................... ~~33~~**35**

    **B.**    **Feasibility** ................................................................................. ~~34~~**36**

**ARTICLE V PLAN-RELATED RISK FACTORS TO CONFIRMING AND
            CONSUMMATING PLAN** ................................................... ~~34~~**36**

    **A.**    **Certain Bankruptcy Law Considerations** ................................ ~~35~~**37**

1.   Parties in Interest May Object To Plan's Classification of Claims and Equity Interests .................... 35 37
2.   Plan May Not Receive Requisite Acceptances .................... 35 37
3.   Plan Proponents May Not Be Able To Obtain Confirmation of Plan 35 37
4.   Plan Proponents May Not Obtain Recognition from Canadian Court 36 38
5.   Plan Proponents May Not Be Able To Consummate Plan .................... 36 38
6.   Plan Proponents May Object to Amount or Classification of Claim . 36 39
7.   Contingencies Not To Affect Votes of Impaired Classes To Accept Plan .................... 37 39
8.   Plan Proponents May Not Obtain Harbinger Litigation Determination 37 39
9.   Withdrawal of Plan for Inc. Debtors May Result in Litigation Among Debtor Estates .................... 37 39

B.   **Factors Affecting LightSquared** .................... 37 40

1.   Regulatory Risks .................... 37 40
2.   Business-Related Risks .................... 39 41
3.   Risks Related to New LightSquared Common Equity and the Auction 42 45

C.   **Litigation Risks** .................... 43 46

D.   **Certain Tax Matters** .................... 44 46

**ARTICLE VI CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** .................... 44 46

A.   **Certain United States Federal Income Tax Consequences of Plan to LightSquared** .................... 45 48

1.   U.S. Federal Income Tax Consequences of Plan to LightSquared Inc. 46 48
2.   Cancellation of Debt and Reduction of Tax Attributes to LightSquared 46 49
3.   Potential Limitations on NOLs and Other Tax Attributes .................... 47 49

B.   **Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests Under Plan** .................... 48 51

1.   Consequences to Holders of Claims .................... 49 51
2.   Consequences to Holders of Equity Interests .................... 57 59
3.   Consequences of Holding New LightSquared Common Equity and Debt Obligations .................... 59 61
4.   Information Reporting and Backup Withholding .................... 61 64

**ARTICLE VII CONCLUSION AND RECOMMENDATION** .................... 61 64

## EXHIBITS

**Exhibit A**    **First Amended** Joint Plan Pursuant to Chapter 11 of Bankruptcy Code
Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders

**Exhibit B**    Projections

**Exhibit C**    Liquidation Analysis/Comparison

*Management, LLC* [Docket No. 823] (**as amended, modified, or supplemented,** the "One Dot Six Plan") that, among other things, contemplated the sale of One Dot Six Corp.'s assets to a purchaser through a court-supervised auction process.  MAST Spectrum Acquisition Company LLC ("MSAC"), an entity formed by MAST Capital Management, LLC, was to serve as the stalking horse bidder for certain of One Dot Six Corp.'s assets with a bid consisting of (i) a credit bid of all of its claims under the DIP Inc. Facility and $1 of its claims under the Prepetition Inc. Facility and (ii) cash sufficient to pay in full all classes of claims receiving such treatment under the One Dot Six Plan.  The proceeds of the sale were to be distributed to Holders of Claims against that Debtor.

As discussed in Article III.G of the General Disclosure Statement, entitled "**Special Committee**," on September 16, 17, and 27, 2013, LightSquared's board of directors appointed the Special Committee to, among other things, (a) oversee the potential sale of LightSquared's assets in connection with any auction and sale process and (b) evaluate potential restructuring plans or plans of reorganization filed by LightSquared or any other parties.  In particular, the Special Committee was charged with weighing all of LightSquared's options for exiting chapter 11.

With the principal aim of maximizing value for all of LightSquared's stakeholders, LightSquared and its advisors vigorously marketed, and solicited bids for, all of LightSquared's assets.  In connection therewith, LightSquared and its advisors contacted approximately ninety (90) potential bidders, provided public information with respect to LightSquared to forty (40) such potential bidders, and, ultimately, signed nondisclosure agreements with seven (7) potential bidders.  After engaging in such sale process and thoroughly marketing its Assets, however, LightSquared realized that an Auction was not the appropriate forum to render a value-maximizing result for LightSquared's Estates.  Indeed, in light of the then-existing circumstances surrounding the Chapter 11 Cases, there was limited interest in the auction and LightSquared ultimately only received bids from parties already highly involved in the Chapter 11 Cases.  Since no qualified bids were received from third parties outside of LightSquared's capital structure, LightSquared, at the direction of the Special Committee, determined not to hold the Bankruptcy Court-scheduled Sale Plan Auction.

        **b.**        **Second Amended Plan**

Although LightSquared did not receive any other qualified bids for its Assets, third parties expressed to LightSquared an interest in providing LightSquared with new debt financing and equity investments to support a reorganization.  LightSquared and its advisors, at the direction of the Special Committee, worked with such third parties over the course of two (2) months to develop an alternative plan of reorganization based on new financing and equity investments, subject to receipt of regulatory approvals, execution and delivery of commitment letters and definitive documentation, and the satisfaction of various conditions

LightSquared, at the direction of the Special Committee, determined that the Sale Plan Auction would not yield the optimal result for the Estates and was not the best option for maximizing value for all of LightSquared's stakeholders.  Accordingly, at the direction of the Special Committee, LightSquared did not hold the Bankruptcy Court-scheduled Sale Plan

Notwithstanding LightSquared's good faith efforts to negotiate and file a consensual plan, such plan did not materialize by July 21, 2014, and it does not appear that the agreement-in-principle reached during the Mediation will materialize into a chapter 11 plan to be filed with the Bankruptcy Court. Meanwhile, secured Claims against the Debtors continue to accrue interest, and the Debtors continue to incur administrative expenses that will need to be satisfied pursuant to a plan. With each passing day, the Debtors' ability to successfully reorganize becomes more difficult. Recognizing this fact, the Plan Proponents propose the Plan, as described herein.

### e.    Summary of Plan Terms

The following is an overview of the Plan. This overview is qualified in its entirety by reference to the full text of the Plan, which is attached to this Specific Disclosure Statement as Exhibit A.

#### (i)    General Structure

The Plan is a joint plan for all of the Debtors premised on the merger or other combination of **each Inc. Debtor and each of** LightSquared **Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP** Inc. with and into LightSquared LP, in consideration for the treatment provided under the Plan to Holders of Claims against, and Equity Interests in, as applicable, the Inc. Debtors **and LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc**. LightSquared LP, prior to or following the merger or other combination with LightSquared Inc., will be converted into a Delaware corporation or limited liability company ("New LightSquared"). The Plan also provides for the consolidation of the Inc. Debtors for voting, confirmation, and distribution purposes under the Plan. Pursuant to such consolidation, (~~i~~**A**) all assets and all liabilities of the Inc. Debtors shall be treated as though they were merged, (~~ii~~**B**) all joint obligations of two or more Inc. Debtors and all multiple Claims against such Inc. Debtors on account of such joint obligations shall be treated and Allowed as a single Claim against the consolidated Inc. Debtors, (~~iii~~**C**) each Claim filed in the Chapter 11 Case of any Inc. Debtor shall be deemed filed against the consolidated Inc. Debtors and a single obligation of the consolidated Inc. Debtors, and (~~iv~~**D**) all transfers, disbursements, and distributions made by any Inc. Debtor hereunder will be deemed to be made by the substantively consolidated Inc. Debtors and their Estates.

#### (ii)    Financing Transactions

On the Confirmation Date, the Debtors will enter into the New DIP LP Facility and the New DIP Inc. Facility, which together are expected to be in the aggregate principal amount of $~~[142.8]~~**141.2** million, plus the aggregate amount of Allowed DIP LP Facility Claims and Allowed DIP Inc. Facility Claims. The New DIP Facilities will provide working capital for the Debtors between the New DIP Facilities Closing Date and the Effective Date, and Holders of Allowed DIP Inc. Facility Claims and Allowed DIP LP Facility Claims will receive New DIP Facility Loans to be issued under the New DIP Facilities in an amount equal to such Claims, respectively. To the extent a Holder of Allowed DIP LP Facility Claims or Allowed DIP Inc. Facility Claims objects to this treatment, such Holder, as applicable, will receive

Cash from the proceeds of the applicable New DIP Facility on the New DIP Facilities Closing Date.

On the Effective Date, the Reorganized Debtors will enter into the New LightSquared Working Capital Facility in the aggregate principal amount of $500 million, plus the aggregate amount of Allowed New DIP Facility Claims to be satisfied thereby. The New LightSquared Working Capital Facility will provide working capital for the Reorganized Debtors from and after the Effective Date and will be used to satisfy New DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims. The New LightSquared Working Capital Facility will be divided into New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans, which will have identical economic terms, but the New LightSquared Tranche B Working Capital Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Working Capital Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Working Capital Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Working Capital Loans compared to the New LightSquared Tranche A Working Capital Loans. The New LightSquared Working Capital Loans will be secured by senior liens on all assets of New LightSquared and its subsidiaries that shall rank *pari passu* with the liens securing the loans made pursuant to the New LightSquared Term Loan Facility (discussed below), but shall have "super-priority" status over the New LightSquared Term Loan Facility with respect to application of proceeds from collateral and (in certain circumstances) voluntary and mandatory prepayments.

