**EXHIBIT 2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

**HARBINGER CAPITAL PARTNERS LLC'S FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION FOR THE INC. DEBTORS**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

THIS PLAN IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1125. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE INITIAL INVESTORS, THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

David M. Friedman
Adam L. Shiff
Matthew B. Stein
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

1633 Broadway
New York, NY 10019
(212) 506-1700

*Counsel to Harbinger Capital Partners LLC*

Dated:  New York, New York
AugustSeptember 11, 2014

## **TABLE OF CONTENTS**

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW...................................................................1

    A.      Defined Terms.................................................................................1

    B.      Rules of Interpretation..........................................................~~18~~19

    C.      Computation of Time...........................................................~~19~~20

    D.      Governing Law....................................................................~~19~~20

    E.      Reference to Monetary Figures............................................~~19~~20

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX
CLAIMS, AND U.S. TRUSTEE FEES.................................................~~19~~20

    A.      Administrative Claims.................................................................20

    B.      Accrued Professional Compensation Claims..............................21

    C.      Post-Confirmation Date Fees and Expenses......................~~21~~22

    D.      DIP Inc. Facility Claims.....................................................~~21~~22

    E.      New DIP Facility Claims.....................................................~~22~~23

    F.      Priority Tax Claims.............................................................~~22~~23

    G.      Payment of Statutory Fees..................................................~~22~~23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS..............................................................................~~23~~24

    A.      Summary.............................................................................~~23~~24

    B.      Classification and Treatment of Claims and Equity Interests...~~23~~24

    C.      Special Provision Governing Unimpaired Claims...............~~28~~29

    D.      Acceptance or Rejection of Plan.........................................~~28~~29

    E.      Elimination of Vacant Classes............................................~~29~~30

    F.      Confirmation Pursuant to Section 1129(b) of Bankruptcy Code...~~29~~30

    G.      Controversy Concerning Impairment..................................~~29~~30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN.....................~~29~~30

    A.      Overview of Plan...............................................................~~29~~30

    B.      Plan Transactions...............................................................~~29~~31

    C.      Sources of Consideration for Plan Distributions................~~30~~31

    D.      Certain Confirmation Date and Effective Date Plan Transactions...~~30~~31

| | | |
|---|---|---|
| E. | One Dot Six Exit Facility | ~~33~~35 |
| F. | One Dot Six Second Lien Exit Facility | ~~34~~35 |
| G. | LightSquared Inc. Exit Facility | ~~34~~36 |
| H. | Issuance of Reorganized Inc. Debtors Equity Interests; Reinstatement of Inc. Intercompany Claims and Inc. Intercompany Interests | ~~35~~36 |
| I. | Section 1145 and Other Exemptions | ~~35~~37 |
| J. | Reorganized One Dot Six Interest Holders Agreement | ~~36~~37 |
| K. | Listing of Reorganized Inc. Debtors Equity Interests; Reporting Obligations | ~~36~~38 |
| L. | Indemnification Provisions in Reorganized Inc. Debtors Corporate Governance Documents | ~~36~~38 |
| M. | Corporate Governance | ~~37~~38 |
| N. | Vesting of Assets in Reorganized Inc. Debtors | ~~37~~39 |
| O. | Cancellation of Securities and Agreements | ~~37~~39 |
| P. | Corporate Existence | ~~38~~40 |
| Q. | Corporate Action | ~~38~~40 |
| R. | Effectuating Documents; Further Transactions | ~~39~~41 |
| S. | Exemption from Certain Taxes and Fees | ~~39~~41 |
| T. | Preservation of Rights of Action | ~~40~~41 |
| U. | Assumption of D&O Liability Insurance Policies | ~~40~~42 |
| V. | Employee and Retiree Benefits | ~~41~~43 |
| ARTICLE V. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | ~~42~~44 |
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | ~~42~~44 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | ~~43~~45 |
| C. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan | ~~43~~45 |
| D. | Pre-existing Obligations to Inc. Debtors Under Executory Contracts and Unexpired Leases | ~~44~~46 |
| E. | Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases | ~~45~~47 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | ~~45~~47 |
| G. | Reservation of Rights | ~~45~~47 |
| H. | Nonoccurrence of Effective Date | ~~45~~47 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................... ~~46~~48

    A.    Distribution Record Date ................................................................... ~~46~~48

    B.    Timing and Calculation of Amounts To Be Distributed ..................... ~~46~~48

    C.    Disbursing Agent ............................................................................... ~~47~~49

    D.    Rights and Powers of Disbursing Agent ........................................... ~~47~~49

    E.    Plan Distributions on Account of Claims Allowed After Effective Date .......... ~~47~~49

    F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions ........ ~~48~~50

    G.    Compliance with Tax Requirements/Allocations ............................... ~~49~~51

    H.    Setoffs ............................................................................................... ~~49~~51

    I.    Recoupment ...................................................................................... ~~50~~52

    J.    Claims Paid or Payable by Third Parties ......................................... ~~50~~52

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........... ~~51~~53

    A.    Allowance of Claims ......................................................................... ~~51~~53

    B.    Claims Administration Responsibilities ............................................ ~~51~~53

    C.    Estimation of Claims ........................................................................ ~~52~~53

    D.    Expungement or Adjustment to Claims Without Objection ............... ~~52~~54

    E.    No Interest ........................................................................................ ~~53~~55

    F.    Deadline To File Objections to Claims ............................................ ~~53~~55

    G.    Disallowance of Claims .................................................................... ~~53~~55

    H.    Amendments to Claims ..................................................................... ~~53~~55

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........... ~~54~~56

    A.    Discharge of Claims and Termination of Equity Interests ............... ~~54~~56

    B.    Subordinated Claims ........................................................................ ~~54~~56

    C.    Compromise and Settlement of Claims and Controversies ............... ~~54~~56

    D.    Releases ~~By~~by Inc. Debtors ......................................................... ~~55~~57

    E.    Exculpation ...................................................................................... ~~56~~58

    F.    Injunction ......................................................................................... ~~56~~58

    G.    Release of Liens ............................................................................... ~~57~~59

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ........... ~~57~~59

    A.    Conditions Precedent to Confirmation Date ..................................... ~~57~~59

B.    Conditions Precedent to Effective Date ............................................ ~~58~~61

C.    Waiver of Conditions ......................................................................... ~~60~~62

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN .............. ~~60~~63

A.    Modification and Amendments ......................................................... ~~60~~63

B.    Effect of Confirmation on Modifications ......................................... ~~60~~63

C.    Revocation or Withdrawal of Plan ................................................... ~~60~~63

D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur ......... 64

ARTICLE XI. RETENTION OF JURISDICTION ................................................... ~~61~~64

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................. ~~63~~66

A.    Immediate Binding Effect ................................................................. ~~63~~66

B.    Additional Documents ....................................................................... ~~63~~66

C.    Reservation of Rights ......................................................................... ~~63~~66

D.    Successors and Assigns ...................................................................... ~~63~~67

E.    Service of Documents ........................................................................ ~~63~~67

F.    Term of Injunctions or Stays ............................................................. ~~64~~68

G.    Plan Supplement ................................................................................ ~~65~~68

H.    Entire Agreement ............................................................................... ~~65~~68

I.    Non-severability of Plan Provisions .................................................. ~~65~~68

J.    Votes Solicited in Good Faith ........................................................... ~~65~~69

K.    Waiver or Estoppel ............................................................................ ~~66~~69

L.    Conflicts ............................................................................................. ~~66~~69

iv

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) asserted against the Inc. Debtors for services rendered to the Inc. Debtors by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.      "**Acquired Inc. Facility Claims**" has the meaning set forth in Article III.B.3(b).

3.      "**Administrative Claim**" means a Claim against any of the Inc. Debtors for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates of the Inc. Debtors and operating the businesses of the Inc. Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates of the Inc. Debtors pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the New DIP Facility Claims; (e) the DIP Inc. Facility Claims; and (f) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.  To the extent an Allowed Administrative Claim was a cost or expense of administration of both the Inc.  Debtors' and LP Debtors' Chapter 11 Cases, such Allowed Administrative Claims shall be deemed incurred by the Inc. Debtors in an amount not to exceed 15% of the aggregate amount of those Administrative Claims; provided, however, that the Reorganized Inc. Debtors and the Initial Investors reserve the right to challenge this amount and/or recapture from the LP Debtors any Administrative Claim incurred by the LP Debtors that is satisfied by the Inc. Debtors pursuant to this Plan.

4.      "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

5.      "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Inc. Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Inc. Debtor or Reorganized Inc. Debtor, as applicable.

7.      "**Assets**" means all rights, titles, and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

8.      "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Inc. Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.      "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

10.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

11.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

12.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

2

13.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

14.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

16.    "**Canadian Proceedings**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

16.    17.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

17.    18.    "**Cause of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Exculpated Released Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

18.    19.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

19.    20.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.    21.    "**Claim**" means any claim against an Inc. Debtor as defined in section 101(5) of the Bankruptcy Code.

21.    22.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11

Cases, or such other entity identified by the Initial Investors in advance of the hearing to approve the Inc. Disclosure Statement.

22.    ~~23.~~ "**Claims Bar Date**" means the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

23.    ~~24.~~ "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

24.    ~~25.~~ "**Claims Objection Bar Date**" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) four (4) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

25.    ~~26.~~ "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

26.    ~~27.~~ "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27.    ~~28.~~ "**Collateral**" means any property or interest in property of the Estates of the Inc. Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

28.    "**Commitment Letters**" means the JPM Commitment Letter and the Harbinger Commitment Letter.

29.    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases of the Inc. Debtors.

30.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the Inc. Debtors, within the meaning of Bankruptcy Rules 5003 and 9021.

31.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

33.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

34.    "**Consummation**" means the occurrence of the Effective Date.

35.     "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Inc. Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

36.     "**D&O Liability Insurance Policies**" means all insurance policies of any of the Inc. Debtors for directors', managers', and officers' liability.

37.     "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases or the Chapter 11 Cases of the LP Debtors.

38.     "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

39.     "**DIP Facility Claim"** means a New DIP Facility Claim or DIP Inc. Facility Claim.

40.     "**DIP Inc. Agent**" means U.S. Bank National Association, as administrative agent under the DIP Inc. Credit Agreement, or any successor agent appointed in accordance with the DIP Inc. Credit Agreement.

41.     "**DIP Inc. Borrower**" means One Dot Six Corp., in its respective capacities as a borrower under the New DIP Credit Agreement or the DIP Inc. Credit Agreement, as applicable.

42.     "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012, among the DIP Borrower, the DIP Guarantors, the DIP Agent, and the DIP Inc. Lenders.

