**EXHIBIT 3**

**EXECUTION VERSION**

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of September 8, 2014, by and among (i) Harbinger Capital Partners LLC on behalf of itself and each of its and its Affiliates' (as defined below) managed funds and/or accounts that hold Claims[1] and/or Equity Interests ("<u>Harbinger</u>"), (ii) SIG Holdings, Inc. ("<u>SIG</u>"), as holder of Claims and/or Equity Interests, (iii) U.S. Bank National Association, in its capacity as DIP Inc. Agent and Prepetition Inc. Agent (the "<u>Inc. Administrative Agent</u>"), (iv) J.P. Morgan Securities LLC, with respect to only its Credit Trading Group, and Chase Lincoln First Commercial Corporation, with respect to only its Credit Trading Group (together, the "<u>JPM Commitment Parties</u>"), (v) Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund L.P. (collectively, the "<u>Harbinger Commitment Parties</u>" and, together with the JPM Commitment Parties, the "<u>Commitment Parties</u>") and (vi) MAST Capital Management, LLC, on behalf of itself and its managed funds and/or accounts that hold Claims and/or Equity Interests ("<u>MAST</u>", together with Harbinger, SIG, the Commitment Parties and the Inc. Administrative Agent, the "<u>Plan Support Parties</u>").  For the avoidance of doubt, for all purposes hereunder the term "Plan Support Party" or "Plan Support Parties" as used in reference to the JPM Commitment Parties shall refer only to the Credit Trading Group of each of J.P. Morgan Securities LLC and Chase Lincoln First Commercial Corporation, and not to any other business units or entities of JPMorgan Chase & Co. or any of its affiliates.

## RECITALS

**WHEREAS**, on May 14, 2012, LightSquared Inc. and certain of its direct and indirect subsidiaries (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

**WHEREAS**, the Debtors are operating their businesses as debtors in possession in jointly administered cases under chapter 11 of the Bankruptcy Code that are styled as In re LightSquared Inc., et. al., Case No. 12-12080 (SCC) (the "<u>Chapter 11 Cases</u>");

**WHEREAS**, on August 30, 2013, MAST and the Inc. Administrative Agent filed the *Chapter 11 Plan for One Dot Six Corp., Proposed by U.S. Bank National Association and MAST Capital Management, LLC* (as amended, supplemented or otherwise modified from time to time, the "<u>MAST Plan</u>");

**WHEREAS**, on August 7, 2014, the Debtors filed the *Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed By Debtors and Ad Hoc Secured Group of LightSquared LP Lenders* (as amended, supplemented or otherwise modified from time to time, the "<u>Fourth Amended Plan</u>");

**WHEREAS**, to the extent MAST and the Inc. Administrative Agent vote to reject the Fourth Amended Plan, the Fourth Amended Plan, pursuant to its terms, will be withdrawn as to

---

[1]  Capitalized terms not defined herein shall have the same meaning as set forth in the Plan referenced in the Recitals below.

the Debtors (as defined below) identified therein and shall provide for the reorganization of the remaining Debtors;

**WHEREAS**, on August 11, 2014, Harbinger filed *Harbinger Capital Partners LLC's Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "Initial Inc. Plan") which provides for the reorganization of LightSquared Inc., One Dot Six Corp., LightSquared Investors Holdings Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, Sky Terra Investors LLC and TMI Communications Delaware, Limited Partnership (collectively, the "Inc. Debtors");

**WHEREAS**, on October 10, 2013, the Bankruptcy Court entered an order approving the specific disclosure statement in respect of the MAST Plan and authorizing the solicitation of such plan and approving the related solicitation materials (the "Initial Solicitation Order");

**WHEREAS**, on August 20, 2014, the Bankruptcy Court entered an order conditionally approving separate disclosure statements for each of the Fourth Amended Plan and the Initial Inc. Plan and authorizing the solicitation of each those plans of reorganization and approving the related solicitation materials (the "New Solicitation Order" and, together with the Initial Solicitation Order, the "Solicitation Orders");

**WHEREAS**, Harbinger has agreed to file *Harbinger Capital Partners LLC's Modified Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "Plan") for the Inc. Debtors attached hereto as **Exhibit A** within three (3) Business Days of the effectiveness of this Agreement;

**WHEREAS** in connection with the Plan, the Commitment Parties have agreed, severally and not jointly and severally, to fund the New Senior DIP Facility and the New Junior DIP Facility pursuant to the terms and conditions of the New DIP Commitment Letters (as defined below);

**WHEREAS**, the Plan Support Parties have agreed to support the Plan, subject to the terms and conditions of this Agreement; and

**WHEREAS**, in expressing their support for this Agreement and the Plan (subject to the terms and conditions of this Agreement), the Plan Support Parties do not desire and do not intend in any way to derogate, diminish or violate, and intend to fully comply with, the solicitation requirements of applicable securities and bankruptcy law, including the solicitation procedures set forth in the Solicitation Orders.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the Parties agree as follows:

509600-0311-16296835

**Section 1.**    **Commitments of the Plan Support Parties Under this Agreement.**

**1.1.    Plan Support Parties' Commitments.**

So long as this Agreement shall not have been terminated in accordance with Section 5 hereof, and subject in all respects to Section 1.2 hereof, each Plan Support Party, severally and not jointly:

(a)    Shall, in the case of Harbinger and SIG, use commercially reasonable efforts to effectuate and consummate the transactions contemplated by this Agreement and the Plan;

(b)    Shall, to the extent entitled to vote on the Plan, timely vote all Claims and/or Equity Interests (if any) held on the voting record date by such Plan Support Party to accept the Plan and shall not change or withdraw (or cause to be changed or withdrawn) such vote;

(c)    Shall, to the extent entitled to vote on the Fourth Amended Plan, vote, no later than three (3) Business Days after the filing of the Plan, all Claims and/or Equity Interests (if any) held on the voting record date by such Plan Support Party to reject the Fourth Amended Plan and shall not change or withdraw (or cause to be changed or withdrawn) such vote;

(d)    Shall not, and shall not cause any other entity to, directly or indirectly, vote in favor of or support any chapter 11 plan (including, without limitation, the Fourth Amended Plan), sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Inc. Debtors other than (i) the Plan and (ii) in the case of MAST and the Inc. Administrative Agent, the MAST Plan;

(e)    Shall not, and shall not cause any other entity to, directly or indirectly, object to or otherwise commence any proceeding or prosecute, join in, or otherwise support any action to oppose, whether in the Bankruptcy Court, any other foreign or domestic court or with any Governmental Unit, any of the terms of the Plan, or the Inc. Disclosure Statement or the effectuation and consummation of the transactions contemplated by this Agreement and the Plan; provided, that nothing contained herein shall limit the ability of (a) any Plan Support Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases, so long as such consultation, appearance or objection is not inconsistent with (i) such Plan Support Party's obligations under this Agreement or (ii) the terms of the Plan and the other transactions contemplated by this Agreement and the Plan; or (b) MAST or the Inc. Administrative Agent to take all actions necessary to obtain confirmation of the MAST Plan, subject to the limitations contained herein;

(f)    Shall not, and shall not cause any other entity to, directly or indirectly, commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to entry of the New DIP Order, the Prepetition LP Facility Guarantee Claim Order or the Confirmation Order (collectively, the "Plan Related Orders");

3

(g)     Shall not, and shall not cause any other entity to, directly or indirectly, or encourage any other entity to, object to, delay, impede, appeal, or take any other action, directly or indirectly, that would interfere with, delay or impede entry of the Plan Related Orders;

(h)     (i) Shall modify all pending subpoenas or discovery requests served on any other Plan Support Party or its Affiliates to limit them to (x) matters relating to the MAST Plan, including objections thereto, and (y) copies of any production made to any other party in interest in the Chapter 11 Cases and (ii) shall not serve on any other Plan Support Party or its Affiliates any further subpoenas, discovery requests or deposition notices except relating to the MAST Plan, including any objections thereto;

(i)     Shall not, and shall not cause any other entity to, directly or indirectly, object to, delay, impede, appeal, or take any other action, directly or indirectly, that would interfere with, delay or impede the satisfaction of the conditions to the Confirmation Date contained in the Plan or the conditions precedent to the consummation of the New DIP Credit Agreement as set forth therein;

(j)     Shall not amend, modify or alter (x) the Plan with respect to the MAST Terms (as defined in Section 5.2(g)(i)) without MAST's prior written consent and (y) its respective New DIP Commitment Letter with respect to the MAST Commitment Terms (as defined in Section 5.2(g)(ii)) without MAST's prior written consent;

(k)     Shall, with respect to Harbinger, not withdraw the Plan;

(l)     Shall, to the extent such Plan Support Party is a holder of a DIP Inc. Facility Claim or a Prepetition Inc. Non-Subordinated Claim, amend (as applicable) the DIP Inc. Credit Agreement and the DIP Inc. Order no later than the date of entry of the order confirming the Plan to extend the maturity date of the DIP Inc. Facility and the use of cash collateral to no earlier than the Outside Date (as defined in Section 5.2(b));

(m)     Shall, in the case of SIG and MAST, execute on the New DIP Closing Date the Inc. Claim Purchase Agreement in substantially the form attached hereto as **Exhibit D** and perform all obligations thereunder pursuant to the terms and conditions thereof; and

(n)     Shall, with respect to Harbinger and SIG, remove from the Plan any modifications or amendments made after the filing of the Plan contemplated hereby, to the extent the Bankruptcy Court has indicated or held at any time that such amendment or modification, while made in accordance with the terms hereof but without the consent of MAST, shall form a basis for the Bankruptcy Court to deny confirmation of the Plan.

The Plan Support Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate MAST, the Inc. Administrative Agent to or any of their respective Affiliates to, provide any new financing or credit support to the Debtors.

4

**1.2.    The MAST Plan.**

MAST and the Inc. Administrative Agent hereby agree that, at the joint confirmation hearing scheduled in respect of each of the MAST Plan, the Fourth Amended Plan and the Plan (the "Confirmation Hearing"), they shall not prosecute the MAST Plan until after the Plan has been prosecuted.  MAST and the Inc. Administrative Agent further agree that, (i) in the event the Bankruptcy Court indicates that it will confirm the Plan upon the conclusion of the Confirmation Hearing, MAST and the Inc. Administrative Agent shall request that the Bankruptcy Court adjourn its consideration of the MAST Plan to the Outside Date and (ii) in the event the Bankruptcy Court confirms the Plan, MAST and the Inc. Administrative Agent further agree to withdraw the MAST Plan within one (1) Business Day of the incurrence of the New Inc. DIP Facility and the satisfaction in full, in cash of all Claims held by MAST and the Inc. Administrative Agent in accordance with the terms of the Plan.  Each of the Plan Support Parties (other than MAST and the Inc. Administrative Agent) reserves all of its rights to object to and contest the confirmation of the MAST Plan, and nothing herein shall be deemed to limit any such rights.

**1.3.    Transfer of Claims and Interests.**

Until the termination of this Agreement in accordance with Section 5 hereof, no Plan Support Party shall (a) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of its Claims and/or Equity Interests, in whole or in part, (b) grant any proxies, deposit any of its Claims and/or Equity Interests into a voting trust, or enter into a voting agreement with respect to any such claim or interest, or (c) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences or other privileges of ownership of its Claims and/or Equity Interests, whether any such transaction described in clause (a), (b) or (c) above is to be settled by delivery of Claims and/or Equity Interests, in cash or otherwise (collectively, the actions described in clauses (a), (b) and (c), a "Transfer"), unless such Transfer is to a Plan Support Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the other Plan Support Parties transferee acknowledgments substantially in the form attached hereto as **Exhibit E** (the "Joinder Agreement"); provided that, unless otherwise agreed to by MAST, any Transfer by Harbinger or SIG shall vest such transferee with only the obligations under this Agreement and not any rights enuring to the benefit of Harbinger or SIG hereunder, which rights shall at all times be retained by Harbinger or SIG (as applicable).  Copies of all Joinder Agreements shall be served on all Plan Support Parties in accordance with Section 7.13 hereof.   Any transferee shall be deemed to make all of the commitments, representations and warranties of a Plan Support Party set forth in Sections 1 and 2 of this Agreement. Any Transfer made in violation of this Section 1.3 shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Plan Support Parties hereunder (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

Without limiting any Plan Support Party's rights to Transfer set forth in the immediately foregoing paragraph, any holder of Claims and/or Equity Interests may elect to become a Plan Support Party hereunder (a "Plan Supporter") provided that such Plan Supporter first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the other Plan

5

Support Parties a Joinder Agreement, and is capable of fulfilling its obligations under this Agreement, as reasonably determined by the other Plan Support Parties. Copies of all Joinder Agreements shall be served on all Plan Support Parties in accordance with Section 7.13 hereof. Following execution of its Joinder Agreement, the Plan Supporter shall be deemed to make all of the commitments, representations and warranties of a Plan Support Party set forth in Sections 1 and 2 of this Agreement.

**1.4.     Further Acquisition of Claims and Interests.**

This Agreement shall in no way be construed to preclude any Plan Support Party or any of its Affiliates (as defined in section 101(2) of the Bankruptcy Code, "<u>Affiliates</u>") from acquiring additional Claims and/or Equity Interests following its execution of this Agreement. Any such Claims and/or Equity Interests acquired by a Plan Support Party shall automatically and immediately upon acquisition (regardless of when notice is provided) be deemed to be subject to the terms of this Agreement, and such acquiring Plan Support Party shall promptly (and, in no event, later than two (2) business days) inform the other Plan Support Parties of such acquisition.

**Section 2.     <u>Representations and Warranties.</u>**

Each of the Plan Support Parties represents and warrants severally, and not jointly and severally, to the other Plan Support Parties the following as of the date hereof:

(a)    *Authority*. (i) Such Plan Support Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership or other power and authority to execute, deliver and perform its obligations under this Agreement (including, as applicable, full power to vote with respect to accepting the Plan), and to consummate the transactions contemplated herein; and (ii) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate, partnership or otherwise) and no other proceedings are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    *Validity*. This Agreement has been duly executed and delivered and constitutes the legal, valid and binding agreement of such Plan Support Party, enforceable against it in accordance with its terms except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(c)    *No Conflict*. The execution, delivery and performance by such Plan Support Party (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

509600-0311-16296835

(d)     *Authorization of Governmental Authorities*.    No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by such Plan Support Party of this Agreement.

(e)     *No Reliance*.  Such Plan Support Party (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement and (iv) has independently and without reliance upon any other Plan Support Party or any officer, employee, agent or representative thereof, and based on such information as such Plan Support Party has deemed appropriate, made its own analysis and decision to enter into this Agreement, and such Plan Support Party acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)     *Claims and/or Equity Interests*. Such Plan Support Party (i) is the sole beneficial owner of the Claims and/or Equity Interests set forth below under its signature hereto and has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and/or Equity Interests, and, other than such Claims and/or Equity Interests set forth below under its signature page hereto, such Plan Support Party has no direct or indirect right, title or interest in any Claims or Equity Interests, (ii) has made no prior sale, transfer, assignment, pledge, grant of participation interest in, or other disposition of, direct or indirect, its right, title, or interest in respect of any of its Claims and/or Equity Interests set forth below under its signature page hereto, in whole or in part, (iii) has not granted any proxies, deposited any of its Claims and/or Equity Interests into a voting trust, or entered into a voting agreement with respect to any such Claim or Equity Interest, and (iv) has not entered into any swap or other agreement that transfers, in whole or in part, any of the economic consequences or other privileges of ownership of its Claims and/or Equity Interests.

**Section 3.     <u>No Waiver of Participation and Preservation of Rights.</u>**

Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Plan Support Parties to protect and preserve its rights, remedies, and interests, including, but not limited to, its Claims against or Equity Interests in any of the Debtors, any liens or security interests it may now or hereafter have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases so long as, in each case, such actions are not inconsistent with the Plan Support Party's obligations hereunder or the Plan.  Furthermore, nothing in this Agreement shall be construed to prohibit any Plan Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering,

7

delaying or preventing the consummation of the transactions contemplated hereby and by the Plan.

## Section 4.        Acknowledgement.

THIS AGREEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PLAN SUPPORT PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.  EACH PLAN SUPPORT PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.  ACCEPTANCES OF THE PLAN FROM HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS (OR ANY OTHER PERSON OR ENTITY) WILL NOT BE SOLICITED UNTIL SUCH HOLDERS (OR ANY OTHER PERSON OR ENTITY) HAVE BEEN PROVIDED WITH A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT, WHICH APPROVAL WAS PROVIDED PURSUANT TO THE NEW SOLICITATION ORDER.  EACH PLAN SUPPORT PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.  NOTWITHSTANDING THE FOREGOING PROVISIONS, NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PLAN SUPPORT PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

## Section 5.        Termination.

### 5.1.    Term.

This Agreement shall terminate and have no further force or effect after the New DIP Closing Date.

### 5.2.    Termination by the Plan Support Parties.

This Agreement may be terminated prior to the occurrence of the New DIP Closing Date following the occurrence of any of the following events (each a "Termination Event") by any Plan Support Party upon delivering written notice to the other Plan Support Parties in accordance with Section 7.13, identifying with specificity the applicable Termination Event and the intent to terminate this Agreement; provided that, upon a Termination Event under clauses (d), (e), or (h) of this Section 5.2, this Agreement shall terminate one (1) Business Day after written notice to the Plan Support Parties thereof and of the intent to terminate this Agreement and the breach or other event giving rise to the right to so terminate this Agreement shall not have been cured during the one (1) Business Day period after receipt of such notice:

8

(a)     (i) an order is entered by the Bankruptcy Court denying confirmation of the Plan or (ii) the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect as to any Plan Support Party or Parties, then such Plan Support Party or Parties may terminate this Agreement;

(b)     the conditions precedent to confirmation of the Plan are not satisfied or waived in accordance with Article IX of the Plan on or prior to November 15, 2014 (the "Outside Date"); provided that if prior thereto the Bankruptcy Court has informed the Plan Support Parties that it will confirm the Plan but the Confirmation Order has not been entered prior to November 15, 2014, the Outside Date shall be automatically extended to November 30, 2014;

(c)     the New DIP Closing Date does not occur on or prior to the Outside Date;

(d)     any Plan Support Party breaches its representation, warranties, covenants or obligations under this Agreement or the Plan;

(e)     any Commitment Party breaches its obligations under the New DIP Commitment Letter to which such Commitment Party is party;

(f)     upon withdrawal of the Plan;

(g)     with respect to MAST and the Inc. Administrative Agent: (i)(x) if any new conditions to confirmation of the Plan are added without the prior written consent of MAST and the Inc. Administrative Agent; or (y) if any Plan terms are amended, modified or supplemented or any conditions to confirmation of the Plan are amended, modified, supplemented or waived, in each case in respect of this clause (y) that adversely affect, the (1) allowance, treatment and repayment of such Plan Support Party's DIP Inc. Facility Claims or Prepetition Inc. Facility Non-Subordinated Claims, (2) timing and form of such payment, (3) consideration or other rights provided to such Plan Support Party, including the benefit of exculpation and release provisions of the Plan, or (4) reimbursement of such Plan Support Party's fees and expenses in accordance with the Plan (collectively, the "MAST Terms") without MAST's and the Inc. Administrative Agent's prior written consent; (ii) the New DIP Commitment Letters are amended, modified or supplemented without MAST's and the Inc. Administrative Agent's prior written consent to (1) add any conditions to funding, (2) specify a use of proceeds of the New DIP Facilities that does not include the repayment and/or repurchase in full, in cash of the Prepetition Inc. Facility Non-Subordinated Claims and the DIP Inc. Facility Claims on the New DIP Closing Date in accordance with the Plan or (3) relieve the Commitment Parties of all or any part of their respective funding commitment obligations thereunder irrespective of the syndication of the commitments or loans thereunder, including but not limited to any reduction in the overall proceeds available thereunder (collectively, the "MAST Commitment Terms") (it being understood and agreed that the Commitment Parties may from time to time syndicate the commitments under the New DIP Facilities and modify the other terms thereof in connection

9

therewith without the prior consent of MAST or the Inc. Administrative Agent) or (iii) the revocation, termination, expiration, withdrawal of or breach under either the Harbinger Commitment Letter or the JPM Commitment Letter;

(h)     SIG breaches its obligations under the Inc. Claim Purchase Agreement;

(i)     an order converting any of the Inc. Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court;

(j)     if any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable;

(k)     upon the entry of an order dismissing any of the Inc. Debtors' Chapter 11 Cases; or

(l)     an examiner (with expanded powers beyond those set forth in section 1106(a)(3)and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in any of the Inc. Debtors' Chapter 11 Cases without the prior consent of the Plan Support Parties.

No Plan Support Party may seek to terminate this Agreement based upon a breach or a failure of a condition (if any) in this Agreement if such breach or failure is caused by, results from or arises out of such Plan Support Party's own actions or omissions.

**5.3.    Consensual Termination**

In addition to the Termination Events, this Agreement shall terminate immediately upon written agreement of each of the Plan Support Parties.

**5.4.    Effects of Termination.**

In the event this Agreement is terminated, the Plan Support Parties shall not have any continuing liability or obligation under this Agreement and each Plan Support Party shall have all the rights and remedies available to it under applicable law (including, without limitation, the right to prosecute, solicit and vote in favor of, or contest, the MAST Plan); provided, however, that no such termination shall relieve any Plan Support Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination, including but not limited to the rights and obligations set forth in Section 3 and the right of specific performance set forth in Section 7.10.

**Section 6.    Conditions to Effectiveness.**

The obligations of the Plan Support Parties and the effectiveness hereof are subject to satisfaction of each of the following conditions, and this Agreement shall automatically become effective upon the satisfaction of each of the following conditions:

(a)     Each of the Plan Support Parties shall have executed and delivered to the other Plan Support Parties a signature page to this Agreement;

(b)    The JPM Commitment Parties shall have executed and delivered the commitment letter substantially in the form attached hereto as **Exhibit B** and otherwise acceptable to MAST (the "JPM Commitment Letter"), and the JPM Commitment Letter shall be in full force and effect as to the JPM Commitment Parties; and

(c)    The Harbinger Commitment Parties shall have executed and delivered the commitment letter substantially in the form attached hereto as **Exhibit C** and otherwise acceptable to MAST (the "Harbinger Commitment Letter", together with the JPM Commitment Letter, the "New DIP Commitment Letters"), and the Harbinger Commitment Letter shall be in full force and effect as to the Harbinger Commitment Parties.

## Section 7.    Miscellaneous Terms.

### 7.1.    Binding Effect.

Except as expressly set forth herein, this Agreement shall inure to the benefit of and be binding upon the Plan Support Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement.    Notwithstanding anything to the contrary contained herein, the agreements, representations, warranties, covenants, and obligations of each Plan Support Party contained in this Agreement are, in all respects, several, but not joint and several and no Plan Support Party shall have any liability hereunder or in connection with the transactions contemplated hereby for the breach of a representation, warranty, covenant or other agreement by any other Plan Support Party.

### 7.2.    Assignment.

Except as permitted in compliance with Section 1.3, no rights or obligations of any Plan Support Party under this Agreement may be assigned or transferred to any other entity.

### 7.3.    Further Assurances.

The Plan Support Parties shall, and shall cause their Affiliates to, take such action (including executing and delivering such other instruments and documents concerning the implementation and consummation of the transactions contemplated by this Agreement and the Plan), as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Plan Support Parties.

### 7.4.    Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.    References to sections, unless otherwise indicated, are references to sections of this Agreement.

11

**7.5.    Governing Law.**

(a) The Plan Support Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute under or arising out of or in connection with this Agreement, whether sounding in contract, tort or otherwise.

(b) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, and, to the extent applicable, the Bankruptcy Code.  By its execution and delivery of this Agreement, each Plan Support Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 7.5(c), any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in a state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Agreement, each of the Plan Support Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c) Notwithstanding the foregoing, nothing in Sections 7.5(a) or 7.5(b) shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of or in connection with this Agreement.

**7.6.    Entire Agreement.**

This Agreement, together with the Plan and the Exhibits, schedules and annexes hereto constitutes the entire agreement between the Plan Support Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, warranties, and understandings of the Plan Support Parties, whether oral, written, or implied, as to the subject matter hereof; provided, however, that any confidentiality agreement or waivers executed by any Plan Support Party shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

**7.7.    Interpretation.**

This Agreement is the product of negotiation by and among the Plan Support Parties. Any Plan Support Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Plan Support Party by reason of that Plan Support Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.  To the extent there is any conflict between the terms of this Agreement and the terms of the Exhibits, the terms and conditions as set forth in this Agreement shall govern. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to any Articles, Sections, exhibits, annexes, and schedules are to such Articles, Sections, exhibits, annexes, and schedules of this Agreement unless otherwise specified. All exhibits and schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the

12

singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. In the event of an inconsistency between the terms of this Agreement and the Plan, the terms of the Plan will govern and control.

### 7.8.    Amendment and Waiver.

Except as otherwise specifically provided herein, this Agreement (excluding all exhibits hereto) may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by each of the Plan Support Parties. No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

### 7.9.    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. The signatures of all of the Plan Support Parties need not appear on the same counterpart. Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of this Agreement.

### 7.10.    Remedies.

In addition to the availability of damages arising out of a breach of this Agreement and except as otherwise set forth below, each Plan Support Party shall be entitled to enforce the terms of this Agreement by a decree of specific performance and/or injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond. NO PLAN SUPPORT PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PLAN SUPPORT PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PLAN SUPPORT PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

### 7.11.    No Admissions.

This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Plan Support Party of any claim or fault or liability or damages whatsoever. Each of the Plan Support Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Plan Support Party shall have, by reason of this Agreement, a fiduciary

relationship in respect of any other Plan Support Party or any person or entity, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Plan Support Party any obligations in respect of this Agreement except as expressly set forth herein.  This Agreement is part of a proposed settlement of a dispute among the Plan Support Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

**7.12.   Consideration.**

Each Plan Support Party hereby acknowledges that no consideration, other than that specifically described herein or in the Plan, shall be due or paid to any Plan Support Party for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Plan Support Parties' representations, warranties and agreements hereunder.

**7.13.   Notices.**

All notices hereunder (including notices of a Termination Event and copies of Joinder Agreements in accordance with Section 1.3 of this Agreement) shall be deemed given if in writing and (x) hand-delivered or sent by courier, by registered or certified mail (return receipt requested), <u>and</u> (y) sent by electronic mail to the following addresses (or at such other addresses as shall be specified by like notice):

Harbinger and the Harbinger Commitment Parties, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019
Attention: David M. Friedman (email: dfriedman@kasowitz.com)
Adam L. Shiff (email: ashiff@kasowitz.com)
Matthew B. Stein (email:mstein@kasowitz.com)

SIG and the JPM Commitment Parties, shall be served on:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention:  Sandy Qusba (email: squsba@stblaw.com)
Nicholas Baker (email: nbaker@stblaw.com)

MAST, shall be served on:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention:  Philip Dublin (email: pdublin@akingump.com)

509600-0311-16296835

Meredith Lahaie (email: mlahaie@akingump.com)

Inc. Administrative Agent, shall be served on:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention:  Philip Dublin (email: pdublin@akingump.com)
Meredith Lahaie (email: mlahaie@akingump.com)

Any notice given by hand-delivery, courier, mail, and/or electronic mail shall be effective when received.

**7.14.    Third Party Beneficiaries.**

This Agreement shall be solely for the benefit of the Plan Support Parties (or any other party that may become a party to this Agreement pursuant to Section 1.3 of this Agreement) and no other person or entity shall be a third-party beneficiary hereof.

**[Remainder of page intentionally left blank]**

509600-0311-16296835

IN WITNESS WHEREOF, the Plan Support Parties have entered into this Agreement on the day and year first above written.

HARBINGER CAPITAL PARTNERS LLC

By: _____

Name:
Title: Philip Falcone

Prepetition Inc. Facility Subordinated Claims As of August 31, 2014: $180.4 million

Existing Inc. Common Stock Equity Interests: 91,895,051 Shares

**SIG HOLDINGS, INC.**

By:
Name:      Ana Capella Gomez-Acebo
Title:       Managing Director

151,515 shares of Convertible Series B Preferred
Stock issued by Lightsquared Inc., together with all
accrued and unpaid dividends thereon

**MAST CAPITAL MANAGEMENT, LLC, on behalf of itself and its managed funds and/or accounts that hold Claims and/or Equity Interests**

By:

Name:        Adam Kleinman

Title:        Authorized Signatory

DIP Inc. Facility Claims through September 8, 2014:  **$96,462,843.67**

Prepetition Inc. Facility Non-Subordinated Claims through September 8, 2014:  **$321,858,013.36**

Total Claims through September 8, 2014:  **$418,320,857.02**

**U.S. BANK NATIONAL ASSOCIATION, in its capacity as DIP Inc. Agent and Prepetition Inc. Agent**

By:
Name:
Title:

James A. Hanley
Vice President

**J.P. MORGAN SECURITIES LLC, with respect
to only its Credit Trading Group**

By:

Name:        Andrew C. Faherty

Title:         Authorized Signatory

**CHASE LINCOLN FIRST COMMERCIAL CORPORATION, with respect to only its Credit Trading Group**

By: _____

Name:    Andrew C. Faherty

Title:    Authorized Signatory

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD., as a Commitment Party

By:  Harbinger Capital Partners LLC, its investment
manager

By: _____
    Name:
    Title:


HARBINGER CAPITAL PARTNERS SPECIAL
SITUATIONS FUND, L.P., as a Commitment Party

By:  Harbinger Capital Partners LLC, its investment
manager

By: _____
    Name:
    Title:

## EXHIBIT A

**PLAN**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

---

## HARBINGER CAPITAL PARTNERS LLC'S FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR THE INC. DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

David M. Friedman
Adam L. Shiff
Matthew B. Stein
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

*Counsel to Harbinger Capital Partners LLC*

Dated: New York, New York
         September __, 2014

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, AND GOVERNING LAW ............................................................................1

    A.    Defined Terms ............................................................................................1

    B.    Rules of Interpretation ...........................................................................19

    C.    Computation of Time ..............................................................................20

    D.    Governing Law ......................................................................................20

    E.    Reference to Monetary Figures................................................................20

ARTICLE II. ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX
CLAIMS, AND U.S. TRUSTEE FEES ....................................................................20

    A.    Administrative Claims ...........................................................................20

    B.    Accrued Professional Compensation Claims................................................21

    C.    Post-Confirmation Date Fees and Expenses .............................................22

    D.    DIP Inc. Facility Claims ........................................................................22

    E.    New DIP Facility Claims .......................................................................23

    F.    Priority Tax Claims................................................................................23

    G.    Payment of Statutory Fees .....................................................................23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ........................................................................................................24

    A.    Summary ..............................................................................................24

    B.    Classification and Treatment of Claims and Equity Interests..............................24

    C.    Special Provision Governing Unimpaired Claims ..................................29

    D.    Acceptance or Rejection of Plan.............................................................29

    E.    Elimination of Vacant Classes ...............................................................30

    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code............................30

    G.    Controversy Concerning Impairment .......................................................30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF PLAN ...............................................30

    A.    Overview of Plan ..................................................................................30

    B.    Plan Transactions .................................................................................31

    C.    Sources of Consideration for Plan Distributions .................................31

    D.    Certain Confirmation Date and Effective Date Plan Transactions ......................31

i

E.      One Dot Six Exit Facility ........................................................................35

F.      One Dot Six Second Lien Exit Facility ..................................................35

G.      LightSquared Inc. Exit Facility ..............................................................36

H.      Issuance of Reorganized Inc. Debtors Equity Interests; Reinstatement of Intercompany Claims and Intercompany Interests ..............................36

I.      Section 1145 and Other Exemptions .......................................................37

J.      Reorganized One Dot Six Interest Holders Agreement ..........................37

K.      Listing of Reorganized Inc. Debtors Equity Interests; Reporting Obligations ...............................................................................................38

L.      Indemnification Provisions in Reorganized Inc. Debtors Corporate Governance Documents ..........................................................................38

M.      Corporate Governance ............................................................................38

N.      Vesting of Assets in Reorganized Inc. Debtors .....................................39

O.      Cancellation of Securities and Agreements ...........................................39

P.      Corporate Existence ................................................................................40

Q.      Corporate Action .....................................................................................40

R.      Effectuating Documents; Further Transactions ......................................41

S.      Exemption from Certain Taxes and Fees ................................................41

T.      Preservation of Rights of Action ............................................................41

U.      Assumption of D&O Liability Insurance Policies ..................................42

V.      Employee and Retiree Benefits ..............................................................43

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....................................................................................................44

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........44

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ............45

C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan ......................................................................45

D.      Pre-existing Obligations to Inc. Debtors Under Executory Contracts and Unexpired Leases ..............................................................................46

E.      Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases ................47

F.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ..............................................................................................47

G.      Reservation of Rights ..............................................................................47

H.      Nonoccurrence of Effective Date ...........................................................47

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................48

    A.    Distribution Record Date ..................................................................48

    B.    Timing and Calculation of Amounts To Be Distributed.......................................48

    C.    Disbursing Agent ..................................................................49

    D.    Rights and Powers of Disbursing Agent ..................................................................49

    E.    Plan Distributions on Account of Claims Allowed After Effective Date ..............49

    F.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions..................................................................50

    G.    Compliance with Tax Requirements/Allocations ..................................................51

    H.    Setoffs ..................................................................51

    I.    Recoupment ..................................................................52

    J.    Claims Paid or Payable by Third Parties ..................................................................52

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ..................................................................53

    A.    Allowance of Claims..................................................................53

    B.    Claims Administration Responsibilities ..................................................................53

    C.    Estimation of Claims..................................................................53

    D.    Expungement or Adjustment to Claims Without Objection .................................54

    E.    No Interest..................................................................55

    F.    Deadline To File Objections to Claims..................................................................55

    G.    Disallowance of Claims ..................................................................55

    H.    Amendments to Claims..................................................................55

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..................................................................56

    A.    Discharge of Claims and Termination of Equity Interests....................................56

    B.    Subordinated Claims ..................................................................56

    C.    Compromise and Settlement of Claims and Controversies .................................56

    D.    Releases by Inc. Debtors ..................................................................57

    E.    Exculpation ..................................................................58

    F.    Injunction ..................................................................58

    G.    Release of Liens ..................................................................59

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ..................................................................59

    A.    Conditions Precedent to Confirmation Date ..................................................................59

    B.       Conditions Precedent to Effective Date ................................................................61

    C.       Waiver of Conditions ..............................................................................................62

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ................63

    A.       Modification and Amendments ................................................................................63

    B.       Effect of Confirmation on Modifications ..............................................................63

    C.       Revocation or Withdrawal of Plan ........................................................................63

    D.       Validity of Certain Plan Transactions If Effective Date Does Not Occur ............64

ARTICLE XI. RETENTION OF JURISDICTION .................................................................64

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................66

    A.       Immediate Binding Effect ......................................................................................66

    B.       Additional Documents ............................................................................................66

    C.       Reservation of Rights .............................................................................................66

    D.       Successors and Assigns ..........................................................................................67

    E.       Service of Documents .............................................................................................67

    F.       Term of Injunctions or Stays ..................................................................................68

    G.       Plan Supplement .....................................................................................................68

    H.       Entire Agreement ....................................................................................................68

    I.       Non-severability of Plan Provisions ......................................................................68

    J.       Votes Solicited in Good Faith ................................................................................69

    K.       Waiver or Estoppel .................................................................................................69

    L.       Conflicts ..................................................................................................................69

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) asserted against the Inc. Debtors for services rendered to the Inc. Debtors by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Article VII.C hereof.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.    "**Acquired Inc. Facility Claims**" has the meaning set forth in Article III.B.3(b).

