**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**BENCH DECISION DENYING MOTION TO (A) EXPUNGE THE GUARANTY CLAIM ASSERTED BY THE LP LENDERS OR, IN THE ALTERNATIVE, (B) ESTIMATE THE GUARANTY CLAIM AT ZERO PURSUANT TO 11 U.S.C. § 502(c)**

A P P E A R A N C E S:

MILBANK, TWEED, HADLEY & M^CCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
By: Matthew S. Barr, Esq.
 Karen Gartenberg., Esq.

International Square Building
1850 K Street, NW
Washington, DC 20006
By: Andrew M. Leblanc, Esq.

*Attorneys for Debtors and Debtors in Possession*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By: David M. Friedman, Esq.
 Adam L. Shiff, Esq.
 Christine A. Montenegro, Esq.
 Matthew B. Stein, Esq.

*Attorneys for Harbinger Capital Partners LLC*

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By: Thomas E Lauria, Esq.
 Glenn M. Kurtz, Esq.
 Andrew C. Ambruoso, Esq.

*Attorneys for Ad Hoc Secured Group of LightSquared LP Lenders*

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
By: Sandeep Qusba, Esq.

*Attorneys for SIG Holdings, Inc.*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:   Rachel C. Strickland, Esq.
      James C. Dugan, Esq.

*Attorneys for SP Special Opportunities, LLC*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:   Paul M. Basta, Esq.
      Joshua A. Sussberg, Esq.

*Attorneys for Special Committee of Boards of Directors of LightSquared Inc. and LightSquared GP Inc.*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, NY 10036
By:   Philip C. Dublin, Esq.

*Attorneys for U.S. Bank National Association and MAST Capital Management, LLC*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of Harbinger Capital Partners LLC ("Harbinger") to (a) expunge the guaranty claim asserted by the LP Lenders against the LP Parent Guarantors (the "Guaranty Claim") or, in the alternative, (b) estimate the Guaranty Claim at zero for purposes of allowance (the "Motion"). A statement in support of the Motion was filed by SIG Holdings, Inc. ("SIG"), together with the Declaration of Sandeep Qusba. Objections to the Motion were filed by (i) SP Special Opportunities, LLC ("SPSO"), which submitted the Declaration of James C. Dugan in support of its objection, and (ii) the Ad Hoc Secured Group of LightSquared LP Lenders (the "Ad Hoc Secured Group"), which filed the Declaration of Steven Zelin in support of its objection. Harbinger and SIG both filed replies to the objections on October 13, 2014, and Harbinger has submitted two declarations of David M. Friedman in support of the Motion. A hearing on the Motion was held on October 27, 2014. At the hearing, the Court elected to hear legal argument only and declined to hold an evidentiary hearing on the Motion. For the reasons that follow, the Motion is denied.[1]

**I.     Background**

While the Court assumes familiarity with the extensive prior record of these proceedings and with the pleadings submitted by the parties with respect to the Motion, the Court will provide limited factual background for the purposes of this Bench Decision.

Pursuant to the October 1, 2010 Credit Agreement (the "LP Credit Agreement") among LightSquared LP, as borrower (the "Borrower"); LightSquared Inc. and the other parent guarantors party thereto (the "Parent Guarantors"); the subsidiary guarantors party thereto (the

---

[1]     This decision was read into the record on October 30, 2014.

1

"Subsidiary Guarantors"); the administrative agent; and the lenders party thereto (the "LP Lenders"), the LP Lenders provided a term loan to LightSquared LP in the aggregate principal amount of $1.5 billion. Amounts outstanding under the LP Credit Agreement are secured by a first-priority security interest in, among other things, (i) substantially all of the assets of LightSquared LP and the LP Subsidiary Guarantors; (ii) the equity interests of LightSquared LP; and (iii) the equity interests of the LP Subsidiary Guarantors (collectively, the "LP Collateral"). Pursuant to Article VII of the LP Credit Agreement, the Subsidiary Guarantors and the Parent Guarantors (collectively, the "Guarantors") have each provided an unconditional joint and several guaranty (the "Guaranty") of what is defined in the LP Credit Agreement as the "Guaranteed Obligations." The Guaranteed Obligations include the payment in full in cash, when due, of the principal and interest on the LP Loans to, and the notes held by each LP Lender of, LightSquared LP, as well as all other obligations owing to the LP Lenders by any of LightSquared LP or the Guarantors under any loan document. (LP Credit Agreement § 7.01.)