On the Effective Date, the Reorganized Debtors will also enter into the New LightSquared Term Loan Facility in an aggregate principal amount of either (i**A**) $1.0 billion if Holders of Prepetition LP Facility SPSO Claims vote to accept the Plan or (ii**B**) if Holders of Prepetition LP Facility SPSO Claims vote to reject the Plan, $1.2 billion plus the Allowed amount of Prepetition LP Facility SPSO Claims (as discussed below). The New LightSquared Term Loans issued under the New LightSquared Term Loan Facility shall be used to satisfy (in full or in part, depending on certain conditions in the Plan) Allowed Prepetition LP Facility Non-SPSO Claims, Allowed Prepetition LP Facility SPSO Claims, and Allowed Prepetition Inc. Facility Non-Subordinated Claims. The New LightSquared Term Loans will be divided into New LightSquared Tranche A Term Loans and New LightSquared Tranche B Term Loans, which will have identical economic terms, but the New LightSquared Tranche B Term Loans shall not have any voting, approval, or waiver rights (including with respect to the exercise of remedies) under the New LightSquared Term Loan Facility, other than with respect to changes to the principal amount of, or the interest rate or payment date or maturity date applicable to, New LightSquared Tranche B Term Loans, the release of all or substantially all of the Collateral or the value of the guarantees in respect of the New LightSquared Loan Facility, or with respect to any modification or waiver that would have a disproportionate impact on the New LightSquared Tranche B Term Loans compared with the New LightSquared Tranche A Term Loans. If (i**A**) a default or an event of default has occurred and is continuing under the New LightSquared Loan Facilities or (ii**B**) an enforcement action

8

against the Collateral has commenced, all voluntary prepayments and mandatory prepayments, and the proceeds realized in any enforcement action, shall first be applied to prepay or repay in full all then outstanding New LightSquared Tranche A Working Capital Loans and New LightSquared Tranche B Working Capital Loans (on a *pro rata* basis) before any portion of such prepayment or repayment is applied to the New LightSquared Term Loans.

**(iii)    *New Equity Issuances, Claims and Equity Interests Treatment, and Auction Process***

On the Effective Date, New LightSquared will issue New LightSquared Common Equity, which may be divided into two classes:  New LightSquared Class A Common Equity and New LightSquared Class B Common Equity.  The New LightSquared Class A Common Equity and New LightSquared Class B Common Equity will provide for identical rights as to dividends and distributions upon liquidation, but each share or unit of New LightSquared Class B Common Equity will have one-fifth **(1/5th)** the voting power of a share or unit of New LightSquared Class A Common Equity.  The New LightSquared Common Equity will be issued, subject to the Auction described below, to Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims and may be issued to Allowed Prepetition LP Facility SPSO Claims if they accept the Plan, subject to the Auction described below.

Allowed Prepetition LP Facility Non-SPSO Claims generally will be satisfied through the receipt of New LightSquared Tranche A Term Loans made under the New LightSquared Term Loan Facility and New LightSquared Class A Common Equity, subject to the Auction described below.

The allowance and treatment of Prepetition LP Facility SPSO Claims will be determined by whether the Holders of Prepetition LP Facility SPSO Claims vote to accept or reject the Plan.  If Holders of Prepetition LP Facility SPSO Claims vote to accept the Plan, such Claims will be Allowed in the reduced amount of $900 million (plus interest accrued from the Confirmation Date through the Effective Date), and Holders of such Allowed Claims will receive their Pro Rata share (along with Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable)) of (i**A**) New LightSquared Term Loans under the New LightSquared Term Loan Facility and (ii**B**) New LightSquared Common Equity.  If, however, Holders of Prepetition LP Facility SPSO Claims vote to reject the Plan, the Prepetition LP Facility SPSO Claims will be subject to equitable subordination (the "Subordinated SPSO Claims"), and the remaining secured portion of the Prepetition LP Facility SPSO Claims will receive New LightSquared Term Loans in the Allowed amount of such secured Claims.  The Subordinated SPSO Claims will be treated along with other junior claims, as described below.  The New LightSquared Term Loans and New LightSquared Common Equity to be issued to Holders of Allowed Prepetition LP Facility ~~Non-SPSO~~**SPSO** Claims, as applicable, will be New LightSquared Tranche B Term Loans and New LightSquared Class B Common Equity, respectively.

The treatment of Prepetition Inc. Facility Non-Subordinated Claims will be determined by whether the Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to accept or reject the Plan.  If Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to accept

9

the Plan, such Holders will receive their Pro Rata share (along with Holders of Allowed Prepetition LP Facility Non-SPSO Claims and Allowed Prepetition LP SPSO Claims (if applicable)) of (i**A**) New LightSquared Term Loans under the New LightSquared Term Loan Facility and (ii**B**) New LightSquared Common Equity.  The New LightSquared Term Loans and New LightSquared Common Equity to be issued to Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims, as applicable, will be New LightSquared Tranche A Term Loans and New LightSquared Class A Common Equity, respectively.  If, however, Holders of Prepetition Inc. Facility Non-Subordinated Claims vote to reject the Plan, then, as discussed below, the Plan shall be withdrawn with respect to all of the Inc. Debtors, shall be a plan only for the LP Debtors **(as set forth in the LP Debtors-Only Plan)**, and may be confirmed with respect to the LP Debtors.

**Except as may be set forth by the Plan Proponents in the Plan Supplement, the New LightSquared Class A Common Equity shall be stapled** to the New LightSquared Tranche A Term Loans**, and, if applicable, to the New LightSquared Tranche A Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled A Units).  If any New LightSquared Stapled A Units are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled A Units shall convert into New LightSquared Stapled B Units.**

**Except as may be set forth by the Plan Proponents in the Plan Supplement, the New LightSquared Class B Common Equity shall be stapled to the New LightSquared Tranche B Term Loans, and, if applicable, to the New LightSquared Tranche B Working Capital Loans, and may only be Transferred together as a single strip (with such strips to be divided into New LightSquared Stapled B Units).  If any New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans are Transferred to an Entity that has not been determined by the Board to be an Eligible Transferee, then such New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable, shall not convert into New LightSquared Stapled A Units, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans and shall remain New LightSquared Stapled B Units, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable.  If any New LightSquared Stapled B Units are Transferred to an Eligible Transferee (as determined by the Board), then such New LightSquared Stapled B Units shall convert into New LightSquared Stapled A Units.**

**Each New LightSquared Stapled A Unit shall be comprised of (A) $1 million (or such lesser amount to be determined by the Plan Proponents) of principal amount of New LightSquared Tranche A Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche A Term Loans beneficially owned by the applicable holder and its affiliates), together with (B) a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche A Term Loans bears to the aggregate principal amount of New LightSquared Tranche A Term**

**Loans beneficially owned by the applicable holder and its affiliates) of (1) New LightSquared Tranche A Working Capital Loans (to the extent applicable) and (2) New LightSquared Class A Equity Interests. For illustrative purposes only, if a holder of 200 shares of New LightSquared Class A Equity Interests and $100 million of New LightSquared Tranche A Term Loans wished to transfer twenty (20) shares of New LightSquared Class A Equity Interests, each New LightSquared Stapled A Unit would consist of $1 million of principal amount of New LightSquared Tranche A Term Loans and two (2) shares of New LightSquared Class A Equity Interests. In order to transfer twenty (20) shares of New LightSquared Class A Equity Interests, such holder would be required to transfer ten (10) New LightSquared Stapled A Units, representing in the aggregate, $10 million of principal amount of New LightSquared Tranche A Term Loans and twenty (20) shares of New LightSquared Class A Equity Interests.**

**Similarly, each New LightSquared Stapled B Unit shall be comprised of (A) $1 million (or such lesser amount to be determined by the Plan Proponents, which shall be the same as the amount set with respect to the New LightSquared Stapled A Units) of principal amount of New LightSquared Tranche B Term Loans (or, if less than such amount, the entire aggregate principal amount of the New LightSquared Tranche B Term Loans beneficially owned by the applicable holder and its affiliates), together with (B) a proportionate share (based on the proportion (when expressed as a percentage) that $1 million (or such lesser amount, if applicable) of New LightSquared Tranche B Term Loans bears to the aggregate principal amount of New LightSquared Tranche B Term Loans beneficially owned by the applicable holder and its affiliates) of (1) New LightSquared Tranche B Working Capital Loans (to the extent applicable) and (2) New LightSquared Class B Equity Interests.**

**If any Prohibited Transferee acquires any right, title, or interest to, or in respect of, New LightSquared Stapled A Units, New LightSquared Class A Common Equity, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans, then such New LightSquared Stapled A Units, New LightSquared Class A Common Equity, New LightSquared Tranche A Term Loans, or New LightSquared Tranche A Working Capital Loans, as applicable, shall automatically convert into New LightSquared Stapled B Units, New LightSquared Class B Common Equity, New LightSquared Tranche B Term Loans, or New LightSquared Tranche B Working Capital Loans, as applicable.**