43.     "**DIP Inc. Facility**" means that certain debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

44.     "**DIP Inc. Facility Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under, or related to, the DIP Inc. Facility.

45.     "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., in their respective capacities as guarantors under the New DIP Credit Agreement or DIP Inc. Credit Agreement, as applicable.

46.     "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

47.     "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time).

48.    "**Disbursing Agent**" means the Reorganized Inc. Debtors, or the Entity or Entities designated by the Reorganized Inc. Debtors and the Initial Investors to make or facilitate Plan Distributions pursuant to the Plan.

49.    "**Disclosure Statement Hearing**" means the hearing held in the Bankruptcy Court to consider the approval of the Inc. Disclosure Statement.

50.    "**Disclosure Statement Order**" means the *Order (IA) Conditionally Approving Specific* Disclosure ~~Statement~~*Statements,* (IIB) *Approving Solicitation and Notice Procedures, (III in Connection With Voting on Certain Chapter 11 Plans, (C)* Approving ~~Forms~~*Form* of ~~Various Ballots~~*Ballot and* Notices in Connection Therewith, (IV) Approving*D) Scheduling of Certain Dates and Deadlines in Connection with Confirmation of All Competing Chapter 11 Plans, and (VE) Granting Related Relief* [Docket No. ——1715] (as amended, supplemented, or modified from time to time).

51.    "**Disputed**" means, with respect to any Claim, any Claim that is not yet Allowed.

52.    "**Disputed Claims Reserve**" means sufficient availability in the One Dot Six Revolving Loan Facility reserved for the benefit of each Holder of a Disputed Claim, in an amount equal to the Plan Distributions such Disputed Claim would be entitled to on the Effective Date if such Disputed Claim were Allowed in its full amount on the Effective Date.

53.    "**Distribution Record Date**" means the New DIP Closing Date.

54.    "**Effective Date**" means the date selected by the Initial Investors that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

55.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

56.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

57.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in an Inc. Debtor, including any issued or unissued share of common stock, Preferred Equity Interests, or other instrument evidencing an ownership interest in an Inc. Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in an Inc. Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan

maintained by the Inc. Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Inc. Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

58.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

59.    "**Exculpated Party**" means ~~(a) the Inc. Debtors; (b) the New DIP Agent and each New DIP Lender; (c) the One Dot Six Exit Agent and each One Dot Six Exit Lender; (d) the Proponent; (e) the Initial Investors (individually and together with their respective Affiliates in each of their respective capacities contemplated hereunder); and (f) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including *ex officio* members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such).~~ a Released Party.

60.    "**Executory Contract**" means a contract to which one or more of the Inc. Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

61.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Equity Interests).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

62.    "**Existing Inc. Preferred Equity Interest**" means the outstanding shares of Existing Inc. Series A Preferred Equity Interests and Existing Inc. Series B Preferred Equity Interests.

63.    "**Existing Inc. Series A Preferred Equity Interests**" means the outstanding shares of Convertible Series A Preferred Equity Interests issued by LightSquared Inc.

64.    "**Existing Inc. Series B Preferred Equity Interests**" means the outstanding shares of Convertible Series B Preferred Equity Interests issued by LightSquared Inc.

65.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Equity Interests, and Intercompany Interests.

66.    "**FCC**" means the Federal Communications Commission.

67.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

68.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

69.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; provided, further, the Initial Investors reserve the right to waive any appeal period.

70.    "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

71.    "**General Unsecured Claim**" means any Claim against any of the Inc. Debtors that is not one of the following Claims: (a) Administrative Claim; (b) Priority Tax Claim; (c) New DIP Facility Claim; (d) DIP Inc. Facility Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Prepetition Inc. Facility Claim; or (h) Inc. Intercompany Claim.

72.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

73.    "**Harbinger**" means Harbinger Capital Partners, LLC and its designated affiliates.

74.    "**Harbinger Commitment Letter**" means that certain commitment letter pursuant to which the Harbinger Commitment Parties commit to provide the Inc. Debtors with approximately $180 million in financing under the New Senior DIP Facility and the New Junior DIP Facility.

75.    "**Harbinger Commitment Parties**" means Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund L.P.

76.    ~~74.~~ "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

77.    ~~75.~~ "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

78.    ~~76.~~ "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, One Dot Six TVCC Corp, LightSquared Investors Holdings Inc., and TMI Communications Delaware, Limited Partnership.

79.    ~~77.~~ "**Inc. Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918], and (b) the *Specific Disclosure Statement for ~~Harbinger Capital Partners LLC and SIG Holdings, Inc.'s~~the* Joint Plan of Reorganization for ~~the Inc. Debtors Pursuant to Chapter 11 of Bankruptcy Code~~ [Docket No. ___ *LightSquared Inc. and Its Subsidiaries Proposed by Harbinger Capital Partners, LLC* [Dkt. No. 1701] (as

either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan).

80. 78. "**Inc. Facility Claim Purchase Agreement**" means that certain purchase agreement to be entered into between SIG and the Inc. Facility Claim Sellers on terms mutually acceptable to the parties pursuant to which SIG shall purchase Acquired Inc. Facility Claims in cash from the Inc. Facility Claim Sellers on the New DIP Closing Date.

81. 79. "**Inc. Facility Claim Sellers**" means the Holders of Prepetition Inc. Facility Non-Subordinated Claims immediately prior to the New DIP Closing Date.

82. 80. "**Inc. Intercompany Claim**" means any Claim against an Inc. Debtor held by an Inc. Debtor.

83. 81. "**Inc. Intercompany Interest**" means any Equity Interest in an Inc. Debtor held by another Inc. Debtor.

84. 82. "**Initial Investors**" means Harbinger and SIG.

85. 83. "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement (as amended, supplemented, restated, or otherwise modified from time to time), dated as of August 6, 2010, by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited.

86. 84. "**Insider**" shall have the definition ascribed to it in Section 101(31) of the Bankruptcy Code.

87. 85. "**Insider General Unsecured Claim**" means General Unsecured Claims that are held by Insiders.

88. 86. "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Inc. Debtors.

89. 87. "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

90. 88. "**JPM Commitment Letter**" means that certain commitment letter pursuant to which the JPM Commitment Parties commit to provide the Inc. Debtors with approximately $280 million in financing under the New Senior DIP Facility and the New Junior DIP Facility.

91. "**JPM Commitment Parties**" means J.P. Morgan Securities LLC, with respect to only its Credit Trading Group, and Chase Lincoln First Commercial Corporation, with respect to only its Credit Trading Group.

92. "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

93.  89. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

94.  90. "**LightSquared Inc. Exit Agent**" means the administrative agent under the LightSquared Inc. Exit Facility Agreement or any successor agent appointed in accordance with the LightSquared Inc. Exit Facility Agreement.

95.  91. "**LightSquared Inc. Exit Facility**" means that certain $200 million term loan credit facility provided in connection with the LightSquared Inc. Exit Agreement

96.  92. "**LightSquared Inc. Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized LightSquared Inc., the LightSquared Inc. Exit Agent, and the LightSquared Inc. Exit Lenders on the Effective Date.

97.  93. "**LP Debtor Plan**" means any confirmed plan of reorganization or plan of liquidation for the reorganization or liquidation, as applicable, of the LP Debtors' estates.

98.  94. "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., and LightSquared GP Inc.

99.  95. "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement, or any successor agent appointed in accordance with the New DIP Credit Agreement.

100.  96. "**New DIP Closing Date**" means the date on or before the 14th day after Confirmation upon which the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the New DIP Facility shall have occurred.

101.  97. "**New DIP Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of New DIP Closing Date, among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders.

102.  98. "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the aggregate principal amount of approximately $460 million, comprised of (i) the New Senior DIP Facility provided by the New Senior DIP Facility Lenders, and (ii) the New Junior DIP Facility provided by the Initial Investors.

103.  99. "**New DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New DIP Facility.

104.  100. "**New DIP Facility Claims Treatment**" means that (i) the New Senior DIP Facility Claims shall convert into the One Dot Six Term Loan Facility, (ii) the New Junior DIP Facility Claims, in the original principal amount of $200 million and held by SIG, shall convert into the LightSquared Inc. Exit Facility, and (iii) the New Junior DIP Facility Claims, in the

original principal amount of $100 million and held by Harbinger, shall be contributed to Reorganized One Dot Four and TVCC.

105. 101. "**New DIP Lenders**" means the New Senior DIP Lenders and the Initial Investors, as parties to the New DIP Credit Agreement.

106. 102. "**New DIP Obligors**" means the Inc. Debtors.

107. 103. "**New DIP Order**" means each of the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing New DIP Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay*.

108. 104. "**New Junior DIP Facility**" means that certain junior debtor in possession credit facility provided to LightSquared Inc. as the borrower (a) in the original principal amount of $300 million, comprised of (i) $200 million provided by SIG through the conversion of the Acquired Inc. Facility Claims, and (ii) $100 million provided by Harbinger in new funding, (b) guaranteed by the New DIP Obligors other than LightSquared Inc. and (c) secured by Liens junior to the Liens securing the New Senior DIP Facility, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

109. 105. "**New Junior DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New Junior DIP Facility.

110. 106. "**New Senior DIP Facility**" means that certain senior debtor in possession credit facility provided to One Dot Six Corp. (a) in the original principal amount of $160 million provided by the New Senior DIP Facility Lenders, (b) guaranteed by the New DIP Obligors other than One Dot Six Corp. and (c) secured by Liens senior to the Liens securing the New Junior DIP Facility, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

111. 107. "**New Senior DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New Senior DIP Facility.

112. 108. "**New Senior DIP Facility Lenders**" means the JPM Commitment Parties, the Harbinger Commitment Parties, and any other banks or other financial institutions providing funding under that may become a party to the New Senior DIP Facility from time to time.

113. 109. "**One Dot Six Exit Agent**" means the administrative agent under the One Dot Six Exit Facility Agreement or any successor agent appointed in accordance with the One Dot Six Exit Facility Agreement.

114. 110. "**One Dot Six Exit Facility**" means the One Dot Six Term Loan Facility and the One Dot Six Revolving Loan Facility obtained pursuant to the One Dot Six Exit Facility Agreement.

115. 111. "**One Dot Six Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized One Dot Six, the One Dot Six Exit Facility Guarantors, the One Dot Six Exit Agent, and the One Dot Six Exit Lenders on the Effective Date.

116. 112. "**One Dot Six Exit Facility Collateral**" means (a) all assets of Reorganized One Dot Six (including all assets contributed to Reorganized One Dot Six in accordance with Article IV.D.2(a)) and (b) all Causes of Action of Harbinger or its affiliates arising out of, relating to, or in connection with its investment in the ~~Chapter 11 Cases, the Debtors or the Debtors' businesses on and after the Effective Date~~ Debtors.