3.    "**Administrative Claim**" means a Claim against any of the Inc. Debtors for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates of the Inc. Debtors and operating the businesses of the Inc. Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates of the Inc. Debtors pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the New DIP Facility Claims; (e) the DIP Inc. Facility Claims; and (f) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.  To the extent an Allowed Administrative Claim was a cost or expense of administration of both the Inc.  Debtors' and LP Debtors' Chapter 11 Cases, such Allowed Administrative Claims shall be deemed incurred by the Inc. Debtors in an amount not to exceed 15% of the aggregate amount of those Administrative Claims; provided, however, that the Reorganized Inc. Debtors and the Initial Investors reserve the right to challenge this amount and/or recapture from the LP Debtors any Administrative Claim incurred by the LP Debtors that is satisfied by the Inc. Debtors pursuant to this Plan.

4.    "**Administrative Claim Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

5.    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Inc. Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Inc. Debtor or Reorganized Inc. Debtor, as applicable.

7.    "**Assets**" means all rights, titles, and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

8.    "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Inc. Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.    "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

10.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

11.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

12.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

13.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

14.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced by the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

16.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

17.    "**Cause of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes, without limitation, the following:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; (f) any claim or cause of action of any kind against any Released Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any cause of action listed on the Schedule of Retained Causes of Action.

18.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

19.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.    "**Claim**" means any claim against an Inc. Debtor as defined in section 101(5) of the Bankruptcy Code.

21.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases, or such other entity identified by the Initial Investors in advance of the hearing to approve the Inc. Disclosure Statement.

22.    "**Claims Bar Date**" means the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

23.      "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

24.      "**Claims Objection Bar Date**" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) four (4) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

25.      "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

26.      "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27.      "**Collateral**" means any property or interest in property of the Estates of the Inc. Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

28.      "**Commitment Letters**" means the JPM Commitment Letter and the Harbinger Commitment Letter.

29.      "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases of the Inc. Debtors.

30.      "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the Inc. Debtors, within the meaning of Bankruptcy Rules 5003 and 9021.

31.      "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32.      "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

33.      "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

34.      "**Consummation**" means the occurrence of the Effective Date.

35.      "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Inc. Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

36.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Inc. Debtors for directors', managers', and officers' liability.

37.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases or the Chapter 11 Cases of the LP Debtors.

38.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

39.    "**DIP Facility Claim"** means a New DIP Facility Claim or DIP Inc. Facility Claim.

40.    "**DIP Inc. Agent**" means U.S. Bank National Association, as administrative agent under the DIP Inc. Credit Agreement, or any successor agent appointed in accordance with the DIP Inc. Credit Agreement.

41.    "**DIP Inc. Borrower**" means One Dot Six Corp., in its respective capacities as a borrower under the New DIP Credit Agreement or the DIP Inc. Credit Agreement, as applicable.

42.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012, among the DIP Borrower, the DIP Guarantors, the DIP Agent, and the DIP Inc. Lenders.

43.    "**DIP Inc. Facility**" means that certain debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

44.    "**DIP Inc. Facility Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under, or related to, the DIP Inc. Facility.

45.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., in their respective capacities as guarantors under the New DIP Credit Agreement or DIP Inc. Credit Agreement, as applicable.

46.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

47.    "**DIP Inc. Order**" means the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time).

48.    "**Disbursing Agent**" means the Reorganized Inc. Debtors, or the Entity or Entities designated by the Reorganized Inc. Debtors and the Initial Investors to make or facilitate Plan Distributions pursuant to the Plan.

49.    "**Disclosure Statement Hearing**" means the hearing held in the Bankruptcy Court to consider the approval of the Inc. Disclosure Statement.

50.    "**Disclosure Statement Order**" means the *Order (A) Conditionally Approving Specific Disclosure Statements, (B) Approving Solicitation and Notice Procedures in Connection With Voting on Certain Chapter 11 Plans, (C) Approving Form of Ballot and Notices in Connection Therewith, (D) Scheduling of Certain Dates and Deadlines in Connection with Confirmation of All Competing Chapter 11 Plans, and (E) Granting Related Relief* [Docket No. 1715] (as amended, supplemented, or modified from time to time).

51.    "**Disputed**" means, with respect to any Claim, any Claim that is not yet Allowed.

52.    "**Disputed Claims Reserve**" means sufficient availability in the One Dot Six Revolving Loan Facility reserved for the benefit of each Holder of a Disputed Claim, in an amount equal to the Plan Distributions such Disputed Claim would be entitled to on the Effective Date if such Disputed Claim were Allowed in its full amount on the Effective Date.

53.    "**Distribution Record Date**" means the New DIP Closing Date.

54.    "**Effective Date**" means the date selected by the Initial Investors that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.A hereof have been satisfied or waived (in accordance with Article IX.B hereof).

55.    "**Employee Settlement Agreement**" means that certain Settlement Agreement, by and among LightSquared Inc., on behalf of itself and each of its Debtor Affiliates, Harbinger, and Mr. Sanjiv Ahuja, approved by the Bankruptcy Court pursuant to the *Order, Pursuant to Sections 105(a) and 365(a) of Bankruptcy Code and Bankruptcy Rules 6006, 9014, and 9019, (a) Approving Settlement Agreement Regarding Employment Agreement Claims, (b) Rejecting Employment Documents, and (c) Authorizing Any and All Actions Necessary To Consummate Settlement Agreement* [Docket No. 223].

56.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

57.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in an Inc. Debtor, including any issued or unissued share of common stock, Preferred Equity Interests, or other instrument evidencing an ownership interest in an Inc. Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in an Inc. Debtor that existed immediately prior to the Effective Date, any award of stock options, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Inc. Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Inc. Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

58.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

59.    "**Exculpated Party**" means a Released Party.

60.    "**Executory Contract**" means a contract to which one or more of the Inc. Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

61.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Equity Interests).  For the avoidance of doubt, Existing Inc. Common Stock includes the common equity interest in LightSquared Inc. Allowed pursuant to the Employee Settlement Agreement.

62.    "**Existing Inc. Preferred Equity Interest**" means the outstanding shares of Existing Inc. Series A Preferred Equity Interests and Existing Inc. Series B Preferred Equity Interests.

63.    "**Existing Inc. Series A Preferred Equity Interests**" means the outstanding shares of Convertible Series A Preferred Equity Interests issued by LightSquared Inc.

64.    "**Existing Inc. Series B Preferred Equity Interests**" means the outstanding shares of Convertible Series B Preferred Equity Interests issued by LightSquared Inc.

65.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Equity Interests, and Intercompany Interests.

66.    "**FCC**" means the Federal Communications Commission.

67.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

68.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

69.    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; <u>provided</u>, <u>however</u>, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order; <u>provided</u>, <u>further</u>, the Initial Investors reserve the right to waive any appeal period.

70.    "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

71.    "**General Unsecured Claim**" means any Claim against any of the Inc. Debtors that is not one of the following Claims:  (a) Administrative Claim; (b) Priority Tax Claim; (c) New DIP Facility Claim; (d) DIP Inc. Facility Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Prepetition Inc. Facility Claim; or (h) Inc. Intercompany Claim.

72.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

73.    "**Harbinger**" means Harbinger Capital Partners, LLC and its designated affiliates.

74.    "**Harbinger Commitment Letter**" means that certain commitment letter pursuant to which the Harbinger Commitment Parties commit to provide the Inc. Debtors with approximately $180 million in financing under the New Senior DIP Facility and the New Junior DIP Facility.

75.    "**Harbinger Commitment Parties**" means Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund L.P.

76.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

77.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

78.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, One Dot Six TVCC Corp, LightSquared Investors Holdings Inc., and TMI Communications Delaware, Limited Partnership.

79.    "**Inc. Disclosure Statement**" means, collectively, (a) the *First Amended General Disclosure Statement* [Docket No. 918], and (b) the *Specific Disclosure Statement for the Joint Plan of Reorganization for LightSquared Inc. and Its Subsidiaries Proposed by Harbinger Capital Partners, LLC* [Dkt. No. 1701] (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan).

80.    "**Inc. Facility Claim Purchase Agreement**" means that certain purchase agreement to be entered into between SIG and the Inc. Facility Claim Sellers on terms mutually acceptable to the parties pursuant to which SIG shall purchase Acquired Inc. Facility Claims in cash from the Inc. Facility Claim Sellers on the New DIP Closing Date.

81.    "**Inc. Facility Claim Sellers**" means the Holders of Prepetition Inc. Facility Non-Subordinated Claims immediately prior to the New DIP Closing Date.

82.    "**Inc. Intercompany Claim**" means any Claim against an Inc. Debtor held by an Inc. Debtor.

83.    "**Inc. Intercompany Interest**" means any Equity Interest in an Inc. Debtor held by another Inc. Debtor.

84.    "**Initial Investors**" means Harbinger and SIG.

85.    "**Inmarsat Cooperation Agreement**" means that certain Amended and Restated Cooperation Agreement (as amended, supplemented, restated, or otherwise modified from time to time), dated as of August 6, 2010, by and among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited.

86.    "**Insider**" shall have the definition ascribed to it in Section 101(31) of the Bankruptcy Code.

87.    "**Insider General Unsecured Claim**" means General Unsecured Claims that are held by Insiders.

88.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Inc. Debtors.

89.    "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

90.    "**JPM Commitment Letter**" means that certain commitment letter pursuant to which the JPM Commitment Parties commit to provide the Inc. Debtors with approximately $280 million in financing under the New Senior DIP Facility and the New Junior DIP Facility.

91.    "**JPM Commitment Parties**"[2] means J.P. Morgan Securities LLC, with respect to only its Credit Trading Group, and Chase Lincoln First Commercial Corporation, with respect to only its Credit Trading Group.

92.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

93.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

94.    "**LightSquared Inc. Exit Agent**" means the administrative agent under the LightSquared Inc. Exit Facility Agreement or any successor agent appointed in accordance with the LightSquared Inc. Exit Facility Agreement.

95.    "**LightSquared Inc. Exit Facility**" means that certain $200 million term loan credit facility provided in connection with the LightSquared Inc. Exit Agreement

96.    "**LightSquared Inc. Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized LightSquared Inc., the LightSquared Inc. Exit Agent, and the LightSquared Inc. Exit Lenders on the Effective Date.

97.    "**LP Debtor Plan**" means any confirmed plan of reorganization or plan of liquidation for the reorganization or liquidation, as applicable, of the LP Debtors' estates.

---

[2] NTD: How do we enforce rights against the Credit Trading Group?  We need to see other JPM transactions where this term was used.

98.    "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., and LightSquared GP Inc.

99.    "**New DIP Agent**" means the administrative agent under the New DIP Credit Agreement, or any successor agent appointed in accordance with the New DIP Credit Agreement.

100.    "**New DIP Closing Date**" means the date on or before the 14th day after Confirmation upon which the New DIP Credit Agreement shall have been executed by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the New DIP Facility shall have occurred.

101.    "**New DIP Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of New DIP Closing Date, among the New DIP Obligors, the New DIP Agent, and the New DIP Lenders.

102.    "**New DIP Facility**" means that certain debtor in possession credit facility provided in connection with the New DIP Credit Agreement and New DIP Order in the aggregate principal amount of approximately $460 million, comprised of (i) the New Senior DIP Facility provided by the New Senior DIP Facility Lenders, and (ii) the New Junior DIP Facility provided by the Initial Investors.

103.    "**New DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New DIP Facility.

104.    "**New DIP Facility Claims Treatment**" means that (i) the New Senior DIP Facility Claims shall convert into the One Dot Six Term Loan Facility, (ii) the New Junior DIP Facility Claims, in the original principal amount of $200 million and held by SIG, shall convert into the LightSquared Inc. Exit Facility, and (iii) the New Junior DIP Facility Claims, in the original principal amount of $100 million and held by Harbinger, shall be contributed to Reorganized One Dot Four and TVCC.

105.    "**New DIP Lenders**" means the New Senior DIP Lenders and the Initial Investors, as parties to the New DIP Credit Agreement.

106.    "**New DIP Obligors**" means the Inc. Debtors.

107.    "**New DIP Order**" means each of the *Final Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing New DIP Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay.*

108.    "**New Junior DIP Facility**" means that certain junior debtor in possession credit facility provided to LightSquared Inc. as the borrower (a) in the original principal amount of $300 million, comprised of (i) $200 million provided by SIG through the conversion of the

10

Acquired Inc. Facility Claims, and (ii) $100 million provided by Harbinger in new funding, (b) guaranteed by the New DIP Obligors other than LightSquared Inc. and (c) secured by Liens junior to the Liens securing the New Senior DIP Facility, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

109.    "**New Junior DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New Junior DIP Facility.

110.    "**New Senior DIP Facility**" means that certain senior debtor in possession credit facility provided to One Dot Six Corp. (a) in the original principal amount of $160 million provided by the New Senior DIP Facility Lenders, (b) guaranteed by the New DIP Obligors other than One Dot Six Corp. and (c) secured by Liens senior to the Liens securing the New Junior DIP Facility, in accordance with the Plan, the New DIP Credit Agreement, and the New DIP Order.

111.    "**New Senior DIP Facility Claim**" means a Claim held by the New DIP Agent or New DIP Lenders arising under, or related to, the New Senior DIP Facility.

112.    "**New Senior DIP Facility Lenders**" means the JPM Commitment Parties, the Harbinger Commitment Parties, and any other banks or financial institutions that may become a party to the New Senior DIP Facility from time to time.

113.    "**One Dot Six Exit Agent**" means the administrative agent under the One Dot Six Exit Facility Agreement or any successor agent appointed in accordance with the One Dot Six Exit Facility Agreement.

114.    "**One Dot Six Exit Facility**" means the One Dot Six Term Loan Facility and the One Dot Six Revolving Loan Facility obtained pursuant to the One Dot Six Exit Facility Agreement.

115.    "**One Dot Six Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized One Dot Six, the One Dot Six Exit Facility Guarantors, the One Dot Six Exit Agent, and the One Dot Six Exit Lenders on the Effective Date.

116.    "**One Dot Six Exit Facility Collateral**" means (a) all assets of Reorganized One Dot Six (including all assets contributed to Reorganized One Dot Six in accordance with Article IV.D.2(a)) and (b) all Causes of Action of Harbinger or its affiliates arising out of, relating to, or in connection with its investment in the Debtors.

117.    "**One Dot Six Exit Facility Guarantors**" means the Reorganized Inc. Debtors that guarantee the payment and performance of the One Dot Six Exit Facility and the One Dot Six Second Lien Exit Facility; provided that, Reorganized LightSquared Inc. and its subsidiaries shall not be One Dot Six Exit Facility Guarantors.

118.    "**One Dot Six Exit Lenders**" means the lenders party to the One Dot Six Exit Facility Agreement from time to time.

119.    "**One Dot Six Revolving Loan Facility**" means that certain $100 million revolving loan credit facility provided in connection with the One Dot Six Exit Agreement.[3]

120.    "**One Dot Six Second Lien Exit Agent**" means the administrative agent under the One Dot Six Second Lien Exit Facility Agreement or any successor agent appointed in accordance with the One Dot Six Second Lien Exit Facility Agreement.

121.    "**One Dot Six Second Lien Exit Facility**" means that certain $40 million term loan credit facility provided in connection with the One Dot Six Second Lien Exit Agreement.

122.    "**One Dot Six Second Lien Exit Facility Agreement**" means that certain credit agreement to be entered into among Reorganized One Dot Six, the One Dot Six Exit Facility Guarantors, the One Dot Six Second Lien Exit Agent, and SIG on the Effective Date.

123.    "**One Dot Six Term Loan Facility**" means that certain $160 million term loan credit facility provided in connection with the One Dot Six Exit Agreement.

124.    "**Other Existing Inc. Preferred Equity Interest Holders**" means each Holder of Existing Inc. Preferred Equity Interests other than SIG.

125.    "**Other Priority Claim**" means any Claim against an Inc. Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

126.    "**Other Secured Claim**" means any Secured Claim against an Inc. Debtor that is not a New DIP Facility Claim or Prepetition Facility Claim.

127.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "**Petition Date**" means May 14, 2012.

129.    "**Plan**" means this *Harbinger Capital Partners LLC Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or modified from time to time with the prior consent of the Initial Investors), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

130.    "**Plan Consideration**" means, as applicable, (a) Cash provided by (i) New DIP Facility, (ii) One Dot Six Revolving Loan Exit Facility, and (iii) Inc. Debtors' Cash on hand; (b) One Dot Six Term Loan Facility; (c) One Dot Six Second Lien Exit Facility; (d) LightSquared Inc. Exit Facility; (e) Reorganized LightSquared Inc. Common Shares; and (f) Reorganized One Dot Six Interests.

131.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, or other eligible Entities under the Plan or Plan Supplement documents.

---

[3]    The One Dot Six Revolving Loan Facility may be structured as a delayed draw term loan.

132.    "**Plan Documents**" means the documents other than this Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement.

133.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, in accordance with the Bankruptcy Code and the Bankruptcy Rules) to be Filed no later than the Plan Supplement Date or such other date as may be permitted by the Bankruptcy Court, including:  (a) executed commitment letters, engagement letters, highly confident letters, and related term sheets, or form and/or definitive agreements and related documents with respect to (i) the One Dot Six Exit Facility Agreement, (ii) One Dot Six Second Lien Exit Facility Agreement, and (iii) the LightSquared Inc. Exit Facility Agreement; (b) the Reorganized Inc. Debtors Corporate Governance Documents; (c) the Schedule of Assumed Agreements; and (d) the Schedule of Retained Causes of Action.

134.    "**Plan Supplement Date**" means September 16, 2014 at 4:00 p.m. (prevailing Eastern time), or such other, later date set by the Bankruptcy Court; provided, however, that the Initial Investors reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

135.    "**Plan Support Agreement**" means that certain plan support agreement, dated as of September 8, 2014, among Harbinger, SIG, U.S. Bank National Association, MAST Capital Management, LLC, the Harbinger Commitment Parties, the JPM Commitment Parties, and such other entities that may become party thereto in accordance with the terms thereof, which agreement is attached hereto as Exhibit A.

136.    "**Plan Transactions**" means one or more transactions to occur on the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, reconstitution, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, and the Initial Investors determine are necessary or appropriate.

137.    "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

138.    "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

139.    "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011, among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

140.    "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

141.    "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

142.    "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

143.    "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

144.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

145.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

146.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents.

147.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Facility Borrower and One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

148.    "**Prepetition LP Agent**" means, collectively, UBS AG, Stamford Branch, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

149.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010, among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

150.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

151.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

152.    "**Prepetition LP Facility Guarantee Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders (including any LP Lender whose Claim or portion thereof is subordinated pursuant to section 510(c) of the Bankruptcy Code) arising under, or related to, the Prepetition LP Loan Documents against any Inc. Debtors, including the Parent Guarantors as defined in the Prepetition LP Credit Agreement.

153.    "**Prepetition LP Facility Guarantee Claim Order**" means an order (which may be the Confirmation Order) entered by the Bankruptcy Court estimating the Prepetition LP Facility Guarantee Claim at zero dollars pursuant to Article VII.C of the Plan and/or expunging the Prepetition LP Facility Guarantee Claim.

154.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

155.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents.

156.    "**Prepetition LP Obligors**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement, and LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

157.    "**Priority Tax Claim**" means any Claim against an Inc. Debtor of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

158.    "**Pro Rata**" means, with respect to Claims, the proportion that an Allowed Claim in a particular Class (or among particular unclassified Claims) bears to the aggregate amount of the Allowed Claims in that Class (or among those particular unclassified Claims), or the proportion that Allowed Claims in a particular Class and other Classes (or particular unclassified Claims) entitled to share in the same recovery as such Allowed Claim under the Plan bears to the aggregate amount of such Allowed Claims.

159.    "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

160.    "**Professional Fee Reserve**" means sufficient availability in the One Dot Six Revolving Loan Facility in an amount equal to the Professional Fee Reserve Amount.

161.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.B.3 hereof.

162.    "**Proof of Claim**" means a proof of Claim Filed against any of the Inc. Debtors in the Chapter 11 Cases.

163.    "**Proponent**" means Harbinger.

164.    "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Inc. Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

165.    "**Reinstated Intercompany Interests**" means the Inc. Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

166.    "**Released Party**" means (a) the Inc. Debtors; (b) the New DIP Agent and each New DIP Lender; (c) the One Dot Six Exit Agent and each One Dot Six Exit Lender; (d) the Proponent; (e) the Initial Investors (individually and together with their respective Affiliates in each of their respective capacities contemplated hereunder); (f) the DIP Inc. Agent, (g) each DIP Inc. Lender, (h) the Prepetition Inc. Agent, (i) each Prepetition Inc. Lender, and (j) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including *ex officio* members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such).

167.    "**Reorganized Inc. Debtors**" means the Inc. Debtors, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D.

168.    "**Reorganized Inc. Debtors Boards**" means, collectively, the boards of directors of each of the Reorganized Inc. Debtors.

169.    "**Reorganized Inc. Debtors Bylaws**" means, collectively, the bylaws of each of the Reorganized Inc. Debtors.

170.    "**Reorganized Inc. Debtors Charters**" means, collectively, the charters of each of the Reorganized Inc. Debtors.

171.    "**Reorganized Inc. Debtors Corporate Governance Documents**" means, collectively, (a) the Reorganized Inc. Debtors Bylaws, (b) the Reorganized Inc. Debtors Charters, (c) the Reorganized One Dot Six Interest Holders Agreement, and (d) any other applicable organizational or operational documents with respect to the Reorganized Inc. Debtors.

172.    "**Reorganized Inc. Debtors Equity Interests**" means, collectively, the Reorganized LightSquared Inc. Common Shares, One Dot Six Preferred Shares, and the Reinstated Intercompany Interests.

173.    "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

174.    "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

175.    "**Reorganized One Dot Four**" means One Dot Four Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

176.    "**Reorganized One Dot Four Common Shares**" means those certain common interests issued by Reorganized One Dot Four Reinstated in connection with, and subject to, the Plan, and the Confirmation Order.

177.    "**Reorganized One Dot Six**" means One Dot Six Corp., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D.

178.    "**Reorganized One Dot Six Common Shares**" means those certain common interests issued by Reorganized One Dot Six in connection with, and subject to, the Plan, the Confirmation Order, and the Reorganized One Dot Six Interest Holders Agreement.

179.    "**Reorganized One Dot Six Interest Holders Agreement**" means that certain agreement with respect to the Reorganized One Dot Six Interests, to be effective on the Effective Date and binding on all holders of Reorganized One Dot Six Interests.

180.    "**Reorganized One Dot Six Interests**" means collectively, the Reorganized One Dot Six Common Shares and Reorganized One Dot Six Preferred Shares.

181.    "**Reorganized One Dot Six Preferred Shares**" means those certain payable-in-kind preferred interests issued by Reorganized One Dot Six in connection with, and subject to, the Plan, the Confirmation Order, and the Reorganized One Dot Six Interest Holders Agreement.

182.    "**Reorganized TMI**" means TMI Communications Delaware, Limited Partnership, as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date in connection with the Plan Transactions contemplated by Article IV.D hereof.

183.    "**Retained Causes of Action**" means the Causes of Action of the Inc. Debtors.

184.    "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Inc. Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time).

185.    "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

186.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

187.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

188.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

189.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

190.    "**SIG**" means SIG Holdings, Inc. and one or more of its designated affiliates.

191.    "**TVCC**" means TVCC Intermediate Corp.

192.    "**TVCC Common Shares**" means those certain common interests issued by Reorganized TVCC.

193.    "**Unexpired Lease**" means a lease to which one or more of the Inc. Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

194.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

195.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

196.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

197.    "**Voting Record Date**" means the first day of the hearing held by the Bankruptcy Court to consider approval of the Inc. Disclosure Statement filed with respect to the Plan.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit (as it may thereafter be amended, modified, or supplemented); (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) any reference to an agreement, contract or instrument shall, unless otherwise specified, refer to such agreement, contract or instrument as amended, supplemented, restated, or otherwise modified from time to time; and (12) unless otherwise specified herein, any Plan Supplement Document, any Order (including the Confirmation Order) and any other agreement, contract, instrument or Plan Transaction relating to the New DIP Facility or to Confirmation or Consummation shall be in

form and substance reasonably satisfactory to each of the Initial Investors.

C.     *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, corporate governance matters relating to the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Inc. Debtor or Reorganized Inc. Debtor, as applicable.

E.     *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
## COMPENSATION CLAIMS, DIP FACILITY CLAIMS,
## PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Inc. Facility Claims, New DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof.  In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Inc. Facility Claims, New DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

A.     *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Initial Investors, each Holder of an Allowed Administrative Claim (including an Accrued Professional Compensation Claim, but other than a DIP Inc. Facility Claim and New DIP Facility Claim) shall receive in full and final satisfaction, settlement, release, and discharge of,

and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Inc. Debtors in the ordinary course of their businesses after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Inc. Debtors or the Reorganized Inc. Debtors and the Holders of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order of the Bankruptcy Court; provided that, to the extent any Allowed Administrative Claims are due and payable after the Effective Date, such Claims shall be paid by, and be the sole obligation of, Reorganized One Dot Six.

Except for DIP Inc. Facility Claims, New DIP Facility Claims and U.S. Trustee Fees, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Inc. Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Confirmation Date. Objections to such requests must be Filed and served on the Reorganized Inc. Debtors and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Inc. Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Inc. Debtors or any action by the Bankruptcy Court.

B.    *Accrued Professional Compensation Claims*

1.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.      Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Inc. Debtors and the Initial Investors no later than five (5) days prior to the anticipated Confirmation Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Initial Investors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

C.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Inc. Debtors or Reorganized Inc. Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Inc. Debtors or Reorganized Inc. Debtors, as applicable, on or after the Confirmation Date.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Inc. Debtors or Reorganized Inc. Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

D.      DIP Inc. Facility Claims

The DIP Inc. Facility Claims shall be Allowed and deemed to be Allowed Claims in the amount of (x) $109.28 million as of October 31, 2014 (as increased to the extent the New DIP Closing Date occurs after October 31, 2014 and decreased to the extent the New DIP Closing Date occurs before October 31, 2014, in each case on a per diem basis), which Allowed amount includes all outstanding principal, interest, default interest and fees, plus accrued expenses, plus (y) any additional incremental funding provided by the DIP Inc. Lenders under the DIP Inc. Credit Agreement pursuant to a budget provided by the Debtors that is acceptable to the DIP Inc. Lenders together with related interest, default interest, fees and expenses.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Facility Claim, on the New DIP Closing Date, except to the extent that a Holder of a DIP Inc. Facility Claim agrees to a less favorable or other treatment, each Holder of a DIP Inc. Facility Claim shall receive Cash in an amount equal to the full amount of its DIP Inc. Facility Claim.

In addition, on the New DIP Closing Date, the Inc. Debtors shall pay all fees and expenses of the DIP Inc. Agent and Inc. Facility Claim Sellers (including all professionals fees and expenses) outstanding as of such date in accordance with the terms of the New DIP Order and the Confirmation Order.  For the avoidance of doubt, on the New DIP Closing Date, the Inc. Debtors shall pay the professional fees owed to Houlihan Lokey (including any transaction fee payable pursuant to the terms of Houlihan Lokey's engagement letter) in accordance with the

terms of the DIP Inc. Order.

E.      *New DIP Facility Claims*

The New DIP Facility Claims shall be Allowed in the full aggregate principal amount outstanding as of the Effective Date, plus all accrued and unpaid interest, fees, costs, expenses, and other charges payable as of the Effective Date pursuant to the terms of the New DIP Credit Agreement.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Holder of a New DIP Facility Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a New DIP Facility Claim agrees to a less favorable or other treatment, shall receive the New DIP Facility Claims Treatment in accordance with the Plan Transactions set forth in Article IV.D.2 below, provided, however, that any indemnification and expense reimbursement obligations of the Inc. Debtors under the New DIP Credit Agreement that are contingent as of the Effective Date shall survive and be paid by the Inc. Debtors or, following the Effective Date, Reorganized One Dot Six as and when due under the New DIP Credit Agreement.

F.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable:  (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and the Reorganized Inc. Debtors; or (3) at the option of the Reorganized Inc. Debtors, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between the Reorganized Inc. Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

G.      *Payment of Statutory Fees*

On the Effective Date or as soon thereafter as reasonably practicable, Reorganized One Dot Six shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, Reorganized One Dot Six shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Article III.B hereof classify Claims against, and Equity Interests in, each of the Inc. Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Equity Interests with respect to a particular Inc. Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    Class 1 – Other Priority Claims

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Other Priority Claim agrees to any other treatment, each Holder of an Allowed Other Priority Claim against an individual Inc. Debtor shall receive Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Priority Claim.