Section 7.01 of the LP Credit Agreement further provides, in pertinent part, that "[t]he Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due" of the principal and interest on the Loans. If LightSquared LP, as Borrower, or any of the Guarantors, which are all primary obligors, does not pay in full all of the Guaranteed Obligations when due, Section 7.01 provides that the Guarantors are jointly and severally liable to "promptly pay the same in cash." (LP Credit Agreement § 7.01.) The LP Credit Agreement also provides the LP Lenders with the right to seek recovery from the Guarantors even if the lenders do not first, or ever, seek it from the Borrower. (*See* LP Credit Agreement § 7.02.)

2

On May 14, 2012, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, triggering an Event of Default under the LP Credit Agreement. On June 6, 2012, the Court entered a final agreed order approving the Debtors' Cash Collateral Motion (the "Cash Collateral Order"). The Cash Collateral Order defines "Prepetition Obligations" to include, *inter alia*, the $1,700,571,106 in aggregate principal amount outstanding under the LP Credit Agreement as of the Petition Date, and the defined term "Prepetition Obligations" encompasses the Guaranty. The Cash Collateral Order established August 11, 2012 as the "Investigation Termination Date" by which parties in interest could investigate the validity and enforceability of the Prepetition Obligations or would be forever barred from doing so after such date. No challenge to the Prepetition Obligations was filed on or before August 11, 2012. On September 6, 2012, the prepetition agents for the LP Lenders filed a master proof of claim, which was deemed to be filed against LightSquared LP and the Guarantors (the "Proof of Claim"). The Proof of Claim encompassed all claims for the Guaranteed Obligations under the LP Credit Agreement.

At this time, there are two pending plans of reorganization proposed for the Debtors; the Court has not yet held a confirmation hearing with respect to either Plan. The so-called "LP Only Plan" has been withdrawn, and the Ad Hoc Secured Group has filed its Second Amended Joint Plan, dated October 13, 2014,[2] which proposes a plan of reorganization for all of the Debtors; votes on this plan have not yet been solicited. Harbinger, a substantial equity holder and also a debt holder in LightSquared Inc., is the sponsor of a proposed plan of reorganization

---

[2] The Court notes that the naming convention of the plans of reorganization filed in these cases has changed over time. The Court's Bench Decision read on May 8, 2014 and superseding published decision filed on July 11, 2014 denied confirmation of the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code. On August 7, 2014, the Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Debtors and Ad Hoc Secured Group of LightSquared LP Lenders was filed. On October 13, 2014, the Ad Hoc Secured Group filed the Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code Proposed by Ad Hoc Secured Group of LightSquared LP Lenders.

3

for LightSquared Inc. and certain of its related Debtors.  This plan, referred to as the "Inc. Plan" by the parties, is supported by the other major constituencies of LightSquared Inc. – SIG and MAST Capital Management LLC.  It is a condition to confirmation of the Inc. Plan that the Court expunge or estimate the Guaranty Claim at zero.  Although the Inc. Plan does not classify the Guaranty Claim at all, in its recently revised form it proposes to make a distribution to Holders of the Guaranty Claim by "surrender[ing] to the Prepetition LP Agent" the equity in LightSquared LP and LightSquared GP held by two of the Parent Guarantors, TMI Communications Delaware, Limited Partnership and LightSquared Investors Holdings Inc.  The Inc. Plan also provides that, if the Court estimates a claim that has not yet been allowed, then the estimated amount shall constitute either the allowed amount of such claim or the maximum limitation on such claim.