The New LightSquared Common Equity to be distributed on account of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable) may be sold pursuant to an Auction that will occur following confirmation of the Plan. The Auction Proceeds shall be applied first *in lieu* of the New LightSquared Common Equity to be otherwise distributed to Holders of Allowed Prepetition LP Facility Non-SPSO Claims, Allowed LP Facility SPSO Claims (if applicable), and Allowed Prepetition Inc. Facility Non-Subordinated Claims (if applicable), then to reduce on a ~~dollar for dollar~~**dollar-for-dollar** basis the amount of New LightSquared Term Loans to be issued to satisfy such Claims, and then to pay Allowed New DIP Facility Claims (and thereby reduce the amount of the New LightSquared Working Capital Facility). If the Allowed Prepetition LP Facility Non-SPSO

Claims, Allowed LP Facility SPSO Claims (excluding any Subordinated SPSO Claims), Allowed Prepetition Inc. Facility Non-Subordinated Claims, and Allowed New DIP Facility Claims are satisfied in full in Cash from the Auction Proceeds, then the remaining Auction Proceeds, if any, will be held in trust subject to a determination by the Bankruptcy Court regarding the allocation of such remaining Auction Proceeds as between the Estates of the Inc. Debtors, on the one hand, and the LP Debtors, on the other hand. Following such allocation, the remaining Auction Proceeds will be distributed in order of priority to the other Holders of Claims against, and Equity Interests in, the Inc. Debtors and LP Debtors, respectively (including the Subordinated SPSO Claims).

Holders of Allowed LP General Unsecured Claims or Allowed Inc. Convenience Claims (which are General Unsecured Claims asserted against an Inc. Debtor that are Allowed in an amount equal to or less than $65,000), shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed LP General Unsecured Claims or Allowed Inc. Convenience Claims.

*(iv)    LP Debtors-Only Plan*

~~Notwithstanding any of the foregoing,~~**Pursuant to Article IV.U of** the Plan ~~includes a "toggle" concept whereby~~, if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan **(the "Vote To Reject")**, then the Plan shall be withdrawn with respect to all of the Inc. Debtors, ~~shall be a plan only for the LP Debtors, and may be confirmed~~**and the Plan Proponents shall pursue confirmation of the Plan** with respect to the LP Debtors.  ~~If the~~**The** Plan ~~is withdrawn with respect to the Inc. Debtors, then without any further notice or action, order, or approval of the Bankruptcy Court, and notwithstanding anything to the contrary contained in~~ **implements this concept through the** *Joint Plan of LP Debtors Only Pursuant to Chapter 11 of Bankruptcy Code Proposed by LP Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* **(as amended, supplemented, or modified from time to time, the "LP Debtors-Only Plan"), which is attached as Exhibit A to** the Plan~~.~~

**As set forth therein,** the **LP Debtors-Only** Plan ~~shall be deemed amended and modified to~~, among other things, ~~eliminate~~**eliminates** (~~i~~**A**) the Inc. Debtors from the Plan, (~~ii~~**B**) treatment of all Claims against, and Equity Interests in, any of the Inc. Debtors, (~~iii~~**C**) the combination of Inc. Debtors' Assets with and into LightSquared LP pursuant to Article IV.B.2 of the Plan, (~~iv~~**D**) the substantive consolidation of the Inc. Debtors pursuant to Article I.C of the Plan, (~~v~~**E**) the inclusion of any Claims against, or Equity Interests in, the Inc. Debtors in the calculation of the Pro Rata share of treatment provided to a Holder of an Allowed Claim against the LP Debtors, (~~vi~~**F**) any New LightSquared Working Capital Facility Loans related to repayment of New DIP Inc. Facility Loans, and the amount of the New LightSquared Working Capital Facility will be adjusted accordingly, (~~vii~~**G**) any Inc. Debtor and any Holder of a Claim against, or Equity Interest in, any Inc. Debtor, in their capacity as such a Holder, from the definition of "Released Party," ~~and (viii~~**H**) any settlement or compromise for the benefit of any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, any Inc. Debtor, in their capacity as such a Holder**, and (I) the allocation of Excess Auction Proceeds as between the Inc. Debtors and LP Debtors**.

~~Notwithstanding~~For the avoidance of doubt, notwithstanding anything to the contrary contained herein, in the Plan, or in the LP Debtors-Only Plan, if the Plan is withdrawn ~~with respect to~~because of the ~~Inc. Debtors~~Vote To Reject, then:  (A) all Articles, provisions, and terms of the LP Debtors-Only Plan shall apply and control; (B) as set forth in the LP Debtors-Only Plan, all claims and Causes of Action held by any LP Debtor or any Holder of a Claim against, or Equity Interest in, an LP Debtor against any Inc. Debtor or any Holder of a Claim against, or Equity Interest in, an Inc. Debtor shall be and are preserved and shall not be and are not released, waived, or compromised under or pursuant to the Plan, including, without limitation, any and all claims arising under and pursuant to the Prepetition LP Loan Documents~~.  Moreover, if the Plan is withdrawn with respect to the Inc. Debtors,~~; and (C) all parties (~~a~~1) reserve their respective rights and defenses with respect to the foregoing (including with respect to the value of consideration provided to Holders of Allowed Claims under the Plan and in connection with the Prepetition LP Loan Documents)~~,~~ and (~~b~~2) reserve their rights with respect to any Claims or Causes of Action challenging the liens securing the Prepetition Inc. Facility Claims or otherwise seeking to recharacterize any Claims held by the Prepetition Inc. Lenders (any such action, a "Prepetition Inc. Facility Action").

With respect to any Holders of a Prepetition Inc. Facility Non-Subordinated Claim in Class 6 who vote to reject the Plan or Prepetition Inc. Facility Subordinated Claim in Class 7 who vote to reject the Plan and do not waive the Potential Harbinger Claims, the Plan serves as a request by the Ad Hoc LP Secured Group for a ruling, in connection with Confirmation of the Plan, on the Standing Motion (which has been fully briefed, argued, and submitted to the Bankruptcy Court), which Standing Motion may be granted by the Bankruptcy Court as part of the Confirmation Order. For the avoidance of doubt, the Debtors take no position with respect to a grant of standing to the Ad Hoc LP Secured Group for purposes of pursuing any Prepetition Inc. Facility Action, and the filing of the Plan shall not be deemed as the Debtors' consent ~~to,~~ or support ~~with respect to~~of, the grant of such standing.

For more details, refer to the Plan, attached hereto as Exhibit A.

**3.      General Structure of LightSquared and Reorganized Debtors Under Plan**

As of the Petition Date, LightSquared maintained the following corporate organizational structure:



Article IV.B of the Plan sets forth the key restructuring transactions contemplated by LightSquared's reorganization.  In connection with the Plan, the Debtors will be reorganized, and **all of the Assets of, or Equity Interests in,** each Inc. Debtor ~~shall sell, assign, and/or transfer~~**and each of LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc. shall be sold, assigned, and/or transferred** to LightSquared LP, including through a merger or other combination~~, all of such Inc. Debtor's assets and equity interests~~, including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of such ~~Inc.~~Debtor's equity interests, if any, in any Reorganized Debtor, intellectual property, contractual rights, Retained Causes of Action, and the right to prosecute such Retained Causes of Action and receive the benefits therefrom.  LightSquared LP shall then be converted into a Delaware corporation or limited liability company with the appropriate governmental authorities pursuant to applicable law.