117. 113. "**One Dot Six Exit Facility Guarantors**" means the Reorganized Inc. Debtors that guarantee the payment and performance of the One Dot Six Exit Facility and the One Dot Six Second Lien Exit Facility; provided that, Reorganized LightSquared Inc. and its subsidiaries shall not be One Dot Six Exit Facility Guarantors.

118. 114. "**One Dot Six Exit Lenders**" means the lenders party to the One Dot Six Exit Facility Agreement from time to time.

119. 115. "**One Dot Six Revolving Loan Facility**" means that certain $100 million revolving loan credit facility provided in connection with the One Dot Six Exit Agreement.[2]

120. 116. "**One Dot Six Second Lien Exit Agent**" means the administrative agent under the One Dot Six Second Lien Exit Facility Agreement or any successor agent appointed in accordance with the One Dot Six Second Lien Exit Facility Agreement.

121. 117. "**One Dot Six Second Lien Exit Facility**" means that certain $40 million term loan credit facility provided in connection with the One Dot Six Second Lien Exit Agreement.

122. 118. "**One Dot Six Second Lien Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized One Dot Six, the One Dot Six Exit Facility Guarantors, the One Dot Six Second Lien Exit Agent, and SIG on the Effective Date.

123. 119. "**One Dot Six Term Loan Facility**" means that certain $160 million term loan credit facility provided in connection with the One Dot Six Exit Agreement.

124. 120. "**Other Existing Inc. Preferred Equity Interest Holders**" means each Holder of Existing Inc. Preferred Equity Interests other than SIG.

125. 121. "**Other Priority Claim**" means any Claim against an Inc. Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

126. 122. "**Other Secured Claim**" means any Secured Claim against an Inc. Debtor that is not a New DIP Facility Claim or Prepetition Facility Claim.

127. 123. "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128. 124. "**Petition Date**" means May 14, 2012.

---

[2]    The One Dot Six Revolving Loan Facility may be structured as a delayed draw term loan.

129.  ~~125.~~ "**Plan**" means this *Harbinger Capital Partners LLC Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of the Initial Investors), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

130.  ~~126.~~ "**Plan Consideration**" means, as applicable, (a) Cash provided by (i) New DIP Facility, (ii) One Dot Six Revolving Loan Exit Facility, and (iii) Inc. Debtors' Cash on hand; (b) One Dot Six Term Loan Facility; (c) One Dot Six Second Lien Exit Facility; (d) LightSquared Inc. Exit Facility; (e) Reorganized LightSquared Inc. Common Shares; and (f) Reorganized One Dot Six Interests.

131.  ~~127.~~ "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, or other eligible Entities under the Plan or Plan Supplement documents.

132.  ~~128.~~ "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement.

133.  ~~129.~~ "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, in accordance with the Bankruptcy Code and the Bankruptcy Rules) to be Filed no later than the Plan Supplement Date or such other date as may be permitted by the Bankruptcy Court, including:  (a) executed commitment letters, engagement letters, highly confident letters, and related term sheets, or form and/or definitive agreements and related documents with respect to (i) the One Dot Six Exit Facility Agreement, (ii) One Dot Six Second Lien Exit Facility Agreement, and (iii) the LightSquared Inc. Exit Facility Agreement; (b) the Reorganized Inc. Debtors Corporate Governance Documents; (c) the Schedule of ~~Assumed~~Rejected Agreements; and (d) the Schedule of Retained Causes of Action.

134.  ~~130.~~ "**Plan Supplement Date**" means ~~—————~~,September 16, 2014 at 4:00 p.m. (prevailing Eastern time), or such other, later date set by the Bankruptcy Court; provided, however, that the Initial Investors reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

135.  "**Plan Support Agreement**" means that certain plan support agreement, dated as of September 8, 2014, among Harbinger, SIG, U.S. Bank National Association, MAST Capital Management, LLC, the Harbinger Commitment Parties, the JPM Commitment Parties, and such other entities that may become party thereto in accordance with the terms thereof, which agreement is attached hereto as Exhibit A.

136.  ~~131.~~ "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other

documents of merger, amalgamation, consolidation, equity issuance, sale, reconstitution, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, and the Initial Investors determine are necessary or appropriate.

137.    132. "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

138.    133. "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

139.    134. "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011, among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

140.    135. "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

141.    136. "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

142.    137. "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens and Claims (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

143.    138. "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

144.    139. "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

145.    140. "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

146.    141. "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements,

instruments, agreements, documents, assignments, account control agreements, or other security documents.

147. 142. "**Prepetition Inc. Obligors**" means the Prepetition Inc. Facility Borrower and One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

148. 143. "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

149. 144. "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010, among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

150. 145. "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

151. 146. "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

152. 147. "**Prepetition LP Facility Guarantee Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders (including any LP Lender whose Claim or portion thereof is subordinated pursuant to section 510(c) of the Bankruptcy Code) arising under, or related to, the Prepetition LP Loan Documents against any Inc. Debtors, including the Parent Guarantors as defined in the Prepetition LP Credit Agreement.

153. 148. "**Prepetition LP Facility Guarantee Claim Order**" means an order (which may be the Confirmation Order) entered by the Bankruptcy Court estimating the Prepetition LP Facility Guarantee Claim at zero dollars pursuant to Article VII.C of the Plan and/or expunging the Prepetition LP Facility Guarantee Claim.

154. 149. "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

155. 150. "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents.

156. 151. "**Prepetition LP Obligors**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement, and LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

157. 152. "**Priority Tax Claim**" means any Claim against an Inc. Debtor of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

158. 153. "**Pro Rata**" means, with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims.

159. 154. "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

160. 155. "**Professional Fee Reserve**" means sufficient availability in the One Dot Six Revolving Loan Facility in an amount equal to the Professional Fee Reserve Amount.

161. 156. "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

162. 157. "**Proof of Claim**" means a proof of Claim Filed against any of the Inc. Debtors in the Chapter 11 Cases.

163. 158. "**Proponent**" means Harbinger.

164. 159. "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Inc. Debtors or an insider) for any actual pecuniary loss incurred by such

Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

165. 160. "**Reinstated Intercompany Interests**" means the Inc. Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

166. 161. "**Released Party**" means an Exculpated Party.(a) the Inc. Debtors; (b) the New DIP Agent and each New DIP Lender; (c) the One Dot Six Exit Agent and each One Dot Six Exit Lender; (d) the Proponent; (e) the Initial Investors (individually and together with their respective Affiliates in each of their respective capacities contemplated hereunder); (f) the DIP Inc. Agent, (g) each DIP Inc. Lender, (h) the Prepetition Inc. Agent, (i) each Prepetition Inc. Lender, and (j) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including *ex officio* members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such); provided that, the directors of the Inc. Debtors serving as of the filing date of the Plan, shall not be Released Parties with respect to a breach of any duty relating to a conflict of interest between or among the Debtors' Estates.

167. 162. "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D.

168. 163. "**Reorganized Inc. Debtors Boards**" means, collectively, the boards of directors of each of the Reorganized Inc. Debtors.

169. 164. "**Reorganized Inc. Debtors Bylaws**" means, collectively, the bylaws of each of the Reorganized Inc. Debtors.

170. 165. "**Reorganized Inc. Debtors Charters**" means, collectively, the charters of each of the Reorganized Inc. Debtors.

171. 166. "**Reorganized Inc. Debtors Corporate Governance Documents**" means, collectively, (a) the Reorganized Inc. Debtors Bylaws, (b) the Reorganized Inc. Debtors Charters, (c) the Reorganized One Dot Six Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Inc. Debtors.

172. 167. "**Reorganized Inc. Debtors Equity Interests**" means, collectively, the Reorganized LightSquared Inc. Common Shares, One Dot Six Preferred Shares, and the Reinstated Intercompany Interests.

173. 168. "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

174.  169. "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

175.  170. "**Reorganized One Dot Four**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

176.  171. "**Reorganized One Dot Four Common Shares**" means those certain common interests issued by Reorganized One Dot Four Reinstated in connection with, and subject to, the Plan, and the Confirmation Order.

177.  172. "**Reorganized One Dot Six**" means One Dot Six Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D.

178.  173. "**Reorganized One Dot Six Common Shares**" means those certain common interests issued by Reorganized One Dot Six in connection with, and subject to, the Plan, the Confirmation Order, and the Reorganized One Dot Six Interest Holders Agreement.

179.  174. "**Reorganized One Dot Six Interest Holders Agreement**" means that certain agreement with respect to the Reorganized One Dot Six Interests, to be effective on the Effective Date and binding on all holders of Reorganized One Dot Six Interests.

180.  175. "**Reorganized One Dot Six Interests**" means collectively, the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares.

181.  176. "**Reorganized One Dot Six Preferred Shares**" means those certain payable-in-kind preferred interests issued by Reorganized One Dot Six in connection with, and subject to, the Plan, the Confirmation Order, and the Reorganized One Dot Six Interest Holders Agreement.

182.  177. "**Reorganized TMI**" means TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

183.  178. "**Retained Causes of Action**" means the Causes of Action of the Inc. Debtors.

184.  179. "**Schedule of** ~~Assumed~~**Rejected Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be ~~assumed, or assumed and assigned,~~rejected by the Inc. Debtors pursuant to the Plan~~, including any Cure Costs related thereto~~ (as the same may be amended, modified, or supplemented from time to time).

185. 180. "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

186. 181. "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

187. 182. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

188. 183. "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

189. 184. "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

190. 185. "**SIG**" means SIG Holdings, Inc. and one or more of its designated affiliates.

191. 186. "**TVCC**" means TVCC Intermediate Corp.

192. 187. "**TVCC Common Shares**" means those certain common interests issued by Reorganized TVCC.

193. 188. "**Unexpired Lease**" means a lease to which one or more of the Inc. Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

194. 189. "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

195. 190. "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

196. 191. "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

197. 192. "**Voting Record Date**" means the first day of the hearing held by the Bankruptcy Court to consider approval of the Inc. Disclosure Statement filed with respect to the Plan.

B.      *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) any reference to an agreement, contract or instrument shall, unless otherwise specified, refer to such agreement, contract or instrument as amended, supplemented, restated, or otherwise modified from time to time; and (12) unless otherwise specified herein, any Plan Supplement Document, any Order (including the Confirmation Order) and any other agreement, contract, instrument or Plan Transaction relating to the New DIP Facility or to Confirmation or Consummation shall be in form and substance reasonably satisfactory to each of the Initial Investors.

C.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, corporate governance matters relating to the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Inc. Debtor or Reorganized Inc. Debtor, as applicable.