(c)    *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 1 Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

(a)    *Classification*:  Class 2 consists of all Other Secured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Other Secured Claim agrees to any

24

other treatment, each Holder of an Allowed Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable:  (i) Plan Consideration attributed to such Inc. Debtor in the form of Cash in an amount equal to such Allowed Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 2 Other Secured Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Prepetition Inc. Facility Non-Subordinated Claims

(a)    *Classification*:   Class 3 consists of all Prepetition Inc. Facility Non-Subordinated Claims.  Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of $331.128 million, as of October 31, 2014 (as increased to the extent that the New DIP Closing Date occurs after October 31, 2014 and decreased to the extent that the New DIP Closing Date occurs before October 31, 2014, in each case, on a *per diem* basis), which Allowed amount includes all outstanding principal, interest, default interest and prepayment premium allocable to all Prepetition Inc. Facility Non-Subordinated Claims.  For the avoidance of doubt, Prepetition Inc. Facility Non-Subordinated Claims shall not be subject to any avoidance, setoff, allowance, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under applicable law by any entity.

(b)    *Treatment*:  On the New DIP Closing Date, and in accordance with the Inc. Facility Claim Purchase Agreement, SIG shall purchase from the Inc. Facility Claim Sellers all rights, title, and interest to $200 million of the Prepetition Inc. Facility Non-Subordinated Claims (the "**Acquired Inc. Facility Claims**") for $200 million, which Acquired Inc. Facility Claims shall be converted into the New Junior DIP Tranche Facility on a dollar for dollar basis.

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Non-Subordinated Claim other than the Acquired Inc. Facility Claims, on the New DIP Closing Date, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Non-Subordinated Claim agrees to any other treatment, each Holder of such Allowed Prepetition Inc. Facility Non-Subordinated Claim

shall receive Plan Consideration in the form of its Pro Rata share of Cash in an amount equal to such Allowed Prepetition Inc. Facility Non-Subordinated Claims.

(c)  *Voting:*  Class 3 is Unimpaired by the Plan.  Each Holder of a Class 3 Prepetition Inc. Facility Non-Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 3 Prepetition Inc. Facility Non-Subordinated Claim is entitled to vote to accept or reject the Plan.

4.  Class 4 – Prepetition Inc. Facility Subordinated Claims

(a)  *Classification*:    Class 4 consists of all Prepetition Inc. Facility Subordinated Claims.  The Prepetition Inc. Facility Subordinated Claims shall be Allowed in the full aggregate principal amount outstanding as of the Effective Date, plus all accrued and unpaid interest, fees, costs, expenses and other charges payable as of the Effective Date pursuant to the terms of the Prepetition Inc. Credit Agreement.

(b)  *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive such Holder's Pro Rata share of (a) 100% of the Reorganized One Dot Four Common Shares and 100% of the TVCC Common Shares; (b) 70% of the Reorganized One Dot Six Common Shares; and (c) Reorganized One Dot Six Preferred Shares having an original stated principal value of $75 million; provided, however, that the Class 4 treatment is subject to the Plan Transactions set forth in Article IV herein.  For purposes of this Plan only, Harbinger agrees to accept Plan treatment in full satisfaction of its legal, equitable, and contractual rights.

(c)  *Voting:*  Class 4 is Unimpaired by the Plan because of its acceptance of its treatment under the Plan in full satisfaction of its legal, equitable, and contractual rights pursuant to sections 1123(a)(4) and 1124 of the Bankruptcy Code.  Each Holder of a Class 4 Prepetition Inc. Facility Subordinated Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 4 Prepetition Inc. Facility Subordinated Claim is entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

(a)    *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to any other treatment, each Holder of an Allowed General Unsecured Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to the principal amount of such Allowed General Unsecured Claim, plus any accrued interest.

(c)    *Voting*:  Class 5 is Unimpaired by the Plan.  Each Holder of a Class 5 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 5 General Unsecured Claim is entitled to vote to accept or reject the Plan.

6.    Class 6 – Insider General Unsecured Claims

(a)    *Classification*:  Class 6 consists of all Insider General Unsecured Claims.

(b)    *Treatment*:  Holders of Allowed Insider General Unsecured Claims shall not receive any distribution from Plan Consideration on account of such Insider General Unsecured Claims.

(c)    *Voting*:  Class 6 is Impaired by the Plan.  Each Holder of a Class 6 Insider General Unsecured Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 6 Insider General Unsecured Claim is entitled to vote to accept or reject the Plan.

7.    Class 7 – Existing Inc. Preferred Equity Interests

(a)    *Classification*:  Class 7 consists of all Existing Inc. Preferred Equity Interests.

(b)    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Equity Interest held by the Other Existing Inc. Preferred Equity Interest Holders, on the Effective Date, except to the extent that an Other Existing Inc. Preferred Equity Interest Holder agrees to any other treatment, each Other Existing Inc. Preferred Equity Interest Holder shall receive Plan Consideration in the form of its Pro Rata share of 8.0% of the Reorganized One Dot Six Common Shares.

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Equity Interest held by

SIG, on the Effective Date SIG shall receive 100% of the Reorganized LightSquared Inc. Common Shares.

(c) *Voting*:  Class 7 is Impaired by the Plan.  Each Holder of a Class 7 Existing Inc. Preferred Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Existing Inc. Common Stock Equity Interests</u>

(a) *Classification*:  Class 8 consists of all Existing Inc. Common Stock Equity Interests.

(b) *Treatment*:  Holders of Allowed Existing Inc. Common Stock Equity Interests shall not receive any distribution from Plan Consideration, or retain any Interest, on account of such Existing Inc. Common Stock Equity Interests.

(c) *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of a Class 8 Existing Inc. Common Stock Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a Class 8 Existing Inc. Common Stock Equity Interest is entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Inc. Intercompany Interests</u>

(a) *Classification*:  Class 9 consists of all Inc. Intercompany Interests.

(b) *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Intercompany Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that (i) a Holder of an Allowed Inc. Intercompany Interest agrees to any other treatment or (ii) different treatment is necessary, as determined by the Initial Investors, to effectuate the Plan Transactions (including as set forth in Article IV), each Allowed Inc. Intercompany Interest shall be Reinstated for the benefit of the Holder thereof.

(c) *Voting*:  Class 9 is Unimpaired by the Plan.  Each Holder of a Class 9 Inc. Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 9 Inc. Intercompany Interest is entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Inc. Intercompany Claims</u>

(a) *Classification*:  Class 10 consists of all Inc. Intercompany Claims.

(b) *Treatment*:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Intercompany Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to

the extent that a Holder of an Allowed Inc. Intercompany Claim agrees to any other treatment, each Allowed Inc. Intercompany Claim shall be Reinstated for the benefit of the Holder thereof.

(c)    *Voting*: Class 10 is Unimpaired by the Plan. Each Holder of a Class 10 Inc. Intercompany Claim is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 10 Inc. Intercompany Claim is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Inc. Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims. The Plan, and the treatment hereunder of all Claims and Equity Interests, are predicated on either (i) all of the Prepetition LP Facility Claims having been or being satisfied in full pursuant to an LP Debtor Plan, or (ii) as provided in Article VII.C herein, the Bankruptcy Court issuing the Prepetition LP Facility Guarantee Claim Order expunging the Prepetition LP Facility Guarantee Claim or estimating the Prepetition LP Facility Guarantee Claim in the amount of zero dollars.

D.    *Acceptance or Rejection of Plan*

1.    Voting Classes Under Plan

Under the Plan, Class 7 is Impaired, and each Holder of a Class 7 as of the Voting Record Date is entitled to vote to accept or reject the Plan; provided, however, to the extent that any Class of Claims is satisfied in full, in Cash, from Plan Consideration, the Initial Investors reserve the right to (a) deem such Class as Unimpaired and (b) treat the Holders in such Class as conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 5, 9 and 10 are Unimpaired, (b) the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.    Presumed Rejection Under Plan

Under the Plan, (a) Classes 6 and 8 are Impaired, (b) the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have rejected the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

4.    Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if

the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

5.    Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

To the extent that any Impaired Class votes to or is deemed to reject the Plan, the Initial Investors may request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  The Initial Investors reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *Overview of Plan*

The Plan contemplates, among other things, (1) $460 million in new debtor in possession financing (approximately $360 million of which will be converted into first lien exit financing), (2) $100 million in first lien revolving exit financing, (3) the issuance of new debt and equity instruments, (4) the assumption of certain liabilities, (5) the satisfaction in full of all Allowed Claims, and (6) the preservation of the Inc. Debtors' litigation claims.

B.      *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions.  On the Confirmation Date or the Effective Date, as applicable, or as soon thereafter as reasonably practicable, the Reorganized Inc. Debtors, with the consent of the Initial Investors, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, formation, partnership, merger, amalgamation, consolidation, conversion or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Inc. Debtors or Reorganized Inc. Debtors, as applicable, and the Initial Investors determine are necessary or appropriate.  For the avoidance of doubt, nothing contained in the Plan shall be construed as a waiver of any Inc. Debtor's right to recover on account of equity interests held by such Inc. Debtor in one or more LP Debtors, including LightSquared LP and LightSquared GP Inc., and all such rights are expressly reserved; <u>provided</u> that, the retention of such equity interests or recovery thereon shall not be a condition precedent to the occurrence of either the Confirmation Date or the Effective Date.

C.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Reorganized Inc. Debtors or Disbursing Agent to make Plan Distributions shall be obtained from the Plan Consideration.  After the satisfaction of all Allowed Claims in accordance with the Plan, all remaining proceeds from the New DIP Facility and the One Dot Six Exit Facility shall be placed in a working capital reserve of Reorganized One Dot Six.

D.      *Certain Confirmation Date and Effective Date Plan Transactions*

1.      <u>Confirmation Date Plan Transactions.</u>  Certain Plan Transactions occurring on or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)      Contemporaneously with the New DIP Closing Date, pursuant to the Inc. Facility Claim Purchase Agreement, SIG shall purchase from the Inc. Facility Claim Sellers all rights, title, and interest to the Acquired Inc. Facility Claims for $200 million.

(b)      The New DIP Obligors and the other relevant Entities shall enter into the New DIP Credit Agreement.  On the New DIP Closing Date, subject to the terms of the New DIP Credit Agreement, the New DIP Lenders shall fund the New DIP Facility as follows: (i) SIG shall convert the Acquired Inc. Facility Claims into $200 million under the New Junior DIP Facility;

(ii) Harbinger shall provide new financing in the amount of $100 million under the New Junior DIP Facility; (iii) the New Senior DIP Facility Lenders shall provide new financing in the amount of $160 million under the New Senior DIP Facility, in each instance in accordance with the Plan, Confirmation Order, New DIP Credit Agreement, New DIP Order and Commitment Letters.

(c)     The Inc. Debtors shall use the proceeds of the New DIP Facility to, among other things, indefeasibly repay in full the Allowed DIP Inc. Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (other than the Acquired Inc. Facility Claims, which shall be converted into the New Junior DIP Facility) and fund the working capital requirements of the Inc. Debtors prior to the Effective Date.

2.     <u>Effective Date Plan Transactions.</u>  Certain Plan Transactions occurring on or as soon as practicable after the Effective Date shall include, without limitation, the following:

(a)     Certain Transactions Concerning Reorganized Inc. Debtors

(1)     One Dot Six Corp. shall be reconstituted as a limited liability company with the appropriate governmental authorities pursuant to applicable law.

(2)     Each of the Reorganized Inc. Debtors, other than Reorganized One Dot Six, shall contribute and/or distribute, as applicable, all such Entity's legal, equitable, and beneficial right, title, and interest in its Retained Causes of Action and the right to prosecute such Retained Causes of Action to Reorganized One Dot Six.

(3)     Reorganized TMI and Reorganized LightSquared Investors Holdings Inc. shall distribute to Reorganized LightSquared Inc. their respective equity interests in LightSquared LP and LightSquared GP Inc., and Reorganized LightSquared Inc. shall contribute to Reorganized One Dot Six all such equity interests; <u>provided</u> that, both Reorganized TMI and Reorganized LightSquared Investors Holdings Inc. shall each retain 1% of the equity interest in LightSquared LP; <u>provided further</u> that, if the effective date of a plan of reorganization has occurred with respect to LightSquared LP or LightSquared GP Inc., then the distributions made in accordance with such plans of reorganization on account of the respective equity interests, if any, shall be distributed and contributed in accordance with this section in place of the respective equity interests.

(4)     Reorganized Inc. Debtors shall cause TVCC Holding Company, LLC to transfer to Harbinger, as Holder of Prepetition Inc. Facility

32

Subordinated Claims, in partial satisfaction of such Claims, 100% of the TVCC Common Shares.

(b)    Certain Transactions Concerning Reorganized One Dot Six

    (1)    Reorganized One Dot Six, the One Dot Six Exit Lenders, the One Dot Six Exit Agent and the other relevant Entities shall enter into the One Dot Six Exit Facility Agreement. The One Dot Six Exit Lenders shall (A) fund the One Dot Six Term Loan Facility by converting the New Senior DIP Facility Claims into the One Dot Six Term Loan Facility on the Effective Date and (B) provide commitments for the One Dot Six Revolving Loan Facility, in each instance in accordance with the Plan, the Confirmation Order, and the One Dot Six Exit Facility Agreement. The proceeds of the One Dot Six Exit Facility shall be used to, among other things, refinance the New Senior DIP Facility Claims, fund the Cash payments contemplated by the Plan to be made on the Effective Date and provide post-Effective Date working capital. The One Dot Six Exit Facility shall be secured by first priority Liens on the One Dot Six Exit Facility Collateral.

    (2)    Reorganized One Dot Six, Reorganized LightSquared Inc., the One Dot Six Second Lien Exit Agent and the other relevant Entities shall enter into the One Dot Six Second Lien Exit Facility Agreement. Reorganized One Dot Six shall issue to Reorganized LightSquared Inc. the One Dot Six Second Lien Exit Facility in connection with the recapitalization of Reorganized One Dot Six described in the immediately succeeding subsection. The One Dot Six Second Lien Exit Facility shall be secured by second priority Liens on the One Dot Six Exit Facility Collateral, junior to the Liens Securing the One Dot Six Exit Facility pursuant to the an intercreditor agreement.

    (3)    The Equity Interests in Reorganized One Dot Six shall be cancelled and in exchange Reorganized One Dot Six shall issue to Reorganized LightSquared Inc. (A) the One Dot Six Second Lien Exit Facility, (B) Reorganized One Dot Six Preferred Shares having an original stated principal value of $335 million and (C) 100% of the Reorganized One Dot Six Common Shares.

(c)    Certain Transactions Concerning Reorganized LightSquared Inc.

    (1)    Reorganized LightSquared Inc. shall transfer to Harbinger, as a Holder of Prepetition Inc. Facility Claims, in partial satisfaction of such Claims, 100% of the Reorganized One Dot Four Common Shares.

(2)     Reorganized LightSquared Inc. shall transfer to Holders of New Junior DIP Facility Claims (other than SIG) and Holders of Prepetition Inc. Facility Subordinated Claims in satisfaction of such Claims, (A) Reorganized One Dot Six Preferred Shares having an original stated principal value of $175 million and (B) 70% of the Reorganized One Dot Six Common Shares.

(3)     Reorganized LightSquared Inc., SIG, the LightSquared Inc. Exit Facility Agent and the other relevant Entities shall enter into the LightSquared Inc. Exit Facility Agreement.   Reorganized LightSquared Inc. shall issue the LightSquared Inc. Exit Facility to SIG in satisfaction of its New Junior DIP Facility Claims.

(4)     Reorganized LightSquared Inc. shall transfer to the Other Existing Inc. Preferred Equity Interest Holders, in satisfaction for such Holders' Existing Inc. Preferred Equity Interests, 8.0% of the Reorganized One Dot Six Common Shares.

(5)     Reorganized LightSquared Inc. shall issue to SIG, in satisfaction of its Existing Series B Preferred Equity Interests, 100% of the Reorganized Inc. Common Shares.

(d)     Certain Transactions Concerning Harbinger

(1)     Prior to the transfer of Reorganized One Dot Six Preferred Shares and One Dot Six Common Shares to the Holders of New Junior DIP Facility Claims and the Holders of Prepetition Inc. Facility Subordinated Claims in IV.D.2(c)(2) above, but after the distribution of Reorganized One Dot Four Common Shares and TVCC Common Shares to the Holders of Prepetition Inc, Facility Subordinated Claims, Harbinger shall contribute its Prepetition Inc. Facility Subordinated Claims to Reorganized One Dot Four and TVCC.

As a result of the foregoing Plan Transactions, (A) Reorganized One Dot Six shall directly or indirectly wholly own LightSquared GP Inc. and 98% of the equity interests in LightSquared LP; (B) Reorganized LightSquared Inc. shall retain its 100% direct or indirect ownership, as applicable, of Reorganized SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, LightSquared Investors Holdings Inc., SkyTerra Investors LLC, and TMI and, indirectly, 2% of the equity interests in LightSquared LP; (C) Reorganized LightSquared Inc. will own 22% of the Reorganized One Dot Six Common Shares; (D) Other Existing Inc. Preferred Equity Interest Holders will own 8% of Reorganized One Dot Six Common Shares; (E) Reorganized One Dot Four and TVCC will own, collectively, 70% of Reorganized One Dot Six Common Shares; (f) SIG will own 100% of Reorganized LightSquared Inc. Common Shares; and (G) Harbinger will own  100%  of  Reorganized  One  Dot  Four  Common  Shares  and  TVCC  Common Shares; provided that, if the effective date of a plan of reorganization has occurred with respect to LightSquared LP or LightSquared GP Inc., then (i) Reorganized One Dot Six shall directly or

indirectly wholly own the distributions, if any, on account of the equity interests in LightSquared GP Inc. and 98% of the equity interests in LightSquared LP, and (ii) LightSquared Inc. shall directly or indirectly wholly own the distributions, if any, on account of 2% of the equity interests in LightSquared LP, made in accordance with such plans of reorganization. Notwithstanding the foregoing, the retention of equity interests in LightSquared LP and LightSquared GP Inc. shall not occur to the extent not authorized by the Bankruptcy Court under the Confirmation Order, and the Plan Transactions shall be modified to remove such retention as and to the extent necessary to comply with any Bankruptcy Court order.

E.      *One Dot Six Exit Facility*

On the Effective Date, Reorganized One Dot Six and the other relevant Entities shall enter into the One Dot Six Exit Facility Agreement and the One Dot Six Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  The One Dot Six Exit Facility shall permit Reorganized One Dot Six to incur the One Dot Six Revolving Loan Facility.  Reorganized One Dot Six shall use the One Dot Six Exit Facility for the purposes specified in the Plan, the One Dot Six Exit Facility Agreement, and the other governing documents.

Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the One Dot Six Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized One Dot Six in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized One Dot Six to enter into and execute the One Dot Six Exit Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the One Dot Six Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized One Dot Six and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized One Dot Six pursuant to the One Dot Six Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the One Dot Six Exit Facility Agreement and the related documents.  Neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the One Dot Six Exit Facility.

F.      *One Dot Six Second Lien Exit Facility*

On the Effective Date, Reorganized One Dot Six and the other relevant Entities shall enter into the One Dot Six Second Lien Exit Facility Agreement and the One Dot Six Second Lien Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  Reorganized One Dot Six shall use the One Dot Six Second Lien Exit Facility for the purposes specified in the Plan, the One Dot Six Second Lien Exit Facility Agreement, and the other governing documents.

Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the One Dot Six Second Lien Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred

by Reorganized One Dot Six in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized One Dot Six to enter into and execute the One Dot Six Second Lien Exit Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the One Dot Six Second Lien Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized One Dot Six and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized One Dot Six pursuant to the One Dot Six Second Lien Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the One Dot Six Second Lien Exit Facility Agreement and the related documents.  Neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the One Dot Six Second Lien Exit Facility.

G.    *LightSquared Inc. Exit Facility*

On the Effective Date, Reorganized LightSquared Inc. and the other relevant Entities shall enter into the LightSquared Inc. Exit Facility Agreement and the LightSquared Inc. Exit Facility shall be funded as set forth in Article IV.D.2 hereof.  Reorganized LightSquared Inc. shall use the LightSquared Inc. Exit Facility for the purposes specified in the Plan, the LightSquared Inc. Exit Facility Agreement, and the other governing documents.

Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the LightSquared Inc. Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (2) authorization for Reorganized LightSquared Inc. to enter into and execute the LightSquared Inc. Exit Facility Agreement and such other documents as may be required or appropriate.  On the Effective Date, the LightSquared Inc. Exit Facility, together with any new promissory notes evidencing the obligation of Reorganized LightSquared Inc. and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby.  The obligations incurred by Reorganized LightSquared Inc. pursuant to the LightSquared Inc. Exit Facility and any related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the LightSquared Inc. Exit Facility Agreement and the related documents.  Neither Reorganized One Dot Six, Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall be obligors for, nor be liable for any obligations arising under, the LightSquared Inc. Exit Facility.

H.    *Issuance of Reorganized Inc. Debtors Equity Interests; Reinstatement of Inc. Intercompany Claims and Inc. Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) the Reorganized Inc. Debtors shall issue the Reorganized LightSquared Inc. Common Shares for distribution to the eligible Holders of Allowed Claims and Allowed

Interests, and the other Entities hereunder, as applicable, in accordance with the Plan and other governing documents, and (2) all Inc. Intercompany Claims and Inc. Intercompany Interests shall be Reinstated for the benefit of the Holders thereof.  The issuance of the Reorganized LightSquared Inc. Common Shares, the Reorganized One Dot Six Interests, and the Reinstatement of the Inc. Intercompany Claims and Inc. Intercompany Interests to the extent provided for in the Plan are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  All of the Reorganized Inc. Debtors Equity Interests issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid, and non-assessable.

The applicable Reorganized Inc. Debtors Corporate Governance Documents shall contain provisions necessary to (1) except as consented to by the initial holder thereof, prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendments of the applicable Reorganized Inc. Debtors Corporate Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of the Reorganized Inc. Debtors Equity Interests or directors of the Inc. Debtors or the Reorganized Inc. Debtors.

I.      Section 1145 and Other Exemptions

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Inc. Debtors Equity Interests shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.

In addition, under section 1145 of the Bankruptcy Code, any securities contemplated by the Plan and any and all agreements incorporated therein, including the Reorganized Inc. Debtors Equity Interests shall be subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized Inc. Debtors Corporate Governance Documents, and (4) applicable regulatory approval, if any.

J.      Reorganized One Dot Six Interest Holders Agreement

On the Effective Date, Reorganized One Dot Six and each holder of Reorganized One Dot Six Equity Interests shall enter into and deliver the Reorganized One Dot Six Interest Holders Agreement.  Consummation of the Plan shall constitute, upon the occurrence of the Effective Date, (1) approval of the Reorganized One Dot Six Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized One Dot Six and (2) authorization for Reorganized One Dot Six and each holder of Reorganized One Dot Six Equity Interests to enter into and execute the Reorganized One Dot Six Interest Holders Agreement and such other

documents that may be required or appropriate.  On the Effective Date, the Reorganized One Dot Six Interest Holders Agreement, together with all other documents, instruments and agreements to be entered into, delivered or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each holder of Reorganized One Dot Six Equity Interests shall be bound thereby.

K.      *Listing of Reorganized Inc. Debtors Equity Interests; Reporting Obligations*

The Reorganized Inc. Debtors shall not be (1) obligated to list any of the Reorganized Inc. Debtors Equity Interests on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

L.      *Indemnification Provisions in Reorganized Inc. Debtors Corporate Governance Documents*

As of the Effective Date, the Reorganized Inc. Debtors Corporate Governance Documents of Reorganized One Dot Six shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Inc. Debtors' current and former directors, managers, officers, employees, or agents at least to the same extent as the organizational documents of each of the respective Inc. Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and, other than Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC and their respective wholly owned subsidiaries after the Effective Date, none of the Reorganized Inc. Debtors shall amend or restate the applicable Reorganized Inc. Debtors Governance Documents before or after the Effective Date to terminate or materially adversely affect any of such Reorganized Inc. Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

M.      *Corporate Governance*

As shall be set in the Reorganized Inc. Debtors Corporate Governance Documents, the Reorganized Inc. Debtors Boards shall consist of a number of members, and appointed in a manner to be agreed upon by the Initial Investors or otherwise provided in the Reorganized Inc. Debtors Corporate Governance Documents.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the Initial Investors shall disclose the following at, or prior to, the Confirmation Hearing:  (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized Inc. Debtors Boards or officer of the Reorganized Inc. Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized Inc. Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

N.       *Vesting of Assets in Reorganized Inc. Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate of the Inc. Debtors, and any property acquired by any of the Inc. Debtors pursuant to the Plan shall vest in each respective Reorganized Inc. Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility or the LightSquared Inc. Exit Facility and any rights of any of the parties under any One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement or the LightSquared Inc. Exit Facility Agreement, or any of the related documents, and (2) any rights of any of the parties under any of the Reorganized Inc. Debtors Corporate Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

On and after the Effective Date of the Plan, except as otherwise provided in the Plan, each Reorganized Inc. Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to Article IV.D.2(a)(2).

O.       *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Inc. Debtors under the New DIP Facility, DIP Inc. Facility, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Inc. Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Inc. Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Inc. Debtors, and the Reorganized Inc. Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Inc. Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Inc. Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Inc. Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Inc. Debtors.

P.      *Corporate Existence*

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Inc. Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Inc. Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

Q.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Inc. Debtors, the Reorganized Inc. Debtors, or any other Entity or Person, including, without limitation, the following:  (1) execution of, and entry into, the One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement, LightSquared Inc. Exit Facility Agreement, the Reorganized Inc. Debtors Corporate Governance Documents, and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the members of the Reorganized Inc. Debtors Boards, managers and officers for the Reorganized Inc. Debtors; (5) the issuance and distribution of the Reorganized Inc. Debtors Equity Interests; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Inc. Debtors, and any company action required by the Inc. Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Inc. Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Inc. Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Inc. Debtors, including, as appropriate:  (1) the One Dot Six Exit Facility Agreement; (2) the One Dot Six Second Lien Exit Facility Agreement; (3) the LightSquared Inc. Exit Facility Agreement; (4) the Reorganized Inc. Debtors Corporate Governance Documents; and (5) any and all other agreements, documents, securities, and

instruments related to the foregoing.  The authorizations and approvals contemplated by this Article IV.O shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Inc. Debtors and the officers and members of the boards of directors thereof, are authorized and directed to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Inc. Debtors, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

S.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from an Inc. Debtor to a Reorganized Inc. Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan, or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Inc. Debtors or the Reorganized Inc. Debtors, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

T.      *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.D.2(a)(2) and Article VIII hereof, the Reorganized Inc. Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Actions, and the Reorganized Inc. Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Inc. Debtors, subject to Article IV.D.2(a)(2), may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Inc. Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Inc. Disclosure Statement to any Cause of Action against them as any indication that the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, shall not pursue any and all available Causes of Action against them. The Inc. Debtors or the Reorganized Inc. Debtors, as applicable, expressly reserve all rights to

prosecute any and all Causes of Action against any Entity, subject to Article IV.D.2(a)(2) and except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Inc. Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that an Inc. Debtor may hold against any Entity shall vest in the Reorganized Inc. Debtors, as applicable, subject to Article IV.D.2(a)(2). The Reorganized Inc. Debtors, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Inc. Debtors, subject to Article IV.D.2(a)(2), shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Reorganized Inc. Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan or the release, transfer or settlement of any such Cause of Action by the LP Debtors, in each case, unless the Bankruptcy Court orders otherwise by a Final Order.

U.      *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Inc. Debtors shall be deemed to have assumed all of the Inc. Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date; provided that, all D&O Liability Insurance Policies to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date would be a counterparty or obligor shall be assigned to Reorganized One Dot Six on the Effective Date and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall have any liability or obligations with respect to any D&O Liability Insurance Policies. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Inc. Debtors' foregoing assumption and, as applicable, assignment of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, but without limiting the proviso in the first sentence of this paragraph, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Inc. Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, but subject to the proviso in the first sentence of the first paragraph of this Article IV.U, after the Effective Date, none of the Reorganized Inc. Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all

directors and officers of the Inc. Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.  As of the Effective Date, Reorganized One Dot Six anticipates purchasing and maintaining continuing director and officer insurance coverage for a tail period of six (6) years.

## V.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, Reorganized One Dot Six shall assume and continue to perform the Inc. Debtors' obligations to:  (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Inc. Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Inc. Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, the Inc. Debtors' or Reorganized Inc. Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Inc. Debtors pursuant to any equity plan maintained by the Inc. Debtors or under any existing employment agreement of the Inc. Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Article III.B.7 hereof; provided, further, the applicable Reorganized Inc. Debtors Boards shall maintain the discretion to execute and implement agreements or plans that grant employees of the applicable Reorganized Inc. Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other cash or performance-based awards as the Reorganized Inc. Debtors Boards deem appropriate.

Except as set forth in the Plan, nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Inc. Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.    <u>Rejection of Executory Contracts and Unexpired Leases</u>

Except as otherwise provided herein (including Article IV.S hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:    (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement; (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date; (d) is an Intercompany Contract; or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, the non-Debtor parties must comply with Article V.B hereof.

Any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed on the Schedule of Assumed Agreements in the Plan Supplement, shall be rejected on the Effective Date.

2.    <u>Assumption of Executory Contracts and Unexpired Leases</u>

In connection with the Confirmation and Consummation of the Plan, the Initial Investors shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan.  On the Effective Date, the Inc. Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement; <u>provided</u> that, all assumed Executory Contracts and Unexpired Leases to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date would be a counterparty or obligor shall be assigned to Reorganized One Dot Six on the Effective Date and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall have any liability or obligations with respect to any such Executory Contracts and Unexpired Leases.

With respect to each such Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Initial Investors (upon consultation with the Inc. Debtors) shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs.  The

Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Inc. Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the Reorganized Inc. Debtors no later than thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 hereof and all payments thereon, if any, shall be solely paid by, and the obligation of, Reorganized One Dot Six. After the Effective Date, neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries shall have any obligations with respect to the Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied at the option of the Initial Investors or Reorganized Inc. Debtors, as applicable, (1) by payment of the Cure Costs in Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.  Cure Costs to be paid in accordance with the Plan shall be solely paid by, and the obligation of, Reorganized One Dot Six and, after the Effective Date, neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries shall have any obligations with respect to the Cure Costs.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and

(3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, NY 10005, counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; provided, however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the Reorganized Inc. Debtors' financial wherewithal must be Filed, served, and actually received by the appropriate notice parties no later than August 8, 2014, at 4:00 p.m. (prevailing Eastern time) (the "Financial Wherewithal Objection Deadline").  Any counterparty to an Executory Contract or Unexpired Lease that has failed to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable.

In the event of a dispute regarding the ability of the Reorganized Inc. Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, the payment of any Cure Costs shall be made by Reorganized One Dot Six following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, the Reorganized Inc. Debtors may settle any dispute without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; provided, further, notwithstanding anything to the contrary herein, prior to the Effective Date or such other date as determined by the Bankruptcy Court and prior to the entry of a Final Order resolving any dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the Initial Investors and the Reorganized Inc. Debtors reserve the right, to reject any Executory Contract or Unexpired Lease which is subject to dispute.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.    *Pre-existing Obligations to Inc. Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Inc. Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Inc. Debtors and Reorganized Inc. Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties and continued maintenance obligations on goods previously purchased by the contracting Inc. Debtors or the Reorganized Inc. Debtors, as applicable, from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.      *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date,*
        *Assumed Executory Contracts, and Unexpired Leases*

The obligations arising under any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Inc. Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Inc. Debtor and not rejected prior to the Effective Date, may be performed by the applicable Reorganized Inc. Debtor in the ordinary course of business; <u>provided</u> that, any such contracts and leases described in the foregoing clauses (1) through (3) to which Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC or any of their respective wholly owned subsidiaries after the Effective Date are a counterparty or obligor shall be assigned to Reorganized One Dot Six, and neither Reorganized LightSquared Inc., Reorganized One Dot Four, TVCC nor any of their respective wholly owned subsidiaries after the Effective Date shall retain any obligations or liabilities thereunder.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Inc. Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Initial Investors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Inc. Debtors, or their respective Affiliates, have any liability thereunder.  The Initial Investors reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Inc. Debtors, the DIP Inc. Agent, the New DIP Agent, the Prepetition Inc. Agent, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests without the consent of the Initial Investors and the Inc. Debtors.  The Initial Investors and the Reorganized Inc. Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Initial Investors and the Reorganized Inc. Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.      *Timing and Calculation of Amounts To Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim is not Allowed on the Effective Date, on the date that such a Claim is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, (i) Allowed Administrative Claims with respect to liabilities incurred by the Inc. Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Inc. Debtors prior to the Effective Date, shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) the Allowed DIP Inc. Facility Claims and Allowed Prepetition Inc. Facility Non-Subordinated Claims (other than the Acquired Inc. Facility Claims) shall be repaid in full on the New DIP Closing Date with the proceeds of the New DIP Facility.