## II.     The Motion

By the Motion, Harbinger argues that the Court can and should find that the LP Collateral is worth at least as much as the LP Debt plus the amount outstanding under the LP Debtors' DIP Facility and that, therefore, the LP Lenders will be paid in full under the terms of the LP Only Plan.  Undaunted by the fact that the LP Only Plan has been withdrawn, Harbinger in its Reply argues that the Inc. Plan "accomplishes the very same thing" through its proposed surrender of 100% of the equity interests in LightSquared GP and LightSquared LP to the LP Lenders, the value of which, Harbinger submits, constitutes payment in full because its value exceeds the amount of the LP Debt.  (Reply at ¶ 18.)  Once the LP Lenders are "paid in full" in this way under the Inc. Plan, the Guaranty Claim would be discharged under the terms of the LP Credit Agreement.  Accordingly, Harbinger and SIG submit that the Court can and should expunge the Guaranty Claim or, alternatively, estimate it at zero.

The Ad Hoc Secured Group and SPSO (together, the "Objectors") argue that the Motion should be denied because the Guaranty Claim cannot be expunged or estimated at zero **until** the LP Lenders are paid in full, and, aside from speculation that the LP Lenders will receive a full recovery sometime in the future, there has been no showing that the LP Debt can and will be satisfied. The LP Only plan has been withdrawn; the Second Amended Joint Plan has not been presented for confirmation; other than adequate protection payments, the LP Lenders have received no payment on the LP Debt since the Petition Date. Moreover, even though the Inc. Plan purports to pay the LP Lenders "in full" through the surrender of the equity of LightSquared LP and LightSquared GP, the Objectors point out that the value of such equity interests has not been monetized, or even determined, and the Inc. Plan has not yet been confirmed. The Objectors continuously emphasize that, under the LP Credit Agreement, the LP Lenders are entitled to assert the full amount of the Guaranty Claim against each of the Guarantors until the lenders are paid in full, which has not occurred; thus, there is no basis to expunge the Guaranty Claim. In addition, the Guaranty Claim is not subject to estimation, argue the Objectors, because the claim does not meet the requirements set forth in section 502(c) of the Bankruptcy Code.

## DECISION

### I.    The Request to Estimate the Guaranty Claim at Zero

Section 502(c)(1) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case. . . ." 11 U.S.C. § 502(c)(1). This Court has stated that, "when estimating claims, bankruptcy courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization 'must be

5

accomplished quickly and efficiently.'" *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007) (citations omitted). In order to seek estimation, however, a party must demonstrate that the gating requirements for estimation are met – namely, that the claim to be estimated is contingent or unliquidated and that the delay associated with the fixing or liquidation of such claim would be "undue." *See In re Dow Corning Corp.*, 211 B.R. 545, 562-63 (Bankr. E.D. Mich. 1997). Courts have observed that "it is within [the court's] sound discretion and not the obligation of [the court] to estimate a claim." *In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989).

### a. The Guaranty Claim is Not Contingent

Harbinger argues that the Guaranty Claim is contingent, as a guaranty is a "classic illustration of a contingent claim." (Motion at ¶ 81 (citing to *In re Barnett*, 42 B.R. 254, 257 (Bankr. S.D.N.Y. 1984)).) While the Bankruptcy Code does not define the term "contingent" for purposes of section 502(c), courts have held that "a claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event" and "the occurrence or happening of [such] extrinsic event . . . will trigger . . . liability." *Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997) (citation omitted). Upon default of the principal on the underlying debt, liability on a guaranty becomes fixed and is no longer contingent because all predicates to enforcement have occurred. *See*, *e.g.*, *In re Rhead*, 179 B.R. 169, 172 (Bankr. D. Ariz. 1994) (stating that, "but for the bankruptcy, SKW could seek a judgment against the Rheads for the full amount guaranteed, without the occurrence of any future event");[3] *In re F.B.F. Indus., Inc.*, 165 B.R. 544, 548-49 (Bankr. E.D. Penn. 1994) ("[t]he law is clear that a guaranty or surety claim is not contingent after a default by the primary obligor

---

[3] *See also* October 27, 2014 Hr'g Tr. at 111:12-18.

6

has occurred."). Because the Guarantors have primary obligations to pay the LP Loans when due, their liability is not contingent upon any future event.