14

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | | such Successful Purchaser closes, Holders of Allowed Prepetition LP Facility Non-SPSO Claims shall receive Auction Proceeds in lieu of certain consideration set forth in Article III.B.5(c) of the Plan, as provided in Article IV.C of the Plan.<br><br>For the avoidance of doubt, except as set forth in Article IV.U of the Plan, the treatment specified in Article III.B.5(c) of the Plan shall be deemed in full and final satisfaction of Allowed Prepetition LP Facility Non-SPSO Claims and, upon the occurrence of the Effective Date and receipt of the treatment provided for herein, Holders of such Allowed Prepetition LP Facility Non-SPSO Claims shall not hold or assert deficiency claims against any of the Inc. Debtors' Estates. | | | |
| 5B | Prepetition LP Facility SPSO Claims | *Allowance:* Prepetition LP Facility SPSO Claims shall be Allowed as follows:<br><br>(i)    in the event that Class 5B votes to accept the Plan, the Prepetition LP Facility SPSO Claims shall be Allowed Claims on the Effective Date for all purposes, without subordination, in the aggregate amount of (A) $900 million (which amount, for the avoidance of doubt, includes all Prepetition LP Facility Postpetition Interest, all Prepetition LP Facility Prepetition Interest, the Prepetition LP Facility Repayment Premium, SPSO Fee Claims, and all other amounts | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 5C | Prepetition LP Facility SPSO Subordinated Claims | *Allowance*: In the event that Class 5B votes to reject the Plan, (i) the Allowed Amount of the Prepetition LP Facility SPSO Subordinated Claims shall be determined by the Bankruptcy Court after the Confirmation Date, (ii) the Class 5C – Prepetition LP Facility SPSO Subordinated Claims ~~will~~**shall** be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII of the Plan, (iii) each Holder of a Prepetition LP Facility SPSO Subordinated Claim ~~will~~**shall** not be treated as a Released Party, and (iv) all claims against SPSO ~~will~~**shall** be preserved.<br><br>*Treatment*: In the event that Class 5B votes to reject the Plan, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim shall receive its Pro Rata share of (i) Excess LP Auction Proceeds, if any, and (ii) on account of any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims, Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; <u>provided</u>, in no event shall any distribution to a Holder of an Allowed Prepetition LP Facility SPSO Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition LP Facility SPSO Subordinated Claim (including any Allowed Prepetition LP Facility SPSO Subordinated Guarantee Claims). | Impaired | Yes | 0% |
| 6 | Prepetition Inc. Facility Non-Subordinated Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of a Prepetition Inc. Facility Non-Subordinated Claim shall receive (i) Cash in the amount of the MAST Fee Claims, (ii) its Pro Rata share of $1.0 billion of New LightSquared Term | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| 7 | Prepetition Inc. Facility Subordinated Claims | *Allowance*: Prepetition Inc. Facility Subordinated Claims shall be Allowed as follows:<br><br>(i)        in the event that Class 7 votes to accept the Plan, the Prepetition Inc. Facility Subordinated Claims shall be Allowed Claims on the Effective Date for all purposes; or<br><br>(ii)        in the event that Class 7 votes to reject the Plan, (A) the Allowed amount of the Prepetition Inc. Facility Subordinated Claims shall be determined by the Bankruptcy Court following and after giving effect to the outcome of the Prepetition Inc. Facility Actions, (B) the Class 7 – Prepetition Inc. Facility Subordinated Claims ~~will~~**shall** be Disputed Claims, subject to disallowance, subordination, recharacterization, and all other remedies, and shall be treated in accordance with Articles VI and VII of the Plan, (C) each Holder of a Prepetition Inc. Facility Subordinated Claim ~~will~~**shall** not be treated as a Released Party, and (D) all claims against Holders of Prepetition Inc. Facility Subordinated Claims ~~will~~**shall** be preserved.<br><br>*Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan; provided, in no event shall any distribution to a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim pursuant to the Plan be in excess of 100% of the amount of such Holder's Allowed Prepetition Inc. Facility Subordinated Claim. | Impaired | Yes | 0% |
| 8 | LP General Unsecured Claims | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an | | | |

| Class | Claims or Equity Interests | Treatment | Impairment Status | Entitlement to Vote | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|---|
| | Equity Interests | Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan. | | | |
| 15 | Intercompany Claims | All Allowed Intercompany Claims shall be cancelled as of the Effective Date, and Holders of Allowed Intercompany Claims shall not receive any distribution from Plan Consideration, or retain any Claims, on account of such Allowed Intercompany Claims; [provided, however, that any Allowed Intercompany Claim of SkyTerra (Canada) Inc. against LightSquared Corp. shall not be cancelled and shall be Reinstated for the benefit of the Holder thereof.] | Impaired | No (Deemed to Reject) | 0% |
| 16 | Intercompany Interests | In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest other than Allowed Existing LP Common Units Equity Interests, on the Effective Date or as soon thereafter as reasonably practicable, each Allowed Intercompany Interest other than an Existing LP Common Units Equity Interests shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable. | Unimpaired | No (Deemed To Accept) | 100% |

27

**B.      Chapter 11 Cases**

Reference should be made to Article III of the General Disclosure Statement, entitled "Chapter 11 Cases," for a discussion of, among other things, the events leading to the Chapter 11 Cases, events in the Chapter 11 Cases, pending litigation proceedings, and LightSquared's restructuring efforts.

**1.      Debtor-in-Possession Financing**

A description of the DIP Inc. Facility is provided in Article III.B.3 of the General Disclosure Statement, entitled "**DIP Inc. Facility**."  Notwithstanding the foregoing, the following information is intended to supplement Article III.B.3 of the General Disclosure Statement and additionally provide a description of the DIP LP Facility:

**a.      DIP Inc. Facility**

As described in Article III.B.3 of the General Disclosure Statement, on July 17, 2012, the Bankruptcy Court entered an order (the "DIP Inc. Order"), which provided the DIP Borrower access to $41.4 million of secured, priming postpetition borrowings [Docket No. 224] (the "DIP Inc. Facility").  The DIP Inc. Order was subsequently amended pursuant to those certain orders dated as of  March 13, 2013 [Docket No. 579], December 23, 2013 [Docket No. 1126], January 31, 2014 [Docket No. 1286], March 25, 2014 [Docket No. 1444], April 15, 2014 [Docket No. 1492], June 13, 2014 [Docket No. 1581], June 30, 2014 [Docket No. 1613], July 8~~15~~, 2014 [Docket No. ~~1625~~1645], July ~~18~~22, 2014 [Docket No. ~~1653~~1657], and August 1, 2014 [Docket No. ~~1680~~1683].  The DIP Inc. Facility is scheduled to mature on August 31, 2014.

**b.      DIP LP Facility**

On January 18, 2014, the Debtors filed a motion (the "DIP LP Motion") seeking authority to allow LightSquared LP (the "DIP LP Borrower") to obtain, and each LightSquared LP subsidiary (collectively, the "DIP LP Guarantors" and, together with the DIP LP Borrower, the "LP Obligors") to unconditionally guaranty jointly and severally the DIP LP Borrower's obligations in respect of, secured, priming superpriority postpetition financing (the "DIP LP Facility") in the amount of $33 million [Docket No. 1237].  On February 4, 2014, the Bankruptcy Court entered the order approving the DIP LP Motion (the "DIP LP Order") [Docket No. 1291].

On April 10, 2014, the Bankruptcy Court entered the *Final Order (A) Authorizing LP DIP Obligors To Obtain Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1476] and thereby approved, among other things, the provision of certain superpriority senior secured priming postpetition financing by the DIP LP Lenders to the DIP LP Obligors through June 15, 2014.  On June 9, 2014, the Debtors filed the *Notice of Extension of Final Maturity Date Under Replacement LP DIP Facility* [Docket No. 1574], providing that the DIP LP Lenders had agreed to extend the maturity of the replacement DIP LP Facility to June 30,

2014. The existing DIP LP Facility was subsequently supplanted with a "replacement" DIP LP Facility with an extended maturity date pursuant to those certain orders dated as of June 30, 2014 [Docket No. 1614], July ~~11~~14, 2014 [Docket No. ~~1634~~1639], July 24, 2014 [Docket No. 1668], and August 1, 2014 [Docket No. 1681]. Such DIP LP Facility is scheduled to mature on August 31, 2014.

### 2. Ergen Adversary Proceeding

Article III.D.3 of the General Disclosure Statement and the Introduction hereof provides a discussion of the adversary proceeding brought against the Ergen Defendants. Following the issuance of the Ergen Adversary Decision, parties in interest in the Ergen Adversary Proceeding filed notices of appeal regarding certain issues and pleadings related thereto. The appeal process is ongoing.

### 3. Postpetition FCC Developments

A detailed description of the FCC process is provided in Article III.F.1 of the General Disclosure Statement, entitled "**Current Status of FCC Process**." Notwithstanding the foregoing, the following information is intended to supplement Article III.F.1 of the General Disclosure Statement:

On July 1, 2014, Karl B. Nebbia, the Associate Administrator of the Office of Spectrum Management of the National Telecommunications and Information Administration (the "NTIA") sent a letter to Julius Knapp, Chief, Office of Engineering and Technology of the FCC. The letter forwarded, for inclusion in the record of the License Modification Application and related FCC proceedings and for consideration by the FCC, a letter to the NTIA from the Department of Transportation ("DOT"). That DOT letter raises certain issues about the compatibility of GPS receivers with terrestrial "uplink" operations (i.e., terrestrial handset operations) over LightSquared's network. To the extent that the FCC is inclined to authorize terrestrial-only handsets in the 1626.5-1660.5 MHz band, NTIA urges the FCC to carefully consider the issues raised by DOT along with the rest of the record and to ensure that LightSquared's proposal is adequately supported.