20

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Inc. Facility Claims, New DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Inc. Facility Claims, New DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Initial Investors, each Holder of an Allowed Administrative Claim (including an Accrued Professional Compensation Claim, but other than a DIP Inc. Facility Claim and New DIP Facility Claim) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Inc. Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Inc. Debtors or the Reorganized Inc. Debtors and the Holders of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order of the Bankruptcy Court; provided that, to the extent any Allowed Administrative Claims are due and payable after the Effective Date, such Claims shall be paid by, and be the sole obligation of, Reorganized One Dot Six.

Except for DIP Inc. Facility Claims, New DIP Facility Claims and U.S. Trustee Fees, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served

on the Reorganized Inc. Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date.  Objections to such requests must be Filed and served on the Reorganized Inc. Debtors and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Inc. Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Inc. Debtors or any action by the Bankruptcy Court.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Inc. Debtors and the Initial Investors no later than five (5) days prior to the anticipated Confirmation Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Initial Investors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

C.    *Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Inc. Debtors or Reorganized Inc. Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Inc. Debtors or Reorganized Inc. Debtors, as applicable, on or after the Confirmation Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or

the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Inc. Debtors or Reorganized Inc. Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

D.   *DIP Inc. Facility Claims*

The DIP Inc. Facility Claims shall be Allowed and deemed to be Allowed Claims in the full aggregate principal amount outstanding as of amount of (x) $109.28 million as of October 31, 2014 (as increased to the extent the New DIP Closing Date, plus all accrued and unpaid interest, fees, costs, expenses, and other charges payable as of the New DIP Closing Date pursuant to the terms of occurs after October 31, 2014 and decreased to the extent the New DIP Closing Date occurs before October 31, 2014, in each case on a *per diem* basis), which Allowed amount includes all outstanding principal, interest, default interest and fees, plus accrued expenses, plus (y) any additional incremental funding provided by the DIP Inc. Lenders under the DIP Inc. Credit Agreement pursuant to a budget provided by the Debtors that is acceptable to the DIP Inc. Lenders together with related interest, default interest, fees and expenses.   In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to a less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive Cash in an amount equal to the full amount of its DIP Inc. Facility Claim.

In addition, on the New DIP Closing Date, the Inc. Debtors shall pay all fees and expenses of the DIP Inc. Agent and Inc. Facility Claim Sellers (including all professionals fees and expenses) outstanding as of such date in accordance with the terms of the New DIP Order and the Confirmation Order.  For the avoidance of doubt, on the New DIP Closing Date, the Inc. Debtors shall pay the professional fees owed to Houlihan Lokey (including any transaction fee payable pursuant to the terms of Houlihan Lokey's engagement letter) in accordance with the terms of the DIP Inc. Order.

E.   *New DIP Facility Claims*

The New DIP Facility Claims shall be Allowed in the full aggregate principal amount outstanding as of the Effective Date, plus all accrued and unpaid interest, fees, costs, expenses, and other charges payable as of the Effective Date pursuant to the terms of the New DIP Credit Agreement.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Holder of a New DIP Facility Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, shall receive the New DIP Facility Claims Treatment in accordance with the Plan Transactions set forth in Article IV.D.2 below, provided, however, that any indemnification and expense reimbursement obligations of the Inc. Debtors under the New DIP Credit Agreement that are contingent as of the Effective Date shall survive and be paid by the Inc. Debtors or, following the Effective Date, Reorganized One Dot Six as and when due under the New DIP Credit Agreement.

F.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized Inc. Debtors; or (3) at the option of the Reorganized Inc. Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized Inc. Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

G.    *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, Reorganized One Dot Six shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, Reorganized One Dot Six shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Inc. Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Equity Interests with respect to a particular Inc. Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Other Priority Claim agrees to any other treatment, each Holder of an Allowed Other Priority Claim against an individual Inc. Debtor shall receive Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Priority Claim.

(c)    *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

(a)    *Classification*:  Class 2 consists of all Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Other Secured Claim agrees to any other treatment, each Holder of an Allowed Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable:  (i) Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 Other Secured Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Prepetition Inc. Facility Non-Subordinated Claims

(a)    *Classification*:  Class 3 consists of all Prepetition Inc. Facility Non-Subordinated Claims.  ~~The~~ Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the ~~full~~ aggregate ~~principal amount outstanding as of the New~~

25

~~DIP Closing Date, plus all accrued and unpaid interest, fees, costs, expenses and other charges payable as of the New DIP Closing Date pursuant to the terms of the Prepetition Inc. Credit Agreement~~<u>amount of $331.128 million, as of October 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after October 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before October 31, 2014, in each case, on a *per diem* basis), which Allowed amount includes all outstanding principal, interest, default interest and prepayment premium allocable to all Prepetition Inc. Facility Non-Subordinated Claims. For the avoidance of doubt, Prepetition Inc. Facility Non-Subordinated Claims shall not be subject to any avoidance, setoff, allowance, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under applicable law by any entity</u>.

(b)   *Treatment*:  On the New DIP Closing Date, <u>and in accordance with the Inc. Facility Claim Purchase Agreement,</u> SIG shall purchase from the Inc. Facility Claim Sellers all rights, title, and interest to $200 million of the Prepetition Inc. Facility Non-Subordinated Claims (the "Acquired Inc. Facility Claims") for $200 million, which Acquired Inc. Facility Claims shall be converted into the New Junior DIP Tranche Facility on a dollar for dollar basis.

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim other than the Acquired Inc. Facility Claims, on the New DIP Closing Date, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, each Holder of such Allowed Prepetition Inc. Facility Non-Subordinated Claim shall receive Plan Consideration in the form of its Pro Rata share of Cash in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claims.

(c)   *Voting:*  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

4.   <u>Class 4 – Prepetition Inc. Facility Subordinated Claims</u>

(a)   *Classification*:  Class 4 consists of all Prepetition Inc. Facility Subordinated Claims.  The Prepetition Inc. Facility Subordinated Claims shall be Allowed in the full aggregate principal amount outstanding as of the Effective Date, plus all accrued and unpaid interest, fees, costs, expenses and other charges payable as of the Effective Date pursuant to the terms of the Prepetition Inc. Credit Agreement.

26

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive such Holder's Pro Rata share of (a) 100% of the Reorganized One Dot Four Common Shares and 100% of the TVCC Common Shares; (b) 70% of the Reorganized One Dot Six Common Shares; and (c) Reorganized One Dot Six Preferred Shares having an original stated principal value of $75 million; provided, however, that the Class 4 treatment is subject to the Plan Transactions set forth in Article IV herein. For purposes of this Plan only, Harbinger agrees to accept Plan treatment in full satisfaction of its legal, equitable, and contractual rights.

(c) *Voting:* Class 4 is Unimpaired by the Plan because of its acceptance of its treatment under the Plan in full satisfaction of its legal, equitable, and contractual rights pursuant to sections 1123(a)(4) and 1124 of the Bankruptcy Code. Each Holder of a Class 4 Prepetition Inc. Facility Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 4 Prepetition Inc. Facility Subordinated Claim is entitled to vote to accept or reject the Plan.

5. Class 5 – General Unsecured Claims

(a) *Classification*: Class 5 consists of all General Unsecured Claims.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to any other treatment, each Holder of an Allowed General Unsecured Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed General Unsecured Claim, plus any accrued interest.

(c) *Voting*: Class 5 is Unimpaired by the Plan. Each Holder of a Class 5 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 5 General Unsecured Claim is entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – Insider General Unsecured Claims</u>

    (a)     *Classification*:  Class 6 consists of all Insider General Unsecured Claims.

    (b)     *Treatment*:  Holders of Allowed Insider General Unsecured Claims shall not receive any distribution from Plan Consideration on account of such Insider General Unsecured Claims.

    (c)     *Voting*:  Class 6 is Impaired by the Plan.  Each Holder of a Class 6 Insider General Unsecured Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 6 Insider General Unsecured Claim is entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Existing Inc. Preferred Equity Interests</u>

    (a)     *Classification*:  Class 7 consists of all Existing Inc. Preferred Equity Interests.

    (b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Equity Interest held by the Other Existing Inc. Preferred Equity Interest Holders, on the Effective Date, except to the extent that an Other Existing Inc. Preferred Equity Interest Holder agrees to any other treatment, each Other Existing Inc. Preferred Equity Interest Holder shall receive Plan Consideration in the form of its Pro Rata share of 8.0% of the Reorganized One Dot Six Common Shares.

        In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Equity Interest held by SIG, on the Effective Date SIG shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

    (c)     *Voting*:  Class 7 is Impaired by the Plan.  Each Holder of a Class 7 Existing Inc. Preferred Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.     <u>Class 8 – Existing Inc. Common Stock Equity Interests</u>

    (a)     *Classification*:  Class 8 consists of all Existing Inc. Common Stock Equity Interests.

    (b)     *Treatment*:  Holders of Allowed Existing Inc. Common Stock Equity Interests shall not receive any distribution from Plan Consideration, or retain any Interest, on account of such Existing Inc. Common Stock Equity Interests.

    (c)     *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Existing Inc. Common Stock Equity Interest is deemed to have rejected

the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Class 8 Existing Inc. Common Stock Equity Interest is entitled to vote to accept or reject the Plan.

9.    Class 9 – Inc. Intercompany Interests

(a)    *Classification*:  Class 9 consists of all Inc. Intercompany Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that (i) a Holder of an Allowed Inc. Intercompany Interest agrees to any other treatment or (ii) different treatment is necessary, as determined by the Initial Investors, to effectuate the Plan Transactions (including as set forth in Article IV), each Allowed Inc. Intercompany Interest shall be Reinstated for the benefit of the Holder thereof.

(c)    *Voting*:  Class 9 is Unimpaired by the Plan. Each Holder of a Class 9 Inc. Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 9 Inc. Intercompany Interest is entitled to vote to accept or reject the Plan.

10.    Class 10 – Inc. Intercompany Claims

(a)    *Classification*:  Class 10 consists of all Inc. Intercompany Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Intercompany Claim agrees to any other treatment, each Allowed Inc. Intercompany Claim shall be Reinstated for the benefit of the Holder thereof.

(c)    *Voting*:  Class 10 is Unimpaired by the Plan. Each Holder of a Class 10 Inc. Intercompany Claim is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 10 Inc. Intercompany Claim is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Inc. Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims. The Plan, and the treatment hereunder of all Claims and Equity Interests, are predicated on either (i) all of the Prepetition LP Facility Claims having been or being satisfied in full pursuant to an LP Debtor Plan, or (ii) as provided in Article VII.C herein, the Bankruptcy Court issuing the Prepetition LP Facility Guarantee Claim Order expunging the Prepetition LP Facility Guarantee Claim or estimating the Prepetition LP Facility Guarantee Claim in the

amount of zero dollars.