Upon the Consummation of the Plan (subject to the terms hereof, including Article IV), the Reorganized Inc. Debtors Equity Interests shall be deemed to be issued to (and the Intercompany Interests, shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the eligible Holders of Allowed Claims, and the other eligible Entities hereunder, as applicable, without the need for further action by the Initial Investors, any Inc. Debtor, Disbursing Agent, Reorganized Inc. Debtor, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable.  Except as otherwise provided herein, the eligible Holders of Allowed Claims and Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

C.      *Disbursing Agent*

All Plan Distributions shall be made by the Reorganized Inc. Debtors as Disbursing Agent or such other Entity designated by the Reorganized Inc. Debtors or the Initial Investors as a Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between the Reorganized Inc. Debtors and such Disbursing Agent.

Plan Distributions of Plan Consideration under the Plan shall be made by the Reorganized Inc. Debtors to the Disbursing Agent for the benefit of Holders of Allowed Claims and Equity Interests, and the other eligible Entities hereunder, as applicable.  All Plan Distributions by the Disbursing Agent shall be at the discretion of the Reorganized Inc. Debtors and the Initial Investors, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.      *Rights and Powers of Disbursing Agent*

1.      Powers of Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

2.      Expenses Incurred on or After Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by Reorganized One Dot Six.

E.      *Plan Distributions on Account of Claims Allowed After Effective Date*

1.      Payments and Plan Distributions on Disputed Claims

Plan Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

2.      Special Rules for Plan Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to

by the relevant parties no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

F.    *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

1.    Delivery of Plan Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Equity Interests at the address for each such Holder as indicated on the Reorganized Inc. Debtors' records as of the date of any such Plan Distribution; provided, however, the manner of such Plan Distributions shall be determined at the discretion of the Reorganized Inc. Debtors; provided, further, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Except as set forth in Article VI.F.4 and VI.F.5 hereof, each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    Delivery of Plan Distributions to Holders of Allowed DIP Inc. Facility Claims

The Plan Distributions provided for Allowed DIP Inc. Facility Claims pursuant to Article II.D hereof shall be made to the DIP Inc. Agent on the New DIP Closing Date.

3.    Delivery of Plan Distributions to Holders of Allowed New DIP Facility Claims

The Plan Distributions provided for Allowed New DIP Facility Claims pursuant to Article II.E hereof shall be made to the New DIP Agent.  To the extent possible, the Reorganized Inc. Debtors and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New DIP Agent.

4.    Delivery of Plan Distributions to Holders of
Allowed Prepetition Inc. Facility Claims

The Plan Distribution provided by Article III.B.3 and Article III.B.4. hereof shall be made to the Prepetition Inc. Agent.  To the extent possible, the Reorganized Inc. Debtors and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the Prepetition Inc. Lenders at the direction of the Prepetition Inc. Agent.

5.    Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and shall not be required to make partial Plan Distributions or payments of fractions of dollars.

Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down. The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of Reorganized Inc. Debtors Equity Interests and such fractions shall be deemed to be zero.

6.      Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Inc. Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

G.      Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Inc. Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Inc. Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Inc. Debtors reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      Setoffs

Except with respect to any distributions on account of (1) DIP Inc. Facility Claims, and (2) Prepetition Inc. Facility Claims, or as otherwise expressly provided for in the Plan, each Inc. Debtor or Reorganized Inc. Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the Plan Distributions to be made pursuant to the Plan on account of such Allowed Claim (before any Plan Distribution is made on account of such Allowed Claim) any claims, rights, and Causes of Action of any nature

that such Inc. Debtor or Reorganized Inc. Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Inc. Debtor or Reorganized Inc. Debtor, as applicable, of any such claims, rights, or Causes of Action that such Reorganized Inc. Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Inc. Debtor or Reorganized Inc. Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

I.    *Recoupment*

In no event shall any Holder of Claims against the Inc. Debtors be entitled to recoup any such Claim against any claim, right, or Cause of Action of the Inc. Debtors or the Reorganized Inc. Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Inc. Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Inc. Debtors or the Reorganized Inc. Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not an Inc. Debtor or a Reorganized Inc. Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not an Inc. Debtor or a Reorganized Inc. Debtor on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Inc. Debtor, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized Inc. Debtor annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Inc. Debtors' insurance policies until the Holder of such

Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Inc. Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

      3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Inc. Debtors, the Reorganized Inc. Debtors, or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
**AND DISPUTED CLAIMS**

A.    *Allowance of Claims*

After the Effective Date, the Reorganized Inc. Debtors shall have and retain any and all rights and defenses that the Inc. Debtors had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided herein, no Claim shall become Allowed unless and until such Claim is deemed Allowed under Article I.A.5 hereof or the Bankruptcy Code.

B.    *Claims Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Inc. Debtors shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims, (2) settle or compromise any Disputed Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

The Reorganized Inc. Debtors shall maintain the Disputed Claims Reserve on account of the Disputed Claims or, at its discretion, shall reserve sufficient availability under the One Dot Six Revolving Loan Facility to satisfy the Disputed Claims. The Disputed Claims Reserve or the reserved amount of the One Dot Six Revolving Loan Facility may be adjusted from time to time, and funds previously held in the Disputed Claims Reserve (if any) on account of Disputed Claims that have subsequently become Disallowed Claims shall be released from such reserve and used to fund the other reserves and Plan Distributions.

C.    *Estimation of Claims*

Before the Effective Date, the Initial Investors, and after the Effective Date, the

Reorganized Inc. Debtors, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim pursuant to applicable law and (2) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim, any group of Claims, or any Class of Claims, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim, (2) a maximum limitation on such Disputed Claim, or (3) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated, in each case for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, the Initial Investors or Reorganized Inc. Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim and any ultimate Plan Distributions on such Claim.  Notwithstanding any provision in the Plan to the contrary, a Claim that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

The Initial Investors will seek entry of the Prepetition LP Facility Guarantee Claim Order from the Bankruptcy Court estimating the Prepetition LP Facility Guarantee Claim in the amount of zero dollars and/or expunging the Prepetition LP Facility Guarantee Claim and any Liens securing any such Claims on the assets of the Inc. Debtors.

All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid, satisfied, superseded, or compromised in full may be expunged on the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as applicable, by the Reorganized Inc. Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Inc. Debtors, in both cases without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.   Additionally, any Claim that is duplicative or redundant with another Claim against the same Inc. Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Inc. Debtor, as

applicable, by the Reorganized Inc. Debtors without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

E.      *No Interest*

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the Initial Investors or Reorganized Inc. Debtors, (3) provided for in a postpetition agreement in writing between the Initial Investors or Reorganized Inc. Debtors and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      *Deadline To File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Plan Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Inc. Debtors by that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.      *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Initial Investors, or the Reorganized Inc. Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Inc. Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by employees of the Inc. Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Any default by the Inc. Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Initial Investors or the Reorganized Inc. Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan,

the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Inc. Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, after the Effective Date, the Reorganized Inc. Debtors may compromise and settle Claims against, or Equity Interests in, the Inc. Debtors, and Causes of Action against other Entities.

D.      *Releases by Inc. Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Inc. Debtors and the implementation of the restructuring transactions contemplated by the Plan, including those contemplated by the Plan Support Agreement, on and after the Effective Date, the Released Parties are deemed released and discharged by the Inc. Debtors, the Reorganized Inc. Debtors, and the Estates of the Inc. Debtors from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including, but not limited to, any derivative claims asserted on behalf of the Inc. Debtors or the Estates of the Inc. Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Inc. Debtors, the Reorganized Inc. Debtors, the Estates of the Inc. Debtors, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Inc. Debtors, the Chapter 11 Cases, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Inc. Debtors, the DIP Inc. Facility, the New DIP Facility, the One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility, the LightSquared Inc. Exit Facility, or the Reorganized One Dot Six Interests, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Inc. Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and the Inc. Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing**

release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the New DIP Credit Agreement, One Dot Six Exit Facility Agreement, One Dot Six Second Lien Exit Facility Agreement, LightSquared Inc. Exit Facility Agreement, Reorganized Inc. Debtors Corporate Governance Documents, and the Plan Supplement) executed to implement the Plan.

E.    *Exculpation*

Except as otherwise specifically provided in the Plan, to the fullest extent of applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of this Plan, the Plan Support Agreement, the Inc. Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Inc. Debtors, the approval of the Inc. Disclosure Statement, or Confirmation or Consummation of this Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, this Plan, or assumed pursuant to this Plan, or assumed pursuant to a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been discharged pursuant to Article VIII.A hereof, released pursuant to Article VIII.D hereof, or are subject to exculpation pursuant to Article VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Inc. Debtors or the Reorganized Inc. Debtors:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any

**right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Inc. Debtors in a nominal capacity to recover insurance proceeds so long as the Inc. Debtors or Reorganized Inc. Debtors, as applicable, and any such Entity agree in writing that such Entity shall: (1) waive all Claims against the Inc. Debtors, the Reorganized Inc. Debtors, and the Inc. Debtors' Estates related to such action; and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

G.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates of the Inc. Debtors shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates of the Inc. Debtors shall revert to the Reorganized Inc. Debtors and their successors and assigns. The Reorganized Inc. Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

Pursuant to the Prepetition LP Facility Guarantee Claim Order, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates of the Inc. Debtors granted or purported to be granted to secure the Prepetition LP Facility Claims, including the Prepetition LP Facility Guarantee Claims, shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates of the Inc. Debtors shall revert to the Reorganized Inc. Debtors and their successors and assigns.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.    *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions

shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Confirmation Order shall have been entered in form and substance satisfactory to each of the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

2.      The New DIP Order, in form and substance reasonably satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall have been entered contemporaneously with the Confirmation Order; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

3.      The Inc. Debtors shall have received binding commitments with respect to the New Senior DIP Facility on terms and conditions reasonably satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and such commitments shall be in full force and effect; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

4.      All conditions to the consummation of the New DIP Facility to be satisfied or waived on or before the Confirmation Date shall have been satisfied or waived in accordance with the terms of the New DIP Credit Agreement, and the New DIP Credit Agreement shall be in full force and effect (but for the non-satisfaction or waiver of the condition that the New DIP Order shall be a Final Order).

5.      The Plan Support Agreement shall be in full force and effect.

6.      The Inc. Facility Claim Purchase Agreement shall be in full force and effect.

7.      The Bankruptcy Court shall have entered the Prepetition LP Facility Guarantee Claim Order.

8.      Since August 29, 2014, the DIP Inc. Credit Agreement, the DIP Inc. Order or any other agreement in respect of the DIP Inc. Facility shall not have been amended, supplemented or otherwise modified in a manner to increase or include additional fees, interest, original interest discount, or other economic consideration that is more burdensome to the Inc. Debtors without the prior approval of the Commitment Parties, except (1) to the extent such economic consideration (including, for the avoidance of doubt, for the additional loans to be funded under

the DIP Inc. Credit Agreement after the date hereof in accordance with any budget proposed by the Debtors and accepted by the DIP Inc. Lenders) is contemplated by the DIP Inc. Credit Agreement and the DIP Inc. Order in each case as in effect on the date hereof and (2) a commitment fee on the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof at a rate no higher than the rate of the Up-Front Fee (as defined in and under the DIP Inc. Credit Agreement as in effect on the date hereof), which fee shall be waived if the obligations in respect of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims are paid in full and/or purchased in Cash on or before the Outside Date.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, in a form and in substance satisfactory to the Initial Investors, the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall have become a Final Order; provided that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, the rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

2.    The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Initial Investors that the Effective Date has occurred) contained therein shall have been waived or satisfied in accordance therewith, including, but not limited to:

(a)    the One Dot Six Exit Facility Agreement and any related documents, in form and substance acceptable to the Initial Investors, the One Dot Six Exit Agent, and One Dot Six Exit Lenders, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the One Dot Six Exit Facility shall have occurred;

(b)    the One Dot Six Second Lien Exit Facility Agreement and any related documents, in form and substance acceptable to the Initial Investors, and the One Dot Six Second Lien Exit Agent, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the One Dot Six Second Lien Exit Facility shall have occurred;

(c)    the LightSquared Inc. Exit Facility Agreement and any related documents, in form and substance acceptable to SIG, and the LightSquared Inc. Exit

Agent shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the LightSquared Inc. Exit Facility shall have occurred;

(d)     the Reorganized Inc. Debtors Corporate Governance Documents, in forms and substance acceptable to the Initial Investors, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(e)     the Inc. Debtors shall have sufficient availability in the One Dot Six Revolving Loan Facility to constitute the Disputed Claims Reserve.

3.     The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Initial Investors, without prejudice to the Reorganized Inc. Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement; provided, however, each such altered, amended, or modified schedule, documents, or exhibit shall be in form and substance acceptable to the Reorganized Inc. Debtors and the Initial Investors.

4.     All necessary actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

5.     All authorizations, consents, and regulatory approvals required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from the FCC or any other regulatory agency including, without limitation, any approvals required in connection with the transfer, change of control, or assignment of FCC licenses (each of which license is set forth on a schedule to be included as a Plan Supplement), and no appeals of such approvals remain outstanding.

C.     *Waiver of Conditions*

The conditions to the Confirmation Date or the Effective Date of the Plan set forth in Article IX.A may be waived by the Initial Investors and, to the extent such conditions relate to those issues addressed in Section 5.2(g) of the Plan Support Agreement and the Plan Support Agreement remains valid and enforceable, each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Initial Investors reserve the right to modify the Plan with the consent of each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, and seek Confirmation consistent with the Bankruptcy Code; provided, however, that any amendment or modification made without the consent of MAST Capital Management, LLC shall be removed to the extent the Bankruptcy Court determines or otherwise indicates that such modification or amendment shall form a basis for the Bankruptcy Court to deny confirmation of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Initial Investors expressly reserve their respective rights to revoke or withdraw, or, to alter, amend, or modify materially the Plan with the consent of each of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Inc. Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.A. The rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims set forth in this Section X.A. shall only exist with respect to those issues specifically identified in Section 5.2(g) of the Plan Support Agreement; provided further that, these rights of the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims shall only exist as long as the Plan Support Agreement remains valid and enforceable.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Initial Investors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Initial Investors revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (3) nothing contained in the Plan or the Inc. Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of any Inc. Debtor or any

other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Inc. Debtor or any other Entity in any respect.

D.      *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facility, the One Dot Six Exit Facility, the LightSquared Inc. Exit Facility, the Plan, or otherwise, the allowance of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims as set forth in Articles II.D and III.B.3, and any distributions made from proceeds of the New DIP Facility, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

# ARTICLE XI.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      Decide and resolve all matters relating to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters relating to the following:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which an Inc. Debtor is party or with respect to which an Inc. Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized Inc. Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving an Inc. Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Inc. Disclosure Statement;

9.      To hear and determine any matters relating to, arising out of, or in connection with the implementation of the One Dot Six Exit Facility, the One Dot Six Second Lien Exit Facility, LightSquared Inc. Exit Facility, or any ancillary or related agreements thereto;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Hear and determine all disputes involving the existence, nature, or scope of the Inc. Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

14.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J hereof;

15.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     Determine any other matters that may arise in connection with or relate to the Plan, the Inc. Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Inc. Disclosure Statement;

17.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

18.     Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

19.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Enforce all orders previously entered by the Bankruptcy Court; and

22.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Inc. Debtors, the Reorganized Inc. Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Inc. Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Initial Investors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Initial Investors or the Reorganized Inc. Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Initial Investors or any Inc. Debtor with respect to the Plan or the Inc. Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Inc. Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the Reorganized Inc. Debtors, shall be served on:

| | |
|---|---|
| LightSquared Inc. | Milbank, Tweed, Hadley & M$^c$Cloy LLP |
| Attn: General Counsel | Matthew S. Barr |
| 10802 Parkridge Boulevard | Steven Z. Szanzer |
| Reston, VA 20191 | Karen Gartenberg |
| | One Chase Manhattan Plaza |
| | New York, NY 10005 |

the special committee of the Debtors' board of directors, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Harbinger or its affiliates, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
Matthew B. Stein
1633 Broadway
New York, NY 10019

SIG, shall be served on:

Simpson Thacher & Bartlett LLP
Sandeep Qusba
Nicholas Baker
425 Lexington Avenue
New York, NY 10017

the DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims, shall be served on:

Akin Gump Strauss Hauer & Feld LLP
Michael S. Stamer
Philip C. Dublin
Meredith A. Lahaie
One Bryant Park
New York, New York 10036

After the Effective Date, the Reorganized Inc. Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Inc. Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.      *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent

practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Initial Investors' or the Reorganized Inc. Debtors', as applicable, consent, and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Initial Investors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Inc. Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.      *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Inc. Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Inc. Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Inc. Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

Dated:  September __, 2014
            New York, New York

By:__/s/_____
David M. Friedman

69

Adam L. Shiff
Matthew B. Stein
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Harbinger Capital Partners LLC*

## EXHIBIT B

**JPM COMMITMENT LETTER**

**EXECUTION VERSION**

September 8, 2014

LightSquared Inc.
10802 Parkridge Boulevard
Reston, Virginia 20191-5416

<u>Debtor-in-Possession Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised J.P. Morgan Securities LLC ("<u>JPMorgan</u>") and Chase Lincoln First Commercial Corporation (the "<u>JPM DIP Lender</u>"; and, together with JPMorgan, the "<u>Commitment Parties</u>") that, on or about May 14, 2012, LightSquared Inc., a Delaware corporation ("<u>you</u>" or "<u>LightSquared</u>") and certain of its subsidiaries (collectively, the "<u>Debtors</u>"; and the Debtors subject to the Plan (as defined below), the "<u>Inc. Debtors</u>"), including One Dot Six Corp. ("<u>One Dot Six</u>") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") commencing the chapter 11 cases (the "<u>Chapter 11 Cases</u>"). Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exhibits and Schedules attached hereto (such Exhibits and Schedules, together with this letter, collectively, this "<u>Commitment Letter</u>") and, to the extent not defined in this Commitment Letter, in the Plan referred to below.

In connection with Harbinger Capital Partners LLC's Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated August 11, 2014, (including the Plan Supplement and Plan Documents as such terms are defined therein, as amended, supplemented or otherwise modified from time to time with the prior written consent of the Commitment Parties, the "<u>Plan</u>"), (a) the JPM DIP Lender has agreed to provide new money loans in the original principal amount of $80,000,000 (the "<u>JPM Senior DIP Loan</u>") to LightSquared pursuant to a first lien, superpriority debtor-in-possession financing facility (the "<u>Senior DIP Facility</u>"), (b) Harbinger Capital Partners LLC or one or more of its designated affiliates (collectively, "<u>Harbinger</u>") has agreed to provide new money loans in the original principal amount of $80,000,000 (the "<u>Harbinger Senior DIP Loan</u>" and, together with the JPM Senior DIP Loan and the Third Party Senior DIP Loans (as defined below), the "<u>Senior DIP Loans</u>") to LightSquared pursuant to the Senior DIP Facility, (c) the JPM DIP Lender has committed to acquire $200,000,000 of the outstanding Prepetition Inc. Facility Non-Subordinated Claims held by one or more affiliates of Mast Capital Management LLC ("<u>MAST</u>") under the Prepetition Inc. Credit Agreement for $200,000,000, and has agreed to convert, on a dollar-for-dollar basis, such acquired Prepetition Inc. Facility Non-Subordinated Claims into loans in the original principal amount of $200,000,000 (the "<u>JPM Junior DIP Loan</u>") to LightSquared on the Closing Date (as defined below) pursuant to a second lien superpriority debtor-in-possession financing facility (the "<u>Junior DIP Facility</u>", together with the Senior DIP Facility, the "<u>DIP Facilities</u>") and (d) Harbinger has agreed to provide new money loans in the original principal amount of $100,000,000 (the "<u>Harbinger Junior DIP Loan</u>" and, together with the JPM Junior DIP Loan, the "<u>Junior DIP Loans</u>") to LightSquared on the Closing Date pursuant to the Junior DIP Facility. The Senior DIP Loans shall be guaranteed by each of the Inc. Debtors (other than LightSquared) and secured by a

security interest on substantially all of the assets of the Inc. Debtors, senior to all existing liens, including the liens securing the Prepetition Inc. Facility Subordinated Claims and the liens securing the Junior DIP Loans. The Junior DIP Loans shall be guaranteed by each of the Inc. Debtors (other than LightSquared) and secured by a security interest on substantially all of the assets of the Inc. Debtors, junior in all respects to the liens securing the Senior DIP Loans but senior to all other existing liens, including the liens securing the Prepetition Inc. Facility Subordinated Claims. To the extent the Inc. Debtors receive commitments to provide all or a portion of the Senior DIP Facility from third parties other than the Commitment Parties and Harbinger on terms and conditions satisfactory to the Commitment Parties and Harbinger, including as a result of the syndication contemplated in section 3 below (the loans provided pursuant to such third party commitments, the "Third Party Senior DIP Loans"), the principal amount of the JPM Senior DIP Loan and the Harbinger Senior DIP Loan to be provided by the Commitment Parties and Harbinger, respectively, shall be ratably reduced by the principal amount of such Third Party Senior DIP Loans to the extent and solely to the extent such third parties shall have funded the Third Party Senior DIP Loans on the Closing Date.

On the Effective Date (x) the Senior DIP Loans shall be converted into and/or refinanced by the One Dot Six Term Loan Facility, (y) the JPM Junior DIP Loan shall be converted into the exit financing for Reorganized LightSquared Inc., and (z) the Harbinger Junior DIP Loan shall be converted into certain equity interests in Reorganized One Dot Six, each as more fully set forth in the Plan.

The proceeds of the DIP Facilities shall be used to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims and the DIP Inc. Facility Claims in full, and for the Inc. Debtors' working capital or general corporate purposes through the Effective Date.

The terms and conditions for the Senior DIP Facility and the Junior DIP Facility shall be substantially as set forth in the term sheet attached hereto as Exhibit A and Exhibit C, respectively, and shall constitute a part of the Plan Supplement and Plan Documents subject to the terms and conditions of the Plan.

1. Commitments

In connection with the transactions described above and in the Plan (the "Transactions"), the JPM DIP Lender is pleased to advise you of its commitment to provide the JPM Senior DIP Loan and the JPM Junior DIP Loan (which JPM Junior DIP Loan shall be provided by converting, on a dollar-for-dollar basis, the Prepetition Inc. Facility Non-Subordinated Claims purchased by the JPM DIP Lender into the JPM Junior DIP Loan on the Closing Date) upon the terms and conditions set forth in this Commitment Letter.

2. Titles and Roles

It is agreed that JPMorgan will act as sole lead arranger and sole bookrunner for the DIP Facilities.

It is further agreed that JPMorgan will have "left" placement in any marketing materials or other documentation used in connection with the DIP Facilities. You agree that no agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than with respect to any administrative agent, collateral agent or indenture trustee for the DIP Facilities) will be paid in connection with the DIP Facilities unless you and we shall so reasonably agree in writing.

2

3. Syndication

Absent the completion of a syndication of the Senior DIP Facility by a financial institution other than JPMorgan prior to the Closing Date, we, in coordination with Harbinger, intend to syndicate the Senior DIP Facility to a group of lenders identified by us in consultation with you (together with Harbinger and the JPM DIP Lender, the "Lenders") who will also commit to provide the One Dot Six Term Loan Facility. The Commitment Parties, in coordination with Harbinger, intend to commence syndication efforts promptly, and you agree actively to assist the Commitment Parties in completing a syndication satisfactory to the Commitment Parties whether conducted by JPMorgan or another institution. Such assistance shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your affiliates' existing banking relationships, (B) direct contact between your senior management and advisors and the proposed Lenders, (C) your preparing and providing to the Commitment Parties all information with respect to you and your subsidiaries, including all financial information and Projections (as defined below), as the Commitment Parties may reasonably request in connection with the arrangement and syndication of the Senior DIP Facility and your assistance in the preparation of one or more confidential information memoranda and other marketing materials to be used in connection with the syndication, and (D) your hosting, with the Commitment Parties, of one or more meetings of prospective Lenders at times and locations to be mutually agreed.

The Commitment Parties, in coordination with Harbinger, will manage, in consultation with you, all aspects of such syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders. Notwithstanding anything to the contrary in this Commitment Letter, we shall be entitled at any time before or after the Closing Date, to change the terms of the DIP Facilities in a manner that is reasonably acceptable to the Inc. Debtors or otherwise approved by the Bankruptcy Court (including without limitation, pursuant to the Confirmation Order or the DIP Order (each such term, as defined below)), if we reasonably determine that such changes are advisable to ensure a successful syndication of the DIP Facilities, provided, that no amendment, waiver, supplement or other modification, directly or indirectly, to the MAST Commitment Terms (as defined in the Support Agreement (as defined below) and as used herein, the "MAST Commitment Terms") may be effective without the prior written consent of MAST.

4. Information

You hereby represent and warrant that (a) all information and materials, other than the Projections and information of a general economic or industry-specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto and made available to us) and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by such preparer to be reasonable at the time such Projections are furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the closing date of the DIP Facilities (the "Closing Date"), you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if such Information or Projections were furnished at such time and such representations were being made at such

3

time, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances. You understand that in arranging the DIP Facilities we may use and rely on the Information and Projections without independent verification thereof.

5.  Conditions

       Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 5, in Exhibit B, in Exhibit D, in Exhibit A under the heading "CERTAIN CONDITIONS – Initial Conditions" and in Exhibit C under the heading "CERTAIN CONDITIONS – Initial Conditions".

       Each Commitment Party's commitments and agreements hereunder are further subject to (a) the approval by the Bankruptcy Court of, (i) this Commitment Letter and the DIP Facilities, including without limitation, authorizing the superpriority administrative expense priority of, and granting the liens and security interests necessary to secure, the indemnification and other obligations hereunder and under the DIP Facilities, and all definitive documentation in connection therewith substantially consistent with the Exhibits hereto, and (ii) all obligations to be incurred by the Loan Parties in connection with the DIP Facilities and all liens or other security to be granted by the Loan Parties in connection with the DIP Facilities (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court reasonably satisfactory in form and substance to each of the Commitment Parties and, solely with respect to the MAST Terms (as defined in the Support Agreement and as used herein, the "MAST Terms") or the MAST Commitment Terms, MAST, which orders shall, among other things, approve the terms of this Commitment Letter and the definitive documentation); (b) your performance of your obligations hereunder in all material respects; (c) entry, on or before the Outside Date (as defined in the Support Agreement and as used herein, the "Outside Date"), by the Bankruptcy Court of (A) a final order approving, and authorizing and directing the Inc. Debtors to perform their obligations under, this Commitment Letter and the DIP Facilities as described in clause (a) of this paragraph (the "DIP Order") and (B) an order confirming the Plan (the "Confirmation Order"), each of which orders shall (i) be in form and substance reasonably satisfactory to each of the Commitment Parties, (ii) be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by each of the Commitment Parties, (iii) not have been amended, supplemented or otherwise modified in any manner materially adverse to (x) the Commitment Parties without the written consent of each of the Commitment Parties or (y) MAST, in the case of any such amendment, supplement or other modification of the MAST Terms or the MAST Commitment Terms, without the written consent of MAST, and (iv) not have been reversed or vacated, without the written consent of each of the Commitment Parties; (d) on and after the date hereof, Harbinger not having withdrawn (or supported any other person's motion to withdraw) the Plan or the support agreement, dated as of the date hereof, in respect of the transactions contemplated by this Commitment Letter and the Plan (as amended, supplemented or otherwise modified in accordance with the terms thereof, the "Support Agreement") not having been terminated as a result of a breach by either Harbinger or Mast; (e) the Senior DIP Loans and Junior DIP Loans (other than the JPM Senior DIP Loan and the JPM Junior DIP Loan committed by the Commitment Parties pursuant to the Commitment Letter) shall have been funded pursuant to definitive documentation consistent with the terms set forth in this Commitment Letter or otherwise reasonably satisfactory to the Commitment Parties; (f) the Plan has not been amended, supplemented or otherwise modified in any manner adverse to (i) the Commitment Parties without the written consent of the Commitment Parties or (ii) MAST, in the case of any such amendment, supplement or other modification of the MAST Terms, without the written consent of MAST; (g) the Plan Supplement and the other Plan Documents shall be in form and substance reasonably satisfactory to the Commitment Parties, and the form of the definitive documentation in respect of the One Dot Six Exit Facility and the One Dot Six Second Lien Exit Facility shall be consistent with the terms and conditions substantially set forth in

4

the term sheet attached hereto as Exhibit E and Exhibit F, respectively, and otherwise in form and substance reasonably satisfactory to the Commitment Parties; (h) the consummation of the transactions contemplated by the DIP Facilities on or before the Outside Date, including consummation of the sale of the Prepetition Inc. Facility Non-Subordinated Claims to the JPM DIP Lender by MAST as contemplated by the Plan and the release of the liens in respect of the Prepetition Inc. Facility Non-Subordinated Claims and the DIP Inc. Facility as contemplated by the Plan and as set forth in the Confirmation Order; (i) all conditions to consummation of the Plan (other than the consummation of the DIP Facilities) having been satisfied or waived in accordance with the terms of the Plan, including without limitation, entry of the Prepetition LP Facility Guarantee Claim Order in form and substance satisfactory to each of the Commitment Parties; (j) no person having exercised any rights or remedies against the Inc. Debtors, or taken any action, in respect of the Prepetition Inc. Credit Agreement or the DIP Inc. Facility (including any of MAST, the DIP Inc. Agent, the Prepetition Inc. Agent or any of their designees, assignees or agents) that prejudices the confirmation of the Plan, the implementation thereof or closing of the DIP Facilities, or any transactions contemplated thereby, in each case as reasonably determined by the Commitment Parties; and (k) the DIP Inc. Credit Agreement, the DIP Inc. Order or any other agreement in respect of the DIP Inc. Facility shall not have been amended, supplemented or otherwise modified in a manner to increase or include additional fees, interest, original interest discount, or other economic consideration that is more burdensome to the Inc. Debtors without the prior approval of the Commitment Parties, except (1) to the extent such economic consideration (including, for the avoidance of doubt, for the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof in accordance with any budget prepared by the Debtors and accepted by the DIP Inc. Lenders) is contemplated by the DIP Inc. Credit Agreement and the DIP Inc. Order in each case as in effect on the date hereof and (2) a commitment fee on the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof at a rate no higher than the rate of the Up-Front Fee (as defined in and under the DIP Inc. Credit Agreement as in effect on the date hereof) which fee shall be waived if the obligations in respect of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims are paid in full and/or purchased in cash on or before the Outside Date.

6.   Indemnification and Expenses

You agree (a) if the Closing Date occurs (and the transactions described in the fourth paragraph of this Commitment Letter are consummated on the Closing Date) to indemnify and hold harmless each Commitment Party, its affiliates and each Commitment Party's directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the DIP Facilities, or the use of the proceeds thereof, and the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to (i) legal fees and expenses or (ii) losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such indemnified person or its control affiliates, directors, officers or employees (collectively, the "Related Parties") and (b) if the Closing Date occurs (and the transactions described in the fourth paragraph of this Commitment Letter are consummated on the Closing Date), to reimburse certain reasonable and documented out-of-pocket expenses (if any) as agreed between the Commitment Parties and you that have been invoiced prior to the Closing Date (including due diligence expenses, fees and expenses of consultants (so long as approved by you), travel expenses (so long as approved by you), and the fees, charges and disbursements of counsel) incurred in connection with the DIP Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or

509600-0311-11363-Active.16192272

waiver thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facilities on a several, and not joint, basis with any other party providing or purporting to provide commitments for a DIP Facility (or any of its Related Parties), including without limitation, Harbinger or any Lender. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of such indemnified person. None of the indemnified persons or you or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facilities or the transactions contemplated hereby, provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6. Notwithstanding anything in this Section 6 to the contrary LightSquared shall provide to the Commitment Parties indemnification and expense reimbursement terms that are no less favorable to the Commitment Parties and the other beneficiaries of this Section 6 than the indemnification and expense reimbursement terms provided by LightSquared and its affiliates to any other person committing debt or equity financing in connection with the Plan and their respective advisors.