While many words and pages have been devoted to the question of the existence or not of a prepetition default, the question is entirely beside the point. The LP Loans are now indisputably due and payable, and remain unpaid. The filing of the LightSquared chapter 11 cases was an Event of Default under the LP Credit Agreement which, pursuant to Section 7.01, triggered the Guarantors' obligation to pay the principal and interest in full and in cash and, pursuant to Section 8.01, entitled the Administrative Agent and the LP Lenders to exercise any and all remedies. The Guarantors' liability is no longer contingent on any future event. To borrow the words of the *Rhead* court, if LightSquared Inc. and the other Guarantors were not debtors, the LP Lenders could demand full payment – in cash – from LightSquared Inc. and the other Guarantors today.

Nor does the fact that the Borrower may be able to satisfy the claim render a guaranty claim contingent, as Harbinger attempts to argue. *See, e.g.*, *In re Rhead*, 179 B.R. at 172 (stating that "[a]dmittedly, it is possible, perhaps even probable, that the obligation due under the guarantee will be paid from another source. However, that fact alone does not make the debt either unliquidated []or contingent."); *In re F.B.F.*, 165 B.R. at 552 (stating that, in estimating guaranty claim of secured creditor, the court will not look to the collateral or the financial resources of other obligors and would instead estimate debtor's liability (as a surety) to be equal to 100 percent of the underlying liability, provided the creditor could not collect more than the total amount of the debt.).

Harbinger has cited several cases to this Court which it claims support the relief it seeks, including *In re Fox*, 64 B.R. 148 (Bankr. N.D. Ohio 1986); *In re Zucker*, 1979 Bankr. LEXIS

7

891 (Bankr. S.D.N.Y. July 2, 1979); and *In re Kaplan*, 186 B.R. 871 (Bankr. D.N.J. 1995). While the courts in each of these cases held that, when estimating a contingent guaranty claim, it is in fact appropriate to factor in the ability of the primary obligor to satisfy the obligation, the facts of each such case are notably distinguishable. In each case, the guarantees had not yet been triggered and the obligations remained conditional and contingent. In *Fox*, the debt on the obligations underlying the guaranty claim was current and the debt was not in default; in *Zucker*, the guarantors' obligations were contingent on both the default and the death of the primary obligor, neither of which had yet occurred; and, in *Kaplan*, the primary obligor was not in default on the loan, as the court found that there had been a waiver of a prior default. In contrast to these facts, as already discussed, no contingency remains here because a payment default has occurred and the Guarantors are guarantors of payment, and not collection – they are primary obligors under the LP Credit Agreement. The LP Credit Agreement provides the LP Lenders with the right to seek recovery from any Guarantors even if the lenders do not first, or ever, seek it from the Borrower. In addition, under New York law, the lender – not the obligor – has the right to decide what remedies to exercise, in what order, and against which co-obligor. *See*, *e.g.*, *In re King*, 2010 Bankr. LEXIS 3830, at *9-10 (Bankr. N.D.N.Y. Oct. 20, 2010) ("[i]t is universally understood that the UCC does not require a secured creditor to elect a remedy . . . . Rather, the rights afforded a secured creditor are cumulative and may be exercised simultaneously.") (citations omitted).

Harbinger also attempts to rely on *Chemical Bank v. Meltzer*, 93 N.Y.2d 296 (N.Y. 1999), which it asserts "establishes the duty of LightSquared LP to LightSquared Inc. with respect to the discharge of the Guaranty Claim, thus further establishing a contingency to the claim." (Reply at ¶ 45.) In *Meltzer*, the New York Court of Appeals allowed a lender to pursue