## C. Solicitation Process and Voting Procedures

### 1. Solicitation Process

#### a. General

A description of the solicitation process is provided in Article I.C of the General Disclosure Statement, entitled "**Solicitation Process and Voting Procedures**." Notwithstanding the foregoing, the following process and procedures apply with respect to the Plan:

On ~~[___]~~**August 15**, 2014, the Bankruptcy Court entered the *Order ~~with Respect to Motion for Entry of Order with Respect to Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders (I)~~**Scheduling Certain Hearing Dates and Establishing Deadlines in Connection with***

***Chapter 11 Process*** [Docket No. 1708] (the "Scheduling Order") and, on August 20, 2014, the Bankruptcy Court entered the *(i) Order (A) Conditionally* Approving ~~the~~*Specific* Disclosure ~~Statement;~~*Statements,* (~~II~~*B*) Approving Solicitation and ~~Voting~~*Notice* Procedures~~;~~ ~~(III~~ *in Connection with Voting on Certain Chapter 11 Plans, (C) Approving Form of Ballot and Notices in Connections Therewith, (D)* Scheduling ~~the Plan~~*Certain Dates and Deadlines in Connection with* Confirmation ~~Process,~~*of All Competing Chapter 11 Plans,* and (~~IV~~*E*) Granting Related Relief [Docket No. ~~—~~*1715*] (the "Solicitation Order")~~, which,~~ **The Solicitation Order, together with the Scheduling Order**, among other things, **(i) conditionally** approved the ~~Specific Disclosure Statement~~ ~~and the~~**disclosure statements for, and** solicitation of**, the new chapter 11 plans proposed by (A)** the Plan~~.~~ **Proponents and (B) Harbinger[4] and (ii) as detailed below, scheduled certain dates in connection with the approval process of such new plans and a third competing plan (i.e., the One Dot Six Plan).[5]**

This Specific Disclosure Statement and other documents described herein are being furnished by the Plan Proponents to Holders of Claims against, and Equity Interests in, the Debtors pursuant to the Disclosure Statement Order, as recognized in the Canadian Proceedings (the "Disclosure Statement Recognition Order"), for the purpose of soliciting votes on the Plan. There will be no separate voting process for Canadian Holders of Claims or Equity Interests, and Canadian Holders of Claims or Equity Interests will be subject to the voting process set out in the Disclosure Statement Order, as recognized by the Disclosure Statement Recognition Order.

Copies of the Disclosure Statement Order entered by the Bankruptcy Court~~, the Disclosure Statement Recognition Order entered by the Canadian Court,~~ and a notice (the "Confirmation Hearing Notice") of, among other things, voting procedures and the dates set for objections to, and the hearing on, confirmation (the "Confirmation Hearing") of the Plan ~~is~~**(and approval of the Disclosure Statement) are** also being transmitted with this Specific Disclosure Statement. The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan **(and approval of the Disclosure Statement)**, the treatment for balloting purposes of certain types of Claims and Equity Interests, and the assumptions for tabulating ballots. In addition, detailed voting instructions will accompany each ballot. Each Holder of a Claim or Equity Interest within a Class entitled to vote should read, as applicable, the General Disclosure Statement, the Specific Disclosure Statement (including all exhibits, attachments, and other accompanying documents), the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

---

[4]    *See Harbinger Capital Partners LLC's Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1696].

[5]    *See Second Amended Chapter 11 Plan for One Dot Six Corp. Proposed by U.S. Bank National Association and MAST Capital Management, LLC* [Docket No. 1714].

### b.    Who Is Entitled To Vote

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established [   ]**August 25, 2014** (the "Voting Record Date") as the record date for determining the Holders of Claims or Equity Interests entitled to vote to accept or reject the Plan.  Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest Holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote. Creditors or equity interest Holders whose claims or interests are impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.

Under the Plan, Classes 5A, 5B, 5C, 6, 7, 8, 9, 10, 11, 12, 13, and 14 are "Impaired," and the Holders in such Classes are entitled to vote to accept or reject the Plan.

### c.    Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot providing for voting on the Plan is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Each ballot votes only your Claim or Equity Interest indicated on that Ballot.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON [   ]**SEPTEMBER 23**, 2014.  BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

BALLOTS MUST BE DELIVERED TO THE CLAIMS AND SOLICITATION AGENT BY (A) E-MAIL TO LIGHTSQUAREDBALLOTS@KCCLLC.COM, (B) FACSIMILE TO (310) 776-8379, OR (C) FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO:

LIGHTSQUARED BALLOT PROCESSING
c/o KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CA  90245

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THEIR APPLICABLE VOTING INSTRUCTIONS BY (A) FIRST CLASS MAIL, (B) OVERNIGHT DELIVERY, (C) PERSONAL DELIVERY,

(D) E-MAIL, OR (E) FACSIMILE, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND SOLICITATION AGENT.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE BANKRUPTCY COURT, LIGHTSQUARED, LIGHTSQUARED'S AGENTS (OTHER THAN THE CLAIMS AND SOLICITATION AGENT), LIGHTSQUARED'S FINANCIAL OR LEGAL ADVISORS, THE AD HOC LP SECURED GROUP, OR THE AD HOC LP SECURED GROUP'S FINANCIAL OR LEGAL ADVISORS.**

### d.    Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Claims and Solicitation Agent, Kurtzman Carson Consultants LLC, by writing to 2335 Alaska Avenue, El Segundo, CA 90245, Attn: LightSquared, by telephone at (877) 499-4509, or by email at LightSquaredInfo@kccllc.com.

If you wish to obtain additional copies of the Plan, the General Disclosure Statement, this Specific Disclosure Statement, or the exhibits to those documents, you may do so at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d):  (a**i**) from the Claims and Solicitation Agent (~~i~~**A**) (except Ballots) at its website at http://www.kccllc.net/lightsquared, (~~ii~~**B**) by writing to Kurtzman Carson Consultants LLC, Attn: LightSquared, 2335 Alaska Avenue, El Segundo, CA 90245, (~~iii~~**C**) by calling (877) 499-4509, or (~~iv~~**D**) by emailing LightSquaredInfo@kccllc.com; or (b**ii**) (except Ballots) for a fee via PACER at http://www.nysb.uscourts.gov.

### 2.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [  ]**October 20**, 2014 at 10:00 a.m. (prevailing Eastern time), before the Honorable Shelley C. Chapman, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to confirmation **of the Plan (and approval of the Disclosure Statement)** be filed and served so that they are received on or before [  ]**October 3**, 2014 at ~~4:00~~**12:00** p.m. (prevailing Eastern time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Plan Proponents (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a Confirmation Order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

### D.    Plan Supplement

The Plan Supplement documents for the Plan (the "Plan Supplement") will be filed with the Bankruptcy Court by [__]**September 16**, 2014.  The Plan Supplement will include executed commitment letters, engagement letters, highly confident letters, related term sheets, or form and/or definitive agreements, and documents with respect to:

- New LightSquared Loan Facility Agreement

- New DIP Facility Credit Agreements

- Reorganized Debtors Corporate Governance Documents

- Schedule of Assumed Agreements

- Schedule of Retained Causes of Action

- Auction Procedures

### E.    Confirmation and Related Procedures

A description of the procedures and requirements to achieve Confirmation of the Plan is provided in Article IV of the General Disclosure Statement, entitled "**Confirmation Procedures**."  Notwithstanding the foregoing, pursuant to the Solicitation Order **and Scheduling Order**, the Bankruptcy Court approved the following dates and deadlines with respect to the confirmation and related processes **for each of the proposed chapter 11 plans**:

- Plan Voting Deadline:  [__]**September 23**, 2014 at 4:00 p.m. (prevailing Pacific time)

- Plan**/Disclosure Statement** Objection Deadline:  [__]**October 3**, 2014 at 12:00 p.m. (prevailing Eastern time)

- Deadline to submit Voting Report:  [__]**October 2**, 2014 at 4:00 p.m. (prevailing Eastern time)

- Deadline to submit confirmation briefs in support of the Plan**Plans** and in response to Plan Objections:  [__]**objections thereto:  October 10**, 2014 at 4:00**5:00** p.m. (prevailing Eastern time)

- Commencement of Confirmation Hearing:  [__]**October 20**, 2014 at 10:00 a.m. (prevailing Eastern time).

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or Plan Proponents (at the Bankruptcy Court's direction) without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.  Should a confirmation order be entered, it is anticipated that recognition of such order will be sought in the Canadian Proceedings thereafter.

and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "**Articles**" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Specific Disclosure Statement in its entirety rather than to a particular portion of the Specific Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined herein shall have the meaning ascribed to that term in the Plan; (11) any term used in capitalized form herein that is not otherwise defined herein or in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Specific Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (13) unless otherwise specified, all references in the Specific Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## SUMMARY OF PLAN

The terms of the Plan are incorporated by reference herein. The statements contained in the Specific Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein, which are qualified in their entirety by reference to the Plan (as well as the exhibits thereto and definitions therein), which is attached hereto as Exhibit A. The statements contained in the Specific Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, LightSquared under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Equity Interests in, LightSquared, LightSquared's Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between the Specific Disclosure Statement, the General Disclosure Statement, and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

**Notwithstanding the foregoing, however, if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject Pursuant to Article IV.U of the Plan, then in the event of the Vote To Reject, the Plan shall be withdrawn with respect to all of the Inc.**

Debtors, ~~shall be a plan only for the LP Debtors, and may be confirmed~~**and the Plan Proponents shall pursue confirmation of the Plan solely** with respect to the LP Debtors ~~and~~.  **A version of the Plan that reflects implementation of the LP Debtors-only reorganization (as contemplated by the Plan following the Vote To Reject) is attached as Exhibit A to the Plan.  Upon its confirmation, the LP Debtors-Only Plan shall** be binding upon all Holders of Claims against, and Equity Interests in, the LP Debtors, the LP Debtors' Estates, the Reorganized Debtors (excluding the Inc. Debtors), all parties receiving property under the Plan, and other parties in interest.

## ARTICLE III
## VALUATION CONSIDERATIONS AND FINANCIAL PROJECTIONS

### A.    Valuation Considerations

As previously stated, the purpose of the Disclosure Statement is to provide "adequate information" of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Holders of Claims or Equity Interests of the relevant Class to make an informed judgment concerning the Plan.  See 11 U.S.C. § 1125(a).  The Bankruptcy Court may approve the Disclosure Statement without a valuation of the Debtors or an appraisal of the Debtors' Assets.  See 11 U.S.C. § 1125(b).