D.    *Acceptance or Rejection of Plan*

1.    Voting Classes Under Plan

Under the Plan, Class 7 is Impaired, and each Holder of a Class 7 as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, however, to the extent that any Class of Claims is satisfied in full, in Cash, from Plan Consideration, the Initial Investors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 9 and 10 are Unimpaired, (b) the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.    Presumed Rejection Under Plan

Under the Plan, (a) Classes 6 and 8 are Impaired, (b) the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have rejected the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

4.    Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

5.    Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for

purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to or is deemed to reject the Plan, the Initial Investors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Initial Investors reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

G.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.     *Overview of Plan*

The Plan contemplates, among other things, (1) $460 million in new debtor in possession financing (approximately $360 million of which will be converted into first lien exit financing), (2) $100 million in first lien revolving exit financing, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims, and (6) the preservation of the Inc. Debtors' litigation claims.

B.     *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions. On the Confirmation Date or the Effective Date, as applicable, or as soon thereafter as reasonably practicable, the Reorganized Inc. Debtors, with the consent of the Initial Investors, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, formation, partnership, merger, amalgamation, consolidation, conversion or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Inc. Debtors or Reorganized Inc. Debtors, as applicable, and the Initial Investors determine are necessary or appropriate. For the avoidance of doubt, nothing contained in the Plan shall be construed as a waiver of any Inc. Debtor's right to recover on account of equity interests held by such Inc. Debtor in one or more LP Debtors, including LightSquared LP and LightSquared GP Inc., and all such rights are expressly reserved; provided that, the retention of such equity

31

interests or recovery thereon shall not be a condition precedent to the occurrence of either the Confirmation Date or the Effective Date.

C.    *Sources of Consideration for Plan Distributions*

All consideration necessary for the Reorganized Inc. Debtors or Disbursing Agent to make Plan Distributions shall be obtained from the Plan Consideration.  After the satisfaction of all Allowed Claims in accordance with the Plan, all remaining proceeds from the New DIP Facility and the One Dot Six Exit Facility shall be placed in a working capital reserve of Reorganized One Dot Six.

D.    *Certain Confirmation Date and Effective Date Plan Transactions*

1.    Confirmation Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)    Contemporaneously with the New DIP Closing Date, pursuant to the Inc. Facility Claim Purchase Agreement, SIG shall purchase from the Inc. Facility Claim Sellers all rights, title, and interest to the Acquired Inc. Facility Claims for $200 million.

(b)    The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, subject to the terms of the New DIP Credit Agreement, the New DIP Lenders shall fund the New DIP Facility as follows: (i) SIG shall convert the Acquired Inc. Facility Claims into $200 million under the New Junior DIP Facility; (ii) Harbinger shall provide new financing in the amount of $100 million under the New Junior DIP Facility; (iii) the New Senior DIP Facility Lenders shall provide new financing in the amount of $160 million under the New Senior DIP Facility, in each instance in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, ~~and~~ New DIP Order and Commitment Letters.

(c)    The Inc. Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (other than the Acquired Inc. Facility Claims, which shall be converted into the New Junior DIP Facility) and fund the working capital requirements of the Inc. Debtors prior to the Effective Date.

2.    Effective Date Plan Transactions.  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)    Certain Transactions Concerning Reorganized Inc. Debtors

(1)    One Dot Six Corp. shall be reconstituted as a limited liability

32

company with the appropriate governmental authorities pursuant to applicable law.

(2)     Each of the Reorganized Inc. Debtors, other than Reorganized One Dot Six, shall contribute and/or distribute, as applicable, all such Entity's legal, equitable, and beneficial right, title, and interest in its Retained Causes of Action and the right to prosecute such Retained Causes of Action to Reorganized One Dot Six.

(3)     Reorganized TMI and Reorganized LightSquared Investors Holdings Inc. shall distribute to Reorganized LightSquared Inc. their respective ~~Equity Interests~~equity interests in LightSquared LP and LightSquared GP Inc., and Reorganized LightSquared Inc. shall contribute to Reorganized One Dot Six all such ~~Equity Interests~~equity interests; provided that, both Reorganized TMI and Reorganized LightSquared Investors Holdings Inc. shall each retain 1% of the ~~Equity Interest~~equity interest in LightSquared LP~~.~~; provided further that, if the effective date of a plan of reorganization has occurred with respect to LightSquared LP or LightSquared GP Inc., then the distributions made in accordance with such plans of reorganization on account of the respective equity interests, if any, shall be distributed and contributed in accordance with this section in place of the respective equity interests.

(4)     Reorganized Inc. Debtors shall cause TVCC Holding Company, LLC to transfer to Harbinger, as Holder of Prepetition Inc. Facility Subordinated Claims, in partial satisfaction of such Claims, 100% of the TVCC Common Shares.

(b)     Certain Transactions Concerning Reorganized One Dot Six

(1)     Reorganized One Dot Six, the One Dot Six Exit Lenders, the One Dot Six Exit Agent and the other relevant Entities shall enter into the One Dot Six Exit Facility Agreement. The One Dot Six Exit Lenders shall (A) fund the One Dot Six Term Loan Facility by converting the New Senior DIP Facility Claims into the One Dot Six Term Loan Facility on the Effective Date and (B) provide commitments for the One Dot Six Revolving Loan Facility, in each instance in accordance with the Plan, the Confirmation Order, and the One Dot Six Exit Facility Agreement. The proceeds of the One Dot Six Exit Facility shall be used to, among other things, refinance the New Senior DIP Facility Claims, fund the Cash payments contemplated by the Plan to be made on the Effective Date and provide post-Effective Date working capital. The One Dot Six Exit Facility shall be secured by first priority Liens on the One Dot Six Exit Facility Collateral.

(2)     Reorganized One Dot Six, Reorganized LightSquared Inc., the One Dot Six Second Lien Exit Agent and the other relevant Entities shall enter into the One Dot Six Second Lien Exit Facility Agreement.  Reorganized One Dot Six shall issue to Reorganized LightSquared Inc. the One Dot Six Second Lien Exit Facility in connection with the recapitalization of Reorganized One Dot Six described in the immediately succeeding subsection. The One Dot Six Second Lien Exit Facility shall be secured by second priority Liens on the One Dot Six Exit Facility Collateral, junior to the Liens Securing the One Dot Six Exit Facility pursuant to the an intercreditor agreement.

(3)     The Equity Interests in Reorganized One Dot Six shall be cancelled and in exchange Reorganized One Dot Six shall issue to Reorganized LightSquared Inc. (A) the One Dot Six Second Lien Exit Facility, (B) Reorganized One Dot Six Preferred Shares having an original stated principal value of $335 million and (C) 100% of the Reorganized One Dot Six Common Shares.

(c)     Certain Transactions Concerning Reorganized LightSquared Inc.

(1)     Reorganized LightSquared Inc. shall transfer to Harbinger, as a Holder of Prepetition Inc. Facility Claims, in partial satisfaction of such Claims, 100% of the Reorganized One Dot Four Common Shares.

(2)     Reorganized LightSquared Inc. shall transfer to Holders of New Junior DIP Facility Claims (other than SIG) and Holders of Prepetition Inc. Facility Subordinated Claims in satisfaction of such Claims, (A) Reorganized One Dot Six Preferred Shares having an original stated principal value of $175 million and (B) 70% of the Reorganized One Dot Six Common Shares.

(3)     Reorganized LightSquared Inc., SIG, the LightSquared Inc. Exit Facility Agent and the other relevant Entities shall enter into the LightSquared Inc. Exit Facility Agreement.  Reorganized LightSquared Inc. shall issue the LightSquared Inc. Exit Facility to SIG in satisfaction of its New Junior DIP Facility Claims.

(4)     Reorganized LightSquared Inc. shall transfer to the Other Existing Inc. Preferred Equity Interest Holders, in satisfaction for such Holders' Existing Inc. Preferred Equity Interests, 8.0% of the Reorganized One Dot Six Common Shares.

(5)     Reorganized LightSquared Inc. shall issue to SIG, in satisfaction of its Existing Series B Preferred Equity Interests, 100% of the Reorganized Inc. Common Shares.

34

  (d)  Certain Transactions Concerning Harbinger

    (1)  Prior to the transfer of Reorganized One Dot Six Preferred Shares and One Dot Six Common Shares to the Holders of New Junior DIP Facility Claims and the Holders of Prepetition Inc. Facility Subordinated Claims in IV.D.2(c)(2) above, but after the distribution of Reorganized One Dot Four Common Shares and TVCC Common Shares to the Holders of Prepetition Inc, Facility Subordinated Claims, Harbinger shall contribute its Prepetition Inc. Facility Subordinated Claims to Reorganized One Dot Four and TVCC.

As a result of the foregoing Plan Transactions, (A) Reorganized One Dot Six shall directly or indirectly wholly own LightSquared GP Inc. and 98% of the ~~Equity Interests~~equity interests in LightSquared LP; (B) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, LightSquared Investors Holdings Inc., SkyTerra Investors LLC, and TMI and, indirectly, 2% of the ~~Equity Interests~~equity interests in LightSquared LP; (C) Reorganized LightSquared Inc. will own 22% of the Reorganized One Dot Six Common Shares; (D) Other Existing Inc. Preferred Equity Interest Holders will own 8% of Reorganized One Dot Six Common Shares; (E) Reorganized One Dot Four and TVCC will own, collectively, 70% of Reorganized One Dot Six Common Shares; (f) SIG will own 100% of Reorganized LightSquared Inc. Common Shares; and (G) Harbinger will own 100% of Reorganized One Dot Four Common Shares and TVCC Common Shares; provided that, if the effective date of a plan of reorganization has occurred with respect to LightSquared LP or LightSquared GP Inc., then (i) Reorganized One Dot Six shall directly or indirectly wholly own the distributions, if any, on account of the equity interests in LightSquared GP Inc. and 98% of the equity interests in LightSquared LP, and (ii) LightSquared Inc. shall directly or indirectly wholly own the distributions, if any, on account of 2% of the equity interests in LightSquared LP, made in accordance with such plans of reorganization. Notwithstanding the foregoing, the retention of equity interests in LightSquared LP and LightSquared GP Inc. shall not occur to the extent not authorized by the Bankruptcy Court under the Confirmation Order, and the Plan Transactions shall be modified to remove such retention as and to the extent necessary to comply with any Bankruptcy Court order.

*E.*  *One Dot Six Exit Facility*

  On the Effective Date, Reorganized One Dot Six and the other relevant Entities shall enter into the One Dot Six Exit Facility Agreement and the One Dot Six Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  The One Dot Six Exit Facility shall permit Reorganized One Dot Six to incur the One Dot Six Revolving Loan Facility.  Reorganized One Dot Six shall use the One Dot Six Exit Facility for the purposes specified in the Plan, the One Dot Six Exit Facility Agreement, and the other governing documents.

  Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the One Dot Six Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized One Dot Six in connection therewith, including the payment of all fees, indemnities,

and expenses provided for therein, and (2) authorization for Reorganized One Dot Six to enter into and execute the One Dot Six Exit Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the One Dot Six Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized One Dot Six and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized One Dot Six pursuant to the One Dot Six Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the One Dot Six Exit Facility Agreement and the related documents.   Neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the One Dot Six Exit Facility.

F.     *One Dot Six Second Lien Exit Facility*

On the Effective Date, Reorganized One Dot Six and the other relevant Entities shall enter into the One Dot Six Second Lien Exit Facility Agreement and the One Dot Six Second Lien Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  Reorganized One Dot Six shall use the One Dot Six Second Lien Exit Facility for the purposes specified in the Plan, the One Dot Six Second Lien Exit Facility Agreement, and the other governing documents.

Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the One Dot Six Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized One Dot Six in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized One Dot Six to enter into and execute the One Dot Six Second Lien Exit Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the One Dot Six Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized One Dot Six and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized One Dot Six pursuant to the One Dot Six Second Lien Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the One Dot Six Second Lien Exit Facility Agreement and the related documents.  Neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the One Dot Six Second Lien Exit Facility.

G.     *LightSquared Inc. Exit Facility*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the LightSquared Inc. Exit Facility Agreement and the LightSquared Inc. Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  Reorganized LightSquared Inc. shall use the LightSquared Inc. Exit Facility for the purposes specified in the Plan, the LightSquared Inc. Exit Facility Agreement, and the other governing documents.

Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the LightSquared Inc. Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the LightSquared Inc. Exit Facility Agreement and such other documents as may be required or appropriate.    On the Effective Date, the LightSquared Inc. Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized LightSquared Inc. and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.    The obligations incurred by Reorganized LightSquared Inc. pursuant to the LightSquared Inc. Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the LightSquared Inc. Exit Facility Agreement and the related documents.    Neither Reorganized One Dot Six, Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the LightSquared Inc. Exit Facility.

H.    *Issuance of Reorganized Inc. Debtors Equity Interests; Reinstatement of Inc. Intercompany Claims and Inc. Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the Reorganized Inc. Debtors shall issue the Reorganized LightSquared Inc. Common Shares for distribution to the eligible Holders of Allowed Claims and Allowed Interests, and the other Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (2) all Inc. Intercompany Claims and Inc. Intercompany Interests shall be Reinstated for the benefit of the Holders thereof.    The issuance of the Reorganized LightSquared Inc. Common Shares, the Reorganized One Dot Six Interests, and the Reinstatement of the Inc. Intercompany Claims and Inc. Intercompany Interests to the extent provided for in the Plan are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.    All of the Reorganized Inc. Debtors Equity Interests issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid, and non-assessable.

The applicable Reorganized Inc. Debtors Corporate Governance Documents shall contain provisions necessary to (1) except as consented to by the initial holder thereof, prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendments of the applicable Reorganized Inc. Debtors Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of the Reorganized Inc. Debtors Equity Interests or directors of the Inc. Debtors or the Reorganized Inc. Debtors.

I.    *Section 1145 and Other Exemptions*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Inc. Debtors Equity Interests shall be exempt from, among other things, the

registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.

In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including the Reorganized Inc. Debtors Equity Interests shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized Inc. Debtors Corporate Governance Documents, and (4) applicable regulatory approval, if any.

J.      *Reorganized One Dot Six Interest Holders Agreement*

On the Effective Date, Reorganized One Dot Six and each holder of Reorganized One Dot Six Equity Interests shall enter into and deliver the Reorganized One Dot Six Interest Holders Agreement.  Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the Reorganized One Dot Six Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized One Dot Six and (2) authorization for Reorganized One Dot Six and each holder of Reorganized One Dot Six Equity Interests to enter into and execute the Reorganized One Dot Six Interest Holders Agreement and such other documents that may be required or appropriate.  On the Effective Date, the Reorganized One Dot Six Interest Holders Agreement, together with all other documents, instruments and agreements to be entered into, delivered or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each holder of Reorganized One Dot Six Equity Interests shall be bound thereby.

K.      *Listing of Reorganized Inc. Debtors Equity Interests; Reporting Obligations*

The Reorganized Inc. Debtors shall not be (1) obligated to list any of the Reorganized Inc. Debtors Equity Interests on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

L.      *Indemnification Provisions in Reorganized Inc. Debtors Corporate Governance Documents*

As of the Effective Date, the Reorganized Inc. Debtors Corporate Governance Documents of Reorganized One Dot Six shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Inc. Debtors' current and former directors, managers, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Inc. Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative,

liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and, other than Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC and their respective wholly owned subsidiaries after the Effective Date, none of the Reorganized Inc. Debtors shall amend or restate the applicable Reorganized Inc. Debtors Governance Documents before or after the Effective Date to terminate or materially adversely affect any of such Reorganized Inc. Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

M.      *Corporate Governance*

As shall be set in the Reorganized Inc. Debtors Corporate Governance Documents, the Reorganized Inc. Debtors Boards shall consist of a number of members, and appointed in a manner to be agreed upon by the Initial Investors or otherwise provided in the Reorganized Inc. Debtors Corporate Governance Documents.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the Initial Investors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized Inc. Debtors Boards or officer of the Reorganized Inc. Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized Inc. Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

N.      *Vesting of Assets in Reorganized Inc. Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate of the Inc. Debtors, and any property acquired by any of the Inc. Debtors pursuant to the Plan shall vest in each respective Reorganized Inc. Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility or the LightSquared Inc. Exit Facility and any rights of any of the parties under any One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement or the LightSquared Inc. Exit Facility Agreement, or any of the related documents, and (2) any rights of any of the parties under any of the Reorganized Inc. Debtors Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each Reorganized Inc. Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to Article IV.D.2(a)(2).

O.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Inc. Debtors under the New DIP Facility, DIP Inc. Facility, the Prepetition

Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Inc. Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Inc. Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Inc. Debtors, and the Reorganized Inc. Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Inc. Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Inc. Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Inc. Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Inc. Debtors.

P.      *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Inc. Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Inc. Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Inc. Debtors, the Reorganized Inc. Debtors, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement, LightSquared Inc. Exit Facility Agreement, the Reorganized Inc. Debtors Corporate Governance Documents, and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4)

selection of the members of the Reorganized Inc. Debtors Boards, managers and officers for the Reorganized Inc. Debtors; (5) the issuance and distribution of the Reorganized Inc. Debtors Equity Interests; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Inc. Debtors, and any company action required by the Inc. Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Inc. Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Inc. Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Inc. Debtors, including, as appropriate: (1) the One Dot Six Exit Facility Agreement; (2) the One Dot Six Second Lien Exit Facility Agreement; (3) the LightSquared Inc. Exit Facility Agreement; (4) the Reorganized Inc. Debtors Corporate Governance Documents; and (5) any and all other agreements, documents, securities, and instruments related to the foregoing. The authorizations and approvals contemplated by this Article IV.O shall be effective notwithstanding any requirements under non-bankruptcy law.

### R.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Inc. Debtors and the officers and members of the boards of directors thereof, are authorized and directed to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Inc. Debtors, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### S.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from an Inc. Debtor to a Reorganized Inc. Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan, or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Inc. Debtors or the Reorganized Inc. Debtors, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform

Commercial Code filing or recording fee, FCC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

T.    *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.D.2(a)(2) and Article VIII hereof, the Reorganized Inc. Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions, and the Reorganized Inc. Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Inc. Debtors, subject to Article IV.D.2(a)(2), may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Inc. Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Inc. Disclosure Statement to any Cause of Action against them as any indication that the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, shall not pursue any and all available Causes of Action against them.  The Inc. Debtors or the Reorganized Inc. Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, subject to Article IV.D.2(a)(2) and except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Inc. Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that an Inc. Debtor may hold against any Entity shall vest in the Reorganized Inc. Debtors, as applicable, subject to Article IV.D.2(a)(2).  The Reorganized Inc. Debtors, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Inc. Debtors, subject to Article IV.D.2(a)(2), shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  The Reorganized Inc. Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan or the release, transfer or settlement of any such Cause of Action by the LP Debtors, in each case, unless the Bankruptcy Court orders otherwise by a Final Order.

U.    *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Inc. Debtors shall be deemed to have assumed all of the Inc. Debtors' unexpired D&O Liability Insurance Policies

pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date; provided that, all D&O Liability Insurance Policies to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date would be a counterparty or obligor shall be assigned to Reorganized One Dot Six on the Effective Date and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall have any liability or obligations with respect to any D&O Liability Insurance Policies.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Inc. Debtors' foregoing assumption and, as applicable, assignment of each of the unexpired D&O Liability Insurance Policies.   Notwithstanding anything to the contrary contained in the Plan, but without limiting the proviso in the first sentence of this paragraph, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Inc. Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, but subject to the proviso in the first sentence of the first paragraph of this Article IV.U, after the Effective Date, none of the Reorganized Inc. Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Inc. Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.   As of the Effective Date, Reorganized One Dot Six anticipates purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

V.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, Reorganized One Dot Six shall assume and continue to perform the Inc. Debtors' obligations to:  (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Inc. Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Inc. Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, the Inc. Debtors' or Reorganized Inc. Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Inc. Debtors pursuant to any equity plan maintained by the Inc. Debtors or under any existing employment agreement of the Inc. Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance

43

with Article III.B.7 hereof; provided, further, the applicable Reorganized Inc. Debtors Boards shall maintain the discretion to execute and implement agreements or plans that grant employees of the applicable Reorganized Inc. Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other cash or performance-based awards as the Reorganized Inc. Debtors Boards deem appropriate.

~~Nothing~~Except as set forth in the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Inc. Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein (including Article IV.S hereof), each Executory Contract and Unexpired Lease shall be deemed automatically ~~rejected~~assumed pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:  (a) is listed on the Schedule of ~~Assumed~~Rejected Agreements in the Plan Supplement; (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date; (d) is an Intercompany Contract; or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of ~~Assumed~~Rejected Agreements in the Plan Supplement, shall be ~~rejected~~assumed on the Effective Date.

    2.    Assumption of Executory Contracts and Unexpired Leases

~~In connection with the Confirmation and Consummation of the Plan, the Initial Investors shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.~~ On the Effective Date, the Inc. Debtors

shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases not listed on the Schedule of ~~Assumed~~Rejected Agreements in the Plan Supplement; provided that, all assumed Executory Contracts and Unexpired Leases to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date would be a counterparty or obligor shall be assigned to Reorganized One Dot Six on the Effective Date and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall have any liability or obligations with respect to any such Executory Contracts and Unexpired Leases.