7.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, your affiliates and of other companies that may be the subject of, or may affect, the transactions contemplated by this Commitment Letter. In addition, each Commitment Party will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you and your affiliates, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and none of the Commitment Parties had an obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

6

8.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) you and your officers, directors, employees, affiliates, members, partners (limited or general), stockholders, subsidiaries, parent entities, attorneys, accountants, agents and advisors (including financial advisors and valuation or appraisal firms), or other representatives, in each case on a confidential and need-to-know basis, (b) MAST and U.S. Bank National Association (as agent under the Prepetition Inc. Credit Agreement) and their respective officers, directors, employees, affiliates, members, partners (limited or general), stockholders, subsidiaries, parent entities, attorneys, accountants, agents and advisors (including financial advisors and valuation or appraisal firms), or other representatives, in each case on a confidential and need-to-know basis, (c) to the extent required in any legal, judicial or administrative proceeding (including, without limitation, in the Bankruptcy Court) or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (d) in a Bankruptcy Court filing, as to which the Commitment Parties had given their prior consent, in order to implement the transactions contemplated hereunder and (e) upon notice to the Commitment Parties, in connection with any public filing requirement.

The Commitment Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to Harbinger and its Representatives (as defined below) or to any Lender or prospective Lender or their respective Representatives, (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions and any related transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense; provided that the disclosure of any such information to any Lenders or prospective Lenders shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with customary market standards for dissemination of such type of information. The provisions of this paragraph shall automatically terminate one year following the date of approval of this Commitment Letter.

9.  Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including without limitation, any other parties in interest in the Chapter 11 Cases, any supporters of the Plan or any other plan of reorganization or any other provider of equity or debt financing) other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Parties reserve the right to

7

employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates any fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree. The Commitment Parties may at any time and from time to time in their discretion assign or participate all or any portion of their respective commitments hereunder; provided that (x) other than an assignment or participation to any controlled affiliate of the Commitment Parties, the Commitment Parties shall not assign or participate all or any portion of their respective commitments with respect to the JPM Junior DIP Loans without the prior written consent of Harbinger (and any purported assignment or participation of such commitments without such consent shall be null and void), (y) other than an assignment or participation to any controlled affiliate of the Commitment Parties, any assignment or participation by the Commitment Parties of their respective commitments with respect to the JPM Senior DIP Loan shall be accompanied by a ratable assignment or participation, as the case may be, by Harbinger of its commitments with respect to the Harbinger Senior DIP Loan on the same terms (unless Harbinger elects not to participate in such assignment or participation, as the case may be), and (z) notwithstanding any assignment or participation, with respect to amounts to be funded on the Closing Date, the commitment of the Commitment Parties to fund the JPM Senior DIP Loan and the JPM Junior DIP Loan on the terms and conditions set forth in this Commitment Letter will only be reduced to the extent such assignees or participants shall have funded their commitments on the Closing Date. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the documents referred to herein and in the Plan are the only agreements that have been entered into among us and you with respect to the DIP Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, the consent rights of MAST under this Commitment Letter shall only exist as long as the Plan Support Agreement remains valid and enforceable.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court over any suit, action or proceeding arising out of or relating to transactions contemplated by this Commitment Letter or the performance of services hereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the performance of services hereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (as amended, signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes names, addresses, tax identification numbers and other information that will allow such Commitment Party to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each Commitment Party.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be

8

executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality which shall terminate in accordance with its terms) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Loan Documents (as defined in the agreements governing the Senior DIP Facility and Junior DIP Facility, as applicable) upon the initial funding thereunder, and you shall automatically be released from all liability in connection herewith at such time, in each case to the extent the DIP Documentation has comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than 5:00 p.m., New York City time, on the earlier of (x) the Outside Date and (y) the day immediately following the Confirmation Date. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence.

9

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By: _____

Name: _____

Title:        Andrew C. Faherty
          Authorized Signatory

CHASE LINCOLN FIRST COMMERCIAL
      CORPORATION

By: _____

Name: _____

Title:        Andrew C. Faherty
         Authorized Signatory

*Commitment Letter Signature Page*

Accepted and agreed to:

LIGHTSQUARED INC., as Debtor and Debtor in
Possession


By: _____
      Name:
      Title:


ONE DOT SIX CORP., as Debtor and Debtor in
Possession


By: _____
      Name:
      Title:

*Commitment Letter Signature Page*

$160 million Senior DIP Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the Senior DIP Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit A is attached and the Plan, as applicable.

1. PARTIES

| | |
|---|---|
| Borrower: | LightSquared Inc., a Delaware corporation, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Borrower"). |
| Guarantors: | One Dot Six Corp., a Delaware corporation, One Dot Four Corp., a Delaware corporation, One Dot Six TVCC Corp., a Delaware corporation, SkyTerra Rollup LLC, a Delaware limited liability company, SkyTerra Rollup Sub LLC, a Delaware limited liability company, TMI Communications Delaware, Limited Partnership, a Delaware limited partnership, LightSquared Investors Holdings Inc., a Delaware corporation, and SkyTerra Investors LLC, a Delaware limited liability company, each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Guarantors" and together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Lead Arranger"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "Administrative Agent"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("JPM"), Harbinger Capital Partners LLC, or one or more of its designated affiliates ("Harbinger") and any third party banks or other financial institutions or entities that become lenders from time to time (together with JPM and Harbinger, the "Lenders"). |

2. TYPES AND AMOUNTS OF FACILITY

A. Senior Term Loan Facility

| | |
|---|---|
| Type and Amount: | A term loan facility (the "Senior DIP Facility") in the amount of $160 million (the loans thereunder, the "Senior DIP Loans"). Harbinger has committed to provide up to $80 million (the "Harbinger Senior DIP Loan") of the Senior DIP Loans pursuant to a commitment letter, dated as of the date of the Commitment |

Letter (the "Harbinger Commitment Letter"), and JPM has committed to provide up to $80 million (the "JPM Senior DIP Loan") of the Senior DIP Loans pursuant to the Commitment Letter.

**Maturity:**

The Senior DIP Loans will mature on the earlier to occur of (x) the effective date under the Plan and (y) the date that is 90 days after the Closing Date (either such date, the "Maturity Date").

The Senior DIP Loans will be repaid or otherwise satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan.

**Availability:**

The full amount of the Senior DIP Loans shall be made (or deemed made, as the case may be) in a single drawing on the Closing Date to the extent authorized by the DIP Order.  Amounts not borrowed on the Closing Date shall not thereafter be available. Repayments and prepayments of the Senior DIP Loans may not be reborrowed.

**Use of Proceeds:**

The proceeds of the Senior DIP Loans shall be used to, together with the proceeds of the Junior DIP Facility, (a) repay the DIP Inc. Facility Claims in full, (b) to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims in full and (c) finance the fees and expenses related to the DIP Facilities that are due and payable on the Closing Date.

## 3.   CERTAIN PAYMENT PROVISIONS

**Interest Rates:**

As set forth on Annex I.

**Optional Prepayments:**

Senior DIP Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice.

**Mandatory Prepayments:**

Mandatory prepayments of Senior DIP Loans shall be required from:

(a)      100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed); and

(b)      100% of the net cash proceeds from issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Senior DIP Facility).

After application as set forth above, the balance of the amounts set forth above may be allocated to repay the Junior DIP Loans.

Mandatory prepayments of the Loans may not be reborrowed.

A-2

## 4.   COLLATERAL AND PRIORITY

Liens and Priority:

All Senior DIP Loans and other obligations of the Loan Parties under the Senior DIP Facility shall at all times (as more fully set forth in the DIP Order):

A.      pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Chapter 11 Cases of the Inc. Debtors (the "Superpriority Claims");

B.      pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is not subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; provided that such unencumbered property shall not include avoidance actions, but subject to entry of the DIP Order, such unencumbered property shall include any proceeds or property recovered in respect of any avoidance actions;

C.      pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the liens described in clause D below) or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (collectively, the liens referred to in clauses (i) and (ii), the "Non-Primed Liens"); and

D.      pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on, and security interest in, all present and after acquired property of the Loan Parties' respective estates that is subject to valid, perfected and non-avoidable pre and postpetition liens securing the Prepetition Inc. Facility Subordinated Claims;

subject in each case to, in the event of the occurrence and during the continuance of an event of default under the Senior DIP Facility and/or a material breach by the Loan Parties of the DIP Order (a "Carve-Out Event"), a carve-out for (1) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a), (2) reasonable fees and expenses incurred by a trustee for the Inc. Debtors under section 726(b) of the Bankruptcy Code up to $50,000 and (3) allowed fees, expenses and disbursements

A-3

(regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) of professionals retained by the Inc. Debtors by order of the Bankruptcy Court, incurred after the occurrence of a Carve-Out Event up to an amount set forth in the DIP Order, plus all unpaid professional fees, expenses and disbursements allowed by the Bankruptcy Court that were incurred prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) (collectively, the fees, expenses and disbursements referred to in clauses (1), (2) and (3), the "Carve-Out").

Adequate Protection:

Harbinger, as the sole lender under the Prepetition Inc. Credit Agreement after the Closing Date, shall agree that the Prepetition Inc. Facility Subordinated Claims, and liens in respect thereof, shall be junior and subordinate in all respects to the obligations under, and the liens securing, the DIP Facilities.

Adequate protection to Harbinger on account of its Prepetition Inc. Facility Subordinated Claims shall be consistent with the adequate protection provided in connection with the DIP Inc. Facility.

## 5.   CERTAIN CONDITIONS

Closing Conditions:

The availability of the Senior DIP Facility on the Closing Date will be subject to (a) conditions precedent consistent with (and no more onerous to the Debtors than) those in respect of the DIP Inc. Facility, to the extent applicable, (b) the conditions precedent set forth in Section 5 of the Commitment Letter and in Exhibit B and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date.  It is agreed and understood that there shall be no conditions to the occurrence of the Closing Date and the funding of the Senior DIP Facility other than those specified in the foregoing sentence, Section 5 of the Commitment Letter and Exhibit B to the Commitment Letter.

## 6.   DOCUMENTATION

DIP Documentation:

The definitive documentation for the Senior DIP Facility (the "DIP Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) that are consistent with the existing DIP Inc. Facility. The DIP Documentation shall include intercreditor arrangements governing the relative rights and priorities of the Senior DIP Facility and the Junior DIP Facility in respect of the collateral securing the DIP Facilities, in form and substance reasonably satisfactory to the Lenders and the administrative agent.

A-4

| | |
|---|---|
| Financial Covenants: | Compliance with capital expenditures and professional fee amounts set forth in the DIP Budget (as defined below), subject to a permitted variance to be agreed upon. |
| Events of Default: | Consistent with the documentation for the existing DIP Inc. Facility (subject to modifications to be mutually agreed upon), but including without limitation: |

A.  failure to comply with the financial covenant;

B.  conversion of any Chapter 11 Case of a Loan Party to a case under chapter 7 of the Bankruptcy Code;

C.  the dismissal of any Chapter 11 Case of a Loan Party;

D.  the appointment in any Chapter 11 Case of a Loan Party of a chapter 11 trustee or an examiner with enlarged powers;

E.  the grant of any super priority administrative expense claim or any lien which is pari passu with or senior to those in respect of the Senior DIP Facility (other than in respect of the Carve-Out or as otherwise permitted under the DIP Documentation);

F.  any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims authorized by the Bankruptcy Court including pursuant to the LP Debtor Plan);

G.  entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Loan Party of a value in excess of an amount to be agreed;

H.  (1) the reversal, revocation, stay, amendment or modification of the Confirmation Order, the Prepetition LP Facility Guarantee Claim Order or the DIP Order, (2) entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order adversely affecting the Senior DIP Facility or the Plan, or (3) any amendment, supplementation or other modification of the Plan in any manner other than with the written consent of the Lenders;

I.  (1) there is a material default under or material breach of (including as a result of rejection thereof under section 365 of the Bankruptcy Code) any of One Dot Six Lease or any Material License (each as defined under the DIP Inc. Credit Agreement), the Crown Castle Lease, or the Inmarsat Cooperation Agreement (as defined below), (2) any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement is terminated or any condition or event occurs which results in the Loan

A-5

Parties no longer having the right to assume any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement pursuant to section 365 of the Bankruptcy Code, or (3) any Material License, the Inmarsat Cooperation Agreement or the Crown Castle Lease, is amended in a manner that the Lenders reasonably determine is materially adverse to LightSquared, its subsidiaries or its business operations;

J.   the withdrawal of the Plan; or

K.   the occurrence of an event of default under the credit agreement governing the Junior DIP Facility that is not waived within the applicable grace period therefor.

**Voting:**

Amendments and waivers with respect to the DIP Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Senior DIP Loans (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any Senior DIP Loan and (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the DIP Documentation) and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral, and (iii) releases of all or substantially all of the Guarantors.

**Assignments and Participations:**

Each Lender may assign, or sell participation rights in, all or a portion of its Senior DIP Loans; provided that, (x) no assignments or participations shall be permitted to competitors (to be defined), (y) in the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the Administrative Agent and (z) Harbinger and JPM shall each have tag along rights to ratably participate in any assignment of, or sale of participation rights in, the Senior DIP Loans by the other, except for any assignment or sale of participation rights by Harbinger or JPM, as applicable, to one of its affiliates or approved funds. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of the Senior DIP Loans in accordance with applicable

A-6

|  |  |
|---|---|
| | law shall be permitted without restriction.  The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. |
| Yield Protection: | The DIP Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the DIP Documentation. |
| | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York and, to the extent applicable, the Bankruptcy Code. |
| Counsel to the Lead Arranger and the JPM Commitment Parties: | Simpson Thacher & Bartlett LLP. |

A-7

Counsel to the Harbinger
Commitment Parties:                    Gibson Dunn & Crutcher LLP.

509600-0311-11363-Active.16293829

Annex I

## **INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Senior DIP Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR plus 10% or (b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the Junior DIP Facility plus 11%.

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than 1.0%. |
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR Senior DIP Loans, quarterly in arrears and in the case of Eurodollar Senior DIP Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods).  Interest shall be paid in kind and added to the principal amount of the Senior DIP Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Senior DIP Loan repaid or prepaid. |
| Default Rate: | If there is an event of default or if any principal of or interest on any Senior DIP Loan or any fee or other amount payable by Borrower under the DIP Documentation is not paid when due, the Senior DIP Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                             All per annum rates shall be calculated on the basis of a year of
                                        360 days for actual days elapsed.

509600-0311-11363-Active.16293829

EXHIBIT B

Conditions

The availability of the Senior DIP Facility shall be subject to the reasonable satisfaction of the following conditions.  Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet to which this Exhibit B is attached, in the Commitment Letter, and in the Plan, as applicable.

1.  Harbinger, JPM, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the DIP Documentation on terms consistent with the Commitment Letter, the Harbinger Commitment Letter and otherwise reasonably satisfactory to the Loan Parties and the Commitment Parties, and the Lenders shall have received:

   a.  customary closing certificates; and

   b.  forecasts for the Inc. Debtors' capital expenditures and professional fees and expenses for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Lenders (the "DIP Budget").

2.  The closing of the Senior DIP Facility shall have occurred on or before November 15, 2014.

3.  The Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

4.  All fees and expenses due to the Commitment Parties and the Lenders (if any) pursuant to the Commitment Letter shall have been paid or shall have been authorized to be deducted from the proceeds of the initial fundings under the Senior DIP Facility.

5.  The DIP Order and the Confirmation Order each shall have been entered by the Bankruptcy Court, shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Required Lenders and not have been reversed, vacated, amended, supplemented or otherwise modified in any manner adverse (as determined in the sole discretion of each Lender) to the rights and interests of the Administrative Agent or the Lenders and their respective affiliates without the written consent of the Lenders.

6.  The Prepetition LP Facility Guarantee Claim Order, in form and substance satisfactory to the Commitment Parties, shall have been entered by the Bankruptcy Court and shall be in full force and effect and unstayed.

7.  The Inc. Debtors shall not have compromised or impaired the value or released the Retained Causes of Action unless pursuant to an order of a court of competent jurisdiction.

8.  Each of the One Dot Six Lease and Material Licenses (each such term as defined under the DIP Inc. Credit Agreement), the Master Agreement, dated as of July 16, 2007 (the "Crown Castle Lease"), among One Dot Six Corp. and Crown Castle MM Holding LLC and the Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (the "Inmarsat Cooperation Agreement"), among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited are in full force and effect and shall not have been terminated.

EXHIBIT C

$300 million Junior DIP Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the Junior DIP Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit C is attached and the Plan, as applicable.

1.  PARTIES

| | |
|---|---|
| Borrower: | LightSquared Inc., a Delaware corporation, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Borrower"). |
| Guarantors: | One Dot Six Corp., a Delaware corporation, One Dot Four Corp., a Delaware corporation, One Dot Six TVCC Corp., a Delaware corporation, SkyTerra Rollup LLC, a Delaware limited liability company, SkyTerra Rollup Sub LLC, a Delaware limited liability company, TMI Communications Delaware, Limited Partnership, a Delaware limited partnership, LightSquared Investors Holdings Inc., a Delaware corporation, and SkyTerra Investors LLC, a Delaware limited liability company, each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Guarantors" and together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Lead Arranger"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "Administrative Agent"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("JPM"), and Harbinger Capital Partners LLC, or one or more of its designated affiliates ("Harbinger", and together with JPM, the "Lenders"). |

2.  TYPES AND AMOUNTS OF FACILITY

A.  Junior Term Loan Facility

| | |
|---|---|
| Type and Amount: | A term loan facility (the "Junior DIP Facility") in the amount of $300 million (the loans thereunder, the "Junior DIP Loans"). Harbinger has committed to provide $100 million (the "Harbinger Junior DIP Loan") of the Junior DIP Loans pursuant to a commitment letter, dated as of the date of the Commitment Letter (the "Harbinger Commitment Letter"), and JPM has committed to provide $200 million (the "JPM Junior DIP Loan") of the Junior |

DIP Loans pursuant to the Commitment Letter, which may be provided by converting the Prepetition Inc. Facility Non-Subordinated Claims purchased by JPM on or prior to the Closing Date into the JPM Junior DIP Loan on a dollar-for-dollar basis on the Closing Date.

Maturity:

The Junior DIP Loans will mature on the earlier to occur of (x) the effective date under the Plan and (y) the date that is 90 days after the Closing Date (either such date, the "Maturity Date").

The Junior DIP Loans will be repaid or otherwise satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan.

Availability:

The full amount of the Junior DIP Loans shall be made (or deemed made, as the case may be) in a single drawing on the Closing Date to the extent authorized by the DIP Order.  Amounts not borrowed on the Closing Date shall not thereafter be available. Repayments and prepayments of the Junior DIP Loans may not be reborrowed.

Use of Proceeds:

The proceeds of the Junior DIP Loans shall be used to, together with the proceeds of the Senior DIP Facility, (a) repay the DIP Inc. Facility Claims in full, (b) to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims in full (including by converting the Prepetition Inc. Facility Non-Subordinated Claims acquired by JPM into JPM Junior DIP Loan) and (c) finance (i) the fees and expenses related to the DIP Facilities and (ii) the working capital needs, capital expenditure needs and general corporate purposes of the Loan Parties, provided that the capital expenditures and aggregate professional fees shall be subject to the DIP Budget.

3.   CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

Junior DIP Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice; provided that, no prepayments of the Junior DIP Loans shall be made so long as the Senior DIP Loans remain outstanding.

Mandatory Prepayments:

Mandatory prepayments of Junior DIP Loans shall be required from:

(a)      100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed); and

C-2

(b)    100% of the net cash proceeds from issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Junior DIP Facility).

The aggregate amount of each mandatory prepayment shall be allocated (x) first to repay the Senior DIP Loans (except to the extent that the Senior Lenders do not require or otherwise have waived such mandatory prepayment) and (y) second, to repay the Junior DIP Loans.

Mandatory prepayments of the Loans may not be reborrowed.

## 4.  COLLATERAL AND PRIORITY

Liens and Priority:

All Junior DIP Loans and other obligations of the Loan Parties under the Junior DIP Facility shall at all times (as more fully set forth in the DIP Order):

A.    pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Chapter 11 Cases of the Inc. Debtors (the "Superpriority Claims");

B.    pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is not subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; provided that such unencumbered property shall not include avoidance actions, but subject to entry of the DIP Order, such unencumbered property shall include any proceeds or property recovered in respect of any avoidance actions;

C.    pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the liens described in clause D below) or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (collectively, the liens referred to in clauses (i) and (ii), the "Non-Primed Liens"); and

D.    pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on, and security interest in, all present and after acquired property of the Loan Parties' respective estates that is subject to valid, perfected

C-3

and non-avoidable pre and postpetition liens securing the Prepetition Inc. Facility Subordinated Claims;

subject in each case to (a) the liens and superpriority claims granted to the Senior Lenders with respect to the Senior DIP Facility, which liens and superiority claims shall be senior to the liens and superpriority claims described in the foregoing clauses (A) – (D), and (b) in the event of the occurrence and during the continuance of an event of default under the Junior DIP Facility and/or a material breach by the Loan Parties of the DIP Order (a "Carve-Out Event"), a carve-out for (1) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a), (2) reasonable fees and expenses incurred by a trustee for the Inc. Debtors under section 726(b) of the Bankruptcy Code up to $50,000 and (3) allowed fees, expenses and disbursements (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) of professionals retained by the Inc. Debtors by order of the Bankruptcy Court, incurred after the occurrence of a Carve-Out Event up to an amount set forth in the DIP Order, plus all unpaid professional fees, expenses and disbursements allowed by the Bankruptcy Court that were incurred prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) (collectively, the fees, expenses and disbursements referred to in clauses (1), (2) and (3), the "Carve-Out").

**Adequate Protection:**

Harbinger, as the sole lender under the Prepetition Inc. Credit Agreement after the Closing Date, shall agree that the Prepetition Inc. Facility Subordinated Claims, and liens in respect thereof, shall be junior and subordinate in all respects to the obligations under, and the liens securing, the DIP Facilities.

Adequate protection to Harbinger on account of its Prepetition Inc. Facility Subordinated Claims shall be consistent with the adequate protection provided in connection with the DIP Inc. Facility.

## 5.    CERTAIN CONDITIONS

**Closing Conditions:**

The availability of the Junior DIP Facility on the Closing Date will be subject to (a) conditions precedent consistent with (and no more onerous to the Debtors than) those in respect of the DIP Inc. Facility, to the extent applicable, (b) the conditions precedent set forth in Section 5 of the Commitment Letter and in Exhibit D and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date. It is agreed and understood that there shall be no conditions to the occurrence of the Closing Date and the funding of the Junior DIP Facility other than those specified in the

509600-0311-11363-Active.16197444

foregoing sentence, Section 5 of the Commitment Letter and Exhibit D to the Commitment Letter.

## 6.  DOCUMENTATION

DIP Documentation:

The definitive documentation for the Junior DIP Facility (the "DIP Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) that are consistent with the existing DIP Inc. Facility.  The DIP Documentation shall include intercreditor arrangements governing the relative rights and priorities of the Senior DIP Facility and the Junior DIP Facility in respect of the collateral securing the DIP Facilities, in form and substance reasonably satisfactory to the Lenders and the administrative agent.

Financial Covenant:

Compliance with capital expenditures and professional fee amounts set forth in the DIP Budget, subject to a permitted variance to be agreed upon.

Events of Default:

Consistent with the documentation for the Senior DIP Facility (subject to modifications to be mutually agreed upon), but including without limitation:

A.  failure to comply with the financial covenant;

B.  conversion of any Chapter 11 Case of a Loan Party to a case under chapter 7 of the Bankruptcy Code;

C.  the dismissal of any Chapter 11 Case of a Loan Party;

D.  the appointment in any Chapter 11 Case of a Loan Party of a chapter 11 trustee or an examiner with enlarged powers;

E.  the grant of any super priority administrative expense claim or any lien which is pari passu with or senior to those in respect of the Junior DIP Facility (other than the liens and superpriority claims granted in respect of the Senior DIP Facility, the Carve-Out or as otherwise permitted under the DIP Documentation);

F.  any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims authorized by the Bankruptcy Court including pursuant to the LP Debtor Plan);

G.  entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Loan Party of a value in excess of an amount to be agreed;

H.  (1) the reversal, revocation, stay, amendment or modification of the Confirmation Order, the Prepetition

C-5

LP Facility Guarantee Claim Order or the DIP Order, (2) entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order adversely affecting the Junior DIP Facility or the Plan, or (3) any amendment, supplementation or other modification of the Plan in any manner other than with the written consent of the Lenders;

I.  (1) there is a material default under or material breach of (including as a result of rejection thereof under section 365 of the Bankruptcy Code) any of One Dot Six Lease or any Material License (each as defined under the DIP Inc. Credit Agreement), the Crown Castle Lease, or the Inmarsat Cooperation Agreement (as defined below), (2) any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement is terminated or any condition or event occurs which results in the Loan Parties no longer having the right to assume any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement pursuant to section 365 of the Bankruptcy Code, or (3) any Material License, the Inmarsat Cooperation Agreement or the Crown Castle Lease, is amended in a manner that the Lenders reasonably determine is materially adverse to LightSquared, its subsidiaries or its business operations;

J.  the withdrawal of the Plan; or

K.  the occurrence of an event of default under the credit agreement governing the Senior DIP Facility that is not waived within the applicable grace period therefor.

Voting:

Amendments and waivers with respect to the DIP Documentation shall require the approval of 100% of the Lenders.

Assignments and Participations:

Each Lender shall only be permitted to assign all or a portion of its Junior DIP Loans with the prior consent of both Harbinger and JPM, unless a Junior DIP Loan is being assigned to an affiliate of a Lender or an approved fund. In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the non-assigning Lenders. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. Pledges of Junior DIP Loans in accordance with applicable law shall be permitted without restriction. No assignments shall be permitted to competitors (to be defined). No participations of the Junior DIP Loans shall be permitted without the prior consent of both Harbinger and JPM.

| | |
|---|---|
| Yield Protection: | The DIP Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the DIP Documentation. |
| | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York and, to the extent applicable, the Bankruptcy Code. |
| Counsel to the Lead Arranger and the JPM Commitment Parties: | Simpson Thacher & Bartlett LLP. |
| Counsel to the Harbinger Commitment Parties: | Gibson Dunn & Crutcher LLP. |

C-7

Annex I

## **INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Junior DIP Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR, plus the applicable margin with respect to alternative base rate loans under the Senior DIP Facility plus 2% or (b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the Senior DIP Facility plus 2%. |

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than the eurodollar rate floor with respect to the Senior DIP Facility.

| | |
|---|---|
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR Junior DIP Loans, quarterly in arrears and in the case of Eurodollar Junior DIP Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods). Interest shall be paid in kind and added to the principal amount of the Junior DIP Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Junior DIP Loan repaid or prepaid. |
| Default Rate: | If there is an event of default or if any principal of or interest on any Junior DIP Loan or any fee or other amount payable by Borrower under the DIP Documentation is not paid when due, the Junior DIP Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                         All per annum rates shall be calculated on the basis of a year of
                                    360 days for actual days elapsed.

509600-0311-11363-Active.16197444

EXHIBIT D

Conditions

The availability of the Junior DIP Facility shall be subject to the reasonable satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet to which this Exhibit D is attached, in the Commitment Letter, and in the Plan, as applicable.

1.  Harbinger, JPM, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the DIP Documentation on terms consistent with the Commitment Letter, the Harbinger Commitment Letter and otherwise reasonably satisfactory to the Loan Parties and the Commitment Parties, and the Lenders shall have received:

    a.  customary closing certificates; and

    b.  forecasts for the Inc. Debtors' capital expenditures and professional fees and expenses for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Lenders (the "DIP Budget").

2.  The acquisition of $200 million of Prepetition Inc. Facility Non-Subordinated Claims by JPM from MAST shall have been consummated pursuant to the Inc. Facility Claim Purchase Agreement; *provided*, however, such acquisition shall not constitute a condition herein to the extent the failure to consummate such acquisition is as a result of JPM's failure to negotiate the Inc. Facility Claim Purchase Agreement in good faith or fund the purchase price thereunder pursuant to the Plan.

3.  The closing of the Junior DIP Facility shall have occurred on or before November 15, 2014.

4.  The Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

5.  All fees and expenses due to the Commitment Parties and the Lenders (if any) pursuant to the Commitment Letter shall have been paid or shall have been authorized to be deducted from the proceeds of the initial fundings under the Junior DIP Facility.

6.  The DIP Order and the Confirmation Order each shall have been entered by the Bankruptcy Court, shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Lenders in their reasonable discretion and not have been reversed, vacated, amended, supplemented or otherwise modified in any manner adverse (as determined in the sole discretion of each Lender) to the rights and interests of the Administrative Agent or the Lenders and their respective affiliates without the written consent of the Lenders.

7.  The Prepetition LP Facility Guarantee Claim Order, in form and substance satisfactory to the Commitment Parties, shall have been entered by the Bankruptcy Court and shall be in full force and effect and unstayed.

8.  The Inc. Debtors shall not have compromised or impaired the value or released the Retained Causes of Action unless pursuant to an order of a court of competent jurisdiction.

9.  Each of the One Dot Six Lease and Material Licenses (each such term as defined under the DIP Inc. Credit Agreement), the Master Agreement, dated as of July 16, 2007 (the "Crown Castle Lease"), among One Dot Six Corp. and Crown Castle MM Holding LLC and the Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (the "Inmarsat Cooperation Agreement"), among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited are in full force and effect and shall not have been terminated.

<u>EXHIBIT E</u>

<u>$160 million One Dot Six First Lien Exit Term Loan Facility</u>
<u>Summary of Terms and Conditions</u>

   Set forth below is a summary of the principal terms and conditions for the One Dot Six First Lien Exit Term Loan Facility.  Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit E is attached and the Plan, as applicable.

1. PARTIES

| | |
|---|---|
| Borrower: | One Dot Six LLC, a Delaware limited liability company, as reorganized pursuant to the Plan (the "<u>Borrower</u>"). |
| Guarantors: | One Dot Six TVCC Corp., a Delaware corporation, as reorganized pursuant to the Plan, each of the Borrower's other subsidiaries (after giving effect to consummation of the Plan) and each other entity that guarantees the loans under the $100 million revolving or delayed draw term loan facility to which the Borrower is party (the "<u>First Lien Revolving Facility</u>") or the One Dot Six Second Lien Exit Facility (collectively the "<u>Guarantors</u>", and together with the Borrower, the "<u>Loan Parties</u>"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "<u>Lead Arranger</u>"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "<u>Administrative Agent</u>"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("<u>JPM</u>"), Harbinger Capital Partners LLC, or one or more of its designated affiliates ("<u>Harbinger</u>") and any third party banks or other financial institutions or entities that become lenders from time to time (together with JPM and Harbinger, the "<u>Lenders</u>"). |

2. TYPES AND AMOUNTS OF FACILITY

A. <u>First Lien Exit Facility</u>

| | |
|---|---|
| Type and Amount: | A term loan facility (the "<u>First Lien Exit Facility</u>") in the original principal amount of $160 million plus all accrued interest on the Senior DIP Facility (the loans thereunder, the "<u>First Lien Exit Loans</u>"), which shall be provided by a conversion and/or refinancing of the Senior DIP Facility on the Closing Date (as defined below), in accordance with the terms of the Plan. |

Maturity:

The First Lien Exit Loans will mature on the date that is [4] years after the Closing Date or on the date the First Lien Exit Loans accelerate pursuant to the terms of the Definitive Documentation (as defined below) (such date, the "Maturity Date").

The First Lien Exit Facility will not have any amortization and shall be repaid in full on the Maturity Date.

Availability:

The First Lien Exit Loans shall be deemed fully drawn and outstanding on the Closing Date pursuant to the Plan. Repayments and prepayments of the First Lien Exit Loans may not be reborrowed.

Use of Proceeds:

The First Lien Exit Loans will be issued for the purposes described in the Plan.

3.   CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

First Lien Exit Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice.

Mandatory Prepayments:

Mandatory prepayments of First Lien Exit Loans shall be required from (x) 100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed) and (y) 100% of the net cash proceeds from the issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the First Lien Exit Facility).