8

its claims in full against a joint and several guarantor, holding that the guarantor would have the right to be subrogated to the lender upon payment in full by the guarantor. *Meltzer*, 93 N.Y.2d at 304. *Meltzer* dealt with the issue of subrogation rights, however, and its holding cannot be cited to create a requirement that LightSquared LP must pay the LP Debt prior to the LP Lenders seeking payment from any Guarantor, nor does its holding support the proposition that the Guaranty Claim is contingent. In fact, Harbinger cites to no case which holds that the LP Lenders must pursue payment from the Borrower first and waive their right to seek payment from the Guarantors rather than first asserting their full cash claim against the Guarantors, should they elect to do so. Finally, Harbinger's reliance on New York General Obligations Law Section 15-103 for the proposition that the value of consideration paid on account of a debt be credited to co-obligors, such that the Guaranty Claim can be reduced by the value of the equity collateral surrendered to the LP Lenders, is also unavailing. No payments on the LP Debt are being made by any obligor under the LP Credit Agreement, and the General Obligations Law does not require a "credit" because one or more co-obligors has *the ability* to pay or *will pay* in the future.

The parties disagree on the applicability of the Supreme Court's decision in *Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243 (1935). In *Ivanhoe*, the United States Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral, subject only to the "single-satisfaction rule" that the creditor could not retain value beyond payment in full. *Id.* at 245-46. Relying on *Ivanhoe*, the court in *In re F.W.D.C., Inc.* allowed a claimant to assert the full value of its claim against one obligor even after receiving collateral from a co-obligor, subject again to the rule that the claimant not retain more than 100 percent of the amount it was owed. *See In re F.W.D.C., Inc.*, 158 B.R. 523, 527-28 (Bankr. S.D. Fla. 1993). Harbinger

9

asserts that *Ivanhoe* and its progeny are inapplicable here because they do not involve scenarios in which a debtor-obligor is capable of satisfying a creditor's claim in full without looking to a guarantor, as Harbinger contends will be accomplished by the Inc. Plan's surrender of collateral to the LP Lenders in allegedly full satisfaction of the LP Debt.  Again, Harbinger fails to recognize that nothing has yet been paid to the LP Lenders under any plan.  Moreover, should the LP Lenders receive the equity interests of LightSquared LP and LightSquared GP as proposed by Harbinger, there are numerous risks and uncertainties related to the value of such equity.  Those risks are properly borne by equityholders, not secured lenders.

### b. The Guaranty Claim is Not Unliquidated

By the Motion, Harbinger asserts – without any legal support whatsoever – that, in addition to the fact that the Debtors scheduled the Guaranty Claim as contingent and unliquidated, "the likelihood that the LP Lenders will be repaid in full through the LP Collateral creates a contingency in the Guaranty Claim and renders the claim unliquidated." (Motion at ¶ 82.) Harbinger argues that, because New York law requires that the value of any consideration paid by one obligor on account of a debt be credited to a co-obligor, the satisfaction of the LP Debt through the Inc. Plan renders the Guaranty Claim unliquidated, as the claim is subject to reduction in an amount yet to be determined.  In support of this argument, Harbinger relies on *In re Teigen*, in which the Bankruptcy Court for the District of South Dakota held that, where the primary obligor will satisfy an unknown portion of a claim pursuant to a confirmed plan of reorganization in a separate case, the corresponding guaranty claim is unliquidated, can be estimated under section 502(c), and can be reduced by the present value of the total payments to be received by the creditor pursuant to the confirmed plan.  228 B.R. 720, 723-24 (Bankr. D.S.D. 1998).  *Teigen*, which is not binding on this Court, is unpersuasive.  Its facts are readily

10

distinguishable from those present here, given that no plan has been confirmed in these cases, providing no definitive other source of payments by which to reduce the Guaranty Claim, as was the case in *Teigen*.

Moreover, Harbinger's circular argument that payment through surrender of the collateral creates a contingency that renders the Guaranty Claim unliquidated confuses and conflates the principles of "contingent" and "unliquidated." The Court has found that the Guaranty Claim is not contingent, as there is no future event that must occur to trigger the Guarantors' obligation to pay the LP Debt. Further, as the Ad Hoc Secured Group argues, there is no dispute regarding the amount and enforceability of the Guaranty Claim that renders such non-contingent claim unliquidated. Courts have held that "where the claim is determinable by reference to an agreement or by a simple computation" and where "the value of a claim is easily ascertainable," the claim is generally viewed as liquidated. *Mazzeo*, 131 F.3d at 304. The liquidated amount of the Guaranty Claim is set forth in the Cash Collateral Order as $1,700,571,106, and any additional interest is determinable by reference to the LP Credit Agreement.