As discussed in Article I.A.1.a of this Specific Disclosure Statement, the Debtors' Assets have been extensively marketed over at least the past year, including at the direction of the Special Committee following its appointment in September 2013.  While the marketing process produced some indications of interest, given the highly contentious and litigious nature of these Chapter 11 Cases, it did not produce adequate bids for the Debtors' Assets that were capable of execution.  In denying confirmation of the Third Amended Plan, the Bankruptcy Court also recognized the uncertainty of the value of the Debtors' Assets under certain circumstances when it did not accept the valuations submitted in support of, and opposition to, the Third Amended Plan, finding that such plan was based "entirely on unsupportable assumptions about the timing of FCC approvals."  See, e.g., In re LightSquared Inc., et al., Case No. 12-12080 (SCC) [Docket No. 1631] (Bankr. S.D.N.Y. July 11, 2014) at 55.

Given these considerations, the Plan Proponents have designed the Plan to test the value of the Debtors' Assets through the Auction of the New LightSquared Common Equity following confirmation of the Plan.  (See Article I.A.1.e of this Specific Disclosure Statement and Article IV.B.1.b of the Plan.)  As such, the Specific Disclosure Statement does not include a valuation or appraisal of the Debtors' Assets.

### B.    Financial Projections

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that a bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is contemplated by the plan."  11 U.S.C. § 1129(a)(11).  For the purposes of determining whether the Plan satisfies feasibility standards, LightSquared's management has, through the

Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion with respect to the Plan.

### 2.      Plan May Not Receive Requisite Acceptances

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan.  If the Plan does not receive the required support from the Voting Classes, the Plan Proponents may elect to amend the Plan.

### 3.      Plan Proponents May Not Be Able To Obtain Confirmation of Plan

The Plan Proponents cannot ensure that it will receive the requisite acceptances to confirm the Plan.  Even if the Plan Proponents receive the requisite acceptances, the Plan Proponents cannot ensure that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  As discussed in further detail in Article IV of the General Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things:  (a) a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes under section 1129(b) of the Bankruptcy Code; (b) that confirmation "is not likely to be followed by a liquidation, or the need for further financial reorganization" under section 1129(a)(11) of the Bankruptcy Code; and (c) the value of distributions to non-accepting Holders of Claims or Equity Interests within an impaired class will not be "less than the amount that such Holder would receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code pursuant to section 1129(a)(7) of the Bankruptcy Code.  While the Plan Proponents believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan Proponents, subject to the terms and conditions of the Plan (including the consent rights provided to the relevant parties therein), reserves the right to modify the terms of the Plan as necessary for Confirmation.  Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

In addition, the Plan provides that if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan, then the Plan shall be withdrawn with respect to all of the Inc. Debtors and shall be a plan only for the LP Debtors.  If that occurs, the Plan will not be confirmed with respect to the Inc. Debtors and may only be confirmed with respect to the LP Debtors **(as contemplated by the LP Debtors-Only Plan)**.

### b.   LightSquared May Not Receive FCC Consents and Related Relief Necessary To Implement Its Current Business Plan

Although not a condition to the effectiveness of the Plan, the implementation of LightSquared's current business plan, post-Effective Date, is contingent upon LightSquared holding certain spectrum rights in 30 MHz of spectrum in the United States.  As described in the General Disclosure Statement, LightSquared's License Modification Application seeks to modify certain of LightSquared's FCC licenses and authorizations so as to secure such access. Nevertheless, LightSquared can provide no assurance that the FCC will grant the requested relief, or without also imposing conditions that would adversely impact LightSquared's operations and/or ability to implement its business plan, post-Effective Date.

Furthermore, the Plan provides that, if Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to reject the Plan, then the Plan shall be withdrawn with respect to all of the Inc. Debtors and shall be a plan only for the LP Debtors **(as set forth in the LP Debtors-Only Plan)**.  LightSquared's License Modification Application contemplates the use of spectrum rights held by the Inc. Debtors in conjunction with spectrum rights held by the LP Debtors.  If the Inc. Debtors are severed from the Plan, there can be no assurances that LightSquared's current business plan will remain viable.

### c.   FCC May Protect Spectrum Operations in Manner that May Not Be Compatible with LightSquared's Terrestrial Wireless Service

LightSquared currently is required to provide its terrestrial wireless service without causing "harmful interference" to other spectrum users.  LightSquared also currently is required to accept interference into that terrestrial wireless service from certain other spectrum users.  It is possible that the FCC could impose restrictions on LightSquared's operations designed to protect spectrum operations in adjacent bands or along border areas that may not be compatible with LightSquared's terrestrial wireless services—regardless of whether such operations currently are legally entitled to interference protection vis-à-vis LightSquared. These requirements and restrictions could hinder the operation or limit the deployment of its 4G LTE terrestrial wireless network, or add additional cost, and may, in certain cases, subject its users to a degradation in service quality.  Although LightSquared has agreements with certain spectrum users in neighboring spectrum bands and within LightSquared's authorized spectrum that are intended to ensure compatibility, there can be no assurance that these agreements will be sufficient or that additional instances of incompatibility with other spectrum users will not occur in the future.

**FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Specific Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and LightSquared does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan, including those items discussed below. The characterization of the Plan set forth in this discussion will not be binding on the IRS or the U.S. courts. Therefore, there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan or that such characterization will be sustained by a U.S. court if so challenged. Except as otherwise specifically provided, this discussion applies solely to Holders that are U.S. Holders (defined below), and does not apply to Holders of Claims or Holders of Equity Interests that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, partnerships, or other pass-through entities (and partners or members in such entities)). The following discussion assumes that Holders of Claims and Holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to LightSquared and Holders of Claims or Holders of Equity Interests based upon their particular circumstances. Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

For purposes of the following discussion, ~~the New LightSquared Term Loans are assumed to be debt~~**while not free from doubt,** for United States federal income tax purposes~~. The treatment of the Plan, particularly to persons that receive New LightSquared Term Loans, may be materially different if~~**, there is a strong likelihood that if one class of** the New LightSquared Term Loans ~~are not treated as debt.~~ **is stapled to one class** of the New LightSquared Common Equity**, the stapled instruments would be treated together as an equity interest in** New LightSquared **(i.e., a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit) and the following discussions assume such treatment. Thus, for example, the Reorganized Debtors generally would not receive a deduction for any payments on a New LightSquared Stapled A Unit or New LightSquared Stapled B Unit, and Holders thereof would receive distributions with respect to their stock – not interest payments with respect to debt – with respect to payments on a New LightSquared Stapled A Unit or New LightSquared Stapled B Unit.**

Additionally, for purposes of this discussion, Auction Proceeds are assumed to be exclusively Cash (as contemplated by the Plan and Auction Procedures), and there is no

discussion regarding the consequences of receiving Auction Proceeds other than Cash. Finally, other than as specifically provided, this discussion assumes that Class 6 (Prepetition Inc. Facility Non-Subordinated Claims) votes to accept the Plan and, therefore, the Plan is not withdrawn with respect to the Inc. Debtors.  If the Plan were withdrawn with respect to the Inc. Debtors as described in Article IV.U of the Plan, the United States federal income tax consequences of the Plan may be materially different for the Inc. Debtors and Holders of Claims against the Inc. Debtors, or Holders of Equity Interests in LightSquared Inc.  For example, if the Plan is withdrawn with respect to the Inc. Debtors, New LightSquared would not succeed to the Group NOLs.  Instead, those NOLs ~~would~~**may** remain with the Inc. Debtors **or, in some cases, may be lost**.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN EQUITY INTEREST.  ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF PLAN TO LIGHTSQUARED

For United States federal income tax purposes, LightSquared Inc. is the parent of an affiliated group of corporations that files a consolidated federal income tax return.  Through December 31, 2012, this group has reported that it incurred United States federal tax net operating loss carryforwards ("NOLs") of approximately $2.3 billion, and it expects that additional NOLs were generated in 2013 (such NOLs of the consolidated group of which LightSquared Inc. is the parent, the "Group NOLs").  Some small portion of these Group NOLs may be subject to existing limitations.

## 2.    Cancellation of Debt and Reduction of Tax Attributes to LightSquared

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued in satisfaction of such existing indebtedness**,** and **(iii)** the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.  A corporate debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  In the case of a debtor that is a partnership, partners of such partnership will not be required to include any amount of COD Income of the partnership in gross income if such partner is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor (or its partners) must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order:  (w) NOLs; (x) most tax credits and capital loss carryovers; (y) tax basis in assets; and (z) foreign tax credits.  A debtor (or partner) with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under the Plan, LightSquared will satisfy most of the Claims for Cash, debt obligations, and equity interests of New LightSquared **(including New LightSquared Stapled A Units and New LightSquared Stapled B Units)**.  Whether LightSquared Inc. and its corporate subsidiaries will recognize COD Income will depend, in part, on the amount that they are considered to owe on the Claims against them for U.S. federal income tax purposes and the amount of Cash, the value of the equity interests and the issue price of the debt obligations**, if any,** transferred in exchange for the Claims, in each case as of the New DIP Closing Date or the Effective Date, as relevant.  To the extent LightSquared Inc. or its subsidiaries that are taxed as corporations recognize (or are treated as recognizing through LightSquared LP) COD Income, such income will reduce tax attributes, including NOLs (if any), that may remain available to New LightSquared and its reorganized subsidiaries.