With respect to each such Executory Contract and Unexpired Lease not listed on the Schedule of ~~Assumed~~Rejected Agreements in the Plan Supplement, the Initial Investors (upon consultation with the Inc. Debtors) shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Inc. Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the Reorganized Inc. Debtors no later than thirty (30) days after the Effective Date. All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 hereof and all payments thereon, if any, shall be solely paid by, and the obligation of, Reorganized One Dot Six. After the Effective Date, neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries shall have any obligations with respect to the Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases.

C.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Initial Investors or Reorganized Inc. Debtors, as applicable, (1) by payment of the Cure Costs in Cash

on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. Cure Costs to be paid in accordance with the Plan shall be solely paid by, and the obligation of, Reorganized One Dot Six and, after the Effective Date, neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries shall have any obligations with respect to the Cure Costs.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005, counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the Reorganized Inc. Debtors' financial wherewithal must be Filed, served, and actually received by the appropriate notice parties no later than August 8, 2014, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline"). Any counterparty to an Executory Contract or Unexpired Lease that has failed to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding the ability of the Reorganized Inc. Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, the payment of any Cure Costs shall be made by Reorganized One Dot Six following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, the Reorganized Inc. Debtors may settle any dispute without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, notwithstanding anything to the contrary herein, prior to the Effective Date or such other date as determined by the Bankruptcy Court and prior to the entry of a Final Order resolving any dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the Initial Investors and the Reorganized Inc. Debtors reserve the right, to reject any Executory Contract or Unexpired Lease which is subject to dispute.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired

Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.      *Pre-existing Obligations to Inc. Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Inc. Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Inc. Debtors and Reorganized Inc. Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Inc. Debtors or the Reorganized Inc. Debtors, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

The obligations arising under any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Inc. Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Inc. Debtor and not rejected prior to the Effective Date, may be performed by the applicable Reorganized Inc. Debtor in the ordinary course of business; <u>provided</u> that, any such contracts and leases described in the foregoing clauses (1) through (3) to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date are a counterparty or obligor shall be assigned to Reorganized One Dot Six, and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall retain any obligations or liabilities thereunder.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Inc. Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Initial Investors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission

that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Inc. Debtors, or their respective Affiliates, have any liability thereunder. The Initial Investors reserve the right to alter, amend, modify, or supplement the Schedule of ~~Assumed~~Rejected Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order.

### H.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Inc. Debtors, the DIP Inc. Agent, the New DIP Agent, the Prepetition Inc. Agent, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests without the consent of the Initial Investors and the Inc. Debtors. The Initial Investors and the Reorganized Inc. Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Initial Investors and the Reorganized Inc. Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### B.    Timing and Calculation of Amounts To Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim is not Allowed on the Effective Date, on the date that such a Claim is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, (i) Allowed Administrative Claims with respect to liabilities incurred by the Inc. Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Inc. Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) the Allowed DIP Inc. Facility Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (other than the Acquired Inc. Facility Claims) shall be repaid in full on the New DIP Closing Date with the proceeds of the New DIP Facility.

Upon the Consummation of the Plan (subject to the terms hereof, including Article IV), the Reorganized Inc. Debtors Equity Interests shall be deemed to be issued to (and the Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective

Date, the eligible Holders of Allowed Claims, and the other eligible Entities hereunder, as applicable, without the need for further action by the Initial Investors, any Inc. Debtor, Disbursing Agent, Reorganized Inc. Debtor, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable.  Except as otherwise provided herein, the eligible Holders of Allowed Claims and Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

C.      *Disbursing Agent*

All Plan Distributions shall be made by the Reorganized Inc. Debtors as Disbursing Agent or such other Entity designated by the Reorganized Inc. Debtors or the Initial Investors as a Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Reorganized Inc. Debtors and such Disbursing Agent.

Plan Distributions of Plan Consideration under the Plan shall be made by the Reorganized Inc. Debtors to the Disbursing Agent for the benefit of Holders of Allowed Claims and Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the Reorganized Inc. Debtors and the Initial Investors, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.      <u>Expenses Incurred on or After Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by Reorganized One Dot Six.

E.      *Plan Distributions on Account of Claims Allowed After Effective Date*

    1.      <u>Payments and Plan Distributions on Disputed Claims</u>

Plan Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

    2.      <u>Special Rules for Plan Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

F.      *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

    1.      <u>Delivery of Plan Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Equity Interests at the address for each such Holder as indicated on the Reorganized Inc. Debtors' records as of the date of any such Plan Distribution; <u>provided</u>, however, the manner of such Plan Distributions shall be determined at the discretion of the Reorganized Inc. Debtors; <u>provided</u>, <u>further</u>, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Article VI.F.4 and VI.F.5 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

    2.      <u>Delivery of Plan Distributions to Holders of Allowed DIP Inc. Facility Claims</u>

The Plan Distributions provided for Allowed DIP Inc. Facility Claims pursuant to Article II.D hereof shall be made to the DIP Inc. Agent on the New DIP Closing Date.

    3.      <u>Delivery of Plan Distributions to Holders of Allowed New DIP Facility Claims</u>

The Plan Distributions provided for Allowed New DIP Facility Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the Reorganized Inc. Debtors and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

4.      Delivery of Plan Distributions to Holders of
        Allowed Prepetition Inc. Facility Claims

The Plan Distribution provided by Article III.B.3 and Article III.B.4. hereof shall be made to the Prepetition Inc. Agent.   To the extent possible, the Reorganized Inc. Debtors and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the Prepetition Inc. Lenders at the direction of the Prepetition Inc. Agent.

5.      Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down.   The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of Reorganized Inc. Debtors Equity Interests and such fractions shall be deemed to be zero.

6.      Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.   After such date, all unclaimed property or interests in property shall revert to the Reorganized Inc. Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

G.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Inc. Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements.   Notwithstanding any provision in the Plan to the contrary, the Reorganized Inc. Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.   The Reorganized Inc. Debtors reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent

that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      Setoffs

Except with respect to any distributions on account of (1) DIP Inc. Facility Claims, and (2) Prepetition Inc. Facility Claims, or as otherwise expressly provided for in the Plan, each Inc. Debtor or Reorganized Inc. Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim (before any Plan Distribution is made on account of such Allowed Claim) any claims, rights, and Causes of Action of any nature that such Inc. Debtor or Reorganized Inc. Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Inc. Debtor or Reorganized Inc. Debtor, as applicable, of any such claims, rights, or Causes of Action that such Reorganized Inc. Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Inc. Debtor or Reorganized Inc. Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.      Recoupment

In no event shall any Holder of Claims against the Inc. Debtors be entitled to recoup any such Claim against any claim, right, or Cause of Action of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Inc. Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      Claims Paid or Payable by Third Parties

1.      Claims Paid by Third Parties

The Inc. Debtors or the Reorganized Inc. Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not an Inc. Debtor or a Reorganized Inc. Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not an Inc. Debtor or a Reorganized Inc. Debtor on account of such Claim, such Holder shall, within two (2) weeks of

receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Inc. Debtor, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized Inc. Debtor annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Inc. Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Inc. Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Inc. Debtors, the Reorganized Inc. Debtors, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
**AND DISPUTED CLAIMS**

A.    *Allowance of Claims*

After the Effective Date, the Reorganized Inc. Debtors shall have and retain any and all rights and defenses that the Inc. Debtors had with respect to any Claim immediately prior to the Effective Date.  Except as expressly provided herein, no Claim shall become Allowed unless and until such Claim is deemed Allowed under Article I.A.5 hereof or the Bankruptcy Code.

B.    *Claims Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Inc. Debtors shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims, (2) settle or compromise any Disputed Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The Reorganized Inc. Debtors shall maintain the Disputed Claims Reserve on account of the Disputed Claims or, at its discretion, shall reserve sufficient availability under the One Dot Six Revolving Loan Facility to satisfy the Disputed Claims.  The Disputed Claims Reserve or the reserved amount of the One Dot Six Revolving Loan Facility may be adjusted from time to time, and funds previously held in the Disputed Claims Reserve (if any) on account of Disputed Claims that have subsequently become Disallowed Claims shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.       *Estimation of Claims*

Before the Effective Date, the Initial Investors, and after the Effective Date, the Reorganized Inc. Debtors, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim pursuant to applicable law and (2) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim, any group of Claims, or any Class of Claims, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim, (2) a maximum limitation on such Disputed Claim, or (3) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated, in each case for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, the Initial Investors or Reorganized Inc. Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim and any ultimate Plan Distributions on such Claim.  Notwithstanding any provision in the Plan to the contrary, a Claim that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

The Initial Investors will seek entry of the Prepetition LP Facility Guarantee Claim Order from the Bankruptcy Court estimating the Prepetition LP Facility Guarantee Claim in the amount of zero dollars and/or expunging the Prepetition LP Facility Guarantee Claim and any Liens securing any such Claims on the assets of the Inc. Debtors.

All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as applicable, by the Reorganized Inc. Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Inc. Debtors, in both cases without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.   Additionally, any Claim that is duplicative or redundant with another Claim against the same Inc. Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as applicable, by the Reorganized Inc. Debtors without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Initial Investors or Reorganized Inc. Debtors, (3) provided for in a postpetition agreement in writing between the Initial Investors or Reorganized Inc. Debtors and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      *Deadline To File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Plan Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Inc. Debtors by that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS,

UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS
BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

*H.    Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy
Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy
Court, the Initial Investors, or the Reorganized Inc. Debtors, and any such new or amended Claim
Filed shall be deemed disallowed in full and expunged without any further notice to, or action,
order, or approval of, the Bankruptcy Court or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A.    Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically
provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan
shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of
Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest
accrued on Claims or Equity Interests from and after the Petition Date, whether known or
unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in,
the Inc. Debtors or any of their assets or properties, regardless of whether any property shall have
been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests,
including demands, liabilities, and Causes of Action that arose before the Effective Date, any
liability to the extent such Claims or Equity Interests relate to services performed by employees
of the Inc. Debtors prior to the Effective Date and that arise from a termination of employment or
a termination of any employee or retiree benefit program, regardless of whether such termination
occurred prior to or after the Effective Date, any contingent or non-contingent liability on
account of representations or warranties issued on or before the Effective Date, and all debts of
the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case
whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or
Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a
Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to
section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has
accepted the Plan.  Any default by the Inc. Debtors or their Affiliates with respect to any Claim
or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11
Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial
determination of the discharge of all Claims and Equity Interests subject to the occurrence of the
Effective Date.

*B.    Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and the respective
Plan Distributions and treatments under the Plan shall give effect to the relative priority and
rights of the Claims and Equity Interests in each Class in connection with any contractual, legal,
and equitable subordination rights relating thereto, whether arising under general principles of

equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Initial Investors or the Reorganized Inc. Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Inc. Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the Reorganized Inc. Debtors may compromise and settle Claims against, or Equity Interests in, the Inc. Debtors, and Causes of Action against other Entities.

D.    *Releases ~~By~~by Inc. Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Inc. Debtors and the implementation of the restructuring transactions contemplated by the Plan, including those contemplated by the Plan Support Agreement, on and after the Effective Date, the Released Parties are deemed released and discharged by the Inc. Debtors, the Reorganized Inc. Debtors, and the Estates of the Inc. Debtors from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including, but not limited to, any derivative claims asserted on behalf of the Inc. Debtors or the Estates of the Inc. Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Inc. Debtors, the Reorganized Inc. Debtors, the Estates of the Inc. Debtors, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Inc. Debtors, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Inc. Debtors, the DIP Inc. Facility, the New DIP Facility, the**

One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility, the LightSquared Inc. Exit Facility, or the Reorganized One Dot Six Interests, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Inc. Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Inc. Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes **(1)** willful misconduct (including fraud) or gross negligence **and/or (2) a breach of any duty by any director of the Inc. Debtors serving as of the filing date of the Plan relating to a conflict of interest between or among the Debtors' Estates**.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New DIP Credit Agreement, One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement, LightSquared Inc. Exit Facility Agreement, Reorganized Inc. Debtors Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, **to the fullest extent permitted under applicable law,** no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, **the Plan Support Agreement,** the Inc. Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Inc. Debtors, the approval of the Inc. Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence ~~and/or (2~~**, (2) a breach of any duty by any director of the Inc. Debtors serving as of the filing date of the Plan relating to a conflict of interest between or among the Debtors' Estates and/or (3)** the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been discharged pursuant to Article VIII.A hereof, released pursuant to Article VIII.AD hereof, or are subject to exculpation pursuant to Article VIII.DE hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Inc. Debtors or the Reorganized Inc. Debtors:    (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Inc. Debtors in a nominal capacity to recover insurance proceeds so long as the Inc. Debtors or Reorganized Inc. Debtors, as applicable, and any such Entity agree in writing that such Entity shall:  (1) waive all Claims against the Inc. Debtors, the Reorganized Inc. Debtors, and the Inc. Debtors' Estates related to such action; and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

G.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates of the Inc. Debtors shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates of the Inc. Debtors shall revert to the Reorganized Inc. Debtors and their successors and assigns.  The Reorganized Inc. Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

Pursuant to the Prepetition LP Facility Guarantee Claim Order, all mortgages, deeds of

trust, Liens, pledges, or other security interests against any property of the Estates of the Inc. Debtors granted or purported to be granted or secure the Prepetition LP Facility Claims, including the Prepetition LP Facility Guarantee Claims, shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates of the Inc. Debtors shall revert to the Reorganized Inc. Debtors and their successors and assigns.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.      *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      ~~The Disclosure Statement Order, in form and substance satisfactory to the Initial Investors, shall have been entered.~~

1.      2.  The Confirmation Order shall have been entered in form and substance satisfactory to ~~the Initial Investors~~each of the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

2.      3.  The New DIP Order, in form and substance reasonably satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall have been entered contemporaneously with the Confirmation Order; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

3.      4.  The Inc. Debtors shall have received binding commitments with respect to the New Senior DIP Facility on terms and conditions reasonably satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and such commitments shall be in full force and effect; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

4.      5.  All conditions to the consummation of the New DIP Facility to be satisfied or

waived on or before the Confirmation Date shall have been satisfied or waived in accordance with the terms of the New DIP Credit Agreement, and the New DIP Credit Agreement shall be in full force and effect (but for the non-satisfaction or waiver of the condition that the New DIP Order shall be a Final Order).

5. The Plan Support Agreement shall be in full force and effect.

6. The Inc. Facility Claim Purchase Agreement shall be in full force and effect.

7. ~~6.~~ The Bankruptcy Court shall have entered the Prepetition LP Facility Guarantee Claim Order.

8. ~~7.~~ Since August ~~11, 2014~~ 29, 2014, the DIP Inc. Credit Agreement, the DIP Inc. Order or any other agreement in respect of the DIP Inc. Facility shall not have been amended, supplemented or otherwise modified in a manner to increase or include additional fees, interest, original interest discount, or other economic consideration that is more burdensome to the Inc. Debtors without the prior approval of the Commitment Parties, except (1) to the extent such economic consideration (including, for the avoidance of doubt, for the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof in accordance with any budget proposed by the Debtors and accepted by the DIP Inc. Lenders) is contemplated by the DIP Inc. Credit Agreement and the DIP Inc. Order ~~shall not have been amended or modified without the prior consent of each of the Initial Investors.~~ in each case as in effect on the date hereof and (2) a commitment fee on the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof at a rate no higher than the rate of the Up-Front Fee (as defined in and under the DIP Inc. Credit Agreement as in effect on the date hereof), which fee shall be waived if the obligations in respect of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims are paid in full and/or purchased in Cash on or before the Outside Date.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, in a form and in substance satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall have become a Final Order; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

2.    The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Initial Investors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)     the One Dot Six Exit Facility Agreement and any related documents, in form and substance acceptable to the Initial Investors, the One Dot Six Exit Agent, and One Dot Six Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the One Dot Six Exit Facility shall have occurred;

(b)     the One Dot Six Second Lien Exit Facility Agreement and any related documents, in form and substance acceptable to the Initial Investors, and the One Dot Six Second Lien Exit Agent, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the One Dot Six Second Lien Exit Facility shall have occurred;

(c)     the LightSquared Inc. Exit Facility Agreement and any related documents, in form and substance acceptable to SIG, and the LightSquared Inc. Exit Agent shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the LightSquared Inc. Exit Facility shall have occurred;

(d)     the Reorganized Inc. Debtors Corporate Governance Documents, in forms and substance acceptable to the Initial Investors, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(e)     the Inc. Debtors shall have sufficient availability in the One Dot Six Revolving Loan Facility to constitute the Disputed Claims Reserve.

3.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Initial Investors, without prejudice to the Reorganized Inc. Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the Reorganized Inc. Debtors and the Initial Investors.

4.      All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

5.    All authorizations, consents, and regulatory approvals required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from the FCC or any other regulatory agency including, without limitation, any approvals required in connection with the transfer, change of control, or assignment of FCC licenses (each of which license is set forth on a schedule to be included as a Plan Supplement), and no appeals of such approvals remain outstanding.

*C.    Waiver of Conditions*

The conditions to the Confirmation Date or the Effective Date of the Plan set forth in Article IX.A may be waived by the Initial Investors and, to the extent such conditions relate to those issues addressed in Section 5.2(g) of the Plan Support Agreement and the Plan Support Agreement remains valid and enforceable, each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN**

*A.    Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Initial Investors reserve the right to modify the Plan with the consent of each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and seek Confirmation consistent with the Bankruptcy Code; provided, however, that any amendment or modification made without the consent of MAST Capital Management, LLC shall be removed to the extent the Bankruptcy Court determines or otherwise indicates that such modification or amendment shall form a basis for the Bankruptcy Court to deny confirmation of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Initial Investors expressly reserve their respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with the consent of each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Inc. Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A.  The rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims set forth in this Section X.A. shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, these rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

B.     *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan*

The Initial Investors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Initial Investors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Inc. Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of any Inc. Debtor or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Inc. Debtor or any other Entity in any respect.

D.     *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the One Dot Six Exit Facility, the LightSquared Inc. Exit Facility, the Plan, or otherwise, the allowance of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims as set forth in Articles II.D and III.B.3, and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.     Decide and resolve all matters relating to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which an Inc. Debtor is party or with respect to which an Inc. Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized Inc. Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving an Inc. Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Inc. Disclosure Statement;

9.      To hear and determine any matters relating to, arising out of, or in connection with the implementation of the One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility, LightSquared Inc. Exit Facility, or any ancillary or related agreements thereto;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Hear and determine all disputes involving the existence, nature, or scope of the Inc. Debtors' discharge, including any dispute relating to any liability arising out of the

termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J hereof;

15.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     Determine any other matters that may arise in connection with or relate to the Plan, the Inc. Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Inc. Disclosure Statement;

17.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.     Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Enforce all orders previously entered by the Bankruptcy Court; and

22.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.     *Immediate Binding Effect*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Inc. Debtors, the Reorganized Inc. Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Inc. Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Initial Investors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Initial Investors or the Reorganized Inc. Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Initial Investors or any Inc. Debtor with respect to the Plan or the Inc. Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Inc. Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the Reorganized Inc. Debtors, shall be served on:

LightSquared Inc.                        Milbank, Tweed, Hadley & McCloy LLP
Attn: General Counsel                    Matthew S. Barr
10802 Parkridge Boulevard                Steven Z. Szanzer
Reston, VA 20191                         Karen Gartenberg
                                         One Chase Manhattan Plaza
                                         New York, NY 10005

the special committee of the Debtors' board of directors, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Harbinger or its affiliates, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
Matthew B. Stein
1633 Broadway
New York, NY 10019

SIG, shall be served on:

Simpson Thacher & Bartlett LLP
Sandeep Qusba
Nicholas Baker
425 Lexington Avenue
New York, NY 10017

the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall be served on:

Akin Gump Strauss Hauer & Feld LLP
Michael S. Stamer
Philip C. Dublin
Meredith A. Lahaie
One Bryant Park
New York, New York 10036

After the Effective Date, the Reorganized Inc. Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Inc. Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the

Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Initial Investors' or the Reorganized Inc. Debtors', as applicable, consent, and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Initial Investors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Inc. Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.      *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Inc. Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Inc. Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Inc. Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

Dated: ~~August~~September 11, 2014
        New York, New York

                        By:   /s/ *David M. Friedman*
                        David M. Friedman
                        Adam L. Shiff
                        Matthew B. Stein
                        KASOWITZ, BENSON, TORRES
                         & FRIEDMAN LLP
                        1633 Broadway
                        New York, New York 10019
                        Telephone: (212) 506-1700
                        Facsimile: (212) 506-1800

                        *Attorneys for Harbinger Capital Partners LLC*

## EXHIBIT A

## PLAN SUPPORT AGREEMENT

Document comparison by Workshare Compare on Thursday, September 11, 2014 1:12:44 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://NYC/2960254/7 |
| Description | NYC-#2960254-v7-L2_-_Inc_Only_Plan |
| Document 2 ID | PowerDocs://NYC/3057318/6 |
| Description | NYC-#3057318-v6-L2_-_First_Amended_Inc._Only_Plan |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 247 |
| Deletions | 296 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 549 |