The aggregate amount of each mandatory prepayment shall be allocated (x) first to ratably repay the First Lien Exit Loans and the First Lien Revolving Facility (except to the extent that the lenders providing the First Lien Exit Facility or the First Lien Revolving Facility do not require or have otherwise waived such mandatory prepayment) and (y) second, to repay the loans under the One Dot Six Second Lien Exit Facility.

Mandatory prepayments of the First Lien Exit Loans may not be reborrowed.

4.   COLLATERAL AND PRIORITY

Liens and Priority:

All First Lien Exit Loans and other obligations of the Loan Parties under the First Lien Exit Facility shall be secured by perfected liens on (x) substantially all assets of the Loan Parties, (y) all Causes of Action of Harbinger or its affiliates arising out

E-2

of, relating to, or in connection with the Chapter 11 Cases, the Debtors, the Loan Parties or the Debtors' or Loan Parties' businesses, and (z) all assets that constitute collateral under the One Dot Six Second Lien Exit Facility and the First Lien Revolving Facility (to the extent not covered by the foregoing clauses (x) and (y)) (collectively, the "Collateral"). The liens on the Collateral securing the First Lien Exit Loans shall be senior to the liens on the Collateral securing the Second Lien Exit Loans and pari passu with the liens on the Collateral securing the First Lien Revolving Facility. The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Exit Facility, the First Lien Revolving Facility and the One Dot Six Second Lien Exit Facility shall be set forth in an intercreditor agreement in form and substance reasonably satisfactory to the Commitment Parties and the administrative agent under the One Dot Six Second Lien Exit Facility.

5.  CLOSING CONDITIONS

Closing Conditions:

The issuance of the First Lien Exit Facility shall be conditioned upon the satisfaction (or waiver) of the following conditions precedent (the date upon which the following conditions are satisfied (or waived) and the closing of the First Lien Exit Facility occurs is referred to herein as the "Closing Date"):

1.  The Lenders, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the Definitive Documentation on terms consistent with the Plan and otherwise reasonably satisfactory to the Commitment Parties;

2.  the Administrative Agent shall have received customary closing certificates and cash flow forecast for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Commitment Parties;

3.  liens creating a first-priority security interest (subject to certain permitted liens) in the Collateral in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders shall have been perfected to the extent required pursuant to the Definitive Documentation;

4.  the Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

E-3

5.  all fees and expenses due to the Administrative Agent and the Commitment Parties (if any) shall have been paid;

6.  the Plan shall not have been amended, modified or supplemented without the prior written consent of the Commitment Parties;

7.  the Confirmation Order and the Prepetition LP Facility Guarantee Claim Order shall have been entered by the Bankruptcy Court, which orders shall (i) be in form and substance reasonably satisfactory to the Commitment Parties, and (ii) be in full force and effect and unstayed;

8.  all conditions precedent to effectiveness of the Plan and the Plan Documents shall have been satisfied, waived or modified to the reasonable satisfaction of the Commitment Parties, the effective date of the Plan shall have occurred on or before the Closing Date and the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms shall occur substantially contemporaneously with the Closing Date;

9.  the pro forma capital and ownership structure of the Borrower and its subsidiaries shall be substantially as described in the Plan;

10. the commitment letter with respect to the One Dot Six Second Lien Exit Facility shall (x) be in form and substance satisfactory to the Commitment Parties in their sole discretion, (y) have been executed and delivered and (z) not have been terminated and be in full force and effect;

11. the closing date with respect to (i) the One Dot Six Second Lien Exit Facility shall have occurred and all conditions to the occurrence thereof shall have been satisfied or waived in accordance with the terms of the Second Lien Definitive Documentation (as defined below) and (ii) the First Lien Revolving Facility shall have occurred and all conditions to the occurrence thereof shall have been satisfied or waived in accordance with the terms of the First Lien Revolving Loan Definitive Documentation (as defined below);

12. all authorizations, consents, and regulatory approvals required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from the FCC and any other regulatory agency including, without

E-4

limitation, any approvals required in connection with the transfer, change of control, or assignment of any FCC license, and no appeals of such approvals remain outstanding; and

13. the representations and warranties contained in the Definitive Documentation shall be accurate in all material respects (and in all respects for any representation or warranty qualified by materiality), and there shall not have occurred, after giving effect to the incurrence of the First Lien Exit Facility and the One Dot Six Second Lien Exit Facility, any event of default.

## 6.   DOCUMENTATION

Definitive Documentation:

The definitive documentation for the First Lien Exit Facility (the "Definitive Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) usual for facilities and transactions of this type as may be reasonably agreed by the Commitment Parties and, to the extent applicable, shall be consistent with the documentation for the One Dot Six Second Lien Exit Facility (such documentation, the "Second Lien Definitive Documentation") and with the documentation for the First Lien Revolving Facility (such documentation, the "First Lien Revolving Loan Definitive Documentation"), subject to modifications to be mutually agreed upon.

Financial Covenants:

None

Voting:

Amendments and waivers with respect to the Definitive Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the First Lien Exit Loans, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any First Lien Exit Loan and (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the Definitive Documentation); and (b) the consent of 100% of the Lenders shall be required to (i) reduce any voting percentages, (ii) permit the Borrower to assign its rights under the Definitive Documentation, and (iii) release all or substantially all the Collateral.

Assignments and Participations:

Each Lender may assign, or sell participation rights in, all or a portion of its First Lien Exit Loans; provided that, (x) no assignments or participations shall be permitted to competitors

E-5

(to be defined), (y) in the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the Administrative Agent and (z) Harbinger and JPM shall each have tag along rights to ratably participate in any assignment of, or sale of participation rights in, the First Lien Exit Loans by the other, except for any assignment or sale of participation rights by Harbinger or JPM, as applicable, to one of its affiliates or approved funds. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of the First Lien Exit Loans in accordance with applicable law shall be permitted without restriction. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment.

Yield Protection:

The Definitive Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes.

Expenses and Indemnification:

The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the Definitive Documentation.

The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and

E-6

will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties).

Governing Law and Forum:        New York

Counsel to the Commitment Parties:        Simpson Thacher & Bartlett LLP

E-7

Annex I

**INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the First Lien Exit Loans comprising each borrowing bear interest at a rate per annum equal to:

(a) ABR plus 10%; or

(b) the Eurodollar Rate plus 11%.

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less 1.0% per annum. |
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR First Lien Exit Loans, quarterly in arrears and in the case of Eurodollar First Lien Exit Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods).  Interest shall be paid in kind and added to the principal amount of the First Lien Exit Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of First Lien Exit Loan repaid or prepaid. |
| Default Rate: | If there is an event of default or if any principal of or interest on any First Lien Exit Loan or any fee or other amount payable by Borrower under the Definitive Documentation is not paid when due, the First Lien Exit Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                            All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

$40 million One Dot Six Second Lien Exit Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the One Dot Six Second Lien Exit Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit F is attached and the Plan, as applicable.

## 1. PARTIES

| | |
|---|---|
| Borrower: | One Dot Six LLC, a Delaware limited liability company, as reorganized pursuant to the Plan (the "Borrower"). |
| Guarantors: | One Dot Six TVCC Corp., a Delaware corporation, as reorganized pursuant to the Plan, each of the Borrower's other subsidiaries (after giving effect to consummation of the Plan) and each other entity that guarantees the First Lien Exit Facility Loans referred to below (collectively the "Guarantors", and together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Lead Arranger"). |
| Administrative Agent: | An entity satisfactory to the Initial Lender (as defined below) (the "Administrative Agent"). |
| Lenders: | LightSquared Inc., a Delaware corporation, as reorganized pursuant to the Plan (the "Initial Lender") and such other financial institutions to which Second Lien Exit Loans (as defined below) are assigned from time to time (such assignees, together with the Initial Lender, the "Lenders"). |

## 2. TYPES AND AMOUNTS OF FACILITY

### A. Second Lien Exit Facility

| | |
|---|---|
| Type and Amount: | A term loan facility (the "Second Lien Exit Facility") in the original principal amount of $40 million (the loans thereunder, the "Second Lien Exit Loans") issued to the Initial Lender on the effective date of the Plan (the "Effective Date") in accordance with the terms of the Plan. |
| Maturity: | The Second Lien Exit Loans will mature on the date that is 5 years after the Closing Date (as defined below) or on the date the Second Lien Exit Loans accelerate pursuant to the terms of the Definitive Documentation (as defined below) (such date, the "Maturity Date"). |

The Second Lien Exit Facility will not have any amortization and shall be repaid in full on the Maturity Date.

Availability:

The Second Lien Exit Loans shall be deemed fully drawn and outstanding on the Closing Date pursuant to the Plan. Repayments and prepayments of the Second Lien Exit Loans may not be reborrowed.

Use of Proceeds:

The Second Lien Exit Loans will be issued for the purposes described in the Plan.

3.    CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

Second Lien Exit Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice; provided that, no prepayments of the Second Lien Exit Loans shall be made so long as the outstanding loans (the "First Lien Exit Loans") under the Borrower's first lien exit facility or facilities consisting of an up to a $100 million revolving or delayed draw term loan and a $160 million first lien term loan (collectively, the "First Lien Exit Facility") remain outstanding.

Mandatory Prepayments:

Mandatory prepayments of Second Lien Exit Loans shall be required from (x) 100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed) and (y) 100% of the net cash proceeds from the issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Second Lien Exit Facility).

The aggregate amount of each mandatory prepayment shall be allocated (x) first to repay the First Lien Exit Loans (except to the extent that the lenders providing the First Lien Exit Facility do not require or otherwise have waived such mandatory prepayment) and (y) second, to repay the Second Lien Exit Loans.

Mandatory prepayments of the Second Lien Exit Loans may not be reborrowed.

4.    COLLATERAL AND PRIORITY

Liens and Priority:

All Second Lien Exit Loans and other obligations of the Loan Parties under the Second Lien Exit Facility shall be secured by perfected liens on (x) substantially all assets of the Loan Parties, (y) all Causes of Action of Harbinger or its affiliates arising out of, relating to, or in connection with the Chapter 11 Cases, the

F-2

Debtors, the Loan Parties or the Debtors' or Loan Parties' businesses, and (z) all assets that constitute collateral under the First Lien Exit Facility (to the extent not covered by the foregoing clauses (x) and (y)) (collectively, the "Collateral"). The liens on the Collateral securing the Second Lien Exit Loans shall be junior to the liens on the Collateral securing the First Lien Exit Loans. The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Exit Facility and the Second Lien Exit Facility shall be set forth in an intercreditor agreement in form and substance reasonably satisfactory to the Commitment Parties and the administrative agent under the First Lien Exit Facility.

## 5. CLOSING CONDITIONS

Closing Conditions:

The issuance of the Second Lien Exit Facility shall be conditioned upon the satisfaction (or waiver) of the following conditions precedent (the date upon which the following conditions are satisfied (or waived) and the closing of the Second Lien Exit Facility occurs is referred to herein as the "Closing Date"):

1. The Initial Lender, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the Definitive Documentation on terms consistent with the Plan and otherwise reasonably satisfactory to the Commitment Parties;

2. the Administrative Agent shall have received customary closing certificates and cash flow forecast for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Commitment Parties;

3. liens creating a second-priority security interest (subject to certain permitted liens) in the Collateral in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders shall have been perfected to the extent required pursuant to the Definitive Documentation;

4. the Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

5. all fees and expenses due to the Administrative Agent and the Commitment Parties (if any) shall have been paid;

F-3

6.   the Plan shall not have been amended, modified or supplemented without the prior written consent of the Commitment Parties;

7.   the Confirmation Order and the Prepetition LP Facility Guarantee Claim Order shall have been entered by the Bankruptcy Court, which orders shall (i) be in form and substance reasonably satisfactory to the Commitment Parties, and (ii) be in full force and effect and unstayed;

8.   all conditions precedent to effectiveness of the Plan and the Plan Documents shall have been satisfied, waived or modified to the reasonable satisfaction of the Commitment Parties, the Effective Date shall have occurred on or before the Closing Date and the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms shall occur substantially contemporaneously with the Closing Date;

9.   the pro forma capital and ownership structure of the Borrower and its subsidiaries shall be substantially as described in the Plan;

10.  the commitment letter with respect to the First Lien Exit Facility shall (x) be in form and substance satisfactory to the Commitment Parties in their sole discretion, (y) have been executed and delivered and (z) not have been terminated and be in full force and effect;

11.  the closing date with respect to the First Lien Exit Facility shall have occurred and all conditions to the occurrence thereof shall have been satisfied or waived in accordance with the terms of the First Lien Definitive Documentation (as defined below);

12.  all authorizations, consents, and regulatory approvals required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from the FCC and any other regulatory agency including, without limitation, any approvals required in connection with the transfer, change of control, or assignment of any FCC license, and no appeals of such approvals remain outstanding; and

13.  the representations and warranties contained in the Definitive Documentation shall be accurate in all material respects (and in all respects for any representation or warranty qualified by materiality), and there shall not have occurred, after giving effect to the

F-4

incurrence of the First Lien Exit Facility and the Second
Lien Exit Facility, any event of default.

## 6.  DOCUMENTATION

Definitive Documentation:

The definitive documentation for the Second Lien Exit Facility
(the "Definitive Documentation") shall contain those terms and
conditions (including without limitation, representations and
warranties, affirmative and negative covenants and events of
default) usual for facilities and transactions of this type as may
be reasonably agreed by the Commitment Parties and, to the
extent applicable, shall be consistent with the documentation for
the First Lien Exit Facility (such documentation, the "First Lien
Definitive Documentation"), subject to modifications to be
mutually agreed upon.

Financial Covenants:

None

Voting:

Amendments and waivers with respect to the Definitive
Documentation shall require the approval of Lenders holding
more than 50% of the aggregate amount of the Second Lien Exit
Loans, except that (a) the consent of each Lender directly
affected thereby shall be required with respect to (i) reductions
in the amount or extensions of the final maturity of any Second
Lien Exit Loan and (ii) reductions in the rate of interest or any
fee or extensions of any due date thereof (provided that waivers
of defaults or events of defaults or waivers of default interest
shall not be deemed to be a reduction in the rate of interest or
any fee under the Definitive Documentation); and (b) the
consent of 100% of the Lenders shall be required to (i) reduce
any voting percentages, (ii) permit the Borrower to assign its
rights under the Definitive Documentation, and (iii) release all
or substantially all the Collateral.

Assignments and
Participations:

The Lenders shall be permitted to assign all or a portion of their
Second Lien Exit Loans. In the case of a partial assignment
(other than to another Lender, an affiliate of a Lender or an
approved fund), the minimum assignment amount shall be
$1,000,000 unless otherwise agreed by the Borrower and the
Administrative Agent. The Administrative Agent shall receive a
processing and recordation fee of $3,500 in connection with each
assignment. The Lenders shall also be permitted to sell
participations in their Second Lien Exit Loans. Participants shall
have the same benefits as the selling Lenders with respect to
yield protection and increased cost provisions, subject to
customary limitations. Voting rights of a participant shall be
limited to those matters set forth in clause (a) of the preceding
paragraph with respect to which the affirmative vote of the
Lender from which it purchased its participation would be
required. Pledges of Second Lien Exit Loans in accordance with

F-5

applicable law shall be permitted without restriction. No assignments or participations shall be permitted to competitors (to be defined).

| | |
|---|---|
| Yield Protection: | The Definitive Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the Definitive Documentation. |
| | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York |
| Counsel to the Initial Lender and the Commitment Parties: | Simpson Thacher & Bartlett LLP |

F-6

Annex I

## **INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Second Lien Exit Loans comprising each borrowing bear interest at a rate per annum equal to: |

(a) ABR, plus the applicable margin with respect to alternative base rate loans under the term loan tranche of the First Lien Exit Facility plus 2.0%; or

(b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the term loan tranche of the First Lien Exit Facility plus 2.0%.

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than 1.0% per annum.

| | |
|---|---|
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR Second Lien Exit Loans, quarterly in arrears and in the case of Eurodollar Second Lien Exit Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods). Interest shall be paid in kind and added to the principal amount of the Second Lien Exit Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Second Lien Exit Loan repaid or prepaid. |

Default Rate:                          If there is an event of default or if any principal of or interest on any Second Lien Exit Loan or any fee or other amount payable by Borrower under the Definitive Documentation is not paid when due, the Second Lien Exit Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate.

Rate Basis:                           All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

## <u>EXHIBIT C</u>

**HARBINGER COMMITMENT LETTER**

**EXECUTION VERSION**

September 8, 2014

LightSquared Inc.
10802 Parkridge Boulevard
Reston, Virginia 20191-5416

<u>Debtor-in-Possession Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised Harbinger Capital Partners Master Fund I, Ltd., and Harbinger Capital Partners Special Situations Fund, L.P., (the "<u>Commitment Parties</u>") that, on or about May 14, 2012, LightSquared Inc., a Delaware corporation ("<u>you</u>" or "<u>LightSquared</u>") and certain of its subsidiaries (collectively, the "<u>Debtors</u>"; and the Debtors subject to the Plan (as defined below), the "<u>Inc. Debtors</u>"), including One Dot Six Corp. ("<u>One Dot Six</u>") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") commencing the chapter 11 cases (the "<u>Chapter 11 Cases</u>").  Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exhibits and Schedules attached hereto (such Exhibits and Schedules, together with this letter, collectively, this "<u>Commitment Letter</u>") and, to the extent not defined in this Commitment Letter, in the Plan referred to below.

In connection with Harbinger Capital Partners LLC's Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated August 11, 2014, (including the Plan Supplement and Plan Documents as such terms are defined therein, as amended, supplemented or otherwise modified from time to time with the prior written consent of the Commitment Parties, the "<u>Plan</u>"), (a) the Commitment Parties have agreed to provide new money loans in the original principal amount of $80,000,000 (the "<u>Harbinger Senior DIP Loan</u>") to LightSquared pursuant to a first lien, superpriority debtor-in-possession financing facility (the "<u>Senior DIP Facility</u>"), (b) Chase Lincoln First Commercial Corporation (including any affiliate thereof as its designee, the "<u>JPM DIP Lender</u>") has agreed to provide new money loans in the original principal amount of $80,000,000 (the "<u>JPM Senior DIP Loan</u>" and, together with the Harbinger Senior DIP Loan and the Third Party Senior DIP Loans (as defined below), the "<u>Senior DIP Loans</u>") to LightSquared pursuant to the Senior DIP Facility, (c) the Commitment Parties have agreed to provide new money loans in the original principal amount of $100,000,000 (the "<u>Harbinger Junior DIP Loan</u>") to LightSquared on the Closing Date (as defined below) pursuant to a second lien superpriority debtor-in-possession financing facility (the "<u>Junior DIP Facility</u>", together with the Senior DIP Facility, the "<u>DIP Facilities</u>") and (d) the JPM DIP Lender has committed to acquire $200,000,000 of the outstanding Prepetition Inc. Facility Non-Subordinated Claims held by one or more affiliates of Mast Capital Management LLC ("<u>MAST</u>") under the Prepetition Inc. Credit Agreement, and has agreed to convert, on a dollar-for-dollar basis, such acquired Prepetition Inc. Facility Non-Subordinated Claims into loans in the original principal amount of $200,000,000 (the "<u>JPM Junior DIP Loan</u>" and, together with the Harbinger Junior DIP Loan, the "<u>Junior DIP Loans</u>") to LightSquared on the Closing Date pursuant to the Junior DIP Facility.  The Senior DIP Loans shall be guaranteed by each of the Inc. Debtors (other than

LightSquared) and secured by a security interest on substantially all of the assets of the Inc. Debtors, senior to all existing liens, including the liens securing the Prepetition Inc. Facility Subordinated Claims and the liens securing the Junior DIP Loans.  The Junior DIP Loans shall be guaranteed by each of the Inc. Debtors (other than LightSquared) and secured by a security interest on substantially all of the assets of the Inc. Debtors, junior in all respects to the liens securing the Senior DIP Loans but senior to all other existing liens, including the liens securing the Prepetition Inc. Facility Subordinated Claims.  To the extent the Inc. Debtors receive commitments to provide all or a portion of the Senior DIP Facility from third parties other than the Commitment Parties, the JPM DIP Lender and J.P. Morgan Securities LLC ("JPMorgan" and, together with the JPM DIP Lender, "JPM") on terms and conditions satisfactory to the Commitment Parties and JPM, including as a result of the syndication contemplated in section 3 below (the loans provided pursuant to such third party commitments, the "Third Party Senior DIP Loans"), the principal amount of the JPM Senior DIP Loan and the Harbinger Senior DIP Loan to be provided by JPM and the Commitment Parties, respectively, shall be ratably reduced by the principal amount of such Third Party Senior DIP Loans to the extent and solely to the extent such third parties shall have funded the Third Party Senior DIP Loans on the Closing Date.

On the Effective Date (x) the Senior DIP Loans shall be converted into and/or refinanced by the One Dot Six Term Loan Facility, (y) the JPM Junior DIP Loan shall be converted into the exit financing for Reorganized LightSquared Inc., and (z) the Harbinger Junior DIP Loan shall be converted into certain equity interests in Reorganized One Dot Six, each as more fully set forth in the Plan.

The proceeds of the DIP Facilities shall be used to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims and the DIP Inc. Facility Claims in full, and for the Inc. Debtors' working capital or general corporate purposes through the Effective Date.

The terms and conditions for the Senior DIP Facility and the Junior DIP Facility shall be substantially as set forth in the term sheet attached hereto as Exhibit A and Exhibit C, respectively, and shall constitute a part of the Plan Supplement and Plan Documents subject to the terms and conditions of the Plan.

1.  Commitments

In connection with the transactions described above and in the Plan (the "Transactions"), the Commitment Parties are pleased to advise you of their several commitments (in the percentages set forth below aggregating 100%) to provide the Harbinger Senior DIP Loan and the Harbinger Junior DIP Loan upon the terms and conditions set forth in this Commitment Letter as follows:  Harbinger Capital Partners Master Fund I, Ltd., 66.67%; Harbinger Capital Partners Special Situations Fund, L.P., 33.33%;.

2.  Titles and Roles

It is agreed that JPMorgan will act as sole lead arranger and sole bookrunner for the DIP Facilities.

It is further agreed that JPMorgan will have "left" placement in any marketing materials or other documentation used in connection with the DIP Facilities.  You agree that no agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than with respect to any administrative agent, collateral agent or indenture trustee for the DIP Facilities) will be paid in connection with the DIP Facilities unless you and we shall so reasonably agree in writing.

3.  Syndication

Absent the completion of a syndication of the Senior DIP Facility by a financial institution other than JPMorgan prior to the Closing Date, JPMorgan, in coordination with the Commitment Parties, intends to syndicate the Senior DIP Facility to a group of lenders identified by us in consultation with you (together with the Commitment Parties and the JPM DIP Lender, the "Lenders") who will also commit to provide the One Dot Six Term Loan Facility.  JPMorgan, in coordination with the Commitment Parties, intends to commence syndication efforts promptly, and you agree actively to assist JPMorgan and the Commitment Parties in completing a syndication satisfactory to the Commitment Parties whether conducted by JPMorgan, the Commitment Parties or another institution.  Such assistance shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your affiliates' existing banking relationships, (B) direct contact between your senior management and advisors and the proposed Lenders, (C) your preparing and providing to JPMorgan or the Commitment Parties all information with respect to you and your subsidiaries, including all financial information and Projections (as defined below), as JPMorgan or the Commitment Parties may reasonably request in connection with the arrangement and syndication of the Senior DIP Facility and your assistance in the preparation of one or more confidential information memoranda and other marketing materials to be used in connection with the syndication, and (D) your hosting, with JPMorgan or the Commitment Parties, of one or more meetings of prospective Lenders at times and locations to be mutually agreed.  JPMorgan, in coordination with the Commitment Parties, will manage, in consultation with you, all aspects of such syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders.  Notwithstanding anything to the contrary in this Commitment Letter, we shall be entitled at any time before or after the Closing Date, to change the terms of the DIP Facilities in a manner that is reasonably acceptable to the Inc. Debtors or otherwise approved by the Bankruptcy Court (including without limitation, pursuant to the Confirmation Order or the DIP Order (each such term, as defined below)), if we reasonably determine that such changes are advisable to ensure a successful syndication of the DIP Facilities, provided, that no amendment, waiver, supplement or other modification, directly or indirectly, to the MAST Commitment Terms (as defined in the Support Agreement (as defined below) and as used herein, the "MAST Commitment Terms") may be effective without the prior written consent of MAST.

You hereby acknowledge and agree that the Commitment Parties will have no responsibility under this Section 3 other than to coordinate with JPM as JPM arranges the syndication as set forth herein.

4.  Information

You hereby represent and warrant that (a) all information and materials, other than the Projections and information of a general economic or industry-specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto and made available to us) and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by such preparer to be reasonable at the time such Projections are furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material).  You agree that if, at any time prior to the closing date of the DIP Facilities (the "Closing Date"), you become aware

that any of the representations in the preceding sentence would be incorrect in any material respect if such Information or Projections were furnished at such time and such representations were being made at such time, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances. You understand that in arranging the DIP Facilities we may use and rely on the Information and Projections without independent verification thereof.

5.  Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 5, in Exhibit B, in Exhibit D, in Exhibit A under the heading "CERTAIN CONDITIONS – Initial Conditions" and in Exhibit C under the heading "CERTAIN CONDITIONS – Initial Conditions".

Each Commitment Party's commitments and agreements hereunder are further subject to (a) the approval by the Bankruptcy Court of, (i) this Commitment Letter and the DIP Facilities, including without limitation, authorizing the superpriority administrative expense priority of, and granting the liens and security interests necessary to secure, the indemnification and other obligations hereunder and under the DIP Facilities, and all definitive documentation in connection therewith substantially consistent with the Exhibits hereto, and (ii) all obligations to be incurred by the Loan Parties in connection with the DIP Facilities and all liens or other security to be granted by the Loan Parties in connection with the DIP Facilities (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court reasonably satisfactory in form and substance to each of the Commitment Parties and, solely with respect to the MAST Terms (as defined in the Support Agreement and as used herein, the "MAST Terms") or the MAST Commitment Terms, MAST, which orders shall, among other things, approve the terms of this Commitment Letter and the definitive documentation); (b) your performance of your obligations hereunder in all material respects; (c) entry, on or before the Outside Date (as defined in the Support Agreement and used herein, the "Outside Date"), by the Bankruptcy Court of (A) a final order approving, and authorizing and directing the Inc. Debtors to perform their obligations under, this Commitment Letter and the DIP Facilities as described in clause (a) of this paragraph (the "DIP Order") and (B) an order confirming the Plan (the "Confirmation Order"), each of which orders shall (i) be in form and substance reasonably satisfactory to each of the Commitment Parties, (ii) be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by each of the Commitment Parties, (iii) not have been amended, supplemented or otherwise modified in any manner materially adverse to (x) the Commitment Parties without the written consent of each of the Commitment Parties or (y) MAST, in the case of any such amendment, supplement or other modification of the MAST Terms or the MAST Commitment Terms, without the written consent of MAST, and (iv) not have been reversed or vacated, without the written consent of each of the Commitment Parties; (d) the support agreement, dated as of the date hereof, in respect of the transactions contemplated by this Commitment Letter and the Plan (as amended, supplemented or otherwise modified in accordance with the terms thereof, the "Support Agreement") not having been terminated as a result of a breach by either JPM or MAST; (e) the Senior DIP Loans and Junior DIP Loans (other than the Harbinger Senior DIP Loan and the Harbinger Junior DIP Loan committed by the Commitment Parties pursuant to the Commitment Letter) shall have been funded pursuant to definitive documentation consistent with the terms set forth in this Commitment Letter or otherwise reasonably satisfactory to the Commitment Parties; (f) the Plan has not been amended, supplemented or otherwise modified in any manner adverse to (i) the Commitment Parties without the written consent of the Commitment Parties or (ii) MAST, in the case of any such amendment, supplement or other modification of the MAST Terms, without the written consent of MAST; (g) the Plan Supplement and the other Plan Documents shall be in form and substance reasonably satisfactory to the Commitment Parties, and the form of the definitive documentation in respect of the One Dot Six Exit Facility and the One

4

Dot Six Second Lien Exit Facility shall be consistent with the terms and conditions substantially set forth in the term sheet attached hereto as Exhibit E and Exhibit F, respectively, and otherwise in form and substance reasonably satisfactory to the Commitment Parties; (h) the consummation of the transactions contemplated by the DIP Facilities on or before the Outside Date, including consummation of the sale of the Prepetition Inc. Facility Non-Subordinated Claims to the JPM DIP Lender by MAST as contemplated by the Plan and the Support Agreement, and the release of the liens in respect of the Prepetition Inc. Facility Non-Subordinated Claims and the DIP Inc. Facility as contemplated by the Plan and as set forth in the Confirmation Order; (i) all conditions to consummation of the Plan (other than the consummation of the DIP Facilities) having been satisfied or waived in accordance with the terms of the Plan, including without limitation, entry of the Prepetition LP Facility Guarantee Claim Order in form and substance satisfactory to each of the Commitment Parties; (j) no person having exercised any rights or remedies against the Inc. Debtors, or taken any action, in respect of the Prepetition Inc. Credit Agreement or the DIP Inc. Facility (including any of MAST, the DIP Inc. Agent, the Prepetition Inc. Agent or any of their designees, assignees or agents) that prejudices the confirmation of the Plan, the implementation thereof or closing of the DIP Facilities, or any transactions contemplated thereby, in each case as reasonably determined by the Commitment Parties; and (k) the DIP Inc. Credit Agreement, the DIP Inc. Order or any other agreement in respect of the DIP Inc. Facility shall not have been amended, supplemented or otherwise modified in a manner to increase or include additional fees, interest, original interest discount, or other economic consideration that is more burdensome to the Inc. Debtors without the prior approval of the Commitment Parties, except (1) to the extent such economic consideration (including, for the avoidance of doubt, for the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof in accordance with any budget prepared by the Debtors and accepted by the DIP Inc. Lenders) is contemplated by the DIP Inc. Credit Agreement and the DIP Inc. Order, in each case as in effect on the date hereof and (2) a commitment fee on the additional loans to be funded under the DIP Inc. Credit Agreement after the date hereof at a rate no higher than the rate of the Up-Front Fee (as defined in and under the DIP Inc. Credit Agreement as in effect on the date hereof) which fee shall be waived if the obligations in respect of the DIP Inc. Facility Claims and the Prepetition Inc. Facility Non-Subordinated Claims are paid in full and/or purchased in cash on or before the Outside Date.

6.   Indemnification and Expenses

You agree (a) if the Closing Date occurs (and the transactions described in the fourth paragraph of this Commitment Letter are consummated on the Closing Date), to indemnify and hold harmless each Commitment Party, its affiliates and each Commitment Party's directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the DIP Facilities, or the use of the proceeds thereof, and the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to (i) legal fees and expenses or (ii) losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such indemnified person or its control affiliates, directors, officers or employees (collectively, the "Related Parties") and (b) if the Closing Date occurs (and the transactions described in the fourth paragraph of this Commitment Letter are consummated on the Closing Date), to reimburse certain reasonable and documented out-of-pocket expenses (if any) as agreed between the Commitment Parties and you that have been invoiced prior to the Closing Date (including due diligence expenses, fees and expenses of consultants (so long as approved by you), travel expenses (so long as approved by you), and the fees, charges and disbursements of counsel)

incurred in connection with the DIP Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facilities on a several, and not joint, basis with any other party providing or purporting to provide commitments for a DIP Facility (or any of its Related Parties), including without limitation, JPM or any Lender. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of such indemnified person. None of the indemnified persons or you or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facilities or the transactions contemplated hereby, provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6. Notwithstanding anything in this Section 6 to the contrary LightSquared shall provide to the Commitment Parties indemnification and expense reimbursement terms that are no less favorable to the Commitment Parties and the other beneficiaries of this Section 6 than the indemnification and expense reimbursement terms provided by LightSquared and its affiliates to any other person committing debt or equity financing in connection with the Plan and their respective advisors.