### c. Liquidation of the Guaranty Claim Would not Unduly Delay the Administration of the Cases

Even if the Guaranty Claim were contingent or unliquidated (and it is neither), estimation would still be improper because Harbinger has failed to demonstrate that the liquidation of the Guaranty Claim would unduly delay the administration of the Guarantors' chapter 11 cases, as it is required to show pursuant to section 502(c). This prong of section 502(c)(1) was not addressed at all in the Motion; Harbinger's Reply simply argues that estimation will help "avoid future gamesmanship and provide clarity to the parties that will ease the path to exit." (Reply at ¶ 60.) At the Hearing, counsel summarized this as a "classic" example of delay, stating that "we can't wait for them any longer to make up their mind what they want to do." (Oct. 27, 2014

11

Hr'g. Tr. at 38:16-20 (Friedman).)  But the cause of this so-called delay is really the inability, in the absence of estimation at zero or expungement of the Guaranty Claim, to confirm a plan that allows Harbinger to effect LightSquared Inc.'s divorce from the LightSquared LP Debtors.  In other words, "if the Court expunges this claim, we can confirm the Inc. Plan."  The Court observes that this type of bootstrap reasoning is reminiscent of the argument made in support of the failed Third Amended Joint Plan regarding the "necessity" of treating SPSO in an unfairly discriminatory fashion.  While the Court recognizes and shares the desire of all parties in interest to bring these cases to a successful conclusion as soon as possible, it declines to consider the failure to meet the parties' self-imposed deadlines and conditions to confirmation of the Inc. Plan as an appropriate factor to be considered in an undue delay analysis.  Delay, undue or otherwise, is not a justification for ignoring applicable law or undermining the settled expectations of parties who transact every day in reliance on the belief, for example, that credit documents such as guarantees mean what they say.

Moreover, as already discussed and as argued by the Ad Hoc Secured Group, liquidation of the Guaranty Claim would not unduly delay the administration of the Guarantors' cases because the dollar amount of such claim can be easily determined by reference to the Cash Collateral Order.  The "undue delay" prong of the inquiry under section 502(c)(1) cannot be satisfied.

    **II.**    **The Request to Expunge the Guaranty Claim**

Finally, the Court turns to the parties' arguments regarding whether the Guaranty Claim can be expunged in its entirety.  Harbinger contends that, as long as the value of the transferred collateral exceeds the amount of the underlying debt, a transfer of collateral from a debtor to its secured creditor can satisfy the secured creditor's right to payment in full.  Here, Harbinger

12

submits that this requirement is satisfied by the Inc. Plan's proposed surrender of a portion of the LP Collateral – the equity interests in LightSquared LP and LightSquared GP – to the LP Lenders through the Inc. Plan. This transfer "gives the LP Lenders complete control over the LP Debtors, which on an 'as-is' basis provides a payment in full to the LP Lenders." (Reply at ¶ 36.) No asset is incapable of valuation, argues Harbinger, and the valuation report prepared by Lazard Freres & Co., Harbinger's financial advisor, is consistent with the prior valuations in these cases that show that the LP Collateral is worth more than the LP Debt. Thus, Harbinger claims, because the value of the LP Debtors "far exceeds" the value of the LP Debt and because the transfer of the equity interests in LightSquared LP and LightSquared GP transfers control of this valuable collateral to the LP Lenders, the Inc. Plan satisfies the LP Debt in full.