## 3.    Potential Limitations on NOLs and Other Tax Attributes

Following the Effective Date, the NOLs and certain other tax attributes of LightSquared that remain and are allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code.  Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD Income, if any, arising in connection with the Plan.

In general under section 382, if a corporation undergoes an "ownership change" the amount of its pre-change losses that may be utilized to offset future taxable income is subject

Allowed Prepetition LP Facility Non-SPSO Claim and the sum of the amount of any Cash, the issue price of the New LightSquared Term Loans and the fair market value of the New LightSquared Common Equity**Stapled A Units** it receives pursuant to the Plan.  A U.S. Holder's tax basis in the New LightSquared Term Loans**Stapled A Units, if applicable,** should equal the issue price**fair market value** of the New LightSquared Term Loans**Stapled A Units on the Effective Date,** and the U.S. Holder's holding period for the New LightSquared Term Loans**Stapled A Units** should begin on the day following the Effective Date.  A U.S. Holder's tax basis in the New LightSquared Common Equity, if applicable, should equal the fair market value of the New LightSquared Common Equity on the Effective Date and the U.S. Holder's holding period for the New LightSquared Common Equity should begin on the day following the Effective Date.

U.S. Holders of Prepetition LP Facility Non-SPSO Claims should discuss with their tax advisors potential alternative U.S. federal income tax treatment of the Plan, including the possibility that the Plan is partially tax-free to them and the U.S. federal income tax consequences of such treatment.

Where gain or loss is recognized by such U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition LP Facility Non-SPSO Claims held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

**b.    Holders of Prepetition LP Facility SPSO Claims and Prepetition LP Facility SPSO Subordinated Claims**

*(i)    Class 5B Votes to Accept the Plan*

In the event that Class 5B votes to accept the Plan, then pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition LP Facility SPSO Claim shall receive:  (A) Cash in the amount of the SPSO Fee Claims incurred between the Confirmation Date and the Effective Date, (B) its Pro Rata share of $1.0 billion of New LightSquared Term Loans issued under the New LightSquared Term Loan Facility, which shall be New LightSquared Tranche B Term Loans, and (C) its Pro Rata share of 100% of the New LightSquared Common Equity issued as of the Effective Date, which shall be New LightSquared Class B Common Equity.  A Holder's Pro Rata share in Article III.B.6(c)(i) of the Plan shall be the proportion that a Holder's Allowed Prepetition LP Facility SPSO Claim bears to the aggregate amount of all (x) Allowed Prepetition LP Facility SPSO Claims, <u>plus</u>

(y) Allowed Prepetition LP Facility Non-SPSO Claims, plus (z) Allowed Prepetition Inc. Facility Non-Subordinated Claims if Class 6 votes to accept the Plan.

In the event that Class 5B votes to accept the Plan, the U.S. federal income tax consequences of the Plan for the U.S. Holders of Prepetition LP Facility SPSO Claims are not certain.

The Plan may be a taxable transaction for the U.S. Holders of Prepetition LP Facility SPSO Claims, in which case a Holder of an Allowed Prepetition LP Facility SPSO Claim is likely to have gain or loss equal to the difference between such Holder's combined basis in their Allowed Prepetition LP Facility SPSO Claim and Prepetition LP Facility SPSO Subordinated Claim and the sum of the amount of any Cash, the issue price of the New LightSquared Term Loans and the fair market value of the New LightSquared Common Equity**Stapled B Units** they receive pursuant to the Plan.  A U.S. Holder's tax basis in the New LightSquared Term Loans**Stapled B Units, if applicable,** should equal the issue price**fair market value** of the New LightSquared Term Loans**Stapled B Units on the Effective Date,** and the U.S. Holder's holding period for the New LightSquared Term Loans**Stapled B Units** should begin on the day following the Effective Date. A U.S. Holder's tax basis in the New LightSquared Common Equity, if applicable, should equal the fair market value of the New LightSquared Common Equity on the Effective Date and the U.S. Holder's holding period for the New LightSquared Common Equity should begin on the day following the Effective Date.

U.S. Holders of Prepetition LP Facility SPSO Claims should discuss with their tax advisors potential alternative U.S. federal income tax treatment of the Plan, including the possibility that the Plan is partially tax-free to them and the U.S. federal income tax consequences of such treatment.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction. Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition LP Facility SPSO Claims held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

*(ii)       Class 5B Votes to Reject the Plan*

In the event that Class 5B votes to reject the Plan, then pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Prepetition LP Facility SPSO Claim treated as an Allowed Prepetition LP Facility SPSO Claim and an Allowed Prepetition LP Facility SPSO Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent that a Holder of an Allowed Prepetition LP Facility SPSO Claim agrees to less favorable treatment, each Holder of a Prepetition LP Facility SPSO Claim treated as, in part, an Allowed Prepetition LP

58

Facility Non-Subordinated Claims, plus (B) Allowed Prepetition LP Facility Non-SPSO Claims, plus (C) Allowed Prepetition LP Facility SPSO Claims if Class 5B votes to accept the Plan.

The tax consequences to the U.S. Holders will depend on whether the Plan is treated as a Reorganization for U.S. federal income tax purposes, which determination will be based, in part, on whether a Prepetition Inc. Facility Non-Subordinated Claim is a "Security." There is no precise definition of what constitutes a Security, and all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether or not it is a Security. Courts have held that a corporate debt instrument with an original maturity of ten years or more generally will be considered a Security, while an instrument with an original maturity of less than five years generally will not be considered a Security. Additional relevant factors for purposes of making this determination may include: (i) whether the instrument is secured; (ii) the degree of subordination of the instrument; (iii) the ratio of debt to equity of the issuer; (iv) the negotiability of the instruments; (v) the creditworthiness of the obligor; (vi) the right to vote or otherwise participate in the management of the obligor; (vii) the convertibility of the instrument into an equity interest of the obligor; (viii) whether payments of interest are fixed, variable, or contingent; and (ix) whether such payments are made on a current basis or are accrued.

If a U.S. Holder's Allowed Prepetition LP Facility Non-SPSO Claim qualifies as a Security for U.S. federal income tax purposes and the LightSquared Inc. Reorganization qualifies as a Reorganization for U.S. federal income tax purposes, then the LightSquared Inc. Reorganization generally would result in the following U.S. federal income tax consequences to U.S. Holders of Allowed Prepetition Inc. Facility Non-Subordinated Claims: (~~1~~i) no gain or loss would be recognized by such a U.S. Holder with respect to the U.S. Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claim surrendered pursuant to the Plan, except that such a U.S. Holder would recognize gain, if any, up to the amount of the sum of any Cash received ~~and the value of the New LightSquared Term Loan received~~ pursuant to the Plan ~~(assuming the New LightSquared Term Loan is not treated as a Security)~~; (~~2~~**ii**) the aggregate tax basis of the New LightSquared ~~Common Equity~~**Stapled A Units** received in the LightSquared Inc. Reorganization would be the same as the aggregate tax basis of the U.S. Holder's Allowed Prepetition Inc. Facility Non-Subordinated Claims surrendered in exchange for the New LightSquared ~~Common Equity Interest~~**Stapled A Units**, decreased by the amount of ~~cash and the value of the New LightSquared Term Loan~~**Cash** received pursuant to the Plan and increased by any gain recognized in connection with the LightSquared Inc. Reorganization; and (~~3~~**iii**) the U.S. Holder's holding period of the New LightSquared ~~Common Equity~~**Stapled A Units** received generally would include the holding period of the Allowed Prepetition Inc. Facility Non-Subordinated Claims surrendered in exchange therefor.

If the LightSquared Inc. Reorganization does not qualify as a Reorganization for U.S. federal income tax purposes or if the Allowed Prepetition Inc. Facility Non-Subordinated Claims do not qualify as Securities for U.S. federal income tax purposes, a U.S. Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim generally should recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash, ~~the issue price of any~~ ~~New LightSquared Tranche A Term Loans~~ and the fair market value of any New LightSquared ~~Common Equity~~**Stapled A Units** received by such Holder and such Holder's

adjusted tax basis in its Allowed Prepetition Inc. Facility Non-Subordinated Claim.  The U.S. Holder's will have ~~an initial tax basis with respect to the New LightSquared Tranche A Term Loans equal to their issue price and~~ an initial tax basis with respect to its New LightSquared ~~Common Equity~~**Stapled A Units** equal to the fair market value of such interests at the Effective Date, and the U.S. Holder's holding period for the New LightSquared **Stapled A Units** should begin on the day following the Effective Date.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition Inc. Facility Non-Subordinated Claim held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

### d.    Holders of Prepetition Inc. Facility Subordinated Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive its Pro Rata share of Excess Inc. Auction Proceeds, if any, as provided in Article IV.C of the Plan.