7.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, your affiliates and of other companies that may be the subject of, or may affect, the transactions contemplated by this Commitment Letter. In addition, each Commitment Party will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you and your affiliates, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and none of the Commitment Parties had an obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to

the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

8.    Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) you and your officers, directors, employees, affiliates, members, partners (limited or general), stockholders, subsidiaries, parent entities, attorneys, accountants, agents and advisors (including financial advisors and valuation or appraisal firms), or other representatives, in each case on a confidential and need-to-know basis, (b) MAST and U.S. Bank National Association (as agent under the Prepetition Inc. Credit Agreement) and their respective officers, directors, employees, affiliates, members, partners (limited or general), stockholders, subsidiaries, parent entities, attorneys, accountants, agents and advisors (including financial advisors and valuation or appraisal firms), or other representatives, in each case on a confidential and need-to-know basis, (c) to the extent required in any legal, judicial or administrative proceeding (including, without limitation, in the Bankruptcy Court) or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (d) in a Bankruptcy Court filing, as to which the Commitment Parties had given their prior consent, in order to implement the transactions contemplated hereunder and (e) upon notice to the Commitment Parties, in connection with any public filing requirement.

The Commitment Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to rating agencies, (b) to JPM and its Representatives (as defined below) or to any Lender or prospective Lender or their respective Representatives, (c) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (f) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions and any related transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense; provided that the disclosure of any such information to any Lenders or prospective Lenders shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with customary market standards for dissemination of such type of information. The provisions of this paragraph shall automatically terminate one year following the date of approval of this Commitment Letter.

9.    Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including without limitation, any

7

other parties in interest in the Chapter 11 Cases, any supporters of the Plan or any other plan of reorganization or any other provider of equity or debt financing) other than the parties hereto and the indemnified persons to the extent expressly set forth herein. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates any fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree. The Commitment Parties may at any time and from time to time in their discretion assign or participate all or any portion of their respective commitments hereunder; provided that (x) other than an assignment or participation to any controlled affiliate of the Commitment Parties, the Commitment Parties shall not assign or participate all or any portion of their respective commitments with respect to the Harbinger Junior DIP Loans without the prior written consent of JPM (and any purported assignment or participation of such commitments without such consent shall be null and void), (y) other than an assignment or participation to any controlled affiliate of the Commitment Parties, any assignment or participation by the Commitment Parties of their respective commitments with respect to the Harbinger Senior DIP Loan shall be accompanied by a ratable assignment or participation, as the case may be, by JPM of its commitments with respect to the JPM Senior DIP Loan on the same terms (unless JPM elects not to participate in such assignment or participation, as the case may be), and (z) notwithstanding any assignment or participation, with respect to amounts to be funded on the Closing Date, the commitment of the Commitment Parties to fund the Harbinger Senior DIP Loan and the Harbinger Junior DIP Loan on the terms and conditions set forth in this Commitment Letter will only be reduced to the extent such assignees or participants shall have funded their commitments on the Closing Date. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the documents referred to herein and in the Plan are the only agreements that have been entered into among us and you with respect to the DIP Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, the consent rights of MAST under this Commitment Letter shall only exist as long as the Support Agreement remains valid and enforceable.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court over any suit, action or proceeding arising out of or relating to transactions contemplated by this Commitment Letter or the performance of services hereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the performance of services hereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (as amended, signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes names, addresses, tax identification numbers and other information that will allow such Commitment Party to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each Commitment Party.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; <u>provided</u> that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality which shall terminate in accordance with its terms) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Loan Documents (as defined in the agreements governing the Senior DIP Facility and Junior DIP Facility, as applicable) upon the initial funding thereunder, and you shall automatically be released from all liability in connection herewith at such time, in each case to the extent the DIP Documentation has comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than 5:00 p.m., New York City time, on the earlier of (x) the Outside Date and (y) the day immediately following the Confirmation Date.  This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.

By:  Harbinger Capital Partners LLC, its investment manager

By:  _____
     Name:
     Title:

HARBINGER CAPITAL PARTNERS SPECIAL SITUATIONS FUND, L.P.

By:  Harbinger Capital Partners LLC, its investment manager

By:  _____
     Name:
     Title:

*Commitment Letter Signature Page*

Accepted and agreed to:

LIGHTSQUARED INC., as Debtor and Debtor in
Possession

By: _____
     Name:
     Title:

ONE DOT SIX CORP., as Debtor and Debtor in
Possession

By: _____
     Name:
     Title:

<u>EXHIBIT A</u>

$160 million Senior DIP Facility
<u>Summary of Terms and Conditions</u>

Set forth below is a summary of the principal terms and conditions for the Senior DIP Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit A is attached and the Plan, as applicable.

1.  PARTIES

| | |
|---|---|
| Borrower: | LightSquared Inc., a Delaware corporation, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "<u>Borrower</u>"). |
| Guarantors: | One Dot Six Corp., a Delaware corporation, One Dot Four Corp., a Delaware corporation, One Dot Six TVCC Corp., a Delaware corporation, SkyTerra Rollup LLC, a Delaware limited liability company, SkyTerra Rollup Sub LLC, a Delaware limited liability company, TMI Communications Delaware, Limited Partnership, a Delaware limited partnership, LightSquared Investors Holdings Inc., a Delaware corporation, and SkyTerra Investors LLC, a Delaware limited liability company, each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "<u>Guarantors</u>" and together with the Borrower, the "<u>Loan Parties</u>"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "<u>Lead Arranger</u>"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "<u>Administrative Agent</u>"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("<u>JPM</u>"), Harbinger Capital Partners LLC, or one or more of its designated affiliates ("<u>Harbinger</u>") and any third party banks or other financial institutions or entities that become lenders from time to time (together with JPM and Harbinger, the "<u>Lenders</u>"). |

2.  TYPES AND AMOUNTS OF FACILITY

A.  <u>Senior Term Loan Facility</u>

| | |
|---|---|
| Type and Amount: | A term loan facility (the "<u>Senior DIP Facility</u>") in the amount of $160 million (the loans thereunder, the "<u>Senior DIP Loans</u>"). Harbinger has committed to provide up to $80 million (the "<u>Harbinger Senior DIP Loan</u>") of the Senior DIP Loans pursuant to a commitment letter, dated as of the date of the Commitment |

Letter (the "Harbinger Commitment Letter"), and JPM has committed to provide up to $80 million (the "JPM Senior DIP Loan") of the Senior DIP Loans pursuant to the Commitment Letter.

Maturity:

The Senior DIP Loans will mature on the earlier to occur of (x) the effective date under the Plan and (y) the date that is 90 days after the Closing Date (either such date, the "Maturity Date").

The Senior DIP Loans will be repaid or otherwise satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan.

Availability:

The full amount of the Senior DIP Loans shall be made (or deemed made, as the case may be) in a single drawing on the Closing Date to the extent authorized by the DIP Order.  Amounts not borrowed on the Closing Date shall not thereafter be available. Repayments and prepayments of the Senior DIP Loans may not be reborrowed.

Use of Proceeds:

The proceeds of the Senior DIP Loans shall be used to, together with the proceeds of the Junior DIP Facility, (a) repay the DIP Inc. Facility Claims in full, (b) to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims in full and (c) finance the fees and expenses related to the DIP Facilities that are due and payable on the Closing Date.

3.   CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

Senior DIP Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice.

Mandatory Prepayments:

Mandatory prepayments of Senior DIP Loans shall be required from:

(a)      100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed); and

(b)      100% of the net cash proceeds from issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Senior DIP Facility).

After application as set forth above, the balance of the amounts set forth above may be allocated to repay the Junior DIP Loans.

Mandatory prepayments of the Loans may not be reborrowed.

A-2

## 4.   COLLATERAL AND PRIORITY

Liens and Priority:

All Senior DIP Loans and other obligations of the Loan Parties under the Senior DIP Facility shall at all times (as more fully set forth in the DIP Order):

A.     pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Chapter 11 Cases of the Inc. Debtors (the "Superpriority Claims");

B.     pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is not subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; provided that such unencumbered property shall not include avoidance actions, but subject to entry of the DIP Order, such unencumbered property shall include any proceeds or property recovered in respect of any avoidance actions;

C.     pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the liens described in clause D below) or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (collectively, the liens referred to in clauses (i) and (ii), the "Non-Primed Liens"); and

D.     pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on, and security interest in, all present and after acquired property of the Loan Parties' respective estates that is subject to valid, perfected and non-avoidable pre and postpetition liens securing the Prepetition Inc. Facility Subordinated Claims;

subject in each case to, in the event of the occurrence and during the continuance of an event of default under the Senior DIP Facility and/or a material breach by the Loan Parties of the DIP Order (a "Carve-Out Event"), a carve-out for (1) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a), (2) reasonable fees and expenses incurred by a trustee for the Inc. Debtors under section 726(b) of the Bankruptcy Code up to $50,000 and (3) allowed fees, expenses and disbursements

509600-0311-11363-Active.16293829

(regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) of professionals retained by the Inc. Debtors by order of the Bankruptcy Court, incurred after the occurrence of a Carve-Out Event up to an amount set forth in the DIP Order, plus all unpaid professional fees, expenses and disbursements allowed by the Bankruptcy Court that were incurred prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) (collectively, the fees, expenses and disbursements referred to in clauses (1), (2) and (3), the "Carve-Out").

**Adequate Protection:** Harbinger, as the sole lender under the Prepetition Inc. Credit Agreement after the Closing Date, shall agree that the Prepetition Inc. Facility Subordinated Claims, and liens in respect thereof, shall be junior and subordinate in all respects to the obligations under, and the liens securing, the DIP Facilities.

Adequate protection to Harbinger on account of its Prepetition Inc. Facility Subordinated Claims shall be consistent with the adequate protection provided in connection with the DIP Inc. Facility.

## 5.   CERTAIN CONDITIONS

**Closing Conditions:** The availability of the Senior DIP Facility on the Closing Date will be subject to (a) conditions precedent consistent with (and no more onerous to the Debtors than) those in respect of the DIP Inc. Facility, to the extent applicable, (b) the conditions precedent set forth in Section 5 of the Commitment Letter and in Exhibit B and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date. It is agreed and understood that there shall be no conditions to the occurrence of the Closing Date and the funding of the Senior DIP Facility other than those specified in the foregoing sentence, Section 5 of the Commitment Letter and Exhibit B to the Commitment Letter.

## 6.   DOCUMENTATION

**DIP Documentation:** The definitive documentation for the Senior DIP Facility (the "DIP Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) that are consistent with the existing DIP Inc. Facility. The DIP Documentation shall include intercreditor arrangements governing the relative rights and priorities of the Senior DIP Facility and the Junior DIP Facility in respect of the collateral securing the DIP Facilities, in form and substance reasonably satisfactory to the Lenders and the administrative agent.

A-4

| | |
|---|---|
| Financial Covenants: | Compliance with capital expenditures and professional fee amounts set forth in the DIP Budget (as defined below), subject to a permitted variance to be agreed upon. |
| Events of Default: | Consistent with the documentation for the existing DIP Inc. Facility (subject to modifications to be mutually agreed upon), but including without limitation: |

A.  failure to comply with the financial covenant;

B.  conversion of any Chapter 11 Case of a Loan Party to a case under chapter 7 of the Bankruptcy Code;

C.  the dismissal of any Chapter 11 Case of a Loan Party;

D.  the appointment in any Chapter 11 Case of a Loan Party of a chapter 11 trustee or an examiner with enlarged powers;

E.  the grant of any super priority administrative expense claim or any lien which is pari passu with or senior to those in respect of the Senior DIP Facility (other than in respect of the Carve-Out or as otherwise permitted under the DIP Documentation);

F.  any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims authorized by the Bankruptcy Court including pursuant to the LP Debtor Plan);

G.  entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Loan Party of a value in excess of an amount to be agreed;

H.  (1) the reversal, revocation, stay, amendment or modification of the Confirmation Order, the Prepetition LP Facility Guarantee Claim Order or the DIP Order, (2) entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order adversely affecting the Senior DIP Facility or the Plan, or (3) any amendment, supplementation or other modification of the Plan in any manner other than with the written consent of the Lenders;

I.  (1) there is a material default under or material breach of (including as a result of rejection thereof under section 365 of the Bankruptcy Code) any of One Dot Six Lease or any Material License (each as defined under the DIP Inc. Credit Agreement), the Crown Castle Lease, or the Inmarsat Cooperation Agreement (as defined below), (2) any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement is terminated or any condition or event occurs which results in the Loan

509600-0311-11363-Active.16293829

Parties no longer having the right to assume any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement pursuant to section 365 of the Bankruptcy Code, or (3) any Material License, the Inmarsat Cooperation Agreement or the Crown Castle Lease, is amended in a manner that the Lenders reasonably determine is materially adverse to LightSquared, its subsidiaries or its business operations;

J.  the withdrawal of the Plan; or

K.  the occurrence of an event of default under the credit agreement governing the Junior DIP Facility that is not waived within the applicable grace period therefor.

Voting:

Amendments and waivers with respect to the DIP Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Senior DIP Loans (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any Senior DIP Loan and (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the DIP Documentation) and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral, and (iii) releases of all or substantially all of the Guarantors.

Assignments and
Participations:

Each Lender may assign, or sell participation rights in, all or a portion of its Senior DIP Loans; provided that, (x) no assignments or participations shall be permitted to competitors (to be defined), (y) in the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the Administrative Agent and (z) Harbinger and JPM shall each have tag along rights to ratably participate in any assignment of, or sale of participation rights in, the Senior DIP Loans by the other, except for any assignment or sale of participation rights by Harbinger or JPM, as applicable, to one of its affiliates or approved funds. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of the Senior DIP Loans in accordance with applicable

A-6

|  |  |
|---|---|
|  | law shall be permitted without restriction. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. |
| Yield Protection: | The DIP Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the DIP Documentation. |
|  | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York and, to the extent applicable, the Bankruptcy Code. |
| Counsel to the Lead Arranger and the JPM Commitment Parties: | Simpson Thacher & Bartlett LLP. |

A-7

Counsel to the Harbinger
Commitment Parties:                    Gibson Dunn & Crutcher LLP.

509600-0311-11363-Active.16293829

Annex I

## **INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Senior DIP Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR plus 10% or (b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the Junior DIP Facility plus 11%. |

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than 1.0%.

| | |
|---|---|
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR Senior DIP Loans, quarterly in arrears and in the case of Eurodollar Senior DIP Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods). Interest shall be paid in kind and added to the principal amount of the Senior DIP Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Senior DIP Loan repaid or prepaid. |
| Default Rate: | If there is an event of default or if any principal of or interest on any Senior DIP Loan or any fee or other amount payable by Borrower under the DIP Documentation is not paid when due, the Senior DIP Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                              All per annum rates shall be calculated on the basis of a year of
                                         360 days for actual days elapsed.

EXHIBIT B

Conditions

The availability of the Senior DIP Facility shall be subject to the reasonable satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet to which this Exhibit B is attached, in the Commitment Letter, and in the Plan, as applicable.

1. Harbinger, JPM, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the DIP Documentation on terms consistent with the Commitment Letter, the Harbinger Commitment Letter and otherwise reasonably satisfactory to the Loan Parties and the Commitment Parties, and the Lenders shall have received:

    a. customary closing certificates; and

    b. forecasts for the Inc. Debtors' capital expenditures and professional fees and expenses for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Lenders (the "DIP Budget").

2. The closing of the Senior DIP Facility shall have occurred on or before November 15, 2014.

3. The Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

4. All fees and expenses due to the Commitment Parties and the Lenders (if any) pursuant to the Commitment Letter shall have been paid or shall have been authorized to be deducted from the proceeds of the initial fundings under the Senior DIP Facility.

5. The DIP Order and the Confirmation Order each shall have been entered by the Bankruptcy Court, shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Required Lenders and not have been reversed, vacated, amended, supplemented or otherwise modified in any manner adverse (as determined in the sole discretion of each Lender) to the rights and interests of the Administrative Agent or the Lenders and their respective affiliates without the written consent of the Lenders.

6. The Prepetition LP Facility Guarantee Claim Order, in form and substance satisfactory to the Commitment Parties, shall have been entered by the Bankruptcy Court and shall be in full force and effect and unstayed.

7. The Inc. Debtors shall not have compromised or impaired the value or released the Retained Causes of Action unless pursuant to an order of a court of competent jurisdiction.

8. Each of the One Dot Six Lease and Material Licenses (each such term as defined under the DIP Inc. Credit Agreement), the Master Agreement, dated as of July 16, 2007 (the "Crown Castle Lease"), among One Dot Six Corp. and Crown Castle MM Holding LLC and the Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (the "Inmarsat Cooperation Agreement"), among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited are in full force and effect and shall not have been terminated.

<u>EXHIBIT C</u>

$300 million Junior DIP Facility<br>
<u>Summary of Terms and Conditions</u>

    Set forth below is a summary of the principal terms and conditions for the Junior DIP Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit C is attached and the Plan, as applicable.

1. **PARTIES**

| | |
|---|---|
| Borrower: | LightSquared Inc., a Delaware corporation, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "<u>Borrower</u>"). |
| Guarantors: | One Dot Six Corp., a Delaware corporation, One Dot Four Corp., a Delaware corporation, One Dot Six TVCC Corp., a Delaware corporation, SkyTerra Rollup LLC, a Delaware limited liability company, SkyTerra Rollup Sub LLC, a Delaware limited liability company, TMI Communications Delaware, Limited Partnership, a Delaware limited partnership, LightSquared Investors Holdings Inc., a Delaware corporation, and SkyTerra Investors LLC, a Delaware limited liability company, each of the foregoing, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "<u>Guarantors</u>" and together with the Borrower, the "<u>Loan Parties</u>"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "<u>Lead Arranger</u>"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "<u>Administrative Agent</u>"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("<u>JPM</u>"), and Harbinger Capital Partners LLC, or one or more of its designated affiliates ("<u>Harbinger</u>", and together with JPM, the "<u>Lenders</u>"). |

2. **TYPES AND AMOUNTS OF FACILITY**

A. <u>Junior Term Loan Facility</u>

| | |
|---|---|
| Type and Amount: | A term loan facility (the "<u>Junior DIP Facility</u>") in the amount of $300 million (the loans thereunder, the "<u>Junior DIP Loans</u>"). Harbinger has committed to provide $100 million (the "<u>Harbinger Junior DIP Loan</u>") of the Junior DIP Loans pursuant to a commitment letter, dated as of the date of the Commitment Letter (the "<u>Harbinger Commitment Letter</u>"), and JPM has committed to provide $200 million (the "<u>JPM Junior DIP Loan</u>") of the Junior |

DIP Loans pursuant to the Commitment Letter, which may be provided by converting the Prepetition Inc. Facility Non-Subordinated Claims purchased by JPM on or prior to the Closing Date into the JPM Junior DIP Loan on a dollar-for-dollar basis on the Closing Date.

Maturity:

The Junior DIP Loans will mature on the earlier to occur of (x) the effective date under the Plan and (y) the date that is 90 days after the Closing Date (either such date, the "Maturity Date").

The Junior DIP Loans will be repaid or otherwise satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan.

Availability:

The full amount of the Junior DIP Loans shall be made (or deemed made, as the case may be) in a single drawing on the Closing Date to the extent authorized by the DIP Order. Amounts not borrowed on the Closing Date shall not thereafter be available. Repayments and prepayments of the Junior DIP Loans may not be reborrowed.

Use of Proceeds:

The proceeds of the Junior DIP Loans shall be used to, together with the proceeds of the Senior DIP Facility, (a) repay the DIP Inc. Facility Claims in full, (b) to repay the Holders of the Prepetition Inc. Facility Non-Subordinated Claims in full (including by converting the Prepetition Inc. Facility Non-Subordinated Claims acquired by JPM into JPM Junior DIP Loan) and (c) finance (i) the fees and expenses related to the DIP Facilities and (ii) the working capital needs, capital expenditure needs and general corporate purposes of the Loan Parties, provided that the capital expenditures and aggregate professional fees shall be subject to the DIP Budget.

## 3.  CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

Junior DIP Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice; provided that, no prepayments of the Junior DIP Loans shall be made so long as the Senior DIP Loans remain outstanding.

Mandatory Prepayments:

Mandatory prepayments of Junior DIP Loans shall be required from:

(a)      100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed); and

C-2

(b)    100% of the net cash proceeds from issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Junior DIP Facility).

The aggregate amount of each mandatory prepayment shall be allocated (x) first to repay the Senior DIP Loans (except to the extent that the Senior Lenders do not require or otherwise have waived such mandatory prepayment) and (y) second, to repay the Junior DIP Loans.

Mandatory prepayments of the Loans may not be reborrowed.

## 4.  COLLATERAL AND PRIORITY

Liens and Priority:

All Junior DIP Loans and other obligations of the Loan Parties under the Junior DIP Facility shall at all times (as more fully set forth in the DIP Order):

A.    pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Chapter 11 Cases of the Inc. Debtors (the "Superpriority Claims");

B.    pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is not subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; provided that such unencumbered property shall not include avoidance actions, but subject to entry of the DIP Order, such unencumbered property shall include any proceeds or property recovered in respect of any avoidance actions;

C.    pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Loan Parties' respective estates in the Chapter 11 Cases that is subject to (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the liens described in clause D below) or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (collectively, the liens referred to in clauses (i) and (ii), the "Non-Primed Liens"); and

D.    pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on, and security interest in, all present and after acquired property of the Loan Parties' respective estates that is subject to valid, perfected

and non-avoidable pre and postpetition liens securing the Prepetition Inc. Facility Subordinated Claims;

subject in each case to (a) the liens and superpriority claims granted to the Senior Lenders with respect to the Senior DIP Facility, which liens and superiority claims shall be senior to the liens and superpriority claims described in the foregoing clauses (A) – (D), and (b) in the event of the occurrence and during the continuance of an event of default under the Junior DIP Facility and/or a material breach by the Loan Parties of the DIP Order (a "Carve-Out Event"), a carve-out for (1) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a), (2) reasonable fees and expenses incurred by a trustee for the Inc. Debtors under section 726(b) of the Bankruptcy Code up to $50,000 and (3) allowed fees, expenses and disbursements (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) of professionals retained by the Inc. Debtors by order of the Bankruptcy Court, incurred after the occurrence of a Carve-Out Event up to an amount set forth in the DIP Order, plus all unpaid professional fees, expenses and disbursements allowed by the Bankruptcy Court that were incurred prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of the Bankruptcy Court) (collectively, the fees, expenses and disbursements referred to in clauses (1), (2) and (3), the "Carve-Out").

**Adequate Protection:**

Harbinger, as the sole lender under the Prepetition Inc. Credit Agreement after the Closing Date, shall agree that the Prepetition Inc. Facility Subordinated Claims, and liens in respect thereof, shall be junior and subordinate in all respects to the obligations under, and the liens securing, the DIP Facilities.

Adequate protection to Harbinger on account of its Prepetition Inc. Facility Subordinated Claims shall be consistent with the adequate protection provided in connection with the DIP Inc. Facility.

## 5.   CERTAIN CONDITIONS

**Closing Conditions:**

The availability of the Junior DIP Facility on the Closing Date will be subject to (a) conditions precedent consistent with (and no more onerous to the Debtors than) those in respect of the DIP Inc. Facility, to the extent applicable, (b) the conditions precedent set forth in Section 5 of the Commitment Letter and in Exhibit D and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date.  It is agreed and understood that there shall be no conditions to the occurrence of the Closing Date and the funding of the Junior DIP Facility other than those specified in the

C-4

foregoing sentence, Section 5 of the Commitment Letter and Exhibit D to the Commitment Letter.

## 6. DOCUMENTATION

DIP Documentation:

The definitive documentation for the Junior DIP Facility (the "DIP Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) that are consistent with the existing DIP Inc. Facility. The DIP Documentation shall include intercreditor arrangements governing the relative rights and priorities of the Senior DIP Facility and the Junior DIP Facility in respect of the collateral securing the DIP Facilities, in form and substance reasonably satisfactory to the Lenders and the administrative agent.

Financial Covenant:

Compliance with capital expenditures and professional fee amounts set forth in the DIP Budget, subject to a permitted variance to be agreed upon.

Events of Default:

Consistent with the documentation for the Senior DIP Facility (subject to modifications to be mutually agreed upon), but including without limitation:

A. failure to comply with the financial covenant;

B. conversion of any Chapter 11 Case of a Loan Party to a case under chapter 7 of the Bankruptcy Code;

C. the dismissal of any Chapter 11 Case of a Loan Party;

D. the appointment in any Chapter 11 Case of a Loan Party of a chapter 11 trustee or an examiner with enlarged powers;

E. the grant of any super priority administrative expense claim or any lien which is pari passu with or senior to those in respect of the Junior DIP Facility (other than the liens and superpriority claims granted in respect of the Senior DIP Facility, the Carve-Out or as otherwise permitted under the DIP Documentation);

F. any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims authorized by the Bankruptcy Court including pursuant to the LP Debtor Plan);

G. entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Loan Party of a value in excess of an amount to be agreed;

H. (1) the reversal, revocation, stay, amendment or modification of the Confirmation Order, the Prepetition

509600-0311-11363-Active.16197444

LP Facility Guarantee Claim Order or the DIP Order, (2) entry by the Bankruptcy Court (or any other court of competent jurisdiction) of an order adversely affecting the Junior DIP Facility or the Plan, or (3) any amendment, supplementation or other modification of the Plan in any manner other than with the written consent of the Lenders;

I.   (1) there is a material default under or material breach of (including as a result of rejection thereof under section 365 of the Bankruptcy Code) any of One Dot Six Lease or any Material License (each as defined under the DIP Inc. Credit Agreement), the Crown Castle Lease, or the Inmarsat Cooperation Agreement (as defined below), (2) any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement is terminated or any condition or event occurs which results in the Loan Parties no longer having the right to assume any Material License, the Crown Castle Lease or the Inmarsat Cooperation Agreement pursuant to section 365 of the Bankruptcy Code, or (3) any Material License, the Inmarsat Cooperation Agreement or the Crown Castle Lease, is amended in a manner that the Lenders reasonably determine is materially adverse to LightSquared, its subsidiaries or its business operations;

J.   the withdrawal of the Plan; or

K.   the occurrence of an event of default under the credit agreement governing the Senior DIP Facility that is not waived within the applicable grace period therefor.

Voting:

Amendments and waivers with respect to the DIP Documentation shall require the approval of 100% of the Lenders.

Assignments and Participations:

Each Lender shall only be permitted to assign all or a portion of its Junior DIP Loans with the prior consent of both Harbinger and JPM, unless a Junior DIP Loan is being assigned to an affiliate of a Lender or an approved fund. In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the non-assigning Lenders. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. Pledges of Junior DIP Loans in accordance with applicable law shall be permitted without restriction. No assignments shall be permitted to competitors (to be defined). No participations of the Junior DIP Loans shall be permitted without the prior consent of both Harbinger and JPM.

C-6

| | |
|---|---|
| Yield Protection: | The DIP Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the DIP Documentation. |
| | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York and, to the extent applicable, the Bankruptcy Code. |
| Counsel to the Lead Arranger and the JPM Commitment Parties: | Simpson Thacher & Bartlett LLP. |
| Counsel to the Harbinger Commitment Parties: | Gibson Dunn & Crutcher LLP. |

C-7

Annex I

**INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Junior DIP Loans comprising each borrowing bear interest at a rate per annum equal to (a) ABR, plus the applicable margin with respect to alternative base rate loans under the Senior DIP Facility plus 2% or (b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the Senior DIP Facility plus 2%. |

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than the eurodollar rate floor with respect to the Senior DIP Facility.

| | |
|---|---|
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR Junior DIP Loans, quarterly in arrears and in the case of Eurodollar Junior DIP Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods).  Interest shall be paid in kind and added to the principal amount of the Junior DIP Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date in accordance with the treatment contemplated by the Plan, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Junior DIP Loan repaid or prepaid. |
| Default Rate: | If there is an event of default or if any principal of or interest on any Junior DIP Loan or any fee or other amount payable by Borrower under the DIP Documentation is not paid when due, the Junior DIP Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                              All per annum rates shall be calculated on the basis of a year of
                                         360 days for actual days elapsed.

509600-0311-11363-Active.16197444

EXHIBIT D

Conditions

The availability of the Junior DIP Facility shall be subject to the reasonable satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet to which this Exhibit D is attached, in the Commitment Letter, and in the Plan, as applicable.

1. Harbinger, JPM, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the DIP Documentation on terms consistent with the Commitment Letter, the Harbinger Commitment Letter and otherwise reasonably satisfactory to the Loan Parties and the Commitment Parties, and the Lenders shall have received:

    a. customary closing certificates; and

    b. forecasts for the Inc. Debtors' capital expenditures and professional fees and expenses for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Lenders (the "DIP Budget").

2. The acquisition of $200 million of Prepetition Inc. Facility Non-Subordinated Claims by JPM from MAST shall have been consummated pursuant to the Inc. Facility Claim Purchase Agreement; *provided*, however, such acquisition shall not constitute a condition herein to the extent the failure to consummate such acquisition is as a result of JPM's failure to negotiate the Inc. Facility Claim Purchase Agreement in good faith or fund the purchase price thereunder pursuant to the Plan.

3. The closing of the Junior DIP Facility shall have occurred on or before November 15, 2014.

4. The Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

5. All fees and expenses due to the Commitment Parties and the Lenders (if any) pursuant to the Commitment Letter shall have been paid or shall have been authorized to be deducted from the proceeds of the initial fundings under the Junior DIP Facility.

6. The DIP Order and the Confirmation Order each shall have been entered by the Bankruptcy Court, shall be in full force and effect, unstayed, final, unmodified and non-appealable and not subject to any appeal, motion to stay, motion for rehearing or reconsideration or a petition for writ of certiorari, unless waived in writing by the Lenders in their reasonable discretion and not have been reversed, vacated, amended, supplemented or otherwise modified in any manner adverse (as determined in the sole discretion of each Lender) to the rights and interests of the Administrative Agent or the Lenders and their respective affiliates without the written consent of the Lenders.

7.  The Prepetition LP Facility Guarantee Claim Order, in form and substance satisfactory to the Commitment Parties, shall have been entered by the Bankruptcy Court and shall be in full force and effect and unstayed.

8.  The Inc. Debtors shall not have compromised or impaired the value or released the Retained Causes of Action unless pursuant to an order of a court of competent jurisdiction.

9.  Each of the One Dot Six Lease and Material Licenses (each such term as defined under the DIP Inc. Credit Agreement), the Master Agreement, dated as of July 16, 2007 (the "Crown Castle Lease"), among One Dot Six Corp. and Crown Castle MM Holding LLC and the Amended and Restated Cooperation Agreement, dated as of August 6, 2010 (the "Inmarsat Cooperation Agreement"), among LightSquared LP, SkyTerra (Canada) Inc., LightSquared Inc. and Inmarsat Global Limited are in full force and effect and shall not have been terminated.

EXHIBIT E

$160 million One Dot Six First Lien Exit Term Loan Facility
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the One Dot Six First Lien Exit Term Loan Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit E is attached and the Plan, as applicable.

1.  PARTIES

| | |
|---|---|
| Borrower: | One Dot Six LLC, a Delaware limited liability company, as reorganized pursuant to the Plan (the "Borrower"). |
| Guarantors: | One Dot Six TVCC Corp., a Delaware corporation, as reorganized pursuant to the Plan, each of the Borrower's other subsidiaries (after giving effect to consummation of the Plan) and each other entity that guarantees the loans under the $100 million revolving or delayed draw term loan facility to which the Borrower is party (the "First Lien Revolving Facility") or the One Dot Six Second Lien Exit Facility (collectively the "Guarantors", and together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Lead Arranger"). |
| Administrative Agent: | An entity mutually satisfactory to JPM and Harbinger (each as defined below) (the "Administrative Agent"). |
| Lenders: | Chase Lincoln First Commercial Corporation, or one or more of its designated affiliates ("JPM"), Harbinger Capital Partners LLC, or one or more of its designated affiliates ("Harbinger") and any third party banks or other financial institutions or entities that become lenders from time to time (together with JPM and Harbinger, the "Lenders"). |

2.  TYPES AND AMOUNTS OF FACILITY

A.  First Lien Exit Facility

| | |
|---|---|
| Type and Amount: | A term loan facility (the "First Lien Exit Facility") in the original principal amount of $160 million plus all accrued interest on the Senior DIP Facility (the loans thereunder, the "First Lien Exit Loans"), which shall be provided by a conversion and/or refinancing of the Senior DIP Facility on the Closing Date (as defined below), in accordance with the terms of the Plan. |

| Maturity: | The First Lien Exit Loans will mature on the date that is [4] years after the Closing Date or on the date the First Lien Exit Loans accelerate pursuant to the terms of the Definitive Documentation (as defined below) (such date, the "Maturity Date"). |
| | |
| | The First Lien Exit Facility will not have any amortization and shall be repaid in full on the Maturity Date. |
| Availability: | The First Lien Exit Loans shall be deemed fully drawn and outstanding on the Closing Date pursuant to the Plan. Repayments and prepayments of the First Lien Exit Loans may not be reborrowed. |
| Use of Proceeds: | The First Lien Exit Loans will be issued for the purposes described in the Plan. |

3.   CERTAIN PAYMENT PROVISIONS

| Interest Rates: | As set forth on Annex I. |
| Optional Prepayments: | First Lien Exit Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice. |
| Mandatory Prepayments: | Mandatory prepayments of First Lien Exit Loans shall be required from (x) 100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed) and (y) 100% of the net cash proceeds from the issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the First Lien Exit Facility). |
| | |
| | The aggregate amount of each mandatory prepayment shall be allocated (x) first to ratably repay the First Lien Exit Loans and the First Lien Revolving Facility (except to the extent that the lenders providing the First Lien Exit Facility or the First Lien Revolving Facility do not require or have otherwise waived such mandatory prepayment) and (y) second, to repay the loans under the One Dot Six Second Lien Exit Facility. |
| | |
| | Mandatory prepayments of the First Lien Exit Loans may not be reborrowed. |

4.   COLLATERAL AND PRIORITY

| Liens and Priority: | All First Lien Exit Loans and other obligations of the Loan Parties under the First Lien Exit Facility shall be secured by perfected liens on (x) substantially all assets of the Loan Parties, (y) all Causes of Action of Harbinger or its affiliates arising out |

E-2

of, relating to, or in connection with the Chapter 11 Cases, the Debtors, the Loan Parties or the Debtors' or Loan Parties' businesses, and (z) all assets that constitute collateral under the One Dot Six Second Lien Exit Facility and the First Lien Revolving Facility (to the extent not covered by the foregoing clauses (x) and (y)) (collectively, the "Collateral"). The liens on the Collateral securing the First Lien Exit Loans shall be senior to the liens on the Collateral securing the Second Lien Exit Loans and pari passu with the liens on the Collateral securing the First Lien Revolving Facility. The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Exit Facility, the First Lien Revolving Facility and the One Dot Six Second Lien Exit Facility shall be set forth in an intercreditor agreement in form and substance reasonably satisfactory to the Commitment Parties and the administrative agent under the One Dot Six Second Lien Exit Facility.

## 5.  CLOSING CONDITIONS

Closing Conditions:

The issuance of the First Lien Exit Facility shall be conditioned upon the satisfaction (or waiver) of the following conditions precedent (the date upon which the following conditions are satisfied (or waived) and the closing of the First Lien Exit Facility occurs is referred to herein as the "Closing Date"):

1. The Lenders, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the Definitive Documentation on terms consistent with the Plan and otherwise reasonably satisfactory to the Commitment Parties;

2. the Administrative Agent shall have received customary closing certificates and cash flow forecast for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Commitment Parties;

3. liens creating a first-priority security interest (subject to certain permitted liens) in the Collateral in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders shall have been perfected to the extent required pursuant to the Definitive Documentation;

4. the Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

E-3

5.  all fees and expenses due to the Administrative Agent
    and the Commitment Parties (if any) shall have been
    paid;

6.  the Plan shall not have been amended, modified or
    supplemented without the prior written consent of the
    Commitment Parties;

7.  the Confirmation Order and the Prepetition LP Facility
    Guarantee Claim Order shall have been entered by the
    Bankruptcy Court, which orders shall (i) be in form and
    substance reasonably satisfactory to the Commitment
    Parties, and (ii) be in full force and effect and unstayed;

8.  all conditions precedent to effectiveness of the Plan and
    the Plan Documents shall have been satisfied, waived or
    modified to the reasonable satisfaction of the
    Commitment Parties, the effective date of the Plan shall
    have occurred on or before the Closing Date and the
    substantial consummation (as defined in section 1101 of
    the Bankruptcy Code) of the Plan in accordance with its
    terms shall occur substantially contemporaneously with
    the Closing Date;

9.  the pro forma capital and ownership structure of the
    Borrower and its subsidiaries shall be substantially as
    described in the Plan;

10. the commitment letter with respect to the One Dot Six
    Second Lien Exit Facility shall (x) be in form and
    substance satisfactory to the Commitment Parties in
    their sole discretion, (y) have been executed and
    delivered and (z) not have been terminated and be in full
    force and effect;

11. the closing date with respect to (i) the One Dot Six
    Second Lien Exit Facility shall have occurred and all
    conditions to the occurrence thereof shall have been
    satisfied or waived in accordance with the terms of the
    Second Lien Definitive Documentation (as defined
    below) and (ii) the First Lien Revolving Facility shall
    have occurred and all conditions to the occurrence
    thereof shall have been satisfied or waived in
    accordance with the terms of the First Lien Revolving
    Loan Definitive Documentation (as defined below);

12. all authorizations, consents, and regulatory approvals
    required by applicable law in order to effect the
    transactions to be consummated pursuant to the
    Confirmation Order shall have been obtained from the
    FCC and any other regulatory agency including, without

E-4

limitation, any approvals required in connection with the transfer, change of control, or assignment of any FCC license, and no appeals of such approvals remain outstanding; and

13. the representations and warranties contained in the Definitive Documentation shall be accurate in all material respects (and in all respects for any representation or warranty qualified by materiality), and there shall not have occurred, after giving effect to the incurrence of the First Lien Exit Facility and the One Dot Six Second Lien Exit Facility, any event of default.

6.   DOCUMENTATION

Definitive Documentation:   The definitive documentation for the First Lien Exit Facility (the "Definitive Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) usual for facilities and transactions of this type as may be reasonably agreed by the Commitment Parties and, to the extent applicable, shall be consistent with the documentation for the One Dot Six Second Lien Exit Facility (such documentation, the "Second Lien Definitive Documentation") and with the documentation for the First Lien Revolving Facility (such documentation, the "First Lien Revolving Loan Definitive Documentation"), subject to modifications to be mutually agreed upon.

Financial Covenants:   None

Voting:   Amendments and waivers with respect to the Definitive Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the First Lien Exit Loans, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any First Lien Exit Loan and (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the Definitive Documentation); and (b) the consent of 100% of the Lenders shall be required to (i) reduce any voting percentages, (ii) permit the Borrower to assign its rights under the Definitive Documentation, and (iii) release all or substantially all the Collateral.

Assignments and Participations:   Each Lender may assign, or sell participation rights in, all or a portion of its First Lien Exit Loans; provided that, (x) no assignments or participations shall be permitted to competitors

E-5

(to be defined), (y) in the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the Administrative Agent and (z) Harbinger and JPM shall each have tag along rights to ratably participate in any assignment of, or sale of participation rights in, the First Lien Exit Loans by the other, except for any assignment or sale of participation rights by Harbinger or JPM, as applicable, to one of its affiliates or approved funds. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of the First Lien Exit Loans in accordance with applicable law shall be permitted without restriction. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment.

| | |
|---|---|
| Yield Protection: | The Definitive Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (provided that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the Definitive Documentation. |

The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and

will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties).

Governing Law and Forum:        New York

Counsel to the Commitment Parties:        Simpson Thacher & Bartlett LLP

Annex I

**INTEREST**

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the First Lien Exit Loans comprising each borrowing bear interest at a rate per annum equal to: |

(a) ABR plus 10%; or

(b) the Eurodollar Rate plus 11%.

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less 1.0% per annum.

| | |
|---|---|
| Interest Payment Dates: | Subject to the provisions of this paragraph, in the case of ABR First Lien Exit Loans, quarterly in arrears and in the case of Eurodollar First Lien Exit Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods).  Interest shall be paid in kind and added to the principal amount of the First Lien Exit Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of First Lien Exit Loan repaid or prepaid. |

| | |
|---|---|
| Default Rate: | If there is an event of default or if any principal of or interest on any First Lien Exit Loan or any fee or other amount payable by Borrower under the Definitive Documentation is not paid when due, the First Lien Exit Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate. |

Rate Basis:                     All per annum rates shall be calculated on the basis of a year of
                                360 days for actual days elapsed.

EXHIBIT F

**$40 million One Dot Six Second Lien Exit Facility**
**Summary of Terms and Conditions**

Set forth below is a summary of the principal terms and conditions for the One Dot Six Second Lien Exit Facility. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit F is attached and the Plan, as applicable.

1. **PARTIES**

| | |
|---|---|
| Borrower: | One Dot Six LLC, a Delaware limited liability company, as reorganized pursuant to the Plan (the "Borrower"). |
| Guarantors: | One Dot Six TVCC Corp., a Delaware corporation, as reorganized pursuant to the Plan, each of the Borrower's other subsidiaries (after giving effect to consummation of the Plan) and each other entity that guarantees the First Lien Exit Facility Loans referred to below (collectively the "Guarantors", and together with the Borrower, the "Loan Parties"). |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities LLC (in such capacity, the "Lead Arranger"). |
| Administrative Agent: | An entity satisfactory to the Initial Lender (as defined below) (the "Administrative Agent"). |
| Lenders: | LightSquared Inc., a Delaware corporation, as reorganized pursuant to the Plan (the "Initial Lender") and such other financial institutions to which Second Lien Exit Loans (as defined below) are assigned from time to time (such assignees, together with the Initial Lender, the "Lenders"). |

2. **TYPES AND AMOUNTS OF FACILITY**

A. **Second Lien Exit Facility**

| | |
|---|---|
| Type and Amount: | A term loan facility (the "Second Lien Exit Facility") in the original principal amount of $40 million (the loans thereunder, the "Second Lien Exit Loans") issued to the Initial Lender on the effective date of the Plan (the "Effective Date") in accordance with the terms of the Plan. |
| Maturity: | The Second Lien Exit Loans will mature on the date that is 5 years after the Closing Date (as defined below) or on the date the Second Lien Exit Loans accelerate pursuant to the terms of the Definitive Documentation (as defined below) (such date, the "Maturity Date"). |

The Second Lien Exit Facility will not have any amortization and shall be repaid in full on the Maturity Date.

Availability:

The Second Lien Exit Loans shall be deemed fully drawn and outstanding on the Closing Date pursuant to the Plan. Repayments and prepayments of the Second Lien Exit Loans may not be reborrowed.

Use of Proceeds:

The Second Lien Exit Loans will be issued for the purposes described in the Plan.

3.   CERTAIN PAYMENT PROVISIONS

Interest Rates:

As set forth on Annex I.

Optional Prepayments:

Second Lien Exit Loans may be prepaid, in whole or in part without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's prior notice; provided that, no prepayments of the Second Lien Exit Loans shall be made so long as the outstanding loans (the "First Lien Exit Loans") under the Borrower's first lien exit facility or facilities consisting of an up to a $100 million revolving or delayed draw term loan and a $160 million first lien term loan (collectively, the "First Lien Exit Facility") remain outstanding.

Mandatory Prepayments:

Mandatory prepayments of Second Lien Exit Loans shall be required from (x) 100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Loan Parties (subject to exceptions and reinvestment rights to be agreed) and (y) 100% of the net cash proceeds from the issuances or incurrences of debt by the Loan Parties (other than certain indebtedness permitted under the Second Lien Exit Facility).

The aggregate amount of each mandatory prepayment shall be allocated (x) first to repay the First Lien Exit Loans (except to the extent that the lenders providing the First Lien Exit Facility do not require or otherwise have waived such mandatory prepayment) and (y) second, to repay the Second Lien Exit Loans.

Mandatory prepayments of the Second Lien Exit Loans may not be reborrowed.

4.   COLLATERAL AND PRIORITY

Liens and Priority:

All Second Lien Exit Loans and other obligations of the Loan Parties under the Second Lien Exit Facility shall be secured by perfected liens on (x) substantially all assets of the Loan Parties, (y) all Causes of Action of Harbinger or its affiliates arising out of, relating to, or in connection with the Chapter 11 Cases, the

F-2

Debtors, the Loan Parties or the Debtors' or Loan Parties' businesses, and (z) all assets that constitute collateral under the First Lien Exit Facility (to the extent not covered by the foregoing clauses (x) and (y)) (collectively, the "Collateral"). The liens on the Collateral securing the Second Lien Exit Loans shall be junior to the liens on the Collateral securing the First Lien Exit Loans. The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Exit Facility and the Second Lien Exit Facility shall be set forth in an intercreditor agreement in form and substance reasonably satisfactory to the Commitment Parties and the administrative agent under the First Lien Exit Facility.

## 5. CLOSING CONDITIONS

Closing Conditions:

The issuance of the Second Lien Exit Facility shall be conditioned upon the satisfaction (or waiver) of the following conditions precedent (the date upon which the following conditions are satisfied (or waived) and the closing of the Second Lien Exit Facility occurs is referred to herein as the "Closing Date"):

1. The Initial Lender, the Administrative Agent, each Loan Party and each other party thereto shall have executed and delivered the Definitive Documentation on terms consistent with the Plan and otherwise reasonably satisfactory to the Commitment Parties;

2. the Administrative Agent shall have received customary closing certificates and cash flow forecast for the period from the Closing Date through the Maturity Date, in each case in the form, substance and detail reasonably satisfactory to the Commitment Parties;

3. liens creating a second-priority security interest (subject to certain permitted liens) in the Collateral in favor of the Administrative Agent for the benefit of the Administrative Agent and the Lenders shall have been perfected to the extent required pursuant to the Definitive Documentation;

4. the Administrative Agent shall have received, at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

5. all fees and expenses due to the Administrative Agent and the Commitment Parties (if any) shall have been paid;

F-3

6. the Plan shall not have been amended, modified or supplemented without the prior written consent of the Commitment Parties;

7. the Confirmation Order and the Prepetition LP Facility Guarantee Claim Order shall have been entered by the Bankruptcy Court, which orders shall (i) be in form and substance reasonably satisfactory to the Commitment Parties, and (ii) be in full force and effect and unstayed;

8. all conditions precedent to effectiveness of the Plan and the Plan Documents shall have been satisfied, waived or modified to the reasonable satisfaction of the Commitment Parties, the Effective Date shall have occurred on or before the Closing Date and the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan in accordance with its terms shall occur substantially contemporaneously with the Closing Date;

9. the pro forma capital and ownership structure of the Borrower and its subsidiaries shall be substantially as described in the Plan;

10. the commitment letter with respect to the First Lien Exit Facility shall (x) be in form and substance satisfactory to the Commitment Parties in their sole discretion, (y) have been executed and delivered and (z) not have been terminated and be in full force and effect;

11. the closing date with respect to the First Lien Exit Facility shall have occurred and all conditions to the occurrence thereof shall have been satisfied or waived in accordance with the terms of the First Lien Definitive Documentation (as defined below);

12. all authorizations, consents, and regulatory approvals required by applicable law in order to effect the transactions to be consummated pursuant to the Confirmation Order shall have been obtained from the FCC and any other regulatory agency including, without limitation, any approvals required in connection with the transfer, change of control, or assignment of any FCC license, and no appeals of such approvals remain outstanding; and

13. the representations and warranties contained in the Definitive Documentation shall be accurate in all material respects (and in all respects for any representation or warranty qualified by materiality), and there shall not have occurred, after giving effect to the

F-4

incurrence of the First Lien Exit Facility and the Second Lien Exit Facility, any event of default.

## 6.  DOCUMENTATION

Definitive Documentation:

The definitive documentation for the Second Lien Exit Facility (the "Definitive Documentation") shall contain those terms and conditions (including without limitation, representations and warranties, affirmative and negative covenants and events of default) usual for facilities and transactions of this type as may be reasonably agreed by the Commitment Parties and, to the extent applicable, shall be consistent with the documentation for the First Lien Exit Facility (such documentation, the "First Lien Definitive Documentation"), subject to modifications to be mutually agreed upon.

Financial Covenants:

None

Voting:

Amendments and waivers with respect to the Definitive Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Second Lien Exit Loans, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any Second Lien Exit Loan and (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the Definitive Documentation); and (b) the consent of 100% of the Lenders shall be required to (i) reduce any voting percentages, (ii) permit the Borrower to assign its rights under the Definitive Documentation, and (iii) release all or substantially all the Collateral.

Assignments and Participations:

The Lenders shall be permitted to assign all or a portion of their Second Lien Exit Loans. In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 unless otherwise agreed by the Borrower and the Administrative Agent. The Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with each assignment. The Lenders shall also be permitted to sell participations in their Second Lien Exit Loans. Participants shall have the same benefits as the selling Lenders with respect to yield protection and increased cost provisions, subject to customary limitations. Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of Second Lien Exit Loans in accordance with

F-5

applicable law shall be permitted without restriction. No assignments or participations shall be permitted to competitors (to be defined).

| | |
|---|---|
| Yield Protection: | The Definitive Documentation shall contain customary provisions protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy, liquidity requirements and other requirements of law (<u>provided</u> that (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented) and from the imposition of or changes in withholding or other taxes. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent associated with the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) and (b) all out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented fees, disbursements and other charges of counsel and financial advisors or consultants) in connection with the enforcement of the Definitive Documentation. |
| | The Administrative Agent, the Lead Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses (including the reasonable and documented fees, disbursements and other charges of counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person (or its related parties). |
| Governing Law and Forum: | New York |
| Counsel to the Initial Lender and the Commitment Parties: | Simpson Thacher & Bartlett LLP |

F-6

Annex I

## **INTEREST**

Interest Rate Options:

The Borrower may elect that the Second Lien Exit Loans comprising each borrowing bear interest at a rate per annum equal to:

(a) ABR, plus the applicable margin with respect to alternative base rate loans under the term loan tranche of the First Lien Exit Facility plus 2.0%; or

(b) the Eurodollar Rate, plus the applicable margin with respect to eurodollar loans under the term loan tranche of the First Lien Exit Facility plus 2.0%.

As used herein:

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (b) the federal funds effective rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1.0%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 Page published by Reuters; provided, however, that notwithstanding the rate calculated in accordance with the foregoing, at no time shall the Eurodollar Rate be less than 1.0% per annum.

Interest Payment Dates:

Subject to the provisions of this paragraph, in the case of ABR Second Lien Exit Loans, quarterly in arrears and in the case of Eurodollar Second Lien Exit Loans, on the last day of each relevant interest period (which may, at the option of the Borrower, be one, two or three month periods).  Interest shall be paid in kind and added to the principal amount of the Second Lien Exit Loans on the applicable payment date; provided that, accrued and unpaid interest shall be satisfied on the Maturity Date, and shall be satisfied in cash on the date of any repayment or prepayment other than on the Maturity Date (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) with respect to the principal amount of Second Lien Exit Loan repaid or prepaid.

Default Rate:                          If there is an event of default or if any principal of or interest on any Second Lien Exit Loan or any fee or other amount payable by Borrower under the Definitive Documentation is not paid when due, the Second Lien Exit Loans shall bear interest at a rate per annum equal to 2.0% plus the non-default rate.

Rate Basis:                           All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

## **EXHIBIT D**

**INC. FACILITY CLAIM PURCHASE AGREEMENT**

<u>PURCHASE AND SALE AGREEMENT</u>

This Purchase and Sale Agreement (this "<u>Agreement</u>"), is made and dated as of
_____, 2014, by and between MAST Capital Management, LLC, on behalf of itself and each
of its and its affiliates' managed funds and/or accounts that hold Prepetition Inc. Facility Non-
Subordinated Claims ("<u>Seller</u>"), and SIG Holdings, Inc. ("<u>Buyer</u>").  All capitalized terms used
herein and not defined herein shall have the meanings ascribed to them in Harbinger Capital
Partners LLC's First Amended Joint Plan of Reorganization for the Inc. Debtors Pursuant to
Chapter 11 of the Bankruptcy Code [Dkt. No. ___] (as amended, supplemented, or otherwise
modified in accordance with the Plan Support Agreement, the "<u>Inc. Debtors Plan</u>"), filed in the
chapter 11 cases captioned *In re LightSquared Inc., et al.*, Case No. 12-12080 (SCC).

WHEREAS, pursuant to the Inc. Debtors Plan, the Seller desires to sell and Buyer desires
to purchase, all rights, title and interest to $200,000,000 of the Prepetition Inc. Facility Non-
Subordinated Claims (the "<u>Acquired Inc. Facility Claims</u>") for $200,000,000 in cash, which
Acquired Inc. Facility Claims shall be converted into the New Junior DIP Facility on a dollar for
dollar basis pursuant to the terms of the JPM Commitment Letter and the Inc. Debtors Plan;

WHEREAS, on September 8, 2014, Seller, Buyer, Harbinger, the Inc. Administrative
Agent, the JPM Commitment Parties, and the Harbinger Commitment Parties entered into the
Plan Support Agreement;

WHEREAS, in connection with the Inc. Debtors Plan, the JPM Commitment Parties and
the Harbinger Commitment Parties have agreed, severally and not jointly and severally, to fund
the New Senior DIP Facility and the New Junior DIP Facility (which includes the consummation
of the purchase of the Acquired Inc. Facility Claims pursuant to this Agreement) subject to the
terms and conditions of the New DIP Commitment Letters (as defined in the Plan Support
Agreement); and

WHEREAS, the Inc. Debtors Plan was confirmed by the Bankruptcy Court pursuant to
the Confirmation Order (as defined therein) [Dkt. No. ___]

NOW, THEREFORE, in consideration of the covenants and agreements made herein, the
parties hereto agree as follows:

1.      Pursuant to the JPM Commitment Letter and the terms and conditions thereof,
including the confirmation of the Inc. Debtors Plan, Seller hereby sells the Acquired Inc. Facility
Claims to Buyer, and Buyer hereby purchases the Acquired Inc. Facility Claims from Seller, for
an amount equal to $200,000,000, by wire transfer payable in same-day funds to an account
specified by Seller.  At the closing, Seller shall execute the assignment agreement attached to the
Prepetition Inc. Credit Agreement as Exhibit B, a copy of which is attached hereto as **<u>Exhibit A</u>**.

2.      Representations and Warranties

a.      The Acquired Inc. Facility Claims are sold without representation,
warranty, indemnity or guarantee, express or implied, except that Seller represents as of
the date hereof that it (i) has legal title to the Acquired Inc. Facility Claims; (ii) has all
necessary power and authority to enter into this Agreement and assign the Acquired Inc.

Facility Claims, has duly authorized, executed and delivered this Agreement, and this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms; (iii) has not heretofore pledged, encumbered, assigned, transferred, conveyed, disposed of, participated out or terminated, in whole or in part, the Acquired Inc. Facility Claims, or suffered to exist any security interest, mortgage, deed of trust, pledge, charge or other encumbrance (a "Lien") on its rights, title or interest therein; and (iv) is the legal and beneficial owner of the Acquired Inc. Facility Claims and has legal title to said Acquired Inc. Facility Claims free and clear of all Liens. The sale and assignment of the Acquired Inc. Facility Claims is without recourse to the Seller and, except as expressly provided in this Agreement, without representation or warranty by the Seller.

b.      Buyer represents as of the date hereof that it (i) has all necessary power and authority to enter into this Agreement, and (ii) has duly authorized, executed and delivered this Agreement, and this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.  Buyer acknowledges that Seller has not given Buyer any investment advice, credit information or opinion on whether the purchase of the Acquired Inc. Facility Claims is prudent.

3.      Except to the extent set forth in paragraph 2 hereof, this Agreement is made and entered into by Seller and Buyer without representation or warranty of any type, whether expressed or implied. Seller and Buyer shall have no liability of any kind whatsoever to each other arising from the transactions contemplated hereby, other than as a result of a breach hereunder.  Without limiting the foregoing, Buyer acknowledges the pending *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323], and Seller shall have no liability to Buyer arising from, relating to, or in connection therewith.

4.      Each of Seller and Buyer agrees to execute and deliver all such additional documents and instruments and perform all such additional acts as may be necessary or appropriate, or as may be reasonably requested by the other party, to effectuate the purposes of this Agreement and the transactions contemplated hereby.

5.      This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of laws principles thereof.  The parties irrevocably agree to waive trial by jury in any action, proceeding, claim or counterclaim brought by or on behalf of either party related to or arising out of this Agreement.  The parties irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court sitting in the County and City of New York over any suit, action or proceeding arising out of or relating to this Agreement.  Notwithstanding the foregoing, nothing in this Paragraph 5 shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of or in connection with this Agreement.

6.      This Agreement is solely for the benefit of the parties hereto, and no other person shall acquire or have any rights under or by virtue of this Agreement.  This Agreement may not be assigned by either party hereto without the other party's prior written consent.

7.      This Agreement contains the entire agreement between the parties relating to the purchase and sale of the Acquired Inc. Facility Claims and supersedes all oral statements and prior writings with respect thereto other than the Inc. Debtors Plan and the Confirmation Order entered with respect thereto.  This Agreement may not be amended or modified except by a writing executed by each of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

8.      In addition to the availability of damages arising out of a breach of this Agreement and except as otherwise set forth below, each party hereto shall be entitled to enforce the terms of this Agreement by a decree of specific performance and/or injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.  NO PARTY HERETO (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY HERETO (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PLAN SUPPORT PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

9.      This Agreement may be executed by telecopy, facsimile, or other form of electronic transmission in multiple counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed by their duly authorized officers on _____, [2014].

MAST CAPITAL MANAGEMENT, LLC,
as Seller

By: _____

SIG HOLDINGS, INC.,
as Buyer

By: _____

<u>Exhibit A</u>

[Form of]
## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Prepetition Inc. Credit Agreement defined below, receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full with the exception of the representations and warranties contained therein. The representations and warranties set forth in the Purchase and Sale Agreement, dated as of [ ], 2014, by and between MAST Capital Management, LLC and SIG Holdings, Inc. shall govern and are incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Prepetition Inc. Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Prepetition Inc. Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any person, whether known or unknown, arising under or in connection with the Prepetition Inc. Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.     Assignor:     _____

2.     Assignee:     _____
                           [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.     Borrower(s):     LightSquared Inc.

---

[1] Select as applicable.

509600-0311-08706-Active.16328292.8

4.      Administrative Agent: U.S. Bank National Association, as the administrative agent under the Prepetition Inc. Credit Agreement

5.      Prepetition Inc. Credit Agreement: The Credit Agreement dated as of July 1, 2011 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition Inc. Credit Agreement**") among LightSquared Inc. ("**Borrower**"), One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors (together, the "**Guarantors**"), U.S. Bank National Association, as administrative agent and collateral agent (in such capacity, "**Agent**") and the lenders party thereto.

6.      Assigned Interest:

| Facility Assigned | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[2] |
|---|---|---|---|
| Loans | $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.][3]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:      _____
          Title:

ASSIGNEE
[NAME OF ASSIGNEE]

---

[2] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

[3] This date may not be fewer than 5 Business days after the date of assignment unless the Administrative Agent otherwise agrees.

509600-0311-08706-Active.16328292.8

By: _____

Title:


Consented to and Accepted:

U.S. BANK NATIONAL ASSOCIATION,

as Administrative Agent

By: _____

Name:

Title:


By: _____

Name:

Title:

509600-0311-08706-Active.16328292.8

ANNEX 1 to Assignment and Assumption

PREPETITION INC.
CREDIT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

Representations and Warranties.

Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Prepetition Inc. Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, the Guarantors, any of their Subsidiaries or Affiliates or any other person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, the Guarantors, any of their Subsidiaries or Affiliates or any other person  of any of their respective obligations under any Loan Document; provided, however, that the Assignee acknowledges that the Assigned Interest is assigned subject in all respects to the claims alleged in the *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323] to the extent not decided as of the New DIP Facility Closing Date (as such term is defined in Harbinger Capital Partners LLC's First Amended Joint Plan of Reorganization for the Inc. Debtors Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. ___]).

Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Prepetition Inc. Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Prepetition Inc. Credit Agreement (subject to receipt of such consents as may be required under the Prepetition Inc. Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Prepetition Inc. Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring as-sets of such type, (v) it has received a copy of the Prepetition Inc. Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 4.01(e) thereof and budget updates and other financial reports delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and

decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender, (vi) if it is not already a Lender under the Prepetition Inc. Credit Agreement, attached to the Assignment and Assumption an Administrative Questionnaire in the form of Exhibit A to the Prepetition Inc. Credit Agreement, (vii) the Administrative Agent has received a processing and recordation fee of $3,500 as of the Effective Date and (viii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to Section [2.13] of the Prepetition Inc. Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.

Payments. From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be construed in accordance with and governed by the law of the State of New York without regard to conflicts of principles of law that would require the application of the laws of another jurisdiction.

## EXHIBIT E

**FORM OF JOINDER AGREEMENT**

## PLAN SUPPORT JOINDER AGREEMENT

This Plan Support Joinder Agreement (the "Agreement") is dated as of _____ and is entered into by [and between *Insert name of Assignor* (the "Assignor")] and][*for transfer*] [*Insert name of Assignee/Existing Creditor or Equity Interest Holder*]] (the "Plan Supporter") in accordance with Section 1.3 of the Plan Support Agreement attached hereto as Exhibit A (as amended, supplemented or otherwise modified from time to time, the "Plan Support Agreement"). Capitalized terms used but not defined herein shall have the meanings given to them in the Plan Support Agreement (including by reference to the Plan).

[**WHEREAS**, Assignor is a party to the Plan Support Agreement and has assigned to Plan Supporter by separate agreement one or more Claims and/or Equity Interests;

**WHEREAS**, the assignment by Assignor to Plan Supporter is not effective unless Plan Supporter complies with Section 1.3 of the Plan Support Agreement; and]

**WHEREAS**, Plan Supporter agrees to comply with the Plan Support Agreement by entering into this Agreement.

**NOW, THEREFORE**, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Plan Supporter (a) agrees to be bound by the Plan Support Agreement as a Plan Support Party and (b) assumes the rights and obligations of Assignor subject to any limitations set forth in Section 1.3 of the Plan Support Agreement, and shall be deemed for all purposes to be a Plan Support Party. Plan Supporter represents and warrants to each of the other Plan Support Parties that, solely with respect to itself, the statements set forth in Section 2 of the Plan Support Agreement are true, correct and complete and further represents and warrants that [(i)] it is [acquiring – *for transfers*] [directly or beneficially own – *for joinder by existing Creditors/Equity Interest Holders*] the Claims and/or Equity Interests [from the Assignor] in the amounts set forth on Schedule 1 hereof (the "Assigning Claims and/or Interests")[, and (ii) upon consummation of such acquisition under the applicable agreements to which such Assigning Claims and/or Interests relate, it will be the legal or beneficial owner of the Assigning Claims and/or Interests. Notwithstanding anything to the contrary herein, Assignor shall remain bound by the terms of any commitments it is a party to in connection with the Plan, subject to the transfer restrictions contained therein.]

2.    Plan Supporter shall deliver a copy of this Agreement to all other Plan Support Parties (in accordance with the Sections 1.3 and 7.13 of the Plan Support Agreement) no later than three (3) Business Days after the date of this Agreement.

3.    When acknowledged by each of the other Plan Support Parties, this Agreement may be attached to the Plan Support Agreement to evidence the foregoing assumptions and agreements; provided that any failure by the other Plan Support Parties to acknowledge this Agreement shall not affect the validity or enforceability hereof; and provided further, no such

acknowledgments shall be required for a Transfer to an affiliate of a Plan Support Party and such Transfers shall be deemed valid notwithstanding the absence of such acknowledgments.

4.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF OR OF ANY OTHER JURISDICTION, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

5.   ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK; PROVIDED THAT, NOTWITHSTANDING THE FOREGOING, NOTHING IN SECTION 5 SHALL LIMIT THE AUTHORITY OF THE BANKRUPTCY COURT TO HEAR ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

6.   This Agreement shall be effective upon execution by [the Assignor and] Plan Supporter and shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Agreement may be executed in any number of counterparts, which together shall constitute one instrument.   Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Assignment.

**[Remainder of page intentionally left blank]**

The terms set forth in this Agreement are hereby agreed to:

**[NAME OF PLAN SUPPORTER]**

By:_____
Title:

Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____

**[[NAME OF ASSIGNOR]**

By:_____
Title:

Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____]

## SCHEDULE 1