Without even reaching the factual aspects of the arguments raised by Harbinger that (i) the LP Debt can be satisfied and the Guaranty Claim can be discharged through a return of collateral rather than solely by payment in cash and (ii) the collateral being returned to the LP Lenders is sufficiently valuable to satisfy the LP Debt in full, the Court again observes that, as an initial matter, the LP Lenders have not been paid at all, in cash or otherwise. No plan for the Debtors has been confirmed at this time which provides for any payments to the LP Lenders. And, prior to actual satisfaction of the LP Lenders' claims, the Guaranty Claim survives, unscathed. There is simply no basis for finding that, as a matter of law, the proposed treatment of secured lenders in a plan of reorganization that has yet to be confirmed is sufficient to constitute payment in full and discharge the secured lenders' guaranty claims against other obligors before any actual distributions to such lenders have been made. As SPSO succinctly states in its objection, "The only way to expunge the debt is to pay the claim." (SPSO Objection at ¶ 5.) Pursuant to Section 7.01 of the LP Credit Agreement, the Guarantors are primary

13

obligors with respect to the Guaranteed Obligations, which obligations must be paid in full when due. Prior to any payment to the LP Lenders in satisfaction of the LP Debt, each LP Lender continues to hold a claim against every Guarantor under the LP Credit Agreement for any amount that is unpaid when due, and each of the LP Lenders' claims continues to exist until the LP Debt is paid, in full.

The Court observes that many of the uncertainties causing delay in these cases are outside of the parties' control – in particular, the regulatory uncertainty that continues to plague the Debtors as they wait for the FCC to make a determination on the License Modification Application filed on September 28, 2012. In arguing that the LP Lenders are oversecured, Harbinger makes much of the Court's prior observations with respect to the value of the Debtors' assets, quoting three times in the Motion the Court's statement at an August 2014 status conference that there may well be enough value in the LP Lenders' collateral, with or without government action, to pay the LP Debt in full. As further support for its argument that the LP Collateral is sufficient to satisfy the LP Debt in full, Harbinger also relies on valuation ranges found in each of the three "credited" valuation reports submitted in connection with the Debtors' Third Amended Joint Plan (confirmation of which was denied in May 2014), two of which it argues "the Court itself has endorsed." (Motion at ¶¶ 30, 35; Reply at ¶ 62.) As the Court indicated in its Confirmation Decision, however, because no party has the ability to predict when and if regulatory approvals will be obtained, any assumptions regarding the timing or likelihood of such approvals are purely speculative. The Court's "guidance" in this regard has been, and continues to be, that valuations of the Debtors' assets remain uncertain, despite the parties' best efforts to submit evidence to the contrary; the Court has not "endorsed" any valuation. One thing that is certain, however, is that, despite its sweeping statements regarding the value of the

14

LP assets, Harbinger has not offered to finance, nor has it secured a third party to finance, a plan of reorganization for the Debtors.  Accordingly, there remains a risk that the LP Lenders will not be repaid in full.

The Court makes one final observation, which was also noted by both SPSO and the Ad Hoc Secured Group in their Objections.  If Harbinger is correct that the value of the LP estates is more than sufficient to pay the LP Debt in full, then it should not be troubled by the Court's refusal to expunge the Guaranty Claim; it could simply allow the Guaranty Claim in the Inc. Plan in its full face amount, confident that the Inc. Debtors will never be called upon to pay it.  (SPSO Objection at ¶ 2; Ad Hoc Secured Group Objection at ¶¶ 9, 100.)  Once again in these cases, holders of equity interests are attempting to leapfrog up the capital structure over secured creditors, inappropriately shifting downside risk to secured creditors that is properly borne by equity.  This did not work in the Third Amended Joint Plan, and it does not work now.

### III.    Conclusion

In sum, Harbinger has cited no caselaw that supports the extraordinary relief it requests. Long-standing principles of commercial law would be overturned if, as Harbinger argues, a secured creditor with a contractual right to seek payment from multiple sources could be precluded from seeking recovery from a co-obligor merely because of an allegation that it is oversecured by the collateral of another co-obligor.  Granting such relief would compromise the clear meaning and value of a guaranty such as the one issued in support of the LP Credit Agreement, which, by its terms, is a primary obligation that specifically promises payment in full and in cash without any condition that the lender look first to the borrower.

15

For all of these reasons, the Motion is denied.

IT IS SO ORDERED.


Dated: October 30, 2014
New York, New York

>/s/ Shelley C. Chapman
>HONORABLE SHELLEY C. CHAPMAN
>UNITED STATES BANKRUPTCY JUDGE