A U.S. Holder of an Allowed Prepetition Inc. Facility Subordinated Claim generally should recognize gain or loss in an amount equal to the difference, if any, between the amount of Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Prepetition Inc. Facility Subordinated Claim. If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Prepetition Inc. Facility Subordinated Claim, such Holder generally will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Prepetition Inc. Facility Subordinated Claim.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition in connection with the Plan of Allowed Prepetition Inc. Facility Subordinated Claims held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

### e.    Holders of LP General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed LP

A Holder generally will recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Existing Inc. Preferred Stock Equity Interest.  If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Existing Inc. Preferred Equity Interest, such Holder will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Existing Inc. Preferred Equity Interest.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held and whether and to what extent the Holder previously had claimed a worthless securities deduction.

### c.    Consequences to Holders of Existing Inc. Common Stock Equity Interests

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Common Stock Equity Interest, each Existing Inc. Common Stock Equity Interest shall be cancelled and, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Common Stock Equity Interest agrees to less favorable treatment, each Holder of an Allowed Existing Inc. Common Stock Equity Interest shall receive its Pro Rata share of Excess Inc. Auction Proceeds remaining, if any, as provided in Article IV.C of the Plan.

A Holder generally will recognize gain or loss in an amount equal to the difference, if any, between the sum of any Cash received by such Holder with respect to its share of Excess Inc. Auction Proceeds, if any, and such Holder's adjusted tax basis in its Allowed Existing Inc. Common Stock Equity Interest.  If a Holder does not receive any Excess Inc. Auction Proceeds with respect to its Allowed Existing Inc. Common Stock Equity Interest, such Holder will recognize a loss in an amount equal to such Holder's adjusted tax basis, if any, in such Allowed Existing Inc. Common Stock Equity Interest.

Where gain or loss is recognized by such Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held and whether and to what extent the Holder previously had claimed a worthless securities deduction.

### 3.    Consequences of Holding New LightSquared ~~Common Equity~~**Stapled A Units, New LightSquared Stapled B Units,** and Debt Obligations

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of New LightSquared ~~Term Loans~~**Stapled A Units, New LightSquared Stapled B Units,** and New LightSquared ~~Common Equity~~**Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit**.  This discussion addresses only the U.S.

federal income tax considerations of U.S. Holders that will receive an interest in the New LightSquared ~~Term Loans~~**Stapled A Units, New LightSquared Stapled B Units,** or New LightSquared ~~Common Equity~~**Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** under the Plan and that will hold such an interest in the New LightSquared ~~Term Loans~~**Stapled A Units, New LightSquared Stapled B Units,** or New LightSquared ~~Common Equity~~**Term Loans that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** as capital assets.

      a.      **Consequences of Ownership of New LightSquared ~~Common Equity~~Stapled A Units or New LightSquared Stapled B Units Issued Pursuant to the Plan**

      *(i)      Distributions*

The gross amount of any distribution of Cash and the fair market value of any property distributed to a U.S. Holder with respect to the New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units** generally will be includible in gross income by such Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of New LightSquared as determined under U.S. federal income tax principles.  Dividends received by non-corporate Holders may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of New LightSquared's current and accumulated earnings and profits will first be treated as a return of capital to the extent of the Holder's adjusted tax basis in the New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable,** and will be applied against and reduce such basis.  To the extent that such distribution exceeds the Holder's adjusted tax basis in its New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable**, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such Holder's holding period in its New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable,** exceeds one **(1)** year as of the date of the distribution.  Long term capital gains may be eligible for reduced rates of taxation.

      *(ii)      Sale and Exchange of New LightSquared ~~Common Equity~~Stapled A Units or New LightSquared Stapled B Units*

For U.S. federal income tax purposes, a Holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable,** in an amount equal to the difference, if any, between the amount realized for the New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable,** and the Holder's adjusted tax basis in the New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as applicable**.  Capital gains of non-corporate Holders derived with respect to a sale, exchange, or other disposition of New LightSquared ~~Common Equity~~**Stapled A Units or New LightSquared Stapled B Units, as**

**applicable,** held for more than one **(1)** year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

  b.  **Consequences of Holding New LightSquared Term Loans that Are Not Component of New LightSquared Stapled A Unit or New LightSquared Stapled B Unit** Issued Pursuant to ~~the~~ Plan

  The New LightSquared Term Loans **that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** will be treated as being issued with OID in an amount equal to the difference between (i) the sum of all payments of principal and stated interest due under ~~the~~**such** New LightSquared Term Loans and (ii) the issue price of ~~the~~**such** New LightSquared Term Loans. The issue price of ~~the~~**such** New LightSquared Term Loans will depend on whether it or the property for which it was exchanged is considered to be "traded on an established market." It is not clear whether ~~the~~**such** New LightSquared Term Loans will be considered traded on an established market. If ~~the~~**such** New LightSquared Term Loans (or the property for which they are exchanged) are traded on an established market, the issue price of ~~the~~**such** New LightSquared Term Loans will be the fair market value of ~~the~~**such** New LightSquared Term Loans (or the fair market value of the property for which they are exchanged) as of the date they are received pursuant to the Plan. If ~~the~~**such** New LightSquared Term Loans (and the property for which they are exchanged) ~~is~~**are** not traded on an established market, the issue price of ~~the~~**such** New LightSquared Term Loans generally will be their stated principal amount.

  U.S. Holders of the New LightSquared Term Loans **that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** must include OID in their gross income as ordinary income calculated on a constant-yield method before the receipt of cash attributable to the income. The amount of OID includible in income by a U.S. Holder is the sum of the daily portions of OID with respect to ~~the~~**such** New LightSquared Term Loan for each day during the taxable year or portion of the taxable year on which the U.S. Holder holds ~~the~~**such** New LightSquared Term Loan ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a *pro rata* portion of the OID allocable to that accrual period. Accrual periods with respect to ~~the~~**such** New LightSquared Term Loan may be of any length selected by the U.S. Holder and may vary in length over the term of ~~the~~**such** New LightSquared Term Loan as long as (i) no accrual period is longer than one **(1)** year and (ii) each scheduled payment of interest or principal on ~~the~~**such** New LightSquared Term Loan occurs on either the final or first day of an accrual period. The amount of OID allocable to an accrual period equals the product of ~~the~~**such** New LightSquared Term Loan's adjusted issue price at the beginning of the accrual period and ~~the~~**such** New LightSquared Term Loan's yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted to reflect the length of the accrual period). The adjusted issue price of ~~the~~**such** New LightSquared Term Loan at the beginning of any accrual period will generally be the issue price of ~~the~~**such** New LightSquared Term Loan increased by (i) the amount of accrued OID for each prior accrual period and decreased by (ii) the amount of any payments previously made on ~~the~~**such** New LightSquared Term Loan.

68

A U.S. Holder will generally recognize gain or loss on the sale, exchange or other disposition of a New LightSquared Term Loan **that is not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** equal to the difference between (i) the amount realized upon the sale, exchange, retirement or other taxable disposition and (ii) the U.S. Holder's adjusted tax basis in ~~the~~**such** New LightSquared Term Loan. Long term capital gain recognized in respect of **such** a New LightSquared Term Loan by certain non-corporate U.S. Holders generally will be subject to tax at a reduced rate. The ability of U.S. Holders to offset capital losses against ordinary income is limited.

The New LightSquared Term Loans **that are not a component of a New LightSquared Stapled A Unit or a New LightSquared Stapled B Unit** may be treated as contingent payment debt instruments ("CPDIs") for U.S. federal income tax purposes. The CPDI rules could affect the timing of accruals and the character of gain on the sale or other disposition of ~~the~~**such** New LightSquared Term Loans.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Equity Interest may be subject to backup withholding (at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS

## ARTICLE VII
## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that Confirmation of the Plan is in the best interests of its Estates and all stakeholders because it is fairest, most confirmable, and provides the greatest opportunity to maximize value for Holders of Claims against and Equity Interests in the LightSquared entities. **Accordingly, the Plan Proponents urge all Holders of Claims or Equity Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific time) on [__]September 23, 2014.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

New York, New York
Dated:  August 726, 2014

**LIGHTSQUARED INC. ( FOR ITSELF AND
ALL OTHER DEBTORS)**

By:         */s/ Douglas Smith*
Name:       Douglas Smith
Title:      Chief Executive Officer, President,
            and Chairman of the Board of
            LightSquared Inc.

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY, IN ITS CAPACITY AS
INVESTMENT MANAGER TO CERTAIN
FUNDS THAT ARE HOLDERS OF
PREPETITION  LP  FACILITY CLAIMS**

By:         */s/ Kristine M. NishiyamaMark E.
            Brubaker*
Name:       Kristine M. NishiyamaMark E.
            Brubaker
Title:      Authorized Signatory

**CYRUS CAPITAL PARTNERS, L.P., IN ITS
CAPACITY AS INVESTMENT MANAGER TO
CERTAIN FUNDS THAT ARE HOLDERS OF
PREPETITION LP FACILITY CLAIMS**

By:         */s/ Jennifer M. Pulick*
Name:       Jennifer M. Pulick
Title:      Authorized Signatory

[Specific Disclosure Statement Forfor First Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code
Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders]